# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

BRIAN J. DONOVAN

      Plaintiff,

v.

CARL J. BARBIER;
STEPHEN J. HERMAN;
JAMES P. ROY;
KENNETH R. FEINBERG; and
PATRICK A. JUNEAU.

      Defendants.

_____/

## <u>COMPLAINT</u>

      Brian J. Donovan ("Plaintiff"), on behalf of his business, himself, and those parties who were injured as a result of the tortious conduct of the RICO MDL 2179 Defendants and who are not able to assert their rights because they have been denied access to the courts, brings this Civil RICO Complaint against Carl J. Barbier, Stephen J. Herman, James P. Roy, Kenneth R. Feinberg, and Patrick A. Juneau ("Defendants" or "RICO MDL 2179 Defendants") to prevent future harm and to redress past wrongs. Based upon personal knowledge, information, and belief, Plaintiff specifically alleges as follows.

# TABLE OF CONTENTS

NATURE OF ACTION        2

JURISDICTION AND VENUE        6

PARTIES        7

       I. PLAINTIFF
             A. Brian J. Donovan

       II. DEFENDANTS
             A. Carl J. Barbier
             B. Stephen J. Herman
             C. James P. Roy
             D. Kenneth R. Feinberg
             E. Patrick A. Juneau

LEGAL BACKGROUND        9

       I.  The Multidistrict Litigation Statute (28 U.S.C. § 1407)        9

             A.  The "Black Hole"        9

       II.  The Oil Pollution Act of 1990 (33 U.S.C. § 2702)        12

             A.  The Text of the OPA Statute        12

             B.  The Legislative History of the OPA Statute        13

       III.  The Toxic Tort        14

       IV.  MDL 2179 is Unconstitutional        18

             A.  Where's the Case or Controversy in MDL 2179?        19

             B.  Where's the Due Process in MDL 2179?        22

       V.  Defendant Barbier Does Not Have Absolute Judicial Immunity        26

             A.  The MDL Statute        27

             B.  A "Case" or "Controversy" Does Not Exist in MDL 2179        29

VI.  Statutes of Limitations Are Tolled and Defendants Are Estopped   30
From Asserting Statutes of Limitations As Defenses

    A. Continuing Conduct   30

    B. Equitable Estoppel and Fraudulent Concealment   30

    C. All Motions Are Stayed in MDL 2179   31

    D. Defendants Persisted in Their Fraudulent Scheme   32
       Despite Repeated Warnings

VII.  Racketeer Influenced and Corrupt Organizations (RICO)   33

    A. 18 U.S.C. § 1341 (Mail Fraud) and 18 U.S.C. § 1343 (Wire Fraud)   34

       1. Racketeering Activity   36

       2. Pattern   37

       3. Enterprise   38

       4. Causation of Injury   39

       5. Civil Conspiracy   40

    B. 18 U.S.C. § 1503 (Obstruction of Justice)   41

VIII.  Litigation Activity as RICO Predicate Acts   42

IX.  Plaintiff Donovan Has Standing and Is the Proper Party to Invoke   45
    Judicial Resolution of This Matter

FACTUAL BACKGROUND   48

   I. Introduction   48

   II. Defendants' 8-Step Fraudulent Scheme to Limit BP's Liability,   57
     Maximize Their Compensation and Maximize Judicial Efficiency

    A. Step No. 1: Capture Market Share   58

    B. Step No. 2: The JPML Transfer Order   59

C.  Step No. 3: Establishment of Feinberg's Victims'
    Compensation Fund     59

D.  Step. No. 4: Appointment of "Cooperative" Attorneys to the PSC     62

E.  Step No. 5: Circumvention of OPA, a Strict Liability Statute     63

F.  Step No. 6: Approval of the Settlement Class Action     71

G.  Step No. 7: The Post-Settlement Mop-Up Procedures     76

H.  Step No. 8: Clawback     80

III.  Defendants Breached Their Fiduciary and Ethical Duties     81

A.  "Come Into the Fold," Pay Us, and Keep Quiet     81

B.  Defendants Refused to Answer Plaintiff's Questions     87

C.  Defendants Refused to Be Fully Transparent and Defendants
    Refused to Be Held Accountable     92

D.  Based on Little More Than Empty Air, Defendant Barbier
    Held That OPA Does Not Impose a Duty on the Responsible
    Party to Settle Plaintiffs' Claims     95

E.  Defendants Improperly Apply Louisiana Law Rather Than the
    Choice-of-Law Rules of the State in Which the Transferor Court
    Sits     98

F.  Defendants Did Not Hold BP Accountable     99

    1.  The Victims' Compensation Fund     99

    2.  The Economic and Property Damages Settlement
        Class Action     100

    3.  The Medical Benefits Settlement Class Action     100
        a.  SPC     101

        b.  BELO     103

4. The Clean Water Act     104
    a. Defendant Barbier Arbitrarily Reduced the Amount of Oil Released from the Reservoir by 1.0 Million Barrels     105
    b. Defendants Barbier, Herman, and Roy Negotiated an Excessively Favorable Payment Schedule for BP     106
    c. Former Attorney General Loretta Lynch and the RICO MDL 2179 Defendants Failed to Take BP's U.S. Taxes into Account     107

IV. Defendants Intentionally and Systematically Misled Plaintiffs     108

    A. The Agreement-in-Principle     108

    B. Examples of False and Misleading Statements Disseminated to Deceptively Promote MDL 2179     112

       1. False Statements Made by Defendant Feinberg     112

       2. False Statements Made by Defendant Barbier     113

       3. False Statements Made by the MDL 2179 PSC and the Garretson Resolution Group     117

    C. Defendants Disseminated Their Misleading Messages About MDL 2179 Through Multiple Channels     118

       1. Defendants Directed Front Groups to Deceptively Promote MDL 2179     118

       2. Defendants Retained Highly Compensated "Thought Leaders" to Deceptively Promote MDL 2179     125

       3. Bi-Annual Mass Tort Conferences Were Used to Spread Defendants' Deceptive Messages About MDL 2179     128

       4. Defendant Feinberg's Amicus Brief Filed with the U.S. Supreme Court on September 4, 2014     129

V. Defendants Excessively Compensated Themselves by "Quadruple Dipping"     130

    A. Compensation Paid to Kenneth R. Feinberg by BP     131

B. Compensation Paid to BP Oil Well Blowout Victims    131
   by Kenneth R. Feinberg (GCCF Program Statistics)

C. The Deepwater Horizon Claims Center    132
   (DHCC Program Statistics)

D. Compensation Paid to Defendants Herman and    132
   Roy and the Seventeen MDL 2179 PSC Members

   1. Common Benefit Fees    132

   2. Contingent Fees    133

   3. Co-counsel Fees    134

   4. Hold-Backs    134

E. Calculation of Compensation Paid to Defendants Herman    135
   and Roy and the Seventeen MDL 2179 PSC Members

F. Calculation of Compensation Paid to 103 Non-PSC Attorneys    135

G. How the Court Allocated the $720.15 million to Common    136
   Benefit Attorneys

VI. The Damages Resulting From the RICO MDL 2179 Defendants'    139
   Tortious and Unlawful Conduct Extend Far Beyond the Four Corners
   of This Complaint

A. The Opioid MDL ("MDL 2804")    139

B. The MDL 2804 Leadership Structure    140

C. The United States Motion to Participate in Settlement Discussions    141

VII. Facts Pertaining to Claims Under Racketeer Influenced and    142
    Corrupt Organizations ("RICO") Act

A. The MDL 2179 Enterprise    142

   1. The Common Purpose and Scheme of the    142
   MDL 2179 Enterprise

2. The Conduct of the MDL 2179 Enterprise                        147
   Violated Civil RICO

3. The RICO MDL 2179 Defendants Controlled and Paid             148
   Front Groups and Thought Leaders to Promote and
   Maximize Their Deceptive and Fraudulent Scheme

4. Pattern of Racketeering Activity                             149


COUNT I                                                         153
RACKETEER INFLUENCED AND CORRUPT
ORGANIZATIONS (RICO) 18 U.S.C. § 1961, et seq.
THE MDL 2179 ENTERPRISE
(AGAINST ALL DEFENDANTS
(THE "RICO MDL 2179 DEFENDANTS"))

COUNT II                                                        163
FRAUD

COUNT III                                                       166
NEGLIGENCE

COUNT IV                                                        171
UNJUST ENRICHMENT

COUNT V                                                         172
FRAUDULENT INDUCEMENT

COUNT VI                                                        175
BREACH OF FIDUCIARY DUTY OF LOYALTY
(BREACH OF THE AGGREGATE SETTLEMENT RULE)

PRAYER FOR RELIEF                                               182

## NATURE OF ACTION

1. At approximately 10 p.m. on April 20, 2010, the U.S. Coast Guard District Eight command center in New Orleans, Louisiana received a report of an explosion and fire aboard the mobile offshore drilling unit *Deepwater Horizon* as it was engaged in drilling activities on the "Macondo Well" on the Outer Continental Shelf off the coast of Louisiana. On the morning of April 22, 2010, the *Deepwater Horizon* sank, resulting in a massive oil spill incident. Oil flowed into the Gulf of Mexico unchecked for months. Ultimately, the "Macondo Well" was finally sealed on September 19, 2010, nearly five months after the blowout began. By that time, millions of barrels of oil had been discharged into the Gulf of Mexico and upon adjoining shorelines, causing immense environmental and economic harm to the entire region.

2. This British Petroleum ("BP") oil well blowout in April 2010 is arguably the largest and most egregious mass tort in U.S. history. It has affected hundreds of thousands of individuals and businesses along the U.S. Gulf Coast and beyond. The full extent of damages may never be known.

3. The Judicial Panel on Multidistrict Litigation ("JPML") centralized all federal actions (excluding securities suits) in the MDL 2179 ("*In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*") pursuant to 28 U.S.C. § 1407. All cases relating to the BP oil well blowout were transferred to the Eastern District of Louisiana on August 10, 2010. Defendants Herman and Roy were formally appointed by Defendant Barbier as Plaintiffs' Co-Liaison Counsel on August 27, 2010. Defendant Barbier formally appointed the seventeen members to the MDL 2179 Plaintiffs' Steering Committee ("PSC") on October 8, 2010.

-2-

4. Defendants, individually and/or in collusion with each other, fraudulently, recklessly, negligently and knowingly conceived, developed, and/or facilitated an "Eight-Step" fraudulent scheme to maximize judicial efficiency and/or maximize their compensation in exchange for limiting the liability of BP.

5. Rather than properly allege claims under the Oil Pollution Act of 1990 ("OPA"), a *strict liability* statute, and the Outer Continental Shelf Lands Act ("OCSLA"), which governs the MDL 2179 personal injury and wrongful death actions and borrows the law of the adjacent state as surrogate federal law, the defendants, for the purpose of limiting BP's liability, state in their "B1" First Amended Master Complaint, "The claims presented herein are admiralty or maritime claims within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure. Plaintiffs hereby designate this case as an admiralty or maritime case, and request a non-jury trial, pursuant to Rule 9(h)."

6. Defendant Herman explains in a Loyola Law Review article (64 Loy. L. Rev. 1) which he authored in 2018: (1) the primary purpose of his appointment as Lead Counsel in MDL 2179 is to further the interests of judicial efficiency and economy [while maximizing his compensation]; and (2) his primary fiduciary duty is to Defendant Barbier. Herman states "the notion that some 'fiduciary duty' extends to individually retained counsel, in my view, *goes too far*." (Emphasis added).

7. The following facts are illustrative of how the defendants limited BP's liability for the purpose of maximizing judicial efficiency and/or maximizing their compensation.

(a) Unbeknownst to the victims of the BP oil well blowout, Defendants and BP made the business decision to have BP pay a total amount of **$20 billion** to compensate all the BP oil well blowout victims in the settlement class action.

-3-

(b) The Feinberg-administered victims' compensation fund denied payment to approximately **61.46%** of the claimants who filed claims.

(c) Approximately **220,000** Feinberg-administered victims' compensation fund claimants who executed a "Release and Covenant Not to Sue" in exchange for a one-time miniscule final payment (**$5,000** for individuals and **$25,000** for businesses) were subsequently excluded by Defendants Barbier, Herman, and Roy from the settlement class action.

(d) The compensation paid to Kenneth R. Feinberg by BP from June 15, 2010 to April 15, 2012 was approximately **$24,700,000**.

(e) Defendants fraudulently induced the MDL 2179 plaintiffs not to opt-out of the settlement.

(f) Defendant Juneau denied payment to approximately **60.03%** of the claims submitted to the Deepwater Horizon Claims Center **("DHCC")**.

(g) The compensation paid to Defendant Juneau is unknown but ongoing.

(h) The defendants and BP negotiated a Medical Benefits Class Action Settlement Agreement which Defendant Barbier approved on January 11, 2013. In order to limit BP's liability, Defendants knowingly ignored the fact that public policy dictates that a toxic tort is a *strict liability* tort. Seventy-eight percent (**78%**) of Specified Physical Condition ("SPC") claims submitted to Garretson received either a "Request for Additional Information" or a "Notice of Defect." In the end, only 20% of claimants received any compensation. These claimants were forced to accept the lowest payment of **$1,300** because they could no longer wait for the money to cover their medical expenses.

(i) As part of Defendants' overall strategy to limit BP's liability, Defendant Barbier knowingly failed to hold BP fully accountable in regard to the Clean Water Act ("CWA") civil penalty. Defendant Barbier saved BP approximately **$4.30 billion** by finding that only 4.0 million barrels of oil, rather than 5.0 million barrels of oil proposed by the United States, exited the reservoir.

(j) Defendants Barbier and Herman also provided an extremely favorable payment schedule for BP in regard to the government entity settlements.

(k) On October 5, 2015, the DOJ released the following statement: "The United States today joins the five Gulf states in announcing a settlement to resolve civil claims against BP arising from the April 20, 2010 Macondo well blowout and the massive oil spill that followed in the Gulf of Mexico….This global settlement resolves the governments' civil claims under the Clean Water Act and natural resources damage claims under the Oil Pollution Act, as well as economic damage claims of the five Gulf states and local governments. Taken together this global resolution of civil claims is worth $20.8 billion."

-4-

The DOJ failed to point out that **BP is able to deduct $15.3 billion of this $20.8 billion on its U.S. tax return**. In short, this "global settlement" requires U.S. taxpayers to pay $15.3 billion and BP is only required to pay $5.5 billion. BP also wrote off the cost of its $32 billion cleanup effort after the spill, costing U.S. taxpayers roughly $10 billion.

(l) The total compensation (composed of common benefit fees, contingent fees, co-counsel fees, and hold-backs) paid to Defendants Herman, Roy, and the seventeen members of the MDL 2179 PSC was **$3.035 billion**.

(m) The RICO MDL 2179 **Defendants improperly apply Louisiana law rather than the choice-of-law rules of the state in which the transferor court sits**. The U.S. Supreme Court held in *Van Dusen* and *Ferens* that the policies underlying the holdings of *Erie* and *Klaxon* mandated that the law, including the choice-of-law rules, of the transferor court, rather than those of the transferee court, must be applied to a case that has been transferred to an MDL Court. In its March 27, 2020 Order, the MDL 2179 Court's uniquely creative reasoning allowed the RICO MDL 2179 Defendants to circumvent the U.S. Supreme Court's holdings in *Van Dusen* and *Ferens* and hold that "Louisiana law, rather than Florida law, governs this dispute." This decision allows Defendant Barbier to maximize judicial efficiency and ensure that the RICO MDL 2179 Defendants are never held accountable for their tortious acts.

(n) In its July 2, 2020 Order, the MDL 2179 Court held "**OPA does not impose on the Responsible Party a duty to settle Plaintiffs' claims**…. OPA is intended to promote settlement….There is a wide chasm between a process that "promotes" settlement (what Congress enacted) and one that "requires" settlements (what the Plaintiffs apparently wish Congress enacted)…." The precedent established by the RICO MDL 2179 Defendants is clear: A "Responsible Party" under OPA may now enter into a contract with a politically well-connected third party "Fund Administrator," e.g., Kenneth R. Feinberg and Feinberg Rozen, LLP, d/b/a GCCF. This third party "Administrator / Straw Person," *directly and excessively compensated by the party responsible for the oil well blowout incident*, may totally disregard OPA, operate the claims process of the responsible party as fraudulently and negligently as it desires for the sole purpose of limiting the liability of, and providing closure to, the responsible party, and the third party "Administrator / Straw Person" shall never be held accountable for its tortious acts.

8. Plaintiff, on behalf of his business, himself, and all others similarly situated who or that have been denied access to the courts as a result of the tortious conduct of the Defendants, brings this action pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, et seq., alleging that the defendants engaged in an "Eight-Step" scheme to

fraudulently limit BP's liability for the purpose of maximizing judicial efficiency and/or maximizing their compensation.

9. Plaintiff Donovan has filed this suit because he believes that our federal justice system is not a sanctuary for Defendants to use for the purpose of carrying out their own massive, nefarious scheme in the name of "judicially-efficient" multidistrict litigation and to hold Defendants responsible for their "Eight-Step" fraudulent scheme which turns MDL 2179 into "the MDL 2179 Enterprise."

## JURISDICTION AND VENUE

10. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1332 because this action is based on the federal claims asserted under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, et seq. ("RICO") and the parties are citizens of different states. This Court may exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the other claims.

11. Venue is proper in this District under 28 U.S.C. § 1391 and 18 U.S.C. § 1965 because Plaintiff resides in this District and a substantial part of the events or omissions giving rise to the claim occurred in this District and each Defendant transacted affairs and conducted activity that gives rise to the claim of relief in this District.

12. This Court has personal jurisdiction over each Defendant as each purposefully availed itself of the privilege of exploiting forum-based business opportunities in the State of Florida, engaged in substantial business activities in the State of Florida, purposefully directed their actions toward Florida, and have the requisite minimum contacts with Florida necessary to constitutionally permit the Court to exercise jurisdiction.

## PARTIES

13.  Since 2010 and at all times material herein, Plaintiff Donovan, an attorney admitted to practice law in the State of Florida, the U.S. District Court, Middle District of Florida, and the U.S. Court of Appeals for the Eleventh Circuit, represented victims of the BP oil well blowout of April 20, 2010 and victims of the RICO MDL 2179 Defendants. Plaintiff Donovan's principal place of business is located in Hillsborough County at 3102 Seaway Ct., #304, Tampa, Florida 33629.

14.  At all times material herein, Defendant Barbier, a resident of the State of Louisiana and a United States District Judge of the United States District Court for the Eastern District of Louisiana, nominated by President William Jefferson Clinton, served as the transferee judge for MDL 2179. The allegations in this complaint are brought against The Honorable Carl J. Barbier under each of the two exceptions to absolute judicial immunity. Defendant Barbier's principal place of business is located at 500 Poydras Street, Room C256, New Orleans, Louisiana 70130.

15.  At all times material herein, Defendant Herman, a resident of the State of Louisiana and a partner at the law firm Herman, Herman & Katz, LLC, served as *pre-MDL 2179* Co-Liaison Counsel for all cases, including cases initially filed in the State of Florida and subsequently consolidated in the EDLA, Co-Liaison Counsel MDL 2179, Co-Lead Class Counsel for the BP Settlement Classes, Co-Lead Settlement Class Counsel for the Halliburton/ Transocean Settlement Class, member of the Plaintiffs' Executive Committee, Co-Chair of the Fee Committee, and *ex officio* member of the PSC. At all times material herein, Defendant Herman oversaw and steered the entire MDL 2179 "litigation" effort. This includes settlement negotiations with BP, Halliburton, and Transocean, as well as settlement approval, and

-7-

settlement implementation, post-settlement administrative disputes, litigation, and appeals, approval, payment, and reimbursement of Shared Expenses and other general planning and administration, coordination with Defendants, Special Masters, the Court, the States, and the United States, case-management orders and procedures, public relations efforts, the monitoring of and coordination with the U.S. Judicial Panel on Multidistrict Litigation ("JPML"), Government, and other satellite investigations, lawsuits, and proceedings, general communications, coordination, organization, and strategy. Herman's principal place of business is located at 820 O'Keefe Ave., New Orleans, Louisiana 70113.

16. At all times material herein, Defendant Roy, a resident of the State of Louisiana and a partner at the law firm Domengeaux Wright Roy & Edwards LLC, served as *pre-MDL* 2179 Co-Liaison Counsel for all cases, including cases initially filed in the State of Florida and subsequently consolidated in the EDLA, Co-Liaison Counsel in MDL 2179, Co-Lead Class Counsel for the BP Settlement Classes, a member of the Plaintiffs' Executive Committee, the Co-Chair of the Fee Committee, and *ex officio* member of the PSC. Defendant Roy, together with Defendant Herman, oversaw and steered the entire litigation effort. Roy's principal place of business is located at 556 Jefferson Street, Suite 500, Lafayette, Louisiana 70501.

17. At all times material herein, Defendant Feinberg, a resident of the District of Colombia and Founder and Managing Partner of Feinberg Rozen, served as the fund administrator of the BP victims' compensation fund in MDL 2179. Feinberg's principal place of business is located at 1455 Pennsylvania Avenue, NW, Suite 390 Washington, DC 20004.

18. On March 8, 2012, the MDL 2179 Court entered an Order creating a process to facilitate the transition from the Feinberg-administered BP victims' compensation fund to the

Court Supervised Claims Program ("CSCP") envisioned by the settlement. The CSCP was later renamed The Deepwater Horizon Claims Center ("DHCC"). At all times material herein, Defendant Juneau, a resident of the State of Louisiana served as the fund administrator of the CSCP/DHCC. Juneau's principal place of business is located at 1018 Harding Street, # 202, Lafayette LA, 70503.

## LEGAL BACKGROUND

### I. The Multidistrict Litigation Statute (28 U.S.C. § 1407)

19.  In 1968, Congress enacted the Multidistrict Litigation Statute (28 U.S.C. § 1407), the statute to which the United States Judicial Panel on Multidistrict Litigation ("JPML") owes its existence. The multidistrict litigation ("MDL") statute provides, in pertinent part, "When civil actions involving one or more common questions of fact are pending in different districts, such actions may be transferred to any district *for coordinated or consolidated pretrial proceedings*. Such transfers shall be made by the judicial panel on multidistrict litigation authorized by this section upon its determination that transfers for such proceedings will be *for the convenience of parties and witnesses and will promote the just and efficient conduct of such actions*. Each action so transferred ***shall be remanded*** by the panel at or before the conclusion of such pretrial proceedings to the district from which it was transferred unless it shall have been previously terminated." (Emphasis added).

#### A. The "Black Hole"

20.  It is the worst-kept secret in civil procedure that the MDL is really a dispositive, not pretrial, action. MDL transferee judges, unlike judges even in class actions, do not generally manage to trial or even to the possibility of trial.

21.  MDL is mushrooming in both impact and sheer numbers. MDLs accounted for 51.9 percent of all pending federal civil cases at the end of 2018. MDL impacts the entire civil justice system. Even though the JPML centralizes factually related cases to promote efficient *pretrial* handling only, the reality is that merely 2.9 percent of cases return to their original districts.

22.  Since 2010, cases transferred by the JPML to MDL 2179 have been sentenced to the proverbial "Black Hole" where they are automatically and indefinitely stayed.

23.  Multidistrict litigation has frequently been described as a "Black Hole" because transfer is typically a one-way ticket. Indeed, the JPML has abdicated its proper role by providing no recourse to remedy or to exit an MDL "Black Hole." *See, e.g.*, *In re* U.S. Lines, Inc., No. 97-CIV-6727, 1998 WL 382023, at *7 (S.D.N.Y. July 9, 1998) (explaining appellants' description of the asbestos multidistrict litigation as "a black hole" and "the third level of Dante's inferno"); Eldon E. Fallon et al., *Bellwether Trials in Multidistrict Litigation*, 82 TUL. L. REV. 2323, 2330 (2008) ("Indeed, the strongest criticism of the traditional MDL process is that the centralized forum can resemble a 'black hole,' into which cases are transferred never to be heard from again."); John G. Heyburn II & Francis E. McGovern, *Evaluating and Improving the MDL Process*, 38 LITIGATION 27, 31 (2012) ("The single most prominent complaint about multidistrict litigation arises from counsel's negative experiences in so-called black hole cases – those that seem not to move at an acceptable pace."); Eduardo C. Robreno, *The Federal Asbestos Product Liability Multidistrict Litigation (MDL 875): Black Hole or New Paradigm?*, 23 WIDENER L. J. 97, 126 (2013) ("Ultimately, neither the court nor the parties were ready, willing, or able to move [asbestos] cases to trial and settlement. This stage of litigation led some litigants to refer to MDL 875 as a 'black hole,' where cases disappeared forever from the active

-10-

dockets of the court.").

24. By all accounts, the multidistrict litigation statute's idealized vision differs dramatically from the real-world practice of MDL. Indeed, most MDL cases are understood by all involved to be unamenable to trial at the outset. As one judge put it, "[i]t's the culture of transferee courts. You have failed if you transfer it back."

25. MDLs depend almost entirely on consent and, in turn, disrupt traditional relationships among their players, turning judges and lawyers into deeply collaborative partners in (as one judge put it) "practical problem solving." MDLs have created a judicial elite among the federal judges chosen to lead them, subverting the baseline premise of horizontal equality among federal district judges and instantiating Judge Richard Posner's view that federal judges, with life tenure and little prospect for formal promotion, are eager to find some way to distinguish themselves from the pack. *See* RICHARD A. POSNER, HOW JUDGES THINK 132-47 (2008).

26. The MDL judge in many ways acts more like a modern administrator than the judge the FRCP envisions, not least because, like agencies, the particular MDL judges are chosen for these cases specifically for their expertise in practical administration.

27. Judge Patrick E. Higginbotham further explains, "The disconnect between the power of the transferee judge and the power that the judge exercises rests on a statute that authorizes only the transfer of cases to that judge for purposes of pretrial proceeding with return to their filing homes, as the U.S. Supreme Court made clear in *Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach*. The rest of the operation finds its footing in some form of consent and assertions of implied and inherent authority sometimes on little more than empty air."

28. Writing in dissent for the Ninth Circuit, Judge Alex Kozinski presaged the U.S. Supreme Court's ruling in *Lexecon* by characterizing self-transfer as "a remarkable power grab by federal judges," because the practice exceeded the authority Congress granted to transferee judges. *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach* (*In re American Continental Corp./Lincoln Sav. & Loan Sec. Litig.*), 102 F.3d 1524, 1540 (9th Cir. 1996) (Kozinski, J., dissenting) (arguing that "the language itself [of 1407] is clear as sunlight"), rev'd, 118 S. Ct. 956 (1998). In addition, Judge Kozinski had observed that nearly 30 years of congressional silence on the issue of self-transfer merited little deference since Congress exercises little oversight in the M.D.L. area. *See Lexecon*, 102 F.3d at 1549 (Kozinski, J., dissenting) (contrasting this area with Congress' "vigorous oversight" of tax laws, where congressional silence could properly be considered ratification).

## II. The Oil Pollution Act of 1990 (33 U.S.C. § 2702)

### A. The Text of the OPA Statute

29. OPA is a *strict liability* statute. In order to recover damages, a claimant merely needs to show that his or her damages "resulted from" the oil spill.

30. OPA provides,
"Each responsible party for a vessel or a facility from which oil is discharged, or which poses the substantial threat of a discharge of oil, into or upon the navigable waters or adjoining shorelines or the exclusive economic zone is liable for the removal costs and damages that result from such incident." 33 U.S.C. § 2702(a).

31. The damages referred to in 33 U.S.C. § 2702(a) include, but are not limited to:
"Damages equal to the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources, which ***shall*** be recoverable by any claimant." 33 U.S.C. § 2702(b)(2)(E) (Emphasis added).

"Payment or settlement of a claim for interim, short-term damages representing less than the full amount of damages to which the claimant ultimately may be entitled ***shall not*** preclude recovery by the claimant for damages not reflected in the paid or settled partial claim." 33 U.S.C. § 2705(a) (Emphasis added); and

"Payment of such a claim [i.e. payment to a claimant for interim, short-term damages representing less than the full amount of damages to which the claimant ultimately may be entitled] ***shall not*** foreclose a claimant's right to recovery of all damages to which the claimant otherwise is entitled under this Act or under any other law."
33 U.S.C. §§ 2715(b)(1) and (2) (Emphasis added).

32.   "Shall" means shall. The U.S. Supreme Court has made clear that when a statute uses the word "shall," Congress has imposed a mandatory duty upon the subject of the command. See *United States v. Monsanto*, 491 U.S. 600, 607, 109 S.Ct. 2657, 105 L.Ed.2d 512 (1989) (by using "shall" in civil forfeiture statute, "Congress could not have chosen stronger words to express its intent that forfeiture be mandatory in cases where the statute applied").

33.   Use of "shall" and "may" in statutes also mirrors common usage; ordinarily "shall" is mandatory and "may" is permissive. "The mandatory 'shall'….normally creates an obligation impervious to judicial discretion." *Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998).

**B. The Legislative History of the OPA Statute**

34.   OPA's legislative history is shot through with general statements indicative of congressional intent to ensure that all oil spill victims are fully compensated. 135 CONG. REC. H7959 (daily ed. Nov. 2, 1989) (statement of Rep. Tauzin) ("ensure that all victims are fully compensated"); 135 CONG. REC. H7964 (daily ed. Nov. 2, 1989) (statement of Rep. Hammerschmidt) ("ensure that all justified claims for compensation are satisfied"); 135 CONG. REC. H7969 (daily ed. Nov. 2, 1989) (statement of Rep. Dyson) ("assurances that damages arising from spills will be completely compensated"); 136 CONG. REC. H336 (daily ed. Feb. 7, 1990) (statement of Rep. Carper) ("ensure that those people or those businesses that are damaged by these spills are fairly and adequately compensated"); 136 CONG. REC. S7752 (daily ed. June 12, 1990) (statement of Sen. Mitchell) ("ensure the fullest possible compensation of oil spill

victims"); S. REP. NO. 101–94, at 12 (1989), *reprinted in* 1990 U.S.C.C.A.N. 722, 734. ("These provisions are intended to provide compensation for a wide range of injuries and are not so narrowly focused as to prevent victims of an oil spill from receiving reasonable compensation."); 135 CONG. REC. H7893 (daily ed. Nov. 1, 1989) (statement of Rep. Quillen) ("full, fair, and swift compensation for everyone injured by oil spills.").

35.  As the U.S. Supreme Court explained,
"[I]n interpreting a statute a court should always turn first to one, cardinal canon before all others. We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992).

36. The text and the legislative history of the OPA statute are clear. OPA *expressly prohibits* Responsible Parties from engaging in a "Delay, Deny, Defend" strategy wherein the victims of an oil spill are starved and ultimately forced to sign a "Release and Covenant Not to Sue" in order to receive a miniscule payment amount for all damages, including future damages, they incur as a result of the oil spill.

### III.  The Toxic Tort

37.  "The long term effects [of the BP oil well blowout] on the environment and fisheries may not be known for many years."
The Honorable Carl J. Barbier, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Rec. Doc. 3830 at 31, August 26, 2011).

38. Gulf War Syndrome, or "Gulf War illness," is a serious illness that affects approximately 25 to 30 percent of the 700,000 U.S. veterans who served in the 1990 - 1991 Gulf War. These veterans' illnesses went untreated and mostly unacknowledged until 2008, when a congressional report titled "Gulf War Illness and the Health of Gulf War Veterans" was published. This complex of multiple concurrent symptoms typically includes persistent memory

-14-

and concentration problems, and other chronic abnormalities not explained by well-established diagnoses. The symptoms of Gulf War Syndrome, which are still being suffered by between 175,000 and 210,000 U.S. veterans, are identical to the symptoms being experienced by the estimated 200,000 BP oil well blowout victims who were exposed to crude oil and/or dispersants.

39. The approximately 200,000 U.S. veterans who continue to suffer from Gulf War Syndrome receive disability benefits from the United States Department of Veterans Affairs. The estimated 200,000 BP oil well blowout victims who are experiencing symptoms identical to Gulf War Syndrome should receive equivalent disability benefits from BP.

40. The chronic illnesses being experienced by the victims of the BP oil well blowout who were exposed to crude oil and/or dispersants will probably be with them for the rest of their lives. According to Dr. Michael Robichaux, a large percentage of BP oil well blowout patients have experienced what he refers to as "Multiple Endocrinopathies." These disorders result in disruption of menses in women, impotence in many of the men, wide fluctuations of blood sugar, and disruption in the function of the adrenal glands.

41. Crude oil contains highly toxic chemicals such as benzene and n-hexane that can cause cancer, birth defects, and permanent nerve damage. Inhaling crude oil mist can cause chemical pneumonitis, a serious lung disease. Serious harm from crude oil that may not be recognized quickly includes liver, kidney, respiratory, reproductive, blood, immune, and nervous system damage.

42. The BP oil well blowout is an environmental toxic tort. Accordingly, damages can only be calculated based on projections of the timing of the ecosystem's recovery and associated

-15-

economic losses. These complexities beg the question: Is it fair to place the burden on the victims of the BP oil well blowout to preserve the right to collect damages from BP that are not known to exist at the time of settlement?

43. A toxic tort is a tort claim that results from a plaintiff's exposure to toxic substances as a result of a defendant's actions. In traditional tort cases, personal injuries occur contemporaneously with the causing event, which allows the victim to recover reasonable expenses for past and future damages in a lump sum. In toxic tort cases, injuries are often not contemporaneous with exposure to the toxic substance and do not manifest until years after the exposure.

44. Typically, toxic tort laws impose *strict liability* on the responsible party whereby the claimant is entitled to recover not only the immediate costs, but also future damages that *result from* the incident. This liability is "analogous to negligence per se, but is not called negligence because a court makes determination judgment that the hazardous activity's value to the community is sufficiently great that the mere participation in the activity is not to be stigmatized as wrongdoing….The activity is simply required to pay its own way…., but it does pay with full tort damages." (VICTOR E. SCHWARTZ, ET AL., PROSSER, WADE AND SCHWARTZ'S TORTS 703-04 (Found. Press, 10th ed. 2000)).

45. Defendant Barbier, in his Order and Reasons [As to Motions to Dismiss the B1 Master Complaint], states "Offshore drilling operations are not considered ultra-hazardous." (Rec. Doc. 3830 at 28, Aug, 26, 2011). Although Defendant Barbier believes "*offshore* drilling operations are not considered ultra-hazardous," an unbiased, reasonable trier of fact would most certainly conclude that BP's Macondo *deep-water* exploratory well drilling operations are

-16-

considered ultra-hazardous and hold BP strictly liable.

46.   Another unique characteristic of toxic tort is that often the exposures involved injure thousands of people. This is important in an administrative sense; it impacts the way toxic tort claims are handled. In order to avoid the potential legal complexities of litigating each claim separately, settlements are usually reached before litigation ensues. With so much money at stake in environmental disasters, the responsible party is often eager to settle claims to avoid adverse rulings that can render the responsible party insolvent, or in a worst-case scenario, destroy an entire industry.

47.   While alternative dispute resolution may be essential to expeditiously and efficiently handling claims in mass toxic tort actions, the lack of judicial oversight raises concerns. In the absence of statutory guidelines, claimants lack many of the protections afforded under the conventional court system, rendering them vulnerable to unscrupulous settlement tactics that are likely to be used by the responsible party.

48.   Those who have attacked the legitimacy of the BP oil well blowout victims' compensation "fund" which was administered by Kenneth R. Feinberg have claimed that courts should refuse to enforce waiver provisions because of public policy, emphasizing the difference between justice in a tort context and in a contract context. Even when the contract is a full and genuine exercise of both parties' freedom to contract, contract provisions may offend public policy, in which case courts can and should refuse to enforce them. The issue is not whether the parties dealt wrongfully with each other, but whether the contract is or should be forbidden because it damages the public good.

49.   In evaluating the BP oil well blowout, one must consider that the unique

-17-

characteristics of toxic tort render traditional-tort remedies inadequate to fully and justly compensate victims.

50. Historically, in environmental catastrophes, courts have refused to allow parties to enter into covenants not to sue without a reopening provision, because **public policy dictates that a toxic tort is a *strict liability* tort** where the claimant is entitled to recover not only the immediate removal costs, but also future damages that result from such an incident.

### IV. MDL 2179 is Unconstitutional

51. In a settlement class action, an agreement to resolve the dispute is reached by the parties involved prior to the district court's ruling on a motion to certify the class.

52. In MDL 2179, Defendants and BP are not adversaries. They are cohorts expeditiously seeking judicial efficiency and the common objectives of closure, limited liability, and profit.

53. Defendants Herman and Roy, and the seventeen MDL 2179 PSC attorneys/dealmakers are privy to the settlement matrix and the confidential guidance document given to the claims administrator, which explains qualifying criteria for recovery. This knowledge allows Defendants Herman and Roy, and the PSC attorneys to tailor their own clients' claim submissions to maximize their payout (and Defendants Herman and Roy, and the PSC attorneys' contingent fees). This insider information also prompts Defendants Herman and Roy, and the PSC attorneys to seek and collect co-counsel fees for serving as co-counsel to non-PSC attorneys.

54. The settlement class action is always unconstitutional because it involves no litigation. A typical class action is legitimate because the interests of the plaintiffs and defendant

are adverse. In that scenario, the monetary interests of class counsel, which are contingent on

class recovery, are aligned with the absent class members' interest in maximum redress,

incentivizing a presentation of the issues that benefits both equally. These incentives break down

in the context of the non-adversarial settlement class action. Because class counsel seeks the

same outcome as the defendant, she has no reason to formulate her clients' arguments or destroy

her opponent's case. Particularly, she lacks incentive to present to the Court evidence that may

shed unfavorable light upon the non-adversarial agreement, even though that evidence may

reveal critical details about the effect of the settlement on absent class members.

55.  The Court needs to consider class settlements in terms of separation of powers

because maintaining the limits of Article III's "case or controversy" requirements is fundamental

for protecting the individual liberties of all. By authorizing a federal court to redistribute

resources as a means of enforcing legislative directives absent an adversary adjudication, the

settlement class action effectively transforms the Court into an administrative body, which is

more appropriately located in the executive branch….and improperly transfers powers reserved

to the executive branch to the federal judiciary, in clear contravention of separation-of-powers

dictates.

### A.  Where's the Case or Controversy in MDL 2179?

56.  "Centralization may also facilitate closer coordination with Kenneth Feinberg's

administration of the BP compensation fund."

> The Honorable John G. Heyburn II, Chairman, Panel on Multidistrict Litigation, *In re:*
> *Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010
> (Transfer Order, August 10, 2010).

57.  "In February 2011, [only 4 months after I appointed my pre-selected cooperative

attorneys to the PSC] negotiations began in earnest for the proposed Economic and

Property Damages Settlement. Talks intensified in July 2011, occurring on an almost-daily

basis."

> The Honorable Carl J. Barbier, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Rec. Doc. 7138 at 3, December 21, 2012).

58.  Article III extends federal judicial power solely to the adjudication of a "case" or a

"controversy." "Case," in Article III, means a justiciable "action or suit," or an "argument."

"Controversy" means a disagreement or a dispute between parties as to the suit's preferred

outcome. Both a "case" and a "controversy" require an adversarial suit. For a suit to be

justiciable, according to the U.S. Supreme Court, the parties must maintain "adverse legal

interests" throughout, and their dispute must be "definite and concrete." The Fifth Circuit has

held that Article III plainly "requires that the parties be truly adverse."

59.  On the most basic analytical level, the unconstitutionality of the settlement class

action should be obvious, purely as a matter of textual construction. There is simply no rational

means of defining the terms "case" or "controversy" to include a proceeding in which, from the

outset, nothing is disputed and the parties are in complete agreement. Moreover, from both

historical and doctrinal perspectives, U.S. Supreme Court decisions could not be more certain

that Article III is satisfied only when the parties are truly "adverse" to one another, which, at the

time the relevant proceeding is undertaken, they are not in the case of the settlement class

action.

60.  The most serious problem with the settlement class action is that by its nature it

does not involve any live dispute between the parties that a federal court is being asked to

resolve through litigation, and because from the outset of the proceeding the parties are in full

accord as to how the claims should be disposed of, there is missing the adverseness between the

parties that is a central element of Article III case-or-controversy requirement. The settlement class action, in short, is inherently unconstitutional.

61. The term "collusion," in the class action context, is used to refer to a secret, unethical agreement between the named plaintiffs and defendant. For purposes of Article III's adverseness requirement, however, the term has a far broader meaning. It includes any suit in which, from the outset, the parties are in agreement as to the outcome.

62. Article III proceeds on the assumption that a showing of a lack of adverseness at the outset of a suit automatically establishes the improperly collusive nature of the suit. Article III adopts lack of adverseness as an ex ante, categorical basis on which to find inadequate representation of the interests of future litigants who are similarly situated.

63. When the plaintiffs and defendant agree on settlement terms and the desirability of certification prior to coming to Court, neither party has the incentive to challenge such important questions as whether class representation is "adequate" or the claims are "typical" of the class as a whole. This inherently deprives the Court of the benefit of adversarial litigation concerning the satisfaction of Rule 23's requirements, thereby seriously limiting its ability to protect absent class members.

64. In contrast to the case-by-case focus employed by class action scholars, Article III employs a far more categorical and prophylactic conception of "collusion." Article III makes an ex ante categorical judgment that a non-adversarial suit is inherently collusive and therefore in violation of constitutional norms. As the U.S. Supreme Court in *Poe v. Ullman*, construing Article III, explained: "The case may not be 'collusive'….in the sense of merely colorable disputes got up to secure an advantageous ruling from the Court. But the Court has found unfit

for adjudication any cause that 'is not in any real sense adversary,' that 'does not assume the honest and actual antagonistic assertion of rights' to be adjudicated - a safeguard essential to the integrity of the judicial process, and one which we have held to be indispensable to adjudication of constitutional questions by this Court."

65.  The settlement class's fundamental constitutional defect is that *all* settlement classes - not merely those involving unethical attorney behavior - are, by definition, non-adversarial. An adversarial dispute cannot be said to exist at the time the class action proceeding begins. At that point, the litigants differ over absolutely nothing. They have agreed on the terms of both certification and settlement prior to the filing of the class proceeding. In fact, the only conceivable reason that class counsel in this position files a complaint and request for certification with the Court, rather than simply embodying the terms of their private agreement in an enforceable contract, is to bind absent class members to a settlement negotiated in their absence."

**B.  Where's the Due Process in MDL 2179?**

66.  "All motions, requests for discovery or other pre-trial proceedings with respect to plaintiffs shall be initiated by and/or coordinated through the Plaintiff Steering Committee ("PSC"), *to be filed by and through Plaintiffs' Liaison Counsel*. If the PSC does not support the motion, discovery or other requested proceeding, then the moving or requesting plaintiff shall be permitted to file such motion or request, but shall include a certificate of non-support."

The Honorable Carl J. Barbier, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Rec. Doc. 569 at 13, October 19, 2010).

67.  "….all pending and future motions, including the Motions to Remand, are continued without date unless a motion is specifically excepted from the continuance by the

Court."
> The Honorable Carl J. Barbier, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Rec. Doc. 676 at 1, November 5, 2010).

68. "Any individual plaintiff who is a named plaintiff in a case that falls within Pleading Bundle B1, B3, D1, or D2, or any combination thereof, is deemed to be a plaintiff in the applicable Master Complaint(s)....All individual petitions or complaints that fall within Pleading Bundles B1, B3, D1, or D2, whether pre-existing or filed hereafter, are stayed until further order of the Court."
> The Honorable Carl J. Barbier, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Rec. Doc. 983 at 2, 4, January 12, 2011).

69. Each claimant in an MDL has an individually held, constitutionally protected property right at stake. Those rights are guaranteed by the Fifth Amendment, which protects life, liberty, and property against deprivation absent due process of law. The "property" at stake in an MDL is the "chose in action." This historically established concept refers to the right to sue to enforce a legally protected claim, even the unlitigated right to sue. Under the Fifth Amendment, then, MDL claimants cannot be deprived of their rights to a chose in action without due process of law.

70. In MDL 2179, individual litigants, for all practical purposes, lose a substantial degree of control over the procedural fate of their claims. In sum, MDL 2179 fails to provide a constitutionally adequate opportunity to litigate.

71. The so-called "day-in-court ideal" is at the heart of constitutionally guaranteed procedural due process, according to the U.S. Supreme Court, and is central to the American conception of the adversarial model of litigation.

72. MDL 2179 severely undermines the day-in-court ideal by depriving individual

litigants of their opportunity to protect their interests through the litigation process.

73.   The right to one's own day-in-court means a right to meaningful control over litigation strategy and goals, including choice of legal representative. It requires a full and fair opportunity to litigate, which means a full opportunity to prepare one's own arguments and evidence. At base, meaningful participation in the adjudicatory process - the day-in-court ideal - includes, in the words of a respected scholar, "the right to observe, to make arguments, to present evidence, and to be informed of the reasons for a decision."

74.   The U.S. Supreme Court has identified the "two central concerns of procedural due process" to be "the prevention of unjustified or mistaken deprivations and the promotion of participation and dialogue by affected individuals in the decision making process." The day-in-court ideal takes account of both of these concerns. First, an individual day-in-court helps achieve accurate outcomes (thus avoiding "unjustified or mistaken deprivations") because the stakeholders, those who will be most affected by the outcome and are the most motivated to protect their own rights, participate in the decision-making process. In addition, individual participation is inherently valuable in a democratic system because it legitimizes the adjudicating entities in the minds of the litigants.

75.   On the surface, MDL practice seems largely innocuous; the JPML merely temporarily transfers cases to a different district court for pretrial matters. But for a variety of reasons transfer effectively amounts to the end of the road for the overwhelming majority of cases. This is troublesome from a constitutional perspective, because not even the most minimal protection of the day-in-court ideal from the perspective of either the paternalism or autonomy models is satisfied.

76. MDL 2179 plaintiffs in no sense meaningfully participate in, much less control, their day-in-court. Nor are there any assurances that those in charge of the litigation are adequately representing the interest of the individual claimants.

77. One key way that litigants control their day-in-court is by selecting their attorneys. This is often the first expression of their autonomy: they seek the advice of counsel when they consider whether to even file a claim.

78. Permitting litigants to choose their representatives is central to providing a full and fair opportunity to litigate. The foundations of due process dictate that that choice belongs to the parties alone. But claimants forced into an MDL are deprived of that essential choice. By virtue of his case's transfer into the MDL - a move that the plaintiff cannot prevent - his chosen lawyer will invariably not be the one actually representing his interests in the course of all the important MDL. Rather, the lawyers on the court-appointed steering committee will take over, and they will do so without the protective assurances of either there adequacy, their good faith, or the extent to which the interests of the absent litigants truly overlap or any other controls.

79. When a transferee judge appoints a steering committee, he does so at his discretion, outside the strictures of any Federal Rule, or statute, or adversary proceeding. Appointment to the steering committee comes after nothing more than a judge-designated period of nominations and written objections. The process fails to guarantee that the appointed representatives will zealously advocate on behalf of absent litigants in the same way that their hired representative presumably would have. This is certainly the case in MDL 2179.

80. In addition to the fact that appointed counsel are selected by the Court, rather than by the individuals they represent, MDL claimants do not enjoy a traditional attorney-client

relationship with the members of the court-appointed steering committee. The small group of attorneys chosen for leadership roles is charged with representing all of the possibly thousands of plaintiffs, whose cases have facts that are often only loosely linked.

81.  MDL 2179 falls far short of providing the "deep-rooted historic tradition" of an individual's day-in-court.

82.  In consolidated proceedings, the attorney's loyalty divides not only between clients, but also between clients and self-interest. Compensation for attorneys who work on behalf of the group depends upon the value of every plaintiff's settlement or judgment. As a result, PSC attorneys may push hard for settlement as opposed to remand, prefer a quick settlement in favor of a protracted discovery period, or advocate for settlement terms that may not be particularly favorable to some or many plaintiffs. The First Circuit has acknowledged existence of this "inherent conflict of interest" between the PSC and individual plaintiffs in mass-tort MDLs.

83.  At the most basic level, MDL 2179 Plaintiffs are not given a meaningful opportunity to present their case(s), as demanded by the Due Process Clause.

## V. Defendant Barbier Does Not Have Absolute Judicial Immunity

84.  The U.S. Supreme Court noted that there are only two incidents where absolute judicial immunity does not apply: (1) where the actions of the judge are not considered to be judicial acts; and (2) where the judge acts in a complete absence of all jurisdiction. *Mireles v. Waco*, 502 U.S. 9 (1991).

85.  In *Forrester v. White*, 484 U.S. 219, 229 (1988), the U.S. Supreme Court held that a judge's exercise of administrative functions, such as "….overseeing the efficient operation of a court - may have been quite important in providing the necessary conditions of a sound

-26-

adjudicative system," but such administrative decisions "were not themselves judicial or adjudicative." The Court determined that administrative actions, when completed by judges, do not allow the judge to be protected by immunity.

86. When a judge knows that he lacks jurisdiction, or acts in the face of clearly valid statutes expressly depriving him of jurisdiction, judicial immunity is lost. *Rankin v. Howard*, (1980) 633 F.2d 844, cert den. *Zeller v. Rankin*, 101 S.Ct. 2020, 451 U.S. 939, 68 L.Ed 2d 326.

87. The U.S. Supreme Court has insisted that a judge will not be deprived of immunity because the action he took was in error, was done maliciously, or was in excess of his authority; rather, he will be subject to liability only when he has acted in the "clear absence of all jurisdiction." *Stump v. Sparkman*, 435 U.S. 349 (1978).

88. In MDL 2179, Defendant Barbier acts in the clear absence of all jurisdiction.

**A. The MDL Statute**

89. The MDL Statute (28 U.S.C. § 1407), provides, in pertinent part, "When civil actions involving one or more common questions of fact are pending in different districts, such actions may be transferred to any district *for coordinated or consolidated pretrial proceedings*. Such transfers shall be made by the judicial panel on multidistrict litigation authorized by this section upon its determination that transfers for such proceedings will be *for the convenience of parties and witnesses and will promote the just and efficient conduct of such actions*. Each action so transferred ***shall be remanded*** by the panel at or before the conclusion of such pretrial proceedings to the district from which it was transferred unless it shall have been previously terminated." (Emphasis added).

90. "Shall" means shall. The U.S. Supreme Court has made clear that when a statute uses the word "shall," Congress has imposed a mandatory duty upon the subject of the

command. See *United States v. Monsanto*, 491 U.S. 600, 607, 109 S.Ct. 2657, 105 L.Ed.2d 512 (1989).

91. Use of "shall" and "may" in statutes also mirrors common usage; ordinarily "shall" is mandatory and "may" is permissive. "The mandatory 'shall'….normally creates an obligation impervious to judicial discretion." *Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998).

92. Judge Alex Kozinski characterizes self-transfer in MDL as "a remarkable power grab by federal judges," because the practice exceeds the authority Congress granted to transferee judges.

93. Judge Patrick E. Higginbotham further explains, "The disconnect between the power of the transferee judge and the power that the judge exercises rests on a statute that authorizes only the transfer of cases to that judge for purposes of pretrial proceeding with return to their filing homes, as the U.S. Supreme Court made clear in *Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach*. The rest of the operation finds its footing in some form of consent and assertions of implied and inherent authority sometimes on little more than empty air."

94. In sum, "each action so transferred [to MDL 2179] ***shall be remanded*** by the panel at or before the conclusion of such pretrial proceedings to the district from which it was transferred."

95. Since Defendant Barbier knows he lacks jurisdiction and acts in the face of 28 U.S.C. § 1407, a clearly valid statute expressly depriving him of jurisdiction (other than for purposes of pretrial proceeding with return of transferred cases to their filing homes), judicial immunity is lost.

### B. A "Case" or "Controversy" Does Not Exist in MDL 2179

96. Article III extends federal judicial power solely to the adjudication of a "case" or a "controversy." "Case," in Article III, means a justiciable "action or suit," or an "argument." "Controversy" means a disagreement or a dispute between parties as to the suit's preferred outcome. Both a "case" and a "controversy" require an adversarial suit. For a suit to be justiciable, according to the U.S. Supreme Court, the parties must maintain "adverse legal interests" throughout, and their dispute must be "definite and concrete." The Fifth Circuit has also held that Article III plainly "requires that the parties be truly adverse."

97. In the transfer order establishing MDL 2179, the JPML states,

"Centralization may also facilitate closer coordination with Kenneth Feinberg's administration of the BP compensation fund."
> The Honorable John G. Heyburn II, Chairman, Panel on Multidistrict Litigation, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Transfer Order, August 10, 2010).

98. "In February 2011, [only 4 months after I appointed my pre-selected cooperative attorneys to the PSC settlement,] negotiations began in earnest for the proposed Economic and Property Damages Settlement. Talks intensified in July 2011, occurring on an almost-daily basis."
> The Honorable Carl J. Barbier, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Rec. Doc. 7138 at 3, December 21, 2012).

99. From the very beginning, there was never a "case" or "controversy" in MDL 2179. Defendant Barbier knows the MDL 2179 parties never maintained "adverse legal interests" throughout, and their dispute was never "definite and concrete." There is simply no rational means of defining the terms "case" or "controversy" to include a proceeding in which, from the outset, nothing is disputed and the parties are in complete agreement.

100. As a result of Defendant Barbier's use of a Feinberg-administered victims' compensation fund and a settlement class action, MDL 2179 is not a justiciable "action or suit,"

or an "argument." *Defendant Barbier has effectively transformed MDL 2179 into an administrative body*. Accordingly, judicial immunity is lost.

### VI. Statutes Of Limitations Are Tolled and Defendants Are Estopped From Asserting Statutes Of Limitations As Defenses

#### A. Continuing Conduct

101. Plaintiffs continue to suffer harm from the unlawful actions by Defendants.

102. The continued tortious and unlawful conduct by Defendants causes a repeated or continuous injury. The damages have not occurred all at once but have continued to occur and have increased as time progresses. The tort is not completed nor have all the damages been incurred until the wrongdoing ceases. The wrongdoing and unlawful activity by Defendants has not ceased. The conduct causing the damages remains unabated.

#### B. Equitable Estoppel and Fraudulent Concealment

103. Defendants are equitably estopped from relying upon a statute of limitations defense because they undertook active efforts to deceive Plaintiffs and to purposefully conceal their unlawful conduct and fraudulently assure Plaintiffs that they were undertaking efforts to comply with their fiduciary duties, all with the goal of continuing their sophisticated and deceptive "Eight-Step" fraudulent scheme to maximize judicial efficiency and/or their compensation. Notwithstanding the allegations set forth above, Defendants affirmatively assured Plaintiffs that they are working to hold BP fully accountable.

104. Defendants were deliberate in taking steps to conceal their conspiratorial behavior and active role in deceptively promoting their fraudulent scheme.

105. Defendants deliberately worked through paid "Thought Leaders" to secretly control messaging. Through their public statements and omissions, the defendants' deceptions deprived

Plaintiffs of actual or implied knowledge of facts sufficient to put Plaintiffs on notice of potential claims.

106. Defendants' repeated misrepresentations misled Plaintiffs, and deprived Plaintiffs of actual or implied knowledge of facts sufficient to put Plaintiffs on notice of potential claims.

107. Plaintiffs did not discover the nature, scope and magnitude of Defendants' misconduct, and its full impact on Plaintiffs, and could not have acquired such knowledge earlier through the exercise of reasonable diligence.

108. Defendants' campaign to misrepresent and conceal the truth about their "Eight-Step" fraudulent scheme to maximize judicial efficiency and/or their compensation deceived Plaintiffs.

109. Defendants have also concealed and prevented discovery of information which will confirm the extent of their wrongful and illegal activities.

110. Defendants intended that their actions and omissions would be relied upon, including by Plaintiffs. Plaintiffs did not know and did not have the means to know the truth, due to Defendants' actions and omissions.

111. Plaintiffs reasonably relied on Defendants' affirmative statements regarding their purported compliance with their fiduciary duties.

**C. All Motions Are Stayed in MDL 2179**

112. "….all pending and future motions, including the Motions to Remand, are continued without date unless a motion is specifically excepted from the continuance by the Court."

> The Honorable Carl J. Barbier, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Rec. Doc. 676 at 1, November 5, 2010).

113. "Any individual plaintiff who is a named plaintiff in a case that falls within Pleading Bundle B1, B3, D1, or D2, or any combination thereof, is deemed to be a plaintiff in

the applicable Master Complaint(s)....All individual petitions or complaints that fall within

Pleading Bundles B1, B3, D1, or D2, whether pre-existing or filed hereafter, are stayed until

further order of the Court."

> The Honorable Carl J. Barbier, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Rec. Doc. 983 at 2, 4, January 12, 2011).

114. Defendants are further estopped from relying upon a statute of limitations defense

because Defendant Barbier stayed all motions in MDL 2179. For Plaintiffs, this means

their cases were stayed for approximately nine years.

### D. Defendants Persisted in Their Fraudulent Scheme Despite Repeated Warnings

115. So determined were the defendants to maximize their compensation and maximize

judicial efficiency that they simply ignored multiple warnings.

116. Since the transfer of his clients' cases to the MDL 2179 Court by the JPML, Plaintiff

has fully and repeatedly briefed the RICO MDL 2179 Defendants in regard to: (a) the text and

legislative history of the Oil Pollution Act of 1990; (b) the text and legislative history of the

MDL statute; and (c) the U.S. Supreme Court's reading of the MDL statute in *Lexecon Inc. v.*

*Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 36-37 (1998).

117. These warnings did not deter Defendants from continuing their sophisticated and

deceptive "Eight-Step" fraudulent scheme to maximize judicial efficiency and/or their

compensation in exchange for limiting the liability of BP.

118. Judge Alex Kozinski characterizes self-transfer in MDL as "a remarkable power

grab by federal judges," because the practice exceeds the authority Congress granted to

transferee judges.

119. Judge Patrick E. Higginbotham further explains, "The disconnect between the

power of the transferee judge and the power that the judge exercises rests on a statute that

-32-

authorizes only the transfer of cases to that judge for purposes of pretrial proceeding with return to their filing homes, as the U.S. Supreme Court made clear in *Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach*. The rest of the operation finds its footing in some form of consent and assertions of implied and inherent authority sometimes on little more than empty air."

120. Defendants knew that their actions were unlawful, and yet deliberately refused to change their practices because compliance with their legal obligations and fiduciary duties would have decreased their compensation and would have limited judicial efficiency.

## VII. Racketeer Influenced and Corrupt Organizations (RICO)

121. Congress designed RICO as a flexible tool to fight organized crime. As such, it makes the following activities unlawful:

(a) investing income derived, directly or indirectly, from a pattern of racketeering activity through collection of an unlawful debt in any enterprise which affects interstate commerce; (b) acquiring or maintaining an interest in any enterprise which affects interstate commerce through a pattern of racketeering activity or through collection of an unlawful debt; (c) conducting or participating in the affairs of any enterprise which affects interstate commerce through a pattern of racketeering activity or collection of an unlawful debt; or (d) conspiring to violate any of the provisions of Section 1962(a)-(c). 18 U.S.C. § 1962.

122. "Racketeering activities" covers a wide range of federal and state crimes, including acts that are 'chargeable' under several generically described state criminal laws, any act 'indictable' under numerous specific federal criminal provisions, *including mail and wire fraud*, and any 'offense' involving bankruptcy or securities fraud or drug-related activities that are 'punishable' under federal law." *Sedima, S.P.R.L. v. Imrex Co. Inc.,* 473 U.S. 479, 482, 105 S. Ct. 3275, 87 L. Ed. 2d 346 (1985) (quoting 18 U.S.C. § 1961(1)).

**A. 18 U.S.C. § 1341 (Mail Fraud) and 18 U.S.C. § 1343 (Wire Fraud)**

123. "There are two elements in mail fraud: (1) having devised or intending to devise a scheme to defraud (or to perform specified fraudulent acts), and (2) use of the mail for the purpose of executing, or attempting to execute, the scheme (or specified fraudulent acts)." *Schmuck v. United States*, 489 U.S. 705, 721 n. 10 (1989); *see also Pereira v. United States*, 347 U.S. 1, 8 (1954) ("The elements of the offense of mail fraud under….§ 1341 are (1) a scheme to defraud, and (2) the mailing of a letter, etc., for the purpose of executing the scheme."); Laura A. Eilers & Harvey B. Silikovitz, *Mail and Wire Fraud*, 31 Am. Crim. L. Rev. 703, 704 (1994).

124. The elements of wire fraud under Section 1343 directly parallel those of the mail fraud statute, but require the use of an interstate telephone call or electronic communication made in furtherance of the scheme. *United States v. Briscoe*, 65 F.3d 576, 583 (7th Cir. 1995) (*citing United States v. Ames Sintering Co.*, 927 F.2d 232, 234 (6th Cir. 1990) (per curiam)); *United States v. Frey*, 42 F.3d 795, 797 (3d Cir. 1994) (wire fraud is identical to mail fraud statute except that it speaks of communications transmitted by wire); *see also*, *e.g.*, *United States v. Profit*, 49 F.3d 404, 406 n. 1 (8th Cir.) (the four essential elements of the crime of wire fraud are: (1) that the defendant voluntarily and intentionally devised or participated in a scheme to defraud another out of money; (2) that the defendant did so with the intent to defraud; (3) that it was reasonably foreseeable that interstate wire communications would be used; and (4) that interstate wire communications were in fact used) (*citing* Manual of Model Criminal Jury Instructions for the District Courts of the Eighth Circuit 6.18.1341 (West 1994)), *cert. denied*, 115 S. Ct. 2289 (1995); *United States v. Hanson*, 41 F.3d 580, 583 (10th Cir. 1994) (two elements comprise the crime of wire fraud: (1) a scheme or artifice to defraud; and (2) use of interstate wire communication to facilitate that scheme); *United States v. Faulkner*, 17 F.3d 745,

771 (5th Cir. 1994) (essential elements of wire fraud are: (1) a scheme to defraud and (2) the use of, or causing the use of, interstate wire communications to execute the scheme), *cert. denied*, 115 S. Ct. 193 (1995); *United States v. Cassiere*, 4 F.3d 1006 (1st Cir. 1993) (to prove wire fraud government must show (1) scheme to defraud by means of false pretenses, (2) defendant's knowing and willful participation in scheme with intent to defraud, and (3) use of interstate wire communications in furtherance of scheme); *United States v. Maxwell*, 920 F.2d 1028, 1035 (D.C. Cir. 1990) ("Wire fraud requires proof of (1) a scheme to defraud; and (2) the use of an interstate wire communication to further the scheme.").

125. To engage in a "pattern of racketeering activity," the defendant must have participated in "at least two acts of racketeering activity, one of which occurred after the effective date of RICO and the last of which occurred within ten years (excluding any term of imprisonment) after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5). Finally, "enterprise" is defined under the statute as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

126. The civil remedies provision of RICO states "any person injured in his business or property by reason of a violation of Section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee." 18 U.S.C. § 1964(c).

127. The elements of a civil RICO claim are: "(1) a violation of section 1962; (2) injury to business or property; and (3) that the violation caused the injury." *Avirgan v. Hull,* 932 F.2d 1572, 1577 (11th Cir. 1991).

128.  To establish a violation of Section 1962, the plaintiff must allege facts demonstrating that the defendant engaged in a pattern of racketeering activity and that an enterprise existed. *Bill Buck Chevrolet v. GTE Fla.,* 54 F. Supp. 2d 1127, 1137 (M.D.Fla.1999).

129.  In showing a pattern of racketeering activity, the plaintiff must allege at least two racketeering predicate acts that are related and that amount to, or threaten the likelihood of, continued criminal activity. *H.J. Inc. v. Northwestern Bell Tele. Co.,* 492 U.S. 229, 237-238, 109 S. Ct. 2893, 106 L. Ed. 2d 195 (1989). Therefore, in order to survive a motion to dismiss, the plaintiff must allege facts sufficient to support at least two of the predicate acts. *Republic of Panama v. BCCI Holdings,* 119 F.3d 935, 949 (11th Cir.1997).

1. Racketeering Activity

130.  In the instant Complaint, Plaintiff Donovan alleges that Defendants knowingly engaged in the following racketeering predicate acts: mail fraud in violation of Title 18, United States Code, Section 1341; wire fraud in violation of Title 18, United States Code, Section 1343; and obstruction of justice in violation of Title 18, United States Code, Section 1503. Each of these statutes requires proof of scienter. *BCCI Holdings,* 119 F.3d at 949 (citing *Pelletier,* 921 F.2d at 1498).

131.  A plaintiff must show the following elements to establish liability under the federal wire and mail fraud statutes: "(1) that defendants knowingly devised or participated in a scheme to defraud plaintiffs, (2) that they did so willingly with an intent to defraud, and (3) that the defendants used the U.S. mails or the interstate wires for the purpose of executing the scheme." *Langford v. Rite Aid of Alabama, Inc.,* 231 F.3d 1308, 1312 (11th Cir.2000) (citing *Neder v. U.S.,* 527 U.S. 1, 24-25, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999)).

-36-

132.  Plaintiff Donovan alleges that Defendants have made, and continue to make, misrepresentations of material facts to Plaintiff and the general public while maintaining that they are complying with the Oil Pollution Act of 1990 (a *strict liability* statute), toxic tort law (a *strict liability tort*), and the Clean Water Act (a *strict liability* statute), and this behavior constitutes Defendants' scheme to defraud Plaintiff. Although proof of mail or wire fraud requires a showing that the defendant had the knowing intent to defraud, a RICO plaintiff does not need direct proof of scienter. *Bill Buck Chevrolet,* 54 F. Supp. 2d at 1132. However, "a RICO plaintiff's allegations of scienter cannot be 'merely conclusory and unsupported by any factual allegations.'" *Id.* (quoting *Republic of Panama v. BCCI Holdings,* 119 F.3d 935, 949 (11th Cir.1997) (quoting *O'Malley v. O'Neill,* 887 F.2d 1557, 1561 (11th Cir.1989))).

133.  The allegations in Plaintiff Donovan's Complaint give rise to a "strong inference" that Defendants possessed the specific intent necessary for the alleged predicate acts. *See Beck v. Manufacturers Hanover Trust Co.,* 820 F.2d 46, 50 (2d Cir.1987) (stating that RICO plaintiffs must "provide some factual basis for conclusory allegations of intent"). Plaintiff Donovan's Complaint, in pertinent part, alleges that Defendants' plan was to knowingly mislead Plaintiffs into thinking or believing that Defendants were complying with the Oil Pollution Act of 1990 (a *strict liability* statute), toxic tort law (a *strict liability tort*), and the Clean Water Act (a *strict liability* statute), and alleges that their purpose in misrepresenting their compliance with federal law was with the sole intent of defrauding Plaintiffs.

2. Pattern

134.  If the plaintiff has pled the requisite predicate acts, the Court must look to see if he or she has pled the pattern of such acts. Pleading that a pattern exists requires the plaintiff to plead both that the predicate acts are related to each other, and that they either constitute or

threaten long-term criminal activity. *Northwestern Bell,* 492 U.S. at 239, 109 S. Ct. 2893. Predicate acts are related if they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.* The continuity aspect refers to either a closed period of repeated conduct or to past conduct that, by its nature, projects into the future with a threat of competition. *Bill Buck Chevrolet,* 54 F. Supp. 2d at 1134 (quoting *Northwestern Bell,* 492 U.S. at 241, 109 S. Ct. 2893). "The threat of continuity may be established by showing that the predicate acts or offenses are part of an ongoing entity's regular way of doing business." *Id.* (quoting *Northwestern Bell,* 492 U.S. at 243, 109 S. Ct. 2893).

135.  In the instant Complaint, Plaintiff Donovan alleges that Defendants have continuously engaged in the predicate acts of mail fraud, wire fraud, and obstruction of justice as part of Defendants' normal process of carrying on its business. Furthermore, given that these acts are related to each other and "have the same or similar purposes, results, participants, victims, or methods of commission," Plaintiff Donovan alleges sufficient facts to show that a pattern of racketeering activity in fact exists.

### 3. Enterprise

136.  "The definitive factor in determining the existence of a RICO enterprise is the existence of an association of individual entities, however loose or informal, that furnishes a vehicle for the commission of two or more predicate crimes." *U.S. v. Goldin Industries, Inc.,* 219 F.3d 1271 (11th Cir. 2000). The "person" and the "enterprise" cannot be the same person. *U.S. v. Goldin Industries, Inc.,* 219 F.3d 1268, 1269 (11th Cir. 2000) (en banc).

137.  Here, Plaintiff Donovan alleges that the RICO MDL 2179 Defendants are part of the MDL 2179 Enterprise, not the MDL 2179 Enterprise; thus, Plaintiff Donovan does not allege

that the person and the enterprise are the same. The presence of an enterprise is an essential element of a RICO complaint. Merely identifying the type of business in which the members of the alleged enterprise engage in is not enough either to allow the Court to evaluate whether the alleged enterprise constitutes an enterprise within the meaning of RICO or to provide Defendant fair notice of the claim against which Defendant must defend. *Bill Buck Chevrolet,* 54 F. Supp. 2d at 1135. Here, Plaintiff Donovan has alleged sufficient facts to show that a RICO enterprise (the "MDL 2179 Enterprise") in fact exists.

### 4. Causation of Injury

138.  A plaintiff suing under civil RICO must show that his injury was proximately caused by the commission of the predicate acts. In *Pelletier v. Zweifel,* the Eleventh Circuit explained: There is some question whether this proximate cause requirement limits damages recoverable to those caused directly by the predicate act or to those caused indirectly by the predicate act. We have taken the more restrictive view, holding that a plaintiff has standing to sue under section 1964(c) *only if his injury flowed directly from the commission of the predicate acts.* This means that when the alleged predicate act is mail or wire fraud, the Plaintiff must have been a target of the scheme to defraud and must have relied to his detriment on misrepresentations made in furtherance of that scheme. 921 F.2d 1465, 1499-1500 (11th Cir.1991) (emphasis added). A "scheme to defraud" involves making misrepresentations "reasonably calculated to deceive persons of ordinary prudence and comprehension." *Wilson v. De Angelis,* 156 F. Supp. 2d 1335, 1338 (S.D. Fla. 2001) (quoting *Pelletier,* 921 F.2d at 1498-1499).

139.  As noted *supra*, Plaintiff Donovan's Complaint, in pertinent part, alleges that Defendants' plan was to knowingly mislead Plaintiffs into thinking or believing that Defendants

were zealously advocating on behalf of Plaintiffs and complying with the Oil Pollution Act of 1990 (a *strict liability* statute), toxic tort law (a *strict liability tort*), and the Clean Water Act (a *strict liability* statute), and alleges that their purpose in misrepresenting their compliance with federal law was with the sole intent of defrauding Plaintiffs. Additionally, Plaintiff Donovan sets forth how Defendants' alleged misrepresentations and alleged predicate acts injured Plaintiff Donovan's business. The allegations clearly lead to the conclusion that Defendants targeted Plaintiffs in the alleged "scheme to defraud" Plaintiffs by the alleged acts of mail fraud, wire fraud, and obstruction of justice. Moreover, Plaintiffs' injuries flow directly from Defendants' alleged commission of the predicate acts, as required to establish a cause of action for a civil RICO claim. In sum, Plaintiff Donovan alleges sufficient facts to show that the causation requirement for a civil RICO cause of action in fact exists.

### 5. Civil Conspiracy

140.  To state a cause of action for a civil conspiracy, a plaintiff must allege: (1) an agreement between two or more parties to achieve an illegal objective; (2) an overt act in furtherance of that illegal objective; and (3) resulting injury. *Bivens Gardens Office Bldg., Inc. v. Barnett Banks of Florida, Inc.,* 140 F.3d 898 (11th Cir.1998). However, the RICO conspiracy provision in Section 1962(d) does not require an overt act. Instead, a Plaintiff asserting a violation of Section 1962(d) must allege that "the conspirators agreed to participate directly or indirectly in the affairs of an enterprise through a pattern of racketeering activity." *Florida Software Sys. v. Columbia/HCA Healthcare Corp.,* 46 F. Supp. 2d 1276, 1281 (M.D. Fla. 1999) (quoting *U.S. v. Castro,* 89 F.3d 1443, 1451 (11th Cir.1996)). In the Eleventh Circuit, proof of an agreement to participate in a RICO conspiracy can be established by either "(1) showing an agreement of an overall objective or (2) in the absence of an agreement on an overall objective,

-40-

by showing that a defendant agreed personally to commit two predicate acts." *Id.* (quoting *U.S. v. Church,* 955 F.2d 688, 694 (11th Cir. 1992)).

141.  Plaintiff Donovan alleges sufficient facts to infer an agreement between Defendants necessary to support the RICO claim under Section 1962(d). Here, Donovan alleges that Defendants have agreed to the overall objective of the conspiracy and/or have agreed to commit predicate acts in furtherance of the conspiracy. The "overall objective" of the conspiracy is to fraudulently limit BP's liability for the purpose of maximizing judicial efficiency and/or maximizing their compensation. The "predicate acts" are mail fraud, wire fraud, and obstruction of justice. The defendants conspired with each other and the "MDL 2179 Enterprise" and/or have agreed to commit predicate acts in furtherance of the conspiracy.

### B.  18 U.S.C. § 1503 (Obstruction of Justice)

142.  The omnibus clause, or "catch-all provision" of 18 U.S.C. § 1503, provides:

Whoever….corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be (guilty of an offense).

143.  The scope of the omnibus clause has been a subject of dispute among the United States Courts of Appeals. Some courts have taken the position that the clause should be read broadly to include any conduct interfering with the fair administration of justice if that conduct was undertaken with a corrupt motive. *United States v. Saget*, 991 F.2d 702 (11th Cir.), *cert. denied*, 510 U.S. 950 (1993); *United States v. Rasheed*, 663 F.2d 843 (9th Cir. 1981), *cert. denied*, *sub. nom. Phillips v. United States*, 454 U.S. 1157 (1982); *United States v. Ogle*, 613 F.2d 233 (10th Cir. 1979), *cert. denied*, 449 U.S. 825 (1980); *United States v. Baker*, 611 F.2d 964 (4th Cir. 1979); *United States v. Howard*, 569 F.2d 1331, 1333-36 (5th Cir.), *cert. denied*, 439 U.S. 834 (1978); *United States v. Walasek*, 527 F.2d 676 (3d Cir. 1975); *United States v.*

*Cioffi*, 493 F.2d 1111 (2d Cir.), *cert. denied*, 419 U.S. 417 (1974).

144.  The United States Supreme Court favors a broad reading of the omnibus clause. *See, e.g., United States v. Aguilar*, U.S. 115 S. Ct. 2357 (1995). The omnibus clause of section 1503 "makes an offense of any proscribed endeavor, without regard to the technicalities of the law or to the law of impossibility." *United States v. Neal*, 951 F.2d 630, 632 (5th Cir. 1992); *United States v. Williams*, 874 F.2d 968 (5th Cir. 1989), citing *Osborn v. United States*, 385 U.S. 323 (1966). The clause was "intended to cover all endeavors to obstruct justice" and as such "was drafted with an eye to the variety of corrupt methods by which the proper administration of justice may be impeded or thwarted, a variety limited only by the imagination of the criminally inclined." *United States v. Neal*, 951 F.2d at 632.

## VIII.  Litigation Activity as RICO Predicate Acts

145.  *Kim v. Kimm*, Case Nos. 16-2944; -3115 (2d Cir., Feb. 27, 2018) is instructive.

146.  In *Kim*, the court declined to reach the issue of whether all RICO actions based on litigation activity are categorically meritless. The court concluded only that "where a plaintiff alleges that a defendant engaged in a single frivolous, fraudulent, or baseless lawsuit, such litigation activity *alone* cannot constitute a viable RICO predicate act. At the time Kim filed this suit, there was no binding precedent in this Circuit as to whether litigation activities could serve as predicate acts for purposes of RICO. Indeed, some courts had endorsed the viability of some such claims. *See Sykes*, 757 F. Supp. 2d at 425–26." In *Kim*, the Second Circuit cites a district court opinion, *Sykes v. Mel Harris & Assocs., LLC*, 757 F. Supp. 2d 413, 418 (S.D.N.Y. 2010), to explain that litigation activity could be predicate acts under RICO.

-42-

147. In *Sykes*, the district court denied the defendants' motion to dismiss the plaintiffs' section 1962(c) claims, observing that the plaintiffs pleaded a pattern of racketeering activity that included "at least twenty allegedly fraudulent statements and eighteen acts involving use of the mail and wires over three years, in furtherance of the alleged fraud." Id. at 425. In *Sykes*, eight plaintiffs allege that a debt-buying company, a law firm, a process service company, and others engaged in a "massive scheme" to fraudulently obtain default judgments against them and more than 100,000 other consumers in state court. Plaintiffs allege that defendants did so by engaging in "sewer service," the practice of failing to serve a summons and complaint and then filing a fraudulent affidavit attesting to service. When the debtors failed to appear in court because they did not have notice of the lawsuits, defendants obtained default judgments against them. Id. at 418-20. Accordingly, even though those defendants used litigation to carry out their scheme, they also engaged in a variety of other out-of-court actions to further this activity.

148. In sum, Courts have held that where a defendant is "engaged in a single frivolous, fraudulent, or baseless lawsuit, such litigation activity *alone* cannot constitute a viable RICO predicate act." *Kim v. Kimm*, Case Nos. 16-2944; -3115 (2d Cir., Feb. 27, 2018). However, many courts have concluded that litigation activity could be predicate acts under RICO where defendants used litigation to carry out a "massive scheme" and/or engaged in a variety of other out-of-court actions to further their fraudulent "massive scheme." *Sykes v. Mel Harris & Assocs., LLC*, 757 F. Supp. 2d 413, 418 (S.D.N.Y. 2010).

149. As noted *supra*, the omnibus clause of section 1503 "makes an offense of any proscribed endeavor, without regard to the technicalities of the law or to the law of impossibility." *United States v. Neal*, 951 F.2d 630, 632 (5th Cir. 1992); *United States v.*

*Williams*, 874 F.2d 968 (5th Cir. 1989), citing *Osborn v. United States*, 385 U.S. 323 (1966). The clause was "intended to cover all endeavors to obstruct justice" and as such "was drafted with an eye to the variety of corrupt methods by which the proper administration of justice may be impeded or thwarted, a variety limited only by the imagination of the criminally inclined." *United States v. Neal*, 951 F.2d at 632.

150.  On October 25, 2010, the MDL 2179 Court issued "Pretrial Order No. 12" which states "IT IS HEREBY ORDERED that whenever service is required by the Federal Rules of Civil Procedure, in lieu of the methods set forth in Rule 5(b),….the parties will utilize the services of LexisNexis File & Serve ("File & Serve") and its litigation system for providing electronic service, storage and delivery of court-filed and discovery related documents through a secure website. All attorneys of record in this litigation on whom service of documents must be effectuated shall….(2) forward to Liaison Counsel (James P. Roy and Stephen J. Herman) for Plaintiffs….a fully completed "MDL 2179 Counsel Contact Information Form,"….and (3) sign up for electronic service in this litigation….[with] File & Serve....Once a document is uploaded and submitted electronically, File & Serve shall send an e-mail to all registered users notifying them that the document has been posted to its Website. The e-mail shall also contain a hypertext link(s) to the document location(s) on the System (or, if so designated by the recipient, the e-mail shall have the document attached thereto)….any document electronically served via File & Serve pursuant to this Order shall be deemed to have been served under the Federal Rules of Civil Procedure....*Any documents served pursuant to this Order shall be deemed to be served by mail under Federal Rule of Civil Procedure 6(e)*….Service of Pleadings and Motions: Once File & Serve advises Liaison Counsel that the File & Serve system is in place, Liaison

Counsel will notify all of their respective counsel of record with whom they are affiliated. Upon such notice by Liaison Counsel, Liaison Counsel is no longer required to serve and distribute pleadings and motions on attorneys of record with whom they are affiliated, as required by this Pre-Trial Order....Service of Court Orders: Liaison Counsel are required to serve and distribute all Orders of the Court on all counsel of record. Such service of Court Orders by Liaison Counsel shall be accomplished electronically through File & Serve."

151. Since 2011, Plaintiff Donovan has received an email, approximately five times per week, from File & Serve which contains all Pleadings, Motions, and Court Orders, resulting from the tortious conduct of the RICO MDL 2179 Defendants, filed in MDL 2179 on the previous date.

152. Our federal justice system is not a sanctuary for those who would use it to carry out their own massive, nefarious schemes in the name of "judicially-efficient" multidistrict litigation.

### IX. Plaintiff Donovan Has Standing and Is the Proper Party to Invoke Judicial Resolution of This Matter

153. Since 2010, Plaintiff Donovan has worked extensively on behalf of his clients (victims of the tortious conduct of the RICO MDL 2179 Defendants) and has not been able to receive proper compensation for his legal services because the RICO MDL 2179 Defendants refused to allow formal discovery to move forward. The injuries suffered by Plaintiff Donovan and his business include, but are not limited to, lost time value of money and the excess legal expenses incurred, loss of profit, loss of business reputation, loss of livelihood, loss of income, and other economic loss, warranting compensatory and punitive damages.

154. The irreducible constitutional minimum of Article III standing consists of three

elements. A plaintiff must have: (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. Of these, the injury in fact is the "first and foremost" of standing's three elements. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998); *Friends of the Earth. Inc. v. Laidlaw Environmental Services*, 528 U.S. 167, 180-81 (2000).

155.  Injury in fact refers to "a harm suffered by the plaintiff that is "concrete" and "actual or imminent, not 'conjectural' or 'hypothetical.'" *Id.* In meeting his burden of showing injury in fact, the plaintiff must clearly allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers. *Warth v. Seldin*, 422 U.S. 490 (1975).

156.  Of increasing importance are causation and redressability, the second and third elements of standing, recently developed and held to be of constitutional requisite. There must be a causal connection between the injury and the conduct complained of; that is, the Court insists that the plaintiff show that "but for" the action, he would not have been injured. And the Court has insisted that there must be a "substantial likelihood" that the relief sought from the court if granted would remedy the harm.

157.  Many cases allow standing to third parties who demonstrate a requisite degree of injury to themselves and if under the circumstances the injured parties whom they seek to represent *would likely not be able to assert their rights*. See *Barrows v. Jackson*, 346 U.S. 249 (1953).

158.  Plaintiff Donovan can clearly demonstrate injury to himself and his business resulting from the tortious conduct of the RICO MDL 2179 Defendants and can also represent

the following parties who were injured as a result of the tortious conduct of the RICO MDL 2179

Defendants and who are not able to assert their rights:

> (a) Those victims of the BP oil well blowout who were illegally forced to sign the RICO MDL 2179 Defendants' "Release and Covenant Not to Sue" which *excluded approximately 220,000* BP oil well blowout victims from the subsequent Deepwater Horizon Economic and Property Damages Class Settlement Agreement;

> (b) Those victims of the BP oil well blowout who were fraudulently induced not to opt-out of the settlement by the RICO MDL 2179 Defendants and were subsequently denied payment;

> (c) Those victims of the BP oil well blowout who were excluded, contrary to OPA, from the settlement class action agreement due to geographic bounds;

> (d) Those victims of the BP oil well blowout who were excluded, contrary to OPA, from the settlement class action agreement due to their business activities; and

> (e) Those victims of the BP oil well blowout who were either completely denied medical benefits or forced by the RICO MDL 2179 Defendants to accept the lowest payment of $1,300 because they could no longer wait for the money to cover their medical expenses.

159. The harm suffered by the plaintiffs is "concrete" and "actual or imminent, not 'conjectural' or 'hypothetical.'"

160. "But for" the tortious conduct of the RICO MDL 2179 Defendants, the plaintiffs would not have been injured.

161. There is a "substantial likelihood" that the relief sought from the court if granted would remedy the harm.

162. Moreover, the aggregate settlement rule ("ASR") governs global MDL settlements. The RICO MDL 2179 Defendants knowingly breached their fiduciary duties to Plaintiffs by violating the ASR. Courts have long recognized that lawyers may be subject to total or partial fee forfeiture as a sanction for serious violations of the ASR. *The plaintiff does not have to prove either causation or injury to be entitled to fee forfeiture as a remedy for the RICO MDL 2179*

*Defendants' breach of fiduciary duty.*

163.  Plaintiff Donovan points out that this Complaint was filed after a careful consideration of context, that is, the entire course of judicial proceedings, rather than isolated incidents. Indeed, it was only after the benefit of hindsight developed over a period of *more than ten years* that Plaintiff Donovan realized that this Civil RICO Complaint was justified and appropriate.

164.  Plaintiffs are the most directly harmed entities and there are no other Plaintiffs better suited to seek a remedy for the economic harms at issue here.

## FACTUAL BACKGROUND

### I. Introduction

165.  At approximately 10 p.m. on April 20, 2010, the U.S. Coast Guard District Eight command center in New Orleans, Louisiana received a report of an explosion and fire aboard the mobile offshore drilling unit *Deepwater Horizon*. On the morning of April 22, 2010, the *Deepwater Horizon* sank, resulting in a massive oil spill incident. Oil flowed into the Gulf of Mexico unchecked for months. Ultimately, the "Macondo Well" was finally sealed on September 19, 2010, nearly five months after the blowout began. By that time, millions of barrels of oil had been discharged into the Gulf of Mexico and upon adjoining shorelines, causing immense environmental and economic harm to the entire region.

166.  This BP oil well blowout in April 2010 is arguably the largest and most egregious mass tort in U.S. history. It has affected hundreds of thousands of individuals and businesses along the U.S. Gulf Coast and beyond. The full extent of damages may never be known.

167.  Immediately after April 20, 2010 Defendants Herman and Roy, and other attorneys,

with the sole intention of securing a lucrative position as an MDL 2179 Liaison Counsel or MDL 2179 PSC member, captured market share via signing up tens of thousands of clients *en masse* to contingent fee contracts, often contacting victims of the BP oil well blowout through a lay intermediary. Defendants immediately started to coordinate with one another and developed a formal limited joint-prosecution agreement to facilitate the coordination and sharing of information, research, and litigation strategy.

168. The JPML created MDL 2179 and transferred cases relating to the BP oil well blowout to the Eastern District of Louisiana on August 10, 2010. Defendants Herman and Roy were formally appointed by Defendant Barbier as Plaintiffs' Co-Liaison Counsel on August 27, 2010. Defendant Barbier formally appointed the PSC on October 8, 2010. In reality, Defendants Herman and Roy appointed themselves months before the JPML established MDL 2179. In MDL 2179 court documents, Defendants Herman and Roy have the arrogance to refer to themselves as "*pre-MDL* Co-Liaison Counsel for the cases consolidated in the EDLA."

169. The U.S. District Court for the Eastern District of Louisiana has defined "collusion" as the "lawful means for the accomplishment of an unlawful purpose" and as a "*secret understanding between two or more persons prejudicial to another, or a secret understanding to appear as adversaries, though in agreement*." Collusion does not require fraudulent conduct. Collusion permeates MDL 2179 as demonstrated, in part, by the fact that the defendants' "Eight-Step" fraudulent scheme circumvents the Oil Pollution Act of 1990, incorporates a Feinberg-administered victims' compensation fund on the frontend and a settlement class action on the backend.

170. At all times material herein, Defendants, individually and/or conspiring with

-49-

each other and the "MDL 2179 Enterprise," fraudulently, recklessly, negligently and knowingly conceived, developed, and/or facilitated an "Eight-Step" fraudulent scheme to maximize judicial efficiency and/or maximize their compensation in exchange for limiting the liability of BP.

171.  At all times material herein, Defendants, individually and/or conspiring with each other and the "MDL 2179 Enterprise," in order to limit BP's liability and thereby maximize judicial efficiency and/or their compensation, have misled Plaintiff by fraudulently, recklessly, negligently and knowingly designating the "B1" Master Complaint as an admiralty or maritime case, and requesting a non-jury trial pursuant to Rule 9(h), rather than properly alleging claims under the Oil Pollution Act of 1990 ("OPA"), a *strict liability* statute, and the Outer Continental Shelf Lands Act ("OCSLA").

172.  At all times material herein, Defendants, individually and/or conspiring with each other and the "MDL 2179 Enterprise," in order to limit BP's liability and thereby maximize judicial efficiency and/or their compensation, have misled Plaintiff by fraudulently, recklessly, negligently and knowingly aiding and abetting the Kenneth R. Feinberg-administered victims' compensation fund to circumvent the OPA. As a result of Defendants' fraudulent and negligent conduct, approximately 220,000 Kenneth R. Feinberg victims who or that executed a "Release and Covenant Not to Sue" in exchange for a one-time miniscule final payment ($5,000 for individuals and $25,000 for businesses) were excluded from the settlement class action.

173.  At all times material herein, Defendants, individually and/or conspiring with each other and the "MDL 2179 Enterprise," in order to limit BP's liability and thereby maximize judicial efficiency and/or their compensation, have misled Plaintiff by fraudulently, recklessly, negligently and knowingly aiding and abetting Kenneth R. Feinberg to use the fear of costly and

protracted litigation in an attempt to coerce MDL 2179 Plaintiffs to accept grossly inadequate settlements. During widely-reported town hall meetings and on the Internet, Kenneth R. Feinberg repeatedly told victims of the BP oil well blowout incident: "The litigation route in court will mean uncertainty, years of delay and a big cut for the lawyers….I take the position, if I don't find you eligible, no court will find you eligible."

174. At all times material herein, Defendants, individually and/or conspiring with each other and the "MDL 2179 Enterprise," in order to limit BP's liability and thereby maximize judicial efficiency and/or their compensation, have misled Plaintiff by fraudulently, recklessly, negligently and knowingly *circumventing the OPA* by negotiating and drafting a settlement class action which limits a claimant's recovery of damages to geographic bounds and certain business activities while requiring a heightened and vague proof of causation between his, her, or its damages and the BP oil well blowout incident.

175. At all times material herein, Defendants, individually and/or conspiring with each other and the "MDL 2179 Enterprise," fraudulently, recklessly, negligently and knowingly breached their fiduciary and ethical duties to Plaintiff by failing to zealously and competently advocate on behalf of all MDL 2179 Plaintiffs.

176. At all times material herein, Defendants, individually and/or conspiring with each other and the "MDL 2179 Enterprise," fraudulently, recklessly, negligently and knowingly breached their fiduciary and ethical duties to Plaintiff by exercising oversight of a multidistrict litigation which is unconstitutional. MDL 2179, which employs a victims' compensation fund on the frontend and a settlement class action on the backend, involves no litigation and infringes individual claimants' procedural due process rights. The most serious problem with the MDL

-51-

2179 settlement class action is that by its nature it does not involve any live dispute between the parties that a federal court is being asked to resolve through litigation, and because from the outset of the proceeding Defendants and BP are in full accord as to how the claims should be disposed of. There is missing the adverseness between the parties that is a central element of Article III case-or-controversy requirement.

177. On November 10, 2014, Defendant Barbier states,
"….as the parties were approaching the final fairness hearing in November 2012, there was *a concerted effort by the parties and claims facility* to process a substantial number of high value claims in order to demonstrate that the settlement program was working as intended…BP and Class Counsel were aware of the push to resolve claims, **as was the Court**. Although some of these claims were for clients of PSC members, according to Mr. Juneau over 60% of the claims were for clients of non-PSC attorneys….While the Settlement Agreement in general terms provides that claims will be processed in the order in which they are received….there is no evidence that the Claims Administrator acted improperly in this regard."
The Honorable Carl J. Barbier, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Rec. Doc. 13635 at 3, November 10, 2014).

178. At all times material herein, Defendants secretly conspired to inflate the amount of compensation received by some plaintiffs (just prior to the "fairness" hearing) in order to induce the remaining plaintiffs into believing that the proposed settlement is "fair, reasonable, and adequate." Fraudulent inducement is not a procedure which is well within a Court's discretion when it conducts a fairness hearing.

179. At all times material herein, Defendants, individually and/or conspiring with each other and the "MDL 2179 Enterprise," in order to limit BP's liability and thereby maximize judicial efficiency and/or their compensation, have misled Plaintiff by fraudulently, recklessly, negligently and knowingly failing to disclose to all MDL 2179 Plaintiffs that a class member seeking to determine his or her compensation would not be able to simply read the settlement

agreements and determine how his or her circumstances fit into the frameworks. The frameworks of the settlement agreements are certainly not detailed and transparent. A claimant could not possibly make a reasonable determination of how his or her claim will be resolved based on his or his business's circumstances. Defendants drafted these settlement agreements under the premise that "if we can't dazzle them with brilliance, we will baffle them with obfuscation."

180.  At all times material herein, Defendants, individually and/or conspiring with each other and the "MDL 2179 Enterprise," in order to limit BP's liability and thereby maximize judicial efficiency and/or their compensation, have misled Plaintiff by fraudulently, recklessly, negligently and knowingly failing to disclose to all MDL 2179 Plaintiffs the material fact that contingent fees are designed to increase proportionally alongside a plaintiff's recovery - to tie the fates of lawyer and client. When Defendants take things one-step further and bargain for the defendant to pay their common benefit fees directly, they sever that tie. As a result, the attorneys' financial self-interest may no longer be linked to their clients' outcome, but to the defendant's wishes. This concern has long been recognized as one of structural collusion in the class context. John C. Coffee, Jr., *Rethinking the Class Action: A Policy Primer on Reform*, 62 IND. L.J. 625, 647-48 (1987). Courts have agreed. *E.g.,* Zucker v. Occidental Petroleum Corp., 192 F.3d 1323 (9th Cir. 1999).

181.  At all times material herein, Defendants, individually and/or conspiring with each other and the "MDL 2179 Enterprise," in order to limit BP's liability and thereby maximize judicial efficiency and/or their compensation, have misled Plaintiff by fraudulently, recklessly, negligently and knowingly failing to disclose to all MDL 2179 Plaintiffs: (a) the total amount of the settlement is only $20 billion; (b) The Feinberg-administered victims' compensation fund

-53-

denied payment to approximately 61.46% of the claimants who filed claims; (c) Approximately 220,000 Feinberg-administered victims' compensation fund claimants who executed a "Release and Covenant Not to Sue" in exchange for a one-time miniscule final payment ($5,000 for individuals and $25,000 for businesses) were subsequently excluded from the settlement class action; (d) the MDL 2179 plaintiffs were fraudulently induced not to opt-out of the settlement; (e) Patrick Juneau denied payment to approximately 60.03% of the claims submitted to the Deepwater Horizon Claims Center; (f) the Medical Benefits Class Action Settlement Agreement forced Claimants to accept the lowest payment of $1,300 because they could no longer wait for the money to cover their medical expenses; (g) Defendant Barbier saved BP approximately $4.30 billion by finding that only 4.0 million barrels of oil, rather than 5.0 million barrels of oil proposed by the United States, exited the reservoir; (h) Defendants Barbier and Herman provided an extremely favorable payment schedule for BP in regard to the government entity settlements; and (i) The total compensation (composed of common benefit fees, contingent fees, co-counsel fees, and hold-backs) paid to Defendants Herman and Roy, and the seventeen MDL 2179 "Front Groups" was $3.035 billion.

182.   Defendant Herman sets forth, in part, one reason for this complaint in a Loyola Law Review article (64 Loy. L. Rev. 1) which he authored in 2018. The article, titled "Duties Owed by Appointed Counsel to MDL Litigants Whom They Do Not Formally Represent," explores the duties, *if any*, owed by appointed counsel in leadership positions to their own clients, to other plaintiffs, and to the privately retained counsel who represent other plaintiffs in the litigation.

183.   In his article, Defendant Herman correctly states, "…the U.S. Supreme Court has made it clear that an MDL transferee judge's authority over actions originating in other judicial

districts extends only to *pre*-trial proceedings, with such actions subject to remand "to the district from which it was transferred unless it shall have been previously terminated. 28 U.S.C. § 1407(a) (2012); see *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26 (1998) (stating that a federal district court conducting pretrial proceedings pursuant to the multidistrict litigation statute has no authority to invoke the change-of-venue statute to assign a transferred case to itself for trial)….In *Deepwater Horizon*, thousands of plaintiffs were individually represented by attorneys who, for all practical purposes, had no power or authority to take depositions, argue motions, question witnesses, or perform other functions an attorney would typically be expected to undertake in a conventional suit for damages….Instead, the MDL transferee judge appointed a steering committee of nineteen lawyers from around the country to: (1) initiate, coordinate, and conduct all pretrial discovery on behalf of plaintiffs; (2) examine witnesses and introduce evidence at hearings; (3) coordinate the trial team's selection, management, and presentation of any common issue, 'bellwether' or 'test case' trial; (4) submit, argue, and oppose motions; and (5) explore, develop, and pursue settlement opportunities."

184. Defendant Herman further states in his article, "It is important to recognize that Lead Counsel's authority in an MDL proceeding emanates from the court. This is distinguished from the typical attorney-client relationship in which the lawyer's authority arises from a formal retainer agreement between the attorney and the plaintiff. When counsel is appointed [by the transferee judge] Lead Counsel's authority and concomitant responsibility is generally defined by the procedural steps that must be undertaken from the court's perspective, rather than the ultimate goals sought by plaintiffs; those responsibilities are generally set forth in an order of appointment which describes the services that Lead Counsel is asked and directed to perform.

***Such appointment's primary purpose is to further the interests of judicial efficiency and economy***….While Lead Counsel clearly has a duty to perform the functions to which they have been appointed in a fair, honest, competent, reasonable, and responsible way **it would be inappropriate to describe their obligations to other plaintiffs as 'fiduciary'** in the traditional sense of the word….**The appointment of Lead Counsel….is intended to enhance judicial economy.** It therefore seems unlikely that the courts would knowingly establish a "fiduciary" role for attorneys who could not efficiently or effectively accomplish the appointed tasks while working within the strictures typically imposed upon a fiduciary." (Emphasis added).

185. In addressing Lead Counsel's duty to provide information to MDL plaintiffs, Herman states, "Both traditional fiduciary responsibility and the Professional Rules of Conduct impose affirmative obligations to inform clients about significant developments or decisions affecting their interests, as well as a general duty of full disclosure regarding any and all facts and circumstances regarding the representation when asked. In the MDL situation, on the other hand, Lead Counsel acquires information, not as agents of a particular plaintiff, but because they have been authorized or directed to undertake a certain function by the court."

186. Defendant Herman concludes by stating, "While such Lead Counsel should, of course, be mindful of the interests of other attorneys who are representing plaintiffs in the MDL under individual retainer agreements, the notion that some 'fiduciary duty' extends to such individually retained counsel, in my view, *goes too far*." (Emphasis added).

187. In sum, Defendant Herman instructs: (1) his primary purpose is to further the interests of judicial efficiency and economy [while maximizing his compensation]; and (2) his primary fiduciary duty is to Defendant Barbier. This duty would logically include the furtherance

of the interests of judicial efficiency and economy via the "Eight-Step" fraudulent scheme which would most certainly require the knowledge and approval of Defendant Barbier.

188.  Defendant Herman illustrates a central problem with MDL 2179, namely, the Court's sole focus is on judicial economy without any consideration for justice, accountability or transparency.

### II.  Defendants' 8-Step Fraudulent Scheme to Limit BP's Liability, Maximize Their Compensation and Maximize Judicial Efficiency

189.  Defendants, individually and/or in collusion with each other and the "MDL 2179 Enterprise" recklessly, negligently and knowingly conceived, developed, and/or facilitated the following sophisticated and deceptive "Eight-Step" fraudulent scheme to maximize judicial efficiency and/or their compensation in exchange for limiting the liability of BP.

190.  While each Defendant deceptively promoted the "Eight-Step" fraudulent scheme to maximize judicial efficiency and/or their compensation in exchange for limiting the liability of BP, not every Defendant propagated (or needed to propagate) each specific step of the plan. Each Defendant's conduct contributed to an overall narrative that aimed to - and did - mislead Plaintiff. While this Complaint endeavors to document examples of each Defendant's fraudulent misrepresentations and the manner in which they were disseminated, they are just that - examples. The Complaint is not, especially prior to discovery, an exhaustive catalog of the nature and manner of each deceptive statement by each Defendant.

191.  Defendants disseminated the following "Eight-Step" fraudulent scheme through various channels, including through purportedly independent "Front Groups" and so-called legal experts ("Thought Leaders") discussed subsequently below.

## A. Step No. 1: Capture Market Share

192.  In MDL 2179, a victim of the BP oil well blowout is not a person. MDL 2179

Plaintiffs are merely bargaining chips or commodities acquired by Defendants Herman and Roy

and the seventeen MDL 2179 PSC members and later "sold" in bulk to BP.

193.  The MDL 2179 plaintiffs serve as a bargaining chips in four ways: (a) an attorney

with a sufficient number of bargaining chips has a better chance to be awarded with a lucrative

appointment to the MDL 2179 PSC by Defendant Barbier; (b) after the attorney has been

appointed to the PSC, he pools his bargaining chips with the bargaining chips of the other

members of the PSC to exert leverage on BP while graciously offering BP and BP's shareholders

closure; (c) the settlement class action achieved by this leverage will hopefully result in

significant judicial efficiency; and (d) this judicial efficiency, in turn, will result in Defendant

Barbier ensuring that Herman, Roy, and the seventeen cooperative PSC attorneys are

excessively compensated for closing the deal with BP in a timely manner. Justice for the BP oil

well blowout victims is never considered by the defendants.

194.  Defendant Barbier praises the attorneys he appointed to the MDL 2179 PSC for

their initiative, "Shortly after the events of April 20, 2010, various law firms who would

eventually become Liaison Counsel, PSC members, Class Counsel, and other common benefit

attorneys….started to coordinate with one another….Working together, the lawyers developed a

formal limited joint-prosecution agreement to facilitate the coordination and sharing of

information, research, and litigation strategy." Defendants Herman and Roy and each attorney

appointed by Defendant Barbier to the MDL 2179 PSC directly represent tens of thousands of

clients.

### B. Step No. 2: The JPML Transfer Order

195. In the transfer order for MDL 2179, the JPML states, "Centralization may also facilitate closer coordination with Kenneth Feinberg's administration of the BP compensation fund."

196. Defendants did not have to rely solely on a settlement class action to limit BP's liability. From the very beginning, Defendants also had a victims' compensation fund, sanctioned by the JPML, to eliminate hundreds of thousands of MDL 2179 Plaintiff-Claimants.

### C. Step No. 3: Establishment of Feinberg's Victims' Compensation Fund

197. Kenneth R. Feinberg, masquerading as a "Fund Administrator," was employed by BP to limit BP's liability.

198. In violation of the OPA, but with the approval of Defendants, Feinberg's approach to determining claimant eligibility was driven by two factors: (1) loss location; and (2) claimant business type.

199. Feinberg's use of coercion and fraudulent inducement was also in clear violation of the OPA. Feinberg used the fear of costly and protracted litigation, during town hall meetings, on the Internet, and via email to coerce victims of the BP oil well blowout to accept grossly inadequate settlements.

200. In MDL 2179, Feinberg used a "Delay, Deny, Defend" tactic against legitimate BP oil well blowout victims. This tactic, commonly used by unscrupulous insurance companies, is as follows: "Delay payment, starve claimant, and then offer the economically and emotionally-stressed claimant a miniscule percent of all damages, including future damages, to which the claimant is entitled. If the financially ruined claimant rejects the settlement offer, he or she may sue."

201.  This "Delay, Deny, Defend" tactic, although unconscionable, proved to be very effective for the defendants and BP.

202.  Defendants fully sanctioned and facilitated Feinberg's "Release and Covenant Not to Sue."

203.  The ultimate objective of Feinberg's "Delay, Deny, Defend" tactic was to limit BP's liability by obtaining a signed "Release and Covenant Not to Sue" from as many BP oil well blowout victims as possible. *Feinberg's "Release and Covenant Not to Sue" requirement violates OPA, State contract law, and is contrary to public policy.*

204.  Releases, compromises and settlement agreements are contracts and the rules of construction applicable to all contracts are used in the interpretation of such agreements.

205.  Whether a compromise, settlement, or release is a valid contract between the parties is determined by reference to State substantive law governing contracts generally. Whether a contract or a contractual provision is unconscionable or unenforceable on grounds of illegality or public policy is a question of law.

206.  In examining whether a contract is unconscionable, the court must determine whether one party lacked a meaningful choice and the contract terms were unreasonably favorable to the other party.

207.  Kenneth R. Feinberg's "Release and Covenant Not to Sue" violates State contract law and is contrary to public policy because it: (a) was obtained through the use of economic duress; (b) was obtained without free consent (Claimants did not consent to the release by choice, because the only option for receiving payment required Claimants to sign a release, the terms of which they had no opportunity to negotiate.); (c) was obtained through fraud;

-60-

(d) requires Claimants to discharge, waive and release future claims (including those resulting from gross negligence) for costs and damages (including punitive damages) that are unknown and have not yet arisen. As Defendant Barbier clearly states in his Order of August 26, 2011, "The long term effects [of the BP oil well blowout] on the environment and fisheries may not be known for many years;" (e) was obtained in exchange for inadequate consideration; and (f) has as its objective the circumvention of the OPA.

208. Accordingly, Defendants' sanctioned "Release and Covenant Not to Sue" is void *ab initio*.

209. Incredibly, Defendant Barbier still held: (a) "While OPA does not specifically address the use of waivers and releases by Responsible Parties, the statute also does not clearly prohibit it;" and (b) "In fact, as the Court has recognized in this Order, one of the goals of OPA was to allow for speedy and efficient recovery by victims of an oil spill."

210. The OPA requires more than merely "speedy and efficient." The OPA requires that all BP oil well blowout victims are *fully* compensated. Furthermore, the purpose of the Federal Rules of Civil Procedure is "to secure the *just*, speedy, and inexpensive determination of every action and proceeding (Emphasis added)." Victims of the BP oil well blowout turned to the court in search of justice, not merely a "speedy" determination of their cases.

211. Efficiency is not the only touchstone of justice. A substantial body of opinion and a respect for jurisdictional principles suggest that a plaintiff ordinarily has a right to a trial in the forum of his or her choosing. Aggregation of cases for the purpose of facilitating settlement is a byproduct of §1407, but is not its central statutory purpose.

212. Judicial economy is undoubtedly well-served by MDL consolidation when scores of

similar cases are pending in the courts. Nevertheless, the excessive delay and marginalization of juror fact finding (i.e., dearth of jury trials) associated with traditional MDL practice, such as MDL 2179, are developments that cannot be defended.

213. The appropriate focus for Defendants' sanctioned Feinberg-administered victims' compensation fund resolution of mass claims should be justice for the claimants, not merely judicial economy and closure for BP.

214. Defendant Feinberg denied payment to approximately 61.46% of the claimants who filed claims.

215. The BP/Feinberg victims who executed a "Release and Covenant Not to Sue" (approximately 220,000 in number) were subsequently excluded by Defendants Barbier, Herman, and Roy from the settlement class action.

**D. Step. No. 4: Appointment of "Cooperative" Attorneys to the PSC**

216. It is important to understand that Defendant Herman, in a 2018 Loyola Law Review article which he authored, openly admits that judicial efficiency replaces justice and his primary fiduciary duty is to Defendant Barbier in MDL 2179.

217. MDL 2179 is not a litigation. Attorneys appointed to the MDL 2179 PSC are not appointed by Defendant Barbier to be litigators. These attorneys are not selected for the purpose of zealously advocating on behalf of their clients. Defendants Herman and Roy and the attorneys appointed to the MDL 2179 PSC are cooperative dealmakers.

218. In sum, the main criteria for membership in the MDL 2179 PSC is very simple: (a) The attorney must be "cooperative;" (b) The attorney should be a "repeat player;" and (c) The attorney must have signed-up a large stable of clients which he or she is already directly representing.

-62-

219.  It is helpful to remember the three Cs of any successful PSC: cooperation, control, and compensation. Greater cooperation (between the dealmakers) and control (in terms of a significant market share of plaintiffs) results in closing the deal faster with the defendant and clearing the docket faster which results in greater compensation. A happy transferee judge is a generous transferee judge. A happy Plaintiffs' Co-Liaison Counsel is a generous Plaintiffs' Co-Liaison Counsel. In MDL 2179, the comatose, hapless plaintiffs received little or no compensation while the compensation paid to Defendants Herman and Roy, and the seventeen members of MDL 2179 PSC, is estimated to be *$3.035 billion*.

### E.  Step No. 5: Circumvention of OPA, a Strict Liability Statute

220.  "OPA applies of its own force, because that act governs, *inter alia*, private claims for property damage and economic loss resulting from a discharge of oil in navigable waters. *See* 33 U.S.C. § 2702(a), (b)(2)(B), (b)(2)(C), (b)(2)(E)."

> The Honorable Carl J. Barbier, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Rec. Doc. 3830 at 11, August 26, 2011).

221.  The OPA is a ***strict liability*** statute. In order to recover damages under the OPA, a claimant merely needs to show that his or her damages "resulted from" the oil spill or oil well blowout.

222.  "Shall" means shall. The U.S. Supreme Court has made clear that when a statute uses the word "shall," Congress has imposed a mandatory duty upon the subject of the command.

223.  Use of "shall" and "may" in statutes also mirrors common usage; ordinarily "shall" is mandatory and "may" is permissive. "The mandatory 'shall'….normally creates an obligation impervious to judicial discretion."

224.  BP, the majority owner and operator of the Macondo Well, is a "responsible party"

-63-

for the BP oil well blowout of April 20, 2010 under the OPA, 33 U.S.C. §2702(a).

225. Although liability under the OPA is subject to a monetary cap of $75,000,000 for each incident by each responsible party, there is no limit to liability if the damage was proximately caused by "gross negligence or willful misconduct." It is important to note that BP, the responsible party, waived the monetary cap of $75,000,000 for the BP oil well blowout incident in the Gulf of Mexico on April 20, 2010 and the MDL 2179 Court concluded that the discharge of oil was the result of BP's "gross negligence" and "willful misconduct" under the Clean Water Act ("CWA"). Accordingly, in theory, there is no limit to BP's liability. Defendants' greed-induced reality is so very different.

226. Allegedly, in order to efficiently manage MDL 2179, the Court consolidated and organized the various types of claims into several "pleading bundles" for the purpose of the filing of complaints, answers, and any Rule 12 motions.

227. The "B1" pleading bundle includes all claims for private or "non-governmental" economic loss and property damages.

228. On January 12, 2011, the MDL 2179 Court issued PTO No. 25, in order to clarify "the scope and effect" of the "B1" Master Complaint. The Court held that any individual plaintiff who is a named plaintiff in a case that falls within pleading bundle "B1" is deemed to be a plaintiff in the "B1" Master Complaint. Also, "the allegations, claims, theories of recovery and/or prayers for relief contained within the pre-existing petition or complaint are deemed to be amended, restated, and superseded by the allegations, claims, theories of recovery, and/or prayers for relief in the respective "B1" Master Complaint(s) in which the defendant is named."

229. Rather than allege claims under OPA and the Outer Continental Shelf Lands Act

("OCSLA") (which governs the MDL 2179 personal injury and wrongful death actions and borrows the law of the adjacent state as surrogate federal law), the "cooperative" Defendants Herman and Roy made the unfathomable decision to allege claims under a hodgepodge of statutes. In the "B1" Master Complaint, Defendant Herman states, "The claims presented herein are admiralty or maritime claims within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure. Plaintiffs hereby designate this case as an admiralty or maritime case, and request a non-jury trial, pursuant to Rule 9(h)."

230. Defendants Herman and Roy were concerned that a jury may not be "cooperative."

231. The U.S. Supreme Court has quoted testimony by an admiralty expert who stated "maritime law in the strict sense has never had to deal with the resources in the ground beneath the sea, and its whole tenor is ill adapted for that purpose." The Court then added that "since the Act [OCSLA] treats seabed, subsoil, and artificial islands the same, dropping any reference to special treatment for presumptive vessels, the most sensible interpretation of Congress' reaction to this testimony is that admiralty treatment was eschewed altogether...." The U.S. Supreme Court additionally stuns with its unqualified statement that it "***has specifically held that drilling platforms are not within admiralty jurisdiction***." (Emphasis added)

232. The U.S. Supreme Court has reaffirmed as a basis for an admiralty tort that the wrong must bear a substantial relation to a traditional maritime activity in *Foremost Insurance Co. v. Richardson, Sisson v. Ruby, Grubart,* and, most recently, *Herb's Welding.* If the MDL 2179 Court were to apply this requirement in the BP oil well blowout litigation, Defendants' claim of admiralty jurisdiction for the BP oil well blowout - the epitome of an oil and gas drilling operation - would have proven difficult, if not impossible, to sustain.

-65-

233.  OCSLA's role as an essential component of the BP oil well blowout cannot be ignored. OCSLA, the U.S. Supreme Court has declared, "defines a body of law applicable to the seabed, the subsoil and the…structures…on the Outer Continental Shelf." OPA is no less essential to the tort, of course, because, as the MDL 2179 Court itself acknowledges, the statute "governs….private claims for property damage and economic loss resulting from a discharge of oil in navigable waters." The BP oil well blowout, in sum, inextricably engages *both* statutes in this unique configuration. OCSLA, the U.S. Supreme Court declared in 1969 in *Rodrigue v. Aetna Casualty & Surety Company*, was intended to "define a body of law applicable to the seabed, the subsoil and the….structures….on the Outer Continental Shelf." OCSLA's legislative history, as carefully evaluated by *Rodrigue*, disdains admiralty law as OCS governing law. Congress refashioned OCSLA in 1978 as a "new statutory regime" designed to "prevent or minimize the likelihood of *blowouts, loss of well control,* fires….or other occurrences which may cause damage to the environment or to property, or endanger life or health." Congress could not have spoken more directly to BP oil well blowout's core issue and corresponding remedial program, particularly as OCSLA was subsequently refined and expanded by OPA.

234.  Following the *Exxon Valdez* disaster in 1989, Congress unanimously adopted OPA, which the Senate Public Works and Environmental Committee portrayed as a "single Federal law providing cleanup authority, penalties, and liability from oil pollution." Consolidated and harmonized within this single act were major elements of four existing oil pollution statutes, including OCSLA's title III.

235.  The comprehensiveness of the displacement of general maritime law by the two non-admiralty statutes, OCSLA and OPA, is evident on two fronts.

236. The first is Congress's reformulation of general maritime law's episodic, conflicting, and, at best, embryonic treatment of the tort. The second is Congress's own undertaking in OPA to comprehensively incorporate and reformulate in a single federal statute its own work in the four prior statutes. This extraordinarily extensive undertaking leaves negligible space for the credibility of any claim that these efforts fall short of Congress's effective occupation of a field coextensive with the boundaries delineated in the BP oil well blowout.

237. In *Herb's Welding*, the U.S. Supreme Court excoriated as "*untenable*" the Fifth Circuit's view that "*offshore drilling is maritime commerce*." *Herb's Welding*'s explicit confirmation of and reference to the U.S. Supreme Court's assessment in *Rodrigue* that OCSLA's legislative history "*at the very least forecloses the Court of Appeals' holding that offshore drilling is a maritime activity*…." would seem to leave precious little space for Defendants' position.

238. In *Rodrigue*, the U.S. Supreme Court clashed with the Fifth Circuit's *Snipes v. Pure Oil Company* decision, which, in another manifestation of the Fifth Circuit's reflexive admiralty-centrism, defined as "maritime" a tortious injury suffered by an OCS stationary platform worker at this OCSLA site. In *Rodrigue*, the U.S. Supreme Court held that admiralty law does not apply to torts originating on OCSLA situses unless Congress affirmatively expresses its "intent" favoring this override. The U.S. Supreme Court's language favoring this conclusion could not be more forthright: "Even if the admiralty law would have applied to the deaths occurring in these cases under traditional principles, OCSLA's legislative history shows that Congress did not intend that result. First, Congress assumed that the admiralty law would not apply to an OCSLA

situs unless Congress made it apply, and then Congress decided not to make it apply." Earlier discussion disclosed Congress's 1978 institution of its "new OCSLA statutory regime." The Conference Committee explained that the former clarified that federal law is to be *applicable to all activities on all devices in contact with the seabed for exploration, development, and production.* The committee intends that federal law is, therefore, to be applicable to activities on drilling ships, *semi-submersible drilling rigs*, and other watercraft, when they are *connected to the seabed by drill string,* pipes, or *other appurtenances*, on the OCS for exploration, development, or production purposes. *Ships and vessels are specifically not covered only when they are being used for the purpose of transporting OCS mineral resources.*

239. The House described title III's function as providing the "procedures to be followed in the event of an oil spill and compensation for cleanup costs and damages resulting from such a spill." The title limits the definition of "vessels" to watercraft operating in OCS or territorial waters and which transport "oil directly from an offshore facility." An "offshore facility," it stated, is "any oil refinery, or *drilling structure*,….which is used to *drill for*, produce,….or transport oil produced from the Outer Continental Shelf….." These definitions exclude semisubmersibles as "vessels" by including them under "any drilling structure." The term "vessel" is restricted to any watercraft used exclusively to "transport oil directly from an offshore facility." Hence the statement of the conferees: "*Once a drilling ship or other watercraft is attached to the seabed for exploration*, development or production, *it is to be considered an 'offshore facility' rather than a vessel*, for purposes of applying the differing requirements for a facility as compared to a vessel."

240. In fact, OCSLA's section 1333(a), its title III OCS economic-and property-loss

-68-

cause of action, and the latter's refinement and expansion in OPA are not creatures of admiralty at all. They are instead independently grounded in the Constitution's Property and Interstate and Foreign Commerce clauses, respectively.

241.  Historically, the U.S. Supreme Court has objected to "fortuitous," "perverse" or "absurd" results that may result from pinning the admiralty tail on disputes for which admiralty can claim no expertise. The U.S. Supreme Court undertook to discourage this practice in *Executive Jet Aviation Company v. City of Cleveland* by requiring a "substantial relationship" connecting the matter in question "to traditional maritime activity." "In determining whether there is admiralty jurisdiction over a particular tort or class of torts," the Court stated, "reliance on the relationship of the wrong to traditional maritime activity is often more sensible and more consonant with the purposes of maritime law than a purely mechanical application of the locality test."

242.  General maritime law's judge-made principles do not enjoy a presumption against displacement by a federal statute. Despite idealized assertions of admiralty's capacity to resolve complex social or economic issues, the reality, as Justice Holmes counseled, is that general maritime law is not a "corpus juris," but "a very limited body of customs and ordinances of the sea."

243.  Defendant Herman's reasoning and Defendant Barbier's orders and reasoning are contrary to U.S. Congressional intent, the OCSLA, the OPA and U.S. Supreme Court decisions. The only logical conclusion is that they are the product of Defendants acting individually and/or in collusion with each other and the "MDL 2179 Enterprise" in order to knowingly limit BP's liability and thereby maximize judicial efficiency and/or their compensation

244.  Filing of the "B1" Master Complaint as an admiralty or maritime case artfully circumvented the OPA. By doing so, Defendant Herman assisted Defendant Barbier in expeditiously being able to erroneously and incomprehensibly find, "….that nothing prohibits Defendants from settling claims for economic loss. While OPA does not specifically address the use of waivers and releases by Responsible Parties, the statute also does not clearly prohibit it. In fact, as the Court has recognized in this Order, one of the goals of OPA was to allow for speedy and efficient recovery by victims of an oil spill."

245.  As a result of this finding by Defendant Barbier, approximately 220,000 Kenneth R. Feinberg victims who or that executed a "Release and Covenant Not to Sue" in exchange for a one-time final payment ($5,000 for individuals and $25,000 for businesses) were excluded from the settlement class action. There is no evidence that these amounts even remotely represent adequate consideration to compensate claimants for the damages that claimants did or will suffer as a result of the BP oil well blowout.

246.  By alleging claims under general maritime law rather than under the OPA (*a strict liability statute*) and OCSLA, in the "B1" First Amended Master Complaint, Defendant Herman assisted Defendant Barbier in expeditiously being able to:

(a) Erroneously find, "The *Deepwater Horizon* was at all material times *a vessel in navigation.*"

(b) Erroneously find, "Admiralty jurisdiction is present because the alleged tort occurred upon navigable waters of the Gulf of Mexico, disrupted maritime commerce, and the operations of the vessel *bore a substantial relationship to traditional maritime activity*. With admiralty jurisdiction comes the application of substantive maritime law."

(c) Erroneously find, "State law, both statutory and common, is preempted by maritime law, *notwithstanding OPA's savings provisions*. All claims brought under state law are dismissed."

-70-

(d) Erroneously find, "General maritime law *claims that do not allege physical damage to a proprietary interest are dismissed* under the *Robins Dry Dock* rule, unless the claim falls into the commercial fishermen exception."

247.  Moreover, the maritime rule in the Fifth Circuit is that operational recklessness or willful disregard is generally insufficient to visit punitive damages upon the employer. Rather, the conduct must emanate from corporate policy or that a corporate official with policy-making authority participated in, approved of, or subsequently ratified the egregious conduct.

248.  Accordingly, Defendant Barbier concluded that BP cannot be held liable for punitive damages under general maritime law. Defendant Barbier further noted that, even if BP were liable for punitive damages, only commercial fishermen or those who could satisfy the "physical injury" threshold of the *Robins Dry Dock* rule would be entitled to such an award.

249.  Since Defendant Herman requested a non-jury trial pursuant to Rule 9(h) and alleged claims under general maritime law, rather than OPA and OCSLA, Defendants Barbier, Herman, and Roy formulated a trial plan that dispensed with trial by jury and instead conducted a bench trial applying general maritime law.

250.  Circumventing the OPA also allowed the settlement to limit a claimant's recovery of damages by geographic bounds, pertain solely to certain business activities, and require a heightened and vague proof of causation between his or her damages and the BP oil well blowout incident.

### F.  Step No. 6: Approval of the Settlement Class Action

251.  In February 2011, only 4 months after Defendant Barbier appointed Defendants Herman and Roy, and the other cooperative attorneys, settlement negotiations began "in earnest." Defendants Herman and Roy, and BP negotiated a total amount which BP was willing to pay in order to settle the BP oil well blowout case.

252. Carefully implementing the above-described Steps No. 1 through No. 5, Defendants Herman and Roy, and BP worked backwards from that agreed upon total amount to draft the terms and conditions of the settlement.

253. Just prior to the final fairness hearing in November 2012, Defendants Herman and Roy, the seventeen members of the MDL 2179 PSC, Defendant Juneau, and BP, with the approval of Defendant Barbier, intentionally processed a substantial number of high value claims in an attempt to demonstrate that the settlement program was working as promised. Here, the objective was to keep as many of the remaining claimants/plaintiffs in the settlement class action as possible. Opt-outs were seriously frowned upon. The settlement class action was the only game in town. Take it or leave it!

254. At the fairness hearing, Defendant Barbier limited oral presentations by individual objectors (or their counsel, as applicable) to not more than 3 minutes each.

255. In sum, the purpose of the fairness hearing was to allow the cooperative dealmakers to argue in favor of approval of the Economic and Property Damages Settlement. Claims Administrator Patrick Juneau and Michael Juneau also presented on the glorious status of the settlement and the virtually non-existent settlement opt-outs.

256. The BP oil well blowout of April 2010 resulted in the largest environmental disaster in the history of the United States. An estimated 5.0 million barrels of crude oil gushed into the Gulf of Mexico.

257. Defendant Barbier clearly states, "The long term effects [of the BP oil well blowout] on the environment and fisheries may not be known for many years." Nevertheless, in order to limit BP's liability, one tactic employed by the defendants was to limit the compensation

period to 2010.

258. Incredibly, Defendant Barbier found, and Defendants Herman and Roy agreed, that limiting the compensation period to 2010 is reasonable. Defendant Barbier explains, "Certain objectors complain that the Economic Damage Claim Frameworks are unfair because they do not compensate persons who did not begin suffering losses until 2011. Yet this provision is reasonable for three reasons: (i) the Macondo well ceased flowing in July 2010; (ii) there is evidence that by late 2010, Gulf Coast tourism had returned to or surpassed 2009 levels; and (iii) as to claims by individuals and businesses in charter fishing, seafood processing, or other businesses relying on access to Gulf waters, nearly all federal and state waters were reopened for commercial fishing by November 2010. *Thus, extending compensation to 2011 would cover losses not likely caused by the spill*." (Emphasis added)

259. Defendants' settlement causation requirements take obfuscation to a new level.

260. The BP oil well blowout settlement contains various causation requirements for Business Economic Loss ("BEL") claims. Two of the causation tests, the Modified V-test and the Decline-Only test, require a revenue calculation based on benchmark periods and, in addition, a decline in the share of total revenue generated by non-local customers or customers in Zones A to C as reflected in specified documentation.

261. In discussing the causation requirements for BEL claims, Defendant Barbier explains, "Certain objectors contend that to invoke the Modified V-Test or the Decline-Only Test, they are required to satisfy the Customer Mix Test, which requires these businesses to establish where their customers are located. The objective evidence shows that the causation tests available under the Settlement Agreement are both economically reasonable and highly

favorable to claimants, which is why they were negotiated by experienced counsel in consultation with their clients and experts....Other objectors complain that before they can invoke the V-Shaped Revenue Pattern test, they must demonstrate a 5% revenue recovery during the correlating months of 2011 as compared to the 2010 baseline period. This provision is reasonable, as *losses that continued after the spill are likely to be due to factors other than the spill*." (Emphasis added)

262. Defendants fraudulently, recklessly, negligently and knowingly breached their fiduciary and ethical duties to Plaintiffs by reassuring BP oil well blowout Plaintiffs that the settlement claims program's Risk Transfer Premium ("RTP") enhances the compensation amount for, among other things, certain claimants whose damages could be recurring, to account for that risk of future damages.

263. Defendants further fraudulently, recklessly, negligently and knowingly breached their fiduciary and ethical duties to Plaintiffs by supporting the Court's finding that, "RTP payments are meant to compensate class members for pre-judgment interest, the risk of oil returning, consequential damages, inconvenience, aggravation, the risk of future loss, the lost value of money, compensation for emotional distress, liquidation of legal disputes about punitive damages, and other factors."

264. According to Defendants Barbier and Herman, RTP payments are simply magical.

265. Defendants Herman and Roy, and the members of the MDL 2179 PSC, tendered either jointly or on their own behalf four "experts" in the law of class actions: Professors Coffee, Issacharoff, Klonoff, and Miller. Indeed, Defendant Barbier cites to, or in some instances quotes from, the opinions of these "Thought Leaders" at various points in its analysis of class

certification issues.

266.  The following are a few examples of the quotes of these "Thought Leaders" and Claims Administrator.

(a)  The class definition is geographically circumscribed to Louisiana, Alabama, Mississippi, and certain specified counties in Florida and Texas along the Gulf Coast, as well as Specified Gulf Waters [*in violation of the OPA*].

(b)  According to Professor Coffee, such careful negotiation of the release was "an example of reasoned statesmanship [*in violation of the OPA*]."

(c)  "Because a class action is the vastly superior method by which to resolve the impact of this mass disaster on the Gulf Coast Region, it would be a social tragedy if class certification were denied."

(d)  "I've never been involved in a project that has gotten up this quick, had the involvement with the volume we had to deal with, and to either have started it earlier or gotten it paid this quickly. It's been a remarkable experience for me."

(e)  "The pace of payment determinations and payments is very high in comparison to other claims matters and is especially reasonable considering the other substantial responsibilities of the Settlement Program during this same period of time."

267.  Defendants fraudulently, recklessly, negligently and knowingly breached their fiduciary and ethical duties to Plaintiffs by retaining, and highly compensating, four law professors/thought leaders to give their "unbiased" opinions in order to induce the plaintiffs into believing that the proposed settlement is "fair, reasonable, and adequate."

268.  Notwithstanding the opinions of the four law professors, Plaintiff believes it is obvious to any reasonable person that the settlement class action violates the OPA statute by defining class members by geographic bounds and certain business activities while requiring proof of a heightened, vague standard of causation.

269.  The MDL 2179 class settlement agreement is a business deal entered into between Defendants Barbier, Herman and Roy, the seventeen members of the MDL 2179 PSC, and BP

for their own personal benefit. This deal was consummated behind closed doors. Although there is no stated limit on the amount that BP is willing to pay, there is an absolute limit that BP is willing to pay ($20 billion). Otherwise, BP would not have agreed to the settlement terms and conditions. More importantly, Defendants conveniently fail to mention that although there is no stated ceiling, there is also no stated floor. BP is not obligated to pay any amount. Moreover, BP and Defendants are able to argue that certain claims are not legitimate and Defendants may clawback "fraudulent" payments previously paid to BP oil well blowout victims.

270.  After eliminating the class members who opted-out and the illegally excluded BP oil well  blowout victims, the vast majority of remaining Plaintiffs are either comatose or are directly represented by Defendants Herman and Roy, and members of the PSC. Plaintiffs directly represented by Defendants Herman and Roy, and members of the PSC know they shall be well-compensated because each client must pay a contingent fee to his or her "cooperative" dealmaker attorney.

### G.  Step No. 7: The Post-Settlement Mop-Up Procedures

271.  Transferee judges tend to issue *Lone Pine* orders after most plaintiffs' cases are resolved through a comprehensive settlement. *Lone Pine* orders are usually issued with little advanced notice. Although plaintiffs may be relying on common evidence produced by the PSC, when they refuse to settle, *Lone Pine* orders might require a plaintiff to retain an individual expert and produce her opinion within a couple of weeks. In sum, *Lone Pine* orders require non-settling plaintiffs to provide some evidentiary support for their claims to avoid dismissal.

272.  Defendants Herman and Roy, and MDL 2179 PSC members routinely argue that a *Lone Pine* order is appropriate as "a post-settlement mop-up procedure utilized to address those

cases which either were not eligible for compensation through the MDL 2179 settlement

program or which had opted-out of participation in the MDL 2179 settlement program." In

reality, the purpose of a *Lone Pine* order is to eliminate those few remaining non-cooperating

plaintiffs who have the audacity to demand justice.

273. In lieu of having the Court issue a *Lone Pine* order, Defendant Barbier created

Pretrial Order No. 60 ("PTO 60") and Pretrial Order No. 64 ("PTO 64") to eliminate those few

remaining non-cooperating, pesky plaintiffs who have the audacity to demand justice.

274. On March 29, 2016, the MDL 2179 Court issued PTO 60 wherein the Court

dismissed the amended "B1" Master Complaint as having "no further administrative or

procedural benefit."

275. In PTO 60, the Court required plaintiffs in pleading bundle "B1" who had filed a

timely claim, and not previously released their claim, to file and serve on BP a sworn statement

disclosing information regarding their claims. PTO 60, in pertinent part, states:

> "A. As to Plaintiffs who filed Individual Lawsuits.
> (i) Any plaintiff who previously filed an individual lawsuit must complete the sworn
> statement in the form reflected in Exhibit A. The completed sworn statement shall be
> attached to a cover sheet reflecting the caption of the individual lawsuit in the form of
> Exhibit B. Both the cover sheet and the attached sworn statement must be filed into the
> record of the plaintiff's individual lawsuit (as opposed to the master docket for MDL
> 2179) no later than May 2, 2016. Plaintiff also shall serve the sworn statement on the
> Plaintiffs' Steering Committee ("PSC") and counsel for BP no later than May 2, 2016."

276. In addition, the Court required those "B1" plaintiffs who had not previously filed an

individual complaint (defined as a complaint not joined in by any other plaintiffs) against BP to

file a new individual complaint. PTO 60, in pertinent part, states:

> "B. Plaintiffs who DID NOT file Individual Lawsuits, (i.e., only filed a SFJ and/or were
> part of a "Mass Joinder" Lawsuit).
> (i) Where Plaintiffs did not file an individual lawsuit, but instead filed a SFJ and/or were

part of a complaint with more than one plaintiff, each such plaintiff must, by May 2, 2016, file an individual lawsuit (Complaint) (one per plaintiff), using the caption reflected in Exhibit C. The Complaint should include as an attachment the completed sworn statement in Exhibit A. Each plaintiff also must, by May 2, 2016, serve the PSC and Counsel for BP with a copy of the completed sworn statement.
(ii) Plaintiffs that did not file individual lawsuits, but instead filed a SFJ and/or were part of a complaint with more than one plaintiff, who fail to comply with the above requirements by May 2, 2016, will have their claims deemed dismissed with prejudice without further notice."

277.  In sum, plaintiffs who failed to comply with the sworn statement requirement or the new individual complaint requirement by the compliance deadline (May 2, 2016) were to have their claims deemed *dismissed with prejudice without further notice*.

278.  PTO 60, allegedly in order to further assist the Court in streamlining the dismissal of the remaining claims, addresses the issue of "Presentment" under the OPA. PTO 60 asks any plaintiff who previously filed an individual lawsuit, "Did you, the plaintiff seeking relief, present this claim at least 90 days prior to filing a lawsuit or joining the "B1" Complaint?"

279.  Plaintiff Donovan believes a logical question is: Why didn't Defendant Herman immediately ask each Plaintiff if he or she presented his or her claim to BP (the "Responsible Party") at least 90 days prior to filing a lawsuit or joining the "B1" Complaint, as required under the OPA, when the plaintiff's case was transferred to MDL 2179 or when the plaintiff filed a SFJ?

280.  Following a show cause process, the MDL 2179 Court recognized approximately 1,000 remaining "B1" plaintiffs to be compliant with PTO 60 and subject to further proceedings in MDL 2179. The claims of any other remaining "B1" plaintiffs were dismissed.

281.  On July 14, 2016, the MDL 2179 Court issued an Order (Re: Compliance with PTO 60 Regarding All Remaining Claims in Pleading Bundle "B1") wherein the Court held "As to all

Plaintiffs in the "B1" bundle, only those Plaintiffs who have not previously released their claims, have made timely presentment as required by OPA, have previously filed an individual lawsuit, and have otherwise complied with the requirements of PTO 60 have preserved their individual claims. All other B1 bundle claims are time-barred."

282.  BP believes that a very large number of these approximately 1,000 remaining claims are subject to dismissal "based upon the MDL 2179 Court's prior orders, *lack of OPA presentment*, or release (including membership in the settlement classes and their attendant releases)." Certain of these claims may require further proceedings, including but not limited to dispositive motion practice.

283.  Interestingly, and ironically, BP states that "it also reserves all of its rights concerning its arguments that *OPA displaces all forms of maritime claims*."

284.  On February 22, 2017, the Court issued Pretrial Order No. 64/Case Management Order No. 6 ("PTO 64," Rec. Doc. 22297), one of the goals of which was to identify those "Remaining B1 Plaintiffs" who could plausibly allege a claim under general maritime law. As used in PTO 64, "Remaining B1 Plaintiffs" meant those plaintiffs who had been deemed compliant with PTO 60 and who had not voluntarily dismissed their claims.

285.  PTO 64 required that each Remaining B1 Plaintiff who wished to pursue a general maritime law claim must complete and serve upon BP's counsel and the Plaintiffs' Steering Committee ("PSC") by April 5, 2017 a "Sworn Statement Regarding General Maritime Law Claims."

286.  If a Remaining B1 Plaintiff failed to comply with PTO 64, then that plaintiff's general maritime law claim(s) would be deemed waived and "any such general maritime law

claims shall be dismissed without further notice and with prejudice."

287. On January 11, 2018, the Court issued Pretrial Order No. 65 ("PTO 65," Rec. Doc. 23825), requiring remaining B1 Plaintiffs to file verified statements regarding causation and damages by April 11, 2018.

288. PTO 65 requires the "Remaining B1 Plaintiffs" to provide sworn answers to the following four questions concerning damages and causation: (1) Describe specifically the compensatory damages that you claim in your lawsuit, including the nature of the damage, the date(s) of the damage, the amount of the damage, and the calculations used to arrive at that amount; (2) Describe specifically the evidence you rely on to prove the damages you allege in response to Question No. 1; (3) Describe specifically how the Deepwater Horizon/Macondo Well incident and oil spill caused the damages you allege in response to Question No. 1; and (4) Do you have at this time an expert who will opine as to any of your responses to the above questions?

289. On *May 25, 2018*, the Court issued an "Order to Show Cause Re: Compliance with PTO 65" (Rec. Doc. 24558). The Order states "Any Plaintiff appearing on the attached lists of 321 Remaining B1 Plaintiffs must show cause in writing on or before *June 15, 2018* why this Court should not dismiss his/her/its B1 claim(s) with prejudice for failing to comply with the requirements of PTO 65."

**H. Step No. 8: Clawback**

290. Carefully implementing the above-described Steps No. 1 through No. 7, Defendants eliminated, excluded or dismissed virtually all remaining claims against BP.

291. In the status report submitted to the BP oil well blowout Court on February 14, 2017, attorneys for BP Exploration & Production Inc. and BP America Production Company

-80-

state, "Following a show cause process, the MDL 2179 Court recognized approximately 1,000 remaining "B1" plaintiffs to be compliant with PTO 60 and subject to further proceedings in MDL 2179. The claims of any other remaining "B1" plaintiffs were dismissed. Certain plaintiffs who were found noncompliant with PTO 60 and had their claims dismissed by the Court's December 16, 2016 Reconciliation Order have filed motions for reconsideration and/or notices of appeal…BP believes that a very large number of these pending claims are subject to dismissal based upon the Court's prior orders, lack of OPA presentment, or release (including membership in the settlement classes and their attendant releases). Certain of these claims may require further proceedings, including but not limited to dispositive motion practice….*BP also reserves all of its rights concerning its arguments that OPA displaces all forms of maritime claims*."

292.  One purpose of the "clawback" order was allegedly to refund to BP the amount paid to claimants who had submitted fraudulent claims. However, Defendants' primary purpose was to burnish BP's tarnished image. Although only an infinitesimal percentage of submitted claims were found to be fraudulent, these claims were highly publicized and reported on the Internet and in the media. Any casual observer could easily conclude that BP was the only true victim of the oil well blowout disaster. Indeed, were there ever any real victims with legitimate claims?

### III.  Defendants Breached Their Fiduciary and Ethical Duties

### A.  "Come Into the Fold," Pay Us, and Keep Quiet

293.  Upon transfer to MDL 2179, the attorneys which the BP oil well blowout plaintiffs initially retained are magically replaced by Defendants Herman and Roy, and the seventeen cooperative attorneys appointed to the MDL 2179 PSC.

294.  The first lawsuit Plaintiff Donovan's clients filed against Feinberg, et al. was

eventually transferred from the Florida State Court to MDL 2179 in August 2011. On August 29, 2011 at 7:12 AM, Plaintiff Donovan emailed James Parkerson Roy, Plaintiffs' Co-Liaison Counsel for MDL 2179. Plaintiff Donovan introduced himself, attached a copy of the JPML transfer order, and stated, "I would like to commence discovery as soon as possible. Since this action does not involve common questions of fact with actions previously transferred to MDL 2179, please advise as to how we may most expeditiously initiate and coordinate discovery. I look forward to working with you on this case."

295.  On September 5, 2011 at 11:15 PM, Plaintiff received an emailed response from Roy and Stephen J. Herman wherein they state, "We have received and appreciate your correspondence of August 29, 2011….Please be advised that the Court has declined to permit formal discovery on Feinberg or the GCCF….Should you desire to participate in the common benefit effort, we would welcome your inclusion in the GCCF Jurisdiction Work Group, which has, for the past year, coordinated Plaintiffs' collective efforts regarding Feinberg and the GCCF in terms of information collection, jurisdictional issues, communications with claimants, OPA compliance, and the appropriate scope and effect of the GCCF release."

296.  Defendant Herman and the seventeen members of the MDL 2179 PSC did not coordinate Plaintiffs' collective efforts regarding Feinberg and the GCCF in terms of OPA compliance and the appropriate scope and effect of the GCCF release.

297.  On November 7, 2011 at 3:46 PM, Plaintiff Donovan sent a follow up letter via email to Herman wherein Plaintiff Donovan states the following.

298.  "I refer to my letter, dated August 29, 2011, to Mr. James Roy and to our

subsequent telephone conversation of September 8, 2011.

299.  During our phone conversation you advised me that, as a result of the transfer of this case to MDL 2179, the extent of my representation of the plaintiffs in this case is now limited to three options. I may: (a) 'do nothing;' (b) 'come into the fold;' or (c) 'go off on my own and directly file pleadings with the Court.'

300.  Given the ongoing economic stress being experienced by my clients resulting from the 'Delay, Deny, Defend' strategy being employed by Kenneth R. Feinberg, et al., 'do nothing' is not a viable option.

301.  I believe Option (b), 'come into the fold,' refers to your invitation to join the GCCF Jurisdiction Work Group (JWG), which has, for the past year, allegedly coordinated Plaintiffs' collective efforts regarding Feinberg and the GCCF in terms of information collection, jurisdictional issues, communications with claimants, OPA compliance, and the appropriate scope and effect of the GCCF release.

302.  Unfortunately, since the Court has declined to permit formal discovery on Feinberg or the GCCF, my clients would not benefit from JWG's limited scope of discovery.

303.  As you had mentioned, Option (c), 'go off on my own and directly file pleadings with the Court,' would be ill-advised because such action would not be well-received by the Court. However, PTO No. 11 (Case Management Order No. l) requires that all motions or other pretrial proceedings with respect to plaintiffs shall be initiated by and/or coordinated through the PSC. If the PSC does not support the motion or other requested action, the moving or requesting party is permitted to file a motion or request, but must include a certificate of non-support. I believe this option is in the best interests of our clients. Rest assured, we will always confer with

or act through the PSC or seek PSC consent prior to filing a motion or request and certificate of non-support."

304.  In his November 7, 2011 letter to Defendant Herman, Plaintiff Donovan also questions the decision of the Court not to permit formal discovery on Feinberg or the GCCF as follows. "When will the Court permit formal discovery on Feinberg and the GCCF?

305.  In your email, dated September 5, 2011, you state, '….the Court has declined to permit formal discovery on Feinberg or the GCCF.'

306.  The passage of time is the defendant's best friend. Memories fade, witnesses are more difficult to locate, and the plaintiffs lose the desire to continue to fight and either 'move on' or settle for less. By declining to permit formal discovery on Feinberg and the GCCF, the MDL 2l79 Court is ensuring that the defendants will not be held accountable and, more importantly, the claimants-turned-plaintiffs will not be fully compensated for damages.

307.  Discovery on Feinberg/GCCF and the associated pressure of a trial are required in order exert pressure on the parties to negotiate a settlement which reflects the true value of the claims and not one which focuses on minimizing the liability of Feinberg Rozen, LLP, Feinberg/GCCF, and the responsible parties."

308.  On November 14, 2011 at 4:27 PM, after Plaintiff had already rejected Herman's offer to "come into the fold" on November 7, 2011, Plaintiff Donovan received an unsolicited GCCF Outreach Workgroup Invitation, GCCF Jurisdiction and Court Oversight Workgroup Invitation, Invoice and Limited Joint Prosecution and Confidentiality Agreement from Herman and Roy wherein they state the following.

309.  "You have been invited by the PSC to serve as a member of the GCCF Outreach

-84-

Workgroup and GCCF Jurisdiction and Court Oversight Workgroup of the PSC. As a work group member, your work will be under the supervision and direction of the work group Coordinators who are reporting directly to the PSC/EC and Liaison. Your common benefit time and expenses will be submitted with those of PSC members, workgroup coordinators, and work group members, for consideration by the Court in the event of recovery by settlement or judgment in connection with the MDL proceedings, in accordance with Pretrial Order No. 9. You will have access to the common work product that is developed, and will be invited to participate in various meetings from time to time.

310. By acceptance of your appointment as a member of the above-named workgroup, your personal time and financial obligations will be potentially significant. Work Group Member Assessments have been set by the PSC at 10% of PSC member assessments (which currently total $330,000); a work group member firm's assessments to date total $33,000.

311. Your appointment is at the discretion of the Executive Committee/PSC, subject to the requirements of Pretrial Order No. 9 and other Orders of the Court, and requires your payment of an initial assessment of at least $10,000 by December 1, 2011; staying current on future assessments; and continued contribution of PSC authorized common benefit work in furtherance of the workgroup for MDL 2179. Common benefit work and expenses will be done only upon written authorization and oversight of the PSC/EC/Liaison and/or upon direction of Workgroup Coordinators.

312. There are no guarantees that you will receive any remuneration; such is dependent upon success of the litigation and determination by the Court of entitlement to common benefit cost reimbursement and/or fees.

313.  Accordingly, if you accept this appointment, please sign where indicated below and FedEx this form and your $10,000 (to $33,000) assessment (payable to MDL 2179 PSC account) to: Plaintiffs Steering Committee, c/o James P. Roy & Steve Herman.

314.  The Limited Joint Prosecution and Confidentiality Agreement (BP Oil Spill Litigation), in pertinent part, states the following.

> "Any and all documents, communications, information, strategy, experts, legal theory and/or other work product that is shared or exchanged by and through this Agreement shall be kept and remain confidential….This agreement is not a co-counsel agreement nor an agreement, whether express or implied, to share, claim, shift, or consent to an award of any type of client contingency, statutory and/or common benefit attorney's fee. The signatories may hereafter be referred to herein as the 'BP Gulf Spill Litigation Joint Prosecution Group.'….Signatories shall obtain signatures of associates and clerical staff working on these matters to assure their compliance with this agreement. Materials subject to this agreement will not be shown to non-group experts or non-group members without compliance with procedures to be established by Group….Any party hereto can withdraw at any time. If a member withdraws, he is still subject to this agreement's confidentiality."

315.  MDL 2179 is so perverse that Defendants Herman and Roy do not want the victims of the BP oil well blowout to even know that this confidentiality agreement exists. Paragraph 6 of the confidentiality agreement states, "This Agreement itself shall be confidential, and no counsel or party shall reference, cite or otherwise use the drafting, circulating, existence or use of this Agreement in any motion, petition or other application to be appointed, designated or otherwise recognized by any Court for any leadership position. The members agree that except as may be ordered by Court this agreement and its terms and conditions and the work product of the Group and/or its members will be kept strictly confidential and shall not be disclosed to any third party for any reason."

316.  Plaintiff Donovan finds the last paragraph of the confidentiality agreement, which appears to be an afterthought, to be "curious." Paragraph 7, titled "Ethics and Conflicts

-86-

Compliance" states, "Each member firm is responsible for doing its own conflict and individual ethics checks on an ongoing basis and otherwise in complying with all applicable Rules of Professional Responsibility."

317.  Plaintiff Donovan does not understand how any attorney could find Defendants to be ethical and in compliance with all applicable Rules of Professional Responsibility. MDL 2179's contravention of the MDL statute, U.S. Supreme Court decisions, and the Oil Pollution Act of 1990, use of a Feinberg-administered fund and a settlement class action treats the plaintiffs as nothing more than a commodity. Moreover, completely replacing justice with judicial efficiency is not remotely ethical.

### B.  Defendants Refused to Answer Plaintiff's Questions

318.  On December 21, 2012, Plaintiff sent a letter via email to Defendant Herman and cc'd the letter to James Parkerson Roy, Brian H. Barr, and Scott Summy. In the letter, Plaintiff asks Defendant Herman the following questions.

319.  "I am writing this open letter on behalf of my clients and all similarly-situated BP oil spill and Gulf Coast Claims Facility (GCCF) victims.

320.  In sum, my clients were forced to be represented by the PSC. Accordingly, since you have stepped into my shoes, I, and all similarly-situated attorneys representing BP oil spill and GCCF victims, hold the PSC strictly accountable to zealously advocate on behalf of all MDL 2179 Plaintiffs.

321.  QUESTION No. 1: Why did the PSC designate the 'B1' Master Complaint as an admiralty or maritime case, and request a non-jury trial pursuant to Rule 9(h), rather than properly allege claims under the Oil Pollution Act of 1990 (OPA), a *strict liability* statute, and the Outer Continental Shelf Lands Act (OCSLA)?

-87-

322. QUESTION No. 2: Why has the PSC failed to inform Judge Barbier that the Honorable MDL 2179 Court has overreached its authority?

323. QUESTION No. 3: Why has the PSC failed to inform Judge Barbier that the E&PD class settlement violates the Oil Pollution Act of 1990 ("OPA")?

324. QUESTION No. 4: Why has the PSC failed to inform Judge Barbier that the honorable MDL 2179 Court has illegally excluded approximately 200,000 BP oil spill victims from the E&PD class settlement thereby greatly decreasing the bargaining power of the remaining class members?

325. QUESTION No. 5: Why has the PSC failed to inform Judge Barbier that the E&PD class settlement is not 'fair, reasonable, and adequate' and has not been entered into without collusion between the parties?

326. QUESTION No. 7: Why has the PSC allowed the MDL 2179 Court to decline to permit formal discovery on Feinberg, et al?

327. QUESTION No. 8: Why does the PSC allow its BP oil spill victim clients to receive grossly inadequate compensation?

328. QUESTION No. 9: Why does the PSC allow for the E&PD class settlement to provide for a refund of approximately $6 billion to BP while granting *excessive* compensation to the PSC and other counsel allegedly performing "common benefit" work?

329. QUESTION No. 10: Given the above-referenced was not merely the result of poor legal strategy, do you believe the MDL 2179 PSC's actions constitute legal malpractice?

330. Since April 8, 2012, our firm has filed: (a) a Motion to Vacate Order and Reasons [As to Motions to Dismiss the B1 Master Complaint]; (b) three Motions to Vacate Preliminary

Approval Order [As to the Proposed Economic and Property Damages Class Action Settlement];
and (c) a Motion to Nullify Each and Every Gulf Coast Claims Facility ("GCCF") "Release and
Covenant Not to Sue."

331. In contrast, as noted *supra*, the PSC appears to be more interested in maximizing its
compensation and ensuring significant economy and efficiency in the judicial administration of
the MDL 2179 Court rather than in obtaining justice for the MDL 2179 plaintiffs.

332. If you have any questions, please do not hesitate to contact me….I would be happy
to provide the PSC with any and all supporting documentation."

333. On December 21, 2012, shortly after he receives Plaintiff's open letter, Defendant
Herman responds, "I respectfully decline to respond to your questions, which seem
argumentative and disingenuous."

334. On December 22, 2012 at 4:03 AM, Plaintiff Donovan sends an email to Defendant
Herman in which he states, "Thank you for your prompt response….Your decision not to address
the issues raised in the open letter, although completely understandable, is disturbing….Last
night, subsequent to your receipt of the open letter, Judge Barbier granted final approval to the
E&PD class settlement agreement. Notwithstanding this fact, all victims of the BP oil spill and
the 'Delay, Deny, Defend' strategy employed by Kenneth R. Feinberg, et al. have a right to
clearly understand how and why they were represented by the PSC in MDL 2179. The PSC's
clients are not being 'argumentative and disingenuous' when they demand to know why they
have not been fully compensated for their damages."

335. On December 25, 2012 at 6:45 PM, Plaintiff receives an email from Defendant
Herman wherein Defendant Herman states, "I suppose that you are free to attack the PSC and/or

the Court in whatever way you deem appropriate. At the same time, I would suggest that your clients not participating in the Economic Settlement will best be served if you: (i) ensure that you and/or they make Presentment of what you and/or they believe to be their full damages before January 18, 2013; and then, having made such presentment, (ii) file (or re-file) (and/or amend) suit on their behalf by April 20, 2013; and then (iii) with respect to any client whom you believe to have executed an invalid GCCF Release, assemble and prepare the best case you can to support the argument that such Release was procured under fraud, error, or duress."

336.  On December 31, 2012, Plaintiff sent a second letter via email to Steve Herman and cc'd the letter to James Parkerson Roy, Brian H. Barr, and Scott Summy. In the letter, Plaintiff states, in pertinent part, the following and asks Defendant Herman four additional questions.

337.  QUESTION No. 11: Why did the PSC wait until one month before the claim filing deadline to notify all BP oil spill and GCCF victims (its clients) of the OPA 'Presentment' requirement?

338.  Defendant Herman and the members of the PSC should have notified all BP oil spill and GCCF victims (their clients) of the Presentment requirement in October 2010, not in December 2012.

339.  QUESTION No. 12: Why has the PSC failed to notify all BP oil spill and GCCF victims (its clients) that a lawsuit may be filed against Kenneth R. Feinberg, et al. without having to fulfill the OPA Presentment requirement?

340.  Since Feinberg, et al. is not a 'Responsible Party' and therefore may not be sued under OPA, a lawsuit against Feinberg, et al. may be filed immediately because it does not require Presentment. Defendant Herman would, however, need to advise all GCCF victims in

regard to the statute of limitations and the associated tolling of the statute of limitations for class actions and fraudulent concealment or a misrepresentation by the defendant.

341.  QUESTION No. 13: Why does the PSC, which failed to adequately challenge the legality of the GCCF Release and Covenant Not to Sue for the past two years, suddenly advise non-PSC attorneys to 'assemble and prepare the best case you can to support the argument that such Release was procured under fraud, error, or duress?'

342.  Steve, if the PSC had properly filed the 'B1' Master Complaint under OPA rather than alleging claims under admiralty law, Feinberg, et al. would never have been allowed to use the Release and Covenant Not to Sue to illegally exclude approximately 200,000 BP oil spill victims from the E&PD class settlement.

343.  It has been, and remains, the responsibility of the PSC to 'assemble and prepare the best case to support the argument that such Release was procured under fraud, error or duress.' On September 25, 2012, my clients filed their Motion to Nullify Each and Every Gulf Coast Claims Facility Release and Covenant Not to Sue. Please feel free to use the legal argument in this motion to assist with the preparation of the PSC case.

344.  QUESTION No. 14: Are you declining to answer these questions because you believe that an attorney-client relationship does not exist between the PSC and all BP oil spill and GCCF victims?

345.  Steve, please understand that these fourteen questions are directed to the PSC by me on behalf of my clients (now PSC's clients) and all similarly-situated BP oil spill and GCCF victims. These questions are not directed to the MDL 2179 Court. In sum, the PSC's clients merely seek a better understanding of their representation by the PSC.

346.  Defendant Herman, the members of the MDL 2179 PSC, and other counsel allegedly performing common benefit work in MDL 2179 initiated settlement negotiations 'in earnest' merely four (4) months after Judge Barbier appointed members to the PSC. Clearly, the MDL 2179 settlement class action was not achieved in the full context of adversarial litigation.

347.  On December 31, 2012 at 3:27 PM, Defendant Herman responded via email, "Not sure what you are trying to accomplish, but I think we have past the point of diminishing returns. Good luck."

348.  Apparently, "Good Luck" is the only response Defendant Herman is willing to give to attorneys who decide not to "come into the fold," pay the PSC at least $10,000, and keep quiet.

349.  Over the years, Plaintiff Donovan has touched base with Defendant Herman to inquire as to when Defendant Herman and Judge Barbier will permit formal discovery on Feinberg or the GCCF. The following exchange of emails is instructive.

350.  On December 9, 2013, Plaintiff emails Defendant Herman, "I attach a copy of your email dated September 5, 2011. Please advise as to when the Court will permit formal discovery on Feinberg or the GCCF….Thank you." Email response from Defendant Herman: "No idea."

351.  Plaintiff's email reply to Defendant Herman: "Would you be kind enough to attempt to find out when the Court will permit formal discovery on Feinberg or the GCCF?" Defendant Herman's response: "Yes. At an appropriate time."

### C.  Defendants Refused to Be Fully Transparent and Defendants Refused to Be Held Accountable

352.  The aggregate settlement rule ("ASR") governs global MDL settlements.

353. Defendants breached their fiduciary duties to Plaintiffs by violating the ASR.

354. Courts have long recognized that lawyers may be subject to total or partial fee forfeiture as a sanction for serious violations of the ASR. Plaintiff does not have to prove either causation or injury to be entitled to fee forfeiture as a remedy for Defendants' breach of fiduciary duty.

355. The ASR is Rule 1.8(g) of the ABA *Model Rules of Professional Conduct* ("*Model Rules*"), and it states: "A lawyer who represents two or more clients shall not participate in making an aggregate settlement of the claims of or against the clients….unless each client gives informed consent, in a writing signed by the client. The lawyer's disclosure shall include the existence and nature of all the claims….involved and of the participation of each person in the settlement."

356. All "group" settlements are now "aggregate settlements" and must comply with the disclosure requirements of Rule 1.8(g).

357. Rule 1.8(g) requires a lawyer to disclose *at a minimum*, the following information to the clients for whom or to whom the settlement or agreement proposal is made.

(a) The total amount of the aggregate settlement;

(b) The existence and nature of all of the claims….involved in the aggregate settlement;

(c) The details of every other client's participation in the aggregate settlement….whether it be their….settlement receipts…..or any other….receipt of something of value as a result of the aggregate resolution;

(d) The total fees and costs to be paid to the lawyer as a result of the aggregate settlement, if the lawyer's fees and/or costs will be paid, in whole or in part, from the proceeds of the settlement or by an opposing party or parties; and

(e) The method by which costs (including costs already paid by the lawyer as well as costs to be paid out of the settlement proceeds) are to be apportioned among them.

358.  Informed consent to an aggregate settlement requires that each claimant be able to review the settlements of all other persons subject to the aggregate settlement or the formula by which the settlement will be divided among all claimants. Further, *informed consent requires that the total financial interest of claimants' counsel be disclosed to each claimant.*

359.  In sum, Defendants owe fiduciary duties to MDL 2179 Plaintiffs. A lawsuit based on a violation of the ASR can be brought as a breach of fiduciary duty claim; the plaintiff(s) need not show any economic loss from the attorney's breach in order to prevail; full or partial forfeiture of the fees that the attorney received from the former client is the remedy.

360.  On November 13, 2017, Plaintiff Donovan filed a motion on behalf of his clients wherein Plaintiff Donovan requested the MDL 2179 Court to place on the public record the total amount and source of compensation, *from all sources*, paid to all members of the PSC and the total amount and source of compensation paid to the legal experts, Special Masters, and Claims Administrator Patrick Juneau. This was neither a Motion to Compel nor an Objection. This was merely a motion by the plaintiff, on behalf of himself and his clients, to request the MDL 2179 Court to conduct itself in a fully transparent manner.

361.  In the motion, Plaintiff Donovan pointed out to the Court that the total compensation paid to Herman and Roy, and the 17 PSC attorneys and their law firms, is guesstimated to be $3.035 billion. It is beyond cavil that a reasonable, objective observer would not conclude that this amount is out of all proportion to the value of the professional services rendered. Plaintiff Donovan further pointed out to the Court that a narrow focus on judicial efficiency cannot allow the circumvention of the core democratic premises of representation,

transparency, and accountability.

362.  On March 6, 2018, the MDL 2179 Court issued an Order wherein the Honorable

Carl J. Barbier succinctly states, "Before the Court is a 'Motion to Request this Court to Place on

the Public Record the Total Amount and Source of Compensation, From All Sources, Paid to All

Members of the PSC, et al.' IT IS ORDERED that the Motion (Rec. Doc. 23677) is DENIED.

New Orleans, Louisiana, this 6th day of March, 2018." Obviously, neither Defendant Barbier

nor Defendant Herman believes that the plaintiffs in MDL 2179 have a right to know how much

compensation the attorneys allegedly representing their interests are receiving.

### D.  Based on Little More Than Empty Air, Defendant Barbier Held That OPA Does Not Impose a Duty on the Responsible Party to Settle Plaintiffs' Claims

363.  Defendant Barbier, in his Order and Reasons (Rec. Doc. 26571 at 8, July 2, 2020),

held:

> "Plaintiffs urge that OPA imposed on the GCCF a duty to settle the Donovan Plaintiffs'
> claims. OPA contains no such duty. OPA is intended "to promote settlement and avoid
> litigation." How does it do this? As mentioned, OPA's presentment procedure requires a
> claimant to give the responsible party the opportunity (90 days) to settle her claim before
> she may sue in court. OPA also provides that interest typically begins to accrue following
> the 30th day after the claim is presented, which incentivizes early settlement. **But there is
> a wide chasm between a process that "promotes" settlement (what Congress
> enacted) and one that "requires" settlements (what the Donovan Plaintiffs
> apparently wish Congress enacted)**….OPA provides no private cause of action to a
> claimant for the mere fact that the responsible party (or a third party engaged to fulfill the
> responsible party's obligations, as occurred here) failed to settle a claim."

364.  OPA is a strict liability statute. In order to recover damages, a claimant merely

needs to show that his or her damages "resulted from" the oil spill. OPA provides,

> "Each responsible party for a vessel or a facility from which oil is discharged, or which
> poses the substantial threat of a discharge of oil, into or upon the navigable waters or
> adjoining shorelines or the exclusive economic zone is liable for the removal costs and
> damages that result from such incident." 33 U.S.C. § 2702(a).

-95-

365.  The damages referred to in 33 U.S.C. § 2702(a) include, but are not limited to:

"Damages equal to the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources, which *shall* be recoverable by any claimant." 33 U.S.C. § 2702(b)(2)(E) (Emphasis added).

366.  OPA further provides,

(a) "Payment or settlement of a claim for interim, short-term damages representing less than the full amount of damages to which the claimant ultimately may be entitled *shall not* preclude recovery by the claimant for damages not reflected in the paid or settled partial claim." 33 U.S.C. § 2705(a) (Emphasis added); and

(b) "Payment of such a claim [i.e. payment to a claimant for interim, short-term damages representing less than the full amount of damages to which the claimant ultimately may be entitled] *shall not* foreclose a claimant's right to recovery of all damages to which the claimant otherwise is entitled under this Act or under any other law." 33 U.S.C. §§ 2715(b)(1) and (2) (Emphasis added).

367.  "The word 'shall' is ordinarily the language of command." *Anderson v. Yungkau*, 329 U.S. 482, 485 (1947) (quoting *Escoe v. Zerbst*, 295 U.S. 490, 493 (1935). And when the same Rule uses both 'may' and 'shall', the normal inference is that each is used in its usual sense - the one act being permissive, the other mandatory. See *United States ex rel. Siegel v. Thoman*, 156 U.S. 353 (1895).

368.  Use of "shall" and "may" in statutes also mirrors common usage; ordinarily "shall" is mandatory and "may" is permissive. "The mandatory 'shall' ……normally creates an obligation impervious to judicial discretion." *Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998).

369.  OPA's legislative history is shot through with general statements indicative of congressional intent to ensure that all oil spill victims are fully compensated. 135 CONG. REC. H7959 (daily ed. Nov. 2, 1989) (statement of Rep. Tauzin) ("**ensure that all victims are fully compensated**"); 135 CONG. REC. H7964 (daily ed. Nov. 2, 1989) (statement of Rep.

-96-

Hammerschmidt) ("**ensure that all justified claims for compensation are satisfied**"); 135 CONG. REC. H7969 (daily ed. Nov. 2, 1989) (statement of Rep. Dyson) ("**assurances that damages arising from spills will be completely compensated**"); 136 CONG. REC. H336 (daily ed. Feb. 7, 1990) (statement of Rep. Carper) ("**ensure that those people or those businesses that are damaged by these spills are fairly and adequately compensated**"); 136 CONG. REC. S7752 (daily ed. June 12, 1990) (statement of Sen. Mitchell) ("**ensure the fullest possible compensation of oil spill victims**"); S. REP. NO. 101–94, at 12 (1989), *reprinted in* 1990 U.S.C.C.A.N. 722, 734. ("**These provisions are intended to provide compensation for a wide range of injuries and are not so narrowly focused as to prevent victims of an oil spill from receiving reasonable compensation**."); 135 CONG. REC. H7893 (daily ed. Nov. 1, 1989) (statement of Rep. Quillen) ("**full, fair, and swift compensation for everyone injured by oil spills.**").

370.  The precedent established by MDL 2179 ensures that the offshore oil and gas industry will never be held strictly liable for damages resulting from an oil well blowout in the Gulf of Mexico.

371.  Although the durability of Defendant Barbier's uniquely creative reasoning in regard OPA is questionable, the precedent established by the RICO MDL 2179 Defendants is clear: A "Responsible Party" under OPA may now enter into a contract with a politically well-connected third party "Fund Administrator," e.g., Kenneth R. Feinberg and Feinberg Rozen, LLP, d/b/a GCCF. This third party "Administrator / Straw Person," *directly and excessively compensated by the party responsible for the oil well blowout incident*, may totally disregard OPA, operate the claims process of the responsible party as fraudulently and negligently as it

-97-

desires for the sole purpose of limiting the liability of, and providing closure to, the responsible party, and the third party "Administrator / Straw Person" shall never be held accountable for its tortious acts.

### E. Defendants Improperly Apply Louisiana Law Rather Than the Choice-of-Law Rules of the State in Which the Transferor Court Sits

372.  On February 26, 2020, Plaintiffs filed a Motion for Clarification (Rec. Doc. 26344) moving the Court to enter an order clarifying whether the Honorable MDL 2179 Court applies the choice-of-law rules of the state in which the transferor court sits. On March 2, 2020, the Honorable MDL 2179 Court issued an Order (Rec. Doc. 26357) denying the Motion for Clarification. In sum, Plaintiffs were left in the dark in regard to the choice-of-law rules applied by the Honorable MDL 2179 Court.

373.  The U.S. Supreme Court held in *Van Dusen* and *Ferens* that the policies underlying the holdings of *Erie* and *Klaxon* mandated that the law, including the choice-of-law rules, of the transferor court, rather than those of the transferee court, must be applied to a case that has been transferred pursuant to 28 U.S.C. § 1404(a). *Ferens v. John Deere Co.*, 494 U.S. 516, 532 (1990); *Van Dusen v. Barrack*, 376 U.S. 612, 639 (1964).

374.  Defendant Barbier, in his Order and Reasons (Rec. Doc. 28, Filed 03/27/20), held:

"….the Court's own research reveals that **Florida's choice of law regime applies the law of the state that has most this significant relationship to the parties and the occurrence**. *See Merkle v. Robinson*, 737 So.2d 540, 542 (Fla. 1999). Donovan is an attorney in Florida. Herman is an attorney in Louisiana. No contract exists between them. Donovan's claims concern actions Herman allegedly took in his role as a member of the PSC and as Plaintiffs' Co-Liaison Counsel, leadership positions in an MDL that is centralized in Louisiana. Herman's appointments came from this Court, which sits in Louisiana. (Rec. Docs. 110, 506). **All attorneys who appear in this MDL, including both Donovan and Herman, are subject to this Court's disciplinary authority** (Rec.

Doc. 7812) and Louisiana's Rules of Professional Conduct. *See In Re: Deepwater Horizon*, 824 F.3d 571 (5th Cir. 2015) (affirming this Court's decision to sanction attorneys in MDL 2179 for violations of the Louisiana Rules of Professional Conduct); *see also* Rec. Doc. 26089 at 8. **Considering these factors, the Court holds that Louisiana has the most significant relationship to the parties and the events giving rise to this dispute. As a result, Donovan's [twelve] claims are untimely under La. R.S. 9:5605(a)**....Herman cites Louisiana case law indicating that no fiduciary duty exists between these parties. (Rec. Doc. 26269-1 at 2 (citing *Scheffler v. Adams & Reese*, 950 So. 2d 641, 652-53 (La. 2007)). As explained above, **Louisiana law governs this dispute.**" (Rec. Doc. 28, Filed 03/27/20).

375.   As explained above, in its March 27, 2020 Order, the MDL 2179 Court's uniquely creative reasoning allows the RICO MDL 2179 Defendants to circumvent the U.S. Supreme Court's holdings in *Van Dusen* and *Ferens* and hold that **Louisiana law, rather than Florida law, governs this dispute.** This allows Defendant Barbier to conveniently and unfathomably find, "As a result, Donovan's [twelve] claims are untimely under La. R.S. 9:5605(a)."

### F.  Defendants Did Not Hold BP Accountable

376.   Defendants fraudulently, recklessly, negligently and knowingly breached their fiduciary and ethical duties to MDL 2179 Plaintiffs by making false statements of material fact in order to induce Plaintiffs into believing that the proposed settlement is "fair, reasonable, and adequate" for the purpose of maximizing their compensation and the compensation of the seventeen members of the MDL 2179 PSC in exchange for limiting the liability of BP.

### 1.  The Victims' Compensation Fund

377.   The compensation paid to BP oil well blowout victims by the Kenneth R. Feinberg-administered victims' compensation fund was $6,079,922,450.47.

378.   The compensation paid to BP oil well blowout victims during the transition period was approximately $405,000,000.00.

379.   In sum, the total compensation paid to BP oil well blowout victims from August 23, 2010 to June 4, 2012 was $6,484,922,450.47.

### 2. The Economic and Property Damages Settlement Class Action

380. In mid-2010, Defendants and BP made the business decision to have BP pay a total amount of $20 billion to compensate all the BP oil well blowout victims in the settlement class action.

381. On October 25, 2016, Defendant Barbier states, "In December 2015, Magistrate Judge Wilkinson estimated the total claims payout from the Economic Settlement when he allocated amounts under the Transocean and Halliburton Settlements. Judge Wilkinson's estimate was $10.825 billion. (Rec. Doc. 15652 at 16). Judge Wilkinson's estimate appears to be based solely on projected payments under the Economic Settlement, and does not appear to include Seafood and Tourism Promotional Grants, Transocean Insurance Proceeds, Medical Settlement benefits, administrative costs, notice costs, or common benefit attorney fees. Considering the foregoing, the Court finds that a conservative estimate of the total value of the Settlements is $13 billion." (Rec. Doc. 21849 at 32 - 33).

382. In October 2016, approximately $6.2 billion had been paid out under the GCCF. Defendant Barbier could not predict, on October 25, 2016, that the total amount that will eventually be paid by just the Deepwater Horizon Claims Center is $13 billion unless Defendant Barbier knew *Defendants and BP made the business decision to have BP pay a total amount of $20 billion to compensate all the BP oil well blowout victims in the settlement class action* ($20 billion - $6.2 billion - $0.6 billion in attorneys' fees yields an estimate of $13 billion).

### 3. The Medical Benefits Settlement Class Action

383. Cleanup workers and coastal residents who suffered exposure to crude oil and chemical dispersants resulting from the BP oil well blowout brought personal injury lawsuits

against BP and other entities involved in this disaster.

384. The defendants and BP negotiated a Medical Benefits Class Action Settlement Agreement which the MDL 2179 court approved on January 11, 2013.

385. During the Fairness Hearing in November 2012, Greenwald stated that she believed approximately 200,000 people, cleanup workers and residents, could belong to the Medical Benefits Settlement Class.

386. The Medical Benefits Class Action Settlement Agreement divided the claims into two phases. Under the first phase, each class member with adequate affidavits or medical records was to be compensated for a Specified Physical Condition ("SPC") according to the list of tables known as the "Matrix," which specified medical conditions, times of physical manifestation of the condition, and proof required for compensation. Under the second phase, known as the Back-End Litigation Option ("BELO"), a class member with a "later-manifested physical condition" ("LMPC") diagnosed after the cut-off date of April 16, 2012, was to be allowed to litigate the claim in court.

387. Claim processing and administration was the responsibility of the Garretson Resolution Group ("Garretson" or "Claims Administrator").

388. Unfathomably, Defendant Barbier agreed with BP and Garretson in finding that a class member who was diagnosed with a chronic condition after April 16, 2012 was excluded from asserting an SPC claim, and could only assert a LMPC claim under the BELO.

**a. SPC**

389. To be compensated for a SPC, claimants had to submit a Proof of Claim form to Garretson no later than one year after the "effective date" of February 12, 2014 or they would lose their right to be compensated.

390.  Allegedly, depending on the type of medical condition suffered because of exposure and the level of proof presented, claimants could qualify for one of five levels of compensation (A1, A2, A3, A4, or B1). Acute conditions are compensable under levels A1, A2, A3, and A4. Chronic conditions are compensable under level B1.

391.  The lowest level of compensation was the A1 level ($1,300 for cleanup workers and $900 for zone residents). Here, a claimant had to declare the manifestation of a medical condition within a prescribed timeframe (within seventy two hours of exposure). To qualify for the A2, A3, and A4 levels of compensation (a lump sum between $2,700 and $12,350), a claimant had to present supporting medical records that Garretson evaluated "based on the totality of the evidence….whether that evidence more likely than not supports the assertions made in the declaration." To qualify for the B1 level of compensation ($60,700 for cleanup workers and $36,950 for zone residents), a claimant had to present relevant medical records establishing ongoing care for a chronic condition as well as "indicate that exposure was considered by either the claimant or the medical professional to be related to the condition(s) or symptom(s)."

392.  The only way to claim compensation above the basic A1 level ($1,300 for cleanup workers and $900 for residents) was for a claimant to have a medical diagnosis of his or her condition. This was disastrous for many class members who did not have health insurance and could not pay for the costly medical tests required to get diagnosis.

393.  As Greenwald admitted during the Fairness Hearing, there was "no fund set up for people….to go to a doctor and get their diagnoses" and there was "no place that they [could] go before they file[d] their claim form to find out what they ha[d]."

-102-

394. If a claimant could not afford medical diagnosis - a process which included not only a visit to a primary care physician, but also multiple visits to and costly medical tests from a specialist - such a claimant was arguably precluded from receiving compensation higher than the A1 level. These claimants, some with multiple conditions, will now have to participate in the litigation phase that was originally intended for class members with medical conditions manifesting years after the exposure, including leukemia and other cancers.

395. Many SPC claims were uncompensated or undercompensated. Garretson has absolute and unreviewable power to determine whether claims are valid or not and what level of compensation is due to each claimant. **Seventy-eight percent (78%)** of SPC claims submitted to Garretson received either a "Request for Additional Information" or a "Notice of Defect." As of November 2018, merely 22,836 out of 37,225 claimants had been awarded $67.2 million in compensation. This yields an average compensation per person of $2,944. **Thirty-six percent (36%)** of the total 37,225 claimants (or 13,403 claimants) were denied any compensation under SPC.

396. Many claimants decided to accept the lowest payment of $1,300 (under A1) because they could no longer wait for the money to cover their medical expenses. Garretson employed a very successful "Delay, Deny, Defend" strategy to limit BP's liability.

**b. BELO**

397. To be compensated under the BELO, a plaintiff must first submit to Garretson a written Notice of Intent to Sue ("NOIS") and identify particular diagnosed medical conditions that the plaintiff will allege in the BELO claim. Garretson is required to review the NOIS and transmit it to BP within ten days. Then, BP has thirty days to choose whether to mediate the

claim. If BP chooses not to mediate, the plaintiff acquires the right to file a BELO action, provided it is filed within six months of the date Garretson informs the plaintiff of BP's decision not to mediate.

398. BELO claims are only for compensatory damages. Plaintiffs may not assert any claims in a BELO lawsuit for punitive damages, exemplary damages, multiple damages, and other non-compensatory damages or penalties of any kind.

399. As of November 2018, class members had filed a total of 6,699 NOIS claims, 4,080 of them were approved by Garretson, and, of those, 2,673 claims are eligible to be filed in the Eastern District of Louisiana.

400. If a plaintiff who claims a LMPC is determined by the MDL 2179 court to have failed to comply with the procedures set forth in Section VIII of the Medical Benefits Class Action Settlement Agreement, and such determination is final and not subject to further appeal, he or she shall be barred from bringing a BELO lawsuit and all of his or her claims related to that LMPC shall be deemed released and discharged with prejudice.

### 4. The Clean Water Act

401. On October 5, 2015, the U.S. Department of Justice ("DOJ") released the following statements:

> "The United States today joins the five Gulf states in announcing a settlement to resolve civil claims against BP arising from the April 20, 2010 Macondo well blowout and the massive oil spill that followed in the Gulf of Mexico….This global settlement resolves the governments' civil claims under the Clean Water Act and natural resources damage claims under the Oil Pollution Act, as well as economic damage claims of the five Gulf states and local governments. Taken together this global resolution of civil claims is worth $20.8 billion."

> "Building on prior actions against BP and its subsidiaries by the Department of Justice, this historic resolution is a strong and fitting response to the worst environmental disaster

in American history," said Attorney General Loretta Lynch. "BP is receiving the punishment it deserves, while also providing critical compensation for the injuries it caused to the environment and the economy of the Gulf region. I am proud that the Department of Justice has helped lead the way from tragedy to opportunity, and I am confident that our actions today will help to ensure that Gulf communities emerge from this disaster stronger and more resilient than ever before."

402.  On April 4, 2016, following the order by Defendant Barbier to enter the consent decree settling *United States of America v. BP Exploration & Production Inc., et al.*, Attorney General Loretta E. Lynch released the following statement:

"Today's action holds BP accountable with the largest environmental penalty of all time while launching one of the most extensive environmental restoration efforts ever undertaken…. The Department of Justice will continue to stand with the people of the Gulf as they seek to rebuild and protect the marine life, coastal systems, and beautiful beaches that have made the region a treasured natural resource."

403.  These statements are indefensible for the following reasons.

### a.  Defendant Barbier Arbitrarily Reduced the Amount of Oil Released from the Reservoir by 1.0 Million Barrels

404.  Defendant Barbier knowingly failed to hold BP fully accountable in regard to the Clean Water Act ("CWA") civil penalty. Defendant Barbier saved BP approximately $4.30 billion by finding that only 4.0 million barrels of oil, rather than 5.0 million barrels of oil proposed by the United States, exited the reservoir.

405.  The parties stipulated that during the spill response 810,000 barrels of oil were collected without contacting any ambient sea water ("Collected Oil"). Thus, while the parties present estimates of the total volume of oil that left the reservoir, they agree that 810,000 barrels should not be used to calculate the statutory maximum penalty under the CWA.

406.  Ultimately, the United States proposed that 5.0 million barrels of oil exited the reservoir, resulting in a net discharge of 4.19 million barrels once adjusted for the collected oil.

-105-

407.  The MDL 2179 Court found that 4.0 million barrels of oil released from the reservoir. After deducting the collected oil from this amount per the parties' stipulation, the Court found for purposes of calculating the maximum possible civil penalty under the CWA that 3.19 million barrels of oil discharged into the Gulf of Mexico.

408.  The MDL 2179 Court held that the EPA's regulation, 40 C.F.R. § 19.4 (2010), adjusting the civil penalty in 33 U.S.C. § 1321(b)(7)(D) is valid and that the maximum CWA civil penalty that may be imposed against BP is $4,300 per barrel of oil discharged. (*See* The Honorable Carl J. Barbier, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Rec. Doc. 14206 at 7, February 19, 2015)).

409.  In short, the maximum CWA civil penalty that could be assessed against BP is approximately $13.72 billion (3,190,000 x $4,300).

410.  If Defendant Barbier had not arbitrarily reduced the amount of oil released from the reservoir by 1.0 million barrels, the maximum CWA civil penalty that could be assessed against BP would have been approximately $18.02 billion (4,190,000 x $4,300).

**b. Defendants Barbier, Herman, and Roy Negotiated an Excessively Favorable Payment Schedule for BP**

411.  Defendants Barbier, Herman, and Roy negotiated the following payment schedule for BP in regard to the government entity settlements. BP is required to pay,

(a) $5.5 billion to the United States as a civil penalty under the Clean Water Act, *payable over 15 years*;

(b) $7.1 billion to the United States and the five Gulf states for natural resource damages, *payable over 15 years*; and

(c) $4.9 billion to settle economic and other claims made by the five Gulf Coast states, *payable over 18 years*.

**c. Former Attorney General Loretta Lynch and the RICO MDL 2179 Defendants Failed to Take BP's U.S. Taxes into Account**

412. As stated above, on October 5, 2015, the DOJ released the following statement:

"The United States today joins the five Gulf states in announcing a settlement to resolve civil claims against BP arising from the April 20, 2010 Macondo well blowout and the massive oil spill that followed in the Gulf of Mexico….This global settlement resolves the governments' civil claims under the Clean Water Act and natural resources damage claims under the Oil Pollution Act, as well as economic damage claims of the five Gulf states and local governments. Taken together this global resolution of civil claims is worth $20.8 billion."

413. Ms. Lynch and the RICO MDL 2179 Defendants failed to point out that BP is able to deduct $15.3 billion of this $20.8 billion on its U.S. tax return. In short, this "global settlement" requires U.S. taxpayers to pay $15.3 billion and BP is only required to pay $5.5 billion.

414. BP can also write off the natural resource damages payments, restoration, and reimbursement of government costs. Accordingly, BP wrote off the cost of its $32 billion cleanup effort after the spill, costing U.S. taxpayers roughly $10 billion.

415. In sum, Defendants Barbier, Herman, and Roy failed to hold BP accountable in regard to the Clean Water Act ("CWA") civil penalty as follows.

(a) The total amount of oil released from the reservoir was 5,000,000 barrels;

(b) The total amount of "collected oil" was 810,000 barrels;

(c) The net discharge of oil was 4,190,000 barrels;

(d) The CWA civil penalty due to BP's gross negligence is $4,300/barrel;

(e) The CWA penalty BP should pay is $18.02 billion; and

(f) The total CWA penalty BP actually paid is $13.72 billion.

416. Defendant Barbier saved BP approximately $4.30 billion by agreeing that only 4.0 million barrels of oil, rather than 5.0 million barrels of oil, was released from the reservoir. Defendant Barbier argued that for purposes of calculating the maximum possible civil penalty under the CWA that 3.19 million barrels of oil discharged into the Gulf of Mexico. In short, the maximum CWA civil penalty that could be assessed against BP is approximately $13.72 billion (3,190,000 x $4,300).

417. Defendants Barbier, Herman, and Roy also negotiated the following very favorable payment schedule for BP in regard to the government entity settlements. BP is required to pay,

(a) $5.5 billion to the United States as a civil penalty under the Clean Water Act, *payable over 15 years*;

(b) $7.1 billion to the United States and the five Gulf states for natural resource damages, *payable over 15 years*; and

(c) $4.9 billion to settle economic and other claims made by the five Gulf Coast states, *payable over 18 years*.

418. As explained above, The RICO MDL 2179 Defendants also intentionally failed to take BP's U.S. taxes into account.

### IV. Defendants Intentionally and Systematically Misled Plaintiffs

### A. The Agreement-in-Principle

419. On March 9, 2012, the RICO MDL 2179 Defendants released a summary of the agreement-in-principle which was allegedly entered into between the MDL 2179 plaintiffs and BP.

420. In this summary, the RICO MDL 2179 Defendants made the following false statements of material fact to Plaintiffs.

-108-

(a) This Settlement is an *enormous victory* for Gulf Coast workers, businesses and families.

(b) The Settlement *does the most good for the greatest number of people* - encompassing the wide geographic region and many types of businesses affected by the BP Gulf Oil Spill.

(c) Contrary to what some news outlets have implied, the Settlement has *no cap or limit*. The only exception is the Seafood Program for commercial fishing vessel owners, captains and deckhands. BP has agreed to fund this Seafood Program at $2.3 billion.

(d) The Settlement *holds BP accountable*.

(e) The parties *have not had any fee discussions to date* and will not have any such discussions until authorized to do so by the Court.

(f) Many qualifying claimants *may receive greater benefits* from the Settlement Claims Programs than from the GCCF.

(g) *Hundreds of thousands of victims of the BP Gulf Oil Spill will be made whole* as a result of this settlement - regardless of whether or not they previously joined the MDL lawsuit or filed a claim with the GCCF.

(h) Once the Settlement Claims Programs are set up, the Court will continue to supervise their operation in all respects throughout their duration to *ensure fairness, transparency, and efficiency.*

(i) A $57 million marketing fund will be established *to promote tourism and Gulf seafood*.

421. The RICO MDL 2179 Defendants make the following false statements of material fact to Plaintiffs when they further try to explain why they believe the settlement claims program is fair.

(a) The Settlement process and formulas used to calculate compensation will be *completely transparent* and applied with consistency.

(b) The Court will supervise the Settlement Claims process from start to finish to *ensure fair, impartial, and consistent processing and payment of claims*.

(c) Claimants, their accountants, and their lawyers will know the compensation formulas and *will be able to calculate compensation for specific claims before deciding whether to opt-out* or participate in the Settlement.

(d) The compensation *calculations have been carefully determined* to account for relevant economic factors and are flexible to each claimant's specific circumstances.

(e) The Settlement Claims Program will generally apply a larger enhancement to *account for potential future losses* and other risks than did the GCCF.

(f) Offsets for amounts already received from BP or the GCCF are deducted after *the enhancement for future losses* is applied.

(g) A Class Member *can choose to opt-out of the Settlement and instead prosecute their case in Court*.

(h) Businesses and individuals that are not Class Members, or whose claims are not included in the Settlement, *can generally continue to prosecute their cases in Court*.

422. On May 2, 2012, the MDL 2179 Court issued a "Preliminary Approval Order as to the Proposed Economic and Property Damages Class Action Settlement." In this Order, Defendant Barbier explains,

> "At this stage, the Settlement Agreement appears fair, has no obvious deficiencies, does not improperly grant preferential treatment to the Class Representatives or to segments of the Class, and *does not grant excessive compensation to attorneys*…"

423. The total compensation (composed of common benefit fees, contingent fees, co-counsel fees, and hold-backs) paid to Defendants Herman and Roy, and the seventeen members of the MDL 2179 PSC, was $3.035 billion. It is beyond cavil that a reasonable, objective observer would not conclude that this amount is out of all proportion to the value of the professional services rendered.

424. On November 5, 2010, the MDL 2179 Court issued PTO No. 15 which states, "All pending and future motions, including the Motions to Remand, are continued without date unless a motion is specifically excepted from the continuance by the Court."

-110-

425.  On January 12, 2011, the MDL 2179 Court issued PTO No. 25 which states, "Any individual plaintiff who is a named plaintiff in a case that falls within Pleading Bundle B1, B3, D1, or D2, or any combination thereof, is deemed to be a plaintiff in the applicable Master Complaint(s)….All individual petitions or complaints that fall within Pleading Bundles B1, B3, D1, or D2, whether pre-existing or filed hereafter, are stayed until further order of the Court."

426.  Defendants Barbier and Herman make it very clear that the settlement class action is the only game in town. Take it or leave it. It has been nearly 10 years since the BP oil well blowout. PTO No. 15 and PTO No. 25 are still in force. Class Members who opted-out are still not able to pursue their claims.

427.  It is important to understand that *the MDL 2179 plaintiffs* did not reach an Agreement-in-Principle on the proposed settlements. Herman, Roy, the seventeen MDL 2179 PSC members and BP entered into a mutually beneficial settlement. The plaintiffs in MDL 2179 were merely a commodity bargained for and sold by Defendants Herman and Roy, and the seventeen MDL 2179 PSC members to BP.

428.  The negotiated settlement class action is not superior to the OPA (a *strict liability* statute). The only reason this settlement class action exists is because Defendant Herman designated the "B1" Master Complaint as an admiralty or maritime case in order to limit BP's liability.

429.  The settlement is not "an enormous victory for Gulf Coast workers, businesses and families."

430.  The negotiated settlement class action which illegally excludes approximately 220,000 claimants, requires that a claimant's recovery of damages under the OPA be limited by

-111-

geographic bounds, pertain solely to certain business activities, and demands a heightened and vague proof of causation between his or her damages and the oil well blowout incident is not "fair, reasonable, adequate, and consistent with governing law."

431.  The RICO MDL 2179 Defendants fraudulently, recklessly, negligently and knowingly breached their fiduciary and ethical duties to MDL 2179 Plaintiffs by making false statements of material fact in order to induce MDL 2179 Plaintiffs into believing that the proposed settlement is "fair, reasonable, and adequate."

### B. Examples of False and Misleading Statements Disseminated to Deceptively Promote MDL 2179

#### 1. False Statements Made by Defendant Feinberg

432.  In the agreement entered into between BP and Feinberg Rozen, LLP on June 15, 2010 Defendant Feinberg clearly and repetitively states,
"Feinberg Rozen shall follow OPA as it operates and administers the GCCF;"
"Feinberg Rozen's determinations with respect to OPA Claims will be guided by OPA;"
"The GCCF (and the protocols under which it operates) are structured to be compliant with OPA;" and
"The GCCF claims process is structured to comply with OPA and apply the standards of OPA."

433.  In concurrence, Defendant Barbier states,
"….the Gulf Coast Claims Facility ("GCCF"), spearheaded by Mr. Feinberg and his law firm, would replace the original BP claims process and *perform BP's obligations under OPA with respect to private economic loss claims*;" and
"This Court has the responsibility to ensure that the mandates of OPA are implemented."

434.  On August 23, 2010, Kenneth R. Feinberg and Feinberg Rozen, LLP, doing business as GCCF, replaced the claims process which BP had established to fulfill its obligations as a Responsible Party pursuant to OPA. Defendant Feinberg, in clear violation of OPA, used the fear of costly and protracted litigation to coerce victims of the BP oil well blowout to accept

grossly inadequate settlements from GCCF. During widely-reported town hall meetings and on the Internet, during the period from approximately June 15, 2010 to April 15, 2012, Feinberg repeatedly told victims of the BP oil well blowout:

"The litigation route in court will mean uncertainty, years of delay and a big cut for the lawyers;"
"I am determined to come up with a system that will be more generous, more beneficial, than if you go and file a lawsuit;"
"It is not in your interest to tie up you and the courts in years of uncertain protracted litigation when there is an alternative that has been created;" and
"I take the position, if I don't find you eligible, no court will find you eligible."

435.  In clear violation of OPA, Feinberg's approach to determining claimant eligibility was driven by two factors: (1) loss location; and (2) claimant business type. Feinberg repeatedly made the following false statements of material fact to induce victims of the BP oil well blowout to accept grossly inadequate settlements from GCCF:

"The Gulf of Mexico will recover from the BP oil spill by the end of 2012;"
"Experts have determined that most of the oil would have dispersed and the economy picked up by the end of 2012;" and
"There will be a 30% recovery in 2011."

436.  In an interview with investigative reporter David Hammer of WWLTV on April 17, 2015, Feinberg states,

"I've never seen any evidence of duress;"
"I can either get a great deal more money with documentation, or I don't even need documentation and I can get a check in the next couple of weeks or months. I'm not surprised at all, human nature being what it is. I see no duress. I see each fisherman making the decision of what's best for the fisherman." and
"….when it comes to compensating innocent people, I think that what we [Feinberg Rozen, et al.] did and what BP did deserves a great deal of praise."

### 2.  False Statements Made by Defendant Barbier

437.  Defendant Barbier, in his Preliminary Approval Order, incomprehensibly states, "However, extended litigation between or among adversaries, as occurred here, might bolster confidence that the settlement negotiations were at arm's length."
The Honorable Carl J. Barbier, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Rec. Doc. 6418 at 14).

438. On May 2, 2012, the MDL 2179 Court issued a "Preliminary Approval Order as to the Proposed Economic and Property Damages Class Action Settlement." The following are excerpts from Defendant Barbier's 47-page Order.

"The Proposed Settlement intends to resolve certain claims by private individuals and businesses for economic loss and property damage resulting from the '*Deepwater Horizon* Incident.' The class would consist of individuals and entities defined by (1) geographic bounds and (2) the nature of their loss or damage. If both criteria are not met, or the individual or entity opts out of the class, then the individual or entity is not within the settlement class and the claims are unaffected by the Proposed Settlement [in violation of OPA];"

"Those who accept payments under the Proposed Settlement are required to release their claims against BP, government oil spill liability funds, and all other Defendants in MDL 2179 (except Transocean and Halliburton) [in violation of OPA];"

439. Defendant Barbier emphasizes, in his opinion,
"The Parties engaged in a multi-month, extensive, *arms-length settlement process*, *free of collusion*…Over the course of these many months, the parties' counsel, assisted and informed by experts and colleagues with specialized knowledge of various aspects of the litigation and the array of claims categories, engaged in numerous and ongoing settlement discussions and negotiation sessions….During these lengthy settlement negotiations, which commenced in February 2011 and continued for more than one year, the parties negotiated the detailed, complex, and carefully thought-out claims categories and benefits of this settlement;"

440. Defendant Barbier further explains, in his opinion,
"The comprehensive system of claims frameworks featured in the Settlement Agreement is the product of many months of intensive negotiation, *provides for class recovery unlimited by any aggregate cap, does not constitute a limited fund to be divided among competing claimants* (with the sole exception of the US$2.3 billion Seafood Compensation Program, whose allocation was placed with a court-appointed neutral), and does not place class members in conflict or competition with each other. The settlement thus provides 'a procedure for distribution of the settlement fund that treats class claimants equitably amongst themselves;'"

441. Defendant Barbier concludes,
"At this stage, the Settlement Agreement appears fair, has no obvious deficiencies, does not improperly grant preferential treatment to the Class Representatives or to segments of the Class, and *does not grant excessive compensation to attorneys*;" and

"All Economic Loss and Property Damage Class Members who do not timely and properly Opt-Out shall, in all respects, be bound by all terms of this Agreement and the Final Order and Judgment, shall be entitled to all procedural opportunities and protections described herein and provided by the Court, and all compensation for which they qualify under its terms, and shall be permanently and forever barred from commencing, instituting, maintaining or prosecuting any action based on any Released Claim against any Released Parties in any court of law or equity, arbitration tribunal, administrative proceeding, or other forum [in violation of OPA]."

442. The aggregate settlement rule ("ASR") governs global MDL settlements. The

following false statement by Defendant Barbier is a clear violation of the ASR.

"Claimants have no right to know their exact compensation amount prior to the opt-out date….any class member seeking to determine his compensation may simply read the settlement agreements and determine how his circumstances fit into the frameworks….in all cases, the frameworks are detailed and transparent and a claimant can make a reasonable determination of how his claim will be resolved based on his or his business's circumstances….class members do not need to be able to pinpoint the compensation for which they will be eligible in order to decide whether to remain in the Settlement Class." The Honorable Carl J. Barbier, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Rec. Doc. 8138 at 81, December 21, 2012).

443. On August 26, 2011, Defendant Barbier states,
"….While OPA does not specifically address the use of waivers and releases by Responsible Parties, *the statute also does not clearly prohibit it*….In fact, as the Court has recognized in this Order, one of the goals of OPA was to allow for speedy and efficient recovery by victims of an oil spill."
The Honorable Carl J. Barbier, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Rec. Doc. 3830 at 34-35).

444. Defendant Barbier clearly states, "The long term effects [of the BP oil well

blowout] on the environment and fisheries may not be known for many years." Nevertheless, in

order to limit BP's liability, Defendant Barbier found that limiting the compensation period to

2010 is reasonable. On December 21, 2012, Defendant Barbier states,

"Certain objectors complain that the Economic Damage Claim Frameworks are unfair because they do not compensate persons who did not begin suffering losses until 2011. Yet this provision is reasonable for three reasons: (i) the Macondo well ceased flowing in July 2010; (ii) there is evidence that by late 2010, Gulf Coast tourism had returned to or

-115-

surpassed 2009 levels; and (iii) as to claims by individuals and businesses in charter fishing, seafood processing, or other businesses relying on access to Gulf waters, nearly all federal and state waters were reopened for commercial fishing by November 2010. *Thus, extending compensation to 2011 would cover losses not likely caused by the spill*." The Honorable Carl J. Barbier, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Rec. Doc. 8138 at 88, December 21, 2012).

445. On December 21, 2012, Defendant Barbier, in discussing the causation

requirements for BEL claims, states,

"Certain objectors contend that to invoke the Modified V-Test or the Decline-Only Test, they are required to satisfy the Customer Mix Test, which requires these businesses to establish where their customers are located. The objective evidence shows that the causation tests available under the Settlement Agreement are both economically reasonable and highly favorable to claimants, which is why they were negotiated by experienced counsel in consultation with their clients and experts….Other objectors complain that before they can invoke the V-Shaped Revenue Pattern test, they must demonstrate a 5% revenue recovery during the correlating months of 2011 as compared to the 2010 baseline period. This provision is reasonable, as *losses that continued after the spill are likely to be due to factors other than the spill*." The Honorable Carl J. Barbier, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Rec. Doc. 8138 at 89, December 21, 2012).

446. On December 21, 2012, Defendant Barbier issued his "Order and Reasons Granting

Final Approval of the Economic and Property Damages Settlement Agreement." This 125-page

Order is replete with examples of judicial deception. Each of these deceptively false statements

is an example of the MDL 2179 Court contravening the MDL statute, the U.S. Supreme Court's

decision in the *Lexecon* case, and the Oil Pollution Act of 1990.

447. On December 21, 2012, Defendant Barbier makes the following false statements, "Perhaps most importantly, this Settlement *does not involve a limited fund*….;" "The preference for settlement over the expenditure of scarce judicial resources gains added force under the OPA statute, which is designed to catalyze settlements. *This settlement represents exactly the type of outcome that OPA was intended to produce*;" "There is no evidence whatsoever of any fraud or collusion in the negotiation of the Settlement. Rather, in light of the considerations discussed above, any suggestion of fraud or collusion is baseless;" "The Settlement Agreement provides compensation to class members that appears sufficient to make each and every class member whole for his, her, or its compensatory losses;"

-116-

"Claims Administrator Patrick Juneau: 'I've never been involved in a project that has gotten up this quick, had the involvement with the volume we had to deal with, and to either have started it earlier or gotten it paid this quickly. It's been a remarkable experience for me.'….'*The pace of payment determinations and payments is very high* in comparison to other claims matters and is especially reasonable considering the other substantial responsibilities of the Settlement Program during this same period of time;'"

"….any class member seeking to determine his compensation may simply read the settlement agreements and determine how his circumstances fit into the frameworks….In all cases, the frameworks are detailed and transparent and a claimant can make a reasonable determination of how his claim will be resolved based on his or his business's circumstances;"

"BP has agreed to make the class members whole for their compensatory damages, and in many cases perhaps more than whole, especially as to claimants eligible to claim multiples of their losses via RTPs;"

"….the Settlement reasonably compensates the owners of failed businesses for the entire value of their firm;"

"There is no basis in OPA for the preferential treatment of a particular ethnic community, and subsistence claimants in the Gulf belong to many ethnicities, heritages, and communities….*The Settlement Agreement is already extremely generous in compensating claimants for the retail value of their lost subsistence*;"

"Several objectors assert that the Seafood Compensation Program fails to account for future risks to Gulf of Mexico fisheries. These objections fail. First, the SCP includes RTPs designed specifically to compensate for such claims of uncertainty. Second, this was a reasonable compromise considering evidence, in the declarations of Dr. Tunnell and Dr. Smith, that *most of the relevant commercial species appear to be within normal, pre-spill trends*….;"

"….the Court finds that this Settlement is superior to the GCCF at the very least because it is judicially supervised, meaning that it is a program that must meet heightened guarantees of consistency with due process and fairness;"

"The release was crafted with care. Such careful negotiation of the release was "an example of reasoned statesmanship;"

"….there was no collusion in the negotiation of the Settlement;" and

"….the procedures by which the Court conducted the fairness hearing were well within its discretion."

The Honorable Carl J. Barbier, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Rec. Doc. 8138 at 57, December 21, 2012).

### 3. False Statements Made by the MDL 2179 PSC and the Garretson Resolution Group

448. The MDL 2179 PSC and the Garretson Resolution Group make the following false statements of material fact to Plaintiffs under the section titled, "MORE DETAILS ON THE MEDICAL SETTLEMENT CLAIMS PROGRAM" in the summary of the agreement-in-

principle.

    (a) The Medical Settlement will provide benefits to qualifying cleanup workers and Gulf Coast residents and improve access to medical services for families in underserved Gulf Coast communities.

    (b) The Medical Settlement is designed to do the most good for the greatest number of people.

    (c) The GCCF rarely compensated medical claims.

    (d) There are four components to the Medical Settlement:

    (1) Compensation for specified physical conditions;

    (2) Provision of periodic medical consultations;

    (3) Provision of a back-end litigation option for later-manifested illnesses;

    (4) Provision of a $105 million Gulf Coast Region Health Outreach Program.

    (e) Specified medical conditions caused by exposure to oil or chemical dispersants are covered:

    (1) No proof of medical treatment required in some instances.

    (2) Covered symptoms and conditions include certain respiratory, eye, skin, gastroenterological and neurological conditions.

    (f) Periodic medical consultations and diagnostic screenings are provided for 21 years.

    (g) Individuals with exposure-related illnesses that manifest in the future are protected and can sue BP without proof of fault (although punitive damages are waived).

    (h) The Gulf Coast Region Health Outreach will improve access to healthcare services in underserved communities throughout the Gulf Coast region.

### C. Defendants Disseminated Their Misleading Messages About MDL 2179 Through Multiple Channels

449. Defendants utilized various channels to carry out their "Eight-Step" fraudulent scheme to maximize judicial efficiency and/or maximize their compensation in exchange for limiting the liability of BP: (1) "Front Groups" with the appearance of independence from the defendants; (2) so-called legal experts ("Thought Leaders") who were paid by the defendants to promote their misleading messages and fraudulent scheme; (3) Bi-Annual mass tort conferences used to spread Defendants' deceptive messages about MDL 2179; and (4) Defendant Feinberg's amicus brief filed with the U.S. Supreme Court on September 4, 2014.

#### 1. Defendants Directed Front Groups to Deceptively Promote MDL 2179

450. The "Front Groups" used by Defendants to disseminate their misleading messages about MDL 2179 are composed of the seventeen members of the MDL 2179 PSC, each MDL

2179 PSC member's respective law firm, and The Garretson Firm Resolution Group, Inc.

451. The seventeen members of the MDL 2179 PSC are: Brian H. Barr, Scott Summy, Jeffrey A. Breit, Elizabeth J. Cabraser, Philip F. Cossich, Jr., Robert T. Cunningham, Alphonso Michael Epsy, Calvin C. Fayard, Jr., Robin L. Greenwald, Colson Hicks Eidson, Rhon E. Jones, Matthew E. Lundy, Michael C. Palmintier, Paul M. Sterbcow, Mikal C. Watts, Joseph F. Rice, and Conrad S.P. "Duke" Williams, III.

452. It is important to note, "….the settlement terms for each identifiable subgroup were subjected to the approval of a seventeen-member Plaintiffs' Steering Committee. The PSC was consulted and participated throughout the settlement process…." The Honorable Carl J. Barbier, *See, e.g.*, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Rec. Doc. 8138 at 32, December 21, 2012).

453. It is important to note that the appointment to the MDL 2179 PSC is of a personal nature. Accordingly, the appointees cannot be substituted by other attorneys, including members of the appointees's law firm, to perform the PSC's exclusive functions, such as committee meetings and court appearances, except with prior approval of the Court.

454. The total compensation (composed of common benefit fees, contingent fees, co-counsel fees, and hold-backs) paid to Defendants Herman and Roy, and the seventeen members of the MDL 2179 PSC, is estimated to be **$3.035 billion**.

455. At all times material herein, Brian H. Barr, a resident of the State of Florida and a partner at the "Front Group" law firm Levin, Papantonio, Thomas, Mitchell, Rafferty & Proctor, P.A., served as a member of the MDL 2179 PSC. Barr was one of the primary attorneys that Co-Liaison Counsel relied upon for leadership and overall strategy. He was one of the

primary attorneys responsible for PSC / Common Benefit Attorneys communications and PR. Barr participated in the BP Economic Settlement negotiations, and also participated in settlement implementation and the post-settlement disputes. Barr's principal place of business is located at 316 S Baylen Street, Ste. 600, Pensacola, FL 32502

456.  At all times material herein, Scott Summy, a resident of the State of Texas and a partner at the "Front Group" law firm Baron & Budd, P.C., served as a member of the MDL 2179 PSC. Summy was appointed to the Executive Committee and contributed to the development of the scientific and environmental issues, assisted with the *pre-MDL* 2179 organization, and participated in various Executive Committee and PSC strategy discussions and projects throughout the litigation. Summy's principal place of business is located at 3102 Oak Lawn Ave Suite 1100, Dallas, TX 75219.

457.  At all times material herein, Jeffrey A. Breit, a resident of the State of Virginia and a partner at the "Front Group" law firm Breit, Drescher, Imprevento & Walker, P.C., served as a member of the MDL 2179 PSC and committed substantially to the MDL 2179 "litigation." Breit's principal place of business is located at 600 22nd Street, Suite 402, Virginia Beach, VA 23451.

458.  At all times material herein, Elizabeth J. Cabraser, a resident of the State of California and a partner at the "Front Group" law firm Lieff, Cabraser, Heimann & Bernstein, LLP, served as a member of the MDL 2179 PSC. Cabraser played a lead role in the research, preparation, drafting and other coordination of pleadings, briefs, and appeals. She participated in BP Settlement Negotiations, the settlement approval process, the settlement implementation process, and the post-settlement disputes. Cabraser was also involved in the development of

economic and property damages models. Cabraser's principal place of business is located at 275 Battery Street, 29th Floor, San Francisco, CA 94111.

459.  At all times material herein, Philip F. Cossich, Jr., a resident of the State of Louisiana and a partner at the "Front Group" law firm Cossich, Sumich, Parsiola & Taylor, L.L.C., served as a member of the MDL 2179 PSC and contributed substantial efforts to the development of scientific and environmental issues through the BP Settlements. Cossich's principal place of business is located at 8397 Highway 23, Suite 100, Belle Chasse, Louisiana 70037.

460.  At all times material herein, Robert T. Cunningham, a resident of the State of Alabama and a partner at the "Front Group" law firm Cunningham Bounds, LLC, served as a member of the MDL 2179 PSC and participated in the post-settlement "litigation" with BP, general settlement implementation in the program, and Class Counsel assistance to other plaintiffs' attorneys, CPAs and unrepresented claimants with their Settlement Program claims and appeals. Cunningham was also a member of the PSC whom Co-Liaison Counsel generally relied upon for leadership and overall strategy. Cunningham's principal place of business is located at 1601 Dauphin Street, Mobile, Alabama 36604.

461.  At all times material herein, Alphonso Michael Epsy, a resident of the State of Mississippi and an attorney at the "Front Group" law firm Morgan & Morgan, P.A., served as a member of the MDL 2179 PSC; participated in the development of scientific, economic, and environmental issues; and assisted with the PSC / Common Benefit Attorney communication and PR efforts. Epsy's principal place of business is located at 4450 Old Canton Road, Suite 200, Jackson, Mississippi 39211.

462. At all times material herein, Calvin C. Fayard, Jr., a resident of the State of Louisiana and a partner at the "Front Group" law firm Fayard & Honeycutt APC, served as a member of the MDL 2179 PSC. He was the designated PSC member responsible for exploring settlement opportunities, working closely with Rice and Defendants Herman and Roy on the BP Settlement negotiations. Fayard's principal place of business is located at 519 Florida Ave SW, Denham Springs, Louisiana 70726.

463. At all times material herein, Robin L. Greenwald, a resident of the State of New York and a partner at the "Front Group" law firm Weitz & Luxenberg, P.C., served as a member of the MDL 2179 PSC. Greenwald served as a negotiator of the Medical Benefits Settlement and also played a major role in Medical Settlement approval, implementation, administration, the post-settlement Chronic SPC dispute, and the BELO CMO. Greenwald's principal place of business is located at 700 Broadway, New York, NY 10003.

464. At all times material herein, Ervin A. Gonzalez, a former resident of the State of Florida and a partner at the "Front Group" law firm Colson Hicks Eidson, served as a member of the MDL 2179 PSC. Mr. Gonzalez passed away on June 8, 2017. Colson Hicks Eidson's principal place of business is located at 255 Alhambra Circle, Penthouse, Coral Gables, Florida 33134.

465. At all times material herein, Rhon E. Jones, a resident of the State of Alabama and a partner at the "Front Group" law firm Beasley Allen, served as a member of the MDL 2179 PSC. He made substantial contributions to the BP Economic Class Settlement negotiations and settlement implementation, both with respect to the BEL "matching" issues and with respect to the general Class Counsel assistance of plaintiffs' attorneys, CPAs, and unrepresented claimants

with questions regarding Settlement Program claims and appeals. Jones also assisted with the general coordination of private and Government claims. Jones's principal place of business is located at 218 Commerce Street, Montgomery, Alabama 36104.

466.  At all times material herein, Matthew E. Lundy, a resident of the State of Louisiana and a partner at the "Front Group" law firm Lundy, Lundy, Soileau & South, LLP, served as a member of the MDL 2179 PSC. He made substantial contributions to the negotiation and implementation of the Medical Settlement. Lundy's principal place of business is located at 501 Broad Street, Lake Charles, Louisiana 70601.

467.  At all times material herein, Michael C. Palmintier, a resident of the State of Louisiana and a partner at the "Front Group" law firm degravelles, Palmintier, Holthaus & Fruge, served as a member of the MDL 2179 PSC. He assisted with the negotiation and drafting of the Assignment of BP Claims that was incorporated into the BP Economic & Property Damages Settlement. Palmintier's principal place of business is located at 618 Main Street, Baton Rouge, Louisiana 70801.

468.  At all times material herein, Paul M. Sterbcow, a resident of the State of Louisiana and a partner at the "Front Group" law firm Lewis, Kullman, Sterbcow & Abramson, LLC, served as a member of the MDL 2179 PSC and assisted with research and briefing, as well as general PSC duties and overall litigation strategy. Sterbcow's principal place of business is located at 601 Poydras Street, # 2615, New Orleans, Louisiana 70130.

469.  At all times material herein, Mikal C. Watts, a resident of the State of Texas and a partner at the "Front Group" law firm Watts Guerra LLP, served as a member of the MDL 2179 PSC. Watts and six codefendants were accused in a federal fraud and identity theft indictment of

-123-

orchestrating a scheme to defraud BP and the Courts by asserting claims on behalf of more than 40,000 *phantom* plaintiffs who purported suffered damages in the 2010 BP oil well blowout. Incredibly, Watts was acquitted in this criminal trial that was held in the Southern District of Mississippi. Watts is known as a "mega donor" to the Democratic Party. He has given more than $7 million to Democratic candidates in statewide and national elections. In 2012, he held a $35,800-a-plate fundraiser at his mansion in the Dominion for President Barack Obama, who was in attendance. Watts's principal place of business is located at 4 Dominion Dr. Building 3, Suite 100, San Antonio, Texas 78257.

470.  At all times material herein, Joseph F. Rice, a resident of the State of South Carolina and a partner at the "Front Group" law firm Motley Rice LLC, served as a member of the MDL 2179 PSC. He worked closely with Co-Liaison Counsel with respect to the exploration of settlement opportunities and took the lead with respect to much of the settlement discussions with BP. He provided support with respect to GCCF outreach and supervision and was intimately involved in assisting Co-Liaison Counsel with settlement approval, settlement implementation, and the post-settlement "litigation" with BP. Rice's principal place of business is located at 28 Bridgeside Blvd., Mount Pleasant, South Carolina 29464.

471.  At all times material herein, Conrad S.P. "Duke" Williams, III, a resident of the State of Louisiana and a partner at the "Front Group" law firm Williams Law Group, LLC, served as a member of the MDL 2179 PSC. He provided continuous support within the depository, as well as general PSC duties and overall "litigation" strategy, and participated in the BP settlement negotiations. Williams's principal place of business is located at 909 Poydras Street, #1625, New Orleans, Louisiana 70112.

472.  At all times material herein, "Front Group" The Garretson Firm Resolution Group, Inc. d/b/a Garretson Resolution Group ("GRG"), served as the claims administrator of the Medical Settlement Agreement in MDL 2179. GRG's principal place of business is located at 7775 Cooper Road, Cincinnati, OH 45242.

### 2. Defendants Retained Highly Compensated "Thought Leaders" to Deceptively Promote MDL 2179

473.  Theoretically, a "Thought Leader" means one whose views on a subject are taken to be authoritative and influential. Thought leaders are the informed opinion leaders and the go-to people in their field of expertise. In reality, thought leaders are primarily academics who are highly compensated by an industry to either maintain the status quo of the industry or increase market share for their benefactors. It is important to remember that this requires more greed than thought on the part of these leaders.

474.  The financial services industry, pharmaceutical companies, and, most recently, Defendants retain highly compensated thought leaders.

475.  In the BP oil well blowout MDL, Defendants retained four "experts" in the law of class actions: Professors Coffee, Issacharoff, Klonoff, and Miller.

476.  The "unbiased" opinions of these four individuals are included to deceive the class members. If the MDL 2179 economic and property damages settlement agreement is fair, reasonable, adequate, and free of collusion, it would be clearly obvious to anyone who reads the agreement. There would be no need to retain "four experts in the law of class actions" to try to lend a thin veneer of respectability to an otherwise abhorrent, one-sided, collusive agreement.

477.  Defendants fraudulently, recklessly, negligently and knowingly breached their fiduciary and ethical duties to MDL 2179 Plaintiffs by retaining these four legal thought leaders

to make false statements of material fact in order to induce MDL 2179 Plaintiffs into believing

that the proposed settlement is "fair, reasonable, and adequate."

478.  The following are examples of the "unbiased" opinions of Defendants'

highly-compensated "Thought Leaders" in MDL 2179.

479.  Defendant Barbier included each of these false statements of material fact in his

Order granting final approval of the economic and property damages settlement agreement.

Opinion No. 1: "This Settlement is nearly the epitome of how a class in a mass tort action ought to be defined, as it is objective, precise, and detailed, and does not turn on the merits."

Opinion No. 2: "Since their appointment, members of the PSC have diligently prosecuted this litigation, consulted widely among class members in negotiating the Settlement, and aggressively represented the interests of their clients."

Opinion No. 3: "The proposed class in this case consists exclusively of individuals and businesses that have already suffered economic loss and property damage, and the Settlement compensates class members for their past losses through detailed, objective compensation criteria and for their anticipated potential future damages through RTP payments or through other methods that take into account risk of future loss."

Opinion No. 4: According to Professor Miller, this case is "perhaps the single most impressive class action settlement I have observed in nearly thirty years as a scholar, practitioner, and teacher in the field" in its structural features designed to avoid intraclass conflicts."

Opinion No. 5: "….the settlement terms for each identifiable subgroup were subjected to the approval of a seventeen-member Plaintiffs' Steering Committee. The PSC was consulted and participated throughout the settlement process. Whenever a particular category of claims was discussed during negotiations, lawyers who had clients with such claims took an active role in advising the negotiators."

Opinion No. 6: "….there was no discussion of attorneys' fees until all other terms of the agreement were negotiated, agreed upon, reduced to writing, and submitted to the Court, so Class Counsel could not have engaged in trading off the interests of class representatives or absent class members so as to maximize their fee recovery."

Opinion No. 7: "Because a class action is the vastly superior method by which to resolve the impact of this mass disaster on the Gulf Coast Region, it would be a social tragedy if

class certification were denied." "Individual lawsuits are neither a feasible nor a sensible alternative to a class action in this case."

Opinion No. 8: "….the Settlement preserved the Rule 23(b)(3) opt-out opportunity, and provided a generous opt-out period that the Court later extended to November 1, 2012. Any plaintiff who does not wish to take part in the Settlement remained free to opt-out of the settlement class and pursue his own action."

Opinion No. 9: "The uncontroverted evidence establishes that the Settlement was reached only after many months of hard-fought negotiations that were conducted simultaneously with adversarial trial preparations."

Opinion No. 10: "Certain objectors complain that the Economic Damage Claim Frameworks are unfair because they do not compensate persons who do not begin suffering losses until 2011. Yet this provision is reasonable for three reasons: (i) the Macondo well ceased flowing in July 2010; (ii) there is evidence that by late 2010, Gulf Coast tourism had returned to or surpassed 2009 levels; and (iii) as to claims by individuals and businesses in charter fishing, seafood processing, or other businesses relying on access to Gulf waters, nearly all federal and state waters were reopened for commercial fishing by November 2010. *Thus, extending compensation to 2011 would cover losses not likely caused by the spill*." (Emphasis added)

Opinion No. 11: "Other objectors complain that before they can invoke the V-Shaped Revenue Pattern test, they must demonstrate a 5% revenue recovery during the correlating months of 2011 as compared to the 2010 baseline period. *This provision is reasonable, as losses that continued after the spill are likely to be due to factors other than the spill*." (Emphasis added)

480.  The Aggregate Fee Petition includes a declaration by Brian T. Fitzpatrick, a law professor at Vanderbilt University and an MDL 2179 "Thought Leader." Professor Fitzpatrick states, "I have never seen a case this complex nor one that required more of class counsel. The number of moving parts here was - and this is an understatement - dizzying. The law, the facts, the science - all of it was far more challenging than perhaps any class action case I have ever seen."

481.  Given the opinions of Defendant Barbier and Professor Fitzpatrick, the victims of the BP oil well blowout are led to believe that Herman, Roy, and the seventeen MDL 2179 PSC

members are zealously advocating on their behalf. Justice is most assuredly just around the corner.

### 3. Bi-Annual Mass Tort Conferences Were Used to Spread Defendants' Deceptive Messages About MDL 2179

482. During the National Prayer Breakfast, political and business leaders come together under the guise of religion, to initiate contacts and build networks among like-minded "believers."

483. Plaintiff attorneys, more specifically members and want-to-be-members of multidistrict litigation ("MDL") plaintiffs' steering committees ("PSCs"), have their own "National Prayer Breakfast." It is called "Mass Torts Made Perfect."

484. "Mass Torts Made Perfect" is a bi-annual conference held in the spring and fall of each year in Las Vegas. Both conferences are designed for individuals working in the area of plaintiff mass torts and personal injury litigation, as well as securities and toxic torts. The conferences are the largest plaintiff mass torts gatherings in the world, with more than 1,000 participants (from 500 law firms) at each event, covering every form of mass torts topic, from prescription drugs, defective products, investment fraud, consumer fraud and business litigation. It has become the key gathering point for the promotion of mass torts litigation, with virtually every major plaintiff's law firm and lawyer in the field attending the event. It was co-founded by Mike Papantonio. Papantonio, a partner at the "Front Group" law firm Levin, Papantonio, Thomas, Mitchell, Rafferty & Proctor, P.A., humbly refers to himself as "America's Lawyer."

485. The "National Prayer Breakfast" and the "Mass Torts Made Perfect" conferences are remarkably similar. One attracts politicians and wealthy business leaders. The other attracts attorneys who are, or want to become, wealthy deal-making MDL PSC attorneys. In sum, both

are about the almighty dollar. The latter is most certainly not about justice for mass torts victims.

### 4. Defendant Feinberg's Amicus Brief

486. On September 4, 2014, Defendant Kenneth R. Feinberg filed an amicus brief with the U.S. Supreme Court in support of BP.

487. In his amicus brief, Defendant Feinberg states, "Administrative claims programs like the 9/11 and Deepwater Horizon funds provide much-needed alternatives to conventional mass tort litigation."

488. Defendant Feinberg's brief is replete with false and misleading statements which are intended to support this statement. The following are a few examples.

(a) The Gulf Coast Claims Facility program "demonstrates that principled, transparent, and effectively administered claims programs can fairly compensate victims, conserve judicial resources, and efficiently resolve claims without the uncertainty and cost associated with conventional litigation."

(b) "Mr. Feinberg offers a unique perspective on effective alternatives to mass tort litigation - and has an interest in the continued viability of those alternatives. The September 11th Victim Compensation Fund and the Gulf Coast Claims Facility administered by Mr. Feinberg demonstrate that when designed and implemented appropriately, these alternatives to mass tort litigation can secure fair compensation for eligible victims, avoid delay, and alleviate crowded court dockets."

(c) "Given scarce judicial resources, these alternatives to conventional mass tort litigation - the shortcomings of which are well-documented - are essential because they provide expedited relief for injured parties and relieve overburdened courts clogged with mass tort filings."

(d) "The Court should therefore grant the petition to ensure that a key alternative to the conventional tort system remains viable for the fair, efficient, and expeditious compensation of injured victims."

(e) "While these programs (the 9/11 Victim Compensation Fund and the GCCF Fund) have been extraordinarily effective, by any measure, at efficiently and fairly compensating individual victims, the Fifth Circuit's decisions in this case affecting the causation standard, if permitted to stand, threaten to make these sorely needed alternatives to mass tort litigation unlikely to be replicated."

(f) "The 9/11 Victim Compensation Fund and the Gulf Coast Claims Facility, both designed and administered by Mr. Feinberg, successfully compensated thousands of victims with billions of dollars in claims in a streamlined and efficient fashion."

(g) "The numbers confirm the success of both the 9/11 Fund and the Gulf Coast Claims Facility. An overwhelming percentage of eligible claimants chose to file a claim and receive compensation from the funds rather than litigate in court. And both programs worked precisely as intended. If a claimant could demonstrate causation - i.e., that the death, physical injury, or business loss was caused, respectively, by the terrorist attacks or the oil rig disaster - payment was authorized without having to resort to litigation. Instead of waiting years for an uncertain litigation outcome, hundreds of thousands of claimants received prompt, certain, and fair compensation with relatively minimal delay and cost."

(h) "The success of the 9/11 Fund and the Gulf Coast Claims Facility demonstrate that fair compensation can be efficiently delivered to thousands of eligible victims without the necessity of litigating for years in federal and state courts throughout the Nation."

## V. Defendants Excessively Compensated Themselves by "Quadruple Dipping"

489.  Defendants Herman and Roy, and the seventeen MDL 2179 PSC members,

"quadruple dip."

490.  Defendants Herman and Roy, and the seventeen MDL 2179 PSC members, are

compensated from at least the following four sources of revenue.

(a) Six percent (6%) of the gross monetary settlements, judgments or other payments made on or after December 30, 2011 through June 3, 2012 to any other plaintiff or claimant-in-limitation;

(b) BP has agreed to pay any award for common benefit and/or Rule 23(h) attorneys' fees, as determined by the Court, up to $600 million;

(c) Contingent fees from clients directly "represented" by Herman, Roy, and the seventeen MDL 2179 PSC members; and

(d) Co-counsel fees received by Herman, Roy, and the seventeen MDL 2179 PSC members for serving as co-counsel to non-member firms of the PSC.

491.  Mikal C. Watts of Watts Guerra could easily be the posterchild for how attorneys

applying for a lucrative position on the MDL 2179 PSC should not try to capture market share via signing up a large stable of "clients."

492.  Watts and six codefendants were accused in a federal fraud and identity theft indictment of orchestrating a scheme to defraud BP and the Courts by asserting claims on behalf of more than 40,000 phantom plaintiffs who purported suffered damages in the 2010 BP oil well blowout. The indictment against Watts was brought on behalf of the United States because this PSC member stands accused of corrupting the federal justice system to make money for himself and his investors.

493.  Though the Watts firm initially presented more than 44,000 claim forms to BP, including a nearly $46,000 claim by the dog Lucy Lu, it ended up asserting claims for just 786 clients. According to the indictment, only 4 were deemed eligible for payments.

### A.  Compensation Paid to Kenneth R. Feinberg by BP

494.  The following is an overview of the compensation which BP paid to Kenneth R. Feinberg.

| | |
|---|---|
| June 15, 2010 to January 15, 2011 | $ 5,950,000 |
| January 16, 2011 to April 15, 2012 | $18,750,000 |
| **Total Compensation Paid to Feinberg by BP** | **$24,700,000** |

### B.  Compensation Paid to BP Oil Well Blowout Victims by Kenneth R. Feinberg (GCCF Program Statistics)

495.  The GCCF status report of March 7, 2012 indicates that a total of 574,379 unique claimants filed claims with the GCCF during the period from approximately August 23, 2010 to March 7, 2012. The GCCF paid only 221,358 of these claimants. The total amount paid was $6,079,922,450.47. In sum, Kenneth R. Feinberg denied payment to approximately 61.46% of the claimants who filed claims.

-131-

496.  The status report further indicates that the GCCF paid a total of 230,370 claimants who filed claims with the GCCF during the "Phase II" period. Of these, 195,109 were either Quick Pay or Full Review Final payments; only 35,261 were Interim payments. In sum, Kenneth R. Feinberg forced 84.68% of the claimants to sign a "Release and Covenant Not to Sue" in which the claimant agreed not to sue BP and all other potentially liable parties.

### C.  The Deepwater Horizon Claims Center (DHCC Program Statistics)

497.  The DHCC status report of March 29, 2017 indicates that a total of 389,457 claims were submitted to the DHCC during the period from approximately June 4, 2012 to March 29, 2017. The DHCC paid only 155,652 of these claims. The total amount paid was $10,070,688,009.00. In sum, the DHCC denied payment to approximately 60.03% of the submitted claims.

498.  On October 25, 2016, Defendant Barbier stated that he believes that a conservative estimate of the total amount that will eventually be paid by just the Deepwater Horizon Claims Center is $13 billion.

### D.  Compensation Paid to Defendants Herman and Roy and the Seventeen MDL 2179 PSC Members

499.  Herman, Roy, and the seventeen MDL 2179 PSC members and their "Front Group" law firms in MDL 2179 are not double-dipping. They are quadruple-dipping.

500.  The known sources of compensation received by Herman, Roy, and the seventeen MDL 2179 PSC members and their "Front Group" law firms in MDL 2179 are: common benefit fees, contingent fees, co-counsel fees, and "Hold-Backs."

#### 1.  Common Benefit Fees

501.  BP has agreed to pay any award for common benefit and/or Rule 23(h) attorneys' fees, as determined by the MDL 2179 Court, up to $600 million.

502. On October 25, 2016, Defendant Barbier approved and awarded a common benefit fee and cost award of $600 million consisting of:

"$37,597,151.98 in Shared Expenses, which have already been paid to third-party service providers and/or reimbursed to Common Benefit Attorneys, pursuant to previous Court orders;

Up to $7,187,698.30 in claimed Held Expenses, which have been submitted to Court-appointed CPA Phil Garrett and the Fee Committee pursuant to PTO 9, (as amended), and PTO 59; and

The remainder of the Settlements' Common Benefit Cost and Fee Award amount, of approximately $555.2 million, to Class Counsel and other common benefit attorneys collectively, for work performed to advance the common and collective interests of the Economic Class and the Medical Class."

503. During the summer of 2015, BP announced a global settlement with the United States, the five Gulf Coast States, and local governments, to resolve Clean Water Act, natural resource damage, and economic loss claims, damages, and penalties. In order to help facilitate that settlement, the existing hold-back on all state and local government recoveries was lifted, and a payment by BP of $40 million to common benefit attorneys collectively was approved.

504. Halliburton and Transocean have agreed to pay up to $124,950,000 in common benefit attorneys' fees and expenses in connection with the Halliburton and Transocean class settlements.

### 2. Contingent Fees

505. Herman, Roy, and the seventeen MDL 2179 PSC members and their "Front Group" law firms have their own clients and have also received or will also receive a fee directly from them. (N.B. - On June 15, 2012, the MDL 2179 Court ordered that "contingent fee arrangements for all attorneys representing claimants/plaintiffs that settle claims through either or both of the Settlements will be capped at 25% plus reasonable costs.").

### 3. Co-counsel Fees

506. Co-counsel fees are received by Herman, Roy, and the seventeen MDL 2179 PSC members and their "Front Group" law firms for serving as co-counsel to non-member firms of the PSC. For example, on March 13, 2012 at 12:29 PM, Plaintiff Donovan received an unsolicited mass email from Russell Budd of the "Front Group" law firm Baron Budd, P.C. The email stated, in pertinent part, "Co-Counsel Opportunity for BP Oil Spill Cases: News of the recent BP Settlement has caused many individuals and businesses along the Gulf Coast to contemplate either filing a new claim or amending a claim that has already been submitted. *If you receive inquiries of this nature we would like you to consider a co-counsel relationship with our firm.* Even if someone has already filed a claim it is advisable to retain legal counsel to analyze the impact of this settlement on claimants and maximize recovery. If you receive inquiries and are interested in co-counseling with us on the BP claims, please email Erin McIntosh."

### 4. Hold-Backs

507. The MDL 2179 Court issued a hold-back order which ultimately directed the defendants to hold back and place into escrow, from any judgment or settlement after December 30, 2011:

(a) Six Percent (6%) of the recoveries of any private claimants or plaintiffs who, at any time, had an action that was filed in, removed to, or transferred to, the MDL;

(b) Four Percent (4%) of the economic loss damages payable to the States of Alabama and/or Louisiana;

(c) Four Percent (4%) of the recoveries of any local government entities located within the State of Alabama and/or the State of Louisiana, that, at any time, had an action that was filed in, removed to, or transferred to the MDL;

(d) Six Percent (6%) of the recoveries of any local government entities in the States of Mississippi, Florida, and/or Texas, that, at any time, had an action that was filed in,

removed to, or transferred to the MDL; and,

(e) Six Percent (6%) of the economic loss damages payable to the States of Florida, Mississippi, and/or Texas, should they ever file actions in, be removed to, or be transferred to, the MDL.

### E. Calculation of Compensation Paid to Defendants Herman and Roy and the Seventeen MDL 2179 PSC Members

508.  The following is an overview of the compensation paid to Herman, Roy, and the seventeen MDL 2179 PSC members and their "Front Group" law firms.

| | |
|---|---|
| Common Benefit Fees | $597.354 million |
| Contingent Fee (25%) | $    2.438 billion |
| Co-counsel Fee | Unknown |
| Hold-Backs | Unknown |
| **Total Compensation Paid to Herman, Roy, et al.** | **$    3.035 billion** |

### F. Calculation of Compensation Paid to 103 Non-PSC Attorneys

509.  The following is an overview of the compensation paid to 103 Non-PSC attorneys.

| | |
|---|---|
| Total Recommended Fee Allocations | $704.500 million |
| Total Compensation Paid to 19 PSC Attorneys | $597.354 million |
| Total Compensation Paid to 103 Non-PSC Attorneys | $107.146 million |

510.  Common benefit attorneys' fees are generated from the following three sources.

| | |
|---|---|
| BP Class Settlements | $555.20 million |
| Louisiana & Alabama Settlements | $ 40.00 million |
| Transocean/Haliburton Settlements | $124.95 million |
| Total | $720.15 million |

511.  Contingent Fee (25%) is calculated from the following total amounts paid for

submitted claims.

| | |
|---|---|
| Gulf Coast Claims Facility (GCCF) | $    6.1 billion |
| Transition Period | $  405 million |
| Deepwater Horizon Claims Facility (DHCC) | $   13 billion |
| Total Amount Paid | $19.505 billion |

512.  According to the FCC, the proposed recommended fee allocations total approximately $704.5 million. This leaves a proposed reserve of approximately $15.65 million.

### G.  How the Court Allocated the $720.15 million to Common Benefit Attorneys

513.  The manner in which Defendant Barbier allocated the $720.15 million to Herman, Roy, the seventeen MDL 2179 PSC members, and other Common Benefit Attorneys is humorously instructive.

514.  On July 15, 2015, Defendant Barbier issued Pretrial Order No. 59 which, in pertinent part, states, "Pursuant to the Court's inherent authority over this multidistrict litigation, the Court hereby appoints a fee committee and sets forth guidelines for common benefit fee and cost reimbursements….The Court appoints a Common Benefit Fee and Cost Committee ("FCC") to be responsible for submitting to the Court, at an appropriate time, an Aggregate Fee and Cost Petition and an Allocation Recommendation."

515.  The FCC shall be composed of: (a) Stephen J. Herman of Herman, Herman & Katz, LLC, Co-Liaison Counsel in MDL 2179, who shall serve as Co-Chair and Secretary of the FCC and (b) James P. Roy of Domengeaux Wright Roy Edwards & Colomb LLC, Co-Liaison Counsel in MDL 2179, who shall serve as Co-Chair of the FCC.

516.  The FCC shall recommend an allocation of the amounts awarded by the Court to compensate counsel for common benefit fees and reimbursement of reasonable expenses….The FCC shall evaluate the Fee Applicants' common benefit contributions, using objective measures and the FCC's subjective understanding of the relevant contributions of each Fee Applicant toward generating the benefits provided pursuant to…. the Economic Settlement, and/or otherwise substantially advancing the litigation on behalf of all claimants in MDL 2179, in

-136-

accordance with established protocols, and make a recommendation to the Court for consideration as to each Fee Applicant.

517. On April 11, 2017, the FCC filed its proposed fee allocation with the MDL 2179 Court.

518. Defendant Herman and the FCC explains that it "did not employ a 'lodestar' or 'hourly rate' approach….the Fee Committee did not solicit from Common Benefit Attorneys what they might claim to be their own individual or average blended hourly 'rates'….Nor did the FCC interpret its task to simply apply a single blended hourly rate to all hours that had been submitted in the case….Rather, the Court asked the Fee Committee to rely, in part, upon '*the FCC's subjective understanding of the relevant contributions of each Fee Applicant*.'

519. Defendant Herman and the FCC made the following final recommended allocation to each potential FCC and PSC Common Benefit Fee Applicant Firm.

| | |
|---|---|
| Total Amount the FCC Members Paid to Themselves | $321,602,542.45 |
| Total Amount Paid to Other PSC Members | $277,043,154.06 |
| Total Amount Paid a Non-PSC Member (Barrios, Kingsdorf & Casteix) | $  1,291,576.47 |

520. Defendant Herman paid himself $87,827,200.35.

521. On October 8, 2010, Defendant Barbier appointed Mikal C. Watts as one of the initial fifteen members to the MDL 2179 PSC. Watts was appointed based largely on the fact that he allegedly had more than 40,000 clients. On March 13, 2013, Watts resigned from the MDL 2179 PSC. On September 15, 2015, Watts and six codefendants were indicted by a federal grand jury on 95 counts of conspiracy, mail and wire fraud, identity theft, and aggravated identity theft. As set forth in the indictment, the defendants, without contacting the individuals, would obtain names, addresses, dates of birth, and social security numbers from any source available to create

"clients" for anticipated litigation as a result of the *Deepwater Horizon* Oil Spill. The indictment further alleges that the defendants fraudulently submitted names of over 40,000 individuals as plaintiffs represented by Mikal C. Watts in litigation related to the *Deepwater Horizon*/BP oil spill, knowing that the individuals had not consented to be represented by the firm, and/or that stolen and false social security numbers, dates of birth, addresses, and occupations were claimed. According to the indictment, the defendants attempted to obtain payments from the Gulf Coast Claims Facility for persons Mikal C. Watts claimed to represent and ultimately submitted 'Presentment Forms' to BP for each of the 40,000 plus individuals Mikal C. Watts claimed to represent. The indictment alleges that the total amount of claims submitted by the defendants to BP was in excess of $2 billion.

522. On April 11, 2017, the FCC filed its proposed fee allocation with the MDL 2179 Court. (Rec. Doc. 22628).

523. The FCC recommended Watts Guerra Craft, LLP be allocated $16,790,494.18 in common benefit fees.

524. The FCC explains, "The Fee Committee has not taken into consideration any of the issues raised in BP's Complaint and Motion to Enjoin the Seafood Program [Civil Action No. 2:13-cv-6674]. Whether and/or how such allegations might or might not affect the allocation or award of common benefit fees to Watts Guerra is left to the sound judgment and discretion of the Court. The Fee Committee does note that Mr. Watts was acquitted by the jury in the criminal trial that was held in the Southern District of Mississippi."

525. On October 12, 2017, Special Master John W. Perry, Jr. filed "Special Master's Recommendations Concerning the Allocation of Common Benefit Fees and the Reimbursement

of Shared Expenses and Held Costs" with the MDL 2179 Court. (Rec. Doc. 23491)

526.  Special Master Perry recommended Watts Guerra Craft, LLP be allocated *$18,290,494.18* in common benefit fees.

527.  How much would Watts Guerra Craft, LLP have been allocated if its more than 40,000 "clients" were not phantoms? The MDL 2179 plaintiffs may never know.

528.  Defendants Herman, Roy, and the seventeen MDL 2179 PSC members, with the approval of Defendant Barbier, were able to grossly overcompensate themselves in exchange for limiting the liability of BP.

### VI. The Damages Resulting From the RICO MDL 2179 Defendants' Tortious and Unlawful Conduct Extend Far Beyond the Four Corners of This Complaint

529.  As explained above, Plaintiffs in MDL 2179 continue to suffer harm from the unlawful actions by Defendants.

530.  The RICO MDL 2179 Defendants' "Eight-Step" fraudulent scheme proved to be so successful that, since 2010, it has served as a template for subsequent MDLs. As explained below, many of the cooperative dealmakers who were appointed to the MDL 2179 PSC now serve on the Opioid MDL ("MDL 2804") PSC.

### A. The Opioid MDL ("MDL 2804")

531.  On December 5, 2017, the JPML created MDL 2804 and transferred to the Northern District of Ohio and, with the consent of that court, assigned to the Honorable Dan A. Polster for coordinated or consolidated pretrial proceedings, the lawsuits relating to the national epidemic resulting from the manufacturing and improper marketing and inappropriate distribution, and sale of various prescription opioids. Specifically, Plaintiffs allege that the manufacturers of prescription opioids grossly misrepresented the risks of long-term use of those drugs for persons

with chronic pain, and distributors failed to properly monitor suspicious orders of those

prescription drugs - all of which contributed to the current opioid epidemic.

### B. The MDL 2804 Leadership Structure

532.  The MDL 2804 leadership structure, in pertinent part, is composed of the following

attorneys. It is important to note that each of these attorneys, or other members of their law firms,

previously served on, or provided significant support to, the MDL 2179 PSC. These self-

appointed repeat players are experienced dealmakers.

#### 1. Co-Lead Counsel
Paul J. Hanly, Jr. is a founding member of Simmons Hanly Conroy LLC
Joseph F. Rice is a founding partner of Motley Rice LLC

#### 2. Plaintiffs' Executive Committee
Elizabeth Cabraser is a founder of Lieff Cabraser Heimann & Bernstein, LLP
Peter J. Mougey is a partner with Levin, Papantonio, Thomas, Mitchell,
Rafferty & Proctor, PA
Roland Tellis is a shareholder with Baron & Budd, P.C.
James D. Young is a partner with Morgan & Morgan

#### 3. Co-Liaison Counsel
Troy Rafferty is a partner with Levin, Papantonio, Thomas, Mitchell,
Rafferty & Proctor, PA

#### 4. Plaintiffs' Negotiating Team
533.  On February 7, 2018, the MDL 2804 Court issued an Order wherein it appointed

members to the various negotiating teams for the purpose of working with the Special Masters

and the Court to discuss settlement. The Plaintiffs' Negotiating Team is composed of:

Joseph F. Rice
Paul J. Hanly, Jr.
Elizabeth Cabraser
Troy Rafferty
Russell W. Budd is President and Managing Shareholder of Baron &
Budd, P.C.

-140-

### 5. Judge Dan A. Polster

534. Judge Dan A. Polster is the transferee judge in MDL 2804. Similar to Defendant Barbier in MDL 2179, Judge Polster insists on a quick settlement without the benefit of litigation or discovery. The first meeting of counsel in MDL 2804 was held on January 9, 2018. During this meeting, Judge Polster stated, "People aren't interested in depositions, and discovery, and trials. My objective is to do something meaningful to abate this crisis and to do it in 2018. Ideally, this [opioid crisis] should be handled by the legislative and executive branches, our federal government, and our state governments. They haven't seemed to have done a whole lot. So it's here."

### C. The United States Motion to Participate in Settlement Discussions

535. The United States government's substantial financial stake in combatting the opioid epidemic necessitates the proper allocation of any monetary settlement of the claims asserted in the opioid MDL.

536. On April 2, 2018, the United States filed a motion wherein it explains to the MDL 2804 Court,

> "The United States has deployed extensive resources to combat the opioid crisis, which not only claims tens of thousands of Americans' lives each year but is also a substantial economic burden on the public and its federal government….After evaluating applicable federal statutes, the federal government's numerous other opioids efforts and its statutory authority to recover funds when the United States has paid for or provided medical treatments, the United States….files this motion to participate in forthcoming settlement discussions in [MDL 2804]....Because of the United States' unique national perspective, the government's participation in settlement discussions could help ensure that remedial action in the multi-district litigation is structured to serve the public interest....Moreover, the government's participation in settlement discussions is consistent with the legal avenues....that provide the United States with numerous ways in which to seek reimbursement for its direct and indirect costs of providing medical care to opioid users. The United States' substantial financial stake in combatting the opioid epidemic has implications for the proper allocation of any monetary settlement of the claims asserted in the multi-district litigation. Accordingly, the United States has an interest in facilitating

-141-

discussions regarding the parties' legal obligations. The United States has expertise and information that can assist the parties in crafting a settlement that will effectively combat the opioid crisis on a nationwide basis. For these reasons, the United States respectfully moves this Court to participate in settlement discussions." (In Re: National Prescription Opiate Litigation, Case: 1:17-md-02804-DAP, Doc #: 212-1, Filed: 04/02/18).

537.  Unlike MDL 2179, the U.S. government has wisely filed a motion to participate in MDL 2804 settlement discussions. However, it should be emphasized that the Attorneys for the United States of America must actually participate in, and not be excluded from, any and all backroom negotiations between the MDL 2804 parties.

538.  As noted above, the MDL 2804 leadership structure, in pertinent part, is composed of cooperative, self-serving attorneys who previously served on, or provided significant support to, MDL 2179. In addition, Judge Polster, similar to Defendant Barbier in MDL 2179, insists on a quick settlement without the benefit of litigation or discovery.

539.  In addition to the mass tort victims, U.S. taxpayers are also MDL victims when transferee judges, PSC members, and fund administrators conspire to exploit our judicial system to benefit themselves. MDL 2179 is a case in point. MDL 2804 should not be merely another "case in point." In short, MDL 2804 must not be allowed to become "the MDL 2804 Enterprise."

**VII. Facts Pertaining to Claims Under Racketeer Influenced and Corrupt Organizations ("RICO") Act**

**A. The MDL 2179 Enterprise**
    **1. The Common Purpose and Scheme of the MDL 2179 Enterprise**
540.  The RICO MDL 2179 Defendants formed an association-in-fact enterprise and engaged in a scheme to unlawfully limit BP's liability for the purpose of maximizing judicial efficiency and/or maximizing their compensation.

541. The RICO MDL 2179 Defendants referred to in this section are: Carl J. Barbier, Stephen J. Herman, James P. Roy, Kenneth R. Feinberg, and Patrick A. Juneau.

542. In order to unlawfully limit BP's liability for the purpose of maximizing judicial efficiency and/or maximizing their compensation, the RICO MDL 2179 Defendants formed an association-in-fact enterprise (the "MDL 2179 Enterprise") with the "Front Groups" and "Thought Leaders" described above. Through their personal relationships, the members of the MDL 2179 Enterprise had the opportunity to form and take actions in furtherance of the MDL 2179 Enterprise's common purpose.

543. The RICO MDL 2179 Defendants, through the MDL 2179 Enterprise, concealed the "Eight-Step" fraudulent scheme from the Plaintiffs, and made misleading statements and misrepresentations about MDL 2179 that exaggerated the benefits of the Feinberg-administered victims' compensation fund, the economic and property damages settlement agreement, and medical benefits settlement agreement. Examples of the misleading statements are described above.

544. The scheme devised, implemented and conducted by the RICO MDL 2179 Defendants was a common course of conduct designed to ensure that the RICO MDL 2179 Defendants unlawfully limited BP's liability for the purpose of maximizing judicial efficiency and/or maximizing their compensation through concealment of their fraudulent scheme and misrepresentations about the benefits of the Feinberg-administered victims' compensation fund, the economic and property damages settlement agreement, and medical benefits settlement agreement. The RICO MDL 2179 Defendants, "Front Groups" and "Thought Leaders" acted together for a common purpose and perpetuated the MDL 2179 Enterprise's scheme.

545. There was regular communication between the RICO MDL 2179 Defendants, "Front Groups" and "Thought Leaders" in which information was shared, misrepresentations

were coordinated, and payments were exchanged. Typically, the coordination, communication and payment occurred, and continues to occur, through the repeated and continuing use of the wires and mail in which the RICO MDL 2179 Defendants, "Front Groups" and "Thought Leaders" share information regarding overcoming objections to the failure of the defendants to ensure that all BP oil well blowout victims are fully compensated. The RICO MDL 2179 Defendants, "Front Groups" and "Thought Leaders" functioned as a continuing unit for the purpose of implementing the MDL 2179 Enterprise's scheme and common purpose, and each agreed and took actions to hide the scheme and continue its existence.

546. At all relevant times, the "Front Groups" were aware of the RICO MDL 2179 Defendants' conduct, were knowing and willing participants in and beneficiaries of that conduct. Each "Front Group" also knew, but did not disclose, that the other "Front Groups" were engaged in the same scheme, to the detriment of the plaintiffs. But for the MDL 2179 Enterprise's unlawful fraud, the "Front Groups" would have had incentive to disclose the deceit by the RICO MDL 2179 Defendants and the MDL 2179 Enterprise to their clients. By failing to disclose this information, "Front Groups" perpetuated the MDL 2179 Enterprise's scheme and common purpose, and reaped substantial benefits.

547. At all relevant times, the "Thought Leaders" were aware of the RICO MDL 2179 Defendants' conduct, were knowing and willing participants in that conduct, and reaped benefits from that conduct. The RICO MDL 2179 Defendants selected "Thought Leaders" solely because they favored settlement class action agreements. The RICO MDL 2179 Defendants' support helped the "Thought Leaders" become respected legal experts. And, as they rose to prominence, the "Thought Leaders" falsely touted the benefits of using settlement class action agreements,

-144-

repaying the RICO MDL 2179 Defendants by advancing their fraudulent scheme to limit BP's liability for the purpose of maximizing judicial efficiency and/or maximizing their compensation. The "Thought Leaders" also knew, but did not disclose, that the other "Thought Leaders" and Front Groups were engaged in the same scheme, to the detriment of the plaintiffs. But for the MDL 2179 Enterprise's unlawful conduct, the "Thought Leaders" would have had incentive to disclose the deceit by the RICO MDL 2179 Defendants and the MDL 2179 Enterprise, and to protect Plaintiffs. By failing to disclose this information, "Thought Leaders" furthered the MDL 2179 Enterprise's scheme and common purpose, and reaped substantial benefits.

548. As public scrutiny and media coverage focused on how the defendants were failing to ensure that all BP oil well blowout victims were being fully compensated, the "Front Groups" and "Thought Leaders" did not challenge the RICO MDL 2179 Defendants' misrepresentations, seek to correct their previous misrepresentations, terminate their role in the MDL 2179 Enterprise, nor disclose publicly the fraudulent scheme and misrepresentations about the benefits of the Feinberg-administered victims' compensation fund, the economic and property damages settlement agreement, and medical benefits settlement agreement.

549. The RICO MDL 2179 Defendants, "Front Groups" and "Thought Leaders" engaged in certain discrete categories of activities in furtherance of the common purpose of the MDL 2179 Enterprise. As described herein, the MDL 2179 Enterprise's conduct in furtherance of the common purpose of the MDL 2179 Enterprise involved the following.

550. In addition to disseminating misrepresentations about the benefits of the Feinberg-administered victims' compensation fund, the economic and property damages settlement agreement, and medical benefits settlement agreement, the MDL 2179 Enterprise also furthered

its common purpose by criticizing or undermining the credibility of any person who objected to the settlement approval orders. Defendant Barbier labels plaintiffs and plaintiffs' counsel as "professional objectors" if they have the audacity to object to a settlement approval order. Defendant Barbier even goes as far as to accuse these "professional objectors" of filing their objections "for the sole purpose of attempting to extract a side-deal pay-off to go away."

551. The RICO MDL 2179 Defendants alone could not have accomplished the purpose of the MDL 2179 Enterprise without the assistance of the "Front Groups" and "Thought Leaders," who were perceived as "neutral" and "experts" in the law of class actions. Without the work of the "Front Groups" and "Thought Leaders" in spreading misrepresentations about the benefits of the Feinberg-administered victims' compensation fund, the economic and property damages settlement agreement, and medical benefits settlement agreement, the MDL 2179 Enterprise could not have achieved its common purpose.

552. The impact of the MDL 2179 Enterprise's scheme is still in place - i.e., Plaintiffs, indeed all victims of this BP oil well blowout, continue to suffer damages from three separate sources: (a) once from the oil spill, the environmental and economic damages of which have devastated their way of life; (b) again by being left in financial ruin as a direct result of Defendants' tortious acts; and (c) a third time for daring to demand justice from the MDL 2179 Court which has consumed, and will continue to consume, their time, energy and hopes for years to come.

553. As a result, it is clear that the RICO MDL 2179 Defendants, the "Front Groups" and the "Thought Leaders" were each willing participants in the MDL 2179 Enterprise, had a common purpose and interest in the object of the scheme, and functioned within a structure

designed to effectuate the Enterprise's purpose.

### 2. The Conduct of the MDL 2179 Enterprise Violated Civil RICO

554. From 2010 to the present, each of the RICO MDL 2179 Defendants exerted control over the MDL 2179 Enterprise and participated in the operation or management of the affairs of the MDL 2179 Enterprise, directly or indirectly, as described herein.

555. The MDL 2179 Enterprise had a hierarchical decision-making structure that was headed by the RICO MDL 2179 Defendants and corroborated by the "Front Groups" and "Thought Leaders." The RICO MDL 2179 Defendants controlled representations made about the Feinberg-administered victims' compensation fund, the economic and property damages settlement agreement, and medical benefits settlement agreement, doled out payments to the "Front Groups" and "Thought Leaders," and ensured that representations made by the "Front Groups" and "Thought Leaders" were consistent with the RICO MDL 2179 Defendants' messaging. The "Front Groups" and "Thought Leaders" in the MDL 2179 Enterprise were dependent on the RICO MDL 2179 Defendants for their compensation and for career development.

556. The "Front Groups" also conducted and participated in the conduct of the MDL 2179 Enterprise, directly or indirectly, in the following ways:

a. The "Front Groups" promised to, and did, make representations that were consistent with the RICO MDL 2179 Defendants' messages;

b. The "Front Groups" distributed, through the U.S. Mail and interstate wire facilities, promotional and other materials which induced the BP oil well blowout victims into believing that the proposed settlements are "fair, reasonable, and adequate;" and

c. The "Front Groups" echoed and amplified messages favorable to limiting BP's liability - and thereby ultimately, maximizing the compensation of the RICO MDL 2179 Defendants and maximizing judicial efficiency.

557. The "Thought Leaders" also participated in the conduct of the affairs of the MDL 2179 Enterprise, directly or indirectly, in the following ways:

a. The "Thought Leaders" promised to, and did, make representations that were consistent with the RICO MDL 2179 Defendants' messages themselves;

b. The "Thought Leaders" distributed, through the U.S. Mail and interstate wire facilities, promotional and other materials which induced the BP oil well blowout victims into believing that the proposed settlements are "fair, reasonable, and adequate;" and

c. The "Thought Leaders" echoed and amplified messages favorable to limiting BP's liability - and thereby ultimately, maximizing the compensation of the RICO MDL 2179 Defendants and maximizing judicial efficiency.

558. The scheme devised and implemented by the RICO MDL 2179 Defendants and members of the MDL 2179 Enterprise, amounted to a common course of conduct intended to increase the RICO MDL 2179 Defendants' compensation in exchange for limiting BP liability by (a) encouraging Plaintiffs to execute a Feinberg-administered victims' compensation fund "Release and Covenant Not to Sue" in exchange for a one-time miniscule final payment (**$5,000** for individuals and **$25,000** for businesses) and be subsequently excluded by Defendants Barbier, Herman, and Roy from the settlement class action; or (b) fraudulently inducing BP oil well blowout victims not to opt-out of the settlements. The scheme was a continuing course of conduct, and many aspects of it continue through to the present.

### 3. The RICO MDL 2179 Defendants Controlled and Paid Front Groups and Thought Leaders to Promote and Maximize Their Deceptive and Fraudulent Scheme

559. The RICO MDL 2179 Defendants funded and controlled the various "Front Groups." The "Front Groups," which appeared to be independent, but were not, transmitted the RICO MDL 2179 Defendants' misrepresentations. The RICO MDL 2179 Defendants and the "Front Groups" thus worked together to promote the goals of the MDL 2179 Enterprise.

560. The RICO 2179 Defendants worked together with each other through the "Front Groups" through which they collaborated on the joint promotional materials for the Feinberg-administered victims' compensation fund, the economic and property damages settlement agreement, and medical benefits settlement agreement.

561. The RICO MDL 2179 Defendants paid "Thought Leaders," including Professors Coffee, Issacharoff, Klonoff, and Miller, to spread their misrepresentations and promote their opinions. The RICO MDL 2179 Defendants and the "Thought Leaders" thus worked together to promote the goals of the MDL 2179 Enterprise.

### 4. Pattern of Racketeering Activity

562. The RICO MDL 2179 Defendants' scheme described herein was perpetrated, in part, through multiple acts of mail fraud and wire fraud, constituting a pattern of racketeering activity as described herein.

563. The pattern of racketeering activity used by the RICO MDL 2179 Defendants and the MDL 2179 Enterprise likely involved thousands of separate instances of the use of the U.S. Mail or interstate wire facilities in furtherance of the unlawful MDL 2179 Enterprise, including essentially uniform misrepresentations, concealments and material omissions regarding the Feinberg-administered victims' compensation fund, the economic and property damages settlement agreement, and medical benefits settlement agreement, with the goal of limiting BP's liability for the purpose of maximizing judicial efficiency and/or maximizing their compensation induced by Plaintiffs' reliance on the RICO MDL 2179 Defendants' misrepresentations.

564. Each of these fraudulent mailings and interstate wire transmissions constitutes racketeering activity and collectively, these violations constitute a pattern of racketeering activity, through which the RICO MDL 2179 Defendants, the "Front Groups" and the "Thought

-149-

Leaders" defrauded and intended to defraud Plaintiffs, and other intended victims.

565. The RICO MDL 2179 Defendants devised and knowingly carried out an illegal scheme and artifice to defraud by means of materially false or fraudulent pretenses, representations, promises, or omissions of material facts regarding the Feinberg-administered victims' compensation fund, the economic and property damages settlement agreement, and the medical benefits settlement agreement. The RICO MDL 2179 Defendants and members of the MDL 2179 Enterprise knew that these representations violated the Multidistrict Litigation statute, U.S. Supreme Court decisions, the Oil Pollution Act of 1990, State contract law, and are contrary to public policy. The RICO MDL 2179 Defendants intended that their common purpose and scheme to defraud would, and did, use the U.S. Mail and interstate wire facilities, intentionally and knowingly with the specific intent to advance, and for the purpose of executing, their illegal scheme.

566. By omitting and/or intentionally concealing above-mentioned material facts to Plaintiffs, the RICO MDL 2179 Defendants, the "Front Groups" and the "Thought Leaders" engaged in a fraudulent and unlawful course of conduct constituting a pattern of racketeering activity.

567. Many of the precise dates of the fraudulent uses of the U.S. mail and interstate wire facilities have been deliberately hidden by Defendants and cannot be alleged without access to Defendants' books and records. However, Plaintiff has described the types of, and in some instances, occasions on which the predicate acts of mail and/or wire fraud occurred. They include thousands of communications to perpetuate and maintain the scheme, including the documents described in the preceding paragraphs. The RICO MDL 2179 Defendants' use of the

U.S. Mail and interstate wire facilities to perpetrate their fraudulent scheme involved thousands of communications, publications, representations, statements, electronic transmissions, payments, including, inter alia:

a. Informational materials regarding the Feinberg-administered victims' compensation fund, the economic and property damages settlement agreement, and the medical benefits settlement agreement which the RICO MDL 2179 Defendants sent to BP oil well blowout victims, transmitted through the internet and television, published, and transmitted to "Front Groups" and "Thought Leaders" located across the country and Plaintiffs;

b. Written representations and telephone calls between the RICO MDL 2179 Defendants and "Front Groups" regarding the misrepresentations about the Feinberg-administered victims' compensation fund, the economic and property damages settlement agreement, and the medical benefits settlement agreement;

c. Written representations and telephone calls between the RICO MDL 2179 Defendants and "Thought Leaders" regarding the misrepresentations about the Feinberg-administered victims' compensation fund, the economic and property damages settlement agreement, and the medical benefits settlement agreement;

d. E-mails, telephone and written communications between the RICO MDL 2179 Defendants and the "Front Groups" agreeing to or implementing the "Eight-Step" fraudulent scheme;

e. E-mails, telephone and written communications between the RICO MDL 2179 Defendants and the "Thought Leaders" agreeing to or implementing the "Eight-Step" fraudulent scheme;

f. Communications between the RICO MDL 2179 Defendants, "Front Groups" and the media regarding the misrepresentations about the Feinberg-administered victims' compensation fund, the economic and property damages settlement agreement, and the medical benefits settlement agreement, and the dissemination of the same as part of the MDL 2179 Enterprise;

g. Communications between the RICO MDL 2179 Defendants, "Thought Leaders" and the media regarding the misrepresentations about the Feinberg-administered victims' compensation fund, the economic and property damages settlement agreement, and the medical benefits settlement agreement, and the dissemination of the same as part of the MDL 2179 Enterprise;

h. Written and oral communications directed to Plaintiffs that fraudulently misrepresented the Feinberg-administered victims' compensation fund, the economic and property damages settlement agreement, and the medical benefits settlement agreement;

i. Receipts of the excessive compensation sent through the U.S. Mail and interstate wire facilities - the wrongful proceeds of the scheme.

568. In addition to the above-referenced predicate acts, it was intended by and foreseeable to the RICO MDL 2179 Defendants that the "Front Groups" and the "Thought Leaders" would distribute communications through the U.S. Mail and by interstate wire facilities which would exaggerate the benefits of the Feinberg-administered victims' compensation fund, the economic and property damages settlement agreement, and medical benefits settlement agreement.

569. To achieve the common goal and purpose of the MDL 2179 Enterprise, the RICO MDL 2179 Defendants and members of the MDL 2179 Enterprise hid from Plaintiffs: (a) the fraudulent nature of the Feinberg-administered victims' compensation fund, the economic and property damages settlement agreement, and medical benefits settlement agreement; (b) the fraudulent nature of statements made by the RICO MDL 2179 Defendants and by their "Front Groups," "Thought Leaders" and other third parties regarding the Feinberg-administered victims' compensation fund, the economic and property damages settlement agreement, and medical benefits settlement agreement; and (c) the true nature of the relationship between the members of the MDL 2179 Enterprise.

570. The RICO MDL 2179 Defendants, and each member of the MDL 2179 Enterprise agreed, with knowledge and intent, to the overall objective of the RICO MDL 2179 Defendants' fraudulent scheme and participated in the common course of conduct to commit acts of fraud in furtherance of limiting BP's liability for the purpose of maximizing judicial efficiency and/or

maximizing their compensation.

571. Indeed, for the RICO MDL 2179 Defendants' fraudulent scheme to work, each of them had to agree to implement similar tactics regarding the fraudulent nature of the Feinberg-administered victims' compensation fund, the economic and property damages settlement agreement, and medical benefits settlement agreement. This conclusion is supported by the fact that the RICO MDL 2179 Defendants each financed, supported, and worked through the same "Front Groups" and "Thought Leaders," and often collaborated on and mutually supported the settlement matrix and the confidential guidance documents used by the claims administrators.

572. The RICO MDL 2179 Defendants' predicate acts all had the purpose of creating and facilitating the fraudulent scheme that substantially injured Plaintiffs' business and property, while simultaneously generating grossly enormous compensation for the RICO MDL 2179 Defendants. The predicate acts were committed or caused to be committed by the RICO MDL 2179 Defendants through their participation in the MDL 2179 Enterprise and in furtherance of its fraudulent scheme.

## COUNT I
## RACKETEER INFLUENCED AND CORRUPT
## ORGANIZATIONS (RICO) 18 U.S.C. § 1961, ET SEQ.
## THE MDL 2179 ENTERPRISE
## (AGAINST ALL DEFENDANTS
## (THE "RICO MDL 2179 DEFENDANTS"))

573. Plaintiff Donovan refers to and incorporates by reference as though fully set forth herein each and every foregoing paragraph of this Complaint, and further alleges as follows:

574. The RICO MDL 2179 Defendants through the use of "Front Groups" that appeared to be independent of the RICO MDL 2179 Defendants; through the dissemination of information

and documents that supported the RICO MDL 2179 Defendants' scheme; through the use of the

opinions of four legal experts ("Thought Leaders") in the law of class actions who were

controlled and/or funded by the RICO MDL 2179 Defendants to promote their message;

and through implementation of their "Eight-Step" fraudulent scheme, conducted an association-

in-fact enterprise, and/or participated in the conduct of an enterprise through a pattern of illegal

activities (the predicate racketeering acts of mail, wire fraud, and obstruction of justice) to carry-

out the common purpose of the MDL 2179 Enterprise, i.e., to unlawfully limit BP's liability for

the purpose of maximizing judicial efficiency and/or maximizing their compensation. Through

the racketeering activities of the MDL 2179 Enterprise, the RICO MDL 2179 Defendants sought

to further the common purpose of the enterprise by: (a) grossly exaggerating the benefits of the

Feinberg-administered victims' compensation fund, the economic and property damages

settlement agreement, and medical benefits settlement agreement; (b) convincing BP oil well

blowout victims to execute a Feinberg-administered victims' compensation fund "Release and

Covenant Not to Sue" in exchange for a one-time miniscule final payment (**$5,000** for

individuals and **$25,000** for businesses) and be subsequently excluded by Defendants Barbier,

Herman, and Roy from the settlement class action; and (c) fraudulently inducing BP oil well

blowout victims not to opt-out of the settlements. In so doing, each of the RICO MDL

2179 Defendants knowingly conducted and participated in the conduct of the activities of the

MDL 2179 Enterprise by engaging in mail fraud, wire fraud, and obstruction of justice in

violation of 18 U.S.C. §§ 1962(c), and (d).

575. The MDL 2179 Enterprise alleged above is an association-in-fact enterprise that

consists of the RICO MDL 2179 Defendants (Carl J. Barbier, Stephen J. Herman, James P. Roy,

Kenneth R. Feinberg, and Patrick A. Juneau), the "Front Groups" which are composed of the seventeen members of the MDL 2179 PSC, each MDL 2179 PSC member's respective law firm, and The Garretson Firm Resolution Group, Inc. The seventeen members of the MDL 2179 PSC are: Brian H. Barr, Scott Summy, Jeffrey A. Breit, Elizabeth J. Cabraser, Philip F. Cossich, Jr., Robert T. Cunningham, Alphonso Michael Epsy, Calvin C. Fayard, Jr., Robin L. Greenwald, Colson Hicks Eidson, Rhon E. Jones, Matthew E. Lundy, Michael C. Palmintier, Paul M. Sterbcow, Mikal C. Watts, Joseph F. Rice, and Conrad S.P. "Duke" Williams, III; and the "Thought Leaders" (Professors Coffee, Issacharoff, Klonoff, and Miller).

576. Each of the RICO MDL 2179 Defendants and the other members of the RICO MDL 2179 Enterprise conducted and participated in the conduct of the RICO MDL 2179 Enterprise by playing a distinct role in furthering the enterprise's common purpose of unlawfully limiting BP's liability for the purpose of maximizing judicial efficiency and/or maximizing their compensation through the knowing and intentional dissemination of false and misleading information about the benefits of the Feinberg-administered victims' compensation fund, the economic and property damages settlement agreement, and medical benefits settlement agreement.

577. Specifically, the RICO MDL 2179 Defendants each worked together to coordinate the enterprise's goals and conceal their role, and the enterprise's existence, from the plaintiffs and the public by, among other things,

> (i) knowingly conceiving, developing, promoting, and/or facilitating their "Eight-Step" fraudulent scheme to maximize judicial efficiency and/or maximize their compensation in exchange for limiting the liability of BP;
> (ii) failing to inform Claimants that BP would only pay a total amount of $20 billion to compensate all the BP oil well blowout victims in the settlement class action;
> (iii) using the fear of costly and protracted litigation in an attempt to coerce MDL 2179 Plaintiffs to accept grossly inadequate settlements;

-155-

(iv) circumventing the OPA by negotiating and drafting a settlement class action agreement which limits a claimant's recovery of damages to geographic bounds and certain business activities while requiring a heightened and vague proof of causation between his, her, or its damages and the BP oil well blowout incident;

(v) failing to inform Claimants the victims' compensation fund "Release and Covenant Not to Sue" requirement violates OPA, State contract law, and is contrary to public policy;

(vi) secretly colluding to inflate the amount of compensation received by some MDL 2179 plaintiffs (just prior to the "fairness" hearing) in order to induce the remaining MDL 2179 plaintiffs into believing that the proposed settlement is "fair, reasonable, and adequate;"

(vii) failing to inform Plaintiffs that judicial efficiency replaces justice in MDL 2179;

(viii) informing Claimants that limiting the compensation period to 2010 is reasonable ("….*extending compensation to 2011 would cover losses not likely caused by the spill*.");

(ix) further promoting their false messages by retaining, and highly compensating, four law professors/thought leaders to give their "unbiased" opinions in order to induce the plaintiffs into believing that the proposed settlement is "fair, reasonable, and adequate;" and

(x) knowingly making false statements of material fact to MDL 2179 Plaintiffs.

578. Each of the Front Groups helped disguise the role of the RICO MDL 2179 Defendants by purporting to be lawyers and law firms zealously and competently advocating on behalf of all MDL 2179 Plaintiffs in order to disseminate information that promoted the RICO MDL 2179 Defendants' false messages, thereby further obscuring the RICO MDL 2179 Defendants' role in the enterprise and the enterprise's existence.

579. Further, each of the RICO MDL 2179 Defendants, "Front Groups" and "Thought Leaders" that made-up the MDL 2179 Enterprise had systematic links to and personal relationships with each other through joint participation in the MDL 2179 Plaintiffs' Steering Committee and the MDL 2179 Court. The systematic links and personal relationships that were formed and developed allowed members of the MDL 2179 Enterprise the opportunity to form the common purpose and agree to conduct and participate in the conduct of the MDL 2179

Enterprise. Each of the individuals and entities who formed the MDL 2179 Enterprise acted to enable the common purpose and fraudulent scheme of the MDL 2179 Enterprise.

580. At all relevant times, the MDL 2179 Enterprise: (a) had an existence separate and distinct from each RICO MDL 2179 Defendant and its members; (b) was separate and distinct from the pattern of racketeering in which the RICO MDL 2179 Defendants engaged; (c) was an ongoing and continuing organization consisting of individuals, persons, and legal entities, including each of the RICO MDL 2179 Defendants; (d) was characterized by interpersonal relationships between and among each member of the MDL 2179 Enterprise, including between the RICO MDL 2179 Defendants and each of the Front Groups and "Thought Leaders;" and (e) had sufficient longevity for the enterprise to pursue its purpose and functioned as a continuing unit.

581. The persons and entities engaged in the MDL 2179 Enterprise are systematically linked through contractual relationships, financial ties, personal relationships, and continuing coordination of activities, as spearheaded by the RICO MDL 2179 Defendants.

582. The RICO MDL 2179 Defendants conducted and participated in the conduct of the MDL 2179 Enterprise through a pattern of racketeering activity that included mail fraud in violation of Title 18, United States Code, Section 1341; wire fraud in violation of Title 18, United States Code, Section 1343; and obstruction of justice in violation of Title 18, United States Code, Section 1503, to limit BP's liability for the purpose of maximizing judicial efficiency and/or maximizing their compensation.

583. The RICO MDL 2179 Defendants each committed, conspired to commit, and/or aided and abetted in the commission of at least two predicate acts of racketeering activity (i.e.

violations of 18 U.S.C. §§§ 1341, 1343, and 1503) within the past ten years. The multiple acts of

racketeering activity that the RICO MDL 2179 Defendants committed, or aided and abetted in

the commission of, were related to each other, posed a threat of continued racketeering activity,

and therefore constitute a "pattern of racketeering activity." The racketeering activity was made

possible by the RICO MDL 2179 Defendants' regular use of the facilities and services of the

MDL 2179 Enterprise, the U.S. Mail, and interstate wire facilities. The RICO MDL 2179

Defendants participated in the scheme to defraud by using mail, telephones and the Internet to

transmit mailings and wires in interstate or foreign commerce.

584. The RICO MDL 2179 Defendants' predicate acts of racketeering (18 U.S.C. §

1961(1)) include, but are not limited to:

> a. Mail Fraud: The RICO MDL 2179 Defendants violated 18 U.S.C. § 1341 by
> sending or receiving, or by causing to be sent and/or received, materials via U.S.
> mail or commercial interstate carriers for the purpose of executing the unlawful
> scheme to limit BP's liability for the purpose of maximizing judicial efficiency
> and/or maximizing their compensation by means of false pretenses,
> misrepresentations, promises, and omissions;

> b. Wire Fraud: The RICO MDL 2179 Defendants violated 18 U.S.C. § 1343 by
> transmitting and/or receiving, or by causing to be transmitted and/or received,
> materials by wire for the purpose of executing the unlawful scheme to limit BP's
> liability for the purpose of maximizing judicial efficiency and/or maximizing their
> compensation by means of false pretenses, misrepresentations, promises, and
> omissions; and

> c. Obstruction of Justice: The RICO MDL 2179 Defendants violated 18 U.S.C. §
> 1503 by engaging in a variety of corrupt methods by which the proper
> administration of justice was impeded or thwarted, a variety limited only by the
> imagination of the criminally inclined RICO MDL 2179 Defendants.

585. Indeed, as summarized herein, the RICO MDL 2179 Defendants obstructed justice

and used the mail and wires to send or receive thousands of communications, documents,

representations, statements, electronic transmissions and payments to carry-out the MDL 2179

-158-

Enterprise's fraudulent scheme.

586. Because the RICO MDL 2179 Defendants disguised their participation in the enterprise, and worked to keep even the enterprise's existence secret so as to give the false appearance that they were zealously and competently advocating on behalf of all MDL 2179 Plaintiffs, many of the precise dates of the MDL 2179 Enterprise's uses of the U.S. Mail and interstate wire facilities (and corresponding predicate acts of mail and wire fraud) have been hidden and cannot be alleged without access to the books and records maintained by the RICO MDL 2179 Defendants, "Front Groups" and "Thought Leaders." Indeed, an essential part of the successful operation of the MDL 2179 Enterprise alleged herein depended upon secrecy. However, Plaintiff Donovan has described the occasions on which the RICO MDL 2179 Defendants, "Front Groups" and "Thought Leaders" disseminated misrepresentations and false statements to MDL 2179 Plaintiffs, and how those acts were in furtherance of the scheme.

587. Each instance of racketeering activity alleged herein was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims and Plaintiffs. The RICO MDL 2179 Defendants calculated and intentionally crafted the scheme and common purpose of the MDL 2179 Enterprise to ensure maximum judicial efficiency and/or to maximize their own compensation. In designing and implementing the scheme, the RICO MDL 2179 Defendants understood and intended that the MDL 2179 plaintiffs would rely on the integrity and oversight of the MDL 2179 Court in regard to the RICO MDL 2179 Defendants' activities. As explained herein, the integrity and oversight of the MDL 2179 Court were non-existent.

588. The RICO MDL 2179 Defendants' pattern of racketeering activity alleged herein

and the MDL 2179 Enterprise are separate and distinct from each other. Likewise, the RICO MDL 2179 Defendants are distinct from the MDL 2179 Enterprise.

589. The racketeering activities conducted by the RICO MDL 2179 Defendants, "Front Groups" and "Thought Leaders" amounted to a common course of conduct, with a similar pattern and purpose, intended to deceive the Plaintiffs. Each separate use of the U.S. Mail and/or interstate wire facilities employed by Defendants was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same BP oil well blowout victims and the Plaintiffs. The RICO MDL 2179 Defendants have engaged in the pattern of racketeering activity for the purpose of conducting the ongoing business affairs of the MDL 2179 Enterprise.

590. Each of the RICO MDL 2179 Defendants aided and abetted others in the violations of the above laws, thereby rendering them indictable as principals in the 18 U.S.C. §§§ 1341, 1343, and 1503 offenses.

591. As described herein, the RICO MDL 2179 Defendants engaged in a pattern of related and continuous predicate acts for more than ten years. The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of maximizing judicial efficiency and obtaining grossly excessive compensation from limiting the liability of BP. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

592. The pattern of racketeering activity alleged herein is continuing as of the date of this Complaint and, upon information and belief, will continue into the future unless enjoined by this Court. The last racketeering incident occurred within five years of the commission of a prior

incident of racketeering.

593. The RICO MDL 2179 Defendants' violations of law and their pattern of racketeering activity directly and proximately caused Plaintiffs' injuries to their businesses and properties. The RICO MDL 2179 Defendants' pattern of racketeering activity logically, substantially and foreseeably caused Plaintiff Donovan's injuries. Plaintiffs' injuries were not unexpected, unforeseen or independent.

594. It was foreseeable and expected that the RICO MDL 2179 Defendants creating and then participating in the MDL 2179 Enterprise through a pattern of racketeering activities to carry-out their fraudulent scheme would lead to Plaintiffs, indeed all victims of this BP oil well blowout, continuing to suffer damages from three separate sources: (a) once from the oil spill, the environmental and economic damages of which have devastated their way of life; (b) again by being left in financial ruin as a direct result of Defendants' tortious acts; and (c) a third time for daring to demand justice from the MDL 2179 Court which has consumed, and will continue to consume, their time, energy and hopes for years to come.

595. Specifically, the RICO MDL 2179 Defendants' creation of, and then participation in, the MDL 2179 Enterprise through a pattern of racketeering activities to carry-out their fraudulent scheme has injured Plaintiffs in the form of substantial losses of money that logically, directly and foreseeably arise from limiting BP's liability for the purpose of maximizing judicial efficiency and/or maximizing the compensation of the RICO MDL 2179 Defendants, "Front Groups" and "Thought Leaders." Plaintiffs' injuries, as alleged throughout this complaint, and expressly incorporated herein by reference, include but are not limited to:

-161-

a. Damages equal to the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources;

b. Costs for providing healthcare and medical care, additional therapeutic, and prescription drug purchases, and other treatments for patients suffering from the effects of the BP oil well blowout toxic tort;

c. Costs associated with the injuries to the health and welfare of Plaintiffs caused by Defendants' intentional failure to hold BP accountable; and

d. Costs associated with the injury to Plaintiff Donovan's business.

596. Plaintiffs' injuries were directly and thus proximately caused by these Defendants' racketeering activities because they were the logical, substantial and foreseeable cause of Plaintiffs' injuries. But for the fraudulent scheme the RICO MDL 2179 Defendants created through their MDL 2179 Enterprise, Plaintiffs would not have lost money or property, and the health and welfare of the MDL 2179 Plaintiffs would not have been injured.

597. Plaintiff seeks all legal and equitable relief as allowed by law, including, inter alia, actual damages; treble damages; equitable and/or injunctive relief; forfeiture as deemed proper by the Court; attorney's fees; all costs and expenses of suit; and pre- and post-judgment interest, including, inter alia:

a. Actual damages and treble damages, including pre-suit and post-judgment interest;

b. An order enjoining any further violations of RICO;

c. An order enjoining any further violations of any statutes alleged to have been violated in this Complaint;

d. An order enjoining the commission of any tortious conduct, as alleged in this Complaint;

e. Dissolution and/or reorganization of any "Front Group," or any other entity or association associated with the MDL 2179 Enterprise identified in this Complaint, as

the Court sees fit;

f. Forfeiture as deemed appropriate by the Court; and

g. Attorney's fees and all costs and expenses of suit; and

h. Such other relief as the Court deems just and proper.

### COUNT II
### FRAUD
### (Against All Defendants)

598.  Plaintiff Donovan refers to and incorporates by reference as though fully set forth herein each and every foregoing paragraph of this Complaint.

599.  As alleged herein and throughout this Complaint, the RICO MDL 2179 Defendants have made material misrepresentations as well as false or misleading descriptions and representations of fact for the purpose of limiting BP's liability in order to maximize judicial efficiency and/or maximize their compensation, and those material misrepresentations and false or misleading descriptions and representations of fact were knowingly or recklessly made.

600.  The RICO MDL 2179 Defendants, knowing the representations were false at the time the representations were made, made the following false representations of fact to Plaintiffs.

601.  On March 9, 2012, the RICO MDL 2179 Defendants released a summary of the agreement-in-principle allegedly entered into between MDL 2179 Plaintiffs and BP. This summary contained the following material misrepresentations and false or misleading descriptions and representations of fact.

(a) "This Settlement is an *enormous victory* for Gulf Coast workers, businesses and families;"

(b) "The Settlement *does the most good for the greatest number of people* - encompassing the wide geographic region and many types of businesses affected by the BP Gulf Oil Spill;"

(c) "Contrary to what some news outlets have implied, the Settlement has *no cap or limit*. The only exception is the Seafood Program for commercial fishing vessel owners, captains and deckhands. BP has agreed to fund this Seafood Program at $2.3 billion;"

(d) "The Settlement *holds BP accountable*;"

(e) "The parties *have not had any fee discussions to date* and will not have any such discussions until authorized to do so by the Court;"

(f) "Many qualifying claimants *may receive greater benefits* from the Settlement Claims Programs than from the GCCF;"

(g) "*Hundreds of thousands of victims of the BP Gulf Oil Spill will be made whole* as a result of this settlement - regardless of whether or not they previously joined the MDL lawsuit or filed a claim with the GCCF;"

(h) "Once the Settlement Claims Programs are set up, the Court will continue to supervise their operation in all respects throughout their duration to *ensure fairness, transparency, and efficiency*;" and

(i) "A $57 million marketing fund will be established *to promote tourism and Gulf seafood*."

602. The RICO MDL 2179 Defendants further attempt to explain why the settlement claims program is fair by making the following false representations of fact to Plaintiffs.

(a) "The Settlement process and formulas used to calculate compensation will be *completely transparent* and applied with consistency;"

(b) "The Court will supervise the Settlement Claims process from start to finish to *ensure fair, impartial, and consistent processing and payment of claims*;"

(c) "Claimants, their accountants, and their lawyers will know the compensation formulas and *will be able to calculate compensation for specific claims before deciding whether to opt-out* or participate in the Settlement;"

(d) "The compensation *calculations have been carefully determined* to account for relevant economic factors and are flexible to each claimant's specific circumstances;"

-164-

(e) "The Settlement Claims Program will generally apply a larger enhancement to *account for potential future losses* and other risks than did the GCCF;"

(f) "Offsets for amounts already received from BP or the GCCF are deducted after *the enhancement for future losses* is applied;"

(g) "A Class Member *can choose to opt-out of the Settlement and instead prosecute their case in Court*;" and

(h) "Businesses and individuals that are not Class Members, or whose claims are not included in the Settlement, *can generally continue to prosecute their cases in Court*."

603. The RICO MDL 2179 Defendants made these material misrepresentations and false or misleading descriptions and representations of fact in an intentional effort to deceive and induce Plaintiffs not to opt-out of the settlement and not to prosecute their cases in Court.

604. The RICO MDL 2179 Defendants continued making these material misrepresentations and omissions, and failed to correct them, despite repeated warnings demonstrating the false nature of the Defendants' claims.

605. Plaintiffs relied on the RICO MDL 2179 Defendants' misrepresentations and omissions rather than elect to commence an action in Court against BP, the responsible party, or to present the claim to the OSLTF.

606. The RICO MDL 2179 Defendants are liable to Plaintiffs for the damage the RICO MDL 2179 Defendants' material, uncorrected, and knowingly or recklessly made misrepresentations, omissions, and false statements have caused to Plaintiffs.

607. The reliance by Plaintiffs which was reasonable and foreseeable, resulted in the following damages: The injuries suffered by Plaintiff Donovan, his business and all others similarly situated who or that have been denied access to the courts as a result of the tortious conduct of the RICO MDL 2179 Defendants include, but are not limited to, lost time value of

money and the excess legal expenses incurred, loss of profit, loss of business reputation, loss of livelihood, loss of income, and other economic loss, warranting compensatory and punitive damages.

## COUNT III
## NEGLIGENCE
## (Against All Defendants)

608. Plaintiff Donovan refers to and incorporates by reference as though fully set forth herein each and every foregoing paragraph of this Complaint.

609. The RICO MDL 2179 Defendants owed Plaintiffs a duty to ensure that all BP oil well blowout victims in MDL 2179 were fully compensated for their damages.

610. The Oil Pollution Act ("OPA") of 1990 (33 U.S.C. § 2702) is a *strict liability* statute. In order to recover damages, a claimant merely needs to show that his or her damages "resulted from" the oil spill.

611. OPA provides,
"Each responsible party for a vessel or a facility from which oil is discharged, or which poses the substantial threat of a discharge of oil, into or upon the navigable waters or adjoining shorelines or the exclusive economic zone is liable for the removal costs and damages that result from such incident." 33 U.S.C. § 2702(a).

The damages referred to in 33 U.S.C. § 2702(a) include, but are not limited to:
"Damages equal to the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources, which ***shall*** be recoverable by any claimant." 33 U.S.C. § 2702(b)(2)(E) (Emphasis added).

612. OPA further provides,
(a) "Payment or settlement of a claim for interim, short-term damages representing less than the full amount of damages to which the claimant ultimately may be entitled ***shall not*** preclude recovery by the claimant for damages not reflected in the paid or settled partial claim." 33 U.S.C. § 2705(a) (Emphasis added); and
(b) "Payment of such a claim [i.e. payment to a claimant for interim, short-term damages representing less than the full amount of damages to which the claimant ultimately may

be entitled] **shall not** foreclose a claimant's right to recovery of all damages to which the claimant otherwise is entitled under this Act or under any other law."
33 U.S.C. §§ 2715(b)(1) and (2) (Emphasis added).

613. "OPA applies of its own force, because that act governs, *inter alia*, private claims for property damage and economic loss resulting from a discharge of oil in navigable waters." 33 U.S.C. § 2702(a), (b)(2)(B), (b)(2)(C), (b)(2)(E)." The Honorable Carl J. Barbier, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Rec. *See* Doc. 3830 at 11, August 26, 2011).

614. The RICO MDL 2179 Defendants owed a duty to Plaintiffs to exercise reasonable care in regard to Defendants' oversight of MDL 2179. At all times material herein the RICO MDL 2179 Defendants oversaw and steered MDL 2179. This includes oversight of the Gulf Coast Claims Facility, settlement negotiations with BP, Halliburton, and Transocean, as well as settlement approval, and settlement implementation, post-settlement administrative disputes, litigation, and appeals, approval, payment, and reimbursement of Shared Expenses and other general planning and administration, coordination with Defendants, Special Masters, the Court, the States, and the United States, case-management orders and procedures, public relations efforts, the monitoring of and coordination with the JPML, Government, and other satellite investigations, lawsuits, and proceedings, general communications, coordination, organization, and strategy.

615. The RICO MDL 2179 Defendants knew or should have known that their conduct would foreseeably result in the financial ruin of Plaintiffs thereby causing irreversible damage to the health and the economic interests of the plaintiffs.

616. The RICO MDL 2179 Defendants breached their legal duty to Plaintiffs and failed

to exercise reasonable care in their oversight of MDL 2179.

617. Again, Plaintiff Donovan refers to and incorporates by reference as though fully set forth herein each and every foregoing paragraph of this Complaint. The manner in which the RICO MDL 2179 Defendants breached their legal duty to Plaintiffs, failed to exercise reasonable care, and acted with reckless, willful, and wanton disregard for the business and livelihood of Plaintiffs in their negligent oversight of MDL 2179 includes, but is not limited to, the following.

618. The Eight-Step Plan - At all times material herein, the RICO MDL 2179 Defendants, individually and/or in collusion with their "Front Groups" and "Thought Leaders," fraudulently, recklessly, negligently and/or knowingly conceived, developed, and/or facilitated an eight-step plan to maximize judicial efficiency and to maximize their compensation in exchange for limiting the liability of BP. The purpose of the RICO MDL 2179 Defendants' eight-step plan was not to zealously advocate on behalf of the plaintiffs.

619. Circumventing the OPA - At all times material herein, the RICO MDL 2179 Defendants, individually and/or in collusion with their "Front Groups" and "Thought Leaders," in order to maximize judicial efficiency and maximize their compensation in exchange for limiting the liability of BP have misled Plaintiffs by fraudulently, recklessly, negligently and/or knowingly designating the "B1" Master Complaint as an admiralty or maritime case, and requesting a non-jury trial pursuant to Rule 9(h), rather than properly alleging claims under the Oil Pollution Act of 1990 ("OPA"), a *strict liability* statute, and the Outer Continental Shelf Lands Act ("OCSLA").

620. Feinberg's Release and Covenant Not to Sue - At all times material herein, the RICO MDL 2179 Defendants, individually and/or in collusion with their "Front Groups" and

-168-

"Thought Leaders," in order to maximize judicial efficiency and maximize their compensation in exchange for limiting the liability of BP have misled Plaintiffs by fraudulently, recklessly, negligently and/or knowingly aiding and abetting the Kenneth R. Feinberg-administered victims' compensation fund to circumvent the OPA. As a result of the RICO MDL 2179 Defendants' fraudulent and negligent conduct, approximately 220,000 Kenneth R. Feinberg victims who or that executed a "Release and Covenant Not to Sue" in exchange for a one-time miniscule final payment ($5,000 for individuals and $25,000 for businesses) were excluded from the settlement class action.

621. MDL 2179 is Unconstitutional - At all times material herein, the RICO MDL 2179 Defendants, individually and/or in collusion with their "Front Groups" and "Thought Leaders," fraudulently, recklessly, negligently and/or knowingly breached his fiduciary and ethical duties to Plaintiffs by exercising oversight of a multidistrict litigation which is unconstitutional. MDL 2179, which employs a victims' compensation fund on the frontend and a settlement class action on the backend, involves no case or controversy and infringes individual claimants' procedural due process rights.

622. It was reasonably foreseeable that the RICO MDL 2179 Defendants' actions and omissions would result in the harm to Plaintiffs described herein.

623. The RICO MDL 2179 Defendants' failure to comply with their duties of care proximately caused damage to Plaintiffs.

624. The negligence of the RICO MDL 2179 Defendants was a substantial factor in causing Plaintiffs' damages.

625. As a further direct and proximate result of the RICO MDL 2179 Defendants'

negligence, Plaintiffs suffered damages including, but not limited to, lost time value of money and the excess legal expenses incurred, loss of profit, loss of business reputation, loss of livelihood, loss of income, and other economic loss.

626. Public policy supports finding a duty of care in this circumstance, and a finding of a duty of care on Defendants will also deter Defendants from engaging in such behavior in the future.

627. Further, the conduct alleged against the RICO MDL 2179 Defendants in this complaint was despicable and subjected Plaintiffs to cruel and unjust hardship in conscious disregard of their rights, constituting oppression, for which the RICO MDL 2179 Defendants must be punished by punitive and exemplary damages in an amount according to proof. The RICO MDL 2179 Defendants' conduct evidences a conscious disregard for the legal rights of Plaintiffs. The RICO MDL 2179 Defendants' conduct was and is outrageous, done with malice and evidenced reckless indifference to the interests of the Plaintiffs. The RICO MDL 2179 Defendants personally committed, authorized, and/or ratified the outrageous and wrongful conduct alleged in this complaint.

628. The RICO MDL 2179 Defendants are further liable under the doctrine of *res ipsa loquitor* because the lost time value of money and the excess legal expenses incurred, the loss of profit, loss of business reputation, loss of livelihood, loss of income, and other economic loss by Plaintiffs could not have occurred in the absence of the negligence of the RICO MDL 2179 Defendants.

## COUNT IV
## UNJUST ENRICHMENT
### (Against All Defendants)

629.  Plaintiff Donovan refers to and incorporates by reference as though fully set forth herein each and every foregoing paragraph of this Complaint.

630.  At all times material herein, the RICO MDL 2179 Defendants, individually and/or in collusion with their "Front Groups" and "Thought Leaders," fraudulently, recklessly, negligently and/or knowingly conceived, developed, and/or facilitated an eight-step plan to maximize judicial efficiency and to maximize their compensation in exchange for limiting the liability of BP. The purpose of the RICO MDL 2179 Defendants' eight-step plan was not to zealously advocate on behalf of the plaintiffs.

631. As an expected and intended result of their conscious wrongdoing as set forth in this Complaint, the RICO MDL 2179 Defendants have profited and benefited from limiting the liability of BP.

632.  In MDL 2179, as a direct result of the RICO MDL 2179 Defendants' actions, the comatose, hapless plaintiffs received little or no compensation while Defendants Herman and Roy, and the seventeen members of the MDL 2179 PSC have been compensated **$3.035 billion**.

633.  The RICO MDL 2179 Defendants' actions did not rise to the standards expected of the legal profession.

634. Because of their fraudulent eight-step plan, the RICO MDL 2179 Defendants obtained enrichment they would not otherwise have obtained. Because they fraudulently, recklessly, negligently and knowingly breached their fiduciary and ethical duties to Plaintiffs, the RICO MDL 2179 Defendants obtained enrichment they would not otherwise have obtained. The

-171-

enrichment was without justification and Plaintiffs lack a remedy provided by law.

635. The RICO MDL 2179 Defendants are aware of this obvious benefit, and that retention of this benefit is unjust.

636. The RICO MDL 2179 Defendants have been unjustly enriched by their negligent, intentional, malicious, oppressive, illegal and unethical acts, omissions, and wrongdoing.

637. It would be inequitable to allow the RICO MDL 2179 Defendants to retain benefit or financial advantage.

638. The RICO MDL 2179 Defendants' misconduct alleged in this case is ongoing and persistent.

639. Plaintiffs demand judgment against each RICO MDL 2179 Defendant for restitution, disgorgement, and any other relief allowed in law or equity.

## COUNT V
## FRAUDULENT INDUCEMENT
### (Against All Defendants)

640. Plaintiff Donovan refers to and incorporates by reference as though fully set forth herein each and every foregoing paragraph of this Complaint.

641. On November 10, 2014, Defendant Barbier states,
> "….as the parties were approaching the final fairness hearing in November 2012, there was *a concerted effort by the parties and claims facility* to process a substantial number of high value claims in order to demonstrate that the settlement program was working as intended…BP and Class Counsel were aware of the push to resolve claims, **as was the Court**. Although some of these claims were for clients of PSC members, according to Mr. Juneau over 60% of the claims were for clients of non-PSC attorneys….While the Settlement Agreement in general terms provides that claims will be processed in the order in which they are received….there is no evidence that the Claims Administrator acted improperly in this regard."
>> The Honorable Carl J. Barbier, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Rec. Doc. 13635 at 3, November 10, 2014).

642. At all times material herein, the RICO MDL 2179 Defendants secretly conspired to inflate the amount of compensation received by some plaintiffs (just prior to the "fairness" hearing) in order to induce the remaining plaintiffs into believing that the proposed settlement is "fair, reasonable, and adequate." Fraudulent inducement is not a procedure which is well within a Court's discretion when it conducts a fairness hearing.

643. The RICO MDL 2179 Defendants, knowing the representations were false at the time the representations were made, made the following false representations of fact to Plaintiffs.

644. On March 9, 2012, the RICO MDL 2179 Defendants released a summary of the agreement-in-principle allegedly entered into between MDL 2179 Plaintiffs and BP. This summary contained the following material misrepresentations and false or misleading descriptions and representations of fact.

(a) "This Settlement is an *enormous victory* for Gulf Coast workers, businesses and families;"

(b) "The Settlement *does the most good for the greatest number of people* - encompassing the wide geographic region and many types of businesses affected by the BP Gulf Oil Spill;"

(c) "Contrary to what some news outlets have implied, the Settlement has *no cap or limit*. The only exception is the Seafood Program for commercial fishing vessel owners, captains and deckhands. BP has agreed to fund this Seafood Program at $2.3 billion;"

(d) "The Settlement *holds BP accountable*;"

(e) "The parties *have not had any fee discussions to date* and will not have any such discussions until authorized to do so by the Court;"

(f) "Many qualifying claimants may *receive greater benefits* from the Settlement Claims Programs than from the GCCF;"

(g) "*Hundreds of thousands of victims of the BP Gulf Oil Spill will be made whole* as a result of this settlement - regardless of whether or not they previously joined the MDL lawsuit or filed a claim with the GCCF;"

(h) "Once the Settlement Claims Programs are set up, the Court will continue to supervise their operation in all respects throughout their duration to *ensure fairness, transparency, and efficiency*;" and

(i) "A $57 million marketing fund will be established *to promote tourism and Gulf seafood*."

645.  The RICO MDL 2179 Defendants further attempt to explain why the settlement claims program is fair by making the following false representations of fact to Plaintiffs.

(a) "The Settlement process and formulas used to calculate compensation will be *completely transparent* and applied with consistency;"

(b) "The Court will supervise the Settlement Claims process from start to finish to *ensure fair, impartial, and consistent processing and payment of claims*;"

(c) "Claimants, their accountants, and their lawyers will know the compensation formulas and *will be able to calculate compensation for specific claims before deciding whether to opt-out* or participate in the Settlement;"

(d) "The compensation *calculations have been carefully determined* to account for relevant economic factors and are flexible to each claimant's specific circumstances;"

(e) "The Settlement Claims Program will generally apply a larger enhancement to *account for potential future losses* and other risks than did the GCCF;"

(f) "Offsets for amounts already received from BP or the GCCF are deducted after *the enhancement for future losses* is applied;"

(g) "A Class Member *can choose to opt-out of the Settlement and instead prosecute their case in Court*;" and

(h) "Businesses and individuals that are not Class Members, or whose claims are not included in the Settlement, *can generally continue to prosecute their cases in Court*."

646.  The RICO MDL 2179 Defendants made these material misrepresentations and false or misleading descriptions and representations of fact in an intentional effort to deceive and induce Plaintiffs not to opt-out of the settlement and not to prosecute their cases in Court.

647. The RICO MDL 2179 Defendants continued making these material

-174-

misrepresentations and omissions, and failed to correct them, despite repeated warnings demonstrating the false nature of the RICO MDL 2179 Defendants' claims.

648. Plaintiffs justifiably relied on the RICO MDL 2179 Defendants' misrepresentations and omissions rather than elect to commence an action in Court against BP, the responsible party, or to present the claim to the OSLTF.

649. The RICO MDL 2179 Defendants are liable to Plaintiffs for the damage the RICO MDL 2179 Defendants' material, uncorrected, and knowingly or recklessly made misrepresentations, omissions, and false statements have caused to Plaintiffs.

650. Reliance on these false statements of material fact did, in fact, induce Plaintiffs to refrain from commencing an action in Court against BP, the responsible party, or presenting the claim to the OSLTF which proximately caused the following injury to Plaintiffs: Plaintiffs have suffered legal injury and damages, in an amount to be proven at trial, including, but not limited to, lost time value of money and the excess legal expenses incurred, loss of profit, loss of business reputation, loss of livelihood, loss of income, and other economic loss.

651. If an attorney is guilty of deceit or collusion or consents thereto with intent to deceive the Court, judge or party, he shall forfeit to the injured party, treble damages to be recovered in a civil action.


### COUNT VI
### BREACH OF FIDUCIARY DUTY OF LOYALTY
### (BREACH OF THE AGGREGATE SETTLEMENT RULE)
### (Against All Defendants)

652. Plaintiff Donovan refers to and incorporates by reference as though fully set forth herein each and every foregoing paragraph of this Complaint.

653.   The aggregate settlement rule ("ASR") governs global MDL settlements.

654.   The RICO MDL 2179 Defendants breached their fiduciary duties to Plaintiffs by violating the ASR.

655.   Courts have long recognized that lawyers may be subject to total or partial fee forfeiture as a sanction for serious violations of the ASR. *The plaintiff does not have to prove either causation or injury to be entitled to fee forfeiture* as a remedy for The RICO MDL 2179 Defendants' breach of fiduciary duty.

656.   The ASR is Rule 1.8(g) of the ABA *Model Rules of Professional Conduct* ("*Model Rules*"), and it states: "A lawyer who represents two or more clients shall not participate in making an aggregate settlement of the claims of or against the clients….unless each client gives informed consent, in a writing signed by the client. The lawyer's disclosure shall include the existence and nature of all the claims….involved and of the participation of each person in the settlement."

657.   All "group" settlements are now "aggregate settlements" and must comply with the disclosure requirements of Rule 1.8(g).

658.   Rule 1.8(g) requires a lawyer to disclose *at a minimum*, the following information to the clients for whom or to whom the settlement or agreement proposal is made.

(a) The total amount of the aggregate settlement;

(b) The existence and nature of all of the claims….involved in the aggregate settlement;

(c) The details of every other client's participation in the aggregate settlement…. whether it be their….settlement receipts…..or any other….receipt of something of value as a result of the aggregate resolution;

(d) The *total fees and costs to be paid to the lawyer* as a result of the aggregate

settlement, if the lawyer's fees and/or costs will be paid, in whole or in part, from the proceeds of the settlement or by an opposing party or parties; and

(e) The method by which costs (including costs already paid by the lawyer as well as costs to be paid out of the settlement proceeds) are to be apportioned among them.

659.  Informed consent to an aggregate settlement requires that each claimant be able to review the settlements of all other persons subject to the aggregate settlement or the formula by which the settlement will be divided among all claimants. Further, *informed consent requires that the total financial interest of claimants' counsel be disclosed to each claimant.* (Emphasis added).

660.  In sum, the RICO MDL 2179 Defendants owe fiduciary duties to Plaintiffs and each member of the settlement class. A lawsuit based on a violation of the ASR can be brought as a breach of fiduciary duty claim.

661.  *The plaintiff(s) need not show any economic loss from the attorney's breach in order to prevail.*

662.  Full or partial forfeiture of the fees that the attorney received is the remedy.

663.  Generally, liability for breach of fiduciary duty requires a Plaintiff to prove:

(a) the existence of a fiduciary duty relationship,

(b) breach of the fiduciary duty by the defendant, and

(c) damages proximately caused by the defendant's breach.

664.  "All motions, requests for discovery or other pre-trial proceedings with respect to plaintiffs shall be initiated by and/or coordinated through the Plaintiff Steering Committee ("PSC"), *to be filed by and through Plaintiffs' Liaison Counsel.* If the PSC does not support the motion, discovery or other requested proceeding, then the moving or requesting plaintiff shall be

permitted to file such motion or request, but shall include a certificate of non-support." The Honorable Carl J. Barbier, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Rec. Doc. 569 at 13, October 19, 2010).

665.  Pursuant to the MDL 2179 Court's Pretrial Order No. 15, "Pending further orders of this Court, all pending and future motions, including Motions to Remand, are continued without date unless a motion is specifically excepted from the continuance by the Court."

666.  On January 12, 2011, the MDL 2179 Court issued PTO No. 25, in order to clarify "the scope and effect" of the "B1" Master Complaint. The Court held that any individual plaintiff who is a named plaintiff in a case that falls within pleading bundle "B1" "is deemed to be a plaintiff in the "B1" Master Complaint. Also, "the allegations, claims, theories of recovery and/or prayers for relief contained within the pre-existing petition or complaint are deemed to be amended, restated, and superseded by the allegations, claims, theories of recovery, and/or prayers for relief in the respective "B1" Master Complaint(s) in which the defendant is named."

667.  In sum, Plaintiffs were forced to be represented by Defendants Herman and Roy and the seventeen members of the MDL 2179 PSC. Since Defendant Herman stepped into the shoes of Plaintiff Donovan, Plaintiff Donovan holds Defendants Herman and Roy and the seventeen members of the MDL 2179 PSC strictly accountable to zealously advocate on his behalf and on the behalf of the aforementioned parties who were injured as a result of the tortious conduct of the RICO MDL 2179 Defendants and *who are not able to assert their rights*.

668.  A fiduciary duty relationship clearly exists between: (a) Defendants Herman and Roy and the seventeen members of the MDL 2179 PSC and Plaintiff; and (b) Defendants Herman and Roy and the seventeen members of the MDL 2179 PSC and the aforementioned

parties who were injured as a result of the tortious conduct of the RICO MDL 2179 Defendants and *who are not able to assert their rights*.

669.  Defendants Herman and Roy and the seventeen members of the MDL 2179 PSC have many fiduciary duties, including the duty of care, the duty of loyalty, the duty to zealously protect the interests of Plaintiff Donovan and the aforementioned parties who were injured as a result of the tortious conduct of the RICO MDL 2179 Defendants and *who are not able to assert their rights*, and the sacred duty of confidentiality.

670.  As explained *supra*, a lawsuit based on a violation of the ASR can be brought as a breach of fiduciary duty claim; the plaintiff(s) need not show any economic loss from the attorney's breach in order to prevail; and full or partial forfeiture of the fees that the attorney received is the remedy.

671.  Defendants Herman and Roy and the seventeen members of the MDL 2179 PSC breached their fiduciary duty of loyalty to Plaintiff Donovan and the aforementioned parties who were injured as a result of the tortious conduct of the RICO MDL 2179 Defendants and *who are not able to assert their rights* when they clearly and seriously violated the ASR.

672.  Defendants Herman and Roy and the seventeen members of the MDL 2179 PSC committed the breach of their fiduciary duty of loyalty knowingly and willingly, intentionally, willfully, recklessly, maliciously, and/or with gross negligence.

673.  The conduct of Defendants Herman and Roy and the seventeen members of the MDL 2179 PSC offends a public sense of justice and propriety.

674.  Defendants Herman and Roy and the seventeen members of the MDL 2179 PSC, in violation of the ASR, refused to disclose the following information to Plaintiff and the

aforementioned parties who were injured as a result of the tortious conduct of the RICO MDL 2179 Defendants and *who are not able to assert their rights*:

    (a) The total amount of the aggregate settlement;

    (b) The existence and nature of all of the claims….involved in the aggregate settlement;

    (c) The details of every other client's participation in the aggregate settlement…. whether it be their….settlement receipts…..or any other….receipt of something of value as a result of the aggregate resolution;

    (d) The *total amount and source of compensation* and costs to be paid to Defendants Herman and Roy and the seventeen members of the MDL 2179 PSC and the total amount and source of compensation paid to the legal experts, Special Masters, and Claims Administrator Patrick Juneau as a result of the aggregate settlement, if this compensation and/or costs will be paid, in whole or in part, from the proceeds of the settlement or by an opposing party or parties; and

    (e) The method by which costs (including costs already paid by the lawyer as well as costs to be paid out of the settlement proceeds) are to be apportioned among them.

    675.  Informed consent to an aggregate settlement requires that each claimant be able to review the settlements of all other persons subject to the aggregate settlement or the formula by which the settlement will be divided among all claimants. Further, *informed consent requires that the total financial interest of claimants' counsel be disclosed to each claimant.* (Emphasis added).

    676.  Moreover, Defendants Herman and Roy and the seventeen members of the MDL 2179 PSC, in violation of rules governing his professional conduct,

    (a)  solicited business through a lay intermediary;

    (b)  failed to fully investigate and assess individual claims;

    (c)  failed to communicate offers received and demands made;

(d)  entered into an aggregate settlement with BP of all plaintiffs' claims without plaintiffs' approval; and

(e)  intimidated and coerced their clients into accepting the settlement.

677.  Defendants Herman and Roy and the seventeen members of the MDL 2179 PSC signed up plaintiffs *en masse* to contingent fee contracts, often contacting plaintiffs through a lay intermediary.

678.  Defendants Herman and Roy and the seventeen members of the MDL 2179 PSC settled all the claims in the aggregate and allocated dollar figures to the plaintiffs without regard to individual conditions and damages.

679.  MDL 2179 Plaintiffs were not allowed to meet with Defendants Herman and Roy and the seventeen members of the MDL 2179 PSC for more than a few minutes.

680.  Any MDL 2179 Plaintiff who expressed reservations about the settlement was threatened by Defendants Herman and Roy and the seventeen members of the MDL 2179 PSC with being afforded no recovery at all.

681.  The U.S. Supreme Court, as well as Courts in the State of Florida, have held that fee forfeiture is appropriate without regard to whether the breach of fiduciary duty resulted in damages.

682.  Generally, where the claim rests on the disloyalty of the lawyer, and the remedy sought is fee forfeiture, rather than compensatory damages for poor service, the breach of the duty of loyalty *is* the harm, and the client is not required to prove causation or specific injury.

683.  It is the disloyalty of Defendants Herman and Roy and the seventeen members of the MDL 2179 PSC, not any resulting harm, that violates the fiduciary relationship and thus impairs the basis for compensation.

-181-

684.  Concern for the integrity of attorney-client relationships is at the heart of the fee forfeiture remedy.

685.  Forfeiture extends to *all* fees for the matter(s) for which Defendants Herman and Roy and the seventeen members of the MDL 2179 PSC were retained.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Brian J. Donovan requests the Court enter the following relief:

a. Actual damages and treble damages, including pre-suit and post-judgment interest;

b. An order enjoining any further violations of RICO;

c. An order enjoining any further violations of any statutes alleged to have been violated in this Complaint;

d. An order enjoining the commission of any tortious conduct, as alleged in this Complaint;

e. Dissolution and/or reorganization of any "Front Group," or any other entity or association associated with the MDL 2179 Enterprise identified in this Complaint, as the Court sees fit;

f. Forfeiture as deemed appropriate by the Court;

g. Attorney's fees and all costs and expenses of suit; and

h. Such other relief as the Court deems just and proper.

DATED: November 5, 2020                    Respectfully submitted,

                                           /s/ Brian J. Donovan
                                           Brian J. Donovan, Esq.
                                           Florida Bar No. 143900
                                           3102 Seaway Court, Suite 304
                                           Tampa, FL 33629
                                           Tel: (352)328-7469
                                           BrianJDonovan@verizon.net
                                           Plaintiff

-182-