E-SERVICE

64073848
Aug 07 2019
10:41PM

File & ServeXpress

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| In Re: Oil Spill by the Oil Rig | MDL 2179 |
|     "Deepwater Horizon" | |
|     in the Gulf of Mexico, | |
|     on April 20, 2010 | SECTION: J |
| | |
| This Document Relates to: | |
| *All Cases* | JUDGE BARBIER |
| *(including Donovan v. Herman, 2:19-cv-12014)* | MAG. JUDGE WILKINSON |

_____/

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HIS**
**MOTION TO RECUSE**
**THE HONORABLE CARL J. BARBIER**

Plaintiff Donovan respectfully moves for the recusal of The Honorable Carl J. Barbier

from all proceedings involving cases in MDL 2179 in order to redress an appearance of

impropriety and to restore public confidence in the integrity of MDL 2179.

**BACKGROUND**

The Judicial Panel on Multidistrict Litigation (JPML) created MDL 2179 and

transferred cases relating to the "Deepwater Horizon" / Macondo Well incident to the Eastern

District of Louisiana on August 10, 2010. (Exhibit A). On February 12, 2019, Plaintiff Donovan,

on behalf of himself, his clients, and all others similarly situated, filed an action against

Defendant Stephen J. Herman in the Thirteenth Judicial Circuit in and for Hillsborough County,

Florida under the following causes of action: gross negligence, negligence, negligence per se,

fraud, fraudulent inducement, promissory estoppel, unjust enrichment, breach of fiduciary duty,

fraudulent concealment, constructive fraud, breach of fiduciary duty of loyalty (breach of the

aggregate settlement rule), and fraudulent concealment (MDL 2179 is unconstitutional). (*See*

Exhibit G). *Donovan v. Herman* was subsequently transferred by the JPML to the MDL 2179

Court on July 31, 2019. (*See* Exhibit H).

## LAW AND ARGUMENT

Any justice, judge or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned. 28 U.S.C. § 455(a). As the U.S. Supreme Court has explained, that provision requires that the judicial conduct at issue:

> be evaluated on an objective basis, so that what matters is not the reality of bias or prejudice but its appearance. Quite simply and quite universally, recusal was required whenever "impartiality might reasonably be questioned."

*Liteky v. United States*, 510 U.S. 540, 548 (1994)(Scalia, J.). Thus, it is the appearance of partiality - and not actual bias - that is the test for recusal under Section 455(a): "In applying § 455(a), the judge's actual state of mind, purity of heart, incorruptibility, or lack of partiality are not the issue." *United States v. Cooley*, 1 F.3d 985, 993 (10th Cir. 1993).

Congress established the "appearance of impartiality" standard "to promote public confidence in the integrity of the judicial process." *Liljeberg v. Health Services Acquisition Corp*., 486 U.S. 847, 860 (1988). The legislative history of § 455(a) is clear:

> This general standard is designed to promote public confidence in the impartiality of the judicial process by saying, in effect, if there is a reasonable factual basis for doubting the judge's impartiality, he should disqualify himself and let another judge preside over the case.

H. Rep. No. 93-1453, p. 5 (1974), U.S. Code Cong. & Admin. News 1974, p. 6355. In the words of the Seventh Circuit, "Once a judge whose impartiality toward a particular case may reasonably be questioned presides over that case, the damage to the integrity of the system is done." *Durhan v. Neopolitan*, 875 F.2d 91, 97 (1989).

28 U.S.C. § 455(c) requires that "a judge should inform himself about his personal and fiduciary financial interests, and make a reasonable effort to inform himself about the personal

financial interests of his spouse and minor children residing in his household."

Moreover, in *Republic of Panama v. The American Tobacco Company, Inc., et al*., citing *Tramonte v. Chrysler Corporation*, 136 F.3d 1025,1027-29 (5th Cir. 1998), the Fifth Circuit held "if [the district court judge] should have recused [himself] any orders [he] entered following disposition of the recusal motion should be vacated."

The Fifth Circuit requires a motion to recuse to be filed at the earliest moment that a party has knowledge of facts that might cause disqualification. *See Hirczy v. Hamilton*, 190 F. App'x 357, 360 (5th Cir. 2006). A party cannot wait until after an adverse decision has been made by the judge before raising the issue of recusal. *Id.*

Plaintiff respectfully points out that this motion is timely because "the damage to the integrity of the system" is being done right now. The following facts more than satisfy Section 455(a), which mandates recusal merely when a Judge's impartiality "might reasonably be questioned." Not only this Honorable Court's reputation is at stake; if Judge Barbier is not recused, the public may not view his decisions as legitimate.

## I.     Judge Barbier Has Demonstrated a Pattern of Failing to Recuse Himself.

### A.     *Republic of Panama v. American Tobacco Co*., 217 F.3d 343 (5th Cir. 2000)

*Republic of Panama v. American Tobacco Co*. involved claims against the tobacco industry for conspiring to conceal the health risks of tobacco products. Prior to Judge Barbier's appointment to the federal bench, Judge Barbier had been the president of the Louisiana Trial Lawyers Association (LTLA). In 1991, the LTLA filed a state court amicus brief in a tobacco product liability case; the motion for leave to file the brief listed Judge Barbier as counsel and President of LTLA. Judge Barbier's name appeared by mistake on the motion, and he in fact had

nothing to do with the research, writing, signing or approval of the actual brief (where his name did not appear) and was no longer President of LTLA when these papers were filed. Nonetheless, the Court of Appeals held that Section 455(a) required recusal: "The fact that Judge Barbier's name was listed on a motion to file an amicus brief which asserted similar allegations against tobacco companies to the ones made in this case may lead a reasonable person to doubt his impartiality." *Id.* at 347.

Even if the decision to recuse in this case were a close one, the statute's purpose of promoting public confidence in the judiciary requires that judges must resolve any doubts in favor of recusal. *See, e.g.*, *Republic of Panama v. American Tobacco Co.*, 217 F.3d 343, 347 (5th Cir. 2000)("[I]f the question of whether § 455(a) requires disqualification is a close one the balance tips in favor of recusal."); *In re United States*, 158 F.3d 26, 30 (1st Cir. 1998), *Nichols v. Alley*, 71 F.3d 347, 352 (10th Cir. 1995); *United States v. Dandy*, 998 F.2d 1344, 1349 (6th Cir. 1993)("Where the question is close, the judge must recuse himself."); *United States v. Kelly*, 888 F.2d 732, 744 (11th Cir. 1989)(Section 455(a) "requires judges to resolve any doubts they may have in favor of disqualification.").

## B. *In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010* (MDL 2179)

When the first "Deepwater Horizon" cases were assigned to Judge Barbier, he owned debt instruments issued by Halliburton and Transocean. Both Halliburton and Transocean appear as defendants in many of the "Deepwater Horizon" cases that were pending before Judge Barbier. Judge Barbier's disclosure form lists "Halliburton Co. Debentures 3/01/21." The income during the reporting year (2008) was between $1,001 and $2,500. The gross value was between $15,001 and $50,000. Judge Barbier's disclosure form also lists "Transocean Sedco Forex Notes

-4-

4/15/18." The income during the reporting year (2008) was between $1,001 and $2,500. The gross value was between $15,001 and $50,000. Judge Barbier instructed his broker to sell the debt instruments on June 2, 2010. Judge Barbier stated on the record on June 4, 2010, that he was unaware that he owned the debt instruments until reports surfaced in the media.

The fact that Judge Barbier allegedly "was unaware that he owned the debt instruments until reports surfaced in the media" does not excuse Judge Barbier from having to recuse himself. 28 U.S.C. § 455(c) requires that "a judge should inform himself about his personal and fiduciary financial interests…"

Cameron International Corporation, et al. ("Petitioners") petitioned the Fifth Circuit for a writ of mandamus directing Judge Barbier to recuse himself from any further proceedings involving cases related to the "Deepwater Horizon" oil rig. (*See generally*, Exhibit I)

Petitioners moved to have Judge Barbier recuse himself from the proceedings based on 28 U.S.C. § 455(b), the federal recusal statute. Petitioners argued that the debt instruments were "financial interests" under the terms of the statute, and that, accordingly, recusal was mandatory. Judge Barbier orally denied their motion, finding that "the ownership of a bond or debt instrument is not the ownership of a financial interest because when you own a bond, you do not own any part of the company…." Because the debt instruments were "not a legal interest in the corporation," they did not trigger § 455(b) and so did not require recusal.

Section 455 governs the disqualification or recusal of federal judges. Germane to the instant matter is § 455(b)(4), which provides, in relevant part:

(b) A judge shall….disqualify himself in the following circumstances:
(4) He knows that he….has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding….

-5-

Section 455(d)(4) defines "financial interest" as "ownership of a legal or equitable interest, however small…."

On July 22, 2010, the Fifth Circuit held, "Judge Barbier denied the recusal motion on the ground that ownership of debt instruments is different than ownership of corporate stock because the debt instruments do not equate to an ownership interest in a party. We see no error in his reasoning for denying the motion to recuse.

*This conclusion, however, does not put the matter completely to rest for two reasons.* (Emphasis added) First, the Advisory Opinion, which was the basis of Judge Barbier's ruling, ignores language from 28 U.S.C. § 455(b)(4). The statute speaks of a "financial interest in the subject matter in controversy or in a party to the proceeding." 28 U.S.C. § 455(b)(4). Thus, even if debt instruments do not qualify as a "financial interest[s]….in a party" because they do not convey an ownership interest, they could nonetheless qualify as "financial interest[s] in the subject matter in controversy." Furthermore, the second part of § 455(b)(4) speaks of "any other interest that could be substantially affected by the proceeding" as an alternative basis for disqualification. The Advisory Opinion specifically notes that "ownership of any type of debt interest….may in some circumstances occasion disqualification if the judge's interest is such that it could be substantially affected by the outcome of the proceeding." Judge Barbier never reached the "substantially affected" issue because Petitioners' motion relied entirely on the "financial interest" prong of § 455(b)(4).

In sum, because we find no error in the district court's conclusion that the debt instruments do not qualify as "financial interests….in a party to the proceeding," petitions for writ of mandamus are DENIED. The denial is without prejudice to Petitioners moving for

-6-

recusal in the district court on the basis of either (1) the debt instruments being "financial interests in the subject matter in controversy," or (2) the possibility that the debt instruments "could be substantially affected by the proceeding." *See* 28 U.S.C. § 455(b)(4). We express no opinion as to the merits of either ground.

Because Judge Barbier based his holding on a finding that debt instruments do not constitute an ownership interest in a party, he never reached whether the debt instruments might qualify as a financial interest in the subject matter in controversy.

*We note that if the district court concludes that the debt instruments could be substantially affected, then recusal would be mandatory because the divestment exception would not apply. See 28 U.S.C. § 455(f) (noting that divestment exception applies only to a financial interest in a party "other than an interest that could be substantially affected by the outcome"); Advisory Op. No. 69, "Removal of Disqualification by Disposal of Interest," 69-2.*" (Emphasis added) (*See generally*, Exhibit I).

Following the Fifth Circuit's decision, and apparent guidance, Cameron filed a motion for judicial disclosure. Cameron asked Judge Barbier for a hearing on his holdings in Halliburton and Transocean as of April 30, 2010, the dates he bought and sold the bonds, and the prices. Judge Barbier scheduled a hearing for August 18, 2010.

On August 10, 2010, the JPML appointed Judge Barbier to serve as the transferee judge and preside over MDL 2179. Judge Barbier postponed Cameron's disclosure hearing to September 16, 2010. This delay resulted in Cameron, for reasons not clear at the time, making the sound business decision not to move forward with the recusal of Judge Barbier.

Plaintiff respectfully points out that, pursuant to the federal recusal statute, Judge Barbier

-7-

should have recused himself from any further proceedings involving cases related to the

"Deepwater Horizon" oil rig. Alternatively, if Cameron had pursued the matter, the Fifth Circuit

would have directed Judge Barbier to recuse himself.

**II.      Judge Barbier Must Recuse Himself from MDL 2179 Based on 28 U.S.C. § 455(b).**

When the first "Deepwater Horizon" cases were assigned to Judge Barbier, he owned

debt instruments issued by Transocean and Halliburton. Both Transocean and Halliburton appear

as defendants in many of the "Deepwater Horizon" cases pending before Judge Barbier.

Section 455 governs the disqualification or recusal of federal judges. Germane to the

instant matter is § 455(b)(4), which provides, in relevant part:

> (b) A judge shall….disqualify himself in the following circumstances:
> (4) He knows that he….has a financial interest in the subject matter in controversy or in
> a party to the proceeding, or any other interest that could be substantially affected by the
> outcome of the proceeding….

The statute speaks of a "financial interest in the subject matter in controversy or in a party

to the proceeding." 28 U.S.C. § 455(b)(4). Thus, even if debt instruments do not qualify as a

"financial interest[s]….in a party" because they do not convey an ownership interest, they could

nonetheless qualify as "financial interest[s] in the subject matter in controversy." Furthermore,

the second part of § 455(b)(4) speaks of "any other interest that could be substantially affected

by the proceeding" as an alternative basis for disqualification. An Advisory Opinion from the

Judicial Committee on Codes of Conduct specifically notes that "ownership of any type of debt

interest….may in some circumstances occasion disqualification if the judge's interest is such that

it could be substantially affected by the outcome of the proceeding."

In sum, Plaintiff Donovan moves, in part, for the recusal of Judge Barbier on the basis of

either (1) the debt instruments being "financial interests in the subject matter in controversy" or

(2) the possibility that the debt instruments "could be substantially affected by the proceeding." *See* 28 U.S.C. § 455(b)(4).

As noted *supra*, the Fifth Circuit has held that if the debt instruments could be substantially affected, then recusal would be mandatory because the divestment exception would not apply. *See* 28 U.S.C. § 455(f) (noting that divestment exception applies only to a financial interest in a party "other than an interest that could be substantially affected by the outcome"); Advisory Op. No. 69, "Removal of Disqualification by Disposal of Interest," 69-2.

## III.   Judge Barbier Must Recuse Himself from MDL 2179 Based on 28 U.S.C. § 455(a).

The federal recusal statute, 28 U.S.C. § 455(a), requires that "any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." For the reasons set forth below, Plaintiff Donovan respectfully submits that, by the objective standard required by federal law, Judge Barbier's impartiality has reasonably been called into question, and he must recuse himself.

### A.   Judge Barbier's Impartiality "Might Reasonably be Questioned" Because the Transfer Order Establishing MDL 2179 Requires Judge Barbier to "Facilitate Closer Coordination with Kenneth Feinberg's Administration of the BP Compensation Fund."

"Centralization may also facilitate closer coordination with Kenneth Feinberg's administration of the BP compensation fund."
The Honorable John G. Heyburn II, Chairman, Panel on Multidistrict Litigation, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Transfer Order, August 10, 2010).

The inclusion of a Kenneth Feinberg-administered victims' compensation fund in MDL 2179 maximizes judicial efficiency. No longer does Judge Barbier have to rely solely on a settlement class action for judicial efficiency. Now, he has a victims' compensation fund, *sanctioned by the JPML*, to eliminate a substantial number of time-consuming, pesky claimants

prior to the settlement class action.

It is important to note that the ultimate objective of Feinberg's "Delay, Deny, Defend" tactic was to limit BP's liability by obtaining a signed "Release and Covenant Not to Sue" from as many BP oil well blowout victims as possible. (Exhibit B, p. 7; *See generally*, Exhibit C).

The filing of the "B1" Master Complaint as an admiralty or maritime case artfully circumvented the OPA. By doing so, Stephen J. Herman assisted Judge Barbier in expeditiously being able to erroneously and incomprehensibly find, "….that nothing prohibits Defendants from settling claims for economic loss. While OPA does not specifically address the use of waivers and releases by Responsible Parties, *the statute also does not clearly prohibit it*. In fact, as the Court has recognized in this Order, one of the goals of OPA was to allow for speedy and efficient recovery by victims of an oil spill." (Rec. Doc. 3830 at 34 - 35; Exhibit C). As a result of this finding by Judge Barbier, approximately 220,000 Feinberg victims who or that executed a "Release and Covenant Not to Sue" in exchange for a one-time final payment ($5,000 for individuals and $25,000 for businesses) were excluded from the settlement class action.

Circumventing the OPA also allowed the PSC/BP settlement to limit a claimant's recovery of damages by geographic bounds, pertain solely to certain business activities, and require a heightened and vague proof of causation between his or her damages and the BP oil well blowout incident. (*See generally*, Exhibit B).

**B.     Judge Barbier's Impartiality "Might Reasonably be Questioned" Because the JPML Knowingly Selected a Transferee Judge to Preside Over MDL 2179 Who Should Have Recused Himself.**

The JPML states, "….we have asked Judge Carl J. Barbier to serve as transferee judge….Some parties have expressed concern that recusals among Eastern District of Louisiana

judges unduly limit our choices, and that even Judge Barbier may be subject to recusal."

Pursuant to the federal recusal statute, Judge Barbier should have recused himself from any further proceedings involving cases related to the "Deepwater Horizon" oil rig.

The JPML misleadingly states "the Fifth Circuit recently denied the petition of certain defendants for a writ of mandamus directing Judge Barbier to recuse himself." (Exhibit A, p. 4).

As noted *supra*, the Fifth Circuit held, "the denial is without prejudice to Petitioners moving for recusal in the district court on the basis of either (1) the debt instruments being 'financial interests in the subject matter in controversy,' or (2) the possibility that the debt instruments 'could be substantially affected by the proceeding.' *See* 28 U.S.C. § 455(b)(4). We express no opinion as to the merits of either ground....Because Judge Barbier based his holding on a finding that debt instruments do not constitute an ownership interest in a party, he never reached whether the debt instruments might qualify as a financial interest in the subject matter in controversy....*We note that if the district court concludes that the debt instruments could be substantially affected, then recusal would be mandatory because the divestment exception would not apply. See 28 U.S.C. § 455(f)*." (Emphasis added).

In its transfer order, the JPML includes the following disclaimer: "The Panel, of course, has no authority to determine whether a particular judge should recuse himself or herself from presiding over a particular MDL." (Exhibit A, p. 4).

### C.   Judge Barbier's Impartiality "Might Reasonably be Questioned" as a Result of Fraudulent Inducement

"....as the parties were approaching the final fairness hearing in November 2012, there was a concerted effort by the parties and claims facility to process a substantial number of high value claims in order to demonstrate that the settlement program was working as intended....BP and Class Counsel were aware of the push to resolve claims, as was the Court. Although some of these claims were for clients of PSC members, according to Mr.

Juneau over 60% of the claims were for clients of non-PSC attorneys….While the Settlement Agreement in general terms provides that claims will be processed in the order in which they are received….there is no evidence that the Claims Administrator acted improperly in this regard."
The Honorable Carl J. Barbier, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Rec. Doc. 13635 at 3, November 10, 2014).

Plaintiff respectfully points out that Judge Barbier believes that it is acceptable if he, the attorneys he appoints to allegedly represent the plaintiffs, the defendant, and the administrator of the proposed settlement fund secretly collude to inflate the amount of compensation received by some plaintiffs (just prior to the "fairness" hearing) in order to intentionally mislead the remaining plaintiffs into believing that the proposed settlement is "fair, reasonable, and adequate." (Exhibit B, p. 47).

Fraudulent inducement is not a procedure which is well within a Court's discretion when it conducts a fairness hearing. It is, however, one more example of where Judge Barbier's impartiality "might reasonably be questioned."

> **D.**    **Judge Barbier's Impartiality "Might Reasonably be Questioned" When He States "The Settlement Agreement Appears Fair, Has No Obvious Deficiencies….*Does Not Grant Excessive Compensation to Attorneys*."**

Again, Plaintiff respectfully point out to this Honorable Court that the total compensation paid to the 19 PSC attorneys and their law firms is guesstimated to be *$3.035 billion*. It is beyond cavil that a reasonable, objective observer would not conclude that this amount is out of all proportion to the value of the professional services rendered.

Members of the PSC and their law firms in MDL 2179 are quadruple-dipping.

The known sources of compensation received by the members of the PSC and their law firms in MDL 2179 are: (a) Common Benefit Fees; (b) Contingent Fees; (c) Co-counsel Fees; and (d) Hold-Backs. (Exhibit B, pp. 55 - 58; *See generally*, Exhibit D).

The most egregious form of compensation, in terms of pure greed, are co-counsel fees which are fees solicited and received by members of the PSC and their law firms for serving as co-counsel to non-member firms of the PSC. For example, on March 13, 2012, Plaintiff received an unsolicited mass email from a member of the PSC. The email stated, in pertinent part, "Co-Counsel Opportunity for BP Oil Spill Cases: News of the recent BP Settlement has caused many individuals and businesses along the Gulf Coast to contemplate either filing a new claim or amending a claim that has already been submitted. *If you receive inquiries of this nature we would like you to consider a co-counsel relationship with our firm.* Even if someone has already filed a claim it is advisable to retain legal counsel to analyze the impact of this settlement on claimants and maximize recovery. If you receive inquiries and are interested in co-counseling with us on the BP claims, please email…." (Exhibit B, p. 56).

The total compensation paid to the 19 PSC attorneys and their law firms is guesstimated to be *$3.035 billion*. This amount assumes that fifty percent (50%) of the paid claims are for clients of PSC attorneys and their law firms. Plaintiff respectfully points out that due to the complete lack of transparency in MDL 2179 this amount is merely a guesstimate. However, it is not beyond the realm of possibility. (Exhibit B, p. 57; Exhibit D, p. 8).

E.     **Judge Barbier's Impartiality "Might Reasonably be Questioned" When He Requires Common Benefit Attorneys to Enter into an Onerous and Unethical Agreement with the PSC.**

Judge Barbier and Stephen J. Herman require plaintiffs' attorneys who decide to become MDL 2179 Common Benefit Attorneys ("come into the fold") to pay $10,000 to $33,000 to the PSC and enter into an onerous and unethical "Limited Joint-Prosecution and Confidentiality Agreement." (*See* Exhibit B, pp. 49 - 51).

-13-

**F.      Judge Barbier's Impartiality "Might Reasonably be Questioned" When He Awards US$18,290,494.18 in Common Benefit Fees to Mikal C. Watts**

On October 8, 2010, Judge Barbier appointed Mikal C. Watts as one of the initial fifteen members to the MDL 2179 PSC. Watts was appointed based largely on the fact that he allegedly had more than 40,000 clients. On March 13, 2013, Watts resigned from the MDL 2179 PSC. On September 15, 2015, Watts and six codefendants were indicted by a federal grand jury on 95 counts of conspiracy, mail and wire fraud, identity theft, and aggravated identity theft.

The indictment alleges that the defendants fraudulently submitted names of over 40,000 individuals as plaintiffs represented by Mikal C. Watts in litigation related to the "Deepwater Horizon"/BP oil spill, knowing that the individuals had not consented to be represented by the firm, and/or that stolen and false social security numbers, dates of birth, addresses, and occupations were claimed. According to the indictment, the defendants ultimately submitted 'Presentment Forms' to BP for each of the 40,000 plus individuals Mikal C. Watts claimed to represent. The amount of claims submitted by the defendants to BP was in excess of $2 billion.

On April 11, 2017, the FCC filed its proposed fee allocation with the MDL 2179 Court. (Rec. Doc. 22628). The FCC recommended Watts Guerra LLP be allocated *$16,790,494.18* in common benefit fees.

On October 12, 2017, Special Master John W. Perry, Jr. filed "Special Master's Recommendations Concerning the Allocation of Common Benefit Fees and the Reimbursement of Shared Expenses and Held Costs" with the MDL 2179 Court. (Rec. Doc. 23491) Perry recommended Watts Guerra LLP be allocated *$18,290,494.18* in common benefit fees.

On October 24, 2017, the Court issued its Order. Judge Barbier states "The Court hereby adopts in full the Special Master's Recommendations Concerning the Allocation of Common

-14-

Benefit Fees and the Reimbursement of Shared Expenses and Held Costs." (Rec. Doc. 23574).

How much would Mikal C. Watts have been allocated if his more than 40,000 "clients" were not phantoms? The MDL 2179 plaintiffs may never know. (Exhibit B, p. 59).

**G.**  **Judge Barbier's Impartiality "Might Reasonably be Questioned" When He Strongly Urges Plaintiffs to Accept the BP Settlement and Accuses Plaintiffs' Attorneys ("Professional Objectors") of Filing Their Objections "For the Sole Purpose of Attempting to Extract a Side-Deal Pay-Off to Go Away."**

The media reported on November 8, 2012, "….when Barbier started listening to lawyers for some of the 13,000 registered objectors to the settlement, he challenged them at almost every turn….The lead plaintiffs' lawyer, Jim Roy, pooh-poohed the objections, noting that 'anybody who didn't want to participate….had an option: opt out.' Barbier seized on that and told some of the objectors who spoke that if they don't like the deal, why didn't their clients opt out of it to pursue their claims in court?"

(Available at: https://www.wwltv.com/article/news/local/orleans/plaintiffs-urged-to-accept-bp-settlement/289-346601861)

Judge Barbier further states, "A group of professional objectors appealed the settlement approval order, which class counsel successfully defended in the Fifth Circuit….On September 12, 2016, four class members filed an objection to the Aggregate Fee Petition….The Court has serious doubts as to whether these objectors have standing to object. As mentioned, any common benefit award does not reduce the objectors' recoveries, and the Court long ago found that the Settlements were fair, reasonable, and adequate to the Classes. It would appear, then, that the objectors have no stake in the outcome of the Aggregate Fee Petition. Petitioning Attorneys propose that true motivation here is bad faith - that these are 'professional objectors' who filed this untimely objection for the sole purpose of attempting to extract a side-deal pay-off to go

-15-

away." The Honorable Carl J. Barbier, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Rec. Doc. 21849 at 42, October 25, 2016).

Judge Barbier does not exhibit the cold neutrality of an impartial judge. He labels plaintiffs and plaintiffs' counsel as "professional objectors" if they have the audacity to object to a settlement approval order. Judge Barbier even goes as far as to accuse these "professional objectors" of filing their objections "for the sole purpose of attempting to extract a side-deal pay-off to go away." (Exhibit B, p. 54).

> **H.     Judge Barbier's Impartiality "Might Reasonably be Questioned" When He Colludes with Stephen J. Herman to Develop / Facilitate an 8-Step Plan to Maximize Judicial Efficiency While Minimizing Justice For the Plaintiffs.**

On August 27, 2010, the MDL 2179 Court issued PTO No. 6 which states "IT IS ORDERED that Stephen J. Herman be hereby appointed Plaintiffs' Co-Liaison Counsel." Plaintiff respectfully points out that Judge Barbier colluded with Stephen J. Herman to develop and/or facilitate an eight-step plan to maximize judicial efficiency and the compensation of the members of the MDL 2179 PSC in exchange for limiting the liability of BP.

MDL 2179's 8-step plan to maximize judicial efficiency involves: Step No. 1: Capture Market Share; Step No. 2: The JPML Transfer Order; Step No. 3: Establishment of the Kenneth R. Feinberg Victims' Compensation Fund; Step No. 4: Appointment of "Cooperative" Attorneys to the PSC; Step No. 5: Circumvention of Strict Liability Statutes; Step No. 6: Approval of the Settlement Class Action; Step No. 7: The Post-Settlement Mop-Up Procedure; and Step No. 8: Clawback. (Exhibit B, pp. 3 - 12).

The U.S. District Court for the Eastern District of Louisiana has defined "collusion" as the "lawful means for the accomplishment of an unlawful purpose" and as a "*secret*

-16-

*understanding between two or more persons prejudicial to another, or a secret understanding to appear as adversaries, though in agreement*." Collusion does not require fraudulent conduct. *See Dynamic Marine Consortium, SA v. Latini, MV*, 179 F.3d 278 (5th Cir. 1999).

It is beyond cavil that a reasonable, objective observer would not conclude that collusion permeates any MDL which incorporates a Feinberg-administered victims' compensation "fund" on the frontend and a settlement class action on the backend. The MDL 2179 Court's orders and reasoning are contrary to U.S. Congressional intent, the OCSLA, the OPA and U.S. Supreme Court decisions. The only logical conclusion is that they are the product of collusion. (Exhibit B)

I. **Judge Barbier's Impartiality "Might Reasonably be Questioned" When, After Eight Years, He Continues to Deny Plaintiffs Their Right to Conduct Formal Discovery Against Kenneth R. Feinberg, et al.**

On April 24, 2014 and May 26, 2015 Plaintiffs filed their "Motion to Remand or, in the Alternative, Motion to Commence Formal Discovery" with this Court. (*See generally*, Exhibit E)

Judicial discretion is understandable, indeed necessary, in order for a transferee judge to efficiently manage the hundreds or thousands of cases which may be transferred to an MDL court for coordinated or consolidated pretrial proceedings for the convenience of parties and witnesses and to promote the just and efficient conduct of such actions. An "abuse of discretion" occurs when the transferee judge makes a decision which is clearly against reason and evidence or against established law. (Exhibit B, p. 46).

Plaintiff respectfully points out that, in MDL 2179, Judge Barbier intentionally abused his discretion by allowing the Feinberg-administered victims' compensation fund to contravene the OPA and by forcing the surviving plaintiffs to enter into an unfair, inadequate, and unreasonable collusive class settlement agreement which contravenes the MDL statute, the U.S.

-17-

Supreme Court's decision in the *Lexecon* case, and the OPA. (*See generally*, Exhibit C).

Notwithstanding the fact that the JPML instructed Judge Barbier "to facilitate closer coordination with Kenneth Feinberg's administration of the BP compensation fund," there is no legal or ethical justification for Judge Barbier to continue to deny Plaintiffs their right to conduct discovery against Kenneth R. Feinberg. Judge Barbier has abused his discretion. Judge Barbier's impartiality has reasonably been called into question, and he must recuse himself.

### J. Judge Barbier's Impartiality "Might Reasonably be Questioned" Due to His Intentional Lack of Transparency and Lack of Accountability.

#### 1. Lack of Transparency

The MDL 2179 plaintiffs continue to be kept in the dark in regard to the following:

(a) In mid-2010, BP made the business decision to pay a total amount of US$20 billion to compensate all the BP oil well blowout victims;

(b) In February 2011, only four months after Judge Barbier appointed his "cooperative" PSC attorneys, settlement negotiations began "in earnest" between Herman and BP;

(c) Kenneth R. Feinberg used the fear of costly and protracted litigation in an attempt to coerce MDL plaintiffs to accept grossly inadequate settlements. During widely-reported town hall meetings, Feinberg repeatedly told victims of the BP oil well blowout incident: "The litigation route in court will mean uncertainty, years of delay and a big cut for the lawyers….I take the position, if I don't find you eligible, no court will find you eligible;"

(d) The Feinberg-administered victims' compensation fund circumvented the OPA. As a result, approximately 220,000 Feinberg victims who or that executed a "Release and Covenant Not to Sue" in exchange for a one-time miniscule final payment ($5,000 for individuals and $25,000 for businesses) for the damages, including future damages, they incurred as a result of the oil well blowout were excluded from the settlement class action;

(e) The "B1" Master Complaint was designated as an admiralty or maritime case, and a non-jury trial pursuant to Rule 9(h) was requested, rather than properly alleging claims under the Oil Pollution Act of 1990 ("OPA"), a *strict liability* statute, and the Outer Continental Shelf Lands Act ("OCSLA");

(f) In contravention of the OPA, a settlement class action was negotiated and drafted which limits a claimant's recovery of damages to geographic bounds and certain business activities while requiring a heightened and vague proof of causation between his, her, or its damages and the BP oil well blowout incident;

(g) Judge Barbier, the attorneys he appointed to allegedly represent the plaintiffs, BP, and the administrator of the proposed settlement secretly colluded to inflate the amount of compensation received by some MDL 2179 plaintiffs (just prior to the "fairness" hearing in November 2012) in order to induce the surviving plaintiffs into believing that the proposed settlement is "fair, reasonable, and adequate;" (Exhibit B, p. 47).

(h) Herman and the PSC failed to zealously and competently advocate on behalf of the MDL 2179 plaintiffs;

(i) Judge Barbier oversees an MDL which is unconstitutional. MDL 2179, which employs a victims' compensation fund on the frontend and a settlement class action on the backend, infringes individual claimants' procedural due process rights. There is also missing the adverseness between the parties that is a central element of Article III case-or-controversy requirement; (*See* Exhibit B, pp. 60 - 63)

(j) The MDL 2179 Court, Feinberg, the PSC, BP, and Patrick Juneau knew that BP would only pay a total amount of US$20 billion to BP oil well blowout victims. Accordingly, the plaintiffs should have been informed that Juneau would pay less than 40% of the submitted claims. Instead, in order to limit the number of plaintiffs who would opt-out, the MDL 2179 Court, Herman, and the PSC intentionally misled the plaintiffs by telling them that "the settlement has *no cap or limit*." (Exhibit B, p. 29)

(k) A class member seeking to determine his or her compensation would not be able to simply read the settlement agreements and determine how his or her circumstances fit into the frameworks. The frameworks of the settlement agreements are certainly not transparent. A claimant could not possibly make a reasonable determination of how his or her claim will be resolved based on his or his business's circumstances. Herman drafted these settlement agreements under the premise that "if we can't dazzle them with brilliance, we will baffle them with obfuscation;" and

(l) The material fact that contingent fees are designed to increase proportionally alongside a plaintiff's recovery - to tie the fates of lawyer and client. When Herman and the MDL 2179 PSC attorneys take things one-step further and bargain for the defendant to pay their common benefit fees directly, they sever that tie. As a result, the attorneys' financial self-interest may no longer be linked to their clients' outcome, but to the defendant's wishes. **This concern has long been recognized as one of structural collusion in the class context.** (*See* John C. Coffee, Jr., *Rethinking the Class Action: A Policy Primer on Reform*, 62 IND. L.J. 625, 647-48 (1987)). Courts have agreed. *E.g., Zucker v. Occidental Petroleum Corp.*, 192 F.3d 1323 (9th Cir. 1999).

### 2.    Lack of Accountability

On November 13, 2017, Plaintiffs filed a motion wherein they requested the MDL 2179 Court to place on the public record the total amount and source of compensation, *from all sources*, paid to all members of the PSC and the total amount and source of compensation paid to the legal experts, Special Masters, and Claims Administrator Patrick Juneau. This was neither a Motion to Compel nor an Objection. This was merely a motion by the plaintiffs to request the MDL 2179 Court to conduct itself in a fully transparent manner. (Exhibit D).

In the motion, Plaintiffs pointed out to the Court that the total compensation paid to the 19 PSC attorneys and their law firms is guesstimated to be $3.035 billion. Plaintiffs further pointed out that a narrow focus on judicial efficiency cannot allow the circumvention of the core democratic premises of representation, transparency, and accountability. (Exhibit D, p. 3).

On March 6, 2018, the MDL 2179 Court issued an Order wherein Judge Barbier succinctly states "IT IS ORDERED that the Motion (Rec. Doc. 23677) is DENIED." (Exhibit F).

### <u>CONCLUSION</u>

For the reasons given above, and the reasons more extensively set forth in the exhibits attached hereto, Judge Barbier must recuse himself from all proceedings involving cases in MDL 2179.

DATED: August 7, 2019                                   Respectfully submitted,

                                                   **/s/ Brian J. Donovan**_____
                                                   Brian J. Donovan
                                                   Florida Bar No. 143900
                                                   3102 Seaway Court, Suite 304
                                                   Tampa, FL 33629
                                                   Tel: (352)328-7469
                                                   BrianJDonovan@verizon.net