## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

IN THE MATTER OF                                           DISCIPLINARY

BRIAN J. DONOVAN                                           NO. 19-13531
ATTORNEY-RESPONDENT
_____/

**BRIAN J. DONOVAN'S RESPONSE TO DISCIPLINARY COMPLAINT No. 19-13531**

The undersigned respectfully submits the following response in accordance with the

order dated November 8, 2019, issued by United States District Judge Carl J. Barbier in MDL

2179, *In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico on April 20,*

*2010,* and received by the Clerk of Court.

## INTRODUCTION

On July 29, 2019, Plaintiffs Selmer M. Salvesen, Pinellas Marine Salvage, Inc., John

Mavrogiannis, and Andrew J. Ditch, by and through their counsel, filed their Motion to Recuse

the Honorable Carl J. Barbier from the following cases: *Salvesen v. Feinberg, et al.*, 2:11-cv-

02533; *Pinellas Marine Salvage Inc., et al. v. Feinberg, et al.*, 2:11-cv-01987; and *Ditch v.*

*Feinberg et al.*, 2:13-cv-06014. On August 7, 2019, Plaintiff Brian J. Donovan, on behalf of

himself, his clients, and all others similarly situated, filed his Motion to Recuse the Honorable

Carl J. Barbier from MDL 2179. Both Motions to Recuse were filed pursuant to the federal

recusal statute, specifically 28 U.S.C. § 455(a) and 28 U.S.C. § 455(b)(4), in order to redress an

appearance of impropriety and to restore public confidence in the integrity of MDL 2179.

On August 20, 2019, the Court entered an order (Rec. Doc. 25963) which states,

"IT IS ORDERED that any response to the Motions to Recuse (Rec. Docs. 25908, 25927) shall be filed by Thursday, September 19, 2019. Any reply by Mr. Donovan shall be filed by Thursday, September 26, 2019. The Court will determine if oral argument is necessary after it has reviewed the parties' memoranda."

Judge Barbier correctly states that his Order dated August 20, 2019 "**Applies to:** *All Cases and 11-02533, 11-01987, 13-6014, 19-12014*." (*See* Exhibit A).

On August 27, 2019, Plaintiff Donovan filed a Motion for Clarification wherein he respectfully moved the Court, in pertinent part, to enter an order clarifying whether responses to the Motions to Recuse by the 1,079 recipients to whom the Court sent the order via File & ServeXpress is required under the federal recusal statute. Plaintiff Donovan points out that Judge Barbier is uniquely qualified to determine if he should recuse himself. Judge Barbier does not require responses, a reply, or an oral argument to determine if he should recuse himself. (*See* Exhibit B).

On August 27, 2019, Judge Barbier entered an Order denying Plaintiff Donovan's Motion for Clarification. (*See* Exhibit C).

Given that Judge Barbier's Order dated August 20, 2019, "Applies to All Cases," a reasonable person would assume that dozens of responses in opposition to the motions to recuse would be filed with the Court. That did not happen. The only Opposition to Motions to Recuse was filed by Defendant Stephen J. Herman on September 10, 2019 (Rec. Doc. 26014).

On September 17, 2019, Plaintiff Donovan filed Plaintiffs' Reply in Support of Plaintiffs' Motions to Recuse The Honorable Carl J. Barbier wherein he points out to the Court that § 455(a), which can be brought by motion, **also requires judges to disqualify sua sponte where appropriate.** (Emphasis Added). (*See* Exhibit D).

## Statements Which Judge Barbier Believes
## May Have Violated the Rules of Professional Conduct

Judge Barbier believes the following five statements may have violated the Rules of

Professional Conduct. They have not. These are important issues which were brought to the

Court's attention for the purpose of discussion if the Court determined oral argument was

necessary after it had reviewed the parties' memoranda.

Statement No. 1 (Re: Collusion)
> "Plaintiff respectfully points out that Judge Barbier colluded with Stephen J. Herman to
> develop and/or facilitate an eight-step plan to maximize judicial efficiency and the
> compensation of the members of the MDL 2179 PSC in exchange for limiting the
> liability of BP....The MDL 2179 Court's orders are contrary to U.S. Congressional
> intent, the OCSLA, the OPA, and U.S. Supreme Court decisions. The only logical
> conclusion is that they are the product of collusion."

Collusion, or at the very least the appearance of collusion, is inevitable in multidistrict

litigation ("MDL"). The transferee judge appoints the attorneys to the Plaintiffs' Steering

Committee ("PSC") and approves the compensation of the PSC attorneys. Attorneys appointed

to the PSC are not appointed by the transferee judge to be litigators. These attorneys are not

selected for the purpose of zealously advocating on behalf of the plaintiffs. Attorneys appointed

to the PSC are cooperative dealmakers who would never consider rocking the metaphorical boat

of judicial efficiency.

Duties Owed by Appointed Counsel to MDL Litigants
An article, which was written by Defendant Stephen J. Herman and published in the

Loyola Law Review in 2018 is instructive. The article titled "Duties Owed by Appointed

Counsel to MDL Litigants Whom They Do Not Formally Represent" explores the duties, *if any*,

owed by appointed counsel in leadership positions to their own clients, to other plaintiffs, and to

the privately retained counsel who represent other plaintiffs in the litigation. (*See* Exhibit E).

In his article, Defendant Herman states, "The Lead Counsel appointed by the [MDL] court will effectively assume full responsibility for the litigation on behalf of all named and absent putative class members….In *Deepwater Horizon*, thousands of plaintiffs were individually represented by attorneys who, for all practical purposes, had no power or authority to take depositions, argue motions, question witnesses, or perform other functions an attorney would typically be expected to undertake in a conventional suit for damages….Instead, the MDL transferee judge appointed a steering committee of nineteen lawyers from around the country to: (1) initiate, coordinate, and conduct all pretrial discovery on behalf of plaintiffs; (2) examine witnesses and introduce evidence at hearings; (3) coordinate the trial team's selection, management, and presentation of any common issue, 'bellwether' or 'test case' trial; (4) submit, argue, and oppose motions; and (5) explore, develop, and pursue settlement opportunities."

Herman further explains, "It is important to recognize that Lead Counsel's authority in an MDL proceeding emanates from the court. This is distinguished from the typical attorney-client relationship in which the lawyer's authority arises from a formal retainer agreement between the attorney and the plaintiff. When counsel is appointed [by the transferee judge] Lead Counsel's authority and concomitant responsibility is generally defined by the procedural steps that must be undertaken from the court's perspective, rather than the ultimate goals sought by plaintiffs; those responsibilities are generally set forth in an order of appointment which describes the services that Lead Counsel is asked and directed to perform. Such appointment's primary purpose is to further the interests of judicial efficiency and economy….While Lead Counsel clearly has a duty to perform the functions to which they have been appointed in a fair, honest, competent, reasonable, and responsible way it would be inappropriate to describe their obligations to other

plaintiffs as 'fiduciary' in the traditional sense of the word….The appointment of Lead Counsel, like the MDL procedure itself, is intended to enhance judicial economy. It therefore seems unlikely that the courts would knowingly establish a "fiduciary" role for attorneys who could not efficiently or effectively accomplish the appointed tasks while working within the strictures typically imposed upon a fiduciary."

In addressing Lead Counsel's duty to provide information to MDL plaintiffs, Herman states, "Both traditional fiduciary responsibility and the Professional Rules of Conduct impose affirmative obligations to inform clients about significant developments or decisions affecting their interests, as well as a general duty of full disclosure regarding any and all facts and circumstances regarding the representation when asked. In the MDL situation, on the other hand, Lead Counsel acquires information, not as agents of a particular plaintiff, but because they have been authorized or directed to undertake a certain function by the court.

Herman concludes by stating, "While such Lead Counsel should, of course, be mindful of the interests of other attorneys who are representing plaintiffs in the MDL under individual retainer agreements, the notion that some 'fiduciary duty' extends to such individually retained counsel, in my view, *goes too far*." (Emphasis Added).

Since December 2012, Herman has refused to answer Plaintiff's questions. (*See* Exhibit F at 41 - 46)

In sum, Herman believes his primary fiduciary duty rests with the MDL 2179 Court. This duty would logically include the furtherance of the interests of judicial efficiency and economy via the "eight-step" plan which would most certainly require the knowledge and approval of the MDL 2179 Court.

-5-

<u>The MDL 2179 Court's Orders Are Contrary to U.S. Congressional Intent, the OCSLA, the OPA, and U.S. Supreme Court Decisions.</u>

Donovan respectfully points out that the Court has been fully briefed in regard to these issues. (*See* Exhibits G and H).

<u>Statement No. 2 (Re: Abuse of Discretion)</u>

"Plaintiff respectfully points out that, in MDL 2179, Judge Barbier intentionally abused his discretion by allowing the Feinberg administered victims' compensation fund to contravene the OPA and by forcing the surviving plaintiffs to enter into an unfair, inadequate, and unreasonable collusive class settlement agreement which contravenes the MDL statute, the U.S. Supreme Court's decision in the Lexecon case, and the OPA…."

Again, this Honorable Court has been fully briefed on this matter. (*See* Exhibit G)

Judge Barbier explains, "I forced no one into the Economic Settlement. Class members had the opportunity to opt out if they desired, and many did. The Economic Settlement was not unfair, inadequate, unreasonable, collusive, or in contravention of any law, although Donovan's statements to the contrary could be viewed as merely a difference of opinion. I also did not allow the GCCF to contravene OPA, although, again, Donovan's statements to the contrary could be viewed as merely a difference of opinion….In any event, the fact that Donovan disagrees with my rulings is hardly support for the claim that I 'intentionally abused [my] discretion,' which I certainly did not."

This is not "merely a difference of opinion" between Donovan and Judge Barbier. Many of the rulings in MDL 2179 contravene the MDL statute, the U.S. Supreme Court's decision in the Lexecon case, and the OPA. Judge Barbier states "I forced no one into the Economic Settlement. Class members had the opportunity to opt out if they desired." This is misleading. Donovan's clients opted out and, *after eight years*, their cases are still unjustifiably pending before the MDL 2179 Court. Others opted out and have had, or are in the process of having, their cases dismissed with prejudice on procedural grounds.

-6-

Statement No. 3 (Re: US$20 Billion Cap)

"The MDL 2179 Court, the PSC, BP, and Patrick Juneau knew that BP would only pay a total amount of US$20 billion to BP oil well blowout victims. Accordingly, the plaintiffs should have been informed that Patrick Juneau would pay less than 40% of the submitted claims. Instead, in order to limit the number of plaintiffs who would opt out, the MDL 2179 Court and PSC intentionally misled the plaintiffs by telling them that 'the settlement has no cap or limit.'"

Judge Barbier explains, "Aside from the Seafood Compensation Program, the Economic Settlement has no cap. No one can be misled by a statement that is true. Also, BP's liability was never limited to $20 billion. Donovan's claim that I or anyone else knew otherwise is not only false, it is impossible. Finally, no one could know in advance how many claims would be determined eligible and paid under the Economic Settlement."

On October 25, 2016, Judge Barbier states, "In December 2015, Magistrate Judge Wilkinson estimated the total claims payout from the Economic Settlement when he allocated amounts under the Transocean and Halliburton Settlements. Judge Wilkinson's estimate was $10.825 billion. (Rec. Doc. 15652 at 16). Judge Wilkinson's estimate appears to be based solely on projected payments under the Economic Settlement, and does not appear to include Seafood and Tourism Promotional Grants, Transocean Insurance Proceeds, Medical Settlement benefits, administrative costs, notice costs, or common benefit attorney fees. Considering the foregoing, the Court finds that a conservative estimate of the total value of the Settlements is $13 billion." (Rec. Doc. 21849 at 32 - 33, Filed 10/25/16).

In October 2016, approximately $6.2 billion had been paid out under the GCCF. How could Judge Barbier find "that a conservative estimate of the total value of the Settlements is $13 billion?" The most logical explanation is that there was a Settlements cap of $20 billion. ($20 billion - $6.2 billion - $0.6 billion in attorneys' fees yields an estimate of $13 billion).

Statement No. 4 (Re: Confidentiality Agreement)

      "Judge Barbier and Stephen J. Herman require plaintiffs' attorneys who decide to become MDL 2179 Common Benefit Attorneys ('come into the fold') to pay $10,000 to $33,000 to the PSC and enter into an onerous and unethical 'Limited Joint-Prosecution and Confidentiality Agreement.'" (Rec. Doc. 25927-1 at 13).

      Judge Barbier explains, "I did not require any financial commitments by common benefit attorneys, nor did I require those attorneys to enter the agreement Donovan describes."

      On November 14, 2011, after Plaintiff Donovan had already rejected Defendant Herman's offer to "come into the fold" on November 7, 2011, Plaintiff Donovan received an unsolicited GCCF Outreach Workgroup Invitation, GCCF Jurisdiction and Court Oversight Workgroup Invitation, Invoice and Limited Joint Prosecution and Confidentiality Agreement from Defendant Herman and Roy wherein they state the following.

      "You have been invited by the PSC to serve as a member of the GCCF Outreach Workgroup and GCCF Jurisdiction and Court Oversight Workgroup of the PSC. As a work group member, your work will be under the supervision and direction of the work group Coordinators who are reporting directly to the PSC/EC and Liaison. Your common benefit time and expenses will be submitted with those of PSC members, workgroup coordinators, and work group members, for consideration by the Court in the event of recovery by settlement or judgment in connection with the MDL proceedings, in accordance with Pretrial Order No. 9. You will have access to the common work product that is developed, and will be invited to participate in various meetings from time to time. By acceptance of your appointment as a member of the above-named workgroup, your personal time and financial obligations will be potentially significant. Work Group Member Assessments have been set by the PSC at 10% of PSC member assessments (which currently total $330,000); a work group member firm's assessments to date total $33,000. Your appointment is at the discretion of the Executive Committee/PSC, subject to the requirements of Pretrial Order No. 9 and other Orders of the Court, and requires your payment of an initial assessment of at least $10,000 by December 1, 2011; staying current on future assessments; and continued contribution of PSC authorized common benefit work in furtherance of the workgroup for MDL 2179. Common benefit work and expenses will be done only upon written authorization and oversight of the PSC/EC/Liaison and/or upon direction of Workgroup Coordinators…..

      "….There are no guarantees that you will receive any remuneration; such is dependent upon success of the litigation and determination by the Court of entitlement to common benefit cost reimbursement and/or fees….if you accept this appointment, please sign

where indicated below and FedEx this form and your $10,000 (to $33,000) assessment (payable to MDL 2179 PSC account) to: Plaintiffs Steering Committee, c/o James P. Roy & Steve Herman.

The Limited Joint Prosecution and Confidentiality Agreement (BP Oil Spill Litigation), in pertinent part, states the following.

"Any and all documents, communications, information, strategy, experts, legal theory and/or other work product that is shared or exchanged by and through this Agreement shall be kept and remain confidential….This agreement is not a co-counsel agreement nor an agreement, whether express or implied, to share, claim, shift, or consent to an award of any type of client contingency, statutory and/or common benefit attorney's fee. The signatories may hereafter be referred to herein as the 'BP Gulf Spill Litigation Joint Prosecution Group.'….Signatories shall obtain signatures of associates and clerical staff working on these matters to assure their compliance with this agreement. Materials subject to this agreement will not be shown to non-group experts or non-group members without compliance with procedures to be established by Group….Any party hereto can withdraw at any time. If a member withdraws, he is still subject to this agreement's confidentiality."

MDL 2179 is so perverse that Defendant Herman does not want the victims of the BP oil well blowout to even know that this confidentiality agreement exists. Paragraph 6 of the confidentiality agreement states, "This Agreement itself shall be confidential, and no counsel or party shall reference, cite or otherwise use the drafting, circulating, existence or use of this Agreement in any motion, petition or other application to be appointed, designated or otherwise recognized by any Court for any leadership position. The members agree that except as may be ordered by Court this agreement and its terms and conditions and the work product of the Group and/or its members will be kept strictly confidential and shall not be disclosed to any third party for any reason."

Plaintiff Donovan finds the last paragraph of the confidentiality agreement, which appears to be an afterthought, to be "curious." Paragraph 7, titled "Ethics and Conflicts Compliance" states, "Each member firm is responsible for doing its own conflict and individual

ethics checks on an ongoing basis and otherwise in complying with all applicable Rules of Professional Responsibility."

Plaintiff Donovan does not understand how any attorney could find Defendant Herman and the members of the MDL 2179 PSC to be ethical and in compliance with all applicable Rules of Professional Responsibility. MDL 2179's contravention of the MDL statute, U.S. Supreme Court decisions, and the Oil Pollution Act of 1990, use of a Feinberg-administered fund and a settlement class action treats the plaintiffs as nothing more than a commodity. Moreover, completely replacing justice with judicial efficiency is not remotely ethical.

Statement No. 5 (Re: Fraudulent Inducement)
"Judge Barbier's Impartiality 'Might Reasonably be Questioned' as a Result of Fraudulent Inducement....Plaintiff respectfully points out that Judge Barbier believes that it is acceptable if he, the attorneys he appoints to allegedly represent the plaintiffs, the defendant, and the administrator of the proposed settlement fund secretly colluded to inflate the amount of compensation received by some plaintiffs (just prior to the 'fairness' hearing) in order to intentionally mislead the remaining plaintiffs into believing that the proposed settlement is 'fair, reasonable, and adequate.'"

Judge Barbier explains, "I did not engage in 'fraudulent inducement' or secretly collude to inflate the amount of compensation received by some plaintiffs (just prior to the 'fairness' hearing) in order to intentionally mislead the remaining plaintiffs into believing that the proposed settlement is 'fair, reasonable, and adequate.' Donovan's statements take out of context and improperly contort a portion of an order I issued on November 14, 2014."

On November 10, 2014, Judge Barbier states,
"....as the parties were approaching the final fairness hearing in November 2012, there was a concerted effort by the parties and claims facility to process a substantial number of high value claims in order to demonstrate that the settlement program was working as intended…BP and Class Counsel were aware of the push to resolve claims, **as was the Court**. Although some of these claims were for clients of PSC members, according to Mr. Juneau over 60% of the claims were for clients of non-PSC attorneys….While the Settlement Agreement in general terms provides that claims will be processed in the

-10-

order in which they are received....there is no evidence that the Claims Administrator
acted improperly in this regard."
The Honorable Carl J. Barbier, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in
the Gulf of Mexico*, on April 20, 2010 (Rec. Doc. 13635 at 3, November 10, 2014).

Donovan's statements do not "take out of context and improperly contort a portion of an

order that Judge Barbier issued." Judge Barbier is an exceptional jurist who writes in plain

English. Here, the issue is that fraudulent inducement is not a procedure which is well within a

Court's discretion when it conducts a fairness hearing.

### Donovan's Motions to Recuse Were Filed Only After a Careful Consideration of Context, That Is, the Entire Course of Judicial Proceedings, Rather Than Isolated Incidents

Judge Barbier correctly points out that he has been assigned to the Donovan Clients'

cases since 2011 and 2013, when they were consolidated with MDL 2179. He believes the

motions filed by Donovan are untimely and lack merit. Judge Barbier states that the motions are

untimely because "The general rule on timeliness requires that 'one seeking disqualification must

do so at the earliest moment after knowledge of the facts demonstrating the basis for such

disqualification.'" He explains that Section 455(a) mandates recusal "in any proceeding in which

[the judge's] impartiality might reasonably be questioned." 28 U.S.C. § 455(a). The Supreme

Court has explained that § 455(a) is "evaluated on an objective basis, so that what matters is not

the reality of bias or prejudice but its appearance."

Judge Barbier further instructs that "review should entail a careful consideration of

context, that is, the entire course of judicial proceedings, rather than isolated incidents." Judge

Barbier incorrectly states "Movants make a habit of improperly focusing on isolated incidents

while ignoring the entire course of judicial proceedings or even the immediate context.....I will

not waste time going through all of Movants' purported examples and explaining why each fails

to meet § 455(a)'s standard. A more thorough discussion can be found in Herman's opposition. (See Rec. Doc. 26014 at 8-18)."

Donovan points out that his Motions to Recuse were filed after a careful consideration of context, that is, the entire course of judicial proceedings, rather than isolated incidents. Indeed, it was only after the benefit of hindsight over a period of eight years that Donovan realized that a Motion to Recuse Judge Barbier was justified and appropriate.

The fact that Judge Barbier believes that a though discussion of § 455(a)'s standard can be found in Herman's opposition is disturbing. Defendant Herman mistakenly based his arguments in his Opposition to Motions to Recuse on 28 U.S.C. § 144. Donovan's instant Motions to Recuse were filed pursuant to 28 U.S.C. § 455(a). (*See* Exhibit D at 4).

Lastly, Judge Barbier fails to acknowledge that unlike § 455(a), which can be brought by motion but also **requires judges to disqualify sua sponte where appropriate**, § 144 is triggered only by the submission of an affidavit and motion for disqualification. Absent this trigger, there is no basis for disqualification under § 144, and no appeal based on § 144 will be heard. *See, United States v. Sammons*, 918 F.2d 592, 598 (6th Cir. 1999). (*See* Exhibit D at 6).

### Footnotes Which Merit Discussion

The following footnotes, which appear in Judge Barbier's Order, merit discussion.

Footnote No. 1

"Movants complain about a ruling from August 26, 2010 where I held that the Oil Pollution Act ("OPA") does not prohibit the use of waivers and releases (see Rec. Doc. 3830 at 34-35)."

Judge Barbier explains, "As reflected in the ruling itself, my conclusion was based on OPA's language. While Movants may disagree with this interpretation, my decision does not reflect an improper bias or prejudice."

-12-

Judge Barbier's conclusion was most certainly not based on OPA's language.

**A. The Text of the OPA Statute**

OPA is a strict liability statute. In order to recover damages, a claimant merely needs to

show that his or her damages "resulted from" the oil spill.

OPA provides,
"Each responsible party for a vessel or a facility from which oil is discharged, or which
poses the substantial threat of a discharge of oil, into or upon the navigable waters or
adjoining shorelines or the exclusive economic zone is liable for the removal costs and
damages that result from such incident." 33 U.S.C. § 2702(a).

The damages referred to in 33 U.S.C. § 2702(a) include, but are not limited to:
"Damages equal to the loss of profits or impairment of earning capacity due to the injury,
destruction, or loss of real property, personal property, or natural resources, which ***shall***
be recoverable by any claimant." 33 U.S.C. § 2702(b)(2)(E) (Emphasis added).

OPA further provides,
(a) "Payment or settlement of a claim for interim, short-term damages representing less
than the full amount of damages to which the claimant ultimately may be entitled ***shall
not*** preclude recovery by the claimant for damages not reflected in the paid or settled
partial claim." 33 U.S.C. § 2705(a) (Emphasis added); and

(b) "Payment of such a claim [i.e. payment to a claimant for interim, short-term damages
representing less than the full amount of damages to which the claimant ultimately may
be entitled] ***shall not*** foreclose a claimant's right to recovery of all damages to which the
claimant otherwise is entitled under this Act or under any other law."
33 U.S.C. §§ 2715(b)(1) and (2) (Emphasis added).

"Shall" means shall. The Supreme Court has made clear that when a statute uses the word

"shall," Congress has imposed a mandatory duty upon the subject of the command. See *United*

*States v. Monsanto*, 491 U.S. 600, 607, 109 S.Ct. 2657, 105 L.Ed.2d 512 (1989) (by using

"shall" in civil forfeiture statute, "Congress could not have chosen stronger words to express its

intent that forfeiture be mandatory in cases where the statute applied"); *Pierce v. Underwood*,

487 U.S. 552, 569-70, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988) (Congress' use of "shall" in a

housing subsidy statute constitutes "mandatory language"); *Barrentine v. Arkansas-Best Freight*

*Sys., Inc.* 450 U.S. 728, 739 n. 15, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981) (same under Fair

Labor Standards Act); *United States v. Myers*, 106 F.3d 936, 941 (10th Cir.) ("It is a basic canon

of statutory construction that use of the word 'shall' [in 18 U.S.C. § 3553(f) ] indicates

mandatory intent."), cert. denied, 520 U.S. 1270, 117 S.Ct. 2446, 138 L.Ed.2d 205 (1997); see

also *Black's Law Dictionary* 1233 (5th ed. 1979) ("As used in statutes ... [shall] is generally

imperative or mandatory."); *Environmental Defense Ctr. v. Babbitt*, 73 F.3d 867 (9th Cir.1995)

("We believe our 'shall'-means-shall approach has been implicitly recognized by the Ninth

Circuit; *Forest Guardians v. Babbitt*, 174 F.3d 1178 (10th Cir. 1999) (finding a strict statutory

construction); *Yu v. Brown*, 36 F. Supp. 2d 922 (10th Cir. 1999) (agreeing with *Forest Guardians*

in finding a strict requirement to force agencies to act under certain circumstances).

"The word 'shall' is ordinarily the language of command." *Anderson v. Yungkau*, 329

U.S. 482, 485 (1947) (quoting *Escoe v. Zerbst*, 295 U.S. 490, 493 (1935). And when the same

Rule uses both 'may' and 'shall', the normal inference is that each is used in its usual sense - the

one act being permissive, the other mandatory. See *United States ex rel. Siegel v. Thoman*, 156

U.S. 353 (1895).

Use of "shall" and "may" in statutes also mirrors common usage; ordinarily "shall" is

mandatory and "may" is permissive. "The mandatory 'shall'….normally creates an obligation

impervious to judicial discretion." *Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523

U.S. 26, 35 (1998). "The use of a permissive verb - 'may review' instead of 'shall review' -

suggests a discretionary rather than mandatory review process." *Rastelli v. Warden, Metro.

Correctional Center*, 782 F.2d 17, 23 (2d Cir. 1986).

Justice Souter, in delivering the opinion of the *Lexecon* Court, explained, "If we do our

-14-

job of reading the statute whole, we have to give effect to this plain command, see *Estate of Cowart* v. *Nicklos Drilling Co.*, 505 U. S. 469, 476 (1992), even if doing that will reverse the longstanding practice under the statute and the rule, *see Metropolitan Stevedore Co.* v. *Rambo* (1995) ("'Age is no antidote to clear inconsistency with a statute." (quoting *Brown* v. *Gardner*, 513 U. S 115, 122 (1994))). The language is straightforward, and with a straightforward application ready to hand, statutory interpretation has no business getting metaphysical."

**B. The Legislative History of the OPA Statute**

OPA's legislative history is shot through with general statements indicative of congressional intent to ensure that all oil spill victims are fully compensated. 135 CONG. REC. H7959 (daily ed. Nov. 2, 1989) (statement of Rep. Tauzin) ("ensure that all victims are fully compensated"); 135 CONG. REC. H7964 (daily ed. Nov. 2, 1989) (statement of Rep. Hammerschmidt) ("ensure that all justified claims for compensation are satisfied"); 135 CONG. REC. H7969 (daily ed. Nov. 2, 1989) (statement of Rep. Dyson) ("assurances that damages arising from spills will be completely compensated"); 136 CONG. REC. H336 (daily ed. Feb. 7, 1990) (statement of Rep. Carper) ("ensure that those people or those businesses that are damaged by these spills are fairly and adequately compensated"); 136 CONG. REC. S7752 (daily ed. June 12, 1990) (statement of Sen. Mitchell) ("ensure the fullest possible compensation of oil spill victims"); S. REP. NO. 101–94, at 12 (1989), *reprinted in* 1990 U.S.C.C.A.N. 722, 734. ("These provisions are intended to provide compensation for a wide range of injuries and are not so narrowly focused as to prevent victims of an oil spill from receiving reasonable compensation."); 135 CONG. REC. H7893 (daily ed. Nov. 1, 1989) (statement of Rep. Quillen) ("full, fair, and swift compensation for everyone injured by oil spills.").

-15-

As the Supreme Court explained,
"[I]n interpreting a statute a court should always turn first to one, cardinal canon before a
ll others. We have stated time and again that courts must presume that a legislature says
in a statute what it means and means in a statute what it says there." *Conn. Nat'l Bank v.
Germain*, 503 U.S. 249, 253–54 (1992).

The text and the legislative history of the OPA statute are clear. OPA *expressly prohibits*

Responsible Parties from engaging in a "Delay, Deny, Defend" strategy wherein the victims of

an oil spill are starved and ultimately forced to sign a release and covenant not to sue in order to

receive a miniscule payment amount for all damages, including future damages, they incur as a

result of the oil spill.

Footnote No. 2
"Movants state that the B1 Master Complaint "artfully circumvented" OPA by not
'properly alleging claims under' that statute. (Rec. Doc. 25927-1 at 10, 18)."

Judge Barbier states, "To the contrary, the B1 Master Complaint expressly pleaded

claims under OPA. (See Rec. Doc. 1128 ¶¶ 678-690)."

Rather than allege claims under the OPA, Defendant Herman made the unfathomable

decision to allege claims under a hodgepodge of statutes. In the "B1" Master Complaint,

Defendant Herman clearly states, "The claims presented herein are admiralty or maritime claims

within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure. Plaintiffs hereby

designate this case as an admiralty or maritime case, and request a non-jury trial, pursuant to

Rule 9(h)." Filing of the "B1" Master Complaint as an admiralty or maritime case artfully

circumvented the OPA. By doing so, Defendant Herman assisted Judge Barbier in expeditiously

being able to erroneously and incomprehensibly find, "….that nothing prohibits Defendants from

settling claims for economic loss. While OPA does not specifically address the use of waivers

and releases by Responsible Parties, the statute also does not clearly prohibit it. In fact, as the

-16-

Court has recognized in this Order, one of the goals of OPA was to allow for speedy and efficient recovery by victims of an oil spill."

As a result of this finding by Judge Barbier, approximately 220,000 Kenneth R. Feinberg victims who or that executed a "Release and Covenant Not to Sue" in exchange for a one-time final payment ($5,000 for individuals and $25,000 for businesses) were excluded from the settlement class action. There is no evidence that these amounts even remotely represent adequate consideration to compensate claimants for the damages that claimants did or will suffer as a result of the BP oil well blowout.

By alleging claims under general maritime law rather than under the OPA (a strict liability statute) and OCSLA, in the "B1" First Amended Master Complaint, Defendant Herman assisted Judge Barbier in expeditiously being able to:

> (a) Erroneously find, "The *Deepwater Horizon* was at all material times *a vessel in navigation.*"
> (b) Erroneously find, "Admiralty jurisdiction is present because the alleged tort occurred upon navigable waters of the Gulf of Mexico, disrupted maritime commerce, and the operations of the vessel *bore a substantial relationship to traditional maritime activity*. With admiralty jurisdiction comes the application of substantive maritime law."
> (c) Erroneously find, "State law, both statutory and common, is preempted by maritime law, *notwithstanding OPA's savings provisions*. All claims brought under state law are dismissed."
> (d) Erroneously find, "General maritime law *claims that do not allege physical damage to a proprietary interest are dismissed* under the *Robins Dry Dock* rule, unless the claim falls into the commercial fishermen exception."

Moreover, the maritime rule in the Fifth Circuit is that operational recklessness or willful disregard is generally insufficient to visit punitive damages upon the employer. Rather, the conduct must emanate from corporate policy or that a corporate official with policy-making authority participated in, approved of, or subsequently ratified the egregious conduct.

-17-

Accordingly, the MDL 2179 Court concluded that BP cannot be held liable for punitive damages under general maritime law. Judge Barbier further noted that, even if BP were liable for punitive damages, only commercial fishermen or those who could satisfy the "physical injury" threshold of the *Robins Dry Dock* rule would be entitled to such an award.

Footnote No. 3
> "Movants complain that I approved a common benefit fee award in the amount of $18 million to Mikal Watts, a former member of the Plaintiffs' Steering Committee, even though he had been indicted for allegedly falsely claiming to represent 40,000 oil spill claimants. What Movants omit, though, is that Watts was acquitted by a jury after a full trial on the merits. Movants further fail to acknowledge that my order merely adopted, per Fed. R. Civ. P. 53, a special master's recommendation to which there were no objections - not by Movants, not by anyone. (See Rec. Doc. 23574)."

On April 11, 2017, the FCC filed its proposed fee allocation with the MDL 2179 Court. (Rec. Doc. 22628). The FCC recommended Mikal Watts be allocated $16,790,494.18 in common benefit fees. The FCC explains, "The Fee Committee does note that Mr. Watts was acquitted by the jury in the criminal trial that was held in the Southern District of Mississippi." On October 12, 2017, Special Master John W. Perry, Jr. filed "Special Master's Recommendations Concerning the Allocation of Common Benefit Fees and the Reimbursement of Shared Expenses and Held Costs" with the MDL 2179 Court. (Rec. Doc. 23491). Special Master Perry recommended Watts be allocated *$18,290,494.18* in common benefit fees. How much would Watts have been allocated if his more than 40,000 "clients" were not phantoms? The MDL 2179 plaintiffs may never know.

Here, Donovan does not know how to reply to Judge Barbier. Judge Barbier's only justification for paying Watts for 40,000 *non-existent* "clients" is that Watts was acquitted by a jury in a criminal trial. Also, Judge Barbier blindly accepted Perry's recommendation to pay Watts *$18,290,494.18*.

The Watts matter illustrates the central problem with MDL 2179, namely, the Court's sole focus is on judicial economy without any consideration for justice, accountability or transparency. (*See* Exhibits E, F, G, H, I, J, and K).

Judge Barbier states, "I find there are grounds to believe that attorney Brian Donovan may have violated the following Louisiana Rules of Professional Conduct, which have been adopted by this Court:

> Rule 8.2(a) (making statements that the lawyer knows to be false or with reckless disregard as to its truth or falsity concerning the qualifications or integrity of a judge),
> Rule 8.4(c) (engaging in conduct involving dishonesty, fraud, deceit or misrepresentation), and
> Rule 8.4(d) (engaging in conduct that is prejudicial to the administration of justice)."

Judge Barbier's allegations are baseless and without merit. The statements in the *Donovan v. Herman* complaint and the motions to recuse Judge Barbier are truthful. The facts are accurate. Both were filed by the undersigned because the Court has the right to know the truth. The truth should never be considered to be "prejudicial to the administration of justice."

## CONCLUSION

For the reasons given above, and the reasons more extensively set forth in the exhibits attached hereto, the Lawyer Disciplinary Committee should recommend that the court dismiss this complaint.

DATED: November 14, 2019          Respectfully submitted,

**/s/ Brian J. Donovan_____**
Brian J. Donovan
Florida Bar No. 143900
3102 Seaway Court, Suite 304
Tampa, FL 33629
Tel: (352)328-7469
BrianJDonovan@verizon.net
*Attorney-Respondent*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing response was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will forward the response to the Chief Judge and to the Lawyer Disciplinary Committee, on this 14th day of November, 2019.

**/s/ Brian J. Donovan_____**
Brian J. Donovan

E-SERVICE
64115577
Aug 20 2019
06:30PM
File & ServeXpress

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

In Re: Oil Spill by the Oil Rig     *
"Deepwater Horizon" in the Gulf           **MDL 2179**
of Mexico, on April 20, 2010     *

                                  **SECTION: J(2)**

                        *

Applies to:                         **JUDGE BARBIER**
*All Cases and 11-02533, 11-01987,*    *
*13-06014, 19-12014*

                        *          **MAG. JUDGE WILKINSON**

## <u>ORDER</u>

Before the Court are two Motions to Recuse (Rec. Docs. 25908, 25927) filed by Brian J. Donovan, who is the plaintiff in member case No. 19-12014 and plaintiffs' counsel in Nos. 11-02533, 11-01987, 13-06014. The latter Motion seeks to recuse the undersigned from all proceedings involving cases in MDL 2179.

IT IS ORDERED that any response to the Motions to Recuse (Rec. Docs. 25908, 25927) shall be filed by <u>Thursday, September 19, 2019</u>. Any reply by Mr. Donovan shall be filed by <u>Thursday, September 26, 2019</u>. The Court will determine if oral argument is necessary after it has reviewed the parties' memoranda.

New Orleans, Louisiana, this 19th day of August, 2019.

_____
United States District Judge

E-SERVICE
64133376
Aug 27 2019
07:18AM
File & ServeXpress

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

In Re: **Oil Spill by the Oil Rig**           **MDL 2179**
       **"Deepwater Horizon"**
       **in the Gulf of Mexico,**
       **on April 20, 2010**            **SECTION: J**

*This Document Relates to:*          **JUDGE BARBIER**
*All Cases and*
*Salvesen v. Feinberg, et al.,*          **MAG. JUDGE WILKINSON**
*2:11-cv-02533*
*Pinellas Marine Salvage Inc., et al. v. Feinberg, et al.,*
*2:11-cv-01987*
*Ditch v. Feinberg et al.,*
*2:13-cv-06014*
*Donovan v. Herman,*
*2:19-cv-12014*

_____/

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HIS
## MOTION FOR CLARIFICATION

On July 29, 2019, Plaintiffs Selmer M. Salvesen, Pinellas Marine Salvage, Inc., John

Mavrogiannis, and Andrew J. Ditch, by and through their undersigned counsel, filed their

Motion to Recuse the Honorable Carl J. Barbier from the following cases: *Salvesen v. Feinberg,*

*et al.*, 2:11-cv-02533; *Pinellas Marine Salvage Inc., et al. v. Feinberg, et al.*, 2:11-cv-01987; and

*Ditch v. Feinberg et al.*, 2:13-cv-06014. On August 7, 2019, Plaintiff Brian J. Donovan, on

behalf of himself, his clients, and all others similarly situated, filed his Motion to Recuse the

Honorable Carl J. Barbier from MDL 2179. Both Motions to Recuse were filed pursuant to the

federal recusal statute, specifically 28 U.S.C. § 455(a) and 28 U.S.C. § 455(b)(4), in order to

redress an appearance of impropriety and to restore public confidence in the integrity of MDL

2179.

On August 20, 2019, the Court entered an order (Rec. Doc. 25963) which states "IT IS ORDERED that any response to the Motions to Recuse (Rec. Docs. 25908, 25927) shall be filed by Thursday, September 19, 2019. Any reply by Mr. Donovan shall be filed by Thursday, September 26, 2019. The Court will determine if oral argument is necessary after it has reviewed the parties' memoranda."

## THE FIVE ISSUES REQUIRING CLARIFICATION

Plaintiff respectfully moves the Court to enter an order clarifying whether:

(a) the order (Rec. Doc. 25963) filed by the Court on August 20, 2019 was properly drafted pursuant to the federal recusal statute (specifically 28 U.S.C. § 455(a) and 28 U.S.C. § 455(b)(4)) or improperly drafted pursuant to a state recusal statute;

(b) any response to the Motions to Recuse by the 1,079 recipients to whom the Court sent the order via File & ServeXpress is required, or even permitted, under the federal recusal statute;

(c) any reply by Mr. Donovan is required, or even permitted, under the federal recusal statute;

(d) oral argument is necessary, or even permitted, under the federal recusal statute after the Court has reviewed the parties' memoranda; and

(e) the Honorable Carl J. Barbier believes he is required, pursuant to the federal recusal statute, either to deny, in whole or in part, the two Motions to Recuse or grant, in whole or in part, the two Motions to Recuse (and have the cases assigned to a judge whose impartiality might not reasonably be questioned).

## LAW AND ARGUMENT

**I.    28 U.S.C. § 455(a)**

Any justice, judge or magistrate of the United States *shall* disqualify himself in any

proceeding in which his impartiality might reasonably be questioned. 28 U.S.C. § 455(a). As the

U.S. Supreme Court has explained, that provision requires that the judicial conduct at issue:

> be evaluated on an objective basis, so that what matters is not the reality of bias or
> prejudice but its appearance. Quite simply and quite universally, recusal was required
> whenever "impartiality might reasonably be questioned."

*Liteky v. United States*, 510 U.S. 540, 548 (1994)(Scalia, J.). Thus, it is the appearance of

partiality - and not actual bias - that is the test for recusal under Section 455(a): "In applying

§ 455(a), the judge's actual state of mind, purity of heart, incorruptibility, or lack of partiality are

not the issue." *United States v. Cooley*, 1 F.3d 985, 993 (10th Cir. 1993).

Even if the decision to recuse in a particular case were a close one, the statute's purpose

of promoting public confidence in the judiciary requires that judges must resolve any doubts in

favor of recusal. *See, e.g.*, *Republic of Panama v. American Tobacco Co*., 217 F.3d 343, 347 (5th

Cir. 2000)("[I]f the question of whether § 455(a) requires disqualification is a close one the

balance tips in favor of recusal."); *In re United States*, 158 F.3d 26, 30 (1st Cir. 1998), *Nichols v.

Alley*, 71 F.3d 347, 352 (10th Cir. 1995); *United States v. Dandy*, 998 F.2d 1344, 1349 (6th Cir.

1993)("Where the question is close, the judge must recuse himself."); *United States v. Kelly*, 888

F.2d 732, 744 (11th Cir. 1989)(Section 455(a) "requires judges to resolve any doubts they may

have in favor of disqualification.").

Congress established the "appearance of impartiality" standard "to promote public

confidence in the integrity of the judicial process." *Liljeberg v. Health Services Acquisition*

*Corp*., 486 U.S. 847, 860 (1988). The legislative history of § 455(a) is clear:

> This general standard is designed to promote public confidence in the impartiality of the judicial process by saying, in effect, if there is a reasonable factual basis for doubting the judge's impartiality, he should disqualify himself and let another judge preside over the case.

H. Rep. No. 93-1453, p. 5 (1974), U.S. Code Cong. & Admin. News 1974, p. 6355. In the words of the Seventh Circuit, "Once a judge whose impartiality toward a particular case may reasonably be questioned presides over that case, the damage to the integrity of the system is done." *Durhan v. Neopolitan*, 875 F.2d 91, 97 (1989).

28 U.S.C. § 455(c) requires that "a judge should inform himself about his personal and fiduciary financial interests, and make a reasonable effort to inform himself about the personal financial interests of his spouse and minor children residing in his household."

## II.    28 U.S.C. § 455(b)

Section 455 governs the disqualification or recusal of federal judges. Germane to the instant matter is § 455(b)(4), which provides, in relevant part:

> (b) A judge *shall*….disqualify himself in the following circumstances:
> (4) He knows that he….has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding….

The statute speaks of a "financial interest in the subject matter in controversy or in a party to the proceeding." 28 U.S.C. § 455(b)(4). Thus, even if debt instruments do not qualify as a "financial interest[s]….in a party" because they do not convey an ownership interest, they could nonetheless qualify as "financial interest[s] in the subject matter in controversy." Furthermore, the second part of § 455(b)(4) speaks of "any other interest that could be substantially affected

-4-

by the proceeding" as an alternative basis for disqualification. An Advisory Opinion from the Judicial Committee on Codes of Conduct specifically notes that "ownership of any type of debt interest….may in some circumstances occasion disqualification if the judge's interest is such that it could be substantially affected by the outcome of the proceeding."

    In sum, Plaintiff Donovan moves, in part, for the recusal of Judge Barbier on the basis of either (1) the debt instruments being "financial interests in the subject matter in controversy" or (2) the possibility that the debt instruments "could be substantially affected by the proceeding." *See* 28 U.S.C. § 455(b)(4).

    The Fifth Circuit has held that if the debt instruments could be substantially affected, then recusal would be mandatory because the divestment exception would not apply. *See* 28 U.S.C. § 455(f) (noting that divestment exception applies only to a financial interest in a party "other than an interest that could be substantially affected by the outcome"); Advisory Op. No. 69, "Removal of Disqualification by Disposal of Interest," 69-2.

### III.    "Shall" means shall.

    28 U.S.C. § 455(a) provides "Any justice, judge or magistrate of the United States *shall* disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(b) further provides "A judge *shall*….disqualify himself in the following circumstances: (4) He knows that he….has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding…."

    The Supreme Court has made clear that when a statute uses the word "shall," Congress has imposed a mandatory duty upon the subject of the command. See *United States v. Monsanto*,

491 U.S. 600, 607, 109 S.Ct. 2657, 105 L.Ed.2d 512 (1989) (by using "shall" in civil forfeiture statute, "Congress could not have chosen stronger words to express its intent that forfeiture be mandatory in cases where the statute applied"); *Pierce v. Underwood*, 487 U.S. 552, 569-70, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988) (Congress' use of "shall" in a housing subsidy statute constitutes "mandatory language"); *Barrentine v. Arkansas-Best Freight Sys., Inc.* 450 U.S. 728, 739 n. 15, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981) (same under Fair Labor Standards Act); *United States v. Myers*, 106 F.3d 936, 941 (10th Cir.) ("It is a basic canon of statutory construction that use of the word 'shall' [in 18 U.S.C. § 3553(f) ] indicates mandatory intent."), cert. denied, 520 U.S. 1270, 117 S.Ct. 2446, 138 L.Ed.2d 205 (1997); see also *Black's Law Dictionary* 1233 (5th ed. 1979) ("As used in statutes ... [shall] is generally imperative or mandatory."); *Environmental Defense Ctr. v. Babbitt*, 73 F.3d 867 (9th Cir.1995) ("We believe our 'shall'-means-shall approach has been implicitly recognized by the Ninth Circuit); *Forest Guardians v. Babbitt*, 174 F.3d 1178 (10th Cir. 1999) (finding a strict statutory construction); *Yu v. Brown*, 36 F. Supp. 2d 922 (10th Cir. 1999) (agreeing with *Forest Guardians* in finding a strict requirement to force agencies to act under certain circumstances).

"The word 'shall' is ordinarily the language of command." *Anderson v. Yungkau*, 329 U.S. 482, 485 (1947) (quoting *Escoe v. Zerbst*, 295 U.S. 490, 493 (1935). And when the same Rule uses both 'may' and 'shall', the normal inference is that each is used in its usual sense - the one act being permissive, the other mandatory. See *United States ex rel. Siegel v. Thoman*, 156 U.S. 353 (1895).

Use of "shall" and "may" in statutes also mirrors common usage; ordinarily "shall" is mandatory and "may" is permissive. "The mandatory 'shall' ......normally creates an obligation

-6-

impervious to judicial discretion." *Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998). "The use of a permissive verb - 'may review' instead of 'shall review' - suggests a discretionary rather than mandatory review process." *Rastelli v. Warden, Metro. Correctional Center*, 782 F.2d 17, 23 (2d Cir. 1986).

Justice Souter, in delivering the opinion of the *Lexecon* Court, explained, "If we do our job of reading the statute whole, we have to give effect to this plain command, see *Estate of Cowart* v. *Nicklos Drilling Co.*, 505 U. S. 469, 476 (1992), even if doing that will reverse the longstanding practice under the statute and the rule, *see Metropolitan Stevedore Co.* v. *Rambo* (1995) ("'Age is no antidote to clear inconsistency with a statute." (quoting *Brown* v. *Gardner*, 513 U. S 115, 122 (1994))). The language is straightforward, and with a straightforward application ready to hand, statutory interpretation has no business getting metaphysical."

## IV. Judge Barbier is uniquely qualified to determine if he should recuse himself.

As the JPML has noted, a transferee judge has an undeniable interest in policing the conduct of attorneys involved in an MDL. Similarly, a transferee judge has an undeniable interest in and is uniquely qualified to determine if he should recuse himself. Plaintiff respectfully points out that, pursuant to the federal recusal statute, specifically 28 U.S.C. § 455(a) and 28 U.S.C. § 455(b)(4), the Honorable Carl J. Barbier does not require responses, a reply, or an oral argument to determine if he should recuse himself.

## CONCLUSION

For the reasons given above, further clarification of this Court's order (Rec. Doc. 25963) is needed. Plaintiff requests an order be entered (a) addressing the above-referenced five issues

requiring clarification; (b) stating that the Court's order (Rec. Doc. 25963) is vacated; and

(c) pursuant to the federal recusal statute, the Motion(s) to Recuse are either granted or denied, in

whole or in part; if granted, in whole or in part, the Motion(s) to Recuse shall have the cases

assigned to a judge whose impartiality might not reasonably be questioned.

DATED: August 27, 2019                                    Respectfully submitted,

                                                          **/s/ Brian J. Donovan**
                                                          Brian J. Donovan
                                                          Florida Bar No. 143900
                                                          3102 Seaway Court, Suite 304
                                                          Tampa, FL 33629
                                                          Tel: (352)328-7469
                                                          BrianJDonovan@verizon.net

E-SERVICE
64137445
Aug 27 2019
04:31PM
File & ServeXpress

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * | MDL 2179 |
| | | SECTION: J(2) |
| Applies to: *All Cases and 11-02533, 11-01987, 13-06014, 19-12014* | * * | JUDGE BARBIER |
| | | MAG. JUDGE WILKINSON |

## <u>ORDER</u>

Before the Court is Brian J. Donovan's Motion for Clarification. (Rec. Doc. 25985).

IT IS ORDERED that the Motion for Clarification (Rec. Doc. 25985) is DENIED.

New Orleans, Louisiana, this 27th day of August, 2019.

_____
United States District Judge

E-SERVICE
64213517
Sep 17 2019
01:18PM
File & ServeXpress

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **In Re: Oil Spill by the Oil Rig** | **MDL 2179** |
| **"Deepwater Horizon"** | |
| **in the Gulf of Mexico,** | |
| **on April 20, 2010** | **SECTION: J** |
| | |
| **This Document Relates to:** | |
| ***All Cases and 11-02533, 11-01987,*** | **JUDGE BARBIER** |
| ***13-06014, 19-12014*** | **MAG. JUDGE WILKINSON** |

_____/

## PLAINTIFFS' REPLY IN SUPPORT OF PLAINTIFFS' MOTIONS TO RECUSE THE HONORABLE CARL J. BARBIER

The undersigned respectfully submits the following Reply in Support of Plaintiffs' Motions to Recuse, and in reply to several arguments and misrepresentations presented in Defendant Stephen J. Herman's Opposition to Motions to Recuse, in accordance with the Court's Order of August 19, 2019 (Rec. Doc. 25963). The only Opposition to Motions to Recuse was filed, pursuant to Local Civil Rule 7.5, by Defendant Stephen J. Herman on September 10, 2019 (Rec. Doc. 26014).

Before the Court are two Motions to Recuse (Rec. Docs. 25908, 25927) filed by Brian J. Donovan, who is plaintiffs' counsel in case Nos. 11-02533, 11-01987, 13-06014 and the plaintiff in member case No. 19-12014. The latter Motion seeks, pursuant to 28 U.S.C. § 455(a) and 28 U.S.C. § 455(b)(4), to recuse The Honorable Carl J. Barbier from all proceedings involving cases in MDL 2179 in order to redress an appearance of impropriety and to restore public confidence in the integrity of MDL 2179.

## LAW AND ARGUMENT

The two principal statutes governing the disqualification or recusal of federal judges are 28 U.S.C. § 455 ("Disqualification of justice, judge or magistrate judge") and 28 U.S.C. § 144

("Bias or prejudice of judge"). 28 U.S.C. § 144 deals exclusively with *actual* bias or prejudice, whereas 28 U.S.C. § 455(a) deals with the *appearance* of partiality. 28 U.S.C. § 144 is triggered by a party's affidavit, whereas 28 U.S.C. § 455 may be invoked in a motion by a party or sua sponte by the judge.

## I.    28 U.S.C. § 455(a)

Any justice, judge or magistrate of the United States *shall* disqualify himself in any proceeding in which his impartiality might reasonably be questioned. 28 U.S.C. § 455(a). As the U.S. Supreme Court has explained, that provision requires that the judicial conduct at issue:

> be evaluated on an objective basis, so that what matters is not the reality of bias or prejudice but its appearance. Quite simply and quite universally, recusal was required whenever "impartiality might reasonably be questioned."

*Liteky v. United States*, 510 U.S. 540, 548 (1994)(Scalia, J.). Thus, it is the appearance of partiality - and not actual bias - that is the test for recusal under Section 455(a): "In applying § 455(a), the judge's actual state of mind, purity of heart, incorruptibility, or lack of partiality are not the issue." *United States v. Cooley*, 1 F.3d 985, 993 (10th Cir. 1993).

Even if the decision to recuse in a particular case were a close one, the statute's purpose of promoting public confidence in the judiciary requires that judges must resolve any doubts in favor of recusal. *See, e.g*., *Republic of Panama v. American Tobacco Co*., 217 F.3d 343, 347 (5th Cir. 2000)("[I]f the question of whether § 455(a) requires disqualification is a close one the balance tips in favor of recusal."); *In re United States*, 158 F.3d 26, 30 (1st Cir. 1998), *Nichols v. Alley*, 71 F.3d 347, 352 (10th Cir. 1995); *United States v. Dandy*, 998 F.2d 1344, 1349 (6th Cir. 1993)("Where the question is close, the judge must recuse himself."); *United States v. Kelly*, 888 F.2d 732, 744 (11th Cir. 1989) (Section 455(a) "requires judges to resolve any doubts they may

have in favor of disqualification.").

Congress established the "appearance of impartiality" standard "to promote public confidence in the integrity of the judicial process." *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 860 (1988). The legislative history of § 455(a) is clear:

> This general standard is designed to promote public confidence in the impartiality of the judicial process by saying, in effect, if there is a reasonable factual basis for doubting the judge's impartiality, he should disqualify himself and let another judge preside over the case.

H. Rep. No. 93-1453, p. 5 (1974), U.S. Code Cong. & Admin. News 1974, p. 6355. In the words of the Seventh Circuit, "Once a judge whose impartiality toward a particular case may reasonably be questioned presides over that case, the damage to the integrity of the system is done." *Durhan v. Neopolitan*, 875 F.2d 91, 97 (1989). (Exhibit A).

## II.    28 U.S.C. § 455(b)

28 U.S.C. § 455(b)(4) provides, in relevant part:

> (b) A judge *shall*….disqualify himself in the following circumstances:
> (4) He knows that he….has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding….

The statute speaks of a "financial interest in the subject matter in controversy or in a party to the proceeding." 28 U.S.C. § 455(b)(4). Thus, even if debt instruments do not qualify as a "financial interest[s]….in a party" because they do not convey an ownership interest, they could nonetheless qualify as "financial interest[s] in the subject matter in controversy." Furthermore, the second part of § 455(b)(4) speaks of "any other interest that could be substantially affected by the proceeding" as an alternative basis for disqualification. An Advisory Opinion from the Judicial Committee on Codes of Conduct specifically notes that "ownership of any type of debt

interest....may in some circumstances occasion disqualification if the judge's interest is such that it could be substantially affected by the outcome of the proceeding."

In sum, Plaintiff Donovan moves, in part, for the recusal of Judge Barbier on the basis of either (1) the debt instruments being "financial interests in the subject matter in controversy" or (2) the possibility that the debt instruments "could be substantially affected by the proceeding." *See* 28 U.S.C. § 455(b)(4).

The Fifth Circuit has held that if the debt instruments could be substantially affected, then recusal would be mandatory because the divestment exception would not apply. *See* 28 U.S.C. § 455(f) (noting that divestment exception applies only to a financial interest in a party "other than an interest that could be substantially affected by the outcome"); Advisory Op. No. 69, "Removal of Disqualification by Disposal of Interest," 69-2. (Exhibit A) (*See also*, Exhibit B).

### III. Defendant Herman Mistakenly Bases His Arguments in His Opposition to Motions to Recuse on 28 U.S.C. § 144. The Instant Motions to Recuse Were Filed Pursuant to *28 U.S.C. § 455(a)*.

In his Opposition to Motions to Recuse, Defendant Herman states,

"To the extent that Donovan seeks recusal under 28 U.S.C. §455(a), such motion should be denied, as: There is absolutely no evidence of any 'deep-seated favoritism or antagonism' that would make fair judgment in the Donovan cases impossible. *See 28 U.S.C. §144* ('Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party....The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists....It shall be accompanied by a certificate of counsel of record stating that it is made in good faith')....Donovan has presented no extrajudicial sources of alleged 'bias', but merely complains about certain rulings with which he apparently disagrees."

"To prove recusal is warranted, the moving party must generally demonstrate that the alleged comment, action, or circumstance was of 'extrajudicial' origin. Judicial rulings alone 'almost never constitute a valid basis for a bias or partiality motion.' Opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings 'do not constitute a basis for a bias or partiality motion unless

-4-

they display a deep-seated favoritism or antagonism that would make fair judgment impossible.'"

"A party to a proceeding moving for recusal on the basis of an alleged personal bias or prejudice must submit a timely and sufficient affidavit setting forth the facts and reasons for the belief that bias or prejudice exists accompanied by a certificate of counsel stating that it is made in good faith. *See 28 U.S.C. §144.*"

"In this case, neither Donovan nor his clients have submitted an affidavit, nor a certification of good faith. Nor does Donovan point to any 'extrajudicial' sources to support his claims of alleged 'deep-seated favoritism or antagonism' that would supposedly make it impossible for the Court to be fair and impartial in the Donovan cases."

"It is difficult to tell what Donovan is complaining about - or how it shows some type of alleged 'bias' or 'partiality.'"

"Nevertheless, and in any event, most of these complaints relate to the supposed conduct of the parties, and do not in any way evidence any type of 'bias' on the part of the Court."

"There is absolutely no factual or evidentiary basis from which a reasonable and objective person could conclude that the Court has an allegedly 'deep-seated favoritism or antagonism that would make fair judgment impossible' in the Donovan cases."

As noted *supra*, § 144 requires the showing of **actual bias**, whereas § 455(a) requires a

**mere appearance of bias**. § 144 disqualification is triggered by an affidavit that alleges "the

judge before whom the matter is pending has a personal bias or prejudice either against [the

affiant] or in favor of any adverse party." The Fifth and Eleventh Circuits have explained that

"[t]o warrant recusal under § 144, the moving party must allege facts that would convince a

reasonable person that bias actually exists." *See Phillips v. Joint Legislative Comm. on

Performance & Expenditure Review*, 637 F.2d 1014, 1019 n.6 (5th Cir. 1981); *Christo v.

Padgett*, 323 F.3d 1324, 1333 (11th Cir. 2000). In *Liteky v. United States*, 510 U.S. 540 (1994),

the Supreme Court noted that the standard for bias or prejudice under § 144 is identical to

disqualification for bias and prejudice under § 455(b)(1). In so stating, it distinguished § 455(a),

which requires allegations of bias "to be evaluated on an *objective* basis, so that **what matters is not the reality of bias or prejudice but its appearance.**" *Id.*

Unlike § 455(a), which can be brought by motion but also requires judges to disqualify sua sponte where appropriate, § 144 is triggered *only* by the submission of an affidavit and motion for disqualification. Absent this trigger, there is no basis for disqualification under § 144, and no appeal based on § 144 will be heard. *See, e.g.*, *United States v. Sammons*, 918 F.2d 592, 598 (6th Cir. 1999).

In sum, Plaintiffs are not required to file an affidavit alleging Judge Barbier has a personal bias or prejudice either against them or in favor of any adverse party.

## IV. News Articles Have Led to Reasonable Questions About Judge Barbier's Impartiality

Courts have previously relied on news articles in deciding recusal motions under Section 455(a), *e.g., United States v. Tucker*, 78 F.3d 1313, 1322-23 (8th Cir. 1996).

Because the American public, as reflected in the attached list of articles (*See* Exhibit C), has concluded that there is an appearance of favoritism, any objective observer would be compelled to conclude that Judge Barbier's impartiality has been questioned. These facts more than satisfy Section 455(a), which mandates recusal merely when a Justice's impartiality "might reasonably be questioned."

## V. Examples of Why Judge Barbier's Impartiality "Might Reasonably be Questioned"

(a) the Transfer Order establishing MDL 2179 requires Judge Barbier to "facilitate closer coordination with Kenneth Feinberg's administration of the BP Compensation Fund." The ultimate objective of Feinberg was to limit BP's liability by obtaining a signed "Release and Covenant Not to Sue" from as many BP oil well blowout victims as possible;

-6-

(b) the JPML knowingly selected a Transferee Judge to preside over MDL 2179 who should have recused himself;

(c) Judge Barbier condoned fraudulent inducement just prior to the "fairness" hearing;

(d) Judge Barbier states "The settlement agreement appears fair, has no obvious deficiencies....*does not grant excessive compensation to attorneys*." Plaintiffs respectfully point out that "quadruple-dipping" which results in *$3.035 billion* of total compensation being paid to the 19 PSC attorneys and their law firms <u>is</u> excessive;

(e) Judge Barbier requires common benefit attorneys to enter into an onerous and unethical agreement with the PSC;

(f) Judge Barbier awarded US$18,290,494.18 in common benefit fees to Mikal C. Watts. How much would Watts have been allocated if his more than 40,000 "clients" were not phantoms? The MDL 2179 plaintiffs may never know;

(g) Judge Barbier strongly urges plaintiffs to accept the BP settlement and accuses Plaintiffs' attorneys ("Professional Objectors") of filing their objections "for the sole purpose of attempting to extract a side-deal pay-off to go away;"

(h) Judge Barbier colluded with Defendant Herman to develop / facilitate an 8-Step plan to maximize judicial efficiency while minimizing justice for the plaintiffs;

(i) Judge Barbier, *after eight years*, continues to deny plaintiffs their right to conduct formal discovery against Kenneth R. Feinberg, et al.; and

(j) Judge Barbier's intentional lack of transparency and lack of accountability.

*See* Exhibits A, B, and D.

## VI. This Honorable Court Has Been Fully Briefed on Every Issue Raised by Defendant Herman in His Opposition to Motions to Recuse. There is No Reason to be Repetitive.

Not only has Defendant Herman demonstrated that he does not understand the difference

between 28 U.S.C. § 455(a) and 28 U.S.C. § 144, but also his conclusionary, repetitive, and

misleading arguments fail to enlighten either the plaintiffs or this Honorable Court.

Mr. Herman states: "It is somewhat difficult to understand the precise basis upon which

Mr. Donovan seeks recusal....With apologizes to the Court, undersigned counsel simply cannot

understand the mechanics of Mr. Donovan's proffered conspiracy theory well enough to coherently or concisely address." If "Co-Liaison Counsel for Plaintiffs" Herman is truly befuddled by these straight-forward Motions to Recuse, then Defendant Herman shall be significantly challenged when it comes time for him to answer the 130-page complaint which was filed against him on February 12, 2019. (Exhibit D).

## VII. There is a Heightened Need to Preserve the Appearance of Impartiality in Bench Trials

The question has sometimes arisen as to whether the standard for disqualification differs in a bench trial where the judge's role is even more pivotal than in a jury trial. In *Alexander v. Primerica Holdings, Inc.*, 10 F.3d 155 (3d Cir. 1993), the court of appeals said: "We cannot overlook the fact that this is a non-jury case, and that [the judge] will be deciding each and every substantive issue at trial….When the judge is the actual trier of fact, the need to preserve the appearance of impartiality is especially pronounced." Plaintiffs respectfully point out that there is a heightened need to preserve the appearance of impartiality in MDL 2179.

## CONCLUSION

For the reasons given above, and the reasons more extensively set forth in the exhibits attached hereto, Plaintiffs' motions to recuse should be granted.

DATED: September 17, 2019                              Respectfully submitted,

                                                       /s/ Brian J. Donovan
                                                       Brian J. Donovan
                                                       Florida Bar No. 143900
                                                       3102 Seaway Court, Suite 304
                                                       Tampa, FL 33629
                                                       Tel: (352)328-7469
                                                       BrianJDonovan@verizon.net
                                                       *Plaintiffs' Counsel and*
                                                       *Plaintiff in Donovan v. Herman*

-8-

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing has been served on all counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this <u>17</u>th day of September, 2019.

<u>/s/ Brian J. Donovan</u>
Brian J. Donovan

# DUTIES OWED BY APPOINTED COUNSEL TO MDL LITIGANTS WHOM THEY DO NOT FORMALLY REPRESENT

*Stephen J. Herman*[*]

I. INTRODUCTION ........................................................ 1
II. OVERVIEW OF MULTIDISTRICT LITIGATION ................... 2
III. SOURCE OF APPOINTED COUNSEL'S
     PROFESSIONAL RESPONSIBILITIES ............................ 6
IV. LEAD COUNSEL DOES NOT HAVE A TRADITIONAL
     "FIDUCIARY" DUTY.......................................... 8
V. A FALSE CONTROVERSY: THE GM IGNITION
     SWITCH LITIGATION ........................................13
VI. LEAD COUNSEL'S DUTY TO PROVIDE
     INFORMATION TO MDL PLAINTIFFS............................17
VII. LEAD COUNSEL'S DUTY AT THE NEGOTIATING
     TABLE ........................................................20
VIII. CONCLUSION .................................................24

## I. INTRODUCTION

Courts routinely appoint Lead Counsel, Liaison Counsel, and Plaintiffs' Executive or Steering Committees to perform certain functions on behalf of all plaintiffs in multidistrict litigation (MDL) and other complex, coordinated, or consolidated

---

   * Steve Herman practices with Herman Herman & Katz, LLC in New Orleans, Louisiana. The author of *America and the Law: Challenges for the 21st Century* (Gravier House Press 1999), Herman teaches an advanced torts seminar on class actions at Loyola University New Orleans College of Law and an advanced civil procedure course in complex litigation at Tulane University Law School. He is a past president of the Louisiana Association for Justice, a past president of the Civil Justice Foundation, and a fellow of both the International Academy of Trial Lawyers and the Litigation Counsel of America. Herman served for six years as a Lawyer Chair for one of the Louisiana Disciplinary Board Hearing Committees and currently serves on the State Bar Rules of Professional Conduct Committee. For the past eight years, Herman has served as Co-Liaison and Co-Lead Class Counsel for Plaintiffs in MDL 2179, the *Deepwater Horizon* Oil Spill Litigation.

1

proceedings. Questions frequently arise in such cases regarding the existence, nature, and scope of duties that may be owed by such appointed counsel to plaintiffs in the litigation. Some have posited that lawyers in leadership positions have an unqualified "fiduciary" duty to each and all litigants. At the opposite end of the spectrum, others have argued that appointed counsel's duties of loyalty remain with those individual plaintiffs whom they personally represent, to the exclusion, and potential prejudice, of other litigants with cases pending in the MDL or other similar proceedings.

This Article will look to the common law, Rules of Professional Conduct, class action jurisprudence, and other analogous frameworks, such as the Employee Retirement Income Security Act (ERISA), to explore the duties, if any, owed by appointed counsel in leadership positions to their own clients, to other plaintiffs, and to the privately retained counsel who represent other plaintiffs in the litigation.

Part II of this Article provides an overview of multidistrict litigation. Part III identifies the source of appointed counsel's authority and responsibility in MDL proceedings. Part IV explains why there is no "fiduciary" responsibility to each MDL litigant in the traditional sense of the word. Part V places into context the controversy that erupted when two leading experts submitted competing affidavits in the *GM Ignition Switch Litigation.* Part VI discusses Lead Counsel's responsibility to communicate with MDL litigants. Finally, Part VII explores some of the challenges that often arise in settlement negotiations.

In sum, this Article argues that the ethical and fiduciary rules developed for single-plaintiff lawsuits cannot be mechanically applied in such a way that MDL plaintiffs are deprived of the most knowledgeable and experienced counsel or as to otherwise undermine the judicial economy sought by MDL transfer and Lead Counsel appointment in the first place. Lead Counsel, rather, should be thought of as trustees, with a general responsibility to maximize the collective interests of the MDL plaintiffs as a whole.

## II. OVERVIEW OF MULTIDISTRICT LITIGATION

In 1968, Congress established a procedure within the federal court system for the transfer of multiple civil actions involving common questions of fact to a single district for coordinated

**Duties Owed to MDL Litigants**

pretrial proceedings.[1] The Judicial Panel on Multidistrict Litigation (JPML),[2] a panel of federal judges from around the country, convenes every six weeks to decide whether to establish a coordinated multidistrict litigation proceeding, and if established, which particular U.S. district court (and generally which specific transferee judge) to transfer such related actions.[3] Thereafter, the parties are required to notify the JPML of similar "tag-along" cases, which will be conditionally transferred to the MDL; in the event of any objection, the JPML may be called upon to further expand or refine the scope of actions subject to transfer.[4]

Upon establishment of the coordinated action in the transferee court, the management of the proceedings is left largely to the presiding MDL judge. While one of the main objectives is to promote justice and efficiency through economies of scale and the opportunity for global settlement,[5] the U.S. Supreme Court has made it clear that an MDL transferee judge's authority over actions originating in other judicial districts extends only to *pre*-trial proceedings, with such actions subject to remand "to the district from which it was transferred unless it shall have been previously terminated."[6]

To prevent the pleadings, motions, hearings, and discovery efforts from becoming too wasteful, duplicative, or unwieldly, the MDL transferee judge will typically appoint one or more lawyers (Lead Counsel)[7] to "act on behalf of other counsel and their clients

---

1. 28 U.S.C. § 1407(a) (2012).

2. Specifically, 28 U.S.C. § 1407(d) establishes that the JPML "shall consist of seven circuit and district judges designated from time to time by the Chief Justice of the United States, no two of whom shall be from the same circuit," and that the "concurrence of four members shall be necessary to any action by the panel." 28 U.S.C. § 1407(d) (2012).

3. *See generally* 28 U.S.C. § 1407 (2012).

4. RULES OF PROC. OF THE U.S. JUD. PANEL ON MULTIDISTRICT LITIG., Rule 7.1 (eff. Oct. 4, 2016).

5. *See, e.g.*, FED. JUD. CTR., MANUAL FOR COMPLEX LITIGATION (FOURTH) § 20.132 (4th ed. 2004) ("One of the values of multidistrict proceedings is that they . . . afford a unique opportunity for the negotiation of a global settlement.").

6. 28 U.S.C. § 1407(a) (2012); *see* Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach, 523 U.S. 26 (1998) (stating that a federal district court conducting pretrial proceedings pursuant to the multidistrict litigation statute has no authority to invoke the change-of-venue statute to assign a transferred case to itself for trial).

7. The term "Lead Counsel" is used generically as a shorthand for any lawyer or lawyers appointed by the court to act for plaintiffs in the litigation, whether designated "Lead Counsel," "Liaison Counsel," a "Plaintiff Steering Committee" member, a "Plaintiffs' Executive Committee" member, etc. At some point, in some

with respect to certain aspects of the litigation."[8]  In this regard, it is important to make a distinction between MDLs involving "true class actions" and MDLs involving an "aggregation" of cases.[9]  A true class action is a case that will either proceed as a formally certified class action, or it will not proceed at all. Generally, it is a "negative value" suit, which would not be economically viable to prosecute on an individual basis; hence, the proponents of a true class action need to bring additional unnamed parties within the jurisdiction of the court to make the pursuit of the case worthwhile.[10]  From both the parties' and court's perspective, this type of litigation, despite the presence of multiple proposed class representatives, can essentially be treated as a single case.  The true class action will generally proceed under one set of operative pleadings, with one accounting of case costs, one common body of proof, and a judgment or settlement distribution model that is typically mechanical and formulaic.  The Lead Counsel appointed by the court will effectively assume full responsibility for the litigation on behalf of all named and absent putative class members.  As a practical

---

MDLs or other similar proceedings, a formal class may be certified for litigation or settlement purposes, and these same or other counsel may be appointed to serve as "Class Counsel." While many of the same principles at least arguably apply in a formal class action, Class Counsel's obligations vis-à-vis absent class members may differ from Lead Counsel's duties to plaintiffs in the non-class setting.

8. MANUAL FOR COMPLEX LITIGATION, *supra* note 5, at § 10.22.

9. In common parlance, practitioners often draw a distinction between "class actions" and "mass torts" or between "class actions" and "MDLs." I personally do not find these distinctions to be technically accurate or particularly helpful, since almost all MDLs include at least some actions seeking class treatment (and, indeed, there are some MDLs in which virtually all of the coordinated lawsuits are putative class actions) and because mass torts are sometimes certified as class actions (both within MDL proceedings and otherwise), particularly for settlement purposes. Therefore, I prefer to use "true class actions" and "aggregation" of cases to distinguish these two fundamentally different types of proceedings.

10. *See, e.g.*, *In re* Monumental Life Ins. Co., 365 F.3d 408, 411 (5th Cir. 2004) (citing Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 809 (1985) ("Class actions may also permit the plaintiffs to pool claims which would be uneconomical to litigate individually. For example, this lawsuit involves claims averaging about $100 per plaintiff; most of the plaintiffs would have no realistic day in court if a class action were not available.")). *See, e.g.*, Deposit Guaranty Nat'l Bank v. Roper, 445 U.S. 326, 338–39 (1980) ("Where it is not economically feasible to obtain relief within the traditional framework of a multiplicity of small individual suits for damages, aggrieved persons may be without any effective redress unless they may employ the class action device."). There are, of course, other reasons which might prevent individuals from bringing their own separate cases—e.g., where the putative class members are employees who might fear retaliation, or where they are the victims of fraud or concealment and do not even realize that they have grievances to be vindicated.

matter, there are few, if any, other individual cases.

    In an "aggregation" situation, by contrast, the individually-filed cases are generally viable in their own right. While the class action procedure may be utilized for judicial economy or settlement purposes, the individually filed cases will not rise or fall on the class certification determination, assuming one even occurs. Pleadings, discovery materials, and client-specific costs must generally be maintained for each suing plaintiff, and even where many or all of the claims might be litigated or settled on a class-wide basis, each class member will likely be called upon at some point to provide his or her own evidence of case-specific injury or damages. Most of these individual plaintiffs will be represented by their own attorneys, many of whom might not be among those appointed as Lead Counsel. Therefore, within the MDL, the representation is effectively "split" between the Lead Counsel and the attorneys who may have been individually retained by the plaintiff.

    While perhaps atypical in several respects, the *Deepwater Horizon* MDL offers a perfect example of this dynamic. In *Deepwater Horizon*,[11] thousands of plaintiffs were individually represented by attorneys who, for all practical purposes, had no power or authority to take depositions, argue motions, question witnesses, or perform other functions an attorney would typically be expected to undertake in a conventional suit for damages. Instead, the MDL transferee judge appointed a steering committee of nineteen lawyers from around the country to: (1) initiate, coordinate, and conduct all pretrial discovery on behalf of plaintiffs; (2) examine witnesses and introduce evidence at hearings; (3) coordinate the trial team's selection, management, and presentation of any common issue, "bellwether" or "test case" trial; (4) submit, argue, and oppose motions; and (5) explore, develop, and pursue settlement opportunities.[12]

    While the steering committee is generally viewed as having been successful in undertaking these efforts,[13] some MDL

---

    11. *In re* Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mex., on April 20, 2010, MDL No. 2179, Civil Action No. 2:10-md-02179 (E.D. La.) (Barbier, J., presiding).

    12. Pretrial Order No. 8, *In re* Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mex., on April 20, 2010, MDL No. 2179, Civil Action No. 2:10-md-02179, Doc. No. 506, pp. 3–4 (E.D. La. Oct. 8, 2010) (Barbier, J., presiding).

    13. *See, e.g.*, Order and Reasons, *In re* Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mex., on April 20, 2010, MDL No. 2179, Civil Action No. 2:10-

plaintiffs, or their individually retained attorneys, would frequently question or challenge Lead Counsel's actions and decisions. This is typical of the push and pull that frequently occurs between and among plaintiffs' counsel in MDLs that involve the aggregation of hundreds or thousands of separately viable cases.

MDL proceedings encompass an estimated 36% of the entire federal civil docket[14] and as much as 45.6% when excluding social security and prisoner cases.[15] Additionally, at least twelve states have enacted analogues to the federal MDL mechanism.[16] Therefore, the question of Lead Counsel's responsibilities to litigants whom they do not formally represent in these types of proceedings has broad implications for our civil justice system.

## III. SOURCE OF APPOINTED COUNSEL'S PROFESSIONAL RESPONSIBILITIES

It is important to recognize that Lead Counsel's authority in an MDL proceeding emanates from the court.[17] This is distinguished from the typical attorney-client relationship in which the lawyer's authority arises from a formal retainer agreement between the attorney and the plaintiff.[18] In the

---

md-02179, Doc. No. 21849 (E.D. La. Oct. 25, 2016) (Barbier, J., presiding).

14. *MDL Standards and Best Practices*, DUKE L. CTR. FOR JUD. STUD. i, x (2014), https://law.duke.edu/sites/default/files/centers/judicialstudies/MDL_Standards_and_Best_Practices_2014-REVISED.pdf; *2015 Year-End Report*, JUD. PANEL ON MULTIDISTRICT LITIG. 1, 1 (2015).

15. *MDL Standards and Best Practices*, *supra* note 14, at x–xi.

16. *See* CAL. CIV. PROC. CODE §§ 404–404.9 (West, Westlaw through Ch. 2 of 2018 Reg. Sess.); CONN. GEN. STAT. ANN. § 51-347b (West, Westlaw through enactments of the 2017 Jan. Reg. Sess. and the 2017 June Special Sess.); ILL. S. CT. R. 384 (Westlaw through 2/1/18); MD. RULES 2-327(d) (West, Westlaw through Feb. 1, 2018); MASS. TRIAL CT. R. XII (Westlaw through Feb. 1, 2018); N.J. SUPER. TAX & SURROGATE'S CT. CIV. R. 4:38-1, 4:60-1 (Westlaw through Feb. 15, 2018); N.Y. COMP. CODES R. & REGS. tit. 22, § 202.69 (West, Westlaw through Feb. 14, 2018); OKLA. STAT. tit. xx, § 81 (Westlaw through the legislation of the First Reg. Sess., the First Extraordinary Sess., and through Chapter 7 of the Second Extraordinary Sess. of the 56th Legis., and current with emergency effective provisions through Chapter 2 of the Second Reg. Sess. of the 56th Legis. (2018)); PA. R. CIV. P. No. 213.1 (West, Westlaw through Feb. 1, 2018); TEX. R. JUD. ADMIN. r. 13.1 (eff. Mar. 22, 2016); VA. CODE ANN. §§ 8.01-267–267.9 (West, Westlaw the End of 2017 Reg. Sess. and 2018 Reg. Sess. cc. 1, 2, 10, 14, 15 & 45); W. VA. CODE § 56.9-1 (Westlaw through the legislation of the 2018 Reg. Sess. effective through Feb. 9, 2018 except for HB 414).

17. MANUAL FOR COMPLEX LITIGATION, *supra* note 5, at § 10.22.

18. *See generally* RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 14(1) (AM. LAW INST. 2000); MODEL RULE OF PROF'L CONDUCT: PREAMBLE & SCOPE, para. 17 (AM. BAR ASS'N 2015) ("Most of the duties flowing from the client-

traditional attorney-client relationship, the scope of the lawyer's responsibility may be reasonably limited by express agreement between the attorney and the plaintiff,[19] but it is generally presumed that the lawyer will undertake any and all actions reasonably necessary to achieve the desired objectives and results of the litigation.[20]  When counsel is appointed, by contrast, Lead Counsel's authority and concomitant responsibility is generally defined by the procedural steps that must be undertaken from the court's perspective, rather than the ultimate goals sought by plaintiffs; those responsibilities are generally set forth in an order of appointment which describes the services that Lead Counsel is asked and directed to perform.[21]  While such appointment generally advances and protects the interests of each plaintiff, its primary purpose is to further the interests of judicial efficiency and economy for the collective benefit of all plaintiffs, defendants, any affected third parties, and the court.[22]

To the extent that each plaintiff has his or her own particular facts, circumstances, and interests (which may be common in some respects, unique in other respects, and in some ways perhaps even divergent or potentially adverse to those of other plaintiffs), it is assumed that such plaintiffs are simultaneously represented and protected by privately retained counsel.[23]  Therefore, to the extent that Lead Counsel can be said

---

lawyer relationship attach only after the client has requested the lawyer to render legal services and the lawyer has agreed to do so."); *see also, e.g.*, MODEL RULE OF PROF'L CONDUCT r. 1.5(b)–(c) (AM. BAR ASS'N 2015); LA. RULES OF PROF'L CONDUCT r. 1.5(b)–(c) (LA. SUP. CT. 2004).

19. *See, e.g.*, MODEL RULE OF PROF'L CONDUCT r. 1.2(c) (AM. BAR ASS'N 2015); LA. RULES OF PROF'L CONDUCT r. 1.2(c) (LA. SUP. CT. 2004).

20. *See generally* MODEL RULE OF PROF'L CONDUCT r. 1.2(a), 1.4(a)(2) (AM. BAR ASS'N 2015); LA. RULES OF PROF'L CONDUCT r. 1.2(a), 1.4(a)(2) (LA. SUP. CT. 2004).

21. *See, e.g.*, MANUAL FOR COMPLEX LITIGATION, *supra* note 5, at § 10.222 ("The functions of lead, liaison and trial counsel, and of each committee, should be stated in either a court order or separate document drafted by counsel for judicial review and approval.").

22. *See, e.g.*, *id.* ("Traditional procedures in which all papers and documents are served on all attorneys, and each files motions, presents arguments, and examines witnesses, may *waste time and money, confuse and misdirect the litigation, and burden the court unnecessarily*.") (emphasis added).

23. *See, e.g.*, *id.* (assuming "numerous parties with common or similar interests but *separate counsel*") (emphasis added). This is an important source of potential distinction between a class action, on the one hand, and an MDL-like coordinated or consolidated proceeding, on the other. While, in some class actions, many or perhaps even all of the class members are individually represented by counsel, the class action device generally presumes that the absent class members will not have their own independent economically viable claims, and are therefore made parties to the

to have a "fiduciary" duty or other obligations to plaintiffs whom they do not formally represent, such duties are (1) limited to the specific actions that Lead Counsel is appointed and authorized to undertake and (2) owed not to any one individual plaintiff but to the common and collective interests of the plaintiffs as a whole.[24]

## IV. LEAD COUNSEL DOES NOT HAVE A TRADITIONAL "FIDUCIARY" DUTY

While Lead Counsel clearly has a duty to perform the functions to which they have been appointed in a fair, honest, competent, reasonable, and responsible way,[25] it would be inappropriate to describe their obligations to other plaintiffs as "fiduciary" in the traditional sense of the word. As a legal matter, the origin and nature of the relationship between Lead Counsel and MDL plaintiffs differs significantly from the common law fiduciary relationships of agency and trust. As a practical matter, moreover, the imposition of strict fiduciary standards to Lead Counsel would be extremely burdensome for the attorneys and the court. This is, admittedly, somewhat circular logic. But the appointment of Lead Counsel, like the MDL procedure itself, is

---

litigation only by virtue of the class certification order, without individual representation. In that situation, the only attorneys representing their interests are Class Counsel. The considerations are different, and responsibilities arguably less, where the class action device is employed primarily as a settlement vehicle for existing cases, in which most or all of the absent class members are already represented by their own individually retained counsel.

24. *See, e.g.*, MANUAL FOR COMPLEX LITIGATION, *supra* note 5, at § 21.12 ("[A]n attorney acting on behalf of a putative class must act in the best interests of the class as a whole"); Charles Silver, *The Responsibilities of Lead Lawyers and Judges in Multidistrict Litigation*, 79 FORDHAM L. REV. 1985, 1989 (2011) ("By subordinating one client's interests to another's without informed consent, a lawyer would act disloyally. Other fiduciaries are allowed to make tradeoffs. Trustees are the exemplars of this group. A trustee may use entrusted assets to send one beneficiary to college even though less money will be available to help another beneficiary as a result. *When making tradeoffs among beneficiaries, trustees need only be reasonable and fair.* The Principles suggests that *lead attorneys resemble trustees more than lawyers or other agents. Their responsibility is to 'pursu[e] the good of all,'* which, if need be, they may do by making tradeoffs that are reasonably 'likely to *maximize the value of all claims in the group.'*") (emphasis added). *See, e.g.*, Walsh v. Great Atl. & Pac. Tea Co., 726 F.2d 956, 964 (3rd Cir. 1983) ("Class counsel's duty to the class as a whole frequently diverges from the opinion of either the named plaintiff or other objectors.").

25. *See, e.g.*, MANUAL FOR COMPLEX LITIGATION, *supra* note 5, at § 10.22 ("Counsel designated by the court also assume a responsibility to the court and an obligation to act fairly, efficiently, and economically in the interests of all parties and parties' counsel.").

intended to enhance judicial economy.[26] It therefore seems unlikely that the courts would knowingly establish a "fiduciary" role for attorneys who could not efficiently or effectively accomplish the appointed tasks while working within the strictures typically imposed upon a fiduciary.

Under the common law, the agency relationship is generally a consensual relationship under which the principal retains the right to direct and control the agent's actions, as well as the power to terminate the agency.[27] In the MDL context, however, these hallmarks of a traditional agency relationship are absent. With the exception of Lead Counsel's individually retained clients, there is no underlying offer and acceptance of power of attorney or agency between such appointed counsel and the plaintiffs.[28] (Indeed, as noted, it is generally the case that

---

26. *See* MANUAL FOR COMPLEX LITIGATION, *supra* note 5, at §§ 10.22, 10.222.

27. *See* RESTATEMENT (THIRD) OF AGENCY, § 1.01 (AM. LAW INST. 2018) ("Agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act."); *id.* at § 1.01 cmt. (c) ("A relationship is not one of agency within the common-law definition unless the agent consents to act on behalf of the principal, and the principal has the right throughout the duration of the relationship to control the agent's acts. . . . A principal's right to control the agent is a constant across relationships of agency. . . . The requirement that an agent be subject to the principal's control assumes that the principal is capable of providing instructions to the agent and of terminating the agent's authority"); *id.* at § 1.01 cmt. (d) ("Under the common-law definition, agency is a consensual relationship."); *id.* at § 1.01 cmt. (f)(1) ("An essential element of agency is the principal's right to control the agent's actions. Control is a concept that embraces a wide spectrum of meanings, but within any relationship of agency the principal initially states what the agent shall and shall not do, in specific or general terms. Additionally, a principal has the right to give interim instructions or directions to the agent once their relationship is established."); *see also* RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS, § 14(1) (AM. LAW INST. 2000) ("A relationship of client and lawyer arises when a person manifests to a lawyer the person's intent that the lawyer provide legal services for the person.").

28. While § 14(2) of the *Restatement of the Law Governing Lawyers* and comments (c) and (d) to § 1.01 of the *Restatement of Agency* indicate that a fiduciary relationship can also be established when the court appoints a lawyer, this seems to contemplate the situation where a criminal lawyer is appointed to represent an indigent defendant or, perhaps, where a guardian *ad litem* or other attorney is appointed to represent a minor, incompetent, or absentee. *See, e.g.*, RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS, *supra* note 27, at § 14 cmt. (f) (addressing class actions as an exception to § 14(1), as opposed to an example of § 14(2)). *See also* RESTATEMENT (THIRD) OF AGENCY, *supra* note 27, at § 1.01 cmt. (f) ("A relationship of agency is not present unless the person on whose behalf action is taken has the right to control the actor. Thus, if a person is appointed by a court to act as a receiver, the receiver is not the agent of the person whose affairs the receiver manages because the appointing court retains the power to control the receiver.").

**Loyola Law Review**                    [Vol. 64

litigants will retain an attorney to protect and advance his or her own particular interests.)  Lead Counsel, however, generally maintains the discretion to carry out appointed tasks and are not subject to the instruction or control of one or more of the plaintiffs.[29]  Neither one plaintiff independently, nor the plaintiffs collectively, have the power to terminate Lead Counsel's authority to act, as it can only be altered or rescinded by the court.

Unlike privately retained counsel who frequently assume a fiduciary relationship of trust with respect to deposits, advances, or the receipt and distribution of settlement proceeds,[30] Lead Counsel in the typical MDL situation are rarely in possession or control of plaintiffs' funds or other property.  There exists, in this regard, a common misconception relative to the expenditure by Lead Counsel of litigation costs and expenses.  When Lead Counsel advances or incurs expenses for the common benefit of plaintiffs, they, at that point, are simply spending their own money.  A claim is not made against plaintiff funds until Lead Counsel seeks reimbursement out of a successful judgment or settlement—a claim that is almost always subject to court approval.[31]  Moreover, as distinguished from the typical case in

---

29.  In some cases, the court's appointment of Lead Counsel will, at the same time, expressly limit Lead Counsel's ability to bind the plaintiffs. In the *Deepwater Horizon* MDL, for example, the court's Order appointing the Plaintiff Steering Committee provided: "All stipulations entered into by the PSC, except for strictly administrative details such as scheduling, must be submitted for Court approval and will not be binding until the Court has ratified the stipulation. Any attorney not in agreement with a non-administrative stipulation shall file with the Court a written objection thereto within five (5) days after he/she knows or should have reasonably become aware of the stipulation." Pretrial Order No. 8, *In re* Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mex., on April 20, 2010, MDL No. 2167, Civil Action No. 2:10-md-02179, Doc. No. 506, p. 4 (E.D. La. Oct. 4, 2010) (Barbier, J., presiding).

30.  *See, e.g.*, Charles E. Rounds, Jr., *Lawyer Codes Are Just About Licensure, the Lawyer's Relationship with the State: Recalling the Common Law Agency, Contract, Tort, Trust, and Property Principles That Regulate the Lawyer-Client Fiduciary Relationship*, 60 BAYLOR L. REV. 771, 813 (2008).

31.  Even where so-called "shared expenses" are reimbursed to a Lead Counsel firm in advance of a judgment or settlement, such reimbursement is not made from *plaintiff* funds, but from a pool of money put up by the Lead Counsel firms themselves. In the event that a judgment or settlement is reached, such collective expenses may ultimately be reimbursed out of plaintiff funds, but generally subject to interim or final court approval. In some cases, the defendant, as part of a "global" or other settlement, will agree to reimburse litigation expenses, over and above the corpus of settlement proceeds made available to the plaintiffs. While, at least in the class action setting, the court must be mindful of the possibility of "structural collusion" during the class settlement approval process, from a fiduciary standpoint,

which judgment or settlement proceeds are deposited into an attorney's trust account for subsequent accounting and distribution, settlement funds obtained in MDL proceedings are generally placed into a Qualified Settlement Fund with an independent Escrow Agent, and require court approval for any disbursement, reimbursement, payment, or withdrawal.

Additionally, it would be impossible to impose a strict traditional common law duty of loyalty upon Lead Counsel as a practical matter, and as a policy matter, it would be unwise.[32] First, it would require an endless series of inquiry and dispute over the extent to which a potential or actual "conflict" might exist between and among MDL litigants. This would largely undermine, if not eliminate entirely, the judicial efficiencies and economies sought to be gained through MDL proceedings. Second, by depriving plaintiffs of the attorneys who are most knowledgeable about the issues and litigation strategies, it would often work to the detriment of the very litigants whom such rules are ostensibly designed to protect.[33] Third, it would risk "Balkanizing" the plaintiffs into so many sub-groups that

---

Lead Counsel are never even making a claim for common benefit expenses against *plaintiff* funds.

32. It has been widely recognized, in this regard, that the traditional conflict-of-interest proscriptions embodied in Professional Rules of Conduct 1.7 and 1.9 cannot and should not be mechanically applied to Class Counsel with respect to each and all class members. *See, e.g.*, Lazy Oil Co. v. Witco Corp., 166 F.3d 581, 588–91 (3rd Cir. 1999); White v. Nat'l Football League, 822 F. Supp. 1389, 1405 (D. Minn. 1993), *aff'd,* 41 F.3d 402, 408 (8th Cir. 1995), *cert. denied,* 515 U.S. 1137 (1995); *In re* Agent Orange, 800 F.2d 14, 18–19 (2nd Cir. 1986); *In re* Corn Derivatives Antitrust Litig., 748 F.2d 157, 162–65 (3rd Cir. 1984) (Adams, J., concurring). As discussed in MANUAL FOR COMPLEX LITIGATION, *supra* note 5, there is even a less compelling basis to impose professional and fiduciary rules upon Lead Counsel than Class Counsel, as MDL plaintiffs are generally represented by their own privately retained counsel to advance and protect their own particular interests, in addition to the Lead Counsel attorneys appointed to represent the common interests of plaintiffs collectively.

33. *See, e.g.*, Lazy Oil Co. v. Witco Corp., 166 F.3d 581, 590 (3rd Cir. 1999) (quoting *Agent Orange*, 800 F.2d at 18–19) ("[W]hen an action has continued over the course of many years, the prospect of having those most familiar with its course and status be automatically disqualified whenever class members have conflicting interests would substantially diminish the efficacy of class actions as a method of dispute resolution.")); White v. Nat'l Football League, 822 F. Supp. 1389, 1405 (D. Minn. 1993) ("Several objectors contend, however, that class counsel's loyalty to the class has been compromised as a result of counsel's representation of the NFLPA, as well as individual players, in various other lawsuits . . . . [R]ather than creating conflict, the experience gained thereby was likely a prerequisite to the parties' ultimate agreement to settle.").

cooperative and effective progress would be impeded.[34]

At most, it would seem appropriate to think of a privately retained counsel as analogous to a "named fiduciary" under ERISA,[35] whereas Lead Counsel would be more analogous to a "functional fiduciary" who is only a fiduciary to the extent that the appointed counsel actually exercises control over the plaintiffs' funds or undertakes some action or decision with respect to their substantive rights and interests in the litigation.[36]

---

34. *See, e.g., In re*: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mex. on April 20, 2010, 910 F. Supp. 2d 891, 920 (E.D. La. 2012) ("[T]he use of a multitude of subclasses—each with separate class representatives and counsel—would have greatly complicated both the settlement negotiations and the overall administration of the litigation.") (citing *In re* Ins. Brokerage Antitrust Litig., 579 F.3d 241, 271 (3rd Cir. 2009) ("Subclassing can create a 'Balkanization' of the class action and present a huge obstacle to settlement if each subclass has an incentive to hold out for more money.") (quoting *In re* Cendant Corp. Sec. Litig., 404 F.3d 173, 202 (3rd Cir. 2005)), *aff'd, In re* Deepwater Horizon, 739 F.3d 790, 813 (5th Cir. 2014) ("[T]here is no need to create subclasses to accommodate every instance of 'differently weighted interests.'"), *cert. denied,* 135 S. Ct. 754 (2014). An overzealous sub-grouping or balkanization of the MDL Lead Counsel structure and responsibilities in the non-class setting would create similar impediments, both in terms of judicial efficiency and in terms of advancing the common and collective interests of the plaintiffs as a whole.

35. *See* 29 U.S.C. § 1102(a) (1974) (requiring "named fiduciaries" who "jointly or severally shall have authority to control and manage the operation and administration of the plan").

36. *See, e.g.*, Pegram v. Herdrich, 530 U.S. 211, 225–26 (2000) (stating that an administrator is a fiduciary "only 'to the extent' that he acts in such a capacity in relation to a plan") (quoting 29 U.S.C. § 1002(21)(A) (2008) ("[A] person is a fiduciary with respect to a plan *to the extent* (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice . . . , or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.")) (emphasis added); *see also, e.g.*, Mertens v. Hewitt Assocs., 508 U.S. 248, 262 (1993) (stating that the statute "defines 'fiduciary' not in terms of formal trusteeship, but in functional terms of control and authority over the plan"). In addition, ERISA is also a useful analogy in that it draws a distinction between the obligations that are owed to an individual plan participant or beneficiary and the fiduciary duties that are owed, not to any particular plan participant or beneficiary, but to the plan as a whole. *See, e.g.*, Mass. Mut. Life Ins. Co. v. Russell, 437 U.S. 134, 140–42 (1985) ("It is of course true that the fiduciary obligations of plan administrators are to serve the interest of participants and beneficiaries and, specifically, to provide them with the benefits authorized by the plan," but any recovery under § 409(a) of ERISA, entitled Liability for Breach of Fiduciary Duty, "inures to the benefit of the plan as a whole.").

## V. A FALSE CONTROVERSY: THE *GM IGNITION SWITCH LITIGATION*

The existence and extent of Lead Counsel's responsibilities in an MDL proceeding was recently considered by a transferee judge in the Southern District of New York presiding over thousands of lawsuits arising from a series of recalls related to faulty ignition switches in millions of GM automobiles.[37] At the outset, the MDL court had appointed a thirteen-member steering committee, including two co-lead counsel to focus on economic claims and a third co-lead counsel to focus on the injury and death claims.[38] Two years into the proceedings, a group of plaintiffs' attorneys sought to remove the co-lead counsel in charge of injury and death claims after it was discovered that he had negotiated confidential settlements on behalf of his own "inventory" of cases.[39] This attorney was also criticized for favoring his own clients in the bellwether trial selection process to the prejudice of other stronger cases.[40] The motion to remove gained a lot of attention in the legal community, with a particular focus on competing affidavits submitted by noted academics in the complex litigation arena.[41]

University of Texas Law School Professor Charles M. Silver and NYU School of Law Professor Geoffrey P. Miller are frequent writers and collaborators in the fields of complex litigation and professional responsibility. They both participated in the drafting of the American Law Institute's (ALI) Principles of the Law of Aggregate Litigation[42] and co-authored at least one law review article on multidistrict litigation.[43] In addition, they are

---

37. Opinion and Order, *In re*: General Motors Ignition Switch Litig., 14-MC-2543 (JMF), 2016 WL 3920353, at *5–6 (S.D.N.Y. July 15, 2016).

38. *See generally* Opinion and Order, *In re*: General Motors Ignition Switch Litig., 14-MC-2543 (JMF), 2016 WL 3920353 (S.D.N.Y. July 15, 2016).

39. *See generally id.*

40. *See generally id.*

41. *See, e.g.*, Alison Frankel, *Attack on Lead Counsel in GM Switch Case Critiques MDL System*, REUTERS (Jan. 27, 2016), http://blogs.reuters.com/alison-frankel/2016/01/27/attack-on-lead-counsel-in-gm-switch-case-critiques-mdl-system/; Kathryn Higgins, *Judge Blocks Attempt to Oust GM Lead Counsel*, GLOBAL LEGAL POST (Feb. 11, 2016), http://www.globallegalpost.com/big-stories/judge-blocks-attempt-to-oust-gm-lead-counsel-51080474/?utm_source=page-popup.

42. Professor Silver was one of the Reporters, while Professor Miller served on the Advisory Committee. Sam Issacharoff et al., *The American Law Institute's New Principles of Aggregate Litigation*, 8 J. L. ECON. & POL'Y 183 (2011).

43. *See* Charles Silver & Geoffrey P. Miller, *The Quasi-Class Action Method of Managing Multi-District Litigation: Problems and a Proposal*, 63 VAND. L. REV. 107,

frequently retained by attorneys to provide opinion testimony in complex cases.[44]

In the *GM Ignition Switch Litigation,* Professor Silver filed a declaration in support of plaintiffs' attorneys who argued that the co-lead counsel for injury and death claims owed and had breached his fiduciary duties to plaintiffs in the MDL, relying, in part, on the ALI's Principles of the Law of Aggregate Litigation.[45] Professor Miller, on the other hand, explained that the quoted language was not formally adopted by ALI but is contained within a Reporter's Note and simply expresses the opinion of one of the reporters.[46] While many outside observers in the legal community saw this as a significant divergence on the fiduciary question, the import of these dueling declarations is diminished upon closer inspection.

First, it is important to recognize that the opinions regarding

---

161 (2010).

44. *See, e.g., In re* Checking Account Overdraft Litig., 830 F. Supp. 2d 1330, 1347 (S.D. Fla. 2011) (Silver); *In re* Enron Corp. Sec., Derivative & ERISA Litig., 586 F. Supp. 732, 749 (S.D. Tex. 2008) (Silver); Conley v. Sears, Roebuck and Co., 222 B.R. 181, 188 (D. Mass. 1998) (Silver); Hooker v. Sirius XM Radio, Inc., No.13-03, 2017 WL 4484258 (E.D. Va.) (Miller); Elkins v. Equitable Life Ins. of Iowa, No.96-296, 1998 WL 133741 (M.D. Fla.) (Miller); Declaration of Geoffrey P. Miller, *In re* Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mex., on April 20, 2010, MDL No. 2179, Civil Action No. 2:10-md-02179, Doc. No. 7114-16, pp. 37–40 (E.D. La. Aug. 13, 2012) (Barbier, J., presiding) (listing cases in which Miller had provided expert testimony over the previous five years).

45. Motion to Remove the Co-Leads and Reconsider Bellwether Schedule, *In re*: General Motors Ignition Switch Litig., MDL No. 2543, Civil Action No. 1:14-md-02543, Doc. No. 2182, p. 4 n.2 (S.D.N.Y. Jan. 25, 2016) (citing PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION, § 1.04 cmt. (a) (Mar. 2018) (stating that "[c]lass counsel is a [ ] fiduciary to a client[, the named plaintiff,] who is also a fiduciary [to other class members]," and that "[a] similar relationship obtains between lead attorneys and other lawyers in a multidistrict litigation"); *see also* Declaration of Charles Silver, *In re*: General Motors Ignition Switch Litig., MDL No. 2543, Civil Action No. 1:14-md-02543, Doc. No. 2243-2 (S.D.N.Y. Feb. 5, 2016) (Exhibit 2) [Part 3]. In his 2011 law review article, which is quoted in the declaration, Professor Silver noted that there was a "dearth" of admittedly "scarce" "solid authority" for the proposition that Lead Counsel are "fiduciaries." *See* Silver, *supra* note 24, at 1987–89. Notably, Professor Silver starts from the proposition that Lead Counsel, like Class Counsel, resemble trustees, as fiduciaries, more than lawyer-agents, *see id.* at 1987, 1989, but, in making the argument that Lead Counsel should be considered "fiduciaries," relies primarily on the lawyer-agency model: "lead attorneys displace disabled lawyers" and thereby "assume disabled lawyers' duties." *Id.* at 1989.

46. *See* Declaration of Geoffrey P. Miller, *In re*: General Motors Ignition Switch Litig., MDL No. 2543, Civil Action No.1:14-md-02543, Doc. No. 2200-1, p. 5 para. 16 (S.D.N.Y. Feb. 1, 2016). Professor Miller further distinguishes a Restatement, which is intended to reflect the current state of existing law, from Principles, which contain recommendations. *See id.* at p. 5 para. 15.

"fiduciary duty" were not advanced in a vacuum but within a specific factual and procedural context. The issue was raised in a Motion to Remove Lead Counsel, in which the movants cited to the Principles' comment, among other things.[47] Professor Miller's declaration was submitted in opposition to that motion.[48] Professor Silver's declaration was submitted, in turn, as a response to Professor Miller.[49] The precise question before the court was not the extent to which Lead Counsel owed, or had breached, a fiduciary duty to plaintiffs in the litigation, but instead whether Lead Counsel should continue to serve in that capacity to other plaintiffs in the MDL.[50]

More fundamentally, the disagreement between the two professors is largely semantic. Professor Silver's Declaration does not suggest that Lead Counsel owes a fiduciary duty to each and all MDL plaintiffs in the traditional context, but that Lead Counsel must put the common and collective interests of all plaintiffs first.[51] Professor Miller does not appear to disagree.[52]

---

47. *See* Plaintiffs' Motion to Remove the Co-Leads and Reconsider the Bellwether Trial Schedule, *In re*: General Motors Ignition Switch Litig., MDL No. 2543, Civil Action No. 1:14-md-02543, Doc. No. 2179, pp. 5–6, nn.7–8 (S.D.N.Y. Jan. 25, 2016).

48. *See* Declaration of Geoffrey P. Miller, *In re*: General Motors Ignition Switch Litig., MDL No. 2543, Civil Action No. 1:14-md-02543, Doc. No. 2200-1 (S.D.N.Y. Feb. 1, 2016) attached as Exhibit 1 to General Motors LLC's Combined Response to Motion to Remove Co-Leads and to Reconsider the Bellwether Trial Schedule, *In re*: General Motors Ignition Switch Litig., MDL No. 2543, Civil Action No. 1:14-md-02543, Doc. No. 2200 (S.D.N.Y. Feb. 1, 2016).

49. See Declaration of Charles Silver, *In re*: General Motors Ignition Switch Litig., MDL No. 2543, Civil Action No. 1:14-md-02543, Doc. No. 2243-2 (S.D.N.Y. Feb. 5, 2016), attached as Exhibit 2 to Plaintiffs' Reply Brief in Response to Co-Lead Counsel's Memorandum in Opposition to Lance Cooper's Motion to Remove Co-Lead Counsel False . . . and General Motors LLC's Combined Response to Motion to Remove Co-Leads and to Reconsider the Bellwether Trial Schedule, *In re*: General Motors Ignition Switch Litig., MDL No. 2543, Civil Action No. 1:14-md-02543, Doc. No. 2243 (S.D.N.Y. Feb. 5, 2016).

50. *See* Order No. 95, *In re*: General Motors Ignition Switch Litig., MDL No. 2543, Civil Action No. 1:14-md-02543, Doc. No. 2263 (S.D.N.Y. Feb. 10, 2016) (denying the Motion to Remove Co-Lead Counsel (and an associated Motion to Reconsider the Establishment of a Qualified Settlement Fund), while noting that the moving plaintiffs "do not even come close to providing a legal basis for the drastic step of removing Lead Counsel in the middle of MDL proceedings that, all things considered, have proceeded remarkably smoothly and swiftly to date").

51. Declaration of Charles Silver, *In re*: General Motors Ignition Switch Litig., MDL No. 2543, Civil Action No. 1:14-md-02543, Doc. No. 2243-2, p. 13 para. 21 (S.D.N.Y. Feb. 5, 2016) (Exhibit 2) (Part 3) ("[A]n attorney who serves as lead counsel in an MDL is a fiduciary *to the following extent*: the attorney must manage the common benefit workload in a manner that is calculated to maximize the gains for all plaintiffs.") (emphasis added); *see also* Declaration of Charles Silver, *In re*: General Motors Ignition Switch Litig., MDL No. 2543, Civil Action No. 1:14-md-02543, Doc.

The central argument did not revolve around the existence of a general duty to plaintiffs with cases pending in the MDL, but whether Lead Counsel had compromised the common interests of plaintiffs collectively, while protecting or enhancing his own clients' interests in the bellwether or settlement process,[53] and whether attorneys who also serve as Lead Counsel should be retained in that position after settling their own individual cases.[54]

---

No. 2243-2, p. 13 para. 22 (S.D.N.Y. Feb. 5, 2016) (Exhibit 2) (Part 3) (quoting Silver, *supra* note 24, at 1989–90 ("*To the extent that* lead attorneys displace [other] lawyers [by controlling common benefit work], they assume [other] lawyers' duties, including the fiduciary duty to refrain from exploiting clients.")) (emphasis added). *See also id.* at 1989 (stating that Lead Counsel's responsibility is to "pursue the good of all" and, in so doing, may make trade-offs, so long as they are reasonably likely to "maximize the value of all claims") (citing PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION, § 1.05 cmt. (f) (Mar. 2018); MANUAL FOR COMPLEX LITIGATION, *supra* note 5, at § 21.12).

52. *See* Declaration of Geoffrey P. Miller, *In re*: General Motors Ignition Switch Litig., MDL No. 2543, Civil Action No.1:14-md-02543, Doc. No. 2200-1, p. 6 para. 17 (S.D.N.Y. Feb. 1, 2016) (Despite the insinuations of counsel for the moving plaintiffs, "the quotation on which [Silver] relies is consistent with the principles that [Miller sets forth]. The quoted language indicates that attorneys performing common benefit work should act fairly, efficiently and economically in the interests of all plaintiffs – hardly a controversial proposition.").

53. Professor Silver emphasizes that (with one possible exception), he is not saying Lead Counsel did anything that was knowingly or intentionally "improper;" but only that a "serious" and untenable "conflict of interest" exists when Lead Counsel negotiate a side-settlement of his or her own firm's inventory of cases while retaining a leadership position in the MDL. *See* Declaration of Charles Silver, *In re*: General Motors Ignition Switch Litig., MDL No. 2543, Civil Action No. 1:14-md-02543, Doc. No. 2243-2, p. 6, paras. 8–9 (S.D.N.Y. Feb. 5, 2016) (Exhibit 2) (Part 3); *see also* Declaration of Charles Silver, *In re*: General Motors Ignition Switch Litig., MDL No. 2543, Civil Action No. 1:14-md-02543, Doc. No. 2243-2, p. 6 para. 10–20 (S.D.N.Y. Feb. 5, 2016) (Exhibit 2) (Part 3). Whether this is correct, either as a legal proposition or as a matter of policy, is discussed *infra*. But the risk that Professor Silver identifies is a risk that the interests of other MDL plaintiffs will be compromised during the settlement negotiations; the resignation by Lead Counsel "who wants to negotiate a side-settlement" contemplated by Professor Silver would occur before the negotiations begin. And, since the inventory settlement at issue in the *GM Litigation* had already occurred by the time the motion was being considered, it would only justify removal if there was an actual concern of a collusive agreement to compromise the MDL plaintiffs' interests in some way on a going forward basis.

54. Declaration of Charles Silver, *In re*: General Motors Ignition Switch Litig., MDL No. 2543, Civil Action No. 1:14-md-02543, Doc. No. 2243-2, pp. 15–16 para. 26 (S.D.N.Y. Feb. 5, 2016) (Exhibit 2) (Part 3) (questioning "the wisdom of allowing lawyers with few cases to control MDLs") (citing Silver & Miller, *supra* note 43). To the extent Professor Silver or Professor Miller suggest that MDLs should be controlled by those with the largest or most valuable inventory of cases, I strongly disagree, as a matter of practice and policy. While there are, of course, potential benefits to the inclusion of such attorneys within the leadership structure, as well as

## VI. LEAD COUNSEL'S DUTY TO PROVIDE INFORMATION TO MDL PLAINTIFFS

Both traditional fiduciary responsibility and the Professional Rules of Conduct impose affirmative obligations to inform clients about significant developments or decisions affecting their interests, as well as a general duty of full disclosure regarding any and all facts and circumstances regarding the representation when asked.[55]  However, as with the duty of loyalty, it would be both impractical and unwise to require Lead Counsel to reveal sensitive strategic issues, confidential settlement negotiations, and other information provided to Lead Counsel under a condition of confidentiality to all plaintiffs in the litigation.  The *Complex Manual* explicitly admonishes Lead Counsel to "use their judgment" in advising MDL plaintiffs and their attorneys of the progress of the litigation, as "too much communication may defeat the objectives of efficiency and economy."[56]

Taking the existence, nature, scope, and particulars of confidential settlement discussions as a recurring example, individual MDL plaintiffs (or more often, their privately retained counsel) frequently take the position that they are entitled to updates and other disclosures.  At the same time, however, defendants are frequently only willing to engage in such

---

potential risks in assigning Lead Counsel positions to attorneys with few or no cases, the successful management of complex multi-plaintiff litigation requires a unique skill set of knowledge, experience, strategic vision, resources, the ability to work well with others, and both the capacity and the willingness to ascertain and advance the common and collective interests of all plaintiffs—placing them before Lead Counsel's own interests, and, perhaps, at times, even the interests of his or her own individually retained clients. Some lawyers with large inventories have these skill sets. But many do not or will not.

55.  *See, e.g.*, Rounds, *supra* note 30, at 791 ("[T]he lawyer-agent has an ongoing affirmative duty to furnish the client-principal with all material information that is in the lawyer-agent's possession and relevant to the agency, whether or not the client-principal asks for the information."); RESTATEMENT (THIRD) OF AGENCY, *supra* note 27, at § 8.11 ("An agent has a duty to use reasonable effort to provide the principal with facts that the agent knows, has reason to know, or should know when . . . subject to any manifestation by the principal, the agent knows or has reason to know that the principal would wish to have the facts or the facts are material to the agent's duties to the principal"); MODEL RULE OF PROF'L CONDUCT r. 1.4 (AM. BAR ASS'N 2015) (requiring a lawyer to promptly inform the client of any decision or circumstance requiring his or her informed consent; reasonably consult with the client about the means by which the client's objectives are to be accomplished; keep the client reasonably informed about the status of the matter; and promptly comply with reasonable requests for information); LA. RULES OF PROF'L CONDUCT r. 1.4 (LA. SUP. CT. 2004).

56.  MANUAL FOR COMPLEX LITIGATION, *supra* note 5, at § 10.222.

**Loyola Law Review**

discussions under a veil of confidentiality and will discontinue the negotiations in the event of a breach.[57]  To be sure, a proposed settlement negotiated by Lead Counsel must be structured in such a way that neither a privately retained client nor any other plaintiff is bound to its terms until *after* there has been full and transparent notice or other disclosure.[58]  Prior to the point of decision, however, the value of the information to the plaintiffs is of limited utility, whereas the risks and consequences of disclosure are considerable and potentially severe.

From a legal or fiduciary standpoint, complex multi-plaintiff litigation is subtly, yet fundamentally, distinct from single-party litigation in at least two respects.  The first distinction concerns the source of the information.  In the typical case, an attorney is retained to act as the agent of the principal.  Whatever information the attorney acquires in the course of the representation generally "belongs" to the client.[59]  In the MDL situation, on the other hand, Lead Counsel acquires information, not as agents of a particular plaintiff, but because they have been authorized or directed to undertake a certain function by the court.

Another difference between traditional litigation and complex multi-party litigation relates to the security of the information.  In a typical case, the plaintiffs generally have no interest or incentive to reveal privileged or confidential information relayed to them by their attorneys, and plaintiffs who divulge such confidences are generally only hurting themselves. In an MDL situation, by contrast, there are often individual litigants—and privately retained counsel—who, whether acting

---

57.  Particularly when dealing with publicly-traded companies, it is frequently essential that discussions remain confidential in light of SEC or other regulatory issues and requirements, and the potential for undesirable market fluctuations in the stock or corporate bond prices due to speculative trading.

58.  *See generally* MODEL RULE OF PROF'L CONDUCT r. 1.2(a), 1.8(g) (AM. BAR ASS'N 2015); LA. RULES OF PROF'L CONDUCT r. 1.2(a) (LA. SUP. CT. 2006); LA. RULES OF PROF'L CONDUCT r. 1.8(g) (LA. SUP. CT. 2006); FED. R. CIV. P. 23(e).

59.  *See, e.g.*, *Formal Opinion No. 471*, AM. BAR ASS'N. STANDING COMM. ON ETHICS & PROF'L RESP. 1 (July 1, 2015), https://www.americanbar.org/content/dam/aba/images/abanews/CPR_FormalOpinion471.pdf; RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS, *supra* note 18, at § 46 ("On request, a lawyer must allow a client or former client to inspect and copy any document possessed by the lawyer relating to the representation, unless substantial grounds exist to refuse."); LA. RULES OF PROF'L CONDUCT r. 1.16(d) (LA. SUP. CT. 2004) ("Upon written request by the client, the lawyer shall promptly release to the client or the client's new lawyer the entire file relating to the matter.").

in good or bad faith, will perceive some advantage in disseminating the information more broadly.[60]

When such confidences are compromised, whether inadvertently or intentionally, the consequences affect not only the plaintiff or lawyer who divulges the information, but also other plaintiffs with cases pending in the litigation.[61] While different circumstances will call for different levels of disclosure to the plaintiffs and their privately retained counsel, so that they can appropriately protect their interests or make material decisions when a decision is to be made,[62] it seems absurd that Lead Counsel would be "required" to disseminate sensitive information on an unlimited and ongoing basis to lawyers (or litigants) who will predictably prejudice the collective interests of the plaintiffs.

The more difficult question is the level of disclosure owed to Lead Counsel's own individually-retained clients. Both traditional fiduciary standards and the Professional Rules of Conduct recognize exceptions to the general duties of disclosure where such revelations would violate a superior duty owed to another.[63] The question of which duty is "superior" is naturally

---

60. A lawyer attempting to solicit new clients, for example, may want to appear privy to "inside information" not shared by his or her colleagues. Some lawyers, and even litigants, also sometimes perceive that they can gain leverage for their own settlement prospects by encouraging other plaintiffs to join with them in opting in out of, or objecting to, settlement proposals with threshold participation requirements; these lawyers or litigants may often be motivated to disseminate confidential information, whether intentionally or unintentionally, and whether acting in good or bad faith.

61. This could also potentially affect other would-be plaintiffs, putative class members, the defendants, parties with similar cases pending in other jurisdictions, or third parties.

62. In *Ethical Questions Raised by the BP Oil Spill Litigation,* I suggested that the extent—and, particularly, the timing—of the obligation to disclose likely depends on the circumstances of whether, when and how an individual plaintiff or his or her counsel could be expected to utilize the information: "For example, at this time [October 18, 2013], for claims that fall outside either the Medical or Economic Settlements, there are, to my knowledge, no individualized, 'inventory' or other settlement negotiations taking place; and every trial/appeal on the horizon is either a common issue or a test trial, which will be prepared and prosecuted by the Steering Committee; so (at least arguably) why does anyone need any information at this point in time? What would they do with it? There are few, if any, material litigation or settlement choices to be made." Stephen J. Herman, *Ethical Questions Raised by the BP Oil Spill Litigation*, GRAVIER HOUSE PRESS 1, 6–7 (Nov. 11, 2016), http://gravierhouse.com/ethical-questions-raised-by-the-bp-oil-spill-litigation1/.

63. RESTATEMENT (THIRD) OF AGENCY, *supra* note 27, at § 8.11(2); *see also, e.g., Formal Opinion No. 471, supra* note 59, at 3 ("Commonly recognized exceptions to

subjective and will largely depend on the particular facts and
circumstances. However, Lead Counsel should not be obligated to
share—and should generally refrain from sharing—confidential
and sensitive information gained in their capacity as Lead
Counsel with even their own privately-retained clients, absent
some compelling reason to do so. Lead Counsel is not privy to the
information as the representative of their own clients, but rather,
because the court has placed them into that role. The court, in
making such appointment, is not attempting to advance the
interests of Lead Counsel's clients in particular, but rather seeks
to advance the interests of all parties by asking Lead Counsel to
prosecute and protect the common and collective interests of
plaintiffs as a whole.

## VII. LEAD COUNSEL'S DUTY AT THE NEGOTIATING TABLE

One of the primary difficulties in successfully navigating the
ethical or fiduciary landscape surrounding settlement stems from
the fact that resolution efforts are largely driven and defined by
defendants, while the ethical or fiduciary implications fall largely,
if not exclusively, on counsel for the plaintiffs.[64] As a practical
matter, neither Lead Counsel nor any individual plaintiff's
counsel can compel the defendant to negotiate "globally" with
respect to similarly-situated or all of the plaintiffs on a uniform or
transparent basis or prevent a defendant from making favorable
"inventory" settlement offers to some, but not all, firms. They
also cannot discourage defendants from making offers to
bellwether or test plaintiffs whose cases are set for trial. On the
other hand, when faced with certain types of offers, it is the
plaintiffs' counsel who are generally placed in a potential
"conflict" or otherwise subject to fiduciary standards and ethical
proscriptions or limitations.

To the extent, therefore, that the goal is to prevent certain
types of aggregate settlements, potentially harmful secrecy
agreements, restrictions on the right to practice, or other types of

---

surrender include: materials that would violate a duty of non-disclosure to another
person."); RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS, *supra* note 18,
at § 16 cmt. (e) (stating that "a lawyer's duty of confidentiality to another client may
prohibit some disclosure").

64. *See, e.g.*, MODEL RULE OF PROF'L CONDUCT r. 1.7, 1.8(g), 1.15(e) (AM. BAR
ASS'N 2015); LA. RULES OF PROF'L CONDUCT r. 1.7 (LA. SUP. CT. 2004); LA. RULES OF
PROF'L CONDUCT r. 1.8(g) (LA. SUP. CT. 2006); LA. RULES OF PROF'L CONDUCT r.
1.15(e) (LA. SUP. CT. 2010).

settlement arrangements that might pose some risk or harm to the settling or non-settling parties or to public health and safety, the legal and ethical restrictions must also apply to defense counsel, as it is generally the offer that creates the conflict—after the offer is made, it is often too late.[65]

The question then arises: When Lead Counsel negotiates either a limited settlement for their own clients or a multi-plaintiff proposed settlement on behalf of their own clients and other litigants in the MDL, what duties are owed to the Lead Counsel's own privately retained clients vis-à-vis other plaintiffs in the litigation?  To be sure, a proposed settlement negotiated by Lead Counsel must, like any other settlement, be structured in such a way that neither a privately retained client nor any other plaintiff is bound to its terms absent either affirmative and fully informed consent from each participating plaintiff or a transparent class proceeding wherein the settlement agreement is filed into the public record and absent parties are protected, generally by notice and the right to opt out, and in all cases by approval of the court.[66]  Yet questions are frequently raised with respect to Lead Counsel's role in negotiating both inventory settlements on behalf of their own clients that may disfavor other plaintiffs and global settlements that disfavor their own clients.

The question of how Lead Counsel should act in these situations is largely dictated by the defendant, depends on the particular facts and circumstances of each case, and is likely to be somewhat subjective.  Nevertheless, some bright-line type approaches have been suggested.

Professor Silver, for example, suggests in the *GM Ignition Switch Litigation* that, before engaging in "inventory" settlement

---

65.  Notably, the rules that govern restrictions on the right to practice make it unethical to "participate in *offering* or making" such a settlement, as contrasted with the rules on aggregate settlements, which only make it unethical for a "lawyer who represents two or more clients" to "participate in *making* an aggregate settlement" without adhering to certain requirements on disclosure and consent. *Contrast* MODEL RULE OF PROF'L CONDUCT r. 5.6(b) (AM. BAR ASS'N 2015) *and* LA. RULES OF PROF'L CONDUCT r. 5.6(b) (LA. SUP. CT. 2004) (emphasis added), *with* MODEL RULE OF PROF'L CONDUCT r. 1.8(g) (AM. BAR ASS'N 2015) *and* LA. RULES OF PROF'L CONDUCT r. 1.8(g) (LA. SUP. CT. 2006) (emphasis added).

66.  *See generally* MODEL RULE OF PROF'L CONDUCT r. 1.2(a), 1.8(g) (AM. BAR ASS'N 2015); LA. RULES OF PROF'L CONDUCT r. 1.2(a) (LA. SUP. CT. 2004); LA. RULES OF PROF'L CONDUCT r. 1.8(g) (LA. SUP. CT. 2006); FED. R. CIV. P. 23(e)(1) (requiring notice of the proposed class settlement); *see also* FED. R. CIV. P. 23(c)(2)(B)(v), (e)(4) (allowing class members to opt out of at least settlements involving claims for damages), (e)(2) (requiring court approval of any class release).

negotiations, Lead Counsel should resign.[67]   Having been appointed to faithfully carry out certain functions and responsibilities on behalf of all plaintiffs, Lead Counsel cannot consciously trade off the interests of other plaintiffs in an attempt to secure an advantage for their own clients.[68]  But prophylactic disqualification goes too far.  The potential that Lead Counsel may be susceptible to conscious or even only "structural" collusion must be weighed against plaintiffs' loss of Lead Counsel's knowledge, skill, experience, and insight, both generally and as uniquely gained in that particular litigation.   Indeed, such automatic disqualification would likely encourage defendants to try to successively "buy off" Lead Counsel in order to deprive the rest of the plaintiffs of the attorneys best suited to lead the litigation—precisely the type of conduct sought to be avoided.

Where Lead Counsel is negotiating a "global" settlement for all or a majority of the plaintiffs, some have taken the position that attorneys who serve as Lead Counsel, while attempting to achieve the best possible settlement for plaintiffs, continue to owe an undivided duty of loyalty to their own clients and must, within that framework, seek to maximize their own clients' recovery, even if that might arguably work to the prejudice of other plaintiffs.  In my view, it should be incumbent upon Lead Counsel to clearly define the nature and scope of the discussions and their concomitant role at the outset of the negotiation.   Where the defendant desires to explore a proposed settlement of claims beyond the firm's own clients, then attorneys who serve as Lead Counsel are participating in those negotiations not by virtue of their own clients' cases but because the court appointed them to explore settlement on behalf of all plaintiffs.   While Lead Counsel, in such negotiations, would certainly be expected to draw upon the knowledge and perspectives gained from the representation of their own clients, Lead Counsel is obligated, in

---

67.  *See* Declaration of Charles Silver, *In re*: General Motors Ignition Switch Litig., MDL No. 2543, Civil Action No. 1:14-md-02543, Doc. No. 2243-2, pp. 6–13 paras. 8–20 (S.D.N.Y. Feb. 5, 2016) (Exhibit 2) (Part 3).

68.  While declining, for lack of jurisdiction, to address the duties owed by Lead Counsel to other MDL plaintiffs and their attorneys generally, the Seventh Circuit once noted that "a side-agreement is not of itself intrinsically improper, though . . . parties, like those in the case before us, with dual and potentially conflicting loyalties, like Smith [the MDL Lead Counsel] toward both the Fentress [a State Court client] and MDL-907 plaintiffs, *see* [FED. JUD. CTR., MANUAL FOR COMPLEX LITIGATION (SECOND) § 20.222 (2nd ed. 1985)], might be well advised in crafting any side-agreement to proceed in such a manner that all interested parties, including the court, could rely on their good faith and integrity." Winkler v. Eli Lilly & Co., 101 F.3d 1196, 1205 (7th Cir. 1996).

that capacity, to maximize the common and collective interests of the plaintiffs as a whole.[69]

From an overall policy standpoint, the goal is to allow Lead Counsel's own clients to obtain the full benefit of such representation (including any potential premium that might be warranted, in the defendant's eyes, based on Lead Counsel's

---

69. While such Lead Counsel should, of course, be mindful of the interests of other attorneys who are representing plaintiffs in the MDL under individual retainer agreements, the notion that some "fiduciary duty" extends to such individually retained counsel, in my view, goes too far. As noted by the Louisiana Supreme Court, albeit in a different context: "It would be inconsistent with an attorney's duty to exercise independent professional judgment on behalf of his client to impose upon him a fiduciary obligation to take into account the interests of co-counsel in recovering any prospective fee." Scheffler v. Adams and Reese, LLP, 2006-1774, pp. 14–16 (La. 2/22/2007); 950 So. 2d 641, 652–53 (stating that, as a matter of public policy, no cause of action will exist between co-counsel based on the theory that co-counsel has a fiduciary duty to protect one another's interests in a potential fee). Where it has been suggested that Lead Counsel have duties or responsibilities directly to other MDL attorneys (e.g., within the context of a court-appointed Fee Committee), the fact that Lead Counsel's interests may be, to some extent, in "conflict" with the interests of some or all other plaintiffs' counsel, such inherent structural conflict does not lead to disqualification but is simply a factor to be considered when reviewing the recommendation. *See, e.g.*, Order and Reasons, *In re* Chinese Drywall Litig., MDL No. 2047, 2017 WL 2290198, Doc. No. 20789, at *5–6 (E.D. La. May 25, 2017) (denying objecting counsel's Motion to Disqualify Lead Counsel and the Fee Committee, while noting that the objecting attorneys "misunderstand the role of the Fee Committee's recommendation in the overall process. . . . At the core of this misunderstanding seems to be contract counsel's belief that the Court will view the Fee Committee's recommendation as more significant, or accord it more weight, than the position of contract counsel during the final determination of the fee award. . . . In formulating its ruling on the fee allocation issue, the Court will consider all the evidence anew, including the Fee Committee recommendation, the objections of the contract attorneys, the recommendation of the Special Master, and the evidence of time submissions gathered and reviewed by [the Court-appointed CPA]. Only after considering all this evidence will the Court be prepared to issue a ruling on the fee allocation issue.") (citing *In re* High Sulfur Gasoline Prods. Liab. Litig., 517 F.3d 220 (5th Cir. 2008) (stating that the Fifth Circuit acknowledged the court's authority to appoint a committee of plaintiffs' counsel to recommend how to divide up an aggregate fee award (although disagreeing with the process employed by the district court in that particular case), so long as the court takes those attorneys' interests into account in its independent review of the record, including the recommendation). In this respect, ERISA again provides a helpful analogy: courts allow a plan administrator to make fiduciary decisions regarding a beneficiary's right to plan benefits while acting under an inherent conflict of interest, but take such conflict into account when deciding what level of deference should be accorded the decision in question. *See, e.g.*, Metropolitan Life Ins. Co. v. Glenn, 554 U.S. 105 (2008) (stating that a reviewing court should consider the conflict of interest arising from the dual role of an entity as an ERISA plan administrator and payer of plan benefits as a factor in determining whether the plan administrator has abused its discretion in denying benefits, with the significance of the factor depending upon the circumstances of the particular case).

knowledge, skill, experience, commitment, and reputation) without conferring an undue advantage arising solely and directly from their attorney's appointment as Lead Counsel—particularly in the event that such premium will come at the expense of other plaintiffs in the litigation. The best way for Lead Counsel and the court to achieve that balance in any particular situation will be constrained somewhat by the defendant's approach to settlement and will depend on the facts and circumstances of each case.

## VIII. CONCLUSION

The MDL and other aggregation mechanisms have become increasingly central to our civil justice system. The Lead Counsel who are appointed to manage the proceedings are asked to navigate a complex landscape of competing interests, agendas, and philosophies. In setting priorities, communicating with individually retained counsel, and exploring settlement opportunities, Lead Counsel must have the willingness and the ability to put aside their own interests and act in the common and collective interests of plaintiffs as a whole. In setting professional and ethical obligations, the courts and all plaintiffs have the right to expect Lead Counsel to carry out their appointed tasks in a fair, honest, competent, reasonable, and responsible way. Both the MDL Court and Lead Counsel, while focusing on the common issues, should strive to ensure that the unique interests of individual litigants are not sacrificed. At the same time, however, the common and collective interests of plaintiffs cannot be held hostage by the plights of a few outliers or the attempts of an unruly objector to gain leverage in bad faith. The ethical and fiduciary rules developed for single-plaintiff lawsuits should not be applied mechanically in such a way that the MDL plaintiffs are deprived of the most knowledgeable and experienced counsel, or in a way that undermines the judicial economy sought by MDL transfer and Lead Counsel appointment. Rather, Lead Counsel should be treated like ERISA fiduciaries, within the scope of their appointed functions, for the benefit and protection of the MDL plaintiffs as a whole.

### IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
### IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
### CIVIL ACTION

BRIAN J. DONOVAN, ESQ.                                    CASE NO.

      Plaintiff,

v.

STEPHEN J. HERMAN, ESQ.

      Defendant.

_____/

## COMPLAINT

COMES NOW Plaintiff, BRIAN J. DONOVAN, ESQ. (hereinafter "Donovan"), on behalf of himself, his clients, and all others similarly situated, files this action against Defendant STEPHEN J. HERMAN, ESQ., an individual (hereinafter "Herman") and alleges as follows.

## NATURE OF ACTION

1.  At approximately 10 p.m. on April 20, 2010, the U.S. Coast Guard District Eight command center in New Orleans, Louisiana received a report of an explosion and fire aboard the mobile offshore drilling unit *Deepwater Horizon*. On the morning of April 22, 2010, the *Deepwater Horizon* sank, resulting in a massive oil spill incident. Oil flowed into the Gulf of Mexico unchecked for months. Ultimately, the "Macondo Well" was finally sealed on September 19, 2010, nearly five months after the blowout began. By that time, millions of barrels of oil had been discharged into the Gulf of Mexico and upon adjoining shorelines, causing immense environmental and economic harm to the entire region.

2. The British Petroleum ("BP") oil well blowout in April 2010 is arguably the largest and most egregious mass tort in U.S. history. It has affected hundreds of thousands of individuals and businesses along the U.S. Gulf Coast and beyond. The full extent of damages may never be known.

3. On August 10, 2010, the Judicial Panel on Multidistrict Litigation ("JPML") centralized all federal actions (excluding securities suits) in MDL 2179 ("In Re: Oil Spill by the Oil Rig 'Deepwater Horizon' in the Gulf of Mexico, on April 20, 2010") pursuant to 28 U.S.C. § 1407.

4. On August 10, 2010, the MDL 2179 Court issued Pretrial Order No. 1 ("PTO No. 1"). "It is the Court's intent to appoint a Plaintiffs' Steering Committee ("PSC") to conduct and coordinate the discovery stage of this litigation with the defendant's representatives or committee….The Court recognizes that cooperation by and among plaintiffs' counsel and by and among defendants' counsel is essential for the orderly and expeditious resolution of this litigation."

5. On August 27, 2010, the MDL 2179 Court issued PTO No. 6 which states "IT IS ORDERED that Stephen J. Herman be hereby appointed Plaintiffs' Co-Liaison Counsel."

6. At all times material herein, Defendant Herman, individually and/or in collusion with the members of the MDL 2179 PSC and BP, fraudulently, recklessly, negligently and/or knowingly conceived, developed, and/or facilitated an eight-step plan to maximize his compensation and the compensation of the members of the MDL 2179 PSC in exchange for limiting the liability of BP.

7. "OPA applies of its own force, because that act governs, *inter alia*, private claims for

-2-

property damage and economic loss resulting from a discharge of oil in navigable waters." *See* 33 U.S.C. § 2702(a), (b)(2)(B), (b)(2)(C), (b)(2)(E)." The Honorable Carl J. Barbier, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Rec. Doc. 3830 at 11, August 26, 2011).

8.  At all times material herein, Defendant Herman, individually and/or in collusion with the members of the MDL 2179 PSC and BP, in order to limit BP's liability and thereby maximize his compensation and the compensation of the members of the MDL 2179 PSC, has misled Plaintiff, Plaintiff's clients, and all others similarly situated by fraudulently, recklessly, negligently and/or knowingly designating the "B1" Master Complaint as an admiralty or maritime case, and requesting a non-jury trial pursuant to Rule 9(h), rather than properly alleging claims under the Oil Pollution Act of 1990 ("OPA"), a *strict liability* statute, and the Outer Continental Shelf Lands Act ("OCSLA").

9.  At all times material herein, Defendant Herman, individually and/or in collusion with the members of the MDL 2179 PSC and BP, in order to limit BP's liability and thereby maximize his compensation and the compensation of the members of the MDL 2179 PSC, has misled Plaintiff, Plaintiff's clients, and all others similarly situated by fraudulently, recklessly, negligently and/or knowingly aiding and abetting the Kenneth R. Feinberg-administered victims' compensation fund to circumvent the OPA. As a result of Defendant Herman's fraudulent and negligent conduct, approximately 220,000 Kenneth R. Feinberg victims who or that executed a "Release and Covenant Not to Sue" in exchange for a one-time miniscule final payment ($5,000 for individuals and $25,000 for businesses) were excluded from the settlement class action.

10.  At all times material herein, Defendant Herman, individually and/or in collusion

-3-

with the members of the MDL 2179 PSC and BP, has misled Plaintiff, Plaintiff's clients, and all
others similarly situated by fraudulently, recklessly, negligently and/or knowingly aiding and
abetting Kenneth R. Feinberg to use the fear of costly and protracted litigation in an attempt to
coerce Plaintiff's clients and all others similarly situated to accept grossly inadequate
settlements. During widely-reported town hall meetings, Kenneth R. Feinberg repeatedly told
victims of the BP oil well blowout incident: "The litigation route in court will mean uncertainty,
years of delay and a big cut for the lawyers….I take the position, if I don't find you eligible, no
court will find you eligible."

11. At all times material herein, Defendant Herman, individually and/or in collusion with
the members of the MDL 2179 PSC and BP, in order to limit BP's liability and thereby
maximize his compensation and the compensation of the members of the MDL 2179 PSC, has
misled Plaintiff, Plaintiff's clients, and all others similarly situated by fraudulently, recklessly,
negligently and/or knowingly circumventing the OPA by negotiating and drafting a settlement
class action which limits a claimant's recovery of damages to  geographic bounds and certain
business activities while requiring a heightened and vague proof of causation between his, her, or
its damages and the BP oil well blowout incident.

12. At all times material herein, Defendant Herman, individually and/or in collusion with
the members of the MDL 2179 PSC and BP, fraudulently, recklessly, negligently and/or
knowingly breached his fiduciary and ethical duties to Plaintiff, Plaintiff's clients, and all others
similarly situated by failing to zealously and competently advocate on behalf of Plaintiff,
Plaintiff's clients, and all others similarly situated.

13. The purpose of the Federal Rules of Civil Procedure is "to secure the just, speedy,

-4-

and inexpensive determination of every action and proceeding." As a direct result of Defendant Herman fraudulently, recklessly, negligently and/or knowingly breaching his fiduciary and ethical duties to Plaintiff and Plaintiff's clients by failing to zealously and competently advocate on behalf of Plaintiff and Plaintiff's clients, as of the date of the filing of this Complaint, approximately eight years have passed since Plaintiff's clients filed their complaints in Florida State Court.

14.  At all times material herein, Defendant Herman, individually and/or in collusion with the members of the MDL 2179 PSC and BP, fraudulently, recklessly, negligently and/or knowingly breached his fiduciary and ethical duties to Plaintiff, Plaintiff's clients, and all others similarly situated by exercising oversight of a multidistrict litigation which is unconstitutional. MDL 2179, which employs a victims' compensation fund on the frontend and a settlement class action on the backend, involves no litigation and infringes individual claimants' procedural due process rights. The most serious problem with the MDL 2179 settlement class action is that by its nature it does not involve any live dispute between the parties that a federal court is being asked to resolve through litigation, and because from the outset of the proceeding Defendant Herman, the members of the MDL 2179 PSC, and BP are in full accord as to how the claims should be disposed of. There is missing the adverseness between the parties that is a central element of Article III case-or-controversy requirement.

15.  On November 10, 2014, Judge Barbier states, "….as the parties were approaching the final fairness hearing in November 2012, there was a concerted effort by the parties and claims facility to process a substantial number of high value claims in order to demonstrate that the settlement program was working as intended." At all times material herein, Defendant

-5-

Herman, the members of the MDL 2179 PSC, BP, and the administrator of the claims facility secretly colluded to inflate the amount of compensation received by some plaintiffs (just prior to the "fairness" hearing) in order to induce the remaining plaintiffs into believing that the proposed settlement is "fair, reasonable, and adequate."

16.  At all times material herein, Defendant Herman, individually and/or in collusion with the members of the MDL 2179 PSC and BP, in order to limit BP's liability and thereby maximize his compensation and the compensation of the members of the MDL 2179 PSC, has misled Plaintiff, Plaintiff's clients, and all others similarly situated by fraudulently, recklessly, negligently and/or knowingly failing to disclose to their clients that a class member seeking to determine his or her compensation would not be able to simply read the settlement agreements and determine how his or her circumstances fit into the frameworks. The frameworks of the settlement agreements are certainly not detailed and transparent. A claimant could not possibly make a reasonable determination of how his or her claim will be resolved based on his or his business's circumstances. Defendant Herman and the members of the MDL 2179 PSC drafted these settlement agreements under the premise that "if we can't dazzle them with brilliance, we will baffle them with obfuscation."

17.  At all times material herein, Defendant Herman, individually and/or in collusion with the members of the MDL 2179 PSC and BP, in order to limit BP's liability and thereby maximize his compensation and the compensation of the members of the MDL 2179 PSC, has misled Plaintiff, Plaintiff's clients, and all others similarly situated by fraudulently, recklessly, negligently and/or knowingly failing to disclose to Plaintiff, Plaintiff's clients, and all others similarly situated the material fact that contingent fees are designed to increase

-6-

proportionally alongside a plaintiff's recovery - to tie the fates of lawyer and client. When

Defendant Herman and the MDL 2179 PSC attorneys take things one-step further and bargain

for the defendant to pay their common benefit fees directly, they sever that tie. As a result, the

attorneys' financial self-interest may no longer be linked to their clients' outcome, but to the

defendant's wishes. This concern has long been recognized as one of structural collusion in the

class context. John C. Coffee, Jr., *Rethinking the Class Action: A Policy Primer on Reform*, 62

IND. L.J. 625, 647-48 (1987). Courts have agreed. *E.g.,* Zucker v. Occidental Petroleum Corp.,

192 F.3d 1323 (9th Cir. 1999).

    18.  At all times material herein, Defendant Herman, individually and/or in

collusion with the members of the MDL 2179 PSC and BP, in order to limit BP's liability and

thereby maximize his compensation and the compensation of the members of the MDL 2179

PSC, has misled Plaintiff, Plaintiff's clients, and all others similarly situated by fraudulently,

recklessly, negligently and/or knowingly failing to disclose to their clients that: (a) the total

amount of the settlement is $20 billion; (b) Patrick Juneau would deny payment to approximately

60.03% of the claims submitted to the DHCC; (c) the total fees paid to Defendant Herman and

the members of the MDL 2179 PSC would be comprised of common benefit fees, contingent

fees, co-counsel fees, and hold-backs; (d) the total compensation paid to Defendant Herman and

the members of the MDL 2179 would be $3.035 billion; (e) the MDL 2179 plaintiffs were

fraudulently induced not to opt-out of the settlement; (f) the costs incurred for retaining four

experts in the law of class actions (the Court quotes from the opinions of these experts in its

analysis of class certification issues in the settlement class action) and the costs incurred for

retaining a fifth law professor to give his opinion on the Aggregate Fee Petition; and (g) the costs

-7-

incurred for the Special Masters and Claims Administrator.

19.  This case is brought by Plaintiff against Defendant Herman under the following causes of action: (a) Gross Negligence; (b) Negligence; (c) Negligence Per Se; (d) Fraud; (e) Fraudulent Inducement; (f) Promissory Estoppel; (g) Unjust Enrichment; (h) Breach of Fiduciary Duty; (i) Fraudulent Concealment; (j) Constructive Fraud; (k) Breach of Fiduciary Duty of Loyalty (Breach of the Aggregate Settlement Rule); and (l) Fraudulent Concealment (MDL 2179 Is Unconstitutional).

## JURISDICTION AND VENUE

20.  This is an action for damages which exceeds fifteen thousand dollars ($15,000.00).

21.  Venue in this judicial district is proper under Florida Statute § 48.193 because the tortious acts and injuries alleged in this action were committed in more than one judicial circuit in Florida, including the Thirteenth Judicial Circuit in and for Hillsborough County, Florida and Defendant operates, conducts, engages in, or carries on a business or business venture in Florida.

## PARTIES

22.  Plaintiff Donovan, a resident of Hillsborough County, Florida, is an individual and attorney admitted to practice law in the State of Florida, the U.S. District Court, Middle District of Florida, and the U.S. Court of Appeals for the Eleventh Circuit. Plaintiff Donovan's principal place of business is located in Hillsborough County at 3102 Seaway Ct., #304, Tampa, Florida 33629.

23.  At all times material herein, Defendant Herman, a resident of the State of Louisiana and a partner at the law firm Herman, Herman & Katz, LLC, served as pre-MDL Co-Liaison

-8-

Counsel for all cases, including cases initially filed in the State of Florida, consolidated in the

EDLA, Co-Liaison Counsel MDL 2179, Co-Lead Class Counsel for the BP Settlement Classes,

Co-Lead Settlement Class Counsel for the Halliburton/Transocean Settlement Class, member of

the Plaintiffs' Executive Committee, Co-Chair of the Fee Committee, and *ex officio* member of

the PSC. At all times material herein, Defendant Herman oversaw and steered the entire MDL

2179 "litigation" effort. This includes settlement negotiations with BP, Halliburton, and

Transocean, as well as settlement approval, and settlement implementation, post-settlement

administrative disputes, litigation, and appeals, approval, payment, and reimbursement of Shared

Expenses and other general planning and administration, coordination with Defendants, Special

Masters, the Court, the States, and the United States, case-management orders and procedures,

public relations efforts, the monitoring of and coordination with the JPML, Government, and

other satellite investigations, lawsuits, and proceedings, general communications, coordination,

organization, and strategy. Defendant Herman's principal place of business is located at 820

O'Keefe Ave., New Orleans, Louisiana 70113.

24. On December 11, 2018, Judge Barbier issued an Order wherein he states, "Each year

the Court has appointed or re-appointed attorneys to the Plaintiffs' Steering Committee ("PSC")

for one-year terms. The most recent appointments to the PSC expired on September 30, 2018.

(Rec. Doc. 23456). Considering the progress of the MDL, the Court finds it is unnecessary to

appoint or re-appoint members to the PSC. The Court does, however, re-appoint Stephen J.

Herman as Plaintiffs' Co-Liaison Counsel, effective October 1, 2018 through September 30,

2019."

-9-

## BACKGROUND FACTS

### I.  Defendant Herman's 8-Step Plan to Limit BP's Liability and Maximize His Compensation

25.  Defendant Herman, individually and/or in collusion with the members of the MDL 2179 PSC and BP, fraudulently, recklessly, negligently and/or knowingly conceived, developed, and/or facilitated the following eight-step plan to maximize his compensation and the compensation of the members of the MDL 2179 PSC in exchange for limiting the liability of BP.

### A.  Step No. 1: Capture Market Share

26.  In MDL 2179, a victim of the BP oil well blowout is not a person. MDL 2179 plaintiffs are merely bargaining chips or commodities acquired by Defendant Herman and aspiring members of the PSC and later "sold" in bulk to the defendant.

27.  The MDL 2179 plaintiffs serve as a bargaining chips in four ways: (a) an attorney with a sufficient number of bargaining chips has a better chance to be awarded with a lucrative appointment to the MDL 2179 PSC by the transferee judge; (b) after the attorney has been appointed to the PSC, he pools his bargaining chips with the bargaining chips of the other members of the PSC to exert leverage on the defendant while graciously offering the defendant and the defendant's shareholders closure; (c) the settlement class action achieved by this leverage will hopefully result in significant judicial efficiency; and (d) this judicial efficiency, in turn, will result in the transferee judge ensuring that Defendant Herman and the cooperative PSC attorneys are excessively compensated for closing the deal with the defendant in a timely manner. Justice for the BP oil well blowout victims was never considered by Defendant Herman.

28.  Judge Barbier praises the attorneys he appointed to the MDL 2179 PSC for their

-10-

initiative, "Shortly after the events of April 20, 2010, various law firms who would eventually become Liaison Counsel, PSC members, Class Counsel, and other common benefit attorneys….started to coordinate with one another….Working together, the lawyers developed a formal limited joint-prosecution agreement to facilitate the coordination and sharing of information, research, and litigation strategy." Defendant Herman and each attorney appointed by Judge Barbier to the MDL 2179 PSC directly represents thousands or tens of thousands of clients.

29. At all times material herein, Defendant Herman breached his fiduciary and ethical duties to Plaintiff, Plaintiff's clients, and all others similarly situated. At all times material herein, Defendant Herman did not spend very much time, if any, evaluating the merits of whether or not to advise his thousands of clients to opt-out of the settlement class action in light of the individual circumstances of each of his clients and in consultation with them.

30. Litigation in the United States is adversarial. A plaintiff's counsel zealously advocates on behalf of his client. He goes to war on behalf of his client. In contrast, MDL 2179 is a perverted form of transactional law. In transactional law, both parties involved in the transaction should win. In MDL 2179, Defendant Herman, the PSC, and the defendant win. The only losers are the comatose, hapless BP oil well blowout plaintiffs.

## B. Step No. 2: The JPML Transfer Order

31. In the transfer order for MDL 2179, the JPML states, "Centralization may also facilitate closer coordination with Kenneth Feinberg's administration of the BP compensation fund."

-11-

32. Defendant Herman did not have to rely solely on a settlement class action to limit BP's liability. From the very beginning, Defendant Herman also had a victims' compensation fund, sanctioned by the JPML, to eliminate a substantial number of claimants.

### C. Step No. 3: Establishment of Feinberg's Victims' Compensation Fund

33. Kenneth R. Feinberg, masquerading as a "Fund Administrator," was employed by BP to limit its liability.

34. In violation of the OPA, but with the approval of Defendant Herman, Feinberg's approach to determining claimant eligibility was driven by two factors: (1) loss location; and (2) claimant business type.

35. Feinberg's use of coercion and fraudulent inducement was also in clear violation of the OPA. Feinberg used the fear of costly and protracted litigation to coerce victims of the BP oil well blowout to accept grossly inadequate settlements.

36. In MDL 2179, Feinberg used a "Delay, Deny, Defend" tactic against legitimate BP oil well blowout victims. This tactic, commonly used by unscrupulous insurance companies, is as follows: "Delay payment, starve claimant, and then offer the economically and emotionally-stressed claimant a miniscule percent of all damages, including future damages, to which the claimant is entitled. If the financially ruined claimant rejects the settlement offer, he or she may sue."

37. This "Delay, Deny, Defend" tactic, although unconscionable, proved to be very effective for Defendant Herman, Feinberg, and BP.

38. The ultimate objective of Feinberg's "Delay, Deny, Defend" tactic was to limit BP's

-12-

liability by obtaining a signed "Release and Covenant Not to Sue" from as many BP oil well blowout victims as possible. Feinberg's "Release and Covenant Not to Sue" requirement violates OPA, State contract law, and is contrary to public policy.

39. Defendant Herman fully sanctioned and facilitated Feinberg's "Release and Covenant Not to Sue."

40. Releases, compromises and settlement agreements are contracts and the rules of construction applicable to all contracts are used in the interpretation of such agreements.

41. Whether a compromise, settlement, or release is a valid contract between the parties is determined by reference to State substantive law governing contracts generally. Whether a contract or a contractual provision is unconscionable or unenforceable on grounds of illegality or public policy is a question of law.

42. In examining whether a contract is unconscionable, the court must determine whether one party lacked a meaningful choice and the contract terms were unreasonably favorable to the other party.

43. Kenneth R. Feinberg's "Release and Covenant Not to Sue" violates State contract law and is contrary to public policy because it: (a) was obtained through the use of economic duress; (b) was obtained without free consent (Claimants did not consent to the release by choice, because the only option for receiving payment required Claimants to sign a release, the terms of which they had no opportunity to negotiate.); (c) was obtained through fraud; (d) requires Claimants to discharge, waive and release future claims (including those resulting from gross negligence) for costs and damages (including punitive damages) that are unknown and have not yet arisen. As Judge Barbier clearly states in his Order of August 26, 2011, "The

-13-

long term effects [of the BP oil well blowout] on the environment and fisheries may not be known for many years;" (e) was obtained in exchange for inadequate consideration; and (f) has as its objective the circumvention of the OPA.

44.  Accordingly, Defendant Herman's sanctioned "Release and Covenant Not to Sue" is void *ab initio*.

45.  Incredibly, the MDL 2179 Court still held: (a) "While OPA does not specifically address the use of waivers and releases by Responsible Parties, the statute also does not clearly prohibit it;" and (b) "In fact, as the Court has recognized in this Order, one of the goals of OPA was to allow for speedy and efficient recovery by victims of an oil spill."

46.  The OPA requires more than merely "speedy and efficient." The OPA requires that all BP oil well blowout victims are *fully* compensated. Furthermore, the purpose of the Federal Rules of Civil Procedure is "to secure the *just*, speedy, and inexpensive determination of every action and proceeding (Emphasis added)."

47.  In sum, victims of the BP oil well blowout turn to the court in search of justice, not merely a "speedy and efficient" determination of their cases.

48.  Efficiency is not the only touchstone of justice. A substantial body of opinion and a respect for jurisdictional principles suggest that a plaintiff ordinarily has a right to a trial in the forum of his or her choosing. Aggregation of cases for the purpose of facilitating settlement is a byproduct of §1407, but is not its central statutory purpose.

49.  Judicial economy is undoubtedly well-served by MDL consolidation when scores of similar cases are pending in the courts. Nevertheless, the excessive delay and marginalization of juror fact finding (i.e., dearth of jury trials) associated with traditional MDL practice, such as

-14-

MDL 2179, are developments that cannot be defended.

50.  The appropriate focus for Defendant Herman's sanctioned Feinberg-administered victims' compensation fund resolution of mass claims should be justice for the claimants, not merely judicial economy and closure for BP.

51.  Feinberg denied payment to approximately 61.46% of the claimants who filed claims.

52.  The BP/Feinberg victims who executed a "Release and Covenant Not to Sue" (approximately 220,000 in number) were subsequently excluded by Defendant Herman from the settlement class action.

### D.  Step. No. 4: Appointment of "Cooperative" Attorneys to the PSC

53.  It is important to understand that Defendant Herman replaced justice with judicial efficiency in MDL 2179.

54.  MDL 2179 is not a litigation. Attorneys appointed to the MDL 2179 PSC are not appointed by the transferee judge to be litigators. These attorneys are not selected for the purpose of zealously advocating on behalf of their clients. Defendant Herman and attorneys appointed to the MDL 2179 PSC are cooperative dealmakers.

55.  In sum, the main criteria for membership in the MDL 2179 PSC is very simple: (a) The attorney must be "cooperative;" (b) The attorney should be a "repeat player;" and (c) The attorney must have signed-up a large stable of clients which he or she is already directly representing.

56.  It is helpful to remember the three Cs of any successful PSC: cooperation, control,

-15-

and compensation. Greater cooperation (between the dealmakers) and control (in terms of a significant market share of plaintiffs) results in closing the deal faster with the defendant and clearing the docket faster which results in greater compensation. A happy transferee judge is a generous transferee judge. A happy Plaintiffs' Co-Liaison Counsel is a generous Plaintiffs' Co-Liaison Counsel. In MDL 2179, the comatose, hapless plaintiffs received little or no compensation while the compensation paid to Defendant Herman and the members of MDL 2179 PSC is estimated to be *$3.035 billion*.

### E. Step No. 5: Circumvention of OPA, a Strict Liability Statute

57.  "OPA applies of its own force, because that act governs, *inter alia*, private claims for property damage and economic loss resulting from a discharge of oil in navigable waters." *See* 33 U.S.C. § 2702(a), (b)(2)(B), (b)(2)(C), (b)(2)(E)." The Honorable Carl J. Barbier, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Rec. Doc. 3830 at 11, August 26, 2011).

58.  The OPA is a *strict liability* statute. In order to recover damages under the OPA, a claimant merely needs to show that his or her damages "resulted from" the oil spill or oil well blowout.

59.  The OPA, in pertinent part, states: "The responsible party for a vessel or a facility from which oil is discharged, or which poses the substantial threat of a discharge of oil, into or upon the navigable waters or adjoining shorelines or the exclusive economic zone is liable for the removal costs and damages that result from such incident."

60.  The damages referred to in 33 U.S.C. § 2702(a) include, but are not limited to:

-16-

"Damages equal to the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources, which ***shall be recoverable by any claimant***." (Emphasis added)

61.  The OPA further provides: (a) "Payment or settlement of a claim for interim, short-term damages representing less than the full amount of damages to which the claimant ultimately may be entitled **shall not** preclude recovery by the claimant for damages not reflected in the paid or settled partial claim;" and (b) "Payment of such a claim [i.e. payment to a claimant for interim, short-term damages representing less than the full amount of damages to which the claimant ultimately may be entitled] **shall not** foreclose a claimant's right to recovery of all damages to which the claimant otherwise is entitled under this Act or under any other law."

62.  "Shall" means shall. The U.S. Supreme Court has made clear that when a statute uses the word "shall," Congress has imposed a mandatory duty upon the subject of the command.

63.  Use of "shall" and "may" in statutes also mirrors common usage; ordinarily "shall" is mandatory and "may" is permissive. "The mandatory 'shall'….normally creates an obligation impervious to judicial discretion."

64.  BP, the majority owner and operator of the Macondo Well, is a "responsible party" for this incident under the OPA, 33 U.S.C. §2702(a).

65.  Although liability under the OPA is subject to a monetary cap of $75,000,000 for each incident by each responsible party, there is no limit to liability if the damage was proximately caused by "gross negligence or willful misconduct." It is important to note that BP, the responsible party, waived the monetary cap of $75,000,000 for the BP oil well blowout incident in the Gulf of Mexico on April 20, 2010 and the MDL 2179 Court concluded that the

-17-

discharge of oil was the result of BP's "gross negligence" and "willful misconduct" under the
Clean Water Act ("CWA"). Accordingly, in theory, there is no limit to BP's liability. Defendant
Herman's perceived reality is so very different.

66.  Allegedly, in order to efficiently manage MDL 2179, the Court consolidated and
organized the various types of claims into several "pleading bundles" for the purpose of the
filing of complaints, answers, and any Rule 12 motions.

67.  The "B1" pleading bundle includes all claims for private or "non-governmental"
economic loss and property damages.

68. On January 12, 2011, the MDL 2179 Court issued PTO No. 25, in order to clarify
"the scope and effect" of the "B1" Master Complaint. The Court held that any individual plaintiff
who is a named plaintiff in a case that falls within pleading bundle "B1" "is deemed to be a
plaintiff in the "B1" Master Complaint. Also, "the allegations, claims, theories of recovery
and/or prayers for relief contained within the pre-existing petition or complaint are deemed to be
amended, restated, and superseded by the allegations, claims, theories of recovery, and/or
prayers for relief in the respective "B1" Master Complaint(s) in which the defendant is named."

69.  Rather than allege claims under the OPA, the "cooperative" Defendant Herman made
the unfathomable decision to allege claims under a hodgepodge of statutes. In the "B1" Master
Complaint, Defendant Herman states, "The claims presented herein are admiralty or maritime
claims within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure. Plaintiffs hereby
designate this case as an admiralty or maritime case, and request a non-jury trial, pursuant to
Rule 9(h)."

70.  Defendant Herman was concerned that a jury may not be "cooperative."

-18-

71.  The U.S. Supreme Court has quoted testimony by an admiralty expert who stated "maritime law in the strict sense has never had to deal with the resources in the ground beneath the sea, and its whole tenor is ill adapted for that purpose." The Court then added that "since the Act [OCSLA] treats seabed, subsoil, and artificial islands the same, dropping any reference to special treatment for presumptive vessels, the most sensible interpretation of Congress' reaction to this testimony is that admiralty treatment was eschewed altogether…." The U.S. Supreme Court additionally stuns with its unqualified statement that it "*has specifically held that drilling platforms are not within admiralty jurisdiction.*" (Emphasis added)

72.  The U.S. Supreme Court has reaffirmed as a basis for an admiralty tort that the wrong must bear a substantial relation to a traditional maritime activity in *Foremost Insurance Co. v. Richardson, Sisson v. Ruby, Grubart,* and, most recently, *Herb's Welding.* If the MDL 2179 Court were to apply this requirement in the BP oil well blowout litigation, Defendant Herman's claim of admiralty jurisdiction for the BP oil well blowout - the epitome of an oil and gas drilling operation - would have proven difficult, if not impossible, to sustain.

73.  OCSLA's role as an essential component of the BP oil well blowout cannot be ignored. OCSLA, the U.S. Supreme Court has declared, "defines a body of law applicable to the seabed, the subsoil and the…structures…on the Outer Continental Shelf." OPA is no less essential to the tort, of course, because, as the MDL 2179 Court itself acknowledges, the statute "governs….private claims for property damage and economic loss resulting from a discharge of oil in navigable waters." The BP oil well blowout, in short, inextricably engages *both* statutes in this unique configuration. OCSLA, the U.S. Supreme Court declared in 1969 in *Rodrigue v. Aetna Casualty & Surety Company*, was intended to "define a body of law applicable to the

-19-

seabed, the subsoil and the….structures….on the Outer Continental Shelf." OCSLA's legislative

history, as carefully evaluated by *Rodrigue*, disdains admiralty law as OCS governing law.

Congress refashioned OCSLA in 1978 as a "new statutory regime" designed to "prevent or

minimize the likelihood of *blowouts, loss of well control*, fires….or other occurrences which may

cause damage to the environment or to property, or endanger life or health." Congress could not

have spoken more directly to BP oil well blowout's core issue and corresponding remedial

program, particularly as OCSLA was subsequently refined and expanded by OPA.

74. Following the *Exxon Valdez* disaster in 1989, Congress unanimously adopted OPA,

which the Senate Public Works and Environmental Committee portrayed as a "single Federal

law providing cleanup authority, penalties, and liability from oil pollution." Consolidated and

harmonized within this single act were major elements of four existing oil pollution statutes,

including OCSLA's title III.

75. The comprehensiveness of the displacement of general maritime law by the two non-

admiralty statutes, OCSLA and OPA, is evident on two fronts.

76. The first is Congress's reformulation of general maritime law's episodic, conflicting,

and, at best, embryonic treatment of the tort. The second is Congress's own undertaking in OPA

to comprehensively incorporate and reformulate in a single federal statute its own work in the

four prior statutes. This extraordinarily extensive undertaking leaves negligible space for the

credibility of any claim that these efforts fall short of Congress's effective occupation of a field

coextensive with the boundaries delineated in the BP oil well blowout.

77. In *Herb's Welding*, the U.S. Supreme Court excoriated as "*untenable*" the Fifth

Circuit's view that "*offshore drilling is maritime commerce*." *Herb's Welding*'s explicit

-20-

confirmation of and reference to the U.S. Supreme Court's assessment in *Rodrigue* that OCSLA's legislative history "*at the very least forecloses the Court of Appeals' holding that offshore drilling is a maritime activity*...." would seem to leave precious little space for Defendant Herman's position.

78. In *Rodrigue*, the U.S. Supreme Court clashed with the Fifth Circuit's *Snipes v. Pure Oil Company* decision, which, in another manifestation of the Fifth Circuit's reflexive admiralty-centrism, defined as "maritime" a tortious injury suffered by an OCS stationary platform worker at this OCSLA site. In *Rodrigue*, the U.S. Supreme Court held that admiralty law does not apply to torts originating on OCSLA situses unless Congress affirmatively expresses its "intent" favoring this override. The U.S. Supreme Court's language favoring this conclusion could not be more forthright: "Even if the admiralty law would have applied to the deaths occurring in these cases under traditional principles, OCSLA's legislative history shows that Congress did not intend that result. First, Congress assumed that the admiralty law would not apply to an OCSLA situs unless Congress made it apply, and then Congress decided not to make it apply." Earlier discussion disclosed Congress's 1978 institution of its "new OCSLA statutory regime." The Conference Committee explained that the former clarified that federal law is to be *applicable to all activities on all devices in contact with the seabed for exploration, development, and production.* The committee intends that federal law is, therefore, to be applicable to activities on drilling ships, *semi-submersible drilling rigs*, and other watercraft, when they are *connected to the seabed by drill string,* pipes, or *other appurtenances*, on the OCS for exploration, development, or production purposes. *Ships and vessels are specifically not covered only when they are being used for the purpose of transporting OCS mineral resources*.

-21-

79. The House described title III's function as providing the "procedures to be followed in the event of an oil spill and compensation for cleanup costs and damages resulting from such a spill." The title limits the definition of "vessels" to watercraft operating in OCS or territorial waters and which transport "oil directly from an offshore facility." An "offshore facility," it stated, is "any oil refinery, or *drilling structure*,….which is used to *drill for*, produce,….or transport oil produced from the Outer Continental Shelf….." These definitions exclude semisubmersibles as "vessels" by including them under "any drilling structure." The term "vessel" is restricted to any watercraft used exclusively to "transport oil directly from an offshore facility." Hence the statement of the conferees: "*Once a drilling ship or other watercraft is attached to the seabed for exploration*, development or production, *it is to be considered an 'offshore facility' rather than a vessel*, for purposes of applying the differing requirements for a facility as compared to a vessel."

80. In fact, OCSLA's section 1333(a), its title III OCS economic-and property-loss cause of action, and the latter's refinement and expansion in OPA are not creatures of admiralty at all. They are instead independently grounded in the Constitution's Property and Interstate and Foreign Commerce clauses, respectively.

81. Historically, the U.S. Supreme Court has objected to "fortuitous," "perverse" or "absurd" results that may result from pinning the admiralty tail on disputes for which admiralty can claim no expertise. The U.S. Supreme Court undertook to discourage this practice in *Executive Jet Aviation Company v. City of Cleveland* by requiring a "substantial relationship" connecting the matter in question "to traditional maritime activity." "In determining whether there is admiralty jurisdiction over a particular tort or class of torts," the Court stated, "reliance

-22-

on the relationship of the wrong to traditional maritime activity is often more sensible and more consonant with the purposes of maritime law than a purely mechanical application of the locality test."

82.  General maritime law's judge-made principles do not enjoy a presumption against displacement by a federal statute. Despite idealized assertions of admiralty's capacity to resolve complex social or economic issues, the reality, as Justice Holmes counseled, is that general maritime law is not a "corpus juris," but "a very limited body of customs and ordinances of the sea."

83.  Defendant Herman's reasoning and the MDL 2179 Court's orders and reasoning are contrary to U.S. Congressional intent, the OCSLA, the OPA and U.S. Supreme Court decisions. The only logical conclusion is that they are the product of Defendant Herman acting, individually and/or in collusion with the members of the MDL 2179 PSC and BP, in order to limit BP's liability and thereby maximize his compensation and the compensation of the members of the MDL 2179 PSC.

84.  Filing of the "B1" Master Complaint as an admiralty or maritime case artfully circumvented the OPA. By doing so, Defendant Herman assisted Judge Barbier in expeditiously being able to erroneously and incomprehensibly find, "….that nothing prohibits Defendants from settling claims for economic loss. While OPA does not specifically address the use of waivers and releases by Responsible Parties, the statute also does not clearly prohibit it. In fact, as the Court has recognized in this Order, one of the goals of OPA was to allow for speedy and efficient recovery by victims of an oil spill."

85.  As a result of this finding by Judge Barbier, approximately 220,000 Kenneth R.

-23-

Feinberg victims who or that executed a "Release and Covenant Not to Sue" in exchange for a one-time final payment ($5,000 for individuals and $25,000 for businesses) were excluded from the settlement class action. There is no evidence that these amounts even remotely represent adequate consideration to compensate claimants for the damages that claimants did or will suffer as a result of the BP oil well blowout.

86. By alleging claims under general maritime law rather than under the OPA (a strict liability statute) and OCSLA, in the "B1" First Amended Master Complaint, Defendant Herman assisted Judge Barbier in expeditiously being able to:

(a) Erroneously find, "The *Deepwater Horizon* was at all material times *a vessel in navigation.*"

(b) Erroneously find, "Admiralty jurisdiction is present because the alleged tort occurred upon navigable waters of the Gulf of Mexico, disrupted maritime commerce, and the operations of the vessel *bore a substantial relationship to traditional maritime activity*. With admiralty jurisdiction comes the application of substantive maritime law."

(c) Erroneously find, "State law, both statutory and common, is preempted by maritime law, *notwithstanding OPA's savings provisions*. All claims brought under state law are dismissed."

(d) Erroneously find, "General maritime law *claims that do not allege physical damage to a proprietary interest are dismissed* under the *Robins Dry Dock* rule, unless the claim falls into the commercial fishermen exception."

87. Moreover, the maritime rule in the Fifth Circuit is that operational recklessness or willful disregard is generally insufficient to visit punitive damages upon the employer. Rather, the conduct must emanate from corporate policy or that a corporate official with policy-making authority participated in, approved of, or subsequently ratified the egregious conduct.

88. Accordingly, the MDL 2179 Court concluded that BP cannot be held liable for punitive damages under general maritime law. Judge Barbier further noted that, even if BP were

-24-

liable for punitive damages, only commercial fishermen or those who could satisfy the "physical injury" threshold of the *Robins Dry Dock* rule would be entitled to such an award.

89.  Since Defendant Herman requested a non-jury trial pursuant to Rule 9(h) and alleged claims under general maritime law, rather than OPA and OCSLA, the MDL 2179 Court formulated a trial plan that dispensed with trial by jury and instead conducted a bench trial applying general maritime law.

90.  Circumventing the OPA also allowed the settlement to limit a claimant's recovery of damages by geographic bounds, pertain solely to certain business activities, and require a heightened and vague proof of causation between his or her damages and the BP oil well blowout incident.

### F.  Step No. 6: Approval of the Settlement Class Action

91.  In February 2011, only 4 months after Judge Barbier appointed Defendant Herman and the other cooperative attorneys to the BP oil well blowout MDL PSC and Plaintiff Executive Committee, settlement negotiations began "in earnest." Defendant Herman and BP negotiated a total amount which BP was willing to pay in order to settle the BP oil well blowout case.

92.  Carefully implementing the above-described Steps No. 1 through No. 5, Defendant Herman and BP worked backwards from that agreed upon total amount to draft the terms and conditions of the settlement.

93.  Just prior to the final fairness hearing in November 2012, Defendant Herman, the members of the MDL 2179 PSC, BP, and the administrator of the claims facility intentionally processed a substantial number of high value claims in an attempt to demonstrate that the settlement program was working as promised by Defendant Herman. Here, the objective was to

-25-

keep as many of the remaining claimants/plaintiffs in the settlement class action as possible. Opt-outs were seriously frowned upon. The settlement class action was the only game in town. Take it or leave it!

94. At the fairness hearing, Defendant Herman and the MDL 2179 Court limited oral presentations by individual objectors (or their counsel, as applicable) to not more than 3 minutes each.

95. In sum, the purpose of the fairness hearing was to allow the dealmakers (Defendant Herman and BP) to argue in favor of approval of the Economic and Property Damages Settlement. Claims Administrator Patrick Juneau and Michael Juneau also presented on the glorious status of the settlement and the virtually non-existent settlement opt-outs.

96. The BP oil well blowout of April 2010 resulted in the largest environmental disaster in the history of the United States. An estimated 5.0 million barrels of crude oil gushed into the Gulf of Mexico.

97. The Honorable Carl J. Barbier clearly states, "The long term effects [of the BP oil well blowout] on the environment and fisheries may not be known for many years." Nevertheless, in order to limit BP's liability, one tactic employed by Defendant Herman and BP was to limit the compensation period to 2010.

98. Incredibly, Judge Barbier found, and Defendant Herman agreed, that limiting the compensation period to 2010 is reasonable. The Court explains, "Certain objectors complain that the Economic Damage Claim Frameworks are unfair because they do not compensate persons who did not begin suffering losses until 2011. Yet this provision is reasonable for three reasons: (i) the Macondo well ceased flowing in July 2010; (ii) there is evidence that by late 2010, Gulf

-26-

Coast tourism had returned to or surpassed 2009 levels; and (iii) as to claims by individuals and businesses in charter fishing, seafood processing, or other businesses relying on access to Gulf waters, nearly all federal and state waters were reopened for commercial fishing by November 2010. *Thus, extending compensation to 2011 would cover losses not likely caused by the spill*." (Emphasis added)

99.  Defendant Herman's settlement causation requirements take obfuscation to a new level.

100.  The BP oil well blowout settlement contains various causation requirements for Business Economic Loss ("BEL") claims. Two of the causation tests, the Modified V-test and the Decline-Only test, require a revenue calculation based on benchmark periods and, in addition, a decline in the share of total revenue generated by non-local customers or customers in Zones A to C as reflected in specified documentation.

101.  In discussing the causation requirements for BEL claims, Judge Barbier explains, and Defendant Herman agrees, "Certain objectors contend that to invoke the Modified V-Test or the Decline-Only Test, they are required to satisfy the Customer Mix Test, which requires these businesses to establish where their customers are located. The objective evidence shows that the causation tests available under the Settlement Agreement are both economically reasonable and highly favorable to claimants, which is why they were negotiated by experienced counsel in consultation with their clients and experts….Other objectors complain that before they can invoke the V-Shaped Revenue Pattern test, they must demonstrate a 5% revenue recovery during the correlating months of 2011 as compared to the 2010 baseline period. This provision is reasonable, as *losses that continued after the spill are likely to be due to factors other than the*

-27-

*spill*." (Emphasis added)

102. Defendant Herman fraudulently, recklessly, negligently and/or knowingly breached his fiduciary and ethical duties to Plaintiff, Plaintiff's clients, and all others similarly situated by reassuring BP oil well blowout claimants/plaintiffs that the settlement claims program's Risk Transfer Premium ("RTP") enhances the compensation amount for, among other things, certain claimants whose damages could be recurring, to account for that risk of future damages.

103. Defendant Herman further fraudulently, recklessly, negligently and/or knowingly breached his fiduciary and ethical duties to Plaintiff, Plaintiff's clients, and all others similarly situated by supporting the Court's finding that, "RTP payments are meant to compensate class members for pre-judgment interest, the risk of oil returning, consequential damages, inconvenience, aggravation, the risk of future loss, the lost value of money, compensation for emotional distress, liquidation of legal disputes about punitive damages, and other factors."

104. According to Defendant Herman, RTP payments are simply magical.

105. Defendant Herman, the members of the MDL 2179 PSC, and BP tendered either jointly or on their own behalf four "experts" in the law of class actions: Professors Coffee, Issacharoff, Klonoff, and Miller. Indeed, Defendant Herman and the Court cites to, or in some instances quotes from, the opinions of these "Thought Leaders" at various points in its analysis of class certification issues.

106. The following are a few examples of the quotes of these "Thought Leaders" and claims administrator.

(a) The class definition is geographically circumscribed to Louisiana, Alabama, Mississippi, and certain specified counties in Florida and Texas along the Gulf Coast, as well as Specified Gulf Waters [in violation of the OPA].

-28-

(b) According to Professor Coffee, such careful negotiation of the release was "an example of reasoned statesmanship [in violation of the OPA]."

(c) "Because a class action is the vastly superior method by which to resolve the impact of this mass disaster on the Gulf Coast Region, it would be a social tragedy if class certification were denied."

(d) "I've never been involved in a project that has gotten up this quick, had the involvement with the volume we had to deal with, and to either have started it earlier or gotten it paid this quickly. It's been a remarkable experience for me."

(e) "The pace of payment determinations and payments is very high in comparison to other claims matters and is especially reasonable considering the other substantial responsibilities of the Settlement Program during this same period of time."

107.  Defendant Herman, individually and/or in collusion with the members of the MDL 2179 PSC and BP, fraudulently, recklessly, negligently and/or knowingly breached his fiduciary and ethical duties to Plaintiff, Plaintiff's clients, and all others similarly situated by retaining, and highly compensating, four law professors/thought leaders to give their "unbiased" opinions in order to induce the plaintiffs into believing that the proposed settlement is "fair, reasonable, and adequate."

108.  Notwithstanding the opinions of Defendant Herman's four law professors, Plaintiff believes it is obvious to any reasonable person that Defendant Herman's negotiated settlement class action violates the OPA statute by defining class members by geographic bounds and certain business activities while requiring proof of a heightened, vague standard of causation.

109.  The MDL 2179 class settlement agreement is a business deal entered into between Defendant Herman, the members of the MDL 2179 PSC, and BP for their own personal benefit. This deal was consummated behind closed doors. Although there is no stated limit on the amount that BP is willing to pay, there is an absolute limit that BP is willing to pay. Otherwise, BP

-29-

would not have agreed to the settlement terms and conditions. More importantly, Defendant

Herman conveniently fails to mention that although there is no stated ceiling, there is also no

stated floor. BP is not obligated to pay any amount. Moreover, BP and Defendant Herman are

able to argue that certain claims are not legitimate and Defendant Herman may clawback

"fraudulent" payments previously paid to BP oil well blowout victims.

110.  After eliminating the class members who opted-out and the illegally excluded BP

oil well  blowout victims, the vast majority of remaining Plaintiffs are either comatose or are

directly represented by Defendant Herman and members of the PSC. Those plaintiffs directly

represented by Defendant Herman and members of the PSC know they shall be well-

compensated because each must pay a contingent fee to Defendant Herman or his or her

"cooperative" PSC attorney.

### G.  Step No. 7: The Post-Settlement Mop-Up Procedures

111.  Transferee judges tend to issue *Lone Pine* orders after most plaintiffs' cases are

resolved through a comprehensive settlement. *Lone Pine* orders are usually issued with little

advanced notice. Although plaintiffs may be relying on common evidence produced by the PSC,

when they refuse to settle, *Lone Pine* orders might require a plaintiff to retain an individual

expert and produce her opinion within a couple of weeks. In sum, *Lone Pine* orders require non-

settling plaintiffs to provide some evidentiary support for their claims to avoid dismissal.

112.  MDL PSC members routinely argue that a *Lone Pine* order is appropriate as "a

post-settlement mop-up procedure utilized to address those cases which either were not eligible

for compensation through the MDL settlement program or which had opted-out of participation

-30-

in the MDL settlement program." In reality, the purpose of a *Lone Pine* order is to eliminate those few remaining non-cooperating plaintiffs who have the audacity to demand justice.

113.   In lieu of having the Court issue a *Lone Pine* order, Defendant Herman created Pretrial Order No. 60 ("PTO 60") and Pretrial Order No. 64 ("PTO 64") to eliminate those few remaining non-cooperating, pesky plaintiffs who have the audacity to demand justice.

114.   On March 29, 2016, the MDL 2179 Court issued PTO 60 wherein the Court dismissed the amended "B1" Master Complaint as having "no further administrative or procedural benefit."

115.   In PTO 60, the Court required plaintiffs in pleading bundle "B1" who had filed a timely claim, and not previously released their claim, to file and serve on BP a sworn statement disclosing information regarding their claims. PTO 60, in pertinent part, states:

> "A. As to Plaintiffs who filed Individual Lawsuits.
> (i) Any plaintiff who previously filed an individual lawsuit must complete the sworn statement in the form reflected in Exhibit A. The completed sworn statement shall be attached to a cover sheet reflecting the caption of the individual lawsuit in the form of Exhibit B. Both the cover sheet and the attached sworn statement must be filed into the record of the plaintiff's individual lawsuit (as opposed to the master docket for MDL 2179) no later than May 2, 2016. Plaintiff also shall serve the sworn statement on the Plaintiffs' Steering Committee ("PSC") and counsel for BP no later than May 2, 2016."

116.   In addition, the Court required those "B1" plaintiffs who had not previously filed an individual complaint (defined as a complaint not joined in by any other plaintiffs) against BP to file a new individual complaint. PTO 60, in pertinent part, states:

> "B. Plaintiffs who DID NOT file Individual Lawsuits, (i.e., only filed a SFJ and/or were part of a "Mass Joinder" Lawsuit).
> (i) Where Plaintiffs did not file an individual lawsuit, but instead filed a SFJ and/or were part of a complaint with more than one plaintiff, each such plaintiff must, by May 2, 2016, file an individual lawsuit (Complaint) (one per plaintiff), using the caption reflected in Exhibit C. The Complaint should include as an attachment the completed

-31-

sworn statement in Exhibit A. Each plaintiff also must, by May 2, 2016, serve the PSC and Counsel for BP with a copy of the completed sworn statement.

(ii) Plaintiffs that did not file individual lawsuits, but instead filed a SFJ and/or were part of a complaint with more than one plaintiff, who fail to comply with the above requirements by May 2, 2016, will have their claims deemed dismissed with prejudice without further notice."

117.  In sum, plaintiffs who failed to comply with the sworn statement requirement or the new individual complaint requirement by the compliance deadline (May 2, 2016) were to have their claims deemed dismissed with prejudice without further notice.

118.  PTO 60, allegedly in order to further assist the Court in streamlining the dismissal of the remaining claims, addresses the issue of "Presentment" under the OPA. PTO 60 asks any plaintiff who previously filed an individual lawsuit, "Did you, the plaintiff seeking relief, present this claim at least 90 days prior to filing a lawsuit or joining the "B1" Complaint?"

119.  Plaintiff Donovan believes a logical question is: Why didn't Defendant Herman immediately ask each Plaintiff if he or she presented his or her claim to BP (the "Responsible Party") at least 90 days prior to filing a lawsuit or joining the "B1" Complaint, as required under the OPA, when the plaintiff's case was transferred to MDL 2179 or when the plaintiff filed a SFJ?

120.  Following a show cause process, the MDL 2179 Court recognized approximately 1,000 remaining "B1" plaintiffs to be compliant with PTO 60 and subject to further proceedings in MDL 2179. The claims of any other remaining "B1" plaintiffs were dismissed.

121.  On July 14, 2016, the MDL 2179 Court issued an Order (Re: Compliance with PTO 60 Regarding All Remaining Claims in Pleading Bundle "B1") wherein the Court held "As to all Plaintiffs in the "B1" bundle, only those Plaintiffs who have not previously released their claims,

-32-

have made timely presentment as required by OPA, have previously filed an individual lawsuit, and have otherwise complied with the requirements of PTO 60 have preserved their individual claims. All other B1 bundle claims are time-barred."

122.  BP believes that a very large number of these approximately 1,000 remaining claims are subject to dismissal "based upon the MDL 2179 Court's prior orders, *lack of OPA presentment*, or release (including membership in the settlement classes and their attendant releases)." Certain of these claims may require further proceedings, including but not limited to dispositive motion practice.

123.  Interestingly, and ironically, BP states that "it also reserves all of its rights concerning its arguments that *OPA displaces all forms of maritime claims*."

124.  On February 22, 2017, the Court issued Pretrial Order No. 64/Case Management Order No. 6 ("PTO 64," Rec. Doc. 22297), one of the goals of which was to identify those "Remaining B1 Plaintiffs" who could plausibly allege a claim under general maritime law. As used in PTO 64, "Remaining B1 Plaintiffs" meant those plaintiffs who had been deemed compliant with PTO 60 and who had not voluntarily dismissed their claims.

125.  PTO 64 required that each Remaining B1 Plaintiff who wished to pursue a general maritime law claim must complete and serve upon BP's counsel and the Plaintiffs' Steering Committee ("PSC") by April 5, 2017 a "Sworn Statement Regarding General Maritime Law Claims."

126.  If a Remaining B1 Plaintiff failed to comply with PTO 64, then that plaintiff's general maritime law claim(s) would be deemed waived and "any such general maritime law claims shall be dismissed without further notice and with prejudice." (PTO 64 at 3).

-33-

**H. Step No. 8: Clawback**

127. Carefully implementing the above-described Steps No. 1 through No. 7, Defendant Herman, the members of the MDL 2179 PSC, and BP eliminated, excluded or dismissed virtually all remaining claims against BP. A relatively small percentage of claimants/plaintiffs, primarily represented by members of the PSC and other common-benefit attorneys, were partially compensated for the damages resulting from the BP oil well blowout.

128. In the status report submitted to the BP oil well blowout Court on February 14, 2017, attorneys for BP Exploration & Production Inc. and BP America Production Company state, "Following a show cause process, the MDL 2179 Court recognized approximately 1,000 remaining "B1" plaintiffs to be compliant with PTO 60 and subject to further proceedings in MDL 2179. The claims of any other remaining "B1" plaintiffs were dismissed. Certain plaintiffs who were found noncompliant with PTO 60 and had their claims dismissed by the Court's December 16, 2016 Reconciliation Order have filed motions for reconsideration and/or notices of appeal…BP believes that a very large number of these pending claims are subject to dismissal based upon the Court's prior orders, lack of OPA presentment, or release (including membership in the settlement classes and their attendant releases). Certain of these claims may require further proceedings, including but not limited to dispositive motion practice….*BP also reserves all of its rights concerning its arguments that OPA displaces all forms of maritime claims*."

129. One purpose of the "clawback" order was allegedly to refund to BP the amount paid to claimants who had submitted fraudulent claims. However, Defendant Herman's primary purpose was to burnish BP's tarnished image. Although only an infinitesimal percentage of submitted claims were found to be fraudulent, these claims were highly publicized and reported

-34-

in the media. In sum, any casual observer may conclude that BP was the only true victim of the

oil well blowout disaster. Indeed, were there ever any real victims with legitimate claims?

## II. Defendant Herman Breached His Fiduciary and Ethical Duties to Plaintiff

### A. "Come Into the Fold," Pay Us, and Keep Quiet

130.  Upon transfer to MDL 2179, the attorneys which the BP oil well blowout plaintiffs

initially retained are magically replaced by Defendant Herman and/or the cooperative attorneys

appointed to the MDL 2179 PSC.

131.  The first lawsuit Plaintiff Donovan's clients filed against Feinberg, et al. was

eventually transferred from the Florida State Court to MDL 2179 in August 2011. On August 29,

2011, Plaintiff emailed James Parkerson Roy, Plaintiffs' Co-Liaison Counsel for MDL 2179.

Plaintiff introduced himself, attached a copy of the JPML transfer order, and stated, "I would like

to commence discovery as soon as possible. Since this action does not involve common

questions of fact with actions previously transferred to MDL 2179, please advise as to how we

may most expeditiously initiate and coordinate discovery. I look forward to working with you on

this case."

132.  On September 5, 2011, Plaintiff received an emailed response from Roy and

Stephen J. Herman wherein they state, "We have received and appreciate your

correspondence of August 29, 2011….Please be advised that the Court has declined to

permit formal discovery on Feinberg or the GCCF….Should you desire to participate in the

common benefit effort, we would welcome your inclusion in the GCCF Jurisdiction Work

Group, which has, for the past year, coordinated Plaintiffs' collective efforts regarding

-35-

Feinberg and the GCCF in terms of information collection, jurisdictional issues, communications with claimants, OPA compliance, and the appropriate scope and effect of the GCCF release."

133. Defendant Herman and the MDL 2179 PSC did not coordinate Plaintiffs' collective efforts regarding Feinberg and the GCCF in terms of OPA compliance and the appropriate scope and effect of the GCCF release.

134. On November 7, 2011, Plaintiff sent a follow up letter via email to Defendant Herman wherein Plaintiff Donovan states the following.

135. "I refer to my letter, dated August 29, 2011, to Mr. James Roy and to our subsequent telephone conversation of September 8, 2011.

136. During our phone conversation you advised me that, as a result of the transfer of this case to MDL 2179, the extent of my representation of the plaintiffs in this case is now limited to three options. I may: (a) 'do nothing;' (b) 'come into the fold;' or (c) 'go off on my own and directly file pleadings with the Court.'

137. Given the ongoing economic stress being experienced by my clients resulting from the 'Delay, Deny, Defend' strategy being employed by Kenneth R. Feinberg, et al., 'do nothing' is not a viable option.

138. I believe Option (b), 'come into the fold,' refers to your invitation to join the GCCF Jurisdiction Work Group (JWG), which has, for the past year, allegedly coordinated Plaintiffs' collective efforts regarding Feinberg and the GCCF in terms of information collection, jurisdictional issues, communications with claimants, OPA compliance, and the appropriate scope and effect of the GCCF release.

-36-

139.  Unfortunately, since the Court has declined to permit formal discovery on Feinberg or the GCCF, my clients would not benefit from JWG's limited scope of discovery.

140.  As you had mentioned, Option (c), 'go off on my own and directly file pleadings with the Court,' would be ill-advised because such action would not be well-received by the Court. However, PTO No. 11 (Case Management Order No. l) requires that all motions or other pretrial proceedings with respect to plaintiffs shall be initiated by and/or coordinated through the PSC. If the PSC does not support the motion or other requested action, the moving or requesting party is permitted to file a motion or request, but must include a certificate of non-support. I believe this option is in the best interests of our clients. Rest assured, we will always confer with or act through the PSC or seek PSC consent prior to filing a motion or request and certificate of non-support."

141.  In his November 7, 2011 letter to Defendant Herman, Plaintiff Donovan also questions the decision of the Court not to permit formal discovery on Feinberg or the GCCF as follows. "When will the Court permit formal discovery on Feinberg and the GCCF?

142.  In your email, dated September 5, 2011, you state, '….the Court has declined to permit formal discovery on Feinberg or the GCCF.'

143.  The passage of time is the defendant's best friend. Memories fade, witnesses are more difficult to locate, and the plaintiffs lose the desire to continue to fight and either 'move on' or settle for less. By declining to permit formal discovery on Feinberg and the GCCF, the MDL 2l79 Court is ensuring that the defendants will not be held accountable and, more importantly, the claimants-turned-plaintiffs will not be fully compensated for damages.

144.  Discovery on Feinberg/GCCF and the associated pressure of a trial are required in

-37-

order exert pressure on the parties to negotiate a settlement which reflects the true value of the claims and not one which focuses on minimizing the liability of Feinberg Rozen, LLP, Feinberg/GCCF, and the responsible parties."

145.  On November 14, 2011, after Plaintiff had already rejected Defendant Herman's offer to "come into the fold" on November 7, 2011, Plaintiff Donovan received an unsolicited GCCF Outreach Workgroup Invitation, GCCF Jurisdiction and Court Oversight Workgroup Invitation, Invoice and Limited Joint Prosecution and Confidentiality Agreement from Defendant Herman and Roy wherein they state the following.

146.  "You have been invited by the PSC to serve as a member of the GCCF Outreach Workgroup and GCCF Jurisdiction and Court Oversight Workgroup of the PSC. As a work group member, your work will be under the supervision and direction of the work group Coordinators who are reporting directly to the PSC/EC and Liaison. Your common benefit time and expenses will be submitted with those of PSC members, workgroup coordinators, and work group members, for consideration by the Court in the event of recovery by settlement or judgment in connection with the MDL proceedings, in accordance with Pretrial Order No. 9. You will have access to the common work product that is developed, and will be invited to participate in various meetings from time to time.

147.  By acceptance of your appointment as a member of the above-named workgroup, your personal time and financial obligations will be potentially significant. Work Group Member Assessments have been set by the PSC at 10% of PSC member assessments (which currently total $330,000); a work group member firm's assessments to date total $33,000.

148.  Your appointment is at the discretion of the Executive Committee/PSC, subject to

-38-

the requirements of Pretrial Order No. 9 and other Orders of the Court, and requires your

payment of an initial assessment of at least $10,000 by December 1, 2011; staying current on

future assessments; and continued contribution of PSC authorized common benefit work in

furtherance of the workgroup for MDL 2179. Common benefit work and expenses will be done

only upon written authorization and oversight of the PSC/EC/Liaison and/or upon direction of

Workgroup Coordinators.

149.  There are no guarantees that you will receive any remuneration; such is dependent

upon success of the litigation and determination by the Court of entitlement to common benefit

cost reimbursement and/or fees.

150.  Accordingly, if you accept this appointment, please sign where indicated below and

FedEx this form and your $10,000 (to $33,000) assessment (payable to MDL 2179 PSC account)

to: Plaintiffs Steering Committee, c/o James P. Roy & Steve Herman.

151.  The Limited Joint Prosecution and Confidentiality Agreement (BP Oil Spill

Litigation), in pertinent part, states the following.

> "Any and all documents, communications, information, strategy, experts, legal theory
> and/or other work product that is shared or exchanged by and through this Agreement
> shall be kept and remain confidential….This agreement is not a co-counsel agreement nor
> an agreement, whether express or implied, to share, claim, shift, or consent to an award of
> any type of client contingency, statutory and/or common benefit attorney's fee. The
> signatories may hereafter be referred to herein as the 'BP Gulf Spill Litigation Joint
> Prosecution Group.'….Signatories shall obtain signatures of associates and clerical staff
> working on these matters to assure their compliance with this agreement. Materials
> subject to this agreement will not be shown to non-group experts or non-group members
> without compliance with procedures to be established by Group….Any party hereto can
> withdraw at any time. If a member withdraws, he is still subject to this agreement's
> confidentiality."

152.  MDL 2179 is so perverse that Defendant Herman does not want the victims of the

-39-

BP oil well blowout to even know that this confidentiality agreement exists. Paragraph 6 of the confidentiality agreement states, "This Agreement itself shall be confidential, and no counsel or party shall reference, cite or otherwise use the drafting, circulating, existence or use of this Agreement in any motion, petition or other application to be appointed, designated or otherwise recognized by any Court for any leadership position. The members agree that except as may be ordered by Court this agreement and its terms and conditions and the work product of the Group and/or its members will be kept strictly confidential and shall not be disclosed to any third party for any reason."

153.  Plaintiff Donovan finds the last paragraph of the confidentiality agreement, which appears to be an afterthought, to be humorous. Paragraph 7, titled "Ethics and Conflicts Compliance" states, "Each member firm is responsible for doing its own conflict and individual ethics checks on an ongoing basis and otherwise in complying with all applicable Rules of Professional Responsibility."

154.  Plaintiff Donovan does not understand how any attorney could find Defendant Herman and the members of the MDL 2179 PSC to be ethical and in compliance with all applicable Rules of Professional Responsibility. MDL 2179's contravention of the MDL statute, U.S. Supreme Court decisions, and the Oil Pollution Act of 1990, use of a Feinberg-administered fund and a settlement class action treats the plaintiffs as nothing more than a commodity. Moreover, completely replacing justice with judicial efficiency is not remotely ethical.

155.  Pursuant to the MDL 2179 Court's Pretrial Order No. 15, "Pending further orders of this Court, all pending and future motions, including Motions to Remand, are continued without

-40-

date unless a motion is specifically excepted from the continuance by the Court." Furthermore, pursuant to the MDL 2179 Court's Pretrial Order No. 25, "All individual petitions or complaints that fall within Pleading Bundle "B1," whether pre-existing or filed hereafter, are stayed until further order of the Court."

156.  In sum, Plaintiff, Plaintiff's clients, and all others similarly situated are being indefinitely held hostage by Defendant Herman. Escape is impossible.

### B.  Defendant Herman Refused to Answer Plaintiff's Questions

157.  On December 21, 2012, Plaintiff sent a letter via email to Defendant Herman and cc'd the letter to James Parkerson Roy, Brian H. Barr, and Scott Summy. In the letter, Plaintiff asks Defendant Herman the following questions.

158.  "I am writing this open letter on behalf of my clients and all similarly-situated BP oil spill and Gulf Coast Claims Facility (GCCF) victims.

159.  In sum, my clients were forced to be represented by the PSC. Accordingly, since you have stepped into my shoes, I, and all similarly-situated attorneys representing BP oil spill and GCCF victims, hold the PSC strictly accountable to zealously advocate on behalf of all MDL 2179 Plaintiffs.

160.  QUESTION No. 1: Why did the PSC designate the 'B1' Master Complaint as an admiralty or maritime case, and request a non-jury trial pursuant to Rule 9(h), rather than properly allege claims under the Oil Pollution Act of 1990 (OPA), a *strict liability* statute, and the Outer Continental Shelf Lands Act (OCSLA)?

161.  QUESTION No. 2: Why has the PSC failed to inform Judge Barbier that the Honorable MDL 2179 Court has overreached its authority?

-41-

162. QUESTION No. 3: Why has the PSC failed to inform Judge Barbier that the E&PD class settlement violates the Oil Pollution Act of 1990 ("OPA")?

163. QUESTION No. 4: Why has the PSC failed to inform Judge Barbier that the honorable MDL 2179 Court has illegally excluded approximately 200,000 BP oil spill victims from the E&PD class settlement thereby greatly decreasing the bargaining power of the remaining class members?

164. QUESTION No. 5: Why has the PSC failed to inform Judge Barbier that the E&PD class settlement is not 'fair, reasonable, and adequate' and has not been entered into without collusion between the parties?

165. QUESTION No. 7: Why has the PSC allowed the MDL 2179 Court to decline to permit formal discovery on Feinberg, et al?

166. QUESTION No. 8: Why does the PSC allow its BP oil spill victim clients to receive grossly inadequate compensation?

167. QUESTION No. 9: Why does the PSC allow for the E&PD class settlement to provide for a refund of approximately $6 billion to BP while granting *excessive* compensation to the PSC and other counsel allegedly performing "common benefit" work?

168. QUESTION No. 10: Given the above-referenced was not merely the result of poor legal strategy, do you believe the MDL 2179 PSC's actions constitute legal malpractice?

169. Since April 8, 2012, our firm has filed: (a) a Motion to Vacate Order and Reasons [As to Motions to Dismiss the B1 Master Complaint]; (b) three Motions to Vacate Preliminary Approval Order [As to the Proposed Economic and Property Damages Class Action Settlement]; and (c) a Motion to Nullify Each and Every Gulf Coast Claims Facility ("GCCF") "Release and

-42-

Covenant Not to Sue."

170.  In contrast, as noted *supra*, the PSC appears to be more interested in maximizing its compensation and ensuring significant economy and efficiency in the judicial administration of the MDL 2179 Court rather than in obtaining justice for the MDL 2179 plaintiffs.

171.  If you have any questions, please do not hesitate to contact me….I would be happy to provide the PSC with any and all supporting documentation."

172.  On December 21, 2012, shortly after he receives Plaintiff's open letter, Defendant Herman responds, "I respectfully decline to respond to your questions, which seem argumentative and disingenuous."

173.  On December 22, 2012, Plaintiff Donovan sends an email to Defendant Herman in which he states, "Thank you for your prompt response….Your decision not to address the issues raised in the open letter, although completely understandable, is disturbing….Last night, subsequent to your receipt of the open letter, Judge Barbier granted final approval to the E&PD class settlement agreement. Notwithstanding this fact, all victims of the BP oil spill and the 'Delay, Deny, Defend' strategy employed by Kenneth R. Feinberg, et al. have a right to clearly understand how and why they were represented by the PSC in MDL 2179. The PSC's clients are not being 'argumentative and disingenuous' when they demand to know why they have not been fully compensated for their damages."

174.  On December 25, 2012, Plaintiff receives an email from Defendant Herman wherein Defendant Herman states, "I suppose that you are free to attack the PSC and/or the Court in whatever way you deem appropriate. At the same time, I would suggest that your clients not participating in the Economic Settlement will best be served if you: (i) ensure that you and/or

-43-

they make Presentment of what you and/or they believe to be their full damages before January 18, 2013; and then, having made such presentment, (ii) file (or re-file) (and/or amend) suit on their behalf by April 20, 2013; and then (iii) with respect to any client whom you believe to have executed an invalid GCCF Release, assemble and prepare the best case you can to support the argument that such Release was procured under fraud, error, or duress."

175. On December 31, 2012, Plaintiff sent a second letter via email to Steve Herman and cc'd the letter to James Parkerson Roy, Brian H. Barr, and Scott Summy. In the letter, Plaintiff states, in pertinent part, the following and asks Defendant Herman four additional questions.

176. QUESTION No. 11: Why did the PSC wait until one month before the claim filing deadline to notify all BP oil spill and GCCF victims (its clients) of the OPA 'Presentment' requirement?

177. Defendant Herman and the members of the PSC should have notified all BP oil spill and GCCF victims (their clients) of the Presentment requirement in October 2010, not in December 2012.

178. QUESTION No. 12: Why has the PSC failed to notify all BP oil spill and GCCF victims (its clients) that a lawsuit may be filed against Kenneth R. Feinberg, et al. without having to fulfill the OPA Presentment requirement?

179. Since Feinberg, et al. is not a 'Responsible Party' and therefore may not be sued under OPA, a lawsuit against Feinberg, et al. may be filed immediately because it does not require Presentment. Defendant Herman would, however, need to advise all GCCF victims in regard to the statute of limitations and the associated tolling of the statute of limitations for class actions and fraudulent concealment or a misrepresentation by the defendant.

-44-

180.  QUESTION No. 13: Why does the PSC, which failed to adequately challenge the legality of the GCCF Release and Covenant Not to Sue for the past two years, suddenly advise non-PSC attorneys to 'assemble and prepare the best case you can to support the argument that such Release was procured under fraud, error, or duress?'

181.  Steve, if the PSC had properly filed the 'B1' Master Complaint under OPA rather than alleging claims under admiralty law, Feinberg, et al. would never have been allowed to use the Release and Covenant Not to Sue to illegally exclude approximately 200,000 BP oil spill victims from the E&PD class settlement.

182.  It has been, and remains, the responsibility of the PSC to 'assemble and prepare the best case to support the argument that such Release was procured under fraud, error or duress.' On September 25, 2012, my clients filed their Motion to Nullify Each and Every Gulf Coast Claims Facility Release and Covenant Not to Sue. Please feel free to use the legal argument in this motion to assist with the preparation of the PSC case.

183.  QUESTION No. 14: Are you declining to answer these questions because you believe that an attorney-client relationship does not exist between the PSC and all BP oil spill and GCCF victims?

184.  Steve, please understand that these fourteen questions are directed to the PSC by me on behalf of my clients (now PSC's clients) and all similarly-situated BP oil spill and GCCF victims. These questions are not directed to the MDL 2179 Court. In sum, the PSC's clients merely seek a better understanding of their representation by the PSC.

185.  Defendant Herman, the members of the MDL 2179 PSC, and other counsel allegedly performing common benefit work in MDL 2179 initiated settlement negotiations 'in

-45-

earnest' merely four (4) months after Judge Barbier appointed members to the PSC. Clearly, the

MDL 2179 settlement class action was not achieved in the full context of adversarial litigation.

186.  On December 31, 2012, Defendant Herman responded via email, "Not sure what

you are trying to accomplish, but I think we have past the point of diminishing returns. Good

luck."

187.  Apparently, "Good Luck" is the only response Defendant Herman is willing to give

to attorneys who decide not to "come into the fold," pay the PSC at least $10,000, and keep

quiet.

188.  Over the years, Plaintiff has touched base with Defendant Herman to inquire as to

when Defendant Herman and Judge Barbier will permit formal discovery on Feinberg or the

GCCF. The following exchange of emails is instructive.

189.  On December 9, 2013, Plaintiff emails Defendant Herman, "I attach a copy of your

email dated September 5, 2011. Please advise as to when the Court will permit formal discovery

on Feinberg or the GCCF....Thank you." Email response from Defendant Herman: "No idea."

190.  Plaintiff's email reply to Defendant Herman: "Would you be kind enough to

attempt to find out when the Court will permit formal discovery on Feinberg or the GCCF?"

Defendant Herman's response: "Yes. At an appropriate time."

## C.  Defendant Herman Violated the Aggregate Settlement Rule

191.  The aggregate settlement rule ("ASR") governs global MDL settlements.

192.  Defendant Herman breached his fiduciary duties to Plaintiff, Plaintiff's clients, and

all others similarly situated by violating the ASR.

-46-

193.  Courts have long recognized that lawyers may be subject to total or partial fee forfeiture as a sanction for serious violations of the ASR. Plaintiff Donovan does not have to prove either causation or injury to be entitled to fee forfeiture as a remedy for Defendant Herman's breach of fiduciary duty.

194.  The ASR is Rule 1.8(g) of the ABA *Model Rules of Professional Conduct* ("*Model Rules*"), and it states: "A lawyer who represents two or more clients shall not participate in making an aggregate settlement of the claims of or against the clients….unless each client gives informed consent, in a writing signed by the client. The lawyer's disclosure shall include the existence and nature of all the claims….involved and of the participation of each person in the settlement."

195.  All "group" settlements are now "aggregate settlements" and must comply with the disclosure requirements of Rule 1.8(g).

196.  Rule 1.8(g) requires a lawyer to disclose *at a minimum*, the following information to the clients for whom or to whom the settlement or agreement proposal is made.

(a) The total amount of the aggregate settlement;

(b) The existence and nature of all of the claims….involved in the aggregate settlement;

(c) The details of every other client's participation in the aggregate settlement…. whether it be their….settlement receipts…..or any other….receipt of something of value as a result of the aggregate resolution;

(d) The total fees and costs to be paid to the lawyer as a result of the aggregate settlement, if the lawyer's fees and/or costs will be paid, in whole or in part, from the proceeds of the settlement or by an opposing party or parties; and

(e) The method by which costs (including costs already paid by the lawyer as well as costs to be paid out of the settlement proceeds) are to be apportioned among them.

-47-

197.  Informed consent to an aggregate settlement requires that each claimant be able to review the settlements of all other persons subject to the aggregate settlement or the formula by which the settlement will be divided among all claimants. Further, *informed consent requires that the total financial interest of claimants' counsel be disclosed to each claimant.*

198.  In sum, Defendant Herman and the members of the MDL 2179 PSC owe fiduciary duties to Plaintiff, Plaintiff's clients, and each member of the settlement class. A lawsuit based on a violation of the ASR can be brought as a breach of fiduciary duty claim; the plaintiff(s) need not show any economic loss from the attorney's breach in order to prevail; full or partial forfeiture of the fees that the attorney received from the former client is the remedy.

### D.  Defendant Herman Colluded with the Members of the MDL 2179 PSC and BP

199.  The U.S. District Court for the Eastern District of Louisiana has defined "collusion" as the "lawful means for the accomplishment of an unlawful purpose" and as a "*secret understanding between two or more persons prejudicial to another, or a secret understanding to appear as adversaries, though in agreement.*" Collusion does not require fraudulent conduct.

200.  At all times material herein, Defendant Herman has fraudulently, recklessly, negligently and/or knowingly colluded with the members of the MDL 2179 PSC and BP to maximize his compensation and the compensation of the members of the MDL 2179 PSC in exchange for limiting the liability of BP.

201.  Collusion permeates MDL 2179 and any MDL which incorporates a Feinberg-administered victims' compensation "fund" and/or a settlement class action.

-48-

### E.  Defendant Herman Did Not Hold BP Accountable

202.  Defendant Herman, individually and/or in collusion with the members of the MDL 2179 PSC and BP, fraudulently, recklessly, negligently and/or knowingly breached his fiduciary and ethical duties to Plaintiff, Plaintiff's clients, and all others similarly situated by making false statements of material fact in order to induce Plaintiff, Plaintiff's clients and all others similarly situated into believing that the proposed settlement is "fair, reasonable, and adequate" for the purpose of maximizing his compensation and the compensation of the members of the MDL 2179 PSC in exchange for limiting the liability of BP.

203.  The compensation paid to BP oil well blowout victims by the Kenneth R. Feinberg-administered victims' compensation fund was $6,079,922,450.47

204. The compensation paid to BP oil well blowout victims during the transition period was approximately $405,000,000.00

205.  In sum, the total compensation paid to BP oil well blowout victims from August 23, 2010 to June 4, 2012 was $6,484,922,450.47.

206.  In mid-2010, Defendant Herman and BP made the business decision to have BP pay a total amount of $20 billion to compensate all the BP oil well blowout victims in the settlement class action.

207.  On October 25, 2016, Judge Barbier stated that he believes that a conservative estimate of the total amount that will eventually be paid by just the Deepwater Horizon Claims Center is $13 billion.

208.  The Court could not predict, on October 25, 2016, that the total amount that will eventually be paid by just the Deepwater Horizon Claims Center is $13 billion unless the Court

2/12/2019 3:31 PM Electronically Filed: Hillsborough County/13th Judicial Circuit Page 49

knew Defendant Herman and BP made the business decision to have BP pay a total amount of $20 billion to compensate all the BP oil well blowout victims in the settlement class action.

209. Defendant Herman also failed to hold BP accountable in regard to the Clean Water Act ("CWA") civil penalty as follows.

(a) The total amount of oil released from the reservoir was 5,000,000 barrels;

(b) The total amount of "collected oil" was 810,000 barrels;

(c) The net discharge of oil was 4,190,000 barrels;

(d) The CWA civil penalty due to BP's gross negligence is $4,300/barrel;

(e) The CWA penalty BP should pay is $18.02 billion; and

(f) The total CWA penalty BP actually paid is $13.72 billion.

210. Defendant Herman saved BP approximately $4.30 billion by agreeing that only 4.0 million barrels of oil, rather than 5.0 million barrels of oil, was released from the reservoir. Defendant Herman argued that for purposes of calculating the maximum possible civil penalty under the CWA that 3.19 million barrels of oil discharged into the Gulf of Mexico. In short, the maximum CWA civil penalty that could be assessed against BP is approximately $13.72 billion (3,190,000 x $4,300).

211. Defendant Herman also negotiated the following very favorable payment schedule for BP in regard to the government entity settlements. BP is required to pay,

(a) $5.5 billion to the United States as a civil penalty under the Clean Water Act, *payable over 15 years*;

(b) $7.1 billion to the United States and the five Gulf states for natural resource damages, *payable over 15 years*; and

(c) $4.9 billion to settle economic and other claims made by the five Gulf Coast states, *payable over 18 years*.

-50-

### F. Defendant Herman Refuses to Be Fully Transparent and
### Defendant Herman Refuses to Be Held Accountable

212. On November 13, 2017, Plaintiff filed a motion on behalf of his clients wherein

Plaintiff requested the MDL 2179 Court to place on the public record the total amount and

source of compensation, *from all sources*, paid to all members of the PSC and the total amount

and source of compensation paid to the legal experts, Special Masters, and Claims Administrator

Patrick Juneau. This was neither a Motion to Compel nor an Objection. This was merely a

motion by the plaintiff, on behalf of himself and his clients, to request the MDL 2179 Court to

conduct itself in a fully transparent manner.

213. In the motion, Plaintiff pointed out to the Court that the total compensation paid to

the 19 PSC attorneys and their law firms is guesstimated to be $3.035 billion. It is beyond cavil

that a reasonable, objective observer would not conclude that this amount is out of all proportion

to the value of the professional services rendered. Plaintiff Donovan further pointed out to the

Court that a narrow focus on judicial efficiency cannot allow the circumvention of the core

democratic premises of representation, transparency, and accountability.

214. On March 6, 2018, the MDL 2179 Court issued an Order wherein the Honorable

Carl J. Barbier succinctly states, "Before the Court is a 'Motion to Request this Court to Place on

the Public Record the Total Amount and Source of Compensation, From All Sources, Paid to All

Members of the PSC, et al.' IT IS ORDERED that the Motion (Rec. Doc. 23677) is DENIED.

New Orleans, Louisiana, this 6th day of March, 2018." Obviously, neither Defendant Herman

nor Judge Barbier believes that the plaintiffs in MDL 2179 have a right to know how much

compensation the attorneys allegedly representing their interests are receiving.

-51-

### G. Why It Is Difficult to Hold Defendant Herman and
### Self-Dealing PSC Attorneys Accountable

215.  Three factors inoculate the actions of Defendant Herman and the self-dealing members of the MDL 2179 PSC from thorough appellate review.

216.  First, because most multidistrict litigations result in private settlements, they are not reviewable on appeal, even when subject to public judicial commentary.

217.  Second, because most interim rulings are not dispositive orders, they are reviewable only through an extraordinary writ of mandamus or subsequent dismissal. Motions to disqualify a lead attorney, for example, are not immediately appealable as a matter of right even though an attorney could theoretically petition for mandamus.

218.  Third, even if the appellate court grants mandamus or reviews a dismissed case, it tends to do so using the highly deferential abuse-of-discretion standard.

### III.  Defendant Herman Intentionally and Systematically Misled Plaintiff,
### Plaintiff's Clients, and All Others Similarly Situated

### A.  The Agreement-in-Principle

219.  On March 9, 2012, Defendant Herman released a summary of the agreement-in-principle which was allegedly entered into between the MDL 2179 plaintiffs and BP.

220.  In this summary, Defendant Herman made the following false statements of material fact to Plaintiff, Plaintiff's clients, and all others similarly situated.

(a) This Settlement is an *enormous victory* for Gulf Coast workers, businesses and families.

(b) The Settlement *does the most good for the greatest number of people* - encompassing the wide geographic region and many types of businesses affected by the BP Gulf Oil Spill.

-52-

(c) Contrary to what some news outlets have implied, the Settlement has *no cap or limit*. The only exception is the Seafood Program for commercial fishing vessel owners, captains and deckhands. BP has agreed to fund this Seafood Program at $2.3 billion.

(d) The Settlement *holds BP accountable*.

(e) The parties *have not had any fee discussions to date* and will not have any such discussions until authorized to do so by the Court.

(f) Many qualifying claimants may receive greater benefits from the Settlement Claims Programs than from the GCCF.

(g) *Hundreds of thousands of victims of the BP Gulf Oil Spill will be made whole* as a result of this settlement - regardless of whether or not they previously joined the MDL lawsuit or filed a claim with the GCCF.

(h) Once the Settlement Claims Programs are set up, the Court will continue to supervise their operation in all respects throughout their duration to *ensure fairness, transparency, and efficiency*.

(i) A $57 million marketing fund will be established *to promote tourism and Gulf seafood*.

221.  Defendant Herman makes the following false statements of material fact to Plaintiff, Plaintiff's clients, and all others similarly situated when he further tries to explain why he believes the settlement claims program is fair.

(a) The Settlement process and formulas used to calculate compensation will be *completely transparent* and applied with consistency.

(b) The Court will supervise the Settlement Claims process from start to finish to *ensure fair, impartial, and consistent processing and payment of claims*.

(c) Claimants, their accountants, and their lawyers will know the compensation formulas and *will be able to calculate compensation for specific claims before deciding whether to opt-out* or participate in the Settlement.

(d) The compensation *calculations have been carefully determined* to account for relevant economic factors and are flexible to each claimant's specific circumstances.

(e) The Settlement Claims Program will generally apply a larger enhancement to *account for potential future losses* and other risks than did the GCCF.

-53-

(f) Offsets for amounts already received from BP or the GCCF are deducted after the enhancement for future losses is applied.

(g) A Class Member *can choose to opt-out of the Settlement and instead prosecute their case in Court*.

(h) Businesses and individuals that are not Class Members, or whose claims are not included in the Settlement, *can generally continue to prosecute their cases in Court*.

222.  On November 5, 2010, the MDL 2179 Court issued PTO No. 15 which states, "All pending and future motions, including the Motions to Remand, are continued without date unless a motion is specifically excepted from the continuance by the Court."

223.  On January 12, 2011, the MDL 2179 Court issued PTO No. 25 which states, "Any individual plaintiff who is a named plaintiff in a case that falls within Pleading Bundle B1, B3, D1, or D2, or any combination thereof, is deemed to be a plaintiff in the applicable Master Complaint(s)….All individual petitions or complaints that fall within Pleading Bundles B1, B3, D1, or D2, whether pre-existing or filed hereafter, are stayed until further order of the Court."

224.  Defendant Herman and the MDL 2179 Court make it very clear that the settlement class action is the only game in town. Take it or leave it. It has been approximately nine years since the BP oil well blowout. PTO No. 15 and PTO No. 25 are still in force. Class Members who opted-out, including Plaintiff's clients, are still not able to pursue their claims.

225.  It is important to understand that *the MDL 2179 plaintiffs* did not reach an Agreement-in-Principle on the proposed settlements. Defendant Herman and BP entered into a mutually beneficial settlement. The plaintiffs in MDL 2179 were merely a commodity bargained for and sold by Defendant Herman to BP.

226.  Defendant Herman's negotiated settlement class action is not superior to the OPA (a strict liability statute). The only reason this settlement class action exists is because Defendant

-54-

Herman designated the "B1" Master Complaint as an admiralty or maritime case in order to limit BP's liability.

227. The Defendant Herman/BP settlement is not "an enormous victory for Gulf Coast workers, businesses and families."

228. Defendant Herman's negotiated settlement class action which illegally excludes approximately 220,000 claimants, requires that a claimant's recovery of damages under the OPA be limited by geographic bounds, pertain solely to certain business activities, and demands a heightened and vague proof of causation between his or her damages and the oil well blowout incident is not "fair, reasonable, adequate, and consistent with governing law."

229. Defendant Herman, individually and/or in collusion with the members of the MDL 2179 PSC and BP, fraudulently, recklessly, negligently and/or knowingly breached his fiduciary and ethical duties to Plaintiff, Plaintiff's clients, and all others similarly situated by making false statements of material fact in order to induce Plaintiff, Plaintiff's clients and all others similarly situated into believing that the proposed settlement is "fair, reasonable, and adequate."

## B. The Highly Compensated "Thought Leaders"

230. Theoretically, a "Thought Leader" means one whose views on a subject are taken to be authoritative and influential. Thought leaders are the informed opinion leaders and the go-to people in their field of expertise. In reality, thought leaders are primarily academics who are highly compensated by an industry to either maintain the status quo of the industry or increase market share for their benefactors. It is important to remember that this requires more greed than thought on the part of these leaders.

-55-

231.  The financial services industry, pharmaceutical companies, and, most recently, Defendant Herman in MDL 2179 retain highly compensated thought leaders.

232.  In the BP oil well blowout MDL, Defendant Herman retained four "experts" in the law of class actions: Professors Coffee, Issacharoff, Klonoff, and Miller.

233.  The "unbiased" opinions of these four individuals are included to deceive the class members. If the MDL 2179 economic and property damages settlement agreement is fair, reasonable, adequate, and free of collusion, it would be clearly obvious to anyone who reads the agreement. There would be no need to retain "four experts in the law of class actions" to try to lend a thin veneer of respectability to an otherwise abhorrent, one-sided, collusive agreement.

234.  Defendant Herman, individually and/or in collusion with the members of the MDL 2179 PSC and BP, fraudulently, recklessly, negligently and/or knowingly breached his fiduciary and ethical duties to Plaintiff, Plaintiff's clients, and all others similarly situated by retaining these four legal thought leaders to make false statements of material fact in order to induce Plaintiff, Plaintiff's clients, and all others similarly situated into believing that the proposed settlement is "fair, reasonable, and adequate."

235.  The following are examples of the "unbiased" opinions of Defendant Herman's highly-compensated expert legal "Thought Leaders" in MDL 2179.

236.  Judge Barbier included each of these false statements of material fact in his Order granting final approval of the economic and property damages settlement agreement.

> Opinion No. 1: "This Settlement is nearly the epitome of how a class in a mass tort action ought to be defined, as it is objective, precise, and detailed, and does not turn on the merits."

-56-

Opinion No. 2: "Since their appointment, members of the PSC have diligently prosecuted this litigation, consulted widely among class members in negotiating the Settlement, and aggressively represented the interests of their clients."

Opinion No. 3: "The proposed class in this case consists exclusively of individuals and businesses that have already suffered economic loss and property damage, and the Settlement compensates class members for their past losses through detailed, objective compensation criteria and for their anticipated potential future damages through RTP payments or through other methods that take into account risk of future loss."

Opinion No. 4: According to Professor Miller, this case is "perhaps the single most impressive class action settlement I have observed in nearly thirty years as a scholar, practitioner, and teacher in the field" in its structural features designed to avoid intraclass conflicts."

Opinion No. 5: "….the settlement terms for each identifiable subgroup were subjected to the approval of a seventeen-member Plaintiffs' Steering Committee. The PSC was consulted and participated throughout the settlement process. Whenever a particular category of claims was discussed during negotiations, lawyers who had clients with such claims took an active role in advising the negotiators."

Opinion No. 6: "….there was no discussion of attorneys' fees until all other terms of the agreement were negotiated, agreed upon, reduced to writing, and submitted to the Court, so Class Counsel could not have engaged in trading off the interests of class representatives or absent class members so as to maximize their fee recovery."

Opinion No. 7: "Because a class action is the vastly superior method by which to resolve the impact of this mass disaster on the Gulf Coast Region, it would be a social tragedy if class certification were denied." "Individual lawsuits are neither a feasible nor a sensible alternative to a class action in this case."

Opinion No. 8: "….the Settlement preserved the Rule 23(b)(3) opt-out opportunity, and provided a generous opt-out period that the Court later extended to November 1, 2012. Any plaintiff who does not wish to take part in the Settlement remained free to opt-out of the settlement class and pursue his own action."

Opinion No. 9: "The uncontroverted evidence establishes that the Settlement was reached only after many months of hard-fought negotiations that were conducted simultaneously with adversarial trial preparations."

Opinion No. 10: "Certain objectors complain that the Economic Damage Claim Frameworks are unfair because they do not compensate persons who did not begin suffering losses until 2011. Yet this provision is reasonable for three reasons: (i) the

-57-

Macondo well ceased flowing in July 2010; (ii) there is evidence that by late 2010, Gulf Coast tourism had returned to or surpassed 2009 levels; and (iii) as to claims by individuals and businesses in charter fishing, seafood processing, or other businesses relying on access to Gulf waters, nearly all federal and state waters were reopened for commercial fishing by November 2010. *Thus, extending compensation to 2011 would cover losses not likely caused by the spill*." (Emphasis added)

Opinion No. 11: "Other objectors complain that before they can invoke the V-Shaped Revenue Pattern test, they must demonstrate a 5% revenue recovery during the correlating months of 2011 as compared to the 2010 baseline period. *This provision is reasonable, as losses that continued after the spill are likely to be due to factors other than the spill*." (Emphasis added)

237.  The Aggregate Fee Petition includes a declaration by Brian T. Fitzpatrick, a law professor at Vanderbilt University and an MDL 2179 "Thought Leader." Professor Fitzpatrick states, "I have never seen a case this complex nor one that required more of class counsel. The number of moving parts here was - and this is an understatement - dizzying. The law, the facts, the science - all of it was far more challenging than perhaps any class action case I have ever seen."

238.  Given the opinions of Judge Barbier and Professor Fitzpatrick, the victims of the BP oil well blowout are led to believe that Defendant Herman and the members of the MDL 2179 PSC are zealously advocating on their behalf. Justice is most assuredly just around the corner.

### IV.  Defendant Herman Oversees and Steers a Multidistrict Litigation Which is Unconstitutional

239.  In a settlement class action, an agreement to resolve the dispute is reached by the parties involved prior to the district court's ruling on a motion to certify the class.

240.  In MDL 2179, Defendant Herman and BP are not adversaries. They are cohorts

-58-

expeditiously seeking the common objectives of closure, limited liability, and profit. Justice for the plaintiffs is optional.

241.  Defendant Herman and the MDL 2179 PSC attorneys/dealmakers are privy to the settlement matrix and the confidential guidance document given to the claims administrator, which explains qualifying criteria for recovery. This knowledge allows Defendant Herman and the PSC attorneys to tailor their own clients' claim submissions to maximize their payout (and the PSC attorneys' contingent fees). This insider information also prompts Defendant Herman and some PSC attorneys to seek and collect co-counsel fees for serving as co-counsel to non-PSC attorneys.

242.  The settlement class action is always unconstitutional because it involves no litigation. A typical class action is legitimate because the interests of the plaintiffs and defendant are adverse. In that scenario, the monetary interests of class counsel, which are contingent on class recovery, are aligned with the absent class members' interest in maximum redress, incentivizing a presentation of the issues that benefits both equally. These incentives break down in the context of the non-adversarial settlement class action. Because class counsel seeks the same outcome as the defendant, she has no reason to formulate her clients' arguments or destroy her opponent's case. Particularly, she lacks incentive to present to the Court evidence that may shed unfavorable light upon the non-adversarial agreement, even though that evidence may reveal critical details about the effect of the settlement on absent class members.

243.  The Court needs to consider class settlements in terms of separation of powers because maintaining the limits of Article III's "case or controversy" requirements is fundamental for protecting the individual liberties of all. By authorizing a federal court to redistribute

-59-

resources as a means of enforcing legislative directives absent an adversary adjudication, the

settlement class action effectively transforms the Court into an administrative body, which is

more appropriately located in the executive branch….and improperly transfers powers reserved

to the executive branch to the federal judiciary, in clear contravention of separation-of-powers

dictates.

## A. Where's the Case or Controversy in MDL 2179?

244.  "Centralization may also facilitate closer coordination with Kenneth Feinberg's

administration of the BP compensation fund." The Honorable John G. Heyburn II, Chairman,

Panel on Multidistrict Litigation, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf

of Mexico*, on April 20, 2010 (Transfer Order, August 10, 2010).

245.  "In February 2011, [only 4 months after I appointed my pre-selected cooperative

attorneys to the PSC] negotiations began in earnest for the proposed Economic and

Property Damages Settlement. Talks intensified in July 2011, occurring on an almost-daily

basis." The Honorable Carl J. Barbier, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in

the Gulf of Mexico*, on April 20, 2010 (Rec. Doc. 7138 at 3, December 21, 2012).

246.  Article III extends federal judicial power solely to the adjudication of a "case" or a

"controversy." "Case," in Article III, means a justiciable "action or suit," or an "argument."

"Controversy" means a disagreement or a dispute between parties as to the suit's preferred

outcome. Both a "case" and a "controversy" require an adversarial suit. For a suit to be

justiciable, according to the U.S. Supreme Court, the parties must maintain "adverse legal

interests" throughout, and their dispute must be "definite and concrete." The Fifth Circuit has

held that Article III plainly "requires that the parties be truly adverse."

-60-

247.  On the most basic analytical level, the unconstitutionality of the settlement class action should be obvious, purely as a matter of textual construction. There is simply no rational means of defining the terms "case" or "controversy" to include a proceeding in which, from the outset, nothing is disputed and the parties are in complete agreement. Moreover, from both historical and doctrinal perspectives, U.S. Supreme Court decisions could not be more certain that Article III is satisfied only when the parties are truly "adverse" to one another, which, at the time the relevant proceeding is undertaken, they are not in the case of the settlement class action."

248.  The most serious problem with the settlement class action is that by its nature it does not involve any live dispute between the parties that a federal court is being asked to resolve through litigation, and because from the outset of the proceeding the parties are in full accord as to how the claims should be disposed of, there is missing the adverseness between the parties that is a central element of Article III case-or-controversy requirement. The settlement class action, in short, is inherently unconstitutional.

249.  The term "collusion," in the class action context, is used to refer to a secret, unethical agreement between the named plaintiffs and defendant. For purposes of Article III's adverseness requirement, however, the term has a far broader meaning. It includes any suit in which, from the outset, the parties are in agreement as to the outcome.

250.  Article III proceeds on the assumption that a showing of a lack of adverseness at the outset of a suit automatically establishes the improperly collusive nature of the suit. Article III adopts lack of adverseness as an ex ante, categorical basis on which to find inadequate representation of the interests of future litigants who are similarly situated.

-61-

251. When the plaintiffs and defendant agree on settlement terms and the desirability of certification prior to coming to Court, neither party has the incentive to challenge such important questions as whether class representation is "adequate" or the claims are "typical" of the class as a whole. This inherently deprives the Court of the benefit of adversarial litigation concerning the satisfaction of Rule 23's requirements, thereby seriously limiting its ability to protect absent class members.

252. In contrast to the case-by-case focus employed by class action scholars, Article III employs a far more categorical and prophylactic conception of "collusion." Article III makes an ex ante categorical judgment that a non-adversarial suit is inherently collusive and therefore in violation of constitutional norms. As the U.S. Supreme Court in *Poe v. Ullman*, construing Article III, explained: "The case may not be 'collusive'….in the sense of merely colorable disputes got up to secure an advantageous ruling from the Court. But the Court has found unfit for adjudication any cause that 'is not in any real sense adversary,' that 'does not assume the honest and actual antagonistic assertion of rights' to be adjudicated - a safeguard essential to the integrity of the judicial process, and one which we have held to be indispensable to adjudication of constitutional questions by this Court."

253. The settlement class's fundamental constitutional defect is that *all* settlement classes - not merely those involving unethical attorney behavior - are, by definition, non-adversarial. An adversarial dispute cannot be said to exist at the time the class action proceeding begins. At that point, the litigants differ over absolutely nothing. They have agreed on the terms of both certification and settlement prior to the filing of the class proceeding. In fact, the only conceivable reason that class counsel in this position files a complaint and request for

-62-

certification with the Court, rather than simply embodying the terms of their private agreement in an enforceable contract, is to bind absent class members to a settlement negotiated in their absence."

## B. Where's the Due Process in MDL 2179?

254. "All motions, requests for discovery or other pre-trial proceedings with respect to plaintiffs shall be initiated by and/or coordinated through the Plaintiff Steering Committee ("PSC"), *to be filed by and through Plaintiffs' Liaison Counsel*. If the PSC does not support the motion, discovery or other requested proceeding, then the moving or requesting plaintiff shall be permitted to file such motion or request, but shall include a certificate of non-support." The Honorable Carl J. Barbier, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Rec. Doc. 569 at 13, October 19, 2010).

255. "….all pending and future motions, including the Motions to Remand, are continued without date unless a motion is specifically excepted from the continuance by the Court." The Honorable Carl J. Barbier, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Rec. Doc. 676 at 1, November 5, 2010).

256. "Any individual plaintiff who is a named plaintiff in a case that falls within Pleading Bundle B1, B3, D1, or D2, or any combination thereof, is deemed to be a plaintiff in the applicable Master Complaint(s)….All individual petitions or complaints that fall within Pleading Bundles B1, B3, D1, or D2, whether pre-existing or filed hereafter, are stayed until further order of the Court." The Honorable Carl J. Barbier, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Rec. Doc. 983 at 2, 4, January 12, 2011).

-63-

257.  Each claimant in an MDL has an individually held, constitutionally protected property right at stake. Those rights are guaranteed by the Fifth Amendment, which protects life, liberty, and property against deprivation absent due process of law. The "property" at stake in an MDL is the "chose in action." This historically established concept refers to the right to sue to enforce a legally protected claim, even the unlitigated right to sue. Under the Fifth Amendment, then, MDL claimants cannot be deprived of their rights to a chose in action without due process of law.

258.  In MDL 2179, individual litigants, for all practical purposes, lose a substantial degree of control over the procedural fate of their claims. In sum, MDL 2179 fails to provide a constitutionally adequate opportunity to litigate.

259.  The so-called "day-in-court ideal" is at the heart of constitutionally guaranteed procedural due process, according to the U.S. Supreme Court, and is central to the American conception of the adversarial model of litigation.

260.  MDL 2179 severely undermines the day-in-court ideal by depriving individual litigants of their opportunity to protect their interests through the litigation process.

261.  The right to one's own day-in-court means a right to meaningful control over litigation strategy and goals, including choice of legal representative. It requires a full and fair opportunity to litigate, which means a full opportunity to prepare one's own arguments and evidence. At base, meaningful participation in the adjudicatory process - the day-in-court ideal – includes, in the words of a respected scholar, "the right to observe, to make arguments, to present evidence, and to be informed of the reasons for a decision."

262.  The U.S. Supreme Court has identified the "two central concerns of procedural due

-64-

process" to be "the prevention of unjustified or mistaken deprivations and the promotion of participation and dialogue by affected individuals in the decision making process." The day-in-court ideal takes account of both of these concerns. First, an individual day-in-court helps achieve accurate outcomes (thus avoiding "unjustified or mistaken deprivations") because the stakeholders, those who will be most affected by the outcome and are the most motivated to protect their own rights, participate in the decision-making process. In addition, individual participation is inherently valuable in a democratic system because it legitimizes the adjudicating entities in the minds of the litigants.

263.  On the surface, MDL practice seems largely innocuous; the JPML merely temporarily transfers cases to a different district court for pretrial matters. But for a variety of reasons transfer effectively amounts to the end of the road for the overwhelming majority of cases. This is troublesome from a constitutional perspective, because not even the most minimal protection of the day-in-court ideal from the perspective of either the paternalism or autonomy models is satisfied.

264.  MDL 2179 plaintiffs in no sense meaningfully participate in, much less control, their day-in-court. Nor are there any assurances that those in charge of the litigation are adequately representing the interest of the individual claimants.

265.  One key way that litigants control their day-in-court is by selecting their attorneys. This is often the first expression of their autonomy: they seek the advice of counsel when they consider whether to even file a claim.

266.  Permitting litigants to choose their representatives is central to providing a full and fair opportunity to litigate. The foundations of due process dictate that that choice belongs to the

-65-

parties alone. But claimants forced into an MDL are deprived of that essential choice. By virtue

of his case's transfer into the MDL - a move that the plaintiff cannot prevent - his chosen lawyer

will invariably not be the one actually representing his interests in the course of all the important

MDL. Rather, the lawyers on the court-appointed steering committee will take over, and they

will do so without the protective assurances of either there adequacy, their good faith, or the

extent to which the interests of the absent litigants truly overlap or any other controls.

267.  When a transferee judge appoints a steering committee, he does so at his discretion,

outside the strictures of any Federal Rule, or statute, or adversary proceeding. Appointment to

the steering comes after nothing more than a judge-designated period of nominations and written

objections. The process fails to guarantee that the appointed representatives will zealously

advocate on behalf of absent litigants in the same way that their hired representative presumably

would have. This is certainly the case in MDL 2179.

268.  In addition to the fact that appointed counsel are selected by the Court, rather than

by the individuals they represent, MDL claimants do not enjoy a traditional attorney-client

relationship with the members of the court-appointed steering committee. The small group of

attorneys chosen for leadership roles is charged with representing all of the possibly thousands of

plaintiffs, whose cases have facts that are often only loosely linked.

269.  MDL 2179 falls far short of providing the "deep-rooted historic tradition" of an

individual's day-in-court.

270.  In consolidated proceedings, the attorney's loyalty divides not only between clients,

but also between clients and self-interest. Compensation for attorneys who work on behalf of

the group depends upon the value of every plaintiff's settlement or judgment. As a result, PSC

-66-

attorneys may push hard for settlement as opposed to remand, prefer a quick settlement in favor of a protracted discovery period, or advocate for settlement terms that may not be particularly favorable to some or many plaintiffs. The First Circuit has acknowledged existence of this "inherent conflict of interest" "between the PSC and individual plaintiffs in mass-tort MDLs.

271.  At the most basic level, MDL 2179 Plaintiffs are not given a meaningful opportunity to present their case(s), as demanded by the Due Process Clause.

### C.  Opt-Out vs. Opt-In

272.  Generally a waiver of constitutional rights requires some affirmative action on the part of an individual holding such rights.

273.  The opt-out mechanism under Rule 23(b)(3) should be abandoned in favor of an opt-in mechanism that requires absent class members to take some affirmative action before being swept into a class action. Allowing fundamental due process rights to be waived simply by inaction, as under the current version of the rule, does not sufficiently protect such constitutional rights.

274.  The existing Rule 23(b)(3) opt-out procedure also violates the Due Process Clause by departing from key notions of democratic theory.

275.  As a due process matter, rights belong to individuals and cannot be taken away by operation of a procedural rule unless individuals willingly choose to participate in that process. Another way of thinking about this is that litigants have a right to freedom of association or, rather, freedom to be free from association with a class.

276.  It might be argued that the individual litigants do have the right to opt-out of any settlement reached in the course of the MDL, and therefore their due process rights have not

-67-

been compromised. But it should be recalled that even if a litigant does withdraw from the collective settlement, his right to control adjudication of his own claim will have been substantially compromised by the collective, lowest-common-denominator control of the pre-trial process, including all important discovery and pre-trial motions.

277. A narrow focus on result orientation cannot allow the circumvention of the Rules Enabling Act, basic separation-of-powers principles, the case-or-controversy requirement of Article III, or the core democratic premises of transparency, representation and accountability.

278. In sum, Defendant Herman cannot be allowed to sacrifice constitutional rights for mere judicial efficiency or convenience.

### V.  Defendant Herman Excessively Compensated Himself and Members of the MDL 2179 PSC by "Quadruple Dipping"

279. Defendant Herman and the members of the MDL 2179 PSC "quadruple dip."

280. Defendant Herman and the MDL 2179 members are compensated from at least the following four sources of revenue.

(a) Six percent (6%) of the gross monetary settlements, judgments or other payments made on or after December 30, 2011 through June 3, 2012 to any other plaintiff or claimant-in-limitation;

(b) BP has agreed to pay any award for common benefit and/or Rule 23(h) attorneys' fees, as determined by the Court, up to $600 million;

(c) Contingent fees from clients directly "represented" by the PSC members; and

(d) Co-counsel fees received by members of the PSC for serving as co-counsel to non-member firms of the PSC.

281. Mikal C. Watts of Watts Guerra could easily be the posterchild for how attorneys applying for a lucrative position on the MDL 2179 PSC should not try to capture market share

-68-

via signing up a large stable of "clients."

282.  Watts and six codefendants were accused in a federal fraud and identity theft

indictment of orchestrating a scheme to defraud BP and the Courts by asserting claims on behalf

of more than 40,000 phantom plaintiffs who purported suffered damages in the 2010 BP

oil well blowout. The indictment against Watts was brought on behalf of the United States

because this PSC attorney stands accused of corrupting the federal justice system to make money

for himself and his investors.

283.  Though the Watts firm initially presented more than 44,000 claim forms to BP,

including a nearly $46,000 claim by the dog Lucy Lu, it ended up asserting claims for just 786

clients. According to the indictment, only 4 were deemed eligible for payments.

### A.  Compensation Paid to Kenneth R. Feinberg by BP

284.  The following is an overview of the compensation which BP paid to Kenneth R.

Feinberg.

| | |
|---|---|
| June 15, 2010 to January 15, 2011 | $  5,950,000 |
| January 16, 2011 to April 15, 2012 | $18,750,000 |
| **Total Compensation Paid to Feinberg by BP** | **$24,700,000** |

### B.  Compensation Paid to BP Oil Well Blowout Victims by Kenneth R. Feinberg (GCCF Program Statistics)

285.  The GCCF status report of March 7, 2012 indicates that a total of 574,379 unique

claimants filed claims with the GCCF during the period from approximately August 23, 2010 to

March 7, 2012. The GCCF paid only 221,358 of these claimants. The total amount paid was

$6,079,922,450.47. In sum, Kenneth R. Feinberg denied payment to approximately 61.46% of

-69-

the claimants who filed claims.

286.  The status report further indicates that the GCCF paid a total of 230,370 claimants who filed claims with the GCCF during the "Phase II" period. Of these, 195,109 were either Quick Pay or Full Review Final payments; only 35,261 were Interim payments. In sum, Kenneth R. Feinberg forced 84.68% of the claimants to sign a "Release and Covenant Not to Sue" in which the claimant agreed not to sue BP and all other potentially liable parties.

### C.  The Deepwater Horizon Claims Center
### (DHCC Program Statistics)

287.  The DHCC status report of March 29, 2017 indicates that a total of 389,457 claims were submitted to the DHCC during the period from approximately June 4, 2012 to March 29, 2017. The DHCC paid only 155,652 of these claims. The total amount paid was $10,070,688,009.00. In sum, the DHCC denied payment to approximately 60.03% of the submitted claims.

288.  On October 25, 2016, Judge Barbier stated that he believes that a conservative estimate of the total amount that will eventually be paid by just the Deepwater Horizon Claims Center is $13 billion.

### D.  Compensation Paid to Defendant Herman and MDL 2179 PSC Attorneys

289.  Defendant Herman and Members of the PSC and their law firms in the BP oil well blowout MDL ("MDL 2179") are not double-dipping. They are quadruple-dipping.

290.  The known sources of compensation received by Defendant Herman and the members of the PSC and their law firms in MDL 2179 are: common benefit fees, contingent fees, co-counsel fees, and "Hold-Backs."

-70-

**(1) Common Benefit Fees**

291. BP has agreed to pay any award for common benefit and/or Rule 23(h) attorneys' fees, as determined by the MDL 2179 Court, up to $600 million.

292. On October 25, 2016, Judge Barbier approved and awarded a common benefit fee and cost award of $600 million consisting of:

> "$37,597,151.98 in Shared Expenses, which have already been paid to third-party service providers and/or reimbursed to Common Benefit Attorneys, pursuant to previous Court orders;
>
> Up to $7,187,698.30 in claimed Held Expenses, which have been submitted to Court-appointed CPA Phil Garrett and the Fee Committee pursuant to PTO 9, (as amended), and PTO 59; and
>
> The remainder of the Settlements' Common Benefit Cost and Fee Award amount, of approximately $555.2 million, to Class Counsel and other common benefit attorneys collectively, for work performed to advance the common and collective interests of the Economic Class and the Medical Class."

293. During the summer of 2015, BP announced a global settlement with the United States, the five Gulf Coast States, and local governments, to resolve Clean Water Act, natural resource damage, and economic loss claims, damages, and penalties. In order to help facilitate that settlement, the existing hold-back on all state and local government recoveries was lifted, and a payment by BP of $40 million to common benefit attorneys collectively was approved.

294. Halliburton and Transocean have agreed to pay up to $124,950,000 in common benefit attorneys' fees and expenses in connection with the Halliburton and Transocean class settlements.

**(2) Contingent Fees**

295. Defendant Herman and the members of the PSC and their law firms have their own clients and have also received or will also receive a fee directly from them. (N.B. - On June 15, 2012, the MDL 2179 Court ordered that "contingent fee arrangements for all attorneys

-71-

representing claimants/plaintiffs that settle claims through either or both of the Settlements will be capped at 25% plus reasonable costs.").

**(3) Co-counsel Fees**

296.  Co-counsel fees are received by Defendant Herman and the members of the MDL 2179 PSC and their law firms for serving as co-counsel to non-member firms of the PSC. For example, on March 13, 2012, Plaintiff Donovan received an unsolicited mass email from a member of the PSC. The email stated, in pertinent part, "Co-Counsel Opportunity for BP Oil Spill Cases: News of the recent BP Settlement has caused many individuals and businesses along the Gulf Coast to contemplate either filing a new claim or amending a claim that has already been submitted. *If you receive inquiries of this nature we would like you to consider a co-counsel relationship with our firm.* Even if someone has already filed a claim it is advisable to retain legal counsel to analyze the impact of this settlement on claimants and maximize recovery. If you receive inquiries and are interested in co-counseling with us on the BP claims, please email…."

**(4) Hold-Backs**

297.  The MDL 2179 Court issued a hold-back order which ultimately directed the defendants to hold back and place into escrow, from any judgment or settlement after December 30, 2011:

> (a) Six Percent (6%) of the recoveries of any private claimants or plaintiffs who, at any time, had an action that was filed in, removed to, or transferred to, the MDL;
>
> (b) Four Percent (4%) of the economic loss damages payable to the States of Alabama and/or  Louisiana;
>
> (c) Four Percent (4%) of the recoveries of any local government entities located within the State of Alabama and/or the State of Louisiana, that, at any time, had an action that was filed in, removed to, or transferred to the MDL;

-72-

(d) Six Percent (6%) of the recoveries of any local government entities in the States of Mississippi, Florida, and/or Texas, that, at any time, had an action that was filed in, removed to, or transferred to the MDL; and,

(e) Six Percent (6%) of the economic loss damages payable to the States of Florida, Mississippi, and/or Texas, should they ever file actions in, be removed to, or be transferred to, the MDL.

## E. Calculation of Compensation Paid to Defendant Herman and MDL 2179 PSC Attorneys

298. The following is an overview of the compensation paid to Defendant Herman and the MDL 2179 PSC attorneys.

| | |
|---|---|
| Common Benefit Fees | $597.354 million |
| Contingent Fee (25%) | $ 2.438 billion |
| Co-counsel Fee | Unknown |
| Hold-Backs | Unknown |
| Total Compensation Paid to Defendant Herman and PSC | $ 3.035 billion |

## F. Calculation of Compensation Paid to 103 Non-PSC Attorneys

299. The following is an overview of the compensation paid to 103 Non-PSC attorneys.

| | |
|---|---|
| Total Recommended Fee Allocations | $704.500 million |
| Total Compensation Paid to 19 PSC Attorneys | $597.354 million |
| Total Compensation Paid to 103 Non-PSC Attorneys | $107.146 million |

300. Common benefit attorneys' fees are generated from the following three sources.

| | |
|---|---|
| BP Class Settlements | $555.20 million |
| Louisiana & Alabama Settlements | $ 40.00 million |
| Transocean/Haliburton Settlements | $124.95 million |
| Total | $720.15 million |

301. Contingent Fee (25%) is calculated from the following total amounts paid for submitted claims.

| | |
|---|---|
| Gulf Coast Claims Facility (GCCF) | $ 6.1 billion |
| Transition Period | $ 405 million |
| Deepwater Horizon Claims Facility (DHCC) | $ 13 billion |
| Total Amount Paid | $19.505 billion |

-73-

302.  According to the FCC, the proposed recommended fee allocations total approximately $704.5 million. This leaves a proposed reserve of approximately $15.65 million.

### G.  How the Court Allocated the $720.15 million to Common Benefit Attorneys

303.  The manner in which the MDL 2179 Court allocated the $720.15 million to the PSC and other Common Benefit Attorneys is humorously instructive.

304.  On July 15, 2015, Judge Barbier issued Pretrial Order No. 59 which, in pertinent part, states, "Pursuant to the Court's inherent authority over this multidistrict litigation, the Court hereby appoints a fee committee and sets forth guidelines for common benefit fee and cost reimbursements….The Court appoints a Common Benefit Fee and Cost Committee ("FCC") to be responsible for submitting to the Court, at an appropriate time, an Aggregate Fee and Cost Petition and an Allocation Recommendation."

305.  The FCC shall be comprised of: (a) Stephen J. Herman of Herman, Herman & Katz, LLC, Co-Liaison Counsel in MDL 2179, who shall serve as Co-Chair and Secretary of the FCC….

306.  The FCC shall recommend an allocation of the amounts awarded by the Court to compensate counsel for common benefit fees and reimbursement of reasonable expenses….The FCC shall evaluate the Fee Applicants' common benefit contributions, using objective measures and the FCC's subjective understanding of the relevant contributions of each Fee Applicant toward generating the benefits provided pursuant to…. the Economic Settlement, and/or otherwise substantially advancing the litigation on behalf of all claimants in MDL 2179, in accordance with established protocols, and make a recommendation to the Court for consideration as to each Fee Applicant.

-74-

307. On April 11, 2017, the FCC filed its proposed fee allocation with the MDL 2179 Court.

308. Defendant Herman and the FCC explains that it "did not employ a 'lodestar' or 'hourly rate' approach….the Fee Committee did not solicit from Common Benefit Attorneys what they might claim to be their own individual or average blended hourly 'rates'….Nor did the FCC interpret its task to simply apply a single blended hourly rate to all hours that had been submitted in the case….Rather, the Court asked the Fee Committee to rely, in part, upon '*the FCC's subjective understanding of the relevant contributions of each Fee Applicant*.'

309. Defendant Herman and the FCC made the following final recommended allocation to each potential FCC and PSC Common Benefit Fee Applicant Firm.

Total Amount the FCC Members Paid to Themselves             $321,602,542.45
Total Amount Paid to Other PSC Members                      $277,043,154.06
Total Amount Paid a Non-PSC Member (Barrios, Kingsdorf & Casteix)   $   1,291,576.47

310. Defendant Herman paid himself $87,827,200.35.

311. On October 8, 2010, Judge Barbier appointed Mikal C. Watts as one of the initial fifteen members to the MDL 2179 PSC. Watts was appointed based largely on the fact that he allegedly had more than 40,000 clients. On March 13, 2013, Watts resigned from the MDL 2179 PSC. On September 15, 2015, Watts and six codefendants were indicted by a federal grand jury on 95 counts of conspiracy, mail and wire fraud, identity theft, and aggravated identity theft. As set forth in the indictment, the defendants, without contacting the individuals, would obtain names, addresses, dates of birth, and social security numbers from any source available to create "clients" for anticipated litigation as a result of the *Deepwater Horizon* Oil Spill. The indictment further alleges that the defendants fraudulently submitted names of over 40,000 individuals as

-75-

plaintiffs represented by Mikal C. Watts in litigation related to the *Deepwater Horizon*/BP oil spill, knowing that the individuals had not consented to be represented by the firm, and/or that stolen and false social security numbers, dates of birth, addresses, and occupations were claimed. According to the indictment, the defendants attempted to obtain payments from the Gulf Coast Claims Facility for persons Mikal C. Watts claimed to represent and ultimately submitted 'Presentment Forms' to BP for each of the 40,000 plus individuals Mikal C. Watts claimed to represent. The indictment alleges that the total amount of claims submitted by the defendants to BP was in excess of $2 billion.

312.  On April 11, 2017, the FCC filed its proposed fee allocation with the MDL 2179 Court. (Rec. Doc. 22628).

313.  The FCC recommended Watts Guerra Craft, LLP be allocated $16,790,494.18 in common benefit fees.

314.  The FCC explains, "The Fee Committee has not taken into consideration any of the issues raised in BP's Complaint and Motion to Enjoin the Seafood Program [Civil Action No. 2:13-cv-6674]. Whether and/or how such allegations might or might not affect the allocation or award of common benefit fees to Watts Guerra is left to the sound judgment and discretion of the Court. The Fee Committee does note that Mr. Watts was acquitted by the jury in the criminal trial that was held in the Southern District of Mississippi."

315.  On October 12, 2017, Special Master John W. Perry, Jr. filed "Special Master's Recommendations Concerning the Allocation of Common Benefit Fees and the Reimbursement of Shared Expenses and Held Costs" with the MDL 2179 Court. (Rec. Doc. 23491)

-76-

316.  Special Master Perry recommended Watts Guerra Craft, LLP be allocated

*$18,290,494.18* in common benefit fees.

317.  How much would Watts Guerra Craft, LLP have been allocated if its more than

40,000 "clients" were not phantoms? The MDL 2179 plaintiffs may never know.

318.  Defendant Herman was able to grossly overcompensated himself and the members

of the MDL 2179 PSC in exchange for limiting the liability of BP.

319.  MDL 2179 is an example of Louisiana judicial homecookin' at its very worst.

<u>**COUNT I**</u>
<u>**GROSS NEGLIGENCE**</u>

320.  Plaintiff Donovan refers to and incorporates by reference as though fully set forth

herein each and every foregoing paragraph of this Complaint.

321.  "OPA applies of its own force, because that act governs, *inter alia*, private claims

for property damage and economic loss resulting from a discharge of oil in navigable waters."

33 U.S.C. § 2702(a), (b)(2)(B), (b)(2)(C), (b)(2)(E)." The Honorable Carl J. Barbier, *In re: Oil*

*Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Rec. *See*

Doc. 3830 at 11, August 26, 2011).

322.  Defendant Herman owed a duty to Plaintiff, Plaintiff's clients, and all others

similarly situated to exercise reasonable care in regard to Defendant's oversight of MDL 2179.

At all times material herein Defendant Herman oversaw and steered MDL 2179. This includes

oversight of the Gulf Coast Claims Facility, settlement negotiations with BP, Halliburton, and

Transocean, as well as settlement approval, and settlement implementation, post-settlement

administrative disputes, litigation, and appeals, approval, payment, and reimbursement of Shared

-77-

Expenses and other general planning and administration, coordination with Defendants, Special

Masters, the Court, the States, and the United States, case-management orders and procedures,

public relations efforts, the monitoring of and coordination with the JPML, Government, and

other satellite investigations, lawsuits, and proceedings, general communications, coordination,

organization, and strategy.

323. Defendant had a heightened duty of care to Plaintiff, Plaintiff's clients, and all

others similarly situated because of the unprecedented environmental and economic harm

resulting from the millions of barrels of oil that had been discharged into the Gulf of Mexico and

upon adjoining shorelines by the Deepwater Horizon oil spill incident. The damages suffered by

Plaintiff, Plaintiff's clients, and all others similarly situated which resulted from this oil spill

incident, the Kenneth R. Feinberg-administered victims' compensation fund, and Defendant's

oversight of MDL 2179 are enormous and on-going. The damages suffered by Plaintiff,

Plaintiff's clients, and all others similarly situated include, but are not limited to, lost time value

of money and the excess legal expenses incurred, loss of profit, loss of business reputation, loss

of income, and other economic loss. The livelihoods of all persons, including Plaintiff's clients

and all others similarly situated, whose businesses rely on the natural resources of the Gulf Coast

are at risk. Recreational deep sea fishing boat operators, commercial fishermen, clam farmers,

oyster harvesters, shrimpers, and businesses involved, directly or indirectly, in processing and

packaging for the seafood industry will experience the end of a way of life that, in many cases,

has been passed down from one generation to the next.

324. Defendant breached his legal duty to Plaintiff, Plaintiff's clients, and all others

similarly situated, failed to exercise reasonable care, and acted with reckless, willful, and wanton

-78-

disregard for the business and livelihood of Plaintiff, Plaintiff's clients, and all others similarly situated in his negligent oversight of MDL 2179 in the following manner.

325.  Again, Plaintiff Donovan refers to and incorporates by reference as though fully set forth herein each and every foregoing paragraph of this Complaint. The manner in which Defendant breached his heightened legal duty to Plaintiff, Plaintiff's clients, and all others similarly situated, failed to exercise reasonable care, and acted with reckless, willful, and wanton disregard for the business and livelihood of Plaintiff, Plaintiff's clients, and all others similarly situated in his negligent oversight of MDL 2179 includes, but is not limited to, the following.

326.  The Eight-Step Plan - At all times material herein, Defendant Herman, individually and/or in collusion with the members of the MDL 2179 PSC and BP, fraudulently, recklessly, negligently and/or knowingly conceived, developed, and/or facilitated an eight-step plan to maximize his compensation and the compensation of the members of the MDL 2179 PSC in exchange for limiting the liability of BP. The purpose of Defendant's eight-step plan was <u>not</u> to zealously advocate on behalf of Plaintiff, Plaintiff's clients, and all others similarly situated.

327.  Circumventing the OPA - At all times material herein, Defendant Herman, individually and/or in collusion with the members of the MDL 2179 PSC and BP, in order to limit BP's liability and thereby maximize his compensation and the compensation of the members of the MDL 2179 PSC, has misled Plaintiff, Plaintiff's clients, and all BP oil well blowout victims by fraudulently, recklessly, negligently and/or knowingly designating the "B1" Master Complaint as an admiralty or maritime case, and requesting a non-jury trial pursuant to Rule 9(h), rather than properly alleging claims under the Oil Pollution Act of 1990 ("OPA"), a

-79-

*strict liability* statute, and the Outer Continental Shelf Lands Act ("OCSLA").

328. Feinberg's Release and Covenant Not to Sue - At all times material herein, Defendant Herman, individually and/or in collusion with the members of the MDL 2179 PSC and BP, in order to limit BP's liability and thereby maximize his compensation and the compensation of the members of the MDL 2179 PSC, has misled Plaintiff, Plaintiff's clients, and all others similarly situated by fraudulently, recklessly, negligently and/or knowingly aiding and abetting the Kenneth R. Feinberg-administered victims' compensation fund to circumvent the OPA. As a result of Defendant Herman's fraudulent and negligent conduct, approximately 220,000 Kenneth R. Feinberg victims who or that executed a "Release and Covenant Not to Sue" in exchange for a one-time miniscule final payment ($5,000 for individuals and $25,000 for businesses) were excluded from the settlement class action.

329. Defendant Herman's Refusal to Initiate and Conduct Discovery on Kenneth R. Feinberg - As of the date of the filing of this Complaint, approximately eight years have passed since Plaintiff's clients filed their complaints against Feinberg in Florida State Court.

330. MDL 2179 is Unconstitutional - At all times material herein, Defendant Herman, individually and/or in collusion with the members of the MDL 2179 PSC and BP, fraudulently, recklessly, negligently and/or knowingly breached his fiduciary and ethical duties to Plaintiff, Plaintiff's clients, and all others similarly situated by exercising oversight of a multidistrict litigation which is unconstitutional. MDL 2179, which employs a victims' compensation fund on the frontend and a settlement class action on the backend, involves no case or controversy and infringes individual claimants' procedural due process rights.

331. Defendant knew or should have known that his wanton or reckless conduct would

-80-

foreseeably result in the financial ruin of Plaintiff's clients and all others similarly situated thereby causing irreversible damage to the health and the economic interests of Plaintiff's clients, their families, and the families of all others similarly situated.

332.   As a direct and proximate result of Defendant's wanton or reckless conduct, Plaintiff, Plaintiff's clients, and all others similarly situated have suffered legal injury and damages, in an amount to be proven at trial, including, but not limited to, lost time value of money and the excess legal expenses incurred, loss of profit, loss of business reputation, loss of livelihood, loss of income, and other economic loss.

333.   Defendant's wanton or reckless conduct, as described herein, constitutes such a conscious disregard or indifference to the rights and lives of Plaintiff, Plaintiff's clients, and all others similarly situated that it entitles Plaintiff, Plaintiff's clients, and all others similarly situated to punitive damages.

## COUNT II
## NEGLIGENCE

334.   Plaintiff Donovan refers to and incorporates by reference as though fully set forth herein each and every foregoing paragraph of this Complaint.

335.   "OPA applies of its own force, because that act governs, *inter alia*, private claims for property damage and economic loss resulting from a discharge of oil in navigable waters." 33 U.S.C. § 2702(a), (b)(2)(B), (b)(2)(C), (b)(2)(E)." The Honorable Carl J. Barbier, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Rec. *See* Doc. 3830 at 11, August 26, 2011).

336.   Defendant Herman owed a duty to Plaintiff to exercise reasonable care in regard to

-81-

Defendant's oversight of MDL 2179. At all times material herein Defendant Herman oversaw
and steered MDL 2179. This includes oversight of the Gulf Coast Claims Facility, settlement
negotiations with BP, Halliburton, and Transocean, as well as settlement approval, and
settlement implementation, post-settlement administrative disputes, litigation, and appeals,
approval, payment, and reimbursement of Shared Expenses and other general planning and
administration, coordination with Defendants, Special Masters, the Court, the States, and the
United States, case-management orders and procedures, public relations efforts, the monitoring
of and coordination with the JPML, Government, and other satellite investigations, lawsuits, and
proceedings, general communications, coordination, organization, and strategy.

337.  Defendant knew or should have known that his conduct would foreseeably result in
the financial ruin of Plaintiff's clients and all others similarly situated thereby causing
irreversible damage to the health and the economic interests of Plaintiff's clients, their
families, and the families of all others similarly situated.

338.  Defendant breached his legal duty to Plaintiff, Plaintiff's clients, and all others
similarly situated and failed to exercise reasonable care in his oversight of MDL 2179 in the
following manner.

339.  Again, Plaintiff Donovan refers to and incorporates by reference as though fully set
forth herein each and every foregoing paragraph of this Complaint. The manner in which
Defendant breached his legal duty to Plaintiff, Plaintiff's clients, and all others
similarly situated, failed to exercise reasonable care, and acted with reckless, willful, and wanton
disregard for the business and livelihood of Plaintiff, Plaintiff's clients, and all others similarly
situated in his negligent oversight of MDL 2179 includes, but is not limited to, the following.

-82-

340. The Eight-Step Plan - At all times material herein, Defendant Herman, individually and/or in collusion with the members of the MDL 2179 PSC and BP, fraudulently, recklessly, negligently and/or knowingly conceived, developed, and/or facilitated an eight-step plan to maximize his compensation and the compensation of the members of the MDL 2179 PSC in exchange for limiting the liability of BP. The purpose of Defendant's eight-step plan was <u>not</u> to zealously advocate on behalf of Plaintiff, Plaintiff's clients, and all others similarly situated.

341. Circumventing the OPA - At all times material herein, Defendant Herman, individually and/or in collusion with the members of the MDL 2179 PSC and BP, in order to limit BP's liability and thereby maximize his compensation and the compensation of the members of the MDL 2179 PSC, has misled Plaintiff, Plaintiff's clients, and all BP oil well blowout victims by fraudulently, recklessly, negligently and/or knowingly designating the "B1" Master Complaint as an admiralty or maritime case, and requesting a non-jury trial pursuant to Rule 9(h), rather than properly alleging claims under the Oil Pollution Act of 1990 ("OPA"), a *strict liability* statute, and the Outer Continental Shelf Lands Act ("OCSLA").

342. Feinberg's Release and Covenant Not to Sue - At all times material herein, Defendant Herman, individually and/or in collusion with the members of the MDL 2179 PSC and BP, in order to limit BP's liability and thereby maximize his compensation and the compensation of the members of the MDL 2179 PSC, has misled Plaintiff, Plaintiff's clients, and all others similarly situated by fraudulently, recklessly, negligently and/or knowingly aiding and abetting the Kenneth R. Feinberg-administered victims' compensation fund to circumvent the OPA. As a result of Defendant Herman's fraudulent and negligent conduct, approximately 220,000 Kenneth R. Feinberg victims who or that executed a "Release and Covenant Not to Sue"

-83-

in exchange for a one-time miniscule final payment ($5,000 for individuals and $25,000 for businesses) were excluded from the settlement class action.

343.  Defendant Herman's Refusal to Initiate and Conduct Discovery on Kenneth R. Feinberg - As of the date of the filing of this Complaint, approximately eight years have passed since Plaintiff's clients filed their complaints against Feinberg in Florida State Court.

344.  MDL 2179 is Unconstitutional - At all times material herein, Defendant Herman, individually and/or in collusion with the members of the MDL 2179 PSC and BP, fraudulently, recklessly, negligently and/or knowingly breached his fiduciary and ethical duties to Plaintiff, Plaintiff's clients, and all others similarly situated by exercising oversight of a multidistrict litigation which is unconstitutional. MDL 2179, which employs a victims' compensation fund on the frontend and a settlement class action on the backend, involves no case or controversy and infringes individual claimants' procedural due process rights.

345.  Defendant knew or should have known that his wanton or reckless conduct would foreseeably result in the financial ruin of Plaintiff's clients and all others similarly situated thereby causing irreversible damage to the health and the economic interests of Plaintiff's clients, their families, and the families of all others similarly situated.

346.  As a direct and proximate result of Defendant's negligent conduct, Plaintiff, Plaintiff's clients, and all others similarly situated have suffered legal injury and damages, in an amount to be proven at trial, including, but not limited to, lost time value of money and the excess legal expenses incurred, loss of profit, loss of business reputation, loss of livelihood, loss of income, and other economic loss.

347.  Defendant is further liable under the doctrine of *res ipsa loquitor* because the lost

-84-

time value of money and the excess legal expenses incurred, the loss of profit, loss of business

reputation, loss of livelihood, loss of income, and other health and economic loss by Plaintiff,

Plaintiff's clients, and all others similarly situated could not have occurred in the absence of the

negligence of Defendant Herman.

## COUNT III
## NEGLIGENCE PER SE

348.  Plaintiff Donovan refers to and incorporates by reference as though fully set forth

herein each and every foregoing paragraph of this Complaint.

349.  "OPA applies of its own force, because that act governs, *inter alia*, private claims

for property damage and economic loss resulting from a discharge of oil in navigable waters."

33 U.S.C. § 2702(a), (b)(2)(B), (b)(2)(C), (b)(2)(E)." The Honorable Carl J. Barbier, *In re: Oil*

*Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Rec. *See*

Doc. 3830 at 11, August 26, 2011).

350.  As the Honorable Carl J. Barbier instructs, Defendant Herman's conduct with

regard to Defendant's oversight of MDL 2179 is governed by the Oil Pollution Act of 1990.

351.  The Oil Pollution Act of 1990 creates statutory standards that are intended to

protect and benefit Plaintiff, Plaintiff's clients, and all others similarly situated.

352.  Defendant Herman's violations of these statutory standards constitute negligence

*per se* under Florida law.

353.  Defendants' violations of these statutory standards proximately caused injuries to

Plaintiff, Plaintiff's clients, and all others similarly situated. Plaintiff, Plaintiff's clients, and all

others similarly situated  have suffered legal injury and damages, in an amount to be proven at

-85-

trial, including, but not limited to, lost time value of money and the excess legal expenses
incurred, loss of profit, loss of business reputation, loss of livelihood, loss of income, and other
economic loss, warranting compensatory and punitive damages.

**COUNT IV**
**FRAUD**

354.  Plaintiff Donovan refers to and incorporates by reference as though fully set forth
herein each and every foregoing paragraph of this Complaint.

355.  Defendant Herman, knowing the representations were false at the time the
representations were made, made the following false representations of fact to Plaintiff,
Plaintiff's clients, all others similarly situated.

356.  On March 9, 2012, Defendant Herman released a summary of the agreement-in-
principle allegedly entered into between MDL 2179 Plaintiffs and BP. Defendant Herman made
the following false representations of fact in this summary.

(a) "This Settlement is an *enormous victory* for Gulf Coast workers, businesses and
families;"

(b) "The Settlement *does the most good for the greatest number of people* - encompassing
the wide geographic region and many types of businesses affected by the BP Gulf Oil
Spill;"

(c) "Contrary to what some news outlets have implied, the Settlement has *no cap or limit*.
The only exception is the Seafood Program for commercial fishing vessel owners,
captains and deckhands. BP has agreed to fund this Seafood Program at $2.3 billion;"

(d) "The Settlement *holds BP accountable*;"

(e) "The parties *have not had any fee discussions to date* and will not have any such
discussions until authorized to do so by the Court;"

(f) "Many qualifying claimants may receive greater benefits from the Settlement Claims
Programs than from the GCCF;"

-86-

(g) "*Hundreds of thousands of victims of the BP Gulf Oil Spill will be made whole* as a result of this settlement - regardless of whether or not they previously joined the MDL lawsuit or filed a claim with the GCCF;"

(h) "Once the Settlement Claims Programs are set up, the Court will continue to supervise their operation in all respects throughout their duration to *ensure fairness, transparency, and efficiency*;" and

(i) "A $57 million marketing fund will be established *to promote tourism and Gulf seafood.*"

357.  Defendant Herman further attempts to explain why the settlement claims program is fair by making the following false representations of fact to Plaintiff, Plaintiff's clients, all others similarly situated.

(a) "The Settlement process and formulas used to calculate compensation will be *completely transparent* and applied with consistency;"

(b) "The Court will supervise the Settlement Claims process from start to finish to *ensure fair, impartial, and consistent processing and payment of claims*;"

(c) "Claimants, their accountants, and their lawyers will know the compensation formulas and *will be able to calculate compensation for specific claims before deciding whether to opt-out* or participate in the Settlement;"

(d) "The compensation *calculations have been carefully determined* to account for relevant economic factors and are flexible to each claimant's specific circumstances;"

(e) "The Settlement Claims Program will generally apply a larger enhancement to *account for potential future losses* and other risks than did the GCCF;"

(f) "Offsets for amounts already received from BP or the GCCF are deducted after the enhancement for future losses is applied;"

(g) "A Class Member *can choose to opt-out of the Settlement and instead prosecute their case in Court*;" and

(h) "Businesses and individuals that are not Class Members, or whose claims are not included in the Settlement, *can generally continue to prosecute their cases in Court*."

358.  Defendant Herman made these false representations for the purpose of inducing

-87-

Plaintiff, Plaintiff's clients, and all others similarly situated to act in reliance on these false representations.

359. Plaintiff, Plaintiff's clients, and all others similarly situated relied on Defendant's representations rather than elect to commence an action in Court against BP, the responsible party, or to present the claim to the OSLTF.

360. The reliance by Plaintiff, Plaintiff's clients, and all others similarly situated, which was reasonable and foreseeable, resulted in the following damages: Plaintiff, Plaintiff's clients, and all others similarly situated have suffered legal injury and damages, in an amount to be proven at trial, including, but not limited to, lost time value of money and the excess legal expenses incurred, loss of profit, loss of business reputation, loss of livelihood, loss of income, and other health and economic loss.

## COUNT V
## FRAUDULENT INDUCEMENT

361. Plaintiff Donovan refers to and incorporates by reference as though fully set forth herein each and every foregoing paragraph of this Complaint.

362. On November 10, 2014, Judge Barbier states, "….as the parties were approaching the final fairness hearing in November 2012, there was a concerted effort by the parties and claims facility to process a substantial number of high value claims in order to demonstrate that the settlement program was working as intended."

363. At all times material herein, Defendant Herman, the members of the MDL 2179 PSC, BP, and the administrator of the claims facility secretly colluded to inflate the amount of compensation received by some plaintiffs (just prior to the "fairness" hearing) in order to induce

-88-

the remaining plaintiffs into believing that the proposed settlement is "fair, reasonable, and adequate."

364.  If an attorney is guilty of deceit or collusion or consents thereto with intent to deceive the Court, judge or party, he shall forfeit to the injured party, treble damages to be recovered in a civil action.

365.  Defendant Herman made the following false statements of material fact to Plaintiff, Plaintiff's clients, and all others similarly situated:

(a) "This Settlement is an *enormous victory* for Gulf Coast workers, businesses and families;"

(b) "The Settlement *does the most good for the greatest number of people* - encompassing the wide geographic region and many types of businesses affected by the BP Gulf Oil Spill;"

(c) "Contrary to what some news outlets have implied, the Settlement has *no cap or limit*. The only exception is the Seafood Program for commercial fishing vessel owners, captains and deckhands. BP has agreed to fund this Seafood Program at $2.3 billion;"

(d) "The Settlement *holds BP accountable*;"

(e) "The parties *have not had any fee discussions to date* and will not have any such discussions until authorized to do so by the Court;"

(f) "Many qualifying claimants may receive greater benefits from the Settlement Claims Programs than from the GCCF;"

(g) "*Hundreds of thousands of victims of the BP Gulf Oil Spill will be made whole* as a result of this settlement - regardless of whether or not they previously joined the MDL lawsuit or filed a claim with the GCCF;"

(h) "Once the Settlement Claims Programs are set up, the Court will continue to supervise their operation in all respects throughout their duration to *ensure fairness, transparency, and efficiency*;"

(i) "A $57 million marketing fund will be established *to promote tourism and Gulf seafood*;"

-89-

(j) "The Settlement process and formulas used to calculate compensation will be *completely transparent* and applied with consistency;"

(k) "The Court will supervise the Settlement Claims process from start to finish to *ensure fair, impartial, and consistent processing and payment of claims*;"

(l) "Claimants, their accountants, and their lawyers will know the compensation formulas and *will be able to calculate compensation for specific claims before deciding whether to opt-out* or participate in the Settlement;"

(m) "The compensation *calculations have been carefully determined* to account for relevant economic factors and are flexible to each claimant's specific circumstances;"

(n) "The Settlement Claims Program will generally apply a larger enhancement to *account for potential future losses* and other risks than did the GCCF;"

(o) "Offsets for amounts already received from BP or the GCCF are deducted after the enhancement for future losses is applied;"

(p) "A Class Member *can choose to opt-out of the Settlement and instead prosecute their case in Court*;" and

(q) "Businesses and individuals that are not Class Members, or whose claims are not included in the Settlement, *can generally continue to prosecute their cases in Court*."

366. Defendant Herman knew or should have known these statements were false.

367. Defendant Herman made these false statements of material fact for the purpose of inducing Plaintiff's clients and all others similarly situated to enter into a settlement agreement BP.

368. Plaintiff, Plaintiff's clients and all others similarly situated justifiably relied upon these false statements of material fact.

369. Reliance on these false statements of material fact did, in fact, induce Plaintiff, Plaintiff's clients, and all others similarly situated to refrain from commencing an action in Court against BP, the responsible party, or presenting the claim to the OSLTF which proximately caused the following injury to Plaintiff, Plaintiff's clients, and all others similarly situated:

-90-

Plaintiff, Plaintiff's clients, and all others similarly situated have suffered legal injury and damages, in an amount to be proven at trial, including, but not limited to, lost time value of money and the excess legal expenses incurred, loss of profit, loss of business reputation, loss of livelihood, loss of income, and other health and economic loss.

370. As a result of Defendant Herman's refusal to initiate and conduct discovery on Kenneth R. Feinberg, as of the date of the filing of this Complaint, approximately eight years have passed since Plaintiff's clients filed their complaints against Kenneth R. Feinberg in Florida State Court.

## <u>COUNT VI</u>
## <u>PROMISSORY ESTOPPEL</u>

371. Plaintiff Donovan refers to and incorporates by reference as though fully set forth herein each and every foregoing paragraph of this Complaint.

372. Defendant Herman made the following representations as to material facts that are contrary to Defendant Herman's current representations.

373. On September 5, 2011, Plaintiff Donovan received an email from Defendant Herman wherein he states, "We have received and appreciate your correspondence of August 29, 2011….Should you desire to participate in the common benefit effort, we would welcome your inclusion in the GCCF Jurisdiction Work Group, which has, for the past year, coordinated Plaintiffs' collective efforts regarding Feinberg and the GCCF in terms of information collection, jurisdictional issues, communications with claimants, OPA compliance, and the appropriate scope and effect of the GCCF release."

374. On December 9, 2013, Plaintiff Donovan emails Defendant Herman, "….Please

-91-

advise as to when the Court will permit formal discovery on Feinberg or the GCCF….Thank you."

375. On December 9, 2013, in his email response to Plaintiff Donovan, Defendant Herman states, "No idea."

376. On December 9, 2013, in his email reply to Defendant Herman, Plaintiff Donovan inquires, "Would you be kind enough to attempt to find out when the Court will permit formal discovery on Feinberg or the GCCF?"

377. On December 9, 2013, Defendant Herman's responds, "Yes. At an appropriate time."

378. Plaintiff, Plaintiff's clients, and all others similarly situated reasonably relied on Defendant Herman's representations that "the GCCF Jurisdiction Work Group….coordinated Plaintiffs' collective efforts regarding Feinberg and the GCCF in terms of information collection, jurisdictional issues, communications with claimants, OPA compliance, and the appropriate scope and effect of the GCCF release."

379. Defendant Herman and the GCCF Jurisdiction Work Group never coordinated the MDL 2179 Plaintiffs' collective efforts regarding Feinberg and the GCCF in terms of information collection, jurisdictional issues, communications with claimants, OPA compliance, and the appropriate scope and effect of the GCCF release.

380. This reasonable reliance of Plaintiff, Plaintiff's clients, and all others similarly situated on Defendant Herman's representations proximately caused the following injury to Plaintiff, Plaintiff's clients, and all others similarly situated: Plaintiff, Plaintiff's clients, and all others similarly situated have suffered legal injury and damages, in an amount to be proven at

-92-

trial, including, but not limited to, lost time value of money and the excess legal expenses incurred, loss of profit, loss of business reputation, loss of livelihood, loss of income, and other health and economic loss.

381. As a result of Defendant Herman's ongoing refusal to initiate and conduct discovery on Kenneth R. Feinberg, as of the date of the filing of this Complaint, approximately eight years have passed since Plaintiff's clients filed their complaints against Kenneth R. Feinberg in Florida State Court.

## COUNT VII
## UNJUST ENRICHMENT

382. Plaintiff Donovan refers to and incorporates by reference as though fully set forth herein each and every foregoing paragraph of this Complaint.

383. At all times material herein, Defendant Herman claims the protocols under which MDL 2179 and Kenneth R. Feinberg operate are structured to be compliant with the OPA and apply the standards of the OPA.

384. At all times material herein, Defendant Herman, individually and/or in collusion with the members of the MDL 2179 PSC and BP, in order to limit BP's liability and thereby maximize his compensation and the compensation of the members of the MDL 2179 PSC, has misled Plaintiff, Plaintiff's clients, and all others similarly situated by fraudulently, recklessly, negligently and/or knowingly designating the "B1" Master Complaint as an admiralty or maritime case, and requesting a non-jury trial pursuant to Rule 9(h), rather than properly alleging claims under the Oil Pollution Act of 1990 ("OPA"), a *strict liability* statute, and the Outer Continental Shelf Lands Act ("OCSLA").

-93-

385. At all times material herein, Defendant Herman, individually and/or in collusion with the members of the MDL 2179 PSC and BP, in order to limit BP's liability and thereby maximize his compensation and the compensation of the members of the MDL 2179 PSC, has misled Plaintiff, Plaintiff's clients, and all others similarly situated by fraudulently, recklessly, negligently and/or knowingly aiding and abetting the Kenneth R. Feinberg-administered victims' compensation fund to circumvent the OPA. As a result of Defendant Herman's fraudulent and negligent conduct, approximately 220,000 Kenneth R. Feinberg victims who or that executed a "Release and Covenant Not to Sue" in exchange for a one-time miniscule final payment ($5,000 for individuals and $25,000 for businesses) were excluded from the settlement class action.

386. "OPA applies of its own force, because that act governs, *inter alia*, private claims for property damage and economic loss resulting from a discharge of oil in navigable waters." *See* 33 U.S.C. § 2702(a), (b)(2)(B), (b)(2)(C), (b)(2)(E)." The Honorable Carl J. Barbier, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Rec. Doc. 3830 at 11, August 26, 2011).

387. The OPA is a *strict liability* statute. In order to recover damages under the OPA, a claimant merely needs to show that his or her damages "resulted from" the oil spill or oil well blowout.

388. The OPA, in pertinent part, states: "The responsible party for a vessel or a facility from which oil is discharged, or which poses the substantial threat of a discharge of oil, into or upon the navigable waters or adjoining shorelines or the exclusive economic zone is liable for the removal costs and damages that result from such incident."

389. The damages referred to in 33 U.S.C. § 2702(a) include, but are not limited to:

-94-

"Damages equal to the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources, which ***shall be recoverable by any claimant***." (Emphasis added)

390. The OPA further provides: (a) "Payment or settlement of a claim for interim, short-term damages representing less than the full amount of damages to which the claimant ultimately may be entitled **shall not** preclude recovery by the claimant for damages not reflected in the paid or settled partial claim;" and (b) "Payment of such a claim [i.e. payment to a claimant for interim, short-term damages representing less than the full amount of damages to which the claimant ultimately may be entitled] **shall not** foreclose a claimant's right to recovery of all damages to which the claimant otherwise is entitled under this Act or under any other law."

391. "Shall" means shall. The U.S. Supreme Court has made clear that when a statute uses the word "shall," Congress has imposed a mandatory duty upon the subject of the command.

392. Use of "shall" and "may" in statutes also mirrors common usage; ordinarily "shall" is mandatory and "may" is permissive. "The mandatory 'shall'….normally creates an obligation impervious to judicial discretion."

393. At all times material herein, Defendant Herman, individually and/or in collusion with the members of the MDL 2179 PSC and BP, fraudulently, recklessly, negligently and/or knowingly conceived, developed, and/or facilitated an eight-step plan to maximize his compensation and the compensation of the members of the MDL 2179 PSC in exchange for limiting the liability of BP.

394. In MDL 2179, as a direct result of Defendant Herman's actions, the comatose,

-95-

hapless plaintiffs received little or no compensation while Defendant Herman and the members of the MDL 2179 PSC have been enriched in an estimated amount of *$3.035 billion*.

395.  As a result of limiting the liability of BP, Defendant Herman's plan to maximize his compensation and the compensation of the members of the MDL 2179 PSC did not rise to the standards expected of his profession.

396.  As a result of Defendant Herman's ongoing refusal to initiate and conduct discovery on Kenneth R. Feinberg, as of the date of the filing of this Complaint, approximately eight years have passed since Plaintiff Donovan's clients filed their complaints against Kenneth R. Feinberg in Florida State Court.

397.  As a direct and proximate result of Defendant Herman's negligent conduct, Plaintiff, Plaintiff's clients, and all others similarly situated have suffered legal injury and damages, in an amount to be proven at trial, including, but not limited to, lost time value of money and the excess legal expenses incurred, loss of profit, loss of business reputation, loss of livelihood, loss of income, and other economic loss.

398.  Defendant Herman lacks any legal justification for violating the rights provided to Plaintiff, Plaintiff's clients, and all others similarly situated under the OPA.

399.  Under the circumstances described herein it would be inequitable for Defendant Herman to retain the benefits of his actions without paying the value thereof to Plaintiff.

## COUNT VIII
## BREACH OF FIDUCIARY DUTY

400.  Plaintiff Donovan refers to and incorporates by reference as though fully set forth herein each and every foregoing paragraph of this Complaint.

-96-

401.  Liability for breach of fiduciary duty requires a Plaintiff to prove:

(a) the existence of a fiduciary duty relationship,

(b) breach of the fiduciary duty by the defendant, and

(c) damages proximately caused by the defendant's breach.

402.  "All motions, requests for discovery or other pre-trial proceedings with respect to plaintiffs shall be initiated by and/or coordinated through the Plaintiff Steering Committee ("PSC"), *to be filed by and through Plaintiffs' Liaison Counsel*. If the PSC does not support the motion, discovery or other requested proceeding, then the moving or requesting plaintiff shall be permitted to file such motion or request, but shall include a certificate of non-support." The Honorable Carl J. Barbier, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Rec. Doc. 569 at 13, October 19, 2010).

403.  Pursuant to the MDL 2179 Court's Pretrial Order No. 15, "Pending further orders of this Court, all pending and future motions, including Motions to Remand, are continued without date unless a motion is specifically excepted from the continuance by the Court."

404.  On January 12, 2011, the MDL 2179 Court issued PTO No. 25, in order to clarify "the scope and effect" of the "B1" Master Complaint. The Court held that any individual plaintiff who is a named plaintiff in a case that falls within pleading bundle "B1" "is deemed to be a plaintiff in the "B1" Master Complaint. Also, "the allegations, claims, theories of recovery and/or prayers for relief contained within the pre-existing petition or complaint are deemed to be amended, restated, and superseded by the allegations, claims, theories of recovery, and/or prayers for relief in the respective "B1" Master Complaint(s) in which the defendant is named."

405.  In sum, Plaintiff, Plaintiff's clients, and all others similarly situated were forced to

-97-

be represented by Defendant Herman and the MDL 2179 PSC. Since Defendant Herman stepped

into the shoes of Plaintiff Donovan, Plaintiff Donovan, Plaintiff's clients and all others similarly

situated hold Defendant Herman and the MDL 2179 PSC strictly accountable to zealously

advocate on their behalf.

406.  A fiduciary duty relationship clearly exists between Defendant Herman and

Plaintiff, Plaintiff's clients, and all others similarly situated.

407.  Defendant Herman has many fiduciary duties, including the duty of care, the duty

of loyalty, the duty to zealously protect the interests of Plaintiff Donovan, Plaintiff's clients, and

all others similarly situated, and the sacred duty of confidentiality.

408.  Defendant Herman breached his fiduciary duties to Plaintiff Donovan, Plaintiff's

clients, and all others similarly situated when he failed to act with the knowledge, skill, and care

of other qualified attorneys practicing under similar circumstances.

409.  The manner in which Defendant Herman failed to act with the knowledge, skill, and

care of other qualified attorneys practicing under similar circumstances includes, but is not

limited to, the following.

410.  The Eight-Step Plan - At all times material herein, Defendant Herman, individually

and/or in collusion with the members of the MDL 2179 PSC and BP, fraudulently, recklessly,

negligently and/or knowingly conceived, developed, and/or facilitated an eight-step plan to

maximize his compensation and the compensation of the members of the MDL 2179 PSC in

exchange for limiting the liability of BP. The purpose of Defendant's eight-step plan was not to

zealously advocate on behalf of Plaintiff, Plaintiff's clients, and all others similarly situated.

411.  Circumventing the OPA - At all times material herein, Defendant Herman,

-98-

individually and/or in collusion with the members of the MDL 2179 PSC and BP, in order to

limit BP's liability and thereby maximize his compensation and the compensation of the

members of the MDL 2179 PSC, has misled Plaintiff, Plaintiff's clients, and all BP oil well

blowout victims by fraudulently, recklessly, negligently and/or knowingly designating the "B1"

Master Complaint as an admiralty or maritime case, and requesting a non-jury trial pursuant to

Rule 9(h), rather than properly alleging claims under the Oil Pollution Act of 1990 ("OPA"), a

*strict liability* statute, and the Outer Continental Shelf Lands Act ("OCSLA").

412.  Feinberg's Release and Covenant Not to Sue - At all times material herein,

Defendant Herman, individually and/or in collusion with the members of the MDL 2179 PSC

and BP, in order to limit BP's liability and thereby maximize his compensation and the

compensation of the members of the MDL 2179 PSC, has misled Plaintiff, Plaintiff's clients, and

all others similarly situated by fraudulently, recklessly, negligently and/or knowingly aiding and

abetting the Kenneth R. Feinberg-administered victims' compensation fund to circumvent the

OPA. As a result of Defendant Herman's fraudulent and negligent conduct, approximately

220,000 Kenneth R. Feinberg victims who or that executed a "Release and Covenant Not to Sue"

in exchange for a one-time miniscule final payment ($5,000 for individuals and $25,000 for

businesses) were excluded from the settlement class action.

413.  The ultimate objective of Feinberg's "Delay, Deny, Defend" tactic was to limit

BP's liability by obtaining a signed "Release and Covenant Not to Sue" from as many BP oil

well blowout victims as possible. Feinberg's "Release and Covenant Not to Sue" requirement

violates the OPA, State contract law, and is contrary to public policy.

414.  Defendant Herman fully sanctioned and facilitated Feinberg's "Release and

-99-

Covenant Not to Sue."

415.  Defendant Herman's Refusal to Initiate and Conduct Discovery on Kenneth R. Feinberg - As of the date of the filing of this Complaint, approximately eight years have passed since Plaintiff's clients filed their complaints against Feinberg in Florida State Court.

416.  MDL 2179 is Unconstitutional - At all times material herein, Defendant Herman, individually and/or in collusion with the members of the MDL 2179 PSC and BP, fraudulently, recklessly, negligently and/or knowingly breached his fiduciary and ethical duties to Plaintiff, Plaintiff's clients, and all others similarly situated by exercising oversight of a multidistrict litigation which is unconstitutional. MDL 2179, which employs a victims' compensation fund on the frontend and a settlement class action on the backend, involves no case or controversy and infringes individual claimants' procedural due process rights.

417.  Defendant Herman breached his fiduciary duties to Plaintiff, Plaintiff's clients, and all others similarly situated by (a) asking clients to accept a minimal settlement when the facts indicate the client may have a bigger claim, (b) failing to offer appropriate advice, (c) filing an improper document, and (d) ignoring a conflict of interest.

418.  An attorney who undertakes representation of a client owes that client both a duty of competent representation and the highest duty of honesty, fidelity, and confidentiality.

419.  Defendant Herman's *intentional* misrepresentation to Plaintiff, Plaintiff's clients, and all others similarly situated during MDL 2179 where Defendant Herman represents Plaintiff, Plaintiff's clients, and all others similarly situated is clearly a violation of Defendant Herman's duty of honesty.

420.  Defendant knew or should have known that his wanton or reckless conduct would

-100-

foreseeably result in the financial ruin of Plaintiff's clients and all others similarly situated thereby causing irreversible damage to the health and the economic interests of Plaintiff's clients, their families, and the families of all others similarly situated.

421. As a direct and proximate result of Defendant's wanton or reckless conduct, Plaintiff, Plaintiff's clients, and all others similarly situated have suffered legal injury and damages, in an amount to be proven at trial, including, but not limited to, lost time value of money and the excess legal expenses incurred, loss of profit, loss of business reputation, loss of livelihood, loss of income, and other economic loss. Plaintiff, Plaintiff's clients, and all others similarly situated would have won their cases and received compensation if Defendant Herman had not breached his fiduciary duties.

<u>**COUNT IX**</u>
<u>**FRAUDULENT CONCEALMENT**</u>

422. Plaintiff Donovan refers to and incorporates by reference as though fully set forth herein each and every foregoing paragraph of this Complaint.

423. To establish fraudulent concealment, a Plaintiff must prove that:

(a) the defendant owed the plaintiff a duty to disclose a material fact;

(b) the defendant failed to do so;

(c) the defendant intended to defraud or deceive the plaintiff;

(d) the plaintiff acted in justifiable reliance on the concealment; and

(e) the plaintiff was damaged as a result.

424. The existence of a duty to disclose on the defendant's part is the threshold inquiry in a fraudulent concealment case.

-101-

425. As fully explained *supra*, Defendant Herman owed Plaintiff, Plaintiff's clients, and all others similarly situated a duty to disclose material facts.

426. A duty to disclose may be either legal or equitable, and may arise where the parties have a relation of trust and confidence or where there is inequality of condition and knowledge, or where there are other attendant circumstances.

427. The defendant must have actual knowledge of the fact.

428. Defendant Herman knowingly, deliberately, and/or with a reckless disregard of the truth actively concealed from Plaintiff, Plaintiff's clients, and all others similarly situated, with the intent to defraud or deceive Plaintiff, Plaintiff's clients, and all others similarly situated, the following material facts.

429. In mid-2010, BP made the business decision to pay a total amount of $20 billion to compensate all the BP oil well blowout victims in the settlement class action.

430. Defendant Herman, the members of the MDL 2179 PSC, and other counsel allegedly performing common benefit work in MDL 2179 initiated settlement negotiations with BP "in earnest" merely four (4) months after Judge Barbier appointed Defendant Herman and the members to the PSC. Clearly, the MDL 2179 settlement class action was not achieved in the full context of adversarial litigation.

431. The Eight-Step Plan - At all times material herein, Defendant Herman, individually and/or in collusion with the members of the MDL 2179 PSC and BP, fraudulently, recklessly, negligently and/or knowingly conceived, developed, and/or facilitated an eight-step plan to maximize his compensation and the compensation of the members of the MDL 2179 PSC in exchange for limiting the liability of BP. The purpose of Defendant's eight-step plan was <u>not</u> to

-102-

zealously advocate on behalf of Plaintiff, Plaintiff's clients, and all others similarly situated.

432. "OPA applies of its own force, because that act governs, *inter alia*, private claims for property damage and economic loss resulting from a discharge of oil in navigable waters." 33 U.S.C. § 2702(a), (b)(2)(B), (b)(2)(C), (b)(2)(E)." The Honorable Carl J. Barbier, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Rec. *See* Doc. 3830 at 11, August 26, 2011).

433. As the Honorable Carl J. Barbier instructs, Defendant Herman's conduct with regard to Defendant's oversight of MDL 2179 is governed by the Oil Pollution Act of 1990.

434. The Oil Pollution Act of 1990 creates statutory standards that are intended to protect and benefit Plaintiff, Plaintiff's clients, and all others similarly situated.

435. Circumventing the OPA - At all times material herein, Defendant Herman, individually and/or in collusion with the members of the MDL 2179 PSC and BP, in order to limit BP's liability and thereby maximize his compensation and the compensation of the members of the MDL 2179 PSC, has misled Plaintiff, Plaintiff's clients, and all BP oil well blowout victims by fraudulently, recklessly, negligently and/or knowingly designating the "B1" Master Complaint as an admiralty or maritime case, and requesting a non-jury trial pursuant to Rule 9(h), rather than properly alleging claims under the Oil Pollution Act of 1990 ("OPA"), a *strict liability* statute, and the Outer Continental Shelf Lands Act ("OCSLA").

436. Feinberg's Release and Covenant Not to Sue - At all times material herein, Defendant Herman, individually and/or in collusion with the members of the MDL 2179 PSC and BP, in order to limit BP's liability and thereby maximize his compensation and the

-103-

compensation of the members of the MDL 2179 PSC, has misled Plaintiff, Plaintiff's clients, and all others similarly situated by fraudulently, recklessly, negligently and/or knowingly aiding and abetting the Kenneth R. Feinberg-administered victims' compensation fund to circumvent the OPA. As a result of Defendant Herman's fraudulent and negligent conduct, approximately 220,000 Kenneth R. Feinberg victims who or that executed a "Release and Covenant Not to Sue" in exchange for a one-time miniscule final payment ($5,000 for individuals and $25,000 for businesses) were excluded from the settlement class action.

437.  The ultimate objective of Feinberg's "Delay, Deny, Defend" tactic was to limit BP's liability by obtaining a signed "Release and Covenant Not to Sue" from as many BP oil well blowout victims as possible. Feinberg's "Release and Covenant Not to Sue" requirement violates the OPA, State contract law, and is contrary to public policy.

438.  Defendant Herman fully sanctioned and facilitated Feinberg's "Release and Covenant Not to Sue."

439.  MDL 2179 is Unconstitutional - At all times material herein, Defendant Herman, individually and/or in collusion with the members of the MDL 2179 PSC and BP, fraudulently, recklessly, negligently and/or knowingly breached his fiduciary and ethical duties to Plaintiff, Plaintiff's clients, and all others similarly situated by exercising oversight of a multidistrict litigation which is unconstitutional. MDL 2179, which employs a victims' compensation fund on the frontend and a settlement class action on the backend, involves no case or controversy and infringes individual claimants' procedural due process rights.

440.  On November 10, 2014, Judge Barbier states, "….as the parties were approaching the final fairness hearing in November 2012, there was a concerted effort by the parties and

-104-

claims facility to process a substantial number of high value claims in order to demonstrate that the settlement program was working as intended."

441. At all times material herein, Defendant Herman, the members of the MDL 2179 PSC, BP, and the administrator of the claims facility secretly colluded to inflate the amount of compensation received by some plaintiffs (just prior to the "fairness" hearing) in order to induce the remaining plaintiffs into believing that the proposed settlement is "fair, reasonable, and adequate."

442. The MDL 2179 Court, Defendant Herman, the PSC, BP, and Patrick Juneau knew that BP would only pay a total amount of $20 billion to BP oil well blowout victims. Accordingly, the plaintiffs should have been informed that Patrick Juneau would pay less than 40% of the submitted claims. Instead, in order to limit the number of plaintiffs who would opt-out, the MDL 2179 Court and PSC intentionally misled the plaintiffs by telling them that "the settlement has *no cap or limit*."

443. In MDL 2179, as a direct result of Defendant Herman's actions, the comatose, hapless plaintiffs received little or no compensation while Defendant Herman and the members of the MDL 2179 PSC have been enriched in the estimated amount of *$3.035 billion*.

444. Defendant Herman and the FCC explain that it "did not employ a 'lodestar' or 'hourly rate' approach….the Fee Committee did not solicit from Common Benefit Attorneys what they might claim to be their own individual or average blended hourly 'rates'….Nor did the FCC interpret its task to simply apply a single blended hourly rate to all hours that had been submitted in the case….Rather, the Court asked the Fee Committee to rely, in part, upon '*the FCC's subjective understanding of the relevant contributions of each Fee Applicant*.'

-105-

445. The total amount the FCC members paid to themselves is $321,602,542.45.

446. Defendant Herman paid himself $87,827,200.35.

447. Defendant Herman and Members of the PSC and their law firms in the BP oil well blowout MDL ("MDL 2179") are not double-dipping. They are quadruple-dipping.

448. The known sources of compensation received by Defendant Herman and the members of the PSC and their law firms in MDL 2179 are: common benefit fees, contingent fees, co-counsel fees, and "Hold-Backs."

449. Courts have consistently held that where one does speak he must speak the whole truth to the end that he does not conceal any facts which materially qualify those stated.

450. Plaintiff, Plaintiff's clients, and all others similarly situated acted in justifiable reliance on Defendant Herman's concealment; and Plaintiff, Plaintiff's clients, and all others similarly situated were damaged as a result.

451. As a direct and proximate result of Defendant Herman knowingly, deliberately, and/or with a reckless disregard of the truth actively concealing from Plaintiff, Plaintiff's clients, and all others similarly situated, with the intent to defraud or deceive Plaintiff, Plaintiff's clients, and all others similarly situated, Plaintiff, Plaintiff's clients, and all others similarly situated have suffered legal injury and damages, in an amount to be proven at trial, including, but not limited to, lost time value of money and the excess legal expenses incurred, loss of profit, loss of business reputation, loss of livelihood, loss of income, and other economic loss.

452. Plaintiff, Plaintiff's clients, and all others similarly situated would have been fully compensated for their damages by the OPA or won their cases and received compensation if

-106-

Defendant Herman had not concealed these material facts.

**COUNT X**
**CONSTRUCTIVE FRAUD**

453. Plaintiff Donovan refers to and incorporates by reference as though fully set forth herein each and every foregoing paragraph of this Complaint.

454. Black's law dictionary defines constructive fraud as "all acts, omissions, and concealments involving breach of equitable or legal duty, trust or confidence, and resulting in damage to another; i.e. no scienter is required. Thus the party who makes the misrepresentation need not know that it is false."

455. Under contract law, a Defendant can be liable to a Plaintiff for constructive fraud if there was:

(a) a false misrepresentation;

(b) in reference to a material fact;

(c) for the purpose of inducing the other party to rely on such representation;

(d) on which the other party did justifiably rely;

(e) which resulted in damages or injury; and

(f) a fiduciary relationship between the parties.

456. Bad intent or dishonesty is not a requirement to satisfy constructive fraud.

457. In sum, the elements for actual and constructive fraud are the same with two exceptions: constructive fraud drops the element of scienter - knowledge on the part of the injurer of the representation's falsity - and adds the element of a fiduciary relationship.

458. On March 9, 2012, as fully set forth in COUNT IV *supra*, Defendant Herman

-107-

released a summary of the agreement-in-principle allegedly entered into between MDL 2179

Plaintiffs and BP. Defendant Herman made the following false representations of material fact in

this summary.

> (a) "This Settlement is an *enormous victory* for Gulf Coast workers, businesses and families;"
>
> (b) "The Settlement *does the most good for the greatest number of people* - encompassing the wide geographic region and many types of businesses affected by the BP Gulf Oil Spill;"
>
> (c) "Contrary to what some news outlets have implied, the Settlement has *no cap or limit*. The only exception is the Seafood Program for commercial fishing vessel owners, captains and deckhands. BP has agreed to fund this Seafood Program at $2.3 billion;"
>
> (d) "The Settlement *holds BP accountable*;"
>
> (e) "The parties *have not had any fee discussions to date* and will not have any such discussions until authorized to do so by the Court;"
>
> (f) "Many qualifying claimants may receive greater benefits from the Settlement Claims Programs than from the GCCF;"
>
> (g) "*Hundreds of thousands of victims of the BP Gulf Oil Spill will be made whole* as a result of this settlement - regardless of whether or not they previously joined the MDL lawsuit or filed a claim with the GCCF;"
>
> (h) "Once the Settlement Claims Programs are set up, the Court will continue to supervise their operation in all respects throughout their duration to *ensure fairness, transparency, and efficiency*;" and
>
> (i) "A $57 million marketing fund will be established *to promote tourism and Gulf seafood*."

459. Defendant Herman further attempts to explain why the settlement claims program is

fair by making the following false representations of material fact to Plaintiff, Plaintiff's clients,

all others similarly situated.

> (a) "The Settlement process and formulas used to calculate compensation will be *completely transparent* and applied with consistency;"

-108-

(b) "The Court will supervise the Settlement Claims process from start to finish to *ensure fair, impartial, and consistent processing and payment of claims*;"

(c) "Claimants, their accountants, and their lawyers will know the compensation formulas and *will be able to calculate compensation for specific claims before deciding whether to opt-out* or participate in the Settlement;"

(d) "The compensation *calculations have been carefully determined* to account for relevant economic factors and are flexible to each claimant's specific circumstances;"

(e) "The Settlement Claims Program will generally apply a larger enhancement to *account for potential future losses* and other risks than did the GCCF;"

(f) "Offsets for amounts already received from BP or the GCCF are deducted after the enhancement for future losses is applied;"

(g) "A Class Member *can choose to opt-out of the Settlement and instead prosecute their case in Court*;" and

(h) "Businesses and individuals that are not Class Members, or whose claims are not included in the Settlement, *can generally continue to prosecute their cases in Court*."

460. Defendant made these false representations of material fact for the purpose of inducing Plaintiff, Plaintiff's clients, and all others similarly situated to act in reliance on these false representations of material fact.

461. Plaintiff, Plaintiff's clients, and all others similarly situated relied on Defendant's representations rather than elect to commence an action in Court against BP, the responsible party, or to present the claim to the OSLTF.

462. The reliance by Plaintiff, Plaintiff's clients, and all others similarly situated, which was reasonable and foreseeable, resulted in the following damages: Plaintiff, Plaintiff's clients, and all others similarly situated have suffered legal injury and damages, in an amount to be proven at trial, including, but not limited to, lost time value of money and the excess legal expenses incurred, loss of profit, loss of business reputation, loss of livelihood, loss of income,

-109-

and other health and economic loss.

463.  As fully set forth in COUNT VIII *supra*, a fiduciary relationship exists between Defendant Herman and Plaintiff, Plaintiff's clients, and all others similarly situated.

464.  As noted *supra*, the elements for actual and constructive fraud are the same with two exceptions: constructive fraud drops the element of scienter - knowledge on the part of the injurer of the representation's falsity - and adds the element of a fiduciary relationship.

465.  Therefore, even if Defendant Herman did not know the representations of material fact were false at the time he made the false representations of material fact to Plaintiff, Plaintiff's clients, all others similarly situated, Defendant Herman can be liable to Plaintiff, Plaintiff's clients, and all others similarly situated for constructive fraud.

### COUNT XI
### BREACH OF FIDUCIARY DUTY OF LOYALTY
### (BREACH OF THE AGGREGATE SETTLEMENT RULE)

466.  Plaintiff Donovan refers to and incorporates by reference as though fully set forth herein each and every foregoing paragraph of this Complaint.

467.  The aggregate settlement rule ("ASR") governs global MDL settlements.

468.  Defendant Herman breached his fiduciary duties to Plaintiff, Plaintiff's clients, and all others similarly situated by violating the ASR.

469.  Courts have long recognized that lawyers may be subject to total or partial fee forfeiture as a sanction for serious violations of the ASR. The plaintiff does not have to prove either causation or injury to be entitled to fee forfeiture as a remedy for Defendant Herman's breach of fiduciary duty.

470.  The ASR is Rule 1.8(g) of the ABA *Model Rules of Professional Conduct* ("*Model*

-110-

*Rules*"), and it states: "A lawyer who represents two or more clients shall not participate in making an aggregate settlement of the claims of or against the clients….unless each client gives informed consent, in a writing signed by the client. The lawyer's disclosure shall include the existence and nature of all the claims….involved and of the participation of each person in the settlement."

471.  All "group" settlements are now "aggregate settlements" and must comply with the disclosure requirements of Rule 1.8(g).

472.  Rule 1.8(g) requires a lawyer to disclose *at a minimum*, the following information to the clients for whom or to whom the settlement or agreement proposal is made.

(a) The total amount of the aggregate settlement;

(b) The existence and nature of all of the claims….involved in the aggregate settlement;

(c) The details of every other client's participation in the aggregate settlement…. whether it be their….settlement receipts…..or any other….receipt of something of value as a result of the aggregate resolution;

(d) The *total fees and costs to be paid to the lawyer* as a result of the aggregate settlement, if the lawyer's fees and/or costs will be paid, in whole or in part, from the proceeds of the settlement or by an opposing party or parties; and

(e) The method by which costs (including costs already paid by the lawyer as well as costs to be paid out of the settlement proceeds) are to be apportioned among them.

473.  Informed consent to an aggregate settlement requires that each claimant be able to review the settlements of all other persons subject to the aggregate settlement or the formula by which the settlement will be divided among all claimants. Further, *informed consent requires that the total financial interest of claimants' counsel be disclosed to each claimant.* (Emphasis added)

-111-

474.  In sum, Defendant Herman and the members of the MDL 2179 PSC owe fiduciary duties to Plaintiff, Plaintiff's clients, and each member of the settlement class. A lawsuit based on a violation of the ASR can be brought as a breach of fiduciary duty claim.

475.  The plaintiff(s) need not show any economic loss from the attorney's breach in order to prevail.

476.  Full or partial forfeiture of the fees that the attorney received is the remedy.

477.  Generally, liability for breach of fiduciary duty requires a Plaintiff to prove:

(a) the existence of a fiduciary duty relationship,

(b) breach of the fiduciary duty by the defendant, and

(c) damages proximately caused by the defendant's breach.

478.  "All motions, requests for discovery or other pre-trial proceedings with respect to plaintiffs shall be initiated by and/or coordinated through the Plaintiff Steering Committee ("PSC"), *to be filed by and through Plaintiffs' Liaison Counsel*. If the PSC does not support the motion, discovery or other requested proceeding, then the moving or requesting plaintiff shall be permitted to file such motion or request, but shall include a certificate of non-support." The Honorable Carl J. Barbier, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Rec. Doc. 569 at 13, October 19, 2010).

479.  Pursuant to the MDL 2179 Court's Pretrial Order No. 15, "Pending further orders of this Court, all pending and future motions, including Motions to Remand, are continued without date unless a motion is specifically excepted from the continuance by the Court."

480.  On January 12, 2011, the MDL 2179 Court issued PTO No. 25, in order to clarify "the scope and effect" of the "B1" Master Complaint. The Court held that any individual plaintiff

-112-

who is a named plaintiff in a case that falls within pleading bundle "B1" "is deemed to be a plaintiff in the "B1" Master Complaint. Also, "the allegations, claims, theories of recovery and/or prayers for relief contained within the pre-existing petition or complaint are deemed to be amended, restated, and superseded by the allegations, claims, theories of recovery, and/or prayers for relief in the respective "B1" Master Complaint(s) in which the defendant is named."

481.  In sum, Plaintiff, Plaintiff's clients, and all others similarly situated were forced to be represented by Defendant Herman and the MDL 2179 PSC. Since Defendant Herman stepped into the shoes of Plaintiff Donovan, Plaintiff Donovan, Plaintiff's clients and all others similarly situated hold Defendant Herman and the MDL 2179 PSC strictly accountable to zealously advocate on their behalf.

482.  As fully set forth in COUNT VIII *supra*, a fiduciary duty relationship clearly exists between Defendant Herman and Plaintiff, Plaintiff's clients, and all others similarly situated.

483.  Defendant Herman has many fiduciary duties, including the duty of care, the duty of loyalty, the duty to zealously protect the interests of Plaintiff Donovan, Plaintiff's clients, and all others similarly situated, and the sacred duty of confidentiality.

484.  As explained *supra*, a lawsuit based on a violation of the ASR can be brought as a breach of fiduciary duty claim; the plaintiff(s) need not show any economic loss from the attorney's breach in order to prevail; and full or partial forfeiture of the fees that the attorney received is the remedy.

485.  Defendant Herman breached his fiduciary duty of loyalty to Plaintiff Donovan, Plaintiff's clients, and all others similarly situated when he clearly and seriously violated the ASR.

-113-

486.  Defendant Herman committed the breach of his fiduciary duty of loyalty knowingly and willingly, intentionally, willfully, recklessly, maliciously, and/or with gross negligence.

487.  Defendant Herman's conduct offends a public sense of justice and propriety.

488.  Defendant Herman, in violation of the ASR, refuses to disclose the following information to Plaintiff, Plaintiff's clients, and all others similarly situated.

(a) The total amount of the aggregate settlement;

(b) The existence and nature of all of the claims….involved in the aggregate settlement;

(c) The details of every other client's participation in the aggregate settlement…. whether it be their….settlement receipts…..or any other….receipt of something of value as a result of the aggregate resolution;

(d) The *total amount and source of compensation* and costs to be paid to Defendant Herman, to all members of the MDL 2179 PSC and the total amount and source of compensation paid to the legal experts, Special Masters, and Claims Administrator Patrick Juneau as a result of the aggregate settlement, if this compensation and/or costs will be paid, in whole or in part, from the proceeds of the settlement or by an opposing party or parties; and

(e) The method by which costs (including costs already paid by the lawyer as well as costs to be paid out of the settlement proceeds) are to be apportioned among them.

489.  Informed consent to an aggregate settlement requires that each claimant be able to review the settlements of all other persons subject to the aggregate settlement or the formula by which the settlement will be divided among all claimants. Further, *informed consent requires that the total financial interest of claimants' counsel be disclosed to each claimant.* (Emphasis added)

490.  Moreover, Defendant Herman, in violation of rules governing his professional conduct,

(a)  solicited business through a lay intermediary;

-114-

(b)  failed to fully investigate and assess individual claims;

(c)  failed to communicate offers received and demands made;

(d)  entered into an aggregate settlement with BP of all plaintiffs' claims without plaintiffs' approval; and

(e)  intimidated and coerced his clients into accepting the settlement.

491.  Defendant Herman signed up plaintiffs *en masse* to contingent fee contracts, often contacting plaintiffs through a lay intermediary.

492.  Defendant Herman settled all the claims in the aggregate and allocated dollar figures to the plaintiffs without regard to individual conditions and damages.

493.  MDL 2179 Plaintiffs were not allowed to meet with Defendant Herman or a member of the MDL 2179 PSC for more than a few minutes.

494.  Any MDL 2179 Plaintiff who expressed reservations about the settlement was threatened by Defendant Herman with being afforded no recovery at all.

495.  The U.S. Supreme Court, as well as Courts in the State of Florida, have held that fee forfeiture is appropriate without regard to whether the breach of fiduciary duty resulted in damages.

496.  Generally, where the claim rests on the disloyalty of the lawyer, and the remedy sought is fee forfeiture, rather than compensatory damages for poor service, the breach of the duty of loyalty *is* the harm, and the client is not required to prove causation or specific injury.

497.  It is Defendant Herman's disloyalty, not any resulting harm, that violates the fiduciary relationship and thus impairs the basis for compensation.

498.  Concern for the integrity of attorney-client relationships is at the heart of the fee forfeiture remedy.

-115-

499.  Forfeiture extends to *all* fees for the matter(s) for which Defendant Herman was retained.

## COUNT XII
## FRAUDULENT CONCEALMENT
## (MDL 2179 IS UNCONSTITUTIONAL)

500.  Plaintiff Donovan refers to and incorporates by reference as though fully set forth herein each and every foregoing paragraph of this Complaint.

501.  At all times material herein, Defendant Herman oversaw and steered the entire MDL 2179 "litigation" effort. This includes settlement negotiations with BP, Halliburton, and Transocean, as well as settlement approval, and settlement implementation, post-settlement administrative disputes, litigation, and appeals, approval, payment, and reimbursement of Shared Expenses and other general planning and administration, coordination with Defendants, Special Masters, the Court, the States, and the United States, case-management orders and procedures, public relations efforts, the monitoring of and coordination with the JPML, Government, and other satellite investigations, lawsuits, and proceedings, general communications, coordination, organization, and strategy.

502.  To establish fraudulent concealment, a Plaintiff must prove that:

(a) the defendant owed the plaintiff a duty to disclose a material fact;

(b) the defendant failed to do so;

(c) the defendant intended to defraud or deceive the plaintiff;

(d) the plaintiff acted in justifiable reliance on the concealment; and

(e) the plaintiff was damaged as a result.

503.  The existence of a duty to disclose on the defendant's part is the threshold

-116-

inquiry in a fraudulent concealment case.

504. As fully explained *supra*, Defendant Herman owed Plaintiff, Plaintiff's clients, and all others similarly situated a duty to disclose material facts.

505. A duty to disclose may be either legal or equitable, and may arise where the parties have a relation of trust and confidence or where there is inequality of condition and knowledge, or where there are other attendant circumstances.

506. The defendant must have actual knowledge of the fact.

507. Defendant Herman knowingly, deliberately, and/or with a reckless disregard of the truth actively concealed from Plaintiff, Plaintiff's clients, and all others similarly situated, with the intent to defraud or deceive Plaintiff, Plaintiff's clients, and all others similarly situated, the following four material facts:

(a) The fact that MDL 2179 is unconstitutional because there is no case or controversy.

(b) The fact that Article III makes an ex ante categorical judgment that a non-adversarial suit *is inherently collusive* and therefore in violation of constitutional norms.

(c) The fact that MDL 2179 is unconstitutional because there is no due process.

(d) The fact that the opt-out mechanism under Rule 23(b)(3) should be abandoned in favor of an opt-in mechanism that requires absent class members to take some affirmative action before being swept into a class action.

508. In a settlement class action, an agreement to resolve the dispute is reached by the parties involved prior to the district court's ruling on a motion to certify the class.

509. In MDL 2179, Defendant Herman and BP are not adversaries. They are cohorts expeditiously seeking the common objectives of closure, limited liability, and profit. Justice for

-117-

the plaintiffs is optional.

510. Defendant Herman and the MDL 2179 PSC attorneys/dealmakers are privy to the settlement matrix and the confidential guidance document given to the claims administrator, which explains qualifying criteria for recovery. This knowledge allows Defendant Herman and the PSC attorneys to tailor their own clients' claim submissions to maximize their payout (and the PSC attorneys' contingent fees). This insider information also prompts Defendant Herman and some PSC attorneys to seek and collect co-counsel fees for serving as co-counsel to non-PSC attorneys.

511. The settlement class action is always unconstitutional because it involves no litigation.

512. A typical class action is legitimate because the interests of the plaintiffs and defendant are adverse. In that scenario, the monetary interests of class counsel, which are contingent on class recovery, are aligned with the absent class members' interest in maximum redress, incentivizing a presentation of the issues that benefits both equally. These incentives break down in the context of the non-adversarial settlement class action. Because class counsel seeks the same outcome as the defendant, she has no reason to formulate her clients' arguments or destroy her opponent's case. Particularly, she lacks incentive to present to the Court evidence that may shed unfavorable light upon the non-adversarial agreement, even though that evidence may reveal critical details about the effect of the settlement on absent class members.

513. The Court needs to consider class settlements in terms of separation of powers because maintaining the limits of Article III's "case or controversy" requirements is fundamental for protecting the individual liberties of all. By authorizing a federal court to redistribute

-118-

resources as a means of enforcing legislative directives absent an adversary adjudication, the settlement class action effectively transforms the Court into an administrative body, which is more appropriately located in the executive branch….and improperly transfers powers reserved to the executive branch to the federal judiciary, in clear contravention of separation-of-powers dictates.

514.   There is no case or controversy in MDL 2179.

515.   "Centralization may also facilitate closer coordination with Kenneth Feinberg's administration of the BP compensation fund." The Honorable John G. Heyburn II, Chairman, Panel on Multidistrict Litigation, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Transfer Order, August 10, 2010).

516.   "In February 2011, [only 4 months after I appointed my pre-selected cooperative attorneys to the PSC] negotiations began in earnest for the proposed Economic and Property Damages Settlement. Talks intensified in July 2011, occurring on an almost-daily basis." The Honorable Carl J. Barbier, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Rec. Doc. 7138 at 3, December 21, 2012).

517.   Article III extends federal judicial power solely to the adjudication of a "case" or a "controversy." "Case," in Article III, means a justiciable "action or suit," or an "argument." "Controversy" means a disagreement or a dispute between parties as to the suit's preferred outcome. Both a "case" and a "controversy" require an adversarial suit. For a suit to be justiciable, according to the U.S. Supreme Court, the parties must maintain "adverse legal interests" throughout, and their dispute must be "definite and concrete."

518.   The Fifth Circuit has held that Article III plainly "requires that the parties be truly

-119-

adverse."

519.  On the most basic analytical level, the unconstitutionality of the settlement class action should be obvious, purely as a matter of textual construction. There is simply no rational means of defining the terms "case" or "controversy" to include a proceeding in which, from the outset, nothing is disputed and the parties are in complete agreement. Moreover, from both historical and doctrinal perspectives, U.S. Supreme Court decisions could not be more certain that Article III is satisfied only when the parties are truly "adverse" to one another, which, at the time the relevant proceeding is undertaken, they are not in the case of the settlement class action."

520.  The most serious problem with the settlement class action is that by its nature it does not involve any live dispute between the parties that a federal court is being asked to resolve through litigation, and because from the outset of the proceeding the parties are in full accord as to how the claims should be disposed of, there is missing the adverseness between the parties that is a central element of Article III case-or-controversy requirement.

521.  The settlement class action, in sum, is inherently unconstitutional.

522.  The term "collusion," in the class action context, is used to refer to a secret, unethical agreement between the named plaintiffs and defendant. For purposes of Article III's adverseness requirement, however, the term has a far broader meaning. It includes any suit in which, from the outset, the parties are in agreement as to the outcome.

523.  Article III proceeds on the assumption that a showing of a lack of adverseness at the outset of a suit automatically establishes the improperly collusive nature of the suit. Article III adopts lack of adverseness as an ex ante, categorical basis on which to find inadequate

-120-

representation of the interests of future litigants who are similarly situated.

524.  When the plaintiff and defendant agree on settlement terms and the desirability of certification prior to coming to Court, neither party has the incentive to challenge such important questions as whether class representation is "adequate" or the claims are "typical" of the class as a whole. This inherently deprives the Court of the benefit of adversarial litigation concerning the satisfaction of Rule 23's requirements, thereby seriously limiting its ability to protect absent class members.

525.  In contrast to the case-by-case focus employed by class action scholars, Article III employs a far more categorical and prophylactic conception of "collusion." Article III makes an ex ante categorical judgment that a non-adversarial suit is inherently collusive and therefore in violation of constitutional norms. As the U.S. Supreme Court in *Poe v. Ullman*, construing Article III, explained: "The case may not be 'collusive'….in the sense of merely colorable disputes got up to secure an advantageous ruling from the Court. But the Court has found unfit for adjudication any cause that 'is not in any real sense adversary,' that 'does not assume the honest and actual antagonistic assertion of rights' to be adjudicated - a safeguard essential to the integrity of the judicial process, and one which we have held to be indispensable to adjudication of constitutional questions by this Court."

526.  The settlement class's fundamental constitutional defect is that *all* settlement classes - not merely those involving unethical attorney behavior - are, by definition, non-adversarial. An adversarial dispute cannot be said to exist at the time the class action proceeding begins. At that point, the litigants differ over absolutely nothing. They have agreed on the terms of both certification and settlement prior to the filing of the class proceeding. In fact, the only

-121-

conceivable reason that class counsel in this position files a complaint and request for certification with the Court, rather than simply embodying the terms of their private agreement in an enforceable contract, is to bind absent class members to a settlement negotiated in their absence.

527. There is no Due Process in MDL 2179.

528. "All motions, requests for discovery or other pre-trial proceedings with respect to plaintiffs shall be initiated by and/or coordinated through the Plaintiff Steering Committee ("PSC"), *to be filed by and through Plaintiffs' Liaison Counsel*. If the PSC does not support the motion, discovery or other requested proceeding, then the moving or requesting plaintiff shall be permitted to file such motion or request, but shall include a certificate of non-support." The Honorable Carl J. Barbier, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Rec. Doc. 569 at 13, October 19, 2010).

529. "....all pending and future motions, including the Motions to Remand, are continued without date unless a motion is specifically excepted from the continuance by the Court." The Honorable Carl J. Barbier, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Rec. Doc. 676 at 1, November 5, 2010).

530. "Any individual plaintiff who is a named plaintiff in a case that falls within Pleading Bundle B1, B3, D1, or D2, or any combination thereof, is deemed to be a plaintiff in the applicable Master Complaint(s)....All individual petitions or complaints that fall within Pleading Bundles B1, B3, D1, or D2, whether pre-existing or filed hereafter, are stayed until further order of the Court." The Honorable Carl J. Barbier, *In re: Oil Spill by the Oil Rig*

-122-

*"Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Rec. Doc. 983 at 2, 4, January 12, 2011).

531.  Each claimant in an MDL has an individually held, constitutionally protected property right at stake. Those rights are guaranteed by the Fifth Amendment, which protects life, liberty, and property against deprivation absent due process of law. The "property" at stake in an MDL is the "chose in action." This historically established concept refers to the right to sue to enforce a legally protected claim, even the unlitigated right to sue. Under the Fifth Amendment, then, MDL claimants cannot be deprived of their rights to a chose in action without due process of law.

532.  In MDL 2179, individual litigants, for all practical purposes, lose a substantial degree of control over the procedural fate of their claims. In sum, MDL 2179 fails to provide a constitutionally adequate opportunity to litigate.

533.  The so-called "day-in-court ideal" is at the heart of constitutionally guaranteed procedural due process, according to the U.S. Supreme Court, and is central to the American conception of the adversarial model of litigation.

534.  MDL 2179 severely undermines the day-in-court ideal by depriving individual litigants of their opportunity to protect their interests through the litigation process.

535.  The right to one's own day-in-court means a right to meaningful control over litigation strategy and goals, including choice of legal representative. It requires a full and fair opportunity to litigate, which means a full opportunity to prepare one's own arguments and evidence. At base, meaningful participation in the adjudicatory process - the day-in-court ideal – includes, in the words of a respected scholar, "the right to observe, to make arguments, to present

-123-

evidence, and to be informed of the reasons for a decision."

536. The U.S. Supreme Court has identified the "two central concerns of procedural due process" to be "the prevention of unjustified or mistaken deprivations and the promotion of participation and dialogue by affected individuals in the decision making process." The day-in-court ideal takes account of both of these concerns. First, an individual day-in-court helps achieve accurate outcomes (thus avoiding "unjustified or mistaken deprivations") because the stakeholders, those who will be most affected by the outcome and are the most motivated to protect their own rights, participate in the decision-making process. In addition, individual participation is inherently valuable in a democratic system because it legitimizes the adjudicating entities in the minds of the litigants.

537. On the surface, MDL practice seems largely innocuous; the JPML merely temporarily transfers cases to a different district court for pretrial matters. But for a variety of reasons transfer effectively amounts to the end of the road for the overwhelming majority of cases. This is troublesome from a constitutional perspective, because not even the most minimal protection of the day-in-court ideal from the perspective of either the paternalism or autonomy models is satisfied.

538. MDL 2179 Plaintiffs in no sense meaningfully participate in, much less control, their day-in-court. Nor are there any assurances that those in charge of the litigation are adequately representing the interest of the individual claimants.

539. One key way that litigants control their day-in-court is by selecting their attorneys. This is often the first expression of their autonomy: they seek the advice of counsel when they consider whether to even file a claim.

-124-

540.  Permitting litigants to choose their representatives is central to providing a full and fair opportunity to litigate. The foundations of due process dictate that that choice belongs to the parties alone. But claimants forced into an MDL are deprived of that essential choice. By virtue of his case's transfer into the MDL - a move that the plaintiff cannot prevent - his chosen lawyer will invariably not be the one actually representing his interests in the course of all the important MDL. Rather, the lawyers on the court-appointed steering committee will take over, and they will do so without the protective assurances of either there adequacy, their good faith, or the extent to which the interests of the absent litigants truly overlap or any other controls.

541.  When a transferee judge appoints a steering committee, he does so at his discretion, outside the strictures of any Federal Rule, or statute, or adversary proceeding. Appointment to the steering committee comes after nothing more than a judge-designated period of nominations and written objections. The process fails to guarantee that the appointed representatives will zealously advocate on behalf of absent litigants in the same way that their hired representative presumably would have. This is certainly the case in MDL 2179.

542.  In addition to the fact that appointed counsel are selected by the Court, rather than by the individuals they represent, MDL claimants do not enjoy a traditional attorney-client relationship with the members of the court-appointed steering committee. The small group of attorneys chosen for leadership roles is charged with representing all of the possibly thousands of plaintiffs, whose cases have facts that are often only loosely linked.

543.  MDL 2179 falls far short of providing the "deep-rooted historic tradition" of an individual's day-in-court.

544.  In consolidated proceedings, the attorney's loyalty divides not only between clients,

-125-

but also between clients and self-interest. Compensation for attorneys who work on behalf of the group depends upon the value of every plaintiff's settlement or judgment. As a result, PSC attorneys may push hard for settlement as opposed to remand, prefer a quick settlement in favor of a protracted discovery period, or advocate for settlement terms that may not be particularly favorable to some or many plaintiffs. The First Circuit has acknowledged existence of this "inherent conflict of interest" between the PSC and individual plaintiffs in mass-tort MDLs.

545.  At the most basic level, MDL 2179 Plaintiffs are not given a meaningful opportunity to present their case(s), as demanded by the Due Process Clause.

546.  In MDL 2179, the opt-out mechanism under Rule 23(b)(3) should be abandoned in favor of an opt-in mechanism that requires absent class members to take some affirmative action before being swept into a class action.

547.  Generally a waiver of constitutional rights requires some affirmative action on the part of an individual holding such rights.

548.  The opt-out mechanism under Rule 23(b)(3) should be abandoned in favor of an opt-in mechanism that requires absent class members to take some affirmative action before being swept into a class action. Allowing fundamental due process rights to be waived simply by inaction, as under the current version of the rule, does not sufficiently protect such constitutional rights.

549.  The existing Rule 23(b)(3) opt-out procedure also violates the Due Process Clause by departing from key notions of democratic theory.

550.  As a due process matter, rights belong to individuals and cannot be taken away by operation of a procedural rule unless individuals willingly choose to participate in that process.

-126-

Another way of thinking about this is that litigants have a right to freedom of association or, rather, freedom to be free from association with a class.

551. It might be argued that the individual litigants do have the right to opt-out of any settlement reached in the course of the MDL, and therefore their due process rights have not been compromised. But it should be recalled that even if a litigant does withdraw from the collective settlement, his right to control adjudication of his own claim will have been substantially compromised by the collective, lowest-common-denominator control of the pre-trial process, including all important discovery and pre-trial motions.

552. A narrow focus on result orientation cannot allow the circumvention of the Rules Enabling Act, basic separation-of-powers principles, the case-or-controversy requirement of Article III, or the core democratic premises of transparency, representation and accountability.

553. In sum, Defendant Herman cannot be allowed to sacrifice constitutional rights for mere judicial efficiency or convenience.

554. As the Honorable Carl J. Barbier instructs, Defendant Herman's conduct with regard to Defendant's oversight of MDL 2179 is governed by the Oil Pollution Act of 1990.

555. The Oil Pollution Act of 1990 creates statutory standards that are intended to protect and benefit Plaintiff, Plaintiff's clients, and all others similarly situated.

556. MDL 2179 is Unconstitutional - At all times material herein, Defendant Herman, individually and/or in collusion with the members of the MDL 2179 PSC and BP, fraudulently, recklessly, negligently and/or knowingly breached his fiduciary and ethical duties to Plaintiff, Plaintiff's clients, and all others similarly situated by exercising oversight of a multidistrict litigation which is unconstitutional. MDL 2179, which employs a victims' compensation fund on

-127-

the frontend and a settlement class action on the backend, involves no case or controversy and infringes individual claimants' procedural due process rights.

557.  The MDL 2179 Court, Defendant Herman, the PSC, BP, and Patrick Juneau knew that BP would only pay a total amount of $20 billion to BP oil well blowout victims. Accordingly, the plaintiffs should have been informed that Patrick Juneau would pay less than 40% of the submitted claims. Instead, in order to limit the number of plaintiffs who would opt-out, the MDL 2179 Court and PSC intentionally misled the plaintiffs by telling them that "the settlement has *no cap or limit*."

558.  In MDL 2179, as a direct result of Defendant Herman's actions, the comatose, hapless plaintiffs received little or no compensation while Defendant Herman and the members of the MDL 2179 PSC have been enriched in the estimated amount of *$3.035 billion*.

559.  Defendant Herman and Members of the PSC and their law firms in the BP oil well blowout MDL ("MDL 2179") are not double-dipping. They are quadruple-dipping.

560.  The known sources of compensation received by Defendant Herman and the members of the PSC and their law firms in MDL 2179 are: common benefit fees, contingent fees, co-counsel fees, and "Hold-Backs."

561.  Courts have consistently held that where one does speak he must speak the whole truth to the end that he does not conceal any facts which materially qualify those stated.

562.  Plaintiff, Plaintiff's clients, and all others similarly situated acted in justifiable reliance on Defendant Herman's concealment; and Plaintiff, Plaintiff's clients, and all others similarly situated were damaged as a result.

563.   MDL 2179, which employs a victims' compensation fund on the frontend and a

-128-

settlement class action on the backend, involves no case or controversy and infringes individual claimants' procedural due process rights. As a direct and proximate result of Defendant Herman knowingly, deliberately, and/or with a reckless disregard of the truth actively concealing from Plaintiff, Plaintiff's clients, and all others similarly situated, with the intent to defraud or deceive Plaintiff, Plaintiff's clients, and all others similarly situated, the material fact that he exercised oversight of a multidistrict litigation which is unconstitutional, Plaintiff, Plaintiff's clients, and all others similarly situated have suffered legal injury and damages, in an amount to be proven at trial, including, but not limited to, lost time value of money and the excess legal expenses incurred, loss of profit, loss of business reputation, loss of livelihood, loss of income, and other economic loss.

564.  Plaintiff, Plaintiff's clients, and all others similarly situated would have been fully compensated for their damages by the OPA or won their cases and received compensation if Defendant Herman had not concealed these material facts.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Donovan demands judgment against Defendant as follows:

(a) Economic and compensatory damages in amounts to be determined at trial;

(b) Punitive damages;

(c) Treble damages if Defendant is guilty of deceit or collusion or consented thereto with intent to deceive the court, judge or party ("If an attorney is guilty of deceit or collusion or consents thereto with intent to deceive the court, judge or party, he shall forfeit to the injured party, treble damages to be recovered in a civil action . . . .");

-129-

(d) Fee Forfeiture if Defendant Herman breached his fiduciary duties to Plaintiff, Plaintiff's clients, and/or all others similarly situated;

(e) Pre-judgment and post-judgment interest at the maximum rate allowable by law;

(f) Attorney's fees and costs of litigation;

(g) Such other and further relief as the Court may deem just and appropriate; and

(h) A trial by jury as to Defendant on all issues so triable.

DATED: February 12, 2019          Respectfully submitted,

                    **/s/ Brian J. Donovan**
                    **Brian J. Donovan, Esq.**
                    Florida Bar No. 143900
                    Email Address:
                    brianjdonovan@verizon.net
                    3102 Seaway Court, Suite 304
                    Tampa, FL 33629
                    Tel: (352)328-7469
                    Plaintiff and Attorney for Plaintiffs

-130-

57292615
May 26 2015
03:18PM
E-SERVICE
File & ServeXpress

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

In Re: Oil Spill by the Oil Rig          MDL No. 2179
       "Deepwater Horizon"
       in the Gulf of Mexico,
       on April 20, 2010              SECTION: J

This Document Relates to:
Salvesen v. Feinberg, et al.,          JUDGE BARBIER
2:11-cv-02533                MAG. JUDGE SHUSHAN
Pinellas Marine Salvage Inc., et al. v. Feinberg, et al.,
2:11-cv-1987
Ditch v. Feinberg et al.,
2:13-cv-06014
_____/

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
## MOTION TO NULLIFY EVERY GULF COAST CLAIM FACILITY
## RELEASE AND COVENANT NOT TO SUE

## BACKGROUND

**I.     Salvesen v. Feinberg, et al., 2:11-cv-02533**

On June 15, 2011, Plaintiff Salvesen filed his action against Defendants Kenneth R.

Feinberg, Feinberg Rozen, LLP, d/b/a GCCF, and William G. Green, Jr. in the Circuit Court of

the Twentieth Judicial Circuit in and for Lee County, Florida asserting claims for gross

negligence, negligence, negligence per se, fraud, fraudulent inducement, promissory estoppel,

and unjust enrichment under Florida state law. The case was subsequently transferred by the

JPML to the MDL 2179 Court on October 6, 2011. Plaintiff re-filed his Motion to Remand and

Memorandum in Support with this Honorable Court on November 14, 2011 (Rec. Doc. 4575).

Plaintiff filed his Second Refiling of Motion to Remand and Memorandum in Support of His

Second Refiling of Motion to Remand with this Honorable Court on November 13, 2012 (Rec.

Doc. 7884, Exhibit B). Plaintiff filed his Motion to Remand or, in the Alternative, Motion to

Commence Formal Discovery and Memorandum in Support with this Honorable Court on May 21, 2015.

## II.     Pinellas Marine Salvage Inc., et al. v. Feinberg, et al., 2:11-cv-1987

On February 25, 2011, Plaintiffs filed their action against Defendants Kenneth R. Feinberg and Feinberg Rozen, LLP, d/b/a GCCF, in the Circuit Court of the Sixth Judicial Circuit in and for Pinellas County, Florida asserting claims for gross negligence, negligence, negligence per se, fraud, fraudulent inducement, promissory estoppel, and unjust enrichment under Florida state law. The case was subsequently transferred by the JPML to the MDL 2179 Court on August 9, 2011. Plaintiffs re-filed their Motion to Remand and Memorandum in Support with this Honorable Court on November 14, 2011 (Rec. Doc. 4574). Plaintiffs filed their Second Refiling of Motion to Remand and Memorandum in Support of Their Second Refiling of Motion to Remand with this Honorable Court on November 13, 2012. Plaintiffs filed their Motion to Remand or, in the Alternative, Motion to Commence Formal Discovery and Memorandum in Support with this Honorable Court on April 24, 2014 (Rec. Doc. 12708).

## III.    Ditch v. Feinberg et al., 2:13-cv-06014

On June 12, 2013, Plaintiff Ditch, a victim of Defendants' "Expedited EAP Denial" strategy, filed his action against Defendants in the Circuit Court of the Twentieth Judicial Circuit in and for Lee County, Florida asserting claims for gross negligence, negligence, negligence per se, fraud, fraudulent inducement, promissory estoppel, and unjust enrichment under Florida state law. The case was subsequently transferred by the JPML to the MDL 2179 Court on October 2, 2013.

## LAW AND ARGUMENT

**I.     The Oil Pollution Act of 1990**

The Oil Pollution Act of 1990 (OPA) is a strict liability statute. In order to recover

damages under OPA, a claimant merely needs to show that his or her damages "resulted from"

the oil spill.

> OPA, in pertinent part, states:
> "The responsible party for a vessel or a facility from which oil is discharged, or which
> poses the substantial threat of a discharge of oil, into or upon the navigable waters or
> adjoining shorelines or the exclusive economic zone is liable for the removal costs and
> damages that result from such incident." See 33 U.S.C. § 2702(a).
>
> The damages referred to in 33 U.S.C. § 2702(a) include, but are not limited to:
> "Damages equal to the loss of profits or impairment of earning capacity due to the injury,
> destruction, or loss of real property, personal property, or natural resources, which ***shall
> be recoverable by any claimant***." 33 U.S.C. § 2702(b)(2)(E) (Emphasis added).
>
> OPA further provides:
> (a) "Payment or settlement of a claim for interim, short-term damages representing less
> than the full amount of damages to which the claimant ultimately may be entitled **shall
> not** preclude recovery by the claimant for damages not reflected in the paid or settled
> partial claim." 33 U.S.C. § 2705(a) (Emphasis added); and
>
> (b) "Payment of such a claim [i.e. payment to a claimant for interim, short-term damages
> representing less than the full amount of damages to which the claimant ultimately may
> be entitled] **shall not** foreclose a claimant's right to recovery of all damages to which the
> claimant otherwise is entitled under this Act or under any other law.'' 33 U.S.C. §§
> 2715(b)(1) and (2) (Emphasis added).

"Shall" means shall. The Supreme Court has made clear that when a statute uses the word

"shall," Congress has imposed a mandatory duty upon the subject of the command. See *United*

*States v. Monsanto*, 491 U.S. 600, 607, 109 S.Ct. 2657, 105 L.Ed.2d 512 (1989) (Rec. Doc.

7473-1 at 8 - 9).

Use of "shall" and "may" in statutes also mirrors common usage; ordinarily "shall" is mandatory and "may" is permissive. "The mandatory 'shall' ……normally creates an obligation impervious to judicial discretion." *Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998).

Justice Souter, in delivering the opinion of the *Lexecon* Court, explained, "If we do our job of reading the statute whole, we have to give effect to this plain command, see *Estate of Cowart* v. *Nicklos Drilling Co.*, 505 U. S. 469, 476 (1992), even if doing that will reverse the longstanding practice under the statute and the rule, *see Metropolitan Stevedore Co.* v. *Rambo* (1995) ("Age is no antidote to clear inconsistency with a statute." (quoting *Brown* v. *Gardner*, 513 U. S 115, 122 (1994))). The language is straightforward, and with a straightforward application ready to hand, statutory interpretation has no business getting metaphysical." (Id. at 9 -10).

As the Supreme Court further explained,

"[I]n interpreting a statute a court should always turn first to one, cardinal canon before all others. We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992).

(Id. at 10).

## II. OPA clearly prohibits Defendant Feinberg's "Release and Covenant Not to Sue."

This Honorable Court has held:

(a) "While OPA does not specifically address the use of waivers and releases by Responsible Parties, the statute also does not clearly prohibit it;" and

(b) "In fact, as the Court has recognized in this Order, one of the goals of OPA was to allow for speedy and efficient recovery by victims of an oil spill." (Rec. Doc. 3830 at 34-35).

-4-

Plaintiffs respectfully point out that this Honorable Court's reasoning, while novel, is wrong for the following reasons.

The text and the legislative history of the OPA statute are clear. OPA *clearly* prohibits Responsible Parties from engaging in a "Delay, Deny, Defend" strategy wherein the victims of an oil spill are starved and ultimately forced to sign a "Release and Covenant Not to Sue" in order to receive an inadequate, miniscule payment amount for the damages, including future damages, they incur as a result of the oil spill.

As noted *supra*, "Shall" means shall. "The mandatory 'shall' ……normally creates an obligation impervious to judicial discretion." *Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998).

This Honorable Court further notes it has recognized that "one of the goals of OPA was to allow for speedy and efficient recovery by victims of an oil spill." Plaintiffs respectfully point out that OPA requires more than merely "speedy and efficient." OPA requires that all oil spill victims are fully compensated. Furthermore, the purpose of the Federal Rules of Civil Procedure is "to secure the *just*, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1. A Plaintiff turns to the Court in search of <u>justice</u>, not merely a "speedy and efficient" determination of his or her case.

OPA's legislative history is shot through with general statements indicative of congressional intent to ensure that all oil spill victims are fully compensated. 135 CONG. REC. H7959 (daily ed. Nov. 2, 1989) (statement of Rep. Tauzin) ("ensure that all victims are **fully compensated**"); 135 CONG. REC. H7964 (daily ed. Nov. 2, 1989) (statement of Rep. Hammerschmidt) ("ensure that all justified claims for compensation are satisfied"); 135 CONG.

-5-

REC. H7969 (daily ed. Nov. 2, 1989) (statement of Rep. Dyson) ("assurances that damages

arising from spills will be **completely compensated**"); 136 CONG. REC. H336 (daily ed. Feb.

7, 1990) (statement of Rep. Carper) ("ensure that those people or those businesses that are

damaged by these spills are **fairly and adequately compensated**"); 136 CONG. REC. S7752

(daily ed. June 12, 1990) (statement of Sen. Mitchell) ("ensure **the fullest possible**

**compensation** of oil spill victims"); S. REP. NO. 101–94, at 12 (1989), *reprinted in* 1990

U.S.C.C.A.N. 722, 734. ("These provisions are intended to provide compensation for a wide

range of injuries and are not so narrowly focused as to prevent victims of an oil spill from

receiving reasonable compensation."); 135 CONG. REC. H7893 (daily ed. Nov. 1, 1989)

(statement of Rep. Quillen) ("**full, fair, and swift compensation for everyone injured by oil**

**spills.**").

     Efficiency is not the only touchstone of justice. A substantial body of opinion and a

respect for jurisdictional principles suggest that a plaintiff ordinarily has a right to a trial in the

forum of his or her choosing. *See*, e.g., *Koster v. (Am.) Lumbermens Mut. Cas. Co*., 330 U.S.

518, 524 (1947) (noting that a plaintiff ordinarily should not be denied the advantages of his

chosen jurisdiction). Aggregation of cases for the purpose of facilitating settlement is a

byproduct of §1407, but is not its central statutory purpose. *See In re Patenaude*, 210 F.3d 135,

144 (3d Cir. 2000). *Id.*

     Judicial economy is undoubtedly well-served by MDL consolidation when scores of

similar cases are pending in the courts. Nevertheless, the excessive delay and marginalization of

juror fact finding (i.e., dearth of jury trials) associated with traditional MDL practice are

developments that cannot be defended. *Delaventura v. Columbia Acorn Trust*, 417 F. Supp. 2d at

153 (D. Mass. 2006). The appropriate focus for fund resolution of mass claims should be justice for the claimants, not merely judicial economy and closure for the corporate misfeasor.

### III. A Feinberg-administered claims program like the GCCF does not provide a much-needed alternative to conventional mass tort litigation.

#### A. BP's Strategy
##### 1. Establishment of the Pseudo Fund

The BP oil spill victims compensation fund is not a "fund." It is in fact only a set-aside or promised commitment of assets by BP in an amount that on its face appears to be sufficient to settle claims arising from the spill. BP committed twenty billion dollars in assets to "pay all legitimate claims" - a meaningless statement since the company, designated as a "Responsible Party" under the OPA, is legally obligated to pay all legitimate claims.

BP agreed to transfer funds at the anticipated rate of five billion dollars per year to bank accounts owned by BP and make announcements on what had been paid, but there was no "fund" if what one means by a fund is an entity with meaningful juridical independence, such as a trust fund. Here the obligations remain BP's and any funds that remain at the close will revert to BP. In reality, the BP oil spill victims compensation fund is a "Liability Cap" which BP unilaterally established.

##### 2. Selection of the Perfect Fund Administrator

Having determined the maximum amount that it would be willing to compensate claimants for damages resulting from the oil spill, BP's next step was to select a politically well-connected person who would be willing to say and do whatever was necessary to administer the fund ("enforce the liability cap"). BP selected Kenneth R. Feinberg.

-7-

Defendant Feinberg's law firm Feinberg Rozen, LLP bills itself as specialists in "comprehensive negotiations strategy," a firm which has "redefined the practice of law," lawyers "preeminent" in "preventing years of protracted, costly and uncertain litigation."

### B. Defendant Feinberg's Strategy

The agreement entered into between BP and Feinberg Rozen, LLP on June 15, 2010 clearly states, "Feinberg Rozen shall follow OPA as it operates and administers the GCCF." (Rec. Doc. 963-2 at 6). "Feinberg Rozen's determinations with respect to OPA Claims will be guided by OPA." (Id. at 24). "The GCCF (and the protocols under which it operates) are structured to be compliant with OPA." (Id. at 26). "The GCCF claims process is structured to comply with OPA and apply the standards of OPA." (Id. at 26).

This Honorable Court has also noted that "…the Gulf Coast Claims Facility ("GCCF"), spearheaded by Mr. Feinberg and his law firm, would replace the original BP claims process and *perform BP's obligations under OPA with respect to private economic loss claims*." (Rec. Doc. 1098 at 2) (Emphasis added). "[This] Court has the responsibility to ensure that the mandates of OPA are implemented." (Id. at 7).

On August 23, 2010, Feinberg Rozen, LLP, doing business as GCCF, replaced the claims process which BP had established to fulfill its obligations as a Responsible Party pursuant to OPA.

### 1. Defendant Feinberg's Use of Coercion and Fraudulent Inducement Was in Violation of OPA.

Defendant Feinberg, in clear violation of OPA, used the fear of costly and protracted litigation to coerce victims of the BP oil spill to accept grossly inadequate settlements from

-8-

GCCF. During town hall meetings organized to promote GCCF, Feinberg repeatedly told victims of the BP oil spill:

- "The litigation route in court will mean uncertainty, years of delay and a big cut for the lawyers."
- "I am determined to come up with a system that will be more generous, more beneficial, than if you go and file a lawsuit."
- "It is not in your interest to tie up you and the courts in years of uncertain protracted litigation when there is an alternative that has been created."
- "I take the position, if I don't find you eligible, no court will find you eligible."

Defendant Feinberg, in clear violation of OPA, repeatedly made the following false statement of material fact to induce victims of the BP oil spill to accept grossly inadequate settlements from GCCF:

- "The Gulf of Mexico will recover from the BP oil spill by the end of 2012."
- "Experts have determined that most of the oil would have dispersed and the economy picked up by the end of 2012."
- "There will be a 30% recovery in 2011."

"Gulf of Mexico 'to recover from BP spill by end 2012'," BBC News, February 3, 2011, available at http://www.bbc.com/news/world-europe-12352051 (last visited May 20, 2015).

## 2. Defendant Feinberg's Payment Methodology Was in Violation of OPA.

During GCCF Phase I, which operated from August 23, 2010 through November 23, 2010, GCCF accepted Emergency Advance Payment ("EAP") claims. Over 475,000 EAP claims were filed with GCCF by BP oil spill victims from August 23, 2010 through November 23, 2010. GCCF paid in excess of $2.5 billion to more than 169,000 Phase I claimants. In sum, the average total amount paid per EAP claimant by GCCF was a paltry $14,793.00. A claimant who received an EAP during Phase I was not required to execute a "Release and Covenant Not to Sue" BP or any other party.

During GCCF Phase II, known as the "Interim Payment/Final Payment" claims process, GCCF received the following three types of claims: Quick Payment Final Claim, Interim Payment Claim, and Full Review Final Payment Claim.

Under the "Quick Payment Final Claim," a claimant who had received a prior EAP or Interim Payment from GCCF could receive, without further documentation of losses caused by the BP oil spill, a one-time final payment of $5,000 for individuals and $25,000 for businesses. Claimants seeking a Quick Payment were required to submit with their claim form a "Release and Covenant Not to Sue."

Defendant Feinberg cannot justify limiting payments under the "Quick Payment Final Claim" program to just $5,000 for individuals and $25,000 for businesses. There is no evidence that these amounts even remotely represent adequate consideration to compensate claimants for the damages that claimants did or will suffer as a result of the BP oil spill.

Under the "Interim Payment Claim," a claimant allegedly could elect to receive compensation for documented past losses or damages caused by the BP oil spill for which the claimant previously had not been compensated. A claimant seeking an Interim Payment was not required to sign a "Release and Covenant Not to Sue." A claimant was permitted to file only one Interim Payment Claim per quarter.

Under the "Full Review Final Payment Claim," a claimant could receive payment for all documented past damages and estimated future damages resulting from the BP oil spill. Claimants wishing to accept a Final Payment were required to sign and submit a "Release and Covenant Not to Sue." Any Full Review Final Payment awarded to a claimant was decreased by the amount of any previous payments received.

-10-

Claim forms for Phase II became available to the public on December 18, 2010. The

assessment of claimant eligibility and calculation of losses for those claims did not begin until

February 18, 2011.

In violation of OPA, Feinberg's approach to determining claimant eligibility was driven

by two factors: (1) loss location; and (2) claimant business type.

BDO Consulting, BDO USA, *Independent Evaluation of the Gulf Coast Claims Facility: Report of Findings and Observations to the U.S. Department of Justice*, at 63 (June 5, 2012), available at http://www.justice.gov/opa/documents/gccf-rptfind-obs.pdf  (last visited May 20, 2015).

### C.    The Ultimate Objective

Defendant Feinberg employed two strategies to limit BP's liability:

(a) a "Delay, Deny, Defend" strategy against legitimate oil spill victims. This strategy, commonly used by unscrupulous insurance companies, is as follows: "Delay payment, starve claimant, and then offer the economically and emotionally-stressed claimant a miniscule percent of all damages to which the claimant is entitled. If the financially ruined claimant rejects the settlement offer, he or she may sue;" and

(b) an "Expedited Emergency Advance Payment ("EAP") Denial" strategy. This strategy is as follows: "Fail to verify, investigate, and appraise the amount of loss claimed by the claimant in the EAP claim and deny the EAP claim without ever requesting supporting documentation from the claimant."

The ultimate objective of Defendant Feinberg's "Delay, Deny, Defend" strategy and

"Expedited EAP Denial" strategy was to limit BP's liability by obtaining a signed "Release and

Covenant Not to Sue" from as many BP oil spill victims as possible.

The "Release and Covenant Not to Sue" requirement, which was the idea of Defendant

Feinberg, forces economically and emotionally-stressed victims of the BP oil spill to sign a

"Release and Covenant Not to Sue" in order to receive a miniscule payment amount for all

damages, including future damages, they incur as a result of the BP oil spill. Defendant

Feinberg's "Release and Covenant Not to Sue" requirement violates OPA, State contract law, and is contrary to public policy. (Rec. Doc. 7473-1 at 6 - 24).

The "Delay, Deny, Defend" strategy and "Expedited EAP Denial" strategy, although unconscionable, have proven to be very effective for Defendant Feinberg and BP.

The GCCF status report data indicates that a total of 574,379 unique claimants filed claims with the GCCF during the period from approximately August 23, 2010 to March 7, 2012. The GCCF paid only 221,358 of these claimants. In sum, the GCCF denied payment to approximately 61.46% of the claimants who filed claims; the average total amount paid per claimant was a paltry $27,466.47.

The status report data further indicates that the GCCF paid a total of 230,370 claimants who filed claims with the GCCF during the "Phase II" period. Of these, 195,109 were either Quick Pay or Full Review Final payments; only 35,261 were Interim payments. In sum, the GCCF forced **84.68%** of the claimants to sign a "Release and Covenant Not to Sue" in which the claimant agreed not to sue BP and all other potentially liable parties; only **15.31%** of the claimants were not required to sign a "Release and Covenant Not to Sue" in order to be paid.

Defendant Feinberg's "Release and Covenant Not to Sue" excluded approximately 200,000 BP oil spill victims from the MDL 2179 Economic and Property Damages Class Settlement Agreement.

As noted *supra*, Congress never intended that a claimant's recovery of damages under OPA be limited by geographic bounds, pertain solely to certain business activities, or require a heightened and vague proof of causation between his or her damages and the oil spill incident.

-12-

Moreover, OPA *clearly* prohibits Responsible Parties from engaging in a "Delay, Deny, Defend" strategy wherein the victims of an oil spill are starved and ultimately forced to sign a "Release and Covenant Not to Sue" in order to receive an inadequate, miniscule payment amount for the damages, including future damages, they incur as a result of the oil spill.

**IV.    A Feinberg-administered claims program like the GCCF is a cancer which is metastasizing.**

A Feinberg-administered claims program like the GCCF ought to be viewed with a significant degree of concern. The precedent established by the JPML and the MDL 2179 Court is clear:

A "Responsible Party" under OPA may now enter into a contract with a politically well-connected third party "Fund Administrator," e.g., Kenneth R. Feinberg and Feinberg Rozen, LLP, d/b/a GCCF. This third party "Administrator / Straw Person," *directly and excessively compensated by the party responsible for the oil spill incident*, may totally disregard OPA, operate the claims process of the responsible party as fraudulently and negligently as it desires for the sole purpose of limiting the liability of, and providing closure to, the responsible party, and the third party "Administrator / Straw Person" shall never be held accountable for its tortious acts.

**A.    Defendant Feinberg, in his never-ending effort to promote himself and Feinberg-administered claims programs, intentionally misled the U.S. Supreme Court.**

On September 4, 2014, Defendant Feinberg filed an amicus brief (No. 14-123) with the U.S. Supreme Court in support of BP. Two statements made by Defendant Feinberg in his brief are instructive.

-13-

**Statement No. 1: "Kenneth R. Feinberg was selected by Executive Branch officials."**

"Amicus Kenneth R. Feinberg was selected by Executive Branch officials to help design, implement, and administer two successful alternatives to the conventional tort litigation system [9/11 Fund and BP Oil Spill Fund]." Plaintiffs point out that this is true for the 9/11 fund, *not* for the BP oil spill fund.  It is important to note that Feinberg was "selected" by BP and merely presented at a June 2010 White House press conference. This Honorable Court has recognized that "Mr. Feinberg was appointed by BP, without input from opposing claimants or the Plaintiffs' Steering Committee ("PSC"), and without an order from the Court. It has been suggested by several non-PSC attorneys that Mr. Feinberg is a Presidential appointee and therefore a part of the Executive Branch. There is no evidence of such an appointment to support this contention." (Rec. Doc. 1098 at 9).

Plaintiffs understand Defendant Feinberg. "Selected by Executive Branch officials……." does sound a great deal more impressive than "hired by Defendant BP to limit its liability." However, Plaintiffs do not agree that self-promotion justifies Defendant Feinberg intentionally misleading the U.S. Supreme Court.

**Statement No. 2: "Administrative claims programs like the 9/11 and Deepwater Horizon funds provide much-needed alternatives to conventional mass tort litigation."**

Defendant Feinberg's amicus brief is replete with statements which are intended to support this statement. The following are a few examples.

(a) The Gulf Coast Claims Facility program "demonstrates that principled, transparent, and effectively administered claims programs can fairly compensate victims, conserve judicial resources, and efficiently resolve claims without the uncertainty and cost associated with conventional litigation."

(b) "Mr. Feinberg offers a unique perspective on effective alternatives to mass tort litigation - and has an interest in the continued viability of those alternatives. The September 11th Victim Compensation Fund and the Gulf Coast Claims Facility administered by Mr. Feinberg demonstrate that when designed and implemented appropriately, these alternatives to mass tort litigation can secure fair compensation for eligible victims, avoid delay, and alleviate crowded court dockets."

(c) "The Court should therefore grant the petition to ensure that a key alternative to the conventional tort system remains viable for the fair, efficient, and expeditious compensation of injured victims."

(d) "While these programs [the 9/11 Victim Compensation Fund and the GCCF Fund] have been extraordinarily effective, by any measure, at efficiently and fairly compensating individual victims, the Fifth Circuit's decisions in this case affecting the causation standard, if permitted to stand, threaten to make these sorely needed alternatives to mass tort litigation unlikely to be replicated."

(e) "The numbers confirm the success of both the 9/11 Fund and the Gulf Coast Claims Facility. An overwhelming percentage of eligible claimants chose to file a claim and receive compensation from the funds rather than litigate in court. And both programs worked precisely as intended. If a claimant could demonstrate causation - i.e., that the death, physical injury, or business loss was caused, respectively, by the terrorist attacks or the oil rig explosion - payment was authorized without having to resort to litigation. Instead of waiting years for an uncertain litigation outcome, hundreds of thousands of claimants received prompt, certain, and fair compensation with relatively minimal delay and cost."

(f) "The success of the 9/11 Fund and the Gulf Coast Claims Facility demonstrate that fair compensation can be efficiently delivered to thousands of eligible victims without the necessity of litigating for years in federal and state courts throughout the Nation."

These statements are blatantly false and misleading.

The 9/11 victim compensation fund was established because Congress was concerned that conventional mass tort litigation would threaten the financial viability of the Nation's airline industry. (Feinberg U.S. Supreme Court Amicus Brief, No. 14-123, at 9 (September 4, 2014)). The purpose of this fund, funded entirely by federal taxpayer dollars, was not to compensate

-15-

victims of the attacks in a prompt and fair manner.

"Victims' Kin Find Fault With Overseer Of 9/11 Fund," The New York Times, November 13, 2002, available at http://www.nytimes.com/2002/11/13/nyregion/victims-kin-find-fault-with-overseer-of-9-11-fund.html?smid=tw-share (last visited May 24, 2015). and
"7 Families Sue Administrator Of 9/11 Fund," The New York Times, January 27, 2003, available at http://www.nytimes.com/2003/01/27/nyregion/7-families-sue-administrator-of-9-11-fund.html?smid=tw-share (last visited May 24, 2015).

Similarly, the purpose of the GCCF was not to ensure that victims of the BP oil spill received prompt, certain, and fair compensation with relatively minimal delay and cost. The GCCF status report numbers confirm that the principal purpose of the GCCF, funded entirely by BP, was to limit BP's liability.

There is no doubt that the statements made by Defendant Feinberg in his amicus brief are false and misleading. However, this is not the first time that Defendant Feinberg has played so fast and loose with the court.

"Ken Feinberg's Retracted Affidavit Cited in Appeals Ruling Favoring Fen-Phen Lawyers," ABA Journal, February 18, 2011, available at http://www.abajournal.com/news/article/ken_feinbergs_retracted_affidavit_cited_in_appeals_ruling_favoring_fen-phen/ (last visited May 24, 2015). and
"An Expert's Change of Mind Can be Shattering," BullsEye, available at http://documents.jdsupra.com/7156029b-7066-4404-acfd-b9a44531aa29.pdf (last visited May 24, 2015).

**B.** **Defendant Feinberg, in his never-ending effort to promote himself and Feinberg-administered claims programs, continues to use the media to mislead the public.**

In a recent interview with investigative reporter David Hammer of WWLTV, Defendant Feinberg states,

"I've never seen any evidence of duress." "I can either get a great deal more money with documentation, or I don't even need documentation and I can get a check in the next couple of weeks or months. I'm not surprised at all, human nature being what it is. I see no duress. I see each fisherman making the decision of what's best for the fisherman."

"…when it comes to compensating innocent people, I think that what we [Feinberg Rozen, et al.] did and what BP did deserves a great deal of praise."

"BP's oil spill payments: Are they enough?" WWLTV, April 17, 2015, available at http://www.wwltv.com/story/news/local/investigations/david-hammer/2015/04/17/bps-oil-spill-payments-are-they-enough/25915247/ and http://www.wwltv.com/videos/news/local/investigations/david-hammer/2015/04/17/25927209/ (last visited May 22, 2015).

Plaintiffs respectfully point out to this Honorable Court that duress was an essential element of Defendant Feinberg's "Delay, Deny, Defend" strategy. Without his unique ability to place BP oil spill victims under duress, Defendant Feinberg would not have been able to force economically and emotionally-stressed GCCF claimants to sign a "Release and Covenant Not to Sue" in order to receive a miniscule payment amount for all damages, including future damages, they incur as a result of the BP oil spill.

Plaintiffs respectfully point out to the Court that Defendant Feinberg should have said,

"I was never under any financial duress. I think that I deserve a great deal of praise for limiting BP's liability."

## C.     This Honorable Court Has an Obligation to "Make Things Right."

This Honorable Court has an obligation to "Make Things Right" by:

(a) eradicating the Feinberg-administered claims program cancer in MDL 2179; and

(b) preventing the Feinberg-administered claims program cancer from metastasizing to other multidistrict litigation Courts in the U.S.

As noted *supra*, the ultimate objective of every Feinberg-administered claims program like the GCCF is, and will continue to be, to force as many claimants as possible into signing a "Release and Covenant Not to Sue."

-17-

Defendant Feinberg, who markets himself as the "Master of Disasters," used coercion, fraudulent inducement, and a "Delay, Deny, Defend" strategy to starve, and ultimately force, BP oil spill victims into signing a "Release and Covenant Not to Sue" in exchange for an inadequate, miniscule payment amount for the damages, including future damages, they incur as a result of the mass tort. Accordingly, the most "speedy and efficient" way to eradicate the Feinberg-administered claims program cancer in MDL 2179 would be to surgically remove the tumor ("nullify every Release and Covenant Not to Sue").

Plaintiffs respectfully point out to this Honorable Court that "Enough is enough." Defendant Feinberg is not the "Master of Disasters." Defendant Feinberg is a "Master of Deception" and a "Master of Self-Promotion." Defendant Feinberg's blatantly false and misleading statements to BP oil spill victims, the U.S. Supreme Court, and the general public are reprehensible. If Defendant Feinberg is not held accountable, he will continue to play fast and loose with the Courts and continue to mislead the general public and future mass tort victims. What is life worth? Defendant Feinberg believes, for a few lucky claimants, it is worth $5,000 for an individual and $25,000 for a business. Plaintiffs and Plaintiffs' Counsel strongly disagree.

## CONCLUSION

For all the foregoing reasons, Plaintiffs and Plaintiffs' Counsel respectfully request that this Honorable Court grant their Motion to Nullify Every Gulf Coast Claims Facility Release and Covenant Not to Sue.

-18-

DATED: May 26, 2015

Respectfully submitted,

**/s/ Brian J. Donovan**    
Brian J. Donovan
Attorney for Plaintiffs
Florida Bar No. 143900
3102 Seaway Court, Suite 304
Tampa, FL 33629
Tel: (352)328-7469
BrianJDonovan@verizon.net

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

In Re: Oil Spill by the Oil Rig                          MDL No. 2179
     "Deepwater Horizon"
     in the Gulf of Mexico,
     on April 20, 2010                                SECTION: J

This Document Relates to:
Pinellas Marine Salvage Inc., et al. v. Feinberg, et al.,        JUDGE BARBIER
2:11-cv-1987                                              MAG. JUDGE SHUSHAN
Salvesen v. Feinberg, et al.,
2:11-cv-02533
Ditch v. Feinberg et al.,
2:13-cv-06014
_____/

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
MOTION TO REMAND OR, IN THE ALTERNATIVE,
<u>MOTION TO COMMENCE FORMAL DISCOVERY</u>

<u>BACKGROUND</u>

I.     **Pinellas Marine Salvage Inc., et al. v. Feinberg, et al., 2:11-cv-1987**

On February 25, 2011, Plaintiffs filed their action against Defendants Kenneth R.

Feinberg and Feinberg Rozen, LLP, d/b/a GCC, in the Circuit Court of the Sixth Judicial Circuit

in and for Pinellas County, Florida asserting claims for gross negligence, negligence, negligence

per se, fraud, fraudulent inducement, promissory estoppel, and unjust enrichment under Florida

state law. The case was subsequently transferred by the JPML to the MDL 2179 Court on

August 9, 2011. Plaintiffs re-filed their Motion to Remand and Memorandum in Support with

this Honorable Court on November 14, 2011 (Rec. Doc. 4574). Plaintiffs filed their Second

Refiling of Motion to Remand and Memorandum in Support of Their Second Refiling of Motion

to Remand with this Honorable Court on November 13, 2012.

## II.     Salvesen v. Feinberg, et al., 2:11-cv-02533

On June 15, 2011, Plaintiff Salvesen filed his action against Defendants Kenneth R.
Feinberg, Feinberg Rozen, LLP, d/b/a GCCF, and William G. Green, Jr. in the Circuit Court of
the Twentieth Judicial Circuit in and for Lee County, Florida asserting claims for gross
negligence, negligence, negligence per se, fraud, fraudulent inducement, promissory estoppel,
and unjust enrichment under Florida state law. The case was subsequently transferred by the
JPML to the MDL 2179 Court on October 6, 2011. Plaintiff re-filed his Motion to Remand and
Memorandum in Support with this Honorable Court on November 14, 2011 (Rec. Doc. 4575).
Plaintiff filed his Second Refiling of Motion to Remand and Memorandum in Support of His
Second Refiling of Motion to Remand with this Honorable Court on November 13, 2012 (Rec.
Doc. 7884, Exhibit B).

## III.    Ditch v. Feinberg et al., 2:13-cv-06014

On June 12, 2013, Plaintiff Ditch, a victim of Defendants' "Expedited EAP Denial"
strategy, filed his action against Defendants in the Circuit Court of the Twentieth Judicial Circuit
in and for Lee County, Florida asserting claims for gross negligence, negligence, negligence per
se, fraud, fraudulent inducement, promissory estoppel, and unjust enrichment under Florida state
law. The case was subsequently transferred by the JPML to the MDL 2179 Court on October 2,
2013.

## LAW AND ARGUMENT

## I.      Motion to Remand

It is important to note that Kenneth R. Feinberg and Feinberg Rozen, LLP, d/b/a GCCF,
and William G. Green, Jr. are not named Defendants in *any* Master Complaint in MDL 2179. In

sum, neither Plaintiffs nor Defendants in the present cases are associated with MDL 2179.

Pursuant to this Court's Pretrial Order No. 15 (Rec. Doc. 676), "Pending further orders of this Court, all pending and future motions, including Motions to Remand, are continued without date unless a motion is specifically excepted from the continuance by the Court." Furthermore, pursuant to this Court's Pretrial Order No. 25 (Rec. Doc. 983), "All individual petitions or complaints that fall within Pleading Bundles B1, B3, D1, or D2, whether pre-existing or filed hereafter, are stayed until further order of the Court."

District Courts hold "the general discretionary power……..to stay proceedings in the interest of justice and in control of their dockets." *Wedgeworth v. Fibreboard Corp.*, 706 F.2d 541, 544-45 (5th Cir. 1983). *See also Landis v. North Am. Co.*, 299 U.S. 248, 254 (1936) (explaining that "the power to stay proceedings is incidental to the power inherent in every court"). Courts traditionally weigh three factors which are generally relevant to a stay [in this context]: (1) potential prejudice to the nonmovant; (2) hardship and inequity to the movant; and (3) the judicial resources to be saved by avoiding duplicative litigation. *Curtis v. BP Am., Inc.*, 808 F. Supp. 2d 976, 979 (S.D. Tex 2011); *see also Meinhart v. Halliburton Energy Servs., Inc.*, No. H-11-0073, 2011 WL 1463600 at *7 (S.D. Tex. Apr. 4, 2011).

Although *Curtis* and *Meinhart* focused on a stay pending transfer to this MDL, the stay standards are universal features of basic equity and thus are equally applicable to the question of whether Plaintiffs' pending Motions to Remand now in this Court should remain stayed. Again, Plaintiffs respectfully point out to this Honorable Court that each of the three classic equitable factors weigh in favor of immediately lifting the stay and granting Plaintiffs' Motions to Remand (*See* pp. 3, 4, Exhibit B).

-3-

Moreover, if a class member is unsatisfied with an applicable settlement, he or she has the right to choose whether to remain a class member. *See In re Lease Oil Antitrust Litig. (No. II)*, 186 F.R.D. 403, 440 (S.D. Tex. 1999). By opting out, those who are unhappy with the settlements' provisions escape their binding effect, and thus are free to pursue their claims and seek the relief they desire. *See In re Vitamins Antitrust Class Actions*, 215 F.3d 26, 28-29 (D.C. Cir. 2000). Here, each Plaintiff has opted out of the settlement agreements and "thus are free to pursue their claims and seek the relief they desire."

Allowing Feinberg, et al. to further harm Plaintiffs' financial condition by placing Plaintiffs' Motions to Remand on indefinite hold merely rewards the already recalcitrant Defendants.

By forcing Plaintiffs in the instant cases to await resolution of irrelevant discovery and factual disputes relating to completely different parties, theories of recovery and remedies, consolidation with MDL 2179 unreasonably delays Plaintiffs' pursuit of their claims.

For the foregoing reasons, Plaintiffs respectfully request that this Court except their Motion to Remand from the continuance ordered in Pre-Trial Order 15 and enter an order remanding their actions to the U.S. District Court for the Middle District of Florida.

## A. The Damages Incurred by Plaintiffs Did Not "Result From" the BP Oil Spill

The recent opinion of the Honorable Joseph C. Wilkinson, Jr. is instructive in this matter. *See Coastal Services Group, LLC v. BP Company North America, Inc. et al.*, Case No. 2:11-cv-02891-JCW (E.D. La. 2012) (pp. 7 – 10, Exhibit B). The recent opinion of the Honorable Carlton W. Reeves, United States District Court for the Southern District of

-4-

Mississippi, is also instructive in this matter. *See State of Mississippi v. Gulf Coast Claims Facility, et al.*, Case No. 3:11-cv-00509-CWR-LRA (S.D. Miss. 2011) (pp. 10 – 11, Exhibit B).

Plaintiffs respectfully point out to this Honorable Court that the present cases are the only three cases of their kind filed in any court in the country.

In each case, Plaintiffs' damages did not "result from" the oil spill. Defendants are not "Responsible Parties" under OPA. *See* 33 U.S.C. § 2701(32)(C). Defendants are independent contractors that administer, settle, and authorize the payment of certain claims asserted against BP, the "Responsible Party." Here, Defendants' "Delay, Deny, Defend" strategy or "Expedited EAP Denial" strategy and associated tortious acts, *not acts by BP*, resulted in the financial ruin of Plaintiffs. Accordingly, the damages incurred by Plaintiffs as a result of Defendants' tortious acts are not recoverable by Plaintiffs under OPA.

## II.     Motion to Commence Formal Discovery

"In unusual situations, the demands of complex litigation may be great enough to justify relieving the assigned judge from some or all other case assignments for a period of time or giving the judge assistance on aspects of the litigation from other judges." MANUAL FOR COMPLEX LITIGATION (Fourth) §10.12 (2005). "[I]n the course of consolidated or coordinated pretrial proceedings, severable claims or cases may appear that could be assigned to other judges." *Id.* §10.122.

This Court has previously used the help of other magistrate judges to resolve discrete issues in this MDL. For example, this Court reassigned and referred Case No. 12-814, which was consolidated in this MDL and originally assigned to Magistrate Judge Shushan, to Magistrate

Judge Wilkinson for purposes of pretrial case management. [Rec. Doc. 6203].

At the very least, in the event that Plaintiffs' Motion to Remand is denied, this Court could appoint another magistrate judge to handle formal discovery issues. Such an assignment would relieve some of the pressures suffered by this Court. The issues raised in Plaintiffs' cases against Feinberg, et al. do not duplicate or overlap with any issues being tried in the MDL 2179 Court.

Again, it is important to note that Kenneth R. Feinberg and Feinberg Rozen, LLP, d/b/a GCCF, and William G. Green, Jr. are not named Defendants in *any* Master Complaint in MDL 2179. In sum, neither Plaintiffs nor Defendants in the present cases are associated with MDL 2179.

Plaintiffs respectfully point out to this Honorable Court that the purpose of their motion to commence discovery, *in the event that their motion to remand is denied*, is not to seek to determine whether the settlement agreements allegedly negotiated in good faith and at arm's length between BP and the PSC are fair, reasonable, and adequate and free of collusion. Here, Plaintiffs solely move to commence discovery, *independent of the PSC*, with respect to their state law claims against Defendants Feinberg, et al.

At the very least, Plaintiffs require discovery related to: (a) the methodologies used by Feinberg, et al. or their agents to evaluate or pay claims; (b) information on how Feinberg, et al. handled claims for compensation for damages; and (c) any internal documents relating to the management of claims (e.g., employment of either their "Delay, Deny, Defend" strategy or "Expedited EAP Denial" strategy for the purpose of limiting BP's liability and financially ruining the plaintiffs).

-6-

Plaintiffs do not ask for special treatment; rather, they simply request prompt adjudication of their state law claims against Defendants Feinberg, et al. Because all Motions to Remand are stayed and Plaintiffs are not permitted to propound discovery by this Honorable Court, Plaintiffs essentially have no recourse through the legal process. Fundamental fairness requires that Plaintiffs be permitted to advance their claims.

Formal discovery on Feinberg, et al., and the associated pressure of a trial, are required in order exert pressure on the parties to negotiate a settlement which reflects the true value of the claims and not one which focuses on minimizing the liability of the defendants and BP. Certainly, as has occurred in MDL 2179, without formal discovery on Feinberg, et al. certain claims by private individuals and businesses, including Plaintiffs, for economic loss resulting from the operation of the GCCF may never be properly resolved.

### A.    Plaintiffs Do Not Waive Their Right to Remand

Plaintiffs respectfully point out to this Honorable Court that, in the event that the Court inexplicably denies their Motion to Remand and grants, in the alternative, their Motion to Commence Formal Discovery, Plaintiffs do not waive their right to remand their cases to the Transferor Court and subsequently, where applicable, to state court.

When a plaintiff participates in the federal action, he risks waiving his right to remand. *See, e.g., Johnson v. Odeco Oil and Gas Co*., 864 F.2d 40, 42 (5th Cir. 1989). Where a plaintiff does participate in the federal proceeding, "it is within the district court's discretion to determine whether the plaintiff's conduct amounts to a waiver of the right to remand." *Id.* In the cases where courts have found a waiver, the plaintiff generally took considerable affirmative action in

proceeding with the dispute in federal court. For example, plaintiffs have been found to have waived their right to remand by attending depositions, participating in substantial discovery, and failing to move for remand until after significant progress has been made in the federal action. *Benjamin v. Natural Gas Pipeline Co. of America*, 793 F. Supp. 729 (S.D. Texas 1992).

Waiver involves the intentional relinquishment of a known right, either expressly or by conduct inconsistent with an intent to enforce that right. In the removal context, waiver must consist of affirmative conduct or unequivocal assent. *Fellhauer v. City of Geneva* (N.D.Ill. 1987) 673 F.Supp. 1445, 1448. "There are no fixed criteria for determining when waiver of objections to removal has occurred." *Fecchion, Westinghouse Elec. Corp. v. Kirby* (W.D.Pa. 1986) 637 F.Supp. 290, 293. "[N]ot all conduct before the federal court constitutes waiver of the right to seek remand, but instead only conduct that is so substantial as to render it offensive to fundamental principles of fairness." *Beard v. Lehman Brothers Holdings, Inc.* (M.D.Ala. 2006) 458 F.Supp.2d 1314, 1323. The Court in *Beard* held that the plaintiff's participation in motion practice in Federal Court was not a waiver of the right to remand. 458 F.Supp.2d at 1324. Defendants have suffered no prejudice as a result of the plaintiffs' filing the "Request to Enter Default."

In *Knowles v. Hertz Equipment Rental Co.* (S.D.Fla. 1987) 657 F.Supp. 109, even though the Court found that the plaintiffs carried on sufficient activity to constitute a waiver of the right to remand, the Court nevertheless ordered the case remanded because "[t]he Court finds that Plaintiffs' actions in this case have not caused any real prejudice or hardship to Defendants." 657 F.Supp. at 111. In refusing to find a waiver of the right to remand where the defendant did not suffer any prejudice, the Court in *Noethe v. Mann*, (D.Minn. 1928) 27 F.2d 451, 452 stated: "[A]

-8-

party who has improperly removed such a case as this can have no just cause for complaint, if it is sent back to the court where it was commenced. He is simply required to forego some real or fancied advantage in the matter of jurisdiction to which he was not entitled under the law."

In the present cases, Plaintiffs filed timely Motions to Remand. They have hotly contested the improper removal of their cases to federal court, and the subsequent transfer of their cases to this Honorable Court, from the outset. In fact, the only issue that has arisen in these cases involves the propriety of the removals and transfers. To say that Plaintiffs have resigned themselves to litigating their claims in federal court would be to blatantly ignore what has occurred in this Court since Feinberg, et al. removed and transferred their cases. Plaintiffs' conduct, viewed in its totality, clearly shows that they have not resigned themselves to litigating these cases in federal court.

> **B.** **The Stay Imposed on the Plaintiffs' Motions to Remand Was Initially Inappropriate and Remains So. The Continued Refusal of the MDL 2179 Court to Permit Formal Discovery on Feinberg, et al. Is Equally Egregious.**

On August 10, 2010, the United States Judicial Panel on Multidistrict Litigation ("JPML") issued its Transfer Order (Rec. Doc. 1) wherein it clearly states:

> "IT IS THEREFORE ORDERED that, pursuant to 28 U.S.C. § 1407, the actions listed on Schedule A and pending outside the Eastern District of Louisiana are transferred to the Eastern District of Louisiana and, with the consent of that court, assigned to the Honorable Carl J. Barbier *for coordinated or consolidated pretrial proceedings* with the actions pending in that district and listed on Schedule A." (Emphasis added)

Plaintiffs respectfully point out to this Honorable Court that the JPML transferred, albeit inappropriately, their actions to MDL 2179 *for coordinated or consolidated pretrial proceedings*. These actions were not transferred for the purpose of ensuring that Feinberg, et al. are never held accountable for their tortious acts.

-9-

The JPML has previously made clear that, where related claims *are being litigated* in the centralized proceedings in MDL 2179, a case is appropriate for transfer even if it raises different factual issues from the personal injury and economic loss actions in MDL 2179. (4/18/11 Transfer Order, MDL 2179, Doc. No. 555 (transferring contract actions related to VoO program to MDL 2179 where "related claims already [were] being litigated in the centralized proceedings"). The three present cases are not "being litigated" in MDL 2179. These three cases are being inappropriately and indefinitely stayed (in essence, "warehoused") in MDL 2179.

### 1.  The MDL 2179 Court Has Declined to Permit Formal Discovery on Feinberg, et al.

Once these cases were transferred to the MDL 2179 Court, not only were the cases automatically stayed, but the claims were inexplicably deemed "amended, restated, and superseded" by the allegations and claims of the Master Complaint in Pleading Bundle B1 (*See* Pre-Trial Order No. 25, Para. 5, Jan. 12, 2011).

On August 29, 2011, Plaintiffs' Counsel emailed a letter to James Parkerson Roy wherein he informed Mr. Roy that the *Pinellas Marine Salvage, Inc., et al. v. Kenneth R. Feinberg, et al.* case had been transferred to MDL 2179. The letter, in pertinent part, stated "I would like to commence discovery as soon as possible. Since this action does not involve common questions of fact with actions previously transferred to MDL No. 2179, please advise as to how we may most expeditiously initiate and coordinate discovery......I look forward to working with you on this case." On September 5, 2011, Plaintiff's Counsel received an email from Stephen J. Herman wherein Mr. Herman stated, "*please be advised that the Court has, thus far, declined to permit formal discovery on Feinberg or the GCCF.*"

On December 25, 2012, the undersigned counsel received an email from Stephen J. Herman wherein Mr. Herman stated, "….I would suggest that your clients not participating in the Economic Settlement will best be served if you: (i) ensure that you and/or they make Presentment of what you and/or they believe to be their full damages before January 18, 2013; and then, having made such presentment, (ii) file (or re-file) (and/or amend) suit on their behalf by April 20, 2013; and then (iii) with respect to any client whom you believe to have executed an invalid GCCF Release, assemble and prepare the best case you can to support the argument that such Release was procured under fraud, error or duress."

> ### 2. The PSC Intentionally Failed to Notify All GCCF Victims (Its Clients) That a Lawsuit May be Filed Against Kenneth R. Feinberg, et al. Without Having to Fulfill the OPA "Presentment" Requirement.

GCCF victims may file an action alleging that Defendants Kenneth R. Feinberg, Feinberg Rozen, LLP, d/b/a GCCF, misled them by employing a "Delay, Deny, Defend" strategy. This strategy, commonly used by unscrupulous insurance companies, is as follows: "Delay payment, starve claimant, and then offer the economically and emotionally-stressed claimant a miniscule percent of all damages to which the claimant is entitled. If the financially ruined claimant rejects the settlement offer, he or she may sue." In sum, Plaintiffs would allege that BP is responsible for the oil spill incident; Feinberg, et al. (*independent contractors*), via employment of their "Delay, Deny, Defend" strategy, are responsible for not compensating and thereby financially ruining Plaintiffs.

Since Feinberg, et al is not a "Responsible Party" and therefore may not be sued under OPA, a lawsuit against Feinberg, et al. may be filed immediately because it does not require

"Presentment." Moreover, the PSC should have advised all GCCF victims in regard to the statute of limitations and the associated tolling of the statute of limitations for class actions and fraudulent concealment or a misrepresentation by the defendant (See QUESTION NO. 12, Exhibit D).

### 3. The PSC, Which Intentionally Failed to Adequately Challenge the Legality of the GCCF Release and Covenant Not to Sue for the Previous Two Years, Suddenly Advises Non-PSC Attorneys to "Assemble and Prepare the Best Case You Can to Support the Argument That Such Release Was Procured Under Fraud, Error or Duress."

The ultimate objective of the "Delay, Deny, Defend" strategy of Feinberg, et al. was to obtain a signed "Release and Covenant Not to Sue" from as many BP oil spill victims as possible. Here, the GCCF Status Report as of March 07, 2012 is instructive (*See* background information for QUESTION NO. 8, Exhibit C).

Feinberg, et al. cannot justify limiting payments under the Quick Payment Final Claim program to just $5,000 for individuals and $25,000 for businesses. There is no evidence that these amounts even remotely represent adequate consideration to compensate claimants for the damages that claimants did or will suffer.

Plaintiffs respectfully point out to this Honorable Court that *if the PSC had properly filed the B1 Master Complaint under OPA, **a strict liability statute**, rather than alleging claims under admiralty law, Feinberg, et al. would never have been allowed to use the Release and Covenant Not to Sue to illegally exclude approximately 200,000 BP oil spill victims from the E&PD class settlement.*

-12-

On December 31, 2012, the undersigned counsel noted in his letter to Stephen J. Herman, "It has been, and remains, the responsibility of the PSC to 'assemble and prepare the best case to support the argument that such Release was procured under fraud, error or duress.' On September 25, 2012, my clients filed their Motion to Nullify Each and Every Gulf Coast Claims Facility Release and Covenant Not to Sue. (*See* Rec. Doc. 7473-1). Please feel free to use the legal argument in this motion to assist with the preparation of the PSC case" (See QUESTION NO. 13, Exhibit D).

On December 9, 2013, the undersigned counsel sent an email to Stephen J. Herman wherein he inquired, "Please advise as to when the Court will permit formal discovery on Feinberg or the GCCF." Mr. Herman's terse response was "No idea." The undersigned counsel then asked Mr. Herman, "Would you be kind enough to attempt to find out when the Court will permit formal discovery on Feinberg or the GCCF?" Mr. Herman responded, "Yes. At an appropriate time."

Plaintiffs respectfully point out to this Honorable Court that "an appropriate time" to commence formal discovery on Feinberg, et al. has long since passed.

The purpose of the Federal Rules of Civil Procedure is "to secure the just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1. As of the date of the filing of this motion, approximately **38 months** have passed since Plaintiffs Pinellas Marine Salvage Inc., et al. filed their complaint against Feinberg, et al.

-13-

**III.    Plaintiffs' Motion to Remand or, in the Alternative, Motion to Commence Formal Discovery Should be Granted Because MDL 2179 and Feinberg's Fund Approach to Resolving Mass Claims Are Wrong for America!**

Plaintiffs respectfully point out to this Honorable Court that MDL 2179 and Feinberg's fund approach to resolving mass claims are wrong for America (*e.g., See* Exhibits C and D).

The BP Oil Spill Multidistrict Litigation ("MDL 2179") officially started on August 10, 2010. The Transfer Order issued on that date by the JPML clearly states:

"Centralization may also facilitate closer coordination with Kenneth Feinberg's administration of the BP compensation fund."

From the very beginning, the purpose of MDL 2179 has been to replace democratic adversarial litigation with a fund approach to compensating victims of the BP oil spill. BP and the PSC reported settlement negotiations began "in earnest" in February 2011 for two distinct class action settlements: a Medical Benefits Settlement and an Economic and Property Damages Settlement." In sum, the PSC initiated settlement negotiations "in earnest" merely four (4) months after Judge Barbier appointed members to the PSC. Clearly, the MDL 2179 class settlement was not achieved in the full context of adversarial litigation. The vast majority of BP oil spill victims will never have their day in court. Judicial economy, rather than justice, is the primary objective.

The fund approach to resolving mass claims, e.g., those claims resulting from the BP oil spill incident, ought to be viewed with a significant degree of concern. The precedent established by the JPML and the MDL 2179 Court is clear:

A "Responsible Party" under the Oil Pollution Act of 1990 ("OPA 90") may now enter into a contract with a politically well-connected third party "Claims Administrator," e.g.,

-14-

Kenneth R. Feinberg and Feinberg Rozen, LLP, d/b/a Gulf Coast Claims Facility ("GCCF"). This third party "Administrator / Straw Person," *directly and excessively compensated by the party responsible for the oil spill incident*, may totally disregard OPA 90, operate the claims process of the responsible party as fraudulently and negligently as it desires for the sole purpose of limiting the liability of, and providing closure to, the responsible party, and the third party "Administrator / Straw Person" shall never be held accountable for its tortious acts.

On August 23, 2010, Feinberg Rozen, LLP, doing business as GCCF, replaced the claims process which BP had established to fulfill its obligations as a responsible party pursuant to OPA 90.

Feinberg used the fear of costly and protracted litigation to coerce victims of the BP oil spill to accept grossly inadequate settlements from GCCF. During town hall meetings organized to promote GCCF, Feinberg repeatedly told victims of the BP oil spill, "the litigation route in court will mean uncertainty, years of delay and a big cut for the lawyers." "I am determined to come up with a system that will be more generous, more beneficial, than if you go and file a lawsuit." "It is not in your interest to tie up you and the courts in years of uncertain protracted litigation when there is an alternative that has been created," Feinberg said. He added, "I take the position, if I don't find you eligible, no court will find you eligible."

GCCF employed two strategies to limit BP's liability:

(a) an "Expedited Emergency Advance Payment ("EAP") Denial" strategy. This strategy is as follows: "Fail to verify, investigate, and appraise the amount of loss claimed by the claimant in the EAP claim and deny the EAP claim without ever requesting supporting documentation from the claimant;" and

-15-

(b) a "Delay, Deny, Defend" strategy against legitimate oil spill victims. This strategy, commonly used by unscrupulous insurance companies, is as follows: "Delay payment, starve claimant, and then offer the economically and emotionally-stressed claimant a miniscule percent of all damages to which the claimant is entitled. If the financially ruined claimant rejects the settlement offer, he or she may sue."

The ultimate objective of Feinberg's "Expedited EAP Denial" strategy and "Delay, Deny, Defend" strategy was to limit BP's liability by obtaining a signed "Release and Covenant Not to Sue" from as many BP oil spill victims as possible.

Feinberg's "Release and Covenant Not to Sue" requirement (which violates OPA 90, State contract law, and is contrary to public policy) forced economically and emotionally-stressed victims of the BP oil spill to sign a release and covenant not to sue in order to receive a miniscule payment amount for all damages, including future damages, they incur.

Feinberg's actions, although unconscionable, have proven to be very effective for GCCF and BP:

(a) GCCF forced **84.68%** of the claimants to sign a "Release and Covenant Not to Sue" in which the claimant agreed not to sue BP and all other potentially liable parties;

(b) Only **15.32%** of the claimants were not required to sign a "Release and Covenant Not to Sue" in order to be paid;

(c) **GCCF denied payment to approximately 61.46% of the claimants who filed claims;**

(d) The average total amount paid per claimant by GCCF was a paltry $27,466.47; and

(e) Feinberg's "Release and Covenant Not to Sue" excluded approximately 200,000 BP oil spill victims from the MDL 2179 economic and property damages class settlement agreement.

The operation of GCCF has allowed BP to control, manage, and settle its liabilities on highly preferential terms; has permitted members of the MDL 2179 Plaintiffs' Steering Committee, who are directly appointed by Judge Barbier, to be excessively compensated for merely negotiating a collusive settlement agreement; and has enabled judges to clear their

-16-

dockets of large numbers of cases. In sum, fund approaches to resolving massive liabilities shift power over claims resolution entirely into the hands of self-interested parties and largely evade judicial scrutiny and oversight.

Efficiency is not the only touchstone of justice. A substantial body of opinion and a respect for jurisdictional principles suggest that a plaintiff ordinarily has a right to a trial in the forum of his or her choosing. *See*, e.g., *Koster v. (Am.) Lumbermens Mut. Cas. Co*., 330 U.S. 518, 524 (1947) (noting that a plaintiff ordinarily should not be denied the advantages of his chosen jurisdiction). Aggregation of cases for the purpose of facilitating settlement is a byproduct of §1407, but is not its central statutory purpose. *See In re Patenaude*, 210 F.3d 135, 144 (3d Cir. 2000). *Id.*

Judicial economy is undoubtedly well-served by MDL consolidation when scores of similar cases are pending in the courts. Nevertheless, the excessive delay and marginalization of juror fact finding (i.e., dearth of jury trials) associated with traditional MDL practice are developments that cannot be defended. *Delaventura v. Columbia Acorn Trust*, 417 F. Supp. 2d at 153 (D. Mass. 2006). The appropriate focus for fund resolution of mass claims should be justice for the claimants, not merely judicial economy and closure for the corporate misfeasor.

**A.    At the Very Least, Plaintiffs Should be Allowed to Freely Pursue Their Claims and Seek the Relief They Desire Against Defendants Feinberg, et al. in Order to Diminish the Appearance of Impropriety by the MDL 2179 Court.**

Plaintiffs, recognizing the need to: (a) avoid the appearance of impropriety, and (b) demonstrate compliance with the canons of judicial conduct designed to maintain public confidence in the judiciary, respectfully point out the following to this Honorable Court.

-17-

Legislative history indicates that 28 U.S.C. § 455(a) was meant to lessen the traditional "duty to sit," and, as the Supreme Court has indicated, to require avoidance of even the appearance of partiality. *Liljeberg v. Health Serv. Acquisition Corp.*, 486 U.S. 847, 860-61, 108 S.Ct. 2194, 2202-03, 100 L.Ed.2d 855 (1988). Recusal may be required even in the absence of actual partiality if there is an objectively reasonable basis for doubting the judge's impartiality. *Id. See* Code of Judicial Conduct, Canon 2 (1973): "[A] judge should avoid impropriety and the appearance of impropriety in all his activities."

The proper standard for ascertaining whether a judge's impartiality might reasonably be questioned under Section 455(a) is whether the charge of lack of impartiality is grounded on facts that would create a reasonable doubt, not in the mind of the judge, or even necessarily that of the litigant, but rather in the mind of the reasonable person. See *United States v. Cowden*, 545 F.2d 257, 265 (1st Cir. 1976), cert. denied, 430 U.S. 909, 97 S.Ct. 1181, 51 L.Ed.2d 585 (1977).

In *Republic of Panama v. The American Tobacco Company, Inc., et al.*, the Fifth Circuit pointed out that denial of recusal is reviewed for abuse of discretion. *Trevino v. Johnson*, 168 F.3d 173, 178 (5th Cir. 1999). Section 455(a) states that a judge should recuse himself "in any proceeding in which his impartiality might reasonably be questioned." "In order to determine whether a court's impartiality is reasonably in question, the objective inquiry is whether a well-informed, thoughtful and objective observer would question the court's impartiality." *Trust Co. v. N.N.P.*, 104 F.3d 1478, 1491 (5th Cir. 1997) (citing *United States v. Jordan*, 49 F.3d 152, 155-58 (5th Cir.1995)). The review of a recusal order under § 455(a) is "extremely fact intensive and fact bound," thus a close recitation of the factual basis for the appellants recusal motion is necessary. The Fifth Circuit has previously pointed out, the purpose of § 455(a), and the principle of recusal

-18-

itself is not just to prevent *actual* partiality, but to "avoid even the appearance of partiality."
*Jordan*, 49 F.3d at 155. The analysis of a § 455(a) claim must be guided, not by comparison to
similar situations addressed by prior jurisprudence, but rather by an independent examination of
the facts and circumstances of the particular claim. *United States v. Bremers*, 195 F.3d 221, 225
(5th Cir. 1999) (citing *Jordan*, 49 F.3d at 157).

Moreover, in *Republic of Panama v. The American Tobacco Company, Inc., et al.*, citing
*Tramonte v. Chrysler Corporation*, 136 F.3d 1025,1027-29 (5th Cir. 1998), the Fifth Circuit
further held that if the district court judge should have recused himself any orders entered
following disposition of the recusal motion should be vacated.

## **CONCLUSION**

For all the foregoing reasons, Plaintiffs respectfully request that this Honorable Court:
(1) grant their Motion to Remand their actions to the U.S. District Court for the Middle District
of Florida; or (2) *in the alternative*, *without resulting in a waiver of Plaintiffs' right to ultimately
remand their actions to state court where applicable*, grant their Motion to Commence Formal
Discovery against Feinberg, et al. *independent of the PSC*.

DATED: April 24, 2014                                    Respectfully submitted,

                                                         **/s/ Brian J. Donovan**
                                                         Brian J. Donovan
                                                         Attorney for Plaintiffs
                                                         Florida Bar No. 143900
                                                         3102 Seaway Court, Suite 304
                                                         Tampa, FL 33629
                                                         Tel: (352)328-7469
                                                         BrianJDonovan@verizon.net

E-SERVICE
61349602
Nov 13 2017
09:18AM
File & ServeXpress

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

In Re: Oil Spill by the Oil Rig               MDL No. 2179
       "Deepwater Horizon"
       in the Gulf of Mexico,
       on April 20, 2010                SECTION: J

This Document Relates to:
Salvesen v. Feinberg, et al.,               JUDGE BARBIER
2:11-cv-02533                    MAG. JUDGE WILKINSON
Pinellas Marine Salvage Inc., et al. v. Feinberg, et al.,
2:11-cv-1987
Ditch v. Feinberg et al.,
2:13-cv-06014
_____/

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO REQUEST THIS COURT TO PLACE ON THE PUBLIC RECORD THE TOTAL AMOUNT AND SOURCE OF COMPENSATION, *FROM ALL SOURCES*, PAID TO ALL MEMBERS OF THE PSC, et al.

## BACKGROUND

On June 15, 2011, Plaintiff Salvesen filed his action against Defendants Kenneth R. Feinberg, Feinberg Rozen, LLP, d/b/a GCCF, and William G. Green, Jr. in the Circuit Court of the Twentieth Judicial Circuit in and for Lee County, Florida asserting claims for gross negligence, negligence, negligence per se, fraud, fraudulent inducement, promissory estoppel, and unjust enrichment under Florida state law. The case was subsequently transferred by the JPML to the MDL 2179 Court on October 6, 2011. On February 25, 2011, Plaintiffs Pinellas Marine Salvage Inc., et al. filed their action against Defendants Kenneth R. Feinberg and Feinberg Rozen, LLP, d/b/a GCCF, in the Circuit Court of the Sixth Judicial Circuit in and for Pinellas County, Florida asserting claims for gross negligence, negligence, negligence per se, fraud, fraudulent inducement, promissory estoppel, and unjust enrichment under Florida state

law. The case was subsequently transferred by the JPML to the MDL 2179 Court on August 9, 2011. On June 12, 2013, Plaintiff Ditch, a victim of Defendants' "Expedited EAP Denial" strategy, filed his action against Defendants in the Circuit Court of the Twentieth Judicial Circuit in and for Lee County, Florida asserting claims for gross negligence, negligence, negligence per se, fraud, fraudulent inducement, promissory estoppel, and unjust enrichment under Florida state law. The case was subsequently transferred by the JPML to the MDL 2179 Court on October 2, 2013. Pursuant to this Court's Pretrial Order No. 15 (Rec. Doc. 676), "Pending further orders of this Court, all pending and future motions, including Motions to Remand [filed by Plaintiffs Salvesen, Pinellas Marine Salvage Inc., et al., and Ditch], are continued without date unless a motion is specifically excepted from the continuance by the Court." All motions filed by Plaintiffs since August 2011, including Motions to Remand, remain continued without date.

## **INTRODUCTION**

This is neither a Motion to Compel nor an Objection. This is a Motion by the plaintiffs to request this Honorable Court to conduct itself in a fully transparent manner by placing on the public record the total amount and source of compensation, *from all sources*, paid to all members of the PSC and the total amount and source of compensation paid to the legal experts, Special Masters, and Claims Administrator Patrick Juneau.

The following issues have resulted in a complete loss of the public's trust in MDL 2179:
(a) the excessive compensation paid to the MDL 2179 PSC attorneys;
(b) as the parties were approaching the final fairness hearing in November 2012, the PSC, et al. colluded to intentionally mislead the plaintiffs;
(c) the manner in which the FCC allocated the common benefit fees and costs award;
(d) the fact that Mikal C. Watts was awarded $18,290,494.18 in common benefit fees; and
(e) The failure of the PSC to adequately represent victims of the BP oil well blowout of April 20, 2010.

The potential harm to the public's perception of the judicial process is especially acute in MDL 2179 because of the large number of plaintiffs.

The total compensation paid to the 19 PSC attorneys and their law firms is guesstimated to be *$3.035 billion*. It is beyond cavil that a reasonable, objective observer would not conclude that this amount is out of all proportion to the value of the professional services rendered.

Plaintiffs respectfully point out to this Honorable Court that a narrow focus on judicial efficiency cannot allow the circumvention of the core democratic premises of representation, transparency, and accountability.

## LAW AND ARGUMENT

### I.  The Court's Inherent Authority to Exercise Ethical Supervision over the Parties

The judiciary has well-established authority to exercise ethical supervision of the bar in both individual and mass actions. *In re Vioxx Prods. Liab. Litig.*, 574 F. Supp. 2d 606, 611 (E.D. La. 2008) (citing *In re Zyprexa Prods. Liab. Litig.*, 424 F. Supp. 2d 488, 491 (E.D.N.Y. 2006) (mass tort litigation is a "quasi-class action," requiring the "imposition of fiduciary standards to ensure fair treatment to all parties and counsel regarding fees and expenses")). Among the broad equitable powers of a federal court is its supervisory capacity over an attorney's contingent fee contracts. *Karim v. Finch Shipping Co., Ltd.*, 233 F. Supp. 2d 807, 810 (E.D. La. 2002), *aff'd*, 374 F.3d 202 (5th Cir. 2004). Even when the validity of the fee contract itself has not been challenged by the parties, it is within the court's inherent power of supervision over the bar to examine the attorney's fee for conformance with the reasonable standard of the Code of Ethics. *See Rosquist v. Soo Line R.R.*, 692 F.2d 1107, 1111 (7th Cir. 1982). *See Gair v. Peck*, 160 N.E.

-3-

2d 43, 48 (N.Y. 1959) ("contingent fees may be disallowed as between attorney and client in spite of contingent fee retainer agreements, where the amount becomes large enough to be out of all proportion to the value of the professional services rendered."). Transferee courts necessarily retain the authority to examine attorney fees *sua sponte* because the attorneys' interests in this regard are in conflict with those of their clients. *See In re Guidant*, 2008 WL 682174, at *18 ("As for the representative counsel involved, Plaintiffs' counsel have a built-in conflict of interest that is directly opposed to that of their clients."); *In re Zyprexa*, 424 F. Supp. 2d at 491-92 ("Plaintiffs' counsel have a built-in conflict of interest; and the defendant is buying peace and is generally disinterested in how the fund is divided so long as it does not jeopardize the settlement.").

In allocating fees, courts must "conform to 'traditional judicial standards of transparency, impartiality, procedural fairness, and ultimate judicial oversight.'" *In re* Vioxx Products Liability Litigation, 802 F.Supp.2d 740, 772 (2011). They do so with input from lead attorneys, but ultimate discretion lies with the transferee court, whose cost awards are subject to abuse of discretion review by the appellate court. *In re* San Juan Dupont Hotel Fire Litig., 111 F.3d 220, 228 (1st Cir. 1997). *See also* In re High Sulfur Content Gasoline Prod. Liability Litig., 517 F.3d 220, 227 (5th Cir. 2008) ("We must determine whether the record clearly indicates that the district court has….not proceeded in a summary fashion, and has arrived at an amount that can be said to be just compensation."). The transferee court cannot abdicate its responsibility of closely scrutinizing fee awards to appointed counsel. *See* High Sulfur Content Gasoline Prod. Liability Litig., 517 F.3d at 227.

-4-

As these global settlements occur more frequently and as the public consciousness focuses more closely on the outcome of mass tort litigations, there will also be a growing need to protect the public's trust in the judicial process. *See* In re Zyprexa, 424 F.2d at 494. ("Public understanding of the fairness of the judicial process in handling mass torts….is a significant aspect of complex national litigations involving thousands of parties.").

The potential harm to the public's perception of the judicial process is especially acute in the instant case because of the large number of claimants. *See id.* at 493 ("The risk of excessive fees is a special concern here because of the mass nature of the case.").

Plaintiffs respectfully point out to this Honorable Court that contingent fees are designed to increase proportionally alongside a plaintiff's recovery - to tie the fates of lawyer and client. When PSC attorneys take things one-step further and bargain for the defendant to pay their common benefit fees directly, they sever that tie. As a result, the attorneys' financial self-interest may no longer be linked to their clients' outcome, but to the defendant's wishes. This concern has long been recognized as one of structural collusion in the class context. John C. Coffee, Jr., *Rethinking the Class Action: A Policy Primer on Reform*, 62 IND. L.J. 625, 647-48 (1987). Courts have agreed. *E.g.,* Zucker v. Occidental Petroleum Corp., 192 F.3d 1323 (9th Cir. 1999).

## II.     The Basis of the Court's Authority to Conduct Itself in a Fully Transparent Manner

Our democratic society favors court transparency to encourage public confidence in our judicial system and avoid the perception that our courts are "star chambers." *See* Christophersen v. Allied-Signal Corp., 939 F.2d 1106, 1129 (5th Cir. 1991) (The term "star chambers" is the theoretical description of court orders and rulings that cannot be questioned and lack accountability.).

As Chief Justice Burger wrote, the First Amendment is intended to "prohibit government from limiting the stock of information from which members of the public may draw," then it makes sense to say that it prevents the government from closing court proceedings that have long been open to the public. *See* Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 576 (1980).

Justice Stevens further remarked on the significance of the Court's shift in his concurring opinion in *Richmond Newspapers*:

> "This is a watershed case. Until today the Court has accorded virtually absolute protection to the dissemination of information or ideas, but never before has it squarely held that the acquisition of newsworthy matter is entitled to any constitutional protection whatsoever….I agree that the First Amendment protects the public and the press from abridgment of their rights of access to information about the operation of their government, including the Judicial Branch…." *See* Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 582, 584 (1980).

As the California Supreme Court observed: "If public court business is conducted in private, it becomes impossible to expose corruption, incompetence, inefficiency, prejudice, and favoritism." *See* NBC Subsidiary (KNBC-TV), Inc. v. Superior Court, 980 P.2d 337, 360 n.28 (Cal. 1999) (quoting *In re* Estate of Hearst, 136 Cal. Rptr. 821, 824 (Ct. App. 1977)).

"Judges are not politicians, even when they come to the bench by way of the ballot," Chief Justice John Roberts Jr. observed in *Williams-Yulee v. Florida Bar,* 135 S. Ct. 1656 (2015). As he noted, "politicians are expected to be appropriately responsive to the preferences of their supporters," whereas this "is not true of judges." To the contrary, "a judge instead must 'observe the utmost fairness,' striving to be 'perfectly and completely independent.'" *Id.* (quoting Address of John Marshall (Dec. 11, 1829), *in* PROCEEDINGS AND DEBATES OF THE VIRGINIA STATE CONVENTION OF 1829–1830 615, 616 (1830)).

Judge Frank Easterbrook has noted: "The political branches of government claim legitimacy by election, judges by reason. Any step that withdraws an element of the judicial process from public view makes the ensuing decision look more like fiat and requires rigorous justification." *See* Hicklin Eng'g, L.C. v. Bartell, 439 F.3d 346, 348 (7th Cir. 2006).

Although the Supreme Court has not directly addressed the issue of whether a First Amendment right of access extends to civil proceedings, it has noted that "historically both civil and criminal trials have been presumptively open." *See* Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 580 n.17 (1980); *see also* Craig v. Harney, 331 U.S. 367, 374 (1947) ("A trial is a public event. What transpires in the court room is public property.").

Indeed, the Court has observed that "in some civil cases the public interest in access….may be as strong as, or stronger than, in most criminal cases." *See* Gannett Co. v. DePasquale, 443 U.S. 368, 386 n.15 (1979); *see also* Publicker Indus., Inc. v. Cohen, 733 F.2d 1059, 1070 (3d Cir. 1984) ("Public access to civil trials, no less than criminal trials, plays an important role in the participation and the free discussion of governmental affairs."); Chi. Council of Lawyers v. Bauer, 522 F.2d 242, 258 (7th Cir. 1975) ("Civil litigation in general often exposes the need for governmental action or correction. Such revelations should not be kept from the public.").

## III.    Issues Which Have Resulted in a Complete Loss of the Public's Trust in MDL 2179

### A.    Excessive Compensation Paid to MDL 2179 PSC Attorneys

Members of the PSC and their law firms in MDL 2179 are quadruple-dipping.

The known sources of compensation received by the members of the PSC and their law firms in MDL 2179 are: (a) Common Benefit Fees; (b) Contingent Fees; (c) Co-counsel Fees; and (d) Hold-Backs.

The most egregious form of compensation, in terms of pure greed, are co-counsel fees which are fees solicited and received by members of the PSC and their law firms for serving as co-counsel to non-member firms of the PSC. For example, on March 13, 2012, Plaintiffs' retained counsel received an unsolicited mass email from a member of the PSC. The email stated, in pertinent part, "Co-Counsel Opportunity for BP Oil Spill Cases: News of the recent BP Settlement has caused many individuals and businesses along the Gulf Coast to contemplate either filing a new claim or amending a claim that has already been submitted. *If you receive inquiries of this nature we would like you to consider a co-counsel relationship with our firm.* Even if someone has already filed a claim it is advisable to retain legal counsel to analyze the impact of this settlement on claimants and maximize recovery. If you receive inquiries and are interested in co-counseling with us on the BP claims, please email…."

The total compensation paid to the 19 PSC attorneys and their law firms is guesstimated to be *$3.035 billion*. This amount assumes that fifty percent (50%) of the paid claims are for clients of PSC attorneys and their law firms. Plaintiffs respectfully point out that due to the complete lack of transparency in MDL 2179 this amount is merely a guesstimate. However, it is not beyond the realm of possibility.

**B.      The PSC, et al. Colluded to Intentionally Mislead the Plaintiffs**

Judge Barbier states, "….as the parties were approaching the final fairness hearing in November 2012, there was a concerted effort by the parties and claims facility to process a

substantial number of high value claims in order to demonstrate that the settlement program was working as intended....BP and Class Counsel were aware of the push to resolve claims, as was the Court. Although some of these claims were for clients of PSC members, according to Mr. Juneau over 60% of the claims were for clients of non-PSC attorneys....While the Settlement Agreement in general terms provides that claims will be processed in the order in which they are received....there is no evidence that the Claims Administrator acted improperly in this regard." (Rec. Doc. 13635 at 3, November 10, 2014).

In sum, the PSC members colluded with BP and Patrick Juneau, the claims administrator, to expeditiously process and inflate the amount of compensation received by some plaintiffs (just prior to the "fairness" hearing) in order to intentionally mislead the remaining plaintiffs into believing that the proposed settlement is fair, reasonable, and adequate. Approximately 40% of these "high value" claims were for clients of PSC members. Why would a plaintiff possibly want to opt-out of a settlement which is going to provide such generous compensation?

### C.     How the FCC Allocated the Common Benefit Fee and Costs Award

On July 15, 2015, Judge Barbier appointed a Common Benefit Fee and Cost Committee ("FCC") to be responsible for submitting to the Court an Aggregate Fee and Cost Petition and an Allocation Recommendation.

> The FCC is comprised of:
> (a) Stephen J. Herman of Herman, Herman & Katz, LLC, Co-Liaison Counsel in MDL 2179, who shall serve as Co-Chair and Secretary of the FCC.
> (b) James P. Roy of Domengeaux Wright Roy Edwards & Colomb LLC, Co-Liaison Counsel in MDL 2179, who shall serve as Co-Chair of the FCC.
> (c) Robert T. Cunningham of Cunningham Bounds, LLC.
> (d) Brian H. Barr of Levin, Papantonio, Thomas, Mitchell, Rafferty & Proctor, PA.

(e) Calvin C. Fayard, Jr. of Fayard & Honeycutt, APC
(f) Robin L. Greenwald of Weitz & Luzenberg, P.C.
(g) Dawn M. Barrios of Barrios, Kingsdorf & Casteix, L.L.P.
(Rec. Doc. 14863 at 3, July 15, 2015).

It is interesting to note that six of the seven members appointed to the FCC are attorneys previously appointed by Judge Barbier to the MDL 2179 PSC. Plaintiffs respectfully point out that it doesn't take a great deal of imagination to figure out how the $720.15 million would be allocated.

| | |
|---|---|
| Total Amount FCC Paid to Themselves | $321,602,542.45 |
| Total Amount Paid to Other PSC Members | $277,043,154.06 |
| Amount Paid to Barrios, Kingsdorf & Casteix, L.L.P. (a) | $    1,291,576.47 |
| Total Amount Paid to All PSC Members | $597,354,120.04 |

(a) Not an MDL 2179 PSC Member

| Guesstimated Calculation of Common Benefit Fees Paid to 103 Non-PSC Attorneys | |
|---|---|
| Total Recommended Fee Allocations | US$704.500 million (b) |
| Total Compensation Paid to 19 PSC Attorneys | US$597.354 million |
| Total Compensation Paid to 103 Non-PSC Attorneys | US$107.146 million |

(b) According to the FCC, the proposed recommended fee allocations total approximately $704.5 million. This leaves a proposed reserve of approximately $15.65 million.

### D.     Mikal C. Watts was Awarded $18,290,494.18 in Common Benefit Fees

On October 8, 2010, Judge Barbier appointed Mikal C. Watts as one of the initial fifteen members to the MDL 2179 PSC. Watts was appointed based largely on the fact that he allegedly had more than 40,000 clients. On March 13, 2013, Watts resigned from the MDL 2179 PSC. On September 15, 2015, Watts and six codefendants were indicted by a federal grand jury on 95 counts of conspiracy, mail and wire fraud, identity theft, and aggravated identity theft.

-10-

As set forth in the indictment, the defendants, without contacting the individuals, would obtain names, addresses, dates of birth, and social security numbers from any source available to create "clients" for anticipated litigation as a result of the *Deepwater Horizon* Oil Spill. The indictment further alleges that the defendants fraudulently submitted names of over 40,000 individuals as plaintiffs represented by Mikal C. Watts in litigation related to the *Deepwater Horizon*/BP oil spill, knowing that the individuals had not consented to be represented by the firm, and/or that stolen and false social security numbers, dates of birth, addresses, and occupations were claimed. According to the indictment, the defendants attempted to obtain payments from the Gulf Coast Claims Facility for persons Mikal C. Watts claimed to represent and ultimately submitted 'Presentment Forms' to BP for each of the 40,000 plus individuals Mikal C. Watts claimed to represent. The indictment alleges that the total amount of claims submitted by the defendants to BP was in excess of $2 billion.

On April 11, 2017, the FCC filed its proposed fee allocation with the MDL 2179 Court. (Rec. Doc. 22628). The FCC recommended Watts Guerra LLP be allocated $16,790,494.18 in common benefit fees.

The FCC explains, "The Fee Committee has not taken into consideration any of the issues raised in BP's Complaint and Motion to Enjoin the Seafood Program [Civil Action No. 2:13-cv-6674]. Whether and/or how such allegations might or might not affect the allocation or award of common benefit fees to Watts Guerra is left to the sound judgment and discretion of the Court. The Fee Committee does note that Mr. Watts was acquitted by the jury in the criminal trial that was held in the Southern District of Mississippi."

-11-

On October 12, 2017, Special Master John W. Perry, Jr. filed "Special Master's Recommendations Concerning the Allocation of Common Benefit Fees and the Reimbursement of Shared Expenses and Held Costs" with the MDL 2179 Court. (Rec. Doc. 23491)

Special Master Perry recommended Watts Guerra LLP be allocated *$18,290,494.18* in common benefit fees.

On October 24, 2017, the Court issued its Order wherein Judge Barbier states, "The Court hereby adopts in full the Special Master's Recommendations Concerning the Allocation of Common Benefit Fees and the Reimbursement of Shared Expenses and Held Costs." (Rec. Doc. 23574)

How much would Mikal C. Watts have been allocated if his more than 40,000 "clients" were not phantoms? The MDL 2179 plaintiffs may never know.

### E. The Failure of the PSC to Adequately Represent Victims of the BP Oil Well Blowout of April 20, 2010

On February 9, 2011, the PSC filed a First Amended Master Complaint. Rather than allege claims under the Oil Pollution Act of 1990 (OPA) (which governs the MDL 2179 cases alleging economic loss due to the BP oil well blowout) and the Outer Continental Shelf Lands Act (OCSLA) (which governs the MDL 2179 personal injury and wrongful death actions and borrows the law of the adjacent state as surrogate federal law), the PSC made the unfathomable decision to allege claims under admiralty law. In the 'B1' First Amended Master Complaint, the PSC clearly states, "The claims presented herein are admiralty or maritime claims within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure. Plaintiffs hereby designate this case as an admiralty or maritime case, and request a non-jury trial, pursuant to Rule 9(h)."

The OPA is a strict liability statute. In order to recover damages under the OPA, a claimant merely needs to show that his or her damages "resulted from" the oil spill or oil well blowout. As a result of the PSC intentionally circumventing the OPA by designating this case as an admiralty or maritime case, and requesting a non-jury trial, pursuant to Rule 9(h), the PSC limited BP's liability in the following manner.

(a) Kenneth R. Feinberg *denied payment to approximately 61.46%* of the claimants who filed claims with the GCCF; the average total amount paid per claimant was a paltry $27,466.47;

(b) Feinberg's "Release and Covenant Not to Sue" *excluded approximately 220,000* BP oil well blowout victims from the subsequent Deepwater Horizon Economic and Property Damages Class Settlement Agreement; and

(c) Patrick Juneau *has denied payment to approximately 60.03%* of the claims submitted to the DHCC; the average total amount paid per claim was a paltry $64,700.02.

## IV.  Plaintiffs Have a Right to Demand Court Transparency

### A.  Violation of the Aggregate Settlement Rule by Members of the MDL 2179 PSC

Currently, the aggregate settlement rule (ASR) governs global MDL settlements.

In *Arce v. Burrow*, the Texas Supreme Court held that lawyers may be subject to total or partial fee forfeiture as a sanction for serious violations of an ethical rule. *Arce* involved allegations that mass tort lawyers breached their fiduciary duties to their clients by violating the ASR. *See, e.g.*, Arce v. Burrow, 958 S.W.2d 239, 249 (Tex. App. 1997).

The ASR is Rule 1.8(g) of the ABA *Model Rules of Professional Conduct* ("*Model Rules*"), and it states: "A lawyer who represents two or more clients shall not participate in making an aggregate settlement of the claims of or against the clients….unless each client gives

-13-

informed consent, in a writing signed by the client. The lawyer's disclosure shall include the existence and nature of all the claims….involved and of the participation of each person in the settlement."

In the mass tort context, two core questions arise with regard to the ASR: (1) When is a settlement an "aggregate settlement" covered by Rule 1.8(g), rather than simply a group settlement (to which Rule 1.8(g) may not apply)? And, (2) what disclosures must be made by the plaintiffs' attorney to the clients potentially eligible to participate in the aggregate settlement?

In February 2006, the ABA issued *Formal Ethics Opinion 06-438*, which acknowledged that the term "aggregate settlement" is not defined in the *Model Rules* and explicitly undertook to explain that term: "To the extent that this definition would include all situations 'when any two or more clients consent to have their matters resolved together,' it is broader than the definition offered by the *Arce* court. Indeed, the definition set out in the ABA *Opinion* seems to eliminate the space left after *Arce* between a group settlement and an aggregate settlement for purposes of Rule 1.8(g); all 'group' settlements are now arguably 'aggregate settlements' and must comply with the disclosure requirements of Rule 1.8(g)."

The ABA *Formal Ethics Opinion 06-438* interpreted Rule 1.8(g) to require a lawyer to disclose *at a minimum*, the following information to the clients for whom or to whom the settlement or agreement proposal is made:

(a) *The total amount of the aggregate settlement*;
(b) The existence and nature of all of the claims….involved in the aggregate settlement;
(c) The details of every other client's participation in the aggregate settlement….whether it be their….settlement receipts…..or any other….receipt of something of value as a result of the aggregate resolution;
(d) *The total fees and costs to be paid to the lawyer as a result of the aggregate settlement, if the lawyer's fees and/or costs will be paid, in whole or in part, from the proceeds of the settlement or by an opposing party or parties*; and

-14-

(e) *The method by which costs (including costs already paid by the lawyer as well as costs to be paid out of the settlement proceeds) are to be apportioned among them.* (Emphasis added).

The adoption of the ALI *Principles* in 2009 provided yet another view of the disclosures required under Rule 1.8. Section 3.17(a) of the ALI *Principles* states:

"Informed consent to an aggregate settlement requires that each claimant be able to review the settlements of all other persons subject to the aggregate settlement or the formula by which the settlement will be divided among all claimants. Further, *informed consent requires that the total financial interest of claimants' counsel be disclosed to each claimant.*" (Emphasis added).

In the absence of Rule 1.8(g), an attorney who represents multiple clients against the same defendant and who receives an offer of a fixed sum from the defendant to resolve all of their claims would potentially have an irreconcilable client-client conflict. Every dollar of the lump sum which the plaintiffs' attorney allocates to Client A is one less dollar available to be allocated to any of the other clients.

In sum, an MDL PSC attorney owes fiduciary duties to each member of the settlement class. A lawsuit based on a violation of the ASR can be brought as a breach of fiduciary duty claim; the plaintiff need not show any economic loss from the attorney's breach in order to prevail; and full or partial forfeiture of the fees that the attorney received from the former client is the remedy. *See, e.g.*, Arce v. Burrow, 958 S.W.2d 239, 249 (Tex. App. 1997) (holding, in a lawsuit filed by former clients alleging, inter alia, that attorneys breached the aggregate settlement rule, that "fee forfeiture exists in Texas in the context of the attorney-client relationship, and that all the client need prove is a breach of fiduciary duty by the attorney"); Hole v. Wyeth-Ayerst Labs., No. 700000/98, 2007 N.Y. Slip. Op. 50647(U), 2007 WL 969426, at *3-4, *4 n.10 (Sup. Ct. Mar. 27, 2007) (noting that "no penalty is specified for a violation" of

-15-

the New York aggregate settlement rule, but citing *Arce* for proposition that "the remedy for violating the fiduciary duty to multiple clients might be as severe as complete fee forfeiture if the attorneys committed the breach intentionally, willfully, recklessly, maliciously, or with gross negligence").

## V.    Transparency and Accountability Dictate That This Honorable Court Places on the Public Record the Total Amount and Source of Compensation, *From All Sources*, Paid to All Members of the PSC, et al.

As explained *supra*, court transparency promotes public confidence in our judicial system and avoids the perception that our courts are "star chambers." Nevertheless, Plaintiffs would respectfully agree that a transferee court which does not believe that its PSC attorneys should be held accountable negates the need for court transparency.

The ASR requires a lawyer to disclose, in pertinent part, the following information to the clients for whom or to whom the settlement or agreement proposal is made: (a) The total amount of the aggregate settlement; (b) The total fees and costs to be paid to the lawyer as a result of the aggregate settlement, if the lawyer's fees and/or costs will be paid, in whole or in part, from the proceeds of the settlement or by an opposing party or parties; and (c) The method by which costs (including costs already paid by the lawyer as well as costs to be paid out of the settlement proceeds) are to be apportioned among them. Further, informed consent requires that the *total financial interest of claimants' counsel* be disclosed to each claimant.

The members of the PSC failed to disclose to their clients that: (a) the total amount of the settlement is $20 billion; (b) Patrick Juneau would deny payment to approximately 60.03% of the claims submitted to the DHCC; (c) the total fees paid to members of the PSC would be

comprised of common benefit fees, contingent fees, co-counsel fees, and hold-backs; (d) the total compensation paid to the 19 PSC attorneys and their law firms would be $3.035 billion; (e) the plaintiffs were fraudulently induced not to opt-out of the settlement (*See supra* III B); (f) the costs incurred for retaining four experts in the law of class actions (the Court quotes from the opinions of these experts in its analysis of class certification issues in the settlement class action) and the costs incurred for retaining a fifth law professor to give his opinion on the Aggregate Fee Petition; and (g) the costs incurred for the Special Masters and Claims Administrator.

In the Court's Order & Reasons [Granting the Aggregate Common Benefit and Costs Award], Judge Barbier states, "Petitioning attorneys have performed an immense amount of work in this MDL....These lawyers spent days and weeks away from their homes and families. This resulted in a high level of collaboration, benefitting not only class members, but the entire litigation....That counsel were able to achieve so much speaks to their ability. This factor supports the reasonableness of the fee award....*the fees sought here are not only reasonable, they are arguably below what class counsel could have reasonably requested*." (Rec. Doc. 21849 at 39, October 25, 2016). (Emphasis added). Plaintiffs respectfully disagree.

The amount of common benefit fees awarded to the members of the PSC should not be evaluated in a vacuum. In order to properly analyze the reasonableness of the common benefit award, the *total amount of compensation* received by the members of the MDL 2179, *from all sources*, must be taken into consideration. As noted *supra*, the total compensation (common benefit fees, contingent fees, co-counsel fees, and hold-backs) paid to the 19 MDL 2179 PSC attorneys and their law firms is guesstimated to be $3.035 billion. In other words, common

benefit fees represent only *19.68%* of the total compensation paid to the 19 MDL 2179 PSC attorneys and their law firms.

In sum, it is beyond cavil that a reasonable, objective observer would conclude that the common benefit fees sought by members of the MDL 2179 PSC "are not only reasonable, they are arguably below what class counsel could have reasonably requested."

### A. The Total Amount and Source of Compensation, *From All Sources*, Paid to All Members of the MDL 2179 PSC

Plaintiffs respectfully request, for the purpose of transparency and accountability, that this Honorable Court places on the public record the total amount and source of compensation, from all sources (e.g., common benefit fees, contingent fees, co-counsel fees, and hold-backs), paid to the following members of the MDL 2179 PSC and their law firms.

Stephen J. Herman (Herman, Herman & Katz, LLC), James P. Roy (Domengeaux Wright Roy Edwards & Colomb LLC), Robert T. Cunningham (Cunningham Bounds, LLC), Brian H. Barr (Levin, Papantonio, Thomas, Mitchell, Rafferty & Proctor, PA), Calvin C. Fayard, Jr. (Fayard & Honeycutt, APC), Robin L. Greenwald (Weitz & Luzenberg, P.C.), Jeffrey A. Breit (Breit Drescher Imprevento & Walker, P.C.), Elizabeth J. Cabraser (Lieff, Cabraser, Heimann & Bernstein, LLP), Philip F. Cossich, Jr. (Cossich, Sumich, Parsiola & Taylor), Alphonso Michael Espy (Morgan & Morgan, P.A.), Ervin A. Gonzalez (Colson Hicks Eidson), Rhon E. Jones (Beasley, Allen, Crow, Methvin, Portis & Miles, P.C.), Matthew E. Lundy (Lundy, Lundy, Soileau & South, LLP), Michael C. Palmintier (deGravelles, Palmintier, Holthaus & Fruge'), Paul M. Sterbcow (Lewis, Kullman, Sterbcow & Abramson), Scott Summy (Baron & Budd, P.C.), Mikal C. Watts (Watts Guerra LLP), Joseph F. Rice (Motley Rice LLC), and Conrad S. P. "Duke" Williams (Williams Law Group, LLC).

### B. The Total Amount and Source of Compensation, *From All Sources*, Paid to the Following Legal Experts

Plaintiffs respectfully request, for the purpose of transparency and accountability, that this Honorable Court places on the public record the total amount and source of compensation paid to the following legal experts.

-18-

John C. Coffee, Jr. (Columbia Law School), Samuel Issacharoff (NYU), Robert Klonoff (Lewis & Clark Law School), Arthur R. Miller (NYU), and Brian T. Fitzpatrick (Vanderbilt University).

Professor Fitzpatrick states that his compensation in this matter has been $595 per hour. (Rec. Doc. 21423-6, p. 35).

### C. The Total Amount and Source of Compensation, *From All Sources*, Paid to the Following Special Masters and Claims Administrator

Plaintiffs respectfully request, for the purpose of transparency and accountability, that this Honorable Court places on the public record the total amount and source of compensation paid to the following Special Masters and Claims Administrator.

Special Master John W. Perry, Jr., Special Master Louis J. Freeh, Special Master Francis E. McGovern, and Claims Administrator Patrick Juneau

## CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully request that this Honorable Court place on the public record the total amount and source of compensation, *from all sources*, paid to all members of the MDL 2179 PSC and the total amount and source of compensation paid to the above-named legal experts, Special Masters, and Claims Administrator and any other further relief that the Court deems just and appropriate.

DATED: November 13, 2017                      Respectfully submitted,

                                             **/s/ Brian J. Donovan**
                                             Brian J. Donovan
                                             Attorney for Plaintiffs
                                             Florida Bar No. 143900
                                             3102 Seaway Court, Suite 304
                                             Tampa, FL 33629
                                             Tel: (352)328-7469
                                             BrianJDonovan@verizon.net

-19-

E-SERVICE
61766986
Mar 06 2018
06:19PM
File & ServeXpress

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * | MDL No. 2179 SECTION: J |
| | * | JUDGE BARBIER |
| This Document Relates to: *All Cases* | * * | MAG. JUDGE WILKINSON |

## ORDER

Before the Court is a "Motion to Request this Court to Place on the Public Record the Total Amount and Source of Compensation, From All Sources, Paid to All Members of the PSC, et al." filed by Selmer M. Salvensen, Pinellas Marine Salvage, Inc., John Mavrogiannis, and Andrew J. Ditch.  (Rec. Doc. 23677) (italics omitted).

IT IS ORDERED that the Motion (Rec. Doc. 23677) is DENIED.

New Orleans, Louisiana, this 6th day of March, 2018.

_____
United States District Judge

**News Articles Which Have Led to Reasonable Questions**
**About Judge Barbier's Impartiality**

S. Korris, *Oil spill judge to hold hearing on his investments*, Legal Newsline (Aug. 26, 2010) Available at: https://legalnewsline.com/stories/510523413-oil-spill-judge-to-hold-hearing-on-his-investments

*WSJ editorial: BP Oil Spill fund an 'all-you-can-eat buffet' for trial lawyers*, Louisiana Record Reports (Oct. 24, 2014) Available at: https://louisianarecord.com/stories/510585251-wsj-editorial-bp-oil-spill-fund-an-all-you-can-eat-buffet-for-trial-lawyers

D. Hammer, Plaintiffs urged to accept BP settlement, WWLTV.com (updated Nov. 12, 2018) Available at: https://www.wwltv.com/article/news/local/orleans/plaintiffs-urged-to-accept-bp-settlement/289-346601861

T. Hals, *Lawyer steps from dad's shadow in spill legal fight*, Reuters (Aug. 13, 2010) Available at: https://www.reuters.com/article/us-oil-spill-attorney-interview/lawyer-steps-from-dads-shadow-in-spill-legal-fight-idUSTRE67C45A20100813

K. Kidd, *Louisiana Lawsuit Abuse Watch says attorney fees paid out from $20 billion BP oil spill settlement is 'absurd'*, Louisiana Record (Apr. 11, 2016) Available at: https://louisianarecord.com/stories/510712318-local-government-louisiana-lawsuit-abuse-watch-says-attorney-fees-paid-out-from-20-billion-bp-oil-spill-settlement-is-absurd

*Our View: You've fooled us too many times, Judge Barbier*, The SE Texas Record (Sept. 30, 2014) Available at: https://setexasrecord.com/stories/510624552-our-view-you-ve-fooled-us-too-many-times-judge-barbier

S. Korris, *Oil Spill PSC draws fire over six percent holdback proposal*, Louisiana Record (Dec. 13, 2011) Available at: https://louisianarecord.com/stories/510581468-newsinator-oil-spill-psc-draws-fire-over-six-percent-holdback-proposal

J. Nocera, *Justice, Louisiana Style*, The New York Times (July 8, 2013) Available at: https://www.nytimes.com/2013/07/09/opinion/nocera-justice-louisiana-style.html

A. Frankel, *The evil corrupt plaintiffs' lawyers do*, Reuters (Oct. 30, 2015) Available at: http://blogs.reuters.com/alison-frankel/2015/10/30/the-evil-corrupt-plaintiffs-lawyers-do/

Becnel, *Deepwater Horizon plaintiffs steering committee failing claimants, motives questionable*, Louisiana Record Reports (Feb. 13, 2015) Available at: https://louisianarecord.com/stories/510585633-becnel-deepwater-horizon-plaintiffs-steering-committee-failing-claimants-motives-questionable

*Non-PSC attorneys feel left out of Deepwater Horizon settlement process*, Louisiana Record Reports (Oct. 28, 2014) Available at: https://louisianarecord.com/stories/510585262-non-psc-attorneys-feel-left-out-of-deepwater-horizon-settlement-process

*Lawyer who filed initial lawsuit against BP over Deepwater Horizon oil spill says settlement irreparably broken*, Louisiana Record Reports (Jan. 22, 2015) Available at: https://louisianarecord.com/stories/510585547-lawyer-who-filed-initial-lawsuit-against-bp-over-deepwater-horizon-oil-spill-says-settlement-irreparably-broken

S. Canfield, *BP Says It Has 'New Evidence' of Fraud in Claims Process*, Courthouse News Service (Aug. 7, 2013) Available at: https://www.courthousenews.com/bp-says-it-has-new-evidenceof-fraud-in-claims-process/

*As deadline looms for Deepwater Horizon claims, plaintiffs attorneys prepare for huge payday*, Louisiana Record Reports (May 19, 2015) Available at: https://louisianarecord.com/stories/510586106-newsinator-as-deadline-looms-for-deepwater-horizon-claims-plaintiffs-rsquo-attorneys-prepare-for-huge-payday

M. Sledge, *A near-decade after BP oil spill, now-public payout claims run gamut – including ex-NBA star*, NOLA.com (July 2, 2019) Available at: https://www.nola.com/news/business/article_872a7ed6-9cf3-11e9-9055-7b30798f21b4.html?utm_medium=social&utm_source=twitter&utm_campaign=user-share