# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * | **MDL NO. 2179**<br><br>**SECTION J(2)** |
| | * | |
| | * | **Honorable CARL J. BARBIER** |
| This Document relates to: | * | |
| *Global Disaster Recovery & Rebuilding Services LLC, et al. v. BP Expl. & Prod., Inc., et al.*, Case No. 16-cv-06585 | * * * | **Magistrate Judge CURRAULT** |

## BP'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Matthew T. Regan, P.C.
(matthew.regan@kirkland.com)
Kristopher S. Ritter
(kristopher.ritter@kirkland.com)
**KIRKLAND & ELLIS LLP**
300 North LaSalle
Chicago, IL 60654
Telephone:  (312) 862-2000

Christopher W. Keegan
(chris.keegan@kirkland.com)
Ashley Littlefield
(ashley.littlefield@kirkland.com)
Anna Terteryan
(anna.terteryan@kirkland.com)
**KIRKLAND & ELLIS LLP**
555 California Street
San Francisco, CA 94104
Telephone: (415) 439-1400

R. Keith Jarrett (Bar # 16984)
Devin Reid (Bar #32645)
**LISKOW & LEWIS**
One Shell Square
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone: (504) 581-7979
Fax No. (504) 556-4108

**ATTORNEYS FOR BP AMERICA PRODUCTION COMPANY AND BP EXPLORATION & PRODUCTION, INC.**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ...................................................................................................1

PROCEDURAL HISTORY....................................................................................3

BACKGROUND ....................................................................................................4

I.    Plaintiff Alleges It Attempted To Procure Goods And Services For BP In The
Spill Response...............................................................................................4

      A.    Plaintiff Unsuccessfully Attempted To Procure Aqua N-Cap For BP ...................4

      B.    Plaintiff Unsuccessfully Attempted To Procure Other Goods And Services
For BP Directly And Through Other Contractors....................................................7

      C.    Plaintiff Unsuccessfully Attempted To Sublease Land To BP At The Port
Of St. Bernard ................................................................................................9

      D.    Plaintiff Unsuccessfully Attempted To Lease Land To BP At Port
Fourchon Marina..........................................................................................10

II.    Plaintiff Seeks Lost Profits For A Contract To Which Neither It Nor BP Was A
Party ...........................................................................................................11

LEGAL STANDARD...........................................................................................12

ARGUMENT .......................................................................................................13

I.    Summary Judgment Should Be Granted On All Claims Relating To The A-1
Contract ......................................................................................................13

      A.    Plaintiff Does Not Have Standing To Enforce A-1's Contract.............................13

      B.    A-1 Released Its Claims Against BP ...................................................................14

      C.    Plaintiff Has Not Produced Any Evidence Of An Enforceable Agreement ..........14

II.    Plaintiff's Procurement-Based OPA Claim Should Be Dismissed....................................14

      A.    The Spill Did Not Cause Plaintiff's Losses .........................................................14

      B.    No Reasonable Juror Could Find Plaintiff Entered Into Any Valid,
Enforceable Procurement Agreement With BP .....................................................16

      C.    Plaintiff Has No Evidence Of Reasonably Ascertainable Damages.....................19

III.    Plaintiff's Fraudulent Concealment Claim Lacks Any Evidence And Should Be
Dismissed....................................................................................................20

IV.    Summary Judgment Should Be Entered On Plaintiff's Maritime Law Claims .................22

    A.    Plaintiff Waived Maritime Claims By Failing To Comply With PTO 64 .............22

    B.    Plaintiff's Maritime Law Claims Are Barred ........................................................23

    C.    Plaintiff Offers No Evidence Creating A Disputed Issue Of Material Fact .........23

V.    Plaintiff's Claim Under The Florida Pollutant Discharge Prevention And Control
    Act Should Be Dismissed .................................................................................................24

CONCLUSION.....................................................................................................................25

## INTRODUCTION

Plaintiff—a former, one-employee disaster recovery services provider established by its sole owner, Billy Burkette—brings four causes of action against BP:  (1) under the Oil Pollution Act ("OPA"); (2) for fraudulent concealment under Louisiana law; (3) for negligence, gross negligence, and willful misconduct under general maritime law; and (4) under the Florida Pollutant Discharge Prevention and Control Act ("FPDPCA")—seeking at least $310,000,000 in damages. After completing the PTO 69 process, it is clear that Plaintiff's theories are legally flawed, lack evidentiary support, seek admittedly speculative damages, and should be dismissed.

Plaintiff seeks approximately $67,500,000 that a separate company owned by Mr. Burkette, A-1 Towing & Hauling LLC ("A-1"), purportedly would have earned in connection with a contract between A-1 and Robins Seafood ("Robins") for the sale of crushed concrete (the "A-1 Contract"). That claim fails because Plaintiff cannot show any right to recovery.  First, Plaintiff was not a party to the A-1 Contract and cannot satisfy its burden to prove it was a third-party beneficiary.  Second, A-1 already settled and released BP of those claims.  Third, there is no evidence from which a reasonable juror could find a valid agreement for the sale of concrete.

Plaintiff also seeks over $250,000,000 as a fee for Plaintiff's purported efforts to procure goods and services for BP in clean-up activities following the April 20, 2010 explosion and oil spill (the "Spill").  Specifically, Plaintiff claims it entered into oral procurement agreements with BP, which BP allegedly breached by procuring goods and services from other sources.  Those claims similarly should be dismissed.  First, Plaintiff's attempt to shoehorn unpled breach of contract claims into its OPA claim fails as a matter of law because the losses were not due to or resulting from the Spill, as OPA requires.  Plaintiff is not a business seeking revenues it lost due to the Spill; instead, Plaintiff attempted to profit from the Spill by soliciting business from BP in connection with clean-up efforts, and its real grievance is that BP chose to do business with other

contractors.  OPA does not provide recovery for that alleged harm.

Second, Plaintiff's OPA claim also fails because, on the undisputed facts, no reasonable juror could find that any enforceable procurement agreements existed or that Plaintiff suffered reasonably ascertainable damages.  Plaintiff testified that his contract-based claims rest entirely on alleged oral conversations with unknown people purportedly acting on BP's behalf that, by Plaintiff's admission, did not include discussion of material terms, such as price, quantity, or location for delivery of goods or services, or rent and duration of leases.  Plaintiff also testified that his procurement-related damages were speculative and it does not have records from which one could ascertain which goods and services it attempted to procure.

BP also is entitled to summary judgment on Plaintiff's fraudulent concealment claim because Plaintiff has not offered any evidence—let alone well-pled allegations satisfying Rule 9's heightened pleading standards—from which a reasonable juror could find that BP concealed material facts from Plaintiff, that BP had a duty to disclose those facts, that BP gained anything by concealing those facts, or that Plaintiff was harmed by any non-disclosure.

Summary judgment also is warranted for BP on Plaintiff's maritime law claims for negligence, gross negligence, and willful misconduct.  Plaintiff waived any maritime claims when it failed to comply with Pretrial Order No. 64.  *See* MDL No. 2179, Rec. Doc. 22297 ("PTO 64").  Further, Plaintiff acknowledges it is not a commercial fisherman and does not allege any physical damage to a proprietary interest caused by the discharge of oil, so is barred from asserting maritime law claims under well-established federal law.  Nor has Plaintiff alleged and cannot prove that BP breached any duty or committed any other intentional misconduct resulting in damages to Plaintiff.

Finally, BP is entitled to summary judgment on Plaintiff's FPDPCA claim.  Plaintiff's alleged damages do not result from the Spill, and Plaintiff offers no other evidence of reasonably

ascertainable damages.

## PROCEDURAL HISTORY

Plaintiff opted out of the Deepwater Horizon Court-Supervised Settlement Program and submitted a claim to the BP Claims Program for $310,000,000.  *See* Ex. 13; Ex. 14.  Plaintiff, along with A-1 and Billy Burkette, filed a complaint in this action on May 19, 2016, in the Eastern District of Louisiana, generally alleging BP's liability as a result of the Spill without specific allegations regarding the losses Plaintiff now seeks.  *See generally* Case No. 16-cv-06585, Rec. Doc. 1 ("Complaint").  The Complaint asserts four claims: (1) damages under OPA, *see* Compl. at ¶¶ 99-108; (2) fraudulent concealment under state law, *id.* ¶¶ 109-128; (3) negligence, gross negligence, and willful misconduct under general maritime law, *id.* ¶¶ 57-98; and (4) damages under the FPDPCA, *id.* ¶¶ 129-151.  The Complaint does not reference any discussions with BP regarding procurement work, or any efforts by A-1 to sell concrete.  Nor does it contain any allegations, let alone allegations satisfying Rule 9's heightened pleading standard, in support of Plaintiff's fraud claim.

On July 14, 2016, Mr. Burkette, on behalf of A-1, entered into a settlement with BP.  *See* BP's Statement of Undisputed Material Facts ("SOF") ¶ 49.  The A-1 Settlement released ███████ ████████████████████████████████████████████  *Id.* ¶ 50.

Pursuant to Pretrial Orders Nos. 65 and 67, *see* MDL No. 2179, Rec. Docs. 23825 ("PTO 65"), 25370 ("PTO 67"), Plaintiff submitted sworn statements containing vague, unsubstantiated statements untethered to the Complaint's allegations.  *See* Case No. 16-cv-06585, Rec. Doc. 7 ("Plaintiff's PTO 65 Statement"); *see also* Ex. 15.  Like the Complaint, those statements do not identify oral procurement agreements with BP, contain any details surrounding the A-1 Contract, or identify  material facts BP fraudulently concealed from Plaintiff.

On April 18, 2019, in response to PTO 67, Plaintiff produced 53 documents totaling 182 pages.   In August 2019, pursuant to PTO 67, Plaintiff and BP participated in mediation.   On November 5, 2020, in response to PTO 69, Plaintiff produced 54 documents to BP totaling 163 pages, most of which were re-productions of previously provided materials.   BP separately deposed Mr. Burkette in his individual capacity and as Plaintiff's Rule 30(b)(6) designee.

## BACKGROUND

Founded in 2009, Plaintiff was a one-man operation owned by Billy Burkette that purportedly performed disaster recovery services in Louisiana.  *See* SOF ¶¶ 1-2.  Mr. Burkette also owned A-1, a towing and hauling service.  *Id.* ¶ 3.  Prior to the Spill, Plaintiff had secured only one contract with a company named Airware, LLC ("Airware"), pursuant to which Plaintiff agreed to crush Airware's concrete at the Port of St. Bernard in Chalmette, Louisiana.  *Id.* ¶ 4.  Plaintiff had not performed any other services or generated any taxable income prior to the Spill.  *Id.* ¶¶ 5-6. In 2010, after trying, without success, to secure procurement work from BP after the Spill, Plaintiff conducted no further business until 2013, unrelated to the Spill.  *Id.* ¶ 7.

## I.   PLAINTIFF ALLEGES IT ATTEMPTED TO PROCURE GOODS AND SERVICES FOR BP IN THE SPILL RESPONSE

### A.   Plaintiff Unsuccessfully Attempted To Procure Aqua N-Cap For BP

Plaintiff seeks "hundreds of millions" of dollars in damages relating to its alleged efforts to procure a product called Aqua N-Cap for use in connection with the Spill response.  Ex. 1, (Declaration of Austin L. Klar in Support of BP's Motion for Summary Judgment ("Klar Decl.") at Ex. A 215:21–216:6; *see also id.* at 207:22–208:10.  Aqua N-Cap is a polymer sediment filtration technology used to remediate and clean up oil spills on water or solid surfaces.  *See* SOF ¶ 8.  At the time of the Spill, RTASCo (Remediation Technologies & Applications Systems), aka RTA Systems, Inc ("RTASCo") manufactured Aqua N-Cap.  *Id.*  Plaintiff alleges that it had an

oral understanding with RTASCo pursuant to which Plaintiff would hold "the exclusive distribution contract for the Gulf of Mexico," contingent on Plaintiff securing an agreement from BP to purchase Aqua N-Cap.  Plaintiff's PTO 65 Statement at 2; SOF ¶ 10.  Pursuant to that understanding, Plaintiff alleges it would have earned a commission from RTASCo for any Aqua N-Cap sold to BP.  *See* SOF ¶ 9.  Plaintiff's understanding with RTASCo was never reduced to writing, and Plaintiff produced no contemporaneous information corroborating that oral agreement.  *Id.*

After seeing media solicitations for Spill response assistance, Mr. Burkette took it upon himself to drive to an incident command field office in Gray, Louisiana, hoping to secure procurement contracts with BP.  *See* Klar Decl. at Ex. A 82:23–83:13; Klar Decl. at Ex. B 97:17-98:17.  At the time, Plaintiff had no understanding of what incident command's specific response needs were.  *See* Klar Decl. at Ex. B 98:25–99:8.   Upon his arrival, Mr. Burkette spoke with several BP procurement personnel about Aqua N-Cap, but he does not recall when those discussions occurred or with whom he spoke.  *See* SOF ¶ 13.  Plaintiff alleges that BP had included Aqua N-Cap as an approved product in BP's emergency response plan submitted to the State of Louisiana.  *See* Klar Decl. at Ex. A 81:24–82:14, 84:15–18.[1]  Plaintiff contends that, by doing so, BP obligated itself to use Aqua N-Cap supplied by Plaintiff in response to the Spill.  *Id.* at 82:6–22; Klar Decl. at Ex. B 36:8–12.  Despite its purported inclusion in BP's emergency response plan, Mr. Burkette claims that no one in the procurement department was aware of Aqua N-Cap or its potential utility in the Spill response, and that he brought it to their attention.  *See* Klar Decl. at Ex. A 97:20-98:9.

---

[1]    The emergency response plan in force at the time of the Spill does not mention Aqua N-Cap, *see* Ex. 5, and Plaintiff has not produced or identified any other plan substantiating its allegations.

After these discussions, BP allegedly said it would send a written purchase order for "indefinite delivery" of an "indefinite quantity" of Aqua N-Cap.  Klar Decl. at Ex. B 36:21-37:15. Plaintiff admits the parties never negotiated or agreed upon a price, *see* SOF ¶ 14, and that BP personnel informed Mr. Burkette that any commitment to purchase Aqua N-Cap was contingent upon a determination by BP that locations to which Aqua N-Cap would be delivered had the need for the product, capacity to take delivery, and adequate equipment to deploy the product.  *Id.* ¶ 15. BP also informed Mr. Burkette that another individual, Lynn DeHaven, would have to approve Aqua N-Cap for BP's use.  *Id.* ¶ 17.  No one from BP subsequently contacted Plaintiff regarding approvals or to schedule a delivery of Aqua N-Cap, or issued a purchase order, *see id.* ¶¶ 12, 15, 18, and Mr. Burkette is not aware that BP ever determined the information required before an order would issue.  *Id.* ¶ 16.  Within two days of those initial procurement discussions, Mr. Burkette claims he learned from Jacqueline Michel, an employee of a government contractor retained in connection with the Spill response, *see* Klar Decl. at Ex. G, that BP would not be purchasing Aqua N-Cap from Plaintiff.  *See* Klar Decl. at Ex. B 47:24-48:6.

Plaintiff admits that it never had an agreement with BP for the purchase of Aqua N-Cap, or shipped any Aqua N-Cap to BP.  *See* Klar Decl. at Ex. B 57:3-9, 64:12-15; Klar Decl. at Ex. A 95:10-13, 95:20-24.   Yet, Plaintiff seeks at least $150,000,000, *see* Klar Decl. at Ex. A 207:22-208:10, because it believes BP circumvented Plaintiff by purchasing RTASCo directly, thereby acquiring the Aqua N-Cap Plaintiff wished to sell to BP.  *Id.* at 95:10-13, 110:3-8.  In other words, Mr. Burkette seeks a nine-figure finder's fee for alerting BP procurement to Aqua N-Cap's existence—despite BP's purported awareness of the product, evidenced by its alleged inclusion in BP's response plan.  *See* Klar Decl. at Ex. A 82:23-83:7.

**B.    Plaintiff Unsuccessfully Attempted To Procure Other Goods And Services For BP Directly And Through Other Contractors**

Aside from Aqua N-Cap, Mr. Burkette claims to have had multiple oral discussions with BP personnel during which BP personnel orally agreed to procure other goods and services through Plaintiff.  *See* SOF ¶ 20.  Plaintiff does not recall with whom he had those discussions or when they occurred.  *Id.*  Plaintiff has not identified which goods or services specifically were discussed, their cost, or the timing and location of delivery.  *See, e.g., id.* ¶ 21.  Plaintiff also acknowledges that it "never discussed a price" BP would pay Plaintiff for Plaintiff's procurement efforts.  *Id.* ¶ 22.

Plaintiff claims that in reliance on those alleged discussions, it expended time and resources attempting to locate those goods and services for BP, but that BP ultimately circumvented Plaintiff by procuring those goods and services from other contractors or directly from manufacturers.  *See, e.g.,* Klar Decl. at Ex. A 76:7-15, 89:12-19, 115:10-18, 123:11-13.  Plaintiff has not provided any evidence reflecting those efforts and acknowledges it no longer has those records.  *See* Klar Decl. at Ex. B 31:15-32:20.  Plaintiff also produced no evidence identifying the goods or services BP allegedly agreed to procure directly through Plaintiff, but wrongfully procured from other sources, or the cost of those goods and services.  *See* SOF ¶ 21.

At some time after initial attempts to secure BP's business directly, Plaintiff alleges that BP informed Plaintiff that BP would not do any business directly with Plaintiff, and that instead Plaintiff was required to work through BP's "prime contractors."  Klar Decl. at Ex. A 144:2-9.  Plaintiff alleges it then had discussions with a representative of Environmental Safety & Health Consulting Services Inc. ("ES&H"), a contractor that would itself procure goods and services through Plaintiff and ultimately furnish those to BP.  *See id.* at 80:9-81:9, 215:21-216:10.  During their discussions, Mr. Burkette claims to have provided a list of goods and services Plaintiff could

offer ES&H.  *See id.* at 151:16-152:9.  ES&H subsequently sent Plaintiff a proposed contract (the "ES&H Contract").  *See* SOF ¶ 26.  The ES&H Contract provided, and Mr. Burkette understood, that products or services ES&H would acquire through Plaintiff would be specified in a written purchase order or statement of work.  *Id.*  It also stated that the ES&H Contract "does not obligate [ES&H] to order any labor, goods, services, and/or equipment from [Plaintiff]."  Ex. 9 at § IV.[2] Plaintiff also understood it would have had to pay the suppliers for equipment or services, but did not have the funds to do so.  *See* Klar Decl. at Ex. A 225:5-13.  BP is not a party to or referenced in the ES&H Contract.

Plaintiff admits that ES&H never issued a written order requesting any good or service from Plaintiff and that Plaintiff never furnished any labor, goods, services, or equipment to ES&H for provision to BP.  *See* SOF ¶ 27.  Instead, Plaintiff alleges that BP circumvented Plaintiff by acquiring the goods and services Plaintiff was attempting to procure for BP through other sources. *See* Klar Decl. at Ex. A 81:16-21, 89:20-24.

For all of its purported procurement work, Plaintiff claims BP owes Plaintiff a fee equivalent to 20% of the cost of goods and services BP procured through other sources.  *See* Klar Decl. at Ex. B 115:9-24, 118:15-119:2.  The sole basis for that contention is that an unidentified person in BP's procurement department allegedly told Mr. Burkette that 20% was the rate BP paid prime contractors with whom BP did business, like ES&H.  *Id.*  Thus, to calculate Plaintiff's procurement fee, Plaintiff would need to establish each good and service BP agreed to procure through Plaintiff that BP procured from other sources, and calculate 20% of that cost.  *See* Klar Decl. at Ex. B 119:3-11.  Mr. Burkette claims he recorded that information in two notebooks, which he failed to retain.  *See* Klar Decl. at Ex. B 27:17-28:14, 30:19-31:2, 31:15-32:20.  Plaintiff

---

[2]   Plaintiff does not have a signed copy of the ES&H Contract.  *See* Klar Decl. at Ex. A 150:9–16.

failed to produce any other contemporaneous evidence corroborating these claims.  *See e.g.*, Klar Decl. at Ex. A 153:13-154:8; Klar Decl. at Ex. B 122:8-17.[3]

### C.   Plaintiff Unsuccessfully Attempted To Sublease Land To BP At The Port Of St. Bernard

Plaintiff alleges that it had oral conversations with a BP representative regarding potentially subleasing storage space from Plaintiff, which Plaintiff alleges it was leasing from the Port of St. Bernard.  *See* SOF ¶ 34.  At the time, Plaintiff had been using the land to crush concrete, and the volume of concrete was large enough that it would have to be crushed and moved for BP to be able to store equipment at the site.  *See* Klar Decl. at Ex. A 173:12-174:18.  According to Plaintiff, BP would occupy the land gradually as Plaintiff continued to crush concrete and more space became available, and BP hoped to move in as soon as possible.  *Id.*  Plaintiff does not recall when or with whom he had those discussions.  *See* SOF ¶ 34.

Plaintiff acknowledges that those discussions with BP never materialized into a formal lease agreement, *see* SOF ¶ 38, but claims the U.S. Coast Guard, under BP's control, took over the entire Port of St. Bernard, including Plaintiff's land and concrete.  *See* Klar Decl. at Ex. A 180:6-181:14; Klar Decl. at Ex. B 81:6-23, 84:16-19.  By the time of the alleged seizure, the parties never "even talked about pricing structure," SOF ¶ 35, and never settled on a rental price or duration of the lease.  *See* SOF ¶¶ 35-36; *see also* Klar Decl. at Ex. B 85:9-14; Klar Decl. at Ex. A 190:25-192:23.  Mr. Burkette also admitted that he did not know, and never asked, if Plaintiff's alleged lease with the Port of St. Bernard even permitted subleasing.  *See* SOF ¶ 33; *see also* Klar

---

[3]   Plaintiff also produced an unsigned letter of intent ("LOI") from Strategic Services USA, LLC ("SSU"), another contractor, indicating the amount of clean-up workers SSU could provide Plaintiff.  *See* SOF ¶ 28.  The LOI states SSU would "enter into a formal subcontract agreement with [Plaintiff], provided [Plaintiff] discloses their contract with ES&H on payment schedule and Insurance coverage required for the Project."  *Id.*  Mr. Burkette does not recall ever entering into a formal subcontract, any other discussions with SSU about a subcontract, or ever providing SSU with the insurance coverage or ES&H agreement.  *Id.* ¶¶ 29–31.  Plaintiff has not offered any evidence demonstrating that BP procured the workers outlined in the LOI from another source or at what cost.

Decl. at Ex. A 175:7-12.   Yet Plaintiff seeks somewhere between $5,000,000 and $10,000,000 from BP for alleged lost rental income.   *See* Klar Decl. at Ex. A 210:11-20, 211:3-9.

### D.   Plaintiff Unsuccessfully Attempted To Lease Land To BP At Port Fourchon Marina

Plaintiff also alleges that it had oral discussions with BP regarding leasing potential space from Plaintiff at Port Fourchon Marina.  *See* Klar Decl. at Ex. A 183:22-186:7.  Mr. Burkette does not recall with whom at BP he spoke or when those discussions occurred.  *See* SOF ¶ 41.  At the time of the alleged discussions, Plaintiff did not own the land it sought to lease; instead, Mr. Burkette was in negotiations with the owner to purchase the land for $750,000, for eventual lease to BP.  *Id.* ¶ 39.  According to Mr. Burkette, BP never asked him to purchase that land, but purportedly agreed to lease it from Plaintiff if Plaintiff purchased it.  *Id.* ¶ 40; *see also* Klar Decl. at Ex. B 123:21-25.  Mr. Burkette acknowledges, however, that the parties never agreed to material lease terms, including price and duration.  *See* SOF ¶¶ 42-43.  He claims the procurement people with whom he spoke were continually "rotated out" and admits that BP never came back to Plaintiff with a new point of contact with whom to continue discussions regarding the potential lease.  *See* Klar Decl. at Ex. A 192:16-23.

Mr. Burkette also did not have the funds necessary to purchase the land he sought to lease.  *See* SOF ¶ 44.  And while he claims he had discussions with banks regarding potential financing, *see* Klar Decl. at Ex. A 189:16-18, he has produced no evidence reflecting those conversations, and does not recall with which banks those discussions occurred or whether Plaintiff provided any financial information to banks in an evaluation process.  *Id.* at 190:5-13.

Ultimately, Plaintiff never purchased the land or entered into a lease with BP.  *See* SOF ¶ 45.  Yet, Plaintiff seeks approximately $5,000,000 from BP because BP allegedly leased the land from another person.  *See* Klar Decl. at Ex. A 214:3-12, 188:3-4.

## II.  PLAINTIFF SEEKS LOST PROFITS FOR A CONTRACT TO WHICH NEITHER IT NOR BP WAS A PARTY

On June 28, 2010, Plaintiff entered into a contract with Airware to crush concrete belonging to Airware at the Port of St. Bernard.  *See* SOF ¶ 4 (the "Airware Contract").  Under the Airware Contract, Airware agreed to pay Plaintiff $9.50 per ton of concrete crushed.  *Id.* at GLOBAL DISASTER 000077; *see also* Klar Decl. at Ex. A 47:23-48:8.  Plaintiff produced no evidence reflecting how much concrete it contracted to crush, but estimates that 1.5 million cubic yards of uncrushed concrete was available.  *See* Klar Decl. at Ex. A 65:14-22, 241:20-23.

Plaintiff alleges it submitted two invoices to Airware for approximately $500,000 for one months' work, which Airware never paid.  *See* Klar Decl. at Ex. A 49:2-19, 56:5-7.[4]  To resolve a dispute with Airware over non-payment, Plaintiff claims Airware deeded ownership of all of its concrete to Plaintiff.  *Id.* at 63:5-64:11.  Plaintiff admits that no document reflects Plaintiff's ownership of the concrete, and Plaintiff has not provided any agreement with Airware reflecting the resolution.  *Id.* at 68:2-69:4.

Plaintiff alleges that after crushing the concrete, it had intended to provide the concrete to A-1, a company also owned by Mr. Burkette.  *See* Klar Decl. at Ex. A 50:6-12, 51:4-13.  A-1 purportedly had entered into a separate contract with Robins, pursuant to which A-1 would sell Robins 1.5 million cubic yards of crushed concrete to repair oyster beds, for $45 per yard, or a total of $67,500,000.  *Id.* at 65:14-22.  There is no evidence reflecting this agreement or confirming the amount of concrete that would have been available for A-1 to sell to Robins.

Plaintiff alleges that after it took ownership of the concrete from Airware, the U.S. Coast Guard, purportedly controlled by BP, shut down the Port of St. Bernard and took possession of

---

[4]    Plaintiff has not produced copies of those invoices, nor can it.  *See* Klar Decl. at Ex. A 57:16–19.

Plaintiff's concrete, prohibiting further crushing. *See* Klar Decl. at Ex. A 222:16-223:5; *see also id.* at 180:6-181:8, 182:17-20. As a result, Plaintiff claims it could not provide crushed concrete to A-1 for sale to Robins. Plaintiff acknowledges it is not a party to the contract between A-1 and Robins, *see* SOF ¶ 46, and that had A-1 performed under the contract, Robins would have owed money to A-1, not Plaintiff. *See* SOF ¶ 48. Notwithstanding, Plaintiff seeks $67,500,000 from BP for the money A-1 would have earned under the A-1 Contract.

## LEGAL STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). A moving party may satisfy its summary judgment burden by pointing to undisputed evidence in the record. *See, e.g.*, *Templet v. HydroChem Inc.*, 367 F.3d 473, 480 (5th Cir. 2004). Given such undisputed evidence, the non-moving party may not rest upon the pleadings, but must identify specific facts that establish a genuine issue for trial. *See Celotex*, 477 U.S. at 324. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude . . . summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A dispute is genuine if the summary judgment 'evidence is such that a reasonable jury could return a verdict for the [non-movant].'" *Hyatt v. Thomas*, 843 F.3d 172, 177 (5th Cir. 2016) (quoting *id.*). "Such a dispute does not exist where the non-movant's 'critical evidence is so weak or tenuous on an essential fact' needed to prove his claim 'that it could not support a judgment in favor of the nonmovant.'" *Boateng v. BP, P.L.C.*, 779 F. App'x 217, 220 (5th Cir.), *cert. denied*, 140 S. Ct. 616 (2019) (quoting *Little*, 37 F.3d at 1075). While all reasonable inferences are to be drawn in favor of the non-movant, a party cannot defeat summary judgment with conclusory allegations or unsubstantiated assertions. *Little*, 37 F.3d at 1075.

## ARGUMENT

### I.   SUMMARY JUDGMENT SHOULD BE GRANTED ON ALL CLAIMS RELATING TO THE A-1 CONTRACT

#### A.   Plaintiff Does Not Have Standing To Enforce A-1's Contract

Plaintiff admits it is not a party to the A-1 Contract.  *See* SOF ¶ 46.  Accordingly, to avail itself of the benefits of that contract it must establish itself as a third-party beneficiary, which Plaintiff has not done and cannot do.  *See Joseph v. Hosp. Serv. Dist. No. 2 of Parish of St. Mary*, 939 So. 2d 1206, 1211 (La. 2006) (noting that non-parties to a contract "can only avail themselves of the benefit of the [at-issue] contract if they are third party beneficiaries.").   Louisiana law permits contracting parties to stipulate a benefit for a third party—which must be (1) a "manifestly clear" stipulation, (2) with "certainty as to the benefit provided the third party," and (3) "the benefit [must] not [be] a mere incident of the contract between the promisor and the promisee."  *Zaveri v. Condor Petroleum Corp.*, 27 F. Supp. 3d 695, 703 (W.D. La. 2014) (internal citations omitted). That stipulation "is never presumed.  The party claiming the benefit bears the burden of proof." *Joseph*, 939 So. 2d at 1212.

Plaintiff has not satisfied its burden here.  Plaintiff has not produced the A-1 Contract or otherwise provided any evidence from which a reasonable factfinder could determine a "manifestly clear" stipulation that Plaintiff would be a third-party beneficiary, such as a written stipulation, or other evidence of a "clearly expressed intention" to benefit Plaintiff.  *Zaveri*  27 F. Supp. 3d at 703-704.  Plaintiff's own testimony confirms it is not a beneficiary, as Plaintiff's owner acknowledged any payment by Robins under the A-1 Contract would inure to A-1's benefit, not Plaintiff's.  *See* SOF ¶ 48.  Plaintiff offers no evidence suggesting it could benefit from A-1's contract or that A-1 and Robins intended that result.  *Joseph*, 939 So. 2d at 1212.  And to the extent Plaintiff claims Mr. Burkette's common ownership of Plaintiff and A-1 gives Plaintiff the right to

pursue damages under the A-1 Contract, that right is only derivative of A-1's rights in the first instance, which A-1 relinquished when it released BP of those claims.  *See infra* ARGUMENT § I.B.

### B.   A-1 Released Its Claims Against BP

Pursuant to the A-1 Settlement, A-1 agreed 

Plaintiff does not dispute that A-1 signed the the A-1 Settlement, *see* SOF ¶ 3, and does not otherwise claim the A-1 Settlement is invalid or unenforceable.

### C.   Plaintiff Has Not Produced Any Evidence Of An Enforceable Agreement

Plaintiff further failed to provide evidence from which a reasonable juror could find an enforceable agreement for the sale of concrete to Robins.  Plaintiff has not produced any written agreement or any evidence corroborating such an agreement even existed, whether oral or written. Nor has Plaintiff offered evidence from which a reasonable factfinder could determine that Plaintiff owned the concrete it would provide to A-1 for sale to Robins.

## II.   PLAINTIFF'S PROCUREMENT-BASED OPA CLAIM SHOULD BE DISMISSED

Plaintiff's procurement-based claims should be dismissed because OPA does not provide Plaintiff recovery for alleged breaches of contract untethered to the discharge or threat of discharge of oil.  Even if those alleged damages were cognizable under OPA, BP is entitled to summary judgment because no reasonable juror could find for Plaintiff on any element of Plaintiff's claim.

### A.   The Spill Did Not Cause Plaintiff's Losses

OPA is a comprehensive framework designed to "establish limitations on liability for damages *resulting from oil pollution*."  OIL POLLUTION ACT OF 1990, PL 101-380, August 18, 1990, 104 STAT 484 (emphasis added).  Recovery of economic losses under OPA requires Plaintiff

to establish that its losses were "'due to' the injury, destruction, or loss of property or natural resources that 'result[ed] from' the discharge or threatened discharge of oil from [the Spill]." *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on Apr. 20, 2010*, 168 F. Supp. 3d 908, 916 (E.D. La. 2016) ("*In re Deepwater Horizon*").  *See also* 33 U.S.C. § 2702(a) ("each responsible party for a vessel or a facility from which oil is discharged, or which poses the substantial threat of a discharge of oil . . . is liable for the removal costs and damages specified in subsection (b) *that result from such incident*.") (emphasis added); 33 U.S.C. § 2702(b)(2)(E) (limiting OPA profit and earning capacity damages to damages "***due to*** the injury, destruction, or loss of real property, personal property, or natural resources" (emphasis added)); *In re Taira Lynn Marine Ltd. No. 5, LLC*, 444 F.3d 371 (5th Cir. 2006) (losses caused by government-mandated evacuation following discharge did not "result from" discharge and therefore were not recoverable under OPA).  Plaintiff cannot make that showing here as a matter of law.

Plaintiff is not an established business seeking lost profits "'due to' the injury, destruction, or loss of property or natural resources that 'result[ed] from'" the Spill.  *In re Deepwater Horizon*, 168 F. Supp. 3d at 916.  Instead, Plaintiff is a one-man disaster recovery business with zero history of earnings that attempted to capitalize on the Spill by offering to locate goods and services for BP.  Plaintiff's real grievance is that BP purportedly breached oral agreements to procure land, goods and services through Plaintiff by obtaining those items from other sources.  *See supra* BACKGROUND § I.  Plaintiff's damages stem not from the Spill, but from BP's decision after the Spill not to do business with Plaintiff.  Those damages are not recoverable under OPA.  *See In re Deepwater Horizon*, 168 F. Supp. 3d at 916; *see also Gatlin Oil Co., Inc. v. United States*, 169 F.3d 207, 212 (4th Cir. 1999) (denying recovery of economic losses and holding that OPA requires the immediate event causing a claimed loss must lead to a discharge or threatened discharge of oil);

15

*Blue Water Boating Inc. v. Plains All Am. Pipeline, L.P.*, No. CV 16-3283 PSG (JEMx), 2017 WL 405425, at *3 (C.D. Cal. Jan. 26, 2017) (denying recovery for lost business due to decreased tourism following oil spill because it was "a step too far removed from OPA and OSPRA's requirement that the lost profits and impaired earning capacity be 'due to' the destruction of natural resources.").

**B.    No Reasonable Juror Could Find Plaintiff Entered Into Any Valid, Enforceable Procurement Agreement With BP**

Under Louisiana law, agreements for goods and services in excess of $500, agreements to transfer immovable property, and bilateral sale agreements, must be in writing or accompanied by other corroborating evidence to be enforceable. *See*, *e.g.*, LA. CIV. C. ARTS. 1846; 1839; 2623. Plaintiff acknowledges it never entered into any written agreement with BP for any good or service. SOF ¶¶ 11-12, 24. Accordingly, to be enforceable, the agreements "must be proved by at least one witness and other corroborating circumstances." LA. CIV. C. ART 1846. A "plaintiff himself may serve as the witness to establish the existence of the oral contract," *Suire v. Lafayette City-Par. Consol. Gov't*, 907 So. 2d 37, 58 (La. 2005) (internal citations omitted), but "the other corroboration must come from a source other than the plaintiff." *Id.* Plaintiff bears the burden of proving the "existence of the obligation." LA. CIV. C. ART. 1831; *see also Hickey v. Angelo*, 274 So. 3d 47, 51 (La. App. 4 Cir. 2019) ("party claiming to be owed in excess of $500 . . . bears the burden of proving the existence of such a contract.") (internal quotations omitted). Here, Plaintiff provides no corroborating evidence from which a reasonable juror could find enforceable oral agreements.

**Aqua N-Cap**.  Plaintiff has not provided evidence from which a reasonable juror could find it had an enforceable oral agreement with RTASCo to distribute, or an agreement with BP to buy from Plaintiff, Aqua N-Cap. Plaintiff's purported distribution rights were contingent on an

agreement from BP to purchase Aqua N-Cap.  *See* SOF ¶ 10.  And Plaintiff concedes that BP's alleged agreement to purchase Aqua N-Cap from Plaintiff was itself contingent on confirming need and capacity to take delivery and use the product at several locations, and that others would need to approve Aqua N-Cap's use, neither of which occurred.  *Id.* ¶¶ 15-16, 18.  BP also made clear that orders it placed, if any, would be in writing, which Plaintiff admits it never received.  *Id.* ¶¶ 11-12.[5]  Thus, summary judgment is warranted because there is insufficient evidence to create a disputed issue of material fact that an enforceable agreement existed regarding the purchase of Aqua N-Cap from Plaintiff.  *See Law Office of Brian E. Crawford, LLC v. Winnsboro Elevator, LLC*, 251 So. 3d 670, 675 (La. App. 2 Cir. 2018) (holding plaintiff's trial testimony of oral contract, alongside demand letters, email exchange, and invoices, was insufficient corroborating evidence to prove a contract existed).

**Other Goods And Services**.  The same is true for other products and services that Plaintiff alleges BP agreed to procure through Plaintiff.  Plaintiff cannot recall and has not otherwise produced information sufficient to identify with whom or when those agreements were made, and acknowledges material terms of those agreements were never discussed or agreed upon, such as the nature and quantity of goods and services BP purportedly agreed to procure from Plaintiff, their cost, or location of delivery.  *See* SOF ¶¶ 21-22.  And while Mr. Burkette claims he recorded that information, he admits he no longer has those records to offer this Court.  *See* Klar Decl. at Ex. B 27:17-28:14, 30:19-31:2.

---

[5]   Plaintiff's only other basis for the existence of any purported agreement regarding Aqua N-Cap is the product's inclusion on BP's emergency response plan.  *See* Klar Decl. at Ex. A 82:6–22; Klar Decl. at Ex. B 36:8–12.  But the response plan in force at the time of the Spill did not mention Aqua N-Cap, and Plaintiff has not produced or identified any other plan referencing that product.  *See* SOF ¶ 19.  Nor does such a plan constitute a contract requiring BP to use that product, and, even if it did, Plaintiff would not have standing to enforce such a contract. *See Joseph*, 939 So. 2d at 1211.

Further, the scant evidence Plaintiff actually produced confirms that BP would only enter into contracts with Plaintiff, if at all, in writing. *See, e.g.,* SOF ¶ 23 at Ex. 6 (BP representative communicates to Plaintiff that: "Under no circumstance is the product . . . you refer to in the email below committed to BP unless you have a signed Purchase Order, from BP."); *id.* at Ex. 7 ("BP is requesting info . . . for a PO"); *id.* at Ex. 8 ("If we do place an order with you, we will provide you with a purchase order"). The same is true for the other contractors with whom Plaintiff allegedly spoke about procuring goods and services for BP. *See* SOF ¶ 25 at Ex. 9 ("This Agreement … shall [] control and govern all work [sic] orders for same specified in written purchase orders or statements of work issued by *Company* and accepted by *Contractor*"); *id.* at Ex. 10 ("It is the intent of Strategic Services USA, LLC to enter into a formal subcontract agreement with [Plaintiff] … The terms and conditions of the Subcontract Agreement will take precedence over this Letter of Intent."). Thus, there is no evidence sufficient to create a disputed issue of material fact that any enforceable oral procurement agreement existed.

**Land Leases**. Plaintiff's allegations that BP orally agreed to lease property at the Port of St. Bernard and Port Fourchon Marina are similarly flawed. In each case, Plaintiff admitted that the parties never even discussed rental rate or lease duration. *See* SOF ¶¶ 35-37, 42-43; *see also* Klar Decl. at Ex. B 85:9-14; Klar Decl. at Ex. A 173:2-11, 190:25-192:23. Further, regarding land at Port St. Bernard, Plaintiff offers no evidence it actually leased land from the Port of St. Bernard, or that its alleged lease with the Port of St. Bernard permitted subleasing to BP. *See* Klar Decl. at Ex. A 175:7-12; Klar Decl. at Ex. B 86:8-11. Regarding land at Port Fourchon Marina, Plaintiff did not own the land it sought to lease, admits it did not have funds necessary to purchase it, and offers no evidence that it attempted to obtain or could have obtained those funds. *See* SOF ¶¶ 39,

18

44; *see also* Klar Decl. at Ex. A 189:16-18, 190:5-13.  No disputed issue of material fact exists

regarding the existence of any agreement by BP to lease land from Plaintiff.

C.      **Plaintiff Has No Evidence Of Reasonably Ascertainable Damages**

OPA compensates only for "loss of profits or impairment of earning capacity" due to the

damage resulting from the discharge or threatened discharge of oil.  33 U.S.C. § 2702(b)(2)(E).  In

assessing such damages, the Fifth Circuit considers the forum state's law on evidence sufficient to

show lost profits.  *See*, *e.g.*, *Gulf Eng'g Co., L.L.C. v. Dow Chemical Co.*, 961 F.3d 763, 768 (5th

Cir. 2020) (applying Louisiana law).  Louisiana law allows a plaintiff to recover lost profits that

can be "proven with reasonable certainty and [are not] based on conjecture and speculation." *Id.*

at 768.  A plaintiff "must show that the loss of profits is more probable than not" and support a

claim "by more than mere estimates of loss." *Id.* (internal quotations omitted).  A party seeking

lost profits need not prove an exact calculation, but lost profits must be proved with "reasonable

certainty." *In re Rushing*, 424 B.R. 747, 753 (Bankr. M.D. La. 2010) (sustaining objection to claim

for lost profits where the plaintiff did not introduce documents establishing sales).

Here, Plaintiff has provided zero evidence from which a reasonable juror could reliably

calculate damages.  As an initial matter, Mr. Burkette admitted that Plaintiff's asserted damages

"may not even be an accurate assessment," and that "the 310 [million] may be 910 [million].  I

don't know."   Klar Decl. at Ex. A 208:22-24, 212:6-10.   Indeed, he testified that Plaintiff's

damages relating to Aqua N-Cap were more than $150 million, but could be as high as $500

million.  *See* Klar Decl. at Ex. A 208:10-14, 207:22-209:12.  Such unsubstantiated guesswork falls

far short of what OPA requires.  *See Union Oil Co. of California v. Buffalo Marine Serv., Inc.,* No.

1:10-CV-195 2012 WL 13034544 at *10 (E.D. Tex. June 29, 2012) (rejecting lost profits estimate

as "excessive and, most importantly, too speculative"); *In re Disc. Cigarette, Cigars, Etc., Inc.,*

399 B.R. 605, 618 (Bankr. M.D. La. 2009) (lack of evidence of inventory, sales, tax records, or ledgers made it impossible to reliably calculate lost profits).

Nor could a reasonable juror determine Plaintiff's damages resulting from BP's decision to procure goods and services through sources other than Plaintiff.  Plaintiff claims it is entitled to a commission of 20% of the cost of goods and services BP ultimately procured from other sources. *See* Klar Decl. at Ex. B 115:9-24, 118:15-119:15.   But Plaintiff has no records reflecting procurement efforts or which goods and services were requested, *see* SOF ¶ 21, and was unable to estimate damages for products or services BP purportedly agreed to procure.  *See, e.g.,* Klar Decl. at Ex. B 121:23-122:17; 123:5-10; Klar Decl. at Ex. A 210:11-20, 211:10-25 (unable to determine damages associated with ES&H), *id.* at 212:16-25 (speculating on damages associated with Strategic Services per BP's separate and unrelated contracts).

The same is true for damages relating to alleged agreements to lease property from Plaintiff.  Plaintiff never reached any agreement on price or duration of the alleged leases, making it impossible to calculate how much rent Plaintiff allegedly lost as a result of BP's decision not to lease land from Plaintiff.  *See* SOF ¶¶ 34-35, 37.

## III.    PLAINTIFF'S FRAUDULENT CONCEALMENT CLAIM LACKS ANY EVIDENCE AND SHOULD BE DISMISSED[6]

Summary judgment should be granted on Plaintiff's fraudulent concealment claim because Plaintiff has not produced any evidence sufficient to create a disputed issue of material fact on any element.  To prevail on a fraudulent concealment claim, Plaintiff must allege and prove: "(1) the information that was withheld, (2) the general time period during which the fraudulent conduct

---

[6]   Plaintiff's claim for fraudulent concealment has already been dismissed pursuant to prior order of this Court.  *See Deepwater Horizon*, 808 F. Supp. 2d at 956–58.  If not dismissed, the claim is pre-empted to the extent the Court finds that OPA applies to Plaintiff's claims.  *See id.* (dismissing plaintiffs' state common-law claims for nuisance, trespass, and fraudulent concealment, as well as state statutory claim, holding that OPA's savings provisions do not give states power to impose state law to oil spills outside state waters—i.e., the Outer Continental Shelf).

occurred, (3) the relationship giving rise to the duty to speak, and (4) what the person or entity engaged in the fraudulent conduct gained by withholding the information." *Chrysler Credit Corp. v. Whitney Nat'l. Bank*, 824 F. Supp. 587, 598 (E.D. La. 1993). Plaintiff also must "allege and prove that [the] defendant wrongfully concealed information and that plaintiff did not have actual or constructive knowledge of the information and could not have learned of [it] through the exercise of due diligence." *In re Ford Motor Co. Bronco II Prod. Liab. Litig.*, 982 F. Supp. 388, 397 (E.D. La. 1997). The only bases Plaintiff offers for its claim are that BP withheld information from Plaintiff regarding (1) the use of Corexit (an oil dispersant used during the Spill response) and (2) the amount of oil still on the ocean floor in the Gulf. *See* Klar Decl. at Ex. B 136:5-137:14. Plaintiff has not met its burden on either basis.[7]

First, Plaintiff cannot articulate why BP had a duty to disclose that information to Plaintiff, warranting summary judgment. *See Am.'s Favorite Chicken Co. v. Cajun Enters., Inc.*, 130 F.3d 180, 186 (5th Cir. 1997) (affirming summary judgment for failure to identify a duty to disclose). Similarly, Plaintiff offers no evidence or allegation of any benefit to BP of withholding such information, also necessitating dismissal. *See Sheppard v. Liberty Mut. Ins. Co.*, No. CV 16-2401, 2016 WL 6807400, at *3 (E.D. La. Nov. 17 2016) (dismissing for failure to plead any benefit from fraudulently concealing information).

Second, Plaintiff admits it knew or had access to the information it claims BP concealed regarding Corexit, and that the information was publicly available before the Spill. *See* SOF ¶ 51.

---

[7]    Plaintiff also failed to sufficiently allege a fraudulent concealment claim in its Complaint, *see* Compl. ¶¶ 23–56, 109–128, much less to the exacting standards required under Rule 9(b). *See Williams v. WMX Technologies, Inc.*, 112 F.3d 175, 178 (5th Cir. 1997) (When pleading fraud, "the who, what, when, and where must be laid out."); *see also* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must **state with particularity** the circumstances constituting fraud or mistake.") (emphasis added). "[A]rticulating the elements of fraud with particularity requires a plaintiff to specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Williams*, 112 F.3d at 177. Thus, the fraudulent concealment claim should be dismissed for failure to state a claim.

Access to or knowledge of concealed facts bars fraudulent concealment claims. *See In re Ford*, 982 F. Supp. at 397 ("That there can be no concealment when plaintiff has access to the allegedly concealed information is a principle too well-settled to dispute." (citing LA. CIV. C. ART 1954)).

Third, the only ways in which Plaintiff claims it was harmed by alleged non-disclosure of the amount of oil remaining in the Gulf are too speculative to support its claim. Plaintiff's only allegations of damages relating to non-disclosure of the quantity of spilled oil are that: (1) if Plaintiff learned there was more oil to remediate, it would re-open its now shuttered business and attempt to solicit clean-up work for which Plaintiff would then earn some unquantifiable amount of money, *see* Klar Decl. at Ex. B 144:12-21, 145:18-24; and (2) Plaintiff would enjoy a cleaner and better environment. *Id*. at 146:17-21. Plaintiff offers nothing demonstrating from whom it could solicit such work, and it is not an environmental expert (and has not retained one) so cannot quantify any damages associated with environmental impact. *See* Klar Decl. at Ex. B 147:3-14, 151:11-13; Klar Decl. at Ex. A. 206:25-207:7, 228:4-19.

## IV.   SUMMARY JUDGMENT SHOULD BE ENTERED ON PLAINTIFF'S MARITIME LAW CLAIMS

### A.   Plaintiff Waived Maritime Claims By Failing To Comply With PTO 64

On February 22, 2017, the Court entered PTO 64, requiring "each Remaining B1 Plaintiff who wishes to pursue a general maritime law claim [to] complete, sign, and serve" a sworn statement "stating whether the plaintiff owned or otherwise held a proprietary interest in property that was physically damaged by oil from the" Spill. PTO 64 ¶ 3. PTO 64 further provided that such claims would be "waived" and "dismissed . . . with prejudice" if such a statement was not served in accordance with PTO 64 by April 5, 2017. *Id.* Plaintiff acknowledges it did not submit the required sworn statement. *See* SOF ¶ 55. Therefore, Plaintiff's claims for negligence, gross negligence, and willful misconduct under general maritime law have already been dismissed with

22

prejudice.

**B.      Plaintiff's Maritime Law Claims Are Barred**

Under well-established federal law, maritime tort claims are barred unless either brought

by a commercial fisherman or the plaintiff has suffered physical damage to a proprietary interest.

*See Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303, 307-09 (1927); *In re Oil Spill by Oil*

*Rig "Deepwater Horizon" in Gulf of Mexico, on April 20, 2010*, MDL 2179, 2020 WL 6381138,

at *4 (E.D. La. Oct. 26, 2020) (plaintiffs must show physical oiling damage to proprietary interest

to maintain maritime claim); *Deepwater Horizon*, 808 F. Supp. 2d at 968-69 ("General maritime

law claims that do not allege physical damage to a proprietary interest are dismissed under the

*Robins Dry Dock* rule, unless the claim falls into the commercial fisherman exception").  Plaintiff

admits it is not a commercial fisherman and suffered no physical oiling damage, so cannot pursue

such claims.[8]  *See* SOF ¶¶ 56-57.

**C.      Plaintiff Offers No Evidence Creating A Disputed Issue Of Material Fact**

Negligence claims under maritime law require that plaintiffs "show a duty owed by the

defendant to the plaintiff, breach of that duty, injury sustained by [the] plaintiff, and a causal

connection between the defendant's conduct and the plaintiff's injury."  *Ortega Garcia v. United*

*States*, 986 F.3d 513, 526 (5th Cir. 2021) (internal quotations omitted).  "Gross negligence is a

label that straddles the divide between intentional and accidental actions."  *U.S. ex rel. Adm'r of*

*E.P.A. v. CITGO Petroleum Corp.*, 723 F.3d 547, 544 (5th Cir. 2013).  "The Louisiana Supreme

Court has said that 'often [there is] no clear distinction between such willful, wanton, or reckless

conduct and 'gross' negligence, and the two have tended to merge and take on the same

---

[8]     Plaintiff alleges approximately $5,000 in damages to a boat.  *See* Klar Decl. at Ex. A 114:8–11. Mr. Burkette
testified that Corexit caused that damage, not oil, *see id.* at 113:24–114:7, and that he does not know whether the
boat is registered to himself or Plaintiff.  *See id.* at 114:14–16.  Nor has Plaintiff produced any evidence reflecting
that damage or the cost of repairs.

meaning." *Id.* (quoting *Brown v. ANA Ins. Grp.*, 994 So. 2d 1265, 1269 n.7 (La. 2008)). Here, no reasonable juror could find BP had a duty to procure anything from Plaintiff, whether pursuant to any agreement or at law. *See Pac. Bell Tel. Co. v. LinkLine Commc'ns, Inc.*, 555 U.S. 438, 129 S. Ct. 1109, 1113 (2009) ("Businesses are generally free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing."). *See also supra* ARGUMENT § II. Absent a duty, there can be no breach of any duty or resulting damages. *See, e.g., In re Oil Spill by Oil Rig "Deepwater Horizon" in Gulf of Mexico, on Apr. 20, 2010*, MDL No. 2179, 2012 WL 4753418, at \*2-4 (E.D. La. Oct. 4, 2012) (holding plaintiff pleaded insufficient facts to show "law imposed upon BP a duty to specifically implement" remediation technology that plaintiff merely proposed BP use, and rejecting plaintiff's request for "compensation for pointing out how BP should have responded" to the Spill). Nor has Plaintiff offered evidence sufficient to create a disputed issue of material fact regarding alleged damages. *See supra* ARGUMENT § II.C.

## V.   PLAINTIFF'S CLAIM UNDER THE FLORIDA POLLUTANT DISCHARGE PREVENTION AND CONTROL ACT SHOULD BE DISMISSED[9]

To prevail on a claim under the FPDPCA, a plaintiff must prove that: "(1) defendant is a 'responsible party' under the Act; (2) plaintiff suffered 'damages' which are recoverable under the Act; and (3) the recoverable damages result from a discharge or other condition of pollution covered by [the FPDPCA]." *Clark v. Ashland, Inc.*, No. 2:13-cv-794-FTM-29MRM, 2017 WL

---

[9]   Plaintiff's claim under the Florida Pollutant Discharge Prevent and Control Act, Fla. Stat. § 376.011 et seq. ("FPDPCA") has already been dismissed pursuant to prior order of this Court. *See In re Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mexico, on Apr. 20, 2010*, 808 F. Supp. 2d 943, 956–58 (E.D. La. 2011), *aff'd sub nom. In re DEEPWATER HORIZON*, 745 F.3d 157 (5th Cir. 2014) ("*Deepwater Horizon*"). If not dismissed, the claim is pre-empted to the extent the Court finds that OPA applies to Plaintiff's claims. *See id.* (dismissing plaintiffs' state common-law claims for nuisance, trespass, and fraudulent concealment, as well as FPDPCA claim, holding that OPA's savings provisions do not give states power to impose state law to oil spills outside state waters—i.e., the Outer Continental Shelf). *See also Funderburk v. B.P. Prod. N. Am., Inc.*, No. 5:14-CV-43-OC-10PRL, 2014 WL 12868863, at \*3 (M.D. Fla. July 14, 2014), *report and recommendation adopted*, No. 5:14-CV-43-OC-10PRL, 2014 WL 12868862 (M.D. Fla. Aug. 12, 2014) (dismissing FPDPCA claim and holding that plaintiff's claims "are subject to general maritime law and/or OPA and therefore state law may not be adopted as surrogate federal law").

468213, at *5 (M.D. Fla. Feb. 3, 2017).   "'Damage' means ***the documented extent*** of any destruction to or loss of any real or personal property, or the documented extent, pursuant to § 376.121, of any destruction of the environment and natural resources, including all living things except human beings, ***as the direct result of the discharge of a pollutant***." *Id.* (quoting Fla. Stat. § 376.031(5) (emphases added)).   As discussed above, Plaintiff does not seek damages resulting from oil discharge, but rather because BP decided not to procure goods or services through Plaintiff in connection with the Spill response. *See supra* ARGUMENT § II.A.   Even if those damages were cognizable under the FPRPCA, Plaintiff provides no evidence from which any reasonable juror could find that Plaintiff suffered reasonably ascertainable damages. *See supra* ARGUMENT § II.C.

## CONCLUSION

For the foregoing reasons, BP respectfully requests that the Court enter summary judgment and dismiss with prejudice the Complaint.

April 16, 2021

Respectfully submitted,

/s/ Devin C. Reid

R. Keith Jarrett (Bar # 16984)
Devin Reid (Bar #32645)
**LISKOW & LEWIS**
One Shell Square
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone: (504) 581-7979
Fax No. (504) 556-4108

Matthew T. Regan, P.C.
(matthew.regan@kirkland.com)
Kristopher S. Ritter
(kristopher.ritter@kirkland.com)
**KIRKLAND & ELLIS LLP**
300 North LaSalle
Chicago, IL 60654
Telephone:  (312) 862-2000

Christopher W. Keegan
(chris.keegan@kirkland.com)
Ashley Littlefield
(ashley.littlefield@kirkland.com)
Anna Terteryan
(anna.terteryan@kirkland.com)
**KIRKLAND & ELLIS LLP**
555 California Street
San Francisco, CA 94104
Telephone: (415) 439-1400

*Attorneys for BP America Production Company
and BP Exploration & Production, Inc.*

26

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing **BP's Memorandum of Law in Support of its Motion for Summary Judgment** has been served on All Counsel by electronically uploading the same to File & ServeXpress in accordance with Pretrial Order No. 12, as amended, and that the foregoing was electronically filed with the Clerk of the Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 16th day of April, 2021.

*/s/ Devin C. Reid*

Devin C. Reid