# Exhibit A

1                    BILLY BURKETTE

2            UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF LOUISIANA
3

   GLOBAL DISASTER RECOVERY      )
4  & REBUILDING SERVICES,        )
   LLC, ET AL.,                   )
5                                 )
            Plaintiffs,           )
6                                 )          Case No.:
   VS.                            )     2:16-cv-6585
7                                 )
   BP EXPLORATION &               )
8  PRODUCTION, INC., ET AL,       )
                                  )
9           Defendants            )

10 -----------------------------------------------------------

11

12          ORAL AND VIDEOTAPED DEPOSITION OF
                     BILLY BURKETTE
13                 FEBRUARY 2, 2021
             (REPORTED REMOTELY VIA ZOOM)

14 -----------------------------------------------------------

15

16         ORAL AND VIDEOTAPED DEPOSITION, VIA ZOOM

17 VIDEOCONFERENCE, OF BILLY BURKETTE, produced as a witness

18 at the instance of the Defendant and duly sworn, was taken

19 in the above-styled and numbered cause on Tuesday,

20 February 2, 2021, from 9:38 a.m. to 6:17 p.m., before Kari

21 J. Behan, CCR, RPR, CRR, in and for the State of

22 Louisiana, reported by computerized stenotype machine, at

23 the offices of firm, address, Dallas, Texas, pursuant to

24 the Federal Rules of Civil Procedure.

25 JOB NO: 189255

```
 1                     BILLY BURKETTE

 2  Hauling, LLC; is that correct?

 3       Q.  Correct.

 4       A.  Okay.  So are we -- are you deposing me on behalf

 5  of A-1 Towing & Hauling, LLC, or are we talking about

 6  Global Disaster?

 7       Q.  We're talking about Global Disaster.

 8            But I'm -- I'm asking you:  In your personal

 9  capacity, you signed this document as the owner of A-1

10  Towing, correct?

11       A.  I own both, yes, sir, and, yes, sir, I signed --

12  yes, I signed it.

13       Q.  Okay.

14       A.  So what you're basically trying to say is -- is

15  that because --

16            MR. NEWELL:  Billy -- Billy, let him ask

17  questions and answer the question.

18            THE WITNESS:  Okay.

19  BY MR. KLAR:

20       Q.  What was your relationship to A-1 Towing at the

21  time you signed the document?

22       A.  Owner.

23       Q.  Okay.  So you had the sole decision-making

24  authority for A-1 Towing as the owner, correct?

25       A.  Correct.
```

1                    BILLY BURKETTE

2  anything."  Don't you -- you must not have seen the news

3  like it was down here.

4      Q.  Okay.  If you can turn to paragraph 4 of the

5  agreement.

6      A.  Okay.

7      Q.  This is scope of work and related data.  Does

8  this paragraph accurately reflect the scope of work that

9  Airware contracted Global Disaster to perform?

10      A.  "The extent and scope of work and other agreement

11  documents is that the contractor furnishes all labor and

12  materials, equipment and supervision necessary to crush

13  the stockpile concrete into road-based material, commonly

14  known as recycled concrete aggregate, herein referred to

15  as 'work.'  Unless specifically noted otherwise, the

16  contractor shall do all the work described in the contract

17  documents and in all incidental work necessary to complete

18  the work entirely ready for use."

19      Q.  Does that accurately describe the scope of work

20  they were contracting you to perform?

21      A.  That accurately -- I think that's what I just

22  spent the last half hour explaining to you.  Yes.

23      Q.  Okay.  Before -- okay.  If you could turn to the

24  next paragraph where it says, "The total authorized amount

25  is 950 per ton."

1                          BILLY BURKETTE

2              Does that accurately reflect -- that changes

3  the verbal agreement that you had with Airware before

4  entering into this agreement, correct?

5      A.  It does.

6      Q.  Okay.  That -- you -- 950 is the -- is the

7  contracted-to term, correct?

8      A.  Yes, sir.

9      Q.  Okay.  Before entering into this contract, had

10  Airware made any payments to you on account of any work

11  that Global Disaster had done?

12      A.  Don't recall.

13      Q.  Okay.  After entering into this -- or sorry.

14  Stepping back.

15              If you take a look at paragraph 5, the last

16  sentence, it says, "At the end of each week, the

17  contractor shall submit an invoice with the supporting

18  documentation of all work completed for the finance

19  department for payment."

20              Did I read that correctly?

21      A.  I believe so.

22      Q.  Okay.  Did Global Disaster ever submit any

23  invoices to Airware with supporting documentation for

24  payment to Airware's finance department?

25      A.  Yes, sir, we did.

1                        BILLY BURKETTE

2       Q.   Okay.   How -- how much in invoices were

3  submitted?

4       A.   The first week was 250 or 280,000, and -- and

5  Airware didn't have the money to pay it, because they,

6  too, were impacted by BP, and the -- the story that was

7  told to me, which I cannot confirm nor deny -- just

8  telling you what I was told -- by Terry Williams is, is

9  that BP basically impacted his business to where he was

10  unable to cover his cost by this contractual agreement.

11       Q.   Okay.   So after that first week's invoice was

12  submitted, were any other invoices submitted to Airware?

13       A.   Yes, the next week was, and the next week was.   I

14  think we did a full month, if I'm not mistaken.

15       Q.   Do you recall for how much?

16       A.   No, sir, I do not.

17       Q.   Was it -- do you recall if it would be more or

18  less than what the first week was, 250 to 280,000?

19       A.   Oh, I'm sure it would have been more.

20                  So then, because of BP's response to the

21  spill, we were approached by Captain Stanton of the -- who

22  was the sector commander of the Gulf, and Captain Stanton

23  asked what we were going to utilize that rock for.   I

24  guess they needed some somewhere.   Don't really know how

25  or what BP would have -- would have wanted to do with that

1               BILLY BURKETTE

2  rock, but when the conversation that I had with him was

3  that once we crushed it to a small stone, that it was my

4  plan, being Global Disaster's plan, to sell it to Robin

5  Seafood.

6               So Dan Robin's Seafood is friends with

7  Richie Stephens who A-1 was -- had the lease purchase with

8  is how I got introduced into Dan.  So Mr. Richie Stephens

9  introduced me to Dan.  Dan said, "Hey, if -- if you can

10  get the State of Louisiana to approve that crushed

11  concrete and the size of that crushed concrete, then I

12  will buy everything you've got at $45 a ton."

13       Q.  When -- so when did this conversation take place?

14       A.  I don't recall, sir.  Sometime in that time

15  frame, around 2010.

16       Q.  Okay.  It was after the spill, after the Airware

17  contract was signed, right?

18       A.  Yes.

19       Q.  Okay.  Did any -- did you ever enter into any

20  agreement reflecting that?

21       A.  Yes, sir, and y'all have a copy of that.

22       Q.  Which contract is that?

23       A.  The one with Robin Seafood.

24       Q.  Okay.  I don't believe we have a copy of that

25  contract.

1                          BILLY BURKETTE

2      A.  It was in the A-1 documents because A-1 was going

3  to do the hauling.

4      Q.  But you're saying in the A-1 documents there's a

5  contract between Global Disaster and Robin Seafood?

6      A.  Nope.  What I said was Richie Stephens came to

7  find out that I was the one crushing the rock.  He said if

8  I could get it approved, that he would buy everything that

9  there was at $45 a ton.  So A-1 would haul it after the

10  Global Disaster crushed it.

11     Q.  Okay.  So the contract was between A-1 or -- and

12  Robin Seafood, not Global Disaster?

13     A.  Correct.

14     Q.  Okay.  So you're not claiming damages -- Global

15  Disaster is not claiming damages from BP for anything

16  related to the Robin Seafood contract?

17     A.  Absolutely, I am.

18     Q.  Okay.  What -- what are you claiming with respect

19  to the Robin Seafood contract for or on behalf of Global

20  Disaster?

21     A.  BP -- BP forced me out of the Port so I couldn't

22  crush it so I couldn't sell it to Dan Robin.  Surely, you

23  can see that, right?

24     Q.  A-1 Towing had a contract with Dan Robin, not

25  Global Disaster?

1                         BILLY BURKETTE

2      A.   It is my opinion that, yes, it is -- it was my

3  decision as owner of both companies that it was both

4  companies that were impacted, one versus the other.

5      Q.   Okay.  But the contract between Robin's Seafood

6  and A-1 Towing, Global Disaster as the company, Global

7  Disaster, it was not a party to that contract, correct?

8  It was A-1's contract, right?

9      A.   Correct.

10      Q.   Okay.

11      A.   So they are separate, yes.

12      Q.   Under the terms of that contract, Robin Seafood

13  -- let's say if it had been performed, Robin Seafood,

14  under no circumstances, would owe money to Global

15  Disaster; they would owe it to A-1 Seafood [sic], correct?

16      A.   A-1 Towing.

17      Q.   I'm sorry.  A-1 Towing?

18      A.   That is correct.

19      Q.   Okay.

20      A.   But now -- but just for clarity, just so we're

21  clear, BP crushed the concrete and sold it to Robin

22  Seafood.  So again, ultimately, BP impacted Global

23  Disaster's ability to crush that rock, yes, sir.

24      Q.   Okay.  So can you walk me through how it came to

25  be that BP crushed the rock that was eventually sold?

                        BILLY BURKETTE

1

2  month's work.  Was there another invoice after that?

3      A.  No, sir, because after that, you know, is when BP

4  basically shut the Port down and took it over.

5      Q.  Okay.  And Airware never -- did Airware ever pay

6  you for the invoices that you submitted?

7      A.  No, sir, they did not.

8      Q.  Okay.  If you look at paragraph 7 of the contract

9  that says "Project Schedule," let me know when you're

10  there.

11      A.  Yes, sir, I'm here.

12      Q.  Okay.  It says, in the first sentence, "The

13  contractor shall commence work to the -- to be performed

14  under this contract upon receipt of written notice to

15  proceed from the purchasing and contract administrator."

16          Did you ever receive one of those notices?

17      A.  I'm not sure, sir.  Don't remember.

18      Q.  Okay.

19      A.  I know -- I know that we would -- we would not

20  have been there if we didn't.  I mean, we had been working

21  there for a long time prior to this contract, so, I mean,

22  I -- I don't know if that's even a -- I wouldn't even know

23  if that's a legitimate question.

24          I mean, you can't -- can you -- can you say

25  at that after you've been working somewhere that you're

1                         BILLY BURKETTE

2  going to need a written notice to continue to work?  We

3  had already been doing it.  I mean, I don't understand --

4  I guess that's language -- attorney language trying to

5  read into something that was unnecessary or scapegoat or

6  something.  I don't know.  It's just -- whatever.  I don't

7  remember, sir.

8       Q.  Okay.  So you don't -- sitting here today, you

9  don't remember receiving a notice to proceed from the

10  purchasing and contract administrator?

11       A.  No, sir, I don't.

12       Q.  So sitting here today, you have no knowledge of

13  whether Global Disaster or you would have a copy of that

14  document, correct?

15       A.  No, sir, I don't.

16       Q.  And do you have copies of the invoices that --

17  that you claim you submitted to Airware for reimbursement

18  for the work you did?

19       A.  No, sir, I don't.

20       Q.  Do you have any records reflecting what work you

21  did for Airware before signing the Airware contract?

22       A.  I believe y'all have all of that through my

23  attorney.

24       Q.  Okay.  So to the extent there are records of the

25  work that you performed for Airware, we have it?

1                    BILLY BURKETTE

2   apologize.

3              THE STENOGRAPHIC REPORTER:  Thank you.

4   BY MR. KLAR:

5      Q.  So I just want to -- so stepping back to my

6   original question, which is:  Who actually owns -- there's

7   a stock pile of -- of uncrushed concrete.  Who is the

8   owner of that concrete?

9      A.  It was the -- Airware, Terry Williams, until he

10  could not pay his debt.  Then it was my understanding that

11  we were to take ownership.

12     Q.  Of the entire stockpile?

13     A.  Yes.

14     Q.  And that was based on a lien that you -- that

15  Global Disaster placed against Airware as a result of

16  Airware's failure to pay Global Disaster's invoices?

17     A.  Well, I -- I don't think we had to enforce the

18  lien, because I think, if I remember correctly, Terry

19  Williams said he would forfeit the pile to us as long as

20  we continued to -- or agreed to furnish him his 200,000 or

21  10 percent or whatever it -- whatever his needs were for

22  the airport.

23     Q.  Okay.  The agreement that you -- if you didn't

24  own -- if Global Disaster didn't own the concrete until

25  after Airware had failed to pay and they deeded you,

1                    BILLY BURKETTE

2 effectively, ownership of the stockpile, how is it that

3 A-1 Towing was able to agree to sell that crushed concrete

4 to Robin Seafood?  Did that agreement come into place only

5 after Global Disaster obtained title from Airware to the

6 concrete?

7      A.  I'm not -- I don't remember, sir.  I mean,

8 obviously, if I own the concrete and I crush it and then I

9 own A-1 and A-1 hauls it, I mean, it's still a direct

10 result of the spill, and BP forcing us out of the Port is

11 what caused the damage.

12      Q.  Okay.

13      A.  Or the loss.

14      Q.  Did you ever have to sue Airware for payment of

15 your invoices, or did you work that out, you know,

16 informally?

17      A.  We threatened it, and then basically came to

18 terms, because I'm not really wanting to sue people.  He

19 just forfeited because he couldn't pay the bill, and we

20 worked out a settlement agreement that -- verbally that

21 basically we would furnish him the rock, and a few days

22 later, we got kicked out of the Port ourselves, so

23 everything is -- everything was -- no matter who owned it,

24 BP caused us to lose it.

25      Q.  So you only -- Global Disaster only had ownership

                          BILLY BURKETTE

1

2   of the concrete for a few days before the Port had shut

3   down, correct?

4        A.   I'm not sure of the timeframe, sir, but it wasn't

5   long.

6        Q.   Okay.  But then two months?

7        A.   I don't recall.

8        Q.   Less than six months?

9        A.   I -- I'm -- you're asking -- you're trying to pin

10  down an answer that I have answered three times.  I don't

11  recall.

12       Q.   I'm just trying to pin down a range.

13       A.   I don't recall.

14       Q.   Okay.  How much is Global Disaster claiming --

15  and I want to talk specifically about just the concrete.

16  How much in damages is Global Disaster claiming from BP

17  for harm done to Global Disaster's concrete-crushing

18  business in this case?

19       A.   Okay.  So I'm going to -- I'm going to use my

20  calculator on my phone just to give you a rough estimate.

21            You got 1,500,000 cubic yards times $45 a

22  yard, 67,500,000.  That's a gross figure.

23       Q.   And that $45-a-yard figure is based on the

24  contracts between A-1 Towing that it was going --

25  pursuant which -- A-1 Towing and Robin Seafood -- sorry.

1                          BILLY BURKETTE

2  Biloxi?

3       A.  Well, it was the -- so I didn't actually sell it.

4  A-1's trucks delivered it.  There was a guy by the name of

5  Danny -- can't recall his last name -- that facilitated

6  that sale.  He -- he's dead now.  He had cancer and died

7  in '16 or '17.  I don't -- I don't recall, sir.  Can't --

8  can't really remember.

9       Q.  Do you recall how much was suppose -- was

10 delivered under that arrangement?

11      A.  No, sir, I do not.

12      Q.  Okay.  And am I correct that A-1 did haul that

13 crushed concrete, it just ultimately was not paid for at

14 the end of the day?

15      A.  Correct.

16      Q.  Okay.  So that stockpile, that -- that concrete

17 still was part of the 1.5 million cubic yards that we were

18 talking about?

19      A.  Yes, sir, that is correct.

20      Q.  Okay.  Is there any -- are there any documents

21 that would reflect Global Disaster's ownership of the

22 concrete for which it is claiming damages for in this

23 case?

24      A.  I don't think there was a document, basically

25 just communication and agreement between Terry Williams

1                         BILLY BURKETTE

2  and myself.

3       Q.  And it was all -- it was oral?

4       A.  Yes.

5       Q.  Okay.

6       A.  Well, I mean --

7       Q.  Is there --

8       A.  We basically threatened to sue, and he said that,

9  you know, he did not -- I mean, and I understood.  He

10  didn't intentionally not be able to pay us.  He was in the

11  same boat as us, as damages against him, you know --

12  against BP from Airware as well.  You know, basically, BP

13  came in like -- like Katrina and just screwed everything

14  up, and then they -- because of the money and the power

15  and the influence that they had, they did whatever they

16  wanted to do and forced everybody, you know, into

17  hardship, except themselves.

18            So I don't think that we sued -- I think we

19  had prepared the documents -- I'm going by memory, man, so

20  don't hold me to this, but best of my recollection, we

21  prepared those documents, sat down, had a meeting with him

22  and with Mike Taylor at the Road Home project for

23  Louisiana, and it was determined that Terry would forfeit

24  it and we would take ownership, and it was just -- like I

25  said, it wasn't long after that is when BP shut everybody

1               BILLY BURKETTE

2      A.   Yes, sir.  We were in communication with BP for

3  occupying some of that space after we removed some of the

4  crushed concrete for boom deployment and supplies.

5      Q.   Did you ever enter into an agreement with BP for

6  boom deployment or providing supplies?

7      A.   We have a Master Service Agreement with ES&H, who

8  at the time was the prime contractor along with O'Brien,

9  and I spent a considerable amount of time at the office in

10  Gray, BP headquarters, both night shift and day shift, and

11  acquiring boom for which BP, again, circumvented me.  I

12  would -- I would go out and locate the boom manufacturers,

13  have an agreement with that boom manufacturer, and BP

14  would bump the price up $5 and -- and basically steal the

15  contract from me.

16               One guy in Alabama, one of the boom

17  manufacturers in Alabama called me on my phone -- my cell

18  phone and basically told me, "Hey, I hate to tell you

19  this, but BP just called me and said that they were going

20  to buy direct, and that they refused to go through you,"

21  basically terminating my contract.

22      Q.   You're talking about the contracts with ES&H?

23      A.   No, I'm talking about my direct contract

24  agreement that I had with the boom manufacturer.

25      Q.   Okay.  So it's your position that -- let me make

1                          BILLY BURKETTE

2   to buy that boom from you?

3        A.   Not written, but verbally, yes.

4        Q.   Okay.  Who at BP do you claim verbally agreed

5   that they would buy boom from you?

6        A.   I supplied all of those, multiple e-mails.  I

7   would have to go back and look.  I don't recall.  I would

8   have to read them myself.

9        Q.   Is the boom -- so you mentioned -- you mentioned

10  a master agreement with ES&H.  Is that related to this

11  boom business that you're talking about?

12       A.   The Master Service Agreement, after -- after they

13  had basically screwed me over so many times, the Master

14  Service Agreement is what BP, I would like to say, forced

15  me to use a prime contractor, because they did not want a

16  direct contract with me.

17       Q.   But is that -- let me just step back before we

18  talk about the contract itself.

19            The Master Service Agreement with ES&H, is

20  that the contract -- a contract that you had to acquire

21  the boom that you say BP was going to be buying from you

22  or is it something completely different?

23       A.   It was -- it was inclusive of the boom, vessels,

24  bathroom -- portable bathrooms, portable showers, portable

25  living quarters, flotilla hotels, all kinds of stuff.  It

1                      BILLY BURKETTE

2  was -- they had -- BP provided me a list of everything

3  that they need.

4       Q.  Okay.  And you were -- and it was the

5  arrangement, your understanding was, you go and acquire

6  from ES&H and then eventually furnish it to BP?

7       A.  No, negative.  I would go out and acquire it.  I

8  would furnish it to ES&H.  ES&H would put their profit on

9  top, and then they would supply it to BP.

10      Q.  Okay.  So you were supplying it to ES&H, and ES&H

11 ultimately was supplying it to BP?

12      A.  As far as the later in the -- in the response,

13 yes.  But when it originally first started happening, I

14 was dealing directly with BP.

15      Q.  Okay.

16      A.  And then when they kept circumventing me, and I

17 would bring it up that, "Hey, you told me ES&H was X

18 amount of dollars a foot, I went out and got it for X

19 amount of dollars a foot.  Y'all went and bought it for

20 one and a half times more than what you told me was the

21 max."

22      Q.  Okay.  So let's break it up into before ES&H and

23 after ES&H.

24             So starting with before ES&H came into the

25 picture, you claimed you were dealing directly with BP, BP

1                        BILLY BURKETTE

2   saying we need, X, Y, Z, products, and it was your

3   understanding that you were going to go out and get it and

4   furnish it -- furnish those products directly to BP,

5   correct?

6        A.  Correct.  And -- and the instrument that allows

7   that as -- the way we got to that understanding with BP

8   was, I went to the State and the State provided me with

9   BP's hazardous mitigation plan, so -- their spill

10  response.  So when BP, before they can turn right or

11  drill, they have to supply a hazardous mitigation plan and

12  a response plan in case there's a spill that has to be

13  accepted by the State of Louisiana, or any state that they

14  drill in.  Right?

15              So because of my disaster knowledge and --

16  and experience and working with FEMA and homeland security

17  in response to many disasters, not just oil spills, the --

18  the procedure is that once you supply that, there's an

19  agreement that that's the -- that is the course of action

20  that you will take that is ultimately approved by the

21  State prior to BP having been given a permit to drill for

22  oil.

23              So I went to the State and I got that

24  response plan.  I took that response plan down to Gray to

25  meet with -- the incident commander at that time was

1                    BILLY BURKETTE

2   Captain Edwin Stanton, so it was not just for boom or just

3   for boats or just for hotels or just for Aqua N-Cap or

4   just for corrections or just for anything.  It was for --

5   it was their plan that they submitted to the State that

6   says, "If we have a spill, we will do these things as part

7   of our response."

8                    So I took that plan down to Gray and

9   explained that to Captain Stanton, the incident commander,

10  and he said, "Hey, let me -- give me a few minutes.  We

11  are fixing to do changeover from incident command, and

12  I'll be right back out to get you.  Well, that was two

13  hours later.  But one of the many products that BP said

14  that they would use --"

15      Q.  Billy, I think -- I think I lost you.

16                  MR. KLAR:  Can everybody hear me?

17                  MS. DINEO:  I can hear you.

18                  MR. NEWELL:  I can hear you.

19                  His screen is paused.

20                  MR. KLAR:  Okay.

21                  THE STENOGRAPHIC REPORTER:  Should we go off

22  the record?

23                  MR. KLAR:  Yeah, let's go off the record

24  until -- until he is unfrozen.

25                  THE VIDEOGRAPHER:  It's 12:16 p.m.  We are

Page 84

1                     BILLY BURKETTE

2  going off the record.

3                 (Brief recess taken.)

4                 THE VIDEOGRAPHER:   Time is 12:25 p.m.   We

5  are back on the record.

6  BY MR. KLAR:

7      Q.   Okay.   Mr. Burkette, I think when you -- when you

8  cut out, you were talking about a discussion that you had

9  with Captain Stanton, who was incident commander, and he

10  said, "Let me give you a few minutes," and it was a couple

11  hours later, and then you cut out.

12                 So if you want to continue with what you

13  were saying there about your -- your discussions with

14  Captain Stanton.

15      A.   Yes, sir.   So the state mitigation plan or

16  response plan that BP submitted outlined all of the

17  products and methods of response that BP would use in the

18  case that BP should ever have a spill.

19      Q.   Okay.   I'm sending a document labeled Tab 12.

20  It's a fairly large document, so it might take a couple

21  minutes to download here.

22                 MR. KLAR:   When it comes in, can the court

23  reporter mark that as the next exhibit?

24                 (Exhibit 3 was marked for identification.)

25  BY MR. KLAR:

1                    BILLY BURKETTE

2    that they made are the extent of Global Disaster's

3    damages?

4         A.  No, sir.

5         Q.  Okay.  Why do you need to know -- sorry.

6    Stepping back.

7                    Which -- which manufacturers do you claim BP

8    bought boom from?

9         A.  That's the question.

10        Q.  So sitting here --

11        A.  That's the question.

12        Q.  So sitting here today, you don't know if BP --

13   what -- what boom BP bought from which manufacturers that

14   it should have bought from you?

15        A.  I know that -- that there were four different

16   boom manufacturers located in the United States that they

17   circumvented me on and there were at least two, maybe

18   three, outside of the United States that they circumvented

19   me on.

20        Q.  Okay.  Do you have any -- you don't have any

21   agreements with BP where BP agreed to purchase boom from

22   Global Disaster, correct?

23        A.  I mean, nothing other than verbally what the

24   response coordinators in that office told me they needed.

25        Q.  And you are referring to Captain Stanton,

1                    BILLY BURKETTE

2      Q.  Right.  But your -- your -- I understand that

3  part.

4              But your testimony today is that your

5  exclusive -- sorry, Global Disaster's distribution rights

6  to Aqua N-Cap, their exclusive distribution rights to Aqua

7  N-Cap was contingent on BP agreeing to purchase Aqua N-Cap

8  from Global Disaster, correct?

9      A.  Correct.

10     Q.  Okay.  And there's no agreement between BP and

11  Global Disaster reflecting an agreement by BP to purchase

12  Aqua N-Cap from Global Disaster?

13     A.  No, sir, because BP bought the company.  Again,

14  circumventing me.

15     Q.  So there is no agreement between BP and

16  Mr. Burkette requiring BP to purchase Aqua N-Cap from

17  Global Disaster or you?

18     A.  I don't -- I don't know if it was a requirement

19  more so than it was an understanding.

20     Q.  Okay.  Whether it's an understanding or -- or a

21  requirement, BP did not have an agreement to purchase Aqua

22  N-Cap in any quantity or any amount from Global Disaster,

23  correct?

24     A.  Or from anybody.

25     Q.  Okay.  So no agreement whatsoever obligating BP

1                    BILLY BURKETTE

2  contract.

3       Q.   Okay.  So let's turn to another e-mail.

4            I just sent a document labeled Tab 15.

5            MR. KLAR:  Can the court reporter mark it

6  next in line?  I think it's 5.

7            THE WITNESS:  If I remember, it was around 8

8  or $9 a pound, $7 a pound.  I don't remember, something

9  like that.

10           (Exhibit 6 was marked for identification.)

11  BY MR. KLAR:

12      Q.   Okay.  Do you recall when you had those

13  discussions before they were superseded, what time period

14  that was?

15      A.   I do not recall.

16      Q.   Okay.  And you don't recall the names of who --

17  who -- those procurement people?

18      A.   Not off the top of my head, no, sir.  I would

19  have to go back and look.

20      Q.   Okay.  Did those procurement people say that --

21  what -- what did they say specifically with respect to

22  whether or not they would purchase Aqua N-Cap from Global

23  Disaster?

24      A.   Well, basically, they were unaware of -- I was

25  just reading the e-mail -- they were unaware of Aqua N-Cap

1                        BILLY BURKETTE

2  until I provided the document that -- that the State had

3  in order for BP to be able to drill that response plan,

4  and when I -- when I brought that document down there,

5  they had never seen it.  The BP folks had never seen it,

6  the ones on the floor in the procurement section.  So when

7  I brought that down there and showed it to them, they

8  immediately said, "Well, yeah, we'll use it.  How much can

9  you get?"  And then --

10       Q.  Did you tell them how much you can get?

11       A.  I told them that -- I did.  I told them that I

12  had an agreement with the owner, that if they would use

13  it, that I could be the sole distributor, because they had

14  circumvented me so many times in the past I had already

15  gone and negotiated that with Jon Fowler.

16       Q.  Okay.  That's Jon Fowler, though.  Again, that's

17  in writing -- that's oral; it's not in writing, correct?

18       A.  I don't recall.  I mean, I think there's some

19  e-mails back and forth to that effect, but I'm going by

20  memory and I don't remember.

21       Q.  How much money was the agreement for with

22  Mr. Fowler?

23       A.  Oh, it would be -- it would be an IDIQ,

24  indefinite -- indefinite quantity, indefinite delivery

25  /indefinite quantity.

1                          BILLY BURKETTE

2  get the PO issued.

3       Q.  Okay.  They never issued a PO, correct?

4       A.  No, they bought the company instead.

5       Q.  Okay.  So there was never a purchase order or

6  other contract pursuant to BP would buy Aqua N-Cap from

7  Global Disaster?

8       A.  Correct, because again, they circumvented me.

9       Q.  Okay.  How much money is Global Disaster claiming

10 BP is liable to it for Aqua N-Cap?

11      A.  I don't -- I don't recall.  It's in my OPA claim

12 form.

13      Q.  Okay.  We'll get to those.

14      A.  You know, to put this in perspective, I have a

15 lot of years' experience in disasters.  In good faith, I

16 went to BP in order to assist and to help, and I was

17 consistently -- because I was not part of their prime

18 contracting list, they utilized me and my information and

19 my contacts as part of the response to the spill for which

20 they basically stole that information from me and went

21 behind my back and procured all of it.

22            So I worked tirelessly, day and night, to

23 help somebody that was fighting a major disaster and

24 they -- and they basically slapped me in the face and

25 stole all my information.

1                     BILLY BURKETTE

2  really -- I mean, I would have to sit down -- I would have

3  to have a forensic accountant to help me figure that out,

4  but after BP put me out of business, I mean, how do you

5  continue to go on indefinitely doing what BP asked you to

6  do if they are going to repeatedly stab you in the back?

7       Q.  Okay.  So sitting here today, you're not able to

8  reasonably calculate how much damages Global Disaster

9  suffered as a result of BP's decision not to buy Aqua

10  N-Cap from Global Disaster?

11       A.  Correct.

12       Q.  Okay.  So sitting here today, you're not able to

13  reasonably quantify how much damages Global Disaster

14  suffered as a result of BP's decision not to buy booms

15  from Global Disaster, correct?

16       A.  Correct.

17       Q.  You're not able to quantify how much in damages

18  Global Disaster suffered as a result of BP's decision not

19  to buy vessels of opportunity from Global Disaster,

20  correct?

21       A.  I mean, you're asking at this particular time, I

22  can do it, but do I have it?  No.

23       Q.  Okay.

24       A.  Just like my boat, you know, they instructed me

25  to go out and take samples.  It cost me $5,000 just to

1                          BILLY BURKETTE

2  have my boat repainted from all of the COREXIT that ate

3  the paint off of my boat.  Those things I have that, you

4  know, I could provide to you.  But as of sitting here,

5  right now today, no, sir, I don't have that documentation

6  in front of me, but I did provide it to y'all in my OPA

7  claim form.

8       Q.  Okay.  So part of the damages that Global

9  Disaster is asserting is a $5,000 charge for a repaint of

10  the boat?

11      A.  I mean, that's just one of many.

12      Q.  I'm asking if that's one of them, right?

13      A.  Yes, sir.

14      Q.  And that boat is registered to Global Disaster or

15  to Billy Burkette?

16      A.  I don't recall.

17      Q.  Okay.  Do you have any documents that show that

18  Global Disaster owns the boat for which you seek

19  reimbursement in this case?

20      A.  Well, I don't recall if it's me or if it's

21  Global.

22      Q.  Okay.  If it's you, it's not Global Disaster's

23  damages; it's Billy's, correct?

24      A.  Correct.

25      Q.  Okay.

1                         BILLY BURKETTE

2      A.  Well, that's not true, because I own it.  It's my

3  -- it's one of my assets whether Global used it or if --

4  if BP used it.  It's still something that BP used and

5  caused damage to that they didn't pay for.  Any way you

6  want to slice that pie, it's still a -- a vessel that was

7  used in response that BP never paid anything for.  They

8  didn't even pay me for going out and collecting the

9  samples that they told me to go out and collect.

10     Q.  Okay.  So whether it's damages to Billy Burkette

11 or to Global Disaster or to A-1 Towing, your position is

12 you owned all of it, so BP owes it no matter what?

13     A.  I -- I think that the correct posture should be

14 that BP owes for things that BP asked me, my companies, my

15 personal, or anything that -- any words you want to

16 choose, if BP told me to do something, they should pay for

17 that and not circumvent me and stab me in the back.

18 That's bad-faith business where I come from.

19              I bet if the shoe was on the other foot and

20 I caused damage to BP, BP would have the same thought

21 process.  If I caused them damage, they would want me to

22 pay that damage.

23              I cannot hear you.

24     Q.  Sorry.  On the bottom of the page marked Global

25 Disaster 104, can you turn to that?

1                         BILLY BURKETTE

2  yes, sir.

3      Q.  Between -- it's a Confidentiality Agreement, and

4  it says, "Discloser, Billy Burkette.  Recipient, BP"?

5      A.  Yes, sir.

6      Q.  Okay.  Do you recall what the purpose of this

7  document was, why you were entering into a Confidentiality

8  Agreement with BP?

9      A.  I do.

10     Q.  What is it?

11     A.  As I have stated numerous times, BP would request

12  me to do something, I would do it, and they would

13  circumvent me.

14     Q.  Okay.  So it was important to you that BP keep

15  information that you provide them confidential?

16     A.  I mean, is there any other reason that you have

17  to execute that document?

18     Q.  Well, if you scroll down -- so is that a "yes"?

19     A.  Yes.

20     Q.  Okay.  If you scroll down to the last page, BP

21  didn't sign this document, correct?

22     A.  No, sir.  At this time is when they sent me over

23  the Master Service Agreement, I believe.

24     Q.  Are you referring to like a vessel of opportunity

25  agreement or something else?

1                    BILLY BURKETTE

2  helping them -- I guess the answer to your question that

3  you're looking for is they would have had that prior to --

4  because I know Captain Stanton had it.  So yes, it was

5  prior to Jackie getting it.

6      Q.  Okay.  So turning back to that e-mail that's

7  Exhibit 10, Tab 20, in that e-mail you wrote to Chris Ott

8  we talked about earlier, "Lynn DeHaven," there's a phone

9  number, "according to BP, this person is the team lead

10 that has to approve Aqua N-Cap for their use.  Best, Billy

11 Burkette."

12             Do you recall writing that?

13     A.  Yeah.

14     Q.  So did you send this e-mail before speaking to

15 Jackie Michelle or before?

16     A.  Oh, I don't remember what -- I don't remember the

17 exact date that I talked to her.

18     Q.  Did you have any understanding of where Lynn

19 DeHaven fit into the structure at BP?

20     A.  No, sir, I do not.

21     Q.  Who told you that -- it says, "According to BP,

22 this person is the team lead."  Who at BP told you that?

23     A.  It was one of the guys in procurement down there

24 on the floor.  I don't remember who it was.

25     Q.  Okay.  So at this time, by the time you sent this

1                     BILLY BURKETTE

2       Q.   Do you recall when you first became acquainted

3  with ES&H?

4       A.   No, sir.

5       Q.   It was after the spill, though, right?

6       A.   Oh, yes, sir.  It was one of the procurement guys

7  that put in touch with them that said, because I was not a

8  prime contractor, that I had to go underneath a prime

9  contractor.

10      Q.   Got it.  And if I understand what you're -- what

11  you testified to earlier about ES&H, you would procure

12  things for them that they ultimately would provide to BP,

13  correct?

14      A.   Well -- so all of that happened right around the

15  same time that we had the conversation with Jackie and

16  that we had -- the conversations with the EPA and RTASCo

17  and Jon and a bunch of people, Chris and David and all

18  kinds of people.  And, you know, I expressed to them that,

19  financially, they were bankrupting me.  And so I told them

20  that if they had not, you know, intended to use me and to

21  provide -- let -- whatever we could provide in assistance,

22  then I could not financially keep doing what I was doing.

23            And right about that time is when they

24  asked -- I guess it was somewhere in Alabama or

25  Mississippi, they asked for A-1 to send some trucks to

1                        BILLY BURKETTE

2   me, you know, it -- may not seem like much, but you drive

3   all the way to Alabama to meet BP's inspector, which BP

4   sent the inspector over to Alabama to look at the boom to

5   make sure it met spec.  Then they told me to meet the

6   inspector out there.  I mean, it may not be much but you

7   start doing 2, $300 a day in expenses, and then nothing

8   that you could do other than try to do ethical business

9   and BP just steady, you know, back-dooring you, what --

10  what other options do you have other than either to go in

11  debt or either to pull the plug?

12                  So, you know, basically my contention is, is

13  that BP forced me out of business, they forced me out of

14  the Port, they went behind my back.  They asked me to do

15  things that, obviously, you seem to think that require a

16  written agreement that I personally don't think it was

17  required because I'm there in person taking verbal orders

18  from BP's employees to do things, that they never paid

19  for.  So, I mean, you know, that -- at that point, it was

20  just a mute [sic].  I was -- I was driven out of business

21  by BP and no matter whether it was intentional or

22  unintentional, the end result is the same:  BP cost me a

23  lot of money.

24      Q.  Okay.  When you say that you "pulled the plug,"

25  do you mean that you -- you shut down Global Disaster's

1                        BILLY BURKETTE

2  operations and stopped doing business with BP, or do you

3  mean something else?

4       A.  No, I mean I stopped doing business with BP.

5       Q.  Okay.  At that point -- what point did you, using

6  your words, pull the plug?

7       A.  Oh, I -- I don't -- are you asking for a date and

8  a time?

9       Q.  Not -- just a range.  Was it in 2010?

10      A.  Yes, sir.

11      Q.  Okay.  Was -- was Global Disaster still in

12  business in 2010 or -- or did it cease doing business in

13  2010?

14      A.  Well, after the financial burden, I mean, I kept

15  it active, but we didn't do any business until 2013.

16      Q.  Okay.  So from between sometime in 2010 until

17  sometime in 2013, Global Disaster wasn't doing any type --

18  any business?

19      A.  No, sir.  I couldn't afford to.  They broke it.

20      Q.  Okay.  You said -- you were talking about driving

21  to Alabama to meet an inspector.

22                How many times did you do that?

23      A.  I don't recall, sir, multiple times.

24      Q.  Was it more than ten?

25      A.  I don't recall.

1                          BILLY BURKETTE

2  question.

3       Q.  Okay.  So you never had any discussions with BP

4  about money?

5       A.  Not as far as my billable time, no.  Not at a

6  rate which would be, I guess you would call it, documented

7  on the contract, as you would.

8               Don't you have the -- the ES&H contract?

9       Q.  Yep.  I'm sending it to you right now.

10      A.  There you go.

11              MR. KLAR:  Can the court reporter please

12  mark this, Tab 8, the next in line?

13              THE STENOGRAPHIC REPORTER:  Exhibit 11.

14              (Exhibit 11 was marked for identification.)

15  BY MR. KLAR:

16      Q.  Is this the Master Services Agreement that you're

17  referring to with ES&H?

18      A.  It looks close, yes, sir.

19      Q.  Okay.  Is this one dated June 15, 2010, right?

20      A.  I guess.  I don't see any sign -- any signatures

21  on it.

22      Q.  Okay.  Yeah.

23              So at the bottom of the third page, there's

24  a space for initials, right?

25      A.  Yep.

                         BILLY BURKETTE

1

2      Q.  And it's blank?

3      A.  That's what makes me wonder if this is the actual

4  one.

5      Q.  And the signature page on the last page is also

6  blank, right?

7      A.  That's why I say I don't think this is the

8  accurate document.

9      Q.  Okay.  Do you -- this is the only copy of the

10 ES&H agreement that we have.  Are you -- are you aware of

11 any other document reflecting your contract with ES&H?

12     A.  They sent the document to me.  I signed it, sent

13 back, so I'm assuming that they would have a copy of it.

14 We can subpoena that document from them, I'm sure.

15     Q.  Okay.  But you don't have the document, though?

16     A.  No, sir, I do not.

17     Q.  Do you recall whether the -- the terms of the

18 agreement, like the actual words of the contract, were

19 negotiated with ES&H?

20     A.  No, sir.

21     Q.  So you reached out to them at some point when BP

22 told you, "We need you to work with a -- an approved

23 contractor," and they sent you this agreement?

24     A.  I -- I did not have -- I did not reach out to

25 ES&H.  BP had ES&H reach out to me.

1                         BILLY BURKETTE

2      Q.   Okay.  So do you recall when ES&H first contacted

3  you?

4      A.   No, sir, I do not.

5      Q.   Do you know how soon before June 15, 2010, the

6  date of the contract, a week?  A month?

7      A.   It must have been about a week, I'm guessing.

8      Q.   Okay.  So after ES&H reached out to you, did you

9  have any phone calls or meetings with ES&H before seeing

10  this agreement?

11      A.   Yes.

12      Q.   Okay.  With who?

13      A.   Don't recall.

14      Q.   Do you recall when they (inaudible)?

15      A.   No, sir.

16      Q.   Do you recall what was discussed?

17      A.   Basically just the -- the questions -- you know,

18  they were more concerned with what, you know, the products

19  and services that I could provide or that I had that could

20  be utilized was the basics of our discussion.  It was

21  not -- it was not so much about the contract or its

22  contents or its terms; it was more in line with, "Hey, BP

23  told us to send you a Master Service Agreement because

24  they want to use whatever you have, and we are supposed to

25  be getting a list of all the products and services that

1                      BILLY BURKETTE

2  you can provide."

3       Q.  Did you provide them with a list?

4       A.  I don't -- I don't think it was a written list.

5  I don't recall.  I know we had conversations about it,

6  multiple times.

7       Q.  Okay.  Were those conversations all over the

8  phone?

9       A.  Yes.

10      Q.  Okay.  So after those discussions, they sent you

11  a -- a copy of the agreement, right?

12      A.  Yes, sir.

13      Q.  Okay.  And there weren't negotiations over it.

14  You were okay with the terms?

15      A.  I mean, it didn't matter if I was okay or not

16  okay.  It's -- it's an ultimatum.  If you want to do

17  business, here it is, sign it or don't sign it.  We don't

18  care.

19      Q.  Okay.  So there weren't any changes to the

20  agreement?  That's all I'm trying to establish.

21      A.  Correct.

22      Q.  Okay.  Can you please turn to the second page of

23  the agreement, Section 4, that says, "No obligation to

24  order or accept work"?

25      A.  Yep.

1                    BILLY BURKETTE

2      Q.  Okay.  It says, "This agreement does not obligate

3  Company to order any labor, goods, services, and/or

4  equipment from Contractor, nor does it obligate Contractor

5  to accept any such orders.  But it shall, however, control

6  and govern all work, all orders, the same classified in

7  written purchase orders or statements of work issued by

8  Company and accepted by Contractor, and shall define the

9  respective obligations of Company and Contractor during

10  the terms hereof."

11                Did I read that correctly?

12      A.  Yes.

13      Q.  Okay.  So you understood from this contract that

14  any work ES&H or products or services that ES&H was going

15  to acquire or purchase through you would be specified in a

16  written purchase order or statement of work issued by them

17  to you, correct?

18      A.  Correct.

19      Q.  Okay.  Did ES&H ever issue a written purchase

20  order to Global Disaster pursuant to this agreement?

21      A.  No.

22      Q.  So Global Disaster never provided any labor,

23  goods, services or equipment to ES&H for ultimate

24  provision with BP pursuant to this agreement?

25      A.  Nothing other than the list.

1                          BILLY BURKETTE

2        Q.   Okay.   Just a list of what you could offer, not

3    the actual services and goods themselves, correct?

4        A.   That is correct.

5        Q.   Do you have an estimate of how much in damages

6    Global Disaster is claiming it suffered as a result or

7    relating to this relationship with ES&H?

8        A.   No.

9        Q.   When did your contract with ES&H terminate?

10       A.   I don't know.

11       Q.   Was it in 2010?

12       A.   I don't recall.

13       Q.   I'm sending a document, Tab 25.

14              MR. KLAR:   Can the court reporter mark this

15   next in line?

16              THE WITNESS:   Okay.

17              (Exhibit 12 was marked for identification.)

18              THE STENOGRAPHIC REPORTER:   Yes, marked as

19   12.

20              MR. KLAR:   Thank you.

21   BY MR. KLAR:

22       Q.   Do you know what this document is?

23       A.   Yes.

24       Q.   What -- what is it?

25       A.   Price list.

1                          BILLY BURKETTE

2  actually have them in my possession anymore.

3       Q.  Okay.  And you don't recall supplying any of the

4  pieces or equipment that are listed on the services

5  ticket?

6       A.  I mean, we supplied a bunch of stuff.

7       Q.  To ES&H?

8       A.  No, sir, to BP.

9       Q.  Okay.  So you didn't supply anything pursuant to

10 the contract with ES&H?

11      A.  Not to the best of my knowledge, no, sir.

12      Q.  Okay.  Well --

13      A.  You see, this is what I'm telling you.  What

14 happened was BP put these prime contractors in a position

15 to basically force companies like A-1, companies like

16 Global Disaster, companies like, you know, the VOO, all of

17 the fishermen, all of those things, they forced those

18 things to go into companies like ES&H, Oil Mop, Witt

19 O'Brien -- or O'Brien at the time, now it's Witt O'Brien.

20 They forced all of that to happen.  Not whether or not we

21 wanted it to, they made us do that.

22      Q.  What products did you -- did Global Disaster

23 supply to BP?

24      A.  I don't recall the exact list, but boats, of

25 course the rock crushing, of course trucking, of course --

1                    BILLY BURKETTE

2       Q.   Okay.  Did Strategic Services USA ever send you a

3  formal subcontract agreement?

4       A.   I don't recall.

5       Q.   Do you recall Global Disaster ever entering into

6  a formal subcontract agreement with Strategic Services?

7       A.   I do not recall.

8       Q.   Do you recall having any discussions, besides

9  what's in this letter, with Strategic Services about a

10  formal subcontract agreement?

11      A.   Nope.

12      Q.   Do you recall having any discussions with

13  Strategic Services about ES&H?

14      A.   Again, at -- this was all about the time that BP

15  made an executive decision to force everybody to go under

16  a prime contractor.

17      Q.   I understand.

18           But do you have recall specifically having

19  any discussions with Strategic Services about your ES&H

20  contract?

21      A.   Well, yeah, I mean, I told them -- you know, I --

22  again, I try to be as transparent as I can.  I don't

23  disclose, you know -- or I don't not disclose any --

24  there's nothing hidden there.  I don't -- I don't

25  understand what you're trying to get at.

1                    BILLY BURKETTE

2      Q.  I'm just asking if you had discussions with them

3  about ES&H and what those discussions were.  That's it.

4      A.  I mean, I told them that BP was forcing me to go

5  under ES&H, that ES&H would be now acting on BP's behalf.

6      Q.  Did you ever provide Strategic Services USA with

7  signed copy of any contracts with ES&H and Global

8  Disaster?

9      A.  I don't recall.

10     Q.  Did Global Disaster ever provide Strategic

11 Services USA with proof of insurance coverage required for

12 services outlined in those letters of intent?

13     A.  I don't recall.

14     Q.  Is Global Disaster claiming any damages against

15 BP relating to this Letter of Intent with Strategic

16 Services USA, LLC?

17     A.  I'm sure.

18     Q.  Do you know?

19     A.  Yes.

20     Q.  How much is Global Disaster claiming it -- it

21 suffered relating to this Letter of Intent with Strategic

22 Services USA, LLC?

23     A.  I don't have a dollar figure.

24     Q.  How did BP damage Global Disaster with respect to

25 the Strategic Services -- this Letter of Intent with

1                    BILLY BURKETTE

2  and ask me, "Hey, Chief," or, "Hey Billy, can you do this

3  for me?"  And I tell you, "Yeah."  You don't have to

4  worry.  You can lay your little head on your pillow at

5  night and go to sleep because you know that I'm going to

6  do what I said I was going to do.  It's a matter of

7  principle and ethics.

8       Q.  So after the tenth time that you felt like

9  that --

10      A.  There wasn't no feel -- it's not a feeling.

11              THE STENOGRAPHIC REPORTER:  I'm sorry.  I

12  think we lost our videographer.

13              (Brief recess taken.)

14              THE VIDEOGRAPHER:  Time is 4:05 p.m.  We are

15  back on the record.

16  BY MR. KLAR:

17      Q.  Okay.  Mr. Burkette, we were speaking about

18  whether agreements with BP were ever reduced to writing

19  and you indicated that the first ten or 12 times it hadn't

20  been reduced to writing, but after that you were asked

21  that your agreements with BP be put in writing.  Is that

22  generally accurate?

23      A.  Yes, sir, and that's when they forced me to go to

24  ES&H.

25      Q.  Okay.  But even after that point, none of your

1                          BILLY BURKETTE

2     agreements with BP were in writing, right?

3          A.  No, sir, just verbal.

4          Q.  Okay.  And there's no -- at the end of the day,

5     ultimately, the reason we are here is that BP did not do

6     any business with Global Disaster, correct?

7          A.  No, sir, that is not correct.

8          Q.  Okay.  What -- what business did they conduct

9     with Global Disaster?

10         A.  (No response.)

11         Q.  Let me rephrase.

12              Earlier, you said, "I don't know how much

13    more proof you need that BP did not do any business with

14    Global Disaster.  They continually asked me to provide

15    information which they took from me and back-doored me and

16    got it themselves."

17              Am I right to say that BP did not purchase

18    any products or services from Global Disaster?

19         A.  Yes, you're correct.

20         Q.  Okay.  BP did not issue a purchase order in

21    writing to Global Disaster to purchase any products or

22    services?

23         A.  That's correct.

24         Q.  And BP never promised, in writing, in an

25    agreement to purchase any products or services from Global

1                    BILLY BURKETTE

2 Disaster, correct?

3      A.   That's correct.

4      Q.   Okay.  Earlier, we talked about the Airware

5 arrangement with Global Disaster.

6           Were there any other concrete-crushing

7 arrangements that you had with companies besides Airware?

8      A.   No.

9      Q.   Okay.

10     A.   Oh, wait, ask that question again.

11     Q.   Sure.

12           Were -- aside from your agreement with --

13 aside from Global Disaster's agreement with Airware, were

14 there any other contracts that Global Disaster was a party

15 to to crush concrete in the Port of St. Bernard?

16     A.   No.

17     Q.   I want to talk a little bit more about the Port.

18 Other than what we discussed on far today, your -- your

19 concrete crushing -- Global Disaster's concrete-crushing

20 arrangement with Airware and your -- and Global Disaster's

21 attempts to procure products and services for BP.

22           Was there any other activity that Global

23 Disaster was conducting in the Port of St. Bernard?

24     A.   Just the availability of room for BP to store

25 boom and other products for deployment.

1                         BILLY BURKETTE

2      Q.  Okay.  So you were in discussions with BP about

3  storage for equipment?

4      A.  Correct.

5      Q.  Okay.  Who were those discussions with?  Was that

6  procurement as well?

7      A.  Yes.

8      Q.  Do you recall with who?

9      A.  I do not.

10      Q.  Do you recall when those discussions took place?

11      A.  I do not.

12      Q.  Do you recall discussing how much storage was

13  needed or could be provided?

14      A.  I don't remember with whom.  I do remember

15  them -- I do remember them having sent representatives out

16  and asking me how fast we could crush the pile and if we

17  could crush it in such a manner that would free up certain

18  portions of the area for room.

19      Q.  I see.  So the -- the area that Global Disaster

20  would be able to furnish as storage to BP was being

21  occupied by the concrete that Global Disaster had to

22  crush?

23      A.  Correct.

24      Q.  Okay.  Where was that concrete held?  Was it like

25  a yard that Global Disaster owned or leased?

1                         BILLY BURKETTE

2      A.  The -- it was at the Port.

3      Q.  Right.  I understand it was at the Port.

4            But was -- if -- whose land was it where the

5  concrete was?

6      A.  The Port.

7      Q.  Okay.  So it wasn't Global Disaster's land?

8      A.  No.

9      Q.  Okay.  If BP --

10     A.  But -- but Global Disaster had that section of

11 land allocated for the concrete crushing.  BP sent their

12 representatives out to ask how fast we could crush it, and

13 if we could do it in such a manner at a starting point

14 that they would be able to utilize a portion of that land

15 once we started crushing.  In other words, they asked us

16 to start in a place different from where we were set up so

17 that we could accommodate them in freeing up some room for

18 them to have space, which, of course, I agreed to.

19     Q.  Did you have permission from the Port to allow BP

20 to store equipment at the concrete-crushing site?

21     A.  It was our -- that -- that section of land, I

22 didn't need it.  It was -- it was already our section.

23     Q.  I think earlier you testified they had allocated

24 it to you for concrete crushing?

25     A.  Correct.

1                    BILLY BURKETTE

2      Q.  But not for storage, correct?

3      A.  No, but again, because they put me in such a

4  financial hardship that I couldn't complete the crushing

5  and the fact that they came in and took over the Port and

6  forced me out of the Port, I never had time to do that.

7      Q.  Okay.  So in order for you to allow BP to use

8  your concrete-crushing area as storage, you would have had

9  to get permission from the Port, right?

10     A.  Don't know.

11     Q.  Okay.  You never asked?

12     A.  No.

13     Q.  Okay.  So sitting here today, you don't know

14  whether or not the Port would even have allowed that?

15     A.  Well, obviously, they allowed it, because BP took

16  the whole Port over.

17     Q.  Well, you don't know if the Port would have

18  allowed you to let BP use your land, correct?

19     A.  I do not know if they would or would not allow.

20  I guess we can subpoena the Port and ask.

21     Q.  Did you have any other discussions with BP about

22  the concrete?

23     A.  Yes.

24     Q.  What -- what discussions did you have?

25     A.  The discussions that I had were about supplying

1                    BILLY BURKETTE

2   are not processing claims," whatever.  It's just a

3   nightmare, man; just a nightmare.

4       Q.  Going back to -- and we will talk about Worley

5   and all that.

6            But going back to the Port closure, do you

7   remember hearing anything about why the Port was being

8   shut down?

9       A.  Did I not say that earlier?  Because BP took it

10  over.

11      Q.  You are aware that the Coast Guard controlled the

12  Port, correct?

13      A.  I am acutely aware of that.

14      Q.  So incident command and the Coast Guard were in

15  control of the Port, not BP, right?

16      A.  Well, you would think that.  That's a great --

17  that's a great assessment, because the Coast Guard is in

18  control of the response, which we obviously know that BP

19  was instructing the Coast Guard what to do and what not to

20  do, because they instructed the Coast Guard not to use

21  Aqua N-Cap, right?

22      Q.  So you agree, though, that the Coast Guard and

23  incident command running the spill response, they were in

24  charge of the Port --

25      A.  I do not agree.  I do not agree.

1                          BILLY BURKETTE

2        Q.   Who -- who do you think was in charge?

3        A.   BP.

4        Q.   Okay.  If the Coast Guard wanted to, they had the

5    authority to remove BP from the Port, correct?

6        A.   No.

7        Q.   What's that based on?

8        A.   The fact that it didn't happen.

9        Q.   Okay.  So your -- your testimony is because BP

10   wasn't removed, that the Coast Guard had no control over

11   whether BP could occupy the Port?

12       A.   No, sir.  My testimony is that BP instructed the

13   Coast Guard what they were going to do, and they did it.

14   No different than the Aqua N-Cap.

15       Q.   How -- okay.  So setting aside your discussion

16   with Jackie Michelle and the Aqua N-Cap, how do you know

17   that BP instructed the Coast Guard as to what they were

18   and were not going to do with respect to the Port?

19       A.   Well, they instructed the Coast Guard where to

20   put the burn ring, they instructed the Coast Guard where

21   to set up incident command.  They were inside BP's

22   building -- the Incident Command Center was inside BP's

23   headquarters in Gray, Louisiana, so I don't know how much

24   clearer that picture could be painted.

25       Q.   Okay.  So other than the fact that you say the

1                    BILLY BURKETTE

2  Incident Command Center was inside headquarters, were you

3  a party to any conversations, other than your

4  conversations regarding Aqua N-Cap where BP was

5  controlling what the Coast Guard was doing?

6      A.  Absolutely, I was.  So --

7      Q.  Okay.  What?

8      A.  The flyovers with the Russian planes that

9  dispersed the COREXIT, the millions and millions of

10  dollars that Paul Loupe had involved himself in with BP

11  that they never paid him for and the judges in -- in

12  Plaquemines Parish that test -- that -- in their courts,

13  the testimony was BP was in their control, and multiple

14  courts and multiple states and multiple parishes and

15  counties where BP was in control and instructed the Coast

16  Guard exactly what to do.

17      Q.  Okay.  So it's your testimony that BP was in

18  control of the federal government with respect to

19  activities in the Port of St. Bernard?

20      A.  Yes, sir.

21      Q.  Okay.

22      A.  Among other things.

23      Q.  "Among other things" meaning they were in control

24  of other things beyond just the Port of St. Bernard; is

25  that what you're saying?

1                      BILLY BURKETTE

2       A.   Correct.

3       Q.   Like what?

4       A.   They instructed the Coast Guard to do a lot of

5  things that the Coast Guard did.

6       Q.   Okay.

7       A.   And I'm assuming we will get those records when

8  we -- when we get a little closer to going to court, I'm

9  sure.  I mean, that's going to be easy to prove.

10       Q.   Okay.  I just sent Tab 28.

11                 MR. KLAR:  Can the court reporter please

12  mark that as the next exhibit?

13                 (Exhibit 14 was marked for identification.)

14  BY MR. KLAR:

15       Q.   Do you have that open, Mr. Burkette?

16       A.   I do.

17       Q.   Okay.  So this is addressed to you and Global

18  Disaster and -- from a Lil Lalumandier and Robert G.

19  James, "Resale of Stock Port Fourchon Marina, Inc.,"

20  right?

21       A.   That's correct.

22       Q.   Okay.  What is -- what is Port Fourchon Marina,

23  Inc.?

24       A.   Port Fourchon Marina is a -- I guess you're not

25  familiar with Port Fourchon.  When you're traveling down

1                      BILLY BURKETTE

2  to -- towards Grand Isle, Louisiana, Port Fourchon is a

3  port where the shipping industry for the oil industry is

4  basically warehoused.  They have loading bays, they have

5  docks, they have land that BP, again, instructed me that

6  that's what they were looking for.  So I contacted Lil and

7  Robert and I said, "Look, I need to come up with a figure

8  because BP is saying that they need space, and I want to

9  provide that space.  I would like the opportunity to buy

10 that marina."

11     Q.  Okay.

12     A.  So I -- they said, "We would gladly sell it to

13 you for this amount of money, the $750,000."

14     Q.  When did you first come into contact with Port

15 Fourchon Marina, Inc.?

16     A.  The beginning of June, I guess it was.

17     Q.  Okay.  And -- and so you knew that BP was looking

18 for storage.  Did you go out looking for, like, areas that

19 could be provided and that's how you ended up here, or did

20 they contact you?

21     A.  BP contacted me.  They told me that they were

22 looking.  I drove five hours around to go down to

23 Fourchon, met with David -- I guess his name is Barker --

24 and another guy who was the land-procurement guy -- don't

25 recall his name.  He told me that that's the area that

1                    BILLY BURKETTE

2   they were looking for, and I went to Chris Moran, who is

3   the owner of Port Fourchon.  It's Chris Moran's Marina.  I

4   had a discussion with Chris about the marina on the next

5   road over, which is this one, Port Fourchon Marina, and I

6   also contacted Bobby Gros, who has Bobby Lynn's Marina,

7   which BP occupied their space, but it was more for

8   sleeping quarters for the BP employees and a few

9   subcontractors.

10                    So I went out and negotiated the purchase of

11  this, so that I could provide this property to BP for them

12  to put boom on for deployment, because it had water access

13  and a loading access to load the barges and the vessels

14  with the boom for deployment.  So at that point, as you

15  can tell, I went to great lengths to accommodate BP and

16  what their needs were in responding to this spill.  So I

17  signed my name to this, saying that I would buy it.  I

18  took it to the guy that was doing the land procurement and

19  I said, "Look, I'm willing to buy this property.  If you

20  need it, we will be happy to accommodate you."  At that

21  point -- I'm sorry?

22       Q.   Sorry.  What -- what did he say to you in

23  response to that, the land-procurement person at BP?

24       A.   "Thank you.  We'll be in touch."

25       Q.   So he didn't tell you, "Yes, go buy it; we want

1                          BILLY BURKETTE

2   it"?

3        A.  Well, I mean, I told him it would take a few days

4   to do the paperwork on it, and he said, "Thank you.  We'll

5   be in touch."

6        Q.  Did you ever hear back from him?

7        A.  Nope.  They rotated him out.  He -- he's gone.

8   So if you go back and read the bottom of that, it says,

9   "We agree today to give you this option to purchase until

10  next Friday, June the 25th."  Well, the next week would

11  have been the July the 4th -- or two weeks would have been

12  the July the 4th.  They -- people that was supposed to

13  come back -- you know, they sent them home for two weeks,

14  and then they would come back.

15             So in the interim, the guys that were

16  staying at Moran's Marina, which is David and the -- and

17  the other guy and two other people -- it was -- it was

18  four of them -- they each had different procurement

19  responsibilities, they told Chris Moran that I had

20  procured that property, that I had this agreement.  And --

21       Q.  Okay.  Hold on.  Before we continue.  To be

22  clear, by this time, you had the option to purchase it,

23  but you hadn't actually purchased it yet, right?

24       A.  Well, I was in the process of it.

25       Q.  But you hadn't purchased it, right?

1                          BILLY BURKETTE

2    places and give me that point of contact information,

3    Chris Moran went to Lil and to James and bought the

4    property, and then he leased it out to BP.

5        Q.   Okay.  Chris Moran is a -- is the owner of one of

6    the other marinas at Port -- Port Fourchon, right?

7        A.   Correct, Moran's Marina.

8        Q.   Moran's Marina, and he is not a BP employee,

9    right?

10       A.   No.  He was a BP contractor.

11       Q.   But not a BP employee?

12       A.   No.

13       Q.   Okay.  At the time that you -- so just so we're

14   clear, at no point did David Barker or any

15   land-procurement or other BP employee instruct you to

16   purchase this property so that BP could lease it from you,

17   correct?

18       A.   I wouldn't call it instruction.  I would --

19   the -- the conversation that I had with them was, "Why

20   doesn't BP just buy it?"  BP --

21       Q.   Okay.

22       A.   -- they said BP did not want to own property,

23   they only wanted to lease it, because they knew that as

24   soon as they responded to the spill and got everything

25   cleaned up, that they would be leaving that area.

1                         BILLY BURKETTE

2          Q.  At the time that you have this -- that you had

3    this option to purchase the land for $750,000, did Global

4    Disaster have the necessary cash to close that sale?

5          A.  I could have -- no, sir.  No, sir, we did not.

6          Q.  What would Global Disaster have to have done to

7    get the necessary funds to close the sale?

8          A.  Well, had BP paid for everything that they

9    instructed me to do for them, I would have had the cash,

10   and had they bought the Aqua N-Cap, I would have had the

11   cash, and if BP had bought the boom that they told me to

12   procure for them, I would have had the cash.

13              There's multiple ways that I would have had

14   it, but I didn't, so I would have had to go and finance

15   it.

16         Q.  Okay.  Had you spoken to any banks about

17   financing this sale?

18         A.  I did, but I don't remember whom.

19         Q.  Okay.  Do you remember when you talked to them,

20   talked to banks about financing this sale?

21         A.  I'm sure it was within that week.

22         Q.  Did you ever provide any banks with information

23   about the land or anything else with respect to it that

24   might be relevant to their assessment of whether or not to

25   finance it?

1                    BILLY BURKETTE

2      A.  I'm sure I did, but I don't recall.  Like I say,

3  I don't even recall who the bank manager was that I met

4  with.

5      Q.  Do you recall providing any financial information

6  about Global Disaster to the banks that you were speaking

7  to so that they could assess whether to loan you money to

8  finance the sale?

9      A.  I don't recall.

10     Q.  Do you recall filling out any applications to --

11 for -- for the loan?

12     A.  Yes, sir, I did that, but I don't recall who it

13 was with.

14     Q.  Was -- was Global Disaster taking out the full

15 750 or were there -- was there a portion of that that you

16 would not need to take a loan for?

17     A.  Oh, I don't remember at the time.

18     Q.  Okay.  Just so we are clear, at no point did any

19 representative of BP ask you to purchase this property so

20 that they could lease it from you, correct?

21     A.  They didn't ask me to purchase it, but they

22 agreed to lease it if I purchased it.

23     Q.  Okay.  But you didn't purchase it, right?

24     A.  That is correct.

25     Q.  Okay.  Do you have -- did you have any

1                    BILLY BURKETTE

2  discussions with BP about on what terms you would lease

3  the land to them?

4       A.  Basically the conversation was that I would be

5  happy to accommodate in anything that would assist in the

6  -- in the response.  I mean, I was -- I was willing to

7  accommodate BP in any capacity that I could.

8       Q.  Okay.  But you never -- you never agreed on a

9  price per month for the lease?

10      A.  No, sir, we did not.

11      Q.  Did you agree on how long the lease would last

12 for?

13      A.  They told me until the response was completed.

14      Q.  Okay.  And at that point, in June 2010, nobody

15 could predict when that would be, right?

16      A.  No, sir, they could not.

17      Q.  So the timeline for the potential lease was --

18 was not definite, right?

19      A.  No, sir, not indefinite [sic], but for sure

20 enough to cover this -- the purchase of the marina.

21      Q.  Right.  But no -- nobody had agreed on a

22 particular -- like a specific time frame, right?

23      A.  No, sir, they had not, because they couldn't --

24      Q.  Have you discussed -- had you discussed any --

25 aside from the amount per month that they would owe for

1                    BILLY BURKETTE

2  the lease, any payment terms, method of payment, timeline

3  of payment, where it would be paid to?

4      A.  Well, originally, when I talked to that first

5  procurement guy, the way he explained it was that they

6  basically assess the amount of square footage that would

7  be available for lease, and then they would do the same

8  amount that they would lease from any -- in other words,

9  it wasn't -- it wasn't a set price, because the way he

10  explained it was that they leased based on the amount of

11  product that they could put there.  So if I had a small

12  area, then it would be a small price.  If I had a large

13  area, then, obviously, the price would go up.

14      Q.  Okay.  So just so I understand, by this time when

15  you -- strike that.

16                  You've never -- you never agreed with BP on

17  the ultimate price that was going to be paid for the

18  lease, right?

19      A.  No, sir, I did not agree to any -- any price that

20  was -- that BP offered because they never -- BP,

21  ultimately, never came back with -- because the guy was

22  rotated out -- a point of contact for me to continue that

23  agreement with.

24                  MR. KLAR:  I -- someone's on the record.

25  Someone's speaking.

1              BILLY BURKETTE

2  the spots that I know are -- you would -- you would just

3  be in total awe of the amount of oil that is sitting on

4  the floor of the Gulf, right now.  So that still is down

5  there that needs to be gotten up.

6              So those -- those figures are -- could only

7  be based on the estimates that BP has provided to the

8  federal government.  They are not actuals.

9      Q.  Okay.

10     A.  They're estimates.

11     Q.  So sitting here today, you can't -- you can't

12 definitively or reasonably calculate how much damage

13 Global Disaster has suffered as a result of a decision not

14 to use Aqua N-Cap; is that right?

15     A.  No, sir, that's not what I'm saying.

16              I'm saying I can give you those estimates,

17 but they're estimates.  They are not definitive.  I can

18 only give you the estimate based on what was turned over

19 to the federal government.  All of that oil that's still

20 sitting on the Gulf floor, nobody's calculated that yet,

21 and it's not been cleaned up yet.

22     Q.  Okay.  So if you were to base it on the amount of

23 oil that's still on the floor, you can't tell me what the

24 number is, right, sitting here today?

25     A.  Not sitting right here today.  I would have to

1                    BILLY BURKETTE

2  send an ROV down and get the full length, width, and

3  heighth of the -- of the, you know, the oil sludge, the

4  slick that's on the bottom.  I mean, there's multiple

5  places, and it's shifted because of the Gulf Stream, so I

6  would have to -- I would have to go and find that out.

7  No, sir, I cannot give you a definitive.

8       Q.  Okay.  Is the amount that Full Scope Accounting

9  calculated attributable to your Aqua N-Cap portion of

10  Global Disaster's claim based on the estimates that BP

11  provided to the government about how much oil was in the

12  water?

13       A.  That is my understanding, yes.

14       Q.  Okay.  And -- and sitting here today, you don't

15  know what portion that is of your damages, correct?

16       A.  No, sir, I do not.

17       Q.  Okay.

18       A.  I would consider that to be the bulk of it,

19  though.

20       Q.  The bulk.  Would you say 75 percent?

21       A.  Maybe.

22       Q.  Earlier, you mentioned 67 and a half million in

23  connection with Airware.  310 minus 67 is 243, give or

24  take, so of the remaining 240ish million dollars of your

25  310 total, how much would you say is attributable to Aqua

BILLY BURKETTE

1

2  N-Cap, give or take?

3       A.  I honestly don't know.  I -- I would have to look

4  at those documents to see.

5       Q.  Do you think it's more than a hundred million?

6       A.  Oh, yes.

7       Q.  More than 150?

8       A.  Oh, yeah.

9       Q.  Is it over 200?

10       A.  I don't know.  I would guess that 200 would be

11  a -- you know, I'm -- I'm trying not to guess too

12  definitively, but if you take the estimates and -- that

13  were given to the federal government, whatever that is,

14  500 might not be enough, but I'm -- I'm just trying to go

15  back in my memory bank and think, if you take $8 a pound

16  or 8.50 a pound equates to 11 pounds, and a pound of oil,

17  crude, raw crude, whether it be sweet crude or -- it

18  depends on the actual hydrocarbon, because, you know, in

19  theory, it doesn't -- Aqua N-Cap does not designate the

20  difference between COREXIT, and oil.  It would absorb and

21  encapsulate all of it.  So you would literally be cleaning

22  up the -- the COREXIT, dispersant and the oil.  So it may

23  not even be an accurate assessment of -- the 310 may be

24  910.  I don't know.

25       Q.  So to -- to estimate the -- to reasonably

1              BILLY BURKETTE

2  calculate how much Global Disaster would have earned had

3  BP used Aqua N-Cap to clean everything up, you would need

4  to know the amount of oil that was -- that was spilled,

5  the amount of COREXIT in the water, the amount of

6  dispersant in the water and the amount of whatever else

7  was in the water that Aqua N-Cap would have absorbed,

8  right?

9      A.  Correct.

10     Q.  Okay.  And sitting here today, you don't have any

11 of those figures, right?

12     A.  Not with me, no.

13     Q.  And you're not aware whether Full Scope

14 Accounting or any other advisor has those figures

15 calculated, correct?

16     A.  BP, I'm sure, has it.

17     Q.  Okay.  But you're not aware of any other advisor,

18 Full Scope or anyone else who has done work for you who

19 has those calculations, correct?

20     A.  No, sir, I have not.

21     Q.  And you've never seen any of those calculations,

22 correct?

23     A.  Just my own that I kind of, back then, was trying

24 to figure.

25     Q.  Okay.  And your -- what you were doing back then

1                         BILLY BURKETTE

2  to try and estimate it, it is -- it was a guess, right?

3       A.  Sure, it's a guess, because it was constantly

4  spewing oil, and they were constantly spraying -- you

5  know, spraying dispersant on it.

6       Q.  Okay.  So we have got approximately 200 million,

7  give or take, for Aqua N-Cap, approximately 67 and a half

8  million for Airware.  That's 267 million.  That leaves

9  about 53 or so million for the remaining pieces of your

10 310 million claim.

11                 How much of that is related to the --

12 your -- your -- your claim that you would have allowed BP

13 to store equipment at the Port of St. Bernard?

14      A.  I don't know, sir.

15      Q.  What would you need to -- to calculate that?

16      A.  The square footage and the rate that -- which

17 they paid similar docks in the area.

18      Q.  Did you have that information when you were

19 putting together your $310 million estimate?

20      A.  Not to -- not exactly.  I have a couple of places

21 that they had rented space from, but I don't remember what

22 they were.

23      Q.  Okay.  You don't have any -- like, you don't have

24 the -- the contracts for those places?

25      A.  I did, but like I say, in the flood of '16, we

1                       BILLY BURKETTE

2   lost everything.

3       Q.   Okay.  Would you say that, just a ballpark, if

4   you can -- and if you can't, that's okay -- would -- would

5   that be a piece of your claim related to storage of the

6   Port of St. Bernard be $5 million?  More than that?

7       A.   I guess that would be a fair assessment.

8       Q.   Okay.  Somewhere between five and ten?

9       A.   Correct.

10      Q.   Okay.  What about -- what portion of your damages

11  is attributable to your relationship -- Global Disaster's

12  work with ES&H?

13      A.   I wouldn't know.

14      Q.   How would you go about calculating that?

15      A.   I would have to go back to the timeline and see

16  how much work was done with ES&H that I would have

17  provided those goods and services for that they used,

18  equipment, boats, personnel, equipment, labor, all of

19  those things that they performed for BP.  I would have to

20  have those figures and extrapolate from that the portion

21  that I could have supplied.

22      Q.   Okay.  And -- and you don't have access to -- to

23  that information, right?

24      A.   Not yet.  I think we are going to get that in

25  subpoena.

1                         BILLY BURKETTE

2      Q.  Okay.  So -- so when -- when Full Scope

3  Accounting was calculating $310 million for your losses,

4  they didn't have that information, right?

5      A.  Not to my knowledge.

6      Q.  So to your knowledge, the calculation that is

7  included in your presentment statement is not based on the

8  information that you need to actually calculate your

9  damages associated with the ES&H contract, correct?

10     A.  Correct.

11     Q.  Okay.  What about for Strategic Services, how

12 much of your damages is attributable to that letter of

13 intent that we talked about?

14     A.  I think that -- I think that's where the 9

15 million came from, but I'm not positive of that.

16     Q.  Okay.  What would you need to do to figure out

17 how much in damages you're claiming from the Strategic

18 Services defense?

19     A.  That's simple.  You just take the contract rate

20 times the amount of hours that BP used, whether it be them

21 or anybody else that performed the same job description.

22     Q.  Okay.  So you would have to look at other

23 contracts that BP entered into for that type of labor?

24     A.  Or -- I mean, that's fair, yes, sir.  I think

25 that's a fair statement.

1                      BILLY BURKETTE

2        A.   Correct.

3        Q.   Okay.  And with respect to the Port of -- I'm

4   sorry, Port Fourchon, the -- the lost rent that Global

5   Disaster claims it would have obtained if it ended up

6   purchasing that property and leasing it to BP, how much in

7   damages are attributable of the -- of the 310 for that?

8        A.   I thought you just covered that and we estimated

9   that to be at 5 million.

10       Q.   That was for port storage.

11       A.   Oh.  Then I would say equally amount for the Port

12  Fourchon Marina.

13       Q.   Okay.  How can -- how do you calculate that

14  amount if you never agreed on a lease with BP?

15       A.   That's what I was telling you before and, you

16  know, that may be just that I didn't understand the

17  difference between port and Port Fourchon Marina.  It's

18  the same -- it's the same variables.  Say you go to the

19  next street over, I don't know, three clicks, half a

20  click, go in any direction you want to.  The property that

21  BP did rent, you take that factor times the amount of

22  square footage, and you do some simple math, and you get

23  the dollar figure.  I mean, it's not real hard.

24       Q.   Okay.  So to do that, just like with how much you

25  would charge for storage, you need to see what comparable

1                    BILLY BURKETTE

2  properties and comparable contracts BP entered into with

3  other folks, right?

4       A.  Well, that's what they told me they would base it

5  on.  That's what the procurement guy said.

6       Q.  And you -- you haven't provided any of those

7  documents to Full Scope Accounting, right?

8       A.  No, sir, I didn't.

9       Q.  Are you -- are you aware that Full Scope

10 Accounting has those documents?

11      A.  I am not aware if they do or do not.

12      Q.  Okay.  And you don't have any of those documents,

13 right?

14      A.  Nothing other than what's in the court cases that

15 came out afterwards.

16      Q.  Do you recall what cases?

17      A.  I don't have them with me, but I looked them up

18 online.

19      Q.  It's a list that you could provide?

20      A.  I'm sure.

21      Q.  Okay.  Okay.  Can you look to the third line down

22 in that big paragraph on page 2 of your statement?  It

23 says, "I also lost hundreds of millions of dollars via my

24 master contract with ES&H which BP chose to use the

25 dispersant instead of Aqua N-Cap absorbent listed on their

1                    BILLY BURKETTE

2  Hazard Mitigation Plan given to the State of Louisiana."

3              The "hundreds of millions of dollars" that

4  you're referring to there, that's referring to the Aqua

5  N-Cap claim, not the ES&H claim, right?

6      A.  Correct.  Well, keep in mind that BP was forcing

7  me to go to ES&H.

8      Q.  And does that include for use of -- for a

9  purchase of Aqua N-Cap?

10     A.  Yes.

11     Q.  So had you had discussions with ES&H about Aqua

12  N-Cap?

13     A.  Oh, yes.

14     Q.  Okay.  With who?

15     A.  I don't -- the name Kelly comes up but I'm not

16  positive of that, so don't quote me on that.  I don't

17  remember, sir.

18     Q.  Do you recall when those discussions were taking

19  place?

20     A.  Yes, sir, at the same time that BP was trying to

21  force me to go into that master service contract with

22  ES&H.

23     Q.  Okay.  Are you saying that -- was Aqua N-Cap a

24  product that was listed on ES&H's price sheet?

25     A.  I don't know if it was on ES&H's price sheet, but

1                    BILLY BURKETTE

2  says, "Describe specifically the evidence you rely on to

3  prove the damages you allege in response to question

4  No. 1," And in the first line you wrote, "My contracts

5  with the Port and ES&H, along with the Hazard Mitigation

6  Plan submitted to the State."

7              The contract with the Port that you're

8  referring to, what contract is that?

9      A.  That's for the -- the area that we had for the

10  concrete crushing.

11     Q.  Okay.  So you're saying that there's a contract

12  with the Port where they gave -- where they essentially

13  let you use that land for concrete crushing?

14     A.  Yes.  Well, that and the fact that BP took over

15  the whole port.

16     Q.  Right.  I'm just asking about the contract

17  itself.  You said there's a contract with the Port where

18  the Port said, "Global Disaster, you can use this piece of

19  land for concrete crushing," right?

20     A.  Yes, sir.  If you remember, when Terry -- when I

21  told you Terry forfeited the concrete crushing, at that

22  point is when the Port asked me to assume the note for

23  that area.  Two days later is when the Port was taken

24  over, like you say, by the Coast Guard, but really by BP,

25  because BP -- the Coast Guard didn't use it.  BP used it.

1                        BILLY BURKETTE

2       Q.   So the contract that you're referring to, it was

3   originally an Airware contract with the Port that Global

4   Disaster took over when Airware said they can't pay you?

5       A.   That is correct.

6       Q.   Okay.  You don't have a -- you don't have a copy

7   of that contract, right?

8       A.   I don't but the Port does, and I think Brent and

9   them have that -- it's like a manila envelope with all the

10  stuff on it from the Port.

11      Q.   I'm sorry.  What was the name that you said,

12  Brent?

13      A.   My attorneys, Brent Coon --

14      Q.   Okay.  Okay.  Well, we haven't seen a copy of it,

15  so to the extent it exists, we would like to see it.

16                   Moving to the next paragraph, you say:

17  "Contracts for lease purchase property, rental agreements,

18  Worley Co. forensic accounting sheets," and there's a list

19  of names there.  So starting with the lease purchase

20  property.  That's the Port Fourchon Marina, port storage

21  and the piece that was A-1 Towing's lease purchase that we

22  talked about earlier, correct?

23      A.   No.  A-1 Towing has its own form like this, I

24  believe.

25      Q.   Okay.  So the contracts for lease purchase

1                        BILLY BURKETTE

2  they would pay that invoice.  Then the next week, we

3  started the same conversation, it immediately went to 30

4  to 60 days payout.

5      Q.  Okay.  So you would have to front the money for

6  the equipment first and then you would ultimately get

7  reimbursed?

8      A.  Correct.

9      Q.  Okay.  Did -- at the time that Global Disaster

10  said it was discussing all of these pieces of equipment it

11  would rent for BP, did Global Disaster have the necessary

12  funding to obtain all of those items?

13      A.  No, sir, not all of it, but some of it and, you

14  know, because I'm transparent I was honest with the people

15  and I said, "Hey, look, here's what BP told me.  Here is

16  the guy I talked to.  Here is -- you can call and confirm

17  that."  And then the person I originally was talking to

18  after the first two weeks rotated out, like I told you.

19  They went home and then I got a new person, and that's

20  when it went to 30 to 60 days instead of the seven days.

21      Q.  Okay.  So if -- if Global Disaster didn't have

22  enough funds to obtain all the equipment and goods that it

23  -- it wanted to provide to BP, how was it that Global

24  Disaster was going to get all -- all of the equipment and

25  those goods?

1                          BILLY BURKETTE

2        A.  It was either $8 or 8.50, I think, and -- and the

3   answer is no, I do not recall.

4        Q.  All right.  Turning back to the PTO65 statement.

5   You wrote in the third paragraph there, "Expert testimony

6   for multiple experts on which product would have been the

7   best, safest to use for the recovery of the oil spill, not

8   the most cost-effective advantageous for BP."

9                  Did I read that correctly?

10       A.  I believe so, yes, sir.

11       Q.  You haven't disclosed any experts that you intend

12  to use in this case yet, correct?

13       A.  No, sir, because we kept being threatened that

14  they would, you know, throw my case out, so we basically

15  -- it's my understanding that we have been on hold until

16  now, so now is the time that we produce that.

17       Q.  Okay.  Are you aware that the deadline to do that

18  was yesterday?

19       A.  No, sir, I'm not aware of that.

20       Q.  Are you aware that the deadline to disclose any

21  experts that you intend to offer accounting evidence or

22  opinions was yesterday?

23       A.  No, sir, I did not know that.

24       Q.  You didn't submit anything by that deadline,

25  right?

1                     BILLY BURKETTE

2  work that Global Disaster may or may not have done.  They

3  are absolutely two separate entities.  No matter if I own

4  both or don't, they still all had losses.

5       Q.  Okay.  I -- I understand your --

6                 MR. NEWELL:  How long have we been on the

7  record today?  We have got to be pretty close to six

8  hours.

9                 THE VIDEOGRAPHER:  This is the videographer.

10 So we have been going 6 hours, 13 minutes.

11                MR. KLAR:  I have one question on the next

12 line or I just want to ask about the next sentence and

13 then we can end.

14                THE WITNESS:  Okay.

15                MR. NEWELL:  Okay.

16 BY MR. KLAR:

17      Q.  In -- in part E there, you say, "The business

18 started in 2009 because I had secured a $14 million

19 contract to crush the concrete at the Port of St. Bernard,

20 and the property I was purchasing I lost, and BP would not

21 honor my contract with them."

22                The $14 million contract you're referring

23 to, is that the Airware contract?

24      A.  That is just for the crushing, yes.

25      Q.  Okay.  And that's -- that's with Airware, right?

1                          BILLY BURKETTE

2        A.   Correct.

3        Q.   Okay.  So it wasn't a 67 and a half million

4   dollar contract; it was a $14 million contract?

5        A.   Let's -- since you brought that up, let's go

6   ahead and talk about that.  I thought we covered that

7   earlier.

8        Q.   You're right.  Hold on.  Let me make sure.

9             The 14 million was to crush concrete --

10  concrete with Airware.  The 67 and a half was for the

11  later sale by A-1 to Robin Seafood, right?

12       A.   No.  You asked me how did I calculate that

13  damage.  The concrete crushing originally was 14.  Had --

14  had Airware paid me the 14 million, they would have been

15  entitled to their portion but still also utilized A-1 for

16  hauling it.  So the portion in which you would sell

17  something -- in other words, if Airware had -- had

18  completed their obligation and we crushed it, that's

19  $14 million.  Bam, that's done.

20       Q.   That's the full 1.5 million in cubic yards of

21  crushed?

22       A.   I'm guessing.  No, sir, crushed, it would have

23  been closer to 4 million because it's a 4 to 1 reduction.

24       Q.   Okay.  I understand.

25       A.   So because Terry didn't fulfill his obligation

Page 247

1

2   or indirect, between a court reporting firm and any party

3   litigant in this matter nor is there any such relationship

4   between myself and a party litigant in this matter.  I am

5   not related to counsel or to the parties herein, nor am I

6   otherwise interested in the outcome of this matter.

7            Signed this day, the February 18, 2021.

8

9

10

            *Kari Behan*

11            KARI J. BEHAN, CCR, RPR, CRR
            Certified Court Reporter
12            LA Certificate #97019

13

14

15

16

17

18

19

20

21

22

23

24

25