# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * | MDL NO. 2179 |
| | * | SECTION J |
| This Document relates to: | * * | JUDGE BARBIER |
| | * | MAGISTRATE JUDGE WILKINSON |
| *Gulf Marine Institute of Technology and BioMarine Technologies, Inc. vs.* | * * | |
| *BP America Production Company and BP Exploration & Production Inc. et al.,* | * * | |
| *Case No. 2:13-cv -01286-CJB-DPC* | * | |

## STATEMENT OF UNCONTESTED MATERIAL FACTS

In accordance with Rule 56(c) of the Federal Rules of Civil Procedure and Rule 56.1 of this Court, BP America Production Company and BP Exploration & Production Inc. (together, "BP") respectfully submit the following uncontested material facts that support their Motion for Summary Judgment.

1.       John Ericsson ("Ericsson") founded BioMarine Technologies, Inc. ("BioMarine"), a for-profit corporation, and Gulf Marine Institute of Technology ("Gulf Marine" and together, "Plaintiffs"), a non-profit entity, in 1989 and 1995, respectively, with the intention of establishing a commercial aquaculture business in the federal waters of the Gulf of Mexico.  *See* Ex. 2 at BIOM-GMIT0003584 (BioMarine GCCF Full Review Final Payment Claim Submission, dated Dec. 30, 2011); Ex. 3 (Certificate of Incorporation of Gulf Marine, filed May 15, 1995); Ex. 1, Declaration of Anna Terteryan in Support of BP's Motion for Summary Judgment ("Terteryan Decl.") at Ex. B 39:13-40:21; PTO 65 Verified Statement Regarding Causation and Damages (B1 Claims) by BioMarine and Gulf Marine (Rec. Doc. 24342) ("Plaintiffs' PTO 65 Statement"), at 8.

2.     Gulf shore mariculture is an "infant" industry in the Gulf of Mexico, and there have never been commercial aquaculture operations in the Gulf of Mexico.  *See* Terteryan Decl. at Ex. A 10:15-11:22, 209:21-25.

3.     Investment in commercial aquaculture in the Gulf of Mexico is speculative because "[t]he US legal system can strike down any existing or proposed fish farming operation by some unfriendly person or organization filing a lawsuit."  *See* Terteryan Decl. at Ex. A 8:15-23; *id.* at Ex. C at 3.

4.     Plaintiffs have never launched any aquaculture project in any location, and their equipment for the project remains in storage.  *See* Terteryan Decl. at Ex. A 102:4-16, 218:14-22.

### 1.     Plaintiffs' Claims History

5.     Plaintiffs (and Ericsson individually) submitted claim forms to the Gulf Coast Claims Facility ("GCCF") alleging losses due to the *Deepwater Horizon* explosion, ensuing oil spill, and related response efforts (the "Spill").  *See, e.g.*, Ex. 2 (BioMarine's GCCF Full Review Final Payment Claim Submission dated Dec. 30, 2011); Ex. 4 (Gulf Marine's GCCF Claim Form dated Sept. 20, 2010, seeking emergency advance payment); Ex. 5 (Gulf Marine's Interim Payment Claim Form dated Oct. 7, 2011); Ex. 6 (additional pages missing from Gulf Marine's Interim Payment Claim Form dated Oct. 20, 2011); Ex. 7 (Ericsson's individual GCCF Submission seeking emergency advance payment dated Aug. 30, 2010).

6.     Gulf Marine ████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ █████████████████████████████████████████████████.  *See* Ex. 4 at BPB1_BioMarine_000025 (a████████████████████████████████ █████████████).

7.      On its 2010 tax return, Gulf Marine stated that ████████████████████

███████████████████████████████████).  *See* Terteryan Decl. at

Ex. A 15:9-22; Ex. 8 at BIOM-GMIT00003358.

8.      Plaintiffs opted out of the economic and property damage class settlement in this

MDL.  *See* PTO 60 Filing of Sworn Statements for Disclosure of B1 Claims by BioMarine and

Gulf Marine (Rec. Doc. 7) ("Plaintiffs' PTO 60 Statement") at 18, 19 (BioMarine and Gulf Marine

Opt Out Letters dated October 24 and 26, 2012, respectively).

9.      Plaintiffs only seek lost profits in connection with the FlorAbama Project.

Terteryan Decl. at Ex. B 69:20-23; *id.* at 80:20-23 ("Q. GMIT, like BioMarine, is only seeking

financial damages resulting from the spill's effect on the FlorAbama project, correct?  A. That's

correct.").

10.     Plaintiffs are not commercial fishermen.  *See* PTO 64 Sworn Statement Regarding

General Maritime Law Claims (B1 Claims) by BioMarine (Rec. Doc. 22583) ("BIOM PTO 64

Statement"); PTO 64 Sworn Statement Regarding General Maritime Law Claims (B1 Claims) by

Gulf Marine (Rec. Doc. 22584) ("GMIT PTO 64 Statement"); Terteryan Decl. at Ex. A 218:6-22.

11.     Plaintiffs did not suffer physical damages from the Spill.  *See* BIOM PTO 64

Statement at 1; GMIT PTO 64 Statement at 1; Terteryan Decl. at Ex. A 217:8-14.

## 2.      Plaintiffs Shifted Focus to the FlorAbama Project after Losing the Rights to the Texas Project Site in 2008.

12.     Plaintiffs originally intended to launch their commercial aquaculture business using

an oil platform off the coast of Texas (the "Texas Project").  *See* Terteryan Decl. at Ex A 66:15-22;

Plaintiffs' PTO 65 Statement at n2.

13.     Plaintiffs focused primarily on the Texas Project up until the Texas Court of

Appeals ruled in 2008 that Plaintiffs' lease to the Texas site was not valid, after which Plaintiffs

shifted their focus to an alternative site off the coast of the Florida and Alabama state lines (the "FlorAbama Project").  *See* Terteryan Decl. at Ex. A 66:10-22.

14.     Most of Plaintiffs' development activities were devoted to the Texas Project up until February 2008.  *See* Terteryan Decl. at Ex. A 66:25-67:4.

15.     The Texas platform was not usable at the FlorAbama site and is not part of this lawsuit.  *See* Terteryan Decl. at Ex. A 12:13-15, 48:12-20; Plaintiffs' PTO 65 Statement at n.2.

### 3.     Plaintiffs Applied For, and Were Denied, an Exempted Fishing Permit Three Times.

16.     Plaintiffs applied for an exempted fishing permit ("EFP") from the National Oceanic and Atmospheric Administration ("NOAA") for their aquaculture business three times, but were rejected each time, including most recently in June 2008 with respect to the FlorAbama Project.  *See* Terteryan Decl. at Ex. A 109:11-19; *id*. at Ex. D at 145; *id*. at Ex. E.

17.     In its Final Fishery Management Plan for Regulating Offshore Marine Aquaculture in the Gulf of Mexico (the "Aquaculture Management Plan"), the Gulf Fishery Management Council ("Gulf Council") stated that an EFP is "of limited duration and is not intended for commercial production of fish, making aquaculture in federal waters not viable under the current permitting process."  *See* Terteryan Decl. at Ex. D at x.

18.     The Gulf Council referenced one of Plaintiffs' EFP applications in its Aquaculture Management Plan, stating that "[t]he inability to authorize commercial offshore aquaculture under an EFP is illustrated in a 2008 letter from NOAA Fisheries Service to Biomarine Technologies Inc. that states one of the reasons for rejecting the company's EFP application is that the company sought to establish a long-term, commercial-scale aquaculture operation which is not one of the purposes for which an EFP may be issued."  *See* Terteryan Decl. at Ex. D at 35, 145, 157, 280-81.

19.     The June 3, 2008 letter from NOAA denied Plaintiffs' application for an EFP including because a "long-term, commercial-scale aquaculture operation is not one of the purposes for which an EFP may be issued." *See* Terteryan Decl. at Ex. B 138:25-139:4; *id.* at Ex. E at 1.

20.     Plaintiffs never appealed NOAA's denial of their EFP applications.  *See* Terteryan Decl. at Ex. B 141:15-17.

21.     Plaintiffs' "Mariculture Site Characterization & Environmental Assessment" of Gulf Marine and BioMarine, which was prepared in part by Ericsson, stated that "[t]he Gulf of Mexico Fisheries Management Council has declared [t]he proposed mariculture site…will be required to obtain an Exempt Fisheries Permit (EFP) in order to conduct mariculture activities (including harvesting, possessing, and transporting managed fishes such as cobia) through federal waters to and from it[s] permitted mariculture site." *See* Ex. 9 at BIOM-GMIT0001572.

### 4.     Plaintiffs Held Two Permits at the Time of the Spill.

22.     At the time of the Spill, Plaintiffs held two permits: an Authorization to Discharge Under the National Pollutant Discharge Elimination System from the EPA (the "NPDES Permit") and a permit from the United States Army Corps of Engineers (the "USACOE Permit").  *See* Exs. 11; 12; Terteryan Decl. at Ex. A 118:5-10.

23.     The NPDES Permit and USACOE Permit stated that they covered approximately 27.5 acres of federal waters at the site of the proposed FlorAbama Project.  *See* Ex. 12 at BIOM-GMIT0000140 (USACOE Permit referencing 27.5 acre site); Ex. 11 at BIOM-GMIT0000117 (NPDES Permit listing coordinates for site south of Alabama in the Gulf of Mexico).

24.     At the time of the Spill, the NPDES Permit and USACOE Permit were valid through 2013.  *See* Terteryan Decl. at Ex. A 118:20-22; Ex. 11 at BIOM-GMIT0000117 (NPDES Permit); Ex. 12 at BIOM-GMIT0000140 (USACOE Permit); Plaintiffs' PTO 65 Statement at 9.

25.     The NPDES Permit stated that Plaintiffs were "authorized to discharge from a facility" located at their project site in the Gulf of Mexico "in accordance with effluent limitations, monitoring requirements and other conditions set forth herein."  *See* Ex. 11 at BIOM-GMIT0000117; *see also* Ex. 10 at BIOM-GMIT0000184 (2002 NPDES Permit authorizing Plaintiffs to "discharge sanitary wastewater, deck/equipment washdown, fish food, and stormwater runoff" at their project site).

26.     The USACOE Permit stated that Plaintiffs could "construct forty-eight 30-meter diameter production cages and eight 15-meter diameter nursery cages" at the FlorAbama site.  *See* Ex. 12 at BIOM-GMIT0000140.

27.     The USACOE Permit stated that "[t]his permit does not obviate the need to obtain other Federal, State, or local authorizations required by law."  *See* Ex. 12 at BIOM-GMIT0000160.

28.     During the public comment period for the USACOE Permit, the Gulf Council opposed granting Plaintiffs the USACOE Permit and "*recommended permit modification be suspended until* [BMIT]/GMIT applies for and obtains an EFP from NMFS." *See* Ex. 12 at BIOM-GMIT00000148.

29.     Plaintiffs would have to speculate as to what federal agencies would have done if Plaintiffs had actually attempted to begin operations with only their existing two permits.  *See* Terteryan Decl. at Ex. A 102:17-23, 105:3-6, 139:3-6.

### 5.      Plaintiffs Have Never Had Sufficient Financing to Launch Their Project.

30.     Plaintiffs' aquaculture business could not launch without additional financing.  *See* Terteryan Decl. at Ex. A 82:22-83:10 (the aquaculture project "could not be built without additional financing from one source or another."); *id.* at Ex. B 157:4-7.

31.     Around May 15, 2008, BioMarine developed business plans for investors that estimated that they would need about $24.5 million in financing to launch the FlorAbama Project. *See* Terteryan Decl. at Ex. A 209:6-10; *see also* Ex. 13 at BIOM-GMIT0002776 (Techs Loanstar PPM).

32.     Prior to the Spill, BioMarine made three efforts to obtain financing for its aquaculture project by working with the financial firms Navigator, Heartstream, and Arjent, but these efforts all failed before the Spill.  *See* Terteryan Decl. at Ex. A 167:16-21 (BioMarine "tabled" the 2008 offering with Navigator), 166:14-16 (Plaintiffs have had no dealings with Arjent since 2008), 228:13-229:3 (explaining that BioMarine and Heartstream had a "separation of the ways [] at the end of 2008."); *id.* at Ex. B 66:11-67:3 (fundraising with Arjent and Heartstream were "in suspension going into the period" of the Spill), 154:3-7 (BioMarine had received no money from its New York or European fundraising efforts).

33.     Plaintiffs have no personal knowledge as to Heartstream's efforts to raise capital, including which investors expressed interest, the amount of any commitments, or whether investors ever received BioMarine's private placement memorandum.  *See* Terteryan Decl. at Ex. A 228:16-229:16.

34.     Plaintiffs did not have any "personal control over the actions of the financial consultants and placement agencies that were involved in" Heartstream's fundraising efforts, or any "ability to tell [Heartstream and other] groups that were involved in the placement, when the markets were good enough in their neighborhood to start the fundraising" in 2010.  *See* Terteryan Decl. at Ex. B 155:16-156:14.

35.     BioMarine drafted a private placement memorandum (the "Techs Loanstar PPM") as part of its financing efforts with Arjent, which listed numerous risk factors to BioMarine's

business, including: "our ability to control costs associated with the production and commercialization of BioMarine's finfish product candidates;" "the market acceptance of BioMarine's finfish product candidates;" "our ability to enter into agreements for the distribution of BioMarine's finfish product candidates on acceptable terms;" "developments with respect to state and federal regulatory matters;" "our ability to attract key personnel to assist in the development, production, sales and marketing of BioMarine's products;" "on-going adverse economic conditions, economic uncertainties, recent and possible future terrorist activities and other geopolitical instability;" "on-going climate and weather uncertainties, including, but not limited to, hurricanes, and other geological instability;" and "a contraction of the market for farmed fish." *See* Ex. 13 at BIOM-GMIT0002789 (Techs Loanstar PPM).

36.     The Techs Loanstar PPM also stated that "the projected results are dependent on the successful implementation of management's strategies, but are subject to events over which we have little or no control" and that "[t]he Shares offered hereby are highly speculative, involve a high degree of risk and immediate dilution, and should be purchased only by persons who can afford the loss of their entire investment." *See* Ex. 13 at GMIT0002790, GMIT0002778 (Techs Loanstar PPM).

37.     The Techs Loanstar PPM was never issued to potential investors.  *See* Terteryan Decl. at Ex. A 145:13-16.

38.     BioMarine has had no contact with Arjent since 2008.  *See* Terteryan Decl. at Ex. A 166:14-16.

39.     Plaintiffs did not raise any financing through its financing efforts with Navigator, Heartstream, or Arjent.  *See* Terteryan Decl. at Ex. A 83:11-25.

40.     Sometime around 2007, BioMarine underwent an independent audit of its financial statements (the "Independent Audit") in connection with its efforts to obtain financing.  *See* Terteryan Decl. Ex. A 49:23-50:3; Plaintiffs' PTO 65 Statement (attaching Independent Audit); Ex. 14.

41.     The Independent Audit covered BioMarine's financial status from inception until 2007.  *See* Plaintiffs' PTO 65 Statement (attaching Independent Audit); *see also* Ex. 14.

42.     The Independent Audit stated that BioMarine had "incurred net losses since its inception and has experienced severe liquidity problems" and that "[t]hose conditions raise substantial doubt about the Company's ability to continue as a going concern."  *See* Ex. 14 at BIOM-GMIT0003202; *see also* Plaintiffs' PTO 65 Statement (attaching Independent Audit).

43.     The Independent Audit stated that BioMarine had a net loss of over $5 million from 1989 through September 2007.  *See* Ex. 14 at BIOM-GMIT0003204.

44.     BioMarine suspended its activities in late 2008, and its activities largely remained suspended at the time of the Spill.  *See* Terteryan Decl. at Ex. A 63:7-21 (fundraising in New York and Europe was suspended during the economic crisis), 230:8-12 ("we had some pause in the cause"), 231:13-232:8 (explaining that BioMarine was "not as active as GMIT" between the fourth quarter of 2008 and April 2010, but made "efforts [] to find new capital sources for its FlorAbama project"); *id.* at Ex. B 66:20-67:3 (relationships with investment banks "were in suspension" leading up to the Spill).

45.     Plaintiffs disclosed on their tax returns that, at the beginning of 2010, BioMarine had ███ in cash on hand and Gulf Marine had ████ in cash on hand for a total of ██████. *See* Exs. 8 at BIOM-GMIT0003350; 15 at BIOM-GMIT0003624.

46.     As of the Spill, Plaintiffs did not know when they would raise additional capital, how much they would raise, or from whom.  *See* Terteryan Decl. at Ex. B 155:16-156:14, 157:8-14, 158:20-159:6 ("no one has any crystal balls of what's going to happen in the future.").

### 6.     Gulf Marine Lost Its Primary Source of Funding Before the Spill.

47.     Gulf Marine received a $1.3 million general cash grant when it took over the Texas platform in the late 1990s.  *See* Terteryan Decl. at Ex. B at 24:25-25:4, 25:11-17, 32:3-6; *id.* at Ex. A 12:8-12.

48.     From 2007 to 2010, Gulf Marine received federal grants from the NIH to conduct cephalopod research totaling $947,186.  *See* Terteryan Decl. at Ex. B 93:24-94:24; Ex. F at 1 (NIH report showing that Gulf Marine received grant funding from the NIH of: one grant for $311,478 in 2007; two grants for $293,635 and $38,749 in 2008; three grants for $190,380, $21,854, and $17,090 in 2009; and one grant for $74,000 in 2010); Ex. G at 1 (NIH report showing same); Ex. H at 2 (report from National Resource Center for Cephalopods showing same).

49.     Gulf Marine conducted cephalopod research using the NIH grant funding.  *See* Terteryan Decl. at Ex. B 22:21-23:5.

50.     Gulf Marine's cephalopod research was unrelated to Plaintiffs' aquaculture project. *See* Terteryan Decl. at Ex. B 21:13-22:3.

51.     The NIH did not provide any funding for the FlorAbama Project.  *See* Terteryan Decl. at Ex. B 24:4-6.

52.     From 2007 to 2009, Gulf Marine received no federal grants besides the grants from the NIH.  *See* Terteryan Decl. at Ex. B 96:19-22.

53.     The NIH grants were Gulf Marine's largest source of funding other than the $1.3 million grant.  *See* Terteryan Decl. at Ex. A 12:25-13:6, 13:11-14.

54.     The NIH grant represented approximately ███ of Gulf Marine's total revenue in 2007, ███ of its total revenue in 2008, and ███ of its total revenue in 2009. *Compare* Ex. 16 at BIOM-GMIT00003685 (Gulf Marine's 2008 taxes showing total revenue of ███ in 2007) *with* Terteryan Decl. at Ex. F at 1 (NIH report showing that Gulf Marine received one grant from the NIH for $311,478 in 2007); *compare* Ex. 16 at BIOM-GMIT00003685 (Gulf Marine's 2008 taxes showing total revenue of ███ in 2008) *with* Terteryan Decl. at Ex. F at 1 (NIH report showing that Gulf Marine received two grants from the NIH totaling $332,384 in 2008); *compare* Ex. 17 at BIOM-GMIT00003711 (Gulf Marine's 2009 taxes showing total revenue of ███ in 2009) *with* Terteryan Decl. at Ex. F at 1 (NIH report showing that Gulf Marine received three grants from the NIH totaling $229,324 in 2009).

55.     Gulf Marine and the NIH agreed to an orderly closeout of the grant in July 2009, and the grant terminated by February 2010. *See* Terteryan Decl. at Ex. B 92:2-9, 105:8-13; *id.* at Ex. A 19:10-13; *id.* at Ex. I at 12-13 (Gulf Marine's Motion to Dissolve Order Appointing a Receiver or in the Alternative Motion to Stay Order Appointing a Receiver, dated Feb. 19, 2010, attaching letter from the NIH dated Feb. 16, 2010 describing that the NIH and Gulf Marine "agreed to an orderly closeout of the grant" in July 2009); *id.* at Ex. F at 1 (NIH report showing grants issued to Gulf Marine from 2007-2010); *id.* at Ex. G at 2 (NIH report showing project end date of Feb. 26, 2010); *id.* at Ex. H at 1 (report from National Resource Center for Cephalopods showing same).

56.     Gulf Marine had previously conducted its research at the University of Texas in Galveston and at 20 Daniel Drive in Gulf Breeze, Florida, but by early 2010, it had closed those facilities and was operating out of a metal building and greenhouse on Ericsson's personal property

located in Gulf Breeze, Florida.  *See* Terteryan Decl. at Ex. A 197:17-198:4, 198:16-22, 199:5-13, 200:24-201:6.

57.     By early 2010, Gulf Marine was winding down a bioreactor project unrelated to the Spill.  *See* Terteryan Decl. at Ex. B 119:17-120:4, 121:2-4.

### 7.     Plaintiffs Chose Not to Fundraise After the Spill.

58.     Immediately after the Spill, Plaintiffs did not seek any additional funding for their aquaculture project "by choice" and prevented any interested investors from coming forward because Plaintiffs believed that there was no point and that the project was "dead on arrival."  *See* Terteryan Decl. at Ex. A 95:7-23 ("I more or less extinguished going forward until -- any funding in this project after this spill"), 98:6-20 ("I called off any investments in our projects…and therefore there were no outside investors who had interest.  I basically kicked it to the curb."), 98:22-99:10 ("there was no point in raising capital"), 99:11-14 ("I stopped the -- any investor from coming forward that these investment bankers may have been talking to about it."), 169:19-25 ("Q: Did you direct Heartstream to go solicit potential investors after April 20th, 2010?  A: I did not."), 215:21-216:6 ("[t]he project was more or less dead on arrival"), 218:18-22 ("Q: And since April of 2010, neither BioMarine or Gulf Marine has had commercial sea farming operations in the waters of the Gulf of Mexico, correct?  A: By choice."), 218:23-219:9 ("[W]e had nothing going on after the spill by choice.").

59.     Gulf Marine briefly sought funding for Plaintiffs' aquaculture project in 2016 through an internet crowdfunding website, but raised less than $1,000 before ending the fundraising campaign because it concluded that crowdfunding was not "conducive for a nonprofit."  *See* Terteryan Decl. at Ex. A 214:15-215:20; *id.* at Ex. J; *id.* at Ex. C at 6.

60.     Gulf Marine did not believe that the aquaculture project was futile in 2016.  *See* Terteryan Decl. at Ex. B 136:16-19 ("Q. GMIT would not have asked for funding if it believed the project was futile; fair to say?  A. That's fair to say.").

61.     In 2016, Gulf Marine stated that Plaintiffs' aquaculture project would "get funded eventually either by BP fine funds, state and/or federal coastal restoration funds or investors" because "[its] project is the highest and best use of the $18.7 billion in BP in federal fines recently awarded to the Gulf states and feds to offset the marine damages" created by the Spill.  *See* Terteryan Decl. at Ex. C at 7.

**8.     Gulf Marine Shifted its Focus to Affordable Housing.**

62.     In 2016, Gulf Marine amended its 2011 and 2012 tax returns to reflect a change in scope of its nonprofit purpose to include the rehabilitation of housing for low income people in Chicago, which "ha[d] nothing to do with [the FlorAbama Project]" and made little money for the non-profit.  *See* Terteryan Decl. at Ex. A 236:18-21; *id.* at Ex. B 127:8-10; Ex. 18 at BIOM-GMIT00003724, BIOM-GMIT00003732 (letters on behalf of Gulf Marine dated Feb. 15, 2016, stating that Gulf Marine "changed the scope of their nonprofit purpose to also include the rehabilitation of housing for low income people" and attaching amended 2011 and 2012 tax returns).

63.     Gulf Marine used its non-profit status to purchase several distressed properties in the Chicago area at a discount and hired other companies, including one owned by Ericsson's son, Justin Ericsson, to renovate the properties.  *See* Terteryan Decl. at Ex. B 123:25-124:25.

64.     From October through December 2010, Gulf Marine recorded ███████████ in expenses on its profit and loss statements in connection with two distressed properties it purchased, which expenses Gulf Marine subtracted from the ████████████████████████████ ████████████████████████████████     *See* Ex. 5 at BPB1_BioMarine_00002299–

301 (Gulf Marine's October through December 2010 profit and loss statements showing expenses for the ███████████ properties); Ex. 8 at BIOM-GMIT0003363 (GMIT's 2010 taxes listing ██████████████████ as assets on the depreciation schedule); Terteryan Decl. at Ex. A 45:21-46:5, 235:21-236:21.

<strong>9.      Gulf Marine's Alleged Interest in the FlorAbama Project.</strong>

65.     Plaintiffs cannot identify a document evidencing the terms of BioMarine and Gulf Marine's purported business relationship as to the FlorAbama Project.  *See* Terteryan Decl. at Ex. B 78:20-79:6.

66.     To the extent that Plaintiffs had an understanding that Gulf Marine would receive 2.5% of BioMarine's gross sales from the FlorAbama Project, that understanding was for Gulf Marine's 2.5% interest to continue "in perpetuity," for longer than a year.  *See* Terteryan Decl. at Ex. B 77:9-21, 79:7-9.

67.     There is no indication on Gulf Marine's 2010 tax returns that it owned any shares of BioMarine.  *See* Ex. 8.

68.     Gulf Marine disclosed ████████████████████████ in its 2010 tax return.  *See id.* at BIOM-GMIT0003350.

69.     The ███████████████ that Gulf Marine identified in its 2010 tax return ████████████████████████████████.  *See id.* at BIOM-GMIT0003350.

14

April 29, 2021                              Respectfully submitted,

                                            */s/ Devin C. Reid*
                                            _____
                                            R. Keith Jarrett (Bar # 16984)
                                            Devin C. Reid (Bar # 32645)
                                            **LISKOW & LEWIS**
                                            One Shell Square
                                            701 Poydras Street, Suite 5000
                                            New Orleans, Louisiana 70139-5099
                                            Telephone: (504) 581-7979
                                            Fax No. (504) 556-4108

                                            Matthew T. Regan, P.C.
                                            (matthew.regan@kirkland.com)
                                            Kristopher S. Ritter
                                            (kristopher.ritter@kirkland.com)
                                            **KIRKLAND & ELLIS LLP**
                                            300 North LaSalle
                                            Chicago, IL 60654
                                            Telephone:  (312) 862-2000

                                            Christopher W. Keegan
                                            (chris.keegan@kirkland.com)
                                            Ashley Littlefield
                                            (ashley.littlefield@kirkland.com)
                                            Anna Terteryan
                                            (anna.terteryan@kirkland.com)
                                            **KIRKLAND & ELLIS LLP**
                                            555 California Street
                                            San Francisco, CA 94104
                                            Telephone: (415) 439-1400

                                            *Attorneys for BP America Production Company*
                                            *and BP Exploration & Production Inc.*

**<u>CERTIFICATE OF SERVICE</u>**

       I hereby certify that the above and foregoing **Statement of Uncontested Material Facts** has been served on All Counsel by electronically uploading the same to File & ServeXpress in accordance with Pretrial Order No. 12, as amended, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 29th day of April, 2021.


                          */s/ Devin C. Reid*
                          Devin C. Reid