**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * | **MDL NO. 2179** |
| | * | **SECTION J** |
| | * | |
| | * | **JUDGE BARBIER** |
| This Document relates to: | * | |
| | * | **MAGISTRATE JUDGE WILKINSON** |
| *Gulf Marine Institute of Technology and* | * | |
| *BioMarine Technologies, Inc. vs.* | * | |
| *BP America Production Company and BP* | * | |
| *Exploration & Production Inc., et al.* | * | |
| *Case No. 2:13-cv -01286-CJB-DPC* | * | |
| | * | |

**BP'S MEMORANDUM IN SUPPORT OF ITS
<u>MOTION FOR SUMMARY JUDGMENT</u>**

# <u>TABLE OF CONTENTS</u>

**Page**

I.  **PLAINTIFFS' OPA CLAIMS FAIL AS A MATTER OF LAW.**..................................7

    A.    Plaintiffs Cannot Prove the Spill Caused their Losses................................7

        1.    OPA's Causation Standard ..........................................................7

        2.    Plaintiffs Cannot Show They Would Have Obtained the Federal Permits Needed to Launch Their Aquaculture Business. ...........................9

        3.    Plaintiffs' Failure to Launch Was Caused by Lack of Funds. ..................13

        4.    Ericsson Personally "Kicked" Investment Opportunities "to the Curb" after the Spill. ................................................................15

    B.    Plaintiffs Cannot Prove Damages to a Reasonable Certainty.............................17

        1.    Damages Under OPA....................................................................18

        2.    The Impediments to Launching the FlorAbama Project, Lack of Comparable Companies, and Plaintiffs' History of Failure Inject Insurmountable Uncertainty to Plaintiffs' Alleged Damages. ..................20

        3.    Gulf Marine Did Not Have a Cognizable Financial Stake in the FlorAbama Project. .....................................................................23

    C.    Plaintiffs Cannot Recover Punitive Damages Under OPA................................24

II.  **PLAINTIFFS' MARITIME LAW CLAIMS FAIL AS A MATTER OF LAW.**........................................................................................**24**

III.  **PLAINTIFFS' STATE LAW CLAIMS FAIL AS A MATTER OF LAW.** ...............**25**

IV.  **CONCLUSION** .........................................................................**25**

i

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Al-Saud v. Youtoo Media*,
754 F. App'x 246 (5th Cir. 2018) ...............................................................................19, 21, 22

*All Brand Imps., Inc. v. Tampa Crown Distribs., Inc.*,
864 F.2d 748 (11th Cir. 1989) .................................................................................................24

*Alphamed Pharm. Corp. v. Arriva Pharm., Inc.*,
432 F. Supp. 2d 1319 (S.D. Fla. 2006), *aff'd*, 294 F. App'x 501 (11th Cir.
2008) .........................................................................................................15, 19, 20, 23

*Blue Water Boating Inc. v. Plains All Am. Pipeline, L.P.*,
No. 16-3283 PSG, 2017 WL 405425 (C.D. Cal. Jan. 26, 2017)....................................8, 13, 14

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)...................................................................................................................6

*Fontenot v. Safety Council of Sw. La.*,
No. 2:16-CV-84, 2017 WL 3588200 (W.D. La. Aug. 16, 2017)...............................................5

*Fredonia Farms, LLC v. Enbridge Energy Partners, L.P.*,
No. 1:12-CV-1005, 2014 WL 3573723 (W.D. Mich. July 18, 2014)...................19, 20, 22, 23

*Golnoy Barge Co. v. M/T Shinoussa*,
841 F. Supp. 783 (S.D. Tex. 1993) .........................................................................................25

*Grand Acadian, Inc. v. Fluor Corp.*,
No. 2:07 CV 295, 2010 WL 1053701 (W.D. La. Mar. 22, 2010).........................15, 19, 20, 21

*Grand Isle Shipyards, Inc. v. Black Elk Energy Offshore Operations*, *LLC*,
No. 15-129, 2021 WL 535837 (E.D. La. Feb. 12, 2021)...........................................................5

*Gulf Eng'g Co., L.L.C. v. Dow Chem. Co.*,
961 F.3d 763 (5th Cir. 2020) ..................................................................................................18

*Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*,
968 F.3d 454 (5th Cir. 2020), *as revised* (Aug. 4, 2020)...................................................9, 11

*In re Carney*,
258 F.3d 415 (5th Cir. 2001) ....................................................................................................6

*In re Deepwater Horizon*,
784 F.3d 1019 (5th Cir. 2015) ................................................................................................24

*In re Disc. Cigarette, Cigars, Etc., Inc.*,
   399 B.R. 605 (Bankr. M.D. La. 2009) ................................................................................19

*In re: Oil Spill by the Oil Rig "Deepwater Horizon"*
   *in the Gulf of Mexico, on April 20, 2010* 168 F. Supp. 3d 908 (E.D. La. 2016)............. *passim*

*In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on
   April 20, 2010*
   808 F. Supp. 2d 943 (E.D. La. 2011) .............................................................................24, 25

*In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on
   April 20, 2010, 902 F. Supp. 2d 808 (E.D. La. 2012), aff'd sub nom. In re
   Deepwater Horizon, 741 F. App'x 185 (5th Cir. 2018)* ......................................................18, 23

*In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on
   April 20, 2010, 910 F. Supp. 2d 891 (E.D. La. 2012), aff'd sub nom. In re
   Deepwater Horizon*
   739 F.3d 790 (5th Cir. 2014) ..........................................................................................17

*In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on
   April 20, 2010*,
   MDL 2179, 2020 WL 6381138 (E.D. La. Oct. 26, 2020) .................................................25

*In re Taira Lynn Marine Ltd. No. 5*,
   444 F.3d 371 (5th Cir. 2006) ........................................................................................8, 12

*Little v. Liquid Air Corp.*,
   37 F.3d 1069 (5th Cir. 1994) .........................................................................................6, 11

*Malacara v. Garber*,
   353 F.3d 393 (5th Cir. 2003) ...........................................................................................6

*Norris v. Causey*,
   869 F.3d 360 (5th Cir. 2017) ...........................................................................................19

*Nycal Offshore Dev. Corp. v. U.S.*,
   743 F.3d 837 (Fed. Cir. 2014)........................................................................................8, 12

*Nycal Offshore Dev. Corp. v. United States*,
   106 Fed. Cl. 222 (2012), *aff'd*, 743 F.3d 837 (Fed. Cir. 2014)........................................17, 23

*Peaker Energy Grp., LLC v. Cargill, Inc.*,
   No. 14-2106, 2016 WL 7491851 (E.D. La. Dec. 30, 2016), *aff'd sub nom.
   Peaker Energy Grp., L.L.C. v. Cargill, Inc.*, 706 F. App'x 191 (5th Cir. 2017) ...................21

*Riley v. St Luke's Episcopal Hosp.*,
   No. H-94-3996, 2008 WL 11407332 (S.D. Tex. Sept. 5, 2008)................................................5

*Schonfeld v. Hilliard*,
  218 F.3d 164 (2d Cir. 2000)..................................................................19

*Sekco Energy, Inc. v. Chouest*,
  No. 92-0420, 1993 WL 322942 (E.D. La. Aug. 13, 1993) .....................................8

*Sheline v. Dun & Bradstreet Corp.*,
  948 F.2d 174 (5th Cir. 1991) ..............................................................11

*State of La. ex rel. Guste v. M/V Testbank*,
  524 F. Supp. 1170 (E.D. La. 1981), *aff'd*, 728 F.2d 748 (5th Cir. 1984) ..............25

*Templet v. HydroChem Inc.*,
  367 F.3d 473 (5th Cir. 2004) ...............................................................6

*Union Oil Co. of Cal. v. Buffalo Marine Serv., Inc.*,
  No. 1:10-cv-195, 2012 WL 13034544 (E.D. Tex. June 29, 2012) ...........................18

*Venoco, LLC v. Plains Pipeline, L.P.*,
  No. 16-2988 PSG, 2017 WL 6000455 (C.D. Cal. Jan. 24, 2017)............................16

**Other State Cases**

*Barrand, Inc. v. Whataburger, Inc.*,
  214 S.W.3d 122 (Tex. App. 2006)..........................................................24

*Patterson v. Gulf Marine Inst. of Tech.*,
  No. 13-06-067-CV, 2008 WL 525424 (Tex. App. Feb. 28, 2008) ............................2

**Federal Statutes**

16 U.S.C.
  §§ 1852(h)(1), 1854 ......................................................................9

33 U.S.C.
  § 2702(a) ................................................................................7
  § 2702(b)(2)(E) ...............................................................4, 8, 18, 22

Oil Pollution Act ..........................................................................2, 7

**Other State Statutes**

Fla. Stat.
  § 725.01................................................................................24

Tex. Bus. & Com. Code Ann.
  § 26.01(b)(6) ..........................................................................24

**Federal Rules and Regulations**

33 C.F.R. § 136.233(d) ...................................................................................................17

33 C.F.R. § 136.235 .......................................................................................................18

33 C.F.R. § 136.235(c) .............................................................................................17, 19

81 Fed. Reg. 1,762 (Jan. 13, 2016) ................................................................................9

Fed. R. Civ. P. 36 ............................................................................................................6

Fed. R. Civ. P. 56(a) .......................................................................................................6

Fed R. Civ. P. 56(c)(1)(A) ..............................................................................................6

Federal Rule of Evidence 704 .........................................................................................5

**Other Authorities**

Edwin C. Kisiel III, *A Southern California Surfer's Perspective on Marine Spatial Planning*, 31 VILL. ENVTL. L.J. 225, 261–62 (2020) ...............................................11

## INTRODUCTION

Plaintiffs BioMarine Technologies, Inc. ("BioMarine") and Gulf Marine Institute of Technology ("Gulf Marine") seek lost profits for a non-operating commercial aquaculture business that they had been attempting, unsuccessfully, to launch for over 20 years.  BioMarine, a for-profit company, and Gulf Marine, its non-profit arm, allege their business would have launched and then earned hundreds of millions of dollars in profits but for the Spill.[1]  The facts, not surprisingly, confirm those allegations to be meritless.  In truth, no company—including Plaintiffs—has ever been authorized to operate commercial aquaculture in Gulf waters.  Indeed, Plaintiffs application for the required federal aquaculture permit was *expressly denied in 2008* and they never obtained the necessary permits to operate or appealed that federal decision. Further, at the time of the Spill, Plaintiffs lacked the financing necessary to launch their FlorAbama Project.   By March 2010, *pre-Spill*, BioMarine's activities had been largely suspended for nearly two years, Gulf Marine had lost its largest research grant and closed down two of its labs, and Plaintiffs had just ███████ in cash combined.  While Gulf Marine claimed under oath to the GCCF that ████████████████████████████, discovery now shows those grants terminated in February 2010, months before the Spill.

As set forth below, these businesses were largely dormant as of April 2010, lacking both the authority and capital to operate, and the Spill was in no way the cause of those failings. Plaintiffs, therefore, cannot demonstrate that the failure to launch their aquaculture business was due to or resulted from the Spill.  Nor can Plaintiffs prove to a reasonable certainty that they lost *any* profits, let alone millions of dollars, due to the Spill.  Plaintiffs have no valid claims under maritime law, as the undisputed record shows they suffered no physical injury and were not

---

[1]   Capitalized terms used but not defined in this Introduction are defined below.

1

commercial fishermen.  And, as this Court has repeatedly ruled, OPA preempts Plaintiffs' state law claims.  For these reasons, Defendants BP America Production Company and BP Exploration & Production, Inc. (collectively, "BP")[2] moves this Court to grant summary judgment dismissing all of Plaintiffs' claims, because the incontrovertible record shows that Plaintiffs cannot recover under OPA, general maritime law, or state law.

## STATEMENT OF FACTS

Plaintiffs' FlorAbama Project—the project at issue in this case—was not their first attempt to launch an aquaculture business in the Gulf.  In the decades before the *Deepwater Horizon* explosion, ensuing oil spill, and related response efforts (the "Spill"), BioMarine (a for-profit entity) and Gulf Marine (its non-profit affiliate), led by founder and president John Ericsson ("Ericsson"), set out to develop the very first Gulf of Mexico commercial aquaculture operation, using an old oil platform off the coast of Texas (the "Texas Project") in Texas state waters.  BP's Statement of Uncontested Facts ("SOF") ¶¶ 1, 12.  Plaintiffs never obtained sufficient investments to launch the Texas Project, which ultimately failed in February 2008 after Plaintiffs lost a lawsuit with the state of Texas over the necessary lease.  *See Patterson v. Gulf Marine Inst. of Tech.,* No. 13-06-067-CV, 2008 WL 525424 (Tex. App. Feb. 28, 2008); SOF ¶ 13.

While working to secure the Texas Project, Plaintiffs also worked on their second choice, the FlorAbama Project, named for its proposed location in federal waters off the coast of the Florida-Alabama state line.  *See* SOF ¶¶ 13–14.  Plaintiffs obtained and renewed two permits from the U.S. Army Corps of Engineers and the Environmental Protection Agency that were valid through 2013 and covered approximately 27.5 acres of federal waters for the FlorAbama

---

[2]   BP p.l.c. does not join this Motion because it has not been properly served in this case.

Project. *Id.* ¶¶ 22–24. Plaintiffs also applied for, and ***were denied***, an Exempted Fishing Permit ("EFP") three times, including most recently in June 2008. *See id.* ¶¶ 16, 19.

After Plaintiffs lost their rights to the Texas site in 2008, they shifted focus to their FlorAbama Project. *Id.* ¶¶ 12–13. In business projections for investors, Plaintiffs estimated they would need about $24.5 million for the FlorAbama Project. *Id.* ¶ 31. From 2007 to 2008, BioMarine made three unsuccessful attempts to raise this necessary capital through investment banks Navigator Investments Limited, Heartstream Capital ("Heartstream"), and Arjent. *Id.* ¶¶ 31–32, 39. All three efforts fell through in 2008. *Id.* ¶¶ 32, 39. Though BioMarine got as far as preparing a private placement memorandum (the "Techs Loanstar PPM"), the memorandum was never actually marketed to investors, and none of BioMarine's three funding attempts raised a single dollar for the venture. *Id.* ¶¶ 35, 37, 39. Without funding, BioMarine was forced to suspend its activities in late 2008, and they remained suspended at the time of the Spill. *Id.* ¶ 44. Plaintiffs admit that, at the time of the Spill, BioMarine did not know when it would actually raise funds, how much it would raise, or from whom. *Id.* ¶ 46.

In addition to a $1.3 million grant received in 1998 for the Texas Project, Gulf Marine received $947,186 in grants from the National Institute of Health ("NIH") between 2007 and 2010 to conduct cephalopod research unrelated to the aquaculture projects. *Id.* ¶¶ 48, 50. The NIH grants were Gulf Marine's largest source of funding aside from the 1998 donation, and the entity's only federal funding in the years leading up to the Spill. *Id.* ¶¶ 52–54. Gulf Marine and the NIH agreed to an orderly closeout of the grant in July 2009, and the grant funding terminated by February 2010. *Id.* ¶ 55. Around that time, Gulf Marine closed two of its laboratories, exclusively operated out of a "metal building" and "greenhouse" located at Ericsson's personal residence, and was winding down a separate "bioreactor" project. *Id.* ¶¶ 56, 57.

An independent audit of BioMarine's financial statements from "Inception to September 2007" found BioMarine had "incurred net losses since its inception and ha[d] experienced severe liquidity problems," which "raise[d] substantial doubt about the Company's ability to continue as a going concern." *Id.* ¶¶ 41, 42.  From 1989 through September 2007, BioMarine had a net loss of over $5 million dollars.  *Id.* ¶ 43.  Plaintiffs' 2010 tax returns disclose just ▮▮▮▮ in cash on hand and no certainty as to obtaining additional financing.  *Id.* ¶¶ 45, 46.  Since 2010, neither Plaintiffs, nor anyone else, have launched a commercial aquaculture business in the Gulf of Mexico.  *Id.* ¶ 4.  Plaintiffs' sea cages and other equipment were never launched and remained in storage.  *Id.*  Plaintiffs briefly sought funding in 2016 via an internet crowdfunding website, but raised less than $1,000 before ending it.  *Id.* ¶ 59.

## PROCEDURAL BACKGROUND

Plaintiffs (and Ericsson individually) submitted claims to the Gulf Coast Claims Facility ("GCCF") for losses due to the Spill.  *Id.* ¶ 5.  Gulf Marine received a



*Id.* ¶ 6.  On its 2010 tax return, Gulf Marine claimed ▮▮▮▮▮▮ yet Gulf Marine had lost the NIH grant months before the Spill.  *Id.* ¶¶ 7, 55. Plaintiffs opted out of the economic and property damage class settlement in this MDL.  *Id.* ¶ 8.

Plaintiffs assert causes of action in their complaint for: negligence and gross negligence and willful misconduct under maritime and Florida law; various OPA claims, including for lost profits under § 2702(b)(2)(E); and punitive damages.  *See* Case No. 13-cv-01286, Rec. Doc. 1 ("Complaint") ¶¶ 290–395.  Plaintiffs' PTO 65 sworn statement and deposition testimony confirmed, however, that they only seek lost profits in connection with their failed FlorAbama

Project. *See* SOF ¶ 9.[3]  Plaintiffs do not seek damages for physical injury or as commercial

fishermen. *See* SOF ¶¶ 9–11.  BioMarine individually sought ███████████ in its GCCF

submission.  Ex. 2 at BIOM-GMIT00003580.  However, Plaintiffs jointly alleged damages of

$26,555,053 in their PTO 65 sworn statement.  Plaintiffs' PTO 65 Statement at 6.

During the PTO 69 discovery process, BP deposed Ericsson in his individual capacity

and as Plaintiffs' corporate representative.  Plaintiffs also submitted a report by Dr. Vittor, who

purports to opine on "the status of permitting of [Plaintiffs'] proposed mariculture operation[.]"

*See* Ex. 1, Declaration of Anna Terteryan in Support of BP's Motion for Summary Judgment

("Terteryan Decl."), Ex. K at 1.  However, Dr. Vittor's report offers unreliable, impermissible

legal conclusions, and is otherwise unhelpful to the finder of fact.[4]  Regardless, to the extent that

Dr. Vittor's report suggests Plaintiffs could have moved forward with the FlorAbama Project

without a permit specifically authorizing their intended commercial aquaculture operations—

which Plaintiffs did not do—his conclusion underscores that Plaintiffs' failure to launch the

FlorAbama Project was voluntary and had nothing to do with the Spill. *See* Section I.A.4 *infra*.

---

[3]    To the extent Plaintiffs argue that they could have launched in Florida state waters, Plaintiffs waived this argument by failing to raise it in response to questioning at their deposition, in their complaint, in their GCCF submissions, or in their PTO 65 Statement. *See* Ex. 2 at BIOM-GMIT0003584 (BioMarine's Dec. 30, 2011 GCCF submission describing ███████████████); Complaint ¶ 227 (describing Plaintiffs' site as off the coast of Alabama in federal waters); PTO 65 Verified Statement Regarding Causation and Damages (B1 Claims) by BioMarine and Gulf Marine (Rec. Doc. 24342) ("Plaintiffs' PTO 65 Statement") (describing FlorAbama Aquaculture Business off the coast of Alabama).

[4]    For example, Dr. Vittor's report is inadmissible given his lack of experience with aquaculture regulations, unrelated educational background in biology and zoology, and because he offers impermissible legal opinions on what regulations applied to the FlorAbama Project and the extent of federal agencies' regulatory authority, which are legal questions for this Court to determine. *See Grand Isle Shipyards, Inc. v. Black Elk Energy Offshore Operations*, *LLC,* No. 15-129, 2021 WL 535837, at *3 (E.D. La. Feb. 12, 2021) ("It is inappropriate to allow an expert to opine on legal conclusions, even in a bench trial.  Accordingly, to the extent [Plaintiff's expert] attempts to offer conclusions as to what law is applicable, his testimony will be excluded."); *Riley v. St Luke's Episcopal Hosp.*, No. H-94-3996, 2008 WL 11407332, at *6 (S.D. Tex. Sept. 5, 2008) ("the Fifth Circuit has repeatedly held that Federal Rule of Evidence 704 does not permit an expert witness to offer conclusions of law" (citing *Snap-Drape, Inc. v. Comm'r*, 98 F.3d 194, 198 (5th Cir. 1996)); *Fontenot v. Safety Council of Sw. La.,* No. 2:16-CV-84, 2017 WL 3588200, at *6 (W.D. La. Aug. 16, 2017) (expert could not testify as to meaning and applicability of regulations because "[t]he law requires only one spokesman, the court").  BP reserves all rights to challenge Dr. Vittor's report, should Plaintiffs' claims survive summary judgment.

## **LEGAL STANDARD**

Summary judgment should be entered when "the movant shows that there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). A moving party may satisfy its summary judgment burden by pointing to undisputed evidence in the record. *See e.g. Templet v. HydroChem Inc.*, 367 F.3d 473, 480 (5th Cir. 2004); *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003).

While all reasonable inferences must be drawn in favor of the nonmoving party, a party cannot defeat summary judgment with conclusory allegations or unsubstantiated assertions. *See Little*, 37 F.3d at 1075. Nor may the nonmoving party rest on the pleadings, but rather must identify specific facts that establish a genuine issue for trial. *See Celotex*, 477 U.S. at 324. Disputes as to material facts are found "only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little*, 37 F.3d at 1075. Summary judgment is appropriate, and indeed commonplace, based on factual admissions made by the nonmoving party. *See* Fed R. Civ. P. 56(c)(1)(A); *In re Carney*, 258 F.3d 415, 420 (5th Cir. 2001) (Rule 36 admissions "cannot be overcome at the summary judgment stage by contradictory affidavit testimony or other evidence in the summary judgment record").

## **ARGUMENT**

Plaintiffs' OPA claims fail because they cannot show the Spill caused their losses or prove their damages to a reasonable certainty.  Plaintiffs do not allege and cannot show they suffered any physical injury or were commercial fishermen, as maritime law requires.  And Plaintiffs' state law claims are preempted by OPA.  Accordingly, as a matter of law and as the undisputed record shows, Plaintiffs cannot meet their burden of proof at trial on their claims.

I.      **PLAINTIFFS' OPA CLAIMS FAIL AS A MATTER OF LAW.**

No reasonable juror could (1) find that the Spill caused the FlorAbama Project to lose profits and (2) determine those alleged lost profits to a reasonable certainty.  Thus, Plaintiffs cannot carry their burden at trial to prove both causation and damages under OPA.

A.      **Plaintiffs Cannot Prove the Spill Caused their Losses.**

The undisputed record shows that Plaintiffs failed to launch commercial aquaculture operations for multiple reasons, all unrelated to the Spill.  *First*, federal law did not, and still does not, allow for commercial aquaculture in the Gulf of Mexico.  To this day, there has never been a federal permit granted for commercial aquaculture in the Gulf, a necessary license to operate.  And, any attempt to launch regardless of the regulatory uncertainty in 2010 would have presented substantial regulatory, financing, and operational risk to, and therefore material impediments to the hypothetical investment in or profitability of, the FlorAbama Project. *Second*, in the years leading up to the Spill, BioMarine failed to raise any of the $24.5 million it needed to fund the project. *Third*, Ericsson preemptively called off the aquaculture project after the Spill, a unilateral decision to end the business after years of dormancy.

Plaintiffs have the burden to prove they would have overcome these impediments, absent the Spill; but the undisputed record shows the contrary.  Thus, Plaintiffs cannot prove "that their economic losses were '*due to*' the injury, destruction, or loss of property or natural resources that 'result[ed] from'" the Spill.  *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, 168 F. Supp. 3d 908, 916 (E.D. La. 2016)  (emphasis added).

1.      **OPA's Causation Standard**

Under the Oil Pollution Act ("OPA"), a responsible party is liable for damages that "result from" the discharge, or substantial threat of discharge, of oil.  33 U.S.C. § 2702(a).  Absent physical property damage, only economic losses "due to" the destruction of property or

natural resources are compensable to private claimants under OPA.  33 U.S.C. § 2702(b)(2)(E) (compensable damages include "[d]amages equal to the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources"). "Reading § 2702(a) and § 2702(b)(2)(E) together, Plaintiffs must establish that their economic losses were 'due to' the injury, destruction, or loss of property or natural resources that 'result[ed] from' the discharge or threatened discharge of oil[.]"  *In re Deepwater Horizon*, 168 F. Supp. 3d at 916.

The Fifth Circuit and various district courts have interpreted OPA's "due to" and "result from" language to require a direct causal relationship between the discharge of oil and the resulting damage.  *In re Taira Lynn Marine Ltd. No. 5*, 444 F.3d 371 (5th Cir. 2006) (losses caused by government-mandated evacuation following pollution discharge did not "result from" the discharge and therefore were not recoverable under OPA); *see also In re Deepwater Horizon*, 168 F. Supp. 3d at 916 (economic losses resulting from government moratorium on drilling following the Spill did not "result from" the Spill); *Sekco Energy, Inc. v. Chouest*, No. 92-0420, 1993 WL 322942, at *6 (E.D. La. Aug. 13, 1993) (holding "proximate cause" is required for recovery under 33 U.S.C. § 2702(b)(2)(E)); *Blue Water Boating Inc. v. Plains All Am. Pipeline, L.P.*, No. 16-3283 PSG (JEMX), 2017 WL 405425, at *3 (C.D. Cal. Jan. 26, 2017) (claim for business losses due to decreased tourism following oil spill was "a step too far removed from OPA and OSPRA's requirement that the lost profits and impaired earning capacity be 'due to' the destruction of natural resources").

Plaintiffs bear the burden of establishing causation.  *In re Deepwater Horizon*, 168 F. Supp. 3d at 915; *see also Nycal Offshore Dev. Corp. v. U.S.,* 743 F.3d 837, 842–44 (Fed. Cir. 2014) (holding that "[t]he burden of proof on the issue of causation in a lost-profits case rests on

the plaintiff without regard to the nature of the impediment that the plaintiff would have had to overcome in the nonbreach world to make a profit," and declining to award lost profits for government's breach of leases because, absent the breach, it would have been "virtual[ly] impossib[le]" for plaintiffs to obtain necessary permits to operate).

**2.      Plaintiffs Cannot Show They Would Have Obtained the Federal Permits Needed to Launch Their Aquaculture Business.**

At the time of the Spill, while Plaintiffs held ancillary permits for the FlorAbama Project, neither authorized commercial aquaculture in the Gulf of Mexico.  Plaintiffs had no imminent prospect of obtaining such authorization because federal law did not allow for commercial aquaculture in Gulf waters, and still does not today.  Thus, as a matter of law, Plaintiffs cannot show that the Spill caused their alleged losses because they did not obtain and could not have obtained a license to operate their aquaculture project at the time of the Spill or any time since.

Under the existing regulatory framework at the time of the Spill, commercial fishing in the Gulf required an EFP, but an EFP could not be used for commercial aquaculture.  *See* Terteryan Decl. Ex. D at x (explaining that an EFP is "of limited duration and is not intended for commercial production of fish, making aquaculture in federal waters not viable under the current permitting process").  In 2009, the Gulf Fishery Management Council ("Gulf Council") issued recommendations for a new aquaculture permitting scheme in the Gulf, *see* 16 U.S.C. §§ 1852(h)(1), 1854, but NOAA did not promulgate a final rule for commercial aquaculture permitting until 2016. *See* Terteryan Decl. Ex. D; Final Rule, 81 Fed. Reg. 1,762 (Jan. 13, 2016). At that point, several entities that opposed commercial aquaculture immediately challenged the 2016 regulations, and the Fifth Circuit held in 2020 that the regulations exceeded the agency's congressional authority.  *Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*, 968 F.3d 454, 456 (5th Cir. 2020), *as revised* (Aug. 4, 2020).  That ruling did not, as Plaintiffs contend, make

9

way for an unregulated free-for-all of commercial aquaculture in the Gulf.  To the contrary, it affirmed that Congress must authorize or delegate the authority to regulate commercial aquaculture, but to date has not done so.  Thus, the legality of commercial aquaculture in federal Gulf waters was, at minimum, unsettled both before and in the decade since the Spill; and, following the Fifth Circuit's 2020 ruling, legislative action is needed before any commercial aquaculture operations can begin.  *See* Terteryan Decl. Ex. L at 3, 13 ("there is no explicit statutory authority for permitting and developing aquaculture in federal waters").

At the time of the Spill, Plaintiffs held two valid permits: an Authorization to Discharge Under the National Pollutant Discharge Elimination System ("NPDES Permit") from the Environmental Protection Agency, and a permit from the United States Army Corps of Engineers ("USACOE Permit"), neither of which authorized them to conduct commercial aquaculture in the Gulf.  SOF ¶¶ 22, 25–27.  The NPDES Permit authorized Plaintiffs to "discharge sanitary wastewater, deck/equipment washdown, fish food, and stormwater runoff" into the Gulf of Mexico in certain quantities.  *Id.* ¶ 25.  The USACOE Permit authorized Plaintiffs to "construct forty-eight 30-meter diameter production cages and eight 15-meter diameter nursery cages" at the FlorAbama site.  *Id.* ¶ 26.  The USACOE Permit noted that "***[t]his permit does not obviate the need to obtain other Federal, State, or local authorizations required by law***."  *Id.* ¶ 27. (emphasis added)  During the public comment period, the Gulf Council "recommended permit modification be suspended until [BMIT]/GMIT applies for and obtains an EFP from NMFS."  *Id.* ¶ 28.

Critically, as late as 2008, Plaintiffs sought an EFP for the FlorAbama Project.  *Id.* ¶ 16. That application was expressly denied.  *Id.* ¶ 19.  In a June 2008 letter, NOAA denied Plaintiffs' EFP application because a "long-term, commercial-scale aquaculture operation is not one of the

purposes for which an EFP may be issued." *Id.*  This denial signaled the end of the FlorAbama Project's viability, nearly two years before the Spill.  The denial was never appealed.  SOF ¶ 20.

Plaintiffs' argument that their two permits and three EFP denials in fact ***allowed*** them to launch the FlorAbama Project is irreconcilable with NOAA's repeated statements to the contrary, as well as Plaintiffs' own actions, and common sense.  *See id.* ¶ 17 ("aquaculture in federal waters [is] not viable under the current permitting process"), ¶ 21 ("The Gulf of Mexico Fisheries Management Council has declared [t]he proposed mariculture site…will be required to obtain an Exempt Fisheries Permit (EFP) in order to conduct mariculture activities (including harvesting, possessing, and transporting managed fishes such as cobia) through federal waters to and from it[s] permitted mariculture site.").  Plaintiffs applied for an EFP ***three*** times, clear evidence that they knew an EFP was a prerequisite.  It is only now, in this litigation, that they allege an interpretation that NOAA's third denial letter in 2008 was in fact some alleged "green light from NOAA for BioMarine to proceed with the FlorAbama project[.]"  *See* Terteryan Decl. Ex. B, 138:11–139:19.  This counterfactual defies logic, ignores the law at the time, and cannot defeat summary judgment.  *See Little*, 37 F.3d at 1075 (party opposing summary judgment cannot satisfy its burden "with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence") (internal quotations and citations omitted); *Sheline v. Dun & Bradstreet Corp.*, 948 F.2d 174, 176 (5th Cir. 1991) ("summary judgment is appropriate where the only issue before the court is a pure question of law").  Even today, there is not one commercial aquaculture facility operating in federal Gulf waters because Congress has yet to authorize the regulation of commercial aquaculture and, thus, such activities are still not permitted.  *See* SOF ¶ 2; *Gulf Fishermens Ass'n*, 968 F.3d at 456; Edwin C. Kisiel III, *A Southern California Surfer's Perspective on Marine Spatial Planning*, 31

VILL. ENVTL. L.J. 225, 261–62 (2020) ("Until the legal status of aquaculture is settled or Congress issues clear statutory guidance, the ability to implement aquaculture . . . in federal waters is limited.").

Worse, Plaintiffs' interpretation requires one to stack assumption upon assumption as to what would have happened if they had actually attempted to begin operations with just their two existing permits, who would have invested, and how the business would have performed.  *See* SOF ¶¶ 29, 46.  As Ericsson stated in 2016, "[t]he US legal system can strike down any existing or proposed fish farming operation by some unfriendly person or organization filing a lawsuit." *Id.* ¶ 3.  And, because NOAA had made clear its position that commercial aquaculture was not viable in 2010, any operations put in the water would have flouted NOAA's explicit guidance. *See id.* ¶ 17.

In short, nothing in the record could support a reasonable finding that Plaintiffs would have successfully launched the first commercial aquaculture operation in the Gulf of Mexico in history, with unknown investors, and become profitable in spite of the legal obstacles, including three denials of a necessary permit for their proposed operations by NOAA.  Thus, Plaintiffs cannot meet their burden to show that the Spill caused the failure of their aquaculture business. *See Nycal*, 743 F.3d at 842 (affirming denial of lost profits for breached oil and gas lease where "[t]he owners' inability to obtain air pollution permits was an intervening cause of the lost opportunity").  This Court and many others have already rejected such attenuated theories of OPA causation.  *See In re Deepwater Horizon*, 168 F. Supp. 3d at 916 (holding economic losses resulting from government moratorium on drilling following the Spill did not result from the Spill); *In re Taira Lynn*, 444 F.3d 371 (losses caused by government-mandated evacuation following pollution discharge did not "result from" the discharge and therefore were not

recoverable under OPA); *Blue Water Boating Inc.*, 2017 WL 405425, at *3 (claim for lost business due to decreased tourism following oil spill was "a step too far removed from OPA and OSPRA's requirement that the lost profits and impaired earning capacity be "due to" the destruction of natural resources").

### 3. Plaintiffs' Failure to Launch Was Caused by Lack of Funds.

Not only did Plaintiffs face insurmountable regulatory hurdles before the Spill, they also (and relatedly) could not raise the funding necessary to launch operations. Plaintiffs' project simply "could not be built without additional financing from one source or another" to the tune of ***$24.5 million dollars***—money Plaintiffs did not have as of the Spill. *See* SOF ¶¶ 30–31.

In fact, Plaintiffs were in dire financial straits at the time of the Spill. According to an independent audit in 2007, BioMarine had "incurred net losses since its inception and ha[d] experienced severe liquidity problems[,]" suffering over $5 million in net losses from 1989 through September 2007. *Id.* ¶¶ 42, 43. This "raise[d] substantial doubt about the Company's ability to continue as a going concern." *Id.* ¶ 42. Though BioMarine sought funding, its three attempts to raise capital from 2007 to 2008 failed for reasons completely unrelated to the Spill. *Id.* ¶¶ 32, 39. By late 2008, BioMarine's activities were suspended for lack of funds, and it had just ███ on cash on hand by 2010. *Id.* ¶¶ 44, 45.

Gulf Marine fared no better. Its NIH funding—Gulf Marine's largest source of income and only federal grant—terminated in early 2010, months before the Spill. *Id.* ¶ 55. Gulf Marine had just ███ in cash on hand at the start of 2010. *Id.* ¶ 45. Unrelated to the Spill, Gulf Marine shifted its focus away from cephalopod research and instead used the ███████ ███ to buy and rehabilitate distressed properties for affordable housing projects in Chicago, which "ha[d] nothing to do with [the FlorAbama Project]" and made little money for the non-profit. *See* SOF ¶¶ 62–64.

13

Nothing in the record supports Plaintiffs' contention that they **would have eventually** obtained tens of millions of dollars of funding if the Spill had not happened.  A decades-long history of financial distress, their failed financing attempts, and the fact that their fundraising efforts were indefinitely on hold at the time of the Spill, compel the opposite conclusion. Plaintiffs cannot say with any degree of certainty when, from whom, or how much capital they would have raised.  *Id.* ¶ 46.  In Ericsson's own words, "no one has any crystal balls of what's going to happen in the future."  *Id.*  Although Plaintiffs believe Heartstream may have renewed investors' interest in their project at some unspecified time, Plaintiffs cannot point to any admissible evidence to support their belief.   Ericsson had no firsthand knowledge of Heartstream's earlier failed fundraising attempt, including which investors expressed interest, the amount of any commitments, or whether investors ever received BioMarine's private placement memorandum.  SOF ¶ 33.  Nor did he have any "personal control over the actions of the financial consultants and placement agencies that were involved in" Heartstream's fundraising efforts, or any "ability to tell [Heartstream and other] groups that were involved in the placement, when the markets were good enough in their neighborhood to start the fundraising" in 2010.  *Id.* ¶ 34.  In short, Plaintiffs have adduced no evidence that their efforts to raise $24.5 million in necessary capital were likely to succeed.

This lack of financing, or even a clear path to financing, was the reason for Plaintiffs' failed business and confirms there is no causal connection between Plaintiffs' failure to launch the FlorAbama Project and the Spill.  Because Plaintiffs cannot prove they would have raised the capital needed to start operations had the Spill never occurred, their alleged lost profits are not "**due to** the injury, destruction, or loss of real property, personal property, or natural resources," nor do they "result from" the discharge of oil.  *In re Deepwater Horizon*, 168 F. Supp. 3d at 916.

Outside the OPA context, courts similarly have held that lack of necessary funding bars a claim for lost profits.  For example, in *Grand Acadian,* the District Court for the Western District of Louisiana held Grand could not recover lost profits for a development project because "it is clear that Grand had not obtained any financing for its RV park."  *Grand Acadian, Inc. v. Fluor Corp.,* No. 2:07 CV 295, 2010 WL 1053701, at *3 (W.D. La. Mar. 22, 2010).   The court explained that Grand had preliminary approval for financing, but the financing was unavailable even before the alleged breach because of Grand's noncompliance with certain conditions from the lender.  *Id* at *2.  In fact, "more than a year after completing its business plan…Grand had still not secured any financing to begin construction of an RV park." *Id.*   Here, as in *Grand Acadian*, Plaintiffs could not move forward with the FlorAbama Project without millions of dollars of funding that, given their financial history, was not going to materialize.   The undisputed record shows that, as of the Spill, Plaintiffs' three latest fundraising efforts had failed, and they had suspended or reduced operations, had shifted focus to affordable housing in Chicago, and had minimal cash on hand.  Thus, Plaintiffs cannot prove that the Spill, and not their preexisting financial struggles, caused their losses.  *See Alphamed Pharm. Corp. v. Arriva Pharm., Inc.*, 432 F. Supp. 2d 1319, 1344-45, 1349 (S.D. Fla. 2006), *aff'd,* 294 F. App'x 501 (11th Cir. 2008) (reversing jury award of lost profits because plaintiff could not link its failure to generate profits to defendant's conduct where "[t]he facts establish that [plaintiff's] ***business was faltering*** in late 2000, demonstrated by the company's inability to pay its licensing fees or fund its critical 'proof of concept' research") (emphasis added).

### 4.   Ericsson Personally "Kicked" Investment Opportunities "to the Curb" after the Spill.

Even if the Spill might have reduced some future investment interest in Plaintiffs' project (though there was none as of the Spill), Ericsson repeatedly testified that until at least 2016 he

personally prevented any investors from coming forward and chose to call off the project. *See* SOF ¶ 58 ("I more or less extinguished going forward until -- any funding in this project after this spill"), ("I called off any investments in our projects…and therefore there were no outside investors who had interest.  I basically kicked it to the curb."), ("there was no point in raising capital"), ("I stopped the -- any investor from coming forward that these investment bankers may have been talking to about it."), ("Q: Did you direct Heartstream to go solicit potential investors after April 20th, 2010?  A: I did not."), ("Q: And since April of 2010, neither BioMarine or Gulf Marine has had commercial sea farming operations in the waters of the Gulf of Mexico, correct? A: By choice."), ("[W]e had nothing going on after the spill by choice.").  Plaintiffs' own unilateral actions foreclosed the possibility of raising any capital after the Spill.

In order for lost profits "to be actionable under OPA, the property damage must have resulted from the discharge of oil or the substantial threat of discharge of oil." *Venoco, LLC v. Plains Pipeline, L.P.,* No. 16-2988 PSG (JEMX), 2017 WL 6000455, at *5 (C.D. Cal. Jan. 24, 2017) (citing *In re Deepwater Horizon*, 168 F. Supp. 3d at 916).  Here, the discharge or substantial threat of discharge of oil did not halt Plaintiffs' project for six years:  Ericsson himself did.  Ericsson "kicked it to the curb" because he believed "there was no point in raising capital[.]" *See* SOF ¶ 58.  Yet, Plaintiffs have adduced no evidence beyond their say-so demonstrating that fundraising efforts would have been futile because of the Spill; nor does the record show, as Plaintiffs contend, that the FlorAbama Project "was more or less dead on arrival" from April 20, 2010 due to the Spill. *Id.*  Instead, Ericsson testified that, in over a decade since the Spill, Plaintiffs have not had commercial aquaculture operations in the Gulf "[b]y choice." *Id.*  Any alleged lost profits from the FlorAbama Project, therefore, are due to and result from Plaintiff's own decisions.  And Plaintiffs' failure to attempt any mitigation

whatsoever of their purported millions of dollars in losses further bars their attempt to recover under OPA for their own business failures.  *See In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, 910 F. Supp. 2d 891, 928 (E.D. La. 2012), *aff'd sub nom. In re Deepwater Horizon*, 739 F.3d 790 (5th Cir. 2014) ("OPA includes a mitigation requirement.") (citing 33 C.F.R. § 136.235); 33 C.F.R. § 136.233(d) (Coast Guard regulations require claimant to establish "[w]hether alternative employment or business was available and undertaken and, if so, the amount of income received…and any saved overhead and other normal expenses not incurred as a result of the incident"); *id.* § 136.235(c) (Coast Guard regulations reduce amount of lost earnings or profits following an oil spill for "[p]otential income from alternative employment or business not undertaken, but reasonably available").

### B.  Plaintiffs Cannot Prove Damages to a Reasonable Certainty.

Though Plaintiffs faced substantial regulatory, financial, and other hurdles to becoming operational (let alone profitable), they ask this Court to assume, without evidence, that they would have imminently overcome those impediments in 2010 to successfully launch the first commercial aquaculture operation in the federal waters of the Gulf of Mexico.   This "[c]onjecture that a solution would have been found, but without knowing when, or what it would have cost, '***injects an intolerable level of uncertainty*** into calculating damages.'" *Nycal Offshore Dev. Corp. v. United States*, 106 Fed. Cl. 222, 247 (2012), *aff'd*, 743 F.3d 837 (Fed. Cir. 2014) (affirming trial court's dismissal on causation grounds and therefore declining to reach the dismissal on damages, but acknowledging "there is force to the trial court's conclusion that the evidence is not sufficient to permit the court to make 'a fair and reasonable approximation of the damages'").  Plaintiffs' alleged lost profits are too speculative as a matter of law to support an OPA claim, and Gulf Marine's claim should further be dismissed for failure to show a financial stake in the FlorAbama Project that was damaged.

17

### 1.    Damages Under OPA

OPA compensates only for "loss of profits or impairment of earning capacity" that were caused by the discharge or threatened discharge of oil.  33 U.S.C. § 2702(b)(2)(E).  Unrealized loss in value is not compensable under OPA; a claimant must show actual losses.  *See In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, 902 F. Supp. 2d 808, 816 (E.D. La. 2012), *aff'd sub nom. In re Deepwater Horizon*, 741 F. App'x 185 (5th Cir. 2018); 33 C.F.R. § 136.235 (Coast Guard's regulations interpreting OPA's economic loss provision note compensation "is limited to the ***actual*** net reduction or loss of earnings or profits suffered") (emphasis added).  In assessing the sufficiency of evidence showing lost profits, the Fifth Circuit considers the law of the forum state.

To prevail on an OPA lost profits claim, the party seeking to recover must demonstrate that the lost profits are reasonably ascertainable and not speculative.  *See In re Deepwater Horizon*, 902 F. Supp. 2d at 816 (rejecting unrealized diminution of property value claims as "speculative").  A party seeking lost profits under OPA need not prove an exact calculation, but their alleged losses "must not be based on evidence that is speculative, uncertain, contingent, or hypothetical."  *Union Oil Co. of Cal. v. Buffalo Marine Serv., Inc.*, No. 1:10-cv-195, 2012 WL 13034544 at *9 (E.D. Tex. June 29, 2012) (internal quotation omitted).  Louisiana law likewise allows recovery for lost profits that can be "proven with reasonable certainty and [are not] based on conjecture and speculation."  *Gulf Eng'g Co., L.L.C. v. Dow Chem. Co.*, 961 F.3d 763, 768 (5th Cir. 2020).  A plaintiff "must show that the loss of profits is more probable than not" and support a claim "by more than 'mere estimates of loss.'"  *Id.*

Courts often look to past profitability in comparable periods to guide lost profits calculations.  *Union Oil*, 2012 WL 13034544 at *9–10 (awarding OPA lost profits based on revenue in months prior to oil spill, but rejecting as speculative plaintiff's assertion that it would

have had a "banner month").  The "mere hope of success of an untried enterprise, even when that hope is realistic, is not enough for recovery of lost profits."  *Al-Saud v. Youtoo Media,* 754 F. App'x 246, 255 (5th Cir. 2018); *see also In re Disc. Cigarette, Cigars, Etc., Inc.,* 399 B.R. 605, 618–19 (Bankr. M.D. La. 2009) (lack of evidence of inventory, sales, tax records, or ledgers made it impossible to reliably determine past profits from which to calculate lost profits award). The Coast Guard has interpreted OPA's economic loss provision likewise to require a claimant seeking lost profits to establish its profits in comparable periods.  33 C.F.R. § 136.235(c).

It is well established that lost profits cannot be determined with reasonable certainty for new businesses that lack necessary regulatory approvals, financing, contracts, or other variables. *See Norris v. Causey*, 869 F.3d 360, 372 (5th Cir. 2017) (affirming denial of lost profits for redevelopment project because "profiting from a redevelopment depends on many contingencies such as costs, timely construction, and market conditions"); *Grand Acadian,* 2010 WL 1053701, at *2-3 (lack of financing for development project precluded calculation of profits to reasonable certainty); *Fredonia Farms, LLC v. Enbridge Energy Partners, L.P.*, No. 1:12-CV-1005, 2014 WL 3573723 at *8 (W.D. Mich. July 18, 2014) (lost profits were too speculative because plaintiffs had "not obtained necessary permits, begun construction, planted a single grape, or made a single sale" for new vineyard business); *Alphamed,* 432 F. Supp. 2d at 1344–45, 49 (lost profits were too speculative where business had been faltering and lacked FDA approval for the proposed use of new product); *Schonfeld v. Hilliard*, 218 F.3d 164, 173–74 (2d Cir. 2000) (lost profits were too speculative where new media venture still had to raise $44 million in pre-launch funding, reach certain subscriber levels, and find advertisers before launching in a new market).

19

2. **The Impediments to Launching the FlorAbama Project, Lack of Comparable Companies, and Plaintiffs' History of Failure Inject Insurmountable Uncertainty to Plaintiffs' Alleged Damages.**

A fact-finder would be left to speculate as to whether the FlorAbama Project could have ever even launched, and if so, to speculate how it would have fared over time, what returns it would have needed to reinvest, etc., all before then speculating how, if at all, those hypothetical unknown operations were impacted by the Spill. Plaintiff has adduced no evidence to show if, when, and how it would overcome threshold regulatory and financing contingencies, and there are no comparable commercial aquaculture operations in the Gulf. This speculation prevents calculation of Plaintiffs' alleged lost profits to a reasonable certainty.

*First*, as discussed above, *see supra* I.A.2, even if Plaintiffs could have operated in federal waters without further authorization (they could not), they admit they would have to speculate as to what would have happened if they had attempted to start commercial operations without NOAA's blessing. *See* SOF ¶ 29. This speculation precludes lost profits. *See Fredonia Farms*, 2014 WL 3573723, at *3 n.2, 8, 11 n.7; *Alphamed*, 432 F. Supp. 2d at 1344–45, 49.

*Second*, in Plaintiffs' own words, the aquaculture project "could not be built without additional financing from one source or another." SOF ¶ 30; *see supra* I.A.3. Yet, Plaintiffs could not name any future investors who would have been willing to invest in the project as of the Spill. *See* SOF ¶ 46. Lack of financing alone also makes Plaintiffs' damages impermissibly speculative because it is impossible to know whether, when, or from whom Plaintiffs would have obtained the necessary funding. *See, e.g.*, *Grand Acadian*, 2010 WL 1053701, at *3 (holding lost profits were "too remote and speculative to be proven with reasonable certainty" because "it is clear that [plaintiff] had not obtained any financing for its RV park").

*Third*, Plaintiffs warned potential investors about several **additional** contingencies to profitability in the 2008 Techs Loanstar PPM, including: "our ability to control costs associated

with the production and commercialization of BioMarine's finfish product candidates;" "the market acceptance of BioMarine's finfish product candidates;" "our ability to enter into agreements for the distribution of BioMarine's finfish product candidates on acceptable terms;" "developments with respect to state and federal regulatory matters;" "our ability to attract key personnel to assist in the development, production, sales and marketing of BioMarine's products;" "on-going adverse economic conditions, economic uncertainties, recent and possible future terrorist activities and other geopolitical instability;" "on-going climate and weather uncertainties, including, but not limited to, hurricanes, and other geological instability;" and "a contraction of the market for farmed fish." SOF ¶ 35. The PPM explained that "the projected results are dependent on the successful implementation of management's strategies, ***but are subject to events over which we have little or no control***[.]" *Id.* ¶ 36 (emphasis added). Plaintiffs therefore advised potential investors that "[t]he Shares offered hereby are ***highly speculative***, involve a ***high degree of risk*** and immediate dilution, and should be purchased only by persons who can ***afford the loss of their entire investment***." *Id.* (emphases added). *See Youtoo Media,* 754 F. App'x at 255 (requiring "more reliable indicators of profitability" than projections presented to investors and finding "[t]he 'evidence' of lost profits was speculative").

**Fourth**, any damages calculation would be impermissibly speculative because there are no comparable commercial aquaculture companies in the Gulf. *See* SOF ¶ 2; *Peaker Energy Grp., LLC v. Cargill, Inc.,* No. 14-2106, 2016 WL 7491851, at *1 (E.D. La. Dec. 30, 2016), *aff'd sub nom. Peaker Energy Grp., L.L.C. v. Cargill, Inc.*, 706 F. App'x 191 (5th Cir. 2017) (denying lost profits as speculative, including because plaintiffs were "brand-new business entities, without well-established track records" and "the first entities to develop" the facility type envisioned).

**Fifth,** Plaintiffs' history of failure shows it was highly unlikely they would have suddenly become operational, let alone profitable.  Courts are rightfully suspicious of new ventures without established track records claiming lost profits for an alleged multi-million dollar business.  *See Youtoo Media*, 754 F. App'x 246 at 255 (affirming denial of lost profits where business "was a new venture with no history of profitability" that had to "rely in large part on hoped for partnerships, and speculation about the profits those agreements would generate").  Here, Plaintiffs' venture suffered a series of failures, culminating in suspension of BioMarine's activities in late 2008 and Gulf Marine's wind-down of several laboratories.  *See* SOF ¶¶ 44, 56. Many of Plaintiffs' largest assets, including the Texas platform, were intended for the Texas Project and not usable at the FlorAbama site.  *See id.* ¶¶ 14–15.  By the beginning of 2010, Plaintiffs' financing attempts had failed and they had no money left for the FlorAbama Project: BioMarine had just ███ in cash on hand, and Gulf Marine had ███.  *Id.* ¶¶ 32, 39, 45.  This poor track record cannot support an inference that Plaintiffs would have launched a highly lucrative, first-of-its-kind business.  To the contrary, the irrefutable facts show a historically unprofitable venture with a surfeit of potential pitfalls and no clear path to becoming operational.

Plaintiffs' long-standing failure to develop an aquaculture business, the speculative nature of their startup, the unpredictability of an "infant industry," and the critical regulatory, financing, and countless operational contingencies prevent calculation of lost profits to a reasonable certainty.  In *Fredonia Farms*, the plaintiffs sought lost profits under OPA and state law for a startup after an oil spill contaminated a property intended for a vineyard.  *Fredonia Farms*, 2014 WL 3573723, at *1.  There, the court rejected lost profits, finding them too speculative as a matter of law because the business did not yet exist.  *Id.* at *3 n.2, 11 n.7 (analysis finding lost profits speculative applied to and barred plaintiff's OPA § 2702(b)(2)(E)

claim).  The Court held there was "little evidence that the [development] would have ever gotten off the ground, let alone been a success," because the plaintiffs had "not obtained necessary permits, begun construction, planted a single grape, or made a single sale."  *Id.* at *8.  Similarly, the *Alphamed* court held that a plaintiff could not recover lost profits where several unproven assumptions were required to conclude that its business would have been profitable.  432 F. Supp. 2d at 1347–48.  The court stressed: "[t]o prove this lost profits theory, [plaintiff] locked itself into proving to a reasonable certainty that [defendant's] investment of $750,000-$1.5 million was the ***single missing ingredient*** in an otherwise profitable strategy."  *Id.* at 1345 (emphasis added).  Here, Plaintiffs ask this Court to assume the Spill was the single ingredient that spoiled their otherwise profitable strategy in a project that had not been authorized, financed, built, or put to market, and to assume that all outstanding contingencies would have resolved in their favor.  This contention itself "injects an intolerable level of uncertainty into calculating damages."  *Nycal*, 106 Fed. Cl. at 247.[5]

### 3. Gulf Marine Did Not Have a Cognizable Financial Stake in the FlorAbama Project.

The undisputed record shows that Gulf Marine had no legally cognizable stake in the FlorAbama Project that would entitle it to lost profits under OPA. *See* SOF ¶¶ 66–69.  Plaintiffs contend that Gulf Marine owned shares of BioMarine.  *See* Terteryan Decl. Ex. B, 79:22–80:3. But, as a matter of law, Gulf Marine cannot recover any alleged diminution of value of those shares because any losses are unrealized and therefore speculative.  *In re Deepwater Horizon*, 902 F. Supp. 2d at 816 (damages for "***unrealized*** diminution" of value are speculative) (emphasis in original).   Gulf Marine also alleges that it would have received 2.5% of

---

[5]   Indeed, given the numerous obstacles facing Plaintiffs' business and the assumptions required for its profitability, no expert could reliably calculate lost profits to a reasonable certainty based on the record.  It is therefore unsurprising that Plaintiffs chose not to produce a damages report in connection with PTO 69.

BioMarine's gross sales "in perpetuity" based on an unmemorialized "understanding."  *See* SOF ¶¶ 65, 66.  However, this alleged "understanding" is an unenforceable oral agreement intended to last for more than a year.  *See, e.g.*, Fla. Stat. § 725.01; *All Brand Imps., Inc. v. Tampa Crown Distribs., Inc.*, 864 F.2d 748, 750–51 (11th Cir. 1989) (oral contract intended to be "perpetual" but that was terminable for cause within one year did not satisfy statue of frauds); Tex. Bus. & Com. Code Ann. § 26.01(b)(6); *Barrand, Inc. v. Whataburger, Inc.*, 214 S.W.3d 122, 141 (Tex. App. 2006) (oral agreement with "permanent" obligations violated statute of frauds).  Thus, Gulf Marine cannot show a cognizable interest in the FlorAbama Project entitling it to any lost profits.

### C.    Plaintiffs Cannot Recover Punitive Damages Under OPA.

As this Court has previously ruled, "punitive damages are not available under OPA[.]"  *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, 808 F. Supp. 2d 943, 962 (E.D. La. 2011).

## II.    PLAINTIFFS' MARITIME LAW CLAIMS FAIL AS A MATTER OF LAW.

Maritime claims can only be asserted by those with physical damage to a proprietary interest.  *In re Deepwater Horizon*, 784 F.3d 1019, 1025 (5th Cir. 2015) ("*Robins Dry Dock* bars recovery for economic damages absent physical injury to a plaintiff's proprietary interest.").  Yet, Plaintiffs admit they did not "own or otherwise hold a proprietary interest in property that was physically damaged by oil" from the Spill or "work as a commercial fisherman in or near the Gulf of Mexico."   PTO 64 Sworn Statement Regarding General Maritime Law Claims (B1 Claims) by BioMarine (Rec. Doc. 22583) ("BIOM PTO 64 Statement") and PTO 64 Sworn Statement Regarding General Maritime Law Claims (B1 Claims) by Gulf Marine (Rec. Doc. 22584) ("GMIT PTO 64 Statement") at 1; SOF ¶¶ 10–11.  To the extent courts have recognized a narrow commercial fisherman exception to *Robins Dry Dock*, that exception does not apply to those who engaged in commercial fishing without the required licenses or to seafood enterprises

not actually engaged in fishing.  *See State of La. ex rel. Guste v. M/V Testbank*, 524 F. Supp. 1170, 1174 (E.D. La. 1981), *aff'd*, 728 F.2d 748 (5th Cir. 1984); *Golnoy Barge Co. v. M/T Shinoussa*, 841 F. Supp. 783, 785 (S.D. Tex. 1993) (Claimants not licensed for commercial fishing "were not exercising a 'public right.' To the contrary, without the necessary licenses, they simply had no right to fish.") (rejecting claim for "economic benefits that [claimants] had no right to obtain in the first place").  Plaintiffs did not hold any commercial fishing permits and had never put any equipment into the water.  SOF ¶¶ 10, 11.  Thus, to the extent not displaced because they are addressed in OPA, *see In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, MDL 2179, 2020 WL 6381138 (E.D. La. Oct. 26, 2020), Plaintiffs' maritime law claims for economic losses are barred by *Robins Dry Dock*.  And, because Plaintiffs cannot prove claims under maritime law, they also cannot recover for punitive damages thereunder.

## III.   PLAINTIFFS' STATE LAW CLAIMS FAIL AS A MATTER OF LAW.

Plaintiffs' state law claims, if any, appear to be for lost profits, which are addressed in and therefore preempted by OPA.  *In re Deepwater Horizon*, 808 F. Supp. 2d at 958.

## IV.   CONCLUSION

Plaintiffs' self-serving, unsupported statements that their venture would have been successful do not create a genuine issue of material fact regarding their claims.  After 20 years of failed efforts, Plaintiffs had no money and lacked authorization to operate, all before the Spill. After the Spill, Ericsson himself called off the project, which had been dormant for years.  These facts further confirm the impermissibly speculative nature of Plaintiffs' damage claims.  No reasonable jury could find for Plaintiffs on their OPA lost profits or other claims on this record.

April 29, 2021

Respectfully submitted,

*/s/ Devin C. Reid*

R. Keith Jarrett (Bar # 16984)
Devin C. Reid (Bar # 32645)
**LISKOW & LEWIS**
One Shell Square
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone: (504) 581-7979
Fax No. (504) 556-4108

Matthew T. Regan, P.C.
(matthew.regan@kirkland.com)
Kristopher S. Ritter
(kristopher.ritter@kirkland.com)
**KIRKLAND & ELLIS LLP**
300 North LaSalle
Chicago, IL 60654
Telephone:  (312) 862-2000

Christopher W. Keegan
(chris.keegan@kirkland.com)
Ashley Littlefield
(ashley.littlefield@kirkland.com)
Anna Terteryan
(anna.terteryan@kirkland.com)
**KIRKLAND & ELLIS LLP**
555 California Street
San Francisco, CA 94104
Telephone: (415) 439-1400

*Attorneys for BP America Production Company*
*and BP Exploration & Production Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing **BP's Memorandum in Support of Its Motion for Summary Judgment** has been served on All Counsel by electronically uploading the same to File & ServeXpress in accordance with Pretrial Order No. 12, as amended, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 29th day of April, 2021.

*/s/ Devin C. Reid*

Devin C. Reid
