# Exhibit A

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF LOUISIANA
 2
    In Re: Oil Spill by the    §
 3  Oil Rig "Deepwater         §   MDL NO. 2179
    Horizon" in the Gulf of    §
 4  Mexico on April 20,        §   SECTION J
    2010                       §
 5  _____ §   JUDGE BARBIER
                               §
 6  GULF MARINE INSTITUTE      §   MAGISTRATE JUDGE
    OF TECHNOLOGY AND          §   CURRAULT
 7  BIOMARINE TECHNOLOGIES,    §
    INC.                       §
 8                             §
                 Plaintiffs    §
 9                             §
    VS.                        §   Case No. 13-cv-01286
10                             §
    BP EXPLORATION AND         §
11  PRODUCTION, INC., ET       §
    AL.                        §
12                             §
                 Defendants    §
13  _____ §

14

15

16           REMOTE VIDEOTAPED DEPOSITION OF

17                  JOHN D. ERICSSON

18               Gulf Breeze, Florida

19           Thursday, February 18, 2021

20

21

22

23   Reported by:

24   MICHEAL A. JOHNSON, RDR, CRR

25   JOB NO. 189253
```

```
 1              J. ERICSSON - 2/18/2021
 2                  JOHN D. ERICSSON,
 3   called as a witness, having been duly sworn, was
 4   examined and testified as follows:
 5                      EXAMINATION
 6   BY MR. REGAN:
 7        Q.   Good morning.  Could you please state
 8   and spell your full name.
 9        A.   John D. Ericsson, J-o-h-n, D.,
10   E-r-i-c-s-s-o-n.
11        Q.   And what is your current address,
12   Mr. Ericsson?
13        A.   █████████████████████  Gulf Breeze,
14   Florida.
15        Q.   Mr. Ericsson, you understand today
16   we'll be taking your deposition in your individual
17   capacity with respect to your relationships with
18   BioMarine Technologies and Gulf Marine Institute
19   of Technology.  Do you have that understanding?
20        A.   Yes.
21        Q.   All right.  I will use the shorter
22   words of BioMarine and Gulf Marine.  Is that
23   acceptable to you when we discuss those entities?
24        A.   Yes.
25        Q.   If I ask you a question today that you
```

1                    J. ERICSSON - 2/18/2021

2          A.    Yes.

3          Q.    I'd like to direct you, and I will

4    make this as large as possible, on the third page

5    of the document there is a quote that states, "The

6    exhaustive permitting process with state and

7    federal agencies and the lack of interest by other

8    established foreign seafood producers to enter the

9    heavily litigious US business world makes

10   investment in Gulf of Mexico fish farming

11   speculative."

12              Mr. Ericsson, is that a quote from

13   you?

14         A.    Looks like it.

15         Q.    It further says, "The US legal system

16   can strike down any existing or proposed fish

17   farming operation by some unfriendly person or

18   organization filing a lawsuit."

19              Is that also a quote by you?

20         A.    Yes.

21         Q.    Did you make both of those statements

22   that we see here in this article?

23         A.    Yes.

24         Q.    And did you authorize them to be

25   posted on the Gulf Marine website?

1                J. ERICSSON - 2/18/2021

2    this as large as possible.  On the first page of

3    the Gulf Marine website, does it say, "The US

4    seafood farming industry is completely

5    underdeveloped in the Gulf of Mexico and elsewhere

6    due to lack of investment opportunities and

7    matching federal funding.  GMIT and BioMarine have

8    spent millions and decades of efforts with many

9    individual, corporate, federal supporters in

10   developing technology permitted sites to launch

11   the billion dollar potential of a yet infant

12   industry called 'Gulf offshore mariculture.'"

13             Have I read that correctly?

14        A.   Yes.

15        Q.   And is it fair to say, Mr. Ericsson,

16   that even today, February 18th, 2021, Gulf Marine

17   would describe gulf shore mariculture as an infant

18   industry?

19        A.   Yes, I would.

20        Q.   Would you agree with me that there is

21   not a single entity operating a commercial

22   aquaculture facility in the Gulf of Mexico today?

23        A.   To the best of my knowledge.

24        Q.   And that's been true for the last

25   20 years, correct?

1              J. ERICSSON - 2/18/2021

2        A.    There have been small efforts in

3   developing technologies for offshore sea farming,

4   but not -- nothing in the magnitude of our

5   project.

6        Q.    Can you identify a single commercially

7   profitable effort of commercial -- of aquaculture

8   in the Gulf of Mexico ever?

9        A.    In the Gulf of Mexico?  Again, there

10  have been some small efforts made with redfish

11  and, again, fledging technologies, but nothing on

12  the scale of our project.

13       Q.    Mr. Ericsson, can you identify a

14  single commercially profitable effort of

15  aquaculture in the Gulf of Mexico?

16       A.    I don't recall any, to the best of my

17  knowledge.

18       Q.    And that's been true for the last at

19  least three decades, correct?

20       A.    In the Gulf of Mexico, correct.  There

21  have been other successful ventures in other

22  places in the Gulf of Mexico.

23       Q.    Mr. Ericsson, on behalf of Gulf

24  Marine, you're familiar with how Gulf Marine --

25  let me strike that.

```
1                   J. ERICSSON - 2/18/2021

2                   You're familiar with Gulf Marine's

3    sources of income, correct?

4         A.   Yes.

5         Q.   And Gulf Marine's source -- primary

6    source of income was grants, correct?

7         A.   Partially, yes.

8         Q.   Well, what were the other sources of

9    income for Gulf Marine other than grants?

10        A.   We received a $1.3 million donation

11   from Seagull Energy when we took over the Gulf of

12   Mexico platforms in Texas.

13        Q.   Other than the Texas platform, which I

14   understand is not part of this lawsuit, correct?

15        A.   That's correct.

16        Q.   Okay.  Other than the Texas platform

17   and grants, can you identify any other sources of

18   income for Gulf Marine Institute of Technology?

19        A.   Revenue -- National Institute of

20   Health.

21        Q.   So the National Institute of Health

22   had grants that it provided to GMIT or Gulf

23   Marine, correct?

24        A.   Correct.

25        Q.   Those were the largest grants that
```

```
 1                  J. ERICSSON - 2/18/2021
 2   GMIT received, correct?
 3        A.   Yes.
 4        Q.   Can you identify any grants that GMIT
 5   received that were larger than the NIH grants?
 6        A.   No.  Other than the $1.3 million.
 7        Q.   You're talking about the platform in
 8   Texas again; is that correct?
 9        A.   You asked about revenues larger than
10   NIH, 1.3 million from the Texas transaction.
11        Q.   For clarity, Mr. Ericsson, we can
12   agree that the largest grants received by GMIT
13   were from NIH, correct?
14        A.   Correct.
15             MR. KRELLER:  John, try to look at the
16   screen --
17             THE WITNESS:  This one?
18             MR. KRELLER:  -- when referring to
19   documents, yes, so you're facing Matt.
20             THE WITNESS:  Okay.
21   BY MR. REGAN:
22        Q.   I'm going to skip Exhibit 3 for now
23   and I'm going to post in the chat Exhibit No. 4.
24   I'm going to now share that.
25
```

Page 15

1                    J. ERICSSON - 2/18/2021

2          A.    According to my accountants, correct.

3          Q.    That was based on your signature,

4     right?

5          A.    Correct.

6          Q.    I'm going to turn to the 19th page of

7     the return.  You see a Schedule O?

8          A.    Yes.

9          Q.    And it states here on Schedule O, "The

10    BP oil spill in the Gulf of Mexico on 4-20-11

11    caused a stop to research.  BP has paid $204,800

12    in 2010 to replace the federal grant that was

13    withdrawn since the research could not proceed."

14             Did I read that correctly?

15         A.    Yes.

16         Q.    Now, you're referring to the oil spill

17    on April 20th, 2010, correct?

18         A.    Yes.

19         Q.    And the grant that's referred to that

20    is being replaced by the 204,800, that's the NIH

21    grant, correct?

22         A.    Yes.

23         Q.    And you state in this tax return that

24    the BP oil spill caused a stop to research.

25    You're saying a stop to the NIH research, correct?

1               J. ERICSSON - 2/18/2021

2   correct?

3        A.   I'm trying to remember.  That was

4   in --

5            MR. KRELLER:  Object to the form of

6   the question.  I don't think you were very clear.

7   You just said 2019, which is two years ago.  I

8   think you meant 2009.

9   BY MR. REGAN:

10       Q.   Mr. Ericsson, you knew that the NIH

11  grants that had been received by GMIT were being

12  phased out prior to the oil spill, correct?

13       A.   Yes.

14       Q.   This number of 38,638, which you

15  claimed as monthly losses, was based on grant

16  money from the NIH that was not coming to GMIT

17  even before the spill, correct?

18       A.   Yes, in part.

19       Q.   So it was not true to say that you had

20  lost that NIH grant because of the spill?

21           MR. KRELLER:  Object to the form.

22           You can answer.

23           THE WITNESS:  Beg your pardon?

24           MR. KRELLER:  You can answer.

25       A.   Rephrase that, please.

1                    J. ERICSSON - 2/18/2021

2        A.    Right.  So what's the question?

3        Q.    Did you personally execute a quitclaim

4   deed to acquire 5622 South Ada, a townhouse in

5   Chicago, from GMIT?

6        A.    Well, they say I do.  I don't recall

7   the transaction exactly.  We're -- you know, GMIT

8   invested in properties that my son was involved in

9   as an investment, and in the handling of the --

10  taking down of the properties and reselling them,

11  various transactions were made according to the

12  title company and the firm that was handling

13  Justin's business.  So it was a move title.

14       Q.    So as you sit here today,

15  Mr. Ericsson, do you know if you purchased

16  residential property from GMIT?

17       A.    Again, I don't recall this particular

18  situation.  I think it was in regards to somehow

19  clearing up the title and the transfer of the

20  property to a third-party investor.

21       Q.    I'm going back to the depreciation

22  schedule.  It lists Stewart Property of

23  November 12th, 2010, with a basis of 69,895.

24  What's the Stewart Property, Mr. Ericsson?

25       A.    It was another property in Chicago

1                    J. ERICSSON - 2/18/2021

2    that GMIT invested in.

3         Q.    Those properties, Ada and Stewart,

4    were purchased in November of 2010; is that right?

5         A.    Looks like it.

6         Q.    And those properties were purchased

7    with funds received from the GCCF in October of

8    2010, the $200,000, correct?

9         A.    I don't recall.

10             MR. KRELLER:   Object to the form.   I

11    think that's pure speculation.

12    BY MR. REGAN:

13        Q.    Do you know where GMIT received the

14    funds to purchase the Ada Property and the Stewart

15    Property in November of 2010?

16        A.    I don't recall.   It was money -- by

17    the way, the numbers that are shown here are not

18    the investment basis that I recall.   I don't know

19    what the numbers were for tax purposes.   I don't

20    know how they did that, whether it was based on

21    the sale price or what exactly the basis was.

22        Q.    For purposes of your damages that

23    you're claiming in this lawsuit, Mr. Ericsson, do

24    you believe the Ada Property and the Stewart

25    Property are assets owned by GMIT that would

1                J. ERICSSON - 2/18/2021

2    to do with the project that BioMarine was

3    intending to operate in the Florida-Alabama or

4    FlorAbama region, correct?

5             MR. KRELLER:  Object to the form of

6    the question.  You're reviewing Gulf Marine

7    Institute of Technology tax returns and you're

8    asking -- your question's asking him about

9    BioMarine.  So I just ask that you make clear what

10   you're asking him about.

11   BY MR. REGAN:

12        Q.   Let me try it this way.  Does that

13   production platform listed on this depreciation

14   schedule have anything to do with the project in

15   the Florida-Alabama region?

16        A.   No.

17        Q.   Would you view that production

18   platform as an asset that would be of use in the

19   Florida and Alabama operation?

20        A.   No.

21        Q.   All right.  In connection with seeking

22   prospective investors, it was necessary for

23   BioMarine to develop audited financial statements,

24   correct?

25        A.   Yes.

1              J. ERICSSON - 2/18/2021

2        Q.   And that was done in the 2007 time

3   period, correct?

4        A.   Best of my recollection.

5              (Deposition Exhibit 10 marked for

6   identification.)

7   BY MR. REGAN:

8        Q.   I have marked as Exhibit No. 10 and

9   placed in the chat an excerpt that starts -- it's

10  actually from a filing made by BioMarine and Gulf

11  Marine on April 11th, 2018.  I believe it's the

12  PTO 65 filing.  The first page of which says,

13  Audited Financials Inception to September 2007.

14  Do you see that?

15       A.   It's BioMarine's audited financials.

16            MR. KRELLER:  Yeah, Matt, I just want

17  to make clear that any examination or questions

18  relative to PTO 65, I'm going to lodge a standing

19  objection because that PTO was prepared for

20  settlement purposes.  So with that objection, you

21  can ask him whatever you want to ask him.

22  BY MR. REGAN:

23       Q.   Can we agree, Mr. Ericsson, that what

24  I've marked as Exhibit 10, which is Audited

25  Financials Inception to September 2007, was

```
1                    J. ERICSSON - 2/18/2021

2     prepared in 2007 for prospective investors?

3          A.    Yes.

4          Q.    On page 2, the financial statements

5     are for BioMarine Technologies, correct?

6          A.    Yes.

7          Q.    And it's financial statements for the

8     years ended 2005, 2006 and the nine months ended

9     September 30, 2007, correct?

10         A.    Yes.

11         Q.    Do you see under BioMarine

12    Technologies, Inc. it says, "A Development Stage

13    Enterprise"?

14         A.    Yes.

15         Q.    Are you familiar with the definition

16    of development stage enterprise?

17         A.    Yes.

18         Q.    And that's a definition under a

19    statement of financial accounting standards,

20    correct?

21         A.    I believe so.  I'm not an accountant.

22         Q.    I'm going to go -- turn now to the

23    fourth page.  Do you see there is an independent

24    auditors' report?

25         A.    Looks familiar.
```

1                    J. ERICSSON - 2/18/2021

2    with a United States private placement memorandum?

3         A.   Again, I don't recall.  I don't think

4    there's any money raised regarding the firms in

5    New York City that were the venture capital group

6    that we were working with.

7         Q.   So with respect to the proposed

8    offerings that are identified in Note 8 to the

9    financial statements, as you sit here today,

10   Mr. Ericsson, you are not able to identify what

11   actual investment came into BioMarine from those

12   proposed offerings, correct?

13        A.   Well, again, I don't recall.  It seems

14   like there was a little -- a little raise.  The

15   October -- in October 2001, this application was

16   withdrawn and that was because of the 9/11 event

17   in New York City.  The event that -- in Europe, it

18   was put in suspension, as well as in the venture

19   capital in New York, until the economic chaos

20   result that was during 2008 and '9 had been

21   recovered.

22        Q.   So, Mr. Ericsson, in fairness, I'm not

23   asking for why there wasn't any investment.  My

24   question is, can you identify for the Court and

25   the ladies and gentlemen of the jury what amount

1                    J. ERICSSON - 2/18/2021

2    having access to the platforms.

3         Q.    And, Mr. Ericsson, with no access to

4    the platform, BioMarine had no ability to actually

5    go forward with that project, correct?

6         A.    That's correct.

7         Q.    And that took place in February of

8    2008, correct?

9         A.    Yes.

10        Q.    And it was after losing that lawsuit

11   that you, with BioMarine, decided to change your

12   focus with investors towards the Florida-Alabama

13   project, correct?

14        A.    That's correct.

15        Q.    It's accurate to say that if BioMarine

16   had been able to continue in Texas, that was its

17   first choice?

18        A.    Yes.

19        Q.    So the Florida-Alabama project was the

20   second choice for BioMarine until the Fifth

21   Circuit ruled that the lease was invalid, correct?

22        A.    Yes.

23        Q.    Most of the investment activities --

24   strike that.

25              Most of the development activities of

```
1                    J. ERICSSON - 2/18/2021
2    BioMarine through February of 2008 were devoted
3    towards the Texas site, correct?
4         A.   Most, I would say that's correct.
5         Q.   And BioMarine and Gulf Marine are not
6    seeking any damages in this lawsuit with respect
7    to the loss of operations in the Texas site,
8    correct?
9         A.   Correct.
10        Q.   In the same exhibit, Exhibit 10,
11   there's then a collection of what are titled
12   Unaudited Financials.  I've got the cover page up
13   and I will turn now to page 26, which is the first
14   of these -- first document behind that cover page.
15             Do you recognize these documents, the
16   cover page and then the -- I'll start with the
17   first one?
18        A.   Yes.
19        Q.   Who prepared these unaudited
20   financials?
21        A.   I believe the same -- no, that was --
22   this was done, I believe, by our local accounting
23   firm.
24        Q.   And do you know when these
25   December 2007 through December 2010 unaudited
```

1                      J. ERICSSON - 2/18/2021

2      locations like the hatchery/nursery in the area of

3      Orange Beach.  Fair?

4           A.   Well, that was a $10 million

5      hatchery/nursery proposal as designed, and we

6      would not have built the Orange Beach facility

7      until we had raised additional capital.  That was

8      all part of our business plan.

9           Q.   We can agree, Mr. Ericsson, that the

10     first part of the business plan was to raise

11     capital from investors, correct?

12          A.   I don't understand the first part.

13     Could you rephrase that?

14          Q.    Mr. Ericsson, was the business plan

15     for the Florida-Alabama site viable without

16     raising capital from outside investors?

17          A.   I would say without capital from

18     outside -- yes, that's correct.  We had investors

19     already in BioMarine, over a hundred, that had

20     funded our project for millions of dollars up

21     until, you know, the 2008 period.

22          Q.   The question, Mr. Ericsson, is do you

23     agree that the Florida-Alabama commercial

24     aquaculture project was not viable without first

25     raising additional funds from external investors?

```
 1               J. ERICSSON - 2/18/2021
 2        A.   You mean it couldn't be built, not
 3   viable, that's what you're saying?
 4        Q.   Yes.
 5        A.   Yeah, it could not be built without
 6   additional financing from one source or another.
 7   There were two efforts being made to fund that
 8   project and we developed offering memorandas -- we
 9   were developing the offering memorandas to do
10   that.
11        Q.   And as of April 19th, 2010, the day
12   before the oil spill in the Gulf of Mexico,
13   neither BioMarine nor Gulf Marine had received any
14   investment funds or capital in connection with
15   those financing efforts, correct?
16        A.   You said with those financial efforts.
17   Which ones are you talking about?
18        Q.   The New York PPM, the European PPM,
19   any of them.
20        A.   From the New York and the European,
21   yes.
22        Q.   Yes, you had not received any
23   financing or investment from those efforts as of
24   April 19th, 2010, correct?
25        A.   That's correct.
```

1      J. ERICSSON - 2/18/2021

2  interest in the project?

3          MR. KRELLER:  Object to the form of

4  the question.  Totally mischaracterizes this

5  witness's testimony.

6  BY MR. REGAN:

7      Q.   So let me ask it this way,

8  Mr. Ericsson, to cure the objection.  Can you

9  identify for me a single nonrelated party that

10  told you it no longer had investment interest in

11  either BioMarine or Gulf Marine's FlorAbama

12  aquaculture business after the spill?

13      A.   Well, you're taking the question in

14  the inverse order of how it actually occurred.

15      Q.   Can you answer my question,

16  Mr. Ericsson?

17      A.   Again, I -- I put the information out

18  to the people involved that we had a serious

19  problem going forward.  I more or less

20  extinguished going forward until -- any funding in

21  this project after this spill, this disaster,

22  because of the contaminated waters that were

23  created by this blowout.

24      Q.   So, Mr. Ericsson, after you

25  extinguished the investment prospects for this

1          J. ERICSSON - 2/18/2021

2        A.    There was an effort to rekindle the

3    interest in the project after the economic

4    recession was over, but the BP blowout prevented

5    that from going further.

6        Q.    Mr. Ericsson, I apologize, but that's

7    not my question.  Can you identify a single

8    investor who told you they were no longer

9    interested in investing in the FlorAbama

10   aquaculture business project because of the oil

11   spill, yes or no?

12            MR. KRELLER:  Objection, asked,

13   answered.

14            You can answer it again to the extent

15   that you can.

16       A.    I am saying that I called off any

17   investments in our projects because of the

18   disaster created by the oil spill and therefore

19   there were no outside investors who had interest.

20   I basically kicked it to the curb.

21   BY MR. REGAN:

22       Q.    And having kicked it to the curb,

23   Mr. Ericsson, the Florida-Alabama aquaculture

24   business, there was no point in time after you

25   kicked it to the curb where an investor told you,

```
 1                 J. ERICSSON - 2/18/2021
 2   I will not invest in this project because of the
 3   oil spill?
 4        A.   I had conversations with investment
 5   bankers who were raising the capital and getting
 6   the interest of investors, which I informed
 7   appropriately that at the time of the disaster and
 8   going forward, the environment was contaminated
 9   and there was no point in raising capital until
10   that area -- until that cleared itself up.
11        Q.   So can you --
12        A.   I stopped the -- any investor from
13   coming forward that these investment bankers may
14   have been talking to about it.
15        Q.   And that was your decision,
16   Mr. Ericsson, correct?
17        A.   Absolutely.  I have a fiduciary
18   responsibility about informing the investors or
19   potential investors of the risks associated with
20   making an investment.
21        Q.   Mr. Ericsson, in that fiduciary
22   responsibility, did you ever inform any potential
23   investor that NOAA had declined to grant BioMarine
24   and Gulf Marine an EFP permit for the FlorAbama
25   project?
```

1          J. ERICSSON - 2/18/2021

2  Florida-Alabama region in the water?

3       A.   Would you rephrase that question?

4       Q.   Sure.  Was there any point in time

5  after May of 2008, when either BioMarine or Gulf

6  Marine actually attempted to start its commercial

7  operations in the water for the FlorAbama project?

8       A.   We were raising -- we were -- we were

9  waiting and working on raising additional capital

10  in 2008 to launch the commercial project off

11  Florida Bama.

12       Q.   And were you -- was there ever a point

13  in time when you actually entered the water at

14  that location to start --

15       A.   Not with our equipment.  It was on --

16  in storage waiting additional capital raise.

17       Q.   So is it fair to say that it is

18  unclear what would have happened if you would have

19  attempted to start your commercial operation in

20  the water after NMFS and NOAA declined to give you

21  an EFP for that operation, correct?

22          MR. KRELLER:  Object to the form.

23       A.   I think that's speculative.

24  BY MR. REGAN:

25       Q.   We would have to speculate as to what

1                     J. ERICSSON - 2/18/2021

2    these federal agencies, I don't know.

3         Q.   We would have to speculate as to what

4    the federal agencies would have done if you had

5    tried to actually start operations, correct?

6         A.   You may.

7         Q.   Showing you what I've marked as -- let

8    me redo that because it needs to be 15.

9                   (Deposition Exhibit 15 marked for

10   identification.)

11   BY MR. REGAN:

12        Q.   I'm putting in the chat what I've

13   marked as Exhibit No. 15.  Do you recognize

14   Exhibit 15, Mr. Ericsson, as the final

15   January 2009 report, which is the Fishery

16   Management Plan for Regulating Offshore Marine

17   Aquaculture in the Gulf of Mexico?

18        A.   Yes.  I mean, I recognize this sheet.

19             MR. KRELLER:  Matt, can you identify

20   the Bates range for this?

21             MR. REGAN:  It's a public document.

22             MR. KRELLER:  Again, you haven't

23   produced this in this case?

24             MR. REGAN:  It's on the Internet, but,

25   yeah, it's a public document.

```
 1                  J. ERICSSON - 2/18/2021
 2   this all into the record, Dr. Ericsson, why don't
 3   you -- Mr. Ericsson, why don't you just read the
 4   entire paragraph and then I have a question for
 5   you.
 6        A.   I've lost the right-hand side.  Can
 7   you move it to the left?
 8             (Witness reviews document.)
 9        A.   Okay.
10   BY MR. REGAN:
11        Q.   Mr. Ericsson, is it true that
12   BioMarine Technologies applied for an EFP for its
13   Florida-Alabama project on or about April of 2008?
14        A.   Yes.
15        Q.   Is it true, Mr. Ericsson, that on or
16   about June 3rd, 2008, NMFS notified Dr. Lee and
17   BioMarine Technologies that the application had
18   been rejected?
19        A.   Appears so.
20        Q.   Are you -- have you seen the actual
21   letter from NMFS rejecting the EFP, Mr. Ericsson?
22        A.   I believe I have.
23        Q.   Did you produce it in this litigation?
24        A.   I don't recall who did it.
25        Q.   Was there any point in time when you
```

1          J. ERICSSON - 2/18/2021

2          THE VIDEOGRAPHER:   The time is

3    1:21 p.m., and we are back on the record.

4    BY MR. REGAN:

5          Q.   Mr. Ericsson, as of April 20th, 2010,

6    what permits did BioMarine and Gulf Marine have

7    for the FlorAbama site?

8          A.   We had Section 10 permitting from the

9    Army Corps of Engineers Mobile District and the

10   MPDS permits from the EPA out of Atlanta.

11         Q.   Any others?

12         A.   Well, there was some other permits

13   that we'd have to obtain as far as the vessels

14   that would be involved and the operations,

15   et cetera, but nothing of any major consequence.

16         Q.   Those additional permits might be

17   required by th US Coast Guard?

18         A.   The Coast Guard had already addressed

19   the permit and those concerns were addressed.

20         Q.   And as of April of 2010, when did the

21   US Army Corps of Engineers and EPA permits expire?

22         A.   2013.

23         Q.   Did BioMarine or Gulf Marine attempt

24   to amend or extend those permits?

25         A.   We did extend it.

1               J. ERICSSON - 2/18/2021

2   that contaminated the region.

3          Q.   Because you didn't commence to attempt

4   any operations, we would have to speculate as to

5   what the regulator would have done?

6          A.   Correct.

7          Q.   From a marketing standpoint, what do

8   you mean by marketing speaking, with respect to

9   starting --

10         A.   Well, the public perception -- the

11  public perception of fish taken within the area of

12  this devastated part of the Gulf was they didn't

13  want to eat the fish.  They were concerned about

14  what was in the fish and the market for finfish in

15  the area substantially collapsed.

16         Q.   What about that, what you just said,

17  had any impact on BioMarine and Gulf Marine?

18         A.   I don't understand the question.

19         Q.   Sure.  Well, as of -- from April of

20  2010 until today, neither BioMarine nor Gulf

21  Marine ever offered a -- any type of fish to the

22  public for consumption, correct?

23         A.   No, we have not.

24         Q.   So public perceptions about fish in

25  the Gulf of Mexico, given that you were not

1                      J. ERICSSON - 2/18/2021

2    BY MR. REGAN:

3         Q.   I'm sharing an exhibit marked as

4    Exhibit 18, which is -- starts with Bates number

5    BIOM-GMIT 2776.  It's dated EVW draft 5/15/08 with

6    a title Techs Loanstar, Incorporated.  Do you

7    recognize this, Mr. Ericsson?

8         A.   Yes.

9         Q.   What is it?

10        A.   It's a draft of an offering memoranda

11   that was being prepared by Eaton & Van Winkle in

12   New York City, our securities law firm.

13        Q.   Was this private placement memorandum,

14   or PPM, ever actually issued to potential

15   investors?

16        A.   No.

17        Q.   And whose decision was it to not issue

18   the PPM?

19        A.   Well, you mean not to complete the

20   PPM.

21        Q.   Let me ask a more clear question.

22   Were potential investors ever provided with

23   this -- what we see here as Exhibit 18, this PPM?

24        A.   I'm not aware of whether that was done

25   or not by Eaton & Van Winkle and the team that was

1                    J. ERICSSON - 2/18/2021

2    correct?

3         A.    No, it was not due to the oil spill.

4         Q.    Did you have a contact at Arjent

5    Services named Robert DePalo?

6         A.    Yes.

7         Q.    Did you work with Mr. DePalo with

8    respect to potential financing?

9         A.    Yes.

10        Q.    When was the last time you spoke with

11   Mr. DePalo?

12        A.    I would imagine it was sometime in

13   2008.

14        Q.    Have you had any dealings with Arjent

15   since 2008?

16        A.    Have not.

17        Q.    Did BioMarine pay any money to Arjent

18   with respect to its work for this potential

19   transaction?

20        A.    We only paid Eaton Van Winkle, the

21   attorneys that were negotiating the terms, that

22   Arjent and we were negotiating.

23             THE REPORTER:  Getting close to a

24   break?

25             MR. REGAN:  Happy to take one.

1          J. ERICSSON - 2/18/2021

2          MR. KRELLER:  That's fine with us.

3          THE WITNESS:  Fine.

4          MR. KRELLER:  Want to take --

5          THE VIDEOGRAPHER:  The time is

6  2:32 p.m., and we are going off the record.

7          (Recess taken from 2:32 p.m. to

8  2:47 p.m.)

9          THE VIDEOGRAPHER:  The time is

10  2:47 p.m., and we are back on the record.

11  BY MR. REGAN:

12      Q.   Mr. Ericsson, after April 20, 2010,

13  did you have any further contact with Arjent

14  securities -- or Arjent Ltd.?

15      A.   No.

16      Q.   After April 20th, 2010, did you have

17  any further interaction with -- hang on one

18  second -- Navigator?

19      A.   No, we tabled the whole issue of the

20  2008 offering because of the financial situation

21  worldwide.

22      Q.   So what I'm asking is, after

23  April 20th, 2010, did you ever reengage

24  discussions with either Arjent, Navigator or any

25  other advisors who were helping with the 2008

1              J. ERICSSON - 2/18/2021

2         Q.   Okay.  I'm just trying to make clear.

3   Were you actually meeting with and having

4   discussions with investment banking firms after

5   April 20th, 2010?

6         A.   No, there was no point in it.

7         Q.   And that's true from April 20th, 2010,

8   to today, correct?

9         A.   No, I wouldn't say that.

10        Q.   Okay.  At what point did you start to

11  have engagement with investment banking firms

12  after April 20th, 2010?

13        A.   At what point, in time?

14        Q.   Yes.

15        A.   I had conversations with people at

16  Heartstream.

17        Q.   Okay.  Any other institutions?

18        A.   They were the major one.

19        Q.   Did you direct Heartstream to go

20  solicit potential investors after April 20th,

21  2010?

22        A.   I did not.  I could not because the

23  blowout had damaged the marine environment to the

24  point that it was not logical to start any

25  commercial operations there.

1              J. ERICSSON - 2/18/2021

2    Breeze, Florida.

3         Q.   What's the ZIP code there?

4         A.   32563.

5         Q.   Can you describe that facility?

6         A.   That's a research lab.

7         Q.   How many people are employed there by

8    Gulf Marine Institute of Technology?

9         A.   In the earlier phases of the research,

10   there was three plus myself.

11        Q.   Is that location still owned by Gulf

12   Marine?

13        A.   Parts of it.

14        Q.   What happened to the other parts,

15   Mr. Ericsson?

16        A.   What do you mean, what other parts?

17        Q.   Maybe I misheard you.  Is █████

18   ███████████████████ a residential home?

19        A.   It's a residential home in the county.

20        Q.   Okay.  So is --

21        A.   With a research laboratory attached to

22   it.

23        Q.   Do you live in the home that is on

24   that property?

25        A.   I do.

```
1              J. ERICSSON - 2/18/2021
2         Q.   Is the research lab a separate
3    physical building than your domicile?
4         A.   Yes, it is.
5         Q.   What's the square footage of the
6    research facility at                        ?
7              THE WITNESS:  I need to calculate --
8              MR. KRELLER:  You need a piece of
9    paper?
10             THE WITNESS:  Yes.  What's 35 by 16?
11             MR. KRELLER:  You can just describe it
12   to him.
13        A.   One facility is 35 by 16 and the other
14   one is 20 by 12 or 14.
15   BY MR. REGAN:
16        Q.   Are those like metal buildings or
17   garages?
18        A.   One's a metal building, the other one
19   is a greenhouse.
20        Q.   And were they exclusively used by Gulf
21   Marine?
22        A.   Well, no, they were shared.
23        Q.   Earlier today you told me that there
24   was a facility in Gulf Breeze owned by Gulf Marine
25   for the raising of -- for research and development
```

1          J. ERICSSON - 2/18/2021

2   purposes in the raising of fingerlings.  Do you

3   recall that testimony?

4          A.   Yes.

5          Q.   Where is that facility located?

6          A.   That was located at 20 Daniel Drive in

7   Gulf Breeze.

8          Q.   Okay.  It's not -- it's not there

9   anymore, is it?

10          A.   No, it's not.

11          Q.   When did it -- when did that facility

12   close?

13          A.   2005.

14          Q.   That location is currently like a

15   Kentucky Fried Chicken or something like that,

16   right?

17          A.   It is actually the accessway into the

18   Publix shopping center, 20 Daniels Drive.

19          Q.   All right.  So the Gulf Breeze

20   location for research and development and the

21   raising of fingerlings closed in 2005, correct?

22          A.   That's correct.

23          Q.   So after 2005 for the FlorAbama

24   location, there was no research and development

25   location for nursery development?

```
 1                    J. ERICSSON - 2/18/2021

 2         A.    That's not true.

 3         Q.    Okay.  What was available?

 4         A.    We were doing work at UTMB in

 5   Galveston, Texas, during the time -- during the

 6   time at the end of this project going through

 7   2010.

 8         Q.    So the project at UTMB, that was being

 9   coordinated with Dr. Lee, correct?

10         A.    That's correct.

11         Q.    Dr. Lee left in 2009, right?

12         A.    Thereabouts.

13         Q.    Okay.  So as of January of 2010, Gulf

14   Marine did not have a research facility, correct?

15         A.    Well, other than the one in Gulf

16   Breeze, Florida.

17         Q.    Okay.  Let me make sure I clear this

18   up.  What research facility existed in Gulf

19   Breeze, Florida in 2010?

20         A.    The one I just described to you.

21         Q.    Could you give me the address?

22         A.    ██████████████████, Gulf Breeze,

23   Florida.

24         Q.    To summarize, Mr. Ericsson, as of

25   early 2010, GMIT had closed its facility at
```

1                    J. ERICSSON - 2/18/2021

2     20 Daniel Drive, was no longer using the research

3     facilities at UTMB, but was using the metal

4     building and greenhouse on your property; is that

5     correct?

6          A.   Yes.

7          Q.   And so for the FlorAbama project after

8     January of 2010, the metal building and greenhouse

9     on your property would have been the source for

10    research and development?

11         A.   No.

12         Q.   What other facility was available at

13    that point in time after January 2010 for research

14    and development activities?

15         A.   Other than the one I just described,

16    there was not.  We had all the equipment from the

17    cages, the feeders and et cetera in storage.  That

18    was in storage in Pensacola, Florida, all those

19    assets you had described except for the vessels.

20    The Wellcraft was stored on my property on a

21    trailer.  The research facility -- lab at ███ was

22    constructed around 2010 and shortly thereafter the

23    blowout, because the project came to an abrupt

24    halt thanks to BP's disaster.

25         Q.   We know the oil spill happened in

1          J. ERICSSON - 2/18/2021

2          A.    Could you squeeze it down a little

3     bit?  Because I need to see the left-hand side.

4     It is broken into equipment and working capital to

5     come up with those total numbers.

6          Q.    The team, including you, that

7     developed the investment costs for the FlorAbama

8     project estimated the two-year investment cost at

9     $24.5 million, correct?

10         A.    Correct.

11         Q.    Can you identify a company that has

12    operated a commercial aquaculture business in the

13    Gulf of Mexico?

14         A.    Redfish Hatchery Unlimited in Pass

15    Christian, Mississippi.

16         Q.    Is it in operation today?

17         A.    No.  It was hit by a hurricane.

18         Q.    Was it in federal waters or state

19    waters?

20         A.    It was on county land.

21         Q.    Right.  So let me ask it more

22    precisely, then.  Can you identify a company that

23    operated a commercial aquaculture business in the

24    federal waters of the Gulf of Mexico?

25         A.    I'm not aware of any.

1                J. ERICSSON - 2/18/2021

2        A.   As I said before, Gulf Marine had

3   other assets in its coffers besides what it

4   received from NIH.

5        Q.   Prior to February of 2010, in terms of

6   income, not assets, income, the majority of the

7   income, monthly income coming to GMIT, was from

8   the NIH grants, correct?

9        A.   I'd have to look into the financial

10  statements to understand that question to answer

11  it.

12       Q.   As you sit here right now, you can't

13  answer that?

14       A.   I don't recall.

15       Q.   Mr. Ericsson, did there come a point

16  in time when you solicited financing from Internet

17  crowdfunding sites for BioMarine and Gulf Marine?

18       A.   I think we did a launch on GMIT to

19  test the market.

20       Q.   When did you do that?

21       A.   I think it was in two thousand --

22  let's see.  This is '21.  2018 or '19.

23       Q.   How much money did you raise through

24  your Internet crowdfunding efforts?

25       A.   We withdrew it.  We determined that it

1                    J. ERICSSON - 2/18/2021

2    wasn't conducive for a nonprofit.  If we -- the

3    folks that participate in crowdfunding are usually

4    doing it for the purposes of a product or a

5    service and not for growing capital for a

6    nonprofit.

7         Q.   Is it fair to say that Gulf Marine did

8    not raise any money from its crowdfunding

9    campaign; is that correct?

10        A.   We got some donations.

11        Q.   Did you -- did Gulf Marine retain

12   those donations or return them?

13        A.   They were donations.

14        Q.   And as you sit here today, do you know

15   the amount, roughly, of the donations received in

16   response to your crowdfunding efforts?

17        A.   Well, this was very early on in the

18   program and I -- I think it was less than a

19   thousand dollars, at which time we decided to

20   withdraw it.

21        Q.   From April of 2010 through today,

22   outside of the roughly couple thousand dollars of

23   donations received through crowdfunding, can you

24   identify any other specific investments or

25   donations that were made into Gulf Marine?

1        J. ERICSSON - 2/18/2021

2        A.   As I said before, the intended purpose

3   at FlorAbama of putting in a sea farm was fairly

4   much abandoned after April 20th, 2010.  The

5   project was more or less dead on arrival from that

6   point on.

7        Q.   What were the primary species that you

8   were intending to raise in this commercial

9   aquaculture farm in FlorAbama?

10       A.   Cobia, amberjack, redfish, red porgy

11  were four of them that I recall.

12       Q.   Are cobia, amberjack, redfish and red

13  porgy found in the wild in the Gulf of Mexico?

14       A.   It is.

15       Q.   And do people continue to fish for

16  those species in the Gulf of Mexico today?

17       A.   They do.

18       Q.   Are you familiar with regulations that

19  were issued by NMFS and NOAA in 2016 for the

20  application for permits for aquaculture programs?

21       A.   Vaguely.

22       Q.   Did BioMarine or Gulf Marine ever

23  submit an application for a permit after the 2016

24  regulations were promulgated?

25       A.   We had discussions with National

1          J. ERICSSON - 2/18/2021

2    Marine Fishery Service about it.

3          Q.   Okay.  Did BioMarine or Gulf Marine

4    ever apply for a permit from NMFS after the

5    regulations came into effect in January 2016?

6          A.   We did not.  Didn't think it was

7    essential.

8          Q.   Were any of BioMarine or Gulf Marine's

9    properties or assets physically oiled because of

10   the spill?

11         A.   No, they weren't deployed at the time

12   of the spill.  But the 27 acres was contaminated

13   by the spill, which was our permitted site by the

14   federal government.

15         Q.   Did you own the 27 acres?

16         A.   You do not own the water column in

17   federal waters.  You get permits to use it.

18         Q.   Did your permit grant BioMarine or

19   Gulf Marine a property interest in that location?

20              MR. KRELLER:  I'm going to object to

21   the form of the question to the extent that you're

22   getting into legal questions over what rights --

23   property rights he has or doesn't have.  But to

24   the extent he can answer it as a layperson, I have

25   no problem with him answering.

1              J. ERICSSON - 2/18/2021

2        A.   The permits -- the language in the

3   permits pretty much tell you what they provide and

4   what they don't provide.

5   BY MR. REGAN:

6        Q.   Neither BioMarine or Gulf Marine was

7   engaged as a commercial fisherman at the time of

8   the oil spill in April of 2010, correct?

9        A.   We were not commercial fishermen.  We

10  were commercial sea farmers.

11       Q.   You had no --

12       A.   Engaging to do sea farming in the Gulf

13  of Mexico.

14       Q.   In April of 2010, you had no

15  commercial sea farming operations in the water,

16  correct?

17       A.   That's correct.

18       Q.   And since April of 2010, neither

19  BioMarine or Gulf Marine has had commercial sea

20  farming operations in the waters of the Gulf of

21  Mexico, correct?

22       A.   By choice.

23       Q.   You were the cause of that, correct?

24  You decided to not pursue those operations,

25  correct?

1                J. ERICSSON - 2/18/2021

2                MR. KRELLER:  Object to the form of

3     the question.

4          A.   My advisors and friends in the

5     developing mariculture industry were all concerned

6     about the spoil and the debris issues from the oil

7     spill that is involving the gulf region of our

8     permitted site and elsewhere.  So we had nothing

9     going on after the spill by choice.

10    BY MR. REGAN:

11         Q.   Do you know, Mr. Ericsson, if either

12    BioMarine or Gulf Marine is trying to allege state

13    law claims in this case?

14                MR. KRELLER:  Object to the form of

15    the question.  He's not a lawyer.

16                MR. REGAN:  I'm just asking if he

17    knows.

18         A.   I don't know what you mean by state

19    law.

20                MR. REGAN:  Why don't we take our next

21    break, if we could.

22                MR. KRELLER:  Okay.  How long do you

23    want to break?

24                MR. REGAN:  Ten-minute break would be

25    great.

1          J. ERICSSON - 2/18/2021

2    saying here is actually true, correct?

3          A.   There's no reason for me to believe

4    that it's not true.

5          Q.   The next paragraph then continues, and

6    I want to focus on the last sentence.  It says,

7    "By the fourth quarter of 2008, due to lack of

8    funds, BioMarine was forced to suspend temporarily

9    its activities in such a manner that operations

10   would be resumed when funds would be available."

11          Do you see that?

12          A.   Yeah, I see that.

13          Q.   Is that true?

14          A.   Well, not altogether.  We had a

15   separation of the ways and -- at the end of 2008.

16          Q.   Who had a separation -- who had a

17   separation of the ways?

18          A.   Well, the environment for raising

19   capital by the end of 2008 and early 2009 was not

20   very positive and we were very concerned about,

21   you know -- we didn't know how much of the

22   commitments that he had from his 12 investors, how

23   much dollars that was.  He really never -- he

24   never disclosed that information.  He just told us

25   that he had 41 that were interested and 12 that

1              J. ERICSSON - 2/18/2021

2    were, as you said in the correspondence, seemingly

3    ready to go.

4         Q.   Well, do you know if those 12 ever saw

5    a PPM for BioMarine?

6         A.   I'm pretty certain they did.

7         Q.   Do you know?

8         A.   Well, you'd have to ask Mr. Hersbach

9    on that.

10         Q.   And as you just testified,

11   Mr. Hersbach never told you any amounts of

12   investment from these 12 investors, correct?

13         A.   He never gave us any inkling of how

14   much was being discussed from any of these

15   investors.  Except for the amount of the offering

16   memoranda that was presented before them.

17         Q.   And this statement he makes, "By the

18   fourth quarter of 2008 due to the lack of funds,

19   BioMarine was forced to suspend temporarily its

20   activities in such a manner that operations would

21   be resumed when the funds would be available," do

22   you have any basis as to why he would say that?

23         A.   I just would have to dig down deeper

24   to try to understand what was going on at the end

25   of 2008.  It's been a long time since those days

1      J. ERICSSON - 2/18/2021

2  have passed.

3      Q.   Well, as you sit here today, did

4  BioMarine suspend its activities in the fourth

5  quarter of 2008?

6      A.   I just don't recall what the reason

7  for suspending activity was at the end of 2008.

8      Q.   But as a factual matter, is it true

9  that BioMarine did, in fact, suspend its

10 activities by the fourth quarter of 2008?

11     A.   Well, I think it -- that we had some

12 pause in the cause, yes.

13     Q.   And that cause --

14     A.   Because you suspend, it doesn't --

15 wasn't temporarily -- suspend temporarily its

16 activities.  It wasn't forever.

17     Q.   Okay.  So the pause that took place on

18 or about the fourth quarter of 2008, how long did

19 it last?

20     A.   Again, I don't recall what the -- what

21 was going on exactly at that time in this

22 relationship.

23     Q.   Is it fair to say that the pause that

24 took place starting in 2008 was still in effect as

25 of April of 2010?

1                J. ERICSSON - 2/18/2021

2        A.   You'd have to ask Mr. Hersbach about

3   that.  I don't recall.

4        Q.   Well, you were the person that --

5        A.   I think I -- I think I remember

6   telling you that there was a US and worldwide

7   financial crisis going on in two thousand -- end

8   of 2008 and '10, and I think that perhaps we all

9   recognized that and decided to wait until better

10  times.  But I don't -- I don't know how he said

11  this term, this one line, how he's basing that.

12  So you'll have to ask him.

13       Q.   Based on your recollection,

14  Mr. Ericsson, was BioMarine an active entity

15  between the fourth quarter of 2008 and April of

16  2010?

17       A.   BioMarine was not as active as GMIT

18  was during that period of time.  BioMarine's

19  efforts was to find new capital sources for its

20  FlorAbama project.  GMIT was heading the charge on

21  many of the other areas, as we discussed in our

22  laboratories in Gulf Breeze, as well as in

23  Galveston at the NRCC and the Moody Gardens

24  facilities, which involved, you know, growing

25  fish, raising fish, nutritional requirements of

1           J. ERICSSON - 2/18/2021

2   the fish, you know, those activities.  BioMarine

3   was primarily a vehicle for funding its future

4   commercial development --

5        Q.   Let me turn to page --

6        A.   -- through the sale of stock and,

7   again, as a corporation, and GMIT in the way of a

8   tax exempt bond since it's a tax exempt entity.

9        Q.   Let me turn to page 2 of Exhibit 21.

10  In this memorandum he writes under Purpose, "The

11  purpose of this memorandum is to support the Civil

12  Action of Gulf Marine Institute of Technology and

13  BioMarine Technologies."

14            That's what he wrote, correct?

15       A.   He did.

16       Q.   He then adds a disclaimer below that,

17  correct?

18       A.   You want me to correct everything he's

19  written?  I would say everything that's on this

20  document, he wrote.  As to the correctness,

21  whatever he interpreted at the time.

22       Q.   Mr. Hersbach wrote to you and to your

23  lawyer in the paragraph on page 2, "However, to

24  the maximum extent permitted by applicable law, we

25  exclude all representations, warranties,

1              J. ERICSSON - 2/18/2021

2        A.    What do you mean "do you rely on it"?

3        Q.    Is it something you intend to put

4   forth in support of your claim?

5        A.    Absolutely.

6        Q.    Do you see anywhere in the signature

7   block of Mr. Hersbach that he was making these

8   statements under oath?

9        A.    No.

10       Q.    Apologies.  I have attached what I

11   meant to mark as Exhibit 22 and I will open

12   Exhibit 22 and share it.

13              (Deposition Exhibit 22 marked for

14   identification.)

15   BY MR. REGAN:

16       Q.    Mr. Ericsson, do you recognize what

17   this is a picture of in Exhibit 22?

18       A.    Well, it looks like a condo.  It looks

19   like the one in Chicago.  I don't recall the

20   address of this particular property.

21       Q.    This is a picture from the Internet of

22   a building at the address of 5622 South Ada

23   Street, Chicago, Illinois.  Have you ever been to

24   this location, Mr. Ericsson?

25       A.    I don't recall if I've been to that

```
1                    J. ERICSSON - 2/18/2021
2    one or -- but I have been to others.
3         Q.   This is the address of a building that
4    shows up on the statement of assets of Gulf
5    Marine, correct?
6         A.   Yes.
7         Q.   And is it your recollection that Gulf
8    Marine purchased this property in 2010?
9         A.   I believe so.
10        Q.   What was the business purpose of the
11   purchase of this property?
12        A.   It was bought at a very low cost for
13   the purposes of being rehabbed and resold.
14        Q.   Had Gulf Marine purchased real estate
15   to rehabilitate it and resell it prior to November
16   of 2010?
17        A.   I don't recall.
18        Q.   Does this building have anything to do
19   with the direct aquaculture operations at the
20   FlorAbama site?
21        A.   It has nothing to do with it.
22        Q.   Did Gulf Marine rehabilitate this
23   property?
24        A.   We didn't.  Another company did.
25        Q.   Who rehabilitated it?
```

```
1                C E R T I F I C A T E

2

3    STATE OF _____)
                           )
4                          )  ss.:
                           )
5    COUNTY OF _____)

6

7              I, MICHEAL A. JOHNSON, do hereby

8    certify:

9              That JOHN D. ERICSSON, the witness

10   whose deposition is hereinbefore set forth, was

11   duly sworn by me and that such deposition is a

12   true record of the testimony given by such

13   witness.

14             I further certify that I am not

15   related to any of the parties to this action by

16   blood or marriage; and that I am in no way

17   interested in the outcome of this matter.

18             IN WITNESS WHEREOF, I have hereunto

19   set my hand this 2nd day of March, 2021.

20

21

22   _____

23             MICHEAL A. JOHNSON, RDR, CRR

24

25
```