# Exhibit B

```
 1            IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF LOUISIANA
 2
    In Re: Oil Spill by the    §
 3  Oil Rig "Deepwater         §    MDL NO. 2179
    Horizon" in the Gulf of    §
 4  Mexico on April 20,        §    SECTION J
    2010                       §
 5  _____   §    JUDGE BARBIER
                               §
 6  GULF MARINE INSTITUTE      §    MAGISTRATE JUDGE
    OF TECHNOLOGY AND          §    CURRAULT
 7  BIOMARINE TECHNOLOGIES,    §
    INC.                       §
 8                             §
                Plaintiffs     §
 9                             §
    VS.                        §    Case No. 13-cv-01286
10                             §
    BP EXPLORATION AND         §
11  PRODUCTION, INC., ET       §
    AL.                        §
12                             §
                Defendants     §
13  _____   §

14

15        30(B)(6) REMOTE VIDEOTAPED DEPOSITION OF

16          GULF MARINE INSTITUTE OF TECHNOLOGY

17            AND BIOMARINE TECHNOLOGIES, INC.

18     By and Through Its Designated Representative

19                  JOHN D. ERICSSON

20                Gulf Breeze, Florida

21              Friday, February 19, 2021

22

23   Reported by:

24   MICHEAL A. JOHNSON, RDR, CRR

25   JOB NO. 189254
```

1           J. ERICSSON - 2/19/2021

2    the court reporter please swear in the witness.

3               JOHN D. ERICSSON,

4    called as a witness, having been duly sworn, was

5    examined and testified as follows:

6                   EXAMINATION

7    BY MS. TERTERYAN:

8        Q.   Good morning, Mr. Ericsson.

9        A.   Good morning.

10       Q.   As I said, I'm Anna Terteryan.  I'm

11   with Kirkland & Ellis and I represent BP in this

12   case.  Do you understand that you're still under

13   oath today?

14       A.   Yes.

15       Q.   And the ground rules that Mr. Regan

16   covered with you yesterday, you understand those

17   still apply?

18            MR. KRELLER:  That's basically if you

19   don't understand a question, let her know.  You're

20   still under oath, try not to talk over each other,

21   those general rules.

22            THE WITNESS:  All right.

23       A.   Proceed.

24   BY MS. TERTERYAN:

25       Q.   You understand they still apply?

1                     J. ERICSSON - 2/19/2021

2          Q.   And that NIH project that you're

3    referring to, that was not related to the

4    FlorAbama project?

5          A.   Yes and no.  It had two -- two

6    functions that we were working on.  One was the

7    continuing the growing of marine cephalopods for

8    medical research purposes, and the other was

9    growing our Gulf species candidates from small

10   fish to much larger fish to determine the

11   husbandry requirements for successfully growing

12   marine species at our sea farming site.

13         Q.   You weren't planning for any of

14   your -- the aquaculture projects that are at issue

15   in this case, you weren't planning on farming

16   cephalopods, right?

17         A.   That's correct.  That was a

18   function -- that was a stated function and

19   activity of the funded grant.  We did other

20   activities at, for instance, the Moody Aquarium

21   facilities in Galveston Island with thousands of

22   fingerlings growing into larger fish and feeding

23   them and testing their feed and their health and

24   growth rates and basically determining the

25   management requirements for several species we

1              J. ERICSSON - 2/19/2021

2    fished -- we intended to stock at our sea farming

3    project called the FlorAbama.

4         Q.   When was this Moody Aquarium work that

5    you were -- that you just referred to, when were

6    you doing that work?

7         A.   When was what?

8         Q.   When were you doing the work that you

9    referred to at Moody Aquarium?

10        A.   Well, that was -- that was a later --

11   latter half.  The earlier half was done at UTMB,

12   University of Texas Medical Branch facilities on

13   Galveston Island where the NRCC laboratory had

14   been for 30 years or so.

15        Q.   Apologies.  Let me ask this a

16   different way.  During what time period were

17   you -- was GMIT working on growing fingerlings

18   into larger fish and feeding them and testing

19   them?

20        A.   2006 to 2009.

21        Q.   How was that work funded?

22        A.   Well, GMIT provided funding for parts

23   that were not funded by the NIH, and of course NIH

24   gave us a stipend every month to continue the

25   research growing these cephalopods simultaneously.

1                    J. ERICSSON - 2/19/2021

2          Q.    I want to make sure I'm clear on this.

3     The NIH grant was specifically for the cephalopod

4     research, right?

5          A.    Generally.

6          Q.    When the NIH granted you the money, it

7     was so that GMIT could do research on cephalopods;

8     is that right?

9          A.    Generally.  We were allowed leeway in

10    doing research with other marine organisms.

11         Q.    How much of the NIH funding did GMIT

12    use on research with other marine organisms?

13         A.    I can't tell you.  I don't recall.

14         Q.    If you had to give a rough percentage?

15         A.    I couldn't even give you a good

16    estimate.

17         Q.    You didn't keep track of -- GMIT

18    didn't keep track of those -- of how it was using

19    its funding?

20         A.    Well, it all basically fell under the

21    same umbrella.  The same people were involved in

22    what research we were doing on finfish, they were

23    involved in the cephalopod program.  So we didn't

24    give them two paychecks, if that's what you're

25    asking.  The people who were working at the

1                    J. ERICSSON - 2/19/2021

2    cephalopod program volunteered to work on the

3    finfish program as an adjunct in those facilities.

4          Q.   Did the NIH provide funds to GMIT for

5    the FlorAbama project?

6          A.   None.

7          Q.   None.  Did GMIT receive any funding

8    from any contributor or grantor specifically for

9    the FlorAbama project?

10         A.   Well, most of the funding that we

11   received had to do with the earlier project that

12   was abandoned in 2008, I believe, and everything

13   moved over to the FlorAbama project.  And all the

14   assets that we had and all the cash that we had

15   received basically switched horses from the Texas

16   platform to FlorAbama project.

17         Q.   All right.  So did GMIT receive any

18   funding from anyone specifically for the FlorAbama

19   project?

20         A.   Well, you're -- you're talking about

21   apples and oranges, but they're both fruit.  We

22   received a $1,300,000 grant from Seagull Energy on

23   the Florida -- on the Texas project that we had in

24   play going forward into the FlorAbama project.

25         Q.   When did you receive that $1.3 million

1                    J. ERICSSON - 2/19/2021

2    grant from Seagull?

3         A.    I believe it was right around 1999,

4    2000.

5         Q.    What did you do with that

6    $1.3 million?

7         A.    We used it to continue our project

8    into the FlorAbama site.

9         Q.    The -- you testified that -- strike

10   that.

11                When Seagull gave you 1.3 million --

12   gave GMIT $1.3 million, did it specify how the

13   funds should be used?

14        A.    No.

15        Q.    Did it give any type of guidance on

16   how the funds should be used?

17        A.    Under our discretion.

18        Q.    In 1999 or 2000 when Seagull gave that

19   money, what activities was GMIT doing with respect

20   to the FlorAbama project specifically?

21        A.    Well, in 2000 -- excuse me.  We

22   modified a permit that we had off of Mobile Bay to

23   the current site at the FlorAbama and that was

24   accomplished, I think, in 2003; and we also

25   modified our MPDS permits from the same location

1          J. ERICSSON - 2/19/2021

2          A.    I don't recall.  I don't recall.

3          Q.    And the 1.3 million was not

4    specifically for finfish research either, correct?

5          A.    The 1.3 million was a general grant.

6    There was no requirements attached to it.

7          Q.    And you can't tell me how much of that

8    1.3 million remained among GMIT's assets at the

9    time of the spill?

10         A.    I don't recall.

11         Q.    Okay.  You mentioned in one of your

12   answers earlier an NRCC grant given to GMIT.

13   What's that grant?

14         A.    That's the National Resource Center

15   for Cephalopods science project.

16         Q.    That's the NIH grant you're referring

17   to?

18         A.    Yes.

19         Q.    All right.  Mr. Ericsson, you've been

20   personally involved in the claims that BioMarine

21   and Gulf Marine submitted to BP following the

22   spill, correct?

23         A.    I'm one of -- one of the people

24   involved, yes.

25         Q.    Were there any other nonlawyers

1                 J. ERICSSON - 2/19/2021

2        Q.   March 2010, did BioMarine have

3   employees?

4        A.   I don't recall at that time.  I know I

5   was.

6        Q.   Do you recall any employees besides

7   you?

8        A.   I believe we had a secretary/treasurer

9   and office personnel.

10       Q.   What did the office personnel do?

11       A.   Secretarial work.

12       Q.   How much -- we'll come back to that.

13            Can you explain BioMarine's

14   relationship with Gulf Marine, aside from the fact

15   that Gulf Marine owns some percentage of

16   BioMarine's shares?

17       A.   Well, one was -- Gulf Marine is a

18   501(c)(3) nonprofit organization approved by the

19   IRS for the purposes of commencing -- or doing

20   development of mariculture in the Gulf of Mexico,

21   initially, and later on their purpose was changed

22   to -- or added a new purpose to that IRS approval.

23            As I mentioned earlier, GMIT has been

24   involved in research and development going back to

25   almost the beginning of the company.  As a matter

1    J. ERICSSON - 2/19/2021

2    of fact, it was formed as outreach of BioMarine

3    technology.  I was the president of BioMarine, I'm

4    the managing director of GMIT.  And GMIT as a

5    nonprofit was created basically because it was

6    able to receive donations of equipment and cash

7    from corporate and other sponsors for the purposes

8    of doing marine farming and research that was used

9    eventually for the benefit of BioMarine.

10          BioMarine's part in the program was,

11   once the R&D phases were over, to step in as a

12   partner with GMIT to do the commercialization and

13   raising the fish and operating the project to

14   generate revenues going forward.

15          GMIT was in it basically with grant

16   money and equipment, and it funded its start-up

17   part of the project at the FlorAbama site.  And

18   then after that had been basically initiated and

19   the fish were stocked, then BioMarine was to take

20   over on a for-profit basis with its shareholders

21   to continue the ongoing years of operation.

22        Q.   Did BioMarine and GMIT ever sign a

23   contract with each other?

24        A.   They did.

25        Q.   What contract?

1                  J. ERICSSON - 2/19/2021

2    capacity from its FlorAbama project and loss of

3    value of its permits for the FlorAbama project; is

4    that right?

5         A.   I believe there was a component in the

6    lost damages involving the loss of our contractual

7    relationships with investment bankers who were

8    raising capital or were in the stages of raising

9    capital prior to the blowout.  But I don't recall

10   exactly the components of the loss model.

11        Q.   What contractual relationships with

12   investment bankers are you referring to?

13        A.   The investment banking -- the

14   contracts that we have with investment bankers in

15   New York, with Arjent financial as generated

16   through our securities counsel Eaton & Van Winkle

17   in New York City, as well as our written contracts

18   with George Hersbach and Heartstream financial in

19   Holland.

20        Q.   And what damages did BioMarine suffer

21   as a result of the spill to those contractual

22   relationships?

23        A.   Well, they were in suspension going

24   into the period of the disaster, and upon the

25   disaster there was no basis for going forward with

```
 1                 J. ERICSSON - 2/19/2021

 2    raising capital because the project had been

 3    destroyed.

 4         Q.   All right.  Besides -- besides --

 5    besides the lost value of the permits for

 6    FlorAbama, lost profits from the impaired earning

 7    capacity for the FlorAbama project and damage to

 8    the value of contracts with investment bankers

 9    which contracts were in suspension at the time of

10    the spill, is BioMarine alleging any other damages

11    in this case?

12              MR. KRELLER:  Object to the form of

13    the question.

14         A.   Again, I am not aware of all the

15    components that went into the lost model claim,

16    but the items that you mentioned previously are

17    truly indicative of a major part of the claims.

18    BY MS. TERTERYAN:

19         Q.   You're not aware of any other damages

20    that BioMarine is alleging aside from what we

21    discussed?

22         A.   Would you like me to take a pause and

23    go through some documents to try to refresh my

24    memory?  But at this point -- at this time I would

25    defer to doing that, instead of answering any more
```

```
 1                    J. ERICSSON - 2/19/2021

 2                    MR. KRELLER:  I'm going to object to

 3     the form of that question.  To the extent that it

 4     is attempting to elicit testimony about his

 5     reliance on expert reports when that deadline has

 6     not even yet been established by the Court, but at

 7     this current time, Mr. Giralt is our expert -- our

 8     damages expert.  We provided you with a copy of

 9     that report.  So he can answer the question.  But

10     that's just not to say that his report won't be

11     supplemented at a later date.

12                    You can answer.

13          A.   So again, as far as my recollection is

14     concerned, having been -- I've not looked at this

15     lost -- lost report recently.  I would say those

16     are the -- four of the major components of the

17     claim, but that is not exclusive -- I wouldn't say

18     that's exclusively the components of the claim.

19     BY MS. TERTERYAN:

20          Q.   Okay.  Is BioMarine seeking damages

21     related to any other business activity outside of

22     the FlorAbama project?

23          A.   No, I don't recall any other.

24          Q.   Okay.  Is Gulf Marine -- what damages

25     is Gulf Marine seeking in this case?
```

```
1                J. ERICSSON - 2/19/2021

2    BY MS. TERTERYAN:

3         Q.   Mr. Ericsson, what financial interest

4    did GMIT have in the FlorAbama project besides the

5    value of the permits as you allege?

6         A.   Well, the value of its business

7    relationship with BioMarine had the project gone

8    forward.

9         Q.   What was the value of its business

10   relationship with BioMarine?

11        A.   Well, it had an understanding that

12   they would get 2.5 percent of the gross sales of

13   the seafood products in perpetuity forever, as

14   long as it was there.

15        Q.   That --

16        A.   That was one.

17        Q.   So it was going to get a share of the

18   income from the FlorAbama project?

19        A.   That's correct.

20        Q.   In perpetuity?

21        A.   Right.

22        Q.   Was there a document recording this

23   understanding?

24        A.   I believe you just put it up.  The

25   agreement covering the platform project.  It was
```

1                J. ERICSSON - 2/19/2021

2    the same basic platform -- the platform agreement

3    was basically the same going into the FlorAbama

4    project, that understanding.

5        Q.   So there was no written agreement

6    between BioMarine and Gulf Marine specific to the

7    FlorAbama project, correct?

8        A.   I don't recall.

9        Q.   It was just an understanding between

10   the two entities?

11       A.   I don't remember if there was anything

12   formally or -- I do remember informally, of

13   course.  You have to remember, I'm the guy that's

14   sitting on both boards.

15       Q.   They are separate entities, though,

16   correct?

17       A.   Separate entities, but serving on both

18   boards and, you know, participating in these

19   things.

20       Q.   Aside from a general understanding

21   that GMIT would get two and a half percent of the

22   gross sales of seafood products from the FlorAbama

23   project, was there any document evidencing the

24   terms of BioMarine's and GMIT's business

25   relationship as to the FlorAbama project?

1              J. ERICSSON - 2/19/2021

2        A.   I do not recall.

3        Q.   You're not aware of one sitting here

4   today, correct?

5        A.   Nothing comes to mind as far as formal

6   agreements are concerned.

7        Q.   Fair to say in perpetuity would last

8   more than a year?

9        A.   I would hope so.

10       Q.   And --

11       A.   Till somebody dies.

12       Q.   Aside from the two and a half percent

13  in gross sales, did GMIT -- in the FlorAbama

14  project, did GMIT have any other financial

15  interest in the FlorAbama project?

16       A.   Again, it was a -- an equal owner of

17  the federal permits that granted the use of 27 and

18  a half acres of marine water for sea farming

19  purposes, which has a substantial value that we

20  discussed earlier, of between 250 to, upon

21  operations of over a million dollars per acre.

22       Q.   Aside from the value of the permits

23  that you allege and the two and a half percent in

24  gross sales, did GMIT have any other interest

25  financially in the FlorAbama project?

1            J. ERICSSON - 2/19/2021

2        A.    Well, it had financial interest, as I

3    recall, in the stock ownership of the company.

4        Q.    And aside from the alleged value of

5    the permits, the two and a half percent in gross

6    sales and the stock ownership, did GMIT have any

7    other financial interest in the FlorAbama project?

8        A.    The values of all the equipment that

9    it was providing to start the project and to

10   operate the project, which was listed in the loss

11   estimates provided by LIN.

12       Q.    Okay.  And besides all the things

13   we've already named and the value of the

14   equipment, any other financial interest of GMIT in

15   the FlorAbama project?

16       A.    I reserve my answer to say at this

17   time I don't recall, but there may be others that

18   I -- are listed in the loss estimates that would

19   have to be reviewed.

20       Q.    GMIT, like BioMarine, is only seeking

21   financial damages resulting from the spill's

22   effect on the FlorAbama project, correct?

23       A.    That's correct.

24       Q.    I'm showing you the document that was

25   marked Exhibit 17 yesterday.  I will show you.

1                    J. ERICSSON - 2/19/2021

2         Q.    Those NIH -- the NIH funding, however,

3    ended before the spill.  That's right?

4         A.    About the -- it was right around the

5    same period, but in that interim, but that was not

6    the only source of GMIT's funds.

7         Q.    The NIH funding ended before

8    April 20th, 2010, right?

9         A.    I believe that's correct.

10        Q.    Besides -- about how much annually was

11   the NIH providing GMIT before the funding ended?

12        A.    You're asking me, about.  I don't --

13   it was a substantial amount of money on an annual

14   basis.

15        Q.    If we open -- let's see.  Maybe I can

16   help.  All right.  I'm marking a new exhibit,

17   No. 29.

18                    (Deposition Exhibit 29 marked for

19   identification.)

20   BY MS. TERTERYAN:

21        Q.    And I'll send it in the chat and show

22   it as well.

23                    Mr. Ericsson, this is a printout from

24   the NIH's research portfolio online reporting tool

25   for Gulf Marine Institute of Technology.  Can you

1          J. ERICSSON - 2/19/2021

2    see that on your screen?

3          A.   No.

4          Q.   I can make it a little bigger.  It's

5    pretty small.  Is this a little better?

6          A.   Not much.

7          Q.   All right.  We can zoom in as needed.

8          A.   Okay.

9          Q.   Here, let me --

10         A.   That's better.  That's better.

11         Q.   That's better?  Okay.  Do you see in

12   the right-hand column the heading says FY Total

13   Cost by IC?

14         A.   Yes.

15         Q.   And you see the column that says Gulf

16   Marine Institute of Technology?

17         A.   Yeah.

18         Q.   Do you --

19         A.   That started in '08.

20         Q.   Yes.  Do you see -- do you see the

21   line that says 2007, and the amount in the last

22   column is 311,478?

23         A.   Yes, I see that.  I see that.

24         Q.   All right.  Did Gulf Marine receive

25   $311,478 from the NIH in 2007?

1                    J. ERICSSON - 2/19/2021

2         A.   Yeah, over a period of a year.

3         Q.   Did Gulf Marine receive any other

4    funding from the NIH in 2007?

5         A.   No, that was the only NIH project.

6         Q.   Okay.  And in 2008, did Gulf Marine

7    receive grants of $293,635 and $38,749?

8         A.   Yes.

9         Q.   Did Gulf Marine receive any other

10   grants from the NIH in 2008 besides those two?

11        A.   No.

12        Q.   Okay.  2009, we see three separate

13   grants.  Did Gulf Marine receive from the NIH in

14   2009, a grant of $190,380, $21,854 and $17,090?

15        A.   Appears so.

16        Q.   Did Gulf Marine receive any other

17   grants from the NIH in 2009?

18        A.   No.

19        Q.   And in 2010, did Gulf Marine receive a

20   grant of $74,000 from the NIH?

21        A.   Yes.

22        Q.   Did it receive any other grants from

23   the NIH in 2010?

24        A.   Not that I -- no.

25        Q.   Okay.  About -- what other -- strike

1          J. ERICSSON - 2/19/2021

2          Q.    Other than federal grants, did Gulf

3     Marine receive any other grants between 2007 and

4     the time of the spill?

5          A.    Are you talking about gifts or grants?

6          Q.    Cash grants.  Cash grants.

7          A.    Well, that's a different term than

8     other forms of revenue, but as far as grants, no.

9          Q.    All right.  And since you brought it

10    up, what other forms of revenue did GMIT have

11    between 2007 and 2010, the time of the spill?

12         A.    Well, we had previously received funds

13    from Seagull Energy to the tune of $1.3 million.

14         Q.    Mr. Ericsson, I want you to focus on

15    my -- on the time period of my question.  I'm

16    starting at 2007 and ending at the time of the

17    spill.  What grants did BioMarine --

18         A.    Grants.

19         Q.    What grants did Gulf Marine receive

20    other than the NIH grants between 2007 and the

21    time of the spill?

22         A.    None that I recall.

23         Q.    Okay.  Did it receive any other forms

24    of revenue between 2007 and the time of the spill?

25         A.    Yes.

1                    J. ERICSSON - 2/19/2021

2         Q.   And was a project -- was for a project

3    that ended February 26, 2010, right?

4         A.   I disagree with your terminology.

5         Q.   Why is that?

6         A.   The project didn't end on the date the

7    budget ended.

8         Q.   As far as the NIH was concerned,

9    regardless of what additional work GMIT was doing

10   on its own, as far as the NIH was concerned, the

11   budget for this $74,000 grant ended on

12   February 26th, right?

13        A.   Correct.

14        Q.   And the project for this $74,000 grant

15   ended on February 26th, 2010 --

16        A.   Yes.

17        Q.   -- from the NIH's perspective, right?

18        A.   Fine.  Go ahead.

19        Q.   No, I'm asking you if that's right.

20             MR. KRELLER:  I'm going to object to

21   the form of the questions.  I mean, the document

22   speaks for itself.  I think the witness has

23   indicated that.  He may not necessarily know

24   whether the project ended on that date.

25

1        J. ERICSSON - 2/19/2021

2    I said it depends on what time period in 2009 that

3    that occurred.

4        Q.   Okay.

5        A.   There may have been two or three or

6    one, or there could have been four or five.

7        Q.   Okay.  And let me show you now the

8    analogous page in 2010.  Do you see -- well, let

9    me get there.  All right.  I'm on page 10 of

10   Exhibit 32, which are GMIT's 2010 taxes.  Do you

11   see there's nothing in line 5 compensation of

12   officers, directors, trustees?

13       A.   Yes.

14       Q.   And do you see line 7 says other

15   salaries and wages, 23,547?

16       A.   Yes.

17       Q.   Why did GMIT -- why did GMIT's salary

18   and wage expense in 2010 decrease over $100,000

19   since 2009?

20       A.   Primarily because the activities

21   regarding the development of the bioreactor system

22   that's notated in the 2009 and '10 were phasing

23   down.

24       Q.   Okay.  Why were those activities

25   phasing down?

1                    J. ERICSSON - 2/19/2021

2          A.    Because we had -- we had built it,

3    tested it and were -- set it basically at idle by

4    the end of 2010.

5          Q.    Okay.

6          A.    I'd like to clarify something.

7          Q.    What's that?

8          A.    I said -- in your earlier ask about

9    other activities of Gulf Marine --

10         Q.    Yes.

11         A.    -- I said those that occurred in 2010.

12   You see that there are activities in 2010, but the

13   big construction part of the project was in the

14   last quarter, I believe, of 2009.

15         Q.    I see.  So once that bioreactor was

16   constructed and construction was over, there

17   wasn't a need to spend as much on salaries and

18   wages --

19         A.    Right.  We had --

20         Q.    -- to GMIT employees?

21         A.    We had part-time employees that were

22   monitoring the systems, that came from the

23   University of West Florida and they were involved

24   in watching, monitoring and testing in both 2009

25   and 2010.

1                    J. ERICSSON - 2/19/2021

2          Q.    Okay.  And that particular project did

3    not phase down because of the spill, right?

4          A.    No.

5          Q.    That was separate?

6          A.    That's correct.

7          Q.    Okay.  Mr. Ericsson, I want to talk a

8    little more about the two properties that GMIT

9    bought in November of 2010.  And actually I'll put

10   up Exhibit 32 again for reference.  All right.  So

11   these are -- this is Exhibit 32, GMIT's 2010

12   taxes, and I'm taking you to the -- page 24 of the

13   PDF, which is the 2010 depreciation schedule for

14   GMIT.  Let's take the Ada 1 Property.  That

15   property was purchased in November of 2010; is

16   that right?

17         A.    I do not recall specific dates.

18         Q.    Who bought that property?

19         A.    Gulf Marine did.

20         Q.    But who signed the paperwork?

21         A.    Gulf Marine.

22         Q.    What person signed on behalf of Gulf

23   Marine to buy that property?

24         A.    Myself.

25         Q.    Okay.  So how did you identify the

1               J. ERICSSON - 2/19/2021

2    Ericsson, and others that I don't recall the names

3    of, but he had a corporation doing business in the

4    south side of Chicago renovating distressed

5    properties.

6         Q.   Your son, Justin Ericsson, had a

7    corporation that was renovating distressed

8    properties in the south side of Chicago; is that

9    right?

10        A.   Right.

11        Q.   Was the name of the business Rockwall

12   Construction?

13        A.   No.

14        Q.   What is Rockwall Construction?

15        A.   That was a construction company that I

16   owned for a short period of time.

17        Q.   Did Rockwall Construction have any

18   involvement in GMIT's properties purchased for the

19   purpose of rehabilitation?

20        A.   No.

21        Q.   Okay.  What was the name of your son's

22   construction company that was involved in

23   renovating distressed properties?

24        A.   I don't recall.

25        Q.   And was your son's -- what was your

1                  J. ERICSSON - 2/19/2021

2   son's involvement with respect to GMIT's

3   particular distressed properties?

4        A.   He was -- he was at one point in time

5   involved in the future marketing -- he was

6   basically a marketing expert -- of our

7   technologies as it was evolving and the fish

8   itself as it was produced in the future.  And for

9   a short period of time he was also a director.

10       Q.   I may not have -- let me ask it more

11  clearly.  How was your son's construction business

12  involved with GMIT's distressed properties that it

13  had purchased?

14       A.   They were one of the parties that were

15  involved in rehabbing the properties and reselling

16  or leasing the properties.

17       Q.   Did GMIT pay your son's business to

18  rehabilitate the properties?

19       A.   I believe that's how we came up with

20  the total costs.  We acquired the properties and

21  then gave funds to have the properties rehabbed.

22       Q.   How much did GMIT give your son's

23  business to rehabilitate these properties?

24       A.   Part of those numbers that are showing

25  to be the cost.  I don't recall what part of it.

```
1              J. ERICSSON - 2/19/2021
2    like that.  If we were, it would probably have
3    been as a conduit of the sales proceeds that
4    went -- that were redirected to the parties
5    involved.  We took our part, and we redirected the
6    rest of the funds to the other parties that owned
7    the property.
8         Q.   What was GMIT's part?
9         A.   A very small number of the total
10   numbers.
11        Q.   Were these -- was this relationship
12   with the other parties involved, written in
13   writing anywhere?
14        A.   I believe so, but I don't really
15   recall.  It's been a long time.
16        Q.   I'm sending Exhibit 34 and I'll show
17   it as well.
18              (Deposition Exhibit 34 marked for
19   identification.)
20   BY MS. TERTERYAN:
21        Q.   This is a printout from today from
22   redfin.com for 5622 South Ada.  This is the Ada
23   property that GMIT owned, correct?
24        A.   Yes.
25        Q.   And scrolling down, I'll show you the
```

1                  J. ERICSSON - 2/19/2021

2   for profit, not nonprofit organizations.

3             MR. KRELLER:  Hey, John, look at this

4   monitor in front of you so you're looking ahead.

5             THE WITNESS:  I'm sorry.

6        A.   And so it was a short -- short-lived

7   experiment, you might say, in that platform for

8   crowdfunding, and it was withdrawn.

9   BY MS. TERTERYAN:

10       Q.   One moment.  I'm just fixing an

11  exhibit issue.  There we go.  Apologies.

12            Mr. Ericsson, why did GMIT try to get

13  funding in 2016?

14       A.   Well, we contemplated trying to

15  resurrect the project.

16       Q.   GMIT would not have asked for funding

17  if it believed the project was futile; fair to

18  say?

19       A.   That's fair to say.

20       Q.   But GMIT didn't move forward with that

21  effort?

22       A.   No, it was withdrawn.  It was the

23  wrong platform, the wrong method, you might say.

24  There are other better methods.

25       Q.   GMIT --

1                J. ERICSSON - 2/19/2021

2          Q.    What is it?

3          A.    It's a letter from the National Marine

4     Fisheries Service.

5          Q.    In this -- this letter is dated

6     June 3rd, 2008, correct?

7          A.    Yes.

8          Q.    And it was sent to Dr. Phillip Lee of

9     BioMarine Technologies, Inc., right?

10         A.    Correct.

11         Q.    I'll direct your attention to the

12    first sentence.  The NOAA Fisheries Service denied

13    BioMarine's exempted fishing permit application in

14    this letter, correct?

15         A.    That's correct.

16         Q.    Okay.  And I'll direct your attention

17    to the second sentence of the second paragraph,

18    where it starts, "Many of these proposed."  So it

19    says, "Many of these proposed activities are

20    prohibited or restricted under federal fishing

21    regulations in the Gulf of Mexico (see 50 CFR

22    Part 622) therefore requiring an EFP to conduct

23    such activities."

24               NOAA believed an EFP -- strike that.

25               NOAA told BioMarine an EFP was

1                    J. ERICSSON - 2/19/2021

2    required for the aqua farming activities it was

3    trying to conduct, correct?

4         A.   Yes.

5         Q.   And then I'll skip a few sentences to

6    the last sentence of this big paragraph, "As such,

7    the activities."  It says, "As such, the

8    activities proposed in your application would be

9    inconsistent with the intent of EFP regulations at

10   50 CFR 600.745 and the current management

11   objectives of the Gulf of Mexico Fishery

12   Management Council's fishery management plans."

13             That's not a green light to proceed

14   with the FlorAbama project, right?

15        A.   Well, it was for us.

16        Q.   You read that statement and

17   interpreted it to be a green light from NOAA for

18   BioMarine to proceed with the FlorAbama project?

19        A.   Yes.

20        Q.   Do you have a copy of the application

21   that this letter was responding to?

22        A.   I am sure we do.  It was probably

23   provided in the documents in your possession.  If

24   not, I can assure you that we probably have a

25   copy.

1              J. ERICSSON - 2/19/2021

2    through the 4,000 pages of documents that have

3    been produced in this case.  I was able to put my

4    hands on this document, get it to you per your

5    request.  So you have it now.

6              MS. TERTERYAN:  I appreciate it.  If

7    you give me a moment, I just have -- I see.

8    BY MS. TERTERYAN:

9         Q.   If you can take a look on page 2 of

10   Exhibit 36, the first full paragraph,

11   Mr. Ericsson, do you see it says, "Based on the

12   above-mentioned reasons, your application for an

13   EFP is denied.  This decision constitutes final

14   agency action."

15             Did BioMarine do anything to appeal

16   this final agency action?

17        A.   No, we did not.

18             MS. TERTERYAN:  All right.  I think

19   that's all the questions that I have for now.

20   With the note that, Mr. Kreller, I believe you

21   wanted to ask some questions, so I'll reserve some

22   time, in case it's necessary, after you.

23             MR. KRELLER:  Sure.

24             MS. TERTERYAN:  And do you want to

25   take a break?  I'm happy to go straight into it or

1          J. ERICSSON - 2/19/2021

2    for it.

3          Q.    Before the spill, BioMarine had gotten

4    no actual investment money from the New York

5    private placement memo or its European fundraising

6    efforts, correct?

7          A.    Correct.

8          Q.    But you testified that if the spill

9    hadn't happened, it would have gotten the funding?

10         A.    I believe genuinely that it would have

11   occurred.

12         Q.    When was it going to get the funding?

13         A.    Again, probably, as you may remember

14   earlier, we talked about the economic recession

15   that was primarily '08 and '09, and I would say

16   that probably we would have been at that effort

17   with our folks in Europe in 2010.

18         Q.    What date in 2010?

19         A.    I can't tell you exactly when that

20   would have occurred.  Both the folks in New York

21   as well as in Europe had done extensive amounts of

22   querying of investors.  George Hersbach had

23   secured intent from 41 of his 400 people that he

24   had solicited in 2008 and had, I believe, 12 that

25   were cemented down ready to go forward.  Began

1                    J. ERICSSON - 2/19/2021

2  before the meltdown, the economic meltdown.

3          Q.   As of April 19th, 2010, what day did

4  you expect the fundraising from the New York and

5  European efforts to arrive?

6          A.   I really don't have a timetable to

7  give you an answer.  I would -- it would -- I

8  would say in 2010.  Because the economy had --

9  pretty much was recovering in two thousand -- end

10  of 2009 and into 2010.  So it was -- really been a

11  matter of when Mr. Hersbach felt it would be good

12  to proceed.  He was also funding other companies,

13  I believe, in the 2010 period.  And I believe

14  there's some discussion about that in his letter,

15  which you have access to.

16          Q.   Can you say what -- with certainty

17  what month in 2010 BioMarine would have received

18  the funding necessary to launch its FlorAbama

19  project?

20          A.   Well, I had no personal control over

21  the actions of the financial consultants and

22  placement agencies that were involved in this.  It

23  would have been their decision when to relaunch

24  the fundraising in 2010.

25          Q.   You were waiting on them to push

1                J. ERICSSON - 2/19/2021

2    forward the fundraising effort; fair to say?

3         A.    Well, they were the most likely

4    shortest distance to success placement opportunity

5    that we had.

6         Q.    But because you had no personal

7    control over them, you can't say when the

8    investments would have arrived, correct?

9         A.    Again, I had no ability to tell George

10   Hersbach and the Fountainhead and others, groups

11   that were involved in the placement, when the

12   markets were good enough in their neighborhood to

13   start the fundraising.  They would have to gauge

14   that by testing the waters, probably.

15        Q.    You can't say specifically who would

16   have invested in BioMarine's FlorAbama project as

17   of April 19, 2010, right?

18        A.    That's a good question, and I can say

19   that we have already secured over 100 stockholders

20   and BioMarine had provided, I think in the audited

21   financials, over $5 million of capital to support

22   the company leading up to this point in time.  And

23   there's, again, every belief that we would have

24   found reception to our proposition with our

25   investment bankers' clientele which were in this

1                   J. ERICSSON - 2/19/2021

2    particular case mentioned to be over 400

3    investment groups in Europe.

4         Q.   Mr. Ericsson, as of April 19th, 2010,

5    BioMarine couldn't launch its FlorAbama project

6    solely with its existing investors, correct?

7         A.   That's correct.

8         Q.   And you can't say with specificity who

9    new future investors would have been as of

10   April 19th, 2010, to provide the funding necessary

11   to launch the FlorAbama project, correct?

12        A.   I believe that would be a very

13   reasonable assumption, since there are no crystal

14   balls for what happens in the future.

15        Q.   And you can't say exactly how much

16   those future investors would have invested as of

17   April 19th, 2010?

18             MR. KRELLER:  Object to the form of

19   the question.  I think these questions are better

20   directed to Mr. Hersbach.

21             You can answer what you can answer.

22        A.   Again, George Hersbach and Heartstream

23   and their associates, Merit Capital, were testing

24   the waters with their investment -- investors'

25   portfolio, and I'm sure that they got some

1        J. ERICSSON - 2/19/2021

2   feedback on their interest and perhaps their level

3   of interest, but I have no firsthand knowledge of

4   that.

5   BY MS. TERTERYAN:

6        Q.   You told Mr. Kreller when he was

7   asking you questions a few minutes ago, that you

8   expected investment to come in if this spill

9   hadn't happened.  You have no firsthand knowledge

10  of how much that investment would have been had

11  the spill not occurred, correct?

12       A.   Again, it's called a prospectus to

13  raise capital.  The prospectus that Mr. Hersbach

14  had prepared was to raise five -- three $5 million

15  tranches and that's what he was proposing to his

16  investor groups.  And so I would assume that it

17  would be in one tranche of $5 million, being the

18  first, because that's the way he proposed the

19  offering.

20       Q.   Mr. Ericsson, you have no firsthand

21  knowledge of how much the -- in future investment

22  in BioMarine's FlorAbama project would have been

23  had the spill not occurred, correct?

24            MR. KRELLER:  Objection, Anna, asked

25  and answered.  I don't know how many different

1            J. ERICSSON - 2/19/2021

2    times you're going to ask the question.

3    BY MS. TERTERYAN:

4         Q.   You can answer, Mr. Ericsson.

5         A.   Again, no one has any crystal balls of

6    what's going to happen in the future.

7              MS. TERTERYAN:  Okay.  That's it for

8    me.  Thank you very much for your time and

9    patience, Mr. Ericsson.

10             THE WITNESS:  It was comfortable

11   today.

12             MS. TERTERYAN:  I think we can go off

13   the record.

14             THE VIDEOGRAPHER:  The time is

15   3:30 p.m., and this ends the deposition of

16   Mr. John Ericsson.

17             (Deposition concluded at 3:30 p.m.)

18

19

20

21

22

23

24

25

```
 1                 C E R T I F I C A T E

 2

 3    STATE OF _____)
                            )
 4                          )  ss.:
                            )
 5    COUNTY OF _____)

 6

 7              I, MICHEAL A. JOHNSON, do hereby

 8    certify:

 9              That JOHN D. ERICSSON, the witness

10    whose deposition is hereinbefore set forth, was

11    duly sworn by me and that such deposition is a

12    true record of the testimony given by such

13    witness.

14              I further certify that I am not

15    related to any of the parties to this action by

16    blood or marriage; and that I am in no way

17    interested in the outcome of this matter.

18              IN WITNESS WHEREOF, I have hereunto

19    set my hand this 3rd day of March, 2021.

20

21

22              _____

23              MICHEAL A. JOHNSON, RDR, CRR

24

25
```