# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * | **MDL NO. 2179** |
| | * | |
| | * | **SECTION J(2)** |
| | * | |
| | * | **JUDGE BARBIER** |
| This Document relates to: | * | |
| | * | **MAGISTRATE JUDGE CURRAULT** |
| *Loggerhead Holdings, Inc. v. BP p.l.c., et al.,* **Case No. 16-cv-05952** | * | |
| | * | |

---

## BP'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Matthew T. Regan, P.C.
(matthew.regan@kirkland.com)
Kristopher S. Ritter
(kristopher.ritter@kirkland.com)
**KIRKLAND & ELLIS LLP**
300 North LaSalle
Chicago, IL 60654
Telephone:  (312) 862-2000

Christopher W. Keegan
(chris.keegan@kirkland.com)
Ashley Littlefield
(ashley.littlefield@kirkland.com)
Anna Terteryan
(anna.terteryan@kirkland.com)
**KIRKLAND & ELLIS LLP**
555 California Street
San Francisco, CA 94104
Telephone: (415) 439-1400

R. Keith Jarrett (Bar # 16984)
Devin Reid (Bar #32645)
**LISKOW & LEWIS**
One Shell Square
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone: (504) 581-7979
Fax No. (504) 556-4108

**ATTORNEYS FOR BP AMERICA PRODUCTION COMPANY AND BP EXPLORATION & PRODUCTION, INC.**

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

STATEMENT OF FACTS .............................................................................................. 2

    A.    Plaintiff's Business Declined and Debts Accumulated Before the Spill. ............... 3

    B.    Plaintiff's Vessels Were Inoperable Before and at the Time of the Spill. .............. 4

    C.    The *Nekton Rorqual* Could Not Have Travelled Through Macondo Oil
        When It Returned to Port St. Joe. ............................................................................. 5

    D.    On May 17, 2010, Plaintiff Ceased Operations. ...................................................... 6

    E.    Plaintiff Did Not Attempt to Restart Cruises While Its Competitors
        Continued Operations After the Spill. ....................................................................... 7

    F.    Plaintiff's Damages Include Intercompany Invoices. .............................................. 8

PROCEDURAL HISTORY ............................................................................................ 9

LEGAL STANDARD ..................................................................................................... 10

ARGUMENT ................................................................................................................... 11

I.     Plaintiff's 33 U.S.C. § 2702(b)(2)(E) Claim Fails as a Matter of Law ...................... 11

    A.    Plaintiff Cannot Prove the Spill Caused Its Economic Losses. ............................ 11

        1.    Plaintiff's Failing Business Was Due to Financial and Operational
            Infirmities Pre-Existing and Entirely Unrelated to the Spill ...................... 12

        2.    Plaintiff Did Not Incur Losses Due to Fear of Oiling, and Any
            Such Losses Are Not "Due To" the Spill ................................................... 13

    B.    Plaintiff Cannot Prove its Damages with Reasonable Certainty. ......................... 15

II.    Plaintiff's 33 U.S.C. § 2702(b)(2)(B) Claim Fails as a Matter of Law ..................... 18

III.   Plaintiff Is Not Entitled to Punitive Damages. ............................................................ 21

CONCLUSION ................................................................................................................ 23

## INTRODUCTION

Plaintiff operated a scuba-diving business on two live-aboard boats, offering scuba trips primarily in the Caribbean.  That is, until *prior to the Spill*, when it is undisputed that both of Plaintiff's boats were inoperable and Plaintiff had no ability to generate income or make necessary repairs.  This situation was in no way, shape or form due to the Spill.  Undaunted, Plaintiff now demands more than $40 million for lost profits, "restart costs," and unspecified injuries due to alleged oiling of Plaintiff's vessel when it was over 100 miles east of the Spill zone.  Plaintiff's claim is legally invalid, and no reasonable jury could find for Plaintiff.

*First*, Plaintiff's claim under section 2702(b)(2)(E) for lost profits and "restart" costs are not recoverable under the Oil Pollution Act ("OPA"), 33 U.S.C. § 2701 *et seq*.  Plaintiff's business failure pre-dated and was not due to the Spill.  On April 10, 2010, a generator on one of Plaintiff's scuba vessels failed, requiring Plaintiff to cancel all reservations and return the vessel to port.  Plaintiff's only other vessel had already been in port, in need of significant repair, for more than six months.  After years of six-figure net losses, declining revenues, and mounting debts, and unable to generate income, Plaintiff ceased operations—in no way attributable to the Spill.  Moreover, Plaintiff's contention that it lost business because of a decrease in tourism caused by *fear* of oiling does not satisfy OPA causation standards and is factually unsupported.  Finally, Plaintiff's lost profits are not reasonably ascertainable and its "restart" damages are not cognizable under OPA.

*Second*, Plaintiff's claim under section 2702(b)(2)(B) of OPA fails because the undisputed evidence shows that Plaintiff's vessel was never in a location where it could have been oiled.  Plaintiff contends the *Nekton Rorqual* encountered oil on May 2–3, 2010, while traveling from the southern Bahamas to Port St. Joe, Florida—more than 100 miles from the eastern edge of the Spill.  There were no eye-witnesses to the alleged oiling, there is no contemporaneous evidence of oiling,

Plaintiff never tested any purported oil, and Plaintiff did not preserve samples so that such testing can be conducted.  There is simply no evidence the vessel ever encountered Macondo oil.

*Third*, Plaintiff is not entitled to punitive damages.  Punitive damages are not available under OPA.  And Plaintiff—which suffered no physical injury to property and was not a commercial fisherman—cannot bring any claim under federal maritime law.  For these reasons, BP respectfully requests that the Court grant summary judgment dismissing Plaintiff's claims.

## STATEMENT OF FACTS

Plaintiff's subsidiaries operated scuba-diving cruises in the Caribbean—specifically, Mayaguana (just northwest of Turks and Caicos), Puerto Rico, the island of St. Croix, and multiple destinations in the Bahamas, including Medio Reef, Cay Sal Bank and Cay Lobos.  *See* BP's Statement of Undisputed Material Facts in Support of Its Motion for Summary Judgment ("SOF") ¶ 1.  Plaintiff operated out of Fort Lauderdale, Florida, where Plaintiff's reservations and logistics operations were located and from where Plaintiff's cruises to the Bahamas would depart.  *See id.* ¶¶ 2–3.  For Plaintiff's cruises that operated outside of the Bahamas, the vessels usually departed from a local port—for example, from Puerto Rico or from Turks and Caicos.  *See id.* ¶ 4.  Plaintiff provided maintenance and support services for its vessels out of a shipyard on the Gulf County Canal, about five miles from the coast in Port St. Joe, Florida, located east of Panama City and south of Tallahassee.  *See id.* ¶ 5.  Although Plaintiff's subsidiaries operated in a number of niche businesses, each supported Plaintiff's scuba-diving operations.  *See id.* ¶ 6.

According to Plaintiff, it sold the opportunity for divers to "enjoy looking at the fish and taking pictures of them."  *See id.* ¶ 8.  Although Plaintiff believes this to be "very similar to commercial fishing," Plaintiff acknowledges it did not sell "the destruction or death of fish" and does not recall catching fish and selling them for revenue.  *See id.* ¶¶ 9–11.

### A.   Plaintiff's Business Declined and Debts Accumulated Before the Spill.

In the years leading up to the Spill, Plaintiff's revenue and bookings collapsed.  The company's revenue dropped by over $1 million from 2007 to 2009.  *See id.* ¶¶ 12–14 (reporting ▮▮▮ in revenue in 2007, ▮▮▮ in revenue in 2008, and ▮▮▮ in revenue in 2009).  In each year from 2007 to 2009, Plaintiff reported net *losses* of hundreds of thousands of dollars— ▮▮▮ in 2007, ▮▮▮ in 2008, and ▮▮▮ in 2009.  *See id.* ¶¶ 15–17.  Plaintiff's monthly bookings,[1] reflecting reservations which are sometimes made years in advance, *see id.* ¶¶ 18–19, were in decline before the Spill:

|         | 2008 | 2009 | 2010 |
|---------|------|------|------|
| **March** | 67   | 87   | 71   |
| **April** | 193  | 61   | 49   |
| **May**   | 104  | 46   | 13   |

*See id.* ¶ 20.

Before the Spill, Plaintiff had also accumulated millions of dollars in debt that it was unable to service.  Plaintiff missed payments on its approximately $2.8 million in loans on its two vessels beginning in late 2007 and continuing through approximately January 2010.  *See id.* ¶¶ 21–22.  On May 19, 2010, Nekton Diving Cruises, LLC ("Nekton Diving"), Plaintiff's subsidiary that operated diving cruises, filed an assignment for the benefit of creditors.  *See id.* ¶ 23.  As of filing, Nekton Diving had less than $100,000 in assets and approximately $4.8 million in debts that it could not pay as they became due.  *See id.* ¶ 24.  Of that $4.8 million debt, approximately $3.4 million were in unsecured claims.  *See id.* ¶ 25.  This included $47,310.47 in unpaid wages, about half of which were the current wages for the crew at the time of filing in May 2010.  *See id.* ¶¶ 26–

---

[1]   These are the only periods for which Plaintiff produced data from its reservation system—March through May, 2008–2010.

27.  This also included $417,492.75 in consumer deposits that Plaintiff collected for cancelled trips and never returned.  *See id.* ¶ 28.

### B.    Plaintiff's Vessels Were Inoperable Before and at the Time of the Spill.

Plaintiff's two vessels, the *Nekton Pilot* and the *Nekton Rorqual*, were built in 1994 and 2001, respectively.  *See id.* ¶ 29.  After the *Nekton Pilot*'s trip in September 2009, Plaintiff dry-docked the vessel at its shipyard in Port St. Joe in order to conduct an extended refit of the vessel, not intending to put the vessel back into service for at least eight months.  *See id.* ¶ 30.  Plaintiff estimated the refit of the *Nekton Pilot* would cost approximately $180,000, and by April 2010 Plaintiff had only spent approximately $30,000.  *See id.* ¶ 31.  In addition, Plaintiff planned to rebuild the *Nekton Pilot*'s main engines at $60,000 per engine in Alabama, followed by a Coast Guard inspection.  *See id.* ¶ 32.

At the time of the Spill, the *Nekton Pilot* had no engine, no engine rebuild in progress, and no reservations.  *See id.* ¶ 33.  Plaintiff testified it wanted to see if there was sufficient cash from reservation deposits in May and June 2010 before moving forward with the rebuild.[2]  *See id.* ¶ 34. Plaintiff was unable to pay for the *Nekton Pilot*'s refit absent income from the *Nekton Rorqual*. *See id.* ¶ 36.

The *Nekton Rorqual* was also unable to generate income prior to the Spill.  On or around April 10, 2010, the *Nekton Rorqual* had a casualty to its starter generator that rendered it "inoperable . . . until [Plaintiff] repaired it or replaced it."  *See id.* ¶ 37.  During the week of April 11, 2010, Plaintiff unsuccessfully attempted to install a new generator while continuing to operate. *See id.* ¶ 38.  This resulted in a "low oil pressure issue" that was "the precipitating factor" for bringing the *Nekton Rorqual* back to Plaintiff's Port St. Joe shipyard for repairs.  *See id.* ¶ 39.

---

[2]    Plaintiff testified that it used cash deposits for future trips to pay current expenses.  *See id.* ¶ 35.

Because of these needed repairs and refits unrelated to the Spill, Plaintiff cancelled all trips from April 24 to May 22, 2010. *See id.* ¶ 40. Plaintiff did not complete repairs or refits to either vessel. *See id.* ¶ 41.

### C. The *Nekton Rorqual* Could Not Have Travelled Through Macondo Oil When It Returned to Port St. Joe.

To conduct the *Nekton Rorqual*'s necessary generator repairs, the vessel departed Mayaguana in the southeastern Bahamas on April 25, 2010, and traveled past Key West and the Marquesas, continuing north to Port St. Joe. *See id.* ¶¶ 42–43. On May 2, 2010, the *Nekton Rorqual* approached Port St. Joe from the south, veering no more than "[m]aybe just slightly" five or ten miles west of Port St. Joe. *See id.* ¶ 44.

Port St. Joe is more than one-hundred miles east of the *Deepwater Horizon* oil rig. *See id.* ¶ 45. On April 30, 2010, NOAA forecast oil potentially extending approximately fifty miles south of Pensacola, Florida on May 1, 2010. *See id.* ¶ 46. On May 1, 2010, through its Emergency Response Management Application, NOAA calculated that oil was unlikely to extend past the line of longitude extending south from Milton, Florida. *See id.* ¶ 47. On May 2, 2010, NOAA's forecast again showed oil was unlikely to extend past Mobile Bay on May 3, 2010 and no farther east than Pensacola and Milton, Florida. *See id.* ¶ 48. Port St. Joe is east of Pensacola, Florida. *See id.* ¶ 49. On May 2, 2010, the *Nekton Rorqual* was just south of Port St. Joe. *See id.* Plaintiff has put forth no evidence to dispute these NOAA forecasts.

Despite the significant gap between any oil and Port St. Joe, Plaintiff claims that the *Nekton Rorqual* encountered Macondo oil on this trip.[3] Specifically, Plaintiff alleges that the vessel drove through oil the night of May 2 and into May 3, 2010 before it reached Port St. Joe and travelled

---

[3]     Plaintiff does not allege that any other property was oiled. *See id.* ¶ 58.

up the Gulf County Canal to Plaintiff's shipyard.  *See id.* ¶ 50.  Mr. Dixon could not recall anyone

aboard the *Nekton Rorqual* seeing oil on May 2 or May 3, 2010.  *See id* ¶ 51.  Rather, Plaintiff's

president, Mr. Dixon, testified that a captain onboard the vessel reported "smelling" oil during the

night on May 2, 2010.  *See id.* ¶ 52.  Mr. Dixon also testified that, approximately a week later, he

observed a clear plastic hose on the vessel that he believed was "obviously stained and the color

of oil" as well as an "oily sheen and residue" that he believed was oil from the Macondo Well.

*See id.* ¶ 53.

Plaintiff took no steps to confirm or document the presence of oil on the *Nekton Rorqual*.

Plaintiff created no contemporaneous written communications concerning the oil and does not

recall whether it took photographs or video of oil on the vessel.  *See id.* ¶ 54.  Plaintiff took no

steps to determine whether any oil on the *Nekton Rorqual* was from the Macondo Well.  Plaintiff

did not, and has not, had any substance tested or performed any fingerprinting analysis[4] of the

alleged oil in order to determine whether it came from the Macondo Well.  *See id.* ¶ 55.  And

Plaintiff took no steps to formally collect and preserve samples of any alleged oil on the *Nekton

Rorqual* for testing today.  *See id.* ¶ 56.  Rather, he alleges the substance "remains on the *Rorqual*,"

with the exception of any oil that Plaintiff cleaned out of the vessel's ballast tanks after the Spill.

*See id.* ¶ 57.

**D.     On May 17, 2010, Plaintiff Ceased Operations.**

On May 17, 2010, Plaintiff publicly announced via its website that it was ceasing

operations "[d]ue to the continually increasing cost of operations, decreased discretionary income

---

[4]     Because of the chemical composition of crude oil, it is possible to "fingerprint" petroleum through the use of gas
chromatography in order to determine the source of the crude oil.  *See, e.g., Com. of Puerto Rico v. SS Zoe
Colocotroni*, 456 F. Supp. 1327, 1343 (D.P.R. 1978), *affirmed in part, vacated in part* 628 F.2d 652 (1st Cir.
1980).  Such fingerprinting cannot happen when oil is not preserved and is weathered or aged.

of consumers, and overall economic difficulty." *See id.* ¶ 59.[5]   This announcement made no mention of the Spill.  *See id.* ¶ 60.

### E.   Plaintiff Did Not Attempt to Restart Cruises While Its Competitors Continued Operations After the Spill.

Plaintiff alleged that the media's coverage of the Spill in May 2010 "[a]bsolutely far and away destroyed tourism throughout the Gulf, throughout Florida, throughout the Keys[.]" *See id.* ¶ 64.  Mr. Dixon described it as a "panic" of "imminent oils into the Keys" and testified that he believed "diver[s] anywhere" would not choose to book scuba cruises with Plaintiff because of the fear of oil entering the Loop Current and Gulf Stream, a fear Plaintiff believes caused its bookings to "just stop[]." *See id.* ¶¶ 65–66.  According to Plaintiff, a "small handful" of customers—"[m]aybe half a dozen to a dozen"—cancelled reservations allegedly due to the Spill.  *See id.* ¶ 67.  But Mr. Dixon did not speak with any of these customers.  *See id.* ¶ 68.  Plaintiff cannot remember who the customers were that cancelled reservations, *see id.* ¶ 69, nor has Plaintiff produced any "statements showing" such cancellations, *see id.* ¶ 70.

Plaintiff's competitors, on the other hand, continued to run trips during the summer of 2010 in locations where Plaintiff operated.  *See id.* ¶ 71.  One competitor offered fifty-percent discounts to Plaintiff's customers after Plaintiff cancelled their trips.  *See id.* ¶ 72.  Plaintiff advised former customers of some of its competitors' scuba-diving offerings on its website, since its own vessels were inoperable.  *See id.* ¶ 73.

---

[5]   Plaintiff did not produce the original May 17, 2010 announcement to BP.  Instead, Plaintiff produced a modified version from July 7, 2010 that added "lionfish invasion" and "BP oil catastrophe" to the list of reasons for ceasing operations.  *See id.* ¶ 61.  Plaintiff does not know who modified the announcement, but the modification was made with Mr. Dixon's "input."  *See id.* ¶ 62.  In this litigation, well after the initial May 17, 2010 notification, Mr. Dixon testified that, even though "[t]he other factors were obviously a concern," the Spill was "the precipitating event that stopped" Plaintiff's operations.  *See id.* ¶ 63.

Plaintiff did not attempt to continue operations in areas not affected by the Spill.  Plaintiff claims oil threatened three of its summer 2010 itineraries—Cay Sal Bank, Cay Lobos, and Medio Reef, all in the western Bahamas.  *See id.* ¶ 74.  In May 2010, Plaintiff did not consider operating any trips during the summer of 2010 in the southern Bahamas, where it regularly conducted cruises and where its competitors continued to make trips.  *See id.* ¶ 75.  Plaintiff contended that rescheduling trips to the southern Bahamas would have inconvenienced customers.  *See id.* ¶ 76.  So, Plaintiff cancelled these customers' trips and kept their deposits—over $400,000.  *See id.* ¶ 77.

Similarly, before the Spill, Plaintiff planned to operate itineraries in Puerto Rico beginning in October 2010, but Plaintiff did not conduct these planned trips or continue to accept bookings for such trips after May 17, 2010.  *See id.* ¶ 78.  Plaintiff testified that for Macondo oil to reach Puerto Rico, it "would have had to circle all the way around the Atlantic first," and "the dilution would have been significant by then."  *See id.* ¶ 79.  And although Plaintiff received $325,000 in short-term assistance from BP by the end of September 2010, Plaintiff did not attempt to operate its October 2010 Puerto Rico itineraries.  *See id.* ¶¶ 78, 80.

### F.    Plaintiff's Damages Include Intercompany Invoices.

Plaintiff's alleged damages include the costs of storing the *Nekton Rorqual* and *Nekton Pilot* since 2010.  *See id.* ¶ 81.  Once both of Plaintiff's vessels were laid up in Port St. Joe, Gulf County Shipbuilding, Inc., Plaintiff's subsidiary that operated the Port St. Joe shipyard, billed NR Holdings, Inc. and NP Leasing, Inc., Plaintiff's subsidiaries that owned the *Nekton Rorqual* and *Nekton Pilot*, respectively, over $3 million for costs associated with the lay-up.  *See id.* ¶¶ 82–85.  That is, these "damages" were costs that one of Plaintiff's subsidiaries was purportedly charging to its other subsidiaries.  When one of Plaintiff's subsidiaries paid money to another subsidiary, Plaintiff did not net any profits or incur any losses from such transactions.  *See id.* ¶ 87.  These

expenses were not associated with costs to third parties, and these costs were "well below market" rate.  *See id.* ¶ 86.

## PROCEDURAL HISTORY

Plaintiff opted out of the Deepwater Horizon Court-Supervised Settlement Program on September 19, 2012.  *See* Case No. 16-cv-05952, Rec. Doc. 1-2.  On May 15, 2016, Plaintiff filed its complaint in this action, *see* Case No. 16-cv-05952, Rec. Doc. 1 ("Complaint"), alleging causes of action pursuant to the Oil Pollution Act ("OPA"), 33 U.S.C. § 2701 *et seq*., for damages under sections 2702(b)(2)(B) and (E), *see* Compl. ¶¶ 52–53, and for punitive damages for gross negligence and willful misconduct "under federal, statutory, maritime, and federal common law." *See id.* ¶¶ 55–60.

On April 4, 2017, in response to Pretrial Order No. 64, *see* MDL No. 2179, Rec. Doc. 22297 ("PTO 64"), Plaintiff served BP with a sworn statement claiming that it was a "commercial fisherman."  *See* Ex. 1, Declaration of Ashley E. Littlefield in Support of BP's Motion for Summary Judgment ("Littlefield Decl.") at Ex. L.  One year later, on April 4, 2018, in response to Pretrial Order No. 65, *see* MDL No. 2179, Rec. Doc. 23825 ("PTO 65"), Plaintiff submitted a sworn statement claiming $35,219,425 in total damages.  *See* Case No. 16-cv-05952, Rec. Doc. 7.  On April 15, 2019, in response to Pretrial Order No. 67, *see* MDL No. 2179, Rec. Doc. 25370 ("PTO 67"), Plaintiff submitted initial disclosures and produced sixty-four documents totaling 1,722 pages.  Plaintiff and BP then participated in mediation in August 2019.

Following PTO 69, BP deposed John Dixon in his individual capacity on February 19, 2021 and as Plaintiff's Federal Rule of Civil Procedure 30(b)(6) corporate designee on February 26, 2021.  After BP requested additional, unproduced documents referenced by Mr. Dixon during the depositions, Plaintiff produced twenty-three documents totaling 279 pages between March 26 and April 6, 2021.

Before the depositions, Plaintiff served BP with expert disclosures on February 1, 2021 in compliance with PTO 69.  Rec. Doc. 26709 at 3. Plaintiff then opted out of providing an expert report.  Rec. Doc. 26709 at 3.  Plaintiff now seeks "on the order of $40 million" in damages "[f]rom 2010 to whenever this litigation is resolved," although Plaintiff testified that its final damages will differ from the damages reports that it previously produced.  *See* SOF ¶¶ 88–89.

## LEGAL STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).  Once the movant points to the absence of a genuine dispute, the non-movant must "come forward with appropriate summary judgment evidence sufficient to sustain a finding in its favor on all issues on which it would bear the burden of proof at trial."  *See Rice v. Harken Expl. Co.*, 250 F.3d 264, 266 (5th Cir. 2001).  Therefore, summary judgment is appropriate where the non-movant "fail[s] to produce summary judgment evidence of facts which, if viewed in the reasonable light most favorable to the [plaintiff], do not suffice to establish a viable OPA claim."  *Id.*  A plaintiff cannot satisfy its burden by only pointing to "some metaphysical doubt as to the material facts," "conclusory allegations," "unsubstantiated assertions," or "a scintilla of evidence."  *See Little*, 37 F.3d at 1075 (internal quotations and citations omitted).  There is no material dispute of facts where "the non-movant's 'critical evidence is so weak or tenuous on an essential fact' needed to prove his claim 'that it could not support a judgment in favor of the nonmovant.'"  *Boateng v. BP, P.L.C.*, 779 F. App'x 217, 220 (5th Cir.), cert. denied, 140 S. Ct. 616 (2019) (quoting *Little*, 37 F.3d at 1075).

## ARGUMENT

## I.   PLAINTIFF'S 33 U.S.C. § 2702(B)(2)(E) CLAIM FAILS AS A MATTER OF LAW.

No reasonable juror could (i) find that the Spill caused Plaintiff lost profits or impaired earning capacity and (ii) determine those alleged economic losses with reasonable certainty. Thus, Plaintiff cannot carry its burden at trial to prove both causation and damages under OPA.

### A.   Plaintiff Cannot Prove the Spill Caused Its Economic Losses.

Under OPA, "[p]laintiffs must establish that their economic losses were 'due to' the injury, destruction, or loss of property or natural resources that 'result[ed] from' the discharge or threatened discharge of oil." *Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, 168 F. Supp. 3d 908, 916 (E.D. La. 2016); 33 U.S.C. §§ 2702(a), 2702(b)(2)(E). Courts have interpreted OPA's "due to" and "result from" language to require a direct causal relationship between the discharge of oil and the resulting damage. *In re Taira Lynn Marine Ltd. No. 5, LLC*, 444 F.3d 371, 382 (5th Cir. 2006) (holding that losses caused by government-mandated evacuation following pollution discharge did not "result from" discharge and, thus, were not recoverable under OPA); *Blue Water Boating Inc. v. Plains All Am. Pipeline, L.P.*, No. CV 16-3283 PSG (JEMx), 2017 WL 405425, at *3 (C.D. Cal. Jan. 26, 2017) (declaring business losses due to decreased tourism following oil spill "a step too far removed from OPA and OSPRA's requirement that the lost profits and impaired earning capacity be 'due to' the destruction of natural resources"). Plaintiff bears the burden of establishing causation. *See In re Deepwater Horizon*, 168 F. Supp. 3d at 915; *see also Nycal Offshore Dev. Corp. v. U.S.,* 743 F.3d 837, 844–45 (Fed. Cir. 2014) ("The burden of proof on the issue of causation in a lost-profits case rests on the plaintiff without regard to the nature of the impediment that the plaintiff would have had to overcome in the nonbreach world to make a profit."). But Plaintiff cannot meet its burden here.

1.      *Plaintiff's Failing Business Was Due to Financial and Operational Infirmities Pre-Existing and Entirely Unrelated to the Spill.*

The undisputed evidence establishes that Plaintiff's business failed due to pre-existing circumstances unrelated to the Spill.  Between 2007 and 2009, Plaintiff's revenue decreased by over $1 million each year, its bookings declined each year, and Plaintiff reported net **losses** exceeding $500,000 each year.  *See supra* at section A.  As of its May 19, 2010 filing of an assignment for the benefit of creditors, Nekton Diving (Plaintiff's operating subsidiary) had approximately $4.8 million in debt and less than $100,000 in assets.  *See* SOF ¶ 24.  Plaintiff was unable to pay those debts as they became due, long before the Spill.  *See id.*

Critically, before the Spill, both the *Nekton Pilot* and *Nekton Rorqual* were inoperable, in need of costly repairs, and unable to generate income.  As of April 20, 2010, the *Nekton Pilot* had been docked for an extended refit since her last trip in September 2009.  *See id.* ¶ 30.  Plaintiff's plans to return the *Nekton Pilot* to operations in the summer of 2010 required, *inter alia*, sending the engines to Alabama to be rebuilt, followed by a Coast Guard inspection.  *See id.* ¶ 32.  This was not in process at the time of the Spill.  *See id.* ¶ 33.  Indeed, Plaintiff could not pay for the *Nekton Pilot*'s necessary repairs absent income from the *Nekton Rorqual*.  *See id.* ¶ 36.

Meanwhile, on approximately April 10, 2010, the *Nekton Rorqual* had a casualty to its starter generator, rendering it "inoperable . . . until [Plaintiff] repaired it or replaced it."  *See id.* ¶ 37.  After a failed attempt to install a new generator, Plaintiff had to bring the *Nekton Rorqual* back to the Port St. Joe shipyard for repairs.  *See id.* ¶¶ 38–39.  Plaintiff cancelled all trips through May 22, 2010.  *See id.* ¶ 40.

On May 17, 2010, Plaintiff announced it was ceasing operations "[d]ue to the continually increasing cost of operations, decreased discretionary income of consumers, and overall economic difficulty."  *See id.* ¶ 59.  Plaintiff subsequently revised this announcement in June or July 2010 to

add additional factors that purportedly caused it to cease operations, including the "BP oil catastrophe." *See id.* ¶ 61. But this after-the-fact editing was self-serving, unsubstantiated, and without any factual support. *See Little*, 37 F.3d at 1075 (holding that a party opposing summary judgment cannot satisfy their burden "with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence") (internal citations omitted).

Ultimately, Plaintiff cannot prove to any reasonable juror that its "economic losses were '***due to***' the injury, destruction, or loss of property or natural resources that 'result[ed] from'" the Spill. *In re Deepwater Horizon*, 168 F. Supp. 3d at 916 (emphasis added). Plaintiff's declining revenue and bookings in the years before 2010 were not due to the Spill. Nekton Diving's pre-Spill inability to pay its millions of dollars in outstanding debts was not due to the Spill. Plaintiff's inability to repair its only two vessels, rendering them inoperable, was not due to the Spill.

### 2. *Plaintiff Did Not Incur Losses Due to Fear of Oiling, and Any Such Losses Are Not "Due To" the Spill.*

Plaintiff cannot prove it suffered economic losses "due to" the Spill because of a purported decrease in scuba tourism because of an alleged fear of oiling. Such a claim is not cognizable under OPA causation standards and is belied by the undisputed evidence in this case. Plaintiff alleged that media coverage of the Spill in May 2010 "[a]bsolutely far and away destroyed tourism throughout the Gulf, throughout Florida, throughout the Keys[.]" *See* SOF ¶ 64. Mr. Dixon described it as a "panic" of "imminent oils into the Keys" and explained that "diver[s] anywhere" would not choose to book with Plaintiff because of a possible fear that oil may enter the Loop

Current and Gulf Stream and potentially reach the western Bahamas.  *See id.* ¶¶ 65–66.  Thus, according to Plaintiff, bookings "just stopped."  *See id.* ¶ 66.

But claiming that Plaintiff's economic losses were due to a post-Spill fear within scuba tourism is "a step too far removed from OPA['s] . . . requirement that the lost profits and impaired earning capacity be 'due to' the destruction of natural resources."  *Blue Water Boating*, 2017 WL 405425, at *3; *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, 902 F. Supp. 2d 808, 816 (E.D. La. 2012) (holding pure stigma claims concerning unsold property were not recoverable lost profits or impaired earning capacity under OPA, because such claims were for unrealized diminution of value), *aff'd* 741 F. App'x 185 (5th Cir. 2018).  Plaintiff cannot recover for lost profits or impaired earning capacity under OPA merely because it believes scuba tourism plummeted due to customers *fearing* oil may enter the Loop Current.  *See Blue Water Boating*, 2017 WL 405425, at *3 (holding that the plaintiff could not recover for reputational damages that "might be 'utterly divorced'" from the oil spill and based on "erroneous public perception[s]").

Plaintiff also has not put forth evidence supporting that it experienced such losses.  Mr. Dixon testified that only a "small handful" of customers—"[m]aybe half a dozen to a dozen"— cancelled reservations allegedly due to the Spill.  *See* SOF ¶ 67.  But Mr. Dixon did not speak with any of these customers.  *See id.* ¶ 68.  Plaintiff does not know who the customers were.  *See id.* ¶ 69.  Plaintiff has produced no admissible evidence showing such cancellations.  *See id.* ¶ 70.  On this "'scintilla' of evidence," Plaintiff cannot satisfy its causation burden for the damages it asserts here.  *See Little*, 37 F.3d at 1075.

In fact, scuba operations like Plaintiff's did continue post-Spill.  Plaintiff admits that its competitors continued to run scuba trips after the Spill.  *See* SOF ¶ 71.  Plaintiff agrees that it ran

and could run cruises in areas not impacted by the Spill, such as Puerto Rico and the southern Bahamas.  *See id.* ¶¶ 71, 75, 78–79.  When Plaintiff announced it was ceasing operations and cancelling trips for which its customers had already paid deposits, other scuba-tour companies offered Plaintiff's customers discounted trips to the same locations Plaintiff had also operated.  *See id.* ¶¶ 71–73, 77.[6]

That Plaintiff's losses were not due to the Spill, or even due to a fear of potential oiling, is further confirmed by undisputed evidence that Plaintiff never attempted to mitigate its losses by operating different itineraries.  For example, in May to July 2010, one of Plaintiff's competitors operated scuba trips in the Bahamas and Turks and Caicos, both areas in which Plaintiff operated.  *See* SOF ¶ 71.  Similarly, Plaintiff had itineraries scheduled beginning in October 2010 for Puerto Rico, *see id.* ¶ 78, and Plaintiff received $325,000 in short-term assistance from BP in September 2010, *see id.* ¶ 80.  Yet, Plaintiff made no attempt to repair its vessels so it could operate its pre-planned Puerto Rico itineraries.  *See id.* ¶¶ 41, 78.  In sum, there no evidence Plaintiff's alleged losses were a result of scuba tourism stopping due to fear of oil.

### B.   Plaintiff Cannot Prove its Damages with Reasonable Certainty.

Plaintiff's OPA claim also fails as its damages are not reasonably ascertainable.  Plaintiff seeks more than $40 million in damages, consisting of both lost profits and "restart" costs that Plaintiff believes is needed to restart its operations.  *See id.* ¶ 88; Ex. 12.  OPA compensates only

---

[6]   Mr. Dixon testified that he believed Plaintiff's competitors were able to run these Summer 2010 trips because "none of those companies offer trips in the Bahamas, in the Florida, anywhere near the Cay Sal Bank[,]" claiming "nobody else operated" in the area Plaintiff operated in.  Littlefield Decl. at Ex. A 218:2–9.  But Plaintiff later testified that it ran trips in the southern Bahamas like its competitor, Littlefield Decl. at Ex. B 225:5–16, and that Plaintiff's Mayaguana trip was "just north of Turks and Caicos" where its competitor operated in the summer of 2010.  *Id.* at 226:4–14.  In fact, customers would fly in and out of Turks and Caicos to go on Plaintiff's Mayaguana trip.  *Id.* at 60:16–61:6).  Such an internal conflict in Plaintiff's own evidence does not create a genuine dispute of material fact.  *See Little*, 37 F.3d at 1075 (actual controversy exists only "when both parties have submitted evidence of contradictory facts"); *see also* Fed. R. Civ. P. 56(c)(1)(A).

for "loss of profits or impairment of earning capacity" caused by the discharge or threatened discharge of oil.   33 U.S.C. § 2702(b)(2)(E).   Unrealized loss in value is not a compensable measure of damages under OPA; a claimant must show actual losses.   *See In re Deepwater Horizon*, 902 F. Supp. 2d at 816.   To prevail on an OPA-lost-profits claim, the party seeking to recover must demonstrate that the lost profits are reasonably ascertainable and not speculative.   *See id.* (rejecting unrealized diminution-of-property-value claims in part because such damages were "speculative").   Such damages "must not be based on evidence that is speculative, uncertain, contingent, or hypothetical."   *Union Oil Co. of Cal. v. Buffalo Marine Serv., Inc.*, Civil Action No. 1:10-cv-195, 2012 WL 13034544, at *9 (E.D. Tex. June 29, 2012) (internal quotation omitted).   Plaintiff's claim for damages fails as a matter of law as Plaintiff cannot prove damages with reasonable certainty.

   ***First***, Plaintiff was not profitable before the Spill.   Courts often look to past profitability in comparable periods to guide calculations of lost profits.   *See Union Oil*, 2012 WL 13034544, at *9–10 (awarding OPA lost profits based on revenue in months prior to oil spill but rejecting plaintiff's assertions that it would have had a "banner month").   When looking to past profitability, courts will consider whether the plaintiff was profitable in previous years as evidence of forecasting future lost profits.   *See Sea Trek, Inc. v. Capt. Tom's Seafood*, No. Civ.A. 97-150, 1998 WL 149576, at *2 (E.D. La. March 24, 1998) (granting summary judgment, holding that the plaintiff failed to produce competent evidence of lost profits and finding that the plaintiff had no net profits except in one of preceding four years).   Plaintiff recorded net ***losses*** of ███████ in 2007, ███████ in 2008, and ███████ in 2009.   *See* SOF ¶¶ 15–17.   Moreover, Plaintiff's revenue dropped by over $1 million from 2007 to 2009.   *See supra* at section I.A.1.   Yet Plaintiff asserts without support that it would have made millions in profits but for the Spill.   *See* SOF ¶ 88.   As

16

Plaintiff has no past profits from which to forecast future profits, Plaintiff's damages under 33 U.S.C. § 2702(b)(2)(E) cannot be calculated with reasonable certainty. *See Union Oil*, 2012 WL 13034544, at *9–10; *see also Pontchartrain State Bank v. Duden*, 503 F. Supp. 764, 769 (E.D. La. 1980) (denying lost profits, in part because it was "conjectural at best" whether the plaintiffs' business venture would have yielded a future profit).

  ***Second***, Plaintiff's lost-profits claim also fails as a matter of law to the extent Plaintiff seeks lost profits for intercompany transactions.  Plaintiff produced a number of invoices between its own entities, such as invoices from Gulf County Shipbuilding, Inc. to NR Holdings, Inc. and NP Leasing, Inc. for the alleged "lay-up" of the vessels following the Spill. *See* Ex. 13; *see* SOF ¶ 85.  Plaintiff acknowledges that when one of its subsidiaries paid money to another one of its entities, Plaintiff did not net any profits or incur any losses. *See id.* ¶ 87.  These invoices, totaling more than $3 million, were not strictly for the costs or services of third parties. *See* Ex. 13; *see* SOF ¶¶ 85–86.  As Plaintiff did not incur any losses or profits from these intercompany transactions, there is nothing to recover under OPA. *See id.* ¶ 87; *In re Deepwater Horizon*, 902 F. Supp. 2d at 816 (holding that only lost profits or an impairment of earning capacity can be recovered under OPA).

  ***Third***, Plaintiff's "restart" damages are unavailable as a matter of law.  While OPA provides remedies for a broad class of plaintiffs, it is "not without limits." *See In re Deepwater Horizon*, 902 F. Supp. 2d at 816.  Plaintiff's alleged "restart" costs are neither "loss of profits" or "impairment of earning capacity."  33 U.S.C. § 2702(b)(2)(E).  Plaintiff has not incurred these "restart" costs, because such costs are only conjecture of what Plaintiff might need to begin operating cruises again. *See* Littlefield Decl. at Ex. B 220:11–22.  Therefore, Plaintiff has suffered

no loss, and before Plaintiff incurs such costs, any such "restart" damages are speculative.  *See In re Oil Spill by Oil Rig Deepwater Horizon*, 902 F. Supp. 2d at 816.

## II.    PLAINTIFF'S 33 U.S.C. § 2702(B)(2)(B) CLAIM FAILS AS A MATTER OF LAW.

Plaintiff also seeks damages under Section 2702(b)(2)(B) for the alleged physical oiling of the *Nekton Rorqual*.[7]  Section 2702(b)(2)(B) of OPA permits damages for "injury to, or economic losses resulting from destruction of, real or personal property."  *See* 33 U.S.C. § 2702(b)(2)(B).  Such injury or destruction must be "physical."  *See In re Deepwater Horizon*, 902 F. Supp. 2d at 816–17 (citing *Sekco Energy, Inc. v. M/V Margaret Chouest*, 820 F. Supp. 1008, 1015 (E.D. La. 1993)).  Summary judgment on a section 2702(b)(2)(B) claim is appropriate where, as here, the plaintiff fails to show by competent evidence that its property was actually injured.  *See In re Taira Lynn*, 444 F.3d at 382.  The undisputed evidence demonstrates that Plaintiff's Section 2702(b)(2)(B) claim is meritless.

***First***, no reasonable jury could find that the *Nekton Rorqual* was anywhere near, much less physically contaminated by, oil from the Macondo Well.  Plaintiff contends the *Nekton Rorqual* encountered oil while traveling from the Bahamas to Port St. Joe, Florida, sometime in the evening of May 2, 2010.  *See* SOF ¶¶ 42–44, 50.  On May 2, 2010 the *Nekton Rorqual* was south of Port St. Joe.  *See id.* ¶ 44; Ex. 10.  But oil from the Macondo Well was nowhere near Port St. Joe.  According to NOAA's publicly available forecasts,[8] oil from the Macondo Well did not extend farther east than Mobile Bay nor past Pensacola or Milton, Florida at any time on May 2 or May 3, 2010; Port St. Joe, Florida is farther east than all three locations.  *See* SOF ¶ 48; *see* Figure A

---

[7]    Plaintiff does not allege any other property was oiled.  *See* SOF ¶ 58.

[8]    Plaintiff reviewed the NOAA forecasts shortly after the Spill and purportedly considered them in its decision to cease operations.  *See* Littlefield Decl. at Ex. B 181:6–9; 190:23–191:5.

below (depicting NOAA's forecast of oil on May 3, 2010, prepared on May 2, 2010, based on

NOAA's satellite tracking, overflight observations, and modelling).



Plaintiff bears the burden to prove that its vessel was oiled, *see In re Deepwater Horizon*,

902 F. Supp. 2d at 816–17, yet Plaintiff offers no evidence to bridge the over one-hundred mile

distance between the *Nekton Rorqual* and any Macondo oil.[9]  Absent such "critical evidence," no

reasonable jury could conclude that the *Nekton Rorqual* encountered oil from the Macondo Well

---

[9]    Plaintiff produced a number of blog posts and journal articles concerning potential oil in or around the Florida Keys.    None of these articles disputes the location of oil on May 2, 2010.    *See, e.g.*, Ex. 14 (LOGGERHEAD00001883–94) (concluding only that hydrocarbons were transported to the West Florida Continental Shelf and that oil was observed in June 2010).    They are also inadmissible hearsay.  *See Okoye v. Univ. of Tex. Houston Health Sci. Ctr.*, 245 F.3d 507, 510 n.5 (5th Cir. 2001) ("Because these statements are hearsay, they are not competent summary judgment evidence.").

on May 2 or May 3, 2010.  *See Rice*, 250 F.3d at 266 (holding that summary judgment is appropriate where the plaintiff fails to produce evidence sufficient to sustain a finding in its favor at trial).

**Second**, not surprisingly, Plaintiff lacks contemporaneous evidence that it actually did encounter oil.  Plaintiff cannot recall any eye-witness observation of oil or contemporaneous photographs or video of oil on the vessel, and Plaintiff has no contemporaneous writings concerning the oil, no test results, and no preserved samples of oil.  *See* SOF ¶¶ 51, 54.  Plaintiff's only evidence of oiling is (i) Mr. Dixon's testimony that the *Nekton Rorqual*'s captain reported **smelling** oil on the evening of May 2, 2010 and (ii) Mr. Dixon's testimony that he observed what he believed to be oil sometime after the alleged oiling.  *See id.* ¶¶ 52–53.  These unsupported assertions are insufficient to create a material issue of fact.  *See Salazar v. Lubbock Cnty. Hosp. Dist.*, 982 F.3d 386, 389 (5th Cir. 2020) ("[Plaintiff's] self-serving statements . . . are insufficient to create a triable issue of fact[.]").  Absent such evidence, no reasonable jury could find that the *Nekton Rorqual* was physically oiled.  *See In re Taira Lynn*, 444 F.3d at 382 (holding that summary judgment was appropriate where plaintiffs failed to show their property was damaged as a result of the release of propylene/propane gases); *see also Scaffidi v. Thompson-Hayward Chem., Inc.*, No. Civ.A. 94-3860, 1997 WL 469966, at *3 (E.D. La. Aug. 12, 1997) (granting summary judgment as the plaintiff had failed to produce evidence showing exposure to the chemical products at issue).

**Third**, Plaintiff has no evidence that any alleged oil on the *Nekton Rorqual* was from the Macondo Well.  Plaintiff has not performed testing or fingerprinting analysis of any substance found on the *Nekton Rorqual*.  *See* SOF ¶ 55.  Nor has Plaintiff retained any expert to perform such tests.  *See* Ex. M.  And Plaintiff **cannot** now conduct such testing, as it has not collected and

meaningfully preserved any oil.  *See id.* ¶ 56.  Rather, the oil merely "remains on the *Rorqual*," although Plaintiff admitted that it cleaned the vessel's ballast tanks, where Mr. Dixon purportedly saw evidence of oiling, at some point after the Spill.  *See id.* ¶ 57.  In the absence of any evidence of oiling from the Macondo Well, no reasonable jury could find for Plaintiff on its section 2702(B)(2)(B) claim.  *See Little*, 37 F.3d at 1075 (holding that courts "do not, . . . in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts"); *Powe v. Wagner Elec. Sales Corp.*, 589 F. Supp. 657, 661 (S.D. Miss. 1984) ("[I]t has been generally held that where the [evidence] itself was destroyed or is otherwise unavailable and there is no other evidence . . . that a case for the jury is not made.").

## III.   PLAINTIFF IS NOT ENTITLED TO PUNITIVE DAMAGES.

Plaintiff seeks punitive damages for "gross negligence and willful misconduct" under "federal, statutory, maritime, and federal common law," although Plaintiff fails to identify the underlying cause of action to support this remedy.  *See* Compl. ¶ 55.  Punitive damages are not a separate cause of action, but rather a remedy that is dependent on an underlying claim.  *See Sulzer Carbomedics, Inc. v. Oregon Cardio-Devices, Inc.*, 257 F.3d 449, 461 (5th Cir. 2001).  Therefore, "before a plaintiff can recover punitive damages, he or she must first be entitled to legal or equitable relief."  *See Tajonera v. Black Elk Energy Offshore Operations, L.L.C.*, 16 F. Supp. 3d 755, 766 (E.D. La. 2014).

Plaintiff cannot recover punitive damages under any theory.  ***First***, "punitive damages are not available under OPA[.]"  *See In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, 808 F. Supp. 2d 943, 962 (E.D. La. 2011).[10]

---

[10]   Plaintiff has identified no other statutory means entitling it to punitive damages.

**Second**, Plaintiff cannot seek punitive damages under federal maritime law.[11]  To recover for economic loss under federal maritime law, plaintiffs must establish that "oil had physically damaged property in which the plaintiff held a proprietary interest."  *See In re Oil Spill by Oil Rig "Deepwater Horizon" in Gulf of Mexico, on April 20, 2010*, MDL 2179, 2020 WL 6381138, at *4 (E.D. La. Oct. 26, 2020) (referencing *Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303, 307–09 (1927)).  A "narrow" exception to this rule exists for commercial fishermen.  *Id.*

Plaintiff cannot meet either test.  For the reasons explained above in Section II, Plaintiff has no evidence that Macondo Well oil physically damaged its vessel.  Thus, Plaintiff cannot satisfy the *Robins Dry Dock* rule to recover under federal maritime law.

Nor can Plaintiff meet the "narrow" commercial fisherman exception.  *See La. Crawfish Producers Ass'n West v. Amerada Hess Corp.*, Civil No. 6:10-0348, 2015 WL 10571063, at *10 (W.D. La. Nov. 23, 2015) (limiting the class of plaintiffs to those who harvested crawfish, "upon which their livelihood depends," within the impacted area); *see also Yarmouth Sea Prods. Ltd. v. Scully*, 131 F.3d 389, 398 (4th Cir. 1997) (noting as a "critical fact" that the commercial-fishermen exception involves plaintiff where fishing "constituted their very livelihood").  This exception is strictly applied.  *See In re Taira Lynn*, 444 F.3d at 379 (holding that claims by wholesale fishermen did not satisfy the "commercial fishermen" test).  Here, Plaintiff's ordinary business is not catching fish, nor does Plaintiff rely on harvesting fish for its livelihood.  Plaintiff only sold the opportunity for divers to observe fish during dives.  *See* SOF ¶¶ 8–11.  A mere interest in the natural resources of the sea does not satisfy the "commercial fishermen" exception.  *See State of La. ex rel. Guste v.*

---

[11]   To the extent Plaintiff seeks punitive damages under state law, such claim also fails as maritime law preempts state law if state law would otherwise circumvent *Robins Dry Dock*.  *See IMTT-Gretna v. Robert E. Lee SS*, 993 F.2d 1193, 1195 (E.D. La. 1993) ("To allow state law to supply a remedy when one is denied in admiralty would serve only to circumvent the maritime law's jurisdiction.").

*M/V Testbank*, 524 F. Supp. 1170, 1173 (E.D. La. 1981), *affirmed by* 752 F.2d 1019 (5th Cir. 1985) (holding that "[w]holesale and retail seafood enterprises not actually engaged in fishing" did not satisfy the "commercial fishermen" exception); *see also Slaven v. BP Am., Inc.*, 786 F. Supp. 853, 861 (C.D. Cal. 1992) (holding that "fishbrokers" do not fall within the commercial fishermen exception, as while "fishbrokers rely upon the resources of the sea in the same ways as the fishermen . . . that does not turn the brokers into fishermen").  Thus, Plaintiff cannot recover punitive damages.

## **CONCLUSION**

For the foregoing reasons, BP respectfully requests that the Court enter summary judgment and dismiss the Complaint with prejudice.

May 10, 2021                                  Respectfully submitted,


                                             */s/ Devin C. Reid*
                                             _____
                                             Devin C. Reid (Bar #32645)
                                             R. Keith Jarrett (Bar # 16984)
                                             **LISKOW & LEWIS**
                                             One Shell Square
                                             701 Poydras Street, Suite 5000
                                             New Orleans, Louisiana 70139-5099
                                             Telephone: (504) 581-7979
                                             Fax No. (504) 556-4108

                                             Matthew T. Regan, P.C.
                                             (matthew.regan@kirkland.com)
                                             Kristopher S. Ritter
                                             (kristopher.ritter@kirkland.com)
                                             **KIRKLAND & ELLIS LLP**
                                             300 North LaSalle
                                             Chicago, IL 60654
                                             Telephone:  (312) 862-2000

                                             Christopher W. Keegan
                                             (chris.keegan@kirkland.com)
                                             Ashley Littlefield
                                             (ashley.littlefield@kirkland.com)
                                             Anna Terteryan
                                             (anna.terteryan@kirkland.com)
                                             **KIRKLAND & ELLIS LLP**
                                             555 California Street
                                             San Francisco, CA 94104
                                             Telephone: (415) 439-1400

                                             *Attorneys for BP America Production Company*
                                             *and BP Exploration & Production Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing **BP'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT** has been served on All Counsel by electronically uploading the same to File & ServeXpress in accordance with Pretrial Order No. 12, as amended, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 10th day of May, 2021.

*/s/ Devin C. Reid*

Devin C. Reid