# EXHIBIT

# "A"

1                    BILLY BURKETTE

2            UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF LOUISIANA
3

GLOBAL DISASTER RECOVERY      )
4  & REBUILDING SERVICES,      )
  LLC, ET AL.,                 )
5                              )
            Plaintiffs,        )
6                              )           Case No.:
  VS.                          )        2:16-cv-6585
7                              )
  BP EXPLORATION &             )
8  PRODUCTION, INC., ET AL,    )
                              )
9            Defendants        )

10  -----------------------------------------------------------

11

            ORAL AND VIDEOTAPED DEPOSITION OF
12                    BILLY BURKETTE
                  FEBRUARY 2, 2021
13            (REPORTED REMOTELY VIA ZOOM)

14  -----------------------------------------------------------

15

16          ORAL AND VIDEOTAPED DEPOSITION, VIA ZOOM

17  VIDEOCONFERENCE, OF BILLY BURKETTE, produced as a witness

18  at the instance of the Defendant and duly sworn, was taken

19  in the above-styled and numbered cause on Tuesday,

20  February 2, 2021, from 9:38 a.m. to 6:17 p.m., before Kari

21  J. Behan, CCR, RPR, CRR, in and for the State of

22  Louisiana, reported by computerized stenotype machine, at

23  the offices of firm, address, Dallas, Texas, pursuant to

24  the Federal Rules of Civil Procedure.

25  JOB NO: 189255

Page 2

```
 1                    BILLY BURKETTE
 2              A P P E A R A N C E S
 3
     FOR THE PLAINTIFFS (VIA ZOOM):
 4
         ERIC WAYNE NEWELL, ESQ.
 5       BRENT COON & ASSOCIATES
         215 Orleans Street
 6       Beaumont, TX 77701
 7
 8
 9   FOR THE DEFENDANTS (VIA ZOOM):
10       AUSTIN KLAR, ESQ.
              - and -
11       JOY DINEO, ESQ.
              - and -
12       CHRISTOPHER KEEGAN, ESQ.
         KIRKLAND & ELLIS
13       555 California Street
         San Francisco, CA 94104
14
15
16
17
18   ALSO PRESENT:
19       Charles Brennan, Defendants
20
21   THE VIDEOGRAPHER:
22       Carlos Lopez
23
24
25
```

Page 3

```
 1                    I N D E X
 2   Examinations                             Page
 3
 4   BY MR. KLAR                                 7
 5   REPORTER'S CERTIFICATE                    246
 6   CHANGES AND SIGNATURE                     248
 7
 8              E X H I B I T S
 9   No.        Description                    Page
10   Exhibit 1  Deep Water Horizon Confidentiality   14
                Order
11
         Exhibit 2  Agreement between Airware LLC and   40
12                   Global Disaster Recovery &
                     Rebuilding Services LLC, dated June
13                   28, 2010, GLOBAL DISASTER 000076
                     through 000079
14
         Exhibit 3  BP Gulf of Mexico Regional Oil Spill   84
15                   Response Plan, BP-HZN-CEC 019244
                     through 019825
16
         Exhibit 4  E-mail dated July 2, 2010, GLOBAL   88
17                   DISASTER 000162 and 000163
18       Exhibit 5  E-mail dated May 21, 2010, GLOBAL   91
                     DISASTER 000159 through 000161
19
         Exhibit 6  E-mail dated May 12, 2010, GLOBAL   97
20                   DISASTER 000098 through 000107
21       Exhibit 7  Confidentiality Agreement;        122
                     Discloser, Billy Burkette;
22                   Recipient, BP, GLOBAL DISASTER
                     000137 through 000139
23
         Exhibit 8  Non-Circumvent Agreement entered   124
24                   into May 11, 2010, GLOBAL DISASTER
                     000147 and 000148
25
```

Page 4

```
 1   EXHIBITS (CONTINUED):
 2   Exhibit 9   E-mail dated January 29, 2013,       125
                 GLOBAL DISASTER 000108 through
 3               000110
 4   Exhibit 10  E-mail dated May 27, 2010, GLOBAL    131
                 DISASTER 000111 and 000112
 5
     Exhibit 11  Master Service Agreement, dated June 149
 6               15, 2010, GLOBAL DISASTER 000122
                 through 000136
 7
     Exhibit 12  ES&H Oil Spill/HAZMAT Services       154
 8               Ticket, dated June 21, 2010, GLOBAL
                 DISASTER 000089
 9
     Exhibit 13  Letter of Intent to Strategic        160
10               Services USA, LLC, dated June 15,
                 2010, GLOBAL DISASTER 000140 and
11               000141
12   Exhibit 14  Document dated June 18, 2010, from   183
                 Lil Lalumandier and Robert G. James,
13               GLOBAL DISASTER 000075
14   Exhibit 15  Deepwater Horizon Oil Pollution Act  193
                 Claim Form, GLOBAL DISASTER 000001
15               and 000002
16   Exhibit 16  Deepwater Horizon Oil Pollution Act  199
                 Claim Form, GLOBAL DISASTER 000050
17               and 000051
18   Exhibit 17  Exhibit A, Global Disaster's         202
                 Response to Pretrial Order No. 65
19
     Exhibit 18  Letter from Billy Burkette with BP   235
20               Complaint Form, GLOBAL DISASTER
                 000044 and 000045
21
22
23
24
25
```

Page 5

```
 1                    BILLY BURKETTE
 2                    PROCEEDINGS:
 3       (Tuesday, February 2, 2021, at 9:38 a.m.)
 4            THE VIDEOGRAPHER:  Good morning.  My name is
 5   Carlos Lopez.  I am a legal videographer in association
 6   with TSG Reporting, Inc.  Due to the severity of COVID-19
 7   and following the practice of social distancing, I will
 8   not be in the same room with the witness.  Instead, I will
 9   record this videotaped deposition remotely.  The reporter,
10   Kari Behan, also will not be in the same room and will
11   swear in the witness remotely.
12            Will all parties stipulate to the validity
13   of this video recording and remote swearing and that it
14   will be admissible in the courtroom as if it had been
15   taken following Rule 30 of the Federal Rules of Civil
16   Procedures and the state's rules where this case is
17   pending.
18            THE STENOGRAPHIC REPORTER:  I think he just
19   wanted you attorneys to agree that it was okay we were
20   taking it remotely.
21            MR. NEWELL:  Yes, agreed.
22            MR. KLAR:  Same.
23            THE STENOGRAPHIC REPORTER:  Mr. Burkette,
24   would you please raise your right hand?  Can you hear us
25   okay, Mr. Burkette?
```

BILLY BURKETTE

1
2          Carlos, do you want to stop the video for a
3 second?
4          THE VIDEOGRAPHER:  Yeah, let's go off the
5 record.  Time is 9:38 a.m.  We're going off the record.
6          (Brief recess taken.)
7          THE VIDEOGRAPHER:  This is the start of
8 Media Label No. 1 of the video-recorded deposition of
9 Billy Burkette in the matter of Global Disaster Recovery
10 and Rebuilding Services, LLC, et al., versus BP
11 Exploration & Production, Inc., et al.
12          This deposition is being held remotely on
13 February 2nd, 2021, at approximately 9:54 a.m.  My name is
14 Carlos Lopez.  I am the legal video specialist from TSG
15 Reporting, Inc.  The court reporter is Kari Behan in
16 association with TSG Reporting.
17          Would counsel please introduce yourself for
18 the record.
19          MR. KLAR:  Good morning.  This is Austin
20 Klar with Kirkland & Ellis for the Defendants.
21          MR. NEWELL:  Eric Newell on behalf of the
22 Plaintiff, Billy Burkette.
23          MS. DINEO:  Good morning.  My name is Joy
24 Dineo on behalf of the Defendants.
25          MR. BRENNAN:  Good morning.  My name is

BILLY BURKETTE

1
2 Charles Brennan on behalf of the Defendants.
3          BILLY BURKETTE,
4 after having been first duly sworn by the above-mentioned
5 Certified Court Reporter, was examined and testified as
6 follows:
7          THE STENOGRAPHIC REPORTER:  Thank you so
8 much.
9          We may proceed.
10          EXAMINATION
11 BY MR. KLAR:
12    Q.  Good morning, Mr. Burkette.
13    A.  Good morning.
14    Q.  So my name is Austin Klar.  I'm a lawyer at
15 Kirkland & Ellis, and I represent BP Defendants in these
16 proceedings.
17          Have you been deposed before?
18    A.  Couple times, yes, sir.
19    Q.  What -- what types of cases were you deposed in?
20    A.  Just a case where my daughter was removed from
21 school, and we had to file suit to have her put back into
22 the school because she lived out of the district, but the
23 school did not realize that we were renting a home inside
24 the district area.  So just a bunch of confusion.
25    Q.  So nothing to do with your -- your businesses or

BILLY BURKETTE

1
2 anything like that?
3    A.  No.
4    Q.  I want --
5    A.  I mean, they asked questions -- they asked
6 questions about, you know, where I worked, what I did,
7 those kinds of things, but other than that, no, sir.
8    Q.  Understood.
9          So I want to go over a few ground rules
10 today before we get started.  This may be different from
11 what you're used to because we're doing it remotely.
12          So if at any point you want to take a break,
13 just -- just let us know.  We don't -- we don't need to go
14 straight through this.  I just ask that if there's a -- a
15 question pending, that you answer it before we take a
16 break.
17          Is that okay?
18    A.  Yes, sir.
19    Q.  It's -- it's very important that you understand
20 my questions.  So if you don't understand any aspect of
21 it, will you please let me know?
22    A.  Yes, sir.
23    Q.  And if you're -- if you're going to answer one of
24 my questions without asking to clarify or saying you don't
25 understand, I'm -- I'm going to assume that you understand

BILLY BURKETTE

1
2 it.
3          Is that okay?
4    A.  Yes, sir.
5    Q.  Okay.  We have a court reporter who is being --
6 taking down, kind of, a transcript of everything that we
7 say today, so it's important that you let me finish asking
8 my question before you answer, and I let you, best I can,
9 finish your answer before I continue and that we don't
10 talk over each other.
11          Is that fair?
12    A.  Yes, sir.
13    Q.  And since everything's being written down, could
14 you make sure that you give verbal responses like you're
15 doing right now, "yes," "no," rather than, you know, a
16 head-nod or a head-shake or a "uh-huh" or anything like
17 that?
18    A.  Yes, sir.
19    Q.  Okay.  And if I refer to Global Disaster Recovery
20 Rebuilding Services, LLC, as "Global Disaster" or "the
21 Company," you'll -- you'll understand what I mean, right?
22    A.  Yes, sir.
23    Q.  And if I refer to the oil spill that occurred on
24 April 20th, 2010 that's the subject of this litigation as
25 "the spill," you'll understand what I mean, correct?

BILLY BURKETTE

1
2    A.  Yes, sir.
3    Q.  Do you understand that you are under oath today?
4    A.  Yes, sir.
5    Q.  Do you understand that you have to testify
6  truthfully and answer questions completely?
7    A.  Yes, sir.
8    Q.  Is there any reason why you are not able to do
9  that today?
10   A.  I don't think so.
11   Q.  Are you on any medications that would affect your
12 ability to testify truthfully and -- and accurately today?
13   A.  No, sir.
14   Q.  Do you have any illnesses that would prevent you
15 from testifying truthfully today?
16   A.  I didn't know there was such a thing.
17           No, sir.
18   Q.  And you understand that today you're testifying
19 in your personal capacity, correct?
20   A.  Don't know what the difference is, but I'm here.
21   Q.  Well, you've -- you've separately been designated
22 as a representative of Global Disaster to testify on
23 behalf of Global Disaster, correct?
24   A.  Well, I'm -- I'm sole owner of that, so there's
25 not anybody else that can testify but myself.

BILLY BURKETTE

1
2    Q.  Okay.  But today's deposition is -- is about
3  Billy Burkette, personally.  We'll talk, obviously, about
4  Global Disaster.
5           But you're not testifying in your capacity
6  as Global Disaster itself; you're testifying as Billy
7  Burkette.  You understand that?
8    A.  No, sir, not really.  Don't understand the
9  difference.
10   Q.  Okay.
11   A.  Would you like to explain that to me?
12   Q.  So today you're just asking -- asking questions,
13 and we ask that you answer them based on your personal
14 knowledge as Mr. Burkette.  Separately, there is a
15 requirement under the rules that if a company is asked to
16 testify, that a representative be designated on the
17 company's behalf to, kind of, speak as the company and be
18 educated on the topics for which the company was asked to
19 provide a deposition for.
20           So tomorrow's deposition will be more, kind
21 of, in your -- in your capacity as a representative of
22 Global Disaster.  Today's deposition is -- we are asking
23 Billy Burkette questions about what Billy Burkette knows
24 and -- and doesn't know.
25   A.  Okay.  So do -- is there an anticipation that

BILLY BURKETTE

1
2  there will be different answers as a representative as --
3  versus myself?
4    Q.  That's -- only -- I -- only you could -- could
5  tell us that, especially if --
6    A.  Well, no, I'm -- I'm asking -- I'm asking the
7  question, sir, because you said if I don't understand to
8  ask you.  Okay?  So I'm trying to understand your
9  position.
10          If -- if there is a Global Disaster rep- --
11 representative named Billy Burkette and I am a person
12 named Billy Burkette, is it your thought process that if
13 you ask me if gold -- if the color gold is gold, or if you
14 ask Global Disaster Recovery representative Billy Burkette
15 if the color gold is gold, would there be any other color,
16 other than gold, that you would suspect my answer to be?
17   Q.  I think if -- if -- if -- if the answers are
18 going to be the same in both capacities, that's okay.  We
19 are not expecting that an answer necessarily be different
20 or the same here --
21   A.  That's the part I'm confused about.  That's the
22 part I didn't understand.
23          So there would be no difference, in other
24 words?
25   Q.  Depending on the question, in theory, there could

BILLY BURKETTE

1
2  be, but --
3    A.  So you don't know --
4    Q.  -- if there is no difference in your answer, then
5  -- then there's no difference, and you can say so.
6    A.  So we're talking about theory, or are we talking
7  about facts?
8    Q.  We're talking about facts.
9    A.  Okay.  Well --
10   Q.  If I ask you a question toady --
11   A.  -- you said "theory."
12   Q.  If I ask you a question today and you answer it
13 and then I ask you a question tomorrow and you say, "I
14 have answered that; it's the same -- same answer, nothing
15 different," that's perfectly okay.
16          If you have something on behalf of the
17 Company that you're educated on that you'd like to say --
18 that, you know -- you -- you say that's different than
19 what you said yesterday, we can explore that too.  There's
20 -- there's no rule or requirement one way or the other.
21   A.  All right.
22   Q.  It's just answer the question truthfully and in
23 the capacity that you're presented.
24          MR. KLAR:  Can the court reporter please
25 mark Tab 1 as the first exhibit.  And I'll send it over

Page 14

```
1                    BILLY BURKETTE
2  the chat.
3                Did you receive that, Mrs. Behan?
4            THE WITNESS:  Did I?
5            THE STENOGRAPHIC REPORTER:  Yes, I have it.
6            (Exhibit 1 was marked for identification.)
7  BY MR. KLAR:
8      Q.  Mr. Burkette, did you get a copy of that?
9      A.  I got something.  You got to forgive me.  I'm not
10 a Zoom person.  Okay?
11     Q.  Understood.  We'll work together today.
12     A.  Yes, I have that.
13     Q.  Are -- are you able to open it?
14     A.  Tab 01.  Well, it's asking me to save it.  Click
15 to open.
16                All right.  It says here something from
17 2016.  Is that what I'm looking at?
18
```

Page 15

```
1                    BILLY BURKETTE
2      A.  Okay.
3
                                                    up -- I
24 passed it up a little bit.
25                Okay.  We are talking about A-1 Towing &
```

Page 16

```
1                    BILLY BURKETTE
2  Hauling, LLC; is that correct?
3      Q.  Correct.
4      A.  Okay.  So are we -- are you deposing me on behalf
5  of A-1 Towing & Hauling, LLC, or are we talking about
6  Global Disaster?
7      Q.  We're talking about Global Disaster.
8                But I'm -- I'm asking you:  In your personal
9  capacity, you signed this document as the owner of A-1
10 Towing, correct?
11     A.  I own both, yes, sir, and, yes, sir, I signed --
12 yes, I signed it.
13     Q.  Okay.
14     A.  So what you're basically trying to say is -- is
15 that because --
16           MR. NEWELL:  Billy -- Billy, let him ask
17 questions and answer the question.
18           THE WITNESS:  Okay.
19 BY MR. KLAR:
20     Q.  What was your relationship to A-1 Towing at the
21 time you signed the document?
22     A.  Owner.
23     Q.  Okay.  So you had the sole decision-making
24 authority for A-1 Towing as the owner, correct?
25     A.  Correct.
```

Page 17

```
1                    BILLY BURKETTE
2      Q.  Okay.  At the time you entered into this -- at
3  the time you signed this document on July 13, 2016, what
4  was your affiliation with Global Disaster?
5      A.  The same, owner.
6      Q.  So A-1 Towing and Global Disaster were both under
7  your control as owner at the time you signed this -- this
8  document, correct?
9      A.  Well, that's kind of a weird question, sir.
10 Would -- you're asking my understanding of something, so I
11 would like to explain that, if I may.
12     Q.  You can answer the question.
13     A.  Okay.  So my -- my understanding is the state
14 law, as well as the federal law, separates two -- two
15 companies by the division of their EIN and their tax ID
16 number and your secretary of state for the filings in
17 which you opened that business.
18                So there are two separate companies, and my
19 understanding, at that time, was that they are not related
20 businesses.
21     Q.  Okay.  A-1 Towing and Global Disaster were, while
22 separate businesses, under your control as the owner of
23 each of those at the time you signed this document,
24 correct?
25     A.  I believe so.  To the best of my knowledge, yes.
```



**Page 18**

BILLY BURKETTE

1
2
[redacted]

19  Q.  Did you read the -- the release before you signed
20  it?
21  A.  I did.
22  Q.  Did you understand it when you signed it?
23  A.  No, sir, I -- I did not understand it -- your
24  position of they are the same company.
25  Q.  I'm not saying -- I'm not saying --

**Page 19**

BILLY BURKETTE

2  A.  Under the same control, I'm sorry.
3  Q.  Did you understand the document when you read it?
4  A.  I did not understand it to mean what you are
5  saying it means.
6  Q.  Did you understand the words of the document when
7  you read it?
8  A.  No.
9  Q.  Can you turn to paragraph 10 of the document?
10  It's on the page marked 6 -- page 6.
11  A.  Which section?
12  Q.  Paragraph 10, on page 6.
13  A.  All right.
14  Q.  You see where it says, "By executing this Release
15  Agreement, Claimant warrants that it has read and
16  understood the terms of the Release Agreement and that it
17  executes the Release Agreement voluntarily and without
18  being pressured, influenced by or relying on any statement
19  or representation made by any person acting on behalf of
20  any BP Entity or other released parties."
21  Did I read that correctly?
22  A.  You read it correctly, yes, sir.
23  Q.  Okay.  So paragraph 10 says by signing this, you
24  read and understood the terms of this Release Agreement,
25  correct?

**Page 20**

BILLY BURKETTE

2  MR. NEWELL:  Objection, form.
3  THE WITNESS:  I mean -- could you repeat
4  your question, please?
5  BY MR. KLAR:
6  Q.  When you signed this document, you agree that,
7  pursuant to paragraph 10, that you were certifying that
8  you read and understood the terms of the Release
9  Agreement, correct?
10  A.  I -- I read and understood them to mean, I guess,
11  that A-1 is separate from Global, yes.  That's the way I
12  understood that to mean, yes.
13  [redacted]

**Page 21**

BILLY BURKETTE

2  postured it.  So it was either, "You take this, or you
3  won't get anything."  It was basically threatened to me
4  that way.
5  And the judge read this as well, so I'm
6  assuming that, you know, the judge would interpret it the
7  same way that I would interpret it or anybody would
8  interpret it, that they're obviously two separate
9  companies, and it is by far better for you to take this
10  little pittance right now, is the first avenue.
11  Now, the second thing that was a factor of
12  that is that because of BP's stagnating this in the court
13  system and dragging it out, here we are, what, 11 years
14  later just now having depositions, I felt like that I was
15  forced into accepting that and not as clearly as you so
16  read it.  There were different -- there were different
17  factors.
18  Q.  At the time that you signed the document, you
19  didn't tell anybody that you didn't understand it,
20  correct?
21  A.  At the time that I signed the document, I told
22  everybody that I understood it to mean that Global
23  Disaster was separate from BP -- I mean was separate from
24  A-1.
25  Q.  Okay.  At the time that you signed this document,

Page 22

BILLY BURKETTE

1
2  you didn't ask that any terms of the document be revised
3  to reflect your understanding, correct?
4       A.  No, sir, because they were in agreement with my
5  understanding that they were separate companies.  There
6  were no --
7       Q.  Who was in agreement with that?
8       A.  Everybody.
9       Q.  What is that based on?  What --
10  [REDACTED]
11
12       Q.  Okay.  Other than your attorneys, did you have
13  any conversations with anybody else regarding the terms of
14  this release?
15       A.  Yes -- oh, I don't know about that.  I don't
16  know -- you'll have to ask my attorney that.  [REDACTED]
17  [REDACTED]
18
19
20
21
22       Q.  Sitting here today, when you reviewed and signed
23  this document, did you have -- did you have any
24  discussions with anyone, besides your attorney, about the
25  terms of this agreement?

Page 23

BILLY BURKETTE

1
2       A.  Prior to my signing this document, best of my
3  recollection -- and you can correct me if I'm wrong with
4  this, Eric -- it was sent to me, e-mail and hardcopy.  I
5  was asked to read it, and if I had any questions about it,
6  to call and that they would get clarification.
7            So, obviously, the question was:  Is this
8  two separate companies, or is this all one company?  And
9  will -- me taking -- because that was my only question,
10  really, becau- -- that had the largest concern:  If I
11  accept this little punky 200,000 -- $250,000, will it
12  impact or have any impact at all on my Global Disaster
13  claim?  Their response to me was, "We don't think so, but
14  we will clarify."
15            So a couple of days had gone by, and I
16  called them back, and I said, "Look, I'm trying to find
17  out what's going on, because, you know, if I need to -- to
18  change or do something."  [REDACTED]
19  [REDACTED]
20
21
22
23
24
25

Page 24

BILLY BURKETTE

1
2  today?
3       A.  I -- I think that it is reflective of that today.
4       Q.  How long in between when you received -- first
5  received a copy of this agreement did you sign the
6  agreement?
7       A.  I don't know.  I would have to go back and look.
8       Q.  Do you recall, like -- like a range?  Was it a
9  week?  Was it a day?  More than that?
10       A.  I honestly don't recall exactly, but it was more
11  than -- it was more than just a day.
12       Q.  Okay.
13       A.  What was the date that I signed that?
14       Q.  July 13th, 2016.
15       A.  All right.  And what was the day it was prepared?
16       Q.  I don't know based on looking at the document.
17       A.  Well, I was looking for a date.  Usually, the
18  Court puts -- there it is, April 20th.  So, I mean, you
19  are talking about two months later.  I would think that
20  would probably be about fair for the speed in which this
21  thing has been going on.  That's pretty norm.  So, yes, it
22  was two months lapsed between the date that I would even
23  have been able to get it and when I signed it.
24       Q.  During those two months, presumably -- is that
25  the time period in which you claim to have had, whether

Page 25

BILLY BURKETTE

1
2  [REDACTED]
3  [REDACTED]
4  [REDACTED]
5  [REDACTED]
6  [REDACTED]
7  [REDACTED]
8  [REDACTED]
9  [REDACTED]
10       Q.  You tell me.
11       A.  Well, I'm -- I mean, I'm going by the best I can
12  do memory-wise, so "I don't know" is my answer.  I cannot
13  recall.
14       Q.  During the -- time from when you received the
15  document to the time that it was signed, do you recall
16  requesting any changes to the language of the document
17  itself?
18       A.  I'm not so sure that it was necessary because I
19  believe everybody understood that it was two separate
20  companies.
21       Q.  So -- so is that no, you didn't request any
22  language changes be made?
23       A.  I don't remember, sir.
24       Q.  Can you look at paragraph 1(e)?
25       A.  What page might that be on?

Page 26

BILLY BURKETTE

1
2      Q.  It's page 1 of the -- the Release Agreement,
3  page 4 of the PDF.
4      A.  E?
5      Q.  E, 1(e).
6      A.  Okay.  All right.
7      Q.  Do you recall requesting any changes be made to
8  that paragraph?
9      A.  Let's see.  I don't remember this paragraph, so I
10  need to read it.  Hold on just a moment, please.
11          "Claimant's related parties..."
12          Okay.  Can I ask a question right here?  Is
13  there a definition in -- within this documentation that is
14  different or that gives a definition of related parties?
15      Q.  (No response.)
16      A.  Because if -- I'm reading from D, which is right
17  above E, just so I understand, because you're picking this
18  thing apart and asking different paragraphs here and
19  different paragraphs there, and I'm trying to follow to
20  the best of my ability.
21          But it says, "'Claimant' meaning A-1 Towing
22  & Hauling, individually, and claimant's related parties."
23  So if I'm understanding your question correctly -- correct
24  me if I'm wrong -- it is A-1 Towing & Hauling, LLC and any
25  and all parties that A-1 Towing & Hauling, LLC would own,

Page 27

BILLY BURKETTE

1
2  it says, "individually or in claimant's related parties."
3  So claimant is A-1 Towing.  So claimant's related parties,
4  so A-1 Towing's ownership of something else is the way
5  that I understand that.
6          And then it says, "Claimant's related party
7  shall mean Claimant's affiliates, corporate" -- so
8  "Claimant's" meaning A-1 Towing.  So it means A-1 Towing's
9  "affiliates, corporate parents, subsidiaries,
10  predecessors, successors, indemnitors, subrogees, assigns,
11  officers, directors, employees, agents, representatives,
12  trustees, insurers, reinsurers, heirs, beneficiaries,
13  estates, executors, administrators, receivers,
14  conservatories, personal representatives, and any natural
15  legal, or juridical person, or entity entitled or
16  empowered to assert any claim on behalf or in respect of
17  A-1 Towing & Hauling, LLC, including A-1 Towing & Hauling,
18  LLC as a natural person, any spouse of the A-1 Towing &
19  Hauling, LLC and if A-1 Towing & Hauling is a sole
20  proprietorship in the spouse of Claimant's proprietor."  I
21  don't understand the spouse -- I guess that would be A-1's
22  married to somebody.  I'm not sure I understand that.
23          But, okay.  So what's the question about
24  that now?
25  BY MR. KLAR:

Page 28

BILLY BURKETTE

1
2      Q.  The question is -- just stepping back.
3          From the time that you -- sitting here
4  today, from the time that you received a copy of this
5  document and signed it, do you recall requesting that any
6  specific changes be made to any specific language of this
7  agreement?
8      A.  I recall asking if it was necessary and was told
9  no, because they were separate companies.  That's what I
10  recall.
11     ████████████████████████████████████████████
███████████████████████████
████████████████████████████████████████████
███████████████
████████████████████████████████████████████
████████████████████████████████████████████
█████████████████████████████████████
██████████████████████████████████
████████████████████████████████████████████
█████████████████████
22     Q.  So no changes were ultimately made after you --
23  no changes were made, whether you asked or not, no changes
24  were made to the best of your knowledge sitting here
25  today?

Page 29

BILLY BURKETTE

1
2      A.  To the best of my knowledge, that is correct.
3      Q.  Okay.  And earlier you indicated that you -- that
4  was one of the reasons that you signed it was that you
5  understood that it would not impact Global Disaster.
6  That's what you said, right?
7      A.  Correct.
8      Q.  And another -- and another reason why you
9  ultimately signed this particular document is because you
10  felt forced, right?  I think those were your words.
11     A.  I felt BP forced me, yes, those are my words.
12     Q.  Okay.  Are there any other reasons why you were
13  -- you felt that you were comfortable with or needed to
14  sign this document besides an understanding that it
15  wouldn't impact Global Disaster and feeling forced?
16     A.  Yes, sir, there was.  The confidence level which
17  I had in the case being able to move forward from the
18  court system and BP impacted my decision as well.
19     Q.  Okay.  Other than your confidence level and
20  feeling forced and your understanding of the agreement,
21  there weren't any other factors that you considered in
22  deciding to sign this agreement, correct?
23     A.  Not that I can think of at this particular time.
24     Q.  Okay.  All right.  Okay.  So earlier you
25  testified that you are the owner of Global Disaster,

BILLY BURKETTE

1
2  correct?
3      A.  Correct.
4      Q.  And are you the sole owner?
5      A.  Correct.
6      Q.  And has that always been the case?
7      A.  Best of my knowledge, yes, sir.
8      Q.  Okay.  Other than owner, have you had any other
9  roles with respect to Global Disaster?
10     A.  I'm not sure I understand that question, sir.
11     Q.  I'll ask it differently.
12         Are you the sole employee of Global
13 Disaster?
14     A.  No, sir.
15     Q.  Who are the --
16     A.  I'm not an employee.  I was the owner.
17     Q.  Does Global Disaster have employees?
18     A.  They did until the -- until BP put us out of
19 business.
20     Q.  Okay.  When -- at the time of the spill, how many
21 employees did Global Disaster have?
22     A.  I do not recall, sir.
23     Q.  Do you recall, was it less than ten?  Less than
24 50?  Is there a range you could give?
25     A.  I'm sure -- no, sir, I honestly -- at that time,

BILLY BURKETTE

1
2  I honestly cannot remember that far back.
3      Q.  Just to clarify:  At the time of the spill, you
4  were the 100 percent owner of the company, though,
5  correct?
6      A.  Best of my knowledge, yes, sir.
7      Q.  Okay.  Does Global Disaster have, like, a board
8  of directors or anything like that, or are you kind of the
9  sole decision-maker for Global Disaster?
10     A.  It is -- I guess you would say that I'm kind of
11 the sole decision-make- -- I mean, I wouldn't say I'm sole
12 decider, but at the end of the day, I am solely
13 responsible.
14     Q.  Who else at the company would you say, you know,
15 shares decision-making authority?
16     A.  Oh, well, at that time, it probably would have
17 been a lot of people because we were asking, you know, for
18 a multitude of wisdom.  So we asked a lot of people to
19 help decide those factors.  We -- we had meetings with the
20 governor.  We had meetings with congressmen.  We had
21 meetings with the sector commander, Mr. -- Captain
22 Stanton.  We had meetings with BP.  We had a lot of
23 meetings with a lot of people to help make the decision
24 for, you know, response and recovery to this operation so
25 that we would have, you know, obviously, the -- the best

BILLY BURKETTE

1
2  move forward from a response standpoint.
3      Q.  Understood.
4          So I'm asking specifically about
5  decision-making authority within Global Disaster itself,
6  recognizing you may have discussions with external parties
7  about what a course of action is that you want to take.
8  When it comes to making a decision for Global Disaster,
9  you --
10     A.  I mean, that's me --
11     Q.  Okay.
12     A.  I'm sorry.  I didn't mean to speak over you.
13     Q.  No.  No.  Understood.
14         To confirm, has Global Disaster ever done
15 business under any other name?
16     A.  No, sir, not that I -- not that I'm aware of.
17     Q.  Does Global Disaster have a parent company?
18     A.  Not that I'm aware of, no, sir.
19     Q.  Does Global Disaster have any subsidiaries?
20     A.  No, sir, not that I'm aware of.
21     Q.  Is Global Disaster an affiliate of any other
22 companies?
23     A.  Not that I'm aware of.
24     Q.  Okay.  At the time of the spill, where was Global
25 Disaster headquartered?

BILLY BURKETTE

1
2      A.  I guess you would say out of my truck, because we
3  were in the process of moving from one office to a
4  different office for A-1, and primarily, I was working out
5  of my truck and looking for an office space in New
6  Orleans, and that's where I finally came to the Port.  We
7  were looking for an office right around the Port there in
8  New Orleans, because that's where the rock was that we
9  were crushing, that Global Disaster had the contract to
10 crush, and as I was looking for that, that's when BP came
11 in and closed the Port down and made us evacuate.
12         So I really didn't have time to set up a --
13 a actual office in New Orleans at that time, and BP forced
14 me out of the Port, and, you know, basically shut my
15 business down.
16     Q.  Which -- which port are you referring to?
17     A.  I'm -- what do you mean which part?
18     Q.  Which port?
19     A.  Oh, it's in St. Bernard Parish.  It's St. Bernard
20 Port.
21     Q.  Okay.  And you -- you said that you were in the
22 process of moving from one office to another and you were
23 looking for office space in New Orleans before you
24 ultimately reached the Port.
25         What time period was that occurring in,

BILLY BURKETTE

1
2 approximately?
3     A.  So we had this contract.  I had been working on
4 this contract with Airware for -- so I'm going back in
5 memory.  They started piling the rock in '08.  We started
6 in '09 with design and a plan for crushing and
7 facilitating with the State and the oysters -- through
8 Wildlife and Fisheries to have the samples done.
9         Okay.  So I would -- I would say a couple of
10 months prior to the execution of the contract, when we --
11 not -- when I say "we," I'm speaking of Global Disaster --
12 when Global Disaster was in the Port and looking around
13 the Port for office space is about a couple of months
14 prior to execution of that contract.  Then at the same
15 time, because I was down there, we, being Global Disaster,
16 were not fruitful in finding our office space, whatever
17 you want to call it.
18         So I was negotiating the hauling portion of
19 the rock from the demolition of Katrina houses, and as I
20 was eating lunch with somebody, another man came over from
21 Phillips and Jordan, I think it was, and asked me how many
22 dump trucks I owned.  And I said, "Well, my company, A-1,
23 has 7 and we have contracted with 35.  He said, "Would you
24 like to do some levee work?"  I said, "Well, we can see,"
25 I said, "but right now I'm busy.  Can I call you later."

BILLY BURKETTE

1
2         So it ended up that A-1 started doing some
3 hauling in New Orleans, and they had a separate yard in
4 Slidell that A-1 was leasing that yard from.  Richie
5 Stephens was the man's name.  So I had a lease purchase
6 agreement for $205,000 for that yard.  It was a metal
7 building and -- I forget how many acres of land.
8         And that was -- that was the part that A-1
9 was moving from Baton Rouge to New Orleans or to Slidell
10 on Highway 90 to Richie Stephens' place.  At the same
11 time -- about the same time, because I don't want to say
12 exactly, is when BP came in and shut the yard down -- I
13 mean the Port down and said, "Everybody evacuate.  We --
14 it's a matter of national security," or some kind of crap
15 that they forced me out of the yard.
16     Q.  Okay.  So just stepping -- stepping back for a
17 second.  I want to break this up a little bit.
18         You mentioned a $250,000 lease purchase
19 agreement for the yard.  That was an agreement for A-1
20 Towing to lease the -- yard space for -- for their
21 hauling, correct?
22     A.  Correct.
23     Q.  Okay.
24     A.  And, actually, it was just a -- it was a small
25 shop, and it had vacant parking for A-1 to have the

BILLY BURKETTE

1
2 ability to park their trucks in order so that my drivers
3 did not have to drive all the way back to Baton Rouge
4 every day.
5     Q.  Okay.  So it wasn't a -- a lease that Global
6 Disaster was a party to, correct?
7     A.  Absolutely correct.
8     Q.  Okay.  So earlier, you mentioned you had been
9 working on a contract with Airware.  Airware started
10 piling rock in 2008, and you started designing a plan for
11 crushing, facilitating, moving that rock in 2009; is that
12 correct?
13     A.  No, sir.  What had happened was in -- after
14 Hurricane Katrina, there were -- in the recovery phase of
15 Katrina, there was about 4 million cubic yards of
16 demolition slabs that needed to be disposed of, and in
17 the -- you know, you have a hazardous mitigation plan, and
18 that plan was -- is pretty thorough as we could write it,
19 and it required certain things to be done to the concrete
20 prior to it being allowed to be moved.  That was part of
21 the reason that I was going into the disaster-recovery
22 business, is because the work that I had done previously
23 for the government as a -- train the trainer for
24 disaster-recovery business, I would teach classes to teach
25 people how to -- what the difference is between mitigation

BILLY BURKETTE

1
2 response, recovery, you know, the whole nine yards.
3         So anyway, I was trying to focus on the rock
4 moving.  Well, A-1 is the rock mover.  They moved slabs
5 from lower St. Bernard Parish, the Ninth Ward, they would
6 call it, over to the Port of St. Bernard.  This was
7 several hundred yards long and at least a 120-something
8 feet tall, so it was well over a million cubic yards of
9 slabs.  They did not have anybody that could crush it on
10 site, so I went to Airware and Airware was the one that
11 said, "Hey, if you can find a way to get a mobile-crushing
12 machine in here, we'll give you the contract."
13         So I put together the mobile-crushing --
14 it's -- it was really three or four parts.  You had to
15 screen, you had to remove the metal, you had to have a
16 scrap yard, you had to have front-end loaders, you had to
17 have, you know, excavators, with a live thumb to feed the
18 crusher.  I mean, it was a scaleable operation, and it
19 scaled under very, very rapidly.  So our first month that
20 we did, we crushed almost $210,000 worth of stone -- or
21 slabs.  And I think we were in the beginning phases of the
22 first month -- or at the end of the first month.  First --
23 first week or so of the second month is when BP came in
24 and shut the Port down and -- and made us remove.
25     Q.  So the -- the -- you said Airware told you -- no

Page 38

BILLY BURKETTE

1  one could crush rock on site and Airware told you if you
2  had a -- if you got a mobile-crushing unit, they would
3  give you the contract.
4        By "you," do you mean A-1 hauling or do you
5  mean Global Disaster or some other entity?
6     A. Okay, Global Disaster.
7        Now, the reason that Airware even knew about
8  Global Disaster is because A-1 Towing & Hauling was
9  assisting to bring those slabs into the Port.
10    Q. Okay. Once A-1 Towing brought the slabs into the
11  Port, you're saying that Global Disaster was responsible
12  for crushing it?
13    A. Correct.
14    Q. And that's --
15    A. Two separate businesses all together.
16    Q. And that's pursuant to a contract that you signed
17  with Airware; is that correct?
18    A. That is correct, yes, sir.
19    Q. So talking about Airware, while we are on the
20  subject, so when did you -- when were you first contacted
21  by Airware?
22    A. I don't recall, sir.
23    Q. Do you recall, was it in 2008, 2009?  Do you have
24  a -- any range?

Page 39

BILLY BURKETTE

1     A. Oh, it was in '8.  I'm -- I mean, that -- it
2  was -- 2008 is when we started, but --
3     Q. And --
4     A. Actually, it was at the end -- it was probably
5  closer to around Christmastime or Thanksgiving time of
6  '07, because I believe that's when A-1 started hauling the
7  slabs.  I would have to go back and look, sir.  "I'm not
8  sure" is my answer.
9     Q. How long between -- did -- did -- sorry.  Step
10  back.
11        You mentioned that the concrete-crushing
12  business had multiple parts to the process, correct; there
13  was a screen, removing scrap and then loaders, excavators,
14  et cetera.  From -- did you start putting those pieces
15  together before or after Airware first contacted you in
16  2008?
17    A. Oh, no, it was after.
18    Q. Okay.  How long, from your first contact with
19  Airware, were you able to start your concrete-crushing --
20  or Global Disaster's concrete-crushing operation?
21    A. Couple of weeks, I'm guessing.  Not sure, sir.
22    Q. I'm sending Tab 27 to the group.
23        Can you open that when it gets to you,
24  Mr. Burkette?

Page 40

BILLY BURKETTE

1     A. Yes, sir.
2        THE STENOGRAPHIC REPORTER:  Will this be
3  Exhibit 27, Mr. Klar?
4        MR. KLAR:  This will be, I guess, whatever
5  the next in line is, I guess that's --
6        THE STENOGRAPHIC REPORTER:  2.
7        MR. KLAR:  -- 2?
8        We can just mark them next in line.  We just
9  labeled them on our end, so we can keep them straight.
10        THE STENOGRAPHIC REPORTER:  Okay.  No
11  problem.
12        And, Mr. Burkette, while you're doing that,
13  just make sure to let him finish asking his question
14  before you begin answering.
15        THE WITNESS:  Yes, ma'am.
16        THE STENOGRAPHIC REPORTER:  It gets a little
17  tough on me when it's two people at one time.  Thank you.
18        THE WITNESS:  I'm sorry.
19        THE STENOGRAPHIC REPORTER:  It's okay.
20        (Exhibit 2 was marked for identification.)
21  BY MR. KLAR:
22    Q. Mr. Burkette, can you -- were you able to open
23  that document?
24    A. Yes, sir.

Page 41

BILLY BURKETTE

1     Q. Do you recognize this document?
2     A. I do.
3     Q. Is this the agreement with Airware that we were
4  just referring to?
5     A. Yes, sir.
6     Q. And it is dated June 28, 2010, between Airware
7  and Global Disaster; is that correct?
8     A. That's what the date says, yes, sir.
9     Q. And on the last page of the document, that's your
10  signature, correct?
11    A. Yes, sir.
12    Q. Okay.  And is this the only contract that you
13  entered into between Global Disaster and Airware?
14    A. Yes, sir -- well, you know, I -- I don't want to
15  say "the only," because we had several verbal agreement
16  contracts prior to executing that one.
17    Q. Okay.  What -- what verbal agreements did you
18  have?
19    A. Well, like I just told you, setting up, finding a
20  way to make that mobile-crushing operation, finding areas
21  for the scrap -- trying to locate scrap dealers, trying to
22  set up a contract with -- which ultimately became my
23  responsibility, because Airware did not want the
24  responsibility of the scrap removal.  Then it took

Page 42

BILLY BURKETTE

1
2 probably six months to get the deal with the Port for us
3 to even start putting the rock there in '08.  I don't
4 know.  It was just a bunch of different things.
5      Q.  Okay.  What -- what of those, though, were the --
6 are the verbal agreements with Airware?
7      A.  That we would do the crushing of the concrete.
8      Q.  So everything that you just described are the
9 steps that Global Disaster had to take in order to perform
10 under the eventual agreement that you signed with Airware,
11 correct?
12      A.  That's a portion of some of the steps.  That's
13 not all of the steps, yes, sir.
14      Q.  When did -- okay.  So in 2008, when you first had
15 discussions with Airware, can you describe to me the --
16 the steps that you took to get ready -- strike that.
17           Other than the verbal -- other than this
18 written document with Airware that you're looking at, did
19 you have an agreement with Airware on any other payment
20 terms for work that Global Disaster would perform?
21      A.  I'm sorry.  Say it -- repeat the question.
22      Q.  Before signing this agreement, was Airware
23 obligated to pay Global Disaster anything for concrete
24 crushing?
25      A.  Yes, sir.  We originally had a price of $14.50

Page 43

BILLY BURKETTE

1
2 per cubic yard.
3      Q.  Okay.  And that's reflected verbally?
4      A.  Yes.
5      Q.  With who did you -- who was your main
6 contact at Airware?
7      A.  Terry Williams.
8      Q.  I'm sorry.  Harry --
9      A.  Terry, T-E-R-R-Y.
10      Q.  And is he the person you first talked to when you
11 had your first contact with Airware in 2008?
12      A.  Yes.
13      Q.  Okay.  When you first met, what -- what did you
14 talk about?
15      A.  Well, when we first met, we talked about the huge
16 pile of rock down there in the Port and how it was growing
17 every day, and he asked if I would send a couple of people
18 with excavators and a dozer to help manage that pile,
19 because it was so out of control, because you had every
20 trucking company down there bringing this rock/slabs into
21 this area and basically just dumping it.
22           So they had no way to manage the site.  So
23 we had to send people down and basically organize a route
24 to get the trucks up to a flat spot on top of the -- the
25 pile of rock, and then provide a turnaround and a dumping

Page 44

BILLY BURKETTE

1
2 area on top of this pile of rock and manage that so that
3 the daily intake could continue to come in.  That went on
4 for over a year.
5      Q.  Okay.  So can you -- earlier you testified that
6 after your first discussion with Airware, it took you a
7 few weeks to have the mobile-crushing operation set up,
8 correct?
9      A.  After we -- yes, sir, after -- after we went to
10 the Port and to the oyster fishermen and to Wildlife and
11 Fisheries and to the State of Louisiana for the -- what
12 was Mike's -- as part of the recovery package under
13 Jindal.
14           Anyway, there was a couple of places we had
15 to visit that had to give, I guess, approval for that to
16 be done.  So I'm thinking that that took a couple of
17 weeks, yes.  Now, that's way after the fact of -- you've
18 referred to the date of the contract is when we actually
19 started that process.  So we -- understand, we had been
20 doing work there prior to the signing of the contract
21 because we had verbal agreements.
22      Q.  So you said the couple of weeks that you are
23 referring to, the date of the contract is when you
24 actually started the process.
25           So I just want to make sure I understand.

Page 45

BILLY BURKETTE

1
2 The date of this contract is June 28th, 2010.  Are you
3 saying that once you signed this document, that's when you
4 started the process of going to the Port, going to the
5 State, going to the oyster organizations, et cetera?
6      A.  No, sir.
7      Q.  Okay.
8      A.  What I'm saying is --
9      Q.  Can you give me a timeline --
10      A.  I'm sorry?
11      Q.  Go ahead.
12      A.  What I'm saying is, we had been down there moving
13 rock and managing the pile for Airware.  Okay?  In order
14 for me to set up a half-a-million-dollar piece of
15 equipment to screen out the copper, the metal, the brass,
16 all of the things, and a $4 million piece of equipment to
17 crush the actual slabs, when I went to -- to lease that
18 equipment, the leasing company, being Doggett, told me
19 that they would not lease it without a contract.  So I
20 went to Airware and said, "Hey, Terry, we got to have a
21 contract in order for me to get the equipment."
22 BY MR. KLAR:
23      Q.  Okay.  And that's why you entered into this
24 contract?
25      A.  Absolutely.

Page 46

BILLY BURKETTE

1
2    Q.  Okay.  At the time you entered into this
3  contract, it was over two months after the spill had
4  occurred, correct?
5    A.  That is absolutely my best guesstimate, yes.
6    Q.  Okay.  And you understood the spill potentially
7  could impact businesses in that area, correct, in the area
8  of the Port?
9    A.  No.
10    Q.  At the time you entered into the contract with
11  Airware, you had no understanding or information the spill
12  might impact business in the Port?
13    A.  Well, no, sir, because the president said it
14  wouldn't.
15    Q.  That wasn't based on any of your own
16  investigation or anything.  It's what the president of
17  Airware said?
18    A.  No, not the president of Airware, the president
19  of the United States.
20    Q.  The president of the United States said that the
21  spill would have no impact on the Port of St. Bernard?
22    A.  And -- not just the Port of St. Bernard, but any
23  of the ports, and BP's head people said that it would not
24  impact us.  Don't you remember BP saying, "Oh, it's
25  nothing, it's just a mild spill.  It wouldn't impact

Page 47

BILLY BURKETTE

1
2  anything."  Don't you -- you must have seen the news
3  like it was down here.
4    Q.  Okay.  If you can turn to paragraph 4 of the
5  agreement.
6    A.  Okay.
7    Q.  This is scope of work and related data.  Does
8  this paragraph accurately reflect the scope of work that
9  Airware contracted Global Disaster to perform?
10    A.  "The extent and scope of work and other agreement
11  documents is that the contractor furnishes all labor and
12  materials, equipment and supervision necessary to crush
13  the stockpile concrete into road-based material, commonly
14  known as recycled concrete aggregate, herein referred to
15  as 'work.'  Unless specifically noted otherwise, the
16  contractor shall do all the work described in the contract
17  documents and in all incidental work necessary to complete
18  the work entirely ready for use."
19    Q.  Does that accurately describe the scope of work
20  they were contracting you to perform?
21    A.  That accurately -- I think that's what I just
22  spent the last half hour explaining to you.  Yes.
23    Q.  Okay.  Before -- okay.  If you could turn to the
24  next paragraph where it says, "The total authorized amount
25  is 950 per ton."

Page 48

BILLY BURKETTE

1
2         Does that accurately reflect -- that changes
3  the verbal agreement that you had with Airware before
4  entering into this agreement, correct?
5    A.  It does.
6    Q.  Okay.  That -- you -- 950 is the -- is the
7  contracted-to term, correct?
8    A.  Yes, sir.
9    Q.  Okay.  Before entering into this contract, had
10  Airware made any payments to you on account of any work
11  that Global Disaster had done?
12    A.  Don't recall.
13    Q.  Okay.  After entering into this -- or sorry.
14  Stepping back.
15         If you take a look at paragraph 5, the last
16  sentence, it says, "At the end of each week, the
17  contractor shall submit an invoice with the supporting
18  documentation of all work completed for the finance
19  department for payment."
20         Did I read that correctly?
21    A.  I believe so.
22    Q.  Okay.  Did Global Disaster ever submit any
23  invoices to Airware with supporting documentation for
24  payment to Airware's finance department?
25    A.  Yes, sir, we did.

Page 49

BILLY BURKETTE

1
2    Q.  Okay.  How -- how much in invoices were
3  submitted?
4    A.  The first week was 250 or 280,000, and -- and
5  Airware didn't have the money to pay it, because they,
6  too, were impacted by BP, and the -- the story that was
7  told to me, which I cannot confirm nor deny -- just
8  telling you what I was told -- by Terry Williams is, is
9  that BP basically impacted his business to where he was
10  unable to cover his cost by this contractual agreement.
11    Q.  Okay.  So after that first week's invoice was
12  submitted, were any other invoices submitted to Airware?
13    A.  Yes, the next week was, and the next week was.  I
14  think we did a full month, if I'm not mistaken.
15    Q.  Do you recall for how much?
16    A.  No, sir, I do not.
17    Q.  Was it -- do you recall if it would be more or
18  less than what the first week was, 250 to 280,000?
19    A.  Oh, I'm sure it would have been more.
20         So then, because of BP's response to the
21  spill, we were approached by Captain Stanton of the -- who
22  was the sector commander of the Gulf, and Captain Stanton
23  asked what we were going to utilize that rock for.  I
24  guess they needed some somewhere.  Don't really know how
25  or what BP would have -- would have wanted to do with that

Page 50

BILLY BURKETTE

1     BILLY BURKETTE
2 rock, but when the conversation that I had with him was
3 that once we crushed it to a small stone, that it was my
4 plan, being Global Disaster's plan, to sell it to Robin
5 Seafood.
6           So Dan Robin's Seafood is friends with
7 Richie Stephens who A-1 was -- had the lease purchase with
8 is how I got introduced into Dan.  So Mr. Richie Stephens
9 introduced me to Dan.  Dan said, "Hey, if -- if you can
10 get the State of Louisiana to approve that crushed
11 concrete and the size of that crushed concrete, then I
12 will buy everything you've got at $45 a ton."
13      Q.  When -- so when did this conversation take place?
14      A.  I don't recall, sir.  Sometime in that time
15 frame, around 2010.
16      Q.  Okay.  It was after the spill, after the Airware
17 contract was signed, right?
18      A.  Yes.
19      Q.  Okay.  Did any -- did you ever enter into any
20 agreement reflecting that?
21      A.  Yes, sir, and y'all have a copy of that.
22      Q.  Which contract is that?
23      A.  The one with Robin Seafood.
24      Q.  Okay.  I don't believe we have a copy of that
25 contract.

Page 51

1     BILLY BURKETTE
2      A.  It was in the A-1 documents because A-1 was going
3 to do the hauling.
4      Q.  But you're saying in the A-1 documents there's a
5 contract between Global Disaster and Robin Seafood?
6      A.  Nope.  What I said was Richie Stephens came to
7 find out that I was the one crushing the rock.  He said if
8 I could get it approved, that he would buy everything that
9 there was at $45 a ton.  So A-1 would haul it after the
10 Global Disaster crushed it.
11      Q.  Okay.  So the contract was between A-1 or -- and
12 Robin Seafood, not Global Disaster?
13      A.  Correct.
14      Q.  Okay.  So you're not claiming damages -- Global
15 Disaster is not claiming damages from BP for anything
16 related to the Robin Seafood contract?
17      A.  Absolutely, I am.
18      Q.  Okay.  What -- what are you claiming with respect
19 to the Robin Seafood contract for or on behalf of Global
20 Disaster?
21      A.  BP -- BP forced me out of the Port so I couldn't
22 crush it so I couldn't sell it to Dan Robin.  Surely, you
23 can see that, right?
24      Q.  A-1 Towing had a contract with Dan Robin, not
25 Global Disaster?

Page 52

1     BILLY BURKETTE
2      A.  I'm sorry?
3      Q.  A-1 Towing had a contract with Dan Robin to sell
4 the concrete, not Global Disaster, correct?
5      A.  I'm sorry.  I misunderstood your question.  Did
6 you ask me if Global Disaster was making a claim against
7 BP because of the rock not being able to be sold to Dan
8 Robin.  Is that what your question was?
9      Q.  Yes.
10      A.  Okay.  Then, yes, my answer is yes.
11      Q.  Okay.  What is that based on?  Because the
12 contract was between A-1 and Robin Seafood, correct?
13      A.  Correct.
14      Q.  Okay.  So how is Global Disaster impacted by A-1
15 Towing's agreement with Robin Seafood not being able to be
16 carried -- carried through?
17      A.  Well, it was impacted because BP forced me out of
18 the Port.  I'm not so sure my mic is working.  Can you
19 hear me?
20      Q.  I can hear you.
21      A.  Okay.  Well, I've said that twice.  I just didn't
22 understand.
23      Q.  Okay.  You said BP forced you out of the Port?
24      A.  Yeah.
25      Q.  Global -- Robin Seafood had no obligation to

Page 53

1     BILLY BURKETTE
2 purchase any concrete from Global Disaster, correct?
3      A.  I wouldn't -- no, sir, I wouldn't say that was
4 correct.
5      Q.  Why not?
6      A.  Depends on how your view is.  If I own both
7 companies -- if I own both companies and choose to
8 separate the job description because of the nature of the
9 work, it's --
10      Q.  The contract between Robin Seafood and A-1
11 Towing, Global Disaster was not a party to it, correct?
12      A.  You know, that's a very good question.  I would
13 think that since I own both that, yes, sir, I would be a
14 party to both.
15      Q.  Not you, Billy Burkette.  Global Disaster, was
16 Global Disaster a party to A-1 Towing and Robin Seafood
17 contract?
18      A.  I'm sorry.  I misunderstood again.  I thought you
19 said we were talking about me today, not Global Disaster.
20 That would be tomorrow.
21      Q.  We are talking about -- we are asking you
22 questions in your personal capacity, but if you have
23 knowledge about Global Disaster's operations and
24 relationships, you have to answer them.  So to your
25 knowledge --

BILLY BURKETTE

1
2    A.  It is my opinion that, yes, it is -- it was my
3 decision as owner of both companies that it was both
4 companies that were impacted, one versus the other.
5    Q.  Okay.  But the contract between Robin's Seafood
6 and A-1 Towing, Global Disaster as the company, Global
7 Disaster, it was not a party to that contract, correct?
8 It was A-1's contract, right?
9    A.  Correct.
10    Q.  Okay.
11    A.  So they are separate, yes.
12    Q.  Under the terms of that contract, Robin Seafood
13 -- let's say if it had been performed, Robin Seafood,
14 under no circumstances, would owe money to Global
15 Disaster; they would owe it to A-1 Seafood [sic], correct?
16    A.  A-1 Towing.
17    Q.  I'm sorry.  A-1 Towing?
18    A.  That is correct.
19    Q.  Okay.
20    A.  But now -- but just for clarity, just so we're
21 clear, BP crushed the concrete and sold it to Robin
22 Seafood.  So again, ultimately, BP impacted Global
23 Disaster's ability to crush that rock, yes, sir.
24    Q.  Okay.  So can you walk me through how it came to
25 be that BP crushed the rock that was eventually sold?

BILLY BURKETTE

1
2    A.  Yes, sir, I can.  They -- when they found out
3 what I was trying to do as part of the mitigation plan and
4 the recovery operations, BP was trying to make itself look
5 good to the public.  So they knew that I had the pile of
6 rock there; they knew that they had caused catastrophic
7 financial damages to my company, basically ruining my
8 company, because of hardship that they forced me into, not
9 being able to perform on the contract, and they just
10 circumvented me.
11    Q.  Okay.  So is it your testimony that after the
12 Port was shut down, BP took over the concrete pile and
13 crushed it for themselves and sold it?
14    A.  That is my understanding, yes.
15    Q.  Okay.  Do you know approximately when the Port
16 closed and BP took over?
17    A.  It was sometime around middle of '10 to maybe
18 July/August or something like that, I'm guessing.  I don't
19 really know, no, sir, I don't remember.  But I'm sure if
20 you contact the Port, they can give you that information.
21    Q.  Okay.  So stepping back, we were talking about
22 the Airware contract a few minutes ago.
23    A.  Yep.
24    Q.  You mentioned that you submitted a -- an invoice
25 the first week, and then another one, maybe, for a full

BILLY BURKETTE

1
2 month's work.  Was there another invoice after that?
3    A.  No, sir, because after that, you know, is when BP
4 basically shut the Port down and took it over.
5    Q.  Okay.  And Airware never -- did Airware ever pay
6 you for the invoices that you submitted?
7    A.  No, sir, they did not.
8    Q.  Okay.  If you look at paragraph 7 of the contract
9 that says "Project Schedule," let me know when you're
10 there.
11    A.  Yes, sir, I'm here.
12    Q.  Okay.  It says, in the first sentence, "The
13 contractor shall commence work to the -- to be performed
14 under this contract upon receipt of written notice to
15 proceed from the purchasing and contract administrator."
16        Did you ever receive one of those notices?
17    A.  I'm not sure, sir.  Don't remember.
18    Q.  Okay.
19    A.  I know -- I know that we would -- we would not
20 have been there if we didn't.  I mean, we had been working
21 there for a long time prior to this contract, so, I mean,
22 I -- I don't know if that's even a -- I wouldn't even know
23 if that's a legitimate question.
24        I mean, you can't -- can you -- can you say
25 at that after you've been working somewhere that you're

BILLY BURKETTE

1
2 going to need a written notice to continue to work?  We
3 had already been doing it.  I mean, I don't understand --
4 I guess that's language -- attorney language trying to
5 read into something that was unnecessary or scapegoat or
6 something.  I don't know.  It's just -- whatever.  I don't
7 remember, sir.
8    Q.  Okay.  So you don't -- sitting here today, you
9 don't remember receiving a notice to proceed from the
10 purchasing and contract administrator?
11    A.  No, sir, I don't.
12    Q.  So sitting here today, you have no knowledge of
13 whether Global Disaster or you would have a copy of that
14 document, correct?
15    A.  No, sir, I don't.
16    Q.  And do you have copies of the invoices that --
17 that you claim you submitted to Airware for reimbursement
18 for the work you did?
19    A.  No, sir, I don't.
20    Q.  Do you have any records reflecting what work you
21 did for Airware before signing the Airware contract?
22    A.  I believe y'all have all of that through my
23 attorney.
24    Q.  Okay.  So to the extent there are records of the
25 work that you performed for Airware, we have it?

BILLY BURKETTE

1
2    A.  Yes.
3    Q.  And other than what was produced in this
4  litigation, there is no other documents that -- that
5  you're aware of that reflect any work that was done by
6  Airware -- I'm sorry, for Airware before entering into the
7  contract?
8    A.  I have -- I mean, I'm sure I have e-mails of
9  that.  I just don't know -- I don't know, sir.
10    Q.  Okay.  Is -- what about documents reflecting work
11  performed for Airware before you entered into the
12  agreement?
13    A.  I don't know, sir.
14    Q.  Okay.  All right.
15        MR. KLAR:  Can we go off the record for a
16  few minutes?
17        THE VIDEOGRAPHER:  Time is 11:15 a.m.  We
18  are going off the record.
19        (Brief recess taken.)
20        THE VIDEOGRAPHER:  Time is 11:32 a.m.  We
21  are back on the record.
22  BY MR. KLAR:
23    Q.  Mr. Burkette, earlier you mentioned that it was
24  A-1 Towing's responsibility to haul the concrete to the
25  site where Global Disaster was responsible for crushing

BILLY BURKETTE

1
2  it, and then A-1 Towing had a contract with Robin Seafood
3  to then sell that crushed concrete.
4        Does that -- does that accurately summarize
5  what we were discussing earlier?
6    A.  Could you repeat that, please?
7    Q.  Sure.  So A-1 Towing was responsible for -- for
8  hauling the concrete to the site where Global Disaster had
9  a contract with Airware to crush it, and then A-1 Towing
10  had a contract with Robin Seafood to then sell that
11  crushed concrete, correct?
12    A.  No, sir.  I believe Eric has that document.
13  Basically, the way I said that, if it's -- my
14  understanding was correct, is A-1 Towing & Hauling had a
15  contract to bring the crushed concrete to Dan Robin.
16    Q.  So who owned that concrete -- who owned the
17  concrete before -- is it -- does Robin Seafood own the
18  concrete or somebody else?
19    A.  Nope.  It basically is going to be tied up in
20  this litigation that BP took possession of the con- -- of
21  the concrete and stole it from -- from Global, because I'm
22  the only one that had an active contract for the crushing
23  of that concrete.  So they took it from me.
24    Q.  Okay.  Airware is paying Global Disaster -- under
25  this contract, Airware was paying Global Disaster to crush

BILLY BURKETTE

1
2  the concrete, correct?
3    A.  Correct.  But then when they could not pay their
4  bill, obviously we would take -- until they paid their
5  bill, we had a lien -- I'm not sure that that lien was
6  through the justice of the peace.  I don't know, it was --
7  it was my understanding that we would have a contract -- I
8  forget what you call it, I talked to an attorney, Perez,
9  down there in St. Bernard -- that basically would give us
10  the right to take the pile until such a time we were paid
11  or until such time as we could sell it ourselves and make
12  us whole.
13        And that's when BP basically forced us out
14  and did it themselves.
15    Q.  Okay.  What -- if Airware doesn't own the
16  concrete, why are they paying Global Disaster to crush the
17  concrete?  How does Airware fit into this?
18    A.  Terry Williams is very close friends with
19  Congressman Cedric Richardson [sic].  Duration the
20  administration, there was a lot of political involvement
21  with BP and the Obama Administration and Terry Williams
22  and Cedric Richardson, and a lot of political stuff
23  happened.  Okay?
24        And Terry Williams was originally a
25  contractor for the airport.  He originally had a contract

BILLY BURKETTE

1
2  with the airport to provide this rock as a foundation for
3  new runways.  I was not privy to that conversation, other
4  than what Terry Williams told me out of his own mouth,
5  that there was some special consideration and some special
6  favors given via communication with Obama and Cedric
7  Richardson, the congressman.
8        And, ultimately, BP, because they took over
9  the Port, took it away from Terry and myself, is my
10  understanding.
11    Q.  "It," being the concrete?
12    A.  Yes.  Well, that's what you asked me, isn't it?
13    Q.  I was -- okay.  So stepping back.  Is this -- is
14  it your testimony that the concrete that -- that Global
15  Disaster was contracted to crush for -- that Airware was
16  paying for was to be used to build airport runways based
17  on an agreement between Airware and the airport?
18    A.  A portion of it.
19    Q.  Okay.  What portion?
20    A.  200,000 tons.
21    Q.  And what -- what's the -- what was the total
22  tonnage of the stock that --
23    A.  Almost 2 million -- almost 2 million tons.
24    Q.  Okay.  So approximately 10 percent of the total
25  stockpile was going to be -- was supposed to be used by

BILLY BURKETTE

1
2 the airport to build runways?
3      A.  Okay.  So, wait, I don't want there to be any
4 mis- -- miscommunication.  I may have misspoke.
5           The dimensions of that pile is a hundred
6 thousand cubic yards when they first started.  We had to
7 build the roads and work the pile and manage the pile, and
8 eventually, the last calculation that we had was
9 1.8 million cubic yards.  If you know about disasters,
10 then the reduction is a 4 to 1 reduction.  So that's going
11 to equate to 4 million cubic yards once it's crushed.
12      Q.  Got it.
13           So earlier what you were saying is there
14 were 2 million tons of uncrushed concrete, and
15 200,000 tons of crushed was scheduled to go to the airport
16 rebuild?
17      A.  If -- yes.  If -- if we are using a tonnage.  But
18 actually, to configure it, it's figured in cubic yards by
19 disaster standards.
20      Q.  But either way, whether you're talking about
21 tons --
22      A.  Yards or tons, it's 10 percent, yes.
23      Q.  Okay.  Okay.  So I think we are on the same page
24 there.
25      A.  And I'm sorry, Mrs. Court reporter.  I -- I

BILLY BURKETTE

1
2 apologize.
3           THE STENOGRAPHIC REPORTER:  Thank you.
4 BY MR. KLAR:
5      Q.  So I just want to -- so stepping back to my
6 original question, which is:  Who actually owns -- there's
7 a stock pile of -- of uncrushed concrete.  Who is the
8 owner of that concrete?
9      A.  It was the -- Airware, Terry Williams, until he
10 could not pay his debt.  Then it was my understanding that
11 we were to take ownership.
12      Q.  Of the entire stockpile?
13      A.  Yes.
14      Q.  And that was based on a lien that you -- that
15 Global Disaster placed against Airware as a result of
16 Airware's failure to pay Global Disaster's invoices?
17      A.  Well, I -- I don't think we had to enforce the
18 lien, because I think, if I remember correctly, Terry
19 Williams said he would forfeit the pile to us as long as
20 we continued to -- or agreed to furnish him his 200,000 or
21 10 percent or whatever it -- whatever his needs were for
22 the airport.
23      Q.  Okay.  The agreement that you -- if you didn't
24 own -- if Global Disaster didn't own the concrete until
25 after Airware had failed to pay and they deeded you,

BILLY BURKETTE

1
2 effectively, ownership of the stockpile, how is it that
3 A-1 Towing was able to agree to sell that crushed concrete
4 to Robin Seafood?  Did that agreement come into place only
5 after Global Disaster obtained title from Airware to the
6 concrete?
7      A.  I'm not -- I don't remember, sir.  I mean,
8 obviously, if I own the concrete and I crush it and then I
9 own A-1 and A-1 hauls it, I mean, it's still a direct
10 result of the spill, and BP forcing us out of the Port is
11 what caused the damage.
12      Q.  Okay.
13      A.  Or the loss.
14      Q.  Did you ever have to sue Airware for payment of
15 your invoices, or did you work that out, you know,
16 informally?
17 ████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████
████████████████████████████████████████
████████████████████████████
25      Q.  So you only -- Global Disaster only had ownership

BILLY BURKETTE

1
2 of the concrete for a few days before the Port had shut
3 down, correct?
4      A.  I'm not sure of the timeframe, sir, but it wasn't
5 long.
6      Q.  Okay.  But then two months?
7      A.  I don't recall.
8      Q.  Less than six months?
9      A.  I -- I'm -- you're asking -- you're trying to pin
10 down an answer that I have answered three times.  I don't
11 recall.
12      Q.  I'm just trying to pin down a range.
13      A.  I don't recall.
14      Q.  Okay.  How much is Global Disaster claiming --
15 and I want to talk specifically about just the concrete.
16 How much in damages is Global Disaster claiming from BP
17 for harm done to Global Disaster's concrete-crushing
18 business in this case?
19      A.  Okay.  So I'm going to -- I'm going to use my
20 calculator on my phone just to give you a rough estimate.
21           You got 1,500,000 cubic yards times $45 a
22 yard, 67,500,000.  That's a gross figure.
23      Q.  And that $45-a-yard figure is based on the
24 contracts between A-1 Towing that it was going --
25 pursuant which -- A-1 Towing and Robin Seafood -- sorry.

Page 66

BILLY BURKETTE

1
2  Let me restate that.
3         The $45 a yard that -- that you're using in
4  that calculation, that's taken from the A-1 Towing and
5  Robin Seafood contract, correct?
6     A.  No, sir.  I mean, it is one of those contracts.
7  We also had sold some for $80 a yard that we delivered to
8  Biloxi, Mississippi, to the sheriff's department over
9  there to build their new jail.
10        So it was based on the mileage calculation
11 of how far or how close you are to the concrete as to
12 oppose what the price is because, obviously, you can't
13 deliver something that's ten miles for the same price of
14 something that's a hundred miles, right?
15    Q.  Understood.  That makes sense.  The price depends
16 on how far away the -- the ultimate recipient is.  I
17 understand that.
18        What I'm asking is:  In the calculation you
19 just did, which is 1.5 million cubic yards times $45 a
20 yard, that $45 that you got, that's the figure that Robin
21 Seafood agreed to pay A-1 Towing to sell that concrete,
22 right?
23    A.  And that was based on the lowest cost factor.
24    Q.  Okay.  What -- you mentioned that you sold
25 some -- well, let's first talk about the 200,000 tons that

Page 67

BILLY BURKETTE

1
2  were going to be -- you agreed that 200,000 tons were
3  still going to be delivered for the airport building under
4  your agreement with Airware, right?
5     A.  I mean, it was not a specific amount.  It was
6  just whatever the airport needed.
7     Q.  Okay.  How much, ultimately --
8     A.  We did not get to deliver any of it --
9     Q.  How much --
10    A.  -- because BP kicked us off the yard.
11    Q.  How much was scheduled to be delivered, let's
12 say, had BP not -- had the spill not happened and BP not
13 been involved, as you say they were, how much did you
14 estimate would have been delivered based on that
15 agreement?
16    A.  If I had to guess, it would be somewhere between
17 a hundred and 200,000, yes.
18    Q.  And that's tons or cubic yards?
19    A.  It's cubic yards.
20    Q.  Okay.  Okay.  So -- and that's -- is that
21 separate from the 1.5 million cubic yards we just
22 discussed?
23    A.  That would be a portion of that.
24    Q.  Okay.  And you also mentioned that you sold some
25 for $80 a yard to -- a cubic yard to -- what was it,

Page 68

BILLY BURKETTE

1
2  Biloxi?
3     A.  Well, it was the -- so I didn't actually sell it.
4  A-1's trucks delivered it.  There was a guy by the name of
5  Danny -- can't recall his last name -- that facilitated
6  that sale.  He -- he's dead now.  He had cancer and died
7  in '16 or '17.  I don't -- I don't recall, sir.  Can't --
8  can't really remember.
9     Q.  Do you recall how much was suppose -- was
10 delivered under that arrangement?
11    A.  No, sir, I do not.
12    Q.  Okay.  And am I correct that A-1 did haul that
13 crushed concrete, it just ultimately was not paid for at
14 the end of the day?
15    A.  Correct.
16    Q.  Okay.  So that stockpile, that -- that concrete
17 still was part of the 1.5 million cubic yards that we were
18 talking about?
19    A.  Yes, sir, that is correct.
20    Q.  Okay.  Is there any -- are there any documents
21 that would reflect Global Disaster's ownership of the
22 concrete for which it is claiming damages for in this
23 case?
24    A.  I don't think there was a document, basically
25 just communication and agreement between Terry Williams

Page 69

BILLY BURKETTE

1
2  and myself.
3     Q.  And it was all -- it was oral?
4     A.  Yes.
5     Q.  Okay.
6     A.  Well, I mean --
7     Q.  Is there --
8     A.  We basically threatened to sue, and he said that,
9  you know, he did not -- I mean, and I understood.  He
10 didn't intentionally not be able to pay us.  He was in the
11 same boat as us, as damages against him, you know --
12 against BP from Airware as well.  You know, basically, BP
13 came in like -- like Katrina and just screwed everything
14 up, and then they -- because of the money and the power
15 and the influence that they had, they did whatever they
16 wanted to do and forced everybody, you know, into
17 hardship, except themselves.
18        So I don't think that we sued -- I think we
19 had prepared the documents -- I'm going by memory, man, so
20 don't hold me to this, but best of my recollection, I
21 prepared those documents, sat down, had a meeting with him
22 and with Mike Taylor at the Road Home project for
23 Louisiana, and it was determined that Terry would forfeit
24 it and we would take ownership, and it was just -- like I
25 said, it wasn't long after that is when BP shut everybody

BILLY BURKETTE

1
2 down and took over the supply.
3       So the easiest way to find out -- the
4 easiest way to find the answer to your question is follow
5 the money.  Find out where the rock went and then you'll
6 know the answer.
7     Q.  Do you know, approximately, when you -- you
8 reached this oral understanding with Terry Williams at
9 Global Disaster which takes ownership of the concrete?
10    A.  It was prior to BP taking over the Port.  I don't
11 know the exact date, no, sir, I don't.
12    Q.  At the time that you entered into -- you said
13 that -- you say Terry forfeited these -- the concrete to
14 you, that was after the Port had already shut down,
15 correct?
16    A.  No.
17    Q.  Before?
18    A.  Yes.
19    Q.  Okay.
20    A.  Because we were going to crush it.
21    Q.  Okay.  Do you -- the invoices that you submitted
22 to Airware for payment for the work Global Disaster did,
23 you mentioned one was around 250 to $280,000 worth of
24 work, and then you submitted one additional one, not sure
25 for how much, but it was more than 250 to 280, based on

BILLY BURKETTE

1
2 your recollection, correct?
3     A.  I believe so, yes, sir.
4     Q.  At the time that Terry Williams -- that you say
5 Terry Williams forfeited ownership of the concrete to
6 Global Disaster, did -- did you have any discussions about
7 how much that concrete was worth?
8     A.  I mean, it's common industry standard, I mean.
9     Q.  And so --
10    A.  I can find out.
11    Q.  Based on common industry knowledge, you think
12 Terry understood that that concrete was worth tens of
13 millions of dollars?
14    A.  Oh, absolutely.
15    Q.  And he -- and it's your testimony that he
16 forfeited tens of millions of dollars' worth of concrete
17 to you to satisfy payment of two invoices for less than a
18 million dollars?
19    A.  We didn't have any choice.
20    Q.  And you didn't -- you didn't think it would be a
21 good idea to reflect tens of millions dollars' worth of
22 concrete ownership in writing?
23    A.  You know, that's why I'm telling you, I don't --
24 I don't recall if we had that agreement in writing or not.
25 I mean, it makes sense that we would do that, but I just

BILLY BURKETTE

1
2 don't recall.
3     Q.  If you -- if you had an agreement that was
4 potentially worth 67 and a half million dollars, you would
5 want that in writing, right?
6     A.  I mean, I'm not saying we didn't.
7     Q.  But you're not aware of any document that
8 actually reflects that Global Disaster owned this
9 concrete, correct?
10    A.  I'm not -- I'm not saying that I am reflecting
11 back on my memory that there was not some e-mail or some
12 communication back and forth, text message, maybe, or
13 e-mail, maybe, that we had possession of the pile.  I just
14 don't recall, sir.
15    Q.  Well, there's a difference between having
16 possession of it and having ownership of it.  Your
17 position is Global Disaster owned that pile pursuant to
18 your agreement with Terry Williams?
19    A.  Can you -- can you maybe explain to me the
20 definition difference between ownership and possession?
21    Q.  Merely holding it versus actually owning, like --
22 let's say you're renting a house.  You possess the house
23 because you're living in it but you don't own it.  There's
24 a landlord; they own it.
25       You see the difference there?  So are you

BILLY BURKETTE

1
2 say doing --
3     A.  I mean, I see what you are saying, but if I
4 possess it --
5     Q.  So are you saying that --
6     A.  If I possess it, do I not have use the -- of
7 that?
8     Q.  That depends, based on your -- let me step back.
9       Do you have any agreement -- let me step
10 back.
11       There is no agreement between Global
12 Disaster and Terry Williams reflecting that Global
13 Disaster has ownership rights to the 1.5 million,
14 approximately, cubic yards of concrete that were at the
15 Port?
16    A.  It is my understanding that, yes, we have a
17 verbal, possibly confirmed via e-mail or text message, of
18 that, yes.
19    Q.  You have an understanding that part of your
20 obligations in this case is to produce documents that are
21 responsive to BP's document request, correct?
22    A.  I do understand that, and again, you know, this
23 just reflects at here we are, 11 years later, that BP is
24 asking for these documents.  I think it's a -- great
25 negligence that they waited 11 years to ask for something

BILLY BURKETTE

1
2 that they wanted to use in a court of law now.
3     Q.  Okay.  Well, you have an understanding that as a
4 plaintiff in this case, you have a legal obligation to
5 preserve all of your documents, correct, whether or not
6 someone asks for it?
7     A.  I do.
8     Q.  And is it your position -- and did you comply
9 with that duty to preserve all of your documents?
10     A.  I did until such time as the 2016 flood, which
11 was beyond my control, that we lost everything.
12     Q.  Okay.  So to the extent there was a document
13 reflecting your -- Global Disaster's ownership rights to
14 67 and a half, approximately, million dollars' worth of
15 concrete, you don't have that -- that written document
16 anymore, correct?
17     A.  To the best of my knowledge -- like I said, I
18 would have to go back and look.
19     Q.  Okay.
20     A.  But I'm sure when we get to court, we can bring
21 him to court and he can testify to that.  He is still
22 alive.  We can subpoena him.
23     Q.  Terry Williams?
24     A.  Yes.
25     Q.  Okay.  Aside from the 67 and a half million

BILLY BURKETTE

1
2 dollars that you're claiming for that 1.5 million cubic
3 yards of concrete, are there any other damages that Global
4 Disaster is claiming relating to its concrete-crushing
5 business?
6     A.  Is it just me or is everybody else losing audio?
7     Q.  Can everybody hear me?
8         MR. NEWELL:  I can hear you.
9         MS. DINEO:  Yeah, I can hear you fine,
10 Austin.
11         THE STENOGRAPHIC REPORTER:  I can.
12 BY MR. KLAR:
13     Q.  Mr. Burkette, can you hear me?
14     A.  I can now.  It was broken up a while ago.
15     Q.  Okay.  I'll ask my question again.
16         Aside from the 67 and a half million dollars
17 that Global Disaster is claiming for that 1.5 million
18 cubic yards of concrete, are there any other damages that
19 Global Disaster is seeking relating to its
20 concrete-crushing business from BP?
21     A.  Related specifically to the concrete crushing,
22 no.
23     Q.  Okay.  Were there any other operations that
24 Global Disaster was conducting in the Port of St. Bernard
25 around the time of the spill besides concrete crushing?

BILLY BURKETTE

1
2     A.  Yes, sir.  We were in communication with BP for
3 occupying some of that space after we removed some of the
4 crushed concrete for boom deployment and supplies.
5     Q.  Did you ever enter into an agreement with BP for
6 boom deployment or providing supplies?
7     A.  We have a Master Service Agreement with ES&H, who
8 at the time was the prime contractor along with O'Brien,
9 and I spent a considerable amount of time at the office in
10 Gray, BP headquarters, both night shift and day shift, and
11 acquiring boom for which BP, again, circumvented me.  I
12 would -- I would go out and locate the boom manufacturers,
13 have an agreement with that boom manufacturer, and BP
14 would bump the price up $5 and -- and basically steal the
15 contract from me.
16         One guy in Alabama, one of the boom
17 manufacturers in Alabama called me on my phone -- my cell
18 phone and basically told me, "Hey, I hate to tell you
19 this, but BP just called me and said that they were going
20 to buy direct, and that they refused to go through you,"
21 basically terminating my contract.
22     Q.  You're talking about the contracts with ES&H?
23     A.  No, I'm talking about my direct contract
24 agreement that I had with the boom manufacturer.
25     Q.  Okay.  So it's your position that -- let me make

BILLY BURKETTE

1
2 sure I understand what you're saying.  So Global Disaster
3 had an agreement with a boom manufacturer to purchase a
4 certain amount of booms that it was Global Disaster's
5 intention of then supplying to BP for use in connection
6 with the spill response, and it's your position that BP
7 effectively outbid you for the price of those booms and
8 bought them directly from the manufacturer; is that
9 correct?
10     A.  Kind of.
11     Q.  Okay.
12     A.  I went to BP, and BP told me the most -- so
13 understand, I'm dealing directly with -- in BP
14 headquarters, there was this massive room with cubicles,
15 okay, and every day, as you normally do with shift change,
16 the incident commander of the night shift would then
17 prioritize what was needed for the day shift and vice
18 versa.  So depending on when BP's response was needed for
19 a specific item, whether it be boom, whether it be VOO,
20 whether it be boats, whether it be scouts, whether it be
21 beach-cleaning equipment, whether it be trucks for hauling
22 the -- the tar balls, whether it be whatever, you would go
23 and talk to these -- these people in this room were BP
24 employees, and these employees would be, I guess, tasked
25 by the incident commander as the need for the response in

BILLY BURKETTE

1 a prioritized level.
2
3          So whatever they needed at that specific
4 time, they would tell me a price.  Okay?  So let's just
5 say BP would buy it at -- I'm just going to use round
6 numbers, $5 a foot.  It's really more like 50 bucks a
7 foot.  But I'm going to use round numbers.  So they would
8 say $5 a foot is all that they would pay, that's all that
9 they were authorized to pay.  They could not pay above
10 that.
11          So I would go out, using my network of
12 businesses that I had done business with in the past, my
13 contacts, and I would say, "Hey, look, I -- I'm here on
14 the ground, I'm boots on the ground in the office with BP
15 employees," which I think y'all do have the copies of the
16 e-mails between myself and BP employees to verify that,
17 and I would -- I would go to them and say, "Hey, look,
18 I'm -- I want to haul it or my company, A-1, wants to haul
19 it.  I'll deliver it.  I need to make something."  We
20 would come up with -- just say a dollar a foot, I would
21 make, the owner would make -- or the manufacturer would
22 make 4.
23          Well, based on the conversation that I had
24 with BP, they said maximum was $5 a foot.  Well, it turns
25 out that they went up to 6.50 a foot and they supplied

BILLY BURKETTE

1
2 their own transportation, so it would increase the cost
3 another dollar -- so it would be $7.50 a foot.  So BP flat
4 out lied and misrepresented the whole deal.  And I have
5 that multiple times.  That's not only with, you know, the
6 boom.  They did that with my A-1 Towing.  I mean, we
7 hauled some in from Alabama and from Mississippi, some of
8 the tar balls, and then BP would come back and say, "Okay,
9 well, today it's over.  Well, you know, we are not going
10 to use y'all anymore, we got our own trucking."
11          So everything BP did was never to fulfill
12 the obligation to the public that they were presenting on
13 TV.  They falsified everything.  They -- they bald-face
14 lied to me and went behind me and secured it for more than
15 what they told me was the maximum that they can secure it
16 for.
17     Q.  Okay.  So in discussions between you and BP about
18 how much they could secure a certain product for, it's a
19 -- you said a boom, right?
20     A.  Yes.
21     Q.  Or a certain quantity of boom?
22     A.  Correct.
23     Q.  So in discussions with BP about BP obtaining a
24 certain quantity of boom, did you ever enter into any
25 contract with BP pursuant to where BP obligated themselves

BILLY BURKETTE

1 to buy that boom from you?
2     A.  Not written, but verbally, yes.
3     Q.  Okay.  Who at BP do you claim verbally agreed
4 that they would buy boom from you?
5     A.  I supplied all of those, multiple e-mails.  I
6 would have to go back and look.  I don't recall.  I would
7 have to read them myself.
8     Q.  Is the boom -- so you mentioned -- you mentioned
9 a master agreement with ES&H.  Is that related to this
10 boom business that you're talking about?
11     A.  The Master Service Agreement, after -- after they
12 had basically screwed me over so many times, the Master
13 Service Agreement is what BP, I would like to say, forced
14 me to use a prime contractor, because they did not want a
15 direct contract with me.
16     Q.  But is that -- let me just step back before we
17 talk about the contract itself.
18          The Master Service Agreement with ES&H, is
19 that the contract -- a contract that you had to acquire
20 the boom that you say BP was going to be buying from you
21 or is it something completely different?
22     A.  It was -- it was inclusive of the boom, vessels,
23 bathroom -- portable bathrooms, portable showers, portable
24 living quarters, flotilla hotels, all kinds of stuff.  It

BILLY BURKETTE

1
2 was -- they had -- BP provided me a list of everything
3 that they need.
4     Q.  Okay.  And you were -- and it was the
5 arrangement, your understanding was, you go and acquire
6 from ES&H and then eventually furnish it to BP?
7     A.  No, negative.  I would go out and acquire it.  I
8 would furnish it to ES&H.  ES&H would put their profit on
9 top, and then they would supply it to BP.
10     Q.  Okay.  So you were supplying it to ES&H, and ES&H
11 ultimately was supplying it to BP?
12     A.  As far as the later in the -- in the response,
13 yes.  But when it originally first started happening, I
14 was dealing directly with BP.
15     Q.  Okay.
16     A.  And then when they kept circumventing me, and I
17 would bring it up that, "Hey, you told me ES&H was X
18 amount of dollars a foot, I went out and got it for X
19 amount of dollars a foot.  Y'all went and bought it for
20 one and a half times more than what you told me was the
21 max."
22     Q.  Okay.  So let's break it up into before ES&H and
23 after ES&H.
24          So starting with before ES&H came into the
25 picture, you claimed you were dealing directly with BP, BP

---

Page 82

```
                BILLY BURKETTE
1
2  saying we need, X, Y, Z, products, and it was your
3  understanding that you were going to go out and get it and
4  furnish it -- furnish those products directly to BP,
5  correct?
6      A.  Correct.  And -- and the instrument that allows
7  that as -- the way we got to that understanding with BP
8  was, I went to the State and the State provided me with
9  BP's hazardous mitigation plan, so -- their spill
10 response.  So when BP, before they can turn right or
11 drill, they have to supply a hazardous mitigation plan and
12 a response plan in case there's a spill that has to be
13 accepted by the State of Louisiana, or any state that they
14 drill in.  Right?
15         So because of my disaster knowledge and --
16 and experience and working with FEMA and homeland security
17 in response to many disasters, not just oil spills, the --
18 the procedure is that once you supply that, there's an
19 agreement that that's the -- that is the course of action
20 that you will take that is ultimately approved by the
21 State prior to BP having been given a permit to drill for
22 oil.
23         So I went to the State and I got that
24 response plan.  I took that response plan down to Gray to
25 meet with -- the incident commander at that time was
```

Page 83

```
                BILLY BURKETTE
1
2  Captain Edwin Stanton, so it was not just for boom or just
3  for boats or just for hotels or just for Aqua N-Cap or
4  just for corrections or just for anything.  It was for --
5  it was their plan that they submitted to the State that
6  says, "If we have a spill, we will do these things as part
7  of our response."
8          So I took that plan down to Gray and
9  explained that to Captain Stanton, the incident commander,
10 and he said, "Hey, let me -- give me a few minutes.  We
11 are fixing to do changeover from incident command, and
12 I'll be right back out to get you.  Well, that was two
13 hours later.  But one of the many products that BP said
14 that they would use --"
15     Q.  Billy, I think -- I think I lost you.
16         MR. KLAR:  Can everybody hear me?
17         MS. DINEO:  I can hear you.
18         MR. NEWELL:  I can hear you.
19         His screen is paused.
20         MR. KLAR:  Okay.
21         THE STENOGRAPHIC REPORTER:  Should we go off
22 the record?
23         MR. KLAR:  Yeah, let's go off the record
24 until -- until he is unfrozen.
25         THE VIDEOGRAPHER:  It's 12:16 p.m.  We are
```

Page 84

```
                BILLY BURKETTE
1
2  going off the record.
3         (Brief recess taken.)
4         THE VIDEOGRAPHER:  Time is 12:25 p.m.  We
5  are back on the record.
6  BY MR. KLAR:
7      Q.  Okay.  Mr. Burkette, I think when you -- when you
8  cut out, you were talking about a discussion that you had
9  with Captain Stanton, who was incident commander, and he
10 said, "Let me give you a few minutes," and it was a couple
11 hours later, and then you cut out.
12         So if you want to continue with what you
13 were saying there about your -- your discussions with
14 Captain Stanton.
15     A.  Yes, sir.  So the state mitigation plan or
16 response plan that BP submitted outlined all of the
17 products and methods of response that BP would use in the
18 case that BP should ever have a spill.
19     Q.  Okay.  I'm sending a document labeled Tab 12.
20 It's a fairly large document, so it might take a couple
21 minutes to download here.
22         MR. KLAR:  When it comes in, can the court
23 reporter mark that as the next exhibit?
24         (Exhibit 3 was marked for identification.)
25 BY MR. KLAR:
```

Page 85

```
                BILLY BURKETTE
1
2      Q.  While that's downloading, can you tell me what
3  products you specifically discussed with Captain Stanton?
4      A.  Yes, sir.  Captain Stanton brought me into that
5  room that I was describing and introduced me to the -- his
6  shift was -- at that time was the day shift.  Okay?
7          So that day shift, the people were different
8  than the night shift, obviously, so when you have a
9  disaster, your incident commanders, based on the Intel
10 given to them from the response, they have a prioritized
11 list, right, so that prioritized list of needs is what
12 they are focused on.
13         So there were simultaneously about 20
14 different functions as part of a response that they were
15 engaged in.  So in lieu of me having to use Captain
16 Stanton as a conduit, he put me directly in touch with
17 those people inside.
18     Q.  Okay.  The people you were referring to --
19     A.  Those people inside were the ones that I made
20 the -- I was instructed to go directly through them
21 because they were the ones that were, like me, boots on
22 the ground in search of these things.  One of the products
23 was boom.  Other products were vessels of opportunity.
24 Other products were hotels.  Other products, needs that
25 they -- services that they needed were hauling, equipment,
```

Page 86

BILLY BURKETTE

1  new technology that they were looking for, the cap on the
2  well with the fabrication shop in Houma.  There was a
3  multitude of things happening.
4       But the most interesting thing that -- that
5  caught Captain Stanton's ear was the Aqua N-Cap.  Now, let
6  me -- let me elaborate on that, if you will, because --
7       Q.  Hold on.  We'll -- we'll get there, but does
8  that -- does that list that you just outlined reflect the
9  list of products that you discussed with Captain Stanton
10 or the -- the folks that he introduced you to that were
11 working the day shift?
12      A.  Does what?  Say that again.
13      Q.  The list of products, boom or -- and services,
14 boom, vessels of opportunity, hotels, hauling equipment,
15 capping services, fabrication, Aqua N-Cap.
16      Does that accurately reflect the extent of
17 products or services that you discussed with Captain
18 Stanton and the other day-shift workers?
19      A.  Oh, Lord, no.
20      Q.  Okay.  So there were many more?
21      A.  Yes.
22      Q.  For which products are you claiming damages for
23 from BP?
24      A.  Well, I would like to -- to -- just one second.
25

Page 87

BILLY BURKETTE

1  Hold on.  I'm going to put my glasses on.  I'm getting
2  old, man.  You have to forgive me.
3       Q.  Is there a document that you are looking at
4  that's in front of you?
5       A.  What you sent me.
6       Q.  Oh, Tab 12?  We'll -- we'll get there.  You don't
7  have to look at that right now.
8       A.  Oh, okay.  I'm sorry.  So --
9       Q.  Going back to my question --
10      A.  Everything that's in that list -- everything
11 that's in that list, depending on the day and the shift, I
12 was in communication with BP to help and assist them in
13 finding those resources.
14      Q.  Okay.  For -- other than boom, vessels of
15 opportunity, hotels, the services you listed and Aqua
16 N-Cap, what other products -- is there any document that
17 would reflect what other products you were looking for
18 them?
19      A.  Yes.  It's all inclusive in that document you
20 said we'll get to.
21      Q.  Okay.  So if you can open that document.
22      MR. KLAR:  And if the court reporter can
23 mark that the next in line.
24      THE WITNESS:  Yes, sir.
25

Page 88

BILLY BURKETTE

1       (Exhibit 4 was marked for identification.)
2  BY MR. KLAR:
3       Q.  Okay.  Do you have it open, Mr. Burkette?
4       A.  Yes, sir.  I'm just trying to make it a little
5  bit bigger so I can read it.  Okay.  Yes, sir.
6       Q.  Is this the document that -- that you're
7  referring to, the Hazard Mitigation Plan, that has
8  products that you were looking for for BP?
9       A.  I believe it's -- it may not be the exact
10 document, but I believe it's close, yes, sir.
11      Q.  Okay.  Can you point me to where those products
12 that you're referring to are listed?
13      Let's -- let's strike that.
14      Mr. Burkette, if you can focus on me for a
15 second.  We'll go back to the document.  Starting with
16 the -- just -- I just want to clarify:  How much in
17 damages are you claiming from BP for BP buying boom around
18 you?
19      A.  I don't rightly know.
20      Q.  How would you go about calculating that?
21      A.  I would have to have BP's records of how much
22 boom they bought from each boom manufacturer.
23      Q.  Okay.  So it's your position that boom that BP
24 bought from every manufacturer but you, that the profits
25

Page 89

BILLY BURKETTE

1  that they made are the extent of Global Disaster's
2  damages?
3       A.  No, sir.
4       Q.  Okay.  Why do you need to know -- sorry.
5  Stepping back.
6       Which -- which manufacturers do you claim BP
7  bought boom from?
8       A.  That's the question.
9       Q.  So sitting here --
10      A.  That's the question.
11      Q.  So sitting here today, you don't know if BP --
12 what -- what boom BP bought from which manufacturers that
13 it should have bought from you?
14      A.  I know that -- that there were four different
15 boom manufacturers located in the United States that they
16 circumvented me on and there were at least two, maybe
17 three, outside of the United States that they circumvented
18 me on.
19      Q.  Okay.  Do you have any -- you don't have any
20 agreements with BP where BP agreed to purchase boom from
21 Global Disaster, correct?
22      A.  I mean, nothing other than verbally what the
23 response coordinators in that office told me they needed.
24      Q.  And you are referring to Captain Stanton,
25

Page 90

                    BILLY BURKETTE
1
2  correct?
3      A.  No, sir, not just Captain Stanton, the actual BP
4  employees.  So in that room, there were logistics people;
5  there were products people; there was new technology
6  people; there were a -- it was -- it was a multitude of
7  tasks.  So those task operators, while I would go into the
8  office at Gray, I would visit with them.
9      Q.  And it's your -- each of those people you're
10 saying are BP employees that you spoke with, correct?
11     A.  Correct.
12     Q.  Okay.  You don't know the names of any of the
13 people that you spoke with?
14     A.  I have supplied that to y'all.
15     Q.  Okay.  So it's -- okay.
16           The dates -- the communications that you've
17 produced to us are the full extent of the -- the
18 communications that you had with BP employees regarding
19 boom?
20     A.  No.
21     Q.  Okay.  Besides what you've provided us, what
22 other communications are there?
23     A.  Verbal.
24     Q.  Okay.  So aside from the written communications
25 that you provided to us, the only other communications

Page 91

                    BILLY BURKETTE
1
2  that you had with BP employees regarding the purchase of
3  boom from Global Disaster was verbal?
4      A.  Correct.
5      Q.  You don't have any written agreement with anybody
6  at BP for the purchase of boom from Global Disaster,
7  correct?
8      A.  Not correct.
9      Q.  We -- there is no agreement for the purchase of
10 boom in Global Disaster's production with BP?
11     A.  The e-mails that I provided were e-mails
12 instructing me what their needs were at that particular
13 date and time.
14     Q.  Okay.  Let's look at some of those e-mails.
15           MR. KLAR:  Okay.  I just sent Tab 11 to the
16 court reporter.  Can the court reporter mark that next in
17 line?
18           THE STENOGRAPHIC REPORTER:  Yes, sir.
19 That's 4 [sic].
20           MR. KLAR:  Thank you.
21           (Exhibit 5 was marked for identification.)
22 BY MR. KLAR:
23     Q.  Okay.  Do you recognize this document,
24 Mr. Burkette?
25     A.  Let me just see.  That's just the Aqua N-Cap.

Page 92

                    BILLY BURKETTE
1
2      Q.  Okay.  Well, we are going to go through all the
3  e-mails that we have on -- on these products, so...
4           This relates -- you're saying that this
5  relates to Aqua N-Cap?
6      A.  Yes.
7      Q.  Okay.
8      A.  RTASCo.  RTASCo was the company that I was told
9  -- so when I went in to speak with Captain Stanton,
10 Captain Stanton brought me to this lady, which we walked
11 around the building for 30 minutes trying to find.  We
12 found her walking down a hallway, and he introduced me to
13 her as Jackie Michelle or Jackie Mitchell, whichever it
14 is, and she was the head microbiologist in regards to
15 the -- the response for BP.
16           He provided her with a copy of the document
17 that I sent to the State as the response to the spill,
18 where it highlighted the use of Aqua N-Cap because of the
19 environmental impact that it would have as opposed to
20 using COREXIT.  And he indicated to her that I had the
21 contract with Fowler at RTASCo, Jeff or Jon, I can't
22 remember, but anyway, he asked if -- if they could use --
23 so let's put this in perspective.  He requested that they
24 use -- as incident commander and sector commander of the
25 United States Coast Guard, asked if this was the product

Page 93

                    BILLY BURKETTE
1
2  that BP submitted to the State saying that they would use
3  in their response, if there was a spill.  She said, "Yes."
4           He said, "I would like to use it."  She
5  said, "No."  He says, "Well, isn't this on the list?"  She
6  said, "Yes, it's on the list."  He says, "Well, I'm
7  requesting to use it."  She says, "Not no, but hell no.
8  It would quantify the spill and cost us billions in
9  fines."
10     Q.  Okay, well --
11     A.  So he said, "Well, I want to use it in the burn
12 ring on the animals. " She said, "Maybe you didn't hear
13 me.  We are not using that at all."  He said, "Well, isn't
14 that the safest product to be using as opposed -- I mean,
15 as far as the environmental impact is concerned?"  She
16 said, "It may be, but we are -- we are not using it.  We
17 are using COREXIT and COREXIT only."
18 BY MR. KLAR:
19     Q.  Okay.  Do you have any documents reflecting that
20 you had rights to distribute Aqua N-Cap --
21     A.  That e-mail shows as one.
22     Q.  Okay.  So this e-mail says, reading from the --
23 there's one line in this e-mail.  "Hey, Billy, are you
24 having any luck working the spill?  Regards, Jon Fowler."
25           Where in that e-mail does it say anything

Page 94

```
                    BILLY BURKETTE
1
2  about Global Disaster having rights to sell Aqua N-Cap to
3  BP?
4       A.  Well, I mean -- I mean, I -- I'm guessing that,
5  you know, you have this e-mail sent to everybody?  It was
6  sent to specific -- specifically to me, based on the phone
7  calls and -- and the communication that I had had with Jon
8  about utilizing that and the agreement was that he would
9  give me sole distribution rights if BP would use it in the
10 spill.
11      Q.  Okay.
12      A.  That's the whole reason that we set up the
13 conference -- the communication and had the conference
14 meeting with BP and the incident commander.  I mean, it
15 took me a week to get that -- even that meeting.
16      Q.  Understood.
17          So, Mr. Burkette, it's your -- it's your
18 testimony today that Global Disaster's rights to
19 distribute Aqua N-Cap, pursuant to some agreement with
20 Mr. Fowler at RTASCo, was contingent on an agreement with
21 BP to use Aqua N-Cap?
22      A.  It was -- it was -- it was based on the document
23 that BP supplied to the State stating that they would use
24 Aqua N-Cap as part of their response to a spill, which
25 they did not do.
```

Page 95

```
                    BILLY BURKETTE
1
2       Q.  Right.  But your -- your -- I understand that
3  part.
4           But your testimony today is that your
5  exclusive -- sorry, Global Disaster's distribution rights
6  to Aqua N-Cap, their exclusive distribution rights to Aqua
7  N-Cap was contingent on BP agreeing to purchase Aqua N-Cap
8  from Global Disaster, correct?
9       A.  Correct.
10      Q.  Okay.  And there's no agreement between BP and
11 Global Disaster reflecting an agreement by BP to purchase
12 Aqua N-Cap from Global Disaster?
13      A.  No, sir, because BP bought the company.  Again,
14 circumventing me.
15      Q.  So there is no agreement between BP and
16 Mr. Burkette requiring BP to purchase Aqua N-Cap from
17 Global Disaster or you?
18      A.  I don't -- I don't know if it was a requirement
19 more so than it was an understanding.
20      Q.  Okay.  Whether it's an understanding or -- or a
21 requirement, BP did not have an agreement to purchase Aqua
22 N-Cap in any quantity or any amount from Global Disaster,
23 correct?
24      A.  Or from anybody.
25      Q.  Okay.  So no agreement whatsoever obligating BP
```

Page 96

```
                    BILLY BURKETTE
1
2  to purchase Aqua N-Cap?
3       A.  Other than -- other than the agreement that the
4  sector commander and the products manager on the floor
5  said that they would use it.  Then they got superseded by
6  this microbiologist lady.  And they said, no, because it
7  would quantify the spill.
8           In other words, it was just a -- they got
9  superseded and overrode on their ability to contract with
10 me, because it would make BP more exposed and --
11 liability-wise and funds are protecting BP from being
12 qualified the amount of oil.
13      Q.  Okay.  At the time that you had discussions with,
14 I think you said it was procurement, maybe it was the
15 procurement folks, where you -- you believed that you had
16 some sort of verbal discussions with them about purchasing
17 Aqua N-Cap, before they were superseded, so focusing your
18 discussion where you believe it sounded like they would
19 purchase it, did you discuss price of -- of the Aqua N-Cap
20 that you -- that Global Disaster would be selling to BP?
21      A.  I believe you have that as well.  It was -- it
22 was sent in an e-mail.  That price was sent in an e-mail
23 as well.
24      Q.  Okay.  And quantity?
25      A.  As much as they could produce, and it's an IDIQ
```

Page 97

```
                    BILLY BURKETTE
1
2  contract.
3       Q.  Okay.  So let's turn to another e-mail.
4           I just sent a document labeled Tab 15.
5           MR. KLAR:  Can the court reporter mark it
6  next in line?  I think it's 5.
7           THE WITNESS:  If I remember, it was around 8
8  or $9 a pound, $7 a pound.  I don't remember, something
9  like that.
10          (Exhibit 6 was marked for identification.)
11 BY MR. KLAR:
12      Q.  Okay.  Do you recall when you had those
13 discussions before they were superseded, what time period
14 that was?
15      A.  I do not recall.
16      Q.  Okay.  And you don't recall the names of who --
17 who -- those procurement people?
18      A.  Not off the top of my head, no, sir.  I would
19 have to go back and look.
20      Q.  Okay.  Did those procurement people say that --
21 what -- what did they say specifically with respect to
22 whether or not they would purchase Aqua N-Cap from Global
23 Disaster?
24      A.  Well, basically, they were unaware of -- I was
25 just reading the e-mail -- they were unaware of Aqua N-Cap
```

```
                                                    Page 98
                    BILLY BURKETTE
1
2  until I provided the document that -- that the State had
3  in order for BP to be able to drill that response plan,
4  and when I -- when I brought that document down there,
5  they had never seen it.  The BP folks had never seen it,
6  the ones on the floor in the procurement section.  So when
7  I brought that down there and showed it to them, they
8  immediately said, "Well, yeah, we'll use it.  How much can
9  you get?"  And then --
10     Q.  Did you tell them how much you can get?
11     A.  I told them that -- I did.  I told them that I
12  had an agreement with the owner, that if they would use
13  it, that I could be the sole distributor, because they had
14  circumvented me so many times in the past I had already
15  gone and negotiated that with Jon Fowler.
16     Q.  Okay.  That's Jon Fowler, though.  Again, that's
17  in writing -- that's oral; it's not in writing, correct?
18     A.  I don't recall.  I mean, I think there's some
19  e-mails back and forth to that effect, but I'm going by
20  memory and I don't remember.
21     Q.  How much money was the agreement for with
22  Mr. Fowler?
23     A.  Oh, it would be -- it would be an IDIQ,
24  indefinite -- indefinite quantity, indefinite delivery
25  /indefinite quantity.
```

```
                                                    Page 99
                    BILLY BURKETTE
1
2      Q.  Okay.  How much did you have to pay Mr. Fowler to
3  get exclusive distribution rights to Aqua N-Cap?
4      A.  I didn't pay him anything.
5      Q.  Okay.
6      A.  Why -- I don't understand your question.  Why
7  would I pay somebody for something that they own?  I mean,
8  for something for a contract?  That's -- that's
9  fraudulent.
10     Q.  Mr. Burkette, so RTASCo owns Aqua N-Cap, correct?
11     A.  Correct.
12     Q.  As the owner, separate -- let's say that an
13  agreement with Global Disaster never existed.  As the
14  owner, they have the right to distribute it, correct?
15     A.  Correct.
16     Q.  Okay.  Global Disaster wants the right to
17  distribute it from them, so Global Disaster has to pay for
18  that, correct?  They want a right that they don't have?
19     A.  No, sir.  It's -- it's not -- that's not the way
20  I understood it.  What I understood is that Aqua N-Cap has
21  a retail price, and they have a distribution
22  responsibility, I guess you would call it, to fulfill, and
23  at the time that I was having my communications, the first
24  question was:  How much would it absorb?  It would absorb
25  11 pounds of oil to the 1 pound of Aqua N-Cap.
```

```
                                                    Page 100
                    BILLY BURKETTE
1
2          That was the first question that BP asked
3  me.  Then when I provided that information --
4      Q.  Stop it.  Stop.  Let's step back.
5          So I'm not asking about questions -- or
6  discussions with BP at this moment.  I'm talking about
7  your discussions with RTASCo about the terms of your
8  distribution agreement with them.  So.
9      A.  My terms were --
10     Q.  -- they owned the right to distribute this
11  product?
12     A.  My terms -- I'm sorry.  I didn't let you finish.
13     Q.  Is it your testimony that RTASCo granted Global
14  Disaster the exclusive right to distribute Aqua N-Cap for
15  free?
16     A.  No.  I would be paid a commission.
17     Q.  Okay.  Yeah.  You would be paid a commission for
18  sales.  How much did you have to pay Aqua -- I'm sorry,
19  RTASCo for that right?
20     A.  I didn't have to pay anything.  It was in the
21  agreement.  I would become a salesman.  I would be a
22  commission-paid salesman.
23     Q.  Okay.  So there was an agreement with Aqua N-Cap
24  where you would be a salesman?
25     A.  I would be what they called a distributor.
```

```
                                                    Page 101
                    BILLY BURKETTE
1
2      Q.  Okay.  Pursuant to what agreement with RTASCo?
3  What agreement reflects Global Disaster's role as the sole
4  distributor of Aqua N-Cap?
5      A.  The agreement that BP would use it.
6      Q.  Okay.  There's an agreement between BP and -- and
7  I don't know who.
8      A.  Me.
9      Q.  What agreement reflects that Global Disaster and
10  RTASCo had an agreement pursuant to which Global Disaster
11  would be the sole salesman or distributor of Aqua N-Cap?
12     A.  Okay.  Jon Fowler --
13     Q.  What document?
14     A.  I'm sorry?
15     Q.  What document reflects that?
16     A.  I think it's in the e-mails but I'm not positive.
17     Q.  Okay.  So if it's not in the e-mails, you don't
18  have a copy of the document, correct?
19     A.  No, but we can subpoena him and -- and get his
20  testimony and he'll testify to that, because Christopher
21  Ott, the guy that you sent the e-mail from on that last
22  document, would testify that -- because he was on the
23  conference call with me with RTASCo.
24     Q.  Okay.  Well, let's look at that e-mail right now.
25     A.  Okay.
```

BILLY BURKETTE

1
2    Q.  So at the bottom of that first page, it says Jon
3  Fowler is e-mailing Christopher Ott on May 21st of 2010,
4  correct?
5    A.  Correct.
6    Q.  It says:  "We got a call from Tommy, VP at S&D
7  Environmental, "and there's a phone number," requesting a
8  price quote and production timelines for 3 million pounds
9  of Aqua N-Cap.  They know we have 1 million pounds
10 available today and can deliver the other 2 million within
11 30 days of sale.  Tommy claims that BP is requesting info
12 on the amount and production timeline from them for a PO
13 that would be delivered next week.  Good luck... "
14         Did I read that correctly?
15   A.  That is correct.
16   Q.  Who is Tommy?
17   A.  Okay.  Tommy is a close friend of Christopher
18 Ott.
19   Q.  Okay.  Do you know who, at BP, Tommy was in
20 contact with about this request?
21   A.  It came via the -- so, again, I -- I'm probably,
22 obviously, I'm not doing a good enough job.  I am boots on
23 the ground, face to face, just like I'm looking at you,
24 except we were in person.  I would go to the procurement
25 section.  I brought them this document that BP provided to

BILLY BURKETTE

1
2  the State saying that they would use Aqua N-Cap.  They had
3  all kind of questions about it.  Once they found the
4  questions -- the answers to the questions that they asked,
5  how much it would absorb and all that, the cost factor and
6  all of those things, they, in turn, said, "How much is
7  available?"  I said, "I don't know.  Here is the number to
8  find out what's actually on hand."
9         So I'm standing there, looking at the guy,
10 face to face, as he picks up the phone and calls.
11   Q.  Okay.  So you're not sure who Tommy spoke to at
12 BP specifically?
13   A.  I am -- I -- I can tell you that I was standing
14 there when the guy at BP picked up the phone and called
15 Tommy, but I don't recall his name.
16   Q.  Okay.  So the next e-mail, Chris forwards it --
17 Mr. Ott forwards it to a Dave Guardanapo and to you,
18 correct?
19   A.  Yep.  Dave Guardanapo was the ex-marine that
20 carried the football for President Reagan.  He came to me
21 and said, "Billy, if you have any problems, call me."  He
22 said, "I will try to assist politically."
23   Q.  So Christopher Ott sends -- forwards Mr. Fowler's
24 e-mail to you and says:  "Call this guy today and find out
25 what he needs.  Also, send me the draft of the plan or at

BILLY BURKETTE

1
2  least tell me the areas you are working on so we do not
3  duplicate efforts."
4         Did I read that correctly?
5    A.  That is.
6    Q.  Okay.  Did you speak to Tommy at the number that
7  was provided in Mr. Fowler's e-mail about Aqua N-Cap?
8    A.  Say -- repeat the question.
9    Q.  So Mr. Ott is telling you, "Call this guy today,
10 find out what he needs," and he is referring to Tommy, the
11 vice president at S&D environmental, correct?
12         Did you call Tommy?
13   A.  I didn't.  I had the guy at BP call, the
14 procurement office.
15   Q.  Okay.  So you didn't speak to anybody -- you
16 didn't speak to Tommy?
17   A.  Not that day, I don't believe.
18   Q.  Okay.  And so you told -- do you have -- do you
19 know if anybody spoke to Tommy after this e-mail was sent
20 to you about Aqua N-Cap?
21   A.  I know the phone call was made.  I don't know
22 what they spoke about.
23   Q.  Okay.  Were -- you were present when this phone
24 call was made?
25   A.  Yes, I was standing in the procurement office.

BILLY BURKETTE

1
2    Q.  Okay.  Earlier you said, this -- so let's step
3  back.
4         On Friday, May 21, at 9:50 a.m., Jon Fowler
5  e-mails Christopher Ott and says, "We got a call from
6  Tommy, saying he was -- he spoke to BP."  That's the
7  conversation that you were in the procurement for, where
8  BP called Tommy, right?
9    A.  Correct.
10   Q.  Okay.
11   A.  Because they do the shift change, the incident
12 command change at 06:00 a.m.
13   Q.  Okay.  Now, about two and a half hours later or a
14 little over two hours later, Christopher Ott forwards the
15 e-mail to you and says, "Call this guy and find out what
16 he needs."  You did not call this guy to find out what he
17 needs, correct?
18   A.  I did not because I had BP folks, the procurement
19 officer, call.
20   Q.  Okay.  So you are saying you were still in the
21 procurement office at the time you received this forwarded
22 e-mail?
23   A.  To the best of my knowledge, yes.
24   Q.  Okay.  And you said, "Hey, BP guy, call Tommy
25 again"?

Page 106

BILLY BURKETTE

1
2     A.  Not "again."  The list of phone numbers that I
3  provided to the BP folks had Tommy's name, had Christopher
4  Ott's name, had Jon Fowler's name, had everybody's name,
5  and I asked him to call and see -- I'm sorry -- he asked
6  me if he could call and see how much product they had
7  available at that time.  I said, "Yes, call them any time
8  you want to call them."
9     Q.  Okay.  And did you call them?
10    A.  Did I lose you again?
11    Q.  Sorry.  You said he -- so your testimony -- the
12  BP folks, not sure who, had multiple people's names.  They
13  had Christopher Ott, they had Jon Fowler and a person
14  named Tommy, right?
15    A.  Correct.
16    Q.  And it's your testimony that, while you were at
17  the procurement office, you asked BP to call one of them
18  to talk about how much product they potentially might
19  have, correct?
20    A.  Correct.
21    Q.  Okay.  And presumably, that's the phone call that
22  is reflected in the May 21, 9:51 a.m. e-mail at the bottom
23  where it says, "Got a call from Tommy requesting a price
24  quote claiming BP is requesting info on the amounts in
25  production," correct?

Page 107

BILLY BURKETTE

1
2     A.  That is my understanding, correct.
3     Q.  Okay.  Then the next e-mail, Chris Ott forwards
4  to you and says, "Call this guy.  Find out what he needs."
5         What action was taken in response to
6  Mr. Ott's e-mail?
7     A.  The response was, I put it directly in the
8  procurement hands of whatever BP personnel -- because you
9  see, that's what I'm telling you, it's like a -- it's like
10 a phone-bank room.  You have one person, and then they are
11 like a team leader, and then they redisseminate that to
12 whoever is free at that particular time.  It's no one
13 person that you -- that you have constant communication
14 with.  It's multiple people that you're engaged in
15 communication.
16    Q.  I understand.
17    A.  So I really can't answer that question
18 effectively to tell you exactly who it was that called and
19 when they called.  I just know that the call was made
20 showing just what you're saying, Chris saying they got the
21 call from BP procurement saying that they wanted to buy
22 the Aqua N-Cap, and then he asked me to check on it.  I
23 said, "I'm standing here in the -- in the procurement
24 room.  I'm talking to the guy.  He is going to call Tommy
25 right now or -- or has called Tommy, and they are working

Page 108

BILLY BURKETTE

1
2  on procuring it."
3     Q.  Okay.
4     A.  Then, after that is when -- when we went to
5  Jackie and she said, "Not no, but hell no, because it will
6  quantify the spill and cost us billions in fines."
7     Q.  Okay.  So before going to Jackie -- we'll get to
8  Jackie in a moment -- before going to Jackie, when you
9  were talking with procurement at BP and BP said, "We want
10 this product," you didn't actually have an agreement with
11 BP that they were definitively going to purchase this
12 product, correct?
13    A.  Do I have a written agreement?  No.  Do I have a
14 verbal commitment?  Yes.
15    Q.  You only had discussions with them about them
16 potentially wanting to buy the product, correct?
17    A.  Not potentially.  Not potentially.  They said --
18 once I furnished them the document from the State, they
19 said, "Yes, we want this."
20    Q.  Okay.  At the moment that they said, "Yes, we
21 want this," how much were they buying?  What was the
22 agreement?
23    A.  All that they could get.  They said they would
24 buy it all.
25    Q.  Okay.  How much was "all"?

Page 109

BILLY BURKETTE

1
2     A.  Well, that's the conversation that they -- that
3  you have in that e-mail.  They had 1 million pounds
4  available immediately and 3 million more pounds available
5  within -- whatever it was, 30 days or whatever the time
6  frame was reflected in that e-mail.
7     Q.  Okay.  But it says, "Tommy claims that BP is
8  requesting info on the amounts and production timeline
9  from them for a PO that will be delivered next week."  A
10 PO is purchase order, right?
11    A.  Correct.
12    Q.  And they claimed that they were going to
13 deliver it next week?
14    A.  Correct, because --
15    Q.  To do what they needed -- okay.
16         They didn't have approval at that time,
17 correct?
18    A.  Well, they didn't have approval from Jackie.
19    Q.  Okay.  But they needed it, correct?
20    A.  I'm assuming.  I don't know.
21    Q.  Okay.  So at the time -- based on this e-mail, BP
22 is requesting info on what the production timeline is,
23 what amounts are available, because they want to furnish a
24 request to buy this product, correct?
25    A.  No, they said that it takes a couple of days to

BILLY BURKETTE

1
2 get the PO issued.
3      Q.  Okay.  They never issued a PO, correct?
4      A.  No, they bought the company instead.
5      Q.  Okay.  So there was never a purchase order or
6 other contract pursuant to BP would buy Aqua N-Cap from
7 Global Disaster?
8      A.  Correct, because again, they circumvented me.
9      Q.  Okay.  How much money is Global Disaster claiming
10 BP is liable to it for Aqua N-Cap?
11      A.  I don't -- I don't recall.  It's in my OPA claim
12 form.
13      Q.  Okay.  We'll get to those.
14      A.  You know, to put this in perspective, I have a
15 lot of years' experience in disasters.  In good faith, I
16 went to BP in order to assist and to help, and I was
17 consistently -- because I was not part of their prime
18 contracting list, they utilized me and my information and
19 my contacts as part of the response to the spill for which
20 they basically stole that information from me and went
21 behind my back and procured all of it.
22      So I worked tirelessly, day and night, to
23 help somebody that was fighting a major disaster and
24 they -- and they basically slapped me in the face and
25 stole all my information.

BILLY BURKETTE

1
2      Q.  Understood.  Can you open Tab 16 which I just
3 sent?
4      MR. KLAR:  I think -- can the court reporter
5 mark that the next exhibit, 7, 6?
6      THE STENOGRAPHIC REPORTER:  Yes, sir, 6.
7      MR. KLAR:  Thank you.
8      (Exhibit 6 was marked for identification.)
9      MR. KLAR:  Hold on one second.
10 BY MR. KLAR:
11      Q.  Okay.  So this is an e-mail thread between you
12 and a Nelson Fetgatter in May of 2010, correct?
13      A.  Correct.
14      Q.  Do you recall writing and sending these e-mails
15 to Mr. Fetgatter?
16      A.  Yes, sir, along with -- see that guy, hold on,
17 David Barker, where it says, "Please contact David Barker
18 at BP.com regarding the future correspondence and
19 availability of resources"?  So he is the guy, like I --
20 like I'm telling you, I only had communication with him
21 for a few days and then they basically -- they would
22 rotate these guys out, so as you build this relationship
23 with some, they -- you have the communications and you
24 have, you know, back and forth, back and forth, and we are
25 going to get it here, and we are going to get it there,

BILLY BURKETTE

1
2 and yes, we want to use it; yes, we'll buy it from this
3 distributor.  They are not on our approved distributor
4 list.  We have to send somebody to certify that they are
5 making the boom the way that we want it made to meet the
6 -- the specifications that BP has, and all of these
7 factors.  And then all of a sudden, they are no longer
8 there.  They rotated out with somebody else, so you have
9 to continue with the next guy and the next guy or the next
10 woman and so on.
11      So inevitably, what you think you're doing
12 in good faith ends up being that you are circumvented,
13 because you can't get in contact with the person that you
14 were told by BP management that you had to deal with.  See
15 where it says he is the night shift supervisor?  So he is
16 the one that told me to go to David.  I went to David, had
17 all these communications.  David agreed to buy this,
18 agreed to buy that, agreed to buy this.  I gave him the
19 contact information for the manufacturers.  I gave him the
20 contact information for everyone, because I was trying to
21 be open and transparent and do what was right.  And every
22 time that I did that, BP stuck me in the back with a big
23 knife and said, "We're going around you."
24      So I mean, I don't -- to give your -- to
25 give you an answer of how much, oh, there's no way to

BILLY BURKETTE

1
2 really -- I mean, I would have to sit down -- I would have
3 to have a forensic accountant to help me figure that out,
4 but after BP put me out of business, I mean, how do you
5 continue to go on indefinitely doing what BP asked you to
6 do if they are going to repeatedly stab you in the back?
7      Q.  Okay.  So sitting here today, you're not able to
8 reasonably calculate how much damages Global Disaster
9 suffered as a result of BP's decision not to buy Aqua
10 N-Cap from Global Disaster?
11      A.  Correct.
12      Q.  Okay.  So sitting here today, you're not able to
13 reasonably quantify how much damages Global Disaster
14 suffered as a result of BP's decision not to buy booms
15 from Global Disaster, correct?
16      A.  Correct.
17      Q.  You're not able to quantify how much in damages
18 Global Disaster suffered as a result of BP's decision not
19 to buy vessels of opportunity from Global Disaster,
20 correct?
21      A.  I mean, you're asking at this particular time, I
22 can do it, but do I have it?  No.
23      Q.  Okay.
24      A.  Just like my boat, you know, they instructed me
25 to go out and take samples.  It cost me $5,000 just to

BILLY BURKETTE

1
2 have my boat repainted from all of the COREXIT that ate
3 the paint off of my boat.  Those things I have that, you
4 know, I could provide to you.  But as of sitting here,
5 right now today, no, sir, I don't have that documentation
6 in front of me, but I did provide it to y'all in my OPA
7 claim form.
8     Q.  Okay.  So part of the damages that Global
9 Disaster is asserting is a $5,000 charge for a repaint of
10 the boat?
11     A.  I mean, that's just one of many.
12     Q.  I'm asking if that's one of them, right?
13     A.  Yes, sir.
14     Q.  And that boat is registered to Global Disaster or
15 to Billy Burkette?
16     A.  I don't recall.
17     Q.  Okay.  Do you have any documents that show that
18 Global Disaster owns the boat for which you seek
19 reimbursement in this case?
20     A.  Well, I don't recall if it's me or if it's
21 Global.
22     Q.  Okay.  If it's you, it's not Global Disaster's
23 damages; it's Billy's, correct?
24     A.  Correct.
25     Q.  Okay.

BILLY BURKETTE

1
2     A.  Well, that's not true, because I own it.  It's my
3 -- it's one of my assets whether Global used it or if --
4 if BP used it.  It's still something that BP used and
5 caused damage to that they didn't pay for.  Any way you
6 want to slice that pie, it's still a -- a vessel that was
7 used in response that BP never paid anything for.  They
8 didn't even pay me for going out and collecting the
9 samples that they told me to go out and collect.
10     Q.  Okay.  So whether it's damages to Billy Burkette
11 or to Global Disaster or to A-1 Towing, your position is
12 you owned all of it, so BP owes it no matter what?
13     A.  I -- I think that the correct posture should be
14 that BP owes for things that BP asked me, my companies, my
15 personal, or anything that -- any words you want to
16 choose, if BP told me to do something, they should pay for
17 that and not circumvent me and stab me in the back.
18 That's bad-faith business where I come from.
19         I bet if the shoe was on the other foot and
20 I caused damage to BP, BP would have the same thought
21 process.  If I caused them damage, they would want me to
22 pay that damage.
23         I cannot hear you.
24     Q.  Sorry.  On the bottom of the page marked Global
25 Disaster 104, can you turn to that?

BILLY BURKETTE

1
2     A.  Which -- which document is that?  That's the last
3 one you just sent?
4     Q.  Tab 16, yes, Exhibit 6.
5     A.  Okay.  Where am I going?
6     Q.  So do you see how on the bottom of that document,
7 there's a big stamp that says "Global Disaster" and then
8 there's a number, 000098?  You see that?
9         If you're looking at page 1, at the bottom,
10 there's bold font that says "Global Disaster 98."  Do you
11 see that?
12     A.  Yes, sir, I see that.
13     Q.  Okay.  If you scroll down to the page that's
14 marked 104.  Are you there?
15     A.  I'm getting there.  Yes, sir.
16     Q.  If you scroll up just a little bit so you can see
17 the full e-mail.
18     A.  There's two e-mails on that page.  Oh, no, I see
19 it.  From Nelson.
20     Q.  Yeah.  So on May 11, 2010, at 9:27 p.m., Nelson
21 Fetgatter e-mailed you, correct?
22     A.  Yes.
23     Q.  Okay.  What is Phoenix Pollution?  Do you know
24 what that is?
25     A.  I'm sorry?

BILLY BURKETTE

1
2     Q.  Phoenix Pollution.  His e-mail is
3 nelson@phoenixpollution.com.  Do you know what that
4 company is?
5     A.  I -- it's -- Phoenix Pollution, if I remember
6 correctly, I'm going based -- I'm guessing, because I
7 can't recall it exactly, is one of the partners that had
8 additional Aqua N-Cap on hand.  If I remember correctly,
9 Jon said that -- that he was another distributor that
10 actually had product on hand that we could get.
11     Q.  Okay.  If you look at the last -- the
12 second-to-last sentence of that e-mail says, "If we do
13 place an order with you, we will provide you with a
14 purchase order for goods and services we are asking you to
15 provide and we will provide you with a ship-to location as
16 needed."
17         Did I read that correctly?
18     A.  Oop, this crazy thing.
19         "Please send a requisition authorization
20 letter on letterhead for me to show good faith to the
21 seller that we are not wasting his time."  And that's on
22 what document now?
23     Q.  Okay.  So the -- the e-mail that you were just
24 looking at where you said, "Please send a requisition
25 letter," scroll up.  I'm talking about the e-mail right

BILLY BURKETTE

1
2 above that.
3      A.   Okay.  What about it now?
4      Q.   The one that Nelson sent you.
5      A.   Uh-huh.  Containing the boom?
6      Q.   Yeah.  If you look at the second-to-last
7 sentence, it says, "If we do place an order with you, we
8 will provide you a purchase order for goods and services
9 we are asking you to provide and we will provide you with
10 a ship-to location as needed"?
11      A.   Correct.  I see that.
12      Q.   And he was telling you if he wants to purchase
13 something from you, he'll send you a purchase order,
14 right?
15      A.   Yes, sir, but I believe he transferred out.
16      Q.   Okay.  You never received a purchase order from
17 Phoenix Pollution, correct?
18      A.   I was not expecting one from Phoenix Pollution.
19 I thought we were talking about BP section chief.
20      Q.   You didn't receive one from BP either, correct?
21      A.   No, because they bought the company.
22      Q.   Okay.  So you never had a purchase order or
23 contract for any boom from BP?
24      A.   Not in writing, no.
25      Q.   What were the terms of your -- this oral

BILLY BURKETTE

1
2 agreement that you say for boom?
3      A.   That's what I'm telling you, it -- it fluctuated.
4 It was -- they told me that they would buy everything that
5 I could get my hands on.  So then I would supply them with
6 the name of the company, the location of the company, and
7 the quantity that they had on hand.  So then I would do
8 all the work, and then BP would circumvent me and buy the
9 boom anyway.  So it would be -- it would be -- I wouldn't
10 even have a claim had BP -- had BP not gone behind my back
11 and bought it.  Right?  But because they bought it --
12      Q.   They weren't obligated to buy it from you.  Your
13 claim only exists because you say BP bought something from
14 somebody else and not from you?
15      A.   No.  My claim exists because BP asked me to
16 locate it and that they would buy it, and then they didn't
17 do it.  They -- they -- they basically, like I said,
18 stabbed me in the back.  They told me they would do one
19 thing, and then they did something completely different.
20      Q.   Okay.  And that is based on your oral discussions
21 with people you say are representatives from BP?
22      A.   Well, I mean, don't these e-mails prove that
23 that's who they are?
24      Q.   Your claims are based on your oral discussions
25 with people that you claim are representatives of BP,

BILLY BURKETTE

1
2 correct?
3      A.   No, sir.
4      Q.   Okay.  So your claims are not based on oral
5 discussions with BP?
6      A.   No, sir.  You -- your statement was that my
7 claims are based on communications that I supposed are --
8 what was the word you just used, that I presumed were BP
9 employees?  I can only take the fact that I was in BP
10 headquarters, in that room, looking at people that --
11 eyeball to eyeball that said -- that had their names on
12 their shirts, that had BP shirts on, that they are
13 representatives of BP.  I didn't assume that.  That's just
14 -- I mean, if you're in a -- if you go in the gas station
15 at Exxon, you don't think you are going to buy Shell gas.
16      Q.   Understood.
17           What you are saying is your -- Global
18 Disaster's claims are based on oral discussions with those
19 people, not anything in writing, correct?
20      A.   Other than the e-mails, correct.
21      Q.   Okay.  If you scroll up to the e-mail dated
22 May 12, 2010, on Global Disaster 101, so it's the next
23 e-mail in line, the one that you were talking about
24 earlier where they referred you to David Barker.
25      A.   Okay.

BILLY BURKETTE

1
2      Q.   In that e-mail, Mr. Fetgatter said, "I'm not in a
3 position to execute any contractual agreements on behalf
4 of BP nor can I continue to do the dancing game and
5 therefore must pass your information down the line to
6 someone who has that ability."
7           That's consistent with what we were
8 discussing just now, that Mr. Fetgatter could -- did not
9 agree to any contractual arrangement with you in these
10 e-mails, correct?
11      A.   No, sir.  He didn't.  He sent me to somebody who
12 could.
13      Q.   Okay.  I'm sending a document --
14      A.   So that e-mail that you're talking about from
15 Mr. Fetgatter, it reads -- at the very beginning of it, it
16 says, "Many thanks for your kind words.  We are working
17 diligently to resolve the issues at hand," which means
18 that they kept circumventing me.
19           "Trust" -- so he is asking me to put trust
20 in BP, "that we might have some success in acquiring some
21 of the needed resources that you may have available."  So
22 I'm -- they are -- BP is asking me to trust in them, that
23 they will have some success in acquiring some of the
24 needed resources that I have available.
25      Q.   Well, in the e-mail, Mr. Fetgatter says "might

BILLY BURKETTE

1
2 have some success," not "will have some success," right?
3      A. Yeah, absolutely. You're correct, sir. I see
4 where we are going. Yes, sir, that is correct.
5      Q. And he said "success in acquiring some of the
6 needed resources that you may have available," right?
7      A. Correct. Yep.
8      Q. He is not telling you definitively, "We will buy
9 this product from you at this price," correct?
10     A. Correct.
11     Q. You understood from his e-mail you had to go to
12 someone else to potentially get that authorization,
13 correct?
14     A. Correct.
15     Q. Okay. Can you open the document that I just sent
16 that's marked Tab 17?
17          MR. KLAR: I think this is Exhibit Number 8
18 or 7.
19          THE STENOGRAPHIC REPORTER: 7.
20          MR. KLAR: Tab 17 will be Exhibit 7.
21          THE WITNESS: Yes, sir.
22          (Exhibit 7 was marked for identification.)
23 BY MR. KLAR:
24     Q. Okay. Do you recognize this document?
25     A. Looks like the standard one that we always use,

BILLY BURKETTE

1
2 yes, sir.
3      Q. Between -- it's a Confidentiality Agreement, and
4 it says, "Discloser, Billy Burkette. Recipient, BP"?
5      A. Yes, sir.
6      Q. Okay. Do you recall what the purpose of this
7 document was, why you were entering into a Confidentiality
8 Agreement with BP?
9      A. I do.
10     Q. What is it?
11     A. As I have stated numerous times, BP would request
12 me to do something, I would do it, and they would
13 circumvent me.
14     Q. Okay. So it was important to you that BP keep
15 information that you provide them confidential?
16     A. I mean, is there any other reason that you have
17 to execute that document?
18     Q. Well, if you scroll down -- so is that a "yes"?
19     A. Yes.
20     Q. Okay. If you scroll down to the last page, BP
21 didn't sign this document, correct?
22     A. No, sir. At this time is when they sent me over
23 the Master Service Agreement, I believe.
24     Q. Are you referring to like a vessel of opportunity
25 agreement or something else?

BILLY BURKETTE

1
2      A. The Master Service Agreement was to provide a
3 multitude of things, including the vessel of opportunity.
4      Q. Okay. So BP and Mr. Burkette, Global Disaster,
5 never signed a Confidentiality Agreement, correct?
6      A. I don't know if they did or not.
7      Q. Okay. Sending you document marked Tab 18.
8          MR. KLAR: So you can mark that the next in
9 line, please?
10          (Exhibit 8 was marked for identification.)
11 BY MR. KLAR:
12     Q. And this is a document produced by Global
13 Disaster, right, labeled Global Disaster 147?
14     A. I think this is the one that BP sent to me.
15     Q. Okay. What is this document?
16     A. Yeah, because it says -- this is the document
17 that BP sent back. I guess they did not like the wording
18 in mine.
19     Q. Okay. This is a non-circumvention, nondisclosure
20 Confidentiality Agreement, correct?
21     A. I believe so, yes.
22     Q. And if you scroll to the signature page, it just
23 has your name on it, correct?
24     A. Correct. That's why I said I don't know if BP
25 signed it or not, because they sent it to me requesting my

BILLY BURKETTE

1
2 signature. I signed it and sent it back to them.
3      Q. Okay. But you don't have an executed copy of
4 this document from BP?
5      A. I'm not sure if I do or don't.
6      Q. Okay.
7      A. I'm not -- I'm not sure -- you know, that may
8 have been some of the documents that I lost in the flood.
9 I am not positive. I don't know.
10     Q. I'm sending a document marked Tab 19.
11          MR. KLAR: If the court reporter can please
12 mark that the next exhibit.
13          (Exhibit 9 was marked for identification.)
14 BY MR. KLAR:
15     Q. Do you recognize this e-mail string between you
16 and Mr. David Barker?
17     A. Yes.
18     Q. That's the person that Mr. Fetgatter referred you
19 to in his e-mails, correct?
20     A. Correct.
21     Q. Okay. If you scroll to the bottom of the first
22 page, it's an e-mail from you to Mr. Barker on May 11th,
23 right?
24     A. Yes.
25     Q. Okay. It says, "This is all -- this is all I

Page 126

BILLY BURKETTE

1 have left.  The fine folks at ES&H and the State of
2 Louisiana took the rest I had.  I will have some more
3 confirmations on boom this afternoon, and I just signed a
4 contract with the MFG to produce 2,000 foot a day
5 exclusively for us.  I also have three other sources.  I'm
6 waiting for the contract to come back to me.  I promise
7 350 miles of it.  I don't have the contract, but I do have
8 the Confidentiality Agreement and the Non-Circumvent
9 Agreement signed for them.  Thanks again in advance for
10 your time and assistance."
11          Did I read that correctly?
12    A.  Yep.
13    Q.  Okay.  Mr. Barker replied to that e-mail that
14 same day, correct?
15    A.  I don't see that.
16    Q.  It's right above your e-mail.
17    A.  Oh, yes, I see it now.
18    Q.  Okay.  And Mr. Barker said:  "We will be
19 considering your proposal.  Under no circumstance is the
20 product, 2,000 feet per day exclusively for us, you refer
21 to in the e-mail below committed to BP unless you have a
22 signed purchase order from BP."
23          That's what he wrote, right?
24    A.  Yes.

Page 127

BILLY BURKETTE

1    Q.  Okay.  You never got a signed purchase order from
2 BP, correct, for this product?
3    A.  No, sir.
4    Q.  Okay.  Who is -- who is MF G?
5    A.  They were a boom manufacturer that BP went
6 directly to and circumvented me and bought, which is, if
7 you go back and look at that previous e-mail, one of the
8 reasons that they asked for that is because I kept getting
9 circumvented.
10          Whether it was directly, intentional,
11 unintentional or indirectly, they -- I was there in the
12 office.  They asked for me to do things, and then once I
13 would do it, they would go buy it and circumvent it, which
14 is the whole reason that we had to have the Non-Circumvent
15 Agreement.
16    Q.  But sitting here today, you don't know if they
17 actually ever signed a Non-Circumvent Agreement with you?
18    A.  I remember -- I remembered them saying -- I
19 remember them saying that they received mine that they
20 sent to me, and that that was all that was needed.  You
21 know, keep in mind, again -- I keep trying to reiterate
22 that I did a lot of work for which I was never paid that
23 BP asked me to.
24          If you go out and you buy a lawn mower and

Page 128

BILLY BURKETTE

1 you go and cut somebody's grass because they asked you to
2 cut it and they don't pay you, you would have expenses in
3 that, you would have a loss in that, you would have the
4 understanding, even though it's not in contract form,
5 that, "Hey, I'll pay you a hundred dollars to cut my grass
6 if you go buy a lawn mower to do so."  And then they went
7 and bought a lawn mower themselves at a garage sale for
8 $20 and cut their own grass.  I'm not blaming them for
9 doing that.  I'm just saying they asked me to do
10 something, I did it in good faith and they did not perform
11 in good faith reciprocatoral [sic].  That's all I --
12 that's what my statement is.
13    Q.  Do you know whether BP -- stepping back.
14          The product that is discussed in this
15 e-mail, "2,000 feet a day exclusively for us" of boom, do
16 you know whether BP procured that boom from another
17 manufacturer or distributor?
18    A.  That was that manufacturer that circumvented me
19 and went and bought.
20    Q.  MFG?
21    A.  I'm almost positive, yes.
22    Q.  Okay.  You're not sure, though?
23    A.  I'm not completely positive, no.
24    Q.  How much did you -- let's say BP was going to

Page 129

BILLY BURKETTE

1 place an order with you for that product.  How much did
2 you expect to -- to make off of that contract?
3    A.  $2 a foot.
4    Q.  Okay.  And at 2,000 feet, that's 4,000, right?
5    A.  Correct.
6    Q.  Okay.  And for over what period of time?
7    A.  As much as that manufacturer could produce.
8    Q.  So is it -- is it --
9    A.  That's what they --
10    Q.  Are you paying for the per-day use of the
11 equipment?  Is that's how it's supposed to be structured?
12    A.  It's per-day purchase of boom.
13    Q.  Okay.  So if BP were to purchase 2,000 feet of
14 boom, let's say, on May 12th, do they pay for that
15 2,000 feet once or do they pay for it every single day?
16    A.  Depending on where -- see, that was part of the
17 discussion that we had of whether or not they would rent
18 or buy, so when they -- when they -- basically when they
19 started this, it was -- everything changes at a blink of
20 an eye.
21          So some contracts, they rented boom, and
22 then some contracts, they bought boom.  I do not recall
23 exactly what this was for, but the best of my
24 recollection, this was the purchase of the boom.

BILLY BURKETTE

1
2    Q.  Got it.  Did you -- in that e-mail at the bottom
3  of the page you referenced potentially having other
4  sources and "waiting for contracts to get back to me."
5        Did you ever enter into those contracts?
6    A.  I want -- don't want to answer incorrectly, so.
7  I know that we had several contracts with several
8  manufacturers that BP circumvented me on.  I do not recall
9  if that specific e-mail references a named manufacturer.
10 Like I say, because BP kept stabbing me in the back, I
11 don't -- I don't recall at what point -- we were talking
12 about so much and so many things.
13        Again, in good faith, I'm trying to help.
14 I'm not trying to -- you know, I'm trying to do honest,
15 straightforward, good-faith business for which BP kept
16 circumventing me.  So I don't recall if it's -- what
17 companies those were at that time, so that e-mail.
18        MR. KLAR:  Are folks okay to break for
19 lunch?  I know it's a little late over there.  We have
20 been going for awhile.
21        MR. NEWELL:  Fine with me.
22        MR. KLAR:  What was that?
23        THE WITNESS:  I'm good.  We can keep going.
24 I mean, do we have a lot left?
25        MR. KLAR:  Yeah.  We have got quite a bit.

BILLY BURKETTE

1
2  Want to break for -- for 30 minutes?
3        THE WITNESS:  That's fine with me.  It's up
4  to y'all.
5        MR. KLAR:  Okay.  Eric is that good with
6  you?
7        MR. NEWELL:  How about, yeah, like 2:15
8  central time.  That's about 35 minutes.
9        MR. KLAR:  That works.  We can go off the
10 record.
11        THE VIDEOGRAPHER:  Time is 1:39 p.m.  We are
12 going off the record.
13        (Lunch break taken.)
14        THE VIDEOGRAPHER:  Time is 2:29 p.m.  We are
15 back on the record.
16 BY MR. KLAR:
17    Q.  Okay.  Mr. Burkette, I'm sending you a document
18 labeled Tab 20.
19        MR. KLAR:  Can the court reporter please
20 mark this the next exhibit?
21        THE STENOGRAPHIC REPORTER:  Yes, that's 10.
22        (Exhibit 10 was marked for identification.)
23 BY MR. KLAR:
24    Q.  Are you able to open that, Mr. Burkette?
25    A.  Yes.

BILLY BURKETTE

1
2    Q.  Okay.  Do you recognize this e-mail?
3    A.  I guess.  It looks like I sent it on May 27th.
4    Q.  Okay.  What does -- the subject line reads "EPA
5  POC."  Do you recall what that means?
6    A.  Yeah.  That was the -- according to -- don't
7  remember who it was, but somebody above Jackie's head said
8  that the product Aqua N-Cap could not be used because of
9  its detriment to the environment, that they needed proof
10 from the EPA that it met the specs, and that it was an
11 approved product that the EPA -- in other words, in order
12 for BPA -- BP to be allowed to use the product Aqua N-Cap,
13 they wanted proof, which made no sense to me, that the EPA
14 would approve it.
15        And I think you have the other e-mail that
16 goes with this; that is, the actual EPA from -- document
17 approving BP -- approving Aqua N-Cap for BP's use.  In
18 other words, the Environmental Protection Agency had to
19 authenticate that Aqua N-Cap was the correct product to
20 use that would demonstrate less environmental impact than
21 COREXIT.
22 BY MR. KLAR:
23    Q.  Okay.  So when did you learn that the -- strike
24 that.
25        You learned that the EPA was going to

BILLY BURKETTE

1
2  require some sort of proof or certification after you had
3  spoken with BP procurement?
4    A.  No, sir, incorrect.
5    Q.  Okay.  When did you learn that the EPA was going
6  to require this information in order for BP to use Aqua
7  N-Cap?
8    A.  You have it completely backwards.  BP wanted to
9  know if the EPA would approve -- or was it an approved
10 product by the EPA.  The EPA didn't want to know anything.
11 It was all BP.
12    Q.  Okay.  Understood.
13        When did you learn that BP wanted the EPA to
14 approve this product?  Was this after your discussions
15 with procurement?
16    A.  I think it was probably during the same
17 timeframe.
18    Q.  I just -- I just want to make sure I understand
19 the timeline correctly.  So sorry that we are treading
20 over this again.
21        So you initially had discussions with folks
22 in BP's procurement group about using Aqua N-Cap?
23    A.  Correct.
24    Q.  Correct?  Okay.
25        Do you remember who in the procurement

BILLY BURKETTE

1
2  specifically or no?
3      A.  No, sir, I do not.  Multiple people.  It was
4  multiple people.
5      Q.  Do you remember the approximate timeline of those
6  -- strictly the procurement discussions?
7      A.  No, sir.
8      Q.  Okay.  After you spoke with procurement,
9  that's -- at some point in time, you had a conversation
10 with a Jackie Michelle; is that right?
11     A.  After I had had multiple conversations with
12 procurement and provided to procurement that -- the EPA
13 document, the state emergency response plan from BP and
14 multiple communications with Captain Stanton at the Coast
15 Guard.  And then Captain Stanton is the one that brought
16 me into the building and introduced me to Jackie.
17     Q.  Okay.  Was it before or after that discussion
18 where you were told BP needs to check with the EPA first
19 before using this product?
20     A.  I'm sure it was before, because her answer was
21 short and sweet.
22     Q.  That BP wouldn't use the product?
23     A.  Well, it wasn't so much that they would or
24 wouldn't use the product.  It was the reason that they
25 would or wouldn't use the product that struck -- I mean,

BILLY BURKETTE

1
2  when she told Captain Stanton and I, "Not no but hell no,
3  because it'll quantify the spill and cost us billions in
4  fines," we both looked at each other in shock.  Captain
5  Stanton and I did.
6          So basically, at that point, when he asked
7  to use it in the burn ring and she still -- she said,
8  "Maybe you didn't hear me, but no, we are not going to use
9  Aqua N-Cap at all," I -- I was -- I asked -- I said, "So
10 the environmental impact is not as important as saving BP
11 money?"  And that's -- she said, "That's correct."
12          So the whole -- the whole liability portion
13 of quantifying the spill was basically viewed as, "We are
14 more concerned" -- BP's view, according to her, was that
15 the use of Aqua N-Cap was obviously the right choice of
16 product to use to respond to the spill, and it was the
17 product -- one of the products on the list that told
18 the State that they would use, but because it was going to
19 quantify something that everybody was guessing at, because
20 they couldn't verify how much was coming out, that because
21 it would quantify it, because every pound captures
22 11 pounds of carbons, then they made an executive decision
23 to reduce their liability, and dollar figures and fines
24 became more important than the environmental impact.
25     Q.  So before your discussion with Jackie, you

BILLY BURKETTE

1
2  learned BP needed to get -- or BP told you that they
3  needed to get EPA approval for the products first.
4          By the time you had spoken with Jackie, do
5  you know one way or another whether BP had received that
6  okay from the EPA?
7      A.  Best of my recollection, we gave that to them
8  prior to that conversation with her, because, like I said,
9  it was multiple conversations with multiple people.  The
10 first -- the first time I introduced it, they said that it
11 was not an approved product.  When I provided them
12 the letter from the State, their own hazardous
13 mitigation -- I mean, hazardous response plan and showed
14 them where it was highlighted that Aqua N-Cap was on
15 there, the next thing came back was, "We need an EPA
16 approval."
17          I got them the EPA approval, and the EPA
18 approval was on the State's website, because BP had to
19 give it to the State, along with the product list.  And so
20 it was just very obvious that, you know, the employees
21 down on the floor really had no clue.  They are just doing
22 what they are told.  They had a job to do and they did
23 what they were told to do.  They really didn't know.
24     Q.  Okay.
25     A.  And that's why I tried to help them.  And so by

BILLY BURKETTE

1
2  helping them -- I guess the answer to your question that
3  you're looking for is they would have had that prior to --
4  because I know Captain Stanton had it.  So yes, it was
5  prior to Jackie getting it.
6      Q.  Okay.  So turning back to that e-mail that's
7  Exhibit 10, Tab 20, in that e-mail you wrote to Chris Ott
8  we talked about earlier, "Lynn DeHaven," there's a phone
9  number, "according to BP, this person is the team lead
10 that has to approve Aqua N-Cap for their use.  Best, Billy
11 Burkette."
12          Do you recall writing that?
13     A.  Yeah.
14     Q.  So did you send this e-mail before speaking to
15 Jackie Michelle or before?
16     A.  Oh, I don't remember what -- I don't remember the
17 exact date that I talked to her.
18     Q.  Did you have any understanding of where Lynn
19 DeHaven fit into the structure at BP?
20     A.  No, sir, I do not.
21     Q.  Who told you that -- it says, "According to BP,
22 this person is the team lead."  Who at BP told you that?
23     A.  It was one of the guys in procurement down there
24 on the floor.  I don't remember who it was.
25     Q.  Okay.  So at this time, by the time you sent this

---

**Page 138**

BILLY BURKETTE

e-mail on May 27th, 2010, you understood that you had to
reach out to somebody else to get approval to -- for BP to
purchase Aqua N-Cap from you, right?

A. Oh, man, I don't -- I don't really recall.  You
know, it was never -- it was never in a -- I didn't have a
thought process of what a requirement would mean for
procurement.  My thought process at that time was, based
on my experience and knowledge, you have a disaster plan
that you have submitted to the State that says, "This is
what BP will do if there's a spill."

So I tried to read through that, make some
notes, assess the damages and the impact to the
environment, as well as the wildlife, as well as the
fishing estuaries, all of those things were being
impacted.  And I tried to do what was right, and the right
thing would have been -- or the most prudent thing in
doing due diligence would have been to use the Aqua N-Cap.
But when they -- when I was told that it was BP's position
that the environment didn't matter as much as their
pocketbook did, then, at that point, it was, you know, you
tried to -- to ask, you tried to question, and you tried
to discuss the approach, and to learn why their thought
process was money over the environment and over the
documents that they said that they would use took

**Page 139**

BILLY BURKETTE

precedence.  And the only thing that I could figure out
was that BP was, at no point, concerned about people,
animals or environment.  They were only concerned about
cost.  So that was not part of what the -- the emergency
response plan, you know, verbiage was.

Q. At the point that you sent this e-mail, is it
fair to say that you were still trying to get BP to
purchase Aqua N-Cap from Global Disaster?

A. Not so much that I was trying to get BP to
purchase something; I was trying to get BP to respond to a
disaster in an appropriate fashion that would mitigate
damages to the environment as well as the wildlife
and people.  It was just the right thing to do.  I was
trying to do what was right.

Q. But it's your position that the right thing to do
in this situation would have been to use Aqua N-Cap, and
at the point that you sent this e-mail, you were trying to
get BP to purchase it from Global Disaster, correct?

A. Well, I'm not going to say that that was my
thought process.  I mean, I guess you can interpret that
any way you want to interpret it.  I'm trying to do what
was right and if -- if that's how you want to view it,
then view it however you want to view it.  Still, either
way you view it, in any capacity, BP chose not to use it.

**Page 140**

BILLY BURKETTE

So there you go.

It doesn't matter if it was right or wrong.
BP didn't care.  BP only cared about the money.

Q. Okay.  I -- I understand your position.  I'm just
saying, by the time -- I'm just asking:  By the time that
you sent this e-mail, it's fair to say you hadn't given up
on trying to get BP to use Aqua N-Cap, correct?

A. Well, here we are 11 years later, and I'm still
trying to get BP to do what was right.  So that is a
correct statement, yes.

Q. Okay.  As of May 27, you were still trying to get
BP to use Aqua N-Cap?

A. Yes.

Q. Okay.  How many discussions did you have with
Jackie Michelle?  Was it just the one?

A. One face to face and probably, I think, three or
four over the phone.

Q. Do you recall the order, like, was the first --
the first one face to face and then you had the phone
calls after, or was it a different order?

A. No.  First one was face to face, and then the
phone calls -- subsequent phone calls after that was to
discuss why doing what was right was not as important as
saving money and saving face.

**Page 141**

BILLY BURKETTE

Q. Were all the discussions that you had with --
with Jackie Michelle related to Aqua N-Cap specifically?

A. Nope.

Q. What other topics did you discuss besides Aqua
N-Cap and what you just mentioned?

A. The horrible effect that COREXIT had on
everything, water, estuaries, O2 levels, animals, you name
it, just people -- pick one, vessels.  The damage that
that toxic stuff caused versus using something that was
safe, I mean, it was -- to me, it was a no-brainer.  I
mean, it wasn't brain science or rocket surgery.  It was
commonsense.

Q. Did you -- do you recall how soon after that
face-to-face with Ms. Michelle you had phone calls?

A. No, sir, I do not.

Q. Do you recall the time period in between those
phone calls?  Were they same day, multiple days, weeks?

A. No, sir, I do not.

Q. And is the only reason -- is it your
understanding that the -- sorry.  Strike that.

Is all that Ms. Michelle conveyed to you,
the reason why BP would not use Aqua N-Cap, is that it
would quantify the impact of the spill and cost them
money?

BILLY BURKETTE

1
2    A.  Yes.
3    Q.  Okay.  No other reasons why they wouldn't use it?
4    A.  No, sir, I -- I shouldn't say that.  I found out
5  later -- and I don't recall the timeframe, but I found out
6  later that they acquired the RTASCo and Aqua N-Cap, is
7  what I was told, and so that was completely baffling to
8  me, because why would you buy something that you didn't
9  want to use?
10   Q.  Do you recall -- not when you found out but when
11  this acquisition occurred?
12   A.  No, sir, I don't recall.  It was shortly.  I
13  mean, it wasn't -- it wasn't like a year.  It was, like,
14  within, I don't know -- it wasn't much -- I don't recall,
15  no, sir.
16   Q.  Do you know one way or the other whether BP ever
17  actually used Aqua N-Cap in response to the spill?
18   A.  Do I know?  No, sir, I do not.
19   Q.  Do you recall any discussions with RTASCo --
20  well, taking a step back.
21       When was the last time you had a
22  conversation with anybody at RTASCo?
23   A.  Jon Fowler told me that he was at -- no longer at
24  liberty to discuss anything with the BP spill with me or
25  anybody, for that matter.

BILLY BURKETTE

1
2    Q.  When was that?
3    A.  Don't recall.
4    Q.  Did you ask him anything during that conversation
5  about your distribution rights to Aqua N-Cap?
6    A.  I tried.  He said he was not at liberty to
7  discuss anything with anybody.  He kept reiterating that.
8    Q.  Okay.  Did you ever initiate any kind of dispute
9  or a lawsuit with RTASCo about -- over -- over your
10  distribution rights with Aqua N-Cap?
11   A.  No, sir.
12   Q.  During your conversation with Ms. Michelle, the
13  face-to-face one, am I correct that Captain Stanton was
14  present?
15   A.  You are correct.
16   Q.  Was there anyone else that was there?
17   A.  No, sir.
18   Q.  Over the phone was it just you two, Ms. Michelle
19  and you, or anyone else on the line?
20   A.  To the best of my knowledge, it was just us two.
21   Q.  Okay.  I want to switch gears a little bit and
22  talk about ES&H, which we touched on briefly earlier.
23       You mentioned that you had a Master Services
24  Agreement with ES&H, right?
25   A.  Yes, sir.

BILLY BURKETTE

1
2    Q.  Do you recall when you first became acquainted
3  with ES&H?
4    A.  No, sir.
5    Q.  It was after the spill, though, right?
6    A.  Oh, yes, sir.  It was one of the procurement guys
7  that put in touch with them that said, because I was not a
8  prime contractor, that I had to go underneath a prime
9  contractor.
10   Q.  Got it.  And if I understand what you're -- what
11  you testified to earlier about ES&H, you would procure
12  things for them that they ultimately would provide to BP,
13  correct?
14   A.  Well -- so all of that happened right around the
15  same time that we had the conversation with Jackie and
16  that we had -- the conversations with the EPA and RTASCo
17  and Jon and a bunch of people, Chris and David and all
18  kinds of people.  And, you know, I expressed to them that,
19  financially, they were bankrupting me.  And so I told them
20  that if they had not, you know, intended to use me and to
21  provide -- let -- whatever we could provide in assistance,
22  then I could not financially keep doing what I was doing.
23       And right about that time is when they
24  asked -- I guess it was somewhere in Alabama or
25  Mississippi, they asked for A-1 to send some trucks to

BILLY BURKETTE

1
2  haul the tar balls, and it took them weeks to pay that
3  bill, and it was -- I don't know, it was almost a hundred
4  thousand dollars, I believe, or more.  I don't remember
5  exactly, but it was up there.  It wasn't no -- just a
6  little bit.
7    Q.  When you say it "took them weeks," who do you
8  mean, "them"?
9    A.  BP.
10   Q.  BP, okay.
11   A.  Yes.  And so it was such a delay and a hassle and
12  aggravation and lies and deceit from BP's part that,
13  basically, you know, I pulled the plug, because I didn't
14  trust them; they weren't doing what they said they would
15  do; they back-stabbed me; they did everything that -- that
16  you could possibly do to delay their -- their objective
17  was clear and concise by that point that they were not
18  concerned with anything that was right.  They only wanted
19  to do what they wanted to do, how they wanted to do it,
20  totally inconsistent with what they told the State of
21  Louisiana that they would do in response to the spill.  So
22  I guess I was --
23   Q.  When you said --
24   A.  I was aggravated and just really, just --
25  financially, because BP did everything that they did to

BILLY BURKETTE

1
2 me, you know, it -- may not seem like much, but you drive
3 all the way to Alabama to meet BP's inspector, which BP
4 sent the inspector over to Alabama to look at the boom to
5 make sure it met spec.  Then they told me to meet the
6 inspector out there.  I mean, it may not be much but you
7 start doing 2, $300 a day in expenses, and then nothing
8 that you could do other than try to do ethical business
9 and BP just steady, you know, back-dooring you, what --
10 what other options do you have other than either to go in
11 debt or either to pull the plug?
12        So, you know, basically my contention is, is
13 that BP forced me out of business, they forced me out of
14 the Port, they went behind my back.  They asked me to do
15 things that, obviously, you seem to think that require a
16 written agreement that I personally don't think it was
17 required because I'm there in person taking verbal orders
18 from BP's employees to do things, that they never paid
19 for.  So, I mean, you know, that -- at that point, it was
20 just a mute [sic].  I was -- I was driven out of business
21 by BP and no matter whether it was intentional or
22 unintentional, the end result is the same:  BP cost me a
23 lot of money.
24    Q.  Okay.  When you say that you "pulled the plug,"
25 do you mean that you -- you shut down Global Disaster's

BILLY BURKETTE

1
2 operations and stopped doing business with BP, or do you
3 mean something else?
4    A.  No, I mean I stopped doing business with BP.
5    Q.  Okay.  At that point -- what point did you, using
6 your words, pull the plug?
7    A.  Oh, I -- I don't -- are you asking for a date and
8 a time?
9    Q.  Not -- just a range.  Was it in 2010?
10    A.  Yes, sir.
11    Q.  Okay.  Was -- was Global Disaster still in
12 business in 2010 or -- or did it cease doing business in
13 2010?
14    A.  Well, after the financial burden, I mean, I kept
15 it active, but we didn't do any business until 2013.
16    Q.  Okay.  So from between sometime in 2010 until
17 sometime in 2013, Global Disaster wasn't doing any type --
18 any business?
19    A.  No, sir.  I couldn't afford to.  They broke it.
20    Q.  Okay.  You said -- you were talking about driving
21 to Alabama to meet an inspector.
22        How many times did you do that?
23    A.  I don't recall, sir, multiple times.
24    Q.  Was it more than ten?
25    A.  I don't recall.

BILLY BURKETTE

1
2    Q.  Was it less than 50?
3    A.  Yes.  I would say that would be a safe number.
4    Q.  Okay.  So $300 a day, let's say you did it 50
5 times at most --
6    A.  That's just -- when I say that, I'm talking about
7 actual cost:  fuel, drive time, eat, sleep, hotel,
8 whatever you want to call it.  I mean, I'm talking about
9 actual cost.  We are not talking about any -- any labor in
10 there, any of my time.  Well, that's -- you know, I didn't
11 even count that.
12    Q.  Well, what would your time be billed towards BP
13 if they are coming to inspect a -- a boom lot, for
14 example?
15    A.  Well, I mean -- I would think that my time would
16 be the same no matter what, no matter if you -- as a
17 consultant, as a response, as a mitigation expert, however
18 you want to call it.  I mean, I bill out at a hundred
19 dollars an hour, so, you know.
20    Q.  Did you tell the BP representatives that your
21 rate was $150 an hour?
22    A.  Nobody ever asked.
23    Q.  Okay.  So you never had any verbal or written
24 agreement with them to pay $150 an hour for your time?
25    A.  They did not -- the factor of dollars never was a

BILLY BURKETTE

1
2 question.
3    Q.  Okay.  So you never had any discussions with BP
4 about money?
5    A.  Not as far as my billable time, no.  Not at a
6 rate which would be, I guess you would call it, documented
7 on the contract, you know, except.
8        Don't you have the -- the ES&H contract?
9    Q.  Yep.  I'm sending it to you right now.
10    A.  There you go.
11        MR. KLAR:  Can the court reporter please
12 mark this, Tab 8, the next in line?
13        THE STENOGRAPHIC REPORTER:  Exhibit 11.
14        (Exhibit 11 was marked for identification.)
15 BY MR. KLAR:
16    Q.  Is this the Master Services Agreement that you're
17 referring to with ES&H?
18    A.  It looks close, yes, sir.
19    Q.  Okay.  Is this one dated June 15, 2010, right?
20    A.  I guess.  I don't see any sign -- any signatures
21 on it.
22    Q.  Okay.  Yeah.
23        So at the bottom of the third page, there's
24 a space for initials, right?
25    A.  Yep.

Page 150

BILLY BURKETTE

1
2     Q.   And it's blank?
3     A.   That's what makes me wonder if this is the actual
4 one.
5     Q.   And the signature page on the last page is also
6 blank, right?
7     A.   That's why I say I don't think this is the
8 accurate document.
9     Q.   Okay.  Do you -- this is the only copy of the
10 ES&H agreement that we have.  Are you -- are you aware of
11 any other document reflecting your contract with ES&H?
12    A.   They sent the document to me.  I signed it, sent
13 back, so I'm assuming that they would have a copy of it.
14 We can subpoena that document from them, I'm sure.
15    Q.   Okay.  But you don't have the document, though?
16    A.   No, sir, I do not.
17    Q.   Do you recall whether the -- the terms of the
18 agreement, like the actual words of the contract, were
19 negotiated with ES&H?
20    A.   No, sir.
21    Q.   So you reached out to them at some point when BP
22 told you, "We need you to work with a -- an approved
23 contractor," and they sent you this agreement?
24    A.   I -- I did not have -- I did not reach out to
25 ES&H.  BP had ES&H reach out to me.

Page 151

BILLY BURKETTE

1
2     Q.   Okay.  So do you recall when ES&H first contacted
3 you?
4     A.   No, sir, I do not.
5     Q.   Do you know how soon before June 15, 2010, the
6 date of the contract, a week?  A month?
7     A.   It must have been about a week, I'm guessing.
8     Q.   Okay.  So after ES&H reached out to you, did you
9 have any phone calls or meetings with ES&H before seeing
10 this agreement?
11    A.   Yes.
12    Q.   Okay.  With who?
13    A.   Don't recall.
14    Q.   Do you recall when they (inaudible)?
15    A.   No, sir.
16    Q.   Do you recall what was discussed?
17    A.   Basically just the -- the questions -- you know,
18 they were more concerned with what, you know, the products
19 and services that I could provide or that I had that could
20 be utilized was the basics of our discussion.  It was
21 not -- it was not so much about the contract or its
22 contents or its terms; it was more in line with, "Hey, BP
23 told us to send you a Master Service Agreement because
24 they want to use whatever you have, and we are supposed to
25 be getting a list of all the products and services that

Page 152

BILLY BURKETTE

1 you can provide."
2     Q.   Did you provide them with a list?
3     A.   I don't -- I don't think it was a written list.
4 I don't recall.  I know we had conversations about it,
5 multiple times.
6     Q.   Okay.  Were those conversations all over the
7 phone?
8     A.   Yes.
9     Q.   Okay.  So after those discussions, they sent you
10 a -- a copy of the agreement, right?
11    A.   Yes, sir.
12    Q.   Okay.  And there weren't negotiations over it.
13 You were okay with the terms?
14    A.   I mean, it didn't matter if I was okay or not
15 okay.  It's -- it's an ultimatum.  If you want to do
16 business, here it is, sign it or don't sign it.  We don't
17 care.
18    Q.   Okay.  So there weren't any changes to the
19 agreement?  That's all I'm trying to establish.
20    A.   Correct.
21    Q.   Okay.  Can you please turn to the second page of
22 the agreement, Section 4, that says, "No obligation to
23 order or accept work"?
24    A.   Yep.

Page 153

BILLY BURKETTE

1
2     Q.   Okay.  It says, "This agreement does not obligate
3 Company to order any labor, goods, services, and/or
4 equipment from Contractor, nor does it obligate Contractor
5 to accept any such orders.  But it shall, however, control
6 and govern all work, all orders, the same classified in
7 written purchase orders or statements of work issued by
8 Company and accepted by Contractor, and shall define the
9 respective obligations of Company and Contractor during
10 the terms hereof."
11         Did I read that correctly?
12    A.   Yes.
13    Q.   Okay.  So you understood from this contract that
14 any work ES&H or products or services that ES&H was going
15 to acquire or purchase through you would be specified in a
16 written purchase order or statement of work issued by them
17 to you, correct?
18    A.   Correct.
19    Q.   Okay.  Did ES&H ever issue a written purchase
20 order to Global Disaster pursuant to this agreement?
21    A.   No.
22    Q.   So Global Disaster never provided any labor,
23 goods, services or equipment to ES&H for ultimate
24 provision with BP pursuant to this agreement?
25    A.   Nothing other than the list.

Page 154

BILLY BURKETTE

1
2    Q.  Okay.  Just a list of what you could offer, not
3  the actual services and goods themselves, correct?
4    A.  That is correct.
5    Q.  Do you have an estimate of how much in damages
6  Global Disaster is claiming it suffered as a result or
7  relating to this relationship with ES&H?
8    A.  No.
9    Q.  When did your contract with ES&H terminate?
10   A.  I don't know.
11   Q.  Was it in 2010?
12   A.  I don't recall.
13   Q.  I'm sending a document, Tab 25.
14        MR. KLAR:  Can the court reporter mark this
15  next in line?
16        THE WITNESS:  Okay.
17        (Exhibit 12 was marked for identification.)
18        THE STENOGRAPHIC REPORTER:  Yes, marked as
19  12.
20        MR. KLAR:  Thank you.
21  BY MR. KLAR:
22   Q.  Do you know what this document is?
23   A.  Yes.
24   Q.  What -- what is it?
25   A.  Price list.

Page 155

BILLY BURKETTE

1
2    Q.  Is this something that you provided to ES&H?
3    A.  I don't recall.  If it was -- if it was something
4  that I supplied or if it was something that they sent to
5  me as a sample of what they needed.  I don't recall, sir.
6    Q.  Okay.  Do you know why at the top right corner in
7  the customer it says "BP Lafitte," or Lafitte?
8    A.  Lafitte.
9    Q.  Lafitte.  What is that name?
10   A.  That's the location of that site.
11   Q.  Where is Lafitte?
12   A.  Lafitte is south of Houma.  It's on the coast,
13  Louisiana coastline.
14   Q.  Got it.
15        On the bottom left corner, "company rep
16  signature," you didn't -- you haven't signed this
17  document, right?
18   A.  No, sir.
19   Q.  And this services ticket if you look at the
20  bottom right corner it says, "Total column A and B,
21  68,913.75," right?
22   A.  Yes, sir.
23   Q.  Did you recall receiving any other service
24  tickets from ES&H?
25   A.  I recall seeing plenty of them.  I just don't

Page 156

BILLY BURKETTE

1
2  actually have them in my possession anymore.
3    Q.  Okay.  And you don't recall supplying any of the
4  pieces or equipment that are listed on the services
5  ticket?
6    A.  I mean, we supplied a bunch of stuff.
7    Q.  To ES&H?
8    A.  No, sir, to BP.
9    Q.  Okay.  So you didn't supply anything pursuant to
10  the contract with ES&H?
11   A.  Not to the best of my knowledge, no, sir.
12   Q.  Okay.  Well --
13   A.  You see, this is what I'm telling you.  What
14  happened was BP put these prime contractors in a position
15  to basically force companies like A-1, companies like
16  Global Disaster, companies like, you know, the VOO, all of
17  the fishermen, all of those things, they forced those
18  things to go into companies like ES&H, Oil Mop, Witt
19  O'Brien -- or O'Brien at the time, now it's Witt O'Brien.
20  They forced all of that to happen.  Not whether or not we
21  wanted it to, they made us do that.
22   Q.  What products did you -- did Global Disaster
23  supply to BP?
24   A.  I don't recall the exact list, but boats, of
25  course the rock crushing, of course trucking, of course --

Page 157

BILLY BURKETTE

1
2  not so much A-1 trucking, but other company trucking that
3  we would subcontract to, equipment, rakes, computers, me
4  teaching classes, just a menagerie of stuff.
5    Q.  Okay.  Of that list that you just listed --
6  described, are there pieces of that that BP did not pay
7  for?
8    A.  They didn't pay me for anything.
9    Q.  Okay.  So all of that that you provided --
10   A.  Let me take that back.  Let me take that back.
11  Let's back up.  They paid me 250,000 -- they forced me to
12  accept a $250,000 payment for A-1 Towing & Hauling,
13  exclusively for A-1 Towing & Hauling.  Had absolutely
14  nothing to do with Global Disaster.
15   Q.  Okay.  The -- the services and the products that
16  you just discussed, rock crushing, of course trucking,
17  subcontractor, equipment, rakes, computers, teaching
18  classes, who was providing those to BP?  Was it you?  Was
19  it A-1?  Was it Global Disaster?  Who was providing that?
20   A.  It was me.
21   Q.  Billy Burkette?
22   A.  Yes.
23   Q.  Okay.  So Global Disaster wasn't teaching
24  courses?
25   A.  Man, I don't -- you know --

Page 158

BILLY BURKETTE

1
2    Q.  Okay.  Looking back at that certificate --
3    A.  However you want to word it.  If you want to try
4  to make it convoluted and -- and confusing, that's up to
5  you, sir.  Any -- it doesn't matter to me, whether you
6  want to classify it as me or if you want to classify it as
7  Global.  I don't care, however you want to word it.
8    Q.  So Global Disaster wasn't providing -- Billy
9  Burkette, not Global Disaster, was providing subcontracts
10  for equipment, rakes, computers and teaching classes to
11  BP?
12    A.  If you say so.
13    Q.  Do you?
14    A.  Nope.
15    Q.  So what do you think?
16    A.  I don't -- I don't have anything to say.
17    Q.  Okay.  You have no position?
18    A.  If you really want to know what I have to say,
19  which I'm sure you don't, I'm saying that you are
20  confusing this and trying to structure the narrative for
21  your benefit.
22    Q.  I'm just trying to get some questions answered.
23  I'm trying to understand who provided what services and
24  what was and wasn't paid for.
25    A.  I provided all the services, along with Global

Page 159

BILLY BURKETTE

1
2  Disaster, and they didn't pay for any of it.  How about
3  that?
4    Q.  Okay.  But sitting here today, you can't
5  differentiate who was providing what?
6    A.  Did not know that I needed to.
7    Q.  So no?
8    A.  No.
9    Q.  Okay.  Did you -- going back to the services
10  agreement, is Global Disaster claiming damages relating to
11  this services agreement with ES&H?
12    A.  I don't know.  I don't recall.
13    Q.  Aside from the Master Service Agreement with
14  ES&H, was there any other agreement or relationship
15  between Global Disaster and ES&H?
16    A.  No.
17    Q.  Okay.
18      MR. NEWELL:  Hey, Austin?
19      Yeah.
20      When we get to a stopping point, can we take
21  a bathroom break?
22      MR. KLAR:  Yes.
23      MR. NEWELL:  I mean, obviously, if you are
24  on a roll, we can keep going, but I wanted to --
25      MR. KLAR:  If you want to do -- I was about

Page 160

BILLY BURKETTE

1
2  to switch topics, so if you want to do like a five or
3  ten-minute, that's fine with me.
4      MR. NEWELL:  Okay.
5      MR. KLAR:  Off the record.
6      THE VIDEOGRAPHER:  Okay.  Time is -- sorry.
7  Time is 3:18 p.m.  We are going off the record.
8      (Brief recess taken.)
9      THE VIDEOGRAPHER:  Time is 3:39 p.m.  We are
10  back on the record.
11      MR. KLAR:  I'm sending Tab 26.  Can the
12  court reporter please mark that the next-in-line exhibit.
13      THE STENOGRAPHIC REPORTER:  Yes, sir, 13.
14      (Exhibit 13 was marked for identification.)
15      MR. KLAR:  You said 13?
16      THE STENOGRAPHIC REPORTER:  Correct.
17  BY MR. KLAR:
18    Q.  Mr. Burkette, do you have Exhibit 13 open?
19    A.  Yes.
20    Q.  Okay.  Do you recognize this document?
21    A.  Yes.
22    Q.  What is it?
23    A.  It's another request from BP at that time for me
24  to procure labor that they shafted me on.
25    Q.  So this is from Strategic Services USA, LLC, not

Page 161

BILLY BURKETTE

1
2  BP, right?
3    A.  Correct.
4    Q.  Okay.  Who is Strategic Services USA, LLC?
5    A.  A subcontractor that I reached out to.
6    Q.  Regarding what?
7    A.  Regarding the request for labor that BP had asked
8  me to obtain.
9    Q.  Is this the only -- is the labor the only item
10  which you discussed with Strategic Services USA or are
11  there other products or services that you discussed with
12  them?
13    A.  I don't recall.
14    Q.  The bottom right-hand corner is your signature or
15  your name where the signature would go, right?
16    A.  Yes.
17    Q.  This is not signed By Strategic Services USA,
18  LLC, correct?
19    A.  They sent it to me.  There's no need to sign it.
20    Q.  There's no signature by Strategic Services,
21  correct?
22    A.  Correct.
23    Q.  When did you become acquainted with Strategic
24  Services?
25    A.  I don't recall.

Page 162

BILLY BURKETTE

1
2    Q.  Do you recall how you learned what they offer?
3    A.  Over the telephone.
4    Q.  Did they reach out to you, or did -- did you
5  reach out to them?
6    A.  I reached out to them.
7    Q.  And what did you discuss?
8    A.  The discussion I had was:  This is a
9  communication that basically BP, again, in the big room
10  and through phone calls, that BP said that's what their
11  needs were.
12    Q.  Okay.  So BP told you that they need between 250
13  to 500 workers in each of these four states that are
14  listed on this page?
15    A.  That is correct.
16    Q.  Okay.  And then you called Strategic Services and
17  said, "BP wants these workers; can you provide me a
18  quote?"
19    A.  Yes.
20    Q.  Okay.  For how much was -- was it the intent that
21  Global Disaster would then provide these laborers to BP
22  pursuant to an agreement between BP and Global Disaster?
23    A.  Could you repeat the question?
24    Q.  Sure.
25        So this -- this is a Letter of Intent from

Page 163

BILLY BURKETTE

1
2  Strategic Services to Global Disaster.  Was the intent
3  that BP would have a separate arrangement with Global
4  Disaster where Global Disaster would provide the laborers
5  that Global Disaster was obtaining through this agreement
6  with Strategic Services?
7    A.  That is correct.
8    Q.  Okay.  Was that arrangement with BP an oral
9  agreement, or was it reduced to writing?
10    A.  Oral.
11    Q.  Do you recall who the agreement was with at BP?
12    A.  I do not.
13    Q.  Do you recall when that agreement was made?
14    A.  I do not.
15    Q.  Do you recall at what cost to BP Global Disaster
16  would provide these laborers to BP?
17    A.  I do not.
18    Q.  If you turn to the second-to-last paragraph here,
19  it says, "It is the intent of Strategic Services USA, LLC
20  to enter into a formal subcontract agreement with Global
21  Disaster provided Global Disaster Recovery discloses their
22  contract with ES&H on payment schedule and insurance
23  coverage required for the project."
24        Did I read that correctly?
25    A.  I believe so.

Page 164

BILLY BURKETTE

1
2    Q.  Okay.  Did Strategic Services USA ever send you a
3  formal subcontract agreement?
4    A.  I don't recall.
5    Q.  Do you recall Global Disaster ever entering into
6  a formal subcontract agreement with Strategic Services?
7    A.  I do not recall.
8    Q.  Do you recall having any discussions, besides
9  what's in this letter, with Strategic Services about a
10  formal subcontract agreement?
11    A.  Nope.
12    Q.  Do you recall having any discussions with
13  Strategic Services about ES&H?
14    A.  Again, at -- this was all about the time that BP
15  made an executive decision to force everybody to go under
16  a prime contractor.
17    Q.  I understand.
18        But do you have recall specifically having
19  any discussions with Strategic Services about your ES&H
20  contract?
21    A.  Well, yeah, I mean, I told them -- you know, I --
22  again, I try to be as transparent as I can.  I don't
23  disclose, you know -- or I don't not disclose any --
24  there's nothing hidden there.  I don't -- I don't
25  understand what you're trying to get at.

Page 165

BILLY BURKETTE

1
2    Q.  I'm just asking if you had discussions with them
3  about ES&H and what those discussions were.  That's it.
4    A.  I mean, I told them that BP was forcing me to go
5  under ES&H, that ES&H would be now acting on BP's behalf.
6    Q.  Did you ever provide Strategic Services USA with
7  signed copy of any contracts with ES&H and Global
8  Disaster?
9    A.  I don't recall.
10    Q.  Did Global Disaster ever provide Strategic
11  Services USA with proof of insurance coverage required for
12  services outlined in those letters of intent?
13    A.  I don't recall.
14    Q.  Is Global Disaster claiming any damages against
15  BP relating to this Letter of Intent with Strategic
16  Services USA, LLC?
17    A.  I'm sure.
18    Q.  Do you know?
19    A.  Yes.
20    Q.  How much is Global Disaster claiming it -- it
21  suffered relating to this Letter of Intent with Strategic
22  Services USA, LLC?
23    A.  I don't have a dollar figure.
24    Q.  How did BP damage Global Disaster with respect to
25  the Strategic Services -- this Letter of Intent with

BILLY BURKETTE

1    BILLY BURKETTE
2 Strategic Services, LLC?
3       A.  BP told me what their needs were and asked for me
4 to go get it.  I went out, worked, found them, got the
5 list, sent it in, and then they sent me to ES&H.  Said,
6 "You got to go through a prime contractor."
7       Q.  Okay.  That's -- that's the entire basis of your
8 claim against BP relating to the Letter of Intent from
9 Strategic Services USA, LLC?
10      A.  Well, I guess, you know, we have been over about
11 however many documents we have been over, and each time,
12 the end result is BP asked me to do something.  I didn't
13 just go out and do all this on my own.  I didn't -- I
14 wouldn't even know who to ask or what to get unless
15 somebody at BP told me to get it.  Right?
16          So I'm following their instruction on all of
17 these documents that you sent to me showing time and time
18 and time again that I'm in communication with BP, and at
19 the end of the day, BP didn't pay for any of it.
20          So, I mean, I don't know how much more proof
21 you need that BP did not do anything -- any business with
22 Global Disaster.  But yet, they continually asked me to --
23 to provide information, which they took from me, and
24 back-doored me and got it themselves.
25      Q.  It's Global Disaster's intention -- if I

BILLY BURKETTE

1 understand what you're saying, it's Global Disaster's
2 intention that BP does not have any beef with Global
3 Disaster, but the basis of your claim is they asked you to
4 procure products and services and ultimately did not
5 purchase those products and services from Global Disaster.
6 Is that accurate?
7       A.  No, that is not accurate.
8       Q.  What did I get wrong there?
9       A.  BP, through multiple, multiple conversations,
10 face to face and on the telephone, would tell me what they
11 needed, based on whether it be a day shift or a night
12 shift, incident command priorities list.  So I would
13 communicate with the BP employees; they would tell me what
14 they wanted.  I would go out and get it, line it up, do
15 all the work -- all the groundwork for them on their
16 behalf, representing them.  That's what they told me to
17 do, and either they would circumvent me or they would
18 direct contract.  Either way, you want to verb that -- use
19 the verbiage on that, and they would basically not pay for
20 anything that they asked me to do.
21          So if it would just be once or twice, I
22 could see that.  But you can tell, obviously with how many
23 documents that you put up here, that every time I was in
24 communication with BP, and BP asked me -- or told me what

BILLY BURKETTE

1    BILLY BURKETTE
2 their needs were and asked me to get those things and then
3 they did not fulfill their obligation.  So why would
4 you -- why would anybody go out and say, you know --
5 that's like -- that's like if I asked you, "Hey, I'm --
6 I'm new to this town" -- I don't know where you live.
7 Let's say you lived in Illinois.  "I'm new to Illinois.
8 Can you get me a hamburger from McDonald's?"  And you say,
9 "Oh, yeah, I'll get that for you."  You go get the
10 hamburger, bring it back to me, and I eat it, and then I
11 say, "Oh, well, I ain't paying you for that."
12          How many times would you repeatedly do that,
13 and then ultimately come to the decision that my intent
14 behind all of that conversation and many trips that you
15 made was to take advantage of you and to not fulfill my
16 obligation that I intended to you to get what I wanted you to
17 get for me?
18      Q.  If you felt that BP had repeatedly asked you to
19 do something for them, you would go and do it, and then
20 they refused to pay for it, why didn't you start trying
21 to -- well, scratch that.
22          If you felt that BP had repeatedly asked you
23 to do something for them and then not pay for it once
24 you've done that work, based on oral agreements with BP
25 representatives, why didn't you get any of these

BILLY BURKETTE

1 agreements in writing?
2       A.  Well, as I had stated earlier, I'm working out of
3 my truck 200 miles away from where any kind of office
4 space was that we could get to to draft anything.  And
5 again, I'm trying to do anything to help in a drastic
6 situation, and at any point in time, if somebody asks you
7 for help and you do it in good faith, be -- you have to be
8 able to see that -- through all of this information that
9 you are providing, that they continued to ask me to do
10 those things, because I wouldn't know that they needed
11 those goods and services unless BP told me what they
12 needed.
13      Q.  You never asked BP to put any of your agreements
14 with them in writing, correct?
15      A.  That's not correct.  I did after about 10 or 12
16 times that they screwed me.
17      Q.  At that point, before the tenth time, you had
18 never asked them to put any of your agreements in writing,
19 correct?
20      A.  No, sir, because, you know, it's -- it's just
21 like anything else, you know, I'm not a big business like
22 BP.  I'm not a big company like BP or ES&H or anything
23 like that.
24          We are a service-based company.  You come

BILLY BURKETTE

1              BILLY BURKETTE
2  and ask me, "Hey, Chief," or, "Hey Billy, can you do this
3  for me?"  And I tell you, "Yeah."  You don't have to
4  worry.  You can lay your little head on your pillow at
5  night and go to sleep because you know that I'm going to
6  do what I said I was going to do.  It's a matter of
7  principle and ethics.
8       Q.  So after the tenth time that you felt like
9  that --
10      A.  There wasn't no feel -- it's not a feeling.
11             THE STENOGRAPHIC REPORTER:  I'm sorry.  I
12  think we lost our videographer.
13            (Brief recess taken.)
14             THE VIDEOGRAPHER:  Time is 4:05 p.m.  We are
15  back on the record.
16  BY MR. KLAR:
17      Q.  Okay.  Mr. Burkette, we were speaking about
18  whether agreements with BP were ever reduced to writing
19  and you indicated that the first ten or 12 times it hadn't
20  been reduced to writing, but after that you were asked
21  that your agreements with BP be put in writing.  Is that
22  generally accurate?
23      A.  Yes, sir, and that's when they forced me to go to
24  ES&H.
25      Q.  Okay.  But even after that point, none of your

BILLY BURKETTE

1              BILLY BURKETTE
2  agreements with BP were in writing, right?
3       A.  No, sir, just verbal.
4       Q.  Okay.  And there's no -- at the end of the day,
5  ultimately, the reason we are here is that BP did not do
6  any business with Global Disaster, correct?
7       A.  No, sir, that is not correct.
8       Q.  Okay.  What -- what business did they conduct
9  with Global Disaster?
10      A.  (No response.)
11      Q.  Let me rephrase.
12             Earlier, you said, "I don't know how much
13  more proof you need that BP did not do any business with
14  Global Disaster.  They continually asked me to provide
15  information which they took from me and back-doored me and
16  got it themselves."
17             Am I right to say that BP did not purchase
18  any products or services from Global Disaster?
19      A.  Yes, you're correct.
20      Q.  Okay.  BP did not issue a purchase order in
21  writing to Global Disaster to purchase any products or
22  services?
23      A.  That's correct.
24      Q.  And BP never promised, in writing, in an
25  agreement to purchase any products or services from Global

BILLY BURKETTE

1              BILLY BURKETTE
2  Disaster, correct?
3       A.  That's correct.
4       Q.  Okay.  Earlier, we talked about the Airware
5  arrangement with Global Disaster.
6              Were there any other concrete-crushing
7  arrangements that you had with companies besides Airware?
8       A.  No.
9       Q.  Okay.
10      A.  Oh, wait, ask that question again.
11      Q.  Sure.
12             Were -- aside from your agreement with --
13  aside from Global Disaster's agreement with Airware, were
14  there any other contracts that Global Disaster was a party
15  to to crush concrete in the Port of St. Bernard?
16      A.  No.
17      Q.  I want to talk a little bit more about the Port.
18  Other than what we discussed on far today, your -- your
19  concrete crushing -- Global Disaster's concrete-crushing
20  arrangement with Airware and your -- Global Disaster's
21  attempts to procure products and services for BP.
22             Was there any other activity that Global
23  Disaster was conducting in the Port of St. Bernard?
24      A.  Just the availability of room for BP to store
25  boom and other products for deployment.

BILLY BURKETTE

1              BILLY BURKETTE
2       Q.  Okay.  So you were in discussions with BP about
3  storage for equipment?
4       A.  Correct.
5       Q.  Okay.  Who were those discussions with?  Was that
6  procurement as well?
7       A.  Yes.
8       Q.  Do you recall with who?
9       A.  I do not.
10      Q.  Do you recall when those discussions took place?
11      A.  I do not.
12      Q.  Do you recall discussing how much storage was
13  needed or could be provided?
14      A.  I don't remember with whom.  I do remember
15  them -- I do remember them having sent representatives out
16  and asking me how fast we could crush the pile and if we
17  could crush it in such a manner that would free up certain
18  portions of the area for room.
19      Q.  I see.  So the -- the area that Global Disaster
20  would be able to furnish as storage to BP was being
21  occupied by the concrete that Global Disaster had to
22  crush?
23      A.  Correct.
24      Q.  Okay.  Where was that concrete held?  Was it like
25  a yard that Global Disaster owned or leased?

Page 174

BILLY BURKETTE

1
2     A.  The -- it was at the Port.
3     Q.  Right.  I understand it was at the Port.
4          But was -- if -- whose land was it where the
5  concrete was?
6     A.  The Port.
7     Q.  Okay.  So it wasn't Global Disaster's land?
8     A.  No.
9     Q.  Okay.  If BP --
10    A.  But -- but Global Disaster had that section of
11 land allocated for the concrete crushing.  BP sent their
12 representatives out to ask how fast we could crush it, and
13 if we could do it in such a manner at a starting point
14 that they would be able to utilize a portion of that land
15 once we started crushing.  In other words, they asked us
16 to start in a place different from where we were set up so
17 that we could accommodate them in freeing up some room for
18 them to have space, which, of course, I agreed to.
19    Q.  Did you have permission from the Port to allow BP
20 to store equipment at the concrete-crushing site?
21    A.  It was our -- that -- that section of land, I
22 didn't need it.  It was -- it was already our section.
23    Q.  I think earlier you testified they had allocated
24 it to you for concrete crushing?
25    A.  Correct.

Page 175

BILLY BURKETTE

1
2     Q.  But not for storage, correct?
3     A.  No, but again, because they put me in such a
4  financial hardship that I couldn't complete the crushing
5  and the fact that they came in and took over the Port and
6  forced me out of the Port, I never had time to do that.
7     Q.  Okay.  So in order for you to allow BP to use
8  your concrete-crushing area as storage, you would have had
9  to get permission from the Port, right?
10    A.  Don't know.
11    Q.  Okay.  You never asked?
12    A.  No.
13    Q.  Okay.  So sitting here today, you don't know
14 whether or not the Port would even have allowed that?
15    A.  Well, obviously, they allowed it, because BP took
16 the whole Port over.
17    Q.  Well, you don't know if the Port would have
18 allowed you to let BP use your land, correct?
19    A.  I do not know if they would or would not allow.
20 I guess we can subpoena the Port and ask.
21    Q.  Did you have any other discussions with BP about
22 the concrete?
23    A.  Yes.
24    Q.  What -- what discussions did you have?
25    A.  The discussions that I had were about supplying

Page 176

BILLY BURKETTE

1
2  the oyster -- so keep in mind, get back to the
3  environment, and the -- the estuaries and the wildlife.
4  So obviously, the spill killed all the oysters.  So the
5  process that has to be done is you have to clean that,
6  then you have to reapply a concrete rock base or limestone
7  base or pebble rock base or some -- some form for the
8  clutches to attach to grow.
9          So the contract that I had was to supply
10 that gravel to the oyster leases, and -- with Dan Robin.
11 So the contract that I had -- I mean, the conversation
12 that I had with BP representatives was, "Y'all are taking
13 over the Port, and you're denying me the opportunity to
14 fulfill my concrete-crushing responsibility.  Is BP going
15 to pay to have this rock moved or is BP going to pay us to
16 haul that concrete to a different location where we could
17 resume the crushing?"  And they said, "We will let you
18 know."  And never heard back from anybody.
19    Q.  So prior to BP essentially taking over the
20 Port, you hadn't had discussions with them about your
21 concrete-crushing business, right?
22    A.  I just told you yes, they sent people out there
23 to see if they could have room.
24    Q.  Sorry.
25          Aside from discussing potential storage

Page 177

BILLY BURKETTE

1
2  options and aside from the discussions that we just went
3  over about whether they would reimburse you for the
4  concrete after they took over the Port, were there any
5  other discussions with BP about your -- Global Disaster's
6  concrete-crushing?
7     A.  Yes.  The portion about taking the rest --
8  whatever the airport didn't need, we were going to take
9  the remainder of that and supply it to the oyster leases.
10    Q.  Right.
11    A.  Which, after the fact that they seized everything
12 in the Port, basically, the concrete, the crushing
13 opportunity, the -- the crushing of that stone and
14 supplying it to the oysters, they did all of that.  BP did
15 all of that.
16    Q.  Okay.  Other than your discussions about storage
17 and about supply for the oysters, no other discussions
18 with BP about your concrete-crushing business, right?
19    A.  No, sir, because they told me that -- that they
20 were taking over the Port and somebody would get back to
21 me, and they never did.
22    Q.  Do you recall who told you that?
23    A.  No, sir, I do not.
24    Q.  Do you recall when that person told you that?
25    A.  No, sir, I do not know the day.

BILLY BURKETTE

Q. How long was the Port shut down for? Do you know when it started and ended?
A. No, sir, I do not.
Q. Do you have a general sense? Was it a few months?
A. From my understanding, it was well over a year.
Q. So sometime in 2010 to sometime in 2011, as best you recall?
A. The best I recall, yes.
Q. Okay. And after the Port was reopened, what efforts did Global Disaster take to determine what it still could or couldn't do with regards to its crushing-concrete business?
A. Well, every time I tried to go down to do that, they kept telling me that BP still had the space. So, like I say, after you -- after I called it quits with BP, you know, I didn't have any recourse other than to file my claim with BP, which is what, at the end of the day, why we are here, and -- and BP basically said, I don't remember the exact words, but if I -- if I had any losses or damages, I could make my claim with the -- with Worley Co.
So I went down to St. Bernard to the Worley Co. office, there was a trailer set up. I made the claim,

BILLY BURKETTE

they paid me -- I don't know -- it was $5,000, I think, and then they were supposed to set me up in the computer on a weekly basis.
Then BP got into some kind of conflict with Worleyclo [sic] -- Worley Co. and that's when they went with Feinstein and all the rest of that nightmare, and basically, they cut that off. Then they had Phil Strunk from some attorney firm -- he was an attorney that called me, and they sent me the 200-and-whatever-thousand dollars or whatever they sent, and they said that was a -- what did they call that -- six-month -- it was a six-month payment for estimated damages or whatever the words that the attorney, Phil Strunk, used. He sent me $287,000.
Q. That 287,000, that was sent to -- to Global -- like, for Global Disaster's claims or was that for A-1 Towing or for something else?
A. I believe that was for just the portion of A-1 that we lost the hauling, and like I say, it was just a -- they called it a EAP program, whatever that is, Estimated Actual Payments. It was for six-month estimated payments.
And then Phil Strunk and them, BP threw them out, they got a new attorney firm, and they sent me over to Feinstein, and Feinstein, you know, basically, he shafted everybody and told everybody, you know, "Well, we

BILLY BURKETTE

are not processing claims," whatever. It's just a nightmare, man; just a nightmare.
Q. Going back to -- and we will talk about Worley and all that.
But going back to the Port closure, do you remember hearing anything about why the Port was being shut down?
A. Did I not say that earlier? Because BP took it over.
Q. You are aware that the Coast Guard controlled the Port, correct?
A. I am acutely aware of that.
Q. So incident command and the Coast Guard were in control of the Port, not BP, right?
A. Well, you would think that. That's a great -- that's a great assessment, because the Coast Guard is in control of the response, which we obviously know that BP was instructing the Coast Guard what to do and what not to do, because they instructed the Coast Guard not to use Aqua N-Cap, right?
Q. So you agree, though, that the Coast Guard and incident command running the spill response, they were in charge of the Port --
A. I do not agree. I do not agree.

BILLY BURKETTE

Q. Who -- who do you think was in charge?
A. BP.
Q. Okay. If the Coast Guard wanted to, they had the authority to remove BP from the Port, correct?
A. No.
Q. What's that based on?
A. The fact that it didn't happen.
Q. Okay. So your -- your testimony is because BP wasn't removed, that the Coast Guard had no control over whether BP could occupy the Port?
A. No, sir. My testimony is that BP instructed the Coast Guard what they were going to do, and they did it. No different than the Aqua N-Cap.
Q. How -- okay. So setting aside your discussion with Jackie Michelle and the Aqua N-Cap, how do you know that BP instructed the Coast Guard as to what they were and were not going to do with respect to the Port?
A. Well, they instructed the Coast Guard where to put the burn ring, they instructed the Coast Guard where to set up incident command. They were inside BP's building -- the Incident Command Center was inside BP's headquarters in Gray, Louisiana, so I don't know how much clearer that picture could be painted.
Q. Okay. So other than the fact that you say the

BILLY BURKETTE

1  Incident Command Center was inside headquarters, were you
2  a party to any conversations, other than your
3  conversations regarding Aqua N-Cap where BP was
4  controlling what the Coast Guard was doing?
5      A.  Absolutely, I was.  So --
6      Q.  Okay.  What?
7      A.  The flyovers with the Russian planes that
8  dispersed the COREXIT, the millions and millions of
9  dollars that Paul Loupe had involved himself in with BP
10 that they never paid him for and the judges in -- in
11 Plaquemines Parish that test -- that -- in their courts,
12 the testimony was BP was in their control, and multiple
13 courts and multiple states and multiple parishes and
14 counties where BP was in control and instructed the Coast
15 Guard exactly what to do.
16     Q.  Okay.  So it's your testimony that BP was in
17 control of the federal government with respect to
18 activities in the Port of St. Bernard?
19     A.  Yes, sir.
20     Q.  Okay.
21     A.  Among other things.
22     Q.  "Among other things" meaning they were in control
23 of other things beyond just the Port of St. Bernard; is
24 that what you're saying?

BILLY BURKETTE

1
2      A.  Correct.
3      Q.  Like what?
4      A.  They instructed the Coast Guard to do a lot of
5  things that the Coast Guard did.
6      Q.  Okay.
7      A.  And I'm assuming we will get those records when
8  we -- when we get a little closer to going to court, I'm
9  sure.  I mean, that's going to be easy to prove.
10     Q.  Okay.  I just sent Tab 28.
11         MR. KLAR:  Can the court reporter please
12 mark that as the next exhibit?
13         (Exhibit 14 was marked for identification.)
14 BY MR. KLAR:
15     Q.  Do you have that open, Mr. Burkette?
16     A.  I do.
17     Q.  Okay.  So this is addressed to you and Global
18 Disaster and -- from a Lil Lalumandier and Robert G.
19 James, "Resale of Stock Port Fourchon Marina, Inc.,"
20 right?
21     A.  That's correct.
22     Q.  Okay.  What is -- what is Port Fourchon Marina,
23 Inc.?
24     A.  Port Fourchon Marina is a -- I guess you're not
25 familiar with Port Fourchon.  When you're traveling down

BILLY BURKETTE

1  to -- towards Grand Isle, Louisiana, Port Fourchon is a
2  port where the shipping industry for the oil industry is
3  basically warehoused.  They have loading bays, they have
4  docks, they have land that BP, again, instructed me that
5  that's what they were looking for.  So I contacted Lil and
6  Robert and I said, "Look, I need to come up with a figure
7  because BP is saying that they need space, and I want to
8  provide that space.  I would like the opportunity to buy
9  that marina."
10     Q.  Okay.
11     A.  So I -- they said, "We would gladly sell it to
12 you for this amount of money, the $750,000."
13     Q.  When did you first come into contact with Port
14 Fourchon Marina, Inc.?
15     A.  The beginning of June, I guess it was.
16     Q.  Okay.  And -- and so you knew that BP was looking
17 for storage.  Did you go out looking for, like, areas that
18 could be provided and that's how you ended up here, or did
19 they contact you?
20     A.  BP contacted me.  They told me that they were
21 looking.  I drove five hours around to go down to
22 Fourchon, met with David -- I guess his name is Barker --
23 and another guy who was the land-procurement guy -- don't
24 recall his name.  He told me that that's the area that

BILLY BURKETTE

1
2  they were looking for, and I went to Chris Moran, who is
3  the owner of Port Fourchon.  It's Chris Moran's Marina.  I
4  had a discussion with Chris about the marina on the next
5  road over, which is this one, Port Fourchon Marina, and I
6  also contacted Bobby Gros, who has Bobby Lynn's Marina,
7  which BP occupied their space, but it was more for
8  sleeping quarters for the BP employees and a few
9  subcontractors.
10         So I went out and negotiated the purchase of
11 this, so that I could provide this property to BP for them
12 to put boom on for deployment, because it had water access
13 and a loading access to load the barges and the vessels
14 with the boom for deployment.  So at that point, as you
15 can tell, I went to great lengths to accommodate BP and
16 what their needs were in responding to this spill.  So I
17 signed my name to this, saying that I would buy it.  I
18 took it to the guy that was doing the land procurement and
19 I said, "Look, I'm willing to buy this property.  If you
20 need it, we will be happy to accommodate you."  At that
21 point -- I'm sorry?
22     Q.  Sorry.  What -- what did he say to you in
23 response to that, the land-procurement person at BP?
24     A.  "Thank you.  We'll be in touch."
25     Q.  So he didn't tell you, "Yes, go buy it; we want

BILLY BURKETTE

1

2 it"?

3      A.  Well, I mean, I told him it would take a few days

4 to do the paperwork on it, and he said, "Thank you.  We'll

5 be in touch."

6      Q.  Did you ever hear back from him?

7      A.  Nope.  They rotated him out.  He -- he's gone.

8 So if you go back and read the bottom of that, it says,

9 "We agree today to give you this option to purchase until

10 next Friday, June the 25th."  Well, the next week would

11 have been the July the 4th -- or two weeks would have been

12 the July the 4th.  They -- people that was supposed to

13 come back -- you know, they sent them home for two weeks,

14 and then they would come back.

15           So in the interim, the guys that were

16 staying at Moran's Marina, which is David and the -- and

17 the other guy and two other people -- it was -- it was

18 four of them -- they each had different procurement

19 responsibilities, they told Chris Moran that I had

20 procured that property, that I had this agreement.  And --

21      Q.  Okay.  Hold on.  Before we continue.  To be

22 clear, by this time, you had the option to purchase it,

23 but you hadn't actually purchased it yet, right?

24      A.  Well, I was in the process of it.

25      Q.  But you hadn't purchased it, right?

BILLY BURKETTE

1

2      A.  I mean, I have an agreement to purchase.

3      Q.  So you hadn't actually purchased it; you had an

4 option to purchase it?

5      A.  Correct.

6      Q.  Okay.

7      A.  And -- and again, if you look at all these dates

8 on all these documents, they are all around the same time,

9 and this is when they forced me to go to ES&H and

10 basically they would lease it through ES&H.  If I wanted

11 to exercise a contract with BP, I was forced to go through

12 the subcontractor to lease instead of through BP, which is

13 different than what BP actually told me.

14      Q.  Okay.  After -- let me just make sure I have this

15 -- this straight.  So after Ms. Lalumandier and Mr. James

16 sent you this option to purchase the land.  You went to

17 David Barker and the land-procurement person at BP and

18 told them that you had this option to purchase and they

19 said, "We'll get back" -- like, "Thank you, we'll be in

20 touch."  You didn't hear back from them; they had been

21 rotated out.  And the next you heard was that if you

22 wanted to do this, you were going to have to go through

23 ES&H and BP would lease the land through ES&H?

24      A.  And this -- yes, and the same day that that

25 happened, because BP didn't assign anybody to take their

BILLY BURKETTE

1

2 places and give me that point of contact information,

3 Chris Moran went to Lil and to James and bought the

4 property, and then he leased it out to BP.

5      Q.  Okay.  Chris Moran is a -- is the owner of one of

6 the other marinas at Port -- Port Fourchon, right?

7      A.  Correct, Moran's Marina.

8      Q.  Moran's Marina, and he is not a BP employee,

9 right?

10      A.  No.  He was a BP contractor.

11      Q.  But not a BP employee?

12      A.  No.

13      Q.  Okay.  At the time that you -- so just so we're

14 clear, at no point did David Barker or any

15 land-procurement or other BP employee instruct you to

16 purchase this property so that BP could lease it from you,

17 correct?

18      A.  I wouldn't call it instruction.  I would --

19 the -- the conversation that I had with them was, "Why

20 doesn't BP just buy it?"  BP --

21      Q.  Okay.

22      A.  -- they said BP did not want to own property,

23 they only wanted to lease, because they knew that as

24 soon as they responded to the spill and got everything

25 cleaned up, that they would be leaving that area.

BILLY BURKETTE

1

2      Q.  At the time that you have this -- that you had

3 this option to purchase the land for $750,000, did Global

4 Disaster have the necessary cash to close that sale?

5      A.  I could have -- no, sir.  No, sir, we did not.

6      Q.  What would Global Disaster have to have done to

7 get the necessary funds to close the sale?

8      A.  Well, had BP paid for everything that they

9 instructed me to do for them, I would have had the cash,

10 and had they bought the Aqua N-Cap, I would have had the

11 cash, and if BP had bought the boom that they told me to

12 procure for them, I would have had the cash.

13           There's multiple ways that I would have had

14 it, but I didn't, so I would have had to go and finance

15 it.

16      Q.  Okay.  Had you spoken to any banks about

17 financing this sale?

18      A.  I did, but I don't remember whom.

19      Q.  Okay.  Do you remember when you talked to them,

20 talked to banks about financing this sale?

21      A.  I'm sure it was within that week.

22      Q.  Did you ever provide any banks with information

23 about the land or anything else with respect to it that

24 might be relevant to their assessment of whether or not to

25 finance it?

BILLY BURKETTE

1
2    A.  I'm sure I did, but I don't recall.  Like I say,
3  I don't even recall who the bank manager was that I met
4  with.
5    Q.  Do you recall providing any financial information
6  about Global Disaster to the banks that you were speaking
7  to so that they could assess whether to loan you money to
8  finance the sale?
9    A.  I don't recall.
10    Q.  Do you recall filling out any applications to --
11  for -- for the loan?
12    A.  Yes, sir, I did that, but I don't recall who it
13  was with.
14    Q.  Was -- was Global Disaster taking out the full
15  750 or were there -- was there a portion of that that you
16  would not need to take a loan for?
17    A.  Oh, I don't remember at the time.
18    Q.  Okay.  Just so we are clear, at no point did any
19  representative of BP ask you to purchase this property so
20  that they could lease it from you, correct?
21    A.  They didn't ask me to purchase it, but they
22  agreed to lease it if I purchased it.
23    Q.  Okay.  But you didn't purchase it, right?
24    A.  That is correct.
25    Q.  Okay.  Do you have -- did you have any

BILLY BURKETTE

1
2  discussions with BP about on what terms you would lease
3  the land to them?
4    A.  Basically the conversation was that I would be
5  happy to accommodate in anything that would assist in the
6  -- in the response.  I mean, I was -- I was willing to
7  accommodate BP in any capacity that I could.
8    Q.  Okay.  But you never -- you never agreed on a
9  price per month for the lease?
10    A.  No, sir, we did not.
11    Q.  Did you agree on how long the lease would last
12  for?
13    A.  They told me until the response was completed.
14    Q.  Okay.  And at that point, in June 2010, nobody
15  could predict when that would be, right?
16    A.  No, sir, they could not.
17    Q.  So the timeline for the potential lease was --
18  was not definite, right?
19    A.  No, sir, not indefinite [sic], but for sure
20  enough to cover this -- the purchase of the marina.
21    Q.  Right.  But no -- nobody had agreed on a
22  particular -- like a specific time frame, right?
23    A.  No, sir, they had not, because they couldn't --
24    Q.  Have you discussed -- had you discussed any --
25  aside from the amount per month that they would owe for

BILLY BURKETTE

1
2  the lease, any payment terms, method of payment, timeline
3  of payment, where it would be paid to?
4    A.  Well, originally, when I talked to that first
5  procurement guy, the way he explained it was that they
6  basically assess the amount of square footage that would
7  be available for lease, and then they would do the same
8  amount that they would lease from any -- in other words,
9  it wasn't -- it wasn't a set price, because the way he
10  explained it was that they leased based on the amount of
11  product that they could put there.  So if I had a small
12  area, then it would be a small price.  If I had a large
13  area, then, obviously, the price would go up.
14    Q.  Okay.  So just so I understand, by this time when
15  you -- strike that.
16         You've never -- you never agreed with BP on
17  the ultimate price that was going to be paid for the
18  lease, right?
19    A.  No, sir, I did not agree to any -- any price that
20  was -- that BP offered because they never -- BP,
21  ultimately, never came back with -- because the guy was
22  rotated out -- a point of contact for me to continue that
23  agreement with.
24         MR. KLAR:  I -- someone's on the record.
25  Someone's speaking.

BILLY BURKETTE

1
2         THE VIDEOGRAPHER:  Should we go off the
3  record?
4         MR. KLAR:  Do you mind if we take a
5  five-minute break so I can see what else we need to go
6  over today?
7         THE WITNESS:  That's fine with me, yeah.
8         MR. KLAR:  Eric, does that work for you.
9         MR. NEWELL:  Yeah.
10         MR. KLAR:  Okay.  Thank you.  Off the
11  record.
12         THE VIDEOGRAPHER:  Time is 4:43 p.m.  We are
13  going off the record.
14         (Brief recess taken.)
15         THE VIDEOGRAPHER:  Time is 4:58 p.m.  We are
16  back on the record.
17         MR. KLAR:  I'm sending Tab 2.  Can the court
18  reporter please mark that as the next exhibit?
19         THE STENOGRAPHIC REPORTER:  Yes.  That's
20  Exhibit 15.
21         MR. KLAR:  Thank you.
22         (Exhibit 15 was marked for identification.)
23  BY MR. KLAR:
24    Q.  Mr. Burkette, were you able to open that?
25    A.  Yes.

BILLY BURKETTE

1
2    Q.  Okay.  This is a Deepwater Horizon Oil Pollution
3  Act Claim Form that Global Disaster filled out, and it's
4  labeled Global Disaster 1 to 2.
5          Do you recognize this document?
6    A.  I do.  That's my handwriting.
7    Q.  Okay.  And is that your signature on the second
8  page there?
9    A.  Yes.
10   Q.  If you look at the second -- the second page,
11 question 3, it says "Total Amount of Loss Requested."
12 Under the -- you filled out $310 million; is that correct?
13   A.  Yes.
14   Q.  And that's a total of the -- the amounts listed
15 in item A below that, right?  It's the same number, right?
16   A.  Yes.
17   Q.  Okay.  And so in this presentment form, Global
18 Disaster's claiming $310 million of loss of income,
19 profits, and/or earning capacity, right?
20   A.  Yes.
21   Q.  No damages to properties are referenced?
22   A.  I don't -- I don't know what your definition of
23 "damage" would be.  The only thing really I had was that
24 $5,000 to the boat and then the only other thing that
25 comes to mind is -- it's really not Global.  It was the

BILLY BURKETTE

1
2  lease purchase that I had paid in, I don't know, somewhere
3  around $70,000 on the -- for A-1.
4    Q.  Okay.  So for Global Disaster, the only
5  property that -- even though it's not filled out here, you
6  say was damaged was the approximately $5,000 of damage to
7  a boat?
8    A.  Yes.
9    Q.  And that damage was caused, I believe you said,
10 by the material or the dispersement or whatever it was
11 that was being used as part of the cleanup?
12   A.  Yes.  You know, eventually, I had to replace the
13 power units on the back because the COREXIT had just
14 totally eaten up the inside of the motors, but the guy at
15 the marine place said that he had replaced -- I don't know
16 how many motors that they ultimately had to replace, but I
17 don't -- I don't have anything documented to prove that,
18 no.
19   Q.  Okay.  So like no receipt or photos or anything
20 like that for the -- the damage or the repairs?
21   A.  I mean, I have pictures and a receipt for the
22 paint, but -- and I have receipts for the new power units
23 that I put on there, but I mean, I don't have anything as
24 far as -- maybe I have some photos.  I'd have to go back
25 and look to see if I had photo damage.  I believe I

BILLY BURKETTE

1
2  submitted all that to the GCCF.
3    Q.  Okay.  Do you mind just double-checking when you
4  get a chance after this for that information?
5    A.  Yes, sir, I will.
6    Q.  Okay.  The other property you mentioned, it was a
7  lease purchase that you paid in 70K.  That was on behalf
8  of A-1 Towing, though, not Global Disaster, right?
9    A.  That is correct.  That's why -- that's why, you
10 know -- and this just -- in earnest, when you look at the
11 money that BP basically forced me to take on the A-1, and
12 I didn't really want to take it, but I felt like that BP's
13 attorneys were threatening to -- if I didn't take that,
14 that they would have my claim totally dismissed.
15   Q.  You understand that you had every right to
16 continue fighting that claim, notwithstanding any argument
17 from BP's lawyers?
18   A.  No, sir, I did not understand that.
19   Q.  You believe you had no choice but to sign that
20 document?
21   A.  That is absolutely what I believe.
22   Q.  And that's based on statements from BP's lawyers
23 that they would have your claim dismissed if you don't
24 sign it?
25   A.  Well, not just mine.  It wasn't just mine.  It

BILLY BURKETTE

1
2  was a multitude of people that they did that to.
3    Q.  But that's your statement that you were forced to
4  based on, statements from BP's lawyers saying, "If you
5  don't sign this, your claim is going to get dismissed"?
6    A.  Yes.
7    Q.  Nothing else, right?
8    A.  Well, just general conversation with other
9  claimants.
10   Q.  Okay.  Underneath -- so assistance used in Item 3
11 here, removal and cleanup cost, there's no damages there,
12 correct?
13   A.  (No response.)
14   Q.  They are blank on that page, right?
15   A.  They are.  I just included everything in the loss
16 of income and profits, because I didn't know any better.
17   Q.  Okay.  At the end of the page, above your
18 signature, you certify that the information provided is
19 accurate to the best of your knowledge, right?
20   A.  To the best of my knowledge at the time, yes.
21   Q.  And your attorney signed that document as well as
22 you, right?
23   A.  Oh, I don't know.  Somebody signed it, and --
24 and, you know, my attorneys had some forensic accountant
25 firm do all that math, I don't -- I don't recall who it

Page 198

BILLY BURKETTE

1
2  was, Four something, I guess.  You would have to ask Eric
3  that.
4       Q.  Was it Four Scope Accounting [sic]?
5       A.  I believe that's correct.
6       Q.  Okay.  So Four Scope Accounting worked on your
7  behalf to calculate that $310 million --
8            MR. NEWELL:  It's Full Scope.
9            MR. KLAR:  Full Scope, excuse me.
10 BY MR. KLAR:
11      Q.  Sorry, Mr. Burkette.  I'll ask that again.
12           Full Scope Accounting performed work for you
13 to calculate that $310 million figure?
14      A.  Yes.
15      Q.  What information did you provide to Full Scope
16 that they used?
17      A.  I think basically accumulation of everything that
18 you went over today.
19      Q.  Is there any -- are there any documents that you
20 didn't produce to BP that you did provide to Full Scope
21 for their work?
22      A.  I don't know.  That would be an Eric question.
23      Q.  Okay.  To the best of your knowledge, BP has what
24 Full Scope Accounting had in rendering their analysis?
25      A.  I believe so, yes, sir.

Page 199

BILLY BURKETTE

1
2       Q.  The loss of income profits and earning capacity,
3  I just want to make sure we understand the universe of
4  what that refers to.  Today, we spoke about Aqua N-Cap,
5  your concrete-crushing business, and Airware, your efforts
6  to store equipment for BP at the Port of St. Bernard, and
7  your efforts to contract with ES&H and Strategic Services
8  to procure products and -- and labor and other supplies
9  and services for BP, and your contract or your option to
10 purchase land at Port Fourchon Marina.  Are there any
11 other items that you -- that Global Disaster is claiming
12 besides those as part of this damage for loss of income,
13 profits or earning capacity?
14      A.  I mean, there was so much that happened, sir,
15 I -- not that I can recall.
16      Q.  Okay.  Sitting here today, the list that I just
17 went over reflects the extent of sources of Global
18 Disaster's alleged damages in this case?
19      A.  I believe that's correct.
20      Q.  I'm sending Tab 3.
21           MR. KLAR:  Can you please mark that the next
22 exhibit?
23           (Exhibit 16 was marked for identification.)
24 BY MR. KLAR:
25      Q.  Do you recognize this document, Mr. Burkette?

Page 200

BILLY BURKETTE

1
2       A.  Yes, sir.  That was just for the boom, I believe,
3  or either that was the portion from A-1.  I may have
4  missed -- miswritten the information.
5       Q.  Okay.  So you don't believe the 9.9 million here
6  reflects the total alleged damages that Global Disaster is
7  seeking?
8       A.  It is not the total, no, sir.  This was -- if I
9  remember correctly, this was the form that they asked for
10 me to provide to the Port neutrals as a -- a number that
11 would be reflective of the -- I'm trying to remember.
12 This was something else that -- that came up in -- while
13 we were discussing the amount with Full Scope.  I don't
14 remember what it was for.  I mean, this has been since
15 '16, and the other one was '13.  So this may have been a
16 supplement.  I don't -- I really don't remember, sir.  I
17 just know that this would have been in addition to
18 whatever the original was.
19      Q.  Okay.  But to be clear, this isn't the full
20 extent of your damages and you're not sure if it's a
21 supplement or a subset or to what specific piece of your
22 claim that it relates?
23      A.  Correct.
24      Q.  Okay.  So sitting here today, is 310 million
25 still the amount that Global Disaster is -- is seeking in

Page 201

BILLY BURKETTE

1
2  this case?
3       A.  Is that an offer?
4       Q.  No.  I'm asking.  Is that still the amount that
5  Global Disaster is asserting against BP?
6       A.  Yes.
7       Q.  Okay.  Since you submit -- since Global Disaster
8  submitted that presentment form with the $310 million
9  damages figure, has Full Scope Accounting done any work
10 for you with respect to your damages?
11      A.  I do not know.  That's -- my attorneys hired that
12 firm.  I don't have a clue.  I just know that I had to pay
13 for it out of the A-1 money.
14      Q.  Okay.  Has any other -- are you aware of any
15 other accountant or -- or third party who has done an
16 assessment of your damages in this case?
17      A.  No, sir, I'm not.
18      Q.  Did -- did Full Scope Accounting provide you any
19 material that shows how they reached $310 million in
20 damages?
21      A.  That was all done through my attorneys' office.
22 I don't know.
23      Q.  Okay.  So you haven't seen anything that -- that
24 says that's how much you were damaged from Full Scope?
25      A.  No, sir.

BILLY BURKETTE

1
2    Q.  Okay.  I'm sending Tab 7.
3           (Exhibit 17 was marked for identification.)
4  BY MR. KLAR:
5    Q.  Do you recognize this, Mr. Burkette?
6    A.  Yes, sir.
7    Q.  This is a copy of Global Disaster's submission to
8  the Court in response to Pretrial Order No. 65, correct?
9    A.  I'm guessing sir.  I -- if you say so, I don't
10  know.
11    Q.  In the first box at the top there, it says, "PTO
12  65 verified statement regarding causation and damages"?
13    A.  I mean, I'm -- I'm unfamiliar with what -- I
14  mean, I see what's in it, but I don't -- I don't know
15  anything about it.
16    Q.  Okay.  Well, do you -- do you remember preparing
17  this document?
18    A.  Oh, yes, sir, I remember preparing it, but I
19  mean, I -- I'm not sure I understand what you -- what
20  you're trying to find out.  Did I write this?  Yes.  Is
21  that my signature at the bottom?  Yes.
22    Q.  Okay.  That -- that's helpful.
23           You see in -- in bold there, on the first
24  page, it says, "The plaintiff, not the plaintiff's
25  attorney, must sign and date the verification and

BILLY BURKETTE

1
2  attestation at the end of the form"?
3    A.  Not really, I don't see where it says that but if
4  you say it says it, I mean, I don't doubt you.
5    Q.  Sorry.  I'll be clear.
6           On the very first page of the document, the
7  pre- -- printed page, do you see that bold text in that
8  big paragraph there?
9    A.  Oh, yes.
10    Q.  Okay.  That's what I was referring to.
11           And -- and you did sign this document
12  verifying that the information in there was -- was true
13  and correct under penalty of perjury, right?
14    A.  I did.
15    Q.  Okay.  So if you look at question 1, which is on
16  page 2 of the document, it says, "Describe specifically
17  the compensatory damages that you claim in your lawsuit,
18  including the nature of the damage, dates of the damage,
19  amount of the damage and the calculation used to arrive at
20  that amount," right?
21    A.  Okay.
22    Q.  The first line says, "Damages consist of lost
23  revenue, property loss, boat and future income from rental
24  property."  So I just want to make sure I understand those
25  buckets.

BILLY BURKETTE

1
2           Earlier we -- we discussed all the sources
3  of lost revenue.  That -- that accurately reflects the
4  scope of lost revenue that Global Disaster is asserting in
5  this case, right?
6    A.  A portion of it, yes.
7    Q.  Sorry.  Which portion?
8    A.  The portion from the Port Fourchon Marina.
9    Q.  So let me step back.  We -- we talked about Aqua
10  N-Cap, concrete crushing and your relationship with
11  Airware, your efforts to provide BP with port storage --
12  storage of port, and your work with ES&H and Strategic
13  Services to provide goods and services -- or products and
14  services to BP in connection with the spill cleanup and
15  your property that you are -- had an option to purchase at
16  Port Fourchon.  That's the full extent of -- of Global
17  Disaster's --
18    A.  It's everything that we discussed today.
19    Q.  Okay.  The "property loss" and "boat," those are
20  the same thing, correct?
21    A.  Correct.
22    Q.  Okay.  And "future income from rental property,"
23  that's the 70,000 for A-1 Towing?
24    A.  No, sir.  That's the Port and the Port Fourchon
25  marina combined.

BILLY BURKETTE

1
2    Q.  Okay.  So the rental property you're referring to
3  is the potential rental to BP of storage space at Port
4  St. Bernard and then the potential lease of the Port
5  Fourchon Marina to BP?
6    A.  Correct.
7    Q.  No other rental property you're referring to,
8  right?
9    A.  No.
10    Q.  Okay.  Earlier we -- you did kind of a rough
11  calculation for us of damages that you were asserting in
12  relation to your concrete-crushing business, about -- I
13  think you said 67 and a half, give or take, million
14  dollars.
15           Do you have a -- you don't have a damages --
16  similar damages assessment for the portion of your overall
17  damages attributed to Aqua N-Cap, right?
18    A.  No, sir, because the estimates that BP gave to
19  the federal government about how much oil was spilled were
20  inaccurate.  They did everything that they could do to
21  minimize that, so that their fines and penalties would be
22  lessened.  So the real number is inaccurate, so there's no
23  way to really definitively say that was X.  The only
24  thing that I could do is to take -- like right now, if --
25  if you want to go get on a boat with me, I'll drive you to

BILLY BURKETTE

1 the spots that I know are -- you would -- you would just
2 be in total awe of the amount of oil that is sitting on
3 the floor of the Gulf, right now. So that still is down
4 there that needs to be gotten up.
5        So those -- those figures are -- could only
6 be based on the estimates that BP has provided to the
7 federal government. They are not actuals.
8    Q.  Okay.
9    A.  They're estimates.
10   Q.  So sitting here today, you can't -- you can't
11 definitively or reasonably calculate how much damage
12 Global Disaster has suffered as a result of a decision not
13 to use Aqua N-Cap; is that right?
14   A.  No, sir, that's not what I'm saying.
15       I'm saying I can give you those estimates,
16 but they're estimates. They are not definitive. I can
17 only give you the estimate based on what was turned over
18 to the federal government. All of that oil that's still
19 sitting on the Gulf floor, nobody's calculated that yet,
20 and it's not been cleaned up yet.
21   Q.  Okay. So if you were to base it on the amount of
22 oil that's still on the floor, you can't tell me what the
23 number is, right, sitting here today?
24   A.  Not sitting right here today. I would have to
25

BILLY BURKETTE

1 send an ROV down and get the full length, width, and
2 height of the -- of the, you know, the oil sludge, the
3 slick that's on the bottom. I mean, there's multiple
4 places, and it's shifted because of the Gulf Stream, so I
5 would have to -- I would have to go and find that out.
6 No, sir, I cannot give you a definitive.
7    Q.  Okay. Is the amount that Full Scope Accounting
8 calculated attributable to your Aqua N-Cap portion of
9 Global Disaster's claim based on the estimates that BP
10 provided to the government about how much oil was in the
11 water?
12   A.  That is my understanding, yes.
13   Q.  Okay. And -- and sitting here today, you don't
14 know what portion that is of your damages, correct?
15   A.  No, sir, I do not.
16   Q.  Okay.
17   A.  I would consider that to be the bulk of it,
18 though.
19   Q.  The bulk. Would you say 75 percent?
20   A.  Maybe.
21   Q.  Earlier, you mentioned 67 and a half million in
22 connection with Airware. 310 minus 67 is 243, give or
23 take, so of the remaining 240ish million dollars of your
24 310 total, how much would you say is attributable to Aqua
25

BILLY BURKETTE

1 N-Cap, give or take?
2    A.  I honestly don't know. I -- I would have to look
3 at those documents to see.
4    Q.  Do you think it's more than a hundred million?
5    A.  Oh, yes.
6    Q.  More than 150?
7    A.  Oh, yeah.
8    Q.  Is it over 200?
9    A.  I don't know. I would guess that 200 would be
10 a -- you know, I'm -- I'm trying not to guess too
11 definitively, but if you take the estimates and -- that
12 were given to the federal government, whatever that is,
13 500 might not be enough, but I'm -- I'm just trying to go
14 back in my memory bank and think, if you take $8 a pound
15 or 8.50 a pound equates to 11 pounds, and a pound of oil,
16 crude, raw crude, whether it be sweet crude or -- it
17 depends on the actual hydrocarbon, because, you know, in
18 theory, it doesn't -- Aqua N-Cap does not designate the
19 difference between COREXIT, and oil. It would absorb and
20 encapsulate all of it. So you would literally be cleaning
21 up the -- the COREXIT, dispersant and the oil. So it may
22 not even be an accurate assessment of -- the 310 may be
23 910. I don't know.
24
25   Q.  So to -- to estimate the -- to reasonably

BILLY BURKETTE

1 calculate how much Global Disaster would have earned had
2 BP used Aqua N-Cap to clean everything up, you would need
3 to know the amount of oil that was -- that was spilled,
4 the amount of COREXIT in the water, the amount of
5 dispersant in the water and the amount of whatever else
6 was in the water that Aqua N-Cap would have absorbed,
7 right?
8    A.  Correct.
9    Q.  Okay. And sitting here today, you don't have any
10 of those figures, right?
11   A.  Not with me, no.
12   Q.  And you're not aware whether Full Scope
13 Accounting or any other advisor has those figures
14 calculated, correct?
15   A.  BP, I'm sure, has it.
16   Q.  Okay. But you're not aware of any other advisor,
17 Full Scope or anyone else who has done work for you who
18 has those calculations, correct?
19   A.  No, sir, I have not.
20   Q.  And you've never seen any of those calculations,
21 correct?
22   A.  Just my own that I kind of, back then, was trying
23 to figure.
24
25   Q.  Okay. And your -- what you were doing back then

Page 210

BILLY BURKETTE

1                    BILLY BURKETTE
2  to try and estimate it, it is -- it was a guess, right?
3      A.  Sure, it's a guess, because it was constantly
4  spewing oil, and they were constantly spraying -- you
5  know, spraying dispersant on it.
6      Q.  Okay.  So we have got approximately 200 million,
7  give or take, for Aqua N-Cap, approximately 67 and a half
8  million for Airware.  That's 267 million.  That leaves
9  about 53 or so million for the remaining pieces of your
10  310 million claim.
11             How much of that is related to the --
12  your -- your -- your claim that you would have allowed BP
13  to store equipment at the Port of St. Bernard?
14      A.  I don't know, sir.
15      Q.  What would you need to -- to calculate that?
16      A.  The square footage and the rate that -- which
17  they paid similar docks in the area.
18      Q.  Did you have that information when you were
19  putting together your $310 million estimate?
20      A.  Not to -- not exactly.  I have a couple of places
21  that they had rented space from, but I don't remember what
22  they were.
23      Q.  Okay.  You don't have any -- like, you don't have
24  the -- the contracts for those places?
25      A.  I did, but like I say, in the flood of '16, we

Page 211

BILLY BURKETTE

1                    BILLY BURKETTE
2  lost everything.
3      Q.  Okay.  Would you say that, just a ballpark, if
4  you can -- and if you can't, that's okay -- would -- would
5  that be a piece of your claim related to storage of the
6  Port of St. Bernard be $5 million?  More than that?
7      A.  I guess that would be a fair assessment.
8      Q.  Okay.  Somewhere between five and ten?
9      A.  Correct.
10      Q.  Okay.  What about -- what portion of your damages
11  is attributable to your relationship -- Global Disaster's
12  work with ES&H?
13      A.  I wouldn't know.
14      Q.  How would you go about calculating that?
15      A.  I would have to go back to the timeline and see
16  how much work was done with ES&H that I would have
17  provided those goods and services for that they used,
18  equipment, boats, personnel, equipment, labor, all of
19  those things that they performed for BP.  I would have to
20  have those figures and extrapolate from that the portion
21  that I could have supplied.
22      Q.  Okay.  And -- and you don't have access to -- to
23  that information, right?
24      A.  Not yet.  I think we are going to get that in
25  subpoena.

Page 212

BILLY BURKETTE

1                    BILLY BURKETTE
2      Q.  Okay.  So -- so when -- when Full Scope
3  Accounting was calculating $310 million for your losses,
4  they didn't have that information, right?
5      A.  Not to my knowledge.
6      Q.  So to your knowledge, the calculation that is
7  included in your presentment statement is not based on the
8  information that you need to actually calculate your
9  damages associated with the ES&H contract, correct?
10      A.  Correct.
11      Q.  Okay.  What about for Strategic Services, how
12  much of your damages is attributable to that letter of
13  intent that we talked about?
14      A.  I think that -- I think that's where the 9
15  million came from, but I'm not positive of that.
16      Q.  Okay.  What would you need to do to figure out
17  how much in damages you're claiming from the Strategic
18  Services defense?
19      A.  That's simple.  You just take the contract rate
20  times the amount of hours that BP used, whether it be them
21  or anybody else that performed the same job description.
22      Q.  Okay.  So you would have to look at other
23  contracts that BP entered into for that type of labor?
24      A.  Or -- I mean, that's fair, yes, sir.  I think
25  that's a fair statement.

Page 213

BILLY BURKETTE

1                    BILLY BURKETTE
2      Q.  And sitting here today, you don't have any of
3  those contracts, right?
4      A.  Not with me.  I mean, I have -- I have since all
5  of this has taken place, and since there were so many
6  court cases about it in Plaquemines Parish and St. Bernard
7  Parish, I have read the other contracts and the other
8  documents -- the court documents that are available.
9      Q.  Those cases all occurred after you -- you
10  submitted your $310 million damages claim in 2013, right?
11      A.  Yes, sir.
12      Q.  So at the time you submitted your $310 million
13  damages claim, it wasn't based on any information that you
14  discerned from any contracts between third parties and BP
15  for labor, right?
16      A.  No, sir, that's not true.  You know, basically,
17  ES&H sent that price sheet of what they were allowed to
18  pay, and the contracted rates that BP had agreed at that
19  time was acceptable rates.
20      Q.  Okay.  So the portion of your -- your damage --
21  that's with regard to ES&H.  Are you saying that the
22  portion of your damages attributable to the Strategic
23  Services letter are based on numbers provided by ES&H?
24      A.  By BP.
25      Q.  Numbers provided by BP to ES&H?

Page 214

BILLY BURKETTE

1
2     A.  Correct.
3     Q.  Okay.  And with respect to the Port of -- I'm
4  sorry, Port Fourchon, the -- the lost rent that Global
5  Disaster claims it would have obtained if it ended up
6  purchasing that property and leasing it to BP, how much in
7  damages are attributable of the -- of the 310 for that?
8     A.  I thought you just covered that and we estimated
9  that to be at 5 million.
10     Q.  That was for port storage.
11     A.  Oh.  Then I would say equally amount for the Port
12  Fourchon Marina.
13     Q.  Okay.  How can -- how do you calculate that
14  amount if you never agreed on a lease with BP?
15     A.  That's what I was telling you before and, you
16  know, that may be just that I didn't understand the
17  difference between port and Port Fourchon Marina.  It's
18  the same -- it's the same variables.  Say you go to the
19  next street over, I don't know, three clicks, half a
20  click, go in any direction you want to.  The property that
21  BP did rent, you take that factor times the amount of
22  square footage, and you do some simple math, and you get
23  the dollar figure.  I mean, it's not real hard.
24     Q.  Okay.  So to do that, just like with how much you
25  would charge for storage, you need to see what comparable

Page 215

BILLY BURKETTE

1
2  properties and comparable contracts BP entered into with
3  other folks, right?
4     A.  Well, that's what they told me they would base it
5  on.  That's what the procurement guy said.
6     Q.  And you -- you haven't provided any of those
7  documents to Full Scope Accounting, right?
8     A.  No, sir, I didn't.
9     Q.  Are you -- are you aware that Full Scope
10  Accounting has those documents?
11     A.  I am not aware if they do or do not.
12     Q.  Okay.  And you don't have any of those documents,
13  right?
14     A.  Nothing other than what's in the court cases that
15  came out afterwards.
16     Q.  Do you recall what cases?
17     A.  I don't have them with me, but I looked them up
18  online.
19     Q.  It's a list that you could provide?
20     A.  I'm sure.
21     Q.  Okay.  Okay.  Can you look to the third line down
22  in that big paragraph on page 2 of your statement?  It
23  says, "I also lost hundreds of millions of dollars via my
24  master contract with ES&H which BP chose to use the
25  dispersant instead of Aqua N-Cap absorbent listed on their

Page 216

BILLY BURKETTE

1
2  Hazard Mitigation Plan given to the State of Louisiana."
3        The "hundreds of millions of dollars" that
4  you're referring to there, that's referring to the Aqua
5  N-Cap claim, not the ES&H claim, right?
6     A.  Correct.  Well, keep in mind that BP was forcing
7  me to go to ES&H.
8     Q.  And does that include for use of -- for a
9  purchase of Aqua N-Cap?
10     A.  Yes.
11     Q.  So had you had discussions with ES&H about Aqua
12  N-Cap?
13     A.  Oh, yes.
14     Q.  Okay.  With who?
15     A.  I don't -- the name Kelly comes up but I'm not
16  positive of that, so don't quote me on that.  I don't
17  remember, sir.
18     Q.  Do you recall when those discussions were taking
19  place?
20     A.  Yes, sir, at the same time that BP was trying to
21  force me to go into that master service contract with
22  ES&H.
23     Q.  Okay.  Are you saying that -- was Aqua N-Cap a
24  product that was listed on ES&H's price sheet?
25     A.  I don't know if it was on ES&H's price sheet, but

Page 217

BILLY BURKETTE

1
2  it definitely was on the -- the response spill plan that
3  they submitted to the State of Louisiana.
4     Q.  You -- you claim to have exclusive distribution
5  rights to Aqua N-Cap, correct?
6     A.  That is what Jeff -- I mean Jon and I talked
7  about, yes.
8     Q.  Okay.  How is it that you could agree with ES&H
9  to provide Aqua N-Cap if you had the exclusive
10  distribution right?
11     A.  It -- the ES&H is basically a conduit that BP was
12  forcing me to use.
13     Q.  Okay.  Did you ever agree with ES&H how much Aqua
14  N-Cap would be provided to BP and at what price?
15     A.  No, sir, I did not.
16     Q.  Did you ever agree with ES&H about how much Aqua
17  N -- the timeline that you would provide the Aqua N-Cap to
18  be distributed?
19     A.  I shared with ES&H the same e-mail that BP has.
20     Q.  Okay.  Nothing beyond that, though, correct?
21     A.  I mean, nothing other than verbal communication
22  between myself and Jon, who basically said, you know, "If
23  BP wants it, we will commit 100 percent of all production
24  to go to the spill."
25     Q.  Do you have any idea how much production would

Page 218

BILLY BURKETTE

1  BILLY BURKETTE
2  have been able to provide?
3      A.  If you go back to that other e-mail, it says in
4  there that they could have -- they could do 4 million
5  pounds a month.
6      Q.  If you look down -- we'll come back to that in a
7  minute.  If you look down to the next small paragraph
8  there on page 2, it says:  "Calculations used to determine
9  my monthly losses of 122K per month were done by BP's
10  contractor, Worley Company.  Also, Full Scope Accounting."
11          What does the 122 -- 122,000 a month relate
12  to?
13      A.  I don't -- I don't really remember exactly.  It
14  was just a -- I think the way it was calculated is they
15  took the 310 and divided that by the amount of months that
16  the spill was going on, if I remember correctly.  I don't
17  -- I don't remember, sir.
18      Q.  Okay.  Well, you submitted that statement --
19  let's see -- the 310 million number was signed on
20  January 18th of 2013, right?
21      A.  Yes, sir, I guess that's what it says.
22      Q.  Okay.  And so between April of 2010, when the
23  spill occurred, and January of 2013, that's just a little
24  over two years, correct?
25      A.  I believe so, yes, sir.

Page 219

BILLY BURKETTE

1  BILLY BURKETTE
2      Q.  Okay.  About two years and -- and -- about two
3  years and eight months, so that's 30 -- 32 months, right?
4      A.  I'm -- if you say so, yes, sir.  I'm not doing
5  the math.
6      Q.  All right.  Well, just doing the math here,
7  310 -- I'm sorry, 310 million -- I'm sorry, 122,000 times
8  32 months is 3.9 million.
9          Do you agree with that generally calculated
10  math?
11      A.  I agree with your math.  I'm not saying that
12  that's -- you're -- you're asking me to definitively say
13  that the 120 whatever thousand, 122 or 23, whatever it is,
14  thousand is based on something that -- your calculation
15  of --
16      Q.  Let's step back.  So it says here that the
17  calculations that Worley and Full Scope Accounting
18  determined were that your monthly losses are $122,000 a
19  month?
20      A.  Okay.  That was -- that was Worley's, not -- not
21  Full Scope.  The combination of Worley's accounting and
22  Full Scope's is how they got to the 310.
23      Q.  Okay.  So it's your testimony today that the 122K
24  per month referenced here is just the piece calculated by
25  Worley?

Page 220

BILLY BURKETTE

1  BILLY BURKETTE
2      A.  That is my understanding and y'all should have a
3  copy of that from Worley, yes.
4      Q.  Okay.  And you don't -- sitting here today, you
5  don't know what piece of your damages is attributable to
6  that 122k per month versus the remainder leading up to 310
7  that Full Scope calculated?
8      A.  No, sir, I do not.  Worley Co. did that.  I do
9  not know.
10      Q.  Okay.  You didn't look at it and verify whether
11  it was, you know, it made sense or was accurate?
12      A.  They never gave it to me.  They just sent me the
13  form saying that's what they calculated.  They never gave
14  me the breakdown.
15      Q.  Okay.  So Full Scope is the only company that
16  provided -- that did a breakdown for you?
17      A.  If they did, I haven't seen that either.
18      Q.  Okay.  So you're not sure if they did or not?
19      A.  Correct.
20      Q.  So sitting here today, you haven't seen any
21  calculations underlying the 122K per month by Worley or
22  any calculations underlying the 310 million that Global
23  Disaster is asserting was done by Full Scope?
24      A.  No, sir, I have not.
25      Q.  Do you know what -- over what period of time

Page 221

BILLY BURKETTE

1  BILLY BURKETTE
2  you're asserting or Global Disaster is asserting losses
3  for?
4      A.  I would think that it would be from the day --
5  two days after the explosion until the completion of the
6  cleanup.
7      Q.  When, approximately, was cleanup deemed complete
8  -- complete?
9      A.  I don't remember.
10      Q.  Okay.  But that's -- that's approximately the --
11  the time period over which Global Disaster is claiming
12  damages?
13      A.  Yes.
14      Q.  Okay.
15      A.  That's why I say the 310 may not be accurate
16  today.  It may be more.
17      Q.  It might be less, too?
18      A.  If you say so.
19      Q.  No, I'm asking you.  It could be less, right?
20      A.  I don't see how, but maybe you can explain that.
21      Q.  It's possible?  I'm not saying one way or
22  another.  I'm asking it's possible, right?
23      A.  Anything's possible, yes, sir.
24      Q.  Okay.  Okay.  If you look at question 2 of the
25  PTO65 statement, and I think we can wrap up soon.  It

Page 222

BILLY BURKETTE

1 says, "Describe specifically the evidence you rely on to
2 prove the damages you allege in response to question
3 No. 1," And in the first line you wrote, "My contracts
4 with the Port and ES&H, along with the Hazard Mitigation
5 Plan submitted to the State."
6         The contract with the Port that you're
7 referring to, what contract is that?
8     A. That's for the -- area that we had for the
9 concrete crushing.
10    Q. Okay. So you're saying that there's a contract
11 with the Port where they gave -- where they essentially
12 let you use that land for concrete crushing?
13    A. Yes. Well, that and the fact that BP took over
14 the whole port.
15    Q. Right. I'm just asking about the contract
16 itself. You said there's a contract with the Port where
17 the Port said, "Global Disaster, you can use this piece of
18 land for concrete crushing," right?
19    A. Yes, sir. If you remember, when Terry -- when I
20 told you Terry forfeited the concrete crushing, at that
21 point is when the Port asked me to assume the note for
22 that area. Two days later is when the Port was taken
23 over, like you say, by the Coast Guard, but really by BP,
24 because BP -- the Coast Guard didn't use it. BP used it.

Page 223

BILLY BURKETTE

1    Q. So the contract that you're referring to, it was
2 originally an Airware contract with the Port that Global
3 Disaster took over when Airware said they can't pay you?
4     A. That is correct.
5     Q. Okay. You don't have a -- you don't have a copy
6 of that contract, right?
7     A. I don't but the Port does, and I think Brent and
8 them have that -- it's like a manila envelope with all the
9 stuff on it from the Port.
10    Q. I'm sorry. What was the name that you said,
11 Brent?
12    A. My attorneys, Brent Coon --
13    Q. Okay. Okay. Well, we haven't seen a copy of it,
14 so to the extent it exists, we would like to see it.
15        Moving to the next paragraph, you say:
16 "Contracts for lease purchase property, rental agreements,
17 Worley Co. forensic accounting sheets," and there's a list
18 of names there. So starting with the lease purchase
19 property. That's the Port Fourchon Marina, port storage
20 and the piece that was A-1 Towing's lease purchase that we
21 talked about earlier, correct?
22    A. No. A-1 Towing has its own form like this, I
23 believe.
24    Q. Okay. So the contracts for lease purchase

Page 224

BILLY BURKETTE

1 property you are referring to are the Port Fourchon Marina
2 and the Port storage at Port of St. Bernard?
3     A. That is correct.
4     Q. Okay. Nothing else, right?
5     A. Not that I can think of right now. My brain is
6 almost dead.
7     Q. I understand.
8         "Rental agreements," what rental agreements
9 are you referring to?
10    A. The rental stuff is, like, the showers, temporary
11 housing, ships that had temporary housing, barges,
12 airboats, scouting boats, skimming boats. There was a
13 multitude of rental stuff that I would have been able to
14 provide.
15    Q. Okay. And these -- these -- these are pursuant
16 to -- I think we talked about oral agreements, not written
17 agreements, right?
18    A. Correct.
19    Q. To obtain all of those items, would you have had
20 to fund that yourself or would BP have funded that for
21 you?
22    A. Well, originally when we first started the
23 conversation, they talked about a seven-day turnaround.
24 In other words, I would submit an invoice. In seven days,

Page 225

BILLY BURKETTE

1 they would pay that invoice. Then the next week, we
2 started the same conversation, it immediately went to 30
3 to 60 days payout.
4     Q. Okay. So you would have to front the money for
5 the equipment first and then you would ultimately get
6 reimbursed?
7     A. Correct.
8     Q. Okay. Did -- at the time that Global Disaster
9 said it was discussing all of these pieces of equipment it
10 would rent for BP, did Global Disaster have the necessary
11 funding to obtain all of those items?
12    A. No, sir, not all of it, but some of it and, you
13 know, because I'm transparent I was honest with the people
14 and I said, "Hey, look, here's what BP told me. Here is
15 the guy I talked to. Here is -- you can call and confirm
16 that." And then the person I originally was talking to
17 after the first two weeks rotated out, like I told you.
18 They went home and then I got a new person, and that's
19 when it went to 30 to 60 days instead of the seven days.
20    Q. Okay. So if -- if Global Disaster didn't have
21 enough funds to obtain all the equipment and goods that it
22 -- it wanted to provide to BP, how was it that Global
23 Disaster was going to get all -- all of the equipment and
24 those goods?

Page 226

BILLY BURKETTE

1    BILLY BURKETTE
2        A.  It was an agreement with those companies that
3    they would be paid when I was paid.
4        Q.  Okay.  And was that agreement oral as well?
5        A.  Some of it.  I think some of it was in writing.
6    I don't really recall.
7        Q.  Do you recall --
8        A.  I don't remember.
9        Q.  Do you recall who you had written contracts with?
10       A.  No, sir, I do not at this time.
11       Q.  Do you recall who you had oral contracts with?
12       A.  Most of the BP people.
13       Q.  No, I'm talking about the -- the companies in
14   which --
15       A.  The service providers?  No, sir, I don't recall.
16       Q.  Do you recall on -- for which items or services
17   specifically you had written versus oral contracts with
18   the providers?
19       A.  No, sir, I do not.
20       Q.  Okay.  If you can turn back to Tab 15, which I
21   think is Exhibit 5, this is the e-mail that we were
22   talking about earlier from Christopher Ott where they
23   talked about the quantity of Aqua N-Cap.
24       A.  Yes, sir.
25       Q.  Okay.  And if you look down to the bottom of that

Page 227

BILLY BURKETTE

1    first page, it mentions "production -- a price quote and
2    production timelines for 3 million pounds of Aqua N-Cap.
3    1 million available today and they can deliver the other 2
4    million within a month or so;" is that right?
5        A.  Yeah, that's -- that's right, yes, sir.
6        Q.  Okay.  So it's not 4 million pounds per month,
7    correct?
8        A.  That would have been 3 million pounds per month.
9        Q.  Nothing in here says that they were delivering it
10   -- that quantity on a monthly basis, right?
11       A.  Well, I don't -- I don't know.  It says that
12   they, meaning BP, knows that they have 1 million pounds
13   available today and can deliver the other 2 million pounds
14   in 30 days or so.
15       Q.  Okay.
16       A.  I took that -- they told me 3 to 4 million pounds
17   per month is what they could produce.
18       Q.  Okay.  But nothing in this e-mail says "per
19   month"?
20       A.  Well, maybe not in this e-mail, but --
21       Q.  Was that something that was discussed orally?
22       A.  I'm -- yes, sir.
23       Q.  Okay.  Do you recall how much one pound of Aqua
24   N-Cap cost back at this time?

Page 228

BILLY BURKETTE

1    BILLY BURKETTE
2        A.  It was either $8 or 8.50, I think, and -- and the
3    answer is no, I do not recall.
4        Q.  All right.  Turning back to the PTO65 statement.
5    You wrote in the third paragraph there, "Expert testimony
6    for multiple experts on which product would have been the
7    best, safest to use for the recovery of the oil spill, not
8    the most cost-effective advantageous for BP."
9            Did I read that correctly?
10       A.  I believe so, yes, sir.
11       Q.  You haven't disclosed any experts that you intend
12   to use in this case yet, correct?
13       A.  No, sir, because we kept being threatened that
14   they would, you know, throw my case out, so we basically
15   -- it's my understanding that we have been on hold until
16   now, so now is the time that we produce that.
17       Q.  Okay.  Are you aware that the deadline to do that
18   was yesterday?
19       A.  No, sir, I'm not aware of that.
20       Q.  Are you aware that the deadline to disclose any
21   experts that you intend to offer accounting evidence or
22   opinions was yesterday?
23       A.  No, sir, I did not know that.
24       Q.  You didn't submit anything by that deadline,
25   right?

Page 229

BILLY BURKETTE

1    BILLY BURKETTE
2        A.  I didn't.  I'm not saying my attorneys did or
3    didn't.  I don't know.
4        Q.  Okay.  You are not aware if your attorneys did
5    either, then, right?
6        A.  I am not aware, no, sir.
7        Q.  Okay.  The next paragraph says, "As we start the
8    official depositions, the truth will come out about how BP
9    did everything in its power to hide, conceal, cover up,
10   lessen its recovery costs, control the media, control the
11   scene as to make the containment and cleanup of the spill
12   seem like it was less than it was.  The mitigation and
13   recovery efforts will speak volumes to any jury.  This
14   will be the bulk of my evidence to prove my damages."
15           Apart from what is listed in this -- in this
16   disclosure and the documents that you've provided to BP to
17   date, is there any other evidence that you intend to
18   submit to prove your damages in this case?
19       A.  Yes, sir.  The -- the court cases that came --
20   that I am referring to, I think, will speak volumes to
21   that as well.
22       Q.  Okay.  Other than the court cases and the
23   documents provided and the information disclosed in
24   question 2, nothing else that you -- that you intend to
25   submit --

Page 230

BILLY BURKETTE

1
2     A.  Well, there's a -- there's a couple of things
3  that -- that I looked at that, you know, I'm not sure that
4  I need to produce because it's -- you know, once we get
5  the information from BP, they -- it will be contained
6  within BP's information.  So when you look at the response
7  and you look at the recovery and you look at the -- the
8  mitigating efforts and you look at the media and the
9  internal e-mails and the internal depositions and -- and
10 other court cases that went on, a lot of that, BP is going
11 to provide for me when we go.
12          I mean, that's not something that I should
13 have to provide.  It's BP's own information about how they
14 covered it up and reduced -- they gave false numbers on
15 the reports as to what the spill was actually producing,
16 because some of those conversations that we had with BP
17 and some of those grounds people, when they started with
18 the ROV's -- the ROV company's documentation, they
19 manipulated those numbers.  So like I say, a lot of it in
20 discovery we'll get from BP and it'll prove it on its own
21 accord.
22     Q.  Okay.  Turning to the next page, at the end of
23 the second paragraph there, you say, "We will provide the
24 evidence in exhibit form in court rather than to give BP a
25 heads-up or opportunity to take further action to lessen

Page 231

BILLY BURKETTE

1
2  its exposure."  Did you write that?
3     A.  I did.
4     Q.  Okay.  Is there anything you haven't disclosed to
5  BP that you plan on using in court to prove your case
6  today?
7     A.  I would have to go back and look in all of the
8  documents that I e-mailed.  The majority of it is, like I
9  said, internal communications from the e-mails and the
10 incident command.  So when we subpoena the incident
11 command reports, the incident command reports will be
12 definitive because that's federal documents that prove to
13 the best of their knowledge.  Then when you cross
14 reference that and you start your -- your depositions with
15 the incident commanders as well as the ability to quantify
16 a spill versus an estimate of a spill, those documents
17 are, you know, in-house that y'all already have.  The
18 thing is, is that in order for me to present it, I have to
19 request it.  In order for me to request it, we have to be
20 able to continue our depositions.
21          So I understand that you're saying that the
22 deadline was yesterday, and -- and I'm not disagreeing
23 with you.  I'm just saying that the deadline for
24 information that you're asking -- or that was supposed to
25 be submitted is -- a lot of it hasn't been founded yet

Page 232

BILLY BURKETTE

1
2  because we haven't been allowed to complete our
3  depositions.  Once we complete our depositions, I don't
4  know how that information is viewed by the Court.  I mean,
5  I don't see the Court being able to put a timeline on
6  something that the Court has already approved for the
7  depositions to be taken, and then say that the deadline
8  was earlier than what the deposition was so now it's not
9  allowed.  I just -- I don't understand that, but if that's
10 what you're saying it is, I guess that's a legal question
11 for, you know, attorneys to figure out.
12     Q.  Yes.  But you can discuss that further with your
13 attorney.
14          My question was:  Is there anything that you
15 have currently in your possession that you haven't
16 provided to BP that you believe you will use in court to
17 prove your case?
18     A.  Yes.
19     Q.  Okay.  What do you have in your possession right
20 now that you haven't provided --
21     A.  It's not in my possession.  I have the authority
22 from the Court to depose BP.
23     Q.  I understand.  I'm only asking about documents
24 that you currently have.  So to the extent you have
25 documents that you're going to use to -- to prove your

Page 233

BILLY BURKETTE

1
2  case, those have already been disclosed to BP, right?
3     A.  To the best of my knowledge, that I can recall at
4  this particular time, not to say that I won't think of
5  something or come across something in the future.  I'm
6  just trying to do the best I can to be honest and -- and
7  forthright with the information to answer the question
8  that I currently have.
9     Q.  Understand and appreciate that.
10          Sitting here today, based on the universe of
11 what you know right now, everything that Global Disaster
12 intends to rely on that you have in your possession, you
13 believe you've provided it to BP?
14     A.  That I have in my possession?  Yes.
15     Q.  Okay.  We talked about the attorney, Phil Strunk,
16 and Stanton and Michelle.
17          Who is Billy Nungesser?
18     A.  He was the parish manager for Plaquemines Parish,
19 which is where primarily the first signs of the spill hit
20 their shores first.  He is currently now the lieutenant
21 governor of the state.
22     Q.  Okay.  Did you have any discussions with him
23 about any of the, you know, procurement contracts or any
24 other arrangements that Global Disaster claims it has with
25 BP?

Page 234

BILLY BURKETTE

1
2    A.  Multiple, multiple, multiple times.
3    Q.  Okay.  What did you talk about with him?
4    A.  We talked about everything as far as a strategic
5  plan to respond to the disaster.  I mean, he's the parish
6  president.  With his knowledge of the parish as well as
7  needs of the parish and the needs to respond to the spill,
8  he was a crucial person that I communicated with all the
9  time, because he had a direct line to the incident command
10  that I didn't have.
11    Q.  Okay.  Did you ever tell him that you had
12  agreements with BP to supply BP with any products or
13  services?
14    A.  Oh, absolutely I did.
15    Q.  Did you ever talk to him about how much you were
16  asserting against BP in this litigation?
17    A.  Didn't come up in conversation.
18    Q.  Did you ever talk to him about Aqua N-Cap?
19    A.  Absolutely, I did.
20    Q.  How many times?
21    A.  Oh, I don't know, ten or so.
22    Q.  Okay.  And you talked to him about ES&H?
23    A.  I don't recall.  I may have been -- I may have
24  been -- may have had a conversation where I told him that
25  they were trying to force me to use them.  I don't recall

Page 235

BILLY BURKETTE

1
2  really.
3    Q.  Any recollection of discussions about storage --
4  storage at the Port of St. Bernard?
5    A.  Not that I can recall, not to say that I did or
6  didn't.
7    Q.  Any recollection of discussing your -- the land
8  that you had an option to buy at Port Fourchon?
9    A.  No, sir.
10    Q.  Any recollection of discussing any other -- your
11  letter of intent with Strategic Services?
12    A.  I don't recall, sir.
13    Q.  Okay.  Last -- I think this should be the last
14  document here for today.
15         MR. KLAR:  Can the court reporter please
16  mark Tab 10 the next in line?
17         (Exhibit 18 was marked for identification.)
18  BY MR. KLAR:
19    Q.  Do you recognize this document, Mr. Burkette?
20    A.  I mean, this is in regards to A-1, as well as --
21         (Reading sotto voce.)
22         Yes, so that's the property.  Remember when
23  I told you that A-1 had a lease purchase from Richie
24  Stephens?
25    Q.  Uh-huh.

Page 236

BILLY BURKETTE

1
2    A.  That's where the trucks were being stored and
3  because, like I said, it's over a hundred miles from my
4  house, that was the closest place that I could get mail,
5  and --
6    Q.  Okay.  When you say "lease purchase" --
7    A.  I'm sorry?
8    Q.  No, no.  Go ahead.  I interrupted you.
9    A.  That's where A -- that -- technically, that
10  address is A-1's lease purchase, and because the yard was
11  so big there, that it could hold, I don't know, 50 trucks
12  or so, I put the boat over there and that's where I stored
13  the boat to keep me from having to go a hundred-plus miles
14  one way to go get the boat to do things that BP would ask
15  me to do, so --
16    Q.  Just so I understand when you say "lease
17  purchase," A-1 -- did A-1 sell it to somebody else and
18  then lease it back from them, or did they own it and lease
19  it to somebody else?
20    A.  I was -- it was a lease that I was entered into
21  with Richie Stephens, and the money that I was paying on a
22  monthly lease went towards the purchase price of $250,000.
23    Q.  Okay.  So eventually the property would be yours
24  once the payment history was completed?
25    A.  Correct.

Page 237

BILLY BURKETTE

1
2    Q.  Okay.  Do you recall sending this letter to BP?
3    A.  Not really.
4    Q.  Okay.  Can you go to the second page.
5         Do you recognize this?
6    A.  "BP complaint form was previously filed..."
7         (Reading sotto voce.)
8         Vaguely, I remember this.
9    Q.  Okay.  In paragraph 2(c), it says, "How it
10  impacted you personally?"  You said you lost everything,
11  "I'm still fighting debt collectors, bad credit and good
12  faith in my character abuse."
13         Is the -- is the debt that you're referring
14  to Billy Burkette's debt or is it debt of the business of
15  Global Disaster?
16    A.  You know, I'm not sure I'm educated enough to
17  answer that because, you know, I -- like I said, I'm --
18  I'm just an old country boy, so whether you talk about my
19  company or whether you talk about me as an --
20  individually, we all lost.  Everybody lost.  So whether
21  you talk about, you know, if you were doing research on a
22  company and you found out that there was a problem, you
23  would obviously look at who the owner of that business is
24  through the Secretary of State, and then you would see
25  that that person is responsible as well, because they lost

Page 238

BILLY BURKETTE

1
2 as well, so I -- I'm not sure how to answer that, sir.
3     Q.  Okay.  Did Global Disaster, did it have any
4 outstanding loans?
5     A.  Yes, sir, we did.  We had money that -- that was
6 owed to Doggett Equipment.  I had money to contractors.  I
7 had money to -- Lord knows, I -- it's -- yes, sir.  The
8 answer is yes.
9     Q.  Do you know how much, approximately, ballpark?
10     A.  No, sir, I do not.
11     Q.  Is it more than a million dollars?
12     A.  Oh, by far.
13         Do what?
14         MR. NEWELL:  Go ahead and answer the
15 question, Billy.
16         THE WITNESS:  I mean, you're asking me to
17 put a price on -- on something that was cumulative between
18 myself and two different companies that I honestly, at
19 this point in time, right -- sitting here right now today,
20 I can't give you that dollar figure.
21 BY MR. KLAR:
22     Q.  I'm asking specifically about Global Disaster and
23 I -- I understand your answer is you're not sure; you're
24 answering across the set of Global Disaster, A-1 Towing
25 and Billy Burkette and you think it's greater than a

Page 239

BILLY BURKETTE

1
2 million, but you're not sure how much.  Is that accurate?
3     A.  Well, you know, that's the reason -- the whole
4 reason that -- it's my understanding, so let's get back to
5 the question.  The question is:  How much money is
6 attributable in -- in losses and debt that I owed?
7         So A-1 owed trucking companies for work that
8 they hired them to do, and whether you look at that as
9 Billy Burkette or whether you look at it as A-1, they both
10 lost.
11         Then you have the same setup as Global
12 Disaster had, debt and responsibilities as a company, and
13 so did Billy Burkette.  They're separate entities so
14 there's separate accounting that needs to be done on that.
15 You can't just lump it all together and say because Billy
16 Burkette owned them all, that -- that Billy Burkette
17 didn't lose anything.  Or you can't also say that because
18 A-1 lost, that Global Disaster did or didn't lose and vice
19 versa.
20         Just like I'm telling you that the contract
21 on a -- on a contractual basis, the work that was
22 performed for BP utilizing A-1 Towing & Hauling to haul
23 tar balls and to haul contract work for the disaster and
24 cleanup was never, in any way, associated with any work
25 that Disaster did -- I mean Global Disaster did or any

Page 240

BILLY BURKETTE

1
2 work that Global Disaster may or may not have done.  They
3 are absolutely two separate entities.  No matter if I own
4 both or don't, they still all had losses.
5     Q.  Okay.  I -- I understand your --
6         MR. NEWELL:  How long have we been on the
7 record today?  We have got to be pretty close to six
8 hours.
9         THE VIDEOGRAPHER:  This is the videographer.
10 So we have been going 6 hours, 13 minutes.
11         MR. KLAR:  I have one question on the next
12 line or I just want to ask about the next sentence and
13 then we can end.
14         THE WITNESS:  Okay.
15         MR. NEWELL:  Okay.
16 BY MR. KLAR:
17     Q.  In -- in part E there, you say, "The business
18 started in 2009 because I had secured a $14 million
19 contract to crush the concrete at the Port of St. Bernard,
20 and the property I was purchasing I lost, and BP would not
21 honor my contract with them."
22         The $14 million contract you're referring
23 to, is that the Airware contract?
24     A.  That is just for the crushing, yes.
25     Q.  Okay.  And that's -- that's with Airware, right?

Page 241

BILLY BURKETTE

1
2     A.  Correct.
3     Q.  Okay.  So it wasn't a 67 and a half million
4 dollar contract; it was a $14 million contract?
5     A.  Let's -- since you brought that up, let's go
6 ahead and talk about that.  I thought we covered that
7 earlier.
8     Q.  You're right.  Hold on.  Let me make sure.
9         The 14 million was to crush concrete --
10 concrete with Airware.  The 67 and a half was for the
11 later sale by A-1 to Robin Seafood, right?
12     A.  No.  You asked me how did I calculate that
13 damage.  The concrete crushing originally was 14.  Had --
14 had Airware paid me the 14 million, they would have been
15 entitled to their portion but still also utilized A-1 for
16 hauling it.  So the portion in which you would sell
17 something -- in other words, if Airware had -- had
18 completed their obligation and we crushed it, that's
19 $14 million.  Bam, that's done.
20     Q.  That's the full 1.5 million in cubic yards of
21 crushed?
22     A.  I'm guessing.  No, sir, crushed, it would have
23 been closer to 4 million because it's a 4 to 1 reduction.
24     Q.  Okay.  I understand.
25     A.  So because Terry didn't fulfill his obligation

Page 242

BILLY BURKETTE

1
2 and forfeited on the contract, then that contract became
3 Global Disaster's.  So Global Disaster would have been
4 entitled to the 14 plus anything else that they could have
5 sold it for.  So let's just say that I sold it for $60 a
6 yard instead of the 45, you can add 15 million right
7 there.  So it's just -- it's -- it's all inclusive because
8 the contract was not fulfilled because BP came in and
9 seized the Port.
10    Q.  Okay.  The most that -- that Global Disaster
11 could have earned under its contract with Airware to crush
12 the concrete was $14 million, right, just for the
13 crushing?
14    A.  For Global Disaster, correct.
15    Q.  Okay.  And -- and you indicated that the -- other
16 than the portion that was already designated for the
17 airport, the remainder of the crushed concrete, A-1 Towing
18 was going to sell to Robin Seafood, right?
19    A.  As much as -- as much as we could get to him,
20 yes, but that was just Robin Seafood.  You know, let's
21 just say that Robin Seafood would have bought 2 million
22 yards.  There's no real definitive answer, and that's what
23 I was trying to explain to you earlier.  You're asking
24 about hypothetical, and you asked me to calculate an
25 estimate of that.

Page 243

BILLY BURKETTE

1
2       So if you had 4 million yards, and you did
3 it at 40 -- at $45 a yard, then that's where you would get
4 those figures.  If the figures would be increased because
5 you had to haul it further and it was $80 a yard, then
6 those figures would be on $80 a yard.
7    Q.  Okay.  Other than your contract -- other than A-1
8 Towing's contract with Robin Seafood at the time that the
9 Port was taken over, Global Disaster had no agreements
10 with any other party to purchase the crushed concrete,
11 right?
12    A.  The only agreements we had were with Robin
13 Seafood, the -- we actually -- in lieu of payment for the
14 property rental, we actually took some of that crushed
15 concrete and rebuilt the roads with -- inside the Port.
16 And then the rest of that would have gone to the airport,
17 yes.
18    Q.  Okay.  So just from a total tonnage standpoint, I
19 just want to make sure I understand the numbers and then
20 we can conclude.  How many cubic yards of crushed concrete
21 were going to the airport versus Robin Seafood?
22    A.  Oh, I -- I think we calculated it at -- I don't
23 -- I don't really know.  I mean, I think it was around
24 200,000 yards.
25    Q.  To the airport?

Page 244

BILLY BURKETTE

1
2    A.  Yes, sir, I believe that's correct.
3    Q.  And 1.5 to Robin?
4    A.  I believe that's correct.  So that would have
5 been a total of 1.7 out of the 4 million crushed.
6    Q.  Okay.  So the remaining 2.3 was not currently --
7 was not under contract at the time of the Port takeover to
8 be sold to any business, right?
9    A.  Not that I'm aware of.  I would have to go back
10 and review all my e-mails and phone calls and...
11    Q.  Okay.  Sitting here today, you are not aware of
12 any contracts for that remain -- sale of the remaining
13 2.3 million?
14    A.  No, sir.
15    Q.  Okay.
16       MR. KLAR:  I think we can end for today,
17 unless, Eric, you have questions.
18       THE STENOGRAPHIC REPORTER:  He is muted.
19 Mr. Newell, you're muted.
20       MR. NEWELL:  Oh, I'm not going to ask any
21 questions today.  We'll pass -- or we'll reserve.
22       MR. KLAR:  Okay.  So we'll resume tomorrow
23 with the 30(b)(6) portion.  It should not take as long as
24 today.
25       THE VIDEOGRAPHER:  Time is 6:17 p.m. We are

Page 245

BILLY BURKETTE

1 going off the record.
2 
3    (Whereupon, the deposition was concluded at 6:17 p.m.)

Page 246

1
2                REPORTER'S CERTIFICATE
3
4        I, KARI J. BEHAN, CCR, RPR, CRR, Certified Court
5   Reporter (LA Certificate #97019), as the officer before
6   whom this testimony was taken, do hereby certify that
7   BILLY BURKETTE , after having been duly sworn by me upon
8   authority of R.S. 37:2554, did testify as hereinbefore set
9   forth in the foregoing ^ number of pages;
10       That this testimony was reported by me in
11  stenotype reporting method, was prepared and transcribed
12  by me or under my person direction and supervision, and is
13  a true and correct transcript to the best of my ability
14  and understanding;
15       That the transcript has been prepared in
16  compliance with transcript format guidelines required by
17  the complete arrangement, financial or otherwise, with the
18  person or entity making arrangements for deposition
19  services;
20       That I have acted in compliance with the
21  prohibition on contractual relationships, as defined by
22  Louisiana Code of Civil Procedure Article 1434 and in
23  rules and advisory opinions of the board;
24       That I have no actual knowledge of any
25  prohibited employment or contractual relationship, direct

Page 247

1
2   or indirect, between a court reporting firm and any party
3   litigant in this matter nor is there any such relationship
4   between myself and a party litigant in this matter.  I am
5   not related to counsel or to the parties herein, nor am I
6   otherwise interested in the outcome of this matter.
7        Signed this day, the February 18, 2021.
8
9
10       *Kari Behan*
11       KARI J. BEHAN, CCR, RPR, CRR
         Certified Court Reporter
12       LA Certificate #97019

Page 248

1
2            CHANGES AND SIGNATURE
                 BILLY BURKETTE
3            Tuesday, February 2, 2021
4   To the Reporter:
        I, BILLY BURKETTE, have read the entire transcript of
5   my deposition taken on September 3, 2007 in the captioned
    matter or the same has been read to me.  I request that
6   the following changes be entered upon the record for the
    reasons indicated.  I have signed my name to the Errata
7   Sheet and authorize you to attach same Errata Sheet to the
    original transcript.
8
9   PAGE/LINE
           | CHANGE      REASON
10  _____  | _____
11  _____  | _____
12  _____  | _____
13  _____  | _____
14  _____  | _____
15  _____  | _____
16  _____  | _____
17  _____  | _____
18  _____  | _____
19  _____  | _____
20  _____  | _____
21  _____  | _____
22  _____  | _____
23  _____  | _____
24  _____  | _____
25  _____  | _____

Page 249

1
2   CHANGES (CONTINUED):
3
    _____  | _____
4   _____  | _____
5   _____  | _____
6   _____  | _____
7   _____  | _____
8   _____  | _____
9   _____  | _____
10  _____  | _____
11
12       I, BILLY BURKETTE, have read the foregoing
13  deposition and hereby affix my signature that same is true
14  and correct, except for the changes noted above.
15
16  _____
    BILLY BURKETTE
17