**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010** | * * * * * * * * | **MDL NO. 2179** <br><br> **SECTION J(2)** <br><br> Honorable CARL J. BARBIER <br><br> Magistrate Judge CURRAULT |
| **This Document relates to:** *Global Disaster Recovery & Rebuilding Services LLC, et al. v. BP Expl. & Prod., Inc., et al.*, Case No. 16-cv-06585 | | |

# GLOBAL DISASTER RECOVERY & REBUILDING SERVICES, LLC.'S MEMORANDUM OF LAW IN RESPONSE TO BP'S MOTION FOR SUMMARY JUDGMENT

Respectfully submitted,

**BRENT COON & ASSOCIATES**
/s/_Brent W. Coon
Brent W. Coon
Federal Bar No. 9308
Texas Bar No. 04769750
Brent@bcoonlaw.com
Eric W. Newell
Texas Bar No. 24046521
Eric_newell@bcoonlaw.com

**ATTORNEYS FOR Plaintiff Global Disaster Recovery & Rebuilding Services, LLC.**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................... 3

PROCEDURAL HISTORY ................................................................................................... 4

BACKGROUND ..................................................................................................................... 5

    A.    BP and the Oil Spill Prevented Global Disaster from Crushing Concrete ............... 6

    B.    BP Refused to Purchase Aqua N-Cap to the Detriment of Global Disaster and the Environment .............................................................................................................. 7

    C.    Other Goods and Services ........................................................................................ 9

LEGAL STANDARD ............................................................................................................. 9

ARGUMENT ......................................................................................................................... 10

    A.    BP's Motion Ignores the Main Claims and Damages at Issue ................................ 10

    B.    Both Global Disaster and A-1 Towing Stood to Benefit from the Sale of Recycled Concrete Aggregate ................................................................................................ 10

    C.    Plaintiff's Procurement Based Claims are Based on Fraudulent Concealment, Not OPA ....... 11

    D.    Plaintiff's losses were Due to the Spill and Therefore Compensable Under OPA .................. 12

    E.    Plaintiff's Damages are Reasonably Ascertainable ................................................ 13

CONCLUSION ...................................................................................................................... 14

REQUEST FOR ORAL ARGUMENT ................................................................................ 16

PRAYER ................................................................................................................................ 16

CERTIFICATE OF SERVICE ............................................................................................ 17

## INTRODUCTION

Global Disaster Recovery & Rebuilding Services, LLC ("Global") was formed in 2009 and began operation cleaning up after Hurricane Katrina shortly thereafter. Initially, it began work cleaning concrete at the Port of St. Bernard in Chalmette, Louisiana. This concrete came from the slabs of hundreds or thousands of homes that were demolished in the wake of the devastation caused by Hurricane Katrina. The volume of work meant that Global could have crushed concrete for years. Instead, the BP Oil Spill shut down the port, and ended his operations while it was still in its infancy.

As a Louisiana disaster relief company, Global Disaster was uniquely qualified to aid BP in the cleanup of the spill. BP took advantage of his assistance but failed to compensate him for his efforts.

Plaintiff's case was filed pursuant PTO 60, which required pleading previously filed in so-called "mass joinder" filings where they were filed individually or in groups with related claims. As this Court is aware, compliance with PTO 60 was challenging given the narrow window to comply. PTO 60 was issued on March 29, 2016 and gave until May 2, 2016 for each plaintiff in a mass joinder to file an individual lawsuit. Unstated in the actual PTO 60 order, is there was an option to settle the case through the Court Appointed Neutral Settlement Program ("the Neutrals"). During the month of April Brent Coon & Associates resolved literally thousands of cases as part of the Court appointed Neutral settlement program. However, it was clear from the outset that not every case could be resolved prior to the deadline—even after they were extended by Court order. Brent Coon & Associates was forced to prepare for the possibility of filing thousands of individual lawsuits. One step in the process was drafting a broad form individual petition that would cover the types of claims typically representative of claimants seeking damage from the spill.

Ultimately, BCA was required to file nearly two hundred individual lawsuits in compliance with PTO 60. Each complaint brought damages for four separate causes of action: (1) under the Oil Pollution Act ("OPA"); (2) for fraudulent concealment under Louisiana law; (3) for negligence, gross negligence, and willful misconduct under general maritime law; and (4) (when applicable) under the Florida Pollutant Discharge Prevention and Control Act ("FPDPCA"). In this instance the Complaint

brought four causes of action against BP, on behalf of Global Disaster Recovery & Rebuilding Services LLC, A-1 Towing & Hauling, LLC, and Billy Burkette (Individually).

There is ample evidence to support Global Disasters claims for losses under OPA because the Oil Spill shut down his ability to crush concrete. BP's motion attempts to muddle the profits that Global Disaster would have made simply crushing the contract per their agreement with Airwave, with additional profit that A-1 Towing and Hauling, LLC would have made delivering the crushed concrete to various entities in and around the gulf. These are distinct sets of damages, and Global Disaster should be allowed to proceed to trial on these facts alone. The measure of these damages is also fairly straight forward—because the contract called for a specific price per unit of concrete crushed.

While the initial body of the Complaint makes an arguably "generic" claim for Fraudulent Concealment related to BP, that is not the extent of the pleading. Attached to the Complaint, and required by PTO 60, is a declaration and signed statement made by the Plaintiff specifying their damages. Additionally, the Court required further pleadings (e.g. PTO PTO 65 and PTO 67), which further elaborate on Plaintiff's claims for damages. It is clear from the pleadings that the allegations against BP for Fraudulent Concealment cost Plaintiff money in terms of trying to run down basic oil recovery items that BP claimed to already have, and their choices locked him out of being able to provide them with an environmentally better alternative. Plaintiff provided initial disclosures with a written statement supporting loss calculations in initial disclosures pursuant to PTO 67. Perhaps most importantly, the way they downplayed the Spill led Burkette and Global Disaster to assume that the Spill would not impact their ongoing rock crushing business.

The claims for general maritime were primarily for Billy Burkette, individually, who as a boat owner had damages that fit in the category. Similarly, the claims under the Florida Pollutant Discharge Prevention and Control Act were primarily designed for those claimants with ties to Florida. Neither of these claims being pursued by Global Disaster.

## PROCEDURAL HISTORY

Plaintiff opted out of the Deepwater Horizon Court-Supervised Settlement Program and

submitted a presentment to the BP Claims Program for $310,000,000. *See* Ex. 13; Ex. 14. Plaintiff, along with A-1 and Billy Burkette, individually, filed a complaint in this action on May 19, 2016, in the Eastern District of Louisiana, generally alleging BP's liability as a result of the Spill. *See generally* Case No. 16-cv-06585, Rec. Doc. 1 ("Complaint"). The Complaint asserts four claims: (1) damages under OPA, *see* Compl. at ¶¶ 99-108; (2) fraudulent concealment under state law, *id.* ¶¶ 109-128; (3) negligence, gross negligence, and willful misconduct under general maritime law, *id.* ¶¶ 57-98; and (4) damages under the FPDPCA, *id.* ¶¶ 129-151.

On July 14, 2016, Mr. Burkette, on behalf of A-1, entered into a settlement with BP. *See* BP's Statement of Undisputed Material Facts ("SOF") ¶ 49. The settlement by A-1 did not, and does not, affect the ability of Global Disaster to recover for its own separate damages.

Pursuant to Pretrial Orders Nos. 65 and 67, *see* MDL No. 2179, Rec. Docs. 23825 ("PTO 65"), 25370 ("PTO 67"), Plaintiff submitted sworn statements explaining his claims in greater detail. *See* Case No. 16-cv-06585, Rec. Doc. 7 ("Plaintiff's PTO 65 Statement").

On April 18, 2019, in response to PTO 67, Plaintiff produced 53 documents totaling 182 pages. In August 2019, pursuant to PTO 67, Plaintiff and BP participated in mediation. On November 5, 2020, in response to PTO 69, Plaintiff produced 54 documents to BP totaling 163 pages, most of which were re-productions of previously provided materials. BP separately deposed Mr. Burkette in his individual capacity and as Plaintiff's Rule 30(b)(6) designee.

## BACKGROUND

Global Disaster was founded in 2009 by Billy Burkette in order to perform disaster recovery services in Louisiana. *See* SOF ¶¶ 1-2. Mr. Burkette also owned A-1, a towing and hauling service. *Id.* ¶ 3. Prior to the Spill, Plaintiff had secured a contract with a company named Airware, LLC ("Airware"), pursuant to which Plaintiff agreed to crush concrete at the Port of St. Bernard in Chalmette, Louisiana. *Id.* ¶ 8. The spill, and BP's subsequent takeover of the Port effectively ended Global Disaster's ability to generate a profit by crushing the concrete.

Concrete Crushing Contract

A.  **BP and the Oil Spill Prevented Global Disaster from Crushing Concrete**

Burkette testified that there were about 4 million cubic yards of demolition slabs that need to be disposed of by crushing.  *See* SOF ¶ 5. These slabs came from underneath thousands of homes that were so damages during Hurricane Katrina, that they had to be demolished.  They were then hauled by various companies, including A-1 to the St. Bernard Parish port.  *See* SOF ¶ 6. Global Disaster was initially brought in to start organizing the slabs, as they had begun to overrun the Port.  This work began well before the spill.  Eventually, Global Disaster reached an agreement to actually crush the concrete, so that it could be disposed of properly.  *See* SOF ¶ 6 But first, Global Disaster needed to procure the equipment necessary to separate the concrete from the rebar and plumbing in the slabs, and the equipment to crush the actual slabs into various sizes.  *See* SOF ¶ 12. The leasing companies for this equipment required Global Disaster to enter into a written contract to provide crushing services. *See* SOF ¶ 7.

On June 28, 2010, Plaintiff entered into a contract with Airware to crush concrete belonging to Airware at the Port of St. Bernard. *See* SOF ¶ 12 (the "Airware Contract"). Under the Airware Contract, Airware agreed to pay Plaintiff $9.50 per ton of concrete crushed. *See* SOF ¶ 13, *see also* Newell Decl. at Ex. A 47:23-48:8. Plaintiff estimates, based on a 4 to 1 reduction, that the full pill of concrete would be reduced to 1.5 million cubic yards of crushed concrete was available. *See* Newell Decl. at Ex. A 65:14-22, 241:20-23.

Plaintiff alleges it submitted invoices to Airware totaling several hundred thousand dollars for one months' work, which Airware never paid. *See* SOF ¶ 14.  To resolve a dispute with Airware over non-payment, Plaintiff reached an agreement with Terry Williams at Airware, where Plaintiff took ownership of all Airware's uncrushed concrete. *See* SOF ¶ 16.

Plaintiff's plan was to profit from crushing the concrete and to sell it directly to various vendors.  *See* SOF ¶ 18. His trucking company A-1 would also profit by being paid to haul the concrete to various locations.   However, after it took ownership of the concrete, but before he could begin selling and hauling the concrete, BP took over the port for its own use.  BP shut down the Port of St.

Bernard and took possession of Plaintiff's concrete, prohibiting further crushing, selling, and shipping. SOF ¶ 9 – 11.

Plaintiff then had oral conversations with a BP representative regarding potentially subleasing storage space from Plaintiff, which Plaintiff alleges it was leasing from the Port of St. Bernard. *See* SOF ¶ 9. At the time, Plaintiff had been using the land to crush concrete, and the volume of concrete was large enough that it would have to be crushed and moved for BP to be able to store equipment at the site. *See* SOF ¶ 10. According to Plaintiff, BP would occupy the land gradually as Plaintiff continued to crush concrete and more space became available, and BP hoped to move in as soon as possible. *Id.*

Plaintiff acknowledges that those discussions with BP never materialized into a formal lease agreement, but claims the U.S. Coast Guard, under BP's control, took over the entire Port of St. Bernard, including Plaintiff's land and concrete. *Se See* SOF ¶ 10

As a result, Plaintiff could not get paid under his contract with Airware, nor could he provide crushed concrete to A-1 for sale pursuant to the one agreement that he had in place with Dan Robins Seafood. SOF ¶ 9 – 11. Ultimately, Plaintiff had access to a nearly unlimited supply of concrete, and had put in place the equipment, the personnel, the knowledge, and the plan to crush it. This plan was disrupted initially when the Spill came along and prevented him from getting paid for crushing the concrete directly, per his contract with Airware. His secondary plan to sell the crushed concrete was completely derailed when BP took possession of the Port and the concrete.

**B. BP Refused to Purchase Aqua N-Cap to the Detriment of Global Disaster and the Environment**

Global Disaster, as a Louisiana disaster recovery company, was in a unique position to help BP with spill response and clean-up efforts. Mr. Burkette went to a command field office in Gray, Louisiana, on behalf of Global Disaster soon after the Spill. He helped them get basic equipment but was not compensated the standard 20% for these efforts. SOF ¶ 35 – 37. He then secured the exclusive right to sell Aqua N-Cap to BP for spill response, so that BP could not go around him a second time. SOF ¶ 23.

As a result, Plaintiff seeks damages relating to its efforts to procure Aqua N-Cap for use in connection with the Spill response. SOF ¶ 22. Aqua N-Cap is a polymer sediment filtration technology used to remediate and clean up oil spills on water or solid surfaces. *See* SOF ¶ 19. At the time of the Spill, RTASCo (Remediation Technologies & Applications Systems), aka RTA Systems, Inc ("RTASCo") manufactured Aqua N-Cap. Plaintiff alleges that it had an oral understanding with RTASCo pursuant to which Plaintiff would hold "the exclusive distribution contract for the Gulf of Mexico," contingent on Plaintiff securing an agreement from BP to purchase Aqua N-Cap. Plaintiff's PTO 65 Statement SOF ¶ 21 & 24. Pursuant to that understanding, Plaintiff would have earned a commission from RTASCo for any Aqua N-Cap sold to BP. *See* SOF ¶ 25.

Plaintiff spoke with several BP procurement personnel about Aqua N-Cap, but he does not recall when those discussions occurred or with whom he spoke. *See* SOF ¶ 28. Plaintiff testified that BP had included Aqua N-Cap as an approved product in BP's emergency response plan submitted to the State of Louisiana. *See* SOF ¶ 24.

After these discussions, BP allegedly said it would send a written purchase order for "indefinite delivery" of an "indefinite quantity" of Aqua N-Cap. Plaintiff's oral agreement was BP would use Aqua- N-Cap in response to the Spill. Global Disaster had an agreement that BP would buy Aqua N-Cap from Global Disaster. *See* SOF ¶ 28-31. The agreed price for the Aqua N-Cap was $7 or $9 per pound, out of which Global Disaster would have earned a $2.50 commission. *See* SOF ¶ 29-31.

As part of the process, Plaintiff had multiple conversations with procurement and Captain Stanton concerning the use of Aqua N-Cap to clean up the Spill. SOF ¶ 29. At BP's request Plainiff obtained EPA approval for the use of Aqua N-Cap. SOF ¶ 20. Ultimately, Plaintiff was introduced to Jackie (Jacqueline Michel), who he believed to be a biologist working for BP. SOF ¶ 33. She told Burkett BP would not use the product because it would "quantify the spill and cost us billions in fines." SOF ¶ 34. *Id.* Under OPA and the Clean Water Act, fines of $1,000 per barrel of oil spilled or $3,000 per barrel if gross negligence was found, would be levied against BP. 33 C.F.R. 40 §2701 *et. seq.* and 33 U.S.C. §1321(b)(7)(A) and §1321(b)(7)(D). This incentivized BP to use Corexit to clean

up the spill, the oil was sunk to the bottom of the ocean, making it much mor difficult to calculate.

C. **Other Goods and Services**

Aside from Aqua N-Cap, Mr. Burkette had multiple oral discussions with BP personnel during which BP personnel orally agreed to procure other goods and services through Plaintiff. In reliance on those discussions, Plaintiff expended time and resources attempting to locate those goods and services for BP; but BP ultimately circumvented Plaintiff by procuring those goods and services from other contractors or directly from manufacturers. SOF ¶ 35-37.

For all this procurement work, Plaintiff claims BP owes Plaintiff a fee equivalent to 20% of the cost of goods and services BP procured through other sources. SOF ¶ 35-37.

**LEGAL STANDARD**

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). A moving party may satisfy its summary judgment burden by pointing to undisputed evidence in the record. *See, e.g.*, *Templet v. HydroChem Inc.*, 367 F.3d 473, 480 (5th Cir. 2004). Given such undisputed evidence, the non-moving party may not rest upon the pleadings, but must identify specific facts that establish a genuine issue for trial. *See Celotex*, 477 U.S. at 324. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude . . . summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A dispute is genuine if the summary judgment 'evidence is such that a reasonable jury could return a verdict for the [non-movant].'" *Hyatt v. Thomas*, 843 F.3d 172, 177 (5th Cir. 2016) (quoting *id.*). "Such a dispute does not exist where the non-movant's 'critical evidence is so weak or tenuous on an essential fact' needed to prove his claim 'that it could not support a judgment in favor of the nonmovant.'" *Boateng v. BP, P.L.C.*, 779 F. App'x 217, 220 (5th Cir.), cert. denied, 140 S. Ct. 616 (2019) (quoting *Little*, 37 F.3d at 1075). While all reasonable inferences are to be drawn in favor of the non-movant, a party cannot defeat

summary judgment with conclusory allegations or unsubstantiated assertions. *Little*, 37 F.3d at 1075. When conflicting evidence is presented, the court is not permitted to make credibility determinations regarding the evidence. See *Lindsey v. Prive Corporation,* 987 F.2d 324, 327 (5th Cir. 1993).

## ARGUMENT

### A. BP's Motion Ignores the Main Claims and Damages at Issue

BP's Motion for Summary Judgement simply skips over clear and direct losses by Global Disaster. Instead, it focuses on a portion of the losses that are potentially not Global Disaster's to claim but presents them as the entirety of Global Disaster's losses. Global Disaster had it's own contract with Airware, to crush concrete at the St. Bernard Parish Port. This contract contained a scope of work for Global Disaster to furnish all labor and materials, equipment, and supervision necessary to crush stockpiled concrete into road base material commonly known as Recycled Concrete Aggregate (RCA). The contract called for a compensation amount that paid $9.50 per ton for the concrete that Global Disaster crushed.

Burkette testified that the first invoice sent to Airware was for $250,000 or $280,000. *See* SOF ¶ 12-13. That single invoice represented between 25,000 and 30,000 tons of concrete that had been crushed. *see* SOF ¶ 18. According to Burkette's testimony this would have amounted to $14,000,000 in payments under the contract. SOF ¶ 15. Burkette further testified that Airwave was not able to pay the invoice because of the impact by the Oil Spill *See* SOF ¶ 17.

The work on the concrete slabs began prior to the signing of the Airware contract in June 2010. Burkette and Global Disaster pressed forward to expand the concrete crushing operation despite the Spill, in part because they relied on BP's representations that the Spill would not affect operations at the Port. *See* SOF ¶ 42

### B. Both Global Disaster and A-1 Towing Stood to Benefit from the Sale of Recycled Concrete Aggregate

Burkette had a secondary plan for the Concrete Aggregate, which had numerous uses depending on the size that it was crushed down to. It could be used as a foundation for roadways or

airport runways, it could be used to seed new oyster beds on the Gulf, or any other number of applications. *See* SOF ¶ 38. The question is whether the benefit of these sales would have inured to the benefit of Global Disaster or to A1 Towing. Burkette was asked whether A-1 had a contract to **sell** concrete to Robin Seafood; Burkette's response was that A-1 had a contract to **"bring the crushed concrete to Dan Robin."** *See* SOF ¶ 41. The clear implication of this is that A-1 Towing stood to reap the benefit of delivery of the concrete, while Global Disaster would benefit from the sale of the concrete.

The existence of specific facts of the contract with Robin Seafood are irrelevant to the argument that the crushed concrete had value. Even though there was no written contract for that specific sale, it is clear from the testimony of Burkette, that there were still tons of concrete that would have been available for sale and shipment. The possibility of these sales was taken away from Global Disaster when their access to the Port was taken away from them by BP.

**C.      Plaintiff's Procurement Based Claims are Based on Fraudulent Concealment, Not OPA**

BP argues in a single footnote that Plaintiff's claim for fraudulent claim was already dismissed and/or should be pre-empted by OPA. *In re Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mexico, on Apr. 20, 2010*, 808 F. Supp. 2d 943, 956–58 (E.D. La. 2011). However, unlike the claims made in the B1 Bundle, the fraudulent concealment claims outlined by Plaintiff's pleadings do not relate to the Outer Continental Shelf and are therefore not pre-empted. The claims stemming from BP's downplaying the severity of the Spill all come from actions taken by BP personal on dry land by individuals in Louisiana, Houston, and/or London. It appears that the decision to avoid quantifying the Spill was made, or at least carried out, in Louisiana. The decisions to seek the aid of Global Disaster in procuring recovery supplies, but not to compensate him for his work, came from personnel in Louisiana.

Burkette's testimony makes clear that he did a lot of work for BP, for which they did not pay him—nor did they intend to pay him for this work. They kept moving the goalposts—by shifting personnel, by going around Global Disaster, by requiring he contract with a preferred vendor, etc.

This is one example of fraudulent concealment. Another example is BP's understating the gravity of the Spill. Global Disaster continued investing in the project at the Port after the Spill began, in part, because of BP's misrepresentation regarding how the Spill would affect the area.

      **D.     Plaintiff's losses were Due to the Spill and Therefore Compensable Under OPA**

OPA is a comprehensive framework designed to "establish limitations on liability for damages *resulting from oil pollution*." OIL POLLUTION ACT OF 1990, PL 101-380, August 18, 1990, 104 STAT 484 (emphasis added). Recovery of economic losses under OPA requires Plaintiff to establish that its losses were "'due to' the injury, destruction, or loss of property or natural resources that 'result[ed] from' the discharge or threatened discharge of oil from [the Spill]." *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on Apr. 20, 2010*, 168 F. Supp. 3d 908, 916 (E.D. La. 2016) ("*In re Deepwater Horizon*"). *See also* 33 U.S.C. § 2702(a) ("each responsible party for a vessel or a facility from which oil is discharged, or which poses the substantial threat of a discharge of oil . . . is liable for the removal costs and damages specified in subsection (b) *that result from such incident*.") (emphasis added); 33 U.S.C. § 2702(b)(2)(E) (limiting OPA profit and earning capacity damages to damages "*due to* the injury, destruction, or loss of real property, personal property, or natural resources" (emphasis added)); *In re Taira Lynn Marine Ltd. No. 5, LLC*, 444 F.3d 371 (5th Cir. 2006) (losses caused by government-mandated evacuation following discharge did not "result from" discharge and therefore were not recoverable under OPA).

Defendant seeks to apply the same standards it imposed on moratorium claims to Global Disaster. Their brief sites this Court's dismissal of moratorium claims when it states, "Plaintiff is not an established business seeking lost profits "'due to' the injury, destruction, or loss of property or natural resources that 'result[ed] from'" the Spill. *In re Deepwater Horizon*, 168 F. Supp. 3d 908, 916 (E.D.L.A. 2016). However, unlike the moratorium claims, Plaintiff's damages stem not from a government decision, but from BP's decision to seize control of the Port.

Defendant's portrayal of the Plaintiff as a "one-man disaster recovery business with zero history of earnings" mischaracterizes his operation. It also shows the importance of both the OPA

claim and the claims for fraudulent concealment. Plaintiff's claims under OPA are interrelated with his claims for fraudulent concealment. Had BP not downplayed the Spill, he might have realized that they would ultimately takeover the Port and his concrete crushing operation.

The elements of a Louisiana fraud or intentional misrepresentation claim are: 1) a misrepresentation of a material fact; 2) made with intent to deceive; and 3) causing justifiable reliance with resultant injury. *Kadlec Medical Center v. Lakeview Anesthesia Assoc.*, 527 F.3d 412, 418 (5th Cir. 2008), cert. denied, 555 U.S. 1046 (2008); see also *Gonzalez v. Gonzalez*, 20 So.3d 557, 563 (La. Ct. App. 2009), writ denied, 27 So.3d 305 (La. 2010).

BP misrepresented their preparedness for the Spill, their willingness to compensate Global Disaster for the work they did filling in those gaps in readiness, and they misrepresented the reasons their choices in how to deal with the Spill in order to conceal the volume of oil being released. They did so knowing that they were deceiving Global Disaster and the general republic.

Courts have already ruled that, "[F]raud by silence . . . 'is, by its very nature, difficult to plead with particularity.'" *In re Ford Motor Co. Vehicle Paint Litig.*, No. 1063, 1997 WL 539665, at *3 (E.D. La. Aug. 27, 1997) (quoting *Chrysler Credit Corp. v. Whitney Nat'l Bank*, 824 F. Supp. 587, 598 (E.D. La. 1993)).

**E. Plaintiff's Damages are Reasonably Ascertainable**

OPA compensates only for "loss of profits or impairment of earning capacity" due to the damage resulting from the discharge or threatened discharge of oil. 33 U.S.C. § 2702(b)(2)(E). In assessing such damages, the Fifth Circuit considers the forum state's law on evidence sufficient to show lost profits. *See, e.g., Gulf Eng'g Co., L.L.C. v. Dow Chemical Co.,* 961 F.3d 763, 768 (5th Cir. 2020) (applying Louisiana law). Louisiana law allows a plaintiff to recover lost profits that can be "proven with reasonable certainty and [are not] based on conjecture and speculation." *Id.* at 768. A plaintiff "must show that the loss of profits is more probable than not" and support a claim "by more than mere estimates of loss." *Id.* (internal quotations omitted). A party seeking lost profits need not prove an exact calculation, but lost profits must be proved with "reasonable certainty." *In re Rushing*, 424 B.R.

747, 753 (Bankr. M.D. La. 2010) (sustaining objection to claim for lost profits where the plaintiff did not introduce documents establishing sales).

Here, the simplest measure of damages is the value of the contract that Plaintiff had with Airware to crush concrete for $9.50 a ton. Any layman on any jury in the Country can understand how to multiple tons of concrete by $9.50 a ton. A Louisiana jury is particularly well suited to understanding the volume of concrete at the Port because many of them will remember firsthand the devastation caused by Hurricane Katrina. Plaintiff's attempts to secure alternate funding by selling the crushed concrete, may complicate this calculation somewhat, but it is unnecessary to the presentation of damages.

Similarly, a reasonable juror could calculate Plaintiff's damages relating to the failure to purchase. BP initially intended to purchase 4 million pounds of Aqua N-Cap, with Global Disaster earning a $2.50 per pound commission. This amounts to a loss of $10 million.

Additionally, BP's decision to procure goods and services through sources other than Plaintiff, or directly from sources that the Plaintiff had located for BP, caused him a loss of profit. Plaintiff claims it is entitled to a commission of 20% of the cost of goods and services BP ultimately procured from other sources.

## CONCLUSION

Defendant's Motion for Summary Judgment spends a lot of time attacking the Plaintiff, but never really addresses the heart of the claims made by Global Disaster. Burkette is rightfully upset and ultimately financially harmed because BP took advantage of all of the work Burkett performed for BP to help contain the Spill but was never compensated for. Burkette is right to be upset that the Spill and the use of Corexit wrecked untold damage on the environment. Plaintiff's claims are really very simple. Global Disaster had a viable business to crush concrete that could have made money for years to come. Global Disaster also had an agreement that would have enabled him to get a commission on the sale of Aqua N-Cap to BP for Oil Spill cleanup. BP attempted to hide the volume of the Spill and cost Plaintiff the expected benefit of those sales.

OPA is by nature a strict liability claim. The statute has already determined that BP is the Responsible Party. Plaintiff only needs to show that it suffered damages because of the Spill and what those damages are. The Plaintiff has clearly demonstrated that it lost out on the value of crushing concrete and/or selling crushed concrete to third parties because of the Spill. There is no evidence of an intervening party deciding to shut down the Port that would allow BP to escape liability, as with the moratorium claims.[1] Alternatively, the Plaintiff suffered damages directly due to the Spill as evidenced by Plaintiff's testimony that Airware could not pay Plaintiff because of the Spill.

The value of the loss of crushing concrete is easy to determine because it was a contractually fixed number. The value of selling the concrete is a little more difficult to determine, only because some portion, but not all the loss, would have gone to A-1 Towing and Hauling—which already settled its claims with BP. Either way Plaintiff has demonstrated that there is a genuine issue of material fact as to the amount of loses sustained when the concrete crushing stopped.

The elements of a Louisiana fraud or intentional misrepresentation claim are: 1) a misrepresentation of a material fact; 2) made with intent to deceive; and 3) causing justifiable reliance with resultant injury. *Kadlec Medical Center v. Lakeview Anesthesia Assoc.*, 527 F.3d 412, 418 (5th Cir. 2008), cert. denied, 555 U.S. 1046 (2008); see also *Gonzalez v. Gonzalez*, 20 So.3d 557, 563 (La. Ct. App. 2009), writ denied, 27 So.3d 305 (La. 2010).

The Plaintiff has shown there is an issue of material fact for each of these elements. BP misrepresented their preparedness for the Spill, the willingness to compensate Global Disaster for the work performed filling in those gaps in readiness, and they misrepresented reasons BP's and choices in how to deal with the Spill in order to conceal the volume of oil being released. They did so with the intent to deceive Global Disaster and the general republic. As a result of BP's deceit, Global Disaster suffered the lost commissions on Aqua N-Cap and the loss of profit from the products and services that it provided BP during the Oil Spill cleanup.

---

[1] Attempts to secure the deposition of the Coast Guard commander were denied by the US Coast Guard under *Touhy* regulation 6 C.F.R. §5 (5.41-5.49) and 49 C.F.R. § 9/

## REQUEST FOR ORAL ARGUMENT

Plaintiff respectfully requests an oral argument, with live testimony, on this matter so that Plaintiff will have an opportunity to have his day in court. It has been over ten years since the Spill began, and Billy Burkette, as the owner of Global Disaster would like an opportunity to personally explain his situation to the Court and how the spill affected him, his family, and his livelihood.

## PRAYER

For the foregoing reasons, Global Disaster respectfully requests that the Court deny BP's motion for summary judgment, that this case be allowed to proceed to trial, and for any further relief to which Plaintiff may show itself to be entitled.

May 12, 2021                                     Respectfully submitted,

                                                 **BRENT COON & ASSOCIATES**

                                                 */s/ Brent W. Coon*
                                                 Brent W. Coon
                                                 Federal Bar No. 9308
                                                 Texas Bar No. 04769750
                                                 Brent@bcoonlaw.com
                                                 Eric W. Newell
                                                 Texas Bar No. 24046521
                                                 Eric_newell@bcoonlaw.com

                                                 **Attorneys For Plaintiff**
                                                 **Global Disaster Recovery**
                                                 **& Rebuilding Services, LLC.**

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing **Global Disaster Recovery & Rebuilding Services, LLC's Memorandum of law in Response to BP's Motion for Summary Judgment** has been served on All Counsel by electronically uploading the same to File & ServeXpress in accordance with Pretrial Order No. 12, as amended, and that the foregoing was electronically filed with the Clerk of the Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 12th day of May, 2021.

                                                  */s/ Brent W. Coon*
                                                  Brent W. Coon