# EXHIBIT

## "A"

1                    BILLY BURKETTE

2            UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF LOUISIANA
3

GLOBAL DISASTER RECOVERY      )
4  & REBUILDING SERVICES,      )
   LLC, ET AL.,                )
5                              )
           Plaintiffs,         )
6                              )          Case No.:
   VS.                         )          2:16-cv-6585
7                              )
   BP EXPLORATION &            )
8  PRODUCTION, INC., ET AL,    )
                               )
9            Defendants        )

10  -----------------------------------------------------------

11

           ORAL AND VIDEOTAPED DEPOSITION OF
12                     BILLY BURKETTE
                     FEBRUARY 2, 2021
13            (REPORTED REMOTELY VIA ZOOM)

14  -----------------------------------------------------------

15

16         ORAL AND VIDEOTAPED DEPOSITION, VIA ZOOM

17  VIDEOCONFERENCE, OF BILLY BURKETTE, produced as a witness

18  at the instance of the Defendant and duly sworn, was taken

19  in the above-styled and numbered cause on Tuesday,

20  February 2, 2021, from 9:38 a.m. to 6:17 p.m., before Kari

21  J. Behan, CCR, RPR, CRR, in and for the State of

22  Louisiana, reported by computerized stenotype machine, at

23  the offices of firm, address, Dallas, Texas, pursuant to

24  the Federal Rules of Civil Procedure.

25  JOB NO: 189255

Page 2

```
 1                   BILLY BURKETTE
 2            A P P E A R A N C E S
 3
   FOR THE PLAINTIFFS (VIA ZOOM):
 4
       ERIC WAYNE NEWELL, ESQ.
 5     BRENT COON & ASSOCIATES
       215 Orleans Street
 6     Beaumont, TX 77701
 7
 8
 9 FOR THE DEFENDANTS (VIA ZOOM):
10     AUSTIN KLAR, ESQ.
             - and -
11     JOY DINEO, ESQ.
             - and -
12     CHRISTOPHER KEEGAN, ESQ.
       KIRKLAND & ELLIS
13     555 California Street
       San Francisco, CA 94104
14
15
16
17
18 ALSO PRESENT:
19     Charles Brennan, Defendants
20
21 THE VIDEOGRAPHER:
22     Carlos Lopez
23
24
25
```

Page 3

```
 1                  I N D E X
 2 Examinations                               Page
 3
 4 BY MR. KLAR                                   7
 5 REPORTER'S CERTIFICATE                      246
 6 CHANGES AND SIGNATURE                       248
 7
 8            E X H I B I T S
 9 No.         Description                     Page
10 Exhibit 1  Deep Water Horizon Confidentiality  14
             Order
11
       Exhibit 2  Agreement between Airware LLC and   40
12                Global Disaster Recovery &
                  Rebuilding Services LLC, dated June
13                28, 2010, GLOBAL DISASTER 000076
                  through 000079
14
       Exhibit 3  BP Gulf of Mexico Regional Oil Spill  84
15                Response Plan, BP-HZN-CEC 019244
                  through 019825
16
       Exhibit 4  E-mail dated July 2, 2010, GLOBAL    88
17                DISASTER 000162 and 000163
18 Exhibit 5  E-mail dated May 21, 2010, GLOBAL    91
                  DISASTER 000159 through 000161
19
       Exhibit 6  E-mail dated May 12, 2010, GLOBAL    97
20                DISASTER 000098 through 000107
21 Exhibit 7  Confidentiality Agreement;          122
                  Discloser, Billy Burkette;
22                Recipient, BP, GLOBAL DISASTER
                  000137 through 000139
23
       Exhibit 8  Non-Circumvent Agreement entered     124
24                into May 11, 2010, GLOBAL DISASTER
                  000147 and 000148
25
```

Page 4

```
 1 EXHIBITS (CONTINUED):
 2 Exhibit 9   E-mail dated January 29, 2013,      125
              GLOBAL DISASTER 000108 through
 3            000110
 4 Exhibit 10  E-mail dated May 27, 2010, GLOBAL   131
              DISASTER 000111 and 000112
 5
 6 Exhibit 11  Master Service Agreement, dated June  149
              15, 2010, GLOBAL DISASTER 000122
 7            through 000136
 8 Exhibit 12  ES&H Oil Spill/HAZMAT Services       154
              Ticket, dated June 21, 2010, GLOBAL
 9            DISASTER 000089
10 Exhibit 13  Letter of Intent to Strategic        160
              Services USA, LLC, dated June 15,
11            2010, GLOBAL DISASTER 000140 and
              000141
12 Exhibit 14  Document dated June 18, 2010, from   183
              Lil Lalumandier and Robert G. James,
13            GLOBAL DISASTER 000075
14 Exhibit 15  Deepwater Horizon Oil Pollution Act  193
              Claim Form, GLOBAL DISASTER 000001
15            and 000002
16 Exhibit 16  Deepwater Horizon Oil Pollution Act  199
              Claim Form, GLOBAL DISASTER 000050
17            and 000051
18 Exhibit 17  Exhibit A, Global Disaster's         202
              Response to Pretrial Order No. 65
19
20 Exhibit 18  Letter from Billy Burkette with BP   235
              Complaint Form, GLOBAL DISASTER
              000044 and 000045
21
22
23
24
25
```

Page 5

```
 1                 BILLY BURKETTE
 2              PROCEEDINGS:
 3   (Tuesday, February 2, 2021, at 9:38 a.m.)
 4          THE VIDEOGRAPHER:  Good morning.  My name is
 5 Carlos Lopez.  I am a legal videographer in association
 6 with TSG Reporting, Inc.  Due to the severity of COVID-19
 7 and following the practice of social distancing, I will
 8 not be in the same room with the witness.  Instead, I will
 9 record this videotaped deposition remotely.  The reporter,
10 Kari Behan, also will not be in the same room and will
11 swear in the witness remotely.
12          Will all parties stipulate to the validity
13 of this video recording and remote swearing and that it
14 will be admissible in the courtroom as if it had been
15 taken following Rule 30 of the Federal Rules of Civil
16 Procedures and the state's rules where this case is
17 pending.
18          THE STENOGRAPHIC REPORTER:  I think he just
19 wanted you attorneys to agree that it was okay we were
20 taking it remotely.
21          MR. NEWELL:  Yes, agreed.
22          MR. KLAR:  Same.
23          THE STENOGRAPHIC REPORTER:  Mr. Burkette,
24 would you please raise your right hand?  Can you hear us
25 okay, Mr. Burkette?
```

BILLY BURKETTE

1
2          Carlos, do you want to stop the video for a
3  second?
4          THE VIDEOGRAPHER:  Yeah, let's go off the
5  record.  Time is 9:38 a.m.  We're going off the record.
6          (Brief recess taken.)
7          THE VIDEOGRAPHER:  This is the start of
8  Media Label No. 1 of the video-recorded deposition of
9  Billy Burkette in the matter of Global Disaster Recovery
10 and Rebuilding Services, LLC, et al., versus BP
11 Exploration & Production, Inc., et al.
12          This deposition is being held remotely on
13 February 2nd, 2021, at approximately 9:54 a.m.  My name is
14 Carlos Lopez.  I am the legal video specialist from TSG
15 Reporting, Inc.  The court reporter is Kari Behan in
16 association with TSG Reporting.
17          Would counsel please introduce yourself for
18 the record.
19          MR. KLAR:  Good morning.  This is Austin
20 Klar with Kirkland & Ellis for the Defendants.
21          MR. NEWELL:  Eric Newell on behalf of the
22 Plaintiff, Billy Burkette.
23          MS. DINEO:  Good morning.  My name is Joy
24 Dineo on behalf of the Defendants.
25          MR. BRENNAN:  Good morning.  My name is

BILLY BURKETTE

1
2  Charles Brennan on behalf of the Defendants.
3          BILLY BURKETTE,
4  after having been first duly sworn by the above-mentioned
5  Certified Court Reporter, was examined and testified as
6  follows:
7          THE STENOGRAPHIC REPORTER:  Thank you so
8  much.
9          We may proceed.
10          EXAMINATION
11 BY MR. KLAR:
12     Q.  Good morning, Mr. Burkette.
13     A.  Good morning.
14     Q.  So my name is Austin Klar.  I'm a lawyer at
15 Kirkland & Ellis, and I represent BP Defendants in these
16 proceedings.
17          Have you been deposed before?
18     A.  Couple times, yes, sir.
19     Q.  What -- what types of cases were you deposed in?
20     A.  Just a case where my daughter was removed from
21 school, and we had to file suit to have her put back into
22 the school because she lived out of the district, but the
23 school did not realize that we were renting a home inside
24 the district area.  So just a bunch of confusion.
25     Q.  So nothing to do with your -- your businesses or

BILLY BURKETTE

1
2  anything like that?
3     A.  No.
4     Q.  I want --
5     A.  I mean, they asked questions -- they asked
6  questions about, you know, where I worked, what I did,
7  those kinds of things, but other than that, no, sir.
8     Q.  Understood.
9          So I want to go over a few ground rules
10 today before we get started.  This may be different from
11 what you're used to because we're doing it remotely.
12          So if at any point you want to take a break,
13 just -- just let us know.  We don't -- we don't need to go
14 straight through this.  I just ask that if there's a -- a
15 question pending, that you answer it before we take a
16 break.
17          Is that okay?
18     A.  Yes, sir.
19     Q.  It's -- it's very important that you understand
20 my questions.  So if you don't understand any aspect of
21 it, will you please let me know?
22     A.  Yes, sir.
23     Q.  And if you're -- if you're going to answer one of
24 my questions without asking to clarify or saying you don't
25 understand, I'm -- I'm going to assume that you understand

BILLY BURKETTE

1
2  it.
3          Is that okay?
4     A.  Yes, sir.
5     Q.  Okay.  We have a court reporter who is being --
6  taking down, kind of, a transcript of everything that we
7  say today, so it's important that you let me finish asking
8  my question before you answer, and I let you, best I can,
9  finish your answer before I continue and that we don't
10 talk over each other.
11          Is that fair?
12     A.  Yes, sir.
13     Q.  And since everything's being written down, could
14 you make sure that you give verbal responses like you're
15 doing right now, "yes," "no," rather than, you know, a
16 head-nod or a head-shake or a "uh-huh" or anything like
17 that?
18     A.  Yes, sir.
19     Q.  Okay.  And if I refer to Global Disaster Recovery
20 Rebuilding Services, LLC, as "Global Disaster" or "the
21 Company," you'll -- you'll understand what I mean, right?
22     A.  Yes, sir.
23     Q.  And if I refer to the oil spill that occurred on
24 April 20th, 2010 that's the subject of this litigation as
25 "the spill," you'll understand what I mean, correct?

Page 10

BILLY BURKETTE

1
2     A.  Yes, sir.
3     Q.  Do you understand that you are under oath today?
4     A.  Yes, sir.
5     Q.  Do you understand that you have to testify
6  truthfully and answer questions completely?
7     A.  Yes, sir.
8     Q.  Is there any reason why you are not able to do
9  that today?
10     A.  I don't think so.
11     Q.  Are you on any medications that would affect your
12  ability to testify truthfully and -- and accurately today?
13     A.  No, sir.
14     Q.  Do you have any illnesses that would prevent you
15  from testifying truthfully today?
16     A.  I didn't know there was such a thing.
17         No, sir.
18     Q.  And you understand that today you're testifying
19  in your personal capacity, correct?
20     A.  Don't know what the difference is, but I'm here.
21     Q.  Well, you've -- you've separately been designated
22  as a representative of Global Disaster to testify on
23  behalf of Global Disaster, correct?
24     A.  Well, I'm -- I'm sole owner of that, so there's
25  not anybody else that can testify but myself.

Page 11

BILLY BURKETTE

1
2     Q.  Okay.  But today's deposition is -- is about
3  Billy Burkette, personally.  We'll talk, obviously, about
4  Global Disaster.
5         But you're not testifying in your capacity
6  as Global Disaster itself; you're testifying as Billy
7  Burkette.  You understand that?
8     A.  No, sir, not really.  Don't understand the
9  difference.
10     Q.  Okay.
11     A.  Would you like to explain that to me?
12     Q.  So today you're just asking -- asking questions,
13  and we ask that you answer them based on your personal
14  knowledge as Mr. Burkette.  Separately, there is a
15  requirement under the rules that if a company is asked to
16  testify, that a representative be designated on the
17  company's behalf to, kind of, speak as the company and be
18  educated on the topics for which the company was asked to
19  provide a deposition for.
20         So tomorrow's deposition will be more, kind
21  of, in your -- in your capacity as a representative of
22  Global Disaster.  Today's deposition is -- we are asking
23  Billy Burkette questions about what Billy Burkette knows
24  and -- and doesn't know.
25     A.  Okay.  So do -- is there an anticipation that

Page 12

BILLY BURKETTE

1
2  there will be different answers as a representative as --
3  versus myself?
4     Q.  That's -- only -- I -- only you could -- could
5  tell us that, especially if --
6     A.  Well, no, I'm -- I'm asking -- I'm asking the
7  question, sir, because you said if I don't understand to
8  ask you.  Okay?  So I'm trying to understand your
9  position.
10         If -- if there is a Global Disaster rep- --
11  representative named Billy Burkette and I am a person
12  named Billy Burkette, is it your thought process that if
13  you ask me if gold -- if the color gold is gold, or if you
14  ask Global Disaster Recovery representative Billy Burkette
15  if the color gold is gold, would there be any other color,
16  other than gold, that you would suspect my answer to be?
17     Q.  I think if -- if -- if -- if the answers are
18  going to be the same in both capacities, that's okay.  We
19  are not expecting that an answer necessarily be different
20  or the same here --
21     A.  That's the part I'm confused about.  That's the
22  part I didn't understand.
23         So there would be no difference, in other
24  words?
25     Q.  Depending on the question, in theory, there could

Page 13

BILLY BURKETTE

1
2  be, but --
3     A.  So you don't know --
4     Q.  -- if there is no difference in your answer, then
5  -- then there's no difference, and you can say so.
6     A.  So we're talking about theory, or are we talking
7  about facts?
8     Q.  We're talking about facts.
9     A.  Okay.  Well --
10     Q.  If I ask you a question toady --
11     A.  -- you said "theory."
12     Q.  If I ask you a question today and you answer it
13  and then I ask you a question tomorrow and you say, "I
14  have answered that; it's the same -- same answer, nothing
15  different," that's perfectly okay.
16         If you have something on behalf of the
17  Company that you're educated on that you'd like to say --
18  that, you know -- you -- you say that's different than
19  what you said yesterday, we can explore that too.  There's
20  -- there's no rule or requirement one way or the other.
21     A.  All right.
22     Q.  It's just answer the question truthfully and in
23  the capacity that you're presented.
24         MR. KLAR:  Can the court reporter please
25  mark Tab 1 as the first exhibit.  And I'll send it over

BILLY BURKETTE

1
2 the chat.
3          Did you receive that, Mrs. Behan?
4          THE WITNESS:  Did I?
5          THE STENOGRAPHIC REPORTER:  Yes, I have it.
6          (Exhibit 1 was marked for identification.)
7 BY MR. KLAR:
8     Q.  Mr. Burkette, did you get a copy of that?
9     A.  I got something.  You got to forgive me.  I'm not
10 a Zoom person.  Okay?
11    Q.  Understood.  We'll work together today.
12    A.  Yes, I have that.
13    Q.  Are -- are you able to open it?
14    A.  Tab 01.  Well, it's asking me to save it.  Click
15 to open.
16          All right.  It says here something from
17 2016.  Is that what I'm looking at?
18    Q.  Yeah.  It has a big "Sealed," kind of, stamped on
19 it?
20    A.  Yes, sir, I see that.
21    Q.  Okay.  Could you, please, turn to the fourth page
22 of that PDF?  At the top, it should say, "Full and Final
23 Release, Settlement, and Covenant Not to Sue."
24    A.  It should say -- what page?
25    Q.  The fourth page is a PDF.

BILLY BURKETTE

2     A.  Okay.
3     Q.  You see where it says, "Full and Final Release,
4 Settlement, and Covenant Not to Sue"?
5     A.  Yes, sir, I see that.
6     Q.  Okay.  And if you look in paragraph 1(d), it
7 says, "'Claimant' shall mean A-1 Towing & Hauling, LLC,
8 individually, and the Claimant's Related Parties"?
9     A.  Yes, sir, I see that.
10    Q.  Okay.  Do you recognize this document?
11    A.  No, sir, I do not.
12    Q.  Okay.  Could you please turn to page 13 of the
13 PDF.  It's a signature page.
14    A.  Is that on -- is that on the page with the bank
15 wire?
16    Q.  Scroll two pages past that.
17    A.  All right.
18    Q.  Do you see a signature page there?
19    A.  I see it.  Yes, sir, I do.
20    Q.  Okay.  And if you look at the line that says,
21 "Claimant's Signatory and Title," it says, "Billy
22 Burkette, Owner," correct?
23    A.  Hold on just a second.  I need to go up -- I
24 passed it up a little bit.
25          Okay.  We are talking about A-1 Towing &

BILLY BURKETTE

1 Hauling, LLC; is that correct?
2
3     Q.  Correct.
4     A.  Okay.  So are we -- are you deposing me on behalf
5 of A-1 Towing & Hauling, LLC, or are we talking about
6 Global Disaster?
7     Q.  We're talking about Global Disaster.
8          But I'm -- I'm asking you:  In your personal
9 capacity, you signed this document as the owner of A-1
10 Towing, correct?
11    A.  I own both, yes, sir, and, yes, sir, I signed --
12 yes, I signed it.
13    Q.  Okay.
14    A.  So what you're basically trying to say is -- is
15 that because --
16          MR. NEWELL:  Billy -- Billy, let him ask
17 questions and answer the question.
18          THE WITNESS:  Okay.
19 BY MR. KLAR:
20    Q.  What was your relationship to A-1 Towing at the
21 time you signed the document?
22    A.  Owner.
23    Q.  Okay.  So you had the sole decision-making
24 authority for A-1 Towing as the owner, correct?
25    A.  Correct.

BILLY BURKETTE

2     Q.  Okay.  At the time you entered into this -- at
3 the time you signed this document on July 13, 2016, what
4 was your affiliation with Global Disaster?
5     A.  The same, owner.
6     Q.  So A-1 Towing and Global Disaster were both under
7 your control as owner at the time you signed this -- this
8 document, correct?
9     A.  Well, that's kind of a weird question, sir.
10 Would -- you're asking my understanding of something, so I
11 would like to explain that, if I may.
12    Q.  You can answer the question.
13    A.  Okay.  So my -- my understanding is the state
14 law, as well as the federal law, separates two -- two
15 companies by the division of their EIN and their tax ID
16 number and your secretary of state for the filings in
17 which you opened that business.
18          So there are two separate companies, and my
19 understanding, at that time, was that they are not related
20 businesses.
21    Q.  Okay.  A-1 Towing and Global Disaster were, while
22 separate businesses, under your control as the owner of
23 each of those at the time you signed this document,
24 correct?
25    A.  I believe so.  To the best of my knowledge, yes.

BILLY BURKETTE

1
2    Q.  Okay.  And I believe you said A-1 Towing and
3  Global Disaster, you don't believe they are affiliated
4  entities?
5    A.  At that time, the question that I asked of BP
6  during that settlement offer was, "If I sign this, does it
7  impact Global Disaster's claim any at all?"  And the
8  neutrals told us, "No."  So it was my understanding that,
9  no, they were not the same.
10    Q.  And you had those discussions directly with the
11  neutrals?
12    A.  Via my attorney, yes.
13    Q.  Okay.  So you don't have any personal knowledge
14  of what the neutrals actually told you that -- told your
15  attorneys, correct?
16    A.  I mean, other than I asked that very specific
17  question, were they going to be separate or the same.  And
18  the neutrals said they would be separate.
19    Q.  Did you read the -- the release before you signed
20  it?
21    A.  I did.
22    Q.  Did you understand it when you signed it?
23    A.  No, sir, I -- I did not understand it -- your
24  position of they are the same company.
25    Q.  I'm not saying -- I'm not saying --

BILLY BURKETTE

1
2    A.  Under the same control, I'm sorry.
3    Q.  Did you understand the document when you read it?
4    A.  I did not understand it to mean what you are
5  saying it means.
6    Q.  Did you understand the words of the document when
7  you read it?
8    A.  No.
9    Q.  Can you turn to paragraph 10 of the document?
10  It's on the page marked 6 -- page 6.
11    A.  Which section?
12    Q.  Paragraph 10, on page 6.
13    A.  All right.
14    Q.  You see where it says, "By executing this Release
15  Agreement, Claimant warrants that it has read and
16  understood the terms of the Release Agreement and that it
17  executes the Release Agreement voluntarily and without
18  being pressured, influenced by or relying on any statement
19  or representation made by any person acting on behalf of
20  any BP Entity or other released parties."
21        Did I read that correctly?
22    A.  You read it correctly, yes, sir.
23    Q.  Okay.  So paragraph 10 says by signing this, you
24  read and understood the terms of this Release Agreement,
25  correct?

BILLY BURKETTE

1
2        MR. NEWELL:  Objection, form.
3        THE WITNESS:  I mean -- could you repeat
4  your question, please?
5  BY MR. KLAR:
6    Q.  When you signed this document, you agree that,
7  pursuant to paragraph 10, that you were certifying that
8  you read and understood the terms of the Release
9  Agreement, correct?
10    A.  I -- I read and understood them to mean, I guess,
11  that A-1 is separate from Global, yes.  That's the way I
12  understood that to mean, yes.
13    Q.  And you said that your understanding is based on
14  representations that you claim the neutrals made to you,
15  correct, or to your attorney?
16    A.  Well -- so there were a couple of factors -- let
17  me -- I can't see you anymore.  Let me minimize this.
18  There we go.
19        So there were a couple of factors in that.
20  The -- the factors were that there is -- has been a
21  longstanding court case that's been going on that both of
22  my businesses, as well as my personal financial
23  responsibilities, have been impacted so greatly that I
24  felt forced into accepting this because not only the way
25  that BP postured it, but also the way that the Courts

BILLY BURKETTE

1
2  postured it.  So it was either, "You take this, or you
3  won't get anything."  It was basically threatened to me
4  that way.
5        And the judge read this as well, so I'm
6  assuming that, you know, the judge would interpret it the
7  same way that I would interpret it or anybody would
8  interpret it, that they're obviously two separate
9  companies, and it is by far better for you to take this
10  little pittance right now, is the first avenue.
11        Now, the second thing that was a factor of
12  that is that because of BP's stagnating this in the court
13  system and dragging it out, here we are, what, 11 years
14  later just now having depositions, I felt like that I was
15  forced into accepting that and not as clearly as you so
16  read it.  There were different -- there were different
17  factors.
18    Q.  At the time that you signed the document, you
19  didn't tell anybody that you didn't understand it,
20  correct?
21    A.  At the time that I signed the document, I told
22  everybody that I understood it to mean that Global
23  Disaster was separate from BP -- I mean was separate from
24  A-1.
25    Q.  Okay.  At the time that you signed this document,

Page 22

BILLY BURKETTE

1
2 you didn't ask that any terms of the document be revised
3 to reflect your understanding, correct?
4       A.  No, sir, because they were in agreement with my
5 understanding that they were separate companies.  There
6 were no --
7       Q.  Who was in agreement with that?
8       A.  Everybody.
9       Q.  What is that based on?  What --
10      A.  That is based on conversation between neutrals,
11 myself, BP's attorneys, my attorneys, everybody.
12      Q.  Okay.  Other than your attorneys, did you have
13 any conversations with anybody else regarding the terms of
14 this release?
15      A.  Yes -- oh, I don't know about that.  I don't
16 know -- you'll have to ask my attorney that.  I don't
17 remember, because we had so many phone calls with neutrals
18 and mediums and -- and mediations and, man, it was -- it's
19 like I said, it's so convoluted, it -- you know, you
20 almost have to have a white board, a timeline to follow
21 all of the -- the stuff that went on.
22      Q.  Sitting here today, when you reviewed and signed
23 this document, did you have -- did you have any
24 discussions with anyone, besides your attorney, about the
25 terms of this agreement?

Page 23

BILLY BURKETTE

1
2       A.  Prior to my signing this document, best of my
3 recollection -- and you can correct me if I'm wrong with
4 this, Eric -- it was sent to me, e-mail and hardcopy.  I
5 was asked to read it, and if I had any questions about it,
6 to call and that they would get clarification.
7            So, obviously, the question was:  Is this
8 two separate companies, or is this all one company?  And
9 will -- me taking -- because that was my only question,
10 really, becau- -- that had the largest concern:  If I
11 accept this little punky 200,000 -- $250,000, will it
12 impact or have any impact at all on my Global Disaster
13 claim?  Their response to me was, "We don't think so, but
14 we will clarify."
15           So a couple of days had gone by, and I
16 called them back, and I said, "Look, I'm trying to find
17 out what's going on, because, you know, if I need to -- to
18 change or do something."  They said, "No, we have
19 clarified with the neutrals and with the" -- there was
20 somebody -- another judge or something that verified that
21 these were two separate companies and two separate claims
22 prior to me ever signing that document.
23      Q.  Did you take any steps to make sure that the
24 terms of the document, the words in the actual document,
25 reflect the understanding that you just conveyed to me

Page 24

BILLY BURKETTE

1
2 today?
3       A.  I -- I think that it is reflective of that today.
4       Q.  How long in between when you received -- first
5 received a copy of this agreement did you sign the
6 agreement?
7       A.  I don't know.  I would have to go back and look.
8       Q.  Do you recall, like -- like a range?  Was it a
9 week?  Was it a day?  More than that?
10      A.  I honestly don't recall exactly, but it was more
11 than -- it was more than just a day.
12      Q.  Okay.
13      A.  What was the date that I signed that?
14      Q.  July 13th, 2016.
15      A.  All right.  And what was the day it was prepared?
16      Q.  I don't know based on looking at the document.
17      A.  Well, I was looking for a date.  Usually, the
18 Court puts -- there it is, April 20th.  So, I mean, you
19 are talking about two months later.  I would think that
20 would probably be about fair for the speed in which this
21 thing has been going on.  That's pretty norm.  So, yes, it
22 was two months lapsed between the date that I would even
23 have been able to get it and when I signed it.
24      Q.  During those two months, presumably -- is that
25 the time period in which you claim to have had, whether

Page 25

BILLY BURKETTE

1
2 they were conversations with your attorney or
3 conversations with the neutrals regarding what your
4 understanding was of the terms of the agreement?
5       A.  Yes, sir, I believe that is correct.  I'm not
6 100 percent positive of that, but I believe that is
7 correct.  That's when I had the con- -- so I could not
8 have had a conversation prior to this document existing,
9 right?
10      Q.  You tell me.
11      A.  Well, I'm -- I mean, I'm going by the best I can
12 do memory-wise, so "I don't know" is my answer.  I cannot
13 recall.
14      Q.  During the -- the time from when you received the
15 document to the time that it was signed, do you recall
16 requesting any changes to the language of the document
17 itself?
18      A.  I'm not so sure that it was necessary because I
19 believe everybody understood that it was two separate
20 companies.
21      Q.  So -- so is that no, you didn't request any
22 language changes be made?
23      A.  I don't remember, sir.
24      Q.  Can you look at paragraph 1(e)?
25      A.  What page might that be on?

Page 26

```
                    BILLY BURKETTE
1
2        Q.  It's page 1 of the -- the Release Agreement,
3   page 4 of the PDF.
4        A.  E?
5        Q.  E, 1(e).
6        A.  Okay.  All right.
7        Q.  Do you recall requesting any changes be made to
8   that paragraph?
9        A.  Let's see.  I don't remember this paragraph, so I
10  need to read it.  Hold on just a moment, please.
11           "Claimant's related parties..."
12           Okay.  Can I ask a question right here?  Is
13  there a definition in -- within this documentation that is
14  different or that gives a definition of related parties?
15       Q.  (No response.)
16       A.  Because if -- I'm reading from D, which is right
17  above E, just so I understand, because you're picking this
18  thing apart and asking different paragraphs here and
19  different paragraphs there, and I'm trying to follow to
20  the best of my ability.
21           But it says, "'Claimant' meaning A-1 Towing
22  & Hauling, individually, and claimant's related parties."
23  So if I'm understanding your question correctly -- correct
24  me if I'm wrong -- it is A-1 Towing & Hauling, LLC and any
25  and all parties that A-1 Towing & Hauling, LLC would own,
```

Page 27

```
                    BILLY BURKETTE
1
2   it says, "individually or in claimant's related parties."
3   So claimant is A-1 Towing.  So claimant's related parties,
4   so A-1 Towing's ownership of something else is the way
5   that I understand that.
6           And then it says, "Claimant's related party
7   shall mean Claimant's affiliates, corporate" -- so
8   "Claimant's" meaning A-1 Towing.  So it means A-1 Towing's
9   "affiliates, corporate parents, subsidiaries,
10  predecessors, successors, indemnitors, subrogees, assigns,
11  officers, directors, employees, agents, representatives,
12  trustees, insurers, reinsurers, heirs, beneficiaries,
13  estates, executors, administrators, receivers,
14  conservatories, personal representatives, and any natural
15  legal, or juridical person, or entity entitled or
16  empowered to assert any claim on behalf or in respect of
17  A-1 Towing & Hauling, LLC, including A-1 Towing & Hauling,
18  LLC as a natural person, any spouse of the A-1 Towing &
19  Hauling, LLC and if A-1 Towing & Hauling is a sole
20  proprietorship in the spouse of Claimant's proprietor."  I
21  don't understand the spouse -- I guess that would be A-1's
22  married to somebody.  I'm not sure I understand that.
23           But, okay.  So what's the question about
24  that now?
25  BY MR. KLAR:
```

Page 28

```
                    BILLY BURKETTE
1
2        Q.  The question is -- just stepping back.
3           From the time that you -- sitting here
4   today, from the time that you received a copy of this
5   document and signed it, do you recall requesting that any
6   specific changes be made to any specific language of this
7   agreement?
8        A.  I recall asking if it was necessary and was told
9   no, because they were separate companies.  That's what I
10  recall.
11       Q.  So, no, you didn't request that any changes be
12  made to this document?
13       A.  Well, that's not true.  No, sir, that's -- that's
14  not true.
15           I asked if it was necessary because of there
16  being two companies and two claims, that they would not be
17  intertwined, and I was told by BP and the neutrals and my
18  attorney, through those discussions, that it was not
19  necessary to change any language because they were
20  separate corporations, companies, and separate claimants.
21  They were separate claims.
22       Q.  So no changes were ultimately made after you --
23  no changes were made, whether you asked or not, no changes
24  were made to the best of your knowledge sitting here
25  today?
```

Page 29

```
                    BILLY BURKETTE
1
2        A.  To the best of my knowledge, that is correct.
3        Q.  Okay.  And earlier you indicated that you -- that
4   was one of the reasons that you signed it was that you
5   understood that it would not impact Global Disaster.
6   That's what you said, right?
7        A.  Correct.
8        Q.  And another -- and another reason why you
9   ultimately signed this particular document is because you
10  felt forced, right?  I think those were your words.
11       A.  I felt BP forced me, yes, those are my words.
12       Q.  Okay.  Are there any other reasons why you were
13  -- you felt that you were comfortable with or needed to
14  sign this document besides an understanding that it
15  wouldn't impact Global Disaster and feeling forced?
16       A.  Yes, sir, there was.  The confidence level which
17  I had in the case being able to move forward from the
18  court system and BP impacted my decision as well.
19       Q.  Okay.  Other than your confidence level and
20  feeling forced and your understanding of the agreement,
21  there weren't any other factors that you considered in
22  deciding to sign this agreement, correct?
23       A.  Not that I can think of at this particular time.
24       Q.  Okay.  All right.  Okay.  So earlier you
25  testified that you are the owner of Global Disaster,
```

Page 30

BILLY BURKETTE

1
2 correct?
3     A.  Correct.
4     Q.  And are you the sole owner?
5     A.  Correct.
6     Q.  And has that always been the case?
7     A.  Best of my knowledge, yes, sir.
8     Q.  Okay.  Other than owner, have you had any other
9 roles with respect to Global Disaster?
10     A.  I'm not sure I understand that question, sir.
11     Q.  I'll ask it differently.
12         Are you the sole employee of Global
13 Disaster?
14     A.  No, sir.
15     Q.  Who are the --
16     A.  I'm not an employee.  I was the owner.
17     Q.  Does Global Disaster have employees?
18     A.  They did until the -- until BP put us out of
19 business.
20     Q.  Okay.  When -- at the time of the spill, how many
21 employees did Global Disaster have?
22     A.  I do not recall, sir.
23     Q.  Do you recall, was it less than ten?  Less than
24 50?  Is there a range you could give?
25     A.  I'm sure -- no, sir, I honestly -- at that time,

Page 31

BILLY BURKETTE

1
2 I honestly cannot remember that far back.
3     Q.  Just to clarify:  At the time of the spill, you
4 were the 100 percent owner of the company, though,
5 correct?
6     A.  Best of my knowledge, yes, sir.
7     Q.  Okay.  Does Global Disaster have, like, a board
8 of directors or anything like that, or are you kind of the
9 sole decision-maker for Global Disaster?
10     A.  It is -- I guess you would say that I'm kind of
11 the sole decision-make- -- I mean, I wouldn't say I'm sole
12 decider, but at the end of the day, I am solely
13 responsible.
14     Q.  Who else at the company would you say, you know,
15 shares decision-making authority?
16     A.  Oh, well, at that time, it probably would have
17 been a lot of people because we were asking, you know, for
18 a multitude of wisdom.  So we asked a lot of people to
19 help decide those factors.  We -- we had meetings with the
20 governor.  We had meetings with congressmen.  We had
21 meetings with the sector commander, Mr. -- Captain
22 Stanton.  We had meetings with BP.  We had a lot of
23 meetings with a lot of people to help make the decision
24 for, you know, response and recovery to this operation so
25 that we would have, you know, obviously, the -- the best

Page 32

BILLY BURKETTE

1
2 move forward from a response standpoint.
3     Q.  Understood.
4         So I'm asking specifically about
5 decision-making authority within Global Disaster itself,
6 recognizing you may have discussions with external parties
7 about what a course of action is that you want to take.
8 When it comes to making a decision for Global Disaster,
9 you --
10     A.  I mean, that's me --
11     Q.  Okay.
12     A.  I'm sorry.  I didn't mean to speak over you.
13     Q.  No.  No.  Understood.
14         To confirm, has Global Disaster ever done
15 business under any other name?
16     A.  No, sir, not that I -- not that I'm aware of.
17     Q.  Does Global Disaster have a parent company?
18     A.  Not that I'm aware of, no, sir.
19     Q.  Does Global Disaster have any subsidiaries?
20     A.  No, sir, not that I'm aware of.
21     Q.  Is Global Disaster an affiliate of any other
22 companies?
23     A.  Not that I'm aware of.
24     Q.  Okay.  At the time of the spill, where was Global
25 Disaster headquartered?

Page 33

BILLY BURKETTE

1
2     A.  I guess you would say out of my truck, because we
3 were in the process of moving from one office to a
4 different office for A-1, and primarily, I was working out
5 of my truck and looking for an office space in New
6 Orleans, and that's where I finally came to the Port.  We
7 were looking for an office right around the Port there in
8 New Orleans, because that's where the rock was that we
9 were crushing, that Global Disaster had the contract to
10 crush, and as I was looking for that, that's when BP came
11 in and closed the Port down and made us evacuate.
12         So I really didn't have time to set up a --
13 a actual office in New Orleans at that time, and BP forced
14 me out of the Port, and, you know, basically shut my
15 business down.
16     Q.  Which -- which port are you referring to?
17     A.  I'm -- what do you mean which part?
18     Q.  Which port?
19     A.  Oh, it's in St. Bernard Parish.  It's St. Bernard
20 Port.
21     Q.  Okay.  And you -- you said that you were in the
22 process of moving from one office to another and you were
23 looking for office space in New Orleans before you
24 ultimately reached the Port.
25         What time period was that occurring in,

BILLY BURKETTE

1
2  approximately?
3      A.  So we had this contract.  I had been working on
4  this contract with Airware for -- so I'm going back in
5  memory.  They started piling the rock in '08.  We started
6  in '09 with design and a plan for crushing and
7  facilitating with the State and the oysters -- through
8  Wildlife and Fisheries to have the samples done.
9          Okay.  So I would -- I would say a couple of
10  months prior to the execution of the contract, when we --
11  not -- when I say "we," I'm speaking of Global Disaster --
12  when Global Disaster was in the Port and looking around
13  the Port for office space is about a couple of months
14  prior to execution of that contract.  Then at the same
15  time, because I was down there, we, being Global Disaster,
16  were not fruitful in finding our office space, whatever
17  you want to call it.
18          So I was negotiating the hauling portion of
19  the rock from the demolition of Katrina houses, and as I
20  was eating lunch with somebody, another man came over from
21  Phillips and Jordan, I think it was, and asked me how many
22  dump trucks I owned.  And I said, "Well, my company, A-1,
23  has 7 and we have contracted with 35.  He said, "Would you
24  like to do some levee work?"  I said, "Well, we can see,"
25  I said, "but right now I'm busy.  Can I call you later."

BILLY BURKETTE

1
2          So it ended up that A-1 started doing some
3  hauling in New Orleans, and they had a separate yard in
4  Slidell that A-1 was leasing that yard from.  Richie
5  Stephens was the man's name.  So I had a lease purchase
6  agreement for $205,000 for that yard.  It was a metal
7  building and -- I forget how many acres of land.
8          And that was -- that was the part that A-1
9  was moving from Baton Rouge to New Orleans or to Slidell
10  on Highway 90 to Richie Stephens' place.  At the same
11  time -- about the same time, because I don't want to say
12  exactly, is when BP came in and shut the yard down -- I
13  mean the Port down and said, "Everybody evacuate.  We --
14  it's a matter of national security," or some kind of crap
15  that they forced me out of the yard.
16      Q.  Okay.  So just stepping -- stepping back for a
17  second.  I want to break this up a little bit.
18          You mentioned a $250,000 lease purchase
19  agreement for the yard.  That was an agreement for A-1
20  Towing to lease the -- yard space for -- for their
21  hauling, correct?
22      A.  Correct.
23      Q.  Okay.
24      A.  And, actually, it was just a -- it was a small
25  shop, and it had vacant parking for A-1 to have the

BILLY BURKETTE

1
2  ability to park their trucks in order so that my drivers
3  did not have to drive all the way back to Baton Rouge
4  every day.
5      Q.  Okay.  So it wasn't a -- a lease that Global
6  Disaster was a party to, correct?
7      A.  Absolutely correct.
8      Q.  Okay.  So earlier, you mentioned you had been
9  working on a contract with Airware.  Airware started
10  piling rock in 2008, and you started designing a plan for
11  crushing, facilitating, moving that rock in 2009; is that
12  correct?
13      A.  No, sir.  What had happened was in -- after
14  Hurricane Katrina, there were -- in the recovery phase of
15  Katrina, there was about 4 million cubic yards of
16  demolition slabs that needed to be disposed of, and in
17  the -- you know, you have a hazardous mitigation plan, and
18  that plan was -- is pretty thorough as we could write it,
19  and it required certain things to be done to the concrete
20  prior to it being allowed to be moved.  That was part of
21  the reason that I was going into the disaster-recovery
22  business, is because the work that I had done previously
23  for the government as a -- train the trainer for
24  disaster-recovery business, I would teach classes to teach
25  people how to -- what the difference is between mitigation

BILLY BURKETTE

1
2  response, recovery, you know, the whole nine yards.
3          So anyway, I was trying to focus on the rock
4  moving.  Well, A-1 is the rock mover.  They moved slabs
5  from lower St. Bernard Parish, the Ninth Ward, they would
6  call it, over to the Port of St. Bernard.  This was
7  several hundred yards long and at least a 120-something
8  feet tall, so it was well over a million cubic yards of
9  slabs.  They did not have anybody that could crush it on
10  site, so I went to Airware and Airware was the one that
11  said, "Hey, if you can find a way to get a mobile-crushing
12  machine in here, we'll give you the contract."
13          So I put together the mobile-crushing --
14  it's -- it was really three or four parts.  You had to
15  screen, you had to remove the metal, you had to have a
16  scrap yard, you had to have front-end loaders, you had to
17  have, you know, excavators, with a live thumb to feed the
18  crusher.  I mean, it was a scaleable operation, and it
19  scaled under very, very rapidly.  So our first month that
20  we did, we crushed almost $210,000 worth of stone -- or
21  slabs.  And I think we were in the beginning phases of the
22  first month -- or at the end of the first month.  First --
23  first week or so of the second month is when BP came in
24  and shut the Port down and -- and made us remove.
25      Q.  So the -- the -- you said Airware told you -- no

Page 38

BILLY BURKETTE

1   one could crush rock on site and Airware told you if you
2   had a -- if you got a mobile-crushing unit, they would
3   give you the contract.
4        By "you," do you mean A-1 hauling or do you
5   mean Global Disaster or some other entity?
6        A.  Okay, Global Disaster.
7        Now, the reason that Airware even knew about
8   Global Disaster is because A-1 Towing & Hauling was
9   assisting to bring those slabs into the Port.
10       Q.  Okay.  Once A-1 Towing brought the slabs into the
11  Port, you're saying that Global Disaster was responsible
12  for crushing it?
13       A.  Correct.
14       Q.  And that's --
15       A.  Two separate businesses all together.
16       Q.  And that's pursuant to a contract that you signed
17  with Airware; is that correct?
18       A.  That is correct, yes, sir.
19       Q.  So talking about Airware, while we are on the
20  subject, so when did you -- when were you first contacted
21  by Airware?
22       A.  I don't recall, sir.
23       Q.  Do you recall, was it in 2008, 2009?  Do you have
24  a -- any range?
25

Page 39

BILLY BURKETTE

1        A.  Oh, it was in '8.  I'm -- I mean, that -- it
2   was -- 2008 is when we started, but --
3        Q.  And --
4        A.  Actually, it was at the end -- it was probably
5   closer to around Christmastime or Thanksgiving time of
6   '07, because I believe that's when A-1 started hauling the
7   slabs.  I would have to go back and look, sir.  "I'm not
8   sure" is my answer.
9        Q.  How long between -- did -- did -- sorry.  Step
10  back.
11       You mentioned that the concrete-crushing
12  business had multiple parts to the process, correct; there
13  was a screen, removing scrap and then loaders, excavators,
14  et cetera.  From -- did you start putting those pieces
15  together before or after Airware first contacted you in
16  2008?
17       A.  Oh, no, it was after.
18       Q.  Okay.  How long, from your first contact with
19  Airware, were you able to start your concrete-crushing --
20  or Global Disaster's concrete-crushing operation?
21       A.  Couple of weeks, I'm guessing.  Not sure, sir.
22       Q.  I'm sending Tab 27 to the group.
23       Can you open that when it gets to you,
24  Mr. Burkette?
25

Page 40

BILLY BURKETTE

1        A.  Yes, sir.
2        THE STENOGRAPHIC REPORTER:  Will this be
3   Exhibit 27, Mr. Klar?
4        MR. KLAR:  This will be, I guess, whatever
5   the next in line is, I guess that's --
6        THE STENOGRAPHIC REPORTER:  2.
7        MR. KLAR:  -- 2?
8        We can just mark them next in line.  We just
9   labeled them on our end, so we can keep them straight.
10       THE STENOGRAPHIC REPORTER:  Okay.  No
11  problem.
12       And, Mr. Burkette, while you're doing that,
13  just make sure to let him finish asking his question
14  before you begin answering.
15       THE WITNESS:  Yes, ma'am.
16       THE STENOGRAPHIC REPORTER:  It gets a little
17  tough on me when it's two people at one time.  Thank you.
18       THE WITNESS:  I'm sorry.
19       THE STENOGRAPHIC REPORTER:  It's okay.
20       (Exhibit 2 was marked for identification.)
21  BY MR. KLAR:
22       Q.  Mr. Burkette, can you -- were you able to open
23  that document?
24       A.  Yes, sir.

Page 41

BILLY BURKETTE

1        Q.  Do you recognize this document?
2        A.  I do.
3        Q.  Is this the agreement with Airware that we were
4   just referring to?
5        A.  Yes, sir.
6        Q.  And it is dated June 28, 2010, between Airware
7   and Global Disaster; is that correct?
8        A.  That's what the date says, yes, sir.
9        Q.  And on the last page of the document, that's your
10  signature, correct?
11       A.  Yes, sir.
12       Q.  Okay.  And is this the only contract that you
13  entered into between Global Disaster and Airware?
14       A.  Yes, sir -- well, you know, I -- I don't want to
15  say "the only," because we had several verbal agreement
16  contracts prior to executing that one.
17       Q.  Okay.  What -- what verbal agreements did you
18  have?
19       A.  Well, like I just told you, setting up, finding a
20  way to make that mobile-crushing operation, finding areas
21  for the scrap -- trying to locate scrap dealers, trying to
22  set up a contract with -- which ultimately became my
23  responsibility, because Airware did not want the
24  responsibility of the scrap removal.  Then it took

BILLY BURKETTE

1
2 probably six months to get the deal with the Port for us
3 to even start putting the rock there in '08.  I don't
4 know.  It was just a bunch of different things.
5      Q.  Okay.  What -- what of those, though, were the --
6 are the verbal agreements with Airware?
7      A.  That we would do the crushing of the concrete.
8      Q.  So everything that you just described are the
9 steps that Global Disaster had to take in order to perform
10 under the eventual agreement that you signed with Airware,
11 correct?
12      A.  That's a portion of some of the steps.  That's
13 not all of the steps, yes, sir.
14      Q.  When did -- okay.  So in 2008, when you first had
15 discussions with Airware, can you describe to me the --
16 the steps that you took to get ready -- strike that.
17          Other than the verbal -- other than this
18 written document with Airware that you're looking at, did
19 you have an agreement with Airware on any other payment
20 terms for work that Global Disaster would perform?
21      A.  I'm sorry.  Say it -- repeat the question.
22      Q.  Before signing this agreement, was Airware
23 obligated to pay Global Disaster anything for concrete
24 crushing?
25      A.  Yes, sir.  We originally had a price of $14.50

BILLY BURKETTE

1
2 per cubic yard.
3      Q.  Okay.  And that's reflected verbally?
4      A.  Yes.
5      Q.  With who did you -- who was your main
6 contact at Airware?
7      A.  Terry Williams.
8      Q.  I'm sorry.  Harry --
9      A.  Terry, T-E-R-R-Y.
10      Q.  And is he the person you first talked to when you
11 had your first contact with Airware in 2008?
12      A.  Yes.
13      Q.  Okay.  When you first met, what -- what did you
14 talk about?
15      A.  Well, when we first met, we talked about the huge
16 pile of rock down there in the Port and how it was growing
17 every day, and he asked if I would send a couple of people
18 with excavators and a dozer to help manage that pile,
19 because it was so out of control, because you had every
20 trucking company down there bringing this rock/slabs into
21 this area and basically just dumping it.
22          So they had no way to manage the site.  So
23 we had to send people down and basically organize a route
24 to get the trucks up to a flat spot on top of the -- the
25 pile of rock, and then provide a turnaround and a dumping

BILLY BURKETTE

1
2 area on top of this pile of rock and manage that so that
3 the daily intake could continue to come in.  That went on
4 for over a year.
5      Q.  Okay.  So can you -- earlier you testified that
6 after your first discussion with Airware, it took you a
7 few weeks to have the mobile-crushing operation set up,
8 correct?
9      A.  After we -- yes, sir, after -- after we went to
10 the Port and to the oyster fishermen and to Wildlife and
11 Fisheries and to the State of Louisiana for the -- what
12 was Mike's -- as part of the recovery package under
13 Jindal.
14          Anyway, there was a couple of places we had
15 to visit that had to give, I guess, approval for that to
16 be done.  So I'm thinking that that took a couple of
17 weeks, yes.  Now, that's way after the fact of -- you've
18 referred to the date of the contract is when we actually
19 started that process.  So we -- understand, we had been
20 doing work there prior to the signing of the contract
21 because we had verbal agreements.
22      Q.  So you said the couple of weeks that you are
23 referring to, the date of the contract is when you
24 actually started the process.
25          So I just want to make sure I understand.

BILLY BURKETTE

1
2 The date of this contract is June 28th, 2010.  Are you
3 saying that once you signed this document, that's when you
4 started the process of going to the Port, going to the
5 State, going to the oyster organizations, et cetera?
6      A.  No, sir.
7      Q.  Okay.
8      A.  What I'm saying is --
9      Q.  Can you give me a timeline --
10      A.  I'm sorry?
11      Q.  Go ahead.
12      A.  What I'm saying is, we had been down there moving
13 rock and managing the pile for Airware.  Okay?  In order
14 for me to set up a half-a-million-dollar piece of
15 equipment to screen out the copper, the metal, the brass,
16 all of the things, and a $4 million piece of equipment to
17 crush the actual slabs, when I went to -- to lease that
18 equipment, the leasing company, being Doggett, told me
19 that they would not lease it without a contract.  So I
20 went to Airware and said, "Hey, Terry, we got to have a
21 contract in order for me to get the equipment."
22 BY MR. KLAR:
23      Q.  Okay.  And that's why you entered into this
24 contract?
25      A.  Absolutely.

Page 46

BILLY BURKETTE

1
2     Q.  Okay.  At the time you entered into this
3  contract, it was over two months after the spill had
4  occurred, correct?
5     A.  That is absolutely my best guesstimate, yes.
6     Q.  Okay.  And you understood the spill potentially
7  could impact businesses in that area, correct, in the area
8  of the Port?
9     A.  No.
10    Q.  At the time you entered into the contract with
11 Airware, you had no understanding or information the spill
12 might impact business in the Port?
13    A.  Well, no, sir, because the president said it
14 wouldn't.
15    Q.  That wasn't based on any of your own
16 investigation or anything.  It's what the president of
17 Airware said?
18    A.  No, not the president of Airware, the president
19 of the United States.
20    Q.  The president of the United States said that the
21 spill would have no impact on the Port of St. Bernard?
22    A.  And -- not just the Port of St. Bernard, but any
23 of the ports, and BP's head people said that it would not
24 impact us.  Don't you remember BP saying, "Oh, it's
25 nothing, it's just a mild spill.  It wouldn't impact

Page 47

BILLY BURKETTE

1
2  anything."  Don't you -- you must have seen the news
3  like it was down here.
4     Q.  Okay.  If you can turn to paragraph 4 of the
5  agreement.
6     A.  Okay.
7     Q.  This is scope of work and related data.  Does
8  this paragraph accurately reflect the scope of work that
9  Airware contracted Global Disaster to perform?
10    A.  "The extent and scope of work and other agreement
11 documents is that the contractor furnishes all labor and
12 materials, equipment and supervision necessary to crush
13 the stockpile concrete into road-based material, commonly
14 known as recycled concrete aggregate, herein referred to
15 as 'work.'  Unless specifically noted otherwise, the
16 contractor shall do all the work described in the contract
17 documents and in all incidental work necessary to complete
18 the work entirely ready for use."
19    Q.  Does that accurately describe the scope of work
20 they were contracting you to perform?
21    A.  That accurately -- I think that's what I just
22 spent the last half hour explaining to you.  Yes.
23    Q.  Okay.  Before -- okay.  If you could turn to the
24 next paragraph where it says, "The total authorized amount
25 is 950 per ton."

Page 48

BILLY BURKETTE

1
2          Does that accurately reflect -- that changes
3  the verbal agreement that you had with Airware before
4  entering into this agreement, correct?
5     A.  It does.
6     Q.  Okay.  That -- you -- 950 is the -- is the
7  contracted-to term, correct?
8     A.  Yes, sir.
9     Q.  Okay.  Before entering into this contract, had
10 Airware made any payments to you on account of any work
11 that Global Disaster had done?
12    A.  Don't recall.
13    Q.  Okay.  After entering into this -- or sorry.
14 Stepping back.
15          If you take a look at paragraph 5, the last
16 sentence, it says, "At the end of each week, the
17 contractor shall submit an invoice with the supporting
18 documentation of all work completed for the finance
19 department for payment."
20          Did I read that correctly?
21    A.  I believe so.
22    Q.  Okay.  Did Global Disaster ever submit any
23 invoices to Airware with supporting documentation for
24 payment to Airware's finance department?
25    A.  Yes, sir, we did.

Page 49

BILLY BURKETTE

1
2     Q.  Okay.  How -- how much in invoices were
3  submitted?
4     A.  The first week was 250 or 280,000, and -- and
5  Airware didn't have the money to pay it, because they,
6  too, were impacted by BP, and the -- the story that was
7  told to me, which I cannot confirm nor deny -- just
8  telling you what I was told -- by Terry Williams is, is
9  that BP basically impacted his business to where he was
10 unable to cover his cost by this contractual agreement.
11    Q.  Okay.  So after that first week's invoice was
12 submitted, were any other invoices submitted to Airware?
13    A.  Yes, the next week was, and the next week was.  I
14 think we did a full month, if I'm not mistaken.
15    Q.  Do you recall for how much?
16    A.  No, sir, I do not.
17    Q.  Was it -- do you recall if it would be more or
18 less than what the first week was, 250 to 280,000?
19    A.  Oh, I'm sure it would have been more.
20          So then, because of BP's response to the
21 spill, we were approached by Captain Stanton of the -- who
22 was the sector commander of the Gulf, and Captain Stanton
23 asked what we were going to utilize that rock for.  I
24 guess they needed some somewhere.  Don't really know how
25 or what BP would have -- would have wanted to do with that

Page 50

BILLY BURKETTE

1
2 rock, but when the conversation that I had with him was
3 that once we crushed it to a small stone, that it was my
4 plan, being Global Disaster's plan, to sell it to Robin
5 Seafood.
6         So Dan Robin's Seafood is friends with
7 Richie Stephens who A-1 was -- had the lease purchase with
8 is how I got introduced into Dan.  So Mr. Richie Stephens
9 introduced me to Dan.  Dan said, "Hey, if -- if you can
10 get the State of Louisiana to approve that crushed
11 concrete and the size of that crushed concrete, then I
12 will buy everything you've got at $45 a ton."
13     Q.  When -- so when did this conversation take place?
14     A.  I don't recall, sir.  Sometime in that time
15 frame, around 2010.
16     Q.  Okay.  It was after the spill, after the Airware
17 contract was signed, right?
18     A.  Yes.
19     Q.  Okay.  Did any -- did you ever enter into any
20 agreement reflecting that?
21     A.  Yes, sir, and y'all have a copy of that.
22     Q.  Which contract is that?
23     A.  The one with Robin Seafood.
24     Q.  Okay.  I don't believe we have a copy of that
25 contract.

Page 51

BILLY BURKETTE

1
2     A.  It was in the A-1 documents because A-1 was going
3 to do the hauling.
4     Q.  But you're saying in the A-1 documents there's a
5 contract between Global Disaster and Robin Seafood?
6     A.  Nope.  What I said was Richie Stephens came to
7 find out that I was the one crushing the rock.  He said if
8 I could get it approved, that he would buy everything that
9 there was at $45 a ton.  So A-1 would haul it after the
10 Global Disaster crushed it.
11     Q.  Okay.  So the contract was between A-1 or -- and
12 Robin Seafood, not Global Disaster?
13     A.  Correct.
14     Q.  Okay.  So you're not claiming damages -- Global
15 Disaster is not claiming damages from BP for anything
16 related to the Robin Seafood contract?
17     A.  Absolutely, I am.
18     Q.  Okay.  What -- what are you claiming with respect
19 to the Robin Seafood contract for or on behalf of Global
20 Disaster?
21     A.  BP -- BP forced me out of the Port so I couldn't
22 crush it so I couldn't sell it to Dan Robin.  Surely, you
23 can see that, right?
24     Q.  A-1 Towing had a contract with Dan Robin, not
25 Global Disaster?

Page 52

BILLY BURKETTE

1
2     A.  I'm sorry?
3     Q.  A-1 Towing had a contract with Dan Robin to sell
4 the concrete, not Global Disaster, correct?
5     A.  I'm sorry.  I misunderstood your question.  Did
6 you ask me if Global Disaster was making a claim against
7 BP because of the rock not being able to be sold to Dan
8 Robin.  Is that what your question was?
9     Q.  Yes.
10     A.  Okay.  Then, yes, my answer is yes.
11     Q.  Okay.  What is that based on?  Because the
12 contract was between A-1 and Robin Seafood, correct?
13     A.  Correct.
14     Q.  Okay.  So how is Global Disaster impacted by A-1
15 Towing's agreement with Robin Seafood not being able to
16 carried -- carried through?
17     A.  Well, it was impacted because BP forced me out of
18 the Port.  I'm not so sure my mic is working.  Can you
19 hear me?
20     Q.  I can hear you.
21     A.  Okay.  Well, I've said that twice.  I just didn't
22 understand.
23     Q.  Okay.  You said BP forced you out of the Port?
24     A.  Yeah.
25     Q.  Global -- Robin Seafood had no obligation to

Page 53

BILLY BURKETTE

1
2 purchase any concrete from Global Disaster, correct?
3     A.  I wouldn't -- no, sir, I wouldn't say that was
4 correct.
5     Q.  Why not?
6     A.  Depends on how your view is.  If I own both
7 companies -- if I own both companies and choose to
8 separate the job description because of the nature of the
9 work, it's --
10     Q.  The contract between Robin Seafood and A-1
11 Towing, Global Disaster was not a party to it, correct?
12     A.  You know, that's a very good question.  I would
13 think that since I own both that, yes, sir, I would be a
14 party to both.
15     Q.  Not you, Billy Burkette.  Global Disaster, was
16 Global Disaster a party to A-1 Towing and Robin Seafood
17 contract?
18     A.  I'm sorry.  I misunderstood again.  I thought you
19 said we were talking about me today, not Global Disaster.
20 That would be tomorrow.
21     Q.  We are talking about -- we are asking you
22 questions in your personal capacity, but if you have
23 knowledge about Global Disaster's operations and
24 relationships, you have to answer them.  So to your
25 knowledge --

BILLY BURKETTE

1
2     A.  It is my opinion that, yes, it is -- it was my
3  decision as owner of both companies that it was both
4  companies that were impacted, one versus the other.
5     Q.  But the contract between Robin's Seafood
6  and A-1 Towing, Global Disaster as the company, Global
7  Disaster, it was not a party to that contract, correct?
8  It was A-1's contract, right?
9     A.  Correct.
10    Q.  Okay.
11    A.  So they are separate, yes.
12    Q.  Under the terms of that contract, Robin Seafood
13 -- let's say if it had been performed, Robin Seafood,
14 under no circumstances, would owe money to Global
15 Disaster; they would owe it to A-1 Seafood [sic], correct?
16    A.  A-1 Towing.
17    Q.  I'm sorry.  A-1 Towing?
18    A.  That is correct.
19    Q.  Okay.
20    A.  But now -- but just for clarity, just so we're
21 clear, BP crushed the concrete and sold it to Robin
22 Seafood.  So again, ultimately, BP impacted Global
23 Disaster's ability to crush that rock, yes, sir.
24    Q.  Okay.  So can you walk me through how it came to
25 be that BP crushed the rock that was eventually sold?

BILLY BURKETTE

1
2     A.  Yes, sir, I can.  They -- when they found out
3  what I was trying to do as part of the mitigation plan and
4  the recovery operations, BP was trying to make itself look
5  good to the public.  So they knew that I had the pile of
6  rock there; they knew that they had caused catastrophic
7  financial damages to my company, basically ruining my
8  company, because of hardship that they forced me into, not
9  being able to perform on the contract, and they just
10 circumvented me.
11    Q.  Okay.  So is it your testimony that after the
12 Port was shut down, BP took over the concrete pile and
13 crushed it for themselves and sold it?
14    A.  That is my understanding, yes.
15    Q.  Okay.  Do you know approximately when the Port
16 closed and BP took over?
17    A.  It was sometime around middle of '10 to maybe
18 July/August or something like that, I'm guessing.  I don't
19 really know, no, sir, I don't remember.  But I'm sure if
20 you contact the Port, they can give you that information.
21    Q.  Okay.  So stepping back, we were talking about
22 the Airware contract a few minutes ago.
23    A.  Yep.
24    Q.  You mentioned that you submitted a -- an invoice
25 the first week, and then another one, maybe, for a full

BILLY BURKETTE

1
2  month's work.  Was there another invoice after that?
3     A.  No, sir, because after that, you know, is when BP
4  basically shut the Port down and took it over.
5     Q.  Okay.  And Airware never -- did Airware ever pay
6  you for the invoices that you submitted?
7     A.  No, sir, they did not.
8     Q.  Okay.  If you look at paragraph 7 of the contract
9  that says "Project Schedule," let me know when you're
10 there.
11    A.  Yes, sir, I'm here.
12    Q.  Okay.  It says, in the first sentence, "The
13 contractor shall commence work to the -- to be performed
14 under this contract upon receipt of written notice to
15 proceed from the purchasing and contract administrator."
16        Did you ever receive one of those notices?
17    A.  I'm not sure, sir.  Don't remember.
18    Q.  Okay.
19    A.  I know -- I know that we would -- we would not
20 have been there if we didn't.  I mean, we had been working
21 there for a long time prior to this contract, so, I mean,
22 I -- I don't know if that's even a -- I wouldn't even know
23 if that's a legitimate question.
24        I mean, you can't -- can you -- can you say
25 at that after you've been working somewhere that you're

BILLY BURKETTE

1
2  going to need a written notice to continue to work?  We
3  had already been doing it.  I mean, I don't understand --
4  I guess that's language -- attorney language trying to
5  read into something that was unnecessary or scapegoat or
6  something.  I don't know.  It's just -- whatever.  I don't
7  remember, sir.
8     Q.  Okay.  So you don't -- sitting here today, you
9  don't remember receiving a notice to proceed from the
10 purchasing and contract administrator?
11    A.  No, sir, I don't.
12    Q.  So sitting here today, you have no knowledge of
13 whether Global Disaster or you would have a copy of that
14 document, correct?
15    A.  No, sir, I don't.
16    Q.  And do you have copies of the invoices that --
17 that you claim you submitted to Airware for reimbursement
18 for the work you did?
19    A.  No, sir, I don't.
20    Q.  Do you have any records reflecting what work you
21 did for Airware before signing the Airware contract?
22    A.  I believe y'all have all of that through my
23 attorney.
24    Q.  Okay.  So to the extent there are records of the
25 work that you performed for Airware, we have it?

BILLY BURKETTE

1
2    A.  Yes.
3    Q.  And other than what was produced in this
4  litigation, there is no other documents that -- that
5  you're aware of that reflect any work that was done by
6  Airware -- I'm sorry, for Airware before entering into the
7  contract?
8    A.  I have -- I mean, I'm sure I have e-mails of
9  that.  I just don't know -- I don't know, sir.
10   Q.  Okay.  Is -- what about documents reflecting work
11 performed for Airware before you entered into the
12 agreement?
13   A.  I don't know, sir.
14   Q.  Okay.  All right.
15         MR. KLAR:  Can we go off the record for a
16 few minutes?
17         THE VIDEOGRAPHER:  Time is 11:15 a.m.  We
18 are going off the record.
19         (Brief recess taken.)
20         THE VIDEOGRAPHER:  Time is 11:32 a.m.  We
21 are back on the record.
22 BY MR. KLAR:
23   Q.  Mr. Burkette, earlier you mentioned that it was
24 A-1 Towing's responsibility to haul the concrete to the
25 site where Global Disaster was responsible for crushing

BILLY BURKETTE

1
2  it, and then A-1 Towing had a contract with Robin Seafood
3  to then sell that crushed concrete.
4         Does that -- does that accurately summarize
5  what we were discussing earlier?
6    A.  Could you repeat that, please?
7    Q.  Sure.  So A-1 Towing was responsible for -- for
8  hauling the concrete to the site where Global Disaster had
9  a contract with Airware to crush it, and then A-1 Towing
10 had a contract with Robin Seafood to then sell that
11 crushed concrete, correct?
12   A.  No, sir.  I believe Eric has that document.
13 Basically, the way I said that, if it's -- my
14 understanding was correct, is A-1 Towing & Hauling had a
15 contract to bring the crushed concrete to Dan Robin.
16   Q.  So who owned that concrete -- who owned the
17 concrete before -- is it -- does Robin Seafood own the
18 concrete or somebody else?
19   A.  Nope.  It basically is going to be tied up in
20 this litigation that BP took possession of the con-- -- of
21 the concrete and stole it from -- from Global, because I'm
22 the only one that had an active contract for the crushing
23 of that concrete.  So they took it from me.
24   Q.  Okay.  Airware is paying Global Disaster -- under
25 this contract, Airware was paying Global Disaster to crush

BILLY BURKETTE

1
2  the concrete, correct?
3    A.  Correct.  But then when they could not pay their
4  bill, obviously we would take -- until they paid their
5  bill, we had a lien -- I'm not sure that that lien was
6  through the justice of the peace.  I don't know, it was --
7  it was my understanding that we would have a contract -- I
8  forget what you call it, I talked to an attorney, Perez,
9  down there in St. Bernard -- that basically would give us
10 the right to take the pile until such a time we were paid
11 or until such time as we could sell it ourselves and make
12 us whole.
13         And that's when BP basically forced us out
14 and did it themselves.
15   Q.  Okay.  What -- if Airware doesn't own the
16 concrete, why are they paying Global Disaster to crush the
17 concrete?  How does Airware fit into this?
18   A.  Terry Williams is very close friends with
19 Congressman Cedric Richardson [sic].  Duration the
20 administration, there was a lot of political involvement
21 with BP and the Obama Administration and Terry Williams
22 and Cedric Richardson, and a lot of political stuff
23 happened.  Okay?
24         And Terry Williams was originally a
25 contractor for the airport.  He originally had a contract

BILLY BURKETTE

1
2  with the airport to provide this rock as a foundation for
3  new runways.  I was not privy to that conversation, other
4  than what Terry Williams told me out of his own mouth,
5  that there was some special consideration and some special
6  favors given via communication with Obama and Cedric
7  Richardson, the congressman.
8         And, ultimately, BP, because they took over
9  the Port, took it away from Terry and myself, is my
10 understanding.
11   Q.  "It," being the concrete?
12   A.  Yes.  Well, that's what you asked me, isn't it?
13   Q.  I was -- okay.  So stepping back.  Is this -- is
14 it your testimony that the concrete that -- that Global
15 Disaster was contracted to crush for -- that Airware was
16 paying for was to be used to build airport runways based
17 on an agreement between Airware and the airport?
18   A.  A portion of it.
19   Q.  Okay.  What portion?
20   A.  200,000 tons.
21   Q.  And what -- what's the -- what was the total
22 tonnage of the stock that --
23   A.  Almost 2 million -- almost 2 million tons.
24   Q.  Okay.  So approximately 10 percent of the total
25 stockpile was going to be -- was supposed to be used by

BILLY BURKETTE

1
2 the airport to build runways?
3      A. Okay. So, wait, I don't want there to be any
4 mis- -- miscommunication. I may have misspoke.
5          The dimensions of that pile is a hundred
6 thousand cubic yards when they first started. We had to
7 build the roads and work the pile and manage the pile, and
8 eventually, the last calculation that we had was
9 1.8 million cubic yards. If you know about disasters,
10 then the reduction is a 4 to 1 reduction. So that's going
11 to equate to 4 million cubic yards once it's crushed.
12      Q. Got it.
13          So earlier what you were saying is there
14 were 2 million tons of uncrushed concrete, and
15 200,000 tons of crushed was scheduled to go to the airport
16 rebuild?
17      A. If -- yes. If -- if we are using a tonnage. But
18 actually, to configure it, it's figured in cubic yards by
19 disaster standards.
20      Q. But either way, whether you're talking about
21 tons --
22      A. Yards or tons, it's 10 percent, yes.
23      Q. Okay. Okay. So I think we are on the same page
24 there.
25      A. And I'm sorry, Mrs. Court reporter. I -- I

BILLY BURKETTE

1
2 apologize.
3          THE STENOGRAPHIC REPORTER: Thank you.
4 BY MR. KLAR:
5      Q. So I just want to -- so stepping back to my
6 original question, which is: Who actually owns -- there's
7 a stock pile of -- of uncrushed concrete. Who is the
8 owner of that concrete?
9      A. It was the -- Airware, Terry Williams, until he
10 could not pay his debt. Then it was my understanding that
11 we were to take ownership.
12      Q. Of the entire stockpile?
13      A. Yes.
14      Q. And that was based on a lien that you -- that
15 Global Disaster placed against Airware as a result of
16 Airware's failure to pay Global Disaster's invoices?
17      A. Well, I -- I don't think we had to enforce the
18 lien, because I think, if I remember correctly, Terry
19 Williams said he would forfeit the pile to us as long as
20 we continued to -- or agreed to furnish him his 200,000 or
21 10 percent or whatever it -- whatever his needs were for
22 the airport.
23      Q. Okay. The agreement that you -- if you didn't
24 own -- if Global Disaster didn't own the concrete until
25 after Airware had failed to pay and they deeded you,

BILLY BURKETTE

1
2 effectively, ownership of the stockpile, how is it that
3 A-1 Towing was able to agree to sell that crushed concrete
4 to Robin Seafood? Did that agreement come into place only
5 after Global Disaster obtained title from Airware to the
6 concrete?
7      A. I'm not -- I don't remember, sir. I mean,
8 obviously, if I own the concrete and I crush it and then I
9 own A-1 and A-1 hauls it, I mean, it's still a direct
10 result of the spill, and BP forcing us out of the Port is
11 what caused the damage.
12      Q. Okay.
13      A. Or the loss.
14      Q. Did you ever have to sue Airware for payment of
15 your invoices, or did you work that out, you know,
16 informally?
17      A. We threatened it, and then basically came to
18 terms, because I'm not really wanting to sue people. He
19 just forfeited because he couldn't pay the bill, and we
20 worked out a settlement agreement that -- verbally that
21 basically we would furnish him the rock, and a few days
22 later, we got kicked out of the Port ourselves, so
23 everything is -- everything was -- no matter who owned it,
24 BP caused us to lose it.
25      Q. So you only -- Global Disaster only had ownership

BILLY BURKETTE

1
2 of the concrete for a few days before the Port had shut
3 down, correct?
4      A. I'm not sure of the timeframe, sir, but it wasn't
5 long.
6      Q. Okay. But then two months?
7      A. I don't recall.
8      Q. Less than six months?
9      A. I -- I'm -- you're asking -- you're trying to pin
10 down an answer that I have answered three times. I don't
11 recall.
12      Q. I'm just trying to pin down a range.
13      A. I don't recall.
14      Q. Okay. How much is Global Disaster claiming --
15 and I want to talk specifically about just the concrete.
16 How much in damages is Global Disaster claiming from BP
17 for harm done to Global Disaster's concrete-crushing
18 business in this case?
19      A. Okay. So I'm going to -- I'm going to use my
20 calculator on my phone just to give you a rough estimate.
21          You got 1,500,000 cubic yards times $45 a
22 yard, 67,500,000. That's a gross figure.
23      Q. And that $45-a-yard figure is based on the
24 contracts between A-1 Towing that it was going --
25 pursuant which -- A-1 Towing and Robin Seafood -- sorry.

BILLY BURKETTE

1  Let me restate that.

3       The $45 a yard that -- that you're using in
4  that calculation, that's taken from the A-1 Towing and
5  Robin Seafood contract, correct?
6       A. No, sir. I mean, it is one of those contracts.
7  We also had sold some for $80 a yard that we delivered to
8  Biloxi, Mississippi, to the sheriff's department over
9  there to build their new jail.
10      So it was based on the mileage calculation
11 of how far or how close you are to the concrete as to
12 oppose what the price is because, obviously, you can't
13 deliver something that's ten miles for the same price of
14 something that's a hundred miles, right?
15      Q. Understood. That makes sense. The price depends
16 on how far away the -- the ultimate recipient is. I
17 understand that.
18      What I'm asking is: In the calculation you
19 just did, which is 1.5 million cubic yards times $45 a
20 yard, that $45 that you got, that's the figure that Robin
21 Seafood agreed to pay A-1 Towing to sell that concrete,
22 right?
23      A. And that was based on the lowest cost factor.
24      Q. Okay. What -- you mentioned that you sold
25 some -- well, let's first talk about the 200,000 tons that

BILLY BURKETTE

1  were going to be -- you agreed that 200,000 tons were
2  still going to be delivered for the airport building under
3  your agreement with Airware, right?
4       A. I mean, it was not a specific amount. It was
5  just whatever the airport needed.
6       Q. Okay. How much, ultimately --
7       A. We did not get to deliver any of it --
8       Q. How much --
9       A. -- because BP kicked us off the yard.
10      Q. How much was scheduled to be delivered, let's
11 say, had BP not -- had the spill not happened and BP not
12 been involved, as you say they were, how much did you
13 estimate would have been delivered based on that
14 agreement?
15      A. If I had to guess, it would be somewhere between
16 a hundred and 200,000, yes.
17      Q. And that's tons or cubic yards?
18      A. It's cubic yards.
19      Q. Okay. Okay. So -- and that's -- is that
20 separate from the 1.5 million cubic yards we just
21 discussed?
22      A. That would be a portion of that.
23      Q. Okay. And you also mentioned that you sold some
24 for $80 a yard to -- a cubic yard to -- what was it,

BILLY BURKETTE

1  Biloxi?
2       A. Well, it was the -- so I didn't actually sell it.
3  A-1's trucks delivered it. There was a guy by the name of
4  Danny -- can't recall his last name -- that facilitated
5  that sale. He -- he's dead now. He had cancer and died
6  in '16 or '17. I don't -- I don't recall, sir. Can't --
7  can't really remember.
8       Q. Do you recall how much was suppose -- was
9  delivered under that arrangement?
10      A. No, sir, I do not.
11      Q. Okay. And am I correct that A-1 did haul that
12 crushed concrete, it just ultimately was not paid for at
13 the end of the day?
14      A. Correct.
15      Q. Okay. So that stockpile, that -- that concrete
16 still was part of the 1.5 million cubic yards that we were
17 talking about?
18      A. Yes, sir, that is correct.
19      Q. Okay. Is there any -- are there any documents
20 that would reflect Global Disaster's ownership of the
21 concrete for which it is claiming damages for in this
22 case?
23      A. I don't think there was a document, basically
24 just communication and agreement between Terry Williams

BILLY BURKETTE

1  and myself.
2       Q. And it was all -- it was oral?
3       A. Yes.
4       Q. Okay.
5       A. Well, I mean --
6       Q. Is there --
7       A. We basically threatened to sue, and he said that,
8  you know, he did not -- I mean, and I understood. He
9  didn't intentionally not be able to pay us. He was in the
10 same boat as us, as damages against him, you know --
11 against BP from Airware as well. You know, basically, BP
12 came in like -- like Katrina and just screwed everything
13 up, and then they -- because of the money and the power
14 and the influence that they had, they did whatever they
15 wanted to do and forced everybody, you know, into
16 hardship, except themselves.
17      So I don't think that we sued -- I think we
18 had prepared the documents -- I'm going by memory, man, so
19 don't hold me to this, but best of my recollection, I
20 prepared those documents, sat down, had a meeting with him
21 and with Mike Taylor at the Road Home project for
22 Louisiana, and it was determined that Terry would forfeit
23 it and we would take ownership, and it was just -- like I
24 said, it wasn't long after that is when BP shut everybody

BILLY BURKETTE

1
2 down and took over the supply.
3          So the easiest way to find out -- the
4 easiest way to find the answer to your question is follow
5 the money.  Find out where the rock went and then you'll
6 know the answer.
7     Q.  Do you know, approximately, when you -- you
8 reached this oral understanding with Terry Williams at
9 Global Disaster which takes ownership of the concrete?
10    A.  It was prior to BP taking over the Port.  I don't
11 know the exact date, no, sir, I don't.
12    Q.  At the time that you entered into -- you said
13 that -- you say Terry forfeited these -- the concrete to
14 you, that was after the Port had already shut down,
15 correct?
16    A.  No.
17    Q.  Before?
18    A.  Yes.
19    Q.  Okay.
20    A.  Because we were going to crush it.
21    Q.  Okay.  Do you -- the invoices that you submitted
22 to Airware for payment for the work Global Disaster did,
23 you mentioned one was around 250 to $280,000 worth of
24 work, and then you submitted one additional one, not sure
25 for how much, but it was more than 250 to 280, based on

BILLY BURKETTE

1
2 your recollection, correct?
3     A.  I believe so, yes, sir.
4     Q.  At the time that Terry Williams -- that you say
5 Terry Williams forfeited ownership of the concrete to
6 Global Disaster, did -- did you have any discussions about
7 how much that concrete was worth?
8     A.  I mean, it's common industry standard, I mean.
9     Q.  And so --
10    A.  I can find out.
11    Q.  Based on common industry knowledge, you think
12 Terry understood that that concrete was worth tens of
13 millions of dollars?
14    A.  Oh, absolutely.
15    Q.  And he -- and it's your testimony that he
16 forfeited tens of millions of dollars' worth of concrete
17 to you to satisfy payment of two invoices for less than a
18 million dollars?
19    A.  We didn't have any choice.
20    Q.  And you didn't -- you didn't think it would be a
21 good idea to reflect tens of millions dollars' worth of
22 concrete ownership in writing?
23    A.  You know, that's why I'm telling you, I don't --
24 I don't recall if we had that agreement in writing or not.
25 I mean, it makes sense that we would do that, but I just

BILLY BURKETTE

1
2 don't recall.
3     Q.  If you -- if you had an agreement that was
4 potentially worth 67 and a half million dollars, you would
5 want that in writing, right?
6     A.  I mean, I'm not saying we didn't.
7     Q.  But you're not aware of any document that
8 actually reflects that Global Disaster owned this
9 concrete, correct?
10    A.  I'm not -- I'm not saying that I am reflecting
11 back on my memory that there was not some e-mail or some
12 communication back and forth, text message, maybe, or
13 e-mail, maybe, that we had possession of the pile.  I just
14 don't recall, sir.
15    Q.  Well, there's a difference between having
16 possession of it and having ownership of it.  Your
17 position is Global Disaster owned that pile pursuant to
18 your agreement with Terry Williams?
19    A.  Can you -- can you maybe explain to me the
20 definition difference between ownership and possession?
21    Q.  Merely holding it versus actually owning, like --
22 let's say you're renting a house.  You possess the house
23 because you're living in it but you don't own it.  There's
24 a landlord; they own it.
25          You see the difference there?  So are you

BILLY BURKETTE

1
2 say doing --
3     A.  I mean, I see what you are saying, but if I
4 possess it --
5     Q.  So are you saying that --
6     A.  If I possess it, do I not have use the -- of
7 that?
8     Q.  That depends, based on your -- let me step back.
9          Do you have any agreement -- let me step
10 back.
11          There is no agreement between Global
12 Disaster and Terry Williams reflecting that Global
13 Disaster has ownership rights to the 1.5 million,
14 approximately, cubic yards of concrete that were at the
15 Port?
16    A.  It is my understanding that, yes, we have a
17 verbal, possibly confirmed via e-mail or text message, of
18 that, yes.
19    Q.  You have an understanding that part of your
20 obligations in this case is to produce documents that are
21 responsive to BP's document request, correct?
22    A.  I do understand that, and again, you know, this
23 just reflects at here we are, 11 years later, that BP is
24 asking for these documents.  I think it's a -- great
25 negligence that they waited 11 years to ask for something

Page 74

BILLY BURKETTE

1                         BILLY BURKETTE
2   that they wanted to use in a court of law now.
3        Q.  Okay.  Well, you have an understanding that as a
4   plaintiff in this case, you have a legal obligation to
5   preserve all of your documents, correct, whether or not
6   someone asks for it?
7        A.  I do.
8        Q.  And is it your position -- and did you comply
9   with that duty to preserve all of your documents?
10       A.  I did until such time as the 2016 flood, which
11  was beyond my control, that we lost everything.
12       Q.  Okay.  So to the extent there was a document
13  reflecting your -- Global Disaster's ownership rights to
14  67 and a half, approximately, million dollars' worth of
15  concrete, you don't have that -- that written document
16  anymore, correct?
17       A.  To the best of my knowledge -- like I said, I
18  would have to go back and look.
19       Q.  Okay.
20       A.  But I'm sure when we get to court, we can bring
21  him to court and he can testify to that.  He is still
22  alive.  We can subpoena him.
23       Q.  Terry Williams?
24       A.  Yes.
25       Q.  Okay.  Aside from the 67 and a half million

Page 75

BILLY BURKETTE

1   dollars that you're claiming for that 1.5 million cubic
2   yards of concrete, are there any other damages that Global
3   Disaster is claiming relating to its concrete-crushing
4   business?
5        A.  Is it just me or is everybody else losing audio?
6        Q.  Can everybody hear me?
7            MR. NEWELL:  I can hear you.
8            MS. DINEO:  Yeah, I can hear you fine,
9   Austin.
10           THE STENOGRAPHIC REPORTER:  I can.
11  BY MR. KLAR:
12       Q.  Mr. Burkette, can you hear me?
13       A.  I can now.  It was broken up a while ago.
14       Q.  Okay.  I'll ask my question again.
15           Aside from the 67 and a half million dollars
16  that Global Disaster is claiming for that 1.5 million
17  cubic yards of concrete, are there any other damages that
18  Global Disaster is seeking relating to its
19  concrete-crushing business from BP?
20       A.  Related specifically to the concrete crushing,
21  no.
22       Q.  Okay.  Were there any other operations that
23  Global Disaster was conducting in the Port of St. Bernard
24  around the time of the spill besides concrete crushing?
25

Page 76

BILLY BURKETTE

1        A.  Yes, sir.  We were in communication with BP for
2   occupying some of that space after we removed some of the
3   crushed concrete for boom deployment and supplies.
4        Q.  Did you ever enter into an agreement with BP for
5   boom deployment or providing supplies?
6        A.  We have a Master Service Agreement with ES&H, who
7   at the time was the prime contractor along with O'Brien,
8   and I spent a considerable amount of time at the office in
9   Gray, BP headquarters, both night shift and day shift, and
10  acquiring boom for which BP, again, circumvented me.  I
11  would -- I would go out and locate the boom manufacturers,
12  have an agreement with that boom manufacturer, and BP
13  would bump the price up $5 and -- and basically steal the
14  contract from me.
15           One guy in Alabama, one of the boom
16  manufacturers in Alabama called me on my phone -- my cell
17  phone and basically told me, "Hey, I hate to tell you
18  this, but BP just called me and said that they were going
19  to buy direct, and that they refused to go through you,"
20  basically terminating my contract.
21       Q.  You're talking about the contracts with ES&H?
22       A.  No, I'm talking about my direct contract
23  agreement that I had with the boom manufacturer.
24       Q.  Okay.  So it's your position that -- let me make

Page 77

BILLY BURKETTE

1   sure I understand what you're saying.  So Global Disaster
2   had an agreement with a boom manufacturer to purchase a
3   certain amount of booms that it was Global Disaster's
4   intention of then supplying to BP for use in connection
5   with the spill response, and it's your position that BP
6   effectively outbid you for the price of those booms and
7   bought them directly from the manufacturer; is that
8   correct?
9        A.  Kind of.
10       Q.  Okay.
11       A.  I went to BP, and BP told me the most -- so
12  understand, I'm dealing directly with -- in BP
13  headquarters, there was this massive room with cubicles,
14  okay, and every day, as you normally do with shift change,
15  the incident commander of the night shift would then
16  prioritize what was needed for the day shift and vice
17  versa.  So depending on when BP's response was needed for
18  a specific item, whether it be boom, whether it be VOO,
19  whether it be boats, whether it be scouts, whether it be
20  beach-cleaning equipment, whether it be trucks for hauling
21  the -- the tar balls, whether it be whatever, you would go
22  and talk to these -- these people in this room were BP
23  employees, and these employees would be, I guess, tasked
24  by the incident commander as the need for the response in

BILLY BURKETTE

1  a prioritized level.

2

3          So whatever they needed at that specific
4  time, they would tell me a price.  Okay?  So let's just
5  say BP would buy it at -- I'm just going to use round
6  numbers, $5 a foot.  It's really more like 50 bucks a
7  foot.  But I'm going to use round numbers.  So they would
8  say $5 a foot is all that they would pay, that's all that
9  they were authorized to pay.  They could not pay above
10 that.

11         So I would go out, using my network of
12 businesses that I had done business with in the past, my
13 contacts, and I would say, "Hey, look, I -- I'm here on
14 the ground, I'm boots on the ground in the office with BP
15 employees," which I think y'all do have the copies of the
16 e-mails between myself and BP employees to verify that,
17 and I would -- I would go to them and say, "Hey, look,
18 I'm -- I want to haul it or my company, A-1, wants to haul
19 it.  I'll deliver it.  I need to make something."  We
20 would come up with -- just say a dollar a foot, I would
21 make, the owner would make -- or the manufacturer would
22 make 4.

23         Well, based on the conversation that I had
24 with BP, they said maximum was $5 a foot.  Well, it turns
25 out that they went up to 6.50 a foot and they supplied

BILLY BURKETTE

1

2  their own transportation, so it would increase the cost
3  another dollar -- so it would be $7.50 a foot.  So BP flat
4  out lied and misrepresented the whole deal.  And I have
5  that multiple times.  That's not only with, you know, the
6  boom.  They did that with my A-1 Towing.  I mean, we
7  hauled some in from Alabama and from Mississippi, some of
8  the tar balls, and then BP would come back and say, "Okay,
9  well, today it's over.  Well, you know, we are not going
10 to use y'all anymore, we got our own trucking."

11         So everything BP did was never to fulfill
12 the obligation to the public that they were presenting on
13 TV.  They falsified everything.  They -- they bald-face
14 lied to me and went behind me and secured it for more than
15 what they told me was the maximum that they can secure it
16 for.

17     Q.  Okay.  So in discussions between you and BP about
18 how much they could secure a certain product for, it's a
19 -- you said a boom, right?

20     A.  Yes.

21     Q.  Or a certain quantity of boom?

22     A.  Correct.

23     Q.  So in discussions with BP about BP obtaining a
24 certain quantity of boom, did you ever enter into any
25 contract with BP pursuant to where BP obligated themselves

BILLY BURKETTE

1

2  to buy that boom from you?

3     A.  Not written, but verbally, yes.

4     Q.  Okay.  Who at BP do you claim verbally agreed
5  that they would buy boom from you?

6     A.  I supplied all of those, multiple e-mails.  I
7  would have to go back and look.  I don't recall.  I would
8  have to read them myself.

9     Q.  Is the boom -- so you mentioned -- you mentioned
10 a master agreement with ES&H.  Is that related to this
11 boom business that you're talking about?

12     A.  The Master Service Agreement, after -- after they
13 had basically screwed me over so many times, the Master
14 Service Agreement is what BP, I would like to say, forced
15 me to use a prime contractor, because they did not want a
16 direct contract with me.

17     Q.  But is that -- let me just step back before we
18 talk about the contract itself.

19         The Master Service Agreement with ES&H, is
20 that the contract -- a contract that you had to acquire
21 the boom that you say BP was going to be buying from you
22 or is it something completely different?

23     A.  It was -- it was inclusive of the boom, vessels,
24 bathroom -- portable bathrooms, portable showers, portable
25 living quarters, flotilla hotels, all kinds of stuff.  It

BILLY BURKETTE

1

2  was -- they had -- BP provided me a list of everything
3  that they need.

4     Q.  Okay.  And you were -- and it was the
5  arrangement, your understanding was, you go and acquire
6  from ES&H and then eventually furnish it to BP?

7     A.  No, negative.  I would go out and acquire it.  I
8  would furnish it to ES&H.  ES&H would put their profit on
9  top, and then they would supply it to BP.

10     Q.  Okay.  So you were supplying it to ES&H, and ES&H
11 ultimately was supplying it to BP?

12     A.  As far as the later in the -- in the response,
13 yes.  But when it originally first started happening, I
14 was dealing directly with BP.

15     Q.  Okay.

16     A.  And then when they kept circumventing me, and I
17 would bring it up that, "Hey, you told me ES&H was X
18 amount of dollars a foot, I went out and got it for X
19 amount of dollars a foot.  Y'all went and bought it for
20 one and a half times more than what you told me was the
21 max."

22     Q.  Okay.  So let's break it up into before ES&H and
23 after ES&H.

24         So starting with before ES&H came into the
25 picture, you claimed you were dealing directly with BP, BP

BILLY BURKETTE

1
2  saying we need, X, Y, Z, products, and it was your
3  understanding that you were going to go out and get it and
4  furnish it -- furnish those products directly to BP,
5  correct?
6       A.  Correct.  And -- and the instrument that allows
7  that as -- the way we got to that understanding with BP
8  was, I went to the State and the State provided me with
9  BP's hazardous mitigation plan, so -- their spill
10 response.  So when BP, before they can turn right or
11 drill, they have to supply a hazardous mitigation plan and
12 a response plan in case there's a spill that has to be
13 accepted by the State of Louisiana, or any state that they
14 drill in.  Right?
15      So because of my disaster knowledge and --
16 and experience and working with FEMA and homeland security
17 in response to many disasters, not just oil spills, the --
18 the procedure is that once you supply that, there's an
19 agreement that that's the -- that is the course of action
20 that you will take that is ultimately approved by the
21 State prior to BP having been given a permit to drill for
22 oil.
23      So I went to the State and I got that
24 response plan.  I took that response plan down to Gray to
25 meet with -- the incident commander at that time was

BILLY BURKETTE

1
2  Captain Edwin Stanton, so it was not just for boom or just
3  for boats or just for hotels or just for Aqua N-Cap or
4  just for corrections or just for anything.  It was for --
5  it was their plan that they submitted to the State that
6  says, "If we have a spill, we will do these things as part
7  of our response."
8       So I took that plan down to Gray and
9  explained that to Captain Stanton, the incident commander,
10 and he said, "Hey, let me -- give me a few minutes.  We
11 are fixing to do changeover from incident command, and
12 I'll be right back out to get you.  Well, that was two
13 hours later.  But one of the many products that BP said
14 that they would use --"
15      Q.  Billy, I think -- I think I lost you.
16      MR. KLAR:  Can everybody hear me?
17      MS. DINEO:  I can hear you.
18      MR. NEWELL:  I can hear you.
19      His screen is paused.
20      MR. KLAR:  Okay.
21      THE STENOGRAPHIC REPORTER:  Should we go off
22 the record?
23      MR. KLAR:  Yeah, let's go off the record
24 until -- until he is unfrozen.
25      THE VIDEOGRAPHER:  It's 12:16 p.m.  We are

BILLY BURKETTE

1
2  going off the record.
3      (Brief recess taken.)
4      THE VIDEOGRAPHER:  Time is 12:25 p.m.  We
5  are back on the record.
6  BY MR. KLAR:
7      Q.  Okay.  Mr. Burkette, I think when you -- when you
8  cut out, you were talking about a discussion that you had
9  with Captain Stanton, who was incident commander, and he
10 said, "Let me give you a few minutes," and it was a couple
11 hours later, and then you cut out.
12      So if you want to continue with what you
13 were saying there about your -- your discussions with
14 Captain Stanton.
15      A.  Yes, sir.  So the state mitigation plan or
16 response plan that BP submitted outlined all of the
17 products and methods of response that BP would use in the
18 case that BP should ever have a spill.
19      Q.  Okay.  I'm sending a document labeled Tab 12.
20 It's a fairly large document, so it might take a couple
21 minutes to download here.
22      MR. KLAR:  When it comes in, can the court
23 reporter mark that as the next exhibit?
24      (Exhibit 3 was marked for identification.)
25 BY MR. KLAR:

BILLY BURKETTE

1
2      Q.  While that's downloading, can you tell me what
3  products you specifically discussed with Captain Stanton?
4      A.  Yes, sir.  Captain Stanton brought me into that
5  room that I was describing and introduced me to the -- his
6  shift was -- at that time was the day shift.  Okay?
7      So that day shift, the people were different
8  than the night shift, obviously, so when you have a
9  disaster, your incident commanders, based on the Intel
10 given to them from the response, they have a prioritized
11 list, right, so that prioritized list of needs is what
12 they are focused on.
13      So there were simultaneously about 20
14 different functions as part of a response that they were
15 engaged in.  So in lieu of me having to use Captain
16 Stanton as a conduit, he put me directly in touch with
17 those people inside.
18      Q.  Okay.  The people you were referring to --
19      A.  Those people inside were the ones that I made
20 the -- I was instructed to go directly through them
21 because they were the ones that were, like me, boots on
22 the ground in search of these things.  One of the products
23 was boom.  Other products were vessels of opportunity.
24 Other products were hotels.  Other products, needs that
25 they -- services that they needed were hauling, equipment,

BILLY BURKETTE

1  new technology that they were looking for, the cap on the
2  well with the fabrication shop in Houma.  There was a
3  multitude of things happening.
4      But the most interesting thing that -- that
5  caught Captain Stanton's ear was the Aqua N-Cap.  Now, let
6  me -- let me elaborate on that, if you will, because --
7      Q.  Hold on.  We'll -- we'll get there, but does
8  that -- does that list that you just outlined reflect the
9  list of products that you discussed with Captain Stanton
10  or the -- the folks that he introduced you to that were
11  working the day shift?
12      A.  Does what?  Say that again.
13      Q.  The list of products, boom or -- and services,
14  boom, vessels of opportunity, hotels, hauling equipment,
15  capping services, fabrication, Aqua N-Cap.
16      Does that accurately reflect the extent of
17  products or services that you discussed with Captain
18  Stanton and the other day-shift workers?
19      A.  Oh, Lord, no.
20      Q.  Okay.  So there were many more?
21      A.  Yes.
22      Q.  For which products are you claiming damages for
23  from BP?
24      A.  Well, I would like to -- to -- just one second.

BILLY BURKETTE

1  Hold on.  I'm going to put my glasses on.  I'm getting
2  old, man.  You have to forgive me.
3      Q.  Is there a document that you are looking at
4  that's in front of you?
5      A.  What you sent me.
6      Q.  Oh, Tab 12?  We'll -- we'll get there.  You don't
7  have to look at that right now.
8      A.  Oh, okay.  I'm sorry.  So --
9      Q.  Going back to my question --
10      A.  Everything that's in that list -- everything
11  that's in that list, depending on the day and the shift, I
12  was in communication with BP to help and assist them in
13  finding those resources.
14      Q.  Okay.  For -- other than boom, vessels of
15  opportunity, hotels, the services you listed and Aqua
16  N-Cap, what other products -- is there any document that
17  would reflect what other products you were looking for
18  them?
19      A.  Yes.  It's all inclusive in that document you
20  said we'll get to.
21      Q.  Okay.  So if you can open that document.
22      MR. KLAR:  And if the court reporter can
23  mark that the next in line.
24      THE WITNESS:  Yes, sir.

BILLY BURKETTE

1      (Exhibit 4 was marked for identification.)
2  BY MR. KLAR:
3      Q.  Okay.  Do you have it open, Mr. Burkette?
4      A.  Yes, sir.  I'm just trying to make it a little
5  bit bigger so I can read it.  Okay.  Yes, sir.
6      Q.  Is this the document that -- that you're
7  referring to, the Hazard Mitigation Plan, that has
8  products that you were looking for for BP?
9      A.  I believe it's -- it may not be the exact
10  document, but I believe it's close, yes, sir.
11      Q.  Okay.  Can you point me to where those products
12  that you're referring to are listed?
13      Let's -- let's strike that.
14      Mr. Burkette, if you can focus on me for a
15  second.  We'll go back to the document.  Starting with
16  the -- just -- I just want to clarify:  How much in
17  damages are you claiming from BP for BP buying boom around
18  you?
19      A.  I don't rightly know.
20      Q.  How would you go about calculating that?
21      A.  I would have to have BP's records of how much
22  boom they bought from each boom manufacturer.
23      Q.  Okay.  So it's your position that boom that BP
24  bought from every manufacturer but you, that the profits

BILLY BURKETTE

1  that they made are the extent of Global Disaster's
2  damages?
3      A.  No, sir.
4      Q.  Okay.  Why do you need to know -- sorry.
5  Stepping back.
6      Which -- which manufacturers do you claim BP
7  bought boom from?
8      A.  That's the question.
9      Q.  So sitting here --
10      A.  That's the question.
11      Q.  So sitting here today, you don't know if BP --
12  what -- what boom BP bought from which manufacturers that
13  it should have bought from you?
14      A.  I know that -- that there were four different
15  boom manufacturers located in the United States that they
16  circumvented me on and there were at least two, maybe
17  three, outside of the United States that they circumvented
18  me on.
19      Q.  Okay.  Do you have any -- you don't have any
20  agreements with BP where BP agreed to purchase boom from
21  Global Disaster, correct?
22      A.  I mean, nothing other than verbally what the
23  response coordinators in that office told me they needed.
24      Q.  And you are referring to Captain Stanton,

BILLY BURKETTE

1
2  correct?
3      A.  No, sir, not just Captain Stanton, the actual BP
4  employees.  So in that room, there were logistics people;
5  there were products people; there was new technology
6  people; there were a -- it was -- it was a multitude of
7  tasks.  So those task operators, while I would go into the
8  office at Gray, I would visit with them.
9      Q.  And it's your -- each of those people you're
10 saying are BP employees that you spoke with, correct?
11     A.  Correct.
12     Q.  Okay.  You don't know the names of any of the
13 people that you spoke with?
14     A.  I have supplied that to y'all.
15     Q.  Okay.  So it's -- okay.
16          The dates -- the communications that you've
17 produced to us are the full extent of the -- the
18 communications that you had with BP employees regarding
19 boom?
20     A.  No.
21     Q.  Okay.  Besides what you've provided us, what
22 other communications are there?
23     A.  Verbal.
24     Q.  Okay.  So aside from the written communications
25 that you provided to us, the only other communications

BILLY BURKETTE

1
2  that you had with BP employees regarding the purchase of
3  boom from Global Disaster was verbal?
4      A.  Correct.
5      Q.  You don't have any written agreement with anybody
6  at BP for the purchase of boom from Global Disaster,
7  correct?
8      A.  Not correct.
9      Q.  We -- there is no agreement for the purchase of
10 boom in Global Disaster's production with BP?
11     A.  The e-mails that I provided were e-mails
12 instructing me what their needs were at that particular
13 date and time.
14     Q.  Okay.  Let's look at some of those e-mails.
15          MR. KLAR:  Okay.  I just sent Tab 11 to the
16 court reporter.  Can the court reporter mark that next in
17 line?
18          THE STENOGRAPHIC REPORTER:  Yes, sir.
19 That's 4 [sic].
20          MR. KLAR:  Thank you.
21          (Exhibit 5 was marked for identification.)
22 BY MR. KLAR:
23     Q.  Okay.  Do you recognize this document,
24 Mr. Burkette?
25     A.  Let me just see.  That's just the Aqua N-Cap.

BILLY BURKETTE

1
2      Q.  Okay.  Well, we are going to go through all the
3  e-mails that we have on -- on these products, so...
4          This relates -- you're saying that this
5  relates to Aqua N-Cap?
6      A.  Yes.
7      Q.  Okay.
8      A.  RTASCo.  RTASCo was the company that I was told
9  -- so when I went in to speak with Captain Stanton,
10 Captain Stanton brought me to this lady, which we walked
11 around the building for 30 minutes trying to find.  We
12 found her walking down a hallway, and he introduced me to
13 her as Jackie Michelle or Jackie Mitchell, whichever it
14 is, and she was the head microbiologist in regards to
15 the -- the response for BP.
16          He provided her with a copy of the document
17 that I sent to the State as the response to the spill,
18 where it highlighted the use of Aqua N-Cap because of the
19 environmental impact that it would have as opposed to
20 using COREXIT.  And he indicated to her that I had the
21 contract with Fowler at RTASCo, Jeff or Jon, I can't
22 remember, but anyway, he asked if -- if they could use --
23 so let's put this in perspective.  He requested that they
24 use -- as incident commander and sector commander of the
25 United States Coast Guard, asked if this was the product

BILLY BURKETTE

1
2  that BP submitted to the State saying that they would use
3  in their response, if there was a spill.  She said, "Yes."
4          He said, "I would like to use it."  She
5  said, "No."  He says, "Well, isn't this on the list?"  She
6  said, "Yes, it's on the list."  He says, "Well, I'm
7  requesting to use it.  She says, "Not no, but hell no.
8  It would quantify the spill and cost us billions in
9  fines."
10     Q.  Okay, well --
11     A.  So he said, "Well, I want to use it in the burn
12 ring on the animals. " She said, "Maybe you didn't hear
13 me.  We are not using that at all."  He said, "Well, isn't
14 that the safest product to be using as opposed -- I mean,
15 as far as the environmental impact is concerned?"  She
16 said, "It may be, but we are -- we are not using it.  We
17 are using COREXIT and COREXIT only."
18 BY MR. KLAR:
19     Q.  Okay.  Do you have any documents reflecting that
20 you had rights to distribute Aqua N-Cap --
21     A.  That e-mail shows as one.
22     Q.  Okay.  So this e-mail says, reading from the --
23 there's one line in this e-mail.  "Hey, Billy, are you
24 having any luck working the spill?  Regards, Jon Fowler."
25          Where in that e-mail does it say anything

BILLY BURKETTE

1
2  about Global Disaster having rights to sell Aqua N-Cap to
3  BP?
4        A.  Well, I mean -- I mean, I -- I'm guessing that,
5  you know, you have this e-mail sent to everybody?  It was
6  sent to specific -- specifically to me, based on the phone
7  calls and -- and the communication that I had had with Jon
8  about utilizing that and the agreement was that he would
9  give me sole distribution rights if BP would use it in the
10 spill.
11       Q.  Okay.
12       A.  That's the whole reason that we set up the
13 conference -- the communication and had the conference
14 meeting with BP and the incident commander.  I mean, it
15 took me a week to get that -- even that meeting.
16       Q.  Understood.
17           So, Mr. Burkette, it's your -- it's your
18 testimony today that Global Disaster's rights to
19 distribute Aqua N-Cap, pursuant to some agreement with
20 Mr. Fowler at RTASCo, was contingent on an agreement with
21 BP to use Aqua N-Cap?
22       A.  It was -- it was -- it was based on the document
23 that BP supplied to the State stating that they would use
24 Aqua N-Cap as part of their response to a spill, which
25 they did not do.

BILLY BURKETTE

1
2        Q.  Right.  But your -- your -- I understand that
3  part.
4           But your testimony today is that your
5  exclusive -- sorry, Global Disaster's distribution rights
6  to Aqua N-Cap, their exclusive distribution rights to Aqua
7  N-Cap was contingent on BP agreeing to purchase Aqua N-Cap
8  from Global Disaster, correct?
9        A.  Correct.
10       Q.  Okay.  And there's no agreement between BP and
11 Global Disaster reflecting an agreement by BP to purchase
12 Aqua N-Cap from Global Disaster?
13       A.  No, sir, because BP bought the company.  Again,
14 circumventing me.
15       Q.  So there is no agreement between BP and
16 Mr. Burkette requiring BP to purchase Aqua N-Cap from
17 Global Disaster or you?
18       A.  I don't -- I don't know if it was a requirement
19 more so than it was an understanding.
20       Q.  Okay.  Whether it's an understanding or -- or a
21 requirement, BP did not have an agreement to purchase Aqua
22 N-Cap in any quantity or any amount from Global Disaster,
23 correct?
24       A.  Or from anybody.
25       Q.  Okay.  So no agreement whatsoever obligating BP

BILLY BURKETTE

1
2  to purchase Aqua N-Cap?
3        A.  Other than -- other than the agreement that the
4  sector commander and the products manager on the floor
5  said that they would use it.  Then they got superseded by
6  this microbiologist lady.  And they said, no, because it
7  would quantify the spill.
8           In other words, it was just a -- they got
9  superseded and overrode on their ability to contract with
10 me, because it would make BP more exposed and --
11 liability-wise and funds are protecting BP from being
12 qualified the amount of oil.
13       Q.  Okay.  At the time that you had discussions with,
14 I think you said it was procurement, maybe it was the
15 procurement folks, where you -- you believed that you had
16 some sort of verbal discussions with them about purchasing
17 Aqua N-Cap, before they were superseded, so focusing your
18 discussion where you believe it sounded like they would
19 purchase it, did you discuss price of -- of the Aqua N-Cap
20 that you -- that Global Disaster would be selling to BP?
21       A.  I believe you have that as well.  It was -- it
22 was sent in an e-mail.  That price was sent in an e-mail
23 as well.
24       Q.  Okay.  And quantity?
25       A.  As much as they could produce, and it's an IDIQ

BILLY BURKETTE

1
2  contract.
3        Q.  Okay.  So let's turn to another e-mail.
4           I just sent a document labeled Tab 15.
5           MR. KLAR:  Can the court reporter mark it
6  next in line?  I think it's 5.
7           THE WITNESS:  If I remember, it was around 8
8  or $9 a pound, $7 a pound.  I don't remember, something
9  like that.
10          (Exhibit 6 was marked for identification.)
11 BY MR. KLAR:
12       Q.  Okay.  Do you recall when you had those
13 discussions before they were superseded, what time period
14 that was?
15       A.  I do not recall.
16       Q.  Okay.  And you don't recall the names of who --
17 who -- those procurement people?
18       A.  Not off the top of my head, no, sir.  I would
19 have to go back and look.
20       Q.  Okay.  Did those procurement people say that --
21 what -- what did they say specifically with respect to
22 whether or not they would purchase Aqua N-Cap from Global
23 Disaster?
24       A.  Well, basically, they were unaware of -- I was
25 just reading the e-mail -- they were unaware of Aqua N-Cap

Page 98

BILLY BURKETTE

1                    BILLY BURKETTE
2 until I provided the document that -- that the State had
3 in order for BP to be able to drill that response plan,
4 and when I -- when I brought that document down there,
5 they had never seen it.  The BP folks had never seen it,
6 the ones on the floor in the procurement section.  So when
7 I brought that down there and showed it to them, they
8 immediately said, "Well, yeah, we'll use it.  How much can
9 you get?"  And then --
10      Q.  Did you tell them how much you can get?
11      A.  I told them that -- I did.  I told them that I
12 had an agreement with the owner, that if they would use
13 it, that I could be the sole distributor, because they had
14 circumvented me so many times in the past I had already
15 gone and negotiated that with Jon Fowler.
16      Q.  Okay.  That's Jon Fowler, though.  Again, that's
17 in writing -- that's oral; it's not in writing, correct?
18      A.  I don't recall.  I mean, I think there's some
19 e-mails back and forth to that effect, but I'm going by
20 memory and I don't remember.
21      Q.  How much money was the agreement for with
22 Mr. Fowler?
23      A.  Oh, it would be -- it would be an IDIQ,
24 indefinite -- indefinite quantity, indefinite delivery
25 /indefinite quantity.

Page 99

BILLY BURKETTE

1                    BILLY BURKETTE
2      Q.  Okay.  How much did you have to pay Mr. Fowler to
3 get exclusive distribution rights to Aqua N-Cap?
4      A.  I didn't pay him anything.
5      Q.  Okay.
6      A.  Why -- I don't understand your question.  Why
7 would I pay somebody for something that they own?  I mean,
8 for something for a contract?  That's -- that's
9 fraudulent.
10      Q.  Mr. Burkette, so RTASCo owns Aqua N-Cap, correct?
11      A.  Correct.
12      Q.  As the owner, separate -- let's say that an
13 agreement with Global Disaster never existed.  As the
14 owner, they have the right to distribute it, correct?
15      A.  Correct.
16      Q.  Okay.  Global Disaster wants the right to
17 distribute it from them, so Global Disaster has to pay for
18 that, correct?  They want a right that they don't have?
19      A.  No, sir.  It's -- it's not -- that's not the way
20 I understood it.  What I understood is that Aqua N-Cap has
21 a retail price, and they have a distribution
22 responsibility, I guess you would call it, to fulfill, and
23 at the time that I was having my communications, the first
24 question was:  How much would it absorb?  It would absorb
25 11 pounds of oil to the 1 pound of Aqua N-Cap.

Page 100

BILLY BURKETTE

1                    BILLY BURKETTE
2            That was the first question that BP asked
3 me.  Then when I provided that information --
4      Q.  Stop it.  Stop.  Let's step back.
5            So I'm not asking about questions -- or
6 discussions with BP at this moment.  I'm talking about
7 your discussions with RTASCo about the terms of your
8 distribution agreement with them.  So.
9      A.  My terms were --
10      Q.  -- they owned the right to distribute this
11 product?
12      A.  My terms -- I'm sorry.  I didn't let you finish.
13      Q.  Is it your testimony that RTASCo granted Global
14 Disaster the exclusive right to distribute Aqua N-Cap for
15 free?
16      A.  No.  I would be paid a commission.
17      Q.  Okay.  Yeah.  You would be paid a commission for
18 sales.  How much did you have to pay Aqua -- I'm sorry,
19 RTASCo for that right?
20      A.  I didn't have to pay anything.  It was in the
21 agreement.  I would become a salesman.  I would be a
22 commission-paid salesman.
23      Q.  Okay.  So there was an agreement with Aqua N-Cap
24 where you would be a salesman?
25      A.  I would be what they called a distributor.

Page 101

BILLY BURKETTE

1                    BILLY BURKETTE
2      Q.  Okay.  Pursuant to what agreement with RTASCo?
3 What agreement reflects Global Disaster's role as the sole
4 distributor of Aqua N-Cap?
5      A.  The agreement that BP would use it.
6      Q.  Okay.  There's an agreement between BP and -- and
7 I don't know who.
8      A.  Me.
9      Q.  What agreement reflects that Global Disaster and
10 RTASCo had an agreement pursuant to which Global Disaster
11 would be the sole salesman or distributor of Aqua N-Cap?
12      A.  Okay.  Jon Fowler --
13      Q.  What document?
14      A.  I'm sorry?
15      Q.  What document reflects that?
16      A.  I think it's in the e-mails but I'm not positive.
17      Q.  Okay.  So if it's not in the e-mails, you don't
18 have a copy of the document, correct?
19      A.  No, but we can subpoena him and -- and get his
20 testimony and he'll testify to that, because Christopher
21 Ott, the guy that you sent the e-mail from on that last
22 document, would testify that -- because he was on the
23 conference call with me with RTASCo.
24      Q.  Okay.  Well, let's look at that e-mail right now.
25      A.  Okay.

BILLY BURKETTE

1
2    Q.  So at the bottom of that first page, it says Jon
3  Fowler is e-mailing Christopher Ott on May 21st of 2010,
4  correct?
5    A.  Correct.
6    Q.  It says:  "We got a call from Tommy, VP at S&D
7  Environmental, "and there's a phone number," requesting a
8  price quote and production timelines for 3 million pounds
9  of Aqua N-Cap.  They know we have 1 million pounds
10 available today and can deliver the other 2 million within
11 30 days of sale.  Tommy claims that BP is requesting info
12 on the amount and production timeline from them for a PO
13 that would be delivered next week.  Good luck... "
14        Did I read that correctly?
15   A.  That is correct.
16   Q.  Who is Tommy?
17   A.  Okay.  Tommy is a close friend of Christopher
18 Ott.
19   Q.  Okay.  Do you know who, at BP, Tommy was in
20 contact with about this request?
21   A.  It came via the -- so, again, I -- I'm probably,
22 obviously, I'm not doing a good enough job.  I am boots on
23 the ground, face to face, just like I'm looking at you,
24 except we were in person.  I would go to the procurement
25 section.  I brought them this document that BP provided to

BILLY BURKETTE

1
2  the State saying that they would use Aqua N-Cap.  They had
3  all kind of questions about it.  Once they found the
4  questions -- the answers to the questions that they asked,
5  how much it would absorb and all that, the cost factor and
6  all of those things, they, in turn, said, "How much is
7  available?"  I said, "I don't know.  Here is the number to
8  find out what's actually on hand."
9        So I'm standing there, looking at the guy,
10 face to face, as he picks up the phone and calls.
11   Q.  Okay.  So you're not sure who Tommy spoke to at
12 BP specifically?
13   A.  I am -- I -- I can tell you that I was standing
14 there when the guy at BP picked up the phone and called
15 Tommy, but I don't recall his name.
16   Q.  Okay.  So the next e-mail, Chris forwards it --
17 Mr. Ott forwards it to a Dave Guardanapo and to you,
18 correct?
19   A.  Yep.  Dave Guardanapo was the ex-marine that
20 carried the football for President Reagan.  He came to me
21 and said, "Billy, if you have any problems, call me."  He
22 said, "I will try to assist politically."
23   Q.  So Christopher Ott sends -- forwards Mr. Fowler's
24 e-mail to you and says:  "Call this guy today and find out
25 what he needs.  Also, send me the draft of the plan or at

BILLY BURKETTE

1
2  least tell me the areas you are working on so we do not
3  duplicate efforts."
4        Did I read that correctly?
5    A.  That is.
6    Q.  Okay.  Did you speak to Tommy at the number that
7  was provided in Mr. Fowler's e-mail about Aqua N-Cap?
8    A.  Say -- repeat the question.
9    Q.  So Mr. Ott is telling you, "Call this guy today,
10 find out what he needs," and he is referring to Tommy, the
11 vice president at S&D environmental, correct?
12        Did you call Tommy?
13   A.  I didn't.  I had the guy at BP call, the
14 procurement office.
15   Q.  Okay.  So you didn't speak to anybody -- you
16 didn't speak to Tommy?
17   A.  Not that day, I don't believe.
18   Q.  Okay.  And so you told -- do you have -- do you
19 know if anybody spoke to Tommy after this e-mail was sent
20 to you about Aqua N-Cap?
21   A.  I know the phone call was made.  I don't know
22 what they spoke about.
23   Q.  Okay.  Were -- you were present when this phone
24 call was made?
25   A.  Yes, I was standing in the procurement office.

BILLY BURKETTE

1
2    Q.  Okay.  Earlier you said, this -- so let's step
3  back.
4        On Friday, May 21, at 9:50 a.m., Jon Fowler
5  e-mails Christopher Ott and says, "We got a call from
6  Tommy, saying he was -- he spoke to BP."  That's the
7  conversation that you were in the procurement for, where
8  BP called Tommy, right?
9    A.  Correct.
10   Q.  Okay.
11   A.  Because they do the shift change, the incident
12 command change at 06:00 a.m.
13   Q.  Okay.  Now, about two and a half hours later or a
14 little over two hours later, Christopher Ott forwards the
15 e-mail to you and says, "Call this guy and find out what
16 he needs."  You did not call this guy to find out what he
17 needs, correct?
18   A.  I did not because I had BP folks, the procurement
19 officer, call.
20   Q.  Okay.  So you are saying you were still in the
21 procurement office at the time you received this forwarded
22 e-mail?
23   A.  To the best of my knowledge, yes.
24   Q.  Okay.  And you said, "Hey, BP guy, call Tommy
25 again"?

BILLY BURKETTE

1
2    A.  Not "again."  The list of phone numbers that I
3 provided to the BP folks had Tommy's name, had Christopher
4 Ott's name, had Jon Fowler's name, had everybody's name,
5 and I asked him to call and see -- I'm sorry -- we asked
6 me if he could call and see how much product they had
7 available at that time.  I said, "Yes, call them any time
8 you want to call them."
9    Q.  Okay.  And did you call them?
10    A.  Did I lose you again?
11    Q.  Sorry.  You said he -- so your testimony -- the
12 BP folks, not sure who, had multiple people's names.  They
13 had Christopher Ott, they had Jon Fowler and a person
14 named Tommy, right?
15    A.  Correct.
16    Q.  And it's your testimony that, while you were at
17 the procurement office, you asked BP to call one of them
18 to talk about how much product they potentially might
19 have, correct?
20    A.  Correct.
21    Q.  Okay.  And presumably, that's the phone call that
22 is reflected in the May 21, 9:51 a.m. e-mail at the bottom
23 where it says, "Got a call from Tommy requesting a price
24 quote claiming BP is requesting info on the amounts in
25 production," correct?

BILLY BURKETTE

1
2    A.  That is my understanding, correct.
3    Q.  Okay.  Then the next e-mail, Chris Ott forwards
4 to you and says, "Call this guy.  Find out what he needs."
5    What action was taken in response to
6 Mr. Ott's e-mail?
7    A.  The response was, I put it directly in the
8 procurement hands of whatever BP personnel -- because you
9 see, that's what I'm telling you, it's like a -- it's like
10 a phone-bank room.  You have one person, and then they are
11 like a team leader, and then they redisseminate that to
12 whoever is free at that particular time.  It's no one
13 person that you -- that you have constant communication
14 with.  It's multiple people that you're engaged in
15 communication with.
16    Q.  I understand.
17    A.  So I really can't answer that question
18 effectively to tell you exactly who it was that called and
19 when they called.  I just know that the call was made
20 showing just what you're saying, Chris saying they got the
21 call from BP procurement saying that they wanted to buy
22 the Aqua N-Cap, and then he asked me to check on it.  I
23 said, "I'm standing here in the -- in the procurement
24 room.  I'm talking to the guy.  He is going to call Tommy
25 right now or -- or has called Tommy, and they are working

BILLY BURKETTE

1 on procuring it."
2
3    Q.  Okay.
4    A.  Then, after that is when -- when we went to
5 Jackie and she said, "Not no, but hell no, because it will
6 quantify the spill and cost us billions in fines."
7    Q.  Okay.  So before going to Jackie -- we'll get to
8 Jackie in a moment -- before going to Jackie, when you
9 were talking with procurement at BP and BP said, "We want
10 this product," you didn't actually have an agreement with
11 BP that they were definitively going to purchase this
12 product, correct?
13    A.  Do I have a written agreement?  No.  Do I have a
14 verbal commitment?  Yes.
15    Q.  You only had discussions with them about them
16 potentially wanting to buy the product, correct?
17    A.  Not potentially.  Not potentially.  They said --
18 once I furnished them the document from the State, they
19 said, "Yes, we want this."
20    Q.  Okay.  At the moment that they said, "Yes, we
21 want this," how much were they buying?  What was the
22 agreement?
23    A.  All that they could get.  They said they would
24 buy it all.
25    Q.  Okay.  How much was "all"?

BILLY BURKETTE

1
2    A.  Well, that's the conversation that they -- that
3 you have in that e-mail.  They had 1 million pounds
4 available immediately and 3 million more pounds available
5 within -- whatever it was, 30 days or whatever the time
6 frame was reflected in that e-mail.
7    Q.  Okay.  But it says, "Tommy claims that BP is
8 requesting info on the amounts and production timeline
9 from them for a PO that will be delivered next week."  A
10 PO is purchase order, right?
11    A.  Correct.
12    Q.  And they claimed that they were going to
13 deliver it next week?
14    A.  Correct, because --
15    Q.  To do what they needed -- okay.
16    They didn't have approval at that time,
17 correct?
18    A.  Well, they didn't have approval from Jackie.
19    Q.  Okay.  But they needed it, correct?
20    A.  I'm assuming.  I don't know.
21    Q.  Okay.  So at the time -- based on this e-mail, BP
22 is requesting info on what the production timeline is,
23 what amounts are available, because they want to furnish a
24 request to buy this product, correct?
25    A.  No, they said that it takes a couple of days to

BILLY BURKETTE

1  get the PO issued.
2      Q.  Okay.  They never issued a PO, correct?
3      A.  No, they bought the company instead.
4      Q.  Okay.  So there was never a purchase order or
5  other contract pursuant to BP would buy Aqua N-Cap from
6  Global Disaster?
7      A.  Correct, because again, they circumvented me.
8      Q.  Okay.  How much money is Global Disaster claiming
9  BP is liable to it for Aqua N-Cap?
10     A.  I don't -- I don't recall.  It's in my OPA claim
11 form.
12     Q.  Okay.  We'll get to those.
13     A.  You know, to put this in perspective, I have a
14 lot of years' experience in disasters.  In good faith, I
15 went to BP in order to assist and to help, and I was
16 consistently -- because I was not part of their prime
17 contracting list, they utilized me and my information and
18 my contacts as part of the response to the spill for which
19 they basically stole that information from me and went
20 behind my back and procured all of it.
21         So I worked tirelessly, day and night, to
22 help somebody that was fighting a major disaster and
23 they -- and they basically slapped me in the face and
24 stole all my information.

BILLY BURKETTE

1      Q.  Understood.  Can you open Tab 16 which I just
2  sent?
3          MR. KLAR:  I think -- can the court reporter
4  mark that the next exhibit, 7, 6?
5          THE STENOGRAPHIC REPORTER:  Yes, sir, 6.
6          MR. KLAR:  Thank you.
7          (Exhibit 6 was marked for identification.)
8          MR. KLAR:  Hold on one second.
9  BY MR. KLAR:
10     Q.  Okay.  So this is an e-mail thread between you
11 and a Nelson Fetgatter in May of 2010, correct?
12     A.  Correct.
13     Q.  Do you recall writing and sending these e-mails
14 to Mr. Fetgatter?
15     A.  Yes, sir, along with -- see that guy, hold on,
16 David Barker, where it says, "Please contact David Barker
17 at BP.com regarding the future correspondence and
18 availability of resources"?  So he is the guy, like I --
19 like I'm telling you, I only had communication with him
20 for a few days and then they basically -- they would
21 rotate these guys out, so as you build this relationship
22 with some, they -- you have the communications and you
23 have, you know, back and forth, back and forth, and we are
24 going to get it here, and we are going to get it there,

BILLY BURKETTE

1  and yes, we want to use it; yes, we'll buy it from this
2  distributor.  They are not on our approved distributor
3  list.  We have to send somebody to certify that they are
4  making the boom the way that we want it made to meet the
5  -- the specifications that BP has, and all of these
6  factors.  And then all of a sudden, they are no longer
7  there.  They rotated out with somebody else, so you have
8  to continue with the next guy and the next guy or the next
9  woman and so on.
10         So inevitably, what you think you're doing
11 in good faith ends up being that you are circumvented,
12 because you can't get in contact with the person that you
13 were told by BP management that you had to deal with.  See
14 where it says he is the night shift supervisor?  So he is
15 the one that told me to go to David.  I went to David, had
16 all these communications.  David agreed to buy this,
17 agreed to buy that, agreed to buy this.  I gave him the
18 contact information for the manufacturers.  I gave him the
19 contact information for everyone, because I was trying to
20 be open and transparent and do what was right.  And every
21 time that I did that, BP stuck me in the back with a big
22 knife and said, "We're going around you."
23         So I mean, I don't -- to give your -- to
24 give you an answer of how much, oh, there's no way to

BILLY BURKETTE

1  really -- I mean, I would have to sit down -- I would have
2  to have a forensic accountant to help me figure that out,
3  but after BP put me out of business, I mean, how do you
4  continue to go on indefinitely doing what BP asked you to
5  do if they are going to repeatedly stab you in the back?
6      Q.  Okay.  So sitting here today, you're not able to
7  reasonably calculate how much damages Global Disaster
8  suffered as a result of BP's decision not to buy Aqua
9  N-Cap from Global Disaster?
10     A.  Correct.
11     Q.  Okay.  So sitting here today, you're not able to
12 reasonably quantify how much damages Global Disaster
13 suffered as a result of BP's decision not to buy booms
14 from Global Disaster, correct?
15     A.  Correct.
16     Q.  You're not able to quantify how much in damages
17 Global Disaster suffered as a result of BP's decision not
18 to buy vessels of opportunity from Global Disaster,
19 correct?
20     A.  I mean, you're asking at this particular time, I
21 can do it, but do I have it?  No.
22     Q.  Okay.
23     A.  Just like my boat, you know, they instructed me
24 to go out and take samples.  It cost me $5,000 just to

BILLY BURKETTE

1   BILLY BURKETTE
2 have my boat repainted from all of the COREXIT that ate
3 the paint off of my boat.  Those things I have that, you
4 know, I could provide to you.  But as of sitting here,
5 right now today, no, sir, I don't have that documentation
6 in front of me, but I did provide it to y'all in my OPA
7 claim form.
8    Q.  Okay.  So part of the damages that Global
9 Disaster is asserting is a $5,000 charge for a repaint of
10 the boat?
11   A.  I mean, that's just one of many.
12   Q.  I'm asking if that's one of them, right?
13   A.  Yes, sir.
14   Q.  And that boat is registered to Global Disaster or
15 to Billy Burkette?
16   A.  I don't recall.
17   Q.  Okay.  Do you have any documents that show that
18 Global Disaster owns the boat for which you seek
19 reimbursement in this case?
20   A.  Well, I don't recall if it's me or if it's
21 Global.
22   Q.  Okay.  If it's you, it's not Global Disaster's
23 damages; it's Billy's, correct?
24   A.  Correct.
25   Q.  Okay.

1   BILLY BURKETTE
2    A.  Well, that's not true, because I own it.  It's my
3 -- it's one of my assets whether Global used it or if --
4 if BP used it.  It's still something that BP used and
5 caused damage to that they didn't pay for.  Any way you
6 want to slice that pie, it's still a -- a vessel that was
7 used in response that BP never paid anything for.  They
8 didn't even pay me for going out and collecting the
9 samples that they told me to go out and collect.
10   Q.  Okay.  So whether it's damages to Billy Burkette
11 or to Global Disaster or to A-1 Towing, your position is
12 you owned all of it, so BP owes it no matter what?
13   A.  I -- I think that the correct posture should be
14 that BP owes for things that BP asked me, my companies, my
15 personal, or anything that -- any words you want to
16 choose, if BP told me to do something, they should pay for
17 that and not circumvent me and stab me in the back.
18 That's bad-faith business where I come from.
19      I bet if the shoe was on the other foot and
20 I caused damage to BP, BP would have the same thought
21 process.  If I caused them damage, they would want me to
22 pay that damage.
23      I cannot hear you.
24   Q.  Sorry.  On the bottom of the page marked Global
25 Disaster 104, can you turn to that?

1   BILLY BURKETTE
2    A.  Which -- which document is that?  That's the last
3 one you just sent?
4    Q.  Tab 16, yes, Exhibit 6.
5    A.  Okay.  Where am I going?
6    Q.  So do you see how on the bottom of that document,
7 there's a big stamp that says "Global Disaster" and then
8 there's a number, 000098?  You see that?
9      If you're looking at page 1, at the bottom,
10 there's bold font that says "Global Disaster 98."  Do you
11 see that?
12   A.  Yes, sir, I see that.
13   Q.  Okay.  If you scroll down to the page that's
14 marked 104.  Are you there?
15   A.  I'm getting there.  Yes, sir.
16   Q.  If you scroll up just a little bit so you can see
17 the full e-mail.
18   A.  There's two e-mails on that page.  Oh, no, I see
19 it.  From Nelson.
20   Q.  Yeah.  So on May 11, 2010, at 9:27 p.m., Nelson
21 Fetgatter e-mailed you, correct?
22   A.  Yes.
23   Q.  Okay.  What is Phoenix Pollution?  Do you know
24 what that is?
25   A.  I'm sorry?

1   BILLY BURKETTE
2    Q.  Phoenix Pollution.  His e-mail is
3 nelson@phoenixpollution.com.  Do you know what that
4 company is?
5    A.  I -- it's -- Phoenix Pollution, if I remember
6 correctly, I'm going based -- I'm guessing, because I
7 can't recall it exactly, is one of the partners that had
8 additional Aqua N-Cap on hand.  If I remember correctly,
9 Jon said that -- that he was another distributor that
10 actually had product on hand that we could get.
11   Q.  Okay.  If you look at the last -- the
12 second-to-last sentence of that e-mail says, "If we do
13 place an order with you, we will provide you with a
14 purchase order for goods and services we are asking you to
15 provide and we will provide you with a ship-to location as
16 needed."
17      Did I read that correctly?
18   A.  Oop, this crazy thing.
19      "Please send a requisition authorization
20 letter on letterhead for me to show good faith to the
21 seller that we are not wasting his time."  And that's on
22 what document now?
23   Q.  Okay.  So the -- the e-mail that you were just
24 looking at where you said, "Please send a requisition
25 letter," scroll up.  I'm talking about the e-mail right

BILLY BURKETTE

1
2  above that.
3      A.  Okay.  What about it now?
4      Q.  The one that Nelson sent you.
5      A.  Uh-huh.  Containing the boom?
6      Q.  Yeah.  If you look at the second-to-last
7  sentence, it says, "If we do place an order with you, we
8  will provide you a purchase order for goods and services
9  we are asking you to provide and we will provide you with
10 a ship-to location as needed"?
11     A.  Correct.  I see that.
12     Q.  And he was telling you if he wants to purchase
13 something from you, he'll send you a purchase order,
14 right?
15     A.  Yes, sir, but I believe he transferred out.
16     Q.  Okay.  You never received a purchase order from
17 Phoenix Pollution, correct?
18     A.  I was not expecting one from Phoenix Pollution.
19 I thought we were talking about BP section chief.
20     Q.  You didn't receive one from BP either, correct?
21     A.  No, because they bought the company.
22     Q.  Okay.  So you never had a purchase order or
23 contract for any boom from BP?
24     A.  Not in writing, no.
25     Q.  What were the terms of your -- this oral

BILLY BURKETTE

1
2  agreement that you say for boom?
3      A.  That's what I'm telling you, it -- it fluctuated.
4  It was -- they told me that they would buy everything that
5  I could get my hands on.  So then I would supply them with
6  the name of the company, the location of the company, and
7  the quantity that they had on hand.  So then I would do
8  all the work, and then BP would circumvent me and buy the
9  boom anyway.  So it would be -- it would be -- I wouldn't
10 even have a claim had BP -- had BP not gone behind my back
11 and bought it.  Right?  But because they bought it --
12     Q.  They weren't obligated to buy it from you.  Your
13 claim only exists because you say BP bought something from
14 somebody else and not from you?
15     A.  No.  My claim exists because BP asked me to
16 locate it and that they would buy it, and then they didn't
17 do it.  They -- they -- they basically, like I said,
18 stabbed me in the back.  They told me they would do one
19 thing, and then they did something completely different.
20     Q.  Okay.  And that is based on your oral discussions
21 with people you say are representatives from BP?
22     A.  Well, I mean, don't these e-mails prove that
23 that's who they are?
24     Q.  Your claims are based on your oral discussions
25 with people that you claim are representatives of BP,

BILLY BURKETTE

1
2  correct?
3      A.  No, sir.
4      Q.  Okay.  So your claims are not based on oral
5  discussions with BP?
6      A.  No, sir.  You -- your statement was that my
7  claims are based on communications that I supposed are --
8  what was the word you just used, that I presumed were BP
9  employees?  I can only take the fact that I was in BP
10 headquarters, in that room, looking at people that --
11 eyeball to eyeball that said -- that had their names on
12 their shirts, that had BP shirts on, that they are
13 representatives of BP.  I didn't assume that.  That's just
14 -- I mean, if you're in a -- if you go in the gas station
15 at Exxon, you don't think you are going to buy Shell gas.
16     Q.  Understood.
17         What you are saying is your -- Global
18 Disaster's claims are based on oral discussions with those
19 people, not anything in writing, correct?
20     A.  Other than the e-mails, correct.
21     Q.  Okay.  If you scroll up to the e-mail dated
22 May 12, 2010, on Global Disaster 101, so it's the next
23 e-mail in line, the one that you were talking about
24 earlier where they referred you to David Barker.
25     A.  Okay.

BILLY BURKETTE

1
2      Q.  In that e-mail, Mr. Fetgatter said, "I'm not in a
3  position to execute any contractual agreements on behalf
4  of BP nor can I continue to do the dancing game and
5  therefore must pass your information down the line to
6  someone who has that ability."
7         That's consistent with what we were
8  discussing just now, that Mr. Fetgatter could -- did not
9  agree to any contractual arrangement with you in these
10 e-mails, correct?
11     A.  No, sir.  He didn't.  He sent me to somebody who
12 could.
13     Q.  Okay.  I'm sending a document --
14     A.  So that e-mail that you're talking about from
15 Mr. Fetgatter, it reads -- at the very beginning of it, it
16 says, "Many thanks for your kind words.  We are working
17 diligently to resolve the issues at hand," which means
18 that they kept circumventing me.
19         "Trust" -- so he is asking me to put trust
20 in BP, "that we might have some success in acquiring some
21 of the needed resources that you may have available."  So
22 I'm -- they are -- BP is asking me to trust in them, that
23 they will have some success in acquiring some of the
24 needed resources that I have available.
25     Q.  Well, in the e-mail, Mr. Fetgatter says "might

Page 122

BILLY BURKETTE

1
2 have some success," not "will have some success," right?
3     A.  Yeah, absolutely.  You're correct, sir.  I see
4 where we are going.  Yes, sir, that is correct.
5     Q.  And he said "success in acquiring some of the
6 needed resources that you may have available," right?
7     A.  Correct.  Yep.
8     Q.  He is not telling you definitively, "We will buy
9 this product from you at this price," correct?
10     A.  Correct.
11     Q.  You understood from his e-mail you had to go to
12 someone else to potentially get that authorization,
13 correct?
14     A.  Correct.
15     Q.  Okay.  Can you open the document that I just sent
16 that's marked Tab 17?
17         MR. KLAR:  I think this is Exhibit Number 8
18 or 7.
19         THE STENOGRAPHIC REPORTER:  7.
20         MR. KLAR:  Tab 17 will be Exhibit 7.
21         THE WITNESS:  Yes, sir.
22         (Exhibit 7 was marked for identification.)
23 BY MR. KLAR:
24     Q.  Okay.  Do you recognize this document?
25     A.  Looks like the standard one that we always use,

Page 123

BILLY BURKETTE

1
2 yes, sir.
3     Q.  Between -- it's a Confidentiality Agreement, and
4 it says, "Discloser, Billy Burkette.  Recipient, BP"?
5     A.  Yes, sir.
6     Q.  Okay.  Do you recall what the purpose of this
7 document was, why you were entering into a Confidentiality
8 Agreement with BP?
9     A.  I do.
10     Q.  What is it?
11     A.  As I have stated numerous times, BP would request
12 me to do something, I would do it, and they would
13 circumvent me.
14     Q.  Okay.  So it was important to you that BP keep
15 information that you provide them confidential?
16     A.  I mean, is there any other reason that you have
17 to execute that document?
18     Q.  Well, if you scroll down -- so is that a "yes"?
19     A.  Yes.
20     Q.  Okay.  If you scroll down to the last page, BP
21 didn't sign this document, correct?
22     A.  No, sir.  At this time is when they sent me over
23 the Master Service Agreement, I believe.
24     Q.  Are you referring to like a vessel of opportunity
25 agreement or something else?

Page 124

BILLY BURKETTE

1
2     A.  The Master Service Agreement was to provide a
3 multitude of things, including the vessel of opportunity.
4     Q.  Okay.  So BP and Mr. Burkette, Global Disaster,
5 never signed a Confidentiality Agreement, correct?
6     A.  I don't know if they did or not.
7     Q.  Okay.  Sending you document marked Tab 18.
8         MR. KLAR:  So you can mark that the next in
9 line, please?
10         (Exhibit 8 was marked for identification.)
11 BY MR. KLAR:
12     Q.  And this is a document produced by Global
13 Disaster, right, labeled Global Disaster 147?
14     A.  I think this is the one that BP sent to me.
15     Q.  Okay.  What is this document?
16     A.  Yeah, because it says -- this is the document
17 that BP sent back.  I guess they did not like the wording
18 in mine.
19     Q.  Okay.  This is a non-circumvention, nondisclosure
20 Confidentiality Agreement, correct?
21     A.  I believe so, yes.
22     Q.  And if you scroll to the signature page, it just
23 has your name on it, correct?
24     A.  Correct.  That's why I said I don't know if BP
25 signed it or not, because they sent it to me requesting my

Page 125

BILLY BURKETTE

1
2 signature.  I signed it and sent it back to them.
3     Q.  Okay.  But you don't have an executed copy of
4 this document from BP?
5     A.  I'm not sure if I do or don't.
6     Q.  Okay.
7     A.  I'm not -- I'm not sure -- you know, that may
8 have been some of the documents that I lost in the flood.
9 I am not positive.  I don't know.
10     Q.  I'm sending a document marked Tab 19.
11         MR. KLAR:  If the court reporter can please
12 mark that the next exhibit.
13         (Exhibit 9 was marked for identification.)
14 BY MR. KLAR:
15     Q.  Do you recognize this e-mail string between you
16 and Mr. David Barker?
17     A.  Yes.
18     Q.  That's the person that Mr. Fetgatter referred you
19 to in his e-mails, correct?
20     A.  Correct.
21     Q.  Okay.  If you scroll to the bottom of the first
22 page, it's an e-mail from you to Mr. Barker on May 11th,
23 right?
24     A.  Yes.
25     Q.  Okay.  It says, "This is all -- this is all I

BILLY BURKETTE

1    have left.  The fine folks at ES&H and the State of
2    Louisiana took the rest I had.  I will have some more
3    confirmations on boom this afternoon, and I just signed a
4    contract with the MFG to produce 2,000 foot a day
5    exclusively for us.  I also have three other sources.  I'm
6    waiting for the contract to come back to me.  I promise
7    350 miles of it.  I don't have the contract, but I do have
8    the Confidentiality Agreement and the Non-Circumvent
9    Agreement signed for them.  Thanks again in advance for
10   your time and assistance."
11             Did I read that correctly?
12       A.  Yep.
13       Q.  Okay.  Mr. Barker replied to that e-mail that
14   same day, correct?
15       A.  I don't see that.
16       Q.  It's right above your e-mail.
17       A.  Oh, yes, I see it now.
18       Q.  Okay.  And Mr. Barker said:  "We will be
19   considering your proposal.  Under no circumstance is the
20   product, 2,000 feet per day exclusively for us, you refer
21   to in the e-mail below committed to BP unless you have a
22   signed purchase order from BP."
23             That's what he wrote, right?
24       A.  Yes.

BILLY BURKETTE

2       Q.  Okay.  You never got a signed purchase order from
3    BP, correct, for this product?
4       A.  No, sir.
5       Q.  Okay.  Who is -- who is MF G?
6       A.  They were a boom manufacturer that BP went
7    directly to and circumvented me and bought, which is, if
8    you go back and look at that previous e-mail, one of the
9    reasons that they asked for that is because I kept getting
10   circumvented.
11             Whether it was directly, intentional,
12   unintentional or indirectly, they -- I was there in the
13   office.  They asked for me to do things, and once I
14   would do it, they would go buy it and circumvent it, which
15   is the whole reason that we had to have the Non-Circumvent
16   Agreement.
17       Q.  But sitting here today, you don't know if they
18   actually ever signed a Non-Circumvent Agreement with you?
19       A.  I remember -- I remembered them saying -- I
20   remember them saying that they received mine that they
21   sent to me, and that that was all that was needed.  You
22   know, keep in mind, again -- I keep trying to reiterate
23   that I did a lot of work for which I was never paid that
24   BP asked me to.
25             If you go out and you buy a lawn mower and

BILLY BURKETTE

1    you go and cut somebody's grass because they asked you to
2    cut it and they don't pay you, you would have expenses in
3    that, you would have a loss in that, you would have the
4    understanding, even though it's not in contract form,
5    that, "Hey, I'll pay you a hundred dollars to cut my grass
6    if you go buy a lawn mower to do so."  And then they went
7    and bought a lawn mower themselves at a garage sale for
8    $20 and cut their own grass.  I'm not blaming them for
9    doing that.  I'm just saying they asked me to do
10   something, I did it in good faith and they did not perform
11   in good faith reciprocatoral [sic].  That's all I --
12   that's what my statement is.
13       Q.  Do you know whether BP -- stepping back.
14             The product that is discussed in this
15   e-mail, "2,000 feet a day exclusively for us" of boom, do
16   you know whether BP procured that boom from another
17   manufacturer or distributor?
18       A.  That was that manufacturer that circumvented me
19   and went and bought.
20       Q.  MFG?
21       A.  I'm almost positive, yes.
22       Q.  Okay.  You're not sure, though?
23       A.  I'm not completely positive, no.
24       Q.  How much did you -- let's say BP was going to

BILLY BURKETTE

1    place an order with you for that product.  How much did
2    you expect to -- to make off of that contract?
3       A.  $2 a foot.
4       Q.  Okay.  And at 2,000 feet, that's 4,000, right?
5       A.  Correct.
6       Q.  Okay.  And for over what period of time?
7       A.  As much as that manufacturer could produce.
8       Q.  So is it -- is it --
9       A.  That's what they --
10       Q.  Are you paying for the per-day use of the
11   equipment?  Is that's how it's supposed to be structured?
12       A.  It's per-day purchase of boom.
13       Q.  Okay.  So if BP were to purchase 2,000 feet of
14   boom, let's say, on May 12th, do they pay for that
15   2,000 feet once or do they pay for it every single day?
16       A.  Depending on where -- see, that was part of the
17   discussion that we had of whether or not they would rent
18   or buy, so when they -- when they -- basically when they
19   started this, it was -- everything changes at a blink of
20   an eye.
21             So some contracts, they rented boom, and
22   then some contracts, they bought boom.  I do not recall
23   exactly what this was for, but the best of my
24   recollection, this was the purchase of the boom.

BILLY BURKETTE

1
2    Q.  Got it.  Did you -- in that e-mail at the bottom
3  of the page you referenced potentially having other
4  sources and "waiting for contracts to get back to me."
5         Did you ever enter into those contracts?
6    A.  I want -- don't want to answer incorrectly, so.
7  I know that we had several contracts with several
8  manufacturers that BP circumvented me on.  I do not recall
9  if that specific e-mail references a named manufacturer.
10 Like I say, because BP kept stabbing me in the back, I
11 don't -- I don't recall at what point -- we were talking
12 about so much and so many things.
13        Again, in good faith, I'm trying to help.
14 I'm not trying to -- you know, I'm trying to do honest,
15 straightforward, good-faith business for which BP kept
16 circumventing me.  So I don't recall if it's -- what
17 companies those were at that time, so that e-mail.
18        MR. KLAR:  Are folks okay to break for
19 lunch?  I know it's a little late over there.  We have
20 been going for awhile.
21        MR. NEWELL:  Fine with me.
22        MR. KLAR:  What was that?
23        THE WITNESS:  I'm good.  We can keep going.
24 I mean, do we have a lot left?
25        MR. KLAR:  Yeah.  We have got quite a bit.

BILLY BURKETTE

1
2  Want to break for -- for 30 minutes?
3         THE WITNESS:  That's fine with me.  It's up
4  to y'all.
5         MR. KLAR:  Okay.  Eric is that good with
6  you?
7         MR. NEWELL:  How about, yeah, like 2:15
8  central time.  That's about 35 minutes.
9         MR. KLAR:  That works.  We can go off the
10 record.
11        THE VIDEOGRAPHER:  Time is 1:39 p.m.  We are
12 going off the record.
13        (Lunch break taken.)
14        THE VIDEOGRAPHER:  Time is 2:29 p.m.  We are
15 back on the record.
16 BY MR. KLAR:
17    Q.  Okay.  Mr. Burkette, I'm sending you a document
18 labeled Tab 20.
19        MR. KLAR:  Can the court reporter please
20 mark this the next exhibit?
21        THE STENOGRAPHIC REPORTER:  Yes, that's 10.
22        (Exhibit 10 was marked for identification.)
23 BY MR. KLAR:
24    Q.  Are you able to open that, Mr. Burkette?
25    A.  Yes.

BILLY BURKETTE

1
2    Q.  Okay.  Do you recognize this e-mail?
3    A.  I guess.  It looks like I sent it on May 27th.
4    Q.  Okay.  What does -- the subject line reads "EPA
5  POC."  Do you recall what that means?
6    A.  Yeah.  That was the -- according to -- don't
7  remember who it was, but somebody above Jackie's head said
8  that the product Aqua N-Cap could not be used because of
9  its detriment to the environment, that they needed proof
10 from the EPA that it met the specs, and that it was an
11 approved product that the EPA -- in other words, in order
12 for BPA -- BP to be allowed to use the product Aqua N-Cap,
13 they wanted proof, which made no sense to me, that the EPA
14 would approve it.
15        And I think you have the other e-mail that
16 goes with this; that is, the actual EPA from -- document
17 approving BP -- approving Aqua N-Cap for BP's use.  In
18 other words, the Environmental Protection Agency had to
19 authenticate that Aqua N-Cap was the correct product to
20 use that would demonstrate less environmental impact than
21 COREXIT.
22 BY MR. KLAR:
23    Q.  Okay.  So when did you learn that the -- strike
24 that.
25        You learned that the EPA was going to

BILLY BURKETTE

1
2  require some sort of proof or certification after you had
3  spoken with BP procurement?
4    A.  No, sir, incorrect.
5    Q.  Okay.  When did you learn that the EPA was going
6  to require this information in order for BP to use Aqua
7  N-Cap?
8    A.  You have it completely backwards.  BP wanted to
9  know if the EPA would approve -- or was it an approved
10 product by the EPA.  The EPA didn't want to know anything.
11 It was all BP.
12    Q.  Okay.  Understood.
13        When did you learn that BP wanted the EPA to
14 approve this product?  Was this after your discussions
15 with procurement?
16    A.  I think it was probably during the same
17 timeframe.
18    Q.  I just -- I just want to make sure I understand
19 the timeline correctly.  So sorry that we are treading
20 over this again.
21        So you initially had discussions with folks
22 in BP's procurement group about using Aqua N-Cap?
23    A.  Correct.
24    Q.  Correct?  Okay.
25        Do you remember who in the procurement

Page 134

BILLY BURKETTE

1
2 specifically or no?
3     A. No, sir, I do not. Multiple people. It was
4 multiple people.
5     Q. Do you remember the approximate timeline of those
6 -- strictly the procurement discussions?
7     A. No, sir.
8     Q. Okay. After you spoke with procurement,
9 that's -- at some point in time, you had a conversation
10 with a Jackie Michelle; is that right?
11     A. After I had had multiple conversations with
12 procurement and provided to procurement that -- the EPA
13 document, the state emergency response plan from BP and
14 multiple communications with Captain Stanton at the Coast
15 Guard. And then Captain Stanton is the one that brought
16 me into the building and introduced me to Jackie.
17     Q. Okay. Was it before or after that discussion
18 where you were told BP needs to check with the EPA first
19 before using this product?
20     A. I'm sure it was before, because her answer was
21 short and sweet.
22     Q. That BP wouldn't use the product?
23     A. Well, it wasn't so much that they would or
24 wouldn't use the product. It was the reason that they
25 would or wouldn't use the product that struck -- I mean,

Page 135

BILLY BURKETTE

1
2 when she told Captain Stanton and I, "Not no but hell no,
3 because it'll quantify the spill and cost us billions in
4 fines," we both looked at each other in shock. Captain
5 Stanton and I did.
6     So basically, at that point, when he asked
7 to use it in the burn ring and she still -- she said,
8 "Maybe you didn't hear me, but no, we are not going to use
9 Aqua N-Cap at all," I -- I was -- I asked -- I said, "So
10 the environmental impact is not as important as saving BP
11 money?" And that's -- she said, "That's correct."
12     So the whole -- the whole liability portion
13 of quantifying the spill was basically viewed as, "We are
14 more concerned" -- BP's view, according to her, was that
15 the use of Aqua N-Cap was obviously the right choice of
16 product to use to respond to the spill, and it was the
17 product -- one of the products on the list that told
18 the State that they would use, but because it was going to
19 quantify something that everybody was guessing at, because
20 they couldn't verify how much was coming out, that because
21 it would quantify it, because every pound captures
22 11 pounds of carbons, then they made an executive decision
23 to reduce their liability, and dollar figures and fines
24 became more important than the environmental impact.
25     Q. So before your discussion with Jackie, you

Page 136

BILLY BURKETTE

1
2 learned BP needed to get -- or BP told you that they
3 needed to get EPA approval for the products first.
4     By the time you had spoken with Jackie, do
5 you know one way or another whether BP had received that
6 okay from the EPA?
7     A. Best of my recollection, we gave that to them
8 prior to that conversation with her, because, like I said,
9 it was multiple conversations with multiple people. The
10 first -- the first time I introduced it, they said that it
11 was not an approved product. When I provided them
12 the letter from the State, their own hazardous
13 mitigation -- I mean, hazardous response plan and showed
14 them where it was highlighted that Aqua N-Cap was on
15 there, the next thing came back was, "We need an EPA
16 approval."
17     I got them the EPA approval, and the EPA
18 approval was on the State's website, because BP had to
19 give it to the State, along with the product list. And so
20 it was just very obvious that, you know, the employees
21 down on the floor really had no clue. They are just doing
22 what they are told. They had a job to do and they did
23 what they were told to do. They really didn't know.
24     Q. Okay.
25     A. And that's why I tried to help them. And so by

Page 137

BILLY BURKETTE

1
2 helping them -- I guess the answer to your question that
3 you're looking for is they would have had that prior to --
4 because I know Captain Stanton had it. So yes, it was
5 prior to Jackie getting it.
6     Q. Okay. So turning back to that e-mail that's
7 Exhibit 10, Tab 20, in that e-mail you wrote to Chris Ott
8 we talked about earlier, "Lynn DeHaven," there's a phone
9 number, "according to BP, this person is the team lead
10 that has to approve Aqua N-Cap for their use. Best, Billy
11 Burkette."
12     Do you recall writing that?
13     A. Yeah.
14     Q. So did you send this e-mail before speaking to
15 Jackie Michelle or before?
16     A. Oh, I don't remember what -- I don't remember the
17 exact date that I talked to her.
18     Q. Did you have any understanding of where Lynn
19 DeHaven fit into the structure at BP?
20     A. No, sir, I do not.
21     Q. Who told you that -- it says, "According to BP,
22 this person is the team lead." Who at BP told you that?
23     A. It was one of the guys in procurement down there
24 on the floor. I don't remember who it was.
25     Q. Okay. So at this time, by the time you sent this

BILLY BURKETTE

1
2  e-mail on May 27th, 2010, you understood that you had to
3  reach out to somebody else to get approval to -- for BP to
4  purchase Aqua N-Cap from you, right?
5      A.  Oh, man, I don't -- I don't really recall.  You
6  know, it was never -- it was never in a -- I didn't have a
7  thought process of what a requirement would mean for
8  procurement.  My thought process at that time was, based
9  on my experience and knowledge, you have a disaster plan
10 that you have submitted to the State that says, "This is
11 what BP will do if there's a spill."
12         So I tried to read through that, make some
13 notes, assess the damages and the impact to the
14 environment, as well as the wildlife, as well as the
15 fishing estuaries, all of those things were being
16 impacted.  And I tried to do what was right, and the right
17 thing would have been -- or the most prudent thing in
18 doing due diligence would have been to use the Aqua N-Cap.
19 But when they -- when I was told that it was BP's position
20 that the environment didn't matter as much as their
21 pocketbook did, then, at that point, it was, you know, you
22 tried to -- to ask, you tried to question, and you tried
23 to discuss the approach, and to learn why their thought
24 process was money over the environment and over the
25 documents that they said that they would use took

BILLY BURKETTE

1
2  precedence.  And the only thing that I could figure out
3  was that BP was, at no point, concerned about people,
4  animals or environment.  They were only concerned about
5  cost.  So that was not part of what the -- the emergency
6  response plan, you know, verbiage was.
7      Q.  At the point that you sent this e-mail, is it
8  fair to say that you were still trying to get BP to
9  purchase Aqua N-Cap from Global Disaster?
10     A.  Not so much that I was trying to get BP to
11 purchase something; I was trying to get BP to respond to a
12 disaster in an appropriate fashion that would mitigate
13 damages to the environment as well as the wildlife
14 and people.  It was just the right thing to do.  I was
15 trying to do what was right.
16     Q.  But it's your position that the right thing to do
17 in this situation would have been to use Aqua N-Cap, and
18 at the point that you sent this e-mail, you were trying to
19 get BP to purchase it from Global Disaster, correct?
20     A.  Well, I'm not going to say that that was my
21 thought process.  I mean, I guess you can interpret that
22 any way you want to interpret it.  I'm trying to do what
23 was right and if -- if that's how you want to view it,
24 then view it however you want to view it.  Still, either
25 way you view it, in any capacity, BP chose not to use it.

BILLY BURKETTE

1
2  So there you go.
3         It doesn't matter if it was right or wrong.
4  BP didn't care.  BP only cared about the money.
5      Q.  Okay.  I -- I understand your position.  I'm just
6  saying, by the time -- I'm just asking:  By the time that
7  you sent this e-mail, it's fair to say you hadn't given up
8  on trying to get BP to use Aqua N-Cap, correct?
9      A.  Well, here we are 11 years later, and I'm still
10 trying to get BP to do what was right.  So that is a
11 correct statement, yes.
12     Q.  Okay.  As of May 27, you were still trying to get
13 BP to use Aqua N-Cap?
14     A.  Yes.
15     Q.  Okay.  How many discussions did you have with
16 Jackie Michelle?  Was it just the one?
17     A.  One face to face and probably, I think, three or
18 four over the phone.
19     Q.  Do you recall the order, like, was the first --
20 the first one face to face and then you had the phone
21 calls after, or was it a different order?
22     A.  No.  First one was face to face, and then the
23 phone calls -- subsequent phone calls after that was to
24 discuss why doing what was right was not as important as
25 saving money and saving face.

BILLY BURKETTE

1
2      Q.  Were all the discussions that you had with --
3  with Jackie Michelle related to Aqua N-Cap specifically?
4      A.  Nope.
5      Q.  What other topics did you discuss besides Aqua
6  N-Cap and what you just mentioned?
7      A.  The horrible effect that COREXIT had on
8  everything, water, estuaries, O2 levels, animals, you name
9  it, just people -- pick one, vessels.  The damage that
10 that toxic stuff caused versus using something that was
11 safe, I mean, it was -- to me, it was a no-brainer.  I
12 mean, it wasn't brain science or rocket surgery.  It was
13 commonsense.
14     Q.  Did you -- do you recall how soon after that
15 face-to-face with Ms. Michelle you had phone calls?
16     A.  No, sir, I do not.
17     Q.  Do you recall the time period in between those
18 phone calls?  Were they same day, multiple days, weeks?
19     A.  No, sir, I do not.
20     Q.  And is the only reason -- is it your
21 understanding that the -- sorry.  Strike that.
22         Is all that Ms. Michelle conveyed to you,
23 the reason why BP would not use Aqua N-Cap, is that it
24 would quantify the impact of the spill and cost them
25 money?

BILLY BURKETTE

1
2    A.  Yes.
3    Q.  Okay.  No other reasons why they wouldn't use it?
4    A.  No, sir, I -- I shouldn't say that.  I found out
5  later -- and I don't recall the timeframe, but I found out
6  later that they acquired the RTASCo and Aqua N-Cap, is
7  what I was told, and so that was completely baffling to
8  me, because why would you buy something that you didn't
9  want to use?
10    Q.  Do you recall -- not when you found out but when
11  this acquisition occurred?
12    A.  No, sir, I don't recall.  It was shortly.  I
13  mean, it wasn't -- it wasn't like a year.  It was, like,
14  within, I don't know -- it wasn't much -- I don't recall,
15  no, sir.
16    Q.  Do you know one way or the other whether BP ever
17  actually used Aqua N-Cap in response to the spill?
18    A.  Do I know?  No, sir, I do not.
19    Q.  Do you recall any discussions with RTASCo --
20  well, taking a step back.
21        When was the last time you had a
22  conversation with anybody at RTASCo?
23    A.  Jon Fowler told me that he was at -- no longer at
24  liberty to discuss anything with the BP spill with me or
25  anybody, for that matter.

BILLY BURKETTE

1
2    Q.  When was that?
3    A.  Don't recall.
4    Q.  Did you ask him anything during that conversation
5  about your distribution rights to Aqua N-Cap?
6    A.  I tried.  He said he was not at liberty to
7  discuss anything with anybody.  He kept reiterating that.
8    Q.  Okay.  Did you ever initiate any kind of dispute
9  or a lawsuit with RTASCo about -- over -- over your
10  distribution rights with Aqua N-Cap?
11    A.  No, sir.
12    Q.  During your conversation with Ms. Michelle, the
13  face-to-face one, am I correct that Captain Stanton was
14  present?
15    A.  You are correct.
16    Q.  Was there anyone else that was there?
17    A.  No, sir.
18    Q.  Over the phone was it just you two, Ms. Michelle
19  and you, or anyone else on the line?
20    A.  To the best of my knowledge, it was just us two.
21    Q.  Okay.  I want to switch gears a little bit and
22  talk about ES&H, which we touched on briefly earlier.
23        You mentioned that you had a Master Services
24  Agreement with ES&H, right?
25    A.  Yes, sir.

BILLY BURKETTE

1
2    Q.  Do you recall when you first became acquainted
3  with ES&H?
4    A.  No, sir.
5    Q.  It was after the spill, though, right?
6    A.  Oh, yes, sir.  It was one of the procurement guys
7  that put in touch with them that said, because I was not a
8  prime contractor, that I had to go underneath a prime
9  contractor.
10    Q.  Got it.  And if I understand what you're -- what
11  you testified to earlier about ES&H, you would procure
12  things for them that they ultimately would provide to BP,
13  correct?
14    A.  Well -- so all of that happened right around the
15  same time that we had the conversation with Jackie and
16  that we had -- the conversations with the EPA and RTASCo
17  and Jon and a bunch of people, Chris and David and all
18  kinds of people.  And, you know, I expressed to them that,
19  financially, they were bankrupting me.  And so I told them
20  that if they had not, you know, intended to use me and to
21  provide -- let -- whatever we could provide in assistance,
22  then I could not financially keep doing what I was doing.
23        And right about that time is when they
24  asked -- I guess it was somewhere in Alabama or
25  Mississippi, they asked for A-1 to send some trucks to

BILLY BURKETTE

1
2  haul the tar balls, and it took them weeks to pay that
3  bill, and it was -- I don't know, it was almost a hundred
4  thousand dollars, I believe, or more.  I don't remember
5  exactly, but it was up there.  It wasn't no -- just a
6  little bit.
7    Q.  When you say it "took them weeks," who do you
8  mean, "them"?
9    A.  BP.
10    Q.  BP, okay.
11    A.  Yes.  And so it was such a delay and a hassle and
12  aggravation and lies and deceit from BP's part that,
13  basically, you know, I pulled the plug, because I didn't
14  trust them; they weren't doing what they said they would
15  do; they back-stabbed me; they did everything that -- that
16  you could possibly do to delay their -- their objective
17  was clear and concise by that point that they were not
18  concerned with anything that was right.  They only wanted
19  to do what they wanted to do, how they wanted to do it,
20  totally inconsistent with what they told the State of
21  Louisiana that they would do in response to the spill.  So
22  I guess I was --
23    Q.  When you said --
24    A.  I was aggravated and just really, just --
25  financially, because BP did everything that they did to

Page 146

BILLY BURKETTE

1          BILLY BURKETTE
2 me, you know, it -- may not seem like much, but you drive
3 all the way to Alabama to meet BP's inspector, which BP
4 sent the inspector over to Alabama to look at the boom to
5 make sure it met spec.  Then they told me to meet the
6 inspector out there.  I mean, it may not be much but you
7 start doing 2, $300 a day in expenses, and then nothing
8 that you could do other than try to do ethical business
9 and BP just steady, you know, back-dooring you, what --
10 what other options do you have other than either to go in
11 debt or either to pull the plug?
12          So, you know, basically my contention is, is
13 that BP forced me out of business, they forced me out of
14 the Port, they went behind my back.  They asked me to do
15 things that, obviously, you seem to think that require a
16 written agreement that I personally don't think it was
17 required because I'm there in person taking verbal orders
18 from BP's employees to do things, that they never paid
19 for.  So, I mean, you know, that -- at that point, it was
20 just a mute [sic].  I was -- I was driven out of business
21 by BP and no matter whether it was intentional or
22 unintentional, the end result is the same:  BP cost me a
23 lot of money.
24     Q.  Okay.  When you say that you "pulled the plug,"
25 do you mean that you -- you shut down Global Disaster's

Page 147

1          BILLY BURKETTE
2 operations and stopped doing business with BP, or do you
3 mean something else?
4     A.  No, I mean I stopped doing business with BP.
5     Q.  Okay.  At that point -- what point did you, using
6 your words, pull the plug?
7     A.  Oh, I -- I don't -- are you asking for a date and
8 a time?
9     Q.  Not -- just a range.  Was it in 2010?
10     A.  Yes, sir.
11     Q.  Okay.  Was -- was Global Disaster still in
12 business in 2010 or -- or did it cease doing business in
13 2010?
14     A.  Well, after the financial burden, I mean, I kept
15 it active, but we didn't do any business until 2013.
16     Q.  Okay.  So from between sometime in 2010 until
17 sometime in 2013, Global Disaster wasn't doing any type --
18 any business?
19     A.  No, sir.  I couldn't afford to.  They broke it.
20     Q.  Okay.  You said -- you were talking about driving
21 to Alabama to meet an inspector.
22          How many times did you do that?
23     A.  I don't recall, sir, multiple times.
24     Q.  Was it more than ten?
25     A.  I don't recall.

Page 148

1          BILLY BURKETTE
2     Q.  Was it less than 50?
3     A.  Yes.  I would say that would be a safe number.
4     Q.  Okay.  So $300 a day, let's say you did it 50
5 times at most --
6     A.  That's just -- when I say that, I'm talking about
7 actual cost:  fuel, drive time, eat, sleep, hotel,
8 whatever you want to call it.  I mean, I'm talking about
9 actual cost.  We are not talking about any -- any labor in
10 there, any of my time.  Well, that's -- you know, I didn't
11 even count that.
12     Q.  Well, what would your time be billed towards BP
13 if they are coming to inspect a -- a boom lot, for
14 example?
15     A.  Well, I mean -- I would think that my time would
16 be the same no matter what, no matter if you -- as a
17 consultant, as a response, as a mitigation expert, however
18 you want to call it.  I mean, I bill out at a hundred
19 dollars an hour, so, you know.
20     Q.  Did you tell the BP representatives that your
21 rate was $150 an hour?
22     A.  Nobody ever asked.
23     Q.  Okay.  So you never had any verbal or written
24 agreement with them to pay $150 an hour for your time?
25     A.  They did not -- the factor of dollars never was a

Page 149

1          BILLY BURKETTE
2 question.
3     Q.  Okay.  So you never had any discussions with BP
4 about money?
5     A.  Not as far as my billable time, no.  Not at a
6 rate which would be, I guess you would call it, documented
7 on the contract, you know.
8          Don't you have the -- the ES&H contract?
9     Q.  Yep.  I'm sending it to you right now.
10     A.  There you go.
11          MR. KLAR:  Can the court reporter please
12 mark this, Tab 8, the next in line?
13          THE STENOGRAPHIC REPORTER:  Exhibit 11.
14          (Exhibit 11 was marked for identification.)
15 BY MR. KLAR:
16     Q.  Is this the Master Services Agreement that you're
17 referring to with ES&H?
18     A.  It looks close, yes, sir.
19     Q.  Okay.  Is this one dated June 15, 2010, right?
20     A.  I guess.  I don't see any sign -- any signatures
21 on it.
22     Q.  Okay.  Yeah.
23          So at the bottom of the third page, there's
24 a space for initials, right?
25     A.  Yep.

Page 150

BILLY BURKETTE

1
2    Q.   And it's blank?
3    A.   That's what makes me wonder if this is the actual
4  one.
5    Q.   And the signature page on the last page is also
6  blank, right?
7    A.   That's why I say I don't think this is the
8  accurate document.
9    Q.   Okay.  Do you -- this is the only copy of the
10  ES&H agreement that we have.  Are you -- are you aware of
11  any other document reflecting your contract with ES&H?
12    A.   They sent the document to me.  I signed it, sent
13  back, so I'm assuming that they would have a copy of it.
14  We can subpoena that document from them, I'm sure.
15    Q.   Okay.  But you don't have the document, though?
16    A.   No, sir, I do not.
17    Q.   Do you recall whether the -- the terms of the
18  agreement, like the actual words of the contract, were
19  negotiated with ES&H?
20    A.   No, sir.
21    Q.   So you reached out to them at some point when BP
22  told you, "We need you to work with a -- an approved
23  contractor," and they sent you this agreement?
24    A.   I -- I did not have -- I did not reach out to
25  ES&H.  BP had ES&H reach out to me.

Page 151

BILLY BURKETTE

1
2    Q.   Okay.  So do you recall when ES&H first contacted
3  you?
4    A.   No, sir, I do not.
5    Q.   Do you know how soon before June 15, 2010, the
6  date of the contract, a week?  A month?
7    A.   It must have been about a week, I'm guessing.
8    Q.   Okay.  So after ES&H reached out to you, did you
9  have any phone calls or meetings with ES&H before seeing
10  this agreement?
11    A.   Yes.
12    Q.   Okay.  With who?
13    A.   Don't recall.
14    Q.   Do you recall when they (inaudible)?
15    A.   No, sir.
16    Q.   Do you recall what was discussed?
17    A.   Basically just the -- the questions -- you know,
18  they were more concerned with what, you know, the products
19  and services that I could provide or that I had that could
20  be utilized was the basics of our discussion.  It was
21  not -- it was not so much about the contract or its
22  contents or its terms; it was more in line with, "Hey, BP
23  told us to send you a Master Service Agreement because
24  they want to use whatever you have, and we are supposed to
25  be getting a list of all the products and services that

Page 152

BILLY BURKETTE

1  you can provide."
2    Q.   Did you provide them with a list?
3    A.   I don't -- I don't think it was a written list.
4  I don't recall.  I know we had conversations about it,
5  multiple times.
6    Q.   Okay.  Were those conversations all over the
7  phone?
8    A.   Yes.
9    Q.   Okay.  So after those discussions, they sent you
10  a -- a copy of the agreement, right?
11    A.   Yes, sir.
12    Q.   Okay.  And there weren't negotiations over it.
13  You were okay with the terms?
14    A.   I mean, it didn't matter if I was okay or not
15  okay.  It's -- it's an ultimatum.  If you want to do
16  business, here it is, sign it or don't sign it.  We don't
17  care.
18    Q.   Okay.  So there weren't any changes to the
19  agreement?  That's all I'm trying to establish.
20    A.   Correct.
21    Q.   Okay.  Can you please turn to the second page of
22  the agreement, Section 4, that says, "No obligation to
23  order or accept work"?
24    A.   Yep.

Page 153

BILLY BURKETTE

1
2    Q.   Okay.  It says, "This agreement does not obligate
3  Company to order any labor, goods, services, and/or
4  equipment from Contractor, nor does it obligate Contractor
5  to accept any such orders.  But it shall, however, control
6  and govern all work, all orders, the same classified in
7  written purchase orders or statements of work issued by
8  Company and accepted by Contractor, and shall define the
9  respective obligations of Company and Contractor during
10  the terms hereof."
11         Did I read that correctly?
12    A.   Yes.
13    Q.   Okay.  So you understood from this contract that
14  any work ES&H or products or services that ES&H was going
15  to acquire or purchase through you would be specified in a
16  written purchase order or statement of work issued by them
17  to you, correct?
18    A.   Correct.
19    Q.   Okay.  Did ES&H ever issue a written purchase
20  order to Global Disaster pursuant to this agreement?
21    A.   No.
22    Q.   So Global Disaster never provided any labor,
23  goods, services or equipment to ES&H for ultimate
24  provision with BP pursuant to this agreement?
25    A.   Nothing other than the list.

BILLY BURKETTE

1
2     Q.  Okay.  Just a list of what you could offer, not
3 the actual services and goods themselves, correct?
4     A.  That is correct.
5     Q.  Do you have an estimate of how much in damages
6 Global Disaster is claiming it suffered as a result or
7 relating to this relationship with ES&H?
8     A.  No.
9     Q.  When did your contract with ES&H terminate?
10    A.  I don't know.
11    Q.  Was it in 2010?
12    A.  I don't recall.
13    Q.  I'm sending a document, Tab 25.
14          MR. KLAR:  Can the court reporter mark this
15 next in line?
16          THE WITNESS:  Okay.
17          (Exhibit 12 was marked for identification.)
18          THE STENOGRAPHIC REPORTER:  Yes, marked as
19 12.
20          MR. KLAR:  Thank you.
21 BY MR. KLAR:
22    Q.  Do you know what this document is?
23    A.  Yes.
24    Q.  What -- what is it?
25    A.  Price list.

BILLY BURKETTE

1
2     Q.  Is this something that you provided to ES&H?
3     A.  I don't recall.  If it was -- if it was something
4 that I supplied or if it was something that they sent to
5 me as a sample of what they needed.  I don't recall, sir.
6     Q.  Okay.  Do you know why at the top right corner in
7 the customer it says "BP Lafitte," or Lafitte?
8     A.  Lafitte.
9     Q.  Lafitte.  What is that name?
10    A.  That's the location of that site.
11    Q.  Where is Lafitte?
12    A.  Lafitte is south of Houma.  It's on the coast,
13 Louisiana coastline.
14    Q.  Got it.
15          On the bottom left corner, "company rep
16 signature," you didn't -- you haven't signed this
17 document, right?
18    A.  No, sir.
19    Q.  And this services ticket if you look at the
20 bottom right corner it says, "Total column A and B,
21 68,913.75," right?
22    A.  Yes, sir.
23    Q.  Did you recall receiving any other service
24 tickets from ES&H?
25    A.  I recall seeing plenty of them.  I just don't

BILLY BURKETTE

1 actually have them in my possession anymore.
2
3     Q.  Okay.  And you don't recall supplying any of the
4 pieces or equipment that are listed on the services
5 ticket?
6     A.  I mean, we supplied a bunch of stuff.
7     Q.  To ES&H?
8     A.  No, sir, to BP.
9     Q.  Okay.  So you didn't supply anything pursuant to
10 the contract with ES&H?
11    A.  Not to the best of my knowledge, no, sir.
12    Q.  Okay.  Well --
13    A.  You see, this is what I'm telling you.  What
14 happened was BP put these prime contractors in a position
15 to basically force companies like A-1, companies like
16 Global Disaster, companies like, you know, the VOO, all of
17 the fishermen, all of those things, they forced those
18 things to go into companies like ES&H, Oil Mop, Witt
19 O'Brien -- or O'Brien at the time, now it's Witt O'Brien.
20 They forced all of that to happen.  Not whether or not we
21 wanted it to, they made us do that.
22    Q.  What products did you -- did Global Disaster
23 supply to BP?
24    A.  I don't recall the exact list, but boats, of
25 course the rock crushing, of course trucking, of course --

BILLY BURKETTE

1 not so much A-1 trucking, but other company trucking that
2 we would subcontract to, equipment, rakes, computers, me
3 teaching classes, just a menagerie of stuff.
4     Q.  Okay.  Of that list that you just listed --
5 described, are there pieces of that that BP did not pay
6 for?
7     A.  They didn't pay me for anything.
8     Q.  Okay.  So all of that that you provided --
9     A.  Let me take that back.  Let me take that back.
10 Let's back up.  They paid me 250,000 -- they forced me to
11 accept a $250,000 payment for A-1 Towing & Hauling,
12 exclusively for A-1 Towing & Hauling.  Had absolutely
13 nothing to do with Global Disaster.
14    Q.  Okay.  The -- the services and the products that
15 you just discussed, rock crushing, of course trucking,
16 subcontractor, equipment, rakes, computers, teaching
17 classes, who was providing those to BP?  Was it you?  Was
18 it A-1?  Was it Global Disaster?  Who was providing that?
19    A.  It was me.
20    Q.  Billy Burkette?
21    A.  Yes.
22    Q.  Okay.  So Global Disaster wasn't teaching
23 courses?
24    A.  Man, I don't -- you know --

BILLY BURKETTE

Q. Okay. Looking back at that certificate --

A. However you want to word it. If you want to try to make it convoluted and -- and confusing, that's up to you, sir. Any -- it doesn't matter to me, whether you want to classify it as me or if you want to classify it as Global. I don't care, however you want to word it.

Q. So Global Disaster wasn't providing -- Billy Burkette, not Global Disaster, was providing subcontracts for equipment, rakes, computers and teaching classes to BP?

A. If you say so.

Q. Do you?

A. Nope.

Q. So what do you think?

A. I don't -- I don't have anything to say.

Q. Okay. You have no position?

A. If you really want to know what I have to say, which I'm sure you don't, I'm saying that you are confusing this and trying to structure the narrative for your benefit.

Q. I'm just trying to get some questions answered. I'm trying to understand who provided what services and what was and wasn't paid for.

A. I provided all the services, along with Global



BILLY BURKETTE

Disaster, and they didn't pay for any of it. How about that?

Q. Okay. But sitting here today, you can't differentiate who was providing what?

A. Did not know that I needed to.

Q. So no?

A. No.

Q. Okay. Did you -- going back to the services agreement, is Global Disaster claiming damages relating to this services agreement with ES&H?

A. I don't know. I don't recall.

Q. Aside from the Master Service Agreement with ES&H, was there any other agreement or relationship between Global Disaster and ES&H?

A. No.

Q. Okay.

MR. NEWELL: Hey, Austin?

Yeah.

When we get to a stopping point, can we take a bathroom break?

MR. KLAR: Yes.

MR. NEWELL: I mean, obviously, if you are on a roll, we can keep going, but I wanted to --

MR. KLAR: If you want to do -- I was about



BILLY BURKETTE

to switch topics, so if you want to do like a five or ten-minute, that's fine with me.

MR. NEWELL: Okay.

MR. KLAR: Off the record.

THE VIDEOGRAPHER: Okay. Time is -- sorry. Time is 3:18 p.m. We are going off the record.

(Brief recess taken.)

THE VIDEOGRAPHER: Time is 3:39 p.m. We are back on the record.

MR. KLAR: I'm sending Tab 26. Can the court reporter please mark that the next-in-line exhibit.

THE STENOGRAPHIC REPORTER: Yes, sir, 13.

(Exhibit 13 was marked for identification.)

MR. KLAR: You said 13?

THE STENOGRAPHIC REPORTER: Correct.

BY MR. KLAR:

Q. Mr. Burkette, do you have Exhibit 13 open?

A. Yes.

Q. Okay. Do you recognize this document?

A. Yes.

Q. What is it?

A. It's another request from BP at that time for me to procure labor that they shafted me on.

Q. So this is from Strategic Services USA, LLC, not



BILLY BURKETTE

BP, right?

A. Correct.

Q. Okay. Who is Strategic Services USA, LLC?

A. A subcontractor that I reached out to.

Q. Regarding what?

A. Regarding the request for labor that BP had asked me to obtain.

Q. Is this the only -- is the labor the only item which you discussed with Strategic Services USA or are there other products or services that you discussed with them?

A. I don't recall.

Q. The bottom right-hand corner is your signature or your name where the signature would go, right?

A. Yes.

Q. This is not signed By Strategic Services USA, LLC, correct?

A. They sent it to me. There's no need to sign it.

Q. There's no signature by Strategic Services, correct?

A. Correct.

Q. When did you become acquainted with Strategic Services?

A. I don't recall.

Page 162

BILLY BURKETTE

1
2    Q.  Do you recall how you learned what they offer?
3    A.  Over the telephone.
4    Q.  Did they reach out to you, or did -- did you
5  reach out to them?
6    A.  I reached out to them.
7    Q.  And what did you discuss?
8    A.  The discussion I had was:  This is a
9  communication that basically BP, again, in the big room
10 and through phone calls, that BP said that's what their
11 needs were.
12   Q.  Okay.  So BP told you that they need between 250
13 to 500 workers in each of these four states that are
14 listed on this page?
15   A.  That is correct.
16   Q.  Okay.  And then you called Strategic Services and
17 said, "BP wants these workers; can you provide me a
18 quote?"
19   A.  Yes.
20   Q.  Okay.  For how much was -- was it the intent that
21 Global Disaster would then provide these laborers to BP
22 pursuant to an agreement between BP and Global Disaster?
23   A.  Could you repeat the question?
24   Q.  Sure.
25        So this -- this is a Letter of Intent from

Page 163

BILLY BURKETTE

1
2  Strategic Services to Global Disaster.  Was the intent
3  that BP would have a separate arrangement with Global
4  Disaster where Global Disaster would provide the laborers
5  that Global Disaster was obtaining through this agreement
6  with Strategic Services?
7    A.  That is correct.
8    Q.  Okay.  Was that arrangement with BP an oral
9  agreement, or was it reduced to writing?
10   A.  Oral.
11   Q.  Do you recall who the agreement was with at BP?
12   A.  I do not.
13   Q.  Do you recall when that agreement was made?
14   A.  I do not.
15   Q.  Do you recall at what cost to BP Global Disaster
16 would provide these laborers to BP?
17   A.  I do not.
18   Q.  If you turn to the second-to-last paragraph here,
19 it says, "It is the intent of Strategic Services USA, LLC
20 to enter into a formal subcontract agreement with Global
21 Disaster provided Global Disaster Recovery discloses their
22 contract with ES&H on payment schedule and insurance
23 coverage required for the project."
24        Did I read that correctly?
25   A.  I believe so.

Page 164

BILLY BURKETTE

1
2    Q.  Okay.  Did Strategic Services USA ever send you a
3  formal subcontract agreement?
4    A.  I don't recall.
5    Q.  Do you recall Global Disaster ever entering into
6  a formal subcontract agreement with Strategic Services?
7    A.  I do not recall.
8    Q.  Do you recall having any discussions, besides
9  what's in this letter, with Strategic Services about a
10 formal subcontract agreement?
11   A.  Nope.
12   Q.  Do you recall having any discussions with
13 Strategic Services about ES&H?
14   A.  Again, at -- this was all about the time that BP
15 made an executive decision to force everybody to go under
16 a prime contractor.
17   Q.  I understand.
18        But do you have recall specifically having
19 any discussions with Strategic Services about your ES&H
20 contract?
21   A.  Well, yeah, I mean, I told them -- you know, I --
22 again, I try to be as transparent as I can.  I don't
23 disclose, you know -- or I don't not disclose any --
24 there's nothing hidden there.  I don't -- I don't
25 understand what you're trying to get at.

Page 165

BILLY BURKETTE

1
2    Q.  I'm just asking if you had discussions with them
3  about ES&H and what those discussions were.  That's it.
4    A.  I mean, I told them that BP was forcing me to go
5  under ES&H, that ES&H would be now acting on BP's behalf.
6    Q.  Did you ever provide Strategic Services USA with
7  signed copy of any contracts with ES&H and Global
8  Disaster?
9    A.  I don't recall.
10   Q.  Did Global Disaster ever provide Strategic
11 Services USA with proof of insurance coverage required for
12 services outlined in those letters of intent?
13   A.  I don't recall.
14   Q.  Is Global Disaster claiming any damages against
15 BP relating to this Letter of Intent with Strategic
16 Services USA, LLC?
17   A.  I'm sure.
18   Q.  Do you know?
19   A.  Yes.
20   Q.  How much is Global Disaster claiming it -- it
21 suffered relating to this Letter of Intent with Strategic
22 Services USA, LLC?
23   A.  I don't have a dollar figure.
24   Q.  How did BP damage Global Disaster with respect to
25 the Strategic Services -- this Letter of Intent with

BILLY BURKETTE

1
2 Strategic Services, LLC?
3     A.  BP told me what their needs were and asked for me
4 to go get it.  I went out, worked, found them, got the
5 list, sent it in, and then they sent me to ES&H.  Said,
6 "You got to go through a prime contractor."
7     Q.  Okay.  That's -- that's the entire basis of your
8 claim against BP relating to the Letter of Intent from
9 Strategic Services USA, LLC?
10     A.  Well, I guess, you know, we have been over about
11 however many documents we have been over, and each time,
12 the end result is BP asked me to do something.  I didn't
13 just go out and do all this on my own.  I didn't -- I
14 wouldn't even know who to ask or what to get unless
15 somebody at BP told me to get it.  Right?
16         So I'm following their instruction on all of
17 these documents that you sent to me showing time and time
18 and time again that I'm in communication with BP, and at
19 the end of the day, BP didn't pay for any of it.
20         So, I mean, I don't know how much more proof
21 you need that BP did not do anything -- any business with
22 Global Disaster.  But yet, they continually asked me to --
23 to provide information, which they took from me, and
24 back-doored me and got it themselves.
25     Q.  It's Global Disaster's intention -- if I

BILLY BURKETTE

1
2 understand what you're saying, it's Global Disaster's
3 intention that BP does not have any beef with Global
4 Disaster, but the basis of your claim is they asked you to
5 procure products and services and ultimately did not
6 purchase those products and services from Global Disaster.
7 Is that accurate?
8     A.  No, that is not accurate.
9     Q.  What did I get wrong there?
10     A.  BP, through multiple, multiple conversations,
11 face to face and on the telephone, would tell me what they
12 needed, based on whether it be a day shift or a night
13 shift, incident command priorities list.  So I would
14 communicate with the BP employees; they would tell me what
15 they wanted.  I would go out and get it, line it up, do
16 all the work -- all the groundwork for them on their
17 behalf, representing them.  That's what they told me to
18 do, and either they would circumvent me or they would
19 direct contract.  Either way, you want to verb that -- use
20 the verbiage on that, and they would basically not pay for
21 anything that they asked me to do.
22         So if it would just be once or twice, I
23 could see that.  But you can tell, obviously with how many
24 documents that you put up here, that every time I was in
25 communication with BP, and BP asked me -- or told me what

BILLY BURKETTE

1
2 their needs were and asked me to get those things and then
3 they did not fulfill their obligation.  So why would
4 you -- why would anybody go out and say, you know --
5 that's like -- that's like if I asked you, "Hey, I'm --
6 I'm new to this town" -- I don't know where you live.
7 Let's say you lived in Illinois.  "I'm new to Illinois.
8 Can you get me a hamburger from McDonald's?"  And you say,
9 "Oh, yeah, I'll get that for you."  You go get the
10 hamburger, bring it back to me, and I eat it, and then I
11 say, "Oh, well, I ain't paying you for that."
12         How many times would you repeatedly do that,
13 and then ultimately come to the decision that my intent
14 behind all of that conversation and many trips that you
15 made was to take advantage of you and to not fulfill my
16 obligation that I intended you to and get what I wanted you to
17 get for me?
18     Q.  If you felt that BP had repeatedly asked you to
19 do something for them, you would go and do it, and then
20 they refused to pay for it, why didn't you start trying
21 to -- well, scratch that.
22         If you felt that BP had repeatedly asked you
23 to do something for them and then not pay for it once
24 you've done that work, based on oral agreements with BP
25 representatives, why didn't you get any of these

BILLY BURKETTE

1
2 agreements in writing?
3     A.  Well, as I had stated earlier, I'm working out of
4 my truck 200 miles away from where any kind of office
5 space was that we could get to to draft anything.  And
6 again, I'm trying to do anything to help in a drastic
7 situation, and at any point in time, if somebody asks you
8 for help and you do it in good faith, be -- you have to be
9 able to see that -- through all of this information that
10 you are providing, that they continued to ask me to do
11 those things, because I wouldn't know that they needed
12 those goods and services unless BP told me what they
13 needed.
14     Q.  You never asked BP to put any of your agreements
15 with them in writing, correct?
16     A.  That's not correct.  I did after about 10 or 12
17 times that they screwed me.
18     Q.  At that point, before the tenth time, you had
19 never asked them to put any of your agreements in writing,
20 correct?
21     A.  No, sir, because, you know, it's -- it's just
22 like anything else, you know, I'm not a big business like
23 BP.  I'm not a big company like BP or ES&H or anything
24 like that.
25         We are a service-based company.  You come

BILLY BURKETTE

1    BILLY BURKETTE
2 and ask me, "Hey, Chief," or, "Hey Billy, can you do this
3 for me?"  And I tell you, "Yeah."  You don't have to
4 worry.  You can lay your little head on your pillow at
5 night and go to sleep because you know that I'm going to
6 do what I said I was going to do.  It's a matter of
7 principle and ethics.
8    Q.  So after the tenth time that you felt like
9 that --
10   A.  There wasn't no feel -- it's not a feeling.
11            THE STENOGRAPHIC REPORTER:  I'm sorry.  I
12 think we lost our videographer.
13            (Brief recess taken.)
14            THE VIDEOGRAPHER:  Time is 4:05 p.m.  We are
15 back on the record.
16 BY MR. KLAR:
17   Q.  Okay.  Mr. Burkette, we were speaking about
18 whether agreements with BP were ever reduced to writing
19 and you indicated that the first ten or 12 times it hadn't
20 been reduced to writing, but after that you were asked
21 that your agreements with BP be put in writing.  Is that
22 generally accurate?
23   A.  Yes, sir, and that's when they forced me to go to
24 ES&H.
25   Q.  Okay.  But even after that point, none of your

1    BILLY BURKETTE
2 agreements with BP were in writing, right?
3    A.  No, sir, just verbal.
4    Q.  Okay.  And there's no -- at the end of the day,
5 ultimately, the reason we are here is that BP did not do
6 any business with Global Disaster, correct?
7    A.  No, sir, that is not correct.
8    Q.  Okay.  What -- what business did they conduct
9 with Global Disaster?
10   A.  (No response.)
11   Q.  Let me rephrase.
12            Earlier, you said, "I don't know how much
13 more proof you need that BP did not do any business with
14 Global Disaster.  They continually asked me to provide
15 information which they took from me and back-doored me and
16 got it themselves."
17            Am I right to say that BP did not purchase
18 any products or services from Global Disaster?
19   A.  Yes, you're correct.
20   Q.  Okay.  BP did not issue a purchase order in
21 writing to Global Disaster to purchase any products or
22 services?
23   A.  That's correct.
24   Q.  And BP never promised, in writing, in an
25 agreement to purchase any products or services from Global

1    BILLY BURKETTE
2 Disaster, correct?
3    A.  That's correct.
4    Q.  Okay.  Earlier, we talked about the Airware
5 arrangement with Global Disaster.
6            Were there any other concrete-crushing
7 arrangements that you had with companies besides Airware?
8    A.  No.
9    Q.  Okay.
10   A.  Oh, wait, ask that question again.
11   Q.  Sure.
12            Were -- aside from your agreement with --
13 aside from Global Disaster's agreement with Airware, were
14 there any other contracts that Global Disaster was a party
15 to to crush concrete in the Port of St. Bernard?
16   A.  No.
17   Q.  I want to talk a little bit more about the Port.
18 Other than what we discussed on far today, your -- your
19 concrete crushing -- Global Disaster's concrete-crushing
20 arrangement with Airware and your -- and Global Disaster's
21 attempts to procure products and services for BP.
22            Was there any other activity that Global
23 Disaster was conducting in the Port of St. Bernard?
24   A.  Just the availability of room for BP to store
25 boom and other products for deployment.

1    BILLY BURKETTE
2    Q.  Okay.  So you were in discussions with BP about
3 storage for equipment?
4    A.  Correct.
5    Q.  Okay.  Who were those discussions with?  Was that
6 procurement as well?
7    A.  Yes.
8    Q.  Do you recall with who?
9    A.  I do not.
10   Q.  Do you recall when those discussions took place?
11   A.  I do not.
12   Q.  Do you recall discussing how much storage was
13 needed or could be provided?
14   A.  I don't remember with whom.  I do remember
15 them -- I do remember them having sent representatives out
16 and asking me how fast we could crush the pile and if we
17 could crush it in such a manner that would free up certain
18 portions of the area for room.
19   Q.  I see.  So the -- the area that Global Disaster
20 would be able to furnish as storage to BP was being
21 occupied by the concrete that Global Disaster had to
22 crush?
23   A.  Correct.
24   Q.  Okay.  Where was that concrete held?  Was it like
25 a yard that Global Disaster owned or leased?

BILLY BURKETTE

1
2    A.  The -- it was at the Port.
3    Q.  Right.  I understand it was at the Port.
4         But was -- if -- whose land was it where the
5 concrete was?
6    A.  The Port.
7    Q.  Okay.  So it wasn't Global Disaster's land?
8    A.  No.
9    Q.  Okay.  If BP --
10   A.  But -- but Global Disaster had that section of
11 land allocated for the concrete crushing.  BP sent their
12 representatives out to ask how fast we could crush it, and
13 if we could do it in such a manner at a starting point
14 that they would be able to utilize a portion of that land
15 once we started crushing.  In other words, they asked us
16 to start in a place different from where we were set up so
17 that we could accommodate them in freeing up some room for
18 them to have space, which, of course, I agreed to.
19   Q.  Did you have permission from the Port to allow BP
20 to store equipment at the concrete-crushing site?
21   A.  It was our -- that -- that section of land, I
22 didn't need it.  It was -- it was already our section.
23   Q.  I think earlier you testified they had allocated
24 it to you for concrete crushing?
25   A.  Correct.

BILLY BURKETTE

1
2    Q.  But not for storage, correct?
3    A.  No, but again, because they put me in such a
4 financial hardship that I couldn't complete the crushing
5 and the fact that they came in and took over the Port and
6 forced me out of the Port, I never had time to do that.
7    Q.  Okay.  So in order for you to allow BP to use
8 your concrete-crushing area as storage, you would have had
9 to get permission from the Port, right?
10   A.  Don't know.
11   Q.  Okay.  You never asked?
12   A.  No.
13   Q.  Okay.  So sitting here today, you don't know
14 whether or not the Port would even have allowed that?
15   A.  Well, obviously, they allowed it, because BP took
16 the whole Port over.
17   Q.  Well, you don't know if the Port would have
18 allowed you to let BP use your land, correct?
19   A.  I do not know if they would or would not allow.
20 I guess we can subpoena the Port and ask.
21   Q.  Did you have any other discussions with BP about
22 the concrete?
23   A.  Yes.
24   Q.  What -- what discussions did you have?
25   A.  The discussions that I had were about supplying

BILLY BURKETTE

1
2 the oyster -- so keep in mind, get back to the
3 environment, and the -- the estuaries and the wildlife.
4 So obviously, the spill killed all the oysters.  So the
5 process that has to be done is you have to clean that,
6 then you have to reapply a concrete rock base or limestone
7 base or pebble rock base or some -- some form for the
8 clutches to attach to grow.
9         So the contract that I had was to supply
10 that gravel to the oyster leases, and -- with Dan Robin.
11 So the contract that I had -- I mean, the conversation
12 that I had with BP representatives was, "Y'all are taking
13 over the Port, and you're denying me the opportunity to
14 fulfill my concrete-crushing responsibility.  Is BP going
15 to pay to have this rock moved or is BP going to pay us to
16 haul that concrete to a different location where we could
17 resume the crushing?"  And they said, "We will let you
18 know."  And never heard back from anybody.
19   Q.  So prior to BP essentially taking over the
20 Port, you hadn't had discussions with them about your
21 concrete-crushing business, right?
22   A.  I just told you yes, they sent people out there
23 to see if they could have room.
24   Q.  Sorry.
25         Aside from discussing potential storage

BILLY BURKETTE

1
2 options and aside from the discussions that we just went
3 over about whether they would reimburse you for the
4 concrete after they took over the Port, were there any
5 other discussions with BP about your -- Global Disaster's
6 concrete-crushing?
7    A.  Yes.  The portion about taking the rest --
8 whatever the airport didn't need, we were going to take
9 the remainder of that and supply it to the oyster leases.
10   Q.  Right.
11   A.  Which, after the fact that they seized everything
12 in the Port, basically, the concrete, the crushing
13 opportunity, the -- the crushing of that stone and
14 supplying it to the oysters, they did all of that.  BP did
15 all of that.
16   Q.  Okay.  Other than your discussions about storage
17 and about supply for the oysters, no other discussions
18 with BP about your concrete-crushing business, right?
19   A.  No, sir, because they told me that -- that they
20 were taking over the Port and somebody would get back to
21 me, and they never did.
22   Q.  Do you recall who told you that?
23   A.  No, sir, I do not.
24   Q.  Do you recall when that person told you that?
25   A.  No, sir, I do not know the day.

BILLY BURKETTE

1
2     Q.  How long was the Port shut down for?  Do you know
3  when it started and ended?
4     A.  No, sir, I do not.
5     Q.  Do you have a general sense?  Was it a few
6  months?
7     A.  From my understanding, it was well over a year.
8     Q.  So sometime in 2010 to sometime in 2011, as best
9  you recall?
10    A.  The best I recall, yes.
11    Q.  Okay.  And after the Port was reopened, what
12 efforts did Global Disaster take to determine what it
13 still could or couldn't do with regards to its
14 crushing-concrete business?
15    A.  Well, every time I tried to go down to do that,
16 they kept telling me that BP still had the space.  So,
17 like I say, after you -- after I called it quits with BP,
18 you know, I didn't have any recourse other than to file my
19 claim with BP, which is what, at the end of the day, why
20 we are here, and -- and BP basically said, I don't
21 remember the exact words, but if I -- if I had any losses
22 or damages, I could make my claim with the -- with Worley
23 Co.
24          So I went down to St. Bernard to the Worley
25 Co. office, there was a trailer set up.  I made the claim,

BILLY BURKETTE

1
2  they paid me -- I don't know -- it was $5,000, I think,
3  and then they were supposed to set me up in the computer
4  on a weekly basis.
5          Then BP got into some kind of conflict with
6  Worleyclo [sic] -- Worley Co. and that's when they went
7  with Feinstein and all the rest of that nightmare, and
8  basically, they cut that off.  Then they had Phil Strunk
9  from some attorney firm -- he was an attorney that called
10 me, and they sent me the 200-and-whatever-thousand dollars
11 or whatever they sent, and they said that was a -- what
12 did they call that -- six-month -- it was a six-month
13 payment for estimated damages or whatever the words that
14 the attorney, Phil Strunk, used.  He sent me $287,000.
15    Q.  That 287,000, that was sent to -- to Global --
16 like, for Global Disaster's claims or was that for A-1
17 Towing or for something else?
18    A.  I believe that was for just the portion of A-1
19 that we lost the hauling, and like I say, it was just a --
20 they called it a EAP program, whatever that is, Estimated
21 Actual Payments.  It was for six-month estimated payments.
22          And then Phil Strunk and them, BP threw them
23 out, they got a new attorney firm, and they sent me over
24 to Feinstein, and Feinstein, you know, basically, he
25 shafted everybody and told everybody, you know, "Well, we

BILLY BURKETTE

1
2  are not processing claims," whatever.  It's just a
3  nightmare, man; just a nightmare.
4     Q.  Going back to -- and we will talk about Worley
5  and all that.
6          But going back to the Port closure, do you
7  remember hearing anything about why the Port was being
8  shut down?
9     A.  Did I not say that earlier?  Because BP took it
10 over.
11    Q.  You are aware that the Coast Guard controlled the
12 Port, correct?
13    A.  I am acutely aware of that.
14    Q.  So incident command and the Coast Guard were in
15 control of the Port, not BP, right?
16    A.  Well, you would think that.  That's a great --
17 that's a great assessment, because the Coast Guard is in
18 control of the response, which we obviously know that BP
19 was instructing the Coast Guard what to do and what not to
20 do, because they instructed the Coast Guard not to use
21 Aqua N-Cap, right?
22    Q.  So you agree, though, that the Coast Guard and
23 incident command running the spill response, they were in
24 charge of the Port --
25    A.  I do not agree.  I do not agree.

BILLY BURKETTE

1
2     Q.  Who -- who do you think was in charge?
3     A.  BP.
4     Q.  Okay.  If the Coast Guard wanted to, they had the
5  authority to remove BP from the Port, correct?
6     A.  No.
7     Q.  What's that based on?
8     A.  The fact that it didn't happen.
9     Q.  Okay.  So your -- your testimony is because BP
10 wasn't removed, that the Coast Guard had no control over
11 whether BP could occupy the Port?
12    A.  No, sir.  My testimony is that BP instructed the
13 Coast Guard what they were going to do, and they did it.
14 No different than the Aqua N-Cap.
15    Q.  How -- okay.  So setting aside your discussion
16 with Jackie Michelle and the Aqua N-Cap, how do you know
17 that BP instructed the Coast Guard as to what they were
18 and were not going to do with respect to the Port?
19    A.  Well, they instructed the Coast Guard where to
20 put the burn ring, they instructed the Coast Guard where
21 to set up incident command.  They were inside BP's
22 building -- the Incident Command Center was inside BP's
23 headquarters in Gray, Louisiana, so I don't know how much
24 clearer that picture could be painted.
25    Q.  Okay.  So other than the fact that you say the

BILLY BURKETTE

1    Incident Command Center was inside headquarters, were you
2    a party to any conversations, other than your
3    conversations regarding Aqua N-Cap where BP was
4    controlling what the Coast Guard was doing?
5         A.  Absolutely, I was.  So --
6         Q.  Okay.  What?
7         A.  The flyovers with the Russian planes that
8    dispersed the COREXIT, the millions and millions of
9    dollars that Paul Loupe had involved himself in with BP
10   that they never paid him for and the judges in -- in
11   Plaquemines Parish that test -- that -- in their courts,
12   the testimony was BP was in their control, and multiple
13   courts and multiple states and multiple parishes and
14   counties where BP was in control and instructed the Coast
15   Guard exactly what to do.
16        Q.  Okay.  So it's your testimony that BP was in
17   control of the federal government with respect to
18   activities in the Port of St. Bernard?
19        A.  Yes, sir.
20        Q.  Okay.
21        A.  Among other things.
22        Q.  "Among other things" meaning they were in control
23   of other things beyond just the Port of St. Bernard; is
24   that what you're saying?
25

BILLY BURKETTE

1         A.  Correct.
2         Q.  Like what?
3         A.  They instructed the Coast Guard to do a lot of
4    things that the Coast Guard did.
5         Q.  Okay.
6         A.  And I'm assuming we will get those records when
7    we -- when we get a little closer to going to court, I'm
8    sure.  I mean, that's going to be easy to prove.
9         Q.  Okay.  I just sent Tab 28.
10             MR. KLAR:  Can the court reporter please
11        mark that as the next exhibit?
12             (Exhibit 14 was marked for identification.)
13   BY MR. KLAR:
14        Q.  Do you have that open, Mr. Burkette?
15        A.  I do.
16        Q.  Okay.  So this is addressed to you and Global
17   Disaster and -- from a Lil Lalumandier and Robert G.
18   James, "Resale of Stock Port Fourchon Marina, Inc.,"
19   right?
20        A.  That's correct.
21        Q.  Okay.  What is -- what is Port Fourchon Marina,
22   Inc.?
23        A.  Port Fourchon Marina is a -- I guess you're not
24   familiar with Port Fourchon.  When you're traveling down
25

BILLY BURKETTE

1    to -- towards Grand Isle, Louisiana, Port Fourchon is a
2    port where the shipping industry for the oil industry is
3    basically warehoused.  They have loading bays, they have
4    docks, they have land that BP, again, instructed me that
5    that's what they were looking for.  So I contacted Lil and
6    Robert and I said, "Look, I need to come up with a figure
7    because BP is saying that they need space, and I want to
8    provide that space.  I would like the opportunity to buy
9    that marina."
10        Q.  Okay.
11        A.  So I -- they said, "We would gladly sell it to
12   you for this amount of money, the $750,000."
13        Q.  When did you first come into contact with Port
14   Fourchon Marina, Inc.?
15        A.  The beginning of June, I guess it was.
16        Q.  Okay.  And -- and so you knew that BP was looking
17   for storage.  Did you go out looking for, like, areas that
18   could be provided and that's how you ended up here, or did
19   they contact you?
20        A.  BP contacted me.  They told me that they were
21   looking.  I drove five hours around to go down to
22   Fourchon, met with David -- I guess his name is Barker --
23   and another guy who was the land-procurement guy -- don't
24   recall his name.  He told me that that's the area that

BILLY BURKETTE

1    they were looking for, and I went to Chris Moran, who is
2    the owner of Port Fourchon.  It's Chris Moran's Marina.  I
3    had a discussion with Chris about the marina on the next
4    road over, which is this one, Port Fourchon Marina, and I
5    also contacted Bobby Gros, who has Bobby Lynn's Marina,
6    which BP occupied their space, but it was more for
7    sleeping quarters for the BP employees and a few
8    subcontractors.
9             So I went out and negotiated the purchase of
10   this, so that I could provide this property to BP for them
11   to put boom on for deployment, because it had water access
12   and a loading access to load the barges and the vessels
13   with the boom for deployment.  So at that point, as you
14   can tell, I went to great lengths to accommodate BP and
15   what their needs were in responding to this spill.  So I
16   signed my name to this, saying that I would buy it.  I
17   took it to the guy that was doing the land procurement and
18   I said, "Look, I'm willing to buy this property.  If you
19   need it, we will be happy to accommodate you."  At that
20   point -- I'm sorry?
21        Q.  Sorry.  What -- what did he say to you in
22   response to that, the land-procurement person at BP?
23        A.  "Thank you.  We'll be in touch."
24        Q.  So he didn't tell you, "Yes, go buy it; we want

BILLY BURKETTE

1
2  it"?
3      A.  Well, I mean, I told him it would take a few days
4  to do the paperwork on it, and he said, "Thank you.  We'll
5  be in touch."
6      Q.  Did you ever hear back from him?
7      A.  Nope.  They rotated him out.  He -- he's gone.
8  So if you go back and read the bottom of that, it says,
9  "We agree today to give you this option to purchase until
10  next Friday, June the 25th."  Well, the next week would
11  have been the July the 4th -- or two weeks would have been
12  the July the 4th.  They -- people that was supposed to
13  come back -- you know, they sent them home for two weeks,
14  and then they would come back.
15          So in the interim, the guys that were
16  staying at Moran's Marina, which is David and the -- and
17  the other guy and two other people -- it was -- it was
18  four of them -- they each had different procurement
19  responsibilities, they told Chris Moran that I had
20  procured that property, that I had this agreement.  And --
21      Q.  Okay.  Hold on.  Before we continue.  To be
22  clear, by this time, you had the option to purchase it,
23  but you hadn't actually purchased it yet, right?
24      A.  Well, I was in the process of it.
25      Q.  But you hadn't purchased it, right?

BILLY BURKETTE

1
2      A.  I mean, I have an agreement to purchase.
3      Q.  So you hadn't actually purchased it; you had an
4  option to purchase it?
5      A.  Correct.
6      Q.  Okay.
7      A.  And -- and again, if you look at all these dates
8  on all these documents, they are all around the same time,
9  and this is when they forced me to go to ES&H and
10  basically they would lease it through ES&H.  If I wanted
11  to exercise a contract with BP, I was forced to go through
12  the subcontractor to lease instead of through BP, which is
13  different than what BP actually told me.
14      Q.  Okay.  After -- let me just make sure I have this
15  -- this straight.  So after Ms. Lalumandier and Mr. James
16  sent you this option to purchase the land.  You went to
17  David Barker and the land-procurement person at BP and
18  told them that you had this option to purchase and they
19  said, "We'll get back" -- like, "Thank you, we'll be in
20  touch."  You didn't hear back from them; they had been
21  rotated out.  And the next you heard was that if you
22  wanted to do this, you were going to have to go through
23  ES&H and BP would lease the land through ES&H?
24      A.  And this -- yes, and the same day that that
25  happened, because BP didn't assign anybody to take their

BILLY BURKETTE

1
2  places and give me that point of contact information,
3  Chris Moran went to Lil and to James and bought the
4  property, and then he leased it out to BP.
5      Q.  Okay.  Chris Moran is a -- is the owner of one of
6  the other marinas at Port -- Port Fourchon, right?
7      A.  Correct, Moran's Marina.
8      Q.  Moran's Marina, and he is not a BP employee,
9  right?
10      A.  No.  He was a BP contractor.
11      Q.  But not a BP employee?
12      A.  No.
13      Q.  Okay.  At the time that you -- so just so we're
14  clear, at no point did David Barker or any
15  land-procurement or other BP employee instruct you to
16  purchase this property so that BP could lease it from you,
17  correct?
18      A.  I wouldn't call it instruction.  I would --
19  the -- the conversation that I had with them was, "Why
20  doesn't BP just buy it?"  BP --
21      Q.  Okay.
22      A.  -- they said BP did not want to own property,
23  they only wanted to lease, because they knew that as
24  soon as they responded to the spill and got everything
25  cleaned up, that they would be leaving that area.

BILLY BURKETTE

1
2      Q.  At the time that you have this -- that you had
3  this option to purchase the land for $750,000, did Global
4  Disaster have the necessary cash to close that sale?
5      A.  I could have -- no, sir.  No, sir, we did not.
6      Q.  What would Global Disaster have to have done to
7  get the necessary funds to close the sale?
8      A.  Well, had BP paid for everything that they
9  instructed me to do for them, I would have had the cash,
10  and had they bought the Aqua N-Cap, I would have had the
11  cash, and if BP had bought the boom that they told me to
12  procure for them, I would have had the cash.
13          There's multiple ways that I would have had
14  it, but I didn't, so I would have had to go and finance
15  it.
16      Q.  Okay.  Had you spoken to any banks about
17  financing this sale?
18      A.  I did, but I don't remember whom.
19      Q.  Okay.  Do you remember when you talked to them,
20  talked to banks about financing this sale?
21      A.  I'm sure it was within that week.
22      Q.  Did you ever provide any banks with information
23  about the land or anything else with respect to it that
24  might be relevant to their assessment of whether or not to
25  finance it?

BILLY BURKETTE

1
2     A.  I'm sure I did, but I don't recall.  Like I say,
3  I don't even recall who the bank manager was that I met
4  with.
5     Q.  Do you recall providing any financial information
6  about Global Disaster to the banks that you were speaking
7  to so that they could assess whether to loan you money to
8  finance the sale?
9     A.  I don't recall.
10    Q.  Do you recall filling out any applications to --
11  for -- for the loan?
12    A.  Yes, sir, I did that, but I don't recall who it
13  was with.
14    Q.  Was -- was Global Disaster taking out the full
15  750 or were there -- was there a portion of that that you
16  would not need to take a loan for?
17    A.  Oh, I don't remember at the time.
18    Q.  Okay.  Just so we are clear, at no point did any
19  representative of BP ask you to purchase this property so
20  that they could lease it from you, correct?
21    A.  They didn't ask me to purchase it, but they
22  agreed to lease it if I purchased it.
23    Q.  Okay.  But you didn't purchase it, right?
24    A.  That is correct.
25    Q.  Okay.  Do you have -- did you have any

BILLY BURKETTE

1
2  discussions with BP about on what terms you would lease
3  the land to them?
4     A.  Basically the conversation was that I would be
5  happy to accommodate in anything that would assist in the
6  -- in the response.  I mean, I was -- I was willing to
7  accommodate BP in any capacity that I could.
8     Q.  Okay.  But you never -- you never agreed on a
9  price per month for the lease?
10    A.  No, sir, we did not.
11    Q.  Did you agree on how long the lease would last
12  for?
13    A.  They told me until the response was completed.
14    Q.  Okay.  And at that point, in June 2010, nobody
15  could predict when that would be, right?
16    A.  No, sir, they could not.
17    Q.  So the timeline for the potential lease was --
18  was not definite, right?
19    A.  No, sir, not indefinite [sic], but for sure
20  enough to cover this -- the purchase of the marina.
21    Q.  Right.  But no -- nobody had agreed on a
22  particular -- like a specific time frame, right?
23    A.  No, sir, they had not, because they couldn't --
24    Q.  Have you discussed -- had you discussed any --
25  aside from the amount per month that they would owe for

BILLY BURKETTE

1
2  the lease, any payment terms, method of payment, timeline
3  of payment, where it would be paid to?
4     A.  Well, originally, when I talked to that first
5  procurement guy, the way he explained it was that they
6  basically assess the amount of square footage that would
7  be available for lease, and then they would do the same
8  amount that they would lease from any -- in other words,
9  it wasn't -- it wasn't a set price, because the way he
10  explained it was that they leased based on the amount of
11  product that they could put there.  So if I had a small
12  area, then it would be a small price.  If I had a large
13  area, then, obviously, the price would go up.
14    Q.  Okay.  So just so I understand, by this time when
15  you -- strike that.
16          You've never -- you never agreed with BP on
17  the ultimate price that was going to be paid for the
18  lease, right?
19    A.  No, sir, I did not agree to any -- any price that
20  was -- that BP offered because they never -- BP,
21  ultimately, never came back with -- because the guy was
22  rotated out -- a point of contact for me to continue that
23  agreement with.
24          MR. KLAR:  I -- someone's on the record.
25  Someone's speaking.

BILLY BURKETTE

1
2          THE VIDEOGRAPHER:  Should we go off the
3  record?
4          MR. KLAR:  Do you mind if we take a
5  five-minute break so I can see what else we need to go
6  over today?
7          THE WITNESS:  That's fine with me, yeah.
8          MR. KLAR:  Eric, does that work for you.
9          MR. NEWELL:  Yeah.
10         MR. KLAR:  Okay.  Thank you.  Off the
11  record.
12         THE VIDEOGRAPHER:  Time is 4:43 p.m.  We are
13  going off the record.
14         (Brief recess taken.)
15         THE VIDEOGRAPHER:  Time is 4:58 p.m.  We are
16  back on the record.
17         MR. KLAR:  I'm sending Tab 2.  Can the court
18  reporter please mark that as the next exhibit?
19         THE STENOGRAPHIC REPORTER:  Yes.  That's
20  Exhibit 15.
21         MR. KLAR:  Thank you.
22         (Exhibit 15 was marked for identification.)
23  BY MR. KLAR:
24    Q.  Mr. Burkette, were you able to open that?
25    A.  Yes.

BILLY BURKETTE

1
2    Q.  Okay.  This is a Deepwater Horizon Oil Pollution
3 Act Claim Form that Global Disaster filled out, and it's
4 labeled Global Disaster 1 to 2.
5         Do you recognize this document?
6    A.  I do.  That's my handwriting.
7    Q.  Okay.  And is that your signature on the second
8 page there?
9    A.  Yes.
10    Q.  If you look at the second -- the second page,
11 question 3, it says "Total Amount of Loss Requested."
12 Under the -- you filled out $310 million; is that correct?
13    A.  Yes.
14    Q.  And that's a total of the -- amounts listed
15 in item A below that, right?  It's the same number, right?
16    A.  Yes.
17    Q.  Okay.  And so in this presentment form, Global
18 Disaster's claiming $310 million of loss of income,
19 profits, and/or earning capacity, right?
20    A.  Yes.
21    Q.  No damages to properties are referenced?
22    A.  I don't -- I don't know what your definition of
23 "damage" would be.  The only thing really I had was that
24 $5,000 to the boat and then the only other thing that
25 comes to mind is -- it's really not Global.  It was the

BILLY BURKETTE

1
2 lease purchase that I had paid in, I don't know, somewhere
3 around $70,000 on the -- for A-1.
4    Q.  Okay.  So for Global Disaster, the only
5 property that -- even though it's not filled out here, you
6 say was damaged was the approximately $5,000 of damage to
7 a boat?
8    A.  Yes.
9    Q.  And that damage was caused, I believe you said,
10 by the material or the dispersement or whatever it was
11 that was being used as part of the cleanup?
12    A.  Yes.  You know, eventually, I had to replace the
13 power units on the back because the COREXIT had just
14 totally eaten up the inside of the motors, but the guy at
15 the marine place said that he had replaced -- I don't know
16 how many motors that they ultimately had to replace, but I
17 don't -- I don't have anything documented to prove that,
18 no.
19    Q.  Okay.  So like no receipt or photos or anything
20 like that for the -- the damage or the repairs?
21    A.  I mean, I have pictures and a receipt for the
22 paint, but -- and I have receipts for the new power units
23 that I put on there, but I mean, I don't have anything as
24 far as -- maybe I have some photos.  I'd have to go back
25 and look to see if I had photo damage.  I believe I

BILLY BURKETTE

1
2 submitted all that to the GCCF.
3    Q.  Okay.  Do you mind just double-checking when you
4 get a chance after this for that information?
5    A.  Yes, sir, I will.
6    Q.  Okay.  The other property you mentioned, it was a
7 lease purchase that you paid in 70K.  That was on behalf
8 of A-1 Towing, though, not Global Disaster, right?
9    A.  That is correct.  That's why -- that's why, you
10 know -- and this just -- in earnest, when you look at the
11 money that BP basically forced me to take on the A-1, and
12 I didn't really want to take it, but I felt like that BP's
13 attorneys were threatening to -- if I didn't take that,
14 that they would have my claim totally dismissed.
15    Q.  You understand that you had every right to
16 continue fighting that claim, notwithstanding any argument
17 from BP's lawyers?
18    A.  No, sir, I did not understand that.
19    Q.  You believe you had no choice but to sign that
20 document?
21    A.  That is absolutely what I believe.
22    Q.  And that's based on statements from BP's lawyers
23 that they would have your claim dismissed if you don't
24 sign it?
25    A.  Well, not just mine.  It wasn't just mine.  It

BILLY BURKETTE

1
2 was a multitude of people that they did that to.
3    Q.  But that's your statement that you were forced is
4 based on, statements from BP's lawyers saying, "If you
5 don't sign this, your claim is going to get dismissed"?
6    A.  Yes.
7    Q.  Nothing else, right?
8    A.  Well, just general conversation with other
9 claimants.
10    Q.  Okay.  Underneath -- so assistance used in Item 3
11 here, removal and cleanup cost, there's no damages there,
12 correct?
13    A.  (No response.)
14    Q.  They are blank on that page, right?
15    A.  They are.  I just included everything in the loss
16 of income and profits, because I didn't know any better.
17    Q.  Okay.  At the end of the page, above your
18 signature, you certify that the information provided is
19 accurate to the best of your knowledge, right?
20    A.  To the best of my knowledge at the time, yes.
21    Q.  And your attorney signed that document as well as
22 you, right?
23    A.  Oh, I don't know.  Somebody signed it, and --
24 and, you know, my attorneys had some forensic accountant
25 firm do all that math, I don't -- I don't recall who it

BILLY BURKETTE

1
2  was, Four something, I guess.  You would have to ask Eric
3  that.
4       Q.  Was it Four Scope Accounting [sic]?
5       A.  I believe that's correct.
6       Q.  Okay.  So Four Scope Accounting worked on your
7  behalf to calculate that $310 million --
8            MR. NEWELL:  It's Full Scope.
9            MR. KLAR:  Full Scope, excuse me.
10 BY MR. KLAR:
11      Q.  Sorry, Mr. Burkette.  I'll ask that again.
12           Full Scope Accounting performed work for you
13 to calculate that $310 million figure?
14      A.  Yes.
15      Q.  What information did you provide to Full Scope
16 that they used?
17      A.  I think basically accumulation of everything that
18 you went over today.
19      Q.  Is there any -- are there any documents that you
20 didn't produce to BP that you did provide to Full Scope
21 for their work?
22      A.  I don't know.  That would be an Eric question.
23      Q.  Okay.  To the best of your knowledge, BP has what
24 Full Scope Accounting had in rendering their analysis?
25      A.  I believe so, yes, sir.

BILLY BURKETTE

1
2       Q.  The loss of income profits and earning capacity,
3  I just want to make sure we understand the universe of
4  what that refers to.  Today, we spoke about Aqua N-Cap,
5  your concrete-crushing business, and Airware, your efforts
6  to store equipment for BP at the Port of St. Bernard, and
7  your efforts to contract with ES&H and Strategic Services
8  to procure products and -- and labor and other supplies
9  and services for BP, and your contract or your option to
10 purchase land at Port Fourchon Marina.  Are there any
11 other items that you -- that Global Disaster is claiming
12 besides those as part of this damage for loss of income,
13 profits or earning capacity?
14      A.  I mean, there was so much that happened, sir,
15 I -- not that I can recall.
16      Q.  Okay.  Sitting here today, the list that I just
17 went over reflects the extent of sources of Global
18 Disaster's alleged damages in this case?
19      A.  I believe that's correct.
20      Q.  I'm sending Tab 3.
21           MR. KLAR:  Can you please mark that the next
22 exhibit?
23           (Exhibit 16 was marked for identification.)
24 BY MR. KLAR:
25      Q.  Do you recognize this document, Mr. Burkette?

BILLY BURKETTE

1
2       A.  Yes, sir.  That was just for the boom, I believe,
3  or either that was the portion from A-1.  I may have
4  missed -- miswritten the information.
5       Q.  Okay.  So you don't believe the 9.9 million here
6  reflects the total alleged damages that Global Disaster is
7  seeking?
8       A.  It is not the total, no, sir.  This was -- if I
9  remember correctly, this was the form that they asked for
10 me to provide to the Port neutrals as a -- a number that
11 would be reflective of the -- I'm trying to remember.
12 This was something else that -- that came up in -- while
13 we were discussing the amount with Full Scope.  I don't
14 remember what it was for.  I mean, this has been since
15 '16, and the other one was '13.  So this may have been a
16 supplement.  I don't -- I really don't remember, sir.  I
17 just know that this would have been in addition to
18 whatever the original was.
19      Q.  Okay.  But to be clear, this isn't the full
20 extent of your damages and you're not sure if it's a
21 supplement or a subset or to what specific piece of your
22 claim that it relates?
23      A.  Correct.
24      Q.  Okay.  So sitting here today, is 310 million
25 still the amount that Global Disaster is -- is seeking in

BILLY BURKETTE

1
2  this case?
3       A.  Is that an offer?
4       Q.  No.  I'm asking.  Is that still the amount that
5  Global Disaster is asserting against BP?
6       A.  Yes.
7       Q.  Okay.  Since you submit -- since Global Disaster
8  submitted that presentment form with the $310 million
9  damages figure, has Full Scope Accounting done any work
10 for you with respect to your damages?
11      A.  I do not know.  That's -- my attorneys hired that
12 firm.  I don't have a clue.  I just know that I had to pay
13 for it out of the A-1 money.
14      Q.  Okay.  Has any other -- are you aware of any
15 other accountant or -- or third party who has done an
16 assessment of your damages in this case?
17      A.  No, sir, I'm not.
18      Q.  Did -- did Full Scope Accounting provide you any
19 material that shows how they reached $310 million in
20 damages?
21      A.  That was all done through my attorneys' office.
22 I don't know.
23      Q.  So you haven't seen anything that -- that
24 says that's how much you were damaged from Full Scope?
25      A.  No, sir.

BILLY BURKETTE

1
2    Q.  Okay.  I'm sending Tab 7.
3         (Exhibit 17 was marked for identification.)
4  BY MR. KLAR:
5    Q.  Do you recognize this, Mr. Burkette?
6    A.  Yes, sir.
7    Q.  This is a copy of Global Disaster's submission to
8  the Court in response to Pretrial Order No. 65, correct?
9    A.  I'm guessing sir.  I -- if you say so, I don't
10 know.
11   Q.  In the first box at the top there, it says, "PTO
12 65 verified statement regarding causation and damages"?
13   A.  I mean, I'm -- I'm unfamiliar with what -- I
14 mean, I see what's in it, but I don't -- I don't know
15 anything about it.
16   Q.  Okay.  Well, do you -- do you remember preparing
17 this document?
18   A.  Oh, yes, sir, I remember preparing it, but I
19 mean, I -- I'm not sure I understand what you -- what
20 you're trying to find out.  Did I write this?  Yes.  Is
21 that my signature at the bottom?  Yes.
22   Q.  Okay.  That -- that's helpful.
23        You see in -- in bold there, on the first
24 page, it says, "The plaintiff, not the plaintiff's
25 attorney, must sign and date the verification and

BILLY BURKETTE

1
2  attestation at the end of the form"?
3    A.  Not really, I don't see where it says that but if
4  you say it says it, I mean, I don't doubt you.
5    Q.  Sorry.  I'll be clear.
6         On the very first page of the document, the
7  pre- -- printed page, do you see that bold text in that
8  big paragraph there?
9    A.  Oh, yes.
10   Q.  Okay.  That's what I was referring to.
11        And -- and you did sign this document
12 verifying that the information in there was -- was true
13 and correct under penalty of perjury, right?
14   A.  I did.
15   Q.  Okay.  So if you look at question 1, which is on
16 page 2 of the document, it says, "Describe specifically
17 the compensatory damages that you claim in your lawsuit,
18 including the nature of the damage, dates of the damage,
19 amount of the damage and the calculation used to arrive at
20 that amount," right?
21   A.  Okay.
22   Q.  The first line says, "Damages consist of lost
23 revenue, property loss, boat and future income from rental
24 property."  So I just want to make sure I understand those
25 buckets.

BILLY BURKETTE

1
2         Earlier we -- we discussed all the sources
3  of lost revenue.  That -- that accurately reflects the
4  scope of lost revenue that Global Disaster is asserting in
5  this case, right?
6    A.  A portion of it, yes.
7    Q.  Sorry.  Which portion?
8    A.  The portion from the Port Fourchon Marina.
9    Q.  So let me step back.  We -- we talked about Aqua
10 N-Cap, concrete crushing and your relationship with
11 Airware, your efforts to provide BP with port storage --
12 storage of port, and your work with ES&H and Strategic
13 Services to provide goods and services -- or products and
14 services to BP in connection with the spill cleanup and
15 your property that you are -- had an option to purchase at
16 Port Fourchon.  That's the full extent of -- of Global
17 Disaster's --
18   A.  It's everything that we discussed today.
19   Q.  Okay.  The "property loss" and "boat," those are
20 the same thing, correct?
21   A.  Correct.
22   Q.  Okay.  And "future income from rental property,"
23 that's the 70,000 for A-1 Towing?
24   A.  No, sir.  That's the Port and the Port Fourchon
25 marina combined.

BILLY BURKETTE

1
2    Q.  Okay.  So the rental property you're referring to
3  is the potential rental to BP of storage space at Port
4  St. Bernard and then the potential lease of the Port
5  Fourchon Marina to BP?
6    A.  Correct.
7    Q.  No other rental property you're referring to,
8  right?
9    A.  No.
10   Q.  Okay.  Earlier we -- you did kind of a rough
11 calculation for us of damages that you were asserting in
12 relation to your concrete-crushing business, about -- I
13 think you said 67 and a half, give or take, million
14 dollars.
15        Do you have a -- you don't have a damages --
16 similar damages assessment for the portion of your overall
17 damages attributed to Aqua N-Cap, right?
18   A.  No, sir, because the estimates that BP gave to
19 the federal government about how much oil was spilled were
20 inaccurate.  They did everything that they could do to
21 minimize that, so that their fines and penalties would be
22 lessened.  So the real number is inaccurate, so there's no
23 way to really definitively say that was X.  The only
24 thing that I could do is to take -- like right now, if --
25 if you want to go get on a boat with me, I'll drive you to

BILLY BURKETTE

1 the spots that I know are -- you would -- you would just
2 be in total awe of the amount of oil that is sitting on
3 the floor of the Gulf, right now.  So that still is down
4 there that needs to be gotten up.
5              So those -- those figures are -- could only
6 be based on the estimates that BP has provided to the
7 federal government.  They are not actuals.
8       Q.  Okay.
9       A.  They're estimates.
10      Q.  So sitting here today, you can't -- you can't
11 definitively or reasonably calculate how much damage
12 Global Disaster has suffered as a result of a decision not
13 to use Aqua N-Cap; is that right?
14      A.  No, sir, that's not what I'm saying.
15          I'm saying I can give you those estimates,
16 but they're estimates.  They are not definitive.  I can
17 only give you the estimate based on what was turned over
18 to the federal government.  All of that oil that's still
19 sitting on the Gulf floor, nobody's calculated that yet,
20 and it's not been cleaned up yet.
21      Q.  Okay.  So if you were to base it on the amount of
22 oil that's still on the floor, you can't tell me what the
23 number is, right, sitting here today?
24      A.  Not sitting right here today.  I would have to

BILLY BURKETTE

1 send an ROV down and get the full length, width, and
2 heighth of the -- of the, you know, the oil sludge, the
3 slick that's on the bottom.  I mean, there's multiple
4 places, and it's shifted because of the Gulf Stream, so I
5 would have to -- I would have to go and find that out.
6 No, sir, I cannot give you a definitive.
7       Q.  Okay.  Is the amount that Full Scope Accounting
8 calculated attributable to your Aqua N-Cap portion of
9 Global Disaster's claim based on the estimates that BP
10 provided to the government about how much oil was in the
11 water?
12      A.  That is my understanding, yes.
13      Q.  Okay.  And -- and sitting here today, you don't
14 know what portion that is of your damages, correct?
15      A.  No, sir, I do not.
16      Q.  Okay.
17      A.  I would consider that to be the bulk of it,
18 though.
19      Q.  The bulk.  Would you say 75 percent?
20      A.  Maybe.
21      Q.  Earlier, you mentioned 67 and a half million in
22 connection with Airware.  310 minus 67 is 243, give or
23 take, so of the remaining 240ish million dollars of your
24 310 total, how much would you say is attributable to Aqua

BILLY BURKETTE

1 N-Cap, give or take?
2       A.  I honestly don't know.  I -- I would have to look
3 at those documents to see.
4       Q.  Do you think it's more than a hundred million?
5       A.  Oh, yes.
6       Q.  More than 150?
7       A.  Oh, yeah.
8       Q.  Is it over 200?
9       A.  I don't know.  I would guess that 200 would be
10 a -- you know, I'm -- I'm trying not to guess too
11 definitively, but if you take the estimates and -- that
12 were given to the federal government, whatever that is,
13 500 might not be enough, but I'm -- I'm just trying to go
14 back in my memory bank and think, if you take $8 a pound
15 or 8.50 a pound equates to 11 pounds, and a pound of oil,
16 crude, raw crude, whether it be sweet crude or -- it
17 depends on the actual hydrocarbon, because, you know, in
18 theory, it doesn't -- Aqua N-Cap does not designate the
19 difference between COREXIT, and oil.  It would absorb and
20 encapsulate all of it.  So you would literally be cleaning
21 up the -- the COREXIT, dispersant and the oil.  So it may
22 not even be an accurate assessment of -- the 310 may be
23 910.  I don't know.
24      Q.  So to -- to estimate the -- to reasonably

BILLY BURKETTE

1 calculate how much Global Disaster would have earned had
2 BP used Aqua N-Cap to clean everything up, you would need
3 to know the amount of oil that was -- that was spilled,
4 the amount of COREXIT in the water, the amount of
5 dispersant in the water and the amount of whatever else
6 was in the water that Aqua N-Cap would have absorbed,
7 right?
8       A.  Correct.
9       Q.  Okay.  And sitting here today, you don't have any
10 of those figures, right?
11      A.  Not with me, no.
12      Q.  And you're not aware whether Full Scope
13 Accounting or any other advisor has those figures
14 calculated, correct?
15      A.  BP, I'm sure, has it.
16      Q.  Okay.  But you're not aware of any other advisor,
17 Full Scope or anyone else who has done work for you who
18 has those calculations, correct?
19      A.  No, sir, I have not.
20      Q.  And you've never seen any of those calculations,
21 correct?
22      A.  Just my own that I kind of, back then, was trying
23 to figure.
24      Q.  Okay.  And your -- what you were doing back then

Page 210

BILLY BURKETTE

1
2  to try and estimate it, it is -- it was a guess, right?
3      A.  Sure, it's a guess, because it was constantly
4  spewing oil, and they were constantly spraying -- you
5  know, spraying dispersant on it.
6      Q.  Okay.  So we have got approximately 200 million,
7  give or take, for Aqua N-Cap, approximately 67 and a half
8  million for Airware.  That's 267 million.  That leaves
9  about 53 or so million for the remaining pieces of your
10 310 million claim.
11          How much of that is related to the --
12 your -- your -- your claim that you would have allowed BP
13 to store equipment at the Port of St. Bernard?
14     A.  I don't know, sir.
15     Q.  What would you need to -- to calculate that?
16     A.  The square footage and the rate that -- which
17 they paid similar docks in the area.
18     Q.  Did you have that information when you were
19 putting together your $310 million estimate?
20     A.  Not to -- not exactly.  I have a couple of places
21 that they had rented space from, but I don't remember what
22 they were.
23     Q.  Okay.  You don't have any -- like, you don't have
24 the -- the contracts for those places?
25     A.  I did, but like I say, in the flood of '16, we

Page 211

BILLY BURKETTE

1
2  lost everything.
3      Q.  Okay.  Would you say that, just a ballpark, if
4  you can -- and if you can't, that's okay -- would -- would
5  that be a piece of your claim related to storage of the
6  Port of St. Bernard be $5 million?  More than that?
7      A.  I guess that would be a fair assessment.
8      Q.  Okay.  Somewhere between five and ten?
9      A.  Correct.
10     Q.  Okay.  What about -- what portion of your damages
11 is attributable to your relationship -- Global Disaster's
12 work with ES&H?
13     A.  I wouldn't know.
14     Q.  How would you go about calculating that?
15     A.  I would have to go back to the timeline and see
16 how much work was done with ES&H that I would have
17 provided those goods and services for that they used,
18 equipment, boats, personnel, equipment, labor, all of
19 those things that they performed for BP.  I would have to
20 have those figures and extrapolate from that the portion
21 that I could have supplied.
22     Q.  Okay.  And -- and you don't have access to -- to
23 that information, right?
24     A.  Not yet.  I think we are going to get that in
25 subpoena.

Page 212

BILLY BURKETTE

1
2      Q.  Okay.  So -- so when -- when Full Scope
3  Accounting was calculating $310 million for your losses,
4  they didn't have that information, right?
5      A.  Not to my knowledge.
6      Q.  So to your knowledge, the calculation that is
7  included in your presentment statement is not based on the
8  information that you need to actually calculate your
9  damages associated with the ES&H contract, correct?
10     A.  Correct.
11     Q.  Okay.  What about for Strategic Services, how
12 much of your damages is attributable to that letter of
13 intent that we talked about?
14     A.  I think that -- I think that's where the 9
15 million came from, but I'm not positive of that.
16     Q.  Okay.  What would you need to do to figure out
17 how much in damages you're claiming from the Strategic
18 Services defense?
19     A.  That's simple.  You just take the contract rate
20 times the amount of hours that BP used, whether it be them
21 or anybody else that performed the same job description.
22     Q.  Okay.  So you would have to look at other
23 contracts that BP entered into for that type of labor?
24     A.  Or -- I mean, that's fair, yes, sir.  I think
25 that's a fair statement.

Page 213

BILLY BURKETTE

1
2      Q.  And sitting here today, you don't have any of
3  those contracts, right?
4      A.  Not with me.  I mean, I have -- I have since all
5  of this has taken place, and since there were so many
6  court cases about it in Plaquemines Parish and St. Bernard
7  Parish, I have read the other contracts and the other
8  documents -- the court documents that are available.
9      Q.  Those cases all occurred after you -- you
10 submitted your $310 million damages claim in 2013, right?
11     A.  Yes, sir.
12     Q.  So at the time you submitted your $310 million
13 damages claim, it wasn't based on any information that you
14 discerned from any contracts between third parties and BP
15 for labor, right?
16     A.  No, sir, that's not true.  You know, basically,
17 ES&H sent that price sheet of what they were allowed to
18 pay, and the contracted rates that BP had agreed at that
19 time was acceptable rates.
20     Q.  Okay.  So the portion of your -- your damage --
21 that's with regard to ES&H.  Are you saying that the
22 portion of your damages attributable to the Strategic
23 Services letter are based on numbers provided by ES&H?
24     A.  By BP.
25     Q.  Numbers provided by BP to ES&H?

Page 214

BILLY BURKETTE

1
2     A.  Correct.
3     Q.  Okay.  And with respect to the Port of -- I'm
4  sorry, Port Fourchon, the -- the lost rent that Global
5  Disaster claims it would have obtained if it ended up
6  purchasing that property and leasing it to BP, how much in
7  damages are attributable of the -- of the 310 for that?
8     A.  I thought you just covered that and we estimated
9  that to be at 5 million.
10    Q.  That was for port storage.
11    A.  Oh.  Then I would say equally amount for the Port
12 Fourchon Marina.
13    Q.  Okay.  How can -- how do you calculate that
14 amount if you never agreed on a lease with BP?
15    A.  That's what I was telling you before and, you
16 know, that may be just that I didn't understand the
17 difference between port and Port Fourchon Marina.  It's
18 the same -- it's the same variables.  Say you go to the
19 next street over, I don't know, three clicks, half a
20 click, go in any direction you want to.  The property that
21 BP did rent, you take that factor times the amount of
22 square footage, and you do some simple math, and you get
23 the dollar figure.  I mean, it's not real hard.
24    Q.  Okay.  So to do that, just like with how much you
25 would charge for storage, you need to see what comparable

Page 215

BILLY BURKETTE

1
2  properties and comparable contracts BP entered into with
3  other folks, right?
4     A.  Well, that's what they told me they would base it
5  on.  That's what the procurement guy said.
6     Q.  And you -- you haven't provided any of those
7  documents to Full Scope Accounting, right?
8     A.  No, sir, I didn't.
9     Q.  Are you -- are you aware that Full Scope
10 Accounting has those documents?
11    A.  I am not aware if they do or do not.
12    Q.  Okay.  And you don't have any of those documents,
13 right?
14    A.  Nothing other than what's in the court cases that
15 came out afterwards.
16    Q.  Do you recall what cases?
17    A.  I don't have them with me, but I looked them up
18 online.
19    Q.  It's a list that you could provide?
20    A.  I'm sure.
21    Q.  Okay.  Okay.  Can you look to the third line down
22 in that big paragraph on page 2 of your statement?  It
23 says, "I also lost hundreds of millions of dollars via my
24 master contract with ES&H which BP chose to use the
25 dispersant instead of Aqua N-Cap absorbent listed on their

Page 216

BILLY BURKETTE

1
2  Hazard Mitigation Plan given to the State of Louisiana."
3           The "hundreds of millions of dollars" that
4  you're referring to there, that's referring to the Aqua
5  N-Cap claim, not the ES&H claim, right?
6     A.  Correct.  Well, keep in mind that BP was forcing
7  me to go to ES&H.
8     Q.  And does that include for use of -- for a
9  purchase of Aqua N-Cap?
10    A.  Yes.
11    Q.  So had you had discussions with ES&H about Aqua
12 N-Cap?
13    A.  Oh, yes.
14    Q.  Okay.  With who?
15    A.  I don't -- the name Kelly comes up but I'm not
16 positive of that, so don't quote me on that.  I don't
17 remember, sir.
18    Q.  Do you recall when those discussions were taking
19 place?
20    A.  Yes, sir, at the same time that BP was trying to
21 force me to go into that master service contract with
22 ES&H.
23    Q.  Okay.  Are you saying that -- was Aqua N-Cap a
24 product that was listed on ES&H's price sheet?
25    A.  I don't know if it was on ES&H's price sheet, but

Page 217

BILLY BURKETTE

1
2  it definitely was on the -- the response spill plan that
3  they submitted to the State of Louisiana.
4     Q.  You -- you claim to have exclusive distribution
5  rights to Aqua N-Cap, correct?
6     A.  That is what Jeff -- I mean Jon and I talked
7  about, yes.
8     Q.  Okay.  How is it that you could agree with ES&H
9  to provide Aqua N-Cap if you had the exclusive
10 distribution right?
11    A.  It -- the ES&H is basically a conduit that BP was
12 forcing me to use.
13    Q.  Okay.  Did you ever agree with ES&H how much Aqua
14 N-Cap would be provided to BP and at what price?
15    A.  No, sir, I did not.
16    Q.  Did you ever agree with ES&H about how much Aqua
17 N -- the timeline that you would provide the Aqua N-Cap to
18 be distributed?
19    A.  I shared with ES&H the same e-mail that BP has.
20    Q.  Okay.  Nothing beyond that, though, correct?
21    A.  I mean, nothing other than verbal communication
22 between myself and Jon, who basically said, you know, "If
23 BP wants it, we will commit 100 percent of all production
24 to go to the spill."
25    Q.  Do you have any idea how much production would

Page 218

BILLY BURKETTE

1  have been able to provide?

2      A.  If you go back to that other e-mail, it says in

3  there that they could have -- they could do 4 million

4  pounds a month.

5      Q.  If you look down -- we'll come back to that in a

6  minute.  If you look down to the next small paragraph

7  there on page 2, it says:  "Calculations used to determine

8  my monthly losses of 122K per month were done by BP's

9  contractor, Worley Company.  Also, Full Scope Accounting."

10             What does the 122 -- 122,000 a month relate

11  to?

12      A.  I don't -- I don't really remember exactly.  It

13  was just a -- I think the way it was calculated is they

14  took the 310 and divided that by the amount of months that

15  the spill was going on, if I remember correctly.  I don't

16  -- I don't remember, sir.

17      Q.  Okay.  Well, you submitted that statement --

18  let's see -- the 310 million number was signed on

19  January 18th of 2013, right?

20      A.  Yes, sir, I guess that's what it says.

21      Q.  Okay.  And so between April of 2010, when the

22  spill occurred, and January of 2013, that's just a little

23  over two years, correct?

24      A.  I believe so, yes, sir.

Page 219

BILLY BURKETTE

1      Q.  Okay.  About two years and -- and -- about two

2  years and eight months, so that's 30 -- 32 months, right?

3      A.  I'm -- if you say so, yes, sir.  I'm not doing

4  the math.

5      Q.  All right.  Well, just doing the math here,

6  310 -- I'm sorry, 310 million -- I'm sorry, 122,000 times

7  32 months is 3.9 million.

8             Do you agree with that generally calculated

9  math?

10      A.  I agree with your math.  I'm not saying that

11  that's -- you're -- you're asking me to definitively say

12  that the 120 whatever thousand, 122 or 23, whatever it is,

13  thousand is based on something that -- your calculation

14  of --

15      Q.  Let's step back.  So it says here that the

16  calculations that Worley and Full Scope Accounting

17  determined were that your monthly losses are $122,000 a

18  month?

19      A.  Okay.  That was -- that was Worley's, not -- not

20  Full Scope.  The combination of Worley's accounting and

21  Full Scope's is how they got to the 310.

22      Q.  Okay.  So it's your testimony today that the 122K

23  per month referenced here is just the piece calculated by

24  Worley?

Page 220

BILLY BURKETTE

1      A.  That is my understanding and y'all should have a

2  copy of that from Worley, yes.

3      Q.  Okay.  And you don't -- sitting here today, you

4  don't know what piece of your damages is attributable to

5  that 122k per month versus the remainder leading up to 310

6  that Full Scope calculated?

7      A.  No, sir, I do not.  Worley Co. did that.  I do

8  not know.

9      Q.  Okay.  You didn't look at it and verify whether

10  it was, you know, it made sense or was accurate?

11      A.  They never gave it to me.  They just sent me the

12  form saying that's what they calculated.  They never gave

13  me the breakdown.

14      Q.  Okay.  So Full Scope is the only company that

15  provided -- that did a breakdown for you?

16      A.  If they did, I haven't seen that either.

17      Q.  Okay.  So you're not sure if they did or not?

18      A.  Correct.

19      Q.  So sitting here today, you haven't seen any

20  calculations underlying the 122K per month by Worley or

21  any calculations underlying the 310 million that Global

22  Disaster is asserting was done by Full Scope?

23      A.  No, sir, I have not.

24      Q.  Do you know what -- over what period of time

Page 221

BILLY BURKETTE

1  you're asserting or Global Disaster is asserting losses

2  for?

3      A.  I would think that it would be from the day --

4  two days after the explosion until the completion of the

5  cleanup.

6      Q.  When, approximately, was cleanup deemed complete

7  -- complete?

8      A.  I don't remember.

9      Q.  Okay.  But that's -- that's approximately the --

10  the time period over which Global Disaster is claiming

11  damages?

12      A.  Yes.

13      Q.  Okay.

14      A.  That's why I say the 310 may not be accurate

15  today.  It may be more.

16      Q.  It might be less, too?

17      A.  If you say so.

18      Q.  No, I'm asking you.  It could be less, right?

19      A.  I don't see how, but maybe you can explain that.

20      Q.  It's possible?  I'm not saying one way or

21  another.  I'm asking it's possible, right?

22      A.  Anything's possible, yes, sir.

23      Q.  Okay.  Okay.  If you look at question 2 of the

24  PTO65 statement, and I think we can wrap up soon.  It

Page 222

BILLY BURKETTE

1  says, "Describe specifically the evidence you rely on to
2  prove the damages you allege in response to question
3  No. 1," And in the first line you wrote, "My contracts
4  with the Port and ES&H, along with the Hazard Mitigation
5  Plan submitted to the State."
6        The contract with the Port that you're
7  referring to, what contract is that?
8     A.  That's for the -- the area that we had for the
9  concrete crushing.
10    Q.  Okay.  So you're saying that there's a contract
11 with the Port where they gave -- where they essentially
12 let you use that land for concrete crushing?
13    A.  Yes.  Well, that and the fact that BP took over
14 the whole port.
15    Q.  Right.  I'm just asking about the contract
16 itself.  You said there's a contract with the Port where
17 the Port said, "Global Disaster, you can use this piece of
18 land for concrete crushing," right?
19    A.  Yes, sir.  If you remember, when Terry -- when I
20 told you Terry forfeited the concrete crushing, at that
21 point is when the Port asked me to assume the note for
22 that area.  Two days later is when the Port was taken
23 over, like you say, by the Coast Guard, but really by BP,
24 because BP -- the Coast Guard didn't use it.  BP used it.

Page 223

BILLY BURKETTE

1     Q.  So the contract that you're referring to, it was
2  originally an Airware contract with the Port that Global
3  Disaster took over when Airware said they can't pay you?
4     A.  That is correct.
5     Q.  Okay.  You don't have a -- you don't have a copy
6  of that contract, right?
7     A.  I don't but the Port does, and I think Brent and
8  them have that -- it's like a manila envelope with all the
9  stuff on it from the Port.
10    Q.  I'm sorry.  What was the name that you said,
11 Brent?
12    A.  My attorneys, Brent Coon --
13    Q.  Okay.  Okay.  Well, we haven't seen a copy of it,
14 so to the extent it exists, we would like to see it.
15       Moving to the next paragraph, you say:
16 "Contracts for lease purchase property, rental agreements,
17 Worley Co. forensic accounting sheets," and there's a list
18 of names there.  So starting with the lease purchase
19 property.  That's the Port Fourchon Marina, port storage
20 and the piece that was A-1 Towing's lease purchase that we
21 talked about earlier, correct?
22    A.  No.  A-1 Towing has its own form like this, I
23 believe.
24    Q.  Okay.  So the contracts for lease purchase

Page 224

BILLY BURKETTE

1  property you are referring to are the Port Fourchon Marina
2  and the Port storage at Port of St. Bernard?
3     A.  That is correct.
4     Q.  Okay.  Nothing else, right?
5     A.  Not that I can think of right now.  My brain is
6  almost dead.
7     Q.  I understand.
8        "Rental agreements," what rental agreements
9  are you referring to?
10    A.  The rental stuff is, like, the showers, temporary
11 housing, ships that had temporary housing, barges,
12 airboats, scouting boats, skimming boats.  There was a
13 multitude of rental stuff that I would have been able to
14 provide.
15    Q.  Okay.  And these -- these -- these are pursuant
16 to -- I think we talked about oral agreements, not written
17 agreements, right?
18    A.  Correct.
19    Q.  To obtain all of those items, would you have had
20 to fund that yourself or would BP have funded that for
21 you?
22    A.  Well, originally when we first started the
23 conversation, they talked about a seven-day turnaround.
24 In other words, I would submit an invoice.  In seven days,

Page 225

BILLY BURKETTE

1  they would pay that invoice.  Then the next week, we
2  started the same conversation, it immediately went to 30
3  to 60 days payout.
4     Q.  Okay.  So you would have to front the money for
5  the equipment first and then you would ultimately get
6  reimbursed?
7     A.  Correct.
8     Q.  Okay.  Did -- at the time that Global Disaster
9  said it was discussing all of these pieces of equipment it
10 would rent for BP, did Global Disaster have the necessary
11 funding to obtain all of those items?
12    A.  No, sir, not all of it, but some of it and, you
13 know, because I'm transparent I was honest with the people
14 and I said, "Hey, look, here's what BP told me.  Here is
15 the guy I talked to.  Here is -- you can call and confirm
16 that."  And then the person I originally was talking to
17 after the first two weeks rotated out, like I told you.
18 They went home and then I got a new person, and that's
19 when it went to 30 to 60 days instead of the seven days.
20    Q.  Okay.  So if -- if Global Disaster didn't have
21 enough funds to obtain all the equipment and goods that it
22 -- it wanted to provide to BP, how was it that Global
23 Disaster was going to get all -- all of the equipment and
24 those goods?

BILLY BURKETTE

1
2      A.  It was an agreement with those companies that
3  they would be paid when I was paid.
4      Q.  Okay.  And was that agreement oral as well?
5      A.  Some of it.  I think some of it was in writing.
6  I don't really recall.
7      Q.  Do you recall --
8      A.  I don't remember.
9      Q.  Do you recall who you had written contracts with?
10     A.  No, sir, I do not at this time.
11     Q.  Do you recall who you had oral contracts with?
12     A.  Most of the BP people.
13     Q.  No, I'm talking about the -- the companies in
14  which --
15     A.  The service providers?  No, sir, I don't recall.
16     Q.  Do you recall on -- for which items or services
17  specifically you had written versus oral contracts with
18  the providers?
19     A.  No, sir, I do not.
20     Q.  Okay.  If you can turn back to Tab 15, which I
21  think is Exhibit 5, this is the e-mail that we were
22  talking about earlier from Christopher Ott where they
23  talked about the quantity of Aqua N-Cap.
24     A.  Yes, sir.
25     Q.  Okay.  And if you look down to the bottom of that

BILLY BURKETTE

1  first page, it mentions "production -- a price quote and
2  production timelines for 3 million pounds of Aqua N-Cap.
3  1 million available today and they can deliver the other 2
4  million within a month or so;" is that right?
5      A.  Yeah, that's -- that's right, yes, sir.
6      Q.  Okay.  So it's not 4 million pounds per month,
7  correct?
8      A.  That would have been 3 million pounds per month.
9      Q.  Nothing in here says that they were delivering it
10  -- that quantity on a monthly basis, right?
11     A.  Well, I don't -- I don't know.  It says that
12  they, meaning BP, knows that they have 1 million pounds
13  available today and can deliver the other 2 million pounds
14  in 30 days or so.
15     Q.  Okay.
16     A.  I took that -- they told me 3 to 4 million pounds
17  per month is what they could produce.
18     Q.  Okay.  But nothing in this e-mail says "per
19  month"?
20     A.  Well, maybe not in this e-mail, but --
21     Q.  Was that something that was discussed orally?
22     A.  I'm -- yes, sir.
23     Q.  Okay.  Do you recall how much one pound of Aqua
24  N-Cap cost back at this time?

BILLY BURKETTE

1
2      A.  It was either $8 or 8.50, I think, and -- and the
3  answer is no, I do not recall.
4      Q.  All right.  Turning back to the PTO65 statement.
5  You wrote in the third paragraph there, "Expert testimony
6  for multiple experts on which product would have been the
7  best, safest to use for the recovery of the oil spill, not
8  the most cost-effective advantageous for BP."
9              Did I read that correctly?
10     A.  I believe so, yes, sir.
11     Q.  You haven't disclosed any experts that you intend
12  to use in this case yet, correct?
13     A.  No, sir, because we kept being threatened that
14  they would, you know, throw my case out, so we basically
15  -- it's my understanding that we have been on hold until
16  now, so now is the time that we produce that.
17     Q.  Okay.  Are you aware that the deadline to do that
18  was yesterday?
19     A.  No, sir, I'm not aware of that.
20     Q.  Are you aware that the deadline to disclose any
21  experts that you intend to offer accounting evidence or
22  opinions was yesterday?
23     A.  No, sir, I did not know that.
24     Q.  You didn't submit anything by that deadline,
25  right?

BILLY BURKETTE

1
2      A.  I didn't.  I'm not saying my attorneys did or
3  didn't.  I don't know.
4      Q.  Okay.  You are not aware if your attorneys did
5  either, then, right?
6      A.  I am not aware, no, sir.
7      Q.  Okay.  The next paragraph says, "As we start the
8  official depositions, the truth will come out about how BP
9  did everything in its power to hide, conceal, cover up,
10  lessen its recovery costs, control the media, control the
11  scene as to make the containment and cleanup of the spill
12  seem like it was less than it was.  The mitigation and
13  recovery efforts will speak volumes to any jury.  This
14  will be the bulk of my evidence to prove my damages."
15             Apart from what is listed in this -- in this
16  disclosure and the documents that you've provided to BP to
17  date, is there any other evidence that you intend to
18  submit to prove your damages in this case?
19     A.  Yes, sir.  The -- the court cases that came --
20  that I am referring to, I think, will speak volumes to
21  that as well.
22     Q.  Okay.  Other than the court cases and the
23  documents provided and the information disclosed in
24  question 2, nothing else that you -- that you intend to
25  submit --

Page 230

BILLY BURKETTE

1
2      A.  Well, there's a -- there's a couple of things
3  that -- that I looked at that, you know, I'm not sure that
4  I need to produce because it's -- you know, once we get
5  the information from BP, they -- it will be contained
6  within BP's information.  So when you look at the response
7  and you look at the recovery and you look at the -- the
8  mitigating efforts and you look at the media and the
9  internal e-mails and the internal depositions and -- and
10  other court cases that went on, a lot of that, BP is going
11  to provide for me when we go.
12          I mean, that's not something that I should
13  have to provide.  It's BP's own information about how they
14  covered it up and reduced -- they gave false numbers on
15  the reports as to what the spill was actually producing,
16  because some of those conversations that we had with BP
17  and some of those grounds people, when they started with
18  the ROV's -- the ROV company's documentation, they
19  manipulated those numbers.  So like I say, a lot of it in
20  discovery we'll get from BP and it'll prove it on its own
21  accord.
22      Q.  Okay.  Turning to the next page, at the end of
23  the second paragraph there, you say, "We will provide the
24  evidence in exhibit form in court rather than to give BP a
25  heads-up or opportunity to take further action to lessen

Page 231

BILLY BURKETTE

1
2  its exposure."  Did you write that?
3      A.  I did.
4      Q.  Okay.  Is there anything you haven't disclosed to
5  BP that you plan on using in court to prove your case
6  today?
7      A.  I would have to go back and look in all of the
8  documents that I e-mailed.  The majority of it is, like I
9  said, internal communications from the e-mails and the
10  incident command.  So when we subpoena the incident
11  command reports, the incident command reports will be
12  definitive because that's federal documents that prove to
13  the best of their knowledge.  Then when you cross
14  reference that and you start your -- your depositions with
15  the incident commanders as well as the ability to quantify
16  a spill versus an estimate of a spill, those documents
17  are, you know, in-house that y'all already have.  The
18  thing is, is that in order for me to present it, I have to
19  request it.  In order for me to request it, we have to be
20  able to continue our depositions.
21          So I understand that you're saying that the
22  deadline was yesterday, and -- and I'm not disagreeing
23  with you.  I'm just saying that the deadline for
24  information that you're asking -- or that was supposed to
25  be submitted is -- a lot of it hasn't been founded yet

Page 232

BILLY BURKETTE

1
2  because we haven't been allowed to complete our
3  depositions.  Once we complete our depositions, I don't
4  know how that information is viewed by the Court.  I mean,
5  I don't see the Court being able to put a timeline on
6  something that the Court has already approved for the
7  depositions to be taken, and then say that the deadline
8  was earlier than what the deposition was so now it's not
9  allowed.  I just -- I don't understand that, but if that's
10  what you're saying it is, I guess that's a legal question
11  for, you know, attorneys to figure out.
12      Q.  Yes.  But you can discuss that further with your
13  attorney.
14          My question was:  Is there anything that you
15  have currently in your possession that you haven't
16  provided to BP that you believe you will use in court to
17  prove your case?
18      A.  Yes.
19      Q.  Okay.  What do you have in your possession right
20  now that you haven't provided --
21      A.  It's not in my possession.  I have the authority
22  from the Court to depose BP.
23      Q.  I understand.  I'm only asking about documents
24  that you currently have.  So to the extent you have
25  documents that you're going to use to -- to prove your

Page 233

BILLY BURKETTE

1
2  case, those have already been disclosed to BP, right?
3      A.  To the best of my knowledge, that I can recall at
4  this particular time, not to say that I won't think of
5  something or come across something in the future.  I'm
6  just trying to do the best I can to be honest and -- and
7  forthright with the information to answer the question
8  that I currently have.
9      Q.  Understand and appreciate that.
10          Sitting here today, based on the universe of
11  what you know right now, everything that Global Disaster
12  intends to rely on that you have in your possession, you
13  believe you've provided it to BP?
14      A.  That I have in my possession?  Yes.
15      Q.  Okay.  We talked about the attorney, Phil Strunk,
16  and Stanton and Michelle.
17          Who is Billy Nungesser?
18      A.  He was the parish manager for Plaquemines Parish,
19  which is where primarily the first signs of the spill hit
20  their shores first.  He is currently now the lieutenant
21  governor of the state.
22      Q.  Okay.  Did you have any discussions with him
23  about any of the, you know, procurement contracts or any
24  other arrangements that Global Disaster claims it has with
25  BP?

Page 234

BILLY BURKETTE

1
2     A.  Multiple, multiple, multiple times.
3     Q.  Okay.  What did you talk about with him?
4     A.  We talked about everything as far as a strategic
5  plan to respond to the disaster.  I mean, he's the parish
6  president.  With his knowledge of the parish as well as
7  needs of the parish and the needs to respond to the spill,
8  he was a crucial person that I communicated with all the
9  time, because he had a direct line to the incident command
10 that I didn't have.
11    Q.  Okay.  Did you ever tell him that you had
12 agreements with BP to supply BP with any products or
13 services?
14    A.  Oh, absolutely I did.
15    Q.  Did you ever talk to him about how much you were
16 asserting against BP in this litigation?
17    A.  Didn't come up in conversation.
18    Q.  Did you ever talk to him about Aqua N-Cap?
19    A.  Absolutely, I did.
20    Q.  How many times?
21    A.  Oh, I don't know, ten or so.
22    Q.  Okay.  And you talked to him about ES&H?
23    A.  I don't recall.  I may have been -- I may have
24 been -- may have had a conversation where I told him that
25 they were trying to force me to use them.  I don't recall

Page 235

BILLY BURKETTE

1
2  really.
3     Q.  Any recollection of discussions about storage --
4  storage at the Port of St. Bernard?
5     A.  Not that I can recall, not to say that I did or
6  didn't.
7     Q.  Any recollection of discussing your -- the land
8  that you had an option to buy at Port Fourchon?
9     A.  No, sir.
10    Q.  Any recollection of discussing any other -- your
11 letter of intent with Strategic Services?
12    A.  I don't recall, sir.
13    Q.  Last -- I think this should be the last
14 document here for today.
15        MR. KLAR:  Can the court reporter please
16 mark Tab 10 the next in line?
17        (Exhibit 18 was marked for identification.)
18 BY MR. KLAR:
19    Q.  Do you recognize this document, Mr. Burkette?
20    A.  I mean, this is in regards to A-1, as well as --
21        (Reading sotto voce.)
22        Yes, so that's the property.  Remember when
23 I told you that A-1 had a lease purchase from Richie
24 Stephens?
25    Q.  Uh-huh.

Page 236

BILLY BURKETTE

1
2     A.  That's where the trucks were being stored and
3  because, like I said, it's over a hundred miles from my
4  house, that was the closest place that I could get mail,
5  and --
6     Q.  Okay.  When you say "lease purchase" --
7     A.  I'm sorry?
8     Q.  No, no.  Go ahead.  I interrupted you.
9     A.  That's where A -- that -- technically, that
10 address is A-1's lease purchase, and because the yard was
11 so big there, that it could hold, I don't know, 50 trucks
12 or so, I put the boat over there and that's where I stored
13 the boat to keep me from having to go a hundred-plus miles
14 one way to go get the boat to do things that BP would ask
15 me to do, so --
16    Q.  Just so I understand when you say "lease
17 purchase," A-1 -- did A-1 sell it to somebody else and
18 then lease it back from them, or did they own it and lease
19 it to somebody else?
20    A.  I was -- it was a lease that I was entered into
21 with Richie Stephens, and the money that I was paying on a
22 monthly lease went towards the purchase price of $250,000.
23    Q.  Okay.  So eventually the property would be yours
24 once the payment history was completed?
25    A.  Correct.

Page 237

BILLY BURKETTE

1
2     Q.  Okay.  Do you recall sending this letter to BP?
3     A.  Not really.
4     Q.  Okay.  Can you go to the second page.
5        Do you recognize this?
6     A.  "BP complaint form was previously filed..."
7        (Reading sotto voce.)
8        Vaguely, I remember this.
9     Q.  Okay.  In paragraph 2(c), it says, "How it
10 impacted you personally?"  You said you lost everything,
11 "I'm still fighting debt collectors, bad credit and good
12 faith in my character abuse."
13        Is the -- is the debt that you're referring
14 to Billy Burkette's debt or is it debt of the business of
15 Global Disaster?
16    A.  You know, I'm not sure I'm educated enough to
17 answer that because, you know, I -- like I said, I'm --
18 I'm just an old country boy, so whether you talk about my
19 company or whether you talk about me as an --
20 individually, we all lost.  Everybody lost.  So whether
21 you talk about, you know, if you were doing research on a
22 company and you found out that there was a problem, you
23 would obviously look at who the owner of that business is
24 through the Secretary of State, and then you would see
25 that that person is responsible as well, because they lost

BILLY BURKETTE

1               BILLY BURKETTE
2 as well, so I -- I'm not sure how to answer that, sir.
3     Q.  Okay.  Did Global Disaster, did it have any
4 outstanding loans?
5     A.  Yes, sir, we did.  We had money that -- that was
6 owed to Doggett Equipment.  I had money to contractors.  I
7 had money to -- Lord knows, I -- it's -- yes, sir.  The
8 answer is yes.
9     Q.  Do you know how much, approximately, ballpark?
10    A.  No, sir, I do not.
11    Q.  Is it more than a million dollars?
12    A.  Oh, by far.
13        Do what?
14        MR. NEWELL:  Go ahead and answer the
15 question, Billy.
16        THE WITNESS:  I mean, you're asking me to
17 put a price on -- on something that was cumulative between
18 myself and two different companies that I honestly, at
19 this point in time, right -- sitting here right now today,
20 I can't give you that dollar figure.
21 BY MR. KLAR:
22    Q.  I'm asking specifically about Global Disaster and
23 I -- I understand your answer is you're not sure; you're
24 answering across the set of Global Disaster, A-1 Towing
25 and Billy Burkette and you think it's greater than a

1               BILLY BURKETTE
2 million, but you're not sure how much.  Is that accurate?
3     A.  Well, you know, that's the reason -- the whole
4 reason that -- it's my understanding, so let's get back to
5 the question.  The question is:  How much money is
6 attributable in -- in losses and debt that I owed?
7        So A-1 owed trucking companies for work that
8 they hired them to do, and whether you look at that as
9 Billy Burkette or whether you look at it as A-1, they both
10 lost.
11        Then you have the same setup as Global
12 Disaster had, debt and responsibilities as a company, and
13 so did Billy Burkette.  They're separate entities so
14 there's separate accounting that needs to be done on that.
15 You can't just lump it all together and say because Billy
16 Burkette owned them all, that -- that Billy Burkette
17 didn't lose anything.  Or you can't also say that because
18 A-1 lost, that Global Disaster did or didn't lose and vice
19 versa.
20        Just like I'm telling you that the contract
21 on a -- on a contractual basis, the work that was
22 performed for BP utilizing A-1 Towing & Hauling to haul
23 tar balls and to haul contract work for the disaster and
24 cleanup was never, in any way, associated with any work
25 that Disaster did -- I mean Global Disaster did or any

1               BILLY BURKETTE
2 work that Global Disaster may or may not have done.  They
3 are absolutely two separate entities.  No matter if I own
4 both or don't, they still all had losses.
5     Q.  Okay.  I -- I understand your --
6        MR. NEWELL:  How long have we been on the
7 record today?  We have got to be pretty close to six
8 hours.
9        THE VIDEOGRAPHER:  This is the videographer.
10 So we have been going 6 hours, 13 minutes.
11        MR. KLAR:  I have one question on the next
12 line or I just want to ask about the next sentence and
13 then we can end.
14        THE WITNESS:  Okay.
15        MR. NEWELL:  Okay.
16 BY MR. KLAR:
17    Q.  In -- in part E there, you say, "The business
18 started in 2009 because I had secured a $14 million
19 contract to crush the concrete at the Port of St. Bernard,
20 and the property I was purchasing I lost, and BP would not
21 honor my contract with them."
22        The $14 million contract you're referring
23 to, is that the Airware contract?
24    A.  That is just for the crushing, yes.
25    Q.  Okay.  And that's -- that's with Airware, right?

1               BILLY BURKETTE
2    A.  Correct.
3    Q.  Okay.  So it wasn't a 67 and a half million
4 dollar contract; it was a $14 million contract?
5    A.  Let's -- since you brought that up, let's go
6 ahead and talk about that.  I thought we covered that
7 earlier.
8    Q.  You're right.  Hold on.  Let me make sure.
9        The 14 million was to crush concrete --
10 concrete with Airware.  The 67 and a half was for the
11 later sale by A-1 to Robin Seafood, right?
12    A.  No.  You asked me how did I calculate that
13 damage.  The concrete crushing originally was 14.  Had --
14 had Airware paid me the 14 million, they would have been
15 entitled to their portion but still also utilized A-1 for
16 hauling it.  So the portion in which you would sell
17 something -- in other words, if Airware had -- had
18 completed their obligation and we crushed it, that's
19 $14 million.  Bam, that's done.
20    Q.  That's the full 1.5 million in cubic yards of
21 crushed?
22    A.  I'm guessing.  No, sir, crushed, it would have
23 been closer to 4 million because it's a 4 to 1 reduction.
24    Q.  Okay.  I understand.
25    A.  So because Terry didn't fulfill his obligation

BILLY BURKETTE

1
2 and forfeited on the contract, then that contract became
3 Global Disaster's. So Global Disaster would have been
4 entitled to the 14 plus anything else that they could have
5 sold it for. So let's just say that I sold it for $60 a
6 yard instead of the 45, you can add 15 million right
7 there. So it's just -- it's -- it's all inclusive because
8 the contract was not fulfilled because BP came in and
9 seized the Port.
10     Q. Okay. The most that -- that Global Disaster
11 could have earned under its contract with Airware to crush
12 the concrete was $14 million, right, just for the
13 crushing?
14     A. For Global Disaster, correct.
15     Q. Okay. And -- and you indicated that the -- other
16 than the portion that was already designated for the
17 airport, the remainder of the crushed concrete, A-1 Towing
18 was going to sell to Robin Seafood, right?
19     A. As much as -- as much as we could get to him,
20 yes, but that was just Robin Seafood. You know, let's
21 just say that Robin Seafood would have bought 2 million
22 yards. There's no real definitive answer, and that's what
23 I was trying to explain to you earlier. You're asking
24 about hypothetical, and you asked me to calculate an
25 estimate of that.

BILLY BURKETTE

1
2        So if you had 4 million yards, and you did
3 it at 40 -- at $45 a yard, then that's where you would get
4 those figures. If the figures would be increased because
5 you had to haul it further and it was $80 a yard, then
6 those figures would be on $80 a yard.
7     Q. Okay. Other than your contract -- other than A-1
8 Towing's contract with Robin Seafood at the time that the
9 Port was taken over, Global Disaster had no agreements
10 with any other party to purchase the crushed concrete,
11 right?
12     A. The only agreements we had were with Robin
13 Seafood, the -- we actually -- in lieu of payment for the
14 property rental, we actually took some of that crushed
15 concrete and rebuilt the roads with -- inside the Port.
16 And then the rest of that would have gone to the airport,
17 yes.
18     Q. Okay. So just from a total tonnage standpoint, I
19 just want to make sure I understand the numbers and then
20 we can conclude. How many cubic yards of crushed concrete
21 were going to the airport versus Robin Seafood?
22     A. Oh, I -- I think we calculated it at -- I don't
23 -- I don't really know. I mean, I think it was around
24 200,000 yards.
25     Q. To the airport?

BILLY BURKETTE

1
2     A. Yes, sir, I believe that's correct.
3     Q. And 1.5 to Robin?
4     A. I believe that's correct. So that would have
5 been a total of 1.7 out of the 4 million crushed.
6     Q. Okay. So the remaining 2.3 was not currently --
7 was not under contract at the time of the Port takeover to
8 be sold to any business, right?
9     A. Not that I'm aware of. I would have to go back
10 and review all my e-mails and phone calls and...
11     Q. Okay. Sitting here today, you are not aware of
12 any contracts for that remain -- sale of the remaining
13 2.3 million?
14     A. No, sir.
15     Q. Okay.
16        MR. KLAR: I think we can end for today,
17 unless, Eric, you have questions.
18        THE STENOGRAPHIC REPORTER: He is muted.
19 Mr. Newell, you're muted.
20        MR. NEWELL: Oh, I'm not going to ask any
21 questions today. We'll pass -- or we'll reserve.
22        MR. KLAR: Okay. So we'll resume tomorrow
23 with the 30(b)(6) portion. It should not take as long as
24 today.
25        THE VIDEOGRAPHER: Time is 6:17 p.m. We are

BILLY BURKETTE

1
2 going off the record.
3 (Whereupon, the deposition was concluded at 6:17 p.m.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 246

```
 1
 2                    REPORTER'S CERTIFICATE
 3
 4        I, KARI J. BEHAN, CCR, RPR, CRR, Certified Court
 5  Reporter (LA Certificate #97019), as the officer before
 6  whom this testimony was taken, do hereby certify that
 7  BILLY BURKETTE , after having been duly sworn by me upon
 8  authority of R.S. 37:2554, did testify as hereinbefore set
 9  forth in the foregoing ^ number of pages;
10        That this testimony was reported by me in
11  stenotype reporting method, was prepared and transcribed
12  by me or under my person direction and supervision, and is
13  a true and correct transcript to the best of my ability
14  and understanding;
15        That the transcript has been prepared in
16  compliance with transcript format guidelines required by
17  the complete arrangement, financial or otherwise, with the
18  person or entity making arrangements for deposition
19  services;
20        That I have acted in compliance with the
21  prohibition on contractual relationships, as defined by
22  Louisiana Code of Civil Procedure Article 1434 and in
23  rules and advisory opinions of the board;
24        That I have no actual knowledge of any
25  prohibited employment or contractual relationship, direct
```

Page 247

```
 1
 2  or indirect, between a court reporting firm and any party
 3  litigant in this matter nor is there any such relationship
 4  between myself and a party litigant in this matter.  I am
 5  not related to counsel or to the parties herein, nor am I
 6  otherwise interested in the outcome of this matter.
 7        Signed this day, the February 18, 2021.
 8
 9
10
11        KARI J. BEHAN, CCR, RPR, CRR
            Certified Court Reporter
12          LA Certificate #97019
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 248

```
 1
 2              CHANGES AND SIGNATURE
                   BILLY BURKETTE
 3             Tuesday, February 2, 2021
 4  To the Reporter:
       I, BILLY BURKETTE, have read the entire transcript of
 5  my deposition taken on September 3, 2007 in the captioned
    matter or the same has been read to me.  I request that
 6  the following changes be entered upon the record for the
    reasons indicated.  I have signed my name to the Errata
 7  Sheet and authorize you to attach same Errata Sheet to the
    original transcript.
 8
 9  PAGE/LINE
            |  CHANGE      REASON
10  _____  |  _____
11  _____  |  _____
12  _____  |  _____
13  _____  |  _____
14  _____  |  _____
15  _____  |  _____
16  _____  |  _____
17  _____  |  _____
18  _____  |  _____
19  _____  |  _____
20  _____  |  _____
21  _____  |  _____
22  _____  |  _____
23  _____  |  _____
24  _____  |  _____
25  _____  |  _____
```

Page 249

```
 1
 2  CHANGES (CONTINUED):
 3
    _____  |  _____
 4
    _____  |  _____
 5
    _____  |  _____
 6
    _____  |  _____
 7
    _____  |  _____
 8
    _____  |  _____
 9
    _____  |  _____
10
    _____  |  _____
11
12        I, BILLY BURKETTE, have read the foregoing
13  deposition and hereby affix my signature that same is true
14  and correct, except for the changes noted above.
15
16  _____
    BILLY BURKETTE
17
18
19
20
21
22
23
24
25
```