# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | § § § § | MDL No. 2179 |
| | | SECTION 1(2) |
| This document relates to | § | Honorable CARL J. BARBIER |
| Global Disaster Recovery and Rebuilding Services, LLC, et al v. BP Expl. & Prod. Inc., et al Cause No. 16-cv-06585 | § § § | Magistrate Judge Currault |

### PLAINTIFF'S STATEMENT OF THE MATERIAL FACT IN OPPOSITION TO BP'S MOTION OF SUMMARY JUDGMENT

In accordance with Rule 56(c) of the Federal Rules of Civil Procedure and Local Rule 56.2 of this Court, Plaintiff Global Disaster Recovery & Rebuilding Services LLC, respectfully submit the following statement of material facts which raise a genuine issue in opposition to BP's Motion for Summary Judgment (the "Motion").

1. Billy Burkette founded Global Disaster Recovery & Rebuilding Services LLC ("Plaintiff") in 2009. *See* Ex. 2, Declaration of Eric W. Newell in Response to BP's Motion for Summary Judgment ("Newell Decl.") at Ex. B 24:24-25:2.

2. Mr. Burkette was Plaintiff's sole owner and sole employee, not including subcontractors. *See* Newell Decl. at Ex. B 24:24-25:2.

3. Mr. Burkette also owned A-1 Towing & Hauling LLC ("A-1"). *See* Newell Decl. at Ex. A 16:8-22.

### Concrete Crushing Contract

4. Prior to the Spill, the only disaster recovery services Plaintiff had provided revolved around cleaning up concrete slabs after Hurricane Katrina at Port St Bernard in Chalmette, Louisiana. *See* Newell Decl. at Ex. B 13:13-22, Ex. B 17:6-10 and Ex. A 34:18-25, 35:2-4.

5. There were about 4 million cubic yards of demolition slabs that need to be disposed of by crushing. Ex. A

at Page 36:8-37:24

6. These slabs came from underneath home that were so damages during Hurricane Katrina, that they had to be demolished. They were then hauled by various companies, including A-1 to the St. Bernard Parish port. Ex. A at Page-33:25-35:15

7. Global Disaster needed to procure the equipment necessary to separate the concrete from the rebar and plumbing in the slabs, and the equipment to crush the actual slabs into various sizes. Ex. A at Page 44:22-45:25

8. Global Disaster entered into a contract with Airware, LLC to crush concrete at the St. Bernard Parish Port. *See* Newell Decl. at Ex. A 240:17-24; Ex. A 37:5-22, 38:24.

9. Plaintiff had oral conversations with a BP representative regarding potentially subleasing storage space from Plaintiff, which Plaintiff alleges it was leasing from the Port of St. Bernard. Ex. A 199: 4-19.

10. As part of these discussions, BP would occupy the land gradually as Plaintiff continued to crush concrete and more space became available, and BP hoped to move in as soon as possible. Plaintiff does not recall when or with whom he had those discussions. Ex. A 174:10-25, 175:7-18.

11. These discussions with BP never materialized into a formal lease agreement, instead the US Coast Guard, under BP's control, took over the entire Port of St. Bernard, including Plaintiff's land and concrete. *See* Newell Decl. at Ex. A 180:6-181:14; Newell Decl. at Ex. B 81:6-23, 84:16-19

12. On June 28, 2010, Plaintiff entered into a contract with Airware to crush concrete belonging to Airware at the Port of St. Bernard. (the "Airware Contract"). *See* Newell Decl. at Ex. A 240: 17-24.

13. Under the Airware Contract, Airware agreed to pay Plaintiff $9.50 per ton of concrete crushed. Ex. A. 47: 23-25, 47: 2-8.

14. The first invoice sent to Airware was for $250,000 or $280,000. Ex. A Page 49:4-10; 48:22-49:14. This invoice was never paid. *See* Newell Decl. at Ex. A 49: 2/10. That single invoice represented between

15. 25,000 and 30,000 tons of concrete that had been crushed. Ex. A 49: 11-13.

15. Global Disaster could have earned $14 million under its contract with Airware to crush the concrete. Ex. A at 242: 10-14.

16. To resolve a dispute with Airware over non-payment, Airware deeded ownership of all of its concrete to Plaintiff. Ex. A. at 63:5-64:11.

17. Burkette further testified that Airware was not able to pay the invoice because of the impact by the Oil Spill. Ex. A at Page 48:22-49:14

18. Plaintiff alleges that after crushing the concrete, it had intended to sell the concrete, which would be shipped by A-1, a company also owned by Mr. Burkette. *See* Newell Decl. at Ex. A 50:6-12, 51:4-13. A-1 and/or Global Disaster purportedly had entered into a separate contract with Robins Seafood, pursuant to which A-1 would sell Robins 1.5 million cubic yards of crushed concrete to repair oyster beds, for $45 per yard, or a total of $67,500,000. Ex. A at 65:14-22.

### Aqua N-Cap

19. Aqua N-Cap is polymer used to remediate fuel, oil, and other hydrocarbon spills and was manufactured by RTASCo (Remediation Technologies & Applications Systems), aka RTA Systems, Inc. ("RTASCO") at the time of the Spill. Ex. A 99:10-11.

20. The Plaintiff had multiple conversations with procurement and Captain Stanton concerning the use of Aqua N-Cap to clean up the spill. Ex. A Page 133:21-134:16. At BP's request he obtained EPA approval for the use of Aqua N-Cap. Ex. A 136: 17-19.

21. At the time of the Spill, RTASCo (Remediation Technologies & Applications Systems), aka RTA Systems, Inc ("RTASCo") manufactured Aqua N-Cap. Ex. A 99:10-1 . Plaintiff alleges that it had an oral understanding with RTASCo pursuant to which Plaintiff would hold "the exclusive distribution contract for the Gulf of Mexico," contingent on Plaintiff securing an agreement from BP to purchase Aqua N-Cap. Ex. A 217:4-7.

22. Plaintiff seeks damages relating to its alleged efforts to procure a product called Aqua N-Cap for use in connection with the Spill response. Ex. A 113: 7-11; Aqua N-Cap is a polymer sediment e technology used to remediate and clean up oil spills on water or solid surfaces.

23. Plaintiff had secured the exclusive right to sell Aqua N-Cap to BP for cleanup after the Oil Spill. Ex A: 93:22-94:10.

24. Aqua N-Cap was an approved product in Bp's emergency response plan submitted to the State of Louisiana. Ex. A 81:24–82:14, 84:15–18.

25. Plaintiff' reached an agreement RTASCo, pursuant to which Plaintiff claims it could have earned commissions from the sale of Aqua N-Cap, was never reduced to writing. *See* Newell Decl. at Ex. B 61:18-22.

26. Plaintiff's agreement with RTASCo was contingent on securing a purchase order from BP. *See* Newell Decl. at Ex. A 95:4-19.

27. BP never purchased any Aqua N-Cap, instead they chose to by the company instead. *See* Newell Decl. at Ex. A 110:3-12.

28. Plaintiff does not recall who at BP allegedly agreed orally to procure Aqua N-Cap through Plaintiff or with whom at BP he orally discussed the procurement of Aqua N-Cap. *See* Newell Decl. at Ex. A 97:12-25; 98: 2-15. Plaintiff admits the parties never negotiated or agreed upon a price. See Ex. B 39: 2-25, 40:2-2-25, 41:2-13 and that BP personnel informed Mr. Burkette that any commitment to purchase Aqua N-Cap was contingent upon a determination by BP that locations to which Aqua N-Cap would be delivered had the need for the product, capacity to take delivery, and adequate equipment to deploy the product.

29. Burkette testified that he had an agreement with the sector commander the [BP] Procurement manager on the floor to purchase Aqua N-Cap that was superseded by Jacqueline Michele. Ex. A at 95:25-96:12.

Case 2:10-md-02179-CJB-DPC   Document 27100-9   Filed 05/12/21   Page 6 of 8

30. The price of the Aqua N-Cap was $7 or $9 per pound. Ex. A at 96:13- 97:10

31. BP was going to buy all of the available Aqua N-Cap; there were 1 million pounds of Aqua N-Cap available immediately and another 3 million pounds available within 30 days. Ex. A 108:7-109:5.

32. Global Disaster would have received a commission of $2.50 per pound on the sale of the Aqua N-Cap to BP by RTASCo. Ex. A at 55:13-17

33. Ultimately, he was introduced to Jackie (Jacqueline Michel), who he believed to be a biologist working for BP. A 92: 2- 93:9.

34. Jacqueline Michel said they would never use Aqua N-Cap because it would "quantify the spill and cost us billions in fines." Ex. A 92: 2- 93:9.

## Other Goods and Services

35. Plaintiff does not recall who at BP allegedly agreed orally to procure other goods and services through Plaintiff or when those discussions occurred. *See* Newell Decl. at Ex. A 97:12-25, 98: 2-25.

36. Aside from Aqua N-Cap, Mr. Burkette had multiple oral discussions with BP personnel during which BP personnel orally agreed to procure other goods and services through Plaintiff. Plaintiff cannot identify which goods or services BP agreed to procure through Plaintiff, the cost of those goods or services, or the timing and location of delivery for those goods or services. *See* Newell Decl. at Ex. B 120:2-25. 121: 2-25, 122:2-24.

37. Burkett's understanding was that BP had a preset contract rate of 20% as a profit margin on top of the costs of goods and services for procurement services. Ex B 116:4-17 and 119:3-11.

## A-1 Towing

38. Burkette's testimony regarding who would have benefited from the sale and shipping of crushed concrete to Robin's Seafood to use in new oyster beds shows that both Global Disaster and A1 would have benefited. Ex. A 49:17-52:20.

39. A1 would have benefited by shipping the concrete, but Global Disaster actually owned the concrete after an agreement with Airware. Ex. A 223: 2-5.

40. On July 14, 2016, Mr. Burkette, on behalf of A-1, entered into a settlement with BP, but it does not release the sperate claims of Global Disaster. Ex. A, 17:2-20.

41. When asked directly whether A-1 had a contract to sell concrete to Robin Seafood, his response was that the A1 had a contract to "bring the rushed concrete to Dan Robin." Ex. A, Page 59:7-15

42. BP represented that the spill was a mild spill and "wouldn't impact anything." Ex. A, 46:20-25

Respectfully submitted,

BRENT COON & ASSOCIATES
*/s/Brent W. Coon*
Brent W. Coon
Federal Bar. No. 9308
Texas Bar. No. 04769750
Brent@bcoonlaw.com
Eric W. Newell
Texas Bar No. 24046521
Eric_Newell@bcoonlaw.com
215 Orleans
Beaumont, TX  77701
Phone: (409)835-2666
Fax: (409)835-1912
**ATTORNEY(S) FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing **Plaintiff's Statement of Material Facts In Opposition to BP's Motion for Summary Judgment** has been served on All Counsel by electronically uploading the same to File & ServeXpress in accordance with Pretrial Order No. 12, as amended, and that the foregoing was electronically filed with the Clerk of the Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 12th day of May, 2021.

*/s/ Brent W. Coon*