UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In Re:  Oil Spill by the Oil Rig *Deepwater Horizon* in the Gulf of Mexico, on April 20, 2010,<br><br>This Document Relates To:<br>Civil Action No. 2:13-cv-01286<br><br><br>GULF MARINE INSTITUTE OF TECHNOLOGY, and BIOMARINE TECHNOLOGIES, INC.<br><br>v.<br><br>BP AMERICA PRODUCTION COMPANY; ET AL. | MDL NO. 2179<br><br>SECTION:  J<br><br>JUDGE BARBIER<br><br>MAGISTRATE JUDGE CURRAULT |

---

BIOMARINE TECHNOLOGIES, INC. AND GULF MARINE INSTITUTE OF TECHNOLOGY'S
RESPONSE AND MEMORANDUM IN OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

---

## TABLE OF CONTENTS

TABLE OF AUTHORITIES...........................................................................................................II

SUMMARY JUDGMENT EVIDENCE ...........................................................................................V

INTRODUCTION ..................................................................................................................... 1

STATEMENT OF FACTS ........................................................................................................... 1

ARGUMENT .......................................................................................................................... 8

I.   GENUINE DISPUTES OF MATERIAL FACT EXIST ON PLAINTIFFS' OPA CLAIMS. ................. 8

   A.   The Spill caused Plaintiffs' damages. ........................................................................9

      1.   The Spill caused damage to the waters of the Gulf of Mexico. ................................9

      2.   The damage to those natural resources caused Plaintiffs' damages. ............... 10

      3.   Defendants' arguments on causation are without merit. ................................... 10

         a.   The only permits required were the USACE and the EPA permits............ 10

         b.   The Exempted Fishing Permit ("EFP") was not required...........................11

            (1)   Plaintiffs' plans and USACE permit were for indigenous fish.................11

            (2)   NOAA lacked authority to regulate aquaculture. ............................... 12

            (3)   Legislative History further belies NOAA's authority. ........................... 13

         c.   But for the Spill, Plaintiffs would have completed fundraising and launched. ........................................................................................................ 14

         d.   Ericsson recognized that the Spill had damaged the Gulf of Mexico. ....... 16

   B.   Plaintiffs' damages are reasonably certain. ........................................................... 18

      1.   Personal Property Damages under OPA ............................................................... 18

      2.   Lost profits and impairment of earning capacity under OPA ............................ 19

II.  GENUINE DISPUTES OF MATERIAL FACT EXIST ON PLAINTIFFS' MARITIME LAW CLAIMS. ............22

III. CONCLUSION ................................................................................................................24

**T<small>ABLE OF</small> A<small>UTHORITIES</small>**

**Federal Cases**                                                                                                               **Pages**

*Al-Saud v. Youtoo Media L.P.*,
   754 Fed. Appx. 246 (5th Cir. 2018) ................................................................................ 22

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ...................................................................................................... 8

*Blase Indus. Corp. v. Anorad Corp.*,
   442 F.3d 235 (5th Cir.) ................................................................................................ 19

*Buffalo Marine Servs. Inc. v. United States*,
   663 F.3d 750 (5th Cir. 2011) ........................................................................................ 8

*Burgess v. M/V TAMANO*,
   370 F.Supp. 247 (S.D. Me. 1973), *aff'd per curiam*, 559 F.2d 1200 (1st Cir. 1977) .................. 23

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ................................................................................................. 7, 8

*Chemical Distributors, Inc. v. Exxon Corp.*,
   1 F.3d 1478 (5th Cir. 1993) .....................................................................................19, 20

*Coffel v. Stryker Corp.*,
   284 F.3d 625 (5th Cir. 2002) ...................................................................................... 19

*Cooper Tire & Rubber Co. v. Farese*,
   423 F.3d 446 (5th Cir. 2005) ........................................................................................ 8

*Fredonia Farms, LLC v. Enbridge Energy Partners, L.P., No. 1:12-CV-1005*,
   2014 WL 3573723 (W.D. Mich. July 18, 2014) ............................................................... 22

*G & H Soybean Oil, Inc. v. Diamond Crystal Specialty Foods, Inc.*,
   796 F. Supp. 1214 (S.D. Iowa, August 10, 1992) ........................................................19, 20

*Gabarick v. Laurin Mar. (Am.), Inc.*,
   406 F. App'x 883 (5th Cir. 2010) .................................................................................. 8

*Great Pines Water Co., Inc. v. Liqui-Box Corp.*,
   203 F.3d 920 (5th Cir. 2000) ...................................................................................... 19

*Gulf Eng'g Co., LLC v. Dow Chem.Co.*,
   961 F.3d 763 (5th Cir. 2020) ...................................................................................... 19

*Gulf Fishermens Ass'n. v. Nat'l Marine Fisheries Serv.*,
   968 F.3d 454 (5th Cir. 2020) .................................................................................12, 13

*Hiller v. Manufacturers Prod. Rsch. Grp. of N. Am., Inc.,*
    59 F.3d 1514 (5th Cir. 1995) ................................................................ 20

*Homoki v. Conversion Services, Inc.,*
    717 F.3d 388 (5th Cir. 2013) .................................................................. 19

*In re Deepwater Horizon*, 808 F. Supp. 2d 943 (E.D. La. 2011) ...................... 21

*In re: Oil Spill by the Oil Rig "Deepwater Horizon"" in the Gulf of Mexico on April 20, 2010,*
    168 F. Supp. 3d 908 (E.D. La. 2016) ...................................................... 9

*In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010,*
    902 F. Supp. 2d 808, 816 (E.D. La. 2012), *aff'd sub nom. In re Deepwater Horizon,*
    741 F. App'x 185 (5th Cir. 2018), .......................................................... 21

*Louisiana ex rel. Guste v. M/V TESTBANK,*
    524 F.Supp. 1170 (E.D.La.1981) ........................................................... 23

*Nycal Offshore Dev. Corp. v. United States,*
    106 Fed. Cl. 222 (2012) .......................................................................... 21

*Pac. Legal Found. v. Costle,*
    586 F.2d 650 (9th Cir. 1978) .................................................................. 14

*Rice v. Harken Expl.,*
    89 F. Supp. 2d 820 (N.D. Tex. 1999) ..................................................... 8

*Rice v. Harken Exploration Co.,*
    250 F.3d 264 (5th Cir. 2001) .................................................................. 8

*Robins Dry Dock & Repair Co. v. Flint,*
    275 U.S. 303 (1927) ............................................................................... 23

*Shaughnessy v. PPG Industries, Inc.,*
    795 F. Supp. 193 (W.D. La. 1992) ......................................................... 23

*Thompson & Wallace of Memphis, Inc. v. Falconwood Corp.,*
    100 F.3d 429 (5th Cir. 1996) .................................................................. 20

*Tolan v. Cotton,*
    572 U.S. 650 (2014) ............................................................................... 7, 8

*U.S. Pub. Interest Research Grp. v. Atl. Salmon of Me., L.L.C.,*
    215 F. Supp. 2d 239 (D. Me. 2002) ....................................................... 14

*Union Oil Co. v. Oppen,*
    501 F.2d 558–71 (9th Cir. 1974) ............................................................ 23

**State Cases**

*Dewhurst v. Gulf Marine Inst. of Tech.*,
  55 S.W.3d 91 (Tex. App.—Corpus Christi 2001, pet. denied) ........................................................ 5

*Hampton v. North Carolina Pulp Co.*,
  223 N.C. 535 (1943) ...................................................................................................... 23

*Masonite Corp. v. Steede*,
  198 Miss. 530 (1945) ..................................................................................................... 23

*Patterson v. Gulf Marine Inst. of Tech.*,
  No. 13–06–067–CV, 2008 Tex. App. LEXIS 1462, at *15, 2008 WL 525424 (Tex. App.—
  Corpus Christi Feb. 28, 2008, pet. denied) (mem.op.) ............................................................ 5

**Federal Statutes**

33 U.S.C. 2701-2761 2702 ..........................................................................................8, 18

33 U.S.C. § 2702 ............................................................................................. 9, 10, 18, 19

33 U.S.C. § 1362 (2012) ................................................................................................. 14

33 U.S.C. § 403 ........................................................................................................... 14

33 U.S.C.A. § 407 ........................................................................................................ 14

43 U.S.C. § 1333 ......................................................................................................... 14

**Federal Rules and Regulations**

Fed. R. Civ. P. 56 ......................................................................................................... 7

40 CFR §§ 122.24, 122.25 .............................................................................................. 13

**Miscellaneous Authorities**

H.R. Conf. Rep. 101–653 (1990), *republished in* 1990 U.S.C.C.A.N. 779 ............................................. 19

H.R. Rep. No. 116-R45952, 116th Cong. (2019) .......................................................................... 13

<u>SUMMARY JUDGMENT EVIDENCE</u>

Defendants have failed to meet their burden of establishing that there is no genuine dispute of material fact on Plaintiffs' claims.  Nevertheless, Plaintiffs attach and incorporate herewith the following summary judgment evidence:

Declaration of Stephen S. Kreller                                              Exhibit 1
      Feb. 18, 2021 John Ericsson Deposition Excerpts          Exhibit 1A
      Feb. 19, 2021 John Ericsson Deposition Excerpts          Exhibit 1B
      ERMA Map of Deepwater Horizon Wreckage and Surface Oiling   Exhibit 1C
      Jun. 3, 2008 NOAA Correspondence to BMT                  Exhibit 1D
      Pensacola New Journal Perdido Key Beach Re-Oiling        Exhibit 1E
      John D. Ericsson U.S. Patent and Trademark Office Patents   Exhibit 1F
BMT Management and GMIT Advisors and Consultants              Exhibit 2
United States Army Corps Permits                              Exhibit 3
United States EPA NPDES Permits                               Exhibit 4
Dr. Barry Vittor Affidavit                                   Exhibit 5
BMT and GMIT Equipment                                       Exhibit 6
Jul. 28, 2003 Tax Opinion                                    Exhibit 7
BMT and GMIT Joint Development Agreement                      Exhibit 8
Jan. 31, 2010 GMIT draft $10mm Bond Offering                 Exhibit 9
Mar. 1, 2010 BMT PPM                                         Exhibit 10
NOAA Closure Map                                             Exhibit 11
Roy R. Williams, Jr. Affidavit                               Exhibit 12
Extent and Degree of Shoreline Oiling Journal Article (TREX-012199)   Exhibit 13
George Hersbach Affidavit                                    Exhibit 14
Emilio (Lin) Giralt Affidavit                               Exhibit 15
Dr. Donald Boesch MDL 2179 Trial Testimony Excerpts          Exhibit 16

BioMarine Technologies, Inc. ("BMT") and Gulf Marine Institute of Technology ("GMIT") (collectively, "Plaintiffs") respectfully provide this response and memorandum in opposition to the Motion for Summary Judgment filed by BP and adopted by other Defendants.

<u>INTRODUCTION</u>

Plaintiffs sued Defendants after the Deepwater Horizon disaster (the "Spill") ended their quest to establish a fish farm in the Gulf of Mexico.  Plaintiffs had the principal permits needed.  They had raised over $9,000,000 in funds and assets.  They had assembled a team of experts, conducted years of research, acquired numerous vessels, sea cages, and other equipment.  They had the promise of raising additional capital to launch their fish farm at the 27.5 acre permitted site, south of the Florida/Alabama border (the "FlorAbama Project").  Then, Defendants caused the Spill, which damaged the Gulf of Mexico waters, including the site of the FlorAbama Project.  Due to and as a result of that damage, Plaintiffs' assets were rendered futile and their fundraising hopes were destroyed.

<u>STATEMENT OF FACTS</u>

**A.  The Origins of the FlorAbama Project**

Around 1985, John Ericsson first had the dream of establishing a fish farm in the Gulf of Mexico.  In or about 1987, Ericsson formed Sea Pride Industries, Inc., which would later be named BioMarine Technologies, Inc. ("BMT").[1] BMT raised capital from over one hundred (100) investors, investing over five million dollars ($5,000,000) prior to the Spill.  *See* Ex.

---

[1] Hereinafter, both Sea Pride Industries, Inc. and BioMarine Technologies, Inc. will be referred to as "BMT."

1.A. at 82:14 – 83:10; 96:14 – 97:13; 156:15 – 157:3; Ex. 1.B. at 156:15 – 157:3.

Around 1992, Ericsson formed a team of experienced individuals to develop, build, and operate the fish farm. These included Phillip Lee, Ph.D. (marine biologist), Edwin Cake, Ph.D. (marine biologist and oceanographer), Arie DeBondt (fish farming expert from The Netherlands), Luis Cabello (fish farming expert from Spain), John Bond (mechanical engineer), and two administrative assistants. *See* Ex. 2.

In 1995, BMT incorporated Gulf Marine Institute of Technology, Inc. ("GMIT") as a 501C (3) non-profit research entity that could receive tax-deductible donations of equipment and funds for mariculture. *See* Ex. 1.B. at 39:13 – 41:12.

### B.  Ericsson's Patents

In 1995, the USPTO issued a patent to Ericsson for a SeaTrek Ocean Farming System (a platform-based sea cage system) (US Patent No. 5,438,958) and a design patent to Ericsson for a mariculture facility (Patent No. D362,508). In 1997, the USPTO issued a patent to Ericsson for a SeaStar Oyster Relay System (US Patent No. 5,628,280) for harvesting wild oysters from contaminated shoreline waters and submerging them into deeper, colder, more saline ocean waters to cleanse them of bacterial contaminants. *See* Ex. 1.F.

### C.  The Permits: Obtained and Several Times Renewed

From 1993 through 2018, BMT and GMIT obtained and several times renewed critical permits for the fish farm from the United States Army Corps of Engineers ("USACE") and the Environmental Protection Agency ("EPA").  In November 1993, the USACE issued Permit No. MD93-01004-M to BMT authorizing construction of a finfish aquaculture platform facility located 4 nautical miles southeast of Fort Morgan, Alabama.  The plan was to raise in open ocean waters a variety of fish species native to the northern Gulf of Mexico.  On July 22, 2002,

BMT applied for a permit (Permit No. MD02-02232-G) with the USACE for authority to operate a manned mariculture platform facility located 4 nautical miles southeast of Fort Morgan, Alabama, for the following project:

> "Locate and **operate a manned mariculture platform facility in the Gulf of Mexico**. Structures include a 7.8-acre fenced area and 8 fish pens (Phase I), up to a 27.5-acre fenced area and 20 fish pens (Phase II), with a 164-foot-diameter work platform. The 100-foot-diameter fish pens would be tethered in-line with the platform perpendicular to prevailing currents. The 800- by 1,500-foot perimeter fence would be a floating polyethylene skirt extending 8 feet deep. The fish pens would extend about 30 feet or deeper. The platform deck would be about 30 feet above mean sea level, and would contain gantry cranes, automated feeding/monitoring and harvesting equipment, enclosed hatchery, laboratory, and crew quarters. The ballasted pens may be raised for cleaning or submerged and/or anchored in the event of severe storms. The facility is anticipated to produce annually 5 million pounds of **indigenous finfish** including, but not limited to, cobia, redfish, red snapper, hybrid striped bass, grouper, mahi-mahi, greater amberjack, and red porgy."

The permit was modified/extended three times before issuance of new Permit No. MD02-02232-G in 2003, which was modified in 2004 to provide for relocation of the facility to deeper water 7.5 nautical miles south southeast of Alabama Point in Baldwin County, Alabama. The permit was renewed in 2008 and in 2013 and valid through 2018. *See* Ex. 1.A. at 118:5 – 119:22; Ex. 3 at BIOM-GMIT 158; and Ex. 5.

In December 2001, the EPA issued a National Pollutant Discharge Elimination System (NPDES) Permit No. AL0067237 to BMT authorizing it to discharge from a facility located at a manned platform. The permit was modified in 2008 to relocate the project to 7.5 nautical miles south southeast of Alabama Point in Baldwin County, Alabama. The permit was renewed in 2008 and 2013 and valid through 2018. *See* Ex. 1.A. at 118:5 – 119:22; Ex.4 at BIOM-GMIT 117; and Ex. 5.

## D. Texas Platform

In September of 1998, GMIT obtained approval from Texas to use a four-platform

system of off the Texas coast to develop techniques to grow finfish. Seagull E & P, Inc. and GMIT executed a "Property Transfer Agreement" under which Seagull agreed to transfer its rights, titles and interest in Tract 526L to GMIT.  Seagull also agreed to pay $1.3 million in cash to GMIT, which was a grant for finfish research. *See* Ex. 1.A. at 12:8 – 15, 30:23 – 32:18; Ex. 1.B. at 30:23 – 32:18.

In 1999, new Texas General Land Commissioner David Dewhurst denied GMIT the right to use the platform system for mariculture and terminated the lease. GMIT sued Dewhurst, and eventually the court ruled against GMIT. From this point forward, BMT/GMIT focused on the FlorAbama site. *See* Ex. 1.B. at 27:12 – 28:13.

### E. Equity Investments and Assets Acquired prior to the Spill

As of the Spill, Plaintiffs had raised substantial equity investments and had acquired assets for the mariculture business.  BMT had raised approximately $5,332,000 from shareholder investments, and GMIT had raised approximately $4,033,000 in assets, totaling $9,365,000 for the FlorAbama Project. *See* Ex. 1.B. at 156:15 – 157:3; Ex. 15; and Ex. 6.

***Research Facility and Office***.  BMT leased space in Gulf Breeze, Florida with a 7,000 square foot building that housed its offices and marine research facilities, including a marine hatchery and experimental growth laboratory.  BMT built a marine finfish production system within an adjoining 3,000 square foot greenhouse.  BMT obtained Florida permits for operating a zero discharge fish nursery and grow-out system.  The nursery facility was successful in growing fish, including cobia, red fish, and tilapia, to learn the growing requirements for cage sea farming of marine species.  The nursery had twelve 5,000-gallon fish raising tanks, two 17-foot raceways, filtration systems, and water monitoring systems. Assets were lost during Hurricane Ivan in 2004. *See* Ex. 1.A. at 79:4 – 80:6, 198:23 – 199:22.

4

After Hurricane Ivan hit the Gulf Breeze research facility, GMIT took over the National Research Center Cephalopods facility at UTMB in Galveston.  GMIT resumed research activities there under until the program closed in late 2009. *See* Ex. 1.B. at 20:3 – 24:3.

**Vessels.**  As of the Spill, Plaintiffs had several vessels.  The M/V Marie Hall, a 67-foot steel hull trawler used for research purposes, was acquired from NIH and had a replacement value between $50,000 and $100,000. *See* Ex. 1.A. at 187:10 – 188:10; Ex. 6.  The M/V Hobgood was a 100-foot steel vessel to be used to deploy, supply, and tend to fish feeding once stocking and growing procedures were initiated; this vessel had value of about $485,000.00.  The Wellcraft vessel was a 36-foot crew boat for deployment and transport, valued at $75,000. *See* Ex. 1.A. at 188:22 – 189:8; Ex. 6.  The Silverton 27-foot crew and supply boat was valued at about $40,000.

**Other Equipment.**  After BMT sought bids to build the Sea Trek Ocean system as patented, the bids were at costs that far exceeded other available open water sea farming cage systems.  Therefore, BMT acquired five Bridgestone sea farming cages, ten sets of sea cage nets, an AKVA automated fish feeding unit.[2]  *See* Ex. 6.  As of 2008, BMT owned these assets.  *See* Ex. 1.A. at 78:15 – 79:3.  BMT only needed five cages to start the FlorAbama project.  *See* Ex. 1.A. at 80:7-15.  At the conclusion of the Galveston operation, the NIH donated equipment to GMIT.  *See* Ex. 1.B. at 27:12 – 30:22.  As of January 2010, all of the equipment (cages, nets, feeders, etc.) were in storage in Pensacola, Florida. *See* Ex. 1.A. at 201:7 – 24.

---

[2] Some of these assets had originally been intended for the Texas project.  However, for several reasons, the Texas project could not move forward. *See Dewhurst v. Gulf Marine Inst. of Tech.*, 55 S.W.3d 91 (Tex. App.— Corpus Christi 2001, pet. denied); *see also Patterson v. Gulf Marine Inst. of Tech.*, No. 13–06–067–CV, 2008 Tex. App. LEXIS 1462, at *15, 2008 WL 525424 (Tex. App.—Corpus Christi Feb. 28, 2008, pet. denied) (mem.op.). Nevertheless, several of the assets, not including the platform, were transferable to the FlorAbama Project.

### F.  Fundraising Efforts

In July of 2003, GMIT obtained a tax opinion from Cantey & Hanger, LLP regarding a proposed $10 million bond issuance by GMIT.  *See* Ex. 7.

Between 2007 and 2009, BMT contracted with investment banking firms in an effort to raise funds. BMT's fundraising effort with Heartstream Corporate Finance, B.V. and Merit Capital was aimed at raising capital up to $15 million from the European investment markets. On November 7, 2007, BMT, Heartstream and Merit entered into a Financial Advisory Agreement (FAA) for the private placements of Convertible Debentures for BMT. *See* Ex. 14, p. 11-30.  In 2007 and 2008, Heartstream and Merit contacted about 200 investors, and by the end of the first quarter of 2008, Heartstream and Merit had contacted 449 investors.  Heartstream and Merit received positive response and serious interest from 41 investors regarding BMT's business and private placements.  Twelve investors expressed their explicit consideration to participate in the offering of Convertible Debentures for BMT. *See* Ex. 14.

The Heartstream and Arjent efforts ended in early 2009 as a result of the Great Recession. *See* Ex. 14, p. 8. As explained by George Hersbach of Heartstream, after the financial crisis subsided, investment interest would have most likely resumed and, but for the Spill, BMT would have most likely raised the capital sought to launch the FlorAbama Project. *See* Ex. 14, p. 7-9.  In 2010, before the Spill, BMT and GMIT were each preparing separate offering memoranda.  *See* Ex. 9; Ex. 10.

### G.  On April 20, 2010, BP caused the Spill that destroyed Plaintiffs' plans.

On April 20, 2010, the Spill sent millions of barrels of crude oil into the Gulf of Mexico. Defendants later released toxic dispersants, including Corexit, to disperse the oil.  In June of

2010, the National Oceanic and Atmospheric Administration (NOAA) estimated that the Spill had contaminated Gulf waters encompassing 86,985 square miles.  As a result, the Federal Government closed all contaminated federal fishery waters. *See* Ex. 11.  Plaintiffs' federally permitted 27.5 acre site was within the contaminated area.  *See* Ex. 11; Ex. 12; Ex. 1.D.  Thus, as a result of the Spill, the site, like much of the Gulf, became contaminated and unsuitable for aquaculture.

### OBJECTION TO DEFENDANTS' ARGUMENTS AS BEYOND THE SCOPE OF PRETRIAL ORDER 69

On September 9, 2020, the Court held an MDL 2179 status conference, during which BP represented that it anticipated a dispositive motion as to Plaintiffs on regulatory issues. *See* Sept. 9, 2020 MDL 2179 Status Conference Transcript at 16:1 – 17:7.  Following the Status Conference, the Court entered Pretrial Order No. 69, allowing limited discovery, including the disclosure of one expert witness by each side.  Per that Order, Plaintiffs designated Barry Vittor, Ph.D. as their expert regarding regulatory issues.  In their motion, Defendants raise challenges to causation and damages that are not related to regulatory issues.  Given the Court's Order allowing limited discovery, and because the Court has not issued a case management order that sets deadlines for designation of all experts in this case, Plaintiffs' object to those portions of Defendants' arguments that relate to issues for which further discovery is needed and for which additional experts will be designated.

### SUMMARY JUDGMENT STANDARD

Summary judgment is proper where there is no genuine dispute of material fact. *Tolan v. Cotton*, 572 U.S. 650 (2014); FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A defendant moving for summary judgment on a plaintiff's claim must demonstrate the absence of a genuine dispute of material fact by either (1) submitting

summary judgment evidence that negates the existence of a material element of the plaintiff's claim, or (2) showing there is no evidence to support an essential element of the plaintiff's claim. *See Celotex Corp.,* 477 U.S. at 322-23.  The movant must demonstrate the absence of a genuine factual dispute.  *Id.* at 324-25. Only if defendant meets its burden is plaintiff required to respond by summary judgment proof to show a genuine dispute of material fact.  *See* FED. R. CIV. P. 56(e)(3).

In determining whether there is a genuine dispute of material fact that prevents summary judgment, a court must consider all evidence in the light most favorable to plaintiff as the nonmovant.  *Tolan,* 572 U.S. at 656.  The Court must draw all reasonable inferences in the light most favorable to the nonmoving party in deciding a summary judgment motion. *Id.* at 255. The court must also resolve all reasonable doubts about the facts in favor of plaintiff as the nonmovant.  *Id.; Cooper Tire & Rubber Co. v. Farese*, 423 F.3d 446, 455-56 (5ᵗʰ Cir. 2005). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## ARGUMENT

### I.   GENUINE DISPUTES OF MATERIAL FACT EXIST ON PLAINTIFFS' OPA CLAIMS.

The Oil Pollution Act ("OPA") imposes liability on a responsible party for damages resulting from the discharge of oil or other pollutants into or upon Unites States navigable waters. 33 U.S.C. 2701-2761; *See Gabarick v. Laurin Mar. (Am.), Inc.*, 406 F. App'x 883, 888 (5th Cir. 2010); *Buffalo Marine Servs. Inc. v. United States*, 663 F.3d 750, 752 (5th Cir. 2011); *Rice v. Harken Expl.*, 89 F. Supp. 2d 820, 823 (N.D. Tex. 1999) (citing 33 U.S.C. §§ 2701(32), 2702(a)).  Under OPA, a plaintiff must prove that (1) there is a discharge of oil or covered

oil-related substances, and (2) the discharge either went into navigable waters or poses a substantial threat to navigable waters of the United States. *See Rice v. Harken Exploration Co.*, 250 F.3d 264 (5th Cir. 2001).

A plaintiff that proves these elements may "recover[] all damages that result from the discharge…the costs to replace personal property or the diminution in value to personal property…." 33 U.S.C. §§ 2702 (2); 2702(b)(2)(B).  A plaintiff may also recover "[d]amages equal to the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, or natural resources, which shall be recoverable by **any claimant**." 33 U.S.C. § 2702(b)(2)(E) (emphasis added).

In this case, the Court has decided the first two issues: The Spill was a discharge of oil or covered oil-related substances that went into navigable waters of the United States.  *See* Nov. 30, 2015 Penalty Phase Findings of Fact and Conclusions of Law (MDL 2179 Rec. Doc. No. 15606) at ¶¶ 6, 20, 31, 33 – 36, 42, 64.  Defendants challenge only causation and damages.

### A.  The Spill caused Plaintiffs' damages.

OPA allows recovery for economic losses "due to" the injury, destruction, or loss of property or natural resources that "result[ed] from" the discharge or threatened discharge of oil[.]" 33 U.S.C. §§ 2702(a); 2702(b)(2)(E); *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico on April 20, 2010*, 168 F. Supp. 3d 908 (E.D. La. 2016).

#### 1.  The Spill caused damage to the waters of the Gulf of Mexico.

On April 20, 2010, the Spill sent millions of barrels of crude oil into the waters of the Gulf of Mexico, a natural resource.  Defendants later released toxic dispersants, including Corexit, to disperse the oil.  In June of 2010, NOAA estimated that the Spill had contaminated Gulf waters encompassing 86,985 square miles. *See* Ex. 11; Ex. 12; Ex. 1.D.  There is no

dispute that this area encompassed the permitted site of the FlorAbama Project, Plaintiffs' planned fish farm. *See* Nov. 30, 2015 Penalty Phase Findings of Fact and Conclusions of Law (MDL 2179 Rec. Doc. No. 15606) at ¶¶6, 20, 31, 33 - 36, 42, and 64.

### 2. The damage to those natural resources caused Plaintiffs' damages.

Under OPA, the causation element requires that the damage be caused by the oil spill, and that the economic loss be caused by the damage. 33 U.S.C. §§ 2702(a); 2702(b)(2)(E). Here, the permitted site was within the contaminated area. *See* Ex. 11; Ex. 12; Ex. 1.D.; Ex. 1.E. As the world watched the disaster of the Spill for 87 days, there were obvious consequences for Plaintiffs. As a result of the Spill and the significant damage done to the natural resource of the Gulf waters, Plaintiffs' federally permitted site became contaminated and unsuitable for aquaculture. As a result of and due to the Spill, Plaintiffs' shareholder investments, permits, assets, team, and research—all the fruits of decades of hard work— were suddenly rendered futile and would be for the foreseeable future. After the Spill, a liability insurer was no longer willing to insure the fish farm. *See* Ex. 1.A. at 142:11 – 144:4.

Furthermore, as a result of and due to the Spill, potential investors lost interest. After the Spill, Plaintiffs could not in good conscience ask investors for money to begin a fish farm in the oil-polluted Gulf of Mexico. Such requests would be ludicrous, and in bad-faith, at best. Just like the NMFS, Plaintiffs recognized the sad reality of the state of the Gulf of Mexico. Moreover, a five-mile stretch of the shoreline just north of the site was re-oiled during Hurricane Sally, underscoring the long-lasting nature of the damage. *See* Ex. 1.E.

### 3. Defendants' arguments on causation are without merit.

#### a. The only permits required were the USACE and the EPA permits.

Defendants contend that Plaintiffs lacked a NOAA permit to launch their business.

Defendants are wrong.  At the time of the Spill, Plaintiffs had permits from the USACE and

from the EPA to conduct the activities required for their fish farm.  Pursuant to PTO 69,

Plaintiffs served the report of Dr. Barry Vittor, who reviewed the regulatory landscape and

concluded:

> Prior to April 2010 the only Federal and State of Alabama statutes that applied
> to mariculture activities in Federal waters of the Gulf of Mexico included
> Section 10 of the Rivers and Harbors Act of 1899, which required
> authorization from U.S. USACE of Engineers (USACE) to install or construct
> mariculture facilities, Section 402 of the Clean Water Act of 1972, which
> required authorization from the U.S. Environmental Protection Agency
> (USEPA) for waste discharges under the National Pollutant Discharge
> Elimination System (NPDES) and the Coastal Zone Management Act of 1972,
> which required State of Alabama certification that proposed activates in
> Federal waters would be consistent with Alabama's coastal zone management
> plan.

Accordingly, Plaintiffs had the principal permits they needed. *See* Ex. 5.[3]

### b.  The Exempted Fishing Permit ("EFP") was not required.

Defendants contend that Plaintiffs could not proceed with their aquaculture business

without an EFP from the NOAA/NMFS.  Defendants are wrong for two reasons.

### (1) Plaintiffs' plans and USACE permit were for indigenous fish.

On April 1, 2003 the USACE published its Statement of Findings, which made clear

that the USACE permit did not require approval from NMFS for species indigenous to the

North Central Gulf of Mexico,[4] and its March 13, 2003 Environmental Assessment, which

---

[3] Pursuant to PTO 69, Defendants had until April 16, 2021 to challenge Dr. Vittor and until May 14, 2021 to take his deposition, but Defendants did neither.  Defendants purport to reserve a right to challenge Dr. Vittor, but the Court's PTO 69 deadline has passed.

[4] *See* Ex. 3, p. BIOM-GMIT 158-159, 174, which states: "Excepting species indigenous to the North Central Gulf of Mexico, species raised and harvested at the mariculture facility shall be approved by the Corps in concert with the National Marine Fisheries Service, and the Marine Resources Division of the Alabama Department of Conservation and Natural Resources. To obtain any National Oceanic and Atmospheric (NOAA) permit for

concluded that the proposed project caused no significant impact to the environment. *See* Ex. 3 at BIOM-GMIT 174 and BIOM-GMIT 181.   Plaintiffs planned to grow indigenous fish. Therefore, there was no requirement for NMFS approval.  *See* Ex. 3 at BIOM-GMIT 158 - 159.

### (2) NOAA lacked authority to regulate aquaculture.

As the Fifth Circuit recently made clear, NOAA and its NMFS lacks authority to regulate aquaculture. *See Gulf Fishermens Ass'n. v. Nat'l Marine Fisheries Serv.*, 968 F.3d 454, 456 (5th Cir. 2020), as revised (Aug. 4, 2020). In *Gulf Fishermens Ass'n*, the Fifth Circuit determined that NOAA's attempt to regulate aquaculture under the Magnuson-Stevens Act ("MSA") was an invalid interpretation of the statute and an overreach by the agency. *Id.*  The court held that NOAA's authority under the MSA was limited to fisheries and could not be extended to aquaculture. *Id.* at 456, 458–59. The court found aquaculture comparable to commercial farming, which does not present the same environmental concerns as fishing for wild stock. This was important because NOAA's authority under the Act was aimed at combating the effects of overfishing on wild fish stocks and coastal habitats. *Id.* at 457–59.

Contrary to the argument presented by Defendants, the Fifth Circuit did not merely curtail NOAA's authority to regulate aquaculture, it cast the agency's authority overboard. 968 F.3d at 456, 468. ("The agency...asks us to believe Congress authorized it to create an elaborate industry the statute does not even mention. Because we cannot suspend our disbelief that high, we reject the agency's position...[t]he Act neither says nor suggests that the agency may regulate aquaculture").

The court's holding in *Gulf Fishermens Ass'n* means that NOAA lacks authority to

---

handling Federally managed species, contact NOAA Fisheries, Mr. Phil Steele or his successor, at (727) 570-5305."

regulate aquaculture, period. NOAA ***cannot grant or deny*** permits for aquaculture. It ***cannot green-light*** fish farms, and it ***cannot red-right*** them either, by denying an EFP or in any other manner.  This was true on the date of the *Gulf Fishermens Ass'n* opinion, and, being a pure matter of statutory construction, it was equally true at the time of the Spill.

Defendants' heavy reliance on Plaintiffs' EFP denial is misplaced. To support the assertion that the EFP permit was another Federal authorization "required by law," Defendants rely on the Gulf Council's public comment that BMIT/GMIT should apply for an EFP permit. However, if NOAA is not authorized to regulate aquaculture, The Gulf Council, as its sub-agency, would be in the same boat.  *See Gulf Fishermens Ass'n,* 968 F.3d at 456.

But for the Spill, Plaintiffs would have launched their business at the 27.5 acre federally permitted site. Had NMFS believed it had the authority to regulate aquaculture, then NMFS would have had to post a bond to seek injunctive relief.  With equipment in water and fish growing in cages, Plaintiffs would have retained counsel, and the matter would have prompted the legal question presented in *Gulf Fisherman's Assoc.*  The district court would have reached the same conclusions as Judge Milazzo, and the Fifth Circuit would have reached the same conclusions that it reached in its affirming opinion.

### (3) Legislative History further belies NOAA's authority.

Comprehensive offshore aquaculture bills were introduced in the 109th–112th Congressional sessions, but none were ever enacted.  Subsequently, both the 115th and 116th Congresses introduced, but also declined to enact, the Advancing the Quality and Understanding of American Aquaculture Act ("AQUAA"). See S. 3138 and H.R. 6966, 115th and 116th Cong. (2017–2019). AQUAA would have provided NOAA Fisheries with authority to issue aquaculture permits. *Id.*; H.R. Rep. No. 116-R45952.

Instead, Congress elected to maintain the existing regulatory framework, which places aquaculture permitting authority with the EPA (40 CFR §§ 122.24, 122.25) and the USACE (33 U.S.C. § 403, and 43 U.S.C. § 1333(e)). *See* Clean Water Act, 33 U.S.C. § 1362(14), 1344 (2012) (authorizing the EPA to regulate permits for aquaculture facilities as point sources in tandem with the USACE); *see also* 33 U.S.C.A. § 407, *et seq* (delegating authority to regulate safety and navigation measures for mariculture structures to USACE); *See Pac. Legal Found. v. Costle*, 586 F.2d 650, 655-56 (9th Cir. 1978), *rev'd on other grounds, Costle v. Pac. Legal Found.*, 445 U.S. 198 (1980) (EPA has authority to permit and regulate discharges that occur in "all ocean waters"); *See U.S. Pub. Interest Research Grp. v. Atl. Salmon of Me., L.L.C.*, 215 F. Supp. 2d 239, 251 (D. Me. 2002)(aquaculture net pens are point sources subject to EPA's regulatory authority).

Plaintiffs obtained the requisite permits from the EPA and the USACE. In response, during the public comment period for the project, the Gulf Council recommended that Plaintiffs seek and obtain an EFP. In turn, NOAA reviewed the application and determined that an EFP was not necessary. *See* Ex. 1.C. ("aquaculture operation is not one of the purposes for which an EFP may be issued."). And as Dr. Vittor explained, "There were no regulatory requirements in place at that time, for authorization from NOAA for operation of a commercial mariculture operation."[5] *See* Ex. 5.

### c. But for the Spill, Plaintiffs would have completed fundraising and launched.

Defendants next argue that Plaintiffs' failure to launch was caused by lack of funds. This argument is also without merit.  Plaintiffs had raised funds through shareholder

---

[5] If the Court considers whether Plaintiffs needed an EFP to be a fact issue, Dr. Vittor would be helpful to the fact-finder.  If the Court considers this a question of law, Dr. Vittor's analysis is nevertheless helpful to the Court.

investments and grants, procured two critical federal permits, assembled an experienced team, accumulated assets including vessels, cages, nets, and a feeding system, and had conducted years of research for the fish farm. (*See supra.* Statement of Facts). With this ample foundational work, Plaintiffs had gained real footing in their effort to raise the additional funding needed.  At the very least, these facts show a genuine dispute of material fact, that, but for the Spill, Plaintiffs would have, with a reasonable degree of certainty, raised the additional capital needed to launch their business.

With all of these factors in place, Plaintiffs engaged in fundraising efforts and earned the confidence of several financial institutions, including Heartstream and Merit.  On November 7, 2007, BMT, Heartstream and Merit entered into a Financial Advisory Agreement ("FAA") for the private placements of Convertible Debentures for BMT.  The FAA set out terms for the private placements with the objective to raise a total amount of $12.5 – 15 million. *See* Ex. 14, p. 11-30.

By late 2007, early 2008, Heartstream and Merit had contacted about 200 investors, and, by the first quarter of 2008, Heartstream and Merit had contacted 449 investors, predominantly in Europe. Heartstream and Merit received positive response and serious interest from 41 investors regarding BMT's business and private placement(s). *See* Ex. 14.

In December 2007 and January and February 2008 multiple web-based presentations by BMT were organized by Heartstream and Merit for European investors.  The majority of the mentioned 41 positively responding and interested investors participated in various presentations and Q&A sessions. Subsequently, twelve (12) investors expressed their explicit consideration to participate in the offering of Convertible Debentures for BMT. Several of the Investors had had equity positions in European marine fish farming

companies. These twelve potential investors continued to have interest in BMT, even after the Texas court decision regarding the Texas-based project. *See* Ex. 14, p. 7-8.

In the meantime, the Great Recession struck the U.S. and Europe.  As a result, many of the investors informed Heartstream and Merit that they preferred to wait until the financial markets recovered. By the fourth quarter of 2008, Heartstream's fundraising activities were delayed until the Eurpoean markets recovered, which coincided with the Spill.  George Hersbach, president and CEO of Hearstream, with over forty years' experience with private and publicly traded companies in various countries in Europe and the United States, has provided his affidavit as to his anticipated testimony in this case.  Hersbach has concluded and will testify:

> Heartstream believes with a reasonable degree of certainty that Merit and Heartstream would have secured the requested funding for [BMT] but for the oil spill….With a reasonable degree of certainty, should the mentioned oil spill not have occurred, Merit and Heartstream, more likely than not, would have been able to complete closings in the staged private placements…in the course of 2010 and in 2011, and [BMT] would have raised the funds for its mariculture business and for its operational activities at the FlorAbama site.

*See* Ex. 14 at p. 9.

Accordingly, with all Plaintiffs had accomplished in furtherance of the fish farm, with their raised capital, plans, permits, personnel, and assets, and considering the declining wild fish population and the rising human population, and considering the success of fish farming in Europe, it was reasonably certain, as George Hersbach will testify, that the European investors would have contributed the additional capital needed for launch. *See* Ex. 14.

### d.  Ericsson recognized that the Spill had damaged the Gulf of Mexico.

Defendants go overboard with enthusiasm with quotes from Ericsson that after the Spill, he "extinguished going forward," "called off any investments," and "kicked it to the

curb." Defendants absurdly attempt to lay causation on *Ericsson* for Plaintiffs' incomplete fundraising efforts. The following map will put this into context:



*See* Ex. 12; Ex. 1.D.; Ex. 1.E.; Ex. 13; Ex. 16.

Ericsson, like the rest of the world, was aware that the Spill had significantly damaged the Gulf of Mexico. He availed himself of common sense: the Gulf of Mexico was severely damaged. To seek investors post-Spill would have been ludicrous. *See* Ex. 1.A. at 97:14 – 99:20. Following the Spill, Ericsson did not direct Heartstream to solicit investors because the blowout damaged the marine environment to the point that it was not logical to start commercial operations. Ericsson expressed to Heartstream his concerns about the damage to the marine environment. *See* Ex. 1.A. at 169:2 – 170:12. In fact, that damage persists; recently, after Hurricane Sally, a five-mile stretch of the shoreline just north of the site was re-oiled. *See* Ex. 1.E. Ericsson's quotes simply evidence his recognition of the obvious: the Spill dealt a devastating blow to the Gulf waters, and therefore to Plaintiffs' business.

Accordingly, none of Defendants' arguments establish the absence of a genuine dispute of material fact as to causation. Instead, the plain truth is that Defendants, through their Spill, damaged the Gulf of Mexico, and that this extensive and long-lasting damage caused Plaintiffs' economic losses, rendering their permits, team, research, assets, and plans futile and making it impossible for them to raise the needed capital to launch. At the very least, Plaintiffs have demonstrated a genuine dispute of material fact as to causation.

### B. Plaintiffs' damages are reasonably certain.

#### 1. Personal Property Damages under OPA

Under OPA, a plaintiff may, "recover all damages that result from the discharge, see § 2702(2)...the costs to replace personal property or the diminution in value to personal property,...." *Id.* (citing 33 U.S.C. §§ 2701, 2702, et seq.).

At a bare minimum, Plaintiffs lost personal property as a result of the Spill. This personal property component of Plaintiffs' losses includes the shareholder investment, the USACE and EPA permits, the assets, including the Bridgestone cages, the vessels, and the AKVA feeder system, all of which was rendered futile as a result of the Spill. These lost assets are susceptible of valuation to a reasonable degree of certainty, as explained by Lin Giralt, Plaintiffs' anticipated economist:

> The basic analysis indicates that, excluding transaction costs and taxes, a USD 5.3MM investment in High Grade AAA corporate Bonds, at a 5.29 percent interest rate in April 2010 would yield an equivalent value of USD 8.875MM today. This represents the basic evaluation of the loss of personal property in the incident. These returns, or very similar could have been achieved by direct purchase of bonds or ETF's which are massively traded.

*See* Ex. 15. Accordingly, at the very least, Plaintiffs have demonstrated a genuine dispute of material fact as to the value of the lost personal property component of their damages, which, to a reasonable degree of certainty, is $8,875,000.

18

### 2.   Lost profits and impairment of earning capacity under OPA

OPA allows recovery for "[d]amages equal to the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, or natural resources, which shall be recoverable ***by any claimant***." 33 U.S.C. § 2702(b)(2)(E) (emphasis added). Furthermore, the House Report noted that "[t]he claimant need not be the owner of the damaged property or resources to recover for lost profits or income." H.R. Conf. Rep. 101–653 (1990), *republished in* 1990 U.S.C.C.A.N. 779, 781; *see In Re Deepwater Horizon*, 808 F. Supp. 2d 943, 959 (E.D. La. 2011).

The recovery of lost profits does not require that the claimant's loss be "susceptible to exact calculation." *Great Pines Water Co., Inc. v. Liqui-Box Corp.*, 203 F.3d 920, 922 (5th Cir. 2000); *Coffel v. Stryker Corp.*, 284 F.3d 625, 638 (5th Cir. 2002). A plaintiff must show that the loss of profits is more probable than not. *Gulf Eng'g Co., LLC v. Dow Chem.Co.*, 961 F.3d 763, 768 (5th Cir. 2020). The amount of a party's loss must be shown by competent evidence with "reasonable certainty" and must not be based on evidence that is uncertain or hypothetical. *Blase Indus. Corp. v. Anorad Corp.*, 442 F.3d 235, 238 (5th Cir.), cert. denied, 549 U.S. 817 (2006).

Evidence of lost profits is highly fact-intensive, and courts allow the fact finder to weigh the evidence. *Chemical Distributors, Inc. v. Exxon Corp.*, 1 F.3d 1478 (5th Cir. 1993). The use of expert witness testimony that is based on generally accepted methodologies is sufficient to prove lost profit damages with reasonable certainty. *Id.*; *G & H Soybean Oil, Inc. v. Diamond Crystal Specialty Foods, Inc.*, 796 F. Supp. 1214 (S.D. Iowa, August 10, 1992). Aside from expert testimony, a business owner's testimony may support lost profits. *See Homoki v. Conversion Services, Inc.*, 717 F.3d 388, 399-400 (5th Cir. 2013) (upholding an award of lost

profits where the only proof came from plaintiff business owner's own testimony at trial).

Lack of a profit history does not, by itself, preclude a new business from recovering lost future profits. *See Hiller v. Manufacturers Prod. Rsch. Grp. of N. Am., Inc.*, 59 F.3d 1514, 1521 (5th Cir. 1995) (holding that the fact that a business is new and does not have a profit history is not a dispositive consideration in awarding lost profits); *Thompson & Wallace of Memphis, Inc. v. Falconwood Corp.*, 100 F.3d 429, 435 (5th Cir. 1996) ("The fact that business in question does not have profit history does not preclude an award of lost profits damages, as long as estimates are based on objective facts, figures, or data from which amount of lost profits can be ascertained.").

In *Chemical Distributors, Inc. v. Exxon Corp.*, plaintiff CDI sued Exxon for breach of contract. 1 F.3d at 1486. Exxon argued that CDI's claim for lost profits was speculative as a matter of law, because "uncorroborated testimony of lost profits is not an adequate substitute for a corporation's extant books and records." *Id*. The court disagreed and found that the experts' testimony alone was sufficient to establish the damages as reasonably certain. *Id*. Specifically, the court noted CDI's experts relied on generally accepted investment and accounting techniques. *Id*. at 1487. Such methods included a pro forma analysis of CDI's income and profit potential based on inventory volume, anticipated sales, product costs, overhead, and operating expenses. As such, the court found that CDI was not required to corroborate its expert testimony with documentary evidence to establish lost profits "with a reasonable degree of certainty." *Id*. Accordingly, the court held that CDI's claims for lost profits were "not speculative as a matter of either Texas or Louisiana law." *Id*.

Similarly, in *G & H Soybean Oil, Inc. v. Diamond Crystal Specialty Foods, Inc.*, the defendant sought summary judgment, arguing that lost profits were speculative and not

20

reasonably certain because plaintiff's expert improperly relied on plaintiffs' own business plans and data. 796 F. Supp. 1214 (S.D. Iowa, August 10, 1992).  The determinative issue was "'whether a prospective loss of net profits has been shown with reasonable certainty." *Id.* (quoting *Standard Machinery Co. v. Duncan Shaw Corp.*, 208 F.2d 61, 64 (1st Cir.1953)). The court denied summary judgment, concluding that "the fact [that] Plaintiffs' data stems largely from their own business plan," did not discredit the expert's testimony, where the expert was qualified and his methodology was generally accepted. *Id.* at 1217.

Similarly, in this case, Plaintiffs' losses can be calculated to a reasonable degree of certainty.  Aside from rendering Plaintiffs' equity investment and assets futile, the Spill stopped BMT from proceeding with the investment banks. *See* Ex. 1.A. at 168:4-24. Considering Plaintiffs' equity investment, permits, assets, team, research, proformas, business plans, fundraising efforts, Ericsson's testimony, and George Hersbach's affidavit, Mr. Giralt has offered his analysis that Plaintiffs' lost profits or impairment of earning capacity is $101,445,000. This figure represents the "discounted cash flow" model of Plaintiffs' damages.  Mr. Giralt's methodology is generally accepted in the field, and his conclusions are to a reasonable degree of certainty.  *See* Ex. 15.  At the very least, this evidence creates a genuine dispute of material fact as to the extent of Plaintiffs' damages.

Defendants cite a number of cases, suggesting that without a history of profits, Plaintiffs cannot prove lost profits or impairment of earning capacity under OPA.  All of these cases are distinguishable or inapposite:

- *Nycal Offshore Dev. Corp. v. United States*, 106 Fed. Cl. 222, 247 (2012), aff'd, 743 F.3d 837 (Fed. Cir. 2014) (whether plaintiff's damages were reasonably certain under the OPA was not at issue; case involved California regulation prohibiting profitability of oil leases).

21

- *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010, 902 F. Supp. 2d 808, 816 (E.D. La. 2012), *aff'd sub nom. In re Deepwater Horizon*, 741 F. App'x 185 (5th Cir. 2018) (case regarding claims by residential real property owners whose land was never touched or contaminated by oil).

- *Al-Saud v. Youtoo Media L.P.*, 754 Fed. Appx. 246, 255 (5th Cir. 2018) (lost profits too speculative where the prospective venture was a new form of entertainment that blended social media and television with no evidence of target audience support and was managed by an inexperienced individual)

- *Fredonia Farms, LLC v. Enbridge Energy Partners, L.P.*, No. 1:12-CV-1005, 2014 WL 3573723, *3, 11 (W.D. Mich. July 18, 2014) (lost profits not reasonably certain where plaintiff had not begun planning for marketing of vineyard, had not submitted applications to install utilities for vineyard, and where plaintiffs had no financing or investment commitments)

- *Alphamed Pharm. Corp. v. Arriva Pharm., Inc. Id.* at 1323 (lost profits too speculative where venture was inadequately funded and involved a new, arguably conceptual medication).

Finally, contrary to Defendants' assertion, GMIT does have a cognizable financial stake in the FlorAbama Project. GMIT provided much of the research and expertise as well as raised some of the capital. Further, GMIT and BMT had a joint development agreement whereby GMIT would receive 2.5% of the gross sales of seafood products from the fish farm. *See* Ex. 1.B. at 77:3 – 80:19; Ex. 8.

Accordingly, the extent of Plaintiffs' damages—personal property, lost profits, and impairment of earning capacity—are reasonably certain. At the very least, Plaintiffs have demonstrated that genuine disputes of material fact exist as to whether the Spill caused Plaintiffs' damages and as to the extent of those damages. For all of these reasons, the Court should deny Defendants' motion for summary judgment on Plaintiffs' OPA claims.

## II.   GENUINE DISPUTES OF MATERIAL FACT EXIST ON PLAINTIFFS' MARITIME LAW CLAIMS.

Defendants contend that Plaintiffs' maritime law claims are barred by *Robins Dry Dock*, arguing that because Plaintiffs "did not hold any commercial fishing permits" and

because they "never put any equipment into the water," their maritime claims fail as a matter of law. Defendants are wrong.

Although Plaintiffs are not "commercial fishermen," they were "commercial sea farmers" engaging to sea farm in the Gulf of Mexico.  Plaintiffs were fully permitted and authorized by the UACE and EPA to operate a manned mariculture platform facility at a geographically defined 27.5-acre permitted location in the Gulf of Mexico to produce 5 million pounds of indigenous finfish, including but not limited to, cobia, redfish, red snapper, hybrid striped bass, grouper, mahi-mahi, greater amberjack, and red porgy.  *See* Ex. 1.A. at 211:4 – 212:8, 217:8 – 219:9; Ex. 3 at BIOM-GMIT 158; Ex. 5.

Under the *Robins rule*, there is no cause of action for purely economic damages without physical injury to a proprietary interest. *Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303 (1927).  However, there is a well-recognized exception for commercial fishermen. *Union Oil Co. v. Oppen*, 501 F.2d 558, 570–71 (9th Cir. 1974); *Louisiana ex rel. Guste v. M/V TESTBANK*, 524 F.Supp. 1170 (E.D.La.1981), *rev'd*, 752 F.2d 1019 (5th Cir.1985) (en banc), *cert. denied sub nom. White v. M/V Testbank*, 479 U.S. 903 (1986). Where there has been a tortious invasion of commercial fishing areas by pollutants or contaminants, courts have affirmatively protected those fishermen who incurred actual economic losses. *Oppen*, 501 F.2d at 570; *Shaughnessy v. PPG Industries, Inc.*, 795 F. Supp. 193 (W.D. La. 1992); *Burgess v. M/V TAMANO*, 370 F.Supp. 247 (S.D. Me. 1973), *aff'd per curiam*, 559 F.2d 1200 (1st Cir. 1977); *Masonite Corp. v. Steede*, 198 Miss. 530 (1945); *Hampton v. North Carolina Pulp Co.*, 223 N.C. 535 (1943).

In *M/V Tamano*, the court recognized that although fishermen and clammers have no individual property rights with respect to the aquatic life harmed by oil, they could sue for

the tortious invasion of a public right, having suffered damages greater in degree than the general public. Thus, when an oil spill prohibited fishermen from plying their trade, the court considered it an interference with the "direct exercise of the public right to fish and dig clams," a special interest different from that of the general public. 370 F.Supp. at 250.

That same rationale applies to commercial fish farmers. Commercial fishermen and commercial fish farmers depend on the same natural resource: the waters of the Gulf. When these waters are oiled, just as commercial fishermen are negatively impacted, so are fish farmers. Accordingly, while Plaintiffs were not commercial fishermen, as sea fish farmers, they enjoy the same exception to the *Robins rule*. For this reason, the Court should deny Defendants' motion with respect to Plaintiffs' maritime claims.

## III. CONCLUSION

For all of the foregoing reasons, genuine disputes of material fact exist as to Plaintiffs' OPA and maritime claims. Plaintiffs respectfully request that the Court deny Defendants' motion for summary judgment and request all other relief to which they are justly entitled.

Date: May 31, 2021                    Respectfully submitted,

THE KRELLER LAW FIRM

*/s/ Stephen Skelly Kreller*
Stephen Skelly Kreller (Bar No. 28440)
Katie M. Cusimano (Bar No. 28545)
757 Saint Charles Avenue, Suite 301
New Orleans, Louisiana 70130
T: (504) 484-3488
F: (888) 294-6091
E: ssk@krellerlaw.com

And

GARCIA DE LA GARZA, LLP

*/s/ Mario de la Garza*
Mario de la Garza (Tex. Bar. No 24040785)
1616 S. Voss Road, Suite 870
Houston, Texas 77057
T: (713) 784-1010
F: (713) 784-1011
E: mdelagarza@dlgtriallaw.com

**Attorneys for plaintiffs, Gulf Marine Institute of Technology and BioMarine Technologies, Inc.**

25

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing Response and Memorandum in Opposition to Defendants' Motion for Summary Judgment in Case No. 2:13-cv-01286 has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 31st day of May, 2021.

*/s/ Stephen Skelly Kreller*
Stephen Skelly Kreller