UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In Re: Oil Spill by the Oil Rig *Deepwater Horizon* in the Gulf of Mexico, on April 20, 2010, | MDL NO. 2179 |
| | SECTION: J |
| This Document Relates To: Civil Action No. 2:13-cv-01286 | JUDGE BARBIER |
| | MAGISTRATE JUDGE CURRAULT |
| GULF MARINE INSTITUTE OF TECHNOLOGY, and BIOMARINE TECHNOLOGIES, INC. | |
| v. | |
| BP AMERICA PRODUCTION COMPANY; ET AL. | |

_____

**PLAINTIFFS' REPONSE TO BP'S STATEMENT OF UNCONTESTED FACTS AND PLAINTIFFS' LIST OF MATERIAL FACTS GENUINLY DISPUTED**
_____

Plaintiffs, BioMarine Technologies, Inc. ("BMT") and Gulf Marine Institute of Technology ("GMIT"), submit the following Response to BP America Production Company's and BP Exploration & Production, Inc.'s Statement of Uncontested Facts, adopted by other Defendants (collectively referred to as "BP"), and Plaintiffs' List of Materially Facts Genuinely Disputed:

**RESPONSE TO BP'S STATEMENT OF UNCONTESTED FACTS:**

Plaintiffs accept the BP "Statements of Uncontested Facts" in Paragraphs 1, 5, 6, 7, 8, 12, 17, 18, 19, 20, 22, 23, 24, 25, 30, 34, 37, 38, 39, 40, 41, 42, 43, 45, 47, 49, 52, 53, 55, 56, 59, 60, 61, 62, 63, 67, 68, and 69. Plaintiffs, however, object to and dispute the BP "Statements of Uncontested Facts" in Paragraphs 2, 3, 4, 9, 10, 11, 13, 14, 15, 16, 21, 26, 27, 28, 29, 31, 32, 33, 35, 36, 44, 46, 48, 50, 51, 54, 57, 58, 64, 65, and 66 for the following

1

reasons:

The statement made by BP in Paragraph 2 is contested as written because BP draws no distinction between state and federal waters. Plaintiff testified that BMT commenced operations with its Sea Star oyster relay system in 1995/1996. *See* Declaration of Stephen S. Kreller, Ex. 1.A. at 57:10 – 58:6, 209:21 – 25.

The statement made by BP in Paragraph 3 is contested as written because BP fails to acknowledge that Mr. Ericsson testified that any concerns or objections are addressed in the permitting process and once you obtain the federal and state permits, the risks are "faint accompli." *See* Ex. 1.A. at 180:13 – 182:15.

The statement made by BP in Paragraph 4 is contested as written because Plaintiffs testified that BMT commenced operations with its Sea Star oyster relay system in 1995/1996. *See* Ex. 1.A. at 57:10 – 58:6, 209:21 – 25.

The statement made by BP in Paragraph 9 is contested as written because it seeks to limit damages to "lost profits," when Plaintiffs are also seeking impairment of earning capacity and damage to personal property, including damage to the natural resources and marine environment at the 27.5-acre federally permitted site, lost use of the USACE and EPA permits, lost contracts with investment bankers, lost shareholder investments, and lost use of the 5 Bridgestone sea cages, 10 sets of nets, AKVA automated feeding system, and numerous support vessels. *See* Ex. 1.A. at 85:12 – 87:5, 93:13 – 96:13, 97:14 – 99:20,139:3 – 144:4, 168:4 – 24; Ex. 1.B. at 13:21 – 14:8, 63:3 – 69:18, 80:20 – 23, 142:18 – 145:18; 148:18 – 151:8; Ex. 14; and Ex. 15.

The statement made by BP in Paragraph 10 is contested as written because

2

Plaintiffs, while not "commercial fisherman," they were "commercial sea farmers" engaging to sea farm in the Gulf of Mexico. Plaintiffs were fully permitted and authorized by the USACE and EPA to operate a manned mariculture platform facility at a geographically defined 27.5-acre permitted location in the Gulf of Mexico to produce 5 million pounds of indigenous finfish, including but not limited to, cobia, redfish, red snapper, hybrid striped bass, grouper, mahi-mahi, greater amberjack, and red porgy. *See* Ex. 1.A. at 211:4 – 212:8, 217:8 – 219:9; Ex. 3 at BIOM-GMIT 158, and Ex. 5.

The statement made by BP in Paragraph 11 is contested as written because Plaintiffs suffered physical damages when BP discharged 3.19 barrels of oil and gas into the Gulf of Mexico, suppressed it with Corexit, and contaminated the natural resources and marine habitat at their 27.5-acre federally permitted site located 7.5 nautical miles south southeast of Alabama Point in Baldwin County, AL (Lat. 30° 9.4' N and Lon. 87° 31.3' W). *See* Ex. 12; Ex. 1.D.; Nov. 30, 2015 Penalty Phase Findings of Fact and Conclusions of Law (MDL 2179 Rec. Doc. No. 15606) at ¶¶6, 20, 31, 33 – 36, 39, 41 – 42, and 64; Ex. 1.A. at 86:23 – 87:5, 217:8 – 14; Ex. 16 at 341:19 – 24 ("everywhere the oil went, it created harm"), 344:17 – 345:16, 346:1 – 15, 352:19 – 353:7 (oil covered approximately 45,000 square miles of the Gulf), 354:1 – 15 (SCAT surveys indicated approximately 1,100 miles of shoreline were oiled), 354:21 – 355:7 (application of dispersants kept more of the toxic components of the oil in the aquatic system), 360:5 – 21 (for every barrel of oil released there was about 2,000 cubic feet of gas released into the marine environment), 373:3 – 374:18 (evidence suggests clear potential for harm of larvae of ocean fish, such as mahi-mahi and greater amberjack). Moreover, a five-mile stretch of the shoreline just north of

the permitted site was re-oiled during Hurricane Sally, underscoring the long-lasting nature of the damage. *See* Ex. 1.E.

The statements made by BP in Paragraphs 13 and 14 are contested as written because they improperly imply that all efforts and activities were focused on the Texas platform site and fails to acknowledge that the FlorAbama site was a fully permitted alternative site long before the Texas Court of Appeals ruled in 2008. *See* Ex. 5; Ex. 1.B. at 27:12 – 28:13. That being said, the Texas platform was the preferred project location until it no longer became an option in February 2008.

The statement made by BP in Paragraph 15 is contested as written because it improperly implies that nothing from the Texas platform was usable at the FlorAbama site and fails to acknowledge the equipment transferred from the Texas platform to the FlorAbama project along with the 1.3mm in grant funding received from Seagull Energy Corporation. *See* Ex. 1.A. at 93:5 – 12; Ex. 1.B. at 24:7 – 25:8, 26:3 – 27:11. That being said, the Texas platform itself could not be transported from Texas for use at the FlorAbama site.

The statement made by BP in Paragraph 16 is contested as written because it states that Plaintiffs applied for an exempted fishing permit (EFP) from the National Oceanic and Atmospheric Administration (NOAA) three times when Mr. Ericsson testified that he only recalled one application in 2008. *See* Ex. 1.A. at 116:16 – 19, 123:10 – 20.

The statement made by BP in Paragraph 21 is contested as written only because it does not include the document date of February 10, 2006, which when read following Paragraph 19, which is dated June 3, 2008, is misleading.

The statements made by BP in Paragraphs 26 and 28 are contested as written only

4

because they are incomplete and do not make clear that the USACE authorized Plaintiffs to operate a manned mariculture platform facility at a geographically defined 27.5-acre permitted location in the Gulf of Mexico to produce 5 million pounds of indigenous finfish, including but not limited to, cobia, redfish, red snapper, hybrid striped bass, grouper, mahi-mahi, greater amberjack, and red porgy. *See* Ex. 3 at BIOM-GMIT 158; and Ex. 5.

The statement made by BP in Paragraph 27 is contested as written only because it is incomplete and misleading to imply that Plaintiffs were required to have some other federal, state, or local authorization to commence operations at the FlorAbama site. *See* Ex. 3 at BIOM-GMIT 158 – 159; Ex. 4, and Ex. 5.

The statement made by BP in Paragraph 29 is contested as written because, as reflected in *Gulf Fishermens Association v. National Marine Fisheries Association*, 968 F. 3d 454 (5th Cir. 2020), Plaintiffs have no way of knowing if and when any federal agency might attempt to exceed its authority granted by Congress under the Magnuson-Stevens Fishery Conservation and Management Act of 1976 (MSA). *See* Ex. 5.

The statement made by BP in Paragraph 31 is contested as written because it is misleading to state that Plaintiffs needed the full $24.5 million in financing to launch the FlorAbama project, when the financing was planned in three private placements and the amount to launch was closer to $5 million. *See* Ex. 14 at p. 4; Ex. 1.A. at 207:16 – 209:10; and Ex. 1.B. at 158:6 – 19.

The statement made by BP in Paragraph 32 is contested as written because it is misleading to state that Plaintiffs fundraising efforts "failed" before the BP oil spill when Plaintiffs were still under a Financial Advisory Agreement (FAA) with Heartstream

5

Corporate Finance B.V. to secure funding from its European investors, who had already had equity positions in European marine fish farming companies, and Heartstream had strong reason to believe it would have raised the requested capital but for the BP oil spill. *See* Ex. 14, p. 7 – 9; Ex. 1.A. at 173:24 – 175:7; and Ex. 1.B. at 149:17 – 150:10.

The statement made by BP in Paragraph 33 is contested as written only because Mr. Ericsson testified that he believes that Heartstream investors were shown a PPM. *See* Ex. 14; and Ex. 1.A. at 229:4 – 9.

The statements made by BP in Paragraphs 35 and 36 are contested as written because they state that BMT drafted the PPM, when Mr. Ericsson testified that a securities law firm drafted the PPM to make sure that all things that could negatively affect the outcome of an investment are disclosed. *See* Ex. 1.A. at 144:22 – 158:8, 164:14 – 165:20; and Ex. 1.B. at 149:17 – 150:10.

The statement made by BP in Paragraph 44 is contested as written because at the time of the spill, Plaintiffs were still under a Financial Advisory Agreement (FAA) with Heartstream to secure funding from its European investors, who had already had equity positions in European marine fish farming companies, and Heartstream had strong reason to believe it would have raised the requested capital but for the BP oil spill, and Plaintiffs were drafting two separate private placements in January and March 2010 to raise capital. *See* Ex. 14, p. 7 – 9; Ex. 1.A. at 173:24 – 175:7; Ex. 1.B. at 149:17 – 150:10; Ex. 9; and Ex. 10.

The statement made by BP in Paragraph 46 is contested as written because Plaintiffs were still under a Financial Advisory Agreement (FAA) with Heartstream to secure funding from its European investors, who had already had equity positions in

6

European marine fish farming companies, and Heartstream had strong reason to believe it would have raised the requested capital but for the BP oil spill, and Mr. Ericsson testified that he believed Heartstream would have raised the funds in 2010.  *See* Ex. 14, p. 7 – 9; and Ex. 1.B. at 149:17 – 150:10, 155:3 – 24.

The statement made by BP in Paragraph 48 is contested as written only because it states that GMIT actually "received" the NIH funding before 2010, when Mr. Ericsson testified that the funds were dispersed quarterly and at least one project had an end date of 2012.  *See* Ex. 1.A. at 23:11 – 28:18.  That being said, Plaintiffs do not dispute that the budget periods for the NIH funding ended in 2010.

The statements made by BP in Paragraph 50 and 51 are contested as written only because they improperly imply that GMIT's research was unrelated to Plaintiffs' aquaculture project when Mr. Ericsson testified that NIH project served two purposes: (1) growing cephalopods for medical research; and (2) growing our Gulf species candidates from small fish to much larger fish to determine husbandry requirements for successfully growing marine species at our sea farming site.  At the Moody Aquarium facilities in Galveston Island, Plaintiffs grew thousands of fingerlings into larger fish, testing feed, and monitoring health and growth rates to determine management requirements for the species they intended to stock at the FlorAbama Project.  The NIH permitted research on other organisms.  *See* Ex. 1.B. at 20:4 – 25:17.  That being said, Plaintiffs do not dispute that NIH funding was for cephalopod research.

The statement made by BP in Paragraph 54 is contested as written only because Plaintiffs have not evaluated its historical NIH funding and broken it down, to verify

7

whether or not the stated annual percentages are accurate.

The statement made by BP in Paragraph 57 is contested as written only because it does not make clear that the expenses associated with the construction of the bioreactor were "winding down," while the research continued. *See* Ex. 1.B. at 119:7 – 121:6.

The statements made by BP in Paragraphs 58 and 60 are contested as written because they are made in bad faith, grossly misrepresent the facts and testimony, attempt to support the false narrative that "Plaintiffs chose not to fundraise after the spill," and improperly attempt to lay causation for the damages caused by the oil spill on Plaintiffs. At the time of the BP oil spill, Plaintiffs were still under a Financial Advisory Agreement (FAA) with Heartstream to secure funding from its European investors, who had already had equity positions in European marine fish farming companies, and Heartstream had strong reason to believe it would have raised the requested capital but for the BP oil spill, and Mr. Ericsson testified that he believed Heartstream would have raised the funds in 2010. Mr. Ericsson testified that he informed the individuals raising capital in New York and Europe that the contaminated waters caused by the BP oil spill had made it very difficult to find people who would buy products from the contaminated areas of the Gulf. The BP oil spill damaged the Gulf seafood market as people did not want to purchase or eat fish taken from the Gulf areas devastated by the oil spill. As a result, the market for finfish in the area substantially collapsed. Mr. Ericsson testified that Plaintiffs looked at reestablishing the project after the BP oil spill; however, the concerns in the marketplace and al of the other information brought forward by the scientific community regarding the environmental conditions prohibited Plaintiffs from proceeding with the FlorAbama project. *See* Ex. 14, p.

8

7 – 9; Ex. 1.A. at 93:13 – 96:13, 139:3 – 141:20; Ex. 1.B. at 149:17 – 150:10, 155:3 – 24; Nov. 30, 2015 Penalty Phase Findings of Fact and Conclusions of Law (MDL 2179 Rec. Doc. No. 15606) at ¶6 ("Each day for nearly three months, thousands of barrels of oil and gas from the MC252 reservoir flowed into and up the Macondo Well, through the blowout preventer and broken riser, and into the Gulf of Mexico."); ¶20 ("3.19 million barrels of oil discharged into the Gulf of Mexico."); ¶31 ("This was the largest oil spill in American waters. This Court has determined that approximately 4.0 million barrels of oil exited the MC252 reservoir, 3.19 million of which entered Gulf waters."); ¶33 ("Between 45,000 and 68,000 square miles of surface waters were oiled at one point or another."); ¶42 ("The seriousness of this violation cannot be overstated. The oil spill was extremely serious. It was gravely serious. It was a massive and severe tragedy."); ¶34 ("According to the Shoreline Cleanup Assessment Technique—a technique used during the response to assess the shoreline and determine where response actions were appropriate—approximately 1,100 miles of the coast were visibly oiled to some extent, 220 miles of which were categorized as "heavily" oiled and another 140 miles as "moderately" oiled. Four years later, 393 miles of shoreline were still visibly oiled to some extent, fourteen miles of which were moderately or heavily oiled."); ¶35 ("In response to the spill, recreational and commercial fishing grounds were closed. At the peak of closures, 88,552 square miles of fishing grounds were closed."); ¶36 ("The oil caused actual harm to organisms. For example, approximately 4,400 visibly-oiled birds were collected during the response, 2,303 of which were dead. Four hundred seventy-four visibly-oiled sea turtles were collected, eighteen of which were dead. Twelve visibly-oiled dolphins were collected, though many others were observed swimming in

oiled waters."); ¶39 ("Approximately $14 billion was spent on the response."); ¶41 ("The response required the use of 6,300 vessels."); ¶64 ("Under a proposed consent decree filed on October 5 2015, BPXP agreed to pay $5.5 billion in civil penalties under the CWA. On November 15, 2012, the United States and BPXP entered into a plea agreement, which was accepted by Judge Vance, pursuant to which BPXP paid $1.15 billion for criminal violations of the CWA, $100 million for violating the Migratory Bird Treaty Act, $5.5 million for eleven counts of seaman's manslaughter, and $500,000 for one count of Obstruction of Congress. The November 2012 plea agreement also required BPXP to pay $350 million to the National Academy of Sciences and $2.394 billion to the National Fish and Wildlife Foundation, but stated that these payments "shall have no effect on, and shall not be argued by [BPXP] . . . to reduce in any way, any civil claims by any party arising out of the *Deepwater Horizon* blowout, explosion, oil spill and response, including but not limited to natural resource damage claims.").

The statement made by BP in Paragraph 64 is contested as written because it assumes facts not in the record, mischaracterizes profit and loss statements and income tax returns, and draws improper conclusions to support a false narrative that "Gulf Marine shifted its focus to affordable housing," when Mr. Ericsson testified that the Chicago properties were purchased for investment purposes. *See* Ex. 1.A. at 43:4 – 47:14, 235:16 – 240:2; and Ex. 1.B. at 97:2 – 98:23.

The statements made by BP in Paragraphs 65 and 66 are contested as written because they fail to acknowledge GMIT as a co-holder of the USACE and EPA permits and ignore Mr. Ericsson's testimony that the joint development agreement that GMIT had with

10

BMT relative to the Texas platform also applied to the FlorAbama project and specified that GMIT would receive 2.5 percent of the gross sales of the seafood products as long as it was there. *See* Ex. 3 at BIOM-GMIT 158; Ex. 4 at BIOM-GMIT 117; Ex. 1.B. at 77:3 – 80:19; and Ex. 8.

## LIST OF MATERIAL FACTS GENUINLY DISPUTED:

In addition to the above referenced facts contested, Plaintiffs submit that the following facts are genuinely disputed:

(1) There is a genuine dispute of material fact as to whether Plaintiffs' damages resulted from and were due to the April 20, 2010 explosion of the *MODU Deepwater Horizon* and subsequent discharge of 3.19 barrels of oil and gas and the application of Corexit to suppress that oil and gas into the Gulf of Mexico water column for nearly 3 months.

(2) There is a genuine dispute of material fact as to the extent with reasonable certainty of Plaintiffs' damages that resulted from and were due to the April 20, 2010 explosion of the *MODU Deepwater Horizon* and subsequent discharge of 3.19 barrels of oil and gas and the application of Corexit to suppress that oil and gas into the Gulf of Mexico water column for nearly 3 months.

Date: May 31, 2021                                  Respectfully submitted,

**THE KRELLER LAW FIRM**

*/s/ Stephen Skelly Kreller*
Stephen Skelly Kreller (Bar No. 28440)
Katie M. Cusimano (Bar No. 28545)
757 Saint Charles Avenue, Suite 301
New Orleans, Louisiana 70130
T: (504) 484-3488
F: (888) 294-6091
E: ssk@krellerlaw.com

And

**GARCIA DE LA GARZA, LLP**

*/s/ Mario de la Garza*
Mario de la Garza
1616 S. Voss Road, Suite 870
Houston, Texas 77057
T: (713) 784-1010
F: (713) 784-1011
E: mdelagarza@dlgtriallaw.com

***Attorneys for plaintiffs, Gulf Marine Institute of Technology and BioMarine Technologies, Inc.***

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing Response to BP's Statement of Uncontested Facts and List of Material Facts Genuinely Disputed in Case No. 2:13-cv-01286 has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 31st day of May, 2021.

*/s/ Stephen Skelly Kreller*
Stephen Skelly Kreller
