```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF LOUISIANA
 2
    In Re: Oil Spill by the    §
 3  Oil Rig "Deepwater         §    MDL NO. 2179
    Horizon" in the Gulf of    §
 4  Mexico on April 20,        §    SECTION J
    2010                       §
 5  _____   §    JUDGE BARBIER
                               §
 6  GULF MARINE INSTITUTE      §    MAGISTRATE JUDGE
    OF TECHNOLOGY AND          §    CURRAULT
 7  BIOMARINE TECHNOLOGIES,    §
    INC.                       §
 8                             §
                Plaintiffs     §
 9                             §
    VS.                        §    Case No. 13-cv-01286
10                             §
    BP EXPLORATION AND         §
11  PRODUCTION, INC., ET       §
    AL.                        §
12                             §
                Defendants     §
13  _____   §

14

15

16            REMOTE VIDEOTAPED DEPOSITION OF

17                   JOHN D. ERICSSON

18                 Gulf Breeze, Florida

19             Thursday, February 18, 2021

20

21

22

23   Reported by:

24   MICHEAL A. JOHNSON, RDR, CRR

25   JOB NO. 189253
```

**EXHIBIT A**

Page 2

1

2                    February 18, 2021

3                    9:39 a.m. EST

4

5

6        Remote videotaped deposition of JOHN D.

7   ERICSSON, held at the location of the witness,

8   3881 Paradise Bay Drive, Gulf Breeze, Florida,

9   before Micheal A. Johnson, a Registered Diplomate

10  Reporter and Certified Realtime Reporter.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    A P P E A R A N C E S

 2            KRELLER LAW FIRM
              Attorney for Plaintiffs
 3                 757 Saint Charles Avenue
                   New Orleans, Louisiana 70130
 4            BY:   STEPHEN KRELLER, ESQ.

 5


 6            THE DE LA GARZA LAW GROUP
              Attorney for Plaintiffs
 7                 1616 South Voss Road
                   Houston, Texas 77057
 8            BY:   MARIO DE LA GARZA, ESQ.

 9


10            KIRKLAND & ELLIS
              Attorney for Defendants
11                 300 North LaSallle Street
                   Chicago, Illinois 60654
12            BY:   MATTHEW REGAN, ESQ.

13


14            KIRKLAND & ELLIS
              Attorney for Defendants
15                 555 California Street
                   San Francisco, California 94104
16            BY:   ANNA TERTERYAN, ESQ.
                   NICOLETTE ROGER, ESQ.
17

18

19            VIDEOGRAPHER:

20                 Philip Rizzuti

21

22

23

24

25
```

```
 1                 J. ERICSSON - 2/18/2021
 2                 You're familiar with Gulf Marine's
 3      sources of income, correct?
 4           A.    Yes.
 5           Q.    And Gulf Marine's source -- primary
 6      source of income was grants, correct?
 7           A.    Partially, yes.
 8           Q.    Well, what were the other sources of
 9      income for Gulf Marine other than grants?
10           A.    We received a $1.3 million donation
11      from Seagull Energy when we took over the Gulf of
12      Mexico platforms in Texas.
13           Q.    Other than the Texas platform, which I
14      understand is not part of this lawsuit, correct?
15           A.    That's correct.
16           Q.    Okay.  Other than the Texas platform
17      and grants, can you identify any other sources of
18      income for Gulf Marine Institute of Technology?
19           A.    Revenue -- National Institute of
20      Health.
21           Q.    So the National Institute of Health
22      had grants that it provided to GMIT or Gulf
23      Marine, correct?
24           A.    Correct.
25           Q.    Those were the largest grants that
```

1                 J. ERICSSON - 2/18/2021

2   GMIT received, correct?

3        A.   Yes.

4        Q.   Can you identify any grants that GMIT

5   received that were larger than the NIH grants?

6        A.   No.  Other than the $1.3 million.

7        Q.   You're talking about the platform in

8   Texas again; is that correct?

9        A.   You asked about revenues larger than

10  NIH, 1.3 million from the Texas transaction.

11       Q.   For clarity, Mr. Ericsson, we can

12  agree that the largest grants received by GMIT

13  were from NIH, correct?

14       A.   Correct.

15            MR. KRELLER:  John, try to look at the

16  screen --

17            THE WITNESS:  This one?

18            MR. KRELLER:  -- when referring to

19  documents, yes, so you're facing Matt.

20            THE WITNESS:  Okay.

21  BY MR. REGAN:

22       Q.   I'm going to skip Exhibit 3 for now

23  and I'm going to post in the chat Exhibit No. 4.

24  I'm going to now share that.

25

1       J. ERICSSON - 2/18/2021

2              (Deposition Exhibit 4 marked for

3   identification.)

4   BY MR. REGAN:

5       Q.   Mr. Ericsson, I've posted as Exhibit

6   No. 4 a document that starts with the Bates number

7   BIOM-GMIT 3340 and is the 2010 tax returns for

8   Gulf Marine Institute of Technology.  Do you

9   recognize that?

10      A.   Yeah, it looks familiar.

11      Q.   Now, the copy that was produced by us

12  has your -- you as the officer to sign the tax

13  return.  Do you see that on the screen?

14      A.   Yes.

15      Q.   The copy that was produced does not

16  contain your signature, but do you believe that

17  you did sign this tax return?

18      A.   I believe I did.

19      Q.   And you understood in signing this tax

20  return that you were doing so, as it sets forth

21  here, under penalties of perjury, correct?

22      A.   Yes.

23      Q.   And that the statements were, to the

24  best of your knowledge and belief, true, correct

25  and complete, correct?

1                    J. ERICSSON - 2/18/2021

2        A.   According to my accountants, correct.

3        Q.   That was based on your signature,

4   right?

5        A.   Correct.

6        Q.   I'm going to turn to the 19th page of

7   the return.  You see a Schedule O?

8        A.   Yes.

9        Q.   And it states here on Schedule O, "The

10  BP oil spill in the Gulf of Mexico on 4-20-11

11  caused a stop to research.  BP has paid $204,800

12  in 2010 to replace the federal grant that was

13  withdrawn since the research could not proceed."

14            Did I read that correctly?

15       A.   Yes.

16       Q.   Now, you're referring to the oil spill

17  on April 20th, 2010, correct?

18       A.   Yes.

19       Q.   And the grant that's referred to that

20  is being replaced by the 204,800, that's the NIH

21  grant, correct?

22       A.   Yes.

23       Q.   And you state in this tax return that

24  the BP oil spill caused a stop to research.

25  You're saying a stop to the NIH research, correct?

1                    J. ERICSSON - 2/18/2021

2          A.   Yes.

3          Q.   Can we agree that the 26th of February

4    was two months before the oil spill?

5          A.   Yes.

6          Q.   Can we agree that the funding that was

7    received in 2010 for this grant was completed

8    before the oil spill?

9          A.   Well, the funding was completed, but

10   the project didn't end then.

11         Q.   Can we agree that there was -- could

12   be no anticipation of further funding for a

13   project that ended on February 26th, 2010?

14         A.   Again, the funding ended but the

15   project didn't.

16         Q.   Okay.  Go to the third page, the next

17   grant.  Again, do you see a project start date and

18   a project and budget end date on your screen?

19         A.   Yes.

20         Q.   The project end date and the budget

21   end dates are February 26, 2010; is that correct?

22         A.   Appears to be, yes.

23         Q.   And the funding that was received for

24   this second item was all received in 2009,

25   correct?

1               J. ERICSSON - 2/18/2021

2        A.    Looks correct.

3        Q.    Go to the third grant.  Do you see a

4   project end date for the third grant of

5   26 February 2010?

6        A.    Yes.

7        Q.    Do you see that funding was -- all the

8   funding was complete in 2009, here on the bottom

9   of the page?

10       A.    2009.  Okay.  On the left-hand corner?

11       Q.    Yes.

12       A.    That's what it says.

13       Q.    And you were -- you had a

14  responsibility with respect to these grants,

15  right?

16       A.    Yes.

17       Q.    So you were aware that the funding

18  for -- like this grant would have ended in 2009;

19  you would have been aware of that, right?

20       A.    Again, you're taking a sequence out of

21  the total.  The budget -- the budget for the

22  project funding ended, as it says, probably

23  February the 28th is, actually, I think later than

24  that, but we were funded but the project continued

25  on beyond that budget end date.

1                  J. ERICSSON - 2/18/2021

2        Q.   Is it your testimony, Mr. Ericsson,

3   that the NIH was actually going to provide

4   additional funding after the end date for the

5   project?

6        A.   No, I'm not saying that.

7        Q.   Go to the fourth example.  Do you see

8   a project end date and a budget end date of the

9   26th of February 2010?

10       A.   Yes.

11       Q.   Do you see that the total funding was

12  received in 2009?

13       A.   That wasn't the total funding for

14  2009.

15       Q.   You disagree --

16       A.   That was for a period of time.

17       Q.   Okay.  So you disagree with what's set

18  forth here on the exhibit?

19       A.   I'm saying this is -- you're taking a

20  snapshot of a period of time.  The proceeds were

21  disbursed on a quarterly basis, usually.

22       Q.   Do I read this correctly, total

23  funding 17,090, Year 2009, Total Cost 17,090?  Did

24  I read that correctly?

25       A.   Well, that's what it says, but again,

```
1                    J. ERICSSON - 2/18/2021
2    I don't -- I don't agree with that being the total
3    amount of funding in 2009.
4         Q.   Okay.  If we go to the next grant, do
5    we see again a budget end date of the 26th of
6    February 2010?
7         A.   Yes.
8         Q.   Do we see a total funding amount that
9    lists that the funding was -- took place in 2008?
10        A.   Yes.
11        Q.   And we could look at GMIT's tax
12   returns as well, to line up the dates that these
13   funds were received, right?
14        A.   That would have -- yeah, that would be
15   true.
16        Q.   Okay.  And if we go to the seventh
17   page, here in this, we have a budget end date of
18   the 30th of June 2008 and a project end date of
19   the 30th of June 2012.  Do you see that?
20        A.   Yes.
21        Q.   And the total funding indicated 38,749
22   all in 2008, correct?
23        A.   Yes.  I'm looking at something on the
24   right-hand side.
25        Q.   Sure.
```

1                   J. ERICSSON - 2/18/2021

2          A.    Okay.   Project end date says it's

3    June 30th, 2012.

4          Q.    Right.

5          A.    Okay.

6          Q.    And the --

7          A.    Budget date -- budget date was this

8    period of time in 2008.

9          Q.    And under --

10         A.    Project end date is 2012, which is

11   beyond the 2010 period that you -- in question.

12         Q.    Principal investigator on this grant

13   was Phillip Lee, correct?

14         A.    Let's see.   Let me see the date again.

15         Q.    Top left corner, Phillip Grant Lee.

16   Do you see that?

17         A.    I see that, but what date?

18         Q.    He's listed as the principal

19   investigator, the PI, for this grant.

20         A.    In 2008, that's correct.

21         Q.    Mr. Lee was no longer with GMIT in

22   2010, was he?

23         A.    No, he wasn't.

24         Q.    And then the last grant also with

25   Mr. Lee, indicates a project end date of

1                    J. ERICSSON - 2/18/2021

2    June 2012, but a budget end date of 2008, correct?

3         A.    Looks right.

4         Q.    And the total funding is listed for

5    2007, 311,478, right?

6         A.    Yes.

7         Q.    Is it your testimony, Mr. Ericsson,

8    that GMIT actually received funds from NIH

9    pursuant to these seven grants after February 28th

10   of 2010?

11        A.    After February 2010.

12        Q.    Yeah.

13        A.    Would you rephrase that again?

14        Q.    Do you believe, Mr. Ericsson -- let me

15   ask you this way.  Is it your testimony that GMIT

16   received money from the NIH pursuant to any of

17   those seven grants after February 28th of 2010?

18        A.    I don't recall.

19        Q.    Mr. Lee, Phillip Lee, was a director

20   and officer of GMIT, correct?

21        A.    For a period of time.

22        Q.    He was a director and officer during

23   the period of time when he was identified as the

24   principal investigator on those grants, correct?

25        A.    Yes, up to a point.

1                    J. ERICSSON - 2/18/2021

2    GMIT.  GMIT was then to determine how it was going

3    to be retained and disposed of.

4         Q.   GMIT purchased two townhouses in 2010,

5    correct?

6         A.   Could you be a little more definitive?

7         Q.   Well, let's go back to exhibit -- let

8    me share -- back to our Exhibit No. 4.  This was

9    the 2010 tax return for GMIT.  Do you see on your

10   screen a depreciation schedule?

11        A.   Yes.

12        Q.   The first line says, Ada 1 Property,

13   Date November 16, 2010, Cost 48,000.  That's a

14   townhouse in Chicago, right?

15        A.   That's correct.

16        Q.   GMIT bought that?

17        A.   Yes.

18        Q.   And what was the use of the townhouse

19   in Chicago for the Gulf of Mexico aquaculture

20   project?

21        A.   It was made as a side investment.

22        Q.   A side investment by the nonprofit

23   GMIT?

24        A.   Yes, sir.

25        Q.   Was that within the scope of GMIT's

1                   J. ERICSSON - 2/18/2021

2    charter?

3          A.    Yes.

4          Q.    Real estate investments?

5          A.    If you will check the IRS records,

6    you'll see that we amended the purpose of our

7    company to allow that.

8          Q.    You then purchased that property from

9    GMIT, correct?

10         A.    I don't recall ever purchasing it from

11   the company.  It was -- it was sold through a

12   third party later.

13         Q.    Same exhibit, which is, again, Exhibit

14   No. 4, last page, 26, which has a Bates number of

15   BIOM-GMIT 3365, has an e-mail to you and others of

16   October 17th, 2011, from Melissa Poppenger

17   regarding 5622 South Ada.  "Hello, Here is the

18   title for Ada.  I am not sure if you guys did a

19   quit claim deed, but John Ericsson personally owns

20   this now, not Gulf Marine."

21               Did I read that correctly?

22         A.    Well, that's an e-mail from Melissa

23   Poppenger with Mages & Price to Justin Ericsson.

24         Q.    JDE4U@aol.com.  That's your e-mail

25   address, correct?

Page 45

1                    J. ERICSSON - 2/18/2021

2          A.   Right.  So what's the question?

3          Q.   Did you personally execute a quitclaim

4     deed to acquire 5622 South Ada, a townhouse in

5     Chicago, from GMIT?

6          A.   Well, they say I do.  I don't recall

7     the transaction exactly.  We're -- you know, GMIT

8     invested in properties that my son was involved in

9     as an investment, and in the handling of the --

10    taking down of the properties and reselling them,

11    various transactions were made according to the

12    title company and the firm that was handling

13    Justin's business.  So it was a move title.

14         Q.   So as you sit here today,

15    Mr. Ericsson, do you know if you purchased

16    residential property from GMIT?

17         A.   Again, I don't recall this particular

18    situation.  I think it was in regards to somehow

19    clearing up the title and the transfer of the

20    property to a third-party investor.

21         Q.   I'm going back to the depreciation

22    schedule.  It lists Stewart Property of

23    November 12th, 2010, with a basis of 69,895.

24    What's the Stewart Property, Mr. Ericsson?

25         A.   It was another property in Chicago

Page 46

1              J. ERICSSON - 2/18/2021
2   that GMIT invested in.
3        Q.    Those properties, Ada and Stewart,
4   were purchased in November of 2010; is that right?
5        A.    Looks like it.
6        Q.    And those properties were purchased
7   with funds received from the GCCF in October of
8   2010, the $200,000, correct?
9        A.    I don't recall.
10             MR. KRELLER:  Object to the form.  I
11   think that's pure speculation.
12   BY MR. REGAN:
13        Q.    Do you know where GMIT received the
14   funds to purchase the Ada Property and the Stewart
15   Property in November of 2010?
16        A.    I don't recall.  It was money -- by
17   the way, the numbers that are shown here are not
18   the investment basis that I recall.  I don't know
19   what the numbers were for tax purposes.  I don't
20   know how they did that, whether it was based on
21   the sale price or what exactly the basis was.
22        Q.    For purposes of your damages that
23   you're claiming in this lawsuit, Mr. Ericsson, do
24   you believe the Ada Property and the Stewart
25   Property are assets owned by GMIT that would

1                      J. ERICSSON - 2/18/2021

2    benefit a Gulf of Mexico aquaculture operation?

3         A.    Not directly.  Indirectly.

4         Q.    How would those townhouses indirectly

5    benefit a Gulf of Mexico aquaculture operation?

6         A.    Because when the properties were sold,

7    the funds came back to GMIT, to the best of my

8    recollection.

9         Q.    But we've also -- we understand you

10   don't know if, in fact, you were the owner of

11   those properties, not GMIT, correct?

12        A.    If I was, it was only for title

13   purposes on some interim -- interim basis for

14   transferring the title.

15        Q.    There's a list of production platform

16   on this schedule of assets.  Do you see that?

17        A.    Yeah.

18        Q.    That's the Texas production platform,

19   correct?

20        A.    Not on this schedule.  Production

21   platform.  Oh, there it is.  Okay.

22        Q.    That refers to the production platform

23   in Texas, correct?

24        A.    That's correct.

25        Q.    That production platform has nothing

```
 1                J. ERICSSON - 2/18/2021
 2    once adequate capital has been raised to permit
 3    construction of cages, equipment, and operating
 4    facilities necessary to conduct such operations."
 5             Did I read that correctly?
 6        A.   Yes.
 7        Q.   And do you agree with that statement
 8    as of December of 2007?
 9        A.   Yes.
10        Q.   BioMarine never commenced commercial
11    operations, did it?
12        A.   Yes, it did.
13        Q.   When did BioMarine commence commercial
14    operations, Mr. Ericsson?
15        A.   We commenced commercial operations
16    with our Sea Star oyster relay system in about
17    1995, '96.
18        Q.   So the financial statements from 2007
19    that say "commencement of commercial operations
20    has not yet occurred," that's incorrect?
21        A.   Well, depending on how they view our
22    activities with our Sea Star oyster relay system.
23    I mean, they weren't intimately involved in our
24    business history.
25        Q.   Can we agree that --
```

1                    J. ERICSSON - 2/18/2021

2         A.    We're looking at numbers.

3         Q.    Can we agree that BioMarine never

4    commenced commercial operations in the

5    Florida-Alabama region?

6         A.    That's correct.

7         Q.    I'm going to page 21 of Exhibit 10,

8    Note 8, Proposed Offerings.  Do you see that,

9    Mr. Ericsson?

10        A.    Yes.

11        Q.    The first paragraph says that, "In

12   February 2000, the Company filed an SB-2

13   Registration Statement with the Securities and

14   Exchange Commission, for a proposed initial public

15   offering of the Company's common stock aggregating

16   up to $10 million.  In October 2001, this

17   application was withdrawn."

18             Is that an accurate statement?

19        A.    Yes.  It doesn't state why it was

20   withdrawn, but, yes, it was.

21        Q.    Can you identify, Mr. Ericsson, the

22   total amount of investment received by BioMarine

23   under that initial public offering that was filed

24   in February 2000?

25        A.    Again, it was withdrawn.  That means

1                    J. ERICSSON - 2/18/2021

2          Q.   At any point in time, Mr. Ericsson,

3    did BioMarine or Gulf Marine lease or purchase a

4    jack-up barge for the Florida-Alabama site?

5          A.   No.  We investigated the equipment

6    being available and the terms that it would be

7    available under.

8          Q.   But we can agree that there was no

9    point in time when either BioMarine or Gulf Marine

10   actually leased or purchased a jack-up barge to

11   operate the FlorAbama site, right?

12         A.   Correct.  The staging of the platform

13   into the project was after it had commenced with

14   five cages.

15         Q.   The cages -- as of February 2008, did

16   either BioMarine or Gulf Marine own cages?

17         A.   Yes.

18         Q.   How many cages did -- were owned?

19         A.   Five.

20         Q.   And who was the owner of those cages?

21         A.   I believe BioMarine did.  Also owned

22   ten sets of nets and an aqua automatic feeder.

23         Q.   The aqua automatic feeder was donated

24   to BioMarine, correct?

25         A.   Yes.  As well as the cages and the

1                    J. ERICSSON - 2/18/2021

2    nets, by a Japanese donation to our project in the

3    Gulf.

4         Q.   Okay.  Given that the cages, the

5    feeder and the nets were donated, did BioMarine or

6    Gulf Marine ever purchase any equipment to use at

7    the Florida-Alabama site?

8         A.   Yes.

9         Q.   What equipment did you purchase and

10   who purchased it?

11        A.   I don't recall exactly which company

12   bought things, but we had a marine nursery in

13   operation -- fully in operation in Gulf Breeze,

14   Florida, for a number of years.

15        Q.   Anything --

16        A.   Which had 12 5,000-gallon round fish

17   raising tanks, two 17-foot raceways, filtration

18   systems, water monitoring systems.  We raised fish

19   in them, including cobia.  They were one of the

20   species that were part of the project that we were

21   going to do in the Gulf of Mexico.

22             And, yes, there were a number of

23   assets that were involved.  Plus all the assets

24   that came from the NRCC ended up in our

25   possession.  That was, you know, listed in the

1                    J. ERICSSON - 2/18/2021

2    equipment that we owned that was going to go to

3    the FlorAbama project and that represented, you

4    know, I don't know how many dollar values, but NIH

5    I'm sure, spent millions of dollars acquiring all

6    that.

7         Q.   The five cages, have they ever been

8    put in the Gulf of Mexico to raise fish for

9    commercial aquaculture purposes?

10        A.   No, they were in storage until we were

11   ready to deploy.

12        Q.   And the total number of cages that you

13   thought were necessary to start the

14   Florida-Alabama project was how many?

15        A.   One to five.

16        Q.   Go to paragraph 9 of your e-mail, you

17   write, "The hatchery/nursery at the FloriBama site

18   in the area of Orange Beach, Alabama, area and can

19   be built using cost-effective metal building

20   structures."

21             Did I read that correctly?

22        A.   Yes.

23        Q.   Did either BioMarine or Gulf Marine

24   ever own a hatchery/nursery in the area of Orange

25   Beach, Alabama?

1                    J. ERICSSON - 2/18/2021

2          A.    No.  We had one in Gulf Breeze,

3    Florida.

4          Q.    The e-mail -- as we see in your

5    e-mail, you believe that you needed to have a

6    hatchery/nursery in the Orange Beach, Alabama,

7    area for the Florida-Alabama site, correct?

8          A.    Eventually.  Not initially.

9          Q.    But we can agree, Dr. Ericsson, that

10   at no point in time did either BioMarine or Gulf

11   Marine own a hatchery or nursery in the area of

12   Orange Beach, Alabama, correct?

13         A.    We owned one in Gulf Breeze, not in

14   Orange Beach.  We were looking for a site to build

15   one from the proceeds that we were raising with

16   our European investors and our New York investors.

17         Q.    At the end of the day, you raised no

18   proceeds from the European investors and the

19   New York investors, correct?

20         A.    Yes, for the fact of the economic

21   destruction -- disaster that occurred in 2008

22   through 2009.  We tabled our fundraising efforts.

23         Q.    And having raised no proceeds from

24   either New York investors or European investors,

25   you then had no proceeds to purchase equipment or

Page 82

1                    J. ERICSSON - 2/18/2021

2   locations like the hatchery/nursery in the area of

3   Orange Beach.  Fair?

4        A.   Well, that was a $10 million

5   hatchery/nursery proposal as designed, and we

6   would not have built the Orange Beach facility

7   until we had raised additional capital.  That was

8   all part of our business plan.

9        Q.   We can agree, Mr. Ericsson, that the

10  first part of the business plan was to raise

11  capital from investors, correct?

12       A.   I don't understand the first part.

13  Could you rephrase that?

14       Q.   Mr. Ericsson, was the business plan

15  for the Florida-Alabama site viable without

16  raising capital from outside investors?

17       A.   I would say without capital from

18  outside -- yes, that's correct.  We had investors

19  already in BioMarine, over a hundred, that had

20  funded our project for millions of dollars up

21  until, you know, the 2008 period.

22       Q.   The question, Mr. Ericsson, is do you

23  agree that the Florida-Alabama commercial

24  aquaculture project was not viable without first

25  raising additional funds from external investors?

1                 J. ERICSSON - 2/18/2021

2        A.   You mean it couldn't be built, not

3   viable, that's what you're saying?

4        Q.   Yes.

5        A.   Yeah, it could not be built without

6   additional financing from one source or another.

7   There were two efforts being made to fund that

8   project and we developed offering memorandas -- we

9   were developing the offering memorandas to do

10  that.

11       Q.   And as of April 19th, 2010, the day

12  before the oil spill in the Gulf of Mexico,

13  neither BioMarine nor Gulf Marine had received any

14  investment funds or capital in connection with

15  those financing efforts, correct?

16       A.   You said with those financial efforts.

17  Which ones are you talking about?

18       Q.   The New York PPM, the European PPM,

19  any of them.

20       A.   From the New York and the European,

21  yes.

22       Q.   Yes, you had not received any

23  financing or investment from those efforts as of

24  April 19th, 2010, correct?

25       A.   That's correct.

Page 82

1                    J. ERICSSON - 2/18/2021

2    locations like the hatchery/nursery in the area of

3    Orange Beach.  Fair?

4         A.   Well, that was a $10 million

5    hatchery/nursery proposal as designed, and we

6    would not have built the Orange Beach facility

7    until we had raised additional capital.  That was

8    all part of our business plan.

9         Q.   We can agree, Mr. Ericsson, that the

10   first part of the business plan was to raise

11   capital from investors, correct?

12        A.   I don't understand the first part.

13   Could you rephrase that?

14        Q.   Mr. Ericsson, was the business plan

15   for the Florida-Alabama site viable without

16   raising capital from outside investors?

17        A.   I would say without capital from

18   outside -- yes, that's correct.  We had investors

19   already in BioMarine, over a hundred, that had

20   funded our project for millions of dollars up

21   until, you know, the 2008 period.

22        Q.   The question, Mr. Ericsson, is do you

23   agree that the Florida-Alabama commercial

24   aquaculture project was not viable without first

25   raising additional funds from external investors?

1                    J. ERICSSON - 2/18/2021

2         A.    You mean it couldn't be built, not

3    viable, that's what you're saying?

4         Q.    Yes.

5         A.    Yeah, it could not be built without

6    additional financing from one source or another.

7    There were two efforts being made to fund that

8    project and we developed offering memorandas -- we

9    were developing the offering memorandas to do

10   that.

11        Q.    And as of April 19th, 2010, the day

12   before the oil spill in the Gulf of Mexico,

13   neither BioMarine nor Gulf Marine had received any

14   investment funds or capital in connection with

15   those financing efforts, correct?

16        A.    You said with those financial efforts.

17   Which ones are you talking about?

18        Q.    The New York PPM, the European PPM,

19   any of them.

20        A.    From the New York and the European,

21   yes.

22        Q.    Yes, you had not received any

23   financing or investment from those efforts as of

24   April 19th, 2010, correct?

25        A.    That's correct.

```
1              J. ERICSSON - 2/18/2021
2   reiterate our objection to PTO 65 and I'll go
3   ahead and lodge the same objection for PTO 67.
4   Both of these documents were created for purposes
5   of settlement negotiations with the neutrals and
6   the magistrate.
7              MR. REGAN:  I don't agree with that
8   position, but you're welcome to state it on the
9   record and we can deal with what we need to at
10  some later juncture.
11  BY MR. REGAN:
12       Q.  This PTO 65 filing is approximately
13  894 pages, so I will share it as best I can, but I
14  want to try to go to some excerpts on it.
15  Mr. Ericsson, can you see what I've marked as
16  Exhibit 13?
17       A.  You mean Exhibit A?
18       Q.  Yes.
19       A.  Okay.  Yes.
20       Q.  And do you see at the top that it was
21  filed with the Court on April 11th, 2018?
22       A.  Yes.
23       Q.  It lists you as the person who's
24  filing the verified statement regarding causation
25  and damages?
```

1              J. ERICSSON - 2/18/2021

2          A.   Yes.

3          Q.   And you signed this submission,

4    correct?

5          A.   Yes.

6          Q.   And when you signed it, it was under

7    penalty of perjury, correct?

8          A.   Yes.

9          Q.   I've got on the page -- on the screen

10   page 5 of Exhibit 13.  Is that your signature?

11         A.   Yes.

12         Q.   I want to go to page 8 of the PDF in

13   Exhibit 13.  Do you see the paragraph that starts

14   with "BIOM"?

15         A.   Yes.

16         Q.   Says, "BIOM-GMIT held federal permits

17   covering 27.5 acres of waters in the Gulf of

18   Mexico, located approximately 9.9 miles south of

19   Perdido Pass, Alabama, to establish an aquaculture

20   business (the 'FlorAbama Aquaculture Business')."

21              Did I read that correctly?

22         A.   Yes.

23         Q.   The next sentence says, "The permitted

24   site was within the contaminated area."

25              What does that mean?

1                 J. ERICSSON - 2/18/2021

2        A.    That the 27.5 acres was in the hot

3   zone for the crude oil and Clorexit that was put

4   into the gulf waters that affected the water

5   column and the shoreline of the area.

6        Q.    Well, as of November of 2010, there

7   was no closure of the fishery in that location of

8   the FlorAbama business, correct?

9        A.    I'm not aware of that.

10       Q.    Okay.  I'll show you what I'll mark as

11  Exhibit 14.

12             (Deposition Exhibit 14 marked for

13  identification.)

14  BY MR. REGAN:

15       Q.    I've put it into the chat.  I've

16  marked as Exhibit 14 a map from NOAA, the National

17  Oceanic and Atmospheric Administration, from the

18  15th of November, 2010, that indicates the areas

19  of fishery closure.  Do you see that on your

20  screen?

21       A.    Yes.

22       Q.    Is the Florida-Alabama site within the

23  closed area, that is, the box with no lines

24  indicated on Exhibit 14?

25       A.    I quite -- I have to map it on your

1          J. ERICSSON - 2/18/2021

2      A.   Yes.  There was a depreciated value of

3  the platform and equipment on the platform at that

4  time.

5      Q.   We can agree that that production

6  platform is of no value to the Florida-Alabama

7  project, correct?

8      A.   Well, with the exception there was

9  equipment on the platform that could be salvaged.

10     Q.   But the platform itself was of no

11  value to the Florida-Alabama project, correct?

12     A.   That is correct.

13     Q.   All right.  If we go back to

14  Exhibit 13, back to page 9 of Exhibit 13, it says,

15  "Finally, as a result of the spill, BIOM-GMIT was

16  unable to continue to raise the capital it would

17  need to launch the FlorAbama Aquaculture Business

18  as envisioned.  With the gulf waters contaminated,

19  the investment interest in this project

20  disappeared."

21          Did I read that correctly?

22     A.   Yes.

23     Q.   Can you identify a single investor

24  that told you that his or her or its interest had

25  disappeared because of the oil spill?

1                  J. ERICSSON - 2/18/2021

2        A.    A number of people, including myself.

3        Q.    What are their names?

4        A.    John Ericsson, Dr. Edwin Cake.

5        Q.    Let me do it this way, Mr. Ericsson.

6   Can you identify a nonrelated party to BIOM or

7   GMIT who informed you that their investment

8   interest in the project disappeared because of the

9   oil spill?

10       A.    I informed the folks raising capital

11  in Europe and in New York City, that because of

12  the contaminated waters created by the spill and

13  the issues involved in there, it would be very

14  difficult to find folks who would buy the products

15  from contaminated gulf waters where we had it

16  permitted to be sited.  And so I basically kicked

17  the potential for the investment interest at that

18  time which went out to the people who were raising

19  the capital, in the form of telephone calls and

20  similar to the e-mail that you just had me look

21  at, where I notified them of there were issues

22  that we were concerned with.

23       Q.    So, Mr. Ericsson, you told the people

24  who were potentially raising capital for you that

25  you did not believe there should be any further

1                J. ERICSSON - 2/18/2021

2    interest in the project?

3              MR. KRELLER:  Object to the form of

4    the question.  Totally mischaracterizes this

5    witness's testimony.

6    BY MR. REGAN:

7         Q.   So let me ask it this way,

8    Mr. Ericsson, to cure the objection.  Can you

9    identify for me a single nonrelated party that

10   told you it no longer had investment interest in

11   either BioMarine or Gulf Marine's FlorAbama

12   aquaculture business after the spill?

13        A.   Well, you're taking the question in

14   the inverse order of how it actually occurred.

15        Q.   Can you answer my question,

16   Mr. Ericsson?

17        A.   Again, I -- I put the information out

18   to the people involved that we had a serious

19   problem going forward.  I more or less

20   extinguished going forward until -- any funding in

21   this project after this spill, this disaster,

22   because of the contaminated waters that were

23   created by this blowout.

24        Q.   So, Mr. Ericsson, after you

25   extinguished the investment prospects for this

1                 J. ERICSSON - 2/18/2021

2  project after the spill, was there any point in

3  time where you decided to reopen potential for

4  investment?

5        A.    Yes.

6        Q.    When did you do that?

7        A.    2010.

8        Q.    With whom?

9        A.    The same people that we were -- had

10 been dealing with, but also we were drafting new

11 offering memorandas to update the project to raise

12 up to $10 million with the bond issues from

13 BioMarine and GMIT.

14       Q.    So after 2010, how much capital has

15 BioMarine or Gulf Marine raised from nonrelated

16 parties?

17       A.    I don't recall.

18       Q.    Has it raised a dollar of capital from

19 nonrelated parties?

20       A.    Yes.

21       Q.    Can you identify who has made an

22 investment into BioMarine or Gulf Marine since

23 2010?

24       A.    I just don't recall.  We had -- we

25 already had 100 stockholders who put up over

Page 97

1          J. ERICSSON - 2/18/2021

2   6 million -- around $6 million in funding this

3   project to the point of the blowout.

4        Q.   To confirm, Mr. Ericsson, you are

5   unable to identify a single nonrelated investor

6   who told you that they were no longer interested

7   in investing in the FlorAbama project because of

8   the oil spill, correct?

9        A.   They didn't have to.  I had called it

10  off.

11       Q.   Not my question, Mr. Ericsson.

12       A.   No, there was none because I called it

13  off.

14       Q.   So to confirm, Mr. Ericsson, you are

15  unable to identify a single non-party or

16  nonrelated investor who told you they were no

17  longer investing in the FlorAbama project for

18  BioMarine or Gulf Marine because of the oil spill.

19  True?

20       A.   The way you phrased that, I would say

21  that's somewhat accurate.

22       Q.   Well, can you give me the name of a

23  single investor who said, I am no longer

24  interested in investing in BioMarine or Gulf

25  Marine because of the oil spill?

1              J. ERICSSON - 2/18/2021

2        A.   There was an effort to rekindle the

3   interest in the project after the economic

4   recession was over, but the BP blowout prevented

5   that from going further.

6        Q.   Mr. Ericsson, I apologize, but that's

7   not my question.  Can you identify a single

8   investor who told you they were no longer

9   interested in investing in the FlorAbama

10  aquaculture business project because of the oil

11  spill, yes or no?

12            MR. KRELLER:  Objection, asked,

13  answered.

14            You can answer it again to the extent

15  that you can.

16        A.   I am saying that I called off any

17  investments in our projects because of the

18  disaster created by the oil spill and therefore

19  there were no outside investors who had interest.

20  I basically kicked it to the curb.

21  BY MR. REGAN:

22        Q.   And having kicked it to the curb,

23  Mr. Ericsson, the Florida-Alabama aquaculture

24  business, there was no point in time after you

25  kicked it to the curb where an investor told you,

1                J. ERICSSON - 2/18/2021

2   I will not invest in this project because of the

3   oil spill?

4        A.   I had conversations with investment

5   bankers who were raising the capital and getting

6   the interest of investors, which I informed

7   appropriately that at the time of the disaster and

8   going forward, the environment was contaminated

9   and there was no point in raising capital until

10   that area -- until that cleared itself up.

11        Q.   So can you --

12        A.   I stopped the -- any investor from

13   coming forward that these investment bankers may

14   have been talking to about it.

15        Q.   And that was your decision,

16   Mr. Ericsson, correct?

17        A.   Absolutely.  I have a fiduciary

18   responsibility about informing the investors or

19   potential investors of the risks associated with

20   making an investment.

21        Q.   Mr. Ericsson, in that fiduciary

22   responsibility, did you ever inform any potential

23   investor that NOAA had declined to grant BioMarine

24   and Gulf Marine an EFP permit for the FlorAbama

25   project?

1            J. ERICSSON - 2/18/2021

2            MR. KRELLER:  I'm going to object to

3   this line of questioning.  This man's not a

4   lawyer.

5         A.   We have experts in the areas of

6   permitting and law that you best ask those

7   questions.

8   BY MR. REGAN:

9         Q.   So in your documents when you say that

10  the Florida-Alabama project was fully permitted,

11  we should understand that is based on your opinion

12  that the EFP was irrelevant, correct?

13        A.   Again, our experts in these areas

14  would best be queried on these questions regarding

15  whether we had it or didn't have it.

16        Q.   How many EFPs did BioMarine apply for

17  over the course of time for the Florida-Alabama

18  project?

19        A.   Only one that I'm aware of.

20        Q.   As you sit here right now, do you

21  believe you have a copy of the June 2008 letter

22  from NOAA rejecting the application?

23        A.   Do I have it now?  I'm not aware of

24  it, having it here.

25            THE WITNESS:  Do we have it here?

1          J. ERICSSON - 2/18/2021

2          THE VIDEOGRAPHER:   The time is

3   1:21 p.m., and we are back on the record.

4   BY MR. REGAN:

5          Q.   Mr. Ericsson, as of April 20th, 2010,

6   what permits did BioMarine and Gulf Marine have

7   for the FlorAbama site?

8          A.   We had Section 10 permitting from the

9   Army Corps of Engineers Mobile District and the

10   MPDS permits from the EPA out of Atlanta.

11          Q.   Any others?

12          A.   Well, there was some other permits

13   that we'd have to obtain as far as the vessels

14   that would be involved and the operations,

15   et cetera, but nothing of any major consequence.

16          Q.   Those additional permits might be

17   required by th US Coast Guard?

18          A.   The Coast Guard had already addressed

19   the permit and those concerns were addressed.

20          Q.   And as of April of 2010, when did the

21   US Army Corps of Engineers and EPA permits expire?

22          A.   2013.

23          Q.   Did BioMarine or Gulf Marine attempt

24   to amend or extend those permits?

25          A.   We did extend it.

1               J. ERICSSON - 2/18/2021

2        Q.   So what is the current expiration date

3   of those two permits?  Let's start with the Army

4   Corps of Engineer permit.  When does that expire?

5        A.   I can't give you an exact month, but I

6   believe it's 2018.

7        Q.   Okay.  Given it's 2021, is it -- is

8   that permit now expired today?

9        A.   Yes.

10       Q.   Okay.  How about the EPA permit?  Was

11  it extended past 2013?

12       A.   I believe it was, yes.

13       Q.   Do you know when it was extended to?

14       A.   Same period as the Army Corps permit,

15  in 2018.

16       Q.   Was the EPA permit extended past 2018?

17       A.   No.

18       Q.   So as we sit here today, does either

19  BioMarine or Gulf Marine have permits to operate

20  the FlorAbama site from the U.S. Army Corps of

21  Engineers or the EPA?

22       A.   It does not.  It does not.

23       Q.   I'll show you what I've marked as

24  Exhibit 16.

25

1                J. ERICSSON - 2/18/2021

2   until BMTI/GMIT commits to EFP procedures.

3   Response:  Pursuant to Code 50 of the Federal

4   Register (50 CFR, Chapter 6-1, October 2002

5   edition), by 23 February 2004 letter, BMTI/GMIT

6   made official application for EFP."

7          Did I read that correctly,

8   Mr. Ericsson?

9       A.    Looks correct to me.

10      Q.    Did BioMarine and Gulf Marine file an

11  application for an EFP on or about February 23rd,

12  2004?

13      A.    I don't recall the date.  I believe

14  you looked at that earlier.

15      Q.    We looked at a filing that was made in

16  2008 earlier.  So my question is, do you recall

17  that a EFP was also filed in February of 2004, as

18  indicated here in the Army Corps of Engineer

19  document?

20      A.    I don't recall one.

21      Q.    Mr. Ericsson, was that application for

22  EFP rejected in 2004; do you know?

23      A.    I don't recall filing one.

24      Q.    Why did BioMarine or Gulf Marine, if

25  you know, file an EFP in 2004?

1                    J. ERICSSON - 2/18/2021

2    that contaminated the region.

3         Q.   Because you didn't commence to attempt

4    any operations, we would have to speculate as to

5    what the regulator would have done?

6         A.   Correct.

7         Q.   From a marketing standpoint, what do

8    you mean by marketing speaking, with respect to

9    starting --

10        A.   Well, the public perception -- the

11   public perception of fish taken within the area of

12   this devastated part of the Gulf was they didn't

13   want to eat the fish.  They were concerned about

14   what was in the fish and the market for finfish in

15   the area substantially collapsed.

16        Q.   What about that, what you just said,

17   had any impact on BioMarine and Gulf Marine?

18        A.   I don't understand the question.

19        Q.   Sure.  Well, as of -- from April of

20   2010 until today, neither BioMarine nor Gulf

21   Marine ever offered a -- any type of fish to the

22   public for consumption, correct?

23        A.   No, we have not.

24        Q.   So public perceptions about fish in

25   the Gulf of Mexico, given that you were not

1                    J. ERICSSON - 2/18/2021

2    selling any fish, how did that impact BioMarine

3    and Gulf Marine?

4         A.   Well, because we're aware what

5    happened to the fish markets after the blowout.

6    We know what happened to the very fish that were

7    being sold or had been sold in the fish markets in

8    our area and other areas.

9         Q.   Neither BioMarine nor Gulf Marine was

10   a fish market or sold fish after April 2010,

11   correct?

12        A.   Correct, but that doesn't keep me from

13   knowing what happened with the fish market.

14        Q.   My question is a little more specific,

15   Mr. Ericsson.  How did people's perception about

16   Gulf of Mexico fish hurt BioMarine or Gulf Marine

17   after April of 2010?

18        A.   Why would you want to take, as a

19   businessman, the risk of raising fish in a

20   contaminated area that the public wasn't buying

21   because of their concerns?

22        Q.   So did you, Mr. Ericsson, decide after

23   April 2010, to not take the risk of pursuing the

24   business at the FlorAbama site?

25        A.   Like I said, we looked at

1                J. ERICSSON - 2/18/2021

2    reestablishing the project and went forward in two

3    thousand -- early 2010 before the spill, to update

4    our offering memoranda to raise capital to launch

5    the project.  That was immediately before the

6    spill.  After the spill, we did not pursue any --

7    pursue it any further for some years.

8         Q.   For how long after April 2010 did you

9    not pursue the Florida-Alabama aquaculture

10   project?

11        A.   Well, after two or three years of

12   concerns in the marketplace and all the other

13   information that was being brought forward by the

14   scientific community of what the impact was to the

15   environmental conditions within our site and in

16   that perimeter, we were very concerned that the

17   long-term effects of the BP blowout would be

18   within our area of our fish farm as well as all

19   over the high-impact zones that that spill

20   infected -- or affected.

21        Q.   Okay.  Other than causing you to not

22   pursue further the business opportunity, what

23   direct impact on BioMarine or Gulf Marine, what

24   was the direct impact on the entities from this

25   perception about the Gulf of Mexico?  Do you

1              J. ERICSSON - 2/18/2021

2   understand my question?

3        A.   There were -- there's a number of

4   factors that went into deciding whether or not to

5   pursue after the blowout.  The market for the fish

6   that we were going to be growing under our permits

7   was certainly devastated for some time after the

8   blowout.  There are other factors that -- on a

9   business sense that affected the viability of

10  going forward.

11       Q.   Mr. Ericsson, can you identify for me

12  any nonrelated party to BioMarine or Gulf Marine

13  that told you they were no longer willing to do

14  business with BioMarine or Gulf Marine because of

15  the oil spill?

16       A.   Nonrelated party that told you that

17  they were no longer going to do business -- there

18  were parties that were involved in our project

19  that were not interested in doing things related

20  to our business going forward because of the oil

21  spill.

22       Q.   Can you identify them?

23       A.   Certainly.  Our product liability

24  insurance policy quotes, from various sources,

25  said that they were not interested in insuring the

```
 1                  J. ERICSSON - 2/18/2021

 2    crop or the equipment involved in an area highly

 3    impacted by the spill.

 4         Q.   Did BioMarine or Gulf Marine spend any

 5    money on product liability insurance after April

 6    of 2010?

 7         A.   There wasn't any product to get

 8    liability insurance for.  You don't get product

 9    liability insurance until you have a product, a

10    fish in the nets growing.

11         Q.   Can you identify by name a product

12    liability insurer who said they were no longer

13    interested in providing product liability

14    insurance because of --

15         A.   I can give you the name of the -- a

16    major company that was -- would not go forward

17    with insuring the project.  That was the Hartford

18    Insurance Company, and a policy outline of that

19    proposed insurance is in the records that you

20    have.

21         Q.   Anyone else other than Hartford?

22         A.   We checked with some other companies

23    that -- about the general issue of getting product

24    liability insurance on fish harvested and being

25    sold when they were going to be sold in the
```

1                J. ERICSSON - 2/18/2021

2   future.  There was an indication that they would

3   not be interested until the environmental issues

4   be resolved.

5        Q.   Is the risk of an oil spill in the

6   Gulf of Mexico a known risk to an aquaculture

7   operation that is in the Gulf of Mexico?

8        A.   Yes.  It's one of the items that's

9   covered under our proposed policy with Hartford

10  Insurance Company.  They discussed that in the

11  terms of the policy.

12       Q.   But in terms of out-of-pocket expenses

13  to either BioMarine or Gulf Marine, there was no

14  out-of-pocket expense increase to BioMarine or

15  Gulf Marine because of the proposed increase in a

16  potential product liability policy.  Fair?  You

17  never spent any money on a policy after

18  April 2010, correct?

19       A.   We did not.  We got quotes from the

20  company and they were ready to put it in force

21  when we were ready to start the project.

22       Q.   I'm marking as Exhibit 18 the next

23  exhibit.

24            (Deposition Exhibit 18 marked for

25  identification.)

1                J. ERICSSON - 2/18/2021

2   BY MR. REGAN:

3        Q.   I'm sharing an exhibit marked as

4   Exhibit 18, which is -- starts with Bates number

5   BIOM-GMIT 2776.  It's dated EVW draft 5/15/08 with

6   a title Techs Loanstar, Incorporated.  Do you

7   recognize this, Mr. Ericsson?

8        A.   Yes.

9        Q.   What is it?

10        A.   It's a draft of an offering memoranda

11   that was being prepared by Eaton & Van Winkle in

12   New York City, our securities law firm.

13        Q.   Was this private placement memorandum,

14   or PPM, ever actually issued to potential

15   investors?

16        A.   No.

17        Q.   And whose decision was it to not issue

18   the PPM?

19        A.   Well, you mean not to complete the

20   PPM.

21        Q.   Let me ask a more clear question.

22   Were potential investors ever provided with

23   this -- what we see here as Exhibit 18, this PPM?

24        A.   I'm not aware of whether that was done

25   or not by Eaton & Van Winkle and the team that was

1                J. ERICSSON - 2/18/2021

2    involved in placing it.  There was an investment

3    banking firm also involved with this transaction.

4         Q.   There is -- if we go to page 2 of

5    Exhibit 18, it says that, "We have entered into a

6    Placement Agent Agreement dated as of May, blank,

7    2008, with Arjent Services, LLC (the 'Placement

8    Agent')."

9              Do you see that?

10        A.   Yes.

11        Q.   Who is Arjent?

12        A.   They're an investment banking firm in

13   New York City.

14        Q.   Was there a specific person that you

15   were working with at Arjent?

16        A.   At Arjent.  Yes.  Well, we dealt with

17   several people at Arjent, but, yes, we had contact

18   persons.  I was primarily involved with

19   corresponding with Eaton & Van Winkle, the law

20   firm, who basically set up the Arjent Services

21   agreement.

22        Q.   Okay.  If we go to page 5, it's true

23   that the PPM notified potential investors, in that

24   no investment should be made by any person who is

25   not in a position to lose the entire amounts of

1            J. ERICSSON - 2/18/2021

2   such investment, correct?

3        A.   Yes.

4        Q.   And the PPM included risk factors for

5   the investment, correct?

6        A.   Correct.

7        Q.   And you -- the PPM directed investors

8   to carefully review those risk factors, correct?

9        A.   Yes.

10        Q.   Go to that.  First let me go to

11   page 9.  There's a paragraph on Use of Proceeds.

12   Do you see that, Mr. Ericsson?

13        A.   Well, can you move it to the left

14   some, please?  There we go.

15        Q.   So as of May of 2008, it's correct

16   that neither BioMarine or Gulf Marine had a

17   leasehold for a docking facility and hatchery

18   building, correct?

19        A.   We had not leased any property for a

20   hatchery in Alabama.

21        Q.   Okay.  Also under Use of Proceeds, it

22   says, "to repay Excalibur and Fountainhead."

23   Who's that?

24        A.   That is another investment banking

25   firm in Europe that was involved in this project

```
1                    J. ERICSSON - 2/18/2021

2    to raise capital for -- that was the subject

3    matter of this offering.

4        Q.    I think we established this morning,

5    we're not aware of any investors who signed

6    commitments with respect to this private placement

7    offering in 2008, correct?

8        A.    That is correct.  It was deferred

9    until -- because of the economic events that

10   occurred late in 2008 through 2009 and into 2010.

11       Q.    The decisions to defer it in 2008 and

12   2009 had nothing to do with the BP oil spill,

13   correct?

14       A.    That's correct.

15       Q.    Are you familiar with the risk factors

16   that are set forth in this private placement

17   memorandum, Mr. Ericsson?

18       A.    Vaguely.  It was all part of a very

19   lengthy document.

20       Q.    Okay.  Do you see here on page 14

21   under Risks Relating to BioMarine, it says,

22   "BioMarine has a limited operating experience and

23   a history of net losses and may never achieve or

24   maintain profitability"?

25              Do you see that?
```

1                   J. ERICSSON - 2/18/2021

2          A.    I see that.

3          Q.    And that was one of the risks to

4    potential investors, correct?

5          A.    Well, the lists are described below.

6          Q.    The private placement memorandum,

7    Exhibit 18, describes a series of risks to

8    potential investors, correct?

9          A.    Right.

10         Q.    And one of the risks --

11         A.    That's the heading, but other items

12   are below.

13         Q.    And one of the risks as set forth in

14   this document in 2008 was that BioMarine had a --

15   has a limited operating experience and a history

16   of net losses and may never achieve or maintain

17   profitability, correct?

18         A.    That's correct.

19         Q.    Go to page 15 of Exhibit 18.  There's

20   a title, "BioMarine's financial projections may

21   not predict our future results."  Do you see that?

22         A.    Yes.

23         Q.    The financial projections that are in

24   this PPM, those are the same financial projections

25   that you see in BioMarine and Gulf Marine's

1          J. ERICSSON - 2/18/2021

2   damages claim in this lawsuit, correct?

3       A.   I can't tell you.

4       Q.   The next heading says, "BioMarine's

5   limited operating history makes evaluation of its

6   business difficult."

7            Is that one of the risks?

8       A.   Says so.

9       Q.   Do you agree with that, that was a

10  risk of an investment in BioMarine?

11      A.   Do you want me to say yes or no or do

12  you want me to give you an encapsulated

13  interpretation?

14      Q.   Just ask -- just answer my question.

15  That's all I need.

16      A.   All of these matters that are

17  disclosed in this offering memoranda are created

18  by the securities firm, Eaton & Van Winkle, which

19  are typically used in any business raising new

20  capital, in New York City and elsewhere.  The

21  financial -- the audited financials were reviewed,

22  the status of the business was determined and the

23  forward-looking projections of our success are all

24  those types of factors that go into evaluating an

25  investment to which Eaton & Van Winkle wanted to

1                        J. ERICSSON - 2/18/2021

2      bring out so that the investors can't say we

3      didn't give them full disclosure.

4           Q.   And, Mr. Ericsson, the disclosure that

5      you're providing, you're intending it to be an

6      accurate disclosure, correct?

7           A.   I believe that was Eaton &

8      Van Winkle's intent.

9           Q.   Right.  Under the section headed

10     "BioMarine's limited operating history," it says,

11     "As a young company operating in an unproven

12     market, we face risks and uncertainties relating

13     to our ability to implement our business plan

14     successfully."

15               Did I read that correctly?

16          A.   Yes.

17          Q.   And that was a true statement,

18     correct?

19          A.   It is with every new start-up company.

20          Q.   That is a true statement with respect

21     to BioMarine, correct?

22          A.   It is, and it's also said in just

23     about every start-up company that ever raised

24     capital.

25          Q.   The next heading says, "To date

1              J. ERICSSON - 2/18/2021

2   BioMarine has not developed product candidates on

3   a commercially marketable scale."

4              Do you see that?

5        A.   Yes.

6        Q.   Is that a true statement?

7        A.   In part, but not in total.

8        Q.   What part of that statement is not

9   true?

10       A.   We had developed the candidate

11  species, but not on a commercial marketable scale.

12  That doesn't happen until we put them in the cages

13  and sell them.

14       Q.   The last sentence of that first

15  paragraph says, "Even if we successfully develop

16  finfish product candidates for commercial

17  distribution, BioMarine's product may not be

18  accepted by the marketplace, or we may not be

19  capable of selling BioMarine's product at prices

20  that will enable us to become profitable."

21              Is that a true statement?

22       A.   Again, it's an unknown risk -- it's an

23  unknown risk factor that's disclosed in most young

24  start-up companies.

25       Q.   And so the -- it is unknown whether or

1                     J. ERICSSON - 2/18/2021

2    not BioMarine, if it actually did develop finfish

3    product candidates for commerce, it's unknown if

4    those products would be accepted by the

5    marketplace, correct?

6         A.    That's true.  It's hard to predict the

7    future.

8         Q.    Right.  And we'd be speculating to say

9    that BioMarine would develop finfish products that

10   absolutely would be accepted by the marketplace?

11             MR. KRELLER:  Object to the form of

12   your question.

13             You can answer to the extent you can.

14        A.    Restate the question.

15   BY MR. REGAN:

16        Q.    It would be speculating to say that

17   BioMarine's product would absolutely without a

18   doubt be accepted by the marketplace; that's an

19   unknown thing, correct?

20        A.    Well, just like the blowout was

21   unknown.  If we had been in business, the blowout

22   would have affected our saleability of our seafood

23   products.

24        Q.    Mr. Ericsson, it is speculative as to

25   whether BioMarine's product would be accepted by

1                   J. ERICSSON - 2/18/2021

2     the marketplace once it was developed, correct?

3          A.   Again, all market information that we

4     had on our species of fish indicates it had a

5     strong market for our product.  Again, the Eaton &

6     Van Winkle people put these caveats in there to

7     make sure that the investors are aware of any and

8     all potential risks after they have invested, so

9     that there's no cause to come back on the company

10    for not fully disclosing the risk factors.

11         Q.   Mr. Ericsson, a risk factor for

12    BioMarine would be, even if it developed products

13    for commercial distribution, those products may

14    not be accepted in the marketplace, correct?

15         A.   I'm not going to agree or deny your

16    summary.

17         Q.   Is the risk factor in the PPM here at

18    page 15 of Exhibit 18, is it accurate?

19         A.   Again, I gave you an answer.  I'm not

20    going to agree or disagree with what your summary

21    is.

22         Q.   For purposes of your damages

23    calculation in this case, do you assume that

24    BioMarine's product is accepted by the

25    marketplace?

1              J. ERICSSON - 2/18/2021

2              MR. KRELLER:  Object to the form of

3      the question.  What damages model are you

4      referring to?

5      BY MR. REGAN:

6         Q.   Let me ask it this way.  Mr. Ericsson,

7      for purposes of the damages you're claiming from

8      BP, those are based on a business plan, correct?

9         A.   Business projections, yes.

10        Q.   And the business projections that

11     underlie that claim, they assume that BioMarine's

12     product is accepted by and sold to the

13     marketplace, correct?

14        A.   Yes, that's logical.

15        Q.   But there's a risk that the product

16     actually would not be accepted by the marketplace,

17     correct?

18        A.   There's a risk of everything that

19     could possibly happen, and these attorneys try to

20     cover all of those.

21        Q.   Next heading says, "Failure to

22     successfully farm, market, and sell BioMarine's

23     products will have a material adverse effect on

24     our business, financial condition, and results of

25     operations."

1                    J. ERICSSON - 2/18/2021

2              Did I read that correctly?

3        A.   Yes.

4        Q.   And was that a risk with respect to

5    any investment in BioMarine?

6        A.   It's appropriate, again, for anyone

7    involved in sea farming or seafood products.

8        Q.   Including BioMarine?

9        A.   Including BioMarine.

10       Q.   Next risk factor says, "Market

11   acceptance of BioMarine's products is uncertain."

12   This is page 16 of Exhibit 18.  Do you see that at

13   the top of the page?

14       A.   Yes.

15       Q.   Is that a true statement?

16       A.   Can anybody predict the future?

17       Q.   Well, Mr. Ericsson, can BioMarine

18   predict the future?

19       A.   Can anybody predict the future,

20   whether it's in seafood or anything else?

21       Q.   Just to be clear, Mr. Ericsson, we can

22   agree that it is speculative as to whether or not

23   BioMarine's products would be accepted by the

24   market if they were developed?

25              MR. KRELLER:  I'm going to object to

1                    J. ERICSSON - 2/18/2021

2   the form of the question and your frivolous use of

3   the term "speculative" in relation to all of these

4   questions, Matt.  Do you have a specific question

5   or are you going to belabor this draft document

6   and we're going to read through the whole thing?

7   BY MR. REGAN:

8        Q.   Do you remember my question,

9   Mr. Ericsson?

10       A.   Rephrase it again.

11            MR. KRELLER:  He can rephrase it if

12   you don't understand it every time.

13   BY MR. REGAN:

14       Q.   Do you agree that market acceptance of

15   BioMarine's products in the future once they would

16   be developed is speculative?

17       A.   I would agree, but I would caveat that

18   response around the fact that these risk factors

19   are written by the securities law firm in New York

20   City to ensure that the investors have been given

21   all the potential risks associated with investing

22   in BioMarine, whether or not they happen or not.

23       Q.   The next risk factor says, "Because

24   BioMarine has no farming experience for

25   commercial-scale quantities, we may be unable to

1                    J. ERICSSON - 2/18/2021

2    control the availability of BioMarine's products."

3            Do you see that?

4        A.   Yes.

5        Q.   And is it a true statement that

6    BioMarine had no farming experience for

7    commercial-scale quantities?

8        A.   That is -- that is correct.

9        Q.   On page 17 of Exhibit 18 it says, "We

10   have no sales and marketing experience and any

11   failure to expand sales of BioMarine's products

12   will negatively impact future sales."

13           Do you see that?

14       A.   Yes.

15       Q.   Was it correct that as of May of 2008,

16   BioMarine had no sales and marketing experience?

17       A.   That's not true.

18       Q.   The first sentence under there says,

19   "Although BioMarine has secured consultants and

20   personnel with substantial experience in seafood

21   marketing and operations, we have no experience in

22   marketing, sales, and distribution of BioMarine's

23   finfish product candidates on a commercial scale."

24           Do you see where I am?

25       A.   Yes.

1              J. ERICSSON - 2/18/2021

2       A.   No, I did not acquire it.  We did not

3  acquire it.

4       Q.   Last sentence says, "We plan to

5  construct an onshore hatchery/nursery facility

6  that will provide the fingerling we need beginning

7  in the second year of operations."

8            Did BioMarine have any rights to any

9  land or facility to conduct those operations?

10      A.   We did not own any at the time.

11  However, we did meet with various parties in

12  Orange Beach, Alabama, to do a bond issue for

13  10 million and build the hatchery there.

14      Q.   Are you familiar with the concept of

15  forward-looking statements, Mr. Ericsson?

16      A.   Yes.

17      Q.   And the PPM has a page here, page 7,

18  with a Cautionary Statement Regarding

19  Forward-Looking Statements.  Do you see that?

20      A.   Yes.

21      Q.   In this paragraph, the second full

22  paragraph, it says, "In addition to the items

23  described 'Risk Factors,' many important factors

24  affect the ability to achieve our stated

25  objectives and to successfully develop and

1              J. ERICSSON - 2/18/2021

2   commercialize any of our finfish product

3   candidates, including, among other things, the

4   ability to obtain substantial additional funds,

5   demonstrate proof of concept at each stage of

6   development, to meet applicable regulatory

7   standards, to be capable of producing and

8   distributing finfish products in commercial

9   quantities at reasonable costs, to compete

10  successfully against competitors and to market

11  products in a profitable manner."

12          Did I read that correctly?

13     A.   Yes.

14     Q.   Are those true statements?

15     A.   Risk factors are there to mention any

16  and all things that could negatively affect the

17  outcome of an investment made by an investor, so

18  that they cannot come back and say that we did not

19  fully disclose the risk factors that were

20  encountered.

21     Q.   Was this reverse offering plan still

22  in place as of April of 2010?

23     A.   No.

24     Q.   The cancellation or withdrawal of this

25  offering, that was not due to the oil spill,

1                    J. ERICSSON - 2/18/2021

2    private placement?

3         A.   I don't recall.

4         Q.   And it's correct that since

5    April 20th, 2010, BioMarine has not prepared any

6    new private placement memorandum or offering,

7    correct?

8         A.   Well, we were engaged in 2010, as I

9    said before, in resurrecting the project.  I

10   believe that was in February and March, with

11   BioMarine and GMIT's bond issue.

12        Q.   After April 20th, 2010, did BioMarine

13   prepare or issue any form of private placement

14   memorandum or other type of offering?

15        A.   I mean, we were preparing an offering

16   memoranda prior to the spill, in the months

17   preceding the spill.

18        Q.   I understand, Mr. Ericsson, I'm asking

19   about --

20        A.   Afterwards, we were still involved in

21   preparing a memoranda up and through and past the

22   oil spill.  The oil spill pretty much stopped us

23   in place from doing anything further with any of

24   the prior investment banking firms that we were

25   working with.

1                    J. ERICSSON - 2/18/2021

2          Q.    Okay.  I'm just trying to make clear.

3    Were you actually meeting with and having

4    discussions with investment banking firms after

5    April 20th, 2010?

6          A.    No, there was no point in it.

7          Q.    And that's true from April 20th, 2010,

8    to today, correct?

9          A.    No, I wouldn't say that.

10         Q.    Okay.  At what point did you start to

11   have engagement with investment banking firms

12   after April 20th, 2010?

13         A.    At what point, in time?

14         Q.    Yes.

15         A.    I had conversations with people at

16   Heartstream.

17         Q.    Okay.  Any other institutions?

18         A.    They were the major one.

19         Q.    Did you direct Heartstream to go

20   solicit potential investors after April 20th,

21   2010?

22         A.    I did not.  I could not because the

23   blowout had damaged the marine environment to the

24   point that it was not logical to start any

25   commercial operations there.

1                J. ERICSSON - 2/18/2021

2        Q.    And that conclusion that you just

3    expressed, that was your opinion, correct, that it

4    was not logical to --

5        A.    It was not just my opinion.  It was

6    the opinion of other people, that these

7    environmental issues were something to be very

8    concerned about going forward.

9        Q.    Can you identify anyone at Heartstream

10   who expressed that opinion to you?

11       A.    I expressed that opinion to

12   Heartstream.

13       Q.    I understand that.  What I'm asking

14   for is can you identify anyone at Heartstream or

15   frankly any investment firm, who told you that

16   they did not believe that an investment in the

17   Gulf of Mexico made sense because of the spill?

18       A.    I don't recall any.

19       Q.    Has BioMarine or Gulf Marine paid

20   money to Heartstream, compensation?

21       A.    No.

22       Q.    So how was Heartstream to be

23   compensated for its work on BioMarine or Gulf

24   Marine's behalf?

25       A.    The engagement agreement specified

1              J. ERICSSON - 2/18/2021

2         A.    I believe that it showed the revised

3    version without the platform.

4         Q.    Do you know for certain?

5         A.    I would have to look at the offering

6    memoranda that they provided to I believe you as

7    well, a copy of to be able to tell you that.

8         Q.    It's correct that no investor

9    approached by Merit or Heartstream ever executed a

10   binding commitment to invest in BioMarine or Gulf

11   Marine, correct?  Is that true?

12        A.    Your terminology is not within the

13   normal scope of terminology used by investment

14   bankers.  They secured letters or commitments of

15   interest and/or to go forward.  I believe there

16   was over 400 contacts made by them.  There were 41

17   that gave them affirmative statements of interest

18   and I believe there was a dozen of those 41 that

19   were ready, more or less, to write a check.

20        Q.    Mr. Ericsson, were you involved in the

21   interactions with any of those 41 entities that

22   you just described?

23        A.    No.

24        Q.    So what you've just relayed is

25   something that was relayed to you by another

1              J. ERICSSON - 2/18/2021

2  person?

3        A.   This was relayed to me by George

4  Hersbach, who was placing the offering.

5        Q.   Right.  So whether any investor was,

6  "ready to write a check," he would have been the

7  person in that conversation, not you, correct?

8        A.   I believe his letter specified clearly

9  what they were ready to do.

10        Q.   But you never had an investor tell you

11  they were ready to write you a check, did you?

12        A.   I did not engage directly with

13  investors of Mr. Hersbach.  They were his clients,

14  his relationships, not mine.

15        Q.   And after April 20, 2010, did any

16  investor approached by Mr. Hersbach write a check

17  to Gulf Marine or BioMarine?

18        A.   No, they did not.  I might also say

19  that had they, it would have been fully disclosed

20  in the event of the blowout and how that maybe

21  would affect our business, just like the risk

22  factors that were disclosed in the previous

23  document of your interest.

24        Q.   How many investors approached by

25  Heartstream told them they did not want to invest

1                  J. ERICSSON - 2/18/2021

2    because of the great recession; do you know?

3         A.    I didn't have any direct

4    correspondence regarding that subject.

5         Q.    The great recession is something

6    that's independent of the oil spill, correct?

7         A.    Obviously.

8         Q.    I've added to the chat what I've

9    marked as Exhibit 19.

10                  (Deposition Exhibit 19 marked for

11   identification.)

12   BY MR. REGAN:

13        Q.    Which is an Economic Loss Report for

14   BioMarine Technologies and Gulf Marine Institute

15   of Technology, prepared by Emilio Giralt.  I

16   believe it's dated April of 2019.  Have you seen

17   this report before, Mr. Ericsson?

18        A.    Yes.

19        Q.    You were interviewed by Mr. Giralt in

20   connection with the work done for this report,

21   correct?

22        A.    Yes.

23        Q.    Okay.  Turn to page 3 of Exhibit 19.

24   Do you see a paragraph that starts "In 2008"?

25        A.    Yes.

1          J. ERICSSON - 2/18/2021

2          MR. KRELLER:  Again, object to the

3   form of the question.

4               To the extent you can answer that

5   question, you may.

6      A.   I'm not an international expert in the

7   legal nuances of other countries that do sea

8   farming.  I do know that these operations are in

9   existence, have been for 25, 30 years, and will

10  probably be growing and continuing for the next

11  50 years.

12  BY MR. REGAN:

13     Q.   Let me show you Exhibit 1.  As we

14  established earlier, you said, "The exhaustive

15  permitting process" -- in Exhibit 1.  "The

16  exhaustive permitting process with state and

17  federal agencies and the lack of interest by other

18  established foreign seafood producers to enter the

19  heavily litigious US business world makes

20  investment in Gulf of Mexico fish farming

21  speculative."

22              Those are your words, correct?

23     A.   It's accurate.

24     Q.   And your 250 to $500,000 per acre

25  estimate, that takes into account the heavily

1            J. ERICSSON - 2/18/2021

2   litigious US business world?

3        A.   It takes those risks into

4   consideration.

5        Q.   Does their 250 to 500,000 per acre

6   estimate take into consideration the speculative

7   nature of investment in Gulf of Mexico fish

8   farming?

9        A.   Once you acquire the permits from the

10  state and federal agencies, it's fait accompli.

11  However, getting there is not always a very easy

12  task and can take years of work and effort with

13  the federal agencies to obtain those permits.

14       Q.   Mr. Ericsson --

15       A.   Once you have obtained those permits,

16  then it is not such a risk.

17       Q.   Okay.  Mr. Ericsson, did you say then,

18  "The US legal system can strike down any existing

19  or proposed fish farming operation by some

20  unfriendly person or organization filing a

21  lawsuit"?

22            Those are your words, right?

23       A.   That can occur.

24       Q.   So the system could strike down even,

25  as you just said, a permitted operation, correct?

1              J. ERICSSON - 2/18/2021

2        A.    Anything can happen within the US

3   legal system.

4        Q.    Right.  And what did you do in coming

5   up with your estimate to compare the US legal

6   system with the systems under which these other

7   international operations did business?

8        A.    Well, the way the international

9   companies do business is they go through the

10   permitting process, just as we do, and they get

11   the permits and the approvals of the various folks

12   that's necessary to say press on.  Hopefully by --

13   in the process of doing that, you appease any

14   concerns that anyone has who would object to you

15   doing it after you started doing it.

16        Q.    In the next paragraph on page 3 of

17   Exhibit 19, it says, "Additional funds were to be

18   available for the startup and operation of the

19   venture and to cover cash flow deficiencies and

20   losses in Year 1.  These funds would come from two

21   sources:  a), a USD $10 million credit facility

22   provided by Eksportfinans of Norway, and b)

23   additional Equity in an equivalent amount, USD

24   10-20 million from two U S investment Banks in

25   Europe and NYC."

Page 187

1                J. ERICSSON - 2/18/2021

2    to Mr. Lee, correct?

3         A.    That is not what happened in reality.

4         Q.    Just for clarity, Mr. Ericsson, can

5    you -- do we agree that in the settlement

6    agreement with Mr. Lee, the Marie Hall was

7    assigned to him?

8         A.    In the agreement it says that, but

9    that's not what happened.

10        Q.    Okay.  The Marie Hall, was that

11   actually a vessel that was seaworthy?

12        A.    Yes, it was.

13        Q.    You had litigation about that vessel,

14   did you not, in 2013?

15        A.    Yes.  We sent it in to have additional

16   repairs made on it, we got into a controversy,

17   that is correct.  But we owned it and we were

18   having it -- had already made tens of thousands of

19   repairs and were having the hull further repaired.

20        Q.    Where is the vessel today?

21        A.    We gave title to the vessel to the

22   yard in settlement of the litigation.

23        Q.    When did you give title of the vessel

24   to the yard?

25        A.    I can't give you the exact date.

1                    J. ERICSSON - 2/18/2021

2          Q.    Approximately 2013 time frame?

3          A.    That's probably correct.  It was after

4     the spill.

5          Q.    Do you have a value that you would put

6     on the Marie Hall?

7          A.    Well, we have what -- we know what it

8     costs initially, but in the current state it was

9     in, somewhere between 50 and $100,000 replacement

10    value.

11         Q.    How about the GMIT Hobgood here in

12    No. 3?  Was that vessel seaworthy?

13         A.    Yes, it was.

14         Q.    Do you have a value with respect to

15    that vessel?

16         A.    I don't recall.  It was -- it was

17    donated to GMIT.

18         Q.    And it was donated to GMIT in the 2000

19    time period?

20         A.    In the -- I don't recall exactly the

21    date that that occurred.

22         Q.    Where did BioMarine or GMIT obtain the

23    Guppybaby 32-foot boat?

24         A.    It was bought at auction and rebuilt.

25         Q.    Do you have a value on that vessel?

1                    J. ERICSSON - 2/18/2021

2          A.    Well, it cost $250,000 new and after

3    we rebuilt it, it was probably worth 75,000 or so.

4          Q.    What was the auction price?

5          A.    Well, it had been victimized by a

6    hurricane that occurred, and I think we paid

7    $20,000 for it.  We spent another $50,000

8    rehabbing it.

9          Q.    The five Bridgestone sea cage systems,

10   those are the nonsubmersible cages, correct?

11         A.    That's correct.

12         Q.    Okay.  Again, I'm looking at the

13   section on page 8 of Exhibit 19, Conclusions as to

14   Feasibility.  First bullet says, "The BIOM/GMIT

15   endeavor was not yet operational at the time of

16   the event yet it had acquired or developed a

17   strong base of capabilities from which to proceed

18   to a phase that would permit the initial

19   commercial startup, footnote 15."

20              And the source listed for that is you;

21   is that correct?

22         A.    That's accurate.

23         Q.    I highlighted -- it's -- footnote 15,

24   interview with Mr. Ericsson, April 2nd, 2019.  Do

25   you recall giving an interview to the expert?

1                    J. ERICSSON - 2/18/2021

2         Q.   Is the research lab a separate

3    physical building than your domicile?

4         A.   Yes, it is.

5         Q.   What's the square footage of the

6    research facility at 3881 Paradise Bay Drive?

7              THE WITNESS:  I need to calculate --

8              MR. KRELLER:  You need a piece of

9    paper?

10             THE WITNESS:  Yes.  What's 35 by 16?

11             MR. KRELLER:  You can just describe it

12   to him.

13        A.   One facility is 35 by 16 and the other

14   one is 20 by 12 or 14.

15   BY MR. REGAN:

16        Q.   Are those like metal buildings or

17   garages?

18        A.   One's a metal building, the other one

19   is a greenhouse.

20        Q.   And were they exclusively used by Gulf

21   Marine?

22        A.   Well, no, they were shared.

23        Q.   Earlier today you told me that there

24   was a facility in Gulf Breeze owned by Gulf Marine

25   for the raising of -- for research and development

1              J. ERICSSON - 2/18/2021

2  purposes in the raising of fingerlings.  Do you

3  recall that testimony?

4        A.   Yes.

5        Q.   Where is that facility located?

6        A.   That was located at 20 Daniel Drive in

7  Gulf Breeze.

8        Q.   Okay.  It's not -- it's not there

9  anymore, is it?

10        A.   No, it's not.

11        Q.   When did it -- when did that facility

12  close?

13        A.   2005.

14        Q.   That location is currently like a

15  Kentucky Fried Chicken or something like that,

16  right?

17        A.   It is actually the accessway into the

18  Publix shopping center, 20 Daniels Drive.

19        Q.   All right.  So the Gulf Breeze

20  location for research and development and the

21  raising of fingerlings closed in 2005, correct?

22        A.   That's correct.

23        Q.   So after 2005 for the FlorAbama

24  location, there was no research and development

25  location for nursery development?

1                      J. ERICSSON - 2/18/2021

2    20 Daniel Drive, was no longer using the research

3    facilities at UTMB, but was using the metal

4    building and greenhouse on your property; is that

5    correct?

6         A.   Yes.

7         Q.   And so for the FlorAbama project after

8    January of 2010, the metal building and greenhouse

9    on your property would have been the source for

10   research and development?

11        A.   No.

12        Q.   What other facility was available at

13   that point in time after January 2010 for research

14   and development activities?

15        A.   Other than the one I just described,

16   there was not.  We had all the equipment from the

17   cages, the feeders and et cetera in storage.  That

18   was in storage in Pensacola, Florida, all those

19   assets you had described except for the vessels.

20   The Wellcraft was stored on my property on a

21   trailer.  The research facility -- lab at 3881 was

22   constructed around 2010 and shortly thereafter the

23   blowout, because the project came to an abrupt

24   halt thanks to BP's disaster.

25        Q.   We know the oil spill happened in

Page 207

1          J. ERICSSON - 2/18/2021

2    had they?

3          A.   Yes, we had.

4          Q.   The next page is Personnel Part 1.  Do

5    you see that?

6          A.   Yes.

7          Q.   Does this describe personnel that

8    existed or personnel that would need to be hired

9    in order to conduct the FlorAbama project?

10          A.   Both.

11          Q.   Okay.  How many personnel on this

12    chart existed with BioMarine or Gulf Marine?

13          A.   Well, we had many of these same people

14    at the Galveston operations that we were planning

15    to bring over to this project.

16          Q.   And as you sit here today, you don't

17    know when you actually wrote this business plan?

18          A.   I would say it would be in the

19    confines of 2008.

20          Q.   You see on page 39 a chart titled

21    Capital Requirement?

22          A.   These are budgeted numbers, uh-huh.

23          Q.   Do you see a chart that says Total

24    Investment Costs?

25          A.   Yes.

1              J. ERICSSON - 2/18/2021

2        Q.   Year 1, Year 2 and Total, do you see

3    that?

4        A.   Yes.

5        Q.   What did your business plan have as

6    the total investment cost for the FlorAbama

7    business plan?

8        A.   Well, it's staged in sequences based

9    upon the completion of one period to another.

10       Q.   Mr. Ericsson, I'm going to ask you if

11   I read this number correctly.  Your document,

12   page 39, Capital Requirement, in the FlorAbama

13   business plan that you created, has a total

14   investment cost after two years of $24,541,194,

15   correct?

16       A.   Yes.

17       Q.   That was your estimate in this

18   business plan of the investment necessary,

19   correct?

20       A.   Well, I was part of the team that

21   created the spreadsheets.

22       Q.   And the team that created the

23   spreadsheets, including you, estimated a total

24   investment cost for two years of $24.5 million,

25   correct?

1        J. ERICSSON - 2/18/2021

2        A.   Could you squeeze it down a little

3   bit?  Because I need to see the left-hand side.

4   It is broken into equipment and working capital to

5   come up with those total numbers.

6        Q.   The team, including you, that

7   developed the investment costs for the FlorAbama

8   project estimated the two-year investment cost at

9   $24.5 million, correct?

10       A.   Correct.

11       Q.   Can you identify a company that has

12  operated a commercial aquaculture business in the

13  Gulf of Mexico?

14       A.   Redfish Hatchery Unlimited in Pass

15  Christian, Mississippi.

16       Q.   Is it in operation today?

17       A.   No.  It was hit by a hurricane.

18       Q.   Was it in federal waters or state

19  waters?

20       A.   It was on county land.

21       Q.   Right.  So let me ask it more

22  precisely, then.  Can you identify a company that

23  operated a commercial aquaculture business in the

24  federal waters of the Gulf of Mexico?

25       A.   I'm not aware of any.

1              J. ERICSSON - 2/18/2021

2  yet different because we have to deal with

3  hurricanes.

4              MR. REGAN:  Hold on one second.

5  Apologies.

6  BY MR. REGAN:

7       Q.   What did the permit obtained for the

8  FlorAbama site prior to its exploration, what did

9  that authorize BioMarine and Gulf Marine to do?

10      A.   To grow up to 5 million pounds of

11 indigenous species of marine fish.

12      Q.   It's your belief that the EPA permit

13 authorized a specific number of fish?

14      A.   Well, the Army Corps did.

15      Q.   Right.  I'm asking you about the EPA

16 permit.

17      A.   Well, the EPA basically reviewed the

18 Army Corps permit and the points of volume and

19 discharge and, et cetera, were provided to NPDS,

20 EPA so they could draft their permit being

21 consistent with the Army Corps permit.

22      Q.   The EPA permit simply identified the

23 amount of affluent that could be discharged from

24 the facility, correct?

25      A.   Not entirely.

1                   J. ERICSSON - 2/18/2021

2          Q.   Well, it designated the amount of

3    affluent and the monitoring requirements that

4    BioMarine and Gulf Marine would have to comply

5    with, correct?

6          A.   In part.  It also -- it also specified

7    the species of fish that would be grown at the

8    location.

9          Q.   Since April 20 of 2010, Mr. Ericsson,

10   have you been employed by or done work for any

11   companies other than BioMarine and Gulf Marine?

12         A.   Excuse me for a moment.  I've been

13   basically self-employed or retired.

14         Q.   So how much time have you spent on

15   activities -- since April 20th of 2010, how much

16   time have you spent on activities other than Gulf

17   Marine and BioMarine, rough justice?

18         A.   That's a bit ambiguous.  You mean of

19   my 40-hour working week, or what do you mean by

20   that if I may ask?

21         Q.   We can try in percentages.  Would you

22   say since April 20th, 2010, what percentage of

23   your time has been devoted to the business of

24   BioMarine and Gulf Marine?

25         A.   Well, in the last five years, very

Page 217

1            J. ERICSSON - 2/18/2021

2   Marine Fishery Service about it.

3        Q.   Okay.  Did BioMarine or Gulf Marine

4   ever apply for a permit from NMFS after the

5   regulations came into effect in January 2016?

6        A.   We did not.  Didn't think it was

7   essential.

8        Q.   Were any of BioMarine or Gulf Marine's

9   properties or assets physically oiled because of

10  the spill?

11       A.   No, they weren't deployed at the time

12  of the spill.  But the 27 acres was contaminated

13  by the spill, which was our permitted site by the

14  federal government.

15       Q.   Did you own the 27 acres?

16       A.   You do not own the water column in

17  federal waters.  You get permits to use it.

18       Q.   Did your permit grant BioMarine or

19  Gulf Marine a property interest in that location?

20            MR. KRELLER:  I'm going to object to

21  the form of the question to the extent that you're

22  getting into legal questions over what rights --

23  property rights he has or doesn't have.  But to

24  the extent he can answer it as a layperson, I have

25  no problem with him answering.

1                    J. ERICSSON - 2/18/2021

2        A.    The permits -- the language in the

3    permits pretty much tell you what they provide and

4    what they don't provide.

5    BY MR. REGAN:

6        Q.    Neither BioMarine or Gulf Marine was

7    engaged as a commercial fisherman at the time of

8    the oil spill in April of 2010, correct?

9        A.    We were not commercial fishermen.  We

10   were commercial sea farmers.

11       Q.    You had no --

12       A.    Engaging to do sea farming in the Gulf

13   of Mexico.

14       Q.    In April of 2010, you had no

15   commercial sea farming operations in the water,

16   correct?

17       A.    That's correct.

18       Q.    And since April of 2010, neither

19   BioMarine or Gulf Marine has had commercial sea

20   farming operations in the waters of the Gulf of

21   Mexico, correct?

22       A.    By choice.

23       Q.    You were the cause of that, correct?

24   You decided to not pursue those operations,

25   correct?

1              J. ERICSSON - 2/18/2021

2              MR. KRELLER:  Object to the form of

3    the question.

4         A.   My advisors and friends in the

5    developing mariculture industry were all concerned

6    about the spoil and the debris issues from the oil

7    spill that is involving the gulf region of our

8    permitted site and elsewhere.  So we had nothing

9    going on after the spill by choice.

10   BY MR. REGAN:

11        Q.   Do you know, Mr. Ericsson, if either

12   BioMarine or Gulf Marine is trying to allege state

13   law claims in this case?

14             MR. KRELLER:  Object to the form of

15   the question.  He's not a lawyer.

16             MR. REGAN:  I'm just asking if he

17   knows.

18        A.   I don't know what you mean by state

19   law.

20             MR. REGAN:  Why don't we take our next

21   break, if we could.

22             MR. KRELLER:  Okay.  How long do you

23   want to break?

24             MR. REGAN:  Ten-minute break would be

25   great.

1              J. ERICSSON - 2/18/2021

2    were, as you said in the correspondence, seemingly

3    ready to go.

4         Q.   Well, do you know if those 12 ever saw

5    a PPM for BioMarine?

6         A.   I'm pretty certain they did.

7         Q.   Do you know?

8         A.   Well, you'd have to ask Mr. Hersbach

9    on that.

10        Q.   And as you just testified,

11   Mr. Hersbach never told you any amounts of

12   investment from these 12 investors, correct?

13        A.   He never gave us any inkling of how

14   much was being discussed from any of these

15   investors.  Except for the amount of the offering

16   memoranda that was presented before them.

17        Q.   And this statement he makes, "By the

18   fourth quarter of 2008 due to the lack of funds,

19   BioMarine was forced to suspend temporarily its

20   activities in such a manner that operations would

21   be resumed when the funds would be available," do

22   you have any basis as to why he would say that?

23        A.   I just would have to dig down deeper

24   to try to understand what was going on at the end

25   of 2008.  It's been a long time since those days

1               J. ERICSSON - 2/18/2021

2        A.   What do you mean "do you rely on it"?

3        Q.   Is it something you intend to put

4   forth in support of your claim?

5        A.   Absolutely.

6        Q.   Do you see anywhere in the signature

7   block of Mr. Hersbach that he was making these

8   statements under oath?

9        A.   No.

10       Q.   Apologies.  I have attached what I

11  meant to mark as Exhibit 22 and I will open

12  Exhibit 22 and share it.

13               (Deposition Exhibit 22 marked for

14  identification.)

15  BY MR. REGAN:

16       Q.   Mr. Ericsson, do you recognize what

17  this is a picture of in Exhibit 22?

18       A.   Well, it looks like a condo.  It looks

19  like the one in Chicago.  I don't recall the

20  address of this particular property.

21       Q.   This is a picture from the Internet of

22  a building at the address of 5622 South Ada

23  Street, Chicago, Illinois.  Have you ever been to

24  this location, Mr. Ericsson?

25       A.   I don't recall if I've been to that

1                J. ERICSSON - 2/18/2021

2    one or -- but I have been to others.

3         Q.   This is the address of a building that

4    shows up on the statement of assets of Gulf

5    Marine, correct?

6         A.   Yes.

7         Q.   And is it your recollection that Gulf

8    Marine purchased this property in 2010?

9         A.   I believe so.

10        Q.   What was the business purpose of the

11   purchase of this property?

12        A.   It was bought at a very low cost for

13   the purposes of being rehabbed and resold.

14        Q.   Had Gulf Marine purchased real estate

15   to rehabilitate it and resell it prior to November

16   of 2010?

17        A.   I don't recall.

18        Q.   Does this building have anything to do

19   with the direct aquaculture operations at the

20   FlorAbama site?

21        A.   It has nothing to do with it.

22        Q.   Did Gulf Marine rehabilitate this

23   property?

24        A.   We didn't.  Another company did.

25        Q.   Who rehabilitated it?

1                J. ERICSSON - 2/18/2021

2        A.    I don't recall the name.  I'd have to

3   look at our past history.

4        Q.    Did Gulf Marine sell --

5        A.    Some properties -- you have to

6   realize, we revised our company purpose to the IRS

7   to include rehabilitating -- acquiring and

8   rehabilitating and providing housing in blighted

9   areas of, in this particular case, South Chicago,

10  which includes Englewood and et cetera.  These are

11  neighborhoods that have had economic as well as

12  other blights that resulted in many, many of the

13  houses in the region being abandoned.  And so our

14  plight was to help rehabilitate some of these

15  properties with the help of others and then make

16  them habitable for the neighbors to rent, lease or

17  purchase.

18       Q.    Do you recall how long it took to

19  rehabilitate this property?

20       A.    I do not.

21       Q.    Can you explain how this property

22  would have been sold for several hundred thousand

23  dollars more than it was purchased for by GMIT

24  within a year?

25       A.    That was done by -- again, we acquired

1                    J. ERICSSON - 2/18/2021

2   it initially, then we made arrangements for others

3   to take it up and rehab it and rent it, occupy it,

4   lease it and/or sell it.  That wasn't our part,

5   though.  All we did was acquire the property.  We

6   did some funding for rehabilitation, some we just

7   bought the properties and resold it to others who

8   rehabilitated the properties.

9        Q.   Were the funds that were used to

10  acquire this property for Gulf Marine, were those

11  funds from the NIH grants?

12       A.   No, I don't believe so.  There were

13  funds that we had available to us.

14       Q.   The change in purpose that you have

15  identified, that was not made until 2016, correct?

16       A.   I don't recall.

17       Q.   All right.

18            (Deposition Exhibit 23 marked for

19  identification.)

20  BY MR. REGAN:

21       Q.   Showing you what I've marked as

22  Exhibit 23.  Attempting to do it.  Which is a

23  series of documents that start on BIOM-GMIT 3719

24  through 3733, titled GMIT 2011 Return.  Do you see

25  what I've marked as Exhibit 23?

1              J. ERICSSON - 2/18/2021

2         A.   Yes.

3         Q.   I'm going to page down to page 6 of

4    Exhibit 23.  Do you see a letter with your name on

5    it dated February 15th, 2016?  Did you write this

6    letter?

7         A.   I think I did, sure.

8         Q.   So it was in February of 2016 that you

9    indicated that Gulf Marine had changed the scope

10   of its nonprofit purpose to also include the

11   rehabilitation of housing for low-income people,

12   correct?

13        A.   That's -- rehabilitation and low

14   income -- yeah, for low income -- that's correct.

15   I believe we had already filed for modification.

16   We were just talking about amending the return.

17        Q.   Other than the property on Ada Street,

18   which we looked at in Exhibit 22, and the

19   property -- one moment, the Stewart Property, were

20   there any other properties that Gulf Marine

21   acquired for this purpose of rehabilitation?

22        A.   Yeah, there were several.

23        Q.   Would we be able to see those in Gulf

24   Marine's tax returns?

25        A.   I suppose they're in there.  I didn't

Page 240

1          J. ERICSSON - 2/18/2021

1    prepare the tax returns.

3         Q.   Okay.  Let me bring back up, then,

4    Exhibit No. 4, which is previously established,

5    the 2010 tax returns for Gulf Marine.  I want to

6    direct your attention to page 14 of Exhibit 4.  Do

7    you see that on your screen?

8         A.   I see something.  I don't know if it's

9    14 or what.

10        Q.   Okay.

11        A.   Go ahead.

12        Q.   Do you see that there's a section in

13   the tax return for Public Support and there's

14   boxes for 2006 through 2010?

15        A.   Yes.

16        Q.   The dollar amounts that are listed

17   here for gifts, grants, contributions and

18   membership fees, those include the dollar amounts

19   received from the NIH grants, correct?

20        A.   Among other things.

21        Q.   So if we wanted to determine if the

22   NIH grants were the majority of grants received by

23   Gulf Marine, we could just compare the NIH grant

24   amounts to what Gulf Marine filed in its tax

25   returns, correct?