```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF LOUISIANA
 2
    In Re: Oil Spill by the    §
 3  Oil Rig "Deepwater         §    MDL NO. 2179
    Horizon" in the Gulf of    §
 4  Mexico on April 20,        §    SECTION J
    2010                       §
 5  _____   §    JUDGE BARBIER
                               §
 6  GULF MARINE INSTITUTE      §    MAGISTRATE JUDGE
    OF TECHNOLOGY AND          §    CURRAULT
 7  BIOMARINE TECHNOLOGIES,    §
    INC.                       §
 8                             §
              Plaintiffs       §
 9                             §
    VS.                        §    Case No. 13-cv-01286
10                             §
    BP EXPLORATION AND         §
11  PRODUCTION, INC., ET       §
    AL.                        §
12                             §
              Defendants       §
13  _____   §

14

15       30(B)(6) REMOTE VIDEOTAPED DEPOSITION OF

16         GULF MARINE INSTITUTE OF TECHNOLOGY

17           AND BIOMARINE TECHNOLOGIES, INC.

18    By and Through Its Designated Representative

19                JOHN D. ERICSSON

20              Gulf Breeze, Florida

21           Friday, February 19, 2021

22

23   Reported by:

24   MICHEAL A. JOHNSON, RDR, CRR

25   JOB NO. 189254
```

**EXHIBIT**

**B**

1

2                    February 19, 2021

3                    9:39 a.m. EST

4

5

6        Remote videotaped deposition of JOHN D.

7   ERICSSON, held at the location of the witness,

8   3881 Paradise Bay Drive, Gulf Breeze, Florida,

9   before Micheal A. Johnson, a Registered Diplomate

10  Reporter and Certified Realtime Reporter.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    A P P E A R A N C E S

 2            KRELLER LAW FIRM
              Attorney for Plaintiffs
 3                757 St. Charles Avenue
                  New Orleans, Louisiana 70130
 4            BY:   STEPHEN KRELLER, ESQ.

 5

 6            THE DE LA GARZA LAW GROUP
              Attorney for Plaintiffs
 7                1616 South Voss Road
                  Houston, Texas 77057
 8            BY:   MARIO DE LA GARZA, ESQ.

 9

10            KIRKLAND & ELLIS
              Attorney for Defendants
11                300 North LaSalle
                  Chicago, Illinois 60654
12            BY:   MATTHEW REGAN, ESQ.

13

14            KIRKLAND & ELLIS
              Attorney for Defendants
15                555 California Street
                  San Francisco, California 94104
16            BY:   ANNA TERTERYAN, ESQ.
                    NICOLETTE ROGER, ESQ.
17

18

19            VIDEOGRAPHER:

20                Philip Rizzuti

21

22

23

24

25
```

```
1                J. ERICSSON - 2/19/2021

2        A.    Starting back in the early '90s all

3   the way up till the spill.

4        Q.    Okay.  At the time of the spill, how

5   many hours a month were you spending -- or if it's

6   easier to do hours a day or week, how many -- how

7   much time were you spending as president and board

8   member of BioMarine?

9        A.    Intermittently, depending on what is

10  at hand, ten, 15 hours a month on BioMarine.

11       Q.    Okay.  So at the time of the spill you

12  were spending about ten or 15 hours a month on

13  BioMarine?

14       A.    Right.  That was mostly involved in

15  preparation of a new offering memoranda they were

16  putting out to raise $10 million for the project.

17       Q.    Okay.  Was there -- since the spill

18  happened -- let me see how I can formulate this.

19  Since the spill, how much time on average would

20  you say you've spent on BioMarine?

21       A.    Well, since the spill.  After the

22  spill not so much, because the blowout destroyed

23  the marine environment where we were putting the

24  sea farming cages on 27 and a half acres.  So that

25  pretty much killed our efforts to raise new
```

1         J. ERICSSON - 2/19/2021

2   capital with our broker dealers and associates

3   since the site was contaminated and we didn't know

4   for how long.  So a lot of the efforts that I was

5   previously involved in before the spill were put

6   on hold because we needed to have clarification on

7   when the waters were clean enough to do our sea

8   farming project.

9         Q.   So since April 20, 2010, through

10  present, would you say you've spent roughly

11  five hours a month on BioMarine's work?

12        A.   Well, immediately after the spill

13  there was more; and then later, not long after,

14  you know, a period of time, there was less,

15  because there wasn't really anything else to do

16  except to maintain our Army Corps and EPA permits

17  that were still in effect when the spill occurred.

18        Q.   When you say not long after there was

19  less, can you give me a more precise time period

20  when that was?

21        A.   I don't recall.

22        Q.   In 2010?

23        A.   I don't recall.  I just -- you asked

24  me what my activities were.

25        Q.   Would you say that -- when would you

1              J. ERICSSON - 2/19/2021

2    involvement was more in support of accomplishing

3    the fundraising.

4         Q.   Okay.  So prespill you were spending

5    more time on BioMarine than on GMIT?

6         A.   That's correct.  Well, I'm going to

7    say on the project.  We were doing other things

8    than that project.

9         Q.   What else were you doing with GMIT

10   other than the FlorAbama project?

11        A.   Prespill?

12        Q.   Yes.

13        A.   You said prespill?

14        Q.   Yes.

15        A.   How far back do you want to go?

16        Q.   I want to go 2010 prespill.

17        A.   How far back?

18        Q.   No, in 2010.  So January 2010 through

19   March 2010, prespill.

20        A.   We were involved in -- GMIT was the

21   business principal of a research project that had

22   been funded by the NIH, National Institute of

23   Health, that we were the managing partner on

24   during all of 2009 and leading up to the spill and

25   after.

1                    J. ERICSSON - 2/19/2021

2         Q.   And that NIH project that you're

3    referring to, that was not related to the

4    FlorAbama project?

5         A.   Yes and no.  It had two -- two

6    functions that we were working on.  One was the

7    continuing the growing of marine cephalopods for

8    medical research purposes, and the other was

9    growing our Gulf species candidates from small

10   fish to much larger fish to determine the

11   husbandry requirements for successfully growing

12   marine species at our sea farming site.

13        Q.   You weren't planning for any of

14   your -- the aquaculture projects that are at issue

15   in this case, you weren't planning on farming

16   cephalopods, right?

17        A.   That's correct.  That was a

18   function -- that was a stated function and

19   activity of the funded grant.  We did other

20   activities at, for instance, the Moody Aquarium

21   facilities in Galveston Island with thousands of

22   fingerlings growing into larger fish and feeding

23   them and testing their feed and their health and

24   growth rates and basically determining the

25   management requirements for several species we

1                    J. ERICSSON - 2/19/2021

2    fished -- we intended to stock at our sea farming

3    project called the FlorAbama.

4         Q.   When was this Moody Aquarium work that

5    you were -- that you just referred to, when were

6    you doing that work?

7         A.   When was what?

8         Q.   When were you doing the work that you

9    referred to at Moody Aquarium?

10        A.   Well, that was -- that was a later --

11   latter half.  The earlier half was done at UTMB,

12   University of Texas Medical Branch facilities on

13   Galveston Island where the NRCC laboratory had

14   been for 30 years or so.

15        Q.   Apologies.  Let me ask this a

16   different way.  During what time period were

17   you -- was GMIT working on growing fingerlings

18   into larger fish and feeding them and testing

19   them?

20        A.   2006 to 2009.

21        Q.   How was that work funded?

22        A.   Well, GMIT provided funding for parts

23   that were not funded by the NIH, and of course NIH

24   gave us a stipend every month to continue the

25   research growing these cephalopods simultaneously.

1                    J. ERICSSON - 2/19/2021

2          Q.    I want to make sure I'm clear on this.

3    The NIH grant was specifically for the cephalopod

4    research, right?

5          A.    Generally.

6          Q.    When the NIH granted you the money, it

7    was so that GMIT could do research on cephalopods;

8    is that right?

9          A.    Generally.  We were allowed leeway in

10   doing research with other marine organisms.

11         Q.    How much of the NIH funding did GMIT

12   use on research with other marine organisms?

13         A.    I can't tell you.  I don't recall.

14         Q.    If you had to give a rough percentage?

15         A.    I couldn't even give you a good

16   estimate.

17         Q.    You didn't keep track of -- GMIT

18   didn't keep track of those -- of how it was using

19   its funding?

20         A.    Well, it all basically fell under the

21   same umbrella.  The same people were involved in

22   what research we were doing on finfish, they were

23   involved in the cephalopod program.  So we didn't

24   give them two paychecks, if that's what you're

25   asking.  The people who were working at the

1                    J. ERICSSON - 2/19/2021

2    cephalopod program volunteered to work on the

3    finfish program as an adjunct in those facilities.

4         Q.   Did the NIH provide funds to GMIT for

5    the FlorAbama project?

6         A.   None.

7         Q.   None.  Did GMIT receive any funding

8    from any contributor or grantor specifically for

9    the FlorAbama project?

10        A.   Well, most of the funding that we

11   received had to do with the earlier project that

12   was abandoned in 2008, I believe, and everything

13   moved over to the FlorAbama project.  And all the

14   assets that we had and all the cash that we had

15   received basically switched horses from the Texas

16   platform to FlorAbama project.

17        Q.   All right.  So did GMIT receive any

18   funding from anyone specifically for the FlorAbama

19   project?

20        A.   Well, you're -- you're talking about

21   apples and oranges, but they're both fruit.  We

22   received a $1,300,000 grant from Seagull Energy on

23   the Florida -- on the Texas project that we had in

24   play going forward into the FlorAbama project.

25        Q.   When did you receive that $1.3 million

```
 1                    J. ERICSSON - 2/19/2021
 2   grant from Seagull?
 3        A.   I believe it was right around 1999,
 4   2000.
 5        Q.   What did you do with that
 6   $1.3 million?
 7        A.   We used it to continue our project
 8   into the FlorAbama site.
 9        Q.   The -- you testified that -- strike
10   that.
11             When Seagull gave you 1.3 million --
12   gave GMIT $1.3 million, did it specify how the
13   funds should be used?
14        A.   No.
15        Q.   Did it give any type of guidance on
16   how the funds should be used?
17        A.   Under our discretion.
18        Q.   In 1999 or 2000 when Seagull gave that
19   money, what activities was GMIT doing with respect
20   to the FlorAbama project specifically?
21        A.   Well, in 2000 -- excuse me.  We
22   modified a permit that we had off of Mobile Bay to
23   the current site at the FlorAbama and that was
24   accomplished, I think, in 2003; and we also
25   modified our MPDS permits from the same location
```

1                    J. ERICSSON - 2/19/2021

2    to the new location in 2003.

3         Q.   And you --

4         A.   That was one of several things.

5         Q.   Okay.  When did -- when did GMIT buy

6    the Texas platform?

7         A.   We didn't buy it.  It was donated.

8         Q.   When was that donated?

9         A.   At the same time as the $1.3 million

10   was granted to us.

11        Q.   So it was in addition to the

12   1.3 million?

13        A.   Right.  The platform was appraised

14   based upon, you know, replacement value or salvage

15   value, between 5 million and $13 million.

16        Q.   Who donated that platform to GMIT?

17        A.   Seagull Energy Corporation.

18        Q.   How much of the $1.3 million did GMIT

19   have in February 2008 when it decided to switch

20   its focus from the Texas project to the FlorAbama

21   project?

22        A.   Well, we were carrying on the efforts

23   at the -- on the FlorAbama or the Florida project

24   during the whole time.  As a matter of fact, we

25   were involved in the permitting and developing the

1                    J. ERICSSON - 2/19/2021

2   Alabama/FlorAbama site before we did the -- were

3   involved in the Texas platform project.  And we

4   continued to support the -- as a secondary target

5   for launching our project, it was a backup, when

6   the platform project basically was postponed and

7   so we moved all of our attention from the platform

8   project to the FlorAbama project.  And I can't --

9   I do not have any idea how the incremental funds

10  were paid out of GMIT's account to support these

11  efforts.

12          Q.   Would you agree that before

13  February 2008, GMIT's primary efforts with respect

14  to any aquaculture project were focused on the

15  Texas project?

16          A.   No, I wouldn't agree with that.

17          Q.   What --

18          A.   We were -- when we started having the

19  issue, the legal issue with the General Land

20  Office's David Dewhurst, that was early in 2010 --

21  or 2000, that is.  When we went into that

22  litigation process, we switched our attention to

23  the FlorAbama project because we had no idea what

24  the outcome was going to be.

25          Q.   I think I may have -- when was it that

1                    J. ERICSSON - 2/19/2021

2    you started having the legal issues with respect

3    to the Texas project?

4         A.   I'd have to look at the date of the

5    filing on the first court matter.  I would think

6    it probably occurred between -- in 2002, 2003.  We

7    had a district trial.  We won.  It was appealed to

8    the next district, a trial jury, and we won again

9    with an award of almost 300,000 legal fees and

10   then it was appealed by the State of Texas to the

11   Supreme Court and the ruling was overturned.  And

12   the ruling didn't occur until I think sometime in

13   2008.

14        Q.   Would you agree -- I want to make sure

15   we're clear about who you're talking about with

16   these projects.  What specifically was GMIT doing

17   with respect to the FlorAbama project?  You

18   mentioned getting permits, but was GMIT getting

19   those permits?

20        A.   Both BioMarine and Technologies are on

21   the permit holder's -- on the permits.  They owed

22   them basically equally, 50/50.

23        Q.   What grants specifically did GMIT ever

24   receive that were specifically for finfish

25   research?

1                    J. ERICSSON - 2/19/2021

2          A.    For what again?

3          Q.    Finfish research.

4          A.    Well, we received from Japan

5    five Bridgestone sea cages, ten sets of nets that

6    went within those sea cages, an AKVA automated --

7    pneumatic automatic feeding system to be used to

8    disperse feed to the five cages when the fish were

9    in those cages.

10               We had a grant from the NIH that gave

11   us title to the Marie Hall research vessel, which

12   is a steel 67-foot-long trawler basically used for

13   research, or whatever purposes.  We also got the

14   R/V Hobgood donated from a company in north -- I'm

15   trying to remember.  On the East Coast.  That was

16   a over 100-foot steel vessel that was going to be

17   used to deploy and supply and tend the fish

18   feeding project once it initiated its stocking and

19   growing procedures.  And we had a 36-foot

20   Wellcraft that was used as a rapid deployment and

21   supply boat taking people back and forth to the

22   site.

23               You know, there were a lot of other

24   assets besides, but the entire contents of the

25   35-year funded NRCC grant was given to GMIT at the

```
 1                J. ERICSSON - 2/19/2021
 2    conclusion of that operation in Galveston, which
 3    involved a long list of various kinds of equipment
 4    and laboratory and marine grow-out systems,
 5    fiberglass systems, tanks, various equipment.
 6    It's all listed in the evidence we provided you.
 7    If you give me some time, I might think of some
 8    other items with -- that's a pretty big list.
 9         Q.   Mr. Ericsson, what cash grants --
10              MR. KRELLER:  I'm sorry, for the
11    record, he said AKVA fish feeder and for the
12    benefit of the court reporter, can you just spell
13    that, please.
14              THE WITNESS:  It's A-K-V-A.  It's a
15    Norweigian produced automatic feed system.  It
16    allows you to feed up to 30 cages of feed pellets
17    blown by air from the feed supply vessel to the
18    individual cages.
19              MR. KRELLER:  I was just asking you to
20    spell it.  The way you said it, I can tell it was
21    going to be difficult for the court reporter.
22    Sorry.
23    BY MS. TERTERYAN:
24         Q.   Mr. Ericsson, what cash grants were
25    ever given to GMIT specifically for finfish
```

```
1                    J. ERICSSON - 2/19/2021
2   research?
3        A.   I think I already mentioned the
4   1.3 million.
5        Q.   Anything other than the 1.3 million?
6        A.   But you're saying cash.  I gave you an
7   answer to that earlier.  1.3 million from Seagull
8   Energy Corporation.
9        Q.   Nothing else?
10       A.   It was the largest one in cash.  There
11  were other assets donated to us, which I went
12  into.
13            MR. KRELLER:  Try not to talk over
14  each other.
15  BY MS. TERTERYAN:
16       Q.   Mr. Ericsson, I'd ask you to listen
17  carefully to my questions because they're pretty
18  specific.  Besides the 1.3 million in cash you're
19  referring to from Seagull, was there any cash
20  grants given to GMIT specifically for finfish
21  research?
22       A.   Not specifically for finfish research.
23  For research, yes.
24       Q.   Okay.  I asked specifically for
25  finfish research.  There was not?
```

```
1                 J. ERICSSON - 2/19/2021

2          A.   I don't recall.  I don't recall.

3          Q.   And the 1.3 million was not

4     specifically for finfish research either, correct?

5          A.   The 1.3 million was a general grant.

6     There was no requirements attached to it.

7          Q.   And you can't tell me how much of that

8     1.3 million remained among GMIT's assets at the

9     time of the spill?

10         A.   I don't recall.

11         Q.   Okay.  You mentioned in one of your

12    answers earlier an NRCC grant given to GMIT.

13    What's that grant?

14         A.   That's the National Resource Center

15    for Cephalopods science project.

16         Q.   That's the NIH grant you're referring

17    to?

18         A.   Yes.

19         Q.   All right.  Mr. Ericsson, you've been

20    personally involved in the claims that BioMarine

21    and Gulf Marine submitted to BP following the

22    spill, correct?

23         A.   I'm one of -- one of the people

24    involved, yes.

25         Q.   Were there any other nonlawyers
```

```
 1                   J. ERICSSON - 2/19/2021

 2         Q.    March 2010, did BioMarine have

 3   employees?

 4         A.    I don't recall at that time.  I know I

 5   was.

 6         Q.    Do you recall any employees besides

 7   you?

 8         A.    I believe we had a secretary/treasurer

 9   and office personnel.

10         Q.    What did the office personnel do?

11         A.    Secretarial work.

12         Q.    How much -- we'll come back to that.

13               Can you explain BioMarine's

14   relationship with Gulf Marine, aside from the fact

15   that Gulf Marine owns some percentage of

16   BioMarine's shares?

17         A.    Well, one was -- Gulf Marine is a

18   501(c)(3) nonprofit organization approved by the

19   IRS for the purposes of commencing -- or doing

20   development of mariculture in the Gulf of Mexico,

21   initially, and later on their purpose was changed

22   to -- or added a new purpose to that IRS approval.

23               As I mentioned earlier, GMIT has been

24   involved in research and development going back to

25   almost the beginning of the company.  As a matter
```

1          J. ERICSSON - 2/19/2021

2   of fact, it was formed as outreach of BioMarine

3   technology.  I was the president of BioMarine, I'm

4   the managing director of GMIT.  And GMIT as a

5   nonprofit was created basically because it was

6   able to receive donations of equipment and cash

7   from corporate and other sponsors for the purposes

8   of doing marine farming and research that was used

9   eventually for the benefit of BioMarine.

10          BioMarine's part in the program was,

11   once the R&D phases were over, to step in as a

12   partner with GMIT to do the commercialization and

13   raising the fish and operating the project to

14   generate revenues going forward.

15          GMIT was in it basically with grant

16   money and equipment, and it funded its start-up

17   part of the project at the FlorAbama site.  And

18   then after that had been basically initiated and

19   the fish were stocked, then BioMarine was to take

20   over on a for-profit basis with its shareholders

21   to continue the ongoing years of operation.

22      Q.   Did BioMarine and GMIT ever sign a

23   contract with each other?

24      A.   They did.

25      Q.   What contract?

1                J. ERICSSON - 2/19/2021

2        A.   It was a joint development agreement.

3   It was executed.

4        Q.   When was that joint development

5   agreement executed?

6        A.   I don't recall the date.  I could

7   refresh my memory.

8        Q.   Where would you look to refresh your

9   memory?

10            MR. KRELLER:  In the documents that

11   we've been --

12        A.   In the documents that we provided you.

13            MS. TERTERYAN:  Counsel, I would ask

14   that you let the witness answer my questions.

15        A.   Well, I mean, we provided these things

16   in the documents.  If you like, I have a

17   chronology of events that I could refer to to give

18   you a specific date.  Would you like me to get

19   that?

20   BY MS. TERTERYAN:

21        Q.   No, not right now.

22        A.   Okay.

23        Q.   Do you have a rough sense of whether

24   it was, you know, in the 1990s or the 2000s?

25        A.   I mean, I would rather be specific and

1                    J. ERICSSON - 2/19/2021

2    does BioMarine contend -- strike that.

3                    BioMarine is seeking lost profits

4    arising from its FlorAbama project because of the

5    spill, right?

6           A.    Correct.

7           Q.    Is BioMarine seeking any other kind of

8    economic damages?

9                    MR. KRELLER:  Object to the form of

10   the question to the extent that you're asking him

11   to draw a legal conclusion under OPA 90 and the

12   various avenues of recovery under OPA 90.

13                   To the extent you can answer her

14   question, you can.

15   BY MS. TERTERYAN:

16          Q.    You can answer, Mr. Ericsson.

17          A.    Would you restate the question?

18          Q.    Sure.  Besides lost profits for its

19   FlorAbama project because of the spill, is

20   BioMarine seeking any other kind of damage from

21   the spill?

22          A.    I would have to defer to our experts

23   and how they compiled the damage estimates to get

24   an answer to that question.

25          Q.    I'm not asking for a quantification.

1        J. ERICSSON - 2/19/2021

2   I'm simply asking if there's any other damages

3   besides lost profits to BioMarine that BioMarine

4   is seeking in this litigation?

5        A.   I believe there's a very large asset

6   value to its ownership to the 27.5 acres of

7   federal permits granted by the United States Army

8   Corps of Engineers and the United States

9   Environmental Protection Agency covering our

10  activities at that site.  That has to do with a

11  value of approximately 250,000, on the low end, up

12  to a million dollars an acre on a commercially

13  operational basis.

14       Q.   BioMarine is asserting damage to the

15  value of its U.S. Army Corps of Engineers and US

16  EPA permits for the FlorAbama site; is that right?

17       A.   That's correct.

18       Q.   Okay.  Besides lost profits from the

19  FlorAbama project and damage to the value of its

20  two permits for the FlorAbama site, is BioMarine

21  seeking any other damages in this litigation?

22            MR. KRELLER:  I'm going to -- Anna,

23  I'm going to object to the form of the question

24  just to the extent that your question doesn't also

25  include lost or impairment of earning capacity.

1                    J. ERICSSON - 2/19/2021

2                    You can answer her question.

3          A.   I don't recall how it was structured,

4     so I can't give you a yes or no.

5     BY MS. TERTERYAN:

6          Q.   How what was structured?

7          A.   How the damages were constructed by

8     our expert who did the lost damage report.

9          Q.   So sitting here today, Mr. Ericsson,

10    you do not know whether BioMarine is seeking

11    damages aside from lost profits or impaired

12    earning capacity from its FlorAbama project and

13    loss of the value of its permits for the FlorAbama

14    project; is that right?

15         A.   Again, I'm saying those are three of

16    the components.  I'm not aware of all the

17    components that were derived or generated by our

18    expert who did the lost damage estimate.

19         Q.   I'm not asking you to -- I'm not

20    asking you to tell me what else there is if you

21    don't know, but I do need you to confirm that you

22    don't know.  So let me try this again.

23                    Mr. Ericsson, sitting here today, you

24    don't know whether BioMarine is seeking damages

25    aside from lost profits or impaired earning

1             J. ERICSSON - 2/19/2021

2    capacity from its FlorAbama project and loss of

3    value of its permits for the FlorAbama project; is

4    that right?

5         A.   I believe there was a component in the

6    lost damages involving the loss of our contractual

7    relationships with investment bankers who were

8    raising capital or were in the stages of raising

9    capital prior to the blowout.  But I don't recall

10   exactly the components of the loss model.

11        Q.   What contractual relationships with

12   investment bankers are you referring to?

13        A.   The investment banking -- the

14   contracts that we have with investment bankers in

15   New York, with Arjent financial as generated

16   through our securities counsel Eaton & Van Winkle

17   in New York City, as well as our written contracts

18   with George Hersbach and Heartstream financial in

19   Holland.

20        Q.   And what damages did BioMarine suffer

21   as a result of the spill to those contractual

22   relationships?

23        A.   Well, they were in suspension going

24   into the period of the disaster, and upon the

25   disaster there was no basis for going forward with

1          J. ERICSSON - 2/19/2021

2   raising capital because the project had been

3   destroyed.

4          Q.   All right.  Besides -- besides --

5   besides the lost value of the permits for

6   FlorAbama, lost profits from the impaired earning

7   capacity for the FlorAbama project and damage to

8   the value of contracts with investment bankers

9   which contracts were in suspension at the time of

10  the spill, is BioMarine alleging any other damages

11  in this case?

12          MR. KRELLER:  Object to the form of

13  the question.

14          A.   Again, I am not aware of all the

15  components that went into the lost model claim,

16  but the items that you mentioned previously are

17  truly indicative of a major part of the claims.

18  BY MS. TERTERYAN:

19          Q.   You're not aware of any other damages

20  that BioMarine is alleging aside from what we

21  discussed?

22          A.   Would you like me to take a pause and

23  go through some documents to try to refresh my

24  memory?  But at this point -- at this time I would

25  defer to doing that, instead of answering any more

1          J. ERICSSON - 2/19/2021

2    of your detailed questions.

3          Q.   What document would you refer to to

4    refresh your memory?

5          A.   The documents that were performed by

6    our experts in calculating the damages.

7          Q.   Okay.  So you would be referring --

8    you're talking about your expert reports?

9          A.   That's correct.

10         Q.   Which experts?

11         A.   LIN, Giralt --

12              THE WITNESS:  What was his name?

13         A.   Trying to remember the name of his --

14   Lambda Consulting out of Houston, Texas, is the

15   primary expert that we're relying on.

16   BY MS. TERTERYAN:

17         Q.   Is there a secondary expert that

18   you're relying on?

19         A.   Well, there were previous consultants

20   that gave estimates while we were going through a

21   settlement proposal process that were basically

22   not continued when we hired LIN and -- Lambda.

23         Q.   So you're not going to rely on any

24   other expert analyses besides the Lambda damages

25   analysis?

1          J. ERICSSON - 2/19/2021

2          MR. KRELLER:  I'm going to object to

3    the form of that question.  To the extent that it

4    is attempting to elicit testimony about his

5    reliance on expert reports when that deadline has

6    not even yet been established by the Court, but at

7    this current time, Mr. Giralt is our expert -- our

8    damages expert.  We provided you with a copy of

9    that report.  So he can answer the question.  But

10   that's just not to say that his report won't be

11   supplemented at a later date.

12          You can answer.

13   A.    So again, as far as my recollection is

14   concerned, having been -- I've not looked at this

15   lost -- lost report recently.  I would say those

16   are the -- four of the major components of the

17   claim, but that is not exclusive -- I wouldn't say

18   that's exclusively the components of the claim.

19   BY MS. TERTERYAN:

20   Q.    Okay.  Is BioMarine seeking damages

21   related to any other business activity outside of

22   the FlorAbama project?

23   A.    No, I don't recall any other.

24   Q.    Okay.  Is Gulf Marine -- what damages

25   is Gulf Marine seeking in this case?

1                    J. ERICSSON - 2/19/2021

2     BY MS. TERTERYAN:

3          Q.    Mr. Ericsson, what financial interest

4     did GMIT have in the FlorAbama project besides the

5     value of the permits as you allege?

6          A.    Well, the value of its business

7     relationship with BioMarine had the project gone

8     forward.

9          Q.    What was the value of its business

10    relationship with BioMarine?

11         A.    Well, it had an understanding that

12    they would get 2.5 percent of the gross sales of

13    the seafood products in perpetuity forever, as

14    long as it was there.

15         Q.    That --

16         A.    That was one.

17         Q.    So it was going to get a share of the

18    income from the FlorAbama project?

19         A.    That's correct.

20         Q.    In perpetuity?

21         A.    Right.

22         Q.    Was there a document recording this

23    understanding?

24         A.    I believe you just put it up.  The

25    agreement covering the platform project.  It was

```
1                J. ERICSSON - 2/19/2021
2   the same basic platform -- the platform agreement
3   was basically the same going into the FlorAbama
4   project, that understanding.
5        Q.   So there was no written agreement
6   between BioMarine and Gulf Marine specific to the
7   FlorAbama project, correct?
8        A.   I don't recall.
9        Q.   It was just an understanding between
10  the two entities?
11       A.   I don't remember if there was anything
12  formally or -- I do remember informally, of
13  course.  You have to remember, I'm the guy that's
14  sitting on both boards.
15       Q.   They are separate entities, though,
16  correct?
17       A.   Separate entities, but serving on both
18  boards and, you know, participating in these
19  things.
20       Q.   Aside from a general understanding
21  that GMIT would get two and a half percent of the
22  gross sales of seafood products from the FlorAbama
23  project, was there any document evidencing the
24  terms of BioMarine's and GMIT's business
25  relationship as to the FlorAbama project?
```

1                J. ERICSSON - 2/19/2021

2         A.    I do not recall.

3         Q.    You're not aware of one sitting here

4    today, correct?

5         A.    Nothing comes to mind as far as formal

6    agreements are concerned.

7         Q.    Fair to say in perpetuity would last

8    more than a year?

9         A.    I would hope so.

10        Q.    And --

11        A.    Till somebody dies.

12        Q.    Aside from the two and a half percent

13   in gross sales, did GMIT -- in the FlorAbama

14   project, did GMIT have any other financial

15   interest in the FlorAbama project?

16        A.    Again, it was a -- an equal owner of

17   the federal permits that granted the use of 27 and

18   a half acres of marine water for sea farming

19   purposes, which has a substantial value that we

20   discussed earlier, of between 250 to, upon

21   operations of over a million dollars per acre.

22        Q.    Aside from the value of the permits

23   that you allege and the two and a half percent in

24   gross sales, did GMIT have any other interest

25   financially in the FlorAbama project?

1           J. ERICSSON - 2/19/2021

2        A.    Well, it had financial interest, as I

3    recall, in the stock ownership of the company.

4        Q.    And aside from the alleged value of

5    the permits, the two and a half percent in gross

6    sales and the stock ownership, did GMIT have any

7    other financial interest in the FlorAbama project?

8        A.    The values of all the equipment that

9    it was providing to start the project and to

10   operate the project, which was listed in the loss

11   estimates provided by LIN.

12       Q.    Okay.  And besides all the things

13   we've already named and the value of the

14   equipment, any other financial interest of GMIT in

15   the FlorAbama project?

16       A.    I reserve my answer to say at this

17   time I don't recall, but there may be others that

18   I -- are listed in the loss estimates that would

19   have to be reviewed.

20       Q.    GMIT, like BioMarine, is only seeking

21   financial damages resulting from the spill's

22   effect on the FlorAbama project, correct?

23       A.    That's correct.

24       Q.    I'm showing you the document that was

25   marked Exhibit 17 yesterday.  I will show you.

1                    J. ERICSSON - 2/19/2021

2         Q.   What source of -- what were those

3    other sources of revenue?

4         A.   The sale of real estate.

5         Q.   When, between 2007 and the time of the

6    spill, did GMIT sell real estate?

7         A.   I can't tell you exactly when those

8    transactions occur.  There were several

9    transactions involving purchase of distressed

10   properties in Chicago, Illinois, on the south side

11   that was part of our purpose.  It was a dual

12   purpose, was to assist in reconstructing

13   distressed property in blighted areas, in this

14   particular case in the south side of Chicago, at

15   which time we acquired properties and they were

16   rehabbed by others and then sold.

17        Q.   I want to talk about that a little bit

18   later, but just to be clear, those properties were

19   not purchased until after the spill; is that

20   right?

21        A.   I don't recall.

22        Q.   Okay.  And aside from those two

23   properties on GMIT's depreciation schedule and its

24   taxes, are there any other properties that GMIT

25   purchased and sold as part of its dual purpose of

1          J. ERICSSON - 2/19/2021

2   rehabilitating blighted areas?

3          A.   It's just -- again, it's hard for me

4   to recall the time frame you're mentioning.

5          Q.   Has it ever -- take away the time

6   frame.  Aside from the Stewart and the Ada

7   properties listed on GMIT's tax returns, has GMIT

8   ever purchased and sold any other property in

9   furtherance of its purpose for rehabilitating

10  blighted properties?

11         A.   I believe there were others.

12         Q.   Okay.  But you can't recall whether

13  those others were before or after the spill?

14         A.   I don't recall.

15         Q.   Okay.  Aside from revenue from the

16  purchase and sale of properties in furtherance of

17  its purpose of rehabilitating housing, and aside

18  from the NIH grants, between 2007 and the time of

19  the spill, what other sources of revenue did GMIT

20  have?

21         A.   GMIT have.  I would have to review

22  some financial documents to say yes or when or

23  what amount that might be.  I just don't recall.

24         Q.   Sure.  Let me see if I can help with

25  that.  Let's pull up -- I believe it hasn't been

1      J. ERICSSON - 2/19/2021

2   I said it depends on what time period in 2009 that

3   that occurred.

4        Q.   Okay.

5        A.   There may have been two or three or

6   one, or there could have been four or five.

7        Q.   Okay.  And let me show you now the

8   analogous page in 2010.  Do you see -- well, let

9   me get there.  All right.  I'm on page 10 of

10  Exhibit 32, which are GMIT's 2010 taxes.  Do you

11  see there's nothing in line 5 compensation of

12  officers, directors, trustees?

13       A.   Yes.

14       Q.   And do you see line 7 says other

15  salaries and wages, 23,547?

16       A.   Yes.

17       Q.   Why did GMIT -- why did GMIT's salary

18  and wage expense in 2010 decrease over $100,000

19  since 2009?

20       A.   Primarily because the activities

21  regarding the development of the bioreactor system

22  that's notated in the 2009 and '10 were phasing

23  down.

24       Q.   Okay.  Why were those activities

25  phasing down?

```
 1              J. ERICSSON - 2/19/2021
 2        A.    Because we had -- we had built it,
 3   tested it and were -- set it basically at idle by
 4   the end of 2010.
 5        Q.    Okay.
 6        A.    I'd like to clarify something.
 7        Q.    What's that?
 8        A.    I said -- in your earlier ask about
 9   other activities of Gulf Marine --
10        Q.    Yes.
11        A.    -- I said those that occurred in 2010.
12   You see that there are activities in 2010, but the
13   big construction part of the project was in the
14   last quarter, I believe, of 2009.
15        Q.    I see.  So once that bioreactor was
16   constructed and construction was over, there
17   wasn't a need to spend as much on salaries and
18   wages --
19        A.    Right.  We had --
20        Q.    -- to GMIT employees?
21        A.    We had part-time employees that were
22   monitoring the systems, that came from the
23   University of West Florida and they were involved
24   in watching, monitoring and testing in both 2009
25   and 2010.
```

1              J. ERICSSON - 2/19/2021

2        Q.    Okay.  And that particular project did

3   not phase down because of the spill, right?

4        A.    No.

5        Q.    That was separate?

6        A.    That's correct.

7        Q.    Okay.  Mr. Ericsson, I want to talk a

8   little more about the two properties that GMIT

9   bought in November of 2010.  And actually I'll put

10  up Exhibit 32 again for reference.  All right.  So

11  these are -- this is Exhibit 32, GMIT's 2010

12  taxes, and I'm taking you to the -- page 24 of the

13  PDF, which is the 2010 depreciation schedule for

14  GMIT.  Let's take the Ada 1 Property.  That

15  property was purchased in November of 2010; is

16  that right?

17       A.    I do not recall specific dates.

18       Q.    Who bought that property?

19       A.    Gulf Marine did.

20       Q.    But who signed the paperwork?

21       A.    Gulf Marine.

22       Q.    What person signed on behalf of Gulf

23  Marine to buy that property?

24       A.    Myself.

25       Q.    Okay.  So how did you identify the

1              J. ERICSSON - 2/19/2021

2   take a break, whichever --

3              MR. KRELLER:  We can take -- well, I'm

4   happy to go straight into it.  I just need you to

5   help me and maybe we can go off the court

6   reporter's record for a minute so you can walk me

7   through the training session.

8              MS. TERTERYAN:  Let's go off the

9   record, and we'll take a couple minutes.

10             THE VIDEOGRAPHER:  The time is

11  2:52 p.m., and we're going off the record.

12             (Recess taken from 2:52 p.m. to

13  2:55 p.m.)

14             THE VIDEOGRAPHER:  The time is

15  2:55 p.m., and we are back on the record.

16                    EXAMINATION

17  BY MR. KRELLER:

18       Q.   Good afternoon, Mr. Ericsson.  I'm

19  here in the room with you, but I'd ask that you

20  look at the camera and the screens ahead of you.

21  Fair?

22       A.   Fair.

23       Q.   I've got a few follow-up questions

24  from your deposition yesterday as well as today.

25  I would like to show you an exhibit, and we'll

1              J. ERICSSON - 2/19/2021

2    mark this as Exhibit 37.

3              (Deposition Exhibit 37 marked for

4    identification.)

5    BY MR. KRELLER:

6         Q.   Do you recall Mr. Regan reviewing two

7    NOAA maps with you yesterday?

8         A.   Yes.

9         Q.   This document, the first page of this

10   document on your screen, is -- the first page is

11   labeled TREX 12349.  This was a trial exhibit that

12   was introduced into evidence and in the record

13   during the Phase 2 trial in this MDL 2179.  It was

14   used with Dr. Donald Boesch.  The second page and

15   the third page are taken from the same website,

16   the ERMA website, Environmental Response

17   Management Application website.  And I'll

18   represent to you that the gray area -- first of

19   all, the red area identifies the wreckage site for

20   the Deepwater Horizon platform.  The gray area in

21   the various shades represent the numbers of days

22   that surface oil was seen or spotted.  Okay.

23              MS. TERTERYAN:  Counsel, just

24   objection to the extensive testifying.  Do you

25   have a question for Mr. Ericsson?

1          J. ERICSSON - 2/19/2021

2          MR. KRELLER:  Yes, I do, but I'm

3   explaining to him what the -- the US -- the US

4   attorneys explained this to Dr. Boesch.  I'm just

5   explaining it to this witness so he understands

6   what he's looking at.

7   BY MR. KRELLER:

8       Q.   The gray areas represent surface oil.

9   The yellow dots represent Deepwater Horizon NRDA

10  restoration projects.  Okay.

11          What I'd like for you to do, as

12  Mr. Regan requested that you do yesterday, could

13  you please -- and I'll go to page 3 of Exhibit 37.

14  Could you please look and tell me whether or not

15  the 27.5 acre federally permitted site is located

16  within a gray shaded area?

17          MS. TERTERYAN:  Objection, foundation.

18          MR. KRELLER:  To address your

19  objection, this is -- this document was already

20  admitted into evidence.

21  BY MR. KRELLER:

22      Q.   You can answer the question.

23      A.   Yes, it is.

24      Q.   And you would agree with me, sir, that

25  the identified area for the NRDA restoration

1              J. ERICSSON - 2/19/2021

2    projects that are located on the shoreline, you

3    would agree with me that oil had to have touched

4    those locations in order for there to be a

5    restoration project, correct?

6         A.   I would assume --

7              MS. TERTERYAN:  Objection.

8    BY MR. KRELLER:

9         Q.   And you would agree that oil crossed

10   over and through the 27.5 acre site to get to

11   those locations, correct?

12        A.   That's correct.

13             MS. TERTERYAN:  Objection.

14             MR. KRELLER:  Do you want to just make

15   a standing objection to these questions?

16             MS. TERTERYAN:  No.  It just depends

17   on the question you ask.

18             MR. KRELLER:  Okay.

19   BY MR. KRELLER:

20        Q.   Is it fair to say, sir, that it would

21   have been irresponsible of you to solicit money

22   from investors to open a fish farm in the Gulf of

23   Mexico in the months following the oil spill?

24        A.   Absolutely.

25        Q.   I'm going to try to share another

1              J. ERICSSON - 2/19/2021

2         A.    I do not, no.

3         Q.    Are you aware of any other major oil

4    spill which would have caused oil to wash onto the

5    shores of Perdido to extend five miles across the

6    beach?

7              MS. TERTERYAN:   Object to form.

8         A.    I don't know of any event that could

9    have caused that spoiling of the beaches.

10   BY MR. KRELLER:

11        Q.    Can you tell me where Perdido is in

12   relation to your 29.5-acre federally permitted

13   site?

14        A.    The Perdido Key is located just north

15   of our permitted site.  Our permitted site is

16   approximately nine miles south of Perdido Key in

17   federal waters.

18        Q.    So following the oil spoil, if

19   deployed, did you have any concerns about your

20   cages or equipment becoming oiled during weather

21   events?

22        A.    During what event again?

23        Q.    During weather events.

24        A.    Normal weather events or --

25        Q.    Hurricanes, like Hurricane Sally.

1              J. ERICSSON - 2/19/2021

2       A.   Well, of course.  I mean, if oil were

3  to come from wherever onto the Perdido Key Beach,

4  I would assume that it would have traversed in

5  order to get there through our 27.5-acre permitted

6  site.

7       Q.   And if your cages were in the water

8  last year and they were oiled, would you have been

9  able to even sell those crops to a processor or

10  market?

11           MS. TERTERYAN:  Objection to form.

12       A.   I doubt it.  I imagine that if this

13  situation was consistent with other similar

14  situations, that the fish would either have been

15  severally damaged or killed.

16  BY MR. KRELLER:

17       Q.   Mr. Ericsson, I'd like to have a clear

18  understanding of the business activities of

19  BioMarine and GMIT in 2010 in the few months

20  before the oil spill.  Is it true that both

21  BioMarine and GMIT were in the process of drafting

22  private placement memorandas in January and

23  March 2010 to raise capital for the FlorAbama sea

24  farming project?

25       A.   Yes.

1          J. ERICSSON - 2/19/2021

2          Q.   And is it true that the 2008-2009

3    recession delayed, but did not terminate the

4    project funding efforts with Heartstream and

5    Merit?

6          A.   Correct.

7          Q.   And you never terminated your

8    fundraising efforts with Heartstream and Merit,

9    correct?

10         A.   Only delayed.

11         Q.   And is it true that but for the oil

12   spill, BioMarine and Gulf Marine had a reasonable

13   expectation that Heartstream and Merit would raise

14   the requested capital to move the sea cages to the

15   27.5 federally permitted site and begin farming

16   operations?

17              MS. TERTERYAN:  Objection, leading.

18   BY MR. KRELLER:

19         Q.   You can answer the question.

20         A.   Yes.  To my best knowledge and

21   experience with these gentlemen, there is no

22   reason to think that they would not have performed

23   leading up to the spill.

24         Q.   And is it true that you believe that

25   the oil spill made that delayed expectation of

1          J. ERICSSON - 2/19/2021

2   fundraising an impossibility?

3          MS. TERTERYAN:  Objection, leading.

4      A.   The oil spill by its nature, destroyed

5   the marine environment to which our cages and fish

6   would have been farmed within, and therefore

7   asking investors after that to invest would be, as

8   a minimum, fraudulent transaction.

9   BY MR. KRELLER:

10     Q.   Yesterday Mr. Regan asked you a number

11  of questions from the document that the securities

12  lawyers, Mr. Van Winkle I believe is his name, he

13  asked you about all the risks and disclosures

14  relative to those private placements.  Do you

15  remember those questions?

16     A.   I recall many of them.

17     Q.   Now, with respect to those risks, just

18  generally, has BioMarine as a business taken into

19  consideration those various risks and taken steps

20  or efforts to hedge itself against those risks?

21     A.   Yes, as much as possible, either

22  through bonds or insurance company.

23     Q.   Okay.

24     A.   Insurance protection against events,

25  including hurricanes and natural disasters and

1                J. ERICSSON - 2/19/2021

2     before the meltdown, the economic meltdown.

3          Q.   As of April 19th, 2010, what day did

4     you expect the fundraising from the New York and

5     European efforts to arrive?

6          A.   I really don't have a timetable to

7     give you an answer.  I would -- it would -- I

8     would say in 2010.  Because the economy had --

9     pretty much was recovering in two thousand -- end

10    of 2009 and into 2010.  So it was -- really been a

11    matter of when Mr. Hersbach felt it would be good

12    to proceed.  He was also funding other companies,

13    I believe, in the 2010 period.  And I believe

14    there's some discussion about that in his letter,

15    which you have access to.

16         Q.   Can you say what -- with certainty

17    what month in 2010 BioMarine would have received

18    the funding necessary to launch its FlorAbama

19    project?

20         A.   Well, I had no personal control over

21    the actions of the financial consultants and

22    placement agencies that were involved in this.  It

23    would have been their decision when to relaunch

24    the fundraising in 2010.

25         Q.   You were waiting on them to push

Page 156

1                    J. ERICSSON - 2/19/2021

2    forward the fundraising effort; fair to say?

3         A.   Well, they were the most likely

4    shortest distance to success placement opportunity

5    that we had.

6         Q.   But because you had no personal

7    control over them, you can't say when the

8    investments would have arrived, correct?

9         A.   Again, I had no ability to tell George

10   Hersbach and the Fountainhead and others, groups

11   that were involved in the placement, when the

12   markets were good enough in their neighborhood to

13   start the fundraising.  They would have to gauge

14   that by testing the waters, probably.

15        Q.   You can't say specifically who would

16   have invested in BioMarine's FlorAbama project as

17   of April 19, 2010, right?

18        A.   That's a good question, and I can say

19   that we have already secured over 100 stockholders

20   and BioMarine had provided, I think in the audited

21   financials, over $5 million of capital to support

22   the company leading up to this point in time.  And

23   there's, again, every belief that we would have

24   found reception to our proposition with our

25   investment bankers' clientele which were in this

1                  J. ERICSSON - 2/19/2021

2    particular case mentioned to be over 400

3    investment groups in Europe.

4         Q.   Mr. Ericsson, as of April 19th, 2010,

5    BioMarine couldn't launch its FlorAbama project

6    solely with its existing investors, correct?

7         A.   That's correct.

8         Q.   And you can't say with specificity who

9    new future investors would have been as of

10   April 19th, 2010, to provide the funding necessary

11   to launch the FlorAbama project, correct?

12        A.   I believe that would be a very

13   reasonable assumption, since there are no crystal

14   balls for what happens in the future.

15        Q.   And you can't say exactly how much

16   those future investors would have invested as of

17   April 19th, 2010?

18             MR. KRELLER:  Object to the form of

19   the question.  I think these questions are better

20   directed to Mr. Hersbach.

21             You can answer what you can answer.

22        A.   Again, George Hersbach and Heartstream

23   and their associates, Merit Capital, were testing

24   the waters with their investment -- investors'

25   portfolio, and I'm sure that they got some

1              J. ERICSSON - 2/19/2021

2    feedback on their interest and perhaps their level

3    of interest, but I have no firsthand knowledge of

4    that.

5    BY MS. TERTERYAN:

6          Q.   You told Mr. Kreller when he was

7    asking you questions a few minutes ago, that you

8    expected investment to come in if this spill

9    hadn't happened.  You have no firsthand knowledge

10   of how much that investment would have been had

11   the spill not occurred, correct?

12         A.   Again, it's called a prospectus to

13   raise capital.  The prospectus that Mr. Hersbach

14   had prepared was to raise five -- three $5 million

15   tranches and that's what he was proposing to his

16   investor groups.  And so I would assume that it

17   would be in one tranche of $5 million, being the

18   first, because that's the way he proposed the

19   offering.

20         Q.   Mr. Ericsson, you have no firsthand

21   knowledge of how much the -- in future investment

22   in BioMarine's FlorAbama project would have been

23   had the spill not occurred, correct?

24              MR. KRELLER:  Objection, Anna, asked

25   and answered.  I don't know how many different