Claimant Name:  BioMarine Technologies, Inc. & Gulf Marine Institute of Technolgy      Claimant EIN: 75-2309471 & 31-1475321

# USACOE
## Site Permit Documents

EXHIBIT

3

BIOM-GMIT 0000139

Claimant Name: BioMarine Technologies, Inc. & Gulf Marine Institute of Technolgy          Claimant EIN: 75-2309471 & 31-1475321



**DEPARTMENT OF THE ARMY**
MOBILE DISTRICT, CORPS OF ENGINEERS
P.O. BOX 2288
MOBILE, AL 36628-0001

June 23, 2008

REPLY TO
ATTENTION OF

Coastal Branch
Regulatory Division

SUBJECT: Modification Number No. 2 to Department of the Army Permit Number SAM-2002-2232-MBM, Biomarine Technologies, Inc. and Gulf Marine Institute of Technology.

Biomarine Technologies, Inc. and
   Gulf Marine Institute of Technology
Attention: Mr. John Ericsson
Post Office Box 776
Gulf Breeze, Florida 32562

Dear Mr. Ericsson:

In accordance with your request dated March 11, 2008, Department of the Army (DA) permit SAM-2002-2232-MBM is hereby modified as follows:

a. The permittee is authorized to construct forty-eight 30-meter diameter production cages and eight 15-meter diameter nursery cages within the original 27.5-acre project site.

b. The permit expiration date for DA permit SAM-2002-2232-MBM is extended until March 31, 2013. This is the same expiration date as the U.S. Environmental Protection Agency's National Pollutant Discharge Elimination System authorization for the project.

All other previous conditions to which the work is made subject shall remain in full force and effect, including the above listed expiration date.

Please contact me at (251) 694-3771, if you have any questions. For additional information about our Regulatory Program, please visit our web site at www.sam.usace.army.mil/RD/reg, and please take a moment to complete our customer satisfaction survey while you're there. Your responses are appreciated and will allow us to improve our services.

BY AUTHORITY OF THE SECRETARY OF THE ARMY:

BYRON G. JORNS
Colonel, Corps of Engineers
District Commander

BY:

MICHAEL B. MOXEY
Acting Chief, Coastal Branch
Regulatory Division

BIOM-GMIT 0000140

Claimant Name: BioMarine Technologies, Inc. & Gulf Marine Institute of Technolgy      Claimant EIN: 75-2309471 & 31-1475321

- 2 -

Enclosures

Copy Furnished:

U.S. Environmental Protection Agency
Region 4
Water Management Division
Attention: Mr. Marshall Hyatt
Atlanta Federal Center
61 Forsyth Street
Atlanta, Georgia 30303-8960

BIOM-GMIT 0000141

Claimant Name: BioMarine Technologies, Inc. & Gulf Marine Institute of Technology          Claimant EIN: 75-2309471 & 31-1475321



**BioMarine Technologies, Inc.**
P.O. Box 776 , Gulf Breeze, Fl 32562
Phone: (850) 932-9038     Fax: (850) 932-0422
Email: j.ericsson@biomarineinfo.com
Website: www.biomarineinfo.com

March 11, 2008
Certified Return Receipt-Priority US Mail

Ms. Joy Earp
Division Head
Regulatory Department
Alabama Coastal Team
US Army Corps of Engineers
P.O. Box 2288
Mobile, Alabama 36628

Dear Ms. Earp,

This letter is to request a modification of BioMarine Technologies, Inc Section 10 permit number #MD02-02232-G also issued to Gulf Marine Institute of Technology which I am the Managing Director.

The purpose of this request is to expand the project number of sea cages to the proposed 56 cage system in Phase II of the project development to maximize the number of gulf animals being grown within the site and therefore be able to study the environmental impact of commercial sea farming operations pursuit to the recently issued EPA NPDES permit number #AL0067237.

The current Bush Administration has legislatively launched an initiative to create offshore sea farming operations in US territorial waters via the National Offshore Aquaculture Act of 2007. This project will help to establish a real time data base of the environmental effects of commercial sea farming in the Gulf of Mexico, that does not exist today.

In addition, the economic cost of operating commercial offshore sea farming requires a much larger number of sea cages in order to derive a reasonable return on the millions required to be invested in order to start these type of open water enterprise.

Finally, our investment bankers in New York have prepared a financing program for this project, providing the site is approved for a much larger number of cage systems as requested by the attached new site drawings.

Your immediate attention to this request is sincerely appreciated, since time is of the essence in getting the funding approved in New York for this project which is planned to have a spring 2008 launch.

Thanks,

John Ericsson,
President-BioMarine Technologies Inc.
Managing Director-Gulf Marine Institute of Technologies

Enclosures: NPDES permit #AL0067237: New phase 2 site diagram: Mariculture Site Assessment-2006



**Revised Phase III**

BioMarine Technology FlorAbama Project
Site is 27.5 acres; (48) 30 m diameter production cages and (8) 15 m diameter nursery cages surrounding a 30 X 50 m platform/feeder barge.

Claimant Name: BioMarine Technologies, Inc. & Gulf Marine Institute of Technology

Claimant EIN: 75-2309471 & 31-4475321

BIOM-GMIT 0000143

Claimant Name: BioMarine Technologies, Inc. & Gulf Marine Institute of Technolgy       Claimant EIN: 75-2309471 & 31-1475321



**DEPARTMENT OF THE ARMY**
MOBILE DISTRICT, CORPS OF ENGINEERS
P.O. BOX 2288
MOBILE, ALABAMA 36628-0001



August 30, 2004



REPLY TO
ATTENTION OF

Regulatory Branch
Operations Division

SUBJECT:  Department of the Army Permit Application Number
MD02-02232-G, BioMarine Technologies, Inc./Gulf Marine Institute
of Technology (BMTI/GMIT)

Gentlemen:

    Please refer to the interagency teleconference on August 27
with BMTI/GMIT.  Per your request, enclosed are copies of the
Statement of Findings and Environmental Assessments compiled
during eleven years of regulatory review.  The permitted
mariculture facility would be located in the Gulf of Mexico in
85-foot-deep waters at Latitude 30° 9.4' North and Longitude 87°
31.3' West.

    The first Department of Army permit (MD93-01004-M) was issued
to BMTI/GMIT d/b/a Sea Pride Industries, Inc., in November of
1993, modified in October 1994 to include an "aqua fence" to
enclose the fish pens, modified again to extend the permit to
September 30, 1999, and finally modified in October 1996 for
phased operations.  The current Department of the Army permit was
issued on September 9, 2003, and subsequently modified to
relocate the facility to deeper waters on July 29, 2004.

    As the enclosed documents are executive summaries of the
regulatory process including notification of the mariculture
activity, coordination between local, state and federal agencies,
the public and stakeholders, and issue resolution, the
administrative record is available upon request.  If you have
any comments, questions or need additional information, please
contact me.

                                    Sincerely,

                                    *Larry Godwin*

                                    Larry Godwin
                                    Project Manager
                                    Permit Evaluation Section

Enclosures

Copy Furnished

Mr. Andy Strelcheck (NMFS)
Mr. Vince Miller (EPA)
Dr. Ed Cake (BMTI/GMIT)

3

BIOM-GMIT 0000144

Claimant Name: BioMarine Technologies, Inc. & Gulf Marine Institute of Technolgy         Claimant EIN: 75-2309471 & 31-1475321

-2-

Copy Furnished:

Mr. Andy Strelcheck
National Marine Fisheries Service
Southeast Regional Office
9721 Executive Center Drive North
St. Petersburg, Florida  33702

Mr. Vince Miller
U.S. Environmental Protection
  Agency, Region 4
Atlanta Federal Center
61 Forsyth Street
Atlanta, Georgia  30303-8801

Dr. Ed Cake
BMTI/GMIT
2510 Ridgewood Road
Ocean Springs, Mississippi  39564

4

BIOM-GMIT 0000145

Claimant Name: BioMarine Technologies, Inc. & Gulf Marine Institute of Technolgy       Claimant EIN: 75-2309471 & 31-1475321

CESAM-OP-S (1145b)                                    27 July 2004
Godwin

SUPPLEMENT TO STATEMENT OF FINDINGS
REGULATORY BRANCH
OPERATIONS DIVISION
U.S. ARMY CORPS OF ENGINEERS, MOBILE DISTRICT

My evaluation and findings are:

1.   INTRODUCTION:

     a.  Permittee.  BioMarine Technologies, Inc. (BMTI).  Mr. John
Ericsson is the point-of-contact.

     b.  Co-Permittee.  Gulf Marine Institute of Technology (GMIT).
Mr. John Ericsson and Dr. Ed Cake are the points-of-contact.

     c.  Permit Number.  MD02-02232-G.

2.   PROJECT LOCATION:

     a.  Authorized Location.  Gulf of Mexico, in 47-foot-deep
waters, 4.7 nautical miles south southeast of Fort Morgan, Baldwin
County, Alabama.  Outer Continental Shelf Block Number 827.  See
Chart 11376 published by National Oceanic and Atmospheric
Administration (NOAA); Latitude 30° 9.73' North and Longitude 87°
58.35' West.

     b.  Proposed Relocation.  Gulf of Mexico, in 85-foot-deep
waters, 7.5 nautical miles south southeast of Alabama Point in
Baldwin County, Alabama, 23.1 nautical miles east southeast of
authorized location.  Outer Continental Shelf Block Number 842.
See NOAA Chart 11382; Latitude 30° 9.4' North and Longitude 87°
31.3' West.

3.   AUTHORITY:  The authorized mariculture facility is regulated
under Section 10 of the River and Harbor Act of 1899 (33 USC 403).

4.   MODIFICATION REQUEST RECEIVED:  The 14 October relocation
request was received by electronic mail on 15 October 2003.

5.   PUBLIC NOTICE:  A 30-day public notice advertising the proposed
relocation was issued 31 October 2003 and described the following
authorized work:  Locate and operate a manned mariculture platform
facility in the Gulf of Mexico.  Structures include a 7.8-acre
fenced area and 8 fish pens (Phase I), up to a 27.5-acre fenced
area and 20 fish pens (Phase II), with a 164-foot-diameter work
platform.  The 100-foot-diameter fish pens would be tethered in-
line with the platform perpendicular to prevailing currents.  The
800- by 1,500-foot perimeter fence would be a floating polyethylene
skirt extending 8 feet deep.  The fish pens would extend about 30
feet or deeper.  The platform deck would be about 30 feet above
mean sea level, and would contain gantry cranes, automated
feeding/monitoring and harvesting equipment, enclosed hatchery,
laboratory, and crew quarters.  The ballasted pens may be raised
for cleaning or submerged and/or anchored in the event of severe
storms.  The facility is anticipated to produce annually 5 million

5

BIOM-GMIT 0000146

pounds of indigenous finfish including, but not limited to, cobia, redfish, red snapper, hybrid striped bass, grouper, mahi-mahi, greater amberjack, and red porgy.

6.  COORDINATION WITH OTHERS:

    a.  Public Notice Response.  Concerns expressed included lack of Exempted Fishing Permit (EFP), resource user conflicts, navigational safety, and cultural resources.  Public and agency comments and Corps responses are summarized as follows:

    (1)  U.S. Fish and Wildlife Service (FWS).  By 19 November 2003 letter, FWS had no objection to the project relocation and deferred comments to the National Marine Fisheries Service.

    (2)  National Marine Fisheries Service (NMFS).  By 1 December 2003 letter, the Habitat Conservation Division at Panama City, Florida, (NMFS-HCD) requested the permit modification be suspended until BMTI/GMIT commits to EFP procedures.  RESPONSE:  Pursuant to Code 50 of the Federal Register (50 CFR, Chapter 6, 1 October 2002 edition), by 23 February 2004 letter, BMTI/GMIT made official application for EFP.  The application included the Department of the Army permit (MD02-02232-G), relocation coordinates, the NPDES permit (AL0067237) with baseline and operational data collection requirements; and an executive summary of project purpose, public impact, background research and overview of nursery/hatchery and sea cages for finfish farming.

    (3)  U.S. Department of Homeland Security.  By 4 December 2003 letter, the U.S. Coast Guard (Private Aids to Navigation Section, District 8) determined the mariculture facility must be marked with private navigation aids.  Appropriate application forms (CG-2554 and CG-4143) and telephone numbers were furnished BMTI/GMIT.  RESPONSE:  The authorized facility must have Coast Guard approved lighting and NMFS approved sonic warning devices. Lighted buoys may be placed along the facility perimeter.

    (4)  Alabama Department of Conservation and Natural Resources (ADCNR).  By 2 December 2003 letter, ADCNR expressed concern for user conflicts and potential ill-feelings toward the mariculture industry since the proposed relocation site is within two and one half miles from the Alabama general artificial reef permit area; attraction of wild stocks away from the reef area would further antagonize local fishers; lack of application for a EFP; and lack of (baseline) data to justify expansion (to a full production facility of 27.5 acres).  RESPONSE:  The permitted activity provides for phased operations beginning with a research and development phase, baseline data analysis, and monitoring, including the monitoring of incidents of user conflict.  User conflicts perceived by BMTI/GMIT include illicit theft and vandalism, or accidents to the curious or to the recreational fisher during normal operations.  The perimeter fence would be a permitted structure (phased in scope), not a permit requirement, which would address or thwart these types of user conflicts. General user conflict in the vast Gulf of Mexico within the

2

BIOM-GMIT 0000147

Exclusive Economic Zone are not anticipated. The BMTI/GMIT response to GMFMC suggested attraction and accommodation, not conflict, of fish and fishers to the mariculture facility. BMTI/GMIT made official application for EFP on 23 February 2004.

(5)  Alabama Historical Commission (AHC).  By 26 November 2003 letter, AHC requested a maritime survey of the project area and a architectural survey of any structures at least 50 years old within one mile of the project area.  RESPONSE: Permit conditions include visual inspection of the immediate project area.  No disturbance of substrate (other than platform supports) is anticipated.  If ship wrecks or other cultural remains are found during reconnaissance prior to facility deployment, notification procedures must be implemented.  The facility would avoid impacting any cultural artifacts.  By 23 April 2004 memorandum from CESAM-PD-EI, the District Archeologist stated there are no standing structures (other than modern oil and gas platforms) in the project area and permit conditions require (permittee) to conduct dive inspections of the seafloor; if shipwrecks or other cultural materials are observed, notification procedures would apply and the mariculture facility would be relocated to avoid any effects to cultural resources.

(6)  Gulf of Mexico Fishery Management Council (GMFMC).  By 19 November 2003 letter, GMFMC expressed concerns for user conflicts, adverse impacts to Essential Fish Habitat (EFH), navigational safety and lack of EFP; recommended permit modification be suspended until BMTI/GMIT applies for and obtains an EFP from NMFS.  RESPONSE:  The proposed relocation of the authorized facility would address environmental and safety concerns; deeper water would provide more bottom clearances during storm events and greater dispersion of metabolic wastes and residual fish food.  Adverse impacts regarding low dissolved oxygen in EFH for the brown, white and pink shrimp would be improved at the deeper relocated site; initially, shrimp populations are anticipated to spike as new food sources within the protected facility are utilized; environmental conditions will be monitored.  Integral to the Department of the Army (DA) permit, the U.S. Environmental Protection Agency's National Pollutant Elimination System (NPDES) permit requires baseline data and operational monitoring to protect the benthic community and water quality.  Conditions of the DA permit include data collection and monitoring requirements, structural integrity, navigational safety, debris or navigational hazard removal requirements with performance bond, and EFP notification.  BMTI/GMIT has applied for an EFP.

(7)  Native American Tribe.  By 5 November 2003 letter, the Chief of the Eastern Shawnee Tribe of Oklahoma had no objection to the project contingent upon notification procedures if remains are recovered during facility mobilization.  RESPONSE:  Permit conditions require notification procedures in the event of recovery of cultural remains.

b.  NMFS.  No response to the public notice from the Protected Resources Division (NMFS-PSD) or the Sustainable Fisheries Division

3

BIOM-GMIT 000014

(NMFS-SFD) at St. Petersburg, Florida. By 7 July 2004 telecon from NMFS-PSD and by 27 July 2004 interagency telcom with NMFS-SFD, NMFS stated issuing the Department of the Army permit modification to relocate the mariculture facility would have no bearing on EFP procedures. RESPONSE: During the eleven years of regulatory review for this mariculture facility, the Corps has made deliberate effort in concert with other federal and state resource agencies to avoid and minimize adverse impacts to species of concern and habitat. The Department of the Army permit provides for an initial research phase of the mariculture facility, baseline and operational data collection and analysis, and interagency review prior to authorizing increased scope of operations.

c. Florida Department of Environmental Protection (FDEP). No response to the public notice. By follow-up telcom on 1 December 2003, FDEP confirmed the receipt of the public notice but elected to provide no comments since the project would be outside state jurisdiction.

d. U.S. Environmental Protection Agency (EPA). Project relocation modification for NPDES permit number AL0067237 is anticipated. RESPONSE: The NPDES permit is integral to the Department of the Army permit.

e. Alabama Department of Environmental Management. State Coastal Program consistency determination for the relocation of the mariculture facility was certified on 15 March 2004 subject to compliance with EPA's NPDES permit.

f. Mississippi-Alabama Sea Grant Consortium (MASGC). No response to the public notice. RESPONSE: Development of marine aquaculture species and the development of sustainable offshore aquaculture systems, and land-based hatchery and nursery support systems are prescribed strategic goals in the publication, MASGC Strategic Plan 2000-2005.

7. ENVIRONMENTAL ASSESSMENT: The reader is referred to the Statement of Findings and Environmental Assessment in the file of the administrative record (MD02-02232-G and MD93-01004-M) for a more complete discussion of environmental impacts, public and agency comments, alternatives considered, threatened and endangered species, and migratory birds. Impacts specific to the proposed relocation site include the following:

a. Biological and Physical Impacts. The proposed relocation of the authorized facility from the authorized 47-foot to the proposed 85-foot depths would address environmental and safety concerns; deeper water would provide more bottom clearances during storm events and greater dispersion of metabolic wastes and residual fish food. Impacts to the benthic community would be reduced. Operational requirements to maintain the health and integrity of the benthic community and water quality would be reduced by facility relocation. For the relocated project area, the adverse impacts to species of concern would be avoided and/or

BIOM-GMIT 0000149

minimized to a greater extent than the authorized location given the safer and current dynamics afforded by deeper water.

b. Public Interest Determination. Congressional mandates promote the domestic mariculture industry to reduce dependency on foreign imports of fish products. The National Aquaculture Act of 1980 (Act of 26 September 1980, Public Law 96-362, 94 Statute 1198, 16 U.S.C. 2081, et seq.) establishes, in the national interest, national policy to encourage the development of aquaculture (e.g. mariculture) in the United States and provides the following Congressional findings:

(1) The harvest of certain species of fish and shellfish exceeds levels of optimum sustainable yield, thereby making it more difficult to meet the increasing demand for aquatic food.

(2) To satisfy the domestic market for aquatic food, the United States imports more than 50 percent of its fish and shellfish, but this dependence on imports adversely affects the national balance of payments and contributes to the uncertainty of supplies.

(3) Although aquaculture currently contributes approximately 13 percent of world seafood production, less than 6 percent of current United States seafood production results from aquaculture. Domestic aquaculture production, therefore, has the potential for significant growth.

(4) Aquaculture production of aquatic plants can provide sources of food, industrial materials, pharmaceuticals, and energy, and can assist in the control and abatement of pollution.

(5) The rehabilitation and enhancement of fish and shellfish resources are desirable applications of aquacultural technology.

(6) The principal responsibility for the development of aquaculture in the United States must rest with the private sector.

(7) Despite its potential, the development of aquaculture in the United States has been inhibited by many scientific, economic, legal, and production factors, such as inadequate credit, diffused legal jurisdiction, the lack of management information, the lack of supportive Government policies, and the lack of reliable supplies of seed stock.

(8) Many areas of the United States are suitable for aquaculture, but are subject to land-use or water-use management policies that do not adequately consider the potential for aquaculture and may inhibit the development of aquaculture.

c. Finding of No Significant Impact. Within the scope of the National Environmental Policy Act of 1969, I find this permit decision to relocate the authorized project site is not a major Federal action significantly affecting the quality of the human

9.

BIOM-GMIT 000015

Claimant Name: BioMarine Technologies, Inc. & Gulf Marine Institute of Technology     Claimant EIN: 75-2309471 & 31-1475321



BIOM-GMIT 0000151

Claimant Name: BioMarine Technologies, Inc. & Gulf Marine Institute of Technolgy     Claimant EIN: 75-2309471 & 31-1475321



BIOM-GMIT 0000152



BIOM-GMIT 000015

environment.  The preparation of an Environmental Impact Statement for this project is not warranted.

8.  FINDINGS:  In concurrence with national policy, statutes and administrative directives, after reviewing the application, formulating an Environmental Assessment, finding no significant impact, considering comments by other agencies and the public, and weighing all known factors involved, I find when the total adverse effects of the proposed relocation of the mariculture facility are weighed against the benefits to the using public, issuing the permit modification would not be contrary to the public interest. The authorized location, as modified, shall be:

    -- Gulf of Mexico, in 85-foot-deep waters, 7.5 nautical miles south southeast of Alabama Point in Baldwin County, Alabama.  Outer Continental Shelf Block Number 842.  See Chart 11382 published by the National Oceanic and Atmospheric Administration; Latitude 30° 9.4' North and Longitude 87° 31.3' West.


BY: _____

PETER F. TAYLOR, JR.                 RONALD A. KRIZMAN
Colonel, Corps of Engineers          Chief, Regulatory Branch
District Engineer                    Operations Division

DATE: ____3 Aug 04____


6

BIOM-GMIT 0000154



BIOM-GMIT 000015



# DEPARTMENT OF THE ARMY

### MOBILE DISTRICT, CORPS OF ENGINEERS
### P.O. BOX 2288
### MOBILE, ALABAMA 36628-0001

September 9, 2003

REPLY TO
ATTENTION OF:

Regulatory Branch
Operations Division

SUBJECT: Department of the Army Permit Number MD02-02232-G,
BioMarine Technologies, Inc./Gulf Marine Institute of Technology

BioMarine Technologies, Inc.
Gulf Marine Institute of Technology
Post Office Box 776
Gulf Breeze, Florida 32562

Gentlemen:

### PLEASE READ THIS LETTER CAREFULLY AND COMPLY
### WITH ITS PROVISIONS

There is enclosed a Department of the Army permit authorizing
you to perform the work specified therein in accordance with the
plans shown on the drawings attached thereto. This permit is
issued under provision of the Federal laws for the protection and
preservation of the navigable waters of the United States. These
laws provide that after the proposed work has been approved by
issuance of a Department of the Army permit,

### IT SHALL NOT BE LAWFUL TO DEVIATE FROM SUCH PLANS EITHER
### BEFORE OR AFTER COMPLETION OF THE WORK,

unless modification of said plans has previously been submitted
to and received the approval of the Department of the Army.

You should study and carefully adhere to all the terms and
conditions of the permit. The District must be notified of the
commencement and completion of the permitted work. The enclosed
cards may be used for that purpose. Also enclosed is a "NOTICE
OF AUTHORIZATION" which must be conspicuously displayed at the
site during construction of the permitted work. Any telephone
inquiries relating to this permit should be directed to the
Regulatory Branch, telephone number (251) 694-3788.

If for any reason it becomes necessary to make a material
change in location or plans for this work, revised plans should
be submitted promptly to the District Engineer in order that the
revised plans may receive the approval required by law before
work is begun.

BIOM-GMIT 0000156

-2-

Compliance with this and other conditions of the permit is essential.  Failure to submit the notices requested may result in its revocation.

Sincerely,

Ronald A. Krizman
Chief, Regulatory Branch
Operations Division

Enclosures

BIOM-GMIT 0000157

DEPARTMENT OF THE ARMY PERMIT

Permittee:  BIOMARINE TECHNOLOGIES, INC.

Co-Permittee:  GULF MARINE INSTITUTE OF TECHNOLOGY

Permit Number:  MD02-02232-G

Issuing Office:  MOBILE DISTRICT

NOTE:  The term "you" and its derivatives, as used in this permit, means the permittee or any future transferee.  The term "this office" or the "Corps" refers to the Mobile District office of the U.S. Army Corps of Engineers having jurisdiction over the permitted activity or the appropriate official of that office acting under the authority of the commanding officer.  The Corps authorizes you to perform work in accordance with the terms and conditions specified below.

Project Description:  Locate and operate a manned mariculture platform facility in the Gulf of Mexico.  Structures include a 7.8-acre fenced area and 8 fish pens (Phase I), up to a 27.5-acre fenced area and 20 fish pens (Phase II), with a 164-foot-diameter work platform.  The 100-foot-diameter fish pens would be tethered in-line with the platform perpendicular to prevailing currents.  The 800- by 1,500-foot perimeter fence would be a floating polyethylene skirt extending 8 feet deep.  The fish pens would extend about 30 feet or deeper.  The platform deck would be about 30 feet above mean sea level, and would contain gantry cranes, automated feeding/monitoring and harvesting equipment, enclosed hatchery, laboratory, and crew quarters.  The ballasted pens may be raised for cleaning or submerged and/or anchored in the event of severe storms.  The facility is anticipated to produce annually 5 million pounds of indigenous finfish including, but not limited to, cobia, redfish, red snapper, hybrid striped bass, grouper, mahi-mahi, greater amberjack, and red porgy.

ENCLOSURES:  1. Vicinity Map  2. Plan View (Phase I)  3. Plan View (Phase II)  4. Fish Cage Components (1 of 2)  5. Fish Cage Components (2 of 2)  6. Mooring System  7. Aqua Fence Cross-Section  8. Alabama Coastal Program Permit  9. Monitoring Plan (NPDES Permit Number AL0067237).

Project Location:  Gulf of Mexico, in 47-feet-deep waters, 4 miles southeast of Fort Morgan, Baldwin County, Alabama; 3.2 nautical miles east of the main ship channel; Outer Continental Shelf Block Number 827.  See Chart 11376 published by the National Oceanic and Atmospheric Administration; Latitude 30°9'44" and Longitude 87°58'21".

Permit General Conditions:

1.  The time limit for completing the work authorized ends on  9 September 2006  .  If you find that you need more time to complete the authorized activity, submit your request for a time extension to this office for consideration at least 1 month before the above date is reached.

2.  You must maintain the activity authorized by this permit in good condition and in conformance with the terms and conditions of this permit.  You are not relieved of this requirement if you abandon the permitted activity, although you may make a good faith transfer to a third party in compliance with General Condition 4 below.  Should you wish to cease to maintain the authorized activity or should you desire to abandon it without a good faith transfer, you must submit a modification of this permit from this office, which may require restoration of the area.

3.  If you discover any previously unknown historic or archeological remains while accomplishing the activity authorized by this permit, you must immediately notify this office of what you have found.  We will initiate the Federal and State coordination required to determine if the remains warrant a recovery effort or if the site is eligible for listing in the National Register of Historic Places.

4.  If you sell the property associated with this permit, you must obtain the signature of the new owner in the space provided and forward a copy of the permit to this office to validate the transfer of this authorization.

ENG FORM 1721, Nov 86                    (33 CFR 325 (Appendix A))

5.  You must allow representatives from this office to inspect the authorized activity at any time deemed necessary to ensure that it is being or has been accomplished in accordance with the terms and conditions of your permit.

.  The Alabama Department of Environmental Management has determined your project is consistent with the Alabama Coastal Program (ACP).  You must comply with the ACP conditions specified in the attached state permit and its integral NPDES permit issued by the Environmental Protection Agency as special conditions to this permit.  The Corps would have discretionary enforcement responsibilities for the state conditions.

Special Conditions:

1.  Prior to mobilization and demobilization of main platform facility installation, Permittee and assigns shall provide the Corps video survey of substrate, accurate geographic coordinates (plus or minus 10 meters), and depth (plus or minus one half meter).  The permitted location shall be Latitude 30°9'44" and Longitude 87°58'21".  Deviation from this location shall require further Department of the Army authorization.

2.  Ninety days prior to deployment of perimeter fence, Permittee and assigns shall furnish detailed engineering drawings in accord with industry standards of structure, anchorage system, repair and maintenance specifications, access gate details, signage and lighting.  All proprietary drawings shall be clearly marked as proprietary to preclude unauthorized access.

3.  The mariculture platform structure shall have U.S. Coast Guard approved lighting and National Marine Fisheries Service approved sonic warning devices.  Lighted buoys may be placed along the facility perimeter.  Permittee shall notify the Corps 30 days prior to deployment and operation of any of the permitted structures for coordination with the National Oceanic and Atmospheric Administration and to provide Notice to Mariners.

4.  In accord with the National Pollutant Discharge Elimination System permit issued by the U.S. Environmental Protection Agency (NPDES Permit AL0067237), no non-permitted materials would be discharged from the facility excepting metabolic fish wastes and food pellets.  Upon written request, Permittee and assigns shall provide the Corps NPDES monitoring reports including monthly no-bird-fatality certifications.

5.  Excepting species indigenous to the North Central Gulf of Mexico, species raised and harvested at the mariculture facility shall be approved by the Corps in concert with the National Marine Fisheries Service, and the Marine Resources Division of the Alabama Department of Conservation and Natural Resources.  To obtain any National Oceanic and Atmospheric (NOAA) permit for handling Federally managed species, contact NOAA Fisheries, Mr. Phil Steele or his successor, at (727) 570-5305.

6.  This permit is for phased operations, commencing with a 7.8-acre facility with 8 fish pens, more or less, with a build up to a 27.5-acre facility with 20 or less fish pens.  Corps authorization shall be required for the expansion phase exceeding circumferenced area of 7.8 acres, and for the final phase with 20 fish pens or a circumferenced area of 27.5 acres.

7.  Permittee and assigns shall provide the Corps for interagency review preconstruction benthic surveys and annual benthic survey reports for the first 3 years of operation.  Survey reports shall include (and not be limited to) video tape, assays, sampling method, soil analysis of bottom cores, observations of threatened and endangered species and migratory birds, harvest yields, mortality, feed volume rates and wave frequencies; and to assess perimeter fence effectiveness, theft and vandalism incidents.

8.  Permittee and assigns shall advise all mariculture facility personnel, including contractors, of the Threatened and Endangered Species Act, the Marine Mammal Protection Act, and Migratory Bird Treaty Act:  It is unlawful to kill, harm, or harass threatened and endangered species, marine mammals, and migratory birds.  Any incident involving the entanglement, taking, capture or injury of an endangered, threatened, or protected species must be immediately reported to the Corps for coordination with the National Marine Fisheries Service or the U.S. Fish and Wildlife Service.  Species of concern include whales, manatees, sea turtles and birds (e.g. pelicans and cormorants).

BIOM-GMIT 0000159

9.  To minimize attraction to the facility by migratory birds, night lighting shall be kept to a minimum necessary for operations and to meet U.S. Coast Guard requirements.

).  Permittee and assigns shall assure maintenance of net integrity.  Remedial action to net breaches or escape of cultivated finfish shall be reported to the Corps immediately for agency coordination.

11.  The permittee understands and agrees that, if future operations by the United States require the removal, relocation, or other alteration, of the structure or work herein authorized, or if, in the opinion of the Secretary of the Army or his authorized representative, said structure or work shall cause unreasonable obstruction to the free navigation of the navigable waters, the permittee will be required, upon due notice from the Corps of Engineers, to remove, relocate, or alter the structural work or obstructions caused thereby, without expense to the United States.  No claim shall be made against the United States on account of any such removal or alteration.

12.  Permittee and assigns shall provide oversight of design structures and anchorage systems in accord with industry standards.  To assure removal of any and all structures or other work or parts thereof which may be erected or otherwise installed by breach or intention in the waterway at any time they may become obstructive to navigation after they have ceased to be used for the purpose for which they were constructed or upon revocation of this permit, the permittee is hereby required to furnish a bond or proof of a bond with the Corps in the sum of $100,000 satisfactory to the Chief of Engineers before construction and deployment of any structures are commenced.

Further Information:

1.  Congressional Authorities.  This activity is authorized pursuant to Section 10 of the Rivers and Harbors Act of 1899 (33 U.S.C. 403).

2.  Limits of this authorization.

    a.  This permit does not obviate the need to obtain other Federal, State, or local authorizations required by law.

    b.  This permit does not grant any property rights or exclusive privileges.

    c.  This permit does not authorize any injury to the property or rights of others.

    d.  This permit does not authorize interference with any existing or proposed Federal project.

3.  Limits of Federal Liability.  In issuing this permit, the Federal Government does not assume any liability for the following:

    a.  Damages to the permitted project or uses thereof as a result of other permitted or unpermitted activities or from natural causes.

    b.  Damages to the permitted project or uses thereof as a result of current or future activities undertaken by or on behalf of the United States in the public interest.

    c.  Damages to persons, property, or to other permitted or unpermitted activities or structures caused by the activity authorized by this permit.

    d.  Design or construction deficiencies associated with the permitted work.

    e.  Damage claims associated with any future modification, suspension, or revocation of this permit.

4.  Reliance on Applicant's Data:  The determination of this office that issuance of this permit is not contrary to the public interest was made in reliance on the information you provided.

ENG FORM 1721, Nov 86          3          (33 CFR 325 (Appendix A))

BIOM-GMIT 0000160

5. Reevaluation of Permit Decision. This office may reevaluate its decision on this permit at any time the circumstances warrant. Circumstances that could require a evaluation include, but are not limited to, the following:

   a.  You fail to comply with the terms and conditions of this permit.

   b.  The information provided by you in support of your permit application proves to have been false, incomplete, or inaccurate (See 4 above).

   c.  Significant new information surfaces which this office did not consider in reaching the original public interest decision.

Such a reevaluation may result in a determination that it is appropriate to use the suspension, modification, and revocation procedures contained in 33 CFR 325.7 or enforcement procedures such as those contained in 33 CFR 326.4 and 326.5. The referenced enforcement procedures provide for the issuance of an administrative order requiring you to comply with the terms and conditions of your permit and for the initiation of legal action where appropriate. You will be required to pay for any corrective measures ordered by this office, and if you fail to comply with such directive, this office may in certain situations (such as those specified in 33 CFR 209.170) accomplish the corrective measures by contract or otherwise and bill you for the cost.

6. Extensions. General Condition 1 establishes a time limit for the completion of the activity authorized by this permit. Unless there are circumstances requiring either a prompt completion of the authorized activity or a reevaluation of the public interest decision, the Corps will normally give favorable consideration to a written request (received prior to permit expiration) for an extension of this time limit.

Your signature below, as permittee, affirms that you accept and agree to comply with the terms and conditions of this permit.

_____          _____
(PERMITTEE AND DATE)                        (CO-PERMITTEE AND DATE)
BIOMARINE TECHNOLOGIES, INC.                GULF MARINE INSTITUTE OF TECHNOLOGY
POST OFFICE BOX 776                          20 DANIEL DRIVE
GULF BREEZE, FLORIDA 32562                   GULF BREEZE, FLORIDA 32561


This permit becomes effective when the Federal official, designated to act for the Secretary of the Army, has signed below.


ROBERT B. KEYSER
COLONEL, CORPS OF ENGINEERS              BY: _____
(DISTRICT ENGINEER)                           RONALD A. KRIZMAN              (DATE)
                                              CHIEF, REGULATORY BRANCH       9/15/03
                                              OPERATIONS DIVISION


When the structures or work authorized by this permit are still in existence at the time the property is transferred, the terms and conditions of this permit will continue to be binding on the new owner(s) of the property. To validate the transfer of this permit and the associated liabilities associated with compliance with its terms and conditions, have the transferee sign and date below.


_____          _____
(TRANSFEREE)                                (DATE)

BIOM-GMIT 0000161



BIOM-GMIT 0000162

# Sea Trek Gulf Pilot Project

**Aqua Fence**

## Phase I



850 ft.
Total Enclosed Area - 7.8 Acres

Round, Square or Hexagon
Shaped Cages - 100' In Diameter

APPROVED

# Sea Trek Gulf Pilot Project

## Phase II



Total Enclosed Area - 27.5 Acres

Round, Square or Hexagon
Shaped Cages - 100' In Diameter

BIOM-GMIT 0000164



Revised Phase II

BioMarine Technology FlorAbama Project
Site is 27.5 acres; (48) 30 m diameter production cages and (8) 15 m diameter nursery cages surrounding a 30 X 50 m platform/feeder barge.

BIOM-GMIT 0000165

# Bridgestone Fish Cage

## Component Parts of Fish Cage



To be used for illustrative purposes only.

APPROVED

BIOM-GMIT 000016

# Bridgestone Fish Cage



To be used for illustrative purposes only.



BIOM-GMIT 0000167

## V.   MOORING SYSTEM

(1)   Mooring plan

The mooring of a single "HI-SEAS" fish cage is accomplished using 6 mooring ropes as shown in Figure 27.

Fig. 27



If the direction of prevailing wave can be predicted from sea conditions at the installation site, then countermeasures should be taken by changing the mooring direction in accordance with the prevailing wave as follows : (See Figure 28).

Fig. 28



To be used for illustrative purposes only

APPROVED

BIOM-GMIT 0000168

Signal Light

4" Rail

Net

10" Pipe

Debris Screen made of
20 oz. rubberized canvas
with 2'' knot to knot
predator net draped below
vinyl debris screen

Debris
Screen

Rope

Lead Line

Screen Weight

Sea Bed

Aquafence

APPROVED

Fish Farming International  February 2003



a cage under construction in Port Lincoln, using 450mm pipe both collars and MK20
n stanchion

AquaSURE stanchions

BIOM-GMIT 0000169



CESAM-OP-S (1145b)                                          1 April 2003
Godwin

STATEMENT OF FINDINGS
REGULATORY BRANCH
OPERATIONS DIVISION
U.S. ARMY CORPS OF ENGINEERS, MOBILE DISTRICT

My evaluation and findings are:

1.  <u>INTRODUCTION</u>:

    a.  Applicant.  BioMarine Technologies, Inc. (BMTI).  Mr. John
D. Ericsson, President, and Dr. Edwin Cake, Chief Science Officer,
are the points-of-contact.

    b.  Application Number.  MD02-02232-G.

    c.  Affiliate.  Gulf Marine Institute of Technology (GMIT).

2.  <u>PROJECT LOCATION</u>:  Gulf of Mexico, 4 miles southeast of Fort
Morgan, Baldwin County, Alabama; 3.2 nautical miles east of the
main ship channel; Outer Continental Shelf Block Number 827.  See
Chart 11376 published by the National Oceanic and Atmospheric
Administration; Latitude 30°9'44" and Longitude 87°58'21".

3.  <u>AUTHORITY</u>:  The proposal is regulated under Section 10 of the
River and Harbor Act of 1899 (33 USC 403).

4.  <u>APPLICATION RECEIVED</u>:  22 July 2002.

5.  <u>PUBLIC NOTICE</u>:  A 30-day public notice was issued 9 August 2002
and advertised the following work:  BMTI and its affiliate, GMIT,
request to locate and operate a manned mariculture platform
facility in 47-foot depths of the Gulf of Mexico.  The project was
previously authorized (MD93-01004-M) to Sea Pride Industries, Inc.
(now BMTI), for a 13-acre fenced area to include a 164-foot-
diameter work platform with up to fourteen 78-foot-diameter
octagonal fish pens anchored radially around the platform.  The
request for reauthorization includes a 27.5-acre fenced area with a
164-foot-diameter work platform and up to twenty or more 100-foot-
diameter fish pens tethered in-line with the platform perpendicular
to prevailing currents.  The 800- by 1,500-foot perimeter fence
would be a floating polyethylene skirt extending 8 feet deep.  The
fish pens would extend about 30 feet or deeper.  The platform deck
would be about 30 feet above mean sea level, and would contain
gantry cranes, automated feeding/monitoring and harvesting
equipment, enclosed hatchery, laboratory, and crew quarters.  The
ballasted pens may be raised for cleaning or submerged and/or
anchored in the event of severe storms.  The facility is
anticipated to produce annually 5 million pounds of indigenous
finfish including cobia, redfish, red snapper, hybrid striped bass,
grouper, and mahi-mahi.  In accord with the National Pollutant
Discharge Elimination System permit issued by the U.S.
Environmental Protection Agency (NPDES Permit AL0067237), no non-
permitted materials would be discharged from the facility excepting
metabolic fish wastes and food pellets.

6.   <u>COORDINATION WITH OTHERS</u>:

   a.   Public Notice (MD93-01004-M) Response.  Coordination with
Federal, State and local agencies, and the public began with the
publication of the 27 April 1993 public notice, and is detailed in
the file of the administrative record (Sea Pride Industries, Inc.).
Concerns expressed at that time included water quality impacts
associated with metabolic wastes and residual food waste; the scope
of the facility and the need for data collection prior to full
production; why the need for aqua fence resulting in the exclusive
corporate use of gulf waters prohibiting competing use from public
fishers; predator control commensurate with the protection of birds
(e.g. pelicans and cormorants); night light effects on migratory
birds; fish net impingement, injury, and entanglement of wild
species; and hybridization of native species.  To address these
concerns, a <u>conditional permit was issued, and modified, to include
a pilot facility limited to a fenced 5-acre facility</u>; minimal night
lighting; net mesh size specifications; NPDES permit requirements
along with unspecified monitoring requirements to be determined
(e.g. for the protection of birds and turtles); and state approval
of cultivation of non-indigenous finfish species.

   b.   Public Notice (MD02-02232-G) Response.  The facility was
never constructed and reauthorization was requested after
expiration of two 3-year permit extensions.  Coordination with
Federal, State and local agencies, and the public is detailed in
Attachment 1, Environmental Assessment.  Concerns expressed include
the expansion of project scope from a 5-acre first phase to a 27.5-
acre facility without the benefit of data collection and
monitoring; the need for aqua fence resulting in the exclusive
corporate use and prohibit public fishers from use of gulf waters;
and adverse environmental impact from metabolic and food wastes.

   c.   Public Hearing Request.  There were no requests for a
public hearing in response to the public notice.

   d.   State Certification.  The Alabama Department of
Environmental Management (ADEM) certified that the project is
consistent with the state coastal program contingent on adherence
with Environmental Protection Agency NPDES permit.

   e.   Threatened and Endangered Species Concerns.  No concerns
were expressed for threatened and endangered species or essential
fish habitat.  No concerns were expressed because the previous
conditional authorization addressed concerns for these species:
Monitoring requirements and minimal night lighting.  Subsequent
authorization would impose similar conditions as warranted.

   f.   Migratory Bird Concerns.  Past concerns have been addressed
with the previous conditional authorization:  Minimal night
lighting; monitoring requirements.  The NPDES permit requires
monthly no-bird-fatality certification regarding predatory control
(e.g. pelicans and cormorants).

BIOM-GMIT 0000172

7. <u>ENVIRONMENTAL ASSESSMENT</u>:  Attachment 1 is an Environmental Assessment of the proposal and public interest determination. Within the scope of the National Environmental Policy Act of 1969, I find this permit decision is not a major Federal action significantly affecting the quality of the human environment.  The preparation of an Environmental Impact Statement for this project is not warranted.

8.  <u>EVALUATION BY SECTION 404(b)(1) GUIDELINES</u>:  Evaluation of this proposal in accord with Environmental Protection Agency's (EPA) 404(b)(1) Guidelines (40 CFR 230) was not required for this Section 10 only project.  A National Pollutant Discharge Elimination System (NPDES) Permit Number AL0067237 was issued by the EPA to address ocean discharge (Section 403 of the Clean Water Act) monitoring requirements associated with metabolic waste and residual food discharges.

9.  <u>FINDINGS</u>:  In concurrence with national policy, statutes and administrative directives, after reviewing the application and formulating an Environmental Assessment, considering comments by other agencies and the public, and weighing all known factors involved, I find when the total adverse effects of the proposal are weighed against the benefits to the using public, issuing the permit would not be contrary to the public interest subject to the following conditions:

    a.  Prior to mobilization and demobilization of main platform facility installation, Permittee and assigns shall provide the Corps video survey of substrate, accurate geographic coordinates (plus or minus 10 meters), and depth (plus or minus one half meter).  The permitted location shall be Latitude 30°9'44" and Longitude 87°58'21".  Deviation from this location shall require further Department of the Army authorization.

    b.  Ninety days prior to deployment of perimeter fence, Permittee and assigns shall furnish detailed engineering drawings in accord with industry standards of structure, anchorage system, repair and maintenance specifications, access gate details, signage and lighting.  All proprietary drawings shall be clearly marked as proprietary to preclude unauthorized access.

    c.  The mariculture platform structure shall have U.S. Coast Guard approved lighting and National Marine Fisheries Service approved sonic warning devices.  Lighted buoys may be placed along the facility perimeter.  Permittee shall notify the Corps 30 days prior to deployment and operation of any of the permitted structures for coordination with the National Oceanic and Atmospheric Administration and to provide Notice to Mariners.

    d.  In accord with the National Pollutant Discharge Elimination System permit issued by the U.S. Environmental Protection Agency (NPDES Permit AL0067237), no non-permitted materials would be discharged from the facility excepting metabolic fish wastes and food pellets.  Upon written request, Permittee and assigns shall

3

BIOM-GMIT 0000173

provide the Corps NPDES monitoring reports including monthly no-
bird-fatality certifications.

     e.  Excepting species indigenous to the North Central Gulf of
Mexico, species raised and harvested at the mariculture facility
shall be approved by the Corps in concert with the National Marine
Fisheries Service, and the Marine Resources Division of the Alabama
Department of Conservation and Natural Resources.  To obtain any
National Oceanic and Atmospheric (NOAA) permit for handling
Federally managed species, contact NOAA Fisheries, Mr. Phil Steele
or his successor, at (727) 570-5305.

     f.  This permit is for phased operations, commencing with a
7.8-acre facility with 8 fish pens, more or less, with a build up
to a 27.5-acre facility with 20 or less fish pens.  Corps
authorization shall be required for the expansion phase exceeding
circumferenced area of 7.8 acres, and for the final phase with 20
fish pens or a circumferenced area of 27.5 acres.

     g.  Permittee and assigns shall provide the Corps for
interagency review preconstruction benthic surveys and annual
benthic survey reports for the first 3 years of operation.  Survey
reports shall include (and not be limited to) video tape, assays,
sampling method, soil analysis of bottom cores, observations of
threatened and endangered species and migratory birds, harvest
yields, mortality, feed volume rates and wave frequencies; and to
assess perimeter fence effectiveness, theft and vandalism
incidents.

     h.  Permittee and assigns shall advise all mariculture facility
personnel, including contractors, of the Threatened and Endangered
Species Act, the Marine Mammal Protection Act, and Migratory Bird
Treaty Act:  It is unlawful to kill, harm, or harass threatened and
endangered species, marine mammals, and migratory birds.  Any
incident involving the entanglement, taking, capture or injury of
an endangered, threatened, or protected species must be immediately
reported to the Corps for coordination with the National Marine
Fisheries Service or the U.S. Fish and Wildlife Service.  Species
of concern include whales, manatees, sea turtles and birds (e.g.
pelicans and cormorants).

     i.  To minimize attraction to the facility by migratory birds,
night lighting shall be kept to a minimum necessary for operations
and to meet U.S. Coast Guard requirements.

     j.  Permittee and assigns shall assure maintenance of net
integrity.  Remedial action to net breaches or escape of cultivated
finfish shall be reported to the Corps immediately for agency
coordination.

     k.  The permittee understands and agrees that, if future
operations by the United States require the removal, relocation, or
other alteration, of the structure or work herein authorized, or
if, in the opinion of the Secretary of the Army or his authorized
representative, said structure or work shall cause unreasonable

4

BIOM-GMIT 0000174

obstruction to the free navigation of the navigable waters, the permittee will be required, upon due notice from the Corps of Engineers, to remove, relocate, or alter the structural work or obstructions caused thereby, without expense to the United States. No claim shall be made against the United States on account of any such removal or alteration.

1.  Permittee and assigns shall provide oversight of design structures and anchorage systems in accord with industry standards. To assure removal of any and all structures or other work or parts thereof which may be erected or otherwise installed by breach or intention in the waterway at any time they may become obstructive to navigation after they have ceased to be used for the purpose for which they were constructed or upon revocation of this permit, the permittee is hereby required to furnish a bond or proof of a bond with the Corps in the sum of $100,000 satisfactory to the Chief of Engineers before construction and deployment of any structures are commenced.

BY: _____

ROBERT B. KEYSER
Colonel, Corps of Engineers
District Engineer

RONALD A. KRIZMAN
Chief, Regulatory Branch
Operations Division

DATE: _____31 MAy 03_____

5

BIOM-GMIT 0000175

CESAM-OP-S (1145b)                                    13 March 2003
Godwin

ATTACHMENT 1
ENVIRONMENTAL ASSESSMENT

BioMarine Technologies, Inc., MD02-02232-G

1.  <u>INTRODUCTION</u>:

    a.  Location.  Gulf of Mexico, 4 miles southeast of Fort
Morgan, Baldwin County, Alabama.

    b.  Proposal.  Locate and operate a manned mariculture platform
facility in 47-foot depths of the Gulf of Mexico.  The project
would include a 27.5-acre fenced area with a 164-foot-diameter work
platform and up to twenty 100-foot-diameter fish pens tethered in-
line with the platform perpendicular to prevailing currents.  The
800- by 1,500-foot perimeter fence would be a floating polyethylene
skirt extending 8 feet deep.  The fish pens would extend about 30
feet or deeper.  The platform deck would be about 30 feet above
mean sea level, and would contain gantry cranes, automated
feeding/monitoring and harvesting equipment, enclosed hatchery,
laboratory, and crew quarters.  The ballasted pens may be raised
for cleaning or submerged and/or anchored in the event of severe
storms.  The facility is anticipated to produce annually 5 million
pounds of indigenous finfish including cobia, redfish, red snapper,
hybrid striped bass, grouper, and mahi-mahi.

    c.  Purpose and Need.  Project purpose includes the commercial
cultivation and harvest of marine finfish for domestic use or
export.  The open gulf typifies natural habitat more than land
based pond systems.

    d.  Authority.  Section 10 of the River and Harbor Act of 1899
(33 USC 403).

2.  <u>ENVIRONMENTAL SETTING WITHOUT THE PROJECT</u>:  The project area is
located in the Gulf of Mexico in waters 50 feet deep, 4 miles south
of a sandy shoreline densely developed with multi-unit residential
development.  Several gas production wells and platforms are in the
vicinity.  Nautical charts indicate a featureless bathymetry.

3.  <u>ENVIRONMENTAL IMPACT OF THE PROPOSED ACTION</u>:

    a.  Biological and Physical Impacts.  At full production with
up to 20 fish pens, the facility is anticipated to harvest 5
million pounds of finfish annually.  Depletion of wild stocks of
Federally managed species is of concern.  The proposed mariculture
facility would contribute to the supply for domestic or foreign
consumption and alleviate demand for dwindling wild stocks.
Impacts would include the daily discharges of food pellets and
metabolic wastes.  Most of these discharges would be dispersed by
currents and assimilated within the water column by plankton and
predatory fauna.  Some residual discharge of fecal and food pellets
may accumulate beneath the fish pens but the accumulation is
expected to be short term given the frequency of storms and
dispersal by dynamic forces.  Benthic populations may spike to

BIOM-GMIT 0000176

graze on the new food source.  The platform structure would provide substrate and topographic relief for reef building organisms and associated habitat.

b.  Land Use Changes.  The proposed mariculture facility in the Gulf of Mexico and associated on-shore support facilities are consistent with the surrounding land use and does not conflict with local land use plans or ordinances.  The Alabama Department of Environmental Management certifies that the proposal complies with the Coastal Zone Management Act of 1972 and the State Coastal Zone Management Program.

c.  Historic and Archeological Resources.  This work has been coordinated with the State Historic Preservation Officer.  No properties listed in or eligible for the National Register of Historic Places are located in the project vicinity.

d.  Endangered and Threatened Species.  The work site lies within the range of five Federally listed endangered whales (right, finback, humpback, sei, sperm) and the manatee.  Due to the limited nature of the work, the proposed mariculture facility should not impact these or any listed endangered or threatened species or their critical habitat.  Species of concern include sea turtles which may impinge and entangle with fence or fish nets; the Brown Pelican (endangered listing in Louisiana) may be attracted to the easy prey confined within the fish pens.

e.  Migratory Birds.  The project area is within an intense fly-zone.  Night lighting would be minimized to reduce confusion of birds with land fall.  In addition to the resident Brown Pelican, the migratory White Pelican and the cormorant may be attracted to prey within the fish pens.  Predatory control of pelicans and cormorants would be passive (e.g. use of streamers or top netting to discourage predation).  Killing of birds is prohibited in accord with NPDES permit requirements.

f.  Essential Fish Habitat (EFH).  In consultation with the National Marine Fisheries Service, the project would not have a substantial impact to EFH or Federally managed species in estuarine waters of the Mobile Bay, Mississippi Sound, or their tributaries.

g.  Navigation.  There would be no impact or obstruction of local riparian rights resulting from the proposed facility in Federal waters.  Adverse impacts and obstruction to navigation would be limited around the fixed platform, associated structures and perimeter fence.  The facility would be lighted in accord with U.S. Coast Guard requirements; and bonded for ultimate removal and disposal upon end of project life (30 years), abandonment, or anchorage breaches.

h.  Clean Air.  The project is within a National Ambient Air Quality Standards attainment area; therefore, a conformity analysis pursuant to Section 176(c) of the Clean Air Act is not required. Any later indirect emissions generally cannot be practically

BIOM-GMIT 0000177

controlled by the Corps, and therefore, a conformity determination is not required.

    i.  Public Interest.  The project is not contrary to the public interest of sustainable economic development with minimal adverse environmental impact.

4.  <u>IRREVERSIBLE OR IRRETRIEVABLE COMMITMENTS WITH THE PROJECT</u>: Irreversible or irretrievable commitments of resources include money, labor, fuel and construction materials.  Commitment of these resources present minor impacts.  Resource commitments are not considered irreversible since removal of the facility or cessation of operations would result in recovery of preproject benthic communities within 2 years.  Removal of fish nets would eliminate impingement and injury risks to wild species.  Salvage operations would recycle structural steel.

5.  <u>ADVERSE ENVIRONMENTAL EFFECTS WHICH CANNOT BE AVOIDED</u>:  Adverse environmental effects which cannot be avoided with the project should be temporary and localized, and have been determined to be minor individually and cumulatively.  Water quality and benthic community impacts associated with metabolic wastes and residual food would be monitored in accord with NPDES permit or Corps permit requirements.  The U.S. Environmental Protection Agency would provide lead agency guidance on acceptable levels of degradation to the marine environment.  If facility relocation or temporary cessation of operations are warranted (e.g. to allow benthic community recovery), the EPA would advise the Corps of permit revocation or modification options to improve the marine environment to acceptable standards.

6.  <u>THE RELATIONSHIP BETWEEN LOCAL SHORT-TERM USE OF MAN'S ENVIRONMENT AND MAINTENANCE AND ENHANCEMENT OF LONG-TERM PRODUCTIVITY</u>:  The proposed mariculture facility is a local short-term use of man's environment and is not anticipated to affect long-term productivity.  The proposed facility involves tradeoffs between short-term environmental gains at the expense of long-term losses, or vice versa.  In view of environmentally significant consequences, accumulation of metabolic wastes and residual food may affect the structure and biodiversity of the benthic community but dynamic forces associated with currents and storms would dilute and disperse these nutrients.  The harvest and distribution of cultivated finfish would decrease need for foreign fish import.

7.  <u>ALTERNATIVES TO THE PROPOSED ACTION</u>:  Although the Environmental Assessment need not include a discussion of alternatives to the applicant's proposal when the impacts of the proposal are minor, there are no unresolved conflicts concerning alternative uses of available resources, and the project is water-dependent (33 CFR 325 Appendix B), the following alternative measures were considered:

    a.  No Action.  Delaying the project pending additional studies or denying the permit for the mariculture facility would be

3

BIOM-GMIT 0000178

contrary to Congressional Act promoting the mariculture industry, and thwart investment opportunities.

b.   Phased Construction.  Phased construction with gradual increase of production scope and perimeter is considered a practicable alternative to full production implementation to benefit from seasonal and long-term monitoring and data collection.

c.   Perimeter Fence Design.  Partial circumvention and configuration of the perimeter fence were considered to allow limited access to public fishers to gulf waters.  BMTI contends the perimeter fence is integral to commercial viability by thwarting the perceived threat of external theft and vandalism.  Monitoring of theft and vandalism incidents would assess the effectiveness or need of the perimeter fence and promote alternative measures to secure the facility.

8.   <u>COORDINATION WITH OTHERS</u>:

a.   U. S. Environmental Protection Agency (EPA).  No response to the public notice.  EPA issued a NPDES Permit (AL0067237) for the mariculture facility effective 1 January 2002.

b.   National Marine Fisheries Service (NMFS).  By 10 September 2002 electronic mail, had no comment, in support or opposition of the proposal, due to manpower constraints.

c.   U. S. Fish and Wildlife Service (FWS).  By 14 August 2002 letter, FWS had no objection to issuing the permit, and deferred comments and recommendations to the NMFS.

d.   Alabama Historical Commission (AHC).  By 12 September 2002 letter, AHC had no objection to issuing the permit subject to notification if archeological features are encountered.

e.   Alabama Department of Conservation and Natural Resources (ADCNR).  By 29 August 2002 letter, ADCNR recommended the permit be denied for the following reasons:

(1) Competing uses of gulf waters.  Commercial and recreational fishers and shrimpers would be excluded from about 27.5 acres of gulf waters.  RESPONSE:  BMTI contends the perimeter fence is integral to commercial viability by thwarting the perceived threat of external theft and vandalism.  The fraction of gulf waters excluded from public use would be relatively minor; first phase operations would limit the circumferenced area to no more than 7.8 acres.  Monitoring of theft and vandalism incidents would affirm the effectiveness of the perimeter fence or promote alternative measures to secure the facility.

(2) Potential increase of the Biological Oxygen Demand (BOD) from nutrient loading associated with metabolic and residual food wastes.  RESPONSE:  Preconstruction and annual monitoring requirements imposed, including NPDES permit monitoring requirements, should provide the scientific data to assess concerns

4

BIOM-GMIT 0000179

for BOD increases; open gulf waters should provide the dynamic forces and feeding organisms to disperse, dilute and assimilate these nutrients.

(3) Potential parasitic and disease contamination of indigenous species. Wild fish, attracted by the abundance of food, would be susceptible to disease and parasites from stock fish. RESPONSE:  Co-contamination of cultured fish by wild species and vice versa were considered.  Maintaining healthy cultured fish would be the prudent business strategy.  Through interagency review and oversight, adaptive management may be warranted to modify permit conditions such as relocating the facility to deeper water.

(4) Predators attracted to the structures and food would prey heavily on native juvenile red fish.  RESPONSE:  Based on the extensive artificial reef program in state and Federal waters in the vicinity of the mariculture facility, the increase of such predation should not be significant.

(5) Enlargement of operations (from 5 to 27.5 acres) without benefit of data collection would be ill advised.  RESPONSE: The operations would be phased from 7.8 acres with 8 fish pens, more or less, up to 27.5 acres with less than 20 pens along with required monitoring and data collection.

(6) Breached fish pens could drift and create hazards to navigation or wash onto beaches.  RESPONSE:  State of the art design, inspection and maintenance would minimize risk of anchoring failure and promote profitability.  Removal by the permittee of navigation hazards would be a permit requirement.

(7) Federal oversight in the implementation of the Federal (Fisheries) Management Plan would be required.  RESPONSE: Permittee would be advised of permit requirements from the Fisheries Management Service.  Proposed legislation would exclude mariculture species.

f.  Alabama Department of Environmental Management. Certification that the proposal complies with the Coastal Zone Management Act was issued on 29 October 2002 contingent on 14-day minimum notification of project implementation and adherence to water quality standards and EPA's NPDES permit requirements.

g.  Public.  By 16 September 2002 letter, an individual expressed support for the mariculture industry for its positive contribution to the balance of trade.  This individual and another by 15 August 2002 letter, expressed the following concerns:

(1)  Corporate use would exclude public use of gulf waters. RESPONSE:  The fraction of gulf waters excluded from public use would be relatively minor.  The perimeter fence would prevent aggressive public fishers from hazardous areas during feeding or harvest operations with crane and boom, and thwart the perceived threat of external theft and vandalism.

5

BIOM-GMIT 0000180

(2)   Adverse impacts to native fish and spawning behavior
(e.g. migrating sheepshead).  RESPONSE:  Capture, cultivation and
harvest of fish would not deplete wild stock; after initial capture
select species would be bred "in-house" or obtained from commercial
nurseries.  Native fish species would avoid areas stressed by
nutrient loading during migration and spawning activities.

(3)   Potential hazards to navigation due to net breaches or
structural failure.  RESPONSE:  The marine environment poses
significant challenges to the integrity and stability of man-made
structures; with state of the art design and maintenance of
structures and appurtenances, net breaches and subsequent hazards
to navigation should be minimized.  Removal by the permittee of
such hazards to navigation is not an option.

(4)   Nutrient loading impacts to benthic community.
RESPONSE:  Dynamic forces are anticipated to disperse and dilute
nutrients while marine organisms would assimilate these nutrients
to the extent that adverse impacts would be minimized.

(5)   Marine fouling of fish pens would be significant.
RESPONSE:  Fish pens would be periodically maintained and marine
organisms removed (e.g. pressure washed or cleaned on-shore); anti-
fouling biochemicals would be limited to EPA-approved products.

9.   CONCLUSION/FINDING OF NO SIGNIFICANT IMPACT:   Based on this
assessment, considering comments presented by other agencies and
the public, and weighing all factors involved, I conclude this
permit decision is not a major Federal action significantly
affecting the quality of the human environment; therefore, an
Environmental Impact Statement is not required.


                                      BY:

ROBERT B. KEYSER                          RONALD A. KRIZMAN
Colonel, Corps of Engineers               Chief, Regulatory Branch
District Engineer                         Operations Division

                                      DATE:   31 May 03

                                      6

BIOM-GMIT 0000181