Claimant Name: BioMarine Technologies, Inc. & Gulf Marine Institute of Technolgy        Claimant EIN: 75-2309471 & 31-1475321

# USEPA
# Site Permit Documents



**EXHIBIT**

**4**

BIOM-GMIT 0000110

Claimant Name: BioMarine Technologies, Inc. & Gulf Marine Institute of Technology     Claimant EIN: 75-2309471 & 31-1475321



### UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
REGION 4
ATLANTA FEDERAL CENTER
61 FORSYTH STREET
ATLANTA, GEORGIA 30303-8960

FEB 2 5 2008

<u>CERTIFIED MAIL</u>
<u>RETURN RECEIPT REQUESTED</u>

Mr. John Ericsson, President
Biomarine Technologies, Inc.
Post Office Box 776
Gulf Breeze, FL  32562

RE:   Final Issuance of NPDES Permit No. AL0067237
       Biomarine Technologies, Inc. and Gulf Marine Institute of Technology

Dear Mr. Ericsson:

Enclosed is the National Pollutant Discharge Elimination System (NPDES) permit for the above-referenced facility. Pursuant to the Clean Water Act and its implementing regulations, the permit shall become effective as indicated on the cover page, unless, within thirty (30) days following the date you receive the permit, you petition the Environmental Appeals Board (EAB) to review any conditions of the permit in accordance with the provisions of Title 40, Code of Federal Regulations Section 124.19, which is enclosed.

All pleadings filed by mail must be addressed to the Environmental Protection Agency, Clerk of the Board, Environmental Appeals Board (MC 1103B), Ariel Rios Building, 1200 Pennsylvania Avenue, N.W., Washington, DC 20460. Documents that are hand-delivered must be delivered to the EAB offices at Colorado Building, 1341 G Street N.W., Suite 600, Washington, DC 20005. Documents may be filed with the Clerk of the Board only between the hours of 8:30 a.m. and 4:30 p.m. Eastern Standard Time, Monday through Friday (excluding Federal holidays). The website for the EAB is http://www.epa.gov/eab. The webpage's Frequently Asked Questions deal with filing issues, which you may want to refer to regarding the permit appeal process.

The preprinted Discharge Monitoring Report (DMR) Forms for the enclosed permit are being processed and will be mailed to you before the due date of the first DMR. These forms should be used to report all discharge data at the frequency required in your permit. If you have not received these preprinted forms prior to the end of the first monitoring period, please contact Mike Donehoo at (404) 562-9745.

BIOM-GMIT 0000111

If you have any questions regarding the permit, please direct them to Marshall Hyatt, Permit Writer, at (404) 562-9304, or for any information on procedures pertaining to legal matters relative to this permit issuance, contact Mr. Paul Schwartz, Attorney-Advisor, at (404) 562-9576.

Sincerely,

James D. Giattina, Director
Water Management Division

Enclosures (3)
1. Evidentiary Hearing Procedures
2. Final NPDES Permit
3. Amendment to Fact Sheet

cc:   National Marine Fisheries Service (with all enclosures, except Permit Appeal Procedures)
      U.S. Fish & Wildlife Service (with all enclosures, except Permit Appeal Procedures)

BIOM-GMIT 0000112

Claimant Name: BioMarine Technologies, Inc. & Gulf Marine Institute of Technolgy          Claimant EIN: 75-2309471 & 31-1475321

 **UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION 4
ATLANTA FEDERAL CENTER
61 FORSYTH STREET
ATLANTA, GEORGIA 30303-8960.

DATE:  FEB 2 5 2008

AMENDMENT TO THE FACT SHEET AT THE TIME OF FINAL PERMIT REISSUANCE

APPLICATION NO: AL0067237

NAMES OF APPLICANTS: Biomarine Technologies, Inc. and Gulf Marine Institute of Technology

1. Changes to Permit from Draft Permit to Final Permit Stage:

- Gulf Marine Institute of Technology was added as a co-permittee.

- Due to delays in permit issuance, items I.A.2, V.A.1, and VI.A.1 were revised to require submittal of various plans to EPA or monitoring to begin within 14 days prior to the project's operation.

- In Item IV.A.1, sampling sites and locations were revised. The revisions will allow EPA Region 4 to obtain the scientific data it needs to fully assess any impacts that may result from fish farm discharges. Also, language referencing a quality assurance project plan was replaced with language regarding an environmental monitoring program and submittal of the details of that program to EPA for review.

- In Item IV.A.3, previous references to the Shannon-Wiener diversity index and chlorophyll were revised to the Shannon diversity index and chlorophyll $a$, respectively.

- Item IV.A.5 regarding contingency sampling of therapeutic compounds was deleted and subsequent sections were re-numbered. This deletion was appropriate because: 1) currently EPA knows of no protocol for such sampling; 2) therapeutic agents are not directly regulated by EPA; and 3) EPA's concern is with the impacts, rather than the actual presence, of therapeutics and EPA believes the monitoring plan will be adequate to detect those impacts without monitoring for those specific agents.

- Various typographical errors were corrected and permit language updated, where necessary.

Internet Address (URL) ● http://www.epa.gov
Recycled/Recyclable ● Printed with Vegetable Oil Based Inks on Recycled Paper (Minimum 30% Postconsumer)

BIOM-GMIT 0000113

Claimant Name: BioMarine Technologies, Inc. & Gulf Marine Institute of Technology     Claimant EIN: 75-2309471 & 31-1475321

2. Public Comments

No public comments were received during the public notice period.

3. State Clean Water Act §401 Certification

Because this discharge is to the Gulf of Mexico in federal waters, State certification of the draft permit was not requested.

4. Clean Water Act Section 403(c) No Unreasonable Degradation Determination

A no unreasonable degradation determination was made by Region 4 on April 13, 2004.

BIOM-GMIT 0000114

Claimant Name: BioMarine Technologies, Inc. & Gulf Marine Institute of Technolgy          Claimant EIN: 75-2309471 & 31-1475321

ENVIRONMENTAL PROTECTION AGENCY
REGION 4

PERMITS, GRANTS, AND TECHNICAL ASSISTANCE BRANCH
WATER MANAGEMENT DIVISION

APPEAL OF NPDES PERMITS

The following is a list of acronyms/abbreviations used:

EPA          Environmental Protection Agency
NPDES        National Pollutant Discharge Elimination System
PSD          Prevention of Significant Deterioration
RCRA         Resource Conservation and Recovery Act
UIC          Underground Injection Control
U.S.C.       United States Code

The following regulation discusses the appeal procedures for NPDES permits and is cited from the regulations as found in Title 40, Code of Federal Regulations (40 CFR) Part 124--Procedures for Decisionmaking, Subpart A-General Program Requirements, Volume 21, pages 283-285, revised as of July 1, 2005.

### Section 124.19  Appeal of RCRA, UIC, NPDES, and PSD Permits.

(a)  Within 30 days after a RCRA, UIC, NPDES, or PSD final permit decision (or a decision under 270.29 of this chapter to deny a permit for the active life of a RCRA hazardous waste management facility or unit) has been issued under Section 124.15 of this part, any person who filed comments on that draft permit or participated in the public hearing may petition the Environmental Appeals Board to review any condition of the permit decision. Persons affected by an NPDES general permit may not file a petition under this section or otherwise challenge the conditions of the general permit in further Agency proceedings. They may, instead, either challenge the general permit in court, or apply for an individual NPDES permit under Section 122.21 as authorized in Section 122.28 and then petition the Board for review as provided by this section. As provided in Section 122.28(b)(3), any interested person may also petition the Director to require an individual NPDES permit for any discharger eligible for authorization to discharge under an NPDES general permit. Any person who failed to file comments or failed to participate in the public hearing on the draft permit may petition for administrative review only to the extent of the changes from the draft to the final permit decision. The 30-day period within which a person may request review under this section begins with the service of notice of the Regional Administrator's action unless a later date is specified in that notice. The petition shall include a statement of the reasons supporting that review, including a demonstration that any issues being raised were raised during the public comment period (including any public hearing) to the extent required by these regulations and when appropriate, a showing that the condition in question is based on:

(1)  A finding of fact or conclusion of law which is clearly erroneous, or

(2)  An exercise of discretion or an important policy consideration which the Environmental Appeals Board should, in its discretion, review.

September 21, 2006

BIOM-GMIT 0000115

(b) The Environmental Appeals Board may also decide on its own initiative to review any condition of any RCRA, UIC, NPDES, or PSD permit decision issued under this part for which review is available under paragraph (a) of this section. The Environmental Appeals Board must act under this paragraph within 30 days of the service date of notice of the Regional Administrator's action.

(c) Within a reasonable time following the filing of the petition for review, the Environmental Appeals Board shall issue an order granting or denying the petition for review. To the extent review is denied, the conditions of the final permit decision become final agency action. Public notice of any grant of review by the Environmental Appeals Board under paragraph (a) or (b) of this section shall be given as provided in Section 124.10. Public notice shall set forth a briefing schedule for the appeal and shall state that any interested person may file an amicus brief. Notice of denial of review shall be sent only to the person(s) requesting review.

(d) The Regional Administrator, at any time prior to the rendering of a decision under paragraph (c) of this section to grant or deny review of a permit decision, may, upon notification to the Board and any interested parties, withdraw the permit and prepare a new draft permit under Section 124.6 addressing the portions so withdrawn. The new draft permit shall proceed through the same process of public comment and opportunity for a public hearing as would apply to any other draft permit subject to this part. Any portions of the permit which are not withdrawn and which are not stayed under Section 124.16(a) continue to apply.

(e) A petition to the Environmental Appeals Board under paragraph (a) of this section is, under 5 U.S.C. 704, a prerequisite to the seeking of judicial review of the final agency action.

(f)   (1) For purposes of judicial review under the appropriate Act, final agency action occurs when a final RCRA, UIC, NPDES, or PSD permit decision is issued by EPA and agency review procedures under this section are exhausted. A final permit decision shall be issued by the Regional Administrator:

  (i) When the Environmental Appeals Board issues notice to the parties that review has been denied;

  (ii) When the Environmental Appeals Board issues a decision on the merits of the appeal and the decision does not include a remand of the proceedings; or

  (iii) Upon the completion of remand proceedings if the proceedings are remanded, unless the Environmental Appeals Board's remand order specifically provides that appeal of the remand decision will be required to exhaust administrative remedies.

  (2) Notice of any final agency action regarding a PSD permit shall promptly be published in the Federal Register.

(g) Motions to reconsider a final order shall be filed within ten (10) days after service of the final order. Every such motion must set forth the matters claimed to have been erroneously decided and the nature of the alleged errors. Motions for reconsideration under this provision shall be directed to, and decided by, the Environmental Appeals Board. Motions for reconsideration directed to the administrator, rather than to the Environmental Appeals Board, will not be considered, except in cases that the Environmental Appeals Board has referred to the Administrator pursuant to Section 124.2 and in which the Administrator has issued the final order. A motion for reconsideration shall not stay the effective date of the final order unless specifically so ordered by the Environmental Appeals Board.

[48 FR 14264, April 1, 1983, as amended at 54 FR 9607, March 7, 1989; 57 FR 5335, February 13, 1992; 65 FR 30911, May 15, 2000]

2                                                                    September 21, 2006

Claimant Name: BioMarine Technologies, Inc. & Gulf Marine Institute of Technology    Claimant EIN: 75-2309471 & 31-1475321

Permit No. AL0067237
Minor non-POTW

## UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
## REGION IV

### AUTHORIZATION TO DISCHARGE UNDER THE
### NATIONAL POLLUTANT DISCHARGE ELIMINATION SYSTEM

In compliance with the provisions of the Clean Water Act, as amended (33 U.S.C. 1251 et seq., the "Act"), the

| | |
|---|---|
| Biomarine Technologies, Inc. | Gulf Marine Institute of Technology |
| P.O. Box 776 | P.O. Box 776 |
| Gulf Breeze, Florida 32562 | Gulf Breeze, Florida 32562 |

are authorized to discharge from a facility located at

Mariculture Platform Facility
Gulf of Mexico
7.5 miles south southwest of Alabama Point in Baldwin County, Alabama
(Within OCS Block 842)
Latitude 30 9.4'North Longitude 87 31.3'West

to receiving waters named

**Gulf of Mexico**

in accordance with effluent limitations, monitoring requirements and other conditions set forth herein. The permit consists of this cover sheet. Part I _5_ pages, Part II _17_ pages, Part III _2_ pages, Part IV _4_ pages, Part V _3_ pages, and Part VI _2_ pages.

This permit shall become effective on  April 1, 2008

This permit and the authorization to discharge shall expire at midnight,   March 31, 2013

_____
2/05/08
Date Issued

_____
James D. Giattina, Director
Water Management Division

BIOM-GMIT 0000117

Claimant Name: BioMarine Technologies, Inc. & Gulf Marine Institute of Technolgy        Claimant EIN: 75-2309471 & 31-1475321

Part II
Page II-5

d.   Prohibition of bypass

(1)   Bypass is prohibited, and the Director may take enforcement action against a permittee for bypass, unless:

(a)   Bypass was unavoidable to prevent loss of life, personal injury, or severe property damage;

(b)   There were no feasible alternatives to the bypass, such as the use of auxiliary treatment facilities, retention of untreated wastes, or maintenance during normal periods of equipment downtime. This condition is not satisfied if adequate back-up equipment should have been installed in the exercise of reasonable engineering judgment to prevent a bypass which occurred during normal periods of equipment downtime or preventive maintenance; and

(c).   The permittee submitted notices as required under Paragraph c. of this subsection.

(2)   The Director may approve an anticipated bypass, after considering its adverse effects, if the Director determines that it will meet the three conditions listed above in Paragraph d.(1) of this subsection.

[40 CFR § 122.41(m)(1)-(4)]

4.   Upsets .

a.   Definition

"Upset" means an exceptional incident in which there is unintentional and temporary noncompliance with technology based permit effluent limitations because of factors beyond the reasonable control of the permittee. An upset does not include noncompliance to the extent caused by operational error, improperly designed treatment facilities, inadequate treatment facilities, lack of preventive maintenance, or careless or improper operation.

b.   Effect of an upset

An upset constitutes an affirmative defense to an action brought for noncompliance with such technology based permit effluent limitations if the requirements of Paragraph c. of this subsection are met. No determination made during administrative review of claims that noncompliance was caused by upset, and before an action for noncompliance, is final administrative action subject to judicial review.

c.   Conditions necessary for a demonstration of upset

A permittee who wishes to establish the affirmative defense of upset shall demonstrate, through properly signed, contemporaneous operating logs, or other relevant evidence that:

(1)   An upset occurred and that the permittee can identify the cause(s) of the upset;

Updated 09/22/2006

BIOM-GMIT 0000118

Claimant Name: BioMarine Technologies, Inc. & Gulf Marine Institute of Technology      Claimant EIN: 75-2309471 & 31-1475321

Part II
Page II-9

c.  The alteration or addition results in a significant change in the permittee's sludge use or disposal practices, and such alteration, addition, or change may justify the application of permit conditions that are different from or absent in the existing permit, including notification of additional use or disposal sites not reported during the permit application process or not reported pursuant to an approved land application plan.
*[40 CFR § 122.41(l)(1)(i)-(iii)]*

2.  Anticipated Noncompliance

The permittee shall give advance notice to the Director of any planned changes in the permitted facility or activity which may result in noncompliance with permit requirements.
*[40 CFR § 122.41(l)(2)]*

Any maintenance of facilities, which might necessitate unavoidable interruption of operation and degradation of effluent quality, shall be scheduled during noncritical water quality periods and carried out in a manner approved by the Director.

3.  Transfer of Ownership of Control

a.  This permit is not transferable to any person except after notice to the Director. The Director may require modification or revocation and reissuance of the permit to change the name of the permittee and incorporate such other requirements as may be necessary under the Clean Water Act.
*[40 CFR § 122.41(l)(3)]*

b.  In some cases modification or revocation and reissuance is mandatory.
*[40 CFR § 122.61]*

c.  Automatic transfers. As an alternative to transfers of permits by modification, any NPDES permit may be automatically transferred to a new permittee if:

(1)  The current permittee notifies the Director at least 30 days in advance of the proposed transfer date in Subparagraph b.(2) of this subsection;

(2)  The notice includes a written agreement between the existing and new permittees containing a specific date for transfer of permit responsibility, coverage, and liability between them; and

(3)  The Director does not notify the existing permittee and the proposed new permittee of his or her intent to modify or revoke and reissue the permit. A modification under this subparagraph may also be a minor modification under 40 CFR § 122.63. If this notice is not received, the transfer is effective on the date specified in the agreement mentioned in Subparagraph b.(2) of this subsection.
*[40 CFR § 122.61(b)]*

Updated 09/22/2006

BIOM-GMIT 0000119

Claimant Name: BioMarine Technologies, Inc. & Gulf Marine Institute of Technology          Claimant EIN: 75-2309471 & 31-1475321

Part II
Page II-10

4.   Monitoring Reports

Monitoring results shall be reported at the intervals specified in Part III of the permit.
*[40 CFR § 122.41(l)(4)]*

Monitoring results must be reported on a Discharge Monitoring Report (DMR) or forms provided or
specified by the Director for reporting results of monitoring of sludge use or disposal practices.
*[40 CFR § 122.41(l)(4)(i)]*

5.   Additional Monitoring by the Permittee

If the permittee monitors any pollutant more frequently than required by the permit using test procedures
approved under 40 CFR part 136 or, in the case of sludge use or disposal, approved under 40 CFR part
136 unless otherwise specified in 40 CFR part 503, or as specified in the permit, the results of this
monitoring shall be included in the calculation and reporting of the data submitted in the DMR or sludge
reporting form specified by the Director.
*[40 CFR § 122.41(l)(4)(ii)]*

6.   Averaging of Measurements

Calculations for all limitations which require averaging of measurements shall utilize an arithmetic mean
unless otherwise specified by the Director in the permit.
*[40 CFR § 122.41(l)(4)(iii)]*

7.   Compliance Schedules

Reports of compliance or noncompliance with, or any progress reports on, interim and final requirements
contained in any compliance schedule of this permit shall be submitted no later than 14 days following
each schedule date.
*[40 CFR § 122.41(l)(5)]*

Any reports of noncompliance shall include the cause of noncompliance, any remedial actions taken, and
the probability of meeting the next scheduled requirement.

8.   Twenty-Four Hour Reporting

The permittee shall report any noncompliance which may endanger health or the environment. Any
information shall be provided orally within 24 hours from the time the permittee becomes aware of the
circumstances.  A written submission shall also be provided within 5 days of the time the permittee
becomes aware of the circumstances.  The written submission shall contain a description of the
noncompliance and its cause; the period of noncompliance, including exact dates and times, and if the
noncompliance has not been corrected, the anticipated time it is expected to continue; and steps taken or
planned to reduce, eliminate, and prevent reoccurrence of the noncompliance.

BIOM-GMIT 0000120

Claimant Name: BioMarine Technologies, Inc. & Gulf Marine Institute of Technolgy          Claimant EIN: 75-2309471 & 31-1475321

Part II
Page II-11

The following shall be included as information which must be reported within 24 hours under this paragraph.

    a.   Any unanticipated bypass which exceeds any effluent limitation in the permit. [See 40 CFR § 122.44(g).]

    b.   Any upset which exceeds any effluent limitation in the permit.

    c.   Violation of a maximum daily discharge limitation for any of the pollutants listed by the Director in the permit to be reported within 24 hours. [See 40 CFR § 122.44(g)]

The Director may waive the written report on a case-by-case basis for reports under this subsection if the oral report has been received within 24 hours.
*[40 CFR § 122.41(l)(6)]*

9.   Other Noncompliance

The permittee shall report all instances of noncompliance not reported under Section D at the time monitoring reports are submitted. The reports shall contain the information listed in Section D, Subsection 8.
*[40 CFR § 122.41(l)(7)]*

10.   Other Information

Where the permittee becomes aware that it failed to submit any relevant facts in a permit application, or submitted incorrect information in a permit application or in any report to the Director, it shall promptly submit such facts or information to the Director.
*[40 CFR § 122.41(l)(8)]*

11.   Changes in Discharge of Toxic Substances

The following conditions apply to all NPDES permits within the categories specified below:

    a.   *Existing manufacturing, commercial, mining, and silvicultural dischargers.* All existing manufacturing, commercial, mining, and silvicultural dischargers must notify the Director as soon as they know or have reason to believe:

        (1)  That any activity has occurred or will occur which would result in the discharge, on a routine or frequent basis, of any toxic pollutant which is not limited in the permit, if that discharge will exceed the highest of the following "notification levels":

           (a)  One hundred micrograms per liter (100 $\mu g/l$);

Updated 09/22/2006

BIOM-GMIT 0000121

Part II
Page II-12

(b) Two hundred micrograms per liter (200 μg/l) for acrolein and acrylonitrile; five hundred micrograms per liter (500 μg/l) for 2,4-dinitrophenol and for 2-methyl-4,6-dinitrophenol; and one milligram per liter (1 mg/l) for antimony; or

(c) Five (5) times the maximum concentration value reported for that pollutant in the permit application in accordance with 40 CFR § 122.21(g)(7).

*[40 CFR § 122.42(a)(1)(i-iii)]*

(2) That any activity has occurred or will occur which would result in any discharge, on a non-routine or infrequent basis, of a toxic pollutant which is not limited in the permit, if that discharge will exceed the highest of the following "notification levels":

(a) Five hundred micrograms per liter (500 μg/l);

(b) One milligram per liter (1 mg/l) for antimony; or

(c) Ten (10) times the maximum concentration value reported for that pollutant in the permit application in accordance with 40 CFR § 122.21(g)(7).

*[40 CFR § 122.42(a)(2)(i-iii)]*

b. *Publicly owned treatment works.* All POTWs must provide adequate notice to the Director of the following:

(1) Any new introduction of pollutants into the POTW from an indirect discharger which would be subject to Section 301 or 306 of CWA if it were directly discharging those pollutants; and

(2) Any substantial change in the volume or character of pollutants being introduced into that POTW by a source introducing pollutants into the POTW at the time of issuance of the permit.

(3) For purposes of this paragraph, adequate notice shall include information on

(a) the quality and quantity of effluent introduced into the POTW, and

(b) any anticipated impact of the change on the quantity or quality of effluent to be discharged from the POTW.

*[40 CFR § 122.42(b)]*

12. Duty to Reapply

If the permittee wishes to continue an activity regulated by this permit after the expiration date of this permit, the permittee must apply for and obtain a new permit.
*[40 CFR § 122.41(b)]*

Updated 09/22/2006

Part II
Page II-13

The application should be submitted at least 180 days before the expiration date of this permit. The Regional Administrator may grant permission to submit an application later than the 180 days in advance, but no later than the permit expiration date.
*[40 CFR § 122.21(d)]*

When EPA is the permit-issuing authority, the conditions of an expired permit continue in force under 5 U.S.C. 558(c) until the effective date of a new permit if the permittee has submitted a timely application under this subsection which is a complete application for a new permit; and the Regional Administrator, through no fault of the permittee, does not issue a new permit with an effective date on or before the expiration date of the previous permit.
*[40 CFR § 122.6(a)]*

Permits continued under this section remain fully effective and enforceable.
*[40 CFR § 122.6(b)]*

13.  Signatory Requirements

All applications, reports, or information submitted to the Director shall be signed and certified.
*[40 CFR § 122.41(k)(1)]*

a.  *Applications.*  All permit applications shall be signed as follows:

  (1)  *For a corporation.*  By a responsible corporate officer.  For the purpose of this section, a responsible corporate officer means:

   (a)  A president, secretary, treasurer, or vice-president of the corporation in charge of a principal business function, or any other person who performs similar policy- or decision-making functions for the corporation, or

   (b)  the manager of one or more manufacturing, production, or operating facilities, provided, the manager is authorized to make management decisions which govern the operation of the regulated facility including having the explicit or implicit duty of making major capital investment recommendations, and initiating and directing other comprehensive measures to assure long term environmental compliance with environmental laws and regulations; the manager can ensure that the necessary systems are established or actions taken to gather complete and accurate information for permit application requirements; and where authority to sign documents has been assigned or delegated to the manager in accordance with corporate procedures.

  NOTE: EPA does not require specific assignments or delegations of authority to responsible corporate officers identified in this subparagraph.  The Agency will presume that these responsible corporate officers have the requisite authority to sign permit applications unless the corporation has notified the Director to the contrary.  Corporate procedures governing authority to sign permit applications may provide for assignment or delegation to applicable corporate positions under this subparagraph rather than to specific individuals.

Updated 09/22/2006

BIOM-GMIT 0000123

Claimant Name: BioMarine Technologies, Inc. & Gulf Marine Institute of Technolgy     Claimant EIN: .75-2309471 & 31-1475321

Part II
Page II-14

    (2) *For a partnership or sole proprietorship.* By a general partner or the proprietor, respectively; or

    (3) *For a municipality, State, Federal, or other public agency.* By either a principal executive officer or ranking elected official. For purposes of this section, a principal executive officer of a Federal agency includes:

        (a) the chief executive officer of the agency, or

        (b) a senior executive officer having responsibility for the overall operations of a principal geographic unit of the agency (e.g., Regional Administrators of EPA).

b.   All reports required by permits, and other information requested by the Director shall be signed by a person described in Paragraph a. of this section, or by a duly authorized representative of that person. A person is a duly authorized representative only if:

    (1). The authorization is made in writing by a person described in Paragraph a. of this section;

    (2) The authorization specifies either an individual or a position having responsibility for the overall operation of the regulated facility or activity such as the position of plant manager, operator of a well or a well field, superintendent, position of equivalent responsibility, or an individual or position having overall responsibility for environmental matters for the company, (a duly authorized representative may thus be either a named individual or any individual occupying a named position.) and,

    (3) The written authorization is submitted to the Director.

c.   *Changes to authorization.* If an authorization under Paragraph b. of this section is no longer accurate because a different individual or position has responsibility for the overall operation of the facility, a new authorization satisfying the requirements of Paragraph b. of this section must be submitted to the Director prior to or together with any reports, information, or applications to be signed by an authorized representative.

d.   *Certification.* Any person signing a document under Paragraph a. or b. of this section shall make the following certification:

    *"I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."*

[40 CFR § 122.22]

Updated 09/22/2006

BIOM-GMIT 0000124

Claimant Name: BioMarine Technologies, Inc. & Gulf Marine Institute of Technolgy          Claimant EIN: 75-2303471 & 31-1475321

Part II
Page II-15

14. Availability of Reports

Except for data determined to be confidential under 40 CFR Part 2, all reports prepared in accordance with the terms of this permit shall be available for public inspection at the offices of the Permit Issuing Authority. As required by the Act, permit applications, permits and effluent data shall not be considered confidential.
*[40 CFR §§ 124.18 & 122]*

15. Penalties for Falsification of Reports

The CWA provides that any person who knowingly makes any false statement, representation, or certification in any record or other document submitted or required to be maintained under this permit, including monitoring reports or reports of compliance or non-compliance shall, upon conviction, be punished by a fine of not more than $10,000 per violation, or by imprisonment for not more than six (6) months per violation, or by both.
*[40 CFR § 122.41(k)(2)]*

SECTION E.   DEFINITIONS

1. Permit Issuing Authority

The Regional Administrator of EPA Region 4 or his/her designee is the "Permit Issuing Authority," unless at some time in the future the State or Indian Tribe receives authority to administer the NPDES program and assumes jurisdiction over the permit; at which time, the Director of the State program receiving the authorization becomes the issuing authority.

The use of the term "Director" in this permit shall apply to the Regional Administrator of EPA, Region 4.
*[40 CFR § 122.2]*

2. Act

"Act" means the Clean Water Act (formerly referred to as the Federal Water Pollution Control Act or Federal Water Pollution Control Act Amendments of 1972) Public Law 92-500, as amended by Public Law 95-217, Public Law 95-576, Public Law 96-483, and Public Law 97-117, 33 U.S.C. 1251 et seq.
*[40 CFR § 124.2]*

3. Discharge Monitoring Report (DMR)

"Discharge Monitoring Report" means the EPA national form (Form 3320-1) including any subsequent additions, revisions, or modifications for the reporting of self-monitoring results by permittees. EPA will prepare and mail "pre-printed" DMR forms to permittees for completion. These "pre-printed" DMR forms will indicate the appropriate reporting requirements and limitations as found in Part I of the permit.
*[40 CFR § 122.2]*

Updated 09/22/2006

BIOM-GMIT 0000125

Claimant Name: BioMarine Technologies, Inc. & Gulf Marine Institute of Technolgy       Claimant EIN: 75-2309471 & 31-1475321

Part II
Page II-16

4. Measurements

a.   "**Daily discharge**" means the "discharge of a pollutant" measured during a calendar day or any 24-hour period that reasonably represents the calendar day for purposes of sampling.

For pollutants with limitations expressed in units of mass, the "daily discharge" is calculated as the total mass of the pollutant discharged over the day.

For pollutants with limitations expressed in other units of measurement (i.e., concentration), the "daily discharge" is calculated as the average measurement of the pollutant over the day.

b.   The "**average annual discharge limitation**" means the highest allowable average of "daily discharges" over a period of twelve consecutive calendar months, calculated as the "arithmetic mean" of the monthly averages for the current calendar month and the eleven prior calendar months. The annual average is calculated each month.

This limitation is identified as "Annual Average" in Part I of the permit.

c.   The "**average monthly discharge limitation**" other than for bacterial indicators, means the highest allowable average of "daily discharges" over a calendar month, calculated as the sum of all "daily discharges" measured during a calendar month divided by the number of "daily discharges" measured during that month.

For bacterial indicators, the "average monthly discharge limitation" is calculated using a "geometric mean."

This limitation is identified as "Monthly Average" or "Daily Average" in Part I of the permit.

d.   The "**average weekly discharge limitation**" means the highest allowable average of "daily discharges" over a calendar week, calculated as the sum of all "daily discharges" measured during a calendar week divided by the number of "daily discharges" measured during that week.

This limitation is identified as "Weekly Average" in Part I of the permit.

e.   The "**maximum daily discharge limitation**" means the highest allowable "daily discharge."

This limitation is identified as "Daily Maximum" in Part I of the permit.

[40 CFR § 122.2]

Updated 09/22/2006

BIOM-GMIT 0000126

5. Types of Samples

a.   Composite Sample:  A "composite sample" is a combination of not less than eight influent or
effluent portions (aliquots), of at least 100 ml, collected over the full time period specified in
Part I of the permit.  The composite sample must be flow proportioned by either a time interval
between each aliquot, or by volume as it relates to effluent flow at the time of sampling, or by
total flow since collection of the previous aliquot.  Aliquots may be collected manually or
automatically.

b.   Grab Sample:  A "grab sample" is a single influent or effluent portion which is not a composite
sample.  The sample(s) shall be collected at the period(s) most representative of the total
discharge.

6. Calculation of Means

a.   Arithmetic Mean:  The "arithmetic mean" of any set of values is the sum of the individual
values divided by the number of individual values.

b.   Geometric Mean:  The "geometric mean" of any set of values is the $N^{th}$ root of the product of the
individual values where N is equal to the number of individual values.  The geometric mean is
equivalent to the antilog of the arithmetic mean of the logarithms of the individual values.  For
purposes of calculating the geometric mean, values of zero (0) shall be considered to be one (1).

7. Hazardous Substance

A "hazardous substance" means any substance designated under 40 CFR Part 116 pursuant to Section
311 of the Clean Water Act.
*[40 CFR § 122.2]*

8. Toxic Pollutants

A "toxic pollutant" is any pollutant listed as toxic under Section 307(a)(1) of the Clean Water Act or, in
the case of "sludge use or disposal practices," any pollutant identified in regulations implementing Section
405(d) of the Clean Water Act.
*[40 CFR § 122.2]*

BIOM-GMIT 0000127

Claimant Name: BioMarine Technologies, Inc. & Gulf Marine Institute of Technolgy        Claimant EIN: 75-2309471 & 31-1475321

Page III-1
Permit No. AL0067237

## PART III

Other Requirements

A. Reporting of Monitoring Results

Monitoring results obtained for each calendar month shall be summarized for that month and reported on a DMR Form (EPA No. 3320-1), postmarked no later than the 28th day of the month following the completed calendar month. (For example, data for January shall be submitted by February 28.) Signed copies of these, and all other reports required by Section D of Part II, Reporting Requirements, shall be submitted to the Permit Issuing Authority at the following address:

> Environmental Protection Agency
> Region 4
> Gulf Enforcement Section
> Water Programs Enforcement Branch
> Water Management Division
> 61 Forsyth St., SW
> Atlanta, GA 30303-8960

Monitoring reports for Part IV shall be postmarked no later than the 28th day of the month following the month for which the monitoring period was completed. Monitoring reports shall be submitted to the Permit Issuing Authority at the following address:

> Environmental Protection Agency
> Region 4
> Coastal Section
> Wetlands, Coastal and Nonpoint Source Branch
> Water Management Division
> 61 Forsyth St., SW
> Atlanta, GA 30303-8960

If no discharge occurs during the reporting period, sampling requirements of this permit do not apply. The statement "No Discharge" shall be written on the DMR form. If, during the term of this permit, the facility ceases discharge to surface waters, the Permit Issuing Authority and the State shall be notified immediately upon cessation of discharge. This notification shall be in writing.

BIOM-GMIT 0000128

Claimant Name: BioMarine Technologies, Inc. & Gulf Marine Institute of Technolgy    Claimant EIN: 75-2309471 & 31-1475321

Page III-2
Permit No. AL0067237

PART III

B. Reopener Clause

This permit shall be modified, or alternatively, revoked and reissued, to comply with any applicable effluent standard or limitation issued or approved under Sections 301(b)(2)(C) & (D), 304(b)(2) and 307(a)(2) of the Clean Water Act, as amended, if the effluent standard or limitation so issued or approved:

1. Contains different conditions or is otherwise more stringent than any condition in the permit; or

2. Controls any pollutant not addressed in the permit.

The permit as modified or reissued under this paragraph shall contain any other requirements of the Act then applicable.

BIOM-GMIT 0000129

Claimant Name: BioMarine Technologies, Inc. & Gulf Marine Institute of Technolgy        Claimant EIN: 75-2309471 & 31-1475321

Page IV-1
Permit No. AL0067237

## A. Monitoring Program

The Environmental Monitoring Plan (EMP) shall be submitted to EPA prior to 45 days of the facility's operation. The EMP shall provide details regarding the sampling devices, methods, sample holding times, quality control/quality assurance, chain of custody, etc. to be used to collect water quality and benthic samples. All samples shall be collected consistent with the EMP that is submitted to EPA, unless requested to be modified by EPA.

### 1. Sample types and location

Benthic and water quality samples will be collected at intervals on two perpendicular transects passing through the center of the cluster of cages (the cage cluster is formed by a circle drawn around the outermost edges of cages in a group of cages). Each transect will be two kilometers in length and the two transects intersect at the center of the cage cluster. The first transect lies parallel to the predominant current direction and the second transect lies perpendicular to the first, or the predominant current.

Water quality parameters will be measured at two depths, mid-water and a meter from the bottom, at three sampling sites located along each transect. The sampling sites, from the center of the cage cluster in both directions, include: 1) a point at the center of the cage cluster; 2) the edge of the cage cluster plus 25 meters; and 3) the edge plus 50 meters. Benthic samples are to be collected from the same sample locations and distance intervals along each transect. Each benthic sample is to consist of sufficient surface and below surface materials to adequately determine the parameter of interest. In addition, water quality and benthic samples shall also be collected at one sampling site to serve as a reference, located at the edge of the cage cluster plus one kilometer, positioned at a point equidistant from the main sampling transects. Sufficient replicate samples or sample quantity should be collected to meet the EMP.

During each sampling event, at the beginning and end of the period of active sampling, sea surface conditions (wind, wave amplitude and frequency, rain, cloud cover, air temperature and salinity) and tide stage or change in tidal stage should be recorded plus: current stocking density, feeding rate reported on a per cage and total farm basis and an analysis of feed contents (feed label information).

### 2. Bathymetric and Topographic Description

Prior to sample collection, a complete description of the bathymetric and topographic characteristics within an area that projects out two kilometers from the center of the cage cluster will be developed and documented.

BIOM-GMIT 0000130

Claimant Name: BioMarine Technologies, Inc. & Gulf Marine Institute of Technolgy

Claimant EIN: 75-2309471 & 31-1475321

Page IV-2
Permit No. AL0067237

### 3. Water and Benthic Parameters

Prior to the installation of the cages, each transect will be sampled for the following:

Sediment Characteristics - A profile and description of the sediment to include particle size distribution, total solids, specific gravity, and settling rates. Sediment chemical composition will include total volatile solids (TVS), total organic carbon (TOC), total nitrogen, total phosphate, hydrogen sulfide, and interstitial dissolved oxygen.[1]

Benthic Macroinvertebrate Community Structure - Benthic macroinvertebrates or infauna (organisms that are retained on a 0.5 mm sieve) will be collected at each benthic sample location for community structure analysis. Organisms will be identified to the lowest possible identification level and counted. Infauna community structure analysis will include species richness (calculated as Margalefs index: $d = (S-1)/log\ N$, where $N$ is the total number of species in the sample) and diversity (calculated as Shannon diversity: $H' = -\sum p_i(log\ p_i)$).

Physical and chemical water quality parameters will include dissolved oxygen, salinity, temperature, turbidity, total suspended solids, chlorophyll a, ammonia-N, nitrite-N, nitrate-N, and total phosphate. The above referenced water quality parameters are to be assessed at mid-water and a meter from the bottom at each of the water quality sampling sites. Current speed and direction will be measured at each sampling event.

### 4. Sample Frequency

Water Quality: The following schedule is to be initiated following the initial introduction of animals or animal feed into cages and following any increase in animal stock density (abundance or biomass) or feeding rate 20% or higher. The listed water quality parameters will be measured monthly at each site for the first three months. If no significant changes in water quality parameters are detected over three consecutive months at a given stock density and feeding rate, water sampling will then be done quarterly until a 20% or greater increase in stock density or feeding rate occurs. In addition, a change in sampling frequency, sample location, or parameters measured may be directed by EPA based on detection of significant water quality degradation.

Sediment Characteristics: The following schedule is to be initiated following the initial introduction of animals or animal feed into cages and following any increase in animal

---

[1] Analytical methods to determine TOC or TVS may be hampered by sediment grain size as influenced by scouring currents. In the event one or both of these parameters cannot be determined, the environmental monitoring management team must document such a failure.

Claimant Name: BioMarine Technologies, Inc. & Gulf Marine Institute of Technolgy      Claimant EIN: 75-2309471 & 31-1475321

Page IV-3
Permit No. AL0067237

stock density (abundance or biomass) or feeding rate 20% or higher. The listed sediment quality parameters will be measured monthly at each site for the first three months. If no significant changes in water quality parameters are detected over three consecutive months at a given stock density and feeding rate, sediment sampling and analysis will then be done quarterly until a 20% or greater increase in stock density or feeding rate occurs. In addition, a change in sampling frequency, sample location, or parameters measured may be directed by EPA based on detection of significant sediment quality degradation.

Benthic Infauna Community Structure: The purpose of infauna community analysis is to determine ecological impacts of significant changes to sediment quality and, therefore, scheduling should be tied to detected changes in sediment quality rather than on a predetermined frequency. Following the initial baseline (pre-stocking) sampling and analysis of benthic infauna, subsequent sampling and analysis will be done if significant sediment quality degradation is detected based on measured sediment characteristics.

5. Heavy Metals

Cage materials requiring the application of anti-fouling coatings or attachments (i.e., sacrificial zincs) to the cage structure will require the addition of appropriate sampling methodology of the sediments to detect accumulation of heavy metals (zinc or copper). Such chemical analyses are not required if such coating and attachments are not used.

6. Failure to Sample

Should conditions arise so that some or all of the sampling or analytical procedures prescribed in this Monitoring Program are not done or reporting cannot occur on schedule, the EPA must be notified in writing (email). The notification should include the nature of the problem and recommended solutions.

7. Submission of Monitoring Results

The results of each monthly monitoring event prescribed by this Monitoring Program as per 40 C.F.R., Part 125, Subpart M, will be submitted to the U.S. Environmental Protection Agency/Region 4 within 60 working days of sample collection. Results will include any narrative reporting in electronic format (.doc, .txt, etc.). All processed and raw data will be included in Excel (.xls) format.

Page IV-4
Permit No. AL0067237

8.  Modifications to the Monitoring Program

The specifications in the monitoring program are subject to modification by the EPA if warranted, based on evaluation of physical, chemical, and biological data or proposed changes. The permit applicant may request modifications of the monitoring program in writing to the EPA. The EPA will consider modification requests based on findings to date of the monitoring program, in consultation with the applicant.

Page V-1
Permit No. AL0067237

## PART V

### A. SPILL CONTROL ACTIVITIES AND PLAN

#### 1. Spill Control Plan

The permittee shall prepare and submit a Spill Prevention Plan to EPA within 14 days prior to when the project is scheduled to become operational. This plan shall include information and procedures related to the prevention of spills and unplanned discharges of petroleum products and other hazardous materials.

a. The plan shall provide a complete and up-to-date list of all petroleum products and other hazardous materials stored at and transferred between the facility, its support craft, and its shore-based storage facilities.

b. The plan shall include descriptions of the procedures used to prevent, control, and/or treat spills and unplanned discharges of petroleum products and other hazardous materials according to the type and magnitude of spill or discharge.

c. The plan shall include a description of the supplies and equipment which prevent, control, and/or treat spills and unplanned discharges and a compliance schedule to install any necessary items.

d. The plan shall include the description of the reporting system which will be used to alert responsible facility management and appropriate legal and regulatory authorities.

e. All members of the facility's staff shall have an operational familiarity with the plan.

#### 2. Chemical Storage and Transfer

The permittee shall store and transfer oil, gas, kerosene, antibiotics, solid chemicals, chemical solutions, paints, solvents, acids, caustic solution, and waste material, including batteries, in a manner which will prevent the entry of these materials into waters of the U.S. and in a manner which will prevent spillage by overfilling, tipping, or rupture. The permittee shall not store toxic (as defined in 40 C.F.R. 122, Appendix D) or deleterious materials at the facility. The permittee shall limit on-site supplies of petroleum products and other hazardous materials to small quantities or those amounts required for use during the time period between supply shipments.

Page V-2
Permit No. AL0067237

a. All petroleum products and other hazardous materials shall be held in durable, impervious containers which are clearly labeled to indicate their contents. Fuel used for boat and small engine operation shall be stored in U.S. Coast Guard-approved containers.

b. All petroleum products and other hazardous materials shall be stored under cover, such as tarpaulins or roofed structures. The quantity of petroleum products and other hazardous materials stored on the net-pen facility will be minimized and maintained in well-defined, discrete areas.

c. Incompatible or reactive materials shall be segregated and securely stored in separate containment areas that prevent the mixing of chemicals.

d. All petroleum products and other hazardous materials shall be handled and transferred from containers to equipment using tools and other transfer items designed and intended for use with such materials.

3. Spill Prevention Practices

The permittee shall maintain the mariculture facility, its support craft, and shore-based storage facilities in clean and tidy condition so as to minimize the possibility of accidents and spills of petroleum products and other hazardous materials in the operation of the facility. The permittee shall conduct periodic inspection, cleaning, and maintenance of the facility, its support craft, and shore-based storage facilities.

The permittee shall provide and has on-hand at all times absorbent materials and appropriate tools in sufficient quantities to contain and collect chemicals spilled at the mariculture facility, on its support craft, and in shore-based storage facilities.

4. Spill Cleanup

The permittee shall, in the event of an accidental discharge of petroleum products and other hazardous materials, undertake actions to limit and prevent the spreading of the discharge to the waters of the U.S. The permittee shall, in the event of a spill, notify the appropriate agencies as soon as possible and within 24 hr.

a. Cleanup efforts shall commence immediately and be completed as soon as possible, taking precedence over normal work.

b. Cleanup efforts shall be in accordance with the most current Spill Prevention Plan.

c. Cleanup efforts shall include the proper disposal of any spilled materials and used cleanup materials. Chemical wastes and spilled chemicals shall be removed from the mariculture facility and disposed of at an approved facility.

BIOM-GMIT 0000135

Page V-3
Permit No. AL0067237

d. No emulsifiers or dispersants shall be used in waters of the U.S. without approval of EPA.

BIOM-GMIT 0000136

Claimant Name: BioMarine Technologies, Inc. & Gulf Marine Institute of Technolgy          Claimant EIN: 75-2309471 & 31-1475321

Page VI-1
Permit No. AL0067237

## PART VI

### A. FACILITIES DAMAGES CONTROL ACTIVITIES AND PLAN

1. Facilities Damages Control Plan

The permittee shall prepare and submit a Facilities Damage Prevention Plan to EPA within 14 days prior to when the project is scheduled to become operational. This plan shall include information and procedures related to the prevention of natural and man-made disasters.

a. The plan shall provide a complete and up-to-date list of all facilities used to transport, deliver, remove and confine commercial fish and other aquatic life, its support and emergency craft, and its shore-based storage facilities.

b. The plan shall include descriptions of the procedures used to prevent, control, and/or confine natural and man-made disasters according to the type and magnitude of the disaster.

c. The plan shall include a description of the supplies and equipment which prevent, control, and/or confine natural and man-made disasters and a compliance schedule to install any necessary items.

d. The plan shall include a maintenance schedule of all necessary facilities/items.

e. The plan shall include the description of the reporting system which will be used to alert responsible facility management and appropriate legal and regulatory authorities.

f. All members of the facility's staff shall have an operational familiarity with the plan.

2. Fish/Aquatic Life Containment and Transfer

The permittee shall contain and transfer commercial fish and other aquatic life in a manner which will prevent the unconfined entry of commercial aquatic life into waters of the U.S. and in a manner which will prevent release by overstocking, tipping, or rupture.

a. All containment and transfer structures/facilities shall conform with all applicable manufacturer and U.S. Coast Guard requirements/recommendations.

BIOM-GMIT 0000137

Claimant Name:  BioMarine Technologies, Inc. & Gulf Marine Institute of Technolgy     Claimant EIN: 75-2309471 & 31-1475321

Page VI-2
Permit No. AL0067237

b. All containment and transfer structures/facilities shall be maintained in accordance with applicable manufacturer and U.S. Coast Guard requirements/recommendations.

B. Disaster Prevention Practices

The permittee shall maintain the mariculture facility, confinement structures, support and emergency craft, and shore-based storage facilities in a structurally sound manner and in proper mechanical operating order so as to minimize the impact of disasters.  The permittee shall conduct periodic inspection, cleaning and maintenance of the facility, confinement structures, support and emergency craft, and shore-based storage facilities.

The permittee shall provide and have on hand at all times appropriate material and tools in sufficient quantities to contain and collect commercial fish and aquatic life at the mariculture facility, on support and emergency craft, and in shore-based storage facilities.

C. Disaster Cleanup

The permittee shall, in the event of a disaster, undertake actions to limit and prevent the release of commercial fish and aquatic life to the waters of the U.S.  The permittee shall, in the event of a disaster, notify the appropriate agencies as soon as possible and within 24 hours.

Cleanup efforts shall commence immediately and be completed as soon as possible, taking precedence over normal work.

Cleanup efforts shall be in accordance with the most current Facilities Damages Control Plan.

Cleanup efforts shall include the proper disposal of dead or parts of commercial fish, aquatic life, and debris at an approved facility.

BIOM-GMIT 0000138