# COMMERCIAL JOINT DEVELOPMENT AGREEMENT

This Commercial Joint Development Agreement (this "Agreement"), dated as of the day of 21 September, 2007, by and between Gulf Marine Institute of Technology ("GMIT") a Delaware, non-profit corporation doing business in Texas and Florida and BioMarine Technologies, Inc. ("BioMarine"), a Delaware corporation doing business in Texas.

## WITNESSETH:

**WHEREAS**, GMIT is the assignee under a certain Assignment and Assumption Agreement (the "Assignment Agreement"), dated September 18, 1998, with Seagull Energy E&P Inc. as assignor; and the related Texas General Land Office surface and subsurface lease.

**WHEREAS**, pursuant to the Assignment Agreement, GMIT has a leasehold interest in a surface and subsurface area of land included within the STATE OF TEXAS TRACT 526 L, Offshore Matagorda County, TX, described in State Lease M-74563 (the "Property"); and

**WHEREAS**, GMIT wishes to contract with BioMarine to jointly develop its existing Texas oil platform research complex situated on the Property and the surrounding leasehold waters for commercial mariculture (sea farming) use, and BioMarine wishes to enter into this Commercial Joint Development Agreement for these purposes.

**NOW, THEREFORE**, in consideration of the foregoing and the mutual covenants and agreements herein, the parties agree as follows:

1. **Platform Development.** BioMarine shall develop the platform situated on the Property into a mariculture facility substantially in accordance with the plans and specifications outlined in Exhibit A (Army Corps of Engineers permit drawings as amended September, 2007) hereto, including its Sea Star Oyster Relay system and other, to be specified, sea farming cages and hatchery/nursery systems.

2. **Platform Operation.** Upon commencing BioMarine's Redevelopment Plans (defined as the earlier to occur of (i) the completion by BioMarine of a capital raise aggregating not less



EXHIBIT 8

than $7.6 million gross through the private issuance of equity securities of BioMarine or (ii) the commencement by BioMarine of commercial development efforts at the platform site under its Business Plan) for the platform, BioMarine shall have the right, until the end of the term of this Agreement or its earlier termination upon a Termination Event, to conduct its mariculture operations at the platform location and to make any additional modifications or adjustments to the platform or its systems as it deems necessary or advisable for the conduct of its mariculture operations, subject to GMIT's written approval and the approval of all applicable state and federal agencies, if required. GMIT's approval shall not be unreasonably withheld.

Subject only to non-commercial research activities conducted at the platform by GMIT from time to time, which at no time will interfere with the operations of BioMarine, provided that BioMarine commences activities at the platform no later than June 1, 2008, BioMarine shall have the exclusive use of the platform during the term of this Agreement. Notwithstanding the foregoing, should BioMarine abandon the platform, as evidenced by its failure to conduct operations at the platform for a continuous period of six months, GMIT shall have the right to utilize or grant to others the right to utilize the platform for commercial purposes unless the abandonment was the result of an emergency event which renders the use of the platform impracticable for a longer period than the six months.

**3. Employees and Consultants.** It is agreed that in developing the platform for mariculture use and in the conduct of its operations, BioMarine may retain the services of one or more consultants and hire such employees as it deems necessary or advisable.

**4. GMIT Representations and Warranties.** GMIT represents and warrants to BioMarine, as follows:

a) Subject to the terms of the Assignment Agreement, the related Texas General Land Office surface and subsurface lease, GMIT has a valid and subsisting leasehold interest in the Property and owns, holds, is acquiring or lawfully uses all licenses, permits, franchises, approvals, authorizations, qualifications, concessions or the like, issued or granted by any federal, state or local governmental or regulatory authority which are necessary for the use of the Property as contemplated by this Agreement (collectively, the "Permits"). GMIT is not in default, nor has GMIT received any notice of any claim of

2



default with respect to any Permit and, to the knowledge of GMIT, no event has occurred, which with the giving of notice or passage of time or both, would cause or give rise to any default with respect to any Permit.

b)   Except for Gulf Marine Institute vs. Jerry Patterson (Cause No. 00-J-0292-C) in the District Court of Matagorda County, Texas, in which judgment was entered November 15, 2005, there is no, and at no time during the term of this Agreement shall GMIT permit to exist any, claim, action, suit, proceeding or governmental investigation before any court, arbitrator or governmental or regulatory authority pending or, to the best knowledge of GMIT, threatened against GMIT which relates to or arises out of the Property or the use of the Property as contemplated by this Agreement, and GMIT has no knowledge of any reasonably likely basis or set of circumstances for any such action, suit, proceeding, claim or investigation the result of which could materially and adversely affect the use of the Property as contemplated by this Agreement or otherwise could impair the ability of BioMarine to perform as contemplated by this Agreement.

**5.   Escrow.**  Upon commencing operations at the platform site, BioMarine agrees that it will establish an escrow account (the "Escrow Account") into which it will deposit $325,000 per year for four years (starting in the second year of operation) and thereafter pay $260,000 for the next five years for a total period of ten years or until the amount in the Escrow Account inclusive of accrued interest equals $2.6 million and will make such funds available for the payment of any costs incurred by GMIT in connection with an emergency damage response and/or the eventual decommissioning and deconstruction of the platform situated on the Property; provided, however, (i) that BioMarine shall incur no obligation whatsoever to decommission or deconstruct the platform or to fund such decommissioning or deconstruction beyond the total amount of $2.6 million dollars held in GMIT's platform abandonment and emergency escrow account at the time of an emergency event and/or the platform is decommissioned, (ii) all amounts in the Escrow Account (inclusive of any accrued interest) in excess of $2.6 million shall be paid to BioMarine from time to time upon demand therefore and (iii) any funds remaining in the Escrow Account after the decommissioning and destruction of the platform shall be the property of BioMarine. An "emergency event" is defined to mean a natural or cataclysmic event that renders the platform

3



unsafe for operations as contemplated by this Agreement or renders the platform unsuitable for the purposes contemplated hereby.

6.   **Indemnification**.  GMIT or BioMarine, as the case may be, agrees to indemnify the other and hold the other harmless against any and all loss, damage, judgment, fine or amount paid in settlement, arising out of any claim, cause of action, suit or other actual or threatened proceeding related to the performance under this Agreement or the use of the Property by GMIT or BioMarine, as applicable, together with any and all fees and expenses connected therewith, including any reasonable attorneys' fees incurred by the other party by reason thereof.

7.   **Causality/Liability Insurance and Maintenance of Structures**.  BioMarine agrees to maintain $5.0 million in property/causality and liability insurance naming GMIT as jointly insured until the end of the term of this Agreement or its earlier termination upon a Termination Event, commencing at such time as BioMarine commences its redevelopment plans for the platform site in Texas and to maintain the structural integrity of the all platforms in use and to keep the platforms in generally good repair.  At the end of the term of this Agreement, BioMarine shall relinquish all of its rights to use the platform, and all of the improvements and equipment installed by BioMarine shall remain as part of the platform, subject to GMIT's purchase obligation in Section 10, below.

8.   **Maintenance of Property**.  Subject to the Assignment Agreement, the related Texas General Land Office surface and subsurface lease and the Permits, until the end of the term of this Agreement or its earlier termination upon an Termination Event GMIT shall maintain all Permits, make all payments, execute all documents and take whatever action as may be reasonably necessary to ensure that the Property (i) remains available for use, without interruption or undue interference, by BioMarine as contemplated by this Agreement and (ii) except as may be subordinated to BioMarine's use of the Property as contemplated by this Agreement, is free from any encumbrances, liens, or other restriction which could adversely affect the right or ability of BioMarine to so use the Property.

9.   **Notice of Claim; BioMarine Acting in Stead of GMIT**.

(a)   GMIT shall give prompt written notice to BioMarine of the commencement of any claim, action or proceeding, or any

4

written threat thereof, or its awareness of any state of facts which GMIT reasonably determines will (i) adversely affect or materially prejudice the use by BioMarine of the Property as contemplated by this Agreement or (ii) give rise to a Termination Event (as defined in Section 12) by GMIT under this Agreement, which notice shall set forth the nature and basis of the claim or state of facts, to the extent known, and any other reasonably relevant information in the possession of GMIT (a "Notice of Claim"). BioMarine shall have the right, at its own expense, to monitor and participate in the defense of any such claim, suit or proceeding or in the response to any such state of facts, as applicable.

(b) In the event that GMIT does not offer reasonable assurances to BioMarine as to GMIT's ability to satisfy any judgment or settlement or adequately respond to any state of facts set forth in the Notice of Claim, BioMarine may, upon written notice to GMIT and at its own cost and expense, assume control (with legal counsel reasonably acceptable to GMIT) of the defense or the response, as applicable, and defend, settle or dispose of the claim or state of facts; provided, however, that BioMarine shall be entitled to reimbursement from GMIT of its fees and expenses of such legal counsel if the claim or state of facts results from the negligence or malfeasance of GMIT or is one which GMIT should have reasonably concluded could have an adverse effect on the use of the Property by BioMarine as contemplated by this Agreement.

(c) GMIT or BioMarine, as the case may be, depending upon who is controlling the defense of the claim, suit or proceeding or the response to the state of facts set forth in the Notice of Claim, shall (i) keep the other fully informed of such claim, suit or proceeding or of such response at all stages thereof, whether or not the other is represented by legal counsel and (ii) cooperate with the other and provide such assistance, at the sole cost and expense of the party controlling the defense or response, as applicable, as such party may reasonably request in connection with the defense of any such claim, suit or proceeding or such response, including, but not limited to, providing the other with access to and use of all relevant corporate records and making available its officers and employees, if required. Neither GMIT nor BioMarine shall settle any claim, suit or proceeding or dispose of the claim or state of facts without the prior written consent of the other (which consent shall not be unreasonably withheld or delayed), unless there is no obligation on the part of the other to contribute to

5



any payment and there is no finding or admission of violation of any nature by, or effect on any other claims that may be made against the other and the relief granted in connection therewith requires no action on the part of, and has no adverse effect on, the other or the use of the Property as contemplated by this Agreement.

**10. Purchase Obligation.** At the end of the term of this Agreement or upon early termination thereof, GMIT will pay BioMarine an amount equal to the fair value of all equipment (to the extent BioMarine designates for purchase by GMIT and excluding improvements) installed on or about the platform by BioMarine and used in connection with the operation of the platform. The fair value of such equipment shall be determined by a qualified firm of appraisers selected by BioMarine as to which GMIT has no reasonable objection.

**11. Royalty.** BioMarine shall pay to GMIT a royalty payment of 2.5% of all revenue from BioMarine's use of the Property or derived by BioMarine using intellectual property developed by GMIT alone or together with BioMarine or from properties of GMIT operated by BioMarine, with a minimum maintenance payment (to be credited against future accrued royalties) of $10,000 per month (the "Minimum Maintenance Payment") payable until the end of the term of this Agreement or its earlier termination upon a Termination Event. Such payments shall commence at such time as BioMarine commences its Redevelopment Plans for the platform site in Texas, as provided (and defined) in Section 2 above.

**12. Term and Termination.** This Agreement shall continue in effect until the expiration of GMIT's State Lease M-74563 or unless earlier terminated by any of the following (each, a "Termination Event"):

    a) Failure by GMIT to renew or obtain Permits necessary for use of the Property as contemplated by this Agreement, which failure is not cured within 90 days thereof;

    b) Failure by BioMarine to make any royalty payments in accordance with this Agreement, which amount is not paid within 20 business days after notice of such failure to pay from GMIT;

    c) Failure by BioMarine to make the Minimum Maintenance Payment or maintain insurance in accordance with Section 7 above, which failure is not cured within 6 months after notice of such failure from GMIT;

6

      d) Third-party legal action against the interest and ownership of GMIT which adversely affects the use of the Property by BioMarine as contemplated by this Agreement, from which legal action no relief permitting such use is granted within 90 days of such action;

      e) BioMarine's lack of commercial development activities of the USACOE permitted operations for a continuous period of 12 months after notice thereof by GMIT, or

      f) the mutual agreement of the parties hereto.

**13. Notices.** All notices and other communications hereunder shall be in writing and shall be deemed sufficiently given if delivered by nationally recognized overnight courier to the address set forth below or to such other address as any party may from time to time designate by notice to the other parties, and any notice or other communication given hereunder shall be effective upon receipt.

    If to GMIT:        Gulf Marine Institute of Technology
                            P.O. Box 776
                            Gulf Breeze, Florida  32562
                            Attn:  Dr. S. Randall Hobgood, Director

    If to BioMarine:   BioMarine Technologies, Inc.
                            8111 Broadway Street, Suite 9
                            Galveston, Texas  77552
                            Attn:   John D. Ericsson, President

**14. Severability, Entire Agreement; Binding Effect and Assignment.**

      a) If any provision of the Agreement is held invalid in arbitration or by a court of competent jurisdiction, such invalidity shall not affect the remaining provision of this Agreement, and they shall be given effect without the invalid provisions if to do so would not substantially frustrate the expectations of the parties hereto. This Agreement shall not be amended except by written agreement signed by both parties.

      b) This Agreement and the exhibits attached hereto contain the entire understanding and agreement of the parties relating to the subject matter hereof and supersedes all prior

7

and/or contemporaneous understandings and agreements of any kind and nature (whether written or oral) among the parties with respect to such subject matter, all of which are merged herein.

    c) This Agreement and the rights and obligations hereunder may not be assigned by any party hereto without the prior written consent of the other parties hereby. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns.

**15. Construction.** This Agreement shall be governed by, and construed in accordance with, the laws of the State of Texas.

**16. Headings.** Headings and captions in this Agreement are for convenience only and shall not be used to interpret or construe its provisions.

**17. Counterparts.** This Agreement may be executed in counterparts which, taken together with this Agreement, will be deemed an original and shall constitute one and the same instrument.

**[Signature Page Follows]**

BIOM-GMIT 0001433

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

BIOMARINE TECHNOLOGIES, INC.

By: _____
John D. Ericsson,
President

**SEAL**

_____
Phillip G. Lee Ph.D.,
Director

GULF MARINE INSTITUTE OF TECHNOLOGY

By: _____
Dr. S. Randall Hobgood,
Director

**SEAL**

_____
Edwin Cake Ph.D.,
Director

_____
Georgine Burt,
Acting Secretary

9