Claimant Name: BioMarine Technologies, Inc. & Gulf Marine Institute of Technolgy Claimant EIN: 75-2309471 & 31-1475321

# DRAFT

Offeree ________

Copy No. ________

**CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM**

**GULF MARINE INSTITUTE OF TECHNOLOGY**

**$10.0 MILLION - MARINE RESEARCH AND DEVELOPMENT**

**SERIES A**

**10-YEAR, 9% CUMULATIVE, CONVERTIBLE UNSECURED BOND**

**Gulf Marine Institute of Technology, a 501 (c) (3) nonprofit Delaware corporation (the "Company"), is offering (the "Offering") 10-year, nine (9%) percent cumulative, convertible, unsecured bonds (the "Bonds") on a best efforts basis to prospective investors (a "Prospective Investor") meeting certain minimum suitability standards. The minimum investment permitted in this offering of Bonds is $10,000; however, the Company and the Placement Agent may allow prospective investors to subscribe for and purchase less than $10,000. Any or all of the Bond principal amount may be converted, subject to IRS requirements, into 100% Tax-Deductible Receipts (TDRs) from the Company at any time over the term of the Bond by Bond Holder. In addition, the Bond Holder will be granted an option to convert the Bond principal and interest amount into the common stock of a pre-IPO offering of a for-profit corporation, hereinafter referred to as an "FPC," which will fully commercialize the Company's researched technology. Subscriptions for Bonds will be accepted, as received, subject to the Company's right to reject a subscription for any reason. See "Subscription Procedures." The completion of the Offering is not subject to any minimum amount being raised. See "Risk Factors - Dependence on Proceeds from the Offering" and "Use of Proceeds."**

**GULF MARINE INSTITUTE OF TECHNOLOGY**
**P.O. Box 776**
**Gulf Breeze, FL 32561**

The date of this Memorandum is _______________, 2010

CONFIDENTIAL

Copyright Applied 1/31/2010



EXHIBIT 9

**TABLE OF CONTENTS**

Page

SUMMARY ....6
SUBSCRIPTION PROCEDURES ....9
RISK FACTORS ....10
USE OF PROCEEDS ....15
SUMMARY FINANCIAL INFORMATION ....15
BUSINESS ....17
MANAGEMENT ....22
DETERMINATION OF OFFERING PRICE ....23
DESCRIPTION OF SECURITIES ....23
EXHIBIT A – PROJECT DESCRIPTION
EXHIBIT B – SUBSCRIPTION AGREEMENT
EXHIBIT C – FINANCIAL PROJECTIONS

## TO ALL PROSPECTIVE INVESTORS

Each Prospective Investor will be required to represent in writing that such Prospective Investor is familiar with and understands the terms of the Offering, that such Prospective Investor meets certain minimum suitability standards, and that such Prospective Investor is a bona fide resident of one of the states in which the Offering is being validly made. See "Subscription Procedures."

**INVESTMENT IN THE COMPANY INVOLVES SPECIAL CONSIDERATIONS AND PROSPECTIVE INVESTORS SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION CONTAINED IN THIS MEMORANDUM. IN VIEW OF THE SPECIAL FACTORS AND SIGNIFICANT RESTRICTION ON TRANSFER DISCLOSED HEREIN.**

**THE OFFERING IS MADE SUBJECT TO WITHDRAWAL, CANCELLATION OR MODIFICATION BY THE COMPANY WITHOUT PRIOR NOTICE. THE COMPANY RESERVES THE RIGHT, IN ITS SOLE DISCRETION, TO REJECT ANY SUBSCRIPTION IN WHOLE OR IN PART OR TO ALLOT TO ANY PROSPECTIVE INVESTOR LESS THAN THE DOLLAR AMOUNT SUBSCRIBED FOR BY SUCH PROSPECTIVE INVESTOR.**

**THE INFORMATION CONTAINED IN THIS MEMORANDUM HAS BEEN PREPARED SOLELY FOR THE BENEFIT OF PROSPECTIVE PURCHASERS OF THE BONDS AND CONSTITUTES AN OFFER ONLY IF A NAME THAT APPEARS ON THE APPROPRIATE SPACE ON THE FRONT COVER. ANY REPRODUCTION OR DISTRIBUTION OF THIS MEMORANDUM, IN WHOLE OR IN PART, OR THE DISCLOSURE OF ANY OF ITS CONTENTS TO ANY PERSON OTHER THAN THE PERSON NAMED ON THE COVER PAGE OR HIS OR HER PURCHASER REPRESENTATIVE(S), WITHOUT THE PRIOR WRITTEN CONSENT OF THE COMPANY, IS PROHIBITED.**

**EACH OFFEREE, BY ACCEPTING DELIVERY OF THIS MEMORANDUM, AGREES TO RETURN IT AND ALL RELATED EXHIBITS AND OTHER DOCUMENTS TO THE COMPANY IF THE OFFEREE DOES NOT INTEND TO INVEST IN THE COMPANY'S BONDS, IF THE OFFEREE'S INVESTMENT IS NOT ACCEPTED OR IF THIS OFFER IS TERMINATED.**

**NO PERSON HAS BEEN AUTHORIZED TO MAKE ANY REPRESENTATION NOT CONTAINED HEREIN (INCLUDING THE EXHIBITS HERETO) AND, IF GIVEN OR MADE, SUCH OTHER INFORMATION OR REPRESENTATION MUST NOT BE RELIED UPON. NEITHER THE DELIVERY OF THIS MEMORANDUM AT ANY TIME NOR ANY DISTRIBUTION OF THE BONDS SHALL, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION SET FORTH HEREIN (INCLUDING IN THE EXHIBITS HERETO) OR IN THE AFFAIRS OF THE COMPANY SINCE THE DATE HEREOF. NO LITERATURE OR ADVERTISING IN WHATEVER FORM WILL OR MAY BE EMPLOYED IN THIS OFFERING EXCEPT FOR THIS MEMORANDUM AND THE EXHIBITS HERETO.**

**PROSPECTIVE INVESTORS ARE NOT TO CONSTRUE THE CONTENTS OF THIS MEMORANDUM AS LEGAL, BUSINESS OR TAX ADVICE. EACH PROSPECTIVE INVESTOR SHOULD CONSULT HIS OWN ATTORNEY, BUSINESS ADVISOR AND TAX ADVISOR AS TO LEGAL, BUSINESS, TAX AND RELATED MATTERS CONCERNING THIS OFFERING.**

## FOR NEW YORK INVESTORS

**THIS PRIVATE PLACEMENT MEMORANDUM HAS NOT BEEN FILED WITH OR REVIEWED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY FEDERAL COMMISSION OR**

REGULATORY AUTHORITY, AND HAS NOT BEEN REVIEWED BY THE ATTORNEY GENERAL OF THE STATE OF NEW YORK OR ANY OFFICIAL OF SIMILAR CAPACITY OF ANY OTHER STATE, NOR HAS ANY SUCH COMMISSION, AUTHORITY OR OFFICIAL DETERMINED WHETHER IT IS ACCURATE OR COMPLETE, OR PASSED UPON OR ENDORSED THE MERITS OF THIS OFFERING. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

**FOR NEW JERSEY INVESTORS**

THIS PRIVATE PLACEMENT MEMORANDUM HAS NOT BEEN FILED WITH OR REVIEWED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY FEDERAL COMMISSION OR REGULATORY AUTHORITY, AND HAS NOT BEEN REVIEWED BY THE ATTORNEY GENERAL OF THE STATE OF NEW JERSEY OR ANY OFFICIAL OF SIMILAR CAPACITY OF ANY OTHER STATE, NOR HAS ANY SUCH COMMISSION, AUTHORITY OR OFFICIAL DETERMINED WHETHER IT IS ACCURATE OR COMPLETE, OR PASSED UPON OR ENDORSED THE MERITS OF THIS OFFERING. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

**FOR FLORIDA INVESTORS**

THE SECURITIES FOR FLORIDA PROSPECTIVE INVESTORS HAVE NOT BEEN REGISTERED PURSUANT TO THE ACT, NOR UNDER THE FLORIDA SECURITIES ACT, BY REASON OF SPECIFIC EXEMPTIONS THEREUNDER RELATING TO THE LIMITED AVAILABILITY OF THE OFFERING. THE SECURITIES CANNOT BE SOLD, TRANSFERRED OR OTHERWISE DISPOSED OF TO ANY PERSON OR ENTITY UNLESS SUBSEQUENTLY REGISTERED UNDER THE ACT, OR THE LAWS OF FLORIDA, IF SUCH REGISTRATION IS REQUIRED.

WHERE SALES ARE MADE TO FIVE OR MORE PERSONS IN FLORIDA, ANY SALE MADE PURSUANT TO SUBSECTION 517.061(11) OF THE FLORIDA SECURITIES ACT SHALL BE VOIDABLE BY SUCH FLORIDA PURCHASER EITHER WITHIN THREE DAYS AFTER THE FIRST TENDER OF CONSIDERATION IS MADE BY SUCH FLORIDA PURCHASER EITHER WITHIN THREE DAYS AFTER THE FIRST TENDER OF CONSIDERATION IS MADE BY SUCH PURCHASER TO THE COMPANY, AN AGENT OF THE COMPANY, OR AN ESCROW AGENT, OR WITHIN THREE DAYS AFTER AVAILABILITY OF THAT PRIVILEGE IS COMMUNICATED TO SUCH PURCHASER, WHICHEVER OCCURS LATER. TO ACCOMPLISH THIS WITHDRAWAL, IT IS SUFFICIENT FOR THE SUBSCRIBER TO SEND A LETTER OR TELEGRAM TO THE COMPANY INDICATING HIS INTENTION TO WITHDRAW. THE LETTER OR TELEGRAM SHOULD BE SENT AND POSTMARKED PRIOR TO THE END OF THE AFOREMENTIONED THIRD BUSINESS DAY. IF THE SUBSCRIBER SENDS A LETTER, IT IS PRUDENT TO SEND IT BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO INSURE THAT IT IS RECEIVED AND ALSO TO EVIDENCE THE TIME WHEN IT WAS MAILED. SHOULD THE SUBSCRIBER MAKE THE REQUEST ORALLY, HE SHOULD ASK FOR WRITTEN CONFIRMATION THAT THE REQUEST HAS BEEN RECEIVED.

**FOR NEW HAMPSHIRE INVESTORS**

NEITHER THE FACT THAT A REGISTRATION STATEMENT OR AN APPLICATION FOR A LICENSE HAS BEEN FILED WITH THE STATE OF NEW HAMPSHIRE NOR THE FACT THAT A SECURITY IS EFFECTIVELY REGISTERED OR A PERSON IS LICENSED IN THE STATE OF NEW HAMPSHIRE CONSTITUTES A FINDING BY THE SECRETARY OF STATE THAT ANY DOCUMENT FILED UNDER RSA 421-B IS TRUE, COMPLETE AND NOT MISLEADING. NEITHER ANY SUCH FACT NOR THE FACT THAT AN EXEMPTION OR EXCEPTION IS AVAILABLE FOR A SECURITY OR A TRANSACTION MEANS THAT THE NEW HAMPSHIRE SECRETARY OF STATE HAS PASSES IN ANY WAY UPON THE MERITS OR QUALIFICATIONS OF, OR RECOMMENDED OR GIVEN APPROVAL TO, ANY PERSON, SECURITY, OR TRANSACTION. IT IS UNLAWFUL TO MAKE, OR CAUSE TO BE MADE, TO ANY PROSPECTIVE PURCHASER, CUSTOMER, OR CLIENT ANY REPRESENTATION INCONSISTENT WITH THE PROVISIONS OF THIS PARAGRAPH.

**FOR PENNSYLVANIA INVESTORS**

SECURITIES ACQUIRED BY PENNSYLVANIA SUBSCRIBERS MAY NOT BE SOLD OR TRANSFERRED FOR TWELVE MONTHS FROM THE DATE OF PURCHASE IF SUCH SALE OR TRANSFER WOULD VIOLATE SECTION 203(d) OF THE PENNSYLVANIA SECURITIES ACT OF 1972 AND THE REGULATIONS THEREUNDER.

EACH PENNSYLVANIA SUBSCRIBER WILL HAVE THE RIGHT TO WITHDRAW HIS SUBSCRIPTION AND HAVE HIS PAYMENT AND SUBSCRIPTION DOCUMENTS RETURNED WITHOUT INCURRING ANY LIABILITY TO THE COMPANY, OR ANY OTHER PERSON, WITHIN TWO BUSINESS DAYS FROM THE DATE OF THE RECEIPT BY THE COMPANY OF HIS WRITTEN BINDING CONTRACT OF PURCHASE OR INITIAL PURCHASE. TO ACCOMPLISH THIS WITHDRAWAL, THE SUBSCRIBER NEED ONLY SEND A LETTER OR TELEGRAM TO THE COMPANY INDICATING HIS INTENTION TO WITHDRAW. THE LETTER OR TELEGRAM SHOULD BE SENT AND POSTMARKED PRIOR TO THE END OF THE AFOREMENTIONED SECOND BUSINESS DAY. IF THE SUBSCRIBER SENDS A LETTER, IT IS PRUDENT TO SEND IT BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO INSURE THAT IT IS RECEIVED AND ALSO TO EVIDENCE THE TIME WHEN IT WAS MAILED. SHOULD THE SUBSCRIBER MAKE THE REQUEST ORALLY, HE SHOULD ASK FOR WRITTEN CONFIRMATION THAT THE REQUEST HAS BEEN RECEIVED.

**FOR RHODE ISLAND INVESTORS**

NEITHER THE FACT THAT AN APPLICATION FOR LICENSING OR A REGISTRATION STATEMENT HAS BEEN FILED WITH THE DIRECTOR NOR THE FACT THAT A PERSON IS LICENSED OR A SECURITY IS REGISTERED IN THE STATE OF RHODE ISLAND CONSTITUTES A FINDING BY THE DIRECTOR THAT A DOCUMENT FILED WITH THE DIRECTOR IS TRUE, COMPLETE, AND NOT MISLEADING. NEITHER OF THOSE FACTS NOR THE FACT THAN AN EXEMPTION OR EXCEPTION IS AVAILABLE FOR A SECURITY OR A TRANSACTION MEANS THAT THE DIRECTOR HAS PASSED UPON THE MERITS OR QUALIFICATIONS OF, OR A RECOMMENDED OR GIVEN APPROVAL TO, A PERSON, SECURITY, OR RECOMMENDED OR GIVEN APPROVAL TO, A PERSON, SECURITY, OR TRANSACTION.

**SUMMARY**

*The following summary is qualified in its entirety by reference to the more detailed information including financial statements and bonds thereto, appearing elsewhere in this Memorandum. Each Prospective Investor is urged to read this Memorandum in its entirety.*

**The Company**

The Company was incorporated in 1995 and is engaged in the business of mariculture research and development, which is the cultivation of marine (saltwater) organisms in their natural environment. The Company intends to breed, grow and farm saltwater finfish in their natural environment and under carefully controlled captive conditions, raising various Gulf of Mexico native finfish species like flounder ("fluke"), cobia, redfish, red snapper, amberjack, grouper, tuna and mahimahi from egg to maturity over a twelve (12) to eighteen (18) month period in hatcheries, nurseries and ocean net pens as well as oyster cleansing through off-bottom relaying. The Company is in the research and development stage and is currently devoting substantially all of its efforts and resources to research, permitting, raising capital through tax-deductible investments, donations, and acquiring assets for its Texas platform site. See "Vessels and Platforms" also "Risk Factors - Dependence upon Procuring Leases/Licenses," "Risk Factors - Need for Governmental Approvals," "Business - Expansion Plan" and "Business - Governmental Approvals." The Company has had no significant revenues from sea farming since inception through the date of this Memorandum; however, in 1998, it received over $6.2 million in donations of cash and equipment to initiate the projects. See "Financial Statements."

The Company requires the net proceeds from these Bonds in order to continue operating and allow the Company to continue its research and develop efforts in mariculture technology. Concurrently with this Offering, the Company is seeking to raise up to $10.0 million through state and federal government loan guarantees and tax-deductible donations. The proceeds will be used to permit the Company to implement its mariculture research and development plan. The Company has had only limited discussions to date with potential venture capital investors and no assurance can be given that the Company will successfully raise any additional capital or that the proceeds will be sufficient to repay the Bonds or permit the Company to implement its plan. See "Risk Factors," "Use of Proceeds," and "Business Plan."

The Company expects to have its first harvest within 24 months from the startup of its fish hatchery. While this is likely to be a small harvest and not generate significant cash flow, a larger harvest is expected within 30 to 36 months from startup of the hatchery. See "Risk Factors - Expected Losses from Operations; Working Capital" and "Risk Factors - Need for Additional Financing." Proceeds received will be used to meet continuing operating and research and development expenses and to aid in efforts to raise additional capital for the Company.

The Company believes it is one or the first private organizations to obtain its own offshore platform complex and all required permits for researching and developing commercial mariculture finfish and mollusk production in the waters of the Gulf of Mexico. See "Risk Factors - Need for Governmental Approvals." As a result, management believes that the Company will have certain competitive advantages compared to others subsequently entering the industry. See "Risk Factors - Competition" and "Business Plan."

The Company has organized its business into four research and development phases: hatchery, nursery, grow out and test marketing of our seafood products. In a hatchery and then in a nursery, the finfish are raised for a period of approximately six (6) months from egg to fingerling size. The fingerlings are then transferred to the Company's ocean farming system net pens where they are raised for approximately six (6) to eighteen (18) months until they reach market size. Initially, selected finfish fingerlings will be purchased from existing hatcheries and placed into sea cages and grown at one of the Company's two permitted sites. To insure supply of future fingerlings of the desired quality and quantity, the Company will also establish its own hatchery facility, which is planned to be built and operated on land than, after proven to be successful, placed onboard the platform complex in Texas.

In addition to the finfish research and development the Company also intends to research the use of the patented Sea Star Oyster Relay System to cleanse and enhance oysters. The Sea Star system is designed to containerize oysters for relaying to high-salinity, clean water areas to enhance the quality of oysters for half-shell marketing and raw consumption by increasing the oyster's salt content and reducing the potential illness risks

associated with raw consumption. It takes advantage of the oyster's natural ability to cleanse itself in waters that lack contaminants (chemicals, pathogens, etc.)

The Company was incorporated under the laws of the State of Delaware on December 5, 1995. The Company's executive offices are located in Gulf Breeze, FL 32563, and its telephone number at that address is 850-932-9038

**The Offering**

| | |
|---|---|
| Bonds Offered | 10-Year 9% Cumulative, Convertible Bonds. The minimum amount required in order to make an investment in the Offering is $10,000; however, the Company reserves the right to allow subscriptions for less than $10,000 on a limited basis. |
| Terms of Bonds | Nine (9%) percent interest per annum. Principal and interest due 120 months from the date of issuance, which is the date the subscription is accepted by the Company. |
| Option to Convert To TDRs | The Bonds are convertible at the option of the holders of the Bonds (the "Bond Holders") into 100% tax-deductible receipts (TDRs) as donations to the Company. See "Description of Bonds."<br><br>The Bond Holders may, at their option, convert the outstanding principal amount of the Bonds into TDRs at any time at the holder's option for 120 months. See "Tax Deduction for 501 (c) (3) Nonprofit Organizations." |
| Option to Convert to a Pre-IPO offering | It is the intention of the Company to offer the Bond Holders an option to participate in a pre-IPO stock offering of a For-Profit Company (FPC) that will commercialize the technology developed by GMIT. The terms and conditions of an exchange offer to convert all or part of the Bond Holder's principal and/or interest due at the time of conversion into the stock of the FPC will be determined impartially by the FPC and their pre-IPO underwriters and tax advisors. The conversion will occur at a discount of the FPC's IPO stock price or current trading price at the time of conversion. The final terms of the Bond conversion; however, will require approval of GMIT and the holders of 51% of the outstanding bonds at the time of conversion.<br><br>Note: IRS rule 98-15 requires the nonprofit (GMIT) to control the FPC upon completion of the Bond conversion to equity created as a result of its research and development. |
| Net Proceeds | Upon completion of the Offering, the Company will receive net proceeds of approximately $9,000,000 after deducting expenses of the Offering estimated to be approximately $1,000,000 (which includes commissions, printing, accounting, legal fees, and other related expenses payable at the time of the closing of the Offering). |

| | |
|---|---|
| Use of Proceeds | The net proceeds upon the sale of the Offering will be used for the Company's general R&D working capital requirements, including operating expenses, and to allow the Company to continue efforts to implement its plans for the Sea Trek Ocean Farming System as well as raise additional capital and contributions. See "Use of Proceeds" and "Business Plan." |
| Risk Factors | **Investment in the Bonds offered hereby is highly speculative and involves a high degree of risk. See "Risk Factors" commencing on page 8 for a discussion of certain factors, which should be considered in connection with an investment in the Bonds offered hereby.** |
| Restrictions on Resale | None of the Bonds offered hereby will be registered under the Act and the certificates representing such securities will contain a legend restricting the distribution, resale, transfer, pledge, hypothecation or other disposition of the Bonds. The legend will read substantially as follows: |

**THIS BOND HAS BEEN ACQUIRED FOR INVESTMENT PURPOSES ONLY AND MAY NOT BE TRANSFERRED. THIS LEGEND SHALL BE ENDORSED UPON ANY BOND ISSUED.**

## SUBSCRIPTION PROCEDURES FOR ACCREDITED INVESTORS ONLY

In order to subscribe for the Bonds, each Prospective "ACCREDITED Investor" and a limited number of qualified investors must complete, execute and deliver to the attention of John.D. Ericsson, President and Managing Director of the Company, the following: See "Accredited Investor" definition page 10.

(1) two copies of the executed Subscription Agreement (annexed as Exhibit A hereto);
(2) two copies of the completed Form W-9; and
(3) two copies of the completed Accredited Investor Suitability Questionnaire (see Subscription Agreement).

Each Prospective Accredited Investor should carefully read the Subscription Agreement and sign on the page indicated for subscribers. Any questions should be directed to Mr. John D. Ericsson at the Company, in Gulf Breeze, FL 32563 (850) 932-9038.

By December 30, 2010, unless the Company in its sole discretion elects to extend the Offering for up to 120 days, each Prospective Accredited Investor must deliver to Mr. John D. Ericsson the purchase price for the Bonds to be purchased in accordance with the Subscription Agreement. A check in the amount of the purchase price should be made payable to "Gulf Marine Institute of Technology." The minimum subscription amount required in order to make an investment in the Bonds is $10,000. Subscriptions for Bonds will be accepted as received, subject to the Company's right to reject a subscription for any reason. Promptly following the date of purchase, the Company will deliver an executed Bond representing the Bonds purchased in the purchaser's name or in such other name or names as such purchaser shall have requested, evidencing the Bonds being purchased. The Company will bear all expenses in connection with the preparation, issuance and delivery of the Bonds. In the event the Offering is not consummated for any reason, or a subscription is otherwise rejected, the Company shall promptly cause any payment received from any purchaser to be returned, without interest. (See Subscription Agreement)

Each Prospective Accredited Investor, by executing the Subscription Agreement, will represent, warrant and agree, among other things, that such Prospective Investor (1) has adequate means to provide for his or her personal needs and has no requirement for liquidity for the funds used to invest in the Bonds; (2) alone, or with such Prospective Investor's Purchaser Representative, is capable of evaluating the merits and risks of investing the Bonds; (3) is acquiring the Bonds for such Prospective Investor's own account solely for investment and not with a view towards distribution; and (4) fits the definition of "Accredited Investor" as defined in the definitions described on page 10 of this memoranda, (5) has read this Memorandum, and consents to all of the terms contained herein. The Company may make or cause to be made such further inquiry and obtain such additional information, as it deems appropriate with regard to the accreditation or qualification of Prospective Accredited Investors.

If a copy of this Memorandum is delivered to a Prospective Investor as a result of information furnished or representations made by such Prospective Investor or others acting on such Prospective Investor's behalf that mislead or otherwise result in error by the Company as to the financial or other circumstances of the Prospective Investor, such delivery of this Memorandum shall not be deemed to be an offer and this Memorandum and all related documents must be returned to Mr. John D. Ericsson. Prospective Investors are urged to request any additional information they may consider necessary in making an informed investment decision. The Company will make available to each Prospective Investor, or such Prospective Investor's Purchaser Representative, the opportunity to ask questions of, and receive answers from the Company concerning the terms and conditions of the Offering and to obtain any additional information necessary to verify the accuracy of information set forth in this Memorandum that is in its possession, or that can be acquired without unreasonable effort or expense.

**INVESTOR SUITABILITY**

THIS INVESTMENT INVOLVES A HIGH DEGREE OF RISK AND SHOULD NOT BE PURCHASED BY ANYONE WHO CANNOT AFFORD A TOTAL LOSS OF HIS INVESTMENT. SEE "RISK FACTORS."

1. Substantial Means and Net Worth.

Purchase of the Bonds is suitable only for "Accredited Investors" who have no need for liquidity in this investment and who have adequate means of providing for their annual needs and contingencies. Accordingly, Bonds will only be sold to "Accredited Investors" as that term is defined in Rule 501 of Regulation D promulgated by the Securities and Exchange Commission under the Securities act of 1933, which definition is incorporated herein. Therefore an individual prospective investor must have and so represent that a minimum he or she: (I) has a net worth (inclusive of homes, personal property and automobiles) in excess of $1 million or (ii) has during the last two years, and expects to have during 2010, gross income from any source in excess o$200,000 or joint income with that person's spouse in excess of $300,000 in each of those years. "Accredited Investors will be required to represent in writing in the Subscription Agreement that they meet the aforementioned requirements. See "Subscription Agreement," attached hereto as Exhibit A and made a part hereof.

2. Ability and Willingness to Accept Risks.

Capital investments in research and development stage companies involve a high degree of business and financial risk that may result in substantial losses. See "Risk.Factors." Accordingly, the suitability of any particular investor will depend upon, among other things, such investor's investment objectives and such investor's ability to accept highly speculative risks. The Bonds are not a suitable investment for investors seeking current income or liquidity.

**RISK FACTORS**

**THIS OFFERING INVOLVES SUBSTANTIAL INVESTMENT RISKS AND SECURITIES SHOULD BE PURCHASED ONLY BY PERSONS WHO CAN AFFORD TO SUSTAIN THE LOSS OF THEIR ENTIRE INVESTMENT IN THE COMPANY AND ITS BUSINESS. PRIOR TO PURCHASE, PROSPECTIVE INVESTORS SHOULD CAREFULLY CONSIDER THE FOLLOWING RISK FACTORS RELATING TO THE BUSINESS OF THE COMPANY AND THE OFFERING, TOGETHER WITH THE INFORMATION AND FINANCIAL DATA SET FORTH IN THIS MEMORANDUM BEFORE INVESTING IN THE SECURITIES. PROSPECTIVE INVESTORS SHOULD BOND THAT THIS MEMORANDUM CONTAINS CERTAIN "FORWARD-LOOKING STATEMENTS", INCLUDING WITHOUT LIMITATION, STATEMENTS CONTAINING THE WORDS "BELIEVES", "ANTICIPATES", "EXPECTS", "INTENDS", "SHOULD", "SEEKS TO" AND SIMILAR WORDS. PROSPECTIVE INVESTORS ARE CAUTIONED THAT ANY SUCH FORWARD-LOOKING STATEMENTS ARE NOT GUARANTEES OF FUTURE PERFORMANCE AND INVOLVE RISKS AND UNCERTAINTIES. ACTUAL RESULTS MAY DIFFER MATERIALLY FROM THOSE IN THE FORWARD-LOOKING STATEMENTS AS A RESULT OF VARIOUS FACTORS, INCLUDING BUT NOT LIMITED TO, THE RISK FACTORS SET FORTH IN THIS MEMORANDUM. THE ACCOMPANYING INFORMATION CONTAINED IN THIS MEMORANDUM IDENTIFIES CERTAIN IMPORTANT FACTORS THAT COULD CAUSE SUCH DIFFERENCES.**

**1. Possible Inability to Pay Bonds**

The Company's ability to repay the Bonds on the Maturity Date is dependent on its ability to develop commercial seafood farming technology, which will generate revenues, patents, royalties, licensing fees and other use rights in the next ten (10) years. The Company has been advised that it qualifies for state and federal loan guarantees. Most of the proceeds will be used to permit the Company to implement its research and development plans. The Company has had only limited discussions to date with potential capital investors and no assurance can be given that the Company will successfully raise capital whereby the proceeds will be sufficient to repay the Bonds or permit the Company to implement its sea farming research and development plans; however, the Company has

received approximately $6.2 million in tax deductible donations since September 17, 1998 for its Sea Trek Ocean Farming research and development project in Texas.

There will be no sinking fund established for the redemption of the Bonds. Therefore, the Company will be required to pay the entire principal amount of the Bonds and all interest on the Maturity Date, unless previously converted to TDRs and/or to a stock exchange in an existing public company or in a pre-IPO offering of an FPC. There can be no assurance that the Company will have available funds or will be able to raise funds for the payment of the Bonds on the Maturity Date.

**2. Recently Organized Company; Limited Operating History; Emerging Industry**

The Company is in the advanced research and development stage. The Company continues to devote substantial efforts to research, business planning, raising capital, acquiring assets, obtaining leases and licenses, and obtaining approvals and permits from local authorities and governmental agencies, which may be required in the future. The likelihood of the success of the Company must be considered in light of the expenses, difficulties, and delays frequently encountered in the early phases of a business, as well as the risks generally associated with the development of growing and harvesting seafood. There can be no assurance that the industry will develop to maturity or that the market will accept the industry, or the Company's products. See "Business Plan."

**3. Retention of Key Employees and Consultants**

Various facets of the Company's business rely heavily on the services of individuals possessing knowledge unique to the seafood industry. The Company is dependent upon the efforts and experience of its current employees and consultants, particularly Mr. John D. Ericsson, Dr. Edwin Cake, Jr., and Mr. John W. Hemmer, who have substantial responsibility in the current operations and future planning of the Company. Loss of any one of them or of certain other employees of the Company could have a material adverse affect on the current or future operations of the Company. The success of the Company's business will also depend upon its ability to attract and retain qualified employees. There can be no assurance that the Company will be successful in attracting or retaining such personnel. The Company may in the future enter into employment agreements with certain of its employees in order to encourage their future availability. See "Management."

**4. Dependence Upon Proceeds from the Offering**

The Company is dependent upon the receipt of the net proceeds of the Offering in order to meet its immediate working capital and research requirements, including operating expenses, and to allow the Company to continue efforts to raise additional capital. See "Use of Proceeds" and "Business Plan." The completion of the Offering is not subject to any minimum amount being raised. However, the Company's financial condition will be materially adversely affected, its ability to operate and sell its products will be extremely impaired, and the feasibility of fulfilling its plan diminished, if the Offering Amount is not raised, of which no assurance can be given. See "Use of Proceeds" and "Business Plan."

**5. Need for Additional Financing**

The Offering, if the Offering Amount is raised, will provide the Company with sufficient capital to carry out most of its initial R&D business plans. Thereafter, the Company will be dependent upon operating revenues derived from the franchising and sale of technology that is developed, the sale of finfish and mollusk products and/or additional financing and tax deductible donations. There can be no assurance that the Company will be able to obtain such additional financing on acceptable terms, if at all. See "Use of Proceeds," "Business Plan" and "Business-Growing and Harvesting the Finfish."

**6. No Public Market for Bonds**

There is no public trading market for the Bonds and no public market is expected to develop. Investors in the Bonds may not be able to obtain a return of their principal investment and accrued interest until one of the following occurs: 1) the bonds mature, 2) are redeemed or 3) are converted into TDRs as a 100% tax deduction to the company or 4) through an exchange in a pre-IPO stock offering at 60% of the IPO share price of a for profit corporation (FPC) to be designated.

**7. Conversion Rights and Options under the Bonds**

Pursuant to the terms of the Bonds, a Bond Holder may elect to convert his investment into a Tax Deductible Receipt (TDR) (as hereinafter defined). The Bond Holders shall have the right and option at any time during the term of the bond, to convert any or all of the outstanding principal amount of the Bond into TDRs as a 100% tax-deductible donation to the Company over the 120-month Bond Period. (According to the Internal Revenue Service, only the principal can be donated) It is the intention of the Company to offer the Bond Holder a further option to convert the principal and interest of the Bond into stock of the FPC at a discount to the current trading stock price or IPO offering price. The FPC will be later designated for commercial development of GMIT's research and development technologies.

**8. Suitability**

Due to the speculative nature of this Offering, the Bonds are offered only to Accredited Investors who are in a position to accept the risks and to withstand the loss of their entire investment. See "Terms of Offering," and "Subscription Procedures," and "Accredited Investors."

**9. Arbitrary Interest Rate and Conversion Price**

The nine (9%) cumulative percent rate of interest on the Bonds has been arbitrarily determined by the Company. There is no relationship whatsoever between such cumulative interest rate and the assets, earnings, or book value of the Company, or any other recognized criterion of value.

**10. Amendments and Modifications**

The Company may amend or modify the terms of the Bonds with the written consent of the Holders of not less than 50% of the principal amount of the Bonds; provided, however, that no such amendment or modification: (i) reduced the amount of any payment or prepayment of principal or interest on any principal amount payable (or reduces the principal amount of or rate of interest payable), or (ii) subjects the payee under each Bond to any additional obligations.

**11. Prepayment**

The Company may prepay at anytime over the term of the Bond, in whole or in part, without penalty, the principal amount of the Bonds upon a Bond Holder's failure to convert in accordance with any conversion plan proposed by the Company.

**12. Investments**

The Bonds do not contain any restrictions on the Company's ability to make investments.

**13. Limited Transferability; Illiquidity of Investment**

The Bonds have not been registered under the Act and therefore, must be held indefinitely unless they are subsequently registered under the Act or an exemption from the registration requirements of the Act is obtained. Rule 144 of the Act, which allows dispositions of unregistered securities under certain circumstances, will not be available with respect to the Bonds in the foreseeable future. The Bonds will bear legends with respect to restrictions on subsequent transfers. The Company does not intend to register the Bonds in the foreseeable future, and does not

presently contemplate an offering of its securities to the public in the immediate future. There is no market for the Bonds and it is unlikely there will be a market in the foreseeable future. As a result of the foregoing, purchasers of the Bonds will have to bear the economic risk of their investments.

**14. Competition**

Despite the large and increasing demand for finfish and other seafood in the United States, competition in the mariculture industry has been limited because of the need for substantial capital investment and the expense, difficulty delay in obtaining necessary permits and approvals. Management believes that being one of the first permitted finfish mariculture project in the Gulf of Mexico will give it many competitive advantages over others subsequently attempted to enter the industry. See "Business." However, management anticipates that as the industry matures and evolves, competition will increase. Present or future competitors of the Company may develop, which may affect the Company's proposed business. The Company believes it will not compete with the commercial fishing industry, however, it is possible as Texas regional market basis. Furthermore, the Company will be subject to all the usual price fluctuations inherent in the seafood industry related, in part, to supply and demand.

**15. Need for Governmental Approvals**

The business of the Company is subject to extensive regulation by federal, state and local governmental authorities. The Company has obtained a U.S. Army Corps of Engineers (USACOE) permit to operate its mariculture research project from its existing platform complex in Matagorda County, Texas. The Company has received a reassignment of a 50-year surface lease on September 18, 1998 with approximately 32 years remaining for the platforms site from the Texas General Land Office. In addition, the Company has development opportunities at an alternative fully permitted site located in federal waters off the coast of Fort Morgan Peninsula, Alabama in federal waters. The U.S. Army Corps of Engineers is renewing the Company's previous permits for the Alabama site with an expiration date in 2008 for initial construction and operations. Although the Alabama site does not have a platform, the Company has determined that there are salvageable, refurbished platforms available for the site at reasonable costs. The Texas project in Matagorda County will be subject to phase-in monitoring by the Texas Natural Resource Conservation Committee (TNRCC), relating to, among other things, fish density, water quality and environmental effects of open water grow out. See "Business-Governmental Approvals."

**16. Dependence Upon Procuring Leases/Licenses**

On June 4, 1999, the Company procured from the (USACOE) permit number 11830 (09) granting GMIT permission to develop its mariculture research project for five years from its existing oil production platform within a 500-acre mariculture area located approximately 9 miles southeast of Port O'Connor, Texas. The Company has also received a reassignment of the Surface and Subsurface Lease covering the platform site on September 18, 1998. See "Associated Companies." See "Business Plan" and "Business-Governmental Approvals."

**17. Possible Crop Losses from Diseases**

The Company's anticipated crop of fish may be vulnerable to the numerous diseases known to affect finfish and mollusks. Although some diseases can be treated by medicating the fish food, very few drugs have been approved to treat diseases in mariculture by the United Stated Food and Drug Administration. In the hatchery stage, the water source will be pre-treated to kill pathogens. In the grow out stage, the Company plans to minimize the fish's susceptibility in the open water by implementing techniques to reduce stress on the finfish and by feeding them a high quality diet. No assurance can be given, however, that the Company's entire crop of fish will not become diseased and die. Management will obtain crop insurance coverage when the fish are placed in the ocean in open net pens. Management has no reason to believe that crop insurance will not be available to cover future crop requirements, although no assurance can be given that such insurance will be available, or if available, upon terms favorable to the Company or at premiums, which it can afford.

**18. Dependence on Foreign Sales; Foreign Currency Fluctuations**

The Company intends to sell to foreign and domestic markets. See "Business-Products Sales." The Company's business and prospects could thus be adversely affected by adverse political and economic conditions in

the U.S. and foreign countries and may also be subject to many of the risks of foreign sales and operations, including tariff restrictions and currency control regulations. The Company's international sales will be invoiced in United States dollars. A rising value of the United States dollar makes the Company's products more expensive to overseas buyers. The Company' sales could be materially impacted if the dollar rose in value compared with the yen, the currency of Japan, which is expected to account for most of the Company's international sales.

**USE OF PROCEEDS**

The net proceeds to the Company, assuming the sale of the Offering Amount, and after deducting expenses of the Offering are estimated to be approximately $9.0 million. The net proceeds from the Offering will be utilized for the company's general working capital requirements, including operating, research and development expenses, equipment acquisitions, consulting fees and to raise additional capital to implement its plan. See "Business Plan."

Pending expenditure for the purposes specified herein, the net proceeds of the Offering may be invested in certificates of deposit, savings deposits, short-term obligations of the United States government, other liquid investments or deposits into checking accounts.

The following costs and expenses are estimates only and may be modified in whole or in part by the Company.

**BUSINESS**

**General**

The Company is engaged in the business of research and development of mariculture technologies, which is the cultivation of marine (saltwater) organisms in their natural environment, including the raising of finfish and cleansing oysters and other mollusks for human consumption. The Company is currently devoting substantially all of its efforts and resources to research, business planning, raising capital, and acquiring the critical assets necessary to start its research and development projects.. The Company believes it is the only non-profit private research and development institute to acquire its own offshore platform complex and permits to propose significant mariculture finfish/oyster (mollusk) research and development in the open waters of the Gulf of Mexico or within the territorial waters of the United States. As such, management believes that the Company will have certain R&D advantages over other nonprofit or for profit organizations which are likely to suffer from delays and significant expenses in the process of obtaining the necessary assets, permits and approvals for mariculture projects. The Company has already received approval from the USACOE of its mariculture project. See "Business" and "Business-Government Approvals."

Many U.S. and foreign private research organizations have stated that the worldwide finfish and shellfish market is underserved, and that there is an increasing worldwide shortage of many species of marine fish. Commercially harvested wild stocks of fish have been seriously affected by commercial over exploitation. Consequently, stocks have been depleted due to overfishing and overharvesting beyond sustainable yield. As a result, many governments worldwide (such as Canada, Mexico, Japan, and the United Kingdom) have closed fishing grounds. In December 1994 the United States and Canada closed extensive areas of the Georges Bank, located off the northeast coast of North America, which traditionally supported the largest fishery in the world. The closure of fishing grounds in North America, Europe, and Asia has greatly decreased the supply of fish. Worldwide demand for seafood, however, has continued to grow, fueled by the awesome 100 million annual world population growth and the perceived health benefits of a fish-based diet via an aging U.S. population.

In the last 15 years, the fastest growing segment of fish production has been in aquaculture and mariculture, the cultivation of freshwater and saltwater organisms, respectively, in their natural environment. Although certain species of seafood have been farmed for centuries, large-scale commercial mariculture is still a relatively new industry in the United States. Worldwide, approximately 17% of all fish (13.9 metric tons) are harvested through mariculture or other types of aquaculture. In contrast, mariculture has been utilized only to a limited extent in the United States.

Management believes that, for several reasons, mariculture will play an increasing role in meeting U.S. and worldwide fish demands. Recent technological advancements in fish food diet, fish husbandry, and net pen technology have enabled mariculture to offer a number of competitive advantages. Unlike the commercial fishing industry, which has seasonal catches, the mariculture industry is able to supply the market with fresh seafood throughout the yearly seasons. Mariculture also enables producers to provide consistent quality seafood through stock selection, control of fish diets, monitoring the fish and the quality of the water in which fish live.

**Business Plan**

As the $10.0 million offering is completed, the net proceeds of the Offering will provide sufficient capital to permit the Company to implement its business plan. See "Use of Proceeds." The Company estimates that its initial harvest of fish and/or mollusks will be made within 18 to 24 months after establishing its hatchery and juvenile production capabilities. The Company plans to do market testing and ship product shortly after harvest and expects to begin receiving its initial revenue within 36 months or less.

The Company has established its business into four finfish and one oyster (mollusk) cleansing research project operating divisions: hatchery, nursery, grow out and test marketing of all seafood products.. In the finfish hatchery and nursery, the finfish are reared from egg to fingerling (a size suitable and appropriate for transport to ocean net pens for grow out to market size), which takes approximately one year.

In the mollusk division, the Company will build and test various mollusk cleansing systems and test market the value-added oyster products. The Florida Agricultural Market Research Center, part of the Food and Resource Economics Department, Institute of Food and Agricultural Sciences of the University of Florida conducted a report entitled "Consumer and Restaurant Manager Reaction to Depurated Oysters and Clams," dated July 1994, which stated that the number of oyster consumers that would be willing to pay 65 cents per oyster for safely cleansed oysters, would be 20% greater than the 1994 levels and total oyster sales would be about 23 percent greater.

Management believes that the Company's success will, in large part, depend on its ability to control the entire process of breeding, growing and farming fish. Currently, the Company's facilities consist of an offshore, four-platform complex located in Matagorda County, Texas state waters valued at approximately $5.7 million. The Company has determined that it must research and build its own finfish hatcheries to ensure having fingerlings of desired quality and size for growout experiments. The Company plans to build its first hatchery into the Sea Trek Ocean Farming platform complex immediately upon receiving adequate proceeds from this offering.

The Company's finfish production goals are as follows:

| Phase | Year | Estimated Pounds of Product Produced |
|---|---|---|
| I. | Year 1 | 3,500 |
| II. | Year 2 | 112,500 |
| III. | Year 3 (commercialization) | 240,000 |

The Company's mollusk (oyster) production goals are as follows:

| Phase | Year | Estimated Pounds of Product Produced |
|---|---|---|
| I. | Year 1 | 100,000 |
| II. | Year 2 | 1,000,000 |
| III. | Year 3 | 9.2 million |

The incremental growth production in accordance with the proposed three finfish and mollusk phases are intended to provide for greater flexibility in culture operations so as to apply the best management practices as they become available as well as to reduce any negative environmental impacts associated therewith. See "Business-Governmental Approvals."

The Company intends to package a portion of its cultured finfish at its processing site for sale as bled whole fish. The remaining harvested cultured finfish will undergo full processing, and will be made into fillets, blocks (processed compressed fish for use in frozen fish products), other consumable fish products, and commercially saleable fish waste products to be sold as non-food items or recycled into fish food. See "Business-Growing, Harvesting and Processing the Finfish."

It is anticipated that the bled whole fish will be grown and sold as sashimi-quality to domestic and foreign markets on an f.o.b. basis. The current assumed market price is approximately $4.00 per pound. Farm-raised seafood products are popularly consumed where available and often carry a higher price than other fish products. The Company anticipates selling its other seafood products fresh and frozen in retail and food service packs to markets in the United States at an assumed market price of $5 to $8 per pound for fillets.

The Company will bring a high quality seafood product to the consumer. While seafood inspection is mandatory in the United States, the Company will also conduct its own quality-controlled inspections to ensure a consistent quality, sizing, consumer safety of its oysters, and texture of its products to distinguish itself from its competition. See "Business-Quality Control."

**Growing, Harvesting and Processing the Finfish and Oysters (Mollusks)**

The Company's business encompasses five operating divisions, namely: hatchery/nursery, grow out, processing, oyster cleansing, and test marketing of various farm reared/cleansed seafood products.

***Hatchery*** consists of the rearing of finfish from egg to fingerling (a size suitable and appropriate for transport to ocean net pens for grow out to market size). The rearing includes the selection, conditioning, and spawning of brood stock, and the rearing of early larvae, juvenile, and fingerlings. The rearing from egg to fingerling is expected to take approximately one year. Once the fingerlings have reached appropriate size, they will be transported live to a nursery facility for grow out to approximately 200 grams and then transported live to the ocean net pens for grow out to market size.

Thereafter, in order to reach its production goals, the Company will need to utilize other hatchery facilities. No assurance can be given that the necessary zoning will ever be approved, and even in approved, that the Company will have sufficient funds for the construction of a hatchery. See "Risk Factors- Need for Additional Financing."

The Company intends to build its own hatchery at the platform site. However, no assurance can be given that the Company will have sufficient funds for the construction of a hatchery. See "Risk Factors-Need for Additional Financing."

***Finfish Processing*** is the final phase before the finfish are sold. After they grow to marketable size, the finfish will be harvested and transported to an on-shore-processing site. Processing is completed within a few days following harvest of the fish. The Company intends to package a portion of its finfish at the proposed processing site for sale as bled dead whole fish. The remaining harvested finfish will undergo full processing, and will be made into fillets, blocks (processed compressed fish for use in frozen fish products), other consumable fish products, and commercially saleable fish waste products to be sold as non-food items, such as fertilizer See "Business-Products; Sales." The Company intends to employ technology that allows the utilization of approximately 99% of all harvested finfish by weight.

***Nursery*** Once the larvae have been spawned in the hatchery it will be transferred to the nursery. They remain in the hatchery until they are about 5 grams and are then transported to a nursery facility where they are grown to approximately 200 grams. The nursery operation is important to ensure the survival of fish in open waters and provides large enough fish to grow to maturity.

***Grow out*** is the process of raising finfish from fingerling to marketable size. Subsequent to transport from the hatchery to the nursery, the fingerlings will be transported to, and then confined in the ocean net pen cages, thereby protected from potential predators. The ocean net pens will be located at the Company's existing 500-acre platform complex site located approximately 9 miles southeast of Port O'Connor, Texas, where the finfish will be fed and closely monitored during this phase of their growth, which is expected to take approximately six months. See "Business Plan."

**Oyster (Mollusk) Cleansing**

Another segment of the Gulf of Mexico farming project will be the development of the oyster cleansing and enhancement system.

Hundreds of thousands of acres of natural oyster reefs, beds and farms throughout the Gulf of Mexico region are lost annually from production because of polluted land runoff, domestic wastewater effluents and invasion of coastal waters by the marine bacterium *Vibrio vulnificus*. This bacteria has resulted in sickness and/or deaths of numerous at-risk persons who have immuno-compromised health conditions. As a result of the expanding pollution, millions of dollars worth of oysters cannot be utilized and/or must undergo approved cleansing methods (e.g., controlled purification: depuration or relaying).

As filter feeders, oysters pump large volumes of water through their gills and digestive system in the process of feeding. When placed in approved waters, the oysters are capable of naturally cleansing themselves of

deleterious or poisonous substances such as chemicals, pathogenic bacteria and viruses and marine biotoxins. Recent studies verified by the U.S. Food and Drug Administration (FDA) verify that the *Vibrio vulnificus* bacterium are susceptible to exposure to colder, high-salinity waters.

**Restoring Consumer Confidence**

The oyster cleansing systems will produce an oyster that has undergone a natural biological cleansing process, thereby producing an enhanced oyster that has a consistent salty flavor, with significantly reduced levels of Vibrio vulnificus bacteria. This will help to restore retailer and consumer confidence in the quality of oysters and will enable the acceptable utilization of the vast amounts of oyster resources in closed area waters.

As filter feeders, oysters pump large volumes of water through their gills and digestive system in the process of feeding. When placed in approved waters, the oysters are capable of naturally cleansing themselves of deleterious or poisonous substances such as chemicals, pathogenic bacteria and viruses and marine biotoxins. Recent information suggests that the Vibrio vulnificus bacterium may be susceptible to prolonged exposure to high-salinity waters.

**The Net Pens**

The following chart shows the cost, size, and relative price per square foot with respect to each of the three net pen designs (Note: GMIT acquired (5) Bridgestone sea cages on September, 2002)

COMPARISON OF NET PEN DESIGNS

| Net Pen Manufacturer | Price | Size of Net Pen (square feet) | Price Per Square Foot |
|---|---|---|---|
| Ocean Spar | $60,000 | 1,770 | $33.90 |
| Bridgestone | $254,830 | 12,900 | $19.75 |
| AquaSure or similar | $72,575 | 3,800 | $19.10 |

**TEST MARKETING**

**PRODUCTS, SALES**

The Company intends to sell whole fresh bled fish, fresh fillets, frozen blocks, fish-related products and byproducts, fertilizer and fish food. The finfish will be harvested at maturity, when the fish reach 2.5 lbs (redfish & red porgy) to 15.0 pounds (cobia & amberjack) in weight. Whole bled dead fish will be graded and sold as sashimi-quality into the Japanese seafood markets, on an f.o.b. basis. This product is popularly consumed raw in Japan, and carries a higher price than other fish products ($8.00 per pound reported for sashimi amberjack). The Company estimates that some of its harvests may not be suitable for export sale. These fish will be processed and sold domestically as fresh and frozen in retail and food service packs and directly to the hotel/ restaurant industry following the Greek direct distribution system. The Company anticipates selling whole fresh fish, which currently has an average domestic market price of approximately $3 to $4 per pound. Local seafood processing services are available for specialized packaging (filets) etc.

**QUALITY CONTROL**

The Company seeks to bring a high quality inspected seafood product under the trade name of "Sea Pride" to the consumer. Seafood inspection is mandatory in the United States at present, pursuant to the guidelines of the MNFS Hazard Analysis Critical Control Point Program (HACCP). HACCP-based inspection systems facilitate consistent distribution of safe, wholesome and properly labeled fishery products.

**GOVERNMENTAL APPROVALS**

The Company has received its permit from the ACOE approving its plans for a mariculture facility to built at its existing 500-acre area platform complex site approximately nine miles southeast of Port O'Connor, Texas. In addition, the Company has received a reassignment of the existing platform Surface and Subsurface lease for mariculture on September 18, 1998, from GLO Commissioner, Garry Mauro.

The ACOE permit provides that the premises may be used by the Company for mariculture, including the operation, construction and placement of finfish net pens and oyster (mollusk) cleansing systems; harvesting of fish and ancillary products; and the use of appropriate vessels to service the premises. See "Business-Governmental Approvals."

**EXECUTIVE OFFICES**

The Company occupies an approximately 2,500-square foot facility at in Gulf Breeze, FL 32563, which it uses as its executive offices.

**EMPLOYEES**

As of the date of this Memorandum, the Company's full time and part-time employees, including its executive officers are John D. Ericsson and Georgine Burt. See "Management-Directors and Executive Officers." None of the Company's employees are represented by a union, and management considers its relationship with its employees to be excellent. Although there currently exist no employment arrangements with such individuals, the Company may enter into certain compensation arrangements in the near future with such individuals, or other individuals which the Company wishes to attract or retain, in order to induce them to remain with the Company.

In addition, the Company presently uses the services of aquaculture specialists, environmental planners, marine biologists, engineers, and other consultants.

**LITIGATION**

The Company is currently free from any litigation.

**MANAGEMENT**

**Directors and Executive Officers**

The directors and principal executive officers of the Company are:

| Name | Position |
|---|---|
| John D. Ericsson | Managing Director and President |
| Edwin W. Cake, Jr., Ph.D. | Director, Chief Science Officer |
| Georgine Burt | Secretary/Tresurer |

**John D. Ericsson - Managing Director.** Mr. Ericsson has been Managing Director and President of GMIT since its inception in 1995. Mr. Ericsson has substantial executive management, corporate finance, marketing and sales experience. From 1977 to 1982, Mr. Ericsson was an officer and director of an independent oil and gas company that developed over $10.0 million in oil and gas reserves. From 1982 to 1989, Mr. Ericsson was an independent consultant in the fields of energy, cogeneration and marine aquaculture to various companies and institutions in the United States. Mr. Ericsson holds a B.S. degree in business management and marketing from the University of Tulsa and is listed in Who's Who of American Inventors 1996-1998, holding U.S Patent numbers 5,438,958, DES 362,508 for the Sea Trek ocean farming system and 5,628,280 for the Sea Star oyster relay system. He is a member of the World Aquaculture Society, the Aquacultural Engineering Society and has been honored by the Massachusetts House of Representatives for *"his outstanding contributions to the fishing industry."*

**Edwin W. Cake, Jr., Ph.D. - Director - Chief Science Officer.** A recognized authority in mariculture and marine biology, Dr. Cake has impressive academic, research and consulting credentials. From 1973 to 1986, Dr. Cake was a senior research scientist and section head of the Oyster Biology Section of the Gulf Coast Research Laboratory, a major marine research institution in Ocean Springs, Mississippi. Since 1975, Dr. Cake has be Adjunct Professor of marine science and environmental science at the University of Southern Mississippi. Dr. Cake is a senior environmental consultant to various private and public institutions. A former member of the Executive Committee of the U.S. EPA's Gulf of Mexico Program, he has also served as President of the National Shellfisheries Association. Dr. Cake holds B.S., M.S., and Ph.D. degrees in Marine Biology and Biological Oceanography from Florida State University. He is the author of a large number of professional environmental publications.

**Georgine Burt - Secretary.** Ms. Burt has been Secretary of the Company since 1996. From 2001 to 2010, Mrs. Burt was also an Escambia County Circuit court reporter. Ms. Burt was owner/manager of I.B. Foods, Inc., in Imperial Beach, California. Ms. Burt received her B.S. degree in Business from San Diego State University.

All directors hold office until their successors are elected and qualified, or until the earlier or their death, resignation or removal. Officers serve at the discretion of the Board of Directors.

**Remuneration of Executive Officers, Employees and Directors**

Since the Company has had no real operating history, individual remuneration for officers and directors should not be considered indicative of future remuneration. The Company may in the near future, enter into employment agreements with certain of its employees, in order to induce them to remain with the Company. See "Employees."

**DETERMINATION OF OFFERING PRICE**

The nine (9%) percent rate of interest on the Bonds has been arbitrarily determined by the Company. There is no relationship whatsoever between such interest rate and the assets, earnings, or book value of the Company, or any other recognized criterion of value.

**DESCRIPTION OF SECURITIES**

**Bonds**

The Bonds will bear a cumulative interest at the rate of nine (9%) percent per annum.

The Bonds will mature 10 years after the date of purchase.

The Bonds may be presented for transfer, exchange or conversion at the principal executive offices of the Company without any service charge and subject to the limitations provided in the Bonds. A copy of the Bond, substantially in the form in which it is to be issued, is annexed as Exhibit A hereto. The statements under this caption relating to the Bonds are summaries and are subject to the detailed provisions of the Bond, to which reference is hereby made for a complete statement of such provisions of the Bond, to which reference is hereby made for a complete statement of such provisions. Whenever particular provisions of the Bond or terms defined therein are referred to herein, such provisions or definitions are incorporated by reference as a part of the statements made, and the statements are qualified in their entirety by such references.

Conversion Rights

The Bond Holder shall have the right, at their option, to convert the outstanding principal of the Bond into TDRs (Tax Deductible Receipts) as a 100% charitable donation to the Company. (Note: It is recommended that all debt holders consult with their tax advisors to determine the tax benefits of this offering.)

Defaults and Certain Rights on Default

An Event of Default is defined in the Bond as: (i) default in the payment of principal or interest on the Bond; (ii) non-performance of any material covenant or agreement pursuant to Bond which continues uncured for fifteen (15) days after written notice thereof; and (iii) certain events of bankruptcy. In case of an event of bankruptcy, all obligations under the Bonds shall automatically be and become immediately converted into TDRs, without notice or demand. In case of an Event of Default other than for bankruptcy, the nominee of and/or the Bond Holders may, upon notice to the Company, declare all or any portion of the outstanding principal amount of the Bonds, together with interest accrued thereon to be converted into TDRs.

Modification and Waiver of Bonds

With the vote or written consent of the holders of at least fifty (50%) percent in principal amount of outstanding Bonds, the Company may add provision to, or change in any manner or eliminate any provision of the Bond or modify in any manner the rights of the Bond Holders. Addition, change or elimination shall, among other things, (a) change the date of payment of principal interest on any Bond or reduce the principal amount thereof or the interest thereon, or (b) reduce the aforesaid percentage of Bond Holders whose consent shall be required for the authorization of any such addition, change or modification of a Bond or for any waiver provided for in the Bond.

This description is qualified in its entirety by the provision of the form of the Bond annexed hereto as Exhibit A.

**Further Information**

This Private Placement Memorandum contains summaries of certain documents and other materials. Prospective purchasers who wish to examine any or all of such documents, which were summarized herein, or who require further information, should contact John D. Ericsson, President of the Company at (850) 932-9038.

Claimant Name: BioMarine Technologies, Inc. & Gulf Marine Institute of Technolgy Claimant EIN: 75-2309471 & 31-1475321

**GULF MARINE INSTITUTE OF TECHNOLOGY**
**SUBSCRIPTION AGREEMENT**

Mr. John D. Ericsson, President, Managing Director
Gulf Marine Institute of Technology
P.O.Box 776
Gulf Breeze, FL 32561

Re: Offering Memorandum

Dear Mr. Ericsson:

The undersigned subscriber ("Subscriber") hereby acknowledges receipt of and has carefully reviewed the Private Placement Memorandum ("Memorandum"), dated _________ ______, 2010, of Gulf Marine Institute of Technology ("The Company"), a Delaware corporation, and subscribes for the following Bond amount upon the terms and conditions set forth therein. The Subscriber represents that he is a sophisticated and an accredited investor and, as such, is capable of bearing the economic risks associated with a purchase and investment in the speculative securities of the Company. See "Investor Suitability" and "Risk Factors" in the Memorandum. The Subscriber further represents and acknowledges that the Bonds are restricted and not freely tradable or transferable and are being purchased by him for investment purposes only and not further distribution. The Subscriber agrees that this subscription is subject to acceptance by the Company, to availability and to certain other conditions, and any subscription may be declined in whole or in part by the Company by the return of the subscription funds without interest or deduction. The Subscriber further agrees that the delivery of Subscriber's check to the Company does not indicate acceptance of such subscription by the Company.

The undersigned hereby subscribes for a Bond of the Company for an aggregate purchase price of $_________. Enclosed is the undersigned's check made payable to "Gulf Marine Institute of Technology" and has been forwarded to the Company in the self-addressed envelope that has been provided for convenience.

| | |
|---|---|
| Signature of Investor | Signature of Investor |
| Print Full Name | Print Full Name |
| Print Full Address | Print Full Address |
| Social Security Number/<br>Federal Tax I.D. Number | Social Security Number/<br>Federal Tax I.D. Number |

ACCEPTED AND AGREED
GULF MARINE INSTITUTE OF TECHNOLOGY
By:

______________________________
Mr. John D. Ericsson
President
Managing Director