Memorandum No. ____

# BIOMARINE TECHNOLOGIES, INC.

### Private Placement Memorandum
### Offshore Development of Marine Sea Farming
### In the Gulf of Mexico



By accepting this Private Placement Memorandum (the "Memorandum"), you have acknowledged and agreed that certain of the information contained in this Memorandum is confidential and proprietary to Biomarine Technologies, Inc ("Biomarine") and is being submitted to you solely for your confidential use with the express understanding that, without the prior express permission of Biomarine, you will not release this Memorandum or discuss the information contained herein or make reproductions of or use this Memorandum for any purpose other than evaluating whether you have any interest in investing in Biomarine. This Memorandum may not be reproduced, in whole or in part, and it is accepted with the understanding that it will be returned on request.

**The date of this Memorandum is March 1, 2010**

EXHIBIT
10

## CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

# Biomarine Technologies, Inc.

**_____ Shares**
**Common Stock**

**Subscription Price: $ ___ per Share**
**Minimum Subscription: $_____ (____ Shares)**

Biomarine Technologies, Inc., a Delaware corporation (the "Company," "Biomarine," "we," "us" or "our"), is offering for sale in a private offering (the "Offering") up to _____ shares of common stock, $.01 par value (the "Shares"), at an offering price of $____ per Share (the "Offering Price"). The Shares are being offered and sold only to "accredited investors" (as that term is defined in Rule 501 (a) of Regulation D under the Securities Act of 1933, as amended, or the Securities Act)

Biomarine was organized to develop a fully-integrated commercial seafood business using established mariculture techniques, including the use of offshore fish hatcheries and large, open-ocean sea cages planned to produce USDA "organic" fish and other aquatic animals for human consumption

We have entered into a Placement Agent Agreement with our security broker dealers (the "Placement Agent" or "Argent")), under which our security broker dealers has agreed to act as our placement agent for the Offering on a best efforts basis

The minimum investment is $_____ (_____ Shares), but we and our placement agent may accept lesser investments at their discretion The Offering will continue until
September 31, 2010, or such earlier date (the "Initial Expiration Date") upon which a total of _____ Shares have been sold and we have received a total of $_____ in subscription payments  We have the right to extend the termination date of the Offering until December 30, 2010, subject to the consent of it underwriters

Subscription proceeds will be placed in a non-interest bearing escrow account until the initial closing, at which time the escrowed funds will be released to us and stock certificates evidencing the Shares will be delivered against such funds, as provided in the Escrow Agreement between us, the Placement Agent and the escrow agent  Additional closings of this Offering may be held thereafter at the discretion of the Placement Agent and us as more subscription proceeds are received and cleared up to the full amount of the Shares being offered hereby  If an initial closing has not occurred by the Initial Expiration Date, the escrowed funds shall be returned to the investors and the subscription documents pertaining thereto shall be null and void and without further effect

Officers, directors, employees and affiliates of our Company and the Placement Agent may purchase Shares in this Offering

**We reserve the right to withdraw or cancel the Offering and to accept or reject any subscription in whole or in part, in our sole discretion.**

**The Shares offered hereby are highly speculative, involve a high degree of risk and immediate dilution, and should be purchased only by persons who can afford the loss of their entire investment. See "Risk Factors" on page 5 of this Memorandum for a description of certain risk factors that should be considered by prospective purchasers of the Shares.**

**The Shares have not been registered with, or approved or disapproved by, the Securities and Exchange Commission ("SEC") or any state securities authority, nor has the SEC or any state securities authority passed upon the accuracy or adequacy of this Memorandum or endorsed the merits of this Offering. Any representation to the contrary is a criminal offense.**

| | Price to Investors | Placement Agent Sales Commission (1) | Proceeds to Company (2) |
|---|---|---|---|
| Per Share | $ | $ | $ |
| Minimum Investment (3) | $ | $ | $ |
| Total | $ | $ | $ |

(1) Represents a selling commission payable to our security broker dealers in an amount equal to __% ($___ per Share) of all Shares sold  The Placement Agent may re-allow all or a portion of the sales commission to other FINRA members that participate in the Offering for Shares sold through them   See "Plan of Distribution -Placement Agent Agreement "

(2) Before deducting the legal, accounting, printing and other expenses of the Offering, estimated at $100,000,

(3) The minimum amount of any investment is _____ Shares or $_____   We reserve the right to accept subscriptions for less than this minimum from any investor

---

**The securities are offered pursuant to claimed exemptions from registration under the Securities Act and certain state securities laws. The securities are subject to restriction on transferability and resale and may not be pledged, transferred, resold or otherwise disposed of except as permitted under the Securities Act and such laws pursuant to registration or exemptions therefrom.**

**This Memorandum and all other Offering materials are submitted in connection with the private offering of the Shares and do not constitute an offer or solicitation by anyone in any jurisdiction in which such an offer or solicitation is not authorized.**

**We are a privately-held company.  The Shares have not been registered under the Securities Act or the securities laws of any state or other jurisdiction, and we have no obligation to register the Shares for resale under those laws.  The Shares are "restricted securities" (as defined in Rule 144 under the Securities Act) and may not sold or otherwise disposed of without registration under the Securities Act or an exemption from the registration requirements of the Securities Act. Our common stock is not registered under the Securities Exchange Act of 1934, as amended. Our common stock is not listed on any stock exchange or quoted on any quotation service.  We cannot assure you that our common stock will ever be registered under the Securities Exchange Act, or that a market for our common stock will develop, or if such a market develops, that such market will be maintained. The offering price for the Shares was arbitrarily determined by the Company and the Placement Agent**

---

**The date of this Memorandum is March 1, 2010.**

---

**PLACEMENT AGENT**

BPB1-BioMarine_00000176

## TABLE OF CONTENTS

IMPORTANT NOTICES TO INVESTORS                                              iv

CAUTIONARY STATEMENT REGARDING FORWARD-LOOKING STATEMENTS                   vi

SUMMARY OF OFFERING                                                         1

USE OF PROCEEDS                                                             3

RISK FACTORS                                                                5

BUSINESS OF BIOMARINE                                                       14

PLAN OF OPERATIONS                                                         22

OUR EXECUTIVE OFFICERS AND DIRECTORS                                        37

PRINCIPAL STOCKHOLDERS                                                      40

DESCRIPTION OF OUR SECURITIES                                               41

PLAN OF DISTRIBUTION                                                        42

AVAILABLE INFORMATION                                                       44

EXHIBITS

A – Audited Financial Statements and Unaudited Interim Financial Statements of Biomarine        A-1

## IMPORTANT NOTICES TO INVESTORS

### Notices Regarding This Memorandum

We are furnishing this Memorandum solely for use by potential investors in connection with the Offering.

This Memorandum has been prepared by Biomarine and no person other than our authorized representative has been authorized to give any information or to make any representations other than those contained in this Memorandum in connection with the securities described herein, and if given or made, such information or representations must not be relied upon as having been authorized by us. Potential investors are cautioned not to rely on any information not expressly set forth in this Memorandum. Statements contained herein as to the content of any agreement or other document are summaries and, therefore, are necessarily selective and incomplete and are qualified in their entirety by the actual agreements or other documents. We will make available to any prospective investor prior to the consummation of the sale the opportunity to ask questions of and receive answers from us or persons acting on our behalf concerning the terms and conditions of the Offering, our company, or any other relevant matters and any additional reasonable information to the extent that we possess such information.

Because this Memorandum focuses primarily on information concerning Biomarine rather than the industry in which Biomarine operates, potential investors may wish to conduct their own separate investigation of the sea farming industry to obtain greater insight in assessing our prospects.

This Memorandum does not purport to contain all of the information that a potential investor may require to evaluate the Offering and any recipient hereof should conduct its own independent analysis. We do not expect to update or otherwise revise this Memorandum or other materials supplied

                                    BPB1-BioMarine_00000177

herewith unless there is a material change in the information set forth herein. The delivery of this Memorandum at any time does not imply that the information contained herein is correct as of any time subsequent to the date set forth in this Memorandum. This Memorandum is submitted in connection with the Offering described herein and may not be reproduced or used for any other purpose. Each recipient of this Memorandum agrees that all information contained herein is of a confidential nature, that it will treat such information in a confidential manner and that it will not, directly or indirectly, disclose or permit its agents or affiliates to disclose any such information without our prior written consent.

## Notices Regarding the Offering

This Offering can be withdrawn at any time before a closing and is specifically made subject to the terms described in this Memorandum. We reserve the right to reject any subscription, in whole or in part, or to accept subscriptions from investors for less than the minimum subscription subscribed for by such prospective investor.

The purchase of the securities offered hereby entails a high degree of risk. No investment in the securities offered hereby should be made by any person who is not in a position to lose the entire amount of such investment. All investors should carefully review this Memorandum including the information contained in the section "Risk Factors."

Prospective investors may wish to retain their own professional advisors to review and evaluate the economic, tax and other consequences of investing in this private Offering and are not to construe the contents of this Memorandum or any other information furnished by us as legal, financial or other advice.

The securities offered hereby have not been registered under the Securities Act or the securities or "Blue Sky" laws of any state and are being offered and sold in reliance on exemptions from the registration requirements of the Securities Act and such laws. The securities are subject to restriction on transferability and resale and may not be pledged, transferred, resold or otherwise disposed of except as permitted under the Securities Act and such laws pursuant to registration or exemptions therefrom. The securities have not been approved or disapproved by the Securities and Exchange Commission, any state securities commission or other regulatory authority, nor have any of the foregoing authorities passed upon or endorsed the merits of this Offering or the accuracy or adequacy of the Memorandum. Any representation to the contrary is unlawful.

It is intended that the securities offered hereby will be made available only to "accredited investors," as defined in Section 2(15) of the Securities Act and Rule 501 promulgated thereunder.

The securities offered hereby may not be pledged, transferred, resold or otherwise disposed of by an investor unless, in the opinion of counsel satisfactory to us and our counsel, registration under the applicable federal and state securities or "Blue Sky" laws is not required or compliance is made with such registration requirements.

The investor, by accepting delivery of this Memorandum, agrees to return this Memorandum, all other Offering materials and all accompanying or related documents to us upon request if the investor does not purchase any of the securities offered hereby.

This Memorandum and all other Offering materials are submitted in connection with the private offering of the Shares and do not constitute an offer or solicitation by anyone in any jurisdiction in which such an offer or solicitation is not authorized.

Any reproduction or distribution of this Memorandum or any other Offering materials in whole or in part, or the divulgence of any of their contents, without our prior written consent, is prohibited. Any investor acting contrary to the foregoing restrictions may place itself and the Company in violation of federal or state securities laws.

Each investor may, if it so desires, make inquiries of our management with respect to Biomarine or the business of Biomarine or any other matters set forth herein, and may obtain any additional information which such investor deems to be necessary in order to verify the accuracy of the information contained in this Memorandum and to make an investment decision (to the extent that we possess such information or can acquire it without unreasonable effort or expense). In connection with such inquiry, any documents that any investor wishes to review will be made available for inspection and copying or provided, upon request, subject to the investor's agreement to maintain such information in confidence and to return the same to us if the recipient does not purchase the securities offered hereunder. Any such inquiries or requests for additional information or documents should be made in writing to our company addressed to John D. Ericsson, at Biomarine Technologies, Inc., 8111 Broadway Street, Suite 9, Galveston, Texas 77552.

---

## !NASAA UNIFORM LEGEND

IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SHARES OF COMMON STOCK OFFERED HEREBY AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THE SHARES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THE SHARES OF COMMON STOCK OFFERED HEREBY ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT, AND APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY MAY BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

### FOR FLORIDA RESIDENTS

THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE FLORIDA SECURITIES ACT, BY REASON OF SPECIFIC EXEMPTIONS THEREUNDER RELATING TO THE LIMITED AVAILABILITY OF THE OFFERING. THESE SECURITIES CANNOT BE SOLD, TRANSFERRED, OR OTHERWISE DISPOSED OF TO ANY PERSON OR ENTITY UNLESS THEY ARE SUBSEQUENTLY REGISTERED OR EXEMPTION FROM REGISTRATION IS AVAILABLE. ·

THE SECURITIES REFERRED TO HEREIN WILL BE SOLD TO, AND ACQUIRED BY, THE HOLDER IN A TRANSACTION EXEMPT UNDER SECTION 517.061 OF THE FLORIDA SECURITIES ACT. THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER SAID ACT IN THE STATE OF FLORIDA. IN ADDITION, ALL FLORIDA RESIDENTS SHALL HAVE THE PRIVILEGE OF VOIDING THE PURCHASE WITHIN THREE (3) DAYS AFTER THE FIRST TENDER OF CONSIDERATION IS MADE BY SUCH PURCHASER TO THE ISSUER, AN AGENT OF THE ISSUER, OR AN ESCROW AGENT OR WITHIN THREE (3) DAYS AFTER THE AVAILABILITY OF THAT PRIVILEGE IS COMMUNICATED TO SAID PURCHASER, WHICHEVER OCCURS LATER.

BPB1-BioMarine_00000179

**FOR NEW YORK RESIDENTS**

THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE NEW YORK FRAUDULENT PRACTICES ("MARTIN") ACT, BY REASON OF SPECIFIC EXEMPTIONS THEREUNDER. THESE SECURITIES MAY NOT BE RESOLD OR OTHERWISE DISPOSED OF TO ANY PERSON OR ENTITY UNLESS SUBSEQUENTLY REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE NEW YORK FRAUDULENT PRACTICES ("MARTIN") ACT, IF SUCH REGISTRATION IS REQUIRED.

THIS OFFERING MEMORANDUM HAS NOT BEEN FILED WITH OR REVIEWED BY THE ATTORNEY GENERAL PRIOR TO ITS ISSUANCE AND USE. THE ATTORNEY GENERAL OF THE STATE OF NEW YORK HAS NOT PASSED ON OR ENDORSED THE MERITS OF THIS OFFERING. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

PURCHASE OF THESE SECURITIES INVOLVES A HIGH DEGREE OF RISK. THIS PRIVATE OFFERING MEMORANDUM DOES NOT CONTAIN ANY UNTRUE STATEMENT OF A MATERIAL FACT OR OMIT TO STATE A MATERIAL FACT NECESSARY TO MAKE THE STATEMENTS MADE, IN LIGHT OF THE CIRCUMSTANCES UNDER WHICH THEY WERE MADE, NOT MISLEADING. IT CONTAINS A FAIR SUMMARY OF THE MATERIAL TERMS OF DOCUMENTS PURPORTED TO BE SUMMARIZED HEREIN.

THE SALE OF THE SHARES IS SUBJECT TO THE PROVISIONS OF A CERTAIN SUBSCRIPTION AGREEMENT ACCOMPANYING THIS MEMORANDUM CONTAINING EXPLICIT REPRESENTATIONS, WARRANTIES, TERMS AND CONDITIONS. ANY INVESTMENT IN THE SHARES SHOULD BE MADE ONLY AFTER A COMPLETE AND THOROUGH REVIEW OF THE PROVISIONS OF THE SUBSCRIPTION AGREEMENT ACCOMPANYING THIS MEMORANDUM.

BPB1-BioMarine_00000180

## CAUTIONARY STATEMENT REGARDING FORWARD-LOOKING STATEMENTS

Certain of the statements set forth in this Memorandum and the exhibits attached hereto constitute "Forward Looking Statements." Forward-looking statements include, without limitation, any statement that may predict, forecast, indicate, or imply future results, performance or achievements, and may contain the words "estimate," "project," "intend," "forecast," "anticipate," "plan," "planning," "expect," "believe," "will," "will likely," "should," "could," "would," "may" or words or expressions of similar meaning

All such forward looking statements involve risks and uncertainties, including, but not limited to statements regarding our marketing, sales and redevelopment programs, the effect of competition, the availability to us of additional financing and access to capital, the seeking of joint development, distribution and collaboration and marketing arrangements, and the period of time for which the proceeds of the Offering will enable us to fund our intended operations In addition to the items described "Risk Factors", many important factors affect the ability to achieve our stated objectives and to successfully develop and commercialize any of our finfish product candidates, including, among other things, the ability to obtain substantial additional funds, to demonstrate proof of concept at each stage of development, to meet applicable regulatory standards, to be capable of producing and distributing finfish products in commercial quantities at reasonable costs, to compete successfully against competitors and to market products in a profitable manner Prospective investors are cautioned that there also can be no assurance that the forward-looking statements included in this Memorandum will prove to be accurate In light of the significant uncertainties inherent to the forward looking statements included herein, the inclusion of such information should not be regarded as a representation or warranty by us or any other person that our objectives and plans will be achieved in any specified time frame, if at all Except to the extent required by applicable laws or rules, we do does not undertake any obligation to update any forward-looking statements or to announce revisions to any of the forward-looking statements

BPB1-BioMarine_00000181

## SUMMARY OF OFFERING

*The following summary is qualified in its entirety by, and should be read in conjunction with, the more detailed information contained in this Memorandum or included as an exhibit hereto, including the financial statements of Biomarine*

**About Biomarine**

Biomarine was incorporated in the State of Delaware on October 3, 1989 to develop a fully-integrated commercial seafood business using established mariculture, or sea-farming, techniques, including the use of offshore and/or onshore fish hatcheries and large, open-ocean sea cages to produce USDA "organic" fish and other aquatic animals for human consumption

To date, Biomarine's activities have focused, in part, in conjunction with Gulf Marine Institute of Technology (GMIT), a project affiliated nonprofit research institute, on researching and developing open water sea farming technology, identifying fish stock candidates, securing the requisite operational infrastructure and permits, establishing collaborative arrangements with key suppliers of mariculture technology, equipment and fingerlings, as well as pursuing other strategic relationships for the commercialization of our proposed business operations in the Gulf of Mexico

Biomarine has secured federal permits with GMIT to jointly develop two offshore sea farming sites located in the Gulf of Mexico (GOM)   The first project is off the coast of the Florida/Alabama state line, located 7 5 nautical miles offshore in federal waters, and is planned to install hurricane resistant sea farming cages that are "submersible" and a platform/ feeder barge for commercial mariculture production   Biomarine also has procured rights to a four-platform complex owned by GMIT and permits for a similar operation off the coast of Texas   We also have access to via GMIT or own a number of the equipment components needed to initiate the construction of the first hatchery and nursery system, as well as five (5) Japanese Bridgestone sea cages which are ready for final refitting and deployment, to outfit these sites

Over the last seven years, Biomarine has conducted successful research with both Cobia and Redfish, two of our anticipated finfish candidates

**Financial Information**

Biomarine has conducted limited operations associated with its mariculture research and development efforts, securing the requisite operational infrastructure and permits, establishing collaborative arrangements, as well as engaging representatives and advisors and other activities related to the negotiation of the agreements required to consummate the transactions described herein

Our audited financial statements for the years ended April 30, 2007 and 2006, and our unaudited financial statements for the nine months ended January 31, 2008 are annexed as Exhibit A  The audited financial statements of Biomarine for the years ended December 31, 2006 and 2005, and the nine months ended September 30, 2007, and its unaudited financial statements for the year ended December 31, 2009 are annexed as Exhibit B

**The Offering**

The following is a summary of the proposed terms of the Offering

| | |
|---|---|
| **Securities Offered:** | _____ shares of our common stock, $ 01 par value |
| **Offering Price:** | The Shares are being offered at a per share price equal to $ _____ |
| **Offering Period:** | The Offering will continue until September, 2010, or such earlier date upon which a total of _____ Shares have been sold and we have |

1

received a total of $_____ in subscription payments  We have the right to extend the termination date of the Offering, subject to the consent of the Placement Agent, to a date not later than December 30, 2010

**Minimum Subscription:**   $_____, although we and the Placement Agent may agree to accept subscriptions in lesser amounts

**Use of Proceeds:**   We intend to use the proceeds from the Offering to construct and equip a land-based hatchery/nursery and purchase the feeder barge, sea cages, vessels and related equipment for the Florida/Alabama (or FlorAbama) site, to obtain the leasehold for the docking facility and hatchery building to be located at the FlorAbama site, to purchase fish fingerlings, to pay management salaries and hire personnel for the project, and for working capital and general corporate purposes

**Subscription Procedure:**   In order to subscribe for the Shares, each prospective investor must complete, execute and deliver to us a signature page evidencing such prospective investor's execution of the Subscription Agreement and a completed confidential Investor Questionnaire



2

BPB1-BioMarine_00000183

## USE OF PROCEEDS

We intend to use the net proceeds of the Offering, which we estimate at $\_\_\_\_ if all \_\_\_\_ shares are sold and $\_\_\_\_\_ if only \_\_\_\_\_ shares are sold, after deducting the \_\_% sales commission payable to the Placement Agent and all other expenses of this Offering (estimated at $100,000), as follows

|  | If We Sell All Shares | | If We Sell Only Shares* | |
|---|---|---|---|---|
|  | Amount | Percent | Amount | Percent |
| To construct and equip a land-based hatchery/nursery, and purchase the feeder barge, sea cages, vessels and related equipment (1) | $ | % | $ | % |
| To obtain the leasehold for the docking facility and hatchery building |  | % |  | % |
| To purchase fingerlings |  | % |  | % |
| For management salaries and to hire personnel for the project (2) |  | % |  | % |
| For working capital and general corporate purposes (3) | _____ | __%_ | _____ | __%_ |
| Total | $ _____ | 100 00% | $ _____ | 100 00% |

---

*Although there is no minimum number of Shares which must be subscribed for before we may accept subscriptions and sell shares pursuant to the Offering, the Placement Agent has agreed that we have no obligation, and we do not intend, to hold an initial closing at which we will sell Shares until we receive subscriptions to purchase a total of at least \_\_\_\_\_ Shares, for a total purchase price of $_____   However, we cannot assure you that if we have not received subscriptions for at least \_\_\_\_\_Shares by September 31, 2010, that we will not accept those subscriptions

If we only sell _____ Shares, the development and production of fish candidates would be limited and commercialization of our fish candidates would be delayed until additional financing becomes available  See "Use of Proceeds "  Net proceeds from the sale of more than _____ Shares (but less than _____ Shares) will be used to construct the land-based hatchery/nursery and to increase production

(1) Includes purchase of sea cages and moorings, feeder barge and boats

(2) Includes the salaries of our officers ($710,000), as well as production, maintenance, and vessel personnel for up 12 months following the completion of this Offering  However, Biomarine estimates that commercialization of its fish-farming operations will not commence, and we will not receive revenues, earlier than 18 months following the completion of this Offering, assuming there does not occur any unforeseen event(s) that result in further delays, and any revenues we receive once we commence commercialization are unlikely to be significant until we are able to produce and sell fish commercially in substantial quantities

(3) Includes fish feed, insurance, maintenance, vessel operations, production supplies, environmental monitoring, utilities, travel, legal and accounting

---

Confidential                                           BPB1-BioMarine_00000184

The actual cost, timing and amount of funds required for the items cannot be determined precisely at this time  Pending application to those items, the net proceeds of the Offering will be invested in short-term, investment grade, and interest bearing securities   We will require substantial additional funds in addition to the proceeds from the Offering to support our operating plans   We cannot assure you that such additional financing can be obtained on terms favorable to us, if at all   See "Business of Biomarine – Plan of Operations" and "Risk Factors "  If we sell less than the number of Shares set forth above, the amount we will be able to spend for the items listed in the table, will be reduced based upon their relative importance to the implementation of Biomarine's business plan, until we obtain sufficient additional financing, as to which we cannot give you any assurance  Biomarine anticipates, based on currently proposed plans and assumptions relating to its operations, that the net proceeds from the sale of _____

Shares will be sufficient to fund Biomarine's FlorAbama operations, as described in this Memorandum, for approximately 12 months following the completion of this Offering   Biomarine anticipates that it will require approximately $5,000,000 in additional financing in the first six months of 2009 for additional sea farming equipment, personnel, inventory purchases, to implement its facilities development plan and to satisfy its working capital requirements   We cannot assure you that Biomarine will not require additional financing at an earlier date   This will depend upon the timing of required expenditures  We cannot assure you that such financing will·be available on terms acceptable to us, if at all



**RISK FACTORS**

4

*The securities offered hereby are speculative, involve a high degree of risk and should only be purchased by persons who can afford to lose their entire investment Prospective purchasers should carefully consider, among other things, the following risk factors relating to the business of Biomarine and this Offering prior to making any investment These risk factors are summary and are not intended to be exhaustive or set forth all the possible risks and uncertainties that may be associated with purchasing or owning this investment You are strongly urged to consult with professional financial advisors, accountants, and lawyers in evaluating this investment and making an independent and informed decision about whether or not to invest your money in this Offering*

## RISKS RELATING TO BIOMARINE

### *Biomarine has a limited operating experience and a history of net losses and may never achieve or maintain profitability.*

Biomarine has incurred net losses since inception in 1989 and expects to continue to operate at a loss for the first eighteen to twenty-four months of operation following the completion of this Offering If Biomarine's revenues grow more slowly than anticipated or fail to grow or if operating expenses exceed expectations, it will adversely affect our ability to achieve profitability Our future operating results will depend upon numerous factors, many of which are outside of our control Such factors include

our ability to control costs associated with the production and commercialization of Biomarine's finfish product candidates,

the market acceptance of Biomarine's finfish product candidates,

our ability to compete with larger and more established competitors,

the predicted length of Biomarine's production and sales cycle,

the rate and size of expenditures associated with the implementation of our marketing and distribution strategy for Biomarine's products in the United States,

our ability to enter into agreements for the distribution of Biomarine's finfish product candidates on acceptable terms,

developments with respect to state and federal regulatory matters,

our ability to attract key personnel to assist in the development, production, sales and marketing of Biomarine's products,

on-going adverse economic conditions, economic uncertainties, recent and possible future terrorist activities and other geopolitical instability,

adverse results or failures in the hatching and production activities of the species regarding the quality, quantity and size of the products,

bacterial, viral and other infections and contaminations or other health related to the hatchery and farming of the fish products,

technical or technology failures in terms of the location (platform), fish feed, hatchery, cages, nets, pumps, etc affecting the quantity and quality of the products,

accidents or attacks disturbing or delaying the quantity and quality of the farming,

on-going climate and weather uncertainties, including, but not limited to, hurricanes, and other geological instability,

5

BPB1-BioMarine_00000186

a contraction of the market for farmed fish,

seasonality, and

our ability to develop strategic distribution relationships in the USA, Europe and Asia

### *Biomarine's limited operating history makes evaluation of its business difficult.*

Biomarine is effectively a start up and, accordingly, has limited historical financial data upon which to base planned operating expenses or forecast accurately our future operating results Revenue and income potential of Biomarine's business is unproven As a young company operating in an unproven market, we face risks and uncertainties relating to our ability to implement our business plan successfully

### *To date Biomarine has not developed product candidates on a commercially marketable scale.*

Since inception, Biomarine has engaged in only research and development activities Biomarine has not proven its ability to successfully produce on a large commercial scale and market its products broadly, and we must conduct additional development before Biomarine's products will be ready for broad commercial sale Our operations may be adversely affected by problems encountered in connection with the development and utilization of technologies on a commercial level These problems may limit our ability to develop commercially on a timely basis Even if we successfully develop finfish product candidates for commercial distribution, Biomarine's product may not be accepted by the marketplace, or we may not be capable of selling Biomarine's product at prices that will enable us to become profitable

Our future financial performance and our ability to commercialize Biomarine's finfish candidates also will depend, in part, on our ability to manage any future growth effectively We may not be able to effectively manage the expansion of Biomarine's operations or recruit and train qualified personnel from time to time with respect to our operations Any growth and expansion is expected to place a significant demand on our financial, managerial and operational resources, as well as divert our management and business development resources Any inability to manage growth could delay the execution of our business plans or disrupt our operations

If we are not successful in completing a transition to commercial production, then our ability to become profitable will be jeopardized, and the market price of our common stock is likely to decline

### *Failure to successfully farm, market, and sell Biomarine's products will have a material adverse effect on our business, financial condition, and results of operations.*

Biomarine is focused initially on a limited number of species and the successful commercialization of these species is critical to our future success Our ability to successfully farm, market, and sell Biomarine's products is subject to a number of risks, many of which are outside our control We cannot assure you that we will be able to successfully farm Biomarine's products in commercial quantities at acceptable costs, market Biomarine's products, or generate sales of Biomarine's products Our inability to achieve any of the foregoing will have a material adverse effect on our business, financial condition, and results of operations

### *Market acceptance of Biomarine's products is uncertain.*

Our success and growth will depend on the level of market acceptance of Biomarine's products Wholesalers and retailers may not purchase Biomarine's products We cannot assure you that a market for Biomarine's products will develop or that our Biomarine's products will be adopted However, Biomarine has received indications of interest from major seafood organizations regarding pricing, upon which our assumptions are based

6

BPB1-BioMarine_00000187

***Because Biomarine has no farming experience for commercial-scale quantities, we may be unable to control the availability of Biomarine's products.***

Although Biomarine has secured consultants and personnel with substantial experience in sea farming operations it has no farming experience for large, commercial-scale quantities of its proprietary products  If we are unable to enter into or maintain agreements with suppliers for sufficient quantities of raw materials, e g fish feed, needed to farm Biomarine's products or to enter into agreements with third parties to expand commercial-scale farming capabilities as needed will have a material adverse effect on our business, financial condition, and results of operations  We cannot assure you that our current or future raw material and equipment contracts will meet our requirements for quality, quantity, or timeliness  If the supply of any of our raw materials and equipment is interrupted, alternative suppliers may require prior testing to meet our production needs  Each of these factors may have a material adverse effect on our business, financial condition, and results of operations

***Biomarine depends on suppliers and manufacturers for raw materials and equipment for the farming of its products, and the loss of any of these suppliers or manufacturers could materially harm our business.***

Outside contractors and suppliers supply raw materials and equipment for the farming of Biomarine's products  Many of these raw materials and pieces of equipment are only available from single or a limited number of suppliers  Certain of these suppliers require validation studies in order to act as a supplier for our raw materials  To the extent Biomarine's contractors and suppliers cannot support Biomarine's products, we will be forced to validate other suppliers that could result in a delay in the farming of Biomarine's products  Our operating results may be materially adversely affected by a stoppage or delay of supply, substitution by more expensive or less reliable raw materials and equipment, an increase in the pricing of such raw materials and equipment, or our inability to obtain reduced pricing from our suppliers in response to competitive pressures

***Biomarine's competitors have greater resources, which may make it more difficult for us to achieve significant market penetration.***

The market for farmed fish is subject to rapid change, and significantly affected by new product introductions and other market activities of industry participants  Biomarine's products require significant planning, development, and testing  These activities require significant capital commitments and investment  We cannot assure you that Biomarine's products or farming technologies will remain competitive following the introduction of new products, locations and technologies  Furthermore, we cannot assure you that our competitors will not develop products or quantities that are more attractive or that can be produced at a lower cost than Biomarine's products  We cannot assure you that we will be successful in the face of increasing competition from new technologies, locations or products introduced by existing competitors and by new companies entering the market

Our competitors include large multinational corporations and their operating units  These companies and certain of our other competitors have substantially greater financial, marketing, and other resources than we do  Each of these companies is either publicly traded or a division of a publicly traded company, and enjoys several competitive advantages, including

significantly greater name recognition,

established relationships with wholesalers and retailers,

additional lines of products, and the ability to offer rebates or bundle products to offer higher discounts or incentives to gain a competitive advantage,

established distribution networks and relationships with customers, and

greater resources for product development, sales and marketing

7

These companies and others have developed and will continue to develop new products that compete directly with Biomarine's products. In addition, our competitors spend significantly greater funds for the research, development, promotion, and sale of new and existing products. These resources allow them to respond more quickly to new or emerging technologies and changes in customer requirements. For all the foregoing reasons, we may not be able to compete successfully against our current and future competitors.

***We have no sales and marketing experience and any failure to expand sales of Biomarine's products will negatively impact future sales.***

Although Biomarine has secured consultants and personnel with substantial experience in seafood marketing and operations, we have no experience in marketing, sales, and distribution of Biomarine's finfish product candidates on a commercial scale. We are in the process of establishing marketing, sales, and distribution capabilities in order to support our commercialization efforts. We may be required to recruit additional highly trained salespeople, and we cannot assure you that such personnel will be available on terms acceptable to us. We also cannot assure you that our marketing and direct sales force, if established, will be successful in marketing Biomarine's products. In addition, due to the limited market awareness of Biomarine's products, we believe that the sales process could be lengthy, requiring us to communicate regarding the benefits of Biomarine's products. Our failure to establish an effective sales and marketing organization would have a material adverse effect on our business, financial condition, and results of operations.

***We will require substantial additional financing to commence production of sufficient quantities and varieties of fish candidates to commercialize our operations.***

Biomarine anticipates, based on currently proposed plans and assumptions relating to its operations, that the net proceeds from the sale of _____ Shares will be sufficient to fund Biomarine's operations, as described in this Memorandum, for approximately 12 months following the completion of this Offering. Biomarine anticipates that it will require approximately $5,000,000 in additional financing in the first six months of 2009 for additional sea farming equipment, personnel, inventory purchases, to implement its facilities development plan and to satisfy its working capital requirements. We cannot assure you that Biomarine will not require additional financing at an earlier date. This will depend upon the timing of required expenditures. We cannot assure you that such financing will be available on terms acceptable to us, if at all.

***We may issue shares of our capital stock to obtain additional financing, which would reduce the equity interest of our stockholders.***

We may issue additional shares of common stock to obtain additional financing. If we issue additional shares of our common stock, the equity interest of our existing stockholders may be reduced significantly, and the market price of our common stock may decrease.

***We may issue our debt securities to obtain additional financing, and if we are unable to generate sufficient cash flow from operations to satisfy the debt service associated with that indebtedness, our inability to do so may force us to sell assets, restrict our ability to obtain additional financing.***

If we issue debt securities to obtain additional financing, and we are unable to generate sufficient operating revenues to pay the principal amount and accrued interest on that debt, we may be forced to sell all or a significant portion of our assets to satisfy our debt service obligations, unless we are able to refinance or negotiate an extension of our payment obligation. Even if we are able to meet our debt service obligations as they become due, the holders of that debt may accelerate payment if we fail to comply with, and/or are unable to obtain waivers of, any covenants that require us to maintain certain financial ratios or reserves or satisfy certain other financial restrictions. In addition, the covenants in the loan agreements may restrict our ability to obtain additional financing and our flexibility in operating our business.

8

BPB1-BioMarine_00000189

***If we are unable to retain the services of the senior executive officers of Biomarine, we may not be able to successfully develop and commercialize Biomarine's finfish candidates.***

We are highly dependent on each of John D Ericsson, our Chairman, President and Chief Executive Officer and a director of Biomarine, and on the services of Luis Cabello, Chief Operations Officer, and Dr Phillip G Lee, Chief Scientific Officer and a director of Biomarine  We have entered into employment agreements with each of Messrs Ericsson and Cabello and Lee  However, under their employment agreements they have the right to terminate their employment with us upon 30 to 90 days prior written notice  In addition, although each has agreed to devote substantially all of his business time and efforts to our affairs and to do the utmost to promote our interests, each of Mr Ericsson and Dr Lee from time to time may have to devote time and attention to professional commitments associated with GMIT  Mr Ericsson currently serves as Managing Director of GMIT and Dr Lee, as one of GMIT's directors and scientific advisors  In addition, we have not obtained, nor do we plan to apply for, key man insurance on the lives of any of our officers in the foreseeable future  The loss of any of their services may have a material adverse effect on achieving our product development and commercialization objectives

***Our ability to implement our business plan may be impaired if GMIT and Biomarine lose their rights to use the Texas Site.***

The Texas General Land Office has obtained a judgment from the Court of Appeals in Texas invalidating the lease under which GMIT and Biomarine have the right to use the Texas site for mariculture operations  Although GMIT and Biomarine have filed a motion for a rehearing with the Court of Appeals and has filed an application with the Texas General Land Office for a new 30 year lease for the Texas site, we cannot assure you whether they will retain, or obtain new rights, to use the Texas site  See "Business of Biomarine – Sites – Legal Proceedings Concerning Texas Site "

Although Biomarine has focused its initial efforts to commercialize its fish farming maricultural operations, and the proceeds of this Offering are intended to be used for the development of the FlorAbama site, if we are successful in commercializing Biomarine's mariculture operations at the FlorAbama site and we are able to secure a new platform project site lease from the Texas general Land Office, we plan to expand those operations by developing the Texas site, subject to the availability of substantial additional financing on terms favorable to us  If we are unable to pursue development at the Texas site, we will explore alternative opportunities at other sites  However, we cannot assure you that opportunities will be available to us at other sites, whether we will be successful in obtaining permits for those sites, or the delays we will experience as a result of seeking alternative sites, any or all of which may impair our ability to implement our business plan

***Our business would be significantly harmed if Biomarine's Commercial Joint Development Agreement with GMIT is terminated, or GMIT defaults on the underlying platform lease.***

Upon completion of this offering, we will not own outright the FlorAbama project or the Texas platform complex  Rather, our rights to use the Texas platform complex and the FlorAbama site for mariculture operations are granted to us under our joint development agreement with GMIT and government permits granted to us jointly with GMIT  Our business operations depend, in part on our continued access to the FlorAbama permitted site/or use of the Texas platform complexes under this agreement  The termination of the GMIT commercial joint development agreement for any reason will only deny us our use of the Texas platforms for our business operations

GMIT has the right to terminate the joint development agreement if Biomarine ceases development activities at the site for six months

To the extent that GMIT fails or is unable or unwilling to satisfy its obligations under the agreement with the Texas General Land Office concerning the platform complex, we may be adversely impacted

9

BPB1-BioMarine_00000190

Additionally, GMIT's actions or omissions thereunder may give rise to disputes and claims that may substantially harm us by denying us use of the platform and thereby possibly causing us to default in our performance obligations under contractual arrangements with third parties providing services and/or equipment for our commercial mariculture operations Although our agreement with GMIT enables us to engage in self-help and provides for GMIT to indemnify us against any liabilities caused by its acts or omissions, we could still be subjected to potential claims Even if we were not liable, we would still incur expense and devote significant time and resources to defend against any claims brought against us Moreover, GMIT may not have the financial resources to satisfy any indemnification claims we may make against it in the future A finding against GMIT or us could have a material adverse impact on our business, financial conditions and operations

Neither GMIT, as a shareholder of Biomarine, Mr Ericsson nor Dr Lee bears the same risk of loss as other holders of our common stock in the event the joint development agreement with GMIT is terminated Termination would result in substantial harm to our financial condition, business operations and prospects GMIT, Mr Ericsson and Dr Lee, however, may benefit from a termination and the subsequent return to GMIT of the exclusive use of the Texas platform complex and associated permits for use as a mariculture facility

### Our failure to obtain or maintain necessary regulatory clearances or approvals could hurt our ability to commercially distribute and market Biomarine's products.

Biomarine's products are classified as food and we are subject to regulation and supervision by the FDA in the United States and similar regulatory bodies in other countries Food products are also subject to ongoing controls and regulations, including inspections, compliance with established farming practices, product tracking, record keeping, advertising, labeling, packaging, and compliance with other standards Comparable agencies in certain states may also regulate our activities The process of complying with such regulations with respect to current and new products can be costly and time-consuming and involves compliance by third-party suppliers over which we have no control

Biomarine's farming operations are required to comply with applicable Quality Products Regulation (QSR) of the FDA, which incorporate the Good Agriculture Practices regulations QSR addresses the design controls, methods, facilities, and quality assurance controls used in manufacturing, packing, storing, and shipping In addition, certain international markets have quality assurance and manufacturing requirements that may be more or less rigorous than those in the United States Furthermore, any FDA regulations now governing Biomarine's products are subject to change at any time, which may cause delays and could have material adverse effects on our operations

We also must comply with federal, state, and local laws relating to such matters as safe working conditions, environmental protection and monitoring, industrial safety, and hazardous substance disposal We may incur significant costs to comply with such laws and regulations in the future, and lack of compliance could have material adverse effects on our operations

### If we become subject to product-liability claims, the damages may exceed our insurance coverage.

Biomarine's business will expose us to potential product-liability claims, product recalls and associated adverse publicity, which are inherent in the farming, marketing, and sale of farmed fish, and as such we may face substantial liability to wholesalers, retailers and consumers for damages resulting from the faulty farming of Biomarine's products Biomarine will obtain product-liability insurance prior to marketing its seafood products, but we cannot assure you that this insurance will provide sufficient coverage in the event of a claim, that we will be able to maintain such coverage on acceptable terms, if at all, or that a product-liability claim would not materially adversely affect our business or financial condition

### We will face substantial future capital requirements, which it may not be able to satisfy, and such a scenario may cause us to delay or curtail our business plan.

The amount that we raise in this Offering may not be adequate, and we may be unable to obtain future capital on satisfactory terms We cannot assure you that Biomarine's and our current cash and cash

Confidential

BPB1-BioMarine_00000191

equivalents, including the proceeds of this Offering, will be sufficient to fund our operations until profitability The amount of money we will need will depend on many factors, including

revenues generated by sales of Biomarine's products and future products, if any,

expenses we incur in developing and selling Biomarine's products,

the commercial success of our research and development efforts, and

the emergence of competing technological developments

Therefore, we may seek additional funding through collaborative arrangements with corporate partners and through public or private debt or equity financings  Any additional equity financing may be dilutive to stockholders, and any debt financing, if available, may involve restrictions on our ability to pay dividends on our capital stock or the manner in which we conduct our business  We have no commitments for any additional financings, and we cannot assure you that any such financings, if needed, will be available to us or that adequate funds for our operations, whether from our revenues, financial markets, collaborative or other arrangements with corporate partners or from other sources, will be available when needed or on terms attractive to us

If adequate funds are not available, we may have to delay development or commercialization of Biomarine's products or license to third parties the rights to commercialize products or technologies that we would otherwise seek to commercialize  We also may have to reduce marketing, customer support, or other resources devoted to Biomarine's products  Any of these results would materially harm our business, financial condition, and results of operations

*If we fail to fully implement our financial and managerial controls, reporting systems, and procedures, and if we do not effectively expand, train, and manage our workforce, our business will suffer substantially and we may not be able to implement our business plan.*

Successful implementation of our business plan requires an effective planning and management process  Our business will suffer dramatically if we do not effectively manage our growth  We expect that we will need to continue to improve our financial and managerial controls and reporting systems and procedures, and we will need to continue to expand, train, and manage our workforce  Our anticipated future growth in our operations will place a significant strain on our management systems and resources  We plan to add to our sales and marketing, customer support, and product development personnel  Our future performance may also depend on the effective integration of acquired businesses  This integration, even if successful, may take a significant period of time and expense, and may place a significant strain on our resources  We cannot assure you that any cash distributions to shareholders will be made

## RISKS RELATING TO AFFILIATED PARTIES AND CONFLICTS OF INTEREST

*Conflicts of interest exist between Biomarine and GMIT, and these conflicts might ultimately be resolved in a manner unfavorable to us.*

John D Ericsson, who will become our Non-Executive Chairman and a member of our Board of Directors following the Exchange Transaction, and Dr Phillip G Lee, who will become our Chief Biologist and a member of our Board of Directors following the Exchange Transaction, are directors of GMIT  These affiliations give rise to conflicts of interest when faced with a decision that could favor the interests of one affiliated company over another  In addition, conflicts of interest may arise with respect to existing or possible future commercial arrangements between us and GMIT in which the terms and conditions of the arrangements are subject to negotiation or dispute

Mr Ericsson's and Dr Lee's interests will not necessarily be aligned with other holders of our common stock because of their affiliation with GMIT  This affiliation gives rise to conflicts of interest when faced with a decision that would favor the interests of GMIT over ours  For example, while termination of

11

Biomarine's joint development agreement with GMIT would result in substantial harm to our financial condition, business operations and prospects, GMIT could benefit from the subsequent return of the platform complexes and associated usage rights under the agreement with GMIT

## RISKS RELATING TO THIS OFFERING

*Since there is no minimum number of Shares which must be subscribed for before we may accept subscriptions and sell shares pursuant to the Offering, if you subscribe for Shares and we accept your subscription even though we receive less than the net proceeds sufficient to implement Biomarine's business plan, and we are unable to obtain additional financing from other sources, you **may lose all of your investment in us.**_____*

There is no minimum number of Shares which must be subscribed for before we may accept subscriptions and sell shares pursuant to the Offering   Although under the terms of the placement agent agreement with our security broker dealers we are not obligated to accept subscriptions unless subscriptions have been received for at least $___ and we have the right to reject subscriptions for any or no reason, we cannot assure you that if we have not received subscriptions for at least _____ Shares by September 31, 2010, that we will not accept those subscriptions   If we accept subscriptions for a number of Shares the total purchase price of which yields less than the net proceeds sufficient to implement Biomarine's business plan, and we are unable to obtain additional financing from other sources, you may lose all of your investment in us

## *We will have broad discretion with respect to the use of proceeds from this offering.*

We currently anticipate that we will use the net proceeds from this offering to produce and commercialize Biomarine's finfish product candidates, which may include re-designing the Florida sea farming location and the farming processes of Biomarine's products for cost reduction, as well as financing initial production and sales   Our management and board of directors will have broad discretion with respect to the application of these proceeds, and the amounts actually expended by us for the purposes set forth above may vary significantly depending on a number of factors, including future revenue growth, if any, and the amount of cash, if any, generated by our operations

## *Our principal stockholders and management will own a significant percentage of our common stock and will be able to exercise significant influence and may take actions that may not be in the best interest of other stockholders.*

Aassuming _____ shares of our common stock are sold in this Offering, our executive officers and directors will own _____ shares of our common stock, representing approximately __% of the outstanding shares of our common stock, and if they act together, these stockholders will likely be able to determine the composition of a majority of our board, retain the voting power to approve certain matters requiring stockholder approval, and have significant influence over our affairs   This concentration of ownership could have the effect of delaying or preventing a change in our control   If we sell less than ____ Shares in this Offering, our executive officer and directors will have even greater influence over these matters   See "Principal Stockholders" for further information about the ownership of common stock by our executive officers, directors, and principal stockholders   This concentration of ownership may not be in the best interests of all our stockholders

## *There is no active trading market for our common stock and you may have to hold your investment indefinitely.*

We are offering the Shares in a private placement, and accordingly the Shares have not been registered under the Securities Act or the securities laws of any state or other jurisdiction   The Shares may not be resold without registration under the Securities Act or the availability of an exemption from those registration requirements

As a result, the purchase of the Shares should be considered a long-term investment   Since we are unable to give you an assurance as to the development or liquidity of any market for the Shares, investors must

Confidential                                                                 BPB1-BioMarine_00000193

be prepared to bear the economic risk of an investment in the Shares, perhaps for an indefinite period of time Rule 144 promulgated under the Securities Act ("Rule 144"), which provides for an exemption from the registration requirements under the Securities Act under certain conditions, requires, among other conditions, a that certain information about our company is publicly available and a one-year holding period from the time we become a reporting company under the Securities Exchange Act prior to the resale (in limited amounts) of securities acquired in a non-public offering without having to satisfy the registration requirements under the Securities Act   We cannot assure you that we will register our common stock under the Securities Exchange Act or that if we do, that we will fulfill any reporting requirements in the future under the Securities Exchange Act or disseminate to the public any current financial or other information concerning us, as is required by Rule 144 as part of the conditions of its availability

### Investors will incur immediate and substantial dilution in net tangible book value.

We anticipate that the offering price of the Shares will be substantially higher than the net tangible book value per share of our common stock   Therefore, purchasers of Shares in this Offering will incur immediate and substantial dilution in pro forma net tangible book value

### The Offering Price and other terms of this Offering have been arbitrarily determined and may not be indicative of future market prices.

The Offering Price was not established in a competitive market, but was arbitrarily determined by the Placement Agents and us   The Offering Price bears no relationship to our assets, book value, historical results of operations or any other established criterion of value, and may not be indicative of the fair value of the common stock   The trading price, if any, of the common stock that will prevail in any market that may develop in the future may be higher or lower than the price you pay in this Offering

### We have not retained independent professionals for you.

We have not retained any independent professionals to review or comment on this Offering or otherwise protect your interests   Although the Placement Agen and Biomarine have each retained its own counsel, none of such firms nor any other firm has made any independent examination of any factual matters represented herein, and purchasers of the Shares should not rely on any such firms so retained with respect to any matters herein described

13

## BUSINESS OF BIOMARINE

**Overview**

Biomarine was formed to develop a fully-integrated commercial seafood business using established mariculture techniques, including the use of onshore and offshore fish hatcheries and large, open-ocean sea cages, to produce USDA "organic" fish and other aquatic animals for human consumption. Its stated business objectives include

- *Eventually produce "organically" grown seafood, which is free from contaminants, growth hormones and antibiotics, in a natural marine environment, within one or more highly controlled, man-made offshore facilities located in the Gulf of Mexico.* Biomarine's final intent is to commercially produce and sell USDA certified 'Grown with Organic Ingredients" fresh, never frozen, seafood within the estimated $10 billion annual US domestic import market and foreign markets,

- Obtaining finfish from foreign marine "organic" and other fish farming companies and processing them in U S based plant(s) for commercial sale in domestic and foreign markets,

- Developing a fully integrated commercial seafood business involving the production, processing, distribution, marketing and sale of various fish products, and

- *Producing and marketing fish feed, fingerlings and equipment for use in the Gulf of Mexico mariculture industry*

- Growing other marine animals and organisms for scientific and potentially profitable sea farm grown commercial products, like phytoplankton (algae) for biofuel production

To date, Biomarine's activities have focused, in part, in conjunction with Gulf Marine Institute of Technology (GMIT), an affiliated nonprofit research institute, on researching and developing mariculture technology, identifying fish stock candidates, securing the requisite operational infrastructure and permits, establishing collaborative arrangements with key suppliers of mariculture technology, equipment and fingerlings, as well as pursuing other strategic relationships for the commercialization of our proposed business operations

Over the last seven years, Biomarine also has had successful grow-out experiences with both Cobia and Redfish, two of its anticipated finfish candidates

Biomarine has secured a contract with GMIT to jointly develop a platform/feeder barge based offshore sea farming site located in the Gulf of Mexico off the coast of the Florida/Alabama state line, located 7 5 nautical miles offshore in federal waters with requisite federal government permits  Biomarine also has rights and permits for a second project with similar operations and acreage 9 9 miles off the coast of Texas to refurbish and use a four-platform complex owned by GMIT for commercial mariculture production  However, the lease for the Texas site has been the subject of litigation with Texas governmental authorities to invalidate the lease  See "Legal Proceedings Concerning the Texas Site "  GMIT is engaged in negotiations with Texas governmental authorities with respect to certain issues related to the site lease  The development of the Texas site requires substantial additional financing, which may not be available on favorable terms, if at all Consequently, we will concentrate our efforts on the development and commercialization of the *Florida/Alabama (FlorAbama) site*

**Strategy**

To accomplish our business objectives, we plan, utilizing the proceeds of this Offering, to adapt existing mariculture technologies utilized in the Mediterranean to those fish hatcheries and offshore cage facilities we plan to construct off the Florida/Alabama state line in Federal waters  The FlorAbama project is

14

BPB1-BioMarine_00000195

intended to be configured for offshore "organic" farming of fast-growing, high-value finfish indigenous to such waters without the use of any contaminants, growth hormones or antibiotics

Our choice of the Gulf of Mexico environment is based upon its suitable warm water temperatures and its high quality sea water that is normally well oxygenated for sea farming operations within our FlorAbama or Texas project sites, resulting in an extended growing season and a relatively low-cost access to the sites within 10 miles offshore   A 1998 feasibility study undertaken by the National Marine Fisheries Service, likewise indicates that the Gulf of Mexico has suitable climatic and geographic characteristics conducive to the development of a mariculture industry   The practice of mariculture within the Gulf region remains relatively underdeveloped, particularly when compared to Europe, Asia, and other parts of North America   At the present time, there is no large marine hatchery in the Gulf that can produce juveniles on the commercial scale intended under our business plan, although several are planned in the near future

The mariculture techniques used in the Mediterranean has enabled the production of seabass and seabream to increase from 1,100 mt ($6 million value) in 1985 to 177,221 mt ($1 billion value) in 2005, constituting more than a 150-fold increase   In 2004, The World Conservation Union (IUCN) forecast production to increase to 322,000 mt by 2008   During the first ten years of development (1984-1994), mariculture production of fish in the Mediterranean rose 1050%   Greek mariculture companies dominate production of marine fish in Europe, producing 44% of all fry and 48% of final fish production   The number of Greek fish farms has increased dramatically, from 10 in 1988 to 308 in 2005 with production increasing from 374 mt in 1985 to more than 103,000 mt in 2005   Today, seven (7) Greek mariculture companies are listed on the Athens Stock Exchange Transaction and they export more than 80% of their production, more than $300 million/yr   There can be no assurance, however, that the mariculture techniques utilized in the Mediterranean can be successfully adapted to our proposed sites in the Gulf of Mexico or that the commercial success to date of the fish farming industry in the Mediterranean can be replicated by us

In addition, we plan to adapt Norwegian salmon sea cage technology utilizing a feeder barge vessel equipped with computer-controlled automated feeding and fish monitoring systems to "organically" grow cobia, amberjack and redfish, as well as other marine species indigenous to the warm water of the GOM

## Market Opportunity

On November 3, 2006 a group of world renowned ecologists announced nationally and in *USA Today* the results of one of the most comprehensive studies of marine life as follows: **"All wild seafood will have disappeared from the world's menus within 50 years, if current trends in over fishing continue. . ."**  In the past two decades, the fishing industry has begun to extract fish faster than populations can reproduce According to industry statistics, pressure from commercial fishing is so intense that 80 to 90 percent of the fish in some populations are removed every year   In addition, recent figures provided by the U N  Food and Agricultural Organization Fisheries Department (FAO) show that, among the major marine fish stocks or groups of stocks where information is available, about 47% to 50% of stocks are fully exploited and are, therefore, producing catches that have either reached or are very close to their maximum limits   Another 15% to 18% are overexploited and evidently have no potential for further increase   On July 1, 2007, China was ordered by the USFDA to stop its US shipments of five (5) farm raised seafood's including its largest export-shrimp because of the use of antibiotics and harmful chemicals found in these imported seafood products Obviously the need for USA seafood security and safety will be a defining issue addressed by Biomarine's production of USDA "organic" seafood products from the Gulf of Mexico

The demand for seafood as the primary diet for people of all ages is increasing worldwide  The world average per capita fish consumption grew from 9 4 kg in 1961/63 to 15 8 kg in 1995/97, or by almost 70 percent  In a recent preliminary study for FAO, taking into account per capita income growth and trend factors, estimates that per capita fish consumption could reach 22 5 kg by 2030 (an increase of slightly over 40 percent over the 1995/97 level)  Based on these growth and trend factors, total world demand is forecast to reach 183 million tons, or mt, in 2030, or 95 million tons greater than the amount consumed in 1995  The FAO estimates that in order to maintain current per capita seafood consumption, world mariculture production will have to double to approximately 83 million tons by 2030

15

The United States alone is a net importer of $9 0 billion of fish, being the second largest contributor to the budget deficit for natural resources after oil  This has been an issue of growing importance and focus to the US Department of Commerce and President Bush, culminating in a 10-Year Aquaculture Plan and submission of the National Offshore Aquaculture Acts in 2005 and 2007

Several estimates suggest that harvest from the world's oceans have approached the limits of wild fish stock productivity  It is also widely acknowledged in the fisheries industry that supplies from traditional marine and inland capture fisheries are unlikely to increase substantially  The National Marine Fisheries Service (NMFS) Strategic Plan has noted that this deficit cannot be entirely mitigated by the rebuilding of wild stocks

Biomarine believes that the lower the output from the capture fisheries sector is, the greater the opportunity for growth in the mariculture industry  In contrast to wild fisheries that are limited by many unpredictable factors, such as weather and a finite production capacity, mariculture is well positioned to succeed as a result of (i) the relatively lower harvest and labor cost per kilogram of product and (ii) the ability to plan the harvest timing and volume to meet market demand  Because of limited access to good quality land and water, we also believe that open ocean or offshore mariculture presents a key opportunity for producing aquatic food in the future

## Biomarine's Sites

### Florida/Alabama (FlorAbama)

Biomarine's primary mariculture operations site for sea farming is located in 85 feet of pristine saltwater within a 27 5 acre ACOE permitted site located approximately 7 5 nautical miles south of Alabama Point, the **Florida/Alabama (FlorAbama)** state line, in the federal waters of the Gulf of Mexico  We intend to acquire commercially proven submersible sea cages for fish grow-out operations and a feeder barge manufactured in Norway to provide the fish feeding requirements and to house our on-site operations staff and management team  Eventually in the third to fourth year of commercial finfish production, we intend to acquire a jack-up platform (see platform illustration picture on page 35) for use at the FlorAbama site  We also plan to construct an onshore hatchery/nursery facility that will provide the fingerling that we need beginning in the second year of operations

This area of the Gulf of Mexico has been designated by the government for commercial fish farming  Currently, we possess several government permits authorizing construction of our sea farming system  The first permit (#MD 93-01004-M) was initially granted November 2, 1993 by the US Army Corps of Engineers (USACOE) and subsequently modified and extended to provide for phased operations  The permit was reissued on September 9, 2003 and modified on July 29, 2004 to relocate proposed facility to deeper waters and to extend until July 29, 2009 (Permit #MD 02-02232-G)  On August 10, 1993, the Alabama Department of Environmental Management certified the proposed project to meet coastal management certification requirements  We also procured sanitary waste discharge rights under a NPDES permit # AL0067237 from the U S  Environmental Protection Agency, Region IV in Atlanta, Georgia, on January 1, 2002, and this was renewed for another 5 years on February 25, 2008

The FlorAbama site will involve either the acquisition or lease of a Norwegian manufactured feeder barge specially designed for offshore sea farming operations (See picture of feeder barge located on page 35) and additional sea cages according to the phased development plan illustrated on pages 31 and 32  Later a jack-up service/feeder barge may be acquired for use as a stable platform for maintaining sea farming operations to be located within the 27 5 acre permitted site approximately 7 5 nautical miles southeast of Perdido Pass, Alabama  We have neither acquired nor contracted for the acquisition of a jack-up service/ feeder barge yet and do not anticipate the need for this specialized equipment until the second or third year of operations  We believe that the refitting of any jack-up service/feeder barge would require approximately six months after acquisition to complete and would necessitate additional equipment financing

16

We plan to use a portion of the proceeds of the Offering to construct a land-based facility that contains the hatchery/nursery, office space, with storage for feed, nets and equipment, a packaging station equipped with packaging lines, ice production, cold storage facilities, with an area for the necessary vehicles or boats required for transporting personnel, products, and feed back and forth from the offshore sea farming site

To assist in the design and installation of the FlorAbama project, as well as the initial supply of fingerlings and the day-to-day operation and maintenance of our planned facilities, we intend to enter into collaborative arrangements with the US domestic offshore oil service and foreign sea farming industry

Texas

Biomarine also has identified a to-be refurbished former oil platform complex owned by GMIT and located approximately 9 9 miles south of **Port O'Connor, Texas,** in Texas state waters as an offshore site for commercial sea farming operations  GMIT and Biomarine are engaged in negotiations with the General Land Office of Texas for a new thirty-year lease covering the platform and the 125-acre sea farming site after years of litigation  We do not presently intend to develop this secondary Texas platform site until after  1) implementation of our FlorAbama commercial sea farming operations, 2) obtaining substantial additional financing and 3) obtaining a new Texas site lease surrounding the platforms and the permitted sea farming area  Biomarine possesses rights with GMIT that were granted under several governmental permits to use the four-platform complex as an offshore hatchery and farming facility  **This four platform complex and site are the first such platform project ever granted permits in U.S. continental waters for sea farming research and development.**  Assuming additional development capital is available if a new lease is acquired, the four-platform site will provide a second sea farming development opportunity and a permanent, stable operations base from which to conduct our proposed hatchery and fish farming operations  This site with its existing offshore infrastructure provides a solid base for the stationing of storage facilities, feed delivery equipment and utilities (power, environmental monitoring, etc ), as well as miscellaneous transportation and project support systems  Because oil platforms are well suited as artificial reefs, the abundance of sea life associated with the platform complex suggests a healthy environment suitable for cultivation of fish and shellfish  Its offshore location will also tend to moderate swings in temperature and water currents that should make the cage system self-cleaning, provide new, oxygenated water and remove waste from fish while feeding

As our commercial hatcheries and cage facilities become fully developed and additional development capital is made available, we plan to expand our operations through both vertical and horizontal integration activities  In the midterm, we intend to integrate operations vertically by developing two hatchery operations and grow-out projects for the eventual production of "organically grown " fresh, never frozen mariculture products  From production, we intend to integrate forward into the marketing and distribution of our products  We may also integrate backward from hatchery and grow-out operations to the manufacturing of feed and equipment used in mariculture facilities  In the long run, we hope to integrate our operations horizontally by investing in joint ventures and/or creating offshore mariculture companies operating in other parts of the world  marketing, distribution and sales by providing additional products to sell

We have entered into a Commercial Joint Development Agreement with GMIT, a nonprofit research institute, of which two members of our board are directors, enabling us to use the Texas four-platform complex located offshore Matagorda County, Texas held by GMIT pursuant to a previously reassigned 50-year lease granted to GMIT by GLO Commissioner Garry Mauro and the State of Texas in 1998 which has been the subject of litigation for many years  Under our Commercial Development Agreement with GMIT *executed on August 28, 2000, as amended on September 21, 2007, we* acquired the exclusive right to commercially develop the GMIT platform complex as an offshore commercial mariculture facility once the platform is refurbished and all requisite permits are procured

The Texas platform was initially the subject of a lease of submerged lands from the General Land Office of the State of Texas to Tenneco Oil Company in 1986, which lease was subsequently acquired by GMIT by a series of assignments, under which GMIT agreed to assume liability for removal of the oil production platforms and existing and/or future fixtures and improvements installed in connection with its mariculture use  In assuming this liability, GMIT was required to provide a performance bond for $2 6 million to assure its ability to perform its removal and restoration obligations  The Texas General Land Office is

17

Confidential

challenging the validity of the contract granting GMIT the right to use the site. See "Legal Proceedings Concerning Texas Site," below. GMIT and Biomarine are negotiating the terms of a new 30-year platform and sea farming site lease covering the 125 acre ACOE permitted site with the Texas General Land Office. We cannot assure you that GMIT and Biomarine will be successful in obtaining a new lease on terms favorable to us. Under Biomarine's joint development agreement with GMIT, commencing in Biomarine's second year of operation after refurbishing the platform, it will be obligated to establish an escrow account and deposit $325,000 per year over the first four years and $260,000 per year over the next five years, for an aggregate sum of $2.6 million over those nine years, which funds will be made available for the payment of any costs incurred by GMIT in the decommissioning and deconstruction of the four-platform complex. Biomarine will not be liable beyond the total escrowed amount. Under the joint development agreement, Biomarine is obligated to pay royalties to GMIT equal to 2.5% of the gross sales proceeds derived from the commercial use of the platform, with a minimum maintenance payment of $10,000 per month (to be credited against future accrued royalties) payable upon the commencement of its refurbishing plans for the platform site. GMIT has the right to terminate the agreement if Biomarine ceases commercial development activities at the site for a period of six months.

The US Army Corps of Engineers (ACOE) has granted a permit for Biomarine to cooperate with GMIT in the sea farming project at the Texas platform. The ACOE amended permit, dated June 4, 1999, modified the existing permit to change the use of the platform complex from extraction of petroleum products to commercial mariculture production (Permit #11830-09). On February 7, 2008, this permit was modified to extend the existing permit for another five years. Two National Pollutant Discharge Elimination System (NPDES) permits – the first from the Texas Commission on Environmental Quality (TCEQ#04095) and the second from the U.S. Environmental Protection Agency have been procured, making this site one of the only two in U.S. history to be permitted within the Gulf of Mexico territorial waters. These five-year environmental permits were issued April 18, 2006 and May 1, 2006, respectively. In addition, we also secured a Texas Department of Agriculture Aquaculture License (#293420).

We have decided to concentrate on the development and commercialization of the FlorAbama site utilizing the proceeds of this Offering due to the uncertainty of the outcome of negotiations for a new lease for the platform at the Texas off-shore site and because the project requires over $3.5 million more to refurbish and modify the platform complex and develop than the FlorAbama project.

The Texas platform complex has more than 30,000 square feet of space, crew quarters for 18, a full service galley (kitchen), a heliport, a 30-ton service crane, electric generator plants, fuel and water storage which requires refurbishment prior to use and when so refurbished ultimately may be operated as a 24-hour a day operations center. If we are successful in developing and commercializing the FlorAbama site and are able to obtain a new site lease for the Texas platforms and the substantial additional financing required, we plan to refurbish the platform for mariculture use and to equip the complex with multiple sea cages located around the platform perimeter (see project development diagrams on pages 35 through 36), an automatic feeding system that provides growing fish with daily food pellets, as well as computerized monitoring and harvesting systems. It is anticipated that if we develop the Texas platform, the converted platform complex will contain a finfish hatchery and research laboratory.

## Legal Proceedings Concerning Texas Site

Biomarine is a party to an action instituted by GMIT against The Commissioner of the Texas General Land Office captioned Gulf Marine Institute vs. Jerry Patterson (Case No. 00-J-0292-C) in the District Court of Matagorda County, Texas (130th Judicial District Court). The case challenged actions taken by the Texas General Land Office to invalidate the lease for the site which was to be used by GMIT for a sea farming research and development project, and to cause GMIT to dismantle the four-platform complex situated at the site.

On November 15, 2005, the District Court issued a declaratory judgment affirming that GMIT had a valid contract to use the site for a mariculture research facility and related operations for a term expiring August 26, 2036 or the earlier cessation of mariculture operations at the site.

18

On February 22, 2007, the Texas General Land Office filed a motion for reconsideration of the judgment to the Court of Appeals  On February 28, 2008, the Court of Appeals reversed the judgment of the trial court and rendered a judgment in favor of the Texas General Land Office  The Court of Appeals held that the Texas General Land Office did not violate the law by terminating the GMIT's lease and ruled that the Texas General Land Office was immune from GMIT's and Biomarine's claims for damages for an unlawful taking under the Texas Constitution  On March 14, 2008, GMIT and Biomarine filed a "Motion for Rehearing" with the Court of Appeals requesting a review of the case by all six justices of that Court

This matter is pending and is expected to continue for several months  If the rehearing is denied, or if it is granted and a new opinion is issued, the losing party then can file a petition for review with the Texas Supreme Court no later than 45 days from the date of the denial of the motion for rehearing or the issuance of the new opinion  The Supreme Court can extend the time, but it will give no more than 15 extra days for the review  Once the petition is filed, the winning party can choose to file a response or waive a response pending review by the Supreme Court  The Supreme Court can, on its own, order a party to file a responsive brief

Pending the outcome of the judicial proceedings, Biomarine filed an application during March, 2008 with the Texas General Land Office for a new 30 year lease  On April 28, 2008, representatives of GMIT and Biomarine met with the Deputy Commissioner of the Texas General Land Office who agreed to discuss the application with the Commissioner  Texas General Land Office  On May 13, 2008, representatives of Biomarine were advised by the Deputy Commissioner of the Texas General Land Office that the Commissioner had instructed the leasing staff to process the application for the new lease without consideration of the prior litigation

## Markets

Biomarine believes there are four markets for its products

***Gulf of Mexico and Southern US***  Biomarine estimates the initial market for production will be the coast of the Gulf of Mexico, extending from the Mexican border in south Texas to the Florida peninsula  This area of the US includes many of its fastest growing cities and a population that consumes higher than average amounts of seafood  In contrast, local production of wild caught seafood is declining throughout this region  Texas, the largest and most populated Gulf state, had a population of more than 20 million people in 2000 and is ranked as the second most populated state in the United States behind California  The population is projected to increase by 7 million to more than 27 million by 2025  Texas has three of the top ten populated cities in the US, Houston, San Antonio and Dallas/Ft Worth  In addition to these three cities, Austin, TX joins them in being four of the fastest growing cities in the US  In addition, Las Vegas, Atlanta and Phoenix are three more of the fastest growing cities in the US

Consequently  Biomarine believes eight of the top ten fastest growing populations are located within 500 miles of its two sites  Furthermore, Florida has another three leading cities in consumption of seafood, Orlando, Miami and Tampa  Add to these New Orleans and the casinos along the Gulf Coast and you have an outstanding local market for fresh seafood  The current market for seafood, especially fresh & never frozen, is tremendous within the cities of Houston, San Antonio, Austin and Dallas/Ft Worth whose populations currently consume an average of 15 pounds of seafood per person per year  Biomarine and its affiliates expect to exploit this regional market almost exclusively with whole round products (i e  fresh unprocessed) until Biomarine and its affiliates' production tops 20,000 pounds per month

Confidential                                                                                       BPB1-BioMarine_00000200

### HUGE "FRESH" SEAFOOD MARKETS WITHIN 500 MILES OF PROJECTS



***The United States*** As stated earlier, the US represents a major market for local species from mariculture and imports more than $12 billion of seafood per year. The wholesale markets for seafood are located on the west and northeast coasts. To compete in these markets we must establish a large and stable production. At this stage, Biomarine and its affiliates will need to be producing from 20,000 to 50,000 pounds per month of mostly cobia or other white fish. Discussions between various companies (e g., American Seafood Inc and Darden Restaurants) for collaborative purchasing and marketing agreements to market the potential volume produced by us, may consume all fish products produced for the first 1 to 3 years

***Europe*** Europe is a ready market for fresh and processed fish products produced by Biomarine and its affiliates' finfish in our grow-out facilities. This will be the easiest foreign market to enter because of the collaboration with Nireus Chios Aquaculture S A. The European market for seafood is the largest in the world. Biomarine plans to utilize its relationship with Nireus Chios Aquaculture, S A., to help market its production in Europe. Nireus is a vertically integrated fishery company, not only producing fish but also processing and marketing them direct to supermarket chains in Europe. Eventually, Biomarine and its affiliates intend to transport its processed seafood in refrigerated containers within 24 hours of harvest directly into the European wholesale and retail markets via shipment by airfreight, subject to obtaining approval from the European Commission to export fish products from the U S to the European Union countries. This market will become important when production reaches 20,000 to 50,000 pounds per month for red porgy or other suitable whole round fish species from the Gulf of Mexico

***Japan*** Japan represents another large world market but the Japanese people are the most discriminating consumers of seafood. As a result, Biomarine and its affiliates will develop their processing and marketing skills before trying to enter this market. Japan should be a market for all species from the FlorAbama production facility, especially red-colored fishes like the porgy or snappers that are native to the Gulf of Mexico. The production required to enter this market successfully is 30,000 to 50,000 pounds per month. The world has recognized Japan as a leading consumer of fish and the largest seafood importer in the world with imports of nearly $17 8 billion per year. Seafood in Japan is distributed through seafood markets, similar to the Fulton Fish Market in New York City, our country's largest fish market. In Japan there are 52 seafood markets,

Confidential

BPB1-BioMarine_00000201

51 of them are larger than the Fulton Fish Market  The largest seafood market in the world is located in Tokyo and is known as the Tsukiji Market  The Tsukiji Market moves approximately five million pounds of seafood per day  In comparison, the Fulton Market moves approximately 450,000 pounds per day  Biomarine has a tentative sales agreement with Daito Gyorui Company (largest fish wholesaler in Japan) located in Tsukiji market that could market all of Biomarine's projected production for the first 5 years

## Project Development – Equipment and Technology

### Cage Technology

The FlorAbama and the Texas platform projects are planned to use offshore, floating and submersible cage technology  These Norwegian produced and installed sea cages are planned to be installed in flotillas securely moored between and around the centrally located feeder barge or platforms and is designed to withstand hurricane-generated, six to nine meter waves  Each cage consists of high-strength nylon mesh nets hung from floating and ballastable structures to form a multi-cage array as illustrated on page 36  A farm will have a variety of cages with mesh sizes ranging from five millimeters up to 18 to 20 millimeters to accommodate different size fish as they grow  The size of mesh used depends on the type of fish and the average weight of the population  In addition, larger nets are planned to be employed outside the perimeter of the cages to form an "AquaFence" to restrict entry of predators and deflect floating debris entering into the sea farming site

In rough conditions, the ballastable cages can be lowered until the top is level with the surface of the water, thus reducing the impact of the waves  During stormy conditions, the cages can be completely submerged to the desired depth in order to avoid high waves and heavy swells  In the event of hurricane force winds, the cages can be lowered from the platform control station and anchored along the sea floor until the weather conditions return to normal  During specific operations such as harvesting, grading, net cleaning, close inspection, etc , the system can be de-ballasted or lifted out of the water using a barge or platform crane



**Sea Cage in Floating and Submersed Positions**

21

BPB1-BioMarine_00000202

*Harvesting Techniques*

We intend to stock cages with fingerlings at densities starting at less than two kilograms per cubic meter for small fingerlings and then increase fish densities to reach 10 to 15 or more kilograms per cubic meter over a growing period of 9 to 12 months, as determined by several factors including the species, quality of juveniles and "organic" feed, feeding techniques and biorhythms (level of feeding activity achieved at different times of the day), and quality of husbandry   Environmental variables such as seawater temperature, water quality, and in particular, oxygen concentration can also have a major effect on biological performance

Once fish reach commercial size, harvesting is carried out by crowding the fish to the surface of the cage then collecting the fish with dip nets or fish vacuum pumps that transport the fish directly into iced water in insulated containers   Modern harvesting techniques allow for a shelf-life of up to two weeks versus three to seven days for the same fish derived from capture fisheries, which involves use of a biochemical process during capture that results in a shorter shelf life

Initially, we plan to use regional processors to process and package the harvested fresh, never frozen fish, which processors shall comply with the rules promulgated under the Hazard Analysis Critical Control Points (HACCP) adopted in Europe   Use of HACCP-based quality control systems are mandatory in European states and for countries and companies, like us, wishing to export to Europe     Several HACCP-approved processing plants currently exist within 30 miles of the FlorAbama project including three processors located in Bayou LaBatre, Alabama, and within 15 miles from the Texas mariculture platform complex at Port O'Connor, Texas     Eventually, we intend to transport our fresh, never frozen processed seafood via refrigerated containers directly into the regional and international wholesale and retail markets within 24 hours of harvest, using ground and airfreight similar to the way some Mediterranean products are shipped to European and Asian consumers

**Hatchery Operations**

Hatcheries work by taking brood stock breeders, which are sexually mature fish between three to six years old, from the wild and, after an initial acclimation period, causing these breeding fish to spawn readily in captivity by manipulating stocking densities, quality of the water, and available nutrition     Hatcheries use modified temperature and artificial sunlight to enable spawning to occur naturally and off-season, providing eggs all year round   As fish larvae mature, they are transferred into pre-growing nurseries during which the juveniles, as they are now called, are weaned to dry feeds, prepared for fattening and subjected to several gradings, countings, and vaccinations   Once they reach a weight of 10 to 20 grams, they are considered to be robust enough to withstand transportation to the offshore grow-out cage facilities

Although initially we will stock our offshore grow-out facilities with fish fingerlings purchased from third-party suppliers located in the Gulf of Mexico region and elsewhere, we ultimately plan to produce our own fish fingerlings   Within the first 18 to 24 months of initial operations, we plan to supply our offshore grow-out facilities from our own hatcheries located onshore in the FlorAbama project area, as applicable   We believe that the controlled spawning process perfected by Nireus Chios Mariculture S A  for Mediterranean sea bass and sea bream production in Greece can be adapted to cobia, amberjack and other fast-growing Gulf marine fish species

**Grow-Out Experience**

Biomarine and GMIT have already conducted grow-out experiments with cobia successfully at temporary tank facilities located at the University of Texas Medical Branch and the Moody Quarantine facilities in Galveston, Texas, and from the GMIT prior nursery located in Gulf Breeze, Florida   Biomarine also has prior experience in the grow out of cobia, redfish and greater amberjack in our nursery systems, including having the distinction of having harvested the oldest mature Cobia fish grown from cultured eggs entirely in captivity   Farming of the fourth finfish, Red Porgy, is well established in the Mediterranean

22

                                                         BPB1-BioMarine_00000203

Over the last five years Biomarine has successfully grown Cobia on three separate occasions in three separate locations, and have amassed a wealth of information concerning their feed, transport and handling requirements, as well as their long-term care in tanks. In this process, Biomarine has conducted three long distance transfers of Cobia from South Carolina to Texas in 2001, the Florida Keys to Texas in 2002, and the Florida Keys to Pensacola, FL in 2003. These were all extremely successful with mortality rates ranging 0-5%. The largest transfer moved over 10,000 fish from the Florida Keys to Galveston, TX, in 2002. Our team raised these fish in a nursery system designed by HESY Bergambacht B V of Holland (HESY) at the University of Texas Medical Branch (UTMB) and in a 30 ft circular tank at the Moody Gardens Aquarium, both located in Galveston, Texas. In addition, GMIT built and operated a 16-tank, 35,000-gallon marine nursery in Gulf Breeze, Florida, that was specifically designed to fit on the lower desk level of the Texas main platform. This system was used to rear cobia, amberjack and tilapia in 2003 and 2004. The 16 tank system was first designed in a warehouse in Galveston, Texas, during a research project with UTMB and then moved to Florida to become an operational re-circulating marine salt water nursery and laboratory until hurricane Ivan in 2004. At the time we received these first fish for our research efforts, there was no specific feed and we had to successfully modify existing food formulas to prepare such a feed. Of the more than 10,000 cobia fish which we conducted research on, we were successful in rearing the remaining fish for over 3 years until we again had to move them from Moody Gardens back to UTMB. Among the fish moved from Moody Gardens to UTMB last year, there were 4 fertile females of the 17 brood stock size cobia.

One of our directors and Chief Marine Biologist, Dr Phillip Lee, has extensive experience with Redfish. He led a commercial /university consortium program at a local Redfish farm in Texas for three years in the mid-90's, which farm was the largest, most technically advanced farm along the Gulf coast. The Redfish grew in indoor tanks and outdoor ponds and the Redfish broodstock were spawned every month.

We have also had experience with Greater Amberjack, which we obtained from a hatchery in Hawaii. The intercontinental shipment was highly successful and resulted in 5% mortality. We were then able to raise these fish for more than three months, using a mixture of Redfish and Salmon feed because of their need for a high-fat type feed.

Our President and Dr Lee have visited many sea farming projects worldwide growing the same Gulf of Mexico species specified below and has successfully solicited the assistance of many of these international firms, which are presently commercially farming cobia, red fish, amberjack, red porgy and many other Gulf of Mexico candidate species.

## Our Finfish Candidates

We intend to introduce the following four finfish into our planned hatchery and fish farming operations (1) Cobia, (2) Greater Amberjack, (3) Redfish or Red Drum, and (4) Red Porgy. All of these fish are indigenous to the waters of the Gulf of Mexico and were selected based upon their marketability, spawning and growth potential and profitability. Our production experience suggests that our chosen fish species can be commercially grown & harvested.

**Cobia** (*Rachycentron canadum*), also known as Ling and Lemonfish, is a widely distributed migratory species of significant commercial and recreational value. Commercial landings of Cobia in the Gulf and Atlantic region in 2004 totaled 96 4 metric tons (212,513 lbs) with an average ex-vessel value of US$2 16 per pound. Cobia are sold in Japan at roughly $4 88/lb-whole and in the Gulf Coast at roughly $4 00/lb-whole.

**Cobia (Ling or Lemonfish)**



Family Rachycentridae, COBIA
*Rachycentron canadum*

Preliminary studies on growth rates and spawning suggest that Cobia has excellent potential for mariculture. Given their salinity and temperature requirements, Cobia appears to be best suited to coastal cage culture. Cobia grow rapidly according to a study by Dr Joan Holt of the University of Texas Marine Research

23

BPB1-BioMarine_00000204

Center in Port Aransas, Texas, wherein ¼-pound Cobia fingerlings were grown to 21 to 22 pounds in just 18 months and can reach a maximum size of around 132 pounds  Because of their rapid growth rates, excellent palatability and prolific spawning capacity, they offer excellent potential for commercial mariculture activity  These characteristics of Cobia have been recognized in Taiwan, where they are farmed at the industrial-scale commercial level   Such industrial-scale culture of Cobia has not been attempted in the continental United States   Commercial operations exist in Korea and Puerto Rico

**Amberjack** (*Seriola dumerili*)  Also called Yellowtail, Amberjacks can be found throughout the Gulf of Mexico and are frequently found around reef areas and oil platforms  This is a fast-growing fish and grows to four to five feet in length and weighs up to 140 pounds  The Greater Amberjack is the most abundant species caught and, as a result, the federal government has now limited Amberjack to a 1,000-pound daily vessel limit  Amberjack fillets are selling for $8 75 per pound in the Gulf states and whole, round fish is selling for $4 25 per pound

**Greater Amberjack**

Family Carangidae, JACKS and POMPANOS
*Seriola dumerili*

**Red Drum (*Sciaenops ocellatus*):** Red Drum or Redfish is an estuarine-dependent species that spawns near tidal passes and inlets along the Gulf Coast from September to November  Adults and juveniles tolerate a wide range of water temperature and salinity making them especially well suited to culture in cages and ponds  Redfish are long-lived and reasonably fast growing as juveniles, making it possible to produce a market-

**Red Drum (Redfish)**

Family Sciaenidae, DRUMS
*Sciaenops ocellatus*

size fish in less than two years and possibly in a single growing season if properly managed (Lutz et al 1997)  Current market price for redfish whole and round is $3 50 per pound

Farmed raised Red Fish demand has increased since the "blackened redfish" craze of the 1980's which led to over-fishing the wild stocks in the Gulf of Mexico and the subsequent closure of the commercial Red Fish season by U S  emergency federal regulations in July 1986   As demands on natural fisheries have increased and supplies of wild fish have decreased, Red Drum has became a viable mariculture product  Although Red Drum wild stocks have rebounded, conservation organizations such as the Coastal Conservation Association, Inc  have sought to preserve them for recreational sports fishing interests, making Red Fish an outstanding prospect for commercial scale sea farming operations

**Red Porgy (*Pagrus pagrus*):** The Red Porgy, also known as the Red Sea Bream, is a valuable fish world wide and easily grown in cage culture  The fish has been popular with sports fishermen and it is on the list of regulated species because of declining population  This fish species is indigenous to areas of the Gulf of Mexico and the Mediterranean and one- lb fish are being sold for $5 00 per lb, whole round fish Red Porgy have established markets in Europe and the



**(a)     Red Porgy**

*Pagrus pagrus*

Far East  Japan has been conducting culture research with this genus as long as 70 years ago  Greece has been extremely successful raising these fish in inshore sea cages  Recent production was reported to be more than 220,000 pounds and future production is expected to rise significantly

24

## Collaborative Arrangements

To assist us in accomplishing our business objectives, our management expects to supplement their experience with existing and future collaborative arrangements with leading aquaculture participants from Europe, Greece and Taiwan in the areas of sea farming technology consulting, equipment supply & installation and fingerling production, including our engagement at the Texas platform complex of experienced personnel in all aspects of stocking, cleaning, maintaining and harvesting the fish in our proposed cage operations Collaborative arrangements include

Biomarine is a party to a Commercial Joint Development Agreement with GMIT, a nonprofit research institute, executed on August 28, 2000, as amended on September 21, 2007, which grants Biomarine the right to use the Texas four-platform complex located offshore Matagorda County, Texas held by GMIT pursuant to a previously reassigned 50-year lease granted to GMIT by GLO Commissioner Garry Mauro and the State of Texas in 1998 which has been the subject of litigation for many years Under the terms of the joint development agreement, Biomarine acquired the exclusive right to commercially develop and operate the GMIT platform complex as an offshore mariculture facility once the platform is refurbished and all requisite permits are procured Under the joint development agreement, commencing in Biomarine's second year of operation after refurbishing the platform, it will be obligated to establish an escrow account and deposit $325,000 per year over the first four years and $260,000 per year over the next five years, for an aggregate sum of $2 6 million over those nine years, which funds will be made available for the payment of any costs incurred by GMIT in the decommissioning and deconstruction of the four-platform complex Biomarine will not be liable beyond the total escrowed amount Under the joint development agreement, Biomarine is obligated to pay royalties to GMIT equal to 2 5% of the gross sales proceeds derived from the commercial use of the Texas platform and/or its permits in Texas and/or FlorAbama, with a minimum maintenance payment of $10,000 per month (to be credited against future accrued royalties) payable upon the commencement of its refurbishing plans for the Texas platform site The agreement also provides that at the end of the term of the agreement, GMIT will pay Biomarine an amount equal to the fair value of all improvements and equipment installed by Biomarine, as determined by a qualified firm of appraisers selected jointly by GMIT and Biomarine GMIT has the right to terminate the agreement if Biomarine ceases commercial development activities at the site for a period of six months Two members of the Board of Directors of Biomarine also are directors of GMIT

We have an existing agreement with ***HESY Bergambacht B.V. of Holland*** (HESY), whereby they have been retained to (1) design and construct our proposed platform and land-based fingerling production facility, (2) to provide technical and managerial support, as well assistance in obtaining and training personnel for the operation of our proposed facilities, and (3) to provide on-going consulting services in connection with our planned hatchery and fingerling production facilities HESY is an experienced manufacturer, having built over 60 land-based marine and freshwater recirculating farm systems worldwide, including systems in Holland, Belgium, Spain, Greece, England, Ireland, Israel, Morocco, China, Canada, Australia and New Zealand At least 20 species including Cobia are farmed in existing HESY systems From December 2001 until May 2007, the Managing Director of HESY, Arie de Bondt, held a position on our board of directors

We are in on-going discussions with the mariculture consulting division of ***Nireus Chios Mariculture, S.A.*** (Proteus S A) to retain them to provide services, technology and information to expedite our intended commercialization of Gulf of Mexico mariculture products in the United States Proteus S A is the consulting division of Nireus Chios Mariculture, S A, which is one of the largest and fasted growing marine mariculture companies in Greece, operating seven marine hatcheries and 48 grow out cage farms Nireus Chios Mariculture, S A is considered to have one of the most productive warm water hatchery/nursery systems in the world If engaged by us, Proteus S A consulting would assist us in adapting the systems used by Nireus Chios Mariculture, S A to our planned Gulf of Mexico operations Biomarine has had prior consulting agreements with Nireus Chios in 2001

We have also engaged in discussions with a leading Taiwanese breeder and processor of cobia fish concerning retaining their services in connection with our development of our Gulf of Mexico sea farming market and offshore farming operations Possible services would include supply of fingerlings for our Gulf

Confidential

fish farming project until our hatchery is up and producing, collaborative research efforts to adapt increased hatchery production in Taiwan to our domestic U S projects utilizing Gulf species, as well as assisting in the establishment of a cobia market in the U S

In addition, we have approached various governmental agencies concerning financial assistance in connection with our proposed operations, including *Eksportfinans, ASA*, the Norwegian Export Credit Institution dedicated to providing medium to long-term loans for Norwegian exporters, and the *U.S Rural Development Agency*, a United States agency providing loan guarantees to assist lenders in advancing credit for new business and industry creation and jobs in smaller rural communities

We have entered into a non-binding letter of intent with Eksportfinans, ASA, under which it would finance $10 million in contracts between Norwegian companies and us  Under such financing arrangement, Eksportfinans, ASA would loan up to 85% of the dollar amount and we would be responsible for (i) paying the 15% balance on the contracts and (ii) securing a payment guarantee (e g  Standby Letter of Credit) from either the Norwegian Guarantee Institute for Export Credits in combination with a bank or one percent from Norwegian/International bank(s) acceptable to Eksportfinans, ASA  We cannot assure you that we will obtain financing from Eksportfinans, ASA on terms favorable to us, if at all

Similarly, with respect to financing under U S Rural Development Agency, the U S  Department of Agriculture has reviewed our proposed business plan and has determined that we would be eligible for the federal rural business and industry "B&I" loan guarantee program, subject to our successful completion of the program's formal application process and requirements  One type of assistance available through the loan guarantee program includes an eighty percent (80%) guarantee on loans up to $5 0 million, in which we would only have to provide minimum equity requirements of 20% of the loan amount  We cannot assure you that we will obtain under this loan guarantee program on terms favorable to us, if at all

In addition, our management has participated in numerous recent discussions with wholesalers and restaurant franchises concerning the purchase in bulk of our finfish candidates for commercial retail use  Discussions include the possible entry into a five-year commitment with one such company to provide a set quantity at set prices per metric ton to be negotiated during each year of any such commitment

Our use of third-party collaborators to perform certain aspects of our operations subjects us to certain risks  Assuming we identify third-party collaborators to work with us, we may not successfully negotiate, enter into or maintain such collaborative arrangements upon acceptable terms or at all  Any collaborative arrangement would delegate operational responsibilities to the collaborator, which we would not control, thereby, subjecting us to the risk of delays, increased costs and poor performance or materials  For this reason, we have retained and intend to hire additional "special skilled" professionals as part of our management team that possess many of the resources and knowledge to build and operate our Gulf of Mexico projects

Confidential

BPB1-BioMarine_00000207

## PLAN OF OPERATIONS

Implementation of our business objectives will initially focus on preparing Biomarine's FlorAbama site for commercial fish farming ("Phase I and Phase II"), a process that we expect to accomplish over the next three years, as outlined below, with the proceeds of this Offering. However, our ability to complete this project is subject to procurement of acceptable collaborative arrangements for the construction, supply, maintenance and operation of the planned hatchery and sea cage facilities. The overall task is to build and operate a commercial, integrated, offshore sea cage system for marine finfish (e g cobia, greater amberjack, red porgy and redfish), using the USACOE and EPA permitted sea cage site located 7 5 nautical miles south off Alabama Point in Baldwin County, Alabama. In addition, we will build an onshore hatchery/nursery in the FlorAbama area including corporate offices

The project tasks are to
(1) Initiate cage production of marine finfish, using commercial hatchery produced fingerlings,
(2) Design, construct, and operate a marine finfish hatchery/nursery/laboratory/office for marine finfish
(3) Initiate maturation and reproduction of marine finfish in the hatchery/maturation laboratory,
(4) Develop culture management practices for marine finfish, e g, feeds for weaning fingerlings during the nursery phase (1-10cm length) and production feeds,
(5) Expand to full commercial production using the Biomarine-produced hatchery/nursery fingerlings,
(6) Institute marketing for cage cultured marine fish in association with local and international seafood distributing companies,
(7) Design and implement a disease monitoring program for all stages of cultured finfish (hatchery, nursery, production and broodstock),
(8) Initiate an environmental/ecological monitoring program to assess the effects of sea cage operations on the surrounding environment, and
(9) Design and implement a marine finfish broodstock genetics program

***Task 1*** Initially in Phase I, Biomarine's 5 Bridgestone Sea Cages will be readied for deployment to the FlorAbama site. In addition, 6-10 new submersible sea cages will be installed. The sea cage installation will not differ significantly from other sea cage installations, in that the floating frames can be moored to concrete or metal anchoring systems for greater stability onto the Gulf sea floor. The cages will be attached to mooring lines, including weighted shock absorbers so that the cages can move up and down with the wave action. The newer submersible cages can actually be sunk below the sea surface in order to avoid the wave surge caused by heavy seas, It is known that this area of the Gulf experiences 3 meter (9 foot) seas during typical winter storms and even greater seas during hurricanes



Confidential                                                                      BPB1-BioMarine_00000208

FlorAbama - Phase I Sea Cage Array



BioMarine FlorAbama Project-Phase I
Site is 7 8 acres, (8) 30 m diameter production/nursery cages
w/feeder barge located centrally for maintaining operations

850 Ft.
Total Enclosed Area-7.8 Acres

28

BPB1-BioMarine_00000209

**FlorAbama - Phase II Sea Cage Array.**



The use of submersible cages and newer technology creates an insurable risk described earlier and will be a focus of this development project. Different types of mooring systems and cage designs will be evaluated and periodic adjustments will be made. To reduce the risk of offshore equipment and live fish loss, Biomarine has previously secured an offer from a major U.S. insurance carrier to insure the offshore cages and equipment along with the fingerlings in the production cycles. The insurance premium for this insurance is disclosed in the project proforma as "fish mortality and offshore equipment insurance" the cost is estimated at 9% of the fair market value (FMV) of the fish and equipment involved in offshore sea farming operations and seafood production.

During the first year, fry and fingerlings needed to stock the sea cages will be provided by Harlingen Shrimp Farm, Harlingen, TX, University of Miami Marine Fish Hatchery, Miami, FL, Mote Marine Laboratory's Marine Fish Hatchery, Sarasota, FL, and Redfish Unlimited, Palacios, TX. Approximately 100,000 to 250,000 fry or fingerlings will be obtained. The fingerlings will be reared to a cage stocking size of 6-10 cm within our hatchery/nursery facilities, and then transported by the R/V Marie Hall to the offshore site. The fish will be fed a commercially available marine finfish diet at the rate of 2-10% body weight/day, this feed is available from two Gulf coast aquaculture feed companies, Rangen in Angleton, TX, and Burris/Cargill in Lake Charles, LA. We expect growth rates that will result in market size cobia that are 8 kg in 12 months, amberjack that are 4-5 kg in 12 months, red porgy that are 0.5 kg at the end of 10 months and redfish that are 2 kg in 12 months. Growth and survival statistics will be used to formulate the management practices needed for full-scale commercial stocking in Task 5.

*Task 2.* A 20,000 to 30,000 square foot research laboratory/hatchery will be constructed near the FlorAbama site simultaneously with Task 1 above. This facility will be capable of initially producing small

29

quantities of fingerlings (2,000,000/yr) when off-cycle eggs become available It will be similar in design to the GMIT hatchery/nursery that was operated previously in Gulf Breeze, FL



**GMIT nursery during construction.
& previously in operation in Gulf Breeze,
FL. The system was used for cobia,
amberjack and redfish.**



The design and engineering of the onshore hatchery/nursery and docking facility at the proposed FlorAbama site will be designed and installed by our collaborating partner HESY Bergambacht B V of Holland (HESY) and will be completed in the first year The project will include the construction of the following components (1) a hatchery/nursery building and system for fry and fingerling production, including algal and micro-invertebrate food production facilities, water chemistry laboratory, and kitchen (2) administrative offices, and (3) a dockside, land-based facility for maintaining vessel support for the offshore operations We expect the final capacity of the building will be capable of producing more than 10 million marine fish fry

Each month a sub-sample of fry/fingerlings (5% of population) will be weighed and measured to determine the instantaneous growth rate and compared to literature values for growth in the wild Preliminary hatchery data on cobia, redfish and red porgy are available and comparisons will be possible Results of the management strategies will be evaluated based on fingerling growth, survival and quality We project that each hatchery/nursery tank system will cycle every 90 days with 3 to 5 days for required maintenance

*Task 3.* During the first year the hatchery/nursery building will be expanded to include a maturation laboratory for the reproduction of adult Gulf fish This maturation facility should be built separately to maintain biosecurity between the mature wild fish and cultured fry produced in the hatchery Mature cobia, amberjack, redfish and red porgy will be collected locally and held in maturation tanks for mating and spawning as the tanks are completed The basic design will be similar to other maturation tanks used for

30

BPB1-BioMarine_00000211



**Model of Biomarine Hatchery/Nursery system** designed by HESY Bergambacht B V of Holland (HESY)

estuarine and neritic fish They will operate in both flow-through and recirculating modes so that temperatures can be controlled during winter months The first year maturation systems will be operated on a normal environmental cycle, leading to spawning in the late spring/early summer Fecundity and survival of each spawn will be estimated During the second and third years, broodstock will be environmentally manipulated to produce off-cycle eggs All females will be assessed for fecundity and all subsequent eggs will be evaluated for fertilization and fry viability

*Task 4* We plan to develop and implement best management practices for weaning marine fish fingerlings grown at the FlorAbama hatcheries The nursery system will be constructed so that factorial experiments on feed types and schedules can be conducted A number of different feed types and feeding regimens will be integrated with the use of laboratory reared live prey, growth rate and survival will be used to evaluate each treatment The best management protocols will be used by project personnel to mass-produce fingerlings for stocking into the offshore cages In addition, production feeds will be formulated and tested in the cage culture system Either Burris/Cargill, the closest aquaculture feed plant at Lake Charles, LA or Rangen, Inc , an Idaho feed company with an aquaculture feed mill in Angleton, TX, will be our industry collaborator, providing production-scale feed amounts Fish survival, health and instantaneous growth will used to evaluate feed performance

*Task 5.* Near the end of year two, we plan to expand the site to full commercial production with an additional 20 sea cages, expecting to use our own Biomarine hatchery/nursery fingerlings The site will be further developed with the addition of an AKVA Feeding Barge or a Jack up Platform/Feeder in Phase III This will allow the feeding of all cages with our AKVA automated feeding system and the supervision of the site by staff 24 hr/day Fish will be selectively harvested on a weekly basis, requiring grading and moving from one cage to another This will also allow us to clean the nets regularly

After year 2, the total number of production cages will also be significantly expanded We will add 20 cages in year 3, and 10 cages per year thereafter until we reach the current site capacity of 54 cages During year 2, we will request a revision of the Army Corps of Engineers permit to expand the area of the site up to 125 acres, allowing us to expand production beyond 76 cages, the target of our seven year business proforma We anticipate no problem accomplishing this re-permitting process since we have successfully modified this type of permit several times already, providing that we have substantially complied with the EPA permit guidelines

31



**FlorAbama Feeding Barge – Phase I & II**



**FlorAbama Concept - Feeding Platform & Sea Cage Operations – Phase III**

Confidential

**FlorAbama - Phase III Sea Cage Array.**



**Biomarine Technology FlorAbama Project- Phase III**
Site is 27.5 acres; (48) 30 m diameter production cages and (8) 15 m
diameter nursery cages surrounding a 30 X 50 m platform/feeder barge.

*Task 6*  Biomarine will develop a broker network to help establish our brand name in the up-scale restaurant market  The company will support the broker network in developing this market by working directly with individual restaurants and large chain restaurants  Working within the established broker network, we can achieve both fast market penetration and low start-up marketing and sales costs  Product development is an important aspect of the food-service market  Biomarine has the ability to grow several different species of fish concurrently at its sea cage complex  Through careful selection of fish to be grown, Biomarine will be supplying desirable fish during much of the year  The ability to grow and harvest fish during periods of time that wild fish cannot be caught is a major advantage in developing a strong distribution network and stable market for our branded product  Four levels of marketing will be targeted for Biomarine and its affiliates' fish production  For each phase, a partner will be found with expertise in fresh seafood marketing  See "Business of Biomarine -- Markets "

*Task 7*  High-density culture of any aquatic animal necessitates the implementation of a disease-monitoring program through all culture stages (hatchery, nursery, production and broodstock) and the development of treatment protocols  The US Department of Agriculture's Aquatic Diagnostic Laboratory in College Station, TX, will provide veterinary support for this monitoring program  All disease outbreaks and application of antibiotics will be recorded and these records will be provided to the appropriate government agencies (e g , Texas Parks and Wildlife Department, Texas Natural Resource Conservation Commission, US Fish and Wildlife Service, US National Marine Fisheries Service and Texas Agriculture Department and Texas Health Department)

Confidential

BPB1-BioMarine_00000214

**Task 8.** Mariculture operations proposed at the offshore sea cage complex have the potential to impact the dynamics of finfish, shellfish and encrusting communities adjacent to the complex and beyond These impacts could range from no effect at all to nutrient enrichment of surrounding waters by food and metabolic wastes leaching from cages We will evaluate the impact of these mariculture activities on the receiving ecosystem Surveys would be conducted throughout the year and involve both remote and *in situ* (i e, SCUBA) monitoring techniques Specifically, pre- and post-operation surveys will be conducted at the sea cage complex to characterize changes in ambient water chemistry (e g, nitrogen and phosphate levels, organic and inorganic carbon and chlorophyll) as well as finfish, macro-invertebrate and encrusting communities that may result from mariculture-related impact Emphasis will be placed on determining whether nutrient enrichment and/or shifts in plankton communities take place as a result of cage culture operations and, if so, are these changes accompanied by shifts in the array of finfish's occupying the sea cage complex Furthermore, these studies will assess the impact of cage culture operations on the recreational fishery

Other efforts will identify compositional changes in the cage farming site befouling community (i e, coral, bryozoans, sponges, tunicates, algae) as a result of mariculture practices and track any impact these changes may have on associated flora and fauna Structure-dependent species such as cobia and red snapper that are cultured in cages at the farming site will be tagged, released and tracked to determine their loyalty to the cage site, their survival, and potential for use in offshore stock enhancement initiatives

**Task 9.** This project will monitor the genetics of the stock from the beginning and incorporate genetic management and selective breeding into the standard management practices Selection goals identified already will include growth rate, feed conversion efficiency, tendency to mature and spawn under laboratory conditions and disease resistance The intensive culture of a small, and perhaps genetically distinct, populations in cages located in the Gulf with inevitable escapees presents a problem relating to the genetic diversity of the natural population If the escapees are abundant relative to the natural population they may change the gene frequencies of the natural population by interbreeding This is a critical concern for agencies that manage fish species with wide ranges like the cobia (eastern Atlantic, Gulf of Mexico and Pacific Ocean) and red porgy (on both sides of the Atlantic Ocean and in the Mediterranean Sea and Gulf of Mexico) when cultured stocks are obtained from distant locations This issue will be addressed by incorporating local genotypes by (1) monitoring and recording the genetic composition of the stock and (2) using cage construction and management protocols that are designed to minimize escape of cultured stock to the maximum extent possible with today's technology The genetic monitoring information will permit an assessment of the likelihood that a fish collected elsewhere is from the cultured stock

The use of broodstock from different locations within a species range should maximize genetic diversity and increase opportunities to select for beneficial traits Selection reduces the frequency of undesirable genes and will reduce the similarity between captive and natural populations, but it is extremely important for the commercial success of any animal-husbandry program While few species of fish have been domesticated, the history of fish selection programs is primarily a record of successful improvement Cultured, tilapia and catfish have experienced improvements in growth rates greater than 5% per generation

All broodstock will initially be maintained in recirculating tanks in our land-based maturation facility at the FlorAbama hatchery These systems will be operated with biosecurity in mind, as well as environmental control for spawning induction Tissue or blood samples from all broodstock will be analyzed These data and phenotypic measurements on size, health and reproduction will be used by Dr James Lester (Houston Area Research Center) to design broodstock development and selective breeding programs, beginning before any fish are stocked into the cage systems Initially, mass selection will be the basis of genetic improvement because tank facilities will be limited This will be the first aquaculture development project to initiate genetic monitoring of populations from the start of the project since most finfish species have been cultured a number of years before genetics are considered

34

# Gulf of Mexico= High Biological Productivity



- Platforms function as artificial reefs
- Estimated 10,000 to 30,000 fish on larger platforms & same species as grown in cages
- Over 1,000 species of native fish
- Gulf of Mexico is the US's most productive ocean
- Gulf of Mexico water contains high populations of plankton and bacteria that will act like nutrient sponges
- Excellent circulation and water & wind-driven currents
- Warm water temperatures and high sunlight levels

Confidential

BPB1-BioMarine_00000216

# FlorAbama Project Plan

| Project Tasks | Year One | Year Two | Major Milestones |
|---|---|---|---|
| Task 1- cage production<br>1a- installation<br>1b- stocking<br>1c- harvest<br>1d- installation of second set<br>1e- stocking of second set<br>1f- harvest of second set | | | 1 Sea cages securely installed<br>2 Fingerlings stocked<br>3 Harvest successful<br>4 Survival determined<br>5 Growth rate determined |
| Task 2- hatchery and nursery<br>2a- design<br>2b- construction<br>2c- operation | | | 1 Facility complete<br>2 Facility operational<br>3 Fingerlings survival determined<br>4 Fingerlings survival improved to<br>>30% |
| Task 3- broodstock maturation<br>3a- design<br>3b- construction<br>3c- capture and stocking<br>3d- operation<br>3e- spawns | | | 1 Broodstock successfully captured<br>2 Facility complete<br>3 Broodstock survival >80%<br>4 Spawning begins<br>5 Fertilization > 30% |
| Task 4- management practices<br>4a- first feeds<br>4b- water quality standards<br>4c- weaning practices | | | 1 Live food production operational<br>2 Water quality needs established<br>3 Growth rate on larval feeds<br>determined<br>4 Survival at weaning >50% |
| Task 5- commercial production<br>5a- feeding systems<br>5b- site expansion<br>5c- best management practices | | | 1 install feeder barge/platform<br>2 install mooring array<br>3 install 20 cages<br>4 selective harvesting |
| Task 6- marketing<br>6a- contact wholesalers<br>6b- contract negotiations<br>6c- test market | | | 1 Contracts signed<br>2 Price determined<br>3 Sell 10,000 lbs<br>4 Initiate marketing plan |
| Task 7- disease monitoring<br>7a- laboratory set-up<br>7b- initial analyses of broodstock<br>7c- analyses of fingerlings<br>7d- monitoring all populations | | | 1 Assessment protocols determined<br>2 Broodstock disease free<br>3 Tank systems biosecurity<br>4 Mortalities <20%<br>5 Treatment protocols established |
| Task 8- environmental monitoring<br>8a- install equipment<br>8b- baseline analysis<br>8c- continuous monitoring | | | 1 Monitoring systems operational<br>2 Baseline study complete<br>3 Effects to environment assessed<br>4 Reports to governmental agencies |
| Task 9- genetics program<br>9a- laboratory set-up<br>9b stock identification<br>9c- design of selection program<br>9d- initiation of selection | | | 1 Broodstock assessed<br>2 Performance of fingerlings<br>assessed<br>3 Selection paradigm established<br>4 Performance of fingerlings >10% |

Confidential

BPB1-BioMarine_00000217

## OUR EXECUTIVE OFFICERS AND DIRECTORS

Upon completion of this Offering, Biomarine's executive officers and directors will be

| Name | Title |
| --- | --- |
| John D Ericsson | Chairman, President, Chief executive Officer and Director |
| John W Hemmer | Chief Financial Officer |
| Luis Cabello | Chief Operations Officer |
| Phillip G Lee, Ph D | Director, Chief Biologist and Director |
| Edwin W Cake, Jr , Ph D | Director, Chief Science Officer and Director |
| Gerald M Schwartz | Vice President-Marketing |
| Georgine Burt | Secretary & Treasurer |
| Dr S Randall Hobgood | Director |
| Dr Charles Salisbury | Director |

*John D. Ericsson.* Mr Ericsson has been Chief Executive Officer and President and a founding director of Biomarine since its inception in 1989   Since 1995, he has also served as Managing Director and President of Gulf Marine Institute of Technology (GMIT), a publicly supported, nonprofit marine research institute, which has received numerous equipment and research grants for mariculture development   From 1982 to 1989, Mr Ericsson was an independent consultant advising in the fields of energy, cogeneration and marine mariculture to various companies and institutions in the United States   Mr Ericsson holds a B S degree in business management and marketing from the University of Tulsa and is listed in Who's Who of American Inventors 1996-1998, holding United States patents (now expired) for the Sea Trek Ocean Farming System and the Sea Star Oyster Relay System   He has been a member of the World Mariculture Society, the Aquacultural Engineering Society and has been honored by the Massachusetts House of Representatives for 'his outstanding contributions to the fishing industry " Mr Ericsson and our mariculture systems were featured in the October 23, 1995 issue of Forbes Magazine in the Science and Technology section

*John W. Hemmer*   Mr Hemmer will serve as our Chief Financial Officer   Since December 2002, he has served as a consultant to Biomarine   Previously he has served as both a director (from 1989 to December , 8, 2001) and the Chief Financial Officer (from February 2000 to October 2001) of our Company       Mr Hemmer also has served as a previous director of the Gulf Marine Institute of Technology   From October 1995 to June 1999, Mr Hemmer served as Vice President of Finance, Treasurer, Chief Financial Officer and a director of Paradigm Medical Industries, Inc , a US public company and a manufacturer and marketer of optical surgical and diagnostic equipment   From September 2000 to October 1, 2001, he served as Paradigm's Chief Financial Officer, after which he was appointed Senior Vice President   From August 1991 to December 1994, Mr Hemmer served as Secretary/Treasurer and a director of Belize Agro/Industrial Development, Ltd , which established the first Free Trade Zone in Belize built around a core business of seafood products for the export market   His previous financial background includes serving as Vice President of Bankers Trust Company in charge of venture capital, Vice President of Corporate Finance at Dempsey, Tegler and Company, Inc , a senior security analyst at Lazard Freres & Company and an Investment Officer of The Chase Manhattan Bank   Mr Hemmer received his M S degree from Columbia University Graduate School of Business and a B A degree from Queens College

*Luis Cabello.* Mr Cabello will serve as our Chief Operations Officer, effective upon completion of the Offering   Since March 15, 2007, he has served as a consultant to Biomarine   Mr Cabello has participated as a member of many international sea farming organizations   From 1985 to 1990, he was general manager at Tinamener SA of Spain, overseeing hatching operations with respect to clams, oysters, prawns, sea bass, sea bream and turbot   From 1990 to 1993, he was project manager at Culmarex of Spain, the first company to use sea cages for fish farming in Spain   As Culmarex, he managed a turbot intensive grow-out and oversaw production of up to 800 tons per year of sea bream and sea bass   From 1993 to 1996, Mr Cabello served as general manager for Culmarex II and oversaw the development of sea cages for offshore production of 1000

37

tons per year of sea bass and sea bream   Mr Cabello received his education at the Business School of Economy Cordoba (Spain), where he graduated in 1981 with a doctorate and masters degree in agriculture economy

***Phillip G. Lee, PhD.***  Dr Lee became a director and Chief Biologist of Biomarine on May 10, 2007 He has been working with us since 1999 through a research agreement with the University of Texas Medical Branch, at which university he is a professor  Dr Lee has over 20 years experience in collecting, transporting and rearing marine invertebrates, with particular emphasis on cephalopods and crustaceans  He has also designed, constructed, and patented recirculating mariculture systems  Since 1995, Dr Lee has been the Director of the National Resource Center for Cephalopods at the University of Texas Medical Branch in Galveston, which Center is supported in part by a grant from the National Institutes of Health and a grant from the Texas Institute of Oceanography  He has been an Associate Professor at the Department of Human Biological Chemistry & Genetics, and Preventative Medicine and Community Health since 1985  Dr Lee has published more than 60 scientific articles on mariculture, has 26 patents and patent applications on mariculture systems and feeds, and is a member of many scientific societies  Dr Lee has lectured for various associations at the state, national and international level   Dr Lee holds a B S  in Zoology from the University of Oklahoma, a M S  in Marine Science from the University of South Florida, and a Ph D  in Nutrition from Texas A&M University, specializing in marine hatchery and nutrition requirements for growing marine organisms

***Edwin W. Cake, Jr., PhD.***  Dr Cake has been a director and Chief Science Officer of Biomarine since 1993  From 1994 to 1998, he served as President and a director of Sea Star Industries, Inc , a subsidiary of Biomarine  He has also served as a director of GMIT since 1995  Dr Cake served as Aquaculturist and Secretary/Treasurer of Nauticulture Systems, Inc , from 1988 to 1991  From 1973 to 1986, he was a Senior Research Scientist and Section Head of the Oyster Biology Section of the Gulf Coast Research Laboratory, a marine research institute in Ocean Springs, Mississippi  From 1975 to January 2000, Dr Cake was an Adjunct Professor of marine science and environmental science at the University of Southern Mississippi  He currently serves as a senior environmental consultant to various private and public institutions and was a former member of the Executive Committee of the U S  Environmental Protection Agency's Gulf of Mexico Program  He has also served as president of the National Shellfisheries Association  Dr Cake holds B S , M S , and Ph D degrees in Marine Biology and Biological Oceanography from Florida State University

***Gerry M. Schwartz.***  As soon as we are capable of offering seafood products for sale, Mr Schwartz will serve as our Vice President of Sales and Marketing  Mr Schwartz has been involved in seafood marketing with major seafood companies, including Conner's Bros  and Bumble Bee Seafood as National Sales Manager  Mr Schwartz holds a B A  degree in business administration from Rider College, Trenton New Jersey

***Georgine Burt.***  Mrs Burt is our Secretary/Treasurer and has been with us since August 2000, when she was initially employed as an Administrative Assistant  She received a BS in Business Administration and Marketing from the San Diego State University in California in 1986  Mrs Burt is an Official Circuit Court Reporter with the First Judicial Circuit of Florida and a professional transcriptionist

***S. Randall Hobgood, MD.***  Dr Hobgood has been a director of Biomarine since December 1998  Dr Hobgood was Vice President of Pensacola Radiology Consultants, P A , a position he has held January 1975 until 2002   He is now an independent radiology consultant  Dr Hobgood holds a B E E  in electrical engineering, an M S  in Radiation Biophysics and an M D , each from the University of Florida

***Charles Salisbury, MD.***  Dr Salisbury has been a director of Biomarine since 2003  Dr Salisbury received his Doctorate in Medicine from Tulane Medical School and is a practicing eye surgeon in Mobile, Alabama

In addition to the above management personnel, the following individuals will serve as consultants to us and provide advice with respect to our on-going and proposed operations

38

BPB1-BioMarine_00000219

*Arie de Bondt.* Mr de Bondt serves as an advisor to Biomarine  He previously was a director of Biomarine from December 8, 2001 to May 10, 2007 pursuant to our then arrangement with HESY Bergambacht BV in the Netherlands, a commercial designer and installer of recirculation equipment in the mariculture industry  Since 1981, Mr de Bondt has served as the Managing Director of HESY Bergambacht BV  Mr de Bondt had a technical and economical education in the Netherlands

*Phillip Turk.*  Mr Turk serves as an advisor to Biomarine  Previously, Mr Turk was with Aquatic Feeds and Filters, Inc (AFF), a commercial designer and installer of recirculating systems for use in mariculture  AFF is jointly owned and controlled by Mr Turk and Dr Lee, another director of our Company  Mr Turk has been involved in mariculture for more than 30 years, culturing some of the hardest to culture marine invertebrates squid  He was the National Resource Center for Cephalopod (NRCC) Laboratory Manager and a Research Scientist for 23 years before retiring in 1999  During his management of the NRCC, he became (1) the first to culture squid through the life cycle, (2) the first to routinely culture squid and cuttlefish through multiple laboratory generations, (3) a designer of innovative recirculating filter systems, leading to multiple US and foreign patents, (4) the first to culture shrimp in artificial sea water at an inland site, and (5) a leading author of scientific publications  Recirculating systems designed and installed by AFF for display and production at Disney World's Living Seas Aquarium, the Wood Brother's Shrimp Farm, a production facility for marine shrimp in the Sonora Desert, and Charoen Pokhand Foods Public Company Ltd , a producer of marine shrimp in Thailand  In addition to filtration design, AFF received a grant from the Department of Agriculture to develop chemical attractants and feeding stimulants for use with aquatic feeds of crustaceans

## Employment Agreements

Our executive officers are parties to employment agreements with us  The agreements are for a term of three years, however we have the right to terminate the agreements upon prior written notice  The agreements become effective upon the completion of the Offering, except that the agreement with Mr Ericsson commenced on January 1, 2008 and the agreement with Mr Schwartz will become effective only when seafood products are ready for marketing  The employment agreements provide the following annual base salaries for these individuals  Mr Ericsson  $250,000, Mr Hemmer  $60,000, Mr Cabello  $120,000, Dr Lee  $100,000, Mr Schwartz  $120,000, and Mrs Burt  $60,000

## Indemnification of Officers and Directors

We are subject to the provisions of the Delaware General Corporation Law, including its indemnification and limits on liability

Section ___ of the Delaware General Corporation Law permits a corporation to limit the personal liability of its directors in accordance with the provisions set forth therein  Our Certificate of Incorporation provides that the personal liability of its directors shall be limited to the fullest extent permitted by applicable law

Section ___ of the Delaware General Corporation Law permits a corporation to indemnify any person who is or was a director, officer, employee or agent of the corporation, or who is or was serving at the request of the corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, in accordance with the provisions set forth therein  Our Certificate of Incorporation provide for indemnification of our directors and officers to the fullest extent allowed by applicable law

The inclusion of the foregoing provisions in our Certificates of Incorporation may have the effect of reducing the likelihood of stockholder derivative suits against directors and may discourage or deter stockholders or management from bringing a lawsuit against directors for breach of their duty of care, even though such an action, if successful, might otherwise have benefited us and our stockholders

39

Confidential

BPB1-BioMarine_00000220

## PRINCIPAL STOCKHOLDERS

The following table sets forth certain information regarding beneficial ownership of our common stock as of June 1, 2010, after giving effect to the sale of _____ Shares and _____ Shares, respectively, in this Offering, by (i) each person known by us to be the beneficial owner of more than 5 percent of our outstanding common stock, (ii) each director, (iii) each executive officer, and (iv) all executive officers and directors as a group

The number of shares beneficially owned is determined under rules promulgated by the SEC, which includes shares as to which the individual has sole or shared voting or investment power and shares which the individual has the right to acquire within 60 days of September 31, 2010, through the exercise or conversion of any stock option, convertible security, warrant or other right  Unless otherwise indicated, each person or entity named in the table has sole voting power and investment power (or shares that power with that person's spouse) with respect to all shares of capital stock listed as owned by that person or entity  The table assumes that upon completion of this Offering, we will have a total of _____ shares of common stock outstanding if all _____ Shares are sold in this Offering and a total of _____ shares of common stock outstanding if only _____ Shares are sold in this Offering  If less than _____ Shares are sold, the percentage of our shares owned by the persons listed in the table will increase and the percentage of our shares owned by purchasers of Shares in this Offering will decrease

| | | Ownership Percentage After Offering | |
|---|---|---|---|
| **Beneficial Owner** | **Number of Shares Beneficially Owned After Offering** | **Assuming Sale of Only _____ Shares** | **Assuming Sale of All ____ Shares** |
| John D  Ericsson, President, Chief Executive Office and director | | % | % |
| John W  Hemmer, Chief Financial Officer | | * | * |
| Luis Cabello, Chief Operating Office | none | -- | -- |
| Phillip G  Lee, Chief Biologist & director | ‘ | * | * |
| Edwin W  Cake, Jr , Chief Science Officer and director | | * | * |
| Gerald M  Schwartz, Vice President – Marketing | none | -- | --- |
| Georgine Burt, Secretary /Treasurer | | % | % |
| S  Randall Hobgood, director | | % | % |
| Charles Salisbury, director | | % | % |
| All officers and directors as a group | | % | -   % |

*Less than 1%

Confidential

BPB1-BioMarine_00000221

## DESCRIPTION OF SECURITIES

### General Overview

Our authorized capital stock consists of 5,000,000 shares of preferred stock, par value $.01 per share, none of which have been issued or are outstanding, and 25,000,000 shares of common stock, par value $.01 per share of which 5,501,001 shares are issued and outstanding  An additional ____ shares are issuable upon exercise of outstanding options and warrants at exercise prices ranging from $__ to $__ per share  If all ____ shares are sold in this Offering, we will have outstanding ____ shares of common stock

### Common Stock

The holders of common stock are entitled to receive dividends when and as declared by our Board of Directors out of funds legally available therefore  Upon our dissolution, the holders of our common stock are entitled to share, pro rata, in our net assets after payment of or provision for all of our debts and liabilities, and after provision for any class of preferred stock or other senior security that may be issued by us  Each share of common stock is entitled to participate on a pro rata basis with each other share of such stock in dividends and other distributions declared on shares of our common stock

The holders of our common stock are entitled to one vote per share on all matters submitted to a vote of the stockholders and may not cumulate their votes for the election of directors  The holders of our common stock do not have preemptive rights to subscribe for additional shares of any class that may be issued by us, and no share of common stock is entitled in any manner to any preference over any other share of such stock

### Restrictions on Ownership Under Nevada law

Section __ of the Delaware General Corporation Law imposes certain restrictions on the ability of stockholders owning a specific percentage or more of shares of a corporation's voting stock to engage in a combination transaction with that corporation, and on the ability to certain persons or entities to acquire a controlling interest in a Delaware corporation  Because our Certificate of Incorporation and Bylaws do not prohibit the application of these provisions, these laws may have the effect of inhibiting the acquisition of shares of common stock or any combination transaction with us

### Rule 144

Since Shares sold in this Offering have not been registered under the Securities Act, but will be "restricted securities" under the Securities Act, the Shares may not be resold absent registration under the Securities Act and applicable state securities laws or an available exemption thereunder

Rule 144 provides a safe-harbor for holders of our common stock who desire to sell shares without registration in reliance upon the exemption under Section 4(1) of the Securities Act  Rule 144 generally provides that a person who has beneficially owned restricted common stock for at least six months is entitled to sell their shares provided that (i) such person is not deemed to have been one of our affiliates at the time of, or at any time during the three months preceding, a sale and (ii) we are subject to the Securities Exchange Act periodic reporting requirements for at least three months before the sale

Persons who have beneficially owned restricted common stock for at least six months but who are our affiliates at the time of, or at any time during the three months preceding a sale, are subject to additional restrictions, by which such person is entitled to sell within any three-month period only a number of shares that does not exceed the greater one percent (1%) of the number of shares of common stock then outstanding (or if the common stock is then listed on a national securities exchange, the average weekly trading volume of the common stock during the four calendar weeks preceding the filing of a notice on Form 144 with respect to the sale, if greater than 1% of the then outstanding shares)  Sales by our affiliates under Rule 144 also are

41

BPB1-BioMarine_00000222

limited by manner of sale provisions and notice requirements and to the availability of current public information about us

## PLAN OF DISTRIBUTION

We are offering for sale in a private offering up to _____ shares of our common stock at an offering price of $___ per share  The Shares are being offered and sold only to "accredited investors' (as that term is defined in Rule 501 (a) of Regulation D under the Securities Act of 1933, as amended, or the Securities Act)  The offering price of the Shares has been arbitrarily determined by us and does not necessarily bear any relationship to our assets value, net worth, revenues or other established criteria of value, and should not be considered indicative of the actual value of the Shares

The minimum investment is $____ (___ Shares), but our placement agent and us may accept lesser investments at their discretion  The Offering will continue until September 31, 2010, or such earlier date upon which a total of _____ Shares have been sold and we have received a total of $_____ in subscription payments  We have the right to extend the termination date of the Offering, subject to the consent of our security broker dealers of recore and or the placement agent for the Offering, but in no event later than December 30, 2010

### Placement Agent Agreement

We have entered into a Placement Agent Agreement with our security broker dealers Securities, Inc under which our security broker dealers has agreed to act as our placement agent for the Offering on a best efforts

We have agreed to pay our security broker dealers a sales commission of __% of the gross proceeds from the sale of the Shares ($____ if we sell all _____ shares)  The Placement Agent may re-allow all or a portion of the sales commission to other FINRA members that participate in the Offering for Shares sold through them

### Escrow of Subscription Funds

Until the initial closing, subscription proceeds will be deposited in a non-interest bearing escrow account with the escrow agent named in the subscription documents accompanying this Memorandum  At the initial closing, the subscription proceeds deposited in escrow for subscriptions accepted by us will be released to us and we will deliver stock certificates evidencing the Shares to the purchasers of the Shares, as provided in the escrow agreement between us, our security broker dealers and the escrow agent  Additional closings may be held thereafter at the discretion of our security broker dealers and us as more subscription proceeds are received and cleared until the earlier of the date upon which all _____ shares are sold and the expiration date of the Offering  If we do not accept any subscriptions September 31, 2010, all subscription funds will be returned to the investors and the subscription documents pertaining thereto shall be null and void and without further effect

Officers, directors, employees and affiliates of Biomarine and our security broker dealers may purchase Shares in this Offering

### Accredited Investors

The term "accredited investor" refers to any person or entity who comes, or we reasonably believe comes, within any of the following categories

a       Any bank as defined in Section 3(a)(2) of the Securities Act, or any savings and loan association or other institution as defined in Section 3(a)(5)(A) of the Securities Act whether acting in its individual or fiduciary capacity, any broker or dealer registered pursuant to Section 10 of the Securities Exchange Act of 1934, insurance company as defined in Section 2(13) of the Securities Act, investment company registered under the Investment Company Act of 1940 or a business development company as

42

Confidential                                                    BPB1-BioMarine_00000223

defined in Section 2(a)(48) of the Investment Company Act of 1940, Small Business Investment Company licensed by the U S Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958, any plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of employees, if such plan has total assets in excess of $6,000,000, employee benefit plan within the meaning of Title 1 of the Employee Retirement Income Security Act of 1974 ("ERISA"), if the investment decision is made by a plan fiduciary, as defined in Section 3(2) of ERISA, which is either a bank, a savings and loan association, insurance company, registered investment advisor, or if the employee benefit plan has total assets in excess of $6,000,000 or if a self-directed plan, with investment decisions made solely by persons that are accredited investors,

b    Any private business development company as defined in Section 202(a)(22) of the Investment Advisors Act of 1940,

c    Any organization described in Section 501(c)(3) of the Internal Revenue Code, corporation, Massachusetts or similar business trust or partnership not formed for the specific purpose of acquiring the securities offered, with total assets in excess of $6,000,000,

d    Any of our directors or executive officers,

e    Any trust with total assets in excess of $6,000,000 not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person as described in Rule 506 of Regulation D,

f    Any natural person whose individual net worth or joint net worth with that person's spouse, at the time of his purchase, exceeds $1,000,000,

g    Any natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income in the current year, or

h    Any entity in which all of the equity owners are accredited investors

The above suitability standards are minimum requirements for prospective investors, and the satisfaction of these standards does not mean that the Shares are a suitable investment for a prospective investor Each prospective investor who is an individual must also sign representations that the prospective investor meets the following criteria

- He or she has no need for liquidity in this investment and is able to bear the economic risks of this investment,

- He or she has such knowledge and experience in financial and business matters as to be able to evaluate the merits and risks of an investment in the Shares, and

- He or she is purchasing for his or her own account, for investment and not with a view to resale

We have the right to reject a subscription, in whole or in part, if in our sole discretion we have reason to believe that the prospective investor is not an "accredited investor" or we believe that the Shares are an unsuitable investment for the prospective investor, or for any other reason

## Subscription Procedures

Pending the initial closing, the subscription funds of each prospective investor accompanying the Subscription Agreement will be deposited with the escrow agent named in the subscription documents accompanying the Memorandum

43

Confidential

In order to subscribe for the Shares, each prospective investor must complete, execute and deliver the following in accordance with the instructions set forth in the subscription documents

(a)   A Signature Page evidencing such prospective investor's execution of the Subscription Agreement and a completed confidential Investor Questionnaire included in the subscription documents (the "Subscription Agreement"),

(b)   For U S citizens or residents of the U S , an Internal Revenue Service Form W-9,

(c)   A check or money order payable in accordance with the instructions set forth in the subscription documents   Subscribers may also pay the subscription amount by wire transfer in accordance with the wire transfer instructions in the subscription documents

The subscription payment of each prospective investor accompanying the Questionnaire and the Subscription Agreement will be deposited in a segregated escrow account with the escrow agent named in the subscription documents (the "Escrow Agent")   Subscription payments will be held by the Escrow Agent pursuant to the terms of an escrow agreement among us, the Placement Agent and the Escrow Agent   Our company and the Placement Agent reserve the right, each in its sole discretion to (a) reject any subscription in whole or in part or (b) allot to any prospective investor less than the number of Shares subscribed for by such investor   Subscription payments in respect of subscriptions accepted by us will be released to us on the date of closing   If the Offering terminates or if any prospective investor's subscription is rejected, the Escrow Agent will return to such prospective investor his or her subscription payment, without interest or deduction

The execution of a Subscription Agreement and Questionnaire constitutes a binding offer by each prospective investor to buy the Shares and an agreement to hold the offer open until the subscription is accepted by us   Acceptance shall be deemed to have occurred by virtue of the conduct of a closing utilizing such proceeds   Promptly after each closing, stock certificates representing the shares of common stock purchased will be issued to each purchaser participating in that closing

We reserve the right to reject any subscription in whole or in part and to allocate to any potential subscriber a number of Shares less than the amount subscribed for by such potential subscriber, for any or no reason and without notice   No subscription will be accepted until we have received a fully executed Subscription Agreement and Investor Questionnaire and any other documents that may be required by us or Argent

## AVAILABLE INFORMATION

Any documents or information concerning Biomarine that a prospective investor reasonably requests to inspect or have disclosed to him or her will be made available or disclosed, subject to appropriate circumstances upon receipt by us of reasonable assurances that such documents or information will be maintained in confidence

If you require additional information or have any questions please contact John Ericsson, our President at

**Biomarine Technologies, Inc.**
P O Box 776
Gulf Breeze, Florida 32562
Phone  (850) 525- 3515
Fax  (850) 932-0422

Confidential                                                                 BPB1-BioMarine_00000225