UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE:  OIL SPILL by the OIL RIG | § | MDL NO. 2179 |
| "DEEPWATER HORIZON" in the | § | SECTION J |
| GULF OF MEXICO, on | § | |
| May 24, 2021 | § | JUDGE BARBIER |
| | § | MAG. JUDGE CURRAULT |
| This Document Relates to: | § | |
| Pleading Bundle B1 | § | |

---

| | | |
|---|---|---|
| LOGGERHEAD HOLDINGS, INC. | § | CIVIL ACTION  NO. 16 CV 05952 |
| | § | |
| | § | SECTION  J |
| VS. | § | |
| | § | JUDGE BARBIER |
| | § | MAG. JUDGE CURRAULT |
| BP P.L.C.; BP AMERICA, INC.; BP | § | |
| PRODUCTS NORTH AMERICA, INC.; | § | |
| BP AMERICA PRODUCTION COMPANY; | § | |
| BP EXPLORATION & PRODUCTION, INC. | § | JURY TRIAL DEMANDED |

## <u>PLAINTIFF LOGGERHEAD HOLDINGS, INC.'s RESPONSE IN OPPOSITION TO BP'S MOTION FOR SUMMARY JUDGMENT</u>

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiff, Loggerhead Holdings, Inc., files this response in opposition to Defendants'

Motion for Summary Judgment (Rec. Doc. 27090):

**THE BUZBEE LAW FIRM**

By:   */S/ Anthony G. Buzbee*
Anthony G. Buzbee
Attorney in Charge
State Bar No. 24001820
S.D. Tex. I.D. No. 22679
Caroline E. Adams
State Bar No. 24011198
600 Travis, Suite 7300
Houston, Texas 77002
Telephone: (713) 223-5393
Facsimile: (713) 223-5909
www.txattorneys.com

**ATTORNEYS FOR PLAINTIFF**

## I.     BACKGROUND

Plaintiff, Loggerhead Holdings, Inc., brought this suit against Defendants BP Exploration & Production, Inc., BP America Production Company, and all parties found to be responsible for the spill (collectively "BP")  for losses, injuries, and damages, including actual, compensatory and punitive damages, arising out of the catastrophic and avoidable oil spill in the Gulf of Mexico caused by the April 20, 2010 explosion and fire aboard the Deepwater Horizon oil rig ("Deepwater Horizon"), and the resulting discharge of unprecedented volumes of crude oil into the Gulf of Mexico.This massive and uncontrolled discharge of oil has polluted the waters and natural resources in the Gulf of Mexico and continues to threaten territorial waters and shores surrounding Texas, Louisiana, and other shores along the Gulf Coast of the United States.

Plaintiff founded and operated a niche scuba diving cruise line business.[1]  Plaintiff's scuba diving cruise line business utilized two SWATH ("Small Waterplane Area Twin Hull") vessels respectively named the "*NEKTON PILOT*" and "*NEKTON RORQUAL.*"[2]  The "*NEKTON PILOT*" and "*NEKTON RORQUAL*" are specially designed vessels that were built to house, feed, and support scuba diving cruise passengers.[3]  Plaintiff also had shipyard, boatyard, travel agency, aviation operation, and coral reef restoration businesses that all supported the niche scuba cruises.[4] As a result of the Deepwater Horizon Spill, Plaintiff has been unable to return the vessels to cruise service and they continue to be wet stored in Port St. Joe, Florida (www.gcship.com/webcams).[5]

---

[1] See Declaration of John Dixon § 3.
[2] See Declaration of John Dixon § 3.
[3] See Declaration of John Dixon § 3.
[4] See Declaration of John Dixon § 3.
[5] See Declaration of John Dixon § 3 and 4.

After a decade of litigation, BP filed its Motion for Summary Judgment, BP's Memorandum of Law in Support of Its Motion for Summary Judgment (collectively referred to as the "Motion"), BP's Statement of Uncontested Material Facts in Support of Its Motion for Summary Judgment (the "SOF"). In response, Loggerhead files its opposition and in accordance with Rule 56(c) of the Federal Rules of Civil Procedure and Local Rule 56.1 of this Court, its Statement of Material Facts, which Presents a Material Issue, which is incorporated herein.

## II.      SUMMARY JUDGMENT ANALYSIS

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Little v. Liquid Air Corp*., 37 F.3d 1069, 1075 (5th Cir. 1994). Once the movant points to the absence of a genuine dispute, the non-movant must "come forward with appropriate summary judgment evidence sufficient to sustain a finding in its favor on all issues on which it would bear the burden of proof at trial." See *Rice v. Harken Expl. Co*., 250 F.3d 264, 266 (5th Cir. 2001). Therefore, summary judgment is appropriate where the non-movant "fail[s] to produce summary judgment evidence of facts which, if viewed in the reasonable light most favorable to the [plaintiff], do not suffice to establish a viable OPA claim." *Id*. A plaintiff cannot satisfy its burden by only pointing to "some metaphysical doubt as to the material facts," "conclusory allegations," "unsubstantiated assertions," or "a scintilla of evidence." *See Little*, 37 F.3d at 1075 (internal quotations and citations omitted). There is no material dispute of facts where "the non-movant's 'critical evidence is so weak or tenuous on an essential fact needed to prove his claim 'that it could not support a judgment in favor of the nonmovant.'" *Boateng v. BP, P.L.C.,* 779 F. App'x 217, 220 (5th Cir.), cert. denied, 140 S. Ct. 616 (2019) (quoting *Little*, 37 F.3d at 1075).

### III.   SUMMARY JUDGMENT EVIDENCE

**Exhibit A      Declaration of John Dixon, and attachments**

    **Exhibit 1    John Dixon Curriculum Vitae**

    **Exhibit 2     Deposition of John Dixon**

    **Exhibit 3   2010 Tax Return (Redacted)**

    **Exhibit 4     2011 Tax Return (Redacted)**

    **Exhibit 5    2012 Tax Return (Redacted)**

    **Exhibit 6   2013 Tax Return (Redacted)**

    **Exhibit 7   2014 Tax Return (Redacted)**

Additionally, the following are incorporated herein by reference from BP's Motion:

**Exhibit A(3)      Plaintiff's 2007 Tax Return**

**Exhibit A(4)      Plaintiff's 2008 Tax Return**

**Exhibit A(5)     Plaintiff's 2009 Tax return**

### IV. ARGUMENT AND ANALYSIS

**I.      PLAINTIFF'S 33 U.S.C. § 2702(b)(2)(E) Claim Survives**

The Oil Pollution Act, 33 U.S.C. § 2701, et seq. (the "OPA"), imposes liability upon a "responsible party for a . . . vessel or a facility from which oil is discharged . . . into or upon navigable waters or adjoining shorelines" for the damages that result from such incidents as well as removal costs. 33 U.S.C. § 2702. The OPA is broad, and it made many changes to existing laws. One of OPA's innovations is that it makes statutorily-defined responsible parties strictly liable for removal costs and a wide range of damages that result from an oil spill. 33 U.S.C. § 2702 (a). OPA enumerates six categories of damages that may be recovered. 33 U.S.C. § 2702(b)(2). Section 2702(b)(2)(E) allows recovery of damages equal to the loss of profits or impairment of earning

capacity due to the injury, destruction, or loss of real property, personal property, or natural resources, which shall be recoverable by any claimant. 33 U.S.C. § 2702(b)(2)(E). Here, Plaintiff seeks damages for lost profit impairment of earning capacity due to the injury of personal property and natural resources.

Courts have interpreted OPA's "due to" and "result from" language to require a direct causal relationship between the discharge of oil and the resulting damage. *In re Taira Lynn Marine Ltd*. No. 5, LLC, 444 F.3d 371, 382 (5th Cir. 2006) (holding that losses caused by government mandated evacuation following pollution discharge did not "result from" discharge and, thus, were not recoverable under OPA); *Blue Water Boating Inc. v. Plains All Am. Pipeline, L.P.*, No. CV 16-3283 PSG (JEMx), 2017 WL 405425, at *3 (C.D. Cal. Jan. 26, 2017). Plaintiff bears the burden of establishing causation. Defendants have been found to be the responsible parties for the downhole release of oil and Transocean as the responsible party for the release of diesel on the surface. Therefore, Defendants are strictly liable pursuant to Section 2702 of the OPA for all damages resulting from the Spill. As a result of the Oil Spill, Plaintiffs are entitled to damages pursuant to Section 2702(b)(2)(E), which provides for "[D]amages equal to the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources, which shall be recoverable by any claimant." The damages recoverable under OPA, include the costs of assessing the damages specified in Section 2702(b), and Plaintiffs are entitled to recover the costs of assessing their damages under OPA.

Defendants' Motion for Summary Judgment contends that Plaintiff cannot prove that the spill caused its economic losses because Plaintiff must establish that its economic losses were due to the injury, destruction, or loss of property resulting from the discharge or threatened discharge

of oil, which requires proof of a direct causal relationship and that Plaintiff bears the burden of establishing causation but cannot meet its burden in this case.

### A.  Plaintiff's Business Losses were Caused by the Spill

Defendants' argument that Plaintiff's revenue decreased by $1 million each year between 2007 and 2009, and that Plaintiff suffered net losses exceeding $500,000 during that timeframe, does not alter the reality that Plaintiff suffered a serious impairment in earning capacity directly due to the oil spill.[6] Earnings before interest, taxes, depreciation, and amortization (EBITDA) is the valuation industry standard metric for evaluating the profitability of a business.[7] Plaintiff's EBITDA profits amounted to $448,032 in 2007, $110,383 in 2008, and $306,267 in 2009; all positive and verifying a viable business model even during the Great Recession (2007-2009), which was the worst financial crisis since the Great Depression of the 1930's (1929-1933).[8]

Although Plaintiff suffered ordinary business loss of $789,190 in 2007, $615,088 in 2008, and $597,773 in 2009, Plaintiff's losses became significantly worse in the years following the spill. In 2011, Plaintiff suffered a $1,686,447 ordinary business loss, and in 2012, Plaintiff suffered a $959,029 loss, amounts significantly greater than the deficits that Plaintiff incurred prior to the oil spill.[9] Likewise, Plaintiff's revenue amounted to $3,869,698 in 2007, $3,352,031 in 2008, and $2,522,566 in 2009 before dropping significantly to $282,060 in 2011 and to $0 in 2012 and 2013.[10]  Such dramatic drops go far beyond mere coincidence and instead reflect losses caused directly by the spill. Under the direct terms of the statute, Plaintiff has certainly suffered a loss of

---

[6] See Declaration of John Dixon § 6-9.
[7] See Declaration of John Dixon § 9.
[8] Plaintiff's 1120S Tax Returns for 2007-2009.  See Exhibit A3, A4, and A5 attached to Defendants' Motion and incorporated herein.
[9] See Declaration of John Dixon § 9, and See Exhibit 3,4 and 5 attached to Defendants' Motion and incorporated herein.  Plaintiff's 1120 S 2010-2014, attached as Exhibits 3-7.
[10] Plaintiff's 1120S Tax Returns for 2007-2009. See Exhibit A3,A4 and A5 attached to Defendants' Motion and incorporated herein.  Plaintiff's 1120 S 2010-2014, attached as Exhibit 3-7.

profits as well as a substantial impairment in earning capacity due to the injuries directly caused by Defendants' actions.

On April 20, 2010, when the Deepwater Horizon exploded, Plaintiff's business had been operating successfully for 24 years and had survived the worst financial crisis since the Great Depression. "When did you first start a scuba diving niche cruise operating business?" Mr. Dixon, President of Loggerhead Holdings, Inc. responded, "The idea started in 1986." "And was that your idea?" "Yes, Ma'am." "And what did you do with the idea? Where did you go from there?" "I worked weekends and nights to develop the idea and including the design of the unique vessel, pursued financing, and ultimately realized the construction of the Nekton Pilot, the first vessel."[11] When Mr. Dixon was asked, "Why were you seeing decreased discretionary income of consumers in 2008 and 2009?" Mr. Dixon responds, "It was the worst financial crisis the country had seen since literally the Great Depression. We had President Bush did a TARP bill of 800 billion, which was very close to the -- the support that our Congress has done here in this pandemic, COVID. So it was a devasting time. We had Fannie Mae and Freddie Mac went into foreclosure from the Fed. We had Citibank and Lehman and Ford and AIG, all sorts of bankruptcies. It was a really devasting time, and it was attribute to the great customers base that we had and their dedication to our business that we were in the shape that we were, pretty strong shape as of April 20, 2010."[12]

Additionally, there is a plethora of evidence in the deposition testimony linking the oil spill itself to the ceasing of operations and resulting loss of profits. In response to being asked, "At the time that you ceased operations, were you worried that oil was reaching that area?" Mr. Dixon responds, "We were more than worried. I think we were convinced it was. It was imminent." "And when you say imminent, you mean that oil would reach your area very soon? "Yes, ma'am.

---

[11] Ex. 2, 2-19-21 Deposition of John Dixon at 19:18-20:5
[12] Ex. 2, 2-19-21 Deposition of John Dixon at 226:12-227:5

National Marine Fisheries had closed down all the Gulf of Mexico right up to the Key West for fishing. So National Marine Fisheries had already said all this area is going to be oiled. NOAA was saying it. Coast Guard has come out with an announcement saying oil was going to be imminent as well. So it wasn't really any voices saying that it wasn't going to be."[13]

Defendant alleges that prior to the spill, Plaintiff's vessels were inoperable, and Plaintiff had no ability to generate income or make necessary repairs. This is false. Mr. Dixon testified the cruise which was underway the week of the Deepwater Horizon catastrophe. "Like the week of the Deepwater Horizon explosion, the Rorqual was on charter with 29 passengers. It had 30 booked. Somebody didn't make it that -- that Saturday boarding, but 29 passengers at $57,000 of revenue literally that week that the Deepwater Horizon. So that was a typically, you know, that was a good week. That was a great week." "How much revenue do you -- you need from a trip to break even?" "We -- we would particularly like to see to see 20 people -- 20 guests, fare-paying guests on a trip, and that was a -- that was a trip that was always well worth running."[14]

After the charter during the week of the Deepwater Horizon explosion and sinking, the NEKTON RORQUAL then completed a 9-day open sea voyage over 1,000 nautical sea miles, departing from Providenciales Island in the Turks & Caicos and arriving at Loggerhead's shipyard in Port St. Joe, Florida, on Monday, May 3, 2010. The voyage was recorded by the Ship's Security Alert System (SSAS) and the record of the ship's track is shown in Exhibit 10.[15]

Defendant falsely alleges Plaintiff ceased operations -- in no way attributable to the spill. Mr. Dixon clearly states the reasons the operations were discontinued. In response to being asked "Okay. That's what I'm asking. So you testified before that on May 17th you believe the oiling of

---

[13] Ex. 2, 2-19-21 Deposition of John Dixon at 150:23-151:11.
[14] Ex 2, 2-19-21 Deposition of John Dixon at 119:5-19.
[15] Ex. 10, Satellite tracking of NEKTON RORQUAL 1 Jan to 28 May 2010, attached to BP's Motion for Summary Judgment. Loggerhead 00001924.

some of your itineraries was imminent, right?" Mr. Dixon replied, "Yes, ma'am." In the follow-up question upon being asked, "Okay. And -- and that's why you decided to cease operations?" Mr. Dixon answers, "That, combined with the damage to the Rorqual, yes, ma'am."[16]

Following the cessation of operations on the 27th of May 2010, Plaintiff made a reasonable and necessary business decision to file an Assignment for the Benefit of Creditors (ABC) for the Nekton Diving Cruises subsidiary since its niche scuba diving cruise line vessels were unable to complete the scheduled summer itineraries. Mr. Dixon was asked, "And did -- did Nekton Diving Cruises decide to file an assignment for the benefit of creditors proceeding, or did somebody else institute those proceedings against –" "Oh." "-- Nekton Diving Cruises?" Mr. Dixon replied, "Nekton Diving Cruises elected to file the ABC." The following question was "Okay. And it looks like you filed on May 27, 2010; correct?" to which Mr. Dixon answered, "Yes, ma'am."[17]

Plaintiff intends to reopen the ABC at the completion of this litigation and distribute litigation proceeds to the ABC creditors as a priority. Mr. Dixon is asked, "Were these consumer deposits repaid in full as part of the ABC process?" and replied, "Not yet." The questioning continued, "Well, the ABC process is complete, right?" Mr. Dixon replied, "Not necessarily." Again, follow-up question, "What do you mean by "not necessarily"?" "At the -- conclusion of this litigation, I may be able to reopen the ABC and distribute any proceeds from this litigation back to the crew and guests." The questioner continued, "Are you required to do that?" with Mr. Dixon's response of "I'm -- it's my number one priority."[18]

Defendant seeks to paint the inability of Plaintiff to restart the niche scuba cruise operations as proof of Plaintiff's failure, when the continued failure to restart is clearly attributable to

---

[16] Ex. 2, 2-26-21 Deposition of John Dixon at 198:11-19.
[17] Ex. 2, 2-19-21 Deposition of John Dixon at 214:13-23.
[18] Ex. 2, 2-26-21 Deposition of John Dixon at 88:5-20.

Defendant's inactions following the Disaster. OPA 90 requires the Responsible Party (RP) to make payments for interim, short-term damages. Mr. Dixon clearly states that the inability of Loggerhead to restart its cruises is directly due to Defendant's continued failure to remit to Plaintiff the interim, short-term damage payments required by OPA 90 and promised by Defendant's Vice President Darryl Willis. Mr. Dixon states, "And then my customers and my crew that I was unable to take care of that summer because of this 160 days to get my first interim short-term payment and then no other payment afterwards. And the pain of Ken Feinberg taking over and saying we have to get rules in place, they already had a rule. Darryl Willis went to Congress and NPR and every commercial and said the interim short-term payments every month, you'll get your check. We got ours at the end of September and that was it. One -- one payment. Unbelievable. If -- if that had have just continued, I guarantee we would have been in service the following summer. We absolutely -- with the oil and everything, we could have gotten ourselves back in business the following summer had BP continued our interim short-term payments through that fall and into the winter."[19]

Further testimony on the record continues to strongly support the notion that Plaintiff's operations ceased in direct response to the oiling. [20] In consideration of such, Plaintiff has put forth enough evidence at this time so that there exists a genuine dispute of material fact and Defendants are not entitled to a judgment as a matter of law at this point in time based on the evidence that that has been put forth.

**B.   Plaintiff Incurred Losses due to Oiling and such Losses Can Be Linked to the Spill**

Defendants' attempt to argue that Plaintiff's claim for economic losses resulting from a post-Spill fear within scuba tourism is "a step too far removed from OPA['s] . . . requirement that

---

[19] Ex. 2. 2-19-21 Deposition of John Dixon at 279:24-280:19.

[20] Ex. 2, 2-26-21 Deposition of John Dixon at 151:12-21, 155:11-156:9, 157:25-161:21, 162:3-164:14

the lost profits and impaired earning capacity be 'due to' the destruction of natural resources." Mr. Dixon replied to the question, "Did you personally see oil on the Rorqual?" by responding, "Yes, Ma'am. When I was at the yard a week later trying to shift the engines and I was observing the reverse osmosis clear plastic fill hose that was no longer clear but obviously stained and the color of oil." "And did you visually any other oil on the Rorqual other than what you just described with the reverse osmosis clear plastic?" "Yes. As I mentioned, in the ballast tanks in future -- not that day but future days when I was opening up ballast tanks to check them for maintenance for -- for if there was water accumulating, I -- I witnessed oily sheen and residue that likely, I believe, came from that passage of the boat through Deepwater Horizon oil." Further when asked, "I think you said that you believe that oil you observed on the Rorqual came from the Macondo well though, right?" and "What evidence do you have in support of that belief?" Plaintiff replies, "I was not aware of any other wells leaking at the time that would have provided that oil that the crew testified- -- you know, told me about and that I witnessed myself. So the deduction."[21]

Later in his testimony, Plaintiff is able to specifically establish the link between the spill on the Rorqual and other Loggerhead property being exposed to oil.[22] Further, Plaintiff specifically listed the oil spill as a reason for ceasing operations on its company website.[23] Mr. Dixon went as far as to specifically cite the spill as the reason that the bookings began to collapse, stating, "So beginning on May 21st in the morning news, for every person not just in America but around the world started turning on their televisions, what they front and foremost was a really dramatic image of an oil rig with a billowing fire blowing out of it. And that image continued for two days until the morning of the 22nd when that entire structure, as huge as it is, sank. And immediately

---

[21] Id. at 190:3-8
[22] *Id*. at  Page 204:20-205:17.
[23] *Id.*  at 212:2-9. 221:17-21, 222:5-15, 222:25-223. 225:4-13.

following that was an oil slick with lots of craft around the oil slick and this drip, drip, drip of increasingly deteriorating news about what was really going on."[24] Mr. Dixon continues to describe, in dramatic effect, how the incident occurred and the explicit affect that it had on the area saying, "Absolutely, far and away destroyed tourism throughout the Gulf, throughout Florida, throughout the Keys, panic, imminent oils into the Keys… but had you been anywhere, you know, on the Gulf or in Florida at the time, it was all encompassing, every bit as dramatic as the pandemic we're in now for the people that were in this region."

When asked, "So in terms of what you just described, there's panic and imminent oil, how did that translate to a decrease in bookings?" Mr. Dixon replies, "It wasn't really a decrease. It just stopped." "And you believe that was caused by the spill?" Mr. Dixon replies, "Absolutely, yes, ma'am." Mr. Dixon continues to describe in many other instances how the oil spill affected customer bookings.[25] In fact, Mr. Dixon goes as far as to directly point out the oil spill as the reason for the bookings, rather than any other alternative cause.[26] And rather than being mere speculation or a far-fetched connection, when asked, "Sitting here today, are you aware of any evidence of oil actually hitting Cay Sal Bank" Mr. Dixon could point to very specific reports as to how the incident affected his business.[27] And when asked, "So Nekton Diving Cruises began an Assignment for the Benefit of Creditors on May 19, 2020; is that your testimony?.... Why did Nekton Diving Cruises do that?" Mr. Dixon replied, "Yes, Ma'am. Because the Rorqual on her way back to my yard experienced oiling damage due to the BP Deepwater Macondo blowout and was unable to get back underway to return to Ft. Lauderdale; in addition to the collapse of bookings

---

[24] Id. at Page 229:22-230:4.
[25] Id.  Page 232, 13-18. Page 233,12-234:5.
[26] Id. at Page 257:18-258:3.
[27] Id. at Page 289:13-292:20.

and the run-on cancellation.[28] Further, Plaintiff is capable of laying out in detail the direct impact that the incident had on his business.[29]

In response to being asked, "So at the time that you ceased operations, there was not yet oil in the area in which you operate?", Mr. Dixon responded, "It was imminent…. Dr. Masters was on the record saying we're within three—I think it was three to ten days the water had—the oil had entered the loop current and we—imminent that oil was going to be getting into those Straits of Florida." In making such statements on the record, Plaintiff establishes a genuine dispute of material fact so as to prove that the oil spill caused his losses and overcome the burden of summary judgment. Accordingly, Plaintiff has met its burden at this stage of proving that his losses were due to oiling, and the oil spill. Defendants attempt to make Plaintiff rise to a burden far beyond what is required at the summary judgment stage in bringing this motion.

### C. Plaintiff Can Prove its Damages with Reasonable Certainty

Defendants also attempt to argue that Plaintiff cannot prove its damages with reasonable certainty. As explained earlier in this briefing, the fact that Plaintiff was not profitable before the spill does nothing to diminish the fact that the state of Plaintiff's financial affairs became significantly worse after the oil spill made contact. Further, Plaintiff's 1120S tax returns and available profit and loss statements demonstrate the same in a way that is easily ascertainable from the numbers recorded within those documents. And as documented by Plaintiff's statements, such losses resulted directly from the spill.[30] Each of these documents puts forth in finite and exact terms the numbers establishing exactly what Plaintiff seeks by way of his claims. Far from being

---

[28] Id. at Page 180, 16-23. 192:3-8.
[29] Page 195, Ex.2-20. Page 198, 5-15. 200:5-11. 206:24-207:3.226:24-227:8. 227:22-228:6. 228:23-229:6. 230:3-24.
[30] Ex. A2, 2-19-21 Deposition of John Dixon at 150:23-24-151:3. and Ex. A2, 2-26-21 Deposition of John Dixon at 151:12-21, 155:11-156:9, 157:25-161:21, 162:3-164:14, attached to BP's motion.

baseless and without any explanation, Plaintiff is able to put forth PTO 65, an expert's evaluation of Plaintiff's losses stemming from the underlying incident. That report contains concrete numbers indicating how exactly Plaintiff suffered its losses in a well-plotted out manner. Further PTO 65 was formulated directly in response to the question, "Describe specifically the compensatory damages that you claim in your lawsuit, including the nature of the damage, the date of the damage, the amount of the damage, and a calculations used to arrive at that amount." That report specified Plaintiff's damages resulting from the spill to amount to $35.2 million. Further, Plaintiff also rendered PTO 67 initial disclosures specifying its losses in detail. Both PTO 65 as well PTO 67 were compiled by experts in the field of evaluation, who analyzed tax and financial records, supplied by Plaintiff. As previously outlined, Defendants' financial state became significantly worse after the spill, regardless of any deficits prior to.

In regard to Defendant's arguments about Intercompany Invoices, there remains a fact issue that must be ruled upon by the Court.[31] Accordingly, further discovery is warranted based on such. Plaintiff respectfully requests that if the Court finds the Plaintiff failed to fully or properly address any assertion of fact by Defendants, as required by Rule 56(c), the Court: (1) give an opportunity to properly support or address the fact; or (2) issue any other appropriate order, including more time to properly address the disputed issue of fact. Based on such, further discovery is not only warranted, but necessary, and must be allowed by the Court.

Defendants' criticisms of the "speculative" nature of Plaintiff's losses do not stand up when confronted by the expert testimony contained in PTO 65 as well as PTO 67 in addition to the tax returns that have also already been put forth. 33 U.S.C. § 2702(b)(2)(E) does not specifically exclude restart costs. Further, it is easily conceivable that such restart costs fall within "impairment

---

[31] See Exhibit A § 25.

of earning capacity" as Mr. Dixon describes such losses within the context of his deposition.[32][33]

Accordingly,  summary judgment is not proper at this point in time.

## II. PLAINTIFF'S 33 U.S.C. § 2702(B)(2)(B) CLAIM SURVIVES AS A MATTER OF LAW.

Plaintiff's § 2702(B)(2)(B) Claim also survives as a matter of law. In his deposition, in response to being asked, "Did you personally see oil on the Rorqual?" Mr. Dixon responds, "Yes, Ma'am. When I was at the yard a week later trying to shift the engines and I was observing the reverse osmosis clear plastic fill hose that was no longer clear but obviously stained and the color of oil." Further when questioned, "I think you said that you believe that oil you observed on the Rorqual came from the Macondo well though; right?" and "What evidence do you have in support of that belief?" Plaintiff replies, "I was not aware of any other wells leaking at the time that would have provided that oil that the crew testified- -- you know, told me about and that I witnessed myself. So the deduction."[34]

When asked, "What did you hear from Dr. Masters specifically that contributed to you ceasing operations? Do you recall?" Mr. Dixon responds, "Yes, ma'am. The oil from the Deepwater Horizon Macondo well has now officially entered the Loop Current."[35] Plaintiff also preserved the oil that he believed to come from the Macondo Well. While Plaintiff's statements as to the oil suffice at the summary judgment stage, it is still possible that further testing can be done. When asked, "I think you said that you believe that oil you observed on the Rorqual came from the Macondo well though, right?" and "What evidence do you have in support of that belief?" Mr. Dixon replies, "I was not aware of any other wells leaking at the time that would have provided

---

[32] See Exhibit 2, Page 121:11-18, 223:24-224:7, attached to BP's Motion.
[33] See Exhibit A(3), Operational Restart Costs as a Result of the Deepwater Horizon Tragedy, attached to BP's Motion.
[34] See Exhibit A( 2)  at  Page 204:20-205:17, attached to BP's Motion.
[35] Ex. A(1) at Page 161:8-13, attached to BP's Motion.

that oil that the crew testified- -- you know, told me about and that I witnessed myself. So the deduction."[36] In sum, Defendants attempt to make an inquiry at this time that goes far beyond what must be proven at the summary judgment stage and Plaintiff has also put forth evidence at this time that is sufficient to hold up as a material fact such that a judgment as a matter of law cannot be made at this time.

### III.   PLAINTIFF IS ENTITLED TO PUNITIVE DAMAGES

As discussed above, Plaintiff can already establish the impact that the oil spill had on his property in which he possessed a proprietary interest.[37] Notwithstanding such, Plaintiff can also meet the commercial fisherman exception such that Plaintiff may make a recovery for punitive damages under federal maritime law. In order to meet the commercial fisherman exception as set out in *Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303, 307–09 (1927)), Plaintiff must demonstrate that the incident impacted Plaintiff's livelihood. In Mr. Dixon's deposition, he lays such out in very specific and plain terms stating, "Fishermen depend on a natural resource to be healthy and vibrant and have fish in the natural resource that can be caught [sic] and eaten. In much the same way our scuba diving activity depends on a healthy, natural shared resource where our divers can actually enter the water and enjoy looking at the fish and taking pictures of them. And so I feel like in the same way a fisherman depends on a shared natural resource, so did the livelihood of our seamen and our maritime business."[38]

One relevant exception to the *Robins Dry Dock* rule applies in the case of commercial fishermen. *See Louisiana v. M/V Testbank*, 524 F. Supp. 1170, 1173 (E.D. La. 1981) ("claims for [purely] economic loss [resulting from an oil spill and subsequent river closure]

---

[36] *See Exhibit A § 34-44; See Exhibit 2,*  at 190:3-8, Page 204:20-205:17, at 212:2-9, 221:17-21, 222:5-15, 222:25-223, 225:4-13.
[37] *Id*. at 190:3-8*Id*. at Page 204:20-205:17., *Id.* at 212:2-9, 221:17-21, 222:5-15, 222:25-223, 225:4-13.
[38] *Id.*

asserted by the commercial oystermen, shrimpers, crabbers, and fishermen raise unique considerations requiring separate attention . . . seamen have been recognized as favored in admiralty and their economic interests require the fullest possible legal protection."). A number of other courts have recognized that claims of commercial fishermen are sui generis because of their unique relationship to the seas and fisheries, treating these fishermen as akin to seamen under general maritime law. *See Yarmouth Sea Prods. Ltd. v. Scully*,131 F.3d 389 (4th Cir. 1997); *Union Oil Co. v. Oppen*, 501 F.2d 558 (9th Cir. 1974). *In re Oil Spill*, 808 F. Supp. 2d 943, 958 (E.D. La. 2011).

In addition, courts have cited the palpable unfairness and "harshness" of a rule which denies recourse for the real and tangible loss that occurs when a commercial fisherman is tortiously deprived of his livelihood. See *Yarmouth*, 131 F.3d at 398. The exception corrects this injustice by allowing commercial fishermen, with losses equally foreseeable and direct as those persons with proprietary interests, to recover their losses. See *Miller Industries v. Caterpillar Tractor Co*., 733 F.2d 813, 820 (11th Cir. 1984). *La. Crawfish Producers Ass'n - W. v. Amerada Hess Corp*., No. 6:10-0348, 2015 U.S. Dist. LEXIS 177483, at *17-20 n.19 (W.D. La. Nov. 23, 2015). Under the circumstances in this case, Plaintiff's certainly made his living off of fish so as to fall within the commercial fisherman exception as the rule is described in *Miller* as well as *La. Crawfish Producers Ass'n - W. See also Golnoy Barge*, 841 F. Supp. 783, 1993 WL 735038, at *1 (S.D. Tex. 1993) (limiting recovery to pecuniary losses directly related to commercial fishing activities); *Testbank*, 524 F.Supp. at 1174 (allowing recovery based on commercial fishermens' inability "to earn their livelihood", limiting recovery to "specific pecuniary losses"). *La. Crawfish Producers Ass'n - W. v. Amerada Hess Corp.*, No. 6:10-0348, 2015 U.S. Dist. LEXIS 177483, at *40-41 n.30 (W.D. La. Nov. 23, 2015).

In response to being asked, "In your view, business is dependent on the health of the ecosystem, including the fish; is that fair?" Mr. Dixon responds, "Yes, ma'am… Our divers would not be so interested to go diving if there weren't fish for them to see and to enjoy and take photos of. We were hired by universities to go out and capture fish, and so under your definition, I guess that we were hired to take live fish"[39] Plaintiff's livelihood depends upon fishing within the fact that the very bread and butter of Plaintiff's business, diving expeditions, was fishing. Without fish, it is highly unlikely that Plaintiff's diving business would have had any interest at all from consumers. People paid money so that they could go diving and observe fish during those dives. Without the fish, Plaintiff's business would have suffered a substantial detriment such that it could not have continued on otherwise. That is, fishing was Plaintiff's livelihood.[40] Accordingly, the very livelihood of Plaintiff's business is fishing so as to fall within the exception as laid out by the Courts in *Testbank* and *La. Crawfish Producers Ass'n.*

## V.   CONCLUSION

In consideration of the facts and data discussed above, both Plaintiff's 33 U.S.C. § 2702(B)(2)(E) and 33 U.S.C. § 2702(B)(2)(B) claims survive as a matter of law and Plaintiff is also entitled to the recovery of punitive damages. Defendants attempt to embark on an overly fact intensive inquiry at this time that goes far beyond what is required at the summary judgment stage. At the absolute least, there exists genuine disputes of material fact such that summary judgment cannot be granted based on the evidence currently under review. Accordingly, Plaintiff requests that the Court deny Defendants' Motion for Summary Judgment as granting such would in no way be proper at this time.

---

[39] Id. at 26:23-27:4.
[40] Additionally, the vessels had fishing licenses, and caught fish to serve on the vessel to their customers as part of the cruising  package. See Exhibit A, §42.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing Plaintiff's Complaint has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12 and 60, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on June 9, 2021.

/s/ Caroline Adams
**CAROLINE E. ADAMS**