UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE:  OIL SPILL by the OIL RIG | § | MDL NO. 2179 |
| "DEEPWATER HORIZON" in the | § | SECTION J |
| GULF OF MEXICO, on | § | |
| May 24, 2021 | § | JUDGE BARBIER |
| | § | |
| This Document Relates to: | § | |
| Pleading Bundle B1 | § | |

---

| | | |
|---|---|---|
| LOGGERHEAD HOLDINGS, INC. | § | CIVIL ACTION  NO. 16 CV 05952 |
| | § | |
| | § | |
| | § | SECTION  J |
| VS. | § | |
| | § | |
| | § | |
| BP P.L.C.; BP AMERICA, INC.; BP | § | JUDGE BARBIER |
| | § | |
| | § | |
| PRODUCTS NORTH AMERICA, INC.; | § | MAGISTRATE CURRAULT |
| BP AMERICA PRODUCTION COMPANY; | § | |
| BP EXPLORATION & PRODUCTION, INC.; | § | |
| | § | |
| | § | JURY TRIAL DEMANDED |

**PLAINTIFF LOGGERHEAD HOLDINGS, INC. CONTESTED ISSUES IN SUPPORT
OF ITS RESPONSE AND OPPOSITION TO
BP'S MOTION FOR SUMMARY JUDGMENT**

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiff, Loggerhead Holdings, Inc., files its Contested Issues of Material Fact in response

to Defendants' Motion for Summary Judgment, and any that may subsequently join, and in support

thereof, would show the following are contested issues of fact:

| **BP FACT** | **DISPUTE** |
|---|---|
| BP: 1. Plaintiff's subsidiaries operated scuba-diving cruises in the Caribbean— specifically, Mayaguana (just northwest of Turks and Caicos), Puerto Rico, the island of St. Croix, and multiple destinations in the Bahamas, including Medio Reef, Cay Sal Bank and Cay Lobos. *See* Ex. 1, Declaration of Ashley E. Littlefield in Support of BP's Motion for Summary Judgment ("Littlefield Decl.") at Ex. A 34:25–35:23, 42:21–43:3, 67:8–17; Littlefield Decl. at Ex. B 60:4–70:16; Littlefield Decl. at Ex. C; Ex. 2 at LOGGERHEAD0000391. | Partially uncontested. Mayaguana is an island belonging to the Commonwealth of The Bahamas and is not an island nation of the Caribbean. *See* Dixon Dec. at Ex. A¶5. |
| BP: 3. Plaintiff's cruises to the Bahamas departed from Fort Lauderdale, Florida. *See* Littlefield Decl. at Ex. B 66:3–7, 66:25–67:19, 69:24–70:5; *see also* Littlefield Decl. at Ex. C at 10, 12, 14, 21. | This alleged fact is disputed. The prime summer Bahamas itineraries of Cay Sal, Medio Reef, Cay Lobos and Northwestern Bahamas departed from Fort Lauderdale, Florida, as well as Miami and Stock Island immediately east of Key West, Florida. The winter trips of Southern Bahamas and Mayaguana departed from Georgetown, |

| | Bahamas and Providenciales in the Turks and Caicos, respectively. Due to environmental concerns related to the reefs, Loggerhead was unable due to oiling on the Nekton Rorqual and over sailing in the Southern Bahamas during the summer 2010. *See* Dixon Dec. at Ex. A ¶6,7. |
|---|---|
| BP: 10. Plaintiff did not sell the destruction or death of fish. See Littlefield Decl. at Ex. A 26:21–27:4. | Plaintiff did not sell destruction or death of fish to third party vendors, wholesalers, fish market or restaurants or brokers. That is true. However, fish were sold to customers on the boat as part of the package price. *See* Dixon Dec. A. ¶42. |
| BP: 11. Plaintiff does not recall catching fish and selling them for revenue. See Littlefield Decl. at Ex. A 25:7–10. | Loggerhead disagrees. Loggerhead's business is contingent on fish as a natural resource of the water and fishing is part of its livlihood. *See* Dixon Dec. at Ex. A ¶42, Ex A(2) p. 24, ln 14-19, p. 25, ln 11-14. |
| BP: 11. Plaintiff does not recall catching fish and selling them for revenue. See Littlefield Decl. at Ex. A 25:7–10. | Loggerhead entities held fishing licenses, caught fish, served fish and sold the catch as part of the package of the cruise to its customers aboard the vessel. A commercial |

|  | fishing license was required. See Dixon Dec. at Ex. A ¶42. |
|---|---|
| BP: 12. Plaintiff reported gross receipts of in 2007. Ex. 3 at LOGGERHEAD00000026. | Loggerhead's gross receipts in 2007 were $3,869,698. *See* Dixon Dec. at Ex. A ¶8 |
| BP: 13. Plaintiff reported gross receipts of in 2008. Ex. 4 at LOGGERHEAD00000044. | Loggerhead's gross receipts in 2008 were $3,352,031. *See* Dixon Dec. at Ex. A ¶8 |
| BP: 14. Plaintiff reported gross receipts of in 2009. Ex. 5 at LOGGERHEAD00000058. | Loggerhead's gross receipts in 2009 less returns were $2,773,751. *See* Dixon Dec. at Ex. A ¶8 |
| BP: 15. Plaintiff reported a net loss of in 2007. Ex. 3 at LOGGERHEAD00000039. | Disagree. Earnings before interest, taxes, depreciation, and amortization (EBITDA) is a measure of a company's profitability before extraordinary expenses are reconciled and is the commonly accepted metric for valuing loss of profits (rather than net income)Exhibit LOGGERHEAD00000039 is Loggerhead's IRS Form 1120S. On IRS Form 1120S, ordinary business income (loss) includes the EBITDA items of  interest, taxes, depreciation, and amortization together with extraordinary one-time accounting events. Before adjusting for extraordinary expenses, Loggerhead's EBITDA for 2007 was $364,032.See Exhibit A ¶ 8. |

| | |
|---|---|
| BP: 16. Plaintiff reported a net loss of in 2008. Ex. 4 at LOGGERHEAD00000053. | Disagree. Earnings before interest, taxes, depreciation, and amortization (EBITDA) is a measure of a company's profitability before extraordinary expenses are reconciled and is the commonly accepted metric for valuing loss of profits (rather than net income)Exhibit LOGGERHEAD00000039 is Loggerhead's IRS Form 1120S. On IRS Form 1120S, ordinary business income (loss) includes the EBITDA items of interest, taxes, depreciation, and amortization together with extraordinary one-time accounting events. Before adjusting for extraordinary expenses, Loggerhead's EBITDA for 2007 was $364,032. See Exhibit A ¶ 8. |
| BP: 17. Plaintiff reported a net loss of in 2009. Ex. 5 at LOGGERHEAD00000070. | Disagree. Earnings before interest, taxes, depreciation, and amortization (EBITDA) is a measure of a company's profitability before extraordinary expenses are reconciled and is the commonly accepted metric for valuing loss of profits (rather than net income)Exhibit LOGGERHEAD00000039 is Loggerhead's IRS Form 1120S. On IRS Form 1120S, |

| | ordinary business income (loss) includes the EBITDA items of interest, taxes, depreciation, and amortization together with extraordinary one-time accounting events. Before adjusting for extraordinary expenses, Loggerhead's EBITDA for 2007 was $364,032.See Exhibit A ¶ 8. |
|---|---|
| BP: 23. On May 19, 2010, Nekton Diving Cruises, LLC ("Nekton Diving"), Plaintiff's subsidiary that operated diving cruises, made an assignment for the benefit of creditors. Ex. 9 at BPB1-Loggerhead_00000481–85; Ex. 2 at LOGGERHEAD00000391; Littlefield Decl. at Ex. A 42:21–43:3. | Loggerhead state that the valid filing date of the petition was May 27, 2010, *See* Dixon Dec. at Ex. A¶ 31 and Exhibit 9 attached to BP's Motion. |
| BP: 33. At the time of the Spill, the Nekton Pilot had no engine, no engine rebuild in progress, and no reservations. See Littlefield Decl. at Ex. B 48:12–14; see Littlefield Decl. at Ex. A 115:13–25, 139:24–140:9. | This statement is incorrect. The vessel NEKTON PILOT had both of its main engines at the time of the spill. They were removed from the hull ready for transport to the rapid rebuild facility for routine overhaul. *See* Dixon Dec. at Ex. A ¶11. |

| | |
|---|---|
| **BP: 36. Plaintiff was unable to pay for the Nekton Pilot's refit absent income from the Nekton Rorqual. See Littlefield Decl. at Ex. B 227:9–13.** | This is disputed. Plaintiff had available resources to pay for the Nekton Pilot's refit, including third party sources.  The refit was not completed solely due to the BP Oil Spill and the imminent threat of oil. *See* Dixon Dec. at Ex. A.¶ 12. |
| BP: 37. On or around April 10, 2010, the Nekton Rorqual had a casualty to its starter generator that rendered it "inoperable . . . until [Plaintiff] repaired it or replaced it." See Littlefield Decl. at Ex. A 169:18–170:14. | Loggerhead disputes this fact. The starboard generator had a casualty that was quickly repaired. The NEKTON RORQUAL did not have a "starter" generator. *See* Dixon Dec. at Ex. A ¶ 16, 17 and 18. |
| BP: 38. During the week of April 11, 2010, Plaintiff unsuccessfully attempted to install a new generator while continuing to operate. See Littlefield Decl. at Ex. A 176:11–177:25. | Plaintiff contests and was successful in installing a new starboard generator and it was operating normally for the next few weeks |

| | until it developed a low oil pressure indication. The starboard generator remained operational but was limited in service until a warranty check could be completed on the low oil indication. *See* Dixon Dec. at Ex. A ¶ 16, 17, 18 and 19. |
|---|---|
| BP: 40. Because of these needed repairs and refits unrelated to the Spill, in April 2010 Plaintiff cancelled all trips from April 24 to May 22, 2010. See Littlefield Decl. at Ex. B 56:22–58:16 | This is contested. April 24 to May 8, 2010 were previously scheduled down weeks to reposition and move the NEKTON RORQUAL over 600 nautical miles from where she ended her winter itineraries operating out of Providenciales in the Turks & Caicos islands to where she would begin her summer Cay Sal, Bahamas itineraries operating out of Fort Lauderdale. Only cruises planned for departures on May 8 and May 15 were rescheduled due to the |

| | |
|---|---|
| | generator warranty check. *See* Dixon Dec. at Ex. A ¶ 18 and 19. |
| BP: 44. On May 2, 2010, the Nekton Rorqual approached Port St. Joe from the south, veering no more than "[m]aybe just slightly" five or ten miles west of Port St. Joe. See Littlefield Decl. at Ex. B 166:3–17; Ex. 10 at LOGGERHEAD00001922–24. | This is contested. Plaintiff's testimony as selected by Defendant is incomplete and results in misrepresentation. Actual Plaintiff testimony is "So she may have been – well it could have been 5 or 10 miles west of a run line [sic] line pretty easily." *See* Dixon Dec. at Ex. A §33, and BP's Ex. B 166:3–17; BP's Ex. 10 at LOGGERHEAD00001922. |
| BP: 46. On April 30, 2010, NOAA forecast oil potentially extending approximately fifty miles south of Pensacola, Florida on May 1, 2010. See Littlefield Decl. at Exs. F, G. | This is contested. Oil flow rate estimates are primary input for oil forecast models. Defendant plead guilty to falsifying flow rate information beginning April 24, 2010 with estimate of 1,000 BOPD when it was aware since before 20 April 2010 that actual flow rate was |

possibly as high as 100,000 BOPD. 1,000 BOPD estimate remained operative number until 28 April when NOAA unilaterally increased estimate to 5,000 BOPD which was still an order of magnitude lower than actual flow rate later estimated by the Flow Rate Technical Group (FRTG) of 60,000 BOPD. 37.During the period of the NEKTON RORQUAL's return to Port St. Joe, the NOAA oiling forecasts (Exhibits F and G) were spoiled by Defendant's intentional acts and the poorly performing forecast models required updates from aerial observation, remote sensing, and vessel oil contacts all of which were just being established. See USA v. BP Exploration and Production laedce-12-00292 0002.1. Further, the NOAA documents were experimental and represented a best

| | |
|---|---|
| | effort of immediately available and limited resources by NOAA and were in no way were meant to conclusively determine the location of Macondo oil in a civil case. *See* Dixon Dec. at Ex. A ¶ 36 and 37. |
| BP: 47. On May 1, 2010, through its Emergency Response Management Application, NOAA calculated that oil was unlikely to extend past the line of longitude extending south from Milton, Florida. See Littlefield Decl. at Ex. H; see also Littlefield Decl. at Ex. F. | This is contested. Oil flow rate estimates are primary input for oil forecast models. Defendant plead guilty to falsifying flow rate information beginning 24 April 2010, with public estimate of 1,000 barrels oil per day (BOPD) when it was aware since before 20 April 2010 that actual flow rate was possibly as high as 100,000 BOPD. 1,000 BOPD estimate remained operative number until 28 April when NOAA unilaterally increased estimate to 5,000 BOPD which was still an order of magnitude lower than actual flow rate later determined |

| | by the Flow Rate Technical Group (FRTG) of 60,000 BOPD.<br><br>During the period of the NEKTON RORQUAL's return to Port St. Joe, the NOAA oiling forecasts (Exhibits F and G) were spoiled by Defendant's intentional acts and the poorly performing forecast models required updates from aerial observation, remote sensing, and vessel oil contacts all of which were just being established. See USA v. BP Exploration and Production laedce-12-00292 0002.1. Further, the NOAA documents were experimental and represented a best effort of immediately available and limited resources by NOAA and were in no way were meant to conclusively determine the location of Macondo oil in a civil case. *See* Dixon Dec. at Ex. A, ¶ 36 and 37. |
|---|---|

| | |
|---|---|
| BP: 48. On May 2, 2010, NOAA's forecast showed oil was unlikely to extend past Mobile Bay on May 3, 2010, and no farther east than Pensacola and Milton, Florida. See Littlefield Decl. at Ex. I. | This is contested. Oil flow rate estimates are primary input for oil forecast models. Defendant plead guilty to falsifying flow rate information beginning 24 April 2010, with public estimate of 1,000 barrels oil per day (BOPD) when it was aware since before 20 April 2010 that actual flow rate was possibly as high as 100,000 BOPD. 1,000 BOPD estimate remained operative number until 28 April when NOAA unilaterally increased estimate to 5,000 BOPD which was still an order of magnitude lower than actual flow rate later determined by the Flow Rate Technical Group (FRTG) of 60,000 BOPD. During the period of the NEKTON RORQUAL's return to Port St. Joe, the NOAA oiling forecasts (Exhibits F and G) were spoiled by Defendant's intentional acts and the poorly performing forecast models required updates from aerial observation, remote sensing, and vessel oil contacts all of |

| | which were just being established. See USA v. BP Exploration and Production laedce-12-00292 0002.1. Further, the NOAA documents were experimental and represented a best effort of immediately available and limited resources by NOAA and were in no way were meant to conclusively determine the location of Macondo oil in a civil case.. *See* Dixon Dec. at Ex. A ¶ 36 and 37. |
|---|---|
| BP: 51. Mr. Dixon could not recall anyone aboard the Nekton Rorqual seeing oil on May 2 or May 3, 2010. See Littlefield Decl. at Ex. A 180:3–184:2. | This is contested. Defendant omits that the oiling of the NEKTON RORQUAL occurred at night. Plaintiff stated that the oiling was at night where the Captain reported a very strong smell but due to it being nighttime, he did not specifically report seeing oil on the surface of the Gulf of Mexico. *See* Dixon Dec. at Ex. A ¶ 20 and 21. |
| BP: 54. Plaintiff created no contemporaneous written communications concerning the oil and does not recall whether it took photographs or video of oil on the vessel. See | This is contested. Proceedings have been stayed, and limited discovery has been permitted. Vessel has been preserved and remains afloat at Plaintiff's yard at 1550 Old Dynamite Dock Road, Port St. Joe, Florida |

| | |
|---|---|
| Littlefield Decl. at Ex. B 172:21–173:2, 174:24–175:5. | and is available for discovery at the discretion and scheduling of the Court. *See* Dixon Dec. at Ex. A ¶ 34. |
| BP: 55. Plaintiff did not, and has not, had any substance tested or performed any fingerprinting analysis of the alleged oil in order to determine whether it came from the Macondo Well. See Littlefield Decl. at Ex. A 188:18–20, 189:17–24; Littlefield Decl. at Ex. B 175:21–176:4. | This is contested. Proceedings have been stayed, and limited discovery has been permitted. Vessel has been preserved and remains afloat at Plaintiff's yard at 1550 Old Dynamite Dock Road, Port St. Joe, Florida and is available for discovery at the discretion and scheduling of the Court. *See* Dixon Dec. at Ex. A ¶ 34. |
| BP: 56. Plaintiff left the alleged oil on the Nekton Rorqual. Plaintiff did not take any steps to formally collect and preserve samples of any alleged oil on the Nekton Rorqual for testing today. See Littlefield Decl. at Ex. B 175:16–20. | This is contested. Proceedings have been stayed, and limited discovery has been permitted. Vessel has been preserved and remains afloat at Plaintiff's yard at 1550 Old Dynamite Dock Road, Port St. Joe, |

| | |
|---|---|
| | Florida and is available for discovery at the discretion and scheduling of the Court. *See* Dixon Dec. at Ex. A ¶ 34. |
| BP: 68. Mr. Dixon did not speak with any of these customers. See Littlefield Decl. at Ex. B 232:9–13, 233:8–15. | This is contested. Mr. Dixon did speak with customers who wanted to cancel but as with most of the customers who were calling to cancel between 21 April and 16 May 2010, the customers were persuaded to wait and see if BP could stop the oil blow-out since the first scheduled cruise was not until 22 May 2010. *See* Dixon Dec. at Ex. A ¶ 35. |
| BP: 70. Plaintiff has not produced any "statement[s] showing" such cancellations. See Littlefield Decl. at Ex. B 233:16–234:10. | Plaintiff contests this fact. See Dixon *See* Dixon Dec. at Ex. A ¶ 35. |
| BP: 71. Plaintiff's competitors continued to run trips during the summer of 2010 in locations where Plaintiff operated. See | This is contested. No niche scuba cruse operator ran cruises in the |

| | |
|---|---|
| Littlefield Decl. at Ex. B 223:20–226:17; Littlefield Decl. at Ex. A 217:19–25; Ex. 11 at LOGGERHEAD00000387–388. | summer of 2010 in the locations the Plaintiff planned to operate. *See* Dixon Dec. at Ex. A ¶ 38, 39, 40, and 41. |
| BP: 72. One competitor offered fifty-percent discounts to Plaintiff's customers after Plaintiff cancelled their trips. See Littlefield Decl. at Ex. A 217:10–18; Littlefield Decl. at Ex. B 222:21–223:19; Ex. 11 at LOGGERHEAD00000388. | This is contested. The competitor was not in the same location Plaintiff's summer itineraries. *See* Dixon Dec. at Ex. A ¶ 38, 39, 40, and 41. |
| BP: 73. Plaintiff advertised some of its competitors' scuba-diving offerings on its website, since its vessels were inoperable. See Ex. 11 at LOGGERHEAD00000387; Littlefield Decl. at Ex. B 221:17–222:14, 225:13–24, 226:11–227:13. | This is contested. The Plaintiff advertised some of the competitor's scuba-diving offerings on its website because they were operating in locations very distant from Defendant's discharge of oil and toxic dispersants. *See* Dixon Dec. at Ex. A ¶ 40. |

| | |
|---|---|
| BP: 75. In May 2010, Plaintiff did not consider operating any trips during the summer of 2010 in the southern Bahamas, where it regularly conducted cruises and where its competitors continued to make trips. See Littlefield Decl. at Ex. B 224:2–225:24. | This is contested. Loggerhead considered many options for restarting cruises. None of the options were viable because of the continuing and rapidly growing threat of BP oiling, the Macondo oiling damage to the NEKTON RORQUAL, oiling of Plaintiff's scuba diving waters, and the failure of Defendant to remit interim, short-term damage payments required by OPA 90 and promised by BP Vice President Darryl Willis.<br><br>     Plaintiff had never conducted cruises in the southern Bahamas or other remote destinations during the summer season. For almost two decades since the business started, Loggerhead ran Cay Sal cruises every summer and they were the financial mainstay for the business. |

| | |
|---|---|
| | 30. No competitor of Plaintiff could regularly operate on the Cay Sal itineraries due to the long cruising distance and open seas that Plaintiff's SWATH technology made possible. This competitive differentiation allowed Plaintiff to charge premium prices and obtain the required financial yields. See Littlefield Decl. at Ex. A 62:17-64:20; Ex A 151:17-152:20; US House of Representatives Committee on the Judiciary Darryl Willis Vice President, Resources, BP America, May 27, 2010. *See* Dixon Dec. at Ex. A. ¶ 28, 29, and 30. |
| BP: 76. Plaintiff contended that rescheduling trips to the southern Bahamas would have inconvenienced customers. See Littlefield Decl. at Ex. B 195:21–196:9. | This is disputed. Plaintiff contends that NEKTON RORQUAL was damaged by BP oiling and even if she was not damaged from BP oiling |

| | |
|---|---|
| | changing flights and travel logistics so last minute was unrealistic in part due to Plaintiff had competition in the southern Bahamas during the summer season running the Plaintiff's identical itinerary using the Plaintiff's moorings. Plaintiff installed the moorings and shared the locations freely with other operators to prevent coral reef damage. Scuba niche cruise vessels operating on the same itineraries at the same time would be in daily conflict over use of the moorings. With the summer Cay Sal itineraries Plaintiff was the only operator due to the long distances and open seas where only the Plaintiff's SWATH design vessels could operate. *See* Dixon Dec. at Ex. A. ¶ 38, 40, and 41. |
| BP: 86. These expenses were not associated with costs to third parties, and these costs | This is contested. Expenses did reflect business costs to third parties |

| | |
|---|---|
| were "well below market" rate. See Littlefield Decl. at Ex. B 135:19–136:6, 136:11–14, 140:8–141:8. | such as the electric service, internet, property taxes, insurance, etc. *See* Dixon Dec. at Ex. A. ¶ 45, 46, and 47. |
| BP: 87. When one of Plaintiff's subsidiaries paid money to another subsidiary, Plaintiff did not net any profits or incur any losses from such transactions. See Littlefield Decl. at Ex. B 27:16–22. | This is contested. All intercompany transactions were reconciled under Loggerhead. *See* Dixon Dec. at Ex. A. ¶ 46. |
| BP: 89. Plaintiff testified that its final damages will differ from the damages reports that it previously produced. See Littlefield Decl. at Ex. A 260:22–261:9, 264:20–265:10. | Plaintiff has made every effort to minimize damages and continuing costs of vessel storage while preserving them for discovery once the court ordered stay is lifted. *See* Dixon Dec. at Ex. A. ¶ 47. |

**CONCLUSION**

Plaintiff disputes many of the facts asserted by Defendants.  Accordingly, Plaintiff requests that the Court deny Defendants' Motion for Summary Judgment as granting such would in no way be proper at this time.

Respectfully submitted,

### THE BUZBEE LAW FIRM

By:    /S/ Anthony G. Buzbee
        Anthony G. Buzbee
        Attorney in Charge
        State Bar No. 24001820
        S.D. Tex. I.D. No. 22679
        Caroline E. Adams
        State Bar No. 24011198
        S.D. Tex. I.D. No. 27655
        J.P. Morgan Chase Tower
        600 Travis, Suite 7300
        Houston, Texas 77002
        Telephone: (713) 223-5393
        Facsimile: (713) 223-5909
        www.txattorneys.com

**ATTORNEYS FOR PLAINTIFF**

### CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Plaintiff's Complaint has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12 and 60, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on June 9, 2021.

/s/ Caroline Adams
**CAROLINE E. ADAMS**