UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on May 24, 2021<br><br>This Document Relates to:<br>Pleading Bundle B1 | § § § § § § § § | MDL NO. 2179<br>SECTION J<br><br>JUDGE BARBIER<br>MAG. JUDGE CURRAULT |

| | | |
|---|---|---|
| LOGGERHEAD HOLDINGS, INC.<br><br><br>VS.<br><br><br>BP P.L.C.; BP AMERICA, INC.; BP AMERICA, INC.;<br>BP AMERICA PRODUCTION COMPANY;<br>BP EXPLORATION & PRODUCTION, INC. | § § § § § § § § § § § § | CIVIL ACTION NO. 16 CV 05952<br><br><br>SECTION J<br><br><br><br>JUDGE BARBIER<br>MAG. JUDGE CURRAULT<br><br>JURY TRIAL DEMANDED |

## DECLARATION OF JOHN DIXON

I, John Dixon, respectfully submit this Declaration in Support of Loggerhead's Response and Opposition to BP's Motion for Summary Judgment, and state the following:

1. The statements in this declaration are based on my personal knowledge. If called upon to testify as a witness, I could provide testimony competently under oath as follows:

2. I am a licensed professional engineer, working primarily in naval architecture and marine engineering. I obtained my undergraduate engineering degree in 1985 and my M.B.A in 1989. A copy of my resume is attached and incorporated herein as Exhibit 1.

3. I founded a niche scuba diving cruise line business in 1986 today called Loggerhead, the Plaintiff in this case. Plaintiff utilized two diving vessels of SWATH ("Small Waterplane Area Twin Hull") design named *NEKTON PILOT* and *NEKTON RORQUAL*. The SWATH technology is especially calm and stable riding and the vessels were specifically designed and built to house, feed, and support scuba diving cruise passengers. Both vessels were U.S. built by Plaintiff, U.S. crewed, U.S. flagged, U.S. owned, and inspected and certified by the U.S. Coast Guard as fully international, SOLAS-compliant, passenger vessels, and entirely vested under U.S. law including all U.S. taxes and legal jurisdiction.

1

EXHIBIT A

4. Plaintiff also had a shipyard and boatyard located in the Gulf of Mexico (GOM) in Port St. Joe, Florida, as well as a travel agency, aviation operation, and coral reef restoration business that all supported the niche scuba cruises. As a direct result of the Deepwater Horizon catastrophe, Plaintiff ceased cruise operations and has been unable to return the vessels to cruise service. They continue to be wet stored in Port St. Joe, Florida (www.gcship.com/webcams).

5. Mayaguana is an island belonging to the Commonwealth of The Bahamas and is a part of a winter itinerary for Plaintiff's cruises.

6. Cay Sal Bank is the summer destination for Plaintiff's cruises. The Cay Sal Bank atoll and the Florida Keys form a boundary for the Straits of Florida which receives and accelerates the Gulf of Mexico Loop Current into the high-velocity ocean current known as the Gulf Stream.

7. Loggerhead was essentially a seasonal business. The high-season summer itineraries of Cay Sal including Medio Reef and Cay Lobos, and Northwestern Bahamas departed from Fort Lauderdale, Florida, as well as Miami and Stock Island immediately east of Key West, Florida. The low-season winter itineraries included the Southern Bahamas which departed from Georgetown in the Bahamas and Mayaguana which departed from Providenciales in the Turks and Caicos.

8. Earnings before interest, taxes, depreciation, and amortization (EBITDA) is a measure of a company's profitability before extraordinary expenses are reconciled and is the commonly accepted metric for valuing loss of profits (rather than net income). Exhibit LOGGERHEAD00000039 is Loggerhead's IRS Form 1120S. On IRS Form 1120S, ordinary business income (loss) includes the EBITDA items of interest, taxes, depreciation, and amortization together with extraordinary one-time accounting events. Before adjusting for extraordinary expenses, Loggerhead's EBITDA for 2007 was $364,032, for 2008, $26,383 and for 2009, $222,267, all positive indicating a viable and successful business. Loggerhead's revenues for 2007 were $3,869,698, for 2008 were $3,352,031, and for 2009 were $2,773,751. In 2010, revenue dropped to $1,296,655.

9. The years 2007 to 2009 were called the "Great Recession" because it was the worst financial downturn since the Great Depression of the 1930's eighty years earlier. The Great Recession included subprime mortgage and real estate bubble collapses, receivership of Freddie Mac and Fannie Mae, bankruptcies of Bear Stearns, Lehman Brothers, AIG, Citi, GM, and Chrysler, and the government's $700 million TARP and $831 million economic stimulus programs.

10. Plaintiff well endured this difficult financial time. As of 20 April 2010, Loggerhead was in good standing with all of its creditors including a Guaranty Release Agreement (GRA) with the vessel's note holder as part of a sale of the notes to a high net-worth individual who was also a loyal Loggerhead customer.

2

11. At the time of the Macondo well blowout, and the explosion, fire, and loss of the Deepwater Horizon, the vessel NEKTON PILOT was on the hard at Plaintiff's shipyard in scheduled refit and had both of its main engines and continues to have them today. The engines were removed from the hull and made ready for transport to a rapid rebuild facility for routine overhaul.

12. Plaintiff had available resources including third party sources to pay for the scheduled NEKTON PILOT's refit. The refit was not completed solely due to the BP Oil Spill including the imminent threat of oil, physical oiling damage to the NEKTON RORQUAL, oiling of Plaintiff's scuba diving waters, and Defendant's failure to remit OPA 90 required, and BP promised interim, short-term damage payments.

13. Also, at the very time of the Deepwater Horizon catastrophe, the NEKTON RORQUAL was fully operational on a full boat charter with 29 guests (one guest was a no-show on day of departure) yielding $59,000 in revenue.

14. Immediately following the completion of this last winter itinerary, on 24 April 2010, the NEKTON RORQUAL departed Providenciales in the Turks and Caicos Islands and began a nine-day open sea voyage of more than 1,000 nautical miles arriving Port St. Joe, Florida, on 3 May 2010. The entire return voyage was tracked with regular position updates by the NEKTON RORQUAL's Ship Security Alert System (SSAS), Exhibit 10.

15. The NEKTON RORQUAL was surveyed by an independent surveyor in July of 2009 and rated as above average condition with an estimated market value of $3 million. In October of 2009, she passed a full COI inspection by the US Coast Guard. A well-found ship, the NEKTON RORQUAL had an outstanding crew and shoreside support that was vigilant and proactive consistent with good maritime practice including operation and maintenance.

16. During the last weeks of the 2010 winter itineraries, the starboard generator had a casualty that was quickly fixed by installing a replacement generator. The NEKTON RORQUAL had a "starboard" generator but not a "starter" generator as referred by in deposition transcripts.

17. The NEKTON RORQUAL's new starboard generator was operating normally for the next few weeks until it developed a low-oil pressure indication shortly before the vessel was scheduled to reposition to the summer itineraries. The starboard generator remained operational but was limited in service until a warranty check could be completed on the low-oil pressure indication.

18. For the opportunity to have the shipyard's full support for the generator warranty check, I made the decision to return the NEKTON RORQUAL to Loggerhead's Port St. Joe yard instead of Fort Lauderdale. Loggerhead rescheduled two weeks of planned summer cruises departing on May 8 and 15 to facilitate the generator warranty check.

19. 24 April to 8 May 2010 were previously scheduled off-charter weeks to reposition and move the NEKTON RORQUAL over 600 nautical miles from where she ended her winter

itineraries operating out of Providenciales in the Turks and Caicos Islands to where she would begin her summer Cay Sal Bank itineraries operating out of Fort Lauderdale. Only the cruises planned for departures on May 8 and May 15 were rescheduled due to the generator warranty check.

20. Near the end of the voyage, south of Port St. Joe, during the dark night hours of 2 May 2010, the NEKTON RORQUAL unexpectedly encountered Macondo oil causing damage to her main engines, gensets, reverse osmosis water makers, HVAC, grey, sanitary and ballast water systems.

21. The ship's Captain reported to me the strong smell of oil and alarms and performance issues consistent with oiling. In the days after arrival at the shipyard, the yard staff confirmed to me the oiling damage.

22. I personally observed Macondo oil on the vessel NEKTON RORQUAL, and the oil has been preserved on the vessel. In the event the Court requests additional evidence, the opportunity for testing is requested.

23. Loggerhead's vessels could no longer traverse the water for numerous reasons, including (1) visual evidence of oiling; (2) on-going GOM clean-up efforts; (3) water closures; and/or the presence of oil on the water which resulted in cancelled trips and lost business.

24. In the days and weeks leading up to 17 May, 2010 I witnessed round-the-clock news coverage of the BP catastrophe including the state of emergency declaration by Louisiana Governor Jindal, Macondo oiling of GOM shoreline, National Marine Fisheries closure of huge sections of the GOM to fishing, USCG ordering two drilling rigs to the Macondo site to drill relief wells, multiple failures of BP attempts to stop the oil discharge including the "containment dome," "Junk shot," and "top hat," beach clean-up and, televised aerial dispersant spray operations.

25. On Monday, 17 May 2010, I learned from notable experts including Dr. Jeff Masters of the Wunderground, Dr. William Hogarth of USF, Skytruth and others, that BP's Macondo oil had entered the GOM Loop Current and oiling of the Florida Keys was imminent.

26. On Monday, 17 May 2010, I also witnessed Congressman Markey force BP to open an underwater video feed of the failed blowout preventer (BOP) showing the public for the first time the actual and full extent of the oil discharge realizing the true scale of the unfolding tragedy. Experts' arguments grew much louder that the actual oil flow was an order of magnitude greater than what BP had been publicly stating.

27. Due to the imminent threat of oiling of our scuba cruise waters and the Macondo oiling damage to the NEKTON RORQUAL, on 17 May 2010, I made the only rational choice to cease our scuba cruise operations and had my cruise reservations travel agency office post a cessation notice on our web site.

28. Loggerhead considered many options for restarting cruises. None of the options were viable because of the continuing and rapidly growing threat of BP oiling, the Macondo oiling damage to the NEKTON RORQUAL, oiling of Plaintiff's scuba diving waters, and the failure of Defendant to remit interim, short-term damage payments required by OPA 90 and promised by BP Vice President Darryl Willis.

29. Plaintiff had never conducted cruises in the southern Bahamas or other remote destinations during the summer season. For almost two decades since the business started, Loggerhead ran Cay Sal cruises every summer and they were the financial mainstay for the business.

30. No competitor of Plaintiff could regularly operate on the Cay Sal itineraries due to the long cruising distance and open seas that Plaintiff's SWATH technology made possible. This competitive differentiation allowed Plaintiff to charge premium prices and obtain the required financial yields. See Littlefield Decl. at Ex. A 62:17-64:20; Ex A 151:17-152:20; *US House of Representatives Committee on the Judiciary Darryl Willis Vice President, Resources, BP America, May 27, 2010*.

31. Due directly to the BP catastrophe, on 27 May 2010, Nekton Diving Cruises, LLC ("Nekton Diving"), Plaintiff's subsidiary that operated scuba diving cruises, filed a necessary and reasonable assignment for the benefit of creditors (ABC).

32. Loggerhead is in communication and working on behalf of the Assignee in this litigation with Defendants. After litigation expenses, proceeds from this litigation will be used to reopen the assignment and distribute funds to the ABC creditors including unpaid crew wages, customer deposits, and the remaining assignment creditors.

33. Plaintiff's testimony regarding the path of the NEKTON RORQUAL voyage to Port St. Joe as selected by Defendant is incomplete and results in misrepresentation. Actual Plaintiff testimony is "So she may have been – well it could have been 5 or 10 miles west of a run line [sic] line pretty easily."

34. Proceedings have been stayed and permitted discovery limited. Vessel has been preserved and remains afloat at Plaintiff's yard at 1550 Old Dynamite Dock Road, Port St. Joe, Florida, and is available for discovery at the discretion and scheduling of the Court.

35. I spoke personally with customers who wanted to cancel, but as with most of the customers who were calling to cancel, we were able to persuade the customers to wait and see if BP could stop the oil. After rescheduling the May 8 and May 15 cruises, the next scheduled cruise was not until 22 May 2010, more than a month after the well blowout started.

36. Oil flow rate estimates are primary input for oil forecast models. Defendant plead guilty to falsifying flow rate information beginning 24 April 2010, with public estimate of 1,000 barrels oil per day (BOPD) when it was aware since before 20 April 2010 that actual flow rate was possibly as high as 100,000 BOPD. 1,000 BOPD estimate remained operative number until 28 April when NOAA unilaterally increased estimate to 5,000 BOPD which

was still an order of magnitude lower than actual flow rate later determined by the Flow Rate Technical Group (FRTG) of 60,000 BOPD.

37. During the period of the NEKTON RORQUAL's return to Port St. Joe, the NOAA oiling forecasts (Exhibits F and G) were spoiled by Defendant's intentional acts and the poorly performing forecast models required updates from aerial observation, remote sensing, and vessel oil contacts all of which were just being established. See *USA v. BP Exploration and Production laedce-12-00292 0002.1*. Further, the NOAA documents were experimental and represented a best effort of immediately available and limited resources by NOAA and were in no way were meant to conclusively determine the location of Macondo oil in a civil case.

38. The NEKTON RORQUAL was damaged by BP oiling. Even if she were not damaged from BP oiling, rescheduling summer of 2010 cruise itineraries requiring customers to change flights and travel logistics abruptly was unrealistic. Additionally, changing to the southern Bahamas itineraries was problematic as Plaintiff had competition in the southern Bahamas during the summer season running Plaintiff's identical itinerary using the Plaintiff's moorings.

39. No other niche scuba cruse operator ran cruises in the summer of 2010 in the locations the Plaintiff planned to operate in during the high summer season. The locations of Loggerhead's competition was not Cay Sal Bank.

40. After ceasing operations, Plaintiff advertised some of Loggerhead's competitors' scuba-diving offerings on its website because they were operating in locations very distant from Defendant's discharge of oil and toxic dispersants.

41. Plaintiff installed permanent environmental reef moorings and shared the mooring locations freely with other operators to prevent coral reef damage. Scuba niche cruise vessels operating on the same itineraries, at the same time, would be in daily conflict over use of the moorings. With the summer Cay Sal itineraries Plaintiff was the only operator due to the long distances and open seas where only the Plaintiff's SWATH design vessels could regularly operate.

42. Loggerhead is a commercial fishing business. Loggerhead's cruises involved harvesting fish to feed to the customers on the vessels and to use as bait including for underwater attractions. Each vessel had permits to engage in commercial charter service which included a fishing license in the areas it was operating. Loggerhead did not directly sell the fish to restaurants, vendors, brokers or wholesalers, but it was part of the package to its live aboard customers.

43. Loggerhead's seaman and maritime business depended as intimately on the quality of the shared natural resource as any other type of fishing and more so. In addition to ingesting fish removed from the natural resource, the Loggerhead operations actually immersed the entire bodies of crew and guests in the natural resource for many, many hours during the

course of week's cruise. The harmful and dangerous impact of oil and dispersants was multiplied greatly for Loggerhead.

44. Scuba diving did not exist before Frenchman Jacques Cousteau and Emile Gagnan invented the demand regulator in 1942 during the German occupation of France. Maritime cruise operations serving scuba diving enthusiasts is a recent development in human history of which the Plaintiff is one of the first.

45. Loggerhead expended any interim, short-term monies received from BP on expenses which did reflect business costs to third parties such as the electric service, internet, property taxes, insurance, mortgages, etc.

46. All intercompany transactions were reconciled under Loggerhead. An independent third party was engaged for purposes of preparing tax returns.

47. Plaintiff has made every effort to minimize damages and the continuing costs of vessel storage while preserving them for discovery once the court-ordered stay is lifted. The vessel with Macondo oiling damage is preserved for BP's discovery.

48. Due to the stay, Plaintiff respectfully requests that if the Court finds that facts were not submitted that are essential to justify its opposition, that the Court: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order and allow more time for discovery.

49. Plaintiff respectfully requests that if the Court finds Plaintiff failed to fully or properly address any assertion of fact by Defendants, as required by Rule 56(c), the Court: (1) give an opportunity to properly support or address the fact; or (2) issue any other appropriate order, including more time to properly address the disputed issue of fact.

50. Attached hereto as Exhibit 2 is a true and correct copy of excerpts from the transcript of John Dixon's deposition in his individual capacity on February 19, 2021.

51. Damages to Loggerhead including impairment of earning capacity exceed $41,000,000, with loss of profits in excess of $7,000,000, and are defined below:

| | | |
|---|---:|---:|
| **1. CESSATION OF OPERATIONS** | | |
| MVIC Multiplier (7.1) NAICS CODE 483114 | $7,311,481 | |
| | $7,311,481 | $7,311,481 |
| **2. STORAGE AND MAINTENANCE COSTS 2010 TO 2012** | | |
| Dockage, Elect., Daily Checks, Etc. 2010 to 2012 | $3,288,360 | |
| Charter Rents 2010 to 2012 | $1,088,000 | |
| Base Rents for office, transportation and other fixed costs 2010 to 2012 | $217,000 | |
| Professional fees 2010 to 2012 | $376,895 | |
| | $4,970,255 | $4,970,255 |
| **3. RESTART COST** | | |
| Restart Cost | $19,626,820 | |
| | $19,626,820 | $19,626,820 |
| **4. CONSEQUENTIAL LOSSES (REALIZED)** | | |
| 1550 Old Dynamite Dock Road Property | $5,200,000 | |
| 520 SE 32nd Street Property | $500,000 | |
| | $5,700,000 | $5,700,000 |
| **SUM CERTAIN AS OF DECEMBER 31, 2012:** | | **$37,608,556** |
| **5. 2013 & 2014 COSTS PENDING TRIAL DATE** | | |
| Dockage, Elect., Daily Checks, Etc. 2013 | $1,235,620 | |
| Dockage, Elect., Daily Checks, Etc. 2014 | $1,235,620 | |
| Charter Rents 2013 | $408,000 | |
| Charter Rents 2014 | $408,000 | |
| Base Rents for office, transportation and other fixed costs 2013 | $84,000 | |
| Base Rents for office, transportation and other fixed costs 2014 | $84,000 | |
| Professional fees 2013 | $145,896 | |
| Professional fees 2014 | $145,896 | |
| | $3,747,032 | $3,747,032 |
| **SUM CERTAIN AS OF DECEMBER 31, 2014:** | | **$41,355,588** |

52. Attached hereto as Exhibit 3 is a true and correct copy of Loggerhead's Tax Return 2010.

53. Attached hereto as Exhibit 4 is a true and correct copy of Loggerhead's Tax Return 2011.

54. Attached hereto as Exhibit 5 is a true and correct copy of Loggerhead's Tax Return 2012.

55. Attached hereto as Exhibit 6 is a true and correct copy of Loggerhead's Tax Return 2013.

56. Attached hereto as Exhibit 7 is a true and correct copy of Loggerhead's Tax Return 2014.

I declare, certify, verify, and state under penalty of perjury under the laws of the United States of America that the foregoing is true and correct."

Executed in Florida on June 8TH, 2021.

*/s/ John Dixon*
JOHN DIXON