UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:  OIL SPILL BY THE OIL RIG             MDL NO. 2179 SECTION J
"DEEPWATER HORIZON" IN THE GULF          JUDGE BARBIER
OF MEXICO ON APRIL 20, 2010                  MAGISTRATE JUDGE CURRAULT

This Document Relates To:
*John DeSilva, Individually, and as the Sole Member, Owner,
and Operator of The Bird of Paradise, LLC v. BP Expl. & Prod., Inc., et al*
Case No. 16-cv-05277

## PLAINTIFF'S SUPPLEMENTAL MEMORANDUM REGARDING CLAIM VIABILITY

**NOW INTO COURT**, through undersigned counsel, comes Plaintiff, John R. DeSilva ("DeSilva"), individually and as the former sole member of The Bird of Paradise, LLC ("BOP" or "LLC"), who files this Supplemental Memorandum Regarding Claim Viability ("Memorandum"), negating defendants, BP Exploration & Production, Inc. and BP America Production Company's (collectively "BP"), argument that Mr. DeSilva's significant claim (the "Claim") has somehow evaporated and lost viability. Contrary to BP's assertions, the law, the facts, and the equities involved, all mandate that the OPA Presentment, short-form joinder, opt-out election, ensuing lawsuits, and the compliance with multiple Case Management Orders filed and perfected by John R. DeSilva, establish the viability of his Claim. Thus, as more fully shown below, and previously briefed in Plaintiff's earlier Opposition to BP's Motion to Dismiss For Lack of Standing ("Motion"), not only does standing exist, but BP has utterly failed to explain how the Claim can simply evaporate, after pending for 8-plus years.

**I.    BP's Assertions Are Faulty**

BP contends that Mr. DeSilva never had a claim in his personal capacity and never personally opted out of the Class Settlement. BP also paradoxically contends that the Claim, which BP judicially admits Mr. DeSilva filed, was solely in the name of "BOP", but that after the Claim

had been pending for 8 years, Mr. DeSilva somehow lost standing because BOP was "sold" to a new owner[1], and thus the Claim should somehow simply disappear. Either way, BP is wrong.

**II.     What Was The Harm Actually Suffered and Who Suffered the Harm?**

The general harm resulting from the catastrophic spill of oil from the Macondo rig has two components. First, harm was caused by the presence of Macondo oil on the beaches of West Florida, specifically, the famous Sunset Beach Tampa/St. Petersburg/St. Pete Beach, where Mr. DeSilva owned a historic, waterfront property, formerly known as the Busch Estate, that he operated under the trade name of the Bird of Paradise. BP initially disputed liability in general, claiming that there was no documented Macondo oil on the west coast of Florida. Curiously, BP used this factually inaccurate theory (as opposed to its newly-asserted "standing" theory) to dispute John DeSilva's claim for 8 years, until the University of South Florida's authoritative report ("Report") confirming the presence of Macondo oil on the Tampa/St. Petersburg/St. Pete Beach beaches.[2] That Report was further bolstered and confirmed by the HESI-Transocean Settlement Program's official acknowledgement of this fact on September 9, 2019 in their Appeal Determination Notice (Brief Exhibit B). Specifically, the HESI-Transocean Settlement Program stated, "The Claims Administrator has determined that the University of South Florida study is a credible third-party confirmation that, at a minimum, limited oiling existed in areas adjacent to or adequately close to the claim parcel [City of St. Petersburg]." *Id.*

The second component of the harm caused by BP is the perceived negative consequence of the Macondo oil spill vis-à-vis both ongoing and start-up businesses.  The Settlement Agreement (Brief Exhibit F) clearly contemplated awarding damages for such harm, and did so for the Settlement Class members, including damages for business interruption and for the inability to

---

[1] Mr. DeSilva will more fully address the issue regarding BOP's ownership below, in a separate section.
[2] We attach herein several articles citing the University of South Florida's study (Brief Exhibit A).

effect start-up businesses due to the oil spill. In fact, BP has paid out hundreds of millions of dollars in connection with claims made by injured parties located on the west coast of Florida. Moreover, both types of harm manifested in economic loss when property owners who sold property post-spill could only realize at a fraction of any given property's pre-spill value.[3]  It therefore defies common sense that BP would pay similar claims within the Settlement Program, but deny liability in this case involving an injured party that elected to opt out of the Settlement Program.

There should be no legitimate dispute that Mr. DeSilva was severely harmed by the oil spill. There is no question that he was the sole owner of the luxury resort property in question, located at 2707 Pass-A-Grille Way ("Property"), which he operated as a vacation rental, until he was forced to sell it post-spill at a fraction of its pre-spill value (Brief Exhibit G).  There is also no question that Mr. DeSilva was in the process of expanding the existing luxury resort Property to develop it as a Celebrity Guest and Charity Venue (Brief Exhibit H and I). To that end, Mr. DeSilva had secured, in his personal capacity, the $10-million dollar Loan (Brief Exhibit J), that was revoked specifically due to the lender's expressed concerns about the devastating impact of the oil spill (Brief Exhibit E).  Mr. DeSilva, again in his personal capacity, had also secured a variance from the City of St. Pete Beach which allowed him to expand his facilities and operations on the Property and make the improvements which were to be funded by the withdrawn Loan (Brief Exhibit H).  Mr. DeSilva also was the sole owner of BOP, which held the non-transferable license

---

[3] This negative consequence of BP's wrongdoing, triggers a "Subsequent Purchaser Rule" analysis akin to Judge Eldon E. Fallon's learned opinion authored in conjunction with the Chinese Drywall litigation. See LAED PACER Dkt. No. 2:09-md-02047-EEF-MBN, Rec. Doc. No. 23089, *passim*, esp. pp. 4-6, 10-12. Brief Exhibit R.

from the State of Florida to operate the Property.[4] (Brief Exhibit G).

Finaly, Mr. DeSilva clarified the history of ownership of BOP, and confirmed that he indeed believed that he had never "sold" BOP, and that he had specifically told Mr. Penton and his other attorneys that he had not "sold" BOP.[5] Mr. DeSilva's deposition transcript and related exhibits, in their entirety,[6] are attached herein and identified as Brief Exhibit D.  In fact, Mr. DeSilva was profuse in his sworn apology to all concerned for his misunderstanding of the legal implications of the "Membership Interest Purchase Agreement", as a non-lawyer, *Id.*, at Page 30, Line 23 - Page 31, Line 25, when he acknowledged that BOP (whose only asset was the non-transferable license to operate a resort on the Property) was transferred to Barracuda, LLC (owned by Mr. MacDonald) for $10. Mr. DeSilva testified that "It was my understanding that I was vacating my position as a single sole member of The Birds of Paradise, LLC, that he (MacDonald) could step into that. The Birds of Paradise has no value. It has no assets. It doesn't conduct any

---

[4] It is important for the Court to understand that both the vacation rental license and corporate entity amendments at the Florida state level are simple "click and fill" forms.  Nominal fees and short form electronic processing are all that is necessary to obtain a vacation rental license, amend owners, LLC managers and pertinent contact information.  *See* https://www.myfloridalicense.com/CheckListDetail.asp?SID=&xactCode=1030&clientCode=2007&XACT_DEFN_ID=7694; https://dos.myflorida.com/sunbiz/manage-business/efile/annual-report/.  BP's attempt to make issues out of the license and corporate transfers is disingenuous as the evidence reveals Mr. MacDonald placed and paid no value on either the license or the corporate LLC.  In fact, shortly after his purchase Mr. MacDonald let both the vacation rental license and LLC entity, both named under the BOP, lapse.  In addition to the above link, *See*  MacDonald Decl. ¶ 8 (May 17, 2021).  The harm caused to Mr.  DeSilva by BP in this matter was personal to Mr. DeSilva, including: 1) the loss of pre-spill value of the Property when sold post-spill; 2) the loss of rental and other business revenue due to the spill; and 3) the loss of financing and the related inability to effect the planned expansion of the Property and business; no impact to BOP itself was realized as it owned nothing of value and had no intrinsic value.  See Brief Exhibit D - John DeSilva Deposition Transcript at Page 51, Line 7 - Page 52, Line 15; Page 64, Line 10 - Page 65, Line 14.

[5] BP's pleadings and communications incorrectly and unfairly characterize Mr. Penton for allegedly misleading it and the Court regarding the ownership of BOP. Mr. DeSilva's testimony clarifies that Mr. DeSilva truly believed that he had not "sold" BOP because it was essentially worthless, and the actual transfer of BOP to Barracuda, LLC was for a mere $10, which was why he specifically informed Mr. Penton that he (DeSilva) had not sold BOP. Mr. DeSilva was further adamant that he never sold, transferred or otherwise divested himself of the Claim, either to Mr. MacDonald or to Barracuda, LLC, and apologized on the record for any confusion he may have inadvertently caused. See Brief Exhibit D-John  DeSilva Deposition Transcript at Page 20, Line 17 - 23; Page 30, Line 21-Page 31, Line 24; Page 48, Line 19 - Page 49, Line 23; Page 51, Line 21 - Page 52, Line 15.

[6] Plaintiff has attached herein as Exhibit C an index which cross-references all deposition exhibits throughout this Brief.  Plaintiff has also attached as Brief Exhibit T the remaining deposition exhibits introduced during John DaSilva's deposition for Your Honor's quick reference.

business. The idea that there would be a sale of something like that was beyond my comprehension." *Id*. (Brief Exhibit D, Page 31, Lines 4 - 11). However, to eliminate any confusion about who the real party in interest is, Mr. MacDonald has executed a document that, if necessary, transfers the Claim from himself and/or Barracuda, LLC back to Mr. DeSilva, personally, as the proper Rule 17 real party in interest (Brief Exhibit S), which procedure apparently comports with BP's latest suggestion.

### III. Who Filed The OPA Presentment Claim, Short-Form Joinder, Opt-Out Election, CMO Compliances, And Ensuing Litigation?

Again, it was Mr. DeSilva, personally, who submitted, through his legal counsel, the various filings at issue. The "SWORN STATEMENT FOR DISCLOSURES REGARDING REMAINING NON-GOVERNMENTAL ECONOMIC LOSS AND PROPERTY DAMAGE CLAIMS (B-1 CLAIMS)" (Brief Exhibit L), was filed in the name of "John R. DeSilva for the Bird of Paradise", was signed by Mr. DeSilva personally, using his personal email, phone number and SSN (rather than a business Tax ID), and referenced the Direct Filing Short Form Mr. DeSilva had previously submitted to BP in 2012.

The Short Form Joinder (Brief Exhibit M), itself also reflects that the Claim was presented in Mr. DeSilva's personal capacity, and BOP was referenced as essentially a "dba" or trade name for Mr. DeSilva's business activities. The Short Form specifically lists John R. DeSilva as the Claimant, along with his individual information such as phone number, SSN and email address. The Short Form also indicates that Mr. DeSilva is making a business claim.

The same is true for the Opt-Out Exclusion Election (Brief Exhibit N), that Mr. DeSilva filed. Yet again, that document contains Mr. DeSilva's SSN (not a TIN or EIN for BOP), his driver's license number and individual phone number. The Opt-Out Exclusion Election is also

once again signed by Mr. DeSilva individually, and specifically states that "I wish to be excluded from the Economic & Property Damage Class." The Election form also specifically lists the claimant as "The Bird of Paradise, LLC **by John DeSilva**". (emphasis added). The "Sworn Written Statement for Claimant Accounting Support" (Brief Exhibit O), also lists John R. DeSilva as the Claimant. As such, there should be no dispute that the Claim at issue was presented, pursued and opted out of the Class by Mr. John R. DeSilva, as the Claimant, doing business as BOP.

In the litigation context that has been filed against BP by Mr. DeSilva, Mr. DeSilva's party status is also clear. Mr. DeSilva initially filed suit against BP in federal court in the Middle District of Florida, Tampa division, bearing docket number 8:13-cv-00960-SDM-TBM ("Florida suit"). That suit, which specifically named both Mr. DeSilva and BOP as plaintiffs, was transferred to the Eastern District of Louisiana MDL ("First LAED suit"). The Eastern District of Louisiana docketed the transferred matter as 2:13-cv-02550-CJB-JCW, and again listed both Mr. DeSilva and BOP as plaintiffs.

Due to B-1 bundling issues, the First LAED suit was closed by order of the Court. Mr. DeSilva then filed suit, again in the Eastern District of Louisiana, bearing docket number 2:16-cv-05277-CJB-DPC, specifically referencing "John DeSilva, Individually, and as the Sole Member, Owner, and Operator of the Bird of Paradise, LLC." Attached as an exhibit to that lawsuit was a "Sworn Statement for Disclosures Regarding Remaining Non-Governmental Economic Loss and Property Damage Claims (B1Claims)" (Brief Exhibit L), that listed "DeSilva for The Bird of Paradise" as the claimant, contained Mr. DeSilva's personal information, and was signed by Mr. DeSilva.

Further, on April 11, 2018, Mr. DeSilva filed "PTO 65 Verified Statement Regarding Causation and Damages (B1 Claims)" (Brief Exhibit P), that listed "John R. DeSilva" as the

claimant, contained Mr. DeSilva's personal SSN and other information, was signed by Mr. DeSilva, personally, and stated that "Claimant, John DeSilva, formerly doing business as The Bird of Paradise, LLC, has claimed compensatory damages…" Despite three (3) separate lawsuits, starting in 2013, BP never raised a standing issue until quite recently.

As shown above, the Claim at issue was properly and timely asserted and perfected by Mr. DeSilva, individually, during the Claims process, without objection from BP.

**IV.  Law and Argument: BP's Legal Arguments Lack Legal and Factual Efficacy**

    A.  <u>John R. DeSilva Properly Opted Out of the Settlement Class</u>

As shown above (and in Brief Exhibit N), Mr. DeSilva filed his Election Exclusion timely, in his own name (indicating he was doing business as BOP), with his SSN, which he personally signed in his individual capacity.  BP conveniently ignores these undeniable facts and instead, rests their argument on the flimsy and tenuous premise that the opt-out form only applies to BOP because it mentions "The Bird of Paradise, LLC by John DeSilva."

BP's interpretation also runs afoul of the May 3, 2012 *Deepwater Horizon Economic and Property Damages Settlement Agreement as Amended on May 2,* 2012 (Rec. Doc. 6430-1 in Docket Number 2:10-md-02179-CJB-SS) ("SA") provisions regarding Opt Outs (Brief Exhibit F). Section 8.2.1 of the SA states that the "Economic Class Action Settlement Notice shall provide instructions regarding the [opt out] procedures." Id. Section 8.2.1 then mandates that "to validly Opt Out" a party must submit a written request, that is hand-signed by the actual party (not their attorney), timely, to the designated "Entity identified in the Class Notice Plan." *Id.* No specific form or other mechanism for opting out was ever perfected or required, nor was any other specific information required. Paradoxically, BP now claims that the Election Exclusion signed by Mr. DeSilva (and drafted by his counsel), was adequate to opt out BOP (which is mentioned only as a

d/b/a), but not adequate to opt out Mr. DeSilva personally. That misguided view makes no sense.

The undersigned's research reveals that the history surrounding class actions and opt out mechanisms indicates that opt outs are to be liberally construed in favor of preserving claims, which is diametrically opposite to BP's untenable position. The court in *Council On Social Work Education, Inc. v. Texas Instruments, Inc.*, 105 F.R.D. 68, 71-72 (N.D. Tx. 1985) stated:

> The Tenth Circuit in *In re Four Seasons Securities Laws Litigation,* 493 F.2d 1288 (10th Cir.1974), held that a class member that filed a request for exclusion after the deadline, but had made various previous inquiries and statements during the exclusion period, had indicated a desire to opt out and should be permitted to do so. The court explicitly rejected "a rule that in order to opt out, the request must be explicit." Further, we consider [the examination of whether notice was communicated] to be the correct judicial approach to the problem since we are not construing a will, a deed or a contract. A reasonable indication of a desire to opt out ought to be sufficient ... [f]lexibility is desirable in determining what constitutes an expression of a class member's desire to exclude himself and any written evidence of it ought to be sufficient. *Id.* at 1291.

In *McCubbrey v. Boise Cascade Home & Land Corp.,* 71 F.R.D. 62, 70-71 (N.D.Cal.1976), the court held that various parties had effectively opted out of a class by filing their own lawsuit against the class action defendants, even though they had not filed a formal, written exclusion request; *Accord Bonner v. Texas City Independent School District,* 305 F.Supp. 600, 617 (S.D.Tex.1969). The clear theme of these cases is that "considerable flexibility" should be used in determining what constitutes an effective request for exclusion. 2 Newberg, Class Actions § 2475r (1977). Any written evidence of the desire to exclude oneself should suffice. 7A Wright and Miller, *Federal Practice and Procedure:* Civil § 1787 (1972). *See also Plummer v. Chemical Bank,* 668 F.2d 654, 657 n. 2 (2d Cir.1982) ("Any reasonable indication of a desire to get out should suffice.").

This standard is necessary to give effect to the Due Process right to opt out identified by the Supreme Court in *Phillips Petroleum v. Shutts,* 472 U.S. 797, 812, 105 S.Ct. 2965, 86 L.Ed.2d

628 (1985). As 7A Wright, Miller & Kane, Federal Practice and Procedure § 1787 (1972), p. 156 explains:

> Rule 23(c)(2) does not specify how the absentee is to request exclusion. It certainly would be an undue burden on class members to require them to retain counsel and prepare a formal legal document; on the other hand, allowing too much informality might pose problems of authenticity and ambiguity. Nonetheless, considerable flexibility is desirable in determining what constitutes an effective expression of a class member's desire to exclude himself and any written evidence of it should suffice.

Thus, any given opt out procedure is essentially a matter of contract law, governed on a case-by-case basis by each particular Settlement Agreement, Approval Order, CMO, or other case-specific pertinent agreement or order, and is to be liberally construed in favor of effecting a given party's intent to opt out, such as Mr. Desilva's express statement that "I wish to be excluded from the Economic & Property Damage Class". *See Hughes v. Microsoft Corp.,* 2001 WL 34089697, at * 8 (W.D. Wash. Mar. 26, 2001) (finding "that the requirement that opt-outs be signed, notarized, and dated [was a] reasonable measure[s] to protect against fraud" and that "the procedures for opting out from the class were plainly set forth in the notice of the settlement and were not difficult to follow."); *See also Nicholas v. Uber Technologies, Inc.,* 2020 WL 4039382, at * 5-6 (N.D. Cal. July 17, 2020) (opting "to follow the well-established principles of contract interpretation that require it to give a contract's plain language its ordinary meaning" and finding that Plaintiffs did not effectively opt out of arbitration because they did not follow the very specific opt-out directions).

Applying this same rationale and fairness to the matter *sub judice*, Mr. DeSilva submits that it is abundantly clear that he properly opted out of the Economic and Property Damage Class, in his individual capacity. Mr. DeSilva, at all times, listed himself as a party-plaintiff, as the lawsuits were filed in his name "individually" as well as in his titular capacity as the sole member

of his d/b/a, BOP. Moreover, the short-form joinder document clearly lists Mr. DeSilva's personal social security number, xxx-xx-8841, and the BOP never filed a tax return. Further, as evidenced by the affidavit of Mr. DeSilva's CPA, Mr. Tom Limroth, the BOP was treated as a "disregarded entity" for federal tax purposes, as it was "only the business license holder for the related rental properties, and all "rental income and expense activities were reported on (Mr. DeSilva's) personal income tax returns, Schedule E of form 1040." (Brief Exhibit Q - Also referenced in Rec. Doc. 27005-4). Again, the Opt Out Exclusion Election, which also clearly evidences Mr. DeSilva's personal SSN, is devoid of any EIN for the LLC, contains Mr. DeSilva's personal driver's license number, personal address, and states "I wish to be excluded from the Economic & Property Damage Class." (Brief Exhibit N - Also referenced in Rec. Doc. 27005-5)

      B.    <u>"Standing" Is Determined When A Lawsuit Is Filed, And Is A Red Herring Here</u>

BP argues of DeSilva's lack of standing, when the correct focus should be on whether Mr. Desilva is the real party in interest. Mr. DeSilva is the real party in interest in this matter. Whether analyzed under federal or state law, the result is the same: standing is determined as of the filing of a lawsuit. The rule in the Federal 5th and 11th Circuits is virtually uniform and unequivocal. Article III standing is a jurisdictional prerequisite and if a party lacks standing to bring a claim, the Court lacks subject matter jurisdiction over the claim. Further, the party seeking to invoke federal jurisdiction bears the burden of showing that "standing existed at the time the lawsuit was filed." *Howery v. Allstate Ins. Co.*, 243 F.3d 912, 916 (5th Cir. 2001); *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001); *Harding v. Edwards,* 484 F.Supp.3d 299, 308 (M.D. La. 2020). Standing is determined at the time the plaintiff files its complaint. *Arcia v. Fla. Sec'y of State,* 772 F.3d 1335, 1340 (11th Cir. 2014); *Coral Springs St. Sys., Inc. v. City of Sunrise,* 371 F.3d 1320,

1328 (11th Cir. 2004); *Cook v. Bennett*, (11th Cir. 2015)[7].

State law is also consistent with controlling federal law. In Florida, "a party's standing is determined at the time the lawsuit was filed." *McLean v. JP Morgan Chase Bank Nat'l Ass'n,* 79 So.3d 170, 173 (Fla. 4th DCA 2012); *Elsman v. HSBC Bank USA,* 182 So.3d 770 (Fla. 5th DCA 2015); *May v. PHH Mortgage Corp.,* 150 So.3d 247, 248 (Fla. 2d DCA 2014). Further, "a party is not permitted to establish the right to maintain an action retroactively by acquiring standing after the case is filed." *McLean,* 79 So.3d at 173.

The reality is BP's "standing" argument is a red herring. BP never challenged Mr. DeSilva's standing until approximately six (6) years after the first lawsuit was filed listing Mr. DeSilva and BOP as plaintiffs. BP's entire Motion is premised on the argument that the LLC's composition changed from Mr. DeSilva to Mr. MacDonald at some point in 2018, well **after** suit was filed in 2013 and 2016. BP thus tacitly admits that standing was proper as of the filing of the lawsuits. In actuality, BP's argument is not one of "standing", but rather, is that neither Mr. DeSilva nor BOP is the real party in interest, due to a change in ownership and status of BOP.

It is a well settled principle of law that unless a plaintiff has standing, a federal court lacks subject matter jurisdiction to address the merits of the case. *McClure v. Ashcroft,* 335 F.3d 404 (5th Cir. 2003); *Verizon Business Global LLC v. Hagan,* 2009 WL 928633, at *2 (E.D. La. Mar. 30, 2009). Standing is an irreducible constitutional minimum that is a threshold inquiry to adjudication. *See In re FEMA Trailer Formaldehyde Products Liability Litigation,* 570 F.Supp.2d 851, 853 (E.D.La. Aug 01, 2008). The real party in interest issue is very different from standing. *K–*

---

[7] The two (2) cases cited previously by BP are factually distinct. *Yarls v. Bunton,* 905 F.3d 905, 909 (5th Cir. 2018) involved a § 1983 class action against a public defender, by arrestees who had been put on a waiting list, that was mooted by a governmental decision to end practice of placing indigent defendants on a waiting list, thus removing any active controversy. *Ramming v. U.S.,* 281 F.3d 158, 161 (5th Cir. 2001), did not even address standing, but rather, involved a statute of limitations argument posited as a defense to subject-matter jurisdiction. Both cases are factually inapposite and lack germane legal efficacy.

*B Trucking Co. v. Riss Intern. Corp.,* 763 F.2d 1148, FN7 (10th Cir. 1985) (citing Wright, The Law of Federal Courts 452–53 n. 2 (4th ed.1983)). The standing question arises in the realm of public law, when governmental action is attacked on the ground that it violates private rights or some constitutional principle. *Id.; see also In re Unger & Associates, Inc.,* 292 B.R. 545, 550–51 (Bankr.D.Tex. 2003) ("The standing doctrine, unlike Rule 17, relates only to the public law context.").

The real party in interest question is raised between private parties where a plaintiff's interest is not easily discernible. *See id.*; *see also Malamud v. Sinclair Oil Corp.,* 521 F.2d 1142, 1147 (6th Cir.1975) (citing 13 Charles Alan Wright, Arthur Miller & Edward H. Cooper, Federal Practice & Procedure § 3529 at 176 (1975)) (called into doubt on other grounds). As Professor Miller notes, cases frequently confuse the concepts of standing with the real party in interest principle. 13A Charles Alan Wright, Arthur Miller & Edward H. Cooper, Federal Practice & Procedure § 3531 at 43 (3d ed.2008). BP's last-minute Hail Mary contention implicates a real party in interest issue, not a standing issue.

> Rule 17(a) provides, in pertinent part:
>
> An action must be prosecuted in the name of the real party in interest The court may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action. After ratification, joinder, or substitution, the action proceeds as if it had been originally commenced by the real party in interest.

Fed.R.Civ.P. 17(a).

The real party in interest is the person holding the substantive right sought to be enforced. *United States v. 936.71 Acres of Land,* 418 F.2d 551, 556 (5th Cir.1969). There is no doubt that Mr. DeSilva was the real party in interest during OPA Presentment, short-form joinder, opt-out election, the initiation of the three ensuing lawsuits, and during compliance with multiple Case

Management Orders. Judge Fallon's "Subsequent Purchaser Rule" analysis is pertinent here as well (discussed *infra.* in subsection C. (Brief Exhibit R contains Judge Fallon's Order)).

The Advisory Committee Notes state that this provision was intended **to prevent forfeiture and was added in the interests of justice**. Fed.R.Civ.P. 17(a) Advisory Committee Notes, 1966 Amendment (bold added). Rule 17(a) substitution of plaintiffs should be liberally granted where "the change is merely formal and in no way alters the original complaint's factual allegations as to the events or the participants." *Advanced Magnetics, Inc. v. Bayfront Partners Inc.,* 106 F.3d 11, 20 (2d Cir.1997).

Further, FRCP 15(c) has been used in conjunction with Rule 17(a) to enable an amendment substituting the real party in interest to relate back to the time the original action was filed. *MCI Worldcom Network Services, Inc. v. Graphnet, Inc.,* 2005 WL 1116163, *6 (D.N.J. May 11, 2005) (citing 6A Wright & Miller, Federal Practice & Procedure § 1555). Rule 15 allows liberal amendment and requires a court to permit a party to amend the party's pleading freely when justice so requires, because Rule 17 mandates that no action shall be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed for correction of the defect using Rule 15[8]. Fed.R.Civ.P. 15 advisory committee's note (1966).

C. The Subsequent Purchaser Rule Applies Here

As set forth in Mr. DeSilva's initial Opposition, BP's argument that corporate law mandates that Mr. DeSilva somehow lost standing when the composition of the LLC changed in 2018 is a diversionary tactic, as well as a misapplication of the law.

Given the facts, it is apparent that the Subsequent Purchaser Rule ("SPR") applies. *See Eagle Pipe & Supply, Inc. v. Amerada Hess Corp.*, 79 So. 3d 246, 275 (LA October 25, 2011)

---

[8] Plaintiff respectfully submits that amendment is unnecessary, given that Mr. DeSilva and/or BOP, the real party (parties) in interest, is (are) already a party (parties) to these proceedings.

(holding that absent an assignment of the claim, "an owner of property has no right or actual interest in recovering from a third party for damage which was inflicted on the property before his purchase . . . ."). The SPR is cogently addressed and explained by Judge Fallon's Order in the Chinese Drywall litigation beginning on page 10. (Brief Exhibit R). Florida law is consistent with this well-known rule. Without an assignment of the cause of action, a subsequent purchaser is not permitted to pursue a predecessor's cause of action. *Marianna & B.R. Co. v. Maund*, , 56 So. 670 (Fla. 1911).[9] No such assignment occurred here.

The policy behind the law is plain. Mr. DeSilva's sale consisted of damaged property; he received less than he should have received upon sale. To permit the purchaser of damaged property to pursue the claim would either result in a windfall for the purchaser, who paid less, or as BP argues, to BP, if the claim is disregarded. Such an outcome would be unjust and untenable.

D. <u>BP Has Waived, And Should Be Estopped From Asserting, Dismissal</u>

Again, BP should not be heard, at this eleventh hour, to claim that Mr. DeSilva lacks standing, or more correctly, is not the real party in interest. Obviously, BP could have raised Mr. DeSilva's personal standing at any point during the past 8 years. However, BP did not contest standing during the claims process, when Mr. DeSilva filed OPA presentment on November 6, 2012, filed his short-form joinder using his personal SSN, when Mr. DeSilva elected to opt out using his personal SSN, when Mr. DeSilva filed the first lawsuit in 2013, *inter alia* in his individual capacity, and again, not until almost three (3) years after Mr. DeSilva filed suit, *inter alia* in his individual capacity, in 2016. BP did not challenge standing during the initial settlement discussions

---

[9] "Damages for the taking of land, or for the injury to land not taken, belong to the one who owns the land at the time of the taking or injury, and they do not pass to a subsequent grantee of the land except by a provision to that effect in the deed, *or by assignment*." *Maund* at 672 (emphasis added); *see also State Road Dep't v. Bender*, 2 So.2d 298, 300 (Fla. 1941) (recognizing that a cause of action for injury to property can be assigned even after the injury, but an "action arising from pure tort like personal injury cannot be assigned . . . .").

or mediation of the lawsuits under the guidance of Magistrate Judge Sally Shushan, Retired. As such, BP should not be allowed to argue a lack of standing at this late stage of this dispute, years after BP knew, or should have known, of the sale of Mr. DeSilva's property.

      E.      <u>Equity Mandates Preserving Mr. DeSilva's Individual Claim</u>

As shown above, Mr. DeSilva did indeed opt out of the claims phase of the litigation and did pursue redress individually. BP now seeks to completely eviscerate his valid, significant Claim, based on a 2018 transaction involving BOP (not Mr. DeSilva personally). Equity demands negation of BP's parsimonious and strained position. *See Sprint Communications Co., L.P. v. APCC Services, Inc.*, 554 U.S. 269, 128 S.Ct. 2531, 171 L.Ed.2d 424 (2008); 6A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 1541, pp. 320–321 (2d ed.1990).

**V.    Conclusion**

In sum, for the reasons set forth above, BP's Motion should be denied, in its entirety, and at BP's sole cost and expense. Mr. DeSilva, always used his personal information when pursuing the Claim via OPA presentment, short-form joinder, Opt-out Election, or three (3) lawsuits. BP has provided absolutely no proof that Mr. DeSilva ever sold, nor transferred, the Claim at issue. Likewise, the BOP never owned the Claim or the Property at issue, and the Property was not sold to Mr. MacDonald with an assignment of the Claim. Mr. MacDonald specifically averred that he did not intend to, nor did he actually buy the Claim, either when he bought the Property or thereafter, and he has executed a transfer of the Claim back to Mr. DeSilva, in the event it is determined that Mr. MacDonald somehow ended up as the owner of the Claim.

Respectfully submitted,

THE PENTON LAW FIRM
209 HOPPEN PLACE
BOGALUSA, LOUISIANA 70427
PHONE:        985-732-5651
EMAIL:         fedcourtmail@thepentonlawfirm.com

/s/ Ronnie G. Penton
Ronnie G. Penton
Trial Counsel for Plaintiff, *John DeSilva, Individually, and as the Sole Member, Owner, and Operator of The Bird of Paradise, LLC*
Louisiana Bar Roll Number 10462

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing *Plaintiff's Supplemental Memorandum in Opposition to BP's Motion to Dismiss for Lack of Standing* has been served on all Counsel by electronically uploading the same to File & ServeXpress in accordance with Pretrial Order No. 12, as amended, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electric filing, in accordance with the procedures established in MDL 2179, on this the 11th day of June, 2021.

/s/ Ronnie G. Penton
Ronnie G. Penton