**Brief Exhibit D**

Page 1

1                          DeSilva

2          IN THE UNITED STATES DISTRICT COURT

3             CIVIL ACTION NO.: MDL NO. 2179

4

5   In Re: Oil Spill by the Oil Rig  ) SECTION "J"

    "Deepwater Horizon" in the Gulf  )

6   Of Mexico, on April 20, 2010     )

                                     ) JUDGE BARBIER

7   This Document Relates to:        )

    John De Silva, et al vs. BP      ) MAGISTRATE JUDGE

8   Exploration and Production       ) CURRAULT

    Et al.                           )

9   Civil Action Number 16-CV-05277  )

                                     )

10  ------------------------------------)

11                  **   REVISED **

12          The 30(b)(6) deposition of JOHN DESILVA,

13  taken remotely via Zoom videoconference on Wednesday,

14  May 19, 2021.

15

16

17

18

19

20

21

22

23  Reported by:

24  L. ALAN PEACOCK, FAPR, RDR, CRC, CCR

25  JOB NO. 194051

Page 2

```
 1                    DeSilva
 2
 3
 4            May 19, 2021
 5            9:30 a.m.
 6
 7
 8       Deposition of JOHN DeSILVA, held remotely via
 9  Zoom videoconference, before L. Alan Peacock, a
10  Registered Diplomat Reporter, Certified Realtime
11  Reporter, Certified Livenote Reporter, Realtime Systems
12  Administrator and Notary Public for the State of
13  Alabama.
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1                    DeSilva
 2       A P P E A R A N C E S :
 3
 4       THE PENTON LAW FIRM
 5       Attorneys for the Plaintiff
 6            209 Hoppen Place
 7            Bogalusa, LA 70427
 8       BY:   RONNIE PENTON, ESQ.
 9
10       KIRKLAND & ELLIS
11       Attorneys for the BP America Production
12       Company and BP Exploration & Production, Inc.
13            300 North LaSalle
14            Chicago, IL 60654
15       BY:   KRISTOPHER RITTER, ESQ.
16            and
17            MARLEE PIETTE, ESQ.
18
19       MOORE BOWMAN & REESE
20       Attorneys for the Witness, John DeSilva
21            4100 West Kennedy Boulevard
22            Tampa, FL 33609
23       BY:   JACKSON BOWMAN, IV, ESQ.
24
25       Videographer:  DANIELLE GREENE, TSG Reporting
```

Page 4

```
 1                    DeSilva
 2            E X A M I N A T I O N
 3  DEPOSITION OF JOHN R. DeSILVA, May 19, 2021
 4  By Mr. Ritter ............................ Page 10
 5  By Mr. Bowman ............................ Page 38
 6
 7  Reporter's Certificate ....................... Page 68
 8
 9       PLAINTIFFS' EXHIBITS
10
11  Plaintiffs' Exhibit 1   Board of Adjustment ........... Page 23
        Development Order
12
    Plaintiffs' Exhibit 2   Settlement Agreement .......... Page 26
13
    Plaintiffs' Exhibit 3   Recorded Covenant Running ..... Page 35
14       with Land
15  Plaintiffs' Exhibit 4   Warranty Deed ................ Page 42
16  Plaintiffs' Exhibit 5   Warranty Deed ................ Page 44
17  Plaintiff's Exhibit 6   Contract for Sale and ......... Page 45
        Purchase
18
    Plaintiffs' Exhibit 7   8-4-09 Letter from City ....... Page 55
19       of St. Pete Beach to John
        DeSilva
20
    Plaintiffs' Exhibit 8   License for Professional ...... Page 57
21       Regulation
22  Plaintiffs' Exhibit 9   Settlement Statement .......... Page 52
23  Plaintiffs' Exhibit 10  Warranty Deed ................ Page 59
24  Plaintiffs' Exhibit 11  Affidavit of Steven .......... Page 60
        MacDonald
25
```

Page 5

```
 1                    DeSilva
 2       PLAINTIFFS' EXHIBITS (Continued)
 3  Plaintiffs' Exhibit 12   Declaration of Steven A. ..... Page 49
        MacDonald
 4
    Plaintiffs' Exhibit 13   Renovation Plans ............ Page 62
 5
    Plaintiffs' Exhibit 14   2-15-10 Letter from ACG ...... Page 63
 6       Companies to John DeSilva
 7  Plaintiffs' Exhibit 15   6-15-10 Letter from ACG ...... Page 64
        Companies to John DeSilva
 8       DEFENDANT'S EXHIBITS
 9
10  Defendants' Exhibit 1   Contract for Sale and ......... Page 10
        Purchase
11
    Defendants' Exhibit 2   Membership Interest .......... Page 10
12       Purchase Agreement
13  Defendant's Exhibit 3   Opt Out Letter of the ......... Page 10
        Bird of Paradise
14
15            - - -
16
17
18
19
20
21
22
23
24
25
```

Page 6

DeSilva

IT IS HEREBY STIPULATED AND AGREED by and
between the attorneys for the respective parties
herein, that filing and sealing be and the same are
hereby waived.

IT IS FURTHER STIPULATED AND AGREED that all
objections, except as to the form of the question,
shall be reserved to the time of the trial.

IT IS FURTHER STIPULATED AND AGREED that the
within deposition may be sworn to and signed before any
officer authorized to administer an oath, with the same
force and effect as if signed and sworn to before the
Court.

- oOo -

Page 7

DeSilva

THE VIDEOGRAPHER: Good morning. My name is
Danielle Greene. I am the certified legal video
specialist in association with TSG Reporting.

Due to the severity of COVID-19 and following
the practice of social distancing, I will not be
in the same room as the witness. Instead, I will
record and videotape this deposition remotely.

The reporter, Alan Peacock, will also not be
in the same room as the witness but will swear in
the witness remotely.

Do all parties stipulate to the validity of
this video recording and remote swearing and that
it will be acceptable in the court as if it was
taken following Rule 30 of the Federal Rules of
Civil Procedure and the state's rules where the
case is pending?

MR. RITTER: This is Kris Ritter for the BP
defendants, and I agree.

MR. BOWMAN: This is Jackson Bowman for John
DeSilva, and we agree.

THE VIDEOGRAPHER: Thank you. This is the
start of Media Number 1 in the video-recorded
deposition of John DeSilva in the matter of John
DeSilva, a Sole Member of The Bird of Paradise,

Page 8

DeSilva

LLC v. BP Exploration & Production, Inc., et al.,
filed in the District Court of Louisiana, Case
Number 16-cv-05277.

This deposition is taking place via Zoom with
all participants attending remotely on Wednesday,
May 19th, 2021, at approximately 9:32 a.m. Central
Time.

My name is Danielle Greene. I'm the legal
video specialist from TSG Reporting. The court
reporter today is Alan Peacock in association with
TSG Reporting.

Counsel, will you please introduce yourself,
and the witness will be sworn in.

MR. RITTER: Kris Ritter from Kirkland &
Ellis LLP for the BP defendants.

MR. BOWMAN: Jackson Bowman from Moore
Bowman & Reese for the plaintiff, John DeSilva.

JOY DINEO: Joy Dineo from Kirkland & Ellis
for the BP defendants.

MR. PENTON: Ronnie Penton on behalf of the
plaintiff, John DeSilva.

MR. RITTER: This is Kris Ritter for the BP
defendants. I would like to make a brief
statement before the witness is sworn. We are

Page 9

DeSilva

here for the deposition of plaintiff, John
DeSilva.

BP noticed Mr. DeSilva's deposition on May 7,
2021, pursuant to the court's minute order that
was entered on the 21st of April of this year,
Record Documents 27059 in MDL 2179 master docket.

That order from Judge Barbier allowed the
parties to conduct only limited discovery, as had
been stated on the record at the April 20 --
sorry -- at the April 2021 hearing that was held
in this matter.

At that hearing the Court indicated it would
allow some very limited jurisdictional discovery
in this case at this time and that such discovery
would be limited to the narrow issue of who the
real party in interest is with respect to the
claim of The Bird of Paradise, LLC, and whether
Mr. DeSilva has standing to pursue any claim on
behalf of The Bird of Paradise, LLC.

BP's position is that those directives from
the Court limit the scope and set the scope of
this deposition. BP reserves the right to depose
Mr. DeSilva at a later time, if it is necessary,
with respect to any other issues that are related

3 (Pages 6 to 9)

TSG Reporting - Worldwide     877-702-9580

Page 10

DeSilva

1
2  to this litigation.
3      And BP would object to any questioning that
4  exceeds the scope of that limited discovery that
5  Judge Barbier has permitted.
6      (DEFENDANTS' EXHIBITS 1 THROUGH 3 WERE
7      PRE-MARKED FOR IDENTIFICATION.)
8          JOHN R. DeSILVA,
9      the witness, having been first duly sworn to
10 speak the truth, the whole truth, and nothing but the
11 truth, testified as follows:
12          EXAMINATION
13 BY MR. RITTER:
14     Q.  Good morning, Mr. DeSilva.  My name is Kris
15 Ritter, and I am here with Kirkland & Ellis.  I
16 represent BP in these proceedings.  I believe we met
17 once before in the fall of 2019 at a mediation in
18 New Orleans.
19     A.  Yes.
20     Q.  Could you please state and spell your name
21 for the record?
22     A.  John, J-O-H-N, R. DeSilva, D-E-S-I-L-V-A.
23     Q.  Have you been deposed before, Mr. DeSilva?
24     A.  Yes.
25     Q.  In what matters were you deposed?

Page 11

DeSilva

1
2      A.  I was deposed in my litigation as a plaintiff
3  against the City of St. Pete Beach in our acquisition
4  of a variance to rent the property out by the week.
5      Q.  And what year was that?
6      A.  It was 2004 -- 2003 and '04.
7      Q.  Were you deposed at any other times in any
8  other matters?
9      A.  I can't recall -- I can't recall any
10 others -- nothing recent anyway.  I can't remember any
11 other times I was deposed.
12     Q.  I'd like to lay out a few ground rules as we
13 get started to help with our discussion today.  It may
14 be familiar from years ago when you were deposed.  But
15 if at any point you want to take a break today, please
16 let me know.  But I'd ask that you please answer any
17 pending question before we break.
18     Does that make sense to you?
19     A.  Yes.
20     Q.  If you don't understand any questions that I
21 ask you, could you please let me know?
22     A.  Certainly.
23     Q.  If you answer one of my questions without
24 asking me to clarify it, I'm going to assume that you
25 understood my question.

Page 12

DeSilva

1
2      Is that fair?
3      A.  That's fair.
4      Q.  And I also ask that you please let me finish
5  asking my question before you answer.
6      Is that fair?
7      A.  Yes.
8      Q.  And could you please give verbal answers,
9  like yes or no, rather than head nods or uh-huh or
10 other nonverbal responses?
11     A.  Yes.
12     Q.  That's something that we all need to be
13 mindful of.  And the court reporter will, I think,
14 appreciate it if we remember to do that.
15     A.  Yes.
16     Q.  Now, if I refer to the oil spill that
17 initially occurred in the Gulf of Mexico starting in
18 April 2010 that is the subject of this litigation, if I
19 refer to that as "the spill," will you understand what
20 I mean?
21     A.  Yes.
22     Q.  And there is real estate at 2707 Pass A
23 Grille Way, St. Pete Beach, Florida, that relates to
24 this litigation.  If I refer to that real estate as
25 "the former Busch Estate," will you understand what I

Page 13

DeSilva

1
2  mean?
3      A.  Yes.
4      Q.  Do you understand that you are under oath
5  today?
6      A.  Yes.
7      Q.  Do you understand that you have to testify
8  truthfully and answer questions completely?
9      A.  Yes.
10     Q.  Is there any reason why you are not able to
11 testify fully and truthfully today?
12     A.  No.
13     Q.  Are you on any medications that may affect
14 your ability to testify fully and truthfully?
15     A.  No.
16     Q.  Do you have any illnesses that may prevent
17 you from testifying fully and truthfully today?
18     A.  No.
19     Q.  Now, what have you done to prepare for the
20 deposition today?
21     A.  I spent time with my attorney over the phone,
22 and he briefed me on what type of a deposition this
23 would be.  I have no idea what you're going to ask; so
24 I'm trying to be as prepared as I can, recalling as
25 much as I can.

Page 14

1            DeSilva
2        Q.  When did you have those discussions with
3    counsel?
4        A.  Yesterday and other times during the last
5    week or so briefly.
6        Q.  About how much time did you spend speaking
7    with counsel about this deposition?
8            MR. BOWMAN:  I'm going to object to the form
9        of the question.  It's a privileged matter.
10   BY MR. RITTER:
11       Q.  Mr. DeSilva --
12       A.  Yes.
13       Q.  -- how much time did you spend speaking to
14   counsel?  I'm not asking for the subject of any
15   communications or the subject of any communications at
16   all.
17           MR. BOWMAN:  We're bordering on that.
18       That's --
19           THE WITNESS:  Several hours.  I'll repeat.
20       Several hours.
21   BY MR. RITTER:
22       Q.  Several hours?
23           Was anyone else present in those discussions
24   other than your counsel?
25       A.  No.

Page 15

1            DeSilva
2        Q.  Did you speak to any friends and family about
3    this deposition?
4        A.  Spoke to my family about it, yes.
5        Q.  And what did you tell your family about the
6    deposition?
7        A.  That I was being deposed by the attorneys for
8    British Petroleum company on the 19th of May.
9        Q.  Did you speak to anyone other than your
10   lawyers and your family about this deposition?
11       A.  I have a close friend that has followed this
12   all the way along and known him for 30 years.  I told
13   him about it but no details.
14       Q.  Who was the friend?
15       A.  His name is Steven Weintraub.
16       Q.  And you said you did not discuss any details
17   about the subject matter of this litigation with him?
18       A.  Not with him, no.
19       Q.  Did you review any documents in advance of
20   the deposition?
21       A.  Yes.
22       Q.  Which documents did you review?
23       A.  I reviewed documents relative to the variance
24   that was given to us in 2004; documents relative to the
25   affidavit, I guess you want to call it, that MacDonald

Page 16

1            DeSilva
2    had sent over; the purchase and selling agreement of
3    The Birds of Paradise, LLC; and the purchase and sale
4    agreement of the property itself, as I recall.
5        Q.  Did you bring any documents to the deposition
6    today?  Do you have any with you that you brought to
7    rely on or as part of your preparation?
8        A.  Yes.  I have the submission -- I have the
9    document from Steven MacDonald's attorney that states
10   the sales and purchase agreement of The Birds of
11   Paradise, LLC.
12       Q.  Are you referring to a declaration provided
13   by Mr. MacDonald?
14       A.  No.  This was given to my attorney, and then
15   I downloaded it.
16       Q.  Is this a document that has been provided to
17   BP?
18       A.  Yes.
19       Q.  Mr. DeSilva, I'd like to ask you some
20   questions about Mr. Steven MacDonald.  Do you know who
21   Steven MacDonald is?
22       A.  Yes.
23       Q.  Who is he?
24       A.  Steven MacDonald is the gentleman that bought
25   my property at 2707 Pass A Grille Way on June 16, 2017.

Page 17

1            DeSilva
2        Q.  Did you know Mr. MacDonald prior to 2017?
3        A.  No.
4        Q.  And when did you first meet or speak with
5    Mr. MacDonald?
6        A.  After the offer was made to buy the property
7    and a contract was drafted and some deposits were made
8    according to the standard of the industry, he wanted to
9    preview the property with his family.  And I met him --
10   it was decided by my real estate agent to show him the
11   property because it's extensive.  There was an awful
12   lot involved in the 21-year ownership that I had.  And
13   I was delegated to handle that walk-through.
14           And I met he and his wife and his son and his
15   real estate agent, who met me at the property.  And
16   also my real estate agent was there.  I showed him the
17   property for about an hour.  And then I left and
18   everybody else stayed.  That's the first time I met
19   him, and I never met him again after that until after
20   the close.
21       Q.  Had you communicated with him directly at any
22   point prior to that preview of the property?
23       A.  No.  I'd have to say no.
24       Q.  When was the last time you communicated with
25   Mr. MacDonald?

5 (Pages 14 to 17)

Page 18

DeSilva

1
2   A. I communicated to him the other day. And I
3   guess he was -- he had gotten a -- he'd sent me an
4   email that stated that he had had some relationship
5   with you, his attorney did. And then he called me and
6   told me -- he said he sent me an email, which is
7   whatever it is that you all put together. He sent me
8   an email stating that he didn't have to show up for the
9   deposition because you guys had made -- had gotten some
10  information that was satisfactory to you, I guess.
11      Q. Have you ever spoken to Mr. MacDonald about
12  this litigation prior to that communication?
13      A. Yes.
14      Q. In this year, 2021, what communications have
15  you had with Mr. MacDonald?
16      A. I called him and asked him -- when the order
17  came through for the judge to allow limited discovery,
18  and I guess it was decided that MacDonald and I were to
19  be deposed. So I went to him and asked him if he would
20  mind being deposed, you know, so he didn't have to be
21  subpoenaed.
22      And he said he didn't mind being deposed, and
23  that was it. I had no idea what exactly everything was
24  about, but apparently we were trying to get to a
25  resolution here. And the judge decided that our

Page 19

DeSilva

1
2   depositions would be helpful.
3       Q. Did you communicate with him by phone or by
4   email?
5       A. I met with him.
6       Q. Met with him in person?
7       A. Yes.
8       Q. And what did you tell him about the issues
9   that the Court had authorized for limited discovery?
10      A. I told him straight out that Kirkland & Ellis
11  felt that there was some shenanigans going on between
12  him and I, where he paid me more money than the actual
13  selling price of the property for The Birds of
14  Paradise, LLC, possibly under the table. I might have
15  that wrong.
16      But it was my understanding that there was
17  some trust issue relative to my relationship with him,
18  and that was your issue. And henceforth the judge went
19  ahead and decided to get to the bottom of it by
20  deposing the both of us.
21      Q. Did you tell him that there were allegations
22  from BP -- or Kirkland & Ellis that Mr. MacDonald had
23  done anything improper?
24      A. Say that again. I'm sorry.
25      Q. Did you convey to Mr. MacDonald that there

Page 20

DeSilva

1
2   were insinuations or allegations from BP or from
3   Kirkland & Ellis that Mr. MacDonald had done anything
4   that was improper?
5       A. Yes. I assumed that that's what you were
6   insinuating, that we both had done something improper.
7   That's my understanding of it. True or not, that's my
8   understanding of it.
9       Q. And did you convey to him that that is what
10  Judge Barbier had understood that BP or Kirkland were
11  alleging in this litigation, that Mr. MacDonald had
12  done something improper?
13      A. I didn't go so far as to include the judge in
14  that. I just simply said that the judge decided to get
15  to the bottom of whatever ambiguity there seemed to be
16  here at the behest of your pleadings and that the judge
17  decided to depose us to get to the bottom of it and
18  find out if there's any truth to it.
19      Q. Did you inform Mr. MacDonald that your
20  response brief to BP's motion to dismiss filed in March
21  had indicated that you had never sold The Birds of
22  Paradise, LLC?
23      A. I did. I did tell them I did not sell The
24  Birds of Paradise, LLC. I really believe I did not
25  sell The Birds of Paradise, LLC.

Page 21

DeSilva

1
2       Q. Did you inform Mr. MacDonald when you spoke
3   to him this year that your response brief had indicated
4   that he had filed an amended annual report for The
5   Birds of Paradise, LLC, that you had indicated was
6   filed without proper authorization?
7       A. Okay. Run that by me again.
8       Q. Your response brief in this case filed in
9   March of this year indicated that Mr. MacDonald had
10  filed an amended annual report for The Birds of
11  Paradise, LLC, with the State of Florida and that it
12  was filed without authorization; is that correct?
13      A. I didn't say that he filed anything without
14  authorization. I don't believe I said that.
15      Q. Okay.
16      A. I didn't own it in March of this year anyway.
17  So I didn't -- I mean, I wasn't a member at that point.
18  I didn't think I was.
19      Q. Were you a member of The Birds of Paradise,
20  LLC, in April of 2018?
21      A. You know, apparently I was. And I wasn't --
22  I wasn't aware of that until I found out that the
23  annual report was filed with my name on it for -- I
24  think it was February of 2018. And I was very confused
25  about that because I didn't file. And then I found out

Page 22

1                DeSilva

2  that my property manager -- every year I would get an

3  annual report in an email from sunbiz.org.

4        And I would pay it -- or I'd send it over to

5  Brandon Tecklenburg at Tech Travel, who managed the

6  property, and told him to pay it. So I paid it in

7  2017, when I did own it. And in 2018 I got it, and I

8  emailed it over to him and called him and said, "I'm no

9  longer a member of this thing. You need to go ahead

10  and give this to MacDonald so he can file his annual

11  report accordingly." And that's what happened.

12        But then Tecklenburg or one of his minions

13  there went ahead and paid it. Using his credit card

14  and his name, he paid it, and it looked like I had

15  actually filed it, but I was -- it was his credit card

16  that paid for it. I checked it out. I couldn't

17  believe that -- I knew I didn't do it. I didn't file

18  it.

19      Q. Mr. DeSilva, I'd like to talk to you about

20  the 2017 sale of the former Busch Estate. In 2017 you

21  sold a parcel of property at 2707 Pass A Grille Way to

22  Mr. Steven MacDonald; correct?

23      A. Correct.

24      Q. During the transaction, did you work with

25  Mr. MacDonald personally, or did you communicate

Page 23

1                DeSilva

2  through representatives?

3      A. We communicated through real estate people,

4  what little there was to communicate.

5      Q. I'm sending you, through the chat, a document

6  that is titled "As-Is Residential Contract for Sale and

7  Purchase."

8        Will the court reporter please mark this as

9  Exhibit 1.

10      (PLAINTIFFS' EXHIBIT 1 WAS MARKED FOR

11      IDENTIFICATION.)

12      THE WITNESS: Is this the sales contract?

13  BY MR. RITTER:

14      Q. It's the real estate sales contract.

15      A. I have it here.

16      Q. And do you recognize this document?

17      A. Yeah, I mean, I have it here. I tend to not

18  want to reduce you on the screen in case I lose you

19  here. So I do have that document here, if I might read

20  off of it based on your questions.

21      Q. Now, is this the real estate contract by

22  which you agreed to sell the Busch Estate to

23  Mr. MacDonald?

24      A. Hold on. Bear with me a minute. Let me get

25  to the...

Page 24

1                DeSilva

2      Okay. I have it here, Kris. Yes.

3      Q. I'll ask the question again.

4      Is this the real estate contract by which you

5  agreed to sell the former Busch Estate to

6  Mr. MacDonald?

7      A. Yes, it is.

8      Q. And on the final page, page 12 of the

9  contract, is that your signature there on the "Seller"

10  line?

11      A. Yes, it is.

12      Q. Please look at page 11 of the contract.

13  You'll see a section numbered Section 20.

14      A. I see it.

15      Q. And it's titled "Additional Terms."

16      A. I see it.

17      Q. And the second and third sentences of that

18  section read as follows:

19      "Seller to verify that 'The Birds of

20  Paradise' resort license described below is

21  active/valid and shall be transferred in its entirety

22  to buyer at closing. This resort license issued to

23  'The Birds of Paradise' by the State of Florida permits

24  this property, which is a residential zoned R-2

25  single-family dwelling, to operate as a private

Page 25

1                DeSilva

2  resort."

3      Did I read that correctly?

4      A. You did.

5      Q. Do you understand the reference here to The

6  Birds of Paradise to refer to The Bird of Paradise,

7  LLC?

8      A. Yes. It's a trade name.

9      Q. Did The Bird of Paradise, LLC, hold the

10  resort license on the Busch Estate at the time of this

11  contract?

12      A. Yes.

13      Q. Did Mr. MacDonald or his representative ask

14  for this term to be included in the real estate

15  contract?

16      A. I thought he did, yes.

17      Q. And you agreed to it?

18      A. Well, I agreed that everything relative to

19  this property would be available. I never denied that

20  I would -- you know, the license would go to him or

21  some arrangement would be made where I would vacate my

22  single membership in The Birds of Paradise, LLC, and

23  let him step into it. I had no problem with that.

24      Q. Do you know what person or entity currently

25  holds the resort license for the former Busch Estate?

7 (Pages 22 to 25)

Page 26

1              DeSilva
2     A. I believe it's the Barracuda Club.
3     Q. So what is the Barracuda Club?
4     A. I have no idea what it is. It's his. I
5 don't know anything about it other than --
6     Q. Are you referring to an entity named
7 Barracuda Club LLC?
8     A. Yes.
9     Q. And do you understand that that is a legal
10 entity that is controlled by Mr. Steven MacDonald?
11     A. I do know that much, yeah.
12     Q. And it's your understanding that Barracuda
13 Club LLC is the current holder of the resort license
14 for the former Busch Estate?
15     A. Yes.
16     Q. I'm sending you a document titled "Membership
17 Interest Purchase Agreement."
18     A. I have it here. Let me put this other thing
19 away for a moment if you don't mind.
20     MR. RITTER: Would the court reporter please
21 mark this document as Exhibit 2.
22     (PLAINTIFFS' EXHIBIT 2 WAS MARKED FOR
23     IDENTIFICATION.)
24     THE WITNESS: I have it here, Kris.
25 BY MR. RITTER:

Page 27

1              DeSilva
2     Q. Do you recognize this document?
3     A. I do now, yes.
4     Q. Can you tell me what this document is?
5     A. It's basically structures of sale of The
6 Birds of Paradise to Steven MacDonald.
7     Q. And what is the date of this document?
8     A. Hold on a second. It's on the signature
9 page.
10     Yeah, I don't have a date on this. I'm
11 sorry. It doesn't have a date.
12     Q. So, Mr. DeSilva --
13     A. I think it was June 16, 2017, wasn't it?
14     Q. If you look at the first paragraph of the
15 agreement on page 1, I think you will see that is dated
16 as of June 17, 2017.
17     Do you see that?
18     A. Yes, there it is. Okay. I see it.
19     Q. And if you look at that same paragraph, do
20 you see it identifies the Barracuda Club LLC as the
21 buyer under this agreement?
22     A. Yep, I see that.
23     Q. And it identifies John DeSilva in his
24 capacity as sole member of the company as seller?
25     A. I see that.

Page 28

1              DeSilva
2     Q. And you will see that it identifies The Bird
3 of Paradise, LLC, as the company?
4     A. That's what it says.
5     Q. If you turn to the final page of the
6 agreements. Is that your signature?
7     A. It is.
8     Q. On the line under "Seller"?
9     A. Yes.
10     Q. And then a little further down, under
11 "Company," it states, "The Bird of Paradise, LLC, a
12 Florida limited liability company."
13     Is that your signature --
14     A. It is.
15     Q. -- for The Bird of Paradise, LLC?
16     A. Yes.
17     Q. And did you sign this agreement?
18     A. I did.
19     Q. This is an agreement that conveys 100 percent
20 of the membership interests in The Bird of Paradise,
21 LLC, from you to Barracuda Club LLC; isn't that
22 correct?
23     A. That's what it says, yes.
24     Q. Have you familiarized yourself with this
25 agreement prior to this deposition?

Page 29

1              DeSilva
2     A. I have.
3     Q. Can you point to anything in this agreement,
4 in this purchase agreement, that provides that you
5 would retain any assets of The Bird of Paradise, LLC,
6 after your membership interests were transferred to
7 Barracuda Club LLC?
8     A. I don't.
9     Q. From this membership interest purchase
10 agreement, are there any references to The Bird of
11 Paradise, LLC's claim in litigation against any of the
12 BP defendants?
13     A. I didn't see that in there. It doesn't mean
14 it's not there. I didn't see it.
15     Q. Are you aware of any such provisions in this
16 agreement?
17     A. I'm not aware of any, no. Doesn't mean
18 they're not there; I'm just not aware of any.
19     Q. Who prepared this purchase agreement?
20     A. I really don't know who prepared it. I would
21 imagine MacDonald's attorney prepared it, but I
22 don't -- and I'm going to be very, very frank with you.
23 Until the day before yesterday, I never saw this
24 agreement. I signed the signature page. And if I
25 might have the floor for a minute, I can explain

8 (Pages 26 to 29)

Page 30

DeSilva

something here.  It's very important that I get this
straight.  And I'd appreciate not being interrupted for
a second.

For some 30 years I went into Heritage Title
for innumerable amounts of closings relative to
purchasing property, selling property, mortgages
against property, many closings regarding this
property.  And what would happen is that Peter Graham,
attorney of record for Heritage Title, and his wife,
Tammy Graham, would prepare documents and call me on
the phone and say come on in here.

And so unlike -- or not unlike every other
time I got a call for this and I came in and I signed
these documents, what she would do is pass them across
the table to me, the signature page, wherever there's a
yellow place at the bottom, and I would sign it, either
initialing or putting my signature there.

And she pushed this across to me, the
signature page.  And if you look, the signature page is
all there is is a signature page; there's nothing else
there.

I owe an apology to my attorneys.  I owe an
apology to the Court, Judge Barbier, and to you as
well.  I made a statement that I never sold The Birds

Page 31

DeSilva

of Paradise.  And I would have never made a statement
like that had I known that I actually did sell The
Birds of Paradise, which apparently I did here.  It was
my understanding that I was vacating my position as a
single sole member of The Birds of Paradise, LLC, that
he could step into that.

The Birds of Paradise has no value.  It has
no assets.  It doesn't conduct any business.  The idea
that there would be a sale of something like that was
beyond my comprehension.

So I signed this document, and I never
thought back -- never thought about it again after
that.  And I made the statement to my attorney, to
Ronnie Penton, who I deeply apologize to, that I saw
the letter that you wrote to him.  And it was my -- I'm
just not a liar.  I would never make a statement like
this that is so discoverable to the opposite if I
didn't in my heart think that I had sold The Birds of
Paradise.  I did not think I sold The Birds of
Paradise.

And that's what's happened here.  And I just
want to make that clear.  I didn't read the document.
I own that mistake.  I didn't read the document.
Doesn't alleviate the fact that my signature is on it.

Page 32

DeSilva

I understand that.  But I never read the document.
Q.  Mr. DeSilva, when is the first time that you
read this document, received and read this document?
A.  Day before yesterday, the 17th.
Q.  Do you agree that this membership interest
purchase agreement conveys the entirety of your
membership interests in The Birds of Paradise, LLC, to
Barracuda Club LLC as of June 2017?
A.  It does.
Q.  Did you conduct any business under the name
Bird of Paradise, LLC, after the date of this
agreement?
A.  No.  Not to my knowledge, no.  I walked away
on June 16, after 21 years, 2017, and I didn't look
back.  It was quite a sad day for us.  We had big plans
for this property.  And because of where I'm at with
you right now, they were not able to come to fruition.
The answer is no.
Q.  Having received and had an opportunity to
review this membership interest purchase agreement, are
you now seeking to pursue any claim on behalf of The
Birds of Paradise, LLC?
A.  No, because The Birds of Paradise, LLC, never
did anything.  This is about me litigating against your

Page 33

DeSilva

client for the damage that was done to me.  The Birds
of Paradise had -- it never conducted any business.  It
was a trade name.  And the answer is no, I'm not --
this is about John DeSilva against -- and Birds of
Paradise was the name of the company that -- the name
of the -- trade name of the resort, and I filed
everything with my own personal social security number.
Q.  Are you asserting any claims in this
litigation against BP or any other defendants in your
case other than in your individual capacity?
A.  Say that again so I get this straight.
Q.  Are you asserting any claims in this
litigation other than in your individual capacity as
John DeSilva?
A.  No.
Q.  Mr. DeSilva, I'm sending you a two-page
document that I believe was part of a filing your
counsel made in MDL 2179 in your case.
A.  Okay.  I've got -- I don't have this.
Q.  It should be coming through via the chat.
A.  Do I have to do anything to my screen in
order to get this?
Q.  Yes.  And I'm not an expert in the use of
Zoom, but I think I can walk you through this.

9  (Pages 30 to 33)

Page 34

DeSilva

So at the bottom of your screen you should be able to click on the chat function.

A.  I see it.  Do you want me to do that?

Q.  Yes.  And then I think that a little window should open up to the right of the Zoom screen.  And then you should see some documents there that I have shared via the chat.  The most recent of them should say "Opt Out Letter of The Bird of Paradise."

A.  I see that.  What do you want me to do?  Click on that?

Q.  Yes.  If you click on that, you should be able to open it up.

A.  It's got it where I can save it on my desktop, but I can't -- okay.  I am not Bill Gates over here with the computer.  I'm going to lose you if I start going -- chasing -- why don't you read it to me.  Just read it to me.

Q.  I won't have many more exhibits for you to look at.  So if you save that to your desktop and open it up --

A.  Let me do that.  Desktop.  Hit save.  Okay.  That's where it went.

Q.  And if you open it from your desktop, you can look at the document.

Page 35

DeSilva

A.  So I have to -- I'm going to try to reduce you.  Right?

Q.  That's okay.

A.  You're in the upper right-hand corner.

What was the name of that?  "Opt out"?  I have a lot of things on my desktop here.  Let me see if I can find this.

Q.  The file name should be "Opt Out Letter of The Bird of Paradise."  It's a PDF document.

MR. RITTER:  And while we're getting the document opened, could the court reporter please mark this document as Exhibit 3.

(PLAINTIFFS' EXHIBIT 3 WAS MARKED FOR IDENTIFICATION.)

THE WITNESS:  I know it's here somewhere, but I can't find it on here, though.

MR. BOWMAN:  Mr. Ritter, can I email it to him?

MR. RITTER:  Yes, you may email it to him.

MR. BOWMAN:  So can we go off the record for a second, please.

MR. RITTER:  Yes, we can go off the record.

(A DISCUSSION WAS HELD OFF THE RECORD.)

THE VIDEOGRAPHER:  The time is 10:08, and we

Page 36

DeSilva

are now off the record.

(A BRIEF RECESS WAS HELD.)

THE VIDEOGRAPHER:  The time is 10:10 a.m., and we're back on the record.

BY MR. RITTER:

Q.  So, Mr. DeSilva, I've sent you via the chat and then your counsel emailed to you a document that is marked as Exhibit 3.  It is a two-paged document that bears the federal court filing stamp at the top Document 27005/5.

A.  I'm waiting to get it from him.  I've got the email opened.

I'm refreshing this.  Bear with me a minute.

Okay.  I got it now.  Hold on.  I'm opening it.

Do you want me to click on BP3 opt out letter; right?

MR. BOWMAN:  Yes.

THE WITNESS:  Okay.  I'm here.

BY MR. RITTER:

Q.  Mr. DeSilva, do you recognize this document?

A.  I've seen it before I think, yeah.

Q.  What do you understand it to be?

A.  You know, I don't think I have seen this

Page 37

DeSilva

thing.  Let me read it a minute.

Apparently, it's the opting out of the settlement agreement into another form of pursuit.  Is that right?

Q.  There's a cover page, a cover letter on page one of the document, and page 2 is entitled "Opt Out Exclusion Election."

Do you see that?

A.  I do.

Q.  And do you understand this to be a request for exclusion from the economic and property damage settlement class?

A.  I do.

Q.  And do you see on page 2 where it says "Claimant Name"?

A.  I do.

Q.  Do you see in the line across from "Claimant Name," it states "The Bird of Paradise, LLC"?

A.  I do.

Q.  And beneath that, "By John DeSilva"?

A.  I do.

Q.  And is that your signature at the bottom of this page?

A.  It is.

Page 38

1          DeSilva
2      Q.  And beneath your signature it states, "The
3   Bird of Paradise, LLC, by John DeSilva."  Correct?
4      A.  Correct.
5      Q.  Is this the only opt-out form that you
6   submitted?
7      A.  I have no idea.  I really don't.
8      Q.  Do you have any recollection of submitting an
9   opt-out form that opted you out of the settlement class
10  in your individual capacity?
11     A.  I must tell you, I don't recall.  I don't
12  remember even doing this, but I know that I apparently
13  did.
14         MR. RITTER:  Mr. DeSilva, I don't believe I
15     have any further questions for you at this time.
16         I believe your counsel has some questions for
17     you.  So do we want to take a break?
18         MR. BOWMAN:  I'm ready to go.
19              EXAMINATION
20  BY MR. BOWMAN:
21     Q.  So let's leave this exhibit open,
22  Mr. DeSilva.  Please read what it says on the first
23  page of that document into the record after "Dear Sir."
24     A.  "Please find enclosed an original opt-out
25  exclusion election on behalf of our client John DeSilva

Page 39

1          DeSilva
2   and The Birds of Paradise, LLC, which is being sent
3   pursuant to page 16 of the economic and property damage
4   notice.  Should you have any questions, please
5   contact."
6      Q.  Okay.  And then the second page, counsel had
7   you just read the claimant name.
8          Let me ask you to focus on the federal tax ID
9   number.  Is that The Birds of Paradise federal tax ID
10  number?
11     A.  No.  That's my social security number.
12     Q.  That's your personal social security number?
13     A.  It is xxx-xx-8841.
14     Q.  Is there a federal employment identification
15  number anywhere on this form?
16     A.  No.
17     Q.  Okay.  Go down, please, right above your
18  signature, what does it say?
19     A.  "I wish to be excluded from the economic
20  property damage class."
21     Q.  Does it say The Bird of Paradise wishes to be
22  excluded from the economic and property damage class?
23     A.  No.  It says I, John DeSilva, meaning me.
24     Q.  So I've sent a bunch of exhibits to
25  everybody, and I'm going to walk through these

Page 40

1          DeSilva
2   exhibits, focusing as well on Judge Barbier's limited
3   discovery direction.
4          So, Mr. DeSilva, can you please pull up
5   Exhibit 2?
6      A.  Hold on.  Bear with me while I go through
7   this thing.  I've got this all figured out here.
8          MR. BOWMAN:  So just for the record, when I
9      refer to a deposition exhibit or an exhibit
10     number, Mr. Court Reporter, I'm going to make the
11     assumption that you've marked these all for the
12     record, okay, in the order I have them premarked?
13     Do we have that agreement?
14         THE REPORTER:  Yes, sir.  That's fine.  Thank
15     you.
16  BY MR. BOWMAN:
17     Q.  So do you have deposition Exhibit 2 opened,
18  Mr. DeSilva?
19     A.  I'm going to open it now.  Hold on a second.
20  Why is this doing this?  Just a second.  It's coming.
21         I do.  It's open.
22     Q.  Okay.  Have you seen Exhibit 2 before?
23     A.  Yes.
24     Q.  What is it?
25     A.  This is a filing of the litigation of suit

Page 41

1          DeSilva
2   against the City of St. Pete Beach on behalf of myself
3   and who at that time was a man-and-wife partner in the
4   property.
5      Q.  And what is your understanding that this
6   Exhibit 2 reflects?
7      A.  This is the settlement agreement whereby John
8   DeSilva was granted a variance to be able to rent this
9   property out by the week on the property known at that
10  point in time as the Busch Estate, but it was owned by
11  me.  This is a result -- this is the settlement
12  agreement for the litigation that was against the City
13  of St. Pete Beach.
14     Q.  Was The Bird of Paradise involved -- when I
15  say The Bird of Paradise, you understand me to mean The
16  Bird of Paradise, LLC?
17     A.  I do.
18     Q.  Was The Bird of Paradise involved in the
19  litigation with the City of St. Pete Beach?
20     A.  No.
21     Q.  Why not?
22     A.  First of all, The Bird of Paradise didn't
23  exist at that time.  I owned the property from the date
24  of purchase from '97 to 2004, and The Bird of Paradise
25  had not been formed yet.  This was a litigation by me

11 (Pages 38 to 41)

Page 42

1          DeSilva
2  personally and the settlement to me personally.
3      Q.  All right.  Let me ask you to pull up
4  Exhibit 3, please.
5      A.  Hold on.
6         I'm there.
7      Q.  What is Exhibit 3?
8      A.  It's the recorded covenant stating that -- to
9  me that, running with this land, would be the right to
10  lease out this property by the week with certain
11  stipulations, with no outside signage or other things
12  that were stated in here.  But this particular covenant
13  goes with this property for perpetuity.
14      Q.  Is The Bird of Paradise mentioned anywhere in
15  Exhibit 3?
16      A.  No.
17      Q.  Why not?
18      A.  Because The Bird of Paradise wasn't in an
19  existence at that time, nor would it have had any
20  ownership at all any time of this property.  It never
21  did.
22         (PLAINTIFFS' EXHIBIT 4 WAS MARKED FOR
23         IDENTIFICATION.)
24      Q.  Moving right along, can you open up
25  Exhibit 4, please.

Page 43

1          DeSilva
2      A.  I'm there.
3      Q.  What is Exhibit 4?
4      A.  Just a minute.  This is the purchase of the
5  25 percent interest that Sean Manning, LLC, had and --
6  for the property owned by John DeSilva.
7      Q.  Who was the purchaser?
8      A.  Sean Manning, LLC.
9      Q.  Can you blow the document up and please read
10  it?
11      A.  I think I've got it.  From the word "warranty
12  deed" down?
13      Q.  I'm talking about read it to yourself.  I'm
14  asking who the purchaser was in this warranty deed.
15         Do you know who the grantee is?
16      A.  Yeah.  It would be me in this case; correct?
17      Q.  I'm asking you the question.
18      A.  Yes.
19      Q.  Is there any mention of The Bird of Paradise
20  in this deed?
21      A.  Let me make sure.  No, there is not.
22      Q.  Do you recall what was the circumstance
23  behind this conveyance by Mr. Manning, Sean Manning,
24  LLC?
25      A.  Yeah, he and his wife bought into my

Page 44

1          DeSilva
2  property, were given an amount of money.  And in the
3  middle of that, they got a divorce.  And I took her out
4  of it, and then I had to take him out of it because our
5  goals were not synonymous at that point as to what I
6  wanted to do with the property.  So I bought them back
7  out.
8         (PLAINTIFFS' EXHIBIT 5 WAS MARKED FOR
9         IDENTIFICATION.)
10      Q.  Let me ask you to open Deposition Exhibit 5.
11      A.  I've got it, Jackson.
12      Q.  It shows this -- I'm pretty sure we have
13  another deed behind the one you're looking at, and we
14  have that labeled as Exhibit 10.  So we can skip that
15  for now.
16         But just the first page of this deposition
17  Exhibit 5.  Do you recognize that?
18      A.  I do.
19      Q.  What is this?
20      A.  This is when I bought Beth Manning herself
21  out of this, if I'm not mistaken.  This is very hard to
22  read here.  Let me blow this up a minute.  Hold on a
23  second.
24         Yes, that's what it is.  That's her
25  ex-husband to be.  That's his ex-wife to be, rather.

Page 45

1          DeSilva
2  I'm sorry.
3      Q.  Is The Bird of Paradise mentioned anywhere in
4  this conveyance to you?
5      A.  No.
6      Q.  Why not?
7      A.  Because The Birds of Paradise didn't own
8  anything and it wasn't part of the land.  It just --
9  everything is in my name in all of these circumstances
10  as it is here.  The Birds of Paradise had no ownership
11  in the property of any kind.
12         (PLAINTIFFS' EXHIBIT 6 WAS MARKED FOR
13         IDENTIFICATION.)
14      Q.  Let me pull up Exhibit 6, and this is -- just
15  acknowledge, if you can after you look at it, whether
16  this is the same exhibit as BP's Exhibit 1.
17      A.  Yes.
18      Q.  So I'm looking under parties, and it lists
19  yourself, John R. DeSilva, as the seller; right?
20      A.  Correct.
21      Q.  You've talked about, with Mr. Ritter, what
22  this contract did with regard to the conveyance of the
23  property from Mr. MacDonald.
24         Why isn't The Bird of Paradise mentioned as a
25  seller?

Page 46

DeSilva

A. Because The Bird of Paradise had no ownership of any kind in the property. It never conducted any business. It's just a trade name. It had no ownership of any kind in any of this property or any of the dealings in this property or any of the ongoing businesses of this property. It never was involved. I personally, for 21 years, conducted all and every bit of business that was done on this property.

Q. Let me ask you this since you brought it up. Did The Bird of Paradise have any bank accounts?

A. No, not to my -- no, they didn't do anything. I don't think we had any bank accounts, no.

Q. Did The Bird of Paradise ever file or compile a profit and loss statement?

A. Okay. You're breaking up on me now. Say again.

Q. Did The Bird of Paradise --

A. Great. What happened here?

Q. -- ever file or compile a profit and loss statement?

A. No.

Q. Did The Bird of Paradise ever file or compile a balance sheet?

A. No.

Page 47

DeSilva

Q. Did The Bird of Paradise ever complete a tax return?

A. Are you there?

Q. Can you -- did you hear me?

A. No, I didn't. Go ahead. Repeat it.

MR. RITTER: Mr. Bowman?

MR. BOWMAN: Yes.

MR. RITTER: I'm going to object to this line of questioning as outside of the scope of Judge Barbier's limited discovery that he has authorized the parties to pursue. I don't see that this goes to the question that he identified at the hearing or in his minute entry from April 21, which is -- the question is whether Mr. DeSilva sold or transferred the LLC when he sold the real estate.

These questions go beyond the scope of that and so I'm objecting to this line of questioning.

MR. BOWMAN: You can object. And I appreciate it. But I think it's important we get it in the record because there's more to the story than just the sale as you're characterizing it.

BY MR. BOWMAN:

Q. So, Mr. DeSilva, did The Bird of Paradise

Page 48

DeSilva

entity ever file a tax return?

A. No.

Q. Did it ever complete a tax return?

A. Never.

Q. So Mr. Ritter asked you to turn to page 11 of what we're referring to as Exhibit 6, BP's Exhibit 1, and there's a table -- not a table, I guess, a box -- of "20. Additional Terms."

A. Yes.

Q. Did you find that?

A. I do.

Q. And he had you read from that box on Number 20. And what I want to ask you is what was your intent with regard to what's conveyed in Number 20?

MR. RITTER: Objection to form.

THE WITNESS: Say again. I'm sorry? Somebody said something.

BY MR. BOWMAN:

Q. What was your intent with what is recited under Number 20 with regard to the provision that Mr. Ritter had you quote?

A. My intent was simply to allow the buyer to be able to have the resort license. And I was willing to step out of The Birds of Paradise as a sole member and

Page 49

DeSilva

allow him to simply pick it up and take it from there, either as an individual or as Barracuda Club LLC.

Matter of fact, no matter what he did, he never used The Birds of Paradise for anything. And that's all I thought I was doing. I was trying to make everything as easy for him as I possibly could and sell the property to him. That's it.

At no time did I ever think I was selling two entities in this deal. I must tell you that right now. It's very frustrating, but that's aggravating.

Q. Let me ask you this: What was paid by any entity associated with the buyer for the ability to have the license?

A. Zero. No money.

Q. Why not?

A. Because The Birds of Paradise -- I wasn't -- I wasn't selling The Birds of Paradise, to my knowledge. I know that sounds weak, but that's the truth. I never felt that I was selling The Birds of Paradise. There was nothing to sell. The thing is worthless, quite frankly. So I just wasn't selling The Birds of Paradise. I didn't realize that was on the table.

(PLAINTIFFS' EXHIBIT 12 WAS MARKED FOR

13 (Pages 46 to 49)

Page 50

DeSilva
1
2       IDENTIFICATION.)
3       Q. Let me -- if I can, let's jump to Exhibit 12,
4    which was BP's Exhibit 2.
5       MR. RITTER:  That's not what I have, Jackson.
6    Are you looking at Deposition Exhibit 12?
7       MR. BOWMAN:  No, no.  Our Exhibit 12; your
8    Exhibit 2, yeah.
9       THE WITNESS:  Do you want me to open up
10   Exhibit 12, Jackson?
11      MR. BOWMAN:  The declaration of Steven
12   MacDonald, our Exhibit 12, is the --
13      MR. RITTER:  Our Exhibit 2 is not the
14   declaration of Steven MacDonald; it was the
15   membership interest purchase agreement.
16      MR. BOWMAN:  Which was an excerpt from his
17   declaration.  So I got the whole thing here.
18   Okay?  I'm sorry.  Fair enough.  You're right.
19   BY MR. BOWMAN:
20      Q. But do you have that purchase and membership
21   agreement handy, Mr. DeSilva?
22      A. I do.
23      Q. So this is Exhibit 5 of the declaration --
24      A. I just opened up Exhibit 12.  Do you want me
25   to close out of that?

Page 51

DeSilva
1
2       Q. No, because I'm going to -- well, we're going
3    to refer to Exhibit 5 within Exhibit 12.  But you can
4    use what's in your hand because it will be faster.
5       A. Okay.  I've got the membership interest
6    purchase agreement in my hand and Number 12 on the
7    screen.  Go ahead.  What's your question?
8       Q. Okay.  Can you review BP's Exhibit 2 and
9    Exhibit 5, which is within our Exhibit 12, and tell me
10   if there's anything in that --
11      A. Where do you want me to go, Jackson?
12      Q. Does it reflect a purchase price anywhere in
13   the membership interest purchase agreement?
14      A. What am I looking at, please?  Forgive me.
15   But what am I looking at?
16      Q. The document that's hard-copied in your hand.
17      A. The membership interest purchase agreement?
18      Q. Right.
19      A. And you want me to find out if there's any
20   money transacted in here?
21      Q. Yes.
22      A. The agreement on Item Number 1, it says,
23   "shall deliver to seller purchase price of $10 (the
24   purchase price)."
25      Q. Did you receive the $10?

Page 52

DeSilva
1
2       A. No.
3       But what's disturbing to me, if I might, is
4    that it says -- in Item 1, Section (b), it says, "The
5    purchase price shall be paid by cashier's check, wire
6    transfer, or other means approved by the seller."
7       But, again, I had not seen this document.
8    But it seems awful fishy to me that the $10 would
9    require all of this wire transfer conversation, which
10   is five times the $10 amount.  It makes it look like
11   there was a big deal here.  And MacDonald is beyond
12   reproach in this thing and so am I.  Nobody did
13   anything wrong here.  I did by not reading the darned
14   thing.  But there was no shenanigans between that man
15   and myself.  It's not who we are.
16      I never received any money, $10 or otherwise.
17      (PLAINTIFFS' EXHIBIT 9 WAS MARKED FOR
18      IDENTIFICATION.)
19      Q. Can you open up Exhibit 9.
20      A. I can.  Hold on.
21      Bear with me, Jackson.  I'm sorry.
22      MR. BOWMAN:  Why don't we do this.  Can we
23   take a five-minute break so Mr. DeSilva can find
24   out where his exhibits are, and then we come back?
25      MR. RITTER:  Five minutes is fine.

Page 53

DeSilva
1
2       MR. BOWMAN:  Thank you.
3       THE VIDEOGRAPHER:  It's 10:39 a.m.  We're off
4    the record.
5       (A BRIEF RECESS WAS HELD.)
6       THE VIDEOGRAPHER:  The time is 10:45 a.m.,
7    and we are back on the record.
8    BY MR. BOWMAN:
9       Q. I asked you, Mr. DeSilva, to pull up
10   Exhibit 9.
11      A. I have it up.
12      Q. Can you tell me where on Exhibit 9 there's a
13   settlement charge for the transfer of The Bird of
14   Paradise license?
15      A. I'm looking at both pages; correct?
16      Q. You tell me.
17      A. No, I'm just saying there's two pages to
18   this, and so I'm just verifying that.
19      I see no -- nothing, nothing about that at
20   all.
21      Q. Can you find the line that relates to
22   personal property.  Let me help you out.  102.
23      A. Okay.  I got it.  102 and 402.
24      Q. Right.  How much is indicated as a
25   settlement charge under "Personal Property"?

14  (Pages 50 to 53)

Page 54

DeSilva

1
2    A.  There's no number.  Zero on both 102 and 402.
3    Q.  Okay.  I'm going to backtrack for a second,
4    if we can, and ask you to open Exhibit 1.
5    A.  I have it.
6    Q.  What is it?
7    A.  It's a letter from the City of St. Pete Beach
8    to me.
9    Q.  Please make sure you have Exhibit 1 open,
10   please.
11   A.  Sorry.  Is that Exhibit 1?  Hold on.
12       It's a letter from City of St. Pete Beach;
13   correct?  That's what I have for Exhibit 1.  No?
14   Q.  What's the title?
15   A.  "Board of Adjustment Development Order,
16   Case No. 20090022."
17   Q.  Is that a letter?
18   A.  It's really not a letter; it's an order
19   directed to me, a "Re Variance Application" directed to
20   me.
21   Q.  Who received the variance?
22   A.  John DeSilva, me.
23   Q.  Did The Bird of Paradise receive the
24   variance?
25   A.  No.

Page 55

DeSilva

1
2    Q.  What did the variance achieve?
3    A.  The variance -- this particular variance here
4    allowed us to build and obtain a permit to enlarge two
5    buildings and alter a third and bring this property to
6    the design fruition that we planned for so many years.
7    And we were finally able to acquire that from the City
8    of St. Pete Beach in June 2009.
9    Q.  What's the date on Exhibit 1?
10   A.  7/6/09.
11   Q.  Where in Exhibit 1 is The Bird of Paradise
12   mentioned?
13   A.  It's not mentioned.
14   Q.  I want to make sure I said Exhibit 1.  Did
15   you understand my question to relate to Exhibit 1?
16   A.  Yes.  You asked me about the Exhibit 1, is
17   there any mention of The Birds of Paradise anywhere; is
18   that correct?
19   Q.  That's correct.
20   A.  Okay.  There is not.
21       (PLAINTIFFS' EXHIBIT 7 WAS MARKED FOR
22       IDENTIFICATION.)
23   Q.  Let's open Exhibit 7.
24   A.  Hold on.
25       Okay.  I've got it.

Page 56

DeSilva

1
2    Q.  What is it?
3    A.  This is a letter from the City of St. Pete
4    Beach directed to me.
5    Q.  What significance did this letter have for
6    you?
7    A.  This was huge.  In fact, this was one of the
8    largest and most important events in the history of my
9    property there.  This ratified and gave us permission
10   to go forward and renovate from nine bedrooms and nine
11   baths to 14 bedrooms and 17 baths and be able to
12   implement the celebrity guest and charity venue, which
13   was pretty well established at that point.  This was a
14   big deal.  This was a big deal.
15   Q.  So you mentioned the expansion of the
16   bedrooms and bathrooms.  What is that based on?
17       MR. RITTER:  Objection to form.
18       And, Jackson, I'm objecting to this line of
19       questioning.  Same objection as before.  This is
20       outside of the scope of what Judge Barbier has
21       authorized for limited discovery on real party
22       interest and jurisdiction.
23       MR. BOWMAN:  Fair enough.
24   BY MR. BOWMAN:
25   Q.  Just to cut to the chase, Mr. DeSilva, on

Page 57

DeSilva

1
2    Deposition Exhibit 7, it's dated August 4, 2009; right?
3    A.  It is.
4    Q.  Does it have an expiration date on it?
5    A.  Yes, it does.  It says, "You must obtain a
6    building permit to implement the approved variance no
7    later than July 24th, 2010, or the variance is voided."
8    Q.  Are you seeing where The Bird of Paradise is
9    referenced?
10   A.  No.
11   Q.  Does the expiration date reflected in
12   Exhibit 7 have any significance to you?
13   A.  Yes.  Because of the Deepwater Horizon
14   disaster, we tried to file for a variance -- not a
15   variance but an extension to this because we -- so much
16   difficulty going on at that time.  We could not pull
17   the permit during that period of time.  This Deepwater
18   Horizon crippled this deal.
19       (PLAINTIFFS' EXHIBIT 8 WAS MARKED FOR
20       IDENTIFICATION.)
21   Q.  Let's go to Exhibit 8.
22   A.  I'm there.
23   Q.  What's Exhibit 8?
24   A.  It's a copy of the license from the Division
25   of Hotels and Restaurants, Department of Business and

15 (Pages 54 to 57)

Page 58

DeSilva

1
2   Professional Regulation.
3       Q.  When did you first get a license for this
4   property?
5       A.  I believe it was 2004, December of 2004.
6       Q.  Why did you get a license?
7       A.  Well, with the covenant running with the
8   land, we had the right to rent it out, but we wanted to
9   give a trade name to this property that had no
10  significance as far as conducting a business.  But we
11  wanted to give it a trade name.  And the license needed
12  to be in some type of a trade name.  So we went and got
13  a license.
14      Q.  So in looking at Deposition Exhibit 8, on the
15  lower portion of the exhibit I notice it says
16  "nontransferable."  Do you know what that references?
17      A.  Yes.  That means this license can't be moved
18  to another property.  And it may not allow it to be
19  moved to another person.  "Nontransferable" is pretty
20  clear.  You can't take this license and pick it up and
21  go six blocks down the road and do the same thing with
22  this thing here.
23      Q.  Let me ask you this:  What's the process for
24  getting a license such as Exhibit 8?
25      A.  Say it again, Jackson.  I'm sorry.

Page 59

DeSilva

1
2       Q.  What's the process --
3       A.  I take it -- it was really quite simple.  You
4   just simply applied for it.  And you pay a certain
5   amount of money, probably under $200, and you get your
6   license.
7           And if I might make a point, you know, it
8   says right here The Birds of Paradise, LLC, and the old
9   Anheuser Busch Estate.  Those are two very
10  synonymous -- one is a trade name, and the other is a
11  trade name.  People are still calling that, after 70
12  years, the Old Anheuser Busch Estate.  And a lot of
13  people, because I owned it for 21 years, call it The
14  Birds of Paradise.  But there's no substance to any of
15  those two items.  There isn't any substance to them.
16  John DeSilva is the owner of the property.
17          (PLAINTIFFS' EXHIBIT 10 WAS MARKED FOR
18          IDENTIFICATION.)
19      Q.  Okay.  Let me ask you to pull up Exhibit 10.
20      A.  I just did.  I got it.
21      Q.  What's Exhibit 10?
22      A.  It's a warranty deed.
23      Q.  From whom to whom?
24      A.  Let me read it.  It's from me to Joshua
25  Keleske, a trustee of the 2707 Pass A Grille Way land

Page 60

DeSilva

1
2   trust.
3       Q.  And what's the date on it?
4       A.  Hold on a second.  16th day of June 2017.
5       Q.  Is this the transaction for the property that
6   we've been referring to?
7       A.  Yes.  It looks like it is, yes.
8       Q.  Who's Joshua Keleske?
9       A.  He was an attorney for Steven MacDonald, as I
10  understand.
11      Q.  Is there any reference in Exhibit 10 to The
12  Bird of Paradise?
13      A.  I don't see any, no.
14          (PLAINTIFFS' EXHIBIT 11 WAS MARKED FOR
15          IDENTIFICATION.)
16      Q.  Let me ask you to pull up Exhibit 11.
17      A.  Okay.  I've had to go to another -- hold on a
18  second.
19          I'm there.
20      Q.  Have you seen Exhibit 11 before?
21      A.  Yes, I have.
22      Q.  Now, do you have an understanding of
23  Mr. MacDonald's intent with regard to signing this
24  affidavit?
25          MR. RITTER:  Objection to form.  Foundation.

Page 61

DeSilva

1
2           THE WITNESS:  You want me to answer your
3       question?
4   BY MR. BOWMAN:
5       Q.  Yeah, I think we'll rely on BP's foundation.
6   But go ahead.
7       A.  All right.  The intent is written here -- and
8   I think he -- he did not want -- did not acquire or did
9   not want any interest in the litigation that I had, do
10  still have, against British Petroleum company.  And I
11  think his intent was that he wanted me to go along and
12  do this and get himself out of the way so I could.
13      Q.  So I want to go back.  Do you have that --
14  you don't have the whole thing.  So you have to open up
15  Exhibit 12.  It's a big one.
16      A.  Wait a second here.  I had it a little while
17  ago, but it's not coming up.
18          Okay.  Here it is.  I have it now.  I have
19  it, Jackson.
20      Q.  So, you know, it is the same -- what I want
21  to ask you about is the same Exhibit 5 within this
22  Exhibit 12 that's entitled "Membership Interest
23  Purchase Agreement."
24          You have the hard copy of that, I believe?
25      A.  I do, right in front of me.

TSG Reporting - Worldwide     877-702-9580

Page 62

DeSilva

Q. Okay. Look at Number (D) on the first page.

A. Of 12?

Q. Letter D.

A. Okay. Letter D on the membership interest purchase agreement?

Q. Yes.

What's it say?

A. Okay. "The parties hereto desire that" --

Q. No, no.

A. Oh, D. Sorry.

"The company owns as its sole asset the license (as defined below)."

(PLAINTIFFS' EXHIBIT 13 WAS MARKED FOR IDENTIFICATION.)

Q. Let me ask you to open Exhibit 13. It's, I take it, a fairly large document. Have you found them?

A. Just a second here. I did. I have 13, 14, and 15 now. Do you want me to open up 13?

Q. Yes, sir.

A. Okay. I have it.

Q. What's Exhibit 13?

A. These are the plans that were drafted for the renovation of my property and that were approved by the City Of St. Pete Beach.

Page 63

DeSilva

Q. When you say "approved by the City of St. Pete Beach," was that part of that variance process you speak of?

A. Yes. That was the variance process, right. These were submitted for the review of the board of adjustment. And predicated upon that review, that's how we got this variance.

Q. Did The Bird of Paradise pay for these plans?

A. No.

Q. Who paid for the plans?

A. I did.

(PLAINTIFFS' EXHIBIT 14 WAS MARKED FOR IDENTIFICATION.)

Q. Let me ask you to open Exhibit 14.

A. I'm there.

Q. What's Exhibit 14?

A. Exhibit 14 is a letter to me from ACG Companies in Chicago making a commitment to fund the renovation and pay off the current lender that was on the property -- or for my property.

Q. Why does it say "in care of The Birds of Paradise"?

A. Because that was the trade name of the -- what the place was called. Didn't actually do any

Page 64

DeSilva

business, but that's what it was called.

Q. Did The Bird of Paradise submit any documentation to the ACG Companies?

A. No. I submitted things to them. They came and visited the property, but --

Q. What's the date of Exhibit 14?

A. February 15th, 2010.

(PLAINTIFFS' EXHIBIT 15 WAS MARKED FOR IDENTIFICATION.)

Q. Let me ask you to pull up Exhibit 15.

A. Okay. I have it.

Q. What's Exhibit 15?

A. It's from the same company. This is the letter of rescinding their loan commitment predicated upon the inability for the well to be -- the Deepwater Horizon well to be shut off in the Gulf of Mexico.

Q. What's the date of Exhibit 15?

A. June 15th, 2010.

Q. Let me ask you this: What impact on The Bird of Paradise did the cancellation of the commitment have?

And I'm not talking about you; I'm talking about The Bird of Paradise.

MR. RITTER: Same objection. This is outside

Page 65

DeSilva

of the scope of the discovery Judge Barbier has authorized.

THE WITNESS: The Birds of Paradise and the fact it didn't own anything -- it wasn't good for anybody, but it prohibited me at this point in time from moving forward with the construction and --

BY MR. BOWMAN:

Q. So what about my question?

A. The impact it had on The Bird of Paradise?

Q. Yep.

A. Well, it really didn't have any impact itself on The Bird of Paradise. The Bird of Paradise didn't own anything.

MR. BOWMAN: I don't have anything further.

MR. RITTER: Can we take five minutes?

MR. BOWMAN: Sure.

THE VIDEOGRAPHER: The time is 11:15 a.m., and we are now off the record.

(A BRIEF RECESS WAS HELD.)

THE VIDEOGRAPHER: The time is 11:18 a.m., and we are back on the record.

MR. RITTER: This is Kris Ritter for the BP defendants. Unless there are further questions

17 (Pages 62 to 65)

Page 66

DeSilva

1
2  from plaintiff's counsel, I have no further
3  questions and I think we can conclude the
4  deposition.
5      MR. BOWMAN:  The only thing I want to make
6  sure of, I know we've got a tight time frame here,
7  but I'd like to be able to get the witness to read
8  the deposition to make sure it's transcribed as --
9  with regard to the words he said.
10     MR. RITTER:  Understood.  And, hopefully, we
11 can request an expedited transcript to get that
12 done.
13     MR. BOWMAN:  Okay.  Thank you.
14     THE VIDEOGRAPHER:  Can I have all
15 participating state copy of the records on the
16 record, copies?
17     MR. BOWMAN:  The plaintiffs would like a
18 deposition, please.  I'm rarely in federal court;
19 so I should let Kris go first and I'll say "the
20 same."
21     Do you give me an ASCII version, four on a
22 page?  How does it work?
23     MR. RITTER:  We'd like it expedited.
24     MR. BOWMAN:  And we'll take a copy, and then
25 we -- I'd like four on a page as well as just a

Page 67

DeSilva

1
2  normal PDF.
3      MR. PENTON:  This is Ronnie Penton.  Can you
4  hear me?
5      THE REPORTER:  Yes, sir, I can.
6      MR. PENTON:  Dianne Schilling with my office
7  will get with you right after this deposition and
8  make all the appropriate orders and formats.
9      MR. BOWMAN:  Thank you, Ronnie.
10     THE VIDEOGRAPHER:  This concludes today's
11 deposition given by John DeSilva.  We are now off
12 the record.  Time is 11:20 a.m.
13     (THE DEPOSITION OF JOHN DESILVA WAS CONCLUDED
14     AT 11:20 a.m.)

Page 68

DeSilva

1
2  REPORTER'S CERTIFICATE
3  BY THE VIDEOGRAPHER:
4      I, L. Alan Peacock, Certified Court Reporter
5  (Certificate #2015013) in and for the State of
6  Louisiana, as the officer before whom this testimony
7  was taken, do hereby certify that on Wednesday, May 19,
8  2021, in the above-entitled and numbered cause, the
9  VIDEOTAPED DEPOSITION of JOHN DeSILVA, after having
10 been duly sworn by me upon authority of R.S. 37:2554,
11 did testify as hereinbefore set forth in the foregoing
12 67 pages;
13
14     That this testimony was reported by me in
15 stenographic shorthand, was prepared and transcribed by
16 me or under my personal direction and supervision, and
17 is a true and correct transcript to the best of my
18 ability and understanding;
19
20     That the transcript has been prepared in
21 compliance with transcript format guidelines required
22 by statue or by rules of the board;
23
24     That I have acted in compliance with the
25 prohibition on contractual relationships, as defined by

Page 69

DeSilva

1
2  Louisiana Code of Civil Procedure Article 1434 and in
3  rules and advisory opinions of the board;
4
5      That I am not of Counsel, nor related to any
6  person participating in this cause, and am in no way
7  interested in the outcome of this event.
8
9      SIGNED THIS 19TH DAY OF May, 2021
10
11
12
13  _____
    L. ALAN PEACOCK, CCR, RDR, CRC
    NCRA Realtime Systems Administrator
    Certified Court Reporter (LA)
    CCR #2015013
14
15
16
17
18
19
20
21
22
23
24
25

18  (Pages 66 to 69)