**Brief Exhibit T**

# Brief Exhibit T

## DeSilva Deposition
## Defendant Exhibit 1

docusep signature verification: ...



## "AS IS" Residential Contract For Sale And Purchase
**THIS FORM HAS BEEN APPROVED BY THE FLORIDA REALTORS AND THE FLORIDA BAR**

RESIDENTIAL REAL ESTATE

1* PARTIES: John R. De Silva _____

2* and Steven A. Macdonald _____ ("Seller"),
3 agree that Seller shall sell and Buyer shall buy the following described Real Property and Personal Property ("Buyer"),
4 (collectively "Property") pursuant to the terms and conditions of this AS IS Residential Contract For Sale And Purchase
5 and any riders and addenda ("Contract"):

6  1. **PROPERTY DESCRIPTION:**
7*    (a) Street address, city, zip: 2707 Pass A Grille Way, St Pete Beach, FL 33706 _____
8*    (b) Located in: Pinellas _____ County, Florida. Property Tax ID #: 18-32-16-61002-004-0130 ____
9*    (c) Real Property: The legal description is _____
10     North Pass-A-Grille Sec A BLK D, Lots 13, 14, 15 & 16 _____
11     _____
12     together with all existing improvements and fixtures, including built-in appliances, built-in furnishings and
13     attached wall-to-wall carpeting and flooring ("Real Property") unless specifically excluded in Paragraph 1(e) or
14     by other terms of this Contract.
15     (d) Personal Property: Unless excluded in Paragraph 1(e) or by other terms of this Contract, the following items
16     which are owned by Seller and existing on the Property as of the date of the initial offer are included in the
17     purchase: range(s)/oven(s), refrigerator(s), dishwasher(s), disposal, ceiling fan(s), intercom, light fixture(s),
18     drapery rods and draperies, blinds, window treatments, smoke detector(s), garage door opener(s), security gate
19     and other access devices, and storm shutters/panels ("Personal Property").
20*    Other Personal Property items included in this purchase are: All Refrigerator(S), Microwave(s), Dishwasher(s), Range(s),
21     Oven(s), Washer(s), Dryer(s), All household furniture, Artwork, furnishing, TVs, Security Systems, Audio/Video Equipment, Pool Equipment, Dock/Lifts.
22     Personal Property is included in the Purchase Price, has no contributory value, and shall be left for the Buyer.
23*    (e) The following items are excluded from the purchase: _____
24     _____

25                                   PURCHASE PRICE AND CLOSING

26* 2. **PURCHASE PRICE** (U.S. currency): ................................................................$5,395,000.00
27*    (a) Initial deposit to be held in escrow in the amount of (checks subject to COLLECTION) .......$50,000.00
28     The initial deposit made payable and delivered to "Escrow Agent" named below
29*    (CHECK ONE): (i) ☐ accompanies offer or (ii) ☒ is to be made within 3 ____ (if left
30     blank, then 3) days after Effective Date. IF NEITHER BOX IS CHECKED, THEN
31     OPTION (ii) SHALL BE DEEMED SELECTED.
32*    Escrow Agent Information: Name: Coldwell Banker - Ashley Eddings _____
33*    Address: 500 N. Westshore Blvd., Suite #850, Tampa, FL 33609 _____
34*    Phone: 813-286-6563 ____ E-mail: Ashley.eddings@Floridamoves.com Fax: 813-289-4668 _____
35*    (b) Additional deposit to be delivered to Escrow Agent within 16 _____ (if left blank, then 10)
36*    days after Effective Date ............................................................$50,000.00
37     (All deposits paid or agreed to be paid, are collectively referred to as the "Deposit")
38*    (c) Financing: Express as a dollar amount or percentage ("Loan Amount") see Paragraph 8.........
39*    (d) Other: _____ $ _____
40     (e) Balance to close (not including Buyer's closing costs, prepaids and prorations) by wire
41*    transfer or other COLLECTED funds ...................................................$5,295,000.00
42     NOTE: For the definition of "COLLECTION" or "COLLECTED" see STANDARD S.
43  3. **TIME FOR ACCEPTANCE OF OFFER AND COUNTER-OFFERS; EFFECTIVE DATE:**
44     (a) If not signed by Buyer and Seller, and an executed copy delivered to all parties on or before
45*    05/16/2017 at 6:00 p.m. ____ , this offer shall be deemed withdrawn and the Deposit, if any, shall be returned to
46     Buyer. Unless otherwise stated, time for acceptance of any counter-offers shall be within 2 days after the day
47     the counter-offer is delivered.
48     (b) The effective date of this Contract shall be the date when the last one of the Buyer and Seller has signed or
49     initialed and delivered this offer or final counter-offer ("Effective Date").
50  4. **CLOSING DATE:** Unless modified by other provisions of this Contract, the closing of this transaction shall occur
51     and the closing documents required to be furnished by each party pursuant to this Contract shall be delivered
52*    ("Closing") on 06/16/2017 _____ ("Closing Date"), at the time established by the Closing Agent.

Buyer's Initials _____ / _____    Page 1 of 12    Seller's Initials _____ / _____
FloridaRealtors/FloridaBar-ASIS-5    Rev.4/17 © 2017 Florida Realtors® and The Florida Bar. All rights reserved.

**Exhibit 1**

dotloop signature verification

5. **EXTENSION OF CLOSING DATE:**
   (a) If Paragraph 8(b) is checked and Closing funds from Buyer's lender(s) are not available on Closing Date due to Consumer Financial Protection Bureau Closing Disclosure delivery requirements ("CFPB Requirements"), then Closing Date shall be extended for such period necessary to satisfy CFPB Requirements, provided such period shall not exceed 10 days.
   (b) If an event constituting "Force Majeure" causes services essential for Closing to be unavailable, including the unavailability of utilities or issuance of hazard, wind, flood or homeowners' insurance, Closing Date shall be extended as provided in STANDARD G.

6. **OCCUPANCY AND POSSESSION:**
   (a) Unless the box in Paragraph 6(b) is checked, Seller shall, at Closing, deliver occupancy and possession of the Property to Buyer free of tenants, occupants and future tenancies. Also, at Closing, Seller shall have removed all personal items and trash from the Property and shall deliver all keys, garage door openers, access devices and codes, as applicable, to Buyer. If occupancy is to be delivered before Closing, Buyer assumes all risks of loss to the Property from date of occupancy, shall be responsible and liable for maintenance from that date, and shall be deemed to have accepted the Property in its existing condition as of time of taking occupancy.
   (b) ☐ CHECK IF PROPERTY IS SUBJECT TO LEASE(S) OR OCCUPANCY AFTER CLOSING. If Property is subject to a lease(s) after Closing or is intended to be rented or occupied by third parties beyond Closing, the facts and terms thereof shall be disclosed in writing by Seller to Buyer and copies of the written lease(s) shall be delivered to Buyer, all within 5 days after Effective Date. If Buyer determines, in Buyer's sole discretion, that the lease(s) or terms of occupancy are not acceptable to Buyer, Buyer may terminate this Contract by delivery of written notice of such election to Seller within 5 days after receipt of the above items from Seller, and Buyer shall be refunded the Deposit thereby releasing Buyer and Seller from all further obligations under this Contract. Estoppel Letter(s) and Seller's affidavit shall be provided pursuant to STANDARD D. If Property is intended to be occupied by Seller after Closing, see Rider U. POST-CLOSING OCCUPANCY BY SELLER.

7. **ASSIGNABILITY: (CHECK ONE):** Buyer ☐ may assign and thereby be released from any further liability under this Contract; ☑ may assign but not be released from liability under this Contract; or ☐ may not assign this Contract.

## FINANCING

8. **FINANCING:**
   ☑ (a) Buyer will pay cash for the purchase of the Property at Closing. There is no financing contingency to Buyer's obligation to close. If Buyer obtains a loan for any part of the Purchase Price of the Property, Buyer acknowledges that any terms and conditions imposed by Buyer's lender(s) or by CFPB Requirements shall not affect or extend the Buyer's obligation to close or otherwise affect any terms or conditions of this Contract.
   ☐ (b) This Contract is contingent upon Buyer obtaining approval of a ☐ conventional ☐ FHA ☐ VA or ☐ other _____ (describe) loan within _____ (if left blank, then 30) days after Effective Date ("Loan Approval Period") for (CHECK ONE): ☐ fixed, ☐ adjustable, ☐ fixed or adjustable rate in the Loan Amount (See Paragraph 2(c)), at an initial interest rate not to exceed _____ % (if left blank, then prevailing rate based upon Buyer's creditworthiness), and for a term of _____ (if left blank, then 30) years ("Financing").
      (i) Buyer shall make mortgage loan application for the Financing within _____ (if left blank, then 5) days after Effective Date and use good faith and diligent effort to obtain approval of a loan meeting the Financing terms ("Loan Approval") and thereafter to close this Contract. Loan Approval which requires a condition related to the sale by Buyer of other property shall not be deemed Loan Approval for purposes of this subparagraph.

Buyer's failure to use diligent effort to obtain Loan Approval during the Loan Approval Period shall be considered a default under the terms of this Contract. For purposes of this provision, "diligent effort" includes, but is not limited to, timely furnishing all documents and information and paying of all fees and charges requested by Buyer's mortgage broker and lender in connection with Buyer's mortgage loan application.

      (ii) Buyer shall keep Seller and Broker fully informed about the status of Buyer's mortgage loan application, Loan Approval, and loan processing and authorizes Buyer's mortgage broker, lender, and Closing Agent to disclose such status and progress, and release preliminary and finally executed closing disclosures and settlement statements, to Seller and Broker.
      (iii) Upon Buyer obtaining Loan Approval, Buyer shall promptly deliver written notice of such approval to Seller.
      (iv) If Buyer is unable to obtain Loan Approval after the exercise of diligent effort, then at any time prior to expiration of the Loan Approval Period, Buyer may provide written notice to Seller stating that Buyer has been unable to obtain Loan Approval and has elected to either:
      (1) waive Loan Approval, in which event this Contract will continue as if Loan Approval had been obtained; or
      (2) terminate this Contract.

Buyer's Initials ____ ____      Page 2 of 12      Seller's Initials ____ ____
FloridaRealtors/FloridaBar-ASIS-5   Rev.4/17 © 2017 Florida Realtors® and The Florida Bar.  All rights reserved.

β Signature verification: [illegible]

109  (v) If Buyer fails to timely deliver either notice provided in Paragraph 8(b)(iii) or (iv), above, to Seller prior to
110  expiration of the Loan Approval Period, then Loan Approval shall be deemed waived, in which event this Contract
111  will continue as if Loan Approval had been obtained, provided however, Seller may elect to terminate this Contract
112  by delivering written notice to Buyer within 3 days after expiration of the Loan Approval Period.
113  (vi) If this Contract is timely terminated as provided by Paragraph 8(b)(iv)(2) or (v), above, and Buyer is not in
114  default under the terms of this Contract, Buyer shall be refunded the Deposit thereby releasing Buyer and Seller
115  from all further obligations under this Contract.
116  (vii) If Loan Approval has been obtained, or deemed to have been obtained, as provided above, and Buyer
117  fails to close this Contract, then the Deposit shall be paid to Seller unless failure to close is due to: (1) Seller's
118  default or inability to satisfy other contingencies of this Contract; (2) Property related conditions of the Loan Approval
119  have not been met (except when such conditions are waived by other provisions of this Contract); or (3) appraisal
120  of the Property obtained by Buyer's lender is insufficient to meet terms of the Loan Approval, in which event(s) the
121  Buyer shall be refunded the Deposit, thereby releasing Buyer and Seller from all further obligations under this
122  Contract.
123*  ☐ (c) Assumption of existing mortgage (see rider for terms).
124*  ☐ (d) Purchase money note and mortgage to Seller (see riders; addenda; or special clauses for terms).

125

### CLOSING COSTS, FEES AND CHARGES

126  9.  **CLOSING COSTS; TITLE INSURANCE; SURVEY; HOME WARRANTY; SPECIAL ASSESSMENTS:**
127  (a) **COSTS TO BE PAID BY SELLER:**
128  • Documentary stamp taxes and surtax on deed, if any
129  • Owner's Policy and Charges (if Paragraph 9(c)(i) is checked)
130  • Title search charges (if Paragraph 9(c)(iii) is checked)          • HOA/Condominium Association estoppel fees
131*  • Municipal lien search (if Paragraph 9(c)(i) is checked)          • Recording and other fees needed to cure title
132  If, prior to Closing, Seller is unable to meet the AS IS Maintenance Requirement as required by Paragraph 11   • Seller's attorneys' fees
133  a sum equal to 125% of estimated costs to meet the AS IS Maintenance Requirement shall be escrowed at   • Other:
134  Closing. If actual costs to meet the AS IS Maintenance Requirement exceed escrowed amount, Seller shall pay
135  such actual costs. Any unused portion of escrowed amount(s) shall be returned to Seller.
136  (b) **COSTS TO BE PAID BY BUYER:**
137  • Taxes and recording fees on notes and mortgages
138  • Recording fees for deed and financing statements
139  • Owner's Policy and Charges (if Paragraph 9(c)(ii) is checked)          • Loan expenses
140  • Survey (and elevation certification, if required)          • Appraisal fees
141  • Lender's title policy and endorsements          • Buyer's Inspections
142  • HOA/Condominium Association application/transfer fees          • Buyer's attorneys' fees
143  • Municipal lien search (if Paragraph 9(c)(ii) is checked)          • All property related insurance
144*  • Other:          • Owner's Policy Premium (if Paragraph
145*                 9 (c)(ii) is checked.)
146  (c) **TITLE EVIDENCE AND INSURANCE:** At least __15__ (if left blank, then 15, or if Paragraph 8(a) is checked,
147  then 5) days prior to Closing Date ("Title Evidence Deadline"), a title insurance commitment issued by a Florida
148  licensed title insurer, with legible copies of instruments listed as exceptions attached thereto ("Title
149  Commitment") and, after Closing, an owner's policy of title insurance (see STANDARD A for terms) shall be
150  obtained and delivered to Buyer. If Seller has an owner's policy of title insurance covering the Real Property, a
151  copy shall be furnished to Buyer and Closing Agent within 5 days after Effective Date. The owner's title policy
152  premium, title search and closing services (collectively, "Owner's Policy and Charges") shall be paid, as set
153  forth below. The title insurance premium charges for the owner's policy and any lender's policy will be calculated
154  and allocated in accordance with Florida law, but may be reported differently on certain federally mandated
155  closing disclosures and other closing documents. For purposes of this Contract "municipal lien search" means a
156  search of records necessary for the owner's policy of title insurance to be issued without exception for unrecorded
157  liens imposed pursuant to Chapters 159 or 170, F.S., in favor of any governmental body, authority or agency.
158*  (CHECK ONE):
159  ☑ (i) Seller shall designate Closing Agent and pay for Owner's Policy and Charges, and Buyer shall pay the
160  premium for Buyer's lender's policy and charges for closing services related to the lender's policy,
161  endorsements and loan closing, which amounts shall be paid by Buyer to Closing Agent or such other
162*  provider(s) as Buyer may select; or
163  ☐ (ii) Buyer shall designate Closing Agent and pay for Owner's Policy and Charges and charges for closing
       services related to Buyer's lender's policy, endorsements and loan closing; or

Buyer's Initials _SRM_ [initials]

dotloop signature verification: [illegible]

164* ☐ (iii) [MIAMI-DADE/BROWARD REGIONAL PROVISION]: Seller shall furnish a copy of a prior owner's policy
165 of title insurance or other evidence of title and pay fees for: (A) a continuation or update of such title evidence,
166 which is acceptable to Buyer's title insurance underwriter for reissue of coverage; (B) tax search; and (C)
167 municipal lien search. Buyer shall obtain and pay for post-Closing continuation and premium for Buyer's owner's
168* policy, and if applicable, Buyer's lender's policy. Seller shall not be obligated to pay more than $_____
169 (if left blank, then $200.00) for abstract continuation or title search ordered or performed by Closing Agent.
170 (d) SURVEY: On or before Title Evidence Deadline, Buyer may, at Buyer's expense, have the Real Property
171 surveyed and certified by a registered Florida surveyor ("Survey"). If Seller has a survey covering the Real
172 Property, a copy shall be furnished to Buyer and Closing Agent within 5 days after Effective Date.
173* (e) HOME WARRANTY: At Closing, ☐ Buyer ☐ Seller ☑ N/A shall pay for a home warranty plan issued by
174* _____ at a cost not to exceed $_____. A home
175 warranty plan provides for repair or replacement of many of a home's mechanical systems and major built-in
176 appliances in the event of breakdown due to normal wear and tear during the agreement's warranty period.
177 (f) SPECIAL ASSESSMENTS: At Closing, Seller shall pay: (i) the full amount of liens imposed by a public body
178 ("public body" does not include a Condominium or Homeowner's Association) that are certified, confirmed and
179 ratified before Closing; and (ii) the amount of the public body's most recent estimate or assessment for an
180 improvement which is substantially complete as of Effective Date, but that has not resulted in a lien being
181 imposed on the Property before Closing. Buyer shall pay all other assessments. If special assessments may
182 be paid in installments (CHECK ONE):
183* ☑ (a) Seller shall pay installments due prior to Closing and Buyer shall pay installments due after Closing.
184 Installments prepaid or due for the year of Closing shall be prorated.
185* ☐ (b) Seller shall pay the assessment(s) in full prior to or at the time of Closing.
186 IF NEITHER BOX IS CHECKED, THEN OPTION (a) SHALL BE DEEMED SELECTED.
187 This Paragraph 9(f) shall not apply to a special benefit tax lien imposed by a community development district
188 (CDD) pursuant to Chapter 190, F.S., which lien shall be prorated pursuant to STANDARD K.

189                                           DISCLOSURES

190 **10. DISCLOSURES:**
191 (a) RADON GAS: Radon is a naturally occurring radioactive gas that, when it is accumulated in a building in
192 sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that
193 exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding
194 radon and radon testing may be obtained from your county health department.
195 (b) PERMITS DISCLOSURE: Except as may have been disclosed by Seller to Buyer in a written disclosure, Seller
196 does not know of any improvements made to the Property which were made without required permits or made
197 pursuant to permits which have not been properly closed. If Seller identifies permits which have not been
198 properly closed or improvements which were not permitted, then Seller shall promptly deliver to Buyer all plans,
199 written documentation or other information in Seller's possession, knowledge, or control relating to
200 improvements to the Property which are the subject of such open permits or unpermitted improvements.
201 (c) MOLD: Mold is naturally occurring and may cause health risks or damage to property. If Buyer is concerned or
202 desires additional information regarding mold, Buyer should contact an appropriate professional.
203 (d) FLOOD ZONE; ELEVATION CERTIFICATION: Buyer is advised to verify by elevation certificate which flood
204 zone the Property is in, whether flood insurance is required by Buyer's lender, and what restrictions apply to
205 improving the Property and rebuilding in the event of casualty. If Property is in a "Special Flood Hazard Area"
206 or "Coastal Barrier Resources Act" designated area or otherwise protected area identified by the U.S. Fish and
207 Wildlife Service under the Coastal Barrier Resources Act and the lowest floor elevation for the building(s) and/or
208 flood insurance rating purposes is below minimum flood elevation or is ineligible for flood insurance coverage
209 through the National Flood Insurance Program or private flood insurance as defined in 42 U.S.C. §4012a, Buyer
210* may terminate this Contract by delivering written notice to Seller within _____ (if left blank, then 20) days after
211 Effective Date, and Buyer shall be refunded the Deposit thereby releasing Buyer and Seller from all further
212 obligations under this Contract, failing which Buyer accepts existing elevation of buildings and flood zone
213 designation of Property. The National Flood Insurance Program may assess additional fees or adjust premiums
214 for pre-Flood Insurance Rate Map (pre-FIRM) non-primary structures (residential structures in which the insured
215 or spouse does not reside for at least 50% of the year) and an elevation certificate may be required for actuarial
216 rating.
217 (e) ENERGY BROCHURE: Buyer acknowledges receipt of Florida Energy-Efficiency Rating Information Brochure
218 required by Section 553.996, F.S.

Buyer's Initials [handwritten: SRM] [_____]                    Page 4 of 12                    Seller's Initials [handwritten: OH] [_____]

dotloop signature verification: [illegible]

(f) LEAD-BASED PAINT: If Property Includes pre-1978 residential housing, a lead-based paint disclosure is mandatory.

(g) HOMEOWNERS' ASSOCIATION/COMMUNITY DISCLOSURE: BUYER SHOULD NOT EXECUTE THIS CONTRACT UNTIL BUYER HAS RECEIVED AND READ THE HOMEOWNERS' ASSOCIATION/COMMUNITY DISCLOSURE, IF APPLICABLE.

(h) PROPERTY TAX DISCLOSURE SUMMARY: BUYER SHOULD NOT RELY ON THE SELLER'S CURRENT PROPERTY TAXES AS THE AMOUNT OF PROPERTY TAXES THAT THE BUYER MAY BE OBLIGATED TO PAY IN THE YEAR SUBSEQUENT TO PURCHASE. A CHANGE OF OWNERSHIP OR PROPERTY IMPROVEMENTS TRIGGERS REASSESSMENTS OF THE PROPERTY THAT COULD RESULT IN HIGHER PROPERTY TAXES. IF YOU HAVE ANY QUESTIONS CONCERNING VALUATION, CONTACT THE COUNTY PROPERTY APPRAISER'S OFFICE FOR INFORMATION.

(i) FOREIGN INVESTMENT IN REAL PROPERTY TAX ACT ("FIRPTA"): Seller shall inform Buyer in writing if Seller is a "foreign person" as defined by the Foreign Investment in Real Property Tax Act ("FIRPTA"). Buyer and Seller shall comply with FIRPTA, which may require Seller to provide additional cash at Closing. If Seller is not a "foreign person", Seller can provide Buyer, at or prior to Closing, a certification of non-foreign status, under penalties of perjury, to inform Buyer and Closing Agent that no withholding is required. See STANDARD V for further information pertaining to FIRPTA. Buyer and Seller are advised to seek legal counsel and tax advice regarding their respective rights, obligations, reporting and withholding requirements pursuant to FIRPTA.

(j) SELLER DISCLOSURE: Seller knows of no facts materially affecting the value of the Real Property which are not readily observable and which have not been disclosed to Buyer. Except as provided for in the preceding sentence, Seller extends and intends no warranty and makes no representation of any type, either express or implied, as to the physical condition or history of the Property. Except as otherwise disclosed in writing Seller has received no written or verbal notice from any governmental entity or agency as to a currently uncorrected building, environmental or safety code violation.

### PROPERTY MAINTENANCE, CONDITION, INSPECTIONS AND EXAMINATIONS

11. PROPERTY MAINTENANCE: Except for ordinary wear and tear and Casualty Loss, Seller shall maintain the Property, including, but not limited to, lawn, shrubbery, and pool, in the condition existing as of Effective Date ("AS IS Maintenance Requirement").

12. PROPERTY INSPECTION; RIGHT TO CANCEL:

(a) *PROPERTY INSPECTIONS AND RIGHT TO CANCEL: Buyer shall have* 15_____ *(if left blank, then 15) days after Effective Date ("Inspection Period") within which to have such inspections of the Property performed as Buyer shall desire during the Inspection Period. If Buyer determines, in Buyer's sole discretion, that the Property is not acceptable to Buyer, Buyer may terminate this Contract by delivering written notice of such election to Seller prior to expiration of Inspection Period. If Buyer timely terminates this Contract, the Deposit paid shall be returned to Buyer, thereupon, Buyer and Seller shall be released of all further obligations under this Contract; however, Buyer shall be responsible for prompt payment for such inspections, for repair of damage to, and restoration of, the Property resulting from such inspections, and shall provide Seller with paid receipts for all work done on the Property (the preceding provision shall survive termination of this Contract). Unless Buyer exercises the right to terminate granted herein, Buyer accepts the physical condition of the Property and any violation of governmental, building, environmental, and safety codes, restrictions, or requirements, but subject to Seller's continuing AS IS Maintenance Requirement, and Buyer shall be responsible for any and all repairs and improvements required by Buyer's lender.*

(b) WALK-THROUGH INSPECTION/RE-INSPECTION: On the day prior to Closing Date, or on Closing Date prior to time of Closing, as specified by Buyer, Buyer or Buyer's representative may perform a walk-through (and follow-up walk-through, if necessary) inspection of the Property solely to confirm that all items of Personal Property are on the Property and to verify that Seller has maintained the Property as required by the AS IS Maintenance Requirement and has met all other contractual obligations.

(c) SELLER ASSISTANCE AND COOPERATION IN CLOSE-OUT OF BUILDING PERMITS: If Buyer's inspection of the Property Identifies open or needed building permits, then Seller shall promptly deliver to Buyer all plans, written documentation or other information in Seller's possession, knowledge, or control relating to improvements to the Property which are the subject of such open or needed Permits, and shall promptly cooperate in good faith with Buyer's efforts to obtain estimates of repairs or other work necessary to resolve such Permit issues. Seller's obligation to cooperate shall include Seller's execution of necessary authorizations,

Buyer's Initials [handwritten] [ ]   Page 5 of 12   Seller's Initials [handwritten] [ ]

FloridaRealtors/FloridaBar-ASIS-5   Rev.4/17 © 2017 Florida Realtors® and The Florida Bar. All rights reserved.

dotloop signature verification: [illegible]

274 consents, or other documents necessary for Buyer to conduct inspections and have estimates of such repairs
275 or work prepared, but in fulfilling such obligation, Seller shall not be required to expend, or become obligated to
276 expend, any money.
277 (d) ASSIGNMENT OF REPAIR AND TREATMENT CONTRACTS AND WARRANTIES: At Buyer's option and
278 cost, Seller will, at Closing, assign all assignable repair, treatment and maintenance contracts and warranties
279 to Buyer.

280 ESCROW AGENT AND BROKER

281 13. ESCROW AGENT: Any Closing Agent or Escrow Agent (collectively "Agent") receiving the Deposit, other funds
282 and other items is authorized, and agrees by acceptance of them, to deposit them promptly, hold same in escrow
283 within the State of Florida and, subject to COLLECTION, disburse them in accordance with terms and conditions
284 of this Contract. Failure of funds to become COLLECTED shall not excuse Buyer's performance. When conflicting
285 demands for the Deposit are received, or Agent has a good faith doubt as to entitlement to the Deposit, Agent may
286 take such actions permitted by this Paragraph 13, as Agent deems advisable. If in doubt as to Agent's duties or
287 liabilities under this Contract, Agent may, at Agent's option, continue to hold the subject matter of the escrow until
288 the parties agree to its disbursement or until a final judgment of a court of competent jurisdiction shall determine
289 the rights of the parties, or Agent may deposit same with the clerk of the circuit court having jurisdiction of the
290 dispute. An attorney who represents a party and also acts as Agent may represent such party in such action. Upon
291 notifying all parties concerned of such action, all liability on the part of Agent shall fully terminate, except to the
292 extent of accounting for any items previously delivered out of escrow. If a licensed real estate broker, Agent will
293 comply with provisions of Chapter 475, F.S., as amended and FREC rules to timely resolve escrow disputes through
294 mediation, arbitration, interpleader or an escrow disbursement order.
295 In any proceeding between Buyer and Seller wherein Agent is made a party because of acting as Agent hereunder,
296 or in any proceeding where Agent interpleads the subject matter of the escrow, Agent shall recover reasonable
297 attorney's fees and costs incurred, to be paid pursuant to court order out of the escrowed funds or equivalent. Agent
298 shall not be liable to any party or person for mis-delivery of any escrowed items, unless such mis-delivery is due to
299 Agent's willful breach of this Contract or Agent's gross negligence. This Paragraph 13 shall survive Closing or
300 termination of this Contract.
301 14. PROFESSIONAL ADVICE; BROKER LIABILITY: Broker advises Buyer and Seller to verify Property condition,
302 square footage, and all other facts and representations made pursuant to this Contract and to consult appropriate
303 professionals for legal, tax, environmental, and other specialized advice concerning matters affecting the Property
304 and the transaction contemplated by this Contract. Broker represents to Buyer that Broker does not reside on the
305 Property and that all representations (oral, written or otherwise) by Broker are based on Seller representations or
306 public records. BUYER AGREES TO RELY SOLELY ON SELLER, PROFESSIONAL INSPECTORS AND
307 GOVERNMENTAL AGENCIES FOR VERIFICATION OF PROPERTY CONDITION, SQUARE FOOTAGE AND
308 FACTS THAT MATERIALLY AFFECT PROPERTY VALUE AND NOT ON THE REPRESENTATIONS (ORAL,
309 WRITTEN OR OTHERWISE) OF BROKER. Buyer and Seller (individually, the "Indemnifying Party") each
310 individually indemnifies, holds harmless, and releases Broker and Broker's officers, directors, agents and
311 employees from all liability for loss or damage, including all costs and expenses, and reasonable attorney's fees at
312 all levels, suffered or incurred by Broker and Broker's officers, directors, agents and employees in connection with
313 or arising from claims, demands or causes of action instituted by Buyer or Seller based on: (i) inaccuracy of
314 information provided by the Indemnifying Party or from public records; (ii) Indemnifying Party's misstatement(s) or
315 failure to perform contractual obligations; (iii) Broker's performance, at Indemnifying Party's request, of any task
316 beyond the scope of services regulated by Chapter 475, F.S., as amended, including Broker's referral,
317 recommendation or retention of any vendor for, or on behalf of, Indemnifying Party; (iv) products or services
318 provided by any such vendor for, or on behalf of, Indemnifying Party; and (v) expenses incurred by any such vendor.
319 Buyer and Seller each assumes full responsibility for selecting and compensating their respective vendors and
320 paying their other costs under this Contract whether or not this transaction closes. This Paragraph 14 will not relieve
321 Broker of statutory obligations under Chapter 475, F.S., as amended. For purposes of this Paragraph 14, Broker
322 will be treated as a party to this Contract. This Paragraph 14 shall survive Closing or termination of this Contract.

323 DEFAULT AND DISPUTE RESOLUTION

324 15. DEFAULT:
325 (a) BUYER DEFAULT: If Buyer fails, neglects or refuses to perform Buyer's obligations under this Contract,
326 including payment of the Deposit, within the time(s) specified, Seller may elect to recover and retain the Deposit
327 for the account of Seller as agreed upon liquidated damages, consideration for execution of this Contract, and
328 in full settlement of any claims, whereupon Buyer and Seller shall be relieved from all further obligations under

dotloop signature verification:

this Contract, or Seller, at Seller's option, may, pursuant to Paragraph 16, proceed in equity to enforce Seller's rights under this Contract. The portion of the Deposit, if any, paid to Listing Broker upon default by Buyer, shall be split equally between Listing Broker and Cooperating Broker; provided however, Cooperating Broker's share shall not be greater than the commission amount Listing Broker had agreed to pay to Cooperating Broker.

(b) **SELLER DEFAULT:** If for any reason other than failure of Seller to make Seller's title marketable after reasonable diligent effort, Seller fails, neglects or refuses to perform Seller's obligations under this Contract, Buyer may elect to receive return of Buyer's Deposit without thereby waiving any action for damages resulting from Seller's breach, and, pursuant to Paragraph 16, may seek to recover such damages or seek specific performance.

This Paragraph 15 shall survive Closing or termination of this Contract.

**16. DISPUTE RESOLUTION:** Unresolved controversies, claims and other matters in question between Buyer and Seller arising out of, or relating to, this Contract or its breach, enforcement or interpretation ("Dispute") will be settled as follows:

(a) Buyer and Seller will have 10 days after the date conflicting demands for the Deposit are made to attempt to resolve such Dispute, failing which, Buyer and Seller shall submit such Dispute to mediation under Paragraph 16(b).

(b) Buyer and Seller shall attempt to settle Disputes in an amicable manner through mediation pursuant to Florida Rules for Certified and Court-Appointed Mediators and Chapter 44, F.S., as amended (the "Mediation Rules"). The mediator must be certified or must have experience in the real estate industry. Injunctive relief may be sought without first complying with this Paragraph 16(b). Disputes not settled pursuant to this Paragraph 16 may be resolved by instituting action in the appropriate court having jurisdiction of the matter. This Paragraph 16 shall survive Closing or termination of this Contract.

**17. ATTORNEY'S FEES; COSTS:** The parties will split equally any mediation fee incurred in any mediation permitted by this Contract, and each party will pay their own costs, expenses and fees, including attorney's fees, incurred in conducting the mediation. In any litigation permitted by this Contract, the prevailing party shall be entitled to recover from the non-prevailing party costs and fees, including reasonable attorney's fees, incurred in conducting the litigation. This Paragraph 17 shall survive Closing or termination of this Contract.

STANDARDS FOR REAL ESTATE TRANSACTIONS ("STANDARDS")

**18. STANDARDS:**

A. TITLE:

(i) TITLE EVIDENCE; RESTRICTIONS; EASEMENTS; LIMITATIONS: Within the time period provided in Paragraph 9(c), the Title Commitment, with legible copies of instruments listed as exceptions attached thereto, shall be issued and delivered to Buyer. The Title Commitment shall set forth those matters to be discharged by Seller at or before Closing and shall provide that, upon recording of the deed to Buyer, an owner's policy of title insurance in the amount of the Purchase Price, shall be issued to Buyer insuring Buyer's marketable title to the Real Property, subject only to the following matters: (a) comprehensive land use plans, zoning, and other land use restrictions, prohibitions and requirements imposed by governmental authority; (b) restrictions and matters appearing on the Plat or otherwise common to the subdivision; (c) outstanding oil, gas and mineral rights of record without right of entry; (d) unplatted public utility easements of record (located contiguous to real property lines and not more than 10 feet in width as to rear or front lines and 7 1/2 feet in width as to side lines); (e) taxes for year of Closing and subsequent years; and (f) assumed mortgages and purchase money mortgages, if any (if additional items, attach addendum); provided, that, none prevent use of Property for RESIDENTIAL PURPOSES. If there exists at Closing any violation of items identified in (b) – (f) above, then the same shall be deemed a title defect. Marketable title shall be determined according to applicable Title Standards adopted by authority of The Florida Bar and in accordance with law.

(ii) TITLE EXAMINATION: Buyer shall have 5 days after receipt of Title Commitment to examine it and notify Seller in writing specifying defect(s), if any, that render title unmarketable. If Seller provides Title Commitment and it is delivered to Buyer less than 5 days prior to Closing Date, Buyer may extend Closing for up to 5 days after date of receipt to examine same in accordance with this STANDARD A. Seller shall have 30 days ("Cure Period") after receipt of Buyer's notice to take reasonable diligent efforts to remove defects. If Buyer fails to so notify Seller, Buyer shall be deemed to have accepted title as it then is. If Seller cures defects within Cure Period, Seller will deliver written notice to Buyer (with proof of cure acceptable to Buyer and Buyer's attorney) and the parties will close this Contract on Closing Date (or if Closing Date has passed, within 10 days after Buyer's receipt of Seller's notice). If Seller is unable to cure defects within Cure Period, then Buyer may, within 5 days after expiration of Cure Period,

dotloop signature verification: dotloop.com/my/verification/verify-DL-3/5r5f-3d-5/ax/

## STANDARDS FOR REAL ESTATE TRANSACTIONS ("STANDARDS") CONTINUED

383  deliver written notice to Seller: (a) extending Cure Period for a specified period not to exceed 120 days within which
384  Seller shall continue to use reasonable diligent effort to remove or cure the defects ("Extended Cure Period"); or
385  (b) electing to accept title with existing defects and close this Contract on Closing Date (or if Closing Date has
386  passed, within the earlier of 10 days after end of Extended Cure Period or Buyer's receipt of Seller's notice), or (c)
387  electing to terminate this Contract and receive a refund of the Deposit, thereby releasing Buyer and Seller from all
388  further obligations under this Contract.  If after reasonable diligent effort, Seller is unable to timely cure defects, and
389  Buyer does not waive the defects, this Contract shall terminate, and Buyer shall receive a refund of the Deposit,
390  thereby releasing Buyer and Seller from all further obligations under this Contract.
391  B.  SURVEY: If Survey discloses encroachments on the Real Property or that Improvements located thereon
392  encroach on setback lines, easements, or lands of others, or violate any restrictions, covenants, or applicable
393  governmental regulations described in STANDARD A (i)(a), (b) or (d) above, Buyer shall deliver written notice of
394  such matters, together with a copy of Survey, to Seller within 5 days after Buyer's receipt of Survey, but no later
395  than Closing. If Buyer timely delivers such notice and Survey to Seller, such matters identified in the notice and
396  Survey shall constitute a title defect, subject to cure obligations of STANDARD A above. If Seller has delivered a
397  prior survey, Seller shall, at Buyer's request, execute an affidavit of "no change" to the Real Property since the
398  preparation of such prior survey, to the extent the affirmations therein are true and correct.
399  C.  INGRESS AND EGRESS: Seller represents that there is ingress and egress to the Real Property and title to
400  the Real Property is insurable in accordance with STANDARD A without exception for lack of legal right of access.
401  D.  LEASE INFORMATION: Seller shall, at least 10 days prior to Closing, furnish to Buyer estoppel letters from
402  tenant(s)/occupant(s) specifying nature and duration of occupancy, rental rates, advanced rent and security
403  deposits paid by tenant(s) or occupant(s)("Estoppel Letter(s)"). If Seller is unable to obtain such Estoppel Letter(s)
404  the same information shall be furnished by Seller to Buyer within that time period in the form of a Seller's affidavit
405  and Buyer may thereafter contact tenant(s) or occupant(s) to confirm such information. If Estoppel Letter(s) or
406  Seller's affidavit, if any, differ materially from Seller's representations and lease(s) provided pursuant to Paragraph
407  6, or if tenant(s)/occupant(s) fail or refuse to confirm Seller's affidavit, Buyer may deliver written notice to Seller
408  within 5 days after receipt of such information, but no later than 5 days prior to Closing Date, terminating this
409  Contract and receive a refund of the Deposit, thereby releasing Buyer and Seller from all further obligations under
410  this Contract. Seller shall, at Closing, deliver and assign all leases to Buyer who shall assume Seller's obligations
411  thereunder.
412  E.  LIENS: Seller shall furnish to Buyer at Closing an affidavit attesting (i) to the absence of any financing
413  statement, claims of lien or potential lienors known to Seller and (ii) that there have been no improvements or
414  repairs to the Real Property for 90 days immediately preceding Closing Date. If the Real Property has been
415  improved or repaired within that time, Seller shall deliver releases or waivers of construction liens executed by all
416  general contractors, subcontractors, suppliers and materialmen in addition to Seller's lien affidavit setting forth
417  names of all such general contractors, subcontractors, suppliers and materialmen, further affirming that all charges
418  for improvements or repairs which could serve as a basis for a construction lien or a claim for damages have been
419  paid or will be paid at Closing.
420  F.  TIME: Calendar days shall be used in computing time periods. Time is of the essence in this Contract. Other
421  than time for acceptance and Effective Date as set forth in Paragraph 3, any time periods provided for or dates
422  specified in this Contract, whether preprinted, handwritten, typewritten or inserted herein, which shall end or occur
423  on a Saturday, Sunday, or a national legal holiday (see 5 U.S.C. 6103) shall extend to 5:00 p.m. (where the Property
424  is located) of the next business day.
425  G.  FORCE MAJEURE: Buyer or Seller shall not be required to perform any obligation under this Contract or be
426  liable to each other for damages so long as performance or non-performance of the obligation, or the availability of
427  services, insurance or required approvals essential to Closing, is disrupted, delayed, caused or prevented by Force
428  Majeure. "Force Majeure" means: hurricanes, floods, extreme weather, earthquakes, fire, or other acts of God,
429  unusual transportation delays, or wars, insurrections, or acts of terrorism, which, by exercise of reasonable diligent
430  effort, the non-performing party is unable in whole or in part to prevent or overcome. All time periods, including
431  Closing Date, will be extended a reasonable time up to 7 days after the Force Majeure no longer prevents
432  performance under this Contract, provided, however, if such Force Majeure continues to prevent performance under
433  this Contract more than 30 days beyond Closing Date, then either party may terminate this Contract by delivering
434  written notice to the other and the Deposit shall be refunded to Buyer, thereby releasing Buyer and Seller from all
435  further obligations under this Contract.
436  H.  CONVEYANCE: Seller shall convey marketable title to the Real Property by statutory warranty, trustee's,
437  personal representative's, or guardian's deed, as appropriate to the status of Seller, subject only to matters
438  described in STANDARD A and those accepted by Buyer. Personal Property shall, at request of Buyer, be

dotloop signature verification: [illegible]

## STANDARDS FOR REAL ESTATE TRANSACTIONS ("STANDARDS") CONTINUED

439   transferred by absolute bill of sale with warranty of title, subject only to such matters as may be provided for in this
440   Contract.
441   I.   CLOSING LOCATION; DOCUMENTS; AND PROCEDURE:
442   (i)   LOCATION: Closing will be conducted by the attorney or other closing agent ("Closing Agent") designated by
443   the party paying for the owner's policy of title insurance and will take place in the county where the Real Property
444   is located at the office of the Closing Agent, or at such other location agreed to by the parties. If there is no title
445   Insurance, Seller will designate Closing Agent. Closing may be conducted by mail, overnight courier, or electronic
446   means.
447   (ii)   CLOSING DOCUMENTS: Seller shall at or prior to Closing, execute and deliver, as applicable, deed, bill of
448   sale, certificate(s) of title or other documents necessary to transfer title to the Property, construction lien affidavit(s),
449   owner's possession and no lien affidavit(s), and assignment(s) of leases. Seller shall provide Buyer with paid
450   receipts for all work done on the Property pursuant to this Contract. Buyer shall furnish and pay for, as applicable,
451   the survey, flood elevation certification, and documents required by Buyer's lender.
452   (iii)   FinCEN GTO NOTICE.  If Closing Agent is required to comply with the U.S. Treasury Department's
453   Financial Crimes Enforcement Network ("FinCEN") Geographic Targeting Orders ("GTOs"), then Buyer
454   shall provide Closing Agent with the information related to Buyer and the transaction contemplated by this
455   Contract that is required to complete IRS Form 8300, and Buyer consents to Closing Agent's collection and
456   report of said information to IRS.
457   (iv)   PROCEDURE: The deed shall be recorded upon COLLECTION of all closing funds. If the Title Commitment
458   provides insurance against adverse matters pursuant to Section 627.7841, F.S., as amended, the escrow closing
459   procedure required by STANDARD J shall be waived, and Closing Agent shall, subject to COLLECTION of all
460   closing funds, disburse at Closing the brokerage fees to Broker and the net sale proceeds to Seller.
461   J.   ESCROW CLOSING PROCEDURE: If Title Commitment issued pursuant to Paragraph 9(c) does not provide
462   for insurance against adverse matters as permitted under Section 627.7841, F.S., as amended, the following
463   escrow and closing procedures shall apply: (1) all Closing proceeds shall be held in escrow by the Closing Agent
464   for a period of not more than 10 days after Closing; (2) if Seller's title is rendered unmarketable, through no fault of
465   Buyer, Buyer shall, within the 10 day period, notify Seller in writing of the defect and Seller shall have 30 days from
466   date of receipt of such notification to cure the defect; (3) if Seller fails to timely cure the defect, the Deposit and all
467   Closing funds paid by Buyer shall, within 5 days after written demand by Buyer, be refunded to Buyer and,
468   simultaneously with such repayment, Buyer shall return the Personal Property, vacate the Real Property and re-
469   convey the Property to Seller by special warranty deed and bill of sale; and (4) if Buyer fails to make timely demand
470   for refund of the Deposit, Buyer shall take title as is, waiving all rights against Seller as to any intervening defect
471   except as may be available to Buyer by virtue of warranties contained in the deed or bill of sale.
472   K.   PRORATIONS; CREDITS: The following recurring items will be made current (if applicable) and prorated as of
473   the day prior to Closing Date, or date of occupancy if occupancy occurs before Closing Date: real estate taxes
474   (including special benefit tax assessments imposed by a CDD), interest, bonds, association fees, insurance, rents
475   and other expenses of Property. Buyer shall have option of taking over existing policies of insurance, if assumable,
476   in which event premiums shall be prorated. Cash at Closing shall be increased or decreased as may be required
477   by prorations to be made through day prior to Closing. Advance rent and security deposits, if any, will be credited
478   to Buyer. Escrow deposits held by Seller's mortgagee shall be paid to Seller. Taxes shall be prorated based on
479   current year's tax. If Closing occurs on a date when current year's millage is not fixed but current year's assessment
480   is available, taxes will be prorated based upon such assessment and prior year's millage. If current year's
481   assessment is not available, then taxes will be prorated on prior year's tax. If there are completed improvements
482   on the Real Property by January 1st of year of Closing, which improvements were not in existence on January 1st
483   of prior year, then taxes shall be prorated based upon prior year's millage and at an equitable assessment to be
484   agreed upon between the parties, failing which, request shall be made to the County Property Appraiser for an
485   informal assessment taking into account available exemptions. In all cases, due allowance shall be made for the
486   maximum allowable discounts and applicable homestead and other exemptions.  A tax proration based on an
487   estimate shall, at either party's request, be readjusted upon receipt of current year's tax bill. This STANDARD K
488   shall survive Closing.
489   L.   ACCESS TO PROPERTY TO CONDUCT APPRAISALS, INSPECTIONS, AND WALK-THROUGH: Seller
490   shall, upon reasonable notice, provide utilities service and access to Property for appraisals and inspections,
491   including a walk-through (or follow-up walk-through if necessary) prior to Closing.
492   M.   RISK OF LOSS: If, after Effective Date, but before Closing, Property is damaged by fire or other casualty
493   ("Casualty Loss") and cost of restoration (which shall include cost of pruning or removing damaged trees) does not
494   exceed 1.5% of Purchase Price, cost of restoration shall be an obligation of Seller and Closing shall proceed
495   pursuant to terms of this Contract. If restoration is not completed as of Closing, a sum equal to 125% of estimated

dotloop signature verification: dtlp.us/abc-defg-hijk

## STANDARDS FOR REAL ESTATE TRANSACTIONS ("STANDARDS") CONTINUED

496 cost to complete restoration (not to exceed 1.5% of Purchase Price) will be escrowed at Closing. If actual cost of
497 restoration exceeds escrowed amount, Seller shall pay such actual costs (but, not in excess of 1.5% of Purchase
498 Price). Any unused portion of escrowed amount shall be returned to Seller. If cost of restoration exceeds 1.5% of
499 Purchase Price, Buyer shall elect to either take Property "as is" together with the 1.5%, or receive a refund of the
500 Deposit thereby releasing Buyer and Seller from all further obligations under this Contract. Seller's sole obligation
501 with respect to tree damage by casualty or other natural occurrence shall be cost of pruning or removal.
502 N.  1031 EXCHANGE: If either Seller or Buyer wish to enter into a like-kind exchange (either simultaneously with
503 Closing or deferred) under Section 1031 of the Internal Revenue Code ("Exchange"), the other party shall cooperate
504 in all reasonable respects to effectuate the Exchange, including execution of documents; provided, however,
505 cooperating party shall incur no liability or expense related to the Exchange, and Closing shall not be contingent
506 upon, nor extended or delayed by, such Exchange.
507 O.  CONTRACT NOT RECORDABLE; PERSONS BOUND; NOTICE; DELIVERY; COPIES; CONTRACT
508 EXECUTION: Neither this Contract nor any notice of it shall be recorded in any public records. This Contract shall
509 be binding on, and inure to the benefit of, the parties and their respective heirs or successors in interest. Whenever
510 the context permits, singular shall include plural and one gender shall include all. Notice and delivery given by or to
511 the attorney or broker (including such broker's real estate licensee) representing any party shall be as effective as
512 if given by or to that party. All notices must be in writing and may be made by mail, personal delivery or electronic
513 (including "pdf") media. A facsimile or electronic (including "pdf") copy of this Contract and any signatures hereon
514 shall be considered for all purposes as an original. This Contract may be executed by use of electronic signatures,
515 as determined by Florida's Electronic Signature Act and other applicable laws.
516 P.  INTEGRATION; MODIFICATION: This Contract contains the full and complete understanding and agreement
517 of Buyer and Seller with respect to the transaction contemplated by this Contract and no prior agreements or
518 representations shall be binding upon Buyer or Seller unless included in this Contract. No modification to or change
519 in this Contract shall be valid or binding upon Buyer or Seller unless in writing and executed by the parties intended
520 to be bound by it.
521 Q.  WAIVER: Failure of Buyer or Seller to insist on compliance with, or strict performance of, any provision of this
522 Contract, or to take advantage of any right under this Contract, shall not constitute a waiver of other provisions or
523 rights.
524 R.  RIDERS; ADDENDA; TYPEWRITTEN OR HANDWRITTEN PROVISIONS: Riders, addenda, and typewritten
525 or handwritten provisions shall control all printed provisions of this Contract in conflict with them.
526 S.  COLLECTION or COLLECTED: "COLLECTION" or "COLLECTED" means any checks tendered or
527 received, including Deposits, have become actually and finally collected and deposited in the account of
528 Escrow Agent or Closing Agent. Closing and disbursement of funds and delivery of closing documents
529 may be delayed by Closing Agent until such amounts have been COLLECTED in Closing Agent's accounts.
530 T.  RESERVED.
531 U.  APPLICABLE LAW AND VENUE: This Contract shall be construed in accordance with the laws of the State
532 of Florida and venue for resolution of all disputes, whether by mediation, arbitration or litigation, shall lie in the
533 county where the Real Property is located.
534 V.  FIRPTA TAX WITHHOLDING: If a seller of U.S. real property is a "foreign person" as defined by FIRPTA.
535 Section 1445 of the Internal Revenue Code ("Code") requires the buyer of the real property to withhold up to 15%
536 of the amount realized by the seller on the transfer and remit the withheld amount to the Internal Revenue Service
537 (IRS) unless an exemption to the required withholding applies or the seller has obtained a Withholding Certificate
538 from the IRS authorizing a reduced amount of withholding.
539 (i)  No withholding is required under Section 1445 of the Code if the Seller is not a "foreign person". Seller can
540 provide proof of non-foreign status to Buyer by delivery of written certification signed under penalties of perjury,
541 stating that Seller is not a foreign person and containing Seller's name, U.S. taxpayer identification number and
542 home address (or office address, in the case of an entity), as provided for in 26 CFR 1.1445-2(b). Otherwise, Buyer
543 shall withhold the applicable percentage of the amount realized by Seller on the transfer and timely remit said funds
544 to the IRS.
545 (ii)  If Seller is a foreign person and has received a Withholding Certificate from the IRS which provides for reduced
546 or eliminated withholding in this transaction and provides same to Buyer by Closing, then Buyer shall withhold the
547 reduced sum required, if any, and timely remit said funds to the IRS.
548 (iii)  If prior to Closing Seller has submitted a completed application to the IRS for a Withholding Certificate and has
549 provided to Buyer the notice required by 26 CFR 1.1445-1(c) (2)(i)(B) but no Withholding Certificate has been
550 received as of Closing, Buyer shall, at Closing, withhold the applicable percentage of the amount realized by Seller
551 on the transfer and, at Buyer's option, either (a) timely remit the withheld funds to the IRS or (b) place the funds in
552 escrow, at Seller's expense, with an escrow agent selected by Buyer and pursuant to terms negotiated by the

dotloop signature verification: www.dotloop.com/my/verification/ DL-51431247-1-79EC

## STANDARDS FOR REAL ESTATE TRANSACTIONS ("STANDARDS") CONTINUED

553  parties, to be subsequently disbursed in accordance with the Withholding Certificate issued by the IRS or remitted
554  directly to the IRS if the Seller's application is rejected or upon terms set forth in the escrow agreement.
555  (iv)  In the event the net proceeds due Seller are not sufficient to meet the withholding requirement(s) in this
556  transaction, Seller shall deliver to Buyer, at Closing, the additional COLLECTED funds necessary to satisfy the
557  applicable requirement and thereafter Buyer shall timely remit said funds to the IRS or escrow the funds for
558  disbursement in accordance with the final determination of the IRS, as applicable.
559  (v)  Upon remitting funds to the IRS pursuant to this STANDARD, Buyer shall provide Seller copies of IRS Forms
560  8288 and 8288-A, as filed.
561  W.  RESERVED
562  X.  BUYER WAIVER OF CLAIMS: *To the extent permitted by law, Buyer waives any claims against Seller*
563  *and against any real estate licensee involved in the negotiation of this Contract for any damage or defects*
564  *pertaining to the physical condition of the Property that may exist at Closing of this Contract and be*
565  *subsequently discovered by the Buyer or anyone claiming by, through, under or against the Buyer. This*
566  *provision does not relieve Seller's obligation to comply with Paragraph 10(j). This Standard X shall survive*
567  *Closing.*

568  ADDENDA AND ADDITIONAL TERMS

569 *  19.  ADDENDA: The following additional terms are included in the attached addenda or riders and incorporated into this
570  Contract (Check if applicable):

☐ A.  Condominium Rider
☐ B.  Homeowners' Assn.
☐ C.  Seller Financing
☐ D.  Mortgage Assumption
☐ E.  FHA/VA Financing
☐ F.  Appraisal Contingency
☐ G.  Short Sale
☐ H.  Homeowners/Flood Ins.
☐ I.   RESERVED
☐ J.  Interest-Bearing Acct.

☐ K.  RESERVED
☐ L.  RESERVED
☐ M.  Defective Drywall
☐ N.  Coastal Construction Control
      Line
☐ O.  Insulation Disclosure
☑ P.  Lead Paint Disclosure (Pre-1978)
☐ Q.  Housing for Older Persons
☐ R.  Rezoning
☐ S.  Lease Purchase/ Lease Option

☐ T.  Pre-Closing Occupancy
☐ U.  Post-Closing Occupancy
☐ V.  Sale of Buyer's Property
☐ W.  Back-up Contract
☐ X.  Kick-out Clause
☐ Y.  Seller's Attorney Approval
☐ Z.  Buyer's Attorney Approval
☐ AA.  Licensee Property Interest
☐ BB.  Binding Arbitration
☐ Other:

571 *  20.  ADDITIONAL TERMS:

572  Unless notified otherwise in writing, if Coldwell Banker is identified as the cooperating broker, the
573  company and its sales associates are representing the Buyer in a Transaction Brokerage capacity in
574  accordance with §475.278(2), Fla. Stat.
575
576  Seller to verify that "The Birds of Paradise" Resort License described below is active/valid and shall be
577  transferred in its entirety to Buyer at closing;
578  This Resort License issued to "The Birds of Paradise" by The State of Florida permits this property which
579  is a residentially zoned R-2 Single Family dwelling to operate as a Private Resort. The minimum rental
580  period is one week. No exterior signage or local media advertising is permitted. There are no other
581  restrictions. There is no other Licensed Resort in a residentially zoned neighborhood except "The Birds
582  of Paradise" in the entire Continental United States.
583
584
585
586
587

588  COUNTER-OFFER/REJECTION

589 *  ☐ Seller counters Buyer's offer (to accept the counter-offer, Buyer must sign or initial the counter-offered terms and
590  deliver a copy of the acceptance to Seller).
591 *  ☐ Seller rejects Buyer's offer.

Buyer's Initials _____ _____

Seller's Initials _____ _____

FloridaRealtors/FloridaBar-ASIS-5   Rev.4/17 © 2017 Florida Realtors® and The Florida Bar.  All rights reserved.

dotloop signature verification: [illegible]

592    THIS IS INTENDED TO BE A LEGALLY BINDING CONTRACT. IF NOT FULLY UNDERSTOOD, SEEK THE
593    ADVICE OF AN ATTORNEY PRIOR TO SIGNING.

594    THIS FORM HAS BEEN APPROVED BY THE FLORIDA REALTORS AND THE FLORIDA BAR.

595    *Approval of this form by the Florida Realtors and The Florida Bar does not constitute an opinion that any of the*
596    *terms and conditions in this Contract should be accepted by the parties in a particular transaction. Terms and*
597    *conditions should be negotiated based upon the respective interests, objectives and bargaining positions of all*
598    *interested persons.*

599    AN ASTERISK (*) FOLLOWING A LINE NUMBER IN THE MARGIN INDICATES THE LINE CONTAINS A BLANK
600    TO BE COMPLETED.

601*   Buyer: _Steven A. Macdonald_                          Date: _____

602*   Buyer: _____                        Date: _____

603*   Seller: _John R. Deblieu_                             Date: _05/15/2017_

604*   Seller: _____                       Date: _____

605    Buyer's address for purposes of notice          Seller's address for purposes of notice
606*
607*
608*

609    BROKER: Listing and Cooperating Brokers, if any, named below (collectively, "Broker"), are the only Brokers
610    entitled to compensation in connection with this Contract. Instruction to Closing Agent: Seller and Buyer direct
611    Closing Agent to disburse at Closing the full amount of the brokerage fees as specified in separate brokerage
612    agreements with the parties and cooperative agreements between the Brokers, except to the extent Broker has
613    retained such fees from the escrowed funds. This Contract shall not modify any MLS or other offer of compensation
614    made by Seller or Listing Broker to Cooperating Brokers.

615*   Michael B. Hughes, P.A. #261503009              Rafal Wazio
616    Cooperating Sales Associate, if any             Listing Sales Associate

617*   Coldwell Banker                                 Sand Key Realty
616    Cooperating Broker, if any                      Listing Broker

Buyer's Initials _SAM_ [   ]       Page 12 of 12       Seller's Initials _JRD_ [   ]
FloridaRealtors/FloridaBar-ASIS-5   Rev.4/17 © 2017 Florida Realtors® and The Florida Bar.  All rights reserved.

**Brief Exhibit T**

**DeSilva Deposition
Defendant Exhibit 2**

## MEMBERSHIP INTEREST PURCHASE AGREEMENT

This MEMBERSHIP INTEREST PURCHASE AGREEMENT (this "Agreement"), dated as of June 16, 2017, is entered into by and among BARRACUDA CLUB LLC, a Florida limited liability company (the "Buyer"), THE BIRD OF PARADISE LLC, a Florida limited liability company (the "Company"), and John De Silva, in his capacity as sole member of the Company (the "Seller").

### BACKGROUND:

(A)   The Seller is the beneficial and legal owner of 100% of the membership interests in the Company (including all rights of Seller as a member of the Company, all governance and voting rights and all rights of Seller under the Act (as defined below) with respect to the Company, the "Purchased Interests");

(B)   The Buyer wishes to acquire the Purchased Interests and the Seller wishes to sell the Purchased Interests to Buyer on the terms of this Agreement;

(C)   The parties hereto desire that, concurrently with its purchase of the Purchased Interests, the Buyer will be admitted as the sole member (within the meaning of the Act) of the Company, the Seller will be deemed to have withdrawn as a member (within the meaning of the Act) of the Company and the Buyer will own one hundred percent (100%) of the membership interests of the Company, including the sole right to all capital and profits of the Company;

(D)   The Company owns, as its sole asset, the License (as defined below);

(E)   The Seller is the Company's sole member and manager, and Buyer has requested certain representations and warranties from him as a condition to purchasing the Purchased Interests; and

(F)   The parties hereto desire to set forth certain representations, warranties, and covenants made by each to the other as an inducement to the consummation of the sale and certain additional agreements related to the sale.

### AGREEMENT

The parties hereto agree as follows:

1.   Purchase and Sale; Assignment of Purchased Interests.

    (a)   Concurrently with the execution and delivery of this Agreement, Buyer shall deliver to the Seller the purchase price of $10.00 for the Purchased Interests (the "Purchase Price") and, effective upon the payment of the Purchase Price, the Seller hereby sells, assigns and transfers to Buyer all of his Seller's right, title and interest in and to the Purchased Interest, free and clear of all Encumbrances (as

Defendant
Exhibit 2

defined below).  The payment of the Purchase Price and the assignment of the Purchased Interests on the date hereof are referred to herein as the "Closing."

(b)    The Purchase Price shall be paid by cashier's check, wire transfer or other means approved by the Seller.

(c)    In this Agreement, unless the context otherwise requires: (i) references to this Agreement are references to this Agreement and to the Schedules hereto; (ii) references to any party to this Agreement include references to its respective successors and permitted assigns; (iii) references to a judgment include references to any order, writ, injunction, decree, determination or award of any court or tribunal; (iv) references to a "Person" means any individual, company, corporation (whether public, private or government), corporate body, association, authority, partnership, limited liability company, firm, joint venture, business entity, trust or government agency; (v) references to any document (including this Agreement) are references to that document as amended, consolidated, supplemented, or replaced by the parties thereto from time to time; (vi) the word "affiliate" means, as to the Person in question, any Person that directly or indirectly controls, is controlled by, or is under common control with, the entity in question and any successors or assigns of such entities; (vii) the term "control" means possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person whether through ownership of voting securities, by contract or otherwise; and (viii) the term "knowledge" or "knowledge of the Company" means the actual knowledge of the Seller after due inquiry, provided that, with respect to any facts, events or circumstances, "knowledge" means only the actual knowledge of the Seller; (ix) the term "Proceeding" means and refers to any action, arbitration, audit, hearing, investigation, litigation, suit or similar proceeding (whether civil, criminal, administrative, judicial or investigative, whether formal or informal, whether public or private) commenced, brought, conducted or heard by or before, or otherwise involving, any governmental body or arbitrator; (x) the term "Law" means and refers to any statute, law, ordinance, regulation, rule, code, order, constitution, treaty, common law, judgment, decree, other requirement or rule of law of any Governmental Authority; and (xi) the term "Governmental Authority" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), or any arbitrator, court or tribunal of competent jurisdiction.

2.    Representations and Warranties of Seller. The Seller (except as expressly provided otherwise), hereby represents and warrants to Buyer the following as of the date hereof:

(a)    Binding Agreement; Absence of Conflicts.  The Seller hereby represents and warrants to Buyer as follows:

(i)    This Agreement has been duly executed and delivered by the Seller and (assuming due execution and delivery by Buyer) constitutes the legal, valid and binding obligation of the Seller, enforceable against the Seller in accordance with its terms.

2

(ii)     The Purchased Interest of the Seller has been duly authorized, is validly issued, and is owned of record and beneficially by the Seller, free and clear of all liens, pledges, security interests, charges, claims, encumbrances, agreements, options, voting trusts, proxies and other arrangements or restrictions of any kind (the "Encumbrances"). Upon consummation of the transactions contemplated by this Agreement, Buyer shall own the Purchased Interests, free and clear of all Encumbrances.

(iii)    The execution, delivery and performance by the Seller of this Agreement does not conflict with, violate or result in the breach of, or create any Encumbrance on the Purchased Interest of the Seller pursuant to any agreement, instrument, order, judgment, decree, law or governmental regulation to which the Seller is a party or is subject or by which the Purchased Interest is bound.

(iv)     No governmental, administrative or other third party consents or approvals are required by or with respect to the Seller in connection with the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby.

(b)     Capitalization. The Seller owns all of the Company's currently issued and outstanding membership interests and there are no other owners of the Company.  Additionally, no other equity or ownership interests of the Company, or securities or other rights convertible into or exchangeable for such equity or other ownership interests in the Company, are outstanding. There are no outstanding or authorized options, warrants, purchase rights, subscription rights, conversion rights, exchange rights, or other contracts or commitments that could require the Company to issue, sell, or otherwise cause to become outstanding any of its equity or ownership interests.  There is no voting trust, proxy or other agreement or understanding with respect to the voting of any of the membership units of the Company, including the Purchased Interests.

(c)     Subsidiaries. The Company does not currently own or control, directly or indirectly, any interest in any other Person, and is not a participant in any joint venture, partnership or similar arrangement.

(d)     Licensure.  The Company is the holder of that certain Vacation Rental – Dwelling License, License Number DWE6215636, issued by the Florida Department of Business and Professional Regulation (the "License"), which permits the Company, which is a residentially zoned R-2 single family dwelling, to operate as a private resort at the property located at 2707 Pass-A-Grille Way, St. Pete Beach, FL 33706 (the "Property").  The License represents the all of the licenses and permits required for the operation of a private resort at the Property as currently operated.  The License is in good standing, in full force and effect and not subject to meritorious challenge.  The Company is in compliance in all material respects with the terms of the License, and neither the Company nor the Seller has received any written notice or communication from any Governmental Authority regarding any violation of the License.  No event has occurred and is pending with respect to the License, whether after notice or the passing of time or both, that would serve as grounds for or otherwise authorize the suspension, revocation, or termination of the License or impair the rights of any holder thereof.  All pending applications required to have been filed by the Company for the renewal of the License.

3

(e)    Governmental Consents and Filings.  No governmental, administrative or other third party consents, licenses or approvals are required by or with respect to the Company in connection with the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby.

(f)    Contracts.  Schedule 2(f) is a list of all commitments, contracts, leases and agreements, whether written or oral ("Contracts"), to which the Company is a party.  The Company has delivered to Buyer true and correct copies of all Contracts, including any and all amendments and other modifications thereto.

(g)    Title to and Condition of Property; Leases.  The Company does not own or lease any real property.  The Company has good and marketable title or a valid interest in all personal property and other assets, in each case subject to no mortgage, pledge, lien, security interest, lease, charge or encumbrance, other than liens resulting from taxes which have not yet become delinquent and liens, the interests of lessors in leased property and encumbrances which do not in any case materially detract from the value of the property subject thereto or materially impair the operations of the Company and in all such cases that have arisen in the ordinary course of business.

(h)    Litigation or Proceedings. The Company has not received written notice of any claims, actions, suits, proceedings or investigations pending or threatened against the Company, the Seller or any officer, director or manager of the Company, at law or in equity, or before or by any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality wherever located, and to the knowledge of the Company, no such claims, actions, suits, proceedings or investigations are pending or have been threatened.  The Company is not in default under any order of any court or federal, state, municipal, or other governmental department, commission, board, bureau, agency or instrumentality wherever located.  There is no claim, action, suit, proceeding or investigation pending or, to the knowledge of the Company, threatened against or affecting the Company.

(i)    Tax Returns and Payments.  There are no federal, state, county, local or foreign taxes now due and payable by the Company that have not been timely paid.  There are no accrued and unpaid federal, state, country, local or foreign taxes of the Company which are due, whether or not assessed or disputed.  There have been no examinations or audits of any tax returns or reports by any applicable federal, state, local or foreign governmental agency, except as may have been completed and resolved fully.  The Company has duly and timely filed all federal, state, county, local and foreign tax returns required to have been filed by it (subject to extensions and possible late filings that have no present adverse consequences) and there are in effect no waivers of applicable statutes of limitations with respect to taxes for any year.  Since formation, the Company has not elected to be taxed as a corporation.

(j)    No Brokers.  No broker, finder or investment banker is entitled to any brokerage, finders or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of the Seller.

4

3.     Representation and Warranties of Buyer.

(a)     Binding Agreement.  This Agreement has been duly executed and delivered by Buyer and (assuming due execution and delivery by the Seller) constitutes a legal, valid and binding obligation of Buyer enforceable against Buyer in accordance with its terms.

(b)     Governmental Consents and Filings.  No governmental, administrative or other third party consents or approvals are required by or with respect to Buyer in connection with the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby.

(c)     No Brokers.  No broker, finder or investment banker is entitled to any brokerage, finders or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Buyer.

4.     Admission of Buyer to the Company.  Notwithstanding anything to the contrary, simultaneously with the Closing, the Buyer is hereby admitted to the Company as the sole member of the Company and the holder of the Purchased Interests and the Seller hereby withdraws as the sole member of the Company.

5.     Continuation of the Company.  For the avoidance of doubt and notwithstanding anything to the contrary, the assignment of the Purchased Interests and the admission of the Buyer as the sole member of the Company and as the holder of the Purchased Interests shall not dissolve the Company and the Company shall continue without dissolution.

6.     Consent and Waiver.  The Company and the Seller (as the sole member of the Company) hereby (a) consents to and approves the sale and assignment of the Purchased Interests and the other transactions contemplated hereby, and (b) waives any prohibition, restriction or condition contained in any operating agreement governing the Company or under applicable Law that is applicable to the sale and assignment of the Purchased Interests pursuant to this Agreement.

7.     Releases.  Each of the Company and the Seller hereby releases the Company of and from any and all claims, demands, causes of actions, covenants, contracts whatsoever, both at law and in equity, now existing or hereafter existing, or which may hereafter arise, from the existing state of things, relating in any way to the Company and any actions taken by the Company relating in any way to the Company or any aspect of its business.

8.     Indemnification.

(a)     Indemnification by Seller.  From and after the Closing, the Seller agrees to defend, indemnify and hold harmless the Company, Buyer and its agents (each, a "Buyer Indemnified Party") from, against and for any damages, claims, costs, losses, liabilities, expenses or obligations (including reasonable attorneys' fees and associated expenses), whether or not involving a third-party claim, but excluding any loss of profits (collectively, "Losses"), incurred or suffered by a Buyer Indemnified Party as a result of or arising from: (i) any breach of or inaccuracy in any representation or warranty in Section 2 of this Agreement or in any document executed as a condition to this Agreement (collectively the

5

"Transaction Documents") and (ii) any breach of a covenant, obligation or agreement of the Seller in this Agreement or any other Transaction Document.

(b)     Indemnification by Buyer.  From and after the Closing, Buyer and the Company, jointly and severally, agree to defend, indemnify and hold harmless the Seller (each, a "Seller Indemnified Party") from, against and for any Losses incurred or suffered by the Seller Indemnified Parties as a result of or arising from (i) any breach of or inaccuracy in any representation or warranty made by Buyer in this Agreement or any other Transaction Document or (ii) any breach of a covenant, obligation or agreement of Buyer in this Agreement or any other Transaction Document.

(c)     Procedure for Indemnification – Non Third Party Claims.  Whenever any claim shall arise for indemnification hereunder not involving a demand, claim, action or Proceeding made or brought by a third party, including without limitation a government agency, the party to be indemnified shall notify the indemnifying party promptly after obtaining actual knowledge of the facts constituting the basis for such claim. The notice to the indemnifying party shall specify, if known, the amount or an estimate of the amount of the liability arising therefrom.

9.     Information and Records.  Promptly after the date hereof and in no event later than five (5) days after the Closing, the Seller shall return to Buyer all copies of such books, records, files, documents or other information, in hard copy and/or electronic format, related to the Company or its business that are in the possession or control of the Seller or his affiliates, agents, employees or representatives, including but not limited to, any books, records, files, documents or other information relating to the License.

10.     Survival. All representations, warranties, covenants and indemnities contained herein shall survive the execution and delivery of this Agreement and the purchase and sale of the Purchased Interests hereunder, until the date that is two (2) years from the date of this Agreement.

11.     Further Assurances. Each of the parties hereto shall execute and deliver such additional documents, instruments, conveyances and assurances, and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement.

12.     Expenses. All costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses.

13.     Notices. All notices, requests, consents, claims, demands, waivers and other communications hereunder (each, a "Notice") shall be in writing and addressed to the parties at the addresses set forth on the signature pages to this Agreement (or to such other address that may be designated by the receiving party from time to time in accordance with this section). All Notices shall be delivered by personal delivery, nationally recognized overnight courier (with all fees pre-paid), facsimile or e-mail of a PDF document (with confirmation of transmission) or certified or registered mail (in each case, return receipt requested, postage prepaid). Except as otherwise provided in this Agreement, a Notice is effective only (a) upon receipt by the receiving party, and (b) if the party giving the Notice has complied with the requirements of this Section.

6

14.    Entire Agreement. This Agreement constitutes the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings, agreements, representations and warranties, both written and oral, with respect to such subject matter.

15.    Successor and Assigns. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. No party may assign any of its rights or obligations hereunder without the prior written consent of the other parties hereto, which consent shall not be unreasonably withheld or delayed.

16.    Headings. The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

17.    Amendment and Modification; Waiver. This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. Except as otherwise set forth in this Agreement, no failure to exercise, or delay in exercising, any rights, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

18.    Severability. If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

19.    Governing Law; Submission to Jurisdiction. This Agreement shall be governed by and construed in accordance with the internal laws of the State of Florida without giving effect to any choice or conflict of law provision or rule (whether of the State of Florida or any other jurisdiction). Any legal suit, action or proceeding arising out of or based upon this Agreement or the transactions contemplated hereby may be instituted in the federal courts of the United States or the courts of the State of Florida in each case located in the County of Hillsborough, and each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action or proceeding. Service of process, summons, notice or other document by mail to such party's address set forth herein shall be effective service of process for any suit, action or other proceeding brought in any such court. The parties irrevocably and unconditionally waive any objection to the laying of venue of any suit, action or any proceeding in such courts and irrevocably waive and agree not to plead or claim in any such court that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

7

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the date first written above.

BUYER:

**BARRACUDA CLUB LLC,**
a Florida limited liability company

By: _____

Name: Joshua Keleske
Title: Vice President

Address:

_____
_____
_____

SELLER:

_____
JOHN DE SILVA

Address:

_____
_____
_____

COMPANY:

**THE BIRD OF PARADISE LLC,**
a Florida limited liability company

By: _____

Name: John De Silva
Title: Managing Member

Address:

_____
_____
_____

*Signature Page to Membership Unit Purchase Agreement*

**Brief Exhibit T**

**DeSilva Deposition**
**Plaintiff Exhibit 2**



IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT
IN AND FOR PINELLAS COUNTY, FLORIDA

JOHN R. DASILVA AND BRIAN P.
DUNBURY AND ELIZABETH DUNBURY,

       Plaintiffs,

                            CASE NO. 02-7817-CI-11

vs.

CITY OF ST. PETE BEACH, FLORIDA,

       Defendant.

_____

SETTLEMENT AGREEMENT

    Plaintiff, JOHN R. DASILVA, and Defendant, CITY OF ST. PETE BEACH, FLORIDA,
contract and agree to settle the lawsuit now pending in the Circuit Court of the Sixth Judicial
Circuit in and for Pinellas County, Florida, entitled John R. DaSilva, Plaintiff, vs. City of St. Pete
Beach, Florida, a municipal corporation, Defendant, Case Number 02-7817-CI-11, as follows:

    1.    As used herein, the term "the Beach Front" shall refer to property owned by
Plaintiff located at 7901, 7903 and 7907 Pass-A-Grille Way, St. Pete Beach, Florida. The legal
description of the Beach Front is Lots 13, 14, 15 and 16, Block D, Section A, North Pass-A-
Grille, as recorded in Plat Book 5, Page 18, of the Public Record of Pinellas County, Florida.

    2.    The Beach Front was formerly used as a corporate retreat and meeting center for
the Warner Company and its successors and/or Avon Walter Homes advertising use as a corporate
retreat and meeting center for rental of the entire property for periods of one to less than seven (7)
days under Defendant's Zoning Ordinances. Plaintiff is entitled to continue this non-

Deposition Exhibit 2

conforming use of the Busch Estate in the same manner as any other lawful non-conforming use within the city limits of Defendant and subject to the provisions of Defendant's Code of Ordinances.

3.      It is Plaintiff's intent and purpose when renting the Busch Estate to rent it for use as a corporate retreat and meeting center by persons, groups, and businesses for reserved and discrete corporate purposes having no greater impact on the neighborhood than a typical residential use.

4.      The following terms and conditions are consistent with and define the proper use of the Busch Estate and constitute valid and binding limitations on how Plaintiff and Plaintiff's successors may use the Busch Estate:

a.      The entire Busch Estate, consisting of four lots and three structures, shall be rented as a group and cannot be rented separately for use at any one time, to no more than one person, group, organization, or business.

b.      The Busch Estate may not be rented to any person, group, organization or business for less than a seven day rental period.

c.      The maximum overnight occupancy of the Busch Estate shall be two persons for each bedroom.

d.      The Busch Estate shall not be rented for one or two day parties, weddings or events of this kind.

e.      The Busch Estate shall not be used in a manner that will disturb the normal and usual peace and tranquility of the neighborhood.

i.      All persons using or renting the Beach Estate shall comply with all applicable ordinances and restrictions regarding noise, disturbances and outdoor and amplified music.

g.      No advertising or other signage shall be permitted at the Beach Estate.

h.      There shall be no public advertising of the property inconsistent with the terms herein.

i.      Persons using or renting the Beach Estate must comply with all parking restrictions and limitations of the City of St. Pete Beach. No single day, guest, or special event parking passes or permits, as provided in the St. Pete Beach Code of Ordinances, shall be available for the Beach Estate during periods it is being rented.

4.      Within ten (10) days of the execution of this agreement by Plaintiff and Defendant, Plaintiff and Sean Manning, LLC will execute the attached covenant running with the land that will acknowledge the non-condemning status of the Beach Estate and which shall be recorded in the public records of Pinellas County, Florida.

5.      Within ten (10) days of the execution of this agreement by Plaintiff and Defendant, Plaintiff and Sean Manning, LLC, will execute the attached release releasing Defendant and Defendant's agents, employees, officers and officials from liability and damages arising from the operative events alleged in Plaintiff's complaint and amended complaint in the above referenced lawsuit.

6.      Within ten (10) days of the execution of this agreement by Plaintiff and Defendant, Plaintiff and Sean Manning, LLC will dismiss the above referenced lawsuit against Defendant with prejudice.

7.      Within ten (10) days of the execution of this agreement by Plaintiff and Defendant, Plaintiff and Sena Manning, LLC are entitled to apply for and receive an appropriate occupational license from Defendant allowing Plaintiff to rent the Busch Estate consistent with its legal or grandfathered uses conforming uses and the limitations contained in this agreement.

8.      Within ten (10) days of the execution of this agreement by Plaintiff and Defendant, Defendant will pay the sum of One Hundred Thousand and 00/100 ($100,000) Dollars to Plaintiff.

9.      Defendant will have title search done for the Busch Estate. If the title search reveals that there are owners of the Busch Estate in addition to Plaintiff, then this settlement agreement, the covenant running with the land, and the release will be redrafted to include the names of all owners of the Busch Estate and all such owners of the property shall be obligated to sign the settlement agreement, covenant, and release in order for there to be a settlement of the above referenced lawsuit.

Dated this _____ day of October, 2008.

_____      _____
Date                                            Witness Dotson

_____      _____
Date, RY Busch                             Ward Kirby Smith
                                                     Mayor, City of St. Pete Beach

_____      _____

**Brief Exhibit T**

**DeSilva Deposition
Plaintiff Exhibit 3**



**Plaintiff
Exhibit 3**

Prepared by:
James L. Yacavone, III, Esq.
Fowler White Boggs Banker, P.A.
P.O. Box 1438
Tampa, FL 33601

### RECORDED COVENANT RUNNING WITH LAND

John R. DaSilva and Sean Manning, LLC as the owners of real property located at 2701, 2703 and 2707 Pass-A-Grille Way, St. Pete Beach, Florida (hereinafter identified as the Busch Estate), more particularly described as:

Lots 13, 14, 15 and 16, Block D, Section A, north Pass-A-Grille, as recorded in Plat Book 5, Page 18, of the Public Records of Pinellas County, Florida.

In furtherance of the terms of a settlement agreement made in connection with a lawsuit filed in the Circuit Court of the Sixth Judicial Circuit in and for Pinellas County, Florida, entitled John R. DaSilva, Plaintiff, vs. City of St. Pete Beach, Florida, a municipal corporation, Defendant, Case Number 02-1481-CI-11, I declare and establish that the use of the Busch Estate as a corporate retreat and meeting center for rentals of the entire property for periods of no less than seven (7) days is a legal or grandfathered non-conforming use under Code of Ordinances of the City of St. Pete Beach subject to all the provisions of the Code of Ordinances of the City of St. Pete Beach related to nonconforming uses.

We further declare and establish that the following terms and conditions are consistent with and define the prior use of the Busch Estate and constitute valid and binding limitations on how we and any persons or entities acquiring an interest in the Busch Estate may use the property:

1.   The entire Busch Estate, consisting of four lots and three structures, shall be rented as a group and cannot be rented separately for use at any one time to more than one person, group, organization, or business.

2.   The Busch Estate may not be rented to any person, group, organization or business for less than a seven day rental period.

3.   The maximum overnight occupancy of the Busch Estate shall be two persons for each bedroom.

4.   The Busch Estate shall not be rented for use by third parties, weddings or events of any kind.

5.   The Busch Estate shall not be used in a manner that will disturb the normal use and peaceful and tranquility of the neighborhood.

6.   All persons using or renting the Busch Estate shall comply with all applicable ordinances and restrictions, according to law. Disturbances and noise level amplified music

7.   No advertising or other signage shall be permitted on the Busch Estate

**Deposition Exhibit 3**

PINELLAS COUNTY FL OFF. REC. BK  13902  PG  2494

8.     There shall be no public advertising of the property inconsistent with the terms herein.

9.     Persons using or renting the Busch Estate must comply with all parking restrictions and limitations of the City of St. Pete Beach.  Do single day, guest, or special event parking passes or permits, as provided in the St. Pete Beach Code of Ordinances, shall be available for the Busch Estate during periods it is being rented.

We further declare and establish that the status of the Busch Estate as a legal or grandfathered nonconforming use under the Ordinances of the City of St. Pete Beach and the restrictions and limitations on the use of the Busch Estate as a legal or grandfathered nonconforming use contained in this covenant shall be a covenant running with the land binding upon and enforceable against us and all persons who acquire an interest in the Busch Estate after the date of this covenant.

Signed, sealed and delivered in the presence of:

_____          _____
Witness Signature                                        John R. Busch

_____          JOHN R DASILVA
Printed Name                                               Printed Name

_____          2817 PASS A GRILLE WAY
Witness Signature                                        Address

RALPH O. LICKTON                                  ST PETE BEACH, FL 33706
Printed name

STATE OF FLORIDA
COUNTY OF PINELLAS

The foregoing instrument was acknowledged before me on this ___ day of
_____, 200_ by John R. DaSilva who is personally known to me or who has
produced _____ as identification and who executed the
foregoing instrument.

_____          (SEAL)
Signature of person taking acknowledgment

Michael D. Jones
Printed name of person taking acknowledgment

PINELLAS COUNTY FL OFF. REC. BK ___ PG ___

Sean Manning, LLC

Witness Signature

by _____

Printed Name

SEAN MANNING, Member

Printed Name, Title

Witness Signature

3616 EL CENTRO

RALPH O. LICKTON

CLEAR WATER, FL 33764

Printed Name

State of Florida
County of Pinellas

The foregoing Instrument was acknowledged before me this ___ day of ____ 200_ by ____ Sean Manning ____ as Member ____ of Sean Manning, LLC a Florida limited liability company, on behalf of said company. He/She is personally known to me or has produced _____ as identification.



MICHAEL G. JONES
Notary Public - State of Florida
My Commission Expires
Commission # DD018744

Notary

Michael G. Jones

Printed Name, Commission Number

**Brief Exhibit T**

**DeSilva Deposition
Plaintiff Exhibit 4**



Plaintiff
Exhibit 4

IN: 2005282866 BK: 14466  PG: 612, 07/19/2005 at 04:05 PM, RECORDING 2 PAGES
$18.50 D DOC STAMP COLLECTION $12600.00  KEN BURKE, CLERK OF COURT PINELLAS
COUNTY, FL BY DEPUTY CLERK: CLKDMC1

This instrument prepared by and return to:
Leslie Wager Hudock, Esquire
601 Bayshore Boulevard, Suite 700
Tampa, Florida 33606

The following information is provided
pursuant to Section 689.02(2) F.S.:

Property Appraiser's parcel ID number:

18/32/16/61002/004/0130

## WARRANTY DEED

THIS INDENTURE made as of the __15th__ day of July, 2005, between SEAN MANNING, LLC, a Florida limited liability company ("Grantor"), whose post office address is 3512 Gulf Blvd., St. Petersburg Beach, FL 33706, and ("Grantee"), JOHN R. DE SILVA, whose post office address is 2817 Pass-A-Grille Way, St. Petersburg Beach, FL 33706.

## WITNESSETH:

That Grantor, for and in consideration of the sum of TEN AND NO/100 DOLLARS ($10.00), and other good and valuable considerations to Grantor in hand paid by Grantee, the receipt and sufficiency of which are hereby acknowledged, has granted, bargained and sold to Grantee, and Grantee's heirs and assigns forever, AN UNDIVIDED 25% INTEREST in the following described land (the "Property") located in Pinellas County, Florida, to-wit:

LOTS 13, 14, 15 AND 16, BLOCK D, SECTION "A" NORTH PASS-A-GRILLE, ACCORDING TO THE MAP OR PLAT THEREOF AS RECORDED IN PLAT BOOK 5, PAGE 18, OF THE PUBLIC RECORDS OF PINELLAS COUNTY, FLORIDA.

Subject to taxes and assessments for the year 2005 and subsequent years, and to covenants, conditions, restrictions and easements of record, without intent to reimpose the same.

Together with all the tenements, hereditaments and appurtenances thereto belonging or in any wise appertaining.

TO HAVE AND TO HOLD the same in fee simple forever.

And Grantor hereby covenants with said Grantee, their successors and assigns, that she is lawfully seized of the Property in fee simple; that she has good right and lawful authority to sell and convey said property; that she hereby warrants the title to said land and will defend the same against the lawful claims of all persons, whomsoever.

Deposition Exhibit 4 ----

PINELLAS COUNTY FL OFF. REC. BK  14466  PG   613

Wherever used herein and wherever the context so admits or requires, the terms Grantor and Grantee shall include the singular and the plural; the heirs, legal representatives, and assigns of individuals; and the successors and assigns of corporations and partnerships.

IN WITNESS WHEREOF, the Grantor has executed this Warranty Deed and affixed his seal on the day, month and year first above written.

WITNESSES:

SEAN MANNING, LLC.
a Florida limited liability company

Print
Name: _Wanda L. Diaz_

By: _R. Sean Manning_
R. Sean Manning
Its: President

Print
Name: _Leslie Vega Hudso__

"Grantor"

As to Grantor

STATE OF FLORIDA
COUNTY OF HILLSBOROUGH

The foregoing instrument was acknowledged before me this 15th day of July, 2005, by R. SEAN MANNING, as President of Sean Manning, LLC, a Florida limited liability company, on behalf of the company; who [ ] is personally known to me or who [✓] has produced a Florida driver's license as identification.

[Notarial Seal]

WANDA L. DIAZ
MY COMMISSION # DD 174124
EXPIRES: April 24, 2009

_Wanda L. Diaz_
Notary Public
Print name: _Wanda L. Diaz_
My commission expires: _____
My serial number is: _____

:\CCD01\PCDOCS\BNULEDOCS\259320\1

(2)

**Brief Exhibit T**

**DeSilva Deposition
Plaintiff Exhibit 5**

Plaintiff
Exhibit 5

I#: 2006342789 BK: 15369  PG: 137, 09/15/2006 at 04:21 PM, RECORDING 1 PAGES
$10.00 D DOC STAMP COLLECTION $3150.00  KEN BURKE, CLERK OF COURT PINELLAS
COUNTY, FL BY DEPUTY CLERK: CLKSP18

Prepared by and return to:
A HERITAGE TITLE INSURANCE CORPORATION
5209 CENTRAL AVENUE
St. Petersburg, FL 33707

File Number: 06-153

Parcel Identification No. 18/32/16/65198?/004/0110

[Space Above This Line For Recording Data]

## Warranty Deed
(STATUTORY FORM - SECTION 689.02, F.S.)

This Indenture made this 7th day of August, 2006 between Dolphin Watch VI, LLC, a Florida limited liability company f/k/a Sean Manning, LLC whose post office address is 3615 El Centro Street, St. Pete Beach, FL 33706 of the County of Pinellas, State of Florida, grantor*, and John R. DeSilva, whose post office address is 2317 Pass-A-Grille Way, St. Pete Beach, FL 33706 of the County of Pinellas, State of Florida, grantee*,

Witnesseth, that said grantor, for and in consideration of the sum of TEN AND NO/100 DOLLARS ($10.00) and other good and valuable considerations to said grantor in hand paid by said grantee, the receipt whereof is hereby acknowledged, has granted, bargained, and sold to the said grantee, and grantee's heirs and assigns forever, the following described land, situate, lying and being in Pinellas County, Florida, to-wit:

*AN UNDIVIDED 25% INTEREST IN AND TO:*
Lots 13, 14, 15, and 16, Block D, NORTH PASS A GRILLE SECTION A, according to the Plat thereof, recorded in Plat Book 5, Page 18, Public Records of Pinellas County, Florida.

Subject to taxes for the year 2006 and thereafter; covenants, conditions, restrictions, easements, reservations and limitations of record, if any.

and said grantor does hereby fully warrant the title to said land, and will defend the same against lawful claims of all persons whomsoever.

* "Grantor" and "Grantee" are used for singular or plural, as context requires.

In Witness Whereof, grantor has hereunto set grantor's hand and seal the day and year first above written.

Signed, sealed and delivered in our presence:

_____
Witness Name: Crystal Goldtree

_____
Witness Name: PETER D. GRAHAM

State of Florida
County of Pinellas

The foregoing instrument was acknowledged before me this 7th day of August, 2006 by Beth Ann Moreau, managing member of Dolphin Watch VI, LLC, on behalf of the company, who [X] is personally known or [X] has produced a driver's license as identification.

_____ (Seal)
Beth Ann Moreau, Managing Member

[Notary Seal]

_____
Notary Public

Printed Name: _____

My Commission Expires: _____

PETER D. GRAHAM
Notary Public, State of Florida
My comm. exp. Feb. 15, 2010
Comm. No. DD 500135

DoubleTime®

Deposition Exhibit 5

I#: 2017188430 BK: 19670  PG: 559, 06/19/2017 at 08:54 AM, RECORDING 1 PAGES
$10.00    KEN BURKE, CLERK OF COURT AND COMPTROLLER PINELLAS COUNTY, FL BY
DEPUTY CLERK: CLK101736

Prepared by and return to:
A Heritage Title - Pinellas, Inc.
5200 Central Avenue
St. Petersburg, FL 33707
727-321-2600
File Number: 17-228

Parcel Identification No: 18/32/16/61002/004/0130

_____ [Space Above This Line For Recording Data] _____

# Warranty Deed
(STATUTORY FORM - SECTION 689.02, F.S.)

This Indenture made this 16th day of June, 2017 between John R. DeSilva a/k/a John R. DaSilva, a single man whose
post office address is P.O. Box 7569, St. Petersburg, FL 33734 County of Pinellas, State of Florida, grantor*, and Joshua
T. Keleske, as Trustee of the 2707 Pass A Grille Way Land Trust u/t/d 6/12/2017  whose post office address is 3333 W.
Kennedy Boulevard, , Suite 204, Tampa, FL 33609 of the County of Hillsborough, State of Florida, grantee*,

Witnesseth, that said grantor, for and in consideration of the sum of Five Million Three Hundred Ninety-Five Thousand
and 00/100 Dollars ($5,395,000.00 ) and other good and valuable considerations to said grantor in hand paid by said grantee,
the receipt whereof is hereby acknowledged, has granted, bargained, and sold to the said grantee, and grantee's heirs and
assigns forever, the following described land, situate, lying and being in Pinellas County, Florida, to-wit:

Lots 13, 14, 15 and 16 , Block D, SECTION "A" NORTH PASS A GRILLE, according to the Plat
thereof, recorded in Plat Book 5, Page 18, of the Public Records of Pinellas County, Florida.

Grantor warrants that at the time of this conveyance, the subject property is not the Grantor's homestead
within the meaning set forth in the constitution of the state of Florida, nor is it contiguous to or a part of
homestead property.

This deed hereby confers on the Grantee/Trustee the power and authority to either protect, conserve and to
sell, or to lease, or to mortgage, or to encumber, or otherwise to manage and dispose of the real property
described herein in accordance with Section 689.073, Florida Statutes. A duly appointed Successor Trustee
shall have the same aforementioned powers.

Subject to taxes for the year 2017 and thereafter; covenants, conditions, restrictions, easements, reservations and limitations
of record, if any.

and said grantor does hereby fully warrant the title to said land, and will defend the same against lawful claims of all persons
whomsoever.

* "Grantor" and "Grantee" are used for singular or plural, as context requires.

In Witness Whereof, grantor has hereunto set grantor's hand and seal the day and year first above written.

Signed, sealed and delivered in our presence:

Witness Name: _PETER D GRAHAM_

Witness Name: _Rafal Wazia_

_____(Seal)
John R. DeSilva a/k/a John R. DaSilva

State of Florida
County of Pinellas

The foregoing instrument was acknowledged before me this 16th day of June, 2017 by John R. DeSilva a/k/a John R.
DaSilva, who [_] is personally known or [X] has produced a driver's license as identification.

[Notary Seal]

PETER D GRAHAM
MY COMMISSION #FF036423
EXPIRES: MAR 4, 2016
Bonded through 1st State Insurance

Notary Public

Printed Name: _____

My Commission Expires: _____

DoubleTimes

**Brief Exhibit T**

**DeSilva Deposition**
**Plaintiff Exhibit 7**

**Plaintiff Exhibit 7**

888 Casey Avenue
St. Pete Beach, Florida 33706
727-363-9241
www.spbdir.com

August 4, 2009

John De Silva
3817 Pass-a-Grille Way
St. Pete Beach, Florida 33706

Re: 3707 Pass-a-Grille Way

Dear Mr. De Silva:

On June 24, 2009, the City of St. Pete Beach Board of Adjustment approved your application for variance, in Case # 2009022. This approval provides for reconstruction of one building housing a non-conforming use, and the substantial improvement of two other structures housing non-conforming uses, in accordance with the plans submitted as part of the application package.

This approval is valid for one year from the effective date of the decision, which is July 24, 2009. You must obtain a building permit to implement the approved variance no later than July 24, 2010 or the variance is voided.

If you have any questions, please contact me.

Sincerely,

Paul E. Holley, AICP
Director of Community Development

**Deposition Exhibit 7**

**Brief Exhibit T**

**DeSilva Deposition**
**Plaintiff Exhibit 9**

HUD-1
A. Settlement Statement

U.S. Department of Housing
and Urban Development

OMB No. 2502-0265

**B. Type of Loan**

| ○ 1. FHA | ○ 2. FmHA | ○ 3. Conv. Unins. | 6. File Number 17-228 | 7. Loan Number | 8. Mortg. Ins. Case Num. |
| ○ 4. V.A. | ○ 5. Conv. Ins. | | ID: | | |

C. NOTE: This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown here. Items marked "(p.o.c.)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.

D. NAME OF BORROWER:   Joshua T. Keleske, as Trustee of the 2707 Pass A Grille Way Land Trust u/d/d 6/12/2017
Address of Borrower:   3333 W. Kennedy Boulevard, , Suite 204, Tampa, Florida 33609

E. NAME OF SELLER:   John R. DeSilva, a single man
Address of Seller:   P.O. Box 7599, St. Petersburg, Florida 33734
TIN:

F. NAME OF LENDER:
Address of Lender:

G. PROPERTY LOCATION:   2707 Pass A Grille Way, St. Pete Beach, Florida 33706

H. SETTLEMENT AGENT:   A Heritage Title - Pinellas, Inc.
TIN: 65-0344535
Place of Settlement:   5200 Central Avenue , St. Petersburg, Florida 33707
Phone: 727-321-2500

I. SETTLEMENT DATE:   6/16/17
DISBURSEMENT DATE: 6/16/17

**Plaintiff Exhibit 9**

| J. Summary of borrower's transaction | | K. Summary of seller's transaction | |
|---|---|---|---|
| 100. Gross amount due from borrower: | | 400. Gross amount due to seller: | |
| 101. Contract sales price | 6,395,000.00 | 401. Contract sales price | 6,395,000.00 |
| 102. Personal property | | 402. Personal property | |
| 103. Settlement charges to borrower (Line 1400) | 2,067.02 | 403. | |
| 104. | | 404. Title Discount | 4,137.02 |
| 105. | | 405. | |
| Adjustments for items paid by seller in advance: | | Adjustments for items paid by seller in advance: | |
| 106. City/town taxes | | 406. City/town taxes | |
| 107. County taxes | | 407. County taxes | |
| 108. Assessments | | 408. Assessments | |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| 120. Gross amount due from borrower: | 6,397,067.02 | 420. Gross amount due to seller: | 6,399,137.02 |
| 200. Amounts paid or in behalf of borrower: | | 500. Reductions in amount due to seller: | |
| 201. Deposit or earnest money | 100,000.00 | 501. Excess deposit (see instructions) | |
| 202. Principal amount of new loan(s) | | 502. Settlement charges to seller (line 1400) | 399,091.04 |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. Principal amount of second mortgage | | 504. Payoff of first mortgage loan | 4,230,000.00 |
| 205. Credit 1 day of Tax Proration form Title Co | | 505. Payoff of second mortgage loan | |
| 206. | | 506. Deposits held by seller | |
| 207. Principal amt of mortgage held by seller | | 507. Principal amt of mortgage held by seller | |
| 208. | | 508. | |
| 209. Credit Repair/Termite Treatment | 10,000.00 | 509. Credit Repair/Termite Treatment | 10,000.00 |
| Adjustments for items unpaid by seller: | | Adjustments for items unpaid by seller: | |
| 210. City/town taxes | | 510. City/town taxes | |
| 211. County taxes from 01/01/17 to 06/16/17 | 22,745.65 | 511. County taxes from 01/01/17 to 06/16/17 | 22,745.65 |
| 212. Assessments | | 512. Assessments | |
| 213. | | 513. | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| 220. Total paid by/for borrower: | 132,745.65 | 520. Total reductions in amount due seller: | 4,661,836.69 |
| 300. Cash at settlement from/to borrower: | | 600. Cash at settlement to/from seller: | |
| 301. Gross amount due from borrower (line 120) | 6,397,067.02 | 601. Gross amount due to seller (line 420) | 6,399,137.02 |
| 302. Less amount paid by/for the borrower (line 220) | (132,745.65) | 602. Less total reductions in amount due seller (line 620) | (4,661,836.69) |
| 303. Cash ( ☑ From ☐ To ) Borrower: | 6,264,321.37 | 603. Cash ( ☑ To ☐ From ) Seller: | 737,300.33 |

Substitute Form 1099 Seller Statement:   The information contained in blocks E, G, H, and I on line 401 is important tax information and is being furnished to the IRS. If you are required to file a return, a negligence penalty or other sanction will be imposed on you if this item is required to be reported and the IRS determines that it has not been reported.

Seller Instructions:   If this real estate was your principal residence, file Form 2119, Sale or Exchange of Principal Residence, for any gain, with your tax return; for other transactions, complete the applicable parts of Form 4797, Form 6252 and/or Schedule D (Form 1040).

**Deposition Exhibit 9**

DoubleTime®

HUD-1

U.S. Department of Housing and Urban Development

Page 2

| L. Settlement charges | | Paid from Borrower's Funds at Settlement | Paid from Seller's Funds at Settlement |
|---|---|---|---|
| 700. Total Sales/Brokers Com. based on price $5,395,000.00 @ % = 274,045.00 | | Borrower POC/Seller POC | |
| 701. 112,145.00 % to Sand Key Realty (3% +29S MLS -$50,000 to Seller) | | | |
| 702. 161,900.00 % to Coldwell Banker (3%-$295 MLS)(incl Broker $345 Co | | | |
| 703. Commission paid at settlement | | | |
| 704. to | | 345.00 | 273,700.00 |
| 800. Items payable in connection with loan: | | | |
| 801. Loan origination fee % to | | Borrower POC/Seller POC | |
| 802. Loan discount % to | | | |
| 803. Appraisal fee to | | | |
| 804. Credit report to | | | |
| 805. Lender's inspection fee to | | | |
| 806. Mortgage insurance application fee to | | | |
| 807. Assumption Fee to | | | |
| 808. to | | | |
| 809. to | | | |
| 810. to | | | |
| 811. to | | | |
| 900. Items required by lender to be paid in advance: | | | |
| 901. Interest from to @ /day | | Borrower POC/Seller POC | |
| 902. Mortgage insurance premium for months to | | | |
| 903. Hazard insurance premium for years to | | | |
| 904. Flood insurance premium for years to | | | |
| 905. years to | | | |
| 1000. Reserves deposited with lender. | | | |
| 1001. Hazard insurance months @ per month | | Borrower POC/Seller POC | |
| 1002. Mortgage insurance months @ per month | | | |
| 1003. City property taxes months @ per month | | | |
| 1004. County property taxes months @ per month | | | |
| 1005. Annual assessments months @ per month | | | |
| 1006. Flood insurance months @ per month | | | |
| 1007. months @ per month | | | |
| 1008. months @ per month | | | |
| 1009. Aggregate accounting adjustment months @ per month | | | |
| 1100. Title charges: | | Borrower POC/Seller POC | |
| 1101. Settlement or closing fee to A Heritage Title – Pinellas, Inc. | | 100.00 | 100.00 |
| 1102. Abstract or title search to A Heritage Title – Pinellas, Inc. | | | 250.00 |
| 1103. Title examination to | | | |
| 1104. Title insurance binder to | | | |
| 1105. Document preparation to | | | |
| 1106. Notary fees to | | | |
| 1107. Attorney's Fees to Zacur, Graham & Costis, P.A. | | | |
| (includes above item numbers: Paradigm and McDonald | | | 12,090.00 |
| 1108. Title insurance to First American Title Insurance Company/A Heritage | ) | | |
| (includes above item numbers: | | | 15,963.75 |
| 1109. Lender's coverage (Premium): | 1 | | |
| 1110. Owner's coverage (Premium): $5,395,000.00 ($15,963.75) | | | |
| 1111. Endorse: | | | |
| 1112. to | | | |
| 1113. to | | | |
| 1200. Government recording and transfer charges: | | | |
| 1201. Recording fees Deed $10.00 Mortgage(s) Releases | | 10.00 | |
| 1202. City/county tax/stamps Deed Mortgage(s) | | | |
| 1203. State tax/stamps Deed $37,765.00 Mortgage(s) | | | |
| 1204. Record Satisfaction to Clerk of the Circuit Court | | | 37,765.00 |
| 1205. to | | | 27.00 |
| 1300. Additional settlement charges: | | | |
| 1301. Survey to Surveying St. Pete | | Borrower POC/Seller POC | |
| 1302. Pest Inspection to | | 1,425.00 | |
| 1303. 2016 R.E. Taxes to Pinellas County Tax Collector | | | |
| 1304. E-Recording to CSC/Heritage Title | | | 59,189.29 |
| 1305. Refund 1 day tax Credit/Recording to 2707 Pass A Grille Way Land Trust u/t/a 6/12/2017 | | 6.00 | 6.00 |
| 1306. to | | 181.02 | |
| 1307. to | | | |
| 1308. to | | | |
| 1309. to | | | |
| 1400. Total settlement charges: | | | |
| (Enter on lines 103, Section J and 502, Section K ) | | 2,067.02 | 399,091.04 |

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

_____ Borrower
Joshua T. Keleske, Trustee

_____ Borrower

_____ Seller
John R. DeSilva

_____ Seller

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused, or will cause, the funds to be disbursed in accordance with this statement.

A Heritage Title – Pinellas, Inc.

by: _____   Date 6/16/17
As its Authorized Representative

WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.

DoubleTime®

**Brief Exhibit T**

**DeSilva Deposition**
**Plaintiff Exhibit 10**

I#: 2017216762 BK: 19702  PG: 236, 07/13/2017 at 12:16 PM, RECORDING 1 PAGES
$10.00  D DOC STAMP COLLECTION $37765.00  KEN BURKE, CLERK OF COURT AND
COMPTROLLER PINELLAS COUNTY, FL BY DEPUTY CLERK: CLKPR10

I#: 2017188430 BK: 19670  PG: 559, 06/19/2017 at 08:54 AM, RECORDING 1 PAGES
$10.00   KEN BURKE, CLERK OF COURT AND COMPTROLLER PINELLAS COUNTY, FL BY
DEPUTY CLERK: CLK101736

Prepared by and return to:
A Heritage Title - Pinellas, Inc.
5200 Central Avenue
St. Petersburg, FL 33707
727-321-2600
File Number: 17-228

Parcel Identification No. 18/32/16/61002/004/0130

[Space Above This Line For Recording Data]

**Plaintiff Exhibit 10**

## Warranty Deed

(STATUTORY FORM - SECTION 689.02, F.S.)

**This Indenture** made this 16th day of June, 2017 between John R. DeSilva a/k/a John R. DaSilva, a single man whose post office address is P.O. Box 7569, St. Petersburg, FL 33734 County of Pinellas, State of Florida, grantor*, and Joshua T. Keleske, as Trustee of the 2707 Pass A Grille Way Land Trust u/t/d 6/12/2017  whose post office address is 3333 W. Kennedy Boulevard., Suite 204, Tampa, FL 33609 of the County of Hillsborough, State of Florida, grantee*,

**Witnesseth**, that said grantor, for and in consideration of the sum of Five Million Three Hundred Ninety-Five Thousand and 00/100 Dollars ($5,395,000.00 ) and other good and valuable considerations to said grantor in hand paid by said grantee, the receipt whereof is hereby acknowledged, has granted, bargained, and sold to the said grantee, and grantee's heirs and assigns forever, the following described land, situate, lying and being in Pinellas County, Florida, to-wit:

Lots 13, 14, 15 and 16 , Block D, SECTION "A", NORTH PASS A GRILLE, according to the Plat thereof, recorded in Plat Book 5, Page 18, of the Public Records of Pinellas County, Florida.

Grantor warrants that at the time of this conveyance, the subject property is not the Grantor's homestead within the meaning set forth in the constitution of the state of Florida, nor is it contiguous to or a part of homestead property.

This deed hereby confers on the Grantee/Trustee the power and authority to either protect, conserve and to sell, or to lease, or to mortgage, or to encumber, or otherwise to manage and dispose of the real property described herein in accordance with Section 689.073, Florida Statutes. A duly appointed Successor Trustee shall have the same aforementioned powers.

Subject to taxes for the year 2017 and thereafter; covenants, conditions, restrictions, easements, reservations and limitations of record, if any.

and said grantor does hereby fully warrant the title to said land, and will defend the same against lawful claims of all persons whomsoever.

* "Grantor" and "Grantee" are used for singular or plural, as context requires.

**In Witness Whereof**, grantor has hereunto set grantor's hand and seal the day and year first above written.

Signed, sealed and delivered in our presence:

Witness Name: PETER D GRAHAM

Witness Name: Rafel Wazio

_____(Seal)
John R. DeSilva a/k/a John R. DaSilva

State of Florida
County of Pinellas

The foregoing instrument was acknowledged before me this 16th day of June, 2017 by John R. DeSilva a/k/a John R. DaSilva, who [_] is personally known or [X] has produced a driver's license as identification.

[Notary Seal]

PETER D GRAHAM
MY COMMISSION #FF058439
EXPIRES: MAR 4, 2018
Bonded through 1st State Insurance

Notary Public

Printed Name: _____

My Commission Expires: _____

THIS DEED IS BEING RECORDED TO CORRECT E-RECORD ERROR TO PAY DOC STAMPS.

**Deposition Exhibit 10**

DoubleTimes

**Brief Exhibit T**

**DeSilva Deposition**
**Plaintiff Exhibit 11**



**Plaintiff Exhibit 11**

### Affidavit of Steven MacDonald

ON THIS DAY personally appeared before me Steven MacDonald, and after first being duly sworn, she deposes and says:

1. Affiant's name is Steven MacDonald

2. Affiant has executed this Affidavit and made the statements contained herein with the knowledge and understanding that the Affidavit will be used in conjunction with the litigation known as *In Re: Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mexico, on April 20, 2010, MDL No. 2179.* Specifically, the Affidavit will be used in Plaintiff, John R. DeSilva's matter.

3. Affiant is the beneficial owner of 2707 Pass A Grille Way Land Trust, the grantee in the Warranty Deed recorded at Office Records Book 19670, Page 559 of the Office Records of Pinellas County, Florida.

4. Affiant did not purchase, nor acquire any interest in the Litigation and claims related thereto, and has no interest in and to those rights known as *In Re: Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mexico, on April 20, 2010, MDL No. 2179,* pending before the United States District Court for the Eastern District of Louisiana, and the underlying suite filed in the Middle District of Florida known as *The Bird of Paradise, LLC and John DeSilva v. BP Exploration & Production, Inc., et al.,* 8:13 CV 960.

FURTHER AFFIANT SAYETH NAUGHT.

_____
Steven MacDonald

STATE OF FLORIDA
COUNTY OF HILLSBOROUGH

The foregoing instrument was acknowledged before me by means of ✓ physical presence or ___ online notarization, this 18 day of September, 2020 by Steven MacDonald who is personally known to me or who has produced _____ as identification.

Notary Public State of Florida
Brigitte Stephens
My Commission GG 215823
Expires 05/13/2022

NOTARY PUBLIC:

_____
Printed name: Brigitte Stephens
State of Florida at Large (Seal)
Commission No.: GG215823
My Commission Expires:

**Deposition Exhibit 11**

**Brief Exhibit T**

**DeSilva Deposition
Plaintiff Exhibit 12**


**Plaintiff Exhibit 12**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | ☆ ☆ ☆ ☆ | MDL NO. 2179 SECTION J |
| This Document relates to: | ☆ ☆ | JUDGE BARBIER |
| *John DeSilva, Individually, and as the Sole Member, Owner, and Operator of The Bird of Paradise, LLC v. BP Expl. & Prod., Inc., et al.* Case No. 16-cv-05277 | ☆ ☆ | MAGISTRATE JUDGE CURRAULT |

## DECLARATION OF STEVEN A. MACDONALD

I, Steven A. MacDonald, declare as follows:

1.     I am the manager of MacDonald Family Management, LLC, and MacDonald Family Management, LLC is the manager of Barracuda Club LLC, a Florida limited liability company. *See* 2021 Florida Limited Liability Company Annual Report of the Barracuda Club LLC (Document # L17000124745) (attached hereto as Exhibit 1); 2021 Florida Limited Liability Company Annual Report of MacDonald Family Management, LLC (attached hereto as Exhibit 2).

2.     In 2017, an entity affiliated with me purchased from John DeSilva a parcel of real property at 2707 Pass-A-Grille Way, St. Pete Beach, Florida (the "2017 Transaction") as my assignee under the Contract for Sale and Purchase (attached hereto as Exhibit 3).

3.     In connection with the 2017 Transaction, Mr. DeSilva agreed in May 2017 to transfer the License issued by the State of Florida to The Bird of Paradise, LLC permitting the property at 2707 Pass-A-Grille Way to operate as a Single Resort Dwelling. *See* Exhibit 3 at 11; *see also* Single Resort Dwelling License of The Bird of Paradise, LLC (attached hereto as Exhibit 4) (license number DWE6215636).

<span style="color:red">**Deposition Exhibit 12**</span>

4.      In June 2017, Barracuda Club LLC and Mr. DeSilva entered into a Membership Interest Purchase Agreement, a true and correct copy of which is attached hereto as Exhibit 5 (the "Purchase Agreement").

5.      Pursuant to the Purchase Agreement, Barracuda Club LLC purchased 100% of the membership interests in The Bird of Paradise, LLC from John DeSilva. Barracuda Club LLC was admitted as the sole member of The Bird of Paradise, LLC, and John DeSilva withdrew as sole member of The Bird of Paradise, LLC. *See* Exhibit 5 at 5.

6.      The Purchase Agreement did not reserve to John DeSilva any claims The Bird of Paradise, LLC may have had against BP for any damages relating to the 2010 Deepwater Horizon Oil Spill ("the Spill"). *See* Exhibit 5.

7.      In April of 2018, consistent with the Purchase Agreement, an Amended Annual Report was filed with the Florida Department of State listing myself as the member-manager of The Bird of Paradise, LLC. *See* 2018 Florida Limited Liability Company Amended Annual Report of The Bird of Paradise, LLC (attached hereto as Exhibit 6).

8.      In 2020, no yearly report for The Bird of Paradise, LLC was filed with the Florida Department of State and so The Bird of Paradise, LLC was administratively dissolved. *See* Florida Detail by Document Number for The Bird of Paradise, LLC (#L0400009203) (attached hereto as Exhibit 7).

9.      The Barracuda Club LLC currently holds the License permitting the property at 2707 Pass-A-Grille Way to operate as a Single Resort Dwelling. *See* Florida License Search for License Number DWE6215636 (attached hereto as Exhibit 8).

KE 76845669 2

10.     I do not intend, either individually or through the Barracuda Club LLC, The Bird of Paradise, LLC, or through any other entity I control, to pursue any claim on behalf of The Bird of Paradise, LLC in connection with the Spill.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed in _____5·17·21_____, Florida on this 17th day of May, 2021.

_____
Steven A. MacDonald

3

EXHIBIT 1

2021  FLORIDA LIMITED LIABILITY COMPANY ANNUAL REPORT

DOCUMENT# L17000124745

**FILED**
Mar 13, 2021
Secretary of State
0887045677CC

Entity Name: BARRACUDA CLUB LLC

Current Principal  Place of Business:

1311 N. WESTSHORE BLVD.
SUITE 101A
TAMPA, FL 33607

Current Mailing Address:

1311 N. WESTSHORE BLVD.
SUITE 101A
TAMPA, FL 33607 US

FEI Number: 82-1835075

Certificate of Status Desired: No

Name and Address of Current Registered Agent:

KOCHE, DAVID L
601 BAYSHORE BLVD STE 700
TAMPA, FL 33606 US

*The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.*

SIGNATURE:   DAVID L. KOCHE

03/13/2021

_____
Electronic Signature of Registered Agent

Date

**Authorized Person(s) Detail :**

| | |
|---|---|
| Title | MGR |
| Name | MACDONALD FAMILY MANAGEMENT, LLC |
| Address | 1311 N. WESTSHORE BLVD. SUITE 101A |
| City-State-Zip: | TAMPA FL 33607 |

*I hereby certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am a managing member or manager of the limited liability company or the receiver or trustee empowered to execute this report as required by Chapter 605, Florida Statutes; and that my name appears above, or on an attachment with all other like empowered.*

SIGNATURE: STEVEN A. MACDONALD

MANAGER

03/13/2021

_____
Electronic Signature of Signing Authorized Person(s) Detail

Date

# EXHIBIT 2

2021 FLORIDA LIMITED LIABILITY COMPANY ANNUAL REPORT

DOCUMENT# L20000045829

Entity Name: MACDONALD FAMILY MANAGEMENT, LLC

**FILED**
Mar 13, 2021
Secretary of State
6683979768CC

Current Principal Place of Business:

1311 N. WESTSHORE BLVD, SUITE 101A
TAMPA, FL 33607

Current Mailing Address:

1311 N. WESTSHORE BLVD, SUITE 101A
TAMPA, FL 33607 US

FEI Number: 85-0808216

Certificate of Status Desired: No

Name and Address of Current Registered Agent:

KOCHE, DAVID L
601 BAYSHORE BOULEVARD, SUITE 700
TAMPA, FL 33606 US

*The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.*

SIGNATURE: _____

Electronic Signature of Registered Agent                                    Date

Authorized Person(s) Detail :

| | |
|---|---|
| Title | MGR |
| Name | MACDONALD, STEVEN A |
| Address | 1311 N. WESTSHORE BLVD, SUITE 101A |
| City-State-Zip: | TAMPA FL 33607 |

*I hereby certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am a managing member or manager of the limited liability company or the receiver or trustee empowered to execute this report as required by Chapter 605, Florida Statutes; and that my name appears above, or on an attachment with all other like empowered.*

SIGNATURE: STEVEN A. MACDONALD                     MANAGER                  03/13/2021

Electronic Signature of Signing Authorized Person(s) Detail                              Date

# EXHIBIT 3

dotloop signature verification: dtlp.us/xxxx-xxxx-xxxx

**COLDWELL BANKER**

RESIDENTIAL REAL ESTATE

# "AS IS" Residential Contract For Sale And Purchase
### THIS FORM HAS BEEN APPROVED BY THE FLORIDA REALTORS AND THE FLORIDA BAR

1* PARTIES: John R. De Silva
2* and Steven A. Macdonald _____ ("Seller"),
3  agree that Seller shall sell and Buyer shall buy the following described Real Property and Personal Property
4  (collectively "Property") pursuant to the terms and conditions of this AS IS Residential Contract For Sale And Purchase
5  and any riders and addenda ("Contract"):
6  1. PROPERTY DESCRIPTION:
7*   (a) Street address, city, zip: 2707 Pass A Grille Way, St Pete Beach, FL 33706
8*   (b) Located in: Pinellas _____ County, Florida. Property Tax ID #: 18-32-16-61002-004-0130
9*   (c) Real Property: The legal description is _____
10      North Pass-A-Grille Sec A BLK D, Lots 13, 14, 15 & 16
11      _____
12      together with all existing improvements and fixtures, including built-in appliances, built-in furnishings and
13      attached wall-to-wall carpeting and flooring ("Real Property") unless specifically excluded in Paragraph 1(e) or
14      by other terms of this Contract.
15   (d) Personal Property: Unless excluded in Paragraph 1(e) or by other terms of this Contract, the following items
16      which are owned by Seller and existing on the Property as of the date of the initial offer are included in the
17      purchase: range(s)/oven(s), refrigerator(s), dishwasher(s), disposal, ceiling fan(s), intercom, light fixture(s),
18      drapery rods and draperies, blinds, window treatments, smoke detector(s), garage door opener(s), security gate
19      and other access devices, and storm shutters/panels ("Personal Property").
20*     Other Personal Property items included in this purchase are: All Refrigerator(S), Microwave(s), Dishwasher(s), Range(s),
21      Oven(s), Washer(s), Dryer(s), All household furniture, Artwork, furnishing, TVs, Security Systems, Audio/Video Equipment, Pool Equipment, Dock/Lifts.
22      Personal Property is included in the Purchase Price, has no contributory value, and shall be left for the Buyer.
23*  (e) The following items are excluded from the purchase: _____
24      _____

### PURCHASE PRICE AND CLOSING

26* 2. PURCHASE PRICE (U.S. currency): ........................................................................... $5,395,000.00
27*   (a) Initial deposit to be held in escrow in the amount of (checks subject to COLLECTION) ....... $50,000.00
28      The initial deposit made payable and delivered to "Escrow Agent" named below
29*     (CHECK ONE): (i) ☐ accompanies offer or (ii) ☑ is to be made within 3 _____ (if left
30      blank, then 3) days after Effective Date. IF NEITHER BOX IS CHECKED, THEN
31      OPTION (ii) SHALL BE DEEMED SELECTED.
32*     Escrow Agent Information: Name: Coldwell Banker - Ashley Eddings
33*     Address: 500 N. Westshore Blvd., Suite #850, Tampa, FL 33609
34*     Phone: 813-286-6563 _____ E-mail: Ashley.eddings@Floridamoves.com Fax: 813-289-4668
35*  (b) Additional deposit to be delivered to Escrow Agent within 16 _____ (if left blank, then 10)
36*     days after Effective Date ....................................................................... $50,000.00
37      (All deposits paid or agreed to be paid, are collectively referred to as the "Deposit")
38*  (c) Financing: Express as a dollar amount or percentage ("Loan Amount") see Paragraph 8 .........
39*  (d) Other: _____ $
40   (e) Balance to close (not including Buyer's closing costs, prepaids and prorations) by wire
41*     transfer or other COLLECTED funds ............................................................ $5,295,000.00
42      NOTE: For the definition of "COLLECTION" or "COLLECTED" see STANDARD S.
43 3. TIME FOR ACCEPTANCE OF OFFER AND COUNTER-OFFERS; EFFECTIVE DATE:
44   (a) If not signed by Buyer and Seller, and an executed copy delivered to all parties on or before
45*     05/16/2017 at 6:00 p.m. _____, this offer shall be deemed withdrawn and the Deposit, if any, shall be returned to
46      Buyer. Unless otherwise stated, time for acceptance of any counter-offers shall be within 2 days after the day
47      the counter-offer is delivered.
48   (b) The effective date of this Contract shall be the date when the last one of the Buyer and Seller has signed or
49      initialed and delivered this offer or final counter-offer ("Effective Date").
50 4. CLOSING DATE: Unless modified by other provisions of this Contract, the closing of this transaction shall occur
51      and the closing documents required to be furnished by each party pursuant to this Contract shall be delivered
52*     ("Closing") on 06/16/2017 _____ ("Closing Date"), at the time established by the Closing Agent.

Buyer's Initials _____ _____

Seller's Initials _____ _____

Page 1 of 12

FloridaRealtors/FloridaBar-ASIS-5   Rev.4/17 © 2017 Florida Realtors® and The Florida Bar.  All rights reserved.

docloop signature verification ... ... ... ... ... ... ...

53 5. **EXTENSION OF CLOSING DATE:**
54    (a) If Paragraph 8(b) is checked and Closing funds from Buyer's lender(s) are not available on Closing Date due
65    to Consumer Financial Protection Bureau Closing Disclosure delivery requirements ("CFPB Requirements"),
56    then Closing Date shall be extended for such period necessary to satisfy CFPB Requirements, provided such
57    period shall not exceed 10 days.
58    (b) If an event constituting "Force Majeure" causes services essential for Closing to be unavailable, including the
59    unavailability of utilities or issuance of hazard, wind, flood or homeowners' insurance, Closing Date shall be
60    extended as provided in STANDARD G.
61 6. **OCCUPANCY AND POSSESSION:**
62    (a) Unless the box in Paragraph 6(b) is checked, Seller shall, at Closing, deliver occupancy and possession of the
63    Property to Buyer free of tenants, occupants and future tenancies. Also, at Closing, Seller shall have removed
64    all personal items and trash from the Property and shall deliver all keys, garage door openers, access devices
65    and codes, as applicable, to Buyer. If occupancy is to be delivered before Closing, Buyer assumes all risks of
66    loss to the Property from date of occupancy, shall be responsible and liable for maintenance from that date,
67    and shall be deemed to have accepted the Property in its existing condition as of time of taking occupancy.
68 *  (b) ☐ CHECK IF PROPERTY IS SUBJECT TO LEASE(S) OR OCCUPANCY AFTER CLOSING. If Property is
69    subject to a lease(s) after Closing or is intended to be rented or occupied by third parties beyond Closing, the
70    facts and terms thereof shall be disclosed in writing by Seller to Buyer and copies of the written lease(s) shall
71    be delivered to Buyer, all within 5 days after Effective Date. If Buyer determines, in Buyer's sole discretion, that
72    the lease(s) or terms of occupancy are not acceptable to Buyer, Buyer may terminate this Contract by delivery
73    of written notice of such election to Seller within 5 days after receipt of the above items from Seller, and Buyer
74    shall be refunded the Deposit thereby releasing Buyer and Seller from all further obligations under this Contract.
75    Estoppel Letter(s) and Seller's affidavit shall be provided pursuant to STANDARD D. If Property is intended to
76    be occupied by Seller after Closing, see Rider U. POST-CLOSING OCCUPANCY BY SELLER.
77 * 7. **ASSIGNABILITY:** (CHECK ONE): Buyer ☐ may assign and thereby be released from any further liability under
78 *  this Contract; ☑ may assign but not be released from liability under this Contract; or ☐ may not assign this
79    Contract.
80                                                **FINANCING**
81 8. **FINANCING:**
82 *  ☑ (a) Buyer will pay cash for the purchase of the Property at Closing. There is no financing contingency to Buyer's
83    obligation to close. If Buyer obtains a loan for any part of the Purchase Price of the Property, Buyer acknowledges
84    that any terms and conditions imposed by Buyer's lender(s) or by CFPB Requirements shall not affect or extend
85    the Buyer's obligation to close or otherwise affect any terms or conditions of this Contract.
86 *  ☐ (b) This Contract is contingent upon Buyer obtaining approval of a ☐ conventional ☐ FHA ☐ VA or ☐ other
87 *  _____ (describe) loan within _____ (if left blank, then 30) days after Effective Date ("Loan Approval
88 *  Period") for (CHECK ONE): ☐ fixed, ☐ adjustable, ☐ fixed or adjustable rate in the Loan Amount (See Paragraph
89 *  2(c)), at an initial interest rate not to exceed _____% (if left blank, then prevailing rate based upon Buyer's
90 *  creditworthiness), and for a term of _____(if left blank, then 30) years ("Financing").
91 *     (i) Buyer shall make mortgage loan application for the Financing within _____ (if left blank, then 5) days
92    after Effective Date and use good faith and diligent effort to obtain approval of a loan meeting the Financing terms
93    ("Loan Approval") and thereafter to close this Contract. Loan Approval which requires a condition related to the sale
94    by Buyer of other property shall not be deemed Loan Approval for purposes of this subparagraph.

95    Buyer's failure to use diligent effort to obtain Loan Approval during the Loan Approval Period shall be considered a
96    default under the terms of this Contract. For purposes of this provision, "diligent effort" includes, but is not limited
97    to, timely furnishing all documents and information and paying of all fees and charges requested by Buyer's
98    mortgage broker and lender in connection with Buyer's mortgage loan application.

99       (ii) Buyer shall keep Seller and Broker fully informed about the status of Buyer's mortgage loan application,
100   Loan Approval, and loan processing and authorizes Buyer's mortgage broker, lender, and Closing Agent to disclose
101   such status and progress, and release preliminary and finally executed closing disclosures and settlement
102   statements, to Seller and Broker.

103      (iii) Upon Buyer obtaining Loan Approval, Buyer shall promptly deliver written notice of such approval to Seller.
104      (iv) If Buyer is unable to obtain Loan Approval after the exercise of diligent effort, then at any time prior to
105   expiration of the Loan Approval Period, Buyer may provide written notice to Seller stating that Buyer has been
106   unable to obtain Loan Approval and has elected to either:
107         (1) waive Loan Approval, in which event this Contract will continue as if Loan Approval had been obtained; or
108         (2) terminate this Contract.

dotloop signature verification: ................................................

109  (v) If Buyer fails to timely deliver either notice provided in Paragraph 8(b)(iii) or (iv), above, to Seller prior to
110  expiration of the Loan Approval Period, then Loan Approval shall be deemed waived, in which event this Contract
111  will continue as if Loan Approval had been obtained, provided however, Seller may elect to terminate this Contract
112  by delivering written notice to Buyer within 3 days after expiration of the Loan Approval Period.
113  (vi) If this Contract is timely terminated as provided by Paragraph 8(b)(iv)(2) or (v), above, and Buyer is not in
114  default under the terms of this Contract, Buyer shall be refunded the Deposit thereby releasing Buyer and Seller
115  from all further obligations under this Contract.
116  (vii) If Loan Approval has been obtained, or deemed to have been obtained, as provided above, and Buyer
117  fails to close this Contract, then the Deposit shall be paid to Seller unless failure to close is due to: (1) Seller's
118  default or inability to satisfy other contingencies of this Contract; (2) Property related conditions of the Loan Approval
119  have not been met (except when such conditions are waived by other provisions of this Contract); or (3) appraisal
120  of the Property obtained by Buyer's lender is insufficient to meet terms of the Loan Approval, in which event(s) the
121  Buyer shall be refunded the Deposit, thereby releasing Buyer and Seller from all further obligations under this
122  Contract.
123*  ☐ (c) Assumption of existing mortgage (see rider for terms).
124ᴬ  ☐ (d) Purchase money note and mortgage to Seller (see riders; addenda; or special clauses for terms).
125  CLOSING COSTS, FEES AND CHARGES
126  9.  CLOSING COSTS; TITLE INSURANCE; SURVEY; HOME WARRANTY; SPECIAL ASSESSMENTS:
127  (a)  COSTS TO BE PAID BY SELLER:
128  • Documentary stamp taxes and surtax on deed, if any
129  • Owner's Policy and Charges (if Paragraph 9(c)(i) is checked)
130  • Title search charges (if Paragraph 9(c)(iii) is checked)
131ᴬ  • Municipal lien search (if Paragraph 9(c)(i) or (iii) is checked)
   • HOA/Condominium Association estoppel fees
   • Recording and other fees needed to cure title
   • Seller's attorneys' fees
   • Other:_____
132  If, prior to Closing, Seller is unable to meet the AS IS Maintenance Requirement as required by Paragraph 11
133  a sum equal to 125% of estimated costs to meet the AS IS Maintenance Requirement shall be escrowed at
134  Closing. If actual costs to meet the AS IS Maintenance Requirement exceed escrowed amount, Seller shall pay
135  such actual costs. Any unused portion of escrowed amount(s) shall be returned to Seller.
136  (b)  COSTS TO BE PAID BY BUYER:
137  • Taxes and recording fees on notes and mortgages
138  • Recording fees for deed and financing statements
139  • Owner's Policy and Charges (if Paragraph 9(c)(ii) is checked)
140  • Survey (and elevation certification, if required)
141  • Lender's title policy and endorsements
142  • HOA/Condominium Association application/transfer fees
143  • Municipal lien search (if Paragraph 9(c)(ii) is checked)
144ᴬ  • Other:_____
   • Loan expenses
   • Appraisal fees
   • Buyer's Inspections
   • Buyer's attorneys' fees
   • All property related insurance
   • Owner's Policy Premium (if Paragraph
     9 (c)(ii) is checked.)
145ᴬ  (c)  TITLE EVIDENCE AND INSURANCE: At least 15_____(if left blank, then 15, or if Paragraph 8(a) is checked,
146  then 5) days prior to Closing Date ("Title Evidence Deadline"), a title insurance commitment issued by a Florida
147  licensed title insurer, with legible copies of instruments listed as exceptions attached thereto ("Title
148  Commitment") and, after Closing, an owner's policy of title insurance (see STANDARD A for terms) shall be
149  obtained and delivered to Buyer. If Seller has an owner's policy of title insurance covering the Real Property, a
150  copy shall be furnished to Buyer and Closing Agent within 5 days after Effective Date. The owner's title policy
151  premium, title search and closing services (collectively, "Owner's Policy and Charges") shall be paid, as set
152  forth below. The title insurance premium charges for the owner's policy and any lender's policy will be calculated
153  and allocated in accordance with Florida law, but may be reported differently on certain federally mandated
154  closing disclosures and other closing documents.  For purposes of this Contract "municipal lien search" means a
155  search of records necessary for the owner's policy of title insurance to be issued without exception for unrecorded
165  liens imposed pursuant to Chapters 159 or 170, F.S., in favor of any governmental body, authority or agency.
167  (CHECK ONE):
158ᴬ  ☑ (i) Seller shall designate Closing Agent and pay for Owner's Policy and Charges, and Buyer shall pay the
159  premium for Buyer's lender's policy and charges for closing services related to Buyer's lender's policy,
160  endorsements and loan closing, which amounts shall be paid by Buyer to Closing Agent or such other
161  provider(s) as Buyer may select; or
162*  ☐ (ii) Buyer shall designate Closing Agent and pay for Owner's Policy and Charges and charges for closing
163  services related to Buyer's lender's policy, endorsements and loan closing; or

dotloop signature verification: ....................................

164    □ (iii) [MIAMI-DADE/BROWARD REGIONAL PROVISION]: Seller shall furnish a copy of a prior owner's policy
165    of title insurance or other evidence of title and pay fees for: (A) a continuation or update of such title evidence,
166    which is acceptable to Buyer's title insurance underwriter for reissue of coverage; (B) tax search; and (C)
167    municipal lien search. Buyer shall obtain and pay for post-Closing continuation and premium for Buyer's owner's
168 *    policy, and if applicable, Buyer's lender's policy. Seller shall not be obligated to pay more than $_____
169    (if left blank, then $200.00) for abstract continuation or title search ordered or performed by Closing Agent.
170    (d) SURVEY: On or before Title Evidence Deadline, Buyer may, at Buyer's expense, have the Closing Real Property
171    surveyed and certified by a registered Florida surveyor ("Survey"). If Seller has a survey covering the Real
172    Property, a copy shall be furnished to Buyer and Closing Agent within 5 days after Effective Date.
173 *    (e) HOME WARRANTY: At Closing, □ Buyer □ Seller ☑ N/A shall pay for a home warranty plan issued by
174    _____ at a cost not to exceed $_____. A home
175    warranty plan provides for repair or replacement of many of a home's mechanical systems and major built-in
176    appliances in the event of breakdown due to normal wear and tear during the agreement's warranty period.
177    (f) SPECIAL ASSESSMENTS: At Closing, Seller shall pay: (i) the full amount of liens imposed by a public body
178    ("public body" does not include a Condominium or Homeowner's Association) that are certified, confirmed and
179    ratified before Closing; and (ii) the amount of the public body's most recent estimate or assessment for an
180    improvement which is substantially complete as of Effective Date, but that has not resulted in a lien being
181    imposed on the Property before Closing. Buyer shall pay all other assessments. If special assessments may
182    be paid in installments (CHECK ONE):
183 *    ☑ (a) Seller shall pay installments due prior to Closing and Buyer shall pay installments due after Closing.
184    Installments prepaid or due for the year of Closing shall be prorated.
185 *    □ (b) Seller shall pay the assessment(s) in full prior to or at the time of Closing.
186    IF NEITHER BOX IS CHECKED, THEN OPTION (a) SHALL BE DEEMED SELECTED.
187    This Paragraph 9(f) shall not apply to a special benefit tax lien imposed by a community development district
188    (CDD) pursuant to Chapter 190, F.S., which lien shall be prorated pursuant to STANDARD K.
189

190    **10. DISCLOSURES:**
191    (a) RADON GAS: Radon is a naturally occurring radioactive gas that, when it is accumulated in a building in
192    sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that
193    exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding
194    radon and radon testing may be obtained from your county health department.
195    (b) PERMITS DISCLOSURE: Except as may have been disclosed by Seller to Buyer in a written disclosure, Seller
196    does not know of any improvements made to the Property which were made without required permits or made
197    pursuant to permits which have not been properly closed. If Seller identifies permits which have not been
198    properly closed or improvements which were not permitted, then Seller shall promptly deliver to Buyer all plans,
199    written documentation or other information in Seller's possession, knowledge, or control relating to
200    improvements to the Property which are the subject of such open permits or unpermitted improvements.
201    (c) MOLD: Mold is naturally occurring and may cause health risks or damage to property. If Buyer is concerned or
202    desires additional information regarding mold, Buyer should contact an appropriate professional.
203    (d) FLOOD ZONE; ELEVATION CERTIFICATION: Buyer is advised to verify by elevation certificate which flood
204    zone the Property is in, whether flood insurance is available and what restrictions apply to
205    improving the Property and rebuilding in the event of casualty. If Property is in a "Special Flood Hazard Area"
206    or "Coastal Barrier Resources Act" designated area or otherwise protected area identified by the U.S. Fish and
207    Wildlife Service under the Coastal Barrier Resources Act and the lowest floor elevation for the building(s) and/or
208    flood insurance rating purposes is below minimum flood elevation or is ineligible for flood insurance coverage
209    through the National Flood Insurance Program or private flood insurance as defined in 42 U.S.C. §4012a, Buyer
210 *    may terminate this Contract by delivering written notice to Seller within _____ (if left blank, then 20) days after
211    Effective Date, and Buyer shall be refunded the Deposit thereby releasing Buyer and Seller from all further
212    obligations under this Contract, failing which Buyer accepts existing elevation of buildings and flood zone
213    designation of Property. The National Flood Insurance Program may assess additional fees or adjust premiums
214    for pre-Flood Insurance Rate Map (pre-FIRM) non-primary structures (residential structures in which the insured
215    or spouse does not reside for at least 50% of the year) and an elevation certificate may be required for actuarial
216    rating.
217    (e) ENERGY BROCHURE: Buyer acknowledges receipt of Florida Energy-Efficiency Rating Information Brochure
218    required by Section 553.996, F.S.

Buyer's Initials _____      Page 4 of 12      Seller's Initials _____

FloridaRealtors/FloridaBar-ASIS-5    Rev.4/17 © 2017 Florida Realtors® and The Florida Bar. All rights reserved.

dotloop signature verification: dtlp.us/... ...

219   (f)  LEAD-BASED PAINT: If Property includes pre-1978 residential housing, a lead-based paint disclosure is
220     mandatory.
221   (g)  HOMEOWNERS' ASSOCIATION/COMMUNITY DISCLOSURE: BUYER SHOULD NOT EXECUTE THIS
222     CONTRACT  UNTIL  BUYER  HAS  RECEIVED  AND  READ  THE  HOMEOWNERS'
223     ASSOCIATION/COMMUNITY DISCLOSURE, IF APPLICABLE.
224   (h)  PROPERTY TAX DISCLOSURE SUMMARY: BUYER SHOULD NOT RELY ON THE SELLER'S CURRENT
225     PROPERTY TAXES AS THE AMOUNT OF PROPERTY TAXES THAT THE BUYER MAY BE OBLIGATED TO
226     PAY IN THE YEAR SUBSEQUENT TO PURCHASE. A CHANGE OF OWNERSHIP OR PROPERTY
227     IMPROVEMENTS TRIGGERS REASSESSMENTS OF THE PROPERTY THAT COULD RESULT IN HIGHER
228     PROPERTY TAXES. IF YOU HAVE ANY QUESTIONS CONCERNING VALUATION, CONTACT THE
229     COUNTY PROPERTY APPRAISER'S OFFICE FOR INFORMATION.
230   (i)  FOREIGN INVESTMENT IN REAL PROPERTY TAX ACT ("FIRPTA"): Seller shall inform Buyer in writing if
231     Seller is a "foreign person" as defined by the Foreign Investment in Real Property Tax Act ("FIRPTA"). Buyer
232     and Seller shall comply with FIRPTA, which may require Seller to provide additional cash at Closing. If Seller
233     is not a "foreign person", Seller can provide Buyer, at or prior to Closing, a certification of non-foreign status,
234     under penalties of perjury, to inform Buyer and Closing Agent that no withholding is required. See STANDARD
235     V for further information pertaining to FIRPTA. Buyer and Seller are advised to seek legal counsel and tax
236     advice regarding their respective rights, obligations, reporting and withholding requirements pursuant to
237     FIRPTA.
238   (j)  SELLER DISCLOSURE: Seller knows of no facts materially affecting the value of the Real Property which are
239     not readily observable and which have not been disclosed to Buyer. Except as provided for in the preceding
240     sentence, Seller extends and intends no warranty and makes no representation of any type, either express or
241     implied, as to the physical condition or history of the Property. Except as otherwise disclosed in writing Seller
242     has received no written or verbal notice from any governmental entity or agency as to a currently uncorrected
243     building, environmental or safety code violation.

244                  PROPERTY MAINTENANCE, CONDITION, INSPECTIONS AND EXAMINATIONS

245 **11. PROPERTY MAINTENANCE:** Except for ordinary wear and tear and Casualty Loss, Seller shall maintain the
246     Property, including, but not limited to, lawn, shrubbery, and pool, in the condition existing as of Effective Date ("AS
247     IS Maintenance Requirement").

248 **12. PROPERTY INSPECTION; RIGHT TO CANCEL:**
249*   (a)  *PROPERTY INSPECTIONS AND RIGHT TO CANCEL: Buyer shall have 15_____ (if left blank, then 15)*
250     *days after Effective Date ("Inspection Period") within which to have such inspections of the Property*
251     *performed as Buyer shall desire during the Inspection Period. If Buyer determines, in Buyer's sole*
252     *discretion, that the Property is not acceptable to Buyer, Buyer may terminate this Contract by delivering*
253     *written notice of such election to Seller prior to expiration of Inspection Period. If Buyer timely*
254     *terminates this Contract, the Deposit paid shall be returned to Buyer, thereupon, Buyer and Seller shall*
255     *be released of all further obligations under this Contract; however, Buyer shall be responsible for*
256     *prompt payment for such inspections, for repair of damage to, and restoration of, the Property resulting*
257     *from such inspections, and shall provide Seller with paid receipts for all work done on the Property (the*
258     *preceding provision shall survive termination of this Contract). Unless Buyer exercises the right to*
259     *terminate granted herein, Buyer accepts the physical condition of the Property and any violation of*
260     *governmental, building, environmental, and safety codes, restrictions, or requirements, but subject to*
261     *Seller's continuing AS IS Maintenance Requirement, and Buyer shall be responsible for any and all*
262     *repairs and improvements required by Buyer's lender.*
263   (b)  WALK-THROUGH INSPECTION/RE-INSPECTION: On the day prior to Closing Date, or on Closing Date prior
264     to time of Closing, as specified by Buyer, Buyer or Buyer's representative may perform a walk-through (and
265     follow-up walk-through, if necessary) inspection of the Property solely to confirm that all items of Personal
266     Property are on the Property and to verify that Seller has maintained the Property as required by the AS IS
267     Maintenance Requirement and has met all other contractual obligations.
268   (c)  SELLER ASSISTANCE AND COOPERATION IN CLOSE-OUT OF BUILDING PERMITS: If Buyer's inspection
269     of the Property identifies open or needed building permits, then Seller shall promptly deliver to Buyer all plans,
270     written documentation or other information in Seller's possession, knowledge, or control relating to
271     improvements to the Property which are the subject of such open or needed Permits, and shall promptly
272     cooperate in good faith with Buyer's efforts to obtain estimates of repairs or other work necessary to resolve
273     such Permit issues. Seller's obligation to cooperate shall include Seller's execution of necessary authorizations,

dotloop signature verification: ........................................

274     consents, or other documents necessary for Buyer to conduct inspections and have estimates of such repairs
275     or work prepared, but in fulfilling such obligation, Seller shall not be required to expend, or become obligated to
276     expend, any money.

277    (d) ASSIGNMENT OF REPAIR AND TREATMENT CONTRACTS AND WARRANTIES: At Buyer's option and
278     cost, Seller will, at Closing, assign all assignable repair, treatment and maintenance contracts and warranties
279     to Buyer.

280                      ESCROW AGENT AND BROKER

281  **13. ESCROW AGENT:** Any Closing Agent or Escrow Agent (collectively "Agent") receiving the Deposit, other funds
282    and other items is authorized, and agrees by acceptance of them, to deposit them promptly, hold same in escrow
283    within the State of Florida and, subject to COLLECTION, disburse them in accordance with terms and conditions
284    of this Contract. Failure of funds to become COLLECTED shall not excuse Buyer's performance. When conflicting
285    demands for the Deposit are received, or Agent has a good faith doubt as to entitlement to the Deposit, Agent may
286    take such actions permitted by this Paragraph 13, as Agent deems advisable. If in doubt as to Agent's duties or
287    liabilities under this Contract, Agent may, at Agent's option, continue to hold the subject matter of the escrow until
288    the parties agree to its disbursement or until a final judgment of a court of competent jurisdiction shall determine
289    the rights of the parties, or Agent may deposit same with the clerk of the circuit court having jurisdiction of the
290    dispute. An attorney who represents a party and also acts as Agent may represent such party in such action. Upon
291    notifying all parties concerned of such action, all liability on the part of Agent shall fully terminate, except to the
292    extent of accounting for any items previously delivered out of escrow. If a licensed real estate broker, Agent will
293    comply with provisions of Chapter 475, F.S., as amended and FREC rules to timely resolve escrow disputes through
294    mediation, arbitration, interpleader or an escrow disbursement order.

295    In any proceeding between Buyer and Seller wherein Agent is made a party because of acting as Agent hereunder,
296    or in any proceeding where Agent interpleads the subject matter of the escrow, Agent shall recover reasonable
297    attorney's fees and costs incurred, to be paid pursuant to court order out of the escrowed funds or equivalent. Agent
298    shall not be liable to any party or person for mis-delivery of any escrowed items, unless such mis-delivery is due to
299    Agent's willful breach of this Contract or Agent's gross negligence. This Paragraph 13 shall survive Closing or
300    termination of this Contract.

301  **14. PROFESSIONAL ADVICE; BROKER LIABILITY:** Broker advises Buyer and Seller to verify Property condition,
302    square footage, and all other facts and representations made pursuant to this Contract and to consult appropriate
303    professionals for legal, tax, environmental, and other specialized advice concerning matters affecting the Property
304    and the transaction contemplated by this Contract. Broker represents to Buyer that Broker does not reside on the
305    Property and that all representations (oral, written or otherwise) by Broker are based on Seller representations or
306    public records. **BUYER AGREES TO RELY SOLELY ON SELLER, PROFESSIONAL INSPECTORS AND**
307    **GOVERNMENTAL AGENCIES FOR VERIFICATION OF PROPERTY CONDITION, SQUARE FOOTAGE AND**
308    **FACTS THAT MATERIALLY AFFECT PROPERTY VALUE AND NOT ON THE REPRESENTATIONS (ORAL,**
309    **WRITTEN OR OTHERWISE) OF BROKER.** Buyer and Seller (individually, the "Indemnifying Party") each
310    individually indemnifies, holds harmless, and releases Broker and Broker's officers, directors, agents and
311    employees from all liability for loss or damage, including all costs and expenses, and reasonable attorney's fees at
312    all levels, suffered or incurred by Broker and Broker's officers, directors, agents and employees in connection with
313    or arising from claims, demands or causes of action instituted by Buyer or Seller based on: (i) inaccuracy of
314    information provided by the indemnifying Party or from public records; (ii) indemnifying Party's misstatement(s) or
315    failure to perform contractual obligations; (iii) Broker's performance, at indemnifying Party's request, of any task
316    beyond the scope of services regulated by Chapter 475, F.S., as amended, including Broker's referral,
317    recommendation or retention of any vendor for, or on behalf of, indemnifying Party; (iv) products or services
318    provided by any such vendor for, or on behalf of, indemnifying Party; and (v) expenses incurred by any such vendor.
319    Buyer and Seller each assumes full responsibility for selecting and compensating their respective vendors and
320    paying their other costs under this Contract whether or not this transaction closes. This Paragraph 14 will not relieve
321    Broker of statutory obligations under Chapter 475, F.S., as amended. For purposes of this Paragraph 14, Broker
322    will be treated as a party to this Contract. This Paragraph 14 shall survive Closing or termination of this Contract.

323                      DEFAULT AND DISPUTE RESOLUTION

324  **15. DEFAULT:**
325    (a) **BUYER DEFAULT:** If Buyer fails, neglects or refuses to perform Buyer's obligations under this Contract,
326    including payment of the Deposit, within the time(s) specified, Seller may elect to recover and retain the Deposit
327    for the account of Seller as agreed upon liquidated damages, consideration for execution of this Contract, and
328    in full settlement of any claims, whereupon Buyer and Seller shall be relieved from all further obligations under

Buyer's Initials _____ _____          Page 5 of 12          Seller's Initials _____ _____

dotloop signature verification: dotloop.com/my/verification/DL-342029964-3-17C2

329  this Contract, or Seller, at Seller's option, may, pursuant to Paragraph 16, proceed in equity to enforce Seller's
330  rights under this Contract. The portion of the Deposit, if any, paid to Listing Broker upon default by Buyer, shall
331  be split equally between Listing Broker and Cooperating Broker; provided however, Cooperating Broker's share
332  shall not be greater than the commission amount Listing Broker had agreed to pay to Cooperating Broker.
333  (b)  SELLER DEFAULT: If for any reason other than failure of Seller to make Seller's title marketable after
334  reasonable diligent effort, Seller fails, neglects or refuses to perform Seller's obligations under this Contract,
335  Buyer may elect to receive return of Buyer's Deposit without thereby waiving any action for damages resulting
336  from Seller's breach, and, pursuant to Paragraph 16, may seek to recover such damages or seek specific
337  performance.
338  This Paragraph 15 shall survive Closing or termination of this Contract.
339  **16. DISPUTE RESOLUTION:** Unresolved controversies, claims and other matters in question between Buyer and
340  Seller arising out of, or relating to, this Contract or its breach, enforcement or interpretation ("Dispute") will be settled
341  as follows:
342  (a)  Buyer and Seller will have 10 days after the date conflicting demands for the Deposit are made to attempt to
343  resolve such Dispute, failing which, Buyer and Seller shall submit such Dispute to mediation under Paragraph
344  16(b).
345  (b)  Buyer and Seller shall attempt to settle Disputes in an amicable manner through mediation pursuant to Florida
346  Rules for Certified and Court-Appointed Mediators and Chapter 44, F.S., as amended (the "Mediation Rules").
347  The mediator must be certified or must have experience in the real estate industry. Injunctive relief may be
348  sought without first complying with this Paragraph 16(b). Disputes not settled pursuant to this Paragraph 16
349  may be resolved by instituting action in the appropriate court having jurisdiction of the matter. This Paragraph
350  16 shall survive Closing or termination of this Contract.
351  **17. ATTORNEY'S FEES; COSTS:** The parties will split equally any mediation fee incurred in any mediation permitted
352  by this Contract, and each party will pay their own costs, expenses and fees, including attorney's fees, incurred in
353  conducting the mediation. In any litigation permitted by this Contract, the prevailing party shall be entitled to recover
354  from the non-prevailing party costs and fees, including reasonable attorney's fees, incurred in conducting the
355  litigation. This Paragraph 17 shall survive Closing or termination of this Contract.

356                      STANDARDS FOR REAL ESTATE TRANSACTIONS ("STANDARDS")

357  **18. STANDARDS:**
358  A. TITLE:
359  (i)  TITLE EVIDENCE; RESTRICTIONS; EASEMENTS; LIMITATIONS: Within the time period provided in
360  Paragraph 9(c), the Title Commitment, with legible copies of instruments listed as exceptions attached thereto, shall
361  be issued and delivered to Buyer. The Title Commitment shall set forth those matters to be discharged by Seller at
362  or before Closing and shall provide that, upon recording of the deed to Buyer, an owner's policy of title insurance
363  in the amount of the Purchase Price, shall be issued to Buyer insuring Buyer's marketable title to the Real Property,
364  subject only to the following matters: (a) comprehensive land use plans, zoning, and other land use restrictions,
365  prohibitions and requirements imposed by governmental authority; (b) restrictions and matters appearing on the
366  Plat or otherwise common to the subdivision; (c) outstanding oil, gas and mineral rights of record without right of
367  entry; (d) unplatted public utility easements of record (located contiguous to real property lines and not more than
368  10 feet in width as to rear or front lines and 7 1/2 feet in width as to side lines); (e) taxes for year of Closing and
369  subsequent years; and (f) assumed mortgages and purchase money mortgages, if any (if additional items, attach
370  addendum); provided, that, none prevent use of Property for RESIDENTIAL PURPOSES. If there exists at Closing
371  any violation of items identified in (b) – (f) above, then the same shall be deemed a title defect. Marketable title shall
372  be determined according to applicable Title Standards adopted by authority of The Florida Bar and in accordance
373  with law.
374  (ii)  TITLE EXAMINATION: Buyer shall have 5 days after receipt of Title Commitment to examine it and notify Seller
375  in writing specifying defect(s), if any, that render title unmarketable. If Seller provides Title Commitment and it is
376  delivered to Buyer less than 5 days prior to Closing Date, Buyer may extend Closing for up to 5 days after date of
377  receipt to examine same in accordance with this STANDARD A. Seller shall have 30 days ("Cure Period") after
378  receipt of Buyer's notice to take reasonable diligent efforts to remove defects. If Buyer fails to so notify Seller, Buyer
379  shall be deemed to have accepted title as it then is. If Seller cures defects within Cure Period, Seller will deliver
380  written notice to Buyer (with proof of cure acceptable to Buyer and Buyer's attorney) and the parties will close this
381  Contract on Closing Date (or if Closing Date has passed, within 10 days after Buyer's receipt of Seller's notice). If
382  Seller is unable to cure defects within Cure Period, then Buyer may, within 5 days after expiration of Cure Period,

dotloop signature verification: ...

## STANDARDS FOR REAL ESTATE TRANSACTIONS ("STANDARDS") CONTINUED

383    deliver written notice to Seller: (a) extending Cure Period for a specified period not to exceed 120 days within which
384    Seller shall continue to use reasonable diligent effort to remove or cure the defects ("Extended Cure Period"); or
385    (b) electing to accept title with existing defects and close this Contract on Closing Date (or if Closing Date has
386    passed, within the earlier of 10 days after end of Extended Cure Period or Buyer's receipt of Seller's notice), or (c)
387    electing to terminate this Contract and receive a refund of the Deposit, thereby releasing Buyer and Seller from all
388    further obligations under this Contract. If after reasonable diligent effort, Seller is unable to timely cure defects, and
389    Buyer does not waive the defects, this Contract shall terminate, and Buyer shall receive a refund of the Deposit,
390    thereby releasing Buyer and Seller from all further obligations under this Contract.
391    **B.  SURVEY:** If Survey discloses encroachments on the Real Property or that Improvements located thereon
392    encroach on setback lines, easements, or lands of others, or violate any restrictions, covenants, or applicable
393    governmental regulations described in STANDARD A (i)(a), (b) or (d) above, Buyer shall deliver written notice of
394    such matters, together with a copy of Survey, to Seller within 5 days after Buyer's receipt of Survey, but no later
395    than Closing. If Buyer timely delivers such notice and Survey to Seller, such matters identified in the notice and
396    Survey shall constitute a title defect, subject to cure obligations of STANDARD A above. If Seller has delivered a
397    prior survey, Seller shall, at Buyer's request, execute an affidavit of "no change" to the Real Property since the
398    preparation of such prior survey, to the extent the affirmations therein are true and correct.
399    **C.  INGRESS AND EGRESS:** Seller represents that there is ingress and egress to the Real Property and title to
400    the Real Property is insurable in accordance with STANDARD A without exception for lack of legal right of access.
401    **D.  LEASE INFORMATION:** Seller shall, at least 10 days prior to Closing, furnish to Buyer estoppel letters from
402    tenant(s)/occupant(s) specifying nature and duration of occupancy, rental rates, advanced rent and security
403    deposits paid by tenant(s) or occupant(s)("Estoppel Letter(s)"). If Seller is unable to obtain such Estoppel Letter(s)
404    the same information shall be furnished by Seller to Buyer within that time period in the form of a Seller's affidavit
405    and Buyer may thereafter contact tenant(s) or occupant(s) to confirm such information. If Estoppel Letter(s) or
406    Seller's affidavit, if any, differ materially from Seller's representations and lease(s) provided pursuant to Paragraph
407    6, or if tenant(s)/occupant(s) fail or refuse to confirm Seller's affidavit, Buyer may deliver written notice to Seller
408    within 5 days after receipt of such information, but no later than 5 days prior to Closing Date, terminating this
409    Contract and receive a refund of the Deposit, thereby releasing Buyer and Seller from all further obligations under
410    this Contract. Seller shall, at Closing, deliver and assign all leases to Buyer who shall assume Seller's obligations
411    thereunder.
412    **E.  LIENS:** Seller shall furnish to Buyer at Closing an affidavit attesting (i) to the absence of any financing
413    statement, claims of lien or potential lienors known to Seller and (ii) that there have been no improvements or
414    repairs to the Real Property for 90 days immediately preceding Closing Date. If the Real Property has been
415    improved or repaired within that time, Seller shall deliver releases or waivers of construction liens executed by all
416    general contractors, subcontractors, suppliers and materialmen in addition to Seller's lien affidavit setting forth
417    names of all such general contractors, subcontractors, suppliers and materialmen, further affirming that all charges
418    for improvements or repairs which could serve as a basis for a construction lien or a claim for damages have been
419    paid or will be paid at Closing.
420    **F.  TIME:** Calendar days shall be used in computing time periods. Time is of the essence in this Contract. Other
421    than time for acceptance and Effective Date as set forth in Paragraph 3, any time periods provided for or dates
422    specified in this Contract, whether preprinted, handwritten, typewritten or inserted herein, which shall end or occur
423    on a Saturday, Sunday, or a national legal holiday (see 5 U.S.C. 6103) shall extend to 5:00 p.m. (where the Property
424    is located) of the next business day.
425    **G.  FORCE MAJEURE:** Buyer or Seller shall not be required to perform any obligation under this Contract or be
426    liable to each other for damages so long as performance or non-performance of the obligation, or the availability of
427    services, insurance or required approvals essential to Closing, is disrupted, delayed, caused or prevented by Force
428    Majeure. "Force Majeure" means: hurricanes, floods, extreme weather, earthquakes, fire, or other acts of God,
429    unusual transportation delays, or wars, insurrections, or acts of terrorism, which, by exercise of reasonable diligent
430    effort, the non-performing party is unable to do or in part to prevent or overcome. All time periods, including
431    Closing Date, will be extended a reasonable time up to 7 days after the Force Majeure no longer prevents
432    performance under this Contract, provided, however, if such Force Majeure continues to prevent performance under
433    this Contract more than 30 days beyond Closing Date, then either party may terminate this Contract by delivering
434    written notice to the other and the Deposit shall be refunded to Buyer, thereby releasing Buyer and Seller from all
435    further obligations under this Contract.
436    **H.  CONVEYANCE:** Seller shall convey marketable title to the Real Property by statutory warranty, trustee's,
437    personal representative's, or guardian's deed, as appropriate to the status of Seller, subject only to matters
438    described in STANDARD A and those accepted by Buyer. Personal Property shall, at request of Buyer, be

Buyer's Initials ___ [_SRM_] ___      Page 8 of 12      Seller's Initials ___ [_JTM_] ___

dotloop signature verification: ‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑

## STANDARDS FOR REAL ESTATE TRANSACTIONS ("STANDARDS") CONTINUED

439 transferred by absolute bill of sale with warranty of title, subject only to such matters as may be provided for in this
440 Contract.
441 **I.   CLOSING LOCATION; DOCUMENTS; AND PROCEDURE:**
442 **(i)   LOCATION:** Closing will be conducted by the attorney or other closing agent ("Closing Agent") designated by
443 the party paying for the owner's policy of title insurance and will take place in the county where the Real Property
444 is located at the office of the Closing Agent, or at such other location agreed to by the parties. If there is no title
445 insurance, Seller will designate Closing Agent. Closing may be conducted by mail, overnight courier, or electronic
446 means.
447 **(ii)   CLOSING DOCUMENTS:** Seller shall at or prior to Closing, execute and deliver, as applicable, deed, bill of
448 sale, certificate(s) of title or other documents necessary to transfer title to the Property, construction lien affidavit(s),
449 owner's possession and no lien affidavit(s), and assignment(s) of leases. Seller shall provide Buyer with paid
450 receipts for all work done on the Property pursuant to this Contract. Buyer shall furnish and pay for, as applicable,
451 the survey, flood elevation certification, and documents required by Buyer's lender.
452 **(iii)   FinCEN GTO NOTICE.** If Closing Agent is required to comply with the U.S. Treasury Department's
453 Financial Crimes Enforcement Network ("FinCEN") Geographic Targeting Orders ("GTOs"), then Buyer
454 shall provide Closing Agent with the information related to Buyer and the transaction contemplated by this
455 Contract that is required to complete IRS Form 8300, and Buyer consents to Closing Agent's collection and
456 report of said information to IRS.
457 **(iv)   PROCEDURE:** The deed shall be recorded upon COLLECTION of all closing funds. If the Title Commitment
458 provides insurance against adverse matters pursuant to Section 627.7841, F.S., as amended, the escrow closing
459 procedure required by STANDARD J shall be waived, and Closing Agent shall, subject to COLLECTION of all
460 closing funds, disburse at Closing the brokerage fees to Broker and the net sale proceeds to Seller.
461 **J.   ESCROW CLOSING PROCEDURE:** If Title Commitment issued pursuant to Paragraph 9(c) does not provide
462 for insurance against adverse matters as permitted under Section 627.7841, F.S., as amended, the following
463 escrow and closing procedures shall apply: (1) all Closing proceeds shall be held in escrow by the Closing Agent
464 for a period of not more than 10 days after Closing; (2) if Seller's title is rendered unmarketable, through no fault of
465 Buyer, Buyer shall, within the 10 day period, notify Seller in writing of the defect and Seller shall have 30 days from
466 date of receipt of such notification to cure the defect; (3) if Seller fails to timely cure the defect, the Deposit and all
467 Closing funds paid by Buyer shall, within 5 days after written demand by Buyer, be refunded to Buyer and,
468 simultaneously with such repayment, Buyer shall return the Personal Property, vacate the Real Property and re-
469 convey the Property to Seller by special warranty deed and bill of sale; and (4) if Buyer fails to make timely demand
470 for refund of the Deposit, Buyer shall take title as is, waiving all rights against Seller as to any intervening defect
471 except as may be available to Buyer by virtue of warranties contained in the deed or bill of sale.
472 **K.   PRORATIONS; CREDITS:** The following recurring items will be made current (if applicable) and prorated as of
473 the day prior to Closing Date, or date of occupancy if occupancy occurs before Closing Date: real estate taxes
474 (including special benefit tax assessments imposed by a CDD), interest, bonds, association fees, insurance, rents
475 and other expenses of Property. Buyer shall have option of taking over existing policies of Insurance, if assumable,
476 in which event premiums shall be prorated. Cash at Closing shall be increased or decreased as may be required
477 by prorations to be made through day prior to Closing. Advance rent and security deposits, if any, will be credited
478 to Buyer. Escrow deposits held by Seller's mortgagee will be paid to Seller. Taxes shall be prorated based on
479 current year's tax. If Closing occurs on a date when current year's millage is not fixed but current year's assessment
480 is available, taxes will be prorated based upon such assessment and prior year's millage. If current year's
481 assessment is not available, then taxes will be prorated on prior year's tax. If there are completed improvements
482 on the Real Property by January 1st of year of Closing, which improvements were not in existence on January 1st
483 of prior year, then taxes will be prorated based upon prior year's millage and at an equitable assessment to be
484 agreed upon between the parties, failing which, request shall be made to the County Property Appraiser for an
485 informal assessment taking into account available exemptions. In all cases, due allowance shall be made for the
486 maximum allowable discounts and applicable homestead and other exemptions.  A tax proration based on an
487 estimate shall, at either party's request, be readjusted upon receipt of current year's tax bill. This STANDARD K
488 shall survive Closing.
489 **L.   ACCESS TO PROPERTY TO CONDUCT APPRAISALS, INSPECTIONS, AND WALK-THROUGH:** Seller
490 shall, upon reasonable notice, provide utilities service and access to Property for appraisals and inspections,
491 including a walk-through (or follow-up walk-through if necessary) prior to Closing.
492 **M.   RISK OF LOSS:** If, after Effective Date, but before Closing, Property is damaged by fire or other casualty
493 ("Casualty Loss") and cost of restoration (which shall include cost of pruning or removing damaged trees) does not
494 exceed 1.5% of Purchase Price, cost of restoration shall be an obligation of Seller and Closing shall proceed
495 pursuant to terms of this Contract. If restoration is not completed as of Closing, a sum equal to 125% of estimated

Buyer's Initials _____   _____          Page 9 of 12          Seller's Initials _____   _____
FloridaRealtors/FloridaBar-ASIS-5    Rev.4/17 © 2017 Florida Realtors® and The Florida Bar.  All rights reserved.

STANDARDS FOR REAL ESTATE TRANSACTIONS ("STANDARDS") CONTINUED

496 cost to complete restoration (not to exceed 1.5% of Purchase Price) will be escrowed at Closing. If actual cost of
497 restoration exceeds escrowed amount, Seller shall pay such actual costs (but, not In excess of 1.5% of Purchase
498 Price). Any unused portion of escrowed amount shall be returned to Seller. If cost of restoration exceeds 1.5% of
499 Purchase Price, Buyer shall elect to either take Property "as Is" together with the 1.5%, or receive a refund of the
500 Deposit thereby releasing Buyer and Seller from all further obligations under this Contract. Seller's sole obligation
501 with respect to tree damage by casualty or other natural occurrence shall be cost of pruning or removal.
502 N.  1031 EXCHANGE: If either Seller or Buyer wish to enter Into a like-kind exchange (either simultaneously with
503 Closing or deferred) under Section 1031 of the Internal Revenue Code ("Exchange"), the other party shall cooperate
504 In all reasonable respects to effectuate the Exchange, Including execution of documents; provided, however,
505 cooperating party shall Incur no liability or expense related to the Exchange, and Closing shall not be contingent
506 upon, nor extended or delayed by, such Exchange.
507 O.  CONTRACT NOT RECORDABLE; PERSONS BOUND; NOTICE; DELIVERY; COPIES; CONTRACT
508 EXECUTION: Neither this Contract nor any notice of it shall be recorded in any public records. This Contract shall
509 be binding on, and Inure to the benefit of, the parties and their respective heirs or successors In Interest. Whenever
510 the context permits, singular shall include plural and one gender shall include all. Notice and delivery given by or to
511 the attorney or broker (including such broker's real estate licensee) representing any party shall be as effective as
512 If given by or to that party. All notices must be in writing and may be made by mail, personal delivery or electronic
513 (including "pdf") media. A facsimile or electronic (Including "pdf") copy of this Contract and any signatures hereon
514 shall be considered for all purposes as an original. This Contract may be executed by use of electronic signatures,
515 as determined by Florida's Electronic Signature Act and other applicable laws.
516 P.  INTEGRATION; MODIFICATION: This Contract contains the full and complete understanding and agreement
517 of Buyer and Seller with respect to the transaction contemplated by this Contract and no prior agreements or
518 representations shall be binding upon Buyer or Seller unless included in this Contract. No modification to or change
519 in this Contract shall be valid or binding upon Buyer or Seller unless in writing and executed by the parties intended
520 to be bound by It.
521 Q.  WAIVER: Failure of Buyer or Seller to insist on compliance with, or strict performance of, any provision of this
522 Contract, or to take advantage of any right under this Contract, shall not constitute a waiver of other provisions or
523 rights.
524 R.  RIDERS; ADDENDA; TYPEWRITTEN OR HANDWRITTEN PROVISIONS: Riders, addenda, and typewritten
525 or handwritten provisions shall control all printed provisions of this Contract In conflict with them.
526 S.  COLLECTION or COLLECTED: "COLLECTION" or "COLLECTED" means any checks tendered or
527 received, including Deposits, have become actually and finally collected and deposited In the account of
528 Escrow Agent or Closing Agent. Closing and disbursement of funds and delivery of closing documents
529 may be delayed by Closing Agent until such amounts have been COLLECTED In Closing Agent's accounts.
530 T.  RESERVED.
531 U.  APPLICABLE LAW AND VENUE: This Contract shall be construed in accordance with the laws of the State
532 of Florida and venue for resolution of all disputes, whether by mediation, arbitration or litigation, shall lie in the
533 county where the Real Property is located.
534 V.  FIRPTA TAX WITHHOLDING: If a seller of U.S. real property is a "foreign person" as defined by FIRPTA,
535 Section 1445 of the Internal Revenue Code ("Code") requires the buyer of the real property to withhold up to 15%
536 of the amount realized by the seller on the transfer and remit the withheld amount to the Internal Revenue Service
537 (IRS) unless an exemption to the required withholding applies or the seller has obtained a Withholding Certificate
538 from the IRS authorizing a reduced amount of withholding.
539 (I)  No withholding Is required under Section 1445 of the Code If the Seller Is not a "foreign person". Seller can
540 provide proof of non-foreign status to Buyer by delivery of written certification signed under penalties of perjury,
541 stating that Seller is not a foreign person and containing Seller's name, U.S. taxpayer Identification number and
542 home address (or office address, In the case of an entity), as provided for in 26 CFR 1.1445-2(b). Otherwise, Buyer
543 shall withhold the applicable percentage of the amount realized by Seller on the transfer and timely remit said funds
544 to the IRS.
545 (ii)  If Seller is a foreign person and has received a Withholding Certificate from the IRS which provides for reduced
546 or eliminated withholding In this transaction and provides same to Buyer by Closing, then Buyer shall withhold the
547 reduced sum required, If any, and timely remit said funds to the IRS.
548 (iii)  If prior to Closing Seller has submitted a completed application to the IRS for a Withholding Certificate and has
549 provided to Buyer the notice required by 26 CFR 1.1445-1(c) (2)(i)(B) but no Withholding Certificate has been
550 received as of Closing, Buyer shall, at Closing, withhold the applicable percentage of the amount realized by Seller
551 on the transfer, and at Buyer's option, either (a) timely remit the withheld funds to the IRS or (b) place the funds In
552 escrow, at Seller's expense, with an escrow agent selected by Buyer and pursuant to terms negotiated by the

dotloop signature verification: dtlp.us/xkhbm-xxxhgm-xxhfz 011 1x 6dfd  2411 1..1ex  . : . 1x0

## STANDARDS FOR REAL ESTATE TRANSACTIONS ("STANDARDS") CONTINUED

553 parties, to be subsequently disbursed in accordance with the Withholding Certificate issued by the IRS or remitted
554 directly to the IRS if the Seller's application is rejected or upon terms set forth in the escrow agreement.
555 (iv) In the event the net proceeds due Seller are not sufficient to meet the withholding requirement(s) in this
556 transaction, Seller shall deliver to Buyer, at Closing, the additional COLLECTED funds necessary to satisfy the
557 applicable requirement and thereafter Buyer shall timely remit said funds to the IRS or escrow the funds for
558 disbursement in accordance with the final determination of the IRS, as applicable.
559 (v) Upon remitting funds to the IRS pursuant to this STANDARD, Buyer shall provide Seller copies of IRS Forms
560 8288 and 8288-A, as filed.
561 W.  RESERVED
562 X.  BUYER WAIVER OF CLAIMS: *To the extent permitted by law, Buyer waives any claims against Seller*
563 *and against any real estate licensee involved in the negotiation of this Contract for any damage or defects*
564 *pertaining to the physical condition of the Property that may exist at Closing of this Contract and be*
565 *subsequently discovered by the Buyer or anyone claiming by, through, under or against the Buyer. This*
566 *provision does not relieve Seller's obligation to comply with Paragraph 10(j). This Standard X shall survive*
567 *Closing.*
568

## ADDENDA AND ADDITIONAL TERMS

569 * 19. ADDENDA: The following additional terms are included in the attached addenda or riders and incorporated into this
570 Contract (Check if applicable):

| | | |
|---|---|---|
| ☐ A.  Condominium Rider | ☐ K.  RESERVED | ☐ T.  Pre-Closing Occupancy |
| ☐ B.  Homeowners' Assn. | ☐ L.  RESERVED | ☐ U.  Post-Closing Occupancy |
| ☐ C.  Seller Financing | ☐ M.  Defective Drywall | ☐ V.  Sale of Buyer's Property |
| ☐ D.  Mortgage Assumption | ☐ N.  Coastal Construction Control | ☐ W.  Back-up Contract |
| ☐ E.  FHA/VA Financing | Line | ☐ X.  Kick-out Clause |
| ☐ F.  Appraisal Contingency | ☐ O.  Insulation Disclosure | ☐ Y.  Seller's Attorney Approval |
| ☐ G.  Short Sale | ☑ P.  Lead Paint Disclosure (Pre-1978) | ☐ Z.  Buyer's Attorney Approval |
| ☐ H.  Homeowners/Flood Ins. | ☐ Q.  Housing for Older Persons | ☐ AA. Licensee Property Interest |
| ☐ I.  RESERVED | ☐ R.  Rezoning | ☐ BB. Binding Arbitration |
| ☐ J.  Interest-Bearing Acct. | ☐ S.  Lease Purchase/ Lease Option | ☐ Other:_____ |

571 * 20. ADDITIONAL TERMS:
572
573 Unless notified otherwise in writing, if Coldwell Banker is identified as the cooperating broker, the
574 company and its sales associates are representing the Buyer in a Transaction Brokerage capacity in
575 accordance with §475.278(2), Fla. Stat.
576 Seller to verify that "The Birds of Paradise" Resort License described below is active/valid and shall be
577 transferred in its entirety to Buyer at closing;
578 This Resort License issued to "The Birds of Paradise" by the State of Florida permits this property which
579 is a residentially zoned R-2 Single Family dwelling to operate as a Private Resort. The minimum rental
580 period is one week. No exterior signage or local media advertising is permitted. There are no other
581 restrictions. There is no other Licensed Resort in a residentially zoned neighborhood except "The Birds
582 of Paradise" in the entire Continental United States.
583
584
585
586
587
588

## COUNTER-OFFER/REJECTION

589 * ☐ Seller counters Buyer's offer (to accept the counter-offer, Buyer must sign or initial the counter-offered terms and
590 deliver a copy of the acceptance to Seller).
591 * ☐ Seller rejects Buyer's offer.

Buyer's Initials [SAH]   Seller's Initials [JMJ]

dotloop signature verification: ...

592
593   THIS IS INTENDED TO BE A LEGALLY BINDING CONTRACT. IF NOT FULLY UNDERSTOOD, SEEK THE ADVICE OF AN ATTORNEY PRIOR TO SIGNING.

594   THIS FORM HAS BEEN APPROVED BY THE FLORIDA REALTORS AND THE FLORIDA BAR.

595   *Approval of this form by the Florida Realtors and The Florida Bar does not constitute an opinion that any of the*
596   *terms and conditions in this Contract should be accepted by the parties in a particular transaction. Terms and*
597   *conditions should be negotiated based upon the respective interests, objectives and bargaining positions of all*
598   *interested persons.*

599   AN ASTERISK (*) FOLLOWING A LINE NUMBER IN THE MARGIN INDICATES THE LINE CONTAINS A BLANK
600   TO BE COMPLETED.

601*  Buyer: _Steven A MacDonald_    dotloop verified 05/15/17 6:43PM EDT     Date: _____

602*  Buyer: _____    Date: _____

603*  Seller: _John R. DeSilva_    Date: _05/15/2017_

604*  Seller: _____    Date: _____

605   Buyer's address for purposes of notice
606*
607*
608*

609   BROKER: Listing and Cooperating Brokers, if any, named below (collectively, "Broker"), are the only Brokers
610   entitled to compensation in connection with this Contract. Instruction to Closing Agent: Seller and Buyer direct
611   Closing Agent to disburse at Closing the full amount of the brokerage fees as specified in separate brokerage
612   agreements with the parties and cooperative agreements between the Brokers, except to the extent Broker has
613   retained such fees from the escrowed funds. This Contract shall not modify any MLS or other offer of compensation
614   made by Seller or Listing Broker to Cooperating Brokers.

615*  Michael B. Hughes, P.A. #261503009
616   Cooperating Sales Associate, if any    Rafal Wazio / Listing Sales Associate

617*  Coldwell Banker
616   Cooperating Broker, if any    Sand Key Realty / Listing Broker

Buyer's Initials [___] [___]    Page 12 of 12    Seller's Initials [___] [___]
FloridaRealtors/FloridaBar-ASIS-5   Rev.4/17 © 2017 Florida Realtors® and The Florida Bar. All rights reserved.

EXHIBIT 4



STATE OF FLORIDA

DEPARTMENT OF BUSINESS AND PROFESSIONAL REGULATION

DIVISION OF HOTELS AND RESTAURANTS
1940 NORTH MONROE STREET                                           850-487-1395
NORTHWOOD CENTRE
TALLAHASSEE            FL 32399-1015

THE BIRD OF PARADISE LLC
OLD ANHEUSER BUSCH ESTATE
2817 PASS A GRILLE WAY
ST.PETE BEACH            FL 33706

Congratulations! With this license you become one of the nearly one million
Floridians licensed by the Department of Business and Professional Regulation.
Our professionals and businesses range from architects to yacht brokers, from
boxers to barbeque restaurants, and they keep Florida's economy strong.

Every day we work to improve the way we do business in order to serve you better.
For information about our services, please log onto www.myfloridalicense.com.
There you can find more information about our divisions and the regulations that
impact you, subscribe to department newsletters and learn more about the
Department's initiatives.

Our mission at the Department is: License Efficiently, Regulate Fairly. We
constantly strive to serve you better so that you can serve your customers.
Thank you for doing business in Florida, and congratulations on your new license!



STATE OF FLORIDA            AC#
DEPARTMENT OF BUSINESS AND
PROFESSIONAL REGULATION

DHR6215636         01/20/11 100308050

SINGLE RESORT DWELLING (2007)
THE BIRD OF PARADISE LLC
OLD ANHEUSER BUSCH ESTATE

IS LICENSED under the provisions of Ch.509 FS.
Expiration date: FEB 1, 2012      L1101200035

DETACH HERE

STATE OF FLORIDA
DEPARTMENT OF BUSINESS AND PROFESSIONAL REGULATION
DIVISION OF HOTELS AND RESTAURANTS

| DATE | BATCH NUMBER | LICENSE NBR | | SEQ# L1101300045 |
|------|--------------|-------------|---|---|
| 01/20/2011 | 100308050 | DHR6215636 | NBR. OF UNITS: 1 | |

The SINGLE RESORT DWELLING (2007)
Named below IS LICENSED                                           NON-
Under the provisions of Chapter 509 FS.
Expiration date: FEB 1, 2012                                  TRANSFERABLE

THE BIRD OF PARADISE LLC
OLD ANHEUSER BUSCH ESTATE
2707 PASS-A-GRILLE WAY
ST.PETE BEACH            FL 33706

RICK SCOTT
GOVERNOR                                              CHARLIE LIEM
                                                      SECRETARY

                    DISPLAY AS REQUIRED BY LAW

# EXHIBIT 5

## MEMBERSHIP INTEREST PURCHASE AGREEMENT

This MEMBERSHIP INTEREST PURCHASE AGREEMENT (this "Agreement"), dated as of June 16, 2017, is entered into by and among BARRACUDA CLUB LLC, a Florida limited liability company (the "Buyer"), THE BIRD OF PARADISE LLC, a Florida limited liability company (the "Company"), and John De Silva, in his capacity as sole member of the Company (the "Seller").

### BACKGROUND:

(A)   The Seller is the beneficial and legal owner of 100% of the membership interests in the Company (including all rights of Seller as a member of the Company, all governance and voting rights and all rights of Seller under the Act (as defined below) with respect to the Company, the "Purchased Interests");

(B)   The Buyer wishes to acquire the Purchased Interests and the Seller wishes to sell the Purchased Interests to Buyer on the terms of this Agreement;

(C)   The parties hereto desire that, concurrently with its purchase of the Purchased Interests, the Buyer will be admitted as the sole member (within the meaning of the Act) of the Company, the Seller will be deemed to have withdrawn as a member (within the meaning of the Act) of the Company and the Buyer will own one hundred percent (100%) of the membership interests of the Company, including the sole right to all capital and profits of the Company;

(D)   The Company owns, as its sole asset, the License (as defined below);

(E)   The Seller is the Company's sole member and manager, and Buyer has requested certain representations and warranties from him as a condition to purchasing the Purchased Interests; and

(F)   The parties hereto desire to set forth certain representations, warranties, and covenants made by each to the other as an inducement to the consummation of the sale and certain additional agreements related to the sale.

### AGREEMENT

The parties hereto agree as follows:

1.    Purchase and Sale; Assignment of Purchased Interests.

(a)    Concurrently with the execution and delivery of this Agreement, Buyer shall deliver to the Seller the purchase price of $10.00 for the Purchased Interests (the "Purchase Price") and, effective upon the payment of the Purchase Price, the Seller hereby sells, assigns and transfers to Buyer all of his Seller's right, title and interest in and to the Purchased Interest, free and clear of all Encumbrances (as

defined below). The payment of the Purchase Price and the assignment of the Purchased Interests on the date hereof are referred to herein as the "Closing."

(b)     The Purchase Price shall be paid by cashier's check, wire transfer or other means approved by the Seller.

(c)     In this Agreement, unless the context otherwise requires: (i) references to this Agreement are references to this Agreement and to the Schedules hereto; (ii) references to any party to this Agreement include references to its respective successors and permitted assigns; (iii) references to a judgment include references to any order, writ, injunction, decree, determination or award of any court or tribunal; (iv) references to a "Person" means any individual, company, corporation (whether public, private or government), corporate body, association, authority, partnership, limited liability company, firm, joint venture, business entity, trust or government agency; (v) references to any document (including this Agreement) are references to that document as amended, consolidated, supplemented, or replaced by the parties thereto from time to time; (vi) the word "affiliate" means, as to the Person in question, any Person that directly or indirectly controls, is controlled by, or is under common control with, the entity in question and any successors or assigns of such entities; (vii) the term "control" means possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person whether through ownership of voting securities, by contract or otherwise; and (viii) the term "knowledge" or "knowledge of the Company" means the actual knowledge of the Seller after due inquiry, provided that, with respect to any facts, events or circumstances, "knowledge" means only the actual knowledge of the Seller; (ix) the term "Proceeding" means and refers to any action, arbitration, audit, hearing, investigation, litigation, suit or similar proceeding (whether civil, criminal, administrative, judicial or investigative, whether formal or informal, whether public or private) commenced, brought, conducted or heard by or before, or otherwise involving, any governmental body or arbitrator; (x) the term "Law" means and refers to any statute, law, ordinance, regulation, rule, code, order, constitution, treaty, common law, judgment, decree, other requirement or rule of law of any Governmental Authority; and (xi) the term "Governmental Authority" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), or any arbitrator, court or tribunal of competent jurisdiction.

2.     Representations and Warranties of Seller. The Seller (except as expressly provided otherwise), hereby represents and warrants to Buyer the following as of the date hereof:

(a)     Binding Agreement; Absence of Conflicts. The Seller hereby represents and warrants to Buyer as follows:

(i)     This Agreement has been duly executed and delivered by the Seller and (assuming due execution and delivery by Buyer) constitutes the legal, valid and binding obligation of the Seller, enforceable against the Seller in accordance with its terms.

2

(ii)   The Purchased Interest of the Seller has been duly authorized, is validly issued, and is owned of record and beneficially by the Seller, free and clear of all liens, pledges, security interests, charges, claims, encumbrances, agreements, options, voting trusts, proxies and other arrangements or restrictions of any kind (the "Encumbrances"). Upon consummation of the transactions contemplated by this Agreement, Buyer shall own the Purchased Interests, free and clear of all Encumbrances.

(iii)   The execution, delivery and performance by the Seller of this Agreement does not conflict with, violate or result in the breach of, or create any Encumbrance on the Purchased Interest of the Seller pursuant to any agreement, instrument, order, judgment, decree, law or governmental regulation to which the Seller is a party or is subject or by which the Purchased Interest is bound.

(iv)   No governmental, administrative or other third party consents or approvals are required by or with respect to the Seller in connection with the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby.

(b)   Capitalization. The Seller owns all of the Company's currently issued and outstanding membership interests and there are no other owners of the Company. Additionally, no other equity or ownership interests of the Company, or securities or other rights convertible into or exchangeable for such equity or other ownership interests in the Company, are outstanding. There are no outstanding or authorized options, warrants, purchase rights, subscription rights, conversion rights, exchange rights, or other contracts or commitments that could require the Company to issue, sell, or otherwise cause to become outstanding any of its equity or ownership interests. There is no voting trust, proxy or other agreement or understanding with respect to the voting of any of the membership units of the Company, including the Purchased Interests.

(c)   Subsidiaries. The Company does not currently own or control, directly or indirectly, any interest in any other Person, and is not a participant in any joint venture, partnership or similar arrangement.

(d)   Licensure. The Company is the holder of that certain Vacation Rental – Dwelling License, License Number DWE6215636, issued by the Florida Department of Business and Professional Regulation (the "License"), which permits the Company, which is a residentially zoned R-2 single family dwelling, to operate as a private resort at the property located at 2707 Pass-A-Grille Way, St. Pete Beach, FL 33706 (the "Property"). The License represents the all of the licenses and permits required for the operation of a private resort at the Property as currently operated. The License is in good standing, in full force and effect and not subject to meritorious challenge. The Company is in compliance in all material respects with the terms of the License, and neither the Company nor the Seller has received any written notice or communication from any Governmental Authority regarding any violation of the License. No event has occurred and is pending with respect to the License, whether after notice or the passing of time or both, that would serve as grounds for or otherwise authorize the suspension, revocation, or termination of the License or impair the rights of any holder thereof. All pending applications required to have been filed by the Company for the renewal of the License.

3

(e)   Governmental Consents and Filings.  No governmental, administrative or other third party consents, licenses or approvals are required by or with respect to the Company in connection with the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby.

(f)   Contracts.  Schedule 2(f) is a list of all commitments, contracts, leases and agreements, whether written or oral ("Contracts"), to which the Company is a party.  The Company has delivered to Buyer true and correct copies of all Contracts, including any and all amendments and other modifications thereto.

(g)   Title to and Condition of Property; Leases.  The Company does not own or lease any real property.  The Company has good and marketable title or a valid interest in all personal property and other assets, in each case subject to no mortgage, pledge, lien, security interest, lease, charge or encumbrance, other than liens resulting from taxes which have not yet become delinquent and liens, the interests of lessors in leased property and encumbrances which do not in any case materially detract from the value of the property subject thereto or materially impair the operations of the Company and in all such cases that have arisen in the ordinary course of business.

(h)   Litigation or Proceedings.  The Company has not received written notice of any claims, actions, suits, proceedings or investigations pending or threatened against the Company, the Seller or any officer, director or manager of the Company, at law or in equity, or before or by any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality wherever located, and to the knowledge of the Company, no such claims, actions, suits, proceedings or investigations are pending or have been threatened.  The Company is not in default under any order of any court or federal, state, municipal, or other governmental department, commission, board, bureau, agency or instrumentality wherever located.  There is no claim, action, suit, proceeding or investigation pending or, to the knowledge of the Company, threatened against or affecting the Company.

(i)   Tax Returns and Payments.  There are no federal, state, county, local or foreign taxes now due and payable by the Company that have not been timely paid.  There are no accrued and unpaid federal, state, country, local or foreign taxes of the Company which are due, whether or not assessed or disputed.  There have been no examinations or audits of any tax returns or reports by any applicable federal, state, local or foreign governmental agency, except as may have been completed and resolved fully.  The Company has duly and timely filed all federal, state, county, local and foreign tax returns required to have been filed by it (subject to extensions and possible late filings that have no present adverse consequences) and there are in effect no waivers of applicable statutes of limitations with respect to taxes for any year.  Since formation, the Company has not elected to be taxed as a corporation.

(j)   No Brokers.  No broker, finder or investment banker is entitled to any brokerage, finders or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of the Seller.

4

3.      Representation and Warranties of Buyer.

(a)      Binding Agreement.  This Agreement has been duly executed and delivered by Buyer and (assuming due execution and delivery by the Seller) constitutes a legal, valid and binding obligation of Buyer enforceable against Buyer in accordance with its terms.

(b)      Governmental Consents and Filings.  No governmental, administrative or other third party consents or approvals are required by or with respect to Buyer in connection with the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby.

(c)      No Brokers.  No broker, finder or investment banker is entitled to any brokerage, finders or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Buyer.

4.      Admission of Buyer to the Company.  Notwithstanding anything to the contrary, simultaneously with the Closing, the Buyer is hereby admitted to the Company as the sole member of the Company and the holder of the Purchased Interests and the Seller hereby withdraws as the sole member of the Company.

5.      Continuation of the Company.  For the avoidance of doubt and notwithstanding anything to the contrary, the assignment of the Purchased Interests and the admission of the Buyer as the sole member of the Company and as the holder of the Purchased Interests shall not dissolve the Company and the Company shall continue without dissolution.

6.      Consent and Waiver.  The Company and the Seller (as the sole member of the Company) hereby (a) consents to and approves the sale and assignment of the Purchased Interests and the other transactions contemplated hereby, and (b) waives any prohibition, restriction or condition contained in any operating agreement governing the Company or under applicable Law that is applicable to the sale and assignment of the Purchased Interests pursuant to this Agreement.

7.      Releases.  Each of the Company and the Seller hereby releases the Company of and from any and all claims, demands, causes of actions, covenants, contracts whatsoever, both at law and in equity, now existing or hereafter existing, or which may hereafter arise, from the existing state of things, relating in any way to the Company and any actions taken by the Company relating in any way to the Company or any aspect of its business.

8.      Indemnification.

(a)      Indemnification by Seller.  From and after the Closing, the Seller agrees to defend, indemnify and hold harmless the Company, Buyer and its agents (each, a "Buyer Indemnified Party") from, against and for any damages, claims, costs, losses, liabilities, expenses or obligations (including reasonable attorneys' fees and associated expenses), whether or not involving a third-party claim, but excluding any loss of profits (collectively, "Losses"), incurred or suffered by a Buyer Indemnified Party as a result of or arising from: (i) any breach of or inaccuracy in any representation or warranty in Section 2 of this Agreement or in any document executed as a condition to this Agreement (collectively the

5

"<u>Transaction Documents</u>") and (ii) any breach of a covenant, obligation or agreement of the Seller in this Agreement or any other Transaction Document.

(b)     <u>Indemnification by Buyer</u>. From and after the Closing, Buyer and the Company, jointly and severally, agree to defend, indemnify and hold harmless the Seller (each, a "<u>Seller Indemnified Party</u>") from, against and for any Losses incurred or suffered by the Seller Indemnified Parties as a result of or arising from (i) any breach of or inaccuracy in any representation or warranty made by Buyer in this Agreement or any other Transaction Document or (ii) any breach of a covenant, obligation or agreement of Buyer in this Agreement or any other Transaction Document.

(c)     <u>Procedure for Indemnification – Non Third Party Claims</u>.  Whenever any claim shall arise for indemnification hereunder not involving a demand, claim, action or Proceeding made or brought by a third party, including without limitation a government agency, the party to be indemnified shall notify the indemnifying party promptly after obtaining actual knowledge of the facts constituting the basis for such claim. The notice to the indemnifying party shall specify, if known, the amount or an estimate of the amount of the liability arising therefrom.

9.     <u>Information and Records</u>. Promptly after the date hereof and in no event later than five (5) days after the Closing, the Seller shall return to Buyer all copies of such books, records, files, documents or other information, in hard copy and/or electronic format, related to the Company or its business that are in the possession or control of the Seller or his affiliates, agents, employees or representatives, including but not limited to, any books, records, files, documents or other information relating to the License.

10.     <u>Survival</u>. All representations, warranties, covenants and indemnities contained herein shall survive the execution and delivery of this Agreement and the purchase and sale of the Purchased Interests hereunder, until the date that is two (2) years from the date of this Agreement.

11.     <u>Further Assurances</u>. Each of the parties hereto shall execute and deliver such additional documents, instruments, conveyances and assurances, and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement.

12.     <u>Expenses</u>. All costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses.

13.     <u>Notices</u>. All notices, requests, consents, claims, demands, waivers and other communications hereunder (each, a "<u>Notice</u>") shall be in writing and addressed to the parties at the addresses set forth on the signature pages to this Agreement (or to such other address that may be designated by the receiving party from time to time in accordance with this section). All Notices shall be delivered by personal delivery, nationally recognized overnight courier (with all fees pre-paid), facsimile or e-mail of a PDF document (with confirmation of transmission) or certified or registered mail (in each case, return receipt requested, postage prepaid). Except as otherwise provided in this Agreement, a Notice is effective only (a) upon receipt by the receiving party, and (b) if the party giving the Notice has complied with the requirements of this Section.

6

14.   Entire Agreement. This Agreement constitutes the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings, agreements, representations and warranties, both written and oral, with respect to such subject matter.

15.   Successor and Assigns. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. No party may assign any of its rights or obligations hereunder without the prior written consent of the other parties hereto, which consent shall not be unreasonably withheld or delayed.

16.   Headings. The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

17.   Amendment and Modification; Waiver. This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. Except as otherwise set forth in this Agreement, no failure to exercise, or delay in exercising, any rights, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

18.   Severability. If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

19.   Governing Law; Submission to Jurisdiction. This Agreement shall be governed by and construed in accordance with the internal laws of the State of Florida without giving effect to any choice or conflict of law provision or rule (whether of the State of Florida or any other jurisdiction). Any legal suit, action or proceeding arising out of or based upon this Agreement or the transactions contemplated hereby may be instituted in the federal courts of the United States or the courts of the State of Florida in each case located in the County of Hillsborough, and each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action or proceeding. Service of process, summons, notice or other document by mail to such party's address set forth herein shall be effective service of process for any suit, action or other proceeding brought in any such court. The parties irrevocably and unconditionally waive any objection to the laying of venue of any suit, action or any proceeding in such courts and irrevocably waive and agree not to plead or claim in any such court that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

7

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the date first written above.

BUYER:

BARRACUDA CLUB LLC,
a Florida limited liability company

By: _____
    Name: Joshua Keleske
    Title: Vice President

Address:
_____
_____
_____

SELLER:

_____
JOHN DE SILVA

Address:
_____
_____
_____

COMPANY:

THE BIRD OF PARADISE LLC,
a Florida limited liability company

By: _____
    Name: John De Silva
    Title:  Managing Member

Address:
_____
_____
_____

*Signature Page to Membership Unit Purchase Agreement*

# EXHIBIT 6

2018 FLORIDA LIMITED LIABILITY COMPANY AMENDED ANNUAL REPORT

DOCUMENT# L04000092603

Entity Name: THE BIRD OF PARADISE, LLC

**FILED**
**Apr 18, 2018**
**Secretary of State**
**CC9584339932**

Current Principal Place of Business:

1311 N. WESTSHORE BLVD.
SUITE 101A
TAMPA, FL 33607

Current Mailing Address:

1311 N. WESTSHORE BLVD.
SUITE 101A
TAMPA, FL 33607 US

FEI Number: NOT APPLICABLE

Certificate of Status Desired: No

Name and Address of Current Registered Agent:

KELESKE, JOSHUA T
3333 W. KENNEDY BLVD.
SUITE 204
TAMPA, FL 33609 US

*The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.*

SIGNATURE: JOSHUA T. KELESKE

| | |
|---|---|
| Electronic Signature of Registered Agent | 04/18/2018 |
| | Date |

Authorized Person(s) Detail :

| | |
|---|---|
| Title | MGRM |
| Name | MACDONALD, STEVEN A |
| Address | 1311 N. WESTSHORE BLVD.<br>SUITE 101A |
| City-State-Zip: | TAMPA FL 33607 |

*I hereby certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am a managing member or manager of the limited liability company or the receiver or trustee empowered to execute this report as required by Chapter 605, Florida Statutes; and that my name appears above, or on an attachment with all other like empowered.*

SIGNATURE: STEVEN A. MACDONALD          MANAGER          04/18/2018

| | | |
|---|---|---|
| Electronic Signature of Signing Authorized Person(s) Detail | | Date |

EXHIBIT 7

2/17/2021                                          Detail by Document Number

Sunbiz.org

Department of State / Division of Corporations / Search Records / Search by Document Number /

# Detail by Document Number

Florida Limited Liability Company
THE BIRD OF PARADISE, LLC

**Filing Information**

| | |
|---|---|
| **Document Number** | L04000092603 |
| **FEI/EIN Number** | N/A |
| **Date Filed** | 12/22/2004 |
| **State** | FL |
| **Status** | INACTIVE |
| **Last Event** | ADMIN DISSOLUTION FOR |

ANNUAL REPORT

| | |
|---|---|
| **Event Date Filed** | 09/25/2020 |
| **Event Effective Date** | NONE |

**Principal Address**

1311 N. Westshore Blvd.
Suite 101A
Tampa, FL 33607

Changed: 04/18/2018

**Mailing Address**

1311 N. Westshore Blvd.
Suite 101A
Tampa, FL 33607

Changed: 04/18/2018

**Registered Agent Name & Address**

Keleske, Joshua T
3333 W. Kennedy Blvd.
Suite 204
Tampa, FL 33609

Name Changed: 04/18/2018

Address Changed: 04/18/2018

**Authorized Person(s) Detail**

**Name & Address**

Title MGRM

2/17/2021                                      Detail by Document Number

MACDONALD, STEVEN A
1311 N. Westshore Blvd.
Suite 101A
Tampa, FL 33607

**Annual Reports**

| Report Year | Filed Date |
|-------------|------------|
| 2018        | 02/10/2018 |
| 2018        | 04/18/2018 |
| 2019        | 04/29/2019 |

**Document Images**

| | |
|---|---|
| 04/29/2019 -- ANNUAL REPORT | View image in PDF format |
| 04/18/2018 -- AMENDED ANNUAL REPORT | View image in PDF format |
| 02/10/2018 -- ANNUAL REPORT | View image in PDF format |
| 04/07/2017 -- ANNUAL REPORT | View image in PDF format |
| 03/28/2016 -- ANNUAL REPORT | View image in PDF format |
| 02/22/2015 -- ANNUAL REPORT | View image in PDF format |
| 01/08/2014 -- ANNUAL REPORT | View image in PDF format |
| 01/31/2013 -- ANNUAL REPORT | View image in PDF format |
| 01/25/2012 -- ANNUAL REPORT | View image in PDF format |
| 02/15/2011 -- ANNUAL REPORT | View image in PDF format |
| 02/15/2010 -- ANNUAL REPORT | View image in PDF format |
| 03/28/2009 -- ANNUAL REPORT | View image in PDF format |
| 01/10/2008 -- ANNUAL REPORT | View image in PDF format |
| 01/05/2007 -- ANNUAL REPORT | View image in PDF format |
| 01/19/2006 -- ANNUAL REPORT | View image in PDF format |
| 03/05/2005 -- ANNUAL REPORT | View image in PDF format |
| 12/22/2004 -- Florida Limited Liabilites | View image in PDF format |

# EXHIBIT 8

*10:42:28 AM 5/13/2021*

**Data Contained In Search Results Is Current As Of 05/13/2021 10:41 AM.**

Search Results

**Please see our** glossary of terms **for an explanation of the license status shown in these search results.**

**For additional information, including any complaints or discipline, click on the name.**

| License Type | Name | Name Type | License Number/ Rank | Status/Expires |
|---|---|---|---|---|
| Vacation Rental - Dwelling | BARRACUDA CLUB LLC | Primary | DWE6215636 Dwelling | Current, Active 02/01/2022 |

|  |  |
|---|---|
| **License Location Address*:** | 2707 PASS A GRILLE WAY ST.PETE BEACH, FL 33706 |
| **Main Address*:** | 1311 N WESTSHORE BLVD STE 101 A TAMPA, FL 33607 |
| **Mailing Address*:** | 1311 N WESTSHORE BLVD STE 101 A TAMPA, FL 33607 |

| License Type | Name | Name Type | License Number/ Rank | Status/Expires |
|---|---|---|---|---|
| Vacation Rental - Dwelling | BARRACUDA CLUB LLC | DBA | DWE6215636 Dwelling | Current, Active 02/01/2022 |

|  |  |
|---|---|
| **License Location Address*:** | 2707 PASS A GRILLE WAY ST.PETE BEACH, FL 33706 |
| **Main Address*:** | 1311 N WESTSHORE BLVD STE 101 A TAMPA, FL 33607 |
| **Mailing Address*:** | 1311 N WESTSHORE BLVD STE 101 A TAMPA, FL 33607 |



**\* denotes**
Main Address - This address is the Primary Address on file.
Mailing Address - This is the address where the mail associated with a particular license will be sent (if different from the Main or License Location addresses).
License Location Address - This is the address where the place of business is physically located.

2601 Blair Stone Road, Tallahassee FL 32399 :: Email: Customer Contact Center :: Customer Contact Center: 850.487.1395

The State of Florida is an AA/EEO employer. Copyright 2007-2010 State of Florida. Privacy Statement

Under Florida law, email addresses are public records. If you do not want your email address released in response to a public-records request, do not send electronic mail to this entity. Instead, contact the office by phone or by traditional mail. If you have any questions, please contact 850.487.1395. \*Pursuant to Section 455.275(1), Florida Statutes, effective October 1, 2012, licensees licensed under Chapter 455, F.S. must provide the Department with an email address if they have one. The emails provided may be used for official communication with the licensee. However email addresses are public record. If you do not wish to supply a personal address, please provide the Department with an email address which can be made available to the public.

**Brief Exhibit T**

**DeSilva Deposition Exhibit 13**



Plaintiff Exhibit 13

Deposition Exhibit 13













FIRST LEVEL FLOOR PLAN (BOAT HOUSE)
SCALE: 1/4" = 1'-0"

An Addition/Renovation to:
" THE BIRDS OF PARADISE LLC "
(John DeSilva - Owner)
PH: (727) 360-4116
2707 PASS-A-GRILLE WAY
ST. PETE BEACH, FLORIDA 33706

















# Brief Exhibit T

# DeSilva Deposition Exhibit 14

 **ACG Companies**

**Aldo Datoli,** *Senior Investment Advisor*
Acer Capital Group Chicago
Phone: 1-708-932-8900
Email: adatoli@acgcompanies.com
Website: www.acgcompanies.com

**Plaintiff
Exhibit 14**

Mr. John R. DeSilva
c/o The Birds of Paradise LLC
2817 Pass-A-Grille Way
St. Pete Beach, Fl. 33706
RE: Refinancing and Construction Loan

February 15, 2010

Dear Mr. DeSilva,

Having visited and reviewed the property formerly known as "The Anheuser-Busch Estate" and currently known and licensed as The Birds of Paradise in Pass-A-Grille Beach Florida, please be advised that it is the decision of ACG Companies to work with you and fund your project as described below.

This correspondence will effectively serve as ACG Companies and ACG Capital Group Chicago preliminary commitment to:

1) Pay off the negotiated settlement of $5,640,000 on your current mortgage currently being held by MB Financial of Chicago.
2) Lend the $3,800,000 necessary to renovate the property as approved by The City of St. Pete Beach's Board of Adjustment on June 24, 2009. A construction escrow account would be established and the American Institute of Architects Schedule of Values and Payment Schedules will be used and payments will be predicated on work completed.
3) The total amount of the loan commitment at 70% LTV will be approximately $9,500,000. We feel that the finished renovation will render a value of $14,000,000.
4) ACG Capital Group Chicago and or it's investor group will hold a first mortgage position on the property located at 2707 Pass-A-Grille Way - St. Pete Beach, Florida 33706 at a rate somewhere under 10% for a yet to be determined amount of years.
5) Additionally, ACG Companies will hold a first lien position on the Birds of Paradise LLC, the current holder of the State Issued Resort License.

John, if this initial commitment on our part meets with your approval please advise us. Please understand that there are many details that will have to be dealt with in the due diligence necessary to effectively fund this commitment by ACG Companies and ACG Capital Group Chicago and it's investors and affiliates.

In order to complete this transaction and loan commitment within the next ninety days, it will require that you convey upon request any and all the requested documents that we need. We are looking forward to working with you, John.

Sincerely,

Aldo Datoli, Senior Investment Advisor
Acer Capital Group Chicago

**Deposition Exhibit 14**