# Exhibit 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig | * | **MDL NO. 2179** |
|   "Deepwater Horizon" in the Gulf | | |
|   of Mexico, on April 20, 2010 | * | **SECTION: J** |
| | | |
| **This Document Relates to:** | * | **JUDGE BARBIER** |
| *John DeSilva, Individually, and as the Sole* | | |
| *Member, Owner, and Operator of The Bird of* | * | **MAG. JUDGE CURRAULT** |
| *Paradise, LLC v. BP Expl. & Prod., Inc.,* | | |
| *et al., Case No. 16-cv-05277* | * | |

---

**DECLARATION OF KRISTOPHER S. RITTER IN SUPPORT OF BP'S**
**SUPPLEMENTAL BRIEF IN SUPPORT OF ITS MOTION TO DISMISS**

I, Kristopher S. Ritter, declare as follows:

1.      I am a Partner at Kirkland & Ellis LLP, counsel of record for Defendants BP

Exploration & Production Inc. and BP America Production Company (collectively, "BP") in the

above-captioned action.  I am a member of good standing of the Bar of the State of Illinois.

2.      I respectfully submit this Declaration in Support of BP's Supplemental Brief in

Support of Its Motion to Dismiss.  The statements in this declaration are based on my personal

knowledge.  If called upon to testify as a witness, I could provide testimony competently under

oath.

3.      Attached hereto as Exhibit A is a true and correct copy of the official Transcript

of Motion to Dismiss Hearing heard before this Court on April 21, 2021.

4.      Attached hereto as Exhibit B is a true and correct copy of the Membership Interest

Purchase Agreement dated June 16, 2017 produced to BP by Steven MacDonald on May 14,

2021.

5.      Attached hereto as Exhibit C is a true and correct copy of excerpts from the transcript of John DeSilva's deposition on May 19, 2021.

6.      Attached hereto as Exhibit D is a true and correct copy of the sworn Declaration of Steven A. MacDonald dated May 17, 2021.

7.      Attached hereto as Exhibit E is a true and correct copy of the letter counsel for BP sent to counsel for DeSilva on May 17, 2021.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed in Bay Lake, Florida on this 11th day of June, 2021.

_____
                    Kristopher S. Ritter

# Exhibit A to Declaration of K. Ritter

1                  UNITED STATES DISTRICT COURT

2                 EASTERN DISTRICT OF LOUISIANA

3

4    IN RE:  OIL SPILL BY THE       *
     OIL RIG *DEEPWATER HORIZON*    *
5    IN THE GULF OF MEXICO ON       *
     APRIL 20, 2010                 *
6                                   *
     THIS DOCUMENT RELATES TO:      *     Civil Action No.: 10-MD-2179
7                                   *     Section "J"
     *John DeSilva, Individually,*  *     New Orleans, Louisiana
8    *and as the Sole Member,*      *     April 21, 2021
     *Owner, and Operator of The*   *
9    *Bird of Paradise, LLC v. BP*  *
     *Expl. & Prod., Inc., et al.*  *
10   *Case No.: 16-CV-5277*         *
     *******************************

11

12            TRANSCRIPT OF ORAL ARGUMENT PROCEEDINGS
              HEARD BEFORE THE HONORABLE CARL J. BARBIER
13                  UNITED STATES DISTRICT JUDGE

14

     APPEARANCES:
15

16   For the Plaintiff:          The Penton Law Firm
                                 BY:  RONNIE G. PENTON, ESQ.
17                               209 Hoppen Place
                                 Bogalusa, Louisiana 70427
18

19
     For BP Exploration and
20   Production, Inc.:
                                 Kirkland & Ellis
21                               BY:  MATTHEW T. REGAN, ESQ.
                                 BY:  KRISTOPHER S. RITTER, ESQ.
22                               300 North LaSalle
                                 Chicago, Illinois  60654
23

24

25

                        OFFICIAL TRANSCRIPT

1   APPEARANCES:

2   For BP Exploration and
    Production, Inc.:              Kirkland & Ellis
3                                 BY:  CHRISTOPHER W. KEEGAN, ESQ.
                                  555 California Street
4                                 San Francisco, California 94104

5

6

7   Official Court Reporter:      Jodi Simcox, RMR, FCRR
                                  500 Poydras Street, Room HB-275
8                                 New Orleans, Louisiana 70130
                                  (504) 589-7780
9                                 Jodi_Simcox@laed.uscourts.gov

10

11

12

13
    Proceedings recorded by mechanical stenography using
14
    computer-aided transcription software.
15

16

17

18

19

20

21

22

23

24

25

                            OFFICIAL TRANSCRIPT

1 <u>**PROCEEDINGS VIA ZOOM**</u>

2 **(April 21, 2021)**

3 **\*\*\*\*\*\*\***

4

5 (COURT CALLED TO ORDER)

6 **THE COURT:**  All right.  Good morning, everyone.

7 **MR. REGAN:**  Good morning, Judge.

8 **MR. PENTON:**  Good morning.

9 **THE COURT:**  Gail, let's call the case, please.

10 **THE DEPUTY CLERK:**  MDL-2179, *In re:  Oil Spill by the*

11 *Oil Rig Deepwater Horizon in the Gulf of Mexico on April 20th,*

12 *2010,* relating to 16-5277, *John DeSilva versus BP Exploration*

13 *and Production, et. al.*

14 **THE COURT:**  All right.  Counsel, if you would make

15 your appearances, please.

16 **MR. PENTON:**  May it please the Court, Your Honor,

17 Ronnie Penton on behalf of John DeSilva and The Bird of

18 Paradise, LLC.

19 **THE COURT:**  Okay.

20 **MR. REGAN:**  Good morning, Your Honor.  Matthew Regan

21 on behalf of BP.

22 **MR. KEEGAN:**  Good morning, Your Honor.  Chris Keegan,

23 with Matt, also on behalf of BP.

24 **MR. RITTER:**  Good morning, Your Honor.  Chris Ritter

25 from Kirkland and Ellis on behalf of BP.

1          **THE COURT:**  Okay.  Very well.

2              Okay.  I set this this morning to hear the

3     motion by BP to dismiss the complaint filed by John DeSilva for

4     lack of standing.  This is in the MDL, of course, but the

5     individual case number is 16-5277, and the motion is Record

6     Document No. 26922.

7              Who's going to argue on behalf of BP?

8     Mr. Regan, are you?

9          **MR. REGAN:**  Yes, Your Honor.

10         **THE COURT:**  Okay.  Go ahead.

11         **MR. REGAN:**  Your Honor, I'll be brief.  We have moved

12    to dismiss this claim for lack of standing because this

13    plaintiff does not have standing to bring this claim.  To try

14    to just focus on the very simple questions here, which

15    obviously are jurisdictional if there's no standing.

16             Who's the claimant?  Well, all the pleadings

17    that have been filed in this court, the claimant is The Bird of

18    Paradise, LLC.  The complaint is for The Bird of Paradise and

19    identifies them as the plaintiff.  The short form joinder that

20    was filed as Record 123736 was filed by The Bird of Paradise as

21    a business claim signed by Mr. DeSilva.  The opt-out form that

22    was filed, that was filed by The Bird of Paradise, signed by

23    Mr. DeSilva.  So there's no question who the claimant is here.

24             Then why are we having a standing question?

25    Well, that's because The Bird of Paradise was sold by

1    Mr. DeSilva in 2017, and there has been no production of any
2    evidence that this claim was reserved with that sale.  So
3    Mr. DeSilva lacks standing.  He's no longer the owner of The
4    Bird of Paradise.  He lacks standing to bring The Bird of
5    Paradise's claim, whatever it might be, before this court.
6                    The case law, I won't go through --
7              THE COURT:  Let me interrupt you, if I could,
8    Mr. Regan.  I've got to tell you, there's a lot of -- well, I'm
9    not certain that the evidence is clear as to what went on here,
10   but the question I have, a more precise question, I guess, is:
11   What is the evidence that the LLC -- The Bird of Paradise, LLC,
12   was actually sold?  There seems to be some -- perhaps there's
13   some lack of evidence on that.  I don't know.
14             MR. REGAN:  Well, Your Honor, in our motion, we
15   attached the state filings with the Florida Secretary of State
16   that indicates that it has a new owner.  We also have
17   Mr. DeSilva's own filings where he identifies himself as the
18   former owner.  So to us, there is no dispute that it was sold.
19   We see some arguments that were made for the first time in this
20   response to our motion that somehow it wasn't sold.  We think
21   those are just counterfactual.
22                    So to us, both the actual filing in the Florida
23   Secretary of State's office, and Mr. DeSilva's own
24   representations to the court and where he identifies himself as
25   the former owner.  And I will say, when this was first

1   identified and discussed with Your Honor in September, it was

2   represented that the business had been sold.  So I don't think

3   there's a dispute of fact on that, but that's what I would

4   identify to you.

5          THE COURT:  So the question would be, if you're right

6   that The Bird of Paradise, LLC, was sold along with the real --

7   there's no question real property was sold, I believe, by

8   Mr. DeSilva to Mr. MacDonald or some entity controlled by

9   Mr. MacDonald.  I guess the interesting thing is, what am I to

10  make of this affidavit from Mr. MacDonald which seems to

11  dispute -- or deny that he obtained this claim -- that he

12  bought this claim?

13         MR. REGAN:  Well, what I make of it, it is that --

14         THE COURT:  Because theoretically, at least -- I'm

15  sorry.  Theoretically, at least, you could transfer the LLC but

16  reserve, I guess, the claim.  Right?

17         MR. REGAN:  Matthew Regan, Your Honor.

18             Theoretically, yes.  And as the plaintiff, it's

19  his burden to show you that he has standing to pursue the

20  claim.

21             But what I'd say about that affidavit is it's

22  more interesting for what it does not say.  It does not say

23  that in the transaction the claim was excluded.  It actually

24  even avoids the question that was raised by Your Honor:  What

25  was sold in this?  It only talks about the real estate, but we

1   know from the Secretary of State filings that The Bird of
2   Paradise was purchased by MacDonald because he filed himself as
3   the owner that same calendar year for 2018.
4                   So either he falsified the state court filings
5   in Florida, which I don't think is true, or The Bird of
6   Paradise, LLC, was sold in 2017, just like we were told it was
7   sold when we started down this entire path.
8                   So to summarize, Your Honor, I think the
9   plaintiff has the burden to show you the transactions of the
10  sale.  The plaintiff has only shown you the house, but not
11  shown you anything else, or shown BP it.  The plaintiff has
12  repeatedly said that The Bird of Paradise, that he was the
13  former owner of it.
14                  And then the last point would be this, Your
15  Honor.  I think a lot of this is just to try to cloud the issue
16  as to what really happened here.  I don't think there's any
17  doubt that The Bird of Paradise was sold because it was what
18  held the license.  Right?  You had to have a license to operate
19  this business that was allegedly damaged.  That's what their
20  own accountant says.  Right?
21                  So the notion that there's something here
22  individually or left, well, by whom?  And, I guess -- I mean,
23  Mr. Penton can speak for his own client, but there's been
24  nothing presented that suggests that Mr. DeSilva still owns The
25  Bird of Paradise, LLC.  And if he doesn't, he has no standing

OFFICIAL TRANSCRIPT

1  to be before Your Honor.

2          **THE COURT:**  All right.

3          **MR. REGAN:**  I'm happy to answer any questions, Your

4  Honor.

5          **THE COURT:**  I have one more question for you and then

6  I'll let Mr. Penton respond.

7               I guess my question is, and there seems to be

8  some different -- the case law seems to be not totally clear on

9  whether this issue -- kind of type of issue would really be a

10  Rule 12(b)(1) standing question, or is it more properly a

11  Rule 17, real person in interest?  I don't know if, as a

12  practical matter, if it makes a difference, but do you have any

13  thoughts on that?

14          **MR. REGAN:**  Not specifically.  I think as a practical

15  matter, we know that whether it's Rule 12 or 17, the party

16  before Your Honor has to have the authority to bring the claim.

17  Right?  And I don't think there's a factual issue here.  It

18  hasn't been -- I mean, even in their own briefing, they say

19  they're the former owners.  So you probably could bring it

20  under either basis, Your Honor.  I don't think they're

21  exclusive.

22               But the fundamental question is, just like we

23  had when we were exploring potential mediation of this claim,

24  if this plaintiff doesn't have authority to bring this claim,

25  nothing we're doing matters.  And whether it's Rule 12,

1  Rule 17, those are designed to avoid this situation.

2          **THE COURT:**  Well, under Rule 17, for example, I would

3  allow, or invite -- I'm not sure how to characterize that --

4  whoever the real party in interest might be to come in and

5  substitute themselves; correct?

6          **MR. REGAN:**  I believe you could.  I think -- I mean,

7  I think there would be a question as to whether that makes

8  sense to do, but I believe you would have that authority under

9  the rule.  But I think Mr. DeSilva -- the new owner has

10 essentially disclaimed the claim.

11         **THE COURT:**  Well, I'll tell you what just as a

12 practical matter kind of troubles me about this whole thing,

13 assume -- and I'm going to assume for the sake of argument here

14 today that The Bird of Paradise, the LLC, which had the

15 license, was the legitimate owner of the business and that it

16 suffered some type of economic business loss.

17              If that's the case, then someone has a claim for

18 that -- or someone should have a claim for that, Mr. DeSilva,

19 Mr. MacDonald, unless there's some other party that we haven't

20 identified as the proper party in interest here.  I'm not sure

21 who, but somebody should.

22              So it, frankly, kind of troubles me to -- I

23 hesitate to just grant your motion dismissing this without --

24 I'm not sure I have the whole picture here, I guess is what I'm

25 saying.  There seems to be something lacking here.  And, of

1    course, as you say, it is true, it's the plaintiff's burden to
2    prove that they have the right to bring this claim.
3                    So let me hear from Mr. Penton on that.
4                    Good morning, Mr. Penton.
5            MR. PENTON:  Thank you, Your Honor.
6            THE COURT:  Thank you.
7            MR. PENTON:  Good morning, Judge.
8                    To address the first issue raised by counsel,
9    who is the claimant?  A review of the --
10           THE COURT:  Well, before you get to that, even more
11   fundamental:  What is your claim?  What is the claim here?  Is
12   it strictly a business economic loss type claim --
13           MR. PENTON:  Yes, Your Honor.
14           THE COURT:  -- for whoever owned and operated that
15   resort?
16           MR. PENTON:  Yes, Your Honor.  Mr. DeSilva secured a
17   special resort license for this property and secured financing
18   in the amount of $10 million.  He lost that financing a few
19   weeks after the spill due directly to the cancelation of all
20   obligations in the Gulf Coast.  So he had no capital.  He lost
21   it as a direct result of that.
22           THE COURT:  So what is the claim?  Is the claim for
23   loss -- as I appreciate it, this was an ongoing business, at
24   least in 2009 before the oil spill; correct?
25           MR. PENTON:  Yes, Your Honor.  It was -- it was --

OFFICIAL TRANSCRIPT

1   for many years, the Anheuser-Busch estate, which is this
2   property, was a resort.  And it was -- it was a high rate
3   luxury resort.  And it was rented out, all the facilities.
4   This particular license allowed Mr. DeSilva to go forward with
5   the building of additional facilities there.  And so that's
6   where the financing came from for the license that we're
7   speaking of.
8           THE COURT:  Yeah.  But my question is:  It was an
9   ongoing operating business with regular income for rentals, and
10  then the oil spill occurs --
11          MR. PENTON:  Yes.
12          THE COURT:  -- and the allegation is -- the claim is
13  that a lot of people canceled, and so they lost business
14  income -- I don't know for what period of time -- after the oil
15  spill.  Is that accurate?
16          MR. PENTON:  That's correct.  That's correct, Your
17  Honor.
18          THE COURT:  But you're also making some type of claim
19  beyond that, it seems like, for some type of loss of financing.
20  I'm not sure what the nature of that claim is, but...
21          MR. PENTON:  Yes, Your Honor.  This is what happened.
22  It was being rented out as a luxury resort.  When Mr. DeSilva
23  went to get the building permits to enhance the property by
24  building on to the estate, then at that point, he was required
25  to go get permits for that.  And when he did that, he had to go

OFFICIAL TRANSCRIPT

1  into litigation to get the City of St. Petersburg to issue

2  those permits, which they did.  The litigation was won, and the

3  permits were issued.

4            He secured a $10 million loan guarantee in order

5  to improve the property and enhance and improve and expand the

6  resort facilities and activities.  So that's where that loan

7  came from to be able to follow the license and the permit as

8  they issued it.

9       **THE COURT:**  So there's no real property damage claim

10  here; right?

11       **MR. PENTON:**  No, sir, there is not.

12       **THE COURT:**  Okay.  All right.  So you were going to

13  tell me about -- here's the question:  It's clear that

14  Mr. DeSilva individually owned the real property; correct?

15       **MR. PENTON:**  That's correct, Judge.

16       **THE COURT:**  And there's no question that he sold that

17  in 2017 to Mr. MacDonald or some entity controlled by

18  Mr. MacDonald; right?

19       **MR. PENTON:**  To Mr. MacDonald as a real estate

20  sale --

21       **THE COURT:**  Okay.

22       **MR. PENTON:**  -- solely owned by John DeSilva.

23       **THE COURT:**  So at that time in 2017, at the same

24  time, did he transfer -- what did MacDonald do with this

25  property?  Did he continue to operate it as a resort as

1   Mr. DeSilva was doing?

2           **MR. PENTON:**  Judge, he bought the property and

3   occupied the property and continued doing whatever Mr. DeSilva

4   was doing, to some extent.

5           **THE COURT:**  So he had -- the license from the State

6   of Florida, permits, license, whatever it's called, were

7   transferred to him; correct?

8           **MR. PENTON:**  He didn't -- no, sir.  He didn't get

9   that license until 2018.  The sale was 2017.  And in 2018,

10  DeSilva gave him the license.  There was never -- BP has called

11  this an equity sale.  This wasn't an equity sale.  It was a

12  real estate transaction selling the -- just the real estate.

13  There was never ever any type of transaction selling any

14  business, The Bird of Paradise, stock, or anything else, Judge.

15              And as far as the Secretary of State filings in

16  the state of Florida, Mr. DeSilva just simply quit filing

17  annual reports in 2017 when he sold the real estate.

18  Mr. MacDonald, on his own, unilaterally simply went into the

19  Secretary of State and filed reports and basically took that

20  over.  There was never a sale of any --

21          **THE COURT:**  So he just did that unilaterally even

22  though you're saying he was not the legal owner of the LLC?

23  That's accusing him of a crime essentially; right?

24          **MR. PENTON:**  Well, now -- who was the owner,

25  Mr. MacDonald, is that what you said, Judge?

1        **THE COURT:**  No, that's what you said.  You said

2   MacDonald, after 2017, just went in unilaterally and, quote,

3   took over the LLC, and filed reports.  And, ultimately, he

4   filed -- in 2020, he filed a dissolution of the LLC.  Correct?

5        **MR. PENTON:**  That's my understanding, Judge.

6        **THE COURT:**  So how does MacDonald, who you say never

7   owned the LLC, how can he legally dissolve it?

8        **MR. PENTON:**  Well, I'm telling you this, Mr. DeSilva

9   never sold the LLC to Mr. MacDonald nor anyone else.  He simply

10  quit filing his annual reports.  Simply.  That's what he did.

11  And then according to Secretary of State records,

12  Mr. MacDonald, someone on his behalf, filed reports and took

13  over the Secretary of State filing for that LLC.

14       **THE COURT:**  Why did he continually refer to himself

15  as the former owner of the LLC?

16       **MR. PENTON:**  And you're speaking of Mr. DeSilva?

17       **THE COURT:**  Yes.  Yes.

18       **MR. PENTON:**  Because he just simply abandoned this

19  LLC, is what he did.  You see, Judge, it had never filed a tax

20  return ever.  It was always Mr. DeSilva's tax returns and

21  social security number.  So it was -- it was -- and we have an

22  exhibit of the CPA.

23       **THE COURT:**  So what was the purpose of -- the LLC --

24  now, the LLC is legal, you know, in state law, Florida law,

25  it's pretty standard around the country, is an independent,

 1  separate legal entity.  It's not like a DBA.  You're not just

 2  doing business as.  It's not a trade name.

 3          **MR. PENTON:**  Right.

 4          **THE COURT:**  It's a separate legal entity that people

 5  usually do either for tax purposes or I guess legal protections

 6  or whatever.  There are different reasons you could do it.

 7          **MR. PENTON:**  Yeah.  Right.

 8          **THE COURT:**  So I'm not understanding what you're

 9  saying about -- you sound like you're saying DeSilva just

10  disregarded all the legal formalities.

11          **MR. PENTON:**  Well, Judge, the CPA handled it as a

12  disregarded entity.  He filed it -- he filed it as a

13  disregarded entity.  And when you look at all the paperwork of

14  the claims process, the opt-outs, all the verified statements,

15  everything that went in to the claims process, it was always

16  John DeSilva's personal social security number, personal

17  driver's license, because the CPAs called it a --

18          **THE COURT:**  Well, the CPA's can call it -- I guess

19  they can call it anything they want, but that doesn't change

20  the law.  It's a separate entity.

21              But the question is:  When you say the claim,

22  the claim -- as Mr. Regan pointed out, the claim -- everything

23  we've seen, it wasn't -- DeSilva didn't make an individual

24  claim here.  This was a business economic claim on behalf of

25  Bird of Paradise, LLC, signed by Mr. DeSilva on behalf of --

1   you know, somebody's got to sign the document.  But it's like
2   I'm signing as the president of a company or a member of an
3   LLC.  It doesn't make it an individual claim.
4              So everything we see in the court record in the
5   claim file shows that the claimant is The Bird of Paradise,
6   LLC.
7              **MR. PENTON:**  Your Honor, the short form joinder lists
8   John DeSilva as making the claim.  It identifies the business
9   name as Bird of Paradise.  The Tampa lawsuit is Bird of
10  Paradise and John DeSilva.  The unbundling order that we
11  complied with, it, likewise, lists John DeSilva individually
12  and as the sole member of The Bird of Paradise.
13             **THE COURT:**  So you're saying this is John DeSilva and
14  always was his individual claim?
15             **MR. PENTON:**  Yes.
16             **THE COURT:**  Did he opt out of the settlement, John
17  DeSilva?
18             **MR. PENTON:**  Yes, he did, Your Honor.  And my
19  declaration in Exhibit 4, the transmittal letter to BP was,
20  "Please see the original opt out exclusion on behalf of John
21  DeSilva and The Bird of Paradise."  On the opt out exclusion
22  election form that I filed with them is a quote from John
23  DeSilva, "I wish to be excluded from the economic property
24  damage class, John DeSilva."
25             So, Judge, in all of the process documents of

OFFICIAL TRANSCRIPT

1  this case for the class, as well as for the claims process,

2  John DeSilva and The Bird of Paradise -- in fact, it was -- we

3  were ordered to unbundle them with that caption that I just --

4  that I just read to the Court.  At all times, he made -- John

5  DeSilva made an individual claim with it and opted out of the

6  class as a result of it.

7          But what is an absolute fact, Judge, is The Bird

8  of Paradise as an LLC was never sold to anyone, ever.

9          THE COURT:  Well, one thing that I have not seen is

10  any -- any documentation about -- we haven't seen documentation

11  on the LLC.  How is it that the -- how was the license

12  transferred to Mr. MacDonald?

13          MR. PENTON:  Your Honor, my understanding is it was

14  simply given to Mr. MacDonald.  It was just signed over to him.

15  And that was -- that happened late.  That happened in late

16  2018.  There was no consideration for that.  There was no

17  transaction for that.  But it did not happen in 2017 when the

18  sale occurred.  The only sale.

19          THE COURT:  All right.  Well, I'm not clear on the

20  opt out issue because --

21          Mr. Regan, do you want to respond briefly just

22  to that?  Because I think you all represented to the Court that

23  DeSilva individually did not opt out of the economic

24  settlement.

25          MR. REGAN:  Thank you, Your Honor.  Matthew Regan for

OFFICIAL TRANSCRIPT

1  BP.

2             It's actually an attachment to the plaintiff's

3  own response brief.  The opt out exclusion election -- I can't

4  share the document with you right now based on the Zoom rules

5  we have here for this hearing, Your Honor.  But I'm looking at

6  it, and it's page 27 of their response brief.  It's titled "Opt

7  Out Exclusion Election.  Claimant Name:  The Bird of Paradise,

8  LLC, by John DeSilva."

9             Mr. Penton -- I don't think it was intentional,

10 but when he quoted the signature, it says, "I wish to be

11 excluded from the economic and property damage class."  It does

12 say that.  It's signed by John DeSilva over the following

13 typewritten words "The Bird of Paradise, LLC, by John DeSilva."

14            There is no question on earth that this was The

15 Bird of Paradise opt out exclusion.  And there is zero evidence

16 of Mr. DeSilva ever filing an individual opt out form.

17            Even further, the short form joinder form,

18 which, again, all of this is in the record and cited in the

19 briefings, was filed as a business claim.  There's two boxes to

20 check, individual, business.  Filed as a business claim.  Name

21 of the business, The Bird of Paradise.  So the documents could

22 not be more clear.

23            And there's also -- it's clear why this argument

24 is being made today.  It's being made because he has no

25 ownership interest in The Bird of Paradise.  Now, let me go to

1  that for a second.

2            So now we hear that The Bird of Paradise, LLC,

3  was -- essentially, the license was given to Mr. MacDonald.  If

4  he -- whether it was sold, given, it's not in Mr. DeSilva's

5  possession, and he can't pursue a claim in its name.

6            Further, it's been dissolved.  And I'm going to

7  get to your Rule 17 question here, Your Honor, because I think

8  there's some relevance there too.  But whether it was sold for

9  a dollar, or nothing, or a million dollars, it's not in

10 Mr. DeSilva's possession and he's purporting to bring a claim

11 on its behalf today.  That's the second point.

12           Point number three.  The idea of it being a

13 disregarded entity.  Well, it wasn't disregarded in this court

14 in MDL-2179 when the complaint, the opt out form, the short

15 form joinder are all in the name of The Bird of Paradise.  And

16 the PTO 65 filings, all of those filings in the name of this

17 business claim.  Which, as Your Honor asked, the claim isn't

18 about the real property.  It's about the use of the real

19 property to make money.  It's not about damage to the real

20 property.  It's about the business license owned by The Bird of

21 Paradise.

22           And then let me get to your last point, which I

23 think this is the one, Your Honor, is a very fair question.

24 All of the evidence I've just cited, which is -- many of those

25 things were statements under oath in filings, make clear who is

OFFICIAL TRANSCRIPT

1    the claimant before you.  It's The Bird of Paradise.

2              We've also heard today further confirmation that

3    that entity is not owned by Mr. DeSilva today.  It's not.  So

4    is there someone out there who theoretically could be the

5    plaintiff before you?  I think I have to say, yes, Your Honor,

6    there is.  Theoretically.

7              This is your Rule 17 question.  Is there some

8    potential real party of interest out there who could be there?

9    I think we have to say yes.  It's not Mr. DeSilva.  Is it

10   Mr. MacDonald?  Potentially.

11             But under Rule 17, Your Honor, you know, you

12   have to give a reasonable period of time for that person to

13   show up and say, "I want to take over this claim."  Right?

14   That would be the process under Rule 17.  But Mr. DeSilva

15   dissolved the entity in 2020, I believe, in the filings.  So I

16   think there could be a question about whether there's any

17   interest by -- Mr. MacDonald dissolved it -- if there's any

18   interest by him to pursue it.

19             **THE COURT:**  Which raises another interesting

20   question, and I don't know the answer to it.  I guess it would

21   be under Florida state law.  If you have an LLC and it's

22   dissolved, what happens to its assets, a claim that it may have

23   owned?  Who then inherits that?  Does someone inherit that or

24   what?

25             **MR. REGAN:**  I think that's right.  I think that's a

OFFICIAL TRANSCRIPT

1    question that we would need to have with Mr. MacDonald in the

2    room rather than Mr. DeSilva.

3             But I think, ultimately, you could have issues

4    of notice as well.  Right?  Was he aware that this was out

5    there?  Did he act and say, "I want to dissolve the LLC," and

6    essentially put it in sort of a liquidation posture -- right?

7    I think is where you're going, Your Honor -- to where those

8    claims are extinguished?

9             But for today, and I think just to bring us full

10   circle, we can't go any further in this litigation with the

11   plaintiff that's in front of us because we don't believe he has

12   the authority to take actions for this plaintiff or to bind

13   this plaintiff.  And in that scenario, it's hard for us to

14   really do anything further with this claimant.

15        **THE COURT:**  Has anyone considered taking the

16   deposition of Mr. MacDonald?  I know he submitted an affidavit,

17   but as you pointed out, the affidavit is not entirely

18   clarifying the issues for us here.

19        **MR. REGAN:**  Matthew Regan, Your Honor.

20             We're happy to do it.  We thought that it was

21   pretty straightforward, which is what we talked about last

22   September on this legal question.  But I think a deposition of

23   Mr. MacDonald would probably square up the issues further about

24   what actually happened with this business.  Because my last

25   point, Your Honor, is this one, which, again, is a practical --

OFFICIAL TRANSCRIPT

1          **THE COURT:**  It would be interesting to ask him how he

2    happened to, quote, take over the LLC and dissolve it and so

3    forth and what his take is on that.

4          **MR. REGAN:**  Matthew Regan, Your Honor.

5                Particularly if he continued to do any rental of

6    that property with respect to that was only authorized under a

7    license that was held by the LLC.  Right?  Because, otherwise,

8    there's some real questions about what happened.

9                I think, you know -- let me speculate, but it

10   makes sense that if he purchased the underlying house, that he

11   also took the LLC, which is the way that Florida law allowed it

12   to even operate and have this potential.

13               Which brings me to my final point, Your Honor,

14   which is that the -- if, in fact, Mr. DeSilva didn't sell the

15   LLC and he decided to just abandon it, then I think that's his

16   decision, and I think that decision, you know, further

17   eliminates his standing to bring this claim.

18               But on the record, and, again, the citations are

19   in our brief, I would look at the attachments to the

20   plaintiff's own response.  The opt out form could not be more

21   clear.  And we have zero evidence of an opt out form signed by

22   Mr. DeSilva individually.

23               So I would conclude by, if that's what this case

24   is now, if Mr. Penton's argument is, "No, this is John

25   DeSilva's individual claim," then there's zero doubt, Your

OFFICIAL TRANSCRIPT

1   Honor, that under the Court's authority and the settlement
2   release, that his failure to produce an individual opt out for
3   himself rather than one signed for The Bird of Paradise means
4   that his claim should be dismissed.
5              **THE COURT:**  All right.
6              **MR. PENTON:**  Your Honor, may I respond?
7              **THE COURT:**  Yeah.  Mr. Penton, I was about to say,
8   I'm getting back to you now.  Go ahead, sir.
9              **MR. PENTON:**  Your Honor, on the opt out issue.  The
10  letter is very clear that the election was made on behalf of
11  both John DeSilva as well as Bird of Paradise.
12             **THE COURT:**  I'm sorry.  What letter are you speaking
13  of?
14             **MR. PENTON:**  It's November the --
15             **THE COURT:**  Because there was an opt out form, was
16  there not, in this case?  There was a form.
17             **MR. PENTON:**  No, sir.
18             **THE COURT:**  Was there not an opt out --
19             **MR. PENTON:**  The form, Judge, called the "Opt Out
20  Exclusion Election" is a form that we used just to get the
21  information to BP.  But the transmittal letter very
22  specifically opts out on behalf of both John DeSilva and The
23  Bird of Paradise in November of 2012, and that's Exhibit 4 of
24  our brief.  There is no question.  Even the presentment, Judge,
25  was John DeSilva and The Bird of Paradise.

1          THE COURT:  Well, even -- let me assume for purposes

2    of our present argument that you're right on that, that he

3    opted out too.  He's still got to prove that this was his claim

4    and not the LLC's claim.  And it certainly seems -- everything

5    I've seen sounds like this is the LLC's claim because he owned

6    the real property, but the LLC owned the business and had --

7    the license from the state of Florida was in the name of the

8    LLC, right, not in the name of John DeSilva individually?

9               So all indications are to me that you had a

10   situation where John DeSilva owned -- individually owned the

11   real estate on which he operated a business by virtue of an

12   entity called The Bird of Paradise, LLC, which I'm assuming he

13   was a single member.  I don't know.

14          MR. PENTON:  Yes, he was, Judge.

15          THE COURT:  And he obtained this license to operate

16   this business from the state of Florida in the name of the --

17   the license was in the name of The Bird of Paradise, LLC.

18   Correct?

19          MR. PENTON:  The permit that was issued, yes, Judge,

20   the license was in The Bird of Paradise.

21          THE COURT:  Okay.  So whether DeSilva opted out

22   individually or not may be totally irrelevant because it still

23   seems like it's The Bird of Paradise, LLC, that has a claim.

24   That's a separate entity.  That's not him individually.

25               So one thing, counsel for BP said it when we

OFFICIAL TRANSCRIPT

```
1    started, and he's correct, is all -- I mean, when push comes to
2    shove, your client has to -- you have to prove that your
3    client, DeSilva or the LLC, either that he still owns the LLC,
4    which, of course, has now been dissolved which raises all sorts
5    of other issues, but that he owns -- you have to prove that
6    DeSilva somehow owns this claim, and you're not --
7                    Are you representing The Bird of Paradise, LLC,
8    here, or are you representing DeSilva individually, or what?
9            MR. PENTON:  Well, Judge, I mean, obviously, when
10   things started changing in 2017 and '18 --
11           THE COURT:  I don't know how you can represent a
12   dissolved entity right now.
13           MR. PENTON:  I agree with you.  I agree with you,
14   Judge.  In the court record, obviously, I did represent The
15   Bird of Paradise until Mr. DeSilva no longer operated it.  But
16   the purpose -- the practical purpose of both DeSilva having a
17   claim as well as The Bird of Paradise would be the fact that
18   The Bird of Paradise had nothing.  It had no assets.  It got --
19           THE COURT:  It had the license.  That was a valuable
20   asset, I would assume.
21           MR. PENTON:  I agree with you.  But Mr. DeSilva had
22   millions of dollars invested into this business and into this
23   property.  So, therefore, a claim was made on his behalf as
24   well.  So I think all the documentation once the Court looks at
25   the entire record, you're going to see John DeSilva throughout
```

OFFICIAL TRANSCRIPT

1  making these claims.  We're happy to go -- we had scheduled the
2  depositions to go over and possibly take a couple of these, but
3  BP decided to file the motion.
4        **THE COURT:**  Let me ask you this, Mr. Penton --
5        **MR. PENTON:**  Yes, Judge.
6        **THE COURT:**  -- other than the sale of this property
7  from DeSilva to MacDonald in 2017, is there some relationship
8  between these two parties that is not apparent right now to the
9  Court?
10        **MR. PENTON:**  Your Honor, I have to tell you, I do not
11  have knowledge that there is some relationship between the two
12  parties.  But to me, the best way to find out is, let's go take
13  some sworn testimony.
14        **THE COURT:**  They're not like brothers-in-law or
15  something?  I'm not trying to make light of it, but I'm trying
16  to see if there's something behind the curtain here that is not
17  apparent to us -- or not apparent to me.
18        **MR. PENTON:**  Not to my knowledge, Your Honor, but I
19  certainly can inquire and report to the Court and BP.  But not
20  to my knowledge.
21        **THE COURT:**  Okay.
22        **MR. PENTON:**  An arm's length transaction where a
23  piece of real estate was sold, and it was sold for quite a bit
24  of money less than the value of that real estate, and so there
25  is a residual loss just in the sale of that property.

OFFICIAL TRANSCRIPT

1          And in our brief, Judge, we cite the old 1911

2    Florida Supreme Court of *Marianna*, which is very similar to

3    our -- to our rule that an owner such as Mr. MacDonald does not

4    have a right to proceed on a loss or a damage that occurred

5    before he purchased the property unless there's an express

6    reservation, assignment, or subrogation agreement.

7          THE COURT:  You're talking about -- but I think the

8    principle you're talking about pertains to damage to the

9    property.  Like that's occurred in Louisiana under these cases

10   where someone buys a piece of property and later learns or

11   finds that there was contamination from old oil and gas

12   operations.  It says, you buy it -- you bought it with that,

13   and you knew or should have known, I guess is the theory, what

14   you were buying.

15         MR. PENTON:  That's correct, Judge.

16         THE COURT:  Yeah.  So you don't inherit a former

17   owner's claim for that type of damage, but we're talking about

18   a business loss here.  I'm not sure the same principle applies.

19         MR. PENTON:  Well, Judge, I think because this is a

20   piece of real estate and that is a real estate principle is why

21   we cited it.  We believe it applies.

22         MR. REGAN:  Your Honor, if I might respond to that

23   briefly.

24         THE COURT:  Go ahead.  Go ahead.

25         MR. REGAN:  A couple of thoughts.  First of all, the

OFFICIAL TRANSCRIPT

1  claim here is not about the real estate, so it's irrelevant.
2  So that's point number one.
3          Point number two is, if there is going to be
4  discovery, it should be exclusively jurisdictional discovery
5  and just on this narrow question of:  Does this plaintiff have
6  the right go forward?  Because it's a simple question, but it's
7  a fundamental one is:  Who does Mr. Penton represent here?
8          And if we go and take a deposition of his
9  client, Mr. DeSilva, who it sounds like Mr. Penton absolutely
10  represents Mr. DeSilva.  No question.  But if we go and take a
11  deposition of Mr. MacDonald, we can do that, and answer some of
12  these very simple questions as to who the real party in
13  interest is here.  But the notion of the property itself, this
14  is the challenge.
15          Lastly, again, you do have the clear documents
16  in front of you as to whether -- what is this claim?  Who's
17  bringing it?  But the question of the dissolution is something
18  that we could also frame-up for Your Honor.  If there's a --
19  and that has to be for jurisdictional discovery about who the
20  real party in interest is here.
21          **THE COURT:**  Okay.  Anyone need to say anything else?
22          I think there's still a lack of information that
23  would make me fully confident in ruling on this right now.
24          I've got to say, Mr. Penton, there is -- I
25  think, though, there is evidence in the record which could

OFFICIAL TRANSCRIPT

1    certainly be construed as showing that while Mr. DeSilva owned
2    the real estate, the business and the business loss claim was
3    owned solely by this LLC.
4                The question is whether he sold or transferred
5    the LLC when he sold or transferred -- when he sold the real
6    estate.  Somehow the person he sold the real estate to took
7    over control of that LLC -- I don't think there's any dispute
8    about that -- and then dissolved it in the state of Florida.
9    Again, that's some indication that it was transferred to him.
10               I'm looking at this more of a Rule 17 issue
11   right now.  But before I rule on it, what I'm going do is I'm
12   going to allow some limited -- very limited -- jurisdictional
13   discovery.  Whether it's jurisdictional or real party in
14   interest, but some discovery just limited to that narrow issue.
15   And right now I can't envision what that would be other than
16   deposing Mr. MacDonald.  Has Mr. DeSilva -- no one's been
17   deposed on this claim, I guess, right, as discovery's been
18   stayed?
19          **MR. PENTON:**  No, they have not, Judge.
20          **THE COURT:**  Other than the two parties, Mr. Regan,
21   can you envision any -- what other discovery would you
22   envision?
23          **MR. REGAN:**  Matthew Regan, Your Honor.
24               I think those are the two people for deposition
25   discovery.  I think it's possible that we might need -- well,

OFFICIAL TRANSCRIPT

```
 1   if we do take the depositions, then we don't need any written
 2   discovery anyway because the deposition is under oath and we
 3   can ask whatever relevant questions we would say.
 4             I think -- again, we've asked this question
 5   multiple times, and Mr. Penton has provided some materials.  I
 6   think the deposition would confirm that there's nothing else
 7   out there that's a piece of paper on this deal, but if there is
 8   a piece of paper on the transfer of the LLC, I mean, again,
 9   just that question, then, Your Honor, that would be to me the
10   final piece of it.  Is there actual documentation, not of the
11   home sale -- we received that from Mr. Penton -- but is there
12   anything in writing about the LLC transfer?
13             Those would be my only additional thoughts, Your
14   Honor.
15        THE COURT:  Okay.  Any reason you all can't get that
16   done within, say, 30 days?
17        MR. PENTON:  Your Honor, I think we should be able
18   to.  Not a problem.
19        THE COURT:  Okay.
20        MR. PENTON:  Now, I don't control Mr. MacDonald.  In
21   fact, I've never spoken to him except one time as I recall, but
22   I'm sure he has a lawyer, and we can find that out and work
23   through him to make him available without a subpoena.
24        THE COURT:  Where does he reside?
25        MR. PENTON:  I understand somewhere in St. Petersburg
```

OFFICIAL TRANSCRIPT

1  area, Judge.  Tampa, St. Pete.

2          **THE COURT:**  And what about Mr. DeSilva?

3          **MR. PENTON:**  He lives in St. Petersburg, Judge.

4          **THE COURT:**  Okay.  So you all may be able do them

5  both at the same -- not at the same time, but the same trip

6  there.

7          **MR. PENTON:**  Yeah.  What I'm saying is Mr. DeSilva is

8  not a problem, but Mr. MacDonald, I will ask local counsel

9  there about who his counsel is, and we'll work through it

10  without a subpoena.  We should be able to.

11          **THE COURT:**  Okay.  All right.  So I'm going to defer

12  ruling on this for 30 days.  I'm going to allow the parties to

13  take the limited discovery that we just mentioned, which would

14  be depositions of Mr. DeSilva and Mr. MacDonald and a

15  production of any additional relevant documents on this issue.

16          Then following the completion of those

17  depositions, I'll give each side an additional 21 days to file

18  supplemental briefing and submit additional evidence such as

19  deposition testimony or any other documents that may come to

20  light.

21          Okay.  Is there anything else we need to talk

22  about on this issue or any other issue today, Mr. Regan?

23          **MR. REGAN:**  No, Your Honor.  Understood.  Thank you.

24          **THE COURT:**  Mr. Penton, anything from you?

25          **MR. PENTON:**  No, Your Honor.  Thank you.

1          **THE COURT:**  Okay.  You all have a good day.  All

2     right.  Thank you.

3          **MR. REGAN:**  Thank you, Your Honor.

4          **MR. PENTON:**  Thank you, Your Honor.

5          (WHEREUPON, the proceedings were concluded.)

6                          *******

7                         <u>CERTIFICATE</u>

8          I, Jodi Simcox, RMR, FCRR, Official Court Reporter

9     for the United States District Court, Eastern District of

10    Louisiana, do hereby certify that the foregoing is a true and

11    correct transcript, to the best of my ability and

12    understanding, from the record of the proceedings in the

13    above-entitled and numbered matter.

14

15

16                    <u>s/Jodi Simcox, RMR, FCRR</u>
                      Jodi Simcox, RMR, FCRR
17                    Official Court Reporter

18

19

20

21

22

23

24

25

OFFICIAL TRANSCRIPT

# Exhibit B to Declaration of K. Ritter

<u>MEMBERSHIP INTEREST PURCHASE AGREEMENT</u>

This MEMBERSHIP INTEREST PURCHASE AGREEMENT (this "<u>Agreement</u>"), dated as of June 16, 2017, is entered into by and among BARRACUDA CLUB LLC, a Florida limited liability company (the "<u>Buyer</u>"), THE BIRD OF PARADISE LLC, a Florida limited liability company (the "<u>Company</u>"), and John De Silva, in his capacity as sole member of the Company (the "<u>Seller</u>").

<u>BACKGROUND</u>:

(A)   The Seller is the beneficial and legal owner of 100% of the membership interests in the Company (including all rights of Seller as a member of the Company, all governance and voting rights and all rights of Seller under the Act (as defined below) with respect to the Company, the "<u>Purchased Interests</u>");

(B)   The Buyer wishes to acquire the Purchased Interests and the Seller wishes to sell the Purchased Interests to Buyer on the terms of this Agreement;

(C)   The parties hereto desire that, concurrently with its purchase of the Purchased Interests, the Buyer will be admitted as the sole member (within the meaning of the Act) of the Company, the Seller will be deemed to have withdrawn as a member (within the meaning of the Act) of the Company and the Buyer will own one hundred percent (100%) of the membership interests of the Company, including the sole right to all capital and profits of the Company;

(D)   The Company owns, as its sole asset, the License (as defined below);

(E)   The Seller is the Company's sole member and manager, and Buyer has requested certain representations and warranties from him as a condition to purchasing the Purchased Interests; and

(F)   The parties hereto desire to set forth certain representations, warranties, and covenants made by each to the other as an inducement to the consummation of the sale and certain additional agreements related to the sale.

<u>AGREEMENT</u>

The parties hereto agree as follows:

1.   <u>Purchase and Sale; Assignment of Purchased Interests.</u>

(a)   Concurrently with the execution and delivery of this Agreement, Buyer shall deliver to the Seller the purchase price of $10.00 for the Purchased Interests (the "<u>Purchase Price</u>") and, effective upon the payment of the Purchase Price, the Seller hereby sells, assigns and transfers to Buyer all of his Seller's right, title and interest in and to the Purchased Interest, free and clear of all Encumbrances (as

defined below). The payment of the Purchase Price and the assignment of the Purchased Interests on the date hereof are referred to herein as the "Closing."

(b)     The Purchase Price shall be paid by cashier's check, wire transfer or other means approved by the Seller.

(c)     In this Agreement, unless the context otherwise requires: (i) references to this Agreement are references to this Agreement and to the Schedules hereto; (ii) references to any party to this Agreement include references to its respective successors and permitted assigns; (iii) references to a judgment include references to any order, writ, injunction, decree, determination or award of any court or tribunal; (iv) references to a "Person" means any individual, company, corporation (whether public, private or government), corporate body, association, authority, partnership, limited liability company, firm, joint venture, business entity, trust or government agency; (v) references to any document (including this Agreement) are references to that document as amended, consolidated, supplemented, or replaced by the parties thereto from time to time; (vi) the word "affiliate" means, as to the Person in question, any Person that directly or indirectly controls, is controlled by, or is under common control with, the entity in question and any successors or assigns of such entities; (vii) the term "control" means possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person whether through ownership of voting securities, by contract or otherwise; and (viii) the term "knowledge" or "knowledge of the Company" means the actual knowledge of the Seller after due inquiry, provided that, with respect to any facts, events or circumstances, "knowledge" means only the actual knowledge of the Seller; (ix) the term "Proceeding" means and refers to any action, arbitration, audit, hearing, investigation, litigation, suit or similar proceeding (whether civil, criminal, administrative, judicial or investigative, whether formal or informal, whether public or private) commenced, brought, conducted or heard by or before, or otherwise involving, any governmental body or arbitrator; (x) the term "Law" means and refers to any statute, law, ordinance, regulation, rule, code, order, constitution, treaty, common law, judgment, decree, other requirement or rule of law of any Governmental Authority; and (xi) the term "Governmental Authority" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), or any arbitrator, court or tribunal of competent jurisdiction.

2.     Representations and Warranties of Seller. The Seller (except as expressly provided otherwise), hereby represents and warrants to Buyer the following as of the date hereof:

(a)     Binding Agreement; Absence of Conflicts. The Seller hereby represents and warrants to Buyer as follows:

(i)     This Agreement has been duly executed and delivered by the Seller and (assuming due execution and delivery by Buyer) constitutes the legal, valid and binding obligation of the Seller, enforceable against the Seller in accordance with its terms.

(ii)     The Purchased Interest of the Seller has been duly authorized, is validly issued, and is owned of record and beneficially by the Seller, free and clear of all liens, pledges, security interests, charges, claims, encumbrances, agreements, options, voting trusts, proxies and other arrangements or restrictions of any kind (the "Encumbrances"). Upon consummation of the transactions contemplated by this Agreement, Buyer shall own the Purchased Interests, free and clear of all Encumbrances.

(iii)     The execution, delivery and performance by the Seller of this Agreement does not conflict with, violate or result in the breach of, or create any Encumbrance on the Purchased Interest of the Seller pursuant to any agreement, instrument, order, judgment, decree, law or governmental regulation to which the Seller is a party or is subject or by which the Purchased Interest is bound.

(iv)     No governmental, administrative or other third party consents or approvals are required by or with respect to the Seller in connection with the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby.

(b)     Capitalization. The Seller owns all of the Company's currently issued and outstanding membership interests and there are no other owners of the Company. Additionally, no other equity or ownership interests of the Company, or securities or other rights convertible into or exchangeable for such equity or other ownership interests in the Company, are outstanding. There are no outstanding or authorized options, warrants, purchase rights, subscription rights, conversion rights, exchange rights, or other contracts or commitments that could require the Company to issue, sell, or otherwise cause to become outstanding any of its equity or ownership interests. There is no voting trust, proxy or other agreement or understanding with respect to the voting of any of the membership units of the Company, including the Purchased Interests.

(c)     Subsidiaries. The Company does not currently own or control, directly or indirectly, any interest in any other Person, and is not a participant in any joint venture, partnership or similar arrangement.

(d)     Licensure. The Company is the holder of that certain Vacation Rental – Dwelling License, License Number DWE6215636, issued by the Florida Department of Business and Professional Regulation (the "License"), which permits the Company, which is a residentially zoned R-2 single family dwelling, to operate as a private resort at the property located at 2707 Pass-A-Grille Way, St. Pete Beach, FL 33706 (the "Property"). The License represents the all of the licenses and permits required for the operation of a private resort at the Property as currently operated. The License is in good standing, in full force and effect and not subject to meritorious challenge. The Company is in compliance in all material respects with the terms of the License, and neither the Company nor the Seller has received any written notice or communication from any Governmental Authority regarding any violation of the License. No event has occurred and is pending with respect to the License, whether after notice or the passing of time or both, that would serve as grounds for or otherwise authorize the suspension, revocation, or termination of the License or impair the rights of any holder thereof. All pending applications required to have been filed by the Company for the renewal of the License.

3

(e)     <u>Governmental Consents and Filings</u>.  No governmental, administrative or other third party consents, licenses or approvals are required by or with respect to the Company in connection with the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby.

(f)     <u>Contracts</u>.  Schedule 2(f) is a list of all commitments, contracts, leases and agreements, whether written or oral ("Contracts"), to which the Company is a party.  The Company has delivered to Buyer true and correct copies of all Contracts, including any and all amendments and other modifications thereto.

(g)     <u>Title to and Condition of Property; Leases</u>.  The Company does not own or lease any real property.  The Company has good and marketable title or a valid interest in all personal property and other assets, in each case subject to no mortgage, pledge, lien, security interest, lease, charge or encumbrance, other than liens resulting from taxes which have not yet become delinquent and liens, the interests of lessors in leased property and encumbrances which do not in any case materially detract from the value of the property subject thereto or materially impair the operations of the Company and in all such cases that have arisen in the ordinary course of business.

(h)     <u>Litigation or Proceedings</u>. The Company has not received written notice of any claims, actions, suits, proceedings or investigations pending or threatened against the Company, the Seller or any officer, director or manager of the Company, at law or in equity, or before or by any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality wherever located, and to the knowledge of the Company, no such claims, actions, suits, proceedings or investigations are pending or have been threatened.  The Company is not in default under any order of any court or federal, state, municipal, or other governmental department, commission, board, bureau, agency or instrumentality wherever located.  There is no claim, action, suit, proceeding or investigation pending or, to the knowledge of the Company, threatened against or affecting the Company.

(i)     <u>Tax Returns and Payments</u>.  There are no federal, state, county, local or foreign taxes now due and payable by the Company that have not been timely paid.  There are no accrued and unpaid federal, state, country, local or foreign taxes of the Company which are due, whether or not assessed or disputed.  There have been no examinations or audits of any tax returns or reports by any applicable federal, state, local or foreign governmental agency, except as may have been completed and resolved fully.  The Company has duly and timely filed all federal, state, county, local and foreign tax returns required to have been filed by it (subject to extensions and possible late filings that have no present adverse consequences) and there are in effect no waivers of applicable statutes of limitations with respect to taxes for any year.  Since formation, the Company has not elected to be taxed as a corporation.

(j)     <u>No Brokers</u>.  No broker, finder or investment banker is entitled to any brokerage, finders or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of the Seller.

4

3.    Representation and Warranties of Buyer.

(a)    Binding Agreement.  This Agreement has been duly executed and delivered by Buyer and (assuming due execution and delivery by the Seller) constitutes a legal, valid and binding obligation of Buyer enforceable against Buyer in accordance with its terms.

(b)    Governmental Consents and Filings.  No governmental, administrative or other third party consents or approvals are required by or with respect to Buyer in connection with the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby.

(c)    No Brokers.  No broker, finder or investment banker is entitled to any brokerage, finders or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Buyer.

4.    Admission of Buyer to the Company.  Notwithstanding anything to the contrary, simultaneously with the Closing, the Buyer is hereby admitted to the Company as the sole member of the Company and the holder of the Purchased Interests and the Seller hereby withdraws as the sole member of the Company.

5.    Continuation of the Company.  For the avoidance of doubt and notwithstanding anything to the contrary, the assignment of the Purchased Interests and the admission of the Buyer as the sole member of the Company and as the holder of the Purchased Interests shall not dissolve the Company and the Company shall continue without dissolution.

6.    Consent and Waiver.  The Company and the Seller (as the sole member of the Company) hereby (a) consents to and approves the sale and assignment of the Purchased Interests and the other transactions contemplated hereby, and (b) waives any prohibition, restriction or condition contained in any operating agreement governing the Company or under applicable Law that is applicable to the sale and assignment of the Purchased Interests pursuant to this Agreement.

7.    Releases.  Each of the Company and the Seller hereby releases the Company of and from any and all claims, demands, causes of actions, covenants, contracts whatsoever, both at law and in equity, now existing or hereafter existing, or which may hereafter arise, from the existing state of things, relating in any way to the Company and any actions taken by the Company relating in any way to the Company or any aspect of its business.

8.    Indemnification.

(a)    Indemnification by Seller.  From and after the Closing, the Seller agrees to defend, indemnify and hold harmless the Company, Buyer and its agents (each, a "Buyer Indemnified Party") from, against and for any damages, claims, costs, losses, liabilities, expenses or obligations (including reasonable attorneys' fees and associated expenses), whether or not involving a third-party claim, but excluding any loss of profits (collectively, "Losses"), incurred or suffered by a Buyer Indemnified Party as a result of or arising from: (i) any breach of or inaccuracy in any representation or warranty in Section 2 of this Agreement or in any document executed as a condition to this Agreement (collectively the

5

"Transaction Documents") and (ii) any breach of a covenant, obligation or agreement of the Seller in this Agreement or any other Transaction Document.

(b)      Indemnification by Buyer. From and after the Closing, Buyer and the Company, jointly and severally, agree to defend, indemnify and hold harmless the Seller (each, a "Seller Indemnified Party") from, against and for any Losses incurred or suffered by the Seller Indemnified Parties as a result of or arising from (i) any breach of or inaccuracy in any representation or warranty made by Buyer in this Agreement or any other Transaction Document or (ii) any breach of a covenant, obligation or agreement of Buyer in this Agreement or any other Transaction Document.

(c)      Procedure for Indemnification – Non Third Party Claims.   Whenever any claim shall arise for indemnification hereunder not involving a demand, claim, action or Proceeding made or brought by a third party, including without limitation a government agency, the party to be indemnified shall notify the indemnifying party promptly after obtaining actual knowledge of the facts constituting the basis for such claim. The notice to the indemnifying party shall specify, if known, the amount or an estimate of the amount of the liability arising therefrom.

9.      Information and Records. Promptly after the date hereof and in no event later than five (5) days after the Closing, the Seller shall return to Buyer all copies of such books, records, files, documents or other information, in hard copy and/or electronic format, related to the Company or its business that are in the possession or control of the Seller or his affiliates, agents, employees or representatives, including but not limited to, any books, records, files, documents or other information relating to the License.

10.      Survival. All representations, warranties, covenants and indemnities contained herein shall survive the execution and delivery of this Agreement and the purchase and sale of the Purchased Interests hereunder, until the date that is two (2) years from the date of this Agreement.

11.      Further Assurances. Each of the parties hereto shall execute and deliver such additional documents, instruments, conveyances and assurances, and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement.

12.      Expenses. All costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses.

13.      Notices. All notices, requests, consents, claims, demands, waivers and other communications hereunder (each, a "Notice") shall be in writing and addressed to the parties at the addresses set forth on the signature pages to this Agreement (or to such other address that may be designated by the receiving party from time to time in accordance with this section). All Notices shall be delivered by personal delivery, nationally recognized overnight courier (with all fees pre-paid), facsimile or e-mail of a PDF document (with confirmation of transmission) or certified or registered mail (in each case, return receipt requested, postage prepaid). Except as otherwise provided in this Agreement, a Notice is effective only (a) upon receipt by the receiving party, and (b) if the party giving the Notice has complied with the requirements of this Section.

14. <u>Entire Agreement</u>. This Agreement constitutes the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings, agreements, representations and warranties, both written and oral, with respect to such subject matter.

15. <u>Successor and Assigns</u>. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. No party may assign any of its rights or obligations hereunder without the prior written consent of the other parties hereto, which consent shall not be unreasonably withheld or delayed.

16. <u>Headings</u>. The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

17. <u>Amendment and Modification; Waiver</u>. This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. Except as otherwise set forth in this Agreement, no failure to exercise, or delay in exercising, any rights, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

18. <u>Severability</u>. If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

19. <u>Governing Law; Submission to Jurisdiction</u>. This Agreement shall be governed by and construed in accordance with the internal laws of the State of Florida without giving effect to any choice or conflict of law provision or rule (whether of the State of Florida or any other jurisdiction). Any legal suit, action or proceeding arising out of or based upon this Agreement or the transactions contemplated hereby may be instituted in the federal courts of the United States or the courts of the State of Florida in each case located in the County of Hillsborough, and each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action or proceeding. Service of process, summons, notice or other document by mail to such party's address set forth herein shall be effective service of process for any suit, action or other proceeding brought in any such court. The parties irrevocably and unconditionally waive any objection to the laying of venue of any suit, action or any proceeding in such courts and irrevocably waive and agree not to plead or claim in any such court that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

7

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the date first written above.

BUYER:

**BARRACUDA CLUB LLC,**
a Florida limited liability company

By: _____
    Name: Joshua Keleske
    Title:  Vice President

Address:
_____
_____
_____

SELLER:

_____
**JOHN DE SILVA**

Address:
_____
_____
_____

COMPANY:

**THE BIRD OF PARADISE LLC,**
a Florida limited liability company

By: _____
    Name:  John De Silva
    Title:   Managing Member

Address:
_____
_____
_____

*Signature Page to Membership Unit Purchase Agreement*

# Exhibit C to Declaration of K. Ritter

1                          DeSilva
2            IN THE UNITED STATES DISTRICT COURT
3               CIVIL ACTION NO.: MDL NO. 2179
4
5   In Re: Oil Spill by the Oil Rig  ) SECTION "J"
    "Deepwater Horizon" in the Gulf  )
6   Of Mexico, on April 20, 2010     )
                                     ) JUDGE BARBIER
7   This Document Relates to:        )
    John De Silva, et al vs. BP      ) MAGISTRATE JUDGE
8   Exploration and Production       ) CURRAULT
    Et al.                           )
9   Civil Action Number 16-CV-05277  )
                                     )
10  ---------------------------------)
11                  **   REVISED   **
12          The 30(b)(6) deposition of JOHN DESILVA,
13  taken remotely via Zoom videoconference on Wednesday,
14  May 19, 2021.
15
16
17
18
19
20
21
22
23  Reported by:
24  L. ALAN PEACOCK, FAPR, RDR, CRC, CCR
25  JOB NO. 194051

1                           DeSilva

2        A.    I believe it's the Barracuda Club.

3        Q.    So what is the Barracuda Club?

4        A.    I have no idea what it is.  It's his.  I

5   don't know anything about it other than --

6        Q.    Are you referring to an entity named

7   Barracuda Club LLC?

8        A.    Yes.

9        Q.    And do you understand that that is a legal

10  entity that is controlled by Mr. Steven MacDonald?

11       A.    I do know that much, yeah.

12       Q.    And it's your understanding that Barracuda

13  Club LLC is the current holder of the resort license

14  for the former Busch Estate?

15       A.    Yes.

16       Q.    I'm sending you a document titled "Membership

17  Interest Purchase Agreement."

18       A.    I have it here.  Let me put this other thing

19  away for a moment if you don't mind.

20            MR. RITTER:  Would the court reporter please

21       mark this document as Exhibit 2.

22            (PLAINTIFFS' EXHIBIT 2 WAS MARKED FOR

23             IDENTIFICATION.)

24            THE WITNESS:  I have it here, Kris.

25  BY MR. RITTER:

                            DeSilva

1

2      Q.   Do you recognize this document?

3      A.   I do now, yes.

4      Q.   Can you tell me what this document is?

5      A.   It's basically structures of sale of The

6  Birds of Paradise to Steven MacDonald.

7      Q.   And what is the date of this document?

8      A.   Hold on a second.  It's on the signature

9  page.

10          Yeah, I don't have a date on this.  I'm

11 sorry.  It doesn't have a date.

12     Q.   So, Mr. DeSilva --

13     A.   I think it was June 16, 2017, wasn't it?

14     Q.   If you look at the first paragraph of the

15 agreement on page 1, I think you will see that is dated

16 as of June 17, 2017.

17          Do you see that?

18     A.   Yes, there it is.  Okay.  I see it.

19     Q.   And if you look at that same paragraph, do

20 you see it identifies the Barracuda Club LLC as the

21 buyer under this agreement?

22     A.   Yep, I see that.

23     Q.   And it identifies John DeSilva in his

24 capacity as sole member of the company as seller?

25     A.   I see that.

1                        DeSilva

2       Q.    And you will see that it identifies The Bird

3    of Paradise, LLC, as the company?

4       A.    That's what it says.

5       Q.    If you turn to the final page of the

6    agreements.   Is that your signature?

7       A.    It is.

8       Q.    On the line under "Seller"?

9       A.    Yes.

10      Q.    And then a little further down, under

11   "Company," it states, "The Bird of Paradise, LLC, a

12   Florida limited liability company."

13            Is that your signature --

14      A.    It is.

15      Q.    -- for The Bird of Paradise, LLC?

16      A.    Yes.

17      Q.    And did you sign this agreement?

18      A.    I did.

19      Q.    This is an agreement that conveys 100 percent

20   of the membership interests in The Bird of Paradise,

21   LLC, from you to Barracuda Club LLC; isn't that

22   correct?

23      A.    That's what it says, yes.

24      Q.    Have you familiarized yourself with this

25   agreement prior to this deposition?

<div align="center">DeSilva</div>

1

2     A.    I have.

3     Q.    Can you point to anything in this agreement,

4  in this purchase agreement, that provides that you

5  would retain any assets of The Bird of Paradise, LLC,

6  after your membership interests were transferred to

7  Barracuda Club LLC?

8     A.    I don't.

9     Q.    From this membership interest purchase

10  agreement, are there any references to The Bird of

11  Paradise, LLC's claim in litigation against any of the

12  BP defendants?

13     A.    I didn't see that in there.  It doesn't mean

14  it's not there.  I didn't see it.

15     Q.    Are you aware of any such provisions in this

16  agreement?

17     A.    I'm not aware of any, no.  Doesn't mean

18  they're not there; I'm just not aware of any.

19     Q.    Who prepared this purchase agreement?

20     A.    I really don't know who prepared it.  I would

21  imagine MacDonald's attorney prepared it, but I

22  don't -- and I'm going to be very, very frank with you.

23  Until the day before yesterday, I never saw this

24  agreement.  I signed the signature page.  And if I

25  might have the floor for a minute, I can explain

DeSilva

1
2  something here.  It's very important that I get this
3  straight.  And I'd appreciate not being interrupted for
4  a second.
5         For some 30 years I went into Heritage Title
6  for innumerable amounts of closings relative to
7  purchasing property, selling property, mortgages
8  against property, many closings regarding this
9  property.  And what would happen is that Peter Graham,
10 attorney of record for Heritage Title, and his wife,
11 Tammy Graham, would prepare documents and call me on
12 the phone and say come on in here.
13        And so unlike -- or not unlike every other
14 time I got a call for this and I came in and I signed
15 these documents, what she would do is pass them across
16 the table to me, the signature page, wherever there's a
17 yellow place at the bottom, and I would sign it, either
18 initialing or putting my signature there.
19        And she pushed this across to me, the
20 signature page.  And if you look, the signature page is
21 all there is is a signature page; there's nothing else
22 there.
23        I owe an apology to my attorneys.  I owe an
24 apology to the Court, Judge Barbier, and to you as
25 well.  I made a statement that I never sold The Birds

1                          DeSilva

2  of Paradise.  And I would have never made a statement

3  like that had I known that I actually did sell The

4  Birds of Paradise, which apparently I did here.  It was

5  my understanding that I was vacating my position as a

6  single sole member of The Birds of Paradise, LLC, that

7  he could step into that.

8           The Birds of Paradise has no value.  It has

9  no assets.  It doesn't conduct any business.  The idea

10 that there would be a sale of something like that was

11 beyond my comprehension.

12          So I signed this document, and I never

13 thought back -- never thought about it again after

14 that.  And I made the statement to my attorney, to

15 Ronnie Penton, who I deeply apologize to, that I saw

16 the letter that you wrote to him.  And it was my -- I'm

17 just not a liar.  I would never make a statement like

18 this that is so discoverable to the opposite if I

19 didn't in my heart think that I had sold The Birds of

20 Paradise.  I did not think I sold The Birds of

21 Paradise.

22          And that's what's happened here.  And I just

23 want to make that clear.  I didn't read the document.

24 I own that mistake.  I didn't read the document.

25 Doesn't alleviate the fact that my signature is on it.

DeSilva

1   I understand that.  But I never read the document.

3       Q.   Mr. DeSilva, when is the first time that you

4   read this document, received and read this document?

5       A.   Day before yesterday, the 17th.

6       Q.   Do you agree that this membership interest

7   purchase agreement conveys the entirety of your

8   membership interests in The Birds of Paradise, LLC, to

9   Barracuda Club LLC as of June 2017?

10      A.   It does.

11      Q.   Did you conduct any business under the name

12  Bird of Paradise, LLC, after the date of this

13  agreement?

14      A.   No.  Not to my knowledge, no.  I walked away

15  on June 16, after 21 years, 2017, and I didn't look

16  back.  It was quite a sad day for us.  We had big plans

17  for this property.  And because of where I'm at with

18  you right now, they were not able to come to fruition.

19  The answer is no.

20      Q.   Having received and had an opportunity to

21  review this membership interest purchase agreement, are

22  you now seeking to pursue any claim on behalf of The

23  Birds of Paradise, LLC?

24      A.   No, because The Birds of Paradise, LLC, never

25  did anything.  This is about me litigating against your

DeSilva

1

2  client for the damage that was done to me.  The Birds

3  of Paradise had -- it never conducted any business.  It

4  was a trade name.  And the answer is no, I'm not --

5  this is about John DeSilva against -- and Birds of

6  Paradise was the name of the company that -- the name

7  of the -- trade name of the resort, and I filed

8  everything with my own personal social security number.

9      Q.   Are you asserting any claims in this

10 litigation against BP or any other defendants in your

11 case other than in your individual capacity?

12     A.   Say that again so I get this straight.

13     Q.   Are you asserting any claims in this

14 litigation other than in your individual capacity as

15 John DeSilva?

16     A.   No.

17     Q.   Mr. DeSilva, I'm sending you a two-page

18 document that I believe was part of a filing your

19 counsel made in MDL 2179 in your case.

20     A.   Okay.  I've got -- I don't have this.

21     Q.   It should be coming through via the chat.

22     A.   Do I have to do anything to my screen in

23 order to get this?

24     Q.   Yes.  And I'm not an expert in the use of

25 Zoom, but I think I can walk you through this.

1                          DeSilva
2    Louisiana Code of Civil Procedure Article 1434 and in
3    rules and advisory opinions of the board;
4
5            That I am not of Counsel, nor related to any
6    person participating in this cause, and am in no way
7    interested in the outcome of this event.
8
9            SIGNED THIS 19TH DAY OF May, 2021
10
11
12   _____
     L. ALAN PEACOCK, CCR, RDR, CRC
13   NCRA Realtime Systems Administrator
     Certified Court Reporter (LA)
14   CCR #2015013
15
16
17
18
19
20
21
22
23
24
25

# Exhibit D to Declaration of K. Ritter

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * | MDL NO. 2179 |
| | | SECTION J |
| This Document relates to: | * * | JUDGE BARBIER |
| *John DeSilva, Individually, and as the Sole Member, Owner, and Operator of The Bird of Paradise, LLC v. BP Expl. & Prod., Inc., et al.* Case No. 16-cv-05277 | * * | MAGISTRATE JUDGE CURRAULT |

## DECLARATION OF STEVEN A. MACDONALD

I, Steven A. MacDonald, declare as follows:

1.      I am the manager of MacDonald Family Management, LLC, and  MacDonald Family Management, LLC is the manager of Barracuda Club LLC, a Florida limited liability company. *See* 2021 Florida Limited Liability Company Annual Report of the Barracuda Club LLC (Document # L17000124745) (attached hereto as Exhibit 1); 2021 Florida Limited Liability Company Annual Report of MacDonald Family Management, LLC (attached hereto as Exhibit 2).

2.      In 2017, an entity affiliated with me purchased from John DeSilva a parcel of real property at 2707 Pass-A-Grille Way, St. Pete Beach, Florida (the "2017 Transaction") as my assignee under the Contract for Sale and Purchase (attached hereto as Exhibit 3).

3.      In connection with the 2017 Transaction, Mr. DeSilva agreed in May 2017 to transfer the License issued by the State of Florida to The Bird of Paradise, LLC permitting the property at 2707 Pass-A-Grille Way to operate as a Single Resort Dwelling. *See* Exhibit 3 at 11; *see also* Single Resort Dwelling License of The Bird of Paradise, LLC (attached hereto as Exhibit 4) (license number DWE6215636).

4.      In June 2017, Barracuda Club LLC and Mr. DeSilva entered into a Membership Interest Purchase Agreement, a true and correct copy of which is attached hereto as Exhibit 5 (the "Purchase Agreement").

5.      Pursuant to the Purchase Agreement, Barracuda Club LLC purchased 100% of the membership interests in The Bird of Paradise, LLC from John DeSilva, Barracuda Club LLC was admitted as the sole member of The Bird of Paradise, LLC, and John DeSilva withdrew as sole member of The Bird of Paradise, LLC.  *See* Exhibit 5 at 5.

6.      The Purchase Agreement did not reserve to John DeSilva any claims The Bird of Paradise, LLC may have had against BP for any damages relating to the 2010 Deepwater Horizon Oil Spill ("the Spill").  *See* Exhibit 5.

7.      In April of 2018, consistent with the Purchase Agreement, an Amended Annual Report was filed with the Florida Department of State listing myself as the member-manager of The Bird of Paradise, LLC.  *See* 2018 Florida Limited Liability Company Amended Annual Report of The Bird of Paradise, LLC (attached hereto as Exhibit 6).

8.      In 2020, no yearly report for The Bird of Paradise, LLC was filed with the Florida Department of State and so The Bird of Paradise, LLC was administratively dissolved.  *See* Florida Detail by Document Number for The Bird of Paradise, LLC (#L0400009203) (attached hereto as Exhibit 7).

9.      The Barracuda Club LLC currently holds the License permitting the property at 2707 Pass-A-Grille Way to operate as a Single Resort Dwelling.  *See* Florida License Search for License Number DWE6215636 (attached hereto as Exhibit 8).

2

10.     I do not intend, either individually or through the Barracuda Club LLC, The Bird of Paradise, LLC, or through any other entity I control, to pursue any claim on behalf of The Bird of Paradise, LLC in connection with the Spill.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed in _____5·17·21_____, Florida on this 17th day of May, 2021.

_____

Steven A. MacDonald

3

# EXHIBIT 1

## 2021 FLORIDA LIMITED LIABILITY COMPANY ANNUAL REPORT

DOCUMENT# L17000124745

**Entity Name:** BARRACUDA CLUB LLC

**FILED**

**Mar 13, 2021**
**Secretary of State**
**0887045677CC**

**Current Principal  Place of Business:**

1311 N. WESTSHORE BLVD.
 SUITE 101A
TAMPA,  FL 33607

**Current Mailing Address:**

1311 N. WESTSHORE BLVD.
 SUITE 101A
TAMPA,  FL  33607  US

**FEI Number: 82-1835075**                                          **Certificate of Status Desired:** No

**Name and Address of Current Registered Agent:**

KOCHE, DAVID L
601 BAYSHORE BLVD STE 700
TAMPA, FL  33606  US

*The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.*

SIGNATURE:   DAVID L. KOCHE                                                03/13/2021

                    Electronic Signature of Registered Agent                                      Date

**Authorized Person(s) Detail :**

| | |
|---|---|
| Title | MGR |
| Name | MACDONALD FAMILY MANAGEMENT, LLC |
| Address | 1311 N. WESTSHORE BLVD. SUITE 101A |
| City-State-Zip: | TAMPA  FL  33607 |

*I hereby certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am a managing member or manager of the limited liability company or the receiver or trustee empowered to execute this report as required by Chapter 605, Florida Statutes; and that my name appears above, or on an attachment with all other like empowered.*

SIGNATURE: STEVEN A. MACDONALD                          MANAGER                 03/13/2021

        Electronic Signature of Signing Authorized Person(s) Detail                              Date

# EXHIBIT 2

**2021 FLORIDA LIMITED LIABILITY COMPANY ANNUAL REPORT**

DOCUMENT# L20000045829

**Entity Name:** MACDONALD FAMILY MANAGEMENT, LLC

**FILED**
**Mar 13, 2021**
**Secretary of State**
**6683979768CC**

**Current Principal  Place of Business:**

1311 N. WESTSHORE BLVD, SUITE 101A
TAMPA,  FL  33607

**Current Mailing Address:**

1311 N. WESTSHORE BLVD, SUITE 101A
TAMPA,  FL  33607  US

**FEI Number: 85-0808216**                                     **Certificate of Status Desired:** No

**Name and Address of Current Registered Agent:**

KOCHE, DAVID L
601 BAYSHORE BOULEVARD, SUITE 700
TAMPA, FL  33606  US

*The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.*

SIGNATURE: _____

Electronic Signature of Registered Agent                                    Date

**Authorized Person(s) Detail :**

Title           MGR

Name            MACDONALD, STEVEN A

Address         1311 N. WESTSHORE BLVD, SUITE
                101A

City-State-Zip:  TAMPA  FL  33607

*I hereby certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am a managing member or manager of the limited liability company or the receiver or trustee empowered to execute this report as required by Chapter 605, Florida Statutes; and that my name appears above, or on an attachment with all other like empowered.*

SIGNATURE: STEVEN A. MACDONALD                    MANAGER              03/13/2021

Electronic Signature of Signing Authorized Person(s) Detail              Date

# EXHIBIT 3

dotloop signature verification: [illegible]



**COLDWELL BANKER ☐**

## "AS IS" Residential Contract For Sale And Purchase
THIS FORM HAS BEEN APPROVED BY THE FLORIDA REALTORS AND THE FLORIDA BAR

RESIDENTIAL REAL ESTATE

1* **PARTIES:**John R. De Silva _____ ("Seller"),
2* and Steven A. Macdonald _____ ("Buyer"),
3   agree that Seller shall sell and Buyer shall buy the following described Real Property and Personal Property
4   (collectively "Property") pursuant to the terms and conditions of this AS IS Residential Contract For Sale And Purchase
5   and any riders and addenda ("Contract"):
6   1.  **PROPERTY DESCRIPTION:**
7*      (a) Street address, city, zip:2707 Pass A Grille Way, St Pete Beach, FL 33706
8*      (b) Located in: Pinellas _____ County, Florida. Property Tax ID #:18-32-16-61002-004-0130
9*      (c) Real Property: The legal description is _____
10         North Pass-A-Grille Sec A BLK D, Lots 13, 14, 15 & 16
11
12         together with all existing improvements and fixtures, including built-in appliances, built-in furnishings and
13         attached wall-to-wall carpeting and flooring ("Real Property") unless specifically excluded in Paragraph 1(e) or
14         by other terms of this Contract.
15      (d) Personal Property: Unless excluded in Paragraph 1(e) or by other terms of this Contract, the following items
16         which are owned by Seller and existing on the Property as of the date of the initial offer are included in the
17         purchase: range(s)/oven(s), refrigerator(s), dishwasher(s), disposal, ceiling fan(s), intercom, light fixture(s),
18         drapery rods and draperies, blinds, window treatments, smoke detector(s), garage door opener(s), security gate
19         and other access devices, and storm shutters/panels ("Personal Property").
20*        Other Personal Property items included in this purchase are:All Refrigerator(S), Microwave(s), Dishwasher(s), Range(s),
21         Oven(s), Washer(s), Dryer(s), All household furniture, Artwork, furnishing, TV's, Security Systems, Audio/Video Equipment, Pool Equipment, Dock/Lifts.
22         Personal Property is included in the Purchase Price, has no contributory value, and shall be left for the Buyer.
23*     (e) The following items are excluded from the purchase: _____
24

25                                    **PURCHASE PRICE AND CLOSING**

26* 2. **PURCHASE PRICE** (U.S. currency):.............................................................................$5,395,000.00

27*     (a) Initial deposit to be held in escrow in the amount of **(checks subject to COLLECTION)** .......$50,000.00
28         The initial deposit made payable and delivered to "Escrow Agent" named below
29*        **(CHECK ONE):** (i) ☐ accompanies offer or (ii) ☑ is to be made within 3 ____ (if left
30         blank, then 3) days after Effective Date. IF NEITHER BOX IS CHECKED, THEN
31         OPTION (ii) SHALL BE DEEMED SELECTED.
32*        Escrow Agent Information: Name:Coldwell Banker - Ashley Eddings
33*        Address:500 N. Westshore Blvd., Suite #850, Tampa, FL 33609
34*        Phone:813-286-6563 _____ E-mail:Ashley.eddings@Floridamoves.com Fax:813-289-4668
35*     (b) Additional deposit to be delivered to Escrow Agent within 16 _____ (if left blank, then 10)
36*        days after Effective Date ..............................................................................................$50,000.00
37         (All deposits paid or agreed to be paid, are collectively referred to as the "Deposit")
38*     (c) Financing: Express as a dollar amount or percentage ("Loan Amount") see Paragraph 8.........  _____
39*     (d) Other: _____ ...............$ _____
40      (e) Balance to close (not including Buyer's closing costs, prepaids and prorations) by wire
41*        transfer or other COLLECTED funds ..............................................................................$5,295,000.00
42         **NOTE: For the definition of "COLLECTION" or "COLLECTED" see STANDARD S.**
43   3.  **TIME FOR ACCEPTANCE OF OFFER AND COUNTER-OFFERS; EFFECTIVE DATE:**
44      (a) If not signed by Buyer and Seller, and an executed copy delivered to all parties on or before
45*        05/16/2017 at 6:00 p.m. _____ , this offer shall be deemed withdrawn and the Deposit, if any, shall be returned to
46         Buyer. Unless otherwise stated, time for acceptance of any counter-offers shall be within 2 days after the day
47         the counter-offer is delivered.
48      (b) The effective date of this Contract shall be the date when the last one of the Buyer and Seller has signed or
49         initialed and delivered this offer or final counter-offer ("Effective Date").
50   4.  **CLOSING DATE:** Unless modified by other provisions of this Contract, the closing of this transaction shall occur
51      and the closing documents required to be furnished by each party pursuant to this Contract shall be delivered
52*     ("Closing") on 06/16/2017 _____ ("Closing Date"), at the time established by the Closing Agent.

Buyer's Initials [SM] 05/15/17 [   ]          Page 1 of 12          Seller's Initials [JM] [   ]
FloridaRealtors/FloridaBar-ASIS-5   Rev.4/17 © 2017 Florida Realtors® and The Florida Bar. All rights reserved.

dotloop signature verification: www.dotloop.com/my/verification/DL-644310611-8-202X

53 **5. EXTENSION OF CLOSING DATE:**
54     (a) If Paragraph 8(b) is checked and Closing funds from Buyer's lender(s) are not available on Closing Date due
55        to Consumer Financial Protection Bureau Closing Disclosure delivery requirements ("CFPB Requirements"),
56        then Closing Date shall be extended for such period necessary to satisfy CFPB Requirements, provided such
57        period shall not exceed 10 days.
58     (b) If an event constituting "Force Majeure" causes services essential for Closing to be unavailable, including the
59        unavailability of utilities or issuance of hazard, wind, flood or homeowners' insurance, Closing Date shall be
60        extended as provided in STANDARD G.
61 **6. OCCUPANCY AND POSSESSION:**
62     (a) Unless the box in Paragraph 6(b) is checked, Seller shall, at Closing, deliver occupancy and possession of the
63        Property to Buyer free of tenants, occupants and future tenancies. Also, at Closing, Seller shall have removed
64        all personal items and trash from the Property and shall deliver all keys, garage door openers, access devices
65        and codes, as applicable, to Buyer. If occupancy is to be delivered before Closing, Buyer assumes all risks of
66        loss to the Property from date of occupancy, shall be responsible and liable for maintenance from that date,
67        and shall be deemed to have accepted the Property in its existing condition as of time of taking occupancy.
68*     (b) ☐ **CHECK IF PROPERTY IS SUBJECT TO LEASE(S) OR OCCUPANCY AFTER CLOSING.** If Property is
69        subject to a lease(s) after Closing or is intended to be rented or occupied by third parties beyond Closing, the
70        facts and terms thereof shall be disclosed in writing by Seller to Buyer and copies of the written lease(s) shall
71        be delivered to Buyer, all within 5 days after Effective Date. If Buyer determines, in Buyer's sole discretion, that
72        the lease(s) or terms of occupancy are not acceptable to Buyer, Buyer may terminate this Contract by delivery
73        of written notice of such election to Seller within 5 days after receipt of the above items from Seller, and Buyer
74        shall be refunded the Deposit thereby releasing Buyer and Seller from all further obligations under this Contract.
75        Estoppel Letter(s) and Seller's affidavit shall be provided pursuant to STANDARD D. If Property is intended to
76        be occupied by Seller after Closing, see Rider U. POST-CLOSING OCCUPANCY BY SELLER.
77* **7. ASSIGNABILITY: (CHECK ONE):** Buyer ☐ may assign and thereby be released from any further liability under
78*     this Contract; ☑ may assign but not be released from liability under this Contract; or ☐ may not assign this
79     Contract.

80                         **FINANCING**

81 **8. FINANCING:**
82*     ☑ (a) Buyer will pay cash for the purchase of the Property at Closing. There is no financing contingency to Buyer's
83     obligation to close. If Buyer obtains a loan for any part of the Purchase Price of the Property, Buyer acknowledges
84     that any terms and conditions imposed by Buyer's lender(s) or by CFPB Requirements shall not affect or extend
85     the Buyer's obligation to close or otherwise affect any terms or conditions of this Contract.
86*     ☐ (b) This Contract is contingent upon Buyer obtaining approval of a ☐ conventional ☐ FHA ☐ VA or ☐ other
87*     _____ (describe) loan within _____ (if left blank, then 30) days after Effective Date ("Loan Approval
88*     Period") for **(CHECK ONE):** ☐ fixed, ☐ adjustable, ☐ fixed or adjustable rate in the Loan Amount (See Paragraph
89*     2(c)), at an initial interest rate not to exceed _____% (if left blank, then prevailing rate based upon Buyer's
90*     creditworthiness), and for a term of _____(if left blank, then 30) years ("Financing").
91*        (i) Buyer shall make mortgage loan application for the Financing within _____(if left blank, then 5) days
92     after Effective Date and use good faith and diligent effort to obtain approval of a loan meeting the Financing terms
93     ("Loan Approval") and thereafter to close this Contract. Loan Approval which requires a condition related to the sale
94     by Buyer of other property shall not be deemed Loan Approval for purposes of this subparagraph.

95     Buyer's failure to use diligent effort to obtain Loan Approval during the Loan Approval Period shall be considered a
96     default under the terms of this Contract. For purposes of this provision, "diligent effort" includes, but is not limited
97     to, timely furnishing all documents and information and paying of all fees and charges requested by Buyer's
98     mortgage broker and lender in connection with Buyer's mortgage loan application.

99        (ii) Buyer shall keep Seller and Broker fully informed about the status of Buyer's mortgage loan application,
100     Loan Approval, and loan processing and authorizes Buyer's mortgage broker, lender, and Closing Agent to disclose
101     such status and progress, and release preliminary and finally executed closing disclosures and settlement
102     statements, to Seller and Broker.
103        (iii) Upon obtaining Loan Approval, Buyer shall promptly deliver written notice of such approval to Seller.
104        (iv) If Buyer is unable to obtain Loan Approval after the exercise of diligent effort, then at any time prior to
105     expiration of the Loan Approval Period, Buyer may provide written notice to Seller stating that Buyer has been
106     unable to obtain Loan Approval and has elected to either:
107        (1) waive Loan Approval, in which event this Contract will continue as if Loan Approval had been obtained; or
108        (2) terminate this Contract.

Buyer's Initials _____      Page 2 of 12      Seller's Initials _____
FloridaRealtors/FloridaBar-ASIS-5    Rev.4/17 © 2017 Florida Realtors® and The Florida Bar. All rights reserved.

dotloop signature verification: ....................

109     (v) If Buyer fails to timely deliver either notice provided in Paragraph 8(b)(iii) or (iv), above, to Seller prior to
110 expiration of the Loan Approval Period, then Loan Approval shall be deemed waived, in which event this Contract
111 will continue as if Loan Approval had been obtained, provided however, Seller may elect to terminate this Contract
112 by delivering written notice to Buyer within 3 days after expiration of the Loan Approval Period.
113     (vi) If this Contract is timely terminated as provided by Paragraph 8(b)(iv)(2) or (v), above, and Buyer is not in
114 default under the terms of this Contract, Buyer shall be refunded the Deposit thereby releasing Buyer and Seller
115 from all further obligations under this Contract.
116     (vii) If Loan Approval has been obtained, or deemed to have been obtained, as provided above, and Buyer
117 fails to close this Contract, then the Deposit shall be paid to Seller unless failure to close is due to: (1) Seller's
118 default or inability to satisfy other contingencies of this Contract; (2) Property related conditions of the Loan Approval
119 have not been met (except when such conditions are waived by other provisions of this Contract); or (3) appraisal
120 of the Property obtained by Buyer's lender is insufficient to meet terms of the Loan Approval, in which event(s) the
121 Buyer shall be refunded the Deposit, thereby releasing Buyer and Seller from all further obligations under this
122 Contract.
123* ☐ (c) Assumption of existing mortgage (see rider for terms).
124* ☐ (d) Purchase money note and mortgage to Seller (see riders; addenda; or special clauses for terms).

125 **CLOSING COSTS, FEES AND CHARGES**

126 9. **CLOSING COSTS; TITLE INSURANCE; SURVEY; HOME WARRANTY; SPECIAL ASSESSMENTS:**
127   (a) **COSTS TO BE PAID BY SELLER:**
128 • Documentary stamp taxes and surtax on deed, if any    • HOA/Condominium Association estoppel fees
129 • Owner's Policy and Charges (if Paragraph 9(c)(i) is checked)   • Recording and other fees needed to cure title
130 • Title search charges (if Paragraph 9(c)(iii) is checked)   • Seller's attorneys' fees
131* • Municipal lien search (if Paragraph 9(c)(i) or (iii) is checked)   • Other:_____
132   If, prior to Closing, Seller is unable to meet the AS IS Maintenance Requirement as required by Paragraph 11
133   a sum equal to 125% of estimated costs to meet the AS IS Maintenance Requirement shall be escrowed at
134   Closing. If actual costs to meet the AS IS Maintenance Requirement exceed escrowed amount, Seller shall pay
135   such actual costs. Any unused portion of escrowed amount(s) shall be returned to Seller.
136   (b) **COSTS TO BE PAID BY BUYER:**
137 • Taxes and recording fees on notes and mortgages    • Loan expenses
138 • Recording fees for deed and financing statements    • Appraisal fees
139 • Owner's Policy and Charges (if Paragraph 9(c)(ii) is checked)   • Buyer's Inspections
140 • Survey (and elevation certification, if required)    • Buyer's attorneys' fees
141 • Lender's title policy and endorsements    • All property related insurance
142 • HOA/Condominium Association application/transfer fees   • Owner's Policy Premium (if Paragraph
143 • Municipal lien search (if Paragraph 9(c)(ii) is checked)    9 (c)(iii) is checked.)
144* • Other:_____
145*   (c) **TITLE EVIDENCE AND INSURANCE:** At least 15____(if left blank, then 15, or if Paragraph 8(a) is checked,
146 then 5) days prior to Closing Date ("Title Evidence Deadline"), a title insurance commitment issued by a Florida
147 licensed title insurer, with legible copies of instruments listed as exceptions attached thereto ("Title
148 Commitment") and, after Closing, an owner's policy of title insurance (see STANDARD A for terms) shall be
149 obtained and delivered to Buyer. If Seller has an owner's policy of title insurance covering the Real Property, a
150 copy shall be furnished to Buyer and Closing Agent within 5 days after Effective Date. The owner's title policy
151 premium, title search and closing services (collectively, "Owner's Policy and Charges") shall be paid, as set
152 forth below. The title insurance premium charges for the owner's policy and any lender's policy will be calculated
153 and allocated in accordance with Florida law, but may be reported differently on certain federally mandated
154 closing disclosures and other closing documents.  For purposes of this Contract "municipal lien search" means a
155 search of records necessary for the owner's policy of title insurance to be issued without exception for unrecorded
156 liens imposed pursuant to Chapters 159 or 170, F.S., in favor of any governmental body, authority or agency.
157 **(CHECK ONE):**
158* ☑ (i) Seller shall designate Closing Agent and pay for Owner's Policy and Charges, and Buyer shall pay the
159 premium for Buyer's lender's policy and charges for closing services related to the lender's policy,
160 endorsements and loan closing, which amounts shall be paid by Buyer to Closing Agent or such other
161 provider(s) as Buyer may select; or
162* ☐ (ii) Buyer shall designate Closing Agent and pay for Owner's Policy and Charges and charges for closing
163 services related to Buyer's lender's policy, endorsements and loan closing; or

dotloop signature verification: www.dotloop.com/my/verification/DL-244100363-4-2023

164 *       ☐ (iii) [MIAMI-DADE/BROWARD REGIONAL PROVISION]: Seller shall furnish a copy of a prior owner's policy
165       of title insurance or other evidence of title and pay fees for: (A) a continuation or update of such title evidence,
166       which is acceptable to Buyer's title insurance underwriter for reissue of coverage; (B) tax search; and (C)
167       municipal lien search. Buyer shall obtain and pay for post-Closing continuation and premium for Buyer's owner's
168 *       policy, and if applicable, Buyer's lender's policy. Seller shall not be obligated to pay more than $_____
169       (if left blank, then $200.00) for abstract continuation or title search ordered or performed by Closing Agent.
170    (d) **SURVEY:** On or before Title Evidence Deadline, Buyer may, at Buyer's expense, have the Real Property
171       surveyed and certified by a registered Florida surveyor ("Survey"). If Seller has a survey covering the Real
172       Property, a copy shall be furnished to Buyer and Closing Agent within 5 days after Effective Date.
173 *    (e) **HOME WARRANTY:** At Closing, ☐ Buyer ☐ Seller ☑ N/A shall pay for a home warranty plan issued by
174 *    _____ at a cost not to exceed $_____ . A home
175       warranty plan provides for repair or replacement of many of a home's mechanical systems and major built-in
176       appliances in the event of breakdown due to normal wear and tear during the agreement's warranty period.
177    (f) **SPECIAL ASSESSMENTS:** At Closing, Seller shall pay: (i) the full amount of liens imposed by a public body
178       ("public body" does not include a Condominium or Homeowner's Association) that are certified, confirmed and
179       ratified before Closing; and (ii) the amount of the public body's most recent estimate or assessment for an
180       improvement which is substantially complete as of Effective Date, but that has not resulted in a lien being
181       imposed on the Property before Closing. Buyer shall pay all other assessments. If special assessments may
182       be paid in installments (**CHECK ONE**):
183 *       ☑ (a) Seller shall pay installments due prior to Closing and Buyer shall pay installments due after Closing.
184       Installments prepaid or due for the year of Closing shall be prorated.
185 *       ☐ (b) Seller shall pay the assessment(s) in full prior to or at the time of Closing.
186       IF NEITHER BOX IS CHECKED, THEN OPTION (a) SHALL BE DEEMED SELECTED.
187       This Paragraph 9(f) shall not apply to a special benefit tax lien imposed by a community development district
188       (CDD) pursuant to Chapter 190, F.S., which lien shall be prorated pursuant to STANDARD K.

189                                    **DISCLOSURES**

190  **10. DISCLOSURES:**
191    (a) **RADON GAS:** Radon is a naturally occurring radioactive gas that, when it is accumulated in a building in
192       sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that
193       exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding
194       radon and radon testing may be obtained from your county health department.
195    (b) **PERMITS DISCLOSURE:** Except as may have been disclosed by Seller to Buyer in a written disclosure, Seller
196       does not know of any improvements made to the Property which were made without required permits or made
197       pursuant to permits which have not been properly closed. If Seller identifies permits which have not been
198       properly closed or improvements which were not permitted, then Seller shall promptly deliver to Buyer all plans,
199       written documentation or other information in Seller's possession, knowledge, or control relating to
200       improvements to the Property which are the subject of such open permits or unpermitted improvements.
201    (c) **MOLD:** Mold is naturally occurring and may cause health risks or damage to property. If Buyer is concerned or
202       desires additional information regarding mold, Buyer should contact an appropriate professional.
203    (d) **FLOOD ZONE; ELEVATION CERTIFICATION:** Buyer is advised to verify by elevation certificate which flood
204       zone the Property is in, whether flood insurance is required by Buyer's lender, and what restrictions apply to
205       improving the Property and rebuilding in the event of casualty. If Property is in a "Special Flood Hazard Area"
206       or "Coastal Barrier Resources Act" designated area or otherwise protected area identified by the U.S. Fish and
207       Wildlife Service under the Coastal Barrier Resources Act and the lowest floor elevation for the building(s) and/or
208       flood insurance rating purposes is below minimum flood elevation or is ineligible for flood insurance coverage
209       through the National Flood Insurance Program or private flood insurance as defined in 42 U.S.C. §4012a, Buyer
210 *       may terminate this Contract by delivering written notice to Seller within _____ (if left blank, then 20) days after
211       Effective Date, and Buyer shall be refunded the Deposit thereby releasing Buyer and Seller from all further
212       obligations under this Contract, failing which Buyer accepts existing elevation of buildings and flood zone
213       designation of Property. The National Flood Insurance Program may assess additional fees or adjust premiums
214       for pre-Flood Insurance Rate Map (pre-FIRM) non-primary structures (residential structures in which the insured
215       or spouse does not reside for at least 50% of the year) and an elevation certificate may be required for actuarial
216       rating.
217    (e) **ENERGY BROCHURE:** Buyer acknowledges receipt of Florida Energy-Efficiency Rating Information Brochure
218       required by Section 553.996, F.S.

Buyer's Initials [SMM] [   ]          Page 4 of 12          Seller's Initials [OW] [   ]
FloridaRealtors/FloridaBar-ASIS-5   Rev.4/17 © 2017 Florida Realtors® and The Florida Bar. All rights reserved.

dotloop signature verification: ...

(f) **LEAD-BASED PAINT:** If Property includes pre-1978 residential housing, a lead-based paint disclosure is mandatory.

(g) **HOMEOWNERS' ASSOCIATION/COMMUNITY DISCLOSURE: BUYER SHOULD NOT EXECUTE THIS CONTRACT UNTIL BUYER HAS RECEIVED AND READ THE HOMEOWNERS' ASSOCIATION/COMMUNITY DISCLOSURE, IF APPLICABLE.**

(h) **PROPERTY TAX DISCLOSURE SUMMARY:** BUYER SHOULD NOT RELY ON THE SELLER'S CURRENT PROPERTY TAXES AS THE AMOUNT OF PROPERTY TAXES THAT THE BUYER MAY BE OBLIGATED TO PAY IN THE YEAR SUBSEQUENT TO PURCHASE. A CHANGE OF OWNERSHIP OR PROPERTY IMPROVEMENTS TRIGGERS REASSESSMENTS OF THE PROPERTY THAT COULD RESULT IN HIGHER PROPERTY TAXES. IF YOU HAVE ANY QUESTIONS CONCERNING VALUATION, CONTACT THE COUNTY PROPERTY APPRAISER'S OFFICE FOR INFORMATION.

(i) **FOREIGN INVESTMENT IN REAL PROPERTY TAX ACT ("FIRPTA"):** Seller shall inform Buyer in writing if Seller is a "foreign person" as defined by the Foreign Investment in Real Property Tax Act ("FIRPTA"). Buyer and Seller shall comply with FIRPTA, which may require Seller to provide additional cash at Closing. If Seller is not a "foreign person", Seller can provide Buyer, at or prior to Closing, a certification of non-foreign status, under penalties of perjury, to inform Buyer and Closing Agent that no withholding is required. See STANDARD V for further information pertaining to FIRPTA. Buyer and Seller are advised to seek legal counsel and tax advice regarding their respective rights, obligations, reporting and withholding requirements pursuant to FIRPTA.

(j) **SELLER DISCLOSURE:** Seller knows of no facts materially affecting the value of the Real Property which are not readily observable and which have not been disclosed to Buyer. Except as provided for in the preceding sentence, Seller extends and intends no warranty and makes no representation of any type, either express or implied, as to the physical condition or history of the Property. Except as otherwise disclosed in writing Seller has received no written or verbal notice from any governmental entity or agency as to a currently uncorrected building, environmental or safety code violation.

## PROPERTY MAINTENANCE, CONDITION, INSPECTIONS AND EXAMINATIONS

**11. PROPERTY MAINTENANCE:** Except for ordinary wear and tear and Casualty Loss, Seller shall maintain the Property, including, but not limited to, lawn, shrubbery, and pool, in the condition existing as of Effective Date ("AS IS Maintenance Requirement").

**12. PROPERTY INSPECTION; RIGHT TO CANCEL:**

(a) *PROPERTY INSPECTIONS AND RIGHT TO CANCEL: Buyer shall have 15____ (if left blank, then 15) days after Effective Date ("Inspection Period") within which to have such inspections of the Property performed as Buyer shall desire during the Inspection Period. If Buyer determines, in Buyer's sole discretion, that the Property is not acceptable to Buyer, Buyer may terminate this Contract by delivering written notice of such election to Seller prior to expiration of Inspection Period. If Buyer timely terminates this Contract, the Deposit paid shall be returned to Buyer, thereupon, Buyer and Seller shall be released of all further obligations under this Contract; however, Buyer shall be responsible for prompt payment for such inspections, for repair of damage to, and restoration of, the Property resulting from such inspections, and shall provide Seller with paid receipts for all work done on the Property (the preceding provision shall survive termination of this Contract). Unless Buyer exercises the right to terminate granted herein, Buyer accepts the physical condition of the Property and any violation of governmental, building, environmental, and safety codes, restrictions, or requirements, but subject to Seller's continuing AS IS Maintenance Requirement, and Buyer shall be responsible for any and all repairs and improvements required by Buyer's lender.*

(b) **WALK-THROUGH INSPECTION/RE-INSPECTION:** On the day prior to Closing Date, or on Closing Date prior to time of Closing, as specified by Buyer, Buyer or Buyer's representative may perform a walk-through (and follow-up walk-through, if necessary) inspection of the Property solely to confirm that all items of Personal Property are on the Property and to verify that Seller has maintained the Property as required by the AS IS Maintenance Requirement and has met all other contractual obligations.

(c) **SELLER ASSISTANCE AND COOPERATION IN CLOSE-OUT OF BUILDING PERMITS:** If Buyer's inspection of the Property identifies open or needed building permits, then Seller shall promptly deliver to Buyer all plans, written documentation or other information in Seller's possession, knowledge, or control relating to improvements to the Property which are the subject of such open or needed Permits, and shall promptly cooperate in good faith with Buyer's efforts to obtain estimates of repairs or other work necessary to resolve such Permit issues. Seller's obligation to cooperate shall include Seller's execution of necessary authorizations,

Buyer's Initials _____   Page 5 of 12   Seller's Initials _____
FloridaRealtors/FloridaBar-ASIS-5   Rev.4/17 © 2017 Florida Realtors® and The Florida Bar. All rights reserved.

dotloop signature verification: [illegible]

274   consents, or other documents necessary for Buyer to conduct inspections and have estimates of such repairs
275   or work prepared, but in fulfilling such obligation, Seller shall not be required to expend, or become obligated to
276   expend, any money.
277   (d) **ASSIGNMENT OF REPAIR AND TREATMENT CONTRACTS AND WARRANTIES:** At Buyer's option and
278   cost, Seller will, at Closing, assign all assignable repair, treatment and maintenance contracts and warranties
279   to Buyer.

280                                       **ESCROW AGENT AND BROKER**

281   13. **ESCROW AGENT:** Any Closing Agent or Escrow Agent (collectively "Agent") receiving the Deposit, other funds
282   and other items is authorized, and agrees by acceptance of them, to deposit them promptly, hold same in escrow
283   within the State of Florida and, subject to **COLLECTION**, disburse them in accordance with terms and conditions
284   of this Contract. Failure of funds to become **COLLECTED** shall not excuse Buyer's performance. When conflicting
285   demands for the Deposit are received, or Agent has a good faith doubt as to entitlement to the Deposit, Agent may
286   take such actions permitted by this Paragraph 13, as Agent deems advisable. If in doubt as to Agent's duties or
287   liabilities under this Contract, Agent may, at Agent's option, continue to hold the subject matter of the escrow until
288   the parties agree to its disbursement or until a final judgment of a court of competent jurisdiction shall determine
289   the rights of the parties, or Agent may deposit same with the clerk of the circuit court having jurisdiction of the
290   dispute. An attorney who represents a party and also acts as Agent may represent such party in such action. Upon
291   notifying all parties concerned of such action, all liability on the part of Agent shall fully terminate, except to the
292   extent of accounting for any items previously delivered out of escrow. If a licensed real estate broker, Agent will
293   comply with provisions of Chapter 475, F.S., as amended and FREC rules to timely resolve escrow disputes through
294   mediation, arbitration, interpleader or an escrow disbursement order.
295   In any proceeding between Buyer and Seller wherein Agent is made a party because of acting as Agent hereunder,
296   or in any proceeding where Agent interpleads the subject matter of the escrow, Agent shall recover reasonable
297   attorney's fees and costs incurred, to be paid pursuant to court order out of the escrowed funds or equivalent. Agent
298   shall not be liable to any party or person for mis-delivery of any escrowed items, unless such mis-delivery is due to
299   Agent's willful breach of this Contract or Agent's gross negligence. This Paragraph 13 shall survive Closing or
300   termination of this Contract.
301   14. **PROFESSIONAL ADVICE; BROKER LIABILITY:** Broker advises Buyer and Seller to verify Property condition,
302   square footage, and all other facts and representations made pursuant to this Contract and to consult appropriate
303   professionals for legal, tax, environmental, and other specialized advice concerning matters affecting the Property
304   and the transaction contemplated by this Contract. Broker represents to Buyer that Broker does not reside on the
305   Property and that all representations (oral, written or otherwise) by Broker are based on Seller representations or
306   public records. **BUYER AGREES TO RELY SOLELY ON SELLER, PROFESSIONAL INSPECTORS AND**
307   **GOVERNMENTAL AGENCIES FOR VERIFICATION OF PROPERTY CONDITION, SQUARE FOOTAGE AND**
308   **FACTS THAT MATERIALLY AFFECT PROPERTY VALUE AND NOT ON THE REPRESENTATIONS (ORAL,**
309   **WRITTEN OR OTHERWISE) OF BROKER.** Buyer and Seller (individually, the "Indemnifying Party") each
310   individually indemnifies, holds harmless, and releases Broker and Broker's officers, directors, agents and
311   employees from all liability for loss or damage, including all costs and expenses, and reasonable attorney's fees at
312   all levels, suffered or incurred by Broker and Broker's officers, directors, agents and employees in connection with
313   or arising from claims, demands or causes of action instituted by Buyer or Seller based on: (i) inaccuracy of
314   information provided by the Indemnifying Party or from public records; (ii) Indemnifying Party's misstatement(s) or
315   failure to perform contractual obligations; (iii) Broker's performance, at Indemnifying Party's request, of any task
316   beyond the scope of services regulated by Chapter 475, F.S., as amended, including Broker's referral,
317   recommendation or retention of any vendor for, or on behalf of, Indemnifying Party; (iv) products or services
318   provided by any such vendor for, or on behalf of, Indemnifying Party; and (v) expenses incurred by any such vendor.
319   Buyer and Seller each assumes full responsibility for selecting and compensating their respective vendors and
320   paying their other costs under this Contract whether or not this transaction closes. This Paragraph 14 will not relieve
321   Broker of statutory obligations under Chapter 475, F.S., as amended. For purposes of this Paragraph 14, Broker
322   will be treated as a party to this Contract. This Paragraph 14 shall survive Closing or termination of this Contract.

323                                 **DEFAULT AND DISPUTE RESOLUTION**

324   15. **DEFAULT:**
325   (a) **BUYER DEFAULT:** If Buyer fails, neglects or refuses to perform Buyer's obligations under this Contract,
326   including payment of the Deposit, within the time(s) specified, Seller may elect to recover and retain the Deposit
327   for the account of Seller as agreed upon liquidated damages, consideration for execution of this Contract, and
328   in full settlement of any claims, whereupon Buyer and Seller shall be relieved from all further obligations under

dotloop signature verification: www.dotloop.com/my/verification/DL-244302684-4-0125

329 this Contract, or Seller, at Seller's option, may, pursuant to Paragraph 16, proceed in equity to enforce Seller's
330 rights under this Contract. The portion of the Deposit, if any, paid to Listing Broker upon default by Buyer, shall
331 be split equally between Listing Broker and Cooperating Broker; provided however, Cooperating Broker's share
332 shall not be greater than the commission amount Listing Broker had agreed to pay to Cooperating Broker.
333 (b) **SELLER DEFAULT:** If for any reason other than failure of Seller to make Seller's title marketable after
334 reasonable diligent effort, Seller fails, neglects or refuses to perform Seller's obligations under this Contract,
335 Buyer may elect to receive return of Buyer's Deposit without thereby waiving any action for damages resulting
336 from Seller's breach, and, pursuant to Paragraph 16, may seek to recover such damages or seek specific
337 performance.
338 This Paragraph 15 shall survive Closing or termination of this Contract.
339 **16. DISPUTE RESOLUTION:** Unresolved controversies, claims and other matters in question between Buyer and
340 Seller arising out of, or relating to, this Contract or its breach, enforcement or interpretation ("Dispute") will be settled
341 as follows:
342 (a) Buyer and Seller will have 10 days after the date conflicting demands for the Deposit are made to attempt to
343 resolve such Dispute, failing which, Buyer and Seller shall submit such Dispute to mediation under Paragraph
344 16(b).
345 (b) Buyer and Seller shall attempt to settle Disputes in an amicable manner through mediation pursuant to Florida
346 Rules for Certified and Court-Appointed Mediators and Chapter 44, F.S., as amended (the "Mediation Rules").
347 The mediator must be certified or must have experience in the real estate industry. Injunctive relief may be
348 sought without first complying with this Paragraph 16(b). Disputes not settled pursuant to this Paragraph 16
349 may be resolved by instituting action in the appropriate court having jurisdiction of the matter. This Paragraph
350 16 shall survive Closing or termination of this Contract.
351 **17. ATTORNEY'S FEES; COSTS:** The parties will split equally any mediation fee incurred in any mediation permitted
352 by this Contract, and each party will pay their own costs, expenses and fees, including attorney's fees, incurred in
353 conducting the mediation. In any litigation permitted by this Contract, the prevailing party shall be entitled to recover
354 from the non-prevailing party costs and fees, including reasonable attorney's fees, incurred in conducting the
355 litigation. This Paragraph 17 shall survive Closing or termination of this Contract.

356 <center>STANDARDS FOR REAL ESTATE TRANSACTIONS ("STANDARDS")</center>

357 **18. STANDARDS:**
358 **A. TITLE:**
359 (i) **TITLE EVIDENCE; RESTRICTIONS; EASEMENTS; LIMITATIONS:** Within the time period provided in
360 Paragraph 9(c), the Title Commitment, with legible copies of instruments listed as exceptions attached thereto, shall
361 be issued and delivered to Buyer. The Title Commitment shall set forth those matters to be discharged by Seller at
362 or before Closing and shall provide that, upon recording of the deed to Buyer, an owner's policy of title insurance
363 in the amount of the Purchase Price, shall be issued to Buyer insuring Buyer's marketable title to the Real Property,
364 subject only to the following matters: (a) comprehensive land use plans, zoning, and other land use restrictions,
365 prohibitions and requirements imposed by governmental authority; (b) restrictions and matters appearing on the
366 Plat or otherwise common to the subdivision; (c) outstanding oil, gas and mineral rights of record without right of
367 entry; (d) unplatted public utility easements of record (located contiguous to real property lines and not more than
368 10 feet in width as to rear or front lines and 7 1/2 feet in width as to side lines); (e) taxes for year of Closing and
369 subsequent years; and (f) assumed mortgages and purchase money mortgages, if any (if additional items, attach
370 addendum); provided, that, none prevent use of Property for RESIDENTIAL PURPOSES. If there exists at Closing
371 any violation of items identified in (b) – (f) above, then the same shall be deemed a title defect. Marketable title shall
372 be determined according to applicable Title Standards adopted by authority of The Florida Bar and in accordance
373 with law.
374 (ii) **TITLE EXAMINATION:** Buyer shall have 5 days after receipt of Title Commitment to examine it and notify Seller
375 in writing specifying defect(s), if any, that render title unmarketable. If Seller provides Title Commitment and it is
376 delivered to Buyer less than 5 days prior to Closing Date, Buyer may extend Closing for up to 5 days after date of
377 receipt to examine same in accordance with this STANDARD A. Seller shall have 30 days ("Cure Period") after
378 receipt of Buyer's notice to take reasonable diligent efforts to remove defects. If Buyer fails to so notify Seller, Buyer
379 shall be deemed to have accepted title as it then is. If Seller cures defects within Cure Period, Seller will deliver
380 written notice to Buyer (with proof of cure acceptable to Buyer and Buyer's attorney) and the parties will close this
381 Contract on Closing Date (or if Closing Date has passed, within 10 days after Buyer's receipt of Seller's notice). If
382 Seller is unable to cure defects within Cure Period, then Buyer may, within 5 days after expiration of Cure Period,

dotloop signature verification: www.dotloop.com/my/verification 2411620-312-2023

## STANDARDS FOR REAL ESTATE TRANSACTIONS ("STANDARDS") CONTINUED

383 deliver written notice to Seller: (a) extending Cure Period for a specified period not to exceed 120 days within which
384 Seller shall continue to use reasonable diligent effort to remove or cure the defects ("Extended Cure Period"); or
385 (b) electing to accept title with existing defects and close this Contract on Closing Date (or if Closing Date has
386 passed, within the earlier of 10 days after end of Extended Cure Period or Buyer's receipt of Seller's notice), or (c)
387 electing to terminate this Contract and receive a refund of the Deposit, thereby releasing Buyer and Seller from all
388 further obligations under this Contract. If after reasonable diligent effort, Seller is unable to timely cure defects, and
389 Buyer does not waive the defects, this Contract shall terminate, and Buyer shall receive a refund of the Deposit,
390 thereby releasing Buyer and Seller from all further obligations under this Contract.

391 **B. SURVEY:** If Survey discloses encroachments on the Real Property or that Improvements located thereon
392 encroach on setback lines, easements, or lands of others, or violate any restrictions, covenants, or applicable
393 governmental regulations described in STANDARD A (i)(a), (b) or (d) above, Buyer shall deliver written notice of
394 such matters, together with a copy of Survey, to Seller within 5 days after Buyer's receipt of Survey, but no later
395 than Closing. If Buyer timely delivers such notice and Survey to Seller, such matters identified in the notice and
396 Survey shall constitute a title defect, subject to cure obligations of STANDARD A above. If Seller has delivered a
397 prior survey, Seller shall, at Buyer's request, execute an affidavit of "no change" to the Real Property since the
398 preparation of such prior survey, to the extent the affirmations therein are true and correct.

399 **C. INGRESS AND EGRESS:** Seller represents that there is ingress and egress to the Real Property and title to
400 the Real Property is insurable in accordance with STANDARD A without exception for lack of legal right of access.

401 **D. LEASE INFORMATION:** Seller shall, at least 10 days prior to Closing, furnish to Buyer estoppel letters from
402 tenant(s)/occupant(s) specifying nature and duration of occupancy, rental rates, advanced rent and security
403 deposits paid by tenant(s) or occupant(s)("Estoppel Letter(s)"). If Seller is unable to obtain such Estoppel Letter(s)
404 the same information shall be furnished by Seller to Buyer within that time period in the form of a Seller's affidavit
405 and Buyer may thereafter contact tenant(s) or occupant(s) to confirm such information. If Estoppel Letter(s) or
406 Seller's affidavit, if any, differ materially from Seller's representations and lease(s) provided pursuant to Paragraph
407 6, or if tenant(s)/occupant(s) fail or refuse to confirm Seller's affidavit, Buyer may deliver written notice to Seller
408 within 5 days after receipt of such information, but no later than 5 days prior to Closing Date, terminating this
409 Contract and receive a refund of the Deposit, thereby releasing Buyer and Seller from all further obligations under
410 this Contract. Seller shall, at Closing, deliver and assign all leases to Buyer who shall assume Seller's obligations
411 thereunder.

412 **E. LIENS:** Seller shall furnish to Buyer at Closing an affidavit attesting (i) to the absence of any financing
413 statement, claims of lien or potential lienors known to Seller and (ii) that there have been no improvements or
414 repairs to the Real Property for 90 days immediately preceding Closing Date. If the Real Property has been
415 improved or repaired within that time, Seller shall deliver releases or waivers of construction liens executed by all
416 general contractors, subcontractors, suppliers and materialmen in addition to Seller's lien affidavit setting forth
417 names of all such general contractors, subcontractors, suppliers and materialmen, further affirming that all charges
418 for improvements or repairs which could serve as a basis for a construction lien or a claim for damages have been
419 paid or will be paid at Closing.

420 **F. TIME:** Calendar days shall be used in computing time periods. **Time is of the essence in this Contract.** Other
421 than time for acceptance and Effective Date as set forth in Paragraph 3, any time periods provided for or dates
422 specified in this Contract, whether preprinted, handwritten, typewritten or inserted herein, which shall end or occur
423 on a Saturday, Sunday, or a national legal holiday (see 5 U.S.C. 6103) shall extend to 5:00 p.m. (where the Property
424 is located) of the next business day.

425 **G. FORCE MAJEURE:** Buyer or Seller shall not be required to perform any obligation under this Contract or be
426 liable to each other for damages so long as performance or non-performance of the obligation, or the availability of
427 services, insurance or required approvals essential to Closing, is disrupted, delayed, caused or prevented by Force
428 Majeure. "Force Majeure" means: hurricanes, floods, extreme weather, earthquakes, fire, or other acts of God,
429 unusual transportation delays, or wars, insurrections, or acts of terrorism, which, by exercise of reasonable diligent
430 effort, the non-performing party is unable in whole or in part to prevent or overcome. All time periods, including
431 Closing Date, will be extended a reasonable time up to 7 days after the Force Majeure no longer prevents
432 performance under this Contract, provided, however, if such Force Majeure continues to prevent performance under
433 this Contract more than 30 days beyond Closing Date, then either party may terminate this Contract by delivering
434 written notice to the other and the Deposit shall be refunded to Buyer, thereby releasing Buyer and Seller from all
435 further obligations under this Contract.

436 **H. CONVEYANCE:** Seller shall convey marketable title to the Real Property by statutory warranty, trustee's,
437 personal representative's, or guardian's deed, as appropriate to the status of Seller, subject only to matters
438 described in STANDARD A and those accepted by Buyer. Personal Property shall, at request of Buyer, be

dotloop signature verification: v.../dolloop.com/my/verification/DL-2443/0a9312-4B23

## STANDARDS FOR REAL ESTATE TRANSACTIONS ("STANDARDS") CONTINUED

439 transferred by absolute bill of sale with warranty of title, subject only to such matters as may be provided for in this
440 Contract.

441 **I. CLOSING LOCATION; DOCUMENTS; AND PROCEDURE:**

442 (i) **LOCATION:** Closing will be conducted by the attorney or other closing agent ("Closing Agent") designated by
443 the party paying for the owner's policy of title insurance and will take place in the county where the Real Property
444 is located at the office of the Closing Agent, or at such other location agreed to by the parties. If there is no title
445 insurance, Seller will designate Closing Agent. Closing may be conducted by mail, overnight courier, or electronic
446 means.

447 (ii) **CLOSING DOCUMENTS:** Seller shall at or prior to Closing, execute and deliver, as applicable, deed, bill of
448 sale, certificate(s) of title or other documents necessary to transfer title to the Property, construction lien affidavit(s),
449 owner's possession and no lien affidavit(s), and assignment(s) of leases. Seller shall provide Buyer with paid
450 receipts for all work done on the Property pursuant to this Contract. Buyer shall furnish and pay for, as applicable,
451 the survey, flood elevation certification, and documents required by Buyer's lender.

452 (iii) **FinCEN GTO NOTICE. If Closing Agent is required to comply with the U.S. Treasury Department's**
453 **Financial Crimes Enforcement Network ("FinCEN") Geographic Targeting Orders ("GTOs"), then Buyer**
454 **shall provide Closing Agent with the information related to Buyer and the transaction contemplated by this**
455 **Contract that is required to complete IRS Form 8300, and Buyer consents to Closing Agent's collection and**
456 **report of said information to IRS.**

457 (iv) **PROCEDURE:** The deed shall be recorded upon **COLLECTION** of all closing funds. If the Title Commitment
458 provides insurance against adverse matters pursuant to Section 627.7841, F.S., as amended, the escrow closing
459 procedure required by STANDARD J shall be waived, and Closing Agent shall, **subject to COLLECTION of all**
460 **closing funds,** disburse at Closing the brokerage fees to Broker and the net sale proceeds to Seller.

461 **J. ESCROW CLOSING PROCEDURE:** If Title Commitment issued pursuant to Paragraph 9(c) does not provide
462 for insurance against adverse matters as permitted under Section 627.7841, F.S., as amended, the following
463 escrow and closing procedures shall apply: (1) all Closing proceeds shall be held in escrow by the Closing Agent
464 for a period of not more than 10 days after Closing; (2) if Seller's title is rendered unmarketable, through no fault of
465 Buyer, Buyer shall, within the 10 day period, notify Seller in writing of the defect and Seller shall have 30 days from
466 date of receipt of such notification to cure the defect; (3) if Seller fails to timely cure the defect, the Deposit and all
467 Closing funds paid by Buyer shall, within 5 days after written demand by Buyer, be refunded to Buyer and,
468 simultaneously with such repayment, Buyer shall return the Personal Property, vacate the Real Property and re-
469 convey the Property to Seller by special warranty deed and bill of sale; and (4) if Buyer fails to make timely demand
470 for refund of the Deposit, Buyer shall take title as is, waiving all rights against Seller as to any intervening defect
471 except as may be available to Buyer by virtue of warranties contained in the deed or bill of sale.

472 **K. PRORATIONS; CREDITS:** The following recurring items will be made current (if applicable) and prorated as of
473 the day prior to Closing Date, or date of occupancy if occupancy occurs before Closing Date: real estate taxes
474 (including special benefit tax assessments imposed by a CDD), interest, bonds, association fees, insurance, rents
475 and other expenses of Property. Buyer shall have option of taking over existing policies of insurance, if assumable,
476 in which event premiums shall be prorated. Cash at Closing shall be increased or decreased as may be required
477 by prorations to be made through day prior to Closing. Advance rent and security deposits, if any, will be credited
478 to Buyer. Escrow deposits held by Seller's mortgagee will be paid to Seller. Taxes shall be prorated based on
479 current year's tax. If Closing occurs on a date when current year's millage is not fixed but current year's assessment
480 is available, taxes will be prorated based upon such assessment and prior year's millage. If current year's
481 assessment is not available, then taxes will be prorated on prior year's tax. If there are completed improvements
482 on the Real Property by January 1st of year of Closing, which improvements were not in existence on January 1st
483 of prior year, then taxes shall be prorated based upon prior year's millage and at an equitable assessment to be
484 agreed upon between the parties, failing which, request shall be made to the County Property Appraiser for an
485 informal assessment taking into account available exemptions. In all cases, due allowance shall be made for the
486 maximum allowable discounts and applicable homestead and other exemptions. A tax proration based on an
487 estimate shall, at either party's request, be readjusted upon receipt of current year's tax bill. This STANDARD K
488 shall survive Closing.

489 **L. ACCESS TO PROPERTY TO CONDUCT APPRAISALS, INSPECTIONS, AND WALK-THROUGH:** Seller
490 shall, upon reasonable notice, provide utilities service and access to Property for appraisals and inspections,
491 including a walk-through (or follow-up walk-through if necessary) prior to Closing.

492 **M. RISK OF LOSS:** If, after Effective Date, but before Closing, Property is damaged by fire or other casualty
493 ("Casualty Loss") and cost of restoration (which shall include cost of pruning or removing damaged trees) does not
494 exceed 1.5% of Purchase Price, cost of restoration shall be an obligation of Seller and Closing shall proceed
495 pursuant to terms of this Contract. If restoration is not completed as of Closing, a sum equal to 125% of estimated

Buyer's Initials _____ Page 9 of 12 Seller's Initials _____
FloridaRealtors/FloridaBar-ASIS-5 Rev.4/17 © 2017 Florida Realtors® and The Florida Bar. All rights reserved.

## STANDARDS FOR REAL ESTATE TRANSACTIONS ("STANDARDS") CONTINUED

496 cost to complete restoration (not to exceed 1.5% of Purchase Price) will be escrowed at Closing. If actual cost of
497 restoration exceeds escrowed amount, Seller shall pay such actual costs (but, not in excess of 1.5% of Purchase
498 Price). Any unused portion of escrowed amount shall be returned to Seller. If cost of restoration exceeds 1.5% of
499 Purchase Price, Buyer shall elect to either take Property "as is" together with the 1.5%, or receive a refund of the
500 Deposit thereby releasing Buyer and Seller from all further obligations under this Contract. Seller's sole obligation
501 with respect to tree damage by casualty or other natural occurrence shall be cost of pruning or removal.

502 **N. 1031 EXCHANGE:** If either Seller or Buyer wish to enter into a like-kind exchange (either simultaneously with
503 Closing or deferred) under Section 1031 of the Internal Revenue Code ("Exchange"), the other party shall cooperate
504 in all reasonable respects to effectuate the Exchange, including execution of documents; provided, however,
505 cooperating party shall incur no liability or expense related to the Exchange, and Closing shall not be contingent
506 upon, nor extended or delayed by, such Exchange.

507 **O. CONTRACT NOT RECORDABLE; PERSONS BOUND; NOTICE; DELIVERY; COPIES; CONTRACT**
508 **EXECUTION:** Neither this Contract nor any notice of it shall be recorded in any public records. This Contract shall
509 be binding on, and inure to the benefit of, the parties and their respective heirs or successors in interest. Whenever
510 the context permits, singular shall include plural and one gender shall include all. Notice and delivery given by or to
511 the attorney or broker (including such broker's real estate licensee) representing any party shall be as effective as
512 if given by or to that party. All notices must be in writing and may be made by mail, personal delivery or electronic
513 (including "pdf") media. A facsimile or electronic (including "pdf") copy of this Contract and any signatures hereon
514 shall be considered for all purposes as an original. This Contract may be executed by use of electronic signatures,
515 as determined by Florida's Electronic Signature Act and other applicable laws.

516 **P. INTEGRATION; MODIFICATION:** This Contract contains the full and complete understanding and agreement
517 of Buyer and Seller with respect to the transaction contemplated by this Contract and no prior agreements or
518 representations shall be binding upon Buyer or Seller unless included in this Contract. No modification to or change
519 in this Contract shall be valid or binding upon Buyer or Seller unless in writing and executed by the parties intended
520 to be bound by it.

521 **Q. WAIVER:** Failure of Buyer or Seller to insist on compliance with, or strict performance of, any provision of this
522 Contract, or to take advantage of any right under this Contract, shall not constitute a waiver of other provisions or
523 rights.

524 **R. RIDERS; ADDENDA; TYPEWRITTEN OR HANDWRITTEN PROVISIONS:** Riders, addenda, and typewritten
525 or handwritten provisions shall control all printed provisions of this Contract in conflict with them.

526 **S. COLLECTION or COLLECTED: "COLLECTION" or "COLLECTED" means any checks tendered or**
527 **received, including Deposits, have become actually and finally collected and deposited in the account of**
528 **Escrow Agent or Closing Agent. Closing and disbursement of funds and delivery of closing documents**
529 **may be delayed by Closing Agent until such amounts have been COLLECTED in Closing Agent's accounts.**
530 **T. RESERVED.**

531 **U. APPLICABLE LAW AND VENUE:** This Contract shall be construed in accordance with the laws of the State
532 of Florida and venue for resolution of all disputes, whether by mediation, arbitration or litigation, shall lie in the
533 county where the Real Property is located.

534 **V. FIRPTA TAX WITHHOLDING:** If a seller of U.S. real property is a "foreign person" as defined by FIRPTA,
535 Section 1445 of the Internal Revenue Code ("Code") requires the buyer of the real property to withhold up to 15%
536 of the amount realized by the seller on the transfer and remit the withheld amount to the Internal Revenue Service
537 (IRS) unless an exemption to the required withholding applies or the seller has obtained a Withholding Certificate
538 from the IRS authorizing a reduced amount of withholding.

539 (i) No withholding is required under Section 1445 of the Code if the Seller is not a "foreign person". Seller can
540 provide proof of non-foreign status to Buyer by delivery of written certification signed under penalties of perjury,
541 stating that Seller is not a foreign person and containing Seller's name, U.S. taxpayer identification number and
542 home address (or office address, in the case of an entity), as provided for in 26 CFR 1.1445-2(b). Otherwise, Buyer
543 shall withhold the applicable percentage of the amount realized by Seller on the transfer and timely remit said funds
544 to the IRS.

545 (ii) If Seller is a foreign person and has received a Withholding Certificate from the IRS which provides for reduced
546 or eliminated withholding in this transaction and provides same to Buyer by Closing, then Buyer shall withhold the
547 reduced sum required, if any, and timely remit said funds to the IRS.

548 (iii) If prior to Closing Seller has submitted a completed application to the IRS for a Withholding Certificate and has
549 provided to Buyer the notice required by 26 CFR 1.1445-1(c) (2)(i)(B) but no Withholding Certificate has been
550 received as of Closing, Buyer shall, at Closing, withhold the applicable percentage of the amount realized by Seller
551 on the transfer and, at Buyer's option, either (a) timely remit the withheld funds to the IRS or (b) place the funds in
552 escrow, at Seller's expense, with an escrow agent selected by Buyer and pursuant to terms negotiated by the

Buyer's Initials [SWl 05/15/17] [ ] Page 10 of 12 Seller's Initials [JNI] [ ]
FloridaRealtors/FloridaBar-ASIS-5 Rev.4/17 © 2017 Florida Realtors® and The Florida Bar. All rights reserved.

dotloop signature verification: dtlp.us/dotloop-comalvyevents-abroutRI- x44 13(4(1259: 5 58)23

## STANDARDS FOR REAL ESTATE TRANSACTIONS ("STANDARDS") CONTINUED

553 parties, to be subsequently disbursed in accordance with the Withholding Certificate issued by the IRS or remitted
554 directly to the IRS if the Buyer's application is rejected or upon terms set forth in the escrow agreement.
555 (iv) In the event the net proceeds due Seller are not sufficient to meet the withholding requirement(s) in this
556 transaction, Seller shall deliver to Buyer, at Closing, the additional COLLECTED funds necessary to satisfy the
557 applicable requirement and thereafter Buyer shall timely remit said funds to the IRS or escrow the funds for
558 disbursement in accordance with the final determination of the IRS, as applicable.
559 (v) Upon remitting funds to the IRS pursuant to this STANDARD, Buyer shall provide Seller copies of IRS Forms
560 8288 and 8288-A, as filed.
561 **W. RESERVED**
562 **X. BUYER WAIVER OF CLAIMS:** *To the extent permitted by law, Buyer waives any claims against Seller*
563 *and against any real estate licensee involved in the negotiation of this Contract for any damage or defects*
564 *pertaining to the physical condition of the Property that may exist at Closing of this Contract and be*
565 *subsequently discovered by the Buyer or anyone claiming* by, through, under or against the Buyer. *This*
566 *provision does not relieve Seller's obligation to comply with Paragraph 10(j). This Standard X shall survive*
567 *Closing.*

568 ### ADDENDA AND ADDITIONAL TERMS

569* **19. ADDENDA:** The following additional terms are included in the attached addenda or riders and incorporated into this
570 Contract (**Check if applicable**):

| | | |
|---|---|---|
| ☐ A. Condominium Rider | ☐ K. RESERVED | ☐ T. Pre-Closing Occupancy |
| ☐ B. Homeowners' Assn. | ☐ L. RESERVED | ☐ U. Post-Closing Occupancy |
| ☐ C. Seller Financing | ☐ M. Defective Drywall | ☐ V. Sale of Buyer's Property |
| ☐ D. Mortgage Assumption | ☐ N. Coastal Construction Control | ☐ W. Back-up Contract |
| ☐ E. FHA/VA Financing | Line | ☐ X. Kick-out Clause |
| ☐ F. Appraisal Contingency | ☐ O. Insulation Disclosure | ☐ Y. Seller's Attorney Approval |
| ☐ G. Short Sale | ☑ P. Lead Paint Disclosure (Pre-1978) | ☐ Z. Buyer's Attorney Approval |
| ☐ H. Homeowners/Flood Ins. | ☐ Q. Housing for Older Persons | ☐ AA. Licensee Property Interest |
| ☐ I. RESERVED | ☐ R. Rezoning | ☐ BB. Binding Arbitration |
| ☐ J. Interest-Bearing Acct. | ☐ S. Lease Purchase/ Lease Option | ☐ Other:_____ |

571* **20. ADDITIONAL TERMS:**

572 Unless notified otherwise in writing, if Coldwell Banker is identified as the cooperating broker, the
573 company and its sales associates are representing the Buyer in a Transaction Brokerage capacity in
574 accordance with §475.278(2), Fla. Stat.
575
576 Seller to verify that "The Birds of Paradise" Resort License described below is active/valid and shall be
577 transferred in its entirety to Buyer at closing;
578 This Resort License issued to "The Birds of Paradise" by The State of Florida permits this property which
579 is a residentially zoned R-2 Single Family dwelling to operate as a Private Resort. The minimum rental
580 period is one week. No exterior signage or local media advertising is permitted. There are no other
581 restrictions. There is no other Licensed Resort in a residentially zoned neighborhood except "The Birds
582 of Paradise" in the entire Continental United States.
583
584
585
586
587

588 ### COUNTER-OFFER/REJECTION

589* ☐ Seller counters Buyer's offer (to accept the counter-offer, Buyer must sign or initial the counter-offered terms and
590 deliver a copy of the acceptance to Seller).
591* ☐ Seller rejects Buyer's offer.

Buyer's Initials ___ *SWW* ___ Page 11 of 12 Seller's Initials ___ *JVy* ___
FloridaRealtors/FloridaBar-ASIS-5   Rev.4/17 © 2017 Florida Realtors® and The Florida Bar. All rights reserved.

dotloop signature verification: www.dotloop.com/my/verification/DL-243430083 t3 4124

592 **THIS IS INTENDED TO BE A LEGALLY BINDING CONTRACT. IF NOT FULLY UNDERSTOOD, SEEK THE**
593 **ADVICE OF AN ATTORNEY PRIOR TO SIGNING.**

594 **THIS FORM HAS BEEN APPROVED BY THE FLORIDA REALTORS AND THE FLORIDA BAR.**

595 *Approval of this form by the Florida Realtors and The Florida Bar does not constitute an opinion that any of the*
596 *terms and conditions in this Contract should be accepted by the parties in a particular transaction. Terms and*
597 *conditions should be negotiated based upon the respective interests, objectives and bargaining positions of all*
598 *interested persons.*

599 AN ASTERISK (*) FOLLOWING A LINE NUMBER IN THE MARGIN INDICATES THE LINE CONTAINS A BLANK
600 TO BE COMPLETED.

601* Buyer: *Steven A. Macdonald*     dotloop verified 05/15/17 8:49PM EDT ZVMY-FX2O-GFUZ-6MCU     Date:

602* Buyer:     Date:

603* Seller: *John R. Veselka*     Date: 05/15/2017

604* Seller:     Date:

605 Buyer's address for purposes of notice     Seller's address for purposes of notice
606*
607*
608*

609 **BROKER:** Listing and Cooperating Brokers, if any, named below (collectively, "Broker"), are the only Brokers
610 entitled to compensation in connection with this Contract. Instruction to Closing Agent: Seller and Buyer direct
611 Closing Agent to disburse at Closing the full amount of the brokerage fees as specified in separate brokerage
612 agreements with the parties and cooperative agreements between the Brokers, except to the extent Broker has
613 retained such fees from the escrowed funds. This Contract shall not modify any MLS or other offer of compensation
614 made by Seller or Listing Broker to Cooperating Brokers.

615* Michael B. Hughes, P.A. #261503009     Rafal Wazio
616 **Cooperating Sales Associate, if any**     **Listing Sales Associate**

617* Coldwell Banker     Sand Key Realty
618 **Cooperating Broker, if any**     **Listing Broker**

Buyer's Initials *SAM* 05/15/17     Page 12 of 12     Seller's Initials *JRV*
FloridaRealtors/FloridaBar-ASIS-5   Rev.4/17 © 2017 Florida Realtors® and The Florida Bar. All rights reserved.

# EXHIBIT 4



STATE OF FLORIDA

DEPARTMENT OF BUSINESS AND PROFESSIONAL REGULATION

DIVISION OF HOTELS AND RESTAURANTS
1940 NORTH MONROE STREET                    850-487-1395
NORTHWOOD CENTRE
TALLAHASSEE          FL 32399-1015


THE BIRD OF PARADISE LLC
OLD ANHEUSER BUSCH ESTATE
2817 PASS A GRILLE WAY
ST.PETE BEACH          FL 33706


Congratulations! With this license you become one of the nearly one million
Floridians licensed by the Department of Business and Professional Regulation.
Our professionals and businesses range from architects to yacht brokers, from
boxers to barbeque restaurants, and they keep Florida's economy strong.

Every day we work to improve the way we do business in order to serve you better.
For information about our services, please log onto www.myfloridalicense.com.
There you can find more information about our divisions and the regulations that
impact you, subscribe to department newsletters and learn more about the
Department's initiatives.

Our mission at the Department is: License Efficiently, Regulate Fairly. We
constantly strive to serve you better so that you can serve your customers.
Thank you for doing business in Florida, and congratulations on your new license!

 AC# 5420480
STATE OF FLORIDA
DEPARTMENT OF BUSINESS AND
PROFESSIONAL REGULATION

DWE6215636     01/20/11 100308060

SINGLE RESORT DWELLING (2007)
THE BIRD OF PARADISE LLC
OLD ANHEUSER BUSCH ESTATE

IS LICENSED under the provisions of Ch.509 FS.
Expiration date: FEB 1, 2012        L11012000349

---

DETACH HERE

# 5420480          STATE OF FLORIDA

DEPARTMENT OF BUSINESS AND PROFESSIONAL REGULATION
DIVISION OF HOTELS AND RESTAURANTS
                                          SEQ# L11012000349

| DATE | BATCH NUMBER | LICENSE NBR | |
|------|-------------|-------------|---|
| 01/20/2011 | 100308060 | DWE6215636 | NBR. OF UNITS: 1 |

The SINGLE RESORT DWELLING (2007)
Named below IS LICENSED                              NON-
Under the provisions of Chapter 509 FS.
Expiration date: FEB 1, 2012                    TRANSFERABLE .


THE BIRD OF PARADISE LLC
OLD ANHEUSER BUSCH ESTATE
2707 PASS-A-GRILLE WAY
ST.PETE BEACH          FL 33706


RICK SCOTT                                    CHARLIE LIEM
GOVERNOR                                       SECRETARY
              DISPLAY AS REQUIRED BY LAW

BOP000146

# EXHIBIT 5

## MEMBERSHIP INTEREST PURCHASE AGREEMENT

This MEMBERSHIP INTEREST PURCHASE AGREEMENT (this "Agreement"), dated as of June 16, 2017, is entered into by and among BARRACUDA CLUB LLC, a Florida limited liability company (the "Buyer"), THE BIRD OF PARADISE LLC, a Florida limited liability company (the "Company"), and John De Silva, in his capacity as sole member of the Company (the "Seller").

## BACKGROUND:

(A)     The Seller is the beneficial and legal owner of 100% of the membership interests in the Company (including all rights of Seller as a member of the Company, all governance and voting rights and all rights of Seller under the Act (as defined below) with respect to the Company, the "Purchased Interests");

(B)     The Buyer wishes to acquire the Purchased Interests and the Seller wishes to sell the Purchased Interests to Buyer on the terms of this Agreement;

(C)     The parties hereto desire that, concurrently with its purchase of the Purchased Interests, the Buyer will be admitted as the sole member (within the meaning of the Act) of the Company, the Seller will be deemed to have withdrawn as a member (within the meaning of the Act) of the Company and the Buyer will own one hundred percent (100%) of the membership interests of the Company, including the sole right to all capital and profits of the Company;

(D)     The Company owns, as its sole asset, the License (as defined below);

(E)     The Seller is the Company's sole member and manager, and Buyer has requested certain representations and warranties from him as a condition to purchasing the Purchased Interests; and

(F)     The parties hereto desire to set forth certain representations, warranties, and covenants made by each to the other as an inducement to the consummation of the sale and certain additional agreements related to the sale.

## AGREEMENT

The parties hereto agree as follows:

1.     Purchase and Sale; Assignment of Purchased Interests.

(a)     Concurrently with the execution and delivery of this Agreement, Buyer shall deliver to the Seller the purchase price of $10.00 for the Purchased Interests (the "Purchase Price") and, effective upon the payment of the Purchase Price, the Seller hereby sells, assigns and transfers to Buyer all of his Seller's right, title and interest in and to the Purchased Interest, free and clear of all Encumbrances (as

defined below).  The payment of the Purchase Price and the assignment of the Purchased Interests on the date hereof are referred to herein as the "Closing."

(b)      The Purchase Price shall be paid by cashier's check, wire transfer or other means approved by the Seller.

(c)      In this Agreement, unless the context otherwise requires: (i) references to this Agreement are references to this Agreement and to the Schedules hereto; (ii) references to any party to this Agreement include references to its respective successors and permitted assigns; (iii) references to a judgment include references to any order, writ, injunction, decree, determination or award of any court or tribunal; (iv) references to a "Person" means any individual, company, corporation (whether public, private or government), corporate body, association, authority, partnership, limited liability company, firm, joint venture, business entity, trust or government agency; (v) references to any document (including this Agreement) are references to that document as amended, consolidated, supplemented, or replaced by the parties thereto from time to time; (vi) the word "affiliate" means, as to the Person in question, any Person that directly or indirectly controls, is controlled by, or is under common control with, the entity in question and any successors or assigns of such entities; (vii) the term "control" means possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person whether through ownership of voting securities, by contract or otherwise; and (viii) the term "knowledge" or "knowledge of the Company" means the actual knowledge of the Seller after due inquiry, provided that, with respect to any facts, events or circumstances, "knowledge" means only the actual knowledge of the Seller; (ix) the term "Proceeding" means and refers to any action, arbitration, audit, hearing, investigation, litigation, suit or similar proceeding (whether civil, criminal, administrative, judicial or investigative, whether formal or informal, whether public or private) commenced, brought, conducted or heard by or before, or otherwise involving, any governmental body or arbitrator; (x) the term "Law" means and refers to any statute, law, ordinance, regulation, rule, code, order, constitution, treaty, common law, judgment, decree, other requirement or rule of law of any Governmental Authority; and (xi) the term "Governmental Authority" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), or any arbitrator, court or tribunal of competent jurisdiction.

2.      Representations and Warranties of Seller. The Seller (except as expressly provided otherwise), hereby represents and warrants to Buyer the following as of the date hereof:

(a)      Binding Agreement; Absence of Conflicts.  The Seller hereby represents and warrants to Buyer as follows:

(i)      This Agreement has been duly executed and delivered by the Seller and (assuming due execution and delivery by Buyer) constitutes the legal, valid and binding obligation of the Seller, enforceable against the Seller in accordance with its terms.

2

(ii)    The Purchased Interest of the Seller has been duly authorized, is validly issued, and is owned of record and beneficially by the Seller, free and clear of all liens, pledges, security interests, charges, claims, encumbrances, agreements, options, voting trusts, proxies and other arrangements or restrictions of any kind (the "Encumbrances"). Upon consummation of the transactions contemplated by this Agreement, Buyer shall own the Purchased Interests, free and clear of all Encumbrances.

(iii)    The execution, delivery and performance by the Seller of this Agreement does not conflict with, violate or result in the breach of, or create any Encumbrance on the Purchased Interest of the Seller pursuant to any agreement, instrument, order, judgment, decree, law or governmental regulation to which the Seller is a party or is subject or by which the Purchased Interest is bound.

(iv)    No governmental, administrative or other third party consents or approvals are required by or with respect to the Seller in connection with the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby.

(b)    Capitalization. The Seller owns all of the Company's currently issued and outstanding membership interests and there are no other owners of the Company.  Additionally, no other equity or ownership interests of the Company, or securities or other rights convertible into or exchangeable for such equity or other ownership interests in the Company, are outstanding. There are no outstanding or authorized options, warrants, purchase rights, subscription rights, conversion rights, exchange rights, or other contracts or commitments that could require the Company to issue, sell, or otherwise cause to become outstanding any of its equity or ownership interests.  There is no voting trust, proxy or other agreement or understanding with respect to the voting of any of the membership units of the Company, including the Purchased Interests.

(c)    Subsidiaries. The Company does not currently own or control, directly or indirectly, any interest in any other Person, and is not a participant in any joint venture, partnership or similar arrangement.

(d)    Licensure. The Company is the holder of that certain Vacation Rental – Dwelling License, License Number DWE6215636, issued by the Florida Department of Business and Professional Regulation (the "License"), which permits the Company, which is a residentially zoned R-2 single family dwelling, to operate as a private resort at the property located at 2707 Pass-A-Grille Way, St. Pete Beach, FL 33706 (the "Property").  The License represents the all of the licenses and permits required for the operation of a private resort at the Property as currently operated.  The License is in good standing, in full force and effect and not subject to meritorious challenge. The Company is in compliance in all material respects with the terms of the License, and neither the Company nor the Seller has received any written notice or communication from any Governmental Authority regarding any violation of the License. No event has occurred and is pending with respect to the License, whether after notice or the passing of time or both, that would serve as grounds for or otherwise authorize the suspension, revocation, or termination of the License or impair the rights of any holder thereof.  All pending applications required to have been filed by the Company for the renewal of the License.

3

(e)     <u>Governmental Consents and Filings</u>.  No governmental, administrative or other third party consents, licenses or approvals are required by or with respect to the Company in connection with the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby.

(f)     <u>Contracts</u>.  <u>Schedule 2(f)</u> is a list of all commitments, contracts, leases and agreements, whether written or oral ("<u>Contracts</u>"), to which the Company is a party.  The Company has delivered to Buyer true and correct copies of all Contracts, including any and all amendments and other modifications thereto.

(g)     <u>Title to and Condition of Property; Leases</u>.  The Company does not own or lease any real property.  The Company has good and marketable title or a valid interest in all personal property and other assets, in each case subject to no mortgage, pledge, lien, security interest, lease, charge or encumbrance, other than liens resulting from taxes which have not yet become delinquent and liens, the interests of lessors in leased property and encumbrances which do not in any case materially detract from the value of the property subject thereto or materially impair the operations of the Company and in all such cases have arisen in the ordinary course of business.

(h)     <u>Litigation or Proceedings</u>. The Company has not received written notice of any claims, actions, suits, proceedings or investigations pending or threatened against the Company, the Seller or any officer, director or manager of the Company, at law or in equity, or before or by any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality wherever located, and to the knowledge of the Company, no such claims, actions, suits, proceedings or investigations are pending or have been threatened.  The Company is not in default under any order of any court or federal, state, municipal, or other governmental department, commission, board, bureau, agency or instrumentality wherever located.  There is no claim, action, suit, proceeding or investigation pending or, to the knowledge of the Company, threatened against or affecting the Company.

(i)     <u>Tax Returns and Payments</u>.  There are no federal, state, county, local or foreign taxes now due and payable by the Company that have not been timely paid.  There are no accrued and unpaid federal, state, country, local or foreign taxes of the Company which are due, whether or not assessed or disputed.  There have been no examinations or audits of any tax returns or reports by any applicable federal, state, local or foreign governmental agency, except as may have been completed and resolved fully.  The Company has duly and timely filed all federal, state, county, local and foreign tax returns required to have been filed by it (subject to extensions and possible late filings that have no present adverse consequences) and there are in effect no waivers of applicable statutes of limitations with respect to taxes for any year.  Since formation, the Company has not elected to be taxed as a corporation.

(j)     <u>No Brokers</u>.  No broker, finder or investment banker is entitled to any brokerage, finders or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of the Seller.

3.      Representation and Warranties of Buyer.

(a)      Binding Agreement.  This Agreement has been duly executed and delivered by Buyer and (assuming due execution and delivery by the Seller) constitutes a legal, valid and binding obligation of Buyer enforceable against Buyer in accordance with its terms.

(b)      Governmental Consents and Filings.  No governmental, administrative or other third party consents or approvals are required by or with respect to Buyer in connection with the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby.

(c)      No Brokers.  No broker, finder or investment banker is entitled to any brokerage, finders or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Buyer.

4.      Admission of Buyer to the Company.  Notwithstanding anything to the contrary, simultaneously with the Closing, the Buyer is hereby admitted to the Company as the sole member of the Company and the holder of the Purchased Interests and the Seller hereby withdraws as the sole member of the Company.

5.      Continuation of the Company.  For the avoidance of doubt and notwithstanding anything to the contrary, the assignment of the Purchased Interests and the admission of the Buyer as the sole member of the Company and as the holder of the Purchased Interests shall not dissolve the Company and the Company shall continue without dissolution.

6.      Consent and Waiver.  The Company and the Seller (as the sole member of the Company) hereby (a) consents to and approves the sale and assignment of the Purchased Interests and the other transactions contemplated hereby, and (b) waives any prohibition, restriction or condition contained in any operating agreement governing the Company or under applicable Law that is applicable to the sale and assignment of the Purchased Interests pursuant to this Agreement.

7.      Releases.  Each of the Company and the Seller hereby releases the Company of and from any and all claims, demands, causes of actions, covenants, contracts whatsoever, both at law and in equity, now existing or hereafter existing, or which may hereafter arise, from the existing state of things, relating in any way to the Company and any actions taken by the Company relating in any way to the Company or any aspect of its business.

8.      Indemnification.

(a)      Indemnification by Seller.  From and after the Closing, the Seller agrees to defend, indemnify and hold harmless the Company, Buyer and its agents (each, a "Buyer Indemnified Party") from, against and for any damages, claims, costs, losses, liabilities, expenses or obligations (including reasonable attorneys' fees and associated expenses), whether or not involving a third-party claim, but excluding any loss of profits (collectively, "Losses"), incurred or suffered by a Buyer Indemnified Party as a result of or arising from: (i) any breach of or inaccuracy in any representation or warranty in Section 2 of this Agreement or in any document executed as a condition to this Agreement (collectively the

5

"Transaction Documents") and (ii) any breach of a covenant, obligation or agreement of the Seller in this Agreement or any other Transaction Document.

(b)     Indemnification by Buyer.  From and after the Closing, Buyer and the Company, jointly and severally, agree to defend, indemnify and hold harmless the Seller (each, a "Seller Indemnified Party") from, against and for any Losses incurred or suffered by the Seller Indemnified Parties as a result of or arising from (i) any breach of or inaccuracy in any representation or warranty made by Buyer in this Agreement or any other Transaction Document or (ii) any breach of a covenant, obligation or agreement of Buyer in this Agreement or any other Transaction Document.

(c)     Procedure for Indemnification – Non Third Party Claims.  Whenever any claim shall arise for indemnification hereunder not involving a demand, claim, action or Proceeding made or brought by a third party, including without limitation a government agency, the party to be indemnified shall notify the indemnifying party promptly after obtaining actual knowledge of the facts constituting the basis for such claim. The notice to the indemnifying party shall specify, if known, the amount or an estimate of the amount of the liability arising therefrom.

9.     Information and Records.  Promptly after the date hereof and in no event later than five (5) days after the Closing, the Seller shall return to Buyer all copies of such books, records, files, documents or other information, in hard copy and/or electronic format, related to the Company or its business that are in the possession or control of the Seller or his affiliates, agents, employees or representatives, including but not limited to, any books, records, files, documents or other information relating to the License.

10.     Survival.  All representations, warranties, covenants and indemnities contained herein shall survive the execution and delivery of this Agreement and the purchase and sale of the Purchased Interests hereunder, until the date that is two (2) years from the date of this Agreement.

11.     Further Assurances.  Each of the parties hereto shall execute and deliver such additional documents, instruments, conveyances and assurances, and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement.

12.     Expenses.  All costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses.

13.     Notices.  All notices, requests, consents, claims, demands, waivers and other communications hereunder (each, a "Notice") shall be in writing and addressed to the parties at the addresses set forth on the signature pages to this Agreement (or to such other address that may be designated by the receiving party from time to time in accordance with this section). All Notices shall be delivered by personal delivery, nationally recognized overnight courier (with all fees pre-paid), facsimile or e-mail of a PDF document (with confirmation of transmission) or certified or registered mail (in each case, return receipt requested, postage prepaid). Except as otherwise provided in this Agreement, a Notice is effective only (a) upon receipt by the receiving party, and (b) if the party giving the Notice has complied with the requirements of this Section.

6

14.   Entire Agreement. This Agreement constitutes the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings, agreements, representations and warranties, both written and oral, with respect to such subject matter.

15.   Successor and Assigns. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. No party may assign any of its rights or obligations hereunder without the prior written consent of the other parties hereto, which consent shall not be unreasonably withheld or delayed.

16.   Headings. The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

17.   Amendment and Modification; Waiver. This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. Except as otherwise set forth in this Agreement, no failure to exercise, or delay in exercising, any rights, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

18.   Severability. If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

19.   Governing Law; Submission to Jurisdiction. This Agreement shall be governed by and construed in accordance with the internal laws of the State of Florida without giving effect to any choice or conflict of law provision or rule (whether of the State of Florida or any other jurisdiction). Any legal suit, action or proceeding arising out of or based upon this Agreement or the transactions contemplated hereby may be instituted in the federal courts of the United States or the courts of the State of Florida in each case located in the County of Hillsborough, and each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action or proceeding. Service of process, summons, notice or other document by mail to such party's address set forth herein shall be effective service of process for any suit, action or other proceeding brought in any such court. The parties irrevocably and unconditionally waive any objection to the laying of venue of any suit, action or any proceeding in such courts and irrevocably waive and agree not to plead or claim in any such court that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

7

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the date first written above.

BUYER:

**BARRACUDA CLUB LLC,**
a Florida limited liability company

By: _____
Name: Joshua Keleske
Title: Vice President

Address:
_____
_____
_____

SELLER:

_____
**JOHN DE SILVA**

Address:
_____
_____
_____

COMPANY:

**THE BIRD OF PARADISE LLC,**
a Florida limited liability company

By: _____
Name: John De Silva
Title: Managing Member

Address:
_____
_____
_____

*Signature Page to Membership Unit Purchase Agreement*

# EXHIBIT 6

Case 2:10-md-02179-CJB-DPC   Document 27145-1   Filed 06/11/21   Page 90 of 137

**2018 FLORIDA LIMITED LIABILITY COMPANY AMENDED ANNUAL REPORT**

DOCUMENT# L04000092603

**FILED**

**Apr 18, 2018**
**Secretary of State**
**CC9584339932**

**Entity Name:** THE BIRD OF PARADISE, LLC

**Current Principal Place of Business:**

1311 N. WESTSHORE BLVD.
 SUITE 101A
TAMPA, FL 33607

**Current Mailing Address:**

1311 N. WESTSHORE BLVD.
 SUITE 101A
TAMPA, FL 33607 US

**FEI Number: NOT APPLICABLE**                          **Certificate of Status Desired:** No

**Name and Address of Current Registered Agent:**

KELESKE, JOSHUA T
3333 W. KENNEDY BLVD.
 SUITE 204
TAMPA FL 33609 US

*The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.*

SIGNATURE:   JOSHUA T. KELESKE                                           04/18/2018
              Electronic Signature of Registered Agent                          Date

**Authorized Person(s) Detail :**

| | |
|---|---|
| Title | MGRM |
| Name | MACDONALD, STEVEN A |
| Address | 1311 N. WESTSHORE BLVD. |
| | SUITE 101A |
| City-State-Zip: | TAMPA FL 33607 |

*I hereby certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am a managing member or manager of the limited liability company or the receiver or trustee empowered to execute this report as required by Chapter 605, Florida Statutes; and that my name appears above, or on an attachment with all other like empowered.*

SIGNATURE: STEVEN A. MACDONALD                  MANAGER                04/18/2018
           Electronic Signature of Signing Authorized Person(s) Detail                    Date

# EXHIBIT 7



# Detail by Document Number

Florida Limited Liability Company
THE BIRD OF PARADISE, LLC

**Filing Information**

| | |
|---|---|
| **Document Number** | L04000092603 |
| **FEI/EIN Number** | N/A |
| **Date Filed** | 12/22/2004 |
| **State** | FL |
| **Status** | INACTIVE |
| **Last Event** | ADMIN DISSOLUTION FOR |
| ANNUAL REPORT | |
| **Event Date Filed** | 09/25/2020 |
| **Event Effective Date** | NONE |

**Principal Address**

1311 N. Westshore Blvd.
Suite 101A
Tampa, FL 33607

Changed: 04/18/2018

**Mailing Address**

1311 N. Westshore Blvd.
Suite 101A
Tampa, FL 33607

Changed: 04/18/2018

**Registered Agent Name & Address**

Keleske, Joshua T
3333 W. Kennedy Blvd.
Suite 204
Tampa, FL 33609

Name Changed: 04/18/2018

Address Changed: 04/18/2018

**Authorized Person(s) Detail**

**Name & Address**

Title MGRM

MACDONALD, STEVEN A

1311 N. Westshore Blvd.

Suite 101A

Tampa, FL 33607

### Annual Reports

| Report Year | Filed Date |
|---|---|
| 2018 | 02/10/2018 |
| 2018 | 04/18/2018 |
| 2019 | 04/29/2019 |

### Document Images

| | |
|---|---|
| 04/29/2019 -- ANNUAL REPORT | View image in PDF format |
| 04/18/2018 -- AMENDED ANNUAL REPORT | View image in PDF format |
| 02/10/2018 -- ANNUAL REPORT | View image in PDF format |
| 04/07/2017 -- ANNUAL REPORT | View image in PDF format |
| 03/25/2016 -- ANNUAL REPORT | View image in PDF format |
| 02/22/2015 -- ANNUAL REPORT | View image in PDF format |
| 01/08/2014 -- ANNUAL REPORT | View image in PDF format |
| 01/31/2013 -- ANNUAL REPORT | View image in PDF format |
| 01/25/2012 -- ANNUAL REPORT | View image in PDF format |
| 02/15/2011 -- ANNUAL REPORT | View image in PDF format |
| 02/15/2010 -- ANNUAL REPORT | View image in PDF format |
| 03/28/2009 -- ANNUAL REPORT | View image in PDF format |
| 01/10/2008 -- ANNUAL REPORT | View image in PDF format |
| 01/08/2007 -- ANNUAL REPORT | View image in PDF format |
| 01/19/2006 -- ANNUAL REPORT | View image in PDF format |
| 08/05/2005 -- ANNUAL REPORT | View image in PDF format |
| 12/22/2004 -- Florida Limited Liabilites | View image in PDF format |

Florida Department of State, Division of Corporations

search.sunbiz.org/Inquiry/CorporationSearch/SearchResultDetail?inquiryType=DocumentNumber&aggregateId=flal-l04000092603-96255687-7536-45…    2/2

# EXHIBIT 8

---

**Data Contained In Search Results Is Current As Of 05/13/2021 10:41 AM.**

### Search Results

**Please see our glossary of terms for an explanation of the license status shown in these search results.**

**For additional information, including any complaints or discipline, click on the name.**

| License Type | Name | Name Type | License Number/ Rank | Status/Expires |
|---|---|---|---|---|
| Vacation Rental - Dwelling | **BARRACUDA CLUB LLC** | Primary | DWE6215636 Dwelling | Current, Active 02/01/2022 |

|  |  |
|---|---|
| **License Location Address*:** | 2707 PASS A GRILLE WAY ST.PETE BEACH, FL 33706 |
| **Main Address*:** | 1311 N WESTSHORE BLVD STE 101 A TAMPA, FL 33607 |
| **Mailing Address*:** | 1311 N WESTSHORE BLVD STE 101 A TAMPA, FL 33607 |

| License Type | Name | Name Type | License Number/ Rank | Status/Expires |
|---|---|---|---|---|
| Vacation Rental - Dwelling | **BARRACUDA CLUB LLC** | DBA | DWE6215636 Dwelling | Current, Active 02/01/2022 |

|  |  |
|---|---|
| **License Location Address*:** | 2707 PASS A GRILLE WAY ST.PETE BEACH, FL 33706 |
| **Main Address*:** | 1311 N WESTSHORE BLVD STE 101 A TAMPA, FL 33607 |
| **Mailing Address*:** | 1311 N WESTSHORE BLVD STE 101 A TAMPA, FL 33607 |



**\* denotes**
   Main Address - This address is the Primary Address on file.
   Mailing Address - This is the address where the mail associated with a particular license will be sent (if different from the Main or License Location addresses).
   License Location Address - This is the address where the place of business is physically located.

· · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · ·

**2601 Blair Stone Road, Tallahassee FL 32399** :: Email: **Customer Contact Center** :: Customer Contact Center: 850.487.1395

The State of Florida is an AA/EEO employer. **Copyright 2007-2010 State of Florida. Privacy Statement**

Under Florida law, email addresses are public records. If you do not want your email address released in response to a public-records request, do not send electronic mail to this entity. Instead, contact the office by phone or by traditional mail. If you have any questions, please contact 850.487.1395. *Pursuant to Section 455.275(1), Florida Statutes, effective October 1, 2012, licensees licensed under Chapter 455, F.S. must provide the Department with an email address if they have one. The emails provided may be used for official communication with the licensee. However email addresses are public record. If you do not wish to supply a personal address, please provide the Department with an email address which can be made available to the public.

# Exhibit E to Declaration of K. Ritter

# KIRKLAND & ELLIS LLP

AND AFFILIATED PARTNERSHIPS

Kristopher S. Ritter
To Call Writer Directly:
+1 312 862 7118
kristopher.ritter@kirkland.com

300 North LaSalle
Chicago, IL 60654
United States

www.kirkland.com

May 17, 2021

Ronnie G. Penton
The Penton Law Firm
503 Georgia Avenue
Bogalusa, LA 70427

Re:     *John DeSilva, Individually, and as the Sole Member, Owner, and
        Operator of The Bird of Paradise, LLC* **(Case No. 16-cv-05277)**

Dear Mr. Penton:

I write on behalf of BP Exploration & Production Inc. and BP America Production Company (collectively, "BP") regarding the above-captioned matter.

In response to a subpoena for production of documents that BP served on Steven A. MacDonald on Thursday, May 13, Mr. MacDonald produced to BP on May 14 a Membership Interest Purchase Agreement ("Purchase Agreement") dated June 16, 2017. Under that Purchase Agreement, your client John DeSilva sold 100% of the membership interests in The Bird of Paradise, LLC to Barracuda Club LLC, an entity controlled by Mr. MacDonald. Mr. DeSilva signed the Purchase Agreement both as Seller and as Managing Member of The Bird of Paradise, LLC. Pursuant to the Purchase Agreement, Barracuda Club LLC was admitted as the sole member of The Bird of Paradise, LLC, and Mr. DeSilva withdrew as sole member of The Bird of Paradise, LLC. Nothing in the Purchase Agreement reserved to Mr. DeSilva any claims that The Bird of Paradise, LLC may have had against BP for any damages relating to the 2010 *Deepwater Horizon* Oil Spill.

As of this afternoon, Mr. MacDonald has also provided the attached declaration attesting to the above and attaching the Purchase Agreement.

In Plaintiff's Brief in Opposition to BP's Motion to Dismiss, you repeatedly stated that Mr. DeSilva had never sold The Bird of Paradise, LLC, representing that:

- "[T]he BOP, LLC was never sold," (Pls. Opp. Br. at 4, n.2 (MDL 2179, Rec. Doc. 27005));

Beijing   Boston   Chicago   Dallas   Hong Kong   Houston   London   Los Angeles   Munich   New York   Palo Alto   Paris   Shanghai   Washington, D.C.

# KIRKLAND & ELLIS LLP

May 17, 2021
Page 2

- "[T]here is zero evidence that Mr. DeSilva ever sold or otherwise actively transferred the LLC to Mr. MacDonald (or anyone else)," (*id*. at 8);

- "The BOP, LLC never filed a tax return, never owned any assets, was never sold . . .," (*id*.);

- Mr. DeSilva had no "active involvement of, or even any knowledge" of any change in the composition of The Bird of Paradise, LLC's membership interests, (*id.*);

- "the BOP LLC was never sold by Mr. DeSilva" (*id*. at 12); and

- the reason that Florida Division of Corporation records indicate that a change in ownership of The Bird of Paradise, LLC had taken place by April 2018 was because "Mr. MacDonald simply unilaterally listed himself as a member . . ." (*id*. at 4 n.2).

At the April 21, 2021 hearing, you told the Court that "[t]here was never ever any type of transaction selling any business, The Bird of Paradise, stock, or anything else, Judge. And as far as the Secretary of State filings in the state of Florida, Mr. DeSilva just simply quit filing annual reports in 2017 when he sold the real estate. Mr. MacDonald, on his own, unilaterally simply went into the Secretary of State and filed reports and basically took that over. . . ." (4/21/21 Tr. at 13:8-20). When asked by the Court whether Mr. MacDonald was being accused of a crime of filing a false annual report, you stated "Well, I'm telling you this, Mr. DeSilva never sold the LLC to Mr. MacDonald nor anyone else." (4/21/21 Tr. at 14:8-9).

The Purchase Agreement and Mr. MacDonald's declaration demonstrate, contrary to what the Court has been told, Mr. DeSilva did in fact sell his membership interest in The Bird of Paradise, LLC to an entity controlled by Mr. MacDonald in June 2017. The Purchase Agreement and declaration also directly answer the question posed by the Court at the April 21 hearing, which was to determine from Mr. MacDonald whether Mr. DeSilva "sold or transferred the LLC when he sold or transferred -- when he sold the real estate." (*See* 4/21/21 Tr. at 29:4-6). It is now clear that he did.

Accordingly, BP sees no need for any deposition of Stephen MacDonald to proceed nor for a deposition of John DeSilva on May 19. I have advised Mr. MacDonald's counsel that in view of Mr. MacDonald's declaration, he has provided sufficient information and BP sees no need to require his deposition. (It is also unclear whether Mr. MacDonald's deposition was ever properly noticed, as his counsel had indicated that he was unaware that any deposition notice had been provided to Mr. MacDonald.) Mr. MacDonald's counsel has confirmed that MacDonald does not plan to appear for a deposition tomorrow.

# KIRKLAND & ELLIS LLP

May 17, 2021
Page 3


Finally, we see no good faith basis for Mr. DeSilva to continue to maintain this action on behalf of The Bird of Paradise, LLC. He has no authority to represent that entity, and the documents that have been provided by Mr. MacDonald confirm that Mr. DeSilva has lacked standing to act in Court on behalf of The Bird of Paradise, LLC *for years*. Mr. DeSilva should promptly dismiss this action rather than impose additional unnecessary burden to BP and the Court.

We intend to inform the Court via letter this week that we believe no further briefing is necessary, that Mr. MacDonald's declaration and the Purchase Agreement answer all outstanding issues raised at the April 21 hearing, and that the case should be dismissed. Alternatively, if the court wants a further hearing, we would ask that Mr. DeSilva be required to attend. BP also reserves its rights to seek further relief and direction from the Court with respect to Mr. DeSilva's conduct and the facts brought to light by Mr. MacDonald.


Sincerely,


/s/ *Kristopher S. Ritter*

Kristopher S. Ritter

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * | MDL NO. 2179 |
| | | SECTION J |
| This Document relates to: | * * | JUDGE BARBIER |
| *John DeSilva, Individually, and as the Sole Member, Owner, and Operator of The Bird of Paradise, LLC v. BP Expl. & Prod., Inc., et al.* Case No. 16-cv-05277 | * * | MAGISTRATE JUDGE CURRAULT |

---

## DECLARATION OF STEVEN A. MACDONALD

I, Steven A. MacDonald, declare as follows:

1.      I am the manager of MacDonald Family Management, LLC, and  MacDonald Family Management, LLC is the manager of Barracuda Club LLC, a Florida limited liability company. *See* 2021 Florida Limited Liability Company Annual Report of the Barracuda Club LLC (Document # L17000124745) (attached hereto as Exhibit 1); 2021 Florida Limited Liability Company Annual Report of MacDonald Family Management, LLC (attached hereto as Exhibit 2).

2.      In 2017, an entity affiliated with me purchased from John DeSilva a parcel of real property at 2707 Pass-A-Grille Way, St. Pete Beach, Florida (the "2017 Transaction") as my assignee under the Contract for Sale and Purchase (attached hereto as Exhibit 3).

3.      In connection with the 2017 Transaction, Mr. DeSilva agreed in May 2017 to transfer the License issued by the State of Florida to The Bird of Paradise, LLC permitting the property at 2707 Pass-A-Grille Way to operate as a Single Resort Dwelling. *See* Exhibit 3 at 11; *see also* Single Resort Dwelling License of The Bird of Paradise, LLC (attached hereto as Exhibit 4) (license number DWE6215636).

KE 76845669.2

4.      In June 2017, Barracuda Club LLC and Mr. DeSilva entered into a Membership Interest Purchase Agreement, a true and correct copy of which is attached hereto as Exhibit 5 (the "Purchase Agreement").

5.      Pursuant to the Purchase Agreement, Barracuda Club LLC purchased 100% of the membership interests in The Bird of Paradise, LLC from John DeSilva, Barracuda Club LLC was admitted as the sole member of The Bird of Paradise, LLC, and John DeSilva withdrew as sole member of The Bird of Paradise, LLC. *See* Exhibit 5 at 5.

6.      The Purchase Agreement did not reserve to John DeSilva any claims The Bird of Paradise, LLC may have had against BP for any damages relating to the 2010 Deepwater Horizon Oil Spill ("the Spill"). *See* Exhibit 5.

7.      In April of 2018, consistent with the Purchase Agreement, an Amended Annual Report was filed with the Florida Department of State listing myself as the member-manager of The Bird of Paradise, LLC. *See* 2018 Florida Limited Liability Company Amended Annual Report of The Bird of Paradise, LLC (attached hereto as Exhibit 6).

8.      In 2020, no yearly report for The Bird of Paradise, LLC was filed with the Florida Department of State and so The Bird of Paradise, LLC was administratively dissolved. *See* Florida Detail by Document Number for The Bird of Paradise, LLC (#L0400009203) (attached hereto as Exhibit 7).

9.      The Barracuda Club LLC currently holds the License permitting the property at 2707 Pass-A-Grille Way to operate as a Single Resort Dwelling. *See* Florida License Search for License Number DWE6215636 (attached hereto as Exhibit 8).

2

10.     I do not intend, either individually or through the Barracuda Club LLC, The Bird of Paradise, LLC, or through any other entity I control, to pursue any claim on behalf of The Bird of Paradise, LLC in connection with the Spill.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed in ____5·17·21____, Florida on this 17th day of May, 2021.

_____
Steven A. MacDonald

3

# EXHIBIT 1

**2021  FLORIDA LIMITED LIABILITY COMPANY ANNUAL REPORT**

DOCUMENT# L17000124745

**Entity Name:** BARRACUDA CLUB LLC

**FILED**
**Mar 13, 2021**
**Secretary of State**
**0887045677CC**

**Current Principal  Place of Business:**

1311 N. WESTSHORE BLVD.
 SUITE 101A
TAMPA,  FL 33607

**Current Mailing Address:**

1311 N. WESTSHORE BLVD.
 SUITE 101A
TAMPA,  FL  33607  US

**FEI Number: 82-1835075**                                        **Certificate of Status Desired:** No

**Name and Address of Current Registered Agent:**

KOCHE, DAVID L
601 BAYSHORE BLVD STE 700
TAMPA, FL  33606  US

*The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.*

SIGNATURE:   DAVID L. KOCHE                                                          03/13/2021

Electronic Signature of Registered Agent                                       Date

**Authorized Person(s) Detail :**

| | |
|---|---|
| Title | MGR |
| Name | MACDONALD FAMILY MANAGEMENT, LLC |
| Address | 1311 N. WESTSHORE BLVD. SUITE 101A |
| City-State-Zip: | TAMPA  FL  33607 |

*I hereby certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under
oath; that I am a managing member or manager of the limited liability company or the receiver or trustee empowered to execute this report as required by Chapter 605, Florida Statutes; and
that my name appears above, or on an attachment with all other like empowered.*

SIGNATURE: STEVEN A. MACDONALD                          MANAGER                 03/13/2021

Electronic Signature of Signing Authorized Person(s) Detail                         Date

# EXHIBIT 2

**2021 FLORIDA LIMITED LIABILITY COMPANY ANNUAL REPORT**

DOCUMENT# L20000045829

**Entity Name:** MACDONALD FAMILY MANAGEMENT, LLC

**FILED**

**Mar 13, 2021**
**Secretary of State**
**6683979768CC**

**Current Principal  Place of Business:**

1311 N. WESTSHORE BLVD, SUITE 101A
TAMPA,  FL  33607

**Current Mailing Address:**

1311 N. WESTSHORE BLVD, SUITE 101A
TAMPA,  FL  33607  US

**FEI Number: 85-0808216**                                                     **Certificate of Status Desired:**  No

**Name and Address of Current Registered Agent:**

KOCHE, DAVID L
601 BAYSHORE BOULEVARD, SUITE 700
TAMPA, FL  33606  US

*The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.*

SIGNATURE: _____

                           Electronic Signature of Registered Agent                                                    Date

**Authorized Person(s) Detail :**

| | |
|---|---|
| Title | MGR |
| Name | MACDONALD, STEVEN A |
| Address | 1311 N. WESTSHORE BLVD, SUITE 101A |
| City-State-Zip: | TAMPA  FL  33607 |

*I hereby certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am a managing member or manager of the limited liability company or the receiver or trustee empowered to execute this report as required by Chapter 605, Florida Statutes; and that my name appears above, or on an attachment with all other like empowered.*

SIGNATURE: STEVEN A. MACDONALD                    MANAGER                    03/13/2021

              Electronic Signature of Signing Authorized Person(s) Detail                                    Date

# EXHIBIT 3

dotloop signature verification: [illegible]



## "AS IS" Residential Contract For Sale And Purchase
THIS FORM HAS BEEN APPROVED BY THE FLORIDA REALTORS AND THE FLORIDA BAR

RESIDENTIAL REAL ESTATE

1\*  PARTIES:John R. De Silva _____ ("Seller"),
2\*  and Steven A. Macdonald _____ ("Buyer"),
3   agree that Seller shall sell and Buyer shall buy the following described Real Property and Personal Property
4   (collectively "Property") pursuant to the terms and conditions of this AS IS Residential Contract For Sale And Purchase
5   and any riders and addenda ("Contract"):
6   1. PROPERTY DESCRIPTION:
7\*     (a) Street address, city, zip:2707 Pass A Grille Way, St Pete Beach, FL 33706
8\*     (b) Located in: Pinellas _____ County, Florida. Property Tax ID #:18-32-16-61002-004-0130
9\*     (c) Real Property: The legal description is _____
10        North Pass-A-Grille Sec A BLK D, Lots 13, 14, 15 & 16
11
12        together with all existing improvements and fixtures, including built-in appliances, built-in furnishings and
13        attached wall-to-wall carpeting and flooring ("Real Property") unless specifically excluded in Paragraph 1(e) or
14        by other terms of this Contract.
15     (d) Personal Property: Unless excluded in Paragraph 1(e) or by other terms of this Contract, the following items
16        which are owned by Seller and existing on the Property as of the date of the initial offer are included in the
17        purchase: range(s)/oven(s), refrigerator(s), dishwasher(s), disposal, ceiling fan(s), intercom, light fixture(s),
18        drapery rods and draperies, blinds, window treatments, smoke detector(s), garage door opener(s), security gate
19        and other access devices, and storm shutters/panels ("Personal Property").
20\*       Other Personal Property items included in this purchase are:All Refrigerator(S), Microwave(s), Dishwasher(s), Range(s),
21        Oven(s), Washer(s), Dryer(s), All household furniture, Artwork, furnishing, TV's, Security Systems, Audio/Video Equipment, Pool Equipment, Dock/Lifts.
22        Personal Property is included in the Purchase Price, has no contributory value, and shall be left for the Buyer.
23\*    (e) The following items are excluded from the purchase:_____
24

25                              PURCHASE PRICE AND CLOSING

26\* 2. PURCHASE PRICE (U.S. currency):............................................................................$5,395,000.00

27\*    (a) Initial deposit to be held in escrow in the amount of (checks subject to COLLECTION) ......$50,000.00
28        The initial deposit made payable to "Escrow Agent" named below
29\*       (CHECK ONE): (i) ☐ accompanies offer or (ii) ☑ is to be made within 3 ____(if left
30        blank, then 3) days after Effective Date. IF NEITHER BOX IS CHECKED, THEN
31        OPTION (ii) SHALL BE DEEMED SELECTED.
32\*       Escrow Agent Information: Name:Coldwell Banker - Ashley Eddings
33\*       Address:500 N. Westshore Blvd., Suite #850, Tampa, FL  33609
34\*       Phone:813-286-6563 ____ E-mail:Ashley.eddings@Floridamoves.com Fax:813-289-4668
35\*    (b) Additional deposit to be delivered to Escrow Agent within 16 _____(if left blank, then 10)
36\*       days after Effective Date ............................................................................$50,000.00
37        (All deposits paid or agreed to be paid, are collectively referred to as the "Deposit")
38\*    (c) Financing: Express as a dollar amount or percentage ("Loan Amount") see Paragraph 8.........
39\*    (d) Other:_____ ................$
40     (e) Balance to close (not including Buyer's closing costs, prepaids and prorations) by wire
41\*       transfer or other COLLECTED funds ............................................................$5,295,000.00
42        NOTE: For the definition of "COLLECTION" or "COLLECTED" see STANDARD S.
43  3. TIME FOR ACCEPTANCE OF OFFER AND COUNTER-OFFERS; EFFECTIVE DATE:
44     (a) If not signed by Buyer and Seller, and an executed copy delivered to all parties on or before
45\*       05/16/2017 at 6:00 p.m. _____, this offer shall be deemed withdrawn and the Deposit, if any, shall be returned to
46        Buyer. Unless otherwise stated, time for acceptance of any counter-offers shall be within 2 days after the day
47        the counter-offer is delivered.
48     (b) The effective date of this Contract shall be the date when the last one of the Buyer and Seller has signed or
49        initialed and delivered this offer or final counter-offer ("Effective Date").
50  4. CLOSING DATE: Unless modified by other provisions of this Contract, the closing of this transaction shall occur
51     and the closing documents required to be furnished by each party pursuant to this Contract shall be delivered
52\*    ("Closing") on 06/16/2017 _____("Closing Date"), at the time established by the Closing Agent.

Buyer's Initials 05/15/17 ____                Page 1 of 12                Seller's Initials ____
FloridaRealtors/FloridaBar-ASIS-5   Rev.4/17 © 2017 Florida Realtors® and The Florida Bar.  All rights reserved.

dotloop signature verification: www.dotloop.com/my/verification/DL-444310613-8-2023

53  **5. EXTENSION OF CLOSING DATE:**
54  (a) If Paragraph 8(b) is checked and Closing funds from Buyer's lender(s) are not available on Closing Date due
55  to Consumer Financial Protection Bureau Closing Disclosure delivery requirements ("CFPB Requirements"),
56  then Closing Date shall be extended for such period necessary to satisfy CFPB Requirements, provided such
57  period shall not exceed 10 days.
58  (b) If an event constituting "Force Majeure" causes services essential for Closing to be unavailable, including the
59  unavailability of utilities or issuance of hazard, wind, flood or homeowners' insurance, Closing Date shall be
60  extended as provided in STANDARD G.

61  **6. OCCUPANCY AND POSSESSION:**
62  (a) Unless the box in Paragraph 6(b) is checked, Seller shall, at Closing, deliver occupancy and possession of the
63  Property to Buyer free of tenants, occupants and future tenancies. Also, at Closing, Seller shall have removed
64  all personal items and trash from the Property and shall deliver all keys, garage door openers, access devices
65  and codes, as applicable, to Buyer. If occupancy is to be delivered before Closing, Buyer assumes all risks of
66  loss to the Property from date of occupancy, shall be responsible and liable for maintenance from that date,
67  and shall be deemed to have accepted the Property in its existing condition as of time of taking occupancy.
68* (b) ☐ **CHECK IF PROPERTY IS SUBJECT TO LEASE(S) OR OCCUPANCY AFTER CLOSING.** If Property is
69  subject to a lease(s) after Closing or is intended to be rented or occupied by third parties beyond Closing, the
70  facts and terms thereof shall be disclosed in writing by Seller to Buyer and copies of the written lease(s) shall
71  be delivered to Buyer, all within 5 days after Effective Date. If Buyer determines, in Buyer's sole discretion, that
72  the lease(s) or terms of occupancy are not acceptable to Buyer, Buyer may terminate this Contract by delivery
73  of written notice of such election to Seller within 5 days after receipt of the above items from Seller, and Buyer
74  shall be refunded the Deposit thereby releasing Buyer and Seller from all further obligations under this Contract.
75  Estoppel Letter(s) and Seller's affidavit shall be provided pursuant to STANDARD D. If Property is intended to
76  be occupied by Seller after Closing, see Rider U. POST-CLOSING OCCUPANCY BY SELLER.

77* **7. ASSIGNABILITY: (CHECK ONE):** Buyer ☐ may assign and thereby be released from any further liability under
78* this Contract; ☑ may assign but not be released from liability under this Contract; or ☐ may not assign this
79  Contract.

80                                          **FINANCING**

81  **8. FINANCING:**
82* ☑ (a) Buyer will pay cash for the purchase of the Property at Closing. There is no financing contingency to Buyer's
83  obligation to close. If Buyer obtains a loan for any part of the Purchase Price of the Property, Buyer acknowledges
84  that any terms and conditions imposed by Buyer's lender(s) or by CFPB Requirements shall not affect or extend
85  the Buyer's obligation to close or otherwise affect any terms or conditions of this Contract.
86* ☐ (b) This Contract is contingent upon Buyer obtaining approval of a ☐ conventional ☐ FHA ☐ VA or ☐ other
87* _____ (describe) loan within _____ (if left blank, then 30) days after Effective Date ("Loan Approval
88* Period") for **(CHECK ONE):** ☐ fixed, ☐ adjustable, ☐ fixed or adjustable rate in the Loan Amount (See Paragraph
89* 2(c)), at an initial interest rate not to exceed _____% (if left blank, then prevailing rate based upon Buyer's
90* creditworthiness), and for a term of _____(if left blank, then 30) years ("Financing").
91*   (i) Buyer shall make mortgage loan application for the Financing within _____(if left blank, then 5) days
92  after Effective Date and use good faith and diligent effort to obtain approval of a loan meeting the Financing terms
93  ("Loan Approval") and thereafter to close this Contract. Loan Approval which requires a condition related to the sale
94  by Buyer of other property shall not be deemed Loan Approval for purposes of this subparagraph.

95  Buyer's failure to use diligent effort to obtain Loan Approval during the Loan Approval Period shall be considered a
96  default under the terms of this Contract.  For purposes of this provision, "diligent effort" includes, but is not limited
97  to, timely furnishing all documents and information and paying of all fees and charges requested by Buyer's
98  mortgage broker and lender in connection with Buyer's mortgage loan application.

99    (ii) Buyer shall keep Seller and Broker fully informed about the status of Buyer's mortgage loan application,
100 Loan Approval, and loan processing and authorizes Buyer's mortgage broker, lender, and Closing Agent to disclose
101 such status and progress, and release preliminary and finally executed closing disclosures and settlement
102 statements, to Seller and Broker.
103   (iii) Upon Buyer obtaining Loan Approval, Buyer shall promptly deliver written notice of such approval to Seller.
104   (iv) If Buyer is unable to obtain Loan Approval after the exercise of diligent effort, then at any time prior to
105 expiration of the Loan Approval Period, Buyer may provide written notice to Seller stating that Buyer has been
106 unable to obtain Loan Approval and has elected to either:
107   (1) waive Loan Approval, in which event this Contract will continue as if Loan Approval had been obtained; or
108   (2) terminate this Contract.

Buyer's Initials [SM]  Page 2 of 12  Seller's Initials [JW]
FloridaRealtors/FloridaBar-ASIS-5   Rev.4/17 © 2017 Florida Realtors® and The Florida Bar. All rights reserved.

dotloop signature verification: verifishbap romforforiducation/14-2413-3031-3-4.132

109     (v) If Buyer fails to timely deliver either notice provided in Paragraph 8(b)(iii) or (iv), above, to Seller prior to
110 expiration of the Loan Approval Period, then Loan Approval shall be deemed waived, in which event this Contract
111 will continue as if Loan Approval had been obtained, provided however, Seller may elect to terminate this Contract
112 by delivering written notice to Buyer within 3 days after expiration of the Loan Approval Period.
113     (vi) If this Contract is timely terminated as provided by Paragraph 8(b)(iv)(2) or (v), above, and Buyer is not in
114 default under the terms of this Contract, Buyer shall be refunded the Deposit thereby releasing Buyer and Seller
115 from all further obligations under this Contract.
116     (vii) If Loan Approval has been obtained, or deemed to have been obtained, as provided above, and Buyer
117 fails to close this Contract, then the Deposit shall be paid to Seller unless failure to close is due to: (1) Seller's
118 default or inability to satisfy other contingencies of this Contract; (2) Property related conditions of the Loan Approval
119 have not been met (except when such conditions are waived by other provisions of this Contract); or (3) appraisal
120 of the Property obtained by Buyer's lender is insufficient to meet terms of the Loan Approval, in which event(s) the
121 Buyer shall be refunded the Deposit, thereby releasing Buyer and Seller from all further obligations under this
122 Contract.
123*  ☐ (c) Assumption of existing mortgage (see rider for terms).
124*  ☐ (d) Purchase money note and mortgage to Seller (see riders; addenda; or special clauses for terms).

125 **CLOSING COSTS, FEES AND CHARGES**

126 **9. CLOSING COSTS; TITLE INSURANCE; SURVEY; HOME WARRANTY; SPECIAL ASSESSMENTS:**
127   (a) **COSTS TO BE PAID BY SELLER:**
128 • Documentary stamp taxes and surtax on deed, if any    • HOA/Condominium Association estoppel fees
129 • Owner's Policy and Charges (if Paragraph 9(c)(i) is checked)    • Recording and other fees needed to cure title
130 • Title search charges (if Paragraph 9(c)(iii) is checked)    • Seller's attorneys' fees
131* • Municipal lien search (if Paragraph 9(c)(i) or (iii) is checked)    • Other:_____
132     If, prior to Closing, Seller is unable to meet the AS IS Maintenance Requirement as required by Paragraph 11
133   a sum equal to 125% of estimated costs to meet the AS IS Maintenance Requirement shall be escrowed at
134   Closing. If actual costs to meet the AS IS Maintenance Requirement exceed escrowed amount, Seller shall pay
135   such actual costs. Any unused portion of escrowed amount(s) shall be returned to Seller.
136   (b) **COSTS TO BE PAID BY BUYER:**
137 • Taxes and recording fees on notes and mortgages    • Loan expenses
138 • Recording fees for deed and financing statements    • Appraisal fees
139 • Owner's Policy and Charges (if Paragraph 9(c)(i) is checked)    • Buyer's Inspections
140 • Survey (and elevation certification, if required)    • Buyer's attorneys' fees
141 • Lender's title policy and endorsements    • All property related insurance
142 • HOA/Condominium Association application/transfer fees    • Owner's Policy Premium (if Paragraph
143 • Municipal lien search (if Paragraph 9(c)(iii) is checked)    9 (c)(iii) is checked.)
144* • Other:_____
145*   (c) **TITLE EVIDENCE AND INSURANCE:** At least 15____(if left blank, then 15, or if Paragraph 8(a) is checked,
146   then 5) days prior to Closing Date ("Title Evidence Deadline"), a title insurance commitment issued by a Florida
147   licensed title insurer, with legible copies of instruments listed as exceptions attached thereto ("Title
148   Commitment") and, after Closing, an owner's policy of title insurance (see STANDARD A for terms) shall be
149   obtained and delivered to Buyer. If Seller has an owner's policy of title insurance covering the Real Property, a
150   copy shall be furnished to Buyer and Closing Agent within 5 days after Effective Date. The owner's title policy
151   premium, title search and closing services (collectively, "Owner's Policy and Charges") shall be paid, as set
152   forth below. The title insurance premium charges for the owner's policy and any lender's policy will be calculated
153   and allocated in accordance with Florida law, but may be reported differently on certain federally mandated
154   closing disclosures and other closing documents.  For purposes of this Contract "municipal lien search" means a
155   search of records necessary for the owner's policy of title insurance to be issued without exception for unrecorded
156   liens imposed pursuant to Chapters 159 or 170, F.S., in favor of any governmental body, authority or agency.
157   **(CHECK ONE):**
158*   ☑ (i) Seller shall designate Closing Agent and pay for Owner's Policy and Charges, and Buyer shall pay the
159   premium for Buyer's lender's policy and charges for closing services related to the lender's policy,
160   endorsements and loan closing, which amounts shall be paid by Buyer to Closing Agent or such other
161   provider(s) as Buyer may select; or
162*   ☐ (ii) Buyer shall designate Closing Agent and pay for Owner's Policy and Charges and charges for closing
163   services related to Buyer's lender's policy, endorsements and loan closing; or

dotloop signature verification: www.dotloop.com/my/verification# 24+Ho8t2-J-2023

164 *  □ (iii) [MIAMI-DADE/BROWARD REGIONAL PROVISION]: Seller shall furnish a copy of a prior owner's policy
165  of title insurance or other evidence of title and pay fees for: (A) a continuation or update of such title evidence,
166  which is acceptable to Buyer's title insurance underwriter for reissue of coverage; (B) tax search; and (C)
167  municipal lien search. Buyer shall obtain and pay for post-Closing continuation and premium for Buyer's owner's
168 *  policy, and if applicable, Buyer's lender's policy. Seller shall not be obligated to pay more than $_____
169  (if left blank, then $200.00) for abstract continuation or title search ordered or performed by Closing Agent.
170  (d) **SURVEY:** On or before Title Evidence Deadline, Buyer may, at Buyer's expense, have the Real Property
171  surveyed and certified by a registered Florida surveyor ("Survey"). If Seller has a survey covering the Real
172  Property, a copy shall be furnished to Buyer and Closing Agent within 5 days after Effective Date.
173 *  (e) **HOME WARRANTY:** At Closing, □ Buyer □ Seller ☑ N/A shall pay for a home warranty plan issued by
174 *  _____ at a cost not to exceed $_____. A home
175  warranty plan provides for repair or replacement of many of a home's mechanical systems and major built-in
176  appliances in the event of breakdown due to normal wear and tear during the agreement's warranty period.
177  (f) **SPECIAL ASSESSMENTS:** At Closing, Seller shall pay: (i) the full amount of liens imposed by a public body
178  ("public body" does not include a Condominium or Homeowner's Association) that are certified, confirmed and
179  ratified before Closing; and (ii) the amount of the public body's most recent estimate or assessment for an
180  improvement which is substantially complete as of Effective Date, but that has not resulted in a lien being
181  imposed on the Property before Closing. Buyer shall pay all other assessments. If special assessments may
182  be paid in installments **(CHECK ONE):**
183 *  ☑ (a) Seller shall pay installments due prior to Closing and Buyer shall pay installments due after Closing.
184  Installments prepaid or due for the year of Closing shall be prorated.
185 *  □ (b) Seller shall pay the assessment(s) in full prior to or at the time of Closing.
186  IF NEITHER BOX IS CHECKED, THEN OPTION (a) SHALL BE DEEMED SELECTED.
187  This Paragraph 9(f) shall not apply to a special benefit tax lien imposed by a community development district
188  (CDD) pursuant to Chapter 190, F.S., which lien shall be prorated pursuant to STANDARD K.

189 <center>**DISCLOSURES**</center>

190  **10. DISCLOSURES:**
191  (a) **RADON GAS:** Radon is a naturally occurring radioactive gas that, when it is accumulated in a building in
192  sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that
193  exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding
194  radon and radon testing may be obtained from your county health department.
195  (b) **PERMITS DISCLOSURE:** Except as may have been disclosed by Seller to Buyer in a written disclosure, Seller
196  does not know of any improvements made to the Property which were made without required permits or made
197  pursuant to permits which have not been properly closed. If Seller identifies permits which have not been
198  properly closed or improvements which were not permitted, then Seller shall promptly deliver to Buyer all plans,
199  written documentation or other information in Seller's possession, knowledge, or control relating to
200  improvements to the Property which are the subject of such open permits or unpermitted improvements.
201  (c) **MOLD:** Mold is naturally occurring and may cause health risks or damage to property. If Buyer is concerned or
202  desires additional information regarding mold, Buyer should contact an appropriate professional.
203  (d) **FLOOD ZONE; ELEVATION CERTIFICATION:** Buyer is advised to verify by elevation certificate which flood
204  zone the Property is in, whether flood insurance is required by Buyer's lender, and what restrictions apply to
205  improving the Property and rebuilding in the event of casualty. If Property is in a "Special Flood Hazard Area"
206  or "Coastal Barrier Resources Act" designated area or otherwise protected area identified by the U.S. Fish and
207  Wildlife Service under the Coastal Barrier Resources Act and the lowest floor elevation for the building(s) and/or
208  flood insurance rating purposes is below minimum flood elevation or is ineligible for flood insurance coverage
209  through the National Flood Insurance Program or private flood insurance as defined in 42 U.S.C. §4012a, Buyer
210 *  may terminate this Contract by delivering written notice to Seller within _____ (if left blank, then 20) days after
211  Effective Date, and Buyer shall be refunded the Deposit thereby releasing Buyer and Seller from all further
212  obligations under this Contract, failing which Buyer accepts existing elevation of buildings and flood zone
213  designation of Property. The National Flood Insurance Program may assess additional fees or adjust premiums
214  for pre-Flood Insurance Rate Map (pre-FIRM) non-primary structures (residential structures in which the insured
215  or spouse does not reside for at least 50% of the year) and an elevation certificate may be required for actuarial
216  rating.
217  (e) **ENERGY BROCHURE:** Buyer acknowledges receipt of Florida Energy-Efficiency Rating Information Brochure
218  required by Section 553.996, F.S.

dotloop signature verification: dotloop.com/my/verification/DL-243364994-7-2021

(f) **LEAD-BASED PAINT:** If Property includes pre-1978 residential housing, a lead-based paint disclosure is mandatory.

(g) **HOMEOWNERS' ASSOCIATION/COMMUNITY DISCLOSURE: BUYER SHOULD NOT EXECUTE THIS CONTRACT UNTIL BUYER HAS RECEIVED AND READ THE HOMEOWNERS' ASSOCIATION/COMMUNITY DISCLOSURE, IF APPLICABLE.**

(h) **PROPERTY TAX DISCLOSURE SUMMARY:** BUYER SHOULD NOT RELY ON THE SELLER'S CURRENT PROPERTY TAXES AS THE AMOUNT OF PROPERTY TAXES THAT THE BUYER MAY BE OBLIGATED TO PAY IN THE YEAR SUBSEQUENT TO PURCHASE. A CHANGE OF OWNERSHIP OR PROPERTY IMPROVEMENTS TRIGGERS REASSESSMENTS OF THE PROPERTY THAT COULD RESULT IN HIGHER PROPERTY TAXES. IF YOU HAVE ANY QUESTIONS CONCERNING VALUATION, CONTACT THE COUNTY PROPERTY APPRAISER'S OFFICE FOR INFORMATION.

(i) **FOREIGN INVESTMENT IN REAL PROPERTY TAX ACT ("FIRPTA"):** Seller shall inform Buyer in writing if Seller is a "foreign person" as defined by the Foreign Investment in Real Property Tax Act ("FIRPTA"). Buyer and Seller shall comply with FIRPTA, which may require Seller to provide additional cash at Closing. If Seller is not a "foreign person", Seller can provide Buyer, at or prior to Closing, a certification of non-foreign status, under penalties of perjury, to inform Buyer and Closing Agent that no withholding is required. See STANDARD V for further information pertaining to FIRPTA. Buyer and Seller are advised to seek legal counsel and tax advice regarding their respective rights, obligations, reporting and withholding requirements pursuant to FIRPTA.

(j) **SELLER DISCLOSURE:** Seller knows of no facts materially affecting the value of the Real Property which are not readily observable and which have not been disclosed to Buyer. Except as provided for in the preceding sentence, Seller extends and intends no warranty and makes no representation of any type, either express or implied, as to the physical condition or history of the Property. Except as otherwise disclosed in writing Seller has received no written or verbal notice from any governmental entity or agency as to a currently uncorrected building, environmental or safety code violation.

### PROPERTY MAINTENANCE, CONDITION, INSPECTIONS AND EXAMINATIONS

**11. PROPERTY MAINTENANCE:** Except for ordinary wear and tear and Casualty Loss, Seller shall maintain the Property, including, but not limited to, lawn, shrubbery, and pool, in the condition existing as of Effective Date ("AS IS Maintenance Requirement").

**12. PROPERTY INSPECTION; RIGHT TO CANCEL:**

(a) *PROPERTY INSPECTIONS AND RIGHT TO CANCEL: Buyer shall have* 15 _____ *(if left blank, then 15) days after Effective Date ("Inspection Period") within which to have such inspections of the Property performed as Buyer shall desire during the Inspection Period. If Buyer determines, in Buyer's sole discretion, that the Property is not acceptable to Buyer, Buyer may terminate this Contract by delivering written notice of such election to Seller prior to expiration of Inspection Period. If Buyer timely terminates this Contract, the Deposit paid shall be returned to Buyer, thereupon, Buyer and Seller shall be released of all further obligations under this Contract; however, Buyer shall be responsible for prompt payment for such inspections, for repair of damage to, and restoration of, the Property resulting from such inspections, and shall provide Seller with paid receipts for all work done on the Property (the preceding provision shall survive termination of this Contract). Unless Buyer exercises the right to terminate granted herein, Buyer accepts the physical condition of the Property and any violation of governmental, building, environmental, and safety codes, restrictions, or requirements, but subject to Seller's continuing AS IS Maintenance Requirement, and Buyer shall be responsible for any and all repairs and improvements required by Buyer's lender.*

(b) **WALK-THROUGH INSPECTION/RE-INSPECTION:** On the day prior to Closing Date, or on Closing Date prior to time of Closing, as specified by Buyer, Buyer or Buyer's representative may perform a walk-through (and follow-up walk-through, if necessary) inspection of the Property solely to confirm that all items of Personal Property are on the Property and to verify that Seller has maintained the Property as required by the AS IS Maintenance Requirement and has met all other contractual obligations.

(c) **SELLER ASSISTANCE AND COOPERATION IN CLOSE-OUT OF BUILDING PERMITS:** If Buyer's inspection of the Property identifies open or needed building permits, then Seller shall promptly deliver to Buyer all plans, written documentation or other information in Seller's possession, knowledge, or control relating to improvements to the Property which are the subject of such open or needed Permits, and shall promptly cooperate in good faith with Buyer's efforts to obtain estimates of repairs or other work necessary to resolve such Permit issues. Seller's obligation to cooperate shall include Seller's execution of necessary authorizations,

dotloop signature verification: vcvwslotloop com/my/verification/DL-241363001-5-2RD1

274 consents, or other documents necessary for Buyer to conduct inspections and have estimates of such repairs
275 or work prepared, but in fulfilling such obligation, Seller shall not be required to expend, or become obligated to
276 expend, any money.
277 (d) **ASSIGNMENT OF REPAIR AND TREATMENT CONTRACTS AND WARRANTIES:** At Buyer's option and
278 cost, Seller will, at Closing, assign all assignable repair, treatment and maintenance contracts and warranties
279 to Buyer.

280 ## ESCROW AGENT AND BROKER

281 13. **ESCROW AGENT:** Any Closing Agent or Escrow Agent (collectively "Agent") receiving the Deposit, other funds
282 and other items is authorized, and agrees by acceptance of them, to deposit them promptly, hold same in escrow
283 within the State of Florida and, subject to **COLLECTION**, disburse them in accordance with terms and conditions
284 of this Contract. Failure of funds to become **COLLECTED** shall not excuse Buyer's performance. When conflicting
285 demands for the Deposit are received, or Agent has a good faith doubt as to entitlement to the Deposit, Agent may
286 take such actions permitted by this Paragraph 13, as Agent deems advisable. If in doubt as to Agent's duties or
287 liabilities under this Contract, Agent may, at Agent's option, continue to hold the subject matter of the escrow until
288 the parties agree to its disbursement or until a final judgment of a court of competent jurisdiction shall determine
289 the rights of the parties, or Agent may deposit same with the clerk of the circuit court having jurisdiction of the
290 dispute. An attorney who represents a party and also acts as Agent may represent such party in such action. Upon
291 notifying all parties concerned of such action, all liability on the part of Agent shall fully terminate, except to the
292 extent of accounting for any items previously delivered out of escrow. If a licensed real estate broker, Agent will
293 comply with provisions of Chapter 475, F.S., as amended and FREC rules to timely resolve escrow disputes through
294 mediation, arbitration, interpleader or an escrow disbursement order.

295 In any proceeding between Buyer and Seller wherein Agent is made a party because of acting as Agent hereunder,
296 or in any proceeding where Agent interpleads the subject matter of the escrow, Agent shall recover reasonable
297 attorney's fees and costs incurred, to be paid pursuant to court order out of the escrowed funds or equivalent. Agent
298 shall not be liable to any party or person for mis-delivery of any escrowed items, unless such mis-delivery is due to
299 Agent's willful breach of this Contract or Agent's gross negligence. This Paragraph 13 shall survive Closing or
300 termination of this Contract.

301 14. **PROFESSIONAL ADVICE; BROKER LIABILITY:** Broker advises Buyer and Seller to verify Property condition,
302 square footage, and all other facts and representations made pursuant to this Contract and to consult appropriate
303 professionals for legal, tax, environmental, and other specialized advice concerning matters affecting the Property
304 and the transaction contemplated by this Contract. Broker represents to Buyer that Broker does not reside on the
305 Property and that all representations (oral, written or otherwise) by Broker are based on Seller representations or
306 public records. **BUYER AGREES TO RELY SOLELY ON SELLER, PROFESSIONAL INSPECTORS AND**
307 **GOVERNMENTAL AGENCIES FOR VERIFICATION OF PROPERTY CONDITION, SQUARE FOOTAGE AND**
308 **FACTS THAT MATERIALLY AFFECT PROPERTY VALUE AND NOT ON THE REPRESENTATIONS (ORAL,**
309 **WRITTEN OR OTHERWISE) OF BROKER.** Buyer and Seller (individually, the "Indemnifying Party") each
310 individually indemnifies, holds harmless, and releases Broker and Broker's officers, directors, agents and
311 employees from all liability for loss or damage, including all costs and expenses, and reasonable attorney's fees at
312 all levels, suffered or incurred by Broker and Broker's officers, directors, agents and employees in connection with
313 or arising from claims, demands or causes of action instituted by Buyer or Seller based on: (i) inaccuracy of
314 information provided by the Indemnifying Party or from public records; (ii) Indemnifying Party's misstatement(s) or
315 failure to perform contractual obligations; (iii) Broker's performance, at Indemnifying Party's request, of any task
316 beyond the scope of services regulated by Chapter 475, F.S., as amended, including Broker's referral,
317 recommendation or retention of any vendor for, or on behalf of, Indemnifying Party; (iv) products or services
318 provided by any such vendor for, or on behalf of, Indemnifying Party; and (v) expenses incurred by any such vendor.
319 Buyer and Seller each assumes full responsibility for selecting and compensating their respective vendors and
320 paying their other costs under this Contract whether or not this transaction closes. This Paragraph 14 will not relieve
321 Broker of statutory obligations under Chapter 475, F.S., as amended. For purposes of this Paragraph 14, Broker
322 will be treated as a party to this Contract. This Paragraph 14 shall survive Closing or termination of this Contract.

323 ## DEFAULT AND DISPUTE RESOLUTION

324 15. **DEFAULT:**
325 (a) **BUYER DEFAULT:** If Buyer fails, neglects or refuses to perform Buyer's obligations under this Contract,
326 including payment of the Deposit, within the time(s) specified, Seller may elect to recover and retain the Deposit
327 for the account of Seller as agreed upon liquidated damages, consideration for execution of this Contract, and
328 in full settlement of any claims, whereupon Buyer and Seller shall be relieved from all further obligations under

Buyer's Initials [SWM 05/15/17] [ ] Page 6 of 12 Seller's Initials [ ] [ ]
FloridaRealtors/FloridaBar-ASIS-5   Rev.4/17 © 2017 Florida Realtors® and The Florida Bar. All rights reserved.

dotloop signature verification: www.dotloop.com/my/verification/DL-244316084-4-8123

329 this Contract, or Seller, at Seller's option, may, pursuant to Paragraph 16, proceed in equity to enforce Seller's
330 rights under this Contract. The portion of the Deposit, if any, paid to Listing Broker upon default by Buyer, shall
331 be split equally between Listing Broker and Cooperating Broker; provided however, Cooperating Broker's share
332 shall not be greater than the commission amount Listing Broker had agreed to pay to Cooperating Broker.
333 (b) **SELLER DEFAULT:** If for any reason other than failure of Seller to make Seller's title marketable after
334 reasonable diligent effort, Seller fails, neglects or refuses to perform Seller's obligations under this Contract,
335 Buyer may elect to receive return of Buyer's Deposit without thereby waiving any action for damages resulting
336 from Seller's breach, and, pursuant to Paragraph 16, may seek to recover such damages or seek specific
337 performance.
338 This Paragraph 15 shall survive Closing or termination of this Contract.
339 **16. DISPUTE RESOLUTION:** Unresolved controversies, claims and other matters in question between Buyer and
340 Seller arising out of, or relating to, this Contract or its breach, enforcement or interpretation ("Dispute") will be settled
341 as follows:
342 (a) Buyer and Seller will have 10 days after the date conflicting demands for the Deposit are made to attempt to
343 resolve such Dispute, failing which, Buyer and Seller shall submit such Dispute to mediation under Paragraph
344 16(b).
345 (b) Buyer and Seller shall attempt to settle Disputes in an amicable manner through mediation pursuant to Florida
346 Rules for Certified and Court-Appointed Mediators and Chapter 44, F.S., as amended (the "Mediation Rules").
347 The mediator must be certified or must have experience in the real estate industry. Injunctive relief may be
348 sought without first complying with this Paragraph 16(b). Disputes not settled pursuant to this Paragraph 16
349 may be resolved by instituting action in the appropriate court having jurisdiction of the matter. This Paragraph
350 16 shall survive Closing or termination of this Contract.
351 **17. ATTORNEY'S FEES; COSTS:** The parties will split equally any mediation fee incurred in any mediation permitted
352 by this Contract, and each party will pay their own costs, expenses and fees, including attorney's fees, incurred in
353 conducting the mediation. In any litigation permitted by this Contract, the prevailing party shall be entitled to recover
354 from the non-prevailing party costs and fees, including reasonable attorney's fees, incurred in conducting the
355 litigation. This Paragraph 17 shall survive Closing or termination of this Contract.

356 <div align="center">**STANDARDS FOR REAL ESTATE TRANSACTIONS ("STANDARDS")**</div>

357 **18. STANDARDS:**
358 **A. TITLE:**
359 (i) **TITLE EVIDENCE; RESTRICTIONS; EASEMENTS; LIMITATIONS:** Within the time period provided in
360 Paragraph 9(c), the Title Commitment, with legible copies of instruments listed as exceptions attached thereto, shall
361 be issued and delivered to Buyer. The Title Commitment shall set forth those matters to be discharged by Seller at
362 or before Closing and shall provide that, upon recording of the deed to Buyer, an owner's policy of title insurance
363 in the amount of the Purchase Price, shall be issued to Buyer insuring Buyer's marketable title to the Real Property,
364 subject only to the following matters: (a) comprehensive land use plans, zoning, and other land use restrictions,
365 prohibitions and requirements imposed by governmental authority; (b) restrictions and matters appearing on the
366 Plat or otherwise common to the subdivision; (c) outstanding oil, gas and mineral rights of record without right of
367 entry; (d) unplatted public utility easements of record (located contiguous to real property lines and not more than
368 10 feet in width as to rear or front lines and 7 1/2 feet in width as to side lines); (e) taxes for year of Closing and
369 subsequent years; and (f) assumed mortgages and purchase money mortgages, if any (if additional items, attach
370 addendum); provided, that, none prevent use of Property for RESIDENTIAL PURPOSES. If there exists at Closing
371 any violation of items identified in (b) – (f) above, then the same shall be deemed a title defect. Marketable title shall
372 be determined according to applicable Title Standards adopted by authority of The Florida Bar and in accordance
373 with law.
374 (ii) **TITLE EXAMINATION:** Buyer shall have 5 days after receipt of Title Commitment to examine it and notify Seller
375 in writing specifying defect(s), if any, that render title unmarketable. If Seller provides Title Commitment and it is
376 delivered to Buyer less than 5 days prior to Closing Date, Buyer may extend Closing for up to 5 days after date of
377 receipt to examine same in accordance with this STANDARD A. Seller shall have 30 days ("Cure Period") after
378 receipt of Buyer's notice to take reasonable diligent efforts to remove defects. If Buyer fails to so notify Seller, Buyer
379 shall be deemed to have accepted title as it then is. If Seller cures defects within Cure Period, Seller will deliver
380 written notice to Buyer (with proof of cure acceptable to Buyer and Buyer's attorney) and the parties will close this
381 Contract on Closing Date (or if Closing Date has passed, within 10 days after Buyer's receipt of Seller's notice). If
382 Seller is unable to cure defects within Cure Period, then Buyer may, within 5 days after expiration of Cure Period,

dotloop signature verification: www.dotloop.com/my/verification 2411625445-2023

## STANDARDS FOR REAL ESTATE TRANSACTIONS ("STANDARDS") CONTINUED

383 deliver written notice to Seller: (a) extending Cure Period for a specified period not to exceed 120 days within which
384 Seller shall continue to use reasonable diligent effort to remove or cure the defects ("Extended Cure Period"); or
385 (b) electing to accept title with existing defects and close this Contract on Closing Date (or if Closing Date has
386 passed, within the earlier of 10 days after end of Extended Cure Period or Buyer's receipt of Seller's notice), or (c)
387 electing to terminate this Contract and receive a refund of the Deposit, thereby releasing Buyer and Seller from all
388 further obligations under this Contract. If after reasonable diligent effort, Seller is unable to timely cure defects, and
389 Buyer does not waive the defects, this Contract shall terminate, and Buyer shall receive a refund of the Deposit,
390 thereby releasing Buyer and Seller from all further obligations under this Contract.
391 **B.  SURVEY:** If Survey discloses encroachments on the Real Property or that Improvements located thereon
392 encroach on setback lines, easements, or lands of others, or violate any restrictions, covenants, or applicable
393 governmental regulations described in STANDARD A (i)(a), (b) or (d) above, Buyer shall deliver written notice of
394 such matters, together with a copy of Survey, to Seller within 5 days after Buyer's receipt of Survey, but no later
395 than Closing. If Buyer timely delivers such notice and Survey to Seller, such matters identified in the notice and
396 Survey shall constitute a title defect, subject to cure obligations of STANDARD A above. If Seller has delivered a
397 prior survey, Seller shall, at Buyer's request, execute an affidavit of "no change" to the Real Property since the
398 preparation of such prior survey, to the extent the affirmations therein are true and correct.
399 **C.  INGRESS AND EGRESS:** Seller represents that there is ingress and egress to the Real Property and title to
400 the Real Property is insurable in accordance with STANDARD A without exception for lack of legal right of access.
401 **D.  LEASE INFORMATION:** Seller shall, at least 10 days prior to Closing, furnish to Buyer estoppel letters from
402 tenant(s)/occupant(s) specifying nature and duration of occupancy, rental rates, advanced rent and security
403 deposits paid by tenant(s) or occupant(s)("Estoppel Letter(s)"). If Seller is unable to obtain such Estoppel Letter(s)
404 the same information shall be furnished by Seller to Buyer within that time period in the form of a Seller's affidavit
405 and Buyer may thereafter contact tenant(s) or occupant(s) to confirm such information. If Estoppel Letter(s) or
406 Seller's affidavit, if any, differ materially from Seller's representations and lease(s) provided pursuant to Paragraph
407 6, or if tenant(s)/occupant(s) fail or refuse to confirm Seller's affidavit, Buyer may deliver written notice to Seller
408 within 5 days after receipt of such information, but no later than 5 days prior to Closing Date, terminating this
409 Contract and receive a refund of the Deposit, thereby releasing Buyer and Seller from all further obligations under
410 this Contract. Seller shall, at Closing, deliver and assign all leases to Buyer who shall assume Seller's obligations
411 thereunder.
412 **E.  LIENS:** Seller shall furnish to Buyer at Closing an affidavit attesting (i) to the absence of any financing
413 statement, claims of lien or potential lienors known to Seller and (ii) that there have been no improvements or
414 repairs to the Real Property for 90 days immediately preceding Closing Date. If the Real Property has been
415 improved or repaired within that time, Seller shall deliver releases or waivers of construction liens executed by all
416 general contractors, subcontractors, suppliers and materialmen in addition to Seller's lien affidavit setting forth
417 names of all such general contractors, subcontractors, suppliers and materialmen, further affirming that all charges
418 for improvements or repairs which could serve as a basis for a construction lien or a claim for damages have been
419 paid or will be paid at Closing.
420 **F.  TIME:** Calendar days shall be used in computing time periods. **Time is of the essence in this Contract.** Other
421 than time for acceptance and Effective Date as set forth in Paragraph 3, any time periods provided for or dates
422 specified in this Contract, whether preprinted, handwritten, typewritten or inserted herein, which shall end or occur
423 on a Saturday, Sunday, or a national legal holiday (see 5 U.S.C. 6103) shall extend to 5:00 p.m. (where the Property
424 is located) of the next business day.
425 **G.  FORCE MAJEURE:** Buyer or Seller shall not be required to perform any obligation under this Contract or be
426 liable to each other for damages so long as performance or non-performance of the obligation, or the availability of
427 services, insurance or required approvals essential to Closing, is disrupted, delayed, caused or prevented by Force
428 Majeure. "Force Majeure" means: hurricanes, floods, extreme weather, earthquakes, fire, or other acts of God,
429 unusual transportation delays, or wars, insurrections, or acts of terrorism, which, by exercise of reasonable diligent
430 effort, the non-performing party is unable in whole or in part to prevent or overcome. All time periods, including
431 Closing Date, will be extended a reasonable time up to 7 days after the Force Majeure no longer prevents
432 performance under this Contract, provided, however, if such Force Majeure continues to prevent performance under
433 this Contract more than 30 days beyond Closing Date, then either party may terminate this Contract by delivering
434 written notice to the other and the Deposit shall be refunded to Buyer, thereby releasing Buyer and Seller from all
435 further obligations under this Contract.
436 **H.  CONVEYANCE:** Seller shall convey marketable title to the Real Property by statutory warranty, trustee's,
437 personal representative's, or guardian's deed, as appropriate to the status of Seller, subject only to matters
438 described in STANDARD A and those accepted by Buyer. Personal Property shall, at request of Buyer, be

dotloop signature verification: v.dotloop.com/my/verification/DL-244116891-3-4B23

## STANDARDS FOR REAL ESTATE TRANSACTIONS ("STANDARDS") CONTINUED

439 transferred by absolute bill of sale with warranty of title, subject only to such matters as may be provided for in this
440 Contract.

441 **I. CLOSING LOCATION; DOCUMENTS; AND PROCEDURE:**

442 **(i) LOCATION:** Closing will be conducted by the attorney or other closing agent ("Closing Agent") designated by
443 the party paying for the owner's policy of title insurance and will take place in the county where the Real Property
444 is located at the office of the Closing Agent, or at such other location agreed to by the parties. If there is no title
445 insurance, Seller will designate Closing Agent. Closing may be conducted by mail, overnight courier, or electronic
446 means.

447 **(ii) CLOSING DOCUMENTS:** Seller shall at or prior to Closing, execute and deliver, as applicable, deed, bill of
448 sale, certificate(s) of title or other documents necessary to transfer title to the Property, construction lien affidavit(s),
449 owner's possession and no lien affidavit(s), and assignment(s) of leases. Seller shall provide Buyer with paid
450 receipts for all work done on the Property pursuant to this Contract. Buyer shall furnish and pay for, as applicable,
451 the survey, flood elevation certification, and documents required by Buyer's lender.

452 **(iii) FinCEN GTO NOTICE. If Closing Agent is required to comply with the U.S. Treasury Department's**
453 **Financial Crimes Enforcement Network ("FinCEN") Geographic Targeting Orders ("GTOs"), then Buyer**
454 **shall provide Closing Agent with the information related to Buyer and the transaction contemplated by this**
455 **Contract that is required to complete IRS Form 8300, and Buyer consents to Closing Agent's collection and**
456 **report of said information to IRS.**

457 **(iv) PROCEDURE:** The deed shall be recorded upon **COLLECTION** of all closing funds. If the Title Commitment
458 provides insurance against adverse matters pursuant to Section 627.7841, F.S., as amended, the escrow closing
459 procedure required by STANDARD J shall be waived, and Closing Agent shall, **subject to COLLECTION of all**
460 **closing funds**, disburse at Closing the brokerage fees to Broker and the net sale proceeds to Seller.

461 **J. ESCROW CLOSING PROCEDURE:** If Title Commitment issued pursuant to Paragraph 9(c) does not provide
462 for insurance against adverse matters as permitted under Section 627.7841, F.S., as amended, the following
463 escrow and closing procedures shall apply: (1) all Closing proceeds shall be held in escrow by the Closing Agent
464 for a period of not more than 10 days after Closing; (2) if Seller's title is rendered unmarketable, through no fault of
465 Buyer, Buyer shall, within the 10 day period, notify Seller in writing of the defect and Seller shall have 30 days from
466 date of receipt of such notification to cure the defect; (3) if Seller fails to timely cure the defect, the Deposit and all
467 Closing funds paid by Buyer shall, within 5 days after written demand by Buyer, be refunded to Buyer and,
468 simultaneously with such repayment, Buyer shall return the Personal Property, vacate the Real Property and re-
469 convey the Property to Seller by special warranty deed and bill of sale; and (4) if Buyer fails to make timely demand
470 for refund of the Deposit, Buyer shall take title as is, waiving all rights against Seller as to any intervening defect
471 except as may be available to Buyer by virtue of warranties contained in the deed or bill of sale.

472 **K. PRORATIONS; CREDITS:** The following recurring items will be made current (if applicable) and prorated as of
473 the day prior to Closing Date, or date of occupancy if occupancy occurs before Closing Date: real estate taxes
474 (including special benefit tax assessments imposed by a CDD), interest, bonds, association fees, insurance, rents
475 and other expenses of Property. Buyer shall have option of taking over existing policies of insurance, if assumable,
476 in which event premiums shall be prorated. Cash at Closing shall be increased or decreased as may be required
477 by prorations to be made through day prior to Closing. Advance rent and security deposits, if any, will be credited
478 to Buyer. Escrow deposits held by Seller's mortgagee will be paid to Seller. Taxes shall be prorated based on
479 current year's tax. If Closing occurs on a date when current year's millage is not fixed but current year's assessment
480 is available, taxes will be prorated based upon such assessment and prior year's millage. If current year's
481 assessment is not available, then taxes will be prorated on prior year's tax. If there are completed improvements
482 on the Real Property by January 1st of year of Closing, which improvements were not in existence on January 1st
483 of prior year, then taxes shall be prorated based upon prior year's millage and at an equitable assessment to be
484 agreed upon between the parties, failing which, request shall be made to the County Property Appraiser for an
485 informal assessment taking into account available exemptions. In all cases, due allowance shall be made for the
486 maximum allowable discounts and applicable homestead and other exemptions. A tax proration based on an
487 estimate shall, at either party's request, be readjusted upon receipt of current year's tax bill. This STANDARD K
488 shall survive Closing.

489 **L. ACCESS TO PROPERTY TO CONDUCT APPRAISALS, INSPECTIONS, AND WALK-THROUGH:** Seller
490 shall, upon reasonable notice, provide utilities service and access to Property for appraisals and inspections,
491 including a walk-through (or follow-up walk-through if necessary) prior to Closing.

492 **M. RISK OF LOSS:** If, after Effective Date, but before Closing, Property is damaged by fire or other casualty
493 ("Casualty Loss") and cost of restoration (which shall include cost of pruning or removing damaged trees) does not
494 exceed 1.5% of Purchase Price, cost of restoration shall be an obligation of Seller and Closing shall proceed
495 pursuant to terms of this Contract. If restoration is not completed as of Closing, a sum equal to 125% of estimated

Buyer's Initials 05/15/17 | | Page 9 of 12 Seller's Initials | |
FloridaRealtors/FloridaBar-ASIS-5 Rev.4/17 © 2017 Florida Realtors® and The Florida Bar. All rights reserved.

dotloop signature verification: dotloop.com/my/verification/DL-244455404-5-2B23

## STANDARDS FOR REAL ESTATE TRANSACTIONS ("STANDARDS") CONTINUED

496 cost to complete restoration (not to exceed 1.5% of Purchase Price) will be escrowed at Closing. If actual cost of
497 restoration exceeds escrowed amount, Seller shall pay such actual costs (but, not in excess of 1.5% of Purchase
498 Price). Any unused portion of escrowed amount shall be returned to Seller. If cost of restoration exceeds 1.5% of
499 Purchase Price, Buyer shall elect to either take Property "as is" together with the 1.5%, or receive a refund of the
500 Deposit thereby releasing Buyer and Seller from all further obligations under this Contract. Seller's sole obligation
501 with respect to tree damage by casualty or other natural occurrence shall be cost of pruning or removal.

502 **N. 1031 EXCHANGE:** If either Seller or Buyer wish to enter into a like-kind exchange (either simultaneously with
503 Closing or deferred) under Section 1031 of the Internal Revenue Code ("Exchange"), the other party shall cooperate
504 in all reasonable respects to effectuate the Exchange, including execution of documents; provided, however,
505 cooperating party shall incur no liability or expense related to the Exchange, and Closing shall not be contingent
506 upon, nor extended or delayed by, such Exchange.

507 **O. CONTRACT NOT RECORDABLE; PERSONS BOUND; NOTICE; DELIVERY; COPIES; CONTRACT
508 EXECUTION:** Neither this Contract nor any notice of it shall be recorded in any public records. This Contract shall
509 be binding on, and inure to the benefit of, the parties and their respective heirs or successors in interest. Whenever
510 the context permits, singular shall include plural and one gender shall include all. Notice and delivery given by or to
511 the attorney or broker (including such broker's real estate licensee) representing any party shall be as effective as
512 if given by or to that party. All notices must be in writing and may be made by mail, personal delivery or electronic
513 (including "pdf") media. A facsimile or electronic (including "pdf") copy of this Contract and any signatures hereon
514 shall be considered for all purposes as an original. This Contract may be executed by use of electronic signatures,
515 as determined by Florida's Electronic Signature Act and other applicable laws.

516 **P. INTEGRATION; MODIFICATION:** This Contract contains the full and complete understanding and agreement
517 of Buyer and Seller with respect to the transaction contemplated by this Contract and no prior agreements or
518 representations shall be binding upon Buyer or Seller unless included in this Contract. No modification to or change
519 in this Contract shall be valid or binding upon Buyer or Seller unless in writing and executed by the parties intended
520 to be bound by it.

521 **Q. WAIVER:** Failure of Buyer or Seller to insist on compliance with, or strict performance of, any provision of this
522 Contract, or to take advantage of any right under this Contract, shall not constitute a waiver of other provisions or
523 rights.

524 **R. RIDERS; ADDENDA; TYPEWRITTEN OR HANDWRITTEN PROVISIONS:** Riders, addenda, and typewritten
525 or handwritten provisions shall control all printed provisions of this Contract in conflict with them.

526 **S. COLLECTION or COLLECTED: "COLLECTION" or "COLLECTED"** means any checks tendered or
527 **received, including Deposits, have become actually and finally collected and deposited in the account of
528 Escrow Agent or Closing Agent. Closing and disbursement of funds and delivery of closing documents
529 may be delayed by Closing Agent until such amounts have been COLLECTED in Closing Agent's accounts.**
530 **T. RESERVED.**

531 **U. APPLICABLE LAW AND VENUE:** This Contract shall be construed in accordance with the laws of the State
532 of Florida and venue for resolution of all disputes, whether by mediation, arbitration or litigation, shall lie in the
533 county where the Real Property is located.

534 **V. FIRPTA TAX WITHHOLDING:** If a seller of U.S. real property is a "foreign person" as defined by FIRPTA,
535 Section 1445 of the Internal Revenue Code ("Code") requires the buyer of the real property to withhold up to 15%
536 of the amount realized by the seller on the transfer and remit the withheld amount to the Internal Revenue Service
537 (IRS) unless an exemption to the required withholding applies or the seller has obtained a Withholding Certificate
538 from the IRS authorizing a reduced amount of withholding.

539 (i) No withholding is required under Section 1445 of the Code if the Seller is not a "foreign person". Seller can
540 provide proof of non-foreign status to Buyer by delivery of written certification signed under penalties of perjury,
541 stating that Seller is not a foreign person and containing Seller's name, U.S. taxpayer identification number and
542 home address (or office address, in the case of an entity), as provided for in 26 CFR 1.1445-2(b). Otherwise, Buyer
543 shall withhold the applicable percentage of the amount realized by Seller on the transfer and timely remit said funds
544 to the IRS.

545 (ii) If Seller is a foreign person and has received a Withholding Certificate from the IRS which provides for reduced
546 or eliminated withholding in this transaction and provides same to Buyer by Closing, then Buyer shall withhold the
547 reduced sum required, if any, and timely remit said funds to the IRS.

548 (iii) If prior to Closing Seller has submitted a completed application to the IRS for a Withholding Certificate and has
549 provided to Buyer the notice required by 26 CFR 1.1445-1(c) (2)(i)(B) but no Withholding Certificate has been
550 received as of Closing, Buyer shall, at Closing, withhold the applicable percentage of the amount realized by Seller
551 on the transfer and, at Buyer's option, either (a) timely remit the withheld funds to the IRS or (b) place the funds in
552 escrow, at Seller's expense, with an escrow agent selected by Buyer and pursuant to terms negotiated by the

Buyer's Initials _____ Page 10 of 12 Seller's Initials _____
FloridaRealtors/FloridaBar-ASIS-5 Rev.4/17 © 2017 Florida Realtors® and The Florida Bar. All rights reserved.

dotloop signature verification: [illegible]

## STANDARDS FOR REAL ESTATE TRANSACTIONS ("STANDARDS") CONTINUED

553 parties, to be subsequently disbursed in accordance with the Withholding Certificate issued by the IRS or remitted
554 directly to the IRS if the Buyer's application is rejected or upon terms set forth in the escrow agreement.
555 (iv) In the event the net proceeds due Seller are not sufficient to meet the withholding requirement(s) in this
556 transaction, Seller shall deliver to Buyer, at Closing, the additional COLLECTED funds necessary to satisfy the
557 applicable requirement and thereafter Buyer shall timely remit said funds to the IRS or escrow the funds for
558 disbursement in accordance with the final determination of the IRS, as applicable.
559 (v) Upon remitting funds to the IRS pursuant to this STANDARD, Buyer shall provide Seller copies of IRS Forms
560 8288 and 8288-A, as filed.
561 **W. RESERVED**
562 **X. BUYER WAIVER OF CLAIMS:** *To the extent permitted by law, Buyer waives any claims against Seller*
563 *and against any real estate licensee involved in the negotiation of this Contract for any damage or defects*
564 *pertaining to the physical condition of the Property that may exist at Closing of this Contract and be*
565 *subsequently discovered by the Buyer or anyone claiming* by, through, under or against the Buyer. *This*
566 *provision does not relieve Seller's obligation to comply with Paragraph 10(j). This Standard X shall survive*
567 *Closing.*

568 ## ADDENDA AND ADDITIONAL TERMS

569* **19. ADDENDA:** The following additional terms are included in the attached addenda or riders and incorporated into this
570 Contract (**Check if applicable**):

| | | |
|---|---|---|
| ☐ A. Condominium Rider | ☐ K. RESERVED | ☐ T. Pre-Closing Occupancy |
| ☐ B. Homeowners' Assn. | ☐ L. RESERVED | ☐ U. Post-Closing Occupancy |
| ☐ C. Seller Financing | ☐ M. Defective Drywall | ☐ V. Sale of Buyer's Property |
| ☐ D. Mortgage Assumption | ☐ N. Coastal Construction Control | ☐ W. Back-up Contract |
| ☐ E. FHA/VA Financing |     Line | ☐ X. Kick-out Clause |
| ☐ F. Appraisal Contingency | ☐ O. Insulation Disclosure | ☐ Y. Seller's Attorney Approval |
| ☐ G. Short Sale | ☑ P. Lead Paint Disclosure (Pre-1978) | ☐ Z. Buyer's Attorney Approval |
| ☐ H. Homeowners/Flood Ins. | ☐ Q. Housing for Older Persons | ☐ AA. Licensee Property Interest |
| ☐ I. RESERVED | ☐ R. Rezoning | ☐ BB. Binding Arbitration |
| ☐ J. Interest-Bearing Acct. | ☐ S. Lease Purchase/ Lease Option | ☐ Other:_____ |

571* **20. ADDITIONAL TERMS:**

572 Unless notified otherwise in writing, if Coldwell Banker is identified as the cooperating broker, the
573 company and its sales associates are representing the Buyer in a Transaction Brokerage capacity in
574 accordance with §475.278(2), Fla. Stat.
575
576 Seller to verify that "The Birds of Paradise" Resort License described below is active/valid and shall be
577 transferred in its entirety to Buyer at closing;
578 This Resort License issued to "The Birds of Paradise" by The State of Florida permits this property which
579 is a residentially zoned R-2 Single Family dwelling to operate as a Private Resort. The minimum rental
580 period is one week. No exterior signage or local media advertising is permitted. There are no other
581 restrictions. There is no other Licensed Resort in a residentially zoned neighborhood except "The Birds
582 of Paradise" in the entire Continental United States.
583
584
585
586
587

588 ## COUNTER-OFFER/REJECTION

589* ☐ Seller counters Buyer's offer (to accept the counter-offer, Buyer must sign or initial the counter-offered terms and
590 deliver a copy of the acceptance to Seller).
591* ☐ Seller rejects Buyer's offer.

Buyer's Initials [SWM] 05/15/17      Page 11 of 12      Seller's Initials [JPM]

dotloop signature verification: www.dotloop.com/my/verification/DL-244430983-5-2124

592   **THIS IS INTENDED TO BE A LEGALLY BINDING CONTRACT. IF NOT FULLY UNDERSTOOD, SEEK THE**
593   **ADVICE OF AN ATTORNEY PRIOR TO SIGNING.**

594   **THIS FORM HAS BEEN APPROVED BY THE FLORIDA REALTORS AND THE FLORIDA BAR.**

595   *Approval of this form by the Florida Realtors and The Florida Bar does not constitute an opinion that any of the*
596   *terms and conditions in this Contract should be accepted by the parties in a particular transaction. Terms and*
597   *conditions should be negotiated based upon the respective interests, objectives and bargaining positions of all*
598   *interested persons.*

599   AN ASTERISK (*) FOLLOWING A LINE NUMBER IN THE MARGIN INDICATES THE LINE CONTAINS A BLANK
600   TO BE COMPLETED.

601*  Buyer: *Steven a. Macdonald*      dotloop verified
                                         05/15/17 8:49PM EDT
                                         ZVMY-FX2O-GFUZ-6MCU   Date: _____

602*  Buyer: _____      Date: _____

603*  Seller: *Jim R. J. Jedulson*      Date: *05/15/2017*

604*  Seller: _____      Date: _____

605   Buyer's address for purposes of notice      Seller's address for purposes of notice
606*
607*
608*

609   **BROKER:** Listing and Cooperating Brokers, if any, named below (collectively, "Broker"), are the only Brokers
610   entitled to compensation in connection with this Contract. Instruction to Closing Agent: Seller and Buyer direct
611   Closing Agent to disburse at Closing the full amount of the brokerage fees as specified in separate brokerage
612   agreements with the parties and cooperative agreements between the Brokers, except to the extent Broker has
613   retained such fees from the escrowed funds. This Contract shall not modify any MLS or other offer of compensation
614   made by Seller or Listing Broker to Cooperating Brokers.

615*  Michael B. Hughes, P.A. #261503009      Rafal Wazio
616   **Cooperating Sales Associate, if any**      **Listing Sales Associate**

617*  Coldwell Banker      Sand Key Realty
618   **Cooperating Broker, if any**      **Listing Broker**

Buyer's Initials [ *SWM* 05/15/17 ] [    ]      Page 12 of 12      Seller's Initials [ *JMW* ] [    ]
FloridaRealtors/FloridaBar-ASIS-5   Rev.4/17 © 2017 Florida Realtors® and The Florida Bar. All rights reserved.

# EXHIBIT 4



STATE OF FLORIDA

DEPARTMENT OF BUSINESS AND PROFESSIONAL REGULATION

DIVISION OF HOTELS AND RESTAURANTS
1940 NORTH MONROE STREET                          850-487-1395
NORTHWOOD CENTRE
TALLAHASSEE         FL 32399-1015


THE BIRD OF PARADISE LLC
OLD ANHEUSER BUSCH ESTATE
2817 PASS A GRILLE WAY
ST.PETE BEACH         FL 33706


Congratulations! With this license you become one of the nearly one million Floridians licensed by the Department of Business and Professional Regulation. Our professionals and businesses range from architects to yacht brokers, from boxers to barbeque restaurants, and they keep Florida's economy strong.

Every day we work to improve the way we do business in order to serve you better. For information about our services, please log onto www.myfloridalicense.com. There you can find more information about our divisions and the regulations that impact you, subscribe to department newsletters and learn more about the Department's initiatives.

Our mission at the Department is: License Efficiently, Regulate Fairly. We constantly strive to serve you better so that you can serve your customers. Thank you for doing business in Florida, and congratulations on your new license!



STATE OF FLORIDA                          AC# 5420480
DEPARTMENT OF BUSINESS AND
PROFESSIONAL REGULATION

DWE6215636    01/20/11 100308060

SINGLE RESORT DWELLING (2007)
THE BIRD OF PARADISE LLC
OLD ANHEUSER BUSCH ESTATE

IS LICENSED under the provisions of Ch.509 FS.
Expiration date: FEB 1, 2012         L11012000349

---

DETACH HERE

---

# 5420480              STATE OF FLORIDA

DEPARTMENT OF BUSINESS AND PROFESSIONAL REGULATION
DIVISION OF HOTELS AND RESTAURANTS
                                              SEQ# L11012000349

| DATE | BATCH NUMBER | LICENSE NBR | |
|---|---|---|---|
| 01/20/2011 | 100308060 | DWE6215636 | NBR. OF UNITS: 1 |

The SINGLE RESORT DWELLING (2007)
Named below IS LICENSED                                   NON-
Under the provisions of Chapter 509 FS.
Expiration date: FEB 1, 2012                        TRANSFERABLE .


THE BIRD OF PARADISE LLC
OLD ANHEUSER BUSCH ESTATE
2707 PASS-A-GRILLE WAY
ST.PETE BEACH         FL 33706


RICK SCOTT                                       CHARLIE LIEM
GOVERNOR                                          SECRETARY
                    DISPLAY AS REQUIRED BY LAW

BOP000146

# EXHIBIT 5

MEMBERSHIP INTEREST PURCHASE AGREEMENT

This MEMBERSHIP INTEREST PURCHASE AGREEMENT (this "Agreement"), dated as of June 16, 2017, is entered into by and among BARRACUDA CLUB LLC, a Florida limited liability company (the "Buyer"), THE BIRD OF PARADISE LLC, a Florida limited liability company (the "Company"), and John De Silva, in his capacity as sole member of the Company (the "Seller").

BACKGROUND:

(A)    The Seller is the beneficial and legal owner of 100% of the membership interests in the Company (including all rights of Seller as a member of the Company, all governance and voting rights and all rights of Seller under the Act (as defined below) with respect to the Company, the "Purchased Interests");

(B)    The Buyer wishes to acquire the Purchased Interests and the Seller wishes to sell the Purchased Interests to Buyer on the terms of this Agreement;

(C)    The parties hereto desire that, concurrently with its purchase of the Purchased Interests, the Buyer will be admitted as the sole member (within the meaning of the Act) of the Company, the Seller will be deemed to have withdrawn as a member (within the meaning of the Act) of the Company and the Buyer will own one hundred percent (100%) of the membership interests of the Company, including the sole right to all capital and profits of the Company;

(D)    The Company owns, as its sole asset, the License (as defined below);

(E)    The Seller is the Company's sole member and manager, and Buyer has requested certain representations and warranties from him as a condition to purchasing the Purchased Interests; and

(F)    The parties hereto desire to set forth certain representations, warranties, and covenants made by each to the other as an inducement to the consummation of the sale and certain additional agreements related to the sale.

AGREEMENT

The parties hereto agree as follows:

1.    Purchase and Sale; Assignment of Purchased Interests.

(a)    Concurrently with the execution and delivery of this Agreement, Buyer shall deliver to the Seller the purchase price of $10.00 for the Purchased Interests (the "Purchase Price") and, effective upon the payment of the Purchase Price, the Seller hereby sells, assigns and transfers to Buyer all of his Seller's right, title and interest in and to the Purchased Interest, free and clear of all Encumbrances (as

defined below).  The payment of the Purchase Price and the assignment of the Purchased Interests on the date hereof are referred to herein as the "Closing."

(b)     The Purchase Price shall be paid by cashier's check, wire transfer or other means approved by the Seller.

(c)     In this Agreement, unless the context otherwise requires: (i) references to this Agreement are references to this Agreement and to the Schedules hereto; (ii) references to any party to this Agreement include references to its respective successors and permitted assigns; (iii) references to a judgment include references to any order, writ, injunction, decree, determination or award of any court or tribunal; (iv) references to a "Person" means any individual, company, corporation (whether public, private or government), corporate body, association, authority, partnership, limited liability company, firm, joint venture, business entity, trust or government agency; (v) references to any document (including this Agreement) are references to that document as amended, consolidated, supplemented, or replaced by the parties thereto from time to time; (vi) the word "affiliate" means, as to the Person in question, any Person that directly or indirectly controls, is controlled by, or is under common control with, the entity in question and any successors or assigns of such entities; (vii) the term "control" means possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person whether through ownership of voting securities, by contract or otherwise; and (viii) the term "knowledge" or "knowledge of the Company" means the actual knowledge of the Seller after due inquiry, provided that, with respect to any facts, events or circumstances, "knowledge" means only the actual knowledge of the Seller; (ix) the term "Proceeding" means and refers to any action, arbitration, audit, hearing, investigation, litigation, suit or similar proceeding (whether civil, criminal, administrative, judicial or investigative, whether formal or informal, whether public or private) commenced, brought, conducted or heard by or before, or otherwise involving, any governmental body or arbitrator; (x) the term "Law" means and refers to any statute, law, ordinance, regulation, rule, code, order, constitution, treaty, common law, judgment, decree, other requirement or rule of law of any Governmental Authority; and (xi) the term "Governmental Authority" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), or any arbitrator, court or tribunal of competent jurisdiction.

2.     Representations and Warranties of Seller.  The Seller (except as expressly provided otherwise), hereby represents and warrants to Buyer the following as of the date hereof:

(a)     Binding Agreement; Absence of Conflicts.  The Seller hereby represents and warrants to Buyer as follows:

(i)     This Agreement has been duly executed and delivered by the Seller and (assuming due execution and delivery by Buyer) constitutes the legal, valid and binding obligation of the Seller, enforceable against the Seller in accordance with its terms.

2

(ii)     The Purchased Interest of the Seller has been duly authorized, is validly issued, and is owned of record and beneficially by the Seller, free and clear of all liens, pledges, security interests, charges, claims, encumbrances, agreements, options, voting trusts, proxies and other arrangements or restrictions of any kind (the "Encumbrances"). Upon consummation of the transactions contemplated by this Agreement, Buyer shall own the Purchased Interests, free and clear of all Encumbrances.

(iii)     The execution, delivery and performance by the Seller of this Agreement does not conflict with, violate or result in the breach of, or create any Encumbrance on the Purchased Interest of the Seller pursuant to any agreement, instrument, order, judgment, decree, law or governmental regulation to which the Seller is a party or is subject or by which the Purchased Interest is bound.

(iv)     No governmental, administrative or other third party consents or approvals are required by or with respect to the Seller in connection with the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby.

(b)     Capitalization. The Seller owns all of the Company's currently issued and outstanding membership interests and there are no other owners of the Company.  Additionally, no other equity or ownership interests of the Company, or securities or other rights convertible into or exchangeable for such equity or other ownership interests in the Company, are outstanding. There are no outstanding or authorized options, warrants, purchase rights, subscription rights, conversion rights, exchange rights, or other contracts or commitments that could require the Company to issue, sell, or otherwise cause to become outstanding any of its equity or ownership interests.  There is no voting trust, proxy or other agreement or understanding with respect to the voting of any of the membership units of the Company, including the Purchased Interests.

(c)     Subsidiaries. The Company does not currently own or control, directly or indirectly, any interest in any other Person, and is not a participant in any joint venture, partnership or similar arrangement.

(d)     Licensure.  The Company is the holder of that certain Vacation Rental – Dwelling License, License Number DWE6215636, issued by the Florida Department of Business and Professional Regulation (the "License"), which permits the Company, which is a residentially zoned R-2 single family dwelling, to operate as a private resort at the property located at 2707 Pass-A-Grille Way, St. Pete Beach, FL 33706 (the "Property").  The License represents the all of the licenses and permits required for the operation of a private resort at the Property as currently operated.  The License is in good standing, in full force and effect and not subject to meritorious challenge.  The Company is in compliance in all material respects with the terms of the License, and neither the Company nor the Seller has received any written notice or communication from any Governmental Authority regarding any violation of the License.  No event has occurred and is pending with respect to the License, whether after notice or the passing of time or both, that would serve as grounds for or otherwise authorize the suspension, revocation, or termination of the License or impair the rights of any holder thereof.  All pending applications required to have been filed by the Company for the renewal of the License.

3

(e)     <u>Governmental Consents and Filings</u>.  No governmental, administrative or other third party consents, licenses or approvals are required by or with respect to the Company in connection with the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby.

(f)     <u>Contracts</u>.  <u>Schedule 2(f)</u> is a list of all commitments, contracts, leases and agreements, whether written or oral ("<u>Contracts</u>"), to which the Company is a party.  The Company has delivered to Buyer true and correct copies of all Contracts, including any and all amendments and other modifications thereto.

(g)     <u>Title to and Condition of Property; Leases</u>.  The Company does not own or lease any real property.  The Company has good and marketable title or a valid interest in all personal property and other assets, in each case subject to no mortgage, pledge, lien, security interest, lease, charge or encumbrance, other than liens resulting from taxes which have not yet become delinquent and liens, the interests of lessors in leased property and encumbrances which do not in any case materially detract from the value of the property subject thereto or materially impair the operations of the Company and in all such cases have arisen in the ordinary course of business.

(h)     <u>Litigation or Proceedings</u>. The Company has not received written notice of any claims, actions, suits, proceedings or investigations pending or threatened against the Company, the Seller or any officer, director or manager of the Company, at law or in equity, or before or by any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality wherever located, and to the knowledge of the Company, no such claims, actions, suits, proceedings or investigations are pending or have been threatened.  The Company is not in default under any order of any court or federal, state, municipal, or other governmental department, commission, board, bureau, agency or instrumentality wherever located.  There is no claim, action, suit, proceeding or investigation pending or, to the knowledge of the Company, threatened against or affecting the Company.

(i)     <u>Tax Returns and Payments</u>.  There are no federal, state, county, local or foreign taxes now due and payable by the Company that have not been timely paid.  There are no accrued and unpaid federal, state, country, local or foreign taxes of the Company which are due, whether or not assessed or disputed.  There have been no examinations or audits of any tax returns or reports by any applicable federal, state, local or foreign governmental agency, except as may have been completed and resolved fully.  The Company has duly and timely filed all federal, state, county, local and foreign tax returns required to have been filed by it (subject to extensions and possible late filings that have no present adverse consequences) and there are in effect no waivers of applicable statutes of limitations with respect to taxes for any year.  Since formation, the Company has not elected to be taxed as a corporation.

(j)     <u>No Brokers</u>.  No broker, finder or investment banker is entitled to any brokerage, finders or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of the Seller.

4

3.     Representation and Warranties of Buyer.

       (a)     Binding Agreement.  This Agreement has been duly executed and delivered by Buyer and (assuming due execution and delivery by the Seller) constitutes a legal, valid and binding obligation of Buyer enforceable against Buyer in accordance with its terms.

       (b)     Governmental Consents and Filings.  No governmental, administrative or other third party consents or approvals are required by or with respect to Buyer in connection with the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby.

       (c)     No Brokers.  No broker, finder or investment banker is entitled to any brokerage, finders or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Buyer.

4.     Admission of Buyer to the Company.  Notwithstanding anything to the contrary, simultaneously with the Closing, the Buyer is hereby admitted to the Company as the sole member of the Company and the holder of the Purchased Interests and the Seller hereby withdraws as the sole member of the Company.

5.     Continuation of the Company.  For the avoidance of doubt and notwithstanding anything to the contrary, the assignment of the Purchased Interests and the admission of the Buyer as the sole member of the Company and as the holder of the Purchased Interests shall not dissolve the Company and the Company shall continue without dissolution.

6.     Consent and Waiver.  The Company and the Seller (as the sole member of the Company) hereby (a) consents to and approves the sale and assignment of the Purchased Interests and the other transactions contemplated hereby, and (b) waives any prohibition, restriction or condition contained in any operating agreement governing the Company or under applicable Law that is applicable to the sale and assignment of the Purchased Interests pursuant to this Agreement.

7.     Releases.  Each of the Company and the Seller hereby releases the Company of and from any and all claims, demands, causes of actions, covenants, contracts whatsoever, both at law and in equity, now existing or hereafter existing, or which may hereafter arise, from the existing state of things, relating in any way to the Company and any actions taken by the Company relating in any way to the Company or any aspect of its business.

8.     Indemnification.

       (a)     Indemnification by Seller.  From and after the Closing, the Seller agrees to defend, indemnify and hold harmless the Company, Buyer and its agents (each, a "Buyer Indemnified Party") from, against and for any damages, claims, costs, losses, liabilities, expenses or obligations (including reasonable attorneys' fees and associated expenses), whether or not involving a third-party claim, but excluding any loss of profits (collectively, "Losses"), incurred or suffered by a Buyer Indemnified Party as a result of or arising from: (i) any breach of or inaccuracy in any representation or warranty in Section 2 of this Agreement or in any document executed as a condition to this Agreement (collectively the

5

"Transaction Documents") and (ii) any breach of a covenant, obligation or agreement of the Seller in this Agreement or any other Transaction Document.

(b)      Indemnification by Buyer.  From and after the Closing, Buyer and the Company, jointly and severally, agree to defend, indemnify and hold harmless the Seller (each, a "Seller Indemnified Party") from, against and for any Losses incurred or suffered by the Seller Indemnified Parties as a result of or arising from (i) any breach of or inaccuracy in any representation or warranty made by Buyer in this Agreement or any other Transaction Document or (ii) any breach of a covenant, obligation or agreement of Buyer in this Agreement or any other Transaction Document.

(c)      Procedure for Indemnification – Non Third Party Claims.  Whenever any claim shall arise for indemnification hereunder not involving a demand, claim, action or Proceeding made or brought by a third party, including without limitation a government agency, the party to be indemnified shall notify the indemnifying party promptly after obtaining actual knowledge of the facts constituting the basis for such claim. The notice to the indemnifying party shall specify, if known, the amount or an estimate of the amount of the liability arising therefrom.

9.      Information and Records.  Promptly after the date hereof and in no event later than five (5) days after the Closing, the Seller shall return to Buyer all copies of such books, records, files, documents or other information, in hard copy and/or electronic format, related to the Company or its business that are in the possession or control of the Seller or his affiliates, agents, employees or representatives, including but not limited to, any books, records, files, documents or other information relating to the License.

10.      Survival.  All representations, warranties, covenants and indemnities contained herein shall survive the execution and delivery of this Agreement and the purchase and sale of the Purchased Interests hereunder, until the date that is two (2) years from the date of this Agreement.

11.      Further Assurances.  Each of the parties hereto shall execute and deliver such additional documents, instruments, conveyances and assurances, and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement.

12.      Expenses.  All costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses.

13.      Notices.  All notices, requests, consents, claims, demands, waivers and other communications hereunder (each, a "Notice") shall be in writing and addressed to the parties at the addresses set forth on the signature pages to this Agreement (or to such other address that may be designated by the receiving party from time to time in accordance with this section). All Notices shall be delivered by personal delivery, nationally recognized overnight courier (with all fees pre-paid), facsimile or e-mail of a PDF document (with confirmation of transmission) or certified or registered mail (in each case, return receipt requested, postage prepaid). Except as otherwise provided in this Agreement, a Notice is effective only (a) upon receipt by the receiving party, and (b) if the party giving the Notice has complied with the requirements of this Section.

6

14.    Entire Agreement. This Agreement constitutes the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings, agreements, representations and warranties, both written and oral, with respect to such subject matter.

15.    Successor and Assigns. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. No party may assign any of its rights or obligations hereunder without the prior written consent of the other parties hereto, which consent shall not be unreasonably withheld or delayed.

16.    Headings. The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

17.    Amendment and Modification; Waiver. This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. Except as otherwise set forth in this Agreement, no failure to exercise, or delay in exercising, any rights, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

18.    Severability. If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

19.    Governing Law; Submission to Jurisdiction. This Agreement shall be governed by and construed in accordance with the internal laws of the State of Florida without giving effect to any choice or conflict of law provision or rule (whether of the State of Florida or any other jurisdiction). Any legal suit, action or proceeding arising out of or based upon this Agreement or the transactions contemplated hereby may be instituted in the federal courts of the United States or the courts of the State of Florida in each case located in the County of Hillsborough, and each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action or proceeding. Service of process, summons, notice or other document by mail to such party's address set forth herein shall be effective service of process for any suit, action or other proceeding brought in any such court. The parties irrevocably and unconditionally waive any objection to the laying of venue of any suit, action or any proceeding in such courts and irrevocably waive and agree not to plead or claim in any such court that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the date first written above.

BUYER:

**BARRACUDA CLUB LLC,**
a Florida limited liability company

By: _____

Name: Joshua Keleske
Title:   Vice President

Address:

_____
_____
_____

SELLER:

_____
**JOHN DE SILVA**

Address:

_____
_____
_____

COMPANY:

**THE BIRD OF PARADISE LLC,**
a Florida limited liability company

By: _____

Name:  John De Silva
Title:   Managing Member

Address:

_____
_____
_____

*Signature Page to Membership Unit Purchase Agreement*

# EXHIBIT 6

**2018  FLORIDA LIMITED LIABILITY COMPANY AMENDED ANNUAL REPORT**

DOCUMENT# L04000092603

**FILED**
**Apr 18, 2018**
**Secretary of State**
**CC9584339932**

**Entity Name:** THE BIRD OF PARADISE, LLC

**Current Principal  Place of Business:**

1311 N. WESTSHORE BLVD.
 SUITE 101A
TAMPA, FL 33607

**Current Mailing Address:**

1311 N. WESTSHORE BLVD.
 SUITE 101A
TAMPA, FL 33607 US

**FEI Number: NOT APPLICABLE**                          **Certificate of Status Desired:** No

**Name and Address of Current Registered Agent:**

KELESKE, JOSHUA T
3333 W. KENNEDY BLVD.
 SUITE 204
TAMPA FL 33609 US

*The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.*

SIGNATURE:  JOSHUA T. KELESKE                                                04/18/2018
              Electronic Signature of Registered Agent                              Date

**Authorized Person(s) Detail :**

Title             MGRM

Name              MACDONALD, STEVEN A

Address           1311 N. WESTSHORE BLVD.
                   SUITE 101A

City-State-Zip:   TAMPA FL  33607

*I hereby certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am a managing member or manager of the limited liability company or the receiver or trustee empowered to execute this report as required by Chapter 605, Florida Statutes; and that my name appears above, or on an attachment with all other like empowered.*

SIGNATURE: STEVEN A. MACDONALD                    MANAGER                04/18/2018
        Electronic Signature of Signing Authorized Person(s) Detail                    Date

# EXHIBIT 7



Department of State  /  Division of Corporations  /  Search Records  /  Search by Document Number  /

# Detail by Document Number

Florida Limited Liability Company
THE BIRD OF PARADISE, LLC

**Filing Information**

| | |
|---|---|
| **Document Number** | L04000092603 |
| **FEI/EIN Number** | N/A |
| **Date Filed** | 12/22/2004 |
| **State** | FL |
| **Status** | INACTIVE |
| **Last Event** | ADMIN DISSOLUTION FOR |
| ANNUAL REPORT | |
| **Event Date Filed** | 09/25/2020 |
| **Event Effective Date** | NONE |

**Principal Address**

1311 N. Westshore Blvd.
Suite 101A
Tampa, FL 33607

Changed: 04/18/2018

**Mailing Address**

1311 N. Westshore Blvd.
Suite 101A
Tampa, FL 33607

Changed: 04/18/2018

**Registered Agent Name & Address**

Keleske, Joshua T
3333 W. Kennedy Blvd.
Suite 204
Tampa, FL 33609

Name Changed: 04/18/2018

Address Changed: 04/18/2018

**Authorized Person(s) Detail**

**Name & Address**

**Title MGRM**

MACDONALD, STEVEN A
1311 N. Westshore Blvd.
Suite 101A
Tampa, FL 33607

### Annual Reports

| Report Year | Filed Date |
|---|---|
| 2018 | 02/10/2018 |
| 2018 | 04/18/2018 |
| 2019 | 04/29/2019 |

### Document Images

| | |
|---|---|
| 04/29/2019 -- ANNUAL REPORT | View image in PDF format |
| 04/18/2018 -- AMENDED ANNUAL REPORT | View image in PDF format |
| 02/10/2018 -- ANNUAL REPORT | View image in PDF format |
| 04/07/2017 -- ANNUAL REPORT | View image in PDF format |
| 03/25/2016 -- ANNUAL REPORT | View image in PDF format |
| 02/22/2015 -- ANNUAL REPORT | View image in PDF format |
| 01/08/2014 -- ANNUAL REPORT | View image in PDF format |
| 01/31/2013 -- ANNUAL REPORT | View image in PDF format |
| 01/25/2012 -- ANNUAL REPORT | View image in PDF format |
| 02/15/2011 -- ANNUAL REPORT | View image in PDF format |
| 02/15/2010 -- ANNUAL REPORT | View image in PDF format |
| 03/28/2009 -- ANNUAL REPORT | View image in PDF format |
| 01/10/2008 -- ANNUAL REPORT | View image in PDF format |
| 01/08/2007 -- ANNUAL REPORT | View image in PDF format |
| 01/19/2006 -- ANNUAL REPORT | View image in PDF format |
| 08/05/2005 -- ANNUAL REPORT | View image in PDF format |
| 12/22/2004 -- Florida Limited Liabilites | View image in PDF format |

Florida Department of State, Division of Corporations

# EXHIBIT 8

*10:42:28 AM 5/13/2021*

**Data Contained In Search Results Is Current As Of 05/13/2021 10:41 AM.**

## Search Results

**Please see our glossary of terms for an explanation of the license status shown in these search results.**

**For additional information, including any complaints or discipline, click on the name.**

| License Type | Name | Name Type | License Number/ Rank | Status/Expires |
|---|---|---|---|---|
| Vacation Rental - Dwelling | **BARRACUDA CLUB LLC** | Primary | DWE6215636 Dwelling | Current, Active 02/01/2022 |

| | |
|---|---|
| **License Location Address*:** | 2707 PASS A GRILLE WAY ST.PETE BEACH, FL 33706 |
| **Main Address*:** | 1311 N WESTSHORE BLVD STE 101 A TAMPA, FL 33607 |
| **Mailing Address*:** | 1311 N WESTSHORE BLVD STE 101 A TAMPA, FL 33607 |

| License Type | Name | Name Type | License Number/ Rank | Status/Expires |
|---|---|---|---|---|
| Vacation Rental - Dwelling | **BARRACUDA CLUB LLC** | DBA | DWE6215636 Dwelling | Current, Active 02/01/2022 |

| | |
|---|---|
| **License Location Address*:** | 2707 PASS A GRILLE WAY ST.PETE BEACH, FL 33706 |
| **Main Address*:** | 1311 N WESTSHORE BLVD STE 101 A TAMPA, FL 33607 |
| **Mailing Address*:** | 1311 N WESTSHORE BLVD STE 101 A TAMPA, FL 33607 |



**\* denotes**
   Main Address - This address is the Primary Address on file.
   Mailing Address - This is the address where the mail associated with a particular license will be sent (if different from the Main or License Location addresses).
   License Location Address - This is the address where the place of business is physically located.

**2601 Blair Stone Road, Tallahassee FL 32399** :: Email: **Customer Contact Center** :: Customer Contact Center: 850.487.1395

The State of Florida is an AA/EEO employer. **Copyright 2007-2010 State of Florida. Privacy Statement**

Under Florida law, email addresses are public records. If you do not want your email address released in response to a public-records request, do not send electronic mail to this entity. Instead, contact the office by phone or by traditional mail. If you have any questions, please contact 850.487.1395. *Pursuant to Section 455.275(1), Florida Statutes, effective October 1, 2012, licensees licensed under Chapter 455, F.S. must provide the Department with an email address if they have one. The emails provided may be used for official communication with the licensee. However email addresses are public record. If you do not wish to supply a personal address, please provide the Department with an email address which can be made available to the public.