UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE:  OIL SPILL by the OIL RIG | § | MDL NO. 2179 |
| "DEEPWATER HORIZON" in the | § | SECTION J |
| GULF OF MEXICO, on | § | |
| May 24, 2021 | § | JUDGE BARBIER |
| | § | MAG. JUDGE CURRAULT |
| This Document Relates to: | § | |
| Pleading Bundle B1 | § | |

---

| | | |
|---|---|---|
| CLASSY CYCLES, INC. | § | CIVIL ACTION  NO. 16 CV 05923 |
| | § | |
| | § | SECTION  J |
| VS. | § | |
| | § | |
| BP P.L.C.; BP AMERICA, INC.; BP | § | JUDGE BARBIER |
| | § | MAG. JUDGE CURRAULT |
| | § | |
| PRODUCTS NORTH AMERICA, INC.; | § | |
| BP AMERICA PRODUCTION COMPANY; | § | |
| BP EXPLORATION & PRODUCTION, INC. | § | JURY TRIAL DEMANDED |

### PLAINTIFF CLASSY CYCLES, INC.'s RESPONSE IN OPPOSITION TO BP'S MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiff, Classy Cycles, Inc., files this response in opposition to Defendants' Motion for

Summary Judgment (Rec. Doc. 27103):

**THE BUZBEE LAW FIRM**

By:   /S/ Anthony G. Buzbee
Anthony G. Buzbee
Attorney in Charge
State Bar No. 24001820
S.D. Tex. I.D. No. 22679
Caroline E. Adams
State Bar No. 24011198
600 Travis, Suite 7300
Houston, Texas 77002
Telephone: (713) 223-5393
Facsimile: (713) 223-5909
www.txattorneys.com

**ATTORNEYS FOR PLAINTIFF**

# TABLE OF CONTENTS

I.      SUMMARY ................................................................................1

II.     SUMMARY JUDGMENT EVIDENCE ..................................................1

III.    BACKGROUND ..........................................................................2

IV.     SUMMARY JUDGMENT ANALYSIS ..................................................4

V.      ARGUMENT AND ANALYSIS ........................................................5

        A. Plaintiff's 33 U.S.C. § 2702(b)(2)(E) Claim Survives ..................5

            1. The applicable statute and standard of OPA §

               2702(b)(2)(E) ....................................................................5

            2. Classy Cycles's losses are due to decreased tourism because

               of the oil beaches ..............................................................6

            3.  Plaintiff Lost Profits ........................................................8

        B.  Plaintiff's Claims for Lost Opportunities Survives as a Matter of

            Law

VI.     CONCLUSION ..........................................................................16

# Table of Authorities

*A & W Sheet Metal, Inc. v. Berg Mechanical, Inc.*, 653 So. 2d 158, 162 (La.App. 2nd Cir. 1995) ...................................................................................12

*Barnett v. Jabusch*, 649 So. 2d 1158, 1161 (La. App. 3rd Cir. 1995).....................12

*Blue Water Boating Inc v. Plains All Am. Pipeline L.P..., 2017 WL 405425, at *3 (C.D. Cal. Jan. 26, 2071)* ...........................................................................6

*Boateng v. BP, P.L.C.,* 779 F. App'x 217, 220 (5th Cir.)..........................................5

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986) ...........................................5

*Delta S.S. Lines, Inc. v. Avondale Shipyards, Inc*., 747 F.2d 995, 1001 (5th Cir. 1984) ...........................................................................................................14

*Folds v. Red Arrow Towbar Sales Co*., 378 So.2d 1054, 1059 (La. App. 2d Cir. 1979) ...........................................................................................................14

*Geddes v. Johnson*, CIVIL ACTION NO. 95-4137 SECTION "N", 1997 U.S. Dist. LEXIS 2154 (E.D. La. Feb. 27, 1997) ....................................................13

*Geddes v. Johnson*, CIVIL ACTION NO. 95-4137 SECTION "N", 1997 U.S. Dist. LEXIS 2154, at *2-3 (E.D. La. Feb. 27, 1997)....................................................12

*Gulf Eng'g Co., L.L.C. v. Dow Chemical Co*., 961 F.3d 763, 768 (5th Cir. 2020) 13, 11

*Guy Williams Realty v. Shamrock Const.*, 564 So. 2d 689, 694 (La.App. 5th Cir. 1990)...........................................................................................................12

*Haggerty v. March*, 480 So.2d 1064, 1068 (La. App. 5th Cir. 1985) ....................14

*Hall v. Arkansas-Louisiana Gas Co.*, 368 So. 2d 984, 991 (La. 1979)..................12

*Holt Atherton Ind., Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex. 1992) ........................12

*Koncinsky v. Smith*, 390 So.2d 1377, 1382-83 (La. App. 3rd Cir. 1980)...............14

*Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) ................................5

*Nebula Glass Int'l, Inc. v. Reichhold, Inc.*, 454 F.3d 1203, 1218 (11th Cir. 2006).14

*New Orleans Shrimp Co., Inc. v. Duplantis Truck Lines, Inc.*, 283 So.2d 521, 525

(La. App. 1st Cir. 1973) .......................................................................14

*Quantlab Techs., Ltd. (BVI) v. Kuharsky*, 696 F. App'x 682, 686 (5th Cir. 2017)..10

*Rice v. Harken Expl. Co.*, 250 F.3d 264, 266 (5th Cir. 2001) ...................................5

*Texas Instruments v. Teletron Energy Management, Inc.*, 877 S.W.2d 276 (Tex.

1994)...................................................................................................11

*Union Oil Co. v. Buffalo Marine Servs.*, 538 F. App'x 575, 576 (5th Cir. 2013)....13

*Union Oil Co. v. Buffalo Marine Servs.*, 538 F. App'x 575, 576 n.2 (5th Cir. 2013)

........................................................................................................14

*Water Craft Management, L.L.C. v. Mercury Marine*, 638 F.Supp.2d 619, 623

(M.D. La. 2009) .................................................................................14

# I.   SUMMARY

- Plaintiff's contemporaneous financial records show that its revenues ***decreased*** after the Spill with reasonable certainty. Rick Roof testified that any post spill increases were due to capital influxes due to loans, cashing out retirement funds, and contribution of savings. These contributions were not revenue resulting in profits to the business but rather the owners' survival response to the spill.

- Plaintiff's lost opportunities were exacerbated by its loss of earning capacity and lost earnings which took seven years to return to pre-spill revenues. The losses can be proved with a reasonable certainty, and are not required to be proofed by an exact calculation.

- The stay remains in place and additional discovery is warranted.

- Plaintiff does not contend that is suffered direct physical damage or losses due to commercial fishing. Plaintiff respectfully requests that the stay be lifted, full discovery allowed, and a docket control order regarding an amendment of pleadings be issued.

# II.   SUMMARY JUDGMENT EVIDENCE

**Exhibit A**     **Declaration of Colleen Swab**

      **Exhibit A1 Damage Evaluation**

      **Exhibit A2 Deposition of Colleen Swab.**

**Exhibit B.**    **Declaration of Rick Roof**

      **Exhibit B1 Monthly Revenues**

      **Exhibit B2 Deposition of Rick Roof, February 23, 2021.**

**Exhibit C.  Declaration of Caroline Adams**

Also, incorporated by reference are Plaintiff's evidence filed in Defendants' Motion for Summary Judgment:

      **Defense Exhibits 3 -20.**

## III.   BACKGROUND

### A.  The Plaintiff – Classy Cycles. Inc.

For over thirty years, Classy Cycles, Inc. successfully rented motorized cycles and moped vehicles to tourists in the Florida Peninsula and had the largest selection of street legal golf carts, mopeds, and motorcycles in the area.[1] At the time of the spill, Plaintiff operated from one central location with four depot locations in Panama City Beach, Florida.[2] The business was profitable and had low operating costs consisting of fuel, repairs, and payroll.[3]  Over the years, the family run business added vehicles and continued to grow offering the best mode of tourist travel and sold out season after season.[4]  The father and daughter team of Rick Roof and Colleen Swab, worked together tirelessly to build the business. Following the spill, it took a full six years for recovery.[5] Both have a passion for motorized vehicles and for tourism and keeping the business alive took its toll on the family.[6]

The business owners hired bookkeepers and accountants to manage the financials, and trusted them to do their job pre-spill.[7]  Unfortunately, the books for 2010 did not convey the true extent of the losses.[8]  It was not until after the oil spill, that clerical errors and omissions made by former employees were found, and emergency cash influxes made to keep the business afloat were found to be booked incorrectly as revenue.[9] Despite these known errors, losses resulted.  As a result, retirement accounts and savings were completely depleted and devastated, and health deteriorated so much as to put Rick Roof in the hospital with a major heart attack resulting from the financial

---

[1] See Exhibit A, Declaration of Colleen Swab § 2, and 3; Exhibit B, Declaration of Rick Roof § 2,3 and 4; Exhibit C.
[2] *Id.*
[3] *Id.*
[4] *Id.*
[5] *Id.*
[6] See Exhibit A, Declaration of Colleen Swab § 2, and 3.
[7] *Id.*
[8] *Id.*
[9] See Exhibit A, Declaration of Colleen Swab § 2,3 and Exhibit B, Declaration of Rick Roof § 7-9.

strain.[10]  In support of its prior filings, Classy Cycles submitted the following financials, which were believed to be accurate, except for the errors related to the booking of loans as sales and revenue:[11]

**Benchmark Calculation**

| 2007, 2008 & 2009 | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Revenue | 31,386 | 87,127 | 296,994 | 180,600 | 227,290 | 396,487 | 355,174 | 318,670 | 406,370 | 74,148 | 43,656 | 97,101 | 1,890,460 |
| Total Variable Costs | 10,589 | 35,589 | 155,031 | 54,586 | 60,330 | 108,746 | 58,371 | 99,063 | 92,881 | 36,044 | 8,054 | 138,511 | 848,668 |
| Total Variable Profit | 20,997 | 61,849 | 141,670 | 131,131 | 167,061 | 137,941 | 286,803 | 69,012 | 13,573 | 38,182 | 35,302 | 41,452 | 1,041,992 |

| Step 1 Calculation | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Variable Profit Benchmark Period | 0 | 0 | 0 | 0 | 0 | 137,941 | 286,803 | 69,012 | 13,573 | 29,182 | 35,302 | 41,452 | 519,902 |
| Variable Profit Compensation Period | 0 | 0 | 0 | 0 | 0 | 163,330 | 113,568 | 233,393 | 473,771 | 371,672 | 158,777 | 292,768 | 64,509 |
| Step 1 Compensation | 0 | 0 | 0 | 0 | 0 | 153,390 | 175,238 | 163,781 | 396,344 | 812,770 | 97,478 | 255,337 | 455,393 |

| Step 2 Calculation | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Benchmark Revenue | 31,386 | 87,127 | 296,994 | 180,600 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 869,446 |
| 2010 Revenue | 60,692 | 112,594 | 230,667 | 267,472 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 698,303 |
| Claimant Specific Factor | | | | | | | | | | | | | 1.0000% |
| General Adjustment Factor | | | | | | | | | | | | | 3.09% |
| Incremental Revenue | (June, July, August, September, October, November, December) | | | | | | | | | | | | $127,419.00 |
| Variable Margin Percentage | | | | | | | | | | | | | 58.29% |
| Step 2 Compensation | | | | | | | | | | | | | $67,991.00 |

| | Compensation |
|---|---|
| Step 1 & 2 Compensation | $113,294.00 |
| Risk Transfer Payment | $1,908,120.00 |
| Total Compensation | $1,911,539.00 |

In preparation of this claim, adjustments were made to account for the improperly marked revenues, which are shown with reasonable certainty.[12]

## B. The Oil Spill

On April 20, 2010, at approximately 9:45 p.m. CST, an uncontrolled well blowout caused explosions on the Deepwater Horizon, an oil rig vessel engaged in oil exploration drilling operations in the Gulf of Mexico. The explosions ignited a raging fire, fueled by gas spewing onto the vessel from the blown-out well. After burning for two days, the Deepwater Horizon sank to the ocean floor.  Classy Cycles, Inc. brought this suit against Defendants BP Exploration & Production, Inc., BP America Production Company, and all parties found to be responsible for the spill (collectively "BP")  for losses, injuries, and damages, including actual, compensatory and punitive damages, arising out of the catastrophic and avoidable oil spill in the Gulf of Mexico

---

[10] See Exhibit A, Declaration of Colleen Swab § 2, 3.
[11] See Exhibit A, Declaration of Colleen Swab § 2, 3; See Exhibit B2, p. 142-143.
[12] See Exhibit E, attached to Defendants' Motion for Summary Judgement, calculation of loss 2019, which is incorporated herein by reference.

caused by the April 20, 2010 explosion and fire aboard the Deepwater Horizon oil rig ("Deepwater Horizon"), and the resulting discharge of unprecedented volumes of crude oil into the Gulf of Mexico.

The BP Oil Spill dramatically reduced demand as beaches were vacant and families did not want to spend the vacation with oiled beaches and this business was hit very hard. As a result of the increase in vehicles prior to the spill, and reduction in demand post-spill, the family was struck with high levels of stress, and health issues which where a direct result of the spill.

The uncontrolled blowout caused explosions and a raging fire aboard the Deepwater Horizon; after burning for two days, the rig sank, commencing an oil spill of unprecedented proportion that damaged, depleted, and destroyed marine, estuarine, and coastal environments in the Gulf of Mexico, Louisiana, Mississippi, Alabama, Texas, and Florida (the "Oil Spill"). In fact, it is anticipated that the entire Gulf of Mexico ecosystem will be affected for a decade or more. In the twelve weeks it took to cap the blown-out well, over 210 million gallons of oil gushed unchecked into the Gulf of Mexico, causing widespread and disastrous environmental and economic damage to the people, businesses, and environment of the Gulf of Mexico.

This Complaint asserts claims under general federal maritime law, including federal common law and federal statutory law, specifically the Oil Pollution Act of 1990, seeking damages for the Plaintiff herein including actual, compensatory, and punitive damages, arising from the well blowout, fire, and explosions aboard, and sinking of, the Deepwater Horizon on April 20, 2010, and the subsequent Oil Spill in the Gulf of Mexico.

## IV.   SUMMARY JUDGMENT ANALYSIS

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Little v. Liquid Air Corp*., 37 F.3d 1069, 1075 (5th Cir. 1994). Once the movant points to the absence of a genuine dispute, the non-movant must "come forward with appropriate summary judgment evidence sufficient to sustain a finding in its favor on all issues on which it would bear the burden of proof at trial." See *Rice v. Harken Expl. Co*., 250 F.3d 264, 266 (5th Cir. 2001). Therefore, summary judgment is appropriate where the non-movant "fail[s] to produce summary judgment evidence of facts which, if viewed in the reasonable light most favorable to the [plaintiff], do not suffice to establish a viable OPA claim." *Id*. A plaintiff cannot satisfy its burden by only pointing to "some metaphysical doubt as to the material facts," "conclusory allegations," "unsubstantiated assertions," or "a scintilla of evidence." *See Little*, 37 F.3d at 1075 (internal quotations and citations omitted). There is no material dispute of facts where "the non-movant's 'critical evidence is so weak or tenuous on an essential fact needed to prove his claim 'that it could not support a judgment in favor of the nonmovant.'" *Boateng v. BP, P.L.C.,* 779 F. App'x 217, 220 (5th Cir.), cert. denied, 140 S. Ct. 616 (2019) (quoting *Little*, 37 F.3d at 1075).

## V. ARGUMENT AND ANALYSIS

### A. Plaintiff's 33 U.S.C. § 2702(b)(2)(E) Claim Survives

#### 1. The applicable statute and standard of OPA § 2702(b)(2)(E)

It is undisputed that under the Oil Pollution Act ("OPA"), a responsible party is liable for damages that "result from" the discharge, or substantial threat of discharge, of oil. 33 U.S.C. § 2702(a). Absent physical property damage, only economic losses "due to" the destruction of property or natural resources are compensable to private claimants under OPA. 33 U.S.C. § 2702(b)(2)(E) (compensable damages include "[d]amages equal to the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal

property, or natural resources"). Plaintiff is entitled to damages equal to the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources, which shall be recoverable by any claimant under OPA. 33 U.S.C. § 2702(b)(2)(E).

Plaintiff agrees that at the time of trial, after full discovery, it must establish that their economic losses were 'due to' the injury, destruction, or loss of property or natural resources that 'result[ed] from' the discharge or threatened discharge of oil." *In re Deepwater Horizon*, 168 F. Supp. 3d 908, 916 (E.D. La. 2016). Defendants cite the unpersuasive and distinguishable *Bluewater* case in support of their argument. An argument that in effect would void the purpose of OPA requiring evidence of actual oiling to the claimant's personal or real property – and convert this case to a general maritime claim. In *Bluewater*, the claimant failed to "clarify how the oil spill damaged its property—or the coastline immediately surrounding its property—and to what extent its losses stemmed from such damage" and both the OPA and *Blue Water Boating Inc v. Plains All Am. Pipeline L.P.., 2017 WL 405425, at *3 (C.D. Cal. Jan. 26, 2071) (which also involved an inapplicable* California Lempert-Keene-Seastrand Oil Spill Prevention and Response Act ("OSPRA") cause of action). That is not the case here, and the *Bluewater* case is neither binding or persuasive.[13]

### 2. Classy Cycles's losses are due to decreased tourism because of the oil beaches

Following the landfall of the oil spill in 2011, there was a distinct downward negative shift that can only be attributable to the oil spill as demonstrated by both the deposition testimony as well as financial statements, including tax returns.

---

[13] The 100,000 gallon oil spill on May 19, 2015 occurred near Refugio State Beach when a pipeline ruptured, and cannot be compared to BP's more than 200 million gallons that pumped into the Gulf of Mexico for 87 days which made it the biggest oil spill in United States history. See Exhibit B §4, Declaration of Rick Roof.

When asked, "And you talked about the fact that the spill caused you to have fewer customers, right?" Plaintiff replied, "Correct."[14] When questioned, "So the spill – you allege that the spill negatively impacted your revenues?, is that right?" Plaintiff answered, "Yes, ma'am." [15] And when asked, "So as I understand it, you contend that the spill caused you revenues to go down?" Plaintiff responded, "Right".[16] When asked "Did the spill cause your revenues to decrease in 2010? Plaintiff replied without hesitation, "Yes, they did."[17] Further, Plaintiff acknowledges that after the oil spill made landfall, Classy Cycles had to pay everything out of pocket because it didn't have any revenue coming in.[18]

Plaintiff satisfies OPA's requirement that its economic losses were due to the injury, destruction, or loss of property or natural resources that resulted from the discharge or threatened discharge of oil. To recover under the spill, Plaintiff must have evidence that customers and tourists cancelled their reservations and did not show up to rent carts and cycles because of oil contamination on the coast.[19] Accordingly, Plaintiff can meet its burden and show that its economic losses were due to the injury, destruction, or loss of property or natural resources that resulted from the discharge of threatened discharge of oil and link the property damage to the oil spill.

Plaintiff can easily meet its burden. When questioned, "How was Classy Cycles damaged as a result of the spill?" Plaintiff responded, "We had no customers. We had no customers and for the next -- for the next four years, it was bad. We didn't have customers and I know revenue was

---

[14] See Exhibit B2, Rick Roof Depo, Page 142:17-20.
[15] Id. at Page 142:17-24.
[16] Id., P. 142:17-24.
[17] Id., P. 91:23.
[18] Declaration B of Rick Roof §7, See Exhibit A Declaration of Colleen Swab.
[19] See Declaration B of Rick Roof §7, Declaration of Colleen Swab §8.

down and we had borrowed money and it was very hard. It was a hard time, we suffered a lot."[20]

Additionally, when asked, " I think I heard you say it was—it was bad for this next four years; is

that right? Plaintiff responded, "Yes, ma'am, because unfortunately everybody thought there was

tar and there was oil all over the beaches, that it was everywhere. And so unfortunately people

weren't coming here anymore."[21] "Tourists and customers. They weren't – the phones stopped

ringing – and it was just – people thought there was oil everywhere in Florida, so in our area. And

you know I mean people think there is tar bars on the beach you are not going to go there." "Yeah,

it went on for several years." "We did have tar balls. They were finding them on the beaches and

having cleanup. And so we did have -- we had oil that was on the beach, but the unfortunate thing

was is that you had the news that was playing how the oil was spilling every single day in the

water, every day. And we watched it every day."[22]

Plaintiff is able to establish a direct link between the timing of the oil spill and its loss of

customers, stating that it began to happen in mid-2010, after the oil spill and such happened

because they thought we had oil all over our beaches. Such was due to tar balls that were on the

beach. "They were scared, they didn't want to come to the beach because of the tar balls.

Customers stopped coming to the business because they thought we had oil all over the beaches."[23]

### 3.  Plaintiff Lost Profits

The oil spill made landfall on April 20, 2010. By examining, Plaintiff's profit and loss

statements from 2007 to the present date, one can obtain an accurate assessment of the impact that

the oil spill had on its business. Following the oil spill, making landfall in April of 2010, there was

---

[20] Exhibit A2, Swab Deposition, at P. 126:7 – P. 127: 25; P. 133: 16-24; P. 134:21-24; P. 136:12-21; P.143 ln 11-14;
P. 148:8-15; P. 153-154; P. 157.
[21] *Id*. at 126:18-24.
[22] *Id*. at 127:16-25.
[23] *Id*. at 123:19-23.

a distinct pattern of business records demonstrating that the spill had a directly negative impact on Plaintiff's business. By looking at past profit and lost statements and tax returns, one can obtain an accurate picture of the success of the Classy Cycles. Specifically, in 2007, Plaintiff's pre-spill records reflect a business non-EBITDA,[24] i.e. ordinary business income, of $199,783, in 2008, Plaintiff's business income was $403,119, in 2009, Plaintiff's business income was $470,602.[25] In 2010, Plaintiff had ordinary business income of $500,379, which was in error as it included improperly booked loans in the amount of $900,000.[26]   In 2011, Plaintiff's income decreased significantly all the way down to $71,501 and in 2012, income had still not fully recovered, remaining at $229,408.[27] In 2012, Plaintiff's business income remained at $279,038, still not fully recoverable from the oil spill.[28] When questioned about how the oil spill impacted business in his deposition, Plaintiff directly attributed the loss to the oil spill and no other reason.[29]

A review of certain financial documents easily establishes that not only did Plaintiff lose a lot of money as a result of the spill but that Plaintiff can meet OPA's causation standard in demonstrating that under OPA, a responsible party is liable for damages that "result from" the discharge, or substantial threat of discharge, of oil. 33 U.S.C. § 2702(a) and that Plaintiff can establish that its losses were directly caused by the spill. Plaintiff absolutely meets OPA's causation standard and can prove its damages under such. In consideration of such, Plaintiff has met its burden so as to overcome summary judgment at this time in establishing causation.

---

[24] Earnings before interest, taxes, depreciation, and amortization (EBITDA) is the valuation industry standard metric for evaluating the profitability of a business.
[25] See Defense Exhibits 6-7, incorporated by reference.
[26] See Exhibit A, Declaration of Colleen Swab §3-5; Exhibit B, Declaration of Roof §7-8; See Exhibit B(2), p. 142-3 and Defense Exhibits 6-16, which are incorporated as evidence by reference.
[27] See Defense Exhibits 9 and 10, incorporated herein by reference.
[28] See Defense Exhibit 12, incorporated herein by reference.
[29] See Exhibit A, Declaration of Colleen Swab §2-5; Exhibit B, Declaration of Roof §2-8;

OPA compensates only for "loss of profits or impairment of earning capacity" due to the damage resulting from the discharge or threatened discharge of oil. 33 U.S.C. § 2702(b)(2)(E) (emphasis added). Louisiana law likewise allows a plaintiff to recover lost profits that can be "proven with reasonable certainty and [are not] based on conjecture and speculation." *Gulf Eng'g Co., L.L.C. v. Dow Chemical Co*., 961 F.3d 763, 768 (5th Cir. 2020). A plaintiff "must show that the loss of profits is more probable than not" and support a claim "by more than mere estimates of loss." *Id*. (internal quotations omitted). A party seeking lost profits need not prove an exact calculation, but lost profits must be proved with "reasonable certainty." *In re Rushing*, 424 B.R. 747, 753 (Bankr. M.D. La. 2010) (sustaining objection to claim for lost profits where plaintiff did not introduce documents establishing sales). Plaintiff can prove damages by more than mere estimates of loss.[30]

"Loss of value to the plaintiff is usually measured by lost profits. To recover lost profits, a party must introduce "objective facts, figures, or data from which the amount of lost profits can be ascertained. Reasonable certainty is required to prove lost profits." *Quantlab Techs., Ltd. (BVI) v. Kuharsky*, 696 F. App'x 682, 686 (5th Cir. 2017).

Plaintiff can prove that its lost profits claim survives as a matter of law. Defendant argues that "Plaintiff did not have losses after the Spill. Plaintiff's income statements show revenues increased after the Spill. In 2009, Plaintiff's revenue increased from approximately $1.66 million in May through December 2009 to approximately $1.81 million in that same period in 2010. See SOF ¶¶ 13–14." This is false and contested.[31] because these numbers include injections of savings and retirement funds, which are verifiable errors.[32]  This fact does not make Plaintiff's finances

---

[30] See Exhibit E, attached to Defendants' Motion for Summary Judgement, calculation of loss 2019, which is incorporated herein by reference.
[31] See Plaintiff's Contested Issues of Fact filed contemporaneously, which is incorporated by reference.
[32] See Exhibit B Declaration of Rick Roof §7; Exhibit A, Declaration of Colleen Swab § 2-4.

estimates, but there are errors included in the profit and loss statements.  Plaintiff's tax returns similarly report increased revenues for the same reason, and the inclusion of emergency payments by BP.[33]  The statement that Plaintiff cannot recover under OPA damages because it did not suffer a loss is inaccurate and ignores testimony that the monies booked as revenue were not revenue but instead loans to the company.[34]

Defendant argues that Plaintiff had no losses or it cannot prove lost profits to any reasonable certainty. OPA compensates only for "loss of profits or impairment of earning capacity" due to the damage resulting from the discharge or threatened discharge of oil. 33 U.S.C. § 2702(b)(2)(E). Louisiana law likewise allows a plaintiff to recover lost profits that can be "proven with reasonable certainty and [are not] based on conjecture and speculation." *Gulf Eng'g Co., L.L.C. v. Dow Chemical Co*., 961 F.3d 763, 768 (5th Cir. 2020). A plaintiff "must show that the loss of profits is more probable than not" and support a claim "by more than mere estimates of loss." *Id*. (internal quotations omitted). A party seeking lost profits need not prove an exact calculation, but lost profits must be proved with "reasonable certainty." *In re Rushing*, 424 B.R. 747, 753 (Bankr. M.D. La. 2010) (sustaining objection to claim for lost profits where plaintiff did not introduce documents establishing sales). "Recovery of lost profits does not require that the loss be susceptible to exact calculation. *Texas Instruments v. Teletron Energy Management, Inc.*, 877 S.W.2d 276 (Tex. 1994).

However, the injured party must do more than show that they suffered some lost profits. What constitutes reasonably certain evidence of lost profits is a fact intensive determination. *Holt Atherton Ind., Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex. 1992)."

---

[33] See Declaration of Rick Roof, § 5. See Defense Ex. 6 at CLASSY00000062 (Plaintiff's 2009 tax return reporting $1,870,530 in total income); See Defense Ex. 8 at CLASSY00000080 (Plaintiff's 2010 tax return reporting $2,057,897 in total income).
[34] See Exhibit B, Declaration of Rick Roof §7-9.

"While lost profit damages need not be proven with precise measurement, it is well settled law in Louisiana that such damages cannot be speculative or conjectural. *See Hall v. Arkansas-Louisiana Gas Co.*, 368 So. 2d 984, 991 (La. 1979)(must appear reasonably certain that the amount of damages rests upon a certain basis)(citations omitted); *A & W Sheet Metal, Inc. v. Berg Mechanical, Inc.*, 653 So. 2d 158, 162 (La.App. 2nd Cir. 1995) (damages for lost profits must be proven with reasonable certainty and will not be allowed where purely conjectural); *Barnett v. Jabusch*, 649 So. 2d 1158, 1161 (La. App. 3rd Cir. 1995)(same); *Guy Williams Realty v. Shamrock Const.*, 564 So. 2d 689, 694 (La.App. 5th Cir. 1990)(same). *Geddes v. Johnson*, CIVIL ACTION NO. 95-4137 SECTION "N", 1997 U.S. Dist. LEXIS 2154, at *2-3 (E.D. La. Feb. 27, 1997) (standing for the proposition that lost profits need not be proven with precise measurement). Plaintiff's declaration also supports the sentiment that it is not even appropriate for the Court to make a determination about summary judgment at this time as there is currently a stay in place that would prevent the Court from ruling on the motion at this time.

As seen from Plaintiff's earlier deposition testimony, Plaintiff absolutely suffered a distinct loss in revenue as a result of the spill. As previously put forth, Plaintiff is currently seeking lost profits for 2010 through 2014. Plaintiff reports, "Ruthie told me in that conversation after Collen had been working on it she said you probably down about $900,000."[35] In response to being asked, "What I'm trying to understand is what the $5 million represents."[36] Is it, you know some people might say there was damage to my vehicle and it cost $1 million or some people might say we lost profits in a year. I'm just trying to understand what does the $5 million include." Plaintiff responds, "We lost profits."[37]

---

[35] See Exhibit A2, Collen Swab depo, P. 95, 15-21.
[36] *Id.* at P. 138, 8-15
[37] *Id*. at 138-15.

Based on the standards laid out in *Geddes v. Johnson*, CIVIL ACTION NO. 95-4137 SECTION "N", 1997 U.S. Dist. LEXIS 2154 (E.D. La. Feb. 27, 1997), as well as the other standards in consideration, Plaintiff can certainly meet the burden it faces at this point in time as specific documents backing up its assertions and damages have certainly been lodged with reasonable certainty even if not with precise measurement.

## B. PLAINTIFF'S CLAIMS FOR LOST OPPORTUNITIES SURVIVES AS A MATTER OF LAW

Plaintiff can prove that its lost profits claims survive as a matter of law. Under the standard set out in *Quantlab Techs., Ltd. (BVI)*, Plaintiff can easily meet its burden such that it meets the causation standard in a way that is in line with what must be proved under the OPA standard.[38] Further, Defendant's argument that Plaintiff's alleged plans for new business ventures or purchases were mere ideas without any written business plans, signed agreement, or financing and that Plaintiff cannot prove that these opportunities were lost due to the spill because it is clear that there were numerous obstacles that Plaintiff had to overcome is also a baseless argument and not sufficient to dismiss any of Plaintiff's claims.

In *Union Oil Co. v. Buffalo Marine Servs.*, 538 F. App'x 575 (5th Cir. 2013), the Court wrote, "the 'reasonable certainty' with which Unocal was required to prove lost profits did not require it to identify lost opportunities from specific vessels that would have visited the terminal but for its closure following the spill." *Union Oil Co. v. Buffalo Marine Servs.*, 538 F. App'x 575, 576 (5th Cir. 2013). *In re M/V Nicole Trahan*, 10 F.3d 1190, 1194-95 (5th Cir. 1994). *Union Oil Co. v. Buffalo Marine Servs.*, 538 F. App'x 575, 576 n.2 (5th Cir. 2013) (refusing to require a vessel to prove lost profits by showing 'a specific lost opportunity') as well as *Nebula Glass Int'l, Inc. v. Reichhold, Inc.*, 454 F.3d 1203, 1218 (11th Cir. 2006) (concluding that the defendant-

---

[38] See Exhibit B, Declaration of Rick Roof.

appellant was 'simply wrong in its unsupported assertion that lost profits must be attributable to the loss of specific customers') further back up that sentiment that Plaintiff need not back up its lost opportunity claim with distinct examples of how it would have obtained financing or demonstrate how those ventures or purchases would have been profitable as Defendant claims. Louisiana law allows for the recovery of lost profits as an element of damages for the intentional tort of fraud. *Water Craft Management, L.L.C. v. Mercury Marine*, 638 F.Supp.2d 619, 623 (M.D. La. 2009), citing *Haggerty v. March*, 480 So.2d 1064, 1068 (La. App. 5th Cir. 1985). Babin, Garrett, and Scott bear the burden of proving their lost profits by a preponderance of the evidence. *Id. In re Rushing*, 424 B.R. 747, 752-53 (Bankr. M.D. La. 2010). Further, *Delta S.S. Lines, Inc. v. Avondale Shipyards, Inc*., 747 F.2d 995, 1001 (5th Cir. 1984) stands for the valid and applicable proposition that requiring a vessel owner to prove that specific cargos were not carried because of the casualty would be 'unsound'.

Louisiana law requires courts to award some damages "where damage (including loss of profits) and liability are certain and quantum is uncertain…."*Folds v. Red Arrow Towbar Sales Co*., 378 So.2d 1054, 1059 (La. App. 2d Cir. 1979). This is especially true where the damages were the result of an offense or quasi-offense by a tortfeasor. *Koncinsky v. Smith*, 390 So.2d 1377, 1382-83 (La. App. 3rd Cir. 1980); *New Orleans Shrimp Co., Inc. v. Duplantis Truck Lines, Inc*., 283 So.2d 521, 525 (La. App. 1st Cir. 1973). *In re Rushing*, 424 B.R. 747, 753-54 (Bankr. M.D. La. 2010) Plaintiff has put forth such claims in this instance for negligence, negligence per se, gross negligence and willful misconduct, and fraudulent concealment. There is no other way that Plaintiff's losses can be explained based on the available evidence and consideration of the standards in place.

Defendant contends that it never personally saw oil or any tar balls on its daily walks along the beach but alleges that everybody thought there was tar and there was oil all over the beaches, that it was everywhere. Further, Defendant contends that lost profits for a scooter rental company that asserts a conclusory drop in specific business due to a conclusory general claim of a drop in tourism is too far removed from the spill to satisfy OPA's requirement of a direct casual link between the discharge of oil and the ensuing harm. Under OPA, Plaintiff's theory is too far removed to satisfy OPA's requirement that their economic losses were due to the injury, destruction, or loss of property or natural resources that resulted from the discharge or threatened discharge of oil. To recover under the spill, Plaintiff must prove that tourists cancelled their reservations to rent sailboats, kayaks, and paddle boards from plaintiff's business because of oil contamination on the coast. Accordingly, Plaintiff can meet its burden and show that its economic losses were due to the injury, destruction, or loss of property or natural resources that resulted from the discharge of threatened discharge of oil and link the property damage to the oil spill.

Plaintiff can easily meet its burden. When questioned, "How was Classy Cycles damaged as a result of the spill?" Plaintiff responded, "We had no customers. We had no customers and for the next -- for the next four years, it was bad. We didn't have customers and I know revenue was down and we had borrowed money and it was very hard. It was a hard time, we suffered a lot."[39] Additionally, when asked, I think I heard you say it was—it was bad for this next four years; is that right? Plaintiff responded, "Yes, ma'am, because unfortunately everybody thought there was tar and there was oil all over the beaches, that it was everywhere. And so unfortunately people weren't coming here anymore."[40] "Tourists and customers. They weren't – the phones stopped ringing – and it was just – people thought there was oil everywhere in Florida, so in our area. And

---

[39] See Exhibit A2, Swab Deposition at 126:12-17.
[40] *Id*. at 126:18-24.

you know I mean people think there is tar bars on the beach you are not going to go there." "Yeah, it went on for several years." "We did have tar balls. They were finding them on the beaches and having cleanup. And so we did have -- we had oil that was on the beach, but the unfortunate thing was is that you had the news that was playing how the oil was spilling every single day in the water, every day. And we watched it every day."[41]

Plaintiff is able to establish a direct link between the landfall of the oil spill and its loss of customers, stating that it began to happen in mid-2010, after the oil spill and such happened because they thought we had oil all over our beaches. Such was due to tar balls that were on the beach. They were scared, they didn't want to come to the beach because of the tar balls. Customers stopped coming to the business because they thought we had oil all over the beaches."[42]

## VI. CONCLUSION

In consideration of the facts and data discussed above, both Plaintiff's 33 U.S.C. § 2702(B)(2)(E) and 33 U.S.C. § 2702(B)(2)(B) claims survive as a matter of law.  Defendants attempt to embark on an overly fact intensive inquiry at this time that goes far beyond what is required at the summary judgment stage. This case was consolidated for purposes of discovery. Originally filed in the Southern District of Texas, Plaintiff requests the motion be denied, the stay be lifted and the case transferred to its originating Court for full discovery and a docket control order. At the absolute least, there exists genuine disputes of material fact such that summary judgment cannot be granted based on the evidence currently under review. Accordingly, Plaintiff requests that the Court deny Defendants' Motion for Summary Judgment as granting such would in no way be proper at this time.

---

[41] *Id*. at 127:16-25.
[42] *Id*. at 123:19-23.

Respectfully submitted,

## THE BUZBEE LAW FIRM

By:    /S/ Anthony G. Buzbee
              Anthony G. Buzbee
              Attorney in Charge
              State Bar No. 24001820
              S.D. Tex. I.D. No. 22679
              Caroline E. Adams
              State Bar No. 24011198
              S.D. Tex. I.D. No. 27655
              J.P. Morgan Chase Tower
              600 Travis, Suite 7300
              Houston, Texas 77002
              Telephone: (713) 223-5393
              Facsimile: (713) 223-5909
              www.txattorneys.com

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

       I hereby certify that the above and foregoing Plaintiff's Complaint has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12 and 60, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on June 14, 2021.

/s/ Caroline Adams
**CAROLINE E. ADAMS**

17