1          SWAB - PERSONAL

2      IN THE UNITED STATES DISTRICT COURT

3      FOR THE EASTERN DISTRICT OF LOUISIANA

4   ------------------------------

5   IN RE:  OIL SPILL by the OIL RIG  MDL NO. 2179

6   "DEEPWATER HORIZON" in the GULF

7   OF MEXICO, on APRIL 20, 2010     SECTION J

8   ------------------------------

9   CLASSY CYCLES, INC.,            JUDGE BARBIER

10  v.

11                              Civil Action No.

12  BP P.L.C., et al.,             16-cv-05923

13  ------------------------------

14

15

16          REMOTE VIDEOTAPED DEPOSITION OF

17          COLLEEN SWAB - PERSONAL CAPACITY

18                  February 22, 2021

19

20

21

22

23

24  Reported by:  Susan S. Klinger, RMR-CRR, CSR

25  Job No. 190194

EXHIBIT

2

Page 2

```
 1              SWAB - PERSONAL
 2
 3
 4            February 22, 2021
 5              9:31 a.m.
 6
 7
 8
 9      Remote Videotaped Deposition of COLLEEN
10  SWAB, held remotely before Susan S. Klinger, a
11  Registered Merit Reporter and Certified
12  Realtime Reporter of the State of Texas.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1              SWAB - PERSONAL
 2  A P P E A R A N C E S:
 3  (All appearances via Zoom.)
 4  Attorneys for Plaintiff(s):
 5      Caroline Adams, Esq.
 6      THE BUZBEE LAW FIRM
 7      600 Travis Street
 8      Houston, Texas  77002
 9
10  Attorneys for Defendant(s):
11      Ashley Littlefield, Esq.
12      Anna Terteryan, Esq.
13      Nicolette Roger, Esq.
14      KIRKLAND & ELLIS
15      555 California Street
16      San Francisco, California  94104
17
18
19  Also Present:
20      Tara Kelly, BP
21      Rick Roof
22      Robert Rinkewich, videographer
23
24
25
```

Page 4

```
 1              SWAB - PERSONAL
 2              I N D E X
 3  WITNESS                           PAGE
 4  COLLEEN SWAB
 5  EXAMINATION BY MS. LITTLEFIELD        8
 6              E X H I B I T S
 7
 8  No.     Description              Page
 9  Exhibit 1  GCCF application,        25
10       BPB1-Classy_000000048
11  Exhibit 2  Bank statement, CLASSY00000884   52
12  Exhibit 3  Income statement, CLASSY00000368  55
13  Exhibit 4  Income Statement, CLASSY00000370  67
14  Exhibit 5  Daily sheet, 2/2010       71
15  Exhibit 6  Totals, CLASSY00000402    90
16  Exhibit 7  Tax return, 2009, CLASSY00000062 103
17  Exhibit 8  Tax return, 2008, CLASSY00000044 116
18  Exhibit 9  Tax return, 2010, CLASSY00000080 119
19  Exhibit 10 Tax return, 2011, CLASSY00000112 121
20  Exhibit 11 Tax return, 2012, CLASSY00000142 122
21  Exhibit 12 Tax return, 2013, CLASSY00000284 123
22  Exhibit 13 Tax return, 2014, CLASSY00000303 124
23  Exhibit 14 Opt out letter           141
24  Exhibit 15 Income statement, CLASSY00000366 149
25  Exhibit 16 Yelp reviews             164
```

Page 5

```
 1              SWAB - PERSONAL
 2  Exhibit 17 Yelp 50 reviews          167
 3  Exhibit 18 Promissory note, CLASSY00001208 171
 4  Exhibit 19 Promissory note, CLASSY00001214 175
 5  Exhibit 20 Promissory note, CLASSY00001220 176
 6  Exhibit 21 Promissory note, CLASSY00001226 178
 7  Exhibit 22 Claims Strategies document      198
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
1              SWAB - PERSONAL
2         P R O C E E D I N G S
3         VIDEOGRAPHER:  Good morning,
4    counselors.  My name is Robert Rinkewich.
5    I am the legal videographer in association
6    with TSG Reporting, Inc.  Due to the
7    severity of the COVID-19 and following the
8    practice of social distancing I will not be
9    in the same room with the witness.
10   Instead, I will record this videotaped
11   deposition remotely.  The reporter, Susan
12   Klinger, also will not be in the same room
13   and will swear the witness remotely.
14        Do all parties stipulate to the
15   validity of this video recording and remote
16   swearing and that it will be admissible in
17   the courtroom as if it had been taken
18   following Rule 30 of the Federal Rules of
19   Civil Procedure and the state's rules where
20   this case is pending?
21        MS. LITTLEFIELD:  Yes, we do.
22        MS. ADAMS:  Plaintiff does as well.
23        VIDEOGRAPHER:  Thank you.  This is
24   the start of media labeled number 1 of the
25   video recorded deposition of Colleen Swab
```

```
1              SWAB - PERSONAL
2    in the matter of Classy Cycles, Inc. versus
3    BP, PLC, et al., in the United States
4    District Court Louisiana Eastern, New
5    Orleans.  This deposition is being held
6    telephonically and video streamed on
7    February 22nd, 2021 at approximately 9:32
8    a.m.
9         My name is Robert Rinkewich.  I'm
10   the legal video specialist from TSG
11   Reporting, Inc., headquartered at 228 East
12   45th Street, Suite 810, New York, New York.
13   The court reporter is Susan Klinger in
14   association with TSG Reporting.
15        Counsel, please introduce
16   yourselves.
17        MS. ADAMS:  Caroline Adams for the
18   plaintiff, Classy Cycles.
19        MS. LITTLEFIELD:  Ashley Littlefield
20   for the BP defendants and I'm joined on the
21   line by my colleagues from Kirkland & Ellis
22   Anna Terteryan and Nicolette Roger, and
23   from Tara Kelly of BP.
24        VIDEOGRAPHER:  Would the court
25   reporter please swear in the witness?
```

```
1              SWAB - PERSONAL
2             COLLEEN SWAB,
3    having been first duly sworn testified as
4    follows:
5             EXAMINATION
6    BY MS. LITTLEFIELD:
7         Q.   Good morning, Ms. Swab.  My name is
8    Ashley Littlefield and I represent BP in these
9    proceedings.
10             Can you start by stating your name
11   for the record, please?
12        A.   Colleen Andrea Swab.
13        Q.   Have you ever been deposed before?
14        A.   Yes.
15        Q.   How many times?
16        A.   Three.
17        Q.   Let's start with the most recent,
18   what were you deposed for?
19        A.   A car wreck.
20        Q.   And when was that?
21        A.   Eight years ago.
22        Q.   And what was the most recent time
23   you were deposed before the car accident?
24        A.   Well, I was deposed a couple of
25   years ago, but the car wreck was eight years
```

```
1              SWAB - PERSONAL
2    ago.
3         Q.   Okay, I see.
4         A.   It was last year, I'm sorry.
5         Q.   No, that is a helpful clarification.
6    So before you were deposed about a year ago in
7    the car accident case, when was the last time
8    you were deposed before that approximately?
9         A.   I couldn't be sure, but last year
10   was the recent.
11        Q.   Okay.  What was the nature of the
12   case that you were deposed in before the car
13   accident case?
14        A.   Another car accident.
15        Q.   And then I think you said you have
16   been deposed three times.  What was the third
17   time you have been deposed?
18        A.   I believe it was a civil lawsuit.
19        Q.   What was the -- what was the nature
20   of the civil lawsuit?
21        A.   I don't remember at this time.  It
22   has been -- it has been a long time ago.
23        Q.   Were you personally a party to that
24   lawsuit?
25        A.   Classy Cycles was.
```

SWAB - PERSONAL

1
2      Q.     And was Classy Cycles the plaintiff
3  or the defendant?
4      A.     The defendant.
5      Q.     Who sued Classy Cycles?
6      A.     I don't remember.  I don't remember
7  her name.
8      Q.     Was it, like, a customer or an
9  employee or something else?
10     A.     It was an employee.
11     Q.     And approximately when did this
12 occur?
13     A.     Several years ago.
14     Q.     Okay.  It sounds like you have been
15 through a deposition before, so you probably
16 understand a little bit about how it works, but
17 I'm going to go through some background anyway,
18 okay?
19     A.     Thank you.
20     Q.     So first, if at any point you want
21 to take a break just let me know, that is fine.
22 We will take as many breaks that you would
23 need.  The only thing that I will ask is if I
24 ask a question, please go ahead and answer that
25 question first then we will take a break, okay?

SWAB - PERSONAL

1
2      A.     Yes, ma'am.
3      Q.     It is really important that you
4  understand my questions.  I don't always phrase
5  them perfectly, so if you don't understand my
6  question, please let me know and feel free to
7  ask me to rephrase it, okay?
8      A.     Yes, ma'am.
9      Q.     But if you answer my question
10 without clarifying, I'm going to assume you
11 understood it, okay?
12     A.     Yes, ma'am.
13     Q.     Our court reporter, Ms. Klinger, is
14 taking down all of our words, so it is
15 important that we not speak over each other
16 okay?
17     A.     Yes, ma'am.
18     Q.     You are already all over this, but
19 it is important to give verbal answers like
20 "yes" or "no," instead of shaking your head or
21 saying "uh-huh;" okay?
22     A.     I'm sorry, say that again.  I am
23 hearing impaired, so I missed that last part,
24 say it again.
25     Q.     Sure.  I will speak up and please

SWAB - PERSONAL

1
2  feel free to say any time you can't hear us
3  very well.  I was saying it is important for
4  you to give verbal answers like "yes" or "no"
5  instead of shaking your head, okay?
6      A.     Yes, ma'am.
7      Q.     If I refer to Classy Cycles
8  Incorporated as "Classy Cycles," do you
9  understand what I'm referring to?
10     A.     Yes, ma'am.
11     Q.     And if I refer to the oil spill that
12 began on April 20th, 2010 as "the spill," will
13 you understand what I mean?
14     A.     Yes, ma'am.
15     Q.     You understand that you are under
16 oath today?
17     A.     Yes, ma'am.
18     Q.     So you understand that you need to
19 testify truthfully and answer questions
20 completely?
21     A.     Yes, ma'am.
22     Q.     Is there any reason why you would
23 not be able to testify truthfully and
24 completely today?
25     A.     No, ma'am.

SWAB - PERSONAL

1
2      Q.     What is your relationship to Classy
3  Cycles?
4      A.     I'm one of the owners.
5      Q.     Who is the other owner?
6      A.     It is going to be my dad, Rick Roof.
7      Q.     How long have you been an owner of
8  Classy Cycles?
9      A.     2000.
10     Q.     Is that when Classy Cycles was
11 formed?
12     A.     Yes, ma'am.
13     Q.     What are you -- sorry.
14           Do you have any other titles with
15 Classy Cycles other than owner?
16     A.     President.
17     Q.     What are your responsibilities as
18 the president and owner of Classy Cycles?
19     A.     Hiring, firing, checking in on the
20 stores, making sure employees are doing what
21 they're supposed to be doing, making sure that
22 we have ordered parts.
23     Q.     Are you responsible for any of the
24 financial aspects of Classy Cycles' business?
25     A.     Yes, ma'am.

SWAB - PERSONAL

1
2      Q.    What is your role and responsibility
3  as it relates to the financial aspects of
4  Classy Cycles' business?
5      A.    Can you clarify that?
6      Q.    Sure.  I asked whether you were
7  responsible for any of the financial aspects of
8  Classy Cycles' business and you said yes.  What
9  aspects -- what financial aspects are you
10  responsible for?
11      A.    Loans, sign for loans and leases,
12  make sure the bills get paid, so does my dad,
13  Rick Roof, I'm sorry.
14      Q.    No, I'm sorry, I interrupted you, I
15  apologize.
16            Are you at all involved in tracking
17  Classy Cycles' revenue?
18      A.    Yes, yes, ma'am.
19      Q.    What is your role as it relates to
20  tracking Classy Cycles' revenue?
21      A.    I actually pick up the daily sheets
22  and we also -- we do the daily sheets every day
23  and then turn them in.  At this time, I have --
24  my stepmom is in charge of the daily bookings
25  now.

SWAB - PERSONAL

1
2      Q.    What are the daily sheets?
3      A.    Daily sheets are how we do our --
4  check our money.  So every day an employee they
5  will turn in their -- their daily sheet that
6  shows how many rentals were on there for that
7  day.
8      Q.    Does it just show the number of
9  rentals or does it also show the money that
10  came in?
11      A.    It shows -- sorry, it shows the
12  money.
13      Q.    And then you said your stepmom is
14  currently in charge of the daily bookings?
15      A.    She is now, yes.
16      Q.    What are the daily bookings?
17      A.    Okay.  Well, that is the daily
18  sheets and putting down the information.
19      Q.    So the daily sheets and the daily
20  bookings are the same thing?
21      A.    Right.
22      Q.    You said she's responsible for them
23  now.  Did you used to be responsible for the
24  daily bookings?
25      A.    Yes, ma'am, I was.

SWAB - PERSONAL

1
2      Q.    When were you responsible for the
3  daily bookings?
4      A.    Well, in 2010 we had a bookkeeper
5  that was taking care of it, that was Barbara.
6  When she left I -- I took care of the daily
7  bookings.
8      Q.    What was Barbara's name?
9      A.    Barbara Trask.
10      Q.    Can you spell that last name for us,
11  please?
12      A.    T-r-a-k-e (sic).
13      Q.    We won't hold you to that.
14      A.    I'm sorry, I'm trying to remember.
15  It has been a long time since she has worked
16  for us, so I apologize.
17      Q.    And you said that she left in
18  approximately 2010?
19      A.    No, no, ma'am.  She did the bookings
20  at that time, ma'am.
21      Q.    When did you take over the bookings?
22      A.    '14 or '15.  It was after she left.
23  I can't -- I would say in approximately '14 or
24  '15, but...
25      Q.    So in 2010, Barbara was responsible

SWAB - PERSONAL

1
2  for the daily bookings?
3      A.    Right.
4      Q.    Currently about how many hours a
5  week do you spend working on Classy Cycles'
6  business?
7      A.    Now or then?
8      Q.    Now?
9      A.    Now, I normally work 60 to 70 hours
10  a week.  It depends on during spring time
11  because we're busier, it depends on what part
12  of the season.
13      Q.    Classy Cycles has some related
14  entities; right?
15      A.    Entities, what does that mean?
16      Q.    Sure.  Do you do work for any
17  companies other than Classy Cycles,
18  Incorporated?
19      A.    Yes, ma'am.
20      Q.    Okay.  What other entities do you do
21  work for?
22      A.    Outlaw Rentals.
23      Q.    Any others?
24      A.    No, ma'am.
25      Q.    So when you said you spend

Page 22

SWAB - PERSONAL

1
2  Classy Cycles paid a management fee to RCR;
3  correct?
4      A.   Right.
5      Q.   Did Classy Cycles also pay to lease
6  the golf carts from RCR or was the management
7  fee the only thing that Classy Cycles paid to
8  RCR?
9      A.   The management fee is what we paid
10 RCR.
11     Q.   Okay.  So going back to how Classy
12 Cycles made money, it rented out scooters and
13 similar vehicles to the public; is that
14 correct?
15     A.   Yes, ma'am.
16     Q.   Did it have any other sources of
17 revenue besides those kinds of rentals?
18     A.   We had sales.  I mean, we sold
19 scooters.
20     Q.   Approximately what percentage of
21 your business was rentals versus sales?
22     A.   95 percent rentals and maybe 5
23 percent was sales.
24     Q.   How many locations does Classy
25 Cycles have now?

Page 23

SWAB - PERSONAL

1
2      A.   Seven.
3      Q.   How many locations did Classy Cycles
4  have in 2010?
5      A.   Five.
6      Q.   When did it get the two additional
7  locations?
8      A.   Our store 7 we got about a year ago.
9  The other store I will say approximately four
10 to five years ago.
11     Q.   So it sounds like in 2010 Classy
12 Cycles primarily made revenue through renting
13 out scooters and similar vehicles and through
14 selling them.  Is that also how Classy Cycles
15 makes money today?
16     A.   Yes.
17     Q.   Does Classy Cycles have any
18 additional lines of revenue today that it did
19 not have in 2010?
20     A.   Explain.
21     Q.   Sure.  Perhaps you opened up a side
22 business where you also sell food at one of
23 your locations.  I'm just trying to find out is
24 the business different now than it was then?
25     A.   No, it is -- we do rental vehicles

Page 24

SWAB - PERSONAL

1
2  here.  We have changed the vehicles that we
3  have, but we still do rentals, scooters, golf
4  carts, stuff like that.
5      Q.   What do you mean you've changed the
6  vehicles that you have?
7      A.   We added -- they're called
8  Slingshots and dune buggies.
9      Q.   About when did you add Slingshots
10 and dune buggies?
11     A.   A couple of years ago.
12     Q.   Do you think after 2018?
13     A.   Yes, ma'am, because they just
14 started making them in 2018 -- no, I'm sorry.
15 We bought -- we bought one in 2016, so it is
16 2016 is when we bought our first one and then
17 '17 and then we went from there.
18     Q.   I think you said earlier that spring
19 is your busiest time; is that right?
20     A.   Yes, spring all the way up until
21 about November 1st.
22     Q.   What were your busiest months back
23 in 2009?
24     A.   Well, it is going to be March
25 through November 1st.

Page 25

SWAB - PERSONAL

1
2      Q.   Okay.  So March through November has
3  always generally been your busiest time?
4      A.   Yes, ma'am.
5      Q.   Ms. Swab, I am sending you a
6  document.  It will pop up in the chat section
7  and you will be able to double click on it and
8  open.  It hasn't quite sent.  I'm also going to
9  just show the document on the screen, so you
10 will be able to open it and look at it yourself
11 or you can just look at the screen, okay?
12     A.   Where do I hit a button, oh, okay.
13     Q.   Were you able to see the document
14 and open it?
15     A.   Yes.
16     Q.   Great.  So I've sent you a document
17 that is Bates numbered BPB1-Classy_0000048.
18 Will the court reporter please mark this as
19 exhibit the first exhibit.
20          (Exhibit 1 marked.)
21     Q.   Ms. Swab, do you see this document?
22     A.   I do, but I can't see the whole
23 thing of it.
24     Q.   Were you able to open the one that I
25 sent you through the chat function?

Page 30

SWAB - PERSONAL

1    employees does Classy Cycles have?
2
3        A.    40, 45.
4        Q.    At the time of the spill, who
5    actively managed the business?
6        A.    My dad, Rick Roof.
7        Q.    Anyone else?
8        A.    Well, I was underneath him, so I was
9    his assistant.
10       Q.    Today, 2021, who at the company
11   makes financial decisions for the company?
12       A.    Day-to-day?
13       Q.    Yes.
14       A.    Yes, ma'am, that would be me.  If
15   there -- if there are really big decisions,
16   then we both make the decision together.
17       Q.    And was that also true at the time
18   of the spill?
19       A.    No, that would have been my dad
20   would have been fully owner, full capacity.
21       Q.    When did you start making financial
22   decisions for the company?
23       A.    Probably about three years ago.
24   We've been trying to let him retire.
25       Q.    In 2010, were you at all involved in

Page 31

SWAB - PERSONAL

1    the company's accounting?
2
3        A.    Somewhat.
4        Q.    What was your role?
5        A.    I would -- I would pick up the
6    envelopes with the -- with the money and turn
7    them in and Barbara would do the book work and
8    then they would be taken to Ruthie, our
9    accountant.
10       Q.    Were you at all involved in the work
11   that Barbara or Ruthie were doing?
12       A.    Clarify, please.
13       Q.    Sure.  Did you supervise their work?
14       A.    No, ma'am.
15       Q.    Did you ever review their work?
16       A.    Not usually.
17       Q.    Did you ever discuss their work with
18   them?
19       A.    No.
20       Q.    What was Ruthie's last name?
21       A.    McClain.
22       Q.    Was Ruthie an employee of Classy
23   Cycles or did she work for a different company?
24       A.    She worked for a different company,
25   ma'am.

Page 32

SWAB - PERSONAL

1
2        Q.    What was the name of that company?
3        A.    Jinks & Moody, they're no longer in
4    in business.
5        Q.    Was that first word Jinks?
6        A.    Yes, J-e-n-k-s (sic) and then Moody,
7    is M-o-o-d-y.
8        Q.    In 2010, how did Classy Cycles track
9    its revenue?
10       A.    Clarify what does tracking mean?
11       Q.    How did you keep track of how much
12   money you had coming in?
13       A.    Paperwork, paper.
14       Q.    What kind of paperwork?
15       A.    Daily sheets and then there would be
16   -- basically it was the daily sheets is how we
17   went by.
18       Q.    Who prepared the daily sheets?
19       A.    Employees.
20       Q.    The employees who were on location
21   at the sites?
22       A.    Yes, ma'am.
23       Q.    And then I think you said earlier
24   that you would go pick them up each day; is
25   that right?

Page 33

SWAB - PERSONAL

1
2        A.    Yes, the next morning, yes, ma'am.
3        Q.    Then what would you do with them
4    once you picked them up?
5        A.    I would give them to Barbara.
6        Q.    Do you know what Barbara would do
7    with them once she had them?
8        A.    Yeah, she would put them in folders.
9        Q.    Did she store those documents in her
10   office?
11       A.    She would give them to Ruthie, our
12   accountant.
13       Q.    Who has those documents now?
14       A.    We don't have those now.
15       Q.    Do you know who has them?
16       A.    Well, unfortunately we had Hurricane
17   Michael and Sally.  So we have had hurricanes
18   and floods in the past five years, so a lot of
19   documents were destroyed.
20       Q.    I'm sorry to hear that.  So when the
21   documents were destroyed, were they in Classy
22   Cycles' offices or were they in Ruthie's
23   offices?
24       A.    They were -- they were given back to
25   us by Jinks & Moody when Ruthie retired.

Page 50

SWAB - PERSONAL

1
2     A.    Okay.  Before the oil spill, we
3  would pay them out of our checking account.
4     Q.    And that is the checking account
5  with Prosperity Bank?
6     A.    Yes, ma'am.
7     Q.    And did you change the way you paid
8  expenses after the oil spill?
9     A.    Yes.
10    Q.    How did you change the way you paid
11 expenses?
12    A.    My dad would have to pay for it out
13 of his -- out of his account or any money that
14 he had and he had to -- we had to borrow money
15 from my grandpa and we had to borrow money from
16 friends.
17    Q.    And after the spill when paying for
18 expenses using your dad's money, would your dad
19 pay those expenses directly from his personal
20 bank account or would he put money into Classy
21 Cycles' bank account and then pay directly out
22 of the Classy Cycles' account?
23    A.    Well -- sorry.  Sometimes he
24 would -- he would pay for it out of his -- out
25 of his pocket.  He had money saved up so he

Page 51

SWAB - PERSONAL

1  used his money and whether he would pay for it
2  out of his pocket or he would put it in, you
3  know, Classy Cycles' account and so that we
4  were -- he was doing all that he could to save
5  our company after the oil spill.
6     Q.    Did you also personally -- sorry,
7  strike that.
8           Did you also personally pay any of
9  Classy Cycles' expenses after the spill?
10    A.    I don't remember at that time.  It
11 was mainly my dad, my grandpa, my dad's friends
12 that helped carry our company so...
13    Q.    So sitting here today, you don't
14 recall personally paying any of Classy Cycles'
15 expenses after the spill?
16    A.    I may have, but I don't remember.
17 And I can't tell you a number right now, so I'm
18 going to go with I don't remember.
19    Q.    If you wanted to find an answer to
20 that question, what would you do to remember?
21 Are there any particular documents you could
22 look at?
23    A.    No.
24    Q.    Is there anyone you could talk to to

Page 52

SWAB - PERSONAL

1  find an answer to that question?
2     A.    Probably not.  I mean, the only two
3  people that know that is me or my dad, but at
4  this time I don't remember.
5     Q.    I'm sending you another document, I
6  will also put it up on my screen again.  This
7  is a somewhat shorter document.  I'm showing
8  you a document which is Bates numbered
9  CLASSY00000884.  I will ask the court reporter
10 to please mark this as the next exhibit, which
11 I believe is Exhibit 2.
12         (Exhibit 2 marked.)
13    A.    I can't see it.
14    Q.    Are you able to see the one on the
15 screen?
16    A.    I mean, I see the half part.
17    Q.    Okay.  And are you able to open the
18 exhibit directly from the chat function?
19    A.    There it goes.  Okay, I can see it
20 now.
21    Q.    Okay.  Do you recognize this
22 document?
23    A.    Yes, it is a bank statement.
24    Q.    One of Classy Cycles' bank

Page 53

SWAB - PERSONAL

1  statements?
2     A.    Yes.
3     Q.    And you have seen Classy Cycles'
4  bank statements before, you are familiar with
5  them?
6     A.    Yes, ma'am.
7     Q.    I have a question for you.  Do you
8  see here at the bottom of the first page it
9  lists some deposits and credits?
10    A.    Yes, ma'am.
11    Q.    Okay.  And then under description
12 for the first one it says, January 4th deposit
13 and then merchant?
14    A.    Right.
15    Q.    BNKCD CCD.  Do you see that?
16    A.    Yes.
17    Q.    Do you know what that means?
18    A.    Merchant bank card.
19    Q.    Do you know what merchant bank card
20 refers to?
21    A.    Yeah, it was probably a -- probably
22 a credit card transaction, so...
23    Q.    How would a credit card transaction
24 result in a deposit in your bank account?

SWAB - PERSONAL

1    her before tax time.
2        Q.    Did she prepare these income
3    statements for you once a year or more often
4    than that?
5        A.    I don't know the answer to that.  I
6    know that she did once a year, but I think she
7    did a profit and loss statement.  I think she
8    did that at a 6-month.  I'm pretty sure she did
9    that for 2010, but...
10       Q.    And what makes you think that she
11   did a 6-month profit and loss statement in
12   2010?
13       A.    Because I've seen one.
14       Q.    Do you know whether she has done
15   6-month profit and loss statements for other
16   years?
17       A.    I don't know.
18           MS. ADAMS:  Ashley, we have been
19       going about an hour.  So you can continue
20       as long as you want to, but if we can take
21       a break that would be great.
22           But I also just like I did last week
23       on Friday, I just want to go ahead and make
24       a point that she has been designated as the

SWAB - PERSONAL

1    corporate representative with respect to
2    accounting practices and financial results
3    and a number of these topics.  And so I
4    know you don't want to be duplicative, but
5    I'm just kind of lodging my objection that
6    there is a lot of overlap between the
7    individual and a corporate rep deposition.
8           MS. LITTLEFIELD:  Sure.
9           MS. ADAMS:  And so it is fine and I
10   don't want to mess with your flow, but I
11   also don't want to have these questions
12   reasked, so I'm just making that objection,
13   okay.
14           MS. LITTLEFIELD:  Yes, that is fine.
15   I think on Friday, you had asked for a
16   stipulation when we were talking about a
17   topic for it also to be in her corporate
18   capacity and we're fine with doing that,
19   too, as we're walking through these
20   accounting documents we have.
21           MS. ADAMS:  Perfect.  So does that
22   go -- I won't have to make another
23   objection that is with respect to
24   everything that she has been designated on;

SWAB - PERSONAL

1    correct?
2           MS. LITTLEFIELD:  Yes, that is fine.
3           MS. ADAMS:  Perfect, thank you.
4           MS. LITTLEFIELD:  Just so we have
5    some clarity for the record, within Ms.
6    Swab's individual deposition where we are
7    currently taking to the extent she is
8    answering questions that are designated
9    topics for her in the 30(b)(6), this
10   testimony can also be designated as her
11   30(b)(6) testimony?
12           MS. ADAMS:  Yes, that is correct.
13   And I can read the topic numbers into the
14   record if you want me to.  I know that I
15   provided them.  With respect to Colleen,
16   she is designated on topic 1, A through C,
17   4, 5, 7 through 11 and 14 on our
18   designation, just for clarity.
19           MS. LITTLEFIELD:  Great.  Well, why
20   don't we --
21           MS. ADAMS:  Thank you.
22           MS. LITTLEFIELD:  Sure.  Why don't
23   we go ahead and take a break.  How about --
24   it is 10:33 central now.  Why don't we all

SWAB - PERSONAL

1    come back at 10:45 central, does that work
2    for everybody?
3           MS. ADAMS:  Perfect.
4           VIDEOGRAPHER:  The time is 10:33.
5    This is the end of Media Number 1, we're
6    off the record.
7           (Recess 10:33 to 10:46 a.m.)
8           VIDEOGRAPHER:  The time is 10:46
9    a.m.  This is the start of Media Number 2,
10   we're on the record.
11       Q.    Ms. Swab, do you understand that you
12   are still under oath?
13       A.    Yes, ma'am.
14       Q.    Before the break we were looking at
15   Exhibit 3, which is the 2009 income statement.
16       Do you see that on the screen?
17       A.    Yes, ma'am.
18       Q.    Do you know one way or the other
19   whether the numbers in this document are
20   accurate?
21       A.    Yes, ma'am.
22       Q.    Are they -- are the numbers in this
23   document accurate?
24       A.    Yes, ma'am.

Page 62

```
                    SWAB - PERSONAL
1
2        Q.      How do you know that?
3        A.      Well, because I know we gave all the
4   information to our accountant at that time, so
5   I'm sure this document is correct.  I mean, we
6   gave the information to our accountant, so I
7   assume that it is correct.
8        Q.      So you believe that the data in this
9   income statement at Exhibit 3 is correct --
10       A.      Yes, ma'am.
11       Q.      -- because you provided the data to
12  your accountant to prepare it and believe she
13  did it accurately; is that fair?
14       A.      Yes, ma'am.
15       Q.      Have you personally double-checked
16  any of these numbers?
17       A.      No, ma'am.
18       Q.      Do you know whether anyone else at
19  Classy Cycles has double-checked any of these
20  numbers?
21       A.      Well, the other person that would be
22  -- that would be my father Rick Roof and I'm
23  not -- I'm not sure.
24       Q.      I think you said that when Ms.
25  McClain retired about five years ago you got a
```

Page 63

```
                    SWAB - PERSONAL
1   new accountant; is that right?
2        Q.
3        A.      Yes, ma'am.
4        Q.      Who is your new accountant?
5        A.      Eric Howell.
6        Q.      Have you ever asked Mr. Howell to
7   confirm the accuracy of these income
8   statements?
9        A.      On our 2010, yes, ma'am.
10       Q.      Tell me about that.
11       A.      So when he took over our file, he
12  had realized that my father had put money in
13  and had caught that we were putting money into
14  the bank account and realized that it had gone
15  as revenue instead of -- I'm sorry, it went in
16  as revenue instead of a loan.
17               And so he asked how long my dad had
18  been doing this.  And we said, well, since the
19  oil spill my dad put a bunch of money.  At that
20  time he went back and looked at the document
21  and said, well, this was done as revenue not as
22  a loan and that was an issue.
23       Q.      When did you have this conversation
24  with Mr. Howell?
25       A.      I don't remember what date.
```

Page 64

```
                    SWAB - PERSONAL
1
2        Q.      Do you remember approximately what
3   year that conversation happened?
4        A.      Probably a year after he was hired
5   or approximately '14 or '15, something in
6   that -- in that.
7        Q.      Do you believe this conversation
8   with Mr. Howell occurred in approximately 2014
9   or 2015?
10       A.      Yes, ma'am.
11       Q.      To make sure I understand the error
12  that he caught, your father was loaning money
13  to Classy Cycles in 2010; is that right?
14       A.      Yes, ma'am.
15       Q.      And in the 2010 income statements,
16  those loans were improperly recorded as
17  revenue?
18       A.      Yes, ma'am.
19       Q.      And did this happen in any other
20  year's income statements?
21       A.      I believe 2010 through 2014.
22       Q.      So your understanding is that the
23  2010 -- strike that.
24               Classy Cycles' 2010 through 2014
25  income statements overstate revenue because
```

Page 65

```
                    SWAB - PERSONAL
1
2   they inaccurately classified loans as revenue;
3   is that correct?
4        A.      Yes, ma'am.
5        Q.      And that is not true of the income
6   statements before 2010; is that right?
7        A.      That would be correct, to my
8   knowledge, ma'am.
9        Q.      Do you know whether Mr. Howell went
10  back and reviewed the income statements prior
11  to 2010 to determine whether they had the same
12  error?
13       A.      No, ma'am, because my dad didn't
14  have to give a bunch of money to save our
15  company, because we didn't have an oil spill in
16  2009.  It was in 2010 that we had issues,
17  because we had no customers.
18       Q.      So Mr. Howell didn't check whether
19  the income statements from 2009 and prior had
20  the same error because you didn't think there
21  was any reason to believe that that same error
22  would exist in those years?
23       A.      Clarify that.  I don't understand
24  the way you explained it.
25       Q.      Sure, I can ask it differently.  You
```

SWAB - PERSONAL

1   how much revenue Classy Cycles had in October
2
3   2009?
4        A.    No, ma'am.
5        Q.    Is that also true for every month in
6   2009?
7        A.    Yes, ma'am.
8        Q.    Do you know how much revenue Classy
9   Cycles had in any month in 2009?
10        A.    I'm sorry, say that again some.
11        Q.    Sure.  Do you know how much revenue
12   Classy Cycles had in any month in 2009?
13        A.    No, ma'am.  I don't have any
14   documents to provide for that.  The only thing
15   I have is a tax return that was formed and put
16   together by Ruth McClain.
17        Q.    Do you believe that tax return for
18   2009 is accurate?
19        A.    Yes, ma'am, I do.
20        Q.    And that 2009 tax return would tell
21   us the full year revenue for 2009; correct?
22        A.    Yes, ma'am.
23        Q.    But it would not tell us the monthly
24   revenue for 2009?
25        A.    I haven't looked at the 2009 tax

SWAB - PERSONAL

1   returns in quite some time.  I'm not sure if
2   they have a monthly or not.
3
4        Q.    Why don't we go ahead and pull it
5   up.  I won't make you do a guessing game.  Can
6   you see this document, Ms. Swab?
7        A.    Can you make it smaller, please,
8   ma'am, thank you, ma'am.
9        Q.    Can you see this document now?
10        A.    Yes, ma'am.
11        Q.    All right.  I am showing you a
12   document that is Bates labeled CLASSY00000062.
13   I will ask the court reporter to mark this as
14   the next exhibit, which is Exhibit 7.
15              (Exhibit 7 marked.)
16        Q.    Do you see this document, Ms. Swab?
17        A.    Yes, ma'am.
18        Q.    Do you recognize it?
19        A.    Yes, ma'am.  It is the tax return
20   for 2009, ma'am.
21        Q.    And is this a document you have seen
22   before?
23        A.    Yes, ma'am.
24        Q.    To the best of your knowledge, is
25   the information on this document accurate?

SWAB - PERSONAL

1
2        A.    Yes, ma'am.
3        Q.    We were speaking a minute ago about
4   whether you could determine Classy Cycles'
5   monthly revenue in 2009; right?  Do you
6   remember that?
7        A.    Yes, ma'am.  It is not on the front
8   of this, no, ma'am.
9        Q.    So the front of this page, this line
10   1C here, do you see that?
11        A.    Yes, ma'am.
12        Q.    Do you understand that to be a
13   Classy Cycles' total revenue in 2009?
14        A.    Yes, ma'am.
15        Q.    And to the best of your knowledge,
16   is that information correct?
17        A.    Yes, ma'am.
18        Q.    I sent you this document.  Are you
19   able to open it?  If not then I will just click
20   through it on the screen.
21        A.    No, ma'am.
22        Q.    I will go ahead and click through
23   it.  So my question for you is does this 2009
24   tax return, Exhibit 7, tell us what Classy
25   Cycles' monthly revenue was in 2009?

SWAB - PERSONAL

1
2        A.    Not on the front page, ma'am.
3        Q.    So I will go ahead and click through
4   the document through each page and you tell me
5   once you have reviewed a page when you are
6   ready for me to go to the next one?
7        A.    Okay, I'm ready, I'm ready.  I'm
8   ready.  I'm ready.  I'm ready.  Ready.  Ready.
9   Ready.  Ready.  Ready.  Ready.  Ready.  Ready.
10   Ready.  Ready.  Ready.  Ready.  Ready.
11        Q.    That is the final page.
12        A.    Okay.
13        Q.    So you have now had a chance to
14   review or look at each page of Exhibit 7;
15   correct?
16        A.    Yes, ma'am.
17        Q.    Did Classy Cycles' 2009 tax returns
18   provide monthly revenue information for the
19   year?
20        A.    It shows a total.  It does not show
21   monthly, ma'am.
22        Q.    Okay.  So you personally don't know
23   the revenue for Classy Cycles in any month in
24   2009; correct?
25        A.    No, ma'am.

Page 126

SWAB - PERSONAL

1
2     produced, but we will follow up with that.
3          MS. ADAMS:  Okay, thank you.
4     Q.    Ms. Swab, you understand that Classy
5 Cycles is suing BP in this lawsuit; correct?
6     A.    Yes, ma'am.
7     Q.    To your knowledge, has Classy Cycles
8 been damaged as a result of the spill?
9     A.    Yes, ma'am.
10    Q.    How was Classy Cycles damaged as a
11 result of the spill?
12    A.    We had no customers.  We had no
13 customers and for the next -- for the next four
14 years, it was bad.  We didn't have customers
15 and I know revenue was down and we had borrowed
16 money and it was very hard.  It was a hard
17 time, we suffered a lot.
18    Q.    I think I heard you say it was -- it
19 was bad for the next four years; is that right?
20    A.    Yes, ma'am, because unfortunately
21 everybody thought there was tar and there was
22 oil all over the beaches, that it was
23 everywhere.  And so unfortunately people
24 weren't coming here anymore.
25    Q.    When you say "people," are those

Page 127

SWAB - PERSONAL

1
2 largely tourists?
3     A.    Tourists and customers.  They
4 weren't -- the phones stopped ringing and it
5 was just -- people thought that there was oil
6 everywhere in Florida, so in our area.  And you
7 know, I mean people think there is tar balls
8 that are on the beach you are not going to go
9 there.  You don't want to go there.
10    Q.    And this continued through to 2014?
11    A.    Yeah, it went on for several years,
12 yes, ma'am.
13    Q.    You said that people thought there
14 was oil everywhere near you.  Was there oil
15 everywhere on the beach near you?
16    A.    We did have tar balls.  They were
17 finding them on the beaches and they were
18 having cleanup.  A lot of the hotels were taken
19 up by BP oil spill that would go out and clean
20 the beaches.  And so we did have -- we had oil
21 that was on the beach, but the unfortunate
22 thing was is that you had the news that was
23 playing how the oil was spilling every single
24 day in the water, every day.  And we watched it
25 every day.

Page 128

SWAB - PERSONAL

1
2     Q.    So there were tar balls in your
3 area.
4          Do you need a break or we can --
5     A.    No.
6     Q.    There were tar balls in your area?
7     A.    Yes.
8     Q.    For how long?  When did you first
9 see tar balls in your area?
10    A.    Well, I mean, right after April
11 20th.  I mean, they had people that were
12 finding them here on the beaches.  I know
13 because the news were showing it.
14    Q.    Did you ever personally see tar
15 balls?
16    A.    I didn't, no.
17    Q.    How long did there continue to be
18 tar balls on your beaches?
19    A.    I can't answer that, I don't know.
20    Q.    You said that the effect on your
21 business continued through 2014; is that right?
22    A.    I'm sorry, say it again.  I couldn't
23 hear you.
24    Q.    Sure.  You said that Classy Cycles
25 -- sorry, strike that.

Page 129

SWAB - PERSONAL

1
2          You said that the effect on your
3 business continued through 2014; is that
4 correct?
5     A.    Yes, ma'am.
6     Q.    Were there tar balls on the beach in
7 2014?
8     A.    I don't know that.
9     Q.    So you mentioned earlier that -- let
10 me find it.
11    A.    We had the news that kept repeating
12 that it was -- it hit all of the beaches and
13 that continued for months.  And then almost
14 after a year it was still continuing, so...
15    Q.    That is because people perceived
16 that there was oil in your area?
17    A.    Yes, ma'am.  They thought it was all
18 over our beaches and killing the wildlife.
19    Q.    And people perceived that there was
20 oil all over your beaches through 2014?
21    A.    I don't know that.  I just know that
22 people stopped coming here.  And I believe it
23 is because of the oil spill, because you know,
24 me as somebody who would go on vacation, I
25 wouldn't want to take my family thinking there

SWAB - PERSONAL

1  might be tar balls and go to a beach that I
2  think would have an issue.  And I would -- I
3  would assume that it would take not six months,
4  I would think it would take years to do a
5  cleanup.
6      Q.    So your customers sort of in
7  deciding whether -- strike that.
8          Your customers in deciding where to
9  go on vacation wouldn't come to your area out
10 of fear there might be oil there or it might
11 not be clean yet?
12     A.    Yeah.
13     Q.    And you believe the effect of that
14 lasted at least through 2014?
15     A.    Oh, yeah, absolutely.
16     Q.    Do you go to the beach in your area
17 every day?
18     A.    Yes.  Yes, ma'am, I do.
19     Q.    How often would you say you go to
20 the beach?
21     A.    It depends on the timeframe.  If it
22 was cold then we don't go, but if it is nice
23 the other day we went out it was beautiful.
24     Q.    I think you said that you never
25

SWAB - PERSONAL

1  personally saw tar balls on the beach; is that
2  right?
3      A.    No, ma'am, I didn't, but the news --
4  the news actually showed the tar balls that
5  were on the beaches in our area and
6  unfortunately that was running every day.
7      Q.    Do you think the news created a
8  stigma for people about the area?
9      A.    I don't know what stigma means, so I
10 can't answer that.
11     Q.    Do you think the news kind of scared
12 people out of coming to the area?
13         MS. ADAMS:  Objection, calls for
14         speculation.
15     A.    I don't know.  I think the oil -- I
16 think the oil being on our beaches scared
17 people off.  I think the news was informing
18 that we had tar balls on the beaches, so...
19     Q.    But you didn't see oil on the
20 beaches?
21     A.    I didn't.  At that time, I wasn't
22 going to the beach very much, but I don't know
23 who saw it and who didn't.  But I know that we
24 had tar balls and they were cleaning it up.
25

SWAB - PERSONAL

1  They had cleaning crews that were here, that
2  were taking up all the hotels that were here on
3  the beach, so...
4      Q.    Do you remember about when those
5  cleaning crews were there?
6      A.    No, ma'am.
7      Q.    You have mentioned that the news was
8  reporting on the spill and the tar balls being
9  on the beach.  Do you recall about how long
10 that lasted?
11     A.    I couldn't tell you.  I don't
12 remember.  I stopped watching.  I stopped
13 watching the news because it was so doom and
14 gloom and watching the oil spill into the ocean
15 every day we're wondering, like, if it was ever
16 going to end or if they were actually going to
17 shut the oil off.  If they were -- I mean we
18 prayed every day that it was going to -- that
19 it was going to stop and every day it didn't
20 for a very long time.
21     Q.    Do you know whether the news was
22 still reporting that there were tar balls in
23 your area as of 2011?
24     A.    I don't remember the date that they
25

SWAB - PERSONAL

1  stopped reporting it.  I just know that they
2  were reporting it for at least a good year that
3  I can recall.
4      Q.    Do you remember whether the news was
5  still reporting that there were tar balls in
6  your area as of 2012?
7      A.    That I wouldn't -- I don't know.
8      Q.    Do you not recall one way or the
9  other?
10     A.    I can't recall one way or another.
11     Q.    Do you remember whether the news was
12 still reporting that there were tar balls in
13 your area as of 2013?
14     A.    I don't remember.
15     Q.    I think you testified that you had a
16 reduction in customers or lost customers
17 starting in mid 2010; is that right?
18     A.    After the oil spill, ma'am.
19     Q.    And why do you think that the
20 customers stopped coming to your business?
21     A.    Because they thought we had oil all
22 over our beaches.
23     Q.    And what is the basis for that
24 belief?  Did anybody tell you that?
25

SWAB - PERSONAL

1
2      A.    We had people that canceled their
3  reservations because they were scared to come,
4  because they heard there were tar balls that
5  were on our beaches.  And they were scared,
6  they didn't want to the put their kids where
7  they could get sick.
8      Q.    And when those people called to
9  cancel their reservations, did you personally
10  talk to any of those people?
11      A.    Yes, we talked to them.  I can't
12  tell you their names, because it was 11 years
13  ago.
14      Q.    Understood.  I just want to be
15  clear, because I asked if you personally talked
16  to any of these people and you said yes, you
17  did.  So what I'm trying to do here is
18  understand who did you, Colleen, talk to versus
19  who did other people at Classy Cycles talk to,
20  so I will ask my question more clearly.
21          Did you, Colleen, personally speak
22  directly with anybody who called to cancel
23  their reservations?
24      A.    Yes.
25      Q.    Do you remember approximately how

SWAB - PERSONAL

1  many people?
2      A.    No.
3      Q.    Would it be more than five?
4      A.    I don't remember.  That was 11 years
5  ago, I don't remember.
6      Q.    Do you think it would be more than
7  10?
8      A.    I don't remember.  Unfortunately, I
9  wish -- I wish I could tell you that, but I
10  didn't write down exactly how many customers.
11  It was just -- it was enough to upset you,
12  because they weren't coming to the beach so...
13      Q.    Okay.  So you spoke directly with
14  people who canceled reservations, but you don't
15  remember even ballpark how many people there
16  were; is that right?
17      A.    Correct.
18      Q.    Do you remember the specifics of any
19  of the conversations?
20      A.    No, they just said due to the oil
21  spill they didn't want to come to our beach,
22  that was it.
23      Q.    But you don't remember the day or
24  time?
25

SWAB - PERSONAL

1
2      A.    No.
3      Q.    Or how long any of those calls
4  lasted; is that right?
5      A.    Unfortunately, no.
6      Q.    That is fine, 11 years ago.  What we
7  don't want to do is six months from now you
8  say, yes, there were four phone calls at this,
9  so I'm trying to understand what you remember.
10      A.    Yeah, unfortunately I don't
11  remember.
12      Q.    That is fine.  But you do remember
13  that the people you spoke to said it was due to
14  the oil spill?
15      A.    Yes, ma'am.
16      Q.    Do you remember anything else they
17  told you about that?
18      A.    No, they just told us good luck.
19      Q.    Classy Cycles is seeking money in
20  this lawsuit; correct?
21      A.    Yes, ma'am.
22      Q.    Do you know the amount of damages
23  Classy Cycles is seeking in this lawsuit?
24      A.    How much we're seeking?
25      Q.    Uh-huh.

SWAB - PERSONAL

1
2      A.    $5 million.
3      Q.    Do you know how that $5 million is
4  calculated?
5      A.    Well, I know how much money that we
6  lost.  You take our tax returns from 2009 and
7  you minus that for every year.  If you go to
8  2013, that is $6.2 million.  Last year we did
9  $5 million.  So if we had the funds and BP
10  wouldn't have happened, we would have already
11  experienced that growth 11 years ago, not just
12  having it now.
13      Q.    You just said, so if we had the
14  funds and BP wouldn't have happened.  What do
15  you mean by "if we had the funds"?
16      A.    Well, if we would have had the
17  revenue and people were coming here, then we
18  would have had those funds to grow.  Instead,
19  we were using my father's money, my grandpa's
20  money and friends to borrow money to save our
21  company instead of using it to buy vehicles and
22  to be able to experience growth at that time,
23  because instead we were trying to save our
24  company.
25      Q.    So the damages you're seeking in

Page 138

SWAB - PERSONAL

1        this case are approximately $5 million; is that
2        right?
3            A.   Yes, ma'am.
4            Q.   Does that include lost profits?
5            A.   I don't understand what that means.
6        What does that mean?
7            Q.   Sure.  What I'm trying to understand
8        is what the $5 million represents.  Is it, you
9        know, some people might say there was damage to
10       my vehicle and it cost $1 million or some
11       people might say we lost profits in a year.
12       I'm just trying to understand what does the $5
13       million include?
14           A.   We lost profits.
15           Q.   And for what years -- I'm sorry, go
16       ahead.
17           A.   If you go from 2010 to 2014, it is
18       7.7 million.  But you guys were saying that we
19       would have to do it for three -- I'm sorry, for
20       four years, three to four years.  Well, this is
21       6.2.  So I figured $5 million, that is what I
22       made last year.  I probably would have made
23       that a lot sooner had we not had the BP oil
24       spill happen, so...
25

Page 139

SWAB - PERSONAL

1            Q.   Did Classy Cycles have 5 million in
2        revenue last year or 5 million in profits?
3            A.   Say that again.
4            Q.   Sure.  Did Classy Cycles have 5
5        million in revenue last year or 5 million in
6        profits?
7            A.   5 million is in total.
8            Q.   Total revenue or total profits?
9            A.   Total revenue.
10           Q.   I don't -- maybe I didn't hear you
11       correctly, so sorry for asking the same
12       question again, I just want to make sure I
13       understand.
14           So what years are you seeking lost
15       profits for in this lawsuit?
16           A.   So 2010 through 2012.  I'm sorry,
17       2010 to 2013 is what I have on here.  Hello?
18           Q.   So you're seeking --
19           A.   There you are.
20           Q.   You are seeking lost profits for
21       2010 through 2013?
22           A.   Yes, ma'am.
23           Q.   Okay.  I will just remind you for
24       the record you do your best to testify with
25

Page 140

SWAB - PERSONAL

1        what you know.  I understand that Mr. Roof is
2        in the room with you, but there shouldn't be
3        any talking, okay?
4            A.   Oh, there is no talking.
5            Q.   Okay.  Are you seeking any types of
6        damages other than lost profits?
7            A.   I don't understand what that means.
8            Q.   Sure.  When you take the profits
9        that you lost through 2010 to 2013 and add it
10       all up, is that the entirety of the damages you
11       are seeking or are you seeking anything else?
12           A.   No, that is what we're seeking.
13           Q.   Did oil actually get on any Classy
14       Cycles' properties?
15           A.   No.
16           Q.   There was no direct damage from the
17       oil to any physical property for Classy Cycles?
18           A.   The oil was not on our property, but
19       it did damage our business.
20           Q.   Got it.  I'm showing you the next
21       exhibit.
22           A.   Is there a way we can have a break?
23           Q.   Yes.
24           A.   I would like to have lunch, if you
25

Page 141

SWAB - PERSONAL

1        don't mind.
2            MS. LITTLEFIELD:  No problem, let's
3        do that.
4            MS. ADAMS:  Colleen, is 30 minutes
5        okay?
6            A.   Yes, that is plenty.
7            MS. LITTLEFIELD:  Why don't we plan
8        to come back at -- why don't we plan to
9        come back at 1:15 central.  See y'all at
10       1:15, thanks.
11           VIDEOGRAPHER:  The time is 12:43
12       p.m., we're off the record.
13           (Recess, 12:43 to 1:16 p.m.)
14           VIDEOGRAPHER:  The time is 1:16 p.m.
15       This is the start of Media Number 4.  We're
16       on the record.
17           Q.   Welcome back, Ms. Swab.  You
18       understand you are still under oath?
19           A.   Yes, ma'am.
20           Q.   I sent you and I am showing you a
21       document titled Opt Out Letter Due By November
22       1, 2012 to the Court.  I will ask the court
23       reporter to please mark this as Exhibit 14.
24           (Exhibit 14 marked.)
25

SWAB - PERSONAL

1
2    Q.    Ms. Swab, can you see the document?
3    A.    Yes, ma'am.
4    Q.    Do you recognize this?
5    A.    Yes.  This is my signature, yes,
6  ma'am.
7    Q.    So that is your signature at the
8  bottom of the page?
9    A.    Yes, ma'am.
10   Q.    And you knowingly executed this on
11 behalf of Classy Cycles?
12   A.    Yes, ma'am.
13   Q.    Shortly before the break we were
14 talking about the ways in which the spill
15 affected your business.
16   A.    Yes, ma'am.
17   Q.    And you talked about the fact that
18 the spill caused you to have fewer customers;
19 right?
20   A.    Correct.
21   Q.    So the spill -- you allege that the
22 spill negatively impacted your revenues; is
23 that right?
24   A.    Yes, ma'am.
25   Q.    Do you also contend that the spill

SWAB - PERSONAL

1
2  increased your expenses?
3    A.    I'm sorry, say it again.
4    Q.    Sure.  Do you also contend that the
5  spill increased your expenses?
6    A.    Well, I mean, we're still going to
7  have expenses whether you have customers coming
8  or not, because you still have to pay the
9  bills.  I guess clarify, I don't -- I don't
10 understand what you are asking.
11   Q.    Sure.  So as I understand it, you
12 contend that the spill caused your revenues to
13 go down?
14   A.    Right.
15   Q.    And I'm just wondering did the spill
16 also have any effect on your expenses or did
17 they stay the same as they would have been
18 before the spill?
19   A.    Well, I mean you still have rent and
20 you still have to pay the utility bills so that
21 would stay the same.
22   Q.    So your expenses stayed the same
23 after the spill?
24   A.    Yes.
25   Q.    The spill didn't cause your expenses

SWAB - PERSONAL

1
2  to increase?
3         MS. ADAMS:  Objection.
4    A.    Well, I mean, we had to pay
5  everything out of pocket.
6    Q.    I'm sorry?
7    A.    We had to pay everything out of our
8  pocket.
9    Q.    When you say you had to pay
10 everything out of your pocket, you mean you had
11 to pay Classy Cycles' expenses out of your
12 pocket?
13   A.    Right, because we didn't have the
14 revenue coming in.
15   Q.    Understood.  I'm not asking exactly
16 how you paid the expenses.  I'm asking did the
17 spill cause your expenses to increase?
18        MS. ADAMS:  Objection, misleading.
19 Ms. Swab, you can go ahead and answer, if
20 you can.
21   A.    I'm not sure.  I don't know exactly
22 what the expenses were and you are asking
23 something of 11 years ago, so I don't know if
24 they went up or down.  I just know that -- that
25 we suffered damages and unfortunately it was

SWAB - PERSONAL

1
2  due to BP's spill, so...
3    Q.    Sitting here today --
4    A.    I'm not sure.
5    Q.    I'm sorry, please finish your
6  answer.
7    A.    No, go ahead.
8    Q.    Sitting here today, do you know one
9  way or the other whether Classy Cycles'
10 expenses increased after the spill?
11   A.    I don't know.
12   Q.    Sitting here today, are you alleging
13 that the spill caused Classy Cycles' expenses
14 to increase?
15   A.    I don't know.
16   Q.    I'm going to put back up the first
17 document we looked at, the very long one.  It
18 is Exhibit 1 and I will put it on the screen.
19 You also should have received that in your
20 inbox.
21        I'm showing you what has been
22 previously marked as Exhibit 1.  Can you see
23 it?
24   A.    Yes.
25   Q.    This is your Classy Cycles' GCCF

SWAB - PERSONAL

1   submission?
2        A.    Yes, ma'am.
3        Q.    And you were involved in preparing
4   this?
5        A.    Yes, ma'am.
6        Q.    To the best of your knowledge, is
7   all the information that you provided to the
8   GCCF accurate?
9        A.    Yes, ma'am.
10       Q.    So I'm going to scroll down into the
11  document to some of the attachments.  I'm going
12  to page 90 of the PDF, which is Bates labeled
13  BPB1-Classy_00000137.  Do you see the page I'm
14  referring to?
15       A.    Yes.
16       Q.    Okay.  And you see that this is a
17  profit and loss statement for December 2008?
18       A.    Yes.
19       Q.    Do you know who prepared this profit
20  and loss statement?
21       A.    No.  I would assume our accountant
22  did, but I didn't.
23       Q.    Do you know one way or the other
24  whether the information in this profit and loss

SWAB - PERSONAL

1   statement is accurate?
2        A.    I didn't prepare it.
3        Q.    Do you know --
4        A.    So our accountant --
5        Q.    I'm sorry, go ahead.
6        A.    Our accountant put this together,
7   but...
8        Q.    I understand that you did not
9   prepare it.  My question is a little bit
10  different.
11       A.    Okay.
12       Q.    Do you know one way or the other
13  whether the information in this profit and loss
14  statement is accurate?
15       A.    I don't know.
16       Q.    And who would know whether the
17  information in the profit and loss statement is
18  accurate?
19       A.    That would be Ruth McClain.
20       Q.    Would anybody besides Ruthie McClain
21  know whether the information in this profit and
22  loss statement is accurate?
23       A.    No.
24            MS. ADAMS:  Objection, calls for

SWAB - PERSONAL

1    speculation.
2        Q.    There are a number of profit and
3   loss statements attached to this.  As I'm just
4   clicking through, you can see there is one for
5   each month.
6        A.    Okay.
7        Q.    If I asked you that same question,
8   do you know whether the profit and loss
9   statements are accurate.  Would you have the
10  same answer for each of these profit and loss
11  statements?
12       A.    I didn't prepare them, but I would
13  say that the accountant put them together so I
14  would assume --
15       Q.    Sorry, go ahead.
16       A.    I would assume these are correct,
17  but I don't -- I didn't put them together.  So
18  I don't -- I would assume that they are
19  correct, but I have not gone through them and I
20  didn't put them together.
21       Q.    Am I understanding correctly that
22  for the profit and loss statement submitted to
23  the GCCF you assume they are correct?
24       A.    Yes, I assume.

SWAB - PERSONAL

1        Q.    But you don't know that for sure one
2   way or the other?
3        A.    Correct.
4        Q.    I'm just scrolling back to the
5   December 2008 page we were just on, which is
6   the Bates ending in 137.  And I'm going to pull
7   up a second document, so bear with me for a
8   moment.
9            I am showing you a document which is
10  Bates labeled CLASSY00000366.  I will ask the
11  court reporter to mark that as the next
12  exhibit, which is I believe Exhibit 15.
13           (Exhibit 15 marked.)
14       Q.    Ms. Swab, can you see the document?
15       A.    Yes, I see the document, yes, ma'am.
16       Q.    Do you know what this document is?
17       A.    It is our income statement.
18       Q.    For which year?
19       A.    2008 for Classy Cycles, Inc.
20       Q.    Do you know whether the information
21  in the 2008 income statement is accurate?
22       A.    I would assume so.  Our accountant
23  put it together and I don't have any reason to
24  think that it wasn't correct.

SWAB - PERSONAL

1                 SWAB - PERSONAL
2      Q.    I understand that you assume it is
3 accurate and you have no reason to believe it
4 is inaccurate.
5      A.    Correct.
6      Q.    Do you know for certain one way or
7 the other whether the information in the 2008
8 income statement is accurate?
9         MS. ADAMS:   Objection, asked and
10     answered.
11      Q.    You may answer.
12      A.    It is correct.
13      Q.    I'm going to show you the last two
14 documents we looked at at the same time, so
15 give me a moment again.
16         Okay.   Ms. Swab, can you currently
17 see two documents?
18      A.    I do.
19      Q.    On the left is Exhibit 1 that we
20 were just looking at, the profit and loss
21 statement; correct?
22      A.    Okay.
23      Q.    And then exhibit -- the one on the
24 right is Exhibit 15 that we were just looking
25 at, the 2008 income statement.

1                 SWAB - PERSONAL
2         Do you see that?
3      A.    Okay.
4      Q.    Since the profit and loss statement
5 is December 2008, I'm going to zoom in on
6 December 2008 in the income statement so we can
7 see it better.   Can you see the December 2008
8 better now?
9      A.    I do.
10      Q.    So starting with the profit and loss
11 statement from Exhibit 1, do you see here that
12 lists total income for December 2008 of $5,175?
13      A.    I see that.
14      Q.    And then going to the income
15 statement, do you see that it lists total
16 income in December 2008 of a little over
17 $272,000?
18      A.    I see that.
19      Q.    Do you know why the total income in
20 the profit and loss statement does not match
21 the total income in the income statement?
22      A.    I have no idea, because I didn't --
23 I didn't do either one of these documents.
24      Q.    You agree that they don't match
25 though; correct?

1                 SWAB - PERSONAL
2      A.    Oh, I agree they don't match, but I
3 didn't put either one of them together so...
4      Q.    So now similarly, if we look at the
5 December 2008 profit and loss statement for
6 total cost of goods sold it says $1,777.19.
7         Do you see that?
8      A.    I see it.
9      Q.    And then coming to total cost of
10 goods sold in the income statement it says a
11 little over $178,000.
12         Do you see that?
13      A.    I see that, but the profit and loss
14 is prepared by the accountant, so I don't -- I
15 don't know why they are so different.   I
16 provided what she provided me and I assumed
17 that they were correct.
18      Q.    Just one last number I want to look
19 at on this page, okay.   So here on Exhibit 1
20 you will see the gross profit for December 2008
21 is listed as $3,398.
22         Do you see that?
23      A.    Yes, ma'am.
24      Q.    And then gross profit on the income
25 statement is listed as $94,441.

1                 SWAB - PERSONAL
2         Do you see that?
3      A.    Yes, ma'am.
4      Q.    Do you agree that those don't match?
5      A.    Yes, ma'am.
6      Q.    And you don't know why those don't
7 match; correct?
8      A.    No, I have no idea why -- why
9 they're two totally different.
10      Q.    Is one of these sets of numbers
11 accurate?
12      A.    I'm sorry, say it again.
13      Q.    Sure.   So we're looking at two sets
14 of numbers for December 2008; correct?
15      A.    Right.   I would go by the statement.
16 I never went by the profit and loss, I never
17 went by the that.   I always went by the income
18 statement that we had for 2008, '09, '10.
19      Q.    So you would think that income
20 statement for 2008 and '09, et cetera, are the
21 accurate versions; is that right?
22      A.    Yes, ma'am.
23      Q.    And what is the basis for that
24 belief?
25      A.    I know that is what we went by.   I

SWAB - PERSONAL

1
2  don't know the profit and loss here.  I don't
3  know why they're so different.
4       Q.    And to the extent that the profit
5  and loss statements submitted to GCCF were
6  inaccurate, you did not know that at the time
7  it was submitted; correct?
8       A.    Absolutely not.  I didn't know until
9  you just showed me.
10      Q.    I understand that you believe the
11  income statement is the accurate version.  Are
12  you certain of that?
13      A.    Am I certain of it?
14      Q.    Uh-huh.
15      A.    Yes, ma'am.
16      Q.    Under oath you can state the income
17  statement, the information in the income
18  statement is accurate?
19      A.    Yes, ma'am.
20      Q.    What is the basis for that, Ms.
21  Swab?
22      A.    I mean, I would believe that the
23  income statement is what we have used, that is
24  what we had pay taxes on.  So that is -- I feel
25  that it is correct.

SWAB - PERSONAL

1
2       Q.    Your 2010 income statement turned
3  out to be incorrect; correct, right?
4       A.    Our tax return.
5       Q.    And your 2010 income statement?
6       A.    Yes, it was, but it was because we
7  had money that was loaned by my dad that was
8  put as revenue.  We didn't have that at this
9  time, because this is 2008 and 2009.  This is
10  pre-spill, this is before the spill.
11      Q.    I understand.  So your 2010 income
12  statement and some of the income statements
13  thereafter were inaccurate but --
14      A.    Yes, ma'am.
15      Q.    -- but you believe the 2008 and 2009
16  ones were accurate?
17      A.    Yes, ma'am.
18      Q.    And what is the basis for that
19  belief?
20      A.    We didn't -- my dad didn't put any
21  money at that time, so I felt that they were
22  correct.
23      Q.    Do you feel that they're correct or
24  do you know that they're correct?
25      A.    I know they're correct.

SWAB - PERSONAL

1
2       Q.    How do you know that they're
3  correct?
4       A.    I know they're correct, because that
5  is the paperwork that we gave to our accountant
6  and that is the -- we have bank statements, so
7  I know that is what we have for that timeframe.
8       Q.    The profit and loss statement is
9  also from your accountant; correct?
10      A.    I'm sorry?
11      Q.    The profit and loss statements are
12  also from your accountant?
13      A.    I'm not -- I'm not sure.  I'm not
14  sure that that one came from our -- I'm not
15  sure where that one -- if that is from our
16  accountant or not.  I know that the income
17  statements were done by our accountant.
18      Q.    Okay.  So your profit and loss
19  statements don't match your income statements;
20  correct?
21      A.    Yes, ma'am.  You're right on this
22  one, yes.
23      Q.    And you don't know why?
24      A.    No, ma'am.
25      Q.    I'm going to put up another document

SWAB - PERSONAL

1
2  that we've looked at previously, which is -- it
3  was marked as Exhibit 3.  Just a moment here
4  while I'm putting these up.
5            Has your father, to your knowledge
6  -- strike that?
7            Have any of Classy Cycles' owners
8  ever made loans to Classy Cycles before the
9  spill?
10      A.    Before the spill?
11      Q.    Uh-huh.
12      A.    Not that I'm aware of, but I don't
13  know before then.
14      Q.    So if you don't know whether there
15  were loans --
16      A.    There wasn't any loans that my dad
17  needed to make, because we didn't have any
18  issues prior to 2010.
19      Q.    I'm showing you a document that has
20  already been marked as an exhibit.  This was --
21  this is your 2009 tax return previously marked
22  as Exhibit 7.
23            Do you see that?
24      A.    Yes.
25      Q.    Scroll down to the second page here,

SWAB - PERSONAL

1  make it a little larger.  Do you see line -- do
2  you see line 19 is loans from shareholders?
3
4       A.   Okay.
5       Q.   And then scrolling over it says
6  beginning of tax year, $38,015.
7            Do you see that?
8       A.   Okay.
9       Q.   Were you aware that Classy Cycles'
10  shareholders had made loans of up to $38,000 at
11  the beginning of 2009?
12       A.   No, I wasn't.
13       Q.   And if we come over to the right
14  still on line 19, you see it says end of tax
15  year loans for shareholders, $79,308?
16       A.   I see that.
17       Q.   Were you aware that Classy Cycles
18  had loans from shareholders of up to $79,308 at
19  the end of 2009?
20       A.   No.
21       Q.   Now that you know that there were
22  loans made prior -- well, strike that.
23            Do you have any reason to believe
24  that the information here in your tax returns
25  is incorrect?

SWAB - PERSONAL

1
2       A.   Like I said, I didn't know what my
3  dad put in before then, so I didn't know any of
4  that.
5       Q.   Now that you know that there were
6  loans made to the company before the spill,
7  does that change whether you think the income
8  statements need to be reevaluated before the
9  spill?
10       A.   I don't believe --
11            MS. ADAMS:  Objection.
12       A.   -- to my knowledge.
13       Q.   Sitting here today, you believe that
14  the 2009 income statements are accurate?
15       A.   Yes.
16       Q.   And what is the basis for that
17  belief?
18       A.   Well, like I said, I didn't know
19  that beforehand, but based on our bank
20  statements and the documents that we had turned
21  in that is what she came up with.  And the
22  reason that 2010 was different is because we
23  had an accountant tell us it was incorrect, so
24  that is why I know it is incorrect.
25       Q.   But you have already testified that

SWAB - PERSONAL

1  you didn't ask your accountant to check if the
2  2009 income statements are correct; right?
3
4       A.   No, ma'am, you are right, I didn't.
5       Q.   So your previous accountant prepared
6  the income statements for 2008, 2009, 2010,
7  2011; correct?
8       A.   Yes, ma'am.
9       Q.   The 2010 and 2011 income statements
10  turned out to be inaccurate; correct?
11       A.   Correct.
12       Q.   You did not have your accountant
13  check whether the 2008 and 2009 income
14  statements are accurate; correct?
15       A.   Correct.
16       Q.   The company did have shareholder
17  loans in 2009; correct?
18       A.   Correct.
19       Q.   Sitting here today, can you testify
20  under oath that the information in the 2009
21  income statement is accurate?
22       A.   I can't.  I don't know that.
23       Q.   Sitting here today, can you testify
24  that the information in the 2008 income
25  statement is accurate?

SWAB - PERSONAL

1
2       A.   I don't know that.
3       Q.   Ms. Swab, have you personally ever
4  made a loan to Classy Cycles?
5       A.   Have I?
6       Q.   Yes.
7       A.   Yes.  I can't tell you --
8       Q.   Approximately --
9       A.   I can't tell you when that was or
10  how much it was right off the top of my head.
11       Q.   Sure.  Approximately how many times
12  have you personally made loans to Classy
13  Cycles?
14       A.   I don't know.
15       Q.   Would it be more than once?
16       A.   I don't know.
17       Q.   Do you know an approximate amount
18  that you loaned to Classy Cycles?
19       A.   No, ma'am.
20       Q.   Have all your loans from Classy
21  Cycles been repaid?
22       A.   I don't know that, I don't know.
23       Q.   Have any of your loans -- you know,
24  I am going to rephrase my last question, sorry.
25            Has Classy Cycles repaid all of your

SWAB - PERSONAL

1  fees.  So that part I do know, so I'm sorry if
2  that was contradicting but I guess I didn't
3  understand your question earlier.
4      Q.    No need to apologize.  I appreciate
5  the explanation, it is helpful.  Looking at
6  this chart, there is no management fees in
7  November and December 2010.
8          Do you know why that is?
9      A.    I don't.
10         MS. LITTLEFIELD:  I think I don't
11  have anymore questions in the individual,
12  but can we take another 5-minute break just
13  so I confirm?
14         MS. ADAMS:  Yes.  So does that mean
15  I guess we're going to continue with
16  technically the remaining topics related to
17  the corporate?
18         MS. LITTLEFIELD:  We will begin the
19  30(b)(6), yes.
20         MS. ADAMS:  Okay, sorry.  I have
21  done so many corporate rep depositions that
22  were usually individually and on behalf of
23  the corporate rep.  So this is a little bit
24  unusual for me considering you have already

SWAB - PERSONAL

1  covered at least half the topics if not
2  more, but that is fine with me.
3         Five minutes, is that enough,
4  Colleen, or do you want 10?
5      A.    Yeah, give me 10.  I have got to use
6  the restroom.
7         MS. LITTLEFIELD:  That is fine.
8         VIDEOGRAPHER:  The time is 2:44 p.m.
9  This the end of Media Number 4, we're off
10  the record.
11         (Recess, 2:44 to 2:57 p.m.)
12         VIDEOGRAPHER:  The time is 2:57 p.m.
13  This is the start of Media Number 5, we're
14  on the record.
15         MS. LITTLEFIELD:  We have no further
16  questions for Ms. Swab for the individual
17  portion of the deposition.
18         MS. ADAMS:  Okay, and plaintiff will
19  reserve until the time of trial.
20         MS. LITTLEFIELD:  Go off the record.
21         VIDEOGRAPHER:  Time is 2:57 p.m.
22  we're off the record.
23         (Deposition concluded at 2:57 p.m.)

SWAB - PERSONAL

1  I, Colleen Swab, do hereby certify under
2  penalty of perjury that I have read the foregoing
3  transcript of my deposition taken on February 22, 2021
4  that I have made such corrections as appear noted
5  herein in ink, initialed by me; that my testimony as
6  contained herein, as corrected, is true and correct.

7  Dated this _____ day of _____, 2021,
8  at _____, _____.

9  _____
10         Colleen Swab

SWAB - PERSONAL

C E R T I F I C A T E

1      I, SUSAN S. KLINGER, a certified
2  shorthand reporter within and for the State
3  of Texas, do hereby certify:
4      That COLLEEN SWAB, the witness whose
5  deposition is hereinbefore set forth, was
6  duly sworn by me and that such deposition
7  is a true record of the testimony given by
8  such witness.
9      I further certify that I am not
10  related to any of the parties to this
11  action by blood or marriage; and that I am
12  in no way interested in the outcome of this
13  matter.
14      IN WITNESS WHEREOF, I have hereunto
15  set my hand this 4th day of March, 2021.

_____
Susan S. Klinger, RMR-CRR, CSR
Texas CSR# 6531