UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN Re: Oil Spill by the Oil Rig                                        MDL 2179
"Deepwater Horizon" in the Gulf
of Mexico, on April 20, 2010

_____

PERTAINS TO:                                                          SECTION J-1
*Fin & Feather, LLC v. BP, plc, et al.*, 16-6118
*Fin & Feather Adventures, LLC v. BP, plc, et al.*, 16-6126
*Fin & Feather Cabins, LLC v. BP, plc, et al.*, 16-6131

## FIN & FEATHER'S OPPOSITION MEMORANDUM
## TO BP'S MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

TABLE OF EXHIBITS ......................................................................................................... iii

I.      BACKGROUND  .................................................................................................... 1

        A.  Factual Background  ..................................................................................... 1

             a.   Fin & Feather was resilient and growing  ......................................... 1

             b.   The BP Oil Spill had substantial negative impacts on Fin & Feather  ........... 4

        B.  Procedural Background ................................................................................ 6

II.     LAW AND ARGUMENT  ..................................................................................... 8

        A.  Fin & Feather has viable claims under the Oil Pollution Act  ..................... 8

             1.   The Oil Spill caused damage to the waters of Barataria Bay  ......................... 9

             2.   The damage to those natural resources caused Fin & Feather's damages  ...... 9

        B.  Fin & Feather can meet the evidentiary burden to prove its claims.  ...................... 10

             1.   Fin & Feather's business records are reliable.  ............................................... 10

             2.   The Oil Spill negatively impacted Fin & Feather's business.  ....................... 11

             3.   Fin & Feather can calculate its damages to a reasonable certainty.  .............. 13

             4.   Pelican Plantation would be operating today but for the BP Oil Spill.  ......... 17

             5.   Fin & Feather's growth made the future cabins a certainty.  ......................... 21

             6.   Fin & Feather's boat shed claims are viable.  ................................................ 22

             7.   Fin & Feather mitigated its damages, which remain ongoing.  ..................... 23

        C.  Genuine disputes of material fact exist regarding Maritime Law Claims.  ............... 24

III.    CONCLUSION  ..................................................................................................... 25

## **TABLE OF EXHIBITS**

|  | EXHIBIT NO. |
|---|---|
| Stephen S. Kreller Declaration | 1 |
|  |  |
| Feb. 10, 2021 Kirk Prest Deposition Excerpts | 1-A |
| Feb. 11, 2021 Kirk Prest Deposition Excerpts | 1-B |
| Feb. 11, 2021 Denise Prest Deposition Excerpts | 1-C |
| Fin & Feather Cabin Published Rates | 1-D |
| Fin & Feather Lodge Published Rates | 1-E |
| Fin & Feather Social Media Posting | 1-F |
| ERMA Map of Deepwater Horizon Wreckage and Surface Oiling (TREX-013249) | 1-G |
| LDWF Recreational Fishing Licenses and Permits | 1-H |
| LDWF Hunting Licenses and Permits | 1-I |
| Sept. 29, 2020 Correspondence from C. Keegan | 1-J |
|  |  |
| Kirk Prest Affidavit | 2 |
|  |  |
| Fin & Feather Advertising Pamphlet | 2-A |
| Fin & Feather Trade Show Advertising | 2-B |
| Fin & Feather Businesses Site Map | 2-C |
| Pelican Plantation Design Drawings | 2-D |
| Fin & Feather Adventures, LLC 2010 Trip Cancellations | 2-E |
| Oil Spill Photographs Taken by Kirk Prest | 2-F |
|  |  |
| James (Jack) Howard Declaration | 3 |
| Roy R. Williams, Jr. Affidavit | 4 |
| Captain Lloyd Landry, IV Affidavit | 5 |
| John Mark Patrick Affidavit | 6 |
| Michael Bush Affidavit | 7 |
| Millard McCord Declaration | 8 |
| Kendall Hyatt Affidavit | 9 |
| Jim Presley Affidavit | 10 |
| Rudy (Joe) Wadle, Jr. Declaration | 11 |
| Dr. Jonathan Collier Declaration | 12 |
| Ralph Litolff Declaration | 13 |
| Al J. Robert, Jr. Declaration | 14 |
| Extent and Degree of Shoreline Oiling Journal Article (TREX-012199) | 15 |
| Dr. Donald Boesch MDL 2179 Trial Testimony Excerpts | 16 |

Plaintiffs are three separate limited liability companies: (1) Fin & Feather, LLC; (2) Fin & Feather Cabins, LLC, and (3) Fin & Feather Adventures, LLC (collectively referred to herein as F&F, unless otherwise indicated). The evidence brought forth by F&F in this opposition memorandum establishes that summary judgment is procedurally and substantively unwarranted. As detailed herein, F&F's evidence establishes viable theories of recovery that merit presentation of its claims to the factfinder.

## I.      BACKGROUND

### A.      Factual Background

#### 1.      <u>Fin & Feather was Resilient and Growing</u>

From its start, F&F has catered to recreational anglers and sport fisherman seeking to fish and hunt in the heart of Louisiana's Sportsman's Paradise. The business is located on Highway 23 in Boothville, Louisiana, which provides clients easy access to the inshore waters of the Barataria Basin and the areas around Barataria Bay. All three F&F entities are equally owned by Kirk and Denise Prest. To date, F&F has not received a single payment for damages it has suffered as a result of the BP Oil Spill. Ex. 2, Prest Aff., ¶40.

The families of both Kirk and Denise have spent generations in Plaquemines Parish. The Prests have been married for 30 years and have a son, Kirk, Jr., who is now 21-years old. Mr. Prest grew up hunting and fishing and has remained an avid outdoorsman throughout his life. Like any experienced fisherman who has spent a lifetime fishing the same area, he is intimately familiar with the inshore waters in and around Barataria Bay. He has spent years fishing for speckled trout, red fish, flounder and black drum, both for sport and as a guide for his clients. Ex. 2, Prest Aff., ¶7-9.

Around 2001, the Prests purchased the 4.5 acres that F&F currently occupies. Their plan was to build a side business that would grow into a full-time business that would allow them to share the outdoors experiences that Kirk had growing up as child with their own son, Kirk, Jr. The Prests started the F&F business by constructing and renting boat sheds because such a business could be operated without a substantial time commitment. By early 2010, notwithstanding the impacts of Hurricanes Katrina, Gustav, and Ike, F&F was still renting its rebuilt boat sheds, offering guided hunting and fishing tours, renting eight cabins and the Blue Marlin Lodge, and continuing to grow and expand the business. Ex. 2, Prest Aff., ¶11-12.

At the outset, F&F hoped to cater to two core groups of clients. The first was those with their own boats who were looking for a well-maintained place to spend the night so that they could get up and start fishing the next morning. Many of these clients stored their boats with F&F, but there were many from surrounding areas that would just drive in for a few days. The other group of clients that F&F catered to were those looking for guided fishing and hunting adventures. In 2006, Mr. Prest took a buy-out from his employer and the Prests began devoting their full-time efforts to building the F&F business. Ex. 2, Prest Aff., ¶13.

Once the Prests overcame the challenges posed by Hurricane Katrina and started spending their full-time efforts with F&F, they began marketing both inside and outside of Louisiana. They developed a web site and put together "blast and cast" packages that permitted them to market the hunting and fishing experiences that F&F provided via the internet and using brochures distributed to tourists seeking a fishing or hunting adventure. Ex. 2-A. Starting in 2008 and 2009, they were advertising in Rod and Reel and Louisiana Sportsman, along with renting a booth at large outdoor trade shows in Tampa, Miami, and Atlanta. Ex. 2-B.

Due to their marketing efforts, F&F started selling more all-inclusive experiences in 2008 and 2009. These packages permitted their customers to pay a single fee for lodging, food, and guided hunting and fishing tours. A review of their calendars for 2008 and 2009 indicates that F&F clients primarily came from Louisiana, Mississippi, Florida, and Texas, but that it has hosted customers from around the country. *See* BP Ex. 12, pp. 20-21, 30-32, and 38-40. Around 2008, after getting to know many of their customers, the Prests realized that there was another market opportunity that they had not fully recognized: businesses using hunting and fishing trips as a means to build business relationships with clients, potential clients, employees, and/or potential employees. Early on, the Prests were fortunate enough to earn the business of Mr. Mark Patrick, a Vice President of National Accounts for a Fortune 500 global manufacturer of plastic packaging products. Ex. 6, Patrick Aff., ¶¶ 2-3.

As the Prests were growing their business, they recognized that Mr. Patrick could assist them in better-serving clients like him and his employer and that doing so would prove lucrative for their business. Accordingly, they sought his input before building the Blue Marlin Lodge. *Id.* at ¶21. During those discussions, the Prests recognized that building a facility that could cater to larger corporate groups like Mr. Patrick's was an idea that was worth pursuing.

As detailed in Section II(B)(4) herein, the Prests undertook significant efforts to develop a facility known as the Pelican Plantation that would cater to the needs of customers like Mr. Patrick. As the Prests made progress on the project, Mr. Patrick advised them that if they built it, his employer would spend $100,000 per year entertaining clients at their facility. Ex. 6, Patrick Aff., ¶27. As Mr. Patrick attests, if the facility had been operating in 2012 with hunting and fishing conditions that were comparable to before the oil spill, there is no reason that his company would not have already spent $900,000 at Pelican Plantation by now. *Id.* The project was rendered futile

by the Oil Spill and the destruction of the estuaries, nurseries, and fishing grounds that were the focus of F&F's business.

### 2.  The BP Oil Spill had substantial negative impacts on Fin & Feather.

The BP Oil Spill deeply disrupted the hunting and fishing conditions that had been established in and around the Venice area for decades. As detailed on the following map, oil spilled from the DEEPWATER HORIZON catastrophe spread across the Gulf of Mexico, Barataria Bay, and it contaminated the waters fished and hunted by F&F's customers:



In the wake of the BP Oil Spill, Mr. Prest participated in the Vessels of Opportunity ("VoO") program and regularly travelled the estuaries, fisheries, and nurseries that he had fished his entire life. During that time he took many pictures of the damage that occurred after BP discharged 3.19 million barrels of oil and gas into the Gulf of Mexico, suppressed it with Corexit, and contaminated the natural resources and marine habitat where F&F conducted its hunting and fishing charter trips. *See* Ex. 4 (Williams Affidavit); Ex. 1-A (K. Prest Feb. 10, 2021 Depo.) at 53:8 – 55:5, 74:5 – 19, 213:9 – 219:9; Ex. 1-B (K. Prest Feb. 11, 2021 Depo.) at 46:22 – 47:19, 48:14 – 23; Ex. 2-F (Oil Spill Photographs).

In addition to the testimony of Mr. Prest, this opposition is supported by affidavits and/or declarations from multiple customers who regularly fished out of F&F before the BP Oil Spill and who have continued to do so afterward. As detailed herein, they consistently attest that before the BP Oil Spill, it was expected that everyone would readily reach the limits of whatever they were hunting or fishing. Mr. Patrick, for example, attests as follows:

> Before the BP Oil Spill, we could travel 15 minutes from the dock near Fin & Feather to any number of fishing spots and limit out in speckled trout before 10:00 am or 11:00 am. After the BP Oil Spill, we have to travel at least an hour to the Southwest Pass to find any fish, let alone speckled trout or redfish. I had not been to Southwest Pass before the oil spill, but it is now one of the only places that we can reliably catch fish.

Ex. 6, Patrick Aff., ¶34. See also Ex. 12, Collier Dec., ¶21 and Ex. 11, Wadle Dec., ¶¶ 24-25.

These observations are buttressed by Captain Lloyd Landry, a licensed professional charter fishing guide since approximately 2002. Ex. 5, Landry Aff., ¶2. From July 2007 through August 2017, Captain Landry owned and operated a six-bedroom/four-bathroom camp at 30593 Highway 11, Buras, Louisiana that was not located far from F&F. *Id.* at ¶4. Like F&F, Captain Landry used the Buras Camp to host charter fishing clients interested in catching speckled trout and red fish, along with those clients interested in duck hunting. *Id.* at ¶5. Captain Landry's Affidavit provides a detailed description of the impacts that BP's Oil Spill had on the waters that he fished with his customers—the same waters fished by F&F and its customers.

As a result of the detrimental impacts of the Oil Spill on the estuaries, nurseries, and fishing population, Captain Landry's days grew longer and his fuel expenses grew larger as he struggled to find speckled trout for clients to catch. *Id.* at ¶13. Ultimatley, the damage to the speckled trout fisheries caused such a decline in his charter fishing business that he listed his Buras Camp in 2015 and ultimately sold it at a loss in August 2017. *Id.* at ¶17. Captain Landry attests that it took him over two and one-half years to sell the Buras Camp because the market had been seriously

impacted by the loss of fishing in the area. Although he was hoping that he could sell the Camp to another charter captain, he ultimately sold it to a family. *Id.* at ¶23. He says that it was incredibly difficult for him to relocate his operation and observed that his investment in his camp was not nearly as significant as that made by the Prests. *Id.* at ¶25.

In addition to the evidence already presented to this Court via the earlier trials, the observations of long-time F&F clients and professional fishermen like Mr. Prest and Captain Landry, F&F has also retained two fisheries experts, Scott Goodman with Natural Resource Consultants, Inc. and Heather Reed with Ecological Consulting Services, Inc., who will render expert opinions establishing that the BP Oil Spill was the cause of the decline to the fishing populations discussed herein.

### B. Procedural Background

On May 27, 2021, BP filed a Motion for Summary Judgment (Rec. Doc. 27124) seeking to dismiss F&F's claims for damages. The filing was made in accord with PTO 69, which outlined the process for this Court to "get a little further down the road" on the remaining B1 economic loss opt-out cases. More specifically, Paragraphs II(A)(1) and II(B)(1) of PTO 69 specifically provide that "further document discovery is not required at this time" and "expert discovery is not required at this time."

Prior to the entry of PTO 69, undersigned counsel raised concerns with counsel for BP that the scope of the proposed motion practice might be too broad to resolve under the current procedural posture (*i.e.*, limited third-party discovery, etc.), so the undersigned asked BP to document the anticipated scope of this motion practice. Mr. Keegan obliged when he sent the following after a status conference between counsel seeking to come to terms on the proposed language of PTO 69:

> BP also anticipates that it will file motion practice to narrow the Fin and Feather claims with a focus on (a) limiting the categories of damages requested, such as seeking to dismiss the damages for future developments and (b) seeking to limit the time period for damages to a reasonable period. BP believes that the Case Management Order provides for an efficient path towards those motions in both instances.

Ex. 1-J, Kreller Declaration. Based on the foregoing, undersigned counsel anticipated that BP's Motion would seek to address issues that have presented roadblocks to the potential resolution of this case: (1) whether F&F is entitled to any damages related to the development of Pelican Plantation and six other cabins located on its property; and (2) the time period for which F&F might be entitled to damages for its existing business.

BP's Motion, however, goes beyond that and seeks to dismiss F&F's OPA claim for lost rental income from its existing cabins and charter business on the grounds that the losses from such business cannot be calculated with reasonable certainty. Rec. Doc. 27124-1, pp. 12–14 and 19-21. Additionally, BP asserts that it is also entitled to summary judgment because F&F has insufficient scientific evidence to create any genuine issue of material fact as to whether the BP Oil Spill impacted the relevant fisheries. *Id.* at p. 21.

As there has been no compulsory expert discovery deadline established in this case, F&F has not produced anticipated expert reports in support of its claims, nor has it had the benefit of compulsory third-party discovery. Inasmuch, in the event that this Court is inclined to determine that F&F cannot meet its burden on a claim, Rule 56(d) of the Federal Rules of Civil Procedure is implicated. Rule 56(d) establishes that if a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order.

As detailed in the declaration by undersigned counsel in Ex. 14 outlining the additional discovery implicated by BP's Motion, there is good grounds for this Court to permit F&F to conduct such discovery before dismissing any of its claims. Notwithstanding the foregoing, F&F submits that there is sufficient competent evidence establishing genuine issues of material fact that make summary judgment improper herein. To the extent this Court is inclined to find otherwise, F&F urges this Court to issue an Order pursuant to Rule 56(d) permitting plaintiffs to supplement this opposition with further evidence, including the development and submission of expert testimony, before dismissing any of Plaintiffs' claims.

## II.    LAW AND ARGUMENT

When resolving a motion for summary judgment, the court must review the facts and inferences in the light most favorable to the non-moving party, and the court may not evaluate the credibility of witnesses, weigh the evidence, or resolve factual disputes. *International Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir.1991).

### A.    Fin & Feather has viable claims under the Oil Pollution Act.

The Oil Pollution Act ("OPA") imposes liability on a responsible party for damages resulting from the discharge of oil or other pollutants into or upon Unites States navigable waters. 33 U.S.C. 2701-2761; *See Gabarick v. Laurin Mar. (Am.), Inc*., 406 F. App'x 883, 888 (5th Cir. 2010); *Buffalo Marine Servs. Inc. v. United States*, 663 F.3d 750, 752 (5th Cir. 2011); *Rice v. Harken Expl.*, 89 F. Supp. 2d 820, 823 (N.D. Tex. 1999) (citing 33 U.S.C. §§ 2701(32), 2702(a)). Under OPA, a plaintiff must prove that (1) there is a discharge of oil or covered oil-related substances, and (2) the discharge went into navigable waters or poses a substantial threat to navigable waters of the United States. *Rice v. Harken Expl. Co*., 250 F.3d 264 (5th Cir. 2001).

A plaintiff that proves these elements may recover "[d]amages equal to the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, or natural resources, which shall be recoverable by any claimant." 33 U.S.C. § 2702(b)(2)(E). In this case, the Court has decided the first two issues: The Spill was a discharge of oil or covered oil-related substances that went into navigable waters of the United States. *See* Nov. 30, 2015 Penalty Phase Findings of Fact and Conclusions of Law (MDL 2179 Rec. Doc. No. 15606) at ¶¶6, 20, 31, 33 – 36, 42, 64. BP now raises challenges to causation and damages.

### 1.   The Oil Spill caused damage to the waters of Barataria Bay

On April 20, 2010, the Spill sent millions of barrels of crude oil into the waters of the Gulf of Mexico and adjoining inshore waters, a natural resource. Defendants later released toxic dispersants, including Corexit, to disperse the oil. In June of 2010, NOAA estimated that the Spill had contaminated Gulf waters encompassing 86,985 square miles. There is no dispute that this area encompassed the primary areas were F&F brought its customers to hunt and fish. *See* Nov. 30, 2015 Penalty Phase Findings of Fact and Conclusions of Law (MDL 2179 Rec. Doc. No. 15606) at ¶¶6, 20, 31, 33 - 36, 42, and 64.

### 2.   The damage to those natural resources caused Fin & Feather's damages.

Under OPA, the causation element requires that the damage be caused by the oil spill, and that the economic loss be caused by the damage. 33 U.S.C. §§ 2702(a); 2702(b)(2)(E). F&F's business model is dependent on the natural resources, specifically the speckled trout, redfish, and flounder that have populated the inshore waters located within a ten-mile radius of its facility. As the world watched the disaster of the Spill for 87 days, there were obvious consequences to F&F as the multitude of trips already scheduled for 2010 were lost. Since the spill, fishermen have substantially reduced the number of trips taken to the Venice area and/or chosen to spend their

time and money fishing elsewhere. *See* Exs. 11 (Wadle Dec.), 12 (Collier Dec.), and 16 Patrick Aff.).

### B.       Fin & Feather can meet the evidentiary burden necessary to prove its claims.

BP raises several arguments in an attempt to avoid responsibility for compensating F&F for the damages it has suffered as a result of its Oil Spill. The following arguments detail the viability of F&F's claims: (1) F&F's business records are sufficiently reliable; (2) the BP Oil Spill negatively impacted F&F's business; (3) F&F can calculate its damages to a reasonable certainty; (4) Pelican Plantation would be operating today but for the BP Oil Spill; (5) F&F's growth made the future cabins a certainty; (6) F&F's claim for boat shed damages is also viable; and, (7) F&F did not fail to mitigate its damages, which remain ongoing.

### 1.       Fin & Feather's business records are reliable.

F&F began as a side business that was operated by the Prests while they were both working full-time jobs. In 2006, when the Prests quit their corporate jobs to focus on F&F, they were in the midst of rebuilding the boat sheds, the Dolphin cabin, and bring Greenwing Teal, Mallard, and Wahoo cabins online. The Prests did not run their business on a computer or use Quickbooks. They did, however, keep records in the regular course of their business that included reservation calendars, bank statements, and income tax records. As indicated during the 30(b)(6) deposition of the F&F entities, Ms. Prest was capable of reviewing these records and providing responses to detailed inquiries about the F&F businesses. See Ex. 1-C, (F&F 30(b)(6) depo, Denise, pp. 62:7-63:19).

BP asserts several arguments that F&F's records are unreliable because the Prests did not always book revenue with the entity that technically earned it. Rec. Doc. 27124-1, p. 8. Similarly, BP complains that F&F cannot sufficiently distinguish its charter and lodging income. *Id.* at p. 20.

Bookkeeping practices like those employed by F&F are not unusual for small businesses. Ex. 13, Litolff Dec., ¶¶13-14. Although not ideal, the records, combined with the ability of Ms. Prest to interpret and elaborate upon them when questions arise, are sufficient to permit a forensic accountant to rely upon them in forming an expert opinion about the losses suffered by both the existing business and to also competently inform about the impact about the loss of future businesses. *Id.* at ¶¶21-22.

The three F&F businesses were ultimately operated as a single entity but for the filing of tax returns (and the associated allocation of expenses and income). Accordingly, cumulating the tax returns of the three F&F entities provides a reliable overview of F&F business over the course of time. *Id.* at ¶¶17-19. Mr. Litolff has prepared a summary chart compiling these results and it is attached to his declaration as Exhibit 19, ¶20. As indicated on the chart, F&F's net revenue grew year over year from 2007 through 2009, although there was a loss of net income in 2009. Notwithstanding that downturn, which can be partly attributed due to impacts of Hurricane Gustav, F&F was a profitable business.

## 2.   The Oil Spill Negatively impacted Fin & Feather's business.

The cumulative net revenue of the F&F entities in the three years before the Oil Spill (2007 through 2009) was roughly $215,000, $242,00, and $262,000. Ex. 19 (Litolff Dec., ¶20). BP highlights that 2010 income increased significantly due to the money F&F earned from renting its cabins to entities involved in the Oil Spill clean-up effort. The total net revenue earned by F&F in 2010 was roughly $665,000—nearly the total revenue of the previous three years combined. *Id.* BP argues that it is entitled to summary judgment on F&F's OPA claim for lost rental income from existing cabins because the "Spill did not harm Plaintiffs' cabin rental business." Rec. Doc. 27124, p. 12. More specifically, it argues that because of F&F's "longstanding financial struggles pre-

dated the Spill and improved multiples over directly due to the Spill, Plaintiffs cannot show the Spill harmed the Existing Cabins business." *Id.* at p. 13.

BP advances this narrative by referring to prayers that Ms. Prest made in her reservation book in the wake of Hurricane Gustav referring to F&F's business as "broken." As explained in F&F's Response to BP's Statement of Uncontested Facts 32 and 33 (p. 6), the reliance on such statements is misplaced. Although F&F faced (and overcame) substantial struggles in the years between Hurricane Katrina and BP's Oil Spill, the Prests had worked hard to grow their business and they were poised to reap the benefits of those efforts in 2010. More specifically, as discussed both *supra* and *infra*, they had added significant capacity for both lodging and entertaining clients, in addition to substantially investing into marketing efforts. As detailed in Exhibit 2-E, before the Oil Spill occurred, F&F had trips scheduled for 2010 that would have earned gross revenue of more than $860,000—nearly $200,000 more than it earned in 2010 from leasing its cabins to BP.

BP references ten cancellation letters that F&F received after the Oil Spill but raises concerns that the letters "do not indicate which cabins the customers reserved, the price of those rentals, or the duration of their stays." Rec. Doc. 27124, p. 8. Mr. Prest, however, prepared a detailed calendar and a listing that provided details identifying specific customers, duration of trip, and the anticipated revenue for a multitude of all-inclusive trips that F&F had scheduled for 2010.

That calendar and associated listing is attached hereto as Exhibit 2-E and it lists all of the trips with the following denotation behind them: (No. trips)(type of guided tours)(number in party "x" number of nights). By way of example, Mr. Jack Howard has the following Adventure Description: (3)Inshore(A.I.x9x4), which translates into three separate trips with nine people for four nights, billed at an all-inclusive rate for inshore fishing (meaning the rate includes lodging, food, guide fees). By Mr. Prest's calculation, Mr. Howard would have spent $37,800 with F&F on

his three trips. Those trips are further scheduled on the associated calendar that he prepared. See May 20-25, June 14-18, and November 8-12. Ex. 12-E, pp. 3-4, 9.

This document was prepared by Mr. Prest in 2010. Standing alone, F&F submits that it is sufficient to create genuine issues of material fact that undermine BP's request for summary judgment on F&F's OPA claim for lost charter income and lost rental income for existing cabins. Notwithstanding, F&F has obtained affidavits/declaration from many of these customers who confirm that these trips were, in fact, planned and cancelled as a result of the BP Oil Spill. These affidavits/declarations illustrate the nature of F&F's business and provide context to the massive growth that the business was expecting in 2010.

Mr. Jack Howard's declaration confirms that he had booked three trips in 2010, each for four nights, for eight clients/potential guests and himself with the plan of going inshore fishing for four days. Ex. 3, Howard Dec., ¶6. In 2009, Mr. Howard explains that he had started his own insurance business and that he was planning to bring potential and existing clients as part of business development efforts. *Id.* at ¶4. Mr. Howard was expecting to pay approximately $3,000 per day for these three trips, which would have totaled more than $36,000. *Id.* at ¶7. Mr. Howard cancelled the trips, however:

> Unfortunately, as a result of the BP Oil Spill that occurred in April 2010, I was concerned about the impacts of the spill and its impact on the fishing. Rather than risk wasting money, I chose to cancel my reservations with Fin & Feather and intended to reschedule my trips for the Outer Banks in North Carolina. That did not happen, however, because there was not sufficient interest from my clients and potential clients.

*Id.* at ¶8. Notably, Mr. Howard had visited F&F several times before the oil spill and also visited once after the spill occurred: "The fishing experience was so much worse, in that we did not catch what we had caught on all of my prior trips, that I considered it a different world." *Id.* at ¶ 11. Mr.

Howard also provides testimony that he likely would have continued to bring potential and existing clients in the years that followed if the Oil Spill had not occurred. *Id.* at ¶12.

Dr. Jon Collier is a radiologist who lives and operates a radiology practice in rural Arkansas. Ex. 12, Collier Dec., ¶6. In his declaration, Dr. Collier explains that the rural location made it difficult for him to recruit physicians to serve and grow his business. *Id.* at ¶11. Over the years, he was able to recruit multiple doctors who were also outdoorsmen by taking them on trips to fish out of Venice. *Id.* at ¶12. Dr. Collier explains that there was no fishing like fishing out of Venice and that he regularly visited F&F with radiologists already under his employment, along with potential recruits, as a means of building his team. *Id.* at ¶13. Before the oil spill in April 2010, Dr. Collier confirmed that he had at least three trips scheduled to visit and fish with F&F in 2010 and that he would have typically spent about $6,000 per trip. *Id.* at ¶¶ 15-16 and Ex. 5-E, pp. 3, 6, and 10 (indicating trips scheduled for May 13-15, August 9-11, and December 7-11). Dr. Collier cancelled these trips, however, due to the oil spill. *Id.* at ¶17. He further indicates that there was nowhere to replace the fishing that he had experienced in Venice before the oil spill. In hindsight, he recognized his business lost much of the camaraderie that had been built and nurtured during those prior trips. *Id.* at ¶18.

Likewise, Mr. Joe Wadle is a retired United States Marine who is also a long-time customer of F&F. Ex. 11, Wadle Dec., ¶¶2-4. Mr. Wadle lived in Baton Rouge and/or Mandeville, Louisiana for 20 years before moving to Virginia in 2007. After moving to Virginia, he regularly brought Marines from all over the United States with him on fishing trips to Fin & Feather. *Id*. at ¶8. He confirms that before the oil spill in April 2010, he had at least three trips scheduled to visit and fish with F&F in 2010. *Id*. at ¶13. He cancelled these trips due to his concerns about the impacts that the oil spill had on the fishing. *Id*. at ¶14.

Mr. Wadle explained that when he was inviting new friends to join him on the trips to F&F, he would say that if you want to go fishing and catch "eating" and sport fish, this is a great place to go. *Id*. at ¶11. He described F&F as "amazingly fine hosts" and explains that the fishing is just part of the reason to be there, which is why he has continued to travel to F&F since the oil spill that occurred in 2010. *Id*. at ¶20. Mr. Wadle estimates that he has been to F&F about 15 times since the oil spill, but indicates that he would have gone more frequently and with larger groups if the fishing was what it was before the oil spill. *Id*. at ¶21. Also see declarations provided by retired Major League Baseball player and coach, Mr. Jim Presley (Ex. 10) and Mr. Millard McCord (Ex. 8).

Collectively, the affidavits and declarations of F&F clients like Dr. Collier, Mr. Patrick, Mr. Wadle, and Mr. Presley paint a picture that starkly contrasts with BP's argument that its Oil Spill did not harm its existing cabins business. Taking the view of the foregoing competent summary judgment evidence in the light most favorable to F&F, F&F had a loss of more than $200,000 in 2010 even after taking into consideration the $664,000 it earned renting its cabins in support of the clean-up efforts in 2010. Although there were not trips scheduled in 2011 and beyond at the time of the Oil Spill, there is no reason that F&F would not have continued to experience the business that it was expecting in 2010. As will be established in due course in these proceedings, the damages that F&F suffered to its existing business as a result of the BP Oil Spill are substantial.

### 3.   F&F can calculate its damages to a reasonable certainty.

OPA allows recovery for "[d]amages equal to the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, or natural resources, which shall be recoverable by any claimant." 33 U.S.C. § 2702(b)(2)(E) (emphasis added). Furthermore, the

House Report noted that "[t]he claimant need not be the owner of the damaged property or resources to recover for lost profits or income." H.R. Conf. Rep. 101–653 (1990), republished in 1990 U.S.C.C.A.N. 779, 781; *see In Re Deepwater Horizon*, 808 F. Supp. 2d 943, 959 (E.D. La. 2011).

The recovery of lost profits does not require that the claimant's loss be "susceptible to exact calculation." *Great Pines Water Co., Inc. v. Liqui-Box Corp.*, 203 F.3d 920, 922 (5th Cir. 2000); *Coffel v. Stryker Corp.*, 284 F.3d 625, 638 (5th Cir. 2002). A plaintiff must show that the loss of profits is more probable than not. *Gulf Eng'g Co., LLC v. Dow Chem.Co*., 961 F.3d 763, 768 (5th Cir. 2020). The amount of a party's loss must be shown by competent evidence with "reasonable certainty" and must not be based on evidence that is uncertain or hypothetical. *Blase Indus. Corp. v. Anorad Corp.*, 442 F.3d 235, 238 (5th Cir.), cert. denied, 549 U.S. 817 (2006).

Evidence of lost profits is highly fact-intensive, and courts allow the fact finder to weigh the evidence. *Chemical Distributors, Inc. v. Exxon Corp.*, 1 F.3d 1478 (5th Cir. 1993). The use of expert witness testimony that is based on generally accepted methodologies is sufficient to prove lost profit damages with reasonable certainty. *Id.; G & H Soybean Oil, Inc. v. Diamond Crystal Specialty Foods, Inc.*, 796 F. Supp. 1214 (S.D. Iowa, August 10, 1992). Aside from expert testimony, a business owner's testimony may support lost profits. *See Homoki v. Conversion Services, Inc.*, 717 F.3d 388, 399-400 (5th Cir. 2013) (upholding an award of lost profits where the only proof came from plaintiff business owner's own testimony at trial).

As detailed in a declaration prepared by Plaintiffs' forensic accounting and economic damages expert, Mr. Ralph Litolff, F&F's lodging records from 2007 through 2019 are sufficient to establish historical occupancy rates for the existing cabins. Ex. 13, Litlolff Dec., ¶13. Combined with historical rental rates and input from the Prests, he can reliably determine the average nightly

rental rates earned for each cabin. *Id.* Using this data, along with 2010's anticipated charter income and occupancy rates since the Oil Spill, Mr. Litolff is able to prepare a report quantifying the damages suffered by F&F related to the loss of income from its existing cabins and charter business, along with the loss of future income associated with the additional cabins and Pelican Plantation. *Id.* at ¶22.

The availability of historic tax records from 2007 to date, along with relevant banking records (which documents monthly income associated with credit-cards receipts for the businesses) provides sufficiently reliable records for him to estimate these losses, including the loss of income resulting from non-booked trips since the spill, with reasonable certainty in accord with his professional standards. *Id.* at ¶23. Given the current procedural posture of these matters, BP's attempt to seek summary judgment based on an alleged inability to calculate its damages to a reasonable certainty is procedurally improper and premature.

4.      **Pelican Plantation would be operating today but for the BP Oil Spill.**

Given that the fact finder is allowed to weigh the evidence of lost profits, which is a highly fact-intensive consideration (*Chemical Distributors, Inc. v. Exxon Corp.*, 1 F.3d 1478 (5th Cir. 1993), F&F submits that the facts of this matter require that the availability and amount of these damages be left to the factfinder. Cases relied upon by BP are all readily distinguishable in that there is an intervening or superseding event that breaks the chain of causation (*i.e.*, in *Fredonia Farms*, No. 12-CV-1005, 2014 WL 3537323 (W.D. Mich., July 18, 2014),  the fact that the Plaintiffs decided to postpone bringing their project to market due to the downturn in the economy) or plainly insufficient evidence that financing was attainable (in *Grand Acadian v. Flour*, 07-CV—295, 2010 WL 1053701 (W.D. La. March 22, 2010) where Plaintiff's partial financing was conditioned upon 15 items and admissions that it could not satisfy four of them). As the following

outlines, there is sufficient activity undertaken by F&F that was ongoing at the time of the Oil Spill that warrants the denial of BP's motion on these claims.

BP asserts that F&F's plans to build the Pelican Plantation are speculative because there is no evidence that F&F could have obtained the necessary financing, had final construction plans, or could have obtained the necessary permits. Rec. Doc. 27124, p. 14. Recognizing that F&F could overcome these issues, it also argues that the Pelican Plantation was too speculative because it was a new line of business, intended to cater to an "untapped," "niche market." *Id.* at pp. 15-16. BP's arguments do not account for the efforts that F&F had already undertaken to advance its plans to build the Pelican Plantation. Accordingly, the following: (i) outlines the efforts that had been completed at the time of the Oil Spill, (ii) details the high likelihood that F&F would have obtained financing for the Pelican Plantation; (iii) outlines why permitting or other obstacles would not have sidetracked the project; and (iv) explains how the business was an outgrowth of its existing business that already had significant commitments that would have ensured its success.

Initially, once F&F decided to pursue Pelican Plantation, the Prests began taking concrete actions to make it a reaility. They purchased the adjoining 2.6 acres of property and undertook site preparations. F&F's Response to BP's Statement of Uncontested Facts, No. 44. They hired a designer and had blueprints prepared. *Id.* Mr. Prest worked with Kendell Hyatt, who he had an established history of working on projects for F&F (including, but not limited to, rebuilding boat sheds, building Blue Marlin Lodge, and making final additions to the Greenwing Teal, Mallard, Wahoo, Widgeon, and Speckled Trout cabins) to determine the cost to build the Pelican Plantation. As Mr. Hyatt attested, based on his history with the Prests, he would not have spent the time assisting on preparing the cost estimates if he did not believe the Prests were not going forward with the project. Ex. 9, Hyatt Aff, ¶¶13-14.

The Prests had already discussed the scope of the project and their desire for financing with their bank, Mississippi River Bank. As detailed in Exhibit 7, Mr. Bush was not only familiar with the Prests and their intent to build Pelican Plantation, but he was intimately familiar with the market that F&F was seeking to cater to. Ex. 7, Bush Aff., ¶1 and ¶8. Mr. Bush started working at Mississippi River Bank in 1982 and became President in 1983. *Id.* at ¶3. Mr. Bush (and Mississippi River Bank) has been intimately involved in the development of the recreational fishing industry in Plaquemines Parish. *Id.* at ¶8. Due to his position, he has worked closely with most of the businesses in Plaquemines Parish, especially those in Venice and Boothville. He has known the Prests personally and professionally since they began banking with Mississippi River Bank since at least 2004. *Id.* at ¶¶9-10.

In 2009, Mr. Bush was aware that the Prests were adding additional square footage to the Blue Marlin Lodge, and that Mississippi River Bank engaged in substantive discussions about financing a significant project referred to as Pelican Plantation. *Id.* at ¶14. He was aware that the Prests had spent considerable effort in designing Pelican Plantation to meet the demands of high-end corporate clients and attests that they spoke to him on several occasions about the project and the ways in which they planned to market the project. *Id.* at ¶15.

Mr. Bush attests that the Prests had a strong and well-established financial history with Mississippi River Bank and that, based on the underwriting environment at the time, he is confident that the Prests would have obtained the necessary approvals from both the Mississippi River Bank and the USDA. *Id.* at ¶¶17 and 20. Due to the impacts of the BP oil spill, however, the Prests' work on Pelican Plantation came to an abrupt stop and Mississippi River Bank was never presented with full construction plans and a budget that it would have required to make the anticipated loan. *Id.* at ¶21. But for the BP oil spill, Mr. Bush has attested that he has no reason to believe that the

Pelican Plantation development would not have gone forward and flourished under the Prests management. *Id.* at ¶22. Moreover, because of the BP oil spill and the negative impacts on fishing in Plaquemines Parish, Mr. Bush has also made clear that a loan on the Pelican Plantation project would not be a possibility today. *Id.* at ¶23.

F&F submits that, at a bare minimum, Mr. Bush's affidavit creates a genuine issue of material fact as to the financing issue. Given his long experience in underwriting in Venice in general, and the charter fishing business, specifically, Mr. Bush understood the market and the opportunities that F&F was pursuing. He also understood the scope of their project and has attested he believes that they would have obtained financing for Pelican Plantation but for the Oil Spill.

BP's complaints about F&F's lack of permits and final drawings also rings hollow. Obtaining a building permit is a ministerial task. The drawings are submitted, the square footage is calculated, and the permit fee is paid. There was no need to obtain insurance before construction commenced because there was nothing yet to insure. Moreover, as discussed in the following section, the Prests (and F&F) are resilient and capable of working through obstacles to pursue their vision. If unanticipated roadblocks had developed, the Prests would have worked diligently to address them.

Finally, BP's complaints that F&F was pursuing an untested niche market is also undermined by the testimony of Mr. Bush and its customers like Mr. Patrick and Mr. Presley. Exs. 6 and 10. As Mr. Patrick indicated, but for the BP Oil Spill, he asserts that his employer would have already paid $900,000 to Pelican Plantation. Ex, 6 Patrick Aff., ¶27. Any complaints that the Prests did not have the necessary experience to operate the Pelican Plantation belies the relationships that they have built with people like Mr. Patrick and Mr. Wadle.

Moreover, the Pelican Plantation would have actually simplified the efforts that F&F was already handling to host large groups in the Blue Marlin Lodge. Due to space constraints, when large groups were staying in the Blue Marlin Lodge, the cooking was performed in different cabins and it had to be transferred across the grounds, no matter the weather conditions. Issues like that would have been obviated by the Pelican Plantation. The Prests had worked hard over the prior five years building a business that was primed to cater to the "untapped" market in Venice that was recognized by Mr. Patrick and Mr. Bush. F&F had successfully developed relationships with customers that were committed to ensuring the success of the project. Again, at minimum, F&F has brought forth sufficient summary judgment evidence to establish genuine issues of material fact regarding their entitlement to damages for Pelican Plantation that undermines BP's request for summary judgment on these claims.

### 5.    <u>Fin & Feather's growth made the future cabins a certainty.</u>

The Prests began F&F as a side business that they hoped would eventually grow into a full-time operation. In 2006, when they began devoting their full-time efforts to F&F, they methodically added buildings and expanded their operations year-after-year. As evidenced by the timeline in Mr. Prest's affidavit (Ex. 2, ¶29), F&F has an established history and willingness to invest in the long-term growth of its business at the sake of short-term profits. As detailed on the site plan (Ex. 2-C), F&F had plans to purchase five additional prefabricated cabins (Barracuda, Blue Wing, Yellow Fin, Flounder, and Wood Duck), in addition to refurbishing the fishing camp that had been previously located on the property (Cobia Cabin, which ultimately became Yellow Fin). F&F's Response to BP's Statement of Uncontested Facts, No. 52.

BP complains that F&F had done no analysis of the cost of building or operating the additional cabins and that they would commence construction only if revenues permitted such

construction. Rec. Doc. 27124, p. 14. These complaints, however, are not fatal to F&F's claim for damages related to these additional cabins. The fact that F&F had done no analysis of the cost of building or operating the additional cabins ignores the fact that developing these cabins would have consisted of purchasing pre-manufactured buildings (*i.e.*, similar to Widgeon, Speckled Trout, Greenwing Teal, Mallard, and Wahoo) and adding on porches, etc. as they had historically done. Relative to building a new cabin from the ground up, these were insignificant undertakings.

Additionally, BP's complaints that the cabins were not fully occupied fails to account for the fact that weekends were typically F&F's busier times and that duck season brought an increased demand for cabins. Bringing the smaller cabins online was not a major capital investment, such that it made business sense to have the cabins available to take advantage of peak demand times rather than to risk repeatedly turning away customers. If it cost F&F $60,000 to bring one of these cabins online, it could start earning a return on the investment in less than five years by renting the cabin out less than 50 nights per year at $250.00 per night. F&F would not have continued investing and building cabins if there was not sufficient demand to warrant the investment. Again, F&F submits that the $850,000 of income anticipated in 2010, coupled with its established pattern of methodically expanding its capacity, at minimum, establishes genuine issues of material fact regarding their entitlement to damages for these additional cabins.

### 6.   Fin & Feather's boat shed claims are viable.

BP seeks dismissal of alleged damages suffered by F&F related to lost boat shed rental business on the grounds that: (1) the claim was waived when it was not specifically included in PTO 65; and (2) that the boat shed rental history is inconstant and insufficient. F&F does not dispute that boat shed damages were not included in its response to PTO 65. Compared to the other damages it has suffered and identified in PTO 65, the boat shed damages are *de minimus* and F&F

submits that the damages were otherwise identified in its original complaint filed herein. See LAED Docket No. 16-6118, Rec. Doc. 1, ¶1 ("Plaintiff, a boat shed business").

As detailed in BP Karr, Ex. 5 and during his deposition, (Ex. 1-A, pp. 36-47), Mr. Prest maintained a spreadsheet that recorded income related to boat shed rentals. In those instances where a shed was not rented due to someone leaving for Oil Spill related reasons, he made that row red. To the extent that such evidence is unreliable as asserted by BP, F&F submits that they can confirm the notations via interviews with the customers to ensure that the award of any such damages are not speculative. Inasmuch, F&F submits that the spreadsheets are sufficient to create genuine issues of material fact that warrant denial of BP's request for summary judgment.

### 7.    Fin & Feather mitigated its damages, which remain ongoing.

BP suggests that F&F's failure to mitigate its damages regarding the Pelican Plantation and future cabins is fatal to their claims. Rec. Doc. 27124, p. 16. Similarly, it also argues that F&F has no evidence to suggest that the damages suffered to its charter business are ongoing. Rec. Doc. 27124, p. 21. These related arguments reveal a misunderstanding of the impacts that the BP Oil Spill has had on the Venice area and its long-standing charter fishing community. F&F was a lifelong dream that the Prests had brought into reality—building a business that they could use as a means to pass on their love of all that South Louisiana outdoors had to their son, Kirk, Jr. In 2010, the fruits that were beginning to yield from years of building customer relationships and marketing started withering away as Venice lost its previously well-deserved reputation as Sportsman's Paradise.

Over the last decade, the Prests have continued to try to make their efforts work. They have continued to rent their cabins to fishermen, who have gone out of their way to patronize F&F even though the fishing is not what it was. Exs. 6, 10, 11, and 12.  Individuals like Mr. Patrick, Dr.

Collier, Mr. Presley, and Mr. Wadle have made clear that they have not visited as much as they would have because of the fishing—which they describe as still severely impacted based on visits as recent as last month. Ex.12 , Collier declaration, ¶21. As a result, F&F is required to take its customers on longer trips that result in less fish—resulting in increased expenses and less-satisfied customers as compared to before the Oil Spill.

Given the dwindling inshore charter business in Venice, F&F has been renting cabins for longer-term use by contractors and others working in the Gulf or in the Mississippi River. Ex. 1-C (F&F 30(b)(6), D. Prest, pp. 33:19-36:22. More recently, the Prests sold their family home in Gretna to minimize expenses and they have moved their residence to F&F itself. Ex. 2. Prest Aff., ¶38.The Prests have also explored the possibility of selling the business, but have found no interested suitors. *Id.* at ¶37. Captain Landry sold his camp at a loss in August 2017 because the oil spill damaged the fisheries that made his business viable. Ex. 5, Landry Aff., ¶23. Again, at a minimum, F&F submits that the foregoing establishes genuine issues of material fact regarding whether they failed to mitigate damages and the ongoing nature of such damages.

Finally, since the Oil Spill, F&F has faced remarkably few natural disasters as compared to the years between Katrina and Gustav. As a result, to the extent that BP raises that there are potential superseding causes of its damages, F&F asserts that damages it suffered due to other causes since the Oil Spill are limited to damage to the Specked Trout cabin by Hurricane Ike in 2011. The cabin suffered roof damage that made it unoccupiable for approximately six months.

### C.    Genuine disputes of material fact exist regarding Maritime Law Claims.

Defendants contend that F&F's maritime law claims are barred by *Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303 (1927) and that the exception for commercial fishermen outlined in *Louisiana ex rel. Guste v. M/V TESTBANK*, 752 F.2d 1019 (5th Cir.1985) does not apply. BP,

however, incorrectly asserts that F&F, nor its customers, relied on their catch for sustenance. Rec. Doc. 12174, p. 24. As detailed in F&F's response to BP'S Statement of Uncontested Facts, that is not the case. F&F's Response to BP's Statement of Uncontested Facts, Nos. 11-12. F&F acknowledges TESTBANK and its potential applicability to its claims, but submits that the facts of the present case warrant a different conclusion. As evidenced by Mr. Prest's pictures (Ex. 2-F), he was sailing in oil for months after the Oil Spill in 2010. Revenue in excess of $850,000 was lost as a direct result of this Oil Spill, including to customers who were fishing for subsistence purposes. Although Mr. Prest did not have a commercial permit, his business was not just for "entertainment" purposes. F&F urges this Court to decline BP's invitation to dismiss its GML claims. Likewise, BP argues that F&F's state law claims should be dismissed in one-sentence argument. Given the nature of the claims and the present procedural posture of this case, F&F opposes BP's request.

## III. CONCLUSION

BP and F&F have fundamentally different views of this case. BP portrays F&F as business that was barely struggling to survive when the Oil Spill occurred in 2010 and, thereafter, that they effectively gave up on future development efforts. F&F, however, has brought forth competent evidence establishing that its business was poised for a break-out in 2010. Additionally, such evidence demonstrates that F&F's steady and ongoing efforts to expand its business had overcome a multitude of obstacles until the BP Oil Spill changed everything. Accordingly, for all of the reasons detailed herein, F&F submits that genuine disputes of material fact exist as to its claims and that BP's Motion for Summary Judgment is meritless. F&F urges this Court to deny BP's Motion.

Respectfully submitted,


*/s/ Stephen Kreller*
Stephen Skelly Kreller (Bar No. 28440)
757 Saint Charles Avenue, Suite 301
New Orleans, Louisiana 70130
T: (504) 484-3488
F: (888) 294-6091
E: ssk@krellerlaw.com

- and -

*s/Al J. Robert, Jr.*
Al J. Robert, Jr., Bar No. 29401
AL J. ROBERT, JR., LLC
757 St. Charles Avenue, Suite 301
New Orleans, Louisiana 70130
504.309.4852
ajr@ajrobert.com

**ATTORNEYS FOR PLAINTIFFS**


**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that the above and foregoing Opposition Memorandum to Defendants' Motion for Summary Judgment has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this June 28, 2021.


*/s/ Stephen Kreller*
Stephen Skelly Kreller