UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN Re: Oil Spill by the Oil Rig                                   MDL 2179
"Deepwater Horizon" in the Gulf
of Mexico, on April 20, 2010

_____

PERTAINS TO:                                                     SECTION J-1
*Fin & Feather, LLC v. BP, plc, et al.*, 16-6118
*Fin & Feather Adventures, LLC v. BP, plc, et al.*, 16-6126
*Fin & Feather Cabins, LLC v. BP, plc, et al.*, 16-6131

### FIN & FEATHER'S RESPONSE TO BP'S STATEMENT OF UNCONTESTED FACTS AND FIN & FEATHER'S LIST OF MATERIAL FACTS GENUINELY DISPUTED

Plaintiffs, Fin & Feather, LLC, Fin & Feather Cabins, LLC, and Fin & Feather Adventures, LLC (collectively, "Plaintiffs" or Fin & Feather"), submit the following Response to BP America Production Company's and BP Exploration & Production, Inc.'s Statement of Uncontested Facts (collectively, "BP"), and Plaintiffs' List of Materially Facts Genuinely Disputed:

### RESPONSE TO BP'S STATEMENT OF UNCONTESTED FACTS:

Plaintiffs accept the BP "Statements of Uncontested Facts" in Paragraphs 1, 2, 3, 5, 8, 9, 10, 17, 22, 35, 36, 41, 42, 43, 45, 46, 48, 49, 50, 51, 55, 57, 58, 59, 60, 66, 67, 82, 84, and 85. Plaintiffs, however, object to and dispute the BP "Statements of Uncontested Facts" in Paragraphs 4, 6, 7, 11, 12, 13, 14, 15, 16, 18, 19, 20, 21, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 37, 38, 39, 40, 44, 47, 52, 53, 54, 56, 61, 62, 63, 64, 65, 68, 69, 70, 71, 72, 73, 74, 75, 76, 77, 78, 79, 80, 81, and 83 for the following reasons:

The statement made by BP in Paragraph 4 is contested as written because Mr. Prest testified that Fin & Feather, LLC is a boat shed and cabin rental business and it is seeking damages for lost

1

profits for its boat sheds and cabins. *See* Ex. 1-A (K. Prest Feb. 10, 2021 Depo.) at 24:22 – 25:15.

The statement made by BP in Paragraph 6 is contested as written only because it is incomplete and misleading to imply that Fin & Feather Cabins, LLC only operated a cabin rental business when it also offered charter hunting and fishing trips for a period of time. *See* Ex. 1-A (K. Prest Feb. 10, 2021 Depo.) at 28:4 – 29:12; Ex. 1-C (D. Prest Depo) at 62:7 – 64:5.

The statement made by BP in Paragraph 7 is contested as written because it wholly ignores all charter hunting and fishing revenues Fin & Feather Cabins, LLC would have earned in 2010 and 2011, but for the BP oil spill and subsequent damage to the natural resources, to suggest that Fin & Feather Cabins, LLC benefited from the oil spill. *See* Ex. 2-E (2010 Adventures Cancelled Trips); BP Ex.15 (Cancellation Letters); Ex. 3 (Howard Declaration); Ex. 1-A (K. Prest Feb. 10, 2021 Depo.) at 28:4 – 29:12; Ex. 1-C (D. Prest Depo) at 61:20 – 64:5, 136:3 – 139:10.

The statements made by BP in Paragraphs 11 and 12 are contested as written because they improperly assume that all charter fishing and hunting business are for "entertainment" purposes, when purposes vary between individual and corporate clients, and Mr. Prest testified that it was "mostly entertainment" and Ms. Prest testified that "many Fin & Feather clients are looking to catch speckled trout to take home to feed their families." *See* Ex. 1-B (K. Prest Feb. 11, 2021 Depo.) at 30:2 – 15, 31:20 - 24; Ex. 1-C (D. Prest Depo.) at 96:22 – 97:1.

The statement made by BP in Paragraph 13 is contested as written only because it ignores the fact that clients are required to obtain fishing licenses and hunting licenses from the Louisiana Department of Wildlife and Fisheries to participate in charter fishing and/or hunting trips. *See* Ex. 1-B (K. Prest Feb. 11, 2021 Depo.) at 30:16 – 31:13; Ex. 1-H (Kreller Declaration – LDWF Fishing License Requirements); Ex. 1-I (Kreller Declaration – LDWF Hunting License Requirements).

The statement made by BP in Paragraph 14 is contested as written only because Plaintiffs on occasion would prepare and serve speckled trout and/or redfish caught by a guest as part of the all-inclusive dining experience. *See* Ex. 2 (K. Prest Affidavit) at ¶ 19.

The statements made by BP in Paragraphs 15 and 16 are contested as written only because they are incomplete and do not make clear that Plaintiffs also contracted with additional boat owners and guides to service larger groups of clients. *See* Ex. 1-A (K. Prest Feb. 10, 2021) at 196:17 – 197:23.

The statements made by BP in Paragraph 18 and 19 are contested as written because it does not define "property" and Mr. Prest testified that he and his boat were physically oiled for 8 – 9 months as well as his clothing and washing machine during the oil spill cleanup program. *See* Ex. 1-A (K. Prest Feb. 10, 2021) at 51:20 – 55:5; Ex. 2-F (Oil Spill Photographs).

The statement made by BP in Paragraph 19 is further contested as written because Plaintiffs suffered property damage when BP discharged 3.19 million barrels of oil and gas into the Gulf of Mexico, suppressed it with Corexit, and contaminated the natural resources and marine habitat where they operate hunting and fishing charter trips. *See* Ex. 4 (Williams Affidavit); Ex. 1-A (K. Prest Feb. 10, 2021 Depo.) at 53:8 – 55:5, 74:5 – 19, 213:9 – 219:9; Ex. 1-B (K. Prest Feb. 11, 2021 Depo.) at 46:22 – 47:19, 48:14 – 23; Ex. 2-F (Oil Spill Photographs); Ex. 5 (Landry Affidavit) at ¶10 (following the oil spill, observed displaced oil throughout the waters on the west side and east side of the Mississippi River, including the Summer Trout Fishing and Winter Trout Fishing areas identified on the Landry Map), ¶12 (following the oil spill; observed a decline in the speckled trout and red fish fisheries in the areas on the west side and east side of the Mississippi River, including the Summer Trout Fishing and Winter Trout Fishing areas identified on the Landry

Map), ¶15 (observed speckled trout lease the areas on the west side and east side of the Mississippi River), ¶17 (damage to the speckled trout fisheries caused a decline in my charter fishing business, which caused me to list the Buras Camp in 2015 and sell it at a loss in 2017), ¶25 (it was incredibly difficult for me to relocate my operation and my investment in my camp was not nearly as significant as that made by the Prests); Ex. 1-G (TREX-013249); Nov. 30, 2015 Penalty Phase Findings of Fact and Conclusions of Law (MDL 2179 Rec. Doc. No. 15606) at ¶¶6, 20, 31, 33 – 36, 39, 41 – 42, and 64; Ex. 16 (Boesch Trial Testimony) at 341:19 – 24 (everywhere the oil went, it created harm), 344:17 – 345:16, 346:1 – 15, 352:19 – 353:7 (oil covered approximately 45,000 square miles of the Gulf), 354:1 – 15 (SCAT surveys indicated approximately 1,100 miles of shoreline were oiled), 354:21 – 355:7 (application of dispersants kept more of the toxic components of the oil in the aquatic system), 360:5 – 21 (for every barrel of oil released there was about 2,000 cubic feet of gas released into the marine environment), 373:3 – 374:18 (evidence suggests clear potential for harm of larvae of ocean fish, such as mahi-mahi and greater amberjack).

The statements made by BP in Paragraphs 20 and 21 are contested as written because they are made in bad faith, grossly misrepresent the facts and testimony, and draw improper conclusions to support the false narrative that "Plaintiffs' Businesses Were Struggling Before the Spill" and that cabin rentals were in "decline." Mr. Prest testifies that the cabins were offline for a period of time (weeks not months) after Hurricane Isaac in 2012. *See* Ex. 1-A (K. Prest. Feb. 10, 2021 Depo.) at 147:25 – 149:17. Mr. Prest testified that the Fin & Feather businesses were on an exponential growth rate and made more money year-over-year before the oil spill. *See* Ex. 1-A (K. Prest Feb. 10, 2021 Depo.) at 173:13 – 24. Ms. Prest testified that Hurricane Isaac damaged the Speckled

Trout cabin, which took approximately 6 months to repair, and the Dolphin and Wahoo cabins, which took approximately 2 weeks to repair. *See* Ex. 1-C (D. Prest Depo.) at 130:18 – 133:20. Ms. Prest testified that the Fin & Feather businesses had no damage from Hurricane Zeta and, aside from Hurricane Isaac, there has been no other times where the cabins or charters were knocked offline following the oil spill. *See* Ex. 1-C (D. Prest Depo.) at 135:1 – 136:2.

The statements made by BP in Paragraph 23 – 30 are contested as written because they assume facts not in the record, mischaracterize tax returns, and draw improper conclusions to support a false narrative that "Plaintiffs' Businesses Were Struggling Before the Spill," when Mr. Prest testified that the Fin & Feather businesses were on an exponential growth rate and made more money year-over-year before the oil spill. *See* Ex. 1-A (K. Prest Feb. 10, 2021 Depo.) at 173:13 – 24. That being said, Plaintiffs do not dispute the figures reported in their respective tax returns and reference and incorporate the summary of tax records prepared by Mr. Litolff. *See* Ex. 13, (Litolff Declaration, at ¶ 20 and Exhibit A).

The statement made by BP in Paragraph 31 is contested as written because it is made in bad faith, grossly misrepresents the facts and testimony, and draws improper conclusions to support the false narrative that "Plaintiffs' Businesses Were Struggling Before the Spill," when Ms. Prest testified that September is generally a slower month for the Fin & Feather businesses and Hurricanes Gustav and Ike made things slower in September 2008. *See* Ex. 1-C (D. Prest Depo.) at 165:13 – 167:24.

The statement made by BP in Paragraph 32 is contested as written because it is incomplete, made in bad faith, grossly misrepresents the facts and testimony, mocks Ms. Prest for her spirituality, and draws improper conclusions from her handwritten prayers to support the false

narrative that "Plaintiffs' Businesses Were Struggling Before the Spill," when Ms. Prest testified that she wrote the prayer ("Dear Lord, please guide us in the right direction. Please fill our cabins. We are so broken and need your help.") in her calendar because her spirit was particularly down in September 2008 because of Hurricanes Gustav and Ike. *See* Ex. 1-C (D. Prest Depo.) at 165:13 – 167:24.

The statement made by BP in Paragraph 33 is contested as written because it is incomplete, made in bad faith, grossly misrepresents the facts and testimony, mocks Ms. Prest for her spirituality, and draws improper conclusions from her handwritten prayers to support the false narrative that "Plaintiffs' Businesses Were Struggling Before the Spill," when Ms. Prest that she "would make notes to God just to guide me on how I felt at that moment…Never really thought I would be sharing it with a BP attorney." *See* Ex. 1-C (D. Prest Depo.) at 165:13 – 167:24.

The statement made by BP in Paragraph 34 is contested as written because it misrepresents the facts and testimony and draws improper conclusions to support the false narrative that "Plaintiffs' Businesses Were Struggling Before the Spill," when the statement does not make clear whether the occupancy rates referenced are annual or seasonal and Mr. Prest testified that the existing cabins were near capacity (between 80 – 90 percent) during April/May through January. *See* Ex. 1-A (K. Prest Feb. 10, 2021 Depo.) at 66:9 – 67:6. Mr. Prest further testified that the Fin & Feather businesses were on an exponential growth rate and made more money year-over-year before the oil spill. *See* Ex. 1-A (K. Prest Feb. 10, 2021 Depo.) at 173:13 – 24.

The statement made by BP in Paragraph 37 is contested as written only to the extent that it implies that Fin & Feather, LLC and Fin & Feather Cabins, LLC cannot determine the portions of income from charters, cabin rentals, and boat-shed rentals when Ms. Prest testified that she could

determine the amounts from her books. *See* Ex. 1-C (D. Prest Depo.) at 62:7 – 63:19.

The statements made by BP in Paragraphs 38 and 39 are contested as written because they misrepresent the facts and testimony to suggest that the market for the Pelican Plantation was "untested" and that Plaintiffs had "no experience" running a high-end lodge, when Mr. Prest testified that (1) Fin & Feather was near capacity with the cabins and the Pelican Plantation was the next phase, (2) Fin & Feather clients and the market wanted a resort for high-end clients, and (3) the Pelican Plantation is what high-end clients were looking for and the market was untapped. *See* Ex. 1-A (K. Prest Feb. 10, 2021 Depo.) at 65:17 – 66:8, 67:19 – 68:12. At the time of the BP oil spill, Plaintiffs already had a strong base of high-end clients to support the Pelican Plantation. *See* Ex. 6 (Patrick Affidavit) at ¶5 (clients are high net-worth executive and/or management personnel of both public and private companies), ¶8 (company has been a Fin & Feather client since 2006), ¶17 (Fin & Feather earned my repeat business due to the hospitality of Kirk and Denise Prest…I knew that I could trust the Prests to provide the level of service that was expected by my clients.), ¶27 (encouraged the Prests to build the Pelican Plantation and told them that if they built it, my employer would spend $100,000 per year entertaining clients at their facility. If the facility had been operating in 2012 with hunting and fishing conditions that were comparable to before the oil spill, there is no reason that my company would not have spent $900,000 at Pelican Plantation by this time.); Ex. 7 (Bush Affidavit) at ¶17 (Prests had a strong and well-established financial history with Mississippi River Bank and paid their loans in a timely and consistent manner), ¶18 (based on the history of the Fin & Feather relationship, the Prests' proven development success, and the demand for such a project prior to the BP oil spill, I believe that Mississippi River Bank would have approved a significant loan to fund the construction of the

Pelican Plantation development.), ¶22 (But for the BP oil spill, I have no reason to believe that the Pelican Plantation development would not have gone forward and flourished under the Prests management.)

The statement made by BP in Paragraph 40 is contested as written because it misrepresents the facts and testimony to suggest that there were competing businesses in the area similar to the Pelican Plantation, when Mr. Prest testified that there is nothing like the Pelican Plantation in our area and only one business in the area that he would consider a "small competitor" to the Pelican Plantation and that competitor business did not have the space or amenities that the Pelican Plantation was to offer. *See* Ex. 1-C (K. Prest Feb. 10, 2021 Depo.) at 68:13 – 70:13, 73:9 – 12.

The statement made by BP in Paragraph 44 is contested as written because it does not define "construction" and improperly implies that Plaintiffs took no steps towards the construction of the Pelican Plantation before the BP oil spill, when Mr. Prest testified that Plaintiffs purchased the vacant land for the Pelican Plantation in 2009, cleared the land, prepared preliminary sketches for the Pelican Plantation, retained and met with designer Daniel Boutte on numerous occasions to design the Pelican Plantation, met with builder Kendall Hyatt to discuss construction cost estimates, and met with Mississippi River Bank President and CEO Mike Bush to discuss construction financing. *See* Ex. 1-A (K. Prest Feb. 10, 2021 Depo.) at 58:21 – 23, 63:21 – 66:8, 82:4 – 88:10; Ex. 7 (Mike Bush Affidavit); Ex. 2-D (Pelican Plantation Design Drawings); Ex. 9 (Hyatt Affidavit).

The statement made by BP in Paragraph 47 is contested as written because it improperly implies that Plaintiffs took no steps towards the financing of the Pelican Plantation before the BP oil spill when Ms. Prest testified that she spoke with Mississippi River Bank President and CEO

Mike Bush about the Pelican Plantation on multiple occasions, where they discussed loan amounts and length and Mr. Bush reassured the Prests that the amount request was approvable. *See* Ex. 1-C (D. Prest Depo.) at 111:15 – 120:2; Ex. 1-A (K. Prest Feb. 10, 2021 Depo.) at 88:11 – 92:5; Ex. 7 (Mike Bush Affidavit) at ¶10 (the Prests have been banking with Mississippi River Bank since at least 2004), ¶13 (Mississippi River Bank provided funding for several of the Fin & Feather cabins), ¶14 (Mississippi River Bank engaged in substantive discussions about financing a significant project referred to as the Pelican Plantation), ¶17 (Prests had a strong and well-established financial history with Mississippi River Bank and paid their loans in a timely and consistent manner), ¶18 (based on the history of the Fin & Feather relationship, the Prests' proven development success, and the demand for such a project prior to the BP oil spill, I believe that Mississippi River Bank would have approved a significant loan to fund the construction of the Pelican Plantation development.), ¶22 (But for the BP oil spill, I have no reason to believe that the Pelican Plantation development would not have gone forward and flourished under the Prests management.).

The statement made by BP in Paragraph 52 is contested as written because it is incomplete and misrepresents the facts and testimony as Mr. Prest testified that he expected the Flounder, Yellowfin, and Bluewing to be ready and available for rent in August 2010, the Barracuda to be ready and available for rent in November 2010, and the Wood Duck to be ready and available for rent in January 2011. *See* Ex. 1-A (K. Prest Feb. 10, 2021 Depo.) at 142:11 – 143:18; Ex. 2-C (Site Map).

The statement made by BP in Paragraph 53 is contested as written because it misrepresents the facts and testimony as Mr. Prest and Ms. Prest both testified that they had determined that the

unbuilt cabins would have been built with money on hand, and not bank financing. *See* Ex. 1-C (D. Prest Depo.) at 125:5 – 12; Ex. 1-A (K. Prest Feb. 10, 2021 Depo.) at 100:22 – 101:11.

The statement made by BP in Paragraph 54 is contested as written because it is incomplete and misrepresents the facts and testimony to imply that Plaintiffs had no working knowledge of their operating costs for cabin rentals when Mr. Prest testified that the operating costs for the unbuilt cabins would be the average costs of the existing cabins. *See* Ex. 1-A (K. Prest Feb. 10, 2021 Depo.) at 178:21 – 179:12.

The statement made by BP in Paragraph 56 is contested as written because it misrepresents the facts and testimony to imply that Plaintiffs had no working knowledge of the rental market or rental rates for comparable cabins when Ms. Prest testified that the existing rates are published on their website and are: Dolphin ($275/night), Speckled Trout ($300/night), Greenwing, Mallard, and Wahoo ($200/night), Wigeon ($250/night), Redfish and Pintail ($150/night), and Yellowfin ($450/night). *See* Ex. 1-C (D. Prest Depo) at 146:14 – 20; Ex. 1-E (Kreller Declaration – Cabin Website Rate Sheet). Moreover, Mr. Prest testified that the existing cabins were near capacity (between 80 – 90 percent) during April/May through January. *See* Ex. 1-A (K. Prest Feb. 10, 2021 Depo.) at 66:9 – 67:6.

The statements made by BP in Paragraphs 61 and 62 are contested because they are made in bad faith, grossly misrepresents the facts and testimony, and draw improper conclusions to support the false narrative that Plaintiffs had a choice to abandon development of the Pelican Plantation, and improperly attempt to lay causation for the damages caused by the oil spill on Plaintiffs. Mr. Prest testified that he observed first-hand the damage to the ecosystem and estuary for several months during the oil spill cleanup and during that time he and Ms. Prest made the

10

decision not to move forward with the Pelican Plantation because it wouldn't make logical sense, nor would it make financial sense. *See* Ex. 1-A (K. Prest Feb. 10, 2021 Depo.) at 53:17 – 55:5, 74:5 – 19, 117:19 – 119:9, 213:9 – 219:9; Ex. 1-B (K. Prest Feb. 11, 2021 Depo.) at 46:22 – 47:19, 48:14 – 23; Ex. 4 (Williams Affidavit); Ex. 2-F (Oil Spill Photographs); Ex. 5 (Landry Affidavit); Ex. 6 (Patrick Affidavit); Ex. 1-G (TREX-013249); Ex. 16 (Boesch Trial Testimony) at 341:19 – 24 (everywhere the oil went, it created harm), 344:17 – 345:16, 346:1 – 15, 352:19 – 353:7 (oil covered approximately 45,000 square miles of the Gulf), 354:1 – 15 (SCAT surveys indicated approximately 1,100 miles of shoreline were oiled), 354:21 – 355:7 (application of dispersants kept more of the toxic components of the oil in the aquatic system), 360:5 – 21 (for every barrel of oil released there was about 2,000 cubic feet of gas released into the marine environment), 373:3 – 374:18 (evidence suggests clear potential for harm of larvae of ocean fish, such as mahi-mahi and greater amberjack); Nov. 30, 2015 Penalty Phase Findings of Fact and Conclusions of Law (MDL 2179 Rec. Doc. No. 15606) at ¶6 ("Each day for nearly three months, thousands of barrels of oil and gas from the MC252 reservoir flowed into and up the Macondo Well, through the blowout preventer and broken riser, and into the Gulf of Mexico."); ¶20 ("3.19 million barrels of oil discharged into the Gulf of Mexico."); ¶31 ("This was the largest oil spill in American waters. This Court has determined that approximately 4.0 million barrels of oil exited the MC252 reservoir, 3.19 million of which entered Gulf waters."); ¶33 ("Between 45,000 and 68,000 square miles of surface waters were oiled at one point or another."); ¶42 ("The seriousness of this violation cannot be overstated. The oil spill was extremely serious. It was gravely serious. It was a massive and severe tragedy."); ¶34 ("According to the Shoreline Cleanup Assessment Technique—a technique used during the response to assess the shoreline and determine where response actions

were appropriate—approximately 1,100 miles of the coast were visibly oiled to some extent, 220 miles of which were categorized as "heavily" oiled and another 140 miles as "moderately" oiled. Four years later, 393 miles of shoreline were still visibly oiled to some extent, fourteen miles of which were moderately or heavily oiled."); ¶35 ("In response to the spill, recreational and commercial fishing grounds were closed. At the peak of closures, 88,552 square miles of fishing grounds were closed."); ¶36 ("The oil caused actual harm to organisms. For example, approximately 4,400 visibly-oiled birds were collected during the response, 2,303 of which were dead. Four hundred seventy-four visibly-oiled sea turtles were collected, eighteen of which were dead. Twelve visibly-oiled dolphins were collected, though many others were observed swimming in oiled waters."); ¶39 ("Approximately $14 billion was spent on the response."); ¶41 ("The response required the use of 6,300 vessels."); ¶64 ("Under a proposed consent decree filed on October 5 2015, BPXP agreed to pay $5.5 billion in civil penalties under the CWA. On November 15, 2012, the United States and BPXP entered into a plea agreement, which was accepted by Judge Vance, pursuant to which BPXP paid $1.15 billion for criminal violations of the CWA, $100 million for violating the Migratory Bird Treaty Act, $5.5 million for eleven counts of seaman's manslaughter, and $500,000 for one count of Obstruction of Congress. The November 2012 plea agreement also required BPXP to pay $350 million to the National Academy of Sciences and $2.394 billion to the National Fish and Wildlife Foundation, but stated that these payments "shall have no effect on, and shall not be argued by [BPXP] . . . to reduce in any way, any civil claims by any party arising out of the *Deepwater Horizon* blowout, explosion, oil spill and response, including but not limited to natural resource damage claims."). The Prests had no choice in the matter; rather, BP robbed them of their dream and opportunity to build the unbuilt cabins and

Pelican Plantation when its decisions lead to the April 20, 2010 exposition of the *MODU Deepwater Horizon* and subsequent oil spill for 87-days into the Gulf of Mexico and Louisiana bays, estuaries, and nurseries.

The statement made by BP in Paragraph 63 is contested because it is made in bad faith, grossly misrepresents the facts and testimony, and draws improper conclusions to support the false narrative that Plaintiffs had a choice to abandon development of the Pelican Plantation, and improperly attempt to lay causation for the damages caused by the oil spill on Plaintiffs. Ms. Prest testified that after the oil spill Fin & Feather did not take further steps with Mississippi River Bank or any other financial institution to get a loan to build the Pelican Plantation because the oil spilled into the Gulf for 90 days and we would have been "absolutely crazy" to want to pursue that at that time. Ms. Prest further testified that after the oil spill she and her husband "both cried their eyes out because we knew that our future was destroyed" and "[t]he Gulf of Mexico was our livelihood…so we would have been absolutely insane to look at wanting to increase cabins." *See* Ex. 1-C (D. Prest Depo.) at 123:4 – 124:16; Ex. 1-A (K. Prest Feb. 10, 2021 Depo.) at 119:10 – 123:22; Ex. 7 (Mike Bush Affidavit).

The statement made by BP in Paragraph 64 is contested because it is made in bad faith, grossly misrepresents the facts and testimony, and draws improper conclusions to support the false narrative that Plaintiffs had a choice to abandon development of the Pelican Plantation, and improperly attempt to lay causation for the damages caused by the oil spill on Plaintiffs. Mr. Prest testified that after the oil spill he did not go back to a contractor and express an interest in building the Pelican Plantation. *See* Ex. 1-A (K. Prest Feb. 10, 2021 Depo.) at 120:13 – 121:16.

The statement made by BP in Paragraph 65 is contested because it is made in bad faith,

grossly misrepresents the facts and testimony, and draws improper conclusions to support the false narrative that Plaintiffs had a choice to abandon development of the Pelican Plantation, and improperly attempt to lay causation for the damages caused by the oil spill on Plaintiffs. Mr. Prest testified that after the oil spill he did not go speak with anyone about permits to build the Pelican Plantation because the "opportunity was lost." *See* Ex. 1-A (K. Prest Feb. 10, 2021 Depo.) at 120:25 – 122:7.

The statement made by BP in Paragraph 68 is contested as written because it misrepresents the facts and testimony as Mr. Prest testified that he does not recall the fishery closure dates and does not believe the waters were open for recreational fishing during the oil spill cleanup. Mr. Prest further testified that he was still running in oiled waters inside the estuaries in August 2010 and does not know anyone fishing at that time. *See* Ex. 1-B (K. Prest Feb. 11, 2021 Depo.) at 59:5 – 62:21. Moreover, there is no way to verify the authenticity and/or accuracy of the LDWF Press Release article cited by BP insofar as the press release and the referenced links to maps are no longer available online.

The statements made by BP in Paragraphs 69 and 70 are contested as written because they misrepresent the facts and testimony as Mr. Prest testified that, while he has not personally done scientific testing, he has observed mutated fish with lesions, growths, one eye, no dorsal fins, no tail, no gill plates, etc. And, in making these observations, Mr. Prest testified that he relied upon his life experience as a professional fisherman and hunter. Mr. Prest further testified that the bait fish are absent and there are miles and miles of estuary and nursery that are missing. *See* Ex. 1-A (K. Prest Feb. 10, 2021 Depo.) at 213:9 – 219:9; Ex. 4 (Williams Affidavit); Ex. 2-F (Oil Spill Photographs); Ex. 5 (Landry Affidavit); Ex. 6 (Patrick Affidavit); Ex. 1-G (TREX-013249); Ex.

15 (TREX-012199); Nov. 30, 2015 Penalty Phase Findings of Fact and Conclusions of Law (MDL 2179 Rec. Doc. No. 15606) at ¶¶6, 20, 31, 33 – 36, 39, 41 – 42, and 64; Ex. 16 (Boesch Trial Testimony) at 341:19 – 24 (everywhere the oil went, it created harm), 344:17 – 345:16, 346:1 – 15, 352:19 – 353:7 (oil covered approximately 45,000 square miles of the Gulf), 354:1 – 15 (SCAT surveys indicated approximately 1,100 miles of shoreline were oiled), 354:21 – 355:7 (application of dispersants kept more of the toxic components of the oil in the aquatic system), 360:5 – 21 (for every barrel of oil released there was about 2,000 cubic feet of gas released into the marine environment), 373:3 – 374:18 (evidence suggests clear potential for harm of larvae of ocean fish, such as mahi-mahi and greater amberjack).

The statement made by BP in Paragraph 71 is contested because it is made in bad faith, grossly misrepresents the facts and testimony, is incomplete, and draws improper conclusions from a single social media posting to support the false narrative that Plaintiffs "repeatedly touted" quality fishing and beautiful estuaries after the oil spill. Ms. Prest testified that the client portrayed in the posting is likely Mr. Westbrook, a longtime former client that loves trout fishing, who is pictured with a bull red. Moreover, BP failed to make reference to a second social media posting BP questioned Ms. Prest about during her deposition and her testimony that the client portrayed in that posting, Jim Dare, has not returned to Fin & Feather since the photograph was taken. Ms. Prest testified that the few social media postings made were to "draw interest" to the business. *See* Ex. 1-C (D. Prest Depo.) at 90:5 – 100:16; Ex. 1-F (Social Media Posting).

The statement made by BP in Paragraph 72 is contested because it is made in bad faith, grossly misrepresents the facts and testimony, and draws improper conclusions from a single review from one guest, Rudy "Joe" Wadle, Jr., in October 2011 to suggest that the fishing and

hunting has resumed in Venice, Louisiana after the oil spill. Moreover, BP makes no mention that the same client that authored the 2011 review was upset because he had to cancel a $50,400 trip scheduled in 2010 for his group of Marine Corps veterans. That being said, Mr. Prest testified that he believes Mr. Wadle's review would be accurate for 2011. *See* Ex. 11, (Wadle Declaration) Ex. 1-A (K. Prest Feb. 11, 2021 Depo.) at 39:12 – 41:16, 50:15 – 52:11; BP Ex. 15 (Cancellation Letters); Ex. 2-E (2010 Adventures Cancelled Trips); Ex. 5 (Landry Affidavit); Ex. 6 (Patrick Affidavit); Ex. 10 (Presley Affidavit); Ex. 12 (Collier Declaration).

The statements made by BP in Paragraphs 73 and 75 are contested as written because they are without time reference, grossly misrepresents the facts and testimony, and draw improper conclusions to support the false narrative that "Plaintiffs' Business and Financial Records Are Unreliable," when Ms. Prest testified that reservations are made by telephone, Webervations, and VRBO, which would generate an email and/or text message, and Ms. Prest would also note the reservation in a physical calendar that she maintained. Ms. Prest testified that she would make calendar updates when clients would add or subtract a date or cancel a trip. In the last 2 years, calendars are online through ResNexus, Webervations, and VRBO. Ms. Prest testified that she did not always document the client's reason for cancellation. Moreover, Mr. Prest prepared and testified about a list that he prepared for 2010 reflecting $863,800 in cancellation losses caused by the oil spill. *See* Ex. 1-C (D. Prest Deposition) at 10:20 – 11:8, 18:4 – 23:21; Ex. 1-A (K. Prest Feb. 10, 2021 Depo.) at 199:17 – 210:9; BP Ex. 15 (Cancellation Letters); Ex. 2-E (2010 Adventures Cancelled Trips).

The statement made by BP in Paragraph 74 is contested as written because it is without time reference, grossly misrepresents the facts and testimony, and draws improper conclusions to

support the false narrative that "Plaintiffs' Business and Financial Records Are Unreliable," when Ms. Prest testified that cabin rentals to oil spill cleanup workers were not recorded the same way she did fishing and hunting guests before the oil spill because the waters were closed and everything was shut down. Instead, Ms. Prest noted "BP" in the calendar for oil spill cleanup guests. *See* Ex. 1-C (D. Prest Depo.) at 136:17 – 137:2, 154:12 – 14.

The statement made by BP in Paragraph 76 is contested as written only because it is without time reference and draws improper conclusions to support the false narrative that "Plaintiffs' Business and Financial Records Are Unreliable," when Ms. Prest testified that she would make calendar updates when clients would add or subtract a date or cancel a trip. *See* Ex. 1-C (D. Prest Depo.) at 21:23 – 22:16.

The statements made by BP in Paragraphs 77 and 78 are contested as written because they are without time reference, grossly misrepresent the facts and testimony, and draw improper conclusions to support the false narrative that "Plaintiffs' Business and Financial Records Are Unreliable," when Ms. Prest testified that the existing rates are published on their website and are: Dolphin ($275/night), Speckled Trout ($300/night), Greenwing, Mallard, and Wahoo ($200/night), Wigeon ($250/night), Redfish and Pintail ($150/night), and Yellowfin ($450/night). Ms. Prest further testified that if a discount was offered or a rate adjusted, she would normally make a calendar note of the discount. Ms. Prest further testified that boat storage clients received a $25 per night discount on cabin rentals. *See* Ex. 1-C (D. Prest Depo) at 73:11 – 18, 146:14 – 20, 161:6 – 8; Ex. 1-D (Kreller Declaration – Cabin Website Rate Sheet).

The statement made by BP in Paragraph 79 is contested as written only because it is incomplete and draws improper conclusions to support the false narrative that "Plaintiffs' Business

and Financial Records Are Unreliable," when Mr. Prest testified that he asked one or two clients to send cancellation letters in case BP didn't make things right like they promised to. *See* Ex. 1-A (K. Prest Feb. 11, 2021 Depo.) at 36:9 – 23; BP Ex. 15 (Cancellation Letters); Ex. 2-E (2010 Adventures Cancelled Trips); Ex. 6 (Patrick Affidavit); Ex. 3 (Howard Declaration); Ex. 10(Presley Affidavit); Ex. 9 (Hyatt Affidavit).

The statements made by BP in Paragraphs 80 and 81 are contested as written only because they overlook other source records and draws improper conclusions to support the false narrative that "Plaintiffs' Business and Financial Records Are Unreliable," when the cabins and rates for the guests that cancelled in 2010 are readily ascertainable from other documents and records. *See* BP Ex. 15 (Cancellation Letters); Ex. 2-E (2010 Adventures Cancelled Trips); Ex. 6 (Patrick Affidavit); Ex. 3 (Howard Declaration); Ex. 10(Presley Affidavit); Ex. 9 (Hyatt Affidavit).

The statement made by BP in Paragraph 83 is contested as written because it does not identify the "entity" referenced, grossly misrepresents the facts and testimony, and draws improper conclusions to support the false narrative that "Plaintiffs' Business and Financial Records Are Unreliable," when Ms. Prest testified that Fin & Feather Cabins, LLC was the only business to accept payments by credit card. Thus, if a guest wanted to stay in the Redfish or Pintail cabins, which were owned by Fin & Feather, LLC, income from that transaction would appear on returns for Fin & Feather Cabins, LLC. *See* Ex. 1-C (D. Prest Depo) at 75:1 – 5, 76:13 – 24.

## LIST OF MATERIAL FACTS GENUINLY DISPUTED:

In addition to the above referenced facts contested, Plaintiffs submit that the following facts are genuinely disputed:

1. The extent of damage caused to the estuaries, nurseries, and fisheries in, and around, Barataria Bay that supported the business of Fin & Feather, including, but not limited to, the speckled trout, redfish, flounder and drum populations.

2. The time period over which those damages have impacted, and may continue to impact, those estuaries, nurseries, and fisheries that supported the business of Fin & Feather.

3. Whether damages to such estuaries, nurseries, and fisheries have caused the damages suffered by the Fin & Feather entities.

4. The extent of damages suffered to Fin & Feather's existing lodging business, its charter fishing business, and its boat shed rental business.

5. Whether the actions taken by Fin & Feather in furtherance of building the Pelican Plantation are sufficient to determine that the Pelican Plantation project was not speculative If not, the extent of those damages.

6. Whether the actions taken by Fin & Feather in furtherance of bringing online the Barracuda, Blue Wing, Cobia, Flounder, and Wood Duck cabins are sufficient to determine that the such projects were not speculative. If not, the extent of those damages.

7. Whether Fin & Feather can establish its economic damages with reasonable certainty.

8. Whether Fin & Feather failed to mitigate its damages and/or there is a market for the property beyond its current use.

9. Whether there have been any intervening events sufficient to make the damages caused by the BP Oil Spill indistinguishable from such intervening event.

10. Whether Fin & Feather has claims under General Maritime Law.

Date: June 28, 2021

Respectfully submitted,

**THE KRELLER LAW FIRM**

*s/Stephen S. Kreller*
Stephen Skelly Kreller (Bar No. 28440)
757 Saint Charles Avenue, Suite 301
New Orleans, Louisiana 70130
T: (504) 484-3488
F: (888) 294-6091
E: ssk@krellerlaw.com

- and -

**AL J. ROBERT, JR., LLC**

*s/Al J. Robert, Jr.*
Al J. Robert, Jr. (Bar No. 29401)
757 St. Charles Avenue, Suite 301
New Orleans, Louisiana 70130
T: (504) 309-4852
E: ajr@ajrobert.com

***Attorneys for Fin & Feather, LLC, Fin & Feather Adventures, LLC, and Fin & Feather Cabins, LLC***

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Response to BP's Statement of Uncontested Facts and List of Material Facts Genuinely Disputed in Case Nos. 2:16-cv-6118, 2:16-cv-6126, and 2:16-cv-6131 has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 28th day of June, 2021.

*/s/ Stephen Skelly Kreller*
Stephen Skelly Kreller