```
 1                     KIRK PREST

 2                IN THE DISTRICT COURT

 3                 LOUISIANA EASTERN

 4                     --o0o--

 5

 6  FIN & FEATHER ADVENTURES, LLC,    )
                                      )
 7                 Plaintiff,         )
                                      )
 8            vs.                     ) No. 2:16cv6126
                                      )
 9  BP EXPLORATION & PRODUCTION,      )
    INC., et al.,                     )
10                 Defendants.        )
                                      )
11

12  _____

13    VIDEOCONFERENCE AND VIDEO-RECORDED DEPOSITION OF

14                     KIRK PREST

15                 February 10, 2021

16  _____

17

18          DEPOSITION OF KIRK PREST, produced as a

19  witness, duly sworn by me via videoconference at the

20  instance of the DEFENDANTS, was taken in the

21  above-styled and numbered cause on February 10,

22  2021, from 9:28 A.M. to 5:33 P.M., before BRANDON D.

23  COMBS, CSR, RPR, in and for the State of Texas,

24  reported by computerized machine shorthand via

25  videoconference.  Job No. 189251
```

EXHIBIT

1A

```
 1                     KIRK PREST

 2                     APPEARANCES

 3

 4        KIRKLAND & ELLIS

 5        555 California Street

 6        San Francisco, California 94104

 7        By: ANNA TERTERYAN, ESQ.

 8             AUSTIN KLAR, ESQ.

 9             NATHAN THEOBALD, ESQ.

10        Counsel on behalf of the Defendants

11

12

13        LAW OFFICE OF AL J. ROBERT, JR.

14        757 St. Charles Avenue

15        New Orleans, Louisiana 70130,

16        By: ALVIN ROBERT JR., ESQ.

17        Counsel on behalf of the Plaintiff.

18

19

20

21             ALSO PRESENT:

22     Denise Prest (via videoconference)

23     Darryl Russell, Videographer (via videoconference)

24

25
```

```
 1                    KIRK PREST

 2                     INDEX

 3                                              Page

 4   Examination by MS. TERTERYAN                7

 5

 6                   --o0o--

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                        KIRK PREST

2        Q.    And did you identify in response to this

3   question that you were seeking lost profits for the

4   cabins extending through present and out into the

5   future?

6        A.    Look, the damages are the damages.  This

7   document, at the time that I signed my name on this

8   document, I don't remember this document specifying

9   just cabins on the Fin & Feather, LLC property.  But

10  the damages are the damages, still ongoing.

11       Q.    Mr. Prest, do you see that it says the

12  amount of damages claimed for Fin & Feather, LLC is

13  $324,123?

14       A.    At that time, for that specified

15  description, that probably was the case.  But that's

16  not the case now.  I don't know what the numbers

17  are.  But those numbers aren't accurate.

18       Q.    All right.  Is Fin & Feather, LLC seeking

19  damages for any physical damage to its property by

20  oiling or by the spill response?

21       A.    To my knowledge, no.

22       Q.    Okay.  Is Fin & Feather, LLC seeking any

23  other damages besides lost profits to its existing

24  and future cabins and -- yeah, besides lost profits

25  to its existing and future cabins?

```
 1                     KIRK PREST
 2       A.   I would -- I -- in my opinion, I think its
 3  boat storage as well.  But I'll defer that to my
 4  expert accountant.
 5       Q.   And at the time you completed this form,
 6  were you aware that Fin & Feather, LLC had boat shed
 7  rental lost profits caused by the spill?
 8       A.   Yes, I was aware.  Whether this previous
 9  attorney was aware, it's -- he was aware also.  As
10  to why it's not on this document, I can't answer for
11  that.
12       Q.   So besides lost profits for its cabins and
13  boat shed rental lost profits, is Fin & Feather, LLC
14  claiming any other kind of damages in this case?
15       A.   Not to my knowledge.
16       Q.   Okay.  Talk about Fin & Feather Cabins,
17  LLC.
18            Fin & Feather Cabins, LLC is also seeking
19  damages for lost profits to its existing cabins at
20  the time of the spill; right?
21       A.   Yes.
22       Q.   And those cabins existing at the time of
23  the spill were Greenwing, Mallard, Wahoo, Wigeon,
24  Dolphin, Speckled Trout, and Blue Marlin Lodge.
25  Seven cabins; correct?
```

1                      KIRK PREST

2    seeking any other damages; correct?

3         A.   As far as I can recall, yes.

4              Let me clarify one thing in here.  In the

5    Fin & Feather Cabins, LLC entity and the

6    Fin & Feather, LLC entity I'm not sure about the way

7    the accounting with some of those charters are

8    accounted for back then.  So there may be some

9    charters.

10             When you asked me if there's any other

11   damages, there's charters that are related to those

12   entities as well.

13        Q.   What kind of charters?

14        A.   Some of the -- some of the charters --

15   some of the charters are accounted in Fin & Feather

16   Adventures, LLC.  Some of the charters are mixed

17   with the cabins.  That's a question that Denise is

18   going to be able to speak to.

19             But I just want for you to know that in my

20   estimation, it's -- I just wanted to clear that up.

21        Q.   Okay.  So --

22        A.   With my recollection.

23        Q.   Do you know specifically whether

24   Fin & Feather, LLC is claiming damages related to

25   any charters?

1                          KIRK PREST

2        A.    I'm saying it could be.

3        Q.    But you don't know specifically?

4        A.    I don't know specifically.  I just want

5   the record to reflect that it can be, could be.  I'm

6   not 100 percent sure about that, but I want you to

7   know that it could be.

8        Q.    Okay.  And for Fin & Feather Cabins, LLC

9   you don't know specifically if Fin & Feather Cabins,

10  LLC is alleging damages related to any charters?

11       A.    Yeah, I'm not a hundred percent sure about

12  that.  That's a bookkeeping department.

13       Q.    Okay.  Let's talk about the boat sheds for

14  a few minutes.

15             Fin & Feather, LLC is the entity that

16  rents out boat sheds; is that right?

17       A.    Say that -- repeat that question.

18       Q.    Fin & Feather, LLC is the entity that

19  rents out boat sheds; right?

20       A.    Yes.

21       Q.    Okay.  And does Fin & Feather Cabins, LLC

22  rent out any boat sheds?

23       A.    No.

24       Q.    Does Fin & Feather Adventures, LLC rent

25  out any boat sheds?

1                          KIRK PREST

2   other sense?

3          A.   So like 27, 28, 29, 30, 31 through 36,

4   that's all 50-foot sheds.  They're typically 185.

5   That was 167.  That, actually, that particular guy

6   is a charter fisherman, so he received a charter

7   fishing discount.  Charter fishermen get a discount.

8          Q.   So the -- how many different sizes of

9   sheds did you have?

10         A.   Let's see.  This is after Katrina, so we

11  had three sizes.

12         Q.   And did each of the different, three

13  different sizes have a different price?

14         A.   Yes.  We have a 30, a 40, and a 50.

15         Q.   Okay.  How much was the 30 per month,

16  typically?

17         A.   Well, we're talking, what, 13 years ago

18  here.  It looks like the 30-foot shed might have

19  been 110 or 135.

20         Q.   Okay.  And then the 40-foot shed?

21         A.   Looks like the 40-foot was 160.

22         Q.   Okay.  And then you said the 50-foot was

23  185?

24         A.   50-foot was 185.

25         Q.   Okay.  I just want to understand how to

1                    KIRK PREST

2   read these spreadsheets, so this is helpful.

3            Mr. Prest, looking at the bottommost row

4   that's got dollar amounts in it, what do those

5   dollar amounts in that row represent?

6       A.   That's a tabulation of the 1 through 38.

7       Q.   Okay.  So --

8       A.   Upwards of those dollar figures of those

9   sheds for that particular month.

10      Q.   So the bottom row is a sum of all the

11  dollar amounts due from the 38 sheds for that

12  particular month?

13      A.   Correct.

14      Q.   And then what's this dollar amount in the

15  column that has all the due dates in it, at the

16  bottom of that column?

17      A.   That is a total revenue for those 12

18  months.

19      Q.   Okay.  So Fin & Feather, LLC brought in

20  $68,418 from boat shed rentals in 2008?

21      A.   Yes.

22      Q.   Okay.  And if I look now on the second

23  page of this exhibit, which is the 2009 spreadsheet,

24  Fin & Feather, LLC brought in $66,904 from -- of

25  revenue from boat shed rentals in 2009; is that

1                       KIRK PREST

2  right?

3       A.   That looks -- that looks like it, yes.

4       Q.   Okay.  And then if I look at the 2010

5  spreadsheet, which is page 3 of the exhibit,

6  Fin & Feather, LLC brought in $70,997 worth of

7  revenue from its boat shed rentals in 2010; right?

8       A.   Correct.

9       Q.   And then if I go to page 4 there's no such

10 number at the bottom.  But going to page 5, it

11 looked like this one is a two-page spreadsheet for

12 the 2011 spreadsheet.

13            In 2011, F&F -- Fin & Feather, LLC brought

14 in $67,852 of revenue from its boat shed rental; is

15 that right?

16      A.   Yes.

17      Q.   Okay.  And then going to page 7, which is

18 the bottom of the 2012 spreadsheet, do you see that

19 there's a value missing in that due date column.

20 How would we determine how much revenue

21 Fin & Feather, LLC brought in from boat sheds in

22 2012?

23      A.   Can you go back to the first page.

24      Q.   Yep.

25      A.   Okay.  So the reason that's not totaled is

```
 1                    KIRK PREST
 2   because there was, let's see, one, two, three, looks
 3   like six.  Six folks that were still due, and by
 4   December 31 the payment apparently was not received
 5   yet.
 6             So the payment would be filled when I
 7   would reconcile the boat storage payments to the
 8   boat storage spreadsheet.  At that time, those
 9   columns or cells would be completed, and then it
10   would eventually total the -- give you the total.
11             But it looks like there were six
12   outstanding statements.
13        Q.   Okay.  And did -- were -- let's see.  If
14   you look at the bottom row of the spreadsheet, which
15   is on page 7 for 2012, do you see there's tallies in
16   each of the monthly columns, there's dollar amounts?
17        A.   Right.
18        Q.   Was that the total due or received for
19   each of those months in 2012?
20        A.   As they were reconciled with the payments.
21   But if the payments hadn't been received yet, then
22   it wouldn't be included in those numbers, those
23   totals.
24        Q.   I see.  I see.  All right.  And going back
25   to the 2008 through 2011 boat shed revenues, did
```

```
 1                    KIRK PREST
 2  Fin & Feather, LLC declare those revenues in its
 3  taxes, on its taxes?
 4       A.   You mean that number?
 5       Q.   Yeah.
 6       A.   If they -- the revenues were recorded on
 7  taxes, but if you're asking me that number, I can't
 8  speak to that.
 9       Q.   Okay.  What would -- but these total
10  revenues were reported in some form, on
11  Fin & Feather, LLC's taxes; correct?
12       A.   I'm going to defer that to Denise, but in
13  my understanding, is as of December 31, any payments
14  as of December 31 were recorded on that year's
15  taxes.  That's my understanding.
16            Now, she may have a better, accurate
17  statement than that, but that's the way I understand
18  that it works.
19       Q.   Got it.
20       A.   So these six probably would have went on
21  next year's taxes, but I'm not sure about that.
22       Q.   Okay.
23       A.   If they were received in January of the
24  next -- or February of the next year.
25       Q.   Okay.  Let's look back at the 2010 sheet,
```

```
 1                       KIRK PREST
 2    which is page 3.  Do you see at the very top, right
 3    under shed number and gate code, it says, note, red
 4    indicates oil spill loss of income?
 5         A.   Yes.
 6         Q.   Can you tell me what that means?
 7         A.   Yes.  I started that, but I don't know if
 8    I ever kept up with it.  But that means those three
 9    customers left as a result of the oil spill.
10              They couldn't fish, so they didn't see, I
11    guess, the need to pay boat storage rentals for a
12    boat that they couldn't use.
13         Q.   Okay.  So you're alleging that
14    Fin & Feather, LLC lost income for Boat Shed
15    Number 4, 10, and 26 in 2010 because of the spill?
16         A.   That's some of them, yes.
17         Q.   Okay.  And how much income did
18    Fin & Feather, LLC lose in that year from its boat
19    shed rentals, due to the spill?
20         A.   I'm not -- I don't have a figure at this
21    point, sitting right here, for you right now for
22    that.
23         Q.   If you wanted to determine that number,
24    would you be able to tell that from this 2010
25    spreadsheet?
```

1                    KIRK PREST

2        A.   That, with others, yes.

3        Q.   Okay.  So, for example, what other

4   documents would you need to be able to determine

5   that lost income?

6        A.   Well, we have some cancellation letters

7   from some of the clients.  But I could take these

8   spreadsheets and, between my wife and I, we both

9   know which ones left because of the oil spill.

10            So from 2010 until now, we could come up

11  with that information.  I don't have it right -- I

12  don't have it right this minute to tell you, but it

13  could easily be calculated.

14       Q.   Okay.  So, understood that you don't have

15  the number right now, but I'm trying to understand

16  how you would determine that number and based on

17  what documents you would determine that number.

18            So what information on this 2010

19  spreadsheet that we're looking at would you need to

20  begin to determine that number?  What on here

21  reflects that particular revenue was lost because of

22  the spill?

23       A.   Well, the fact that these folks left, with

24  zero income, zero revenue.  And each year is going

25  to have other clients.

1                          KIRK PREST

2                MR. ROBERT:  If I may, Kirk, I think she's

3    focused on this specific 2010 spreadsheet.  So she's

4    just asking as it relates to 2010 and not worrying

5    about other years at this point.

6                THE WITNESS:  Yeah.  This is going to

7    be --

8    BY MS. TERTERYAN:

9        Q.   Maybe --

10       A.   I don't know if I have all the pieces of

11   the information that I need right here to --

12       Q.   All right.  So maybe if I ask my question

13   a different way.

14                Let's look at Boat Shed Number 4.  You say

15   that customer left because of the spill.  When did

16   that customer tell you they were leaving because of

17   the spill?

18       A.   Well, it looks like August and September

19   is a zero amount, so probably, he probably left at

20   the end of July, beginning of August and it looks

21   like I had two months of zero revenue.

22                And then it looks like I might have

23   started renting that shed again to, looks like LDWF,

24   which is the Louisiana Department of Wildlife and

25   Fisheries.

```
 1                      KIRK PREST
 2       Q.   I see.  So in 2010 for Boat Shed Number 4,
 3   there were two months that you allege you lost
 4   revenue because of the spill; is that right?
 5       A.   It looks like, this particular document,
 6   it looks like two months for that particular shed,
 7   yes.
 8       Q.   All right.  Is there another document that
 9   would reflect a different answer for Shed Number 4
10   for 2010?
11       A.   Not to my knowledge.  I mean, this is a
12   2010 spreadsheet, so there's no other documents.  I
13   mean, only other documents would be payments.
14       Q.   Sorry.  Did you say -- payments?
15       A.   Payments.
16       Q.   All right.  And then looking at
17   Shed Number 10 for 2010, I see four cells from May
18   through September that are zero.
19            Does that mean that you received $0 in
20   revenue for Shed Number 10 for those months?
21       A.   Yeah, that's five months.
22       Q.   And are those the months that you're
23   alleging Fin & Feather, LLC lost revenue for Boat
24   Shed Number 10 because of the spill?
25       A.   That's what it looks like, yes.
```

1                          KIRK PREST

2       Q.   Okay.  And then looking at Shed Number 26

3  here, I see the same four -- five months, May

4  through September.  Just says due.

5            What does that mean?

6       A.   That means he was due May 1, and then

7  apparently left and I didn't put -- I didn't zero it

8  out.  But it's in red, so it indicates that it's

9  empty.  And then it was starting to rent again to

10  LDWF in October.

11      Q.   Okay.  And for Shed Number 29 there's a

12  red cell in the May column.  Is that in any way

13  connected to spill?

14      A.   I would think it is because I have a red

15  tab there.  What I may have done is put this new

16  customer, Billy Nichols, in there, didn't zero it

17  out.

18            I would have to look and see.  He was -- I

19  mean, this is Billy Nichols.  He's another charter

20  fisherman, lodge owner.  Looks like a -- I didn't

21  put a zero there.

22      Q.   Okay.  So it's your testimony that it

23  should say zero?  Is that what you're saying?

24      A.   I can't think of any reason why it would

25  be red and not -- I just didn't put a zero, like I

1                    KIRK PREST

2  didn't in the 26.

3     Q.   Okay.  And is it also your testimony that

4  that zero is because of the spill?

5     A.   I'm not sure if that was calculated that

6  way or not.  It should be because of the spill

7  because the waters were closed; he can't fish.  In

8  my opinion it could be.

9     Q.   So going back to my earlier question, we

10  went through this 2010 sheet to determine which of

11  the sheds in 2010 it shows, according to you, lost

12  revenue due to the spill.

13          But I want to understand, because for some

14  of these you say you're not sure or it seems to be.

15          What would you have to do to be sure

16  exactly what revenue you lost in 2010 from your boat

17  shed rentals due to the spill?

18     A.   Well, I would have to confer with Denise

19  and the expert accountant to determine these

20  uncertainties that I don't know sitting here right

21  this minute.

22     Q.   So besides these spreadsheets, you said

23  the actual payments might be relevant to determining

24  the revenues that you lost related to the spill.

25          Are there any other documents that you

1                    KIRK PREST

2    would look at to be able to determine how much

3    revenue you lost from your boat shed rentals due to

4    the spill?

5        A.   Statements.

6        Q.   What statements?

7        A.   2010, I mean, each month, or each six

8    months or one-year period, we send out the

9    statements.  The boat shed statements due,

10   rentals --

11       Q.   So you mean like an -- I'm sorry.

12       A.   Yeah, we call them statements.  You can

13   call them invoices I guess.

14       Q.   Understood.

15            And then let's look at the 2011

16   spreadsheet.  The -- which is page Number 4 of the

17   exhibit.  The 2011 spreadsheet has two red sheds, 1

18   and 15.

19            Are you alleging that Boat Shed 1 was not

20   rented out due to the spill, in 2011?

21       A.   No.  But I -- as I recall sitting here

22   right now, I think I indicated red tabs on, at that

23   time, on ones that I would -- that I would think

24   were not -- that were connected to the oil spill

25   because of not being able to fish.

1                          KIRK PREST

2    document.

3         Q.   Understood.

4              I think if we want to take a short break,

5    now would be a good time.  Otherwise, I'm happy to

6    keep moving.  But Mr. Prest, how do you feel now?

7              MR. ROBERT:  I'd like to run to the

8    restroom, so a short break sounds good to me.

9              MS. TERTERYAN:  Yeah.  Let's take 5,

10   10 minutes, whatever you need.

11             MR. ROBERT:  Sounds good.

12             THE VIDEOGRAPHER:  Going off the record.

13   The time is 10:44.

14             (Recess taken.)

15             THE VIDEOGRAPHER:  Media Number 2.  On the

16   record at 10:58.

17   BY MS. TERTERYAN:

18        Q.   All right.  Mr. Prest, I'd like to switch

19   topics for a few minutes.

20             Did any oil from the spill touch any of

21   the Fin & Feather entities' real estate?

22        A.   No.

23        Q.   What did it touch?

24        A.   Me and my boat were covered in it.

25        Q.   Aside from touching you and your boat, did

1                        KIRK PREST

2    it touch any other property of Fin & Feather?

3        A.   The washing machine, from my clothes.  But

4    as far as the real estate property itself, no.

5        Q.   Okay.  And how did it come to be that oil

6    touched you and your boat?

7        A.   Well, for eight or nine months I was

8    covered in it from running the waters seven days a

9    week, for eight or nine months every day.

10            MR. ROBERT:  And I'll represent he was

11   working for VOO, working with the spill response.

12   And I don't know if that's part of the scope of

13   today's deposition.  I just want to put that on the

14   record.

15            MS. TERTERYAN:  All right.  I think it's

16   still -- let me --

17            MR. ROBERT:  I don't --

18            MS. TERTERYAN:  That's a helpful note.

19   But I want to make sure I get a question and answer

20   properly from him.

21   BY MS. TERTERYAN:

22       Q.   So did oil touch you and your boat in

23   connection with your Vessels of Opportunity work,

24   Mr. Prest?

25       A.   I don't call it Vessels of Opportunity.

```
 1                         KIRK PREST

 2        Q.   The VOO program?

 3        A.   It's not an opportunity for us.

 4             With the oil spill disaster cleanup, yes.

 5        Q.   Okay.  Aside from that work, did oil touch

 6   any of Fin & Feather's property?

 7        A.   Other than the washing machine, no.

 8        Q.   I'm going to send a new exhibit.  This

 9   will be Exhibit 3, I believe.  And I'll ask that it

10   be so marked at the appropriate time.

11             This is Tab 83.  And Bates Number

12   FAFC000217.

13             I will share it for you, Mr. Prest.

14             (Whereupon, Exhibit 3 was marked for

15             identification.)

16   BY MS. TERTERYAN:

17        Q.   Do you see this document?

18        A.   Yes.

19        Q.   And I'll do a quick scroll so you can get

20   a sense of all the pages, but it's a 22-page

21   document of photographs.

22             Do you recognize these photos, Mr. Prest?

23        A.   Yes, I do.

24        Q.   Okay.  Who took them?

25        A.   From the ones you just went through, I
```

1                          KIRK PREST

2    did.

3         Q.   Did you take all of them?

4         A.   All of the ones I just saw, yes.

5         Q.   And did you -- when did you take those

6    photos?

7         A.   Various dates during the cleanup, after

8    the oil disaster.

9         Q.   And how long did -- how long did you work

10   on the cleanup?

11        A.   As I said, eight to nine months.

12        Q.   So through sometime in 2011?

13        A.   If it was up until 2011.  I'm trying to

14   recall.  It was sometime at the end of 2010 or

15   beginning of 2011.

16        Q.   Okay.  What do these pictures show,

17   Mr. Prest?

18        A.   Well, it shows that the estuaries and

19   fisheries and nurseries of our -- I guess you would

20   say precious estuaries were covered in this toxic

21   soup.

22        Q.   And these areas that are depicted in the

23   pictures, where are they located?

24        A.   Various parts of the estuaries where I was

25   traveling.

```
 1                        KIRK PREST

 2        Q.   Was -- was it near where Fin & Feather is

 3   located, or somewhere else?

 4        A.   Yes, very near where Fin & Feather is

 5   located.

 6        Q.   Okay.  So, moving to another topic.  I

 7   want to talk about the cabins that Fin & Feather,

 8   LLC and Fin & Feather Cabins, LLC and Fin & Feather

 9   Adventures, LLC were -- say they were planning to

10   build and would have built but for the spill.

11             In total, Fin & Feather alleges they would

12   have built and operated six new cabins and a new

13   lodge if the spill hadn't happened; is that right?

14        A.   That's correct.

15        Q.   Let's start with the Fin & Feather, LLC

16   cabins, Flounder and Wood Duck.

17             How many rooms would those two cabins have

18   had?

19        A.   I don't have the blueprints in front of

20   me.  But it was somewhere in the neighborhood of

21   either two- or three-bedroom.

22        Q.   Are there blueprints of those cabins?

23        A.   There's floor plans.

24        Q.   All right.  So there are floor plans of

25   the Wood Duck and Flounder cabins that exist?
```

```
1                        KIRK PREST

2       A.   I'm not sure the date.

3       Q.   Do you remember the year?

4       A.   Could be '09, could be '08.  Could be '10,

5  beginning of '10.  I'm not sure the dates.

6       Q.   Is there a way you could confirm what year

7  it was, what date it was?

8       A.   If I can find those floor plans, I might

9  be able to determine.  It may have a date on them.

10       Q.   Did you ever sign a contract retaining

11  Mr. Hyatt for the purpose of building these cabins?

12       A.   Did I ever obtain what?

13       Q.   Sign a contract with Mr. Hyatt, in

14  connection with this project?

15       A.   No, we didn't work with contracts.  He has

16  been working with projects or buildings with

17  Fin & Feather since the beginning.

18       Q.   Did Mr. Hyatt help build the existing

19  Fin & Feather Cabins?

20       A.   Most of them.

21       Q.   And was he also going to help build the

22  Pelican Plantation?

23       A.   Yes.

24       Q.   Let's actually start there.  I'm going to

25  send you an exhibit.
```

1                    KIRK PREST

2   Pelican Plantation going to sell alcohol to its

3   guests?

4        A.   No, this was a part of the all-inclusive

5   resort amenity, included in their fee.

6        Q.   Part of the all-inclusive package that

7   Pelican Plantation was going to offer would have

8   been alcohol offerings?

9        A.   Yes, a place for folks to have cocktails,

10  yes.

11       Q.   Okay.  I'm going to send a new document,

12  Tab 72, which I'd ask be marked as the next exhibit.

13  It is Bates stamped F&F 30(b)(6) 00401.  And I'll

14  share it as well.

15            (Whereupon, Exhibits 5 & 6 were marked for

16            identification.)

17            MR. ROBERT:  Just for record purposes, I

18  have this as Exhibit 5.

19            MS. TERTERYAN:  I think you...

20  BY MS. TERTERYAN:

21       Q.   Okay.  So I'm showing you Tab 72.  Do you

22  recognize this document, Mr. Prest?

23       A.   Yes.

24       Q.   What is it?

25       A.   That looks like the first floor of the

```
 1                        KIRK PREST
 2   Pelican Plantation woodwork.
 3        Q.    And it's actually, it's 10 pages, which I
 4   can scroll through.  Or if you guys have a copy, it
 5   might be easier if you scroll through your copy to
 6   kind of familiarize yourself with the document.
 7             But what are these 10 pages?
 8        A.    These are the blueprints for the
 9   Pelican Plantation.
10        Q.    Okay.  And I'm -- it's really hard to see,
11   so hopefully I can zoom in and you can see it on the
12   first page, where it says revision and date on the
13   side.
14             Do you see it says, A, issued for review,
15   12/17/2009?
16        A.    Yes.
17        Q.    Was this particular page created in 2009?
18        A.    No, the documents were -- the blueprints
19   were done prior to that date.  That tells me they
20   were issued for our review.  We had some revisions,
21   slight changes here and there.
22        Q.    Do you know when this floor plan was
23   created on this page, the first page?
24        A.    I'm not sure what -- I don't, sitting
25   right here right now, I don't know that.  I don't
```

1                         KIRK PREST

2    know the exact date.

3         Q.   Who created this floor plan?

4         A.   Guy by the name of Daniel Butee.

5         Q.   And who is that?

6         A.   He's an architect.

7         Q.   When did you ask Mr. Butee to create these

8    floor plans?

9         A.   Sometime after my drawings.  I'm not sure

10   the date.

11        Q.   Okay.  So the -- after you drew the last

12   exhibit that we were looking at, then you approached

13   Mr. Butee to draw up some floor plans for Pelican

14   Plantation?

15        A.   Yes.  I mean, I met with him several times

16   and many phone calls, but yes.

17        Q.   Why did you ask Mr. Butee to draw up floor

18   plans for the Pelican Plantation?

19        A.   Due to the fact that that -- that was

20   Fin & Feather's next phase, in addition to our

21   charter business, hunting and fishing charters.  And

22   the fact that we were near capacity with the cabins.

23             And we were also listening to the wants

24   and needs of our clients, and also the market, with

25   regards to a resort of this scale, high-end clients,

1                              KIRK PREST

2    to bring folks to Venice for our, at the time before

3    the oil spill, superior fishing and hunting

4    location.

5               Our area is, it's really kind of a remote

6    area.  There's not a lot to do.  This plantation

7    was -- this plantation was what folks were looking

8    for and the market was really untapped.

9          Q.  When you say your cabins were near

10   capacity, what do you mean by that?

11         A.  Well, you can look at the books that we

12   provided and, I mean, 80, 90 percent, a hundred

13   percent sometimes in our good months.  So we were

14   running into situations where we were turning folks

15   down because we were -- our occupancy rates were at

16   or near full.

17              And so this was a -- this was a business

18   that -- a niche market that we were kind of growing

19   our business into, of the next phase of

20   Fin & Feather.

21         Q.  And when you say you were near 80, 90,

22   a hundred percent capacity in good months, what were

23   the good months prior to the spill?

24         A.  Typical months were April, May, through

25   January.

1                              KIRK PREST

2        Q.   So April through January, you were in the

3    80 to hundred percent occupancy range for your

4    cabins?

5        A.   I'm not saying every month, but a large

6    percentage of those months.

7        Q.   Okay.  And you said that the Pelican

8    Plantation was going to fill a need in an untapped

9    market for high-end fishing and hunting clients.

10            Did I get that right?

11       A.   Yes.

12       Q.   There was no one else in your area doing

13   what you wanted to do with Pelican Plantation?

14       A.   There was a few.

15       Q.   Okay.  But you did not have an existing

16   lodge that was like what you wanted to do with

17   Pelican Plantation; correct?

18       A.   No, we did not.

19       Q.   You didn't have experience building a 20-

20   to 25-room exclusive hunting lodge?

21       A.   We had experience building all of the

22   buildings on our property.  30,000 square foot boat

23   shed, building storage buildings and high-end

24   cabins.

25       Q.   But none of them were -- Pelican

```
1                     KIRK PREST
2   Plantation was going to be a different -- a
3   different -- strike that.
4            Pelican Plantation was going to be
5   different from all the existing cabins that
6   Fin & Feather have; is that fair to say?
7        A.   Different?  Yes, you -- yes, different.
8        Q.   Considerably bigger, fair to say?
9        A.   Yes.
10       Q.   Would have more amenities; is that fair to
11  say?
12       A.   Yes.
13       Q.   And you mentioned there were a couple
14  other businesses in that market that Pelican
15  Plantation would be entering.
16            Who were those other businesses?
17       A.   Well, our competitors would be -- I would
18  consider my small competitor, in terms of the
19  Pelican Plantation, but in the same line of work,
20  Cajun Fishing Adventures would be one.
21       Q.   Do any of those competitors have lodges
22  that are like what you wanted Pelican Plantation to
23  be?
24       A.   They have a very similar, but on a little
25  smaller scale.
```

1                          KIRK PREST

2        Q.    Okay.  Do you know how big that lodge is?

3        A.    I don't know.  He has maybe 15 rooms.  But

4   we -- look, I want you -- I want you to understand

5   something.

6             We didn't want to create the problem that

7   Cajun Fishing Adventures created, in that he started

8   this -- his particular lodge and then shortly

9   learned that he didn't have all of the amenities and

10  all of the space that he needed.

11            So then he has to house people, he had to

12  add on more or less what we call a bunkroom behind

13  his pool area, to house more people.  So now he has

14  different buildings.

15            And then your costs go -- you have a

16  higher operating cost because you have multiple

17  places.  You have more cleaning costs, et cetera,

18  et cetera.  And folks have to walk from one building

19  to the other building in the rain, in the cold.

20            And it's not -- it's not the same

21  atmosphere.  It's not the same resort setting as you

22  have with an all-inclusive resort on the scale, of

23  the quality, of the Pelican Plantation.

24            So that was something that we know because

25  we're in this business, and we've -- I've been there

```
1                        KIRK PREST
2    fishing and hunting since the age of four.
3              So I can adjust and I know what, for the
4    most part, the dos and don'ts.  And I listen to our
5    clients, especially our high-end clients, and we do
6    things that make good business sense.
7         Q.   Do you know when those additions were
8    added in your competitor's lodge?
9         A.   I don't know, you know, his -- the details
10   of his business.  I know at some point right after
11   he -- I know at some point right after he initially
12   started, which was around -- right before Katrina.
13   So I'm pretty sure his add-on was before then.
14        Q.   Understood.  And you mentioned that you
15   understood from your high-end clients that there was
16   a need for the Pelican Plantation.  Can you tell me
17   more about what your clients told you that led you
18   to that conclusion?
19        A.   To build the Pelican Plantation or...
20        Q.   Yes.
21        A.   Well, we, you know, we've heard it from
22   several, from many.
23             I guess one of the ones that really comes
24   to mind right now is one of our high-end corporate
25   clients, who is -- he's an executive with one of the
```

1                          KIRK PREST

2        A.    Clients we had, you know, other clients in

3   other corporate entities that would mention these

4   things, saying 10s of thousands or that sort of

5   thing.

6              We had -- we have clients that we -- we

7   have good relationships with our clients.  And we,

8   you know, we see these folks on a regular basis.

9              So things like the Pelican Plantation

10  would be -- would be a real big deal for them and

11  their clients, that they bring down to entertain.

12  There's nothing like that in our area.

13       Q.    Have your clients since the spill said

14  that they would want a resort like the Pelican

15  Plantation?

16       A.    Well, for one thing, several -- several of

17  those clients don't come to Venice anymore because

18  of the poor fishing and poor hunting.  So in that

19  case, we don't hear from them.

20             But the ones that do, may bring it up,

21  they may not.  It's just random.  They may mention

22  something to Denise or myself.  It's not a big, long

23  conversation, but it just may be a comment like,

24  wish we were in the Pelican Plantation.

25             But folks realize that it's not a viable

1                         KIRK PREST

2   possibility anymore.

3       Q.   When did you -- going back to -- and why

4   isn't -- sorry, strike that.

5            Why isn't it a viable possibility anymore

6   to build the Pelican Plantation?

7       A.   Well, it's due -- it's simple.  It's due

8   to the poor fishing and the poor hunting.  The --

9   the estuary -- the damaged estuary, the damaged

10  nurseries.  I mean, these fish, this food chain all

11  starts with that delicate nursery.

12           These fish are, they're spawned in that

13  area.  They're -- they start from life from there

14  and then when they're juvenile and old enough, big

15  enough to swim to bigger waters without getting

16  eaten by a predator, that's what they do.

17           But this -- it all starts right there.

18  It's the whole food chain, and the whole estuary has

19  been damaged from all of this toxic soup.

20      Q.   You still have clients that come and stay

21  at your existing -- at Fin & Feather's existing

22  cabins; right?

23      A.   We have, compared to pre oil spill, yeah,

24  we have a few, yes.  That's probably accurate, a

25  few.

1                        KIRK PREST

2        Q.   Okay.  And at the time these -- so you

3   said that -- strike that.

4             How much was it going to cost to build the

5   Pelican Plantation?

6        A.   In the phase for the beginning, it was in

7   the $3 million range.

8        Q.   How did you arrive at that number?

9        A.   Cost estimates.

10       Q.   Whose cost estimate?

11       A.   The contractor's cost estimate.

12       Q.   Okay.  And that was Mr. Hyatt; is that

13   right?

14       A.   Yes.

15       Q.   So Mr. Hyatt provided you cost estimates

16   in the range of $3 million for building out Pelican

17   Plantation, as reflected in these final floor plans

18   in Tab 72?

19       A.   At that time, yes, in those -- in those

20   days of those costs.

21       Q.   Okay.  And I see 24 rooms in this third

22   floor plan on page 8.  This was part of your -- that

23   $3 million cost; is that right?

24       A.   This page in front of me?

25       Q.   Yes.

```
 1                      KIRK PREST
 2        A.    Page 3, yes.
 3        Q.    Okay.  And when did Mr. Hyatt provide you
 4   the estimate that it would cost about $3 million to
 5   build Pelican Plantation?
 6        A.    Prior to going to -- well, he had the
 7   first initial set of plans.  I'm not sure the date,
 8   though.  I couldn't tell you the date.
 9              But it was in the process of, you know,
10   when folks having something built, they're between
11   the contractor and between the architect and between
12   the banker and all of that, it works.
13        Q.    Was it before or after the spill?
14        A.    Was it before what now?
15        Q.    Before or after the spill that Mr. Hyatt
16   gave you a cost estimate of $3 million to build
17   Pelican Plantation?
18        A.    It was before.
19        Q.    And how were you going to get that
20   $3 million to build Pelican Plantation?
21        A.    Mississippi River Bank.
22        Q.    Let -- so, did you have an agreement with
23   Mississippi River Bank that they would provide that
24   $3 million?
25        A.    Yes.  We had an open agreement with
```

1                    KIRK PREST

2   Mississippi River Bank.  You know, we have a

3   community bank, and it's a small community bank with

4   a couple of branches.  And, so yeah, we've had an

5   established relationship with Mr. Bush.

6            Whereby we -- we would, if we needed the

7   funds, we would sit down with Mr. Bush and go over

8   everything.  And he's a very sharp, very particular

9   guy, so if Mr. Bush says yes or no, that's what it's

10  going to be.

11           Before it goes to the board, he's usually

12  99.9 percent, wanting whether our project is going

13  to go through or not.

14       Q.   Okay.  You said you had an open agreement

15  with Mississippi River Bank that they would loan you

16  $3 million to build Pelican Plantation?

17       A.   If a project makes sense, yes.

18       Q.   That -- my question is, did you have an

19  actual agreement with Mississippi River Bank that

20  they would loan you $3 million to build Pelican

21  Plantation?

22       A.   Well, I don't know if you want to call it

23  an open agreement, but we had an open relationship

24  and an open business dealings with Mr. Bush and

25  Mississippi River Bank.

1                        KIRK PREST

2        Q.   I didn't call it an open agreement.  You

3   used those words.  And maybe let's pause for a

4   moment and you can tell me what you mean by open

5   agreement.

6        A.   Well, for this project, that we were

7   proposing and getting ready to start, we were

8   approved for this loan to move forward with the

9   Pelican Plantation.

10       Q.   Did you have a loan approval document that

11  said, you're approved for a $3 million loan to build

12  Pelican Plantation?

13       A.   Yes, we do.

14       Q.   Have you provided that loan approval

15  document to your lawyers?

16       A.   You -- wait.  You're saying loan approval.

17  I'm saying Mr. Bush's approval.

18       Q.   Mr. Prest, I want to be really clear on

19  this because it's important, and I'm trying to

20  understand your testimony.

21            So you said you had approval for the

22  $3 million loan.  You said you had a loan approval

23  document showing that you were approved for a

24  $3 million loan to build Pelican Plantation.

25            Is that true?

```
1                    KIRK PREST
2        A.   We have an approval document from Mr. Bush
3   saying we were approved to build the Pelican
4   Plantation.
5        Q.   Where is that document now?
6        A.   I believe my lawyers presented it, that
7   document.
8        Q.   All right.  So you provided it to your --
9        A.   I'm not a hundred percent sure about that,
10  but if not we can dig in our records to find it.
11       Q.   So to the best of your knowledge, you
12  provided that loan approval document to your lawyers
13  and they provided it -- they produced it in this
14  case?
15       A.   To my -- to my knowledge, yes.
16       Q.   Okay.  When was this loan approval
17  document issued?
18       A.   I'm not sure the date.
19       Q.   The year?
20       A.   I think it would have been '09.
21       Q.   So you received a loan -- a written loan
22  approval from Mississippi River Bank in 2009 saying
23  they would loan you $3 million to build Pelican
24  Plantation?  Is that your testimony?
25       A.   Late '-9, early '10, something like that.
```

1                    KIRK PREST

2  I'm not a hundred percent sure of the exact date.

3      Q.    They agreed to issue -- to loan you

4  $3 million in late 2009 or early 2010, before your

5  floor plans for Pelican Plantation were even final?

6      A.    The floor plans were final before then.

7      Q.    When did Pelican Plantation's floor plans

8  become final?

9      A.    The final draft was 2010.  The first draft

10 was somewhere in 2009.

11     Q.    All right.  We're looking at this page 8

12 of Tab 72.  It said issued for review 5/18/2010.

13         So that was when these final drawings were

14 issued to you; correct?

15     A.    Correct.

16     Q.    And you're saying Mississippi River Bank

17 gave you a written loan approval for $3 million to

18 build Pelican Plantation in, at the latest, early

19 2010; is that right?

20     A.    I didn't say that.  I said that Mr. Bush

21 said we were approved for the Pelican Plantation.  I

22 didn't --

23     Q.    When -- Mr. Prest, when did they issue you

24 a written loan approval for the $3 million?

25     A.    I'm not sure of the date.  It all

```
 1                        KIRK PREST
 2    coincided with the blueprints, my meetings with
 3    Mr. Bush, or my wife and I's meetings with Mr. Bush,
 4    contractor.  I can't give you a specific date.
 5         Q.   Was it before or after the spill?
 6         A.   It was around the spill, but -- and I know
 7    it was -- the property was cleared, all that was
 8    done.  As to the date of that letter, I don't recall
 9    because I -- I just don't recall that date right off
10    the top of my head right now.
11         Q.   What information did you have to submit to
12    Mississippi River Bank for them to agree to loan you
13    $3 million to build Pelican Plantation?
14         A.   Mostly cost figures, general, income
15    projections, that sort of thing.
16         Q.   What cost figures?
17         A.   Cost figures from the contractor,
18    general -- general contractor.
19         Q.   How did the -- do you know how the
20    contractor arrived at those cost figures?
21         A.   I'm not going to speculate, but I would
22    think it would be his experience in the cost
23    estimates and also cost -- calling for costs on
24    certain items.
25         Q.   Okay.  And you said you also provided
```

```
 1                        KIRK PREST
 2   income projections.   Who came up with those income
 3   projections?
 4        A.   Well, they were based on our books, our
 5   reservations, canceled trips, that sort of thing.
 6        Q.   Did you come up with the cost -- the
 7   income projections?
 8        A.   Between Denise and I on reservations and
 9   canceled trips, yes.
10        Q.   And you created a document with income
11   projections for Pelican Plantation; is that right?
12        A.   Can you repeat that question.
13        Q.   You created a document that stated the
14   income projections for Pelican Plantation; is that
15   right?
16        A.   Yes.
17        Q.   Where is that document now?
18        A.   I think we sent it to you.  Projected
19   income on Fin & Feather Adventures.
20        Q.   You sent us the same document that you
21   submitted to Mississippi River Bank in an effort to
22   obtain the $3 million loan?
23        A.   No, we sent -- I don't know if that's been
24   sent or not.  But we sent a projected income, lost
25   income with regards to Fin & Feather Adventures.
```

```
 1                    KIRK PREST

 2       Q.   Okay.  Mr. Prest, that's not what I'm

 3  asking about.

 4            I'm asking about the support that you

 5  provided Mississippi River Bank back in 2009, 2010,

 6  in an effort to obtain a $3 million loan to build

 7  Pelican Plantation.  You said you provided them

 8  income projections in connection with that; correct?

 9       A.   In discussion with Mr. Bush, we went over

10  these -- these numbers.

11            MR. ROBERT:  Mr. Prest, that is not --

12  just listen very carefully to her instructions,

13  because she's putting you in a place and time and in

14  certain interactions.  So just pay attention to the

15  question she's asking.

16            THE WITNESS:  Okay.

17  BY MS. TERTERYAN:

18       Q.   So were the income projections that you

19  provided Mr. Bush in an effort to get a $3 million

20  loan, were those purely in verbal discussions, or

21  was there a written document reflecting those income

22  projections?

23       A.   I think both.  As I sit here right now,

24  I'm thinking both.  Not a hundred percent sure.

25       Q.   All right.  Can you provide anything
```

1                      KIRK PREST

2    besides -- what were -- what were your income

3    projections that you provided Mr. Bush based on?

4         A.   Certain adventures, charters, hunting and

5    fishing charters.

6         Q.   All right.  And how did you use that

7    information to project income from the Pelican

8    Plantation?

9         A.   Based on both projected income and lost

10   income.

11        Q.   Can you tell me more specifically than

12   that how you projected the income?

13        A.   Well, part -- well, mostly due to canceled

14   trips because of the oil spill.

15        Q.   Mr. Prest, at the time you were speaking

16   with Mr. Bush about obtaining the $3 million loan,

17   the oil spill hadn't happened yet --

18        A.   I know, but I said part of it was

19   projected trips.  Some of it was after the spill.

20   It was losses.

21        Q.   Mr. Prest, I'm asking you about a

22   conversation that you had with Mr. Bush about

23   obtaining the $3 million loan.  That conversation

24   happened before the spill; correct?

25        A.   And I said it's based on past trips,

```
 1                    KIRK PREST
 2  adventures, charters and future charters.
 3       Q.   All right.
 4       A.   Both past and future charters.  That's
 5  where these projections come from.
 6       Q.   I want to show you a new document.  I'm
 7  sending Tab 69.  And I'll show it as well on the
 8  screen.
 9            All right.  Do you see -- do you see
10  Tab 69 on the screen?
11       A.   Yes.
12       Q.   Do you see this is a letter dated
13  January 20, 2011, from Mississippi River Bank?
14       A.   Yes.
15       Q.   Do you recognize this letter?
16       A.   Yes.
17       Q.   What is it?
18       A.   That's a letter from Mr. Bush basically
19  stating that since the oil spill --
20            MR. ROBERT:  Take the time to read the
21  letter.
22            THE WITNESS:  Okay.
23  BY MS. TERTERYAN:
24       Q.   So what is this letter?
25       A.   This is a letter stating that we had
```

```
 1                    KIRK PREST
 2  I appreciate that.
 3            THE WITNESS:  And I apologize.  I got kind
 4  of confused on that whole question and I needed to
 5  just retrack my mind and start over.  But I just
 6  kept going.
 7  BY MS. TERTERYAN:
 8       Q.   That's all right.
 9            I want to ask about the other six cabins
10  that Fin & Feather was going to build and didn't
11  build.
12            How much was it going to cost to build
13  those other six cabins?
14       A.   I don't know if I have that information in
15  front of me, and I can't recall that number, or
16  those numbers.
17       Q.   Did you get an estimate from your
18  contractor for how much it would cost to build those
19  other six cabins?
20       A.   I'm not sure if we did or not.  I think we
21  did.  Somewhere -- it seems like I remember vaguely.
22       Q.   Did you talk to Mississippi River Bank
23  about getting a loan to finance the construction for
24  those other six cabins?
25       A.   Not to my knowledge.
```

1                      KIRK PREST

2        Q.   Okay.   So you only talked to

3   Mississippi River Bank about potentially financing

4   the Pelican Plantation construction project; right?

5        A.   Correct.   Because we, as we have done in

6   the past, we would typically build some of our

7   cabins on our own funds.   So we would actually build

8   those as we would see fit.

9        Q.   Were you going to build the other six

10  cabins using Fin & Feather's own funds?

11       A.   Some of Fin & Feather's funds, yes.

12       Q.   How much of Fin & Feather's own funds were

13  going to be used for the other six cabins?

14       A.   I don't know at this point in time.   This

15  is 10 years later.

16       Q.   Did you make a record of it somewhere?

17       A.   I don't recall.

18       Q.   Who would know the answer to that?

19       A.   Well, we -- our finances, my wife keeps

20  track of our finances.   So, to say we're going to

21  build this next cabin at this particular date, I

22  don't know what that date is.   But it just depends

23  on the funds at that point in time.

24       Q.   Mr. Prest, do you know whether you

25  obtained any cost estimate for how much it would

1                    KIRK PREST

2       Q.   Why did he send you the final drawings if

3   he knew that the project was off, wasn't going to

4   happen?

5       A.   Because they were still in his possession

6   from the time that we were making some minor changes

7   to the time that the finals were done, and he had

8   finished them up.  But we were going off of the

9   previous drawings.

10      Q.   So he was just giving you those final

11  drawings in May 2010 without any expectation of

12  moving forward with construction of the Pelican

13  Plantation.

14           Is that your testimony?

15      A.   We had a couple of conversations stating

16  that -- I told him, do not -- don't worry about

17  hurrying with the plans.  Because at this point we

18  didn't know what was going to happen.

19      Q.   After April 20, 2010, did you take any

20  steps to try to continue building Pelican

21  Plantation?

22      A.   After April 20, 2010?

23      Q.   Yes.

24      A.   No, no.

25      Q.   So when was it that you decided, I'm not

1                        KIRK PREST

2    going to take any more steps to try to build Pelican

3    Plantation?

4        A.   At somewhere in that first three weeks or

5    so after April 20.

6        Q.   Did you -- so within three weeks of

7    April 20, 2010, you decided not to try to obtain --

8    apply for or obtain any permits for Pelican

9    Plantation; correct?

10       A.   After the oil disaster, I can't tell you

11   which day or which week it was, but it was in that

12   initial time frame.

13            Post oil disaster, I'm not sure which week

14   or which day, but in that recent time period, right

15   after, we made a decision not to move forward

16   because it wouldn't make logical sense nor would it

17   make financial sense.

18       Q.   What -- I want to understand the bases for

19   that decision a little more.

20            So why did you think it wouldn't make

21   financial sense to move forward with the Pelican

22   Plantation project within a few weeks of April 20,

23   2010?

24       A.   It was when I started working the oil

25   spill and at that time realized how our ecosystem

1                         KIRK PREST

2   and estuary, the damage we were facing.  At that --

3   shortly within that time frame, that period of time,

4   is when we made the decision to call this thing off.

5            Now, I'm not sure which date that I

6   started working the oil disaster cleanup, but it was

7   around that time frame.  When I saw that sickening

8   sight every day is when I -- my gut feeling was that

9   this is over.

10       Q.   At the time you made the decision to call

11  off moving forward with the Pelican Plantation

12  project, had Mississippi River Bank told you they

13  weren't going to finance the project?

14       A.   I'm not going to opine to that, because I

15  don't know the times, the time frame of each and

16  every thing.  We're talking 11 years ago, 10 and 11

17  years ago.  And I don't know the -- at which day or

18  which week I had that decision.

19       Q.   I'm trying to understand what your

20  decision is based on.

21            Was your decision -- and so I'm trying to

22  understand, did Mississippi River Bank tell you,

23  we're not going to finance the Pelican Plantation,

24  before you made the decision not to move forward

25  with the project?

                         KIRK PREST

1

2        A.   They didn't call me and say, we're not

3   going to do this.  We didn't pursue it anymore.

4        Q.   So you made the decision, independent of

5   whether Mississippi River Bank would have been

6   willing to finance the project; is that right?

7        A.   My wife and I made the collective

8   decision, business decision, not to risk moving

9   forward at that point in time because of the damages

10   and the effects, not knowing what the effects would

11   be, but we made the decision not to move forward

12   with it.

13        Q.   And at the time you made the decision not

14   to move forward, had your contractor told you they

15   wouldn't move forward with developing the project?

16        A.   My contractor would have done anything I

17   wanted him to do.  But we didn't -- he didn't say,

18   I'm not going to build this now.

19        Q.   When did you tell your contractor you

20   weren't going to build the Pelican Plantation?

21        A.   About that same time frame.

22        Q.   Okay.  After you made the decision not to

23   pursue?

24        A.   Correct.  Correct.

25        Q.   So had you -- at the time you made the

1                         KIRK PREST

2    decision not to pursue the project, had any

3    government agencies, regulators, or organizations

4    who needed to issue permits in connection with the

5    project told you they wouldn't issue you permits to

6    build the Pelican Plantation?

7         A.    I didn't speak to anyone at that point

8    regarding permits, at that time.

9         Q.    At any point -- once you made the decision

10   not to pursue the project further, did you ever take

11   any steps after that to revisit the development of

12   Pelican Plantation, reconsider the development of

13   Pelican Plantation?

14        A.    No.  That's a lost opportunity, because

15   the fisheries just continue to become worse and

16   worse.

17        Q.    So you never went to the

18   Mississippi River Bank and asked them, we're

19   interested in moving forward again, would you still

20   be willing to loan us the money necessary to build

21   the project?

22        A.    I wouldn't want to now.

23        Q.    And you never went to a contractor and

24   said, I'm interested in going ahead and building the

25   Pelican Plantation.  Would you still be willing to

1                    KIRK PREST

2    build it?

3         A.   I didn't want to, or we didn't want to.

4         Q.   And you never applied for any permit that

5    would have been necessary to build Pelican

6    Plantation after the spill?

7         A.   No.  Didn't see a reason to.

8         Q.   And when did you decide not to move

9    forward with construction of the six other cabins

10   that you say you didn't build because of the spill?

11        A.   At or about that same time frame.

12        Q.   And was that decision based on the same

13   reasons you gave for deciding not to move forward

14   with Pelican Plantation?

15        A.   Yes.

16        Q.   You never reached out to any banks to look

17   into getting financing for building those cabins?

18        A.   No.

19        Q.   Those six cabins; correct?

20        A.   Correct.

21        Q.   Did you ever reach out to any banks,

22   before or after the spill, to look into getting

23   financing for those cabins?

24        A.   Not for -- not at that point, for those

25   cabins, no.

```
 1                      KIRK PREST
 2        Q.    Do you know how much cash on hand the
 3   Fin & Feather entities had as of the date of the
 4   spill, roughly around April 2010?
 5        A.    No, I don't.
 6        Q.    Would Ms. Prest know that?
 7        A.    I can't speak for Ms. Prest.
 8        Q.    Okay.  Did Mississippi River Bank ever
 9   reach out to Fin & Feather to say, we had a verbal
10   agreement that we would issue you a $3 million loan
11   and you're not moving forward with that agreement?
12              Did they ever say anything like that?
13        A.    No.
14        Q.    They never tried to enforce your verbal
15   agreement?
16        A.    No, but why would they.  I mean, this
17   whole area was destroyed.
18        Q.    And Mississippi River Bank was the only
19   financial institution you ever spoke with about
20   potentially financing the Pelican Plantation; is
21   that right?
22        A.    Yes.
23        Q.    I think I want to show you Tab 70.  Put it
24   in the chat.
25              So for the record, I'd like to mark Tab 70
```

1                    KIRK PREST

2  would be ready and available for renting?

3       A.   Well, that was going to be a longer

4  project, but I think right there it says 2011 to

5  early 2012.

6       Q.   So at the time of the spill you didn't

7  expect Pelican Plantation to be ready to rent out

8  until 2011 or early 2012 at the earliest; is that

9  fair to say?

10      A.   Correct.

11      Q.   And fair to say at the time of the spill,

12  you didn't expect Cobia Cabin to be yours and

13  available to rent out until November of 2011 at the

14  earliest; is that fair to say?

15      A.   Can you repeat the question.

16      Q.   At the time of the spill you didn't expect

17  Cobia Cabin to be available to rent out until

18  November 2011 at the earliest; is that fair to say?

19      A.   I'm not sure about the Cobia Cabin

20  because, like I said, that was a fish camp.  So I

21  would have to refer to records on that one.

22      Q.   Sure.  And you didn't expect Wood Duck

23  Cabin to be ready and available to rent out until

24  January of 2011; is that fair to say?

25      A.   Yes.

1                    KIRK PREST

2        Q.   And you didn't expect Flounder Cabin to be

3   ready and available to rent out until, at the

4   earliest, August 2010; fair to say?

5        A.   Yes.

6        Q.   Fair to say that at the time of the spill

7   you didn't expect Yellowfin to be available to rent

8   out until, at the earliest, August 2010.  Fair to

9   say?

10       A.   Yes.

11       Q.   And fair to say that at the time of the

12  spill you didn't expect Bluewing to be available to

13  rent out until August 2010 at the earliest?

14       A.   Correct.

15       Q.   Fair to say you didn't expect Barracuda to

16  be available to rent out until November 2010 at the

17  earliest?

18       A.   Right.

19            Can I take a restroom break?

20            MS. TERTERYAN:  Yeah, this is a good time

21  for a break.  Should we do 10 minutes?

22            MR. ROBERT:  That works on this end.

23            THE VIDEOGRAPHER:  Going off the record.

24  The time is 2:43.

25            (Recess taken.)

1                         KIRK PREST

2         Q.    But the construction process was going to

3   be at least a year, if not longer; right?

4         A.    I believe he said about a year.

5         Q.    But he didn't commit to a specific time

6   period to construct?

7         A.    Contractors are not going to -- they're

8   not going to nail themselves down on a date.

9         Q.    And you didn't have a specific date when

10  construction was expected to begin; right?

11        A.    Well, as I said earlier, it was going to

12  be in the couple of months from that time frame we

13  spoke about with the oil spill, that we were at that

14  point.

15        Q.    And when you say the contractor is not

16  going to nail themselves down to a specific date it

17  would be built, why wouldn't they?

18        A.    Because contractors typically don't commit

19  themselves to completion dates, not this particular

20  contractor.  We didn't have -- we didn't have a

21  specific date.

22              He just knew it had to be done just as

23  soon as he could get it done, he and his subs,

24  subcontractors.

25        Q.    All right.  I want to ask about, do you

1                          KIRK PREST

2    recall Hurricane Isaac in 2012?

3         A.   Some parts of Isaac, yes.

4         Q.   How did Hurricane Isaac affect

5    Fin & Feather's business?

6         A.   Well, I know we had a period of time where

7    we were offline, so to speak, due to the natural

8    events from -- from the hurricane.

9         Q.   What period of time was that?

10        A.   The books will reflect that exactly, so --

11   but I'm not sure.

12        Q.   Do you know if it was a matter of months?

13        A.   I don't think it was months.  It was maybe

14   a couple of weeks.

15        Q.   During the time you were offline, did you

16   do any fishing trips with customers?

17        A.   I'm not sure.  My books would reflect

18   that.

19        Q.   When you say you were offline, what do you

20   mean?

21        A.   Lodging, rentals, out of power.  You know,

22   power being restored to the area, that sort of

23   thing.  But after a hurricane it's not uncommon to

24   go fishing.  Fishing is really good after

25   hurricanes.

```
 1                      KIRK PREST

 2      Q.   So after Hurricane Isaac, the

 3  Fin & Feather's cabins were not available for rental

 4  for some period of time?

 5      A.   Yes, some short period of time.

 6      Q.   A couple weeks?

 7      A.   It's a week or two, something like that.

 8      Q.   Were there any damages to Fin & Feather's

 9  cabins as a result of Hurricane Isaac?

10      A.   I am not sure.  We might have had some

11  minimal damage but nothing to speak of.  No water

12  damage or anything like that, but might have had

13  some signage down or maybe some roof damage or

14  something, but I'm not sure about that.

15      Q.   Who would know?  Who would know?

16      A.   Denise would be the one that would be the

17  better answer for that.

18      Q.   Okay.  Take a moment to switch.

19           Mr. Prest, I'm going to send Tab 5, which

20  I'd ask to be marked as the next in line exhibit.

21  It's Bates stamped FAFC000247.  And I'll show it to

22  you as well.

23           (Whereupon, Exhibit 9 was marked for

24           identification.)

25
```

1                          KIRK PREST

2  and also the area, rates in the area, competitors,

3  as an average.

4       Q.   Got it.  Anything else factor into the

5  decision?

6       A.   Well, there was a little bit of a premium

7  because of the Pelican Plantation amenities, the

8  resort-type setting.

9            You know, no one else in this area has, or

10  would have had anything comparable -- equal

11  comparison, I should say -- to the quality and level

12  of this resort.

13       Q.   Do you know as of the time of the spill

14  what the Fin & Feather entities' growth rate was,

15  historical growth rate?

16       A.   I did then.  I don't remember it right

17  this minute sitting here.

18       Q.   Did the Fin & Feather entities each make

19  more money year-over-year leading up to the spill?

20       A.   Typically, yes, unless there was some

21  event, some temporary event such as a hurricane or

22  oil spill.  But, yes, typically yes.  We had -- we

23  were on an exponential growth pattern, with large

24  percentage numbers of growth.

25       Q.   And if you needed to determine what that

```
 1                    KIRK PREST
 2      Q.   Is that the case for all of the existing
 3 Fin & Feather cabins?  You would defer the expenses
 4 related to the cabins to Ms. Prest?
 5      A.   Yes.
 6      Q.   Do you have any -- any idea how many --
 7 how much in loans Fin & Feather, LLC and
 8 Fin & Feather Cabins have outstanding right now?
 9      A.   I do not.
10      Q.   You don't have any idea how much in loans
11 Fin & Feather -- the Fin & Feather entities have
12 paid since the spill?
13      A.   I do not.
14      Q.   You have no idea how much in interest on
15 those loans they have paid since --
16      A.   I do not.
17      Q.   Do you have any idea how much in repairs
18 and maintenance expenses Fin & Feather, LLC and
19 Fin & Feather Cabins, LLC have paid since the spill?
20      A.   No, I don't.
21      Q.   Did you, at the time of the spill, did you
22 come up with projected operating costs for how much
23 it would cost to operate the Fin & Feather unbuilt
24 six cabins?
25      A.   Not -- no.  No.
```

1                              KIRK PREST

2         Q.    Was that part of any of your business

3    plans at the time of the spill?

4         A.    It's not an issue.  It's not -- it's an

5    average cost of what the other cabins are doing.  So

6    in the event that I needed that, I would -- I would

7    have used that estimation.

8         Q.    I see.  But you didn't draw up any

9    specific cost projections for these six unbuilt

10   cabins?

11        A.    Cost projections?  As it relates to

12   projected costs, I might have.

13        Q.    Do you know where those cost projections

14   would be today, like the actual documents?

15        A.    Probably in my notes somewhere.

16        Q.    Okay.  Do you know if those cost

17   projections have been provided to your attorneys?

18        A.    For the unbuilt cabins?

19        Q.    Yes.

20        A.    I believe, I'm not a hundred percent sure,

21   but I think we presented documents as needed for

22   projections.  So I think that they were included.

23        Q.    Do you know if those operating cost

24   projections for the unbuilt cabins were provided to

25   your -- to Mr. Litolff?

1                    KIRK PREST

2  you could provide in a given day?

3      A.   Typically, two.

4      Q.   Is that one for each boat?

5      A.   No, I could usually have a morning trip

6  come in and then do an evening trip with a different

7  group.

8      Q.   Okay.

9      A.   Or do a combination, morning -- morning

10  hunt and then an evening fish.

11      Q.   But what's the --

12          MR. ROBERT:   If I may, I think he -- there

13  may be some confusion, as when you said "you,"

14  meaning him personally versus --

15          MS. TERTERYAN:   That's helpful, thank you.

16  BY MS. TERTERYAN:

17      Q.   What's the maximum number of trips that

18  Fin & Feather Adventures could book in a given day?

19  If it were fully booked, how many trips could it

20  provide?

21      A.   Fin & Feather Adventures?  It would be the

22  number of -- it would be dictated by the number of

23  rooms and groups.

24      Q.   It would be limited by the number of

25  rooms?

1                    KIRK PREST

2       A.   If you get -- you can only book your

3  capacity.  I can get other boats, to fish or hunt,

4  but you have to have the capacity in the bed -- the

5  lodging part of it.

6       Q.   Let me see if I can be more specific.

7            You said that an average trip would be

8  about -- bring in about $700; right?

9       A.   Correct.

10      Q.   That's if you or one of your guides was

11 captain of the boat; correct?

12      A.   Right, per boat, $700 for three people.

13      Q.   If you hired someone else to bring in more

14 boats to do more trips, how much money would

15 Fin & Feather Adventures get out of hiring that

16 third party?

17      A.   Back then it was -- like 300 per boat.

18      Q.   Okay.  And is that how much you would

19 charge the customer, or would the charge to the

20 customer be the same, just that's how much you would

21 get?

22      A.   The charge to the customer would be the

23 same.

24      Q.   Okay.  So was every fishing or hunting

25 trip that was booked with Fin & Feather Adventures,

1                        KIRK PREST

2        A.   It basically depends on what package they

3   choose.  If they want a blast and cast, which means

4   combination trip for hunting and fishing.

5              Then they would have the prices for those

6   respective trips, plus the lodging and the meals,

7   combined in that package price.

8              If they just chose fishing or if they just

9   chose hunting, that price would dictate a different

10  rate per person.

11       Q.   Okay.  And was that set out somewhere in a

12  price sheet?

13       A.   That's on a rate sheet that you should

14  have with those respective prices.

15       Q.   Okay.  Let me just take a look at my

16  notes.

17             Did you have any repeat customers before

18  the spill, so customers who would book with

19  Fin & Feather Adventures multiple times?

20       A.   Yes.

21       Q.   And after the spill did those repeat

22  customers ever book again with Fin & Feather

23  Adventures?

24       A.   Some did, a few.  It became worse later

25  on.

1                            KIRK PREST

2       Q.   I'd like to show you a document.  I'm

3  sending Tab 19, which is Bates stamped FAFA000095.

4  And I'll share it on the screen as well.  19.

5            All right.  This is a 10-page document.  I

6  can scroll through it so you see what's inside.  But

7  do you recognize this document, Mr. Prest?

8       A.   Yes.

9       Q.   What is it?

10      A.   That is the trips calendars, bookings, and

11 then the income schedule from those trips.

12      Q.   All right.  And the trips for what period

13 of time?

14      A.   This would be the -- that particular one

15 is the post -- post oil spill time frame, for 2010.

16      Q.   So this shows -- I want to make sure I get

17 it right.

18            This shows the total revenue for

19 Fin & Feather Adventures for fishing trips from

20 April 20, 2010, through the end of 2010?

21      A.   Yes.

22      Q.   Why did you calculate this particular set

23 of information?

24      A.   Because it was requested of me to do so.

25      Q.   Okay.  And I see at the bottom it says,

1                        KIRK PREST

2   total, 863,800.  Did Fin & Feather Adventures bring

3   in $863,800 during the post spill period in 2010?

4        A.   We would have.  This is canceled trips.

5        Q.   Oh, these are canceled trips.

6             And so I want to take a look -- how did

7   you determine each of these amounts?

8        A.   Booked trips from those clients, times

9   rates times persons.

10        Q.   So, let's look at the first line, maybe,

11   as an example.  It says Mike Post group.  Is that

12   the customer?

13        A.   Yes.

14        Q.   And it says, adventure description,

15   inshore, offshore.  What does that mean?

16        A.   That means he was doing some inshore and

17   some offshore fishing.

18        Q.   All right.  And --

19        A.   Or a combination.

20        Q.   What does AI times six times four mean?

21        A.   That's all-inclusive times the number of

22   persons, times the number of days.

23        Q.   Okay.  So there were six people who booked

24   for Mike Post group, for a period of four days, and

25   they booked all-inclusive packages totaling $8,400;

1                    KIRK PREST

2    is that right?

3         A.   Yes.

4         Q.   Okay.  And then if you look at a few down,

5    it says Jerry Dawson and Co.

6         A.   The company, yes.

7         Q.   Six inshore, AI times six times four.

8    Does that mean there were six people who booked with

9    Jerry Dawson and Co. for four days?

10        A.   That means this particular client, he --

11   he was a repetitive customer.  So it would have been

12   he had six trips.  Times the number -- times

13   all-inclusive, times the number of people, times the

14   number of days.  He was one of our better customers.

15        Q.   I see.  So the six before inshore, means

16   it's six times six times four, times the per-person

17   all-inclusive rate?

18        A.   Times the rate; that's correct.

19        Q.   Okay.  And so when you add that up, that

20   adds up to 50,400?

21        A.   Yes, you're correct.

22        Q.   What's the all-inclusive -- for each of

23   these is the all-inclusive rate that you used to

24   come up with the total number different, based on

25   what the adventure was?

1                        KIRK PREST

2        A.   Yes, it depends on what that description

3    of that adventure is, on the rate sheet.

4        Q.   How did you keep track of the

5    cancellations in 2010 after the spill happened?

6        A.   Well, I had my calendar.  So that's

7    basically calendar and notes, and some of the

8    reservations, on Denise's notes.  But mostly --

9    mostly those three items.

10       Q.   Is the -- I'm going to turn to the second

11   page of this document.  Is the second page of this

12   document the calendar you're talking about?

13       A.   Second page of the document.

14       Q.   Says April 2010.

15       A.   April 2010.  Yes, that would be the

16   calendar for April 2010.

17       Q.   All right.  And how would I tell on this

18   calendar what trips were canceled because of the

19   spill?

20       A.   It might be Xs.  The Xs means that --

21   let's see.  We have certain emails from customers

22   that cancel from time to time.  We get phone calls

23   that cancel for different reasons.

24            I don't know that I made a distinction

25   between the oil spill and regular cancellations.

1                    KIRK PREST

2        Q.   All right.  So this page does not

3    distinguish between an oil spill-related

4    cancellation and just a normal cancellation?

5        A.   Yeah, none of the ones that are before the

6    oil spill are going to be included, if that's what

7    you're asking.  That's not on there.

8        Q.   And did you say that the X, that an X in

9    any given square means a cancellation?

10       A.   Sometimes I X it out if it's a

11   cancellation.  Sometimes I just put a line through

12   it.

13       Q.   Okay.  So these -- let's say the X on

14   April 20, 2010, we don't know if that's a

15   cancellation at all, we don't know if it's a

16   cancellation due to the spill, and we don't know if

17   it's a cancellation for some other purpose.  Is that

18   what you're saying?

19            MR. ROBERT:  And if I may interject.

20            You're running short on time.  And rather

21   than belabor this, I think it may be helpful for me

22   to just remind Mr. Prest that he advised me

23   previously that he created this calendar

24   specifically to document the cancellations after the

25   spill.

1                          KIRK PREST

2              So this is not from his actual calendars.

3    So it might be helpful for him to be able to look

4    through the document, the next four, five pages,

5    just to acclimate himself to what he's looking at.

6    BY MS. TERTERYAN:

7         Q.   Let me ask about that.

8              When was this document and calendar

9    created, Mr. Prest?

10        A.   I don't know the date.  At some point

11   prior to -- at some point during the process of

12   computing the losses for -- for the case.

13        Q.   What year was it created?

14        A.   I'm not sure.  I'm sure I could look back

15   in my records and find out, but sitting right here,

16   right now I don't know.

17        Q.   So you prepared this specifically in

18   connection with this litigation?

19        A.   This particular document, yes.

20        Q.   Yeah.  Okay.  How did you -- what did you

21   rely on in order to create this document?

22        A.   Bookings.

23        Q.   What documents and information did you

24   rely on to create this document?

25        A.   My calendar.  Phone calls with these

1                    KIRK PREST

2   clients, booking the dates, which is a large part of

3   that.  That sort of thing.  Notes on my phone.

4        Q.   Okay.  So various document sources?

5        A.   Correct.

6        Q.   And how do you know that every single one

7   of these customers listed on page 1 of Tab 19

8   canceled because of the spill?

9        A.   Because as of the date of the spill, we,

10  Denise and I, made it a business -- made a business

11  decision.  At that point we thought it would be best

12  not to continue on in the polluted waters.

13           You can -- and then at some point those

14  were closed.  The waters were closed at some point

15  thereafter.

16       Q.   Let's take that in pieces.

17           You said as of the date of the spill, you

18  and Ms. Prest made a business decision not to

19  continue in the waters.  What was -- what was the

20  decision?  What did you decide?

21       A.   I said day of the spill.  It could have

22  been when the oil was reaching the shoreline.  It

23  was somewhere in that time frame.  I mean, I'm not

24  going to say an exact date, but somewhere in that

25  time frame.

1                        KIRK PREST

2       Q.   I want to make sure I understand.

3            So you and Ms. Prest -- these customers

4    had booked trips in 2010, as of the date of the

5    spill.  And at some point you and Ms. Prest reached

6    out to them affirmatively to cancel their trips?

7       A.   Some folks contacted us, and we contacted

8    some folks.  But we have -- we do have

9    communications with folks.  Some were emails, some

10   were phone calls, but, yes, they -- I think they

11   were pretty much aware of what was going on just by

12   watching the news.

13      Q.   So some of these customers you and

14   Ms. Prest reached out to affirmatively and canceled

15   their trips; is that right?

16      A.   Yes.  Some cases, yes.

17      Q.   Can you recall which cases those were in

18   this list?

19      A.   I don't know which ones called, which ones

20   we called, that sort of thing --

21      Q.   How would you be able to determine which

22   ones you called and which ones they called you to

23   cancel?

24      A.   I don't know the answer to that question,

25   who called who.

```
1                     KIRK PREST
2      Q.   You can't know anymore --
3      A.   The point is at the time I knew, but I
4  don't know now.
5      Q.   Okay.  Mr. Prest, you don't know now, and
6  you can't determine in the future as to which of
7  these customers canceled because of the spill and
8  which ones canceled for some -- because you reached
9  out to them to cancel?
10     A.   Well, you can't -- you can't fish or hunt
11 in waters that are polluted, Number 1.  Number 2,
12 Wildlife and Fisheries, that determine that, not
13 Denise and Kirk.
14     Q.   I understand that, but that wasn't my
15 question.
16          My question was, sitting here today or at
17 any point in the future, you are unable to determine
18 which of these customers on this list you and
19 Ms. Prest called and canceled their reservations for
20 and which ones called you and requested that their
21 reservation be canceled; is that right?
22     A.   It's some of both.  I don't know which --
23     Q.   And you can't differentiate which is
24 which?  That's the question.
25     A.   My wife may be able to.  Sitting here
```

```
 1                    KIRK PREST
 2   right now, I can't tell you which way that
 3   conversation went.  We had some call in and we were
 4   calling some, so -- and we have emails from some.
 5   So it's -- I don't know the answer to that three-way
 6   deal.
 7        Q.   All right.  Sitting here right now, you
 8   don't know the answer to which is which.
 9             If you were to go home and look through
10   your notes, would you be able to figure out the
11   answer as to which is which?  Or is it just not
12   something that you would be able to differentiate?
13        A.   I don't think that's anything I would be
14   able to say.
15        Q.   How did you make records of bookings
16   before the spill, for Fin & Feather Adventures
17   booking?
18        A.   Same way I did after the spill.  Some
19   phone notes, some book notes, in the calendar.
20        Q.   All right.  So it was in different places.
21   There was not one place where you recorded all of
22   your bookings for Fin & Feather Adventures?
23        A.   Typically, if I was on the boat, or on --
24   in the water traveling or fishing, hunting,
25   whichever case it may be, it was usually a note in
```

1                        KIRK PREST

2    the phone.  Some was transferred to the book.

3              It's not always -- when you're wearing as

4    many hats in a small business like my wife and I do,

5    it's not a totally -- we don't have the luxury all

6    the time of getting to a book to write it down.

7              It's a combination of -- we make things

8    happen.  So either by phone, or by book, we, between

9    the two, we make it -- we make it all work.

10        Q.   Did you ever -- in 2011, did you or

11   Ms. Prest ever reach out to cancel previously booked

12   adventures?

13        A.   In 2011?

14        Q.   Yeah.

15        A.   There were trips canceled.  I'm pretty

16   sure that the waters were still closed in certain

17   areas.  So there could have been some cancellations.

18   To say that we canceled trips, I don't remember at

19   this time doing that.

20        Q.   Is there a way you could determine whether

21   you or Ms. Prest affirmatively canceled any booked

22   trips in 2011?

23        A.   We may be able to discuss it and see.  But

24   as I'm sitting here right now, I don't remember any

25   specific recollection of that.

1                              KIRK PREST

2    affirmatively cancel adventures; correct?

3         A.    In which year, 2012?

4         Q.    Yeah.

5         A.    I don't recall that.

6         Q.    You don't recall doing so, making any

7    cancellations?

8         A.    Yeah, I don't recall making any.

9         Q.    In 2012, you and Ms. Prest didn't feel

10   that the fisheries were so damaged that you couldn't

11   offer any bookings for Fin & Feather Adventures at

12   all; correct?

13        A.    Well, we were still trying to make a

14   living and keep our businesses in business.  So yes,

15   we were offering charters.

16        Q.    And would you have solicited business from

17   customers if you believed that the fisheries were

18   too damaged to warrant a fishing trip?

19        A.    Would I have warned my customers if it was

20   too damaged?

21        Q.    No.  Would you have asked your customers

22   to book with you and offered bookings if you

23   believed the fisheries were too damaged to warrant a

24   fishing trip?

25        A.    What do you mean when you say damaged?

```
 1                    KIRK PREST
 2  Because your idea of damage and mine may be two
 3  different things.
 4       Q.   If you thought an adventure would be --
 5  would not be worthwhile, would you have offered that
 6  adventure to customers?
 7       A.   In 2012?
 8       Q.   Yeah.
 9       A.   As I recall, 2012 was -- the fisheries
10  were damaged, but they were not in the shape they're
11  in now, in 2021 or 2019 or 2018.  So damage to the
12  estuary, yes.  Damage to the fish, as far as
13  bringing a client to come fish, I didn't see a
14  problem with it then.
15       Q.   You didn't see a problem with bringing
16  clients to fish in 2012?
17       A.   Well, the Wildlife and Fisheries and
18  U.S. Fish and Wildlife and all the different
19  agencies, as far as a safety, consumption aspect,
20  had no issues with the waters.  So as far as my
21  ability to fish, that didn't change from pre BP oil
22  spill.
23       Q.   When you say your ability to fish, what do
24  you mean?
25       A.   My 48 years of being on the water as a
```

```
 1                    KIRK PREST
 2  knowledgeable, sixth-generation fisherman, hunter of
 3  those areas.  We had -- maybe had to adjust, but my
 4  knowledge and ability to fish didn't change.
 5       Q.   Okay.  And --
 6       A.   The fishery changed, but I didn't change.
 7       Q.   Earlier you mentioned that there was a
 8  difference in the fisheries between 2012 and 2021 or
 9  2019 or 2018.  What difference were you referring
10  to?
11       A.   Well, it's been -- it's a huge difference.
12  From 2012 to now, it's -- basically the fishery has
13  been damaged so much that we've had to change our
14  fishing targets on different fish, because some of
15  those species don't even exist anymore.
16       Q.   How do --
17       A.   Or in numbers that are worth fishing for.
18       Q.   So you're saying the state of the
19  fisheries is worse now than it was in 2012?
20       A.   Yes.
21       Q.   And how do you know what that reduction in
22  fishing target is due to?
23       A.   My experiences in fishing and the results
24  from those trips.  Whereas before, we were in for --
25  to the lodge for 10:00, 11:00 o'clock.
```

1                      KIRK PREST

2              Now you can fish all day, until 4:00 or

3      5:00 o'clock and catch a handful of reds if you're

4      lucky.  And mostly bycatch, like sheephead, type of

5      fish.

6         Q.   But how do you know what that reduced

7      catch is due to?

8         A.   Well, I'll leave that up to our fisheries

9      experts, but I can tell you what the results were

10     before the oil spill and what they are now.

11             Not to mention all the mutated fish, no

12     dorsal fins, no gill plates, all these lesions,

13     growths on the fish, one eyeball, sometimes no tail.

14     The list goes on and on.  There's bait fish that are

15     absent.

16             There's miles and miles of estuary that --

17     and nursery that are missing, that are gone.

18             I can tell you what I've observed, and I

19     can tell you what I've lived all my life.  And I

20     have never seen anything like this, and I have never

21     seen mutated fish like this.  That's all I can tell

22     you.  As far as what caused it, I'll leave that to

23     the experts.

24        Q.   All right.  So the conditions that

25     you're -- the current conditions that you're

1                          KIRK PREST

2    describing, have you done a scientific analysis to

3    determine the differences between fish species now

4    in your estuaries, and the fish species in 2012?

5         A.    I personally haven't done a scientific

6    test, no.

7         Q.    This is purely based on your anecdotal

8    observations?

9         A.    This is based on my living in this -- on

10   these waters all my life.  And traveling in these

11   waters during the oil spill, every day, seeing the

12   devastation to the estuaries and the fisheries.

13            And knowing what we've caught prior and

14   the catches that we are experiencing in the last 11

15   years, and see that go decrease each year.

16        Q.    You said that you'll leave to the experts

17   what caused these conditions you're describing.

18            You don't know what caused the conditions

19   that you're describing; correct?

20        A.    Incorrect, because in my opinion BP

21   damaged the fisheries, from the estimated 4 to

22   5 million barrels of crude oil that spewed into the

23   gulf and ended up in just about ever inch of our

24   estuary.

25            It's not just the lake or the shoreline.

1                        KIRK PREST

2   We have miles and -- hundreds of miles of inlets and

3   ditches and ponds and backwaters.

4          So I've seen all of the different aspects

5   of these damages, and it's not because of -- it's,

6   in my opinion, that's the only thing that's

7   different in the last 11 years.

8      Q.   All right.  So the cause of the conditions

9   you're describing is purely the -- in your opinion,

10  it was the spill?

11     A.   It is my testimony that is -- that it is

12  the spill; correct.

13     Q.   All right.  And what is your opinion based

14  on?

15          MR. ROBERT:  Just for the record, it's

16  5:12, so I think maybe two more minutes, giving you

17  the other minutes referenced from the videographer.

18          THE WITNESS:  My answer is the same as

19  it's been.  I have spent a lifetime on these waters,

20  and not to mention generations before me.

21          I'm a sixth generation.  I have a

22  great-uncle that is 106 years old.  He still -- and

23  I still talk to him about how it used to be.  And

24  I've lived on these waters since I -- like I said,

25  since I'm four years old I've been in a duck blind

```
 1                    KIRK PREST
 2   and behind a fishing pole.
 3         I became a pro fisherman because I was
 4   good at it.  I became a pro hunter, taking folks on
 5   these waters, guiding them, because I'm good at
 6   that.
 7         So I know -- that's my office.  Those
 8   waters are my office.  So I know my office just like
 9   you probably know your office.
10   BY MS. TERTERYAN:
11       Q.   Did Fin & Feather Adventures change its
12   adventure routes after the spill?
13       A.   Did Fin & Feather -- repeat that, please.
14       Q.   Did Fin & Feather Adventures change the
15   routes that it took on its adventures after the
16   spill?
17       A.   Yes, because I could not effectively,
18   after a certain point in time, I don't remember
19   which year, but at a certain point I could not seem
20   to keep the advertising and the promotions at the
21   same level we had going before.
22         Because I don't -- I'm not going to bring
23   folks down here, to advertise and promote something
24   that's not there, that we have a diminishing
25   fishery.
```

**EXHIBIT 1A**