Page 1

```
 1                  IN THE DISTRICT COURT

 2                    LOUISIANA EASTERN

 3                         --o0o--

 4

 5   FIN & FEATHER ADVENTURES, LLC,    )
                                       )
 6              Plaintiff,             )
                                       )
 7         vs.                         ) No. 2:16cv6126
                                       )
 8   BP EXPLORATION & PRODUCTION,      )
     INC., et al.,                     )
 9                                     )
                Defendants.            )
10

11   _____

12    VIDEOCONFERENCE AND VIDEO-RECORDED DEPOSITION OF

13                 KIRK PREST 30(b)(6)

14                  February 11, 2021

15   _____

16

17        DEPOSITION OF KIRK PREST 30(b)(6),

18   produced as a witness, duly sworn by me via

19   videoconference at the instance of the DEFENDANTS,

20   was taken in the above-styled and numbered cause on

21   February 11, 2021, from 9:32 A.M. to 11:38 A.M.,

22   before BRANDON D. COMBS, CSR, RPR, in and for the

23   State of Texas, reported by computerized machine

24   shorthand via videoconference.

25   Job No. 189252
```

**EXHIBIT 1B**

```
 1                   APPEARANCES
 2           KIRKLAND & ELLIS
 3           555 California Street
 4           San Francisco, CA 94104
 5           By: ANNA TERTERYAN, ESQ.
 6                AUSTIN KLAR, ESQ.
 7                NATHAN THEOBALD, ESQ.
 8   counsel on behalf of the Defendants.
 9
10
11           LAW OFFICE OF AL J. ROBERT, JR.
12           757 St. Charles Avenue
13           New Orleans, LA 70130
14           By: ALVIN ROBERT, JR., ESQ.
15   counsel on behalf of the Plaintiff.
16
17
18
19
20           ALSO PRESENT:
21   Denise Prest (via videoconference)
22   Michael Arrison, Videographer (via videoconference)
23
24
25
```

1                               INDEX

2                                                            Page

3    Examination by MS. TERTERYAN                              7

4

5                         --o0o--

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1     A.    I said some of all those.
2     Q.    Okay.  Did the clients who bought
3  Fin & Feather Adventures charter trips, did they
4  catch fish for a living?
5     A.    No.  There were sport fishers, there were
6  sport fishermen, meaning they might fly fish or
7  rainbow trout, or they might fish snook or different
8  types of fish down in South Florida, but they were
9  sports, sports fisherman.
10    Q.    So Fin & Feather Adventures clients, they
11 didn't rely on the fish they caught on your charter
12 trips for sustenance either?
13    A.    No.
14    Q.    It was for entertainment purposes?
15    A.    Mostly entertainment, yes.
16    Q.    Did your customers have to have a fishing
17 license to go on the trips?
18    A.    Yes.
19    Q.    How did they obtain those licenses?
20    A.    Through Wildlife and Fisheries, Louisiana
21 Wildlife and Fisheries.
22    Q.    And what type of fishing license did they
23 need?
24    A.    They would need a saltwater license and a
25 basic fishing license.

Case 2:10-md-02179-CJB-DPC   Document 27160-4   Filed 06/28/21   Page 5 of 19

Page 31

1    Q.   What's a saltwater license?

2    A.   It's a license that is designated by the
3 Wildlife and Fisheries to be able to fish in
4 saltwater in the -- in or around the estuaries of
5 the Gulf of Mexico.  Different from fresh water,
6 ponds.

7    Q.   And your customers had to get the licenses
8 themselves?

9    A.   Yes.

10   Q.   So the licenses they needed to go on your
11 charter trips, those weren't for commercial fishing;
12 right?

13   A.   No, they were not.

14   Q.   Did Fin & Feather Adventures personnel,
15 did they fish on the charter trips?

16   A.   Who do you mean by Fin & Feather
17 personnel?

18   Q.   I guess scratch -- strike that.  Let me
19 try this a different way.

20        What happened to the fish that were caught
21 on charter trips?

22   A.   Some folks kept the fish.  Some folks
23 didn't want the fish, they just wanted the catch and
24 the excitement of the catch, and catch and release.

25   Q.   And if Fin & Feather Adventures ever ended

1  situation.
2          And, you know, we know our clients, so we
3  communicate with our clients.  And I'm sure we had
4  conversations.
5       Q.   Did you ask Mr. Howard to send you a
6  cancellation letter in writing?
7       A.   I don't remember particularly asking him
8  for a cancellation letter.
9       Q.   Did you ask any of your clients after the
10 spill to specifically send you a cancellation letter
11 in writing?
12      A.   There was one or two that I mentioned that
13 to, just in case we would need this, in case BP
14 didn't make us -- make things right like they
15 promised to.
16      Q.   So for --
17      A.   There was a couple of conversations about
18 that.  I don't remember who or when.
19      Q.   So for a couple of customers you had
20 conversations with them asking them specifically to
21 send you a cancellation letter referring to the
22 spill?
23      A.   Yes.
24      Q.   But you don't remember which customers
25 those were?

1  where we stand by March 2011 so that I can begin
2  making my plans for next year.
3          Did you communicate with Mr. Howard about
4  making plans for 2011?
5      A.   Not that I recall, sitting here, 11 years
6  later.
7      Q.   Do you know if Mr. Howard came back to
8  Fin & Feather in 2011 or beyond?
9      A.   No, he does -- he did not.
10     Q.   He never booked again with Fin & Feather?
11     A.   Not to my knowledge.
12     Q.   Turning to page 2, this is a letter from
13 Rudy J. Wadle Jr. to you at Fin & Feather
14 Adventures; right?
15     A.   Correct.
16     Q.   And it's not dated.  Do I have that right?
17     A.   I don't -- yeah, I don't see a date.
18     Q.   Do you remember when Mr. Wadle sent this
19 letter to you?
20     A.   Let me read something real quick.
21     Q.   Sure.  Take your time.
22     A.   Yeah, I'm not -- it would be post spill,
23 but I don't know when.
24     Q.   Okay.  Do you know what dates he had
25 booked the fishing and hunting plans for three

Page 40

1  different groups of veterans that he references in
2  his letter?
3     A.   No, I would have to refer to the books or
4  a note.
5     Q.   He mentions that -- had Mr. Wadle already
6  paid for the bookings he was canceling here?
7     A.   I'm not sure about the accounting,
8  bookkeeping part of it.
9     Q.   When -- strike that.
10         In the first sentence of his letter he
11 says, I just wanted to let you know how sad and
12 disappointed my three different groups of veterans
13 were about having to cancel the fishing and hunting
14 plans at Fin & Feather Adventures last fall/winter.
15         He canceled these trips which were
16 scheduled for last fall/winter.  Would that be
17 fall/winter 2010?
18     A.   Yes, I would imagine.
19     Q.   Did you ask Mr. Wadle to send you this
20 letter after he had canceled his fall/winter 2010
21 adventures?
22     A.   Yes, I believe this guy -- this guy is a
23 colonel in the Marine Corps, and I vaguely remember
24 speaking about he was particularly upset about --
25 they looked forward to this trip, these trips, and

Page 41

1  it's one of the highlights of their life.
2          They're older folks, and I guess their
3  trips are limited.
4     Q.  How much revenue did Fin & Feather lose as
5  a result of this specific cancellation?
6     A.  I can't speak to that, to exacts.
7     Q.  In the second paragraph Mr. Wadle writes,
8  I wanted to also assure you that we are now looking
9  at possible dates and groupings for trips down there
10 in fall/winter 2011.
11         Did Mr. Wadle rebook for fall/winter 2011?
12    A.  Not to my knowledge.
13    Q.  Did he rebook with Fin & Feather ever
14 again?
15    A.  Not to my knowledge.  Not that I can
16 recall.  I don't think.
17    Q.  Did any of the customers who sent
18 cancellation letters in this document, rebook with
19 Fin & Feather?
20    A.  We have a lot of clients that come through
21 there, and I'm not going to -- sometimes I can
22 possibly remember a person, particular thing or date
23 or trip.  But I don't recall anything off the top of
24 my head right this minute.
25    Q.  So you don't recall any of these clients

1        Q.   The date of stay for this review says
2   June 2011.
3             Do you see that?
4        A.   Yes.
5        Q.   And in the review this customer says,
6   Fin & Feather's lodges and cabins completely rebuilt
7   after the storm are right at the top of the list.
8             Spent almost a week in the area in
9   June 2011, and had -- and had a blast fishing with
10  Kirk.  The man knows where the redfish and speckled
11  trout are and treats his customers like family.
12            Do you see that?
13       A.   Yes.
14       Q.   Do you remember this customer by any
15  chance?
16       A.   I don't remember the name of this
17  customer.
18            MR. ROBERT:  I think it's on the page
19  above.  Can you scroll up.
20            MS. TERTERYAN:  Yeah.  I'm not sure that
21  it is.
22            THE WITNESS:  It doesn't matter the name.
23  The point is, this is June '11.  This is a year
24  after the oil spill.  There were some fish being
25  caught then.

1                But the point to take away here is that
2    the -- BP's oil disaster has destroyed, decimated,
3    our living, our estuaries, our son's future.
4                And I'm not talking about some oil on the
5    shoreline.  I'm talking about the entire food chain,
6    the entire parts of -- or let's say not entire, but
7    let's say parts of.  The fish are gone.
8                The bottom is such -- is destroyed such
9    that the fish that come in to spawn, there's -- the
10   spawning has been decimated.  We don't catch the
11   little 6-inch fish in fishing for the big adult fish
12   anymore.  You don't see that.
13               The fish aren't reproducing.  The spawns
14   are not taking; okay.
15               So to say that June '11 we didn't catch
16   fish, no, that is an accurate depiction of what that
17   client experienced in that time frame.  Come back
18   now and fish.  And his excellent fishing is going to
19   be the total opposite of that.
20   BY MS. TERTERYAN:
21       Q.   So in June 2011 there was still good
22   fishing where Fin & Feather was doing business?
23       A.   I would say decent fishing.
24       Q.   How about --
25       A.   We still lost millions and millions of

1  pounds of fish.  I saw huge fish kills every day
2  when I was running for the seven months on the water
3  during -- in this toxic soup for the oil disaster
4  that BP created.
5          So I know -- I had biologists on my boat
6  every day, one from Louisiana Wildlife and
7  Fisheries, and one from U.S. Fish and Wildlife
8  Service every day.  I had two biologists with me
9  every day, and we covered almost every inch of this
10 stuff.
11         And it's disgusting to sit here and try to
12 tell me that there's a -- one excellent fishing
13 review, is -- that's ridiculous.
14     Q.   Mr. Prest, you haven't done any scientific
15 studies of the effects of the spill on the areas
16 where Fin & Feather does business; right?
17     A.   My scientific studies on paper don't
18 exist.  My scientific studies and knowledge and
19 experience of these waters, I've been on the
20 waters -- I'm 52 years old, almost 53.  I've been on
21 the waters for 48 years.
22         I don't need a scientist to tell me on a
23 piece of paper what it is.  I know what it is.
24     Q.   In June 2011, you still had happy
25 customers for your fishing trips; is that fair to

1  and I could tell you that maybe there's a sign that

2  things are getting better.  But there's not.

3            It's getting worse and worse and worse

4  each year.

5            MR. ROBERT:  If I may, Kirk, please listen

6  to the question.  And it may be helpful to -- if I

7  may, Anna, you please tell me to disregard.

8            But to discuss what a trip was like

9  pre spill, maybe two years later, two years later,

10 just what did that -- what did a fishing trip

11 entail.

12           MS. TERTERYAN:  I don't think we need to

13 -- I don't think we need to go on.

14 BY MS. TERTERYAN:

15     Q.   Mr. Prest, I'm showing you the bottom of

16 page 4.

17           Do you see where it says Joe Wadle wrote a

18 review, date of stay, October 2011?

19     A.   Yes.

20     Q.   And you see it's got five green bubbles

21 and it says, fantastic fishing, hunting and

22 unbelievably great time?

23     A.   Yes.

24     Q.   Is this the same Mr. Wadle who wrote a

25 cancellation letter that we just reviewed?

1    A.   Yeah, I think it is, Joe Wadle, yes.  He's
2  been five times before the oil spill or five times
3  in five years.  Okay.
4    Q.   Is this the same Mr. Wadle that you can
5  tell?
6    A.   Yes.
7    Q.   So he did come back to you after canceling
8  his 2010 adventures?
9    A.   Not to my knowledge.
10   Q.   You disagree that he came back in
11 October 2011 to Fin & Feather for an experience?
12   A.   I don't recall.
13   Q.   All right.  So you're not disputing that
14 he came back to Fin & Feather in October 2011, are
15 you?
16   A.   I'm not disputing.  I don't -- I just
17 don't remember it.
18   Q.   And Mr. Wadle doesn't say terrible
19 fishing; right?
20   A.   In 2011, year after, no, he didn't --
21 it's -- that was probably -- that's not a problem
22 then, or as big of a problem.
23   Q.   Okay.  So he didn't say there was any
24 problem in his review, though; fair?
25   A.   Look, the bottom line here is, the man is

Page 52

1  putting a review online.  He's going to try to make
2  it beneficial for folks to come to Fin & Feather.
3       Q.   Do you know Mr. Wadle?
4       A.   I know him, yes.
5       Q.   Do you think he's a liar?
6       A.   No.
7       Q.   Do you know him to be an honest person?
8       A.   Yes.
9       Q.   Any reason to believe he was being
10 dishonest in his review here?
11      A.   In 2011, in this review, that's accurate.
12      Q.   Okay.  Just a moment.
13           Mr. Prest, do you know what percentage of
14 the 2010 reservations for Fin & Feather the 10
15 cancellation letters we looked at represent?
16      A.   Not sitting here right now, I don't know
17 that, no.
18      Q.   Is there a way -- is there a way 11 years
19 after those letters were sent to figure out what
20 percentage of your 2010 revenue those cancellation
21 letters represent?
22      A.   There could be.  I'm not sure.
23           MS. TERTERYAN:  Is now a good time for a
24 very short break, like a five-minute break?
25           MR. ROBERT:  Yeah, that's fine with us.

Page 59

1    A.   I'm not an attorney, but that's not the
2  full extent of the causation. I'm not an expert on
3  the causation either.
4    Q.   I'm not asking you -- well -- strike that.
5         The response says that part of the damages
6  resulted from the closure of fishing grounds; right?
7    A.   That's what it says, yes.
8    Q.   What time period were fishing grounds
9  closed as a result of the spill?
10   A.   What time? I don't know off the top of my
11  head sitting right here, right now. But I'm sure
12  that the printed media and other sources would have
13  those dates.
14   Q.   Let me maybe help with that. I'm sending
15  Tab 44, which I ask be marked as the next exhibit,
16  and I'll show it as well.
17         (Whereupon, Exhibit 22 was marked for
18          identification.)
19  BY MS. TERTERYAN:
20   Q.   Mr. Prest, do you see this press release
21  from the Louisiana Wildlife and Fisheries
22  Commission?
23   A.   Yes.
24   Q.   Have you seen this press release before?
25   A.   I don't remember seeing this.

1      Q.   Do you see that the first paragraph says,
2  the Louisiana Wildlife and Fisheries Commission
3  ordered an immediate opening of all state inshore
4  and offshore territorial waters to recreational
5  angling, including charter boat angling.
6           Do you see that statement?
7      A.   Yes.
8      Q.   And that statement is as of August 20,
9  2010; right?
10     A.   That's what the date is in the
11 parentheses, yes.
12     Q.   Do you -- do you have any reason -- strike
13 that.
14          Does this refresh your memory that as of
15 August 20, 2010, state inshore and offshore waters
16 were open to recreational fishing, like
17 Fin & Feather Adventures' charter fishing business?
18     A.   I'm not going to confirm nor deny that
19 date is correct.  What I'll say is if it was open,
20 then why would there be oil disaster cleanups
21 ongoing for well after that time frame?
22     Q.   Do you have any reason to dispute that the
23 waters were open to recreational fishing as of
24 August 20, 2010?
25     A.   Yes, I do.  I just said it.  I don't -- I

Page 61

1 find it hard to believe that oil disaster cleanup is
2 still ongoing and the waters are open at the same
3 time.
4    Q.  Do you have a specific basis for disputing
5 what the Louisiana Wildlife and Fisheries Commission
6 issued in its press release?
7    A.  No one I know was fishing in August of
8 2010.
9    Q.  Were you told after August 20, 2010, by
10 anyone that the waters were closed to recreational
11 fishing?
12    A.  We were still running in oiled waters
13 inside the estuaries.  I've never seen this before,
14 but I find it hard to believe that the waters were
15 open to fishing if there was still oil --
16    Q.  That wasn't my question.
17        Mr. Prest, my question is, were you ever
18 told specifically by anyone after August 20, 2010,
19 that the waters were closed to recreational fishing?
20    A.  I wasn't aware that they were open at that
21 time frame.  I was still on an everyday basis in the
22 oil cleanup project.
23    Q.  Did anyone specifically tell you after
24 August 20, 2010, that the waters were closed to
25 recreational fishing?

Page 62

1    A.   No.  I didn't ask and nor did anyone tell
2  me.
3    Q.   So you didn't inquire with anyone as to
4  whether the waters were open for recreational
5  fishing after that date?
6    A.   My mind wasn't on fishing.
7    Q.   Okay.  So you didn't ask --
8    A.   My mind was on getting this toxic soup out
9  of our estuaries and doing what I could do to help
10  our future.
11    Q.   Mr. Prest, my question was, you didn't try
12  to find out whether the waters were open to
13  recreational fishing as of August 20, 2010?
14    A.   I was working 12 to 14 hours a day in this
15  toxic soup, so I didn't have time to chase this --
16  this document.
17         MR. ROBERT:  Do your best to answer her
18  question --
19         THE WITNESS:  I said no.  I don't have --
20  no one told me this, and I don't -- I said no,
21  earlier.
22  BY MS. TERTERYAN:
23    Q.   Mr. Prest, I want to understand a little
24  bit your reference to working on oil spill cleanup
25  during this time.