Page 1

1                    IN THE DISTRICT COURT

2                     LOUISIANA EASTERN

3                        --o0o--

4

5  FIN & FEATHER ADVENTURES, LLC,    )
                                     )
6                    Plaintiff,      )
                                     )
7             vs.                    ) No. 2:16cv6126
                                     )
8  BP EXPLORATION & PRODUCTION,      )
   INC., et al.,                     )
9                                    )
                     Defendants.     )
10

11  _____

12   VIDEOCONFERENCE AND VIDEO-RECORDED DEPOSITION OF

13              DENISE PREST  30(b)(6)

14                  February 11, 2021

15  _____

16

17          DEPOSITION OF DENISE PREST, produced as a

18  witness, duly sworn by me via videoconference at the

19  instance of the DEFENDANTS, was taken in the

20  above-styled and numbered cause on February 11,

21  2021, from 12:11 P.M. to 4:31 P.M., before BRANDON

22  D. COMBS, CSR, RPR, in and for the State of Texas,

23  reported by computerized machine shorthand via

24  videoconference.

25  Job No. 189252

EXHIBIT
1C

1                    APPEARANCES

2            KIRKLAND & ELLIS

3            555 California Street

4            San Francisco, CA 94104

5            By: ANNA TERTERYAN, ESQ.

6                 AUSTIN KLAR, ESQ.

7    counsel on behalf of the Defendants.

8

9

10

11            LAW OFFICE OF AL J. ROBERT, JR.

12            757 St. Charles Avenue

13            New Orleans, LA 70130

14            By: ALVIN ROBERT, JR., ESQ.

15    counsel on behalf of the Plaintiff.

16

17

18

19            ALSO PRESENT:

20    Kirk Prest (via videoconference)

21    Marlee Piette (via videoconference)

22    Michael Arrison, Videographer (via videoconference)

23

24

25

1                    INDEX

2                                          Page

3   Examination by MR. KLAR                 6

4

5               --o0o--

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        Q.    You understand you've been designated to

2   testify on topics relating to Fin & Feather's books

3   and records and the information that Mr. Prest

4   deferred to you on during his deposition yesterday

5   and earlier this morning; correct?

6        A.    Yes.

7        Q.    And do you understand that you've been

8   designated as the corporate representative on those

9   same topics with respect to -- or I'm sorry, by

10   Fin & Feather Cabins, LLC and Fin & Feather, LLC?

11        A.    Yes.

12        Q.    Are you prepared to testify on behalf of

13   Fin & Feather, each of the Fin & Feather entities,

14   as to those topics?

15        A.    As best as I can be prepared, yes.

16        Q.    What did you do to prepare to testify on

17   behalf of Fin & Feather for those topics?

18        A.    I just reviewed our past books,

19   reservations and things of that nature.

20        Q.    When you say books and reservations, what

21   do you mean?

22        A.    My calendars are primarily what I use for

23   documenting any reservations that I take.

24        Q.    And the calendars that you're referring

25   to, those are the ones that have been provided to BP

1   in this case; correct?

2        A.   Correct.

3        Q.   Other than the calendars that were

4   provided to BP, there aren't any other calendars

5   that you looked at in preparation for today's

6   deposition; correct?

7        A.   No, I have one calendar that I keep for

8   each calendar year.

9        Q.   Other than your counsel, did you speak to

10  anyone else in preparation for your testimony today?

11       A.   Other than my husband, no.

12       Q.   How long would you say that you spent

13  preparing for your testimony today?

14       A.   A couple hours here or there, maybe two or

15  three days.  I don't know.

16       Q.   Other than the calendars that you reviewed

17  that you mentioned earlier, are there any other

18  documents or records that you reviewed in

19  preparation for today's deposition?

20       A.   No.  Just like I said, pretty much my --

21  my records are pretty much for me, and my calendar.

22            As far as like trying to study bank

23  statements or anything of that nature, or taxes, I

24  did not do that because I had no idea what you were

25  going to be questioning me on.

Page 18

1    backup data.  They have what was actually filed on

2    your tax returns; correct?

3         A.   Correct.

4         Q.   So I want to talk a little more about your

5    -- how you keep track of your bookings, your

6    reservations.

7              Can you tell me sort of all the ways that

8    somebody can make a reservation?

9         A.   Well, over the course of the years, things

10   have changed.  Primarily, back in the day when we

11   first started, it was by phone call.  Then, of

12   course, we created a website, and they had the

13   option of going on to Webervations and booking that

14   way.

15             We have evolved a little bit further.  Now

16   we're with a different reservation, and we're with

17   Vrbo.  So they have the option of going on Vrbo,

18   they have the option of going on my website or they

19   have the option to call me.

20        Q.   At what point were web reservations -- at

21   what point did you start offering the ability to

22   make a reservation online?

23        A.   I want to say, I'd have to go back in the

24   records, but I'm thinking that it was 2008, maybe,

25   when we formed our first website.

1          I'm not a hundred percent sure.  I might

2   be able to dig that up for receipts also, looking in

3   the canceled checks for the person that created our

4   website.  But it was back in the, you know, 2007,

5   '-8, '-9, in that area.  I don't know exactly when.

6          I know --

7      Q.   To the best of --

8      A.   -- it was definitely -- I definitely know

9   it was before '-9, because '-9 is when we created

10   the website for Fin & Feather Adventures.  So I had

11   that other -- I had the other one prior to that, a

12   year or two, maybe three.

13          Again, I don't know the exact date when we

14   put that live.

15      Q.   Okay.  That's not a problem.  But to the

16   best of your knowledge, it was certainly before the

17   spill; right?

18      A.   Oh, yes.

19      Q.   Okay.  So when somebody makes a

20   reservation online, can you explain kind of, is

21   there a record that is generated that you get

22   something in your email, or what record -- what

23   record is generated from that?

24      A.   Well, again, back in the day, it was

25   simply as an email.  That's all we could receive.

1          Now, with the great modern technology,

2     when somebody goes in and requests to reserve a

3     cabin, I actually get a text message and an email

4     saying someone is requesting a cabin.

5          Same way with my Vrbo, I get an email and

6     I get a text message saying that someone is

7     inquiring or booking a cabin.  So, therefore, I can

8     go ahead and mark that off in my physical book that

9     I've just received that reservation.

10         Back in the day, there was a stipulation

11    that if they requested a certain date, I had 24

12    hours to respond because the book was not always

13    realtime.  Now it's realtime, because of the fact

14    that I get text messages and emails.

15    Q.   So when you would get -- well, let me ask

16    a different question.

17         At what point do you -- do you recall at

18    what point you started having the ability to receive

19    text messages in addition to emails?

20    A.   It's only been probably the last two

21    years.

22    Q.   Okay.  Which -- is the email that it goes

23    to, is it like a Fin & Feather email address?  Or is

24    it a personal address?

25    A.   Prior to October 2020 it went to

1  finandfeather@cox.net.  We've since sold our home

2  and because of it, we no longer can have Cox

3  Communications, so they have eliminated that email

4  address.  And now I have finandfeather@icloud.com.

5       Q.   Do you still have access to the

6  documents -- to the emails that previously were sent

7  to your Cox email address?

8       A.   I had tried to transfer it all over to my

9  hard computer.  Unfortunately, everything did not

10 transfer over.  I have talked to counsel about this,

11 and we're going to try to see if we can retrieve it

12 from Cox Communications.

13      Q.   Okay.  And even when you get an email or a

14 text message or a phone call about a reservation, it

15 was your practice to still record that in a physical

16 calendar; is that right?

17      A.   I did.

18      Q.   What information would you take down in

19 that physical calendar?

20      A.   I would put their name, address, telephone

21 number, possibly the rate of that particular cabin

22 and their credit card information.

23      Q.   Would -- after creating that initial

24 calendar entry, were there ever any occasions where

25 you would make updates to that entry for a

1   particular booking in your physical calendar?

2        A.   Could be.  It could be that the person

3   wants to add or subtract a date.  It could be that

4   there's a weather-related issue and they've had to

5   cancel.

6             In the new modern world could be that they

7   called in because somebody was affected or had

8   COVID, or was present with somebody with COVID, so

9   they've had to cancel.  Death in the family.

10            So yes, there were times where we had to

11  update the calendar based on cancellations,

12  possibly, or adding to their trip.

13       Q.   And to the best of your knowledge, you

14  typically would record those -- that updated trip

15  information in your physical calendar?

16       A.   Correct.

17       Q.   When somebody would cancel, let's say, for

18  example, weather-related reasons or a death in the

19  family or any other reason, would you ever put what

20  the reason was in your entry, or would you just make

21  a notation that says canceled or something else?

22       A.   Over the last many, many years of doing

23  this, it changes.  There may be a reason -- I mean,

24  I may mark down there was a death in the family; it

25  may be that I would write down it was a

1   COVID-related incident; it may be I wrote down Zeta

2   hit this month.

3            You know, or it may be just erasing it and

4   not -- I mean, there was no set policy.  One of the

5   things about Fin & Feather entities, it's a mom and

6   pop situation.  It's just the two of us.

7            So I only have to explain it to myself,

8   more or less, of what -- why I wrote it down the way

9   I did.  If that makes sense.

10       Q.   Other than your physical calendar that

11  we've just been talking about, was there ever a

12  computerized calendar that you would use?

13       A.   I have that now, through my Webervations.

14  Through my Webervations and through my Vrbo.  If you

15  go online right now and you look, you'll see dates

16  blocked out, things of that nature, if I have

17  reservations booked.

18            So yes, within the last two years when I

19  started using ResNexus, it's realtime, and it's in

20  the calendar, typically, you know, in the computer

21  calendar.

22       Q.   Other than cancellations for like weather,

23  for example, like if you had a hurricane, death in

24  the family, more recently medical related, like

25  COVID issues.

1    I would have to forensically look through each

2    reservation to try to figure that out for you.

3         Q.   Okay.  You haven't done that analysis yet;

4    correct?

5         A.   I have not.

6         Q.   Is -- the -- on what -- without doing that

7    analysis, how would you figure out which entity is

8    the right entity to book the reservation and the

9    associated income to?

10        A.   Based on looking at my calendar and bank

11   statements, like where I -- where the money went to.

12        Q.   Do you know, has anyone else done that

13   analysis that we talked about, looking through your

14   reservations to figure out which cabins or

15   adventures were booked through Cabins or Fin &

16   Feather Adventures, LLC [verbatim] as opposed to

17   Fin & Feather Adventures?

18        A.   I'm not aware of it.

19        Q.   What did you -- what did Fin & Feather

20   Adventures or the other Fin & Feather entities do

21   with the land that they purchased to build the new

22   development that is no longer being built?

23        A.   The land is still under -- owned by

24   Fin & Feather Adventures.

25        Q.   Has Fin & Feather Adventures tried to do

1  anything with that land or is it sort of a vacant

2  lot?

3       A.   At this point it's a vacant lot.

4       Q.   Since the sale, has Fin & Feather tried to

5  do anything with -- let me ask it a different way.

6            Since a couple of weeks after the spill,

7  when Fin & Feather decided that it no longer made

8  sense to develop the land, has Fin & Feather done or

9  tried to do anything with that land?

10      A.   I have not tried -- we have not tried to

11  start any other businesses there.

12      Q.   Have you ever tried to sell that land?

13      A.   No, because I still want to hold on to it

14  in hopes that one day I might have a future with it.

15  I, you know, so no, I haven't tried to sell it at

16  this point.

17           It's directly next to my property, and at

18  this point it's paid for.  The expenditure to keep

19  it is very low.  So I want to hold on to that asset.

20      Q.   How much -- how much did you pay for that

21  when you -- when Fin & Feather first acquired the

22  land?

23      A.   I want to say between 25- to $30,000.

24      Q.   And you said that expenses to keep that

25  now are pretty low.  Can you ballpark what that is?

1        A.    I think my 2020 taxes was about 250 bucks.

2        Q.    It's just property taxes, effectively,

3   that it costs you to keep this land?

4        A.    Exactly.

5        Q.    Has Fin & Feather -- is it still owned in

6   Fin & Feather -- let me ask it a different way.

7              Who is the entity that owns that land?

8        A.    Fin & Feather Adventures, LLC.

9        Q.    And they're still the owners today?

10       A.    Yes.

11       Q.    Has Fin & Feather Adventures ever tried to

12   lease that land to somebody else?

13       A.    Unfortunately, since the BP diaster, our

14   area is a dying industry.  If you would like to come

15   and take a visit and drive down that highway and see

16   all the places for sale, you're more than welcome to

17   come visit us.

18       Q.    So to be clear, Fin & Feather Adventures

19   has not made any attempt to do anything with that

20   land since it made the decision after the oil spill

21   not to develop it; is that right?

22       A.    At this point in time, after the spill, is

23   for our best interest not to invest any more money

24   than we've already invested into our properties.

25       Q.    But --

1      A.    People down there are happy to give their

2  properties away.  So I would definitely take a loss

3  if I tried to sell it, based on the market.

4           I mean, this is -- this is only due -- you

5  know, this is my observation to the market around me

6  of what I've seen sell in the last 10 years.

7      Q.    So since April 20, 2010, the date of the

8  spill, Fin & Feather Adventures has not made any

9  attempt to monetize that land or otherwise develop

10  it in any way; is that correct?

11      A.    No, I have not.  Again, like I said, it's

12  a very low expense to just keep the land at this

13  time.

14           Again, for the first five years we had

15  hoped that the fishing would come back.  You know,

16  we -- our ideal thing was that the fishing will come

17  back and we'll have a business that we can continue

18  to build.

19           Because that was our ultimate goal, was to

20  continue building our business.  Unfortunately, it

21  doesn't make good business sense to do that at this

22  time, or back then.

23      Q.    You mentioned earlier that each

24  Fin & Feather entity had its own checking account.

25           Do you recall that?

```
 1        Q.    Do you remember the time frame that

 2   Mr. Prest was doing that work, the time frame that

 3   that boat was unavailable?

 4        A.    Probably May of 2010 until near the end of

 5   2010.

 6        Q.    And you mentioned there were two boats.

 7   Only one of them was used for the spill cleanup

 8   work; is that right?

 9        A.    Right.  He could only operate one boat at

10   a time.

11        Q.    Fair enough.

12        A.    Can we take a five-minute break.

13             MR. KLAR:  Certainly.  Off the record.

14             THE VIDEOGRAPHER:  Off the record at

15   1:26 P.M.

16             (Recess taken.)

17             THE VIDEOGRAPHER:  On the record at

18   1:33 P.M.

19   BY MR. KLAR:

20        Q.    I have a couple more records-related

21   questions and then I'll move on to a different

22   topic.

23             Earlier you mentioned that the

24   Fin & Feather Adventures entity didn't start filing

25   taxes until 2011 to the best of your recollection;
```

Page 62

1    right?

2         A.    Correct.

3              MR. ROBERT:   I'm sorry, I missed that.

4    Adventures is --

5              THE WITNESS:   Adventures.   Correct.

6    BY MR. KLAR:

7         Q.    Before 2011, Fin & Feather Cabins and

8    Fin & Feather, LLC, in addition to cabin rentals,

9    were still offering fishing and hunting as part of

10   the offerings from those entities; right?

11        A.    Correct.

12        Q.    Do you recall approximately what

13   proportion of income is associated with the fishing

14   and hunting as opposed to cabin rentals during the

15   2009 to 2010 frame before Fin & Feather Adventures

16   started offering those?

17        A.    Again, I would have to go through the book

18   and decipher that for you, what part was adventures

19   and which part was, you know -- and I don't know how

20   to preface it.  I would say that we would have to go

21   through the book and decipher the difference.

22        Q.    Sitting here today, you haven't done that

23   work yet; correct?

24        A.    I have not.

25        Q.    You're not aware of anyone else who has;

1   right?

2       A.   I guess I'm not -- I guess we have looked

3   at them, but I don't have any hard numbers for you.

4       Q.   On -- so the --

5       A.   I think that Kirk gave you the list of

6   charters and hunting that he had done prior to 2010.

7   I think he gave a handwritten sheet.

8       Q.   So if those -- the income that's

9   reflected -- and we'll get to those.

10          The income that's reflected on those for

11  the charter fishing trips between 2007 and 2009,

12  that income would have been reflected on either Fin

13  & Feather Cabins or Fin & Feather, LLC's tax returns

14  for those years?

15      A.   Some of it could have been.

16      Q.   Well, if it wasn't on one of those two,

17  what tax return would it be reflected on?

18      A.   Some of that was cash that was held in for

19  petty cash and was reinvested into the business.

20      Q.   So to the extent -- any income that was

21  reported, would have been reported on either

22  Fin & Feather Cabins' or Fin & Feather, LLC's tax

23  return?

24      A.   Correct.

25      Q.   And the only way to determine how much --

Page 64

1    the only way to determine what proportion of income

2    was hunting and fishing related versus cabin rental

3    related would be looking at the books and records

4    and doing that math?

5          A.   Correct.

6          Q.   Yesterday, there was testimony about a

7    fishing camp on your guys' property; do you recall

8    that?

9          A.   Yes.

10         Q.   And that fishing camp ultimately became

11   the Cobia Cabin; correct?

12         A.   It was -- we'll clarify that.  It was

13   originally going to be called the Cobia.  It was

14   instead called the Yellowfin.  So because we didn't

15   add the other cabins in, we chose to name it the

16   Yellowfin, opposed to the Cobia.

17              So if you look at our books you'll see no

18   reference to Cobia on -- I don't know how

19   extensively you've looked at my calendar, but, for

20   instance, on a particular day, you'll see P, R, D,

21   G, M, W, WI, S, T, L, and then YL.

22              And basically that's stands for Pintail,

23   Redfish, Dolphin, Greenwing, Mallard, Wahoo, Wigeon,

24   Speckled Trout, Blue Marlin and Yellowfin.

25         Q.   Okay.  And I'll go through those -- I do

1    card that I ran would show that you paid $100 per

2    night.

3              Say, for instance, you stayed three

4    nights.  It would show $300, plus the tax.  So, and

5    I would -- plus I would have your name, Austin, next

6    to the Yellowfin on my calendar.

7              And when I would reflect that Austin --

8    why did I only charge Austin $300 for the Yellowfin,

9    you know, usually I could remember the reason why I

10   did that.

11        Q.   Okay.  So the -- if there is a discount or

12   adjustment that you were going to make for a

13   particular booking, that -- it was your practice to

14   reflect that adjusted price in your calendar that

15   you kept; right?

16        A.   I could.  But there's a possibility --

17   normally if -- normally if I was going to give you a

18   discount I would make note of it.

19        Q.   I'm sending Tab 61 into the chat.

20              Can the court reporter please mark this as

21   the next exhibit.

22              (Whereupon, Exhibit 26 was marked for

23              identification.)

24   BY MR. KLAR:

25        Q.   Do you see that Tab 61 there, Ms. Prest?

1           Say, for instance, you call me and you

2    tell me you want to rent the Pintail.  And you're

3    going to pay with a credit card.  I don't take

4    credit cards for Fin & Feather, LLC.  So I would run

5    that credit card through the Cabins business.

6           So it gets a little complicated sometimes,

7    but not really for me, because I know what I'm -- I

8    know that's my practice.  So there will be times

9    where people pay checks, so that may not be a

10   hundred percent boat storage.

11        Q.   Okay.  So I just want to make sure I

12   understand.

13          To the extent that this line 2 gross rents

14   include revenues from rental of the Redfish Cabin or

15   the Pintail Cabin, the charge would have been run

16   through Cabins, but the line item on the tax return

17   reflects that revenue?

18        A.   Right, income would have been on the

19   Cabins side.

20        Q.   The income would have been reflected on

21   Cabins' tax return?

22        A.   Exactly.

23        Q.   Okay.  So the -- to the extent there are

24   rents from Pintail and Redfish, they would not be

25   reflected on Fin & Feather, LLC's tax returns.

1   They would be reflected on Cabins'?

2        A.   If they paid by check, it would go into

3   the boat storage category.  If they paid with a

4   credit card, I don't run credit cards through LLC.

5   So for the customer I'd run it through the Cabins

6   side.

7             Again, we own both entities, so it really

8   doesn't -- it's an accounting thing that would be a

9   nightmare to try to say, okay, I ran this, I'm going

10  to move this over, I've got to take out the credit

11  card surcharge, I've got to -- there would be more

12  paperwork than would be worth the effort to do that.

13       Q.   Okay.  Let me break this down, and make

14  sure that I'm on the same page with you.

15            If a customer paid to rent the Redfish

16  Cabin or the Pintail Cabin by check, that income

17  would be reflected on Fin & Feather, LLC's tax

18  return in this line 2; correct?

19       A.   Correct.

20       Q.   If a customer rented the Redfish Cabin or

21  the Pintail Cabin and paid by credit card, that

22  would be reflected in Fin & Feather Cabins, LLC's

23  tax return; correct?

24       A.   Correct.

25       Q.   And do you accept -- does Fin & Feather,

1          Q.    Okay.  There's nothing in the gross

2     receipts that is something other than fishing and

3     hunting?  This is all fishing and hunting?

4          A.    It should be.

5          Q.    Do you recall earlier today when we were

6     talking about social media with Mr. Prest?

7          A.    Yes.

8          Q.    And he mentioned that he doesn't handle

9     social media for Fin & Feather.  You do that; right?

10          A.    We have a social media for -- on Facebook,

11     and we have uploaded things here and there, but --

12     and I have actually tried to do a little advertising

13     on it, just to see if we would get any interest.

14               But it was very little to nothing -- you

15     know, typically, our clients aren't social media

16     buffs.  They're not -- they're more outdoorsy than a

17     -- you know, stuck on a Facebook page.

18               So it wasn't really lucrative to use.

19     Every now and then I would upload something just to

20     see if I could get some interest, but overall, it

21     wasn't fruitful.

22          Q.    Okay.  And, but you were the person in

23     charge of that social media activity; right?

24          A.    The little bit we had, I would say either

25     myself that uploaded something or possibly a

1  customer could have uploaded something.

2          I happened to look at it when you -- when

3  Anna asked Kirk about it just to see, and there are

4  things that -- I have customers that uploaded

5  things.

6       Q.   Okay.  I'm sending Tab 48 into the chat.

7          If the court reporter can mark that next

8  in line.

9          (Whereupon, Exhibit 29 was marked for

10         identification.)

11 BY MR. KLAR:

12      Q.   Do you see this post here, Ms. Prest?

13      A.   I do.

14      Q.   Was this one that you made?

15      A.   I don't recall making it.  I don't

16 necessarily recall it.

17      Q.   Well, Fin & Feather Venice 2001, is that

18 your -- is that the social media handle that

19 Fin & Feather uses?

20      A.   Yeah, I'm not saying -- I'm not saying I

21 didn't upload it.  I'm just saying that I don't

22 necessarily remember uploading it, but --

23      Q.   Okay.

24      A.   -- I mean, it's definitely a client.  It's

25 definitely a client of ours.

1      Q.   Okay.  The photo is a client of yours, but

2   this is one of Fin & Feather's Instagram posts;

3   right?

4      A.   It looks like it, yes.  But, I mean, if

5   you want me to say I can remember every post we

6   made, I'm not going to say that, because I don't.

7   But yes, that is our page, that is our customer, and

8   apparently yes, we made that post.

9           MR. ROBERT:  You just made the -- you said

10   it was Instagram, you said something.

11           THE WITNESS:  Oh.  Instagram, yeah, that

12   is an Instagram -- that still is our Instagram.

13   But, again, we use it very little.

14   BY MR. KLAR:

15      Q.   Sitting here today, there's no reason for

16   you to believe that this isn't one of your posts;

17   right?

18      A.   No, I would say that's my post, yes.

19      Q.   And this is dated, if you look below the

20   likes, it's August 27, 2017; do you see that?

21      A.   I do.

22      Q.   Okay.  And the caption says, dates are

23   filling fast, in all caps.

24           Were you close to capacity at the time

25   that you wrote this post?

1        A.    No.   I wouldn't say that I was close to

2   capacity.   It's a draw to get people interested.   I

3   mean, it's just -- it's just like when you're

4   watching TV and there's a commercial and they're

5   saying, hurry, it's going fast.

6            I mean, we're trying to generate business.

7   Was I at capacity, look at my books, no, I wasn't.

8   But was I trying to entice someone to come fishing

9   or come hunting with me, yes.   That's my business.

10  I'm trying to survive.

11       Q.    Okay.   So your dates were not -- so your

12  dates were not filling fast when you wrote this

13  post; correct?

14            MR. ROBERT:   I object as asked and

15  answered.

16  BY MR. KLAR:

17       Q.    You can answer.

18       A.    Again, it's enticing folks to -- I'm

19  trying to pique interest.   You know, I'm trying to

20  fill up my book.

21       Q.    Understand --

22       A.    And I can assure you that any business

23  does the same thing.   I mean, I'm sure your company

24  does advertisement, trying to attract customers.

25  That's what I was doing.

1       Q.    Understand what you were trying to do.

2   I'm just asking --

3       A.    No, my book was not full.  I was not near

4   full.  And if you look at my calendar, you'll see it

5   was not full.

6       Q.    Do you know who this customer is?

7       A.    That looks like Mr. Dare.

8       Q.    Is he a repeat customer of Fin & Feather's

9   or a one-time --

10      A.    He is.

11      Q.    He's a repeat?

12      A.    Yes, he is.

13      Q.    How many times, ballpark, has he booked an

14  adventure --

15      A.    He's been a customer of mine since we

16  started the business.  I mean, that's how far back

17  he goes.  He's a -- you know.

18      Q.    Would you say he books an adventure with

19  Fin & Feather once a year?

20      A.    Not every year.

21      Q.    Every other year, give or take?

22      A.    I could look in my book and try to

23  recreate that for you.  He's a repeat customer.  I

24  mean, I've been in business almost 20 years.

25      Q.    Has he come back since when this photo was

1   taken?

2        A.   I don't think so.

3        Q.   Do you recall him having --

4             Well, sending Tab 49.

5             If the court reporter can mark that next

6   in line, please.

7             (Whereupon, Exhibit 30 was marked for

8             identification.)

9   BY MR. KLAR:

10       Q.   This is another post on Fin & Feather's

11  Instagram; correct?

12       A.   Yes.  Can you zoom in a little bit.

13       Q.   Sure.

14       A.   I mean, based on what I can see, I'm

15  thinking that might be Mr. Westbrook.  I can't

16  really make out.

17            But he's no longer -- I would say he's no

18  longer a client.  He's moved his -- he's fishing

19  other places, because he's a trout customer and we

20  just don't have it anymore.

21       Q.   This post is dated September 13, 2017;

22  right?

23       A.   I see that.

24       Q.   And in this post it says, nice and smooth

25  ride out early this morning.  Great fishing with

1   loyal clients.  Happy customers again.

2            Did I read that right?

3       A.   Yes, sir.

4       Q.   And do you recall specifically which trip

5   this was?

6       A.   Like I said, if I -- I can't see the

7   person, but I think that's Mr. Westbrook.

8       Q.   Was it great fishing with loyal clients

9   that day?

10      A.   I don't know.  I don't know how many fish

11   they caught.

12            I can tell you that the picture you showed

13   me, that last picture you showed me, it was a bull

14   redfish.  And they come in to spawn and you can

15   catch them, and you have to release them.  You know,

16   did they end up with a boatload of fish?  You know.

17            A person's perception of a good day of

18   fishing doesn't mean they have -- they take home

19   fish necessarily.  If they can get on to some of

20   these bull reds and pull them in and release them,

21   they're happy with that.

22            But there's -- a lot of our customers we

23   lost were people that came in for meat hauls.  They

24   were looking for -- to catch, you know,

25   speckled trout to bring home to feed their family,

1    and those customers are gone.  You know.

2            I'm not telling BP that I don't have

3    customers.  I have managed to keep my business

4    afloat, even though this disaster has, you know,

5    ruined my expectations of expansion and increased

6    revenues.

7            I've done everything I can to attract

8    customers to still come.

9            I can tell you that if a customer calls me

10   and asks me today -- and actually, since the BP oil

11   spill, when it started being evident that the

12   speckled trout species was not any longer in

13   existence.

14           If they called and asked me, you know,

15   Ms. Prest, we want to book a speckled trout trip, I

16   would express to them, I'm sorry, but since the BP

17   oil spill we do not catch speckled trout.  I'm not

18   going to book a speckled trout.

19           They'll say, well, what can I expect to

20   catch, Ms. Prest, and at the time it used to be I

21   could tell them they could catch their limit of

22   reds, which they no longer can do that.  It's rare

23   that we catch a limit of reds.

24           Now we're stuck catching sheephead, which,

25   when my husband and I started dating 35 years ago,

1   and we went out fishing, if we caught a sheephead,

2   it went back overboard.  We didn't keep it for

3   consumption.  That was a, what we considered a trash

4   fish.

5           Now that's a fish that we keep, because

6   that's all our customer has to take home with them.

7       Q.   I'm not asking you about what your

8   customers' views are.

9           I'm asking about what Fin & Feather posted

10  on their own Instagram account.  And it was

11  Fin & Feather's words, great fishing with loyal

12  customers, happy customers again.

13          You wouldn't put that on Instagram if it

14  was false; right?

15      A.   Put it this way.  I would believe that

16  there are -- am I going to embellish to try to

17  attract customers?  Probably so.  I mean, I'm not

18  trying -- I mean, do you catch fish still, yes.  Are

19  you catching the fish that we used to catch, no.

20          Did that particular group of people on

21  that day catch them some fish, apparently they did.

22          You know, I -- you know, I don't think

23  that I made it up.  They might have left happy.  But

24  you know, our customers leaving happy wasn't always

25  just the fishing.  It was the service that we gave

1   them and the hospitality we treated them with.

2          We treat our customers as family.  So

3   there were many times that our customers left

4   disappointed, without fish, but that didn't mean

5   they didn't believe they had a great trip.

6          Q.   It was Fin & Feather's view in this post

7   that there was great fishing with loyal customers --

8          MR. ROBERT:  I object.  This is asked and

9   answered.  Let's move on.  This is not a -- this is

10   not listed as a topic.  We've exhausted this.  Let's

11   move on.

12          MR. KLAR:  The question actually hasn't

13   been answered yet.

14          MR. ROBERT:  It's been asked and answered.

15   I'm instructing the witness not to answer it again.

16   Do what you want to do.

17   BY MR. KLAR:

18          Q.   Do you consider yourself a truthful

19   person, Ms. Prest?

20          A.   I do.

21          Q.   You wouldn't lie on social media; right?

22          A.   Look, if the customer said that they had a

23   great day of fishing, or if I said that day, we had

24   a great day of fishing, we may have had a great day

25   of fishing.  We may have caught bull reds and threw

1  them back.

2          You know, that could be that particular --

3  I have clients that call and say they want to go out

4  and catch bull reds.  And they go out and they catch

5  and release them, and that's a great day of fishing

6  to them.

7          So you're asking me to remember what --

8  why we considered that a great day of fishing.  I

9  can assure you it wasn't because I had a boatload of

10 speckled trout or flounders in my boat.

11         And a great day of fishing doesn't

12 necessarily mean that they had boatloads of fish.

13 It may have been just a great day on the water.

14     Q.   So to be clear, it's a yes-or-no question.

15         You wouldn't lie on social media; right?

16     A.   I don't lie.

17     Q.   I'm sending Tab 85 to the chat.  It's

18 Bates marked F&F 30(b)(6) 00537.

19         Oh, sorry, I was on mute.

20         Ms. Prest, do you see this document that

21 we went over earlier this morning with Mr. Prest?

22     A.   I didn't know you went over it with him,

23 but, yes, I see the document.

24     Q.   This first page here reflects cash

25 received of cabin rentals; correct?

1    Mr. Prest laid out with respect to building those

2    various cabins?

3         A.   We were anticipating building more cabins,

4    yes.

5         Q.   But do you generally agree with timeline

6    that he laid out yesterday with respect to when each

7    might come online?

8              MR. ROBERT:   I'm going to object as to

9    form.   It's not -- there were various timelines

10   discussed at various times, and I think a little

11   more particularity is --

12             MR. KLAR:   Sure.

13   BY MR. KLAR:

14        Q.   I'll come back to that.

15             Let's focus on the discussion with the

16   Mississippi River Bank regarding the Pelican

17   Plantation lodge.   Mr. Prest indicated yesterday

18   that you primarily had those discussions with the

19   bank.

20             Is that consistent with your recollection?

21        A.   I deal with the bank.

22        Q.   Was Mr. Bush the only person at the bank

23   you dealt with, or were there other people?

24        A.   Over the course of 20 years there's been

25   other people.   Paul Bruce already has retired.   Jeff

1  Raymond, he's currently at the bank.  Mike O'Connor.

2  I've dealt with different people, yes.

3          But for the Pelican Plantation, it was a

4  big project so we were dealing directly with

5  Mr. Bush.

6      Q.   Okay.  So specifically with respect to

7  your dealings with the bank on the Pelican

8  Plantation project, your dealings were with just

9  Mr. Bush?

10     A.   I'm not saying that we never discussed it

11  with the other people.  You know, we may go in and

12  see Jeff or Mike and we might have casual -- but to

13  tell you -- primarily discussing the actual loan, it

14  would have been dealing with Mr. Bush.

15     Q.   Do you recall how many times, ballpark,

16  that you talked with Mr. Bush about the Pelican

17  Plantation lodge development?

18     A.   Multiple times, but to tell you it was,

19  you know, 5 to 10, keep in mind this is, you know,

20  12, 13 years ago.

21     Q.   Understood.  And that's totally fine.

22          The first time -- am I correct that the

23  first time that you had discussions with Mr. Bush

24  about the Pelican Plantation lodge was around the

25  time that you were taking out a loan to expand the

1    Blue Marlin Cabin?

2         A.   No, we had talked to him prior to that.

3         Q.   Okay.  When did you first speak to him

4    about the Pelican Plantation lodge?

5         A.   Again, we purchased the property in 2009,

6    April of 2009.  So there was, you know, discussion

7    with him before around that time.

8         Q.   The first time you spoke to him, do you

9    recall what your discussion was about?

10        A.   Anticipation of building an upscale resort

11   for high-end clients.

12        Q.   At the time that you had that initial

13   discussion about your planned project, was there any

14   discussion about a loan from the bank for that, or

15   the terms of that loan?

16        A.   I'm sure there was discussion of it.  To

17   give you verbatim of what was discussed, I mean, of

18   course when you're discussing a loan, you're going

19   to, you know, discuss amounts, length of loan,

20   viable loan.  I'm sure that was all discussed.

21        Q.   Did you have discussions with him about

22   what you would need to have in place in advance of

23   the bank issuing a loan of that size?

24        A.   We didn't discuss -- no, we did not

25   discuss what he needed from me upfront.  But let me

1   tell you a little bit of history about, you know,

2   Mississippi River Bank and Plaquemines Parish.

3          My husband has been in Plaquemines Parish

4   all of his life.  He's the sixth generation.  His

5   family owned multiple businesses, and prior to that,

6   multiple businesses before that.

7          It was the type of business where you went

8   -- type of bank that you went in and you discussed

9   something and you could almost do a handshake.

10          And I know this is modern times now and

11   there would have been documents that they needed and

12   things.  I'm not saying that we wouldn't have gone

13   through a scrutiny to obtain the loan.

14          But when you discuss something with

15   Mr. Bush, he was aware of what we were looking at,

16   and he knew that -- you know, what we were going to

17   need and we knew what we were going to need.

18     Q.   Earlier we talked about what you had to

19   provide, like your tax returns and other records, to

20   get the loan for the Blue Marlin expansion, which

21   was about 40- to $100,000 of debt; right?

22     A.   Correct.

23     Q.   Okay.  Fair to say that for a loan of

24   $3 million the bank was probably going to require

25   some sort of records from you to verify your

1    financial wherewithal?

2         A.   I'm sure they would have requested

3    financial information.  Why wouldn't they.  And

4    prior with them before, I've provided them what they

5    needed.

6         Q.   I'm not suggesting you wouldn't have

7    provided it if they had asked.

8              I'm saying, do you agree that they -- that

9    to the extent they were going to make a loan to

10   Fin & Feather for $3 million, you expect that you

11   would have had to provide them certain financial

12   records and other information they'd requested in

13   advance of securing that loan; right?

14        A.   Anything they would have requested I would

15   have provided to them.

16        Q.   And you expected that they probably would

17   have asked for certain records; right?

18        A.   They would have asked for the same records

19   they've asked in the past from me.

20        Q.   And earlier when we were talking about --

21   well, let me ask a different way.

22             By the time of the spill, they hadn't made

23   that ask of Fin & Feather yet; right?

24        A.   Repeat that again, I'm sorry.

25        Q.   By the time of the spill in April 2010,

1   they hadn't said to Fin & Feather, we're willing to

2   make this loan to you, but we're going to need X, Y,

3   Z documents before we do it; right?

4        A.    They had not given me a list of

5   information they needed for my loan package, no.

6        Q.    By the time of the spill in April 2010,

7   had you agreed -- had Fin & Feather agreed on an

8   interest rate with the bank for the $3 million loan

9   for the Pelican Plantation lodge?

10       A.    That would be total speculation because

11  it's based on prime.

12       Q.    So no, by the time of the spill there was

13  no firm agreement on interest rate at the time;

14  right?

15       A.    They're not going to -- they're not going

16  to give me a firm agreement in writing unless I've

17  locked it down, where the mortgage is getting ready

18  and I have 30 days to do the loan.

19            They're not going to give me an interest

20  rate before we're actually to that point because

21  prime changes.

22            So they're not going to offer me -- but we

23  knew what the average rate was, based on our past

24  history.  And it's going to be anywhere from one or

25  two points above prime, whatever that is.

1      Q.   But the rate wasn't locked down by the

2   time of the spill; right?

3      A.   No, it was not.

4      Q.   And was the term of what that loan would

5   be locked down by the time of the spill?

6      A.   Did you just ask me if the rate was locked

7   down at the time of the spill?  Because I think you

8   just asked me that, and I --

9      Q.   The term.  The term, the duration of the

10   loan.  Was the duration of the loan locked down by

11   the time of the spill?

12      A.   No, the duration of the loan was not.  But

13   for a loan that size, I'm sure it would have been a

14   normal mortgage.

15      Q.   Were any terms with respect to a loan for

16   developing the Pelican Plantation lodge locked down

17   by the time of the spill in April 2010?

18      A.   Again, we had discussed this loan with

19   Mr. Bush.  We were not at the point of him approving

20   the loan.  We had not discussed the terms or the

21   interest rate.

22      Q.   So he hadn't even approved the loan at the

23   time of the spill; correct?

24      A.   Keep in mind, again, as I told you,

25   Mr. Bush was the president of the bank.  If you went

1   in and you asked him, and you went over your

2   business plan with him, saying, this is what our

3   expectations are and this is what we plan to do.

4            Is this doable with your bank?  Is this

5   something that you can give me the go-ahead to start

6   purchasing the land, clearing the land and doing all

7   of the legwork we had already done up until the

8   spill, that's what we had done with Mr. Bush.

9            He had given us, look, based on your

10  history with your -- your history with my bank, I'm

11  confident that this loan could be approved.

12       Q.   Okay.  But it wasn't approved by the time

13  of the spill; right?  Yes or no?

14       A.   I think I answered that.  I think I told

15  you that our discussion was, is this a project

16  that's approvable, and he said yes.

17            Do I have a loan document that says it was

18  approved, I do not.  I have the word of the bank

19  president telling me that he could approve my loan.

20       Q.   Okay.  But he had not approved it yet?

21       A.   I already answered that.  I don't know how

22  many times I can tell you.

23       Q.   You said he told you that the loan was

24  approvable.  But he hadn't actually approved it;

25  right?

1          A.    I did not have a signed letter.  If that's

2    what you're asking, I did not have a signed document

3    saying that it was approved.  It was a verbal.  Let

4    me give you a little bit of history of, prior to

5    owning my own business, I worked in a bank.

6               And the way people do business in other

7    parts of the world is not necessarily the way they

8    do it in a small town.  There were times where -- I

9    was a loan -- I worked in the loan department.

10              And people would literally come in and

11    say, I'm going to give you three heads of calf for

12    collateral, until my next harvest comes in.  And

13    they would take a chattel mortgage on three head of

14    cattle.

15              So the way of doing business in a small

16    town is a lot different than, you know, around the

17    world.  I mean, because they knew their customers,

18    they knew their track history.  And so, you know,

19    it's a little bit different.

20              If I would have gone in and pitched this

21    to Mr. Bush and he would have said, absolutely not,

22    this is not something I feel comfortable with, he

23    would have been straight up and he would have told

24    me that.

25              That was not what he did.  He gave me

1    reassurances that this was an approvable loan.  And

2    that's all I can --

3        Q.   At the time of the spill you hadn't

4    submitted a formal application for the loan;

5    correct?

6        A.   To be quite honest with you, there's been

7    loans that I've requested and was approved and I

8    didn't sign that loan application until the day that

9    I made the loan.

10            I mean, literally, it went to loan

11   committee and everything before the actual -- that

12   was just a matter of formality so that the bank

13   could put it in their file.

14            So, in other words, if I had a loan, did

15   they make me fill out a loan application every time

16   that my loan -- no.  But did they, when we did the

17   actual paperwork, they would have me sign that loan

18   application just to be able to be legal with the

19   FCC.

20       Q.   And none of those prior loans were for

21   anything close to $3 million; correct?

22       A.   Not with Mississippi River Bank, no.

23       Q.   Okay.  And for a loan of $3 million, you

24   would expect there to be a writing reflecting the

25   loan agreement; correct?

1    insurance or any permits that would have been

2    required for the development?

3         A.   No, we had not.

4         Q.   After the spill, did Fin & Feather take

5    any further steps with Mississippi River Bank or any

6    other financial institution to get a loan for the

7    building of the Pelican Plantation lodge?

8         A.   No, because we watched for almost 90 days

9    oil gushing into the Gulf of Mexico, and we would

10   have been absolutely crazy to want to pursue that at

11   that time.

12        Q.   Did you ever have discussions with the

13   bank about developing any of the other unbuilt

14   cabins after the spill?

15        A.   Again, everything was put on hold.  Why

16   would we want to increase -- we needed to see what

17   was going to happen.  Our phones weren't ringing.

18             Just because the oil stopped gushing in

19   the gulf, people weren't wanting to come to

20   Louisiana to fish.  They just -- they -- they were

21   afraid.

22        Q.   But just so I'm clear, there were no

23   discussions with Mississippi River Bank or any other

24   bank about building any unbuilt cabins since the

25   spill; is that right?

1        A.    Correct.

2        Q.    Did you have any understanding --

3   immediately prior to the spill, did you have any

4   sense of whether you would require -- Fin & Feather

5   would require financing to build those other cabins,

6   setting aside the Pelican Plantation lodge?

7        A.    Again, when the spill happened, within two

8   to three weeks of the spill happening, we knew --

9   and I can sit here and tell you that my husband

10  said -- we both cried our eyes out because we knew

11  that our future was destroyed.

12            You can't even imagine what it's like to

13  sit there and watch the oil gush out into your

14  livelihood.  That Gulf of Mexico was our livelihood.

15  So we would have been absolutely insane to look at

16  wanting to increase cabins.

17       Q.    I understand that you're talking -- what

18  you're talking about.

19            My question was, immediately before the

20  spill.  So we're in a pre spill world now.

21            Did you have any understanding or

22  expectation as to whether Fin & Feather would

23  require financing to build those other cabins it was

24  planning, before the spill ever happened?

25       A.    Not necessarily, no.  Not necessarily.

1    There was lots of things that we did that did not

2    have us -- again, I told you earlier, every time we

3    increased a cabin, we didn't always go to the bank

4    and ask for money.

5         Q.   Okay.  So by the time of the spill, but

6    immediately before the spill, Fin & Feather hadn't

7    made any determination as to whether or not it would

8    need financing to build any of the other unbuilt

9    cabins; is that right?

10        A.   At that time I was not planning on taking

11   a loan out for those.  Those would have been built

12   with my -- with money I already had.

13        Q.   Where would -- where would the

14   funds -- strike that.

15             How much money did Fin & Feather expect

16   the total development, Pelican Plantation lodge plus

17   the other unbuilt cabins, to cost Fin & Feather?

18        A.   I'm sorry, that's almost 11 years ago.  I

19   don't, you know -- I don't have --

20        Q.   Did you ever do any analysis as to how

21   much developing those cabins might cost?

22        A.   At this point I can't tell you if I did an

23   analysis or not.

24        Q.   Okay.  Sitting here today, you can't

25   recall one way or another whether you or anyone else

1    build?

2         A.   I don't understand the question.  What do

3    you mean hosting guests?  We had nine other cabins,

4    so we would continue to host guests.  Because -- we

5    had nine cabins, so, I mean, as we moved -- as we

6    started, we added cabins and cabins and cabins and

7    cabins.

8              I didn't close -- I didn't close the

9    Redfish and the Pintail when I was building the

10   Dolphin.  There was no reason.  So I continued to

11   take reservations on things that were complete, yes,

12   I did.

13        Q.   So you don't believe anything would need

14   to have been closed.  It would have remained open

15   for business during construction; is that fair?

16        A.   Correct.  It would have had nothing to do

17   with the other cabins.

18        Q.   Do you recall a discussion yesterday about

19   Hurricane Isaac in 2012?

20        A.   Yes.

21        Q.   And if I recall correctly, that was in

22   around August of 2012; is that right?

23        A.   August 29.

24        Q.   Do you recall what damage Hurricane Isaac

25   caused to Fin & Feather's property and businesses?

1       A.    I do.

2       Q.    Can you describe that for me.

3       A.    The Speckled Trout -- the roof blew off of

4   the Speckled Trout.  There was some minor damage to

5   the Dolphin and minor damage to the Wahoo.

6       Q.    Let's start with the Speckled Trout.

7             The roof blew off.  How long did it take

8   to repair that?

9       A.    It was quite some time.  It was out of

10  commission for several months.  I mean...

11      Q.    So people weren't renting from -- people

12  weren't renting the Speckled Trout cabin during the

13  several months that it was being repaired; right?

14      A.    Correct.

15      Q.    And you said several months.  Is that like

16  closer to three months or closer to eight months,

17  would you say?

18      A.    I would say, we'll split down the middle

19  and say six months.

20      Q.    So for approximately six months, the

21  Speckled Trout cabin was unavailable to rent to

22  customers due to damage done by Hurricane Isaac?

23      A.    Correct.

24      Q.    How much did it cost, do you recall, to

25  repair the roof?

1      A.   I have no clue.  I mean, of course, it was

2  more than just roof damage.  I mean, the roof was

3  blown off, so there was interior walls that needed

4  to be replaced.  There was furnishing that needed to

5  be replaced.

6           There was -- you know, that particular

7  unit had extensive damage.  That storm sat over us

8  for three days.

9      Q.   The six months that you were -- that you

10  mentioned, that was the time frame for all repairs,

11  not just the roof; right?

12     A.   Correct.  I mean, a tarp was put over it

13  to protect it and repairs were made accordingly.

14     Q.   And you mentioned that there was minor

15  damage to the, I think you said Dolphin and Wahoo

16  cabins; is that right?

17     A.   Correct.

18     Q.   What type of damage was it?

19     A.   Flashing, maybe, on the Dolphin.  And I

20  want to say that the porch -- the porch awning was

21  bent back a little bit.  Like I said, it was minor.

22  It didn't -- it was not out of commission for very

23  long.

24           I really don't even think it was out of

25  commission but just for a few days, just to get

1   power put back on.

2       Q.   Okay.  So at most, the Dolphin and Wahoo

3   cabins may have been out of commission for a week

4   due to damage due to Hurricane Isaac?

5       A.   Well, it's possible that it was a week we

6   didn't even have power.  So I would say within --

7   because theoretically, power sometimes takes a week

8   to get back on, in service.

9            So I would say more like maybe two weeks

10  just to go in and make sure, inspect everything,

11  ensure that there's no unforeseen damages that...

12      Q.   When the power goes out, did it go out

13  with respect to the whole, like all of your cabins,

14  or was it only certain ones?

15      A.   The entire parish.

16      Q.   Okay.  So during the time the power was

17  out for one to two weeks, safe to say there were --

18  rentals were not available during that time;

19  correct?

20      A.   I would say that was correct.

21      Q.   And what about fishing and hunting trips?

22  Fair to say those were also not available due to

23  Hurricane Isaac at that time; correct?

24      A.   I wouldn't say that that's necessarily

25  true, because you don't need electricity to run a

1      Q.   You just mentioned Hurricane Zeta

2   recently.

3           When exactly was that?

4      A.   First of November.

5      Q.   Of 2020?

6      A.   Correct.  I mean, I'm saying the first of

7   November.  It was actually the end of October,

8   beginning of -- I don't know the exact date.  The

9   only reason I can tell you that Isaac was August 29

10  was it was the anniversary of Katrina.

11     Q.   Got it.  Did anything -- was there any

12  damage done to Fin & Feather's property or

13  businesses due to Zeta?

14     A.   No.

15     Q.   Other than Hurricane Isaac, since the

16  spill, have there been any other times that any of

17  Fin & Feather's cabins or hunting and fishing

18  charters were offline?

19     A.   No.

20     Q.   Did you have to cancel any reservations

21  when you shut down due to Hurricane Isaac?

22     A.   If we had no power, then yes.

23     Q.   Do you -- sitting here today, do you

24  recall whether or not you actually canceled

25  reservations?

1        A.   I don't know.  I could look at my book to

2   see, possibly.

3        Q.   Okay.  Following the spill, do you recall

4   Fin & Feather, LLC or Fin & Feather Cabins hosting

5   cleanup workers in its cabins?

6        A.   Yes.

7        Q.   Do you recall the approximate date range

8   when they were occupying the cabins?

9        A.   Shortly after the spill.  Within a couple

10  of weeks, within a week probably.

11       Q.   And do you know for how long they were

12  there for, give or take?

13       A.   Months.

14       Q.   Was it into 2011?

15       A.   There was a few left in 2011.

16       Q.   And the trips -- I'm sorry.

17            The rentals of the cabins by cleanup

18  workers, were those all recorded, like your customer

19  rentals would have been, in your calendars?

20       A.   No.  It was not recorded the same way.

21  The waters were closed.  Everything was shut down.

22  There was really no need to sit there and document.

23  You know, some -- some may be on it.

24            I would have to look back at the book and

25  see if it reflects that all of them are accounted

1   for.  I'm speculating that I didn't necessarily

2   write everyone in.

3         Q.   Understood.  Is there -- if you didn't put

4   it in your calendar, is there any other record that

5   you can think of that might reflect when cleanup

6   workers stayed and how much you earned from that?

7         A.   Again, I might have canceled checks.  You

8   know, I may still have canceled checks from them.

9   I'm not sure.

10        Q.   So, not sure whether there are any records

11  reflecting occupancy by spill cleanup workers;

12  correct?

13        A.   Again, I could probably look through my

14  book and figure it out.

15        Q.   Okay.  But sitting here right now, you

16  just don't recall?

17        A.   I don't know exact dates and amounts.

18        Q.   What did Fin & Feather do with the extra

19  money it earned from the occupancy by spill cleanup

20  workers?

21        A.   We reinvested it back into our business.

22        Q.   Okay.  Can you give me an idea of what

23  you've reinvested it in?

24        A.   I would have to look at the -- I would

25  have to look at the taxes, and it would be a line

1    item on the taxes under expenses.

2        Q.    Okay.  Just like, generally, do you have

3    any idea of what types of things you might have been

4    doing with it, like buying new equipment, or

5    repairs, or something else?

6        A.    Could have been a combination of all of

7    those things.

8        Q.    Do you remember what year you did those

9    reinvestments?

10       A.    I would venture to say at the time of

11   income.

12       Q.    Okay.  So it was gradually, as you were --

13   you would have been receiving money?

14       A.    Correct.

15       Q.    So that would have been in 2010 and early

16   2011; correct?

17       A.    Correct.

18       Q.    But fair to say that the most -- your

19   highest revenue years, between -- sorry, 2007 and

20   2011, was in 2010 and 2011; correct?

21       A.    Yes.  But if I could go back in time and

22   erase the disaster, I would much rather have a gulf

23   that's healthy.

24       Q.    So is what you're saying -- are you saying

25   that the increase in income in 2010 and 2011 was in

1    part because of the spill response?

2          A.    Because the oil spill workers were in my

3    cabins, yes.

4          Q.    And you would not have earned as much

5    money in 2010 and 2011 had they not been occupying

6    your cabins; correct?

7          A.    Again, I said yes to that.  But, again, I

8    would prefer that we have a healthy gulf because I

9    would have a plantation now instead of sitting here

10   talking with you.

11         Q.    I'm sending Tab 5 into the chat, which I

12   believe is already an exhibit.

13               Ms. Prest, do you see this document?

14         A.    Yes, I do.

15               MR. ROBERT:  Just for the record, I'll

16   raise the same objections as I did yesterday.

17               That this was a document prepared in

18   furtherance of settlement and subject to protections

19   under FRE 408.  And any use of the question or

20   deposition beyond this, we would object to.

21               You agree that this is an objection -- a

22   continuing objection?

23               Austin, do you agree to make this --

24               MR. KLAR:  Yeah, that's fine.

25

1    us.

2         Q.    Okay.   Would you have had input with Kirk

3    about how much to charge for all of these various

4    trips?

5         A.    I would venture to say this was basically

6    the going rate, at the time that it was created.

7    But again, I would be speculating.   But I'm looking

8    at the amounts, and they seem reasonable and fair.

9         Q.    Do you have similar sheets for each of

10   your other cabins?

11        A.    I have on my website, if you look at the

12   website, you would see adventures and they would

13   have prices similar to this.

14        Q.    And setting aside adventures, would you

15   have price sheets like this for just the lodging

16   aspect of your offerings?

17        A.    If you -- again, on the website, each

18   cabin has the breakdown.   I don't have a page like

19   this, no.   There's not a reason to have a sheet made

20   up like that.

21        Q.    Look at the bottom of the page where it

22   talks about security deposit and cancellation

23   policy.

24              Do you see that?

25        A.    Yes.

1      Q.   So each of the letters -- stepping back.

2           So let's start with Pintail and Redfish.

3  So the P and R, there's a -- there's like a caret or

4  an arrow there pointing to Coolee.  Is Coolee the

5  name of the customer?

6      A.   Correct.  And he has both cabins.

7      Q.   So Coolee is renting both Pintail and

8  Redfish cabins on the night of the 3rd.  And so the

9  names next to each of these letters, those are

10 customer names?

11     A.   Correct.

12     Q.   And where it says BP, those -- does that

13 mean cleanup workers in response to the spill?

14     A.   Correct.

15     Q.   If there's no name next to a cabin, that

16 means it was vacant for that particular night; is

17 that right?

18     A.   Correct.

19     Q.   Can you walk me through the notes that are

20 in the top row here.  There's some names and phone

21 numbers.

22     A.   Apparently somebody named Jim Brown called

23 me.  That's almost 11 years ago.  I don't recall

24 Jim Brown, so I'm not sure what that stands for.

25          Dr. Sloan was a long-time client.

1   125 in it?

2        A.   Yes.

3        Q.   What's the 125?

4        A.   If I'm -- I'm speculating here.  Gordon

5   was a boat storage customer, and if -- he rented

6   from us often.  So if a boat storage customer rents

7   from us, they get typically a $25 per night

8   discount.

9        So Gordon would have been charged, instead

10  of 150, he would have been charged 125.  And that's

11  just a reflection for me to remember that Gordon

12  will be charged 125.

13       Q.   Looking at this calendar, and on all your

14  calendars, is there a way to definitively determine

15  who is a boat storage customer versus who is just a

16  renter and a cabin rental or fishing customer?

17       A.   As far as boat shed customers, I know --

18  typically know who the boat shed customers are, just

19  by sight.

20       There are other customers, for instance, a

21  few minutes ago you asked me about who Toby is.  I

22  can tell you that that Toby is Toby Revalet with

23  Union -- Union Service & Maintenance Company.  He

24  tends to come every year.

25       So there's people in my book that I can

1   the 3rd here, August 3.  Do you see how next to the

2   initials, I think it's DE, there's a T with a circle

3   around it?

4        A.   That means that Tali cleaned the cabin

5   that day.

6        Q.   Okay.  So it's just a designation for

7   whether a cabin was cleaned or not?

8        A.   Right.

9        Q.   Okay.  And is that --

10       A.   I had more than one person cleaning at

11  that particular entity, so, for instance, the D

12  would be that I cleaned the cabin that day.

13       Q.   Okay.  Showing you Tab 24.

14            Can the court reporter please mark that as

15  the next in line.

16            (Whereupon, Exhibit 34 was marked for

17            identification.)

18  BY MR. KLAR:

19       Q.   Ms. Prest, this is a copy of a September

20  2008 calendar that you maintained; correct?

21       A.   Correct.

22       Q.   And you prepared this document; right?

23       A.   This is my calendar.

24       Q.   It's a little hard to see, so I'm going to

25  try and rotate the page here.  Okay.  Is that

1    better?

2         A.   Yeah.

3         Q.   Okay.  Do you see this note here on the

4    top left?

5         A.   You mean my prayer?

6         Q.   Yes.  Okay, so this is your handwriting?

7         A.   Yes.

8         Q.   There we go.  Looking at the wrong page.

9              Okay.  Sorry.  Do you see this note -- or

10   this prayer written at the bottom of what is the

11   page marked F&F 30(b)(6) 00798?

12        A.   Yes, I see it.

13        Q.   Okay.  And it says, dear Lord, please

14   guide us in the right direction.  Please fill our

15   cabins.  We are so broken and need your help.

16             Did I read that correctly?

17        A.   Yes.

18        Q.   You wrote this in September of 2008;

19   correct?

20        A.   Yes.  And if you look at a reflection of

21   that particular month, I'd been hit with two storms.

22             And to be perfectly honest with you,

23   sometimes I feel that I suffer from PTSD when it

24   comes to hurricanes, because we had been hit by a

25   storm in '04, '05, '08, and then again in '12.

1            So it was just at that moment in my life I

2    felt broken.  You know, I -- my spirit was down at

3    that particular moment, and I would make notes to

4    God just to guide me on how I felt at that moment.

5    Never really thought I would be sharing it with a BP

6    attorney.

7        Q.   It looks like in September of '08, where

8    you have the names Gustav and Ike, there are no

9    rentals during this time other than, it looks like,

10   Bobby M; correct?

11       A.   Right.

12       Q.   And you believed that Fin & Feather's

13   business was broken at that time?

14       A.   I believed we were being affected by a

15   hurricane.

16       Q.   Okay --

17       A.   First Gustav, and then right behind it we

18   were hit by Isaac [verbatim].

19       Q.   And the hurricanes --

20       A.   And theoretically, September is a slower

21   month than any other month.  It's one of our slower

22   months, for several reasons.  Folks don't tend to

23   like to book typically in September because of

24   hurricanes.  So it's not one of our busier months.

25       Q.   Okay.