# Exhibit M

Page 1

1                    KIRK PREST

2              IN THE DISTRICT COURT

3                LOUISIANA EASTERN

4                     --o0o--

5

6  FIN & FEATHER ADVENTURES, LLC,    )
                                     )
7                 Plaintiff,         )
                                     )
8          vs.                       ) No. 2:16cv6126
                                     )
9  BP EXPLORATION & PRODUCTION,      )
   INC., et al.,                     )
10                                   )
                  Defendants.        )
11

12 _____

13   VIDEOCONFERENCE AND VIDEO-RECORDED DEPOSITION OF

14                     KIRK PREST

15                 February 10, 2021

16 _____

17

18         DEPOSITION OF KIRK PREST, produced as a

19  witness, duly sworn by me via videoconference at the

20  instance of the DEFENDANTS, was taken in the

21  above-styled and numbered cause on February 10,

22  2021, from 9:28 A.M. to 5:33 P.M., before BRANDON D.

23  COMBS, CSR, RPR, in and for the State of Texas,

24  reported by computerized machine shorthand via

25  videoconference.  Job No. 189251

1                      KIRK PREST

2        Q.   I'd like to show you a document.  I'm
3   sending Tab 19, which is Bates stamped FAFA000095.
4   And I'll share it on the screen as well.  19.
5             All right.  This is a 10-page document.  I
6   can scroll through it so you see what's inside.  But
7   do you recognize this document, Mr. Prest?
8        A.   Yes.
9        Q.   What is it?
10       A.   That is the trips calendars, bookings, and
11  then the income schedule from those trips.
12       Q.   All right.  And the trips for what period
13  of time?
14       A.   This would be the -- that particular one
15  is the post -- post oil spill time frame, for 2010.
16       Q.   So this shows -- I want to make sure I get
17  it right.
18            This shows the total revenue for
19  Fin & Feather Adventures for fishing trips from
20  April 20, 2010, through the end of 2010?
21       A.   Yes.
22       Q.   Why did you calculate this particular set
23  of information?
24       A.   Because it was requested of me to do so.
25       Q.   Okay.  And I see at the bottom it says,

1                    KIRK PREST

2    total, 863,800. Did Fin & Feather Adventures bring

3    in $863,800 during the post spill period in 2010?

4         A.   We would have. This is canceled trips.

5         Q.   Oh, these are canceled trips.

6              And so I want to take a look -- how did

7    you determine each of these amounts?

8         A.   Booked trips from those clients, times

9    rates times persons.

10        Q.   So, let's look at the first line, maybe,

11   as an example. It says Mike Post group. Is that

12   the customer?

13        A.   Yes.

14        Q.   And it says, adventure description,

15   inshore, offshore. What does that mean?

16        A.   That means he was doing some inshore and

17   some offshore fishing.

18        Q.   All right. And --

19        A.   Or a combination.

20        Q.   What does AI times six times four mean?

21        A.   That's all-inclusive times the number of

22   persons, times the number of days.

23        Q.   Okay. So there were six people who booked

24   for Mike Post group, for a period of four days, and

25   they booked all-inclusive packages totaling $8,400;

```
                                                        Page 202
 1                      KIRK PREST
 2    is that right?
 3          A.    Yes.
 4          Q.    Okay.  And then if you look at a few down,
 5    it says Jerry Dawson and Co.
 6          A.    The company, yes.
 7          Q.    Six inshore, AI times six times four.
 8    Does that mean there were six people who booked with
 9    Jerry Dawson and Co. for four days?
10          A.    That means this particular client, he --
11    he was a repetitive customer.  So it would have been
12    he had six trips.  Times the number -- times
13    all-inclusive, times the number of people, times the
14    number of days.  He was one of our better customers.
15          Q.    I see.  So the six before inshore, means
16    it's six times six times four, times the per-person
17    all-inclusive rate?
18          A.    Times the rate; that's correct.
19          Q.    Okay.  And so when you add that up, that
20    adds up to 50,400?
21          A.    Yes, you're correct.
22          Q.    What's the all-inclusive -- for each of
23    these is the all-inclusive rate that you used to
24    come up with the total number different, based on
25    what the adventure was?
```

1                       KIRK PREST

2        A.   Yes, it depends on what that description
3   of that adventure is, on the rate sheet.
4        Q.   How did you keep track of the
5   cancellations in 2010 after the spill happened?
6        A.   Well, I had my calendar.  So that's
7   basically calendar and notes, and some of the
8   reservations, on Denise's notes.  But mostly --
9   mostly those three items.
10       Q.   Is the -- I'm going to turn to the second
11  page of this document.  Is the second page of this
12  document the calendar you're talking about?
13       A.   Second page of the document.
14       Q.   Says April 2010.
15       A.   April 2010.  Yes, that would be the
16  calendar for April 2010.
17       Q.   All right.  And how would I tell on this
18  calendar what trips were canceled because of the
19  spill?
20       A.   It might be Xs.  The Xs means that --
21  let's see.  We have certain emails from customers
22  that cancel from time to time.  We get phone calls
23  that cancel for different reasons.
24            I don't know that I made a distinction
25  between the oil spill and regular cancellations.

Page 204

1                       KIRK PREST

2        Q.   All right.  So this page does not
3   distinguish between an oil spill-related
4   cancellation and just a normal cancellation?
5        A.   Yeah, none of the ones that are before the
6   oil spill are going to be included, if that's what
7   you're asking.  That's not on there.
8        Q.   And did you say that the X, that an X in
9   any given square means a cancellation?
10       A.   Sometimes I X it out if it's a
11  cancellation.  Sometimes I just put a line through
12  it.
13       Q.   Okay.  So these -- let's say the X on
14  April 20, 2010, we don't know if that's a
15  cancellation at all, we don't know if it's a
16  cancellation due to the spill, and we don't know if
17  it's a cancellation for some other purpose.  Is that
18  what you're saying?
19            MR. ROBERT:  And if I may interject.
20            You're running short on time.  And rather
21  than belabor this, I think it may be helpful for me
22  to just remind Mr. Prest that he advised me
23  previously that he created this calendar
24  specifically to document the cancellations after the
25  spill.

Page 205

1                    KIRK PREST

2            So this is not from his actual calendars.

3    So it might be helpful for him to be able to look

4    through the document, the next four, five pages,

5    just to acclimate himself to what he's looking at.

6    BY MS. TERTERYAN:

7        Q.   Let me ask about that.

8             When was this document and calendar

9    created, Mr. Prest?

10       A.   I don't know the date.  At some point

11   prior to -- at some point during the process of

12   computing the losses for -- for the case.

13       Q.   What year was it created?

14       A.   I'm not sure.  I'm sure I could look back

15   in my records and find out, but sitting right here,

16   right now I don't know.

17       Q.   So you prepared this specifically in

18   connection with this litigation?

19       A.   This particular document, yes.

20       Q.   Yeah.  Okay.  How did you -- what did you

21   rely on in order to create this document?

22       A.   Bookings.

23       Q.   What documents and information did you

24   rely on to create this document?

25       A.   My calendar.  Phone calls with these

Page 224

## CERTIFICATE OF REPORTER

I, BRANDON D. COMBS, a Certified Shorthand Reporter, hereby certify that the witness in the foregoing deposition was by me duly sworn to tell the truth, the whole truth, and nothing but the truth in the within-entitled cause;

That said deposition was taken in shorthand by me, a disinterested person, at the time and place therein stated, and that the testimony of the said witness was thereafter reduced to typewriting, by computer, under my direction and supervision;

That before completion of the deposition, review of the transcript was not requested.  If requested, any changes made by the deponent (and provided to the reporter) during the period allowed are appended hereto.

I further certify that I am not of counsel or attorney for either or any of the parties to the said deposition, nor in any way interested in the event of this cause, and that I am not related to any of the parties thereto.

DATED: February 23, 2021   *Brandon Combs*
BRANDON D. COMBS, RPR, CSR 10927