## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **In Re: Oil Spill by the Oil Rig** | * | |
| **"Deepwater Horizon" in the Gulf** | | **MDL 2179** |
| **of Mexico, on April 20, 2010** | * | |
| | | **SECTION: J(2)** |
| | * | |
| **Applies to:** | | **JUDGE BARBIER** |
| *No. 21-00237* | * | |
| | | **MAG. JUDGE CURRAULT** |
| | * | |

## ORDER & REASONS
### [As to the Motions for Sanctions Against Brian J. Donovan]

Before the Court are two motions for sanctions against Brian J. Donovan ("Donovan") filed by Stephen J. Herman ("Herman"), James P. Roy ("Roy"), and Patrick A. Juneau ("Juneau") (collectively, "Movers"). (Rec. Docs. 26999, 27003).[1] The motions were thoroughly briefed and then argued to the Court on July 23, 2021. At the end of the hearing, the Court granted the motions, sanctioned Donovan, and stated it would issue a written opinion in due course. (Minute Entry, Rec. Doc. 27178). This is the contemplated opinion.

## I.  FACTUAL AND PROCEDURAL HISTORY

### A.  The Oil Spill, the GCCF, MDL 2179, and the Economic Settlement

On April 20, 2010, a blowout, explosions, and fire occurred aboard the semi-submersible drilling rig DEEPWATER HORIZON as it was in the process of temporarily abandoning a well, known as Macondo, it had drilled approximately 50 miles off the coast of Louisiana. These events resulted in, inter alia, a massive oil spill

---

[1] "Rec. Doc." citations are to the MDL master docket, No. 10-md-2179, unless the citation indicates another case, e.g., No. 21-00237.

in the Gulf of Mexico that caused billions of dollars of economic losses and property damage. "Epic" litigation of "gargantuan size and extraordinary complexity" ensued. *In re Deepwater Horizon (Mason)*, 819 F.3d 190, 197 (5th Cir. 2016). Nearly all of those cases have been consolidated before this Court as Multidistrict Litigation No. 2179 ("MDL 2179").

The majority of claims have been governed by the Oil Pollution Act of 1990 ("OPA"), 33 U.S.C. §§ 2701, et seq. Under OPA, the Coast Guard designates the source of the discharge, known as the "responsible party." *In re Settoon Towing Co.*, 859 F.3d 340, 344 (5th Cir. 2017) (citing 33 U.S.C. § 2714(a)). The responsible party is "strictly liable for cleanup costs and damages and first in line to pay any claims for removal costs or damages that may arise under OPA." *Id.* (cleaned up). "Individuals and entities harmed by an oil spill may file claims against the responsible party for damages. However, to promote settlement and avoid litigation, . . . OPA establishes specific procedures which claimants must follow." *Nguyen v. Am. Commercial Lines, L.L.C.*, 805 F.3d 134, 138 (5th Cir. 2015) (cleaned up). Specifically, the responsible party must promptly establish and advertise a procedure for claimants to present their claims to it for possible settlement. 33 U.S.C. § 2714. Once a claim is presented to the responsible party, it has 90 days to attempt to settle with the claimant. 33 U.S.C. § 2713(c). If the claim is not settled in this time, the claimant then has the option of either suing the responsible party in court or submitting the claim to the Oil Spill Liability Trust Fund, a public trust fund administered by the Coast Guard's National Pollution Funds Center. 33 U.S.C. § 2713(c); *Nguyen*, 805 F.3d at 139. OPA's

presentment procedure is "a mandatory condition precedent barring all OPA claims unless and until a claimant has presented her claims in compliance with § 2713(a) . . . ." *Nguyen*, 805 F.3d at 139 (cleaned up).

The Coast Guard named BP as a responsible party for the DEEPWATER HORIZON/Macondo Well oil spill.[2] In accordance with this designation, BP promptly established a claims submission process that operated from May 3 to August 22, 2010. (Order of Oct. 20, 2017 at 3-5, Rec. Doc. 23560). Through this initial process, BP paid over $400 million to over 30,000 claimants. (*Id.*) In mid-June 2010, following discussions between BP and the U.S. government, it was announced that BP would establish a $20 billion trust to fulfill its legal obligations, which would be administered by a new claims facility, the Gulf Coast Claims Facility ("GCCF"), administered by Kenneth Feinberg ("Feinberg"). The GCCF opened on August 23, 2010 and operated for a year and a half. During that time, it paid over $6.2 billion to approximately 220,000 claimants.

On August 10, 2010, around the same time the GCCF commenced operations, the Judicial Panel on Multidistrict Litigation ("JPML") created MDL 2179 pursuant to 28 U.S.C. § 1407, and assigned it to this Court. (Rec. Doc. 1). As mentioned, nearly all federal cases arising from the DEEPWATER HORIZON/Macondo Well incident have been consolidated with this MDL. In October 2010, the Court appointed Herman and Roy, two attorneys who represented plaintiffs in the MDL, as Plaintiffs' Co-Liaison Counsel. (Rec. Doc. 506). The Court also established a Plaintiffs' Steering

---

[2] BP leased the area of the outer continental shelf where the Macondo Well was located. BP also owned a majority interest in the well and was the designated "operator" of same.

Committee ("PSC") and appointed Herman, Roy, and 15 other attorneys to it. (*Id.*)

In March 2012, the PSC and BP reached agreement on a proposed class action settlement aimed at resolving private claims for economic losses and property damage due to the oil spill ("Economic Settlement" or simply "Settlement"). (Rec. Doc. 5955). The Economic Settlement was preliminary approved on May 2, 2012. (Rec. Doc. 6418). Following a months-long objection and opt-out period and then a fairness hearing on November 8, the Court issued a lengthy decision on December 21, 2012 where it addressed and overruled objections, certified the class, and fully approved the Economic Settlement as fair, reasonable, and adequate under Rule 23(e). (Rec. Doc. 8138).

Although BP initially supported approval of the Economic Settlement in this Court, it vigorously opposed the Settlement on appeal to the Fifth Circuit. *See, e.g.*, *In re Deepwater Horizon*, 739 F.3d 790, 795 (5th Cir. 2014) ("BP also now asks this court to vacate the district court's order [approving the Settlement], although BP is not formally an appellant and, in fact, BP originally supported both class certification and settlement approval before the district court.").[3] Nevertheless, the Settlement was upheld by the Fifth Circuit, and the Supreme Court denied certiorari. *Id.* at 821, *reh'g en banc denied* 756 F.3d 320 (5th Cir. 2014), *cert. denied*, 574 U.S. 1054.

Pursuant to the Economic Settlement, the GCCF was replaced with a new claims-processing facility known as the Court-Supervised Settlement Program

---

[3] Beyond this appeal, BP raised multiple other disputes regarding the Settlement's interpretation and administration. The full scope of BP's attacks on the Settlement are catalogued in the Court's Order of Oct. 25, 2016 at pages 18-20. (Rec. Doc. 21849).

("CSSP"), administered by Juneau. Although the Economic Settlement is mostly uncapped, BP predicted in 2012 that it would pay around $7.8 billion. As it turns out, the Economic Settlement paid out $12.2 billion to over 130,000 claimants.  (Rec. Doc. 26571 at 4 n.4; Rec. Doc. 26873).[4]

There are many more chapters to the MDL 2179 saga, but these are the relevant parts thus far. Below the Court recounts Brian Donovan's activity in the MDL.

## B.    The *Feinberg* Actions

Donovan is an attorney licensed to practice law in the State of Florida. His involvement in MDL 2179 began with three clients: Pinellas Marine Salvage, Inc., Selmer Salvesen, and Andrew Ditch. Each of these clients submitted claims to the GCCF. The GCCF denied Salvesen's and Ditch's claims. (Order of July 2, 2021 at 5, Rec. Doc. 26571). However, the GCCF made $78,000 in interim payments to Pinellas Marine (in addition to $10,000 Pinellas received from the GCCF's predecessor), and it offered Pinellas another $173,000 to fully settle that claim. Pinellas Marine rejected the GCCF's offer. (*Id.*).

As discussed, OPA provided Donovan's clients with two options once the GCCF failed to settle their claims: sue BP, the strictly-liable responsible party, or file a claim

---

[4] Donovan has repeatedly argued that there was a secret agreement to cap BP's liability at $20 billion. There was no such agreement, and BP's liability for the oil spill has in fact far exceeded $20 billion. As mentioned, BP has paid some $18.7 billion between BP's initial claims facility, the GCCF, and the Economic Settlement. BP paid another $5.8 billion in individual settlements with private plaintiffs through a Court-appointed neutrals process. BP also paid around $20 billion to settle claims with federal, state, and local governments. And BP has spent billions more on things like responding to and removing the oil spill, resolving criminal penalties, funding the Medical Benefits Class Action Settlement, administering both class settlements, common benefit fees, etc.

with the Oil Spill Liability Trust Fund. Even though Donovan clearly understood this (*see, e.g.*, Pinellas Compl. ¶¶ 5, 70, No. 11-1987, Rec. Doc. 1-2), Donovan advised his clients to do neither. Instead, Donovan filed on behalf of his clients three substantially similar lawsuits against the GCCF and Feinberg, its administrator. ("The *Feinberg* Actions," Nos. 11-1987, 11-2533, 13-6014). Those lawsuits alleged that Feinberg "fraudulently, recklessly, negligently, and/or knowingly" failed to properly process Donovan's clients' claims and circumvented the rights provided to them under OPA. According to Donovan, Feinberg engaged in a "'Delay, Deny, Defend' strategy . . . commonly used by unscrupulous insurance companies." (Pinellas Compl. at ¶ 4). The lawsuits also claimed that Feinberg and the GCCF violated OPA by requiring claimants to sign a release and covenant not to sue in order to receive a full and final settlement. (Ditch Compl. ¶ 12-13, No. 13-06014, Rec. Doc. 1-1).  Donovan, on behalf of his clients, alleged that the purpose of these acts was to limit BP's liability while benefitting Feinberg (through BP's monthly payments to Feinberg). (Pinellas Compl. at ¶¶ 13, 151). The *Feinberg* Actions asserted claims under Florida common law. (*Id.* at ¶ 15).

The *Feinberg* Actions were filed in Florida state court in 2011 and 2013. Each case was removed to the Middle District of Florida and then transferred (over Donovan's objection) by the JPML to this Court where they were consolidated with MDL 2179 and stayed.

C.    ***Donovan I***

While the *Feinberg* Actions were pending, Donovan, representing himself, filed

a 130-page complaint against Herman on February 12, 2019. ("*Donovan I*," No. 19-12014). *Donovan I* included and built upon many of the allegations from the *Feinberg* Actions. *Donovan I* alleged that Herman and the PSC colluded with BP and Feinberg as part of an "eight-step plan" that was designed to limit BP's liability in exchange for increasing the compensation to Herman and the PSC. (Compl. ¶ 25, et seq., No. 19-12014, Rec. Doc. 1-1).

Much of the alleged collusion concerns the Economic Settlement. Donovan claimed that the Settlement was unfair to class members because it "limits a claimant's recovery of damages to geographic bounds and certain business activities while requiring a heightened and vague proof of causation." (Compl. ¶ 11). Donovan also complained about the fact that those who had executed a release after settling through the GCCF were excluded from Settlement class—a somewhat paradoxical position given Donovan's view that the Settlement was unfair to class members. Beyond the Economic Settlement, Donovan alleged that

- MDL 2179 is unconstitutional because there is no case or controversy (*Id.* ¶ 14);

- Herman "aid[ed] and abett[ed] the [GCCF] to circumvent OPA," (*Id.* ¶ 9);

- Herman did not properly plead OPA claims in one of the master complaints drafted by the PSC (*Id.* ¶ 8); and

- Herman "breached his fiduciary and ethical duties to [Donovan], [Donovan's] clients, and all others similarly situated." (*Id.* ¶ 12).

*Donovan I* was filed in Florida state court. Like the *Feinberg* Actions, the case was removed and then transferred (over Donovan's objection) to MDL 2179, where it was automatically stayed.

### D. Donovan's Unsuccessful Attempt to Recuse the Undersigned from the *Feinberg* Actions and *Donovan I*

On July 29, 2019, Donovan filed a "Motion to Recuse the Honorable Carl J. Barbier" from the *Feinberg* Actions. (Rec. Doc. 25908). When *Donovan I* arrived in this Court a few days later, Donovan immediately filed an identical motion regarding that case. (Rec. Doc. 25927). Donovan asserted that recusal was warranted under 28 U.S.C. § 455(b)(4) because the undersigned owned debt instruments (which had been sold nine years earlier) issued by two of BP's contractors (neither of whom were defendants in the *Feinberg* Actions or *Donovan I*). Donovan also moved under 28 U.S.C. § 455(a), claiming that the Court's impartiality might reasonably be questioned. For example, Donovan claimed the undersigned colluded with Herman, Feinberg, and BP as part of an "eight-step plan." (Rec. Doc. 25927-1 at 16). Much of the alleged collusion centered on the Economic Settlement.

The Court denied the motions in a 12-page opinion issued on November 8, 2019. (Rec. Doc. 26089). That ruling addressed many of Donovan's arguments that have now become familiar. For example, Donovan argued that the Economic Settlement was a boon for BP and a disaster for class members, even though neither he nor any of his clients participated in the Settlement.[5] The Court explained that this was a belated attack on the Economic Settlement, as objections to it needed to be raised seven years earlier, during the approval process. (*Id.* at 7 n.9). The Court also

---

[5] In fact, two of Donovan's three clients in the *Feinberg* Actions opted themselves out of the Economic Settlement class. The third client submitted an untimely opt-out, but otherwise did not submit a claim. (*See* Rec. Doc. 26571 at 8 n.7).

noted that Donovan's criticisms appeared nonsensical considering that BP had fought so vigorously to overturn the Settlement's approval. (*Id.* at 7 n.10).

The decision also noted that several of Donovan's allegations in his motions to recuse appeared to violate the Louisiana Rules of Professional Conduct. (*Id.* at 8-12). For example, Donovan's statements that "Judge Barbier colluded with [Herman] to develop and/or facilitate an eight-step plan to maximize judicial efficiency and the compensation of the members of the MDL 2179 PSC in exchange for limiting the liability of BP" and "Judge Barbier intentionally abused his discretion by allowing [the GCCF] to contravene the OPA and by forcing [plaintiffs who did not settle with the GCCF] to enter into an unfair, inadequate, and unreasonable collusive class settlement . . . ." appeared to violate Rule 8.2 (prohibiting a lawyer from making statements that the lawyer knows to be false or with reckless disregard as to its truth or falsity concerning the qualifications or integrity of a judge), among others. Consequently, the Court referred Donovan's briefs to the Clerk of Court with instructions to commence a disciplinary proceeding against Donovan.

## E.   The Court Dismisses the *Feinberg* Actions and *Donovan I*; No Appeals Are Taken

On January 17, 2020, the Court issued an order that partially lifted the stay with respect to the *Feinberg* Actions and *Donovan I*. (Rec. Doc. 26213).[6] Feinberg and Herman then filed motions to dismiss the respective complaints against them.

On March 27, 2020, the Court issued an Order & Reasons that granted

---

[6] This order also denied, with reasons, several other motions that Donovan had filed in the MDL. Of note, the order pointed out that the Fifth Circuit had already rejected arguments identical to the ones Donovan raised. (*See id.* at 6 & n.7).

Herman's motion to dismiss *Donovan I*. (Rec. Doc. 26425). The Court held that Donovan's claims against Herman are untimely under Louisiana law, La. R.S. 9:5605, which provides that an action against a Louisiana attorney must be brought within one year of the discovery of the alleged wrongful conduct or three years from that date of the wrongful conduct. (*Id.* at 4-5).[7] The Court observed that "Donovan's complaint centers on acts or omissions that allegedly occurred between 2010 and 2013"; therefore, his 2019 complaint was untimely. (*Id.* at 4). The Court also agreed with several other of Herman's arguments. It held that "Donovan . . . failed to articulate a concrete and particularized injury in fact." (*Id.* at 6-7). The Court also explained that Donovan appeared to lack standing to complain about the terms of the Settlement and that, even if he had standing, such complaints were untimely and waived because they should have been asserted in 2012. (*Id.* at 6). The Court also noted that many of Donovan's claims were flatly contradicted by the MDL record (*id.* at 6-7)—something the Court had previously noted in the November 19, 2019 and January 17, 2020 decisions. Finally, the Court held that Herman did not owe a fiduciary duty to Donovan. (*Id.* at 7).

Accordingly, the Court entered a final judgment dismissing *Donovan I* with prejudice. (No. 19-12014, Rec. Doc. 29). Donovan did not appeal.

On July 2, 2020, the Court issued an Order & Reasons that granted Feinberg's

---

[7] Donovan had argued that Florida's choice-of-law rules apply to his claims, although he did not explain what those choice-of-law rules were or whether, under those rules, Florida's or Louisiana's statute of limitations would apply. The Court applied Florida's choice-of-law rules but found that, under those rules, Louisiana's statute of limitations governed Donovan's claims against Herman. While Donovan now calls the Court's logic "unfathomable" (*see* Donovan Opp'n to Sanctions at 10, Rec. Doc. 27035; *see also* Notice of Dismissal at 3-4, Rec. Doc. 26916), he has never explained how the Court erred in its application of Florida's choice-of-law regime.

motion to dismiss the *Feinberg* Actions. (Rec. Doc. 26571). As noted above, Donovan's clients sued Feinberg under Florida state law for essentially failing to settle their claims. The Court dismissed those claims based on its earlier holding (which had been affirmed by the Fifth Circuit, *see In re Deepwater Horizon,* 745 F.3d 157, 172-74 (5th Cir. 2014)) that state law claims for losses arising from the oil spill are preempted by federal law. (Rec. Doc. 26571 at 8). Moreover, the Court addressed and rejected Donovan's argument that OPA imposed on the GCCF/Feinberg a duty to settle his clients' claims. (*Id.* at 8-9).[8] The Court also noted that Feinberg raised several other "plausible arguments" in support of dismissal, but declined to address them given its conclusions above.

The Court immediately issued a final judgment dismissing the *Feinberg* Actions with prejudice. As occurred in *Donovan I*, Donovan did not appeal.

## F.   *Donovan II*

On February 24, 2020, while the parties were briefing the motions to dismiss

---

[8] The Court explained:

> OPA is intended "to promote settlement and avoid litigation." *Nguyen*, 805 F.3d at 138. How does it do this? As mentioned, OPA's presentment procedure requires a claimant to give the responsible party the opportunity (90 days) to settle her claim before she may sue in court. 33 U.S.C. § 2713. OPA also provides that interest typically begins to accrue following the 30th day after the claim is presented, which incentivizes early settlement. *Id.* § 2705. But there is a wide chasm between a process that "promotes" settlement (what Congress enacted) and one that "requires" settlements (what the Donovan Plaintiffs apparently wish Congress enacted). Indeed, OPA provides two remedies when a claim is presented and not settled within 90 days: sue the responsible party for any uncompensated removal costs or damages allegedly owed under § 2702 (plus interest) or file a claim with the Oil Spill Liability Trust Fund. *Id.* § 2713(c). However, OPA provides no private cause of action to a claimant for the mere fact that the responsible party (or a third party engaged to fulfill the responsible party's obligations, as occurred here) failed to settle a claim.

(Rec. Doc. 26571 at 9).

11

in the *Feinberg* Actions and *Donovan I,* Donovan commenced a *qui tam* action by filing a 144-page complaint in the Middle District of Florida (*Donovan II*).[9]  Donovan purported to bring this lawsuit on behalf of the United States and himself under the False Claims Act, 31 U.S.C. § 3729 and the Racketeer Influenced and Corrupt Organizations Act ("RICO") 18 U.S.C. § 1961, *et seq.* Donovan named the following parties as defendants: the undersigned, the 17 members of the PSC, including Herman and Roy, Feinberg, Juneau (the Economic Settlement's administrator), and the Garretson Resolution Group, Inc. (the court-appointed administrator of the Medical Benefits Class Action Settlement).

The allegations in *Donovan II* bear striking similarity to those previously alleged in *Donovan I* and which appear in *Donovan III*, discussed below. For example, Donovan alleged that there was an "'Eight Step' fraudulent scheme to maximize judicial efficiency and/or maximize [defendants'] compensation in exchange for limiting the liability of BP." (Compl. at ¶ 4).

Allegedly because the United States decided not to intervene, on October 26, 2020, Donovan voluntarily dismissed *Donovan II* without prejudice by filing a notice of dismissal pursuant to Rule 41(a)(1)(A)(i) with the Florida court. (Rec. Doc. 26997-3).

## G. *Donovan III*

On November 5, 2020, a few days after voluntarily dismissing *Donovan II*, Donovan commenced another lawsuit in the Middle District of Florida ("*Donovan III*,"

---

[9] A copy of the complaint is attached to Herman and Roy's motion for sanctions. (Rec. Doc. 26997-2).

No. 21-237). Donovan sued the undersigned, Herman, Roy, Feinberg, and Juneau—all of whom were defendants in *Donovan II.* For Herman and Feinberg, *Donovan III* marked the third time Donovan had named them in a lawsuit. The claims contained in the 188-page complaint are based on the same basic factual allegations arising from or related to the oil spill, the GCCF, MDL 2179, and the Economic Settlement that appeared in *Donovan I* and *Donovan II,* both of which built upon the *Feinberg* Actions. Once again, Donovan claimed that the defendants engaged in "an 'Eight-Step' fraudulent scheme to maximize judicial efficiency and/or maximize their compensation in exchange for limiting the liability of BP," that MDL 2179 is unconstitutional, and that the Economic Settlement was a product of collusion that unreasonably and unfairly limited BP's liability. (Compl ¶ 4, ¶¶ 51, et seq., ¶¶ 251-270, No. 21-237, Rec. Doc. 1). Donovan pleads these claims under RICO, just as he did in *Donovan II.*

As with the *Feinberg* Actions and *Donovan I,* this case was transferred over Donovan's objection by the JPML to this Court and consolidated with MDL 2179. *Donovan III* was docketed in this Court on Feb. 8, 2021. (No. 21-237, Rec. Doc. 11). That same day, the Clerk of Court issued the customary pretrial orders that automatically issue in all cases consolidated with MDL 2179. (*See* Rec. Docs. 13 & 14 in No. 21-237). Otherwise, the Court took no action in *Donovan III.* Nine days later, on February 17, 2021, Donovan filed a notice of voluntary dismissal without prejudice under Rule 41(a)(1)(A)(i), just as he had done in *Donovan II.* (Rec. Doc. 26916).[10]

---

[10] Donovan asserts that one of the reasons he dismissed his case is because the undersigned did not recuse from *Donovan III*. However, Donovan never moved for recusal in this case, and the Court

**H.     Herman, Roy, and Juneau Move for Sanctions Against Donovan**

On March 18, 2021, Herman and Roy filed a motion for sanctions against Donovan. (Rec. 26997). Four days later, Juneau filed a similar motion that essentially adopts Herman and Roy's arguments. (Rec. Doc. 27003). Movers ask the Court to enjoin Donovan under the All Writs Act and its inherent authority from filing any more lawsuits arising from or in any way related to the oil spill or the claims process without pre-litigation approval from this Court. Invoking 28 U.S.C. § 1927 and the Court's inherent authority, movers also ask the Court to order Donovan to pay their attorneys' fees and costs incurred in defending against his lawsuits.

**I.     Donovan's Multiple Responses to the Motions for Sanctions**

Throughout this MDL, Donovan has made a habit of filing repetitious documents that often serve no other purpose than to repeat previous arguments (even after those arguments have been considered and rejected by the Court), circumvent page limits on briefing, or both. Donovan's filings in response to the motions for sanctions are a prime example of this behavior.

On March 31, 2021, the Court issued a scheduling order that required Donovan "to file a written response to both motions (limited to 25 pages, double-spaced)" by April 21. (Rec. Doc. 27017). On April 11, Donovan filed two responses, one to each motion. (Rec. Doc. 27035, 27036). The responses are essentially identical. Each consists of a 25-page brief and 549 pages of exhibits—for a grand total of 1,148

---

did not have an opportunity to consider whether to recuse *sua sponte* before Donovan voluntarily dismissed the action, including the claims against the undersigned.

pages.[11] One of the first arguments Donovan raises is that Movers engaged in what he calls "sewer service."

On April 20, Donovan filed a motion for leave to file what he called a "sur-reply," but, considering that the movers had not yet filed a reply, was actually a supplement to his opposition. (Rec. Doc. 27053). The proposed supplemental brief consisted of seven pages (plus eight pages of exhibits) and made the same "sewer service" argument pressed in the opposition briefs. The Court immediately denied this motion. (Rec. Doc. 27056). The next day, Donovan filed what he called a "Motion for Clarification." (Rec. Doc. 27057). Although this motion was not entirely duplicative of his previous filings, it too contained Donovan's "sewer service" argument. Six days later, on April 27, Donovan filed what he called a "Request for Oral Argument via Zoom," but which actually presented six more pages of his "sewer service" contentions. (Rec. Doc. 27068).

On April 27, the Court issued a 7-page Order & Reasons addressing Donovan's Motion for Clarification and specifically his "sewer service" argument. (Rec. Doc. 27070). The next day, Donovan filed a "Second Motion for Clarification" that raised the same "sewer service" arguments the Court had just rejected.  (Rec. Doc. 27074). That afternoon, the Court issued another Order & Reasons denying Donovan's "Second Motion for Clarification." (Rec. Doc. 27077). The Court further commented that "Donovan, who is an attorney, has made a habit of filing repetitious documents

---

[11] While this filing exceeded the page limits in the scheduling order, the Court accepted it because, due to a fault with the vendor responsible for serving the Court's orders in MDL 2179, Donovan had not yet received the scheduling order when he filed the oppositions. (*See* Rec. Doc. 27070 at 2).

in the record" and that it is not "uncommon for Donovan to include voluminous exhibits with his filings consisting of documents already in the Court's record." (*Id.* at 2-3). Noting that such practices are an abuse of procedure and waste the Court's and parties' time, the Court admonished Donovan and barred him from filing any other documents until the Court ruled on the pending motions for sanctions.

The Court heard arguments on the motions for sanctions on July 23, 2021. (Rec. Doc. 27178).

## II.   DISCUSSION

### A.   Jurisdiction

Although Donovan filed a Rule 41(a)(1)(A)(i) notice of dismissal with respect to *Donovan III* on February 17, 2021, that act does not deprive the Court of its inherent supervisory powers or prevent the Court from considering collateral issues, such as imposing sanctions for abuse of judicial process. *See Quershi v. United States*, 600 F.3d 523, 525-26 (5th Cir. 2010). Consequently, the Court has jurisdiction to hear Movers' motions for sanctions against Donovan.

### B.   Movers' Request for a Pre-Suit Injunction

Federal courts possess power under the All Writs Act, 28 U.S.C. § 1651,[12] to issue narrowly tailored orders enjoining repeatedly vexatious litigants from filing future actions in federal or state court without first obtaining permission from the court. *Newby v. Enron Corp.*, 302 F.3d 295, 301 (5th Cir. 2002). A court must consider

---

[12] The All Writs Act states, "(a) . . . [A]ll courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law. (b) An alternative writ or rule nisi may be issued by a justice or judge of a court which has jurisdiction." 28 U.S.C. § 1651.

the circumstances of the case, including four factors:

> (1) the party's history of litigation, in particular whether he has filed vexatious, harassing, or duplicative lawsuits;
> (2) whether the party had a good faith basis for pursuing the litigation, or simply intended to harass;
> (3) the extent of the burden on the courts and other parties resulting from the party's filings; and
> (4) the adequacy of alternative sanctions.

*In re Carroll*, 850 F.3d 811, 815 (5th Cir. 2017) (cleaned up).

In addition to the All Writs Act, the Court can enjoin future lawsuits as a sanction against abuse of the judicial process pursuant to its inherent authority. *Quershi*, 600 F.3d at 525-26. The Court must specifically find bad faith. *In re Carroll*, 850 F.3d 811, 815 (5th Cir. 2010). Also, the Court may only exercise this power "if essential to preserve the authority of the court and the sanction chosen must employ the least possible power adequate to the end proposed." *Id.* (cleaned up). "This power reaches both conduct before the court and that beyond the court's confines . . . ." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991).

The Court finds that an injunction against Donovan is warranted.

*Donovan III* is based on essentially the same conduct and asserts essentially the same claims as *Donovan I* and *Donovan II*, both of which contained and built upon the allegations in the *Feinberg* Actions. The JPML recognized as much in its order transferring *Donovan III* to this Court, stating, "[Donovan's] complaint, which spans more than 180 pages, contains very similar, often identical, allegations of misconduct as a previous action filed by [Donovan] that we transferred to MDL No. 2179." (JPML Transfer Order at 1, No. 21-00237, Rec. Doc. 10 (referring to *Donovan I*)). *Donovan I*

and the *Feinberg* Actions were dismissed on the defendants' Rule 12 motions and over Donovan's opposition. (Rec. Docs. 26425, 26571). Donovan has repeatedly criticized those rulings as "flawed" and "unfathomabl[e]." (*See, e.g.*, Donovan Opp'n to Mtn. for Sanctions at 6-7 & 10, Rec. Doc. 27035). Given the apparent conviction of his beliefs, one would expect that Donovan would have wasted no time appealing from those dismissals. Yet, he did not appeal.[13] Instead, Donovan repackaged his claims and arguments as a *qui tam* action in *Donovan II* and then as a civil RICO action in *Donovan III*, filed both in Florida, and then fought to keep *Donovan III* there even though the JPML had transferred, over his objection, his prior actions to this Court as "tag-alongs" to MDL 2179 (*see, e.g.*, Rec. Doc. 3716 (transferring *Pinellas Marine*, No. 11-1987); Rec. Doc. 24 in No. 19-12014 (transferring *Donovan I*).[14] *Donovan II* and *III* were blatant attempts to circumvent or collaterally attack the Court's prior rulings.[15]

Furthermore, throughout the life of this MDL Donovan has inundated the Court with wave after wave of motions that often do no more than repeat previous

---

[13] At oral argument the Court asked Donovan why he did not appeal. Donovan answered that his clients would not or could not pay for an appeal. While this might explain why no appeal was filed with respect to the *Feinberg* Actions, it does not explain why no appeal was taken in *Donovan I*, where Donovan himself was the plaintiff. The fact that Donovan filed *Donovan II* and *Donovan III* shows that a lack of finances did not prevent him from appealing *Donovan I*'s dismissal.

[14] Donovan preempted any attempt to transfer *Donovan II* by voluntarily dismissing that case while it was still under seal.

[15] The JPML thought so as well. (*See* JPML Transfer Order at 2, No. 21-232, Rec. Doc. 10 ("Donovan in his complaint also challenges various decisions of the transferee court, including the dismissal of plaintiff's prior action and the dismissal of three actions (on behalf of plaintiff's clients) against defendant Feinberg relating to the pre-MDL Gulf Coast Claims Facility. *Donovan [III]* thus constitutes a collateral challenge to the rulings of the transferee court.")).

arguments. By the Court's count, he has filed 25 motions in this MDL.[16] On top of this, it is not uncommon for Donovan to include hundreds of pages of attachments with his motions which consist primarily of documents that are already in the Court's record. These practices have wasted the Court's time and that of his opponents. Indeed, the Court has issued 17 orders in this MDL disposing of Donovan's motions,[17] including seven "Order & Reasons" where the Court took pains to explain its reasoning to Donovan.[18] Again, Donovan had the opportunity to appeal many of these rulings following the dismissal of the *Feinberg* Actions and *Donovan I*, but he did not.[19]

Particularly frustrating is the fact that neither Donovan nor any of his clients have standing to assert many of the arguments he raises. For example, one of Donovan's central arguments is that the Economic Settlement was unfair to class members and a massive benefit to BP. Putting aside the fact that (1) these arguments are wildly untimely and (2) the Settlement was upheld despite contentious appeals (most notably by BP), Donovan has never argued that he or any of his clients are class members, nor did he or his clients ever file a claim in the Economic Settlement. As

---

[16] Rec. Docs. 4574, 4575, 4782, 4798, 6186, 6831, 6902, 7473, 7882, 7884, 12708, 14614, 14615, 18613, 23677, 25908, 25927, 25985, 26330, 26344, 26395, 26454, 27053, 27057, 27074. *See also* Objection to CSSP Closure, Rec. Doc. 26383.

[17] Rec. Docs. 5870, 7615, 8138 at pp. 76 & 113-14, 24118, 25986, 26089, 26213, 26337, 26357, 26425, 26570, 26571, 26572, 26872, 27056, 27070, 27077.

[18] Rec. Docs. 8138 at pp. 76 & 113-14, 26089, 26213, 26425, 26571, 27070, 27077.

[19] The JPML has experienced Donovan's repetitious filings as well. As part of his effort to prevent *Donovan III* from being transferred to this Court, Donovan filed with the JPML (1) a motion to vacate, (2) a reply brief, (3) a "motion for clarification" (which was actually a sur-reply brief), and (4) an *ex parte* request for reconsideration. (JPML Dkt. No. 2179, Rec. Docs. 2020, 2032, 2034, 2037). The JPML rejected Donovan's third and fourth filings because they repeated arguments in Donovan's prior briefing. (JPML Transfer Order at 4, No. 21-237, Rec. Doc. 10).

the Court has said time and time again, plaintiffs outside the class "are entirely unaffected by the Settlement, and thus lack standing to challenge it." (Rec. Doc. 26425 at 6 (citing Dec. 21, 2012 Order, Rec. Doc. 8138)). Another example comes from Donovan's recurring argument that GCCF releases are invalid. Putting aside the fact that the Fifth Circuit has affirmed this Court's decision to enforce such releases, *In re Deepwater Horizon*, 761 F. App'x 311 (5th Cir. 2019) (unpublished), neither Donovan nor his clients ever executed a GCCF release. And this is not the first time the Court has pointed out Donovan's lack of standing. (*See* Rec. Doc. 26425 at 5-6). The fact that Donovan lacks standing to press his arguments makes every moment spent addressing them—whether by the parties, this Court, or any other judicial body—a colossal waste of time. To make matters worse, Donovan chooses to create such waste in a "gargantuan" MDL, *Mason*, 819 F.3d at 197, where judicial resources are already spread paper-thin.

It is also is telling that Donovan never sued BP. The fact that Donovan's clients submitted claims to the GCCF shows that they believed that the oil spill caused their losses for which BP owes compensation.[20] Donovan has repeatedly and correctly pointed out in his filings that OPA makes BP strictly liable for damages caused by the oil spill. And yet, when Donovan filed lawsuits on behalf of his clients, he did not sue the obvious defendant, BP. Similarly, while Donovan alleges that a grand conspiracy existed in which BP was both a primary participant and beneficiary, he

---

[20] *See also* JPML Transfer Order re Pinellas Marine, Rec. Doc. 3716 ("[I]t appears that adjudicating plaintiffs' claims [against Feinberg/GCCF] will necessarily require an inquiry into whether, and in what amount, plaintiffs were actually damaged by the oil spill.").

did not sue BP. Such behavior, combined with everything else discussed here, convinces the Court that Donovan's main purpose in bringing *Donovan I, II,* and *III,* if not also the *Feinberg* Actions, was to harass those unfortunate enough to draw his ire.

Donovan's decision to not sue BP is also troubling because of the unfortunate consequences it had for his clients, who no doubt trusted him to adequately represent their claims. Take Pinellas Marine. We know that the GCCF offered it $173,000 to fully resolve its oil spill claim. Pinellas Marine felt it was entitled to more and so rejected the GCCF's offer, as it had every right to do. If Donovan had filed Pinellas Marine's case against BP (as countless other plaintiffs did), then Pinellas Marine would have had at least a chance of recovering its alleged damages, given that countless others have successfully recovered from BP. When one considers that the GCCF offered Pinellas Marine $173,000, then it's not unreasonable to speculate that Pinellas Marine even had a ***good*** chance of recovering some amount from BP. However, by not suing BP, Donovan threw his clients' best hope of recovery out the proverbial window.

Further, *Donovan III* is not Donovan's first frivolous RICO action (setting aside *Donovan II*), nor is it the first time that he has been sanctioned for pursuing such a case. In 2003, in the case *Cabellos v. Great White Fleet (US) Ltd.*, 8:03-cv-138, (M.D. Fla.), Donovan represented plaintiffs and filed on their behalf RICO claims against the defendants, including former counsel for one of the defendant corporate entities.[21]

---

[21] A copy of the district court's opinion, the Eleventh Circuit's decision on appeal, and the district court's order on remand are attached to Herman and Roy's motion. (Rec. Doc. 26997-4, -5, -6).

Finding that the case was an attempt to circumvent the preclusive effect of prior litigation in Louisiana, the Middle District of Florida sanctioned Donovan and explained, in relevant part,

> Here, it appears the sanctions should be entirely against the attorney [Donovan] that brought the action. A client ordinarily would not know the pleading requirements necessary to support a RICO action. The attorney should. Any reasonable attorney, given these facts, would know not to bring a RICO action against opposing counsel. The bringing of such an action can only be the result of a bad heart or an empty head. Either is grounds for sanctions.

(Rec. Doc. 26997-4 at 21). The Eleventh Circuit affirmed that sanction after finding "no abuse of the district court's discretion in its decision to impose Rule 11 sanctions in light of the baseless nature of the claims asserted against" the former attorneys. (Rec. Doc. 26997-5 at 10). After remand, the district court ordered Donovan to pay approximately $20,000 in attorneys' fees to the attorneys he improperly sued. (Rec. Doc. 26997-6 at 1).

Finally, the Court notes that Rule 41's "two dismissal rule" appears to provide additional support for enjoining Donovan. Rule 41 states, "Unless the notice or stipulation states otherwise, the dismissal is without prejudice. But if the plaintiff previously dismissed any federal- or state-court action based on or including the same claim, a notice of dismissal operates as an adjudication on the merits." Fed. R. Civ. P. 41(a)(1)(B). Because Donovan previously used a notice of dismissal to voluntarily dismiss the claims in *Donovan II*, his notice of dismissal in *Donovan III* would appear to "operate[ ] as an adjudication on the merits" notwithstanding the fact that the notice states dismissal is "without prejudice." Accordingly, if Donovan attempted to

file another action "based on or including the same claim" in *Donovan II* or *Donovan III*, that action would almost certainly be barred by the "two dismissal rule." *See Cabot Golf CL-PP 1, LLC v. Nixon Peabody, LLP*, 575 F. App'x 216, 218 (5th Cir. 2014) (unpublished); *Theard v. Dep't of Civ. Serv., La.*, 2012 WL 6161944, at *10 (E.D. La. Dec. 11, 2012) ("Furthermore, Theard does not seek to file her claim against LSBN for a third time, which would traditionally implicate the two dismissal rule if the first two dismissals were pursuant to Rule 41(a)(1).").

Returning to the factors for an injunction under the All Writs Act, Donovan's conduct in this MDL and his filing of the *Feinberg* Actions, *Donovan I, Donovan II,* and *Donovan III* clearly demonstrate a history of filing vexatious, harassing, and duplicative lawsuits. The Court finds that Donovan did not have a good faith basis to file *Donovan I, II,* or *III*—they were merely filed to avoid the Court's prior rulings and to harass. Donovan's repetitive filings have placed a great and wholly unnecessary burden on this Court and on the parties. The Court further finds that alternative sanctions—while also warranted—are inadequate to deter Donovan from filing another lawsuit. The fact that he attempted to voluntarily dismiss *Donovan III* with***out*** prejudice, taken together with his history of filings, indicates that he may file yet another baseless lawsuit. The Court's disciplinary referral on November 8, 2019 was plainly not enough to deter Donovan from filing *Donovan II* or *III*, nor was the past sanction in *Cabellos*. The Court therefore concludes that a pre-suit injunction is warranted under the All Writs Act. *See In re Carroll*, 850 F.3d at 816 ("Appellants' suggestion that their conduct was not done in bad faith is belied by their repeated

attempts to litigate issues that have been conclusively resolved against them or that they had no standing to assert and by their unsupported and multiple attempts to remove Abide as the trustee.").

The Court also finds, for essentially the same reasons, that an injunction is proper under the Court's inherent authority. The Court specifically finds that Donovan acted in bad faith when he filed *Donovan I*, *II*, and *III*. Donovan filed these lawsuits in an effort to harass the defendants and as an attempt to avoid the Court's prior rulings. He has willfully abused the judicial process.

## C.   Movers' Request for Attorney's Fees and Costs

The Court is empowered under 28 U.S.C. § 1927 to shift reasonable fees, costs, and expenses to "any attorney who so multiplies the proceedings in any case unreasonably and vexatiously." *Procter & Gamble Co. v. Amway Corp.*, 280 F.3d 519, 525 (5th Cir. 2002) (cleaned up).[22] While Donovan is a plaintiff, he is also a licensed attorney. Therefore, this statue can be applied to him.

To sanction Donovan under § 1927, the Court must find:

> that the sanctioned attorney multiplied the proceedings both unreasonably and vexatiously. This requires evidence of bad faith, improper motive, or reckless disregard of the duty owed to the court. Section 1927 only authorizes shifting fees that are associated with the persistent prosecution of a meritless claim. The courts often use repeated filings despite warnings from the court, or other proof of excessive litigiousness, to support imposing sanctions. To prevent the courts from dampening the legitimate zeal of an attorney in representing her client, we have interpreted § 1927 as penal and construed it in favor of the sanctioned party.

---

[22] 28 U.S.C. § 1927 states, "Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."

> The district court must make detailed factual findings when imposing large sanctions in a complex case with an extensive record. The court must (1) identify sanctionable conduct and distinguish it from the reasons for deciding the case on the merits, (2) link the sanctionable conduct to the size of the sanctions, and (3) differentiate between sanctions awarded under different statutes.

*Id.* at 525-26 (cleaned up). The evidence must be "clear and convincing" in order to shift all costs of defense associated with an action. *Morrison v. Walker*, 939 F.3d 633, 637 n.13 (5th Cir. 2019). However, if the sanction shifts only part of the defense cost, then the standard is preponderance of the evidence. *Id.*

The Court may also impose attorneys fees as a sanction under its inherent authority. *See Chambers*, 501 U.S. at 50; *In re Carroll*, 850 F.3d at 816. The standard has already been discussed. *Supra* Part II(B).

The same reasons that support an injunction against Donovan also justify an attorney fee award under § 1927 and the Court's inherent authority.

MDL 2179 has been an "epic" litigation of "gargantuan size and extraordinary complexity." *Mason*, 819 F.3d at 197. Managing these cases has required much of this Court,[23] and the Court has likewise required much of the PSC attorneys, claims administrators, mediators, special masters, and others the Court has appointed along the way.[24] After eleven years, and with a master docket straining to contain its 27,000+ entries, that work is finally nearing conclusion.

---

[23] *See, e.g.*, *In re Deepwater* Horizon, 922 F.3d 660, 664 (5th Cir. 2019) (referring to this Court's efforts as "herculean").

[24] To get a feel for the amount and type of work that the PSC and other common benefit attorneys performed in the MDL, the Court directs the reader to the Order & Reasons of October 25, 2016 (Rec. Doc. 21849), which devotes 27 pages to this topic.

25

Meanwhile, Brian Donovan has waged a campaign of abuse of the legal system by filing duplicative lawsuits, repetitive motions, and redundant arguments, all of which have diverted the precious attention, time, and resources of this Court and those who practice before it. His allegations and claims were and remain unwarranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law. His latest flurry of duplicative arguments and incessant requests for clarification proves that he will not stop on his own. Donovan's senseless conduct has delayed this Court's work on the MDL and caused needless expense to the Movers. At the hearing on these motions, Donovan expressed no remorse and offered no apologies for his actions. (Hr'g Transcript at 34-35).

The record before the Court establishes, clearly and convincingly, that Donovan has litigated in bad faith, with improper motive, and with reckless disregard of the duty he owes the Court. Through his repetitive motions and lawsuits, Donovan has unreasonably and vexatiously multiplied the proceedings in this MDL. Donovan, an attorney, should never have instituted *Donovan I*, much less *Donovan II* or *Donovan III*. No party should have had to respond to any of these suits, and no court should have had to entertain them. Donovan has weaponized civil litigation to harass those with whom he disagrees. His behavior has been a constant drain on judicial resources. The waste Donovan creates is shameful and appalling.

Accordingly, the Court will sanction Donovan by requiring him to pay the attorneys' fees and costs that Movers reasonably incurred as a result of defending

against *Donovan I, Donovan II,* and *Donovan III.*

**D.    Additional Sanctions**

At the hearing on these motions, the Court contemplated imposing an additional sanction in the form of a fine paid to the Court. The Court has decided not to go forward with this sanction.

However, the Court will require Donovan to provide a copy of this decision to the clients he represented in the *Feinberg* Actions, and then supply the Court with proof of service. *See Hartz v. Admins. of Tulane Educ. Fund.*, 275 F. App'x 281, 290 (5th Cir. 2008) (unpublished) (taking similar action when an attorney acted with cavalier disregard for his client's interest and for his obligation to the court).

Donovan has a website, ChinAmerica Legal Advisors, where he recently posted four essays he authored entitled "Mob Bosses in Black Robes." These writings repeat the allegations and arguments that Donovan has made during this MDL. Moreover, he expands his rhetoric to all MDLs, accusing the JPML of running an illegal "protection racket" and calling transferee judges "mob bosses." The Court will also require Donovan to conspicuously post this decision on his website, as well as on any other websites or blogs that Donovan owns, operates, or maintains.

### III.    CONCLUSION

For the reasons set forth above,

IT IS ORDERED that Herman, Roy, and Juneau's Motions for Sanctions (Rec. Docs. 26999; 27003) are GRANTED.

IT IS FURTHER ORDERED that Brian J. Donovan or anyone acting on his

behalf is ENJOINED from filing any lawsuit in state or federal court against Stephen J. Herman, James P. Roy, Patrick A. Juneau, or any other person or entity concerning or in any way related to the DEEPWATER HORIZON/Macondo Well casualty and oil spill that began on or around April 20, 2010 in the Gulf of Mexico or any of the claims processes arising from that incident, without first receiving express approval from this Court.

IT IS FURTHER ORDERED that Brian J. Donovan shall pay to Stephen J. Herman, James P. Roy, and Patrick A. Juneau the attorneys' fees and costs each reasonably incurred as a result of defending against *Donovan I, Donovan II,* and *Donovan III.* Herman, Roy, and Juneau shall file motions regarding the amount of these fees and costs by no later than August 13, 2021. Donovan may file a response within 14 days of the date each motion is filed.

IT IS FURTHER ORDERED that Brian J. Donovan shall immediately provide a copy of this decision to the clients he represented in the *Feinberg* Actions (Nos. 11-01987, 11-02533, 13-06014), and then supply the Court with proof of service within 14 days of the date this decision is entered in the MDL master docket.

IT IS FURTHER ORDERED that Brian J. Donovan shall immediately and conspicuously post this decision to his ChinAmerica Legal Advisors website and to any other websites or blogs that Donovan owns, operates, or maintains.

New Orleans, Louisiana, this 2nd day of August, 2021.

_____
Carl J. Barbier, District Judge

28