UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * | MDL 2179 |
| | * | SECTION: J(2) |
| Applies to: *No. 16-06585, Global Disaster Recovery & Rebuilding Servs., LLC v. BP Expl. & Prod., Inc., et al.* | * | JUDGE BARBIER |
| | * | MAG. JUDGE CURRAULT |

ORDER & REASONS

Before the Court is BP's Motion for Summary Judgment against the claims of

Global Disaster Recovery & Rebuilding Services, LLC ("Global Disaster") (Rec. Doc.

27050), as well as Global Disaster's response (Rec. Doc. 27100) and BP's reply (Rec.

Doc. 27113). Having considered the parties' arguments, the record, and the applicable

law, the Court grants summary judgment in favor of BP for the reasons set forth

below.

I.    BACKGROUND

Plaintiff, Global Disaster, is a one-employee disaster recovery services provider

owned by Billy Burkette. Prior to the oil spill, Global Disaster entered into a contract

with Airware, LLC ("Airware") pursuant to which Global Disaster would crush

concrete that Airware owned (" the Airware Contract"). Allegedly as a result of the

oil spill, Airware could not pay Global Disaster for its concrete-crushing services. To

resolve the dispute arising from this breach, Airware agreed to transfer ownership of

the concrete to Global Disaster. Global Disaster claims that BP is liable to it for the

$14 million it would have earned under the Airware Contract had Airware fully

performed.

After the Airware Contract fell apart, a company named Robins Seafood allegedly verbally agreed to purchase 1.5 million cubic yards of crushed concrete from Global Disaster, provided certain government approvals were first obtained ("Robins Seafood Contract"). Global Disaster claims that it lost this contract because the U.S. Coast Guard, under BP's control, took over the Port of St. Bernard, which is where the concrete was stored. Global Disaster contends that BP is liable to it for the $67.5 million it would have earned under the Robins Seafood Contract.

Apart from the concrete contracts, Global Disaster also alleges that it secured the exclusive right to distribute Aqua N-Cap, a polymer sediment filtration technology used to remediate and clean up oil spills on water or solid surfaces, through an oral understanding with Aqua N-Cap's manufacturer, Remediation Technologies & Applications Systems ("RTASCo"). Pursuant to this agreement, RTASCo would pay Global Disaster a commission of $2.50 for each pound of Aqua N-Cap sold to BP. However, the agreement with RTASCo was "contingent on [Global Disaster] securing a purchase order from BP." (Pl.'s Stmt. of Facts ¶ 26, Rec. Doc. 27100-1). Global Disaster engaged in negotiations with BP concerning the use of Aqua N-Cap to clean up the spill, but BP elected to use another product. Global Disaster claims that BP owes it the commission it would have received from RTASCo if BP had purchased Aqua N-Cap, which it calculates to be $10 million. (Pl.'s Opp'n Br. at 14, Rec. Doc. 27100-6). While not entirely clear, Global Disaster may also seek other, unspecified "damages relating to its alleged efforts to procure" Aqua N-Cap. (Pl.'s Stmt. of Facts ¶ 22, Rec. Doc. 27100-1*Id.* ¶ 22).

Finally, Global Disaster allegedly engaged in oral discussions with

unidentified BP personnel to procure other unspecified goods and services. Although BP specified that any order would be issued in writing, Global Disaster allegedly expended time and resources attempting to locate goods and services for BP. Global Disaster complains that BP ultimately procured these goods and services from other contractors or directly from manufacturers. Global Disaster asserts that it is owed 20% of the cost of goods and services BP procured through other sources. This amount is based on "Burkette's understanding . . . that BP had a preset contract rate of 20% as a profit margin on top of the costs of goods and services for procurement services." (*Id.* ¶ 37).

Global Disaster opted out of the *Deepwater Horizon* Economic and Property Damages Settlement and then filed a lawsuit against BP. (Compl., No. 16-6585 & Exhibits, Rec. Docs. 1, 1-5). Global Disaster has proceeded through Pretrial Orders 60, 65, 67, and 69. BP now moves for summary judgment against Global Disaster's claims.

## II.    LEGAL STANDARD

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). When assessing whether a dispute as to any material fact exists, a court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398 (5th

Cir. 2008). All reasonable inferences are drawn in favor of the nonmoving party, but a party cannot defeat summary judgment with conclusory allegations or unsubstantiated assertions. *Little*, 37 F.3d at 1075. A court ultimately must be satisfied that "a reasonable jury could not return a verdict for the nonmoving party." *Delta*, 530 F.3d at 399.

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial." *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264-65 (5th Cir. 1991) (internal citations omitted). The nonmoving party can then defeat the motion by either countering with sufficient evidence of its own, or "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *Id.* at 1265.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See id.* at 324. The nonmovant may not rest upon the pleadings but must identify specific facts that establish a genuine issue for trial. *See, e.g., id.* at 325; *Little*, 37 F.3d at 1075.

## III.   DISCUSSION

### A.   Airware Contract

Global Disaster claims that BP is liable to it under the Oil Pollution Act of 1990 ("OPA") for the loss of its contract with Airware to crush concrete. OPA makes a responsible party—here, BP—strictly liable for certain damages that result from an oil spill. 33 U.S.C. § 2702; *In re Settoon Towing, L.L.C.*, 859 F.3d 340, 344 (5th Cir. 2017). This includes "[d]amages equal to loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources." 33 U.S.C. § 2702(b)(2)(E).

BP is entitled to summary judgment against this claim for two reasons. First, Global Disaster provides no admissible evidence that Airware was unable to fulfill its obligation because of the oil spill. Global Disaster relies solely on Burkette's deposition where he testified that "the story that was told to me, which I cannot confirm nor deny[,] . . . by Terry Williams [Airware's president] . . . is that BP basically impacted [Airware's] business to where he was unable to cover his cost by this contractual agreement." (2/2/21 Burkette Depo. at 49:4-10, Rec. Doc. 27100-7). Airware's president's statements to Burkette are inadmissible hearsay, and Global Disaster does not argue that this evidence could be presented in an admissible form. *See* Fed. R. Civ. P. 56(c)(2).[1] Thus, Global Disaster has failed to submit evidence sufficient for this claim to survive summary judgment.

---

[1] Burkette's statement that he "cannot confirm nor deny" what he was allegedly told suggests that this evidence in fact cannot be presented in a form that would be admissible at trial. Furthermore, putting aside the issue of admissibility, it is not clear what is meant by "BP basically impacted [Airware's] business." BP could negatively impact a business in all sorts of ways that may have nothing to do with the oil spill. The statement is so vague that it alone cannot establish causation under OPA.

Second, Global Disaster admits that Airware resolved its contractual breach by deeding the concrete to Global Disaster. (Pl.'s Stmt. of Material Facts ¶ 16, Rec. Doc. 27100-1). Global Disaster alleges that the contract to crush the concrete for Airware was worth $14 million. Global Disaster also alleges that its subsequent contract with Robins Seafood to crush the concrete received from Airware was worth $67.5 million. Based on these values, Global Disaster's allegations make clear that it was made more than whole by Airware.

**B.     Robins Seafood Contract**

Global Disaster's second claim under OPA arises from the alleged loss of its $67.5 million contract with Robins Seafood to crush concrete.[2] This claim also fails for two reasons. First, Global Disaster cannot prove that the Robins Seafood Contract existed. Louisiana law[3] requires that any contract valued at $500 or more be proved by at least one witness and other corroborating evidence. La. Civ. Code art. 1846. Although a plaintiff may serve as his own witness, the corroborating evidence must come from another source. *Hodson v. Daron Cavaness Builder, Inc.*, 2017-1235 (La. App. 1 Cir. 2/27/18), 243 So. 3d 597, 600. The Robins Seafood Contract was not in writing, and Global Disaster has provided no other corroborating evidence that it existed. Accordingly, this claim cannot survive summary judgment.

Second, Global Disaster admits that this alleged contract was conditioned upon Burkette convincing the State of Louisiana to approve the use of the crushed concrete.

---

[2] It appears that some portion of the $67.5 million allegedly owed under this contract would have gone to a separate entity owned by Burkette. This is irrelevant for present purposes.

[3] BP argues, and Global Disaster does not dispute, that Louisiana law governs this issue. The Court therefore assumes that it does.

(2/2/21 Burkette Depo. at 50:9-12, Rec. Doc. 27100-7). However, there is no evidence that this approval was ever obtained. Courts generally reject allegations of lost profit as too speculative where the profits were contingent on obtaining government approval. *See, e.g.*, *Peaker Energy Grp., LLC v. Cargill, Inc.*, No. 14-2106, 2016 WL 7491851, at *1 (E.D. La. Dec. 30, 2016), *aff'd*, 706 F. App'x 191 (5th Cir. 2017) (declining to award lost profits, in part, because plaintiff had yet to secure government permits); *Alphamed Pharm. Corp. v. Arriva Pharm., Inc.*, 432 F. Supp. 2d 1319, 1344-45, -49 (S.D. Fla. 2006), *aff'd*, 294 F. App'x 501 (11th Cir. 2008) (denying lost profits where FDA approval had not been obtained to market a new product). Therefore, the Court finds that Global Disaster may not recover for this claim because it was contingent upon government approval that was not obtained.

### C.     Procurement of Aqua N-Cap

Global Disaster asserts that RTASCo orally agreed to grant it the exclusive right to distribute RTASCo's product, Aqua N-Cap, which could be used to clean up the oil spill. Global Disaster further asserts that someone with BP orally communicated to Burkette that BP intended to buy 4 million pounds of Aqua N-Cap, although Burkette cannot remember who told him this. (Pl.'s Stmt. of Facts ¶¶ 31, 28, Rec. Doc. 27100-1). Global Disaster claims that, pursuant to the agreement with RTASCo, Global Disaster would have received commissions totaling $10 million if BP purchased Aqua N-Cap.

This claim suffers from multiple defects. Crucially, the oral agreement with RTASCo was, as Global Disaster admits, "contingent on securing a purchase order from BP." (Pl.'s Stmt. of Facts ¶ 26, Rec. Doc. 27100-1). No purchase order was ever

secured. Global Disaster similarly admits that "the parties never negotiated or agreed upon a price and that BP personnel informed Mr. Burkette that any commitment to purchase Aqua N-Cap was contingent upon a determination by BP that locations to which Aqua N-Cap would be delivered had the need for the product, capacity to take delivery, and adequate equipment to deploy the product." (Pl.'s Stmt. of Fact ¶ 28, Rec. Doc. 27100-1) (cleaned up). In fact, Burkette testified that Jacqueline Michel, who worked for BP, told Burkette that BP would not purchase Aqua N-Cap. (*Id.* at ¶ 34). Consequently, RTASCo plainly did not owe Global Disaster any commission, meaning that BP is in no way liable for this amount either.

Global Disaster also "seeks damages relating to its alleged efforts to procure" Aqua N-Cap. (*Id.* ¶ 22). To the extent the damages Global Disaster refers to are something other than the commissions just discussed, Global Disaster does not describe what those damages are.

Global Disaster attempts to couch this claim as one for fraudulent concealment, but the Court fails to understand how that makes it viable. Global Disaster argues that the reason BP did not want to use Aqua N-Cap is because that product would reveal how much oil had discharged. However, the fact remains that BP neither purchased nor agreed to purchase any amount of Aqua N-Cap. Global Disaster cites no case that permitted a plaintiff to recover under circumstances similar to those presented here.

### D.   Procurement of Other Goods and Services

Global Disaster asserts it is entitled to a commission of 20% of the cost of goods and services BP ultimately procured from other sources. However, there is no

evidence that BP ever agreed to pay Global Disaster a 20% commission. Moreover, Global Disaster has not identified what goods or services BP purportedly agreed to procure through Global Disaster, what BP wrongfully procured through other sources, the quantities of those goods or services, or the costs of those goods or services. This claim does not get off the ground.

## IV.   CONCLUSION

Accordingly,

**IT IS ORDERED** that BP's Motion for Summary Judgment (Rec. Doc. 27050) against Global Disaster is **GRANTED**.

**IT IS FURTHER ORDERED** that Global Disaster's claims against BP in member case no. 16-06585 are hereby **DISMISSED** with prejudice.

New Orleans, Louisiana, this 5th day of August, 2021.

Carl J. Barbier
United States District Judge

**Note to Clerk: File in 10-md-2179 and 16-06585.**