UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * | MDL 2179 |
| | * | SECTION: J(2) |
| | * | JUDGE BARBIER |
| Applies to: No. 13-01286, *Gulf Marine Institute of Technology and BioMarine Technologies, Inc. v. BP America Prod. Co., et al.* | * | MAG. JUDGE CURRAULT |
| | * | |

## ORDER & REASONS

Before the Court is BP's Motion for Summary Judgment against the claims by Gulf Marine Institute of Technology ("Gulf Marine") and BioMarine Technologies, Inc. ("BioMarine") (together, "Plaintiffs") in the referenced member case. (Rec. Doc. 27078).[1] After considering the parties' arguments, the record, and the applicable law, the Court grants summary judgment for the reasons set forth below.

### I.

The Court assumes the reader's familiarity MDL 2179 and the DEEPWATER HORIZON/Macondo Well oil spill. Below the Court summarizes the basic facts pertinent to Plaintiffs' claims. Some additional details are discussed later in this opinion.

John Ericsson founded BioMarine and Gulf Marine in 1989 and 1995, respectively, with the intention of establishing a commercial aquaculture business (fish farming) in the Gulf of Mexico. Following an unsuccessful attempt to open an aquaculture operation in Texas state waters that ended in 2008, Plaintiffs turned

---

[1] Related briefing: Pls.' Opp'n, Rec. Doc. 27130; BP's Reply, Rec. Doc. 27146; Pls.' Sur-Reply, Rec. Doc. 27193.

their focus to opening an aquaculture facility at a 27.5 acre site located in federal waters off the coast of the Florida-Alabama state line ("the FlorAbama Project"). Plaintiffs took some steps toward opening the FlorAbama Project before the oil spill began in April 2010. For example, Plaintiffs obtained permits from the Environmental Protection Agency ("EPA") and the U.S. Army Corps of Engineers ("ACOE")[2] and acquired four vessels, sea farming cages, and other equipment. Plaintiffs also attempted to raise the millions of dollars of capital they needed to open the FlorAbama Project by working with three financial firms. These fundraising efforts stopped in early 2009 allegedly due to the Great Recession. Plaintiffs have never raised any financing through these firms. The record reflects that Plaintiffs had a total of $16,195 in cash on hand at the start of 2010.

Plaintiffs never opened the FlorAbama Project. They allege that the DEEPWATER HORIZON/Macondo Well oil spill destroyed their plans for an aquaculture facility at the FlorAbama site. Plaintiffs allege that the planned location for the FlorAbama Project was contaminated by oil, that potential investors lost interest, and Plaintiffs "could not in good conscience ask investors for money to begin a fish farm in the oil-polluted Gulf of Mexico." (Pls.' Opp'n at 10, Rec. Doc. 27130). They assert that "after the financial crisis subsided, investment interest would have most likely resumed and, but for the Spill, [BioMarine] would have most likely raised

---

[2] The EPA permit authorized Plaintiffs to discharge certain levels of pollutants at the FlorAbama site. The ACOE permit authorized Plaintiffs to build 48 production cages and 8 nursery cages at the FlorAbama site. Plaintiffs also applied three times (most recently in 2008) for an Exempted Fishing Permit from the National Oceanic and Atmospheric Administration ("NOAA"), but were rejected each time. Plaintiffs now contend that they never needed a permit from NOAA, because the Fifth Circuit ruled in 2020 that NOAA does not have authority under the Magnuson-Stevens Act to regulate aquaculture. *See Gulf Fishermens Assoc. v. Nat'l Marine Fisheries Serv.*, 968 F.3d 454 (5th Cir. 2020). BP disagrees. As explained below, the Court need not answer this question.

the capital sought to launch the FlorAbama Project." (*Id.* at 6).

Plaintiffs filed a complaint against BP and several of its contractors under the Oil Pollution Act of 1990 ("OPA"), general maritime law, and Florida law. (No. 13-1286, Rec. Doc. 1). Plaintiffs claim that the oil spill caused them over $100 million in lost profits, impaired earning capacity, and diminished value to personal property. (Pls.' Opp'n at 21).

## II.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## III.

The Court finds that BP is entitled to summary judgment against Plaintiffs' OPA claim because there is no genuine dispute that Plaintiffs cannot establish two essential elements of their claims: causation and damages.

As a "responsible party" under OPA, BP is strictly liable for certain damages that result from an oil spill. 33 U.S.C. § 2702(a). These include "[d]amages equal to the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources." *Id.* § 2702(b)(2)(E). The claimant need not own, lease, or have any sort of proprietary interest in the property or natural resources in order to recover these damages. *In re Settoon Towing, L.L.C.*, 859 F.3d 340, 344 (5th Cir. 2017). This Court has previously declined in this MDL to decide what causation standard applies under OPA—proximate, "but for," or something in between. *See, e.g.*, *In re Oil Spill by the Oil Rig "Deepwater Horizon,"*

3

168 F. Supp. 3d 908, 918 (E.D. La. 2016). It does not decide that issue here, because Plaintiffs' claims would not succeed under even the most generous standard (but for).

Without getting too bogged down in statutory language, and assuming a "but for" standard applies, Plaintiffs need to show that, but for the oil spill, the FlorAbama fish farm would have opened and operated at a profit. Two undisputed facts prevent Plaintiffs from meeting this standard.

First, the record before the Court reflects that no commercial aquaculture facility has ever operated in federal waters in the Gulf of Mexico. Obviously, the oil spill did not prevent this activity before April 20, 2010. One may wonder, then, what did prevent aquaculture in the Gulf before 2010, and why has it never occurred in the eleven years since? It is not necessary to answer these questions, because the critical, undisputed fact is that no commercial aquaculture has ever commenced in federal Gulf waters.[3]

Second, Plaintiffs had nowhere near the funding they needed to commence operations. In 2008, BioMarine developed business plans for investors that estimated the two-year investment costs for the FlorAbama Project to be $24.5 million. While

---

[3] For what it's worth, though, the overarching reason seems to be the legal uncertainty surrounding aquaculture. *See, e.g.*, Harold F. Upton, Cong. Research Serv., R45952, *U.S. Offshore Aquaculture Regulation & Development*, Summary (2019) ("Regulatory uncertainty has been identified as one of the main barriers to offshore aquaculture development in the United States. Many industry observers have emphasized that congressional action may be necessary to provide statutory authority to develop aquaculture in offshore areas."); Edwin C. Kisiel III, *A Southern California Surfer's Perspective on Marine Spatial Planning*, 31 VILL. ENVTL. L.J. 225, 261-62 (2020) ("Until the legal status of aquaculture is settled or Congress issues clear statutory guidance, the ability to implement aquaculture within a Coastal and Marine Spatial Planning scheme in federal waters is limited."); Eric Laschever, et al., *U.S. Aquaculture's Promise: Policy Pronouncements & Litigation Problems*, 50 Envtl. L. Rep. 10826, 10839 (2020) ("While it is unclear whether it is possible to build a functional relationship with those on different sides of U.S. aquaculture policy, the current path clearly leads to protracted litigation, with its costs and uncertainty for all the parties.").

Plaintiffs do not disavow this number, they contend that they only needed around $5 million to start operating. Nevertheless, the undisputed evidence in the record shows that Plaintiffs had only $16,195 in cash on hand at the beginning of 2010, far short of what Plaintiffs claim they needed. Plaintiffs rely on a sworn statement from the president of one of the financial firms that had attempted to find investors in 2008. While he states that 12 investors had expressed interest and further claims that, but for the oil spill, Plaintiffs would have raised the necessary funds over the course of 2010 and 2011, the fact remains that no one knows when Plaintiffs would have raised the additional capital, how much they would raise, or from whom. Underscoring this point is the fact that Gulf Marine briefly resumed fundraising efforts in 2016 (six years after the oil spill) through an internet crowdfunding website, but only managed to raise $1,000 before ending that campaign.

In summary, no commercial aquaculture has ever commenced in federal waters in the Gulf of Mexico, Plaintiffs never had the capital needed to commence operations, and Plaintiffs did not know where any investments would come from. Nothing in the record could support a reasonable finding that, but for the oil spill, Plaintiffs would have successfully launched the first commercial aquaculture operation in the Gulf of Mexico in history.

BP is also entitled to summary judgment because Plaintiffs cannot establish damages with reasonable certainty. OPA compensates "loss of profits or impairment of earning capacity." 33 U.S.C. § 2702(b)(2)(E).

> The recovery of lost profits does not require that the claimant's loss be "susceptible to exact calculation." *Great Pines Water Co., Inc. v. Liqui-Box Corp.*, 203 F.3d 920, 922 (5th Cir. 2000); *accord Coffel v. Stryker*

>*Corp.*, 284 F.3d 625, 638 (5th Cir. 2002). Nonetheless, the amount of a party's loss must be shown by competent evidence with "reasonable certainty" and must not be based on evidence that is "speculative, uncertain, contingent, or hypothetical." *Blase Indus. Corp. v. Anorad Corp.*, 442 F.3d 235, 238 (5th Cir.), *cert. denied*, 549 U.S. 817 (2006); *see also McBeth v. Carpenter*, 565 F.3d 171, 176-77 (5th Cir. 2009); *Great Pines Water Co., Inc.*, 203 F.3d at 922. In short, the "plaintiff must do more than demonstrate that some lost profits were suffered." *Coffel*, 284 F.3d at 238.

*Union Oil Co. of Cal. v. Buffalo Marine Serv., Inc.*, No. 10-195, 2012 WL 1303455, at *9 (E.D. Tex. June 29, 2012). Plaintiffs point out that '[t]he fact that the business in question does not have a profit history is not dispositive, but the estimates must be based on objective facts, figures, or data from which the amount of lost profits can be ascertained." *Thompson & Wallace of Memphis, Inc. v. Falconwood Corp.*, 100 F.3d 429, 435 (5th Cir. 1996) (applying Texas law) (cleaned up). At the same time, the "mere hope of success of an untried enterprise, even when that hope is realistic, is not enough for recovery of lost profits." *Al-Saud v. Youtoo Media*, 754 F. App'x 246, 255 (5th Cir. 2018) (cleaned up; applying Texas law) (unpublished).

Here, Plaintiffs' business was never operational. They had no operations, no sales contracts, and no known operating costs. Their business would have been the first of its kind in the Gulf of Mexico, meaning there are no comparable businesses to look to and therefore countless unknowns. It is impermissibly speculative to predict that the FlorAbama Project could have ever launched, but even putting this aside, a fact-finder could only guess as to how it would have fared over time. Indeed, a private placement memorandum ("PPM") created in 2008 warned potential investors of various risks, including "our ability to control costs associated with the production and commercialization of BioMarine's finfish product candidates;" "the market

6

acceptance of BioMarine's finfish product candidates;" "our ability to enter into agreements for the distribution of BioMarine's finfish product candidates on acceptable terms;" "developments with respect to state and federal regulatory matters;" "our ability to attract key personnel to assist in the development, production, sales and marketing of BioMarine's products;" "on-going adverse economic conditions, economic uncertainties, recent and possible future terrorist activities and other geopolitical instability;" "on-going climate and weather uncertainties, including, but not limited to, hurricanes, and other geological instability;" "bacterial, viral and other infections and contaminations or other health related to the hatchery and farming of the fish products;" and "a contraction of the market for farmed fish." (Rec. Doc. 27078-27 at 15). The PPM further states that "[r]evenue and income potential of BioMarine's business is unproven. As a young company operating in an unproven market, we face risks and uncertainties relating to our ability to implement out business plan successfully." (*Id.* at 16). Thus, "[t]he Shares offered hereby are highly speculative, involve a high degree of risk and immediate dilution, and should be purchased only by persons who can afford the loss of their entire investment." (*Id.* at 4).

Accordingly, there is no genuine dispute that Plaintiffs cannot prove their damages with reasonable certainty.

## IV.

Plaintiffs appear to also assert claims under OPA § 2702(b)(2)(***B***), which allows recovery for "[d]amages for injury to, or economic losses resulting from destruction of, real or personal property, which shall be recoverable by a claimant who owns or leases

7

that property." Unlike § 2702(b)(2)(*E*) discussed above, subsection (B) has been interpreted to require ***physical*** injury to the plaintiff's property by oiling. *See In re: Oil Spill by the Oil Rig "Deepwater Horizon,"* 902 F. Supp. 2d 808, 816-17 (E.D. La. 2012). None of Plaintiff's property has been oiled.

Plaintiffs assert claims under general maritime law. The reasons expressed in Part III, *supra*, also bar these claims. Additionally, Plaintiffs stated in their PTO 64 Sworn Statements Regarding General Maritime Law Claims that they did not hold a proprietary interest in oiled property nor were they commercial fishermen (No. 13-1286, Rec. Docs. 9 & 10), meaning they cannot pursue a pure economic loss tort claim under general maritime law. *See In re Oil Spill by the Oil Rig "Deepwater Horizon,"* 808 F. Supp. 2d 943, 958 (E.D. La. 2011). Furthermore, these claims would appear to be displaced by OPA. *See In re Oil Spill by the Oil Rig "Deepwater Horizon,"* 496 F. Supp. 3d 989, 989-99 (E.D. La. 2020).

Finally, to the extent Plaintiffs are pursuing their claims under state law, the reasons expressed in Part III, *supra*, also bar those claims. Furthermore, such claims are preempted. *In re Deepwater Horizon*, 808 F. Supp. 2d 943, 957-58 (E.D. La. 2011).

## V.

For the reasons set forth above,

**IT IS ORDERED** that BP's Motion for Summary Judgment (Rec. Doc. 27078) is **GRANTED**, and Plaintiffs' claims against BP are **DISMISSED WITH PREJUDICE.**

Furthermore, because the reasoning discussed above also bars Plaintiffs' claims against the other defendants in this member case,

**IT IS FURTHER ORDERED** that Plaintiffs' claims against all defendants in the referenced matter are **DISMISSED WITH PREJUDICE.**

Judgment will be entered accordingly.

New Orleans, Louisiana, this 13th day of August, 2021.

_____
Carl J. Barbier
United States District Judge

**Note to Clerk: Enter in 10-md-2179 and 13-01286.**