UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * | MDL 2179 |
| | * | SECTION: J(2) |
| Applies to: *No. 16-05952, Loggerhead Holdings, Inc. v. BP p.l.c., et al.* | * | JUDGE BARBIER |
| | * | MAG. JUDGE CURRAULT |

## ORDER & REASONS

Before the Court is BP's Motion for Summary Judgment against the claims of Loggerhead Holding, Inc. ("Loggerhead"). (Rec. Doc. 27090).[1] After considering the parties' arguments, the record, and the relevant law, the Court grants the motion for the reasons stated below.

### I.   LEGAL STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim. *See Celotex, v. Catrett*, 477 U.S. 317, 325 (1986). The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See id.* at 324. The nonmovant may not rest upon the pleadings but must identify specific facts that establish a genuine issue for trial. *See, e.g., id.* at 325; *Little*

---

[1] Related briefing: Loggerhead's Opp'n, Rec. Doc. 27143; BP's Reply, Rec. Doc. 27155.

*v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). All reasonable inferences are drawn in favor of the nonmoving party, *Little*, 37 F.3d at 1075, and the Court refrains making credibility determinations or weighing the evidence, *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398 (5th Cir. 2008). Still, a non-movant cannot satisfy its burden by only pointing to "some metaphysical doubt as to the material facts," "conclusory allegations," "unsubstantiated assertions," or "a scintilla of evidence." *Little* 37 F.3d at 1075. A court ultimately must be satisfied that "a reasonable jury could not return a verdict for the nonmoving party." *Delta*, 530 F.3d at 399.

## II.   BACKGROUND

The referenced member case is one of the last remaining economic loss claims to arise from the massive oil spill in the Gulf of Mexico in 2010. The source of the discharge was an offshore well, known as Macondo, located approximately fifty miles off the coast of Louisiana. On the night of April 20, 2010, a blowout, explosions, and fire occurred on the semi-submersible drilling rig DEEPWATER HORIZON rig as it was in the process of temporarily abandoning the Macondo Well. After burning for nearly two days, the DEEPWATER HORIZON sank, and the Macondo Well discharged oil until it was successfully capped on July 15, 2010.

Plaintiff Loggerhead and its subsidiaries operated a scuba-diving cruise business in the northern Caribbean and Bahamas. Loggerhead utilized two vessels, the NEKTON PILOT ("PILOT") built in 1994 and NEKTON RORQUAL ("RORQUAL") built in 2001, to house, feed, transport, and support its scuba-diving passengers on week-long cruises. Each vessel could accommodate around 30

passengers. (Rec. Doc. 27090-6 at 4). Loggerhead's summer itineraries included sailings to Cay Sal Bank, Medio Reef, and the Northwest Bahamas. Of these, Cay Sal Bank, located between Cuba and Florida, is closest to the Gulf of Mexico. The other destinations are farther east. These cruises would typically sail out of Ft. Lauderdale, Florida. Loggerhead's winter itineraries included the Southern Bahamas, St. Croix, and Puerto Rico and would depart from the Bahamas or Turks and Caicos. (*See* Decl. of John Dixon ¶¶ 3, 6-7, Rec. Doc. 27143-2 ("Dixon Decl."); BP's Stmt. of Undisputed Facts ¶1, Rec. Doc. 27090-31 ("BP SoF"); 2010 Itineraries, Rec. Doc. 27090-6 at 20-21).

Loggerhead had been operating this business for over two decades before the oil spill began in 2010. However, the undisputed evidence reflects that Loggerhead encountered difficulties beginning in 2007 that continued through the time of the oil spill. Its gross revenue declined by over $1 million, from $3.87 million in 2007 to $2.77 million in 2009. (BP SoF ¶¶ 12-14). The limited data on Loggerhead's bookings that has been provided to the Court (March-May for 2008, '09, '10) similarly indicate that bookings were declining. (BP SoF ¶ 20). Moreover, Loggerhead reported net losses of over $500,000 for each year from 2007 to 2009. (BP SoF ¶ 15-17).[2] Loggerhead also

---

[2] Loggerhead does not dispute this fact, although it does attempt to counter it by asserting that its EBITDA (earnings before interest, taxes, depreciation, and amortization) was positive during this time: $364,032 in 2007, $26,383 in 2008, and $222,267 in 2009. (Dixon Decl. ¶ 8). Loggerhead claims that EBITDA "is the commonly accepted metric for valuing loss of profits (rather than net income)," but it does not provide any support for this position. The Court's own research reveals that it should be skeptical of Loggerhead's figures and the meaning it attaches to them. *See* Blanche Zelmanovich, et al. *The Basics of EBITDA*, 36-FEB AM. BANKR. INST. J. 36 (2017) ("EBITDA is not a defined term under Generally Accepted Accounting Principles (GAAP), guidelines that regulate the preparation of financial statements. This means that the methodology of calculating EBITDA can vary from one company to another—or even within the same company from period to period. . . . While a negative EBITDA generally indicates that a business has a profitability issue and insufficient cash flow from its core operations, a positive EBITDA does not necessarily mean that a business will generate cash. .

3

missed an unspecified number of loan payments covering its vessels. (BP SoF ¶ 22).

Furthermore, in September 2009 Loggerhead dry-docked the PILOT at its shipyard in order to conduct an extended refit of the vessel that was supposed to include rebuilding its two main engines. (BP SoF ¶ 30). Loggerhead did not intend to put the vessel back into service for at least eight months. (BP SoF ¶ 30). The estimated cost of the refit was around $180,000, but Loggerhead had spent only around $30,000 by April 2010 (seven months after going in to dry dock). (BP SoF ¶ 31). Both engines had been removed from the PILOT's hull, but they had not yet been sent to the rebuild facility. (Dixon Decl. ¶ 11). John Dixon, Loggerhead's 30(b)(6) representative, testified that Loggerhead could not pay for the PILOT's refit without income from the RORQUAL. (2/26/21 Dixon Depo. 227:9-13, Rec. Doc. 27090-5).[3]

Meanwhile, the RORQUAL encountered its own mechanical problems. On or around April 10, 2010, the RORQUAL's starboard generator "had a casualty that was quickly fixed by installing a replacement generator." (Dixon Decl. ¶ 16; *see also* Loggerhead Resp. to BP SoF ¶ 37, Rec. Doc. 27143-1). However, the replacement generator soon developed an oil pressure issue. (Dixon Decl. ¶ 17). The issue was

---

. . EBITDA is not synonymous with cash flow. The 'E' in EBITDA represents earnings, not cash. EBITDA does not take into consideration financing costs, investment in capital expenditures, taxes, [etc.] . . . ."). Also, it is not clear how Loggerhead calculated EBITDA, and the figures reported in Loggerhead's brief differ greatly from those provided in John Dixon's declaration. (*Compare* Opp'n at 6, Rec. Doc. 27143 *with* Dixon Decl. ¶ 8). Thus, it is unclear what these figures are meant to convey or whether they convey it accurately. In short, Loggerhead's purported EBITDA fails to create a genuine dispute of material fact regarding the pre-spill financial health of its business.

[3] Loggerhead attempts to create a factual dispute by producing a declaration from John Dixon that broadly states Loggerhead "had available resources including third party sources to pay for the scheduled NEKTON PILOT's refit." (Dixon Decl. ¶ 12). This contradicts Dixon's earlier deposition testimony. The Court can and does disregard this part of Dixon's declaration under the sham affidavit rule. *See Hills v. Tangipahoa Parish Sch. Sys.*, No. 19-5, 2020 WL 1250810, at *5 (E.D. La. Mar. 16, 2020).

severe enough that Loggerhead cancelled two weeks of scheduled cruises (May 8-15 and May 15-22) and directed the RORQUAL to proceed to Loggerhead's shipyard in Port St. Joe, Florida, some 1,000 nautical miles away. (Dixon Decl. ¶¶ 14, 18).[4] Loggerhead had already planned for the RORQUAL to go off charter for two weeks between April 24 and May 8, so the additional cancellations meant the RORQUAL would not conduct any cruises for four weeks. After completing what would be its last cruise, the RORQUAL departed Turks and Caicos on April 24 and arrived in Port St. Joe nine days later, on May 3. Loggerhead alleges that on the night of May 2, while south of St. Joe, the RORQUAL sailed through oil. (Dixon Decl. ¶ 20).

As of April 24, 2010, Loggerhead had no working vessels to operate its business. On May 17, Loggerhead posted on its website that it was ceasing operations "[d]ue to the continually increasing cost of operations, decreased discretionary income of consumers, and overall economic difficulty." (Rec. Doc. 27090-13 at 2). The announcement did not mention the oil spill. Loggerhead cancelled all trips and did not refund the approximately $417,000 in customer deposits it had received as of May 19, 2010. (BP SoF ¶ 77). Loggerhead's website was later modified to add "lionfish invasion" and "BP oil catastrophe" to the list of reasons for ceasing operations. (Rec. Doc. 27090-26).

On May 19, 2010, Nekton Diving Cruises, LLC ("Nekton Diving"), Loggerhead's subsidiary that operated the diving cruises, executed an assignment for

---

[4] Loggerhead claims that it "rescheduled" (as opposed to cancelled) these two cruises, although it does not say what dates these cruises were rescheduled or provide any documentary proof that they were rescheduled. In any event, the last scuba-diving cruise occurred between April 17 and 24, 2010. Therefore, regardless of what word Loggerhead may have used at the time, the May 8th and May 15th cruises were de facto cancelled.

the benefit of creditors, which was filed in Florida state court on May 27. (Rec. Doc. 27090-24). Nekton Diving stated that it had less than $100,000 in assets and $4.8 million in debts that it could not pay. Of the $4.8 million, approximately $3.4 million was in unsecured claims.

### III.   LOGGERHEAD'S CLAIMS AGAINST BP

Loggerhead filed a complaint against various BP entities under the Oil Pollution Act of 1990 ("OPA") and general maritime law. Loggerhead claims that oil physically damaged the RORQUAL when it allegedly drove through an oil slick on May 2, 2010, and this damage prevented the vessel from returning to service. Loggerhead also claims there was an "imminent threat" that oil would reach the areas it typically cruised, which caused its customers to cancel reservations. Loggerhead asserts these events are the reason the PILOT's refit was not completed, Nekton Diving closed its doors, and the scuba-diving cruise business failed. Loggerhead seeks $41 million in compensatory damages. (Dixon Decl. ¶ 51).

### IV.   DISCUSSION

#### A.   OPA § 2702(b)(2)(E)

Under OPA, a "responsible party" (here, BP) is strictly liable for the "the removal costs and damages specified in subsection (b) that result from such incident." 33 U.S.C. § 2702(a). One of those specified damages is "the loss of profits or impairment of earning capacity ***due to*** the injury, destruction, or loss of real property, personal property, or natural resources . . . ." *Id.* § 2702(b)(2)(E)(emphasis added). The plaintiff need not own or lease the property or resources that were injured, destroyed, or lost. *In re Settoon Towing, L.L.C.*, 859 F.3d 340, 344 (5th Cir. 2017).

The summary judgment record paints a picture of a business that had been struggling long before the oil spill occurred, was on the verge of collapse when the blowout began hundreds of miles away, and entered its death throes shortly thereafter. Loggerhead's revenues and bookings had been declining, and it incurred net losses of over $500,000 for each of the three years preceding the oil spill. Nekton Diving, Loggerhead's subsidiary, had substantial debt that it could not pay. The PILOT, one of Loggerhead's two sources of revenue, had been in dry dock for months before the oil spill began, and its refit was nowhere near complete. All hope was on the RORQUAL to keep the business afloat.

That hope was dashed when the ROQUAL suffered a duet of generator malfunctions between April 10 and April 24, 2010, prompting Loggerhead to cancel two weeks of cruises (on top of a planned two-week "off charter" period) and send the RORQUAL to its shipyard in Port St. Joe. With massive debt and no revenue source, Loggerhead announced on May 17 that it was ceasing operations, giving several reasons but making no reference to the oil spill. Loggerhead did not return the $417,000 in deposits its customers paid, and days later its subsidiary filed the assignment for the benefit of creditors, formally giving up the ghost.

Even if the Court assumes that Loggerhead's customers did cancel trips out of oil spill concerns[5] and the RORQUAL was oiled on May 2,[6] no reasonable jury could conclude that the oil spill caused Loggerhead's business to fail. The evidence all points

---

[5] The Court notes that Loggerhead has no admissible evidence that this occurred. John Dixon testified that he spoke with "maybe half a dozen to a dozen" customers who purportedly called to cancel, but he does not know who they were. (BP SoF ¶¶ 67, 69; Dixon Decl. ¶ 35). This is hearsay.

[6] As explained below, the parties dispute whether the RORQUAL was actually oiled.

in one direction: that Loggerhead's business was going to fail in the summer of 2010 regardless of whether the oil spill happened. Accordingly, there is no genuine dispute that Loggerhead's alleged lost profits or impaired earning capacity was not due to the injury, destruction, or loss of real property, personal property, or natural resources. Loggerhead's claim under OPA § 2702(b)(2)(E) fails.

### B. OPA § 2702(b)(2)(B)

Another type of damage recoverable under OPA is "[d]amages for injury to, or economic losses resulting from destruction of, real or personal property." 33 U.S.C. § 2702(b)(2)(B). Unlike subsection (E) just discussed, subsection (B) requires physical injury to the plaintiff's property. *See In re: Oil Spill by the Oil Rig "Deepwater Horizon,"* 902 F. Supp. 2d 808, 816-17 (E.D. La. 2012) (citing *Secko Energy, Inc. v. M/V Margaret Chouest,* 820 F. Supp. 1008, 1015 (E.D. La. 1993)).

As mentioned, Loggerhead claims that the RORQUAL drove through oil on the night of May 2, 2010. BP disputes this, pointing out that contemporaneous forecasts from NOAA showed that oil was unlikely to come within 100 miles of the RORQUAL's position. It also points out that there are no records reflecting that the RORQUAL was oiled, and Loggerhead has never tested any oil it allegedly found on the vessel to verify that it came from Macondo. Loggerhead contends that the NOAA forecasts were inaccurate, that the RORQUAL's captain could smell (but did not see) oil on the water's surface the night of May 2, and that John Dixon saw oil on the RORQUAL after it arrived at Port St. Joe. (Dixon Decl. ¶¶ 21-22). Loggerhead also claims that oil is still on the RORQUAL and testing "is still possible." (Opp'n at 15; Dixon Decl. ¶ 47).

There is perhaps a genuine dispute of material fact over whether the RORQUAL was oiled. Even so, it does not end the matter. Loggerhead's entire argument concerning the purported oiling of the RORQUAL is designed to establish a lost profits/impaired earning capacity claim. (*See* Opp'n at 12-13, Rec. Doc. 27143 (explaining that Nekton Diving filed the assignment for benefit of creditors because the RORQUAL could not return to service after it encountered oil on its way to Port St. Joe)). But, as explained above, even if the RORQUAL was oiled it did not cause Loggerhead's business to fail. The most Loggerhead could hope to recover under § 2702(b)(2)(B) in this circumstance would be the cost of repairing the vessel's oil-damaged components, if any. While Loggerhead seeks over $41 million dollars in damages, it does not include such repair costs among its itemized list of damages. (*See* Dixon Decl. ¶ 51 (listing as damages (1) cessation of operations, (2) storage and maintenance costs (dockage, electricity, daily checks, etc.), (3) restart cost, (4) consequential losses, and (5) 2013 & 2014 costs pending trial date (dockage, elect., daily check, etc.)). Consequently, Loggerhead's claim under § 2702(b)(2)(B) fails.

### C.  General Maritime Law

Loggerhead's claims under general maritime law fail for the same reasons discussed in Parts A & B, above. *See also See In re Oil Spill by the Oil Rig "Deepwater Horizon,"* 496 F. Supp. 3d 989, 989-99 (E.D. La. 2020).

## V.  CONCLUSION

For the reasons above,

**IT IS ORDERED** that BP's Motion for Summary Judgment (Rec. Doc. 27090) is **GRANTED**, and Loggerhead's claims in the referenced member case are

**DISMISSED WITH PREJUDICE**.

New Orleans, Louisiana, this 19th day of August, 2021.

_____<br>
Carl J. Barbier<br>
United States District Judge

**Note to Clerk: File in 10-md-2179 and 16-05952**