# EXHIBIT C

<div style="border: 2px solid red; display: inline-block; padding: 2px;">EXHIBIT B</div>

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * | MDL 2179 |
| | * | SECTION: J(2) |
| Applies to: *All Cases in the B3 Pleading Bundle* | * | JUDGE BARBIER |
| | * | MAG. JUDGE CURRAULT |

## CASE MANAGEMENT ORDER FOR THE B3 BUNDLE

This multidistrict litigation ("MDL") arose from the blowout, explosions, and fire on the mobile offshore drilling unit DEEPWATER HORIZON on April 20, 2010, and the massive oil spill that resulted in the Gulf of Mexico. Early on, the Court organized the various types of claims into "pleading bundles." (*See* PTO 11, Rec. Doc. 569; PTO 25, Rec. Doc. 983). Relevant here is the "B3 bundle," which consists of claims for personal injury and wrongful death due to exposure to oil and/or other chemicals used during the oil spill response (e.g., dispersant).[1] "B3 plaintiff/claim/case" refers to a plaintiff, claim, or case in this bundle. Approximately 810 of the 839 cases remaining in the MDL are in the B3 bundle.[2]

On November 17, 2020, the Court held a status conference to discuss future case management for the B3 bundle. (*See* 11/17/20 Minute Entry, Rec. Doc. 26784; Transcript, Rec. Doc. 26788). After hearing counsels' arguments—and having

---

[1] While all of the remaining B3 cases assert chemical exposure claims, approximately 60 also allege a non-exposure injury (e.g., slip and fall while performing cleanup work). (*See* 8/28/19 Minute Entry at 1, Rec. Doc. 25994).

[2] Most of the B3 cases contain one plaintiff. A relative few contain multiple plaintiffs, such as when spouses and their children are joined in a single case. Consequently, the number of remaining B3 plaintiffs, as opposed to B3 cases, is around 870.

studied the parties' written proposals submitted in advance of the conference—the Court announced its plan for the B3 cases: The B3 cases will be severed from the MDL and either redistributed among the judges of this court or transferred to another district for further proceedings. Prior to severance, each B3 case will be bifurcated such that issues relating solely to punitive damages will be stayed and not litigated until after the plaintiff establishes entitlement to compensatory damages.

This Case Management Order bifurcates the B3 cases as contemplated. The operative language appears near the end of this document. Immediately below the Court explains its reasons for severing the B3 cases from the MDL and bifurcating the issue of punitive damages. A forthcoming order will actually sever the B3 cases from the MDL.

This Case Management Order draws from the Court's extensive experience with the Back-End Litigation Option ("BELO") cases filed pursuant to the *Deepwater Horizon* Medical Benefits Class Action Settlement Agreement ("Medical Settlement" or "Settlement," Rec. Doc. 6427-1). The Medical Settlement is a class action settlement that resolved (or attempted to resolve) many chemical exposure claims that arose from the oil spill and response.[3] Under the Settlement, class members gave up their right to pursue through litigation claims for conditions or illnesses that were diagnosed on or before April 16, 2012.[4] (*See* Medical Settlement § XVI). Claims based

---

[3] The B3 plaintiffs either opted out of the Medical Settlement or were excluded from the class definition.

[4] Class members could submit these claims to the Settlement's Claims Administrator, who paid them in accordance with the Settlement's "Specified Physical Conditions" matrix. The matrix sets forth the conditions that are eligible for compensation, the required proof that the class member must submit, and the available compensation amounts. (*See* Medical Settlement § VI & Ex. 8).

2

on conditions that were diagnosed after April 16, 2012—known as "Later-Manifested Physical Conditions" ("LMPC")—generally were not released by the Settlement. Class members could pursue a claim for LMPC by filing a BELO lawsuit in accordance with the Medical Settlement's BELO provisions. (*See* Medical Settlement § VIII).

Over 4,700 BELO cases have been filed to date.[5] The Settlement requires that these cases be filed in this Court, although they may be transferred to another venue later. (Medical Settlement § VIII(G)(1)(c)). The Court adopted special case management procedures (collectively, "the BELO Initial Proceedings CMO") to handle the BELO cases. (*See* Rec. Docs. 140909, 25738). The BELO Initial Proceedings CMO required that all BELO cases initially be assigned to section J (the undersigned) and division 1 (originally Magistrate Judge Wilkinson (now retired), later Magistrate Judge Currault). BELO plaintiffs had to fill out a Plaintiff Profile Form and produce certain documents (e.g., medical records) within 90 days of filing the BELO lawsuit. BELO plaintiffs who repeatedly failed to comply with this requirement were dismissed.[6] Those who complied were either transferred to another district or re-allotted among one of the judges of this Court for further proceedings and, if necessary, trial.[7] At this point, the BELO Initial Proceedings CMO ended. The newly-assigned judge was free adopt whatever case management plan he or she

---

[5] Most BELO cases were filed in 2018 and 2019. New BELO cases continue to trickle in, but nowhere near the amount that were filed in 2018-19.
[6] Around 1,100 BELO cases were dismissed for this reason.
[7] Around 2,400 BELO cases were transferred to another venue/district for further proceedings, while approximately 1,200 remained in this district.

3

deemed appropriate. Many judges treated the BELO cases like any other case—they simply set pretrial deadlines and trial dates for each BELO case; BELO cases were not consolidated. This approach kept the BELO cases moving. Today, only around 600 BELO cases remain pending across all districts.

BELO cases and the B3 cases are similar in several important respects. Both allege personal injuries or wrongful death due to exposure to oil or other chemicals used during the oil spill response. Furthermore, both BELO plaintiffs and B3 plaintiffs must prove that the legal cause of the claimed injury or illness is exposure to oil or other chemicals used during the response. (*See* Medical Settlement § VIII(G)(3)(a)). Also, pretrial orders in this MDL required B3 plaintiffs to provide information and documents similar to what was required of the BELO plaintiffs under the BELO Initial Proceedings CMO.[8] In other words, the existing B3 cases are in roughly the same state, procedurally speaking, as a typical BELO case just before it is re-allotted within this court or transferred to another for further proceedings.

B3 and BELO cases are not entirely alike, of course, but the few differences that exist are not so great as to persuade the Court to deviate from the well-worn path made by the BELO cases. Notably, experience has shown that causation is a critical element—if not *the* critical element—in BELO cases,[9] and therefore will likely

---

[8] Pretrial Order No. 66 required B3 plaintiffs to complete a Particularized Statement of Claim, which is similar to the Plaintiff Profile Form required in BELO cases. (Rec. Doc. 24282). Pretrial Order No. 68 required B3 plaintiffs to produce medical records and other documents. (Rec. Docs. 26070, 26077).
[9] *See, e.g.*, *McGill v. BP Expl. & Prod., Inc.*, 830 F. App'x 430, 434 (5th Cir. 2020) (affirming dismissal on summary judgment because the BELO plaintiff "failed to offer the evidence necessary to prove legal causation per the [Medical Settlement] under any plausible causation standard. He does not put forward any non-speculative evidence that Corexit and oil exposure cause the types of illnesses he suffers from."); *In re Deepwater Horizon Belo Cases*, No. 19-963, 2020 WL 6689212, at *16 (N.D. Fla. Nov. 4, 2020) (dismissing multiple BELO lawsuits because "absent a qualified expert to testify

4

be the make-or-break issue for many B3 cases as well. Additionally, the issue of causation in these toxic tort cases will require an individualized inquiry. This counsels in favor of severing the B3 cases from the MDL so the parties can litigate this crucial issue.

The possibility of punitive damages is a notable difference between the B3 and BELO cases. The Medical Settlement expressly prohibits BELO plaintiffs from recovering punitive damages—only compensatory damages are available. (Medical Settlement § VIII(G)(2)(b)-(c)). The B3 plaintiffs are not so restrained. Some have argued that this difference means that the B3 cases should be handled differently than the BELO cases, as the availability of punitive damages raises certain issues that should be dealt with on a global basis while the B3 cases are still consolidated in the MDL. The Court's view, however, is that punitive damages are the proverbial tail on the dog; they should not dictate the case management process.

There is a general rule that punitive damages are unavailable unless the party seeking them has sustained actual damage. *See, e.g.*, Richard C. Tenney, Annotation, *Sufficiency of Showing of Actual Damages to Support Award of Punitive Damages— Modern Cases*, 40 A.L.R. 4th 11 § 2(a) (1985). As explained, proving causation will be a key hurdle for the B3 plaintiffs. If a B3 plaintiff cannot prove this element, she will

---

regarding general causation, Plaintiffs cannot survive summary judgment"); *Garcia-Maradiaga v. BP Expl. & Prod. Inc.*, No. 18-11850, 2020 WL 491183, at *3 (E.D. La. Jan. 30, 2020) (Ashe, J.) (dismissing BELO case on summary judgment where plaintiff failed to produce an expert report on causation, explaining, "Expert testimony is required to establish causation in toxic-tort cases where scientific knowledge of the harmful level of exposure to a chemical, plus knowledge that the plaintiff was exposed to such quantities, are minimal facts necessary to sustain the plaintiff's burden of proof." (internal quotations and brackets omitted)); *Torres v. BP Expl. & Prod. Inc.*, No. 18-12652, 2020 WL 2197919 (E.D. La. May 6, 2020) (Barbier, J.) (same).

5

not be entitled to any damages, compensatory or punitive. Considering that there are around 810 B3 cases, the sensible approach is to require the parties to focus on litigating issues that bear on whether a B3 plaintiff is entitled to compensatory damages, and put aside issues that solely relate to punitive damages. Once a B3 plaintiff proves her entitlement to compensatory damages, then and only then should that plaintiff then be allowed to litigate issues concerning punitive damages. Bifurcating the B3 cases in this manner will help to keep each case streamlined and focused on what appears to be the major issues: causation and compensatory damages. In other words, after bifurcation the B3 cases should more or less resemble the BELO cases following the BELO Initial Proceedings CMO.[10]

♦ ♦ ♦

---

[10] Additionally, some of the Court's past rulings in the MDL should narrow the issues in the B3 cases. *See, e.g., In re Oil Spill by the Oil Rig Deepwater Horizon*, 21 F. Supp. 3d 657, 746-47 (E.D. La. 2014) (finding BP liable under general maritime law tort for the oil spill); *id.* at 752 (finding that Transocean's and Halliburton's contractual indemnities and releases are valid and enforceable against BP); *Winkler v. BP Expl. & Prod., Inc.*, 205 F. supp. 3d 820, (E.D. La. 2016) (rejecting BP's argument that it is not be liable to oystermen whose vessel struck "orphaned anchors" left over from the oil spill response even though the Federal On-Scene Coordinator ("FOSC") determined that the anchors should not be removed; explaining that the Clean Water Act reflects Congress' intent that "responsible parties" (as defined under OPA) would be liable for damages that result from actions directed by the FOSC in response to an oil spill); *In re Oil Spill by the Oil Rig Deepwater Horizon*, 2016 WL 614690 (E.D. La. Feb. 16, 2016) *and* 2016 WL 4091416, at *11 (E.D. La. Aug. 2, 2016) (dismissing all B3 claims against certain "Clean-Up Responder Defendants," except for Nathan Fitzgerald's and Joseph Brown's claims against DRC Emergency Services, LLC); *In re Oil Spill by the Oil Rig Deepwater Horizon*, 2012 WL 5960192, at *21 (E.D. La. Nov. 28, 2012) (dismissing B3 claims asserted against Nalco in the B3 Master Complaint).

6

Accordingly, **IT IS ORDERED**:

1. This Case Management Order ("CMO") applies to all cases in the B3 bundle (described above) presently consolidated with MDL 2179.[11]

2. This CMO shall take effect in an individual B3 case once that case is severed from MDL 2179,[12] and it shall remain in effect unless <u>expressly</u> altered or superseded by the judge assigned to the case following severance.

3. Issues in a B3 case that pertain solely to punitive damages (hereinafter, "Punitive Damages Issues") are BIFURCATED from all other issues in the B3 case and STAYED, and there will be no discovery, motion practice, or other litigation respecting a Punitive Damages Issue until the plaintiff in that case is adjudged entitled to compensatory damages on the plaintiff's B3 claim.

4. Following severance from the MDL and either re-allotment within this district or transfer to another district, as applicable, the newly-assigned judge will issue a scheduling order setting forth deadlines for further discovery, motion practice, pretrial conference, trial, etc., which will govern the B3 case <u>subject</u> to the

---

[11] Except that this CMO does not apply to the 3 declaratory actions by United Sates Environmental Services, LLC and its related entities, Nos. 17- 3370, 17-3382, 17-3388. (*See* 11/17/20 Minute Entry at 3, Rec. <u>Doc. 26784</u>).

[12] The B3 cases will be severed from the MDL in a separate and forthcoming order.

7

provisions of this CMO (unless <u>expressly</u> altered or superseded by the newly-assigned judge).

5. **Future B3 Cases:** Any B3 case filed in this Court <u>after</u> the issuance of this CMO ("Future B3 Case") shall be consolidated with MDL 2179, and the plaintiff shall comply with the requirements of PTO 63 (Rec. <u>Doc. 22295</u>), PTO 66 (Rec. <u>Doc. 24282</u>), and PTO 68 (26070, 26077) within 90 days of the date the Future B3 Case is filed.[13] The parties will then follow the procedure set forth in the First Amended BELO Cases Initial Proceeding Case Management Order No. 2 (Rec. <u>Doc. 25738</u>).[14] Once the Future B3 Case is severed from the MDL and either re-allotted within this district or transferred to another district, paragraphs 3 and 4 above (bifurcating and staying Punitive Damages Issues) shall take effect unless <u>expressly</u> altered or superseded by the newly-assigned judge.

---

[13] BP shall similarly comply with its production obligations under PTO 68 within 90 days of the date the Future B3 Case is filed.

[14] For example, if the plaintiff in a Future B3 Case timely complies with PTOs 63, 66, and 68, then the parties to that case will file a venue stipulation within 30 days of compliance, and the Magistrate Judge will sever that Future B3 Case from the MDL and either transfer or re-allot it per the parties' stipulation. If the plaintiff in a Future B3 Case does not timely comply PTOs 63, 66, and 68, then the parties and the Court shall follow the procedure outlined in paragraphs 2-5 in First Amended BELO Cases Initial Proceedings Case Management Order No. 2 (Rec. <u>Doc. 25738</u>).

New Orleans, Louisiana, this 23rd day of February, 2021.

*[Signature]*
United States District Judge

The "Note to Clerk" has been redacted to avoid possible confusion.
█████████████████████████████████████████████
████████████████████