# EXHIBIT F

1           UNITED STATES DISTRICT COURT

2           EASTERN DISTRICT OF LOUISIANA

3

4    IN RE:  OIL SPILL BY THE OIL RIG   *    10-MD-2179
             *DEEPWATER HORIZON* IN THE   *
5            GULF OF MEXICO ON            *
             APRIL 20, 2010               *    Section J(2)
6                                         *
                                          *
7    Related to:                          *    November 17, 2020
     All Cases in the B3 Bundle           *
8                                         *
     *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

9

10               STATUS CONFERENCE BEFORE
11          THE HONORABLE CARL J. BARBIER
                UNITED STATES DISTRICT JUDGE
12

13   Appearances:
14

15   For Various Plaintiffs:      Falcon Law Firm
                                  BY:  TIMOTHY J. FALCON, ESQ.
16                                5044 Lapalco Boulevard
                                  Marrero, Louisiana 70072
17

18   For Various Plaintiffs:      Nexsen Pruet, LLC
                                  BY:   PAUL A. DOMINICK, ESQ.
19                                205 King Street, Suite 400
                                  Post Office Box 486
20                                Charleston, South Carolina 29402

21
     For Various Plaintiffs:      Downs Law Group, PA
22                                BY:  C. DAVID DURKEE, ESQ.
                                  3250 Mary Street, Suite 307
23                                Coconut Grove, Florida  33133

24

25

1  Appearances:

2

3  For Various Plaintiffs:          Herman Herman & Katz, LLC
                                    BY:   SOREN E. GISLESON, ESQ.
                                    820 O'Keefe Avenue
4                                   New Orleans, Louisiana 70113

5

6  For Various Plaintiffs:          Boggs Loehn & Rodrigue
                                    BY:   THOMAS E. LOEHN, ESQ.
                                    2324 Severn Avenue, Suite 100
7                                   Metairie, Louisiana 70001

8

9  For BP America Production        Kirkland & Ellis, LLP
   Company and BP Exploration       BY:   MATTHEW T. REGAN, ESQ.
   & Production, Inc.:                    A. KATRINE JAKOLA, ESQ.
10                                  300 North LaSalle
                                    Chicago, Illinois 60654
11

12 For Knight's Marine &            Franke & Salloum, PLLC
   Industrial Services:             BY:   FREDRICK B. FEENEY II, ESQ.
13                                  10071 Lorraine Road
                                    Gulfport, Mississippi 39503
14

15 For United States                Frilot, LLC
   Environmental Services,          BY:   BRANDON K. THIBODEAUX, ESQ.
16 LLC, et al.                      1100 Poydras Street, Suite 3600
                                    New Orleans, Louisiana 70163
17

18 Official Court Reporter:         Toni Doyle Tusa, CCR, FCRR
                                    500 Poydras Street, Room B-275
19                                  New Orleans, Louisiana 70130
                                    (504) 589-7778
20

21

22

23 Proceedings recorded by mechanical stenography using
   computer-aided transcription software.

24

25

**PROCEEDINGS**

**(November 17, 2020)**

1
2
3       **THE COURT:** All right. Good morning everyone. I
4  think everyone that needs to be on the call is on, I'm told.
5               Gail, go ahead and call this case, please.
6       **THE DEPUTY CLERK:** Civil Action MDL 2179,
7  *In re Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of*
8  *Mexico on April 20, 2010.*
9       **THE COURT:** All right, Counsel. I think we should
10 have the appearances by everyone who intends to speak this
11 morning. We can start with counsel for BP, I guess.
12      **MR. REGAN:** Good morning, Your Honor. It's Matthew
13 Regan on behalf of BP.
14      **THE COURT:** Good morning.
15      (Off the record.)
16      **THE COURT:** Can you hear me now?
17      **MR. REGAN:** Yes. Much better.
18      **THE COURT:** Okay. Go ahead, Mr. Regan.
19      **MR. REGAN:** Matthew Regan and Katie Jakola on behalf
20 of BP, Your Honor.
21      **THE COURT:** Okay. Thank you.
22      **MR. DOMINICK:** Your Honor, this is Paul Dominick.
23 Tim Falcon is supposed to be joining for the plaintiffs'
24 counsel, and he says he is waiting for the host to let him into
25 the hearing. I just hated to proceed without him. He was

09:32

1    going to speak on behalf of the plaintiffs, and I hated for him

2    to be left out.  I don't know what's going on with that.

3                    I'm sorry to interrupt you, Matthew.

4            **THE DEPUTY CLERK:**  Is that Tim Falcon, you said?

5            **THE COURT:**  Yes, Tim Falcon, Gail.

6            **MR. DOMINICK:**  Yes.

7            **THE COURT:**  Can you let him in.

8                    There he is.  I see Mr. Falcon.

9            **MR. DOMINICK:**  I apologize, Your Honor.

10            **THE COURT:**  That's okay.

11                    Good morning, Mr. Falcon.

12            **MR. FALCON:**  Good morning.

13            **THE COURT:**  Okay.  So Mr. Dominick and Mr. Falcon are

14    for the plaintiffs.  Who else is going to speak this morning?

15            **MR. LOEHN:**  Thomas Loehn on behalf of Charles Boggs.

16            **THE COURT:**  Okay.

17            **MR. DURKEE:**  David Durkee on behalf of the Downs Law

18    Group and various plaintiffs.

19            **THE COURT:**  Okay.

20            **MR. GISLESON:**  Soren Gisleson on behalf of the

21    Herman Herman & Katz plaintiffs.

22            **THE COURT:**  Okay.

23            **MR. FEENEY:**  Fred Feeney on behalf of Knight's

24    Marine & Industrial Services, Judge.  We are not a party that

25    has participated actively in any of these hearings, but since

09:33

 1   we were mentioned in the footnote of the Court's order
 2   scheduling this, I thought I better be here.
 3            THE COURT:  Well, footnotes are important, you know.
 4            MR. FEENEY:  Yes, sir.
 5            THE COURT:  Sometimes they are more important than
 6   what's said in the body of an order or an opinion.
 7            Okay.  Who else?  Anyone else?
 8            MR. THIBODEAUX:  Brandon Thibodeaux from Frilot in
 9   New Orleans on behalf of United States Environmental Services,
10   LLC, United States Maritime Services, Inc., and United States
11   Maritime Services, Inc. d/b/a United States Maritime Services,
12   LLC.
13            THE COURT:  Okay.
14            MR. THIBODEAUX:  We are a bit player in all of this,
15   Your Honor.
16            THE COURT:  Okay.  Thank you.
17            All right.  The last time we were here to
18   discuss how to proceed forward with these B3 claims, we ran
19   into a few speed bumps.  First of all, BP raised an issue which
20   at least caught me by surprise, this so-called repairman's
21   doctrine.  Let's start there.
22            I understand that's been withdrawn by BP.
23   Mr. Regan, is that correct?
24            MR. REGAN:  Yes, that's correct, Your Honor.
25            THE COURT:  Okay.  So we don't have to talk about

that any further.

Mr. Regan, I don't know if you or Ms. Jakola are going to go first, but where do we stand now?  To me, there are a couple of issues.  First of all, whether there are any true overarching, common issues that should be decided by this Court or need to be decided by this Court before any thought is given to either remanding or reallocating these cases, maybe you can start there, Mr. Regan or Ms. Jakola.  I don't know who is going to go first.

**MR. REGAN:**  Sure.  Yes, Your Honor.  Thank you. Matthew Regan on behalf of BP, Your Honor.

As we said in our brief, the challenge that we have with this group of 870 or so plaintiffs is just the shear volume of medical conditions and variety of what they are alleging.  The Court has engaged in multiple pretrial orders -- 63, 66, 68 -- that has helped get us to that number and helped us understand a little bit better, but we are still with a really diverse group of plaintiffs with highly individualized issues.  In terms of trying to find common issues to try amongst them, we don't think that there is efficiency there.

There's potentially a few other organizational things that could be done to put a finer point or maybe solve this challenge we have with just how many different variety of allegations, conditions, and other things that we are seeing, but from our standpoint we are informed by the experience that

09:37

1   the courts have had with a larger volume initially of the BELO

2   cases.

3             They are different cases.  There are different

4   allegations and different standards in those cases, but just

5   organizationally we have seen that when those individualized

6   cases have individualized requirements, the vast majority of

7   them have been dismissed, either voluntarily or by courts, I

8   think over 3,000 of them to this point.

9             We are informed by that organizational tool.

10  There may be a few other things that we could do here in the

11  MDL, Your Honor, to put this group in a little bit better shape

12  before individualized treatment, but for the most part we don't

13  see great efficiencies in other significant common legal issues

14  amongst this group.  That's what I would say, Your Honor.  I

15  would be happy to answer further questions.

16          **THE COURT:**  Well, what specific things do you have in

17  mind?  You said there may be a few other organizational issues

18  we could do.

19          **MR. REGAN:**  Sure.  The thing that occurs to us,

20  Your Honor -- and we have this, again, in some of the footnotes

21  in our briefs -- we are dealing with very generic allegations

22  and very generic conditions and lots of them.  Again, informed

23  by some of the BELO experience, what we don't have is the

24  plaintiffs coming forth with an affidavit from an expert who is

25  going to say, "Yes, I would testify that these conditions were

09:38

1    caused by the spill."

2              That's been done in other similar mass tort

3    actions in the *Lone Pine* process, expert affidavits.  If that

4    were to happen here, then you might have a situation where we

5    would have a much more streamlined perspective, not just the

6    plaintiffs saying what they are alleging conditionwise, but

7    with they think they could prove.  Again, informed from BELO, I

8    think to this date there has yet to be a single plaintiff who

9    has gotten past that threshold, either because they have

10   dismissed their cases when it's been required or that there's

11   been *Daubert* proceedings or otherwise.  That's one thing.

12             The other thing is just streamlining of the

13   allegations.  One of the things we did, Your Honor, we listened

14   to you in the last hearing and we went back and really wanted

15   to focus on the cases that are before us; not hypotheticals,

16   not sort of conceptual, but what are these plaintiffs alleging.

17             I understand it.  I'm not criticizing it.

18   There's a lot of generic allegations that are there, but these

19   are highly individualized cases.  So when we are looking for

20   issues about claim exposure, routes of exposure, level of

21   durations, locations, all of the fundamental things that are

22   going to be required in these cases, you can't find that in the

23   complaint, and actually it's hard to find in the pretrial

24   orders in any definitive sense.

25             So could you use an expert to line that up?

09:39

1    Could you do a pretrial order?  I respect the fact in the last

2    discussion, Your Honor, that maybe the questions weren't as

3    precise enough.  I hear you on that.  With 1,900 medical

4    conditions that are alleged by these 873 people, I'm just

5    trying to think creatively about what would give the Court and

6    the parties a much more clear view about being able to

7    categorize those in a definitive way.

8            Again, from our BELO experience, courts that

9    have done things to, say, maybe take things to a *Daubert* place

10   or otherwise have used limited conditions.  Judge Rodgers used

11   seven conditions, I think, is what they were looking at there

12   when they went for their *Daubert* proceedings, so some way to

13   get some confidence about this group.

14           Those would be the two things, Your Honor.

15   Could you go with a *Lone Pine* expert process?  There's a couple

16   of cases I could point you to that have done that to try to get

17   clarity.  Could you go with a requirement for a more specified

18   statement about what actual fault are they alleging?  Is it a

19   generic concept about the response?  Is it specifically about

20   this plaintiff was not instructed about PPE?

21           **THE COURT:**  Let me stop you since you got into that

22   issue.  I want to try to nail down what a trial would look like

23   in these cases.  I understand a lot of these plaintiffs are

24   making allegations or claims for punitive damages.  Put that

25   issue aside, punitive damages.

09:41

1        If we are just talking about compensatory

2   damages, if there's a plaintiff who is alleging only

3   compensatory damages -- I was a cleanup worker.  I was exposed

4   to oil or chemicals, and I suffered X injury or condition which

5   I believe and I think I could prove is related or caused by

6   this exposure -- what else would they have to prove under that

7   scenario?

8        MR. REGAN:  Sure.  Let's take that hypothetical

9   plaintiff.  They would have to prove the route of exposure.

10        THE COURT:  I understand, but that's all related to

11   causation.  They would have to prove general and specific

12   causation, obviously, and damages.  Other than that --

13        MR. REGAN:  Exactly.

14        THE COURT:  -- would there be any other issues in

15   that trial?

16        MR. REGAN:  If the plaintiff is as narrow as you just

17   set forth, Judge, probably not, if they are that narrow.

18        THE COURT:  Right.

19        MR. REGAN:  Most of them aren't, right.

20        THE COURT:  Right.

21        MR. REGAN:  If they were to be that narrow, then --

22   I'm not going to diminish how the causation issue would be a

23   fundamental part of that case.  Under that hypothetical, that's

24   where the focus would be, on causation.

25        THE COURT:  Okay.  Okay.

09:42

1     **MR. REGAN:** Again, I understand your hypothetical,

2 Your Honor. There might be some contributory issues, again,

3 when we get into those. I see where you are going. In the

4 simplest case, it would really be a causation trial.

5     **THE COURT:** Okay. Thank you.

6     Who wants to go next?

7     **MR. FALCON:** Good morning, Your Honor. This is Tim

8 Falcon. Can you hear me okay?

9     **THE COURT:** I can hear you loud and clear,

10 Mr. Falcon. Go ahead.

11     **MR. FALCON:** What is not clear to us, Your Honor, and

12 we think the issue is they keep raising and leaving -- one of

13 their points is affirmative defenses. The problem with a

14 simple blank statement of affirmative defenses is we have never

15 received answers for any of these complaints. These are

16 individual complaints that were filed. Just a blank statement

17 of affirmative defenses leaves us with a whole gamut of what

18 they are going to come up with once we get sent back or sent

19 out to other courtrooms.

20     I do agree with Mr. Regan's statement that for

21 that simple case that may be all there is, but then you start

22 coming up with contributory negligence and then what is that,

23 how do we define that, and then that kind of goes back to -- I

24 know we are leaving punitive damages aside for the moment.

25 What we are trying to accomplish just from the big picture,

1    Your Honor, is if the plaintiffs give up any shot they have at

2    punitive damages, whether under the Eleventh Circuit or under

3    the spill response scenario, does BP give up all affirmative

4    defenses and we just go to trial on the scenario that you

5    painted and that Mr. Regan said he would agree to?

6            I think that's where we are as far as how do we

7    go forward.  If there still are going to be a whole panoply of

8    affirmative defenses that the plaintiffs are going to have to

9    come up with, maybe that's what this Court could sort out

10   before the cases are sent off to be simple causation cases.

11           **THE COURT:**  Give me an example of such an affirmative

12   defense.

13           **MR. FALCON:**  Third-party liability, was it the

14   contractor's fault, did the workers fail to wear their PPE

15   appropriately --

16           **THE COURT:**  Aren't those going to be highly

17   individualized issues?

18           **MR. FALCON:**  Well, it could be.  If that's what they

19   want to try, that's fine.  We also think that --

20           **THE COURT:**  Well, you have people working in

21   different locations under different circumstances, different

22   time frames, different exposures, I'm supposing.  I don't know

23   how that's an overarching, global issue.

24           **MR. FALCON:**  I think the overall issue is what [Zoom

25   audio distortion] law would be a part of it, as the originator

09:45

1    of the spill originally, whether BP is responsible for all
2    actions, you know, of the contractors and, therefore, liability
3    for everything.
4              **THE COURT:**  Well, I will just say this, and I'm not
5    making a ruling here because it's not in front of me.  I don't
6    see how you can argue that they could possibly be liable for
7    punitive damages if their contractor acted recklessly or
8    something like that.
9              The contractors are not parties here, right?
10   You guys are making this thing much more complicated than it
11   needs to be.  I'm going to tell you.  I said this last time and
12   I'll say it again.  If you guys want to get those cases
13   resolved one way or the other, I think the plaintiffs need to
14   forget about punitive damages because I don't see how you get
15   there based on my previous ruling.  But beyond that, you have a
16   situation here where, in terms of the response, this was under
17   the control and coordination of the federal government, the
18   federal on-scene coordinator.  They directed, permitted
19   everything that was done, from what I have seen.
20             How in the world you think you are going to
21   prove punitive damages factually, much less legally, all the
22   legal hurdles you have, it seems to me that the plaintiffs
23   would be wise to say, "We will forget about any punitive
24   damages assuming BP agrees that the case is a straightforward
25   causation and damage case," and we would look at individual

09:47

1  cases on that basis.  That would make sense for each side.

2  Otherwise, you guys are going to be bogged down in litigation

3  for years here.  That's my view here now, but it's not an

4  official ruling.  I'm just telling you my thoughts about this

5  case right now.

6           MR. FALCON:  Frankly, Your Honor, that's the deal the

7  plaintiffs have been trying to agree to and that's what we

8  thought we were headed towards.  At the same time, even though

9  it's maybe a long shot on the punitive damages side, it's a

10  leverage that we have that, until they give up their

11  affirmative defenses and we cut the deal, we believe that we

12  should have a right to discover it and find out is there a

13  factual basis for it on the response side.

14           THE COURT:  Well, let me ask Mr. Regan.  If the

15  plaintiffs waived any claim for punitive damages, would BP

16  agree that the only issues to be tried in individual cases

17  would be general and specific causation and compensatory

18  damages?

19           MR. REGAN:  Well, I think you would still have

20  exposure as part of causation if you want to --

21           THE COURT:  Well, that's causation.  They would have

22  to prove their exposure, sure.  That's part of the causation

23  equation.  I'm talking about there would be no liability issues

24  on either side.

25           MR. REGAN:  I think conceptually it makes sense,

09:48

1  Your Honor.  I think the risk we have is that we just have so
2  many plaintiffs trying to allege that there was fault in that
3  response.  I think --
4         THE COURT:  Well, if they give up punitive damages,
5  there would be no need to get into fault by anybody, it seems
6  to me.  That's the only reason they are raising fault is they
7  are trying to make some argument about punitive damages.
8         MR. REGAN:  Yes.  I think if we could have security
9  about the range of the allegations that are being made, then
10  that's something that would make some sense, Your Honor.
11  Again, I would like to see what it looked like specifically
12  before saying yes, absolutely, but I agree we right now -- our
13  concern is that the complaints that are in front of us are all
14  alleging punitive damages.
15         THE COURT:  I understand that.  They would have to
16  file something stipulating or withdrawing those allegations.
17         MR. REGAN:  Yes.
18         THE COURT:  That would advance these cases greatly
19  for all parties.
20         MR. REGAN:  Yes, I agree it would advance the cases.
21  I think, also, having some form of expert proof would advance
22  the cases, as well, as to where they fall sort of in the tiers.
23         THE COURT:  Let me ask this.  I don't know who wants
24  to speak to it for the plaintiffs.  We have about, what, 800 of
25  these cases left?  Does anybody have a number?  Mr. Regan,

09:50

1    maybe you have that number.

2              MR. REGAN:  873 is the number I'm using this morning,

3    Your Honor.  873.

4              THE COURT:  Okay.  I have the impression that the

5    vast majority of those would remain here even if we --

6              MR. REGAN:  That's right.

7              THE COURT:  -- decided to reallocate them or

8    whatever, right, or separate them out.

9              MR. REGAN:  Yes.  29 of those are in Florida, three

10   are Alabama, you have got one in Tennessee, then a couple of

11   dozen are in Texas, but I think it's 800-plus are EDLA cases,

12   something around that.

13             THE COURT:  Okay.  Mr. Dominick, is it your firm that

14   has most of these?  Who has most of these cases?

15             MR. DOMINICK:  That's correct, Your Honor.

16   Nexsen Pruet.

17             THE COURT:  So you have how many of the 800 or so,

18   roughly?  I don't need an exact number.

19             MR. DOMINICK:  Roughly, between 700 and 750, I

20   believe.

21             THE COURT:  How many?

22             MR. DOMINICK:  I think 700-plus.

23             THE COURT:  Oh, I thought you said 2,700.  I

24   misunderstood you.  Okay.

25             MR. DOMINICK:  Oh, no.  No, Your Honor.  I'm sorry.

09:51

1      **THE COURT:** Somewhere around 700. So how many

2   causation experts do you have?

3      **MR. DOMINICK:** Well, we are still developing this.

4   Part of the problem, Your Honor, is without having -- I know BP

5   would like for us to go ahead and work up all 750 cases totally

6   with all of our experts, but that's just financially not

7   feasible. I think what we have been waiting on is to have some

8   number of representative cases where we could work those up.

9   We are looking at four to five experts probably for these

10  cases.

11     Your Honor, I think the difficulty here, it's

12  not -- you know, what Your Honor is suggesting makes a lot of

13  sense to me. The question is whether BP wants to continue to

14  raise as an affirmative defense that our clients failed to

15  properly use PPE that they were provided, you know, or are they

16  going to waive those. In our view, OSHA has been clear about

17  it on the [Zoom audio distortion] that BP is responsible for

18  workers' safety. What is their obligation? Can they delegate

19  that obligation to the subcontractors? I don't think so. They

20  are supposed to be responsible for workers' safety, and that

21  would include supervision.

22     So if those issues are off the table and they

23  are not going to raise that as an affirmative defense, I

24  certainly understand giving up the punitive damages aspect, and

25  that may be a good resolution that would advance the cases.

1    But if we are just going forward with these cases and BP is

2    going to continue to want to drill down on the response, we are

3    not really saving any time or effort in that situation,

4    Your Honor.

5              THE COURT:  Thank you for that, but what I'm not

6    clear on -- do you have expert reports already on some of these

7    clients?

8              MR. DOMINICK:  We do on some.  We do, and we have

9    been working with some of the other plaintiffs' attorneys, you

10   know, with their clients.  We do have experts who have looked

11   at them.  We haven't generated formal reports on a lot of these

12   because it didn't make sense, you know, to go to that step.  We

13   have experts that have testified that the -- that are lined up

14   to look at the exposure for each individual.  They have looked

15   at some of our cases that are [Zoom audio distortion] exposure,

16   various general and specific causation.

17                   We have done that on some of our cases, but we

18   have been waiting for guidance, I think, from the Court as to

19   whether there are going to be trial flights, whether there are

20   going to be bellwether cases or what.  We just couldn't work up

21   all 750 cases, Your Honor.  It's just not practical to work up

22   750 cases.

23             THE COURT:  What about general causation?  Do you

24   have a single general causation expert or do you have more than

25   one?

1      **MR. DOMINICK:**  We have more than one on general

2  causation, chemist and toxicologist, maybe more than that.

3  Again, we are working with some of the other plaintiff

4  attorneys ready to go to develop those issues.  They have

5  looked at some of it as far as the data is concerned and looked

6  at some of our individual plaintiffs.  Yes, we have two or

7  three on general causation, and then we have specific causation

8  experts also.

9      **THE COURT:**  So if you have roughly 700 clients, how

10  many separate, different medical conditions are your clients

11  alleging?

12      **MR. DOMINICK:**  Well, I think they fall into, you

13  know, certain buckets.  I mean, we can allege five different

14  conditions that could all be related to inhalation and

15  breathing problems.  You could have five conditions that all

16  are related to drum exposure.  You could have different

17  conditions and -- I would call them symptoms that relate to

18  different buckets of medical problems.

19          So there is a difference as far as that is

20  concerned.  There's a difference where they work.  Now, some of

21  them did the same job.  A lot of them did the same jobs:

22  cleaning buoys, cleaning inside ships, food workers.  We have

23  some differences there that would have to be delved into, but

24  the common issues are still, you know, what's BP's

25  responsibility and duty for workers' safety if we are going to

Case 2:10-md-02179-CJB-DPC   Document 27486   Filed 10/22/21   Page 21 of 41

09:57

1    get into that second level of liability and punitive damages.
2    If we are not, then I think it's just a straight-up exposure
3    case and then you are looking at individual issues.  I mean,
4    even in the BELO dockets, it's my understanding they have
5    selected certain groups of plaintiffs and gone through the
6    process of seeing whether they could prove general and specific
7    causation.
8             THE COURT:  Mr. Regan suggested that these 800 or 900
9    remaining plaintiffs are alleging some 1,900 different
10   conditions.  Does that sound accurate to you?
11            MR. DOMINICK:  No.  That doesn't sound accurate, but
12   I don't know.  I don't represent all the plaintiffs.
13            THE COURT:  Well, you represent the bulk of them,
14   700, so you must have some sense of that.
15            MR. DOMINICK:  Well, I think there are a lot of
16   different symptoms that our clients say is related to the
17   spill.  When you drill down and you have a specific case where
18   you have to make a presentation to Your Honor and someone else
19   as to general and specific causation, then that's really going
20   to be the expert's call.  That's not going to be the client's
21   call.
22            THE COURT:  I don't envision that this case involves
23   what I call a signature disease.  In other words, like exposure
24   to asbestos it's pretty commonly known is related to
25   mesothelioma and other lung diseases.  Is there some signature

09:58

1  disease that would be commonly caused, in your experts'

2  opinions, by exposure to, let's say, Corexit?

3          **MR. FALCON:**  Your Honor, may I address that?

4          **MR. DOMINICK:**  I might let Mr. Falcon address that,

5  Your Honor.

6          **THE COURT:**  Okay.  Okay.  Go ahead, Mr. Falcon.

7          **MR. FALCON:**  Again, Your Honor, our experience -- and

8  this kind of goes to the general causation versus specific.  We

9  did a hearing in front of Judge Rodgers.  We have a ruling

10  which has informed us on kind of her path forward of how she

11  sees this going.  We thought general causation would be just is

12  there epidemiology that supports it.  A little bit kind of

13  filters into the exposure, what were the exposures.

14          So to prove these cases, I think general and

15  specific overlap so much it may make more sense to kind of pick

16  out the diseases that are caused and then put them all

17  together.  I think there's probably five or six expert kind of

18  categories that are going to be needed to prove these: a

19  toxicologist, some epidemiologists, a medical doctor who is

20  also an occupational doctor or a cancer expert, an industrial

21  hygiene expert, and then probably some chemists.  Those are the

22  kind of areas of experts that we are going to be relying upon

23  that we are working with currently.

24          Back to the signature disease question,

25  certainly the blood disorders are very clearly linked in the

Case 2:10-md-02179-CJB-DPC Document 27486 Filed 10/24/22 Page 23 of 41

10:00 1   literature with the benzene and the other "zenes" that are out

2   there and part of constituents of this stuff.  So we have some

3   blood cancers that are pretty closely related and some other

4   blood disorders that are very, very well-supported in the

5   literature.  The IARC has kind of put them at Category 1

6   chemicals because they are known to cause humans to get cancers

7   in the blood.

8           **THE COURT:**  How many of your 700 clients are alleging

9   some type of cancer, Mr. Dominick?

10          **MR. DOMINICK:**  Yes, Your Honor.  I believe it's,

11  like, 25 or 30 out of these number of cancer.

12          **THE COURT:**  Okay.

13          **MR. GISLESON:**  Your Honor, this is Soren Gisleson.

14  Out of my five clients --

15          **THE COURT:**  I'm sorry.  Wait a minute.  Mr. Gisleson,

16  you just jumped in there.  Hold on.

17          **MR. GISLESON:**  I apologize.

18          **THE COURT:**  I can barely hear you.  You are breaking

19  up.  You are in and out too.

20          **MR. GISLESON:**  Sorry, Your Honor.  Soren Gisleson on

21  behalf of Herman Herman.  I hope that's better.

22          **THE COURT:**  That's better, yes.

23          **MR. GISLESON:**  All right.  Sorry about that.  I was

24  just saying that out of my five clients, I think somewhere

25  around three of them have leukemia or some kind of blood

10:02  1  disorder, for whatever that's worth.

2            THE COURT:  Okay.

3            MR. LOEHN:  Your Honor, Thomas Loehn.

4            THE COURT:  Yes.  Go ahead.

5            MR. LOEHN:  On behalf of my one client, we have an

6  aggravation of a preexisting cancer.

7            THE COURT:  Okay.  You already have an expert or

8  experts?

9            MR. LOEHN:  Yes, Your Honor.

10            THE COURT:  I think I had asked you this sometime

11  previously, Mr. Loehn, or somebody representing your client.

12  Have his medical records, including expert reports, been

13  provided to BP already?

14            MR. LOEHN:  Yes, Your Honor.

15            THE COURT:  Okay.

16            MR. LOEHN:  He had a preexisting condition.  He lived

17  on the Gulf Coast.  His house was covered with the oil.  BP

18  paid to clean his house.  He was living in the house at the

19  time, and he had the aggravation to his preexisting condition.

20            THE COURT:  Which was what, leukemia?

21            MR. LOEHN:  Yes, sir.

22            THE COURT:  Okay.  Everyone hasn't had a chance to

23  speak.  Who wants to speak next?

24            MR. DURKEE:  Your Honor, David Durkee on behalf of

25  the Downs Law Group.  We are sort of talking in a vacuum on the

Case 2:10-md-02179-CJB-DPC Document 27674-86 Filed 10/22/21 Page 25 of 41

10:03

1    plaintiffs' side because as the other counsel have informed the

2    Court and as the Court knows, we have filed our individual

3    complaints on every single one of the individual plaintiffs.

4    Our proposal, I think, in our briefing is really basically

5    requiring the defendant to file answers in those cases as we

6    filed complaints.

7              **THE COURT:**  What's that going to accomplish right

8    now?

9              **MR. DURKEE:**  Yes, Your Honor.  That's exactly the

10   next point I was going to make.  If those answers are filed, we

11   could then within a very short period of time, maybe 30 days

12   after those answers are filed, outline to the Court those

13   issues that are arising in all of the responsive pleadings, in

14   the affirmative defenses, that we feel as a matter of law --

15   somewhat sort of like we discussed last time, subsequent tort

16   liability may not be applicable to these plaintiffs and may be

17   decided as a matter of law.  There also may be the issue of

18   punitive damages that might be decided as a matter of law, and

19   we could outline those affirmative defenses that we feel could

20   be handled in this situation as a group prior to being released

21   into individualized cases.

22              I think by doing that process, by having the

23   answers and then having 30 days to review their answers and

24   affirmative defenses, to outline to the Court those issues that

25   we feel could be best handled on a group basis would allow the

10:05

1    Court to get to where we believe the Court wants to go and

2    where I believe the plaintiff counsel sort of want to go, and

3    that is really get to the point where there are only two issues

4    that remain and that's causation and damages.

5              THE COURT:  Well, we can get there a lot easier than

6    that if you-all go along with the suggestion I made at the

7    beginning here today.

8              MR. DURKEE:  That's exactly why I think that might

9    lead to that resolution by stipulation.

10             THE COURT:  Well, I don't think requiring them to

11   file 700, 800 answers right now is going to make a difference

12   in what I suggested.  We have all been around long enough to

13   know when you read pleadings and answers, you get so much

14   boilerplate stuff that it's just not very helpful.  It's almost

15   like reading answers to generic interrogatories.  You get so

16   much boilerplate, fluff, and vague stuff that it's just not

17   very helpful, I find.

18             Okay.  Anything else, Mr. Durkee?

19             MR. DURKEE:  No, Your Honor.  Thank you for your

20   time.

21             THE COURT:  Okay.  Anyone else?

22             MR. DOMINICK:  Your Honor -- I'm sorry.

23             THE COURT:  Go ahead.  Go ahead, Mr. Dominick.

24             MR. DOMINICK:  Yes.  Paul Dominick again, Your Honor.

25   I think it comes down to this, to me -- and, of course, it

10:06

1    matters how it comes down to you.  To me it's a question of

2    whether the plaintiffs will waive punitive damages as relates

3    to the spill response; if plaintiffs are willing to do that,

4    will BP waive defenses of contributory and comparative

5    negligence as related to the spill response.

6              **THE COURT:**  Exactly.  That's the question I posed

7    originally.

8              Well, let me ask Mr. Regan again.  What's your

9    response to that?

10             **MR. REGAN:**  I think there are some possibilities

11   there.  I think the challenge is the nature of the allegations

12   that we look at right now and also the fact that these

13   individual exposures and causation questions can include

14   questions of whether people complied with different PPE and

15   different things that are there.

16             We have seen this in the BELO cases.  It is a

17   case-by-case story.  I think there's ways to shape it.  As the

18   defendant here, I would like to see specifically sort of what

19   the plaintiffs are alleging because what I don't want to be is

20   in a situation where they say, "Well, we are going to still

21   want to bring in this stuff to this trial," because then we

22   might as well just go ahead and have the defenses of it.

23             I think if I could circle back to where you

24   were, Your Honor, the 1,900 different conditions comes straight

25   out of PTO 68.  That was the Court's effort to try to answer

10:07

1    the question that you are also asking today, which is what do

2    we have here.

3              From an organizational standpoint -- and I heard

4    Mr. Dominick say it -- that's what the plaintiffs are saying,

5    that that's their condition.  I take that.  I'm not criticizing

6    it, but the cases are going to require experts to say that that

7    condition was caused by the spill.  They are going to have to

8    say it for general causation and specific causation.  If we

9    want clarity about what we are looking at, that's where the

10   clarity comes.  If we look at what's happened in BELO, that's

11   where the cases are getting dismissed.

12             I mean, we can talk about punitive damages and

13   the shape of a trial, but in terms of what the real issue here

14   is, we do have generic complaints.  I agree with Your Honor.

15   I'm not proud to say it, but a generic complaint is going to

16   get a generic answer.  It just is.  It's going to get generic

17   affirmative defenses.  Why?  Because we are all sort of trying

18   to get the shape of the world at that point in time.

19             To get to a place where we have clarity about

20   how many experts are we dealing with, how many experts on

21   general causation, how many conditions really are these cases

22   about, we tried that in PTO 68 and we got 1,900 answers.

23             Again, I'm not saying this is the only way to do

24   this, but we have seen in the *Vioxx* litigation that was

25   Judge Fallon's case and we have seen it in some other

1   Fifth Circuit cases, one in Texas in 2011, where it's not an
2   expert report, but it's an affidavit.  It will cut through this
3   challenge we have right now of saying where is the shape of it.

4          Sorry for the long answer, Your Honor, but that
5   gets me to the last point.  Once I sort of know, okay, this is
6   what this plaintiff is going to come forward and prove, I'm in
7   a better position to know what my defenses are going to be
8   about that plaintiff.  Speaking about it in the abstract is
9   tough.

10         Overall, generically, if we are in a situation
11  where the plaintiffs are not alleging punitive damages, that is
12  a simpler case, absolutely.  Can that case be treated more
13  efficiently?  One hundred percent.  Does it mean that
14  individualized issues about where people were in the response
15  or who they were working with -- some of these people are
16  alleging that people told them not to do things.  We can't get
17  rid of that.  It's going to be part of these cases and
18  important in it.

19         **THE COURT:**  I don't know that I'm any clearer now on
20  what BP's position is.  Let me state what I think you are
21  saying is that if the plaintiffs agree to waive any claim for
22  punitive damages -- let's assume they would do that -- BP would
23  waive any argument of comparative fault or contributory
24  negligence, but you would still feel that in some cases there
25  could be relevant evidence of the plaintiffs' conduct and,

1    like, did you have PPE on or not because that would be relevant

2    to their exposure.

3              **MR. REGAN:**  Correct.  Yes, Your Honor.  Exactly

4    right.

5              **THE COURT:**  I think that's what you are saying.

6              **MR. REGAN:**  Yes.  Correct.

7              **THE COURT:**  Let me go back to Mr. Dominick.  How is

8    that?

9              **MR. FALCON:**  Your Honor, from our standpoint, we

10   think --

11             **THE COURT:**  Wait, wait, wait, wait.  Who is talking?

12             **MR. FALCON:**  -- it still begs the question --

13             **THE COURT:**  Who is trying to talk?  I think I

14   directed the question to Mr. Dominick, but if he wants to defer

15   to Mr. Falcon, I will hear Mr. Falcon.

16             **MR. DOMINICK:**  I will defer to Mr. Falcon and see

17   what he says.  If I don't like it, I'll --

18             **THE COURT:**  Okay.

19             **MR. FALCON:**  There's a pretty good chance of that.

20   Let me try.

21             **THE COURT:**  There's a lot of pressure on you,

22   Mr. Falcon.

23             **MR. FALCON:**  It leaves open the question of why did

24   they not have the PPE on and if [Zoom audio distortion] --

25             **THE COURT:**  Okay.  Well, you know what?  You know

10:12

1  what?  I think I've heard enough here that you-all are not
2  going to agree to anything, it sounds like.  If that's the
3  case, here's what I am going to do.  I think we are going to
4  sever off any issues of punitive damages.  I'm just going to
5  sever them out for now.
6          Plaintiffs don't have to dismiss them or
7  anything, but we are not going to deal with them.  We are not
8  going to have any discovery, anything on those issues.  We are
9  not going to have any motion practice on punitive damages.  We
10 are going to go forward otherwise.  I want you-all to give me a
11 report.  Mr. Regan briefly gave me some stats on --
12         It looks like probably less than 50 cases would
13 be transferred elsewhere, Mr. Regan --
14         **MR. REGAN:**  Yes, sir.
15         **THE COURT:**  -- and the rest would stay here.  I want
16 you-all to put that in writing, see if the parties can agree
17 and give me a report within, let's say, 14 days --
18         **MR. REGAN:**  That's fine, Your Honor.
19         **THE COURT:**  -- a list of the cases that originated
20 elsewhere and would be remanded elsewhere.  Of course, those
21 plaintiffs could elect to stay here.  They could elect to waive
22 *Lexecon*.  Barring that, I want a list of what cases have to be
23 sent where.  The rest that would stay here I'm probably going
24 to have the clerk reallocate amongst all the judges on the
25 Court much like we did the BELO cases.  I will issue some kind

1    of order before I do that about severing off the punitive

2    damages issues.  I think that will streamline the case as much

3    as we can right now.

4            Barring all of the parties coming to their

5    senses and agreeing to a more simplified trial plan, which

6    would be let's try these cases just like the BELO cases --

7    because that's what they are, in my view.  They are BELO cases

8    in the end.  The plaintiffs are going to sink or swim on

9    whether they can survive *Daubert* and get past general and

10   specific causation issues.

11           So that's what I'm going to do.  Anybody have

12   anything else?  There are a couple of discrete cases that maybe

13   we should talk about.  I'm not quite clear.  Who represents

14   DRC?  No one here?

15           Did we sever those cases already, Ben?  No.

16   Okay.

17           Mr. Regan, do you know anything about DRC cases?

18        **MR. REGAN:**  Your Honor, I think you're thinking about

19   the LWCC.  I think DRC, if I remember the pleading, is just

20   saying they want to reserve all rights.  I'm not sure they were

21   asking for any specific relief.  I can double-check that real

22   quick for you.

23        **THE COURT:**  Okay.  There are two cases apparently

24   they are defendants in.

25        **MR. REGAN:**  There also a Knight's Marine that has a

10:15  1    different issue that they wanted to talk about.

2          THE COURT: Right.  Right.  DRC, which is DRC

3    Emergency Services, LLC and DRC Marine, LLC, indicated back in

4    October that they are a defendant in two remaining B3 personal

5    injury claims, *William Fitzgerald v. BP, et al.*, 13-650, and

6    *Joseph Brown v. BP, et al.*, 12-2333.  I'm not sure --

7          MR. REGAN: Your Honor, I think their pleadings are

8    simply saying they support reallocation.  I don't think they

9    are asking for anything specific.

10          THE COURT: Okay.  Then, as you point out, I think we

11    have somebody here for Knight's Marine.

12          MR. FEENEY: Yes, Your Honor.

13          THE COURT: Okay.  I'm sorry.  Identify yourself

14    again.

15          MR. FEENEY: Fred Feeney --

16          THE COURT: Yes, Mr. Feeney.

17          MR. FEENEY: -- from Franke & Salloum in Gulfport.

18          THE COURT: Okay.  What's the situation with Knight's

19    Marine?

20          MR. FEENEY: Your Honor, Knight's Marine has one case

21    filed against it by one singular plaintiff.  That plaintiff

22    also has a separate case filed against BP.  It's Mr. Michael

23    Brandon Vickers.  That case was filed in the Eastern District

24    of Louisiana and then brought into the MDL.  We don't believe

25    it belongs in the Eastern District.  As I understand the

10:17

1    Court's intention to reallocate the cases to other judges, once

2    the reallocation occurred, he would have the opportunity to

3    argue for either a dismissal or a change of venue.

4            THE COURT:  Okay.  You're talking about one case,

5    13-456?

6            MR. FEENEY:  Your Honor, the cause number I have

7    is -- yes, 13-456.

8            THE COURT:  Then the separate case by Mr. Vickers

9    against BP is 13-304, it appears.  Both of those cases were

10   filed here in the Eastern District?

11           MR. FEENEY:  I believe so, yes.  I know the case

12   against us was.

13           THE COURT:  So they did not come here by the JPML as

14   tagalongs?

15           MR. FEENEY:  Correct.

16           THE COURT:  Okay.  I don't know about the one against

17   BP.

18               Mr. Regan, are you familiar with that case at

19   all?

20           MR. REGAN:  Not deeply.  I know there are the two,

21   and I know that this is an issue that could be raised in these

22   cases, but I don't know if it's anything particularly unique.

23           THE COURT:  The case against BP is not really any

24   different than all these other B3 cases?

25           MR. REGAN:  Correct.  That's correct, Your Honor.

10:19

1    **THE COURT:**  Okay.  I guess the only thing that
2    troubles me a little bit is if the case against BP stays
3    here --
4              Is Mr. Vickers -- Mr. Feeney, maybe you know
5    this -- alleging essentially the same thing against BP and
6    Knight's Marine?  In other words, it all arises out of the same
7    conduct?
8    **MR. FEENEY:**  Other than the initial factual basis for
9    each complaint, in that Mr. Vickers was employed by Knight's
10   Marine and he claims to have been a Jones Act seaman who was
11   putting out boom, his claims against BP and the rest of the
12   allegations of the complaint seem to almost mirror each other
13   as far as causation and damages.
14             We do think there's a significant separate
15   question about Mr. Vickers' status, his ability to bring a
16   civil action against his employer, Knight's Marine, or whether
17   this should be handled by a state workers' compensation scheme
18   or maybe a federal scheme under the Longshore Act.
19   **THE COURT:**  Who is his attorney?  Do you know?
20   **MR. FEENEY:**  Mr. Falcon is.
21   **MR. FALCON:**  I am, Your Honor.
22   **THE COURT:**  Oh, Mr. Falcon.  Okay.  Do you want to
23   comment on this, Mr. Falcon?
24   **MR. FALCON:**  Yes, sir.  Yes.  He was working off a
25   vessel [Zoom audio distortion] --

10:20

 1          **THE COURT:**  Wait, wait.  You're breaking up,
 2   Mr. Falcon.  I'm having trouble hearing you.
 3          **MR. FALCON:**  I'm sorry.  Yes.  We allege that he was
 4   working off of a vessel, he is a Jones Act seaman of Knight's
 5   Marine, and he is entitled to damages and maintenance and cure.
 6   It probably should be tried with his BP claim because they are
 7   obviously very overlapping.  I think he was working off the
 8   coast of either Mississippi or Alabama -- Mississippi, so I'm
 9   not so sure whether we would be opposed to consolidate them in
10   Mississippi and try them over there.
11          **THE COURT:**  Well, maybe you and Mr. Feeney need to
12   discuss that before we do anything with these.  Mr. Feeney
13   apparently believes that you're in the wrong venue.
14              Right, Mr. Feeney?
15          **MR. FEENEY:**  Yes, we do, Your Honor.  I would love to
16   have a conversation with Mr. Falcon.  One over seven years
17   would be amazing.
18          **THE COURT:**  Mr. Falcon.
19          **MR. FALCON:**  No problem, Your Honor.
20          **THE COURT:**  Okay.  When we finish this call, why
21   don't you guys pick up the phone and talk to each other.
22              All right.  Mr. Gisleson, do you want to say
23   anything more about Herman & Herman's cases?  You have five
24   cases?
25          **MR. GISLESON:**  Correct, Your Honor.  We have five

10:22

1    cases.  We don't want to be the tail wagging the dog.  The only
2    thing different about our punitive damages question is the fact
3    that it's based on the failure to pay maintenance and cure,
4    because we maintain that our five clients are Jones Act seamen.
5    Other than that, everything else is pretty much along the same
6    lines as Your Honor has been discussing this morning.
7              THE COURT:  Anyone else?
8                   So what I want the parties to jointly provide
9    is, as I said, an updated list of the remaining B3 cases.  The
10   list should identify: (a) which cases will remain in Eastern
11   Louisiana post-severance, either because it was originally
12   filed here or it was removed from Louisiana state court or
13   because the parties consent to trial here; and (b) which cases
14   must be transferred to another district and identify which
15   district.
16                  For cases that will remain in Eastern Louisiana,
17   we are going to have the parties provide a proposed omnibus
18   severance order in Word format that contains -- and I'll put
19   this in a written order -- certain general background
20   information, the relevant procedural history, and so forth.
21                  For cases that will be transferred to anther
22   district, we will need a proposed omnibus suggestion of remand
23   if they came through the JPML because I cannot unilaterally
24   remand the case elsewhere if it was transferred here as a
25   tagalong.  If it's a case such as the Knight's Marine case, I

10:24

1  could send that case somewhere else if it made sense because it

2  was filed here directly.  If it came through the JPML, I will

3  have to file with them a suggestion of remand and let them

4  remand the case.

5             The parties are going to have to supply a master

6  list of joint designated documents in the MDL that would be

7  applicable to all B3 cases so that list can go wherever each of

8  these cases go.

9             All right.  Anybody have anything else right

10  now?  You have 14 days to file what I just said.  We will issue

11  a minute entry from this conference too.  Anybody else have

12  anything?

13             MR. THIBODEAUX:  Your Honor --

14             THE COURT:  Mr. Thibodeaux, you didn't say anything

15  here today.

16             MR. THIBODEAUX:  I represent United States

17  Environmental Services and United States Maritime Services,

18  Inc. and United States Maritime Services, Inc. d/b/a

19  United States Maritime Services, LLC.

20             We had filed a complaint for declaratory

21  judgment in 2012 seeking a defense and indemnity if we were

22  cast in judgment because we were named in a number of the

23  claims arising from the Vessels of Opportunity program.  We

24  have complied with the Court's various orders to divide our

25  complaint for declaratory judgment to represent each of the

three entities we represent.

When we came before Your Honor a year ago, you stayed these three matters. When you first asked for there to be a status conference 60 days ago, we had filed a proposal that we would just like these cases to remain stayed. We have been liaising with --

THE COURT: These are declaratory judgment actions that you filed?

MR. THIBODEAUX: Yes, Your Honor.

THE COURT: You're seeking indemnity from who, BP?

MR. THIBODEAUX: Yes, in the off chance that we would be held liable. It appears that as the MDL has progressed that potential liability has continued and continued to decrease. I think we are basically at the point where our claims may resolve itself without having to move forward because the last list of B3 claimants that were provided to us by BP shows that none of the remaining B3 claimants were involved with the St. Bernard Parish Vessels of Opportunity program, which is what our clients participated in.

What my concern is, Count 2 of my complaint for declaratory judgment deals with claims for potential defense and indemnity for occupational illness. As Your Honor knows, the MDL has been like a Hydra; as one head has been cut off, two or three more have sprung up for potential claims. What I am just concerned of, as a defense lawyer, is unintended

10:27

1    consequences because in the last year --

2              THE COURT:  Well, look, you know, we have been called

3    a lot of things around here, but the Hydra is the first.

4              MR. THIBODEAUX:  First time.  First time, Your Honor.

5              THE COURT:  Go ahead.

6              MR. THIBODEAUX:  Not meaning any offense, just from a

7    defense standpoint you always have to be looking around.  I

8    don't want malpractice.

9              THE COURT:  Okay.

10             MR. THIBODEAUX:  After your last status conference,

11   as I appreciate it, USES received 481 tenders from O'Brien's

12   regarding defense and indemnity in the BELO claims.  Those have

13   been dealt with, Your Honor, in the case 19-CV-01418, but

14   that's certainly on appeal to the Fifth Circuit.  If your

15   ruling is upheld, I think everything could be resolved.

16             THE COURT:  Let's cut to the chase, Mr. Thibodeaux.

17   All you are asking is that we continue to stay your three

18   cases?

19             MR. THIBODEAUX:  Yes, mercifully, Your Honor.

20             THE COURT:  Anybody object to that?

21             Done.  You have won, Mr. Thibodeaux.  You have

22   won for today at least.

23             MR. THIBODEAUX:  Thank you, Your Honor.  For today.

24             THE COURT:  All right.  Anybody have anything else?

25             Ms. Jakola, Mr. Regan is not going to let you

10:29   1   speak today?

2   **MS. JAKOLA:** I guess not, Your Honor.

3   **THE COURT:** Okay. All right. Everyone have a good

4   day.

5   (Proceedings adjourned.)

6   * * *

7   **CERTIFICATE**

8   I, Toni Doyle Tusa, CCR, FCRR, Official Court

9   Reporter for the United States District Court, Eastern District

10   of Louisiana, certify that the foregoing is a true and correct

11   transcript, to the best of my ability and understanding, from

12   the record of proceedings in the above-entitled matter.

13

14

15   */s/ Toni Doyle Tusa*
    Toni Doyle Tusa, CCR, FCRR
16   Official Court Reporter

17

18

19

20

21

22

23

24

25