09:26:59  1                    UNITED STATES DISTRICT COURT.
                            EASTERN DISTRICT OF LOUISIANA

          2

          3     ******************************************************************

          4     IN RE: OIL SPILL BY THE
                OIL RIG *DEEPWATER HORIZON*
          5     IN THE GULF OF MEXICO ON
                APRIL 20, 2010
          6
                                               CIVIL ACTION NO. 10-MD-2179 "J"
          7                                    NEW ORLEANS, LOUISIANA
09:23:34                                       FRIDAY, APRIL 1, 2022, 9:30 A.M.
          8

          9     THIS DOCUMENT RELATES TO:

         10     14-657, 17-2678, 17-3686,
                19-1418, 21-1761, 21-2243,
         11     AND ALL SEVERED B3 CASES

         12
                ******************************************************************
         13

         14

                   TRANSCRIPT OF STATUS CONFERENCE PROCEEDINGS AND ORAL ARGUMENT
         15            HEARD BEFORE THE HONORABLE CARL J. BARBIER
                            UNITED STATES DISTRICT JUDGE
         16

         17
                APPEARANCES:
         18

         19     FOR THE PLAINTIFFS'
                LIAISON COUNSEL:        HERMAN HERMAN & KATZ
         20                             BY:  SOREN GISLESON, ESQUIRE
                                        820 O'KEEFE AVENUE
         21                             NEW ORLEANS, LA  70113

         22

         23     FOR THE PLAINTIFFS:     THE DOWNS LAW GROUP
                                        BY:  C. DAVID DURKEE, ESQUIRE
         24                                  JEREMY D. FRIEDMAN, ESQUIRE
                                        3250 MARCY STREET, SUITE 307
         25                             COCONUT GROVE, FL  33133

                              ***OFFICIAL TRANSCRIPT***

```
 1    APPEARANCES CONTINUED:

 2

 3                              ROBINSON LAW OFFICES
                               BY:  CRAIG M. ROBINSON, ESQUIRE
 4                             700 CAMP STREET
                               NEW ORLEANS, LA  70130
 5

 6
      FOR BP AMERICA INC.,
 7    BP AMERICA PRODUCTION
      COMPANY, BP COMPANY
 8    NORTH AMERICA INC.,
      BP CORPORATION NORTH
 9    AMERICA INC.,
      BP EXPLORATION &
10    PRODUCTION INC.,
      BP HOLDINGS NORTH
11    AMERICA LIMITED,
      BP PRODUCTS NORTH
12    AMERICA INC.:          LISKOW & LEWIS
                             BY:  R. KEITH JARRETT, ESQUIRE
13                                ONE SHELL SQUARE
                             701 POYDRAS STREET
14                           SUITE 5000
                             NEW ORLEANS, LA 70139
15

16
                             KIRKLAND & ELLIS
17                           BY:  MATTHEW T. REGAN, ESQUIRE
                                  A. KATRINE JAKOLA, ESQUIRE
18                                KRISTOPHER S. RITTER, ESQUIRE
                             300 N. LASALLE
19                           CHICAGO, IL 60654

20

21    FOR O'BRIEN'S RESPONSE
      MANAGEMENT, INC.,
22    NATIONAL RESPONSE
      CORPORATION:           QUINN EMANUEL URQUHART & SULLIVAN
23                           BY:  MICHAEL J. LYLE, ESQUIRE
                             1299 PENNSYLVANIA AVE. NW, SUITE 825
24                           WASHINGTON, D.C. 20004

25
```

**OFFICIAL TRANSCRIPT**

1   APPEARANCES CONTINUED:

2

3   ALSO PRESENT:

4

5                        ANDRE LAPLACE, ESQUIRE
                         TIM FALCON, ESQUIRE
6                        JEREMY GRABILL, ESQUIRE
                         WILSON MALOZ, ESQUIRE
7                        ERIC LITTLE, ESQUIRE
                         TARA KELLY, ESQUIRE
8

9                        IVAN RODRIGUE, ESQUIRE
10                       DAVID NEEDHAM, ESQUIRE
                         KEELY DULANEY, ESQUIRE
11                       GRANT LEGER, ESQUIRE
                         JASON MELANCON, ESQUIRE
12

13

    OFFICIAL COURT REPORTER: CATHY PEPPER, CRR, RMR, CCR
14                           CERTIFIED REALTIME REPORTER
                             REGISTERED MERIT REPORTER
15                           500 POYDRAS STREET, ROOM HB-275
                             NEW ORLEANS, LA   70130
16                           (504) 589-7779
                             Cathy_Pepper@laed.uscourts.gov
17

18   PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.   TRANSCRIPT
     PRODUCED BY COMPUTER.
19

20

21

22

23

24

25

                         *OFFICIAL TRANSCRIPT*

1                           I N D E X

2

3      ITEMS                                              PAGE

4

5      14-657, MELANCON RIMES VERSUS DOWNS LAW GROUP,        7

6      MOTION TO DISMISS...................................

7      17-2678, MILLER, MOTION FOR PARTIAL SUMMARY JUDGMENT.   7

8      17-3686, MR. REGAN, COON VERSUS BP...................   7

9      19-1418, O'BRIEN'S VERSUS BP.........................   7

10     21-1761, DOUCET VERSUS DANOS AND CUROLE..............   7

11     21-2243, JOHNSON VERSUS BP...........................   7

12     MR. DURKEE...........................................   8

13     MR. REGAN............................................   9

14     MR. DURKEE...........................................  10

15     THE COURT............................................  12

16     DOUCET...............................................  12

17     MR. LAPLACE..........................................  12

18     THE COURT............................................  15

19     MR. BRISCOE..........................................  15

20     MR. REGAN............................................  16

21     O'BRIEN'S............................................  16

22     MR. LYLE.............................................  17

23     MR. REGAN............................................  20

24     MR. MALOZ............................................  24

25     MR. REGAN............................................  26

                         *OFFICIAL TRANSCRIPT*

1   MR. LYLE..........................................   27

2   THE COURT........................................   27

3   MR. LYLE..........................................   28

4   THE COURT........................................   28

5   MR. REGAN.........................................   28

6   THE COURT........................................   28

7   MR. LYLE..........................................   28

8   MELANCON RIMES VERSUS DOWNS........................   28

9   MR. FRIEDMAN......................................   29

10  THE COURT........................................   38

11  MR. ROBINSON......................................   39

12  MR. MELANCON......................................   44

13  MR. FRIEDMAN......................................   47

14  THE COURT........................................   48

15  MILLER............................................   50

16  MR. GISLESON......................................   50

17  MR. REGAN.........................................   52

18  MR. GISLESON......................................   55

19  MR. REGAN.........................................   56

20  MR. GISLESON......................................   56

21  MR. REGAN.........................................   58

22  THE COURT........................................   61

23  MR. REGAN.........................................   61

24  MR. GISLESON......................................   63

25  THE COURT........................................   64

*OFFICIAL TRANSCRIPT*

**P-R-O-C-E-E-D-I-N-G-S**

FRIDAY, APRIL 1, 2022

M O R N I N G   S E S S I O N

(COURT CALLED TO ORDER)


THE DEPUTY CLERK:  All rise.

THE COURT:  All right.  Good morning, everyone.

VOICES:  Good morning, Your Honor.

THE COURT:  Welcome back.  Have a seat.

Okay.  We have a number of matters on the agenda for this morning.  Gail, just go ahead and call the case, please.

THE DEPUTY CLERK:  Civil Action 10-md-2179, In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico on April 20, 2010.

THE COURT:  Okay.  Has everyone who is here and who needs to show proof that you're here signed this?

MR. DURKEE:  Yes, Your Honor.

MR. REGAN:  Yes, Your Honor.

THE COURT:  I want to see if there are any matters that would be very short and maybe we can resolve quickly and then leave the things that would take more time to the back end this morning.

I think there was one matter that I'm told was

*OFFICIAL TRANSCRIPT*

09:37:09  1  resolved by Mr. Regan and that involve you?

09:37:17  2      MR. REGAN:  Good morning, Your Honor.  Matthew Regan on

09:37:19  3  behalf of BP.

09:37:19  4          The one matter that was resolved was a motion

09:37:22  5  that filed by Mr. Falcon, and that has been resolved and is no

09:37:27  6  longer up for today.

09:37:27  7      THE COURT:  Okay.  Thank you.

09:37:28  8      MR. DURKEE:  Your Honor, our motion to clarify might be

09:37:31  9  a very short motion.  I don't anticipate a long argument on it.

09:37:35 10      THE COURT:  Okay.  The ones that I have, we have the

09:37:40 11  motion to dismiss in 14-657.  That's Melancon Rimes versus

09:37:48 12  Downs Law Group.  We have a motion for partial summary judgment

09:37:54 13  in 17-2678, Miller.  I think those two matters will take more

09:38:02 14  discussion.  Then we have the one that has gone away is

09:38:13 15  17-3686, Mr. Regan, Coon versus BP?

09:38:15 16      MR. REGAN:  Yes, Your Honor.

09:38:16 17      THE COURT:  Okay.  So, we don't need to talk about that

09:38:19 18  today.

09:38:20 19          Okay.  Then let's see.  Of course, we have

09:38:36 20  O'Brien's versus BP, 19-1418.  Then the next one would be

09:38:45 21  Doucet versus Danos and Curole.

09:38:49 22      MR. REGAN:  That's correct.

09:38:50 23      THE COURT:  Then Johnson versus BP, that's the one

09:38:51 24  you're talking, about Mr. Durkee?

09:38:55 25      MR. DURKEE:  Yes, Your Honor.

*OFFICIAL TRANSCRIPT*

09:38:55  1    THE COURT:  Do you want to come up?  Yeah, I think we
09:38:59  2  resolve that quickly.
09:38:59  3    MR. DURKEE:  Yes, Your Honor.  Good morning.  Thank you
09:39:01  4  for taking the time on this morning for this quick motion.
09:39:04  5        I think all parties have done a very good job up
09:39:08  6  to this point complying with everything that you had requested.
09:39:12  7  The clarification for this case is for the future and for
09:39:16  8  Ms. Johnson, and this is the situation, and I do think it's
09:39:19  9  important to point out that I do want to argue differently for
09:39:22 10  workers compared to residents.
09:39:28 11        This is really --
09:39:28 12    THE COURT:  Ms. Johnson is a resident?
09:39:30 13    MR. DURKEE:  She's a resident, Your Honor.  Yes, that's
09:39:32 14  correct.
09:39:33 15        What we're seeing as far as the plaintiffs' side
09:39:35 16  is we have a 120-day delay because of your pretrial orders that
09:39:40 17  forces us to file the case into EDLA.  It takes 120 days to get
09:39:46 18  to our preferred jurisdiction or venue.  During that time, for
09:39:50 19  the residents at least, they don't really receive any benefit.
09:39:54 20        They get a disclosure that is the general
09:39:58 21  disclosure that's been provided to the plaintiffs for the last
09:40:00 22  few years, so it's really just rubber stamping what they had
09:40:03 23  provided previously.
09:40:04 24        The workers are different.  The workers, during
09:40:09 25  that 120 days, get a full disclosure of their badge data, where

**OFFICIAL TRANSCRIPT**

09:40:15  1    they worked, when they worked, their invoicing data.  So, there

09:40:20  2    is a fair exchange of information for a worker.

09:40:22  3            THE COURT:  I understand.  Your argument is that it's

09:40:24  4    unfair because you have to provide certain documents and

09:40:30  5    information in the context of a resident.  They don't have

09:40:34  6    to -- BP doesn't have to do anything.

09:40:36  7            MR. DURKEE:  That's pretty much correct.

09:40:37  8            THE COURT:  All right.  Let me hear from Mr. Regan on

09:40:39  9    that.

09:40:39 10            MR. REGAN:  Good morning, Your Honor.  Matthew Regan.

09:40:42 11            The motion -- the relief that they are asking for

09:40:45 12    is really relief with respect to the JPML, I think that's

09:40:49 13    clear, not relief that this court could offer.

09:40:52 14            The inefficiency argument is a remarkable one

09:40:55 15    from the Down Law Group.  Statistically, nine out of every ten

09:40:59 16    cases they file is dismissed.  So, the process that is through

09:41:02 17    the Pretrial Order 63, 66, 68, it is informative for all

09:41:08 18    plaintiffs.  And actually, that process should be helpful to

09:41:12 19    evaluate these claims for everyone, including plaintiffs, the

09:41:14 20    Court, and for BP to see whether these cases should be going

09:41:19 21    forward because the numbers are just staggering.

09:41:22 22            If we look in the BELO space of 878 cases filed

09:41:27 23    by the Downs Law Group, 776 dismissed, 689 of those

09:41:31 24    voluntarily, but in this B3 space, somewhat as Your Honor is

09:41:35 25    very familiar, of the 40 cases that have been filed by the

*OFFICIAL TRANSCRIPT*

09:41:40  1    Downs Law Group, 11 have been dismissed.

09:41:41  2              So, the notion that having this process at the

09:41:43  3    beginning of the case is somehow inefficient is, I think,

09:41:48  4    fairly remarkable because what is inefficient is for us all to

09:41:52  5    go through the process of these cases just for them to go to a

09:41:53  6    point when they are just dropped.

09:41:54  7         THE COURT:  What is BP doing in these -- I understand

09:41:57  8    we're only talking about two cases, I believe, that the

09:42:01  9    Downs Group mentioned, and I'll let Mr. Durkee respond after,

09:42:07 10    but two nonworker B3 cases?

09:42:12 11         MR. REGAN:  In terms of the motion in front of -- the

09:42:16 12    plaintiff in front of you has already complied with the

09:42:18 13    pretrial orders.  The relief they want is never have to comply

09:42:23 14    with pretrial orders or new filings.  That's a prospective

09:42:26 15    relief.

09:42:27 16         THE COURT:  Okay.  Let me let Mr. Durkee respond

09:42:31 17    briefly.

09:42:31 18         MR. DURKEE:  Yes, Your Honor.

09:42:32 19         THE COURT:  Mr. Durkee, it seems like you're asking me

09:42:34 20    to tell the JPML how to conduct its business.  In your

09:42:42 21    memorandum, for example, you want me to order that the JPML

09:43:01 22    shall apply the appropriate statutory criteria when analyzing

09:43:05 23    whether or not a lawsuit shares a common set of facts, and so

09:43:10 24    forth, and should be transferred here, and then you want me to

09:43:18 25    order that the B3 lawsuits filed in any other district are not

*OFFICIAL TRANSCRIPT*

09:43:23 1    required to comply with Pretrial Order 63, 66, and 68, which is

09:43:29 2    much broader than what you just talked about.  That would apply

09:43:32 3    to all B3 cases filed elsewhere, right, not just nonworker

09:43:37 4    cases?

09:43:38 5         MR. DURKEE:  Your Honor, that's exactly why I started

09:43:40 6    out, Your Honor, I wanted to clarify that.  We're not asking

09:43:42 7    for that broad relief.

09:43:43 8         THE COURT:  I believe you asked for it in your

09:43:46 9    memoranda, though.

09:43:46 10        MR. DURKEE:  That's why I started out, Your Honor, I

09:43:48 11   know we overreached on that.  I think there is some benefit to

09:43:51 12   the workers because there is a fair exchange.  They give us

09:43:55 13   information --

09:43:55 14        THE COURT:  Let me ask you this:  You talk about a

09:43:56 15   delay, but even if I did what you want to do, the likelihood is

09:44:01 16   whatever court you ended up in is going to require you to do

09:44:04 17   something very similar, if not identical, to what you're doing

09:44:08 18   here, correct?

09:44:08 19        MR. DURKEE:  Exactly, Your Honor.  The rules of -- the

09:44:10 20   rules of civil procedure discovery -- and you could even order

09:44:12 21   that these orders be complied with in the venue where it is

09:44:17 22   originally filed in the prior venue, but, you know, the only

09:44:19 23   reason we filed this is the MDL court did ask for -- they said

09:44:23 24   it wasn't clear to them, that --

09:44:24 25        THE COURT:  They never asked me to do anything, I've

*OFFICIAL TRANSCRIPT*

09:44:26  1    got to tell you.

09:44:27  2            MR. DURKEE:  No, they did not.  No, they just said --

09:44:28  3            THE COURT:  They know how to ask me, believe me.  If

09:44:30  4    they had asked me, I would have answered.

09:44:32  5            MR. DURKEE:  In the order, they saw it was a little bit

09:44:35  6    unclear, so we brought the motion exactly to do that, to

09:44:38  7    clarify it.

09:44:38  8            THE COURT:  All right.  I'm denying that motion.  Thank

09:44:40  9    you.

09:44:40 10            MR. DURKEE:  Thank you, Your Honor.

09:44:41 11            THE COURT:  Thank you.

09:44:42 12            Okay.  Does anybody have a thought as to what the

09:44:49 13    next one is that might take less time?  Let's do Doucet.  It's

09:44:53 14    their motion.

09:44:54 15            Come forward, Counsel.

09:44:58 16            MR. LAPLACE:  Good morning, Your Honor.

09:44:59 17            THE COURT:  Mr. LaPlace?

09:45:01 18            MR. LAPLACE:  That' correct, Your Honor.  I'm

09:45:01 19    Andre Laplace on behalf of Hilliard Doucet, that's correct.

09:45:08 20            THE COURT:  Good.  I'm assuming you've read the

09:45:09 21    opposition to your motion?

09:45:10 22            MR. LAPLACE:  I did, Your Honor.

09:45:13 23            THE COURT:  It seems likes you've got a problem here,

09:45:16 24    Mr. LaPlace.  First of all, you're alleging some type of

09:45:21 25    petition for annulment under a Louisiana Code of Civil

*OFFICIAL TRANSCRIPT*

09:45:26 1   Procedure article, correct?

09:45:28 2        MR. LAPLACE:  As to the action taken by this court, my

09:45:32 3   argument, Your Honor, is more fundamental than that, so in my

09:45:36 4   brief -- actually, in my memo, the more salient --

09:45:40 5        THE COURT:  I'm looking at your petition that you

09:45:42 6   filed --

09:45:43 7        MR. LAPLACE:  Yes, sir.

09:45:43 8        THE COURT:  -- in this court.

09:45:45 9        MR. LAPLACE:  Yes, sir.

09:45:46 10       THE COURT:  It says, "Petition for Annulment of Court

09:45:48 11   Order," and it cites, "Annulment for vices of form under

09:46:12 12   Louisiana Code of Civil Procedure Article 2002."

09:46:14 13       MR. LAPLACE:  Action of nullity, that's correct,

09:46:16 14   Your Honor.

09:46:16 15       THE COURT:  What?

09:46:17 16       MR. LAPLACE:  Action of nullity, Your Honor.

09:46:20 17       THE COURT:  That's your cause of action here.  I can't

09:46:23 18   entertain a motion to annul under a petition for annulment

09:46:28 19   under a state statute that doesn't even apply in federal court.

09:46:31 20   There is no such animal in federal court is the problem.

09:46:35 21            The only thing somewhat analogous would be a

09:46:37 22   Rule 60 motion.  We have already gone through that.  You filed

09:46:43 23   a Rule 60 motion.  It was years late, and I find, not only

09:46:49 24   years late, it had no merit.  You appealed that to the

09:46:55 25   Fifth Circuit.  They affirmed the denial of the Rule 60 motion,

**OFFICIAL TRANSCRIPT**

09:47:00  1    correct?

09:47:00  2         MR. LAPLACE:  The Rule 60 motion, you're correct,

09:47:02  3    that's one main thing --

09:47:02  4         THE COURT:  So, why are you here again?

09:47:04  5         MR. LAPLACE:  Because my client has a claim.  He

09:47:07  6    contested the jurisdiction of this court.

09:47:10  7         THE COURT:  Unfortunately, this court has found it had

09:47:13  8    jurisdiction, and so did the Fifth Circuit; so, you're wasting

09:47:17  9    your time here really.

09:47:18 10         MR. LAPLACE:  I appreciate your directive, Your Honor,

09:47:21 11    with all due respect.  The more salient motion was filed in

09:47:25 12    this matter was the motion for partial lift of the stay,

09:47:27 13    because that's what stayed my client from doing anything for

09:47:31 14    over 10 years.

09:47:32 15         THE COURT:  No.  That's not correct.  Your client was

09:47:34 16    ordered, as was everyone else who was in the same posture, even

09:47:40 17    though a lot of or most of the individual complaints were

09:47:45 18    stayed at some point.  At some point the Court ordered certain

09:47:51 19    things to be filed by anyone who had this type of claim.

09:47:56 20    You're alleging a VoO-type claim, right?

09:48:00 21         MR. LAPLACE:  We opted out of the VoO, and he filed his

09:48:03 22    own claim suit in state court, Your Honor.

09:48:04 23         THE COURT:  Okay.  But that's the same type of claim

09:48:07 24    you're making.  As I recall, he's alleging that he wasn't paid

09:48:10 25    for Vessel of Opportunity work, right?

**OFFICIAL TRANSCRIPT**

09:48:13  1          MR. LAPLACE:  Yes.

09:48:15  2          THE COURT:  That's what the underlying claim is about.

09:48:17  3          MR. LAPLACE:  Yes.  He opted out and filed his own

09:48:19  4    suit, that's correct, Your Honor.

09:48:20  5          THE COURT:  He had a chance to participate in that

09:48:22  6    settlement, which included the VoO claims, which he opted out

09:48:25  7    of.  He had a right to opt out.  He filed an individual -- he

09:48:28  8    was part of another lawsuit.  He was ordered to comply with

09:48:33  9    certain pretrial orders, which he didn't do.  Then, not only he

09:48:36 10    didn't comply adequately, he didn't comply at all.  He didn't

09:48:40 11    file anything.

09:48:41 12          MR. LAPLACE:  Because he was stayed.

09:48:42 13          THE COURT:  No, he was ordered to comply with this

09:48:44 14    order.  You can't say I was stayed so I didn't have to comply

09:48:48 15    with the Court's order ordering me to do something.

09:48:51 16               Okay.  I've heard enough.  I'm granting BP's

09:48:57 17    motion to dismiss.

09:49:00 18          MR. LAPLACE:  Thank you, Your Honor.

09:49:00 19          THE COURT:  You're welcome.

09:49:10 20          MR. BRISCOE:  Brandon Briscoe for Danos and Curole.

09:49:14 21    Just to clarify, we had joined in BP's motion, and I want to

09:49:17 22    make sure that the order applies to Danos and Curole as well.

09:49:21 23          THE COURT:  Sure.  It applies to anybody that joined in

09:49:23 24    it.

09:49:24 25               There is just nothing left, Mr. LaPlace.  It's

*OFFICIAL TRANSCRIPT*

09:49:25  1    unfortunate.  Maybe your client had a valid claim, I don't

09:49:27  2    know, but this is years late.  It's not even close.  I don't

09:49:31  3    want to hear any more from you, sir.

09:49:31  4         MR. LAPLACE:  Yes, sir.

09:49:32  5         THE COURT:  And the Fifth Circuit, this is such a dead

09:49:35  6    issue, I can't even believe you filed this thing that you filed

09:49:38  7    here.  I'm not going to go any further.  You're lucky the other

09:49:42  8    side didn't file a Rule 11 motion against you, that's all I

09:49:45  9    would say.

09:49:46 10         Let's take up another matter.

09:49:51 11         MR. REGAN:  Matt Regan on behalf of BP.  I think

09:49:55 12    perhaps the O'Brien's matter would make sense to do next.

09:49:57 13         THE COURT:  Let's do that.  Thank you.

09:50:01 14         MR. REGAN:  The Court had asked for counsel for BP and

09:50:04 15    counsel for O'Brien's insurance to just provide a status update

09:50:08 16    following the Fifth Circuit's ruling and guidance, and we both

09:50:13 17    made those submissions to Your Honor about our proposals.

09:50:17 18         Briefly, BP's proposal is to return to mediation

09:50:20 19    in front of the mediator, Mr. Balhoff, and see if that

09:50:25 20    Fifth Circuit guidance can allow us to reach a resolution

09:50:29 21    without further proceedings in court.

09:50:32 22         I can report, Your Honor, with respect to

09:50:35 23    Navigators, which was the other entity, that we have been

09:50:37 24    successful in returning to mediation since the Fifth Circuit

09:50:41 25    order.  We have an agreement in principle, and we'll come back

*OFFICIAL TRANSCRIPT*

09:50:45  1   to Your Honor with the -- when that's finished.  So, as to

09:50:49  2   Navigators, we just ask for a stay to allow us to finish that

09:50:52  3   up.

09:50:52  4        THE COURT:  You all have, in fact, reengaged or the

09:50:56  5   mediator has reengaged with you all since the Fifth Circuit's

09:51:00  6   opinion came out, right?

09:51:02  7        MR. REGAN:  Correct.  So, with Navigators, we have

09:51:03  8   reengaged and actually completed, and with O'Brien's, I think

09:51:06  9   the question is -- and they'll speak for themselves,

09:51:09 10   obviously -- but the question is whether we go to that process

09:51:11 11   right now, see what comes out of it, and if it's not

09:51:15 12   productive, then go into a formal litigation posture.

09:51:18 13        THE COURT:  Okay.  Let me hear from the other side.

09:51:20 14   Thank you.

09:51:22 15        MR. LYLE:  Good morning, Your Honor.  Michael Lyle on

09:51:26 16   behalf of O'Brien's and NRC.

09:51:27 17        THE COURT:  Good morning.  I've read what you filed,

09:51:32 18   but do you have a problem with Mr. Regan's suggestion?

09:51:38 19        MR. LYLE:  No, we don't have a problem with mediation,

09:51:40 20   Your Honor.  We think that that would be a good idea, but we

09:51:42 21   think that before we do that, we think it would be useful to

09:51:45 22   get a bit more information, a similar approach to the Lone Pine

09:51:51 23   order that we used in the B3 litigation.

09:51:54 24             What we're proposing is that BP do a little bit

09:51:57 25   of homework.  They've identified to the Fifth Circuit 20 --

*OFFICIAL TRANSCRIPT*

09:52:01  1    12 cases, actually, that they thought they needed more

09:52:05  2    information on.  It looks like they think that there is upwards

09:52:09  3    of 400 or so.

09:52:10  4              We think what we want to do, Your Honor, is

09:52:12  5    before we go to mediation, get ourselves --

09:52:14  6         THE COURT:  What we're talking about, as I appreciate

09:52:17  7    it, are B3 cases where the issue is what information BP had or

09:52:28  8    was available to them at what time?

09:52:33  9         MR. LYLE:  Yes, Your Honor.

09:52:34 10         THE COURT:  I think their argument is, and apparently

09:52:36 11    this is one of the things the Circuit relied on, that their

09:52:42 12    representation that there are some number of cases where there

09:52:50 13    wasn't sufficient information on these short-form joinders?

09:52:53 14         MR. LYLE:  Yes.

09:52:54 15         THE COURT:  Has anybody looked at that to try to figure

09:52:58 16    out the numbers?  Is that what you're trying to get?

09:53:02 17         MR. LYLE:  That's exactly what I'm asking them to do,

09:53:04 18    Your Honor.

09:53:04 19         THE COURT:  You don't have access to that yourself?

09:53:06 20         MR. LYLE:  We used to have it.  Remember the old EPIC

09:53:10 21    database?  We don't have access to that anymore.

09:53:10 22         THE COURT:  Okay.

09:53:12 23         MR. LYLE:  They also have a bunch of other databases

09:53:16 24    where that information would be accessible.  We also know, you

09:53:19 25    know, if you remember when we were doing the cleanup, they made

                          *OFFICIAL TRANSCRIPT*

09:53:24   1   us do all kinds of invoices and documentation about who was

09:53:28   2   working, where they were working, why they were there, how long

09:53:30   3   they were there, what they were wearing.

09:53:31   4           I mean, it's the whole, all of the stuff you

09:53:33   5   would expect to see in the normal contractor situation.  It was

09:53:38   6   doubly so because BP wouldn't pay a dime until they had all

09:53:42   7   that information.  The government was looking over should so

09:53:42   8   they needed it right.

09:53:42   9           THE COURT:  Okay.

09:53:47  10           MR. LYLE:  So, we did that.  They have those invoices,

09:53:48  11   and they have the elder databases that you all know about.  You

09:53:50  12   referenced some of them in your order.

09:53:53  13           So, we're asking them to go back and check their

09:53:55  14   databases for those claimants, tell us what the universe is.

09:53:58  15   They told the Circuit about 12.  If that's the list, great.

09:54:02  16   Let's talk about 12.

09:54:04  17           Then, from there --

09:54:04  18           THE COURT:  What's the total universe of all the

09:54:05  19   claims?

09:54:07  20           MR. LYLE:  I think their suggestion is it's roughly

09:54:12  21   426.  Total.  Possible.  We want to know if that's the

09:54:15  22   universe, and then we want to know what they knew, when they

09:54:20  23   knew it so that -- and they have the information in the

09:54:22  24   database, turn it over, give us the names.  We can run it

09:54:25  25   through our stuff.  And then, once we got the universe figured

*OFFICIAL TRANSCRIPT*

09:54:27  1    out, a mediation will be useful.

09:54:27  2         THE COURT:  All right.

09:54:30  3         MR. LYLE:  Counsel has talked to you about

09:54:33  4    efficiencies, let's do some efficiencies.

09:54:34  5         THE COURT:  Let me hear Mr. Regan's response to your

09:54:36  6    suggestion.

09:54:37  7         MR. REGAN:  Two things, Your Honor.  What the

09:54:40  8    Fifth Circuit also said is that it was highly questionable that

09:54:42  9    O'Brien's could show prejudice regardless of what the notice

09:54:46 10    timing was.  So, if we're going to go into litigation posture,

09:54:49 11    then we're going to go into litigation both as to notice --

09:54:53 12         THE COURT:  Let me ask you this:  How difficult would

09:54:57 13    it be for you to produce the information he's asking for?

09:54:59 14         MR. REGAN:  I think the level of the detail that they

09:55:01 15    are asking for would be difficult.  I think in a mediation

09:55:04 16    context, we could give examples and see what's there before we

09:55:08 17    spend a lot of money on discovery that then is --

09:55:11 18         THE COURT:  I think he's just trying to get an idea if

09:55:13 19    it's 20 or 200.

09:55:14 20         MR. REGAN:  Well, the SFJ's were in the public EPIC

09:55:20 21    database.  I believe that counsel can ask EPIC for that

09:55:23 22    information to confirm that it's ambiguous.  The question is

09:55:27 23    how does that advance the matter?  If at the end of the day,

09:55:31 24    there is no ability to show prejudice from the timing of

09:55:34 25    notice, then we've just spent six months, three months,

*OFFICIAL TRANSCRIPT*

09:55:36 1    whatever it is, to get no further than we are today.

09:55:40 2            I think if we got in front of a mediator, we can

09:55:43 3    talk about our relative positions.  The mediator can give

09:55:48 4    guidance both as to examples of proof and as to the question of

09:55:52 5    prejudice.  What prejudice did they suffer from stayed cases?

09:55:56 6    That's what the Fifth Circuit asked in its order.

09:55:59 7            Ultimately, that's the very fine point.  What

09:56:00 8    I've just heard is, well, they sent us invoices.  Well, then

09:56:04 9    that means they know what was going on.  So, how are they

09:56:06 10   arguing they didn't have notice when they were actually then

09:56:08 11   looking at the stuff and sending us the material?

09:56:11 12           If they sent it to us, they have as equal access

09:56:13 13   to it as we do.  So, I think this is actually more about

09:56:17 14   tactics than about actually getting to a resolution.  I think

09:56:21 15   we could learn that quickly --

09:56:22 16       THE COURT:  What do you suspect their tactic is here?

09:56:26 17   I'm trying to get what you think their motivation is.

09:56:29 18       MR. REGAN:  Well, their motivation, obviously, is to

09:56:32 19   have the lowest indemnity possible.

09:56:36 20       THE COURT:  Well, of course, but I'm just trying to

09:56:39 21   understand your suggestion that this is tactical some way.  How

09:56:44 22   would that advance that issue?

09:56:46 23       MR. REGAN:  Sure.  Additional money we have to spend in

09:56:48 24   discovery --

09:56:49 25       THE COURT:  Well, I may be totally wrong, but it sounds

*OFFICIAL TRANSCRIPT*

09:56:54  1    like something that would be fairly easy for your side to

09:56:59  2    provide, Mr. Regan.

09:57:00  3        MR. REGAN:  I think it depends on the level of detail

09:57:02  4    that they are going to and also --

09:57:04  5        THE COURT:  You can still argue the whole thing about

09:57:06  6    lack of prejudice and all that, but at least it would be a

09:57:09  7    starting point if you can quickly and easily provide this

09:57:14  8    information as to are we talking, again, 20 cases, 200 cases,

09:57:23  9    400 cases or what.

09:57:23 10        MR. REGAN:  Understood, Your Honor.  I think as long as

09:57:25 11    we can do it at a level of detail that's not getting into the

09:57:29 12    questions of work product and all of the rest, because a lot of

09:57:33 13    these we're having to look in multiple different databases by

09:57:38 14    people over months of periods of time.

09:57:41 15        THE COURT:  I'll let the other side respond again, but

09:57:43 16    are we talking about primarily data that's from these

09:57:47 17    short-form joinder forms or elsewhere too?

09:57:50 18        MR. REGAN:  I think the, in its purest form, the

09:57:54 19    litigation position is that, as informed by the Fifth Circuit,

09:57:58 20    is the timing of notice is a case-by-case question; so, read

09:58:05 21    literally, that's every single one of those will litigate every

09:58:09 22    single one of those individually as to the timing of the notice

09:58:12 23    and then the question of what prejudice from that timing.

09:58:16 24        THE COURT:  But if there is a clear, unambiguous record

09:58:20 25    that there was notice, there would be nothing to litigate,

**OFFICIAL TRANSCRIPT**

09:58:24  1    right?  In other words, if there was a document that was

09:58:26  2    available to you early on that says this person worked for this

09:58:30  3    company and so forth?

09:58:32  4         MR. REGAN:  Well, there would be something to

09:58:34  5    litigate -- if I take your question, Your Honor, with two

09:58:37  6    scenarios.  Scenario one, clear evidence that we had early

09:58:40  7    whatever definition I use of who this person worked for, that

09:58:44  8    case still requires them, well, what prejudice was suffered

09:58:47  9    from the failure of giving early notice?  That's scenario one.

09:58:51 10         Scenario two, no clear notice of when we had the

09:58:55 11    claim.  So, in that second one, do we need to go to prejudice?

09:58:59 12    Possibly, but maybe we're done there, but in both scenarios, in

09:59:05 13    resolution of the case, both claimants one and two are still in

09:59:08 14    play because of prejudice.  That's the way the Fifth Circuit

09:59:14 15    resolved the issue and directed us to look at it.

09:59:19 16         THE COURT:  Well, I understand, but I guess I'm just

09:59:21 17    trying to think through this.  I understand your argument is

09:59:27 18    you think you should be allowed to arguably litigate lack of

09:59:33 19    prejudice across the board, but at least there would be a

09:59:39 20    starting point where you know, again, whether you're dealing

09:59:41 21    with hundreds of cases or just a handful.

09:59:43 22         MR. REGAN:  Yes.  And if the case goes to full-blown

09:59:48 23    litigation, absolutely, both those things would be in play.

09:59:50 24    Where I'm at today is why don't we go and have the discussion

09:59:52 25    we're having right now with Mr. Balhoff.

09:59:56  1          THE COURT:  Without getting into the weeds on what you

09:59:59  2     have discussed with Balhoff thus far, have y'all had that

10:00:03  3     discussion --

10:00:04  4          MR. REGAN:  I think the reason --

10:00:05  5          THE COURT:  -- at any level?

10:00:06  6          MR. REGAN:  I think the reason you had the case

10:00:08  7     ultimately go to Your Honor and then the Fifth Circuit is that

10:00:10  8     there were barriers to that discussion being productive, and

10:00:14  9     now we have guidance from the Fifth Circuit about the fact that

10:00:17 10     these are case-by-case questions, and so now from my

10:00:24 11     perspective, if we can see has the Fifth Circuit really changed

10:00:26 12     the negotiating positions of the parties such that we can get

10:00:29 13     something done before we go into litigation position of the

10:00:32 14     parties and just spend six, nine more months doing this?

10:00:35 15          THE COURT:  Well, frankly, I mean, Mr. Balhoff

10:00:39 16     reengaged with you all at my request right after the

10:00:42 17     Fifth Circuit case came out because I could envision that this

10:00:47 18     would be a very difficult, time-consuming, expensive way to

10:00:53 19     resolve the issues in litigation with their notion that we need

10:00:59 20     to do this case-by-case, claim-by-claim; so, it seems to me it

10:01:07 21     would behoove both parties or all parties to try to resolve in

10:01:11 22     some other, more efficient way.

10:01:13 23              So, let me hear from him about what you just

10:01:17 24     said, Mr. Regan.

10:01:20 25          MR. MALOZ:  Your Honor, if I may, Wilson Maloz for

**OFFICIAL TRANSCRIPT**

10:01:27  1    Navigators.  My client, right, wrong, or otherwise is the

10:01:31  2    person that both of these tables are looking at mediation, so I

10:01:36  3    just want to add that --

10:01:38  4         THE COURT:  Wait.  So, what did you resolve with -- you

10:01:41  5    resolved some claim against you?

10:01:45  6         MR. MALOZ:  That's right, Your Honor, the third-party

10:01:47  7    complaint directly of BP against Navigators.

10:01:47  8         THE COURT:  Okay.

10:01:50  9         MR. MALOZ:  So, that's should go away.  I would like to

10:01:53 10    add they are asking for a stay.  I think it would be more

10:01:56 11    appropriate to issue a 60-day dismissal order like we normally

10:02:00 12    do in the case of a settlement, but that's a minor point.

10:02:00 13         THE COURT:  Okay.

10:02:04 14         MR. MALOZ:  My point is that the first two mediations

10:02:07 15    were not productive because we didn't really know --

10:02:12 16         THE COURT:  Talking about before the Fifth Circuit

10:02:14 17    opinion?

10:02:14 18         MR. MALOZ:  That's right, Your Honor.  Those were not

10:02:15 19    productive because we didn't know --

10:02:16 20         THE COURT:  Well, I can see the difference was a

10:02:19 21    hundred million or zero.  The Circuit came out at 2 million,

10:02:25 22    right?

10:02:25 23         MR. MALOZ:  We don't know -- we know what the zero is,

10:02:27 24    but we don't know what that higher number is.  We don't know

10:02:29 25    how many claims there are, and we need to have some -- at least

*OFFICIAL TRANSCRIPT*

10:02:32  1    some amount of information on that before we go to mediation

10:02:34  2    for any mediation to be productive right now.

10:02:37  3              I think Your Honor touched upon it.  We don't

10:02:39  4    know if it's -- how many claims that we're going to be talking

10:02:43  5    about at mediation.  BP says they want to talk about that at

10:02:48  6    mediation.  Give us that number before we go to mediation so

10:02:52  7    that we know what we're talking about.

10:02:56  8              Thank you.

10:02:58  9         THE COURT:  Okay.  Does somebody over here want to say

10:03:01 10    something?  Mr. Jarrett, you look like you're eager to say

10:03:05 11    something there.  You're about to jump up.

10:03:08 12         MR. JARRETT:  No, Your Honor.  Thank you.  I don't

10:03:11 13    think Mr. Regan needs my help.

10:03:12 14         THE COURT:  Okay.

10:03:12 15         MR. LYLE:  Do you need to hear from me further,

10:03:16 16    Your Honor?

10:03:19 17         THE COURT:  No.  I do think it's worth trying to have

10:03:21 18    you all provide this additional information.  I don't envision

10:03:27 19    this being, you know, months and months of discovery.  I'm just

10:03:31 20    talking about some efficient, fairly quick way to produce this

10:03:39 21    information or basic information.

10:03:41 22              How long do you think that would take you,

10:03:43 23    Mr. Regan?

10:03:43 24         MR. REGAN:  Your Honor, I think if we're producing the

10:03:46 25    claims -- that we're putting forth, so the 400 or so, and the

*OFFICIAL TRANSCRIPT*

10:03:50  1    short-form joinders for those that confirm that those

10:03:54  2    short-form joinders do not identify O'Brien's by name, that

10:03:58  3    should get us a long way toward answering the question right

10:04:03  4    there, right?  I think we could do that relatively quickly.

10:04:04  5        THE COURT:  Yeah.  I suspect they want something more

10:04:07  6    than that, too.

10:04:08  7        MR. LYLE:  Your Honor, their argument is the short-form

10:04:14  8    joinders don't have the information.  That's what they said, so

10:04:16  9    giving us the short form joinders aren't going to give us

10:04:20 10    anything.

10:04:21 11            They have the databases, they know it, and they

10:04:22 12    have the information.  All we're asking is, look -- do your

10:04:25 13    homework.  Look in there.  Give us a framework so we can have a

10:04:30 14    useful mediation.

10:04:30 15            If you order us the mediation, which you've done,

10:04:32 16    and we go in there and we don't know what we're dealing with,

10:04:35 17    the mediation isn't going to work, just like Billy just told

10:04:38 18    you.  It's going to take some framework, some context for a

10:04:42 19    mediation to be successful.

10:04:43 20        THE COURT:  All right.  Here is what I'm going to do:

10:04:45 21    I'm going to refer this matter initially to our current

10:04:54 22    magistrate judge in the case, Donna Currault, who is extremely

10:05:02 23    efficient, somewhat like the previous magistrate,

10:05:09 24    Judge Shushan.

10:05:09 25        MR. REGAN:  Hard to believe.

*OFFICIAL TRANSCRIPT*

10:05:12  1          THE COURT:  Yeah.  And let you all work out the details

10:05:15  2     of what has to be produced.

10:05:20  3              I'm leaning this way, okay, on this issue, but I

10:05:26  4     don't know enough about what is available and what databases

10:05:30  5     and what they contain and how difficult this task would be.

10:05:33  6     Again, I'm trying to avoid months and months and months of

10:05:38  7     discovery.

10:05:38  8          MR. LYLE:  Understood, Your Honor.  We'll be happy to

10:05:41  9     help BP remember their databases.

10:05:44 10          THE COURT:  Okay.  Good.  So, I'm going to refer the

10:05:48 11     issue of what additional discovery or production of information

10:05:54 12     BP should make to opposing counsel on this matter before they

10:06:02 13     reengage in mediation, okay?  All right.  Is that clear enough,

10:06:07 14     what I just said?

10:06:09 15          MR. LYLE:  Yes, Your Honor.  Thank you.

10:06:09 16          THE COURT:  All right.  I'm going to ask that you all

10:06:13 17     do that promptly, and I'll talk to Judge Currault and ask her

10:06:17 18     to give me a report, say, in 30 days as to where things stand

10:06:24 19     at least, okay?

10:06:25 20          MR. REGAN:  Thank you, Your Honor.

10:06:26 21          THE COURT:  As soon as she tells me that you all have

10:06:32 22     complied with whatever she decides is appropriate, then we'll

10:06:37 23     refer you back to mediation, okay?

10:06:40 24          MR. LYLE:  Thank you, Your Honor.

10:06:57 25          THE COURT:  Let's take up Melancon Rimes versus Downs.

*OFFICIAL TRANSCRIPT*

10:07:16  1          MR. ROBINSON:  Good morning, Your Honor.
10:07:18  2    Craig Robinson on behalf of plaintiffs, Melancon Rimes,
10:07:22  3    Sterbcow Law Group, Jason Melancon, and Marx Sterbcow.
10:07:24  4          THE COURT:  Good morning.
10:07:24  5          MR. FRIEDMAN:  Good morning, Your Honor.
10:07:28  6    Jeremy Friedman on behalf of the defendants, Downs, et al.
10:07:30  7          THE COURT:  Okay.  You showed up here.  You might make
10:07:34  8    yourself subject to personal jurisdiction.  They're saying
10:07:38  9    you've been too involved in this to avoid personal
10:07:42 10    jurisdiction.
10:07:42 11          MR. FRIEDMAN:  Your Honor, when we asked to appear by
10:07:44 12    phone and we were told I had to fly over here, so....
10:07:46 13          THE COURT:  Okay.
10:07:46 14          MR. FRIEDMAN:  Your Honor, it is our motion today.
10:07:49 15    Should we start with the motion to dismiss?
10:07:51 16          THE COURT:  Yes.  And I've read everything that you all
10:07:53 17    have filed, so....
10:07:54 18          MR. FRIEDMAN:  Okay.  Your Honor, just, once again,
10:07:59 19    Jeremy Friedman on behalf of Downs, Craig Downs, and myself in
10:08:04 20    regards to this case.
10:08:05 21          Your Honor, just from a brief factual background
10:08:09 22    of what happened here -- I understand you did say you read the
10:08:11 23    material, so I know you're familiar with this -- but the
10:08:14 24    plaintiffs were retained initially to act as simply as local
10:08:17 25    counsel for the objection part of this case.  We had a written

*OFFICIAL TRANSCRIPT*

10:08:20  1   agreement.

10:08:21  2   THE COURT:  Objections to the medical settlement.

10:08:23  3   MR. FRIEDMAN:  Correct.  Correct.

10:08:23  4   THE COURT:  Okay.  All right.

10:08:25  5   MR. FRIEDMAN:  We had a written agreement that stated

10:08:27  6   they would act as local counsel.  They actually ended up --

10:08:31  7   Mr. Melancon was the one that actually argued that the --

10:08:35  8   THE COURT:  You had a written agreement to that effect,

10:08:36  9   and they were supposed to get 10 percent of anything you

10:08:39 10   recovered if you prevailed on those objections, correct?

10:08:43 11   MR. FRIEDMAN:  That is absolutely correct.

10:08:43 12   THE COURT:  Okay.

10:08:44 13   MR. FRIEDMAN:  There was no further agreement on that

10:08:45 14   after that.  We did not prevail.  We withdrew the appeal and it

10:08:51 15   was over.

10:08:51 16   Now, what happened subsequent to that is is that

10:08:54 17   we continued to -- my client or Downs Law Group continued to

10:09:00 18   represent and also sign-up new clients in regard to the medical

10:09:03 19   settlement phase of the case.

10:09:05 20   THE COURT:  Your firm did or does a lot of national

10:09:08 21   advertising, apparently, right, for these claims?

10:09:10 22   MR. FRIEDMAN:  Yes.  Yes.  So, essentially --

10:09:14 23   THE COURT:  Is all the advertising done by your firm or

10:09:17 24   did Melancon Rimes have any part of that?

10:09:21 25   MR. FRIEDMAN:  No, to my knowledge, not a single part

*OFFICIAL  TRANSCRIPT*

10:09:23  1    at all.

10:09:23  2              THE COURT:  Okay.

10:09:24  3              MR. FRIEDMAN:  Essentially, Your Honor, we were using

10:09:26  4    their offices here in Louisiana in regards to clients.

10:09:26  5              THE COURT:  Right.

10:09:30  6              MR. FRIEDMAN:  A significant issue in this case has

10:09:32  7    come up is what they've alleged in their pleadings, and now in

10:09:35  8    their response is that they said we claim that we had to pay

10:09:39  9    rent for their offices.  We were renting space from them, and

10:09:44 10    essentially, they alleged in their complaint now in their

10:09:47 11    response that that was actually a lie and that we only sent

10:09:52 12    them a rent check after the fact as a scheme to prevail to

10:09:57 13    overcome --

10:09:57 14              THE COURT:  I read that and you produced now emails and

10:10:00 15    invoices showing they were, in fact, billing you for that

10:10:03 16    office space, right?

10:10:04 17              MR. FRIEDMAN:  Absolutely.

10:10:05 18              THE COURT:  So, your argument is the only agreement you

10:10:08 19    had with them post the objection and 10 percent thing, which is

10:10:16 20    not really directly relevant here now, but post that, your

10:10:21 21    argument is the only agreement you had with them was to use

10:10:23 22    some office space, and there was an agreed-upon amount for

10:10:29 23    that --

10:10:30 24              MR. FRIEDMAN:  Yes.

10:10:31 25              THE COURT:  -- and that was it.

                              *OFFICIAL TRANSCRIPT*

10:10:32 1          Now, they claim they allude -- and I'll ask

10:10:36 2   Mr. Robinson about this -- that they did all kind of other

10:10:39 3   work, too.

10:10:39 4          You don't need to get up now, Mr. Robinson.  I'll

10:10:44 5   give you a chance.

10:10:44 6      MR. FRIEDMAN:  Your Honor, if I may, the original

10:10:46 7   agreement, which is called the *Attorneys Participation*

10:10:49 8   *Agreement*, has a provision in it that states that if they are

10:10:52 9   to do additional work, that the party -- they would be entitled

10:10:55 10  to additional fees for that and that they are not agreeing to

10:10:59 11  do any additional work pursuant to that agreement.

10:11:01 12         So, that is the only agreement -- written

10:11:03 13  agreement that we have at all to do any -- for them to provide

10:11:08 14  any type of services to these clients.

10:11:09 15         The services that they did ultimately provide,

10:11:13 16  it's my understanding -- and once again, I've been brought into

10:11:16 17  this personally.  I'm not really on this case other than I'm

10:11:20 18  now representing the Downs Law Group, and I'm part of the firm,

10:11:25 19  of course, but, Your Honor, they helped sign-up the clients.

10:11:29 20  When I say "help," meaning they were there in the office at

10:11:31 21  times, but as far as doing additional work, they did not, you

10:11:36 22  know, perform that.

10:11:37 23         Now --

10:11:38 24      THE COURT:  You had one of your lawyers in their office

10:11:42 25  basically signing up clients; is that right?

**OFFICIAL TRANSCRIPT**

10:11:45  1        MR. FRIEDMAN:  That's correct, Your Honor.  And,

10:11:47  2   Your Honor, I'm also trying to avoid -- I don't want to go too

10:11:50  3   far outside of the pleadings because this is a motion to

10:11:52  4   dismiss, so I want to stay within that.

10:11:54  5        So, you know, what we filed here is not so much

10:11:58  6   as far as the factual issues because, no, they did not perform

10:12:01  7   any type of services for these clients, but as a matter of law,

10:12:06  8   the cause of action, the claims that they've actually alleged,

10:12:10  9   they are just not supported by the applicable case law.

10:12:13 10        If I could begin with the breach of fiduciary

10:12:17 11   duty claim -- well, actually, let me start with personal

10:12:20 12   injuries because that was the first part.  As Your Honor is

10:12:21 13   aware, there is two ways to get personal jurisdiction --

10:12:23 14   general and specific.  There is for the individuals, both

10:12:26 15   myself and Mr. Craig Downs, there is not continuous and

10:12:30 16   systematic contacts in order to establish general jurisdiction.

10:12:32 17        The only evidence that they are claiming would

10:12:36 18   demonstrate this would be that I was --

10:12:40 19        THE COURT:  Mr. Downs, he's the principal in Downs Law

10:12:45 20   Group, right?

10:12:46 21        MR. FRIEDMAN:  Yes.

10:12:46 22        THE COURT:  I asked this question previously, and it's

10:12:50 23   still not clear to me what kind of entity that is.  Apparently,

10:12:54 24   it's a Florida legal entity that is not known here in

10:13:02 25   Louisiana.  It's not an L.L.C., I was told, and it's not a

*OFFICIAL TRANSCRIPT*

10:13:06 1 corporation, but you said or someone told me it's akin to a

10:13:12 2 professional corporation, right?

10:13:13 3      MR. FRIEDMAN:  It is.  It's a P.A., a professional

10:13:17 4 association.  Yes.

10:13:18 5      THE COURT:  Okay.  But Mr. Downs being the principal of

10:13:22 6 that, I don't know, when you file claims in this court in an

10:13:30 7 MDL and you represent clients in this court, I don't know how

10:13:34 8 you can avoid personal jurisdiction.

10:13:37 9       Now, you're in a different situation, I think,

10:13:39 10 because I know you had very limited involvement in any of this.

10:13:45 11      MR. FRIEDMAN:  Yes.  Yes, Your Honor.

10:13:47 12      THE COURT:  I'm talking about Mr. Downs now.

10:13:48 13      MR. FRIEDMAN:  Okay.  Well, from Mr. Downs' standpoint,

10:13:52 14 any representation he would have done would be through the

10:13:55 15 corporate entity, the Downs Law Group.

10:13:58 16      THE COURT:  Yeah, but I could have my own, what do you

10:14:04 17 call it, L.L.C. or legal corporation or professional

10:14:08 18 corporation here, and that doesn't absolve me from personal

10:14:14 19 liability as a lawyer, I don't think.

10:14:17 20      MR. FRIEDMAN:  Well, I understand that he --

10:14:19 21      THE COURT:  A little different than a regular employee

10:14:21 22 of some big company.

10:14:23 23      MR. FRIEDMAN:  I do -- I recognize --

10:14:25 24      THE COURT:  So, let's talk about the more important

10:14:27 25 parts of this case, okay?

*OFFICIAL TRANSCRIPT*

10:14:28  1       MR. FRIEDMAN:  So, if we want to -- shifting from

10:14:32  2  personal jurisdiction over to the actual merits of the cause of

10:14:32  3  action --

10:14:32  4       THE COURT:  Yes.

10:14:36  5       MR. FRIEDMAN:  The first is the breach of fiduciary

10:14:38  6  duty.  Now, we recognize that there can be a joint venture

10:14:45  7  agreement or joint venture agreements are recognized in the

10:14:47  8  State of Louisiana between attorneys for joint representation,

10:14:51  9  but what is the Supreme Court in the case of *Scheffler v.*

10:14:54 10  *Adams and Reese*, the Supreme Court of Louisiana, 950 So.2nd

10:15:06 11  651, (2007) -- the Louisiana Supreme Court stated that as a

10:15:12 12  matter of public policy, based on our authority to regulate the

10:15:16 13  practice of law pursuant to the constitution, no cause of

10:15:19 14  action will exist between co-counsel based on the theory that

10:15:22 15  co-counsel have a fiduciary duty to protect one another's

10:15:28 16  prospective interest in a fee.

10:15:29 17       Now, their defense of this is, well, joint

10:15:32 18  venture agreements are valid, and they are recognized.  We

10:15:34 19  don't disagree with that, but for this particular issue, we're

10:15:37 20  talking about whether or not there is a fiduciary duty to

10:15:41 21  ensure that they are paid, and that's really what they are

10:15:44 22  alleging.

10:15:44 23       They are not alleging breach of contract that we

10:15:47 24  failed to pay them.  They are saying that as fiduciaries, we

10:15:50 25  had an obligation to pay them.  Quite frankly, under Louisiana

*OFFICIAL TRANSCRIPT*

law, that type of claim is not recognized.  So, that's the first basis of dismissal because for a breach of fiduciary duty claim, you need to have all of the elements, and the first element is an existence of a duty.  That's the first reason.

The second reason is, Your Honor, is that there was no joint venture agreement, but, more importantly, they didn't properly allege any terms specific to what a joint venture agreement would be required to have.

The case we cited to was *Coffee Bay Investors v. W.O.G.C. Co.,* 878 So.2nd 665 (La. App 1st Cir. 2004).  In that particular case the Court listed seven different reasons -- seven different indicators as to whether and how a joint venture agreement is created.

First, there is a contract between two or more persons.  Well, they allege an oral agreement.  For the purposes of this case -- excuse me, for the purposes of this, motion, we'll have to agree that there was a contract there. There certainly was not, but let's just say for the purposes of the motion there was.

But there is other factors involved; for example, they have to show that there is contribution by all parties of efforts and resources.  They haven't alleged properly what that contribution was.

Your Honor stated at the last hearing that we had that was over the phone that we appeared at, well, what work

*OFFICIAL TRANSCRIPT*

10:17:15  1   was done?  The only work they said was that they were there to

10:17:19  2   help sign-up the clients, and that does not qualify as a

10:17:21  3   contribution or an effort under a joint venture agreement to

10:17:24  4   represent clients.

10:17:25  5            Number 3, the contribution must be in determinate

10:17:30  6   proportions.  They don't even allege what the contributions

10:17:34  7   were or what their proportion of the contributions should have

10:17:36  8   been.

10:17:37  9            Number 3 [verbatim], there must be a joint

10:17:39 10   effort.  They have made no efforts, Your Honor.  It's been

10:17:41 11   10 years.  They have done nothing.

10:17:44 12            Number 5, there must be mutual risks versus

10:17:47 13   losses.  That's a very important one because that would mean

10:17:50 14   that they would be responsible for a portion of the costs that

10:17:52 15   we've incurred over the last 10 years, and there is nothing

10:17:55 16   alleged in there that says there was any agreement --

10:17:57 17       THE COURT:  Let me ask you.  I know there was the

10:17:59 18   previous lawsuit that was filed in state court in Florida.

10:18:04 19       MR. FRIEDMAN:  Yes.

10:18:05 20       THE COURT:  I understand there was a fair amount of

10:18:08 21   discovery done in that case before it was voluntarily

10:18:13 22   dismissed; is that correct?

10:18:14 23       MR. FRIEDMAN:  There was.  Yes, there was.

10:18:15 24       THE COURT:  Depositions taken and so forth.  So, there

10:18:17 25   must be evidence available to both sides.  Nobody has presented

*OFFICIAL TRANSCRIPT*

10:18:20  1    that to this court, but I don't know how relevant that would be

10:18:24  2    to the issue whether they did any work and all of that.  Was

10:18:28  3    that explored in those depositions?

10:18:30  4        MR. FRIEDMAN:  Yes.  They testified that they did, I

10:18:36  5    believe -- again, I want to stay within the context of the

10:18:38  6    pleadings, but I believe they did state that they did about 40

10:18:41  7    or 50 hours in total of work over the last -- now it's been

10:18:45  8    10 years.  We dispute that, but even if that's true, it's not

10:18:51  9    enough.

10:18:51 10        THE COURT:  Okay.  I understand your arguments.  I've

10:18:53 11    read everything.  Let me hear from the other side, okay?

10:19:02 12        MR. FRIEDMAN:  Thank you, Your Honor.

10:19:02 13        THE COURT:  Mr. Robinson, I've got something I need to

10:19:06 14    have you respond to because yesterday evening at some point you

10:19:15 15    filed a motion for leave to file a surreply, and you also filed

10:19:22 16    a motion for leave to file a second amended complaint, which

10:19:27 17    I'm denying, by the way, okay?

10:19:28 18            In it, you acknowledge, one of the issues that

10:19:39 19    they argued was, as you heard a few minutes ago, is that the

10:19:44 20    only arrangement or agreement beyond the limited scope of that

10:19:52 21    first written agreement about helping out on their objections

10:19:56 22    to the medical class settlement, other than that, the only

10:20:07 23    agreement that they had was to use some of your client's office

10:20:12 24    space at a negotiated fee per month.

10:20:20 25            You and your client -- your client filed

*OFFICIAL TRANSCRIPT*

10:20:23  1   something in this court flatly denying that there had ever been

10:20:30  2   any agreement about rent, there had ever been any invoices sent

10:20:34  3   about rent or any rent paid, and lo and behold, they came up

10:20:39  4   with invoices and emails confirming that your client did bill

10:20:44  5   them for office space.

10:20:48  6        Now, you said you didn't get paid immediately,

10:20:51  7   they would send a check after several months, but I've got a

10:20:55  8   big problem with the misrepresentation that you or your client

10:20:59  9   made to this court, so I'm going to give you a chance to

10:21:03 10   respond to that.

10:21:04 11        MR. ROBINSON:  Your Honor, I have an issue with it as

10:21:04 12   well.

10:21:04 13        THE COURT:  I hope you do.

10:21:07 14        MR. ROBINSON:  Yeah.  Which is why I filed immediately

10:21:10 15   when I understood that there was some rental invoices that were

10:21:13 16   issued.  I think the timing is important, and I want to bring

10:21:15 17   that up as well.

10:21:16 18        We immediately filed a surreply to make sure the

10:21:21 19   Court knew that we were retracting those claims about no

10:21:24 20   invoices being sent, and we even supplemented with that second

10:21:27 21   amended petition just to make sure the Court understood that we

10:21:31 22   were retracting those claims immediately when those documents

10:21:33 23   were provided to us.

10:21:34 24        It's important to note, too, that this claim and

10:21:38 25   this case is about 10 years old now.  It relates back to things

*OFFICIAL TRANSCRIPT*

10:21:45  1   that happened in 2012 and 2013; so, it is an issue over three

10:21:52  2   invoices that were sent over --

10:21:54  3        THE COURT:  But these are your documents, your

10:21:56  4   invoices, your emails, and your client flatly stating, denying

10:22:02  5   that anything like this had ever occurred.  I don't know how

10:22:05  6   you can say now we didn't know about it.

10:22:09  7        MR. ROBINSON:  And it was incorrect, and we tried to --

10:22:10  8        THE COURT:  It was more than incorrect; it was false.

10:22:13  9        MR. ROBINSON:  Right.  And we tried to bring that to

10:22:16 10   the Court's attention as soon as we learned of it.

10:22:20 11             As far as the joint venture agreement, the timing

10:22:25 12   may also be important in that the Attorney Participation

10:22:29 13   Agreement ended after the November fairness hearing, and there

10:22:34 14   were clients being signed up from that period in late 2012.

10:22:37 15        THE COURT:  Well, that's another contradiction.  I know

10:22:39 16   we talked about this last time we were here on this issue.

10:22:43 17   Your client initially filed suit against the Downs group in

10:22:47 18   Florida, right, in state court and basically alleging that you

10:22:55 19   were entitled to 10 percent of all their fees based on that

10:22:58 20   written agreement, which you're now totally disowning, right?

10:23:02 21        MR. ROBINSON:  Well, in part because they have totally

10:23:05 22   disowned the --

10:23:06 23        THE COURT:  No, this is your allegation, your lawsuit.

10:23:11 24        MR. ROBINSON:  And we have since amended our petition

10:23:14 25   to retract.

                         *OFFICIAL TRANSCRIPT*

10:23:16  1        THE COURT:  Then you wanted ten percent of everything

10:23:18  2   still.  What do you want now?  It sounds like you want half of

10:23:21  3   all their fees.

10:23:23  4        MR. ROBINSON:  I think the joint venture agreements

10:23:25  5   that were confected in these individual attorney-fee,

10:23:29  6   contingency agreements was set out one-third, one-third,

10:23:32  7   one-third arrangements, just based upon --

10:23:34  8        THE COURT:  One-third, one-third, who does the third

10:23:37  9   third belong to?

10:23:39 10        MR. ROBINSON:  So, a third to Downs Law Group, a third

10:23:42 11   to Melancon Rimes, and third to Sterbcow Law Group.

10:23:47 12        THE COURT:  So, your clients would be getting

10:23:49 13   two-thirds of the fee, two-thirds of the fee of every fee that

10:23:52 14   Downs Law Firm made in this whole case?

10:23:54 15        MR. ROBINSON:  Under the partnership agreement, you

10:23:55 16   know, and under the joint venture agreement, that's how --

10:23:57 17        THE COURT:  Are you familiar with Rule 1.5 of the

10:24:00 18   Rules of Professional Conduct?

10:24:02 19        MR. ROBINSON:  Yes, Your Honor.

10:24:03 20        THE COURT:  You read it?

10:24:05 21        MR. ROBINSON:  A long time ago, yes, Your Honor.

10:24:06 22        THE COURT:  I'm going to read to you this part, and

10:24:07 23   I'll let you comment.  Rule 1.5(e):  A division of fees between

10:24:11 24   lawyers who are not in the same firm may be made only if:

10:24:16 25            (1) the client agrees in writing to the

**OFFICIAL TRANSCRIPT**

10:24:19  1    representation by all of the lawyers and is advised in writing

10:24:24  2    as to the share of the fees each lawyer will receive;

10:24:26  3                    (2) the total fee is reasonable;

10:24:28  4                    (3) -- and most importantly, perhaps -- each

10:24:32  5    lawyer renders meaningful legal services for the client in the

10:24:35  6    matter.

10:24:37  7              MR. ROBINSON:  Sure.

10:24:38  8              THE COURT:  But you're just asking for two-thirds of

10:24:42  9    the fee doing, essentially, no work.

10:24:46 10              MR. ROBINSON:  Well, it's important -- it might be

10:24:46 11    important to note that the work that was done was done when the

10:24:47 12    clients were being signed up; so, this is at the very

10:24:51 13    beginning.

10:24:52 14              THE COURT:  You think helping to sign up the clients

10:24:55 15    entitles you to two-thirds of their fee?

10:24:58 16              MR. ROBINSON:  In this situation, Your Honor, we're

10:25:01 17    asking for it because of the situation that occurred where the

10:25:04 18    clients were provided a letter that misrepresented the facts,

10:25:09 19    misrepresented that my clients were withdrawing from the case

10:25:13 20    and asking to sign this new agreement.

10:25:15 21              THE COURT:  Let me ask you this:  What part of the

10:25:20 22    expenses that Downs incurred -- I'm assuming they spent tens or

10:25:27 23    hundreds of thousands, I don't know, maybe millions of dollars

10:25:32 24    in advertising to obtain these cases.  Did your client pay any

10:25:36 25    of that?

                              *OFFICIAL  TRANSCRIPT*

10:25:37 1          MR. ROBINSON:  I don't believe we paid any -- any

10:25:43 2     promotional --

10:25:45 3          THE COURT:  Did you pay any other expenses?  Did you

10:25:48 4     pay any court costs?

10:25:49 5          MR. ROBINSON:  No, Your Honor, but we did --

10:25:50 6          THE COURT:  What work was done, after the objections,

10:26:00 7     that issue, under the written agreement, that you are disowning

10:26:05 8     now, beyond that and beyond having someone at the office when

10:26:13 9     Downs had somebody there signing up clients, what work did your

10:26:17 10    clients do in this case to advance the clients' claims?

10:26:23 11         MR. ROBINSON:  So, my clients were acting as local

10:26:26 12    counsel.  They had Louisiana licenses.

10:26:27 13         THE COURT:  I said what work did they do?

10:26:30 14         MR. ROBINSON:  They helped in the marketing.  They

10:26:34 15    would consult with Downs Law Group.  They didn't pay anything,

10:26:36 16    but they would help with the consulting.  They discussed those

10:26:40 17    items with the Downs Law Group.  They discussed --

10:26:41 18         THE COURT:  They discussed the marketing.  Okay.  I'm

10:26:44 19    not sure what you mean by that.

10:26:44 20         MR. ROBINSON:  Sure.  Marketing and signage in

10:26:48 21    Louisiana.  And they discussed the use of their office spaces.

10:26:53 22    Remember --

10:26:53 23         THE COURT:  We talked about that.  You're invoicing for

10:26:59 24    rent for that.

10:26:59 25         MR. ROBINSON:  But that was for a period of time and

*OFFICIAL TRANSCRIPT*

10:27:02  1    only at Sterbcow Law Group's offices, but we acknowledge it,

10:27:05  2    yes, Your Honor.

10:27:05  3           MR. MELANCON:  Your Honor, I'm Jason Melancon.

10:27:08  4           THE COURT:  Please be seated, sir.  You can't just

10:27:12  5    stand up and start talking in court, Mr. Melancon.  Please have

10:27:16  6    a seat.

10:27:18  7           MR. MELANCON:  Yes, Your Honor.

10:27:21  8           THE COURT:  Are you also familiar with the

10:27:25  9    Fifth Circuit case, the *P & E Boat Rentals* case, not for the

10:27:34 10    proposition for which it's usually cited around here for

10:27:37 11    punitive damages but on the matter of attorney's fees between

10:27:41 12    co-counsel?

10:27:42 13           MR. ROBINSON:  No, Your Honor, not offhand.

10:27:43 14           THE COURT:  Okay.  The Fifth Circuit, *In the Matter of*

10:27:48 15    *P & E Boat Rentals*, actually, it involved a claim by a

10:27:53 16    *Charles Collins*, who was the, appellant, *versus Jack Martzell*,

10:28:00 17    and the Martzell Law Firm at the time.  The Fifth Circuit held,

10:28:11 18    they affirmed the District Court had basically said, relying on

10:28:19 19    the then-current ethical rule, which is the same language in

10:28:29 20    the current rule.  They just changed the numbering of the

10:28:32 21    rules.

10:28:32 22           But the District Court relied on the fact that

10:28:36 23    the rule prohibited a lawyer from dividing a legal fee with

10:28:40 24    another lawyer who is neither his partner nor associated

10:28:44 25    unless, and one of the things is that the fee -- the division

*OFFICIAL TRANSCRIPT*

10:28:51  1    is in proportion to the services performed and responsibility

10:28:55  2    assumed by each.

10:28:59  3              The plaintiff in that case, Mr. Collins, was

10:29:04  4    arguing, as you are arguing here, citing an old Louisiana

10:29:08  5    Supreme Court case, *McCann v. Todd*, for the proposition where

10:29:12  6    there is a joint venture among co-counsel, you can just somehow

10:29:20  7    get half of the fee.

10:29:25  8              The Fifth Circuit said, "No such agreement

10:29:34  9    validly could have been made under the Code of Professional

10:29:39 10    Responsibility unless the attorneys equally assume

10:29:42 11    responsibility for the manner and performed essentially equal

10:29:47 12    services.  No contract between counsel which is in conflict

10:29:50 13    with controlling ethical standards should be recognized and

10:29:56 14    enforced by the Court."

10:30:05 15              So, you got anything you want to say?  Anything

10:30:05 16    further?

10:30:07 17         MR. ROBINSON:  Your Honor, I believe that if the

10:30:10 18    Downs Law Group had gone to the clients and told them the truth

10:30:13 19    of, okay, we would like to remove the plaintiffs from this case

10:30:20 20    or that the case or that -- and instead of misrepresenting to

10:30:25 21    the clients that Melancon Rimes and Sterbcow Law Group were

10:30:32 22    voluntarily withdrawing or that they were not participating in

10:30:34 23    this claims [verbatim] anymore, then I think that --

10:30:39 24         THE COURT:  They didn't represent to the clients that

10:30:41 25    you were voluntarily withdrawing.  They were saying, in

*OFFICIAL TRANSCRIPT*

10:30:45 1    essence, that you never were part of the effort to represent

10:30:52 2    them in these claims going forward.

10:30:55 3            MR. ROBINSON:  I mean, I think you look -- if we look

10:30:57 4    at the facts of the situation, if we look at the contingency

10:31:03 5    fee contracts themselves, which contained my clients' names,

10:31:05 6    and if we look at where they were signing up and the

10:31:08 7    consultation Downs Law Group had with my clients, then we can

10:31:14 8    see that there was, obviously, a joint venture that was created

10:31:15 9    here and that my clients were intending --

10:31:17 10           THE COURT:  Mr. Friedman just represented that in the

10:31:20 11   Florida litigation and the depositions taken that your clients

10:31:26 12   contended that they spent 40 to 50 hours in total; is that

10:31:29 13   correct?

10:31:30 14           MR. ROBINSON:  Yes, Your Honor.  I believe so.

10:31:31 15           THE COURT:  Okay.  All right.  Okay.  You can have a

10:31:34 16   seat.  Thank you.

10:31:35 17           MR. ROBINSON:  Yes, Your Honor.

10:31:37 18           THE COURT:  Mr. Friedman, do you want to respond

10:31:40 19   briefly?  I want you to respond to his -- let Mr. Friedman come

10:31:44 20   up, please.

10:31:46 21           Why were their names put on these contingency fee

10:31:50 22   contracts?  As I understand it, in the early stages -- again,

10:31:54 23   I'm talking about post objections and the appeal and all

10:31:56 24   that -- once that was over, your client continued to recruit

10:32:00 25   hundreds or thousands of clients, presumably, and for some

                          *OFFICIAL TRANSCRIPT*

10:32:04 1    period of time, you were using a contingent fee contract that

10:32:08 2    had Melancon Rimes' name -- their names on the form, and then

10:32:13 3    later, you decided to change that.  Now, what was that about?

10:32:18 4            MR. FRIEDMAN:  Yes, Your Honor.  We are required in

10:32:21 5    Florida to put -- to advise the clients in writing if we are

10:32:27 6    going to be using any additional attorneys for our -- to assist

10:32:31 7    us with their representation.

10:32:32 8            THE COURT:  That's the same rule here, yeah.

10:32:35 9            MR. FRIEDMAN:  So, for the objection, they were put on

10:32:37 10   these contingency fee contracts for the objections.  What

10:32:41 11   happened was after the objections were over with -- and, in

10:32:45 12   fact, there was a little bit of overlap when we were beginning

10:32:47 13   to sign-up new clients at the same time that the objections,

10:32:49 14   because they were still -- the appeal was potentially going to

10:32:54 15   go forward.  So, we continued to, essentially, use the same

10:32:57 16   contracts and did not remove them because they weren't doing

10:33:00 17   anything anymore in regards to the further work.

10:33:02 18            We identified, at some point very soon

10:33:07 19   thereafter, that their names were still there, but they weren't

10:33:10 20   actually representing these clients; so, we had an obligation

10:33:13 21   to advise these clients that they are not representing you

10:33:17 22   anymore.  We asked them to so we can -- they can be amended to

10:33:21 23   demonstrate that.

10:33:22 24            Your Honor, putting them on these contracts also

10:33:25 25   denotes gives them liability potentially as well, so -- you

*OFFICIAL TRANSCRIPT*

10:33:27  1    know, and this was part of the Florida issue -- with the

10:33:29  2    Florida case as well.  So, essentially, it was a scrivener's

10:33:32  3    error that the Downs Law Group did not correct and amend their

10:33:37  4    retainer agreements because it was a very small provision

10:33:41  5    [speaking simultaneously] --

10:33:41  6         THE COURT:  All right.  I think part of the confusion

10:33:41  7    arose or the controversy arose because, apparently, you didn't

10:33:46  8    communicate that timely to them, right?

10:33:48  9         MR. FRIEDMAN:  Yes.  Correct.  Correct.  We did --

10:33:52 10    essentially, what happened was was that -- well, I don't want

10:33:55 11    to go into -- too much into the facts but yes, that's correct.

10:33:58 12         THE COURT:  All right.  I've heard enough.  Okay.  I

10:34:03 13    conclude that whether there was some type of oral agreement

10:34:15 14    between the Downs firm and the Melancon Rimes group, if there

10:34:29 15    was an oral agreement -- again, there is no written evidence of

10:34:33 16    that that has been submitted to the Court whatsoever -- and I

10:34:39 17    understand this is a motion to dismiss, not a motion for

10:34:43 18    summary judgment, but under Louisiana Law, which I've cited to

10:34:52 19    you and the Code of Professional Responsibility applicable here

10:34:55 20    in Louisiana, and I'm pretty sure it's a similar rule, I think

10:35:00 21    it's an ABA model rule.  I don't think this is unique to

10:35:04 22    Louisiana.

10:35:04 23         First of all, fees have to be reasonable, even if

10:35:11 24    they are contingent fees.  A lawyer is not entitled to a

10:35:16 25    portion of a fee except as the fee is commensurate with the

*OFFICIAL TRANSCRIPT*

10:35:25  1    work and effort and time and expenses that the lawyer has put

10:35:28  2    into the case.

10:35:32  3            So, I'm going to follow the guidance, follow the

10:35:42  4    Rule 1.5 that I cited and we talked about a few minutes ago and

10:35:48  5    the Fifth Circuit case *In the Matter of P & E Boat Rentals,*

10:35:54  6    *Charles Collins v. Jack Martzell,* 928 F. 2d 662.  It's a 1991

10:36:02  7    Fifth Circuit case, which relies on that same codal article.

10:36:09  8            I think at best what we have here is

10:36:16  9    Melancon Rimes, it is alleged that now that they admit that

10:36:23 10    they did invoice for rent, that they were sent a check, and

10:36:27 11    they have for some reason not negotiated that check, that's

10:36:30 12    what was represented to the Court -- was represented to the

10:36:36 13    Court.

10:36:36 14            At best, I think Melancon Rimes would be entitled

10:36:41 15    to any rent that is due and perhaps some quantum meruit base

10:36:56 16    fee, which I can't really set right now, but based on what's

10:37:02 17    been represented to the Court, I think that would be the

10:37:09 18    maximum that plaintiffs could recover here.

10:37:13 19            Also, I'm going to grant the motion to dismiss on

10:37:20 20    the basis of lack of personal jurisdiction over Mr. Friedman.

10:37:25 21            I'm going to deny the personal jurisdiction

10:37:28 22    motion with respect to Mr. Downs.  I guess what I'm doing is

10:37:36 23    dismissing -- this is a motion to dismiss under 12(b)(6),

10:37:44 24    correct?

10:37:46 25            MR. FRIEDMAN:  Yes, Your Honor.

                                  ***OFFICIAL TRANSCRIPT***

```
10:37:47  1        THE COURT:  So, I'm going to dismiss the plaintiff's
10:37:52  2   complaint except insofar as it may state a claim for unpaid
10:37:59  3   rent and a quantum meruit fee.
10:38:04  4        With that said, I'm going to refer the parties to
10:38:08  5   Magistrate Currault to see if you all can agree on how to
10:38:17  6   resolve those remaining issues, okay?
10:38:23  7        MR. ROBINSON:  Thank you, Your Honor.
10:38:23  8        THE COURT:  Okay.  Let's take up, we have one more
10:38:26  9   matter.  You're involved in this last one, right, Mr. Regan,
10:38:36 10   too?
10:38:37 11        MR. REGAN:  Yes, Your Honor.  The last matter is the
10:38:39 12   Miller matter.
10:38:40 13        THE COURT:  Yeah, and I realize I should have taken
10:38:42 14   that up ahead of Melancon Rimes because, otherwise, there was
10:38:47 15   no need for you all, the whole team to sit through that.
10:38:50 16        MR. REGAN:  No problem, Your Honor.  It's plaintiff's
10:38:54 17   motion, so....
10:38:56 18        MR. GISLESON:  Good morning, Your Honor.
10:38:57 19   Soren Gisleson on behalf of James Miller.
10:39:00 20        THE COURT:  Tell me what you are really asking for
10:39:02 21   here, because after I read your motion, their opposition, and
10:39:08 22   your reply, I'm a little confused, Mr. Gisleson.
10:39:15 23        The thing that makes this unclear is all the
10:39:20 24   things that they say you allege in your complaint about all the
10:39:24 25   things they did or didn't do in their response effort, and they
```

*OFFICIAL TRANSCRIPT*

10:39:29  1    say, well, we have to have a right to defend against those

10:39:34  2    allegations.  So, how do you get around that?

10:39:41  3            MR. GISLESON:  Sure.  Your Honor, the two things we are

10:39:43  4    requesting in our motion is, first off, an order declaring that

10:39:47  5    liability is established based on your Phase One order.  In the

10:39:51  6    simplest of terms --

10:39:53  7            THE COURT:  Liability is established for the oil spill?

10:39:57  8            MR. GISLESON:  Correct.

10:39:58  9            THE COURT:  So, what you seem to be saying is it

10:40:02 10    doesn't matter if they are negligent or not with respect to the

10:40:05 11    response.  They spilled the oil.  If that damaged your client,

10:40:11 12    obviously you have to prove medical causation.  Then they are

10:40:15 13    liable for that.  In simple terms, that's your argument?

10:40:19 14            MR. GISLESON:  That is precisely.  That's where the

10:40:22 15    rubber meets the road.  That's where the disconnect came

10:40:26 16    between the conversations that I had with BP leading up to this

10:40:30 17    motion, which were if there is a limitation trial, the Court

10:40:33 18    entered an order on liability.  Mr. Miller filed a claim in

10:40:36 19    that limitation for his VoO-exposure damages.  That liability

10:40:39 20    determination carries over to this case.  I don't need to prove

10:40:42 21    liability.

10:40:43 22            BP responded:  We agree.  We're never going to

10:40:45 23    contest Judge Barbier's Phase One ruling; however, you still

10:40:50 24    have to prove we did something wrong in the response.  And --

10:40:54 25            THE COURT:  I'm not clear that that's what they are

**OFFICIAL TRANSCRIPT**

10:40:56 1  saying, but maybe you're right.  Let me interrupt you to let

10:41:00 2  them tell me clearly if that's what they are alleging or not.

10:41:07 3          Let's put aside everything he said you did wrong

10:41:10 4  or BP did wrong in the response effort.  Assuming those

10:41:14 5  allegations are gone, were never made or not present, what

10:41:20 6  would be BP's position?  If you're responsible for the oil

10:41:24 7  spill and the oil injures someone, wouldn't you be responsible

10:41:29 8  for that?  Obviously, they've got to prove the causation.

10:41:33 9      MR. REGAN:  In that case, which is not Mr. Miller's

10:41:35 10  case, then I think it's a simpler case, but that is not

10:41:40 11  Mr. Miller's case in a variety of respects.

10:41:42 12          What I would say is we agree we're bound by the

10:41:45 13  Court's order based on its terms.  You know, there was no trial

10:41:48 14  on the issues of respirators and all these other things.

10:41:52 15      THE COURT:  No, we agree with that, obviously.

10:41:55 16      MR. REGAN:  The thing is that Mr. Gisleson's firm,

10:42:00 17  obviously, class counsel put together the B3 master complaint,

10:42:03 18  your order -- Your Honor examined that in 2011.  This notion

10:42:08 19  that actually, no, there is strict liability for anything that

10:42:12 20  happens in the response, this is a brand-new theory that has

10:42:15 21  never been before Your Honor, and, in fact, is wildly

10:42:18 22  inconsistent with those orders.

10:42:19 23          For example, the Clean Water Act, they cite that

10:42:21 24  in the briefs.  The Clean water Act doesn't provide a private

10:42:24 25  right of action.  How can it establish a strict liability for a

*OFFICIAL TRANSCRIPT*

10:42:29  1   response?  OPA.  They don't have an OPA claim.  OPA doesn't

10:42:30  2   provide for personal injury claims, as you ruled in multiple

10:42:34  3   orders.

10:42:34  4          So, what really is this motion is to say, I want

10:42:37  5   to establish as a new legal principle in this litigation that

10:42:42  6   it doesn't matter what happened in the response, there is

10:42:45  7   strict liability no matter what.

10:42:46  8          That's inconsistent also with this Phase Two

10:42:48  9   trial.  If you recall, they were seeking a gross negligence

10:42:53 10   filing with respect to response time -- with respect to source

10:42:55 11   control.

10:42:55 12          So, this is an attempt to get a very broad ruling

10:42:59 13   that is both inconsistent, as you said at the outset, with the

10:43:03 14   actual complaint but also inconsistent with the Court --

10:43:06 15          THE COURT:  From on both sides, I'm trying to think of

10:43:08 16   the practical implications of ruling one way or the other.  Let

10:43:16 17   me give you a hypothetical.  Suppose that Mr. Gisleson would

10:43:20 18   get up right after you sit down and say, Judge, we're

10:43:23 19   withdrawing all of our allegations as to things that BP

10:43:28 20   allegedly did wrong in the response.  Where would that lead us?

10:43:34 21          MR. REGAN:  I think you would have a causation trial.

10:43:36 22          THE COURT:  Not a medical causation?

10:43:37 23          MR. REGAN:  Yeah.  I think he could stand up in that

10:43:38 24   court and say there is a Phase One finding with respect to the

10:43:41 25   fact that there was a spill.  He could identify what

*OFFICIAL TRANSCRIPT*

10:43:45  1    Your Honor's ruling with it.  He could not, though, stand up in

10:43:49  2    front of that jury and suggest that he's -- that BP was -- took

10:43:53  3    bad actions.

10:43:54  4            THE COURT:  But it wouldn't even be relevant --

10:43:55  5            MR. REGAN:  [Speaking simultaneously] I agree.  In

10:43:58  6    terms of --

10:43:58  7            THE COURT:  Now, we didn't talk about the punitive

10:44:03  8    damage issue, but the only relevance I see to all these other

10:44:07  9    allegations would be if there is a punitive damage trial or

10:44:11 10    claim.

10:44:11 11            MR. REGAN:  With Mr. Miller, that's easy because you've

10:44:13 12    already ruled that he has no punitive damages claim because

10:44:16 13    he's a VoO, a Jones Act seaman.  In 2011, you ruled that they

10:44:20 14    do not have a punitive damages claim, so the notion that we

10:44:23 15    even need to talk about punitive damages for this claim or for

10:44:28 16    any of Mr. Gisleson's other four clients, you've already ruled.

10:44:31 17    That would be a motion for reconsideration to Your Honor about

10:44:34 18    how to do punitive damages.

10:44:36 19            So, coming back to your hypothetical, if

10:44:38 20    Mr. Gisleson abandons his allegation, simplifies his case, he's

10:44:42 21    got a compensatory damage case that is going to turn on

10:44:45 22    causation, proximate causation, medical causation.  That's not

10:44:47 23    his pleading, but in your hypothetical, that's what you would

10:44:51 24    have.  There would be no punitive damages at all because it's

10:44:54 25    barred by law.

**OFFICIAL TRANSCRIPT**

10:44:54  1        THE COURT:  Let me see if Mr. Gisleson wants to go with

10:44:58  2    that hypothetical or respond to it.

10:45:02  3        MR. GISLESON:  Sure.  This is something I argue in both

10:45:05  4    briefs that I had submitted to the Court is BP's consistent

10:45:08  5    conflating of proximate cause with medical cause.

10:45:12  6            Your Honor's Phase One ruling dealt with

10:45:15  7    proximate cause.  BP wants to make it seem that at some

10:45:19  8    weird -- it's some strange thing.  There is a disconnect

10:45:24  9    between the explosion in the oil spill and something that

10:45:27 10    happened over here in the response.

10:45:29 11            That's not the reality of what happened,

10:45:31 12    Your Honor.  As you know, the oil spill flowed for 87 days.

10:45:34 13    Mr. Miller was on the water as that proximate cause ruling

10:45:39 14    Your Honor already made, of which BP was found grossly

10:45:43 15    negligent, was going on.  There is no need for any proximate

10:45:47 16    cause causation.

10:45:47 17        THE COURT:  So, what do you want to do with all of

10:45:50 18    these other allegations you made?

10:45:52 19        MR. GISLESON:  They would be mooted.  It would be

10:45:54 20    redundant.  If Your Honor entered an order that said it doesn't

10:45:57 21    matter if I walk into trial and I can't show -- this isn't true

10:46:03 22    at all, but let's just assume for purposes of this argument

10:46:06 23    that I come into a jury and I can't prove to a jury that BP did

10:46:10 24    anything wrong in the course of the response, they're still

10:46:15 25    liable because it's their oil.

*OFFICIAL TRANSCRIPT*

10:46:16  1            It would be different if this case maybe had some

10:46:20  2     respondent defendants in it.  This is as clean as it gets.  I

10:46:25  3     got three defendants.  They are all BP entities.  Your Honor's

10:46:28  4     Phase One order deals with BP America --

10:46:30  5            THE COURT:  Who are the three BP entities?

10:46:34  6            MR. GISLESON:  Sure.  It's BP America, BPXP, and

10:46:37  7     BP p.l.c.

10:46:39  8            THE COURT:  All right.  It may be only one those, I

10:46:40  9     think.  Who did they find liable?  We just called it *BP*

10:46:44 10     throughout the whole trial, so remind me of the different

10:46:47 11     entities.  I know PLC is the big London base.

10:46:50 12            MR. REGAN:  No liability with PLC, Your Honor.

10:46:54 13     BP Exploration & Production Company was the entity that was

10:46:57 14     before you.  Happy to address the argument.

10:47:00 15            MR. GISLESON:  I thought BP America was included in

10:47:03 16     your Phase One ruling.

10:47:05 17            THE COURT:  Well, I don't remember either.

10:47:06 18            MR. GISLESON:  Fair enough.  The guilty plea through

10:47:08 19     the Clean Water Act with the Federales, that was BPXP.

10:47:13 20            So, that's the point.  It almost doesn't matter

10:47:17 21     why maybe Mr. Miller had all this oil exposed to him, but he

10:47:22 22     was covered in oil at the end of the day or if BP did nothing

10:47:25 23     to cause it one way or the other.  It's BP's oil that is a

10:47:29 24     liability determination that comes directly out of your

10:47:32 25     limitation trial.  There is nothing we need to prove on the

**OFFICIAL TRANSCRIPT**

10:47:36  1   response side of things, unless we start talking about punitive

10:47:41  2   damages.

10:47:41  3         THE COURT:  What's your response?  How do you get to

10:47:44  4   punitive damages in this case?

10:47:46  5         MR. GISLESON:  Quite simply, obviously, as we stated in

10:47:49  6   our, brief we're happy to fully brief the issue, if they come

10:47:53  7   forward with some kind of --

10:47:54  8         THE COURT:  First of all, it's kind of interesting, I

10:47:57  9   guess, you want me to apply my Phase One findings, but that

10:48:02 10   included a finding of no punitives damages.

10:48:05 11         MR. GISLESON:  That's correct, Your Honor, for what

10:48:06 12   happened during the course of the explosion.  Then, if

10:48:09 13   Your Honor ever wanted to apply any kind of causation or any

10:48:14 14   kind of punitive damages opportunity for the plaintiff, that

10:48:17 15   would go through the response effort, and that anything that we

10:48:21 16   wanted to prove punitive damages wise would have to be through

10:48:24 17   the response and any alleged misconduct or gross misconduct

10:48:29 18   that they engaged in during the course of the response but it

10:48:31 19   doesn't matter.

10:48:32 20         If they come in and they say, look, and the jury

10:48:35 21   buys, hey, we give him his PPE, we gave him his Tyvek suit, we

10:48:41 22   gave him his gloves, all of this stuff, that's fine, but it's

10:48:45 23   still his oil, and as long as I just prove medical causation,

10:48:48 24   which is a damages component, not a liability component,

10:48:51 25   completely separate from proximate cause, as long as I can

*OFFICIAL TRANSCRIPT*

10:48:55  1    prove medical causation, that's it.  It's a damages trial.

10:49:03  2        THE COURT:  What if they allege that your client was

10:49:07  3    provided protective equipment and failed to use it?

10:49:10  4        MR. GISLESON:  That is 100 percent relevant to the

10:49:14  5    damages inquiry of medical causation.  Everything they did in

10:49:18  6    response is going to be relevant.

10:49:20  7             They are going to come in and say there is no way

10:49:22  8    he can establish medical causation.  We gave him every amount

10:49:26  9    of PPE you could possibly imagine.  We gave him the finest

10:49:31 10    training in the history of oil spill response.  There is no way

10:49:35 11    all this stuff we did for him that that doctor over there can

10:49:39 12    establish medical causation.  Fair point.  Let them argue it to

10:49:42 13    a jury, but it's relevant to medical causation.  It's not

10:49:45 14    relevant to proximate cause.

10:49:47 15        THE COURT:  So, you're not trying to keep that evidence

10:49:48 16    out of the trial.  You're just saying it's not relevant to what

10:49:51 17    you're asking me to do right now?

10:49:53 18        MR. GISLESON:  Correct.  Determination of liability.

10:49:55 19        THE COURT:  Okay.  Mr. Regan.

10:49:58 20        MR. REGAN:  A number of things, Your Honor.  First, in

10:50:00 21    that same trial, he would be asking for the jury to be

10:50:03 22    instructed that liability has already been found with respect

10:50:05 23    to that -- those PPE issues.  So, he says he's only bringing it

10:50:09 24    up for causation, but what he's asking you to do right now, on

10:50:13 25    a case that's not actually been pled, is allow him to have an

*OFFICIAL TRANSCRIPT*

10:50:19  1    instruction to the jury that goes beyond your Phase One ruling.

10:50:23  2    Your Phase One ruling expressly says that it doesn't reach

10:50:28  3    issues of causation but also duty.

10:50:29  4              He also is overreaching --

10:50:29  5         THE COURT:  What do you mean by that it doesn't reach

10:50:31  6    duty?

10:50:31  7         MR. REGAN:  That was what you wrote.

10:50:33  8         THE COURT:  I don't know what that was or what I said

10:50:35  9    exactly.  Remind me what I said there.

10:50:36 10         MR. REGAN:  I think the -- that's the quote from your

10:50:41 11    order.  Your order is -- was bounded by and actually was in the

10:50:46 12    title of that trial we had, that it was -- everything leading

10:50:50 13    up to April 20th, the spill and explosion.  Everything leading

10:50:54 14    up to April 20, 2010, the explosion and the spill, I should

10:51:00 15    say.

10:51:00 16              The guilty plea that he's loosely throwing around

10:51:03 17    here in his papers, there is -- he says, well, the guilty plea

10:51:06 18    was with respect to the response.

10:51:09 19         THE COURT:  But, ordinarily -- I'm trying to put this

10:51:13 20    in a much simpler hypothetical.  If you have a truck filled

10:51:21 21    with oil and you spill it on the highway or somewhere else and

10:51:30 22    someone is injured by it, either physically injured or either

10:51:35 23    causes another accident or it's a chemical oil and somebody is

10:51:44 24    exposed to it, you wouldn't deny that there is liability there.

10:51:49 25    They would have to prove medical causation to whatever type of

*OFFICIAL TRANSCRIPT*

10:51:52  1    injury they are claiming, and it wouldn't be relevant as to

10:51:56  2    whether -- even if they argued you didn't clean it up

10:52:04  3    quickly -- I don't know, I'm trying to come up with a simple

10:52:06  4    example, but it seems to me that Mr. Gisleson has a point here

10:52:12  5    that if you're liable for the oil spill, which you are, then

10:52:19  6    you're liable for injuries which can be shown to have been

10:52:27  7    medically caused by the spill, right, by the chemicals, not the

10:52:31  8    chemicals, by the oil.  It all flows, no pun intended, it all

10:52:39  9    flows together, it seems like to me.

10:52:41 10         MR. REGAN:  In your hypothetical, Your Honor you're

10:52:42 11    describing a pure exposure case.  In your same example, there

10:52:47 12    is a newspaper article for someone to come help with that

10:52:50 13    accident, to come to it, and they are trained, and they are

10:52:53 14    given equipment, and they then show up.  They were not in the

10:52:56 15    original accident.  They have now shown up.

10:52:58 16              As has been pled in his complaint, they claim,

10:53:01 17    well, I wasn't trained well enough for what I was doing, or I

10:53:04 18    was told to not wear my respirator.  Those type of things.

10:53:09 19    Once that comes in, as you have already identified, that's --

10:53:11 20    the bloom is off the rose.  They say, well, we want that for

10:53:14 21    punitive damages.

10:53:15 22              So, we're in this box where they want to use the

10:53:18 23    Phase One ruling, which says you can't get punitive damages,

10:53:22 24    under your exposure hypothetical, and then say, well, but we

10:53:25 25    still want to get punitive damages on the back end.

*OFFICIAL TRANSCRIPT*

10:53:27  1          THE COURT:  I've got to tell you, my impression in this

10:53:30  2     case, I don't think we're ever going to get to punitive damages

10:53:35  3     in this case.  I don't see it as a punitive damages case for

10:53:38  4     several reasons, one of which we're in the Fifth Circuit, and I

10:53:45  5     just don't see it.

10:53:46  6                    So, I don't know if that helps you all in talking

10:53:49  7     about these cases or what, but on the other hand, I do see that

10:53:55  8     BP is liable for the effects that flowed from the oil spill.

10:53:57  9          MR. REGAN:  I think that's a determination that's

10:54:01 10     individualized.

10:54:01 11          THE COURT:  For compensatory damages.

10:54:04 12          MR. REGAN:  Your Honor, it's a determination that's

10:54:06 13     individualized based on what this plaintiff is alleging.  We've

10:54:08 14     talked about that in several --

10:54:09 15          THE COURT:  Well, it's individualized in the sense that

10:54:12 16     if he claims -- I don't know what his client is claiming, but

10:54:15 17     if he's claiming, I've got this kind of cancer or whatever or

10:54:20 18     leukemia or whatever, it came from the oil spill, he's got to

10:54:25 19     prove that.  It's not enough to just prove he was out there and

10:54:30 20     there was an oil spill, obviously.  It's more than that.

10:54:32 21          MR. REGAN:  Understood.  As you said, these cases are

10:54:37 22     going to sink or swim on causation.

10:54:37 23          THE COURT:  Right.

10:54:40 24          MR. REGAN:  In the thousands of personal injury cases

10:54:41 25     that have been filed with respect to the spill, not one case

**_OFFICIAL TRANSCRIPT_**

10:54:44  1    has gotten an expert through the Daubert process, and that

10:54:48  2    still is the threshold that is fundamental.  That threshold

10:54:50  3    comes before we get to these questions of how we're going to

10:54:53  4    try a particular case.

10:54:53  5         THE COURT:  Right.

10:54:54  6         MR. REGAN:  So, we can talk about the hypotheticals,

10:54:56  7    but we're litigating the cases in front of us.  This case in

10:54:59  8    front of us is alleging that we made misrepresentations and

10:55:04  9    failed to give equipment and PPE.

10:55:07  10              If he wants me file an amended complaint and then

10:55:10  11   bring a motion, I think that would be something that we would

10:55:12  12   be organized as to what we're actually dealing with here;

10:55:15  13   otherwise, this is just an advisory discussion with the Court.

10:55:19  14              What is not advisory is his punitive damages

10:55:21  15   request.  The Court has already ruled.  The 2011, October 4th,

10:55:25  16   I can give you the cite in a second, but --

10:55:28  17        THE COURT:  No, I'm familiar with that.  I think you're

10:55:32  18   right on that there.

10:55:34  19        MR. REGAN:  There is no claim.  It's in the pleadings,

10:55:36  20   so I won't belabor it.

10:55:37  21              But the bases that are put forth in the pleadings

10:55:41  22   about Clean Water Act providing for strict liabilities in the

10:55:44  23   response, OPA providing for strict liability on personal injury

10:55:48  24   claims in the response, the guilty plea, there is no basis for

10:55:49  25   these arguments.

                            *OFFICIAL TRANSCRIPT*

10:55:50  1         THE COURT:  Well, okay, let me get back to Mr. Gisleson

10:55:54  2    for a second.

10:55:57  3              First of all, you know you don't have an OPA

10:55:58  4    claim here, right?

10:56:00  5         MR. GISLESON:  Correct, Your Honor.

10:56:00  6         THE COURT:  You don't have a Clean Water Act claim

10:56:03  7    here, and I don't understand this argument about the strict

10:56:08  8    liability.  You don't really mean there is strict liability.

10:56:12  9    You mean liability has been established, some sort of

10:56:15 10    collateral estoppel or res judicata argument, right?

10:56:23 11         MR. GISLESON:  Correct, Your Honor.

10:56:23 12         THE COURT:  That's really what you're arguing --

10:56:24 13         MR. GISLESON:  [Speaking simultaneously] Right.  I'm

10:56:24 14    sorry, didn't mean to talk over you.

10:56:24 15         THE COURT:  Go ahead.

10:56:26 16         MR. GISLESON:  Yes, perhaps something of a misnomer

10:56:28 17    but basically what it is is liability has been established for

10:56:30 18    the oil spill by BP, proximate cause, this 87-day event,

10:56:38 19    100 percent established.  Everywhere that BP turns -- there is

10:56:40 20    a guilty plea, there is Your Honor's OPA, maritime limitation

10:56:43 21    clause, all that stuff -- liability is determined, and there is

10:56:46 22    nothing they can ever do about it.  It was determined years

10:56:50 23    ago.  The only thing left now in this case, this individual

10:56:52 24    case --

10:56:52 25         THE COURT:  Do you want to amend your complaint?

*OFFICIAL  TRANSCRIPT*

10:56:55  1      MR. GISLESON:  Well, if it clarifies Your Honor whether

10:56:59  2  liability will then be established in the case so I can go to

10:57:03  3  jury, yeah, that's no problem.  And, of course, coupled with

10:57:05  4  Your Honor's -- if Your Honor decides to say there is no

10:57:09  5  punitive damages claim.

10:57:10  6      THE COURT:  I think I just said that.

10:57:12  7      MR. GISLESON:  If that's what Your Honor's ruling.

10:57:14  8      THE COURT:  Well, there is clearly no punitive damages

10:57:16  9  in your client's -- in this client's case.

10:57:18 10      MR. GISLESON:  If that's Your Honor's ruling, that

10:57:20 11  clarifies everything, but I do -- as I mentioned earlier, you

10:57:24 12  know, all these response-related activities are relevant to the

10:57:28 13  case just insofar as they bear on medical causation, not

10:57:32 14  proximate cause.

10:57:33 15      THE COURT:  Okay.  Here is what I'm going to do:  I'm

10:57:34 16  going to give you 15 days to decide if you want to amend your

10:57:38 17  complaint.  If you amend, I'll let them respond, but I'll

10:57:45 18  probably be inclined to grant your motion if you amend your

10:57:48 19  complaint, but I'm not ruling on that now, but it certainly

10:57:51 20  would make your case more straightforward, I'll put it that

10:57:55 21  way.

10:57:56 22      MR. GISLESON:  Yes.  I will do that.  After I get

10:57:59 23  permission from the client, of course, I will do that.

10:58:02 24          In terms of a simple couple of points, to correct

10:58:04 25  him, I think he said there was no one of these BELO cases or

*OFFICIAL TRANSCRIPT*

10:58:09 1    anything else like that had ever gotten past Daubert.  I
10:58:13 2    believe that's not actually correct.
10:58:13 3        THE COURT:  DOW-BERT.  DOW-BERT.
10:58:14 4        MR. GISLESON:  DOW-BERT, sir.  You are correct.
10:58:14 5        THE COURT:  Okay.
10:58:15 6        MR. GISLESON:  I thought there was one case out of
10:58:18 7    Tennessee that actually did get past.
10:58:20 8        THE COURT:  I don't know.  I'm not familiar with it,
10:58:20 9    but you all may be more familiar.  I don't keep track of these
10:58:25 10   cases once they go somewhere else.
10:58:27 11       MR. GISLESON:  Fair enough.
10:58:28 12           Just to give you the simplest example of
10:58:29 13   what this looks like is, it's what Your Honor did in the
10:58:34 14   *M/V Bright Field* cases, with the allision that happened at the
10:58:37 15   Riverwalk.
10:58:38 16       THE COURT:  Yeah.  Well, I'm very familiar with that
10:58:39 17   case, but there was one misstatement in that comment about the
10:58:45 18   *Bright Field* case.  There was no limitation trial.  It was a
10:58:48 19   limitation case, but before I had the limitation trial
10:58:55 20   scheduled and before we tried it -- Jimmy Roussel was the
10:59:01 21   lawyer; it was COSCO, not the store, Chinese Oversea Shipping
10:59:09 22   Company that owned this vessel -- and they came in and proposed
10:59:14 23   and easy way to resolve these cases.  We had a couple thousand
10:59:20 24   cases, that we would not try the limitation, at least
10:59:25 25   initially, unless we had to; and, instead, they would agree to

*OFFICIAL TRANSCRIPT*

10:59:30  1  have all the claims would go to bench trials in front of -- we

10:59:35  2  would just randomly allot it to all the judges on the court at

10:59:40  3  the time, and it would be nonjury trials, most of which took a

10:59:45  4  half a day.

10:59:45  5          The judge would render an oral ruling, and they

10:59:49  6  would pay whatever amounts the judge ordered with no appeals,

10:59:53  7  but the plaintiffs could still appeal.  It was a great deal for

10:59:57  8  the plaintiff's side, and that resolved all the remaining two

11:00:00  9  or three thousand cases that we had.  So, I never actually

11:00:06 10  ruled on limitation is my point.

11:00:07 11          MR. GISLESON:  I apologize for the misstatement.

11:00:10 12          THE COURT:  That's okay.

11:00:11 13          All right.  Anything else from over here?

11:00:12 14          MR. REGAN:  No, Your Honor.  I think that's the full

11:00:14 15  agenda for today.

11:00:16 16          THE COURT:  Okay.  All right.  Well, it's good seeing

11:00:19 17  everyone again.

11:00:21 18          MR. GISLESON:  It's been a while.

11:00:22 19          THE COURT:  Have a good day.

11:00:24 20          THE DEPUTY CLERK:  All rise.

11:00:24 21          THE COURT:  So, I guess, technically I'm taking your

11:00:28 22  motion under advisement.

11:00:30 23          MR. GISLESON:  Yes, Your Honor.  Thank you.

24          (WHEREUPON, at 11:00 a.m., the proceedings were

25  concluded.)

*OFFICIAL TRANSCRIPT*

1                        REPORTER'S CERTIFICATE

2

3          I, Cathy Pepper, Certified Realtime Reporter, Registered

4    Merit Reporter, Certified Court Reporter in and for the State

5    of Louisiana, Official Court Reporter for the United States

6    District Court, Eastern District of Louisiana, do hereby

7    certify that the foregoing is a true and correct transcript to

8    the best of my ability and understanding from the record of the

9    proceedings in the above-entitled and numbered matter.

10

11                              _s/Cathy Pepper_____

12                              Cathy Pepper, CRR, RMR, CCR
                                Certified Realtime Reporter
13                              Registered Merit Reporter
                                Official Court Reporter
14                              United States District Court
                                Cathy_Pepper@laed.uscourts.gov
15

16

17

18

19

20

21

22

23

24

25

                        ***OFFICIAL TRANSCRIPT***