# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * | MDL NO. 2179

SECTION J |
| This Document Relates To: | * * | JUDGE BARBIER |
| *21-cv-02243, Johnson v. BP Expl. & Prod. Inc., et al.* | * * | MAGISTRATE JUDGE CURRAULT |

## SUGGESTION OF REMAND

### TO THE UNITED STATES JUDICIAL PANEL ON MULTIDISTRICT LITIGATION:

In accordance with 28 U.S.C. § 1407(a) and Rule 10.1(b) of the Rules of Procedure of the United States Judicial Panel on Multidistrict Litigation, the undersigned transferee judge respectfully suggests that the following case be remanded to the transferor district for further proceedings and trial.

| Case Name | Transferee District and Case No. | Transferor District and Case No. |
|---|---|---|
| Johnson, Sonja v. Exploration & Production Inc., et al. | E.D. La. 21-02243 | S.D. Alabama 21-00312 |

## I. Introduction: The DEEPWATER HORIZON/Macondo Well Casualty and Oil Spill, the Response, and the Claims at Issue

On the evening of April 20, 2010, a blowout, explosions, and fire occurred on the DEEPWATER HORIZON, a semi-submersible drilling rig, as it was in the process of temporarily abandoning a well, known as Macondo, it had drilled on the Outer Continental Shelf approximately 50 miles off the coast of Louisiana. Eleven workers died tragically in the casualty. The 115 survivors evacuated to a nearby supply vessel. Fueled by hydrocarbons from

the well, the fire on the DEEPWATER HORIZON burned continuously until mid-morning on April 22, when it capsized and sank.  As the rig descended, the pipe that had connected it to the well (known as a marine riser) collapsed and fractured in multiple places.  Oil from the well then spewed into the Gulf of Mexico via the riser breaks, approximately 5,000 feet beneath the water's surface.  The Macondo Well was successfully capped on July 15, 2010, halting a nearly three-month discharge that released an estimated 3.19 million barrels of oil into the Gulf.  (Rec. Doc. 14021 ¶¶ 184, 273).[1]  In September, a relief well pumped cement into Macondo's annulus, killing the well.

The Oil Spill instigated a massive response that included government entities and officials, BP (the majority owner and designated operator of the Macondo Well), BP's contractors and subcontractors, other industry participants, and thousands of private individuals. The response involved, over time, a cumulative total of over 90,000 response workers, 6,500 vessels, 127 aircraft, and 13.5 million feet of boom.  (Rec. Doc. 8217 at 2).  Response activities included skimming oil from the surface of the water, *in situ* burning of oil, deploying containment and sorbent boom, onshore and beach clean-up, decontaminating vessels that engaged in various response efforts, and the application of chemical dispersants.  One notable aspect of the response was the "Vessels of Opportunity" ("VoO") Program, in which local vessels were hired to perform various response activities, such as placing or retrieving boom.

## II.    Sonja Johnson's Lawsuit

Ms. Sonja Johnson ("Plaintiff" or "Johnson"), the plaintiff in the referenced member case identified in this Suggestion of Remand, Plaintiff states that she did not work as a cleanup worker on the oil spill response and was also not a member of the Deepwater Horizon Medical

---

[1]    All "Rec. Doc." citations are to the MDL 2179 master docket, No. 10-md-2179, unless the citation indicates otherwise.

Benefits Class Action Settlement class.  Plaintiff filed suit in the United States District Court for the Southern District of Alabama on July 16, 2021, against BP Exploration & Production Inc., BP America Production Co., Transocean Deepwater, Inc., Transocean Offshore Deepwater Drilling Inc., and Halliburton Energy Services, Inc alleging that she was injured by exposure in and around Mobile County and Baldwin County, Alabama to oil from the Macondo Well and/or chemical dispersants or other substances used in the response efforts and other routes including consumption as more particularly listed in her Complaint.  The case was subsequently transferred to this Court by the Judicial Panel on Multidistrict Litigation pursuant to 28 U.S.C. § 1407 on December 9, 2021, and it was consolidated with the instant multidistrict litigation ("MDL").

### III.    Relevant MDL 2179 Proceedings

The Judicial Panel on Multidistrict Litigation created this MDL on August 10, 2010. (Rec. Doc. 1).  There have been many developments over the past ten years.[2]  Here the Court recounts the MDL procedural history relevant to the plaintiff identified in this Suggestion of Remand.

Numerous claims asserting a variety of damages were consolidated in this MDL.  Early on, the Court organized claims by type into one of several "pleading bundles."  (*See* Pretrial Order No. 11, Rec. Doc. 569; Pretrial Order No. 25, Rec. Doc. 983).  The claims at issue fall within the "B3" pleading bundle, which includes personal injury claims due to chemical exposure, non-exposure personal injury claims, and contract claims, among others.  On March 30, 2011, the Plaintiffs' Steering Committee filed an Amended Master Complaint for the B3 bundle.  (Rec. Doc. 1812).  Plaintiffs could join in and adopt the claims of the Amended B3

---

[2]    The MDL master docket, No. 10-md-2179, contains over 26,000 document entries to date.  Many of the significant rulings, case management orders, etc., in MDL 2179 are posted to the Court's public website, http://www.laed.uscourts.gov/OilSpill/OilSpill.htm.

Master Complaint without paying a filing fee by submitting a 3-page Short Form Joinder. (Rec. Docs. 983, 983-3, 982).

On October 4, 2011, the Court issued an order granting in part and denying in part defendants' motion to dismiss the Amended B3 Master Complaint. (Rec. Doc. 4209). In that order, the Court held (among other things) that plaintiffs' state-law claims were preempted by maritime law and dismissed, but that plaintiffs had stated claims for negligence and gross negligence under maritime law.

On November 28, 2012, the Court granted the motion for summary judgment filed by Nalco Company and its related companies the manufacturer of certain chemical dispersants (Corexit EC9500A and Corexit EC9527A) used in the response efforts, dismissing the claims against the Nalco defendants. (Rec. Doc. 8037).

In 2012, BP agreed to the Deepwater Horizon Medical Benefits Class Action Settlement Agreement ("Medical Settlement," Rec. Doc. 6427), which was intended to resolve personal injury claims from alleged exposure to oil and/or dispersants arising from the DEEPWATER HORIZON/Macondo Well incident and response. The Medical Settlement also created a process, known as the Back-End Litigation Option ("BELO"), for class members to pursue later-manifested physical conditions. (*Id.*) The Court granted preliminary approval of the Medical Settlement on May 2, 2012 (Rec. Doc. 6419), oversaw an objection and opt-out period, held a fairness hearing on November 8, 2012 (Rec. Doc. 7900), and granted final approval of the Medical Settlement on January 11, 2013 (Rec. Docs. 8217, 8218).

Many B3 Plaintiffs either properly opted out of the settlement or were not members of the settlement class.

The Court held two major bench trials in 2013 and a third in 2015. The Phase One Trial commenced on February 25, 2013 and concluded on April 17, 2013. Known as the Incident Phase, it addressed fault determinations relating to the loss of well control, the ensuing explosion and fire, the sinking of the DEEPWATER HORIZON, and the initiation of the release of oil from the well. (*See* Findings & Conclusions, Phase One Trial, Rec. Doc. 13381). The Phase Two Trial commenced on September 30, 2013 and concluded on October 18, 2013. This phase was divided into two segments: "Source Control" and "Quantification." Source Control concerned issues pertaining to stopping the discharge of hydrocarbons; the Quantification segment addressed the amount of oil that released into the Gulf of Mexico. (*See* Findings & Conclusions, Phase Two Trial, Rec. Doc. 14021). The third phase, known as the Penalty Phase, occurred between January 20 and February 2, 2015. The purpose of that trial was to determine the amount of the civil penalty to be imposed under the Clean Water Act, 33 U.S.C. § 1321(b)(7), on BP and Anadarko Petroleum Corporation, which owned a minority interest in the Macondo Well. (*See* Findings & Conclusions, Penalty Phase Trial, Rec. Doc. 15606).

Once the major trial phases were concluded, the Court turned its attention to other matters in the MDL. On February 16 and August 2, 2016, the Court dismissed with prejudice the B3 claims against the "Clean-Up Responder Defendants,"[3] a group of defendants who had assisted in the spill response efforts, with the exception of the B3 claims by Nathan Fitzgerald (13-00650) and Joseph Brown (12-2333) against DRC Emergency Services, LLC. (Rec. Docs. 15853, 21406.)

---

[3] O'Brien's Response Management, L.L.C. (formerly known as O'Brien's Response Management, Inc.), National Response Corporation, Marine Spill Response Corporation, Dynamic Aviation Group, Inc., Airborne Support, Inc., Airborne Support International, Inc., DRC Emergency Services, LLC, International Air Response, Inc., Lynden, Inc., Lane Aviation, Inc., Tiger Rentals, Ltd., The Modern Group, Ltd., and The Modern Group GP-SUB, Inc.

On February 22, 2017, the Court issued Pretrial Order No. 63 ("PTO 63"), which applied to all remaining claims in the B3 bundle. (Rec. Doc. 22295). PTO 63 required all plaintiffs who had timely filed a claim in the B3 pleading bundle and had not released their claims (through the Medical Settlement or otherwise) to submit certain documents. Specifically, B3 plaintiffs who previously filed an individual lawsuit (*i.e.*, a single-plaintiff complaint without class allegations) were required to complete, file, and serve a sworn statement regarding the status of their claim. B3 plaintiffs who had not filed an individual lawsuit, but instead had filed a Short Form Joinder and/or were part of a complaint with more than one plaintiff, were required to complete, file, and serve an individual lawsuit in this Court and a sworn statement.[4] B3 plaintiffs initially had until April 12, 2017 to comply with PTO 63. Many sought and received an extension up to May 3, 2017 to comply. PTO 63 warned that plaintiffs who failed to comply would "face dismissal of their claims with prejudice without further notice." (PTO 63 at 7, Rec. Doc. 22295).

On July 18, 2017, the Court issued the "PTO 63 Compliance Order." (Rec. Doc. 23047). Exhibit 1 to the PTO 63 Compliance Order identified 960 B3 plaintiffs deemed to be compliant with PTO 63 and whose B3 claims were subject to further proceedings in this Court. B3 claims that were not listed on Exhibit 1 were dismissed with prejudice. Some B3 plaintiffs moved for reconsideration of the PTO 63 Compliance Order. On December 6, 2017, the Court issued an order granting some of those motions and denying others. (Rec. Doc. 23735). On April 6, 2018, the Court issued an Updated PTO 63 Compliance List, identifying 981 B3 plaintiffs that had complied with PTO 63. (Rec. Doc. 24268).

---

[4]   For plaintiffs whose cases were transferred to this Court by the Judicial Panel on Multidistrict Litigation, filing a new lawsuit in this Court as required by PTO 63 does not constitute consent to having that case tried in this Court, nor does it mean the plaintiff waives his or right to request remand to the transferor court. (*See* PTO 63 ¶ 8, Rec. Doc. 22295 ("[M]ere compliance with this Order will not result in a Plaintiff submitting to this Court's jurisdiction for anything beyond pretrial purposes.")).

On April 9, 2018, the Court issued Pretrial Order No. 66 ("PTO 66," Rec. Doc. 24282), which required remaining B3 plaintiffs to complete, sign, and serve a Particularized Statement of Claim ("PSOC," Exhibit A to PTO 66) on counsel for BP.[5]  The PSOC is a 12-page questionnaire that was designed to help the parties and the Court better understand the nature and scope of the injuries, damages, and causation alleged by the remaining B3 plaintiffs.  The PSOC solicited general background information about each B3 plaintiff as well as information specific to the plaintiff's claim.  For example, Part "D" of the PSOC, entitled "Exposure Claims," and Part "F," entitled "Information About Your Injury or Illness," required the plaintiff to provide the following information:

18.     Were you exposed to oil, dispersants, or both?

19.     How were you exposed?  (Check all that apply)
        A.     Inhalation              Yes_____  No_____
        B.     Dermal (skin) contact Yes_____  No_____
        C.     Ingestion               Yes_____  No_____
        D.     Other (please describe):

20.     What was the date(s) of your exposure?

21.     How many time(s) were you exposed to oil or dispersants (for each time, please note whether the exposure was to oil, dispersants, or both)?

22.     What was the geographic location(s) of your exposure (for each location, please note on what date this exposure occurred and whether the exposure was to oil, dispersants, or both)?

23.     For each time that you were exposed to oil or dispersants or both, for how long were you exposed to this substance or chemical?

24.     Describe in as much detail as possible the circumstance(s) in which your exposure to the oil spill and/or chemical dispersant occurred:

25.     For cleanup workers only: Did you report your exposure to oil and/or dispersants to your direct supervisor?

---

[5]     The B3 plaintiffs were not required to file the PSOC in the Court's record.

Case 2:10-md-02179-CJB-DPC Document 27739-1 Filed 06/21/22 Page 8 of 15

26.    If you answered "Yes" to Question No. 25, provide the name of the supervisor to whom you reported your exposure and the date you first reported the exposure:

. . .

29.    Describe in as much detail as possible the bodily injury (or medical condition) that you claim resulted from the spill or your cleanup work in response to the oil spill:

30.    Please explain how your injury (or medical condition) resulted from the spill or your cleanup work in response to the oil spill:

31.    On what date did you first report or seek treatment for your injury or illness:

32.    On what date was your injury first diagnosed:

33.    Identify the doctor(s) (or other healthcare providers) who first diagnosed your injury (or condition):

34.    Identify doctor(s) (or other healthcare providers) who have treated your injury (or condition):

35.    Have you ever suffered this type of injury or condition before (i.e., before the date given in your answer to Question No. 32)?  [yes or no]  If "Yes,"
       A.    When?
       B     Who diagnosed the injury (or condition) at that time?

36.    Do you claim that your exposure to the oil spill and/or chemical dispersant worsened an injury (or condition) that you already had or had in part?  [yes or no] If "Yes,"
       A.    What date did you first experience such injury or condition?
       B.    What injury (or condition) was made worse?

37.    Please list your family and/or primary care physician(s) for the past ten (10) years:

38.    Do you have in your possession, custody, or control, any medical records, bills, and any other documents, from physicians, healthcare providers, hospitals, pharmacies, insurance companies, or others who have provided treatment to you relating to the diagnosis or treatment of any injuries or illnesses arising from the *Deepwater Horizon* oil spill or response efforts, or that you otherwise identified in this Form?

39.    Describe specifically the compensatory damages that you claim in your lawsuit, including the nature of the damage, the date(s) of the damage, the amount of the damage, and the calculations used to arrive at that amount:

40. Have you received workers compensation or other compensation or reimbursement for the injury alleged or associated expenses? [yes or no] If "Yes":

    A.    From whom did you receive this compensation or reimbursement?
    B.    When did you receive this compensation or reimbursement?
    C.    What was the amount of the compensation or reimbursement?

(Rec. Doc. 24282-1).

BP complied with its disclosure obligations under PTO 68 by the original January 17, 2020 deadline. (Pretrial Order No. 68 Status Report, Rec. Doc. 26449). Many B3 plaintiffs sought and received an extension up to and including August 8, 2018 to comply with PTO 66. (Rec. Doc. 24671). On September 20, 2018, the Court issued the "PTO 66 Show Cause Order." (Rec. Doc. 24875). The PTO 66 Show Cause Order identified 825 B3 plaintiffs who appeared to be compliant with PTO 66. Those who were not compliant were required to show cause in writing why their claims should not be dismissed with prejudice. On January 31, 2019, the Court issued its "PTO 66 Compliance Order." (Rec. Doc. 25356). The PTO 66 Compliance Order identified 911 B3 plaintiffs who had complied with PTO 66. (Rec. Doc. 25356-8). After addressing motions for reconsideration, the Court issued an Updated PTO 66 Compliance List on June 26, 2019, which identified 913 B3 plaintiffs who had complied with PTO 66. (Rec. Doc. 25748). The Court subsequently deemed another 22 plaintiffs to be compliant with PTO 66, bringing the total number of B3 plaintiffs who had complied with PTOs 63 and 66 to 935. (Rec. Docs. 25907, 25929).

On October 21, 2019, the Court issued Pretrial Order No. 68 ("PTO 68"), which required, among other things, that B3 plaintiffs complete a Supplemental Medical Disclosure Form, which provided additional information about the conditions that they claimed were caused by their exposure to oil, dispersants or other substances during the spill or response, provide an executed authorization for release of medical records, and produce medical records in their possession to

9

BP within 90 days.  (Rec. Doc. 26070).  In turn, BP was required to produce 16 categories of

documents to the B3 plaintiffs within that same 90-day period, including (but not limited to):

- All information, data and/or tangible materials, if any, about plaintiff in the BP medical encounters database and/or oil spill cleanup worker database;

- All non-privileged information, data, and/or tangible materials concerning job duty, job assignment, safety training, badge data and/or time records, if any, in BP's possession, custody or control relating to plaintiff; and

- All contracts and/or agreements between BP and plaintiff or plaintiff's direct employer(s), if any, concerning oil spill response work, including but not limited to requirements, policies, invoices and procedures concerning health, safety and welfare of oil spill response workers.

(Rec. Doc. 26070).

Many B3 plaintiffs requested and received an extension up to February 20, 2020 to

comply.  (Rec. Docs. 26199, 26206, & 26211).  On April 20, 2020, the Court issued the "PTO 68

Show Cause Order."  (Rec. Doc. 26453).  The PTO 68 Show Cause Order noted that BP had

fulfilled its obligations under PTO 68 and identified 91 B3 plaintiffs whose compliance with

PTO 68 was disputed and who were therefore required to show cause in writing why their claims

should not be dismissed with prejudice.  On September 8 and 29, 2020, the Court issued its

"PTO 68 Compliance Order" in two parts.  (Rec. Docs. 26663, 26695).  The PTO 68 Compliance

Order dismissed with prejudice the claims of 49 B3 plaintiffs for noncompliance with PTO 68.

The plaintiff identified in this Suggestion of Remand has been deemed to be materially

compliant with PTO 68 and was not dismissed by the PTO 68 Compliance Order.

The Court held a status conference on September 23, 2020 to address future management

of the remaining cases in the B3 pleading bundle.  Prior to the conference, the parties submitted

case management proposals for the future management of the B3 cases.  Following the

September 23, 2020 status conference, the Court ordered the parties to meet and confer regarding

10

what issues needed to be tried in the individual B3 cases and then to file reports with the Court

within 30 days.  (Rec. Doc. 26684).  The Court then held a status conference on November 17,

2020.  After hearing arguments from counsel, the Court announced its intent to sever or suggest

remand nearly all of the remaining B3 cases from MDL 2179.  (Rec. Doc. 26784).

Furthermore, the Court stated its intent to issue, prior to severing the B3 cases, a case

management plan that bifurcates each B3 case such that issues relating solely to punitive

damages will be stayed until after the plaintiff establishes entitlement to compensatory damages.

In other words, plaintiffs must first prove that chemicals from the oil spill or response legally

caused their injuries and the amount of damages that fairly compensates them for those injuries

before any litigation regarding punitive damages (discovery, motion practice, trial, etc.) may

occur.  (*See* Rec. Doc. 26784).  On February 23, 2021, the Court issued the contemplated case

management order.  (Rec. Doc. 26924.)

Because certain B3 cases were transferred to MDL 2179 pursuant to 28 U.S.C. § 1407,

the Court ordered the parties to file a list of B3 cases that indicated, among other things, whether

the parties to any of the B3 cases that were transferred pursuant to 28 U.S.C. § 1407 nonetheless

consented to trial in this Court.  (Rec. Doc. 26784).  If they did not, the case would need to be

remanded to the transferor district.  *See* FED. JUDICIAL CTR., MANUAL FOR COMPLEX

LITIGATION (FOURTH) § 22.93 (2004) (*citing Lexecon Inc. v. Milberg Weiss Bershad Hynes

& Lerach*, 523 U.S. 26 (1998)).  On December 8, 2020, the parties filed the B3 case list, which

listed the plaintiffs who did do not consent to trial of their claims in the Eastern District of

Louisiana.  (Rec. Doc. 26807). In April 2021, the Court severed nearly all of the B3 cases from

the MDL and either re-allotted them among the judges of this court (Rec. Doc. 27028),

transferred them to another district pursuant to 28 U.S.C. § 1404(a) (Rec. Doc. 27018), or

11

suggested that the Judicial Panel on Multidistrict Litigation remand them to another district pursuant to 28 U.S.C. § 1407(a). (Rec. Doc. 27027).[6]

Subsequent to her case being transferred to this Court, Plaintiff Johnson complied with the requirements of PTOs 63, 66 and 68 on March 9, 2022. On April 21, 2022, Johnson filed an unopposed Motion for Suggestion of Remand contending that her case should be severed from the MDL and remanded to the transferor court. (Rec. Doc. 27376). This Court granted Plaintiff's motion. (Rec. Doc. 27378).

## IV. Analysis

The DEEPWATER HORIZON/Macondo Well incident gave rise to not only a great number of claims, but also a wide variety of claim types. Nearly all cases have been resolved or at least severed from the MDL. Only a relative handful remain in the MDL.

The Judicial Panel on Multidistrict Litigation has explained that consolidated cases are ready for individual treatment "[o]nce common pretrial proceedings and any other pretrial proceedings that the transferee court considers appropriate have been completed in the transferee district." *In re Air Crash Disaster Near Chicago, Ill.*, on May 25, 1979, 476 F. Supp. 445, 449 (J.P.M.L. 1979); *In re Evergreen Valley Project Litig.*, 435 F. Supp. 923, 924 (J.P.M.L. 1977) ("It is not contemplated that a Section 1407 transferee judge will necessarily complete all pretrial proceedings in all actions transferred and assigned to him by the Panel, but rather that the transferee judge in his discretion will conduct the common pretrial proceedings with respect to the actions and any additional pretrial proceedings as he deems otherwise appropriate.").

When the Judicial Panel on Multidistrict Litigation created MDL 2179, it noted that centralization "will eliminate duplicative discovery, prevent inconsistent pretrial rulings,

---

[6]   The Judicial Panel on Multidistrict Litigation subsequently remanded the § 1407 cases then pending in MDL 2179 in accordance with this Court's suggestion. (*See* Civ. A. No. 15-06131, Rec. Doc. 19).

including rulings on class certification and other issues, and conserve the resources of the parties, their counsel, and the judiciary." (Rec. Doc. 1 at 3). This case, like the rest of those in the B3 bundle, hashas been the subject of proceedings focused on common issues. As set forth above, those proceedings have included the exchange of information and documents administered through the PTO 63, 66, and 68 processes. Those processes have been completed, and the remaining cases turn on resolution of highly individualized facts and issues.

Transferee courts have determined that remand is appropriate where, as here, individualized issues would predominate in any further proceedings. For example, in *In re A. H. Robins Co., Inc. "Dalkon Shield" IUD Prod. Liab. Litig.*, the judge presiding over an MDL involving claims related to a medical device recommended remand because "all pretrial proceedings of a general nature have been concluded," the "centralized pretrial proceedings under Section 1407 have been achieved," and the "completion of the remaining discovery and resolution of the remaining issues can most expeditiously be effectuated by the transferor courts." 453 F. Supp. 108, 109 (J.P.M.L. 1978); *see also In re Chinese-Mfr'd Drywall Prod. Liab. Litig.*, No. MDL 2047, 2018 WL 3972041, at *5 (E.D. La. Aug. 20, 2018) (suggesting remand of cases where the court, "[a]fter managing this MDL for nine years," had addressed numerous "pretrial issues involving facts and legal questions common to the various cases in this MDL proceeding," and found that remaining "discovery is case-specific; thus, it can, and perhaps should, be supervised by the transferor court"); *In re Activated Carbon-Based Hunting Clothing Mktg. & Sales Practices Litig.*, 840 F. Supp. 2d 1193, 1198-201 (D. Minn. 2012) (remand appropriate where individual issues predominated further proceedings).

The same reasoning applies here: this Court's processes have resolved many issues common to the B3 cases, reducing the number of cases and clarifying the scope of the remaining

cases. The Court now concludes that the B3 case on this Suggestion of Remand would not benefit from further coordinated proceedings in MDL 2179 and is most efficiently advanced through an individual case setting. Furthermore, because the claims of Plaintiff on this Suggestion of Remand were transferred here pursuant to 28 U.S.C. § 1407, the Court believes remand to the transferor court is appropriate.

## V. Conclusion

1. **IT IS HEREBY SUGGESTED** to the United States Judicial Panel on Multidistrict Litigation that the following case, which was previously consolidated with MDL 2179, *In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, be remanded to the transferor districts for further proceedings and trial.

| Case Name | Transferee District and Case No. | Transferor District and Case No. |
|---|---|---|
| Johnson, Sonja v. Exploration & Production Inc. , et al. | E.D. La. 21-02243 | S.D. Alabama 21-00312 |

2. **IT IS FURTHER ORDERED** that the Clerk shall send a copy of this Suggestion of Remand to the United States Judicial Panel on Multidistrict Litigation.

3. **IT IS FURTHER ORDERED** that the Clerk of Court shall file a copy of this Order in the MDL 2179 master docket, no. 10-md-2179, and in the individual docket of the case listed above.

4. The parties previously filed in the MDL master docket a Joint Omnibus Designation of Record for the B3 Cases identifying those parts of the MDL 2179 master docket that are relevant to many or all of the cases in the B3 bundle. ("Joint Designation of Record," Rec. Doc. 26821). **IT IS FURTHER ORDERED** that the Clerk of Court shall create an appendix ("Appendix") to the Joint Designation of Record that contains hyperlinks to the

14

documents listed in the Joint Designation of Record. The Clerk of Court shall file both

the Joint Designation of Record and the Appendix in the individual dockets of the case

listed above.

5.  **IT IS FURTHER ORDERED** that once the Clerk of Court files the Joint Designation of

Record and Appendix into the individual docket as contemplated in paragraph 4, the

documents identified in the Joint Designation of Record shall be deemed a part of the

record of that case. No party need file the Joint Designation of Record or the documents

identified therein into the docket of an individual case.

6.  **IT IS FURTHER ORDERED** that the parties shall jointly designate any additional parts

of the MDL master docket or any other docket associated with MDL 2179 that are

specifically relevant to the case addressed in this Suggestion of Remand and which were

not included in the Joint Designation of Record.

7.  **IT IS FURTHER ORDERED** that following remand to the transferor district, and in

accordance with the Court's Case Management Order for the B3 Bundle of February 23,

2021 (Rec. Doc. 26924 ¶ 3) – a copy of which is attached as Exhibit A – issues that

pertain solely to punitive damages (hereinafter, "Punitive Damages Issues") are

**BIFURCATED**  from all other issues in the case and **STAYED**, and there will be no

discovery, motion practice, or other litigation respecting Punitive Damage Issue until the

plaintiff in the case is adjudged entitled to compensatory damages on the plaintiff's

claim. The provisions of this paragraph shall apply unless expressly altered or superseded

by the judge to whom the case is re-allotted.

New Orleans, Louisiana, this 11th day of May, 2022.

_____
CARL J. BARBIER
UNITED STATES DISTRICT JUDGE