1          UNITED STATES DISTRICT COURT
          EASTERN DISTRICT OF LOUISIANA

2

3   ****************************************************************

4   IN RE: OIL SPILL BY THE
    OIL RIG *DEEPWATER HORIZON*
5   IN THE GULF OF MEXICO ON
    APRIL 20, 2010

6
                         CIVIL ACTION NO. 10-MD-2179 "J"
7                        NEW ORLEANS, LOUISIANA
                         TUESDAY, NOVEMBER 23, 2021, 10:00 A.M.
8

9   THIS DOCUMENT RELATES TO:

10  *NO. 14-657, MELANCON RIMES,*
    *LLC, ET AL V. DOWNS LAW*
11  *GROUP, P.A. ET AL.*
    *NO. 16-5277, DESILVA V.*
12  *BP EXPLORATION AND*
    *PRODUCTION ET AL.*
13  *NO. 16-6118, 16-6126,*
    *16-6131, "FIN & FEATHER"*
14
    ****************************************************************
15

16          TRANSCRIPT OF STATUS CONFERENCE PROCEEDINGS
           HEARD BEFORE THE HONORABLE CARL J. BARBIER
17                UNITED STATES DISTRICT JUDGE

18
    APPEARANCES:
19

20  FOR THE PLAINTIFFS:    ROBINSON LAW OFFICES
                           BY:  CRAIG M. ROBINSON, ESQUIRE
21                         700 CAMP STREET
                           NEW ORLEANS, LA   70130
22

23                         MOORE BOWMAN & REESE
                           BY:  JACKSON H. BOWMAN, ESQUIRE
24                         4100 W. KENNEDY BOULEVARD, SUITE 221
                           TAMPA, FL   33609
25

                    ***OFFICIAL TRANSCRIPT***

09:44:14

```
 1    APPEARANCES CONTINUED:

 2

 3                              KRELLER LAW FIRM
                               BY:  STEPHEN S. KRELLER, ESQUIRE
 4                             757 ST. CHARLES AVENUE, SUITE 301
                               NEW ORLEANS, LA  70130
 5

 6                              LAW OFFICE OF AL J. ROBERT JR.
                               BY:  ALVIN J. ROBERT, JR., ESQUIRE
 7                             757 ST. CHARLES AVENUE, SUITE 301
                               NEW ORLEANS, LA  70130
 8

 9
      FOR BP AMERICA INC.,
10    BP AMERICA PRODUCTION
      COMPANY, BP COMPANY
11    NORTH AMERICA INC.,
      BP CORPORATION NORTH
12    AMERICA INC.,
      BP EXPLORATION &
13    PRODUCTION INC.,
      BP HOLDINGS NORTH
14    AMERICA LIMITED,
      BP PRODUCTS NORTH
15    AMERICA INC.:           KIRKLAND & ELLIS
                               BY:  MATTHEW T. REGAN, ESQUIRE
16                                  KRISTOPHER S. RITTER, ESQUIRE
                               300 N. LASALLE
17                             CHICAGO, IL  60654

18
                               KIRKLAND & ELLIS
19                             BY:  CHRISTOPHER W. KEEGAN, ESQUIRE
                               555 CALIFORNIA STREET
20                             27TH FLOOR
                               SAN FRANCISCO CA  94104
21

22                             THE DOWNS LAW GROUP
                               BY:  JEREMY D. FRIEDMAN, ESQUIRE
23                             3250 MARCY STREET, SUITE 307
                               COCONUT GROVE, FL  33133
24

25


                        *OFFICIAL  TRANSCRIPT*
```

1     APPEARANACES CONTINUED:

2

3     OFFICIAL COURT REPORTER:     CATHY PEPPER, CRR, RMR, CCR
                                   CERTIFIED REALTIME REPORTER
4                                  REGISTERED MERIT REPORTER
                                   500 POYDRAS STREET, ROOM HB-275
5                                  NEW ORLEANS, LA   70130
                                   (504) 589-7779
6                                  Cathy_Pepper@laed.uscourts.gov

7

8     PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.   TRANSCRIPT
      PRODUCED BY COMPUTER.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*OFFICIAL TRANSCRIPT*

**I N D E X**

ITEMS                                                          PAGE

CIVIL ACTION 16-05277, DESILVA VERSUS BP EXPLORATION      6

AND PRODUCTION, ET AL...............................

MR. BOWMAN..........................................      7

MR. REGAN...........................................      8

THE COURT...........................................      9

MR. REGAN...........................................      9

MR. BOWMAN..........................................      9

CIVIL ACTION 16-6118, FIN & FEATHER, LLC VERSUS BP       10

EXPLORATION AND PRODUCTION, INC., ET AL.; 16-6126,

FIN & FEATHER ADVENTURES, LLC VERSUS BP EXPLORATION

AND PRODUCTION, INC., ET AL.; AND 16-6131, FIN &

FEATHER CABINS, LLC VERSUS BP EXPLORATION AND

PRODUCTION, INC., ET A...............................

MR. KRELLER.........................................     10

MR. ROBÉRT..........................................     10

MR. REGAN...........................................     10

MR. KRELLER.........................................     11

MR. REGAN...........................................     11

MR. KRELLER.........................................     12

MR. REGAN...........................................     12

THE COURT...........................................     14

MR. BOWMAN..........................................     15

*OFFICIAL TRANSCRIPT*

1   CIVIL ACTION 14-657, MELANCON RIMES, LLC, ET AL          15

2   VERSUS DOWNS LAW GROUP, P.A., ET AL.................

3   MR. FRIEDMAN.......................................     15

4   MR. ROBINSON.......................................     15

5   MR. FRIEDMAN.......................................     15

6   MR. FRIEDMAN.......................................     17

7   THE COURT..........................................     20

8   MR. ROBINSON.......................................     20

9   MR. FRIEDMAN.......................................     24

10  MR. ROBINSON.......................................     28

11  MR. FRIEDMAN.......................................     30

12  MR. ROBINSON.......................................     30

13  MR. FRIEDMAN.......................................     36

14  MR. ROBINSON.......................................     38

15  THE COURT..........................................     39

16  MR. FRIEDMAN.......................................     40

17  THE COURT..........................................     40

18

19

20

21

22

23

24

25

*OFFICIAL TRANSCRIPT*

| | |
|---|---|
| 1 | **P-R-O-C-E-E-D-I-N-G-S** |
| 09:44:14 2 | TUESDAY, NOVEMBER 23, 2021 |
| 09:44:14 3 | M O R N I N G   S E S S I O N |
| 09:44:14 4 | (VIA ZOOM VIDEO TELECONFERENCE) |
| 10:07:33 5 | |
| 10:07:33 6 | |
| 10:07:46 7 | THE COURT:  Good morning, everyone. |
| 10:07:50 8 | VOICES:  Good morning, Your Honor. |
| 10:07:51 9 | THE COURT:  We're going to take the motion to dismiss |
| 10:08:00 10 | regarding attorneys' fee dispute between Melancon Rimes and |
| 10:08:06 11 | Downs Law Group, we're going to take that last, just so you all |
| 10:08:11 12 | know.  So, we'll take the other two matters first because I |
| 10:08:14 13 | don't think they'll take very long. |
| 10:08:16 14 | Gail, call the first one. |
| 10:08:21 15 | THE DEPUTY CLERK:  Civil Action 16-05277, DeSilva |
| 10:08:32 16 | versus BP Exploration and Production, et al. |
| 10:08:35 17 | THE COURT:  All right.  Whoever is going to speak on |
| 10:08:38 18 | this matter, please identify yourself. |
| 10:08:43 19 | MR. BOWMAN:  Your Honor, my name is Jackson Bowman, and |
| 10:08:46 20 | I'm here on behalf of Mr. DeSilva. |
| 10:08:49 21 | THE COURT:  How do you spell your last name?  Wait, |
| 10:08:51 22 | wait one second.  Bowman, was it?  B-O-W-M-A-N? |
| 10:08:55 23 | MR. BOWMAN:  B-O-W-M-A-N.  Yes, Your Honor. |
| 10:08:59 24 | THE COURT:  Okay.  Very well.  Thank you.  Go ahead. |
| 10:09:00 25 | MR. REGAN:  Good morning, Your Honor Matt Regan along |

*OFFICIAL TRANSCRIPT*

10:09:07  1    with my colleagues Chris Keegan and Kris Ritter on behalf of BP

10:09:14  2    for this matter, but I'll be handling it.

10:09:16  3         THE COURT:  Very well.  Okay.  So, maybe someone, I

10:09:20  4    don't know which of you wants to speak first and kind of give

10:09:25  5    me a status as to where we are with this matter.

10:09:28  6         MR. BOWMAN:  I'm happy to do it, Your Honor.

10:09:33  7    Jackson Bowman.

10:09:33  8         THE COURT:  Okay.

10:09:35  9         MR. BOWMAN:  So, Your Honor, you would probably like to

10:09:41 10    know that Mr. DeSilva paid the sanction to BP last Thursday,

10:09:48 11    the 18th.  I'm assuming that Mr. Keegan, I'm assuming he had

10:09:57 12    it, somebody at his office -- or he received it.  Somebody from

10:09:58 13    his office signed for it.  So, we don't have verification of

10:10:04 14    that, but I'm assuming that occurred.

10:10:06 15              What the parties have agreed to do, Your Honor,

10:10:10 16    is to mediate this case on December 13th, if Your Honor finds

10:10:18 17    that acceptable, of course, with Judge Shushan as the mediator.

10:10:27 18    Hopefully, we'll get it resolved, and if we don't get it

10:10:31 19    resolved, we'll be seeking to go back to the Middle District of

10:10:36 20    Florida.

10:10:37 21         THE COURT:  All right.  Remind me.  This case came here

10:10:42 22    through the JPML.  It was originally filed in Florida?

10:10:47 23         MR. BOWMAN:  Yes, Your Honor, it was filed in 2013,

10:10:50 24    April 15th of 2013, in the Middle District of Florida.

10:10:54 25         THE COURT:  Okay.  Mr. Regan.

*OFFICIAL TRANSCRIPT*

MR. REGAN:  I think Your Honor -- I'm Matt Regan on behalf of BP.

First, I can confirm that we did receive a certified check from Mr. Bowman from his client last week, so that was received for the sanctions.

Secondly, also confirm that we have the mediation that's set forth on December 13th with Magistrate Judge Shushan.  Then, our -- you know, again, we hope that that is a productive session.

If it's not, Your Honor, I think we would propose that there are a few open deadlines that Your Honor set for this plaintiff that haven't been complied with because we were dealing with the other ownership issue, primarily PTO 69, which we never not got to with them while we worked out ownership.

So, in the event that the mediation is unsuccessful, we would propose that we set some short deadlines within your court to finish the work that, you know, we went through with all the other B-1 plaintiffs, get that stuff ready, and then I think we'll be in a position to know what the right next step is for the case.

I think if the case is transferred right after the mediation, we're going to be in a weird situation with open orders from your case management that I don't think should take too long to close, but we do think the work should be completed in the matter before it's transferred.

*OFFICIAL TRANSCRIPT*

| | |
|---|---|
| 10:12:22 | 1 |
| 10:12:28 | 2 |
| 10:12:33 | 3 |
| 10:12:37 | 4 |
| 10:12:41 | 5 |
| 10:12:45 | 6 |
| 10:12:55 | 7 |
| 10:12:58 | 8 |
| 10:13:02 | 9 |
| 10:13:06 | 10 |
| 10:13:08 | 11 |
| 10:13:11 | 12 |
| 10:13:12 | 13 |
| 10:13:16 | 14 |
| 10:13:19 | 15 |
| 10:13:26 | 16 |
| 10:13:27 | 17 |
| 10:13:29 | 18 |
| 10:13:31 | 19 |
| 10:13:39 | 20 |
| 10:13:41 | 21 |
| 10:13:44 | 22 |
| 10:13:45 | 23 |
| 10:13:49 | 24 |
| 10:13:50 | 25 |

THE COURT:  Okay.  Well, why don't we do this:  I won't take any further action right now.  I'll await a report from you all as to the results of the mediation on, what was the date, December 13th, I think?  Yeah.

If it's not successful, what you all should do is, I've dodged the Court, and I guess we'll set a brief either phone or Zoom status conference again maybe right after the first of the year, early January sometime.  Does that sound reasonable?

MR. REGAN:  Yes, Your Honor.

THE COURT:  Is it okay with you, Mr. Bowman?

MR. BOWMAN:  Absolutely, Your Honor.  Thank you.

THE COURT:  Okay.  Anything else that we need to or we can talk about today?  Do you all have everything you need, you think, to engage in a mediation on the 13th?

MR. BOWMAN:  Yes, Your Honor.

MR. REGAN:  Yes, Your Honor, I think we're ready to go.

THE COURT:  Okay.  All right.  Very well.  So, we'll just hold off on any further action at this time on DeSilva versus BP until we get back from counsel.

Okay.  Thank you.  You all can drop off this call, if you would like.

MR. BOWMAN:  Thank you, Your Honor.  I hope you have a good Thanksgiving.

THE COURT:  You're welcome.  Same to all of you.

*OFFICIAL TRANSCRIPT*

10:13:50  1          MR. BOWMAN:  Thank you.  Bye, now.

10:13:55  2          THE COURT:  Okay.  Let's call the next matter, Gail,

10:13:57  3   which is Fin & Feather.

10:14:01  4          THE DEPUTY CLERK:  Civil Action 16-6118, Fin & Feather,

10:14:08  5   LLC versus BP Exploration and Production, Inc., et al.;

10:14:17  6   16-6126, Fin & Feather Adventures, LLC versus BP Exploration

10:14:24  7   and Production, Inc., et al.; and 16-6131, Fin & Feather

10:14:25  8   Cabins, LLC versus BP Exploration and Production, Inc., et al.

10:14:25  9          THE COURT:  All right.  Who is going to speak on this

10:14:27 10   matter?

10:14:32 11          MR. KRELLER:  Good morning, Your Honor.

10:14:34 12   Stephen Kreller for the plaintiffs Fin & Feather, the entities,

10:14:37 13   and along with me online is Al Robért, my co-counsel.

10:14:42 14          THE COURT:  Okay.  I see Mr. Robért; although, he

10:14:44 15   looks very different.  There is something -- is that the same

10:14:49 16   Al Robért that has been around for some time?  What's different

10:14:52 17   about you, Mr. Robért?  I haven't seen you a long time.

10:14:55 18          MR. ROBÉRT:  I've got longer hair.

10:15:00 19          THE COURT:  You got longer hair and more facial hair.

10:15:03 20   I'm not criticizing you.  I just didn't recognize you until I

10:15:07 21   saw your name on the screen, okay?  Okay.  You got a new look.

10:15:12 22              All right.  Who is going to speak on this?

10:15:14 23   Mr. Regan, is it going to be you again?

10:15:16 24          MR. REGAN:  Yes, Your Honor.  Again, Matt Regan for BP

10:15:21 25   on this matter.

*OFFICIAL TRANSCRIPT*

10:15:22  1          THE COURT:  Okay.  Very well.  I see Mr. Ritter and

10:15:24  2   Mr. Keegan is also on the Zoom.

10:15:28  3              Okay.  So, who wants to go first on this?  Where

10:15:31  4   do we stand on this one?

10:15:36  5          MR. KRELLER:  Judge, we have scheduled a mediation for

10:15:39  6   December 1st on this case with Dan Balhoff, so that's where we

10:15:43  7   are right now.

10:15:44  8              We are in the process of getting our position

10:15:47  9   paper to Chris Keegan, Matt, and Kris Ritter.  That should go

10:15:55 10   out this week.  Yeah, we look forward to working with these

10:16:01 11   guys and hopefully bringing this matter to a close on the 1st.

10:16:08 12          THE COURT:  All right.  Mr. Regan, let me hear BP's

10:16:14 13   statement on this.

10:16:14 14          MR. REGAN:  Yes, Your Honor.

10:16:16 15              We share the hope for a productive session with

10:16:20 16   Mr. Balhoff and counsel and the parties on the 1st.  In the

10:16:26 17   event that it not successful, you know, putting aside, we

10:16:31 18   really do hope to have a very productive session with the

10:16:33 19   matter, but if it's not, then perhaps we could have a similar

10:16:38 20   protocol.

10:16:38 21              The case has gone through the PTO processes, and

10:16:43 22   Your Honor did have a ruling on summary judgment where you

10:16:47 23   dismissed certain of the allegations, and certain of the

10:16:50 24   allegations remain, which is why we're mediating.

10:16:53 25              So, I would propose, if it makes sense to

**OFFICIAL TRANSCRIPT**

10:16:56 1   Your Honor, you know, a similar process that if the mediation

10:16:58 2   is unsuccessful, that we come back to you with a proposal for

10:17:02 3   what needs to be done with any additional discovery to position

10:17:06 4   the case for, you know, for the rest.

10:17:11 5          It was filed originally in the EDLA, so there was

10:17:14 6   no transfer issue for this case.

10:17:14 7          THE COURT:  Right.

10:17:16 8          MR. REGAN:  That would be my position.  I turn it back

10:17:17 9   to counsel for the plaintiffs to seek -- to their view.

10:17:40 10         MR. KRELLER:  Yeah, Judge, we agree that if, for some

10:17:28 11  reason, the case isn't resolved in December, we would agree

10:17:31 12  that we just set up a status conference or notify the chambers,

10:17:35 13  and then you set up another conference to figure out, you know,

10:17:39 14  THE scheduling order or what have you, whatever you feel would

10:17:43 15  be the appropriate next step.

10:17:48 16         THE COURT:  Well, I don't know how much discovery has

10:17:50 17  been done in this case.  I do recall that there was an issue,

10:17:55 18  maybe I'm confusing this with another case, but it seems like I

10:18:00 19  recall that there were some issues with the plaintiffs' delay

10:18:06 20  or being unable to produce certain documents.  I don't know, is

10:18:10 21  that still an issue?

10:18:17 22         Well, let me ask Mr. Regan if he thinks it's an

10:18:20 23  issue, I don't know.

10:18:20 24         MR. REGAN:  I think Your Honor's order from this summer

10:18:24 25  clarified the case in terms of what allegations could go

*OFFICIAL TRANSCRIPT*

10:18:28  1    forward and which allegations could not; so, to summarize it

10:18:33  2    without prejudice to anybody here, really the active

10:18:37  3    businesses, the businesses that were in place is what remains.

10:18:39  4    The potential future businesses are gone.

10:18:42  5            With respect to the active businesses, plaintiff

10:18:45  6    has produced documents in response to earlier PTOs.  They are

10:18:49  7    what they are, you know, in terms of what the business had

10:18:53  8    available.

10:18:54  9            There are some, I'll just put it sort of general,

10:18:59 10    there are some challenges with respect to the records that

10:19:02 11    exist, but we have what exists, I think.  If the mediation is

10:19:05 12    not successful, I think we could identify for Your Honor what

10:19:11 13    needs to happen in the additional discovery.

10:19:15 14            The other element would be if there is going to

10:19:17 15    be a need for an expert phase in the case, and that would

10:19:21 16    really, I think, depend on where the plaintiff wants to go with

10:19:25 17    the case, but if the case is going to turn into a study of

10:19:29 18    fisheries, then, you know, we have been through that before,

10:19:31 19    Your Honor, in some other cases, you know, many years ago, but

10:19:35 20    that would require some substantial time and scheduling.

10:19:38 21            So, I think that's where the case sits.  We have

10:19:41 22    enough information, I think, to do a productive mediation for

10:19:44 23    each side to understand the risks to each other.  If it's not

10:19:50 24    successful, though, there will be -- if there is an expert

10:19:53 25    phase in the case, it's going to require some time for that to

*OFFICIAL TRANSCRIPT*

10:19:56  1    go forward.

10:19:56  2            THE COURT:  All right.  Well, I assume I'm about to

10:20:01  3    tell you all what you probably already know, but -- I meant to

10:20:09  4    say this when Mr. Bowman was on the line, too -- but I believe

10:20:13  5    these are the last two remaining B-1 economic claims in this

10:20:19  6    entire MDL.

10:20:23  7                Mr. Regan, you would know if that's true or not;

10:20:26  8    am I right?

10:20:27  9            MR. REGAN:  That is true, Your Honor, with the

10:20:29 10    resolution of the other matter, these are the last two matters.

10:20:33 11            THE COURT:  Right.  So, I don't know why these can't be

10:20:41 12    resolved.  If you don't resolve them at mediation, it's likely

10:20:47 13    to be a lot of additional expense, time, and so forth expended

10:20:54 14    by the parties in this, and it's just going to drag this out

10:20:58 15    much longer, perhaps, unnecessarily; so, that's just my view of

10:21:03 16    things, and these need to be resolved.  Okay?

10:21:08 17                All right.  Anything else about Fin & Feathers

10:21:12 18    that we need to talk about today?  Okay.

10:21:16 19            MR. REGAN:  Nothing further from me, Your Honor.

10:21:18 20            MR. KRELLER:  Nothing further from me.

10:21:20 21            THE COURT:  Okay.  We'll, again, await a report from

10:21:26 22    the parties as to the success or not of the mediation, and

10:21:31 23    then, if necessary, we'll do a follow-up status conference to

10:21:40 24    schedule whatever remains of the case, okay?

10:21:43 25                All right.  Thank you.  Have a good day.

*OFFICIAL  TRANSCRIPT*

10:21:47  1          MR. BOWMAN:  Thank you, Judge.

10:21:52  2          THE COURT:  So, that gets us down to the motion to

10:21:58  3     dismiss in the remaining case, Gail, you can call.

10:22:02  4          THE DEPUTY CLERK:  Civil Action 14-657, Melancon Rimes,

10:22:09  5     LLC, et al versus Downs Law Group, P.A., et al.

10:22:09  6          THE COURT:  Okay.  Who is going to speak on this case?

10:22:16  7          MR. FRIEDMAN:  Good morning, Your Honor.  This is

10:22:18  8     Jeremy Friedman on behalf of defendants, Downs Law Group,

10:22:23  9     et al.  It's our motion.

10:22:26 10          THE COURT:  Okay.

10:22:26 11          MR. ROBINSON:  Craig Robinson on behalf of plaintiffs

10:22:30 12     Melancon Rimes and Sterbcow Law Group.

10:22:31 13          THE COURT:  Okay.  So, this is a dispute over

10:22:41 14     attorneys' fees.  I have a few questions.

10:22:45 15               First of all, have there been any attorneys' fees

10:22:51 16     earned or awarded or whatever in this matter?  Mr. Friedman?

10:22:57 17          MR. FRIEDMAN:  Yes, Your Honor.  Thank you.

10:22:59 18               May it please the Court.  The agreements that we

10:23:04 19     had between the parties relates to an objection -- services

10:23:10 20     rendered to an objection.  It's very specific as to what the

10:23:13 21     services would be.  We were not successful as the objection or

10:23:17 22     as to -- as prevailing on the objection.

10:23:21 23               The attorneys' fees were contingent upon being

10:23:25 24     successful, and as a result, there were no fees awarded to

10:23:28 25     either the Downs Law Group, which would then -- there will be

*OFFICIAL TRANSCRIPT*

10:23:31 1    no fees awarded to the plaintiff in this case.

10:23:34 2              So, to answer your question from our standpoint,

10:23:36 3    no, we have not received any fees in relation to the attorney

10:23:42 4    participation agreement at issue.

10:23:43 5         THE COURT:  Well, I looked at that agreement, and it

10:23:48 6    looks like it says -- well, I have it here somewhere.  Hold on

10:23:59 7    a minute.  Here it is.  I have it in front of me here.  It's

10:24:08 8    only two pages, two and a half pages.

10:24:16 9              So, your position is that the Sterbcow/Melancon

10:24:30 10   Group, who are described as *co-counsel*, that the agreement only

10:24:44 11   provided for them to provide legal services in connection with

10:24:50 12   certain objections to the class settlement; is that what you're

10:24:53 13   talking about?

10:24:55 14        MR. FRIEDMAN:  Absolutely, Your Honor.  We've actually,

10:24:58 15   in the state court case which progressed quite a bit until they

10:25:03 16   dismissed and refiled here, we took the depositions of both

10:25:06 17   parties engaged in discovery, and everyone is in agreement,

10:25:12 18   essentially, that the only work that was ever performed was in

10:25:15 19   relation to the objections pursuant to this agreement.  Now,

10:25:20 20   they say that that was around 40 or 50 hours.  We believe it

10:25:26 21   was 10 to 12 hours.

10:25:29 22             But we're talking about such a small amount of

10:25:31 23   work in relation to -- in relation to these issues; and so, it

10:25:33 24   would be our position absolutely that the only -- if we had

10:25:39 25   been successful, they would have been able to recover attorney

*OFFICIAL TRANSCRIPT*

10:25:42 1    fees, but since we weren't successful, we do not and they

10:25:51 2    shouldn't either.

10:25:51 3         THE COURT:  The agreement says that they were

10:26:02 4    retained -- that services to be provided by co-counsel shall be

10:26:04 5    limited to the following:  A, the filing of objections on

10:26:09 6    behalf of various potential class members in relation to the

10:26:13 7    above-described lawsuit; B, the filing of a motion

10:26:17 8    *pro hac vice*; C, appearing on behalf of the clients along with

10:26:23 9    the Downs Group at the final fairness hearing on November 8,

10:26:28 10   2012; D, appearing on behalf of the clients along with Downs at

10:26:34 11   any subsequent attorneys' fee hearing.

10:26:37 12        Then the second part:  As compensation for these

10:26:45 13   services, co-counsel shall be entitled to receive a percentage

10:26:49 14   of the recovery obtained by Downs Law Group in the lawsuit

10:26:53 15   described equivalent to the amount of 10 percent.

10:27:07 16        MR. FRIEDMAN:  Yes, Your Honor.  If I may --

10:27:10 17        THE COURT:  Go ahead, Mr. Friedman.

10:27:13 18        MR. FRIEDMAN:  Yes.  Just to kind of advise you of what

10:27:15 19   the dispute is, if you take a look at paragraph 1, it says,

10:27:18 20   "Co-counsel agrees to provide certain professional services to

10:27:22 21   Downs and certain clients of Downs that have these claims."

10:27:26 22        Now, at the time that we actually entered into

10:27:28 23   this agreement, we had around 40 or 50 clients that were all

10:27:33 24   making objections jointly to the master -- to the settlement

10:27:38 25   agreement.  We appeared before you at the final fairness

*OFFICIAL TRANSCRIPT*

hearing.  Mr. Melancon appeared as well.  He argued on our behalf.  We all came there.  So, it's our position that these objections would relate to certain clients, and, in fact, it even says, "certain clients."

The plaintiff contends that this -- regardless of what happened with the objection, they are entitled to fees for the last -- no matter if they did work or not, for the last seven years of any client that Downs Law Group has ever had in relation to the *BP* case involving the BELO claims, involving the B-1 claims, involving anything.

It simply doesn't say that in the agreement, and there was no discussion about that, and it's just a strained relation of the agreement, you know.  Of course, the motion today is that this dispute was rightfully before the state courts in Miami per our agreement, and it should remain there.

THE COURT:  Well, I looked at the venue issue, the jurisdictional issue.  I don't see that as a mandatory venue or jurisdictional clause.  That's Paragraph 9 of the agreement. It says, "This agreement shall be governed by and interpreted under the laws applicable in the State of Florida."  Then it says, "All parties" -- That's one issue.  That's a choice of law issue -- "All parties to this agreement hereby submit to the jurisdiction of all courts located in Miami-Dade County, Florida, with respect to any action or proceeding arising out of this agreement and hereby waive any venue or other objection

*OFFICIAL TRANSCRIPT*

10:29:29  1  which it may have to any such action or proceeding being

10:29:32  2  brought in any court located in Miami-Dade County, Florida."

10:29:37  3       It seems to me, under Fifth Circuit law, that

10:29:42  4  would be a permissive venue provision which says, certainly

10:29:47  5  Miami-Dade County has jurisdiction, but it doesn't preclude

10:29:53  6  jurisdiction being found in another court also; so, I don't

10:30:00  7  think it's a mandatory jurisdictional thing.

10:30:03  8       Now, with that said, I've got to say, I'm not

10:30:06  9  sure what the plaintiffs were trying to do by filing there,

10:30:11  10  litigating there, then dismissing and coming and refiling over

10:30:16  11  here.  It's a little strange and concerning, but I'm not sure

10:30:20  12  that they were prevented from doing that.

10:30:23  13       MR. FRIEDMAN:  Your Honor, may I point out one thing

10:30:27  14  that you mentioned about the --

10:30:27  15       THE COURT:  Sure.

10:30:29  16       MR. FRIEDMAN:  -- issue?  In the state court claim, in

10:30:31  17  Miami-Dade County -- I cited to this in our motion, it's

10:30:32  18  paragraph 8 -- they state that the forum selection clause

10:30:40  19  establishes that the laws of Florida and the courts of

10:30:43  20  Miami-Dade County shall have jurisdiction over any actions

10:30:46  21  arising from the agreement.  So, Your Honor, their

10:30:49  22  interpretation is -- is mandatory; and, therefore -- and the

10:30:54  23  court and the state court accepted jurisdiction for that

10:30:57  24  reason.

10:30:57  25       THE COURT:  Shall have jurisdiction doesn't indicate

*OFFICIAL TRANSCRIPT*

10:31:01  1    mandatory to me.  That indicates permissive.  Again, it says

10:31:04  2    that court shall have jurisdiction, but it doesn't say

10:31:07  3    exclusive jurisdiction, does it?

10:31:09  4         MR. FRIEDMAN:  No.  The agreement doesn't but I

10:31:14  5    think (speaking simultaneously) --

10:31:14  6         THE COURT:  You've seen and I've seen -- you all, your

10:31:16  7    firm wrote this thing, right, from what I recall?

10:31:20  8         MR. FRIEDMAN:  Well, we wrote this with the

10:31:23  9    (speaking simultaneously) -- Your Honor.

10:31:23 10         THE COURT:  The point is -- the point is lawyers know

10:31:26 11    how to say "exclusive" when they mean exclusive, and it doesn't

10:31:30 12    say "exclusive;" so, in terms of your motion to dismiss on that

10:31:36 13    ground, I don't think it's well founded, okay?

10:31:41 14         MR. FRIEDMAN:  Okay.

10:31:42 15         THE COURT:  Let me ask some questions of Mr. Robinson.

10:31:57 16    Mr. Robinson, remind me, are you in the Downs Law Firm or are

10:32:08 17    you separate from them?

10:32:09 18         MR. ROBINSON:  No, Your Honor, I'm representing the

10:32:14 19    plaintiff, Melancon Rimes and Sterbcow Law Group.  I have my

10:32:19 20    own office.  It's Robinson Law Offices.

10:32:22 21         THE COURT:  Where are you located, sir?

10:32:25 22         MR. ROBINSON:  In New Orleans, Your Honor, maybe a

10:32:28 23    hundred yards away from you.

10:32:28 24         THE COURT:  Okay.  Good.  So, I've got to tell you,

10:32:34 25    I've read all of this stuff, and I'm not clear on what

*OFFICIAL TRANSCRIPT*

10:32:37 1    Melancon Rimes is really alleging or asking for here in this

10:32:45 2    litigation.  At one point it seems like the claims are all over

10:32:48 3    the board, and then in another thing, I see where they say, oh,

10:32:52 4    no, the only claim we have is under the Louisiana Unfair Trade

10:32:56 5    Practices Act.

10:32:57 6              So, what is the claim?  Is the claim under this

10:33:05 7    contract, this attorneys' fees, attorney participation

10:33:12 8    agreement or not, and if it's not, what is the claim?

10:33:15 9         MR. ROBINSON:  That's a good question, Your Honor.

10:33:19 10   We've got to keep in mind that the attorney participation

10:33:23 11   agreement, which we acknowledge was the underlying contract,

10:33:26 12   but there is also the thousands of individual client contracts

10:33:32 13   that we have from mutual clients with the Downs Law Group.

10:33:39 14   Those individual contracts have an attorney fee split, have our

10:33:42 15   names on those contracts as well.  That is kind of the crux of

10:33:48 16   the case, those attorney fees that might be owed to Downs -- to

10:33:55 17   Sterbcow Law Group and Melancon Rimes as a result of any

10:34:00 18   settlement agreement claims in the medical settlement.

10:34:04 19        THE COURT:  So, wait.  Let me stop you because I want

10:34:07 20   to go through this bit by bit so I can make sure we're clear on

10:34:15 21   everything.

10:34:16 22             So, your claims only pertain to claims in the

10:34:19 23   medical settlement; is that what I'm hearing?

10:34:21 24        MR. ROBINSON:  That would be in the EDLA, yes, but it

10:34:26 25   may also if there was a claim (audio distortion) we --

**OFFICIAL TRANSCRIPT**

10:34:29  1          THE COURT:  Your sound is kind of cutting in and out.

10:34:34  2     I'm not sure why.  I'm not sure where is your microphone.

10:34:44  3          MR. ROBINSON:  We can try to call in on a phone,

10:34:46  4     Your Honor.  Would that help?

10:34:48  5          THE COURT:  Well, let's continue and see if we can get

10:34:51  6     through this.

10:34:52  7               So, are you not relying on this attorney

10:34:58  8     participation agreement whatsoever?  Is that what you're

10:34:59  9     telling me?

10:34:59 10          MR. ROBINSON:  We certainly (audio distortion)

10:34:59 11     underlying attorney participation agreement (audio

10:35:09 12     distortion) --

10:35:09 13          THE COURT:  You're cutting in and out.  I don't know if

10:35:12 14     you've got a weak signal there or what.

10:35:18 15               Mr. Friedman, can you hear Mr. Robinson clearly?

10:35:22 16          MR. FRIEDMAN:  No.  I can hear -- every fourth or fifth

10:35:25 17     word seems to be kind of going out.

10:35:28 18          THE COURT:  That's what I'm getting, too.

10:35:34 19          MR. ROBINSON:  Your Honor, we're going to try to call.

10:35:38 20     Is there a phone number we can call in?

10:35:41 21          THE COURT:  You want a phone number to call in?

10:35:44 22          MR. ROBINSON:  Yes, Your Honor.

10:35:48 23          THE COURT:  Is there a number we can give him, Gail?

10:35:54 24               Okay.  Look, I'm going to recess for five minutes

10:35:58 25     here, and we'll see if we can get this sorted out.

*OFFICIAL TRANSCRIPT*

10:36:02  1          Gail, you can get somebody from Systems up here

10:36:04  2   and see where the problem is.  Okay.  Let's recess for about

10:36:07  3   five minutes, okay?

10:36:08  4          MR. ROBINSON:  Thank you.

10:36:16  5          (WHEREUPON, at 10:36 a.m., the Court took a recess.)

10:42:20  6          THE COURT:  All right.  Let resume and try again.

10:44:02  7   Mr. Robinson, I understand, although I can see you on video,

10:44:06  8   that you're now hooked up to us by telephone; is that correct?

10:44:12  9          MR. ROBINSON:  That's correct, Your Honor.

10:44:13 10          THE COURT:  Great.  Mr. Friedman, can you hear

10:44:16 11   Mr. Robinson?

10:44:18 12          MR. FRIEDMAN:  Yes, Your Honor.

10:44:18 13          THE COURT:  Okay.  Good.  All right.  So, let's see,

10:44:20 14   where were we?  I was asking you some questions, Mr. Robinson.

10:44:24 15   I guess my first question is:  Are the plaintiffs making any

10:44:31 16   claim under this attorney participation agreement?

10:44:40 17          MR. ROBINSON:  No, Your Honor.  So, we acknowledge that

10:44:44 18   there was an attorney participation agreement.

10:44:45 19          THE COURT:  Well, stop.  Stop right there.  I'm just

10:44:49 20   trying to take this a step at a time.  Make this as simple as

10:44:52 21   we can.

10:44:52 22          So, your claim is not brought under this attorney

10:44:56 23   participation agreement.  So, what's the theory or the basis of

10:45:00 24   your claim or claims?

10:45:03 25          MR. ROBINSON:  The basis of the claim for attorney fees

**OFFICIAL TRANSCRIPT**

10:45:09  1   are for the individual claimant attorney-client contract that

10:45:14  2   were confected and signed after the fairness hearing in the

10:45:20  3   month after the fairness hearing at the

10:45:26  4   Melancon Rimes/Sterbcow Law Group offices with the Downs Law

10:45:29  5   Group staff and attorneys present.

10:45:31  6                   There were thousands of contracts that were

10:45:34  7   executed in their offices, all for their individual claims

10:45:39  8   under the medical settlement and potentially for any and all

10:45:43  9   claims.

10:45:44 10        THE COURT:  All right.  Mr. Friedman, do you want to

10:45:47 11   respond to that now that we know what the basis of the claim

10:45:50 12   is?

10:45:51 13        MR. FRIEDMAN:  Yes.  Well, no, I didn't up until now.

10:45:56 14   That seems to be a little bit different.  It was very difficult

10:45:58 15   to decipher what he was alleging because he was kind of

10:46:01 16   combining causes of action.

10:46:02 17                   But, Your Honor, first of all, you take a look at

10:46:04 18   the attorney participation agreement.  In paragraph 9, and

10:46:09 19   Your Honor referenced it also where its choice of law is the

10:46:13 20   State of Florida, it states that -- it says, "All parties to

10:46:17 21   this agreement submit to the jurisdiction of Miami-Dade County

10:46:23 22   with respect to any action or proceeding arising out of this

10:46:26 23   agreement."

10:46:26 24        THE COURT:  Wait a minute.  Wait a minute.  Wait a

10:46:28 25   minute.  Let me stop you because he just that said he's not

*OFFICIAL TRANSCRIPT*

10:46:31 1   bringing his claim at this point under that agreement.

10:46:34 2          It seems like what he's alleging -- obviously,

10:46:38 3   Mr. Robinson can speak for himself if I state this wrongly --

10:46:42 4   but what he's alleging is that after the fairness hearing, when

10:46:49 5   all that was in the past, that there was a continued, if you

10:46:56 6   want to call it a *joint venture* or *dealings* between Downs and

10:47:05 7   Melancon Rimes in that, as I recall from reading the pleadings

10:47:11 8   and all, they even allege that least one employee from Downs

10:47:16 9   was tasked with being -- was actually assigned physically to be

10:47:21 10  in their offices here in New Orleans and that they continued to

10:47:26 11  sign up hundreds or thousands of individuals to bring medical

10:47:32 12  claims, and that they had individual retainer agreements which

10:47:40 13  had both groups' names on the individual agreements, and that's

10:47:46 14  what they are bringing their claims, pursuant to what happened

10:47:52 15  with those clients and the agreements and so forth.  Have I

10:47:57 16  said that essentially correct, Mr. Robinson?

10:48:01 17         MR. ROBINSON:  Yes, Your Honor.  That's correct.

10:48:02 18         THE COURT:  Okay.  All right.  Let me let Mr. Friedman

10:48:05 19  respond to that.

10:48:06 20         MR. FRIEDMAN:  Well, first of all, Your Honor, what it

10:48:08 21  sounds like he's saying is that those would be for the SPC

10:48:12 22  claims, which is where those clients are from.

10:48:16 23         First of all, I still would submit that our

10:48:20 24  relationship all arises out of the attorney participation

10:48:24 25  agreement; and, therefore, Florida law would be applicable to

*OFFICIAL TRANSCRIPT*

10:48:27  1    those contracts.

10:48:27  2            In addition, each one of those contracts -- I

10:48:33  3    know what contracts he's referring to -- state that Florida law

10:48:35  4    applies to them, and Mr. Robinson's clients did not execute a

10:48:39  5    single one of those contracts, and they are required to do so

10:48:44  6    in order to ever get a fee pursuant to Florida law.  Ever.

10:48:49  7    They did not do so.  In addition, they didn't perform the work.

10:48:53  8            Obviously, we're now arguing the merits of the

10:48:56  9    case, but, if their claim has nothing to do with this

10:49:01  10   agreement, at a very minimum it would be governed by Florida

10:49:06  11   law; so, I don't know what the cause of action is.

10:49:08  12         THE COURT:  Well, let me ask you this:  These are just

10:49:12  13   allegations.  I have no idea how valid they are, but from what

10:49:16  14   I'm understanding here, and I could be totally wrong now, but

10:49:20  15   my understanding he's alleging that there were contingent fee

10:49:26  16   contracts with individuals that were executed and signed at

10:49:29  17   their offices here in New Orleans, and those contracts had

10:49:35  18   advised the clients that both Downs and Melancon Rimes would be

10:49:39  19   the attorneys.  That's what I understand they are alleging.

10:49:42  20         MR. FRIEDMAN:  I understand that, Your Honor.  They

10:49:46  21   also -- I mean, do you want me to start arguing the merits of

10:49:51  22   the case, and then we can discuss that?

10:49:52  23         THE COURT:  You see, this has been like two ships

10:49:55  24   passing in the night here because when I listen to you, it

10:50:01  25   sounds like your position is, look, we're focusing on this

**OFFICIAL TRANSCRIPT**

10:50:07  1   narrow attorney participation agreement which does say, as you

10:50:14  2   indicated, they had a very limited role.  What they are saying

10:50:17  3   is that, well, yes, that's true, but we had a more expansive

10:50:26  4   role afterwards in the terms of signing up all these, and I

10:50:31  5   don't know how many clients there were, but a much larger

10:50:35  6   number of clients that we were supposed to be co-counsel on,

10:50:38  7   and that allegedly by the actions of Downs, they have been,

10:50:47  8   whatever you want to say, removed wrongfully or whatever, you

10:50:51  9   know.

10:50:51 10        MR. FRIEDMAN:  May I ask you a question, Your Honor?

10:50:53 11   This actually, then, relates to their most recent -- if this is

10:50:55 12   their position, then wouldn't the Court have to at least

10:50:58 13   dismiss, first of all, based on personal jurisdiction, the

10:51:01 14   individual defendants, myself, and Craig Downs?  Myself, I had

10:51:07 15   nothing to do with that.  I was only involved in the

10:51:11 16   negotiation and the preparation of the attorney participation

10:51:14 17   agreement.

10:51:15 18        They do not have -- there was no general or

10:51:17 19   systemic contacts between myself or Mr. Downs individually in

10:51:23 20   relation to the State of Louisiana and certainly not in regards

10:51:25 21   to what now they are alleging involving subsequent signing up

10:51:28 22   of clients.

10:51:29 23        So, we would at least maintain the position that

10:51:32 24   the individuals should be removed.  This would be a claim

10:51:35 25   between Downs and Sterbcow Law Group and Melancon Law Group.

*OFFICIAL TRANSCRIPT*

10:51:40 1          THE COURT:  Between Downs Law Group, you mean.

10:51:43 2          MR. FRIEDMAN:  Right.

10:51:44 3          THE COURT:  What kind of entity is Downs Law Group?

10:51:47 4   Lawyers practice under all sorts of names and entities.  What

10:51:51 5   sort of entity is that?

10:51:53 6          MR. FRIEDMAN:  It's a *professional association*, I guess

10:51:56 7   the way that they would call it here in Florida.

10:51:58 8          THE COURT:  I don't know what that means in our

10:52:01 9   language over here.  It's not an L.L.C.?

10:52:07 10         MR. FRIEDMAN:  No.

10:52:09 11         THE COURT:  It's not a professional corporation?

10:52:13 12         MR. FRIEDMAN:  I guess the closest would be a

10:52:16 13  professional corporation, yes.

10:52:17 14         THE COURT:  Well, I don't know what that means, but

10:52:21 15  somebody has got to be responsible.  Craig Downs is the guy,

10:52:26 16  right?  He's the main guy.  That's his firm, right?

10:52:29 17         MR. FRIEDMAN:  Yes.  He would be, yes, for the

10:52:34 18  Downs Law Group, but --

10:52:37 19         THE COURT:  Let me ask Mr. Robinson, why are

10:52:42 20  Mr. Friedman and Mr. Perez named as individual defendants in

10:52:46 21  this case?

10:52:48 22         MR. ROBINSON:  So, there are two reasons, Your Honor.

10:52:53 23  One is that they have personally solicited clients in Louisiana

10:53:00 24  to sign up in this settlement and in this MDL.  They personally

10:53:07 25  participated in that.  They have personally appeared before

**OFFICIAL TRANSCRIPT**

10:53:10  1   Your Honor, and they have orchestrated these new contracts to

10:53:18  2   go out personally between the two of them, Craig Downs and

10:53:21  3   Jeremy Friedman, these new contracts that leave off the name of

10:53:27  4   the Louisiana law firm to go out to these clients and get the

10:53:31  5   clients to sign these new agreements and send back to them in

10:53:34  6   Florida.

10:53:38  7        THE COURT:  Mr. Friedman did that personally, you said?

10:53:46  8        MR. ROBINSON:  Yes, Your Honor.  That's our belief,

10:53:48  9   yes.

10:53:49 10             Specifically, there is an email from Mr. Friedman

10:53:52 11   to Mr. Downs specifically discussing --

10:53:56 12        THE COURT:  Why do you need anybody other than

10:53:59 13   Downs Law Group?

10:54:02 14        MR. ROBINSON:  Well, that's something that we can look

10:54:05 15   into, Your Honor, but we believe that they were personally

10:54:10 16   involved in these actions, in signing up Louisiana clients in

10:54:13 17   Louisiana or orchestrating the fraudulent manipulation of the

10:54:20 18   contract from Florida to Louisiana residents and then getting

10:54:24 19   the contracts back to them in Florida.

10:54:30 20        THE COURT:  So, Mr. Friedman, putting aside whether you

10:54:33 21   should be individually named as a defendant, and Mr. Perez,

10:54:48 22   what's the Downs Law Group's position about the allegations

10:54:55 23   that hundreds or thousands of clients were signed up here in

10:55:00 24   Louisiana after the final fairness hearing, and frankly, I

10:55:05 25   don't know if these clients are clients who made claims under

**OFFICIAL TRANSCRIPT**

10:55:12 1   the settlement agreement or BELO claims or whatever?  I'm

10:55:18 2   assuming there is a mix, I'm guessing, right?

10:55:22 3          MR. FRIEDMAN:  Well, Your Honor, to answer your

10:55:23 4   question, it's my understanding that these are SPC claims, not

10:55:28 5   BELO.

10:55:30 6          THE COURT:  Meaning under the settlement claims.

10:55:32 7          MR. FRIEDMAN:  Yes.

10:55:32 8          THE COURT:  Okay.

10:55:32 9          MR. FRIEDMAN:  But I can't verify that.  I would have

10:55:34 10  to verify that, but I believe that's the case.

10:55:37 11         THE COURT:  Mr. Robinson, would you believe that's

10:55:39 12  correct?

10:55:40 13         MR. ROBINSON:  I believe that's correct, but we -- the

10:55:42 14  answer is we don't know at this point because we would need

10:55:46 15  discovery to find that out.

10:55:49 16         THE COURT:  Well, wouldn't the way to resolve any right

10:55:51 17  to attorneys' fees, there was a mechanism in the settlement to

10:55:58 18  file an attorneys' fee lien against any SPC claimant, right?

10:56:07 19         MR. ROBINSON:  That's exactly what my clients did,

10:56:09 20  Your Honor.

10:56:09 21         THE COURT:  Then why are we litigating this?  That's

10:56:11 22  the way to resolve your issues there, it seems to me.  What's

10:56:14 23  all this about in court that you filed all this litigation in

10:56:18 24  Florida and litigation here?  It seems like it's tremendously

10:56:22 25  wasteful and useless.

*OFFICIAL TRANSCRIPT*

10:56:26  1        MR. ROBINSON:  We tried that, Your Honor.  We reached

10:56:28  2   out to the claims administrator, but they would not allow us to

10:56:32  3   assert those claims.  We had to fight for our contingency

10:56:36  4   fees --

10:56:37  5        THE COURT:  Why wouldn't they allow you to file that?

10:56:41  6   I don't recall exactly what the procedure is, but I thought

10:56:44  7   there was a procedural vehicle within the settlement itself.

10:56:51  8        MR. ROBINSON:  They wouldn't give us the information to

10:56:54  9   identify the clients that were jointly represented because,

10:56:59 10   remember, there are some clients that we are aware of and some

10:57:03 11   that we are not.

10:57:04 12        THE COURT:  Well, wait.  If you said you signed them up

10:57:06 13   here in Louisiana, why wouldn't you be aware of who those

10:57:11 14   clients were?

10:57:12 15        MR. ROBINSON:  Because at some point, the Downs Law

10:57:15 16   Group took off our names from the contract, and they were

10:57:18 17   signing them up, and we weren't aware of who they were.  That's

10:57:23 18   kind of the crux of the issue is it's hard to identify who the

10:57:27 19   clients were if we don't have the whole set.

10:57:30 20        THE COURT:  If clients signed up with them separate

10:57:33 21   from you, I don't know how you have a claim in those cases.  I

10:57:37 22   thought we were taking about clients that you say you signed up

10:57:41 23   along with Downs or some person from Downs here in New Orleans

10:57:46 24   that you, when I mean you, Melancon Rimes signed up here in

10:57:51 25   New Orleans with your name on the contracts, right?  Correct?

**OFFICIAL TRANSCRIPT**

10:57:57  1        MR. ROBINSON:  That is correct.

10:58:00  2        THE COURT:  Well, then, why wouldn't you have access to

10:58:02  3   that?

10:58:04  4        MR. ROBINSON:  Because they had employees at the

10:58:07  5   offices in New Orleans and Baton Rouge who would then keep the

10:58:14  6   paperwork, and so, we're not able to identify who the rest of

10:58:17  7   the clients are.  We know who a subset are but not directly.

10:58:23  8        THE COURT:  Well, what did you do with the subset that

10:58:25  9   you knew of?

10:58:26 10        MR. ROBINSON:  We brought it -- we brought that claim

10:58:27 11   to the claims administrator, but we're having to sort it out

10:58:31 12   with Your Honor.  They would not let us assert those claims

10:58:36 13   because the Downs Law Group is saying that our name is off of

10:58:41 14   the new contract that only have their name on it.  They

10:58:44 15   referred us back to your court.

10:58:48 16        THE COURT:  I'm not aware of that being referred back

10:58:51 17   to me by anybody.  I don't know what you're talking about

10:58:53 18   there.

10:58:53 19        MR. ROBINSON:  That's why the original motion was filed

10:59:01 20   in 2014, to assert these claims, to assert the claims that we

10:59:07 21   were not able to make to the claims administrator because we

10:59:10 22   were not able to identify those clients because -- because they

10:59:16 23   told us they couldn't help us with the dispute over the

10:59:21 24   contract that should apply, the ones without our name or the

10:59:24 25   ones with our name.

                              *OFFICIAL TRANSCRIPT*

|          |    |                                                                  |
|----------|----|------------------------------------------------------------------|
| 10:59:25 | 1  | THE COURT:  So, let me ask you this:  According to the           |
| 10:59:31 | 2  | Downs Law Group, as I appreciate it, they are taking the         |
| 10:59:36 | 3  | position that your clients, Melancon Rimes, except for very      |
| 10:59:42 | 4  | limited work early on in terms of advocating on the objections,  |
| 10:59:52 | 5  | did little or no work on any of these cases.  What work was      |
| 10:59:57 | 6  | done on these cases?                                             |
| 10:59:59 | 7  | You can't get a fee on a case, on a contingent                   |
| 11:00:04 | 8  | fee contract if there is an attorneys' fees dispute unless you   |
| 11:00:09 | 9  | can show you did work.                                           |
| 11:00:12 | 10 | MR. ROBINSON:  All the Louisiana clients were signed up          |
| 11:00:15 | 11 | at the Louisiana offices of the Sterbcow Law Firm --             |
| 11:00:21 | 12 | Sterbcow Law Group and Melancon Rimes.  The problem is that      |
| 11:00:23 | 13 | they were cut out by the fraudulent misrepresentation from the   |
| 11:00:27 | 14 | Downs Law Group.                                                 |
| 11:00:28 | 15 | THE COURT:  What's the fraudulent misrepresentation?             |
| 11:00:31 | 16 | What are you talking about?                                      |
| 11:00:33 | 17 | MR. ROBINSON:  There was a letter that was sent out              |
| 11:00:35 | 18 | from the Downs Law Group cutting out the -- cutting out and      |
| 11:00:41 | 19 | misrepresenting to the mutual clients that they had, cutting     |
| 11:00:45 | 20 | out the Louisiana firm from the litigation and saying that they  |
| 11:00:50 | 21 | would no longer be representing them.                            |
| 11:00:52 | 22 | It was just a blanket letter that was sent out to                |
| 11:00:56 | 23 | all the Louisiana clients that had contingency fee agreements    |
| 11:01:01 | 24 | with the joint venture between Downs Law Group and               |
| 11:01:04 | 25 | Melancon Rimes.                                                  |

*OFFICIAL TRANSCRIPT*

11:01:05  1          THE COURT:  Well, clients do have the right to leave

11:01:07  2    one law firm and go to another one or drop one and pick up

11:01:11  3    another one, so you don't have a right to force those clients

11:01:18  4    to retain you forever.

11:01:22  5          MR. ROBINSON:  Sure, but the problem is, Your Honor,

11:01:27  6    that there was misrepresentations from the Downs Law Group

11:01:29  7    saying that we would no longer act as counsel when we were more

11:01:34  8    than willing to.  It was simply a blanket letter that said that

11:01:38  9    they were no longer involved.  Wasn't given a choice.  It was

11:01:41 10    simply, hey, sign this new contract.  They are no longer

11:01:45 11    involved.  And they orchestrated the removal is what we're

11:01:49 12    saying.

11:01:50 13          THE COURT:  It probably goes on every day around here.

11:01:57 14          MR. ROBINSON:  I hope not, Your Honor.

11:01:58 15          THE COURT:  Clients go from one law firm to another law

11:02:01 16    firm.  I see it all the time around here.  That's why we get

11:02:06 17    into these fights.

11:02:07 18              I still don't understand what kind of attorneys'

11:02:10 19    fees you believe you're entitled to.  I still haven't heard

11:02:14 20    anything about what work you did.  What work did your clients

11:02:19 21    do in these cases?  You're not even aware of who the clients

11:02:22 22    are.  I don't know how you're going to prove that you did any

11:02:25 23    work on their behalf.

11:02:27 24          MR. ROBINSON:  I mean, I think that would be getting

11:02:28 25    into the merits of the case, but I think that, you know,

*OFFICIAL TRANSCRIPT*

11:02:33  1    organizing the clients to come into the law offices to sign up

11:02:38  2    the clients, making them aware of what was going on, providing

11:02:41  3    the contract in both English and Spanish and providing the

11:02:46  4    means for them to get involved in the case was the preliminary

11:02:49  5    actions before they were stonewalled out by the Downs Law

11:02:52  6    Group.

11:02:52  7              It's not a good-faith discharge.  It's the

11:02:56  8    Downs Law Group acting in bad faith to remove their co-counsel

11:03:01  9    from the litigation.  We think that this is obviously a --

11:03:13 10         THE COURT:  Why did you drop the case in Florida and

11:03:15 11    then refile here?

11:03:18 12         MR. ROBINSON:  It was a timing issue, Your Honor.  So,

11:03:21 13    when --

11:03:23 14         THE COURT:  By the way, I read that order that you all

11:03:26 15    keep saying I ordered you to file something here.  I did not

11:03:29 16    order you to file anything here.

11:03:34 17         MR. ROBINSON:  Understood, Your Honor.

11:03:36 18              It was a timing issue, Your Honor.  There was a

11:03:39 19    medical settlement agreement, and the settlement agreement had

11:03:43 20    not been finalized as of yet; and so, we filed in the Florida

11:03:51 21    litigation because there was concurrent jurisdiction there.

11:03:55 22              We had a little bit of discovery ongoing, but

11:03:58 23    there was, once the settlement agreement was finalized, we

11:04:04 24    understood that there was exclusive jurisdiction of this court,

11:04:07 25    so we filed into this court, and because we believed that it's

*OFFICIAL TRANSCRIPT*

11:04:11 1  more easily taken care of in this court simply because all the

11:04:17 2  information is with the claims administrator and with the

11:04:20 3  Louisiana clients here in Louisiana.

11:04:26 4      THE COURT:  All of that information is with the

11:04:28 5  Downs Law Group actually.  That's what you're after, right?

11:04:31 6  You didn't seek that.  I understand there was discovery and so

11:04:37 7  forth that took place in Florida.  You didn't seek what you're

11:04:42 8  suggesting you still don't have, identification of these

11:04:49 9  purported clients?

11:04:52 10     MR. ROBINSON:  I don't believe that all of the

11:04:53 11 discovery has been taken care of.  There was just some

11:04:56 12 discovery, including the depositions that were previously

11:04:59 13 mentioned, and some admissions that had gone back and forth,

11:05:03 14 but the crux of the discovery has not yet been undertaken to

11:05:07 15 identify all the clients.  That would be more readily available

11:05:11 16 with the claims administrator.

11:05:19 17     THE COURT:  Mr. Friedman, do you want to respond?

11:05:21 18     MR. FRIEDMAN:  Three things, Your Honor, yes.  First of

11:05:24 19 all, I still don't see how the individuals would be -- relate

11:05:28 20 to this at all if this is what their claim is.

11:05:31 21     THE COURT:  Put that issue aside.  That's a minor,

11:05:34 22 unimportant issue, unimportant to me right now.  It might be

11:05:37 23 important to you, but it's not important to me right now.

11:05:42 24     MR. FRIEDMAN:  Understood.

11:05:42 25         Your Honor, the second thing to respond to that,

**OFFICIAL TRANSCRIPT**

11:05:44   1   first of all, I don't think that there is a -- in one of our --

11:05:46   2   in our motion to dismiss we, actually, also said (audio

11:05:50   3   distortion) cause of action, I don't think there is a cause of

11:05:52   4   action that's been alleged that we would even have the ability

11:05:54   5   to frame a proper response to at this point.  Their pleadings

11:06:00   6   don't seem to mirror what he's arguing here today.  We do not

11:06:05   7   agree with the facts that he is stating by any means.

11:06:08   8            What happened was is that Mr. Sterbcow rented his

11:06:12   9   offices out to us and charged us rent to go ahead and sign up

11:06:15  10   some clients.  They didn't prepare the retainer agreements.

11:06:20  11   The clients didn't sign the retainer agreements understanding

11:06:24  12   that they were going to essentially -- with both attorneys

11:06:28  13   signing it.  Under Florida law, both attorneys have to sign the

11:06:32  14   agreements in order for that to occur.

11:06:35  15            THE COURT:  Well, put that aside because I'm not sure

11:06:36  16   that Florida law applies if you're signing it up in Louisiana,

11:06:41  17   but you're signing those clients up here in Louisiana in a case

11:06:45  18   that's pending in Louisiana; so, I'm not sure that Florida law

11:06:49  19   comes into play on that.  Are you saying Melancon Rimes' names

11:06:55  20   were not on these contracts?

11:06:58  21            MR. FRIEDMAN:  From what I recall, is that they were

11:07:01  22   not actually signatories to the agreement.

11:07:04  23            THE COURT:  That's not what I asked.  I asked if their

11:07:07  24   names were on the contracts?

11:07:08  25            MR. FRIEDMAN:  Their names were -- that they were

**OFFICIAL TRANSCRIPT**

11:07:14  1    assisting initially, yes, assisting they were.  Absolutely.

11:07:14  2         THE COURT:  Okay.

11:07:16  3         MR. FRIEDMAN:  But, Your Honor, to answer your next

11:07:19  4    question, they didn't do the work, though.

11:07:21  5         THE COURT:  Well, that's another issue.  That's

11:07:23  6    something that would have to be resolved.  If they didn't do

11:07:26  7    any work, they are not going to get any fees or their fee would

11:07:30  8    be minuscule if all they did was sign the clients up.

11:07:33  9              If that's all they did, I think Mr. Robinson

11:07:35 10    would have to recognize that, and his clients, that you don't

11:07:39 11    get paid a great deal just for signing a client up.  If you

11:07:46 12    don't do any work -- you got to do work.  Ethically, you can't

11:07:50 13    get paid a contingent fee if there is a dispute for not doing

11:07:55 14    any work, Mr. Robinson.

11:07:57 15         MR. ROBINSON:  And you also can't ethically renege on

11:08:04 16    your fiduciary duty with your co-counsel and manipulate

11:08:08 17    contingency fee contracts.  I hear his quantum meruit argument.

11:08:10 18    Perhaps --

11:08:10 19         THE COURT:  So, what is the legal basis of your claim

11:08:13 20    because you said it's not under this contract; so, very

11:08:18 21    specifically, tell me what is the legal basis of your claim?

11:08:21 22    Not factually, what's the legal basis?

11:08:25 23         MR. ROBINSON:  The attorney fee.  The breach of

11:08:33 24    contract on the attorneys' fees.

11:08:36 25         THE COURT:  You started off today saying it wasn't a

*OFFICIAL TRANSCRIPT*

```
11:08:38  1    breach of contract case.  Now you're saying it is a breach of
11:08:42  2    contract.
11:08:42  3            MR. ROBINSON:  And the individual attorneys' fees in
11:08:47  4    the --
11:08:47  5            THE COURT:  Let me put it this way:  Are you alleging a
11:08:50  6    claim under the Louisiana Unfair Trade Practices Act?
11:08:55  7            MR. ROBINSON:  That is part of it, yes.
11:08:56  8            THE COURT:  Well, you said that was the entire claim in
11:08:59  9    one of these briefs I read.  You said the entire claim was
11:09:02  10   LUTPA.  Now you're backtracking off that?
11:09:07  11           MR. ROBINSON:  I read that as well.  That was in an
11:09:10  12   opposition in 2014, but I think that what they were saying,
11:09:13  13   it's not a breach of -- it's not the breach of contract for the
11:09:18  14   attorney participation agreement.  It's the attorney fee from
11:09:20  15   the individual contract.
11:09:21  16           THE COURT:  Okay.  I've heard enough.  Here is what I'm
11:09:23  17   going to do:  This case is a mess because of the way it's been
11:09:30  18   pled.  It's all over the board.  There is no way I can make
11:09:36  19   sense of this.  The more we talk about it, the more confusing
11:09:40  20   it gets.  I don't think Mr. Friedman can adequately respond to
11:09:44  21   it discretely.
11:09:46  22           I'm going to give the plaintiffs one opportunity
11:09:50  23   to replead the case, and I don't want a partial amendment.
11:09:55  24   Just restate your entire complaint, okay?  I'm going to give
11:10:03  25   you 30 days to do that, plaintiffs to restate their complaint,
```

*OFFICIAL TRANSCRIPT*

11:10:15  1    failing which, I'm going to grant the motion to dismiss for

11:10:20  2    failure to articulate a plausible claim, okay?

11:10:26  3         MR. ROBINSON:  Yes, Your Honor.

11:10:27  4         THE COURT:  If they file a restated complaint,

11:10:34  5    Mr. Friedman, I'm going to give the defendants 30 days

11:10:38  6    thereafter to file responsive pleadings, okay?

11:10:45  7         MR. FRIEDMAN:  Okay.  Your Honor, last question.

11:10:50  8         THE COURT:  Go ahead.  I'm sorry.

11:10:52  9         MR. FRIEDMAN:  I know Your Honor said, obviously, it's

11:10:55 10    important to me and also Mr. Downs personally, from a personal

11:10:59 11    jurisdiction standpoint, are we able to reraise that issue in

11:11:03 12    response to the newly filed complaint if they actually do name

11:11:07 13    us again individually?

11:11:09 14         THE COURT:  Sure, you can reraise any issue you want in

11:11:12 15    response to their restated complaint, okay?

11:11:15 16         MR. FRIEDMAN:  Okay.

11:11:17 17         THE COURT:  Okay.  So, is everybody clear on that?

11:11:24 18         MR. FRIEDMAN:  Yes, Your Honor.

11:11:25 19         MR. ROBINSON:  Yes.

11:11:25 20         THE COURT:  So, I guess what I'm doing is conditionally

11:11:30 21    granting the motion to dismiss basically for failure to state a

11:11:38 22    claim, a colorable claim, but I'm allowing the plaintiffs

11:11:43 23    30 days to submit a restated complaint, and then we'll see

11:11:49 24    where that goes, okay?

11:11:53 25         MR. ROBINSON:  Thank you, Your Honor, for your time.

**OFFICIAL TRANSCRIPT**

11:11:55  1          THE COURT:  Okay.  Anything else?

11:11:56  2          MR. FRIEDMAN:  Thank you.

11:11:57  3          THE COURT:  All right.  Have a good day.  All right.

11:12:01  4          MR. FRIEDMAN:  You, too.

5          (WHEREUPON, at 11:12 a.m., the proceedings were

6      concluded.)

7                              *    *    *

8

9                      REPORTER'S CERTIFICATE

10

11          I, Cathy Pepper, Certified Realtime Reporter, Registered

12      Merit Reporter, Certified Court Reporter in and for the State

13      of Louisiana, Official Court Reporter for the United States

14      District Court, Eastern District of Louisiana, do hereby

15      certify that the foregoing is a true and correct transcript to

16      the best of my ability and understanding from the record of the

17      proceedings in the above-entitled and numbered matter.

18

19                              *s/Cathy Pepper*
                                _____

20                              Cathy Pepper, CRR, RMR, CCR
                                Certified Realtime Reporter
21                              Registered Merit Reporter
                                Official Court Reporter
22                              United States District Court
                                Cathy_Pepper@laed.uscourts.gov
23

24

25

                            ***OFFICIAL  TRANSCRIPT***