# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit
**FILED**
September 2, 2022
Lyle W. Cayce
Clerk

No. 21-30573

―――――

IN RE: DEEPWATER HORIZON

―――――

LOGGERHEAD HOLDINGS, INCORPORATED,

*Plaintiff—Appellant*,

versus

BP, P.L.C.; BP AMERICA, INCORPORATED; BP PRODUCTS NORTH AMERICA, INCORPORATED; BP AMERICA PRODUCTION COMPANY; BP EXPLORATION & PRODUCTION, INCORPORATED,

*Defendants—Appellees*.

―――――

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:10-MD-2179
USDC No. 2:16-CV-5952

―――――

Before KING, ELROD, and SOUTHWICK, *Circuit Judges*.

LESLIE H. SOUTHWICK, *Circuit Judge*:

    Loggerhead Holdings, Inc., a holding company that owned a scuba diving cruise business, was one of many plaintiffs who brought suit against an oil company because of the explosion of an offshore drilling rig and the

No. 21-30573

resulting discharge of a massive quantity of oil into the Gulf of Mexico. Loggerhead's claims were dismissed on summary judgment. We AFFIRM in part, REVERSE in part, and REMAND.

FACTUAL AND PROCEDURAL BACKGROUND

Loggerhead Holdings, Inc. began operating a scuba diving cruise business in 1986. The business relied on two special-purpose vessels named the *Nekton Pilot* and *Nekton Rorqual* that facilitated scuba expeditions. Beginning sometime after 2010, Loggerhead operated out of Fort Lauderdale on Florida's Atlantic shore and offered scuba-diving cruises for tourists in and around the Caribbean through its subsidiary, "Nekton Diving Cruises."

Loggerhead does not dispute that it suffered business setbacks in the late 2000s. Nekton's bookings declined significantly from 2008 to 2010. Loggerhead reported declining receipts and mounting net income losses from 2007 to 2009. Further, even though Loggerhead calculated positive earnings before interest, taxes, depreciation, and amortization ("EBITDA") throughout this period, it is apparent that its cruise business was encountering significant problems. In September 2009, Loggerhead put one of its vessels, the *Pilot*, into dry dock at Port St. Joe, Florida, for a refit of the vessel. Loggerhead's president, John Dixon, testified that the vessel was to be returned to service in June 2010. Despite that testimony, by April 2010, Loggerhead was not accepting bookings. Dixon testified that only $30,000 out of a projected $180,000 had been spent on parts for the *Pilot*.

About the same time, the *Rorqual* experienced problems of its own. Around April 10, 2010, the *Rorqual*'s starboard generator "had a casualty that was quickly fixed by installing a replacement generator." That same week, though, the replacement generator "had a low-oil pressure warning indication," and "Loggerhead limited its operation as a protective measure until the low-oil pressure condition could be diagnosed at Loggerhead's Port

2

No. 21-30573

St. Joe facility." Loggerhead thus planned to return the *Rorqual* to Port St. Joe at the completion of its final winter itinerary on April 24, 2010. To facilitate the generator warranty check, Loggerhead canceled and allegedly rescheduled two weeks of summer cruises that were planned to depart on May 8 and May 15.

On April 20, 2010, *Deepwater Horizon*, a mobile offshore drilling unit hired by BP to drill the Macondo Well in the Gulf of Mexico, suffered a blowout, causing what would become an 87-day discharge of oil into the Gulf. Not long thereafter, the *Rorqual* went from the Turks and Caicos Islands to Port St. Joe on Florida's Gulf Coast. Dixon, in an affidavit, alleged that on the evening of May 2, 2010 — one day before arriving at Port St. Joe — the *Rorqual* encountered oil from the Macondo Well. The oil damaged the vessel's main engines, generators, reverse osmosis water makers, HVAC, grey, sanitary, and ballast water systems. Dixon asserted he "personally observed Macondo oil on the vessel." He acknowledged, though, that he did not have the oil tested to determine if it could be matched to the oil from the Macondo Well. BP asserted in district court, and Loggerhead did not contest, that "it is possible to 'fingerprint' petroleum through the use of gas chromatography in order to determine the source of the crude oil." Dixon's response was that he was unaware of any other wells that were leaking, and thus his "deduction" was that the oil must have come from BP's well.

On May 17, 2010, Loggerhead announced on its website it was ceasing cruising operations, giving several reasons but making no reference to the *Deepwater Horizon* disaster. Loggerhead did not return the $417,000 in deposits paid by its customers, and its Nekton Diving Cruises subsidiary soon filed an assignment for the benefit of its creditors. Shortly after, other diving companies offered credit to Nekton's customers for diving trips with them.

No. 21-30573

On August 10, 2010, the Judicial Panel on Multidistrict Litigation centralized all federal actions in the United States District Court for the Eastern District of Louisiana. *In re Oil Spill by Oil Rig "Deepwater Horizon,"* 910 F. Supp. 2d 891, 900 (E.D. La. 2012); *see* 28 U.S.C. § 1407. In 2012, BP entered two class settlements: one for medical claims and another for economic claims. *See In re Deepwater Horizon*, 723 F. App'x 247, 248 (5th Cir. 2018). Under the terms of the settlement for economic damages, class members released their claims in exchange for payment through a court supervised settlement program. *In re Oil Spill*, 910 F. Supp. 2d at 903. Loggerhead opted out of the settlement on September 19, 2012.

In 2013, Loggerhead sued a variety of BP entities in the United States District Court for the Southern District of Texas for claims arising from the *Deepwater Horizon* disaster. The suit was transferred to the Eastern District of Louisiana to join the others in that multidistrict litigation ("MDL"). Complying with a pretrial order, Loggerhead filed a new complaint in May 2016, asserting claims under the Oil Pollution Act ("OPA") for economic and physical damages. *See* 33 U.S.C. § 2702(b)(2)(B), (E). It also asserted a claim for compensatory and punitive damages under maritime law.

Following the close of the limited discovery allowed, BP moved for summary judgment. BP argued that Loggerhead failed to create a genuine factual issue that the *Deepwater Horizon* disaster caused it economic injury; thus, no reasonable jury could rule in Loggerhead's favor under the OPA or maritime law. BP also argued that Loggerhead's claim for damages due to physical injury failed because there was no evidence that the *Rorqual* had encountered oil discharged from the Macondo Well. Loggerhead's response included its tax returns from 2007-2014, along with a new declaration from Dixon. Loggerhead argued its economic losses were caused by the oil from the *Deepwater Horizon* and it could prove its economic losses with reasonable certainty through its financial statements. Regarding the claim for damages

No. 21-30573

due to physical injury, Loggerhead responded that Dixon's deposition and affidavit established a genuine dispute of material fact as to whether oil from BP's well was what fouled the *Rorqual*'s engines and other systems.

The district court granted BP's motion for summary judgment on all claims. On the Section 2702(b)(2)(E) claim, the district court found that no jury could find Loggerhead's business failed because of the *Deepwater Horizon* disaster: "The evidence all points in one direction: that Loggerhead's business was going to fail in the Summer of 2010 regardless of whether the oil spill happened." The district court also held that no evidence supported Loggerhead suffered any loss in earnings resulting from "the injury, destruction, or loss of real property, personal property, or natural resources" as required by Section 2702(b)(2)(E). The court granted summary judgment on the claim. On the Section 2702(b)(2)(B) claim for "[d]amages for injury to, or economic losses resulting from destruction of, real or personal property," the district court assumed for summary judgment purposes that there may be a question of material fact regarding whether the *Rorqual* had been damaged from encountering BP's oil in the water. Still, the district court granted summary judgment on the claim because the only damages Loggerhead could recover under the statute would be "the cost of repairing the vessel's oil-damaged components, if any" and Loggerhead had not set out "such repair costs among its itemized list of damages."[1]

Loggerhead timely appealed.

---

[1] The district court also granted summary judgment for BP on Loggerhead's claims under general maritime law "for the same reasons" discussed in the remainder of the opinion. Loggerhead does not raise any issue here as to the dismissal.

5

No. 21-30573

DISCUSSION

In reviewing an award of summary judgment *de novo*, we apply the same standard used by the district court. *Rogers v. Bromac Title Servs., L.L.C.*, 755 F.3d 347, 350 (5th Cir. 2014). With a motion for summary judgment, we ask whether, construing the facts in the light most favorable to the nonmoving party, the evidence is sufficient for a reasonable jury to find for the nonmovant. *Sierra Club, Inc. v. Sandy Creek Energy Assocs., L.P.*, 627 F.3d 134, 138 (5th Cir. 2010); *Cuadra v. Houston Indep. Sch. Dist.*, 626 F.3d 808, 812 (5th Cir. 2010). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "An issue is material if its resolution could affect the outcome of the action." *Sierra Club, Inc.*, 627 F.3d at 138 (quotation marks and citation omitted). Summary judgment should be granted "where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant." *McCarty v. Hillstone Rest. Grp., Inc.*, 864 F.3d 354, 358 (5th Cir. 2017) (quotation marks and citations omitted).

A party can present critical evidence, though, in many forms, even self-serving affidavits: "'[S]elf-serving' affidavits and depositions may create fact issues even if not supported by the rest of the record." *Guzman v. Allstate Assurance Co.*, 18 F.4th 157, 160 (5th Cir. 2021). It is unremarkable that evidence submitted by one side at the summary judgment stage will be "self-serving"; the question is whether that self-serving evidence is "conclusory, vague, or not based on personal knowledge." *Id.* at 161.

I.   *33 U.S.C. § 2702(b)(2)(E) claim for economic damages*

We first address the district court's grant of summary judgment on the Section 2702(b)(2)(E) claim. Loggerhead argues the district court erred by: (1) applying the incorrect causation standard to the claim; (2) not finding

6

that Dixon's declaration created a question of material fact regarding the cause of Loggerhead's economic damages; (3) making impermissible credibility determinations regarding Dixon's testimony; and (4) stepping outside the bounds of the Rule 56 inquiry by considering the meaning of Loggerhead's statements regarding EBITDA.

We consider Loggerhead's arguments together. Section 2702(b)(2)(E) allows for recovery of economic losses without requiring a plaintiff to show any physical damage to the plaintiff's property. 33 U.S.C. § 2702(b)(2)(E). "The only restriction on such recovery is that the loss must be *due to* the injury, destruction, or loss of real property, personal property, or natural resources." *In re Settoon Towing, L.L.C.*, 859 F.3d 340, 345 (5th Cir. 2017) (quotation marks omitted) (emphasis added).

The parties dispute the precise causal standard applying to claims under Section 2702(b)(2)(E). A reasonable approach would be to apply the substantial-nexus test employed by the Supreme Court in *Pacific Operators Offshore, LLP v. Valladolid*, 565 U.S. 207 (2012). In that case, the Court addressed a federal statute providing remedies for injuries "occurring as the result of operations" on the Outer Continental Shelf, and it endorsed a "'substantial-nexus' test" requiring a "significant causal link" between the employee's injury and the employer's conduct. *Id.* at 221-222. Accordingly, under the substantial-nexus test, a plaintiff seeking to recover damages under Section 2702(b)(2)(E) must demonstrate a significant causal connection between operations on the Outer Continental Shelf and its alleged loss of profits or impairment of earning capacity.

In a previous opinion in this MDL, the district court applied the substantial-nexus test to determine causation. *In re Oil Spill by Oil Rig "Deepwater Horizon,"* 558 F. Supp. 3d 331, 339 (E.D. La. 2021). The district court utilized a sliding scale approach:

No. 21-30573

> [T]he test [for causation] will vary with the circumstances —
> e.g., what qualifies as a "significant causal link" in a massive
> oil spill may not qualify in a much smaller oil spill. As applied
> here, if a fact-finder determined that the oil spill's injury to
> water and/or beaches caused fewer tourists to travel to Panama
> City Beach and further determined that Classy Cycles lost
> profits because of the decline in tourists, then this Court would
> hold that the "substantial-nexus" test is satisfied.

*Id*. We are not certain how this sliding scale concept works in different circumstances. Without endorsing that variant, we conclude a substantial-nexus test should be applied to the Section 2702(b)(2)(E) claims.

The district court considered the following undisputed facts in holding that no reasonable jury could find Loggerhead's cruise business would have survived even without the *Deepwater Horizon* disaster. Loggerhead's revenues, bookings, and reported profits had been in decline for years, with Loggerhead reporting net losses on its tax returns for the years 2007–2009. In the years prior to 2010, the Loggerhead subsidiary operating the diving cruises had accrued millions of dollars of debt, against which it sometimes made timely payments but sometimes did not. By April 2010, when the oil rig exploded, the *Pilot* had been drydocked for months for an extended refit, only limited work had been done, and reservations were not yet being taken for summer cruises on the vessel. Instead, Loggerhead asserts it was depending on revenue from the *Rorqual* to pay for the repairs to the *Pilot*; indeed, it "needed the *Rorqual* to be in service" to finish the refit of the *Pilot*.

The *Rorqual* suffered two mechanical failures between April 10 and 24, 2010, causing Loggerhead to cancel two weeks of cruises from May 8 through May 22. Loggerhead had already planned off-charter weeks of April 24 through May 8. Then on April 24, four days after the *Deepwater*

8

No. 21-30573

*Horizon* blowout, the *Rorqual* completed its scheduled itinerary and traveled to Port St. Joe, Florida.

Some additional facts are said to be disputed. First, BP contends that Loggerhead canceled — rather than rescheduled — the May 8 and 15 cruises. Certainly, Dixon stated in his February 2021 deposition that the May 8 and 15 cruises were "cancel[ed]." Dixon's May 2021 declaration, though, asserts that the May 8 and 15 cruises were "reschedule[d]." Loggerhead argues that canceling and rescheduling are not mutually exclusive; it asserts that the cruise operations for the weeks of May 8 and 15 were canceled and that the passengers who booked for those two weeks were rescheduled to future cruise weeks. Loggerhead contends that by canceling and rescheduling the cruises to a later date, this suggests Loggerhead's business would have survived but for the *Deepwater Horizon* explosion. The district court determined the cruises were "*de facto* cancelled," relying on the fact Loggerhead "does not say what dates these cruises were rescheduled or provide any documentary proof that they were rescheduled." As previously stated, though, a party's affidavits and depositions may create fact issues even without corroborating evidence. *See Guzman*, 18 F.4th at 160. We conclude that cancelling and rescheduling may simply be different points in time for the same event. A genuine dispute of material fact exists here.

Second, relying on Dixon's declaration, Loggerhead asserts the *Rorqual* was still fully operational prior to the *Deepwater Horizon* explosion, although it was experiencing a starboard generator problem for which it traveled to Port St. Joe. We are not certain BP actually disputes this, but regardless, Dixon's declaration is sufficient factual support for his version of the story.

Third, Dixon stated that on May 2, 2010, on the way to Port St. Joe, the *Rorqual* traveled through waters containing oil from the *Deepwater Horizon* explosion. That oil damaged the vessel's main engines, generators,

9

reverse osmosis water makers, air-conditioning, grey, sanitary, and ballast water systems. Dixon described his assertion about the source of the oil as a "deduction," one based on being unaware of any other wells that were leaking oil. He also argues that on summary judgment that is enough; the oil that had coated some of the *Rorqual* had been preserved and could now be tested.

At least part of that argument is incorrect. Once it is time for a court to make a ruling on summary judgment, its grant or denial turns on whether there is a genuine dispute of material fact based on evidence before the court — not evidence that might be developed later. It is true that the evidence offered for summary judgment purposes need not yet be in a form admissible at trial, but the party offering the evidence needs to be able to demonstrate that it can be put into an admissible form by the time of a trial. *See Lee v. Offshore Logistical & Transport, L.L.C.*, 859 F.3d 353, 355 (5th Cir. 2017). The question of sufficiency of the evidence to create a fact issue as to the source of the oil is not that Dixon's assertions are in the wrong form, but that they are supported only by Dixon's "deduction."

What did BP offer? It presented contemporaneous estimates from that National Oceanic and Atmospheric Administration that on May 2 and May 3, the eastern advance of the oil slick was considerably west of where the *Rorqual* allegedly encountered oil in the water on those dates. Loggerhead does not direct us to any evidence it offered to the contrary, so we are left only with the deduction. We will say, that even though it was Loggerhead's burden to produce some competent evidence that the oil it encountered was from the Macondo Well, BP did not attempt to offer another source as a possibility. Instead, BP disputes that the *Rorqual* encountered any oil.

The district court did not decide whether there was any genuine dispute of fact, which certainly would be material, as to whether the *Rorqual* was damaged by oil from the Macondo Well. After identifying the dispute, the

court concluded that "no reasonable jury could conclude that the oil" from the *Deepwater Horizon* disaster "caused Loggerhead's business to fail. The evidence all points in one direction," that Loggerhead's business was collapsing at that time independently of anything for which BP was responsible.

Because we have the *discretion* to affirm on any basis supported by the record, *Rutila v. Dept. of Transp.*, 12 F.4th 509, 511 n.3 (5th Cir. 2021), we consider as an alternative ground that Loggerhead offered no competent summary judgment evidence identifying the source of any oil that the *Rorqual* encountered. Again, Loggerhead offered Dixon's *deduction* that it was the only possible source. Another way to put the argument is that based on the direct evidence that an oil slick for which BP was responsible was moving east in the Gulf, on the uncertainties that could be accepted as applying to governmental forecasts of how far this oil spread, and on the absence of evidence of any other well leaking oil that could explain the *Rorqual*'s encountering it, there was circumstantial evidence from which jurors could themselves deduce that the Macondo Well provided the oil that fouled the *Rorqual*. Jurors, of course, would first need to accept that the *Rorqual* encountered any oil.

BP is certainly correct that Loggerhead's evidence is exceedingly weak that any oil in the water that damaged the *Rorqual* came from the Macondo Well. Nonetheless, the district court, whose familiarity with the *Deepwater Horizon* disaster and any factual questions that exist about its effects has been hard earned, decided not to determine whether there was a genuine dispute of material fact about damage to the *Rorqual*. We thus decline to exercise our discretion to consider affirming on the basis that no genuine factual dispute exists about the cause of damage to the *Rorqual*.

Fourth, Dixon's declaration asserts that after the disaster, Loggerhead had trouble attracting and retaining future customers because of the ongoing Gulf of Mexico clean-up effort, water closures, and presence of

oil on the water which caused guests to cancel their reservations. BP insists these explanations are contrary to Loggerhead's announcement of cessation of operations on May 17, in which it did not refer to the *Deepwater Horizon* disaster: "Due to the continually increasing cost of operations, decreased discretionary income of consumers, and overall economic difficulty, Nekton is unable to restart cruise operations at this time."

Certainly, it is undisputed that Loggerhead had millions of dollars in debt and limited assets at the time of the assignment for the benefit of creditors. Loggerhead asserts, though, that its demise was not a certainty prior to the *Deepwater Horizon* disaster. The firm had positive EBITDA for the years prior to 2010 and then diminished bookings after *Deepwater Horizon*. Of course, Nekton suffered serious business setbacks before the *Rorqual*'s mechanical problems, had canceled all its May itineraries after sending the vessel to be repaired, shut down operations, and then completed an assignment for the benefit of creditors. Dixon's declaration, though, states the *Rorqual* was "fully operational" and yielding revenue at the time of the *Deepwater Horizon* explosion.

As we stated earlier, summary judgment is appropriate "where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant." *McCarty*, 864 F.3d at 358. The district court's placing this evidence in that category is understandable. The company was in significant financial distress, its survival subject to serious question even without the *Deepwater Horizon* disaster. Nonetheless, Loggerhead had been able to continue operations for several years despite its fraught financial condition, and indeed despite reporting net losses on its taxes for the three years preceding the disastrous events of April 2010 in the Gulf. Whether it could have continued to survive, if not thrive, had the April events not occurred presents a fact question.

We conclude that a reasonable factfinder could find the requisite causal link between the *Deepwater Horizon* disaster and Loggerhead's demise. Summary judgment should not have been granted.

### II.     33 U.S.C. § 2702(b)(2)(B) claim for physical damages

Loggerhead also appeals the district court's holding that BP was entitled to summary judgment regarding Loggerhead's OPA Section 2702(b)(2)(B) claim.  Section 2702(b)(2)(B) permits recovery for "[d]amages for injury to, or economic losses resulting from destruction of, real or personal property."  33 U.S.C. § 2702(b)(2)(B).  Subsection (B) requires physical injury to the plaintiff's property before a plaintiff can recover.  *See In re: Oil Spill by Oil Rig "Deepwater Horizon,"* 902 F. Supp. 2d 808, 817 (E.D. La. 2012).

The district court determined "[t]here is perhaps a genuine dispute of material fact over whether the RORQUAL was oiled," yet still dismissed the claim.  That is because the district court understood "Loggerhead's entire argument concerning the purported oiling of the RORQUAL" to be "designed to establish a lost profits/impaired earning capacity claim."  The district court was correct that "[t]he most Loggerhead could hope to recover under § 2702(b)(2)(B) in this circumstance would be the cost of repairing the vessel's oil-damaged components, if any" and that the list of damages provided in Dixon's declaration and the economic expert's opinion did not include repair costs for oil-damaged components.  Seeing a mismatch between the remedy sought and the one available under the statute, the district court dismissed the Section 2702(b)(2)(B) claim.

Loggerhead argues this was error because the district court failed to consider Dixon's declaration along with a previously submitted "expert evaluation" for the "repairs required for *Nekton Rorqual* after the May 2,

13

2010 oiling" which Loggerhead claims were just shy of $7 million. Loggerhead asserts that it offered "a detailed damage report" which listed "all the supporting documents" reviewed by the damage expert. Together, Loggerhead contends the district court overlooked these documents which Loggerhead believes create a genuine issue of material fact regarding its claim for Section 2702(b)(2)(B) damages.

BP responds that Loggerhead has failed to provide competent evidence of physical damage. Although Dixon's declaration mentioned "restart cost," it did not identify a claim for costs to repair physical damage to the *Rorqual*. BP also argues that because Loggerhead only referred to the expert materials in its opposition to summary judgment regarding claims under Section 2702(b)(2)(E), reliance on those materials is forfeited. Finally, BP is correct that the only evidence for physical damages to the *Rorqual* in the report is a line item under "vessel repairs" titled "*Nekton Rorqual*" citing a sum of just over $6.8 million.

We agree with BP that this is not enough to create a genuine dispute of material fact. Although the expert report catalogues the sources allegedly supporting its findings, the supporting documents are not included in what was submitted to the district court on summary judgment, and they were not referred to in relation to either the Section 2702(b)(2)(E) or Section 2702(b)(2)(B) claims. Because Loggerhead was not able to offer more than Dixon's allegations and an unsupported estimate — evidence "so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant" — the district court properly granted BP's motion for summary judgment on the Section 2702(b)(2)(B) claim. *See McCarty*, 864 F.3d at 358.

The district court's judgment is AFFIRMED in part, REVERSED in part, and REMANDED.