Case Number 10 – 2179
Claim Number SPC0002895

UNITED STATES DISTRICT COURT
Eastern District of Louisiana
Office of the Clerk
April 24, 2023

WILLIAM W. BLEVINS                                    500 Poydras ST., RM. C-151
    CLERK                                              NEW ORLEANS, LA   70130


REFERENCE:  MDL – 2179"J"(1) IN RE:  OIL SPILL BY THE OIL RIG "DEEPWATER HOSIZON" In the Gulf of Mexico, on April 20, 2010


Date Filed_____


JURISDICTION
The U.S. District Court for Eastern District of Has Jurisdiction

STATUTORY
LII > Federal Rules of bankruptcy procedure
Rule 1018. Rule 3008
Title 42

CONSTITUTIONAL PROVISION
Article VII, Amendment XIV, Section 1

David M. Strong, pro se
P.O. Box 5702
Gulf Shores, AL 36547
(251) 407-1027
                        Plaintiff

                           v

Deepwater Horizon Medical Benefits Claims Administrator
935 Gravier Street, Suite 1400
New Orleans, LA 70112
                        Defendant

TENDERED FOR FILING

MAY 01 2023

U.S. DISTRICT COURT
Eastern District of Louisiana
Deputy Clerk

1

Mr. Strong is a poor man and he getting feeling back in his hands and feet. The recovery is a long process. On January 21, 2016 Mr. Strong was hospitalized at Johns Hopkins Hospital in Baltimore, Maryland for "Severe diffuse pancreatic atrophy" and all of these symptoms outside the Brain and Spinal Cord caused by Peripheral Neuropathy can be reverse but memory loss has been most troubling. EXACERBATED by the Oil Spill by the Oil Rig "DEEPWATER HORIZON" In the Gulf of Mexico on April 20, 2010. And hospitalized on June 15, 2010 at South Baldwin Regional Medical Center (SBRMC) and diagnosed with a Complete Atrioventricular (AVB). On June 02, 2011 DOL/OWCP concluded that Mr. Strong could work when he could not breathe the outside air in Gulf Shores, AL 36542 deducted his Benefit Payment by $325.00 per week. (See Exhibit 35 and 35A and 36)

ISSUE BEFORE COURT

**DISPARATE TREATMENT**

Case 2:10-md-02179-CJB-JCW Document 21766 Field 10/04/16 Pages 1 of 3. This Document Relates: No. 12-968

SECTION: J

JUDGE BARBIER        MAG. JUDGE WILKINSON

*****Rule 1018 MOTION TO Vacate Order for Relief*****

Contested Involuntary Petitions; Commencing Chapter 15 Cases; Proceedings to Vacate Order for Relief; Applicability of Rules in Part VII Governing Adversary Proceedings. (See Exhibit 1.)

QUESTIONS BEFORE THE COURT

Did the court error when it failed to respect the needs of residents as it respected and cared for the needs of Cleanup Workers?

Did the court error when it failed to require the Defendant to clean up the disbursed oil in the mouth of Cotton Creek and the Intracoastal Waterways?

Did the court error when it failed to require the Defendant through discovery to combine the GCCF file with the DHMBCA File and respond to Mr. Strong MOTION TO SET ASIDE in court document dated May 22, 2014?

Did the court error when it failed to consider and established a Zone Map that did not consider Mr. Strong's House 300 feet from the mouth of Cotton Creek and Intracoastal Waterway?

Did the court error when it failed to consider or allow the views of the Plaintiff or give the Plaintiff the opportunity to participate in establishing a class for benefits when the Defendant was responsible for all of the damages?

2

Did the court error when it failed to respond or consider Mr. Strong request for financial assistant when his vasomotor reactive airways disease was exacerbated to peripheral neuropathy and the onset was April 18, 1995, but it was dormant until April 20, 2010?

The question remains is why BP ended its relationship with GCCF and established a new relationship with DHMBCA to start a new process?

Did BP error when it established a list of attorneys paid by BP?

RATIONALE TO SUPPORT THE QUESTIONS BEFORE THE COURT

**Question 1. Did the court error when it failed to respect the needs of residents as it respected and cared for the needs of Cleanup Workers?**

"GCCF and its Claims Administrator, Kenneth R. Feinburg, act for and on behalf of BP Exploration & Production, Inc." (Letter from GCCF dated 12/07/2011) BP and GCCF Claims Administrator were very misleading and disingenuous for making a request for residents to provide medical information and knowing they were not going accept a bad outcome on BP's bottom line. And not as its record shows that BP and GCCF were not going to provide relief from Petroleum Distillate Poison Gases and Odors caused by Disbursed Oil. (See Exhibit 5)

**Question 2. Did the court error when it failed to require the Defendant to clean up the disbursed oil in the mouth of Cotton Creek and the Intracoastal Waterways?**

The court failure to require the Defendant to clean up the disbursed oily mirey mud in the mouth of Cotton Creek and the Intracoastal Waterways caused serious harm to Mr. Strong heart Conduction System and exacerbated his intermitting First Degree Heart Block to a Complete heart Block and damage to other organs. (See Exhibit 17)

Also, he had to move out of his house in April 2011 when he developed muscle wasting until September 2020 after Hurricane Sally sat and spined over the area and flood waters raised 10 – 12 feet above sea level. And the under current in Cotton Creek washed all of the disbursed oil/ miry oily mud out of the mouth Cotton Creek and the Intracoastal Waterways where you can see the clay banks and not the bottom of Cotton Creek.

And Mr. Strong drove down to Gulf Shore, Alabama in August 2020 and found that his neighbors had placed tree debris in his front yard but FEMA move the debris free of charge. Then he hired his neighbors to clear out his downed Pine trees and standing Pine trees. And Strong move back in his house in September 2020 and his health improved immensely.

**Question 3. Did the court error when it failed to require the Defendant through discovery to combine the GCCF file with the DHMBCA File and respond to Mr. Strong MOTION TO SET ASIDE in court document dated May 22, 2014?**

The essence of this case is disparate treatment of individuals harmed by crude oil and disbursed crude oil. In REFERENCE:  MDL-2179"J"(!) IN RE: OIL SPILLBY THE OIL RIG "DEEPWATER HORIZON".  The MOTION TO SET ASIDE the MAPS for Settlement Class for Cleanup Workers only who was provided protected clothing and respirators to protect their health.

3

In contrast to residents who live near creeks, rivers, bays, and wet lands controlled by low and high tides did not have protected clothing and respirators to protect their health to keep them safe. The residents who live near creeks, rivers, bays, and wet lands controlled by low and high tides must breathe air contaminated with Petroleum Distillate Poisoning Gases and Orders that emitting by the disbursed oil. At best, this seems like the court and the Defendant lack humanity.

**Question 4. Did the court error when it ruled that Mr. Strong was not a member of a Class?**

Mr. Strong is going to provide the court with a copy of his PROOF OF CLAIM FORMS dated August 08, 2012 and he sent to the court his Challenge Form dated August 3, 2016 this give rise to the intent of the court and the Defendant. Was this intent to deny Mr. Strong a Right to due process of law under the Fourteenth Amendment to the Constitution of the United States of America? Or was the intent to destroy the files to deny all persons exposed to disbursed oil from creeks, rivers, bays and wet lands control by low and high tides would not be eligible for Benefit Payments? {See Exhibit 4 and 4A}

**Question 5. Did the court error when it failed to consider and established a Zone Map that did not consider Mr. Strong's House 300 feet from the mouth of Cotton Creek and Intracoastal Waterway?**

What was the intent of the court and Defendant knowing that Mr. Strong had been exposed to Petroleum Distillate Poisoning Gases and Odor that was emitted by the disbursed oil? GCCF and DHMBCA Defendant had Mr. Strong medical records and knew the extend and the harmfully medical disabilities brough to bare on the Mr. Strong health and individuals living near creeks, rivers, bays and wet lands control by low and high tides. (See page 7 EXERBATION OF OCCUPATIONAL DISEASES PERIPHERAL NEUROPATHY/AMYOTROPHIC LATERAL SCLEROSIS. And Mr. Kenneth R. Feinberg, Claims Administrator GCCF before he wrote a letter dated December 7, 2011 to Mr. Strong, RE: "Denial Letter on Interim Payment/Final Payment Claim DAVID MCARTHUR STRONG Claimant ID: 1173939." (See page 7, paragraph 4)

**Question 6. Did the court error when it failed to consider or allow the views of the Plaintiff or give the Plaintiff the opportunity to participate in establishing a class for benefits when the Defendant was responsible for all of the damages?**

The question remains did the court show fairness when the 44th U.S. President had BP set aside $20,000,000,000.00 to clean up all of the crude oil and disbursed crude oil. And provide medical benefits for financial harm for person and property. Or did the court show bias against Mr. Strong and favoritism to the Defendant since the court and the Defendant did not consider Mr. Strong or individuals like Mr. Strong who lived near creeks, rivers, bays and wet lands effective by low and high tides and disbursed oil.

**Question 7. Did the court error when it failed to respond or consider Mr. Strong request for financial assistant when his vasomotor reactive airways disease was exacerbated to peripheral neuropathy and the onset was April 18, 1995, but it was dormant until April 20, 2010?**

Since Mr. Strong loss his ability to breathes outside air on December 16, 1994 in the Washington DC Metropolitan Area and he moved to Topping, Virginia in July 1996 but Topping Virginia was only suitable in the Summer Months. Then his personal physician Dr. Richard John told him he had three choses, 1. do nothing and die soon, 2. Use an oxygen tank and die in about five years and 3. Find air that you can breathe outside.

4

After Mr. Strong looked at the Jet Streams and Gulf Shores and Orange Beach, Alabama is the only place in the U.S. where the air comes in from the Gulf of Mexico and move inland for a few miles and go back to the Gulf of Mexico. The Plaintiff knew he had to keep his house by all means necessary because this area is the only place in the United States that contaminants are not brough in by the Jet Scream. And GCCF and DHMBCA knew that Mr. Strong had been hospitalized at South Baldwin Regional Medical Center on June 15, 2015 and diagnosed with a Complete AV Heart Block. (See Exhibit 17)

WHAT WAS THE INTENT OF THE ACTION OF BP?

**Question 8. The question remains is why BP ended its relationship with GCCF and established a new relationship with DHMBCA to start a new process?**

Facture evidences does support BP knowledge that the disbursed oil cause tens of thousands more health issues in the general population than with the Cleanup Workers who had protected clothing. BP was knowledgeable that susceptible individuals to Petroleum Distillate Poison Gases and Odors had to move out of their houses and away from creeks, rivers, bays and wet lands controlled by low and high tides or become very ill. BP was knowledgeable by not using the $20,000,000,000.00 to clean up the disbursed oil out of creeks rivers, bays and wet lands that the 44th Presidential Administration had BP to set aside did great harm to the ecosystems in those area if the disbursed oil was not removed. Mr. Strong and Individuals in a similar situation suffer great financial harm by the action BP took to denied Interim Payment/ Final Payment Claims.

**Did BP error when it established a list of attorneys paid by BP?**

These attorneys worked for BP and did not represent the interest of individuals like Mr. Strong who lives near a creek that ended at the mouth of the Intracoastal Waterways effective by the low and high tides. When the Supervisor of pro se cases stated Herman Herman & Katz were the master Class and they will represent you. See Mr. Strong respond from Patrick R. Busby, Esq. which concluded that BP had no intent to used that $20.000.000.000.00 to pay claims by individuals who were harmed by disbursed oil/Petroleum Distillate Poison Gases and Odors for health or housing displacement. BP had no intent of cleaning up the disbursed oil in creeks, rivers, bays and wet lands. (See Exhibit 6)

*****Rule 3008. MOTION FOR RECONSIDRATION OF CLAIMS, MODIFIY*****

Mr. Strong Motion to Modify, to decrease the amount of the claim from $25.000.000.00. to $4.000.000.00.

Mr. Strong PROOF OF CLAIM FORM and Assignment of Claim Identification Number is SPC0002895 and dated August 9, 2012. Mr. Strong CLASS MEMBERSHIP CHALLENGE FORM is Dated August 3, 2016. (See Exhibit 4 and 4A and Rule 3008 see Exhibit 8)

MEDICAL DIAGNOSIS AND PRONOSIS AND INCIDENTS

On October 25, 1994 Mr. Strong personal physician Dr. Michael Kaliner stated that "My impression is that the patient has vasomotor rhinitis and reactive airways disease that are both provoked by exposure to strong smalls or noxious environment." Exhibit 35, pages 32 and 33 of 171

Mr. Strong requested for Reasonable Accommodations on December 12, 1994. See Exhibit 5, 115 of 171).

Mr. Strong suffered his first Asthma Attack on December 16, 1994 on the Parking Lot of Building 30 at NIH. And Mr. Strong loss his ability to breathe outside air in the Washington DC Metropolitan Area. (See incident report from the report of investigation) (See Exhibit 12.)

On December 21, 1994 Mr. Strong went to OMS Clinic for breathing difficulties and OMS medical evaluation concluded Mr. Strong was unable to perform any duties but the nurse did not give Mr. Strong a copy of the Occupational Illness Report Mr. Strong received a copy of the Occupational Illness Report in May of 1995 when he requested a copy of his medical file. (See Exhibit 12)

On December 23, 1994 Dr. James Schmitt, Director of OMS let a letter to Mr. Strong Branch Chief Dr. Kenneth Yamada stating that Mr. Strong can successfully wear a respirator when NIH Division of Safety had denied Mr. Strong the Right to wear a respirator in the Spring of 1994. Knowing that NIH Division of Safety had allowed Mr. Davis to special order Oak Bedding. After many other NIDR Employees had become affective by Oak Bedding and Rodent urine protein NIH Division of Safety approved their use of a respirator and Mr. Strong begun wearing his respirator again but it was too late to save his health. (See Exhibit 5, page 78 and 79 of 171)

April 18, 1995 Mr. Strong went to work and completed his the paper work in his office and he went to the animal room in the afternoon and he had breathing difficulties and he went back to his office and called OMS Clinic and OMS Clinic called an ambulance and the paramedic transported Mr. Strong to Suburban Hospital Emergency Room and he was diagnosed with First Degree Heart Block. When an individual suffer damage to his or her Peripheral Nervous System the first system/ sign of illness is efferent/motor neuron slows down and cause atrioventricular block (AVB). The AVB happen long before the failure of the Peripheral Nervous System that causes Peripheral Neuropathy. (See Exhibit 14}

December 20, 1995 Mr. Strong went to work and he left work at 10:30 am because he had tightness in his chest. Later in the afternoon his friend called him and said you do not sound good, you should go to the ER and I said to her call back and tell my children to come to my room and she did.

And they came to my room and my two sons carry me to the ER and when we arrived at the ER the nurse checked my O2 consecration it was at 69%. This was my official date of Mr. Strong injury and Mr. Strong was hospitalized with COPD. (See Exhibit 16)

On June 4, 2004 Mr. Strong went to Washington, DC to make preparation to sell his house in Washington, DC he knew he could breathe the air in Washington, DC for 3 days but he had been in Washington, DC for 5 days. On the evening of the fifth day, he was tired and laid back on his bed for a few minutes and fell asleep and he woke up in the middle of having a stroke and it felt like someone had placed their hand inside of his skull and twitching his brain.

Then he observed his breathing patten and he was gasping for breast so he concluded that it was too late to call 911. Then he decided to get his Inhalations Aerosol out of his right front pocket but his right hand was not working. Then he said self, use your left hand and get your Inhalations Aerosol out of your right front pocket and shake and puff because if you do nothing you will die and if you over dose you will die but if you get a normal breathing rhythm you will live.

6

June 15, 2010 Mr. Strong was hospitalized in South Baldwin Regional Medical Center (SBRMC) with a Complete Heart Block which means his heart had a disassociation from his Peripheral Nerves System that function outside the Brain and Spinal Cord. Also, he had DVT which the hospital did not diagnosed but the DVT was present in 2018. (See Exhibit 17)

On March 26, 2015 Mr. Strong was hospitalized with a Complete Heart Block and had a permanent Pace Maker implanted on March 27, 2015.

On January 21, 2016 Mr. Strong was hospitalized at Johns Hopkins Hospital in Baltimore, Maryland for "Severe diffuse pancreatic atrophy" and all of these symptoms caused by Peripheral Neuropathy can be reverse but memory loss has been most troubling. Mr. Strong chose to go to Riverside Walter Reed Hospital in Gloucester, Virginia for follow up from Johns Hopkins Hospital dated February 5, 2016 and was Discharged Dx: Acute hypoxic respiratory failure resolved, Sepsis, bacteremia, PE, BLE, DVT, acute on chronic renal failure. And at this, Mr. Strong had to use a walker because he had DVT and the old DVT from 2010 was in his left leg in 2018. Mr. Strong loss Brain/Spinal Cord correlation with his hands and feet but now the feeling is being restores to hands and feet. (See Exhibit 35 and 35A)

In June or July of 1996 Mr. Strong received a copy of the research published by Dr. Michael Kaliner and Dr. Robert Lamenske and Dr. Michael Kaliner was working for the Institution of Allergy and Infectious Diseases at NIH when this research was published. Chapter 3 JAMA 1992 Vol, 268 – 20. Occupational Causes on Page 2815 and on page 2816 Table 3-12 Oak Bedding and Rodent urine protein in phase three can cause Peripheral Neuropathy/Amyotrophic Lateral Sclerosis. And you can find over a hundred causes in Occupational Causes starting on page 2815.

When we look at Chapter 3, Rhinitis and Asthma by Michael Kaliner, MD and Robert Lemanske, MD; JAMA November 25, 1992-Vol 268 No. 20 listed under Occupational Causes; {page 2815) the name Peripheral Neuropathy evolved from Byssinosis in AMERICAN TEXTILE MANUFACTURERS, INC. V. DONOVAN. Supreme Court of the United States, 1981. 452 U.S. 101 S.Ct. 2478, 69 L.Ed.2d 185. BRENNAN, J. The name Byssinosis evolved from Vasculitis. – In  1951. By Churg and Strauss and republished by Kaliner and Lemanske. Page 2817, column 2, paragraph 3.

When we look and review Occupational Causes you can view over a hundred conditions that caused Peripheral Neuropathy, Document Released 12/18/2006 Document Revised 05/04/2015 Document Reviewed 01/17/2014.

Review the "Vasculitis – In 1951, Churg and Strauss described a vasculitic process. …. And in the third phase is the vasculitic phase involving pulmonary vessels (96%), skin (67%), peripheral (63%), gastrointestinal tract, (42%), heart (38%) and kidney 38%)." With modern medicine today in review of the Peripheral Nervous System that all of the body activities outside the Brain and Spinal Cord. Please note that you can only treat the cause and deficiency in function to be consistence with the body's ability to repair and replaced cells outside the Brain and Spinal Cord.

THE PERIPHERAL NERVOUS SYSTEM

'The peripheral nervous system enables the brain and spinal cord to communicate with the entire body. It may be farther divided into the somatic nervous system and the autonomic nervous system. The *somatic* system involves ""voluntary"' movement of the skeletal muscles, and the *autonomic* system controls such ""involuntary"" activities as breathing and glandular secretions." (Biology Text Book)

7

CLOSING

In closing, Mr. Strong was Requested reasonable accommodation on December 12, 1994, after he was denied the use of wearing a respirator in the Spring of 1994. And shortly thereafter Mr. Strong suffer his first asthma attack on December 16, 1994 and he was trans ported to ER his condition was chronic at that time but the scientific community knew that doing this time many individuals succumb during their first asthma attack.

On December 21, 1994 Mr. strong went to OMS Clinic and attending physicians said that Mr. Strong was not able to perform any duties but the Director of OMS in a medical report dated December 23, 1994 to Mr. Strong Branch Chief Dr. Kenneth Yamada stated that Mr. Strong do not need reasonable accommodation because he can safely wear a respirator. And just over a year later on December 20, 1995 Mr. Strong was taken to Washington Hospital Center Emergency Room and he was diagnosed with Chronic Obstruction Pulmonary Disease (COPD). In AMERICAN TEXTILE MANUFACTURERS, INC. V. DONOVAN. Supreme Court of the United States, 1981. 452 U.S. 101 S.Ct. 2478, 69 L.Ed.2d 185. BRENNAN, J. The name Byssinosis is phase 1 or the prodrome phase by Kaliner and Lemanske. Justice Brennan, J. said the U.S. Government stop using the term Byssinosis around time of the above case and Mosby's Medical Dictionary states if Byssinosis become chronic it cannot be reversed.

Mr. Strong BIOLOGY TEXT states that the Human Body repair and replace all cells of the human Body outside of the Brain and the Spinal Cord as long as the Human Body lives. That mean the Peripheral Nervous System can regenerate if the body lives long enough.

Mr. Strong worked at the National Institute of Dental Research managing animal programs involving genetic mutants, transgenic mice and embryological studies. Mr. Strong work required him to attend to details involving developmental physiology.

PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays this Honorable Court enter an order that the Defendant BP and Deepwater Horizon Medical Benefit Claims Administrator make the Plaintiff whole.

I. Compensatory Damages; BP and Deepwater Horizon Medical Claims Administrator for failure to provide reasonable accommodation by cleaning up the disbursed oily mud from the mouth of Cotton Creek and the intracoastal Waterways. $50.000.00.
II. Person Injury; BP and Deepwater Horizon Medical Claims Administrator for failure to provide managerial oversight,
   A. Restriction on a major life activity (breathing) $2.000.000.00.
   B. Suffering, past and future $1.400.000.00.
   C. Mental suffering associated with injury $550000.00.

Respectfully

*David M. Strong* (signature)

David M. Strong, pro se
45413 Cotton Cove Drive, P.O. Box 5702
Gulf Shores, AL 36547
(H) 251-224-4169, (C) 251-407-1027

I David M. Strong that a copy of all documents will be mailed to the defendant the day of the Court's Stamp by Priority Mail.

I certify on the date of the U.S. District Court Stamp.

Date _____

Signature _____

BP and Deepwater Horizon Medical Benefits Claims Administrator
935 Gravier Street, Suite 1400
New Orleans, LA 70112

9