9/2/2022 2:54 PM
Marilyn Burgess - District Clerk Harris County
Envelope No. 67937256
By: SHANNON NORTH-GONZALEZ
Filed: 9/2/2022 2:54 PM

**EXHIBIT**

**1**

tables'

## CAUSE NO.  2020-46985

| | | |
|---|---|---|
| **MARK CANFORA, ET AL.** | § | **IN THE DISTRICT COURT** |
| Plaintiffs | § | |
| | § | |
| **V.** | § | **HARRIS COUNTY, TEXAS** |
| | § | |
| **BRENT W. COON, PC d/b/a** | § | |
| **BRENT COON & ASSOCIATES,** | § | |
| **ET AL.** | § | |
| Defendants | § | **234th JUDICIAL DISTRICT** |

### PLAINTIFFS' SECOND AMENDED PETITION

TO THE HONORABLE JUDGE LAUREN REEDER:

COMES NOW, Mark Canfora, Mark Canfora Investments, LLC, James Glick, Russell Lengacher, Luke Martin and Nelson Mast, Plaintiffs in the above-entitled matter, complaining of Defendants, Brent W. Coon, PC d/b/a Brent Coon & Associates, D. Miller & Associates, PLLC, Brent W. Coon, Eric Newell, John R. Thomas, Lori J. Slocum, Robert A. Schwartz, Mary Cathryne Caraway Jacob, and Darren A. Miller, and would respectfully show as follows:

## I
## DISCOVERY CONTROL PLAN

1.      Based upon this Petition, this case should be controlled by a discovery control plan level 3 pursuant to the Texas Rules of Civil Procedure, Rule 190.4.

## II
## RULE 47 STATEMENT OF RELIEF

2.      In accordance with Texas Rule of Civil Procedure 47, Plaintiffs seek monetary relief in excess of $1,000,000. This is not an expedited action.

## III
## PARTIES

3.      Plaintiff, Mark Canfora is an individual residing in Panama City Beach, Florida.  The last three digits of his social security number is 072.

4.      Plaintiff, Mark Canfora Investments, LLC is a company formed in the State of Florida with its principle office in Panama City Beach, Florida.

5.      Plaintiff, James Glick is an individual residing in Dalton, Ohio.  The last three digits of his social security number is 770.

6.      Plaintiff, Russell Lengacher is an individual residing in Wooster, Ohio. The last three digits of his social security number is 792.

7.      Plaintiff, Martin Luke is an individual residing in Antwerp, New York. The last three digits of his social security number is 097.

8.      Plaintiff, Nelson Mast is an individual residing in Strasburg, Ohio. The last three digits of his social security number is 180.

9.      Defendant, Brent W. Coon, PC d/b/a Brent Coon & Associates is a Professional Corporation formed for the practice of law in the State of Texas and has answered herein.

10.     Defendant, D. Miller & Associates, PLLC is a Professional Limited Liability Company formed to practice law in the State of Texas and has answered herein.

11.     Defendant, Brent W. Coon is an attorney licensed to practice law in the State of Texas and has answered herein.

12.    Defendant, Eric Newell is an attorney licensed to practice law in the State of Texas and has answered herein.

13.    Defendant, John R. Thomas is an attorney licensed to practice law in the State of Texas and has answered herein.

14.    Defendant, Lori K. Solcum is an attorney licensed to practice law in the State of Texas and has answered herein.

15.    Defendant, Robert A. Schwartz is an attorney licensed to practice law in the State of Texas and has answered herein.

16.    Defendant, Mary Cathryne Caraway Jacob is an attorney licensed to practice law in the State of Texas and has answered herein.

17.    Defendant, Darren A. Miller is an attorney licensed to practice law in the State of Texas and has answered herein.

## IV
## JURISDICTION AND VENUE

18.    This Court has subject matter jurisdiction over the controversy because the claims asserted in this Petition arose, in whole or in part, in Texas and the amount in controversy exceeds the minimum jurisdictional limits of this Court.

19.    This Court has personal jurisdiction over each Defendant because the acts and/or omissions complained of herein occurred in Texas, each Defendant does business in Texas and/or committed a tort, in whole or in part in Texas.

20.    Venue is properly laid in Harris County, Texas because all or a substantial part of the events or omissions giving rise to the claim occurred in Harris County, Texas and/or because one or more of the Defendants reside in or

have a principal office in Harris County, Texas. *See* TEX. CIV. PRAC. & REM. CODE § 15.002(a)(1), (2) and (3).

## V
## JOINDER

21.     James Glick ("Glick"), Russell Lengacher ("Lengacher"), Luke Martin ("Martin") and Nelson Mast ("Mast") previously joined this lawsuit pursuant to Texas Rule of Civil Procedure 37 and 40. Their joinder was timely filed because no final judgment has been entered. Glick, Lengacher, Martin and Mast are proper parties to this lawsuit joinder of these parties will not delay trial. *See* TEX. R. CIV. P. 37. Further, Glick, Lengacher, Martin and Mast assert a right to relief which arises out of the same transaction, occurrence, or series of transactions or occurrences, against the same Defendants, and there are common questions of fact and law to all the Plaintiffs. *See* TEX. R. CIV. P. 40. Specifically, Glick, Lengacher, Martin and Mast are similarly situated with the original Plaintiffs, Mark Canfora and Mark Canfora Investments, LLC, in that they were each represented by Defendants and all Plaintiffs seek from each individual Defendant damages as a result of Defendants malfeasance arising out of their representation of all Plaintiffs in the Deepwater Horizon oil spill litigation.  Specifically, Defendants represented all of the Plaintiffs and violated the same orders from the court in the underlying case, which caused the dismissal with prejudice of each of these Plaintiffs' underlying case.

## VI
## FACTUAL BACKGROUND

22.     This is a legal malpractice case arising out of the Deepwater Horizon oil spill litigation. It is a story if two disasters; the explosion of the rig and the subsequent botched representation that Plaintiffs received in pursuit of their economic loss claims against BP and other defendants. Plaintiffs spent years pursuing their viable and demonstrable claims only to have those claims dismissed because their lawyers failed to comply with pretrial orders. Plaintiffs' underlying claims that were valued at more than $6 million were forever lost. This is what happens when mass tort litigation goes massively wrong.

23.     On April 20, 2010, a well-blowout on the oil rig Deepwater Horizon in the Gulf of Mexico marked the beginning of what would become the most pervasive and devastating environmental disaster in the history of the United States and Mexico.  The uncontrolled blowout caused explosions and a raging fire aboard the Deepwater Horizon; after burning for two days, the rig sank, commencing an oil spill of unprecedented proportion that damaged, depleted, and destroyed marine, estuarine, and coastal environments in the Gulf of Mexico, Louisiana, Mississippi, Alabama, Texas, and Florida. The entire Gulf of Mexico ecosystem has been devastatingly affected.  In the twelve weeks it took to cap the blown-out well, over 210 million gallons of oil gushed unchecked into the Gulf of Mexico, causing widespread and disastrous environmental and economic damage to the people, businesses, and environment of the Gulf of Mexico.

24.     Plaintiff, Mark Canfora is a real estate broker and an expert in fractional real estate sales and was engaged to manage sales for the development of a 24 story, 435-unit condominium complex located in Panama City Beach, Florida called Infiniti Blu. The project was to be built by Ohio developer, Nathan Glick and his company, Glick Construction and Development, LLC d/b/a Infinity Blu ("Glick Construction"), and was owned, in part, by the developer and various investors who collectively were known as Ohio Holdings, LLC.

25.     Commencing in 2005, with the infrastructure study and demographic study conducted by Simon Properties for development of a large commercial shopping and dining complex to be known as Pier Park, Panama City Beach, Florida became the center of development in Northwest Florida. The area had already become the center of future attention because the St. Joe Company had undertaken development, following approval, of a new international airport to serve the region and make it more accessible to tourism. The new airport, Northwest Beaches Airport, was scheduled to and did open in May 2010 with Delta and Southwest providing daily flights from multiple locations. Additionally, CNN Money and Moody's Chief Economist, Dr. Steve Cochran, and Business 2.0 named Panama City and Panama City Beach, Florida as the number one real estate investment opportunity in the United States from 2006-2012.

26.     The area was poised in these years for explosive development and growth and Glick proposed to capitalize off the growing market by providing his expertise and successful history of development in Ohio by building the largest

condominium complex in the area. Glick established a real estate sales division, Prepaid Real Estate by Glick, LLC, and hired Canfora as Project Manager of the realty, sales, and marketing operations for the development. Canfora brought his expertise in fractional real estate sales to make sales of the units affordable and to appeal to the largest spectrum of investors for secondary residences. Ragatz Associates published an enthusiastic endorsement of fractional ownership in 2007 and the concept was building in the area already with successful developments in Destin (Emerald Grande) and other projects being marketed in the area.

27.     Glick Construction sold investment units to others and also personally purchased units in order to fund initial costs of the development. The projected costs for the entire construction were to be funded by a combination of this investment, pre-sale commitments and then bank financing. Corus Bank provided a commitment to the developer to fund construction costs up to $120,000,000, subject to pre-sale commitments of 318 of the 435 units.

28.     Pre-sales of the project went exceedingly well and by October 2007 the developer had collected $15,080,000 in sales reservation deposits and had reached its preliminary targets. Unfortunately, Corus Bank had financial difficulties and ceased business in November 2007. The project, of course, was not able at that time to continue without the requisite financing and, given the economic climate caused by the bank and credit failures in early 2008, it was not possible to secure financing so the project was temporarily put on hold.

29.     But Infinity Blu had Canfora continue as Project Manager, and Glick Construction gave him a continuing contract, including incentives for the securing of alternate financing, if possible. Glick himself traveled to Europe in 2009 to raise financing and was successful in generating interest to continue the project right up to the time of the oil spill.  By early 2010, with the advent of the new airport being only a matter of short time, the developer and investors determined the project should and would succeed and Glick Construction was ready to proceed again. Various discussions with financing sources were underway and development permits, previously received, were still in force. However, when the oil spill occurred in April 2010, the development became impractical as the market and financing evaporated because of the disaster. Consequently, while the project is still owned by Glick Construction, it has been effectively terminated due to the oil spill.

30.     The total sales of the project, as per the audited proposal submitted and approved by Corus Bank was $252,212,500. Based on the agreement and subsequent amendments, Canfora was entitled to 1% commissions on the value of the project he was to manage. In addition, he received free housing. Therefore, Canfora and his investment entity, Mark Canfora Investments, LLC ("MCI"), lost more than $2,200,000.00 in economic losses.

31.     Plaintiffs James Glick, Russell Lengacher, Luke Martin and Nelson Mast (collectively "the Investor Plaintiffs") are or were each owners of real property, land and homes with a percentage ownership interest in the Infinity Blu project. Like Canfora, each of the Investor Plaintiffs suffered financial losses, including

their lost investments, because the Infinity Blu project failed due to the oil spill. More specifically, Lengacher invested approximately $1,050,346.61; Mast invested approximately $344,808.74; Martin invested approximately $100,000.00; and Glick invested approximately $124,512.28.

32.   In November 2012, the Investor Plaintiffs and Canfora and MCI ("Canfora Plaintiffs") hired Darren A. Miller and D. Miller & Associates ("M&A") to represent them in connection with "all causes of action" related to the economic damages that they suffered resulting from the oil spill. Miller and M&A ("Miller Defendants") were hired on a contingency fee. The Miller Defendants then associated Brent Coon and Brent W. Coon, PC d/b/a Brent Coon & Associates ("BCA") to assist in the representation of the Investor Plaintiffs and the Canfora Plaintiffs (collectively "Plaintiffs"), and Plaintiffs signed consent to refer agreements. Those agreements incorporated the initial engagement agreements that Plaintiffs signed with M&A and also provided that M&A and BCA would "assume joint responsibility for the representation" and in exchange, the two firms would share attorney's fees. In addition to Miller and Coon, several other attorneys from BCA were the lawyers responsible for the representation, including Eric Newell, John R. Thomas, Lori J. Slocum, Robert A. Schwartz, Mary Cathryne Caraway Jacob ("the BCA Attorneys"). At all material times, Plaintiffs had an attorney-client relationship with Coon, Miller, the BCA Attorneys, M&A and BCA ("Defendants"), and these lawyers and law firms owed Plaintiffs various fiduciary duties as a matter of law.

33.     On October 3, 2013, Coon and BCA, along with attorney Eric Dibert of Matthews & Jones, LLP in Florida, filed suit on behalf of Plaintiffs and approximately 3,696 other Florida residents and entities in the United States District Court for the Northern District of Florida, Pensacola Division ("the Florida Lawsuit").[1] The Florida Lawsuit was transferred into the BP Deepwater Horizon Multi-District Litigation ("the MDL")[2] for pretrial proceedings.  Represented by Defendants, Plaintiffs' economic loss claims worked their way through the court-established settlement process for many years without success.

34.     To facilitate the effective administration of the multidistrict litigation and the prosecution of the remaining claims, the MDL court issued Pre-Trial Order No. 60 ("PTO 60") on March 29, 2016. PTO 60 required all plaintiffs who had timely filed a claim in the "B1 pleading bundle" and who had not released their claims as of the date of PTO 60 file and/or serve certain required submissions by May 2, 2016. A "B1 claim" was classified as a non-governmental claim for economic loss or property damage due to the oil spill. Among other things, PTO 60 required each plaintiff who previously did not have an individual lawsuit on file (i.e., only filed a short-form joinder and/or were part of a "Mass Joinder" lawsuit) to file an individual lawsuit (one per person). The MDL court received and granted several motions for extensions that requested until May 16, 2016 to comply with the PTO 60 requirements. PTO 60 stated that all remaining plaintiffs with B1 claims that

---

[1] *See* Case No. 13-cv-05367, *Roystar Construction, Inc., et al. v. BP Exploration, et al.*, in the United States District Court for the Northern District of Florida, Pensacola Division.

[2] *See* Case No. 10-md-0179, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, in the United States District Court for the Eastern District of Louisiana.

did not comply with the order "will have their claims deemed dismissed with prejudice **without further notice**."

35.     Even though BCA received PTO 60 on March 29, 2016, it waited more than forty days to request the required information from its clients. On May 9, 2016, BCA sent an email to its clients, including Plaintiffs, entitled "IMPORTANT DEADLINE TO PREPARE NEW OIL SPILL LAWSUIT IF YOUR CASE IS STILL UNRESOLVED." In the email, BCA represented that the MDL court had "ordered all unresolved claimants to file a NEW complaint in [the] court with a $400 dollar charge for each claim and attach a three-page information sheet." The letter stated that BCA would "handle the filing" but needed the clients to do three things: (1) complete a background information sheet; (2) fill out a three-page sworn statement; and (3) "[r]emit the $400 filing fee charge made payable to BCA." BCA requested each client to complete the information within **four days**, and requested its clients incur the expense of mailing the payment and information through express mail to make sure it was received by BCA "no later than" May 13, 2016.

36.     BCA agreeing to "handle the filing" on behalf of the clients was nothing more than an agreement by BCA to do something it was contractually and ethically obligated to do. Nonetheless, Plaintiffs complied with the onerous deadlines and demands, and timely remitted to BCA the required information and filing fees.

37.     On May 16, 2016, the day of the PTO 60 deadline, BCA, Coon and the BCA Attorneys filed a single complaint on behalf of Plaintiffs and numerous other individuals or entities who were involved in the Infinity Blu development and who

suffered economic losses as a result of the oil spill ("the Infinity Blu Complaint").[3] BCA and the BCA Attorneys filed a second single "Complaint" on behalf of MCI and two of Canfora's other entities, Fractional Real Estate Advisors, LLC and Prepaid Real Estate of Florida, LLC ("the Canfora Complaint").[4]

38.     In the Infinity Blu Complaint and the Canfora Complaint ("the Complaints"), BCA and the BCA Attorneys asserted claims on behalf of Plaintiffs for negligence, gross negligence, violations of the Federal Oil Pollution Act, the Florida Pollution Discharge Prevention and Control Act, and fraudulent concealment, and sought economic and punitive damages. BCA and the BCA Attorneys attached to the Infiniti Blu Complaint sworn statements from each of the Plaintiffs regarding economic losses, as well as a report from an economic expert named Henry Sienema, who opined that those identified in the Infiniti Blu Complaint, including the Investor Plaintiffs, suffered more than $65 million damages.[5]

39.     On June 7, 2016, the MDL court issued a Show Cause Order that set out a list of plaintiffs who had filed deficient submissions. The plaintiffs on that list, as well as plaintiffs who were not listed as compliant but who believed they had complied with PTO 60, were given until June 28, 2017 to show cause why their claims should not be dismissed. Specifically, the MDL court concluded that, at the

---

[3] *See* Cause No. 16-cv-06303, *Infinity Blu Development, LLC, et al. v. BP Exploration and Production, Inc., et al.*, in the United States District Court for the Eastern District of Louisiana.

[4] *See* Cause No. 16-cv-06280, *Mark Canfora Investments, et al. v. BP Exploration and Production, Inc., et al.*, in the United States District Court for the Eastern District of Louisiana.

[5] Exhibit 1, Summary Report of Payment of Claim.

time, Canfora's individual claims were compliant with PTO 60, but that MCI's pleadings were "materially deficient." Therefore, the MDL court required MCI to show cause by June 28, 2016 why its claims should not be dismissed due to the deficiency. Defendants failed to respond to this show cause order, but the MDL court did not enter an order dismissing MCI's claims until July 11, 2019. Meanwhile, Canfora's individual claims along with the claims of the Investor Plaintiffs proceeded in the MDL without resolution.

40.     On July 14, 2016, the MDL court issued an Order Re: Compliance with PTO 60 ("the PTO 60 Compliance Order") that identified those plaintiffs who had complied with PTO 60 and those who had not. The Investor Plaintiffs were not identified in the PTO 60 Compliance Order. However, the PTO 60 Compliance Order specifically stated that if a B1 plaintiff was not listed in the order, that plaintiff was "**deemed noncompliant with PTO 60**, and their B1 claims are hereby **DISMISSED WITH PREJUDICE**." Although Defendants received notice of this order, they did not notify the Investor Plaintiffs that their claims were dismissed, nor did they immediately appeal the dismissal. Instead, Defendants initially concealed the dismissal from the Investor Plaintiffs for many months.

41.     Defendants eventually appealed the dismissal of the Investor Plaintiffs' cases to the Fifth Circuit Court of Appeals on November 27, 2017.[6] But BP moved to dismiss the appeal as untimely, arguing that the dismissal of the Investor Plaintiffs' cases occurred when Defendants failed to comply with PTO 60.

---

[6] *See* Case No. 17-30936, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, in the United States Court of Appeals for the Fifth Circuit.

BP demonstrated that the Investor Plaintiffs, along with several other BCA clients, never submitted a response to the Show Cause Order, so the claims were "dismissed with prejudice in July 2016" pursuant to the PTO 60 Compliance Order. BP argued that under the federal rules of civil procedure, the judgment was deemed entered 150 days later, in December 2016, and therefore Defendants had until January 10, 2017 to appeal. In other words, **Defendants missed the appellate deadline by more than eight months**.

42.     Coon and BCA filed a response to BP's motion to dismiss the appeal, but the response was sealed from the public record at the request of Coon, likely to conceal his malpractice. However, BP replied, and in that reply restated some of the arguments made by Coon and BCA. The reply revealed that Defendants did not comply with PTO 60 because it would be too "tedious and time consuming" to identify whether their clients' cases had been dismissed because it required them to examine the attachment to the district court's order to determine whether their cases were listed. But as stated by BP, "that is no reason for relieving [Coon and BCA] from their duty to file their notice of appeal at the appropriate time." BP reiterated that, "[a]t the end of the day, [BCA's clients] were dismissed from the case well over a year ago" and, as a result, "they are now jurisdictionally barred from arguing that the dismissal was improper."

43.     Meanwhile, in January 2018, the MDL court issued Pretrial Order No. 65 ("PTO 65") which required the "Remaining B1 Plaintiffs" – which were those plaintiffs who asserted a B1 claim, were compliant with PTO 60, and had not

released their claims or had their claims dismissed by some other order – to provide written answers to four questions regarding the type and scope of the damages and causation alleged in their respective cases. The plaintiff, not the plaintiff's attorney, was required to sign the response and attest under penalty of perjury that the answers to all four questions were true and correct. Responses were due by April 11, 2018, three months after PTO 65 issued.

44. Even though the claims of the Investor Plaintiffs had been dismissed by the district court pursuant to PTO 60 and on appeal with the Fifth Circuit, BCA and the BCA Attorneys curiously attempted to comply with PTO 65 as to the Investor Plaintiffs, filing verified statements on behalf of Glick, Martin, Mast and Lengacher along with economic expert reports that calculated their damages in excess of $4 million.

45. On April 18, 2018, the Fifth Circuit entered an order granting BP's motion to dismiss the appeal that Coon and BCA filed on behalf of the Investor Plaintiffs and several other BCA clients. The Fifth Circuit agreed with BP and concluded that "those appeals were not timely filed in compliance with PTO 60."

46. On April 27, 2018, Coon and BCA sent the Investor Plaintiffs a letter stating "we advised you a few weeks ago via email [that] your case was dismissed by the trial court, and we had filed an appeal [with] the Fifth Circuit Court of Appeals in New Orleans, Louisiana." Based on information and belief, the Investor Plaintiffs did not receive an earlier email notifying them that their cases had been dismissed. The letter continued: "Please find the order from the Fifth Circuit of Appeals Court

[sic] granting defendants' Motion to dismiss your appeal pursuant to PTO 60. We are looking at possible options to continue your appeal, if any, are available at this juncture." Based on information and belief, this was the first time that Defendants disclosed to the Investor Plaintiffs that their cases had been dismissed, or that Defendants were undertaking any appeal. Although Defendants finally disclosed to the Investor Plaintiffs the dismissal, they concealed the fact that the dismissal was caused by their own negligence.

47.     Coon and BCA continued to appeal the dismissal of the Investor Plaintiffs' claims. They first filed a motion for reconsideration with the Fifth Circuit, but that motion was denied on May 16, 2018. Coon and BCA then filed a Petition for Writ of Certiorari with the United States Supreme Court on July 17, 2018.

48.     Meanwhile, on May 25, 2018, the MDL court issued an Order to Show Cause Re: Compliance with PTO 65 ("Show Cause Order") which listed those plaintiffs who appeared to submit no response to PTO 65. Canfora was included in that list because Defendants failed to submit his verified statement. The "Show Cause" Order required those listed to show cause on or before June 15, 2018 why the MDL court should not dismiss the B1 claims with prejudice for failing to comply with the requirements of PTO 65. Defendants failed to respond to the Show Cause

Order, thus, on July 10, 2018, the MDL court dismissed Canforas' individual claims with prejudice.[7]

49.     Recognizing that they had committed malpractice with respect to Canfora, BCA and M&A persuaded Canfora and MCI to sign a release agreement ("the Release Agreement") dated June 23, 2018. In the Release Agreement, Canfora and MCI purportedly agreed to release BCA and M&A and their attorneys from all liability with respect to the way they handled the oil spill in exchange for BCA and M&A waiving their claim to any attorney's fees from settlements that Canfora's other entities, Fractional Real Estate Advisors and Prepaid Real Estate, were to receive. However, because the Release Agreement was entered into during the existence of the attorney-client relationship, BCA and M&A owed Canfora and MCI fiduciary duties to ensure that the Release Agreement was fair and reasonable to Canfora and MCI, and that Canfora and MCI were represented by outside counsel in making the agreement. *See* TEX. DISC. R. PROF. COND. 1.08(g). In other words, BCA and M&A had fiduciary duties to ensure that Canfora and MCI were informed of all material facts relating to the release prior to advising Canfora and MCI to enter into a settlement with them and to sign a release agreement. BCA and M&A failed to comply with these fiduciary duties, which is the basis of MCI's breach of fiduciary duty claim, and the release is invalid, *ab initio*.

50.     Newell, on behalf of BCA, notified Canfora of the dismissal on July 13, 2018, and told him that BCA would not be representing him on any appeal or

---

[7] Canfora agreed that BCA did not need to respond to PTO 65 with respect to the claim asserted by MCI because MCI's claim was already noncompliant since Defendants failed to respond to PTO 60. However, Canfora still requested BCA to file his individual claim, but BCA failed to do so.

request for reconsideration. Newell represented to Canfora that the deadline to appeal or seek reconsideration of the dismissal was "as early as 28 days from July 10, 2018." Therefore, the dismissal of Canfora's underlying claims became final at the earliest according to Newell on August 7, 2018 unless an appeal was filed.

51.    On October 1, 2018, the United States Supreme Court denied the Petition for Writ of Certiorari as to the dismissal of the Investor Plaintiffs' claims. Coon and BCA filed a petition for rehearing with the United States Supreme Court, which was denied on November 19, 2018. Thus, on that date, the dismissal of the Investor Plaintiffs' claims became final.

52.    As a direct and proximate cause of Defendants' negligence, Plaintiffs' underlying claims were forever lost. But the conduct described above is not just negligent; it is grossly negligent. Defendants knew how important Plaintiffs' cases were and knew the importance of compensating Plaintiffs for their significant economic damages. Defendants, as attorneys, also knew the importance of following and adhering to court orders, especially orders of a federal district court. Yet, Defendants, especially Coon, were too busy signing up and attempting to manage thousands of cases arising out of the Oil Spill, rather than keep up with the simple task of complying with the Court's orders. Defendants knew exactly what would happen if they failed to follow those orders, as many of them are seasoned board-certified attorneys and/or "Super Lawyers."[8] Coon himself claims to be an expert in the petrochemical industry, and one of the "top" attorneys in the Nation. Armed

---

[8] https://www.bcoonlaw.com/brent-w-coon/;

with this knowledge and experience, Defendants failure to follow simple pretrial orders may only be classified as wonton and reckless disregard for their clients' financial well-being.

## VII
## STATEMENT OF CLAIMS

53.    Therefore, it has become necessary to bring this suit to collect a legal debt of money damages owing to Plaintiffs due to Defendants' conduct. Specifically, the actions of Defendants constitute negligence, gross negligence, and breach of fiduciary duty.

### A.    NEGLIGENCE

54.    At all material times, each of the Defendants had an attorney-client relationship with Plaintiffs and owed them a duty of care as a matter of law. In addition to the allegations outlined above, the following errors and/or omissions of Defendants proximately caused Plaintiffs' damages:

- **Failure to follow court orders, including PTO 60 and PTO 65**.

  PTO 60 dismissed the Master Complaint and ordered each remaining plaintiff who wished to continue litigation to file a sworn statement (as well as an individual complaint, if the plaintiff had not already done so) by May 2, 2016. PTO 60 stated that all remaining plaintiffs with B1 claims that did not comply with the order "will have their claims deemed dismissed with prejudice without further notice." Defendants failed to comply with PTO 60, so the Investor Plaintiffs' claims were dismissed with prejudice without further notice. Defendants did not comply with PTO 60 because they believed it was "tedious and time consuming." Failing to comply with PTO 60 fell below the standard of care and was negligent. Similarly, Defendants failed to comply with PTO 65 as to Canfora's individual claims, causing his claims to be dismissed.

- **Failure to follow appellate deadlines**.

  The Investor Plaintiffs' claims were dismissed with prejudice in July 2016 pursuant to the PTO 60 Compliance Order. Under the federal rules of civil procedure, the judgment was deemed entered 150 days later, in December 2016, and therefore Defendants had until January 10, 2017 to appeal the dismissal. But Defendants did not appeal the dismissal until November 2017, more than eight months later. Failing to timely appeal the dismissal fell below the standard of care and was negligent.

- **Failure to communicate and comply with reasonable client requests**.

  Defendants had a duty to communicate with Plaintiffs and update them with all material facts relating to the representation. Defendants failed to communicate with Plaintiffs.

Of course, nothing Plaintiffs did, or failed to do, caused or in any way contributed to cause the occurrences that resulted in losses and damages to Plaintiffs.  On the contrary, Defendants fell below the standard of care for attorneys practicing law in Texas, and thus, Defendants' conduct was a proximate and/or producing cause of Plaintiffs' losses and damages.

55.    Additionally, at all times material to the causes of action asserted herein, Defendants' conduct was regulated by the Texas Disciplinary Rules of Professional Conduct and the acts or omissions of Defendants violated these rules. Specifically, Defendants' conduct constitutes a violation of Rule 1.01 (competent and diligent representation), 1.02 (scope and objectives of representation), 1.03 (communication), 1.08 (conflict of interest; prohibited transactions), 1.14 (safekeeping of property), and 8.04 (misconduct). The requirements of these rules establish public policy against such conduct and their violation constitutes

negligence as that term is understood in legal malpractice when supported by the expert opinion of an attorney familiar with the standard of care defined by these rules.

### B.   GROSS NEGLIGENCE

56.   Defendants are also liable for gross negligence. "The factor which lifts ordinary negligence into gross negligence is the mental attitude of the defendant[.]" *Rhodes v. Batilla*, 848 S.W.2d 833, 844 (Tex. App.—Houston [14th Dist.] 1993, writ denied) (internal quotations omitted). When a lawyer acts in direct contravention to the purpose for which they were retained and with an extreme degree of risk to their client, they can be held grossly negligent. *See id.* Here, Defendants were grossly negligent because their acts or omissions in failing to follow the orders of the MDL court, when viewed objectively from the standpoint of Defendants at the time they were representing Plaintiffs, involves an extreme degree of risk that Plaintiffs' case would be dismissed, considering the probability and magnitude of the potential harm to Plaintiffs. Moreover, these Defendants, who advertise to be seasoned in handling BP claims and experts in the field of petrochemical explosions, had actual, subjective awareness of the risk of Plaintiffs' cases being dismissed, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of Plaintiffs. *See* TEX. CIV. PRAC. & REM. CODE § 41.001(A) and (B). Therefore, Defendants are liable for exemplary damages. *See Rhodes*, 848 S.W.2d at 844 (upholding award to client in legal malpractice case for $125,000 in actual damages and $125,000 in exemplary damages).

C.   BREACH OF FIDUCIARY DUTY

57.   "Attorneys owe their clients a fiduciary duty of most abundant good faith, requiring absolute perfect candor, openness and honesty, and the absence of any concealment or deception." *Deutsch v. Hoover, Bax & Slovacek, L.L.P.*, 97 S.W.3d 179, 197 (Tex. App.—Houston [14th Dist.] 2002, no pet.). "Breach of fiduciary duty by an attorney most often involves the attorney's failure to disclose conflicts of interest, failure to deliver funds belonging to the client, placing personal interests over the client's interests, improper use of client confidences, taking advantage of the client's trust, engaging in self-dealing,  and making misrepresentations." *Goffney v. Rabson*, 56 S.W.3d 186, 193 (Tex. App.—Houston [14th Dist.] 2001, pet. denied). "A fiduciary has much more than the traditional obligation not to make any material misrepresentations; he has an affirmative duty to make a full and accurate confession of all his fiduciary activities, transactions, profits, and mistakes." *Jackson Law Office, P.C. v. Chappell*, 37 S.W.3d 15, 22-23 (Tex. App. – Tyler 2000, pet. denied).

58.   Here, Defendants intentionally breached their fiduciary duty to Plaintiffs by:

- **Engaging in inherent and un-waivable conflicts of interest.**

  Defendants engaged in an inherent and un-waivable conflict of interest by accumulating and maintaining a massive BP docket to accumulate millions of dollars in attorney's fees without adequate preparation or resources. Maintaining such a massive BP docket inevitably resulted in Defendants neglecting their duties to Plaintiffs to meet the demands of their other clients.

- **Placing the interests of other clients ahead of Plaintiffs' interests.**

  Defendants placed the interests of other clients ahead of Plaintiff's interest by filing documents on behalf of some clients to ensure that their cases were not dismissed instead of filing documents on behalf of Plaintiffs.

- **Convincing the Canfora Plaintiffs to enter into the Release Agreement without adequate disclosures during the existence of the attorney-client relationship.**

  Moreover, Defendants intentionally breached their fiduciary duties to the Canfora Plaintiffs by convincing them to enter into the Release Agreement without adequate disclosures and during the existence of the attorney-client relationship, and when the Release Agreement was not fair and reasonable to the Canfora Plaintiffs.

These breaches of fiduciary duty proximately caused Plaintiffs' damages and/or resulted in improper benefits to Defendants.

## VIII
## JOINT LIABILITY

59.    At all times material hereto, Defendants represented Plaintiffs in the legal matters described herein.  At all times material hereto, all of the specific acts complained of herein are attributable to the conduct of the individual attorneys associated with their respective law firms as partners, agents, servants, representatives and/or employees.  Thus, the liability and responsibility of Defendants is vicarious, joint and several, and further, Plaintiffs plead the legal theory of *respondeat superior* as between the individual lawyers named herein and their law firms. Additionally, Defendants are jointly liable for each other's conduct because they agreed to engage in a joint venture, joint enterprise, and/or general

partnership with regard to the underlying case and undertook joint responsibility for Plaintiffs' cases.

## IX
## DEFENSES TO LIMITATIONS

60.    To the extent necessary, Plaintiffs affirmatively plead the discovery rule and the *Hughes v. Mahaney & Higgins,* 821 S.W.2d 154 (Tex. 1991) tolling rule to any defense of limitations asserted by Defendants regarding any of Plaintiffs' claims or causes of action. Specifically, the underlying litigation with regard to the Canfora Plaintiffs did not become final as to their claims until August 7, 2018. The Canfora Plaintiffs filed this lawsuit within two years from that date. The underlying litigation with regard to the Investor Plaintiffs did not become final until November 19, 2018 when the United States Supreme Court denied the Petition for Rehearing. The Investor Plaintiffs filed this lawsuit within two years from that date. Therefore, all claims are timely. *See Hughes*, 821 S.W.2d at 157 (tolling of legal malpractice claim ends when the motion for rehearing is overruled "because the last action of right that they could take and did take on the underlying case was concluded on that date.").

## X
## DAMAGES

61.    Regarding the cause of action and conduct alleged above, Plaintiffs have sustained pecuniary losses that were proximately caused by Defendants' conduct. Plaintiffs hereby seek the maximum actual damages allowable that are within the jurisdictional limits of this court, in excess of $6,000,000.

A.   ACTUAL DAMAGES

62.   Plaintiffs seek actual damages in the amount equal to the value of what Plaintiffs would have received in the underlying case **by way of settlement** had their underlying cases been properly handled by the Defendants.

63.   According to the Texas Supreme Court, in malpractice litigation resulting from mass tort litigation, damages can be determined by comparing what similarly situated clients obtained from the same defendants via settlement. *Elizondo v. Krist*, 415 S.W.3d 259, 263 (Tex. 2013). More specifically, that amount may be calculated "by persuasively comparing all the circumstances of the case to the settlements obtained in other cases with similar circumstances arising from the event." *Id*. Not only is such a comparison appropriate, but the Texas Supreme Court has noted that such "data is perhaps the best evidence of the real-world settlement value of the case." *Id*.

64.   Others involved in Infiniti Blu that were properly represented by the Defendants received settlements in the underlying case. The circumstances of those cases and the settlements obtain those cases must be evaluated to determine the value the Plaintiffs' present case.

65.   Furthermore, according to financial and economic experts retained by Defendants, those involved with the Infiniti Blu project suffered losses in excess of $65 million, including approximately $2.7 million in losses to Lengacher, $2 million in losses to Canfora, $788,000 in losses to Mast, $305,000 in losses to Glick, and $286,000 in losses to Martin.

B.   **EQUITABLE FEE FORFEITURE**

66.     The Court may order all profits obtained by a fiduciary to be disgorged as a result of the breach of fiduciary duty when the fiduciary competes with the beneficiary and benefits in some way. Thus, Plaintiffs seek to disgorge the attorney's fees paid to Defendants by their other similarly situated clients. Specifically, Plaintiffs seek to disgorge the attorneys' fees that the Defendants received from the cases they successfully settled relating to Infiniti Blu. The law does not allow Defendants to profit off of their breach of fiduciary duty by knowingly engaging in a conflict of interest to their benefit and to the detriment of Plaintiffs. Thus, Plaintiffs seek such fee forfeiture from Defendants.

C.   **EXEMPLARY DAMAGES**

67.     Due to Defendants' gross negligence and intentional breach of fiduciary duty, Plaintiffs are entitled to exemplary damages which they seek herein. *See Bennett v. Reynolds*, 315 S.W.3d 867, 872 (Tex. 2010) (holding exemplary damages may be awarded in money-damages case because "exemplary damages are not reserved solely for cases that inflict ruinous physical or fiscal calamity."). Plaintiffs seek exemplary damages to the maximum extent of the law.

## XI
## JURY DEMAND

68.     Plaintiffs desire to have a jury decide this case and makes this formal request pursuant to Texas Rule of Civil Procedure 216. This request is filed more than thirty days before this case has been scheduled for trial and all fees have been paid.

26

## XII
## REQUEST FOR DISCLOSURE

69.     Plaintiffs request that Defendants disclose the information or material described in Texas Rule of Civil Procedure 194.2 within the time proscribed by the rules of procedure.

## XIII
## NOTICE OF INTENT TO USE PRODUCED DOCUMENTS

70.     Pursuant to Rule 193.7 of the Texas Rules of Civil Procedure, each party is hereby given notice of Plaintiffs' intent to use any and all documents produced by any and all parties at any pretrial hearing, deposition, proceeding, the trial of this matter, or any combination.

## XIV
## PRAYER

WHEREFORE, Plaintiffs pray that after trial herein, that judgment be entered against Defendants jointly and severally as prayed for, that costs of court be taxed against Defendants, that Plaintiffs be given prejudgment as well as post judgment interest, and for such other and further relief, at law and in equity to which Plaintiffs may show themselves to be justly entitled, to which the Court believes Plaintiffs to be deserving, and for which Plaintiffs will forever pray.

[signature on following page]

Respectfully submitted,

**THE KASSAB LAW FIRM**

LANCE CHRISTOPHER KASSAB
Texas State Bar No. 00794070
lance@kassab.law
DAVID ERIC KASSAB
Texas State Bar No. 24071351
david@kassab.law
NICHOLAS R. PIERCE
Texas State Bar No. 24098263
nicholas@kassab.law
1214 Elgin Street
Houston, Texas 77004
Telephone: (713) 522-7400
Facsimile: (713) 522-7410

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing instrument has been forwarded to all known parties and/or counsel of record pursuant to the Texas Rules of Civil Procedure on this, the 2nd day of September, 2022.

LANCE CHRISTOPHER KASSAB

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

David Kassab
Bar No. 24071351
david@kassab.law
Envelope ID: 67937256
Status as of 9/2/2022 3:13 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Lance Kassab | | eserve@kassab.law | 9/2/2022 2:54:41 PM | SENT |
| Fred L.Shuchart | | fred.shuchart@cooperscully.com | 9/2/2022 2:54:41 PM | SENT |
| Andy Rubensrein | | andy@dmillerlaw.com | 9/2/2022 2:54:41 PM | SENT |
| Anuj Kapur | | anuj@dmillerlaw.com | 9/2/2022 2:54:41 PM | SENT |
| Andy Rubensrein | | andy@dmillerlaw.com | 9/2/2022 2:54:41 PM | SENT |
| Brent WCoon | | brent@bcoonlaw.com | 9/2/2022 2:54:41 PM | SENT |
| Eric Newell | | eric_newell@bcoonlaw.com | 9/2/2022 2:54:41 PM | SENT |
| John Thomas | | john@bcoonlaw.com | 9/2/2022 2:54:41 PM | SENT |
| Lori Slocum | | lori.slocum@bcoonlaw.com | 9/2/2022 2:54:41 PM | SENT |
| Robert Schwartz | | bob.schwartz@bcoonlaw.com | 9/2/2022 2:54:41 PM | SENT |
| Brenda Jenkins | | brenda@bcoonlaw.com | 9/2/2022 2:54:41 PM | SENT |
| Wendy Wafford | | wendy.wafford@bcoonlaw.com | 9/2/2022 2:54:41 PM | SENT |
| Brent Coon | | brent@bcoonlaw.com | 9/2/2022 2:54:41 PM | SENT |
| ERIC NEWELL | | Eric_Newell@bcoonlaw.com | 9/2/2022 2:54:41 PM | SENT |